**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; HOUSING RESEARCH & ADVOCACY CENTER; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA.<br><br>     Plaintiffs,<br><br>        v.<br><br>DEUTSCHE BANK; DEUTSCHE BANK AG; DEUTSCHE BANK NATIONAL TRUST; DEUTSCHE BANK TRUST COMPANY AMERICAS; OCWEN FINANCIAL CORP.; and ALTISOURCE PORTFOLIO SOLUTIONS, INC.<br><br>     Defendants. | Case No. 18 CV 839<br><br><br><br><br><br>Jury Trial Demanded |

**COMPLAINT**

i

## Table of Contents

I. INTRODUCTION AND SUMMARY OF CLAIMS .................................................... 1

II. JURISDICTION .................................................................................................. 5

III. PARTIES ........................................................................................................... 5

   A.   PLAINTIFFS ................................................................................................ 5

   B.   DEFENDANTS ............................................................................................ 17

IV. FACTS .............................................................................................................. 19

   A.   BACKGROUND OF DISCRIMINATION AGAINST MINORITY NEIGHBORHOODS
   AND COMMUNITIES OF COLOR (HISTORICAL CONTEXT OF THE VIOLATIONS) ...... 19

   B.   DEFENDANTS' REO MAINTENANCE AND MARKETING CONDUCT
   DISCRIMINATES AGAINST COMMUNITIES OF COLOR ................................... 22

      1.   Defendants' Ownership and Obligations Relating to REO Properties ............................ 22
      2.   Plaintiffs' Investigation of Defendants' Exterior Maintenance and Marketing of Properties .................... 26
      3.   Summary of the Overall Results of Plaintiffs' Investigation (Aggregate Findings) ................................ 31

   C.   PLAINTIFFS INFORMED DEFENDANTS OF THE RACIALLY DISPARATE
   CONDITION OF THE DEUTSCHE BANK REO PROPERTIES, BUT DEFENDANTS HAVE
   NOT ALTERED THEIR DISCRIMINATORY BEHAVIOR ....................................... 34

   D.   DEFENDANTS HAVE ENGAGED IN A PATTERN AND PRACTICE OF SYSTEMIC
   AND INTENTIONAL RACE DISCRIMINATION IN EACH OF THE CITIES SERVED BY
   PLAINTIFFS ................................................................................................... 36

   E.   DEFENDANTS HAVE ACTED WITH DISCRIMINATORY INTENT ....................... 40

   F.   DEFENDANTS' REO MAINTENANCE AND MARKETING POLICIES AND
   PRACTICES HAVE A DISPROPORTIONATE DISCRIMINATORY IMPACT ON
   COMMUNITIES OF COLOR ............................................................................. 43

   G.   DEFENDANTS' DISCRIMINATORY MAINTENANCE AND MARKETING OF REO
   PROPERTIES PERPETUATES SEGREGATION ................................................... 46

V. INJURIES CAUSED BY DEFENDANTS' BEHAVIOR ...................................... 49

   A.   INJURY TO ALL PLAINTIFFS ..................................................................... 49

   B.   INJURIES TO INDIVIDUAL PLAINTIFFS ...................................................... 52

   C.   INJURIES TO NEIGHBORHOOD RESIDENTS AND COMMUNITIES .................... 74

   D.   INJURIES CAUSED BY DEFENDANTS' CONDUCT CONTINUES ....................... 77

   E.   CONTINUING VIOLATION ........................................................................... 77

VI. VIOLATIONS OF THE FAIR HOUSING ACT .................................................. 78

   A.   COUNT I - DEFENDANTS HAVE VIOLATED SECTION 3604(a) OF THE FHA .......... 78

   B.   COUNT II - DEFENDANTS HAVE VIOLATED SECTION 3604(b) OF THE FHA .......... 80

ii

**C.   COUNT III - DEFENDANTS HAVE VIOLATED SECTION 3605 OF THE ACT** ............. 81

**D.   COUNT IV - DEFENDANTS HAVE VIOLATED THE FHA BY PERPETUATING SEGREGATION** ....................................................................................................... 81

**E.   COUNT V - DEFENDANTS HAVE VIOLATED SECTION 3617 OF THE FHA** .............. 82

*VII.   JURY TRIAL DEMAND* ................................................................................... *83*

*VIII.   PRAYER FOR RELIEF* .................................................................................... *83*

**APPENDIX A: PROPERTIES EXAMINED (Alphabetical by State)**…………..……**A1-A28**

**APPENDIX B: SUMMARY OF METROPOLITAN AREA FINDINGS**……….……**B1-B60**

## I. INTRODUCTION AND SUMMARY OF CLAIMS

1.        This complaint is filed under the Fair Housing Act of 1968, as amended, 42

U.S.C. §3601, et seq. ("FHA"), for compensatory and injunctive relief arising out of the

Defendants' racially discriminatory conduct affecting communities of color in numerous cities

around the country.  The case is based on overwhelming objective evidence that Defendants

discriminated against communities of color in the exterior maintenance and marketing of

properties owned by Deutsche Bank after foreclosure in thirty metropolitan areas.  Defendants'

actions have had a devastating impact on these communities, and Defendants refuse to alter their

behavior.  Defendants' policies and conduct (a) constitute intentional discrimination; (b)

perpetuate segregation; (c) have a disproportionate adverse impact on minority communities that

is not justified by any valid business purpose; and (d) interfere with the enjoyment of rights

protected under the FHA.

2.        Plaintiffs are private, fair housing organizations dedicated to ending housing

discrimination and to promoting residential integration in their communities and around the

nation.  Plaintiffs work to eliminate housing discrimination and to ensure equal housing

opportunity for all persons through education, outreach, membership services, public policy

initiatives, advocacy, investigation of fair housing violations, investment in community

development and stabilization projects, and fair housing enforcement.

3.        Defendants Deutsche Bank, Deutsche Bank AG, Deutsche Bank National Trust

and Deutsche Bank Trust Company Americas (the "Deutsche Bank Defendants") are the owners

of record, as trustee, of thousands of foreclosed homes in metropolitan areas across the country,

commonly referred to as "REO" or "real estate owned" properties.   Defendants Ocwen Financial

Corp. ("Ocwen") and Altisource Portfolio Solutions, Inc., ("Altisource") provide property

1

preservation and maintenance and other services for REO properties owned by the Deutsche

Bank Defendants ("the Deutsche Bank REO properties" or "Deutsche Bank-owned homes").

4.      In the wake of the national foreclosure crisis, and in response to complaints,

public outcry and industry trends and observations regarding the maintenance of foreclosed

properties in African-American/Latino communities, Plaintiffs investigated and examined the

routine exterior maintenance and marketing of the Deutsche Bank-owned homes in an attempt to

determine whether all neighborhoods in certain cities were being treated equally, regardless of

racial composition.  Between 2011 and the present, Plaintiffs investigated Defendants' activities

related to foreclosed properties in communities of color, (predominantly African-American

and/or Latino neighborhoods), and in predominantly white neighborhoods in the metropolitan

areas that are the subject of this Complaint.

5.      During the course of the investigation, Plaintiffs examined 1,141 properties

owned by the Deutsche Bank Defendants after foreclosure, collected evidence on 39 objective

aspects of the routine exterior maintenance of each

property investigated, and accumulated over 29,900

photographs of the pertinent conditions, such as

unsecured doors, damage to steps, handrails, windows

and fences, graffiti, the accumulation of trash and mail,

and overgrown grass and shrubbery.  Plaintiffs'

investigation also documented marketing deficiencies,

such as the failure to post or maintain appropriate "For



**Figure 1: Deutsche Bank REO in AA neighborhood in Indianapolis, IN**

Sale" signage, permitting negative signage and warnings to deter prospective buyers (e.g. "Bank-

owned," "Auction" or "Foreclosed" signs), failure to identify a real estate agent/broker or point

of contact, failure to adequately display property listings on Realtor/Multiple Listing Services or other web sites, and displaying on-line or other auction sites in different states in lieu of utilizing a local real estate agent/company familiar with the neighborhood. Plaintiffs' investigation revealed that there are highly significant disparities in the routine exterior maintenance and marketing of the Deutsche Bank-owned homes in communities of color as compared to white communities.

6. Plaintiffs' investigation of the properties in these metropolitan areas indicates that Defendants treated properties differently depending upon the racial/ethnic composition of the neighborhoods in which they were located. In each of the 30 metropolitan areas examined, the Deutsche Bank-owned homes located in predominantly white census block groups were better-maintained and exhibited fewer objective routine maintenance and marketing deficiencies than the Deutsche Bank-owned properties that were located in neighborhoods comprised primarily of African-Americans and/or Latinos. Across the board, properties located in communities of color were much more likely to have numerous objective routine maintenance and marketing deficiencies than the Deutsche Bank-owned homes located in white areas. Accordingly, in each of the metropolitan areas and across the country, Plaintiffs observed a systemic and particularized pattern of differential treatment by Defendants in maintaining and/or marketing REO properties on the basis of race, color, and/or national origin.

7. The disparities observed between the maintenance of the Deutsche Bank-owned homes in white communities and the Deutsche Bank-owned homes in communities of color are stark, highly probative and statistically significant.

8. As a result of Defendants' discriminatory conduct and perpetuation of residential segregation, municipalities, individuals, neighbors and homeowners in the communities served

3

by Plaintiffs have been: (a) denied housing opportunities and had housing made unavailable; (b) subjected to deteriorating and dilapidated living conditions in their neighborhoods; (c) denied opportunities for neighborhood stabilization and economic recovery; and (d) harmed in the value of their home investments.

9. Plaintiffs allege herein that Defendants' systemic and particularized practice of maintaining and marketing bank-owned properties in a state of disrepair in communities of color, while maintaining and marketing similar properties in predominantly white communities in materially better condition, violates the Fair Housing Act, 42 U.S.C. §§3604(a), (b), (c) and (d), §3605, §3617 and HUD's implementing regulations. Defendants' discriminatory conduct has also had the effect of perpetuating segregated conditions.



**Figure 2: Deutsche Bank REO in AA neighborhood in Milwaukee, WI**

10. Defendants' conduct has caused particularized and concrete injury to the Plaintiffs. Defendants' discriminatory practices of failing to maintain and effectively market bank-owned homes have interfered with Plaintiffs' activities and programs designed to promote compliance with fair housing laws, and have frustrated Plaintiffs' missions by perpetuating the unlawful discrimination and segregation they use their limited resources to dismantle. Plaintiffs' purposes and interests fall squarely within the zone of interests protected by the Fair Housing Act. Defendants' discriminatory behavior has caused Plaintiffs to divert substantial time and resources away from their usual activities and instead to detecting, investigating, and counteracting Defendants' unlawful conduct, and engaging in outreach and education efforts to

address Defendants' ongoing discrimination.  These efforts go above and beyond Plaintiffs'

normal operational activities and expenses.

## II.  JURISDICTION

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§1331, 2201 and 2202, and 42 U.S.C. §3613(a).

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the

Defendants do business in this District, the Defendants are subject to personal jurisdiction in this

District, a substantial part of the events giving rise to these claims occurred in this District, and a

substantial portion of the property that is the subject of these claims is located in this District.

13.     The Plaintiffs originally filed an administrative housing discrimination complaint

with the U.S. Department of Housing and Urban Development Office of Fair Housing and Equal

Opportunity ("HUD FHEO") concerning Defendants' conduct on February 26, 2014.  The

complaint was subsequently amended to update the results of Plaintiffs' ongoing investigation on

April 30, 2014, August 7, 2014, January 22, 2015, August 5, 2016, February 14, 2017 and July

26, 2017. This complaint presently remains pending at HUD FHEO.

## III.  PARTIES

### A.  PLAINTIFFS

14.     Plaintiff National Fair Housing Alliance, Inc. ("NFHA") is a national, nonprofit

public service organization founded in 1988 and incorporated under the laws of the

Commonwealth of Virginia with its principal place of business at 1101 Vermont Avenue NW,

Suite 710, Washington, D.C. 20005.  NFHA is a nationwide alliance of private, nonprofit, fair

housing organizations, including organizations in 30 states and the District of Columbia. NFHA

is the only national organization dedicated solely to ending housing discrimination and

promoting residential integration and neighborhood stabilization.  NFHA works throughout the

5

United States to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, investigation of fair housing violations, investment in community development and stabilization projects, and enforcement. One of NFHA's goals is the elimination of segregation in housing and the promotion of residential integration. NFHA has launched numerous educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. NFHA implemented a community development program using grants to homeowners and persons living in rental properties to make homes accessible to persons with disabilities and to senior homeowners in Washington, D.C.'s African-American neighborhoods to bring their homes up to code, so that their homes would be safe and could qualify for replacement coverage from homeowner's insurance companies. This program was expanded to several states and added grant assistance to veterans with disabilities. Its most recent program implemented in 2013, the Inclusive Communities Grant Programs, provide grants to ameliorate some of the adverse effects of discriminatory practices during and after the foreclosure crisis. Focusing on predominantly African-American and Latino neighborhoods and clients, these grants promote homeownership through direct down payment and closing cost assistance, funding for emergency repairs, grants to homeowners to prevent foreclosure in order to preserve existing homeownership, and home renovation programs to reduce neighborhood blight. The grants also provide accessible housing opportunities for persons with disabilities and facilitate general quality of life improvements to support greenspace development, pocket parks and fresh food access.

15.     Plaintiff Fair Housing Advocates of Northern California (formerly Fair Housing of Marin) is a nonprofit fair housing organization incorporated under the laws of the State of California with its principal place of business in San Rafael, California in the Northern District of California. Fair Housing Advocates of Northern California's primary objectives are: to promote equal opportunity in the renting, purchasing, financing and advertising of housing; to educate persons regarding federal and state fair housing laws; to promote racially integrated communities and neighborhood diversity; and to eliminate discriminatory housing practices.  It is engaged in several different activities to further its mission of promoting equal housing opportunities, including:  education programs in schools and in the community regarding fair housing and diversity; training programs for real estate professionals; research regarding housing discrimination in the community; pre-purchase education for homebuyers; advocacy for affordable housing; and foreclosure prevention and fair housing counseling.  FHANC also provides grants to homeowners and renters to make their living space accessible and to promote both racial and economic integration.

16.     Plaintiff Central Ohio Fair Housing Association ("COFHA") is a private, nonprofit corporation based in Columbus, Ohio.  COFHA recognizes the importance of "home" as a component of the American dream and seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under federal, state or local laws.  One of COFHA's goals is the elimination of segregation in housing and the promotion of residential integration. COFHA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

7

17.     Plaintiff Connecticut Fair Housing Center ("CFHC") is a nonprofit organization dedicated to ensuring that all persons have equal access to housing opportunities in Connecticut. CFHC provides investigative and legal services to those who believe that they have been the victims of housing discrimination and additionally works with state and local government, as well as housing providers, to promote compliance with federal fair housing laws.  One of CFHC's goals is the elimination of segregation in housing and the promotion of residential integration. CFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  CFHC provides grants to persons with disabilities to make their housing accessible and allow them to remain in the neighborhood, thereby promoting both economic and racial integration.

18.     Plaintiff Denver Metro Fair Housing Center ("DMFHC"), established in 2012, is a private, nonprofit fair housing enforcement agency serving six Denver Metro Counties: Adams, Arapahoe, Broomfield, Denver, Douglas, and Jefferson.  DMFHC is dedicated to eliminating housing discrimination and promoting housing choice for all through education, advocacy, and enforcement of fair housing laws.  DMFHC's goals include the elimination of segregation in housing and the promotion of residential integration. DMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  DMFHC established the Fair Housing Action Fund to promote neighborhood development and stabilization.  The Fund has supported construction of new homes in partnership with Habitat for Humanity and other local

nonprofits, and it provides grants for critical repair of existing homes, including grants to make homes and apartments accessible.

19.     Plaintiff Fair Housing Center of Central Indiana ("FHCCI") is a private, nonprofit fair housing organization based in Indianapolis, Indiana and primarily serves 24 counties in Central Indiana. FHCCI's mission is to ensure equal housing opportunities by eliminating housing discrimination through advocacy, enforcement, education and outreach. One of FHCCI's goals is the elimination of segregation in housing and the promotion of residential integration. FHCCI has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. FHCCI's inclusive communities work includes connecting neighborhood partners to help, serve, revitalize, stimulate and invest resources to rebuild an affordable, safe and vital community. In its targeted neighborhood, FHCCI funds acquisition and major rehabilitation of single family homes to be sold to owner-occupants. It provides grants to ensure rehabbed homes are accessible and grants for persons with disabilities to afford them full access to their homes and yards. Grants are used to modify and improve pocket parks to beautify the neighborhood and provide recreational space.

20.     Plaintiff Fair Housing Center of the Greater Palm Beaches ("FHCGPB") is a nonprofit corporation dedicated to ensuring fair and affordable housing opportunities for all persons, by promoting culturally diverse communities, through open housing and the elimination of all barriers to that goal. The FHCGPB's primary purpose is the elimination of housing discrimination on the basis of race, color, national origin, religion, sex, familial status, disability, marital status, age, sexual orientation, and gender identity or expression throughout the Greater

9

Palm Beaches area. The FHCGPB seeks the eradication and elimination of direct and indirect obstacles that limit full access to the housing market throughout Florida and seeks to end unlawful housing discrimination through enforcement, education, public awareness, and helping victims enforce their rights. One of FHCGPB's goals is the elimination of segregation in housing and the promotion of residential integration. FHCGPB has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

21.     Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a private, non-profit organization established in 1980 to ensure equal housing opportunity as guaranteed under federal, state, and local fair housing laws. Based in Grand Rapids, Michigan, FHCWM works cooperatively throughout Michigan with governmental and community-based agencies to further fair housing goals. In particular, FHCWM investigates claims of illegal housing discrimination; assists claimants in litigation and/or administrative enforcement actions; conducts testing to determine compliance with federal and state laws; and provides practical education to rental, sales, and lending professionals, organizations for professionals with a role in the housing industry, and home-seekers.

22.     Plaintiff Fair Housing Continuum, Inc. is a private, nonprofit fair housing agency dedicated to the elimination of housing discrimination in Florida. Fair Housing Continuum serves Brevard, Indian River, Seminole, Osceola, Orange, and Volusia Counties. One of Fair Housing Continuum's goals is the elimination of segregation in housing and the promotion of residential integration. Fair Housing Continuum has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals

10

about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. The Continuum has an Inclusive Communities Program that provides grants for down payments, loan reduction, and home rehabilitation and modification to support homeownership and neighborhood stabilization. If the buyer is a veteran, active duty military, disabled, or willing to be the owner-occupant of a home in a distressed neighborhood, the Continuum will provide a grant to assist with the purchase or building of a home.

23.    Plaintiff Greater New Orleans Fair Housing Action Center ("GNOFHAC") is a private, nonprofit civil rights organization established in 1995. For more than 20 years, GNOFHAC has been dedicated to eradicating housing discrimination throughout Southeast Louisiana. Its service area now includes the entire state of Louisiana. GNOFHAC has been responsible for fighting housing discrimination that arose in the wake of Hurricane Katrina and, in recent years, from the effects of the economic recession. One of GNOFHAC's goals is the elimination of segregation in housing and the promotion of residential integration. GNOFHAC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. GNOFHAC's Inclusive Communities Program has been instrumental in addressing longstanding patterns and promoting fair housing choice in the metropolitan Baton Rouge area, through activities designed to stabilize poor and minority neighborhoods impacted by predatory lending and high foreclosure rates and support affordable rental housing and homeownership opportunities in communities of color.

11

24.     Plaintiff HOPE Fair Housing Center ("HOPE"), established in 1968, is the oldest

fair housing center in Illinois.  HOPE represents 30 counties in Northern and North Central

Illinois.  HOPE works to end the negative effects of housing discrimination and segregation

because of race, color, religion, national origin, sex, disability, familial status, or any other

characteristics protected under federal, state or local laws. One of HOPE's goals is the

elimination of segregation in housing and the promotion of residential integration. HOPE has

launched multiple educational campaigns to address housing discrimination designed to teach

both consumers and housing professionals about equality of treatment of neighborhoods, the

negative consequences that flow from racial steering, and the benefits of residential diversity.

HOPE provides grants to renovate homes, creates marketing materials to affirmatively market

communities of color, and provides homebuying counseling.

25.     Plaintiff Housing Opportunities Made Equal of Virginia ("HOME of Virginia") is

a fair housing and housing counseling organization founded in 1971 to fight discrimination in

housing access.  HOME of Virginia offers a variety of programs and services designed to ensure

equal access to housing for all Virginians. One of HOME's goals is the elimination of

segregation in housing and the promotion of residential integration. HOME has launched

multiple educational campaigns to address housing discrimination designed to teach both

consumers and housing professionals about equality of treatment of neighborhoods, the negative

consequences that flow from racial steering, and the benefits of residential diversity.  HOME

provides grants to create accessible housing in the Richmond area.  Home is a HUD Approved

Housing Counseling Agency that works to eliminate racial and ethnic disparities in

homeownership through extensive foreclosure prevention and home ownership counseling.

26.     Plaintiff Housing Opportunities Project for Excellence, Inc. ("HOPE, Inc.") is the first nonprofit fair housing agency organized in the state of Florida.  HOPE, Inc.'s mission is to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida.  One of HOPE, Inc.'s goals is the elimination of segregation in housing and the promotion of residential integration. HOPE, Inc. has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  HOPE, Inc.'s Inclusive Communities Programs include providing grants to local non-profits to conduct homeownership training workshops, down payment assistance and repairs, including making homes accessible for persons with disabilities.  In partnership with churches, government and corporations, HOPE, Inc.'s grants helped transform an empty lot into a park and garden area.

27.     Plaintiff Housing Research & Advocacy Center (HRAC) is a private, non-profit organization, incorporated under the laws of Ohio and located in Cleveland, Ohio.  Its mission is to promote fair housing and diverse communities, and to work to eliminate housing discrimination in Northeast Ohio by providing effective research, education, and advocacy.  In furthering this goal, HRAC provides counseling, guidance and support to individuals who encounter discrimination in their search for housing. This may include investigation of their complaints.  HRAC also engages in activities designed to encourage fair housing practices by educating consumers regarding their rights and professionals regarding their responsibilities under the FHA, and by working with elected and government representatives to protect and improve fair housing laws.   HRAC also conducts research into housing and lending patterns, and related fair housing matters, throughout Northeast Ohio in order to educate government

13

officials, individuals who work in the housing industry, and the public as a whole regarding housing discrimination and segregation.

28.     Plaintiff Miami Valley Fair Housing Center ("MVFHC") is a private, nonprofit corporation based in Dayton, Ohio.  MVFHC seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under federal, state or local laws.  One of MVFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MVFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. MVFHC established the Inclusive Communities Fund, which provides grants for down payment assistance, closing costs and critical home repairs.  The grant program also supports recreational programs for children and major renovations for a community center.

29.     Plaintiff Metropolitan Milwaukee Fair Housing Council ("MMFHC"), established in 1977, is a private, nonprofit organization that operates a full-service fair housing program. MMFHC serves numerous counties in Wisconsin and works to combat illegal housing discrimination by creating and maintaining racially and economically integrated housing patterns.  One of MMFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  MMFHC's inclusive communities projects include providing grants to neighborhood non-profit partners to expand access to affordable and

14

responsible homeownership while improving neighborhoods that were damaged by the foreclosure crisis.

30.     Plaintiff North Texas Fair Housing Center ("NTFHC") is a nonprofit organization dedicated to eliminating housing discrimination in North Texas.  The organization provides counseling, discrimination complaint investigation, and outreach and education programs with the goal of ensuring that all persons have the opportunity to secure the housing they desire and can afford.  One of NTFHC's goals is the elimination of segregation in housing and the promotion of residential integration. NTFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  NTFHC offers grants to persons with disabilities so that they can remain in their homes by making them safe and accessible. NFTHC's Inclusive Communities Program offers down payment assistance to purchase homes and grants for neighborhood groups in communities of color to make housing repairs.

31.     Plaintiff Open Communities is a nonprofit organization that serves seventeen north suburban communities in the Chicago, Illinois area.  Open Communities works to promote economically and culturally diverse communities that welcome all persons in north suburban Chicago.  Open Communities educates, advocates, and organizes in the name of social justice.  One of Open Communities' goals is the elimination of segregation in housing and the promotion of residential integration. Open Communities has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

32.     Plaintiff South Suburban Housing Center ("SSHC") is a nonprofit community organization that primarily serves the south metropolitan Chicago area, including underserved areas of northwest Indiana.  SSHC is dedicated to eliminating all forms of discrimination in the housing market through the operation of fair housing enforcement and affirmative housing counseling programs to foster stable, racially and economically, diverse communities. SSHC's primary goal is the elimination of segregation in housing and the promotion of residential integration through expanding housing and mortgage lending choices. SSHC has launched multiple educational activities to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.   SSHC provides grants to first-time homebuyers to purchase housing, to persons in housing payment distress, allowing them to stabilize home ownership, and to persons forced to rent due to displacement caused by foreclosure, in recovering communities of color.

33.     Plaintiff Fair Housing Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair Housing Center ("TFHC") is a non-profit public service agency organized under the laws of the State of Ohio, with its principal place of business in Toledo, Ohio.  The purposes of the Toledo Fair Housing Center are to identify and eliminate all forms of unlawful discrimination in housing in the greater Toledo area, including discriminatory advertising, marketing, sales and lending practices; to educate the public about housing discrimination laws, discriminatory housing practices, and the availability of administrative and legal remedies to challenge discriminatory practices; to provide counseling and referral services to the public with respect to housing discrimination matters; and to expand equal housing opportunities for all persons.  TFHC operated the MLK Inclusive Communities Program from 2014 through 2015 to provide grants to

16

help homeowners in African-American and Latino neighborhoods with roof replacement and other renovations to their homes to stabilize neighborhoods and remove blight. TFHC also provided emergency mortgage assistance grants and foreclosure prevention counseling to homeowners in communities of color to become current and remain current on their mortgage payments. Finally, through the MLK Inclusive Communities Program, TFHC partnered with Ability Center of Greater Toledo to provide home accessibility modification grants to homeowners with disabilities to allow them to age in place and/or to fully enjoy their dwelling.

34.     All Plaintiffs are "aggrieved persons" within the meaning of the Fair Housing Act, and are authorized to commence litigation to obtain appropriate relief against Defendants. 42 U.S.C. §§3602, 3612, 3613. All Plaintiffs fall within the zone of interests protected by the Fair Housing Act. All Plaintiffs have suffered concrete and particularized injuries in fact that are fairly traceable to Defendants' conduct in their communities, and that are likely to be redressed by a favorable judicial decision.

### B. DEFENDANTS

35.     Defendants Deutsche Bank, Deutsche Bank AG, Deutsche Bank National Trust, and Deutsche Bank Trust Company Americas (the "Deutsche Bank Defendants") own and maintain REO properties as trustee in metropolitan areas in Washington, D.C.; Memphis, TN; Chicago, IL; Baltimore, MD; Hampton Roads, VA; Toledo, OH; Orlando, FL; Minneapolis, MN;  Indianapolis, IN; Columbus, OH; Cleveland, OH; Baton Rouge, LA; Dayton, OH; Denver, CO; Dallas, TX; Gary, IN; Hartford, CT; Milwaukee, WI; New Orleans, LA; Grand Rapids, MI; Muskegon, MI; Greater Palm Beaches, FL; Miami-Ft. Lauderdale, FL; Tampa, FL; Richmond, VA; Detroit, MI; Philadelphia, PA; Providence, RI; Vallejo and Richmond, CA; and Kansas City, MO/KS.  Plaintiffs allege that the Deutsche Bank Defendants engaged in a pattern and practice of discrimination in maintaining and marketing REO properties that are located in white

communities more favorably than similar REO properties located in predominantly African-American and Latino neighborhoods in the same metropolitan area. During the time period of this Complaint, the Deutsche Bank Defendants have contracted with Ocwen and/or Altisource to provide property maintenance services for most of the REOs owned or controlled by the Deutsche Bank Defendants.

36.     Defendant Ocwen Financial Corp. ("Ocwen") is a publicly traded Florida corporation that maintains its principal place of business in West Palm Beach, Florida. At all times relevant to this Complaint, Ocwen has conducted business in this District and in the metropolitan areas that are the subject of this Complaint directly, and/or through its operating subsidiaries. Ocwen's business activities include providing services and products related to the management, preservation, maintenance and marketing of REO properties. Plaintiffs allege that Ocwen has engaged in a pattern and practice of discrimination through the discriminatory performance of activities with regard to the Deutsche Bank REO properties.

37.     Defendant Altisource Solutions Inc. ("Altisource") was incorporated in 2009 and has its headquarters in Atlanta, Georgia. Altisource is a subsidiary of Altisource Portfolio Solutions S.A., a publicly traded corporation which is incorporated in Luxembourg and was spun off from defendant Ocwen in 2009. Altisource continues to derive substantial revenue from defendant Ocwen and to engage in activities with Ocwen. At all times relevant to this Complaint, Altisource has conducted business in this District and in the metropolitan areas that are the subject of this Complaint. Altisource's business activities include providing services and products related to the management, preservation, maintenance and marketing of REO properties. Plaintiffs allege that Altisource has engaged in a pattern and practice of

discrimination through the discriminatory performance of activities with regard to the Deutsche Bank REO properties.

## IV. FACTS

### A. BACKGROUND OF DISCRIMINATION AGAINST MINORITY NEIGHBORHOODS AND COMMUNITIES OF COLOR (HISTORICAL CONTEXT OF THE VIOLATIONS)

38.     The failure to maintain real estate owned by banks (REO) in minority communities is a continuation of the well-documented history of residential discrimination against minorities and minority neighborhoods in this country by many financial institutions: first mortgages were withheld from neighborhoods of color by redlining; more recently, neighborhoods of color were targeted for expensive, predatory and unfair mortgages; and now a few financial institutions, like Deutsche Bank, are allowing bank-owned homes in neighborhoods of color to deteriorate, become eyesores and lose value due to lack of maintenance. The failure of Defendants to take the minimal actions necessary to equally maintain and monitor bank-owned homes in African-American and Latino communities occurred with their full knowledge that their actions and omissions would severely harm minority communities which have been repeatedly damaged by discriminatory housing practices and conditions in the past.

39.     Discrimination against persons of color by financial institutions and mortgage lenders is entrenched.  For much of the 20th century, banks did not issue mortgages in minority neighborhoods, literally drawing a red line around these neighborhoods on lending maps and thereby forcing minority homebuyers into the high price lending arms of finance companies, hard money lenders and land contracts.

40.     Although the Fair Housing Act of 1968 sought to eliminate these practices, decades later communities of color still lacked access to sound and fair lending products

available to white communities.  As such, these minority communities were ripe for exploitation by predatory lenders during the subprime lending boom of the 1990's and early 2000's.

41.     During this period, some lenders and investment banks, including the Deutsche Bank Defendants, sought to profit from the exploding mortgage securitization business.  When a residential mortgage is securitized, the original mortgage note is sold immediately to an investment bank, which pools the mortgage with thousands of others to create a Residential Mortgage-Backed Security.  This security is then sold to investors, including hedge funds.

42.     Deutsche Bank played key funding and trustee roles in the securitized loan pools that fueled the lending boom.[1]

43.     In order to profit from this market, certain lenders sought to expand markets for subprime mortgage products.  These lenders pushed subprime mortgage products, with increasingly unfavorable and risky loan terms, in minority neighborhoods ("reverse redlining").

44.     With reverse redlining, borrowers in African-American neighborhoods who qualified for prime loans were deliberately steered into more onerous subprime and predatory loans.  As a result, borrowers who would have been able to keep up with mortgage payments under the terms of a less expensive prime loan became unable to make the more demanding payments required by subprime loans.  This practice caused foreclosures and eventual vacancies in properties that otherwise would have remained occupied had the borrowers been given prime loans.

45.     During the subprime boom, African-American and Latino borrowers were nearly twice as likely as white borrowers to have one or more "high risk" features or conditions in their loans, such as higher interest rates, teaser rates, interest only mortgages or a prepayment penalty.

---

[1] Lindsey, Thompson, Cohen, Williamson, National Consumer Law Center (2012), *Why Responsible Mortgage Lending Is a Fair Housing Issue, n. 34.*

Even after controlling for factors such as credit scores and income, African-American and Latino home buyers were 80% and 70% more likely respectively to receive a subprime loan than white home buyers.

46.     In 2003, subprime lending accounted for 8% of all mortgage lending.  By 2006, subprime lending accounted for 28% of the market.   The disparate subprime lending to persons of color was reflected in Home Mortgage Disclosure Act ("HMDA") data.

47.     The subprime lending boom collapsed in 2008, leading to an unprecedented foreclosure crisis.  The crisis hit minority communities especially hard.  During the first years of the crisis, African-Americans and Latinos were nearly 50% more likely to be facing foreclosure than whites, regardless of income.  Foreclosure rates were also directly related to residential segregation:  the more segregated a metropolitan area, the higher its foreclosure rate.  Investors, such as the Deutsche Bank Defendants, became unexpected and reluctant owners of properties in communities of color that were disproportionately affected by the foreclosure crisis.

48.     The foreclosure crisis continues to have significant effects across the country. Since mid-2007, more than 7.5 million foreclosures have been completed and 5 million properties are reported to be substantially underwater, meaning that owners owed 25% more on their mortgages than their homes were worth.

49.     The large volume of foreclosures created a large inventory of vacant homes possessed by banks.  These REO properties surfaced in unprecedented numbers in communities of color after the advent of the foreclosure crisis.   REO properties present a substantial obstacle for recovery in the communities in which they are located, which suffer negative effects such as a depleted tax base, neighborhood blight, health and safety concerns and decreased market values resulting in wealth loss for homeowners who live near foreclosed homes.

50.    Because African-American and Latino homeowners faced disproportionately adverse actions on their loans, the neighborhoods and communities they lived in disproportionately felt the impact.  Estimates are that families affected by nearby foreclosures have lost or will lose a total of 8.8% of their home value.  For residents in African-American or Latino communities, that number doubles to 16% of home value.  The total loss in home equity stripped from communities of color is estimated to be approximately $1.1 trillion.

51.    The Defendants in this case knew or should have known the foregoing facts, including that a large proportion of the Deutsche Bank-owned homes were in neighborhoods of color. Against this historical backdrop, the Defendants in this case, are now allowing REO properties in minority communities to deteriorate due to a lack of proper routine exterior maintenance and marketing, causing more damage to these communities.



**Figure 3: Deutsche Bank REO in AA neighborhood in Milwaukee, WI**

## B.  DEFENDANTS' REO MAINTENANCE AND MARKETING CONDUCT DISCRIMINATES AGAINST COMMUNITIES OF COLOR

### 1.    Defendants' Ownership and Obligations Relating to REO Properties

52.    The Deutsche Bank Defendants are part of Deutsche Bank AG, a large German global banking and financial services conglomerate headquartered in Frankfurt, Germany.  The Deutsche Bank Defendants engage in a wide variety of banking and financial services activities, including those related to mortgage lending and packaging.  Deutsche Bank has been one of the financial institutions with the greatest involvement in the formation and development of

mortgage-backed securities transactions, serving as an underwriter with regard to these transactions and in other capacities.

53. A mortgage-backed security is a type of asset-backed security that is secured by a mortgage or collection of mortgages. The mortgages are sold to an investment bank (or other entity) that securitizes or packages the loans together in a security for purchase by investors. A document called a Pooling and Servicing Agreement ("PSA") designates certain parties to play roles in connection with the mortgage-backed securities. A PSA allocates and assigns duties and responsibilities only as between the parties to the PSA. A PSA does not, and cannot, change the legal obligations of the parties to the PSA to third parties, to persons who come into contact with properties owned by the trust, or to the public at large.

54. One of the parties to mortgage-backed securities transactions is a trustee, who typically receives the assets in exchange for certificates issued to investors evidencing beneficial interests in the assets. The Deutsche Bank Defendants have frequently acted in this capacity. The trustee in an asset-backed securities transaction is the legal owner of the assets underlying the transaction for the benefit of the holders of the asset-backed securities. The trustee performs various functions, including serving as authenticating agent, issuing and paying agent, securities registrar and transfer agent, custodian of the assets, analytics provider and back-up servicer. The trustee of an asset-backed securities transaction typically performs more numerous and complex duties than trustees for traditional corporate and municipal debt transactions. The trustee negotiates compensation for its activities in this capacity and is paid for them.

55. Foreclosure and other legal actions with respect to trust properties must be brought in the name of the trustee as the legal owner of the loans. Any claims against the trust must be brought against the trustee as the trust's legal representative. When a foreclosure

occurs on a property that has been packaged under the security, the trustee becomes the legal owner of record of the property and becomes responsible for all legal obligations as owner.

56.     Another party to a mortgage-backed securities transaction is the loan servicer.  A loan servicer has various pre-foreclosure responsibilities related to managing the loans, such as collecting income from the assets, paying interest on the securities and taking actions related to the underlying properties.  Defendants Ocwen and Altisource have acted in this capacity with regard to the Deutsche Bank REO properties.  Servicer obligations after foreclosure, including property preservation and management, may be carried out through retained subcontractors.  The servicer's fee is usually structured as a percentage of the outstanding balance of the asset pool. After foreclosure on a property, the servicer acts as agent of the trustee, the property's legal owner.

57.     A dwelling as to which a financial institution takes legal title after a completed foreclosure is referred to as a Real Estate Owned or "REO" dwelling.  As a consequence of the foreclosure crisis, Deutsche Bank has obtained title as trustee to hundreds of REO dwellings across the country covered by the Fair Housing Act.

58.     Once title to a property becomes vested in the name of the trustee after foreclosure, i.e., once the property becomes an REO property, the trustee has ultimate responsibility and liability for real estate taxes, zoning and code compliance, nuisance avoidance and abatement, and compliance with all other federal and state laws imposing duties on landowners, including the Fair Housing Act.

59.     Once a dwelling becomes an REO property that is owned by the Deutsche Bank Defendants (as trustee), the Deutsche Bank Defendants assume all duties and responsibilities of ownership, including routine exterior maintenance, while the property is marketed for sale.  As a

property owner, a trustee of an REO property has an affirmative duty to know the conditions existing at the foreclosed properties to which it holds title, to maintain all such properties in compliance with all of the applicable laws, and to take all actions necessary to prevent or abate any unlawful conditions at such properties.

60.     The trustee, as legal owner of the property, is required, under the Fair Housing Act, to maintain all REO properties, regardless of their location, without regard to race, color, religion, sex, handicap, familial status or national origin.  The express provisions of the Fair Housing Act specifically identify "trustees" as "persons" subject to the Act.  42 U.S.C. §3602(d). This responsibility is non-delegable under the Fair Housing Act, whether or not there has been a contractual designation of maintenance and marketing responsibilities under a Pooling and Serving Agreement.

61.     Other parties tasked under a PSA or otherwise with preserving and maintaining a REO property, such as Defendants Altisource and Ocwen, also bear responsibility for complying with local laws and regulations, and the requirements of the Fair Housing Act.

62.     According to the Federal Reserve Board, "[i]nstitutions should have policies and procedures in place to ensure that properties are maintained in compliance with federal, state and local laws, including laws governing health and safety, property preservation, fair housing, and property registration. . . . Further, institutions engaging third-party vendors to carry out functions related to these requirements should ensure that vendors maintain appropriate compliance controls.  Reliance on third party vendors does not relieve an institution of its compliance responsibilities or liability."  Federal Reserve, Q&A's re REOs, No. 20.

63.     Under generally accepted industry practices, the routine exterior maintenance that Defendants are required to perform on all REO properties is objectively measurable, verifiable

25

and externally visible. Such maintenance activities include, but are not limited to, mowing, weeding and edging; trimming shrubs and trees; removing snow, trash and debris; securing doors and windows; repairing or replacing loose handrails and steps; and covering holes in the dwelling. These routine exterior maintenance functions must be addressed readily and regularly at every REO property, regardless of the condition of the property. Post-foreclosure routine exterior maintenance is



**Figure 4: Deutsche Bank REO in AA neighborhood in District Heights, MD**

cost-neutral between properties in white neighborhoods and properties in communities of color.

64.     There is no public data available to identify which servicer (and its subcontractors or agents) have been contractually retained for any specific REO property titled in the name of a bank as trustee. REO trustees do not make this information available to the public. It is not retrievable from tax or land records.

65.     Borrowers do not choose mortgage servicers or property preservation providers and have no control over whether and how such entities conduct their business.

### 2.     Plaintiffs' Investigation of Defendants' Exterior Maintenance and Marketing of Properties

66.     In the aftermath of the foreclosure crisis, Plaintiffs received complaints and concerns regarding the maintenance and marketing of REO properties in communities of color and became aware of the existence of serious inequities in the manner in which REO properties in communities of color were maintained and marketed as compared to the maintenance and marketing of REO properties in white communities. Consistent with the mission of the plaintiff organizations, Plaintiffs acted to investigate the existence and scope of this problem.

26

67.     In one of the most extensive fair housing investigations conducted under the Fair Housing Act, Plaintiffs investigated Defendants' maintenance and marketing of Deutsche Bank-owned homes in certain metropolitan areas from 2011 to December 2017.  Plaintiffs' investigation was conducted in the following metropolitan areas: Washington, D.C.; Memphis, TN; Chicago, IL; Baltimore, MD; Hampton Roads, VA; Toledo, OH; Orlando, FL; Minneapolis, MN;  Indianapolis, IN; Columbus, OH; Cleveland, OH; Baton Rouge, LA; Dayton, OH; Denver, CO; Dallas, TX; Gary, IN; Hartford, CT; Milwaukee, WI; New Orleans, LA; Grand Rapids, MI; Muskegon, MI; Greater Palm Beaches, FL; Miami-Ft. Lauderdale, FL; Tampa, FL; Richmond, VA; Detroit, MI; Philadelphia, PA; Providence, RI; Vallejo and Richmond, CA; and Kansas City, MO/KS.  The investigation included 1,141 residential dwellings covered by the Fair Housing Act.  The properties that were investigated are identified in Appendix A to this Complaint.  For purposes of this Complaint, and the statistical analyses set out below, "predominantly white neighborhoods" refers to those census block groups with more than 50% non-Hispanic white residents and the phrase "communities of color" refers to census block groups with less than 50% non-Hispanic white residents.

68.     In each of these metropolitan areas, Plaintiffs identified the zip codes within the metropolitan area that were racially concentrated (e.g. predominantly white or communities of color) with the highest foreclosure rates.  Plaintiffs then inspected all (100%) of the Deutsche Bank REO properties in those zip codes within the same relative time period, unless the properties appeared to be occupied or work was actively occurring at the time of the site visits. The exclusion of properties where work was ongoing was to avoid recording adverse conditions that might be temporary or related to the work being conducted by a new owner.

69.     Deutsche Bank's ownership of the properties was determined by using county property records, records kept by the clerks of courts, RealtyTrac, and other database sources. The data was also crosschecked with other records in order to verify the ownership of the homes because county recorders occasionally delay recording ownership titles.

70.     Plaintiffs evaluated Defendants' maintenance and marketing of these properties according to specific and objective routine exterior requirements that are standard in the REO maintenance industry and clearly visible by exterior inspection. Plaintiffs' list of exterior deficiencies is based on standard industry practice as to what constitutes "routine" maintenance, or "minimal" property safety conditions, and is consistent with Freddie Mac and Federal Housing Administration requirements, as well as various appropriate updated policies of private institutions.

71.     Whatever other issues that a particular property may have (e.g., interior renovation or other non-routine repair needs), all properties can be equally maintained in terms of these routine exterior maintenance requirements. No reason exists to expect racial disparities in terms of the observed routine exterior maintenance of properties. At the same time, exterior maintenance failures drastically affect property sales rates, values and quality of life in these neighborhoods.

72.     Plaintiffs' investigators observed, recorded and photographed the routine exterior maintenance and marketing conditions of the Deutsche Bank-owned homes with respect to over three dozen exterior features. Plaintiffs examined the Deutsche Bank REO properties for the following maintenance or marketing categories: curb appeal, structure, signage and occupancy, paint and siding, gutters, water damage, and utilities. Curb appeal factors included trash and/or debris, accumulated mail, overgrown grass, accumulated dead leaves, overgrown or dead

28

shrubbery, invasive plants, dead grass, and broken or missing mailboxes. Structural factors

included unsecured, broken, or boarded doors; damaged steps or handrails; unsecured, broken, or boarded windows; damaged roofs; damaged fences; holes in the structure of the home; and wood rot. Signage and occupancy factors included trespassing or warning signs, signage marketing the home as a distressed property,



**Figure 5: Deutsche Bank REO in AA neighborhood in Baltimore, MD**

the absence of a professional "for sale" sign, broken or discarded signage, and unauthorized

occupancy of the REO property. Paint and siding factors included graffiti, peeling or chipped

paint, damaged siding, and missing or damaged shutters. Gutter factors included missing or out

of place gutters, broken or hanging gutters, and obstructed gutters. Water damage factors

included water damage and the presence of mold, algae, or discoloration. Utility factors included

utilities that were exposed, damaged, or missing. Plaintiffs also utilized a miscellaneous factor

under each category for any maintenance or marketing issue that did not fall into any of the other

factors (e.g. failure to shovel snow or an unsecured and undrained swimming pool).

73. To ensure consistency, investigators were thoroughly trained and provided with

examples and field terminology. Training included classroom and field investigations where

new investigators were accompanied by NFHA staff or experienced staff from the local fair

housing center. NFHA staff taught investigators how to evaluate a deficiency, complete forms,

take photographs and upload all photos into a central database. Investigators utilized a glossary

of terminology developed by plaintiff NFHA and its partners at the beginning of this

29

investigation with pictures and descriptions to illustrate various examples for documenting deficiencies. The glossary took into account and illustrated variations in severity for certain deficiency criteria.

74.     The investigators also photographed the routine exterior maintenance and marketing conditions observed. The investigators took photographs of the front of each property, both sides of the property, and the back view of the property when access was available. These photographs were taken whether or not there were deficiencies documented in order to show the state of REO maintenance at the time of the visit. Investigators also took photographs of the homes across the street and on both sides of the bank-owned foreclosure to provide context regarding general routine maintenance of homes in the neighborhood. The investigators' reports and pictures were uploaded into a central database, and each property was assigned a neighborhood designation based on racial or ethnic makeup of the Census block group where the address was located.

75.     The Plaintiffs' tests were conducted over time at different Deutsche Bank-owned homes. In addition, Plaintiffs allowed a period of time for the property to be owned by Deutsche Bank so initial maintenance and security could be performed. This grace period provided Deutsche Bank the opportunity to complete its initial maintenance procedures and bring the home up to sale condition standards as well as to compensate for any routine exterior maintenance problems in the condition of the home at the time the bank took possession.

76.     Plaintiffs' testing was designed and implemented so as to assess whether any patterns of differing treatment were apparent across a particular metropolitan area between predominately white neighborhoods and neighborhoods that were predominantly African-

American and/or Latino, as well as whether, when aggregated, the evidence showed a pattern of differing treatment.



**Figure 6: Deutsche Bank REO in AA neighborhood in Chicago, IL**

77.     The unequal and poor routine exterior maintenance and the unequal and poor marketing of the Deutsche Bank-owned homes in communities of color directly caused and resulted in the various harms alleged in this Complaint.

**3.     Summary of the Overall Results of Plaintiffs' Investigation (Aggregate Findings)**

78.     On a consistent basis, testers examining Deutsche Bank REO properties were far more likely to observe a lack of routine exterior maintenance in neighborhoods of color than in predominantly white neighborhoods.  In their totality, the data and pictures collected by Plaintiffs establish that Defendants failed to perform adequate routine exterior maintenance and marketing of the Deutsche Bank REO properties in communities of color, thereby leaving those Deutsche-owned homes in a state of neglect, while satisfactorily performing routine exterior maintenance and marketing of the Deutsche Bank REO properties in white neighborhoods, thereby leaving those Deutsche-owned homes in a materially better condition.

79.     Examples of the disparate maintenance and marketing based upon the predominant race or national origin of a neighborhood include the following aggregate findings:

a)     44.8 % of the Deutsche Bank REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 14.3% of the Deutsche Bank REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

b) 90.9% of the Deutsche Bank REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 57.2% of the Deutsche Bank REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

c) 66.6% of the Deutsche Bank REO properties in communities of color had trash or debris visible on the property, while only 31.7% of the Deutsche Bank REO properties in predominantly white neighborhoods had trash visible on the property.

d) 39.4% of the Deutsche Bank REO properties in communities of color had unsecured or broken doors, while only 22.1% of the Deutsche Bank REO properties in predominantly white neighborhoods had unsecured or broken doors.

e) 53.4% of the Deutsche Bank REO properties in communities of color had damaged, boarded, or unsecured windows, while only 21.9% of the Deutsche Bank REO properties in white neighborhoods had damaged, boarded or unsecured windows.

80. On an aggregate basis across the communities investigated, the disparities between the routine exterior maintenance and marketing of the Deutsche Bank-owned homes in communities of color and the routine exterior maintenance and marketing of Deutsche Bank-owned homes in predominantly white neighborhoods are extremely substantial and statistically significant.

81. Defendants' racially discriminatory treatment of the Deutsche Bank REO properties is prevalent in each of the cities included herein. In each of the metropolitan areas visited, the REO properties located in predominantly white neighborhoods were better

maintained and exhibited fewer routine exterior maintenance deficiencies than the REO properties located in communities of color.

82.    Defendants' racially discriminatory treatment of REO properties is continuous throughout the period of Plaintiffs' investigation.  Whether analyzed on a year-to-year basis or over the entire period of the investigation, the same pattern of discriminatory treatment is evident.  From 2011 through 2017, Defendants' continuous practice had the purpose and effect of providing inferior routine exterior maintenance and marketing to REO properties in communities of color, while providing better routine exterior maintenance and marketing to REO properties in predominantly white neighborhoods.

83.    Statistical analysis of Plaintiffs' evidence shows a large difference in the average number of exterior maintenance and marketing deficiencies between communities of color and predominantly white neighborhoods.  The average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in communities of color is well over nine, while the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in white neighborhoods is approximately six.   In addition, the percentage of Deutsche Bank REO properties with ten or more deficiencies is approximately three times greater in nonwhite block groups than in white block groups.

84.    The disparities in the maintenance and marketing of the Deutsche Bank-owned homes are not explained by non-racial factors.  A regression analysis taking into account and controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until Plaintiffs' site visit and property values), indicates that routine exterior maintenance and marketing deficiencies at the Deutsche Bank REO properties in

33

communities of color remain higher by a statistically significant margin as compared to the routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in predominantly white neighborhoods.

85.     These statistical disparities are merely representative of the numerous forms of data and observational evidence establishing the differential treatment by Defendants of communities of color as compared to predominantly white neighborhoods.

86.     No valid business purposes are served by, or constitute valid excuses for, Defendants' differing maintenance of REO properties based on neighborhood racial composition.

87.     The disparities identified above flow directly from Defendants' discriminatory conduct.  They are traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision.  They are directly related to the zone of interests protected by the Fair Housing Act.

## C.  PLAINTIFFS INFORMED DEFENDANTS OF THE RACIALLY DISPARATE CONDITION OF THE DEUTSCHE BANK REO PROPERTIES, BUT DEFENDANTS HAVE NOT ALTERED THEIR DISCRIMINATORY BEHAVIOR

88.     During an initial investigation into the maintenance of REO properties throughout the lending industry, Plaintiffs observed that many REO properties exhibiting poor maintenance in communities of color were owned by Deutsche Bank.  As part of these efforts, in 2011, NFHA held a national news conference and released a report analyzing and describing the discriminatory maintenance and marketing of white and non-white REO properties.  The release of this comprehensive report placed Defendants on notice of the fact that their discriminatory conduct and practices violate the Fair Housing Act.  NFHA released additional reports addressing these issues in 2012 and in 2014.

89.     On February 26, 2014, Plaintiffs filed with the U.S. Department of Housing and Urban Development ("HUD") an administrative complaint of discrimination against the Deutsche Bank Defendants pursuant to 42 U.S.C. §3610.  That administrative complaint was subsequently amended on April 30, 2014, August 7, 2014, January 22, 2015, August 5, 2016, February 14, 2017 and July 26, 2017, and Ocwen and Altisource were added as respondents. The administrative complaint remains pending.

90.     Plaintiffs met with Deutsche Bank representatives and informed them of their findings with regard to the discriminatory conditions of the Deutsche Bank REO properties. Plaintiffs requested that the Deutsche Bank Defendants cease and remedy their discriminatory behavior.

91.     On information and belief, at all times since 2011, the Deutsche Bank Defendants have kept Defendants Ocwen and Altisource informed regarding Plaintiffs' findings, contentions and allegations.

92.     After the meeting with the Deutsche Bank representatives, Plaintiffs conducted numerous additional investigations of Deutsche Bank REO properties.  The results of these additional investigations confirm no change in the pattern of disparities between maintenance and marketing of REO properties in predominantly white neighborhoods and neighborhoods of color.

93.     Despite Plaintiffs' attempts to persuade the Deutsche Bank Defendants to voluntarily comply with the Fair Housing Act, the Deutsche Bank Defendants and the other Defendants did not and have not changed their behavior.  With deliberate indifference to the purpose and effects of their discriminatory policies, practices and conduct, Defendants have continued to maintain Deutsche Bank REO properties in a discriminatory manner based on the

predominant race and national origin of neighborhoods. Defendants' discriminatory maintenance and marketing of REO properties in communities of color violates the rights of homeowners and residents in these neighborhoods, causes particularized and concrete injury to these homeowners and residents, and otherwise makes housing unavailable in communities of color.

### D. DEFENDANTS HAVE ENGAGED IN A PATTERN AND PRACTICE OF SYSTEMIC AND INTENTIONAL RACE DISCRIMINATION IN EACH OF THE CITIES SERVED BY PLAINTIFFS

94.     A "pattern or practice" of discrimination refers to systemic intentional discrimination affecting a large group of persons. Statistical evidence of a sufficiently gross disparity over time between the affected population and the general population may establish an inference of intentional discrimination.

95.     To prove systemic discrimination, a plaintiff must show that the discrimination was the defendant's standard operating procedure, more than the mere occurrence of isolated or sporadic discriminatory acts. A plaintiff can establish that discrimination was the defendant's standard operating procedure by, among other things, presenting statistical evidence of similarly situated persons not in the protected class who were treated better than those in the protected class.

96.     Plaintiffs' findings by metropolitan area and violations reveal Defendants' systemic pattern and practice of providing manifestly inferior routine exterior maintenance and marketing services for REO properties in African-American and Latino communities, and thereby discriminating on the basis of race, and national origin. The extensive testing evidence generated by Plaintiffs displays a clear and consistent pattern and regular practice of differing routine exterior maintenance and marketing based on neighborhood racial composition. There is no business or other justification for this conduct.

97.     Defendants' policies, practices and intentional conduct are the direct and proximate cause of the gross statistical disparities in the maintenance and marketing of properties in neighborhoods with different racial and ethnic compositions.

98.     The differences in routine exterior maintenance and marketing at the Deutsche Bank REO properties are consistent in metropolitan areas regardless of their location in the country.  Whether analyzed on a national or metropolitan area basis, the same pattern and practice of discriminatory treatment is evident.  The consistent and repetitive pattern of discriminatory treatment across cities and over the span of time indicates that practices resulting in discrimination at the Deutsche Bank REO properties were approved, occurred or condoned at a high level of management.

99.     Defendants failed to comply with state and local laws regarding property maintenance in that: (a) observations by Plaintiffs of various deficiencies during their investigation of the Deutsche Bank-owned homes included many examples of conduct typically violating local codes and ordinances; and (b) Defendants have been sued under "Slumlord" ordinances as systemic violators, such as in Los Angeles, California.

100.    Defendants deviated from well-established practices concerning property maintenance and preservation in communities of color, which include upkeep of the routine exterior maintenance items Plaintiffs visually investigated at Deutsche Bank-owned homes.

101.    Appendix B to this Complaint, incorporated herein by reference, sets forth Plaintiffs' detailed findings by Metropolitan Area and violation type.

102.    In all areas, there were substantially less REO properties in white neighborhoods than in neighborhoods of color that had fewer than 5 routine exterior maintenance or marketing deficiencies.

103.     In all areas, there were substantially more REO properties in neighborhoods of color than in predominantly white neighborhoods that had more than 10 deficiencies.

104.     In many cities, certain REO properties in neighborhoods of color had more than 15 deficiencies (a condition seen far less often in white communities).

105.     Plaintiff investigated Deutsche Bank REO properties in the following metropolitan areas and found substantial differing treatment and disparities in properties as between neighborhoods of color and white neighborhoods (a) having fewer than 5 deficiencies (b) having more than 5 deficiencies, and (c) having more than 10 deficiencies, as follows:

*[The remainder of this page is intentionally left blank]*

| Metro Area/City | # Deutsche REOs Investigated | More White REOs with Less than 5 Deficiencies | More Minority REOs with More than 5 Deficiencies | More Minority REOs with More than 10 Deficiencies |
|---|---|---|---|---|
| Chicago | 106 | X | X | X |
| Milwaukee | 83 | X | X | X |
| Cleveland | 32 | X | X | X |
| Detroit (Suburban) | 43 | X | X | X |
| Dayton | 37 | X | X | X |
| Toledo | 27 | X | X | X |
| Columbus | 25 | X | X | X |
| D.C. & Prince George's | 66 | X | X | X |
| Memphis | 61 | X | X | X |
| Baltimore | 63 | X | X | X |
| Hampton Roads | 17 | X | X | X |
| Orlando | 64 | X | X | X |
| Minneapolis | 24 | X | X | X |
| Indianapolis | 18 | X | X | X |
| Baton Rouge | 20 | X | X | X |
| Denver | 21 | X | X | X |
| Dallas | 62 | X | X | X |
| Gary | 22 | X | X | X |
| Hartford | 16 | X | X | |
| New Orleans | 42 | | | X |
| Grand Rapids | 14 | X | X | X |
| Muskegon | 29 | X | X | X |
| Greater Palm Beaches | 41 | X | X | X |
| Miami | 63 | X | X | X |
| Tampa | 27 | X | X | X |
| Richmond | 39 | X | X | X |
| Philadelphia | 28 | X | X | X |
| Providence | 19 | X | X | X |
| Vallejo and Richmond CA | 22 | X | X | X |
| Kansas City | 10 | X | X | X |

106.     As detailed in Appendix B, in all metropolitan areas investigated, Plaintiffs found

substantial differences between the occurrence of  various particular deficiencies observed at

REO properties in white neighborhoods and the occurrence of the same deficiencies observed at REO properties in neighborhoods of color (e.g. in Denver, 38.5% of REO properties in neighborhoods of color had broken or hanging gutters while none of the REO properties in predominantly white neighborhoods had the same problem).

### E. DEFENDANTS HAVE ACTED WITH DISCRIMINATORY INTENT

107. Fair housing testing evidence, by itself or in conjunction with other evidence, is a well-established method of proving discrimination in cases alleging violations of the FHA. The facts revealed by fair housing testing evidence may be sufficient on their own to establish intentional discrimination.

108. Intentional discrimination occurs when a defendant acts, at least in part, because of the actual or perceived race or national origin of the alleged targets of discriminatory treatment. Various factors are probative of intent to discriminate, including, but not limited to, statistics demonstrating a clear pattern unexplainable on grounds other than discriminatory ones, the historical background of a decision, the specific sequence of events leading up to the challenged decision, and the defendant's departures from its normal procedures or substantive considerations. Evidence of a consistent pattern of actions that have a much greater harm on minorities than non-minorities is highly probative.

109. The acts and omissions of the Defendants with regard to the inferior and unequal routine exterior maintenance and marketing provided with regard to the Deutsche Bank REO properties in communities of color were taken based on race and national origin and constitute intentional discrimination as evidenced by various facts, including, but not limited to the following:

a) the severity and pervasiveness of the disparities found during comparative testing between the maintenance and marketing of the Deutsche Bank REO

40

properties in communities of color and the maintenance and marketing of the Deutsche Bank REO properties in white neighborhoods;

b)      the absence of credible, non-pretextual explanations for the disparities other than race;

c)      Defendants' knowledge of systemic racial disparities between the maintenance and marketing of the Deutsche Bank REO properties in communities of color and the maintenance and marketing of the Deutsche Bank REO properties in white neighborhoods, but refusal to take responsive actions;

d)      Defendants' failure to comply with state and local laws with regard to property maintenance in African-American and Latino communities;

e)      Defendants' lack of responsiveness to complaints regarding REO maintenance in communities of color;

f)      statistical analysis controlling for non-racial factors, (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until Plaintiffs' site visit and property values), which indicates that routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in communities of color cannot be explained on the basis of factors other than race;

g)      Defendants' knowledge of the foreseeable and continuing consequences of Defendants' conduct on communities of color;

h)      Defendants' deviation in minority communities from well-established standards and practices regarding exterior property maintenance;

41

i)      evidence of prior intentional discriminatory conduct by the Defendants toward African–Americans and Latinos, including, but not limited to, predatory loan practices, which created the conditions upon which the discriminatory conduct in this case could occur;

j)      Defendants' knowledge of the historical and continuing pattern of discrimination against African-Americans and Latinos by the financial and property service provider industries, including Defendants;

k)      evidence of a general pattern of intentional unlawful conduct and corrupt corporate culture with respect to defendant Deutsche Bank extending to such matters as race discrimination, money laundering, market rigging, securities fraud, violating United States Government imposed sanctions, fake transactions and concealing financial losses.

110.    In 2013, Deutsche Bank subsidiary MortgageIT paid $12.1 million to settle claims brought by the United States Department of Housing and Urban Development that: (a) it charged Black and Hispanic borrowers higher fees than white customers; and (b) it more frequently refused loan applications from Black or Hispanic borrowers.  According to HUD, the MortgageIT loan data from 2007 and 2008 indicated that there was a 65% greater chance of African-American borrowers being issued more expensive loans than similar white borrowers. HUD also found that Hispanic borrowers had a 72% greater chance of being issued more expensive loans than similar white borrowers.

111.    In January 2017, Deutsche Bank agreed to a multi-billion settlement with the Justice Department resolving federal claims that Deutsche Bank misled investors in the packaging, securitization, marketing, sale and issuance of residential mortgage-backed securities

42

(RMBS). This represents the single largest RMBS resolution for the conduct of a single entity. $4.1 billion of the relief was in the form of relief to consumers harmed by its unlawful conduct, including loan modifications, loan forbearance and forgiveness, and financing for affordable rental and for-sale housing throughout the country.

112.    Defendants Ocwen and Altisource have similar histories of regulatory violations, allegations of unlawful corporate conduct and intentional bad acts, requiring the payment of millions of dollars to resolve claims that they have intentionally violated consumer finance, civil rights and securities laws, and defrauded borrowers with respect to their mortgage loans.

## F.  DEFENDANTS' REO MAINTENANCE AND MARKETING POLICIES AND PRACTICES HAVE A DISPROPORTIONATE DISCRIMINATORY IMPACT ON COMMUNITIES OF COLOR

113.    Policies and practices based on race-neutral factors may cause an unjustified adverse impact on homeowners in communities of color. In this case, the pervasiveness of the discriminatory conditions relating to the Deutsche Bank REO properties indicates that Defendants operate under policies and practices with regard to the maintenance of REO properties that have an unjustified adverse disparate impact on communities of color.

114.    As regards the Deutsche Bank Defendants, these Defendants have adopted a uniform policy of disavowing any legal responsibility for compliance with federal, state or local laws pertaining to REO exterior maintenance. In connection with this policy, Defendants have sought to "outsource" to third parties compliance with the statutory and common law obligations that are placed on owners of real property.

115.    The Deutsche Bank Defendants have the policy of disavowing their legal obligations as real property owners without appropriate investigation or assessment of the fitness or ability of the retained third parties to act in compliance with obligations imposed under the Fair Housing Act.

116.    The Deutsche Bank Defendants have the policy of abrogating their legal obligations as real property owners without guidance, oversight or review of the activities left to the discretion of retained third parties.

117.    On June 28, 2013, Deutsche Bank publicly confirmed its policies of outsourcing and abrogating legal responsibilities with regard to REO properties in the course of a $10,000,000.00 settlement with the City of Los Angeles in a so-called "slum lord" case regarding the deterioration of foreclosed Deutsche Bank REO properties in Los Angeles.  In this context, Deutsche Bank stated, "[a]s we have said from the outset, loan servicers are responsible for maintaining foreclosed properties."

118.    Deutsche Bank also asserted on June 28, 2013 that the settlement with Los Angeles would "be paid by the servicers responsible for the Los Angeles properties at issue *and by the securitization trusts that hold the properties"* (emphasis supplied), further evidencing its obligations as trustee.

119.    The foregoing policies of the Deutsche Bank Defendants have a disproportionate adverse impact on communities of color, as shown by the statistical disparities and regression analysis described in this complaint.  These policies have operated in combination with the known higher foreclosure rates in neighborhoods of color resulting from predatory lending to minority borrowers during the subprime lending boom.   The policies and practices of the Deutsche Bank Defendants cause an adverse impact on communities of color by causing retention of unqualified and unsupervised third parties who lack incentives to comply with legal obligations regarding the maintenance of the Deutsche Bank REO properties in communities of color and are unsupervised and unmonitored by a property owner in the performance of their duties.

120.     No valid business purposes are served by the foregoing policies, and there is no business justification for failing to undertake basic maintenance of REO properties in communities of color.

121.     Based on available information, it appears that Deutsche Bank Defendants have employed other standard policies and practices in connection with the operation of their businesses that have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color.  For example, the Deutsche Bank Defendants have deliberately outsourced routine exterior maintenance work to large national companies without community ties, knowledge or expertise to service REO properties in communities of color.

122.     The Ocwen and Altisource Defendants also appear to have employed standard policies and practices in connection with the operation of their businesses that have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color, although the details of their policies are not publicly disseminated.  Based on available information, it appears that these policies include:

(a) adopting and following the Deutsche Bank policy of abrogating and outsourcing REO maintenance to third parties without appropriate monitoring or review;

 (b) employing arbitrary methods of allocating resources to the maintenance of REO properties;

(c) avoiding customary real estate brokers, listings and channels in favor of Internet sites used primarily for auctions and by investors, with the predictable result of cash sales or bulk sales by investors, which adversely impact neighborhoods of color by decreasing sales to the homeowner occupants; and

(d) allowing third party contractors and lower level employees to exercise very significant levels of discretion with inappropriately minimal input or oversight from Defendants.

123.    The parameters of these policies are material to this litigation and constitute proper subjects of discovery.  Based upon the pervasiveness of the discriminatory conditions relating to the Deutsche Bank REO properties, there is a substantial likelihood that additional policies and practices of Defendants have a disproportionately adverse impact on communities of color.

124.    At present, Plaintiffs assert claims under a disparate impact theory against the Deutsche Bank Defendants alone.  Upon discovery, Plaintiffs reserve the right to amend this complaint to set forth additional allegations regarding the disparate impact in communities of color caused by or contributed to by the other Defendants' REO maintenance policies and practices.

## G.  DEFENDANTS' DISCRIMINATORY MAINTENANCE AND MARKETING OF REO PROPERTIES PERPETUATES SEGREGATION

125.    One of the fundamental purposes of the Fair Housing Act is to eliminate segregated housing patterns and to increase integration.

126.    The "dissimilarity index" is a well-recognized standard for evaluating a community's level of segregation.  The index measures whether one particular racial group is distributed across census tracts in the metropolitan area in the same way as another racial group. A high dissimilarity index indicates that the two groups tend to live in different tracts.  The index ranges from 0 to 100.  A value of 60 or more is considered a very high level of segregation.  It means that 60% (or more) of the members of one group who reside in the area would need to move to a different tract within that area in order for the two groups to be equally distributed.

Values between 40 and 50 demonstrate a moderate level of segregation, and values of 30 or below indicate a low level of segregation.

127.    The cities in which Plaintiffs investigated Defendants' maintenance of the Deutsche Bank REO properties are located in metropolitan areas that are racially segregated, as indicated by have the following dissimilarity indexes:

| Metro Area/City | 2010 Black-White Dissimilarity Index | 2010 Hispanic-White Dissimilarity Index |
|---|---|---|
| Chicago | 75.2 | 56.3 |
| Milwaukee | 79.6 | 57.0 |
| Cleveland | 72.6 | 52.3 |
| Detroit (Suburban) | 74.0 | 43.3 |
| Dayton | 63.3 | 27.3 |
| Toledo | 63.2 | 31.4 |
| Columbus | 60.0 | 41.4 |
| D.C. & Prince George's | 61.0 | 48.3 |
| Memphis | 62.2 | 50.7 |
| Baltimore | 64.3 | 39.8 |
| Hampton Roads | 46.9 | 32.2 |
| Orlando | 49.3 | 40.2 |
| Minneapolis | 50.2 | 42.5 |
| Indianapolis | 64.5 | 47.3 |
| Baton Rouge | 57.2 | 32.7 |
| Denver | 59.4 | 48.8 |
| Dallas | 55.5 | 50.3 |
| Gary | 76.8 | 43.7 |
| Hartford | 62.3 | 58.4 |
| New Orleans | 63.3 | 38.3 |
| Grand Rapids | 61.4 | 50.4 |
| Muskegon | 71.2 | 30.4 |
| Greater Palm Beaches | 57.3 | 42.6 |
| Miami | 64.0 | 57.4 |
| Tampa | 54.3 | 40.7 |
| Richmond | 51.6 | 44.9 |
| Philadelphia | 67.0 | 55.1 |
| Providence | 50.8 | 60.1 |
| Vallejo and Richmond CA | 41.5 | 29.2 |
| Kansas City | 58.6 | 44.4 |

128. The cities in which the Defendants' maintenance and marketing of the Deutsche Bank REO properties were investigated are moderately or highly segregated under the dissimilarity index measure. The fact of high rates of segregation in these cities was known to the Deutsche Bank Defendants, Altisource and Ocwen.

129. By failing to maintain and market REO dwellings in communities of color according to the same standards as REO dwellings in predominantly white neighborhoods were maintained, Defendants have perpetuated segregation in several ways.

130. The failure to maintain and market REO dwellings in communities of color according to the same standards as REO dwellings in predominantly white neighborhoods were maintained has stigmatized communities of color as less desirable than predominantly white communities. The prospects for integration in the affected communities have been reduced because buyers are deterred from purchasing properties in neighborhoods with poorly maintained REO properties, leaving the segregated racial composition of these neighborhoods unchanged.

131. The existence of poorly maintained REO dwellings in minority neighborhoods diminishes home values for surrounding homeowners. Lower home values in communities of color restrict the ability of minority homeowners to move to majority-white or integrated neighborhoods by reducing the equity they can utilize to buy a new home.

132. As a result of Defendants' discriminatory maintenance and marketing of the Deutsche Bank REO properties, Defendants have thwarted Congressional efforts to eradicate segregated housing patterns, and neighborhood residents have been deprived of the social, economic and professional benefits of living in an integrated community.

## V.  INJURIES CAUSED BY DEFENDANTS' BEHAVIOR

133.    In the context of the national foreclosure crisis, the Plaintiffs became aware of disparities in the routine exterior maintenance and marketing of REO properties in communities of color.  Plaintiffs received complaints and feedback from neighbors living in proximity to these properties and observed firsthand problems in communities that they serviced and had invested funds into for neighborhood stabilization and increasing homeownership.  An important part of the missions of the Plaintiff organizations is to monitor and respond to conduct and conditions in the housing market that are indicative of discrimination.

134.    Based on this information and consistent with the missions of the Plaintiff agencies, Plaintiffs investigated this anecdotal information and determined that a larger, systemic problem existed.  Prior to pursuing administrative action or litigation directed toward this problem, Plaintiff NFHA published and disseminated reports describing Plaintiffs' findings and held news conferences in the hope that Defendants would voluntarily undertake remedial actions.

135.    As described in more detail below, the failure of Defendants to respond to this situation has led Plaintiffs to incur substantial expenditures and damages that might have otherwise been avoided.

### A.  INJURY TO ALL PLAINTIFFS

136.    The unlawful discriminatory conduct of Defendants has proximately caused injury to each of the Plaintiffs by:  (a) undermining Plaintiffs' education, advocacy and training programs designed to promote fair housing and fair lending; (b) requiring Plaintiffs to divert scarce resources away from their usual activities and instead to devote substantial time to evaluating properties, reviewing data, interviewing witnesses, engaging in an education and outreach campaign, and developing educational materials to identify and address Defendants' racially discriminatory maintenance practices; (c) frustrating Plaintiffs' mission of increasing fair

49

housing for all Americans and in all neighborhoods, regardless of race, color or national origin; (d) frustrating Plaintiffs' mission to eliminate racial segregation in their communities; (e) harming the communities that Plaintiffs serve; and (f) impeding Plaintiffs' community investment programs designed to stabilize neighborhoods of color and increase home ownership for all persons in these same neighborhoods.

137.    By causing Plaintiffs to expend substantial time and resources investigating and counteracting Defendants' unlawful conduct, Defendants have harmed Plaintiffs economically by forcing them to divert scarce resources away from their usual education, counseling, investigation, and capacity-building activities and services.  As Defendants' discriminatory activities persist, addressing and counteracting Defendants' discriminatory conduct will continue to require a substantial diversion of resources by Plaintiffs away from their usual activities.

138.    In order to identify and counteract Defendants' discriminatory conduct, Plaintiffs had to divert scarce resources and time away from other projects and programs.  These expenditures were not initially included in Plaintiffs' budgets.  As a result, each Plaintiff had to pull resources away from other planned and budgeted projects in order to garner the resources necessary to counteract Defendants' behavior.  New grant applications had to be refocused from longstanding needs to address the immediate problems caused by Defendants' failure to maintain the Deutsche Bank REO properties in minority neighborhoods.

139.    Because of the measures Plaintiffs were forced to take to identify and counteract Defendants' discriminatory practices, Plaintiffs were forced to delay, suspend or forgo other existing programs or projects.   For example, NFHA had to forgo conducting sales investigations to combat racial steering because staff was needed to conduct REO investigations across the country.  Despite this effect on Plaintiffs' other programs and services, Plaintiffs nevertheless

diverted resources to these counteractive measures because, if left unaddressed, Defendants' discriminatory policies would detrimentally impact Plaintiffs' communities and the constituents they serve.

140.    Defendants' discriminatory conduct has also injured Plaintiffs economically by hindering Plaintiffs' community investment efforts.  Over a course of years, Plaintiffs have provided millions of dollars to promote residential integration and increase home ownership and accessible housing through grant programs to local housing non-profit organizations in communities included within this Complaint.  Plaintiffs also provided funding through non-profit organizations to neighborhoods in cities that are part of this Complaint to conduct education and outreach regarding REO best practices, to foster home ownership, to assist with rebuilding predominantly African-American and Latino neighborhoods affected by the foreclosure crisis, to promote diverse, inclusive communities and to provide employment opportunities for persons living in these neighborhoods.  These funds have been leveraged to obtain additional corporate funding and foundation grants for the same communities of color.   These efforts have allowed homeowners to remain in their homes through foreclosure prevention or home repair grants, have rehabilitated abandoned or blighted dwellings, and have made housing units accessible to persons with disabilities.  The funds have also been used to establish pocket parks and implement neighborhood beautification programs to make communities desirable and the focus of increased interest by real estate agents.

141.    These financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank-owned homes in the same communities.

142.     In an effort to address and attempt to counteract the effects of Defendants' discriminatory conduct, prior to the filing of this action, each of the Plaintiffs engaged in community outreach and public efforts to raise awareness of these discriminatory practices in the communities each Plaintiff serves in order to counteract the alleged discriminatory conduct.

143.     The diversion and expenditure of financial resources and staff time, included, but was not limited to:  time and costs associated with drafting and distributing educational materials; mailing costs and graphic design expenses; travel time and expenses; and staff hours diverted from other work to conduct outreach activities.  In addition to implementing these counteractive measures, Plaintiffs were required to spend additional time designing and preparing counteractive strategies targeted toward addressing the impact of Defendants' unlawful behavior with regard to REO maintenance.

144.     The foregoing injuries have caused Plaintiffs to incur costs that are above and beyond the operational activities and costs normally expended by Plaintiffs.

145.     The foregoing injuries that Plaintiffs have suffered as a result of Defendants' conduct fall within the zone of interests protected by the Fair Housing Act.

### B.  INJURIES TO INDIVIDUAL PLAINTIFFS

146.     Each Plaintiff has suffered particularized and concrete injuries caused by Defendants' discriminatory conduct.

**National Fair Housing Alliance**

147.     As a national organization with the mission of eradicating housing discrimination and segregation, NFHA works to monitor, investigate and respond to evolving conditions in the housing market that indicate the presence of discriminatory conduct.  In this capacity, NFHA became aware of complaints and conditions relating to the inequitable maintenance of REO

52

properties in communities of color. As a result, and consistent with its mission, NFHA undertook to evaluate the scope and causes of this problem.

148. Over the course of eight years, Plaintiff NFHA has conducted hundreds of inspections of Deutsche Bank REO properties across the nation. NFHA has also conducted joint inspections with all of the other Plaintiffs listed below. In total, NFHA has expended over 2044 hours on its investigation into Defendants' discriminatory maintenance and marketing of the Deutsche Bank REO properties and resulting from and attributable to Defendants' conduct.

149. As a result of this expenditure of time and resources, NFHA diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused NFHA to forgo opportunities, including executing new fair housing advocacy projects and investigations, conducting additional consulting and training of housing providers, applying for new grants and funding sources, and attending conferences and professional staff development.

150. In addition, NFHA engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. NFHA's efforts include: meeting with local, state, and federal government officials (including the Federal Reserve Board, legislators, and at least ten local governments/jurisdictions); authoring and distributing reports about discrimination in the maintenance of REO properties, which were subsequently provided to local and state governments; presenting numerous fair housing trainings regarding REO maintenance to real estate professionals and bank employees; planning and sponsoring a national conference on REO maintenance; and serving as keynote speaker and making presentations on numerous panels regarding the economic impact of discriminatory REO maintenance.

151.    Defendants' actions have also frustrated the mission and purpose of NFHA.  As described in greater detail above, NFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices impede its efforts and frustrate its mission.

152.    Finally, NFHA has expended at least $5.5 million of its own funds to engage in community development, home ownership promotion, and neighborhood stabilization efforts across the nation.  NFHA's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in those communities.

**Fair Housing Advocates of Northern California (formerly Fair Housing of Marin)**

153.    Plaintiff Fair Housing Advocates of Northern California conducted inspections of Deutsche Bank REO properties across the greater Solano and Contra Costa counties, expending over 215 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

154.    As a result of this expenditure of time and resources, FHANC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: consulting opportunities, professional staff development, coalition and advocacy meetings, work on local and regional housing policies, expansion of fair housing programs, and new or additional funding applications.

155.    In addition, FHANC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: meeting with government officials regarding REO maintenance, including visits to senators and representatives on Capitol Hill; meeting with local

54

service providers such as Housing and Economic Rights Advocates; creating and distributing public service announcements and conducting radio campaigns; publishing advertisements in local newspapers; sending specialized mailings to neighbors of REO properties; participating in community events; and engaging with media to raise awareness of REO-related issues.

156.   Defendants' actions have also frustrated the mission and purpose of FHANC.  As described in greater detail above, FHANC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

157.   Finally, FHANC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including foreclosure prevention, counseling and education. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in neighborhoods of color in the greater Solano and Contra Costa counties.

**Central Ohio Fair Housing Association**

158.   Plaintiff Central Ohio Fair Housing Association conducted inspections of Deutsche Bank REO properties, expending over 59 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

159.   As a result of this expenditure of time and resources, COFHA diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: community and coalition meetings, professional staff development, and new funding applications.

160. In addition, COFHA engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting outreach and trainings for real estate agents in the greater Columbus metropolitan region; providing educational materials and meeting with local code or government officials regarding REO maintenance; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events, including presentations to Habitat for Humanity Mid-Ohio, Somali Community Association of Ohio, Legal Aid Society of Columbus, and Columbus Realtists Association; engaging with media to raise awareness of REO-related issues; and meeting with officials from the City of Columbus and Franklin County, Ohio.

161. Defendants' actions have also frustrated the mission and purpose of COFHA. As described in greater detail above, COFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

162. Finally, COFHA has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in neighborhoods of color in the greater Columbus metropolitan region.

**Connecticut Fair Housing Center**

163. Plaintiff Connecticut Fair Housing Center, Inc. conducted inspections of Deutsche Bank's REO properties throughout Connecticut, expending over 285 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

164.    As a result of this expenditure of time and resources, CFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including, but not limited to, developing new or additional fair housing investigations, community and coalition meetings, consulting and training opportunities, new funding applications, and professional staff development.

165.    In addition, CFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: conducting classes for more than 100 real estate agents on their obligations to maintain REO properties in a non-discriminatory manner; testifying at legislative hearings at the Connecticut legislature on blight bills to raise awareness of the problems caused by differential treatment of REO properties; meeting with the Mayor of New Haven to highlight problems with REO properties in her city; and discussing REO maintenance with Connecticut's Congressional delegation during meetings on fair housing problems in Connecticut.

166.    Defendants' actions have also frustrated the mission and purpose of CFHC. As described in greater detail above, CFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Denver Metro Fair Housing Center**

167.    Plaintiff Denver Metro Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Denver metropolitan area, expending over 250 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

57

168.     As a result of this expenditure of time and resources, DMFHC diverted limited resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including consulting and training opportunities, new funding applications, professional staff development, and new or additional fair housing investigations.

169.     In addition, DMFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. DMFHC's efforts include: organizing and conducting trainings regarding REO maintenance for housing providers, municipal housing employees, HUD housing counseling agency staff, and the general public in the greater Denver Metro region; meeting with local government officials regarding REO issues, including the Denver Regional Council of Governments, City and County of Denver, City of Aurora, and the State of Colorado Division of Housing; preparing and publishing brochures/reports; creating public service announcements and advertising; designing specialized mailings; participating in community events, including the Montbello 50th Anniversary Fair; and engaging with media to raise awareness for REO-related issues.

170.     Defendants' actions have also frustrated the mission and purpose of DMFHC. As described in greater detail above, DMFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

171.     Finally, DMFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of

deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Denver metropolitan region.

**Fair Housing Center of Central Indiana**

172.     Plaintiff Fair Housing Center of Central Indiana, Inc. conducted inspections of Deutsche Bank REO properties across the greater Indianapolis metropolitan region, expending over 161 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

173.     As a result of this expenditure of time and resources, FHCCI diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: fair housing training opportunities, new funding applications, professional staff development, and expanded forms of education and outreach.

174.     In addition, FHCCI engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. FHCCI's efforts include organizing and conducting trainings for community development and neighborhood organizations in the greater Indianapolis region; meeting with local community development organizations and government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; creating public service announcements for local print and radio; designing specialized mailings; and engaging with media to raise awareness of REO-related issues and answer media related inquiries.

175.     Defendants' actions have also frustrated the mission and purpose of FHCCI. As described in greater detail above, FHCCI's mission is to ensure equal housing opportunities and

to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

176.    Finally, FHCCI has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Indianapolis metropolitan region.

**Fair Housing Center of the Greater Palm Beaches**

177.    Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. conducted inspections of Deutsche Bank REO properties across the greater Palm Beach metropolitan region and expended over 168 hours over the course of this investigation and resulting from and attributable to Defendants' conduct.

178.    As a result of this expenditure of time and resources, FHCGPB diverted resources and time away from other intended projects and programs, and was required to suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including fair housing education and consulting opportunities with housing providers and municipalities and new funding applications.

179.    In addition, FHCGPB engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: presenting over a dozen workshops to community service providers and local housing providers regarding REO maintenance; disseminating anti-discrimination literature; and counseling citizens of the greater Palm Beach metropolitan region on their fair housing rights under federal, state, and local fair housing laws.

180.     Defendants' actions have also frustrated the mission and purpose of FHCGPB. As described in greater detail above, FHCGPB's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Fair Housing Center of West Michigan**

181.     Plaintiff Fair Housing Center of West Michigan conducted inspections of Deutsche Bank's REO properties across the western Michigan region, expending over 200 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

182.     As a result of this expenditure of time and resources, FHCWM diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including community meetings and collaborative efforts, consulting opportunities, conferences and staff development, other systemic investigations, and funding applications.

183.     In addition, FHCWM engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: holding workshops regarding REO issues at its Fair Housing Luncheon & Workshop Series; meeting with local code or government officials regarding REO maintenance; meeting with local service providers, stakeholders and community groups; preparing and publishing newsletters; participating in community events; and engaging with media to raise awareness of REO-related issues.

184.     Defendants' actions have also frustrated the mission and purpose of FHCWM. As described in greater detail above, FHCWM's mission is to ensure equal housing opportunities

and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

185.     Finally, FHCWM has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the Western Michigan region.

**Fair Housing Continuum**

186.     The Fair Housing Continuum, Inc. conducted inspections of Deutsche Bank REO properties in the central Florida region, expending over 940 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

187.     As a result of this expenditure of time and resources, the Continuum diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: new or additional fair housing investigations, individual complaint enforcement, fair housing training opportunities, and professional staff development.

188.     In addition, the Continuum engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include 141 presentations or speaking engagements related to REO issues from July 2013 through Sept. 2016 as well as engaging with media to raise awareness of REO-related issues.

189.     Defendants' actions have also frustrated the mission and purpose of the Continuum. As described in greater detail above, the Continuum's mission is to ensure equal

housing opportunities and to fight unlawful discrimination and segregation. Defendants'
discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Greater New Orleans Fair Housing Action Center**

190.    Plaintiff Greater New Orleans Fair Housing Action Center conducted inspections
of Deutsche Bank REO properties across the New Orleans and Baton Rouge metropolitan areas,
expending over 200 hours throughout the course of this investigation and resulting from and
attributable to Defendants' conduct.

191.    As a result of this expenditure of time and resources, GNOFHAC diverted
resources and time away from other intended projects and programs, and was required to delay
or suspend such programming. Defendants' discriminatory conduct caused Plaintiff to forgo
opportunities including presenting fair housing courses and to delay work related to its annual
outreach and education events, as well as planned investigations.

192.    In addition, GNOFHAC engaged in significant community outreach and public
efforts in order to address and attempt to counteract the effects of Defendants' conduct.
GNOFHAC's efforts include: organizing and conducting trainings to groups of service providers
in the Greater New Orleans area, including meeting with BlightsOut, an organization dedicated
to eradicating blight; meeting with government officials regarding REO maintenance; creating
public service announcements and advertising in local print and radio; participating in
community events, including the Mission Possible Conference with over 100 conference
attendees, and engaging with media to raise awareness of REO-related issues.

193.    Defendants' actions have also frustrated the mission and purpose of GNOFHAC.
As described in greater detail above, GNOFHAC's mission is to ensure equal housing
opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory
maintenance practices directly impede its efforts and frustrate its mission.

194.     Finally, GNOFHAC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater New Orleans metropolitan region.

**HOPE Fair Housing Center**

195.     Plaintiff H.O.P.E. Inc. d/b/a HOPE Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Chicago metropolitan region, expending over 1115 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

196.     As a result of this expenditure of time and resources, HOPE diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: consulting opportunities, new funding applications, professional staff development, and community and coalition meetings.

197.     In addition, HOPE engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for a regional coalition of housing providers, non-profit service providers and government staff in the greater Chicago metropolitan region; meeting with local code or government officials regarding REO maintenance in Elgin and other local municipalities; meeting with local service providers and real estate trade organizations; preparing and publishing brochures/reports; designing targeted websites and specialized mailings; participating in community events, including the Chicago

64

Urban League Homebuyers Fair, among others; and engaging with media to raise awareness of REO-related issues.

198.    Defendants' actions have also frustrated the mission and purpose of HOPE.  As described in greater detail above, HOPE's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

199.    HOPE has also expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Chicago metropolitan region.

**Housing Opportunities Made Equal of Virginia**

200.    Plaintiff Housing Opportunities Made Equal of Virginia trained to gain the expertise and conducted inspections of Deutsche Bank's REO properties in Virginia, expending over 561 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

201.    As a result of this expenditure of time and resources, HOME of Virginia diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including education and outreach activities that would have furthered its mission, training on volunteer recruitment, fair housing planning consulting work, community meetings and collaborative efforts, advocacy efforts to add sexual orientation protections to the Virginia Fair Housing Act, and the delay of its internal strategic planning exercises.

202.     In addition, HOME of Virginia engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: extensive work to prevent foreclosures by providing foreclosure prevention counseling to hundreds of Virginians beyond any contract to do so and expending its own funds; corresponding with City officials regarding REO maintenance and ongoing costs to the localities; meeting with community development corporations; and engaging with media to raise awareness of REO-related issues.

203.     Defendants' actions have also frustrated the mission and purpose of HOME of Virginia. As described in greater detail above, HOME of Virginia's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Housing Opportunities Project for Excellence (HOPE Inc.)**

204.     Plaintiff Housing Opportunities Project for Excellence, Inc., conducted inspections of Deutsche Bank REO properties across the state of Florida (including its Miami-Dade and Broward Counties service area and assisting in Greater Palm Beaches area investigations) and expended over 179 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

205.     As a result of this expenditure of time and resources, HOPE, Inc. diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including resource development, public policy advocacy, identifying opportunities to educate underserved and unserved populations, utilizing research and technology to identify discriminatory trends in housing, and furtherance of the organization's Strategic Plan.

206.    In addition, HOPE, Inc. engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include:  preparation and publication of newsletter articles promoting community awareness; engagement with media to raise awareness of REO-related issues; and development of educational presentations inclusive of REO-related topics, including homebuyer/foreclosure prevention workshops, housing provider trainings, and local (Miami-Dade and Broward County) and statewide (Florida) fair housing workshops.

207.    Defendants' actions have also frustrated the mission and purpose of HOPE, Inc. As described in greater detail above, HOPE Inc.'s mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Housing Research & Advocacy Center**

208.    Plaintiff Housing Research & Advocacy Center conducted inspections of Deutsche Bank REO properties across the greater Cleveland metropolitan area between July 2014 and February 2017, expending over 162 hours over the course of this investigation and resulting from and attributable to Defendants' conduct.

209.    As a result of this expenditure of time and resources, HRAC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such activities.

210.    In addition, HRAC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. HRAC's efforts include: the discussion of REO maintenance issues in more than 250 presentations to housing providers and real estate agents in Northeast Ohio; and engaging with media to raise awareness of REO-related issues.

67

211. Defendants' actions have also frustrated the mission and purpose of HRAC. As described in greater detail above, HRAC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Miami Valley Fair Housing Center**

212. Plaintiff Miami Valley Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Miami Valley region, expending over 114 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

213. As a result of this expenditure of time and resources, MVFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: consulting and training opportunities, community and coalition meetings, new funding applications, and professional staff development.

214. In addition, MVFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for real estate agents, property managers, municipal government employees, and the general public in the greater Miami Valley region; meeting with local code or government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events (including presentations to the Latino Connection, the Dayton Area Realtists, Catholic Social Services, the Dayton Mortgage Broker's Association, and the Ahiska Turkish American Community Center);

and engaging with media to raise awareness of REO-related issues. MVFHC has also been responsible for maintaining the database on which the results of the investigation in this case have been maintained.

215. Finally, MVFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Miami Valley region.

216. Defendants' actions have also frustrated the mission and purpose of MVFHC. As described in greater detail above, MVFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**North Texas Fair Housing Center**

217. Plaintiff North Texas Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Dallas-Fort Worth metropolitan region, expending over 240 hours throughout the course of the investigation and resulting from and attributable to Defendants' conduct.

218. As a result of this expenditure of time and resources, NTFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including expanded forms of outreach and coalition-building, professional staff development, and new funding applications.

219. In addition, NTFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct.

Plaintiff's efforts include: organizing and conducting trainings for social service providers and property management personnel in the Dallas-Fort Worth region; meeting with local government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures; creating public service announcements and advertising in local print and radio; designing specialized mailings; participating in community events, including community resource fairs; and engaging with media to raise awareness of REO-related issues.

220.    Defendants' actions have also frustrated the mission and purpose of NTFHC.  As described in greater detail above, NTFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

221.    NTFHC has also spent its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Dallas-Fort Worth region.

**Metropolitan Milwaukee Fair Housing Council**

222.    Plaintiff Metropolitan Milwaukee Fair Housing Council conducted inspections of Deutsche Bank REO properties across the greater Milwaukee metropolitan area, expending over 102 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

223.    As a result of this expenditure of time and resources, MMFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused Plaintiff to forgo

opportunities including fair lending outreach and education, fair housing outreach and education, fair housing investigations, data collection activities, and housing industry trainings.

224.    In addition, MMFHC engaged in community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include conducting REO-related presentations and meetings with government officials, community organizations, academic institutions, housing providers, individual realtors and realtors' associations, neighborhood associations, lending institutions, community activists, faith-based institutions, and homeowners and residents of neighborhoods affected by discriminatory REO maintenance and marketing practices.

225.    Defendants' actions have also frustrated the mission and purpose of MMFHC. As described in greater detail above, MMFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Open Communities**

226.    Plaintiff Open Communities conducted inspections of Deutsche Bank REO properties in the greater Chicago metropolitan region, expending over 60 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

227.    As a result of this expenditure of time and resources, Open Communities diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including conducting fair housing testing and investigations, holding landlord and tenant mediation services, performing community outreach and professional staff development.

228.    Defendants' actions have also frustrated the mission and purpose of Open Communities. As described in greater detail above, Open Communities' mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**South Suburban Housing Center**

229.    Plaintiff South Suburban Housing Center conducted inspections of Deutsche Bank REO properties across the greater Chicago metropolitan area, and the Gary, northwest Indiana area, expending over 288 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

230.    As a result of this expenditure of time and resources, SSHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including additional fair housing complaint intakes and investigations, fair housing presentations for the general public and housing providers, counseling and advocacy on behalf of mortgage-distressed discrimination victims, and expanded forms of outreach and coalition-building.

231.    In addition, SSHC has engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct.  Plaintiff's efforts include conducting REO-related presentations and meetings with municipal and county officials, community organizations, housing providers, individual realtors and realtors' associations, lending institutions, community service agencies, faith-based institutions, and homeowners and residents of communities affected by discriminatory REO maintenance and marketing practices.

232.     Defendants' actions have also frustrated the mission and purpose of SSHC. As described in greater detail above, SSHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

233.     Finally, SSHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including down payment assistance and mortgage distress assistance programs. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Chicago and Gary, Indiana metropolitan areas.

**Toledo Fair Housing Center**

234.     Plaintiff, Toledo Fair Housing Center, conducted inspections of Deutsche Bank REO properties across the greater Toledo metropolitan area, expending over 78 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

235.     As a result of this expenditure of time and resources, TFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including providing fair housing training to community partners, attending conferences and other forms of professional staff development, and advocating for housing discrimination victims.

236.     In addition, TFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for housing industry professionals and the general public in the Northwest Ohio region; meeting with government

73

officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; participating in community events and meetings; engaging with media to raise awareness of REO-related issues; interviewing neighbors; and participating in neighborhood beautification and revitalization efforts.

237.    Defendants' actions have also frustrated the mission and purpose of TFHC. As described in greater detail above, TFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

238.    Finally, TFHC has expended its own funds to engage in community development, homeownership promotion, neighborhood stabilization, foreclosure prevention and beautification efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Toledo metropolitan region.

## C.  INJURIES TO NEIGHBORHOOD RESIDENTS AND COMMUNITIES

239.    The proper maintenance and marketing of REO dwellings is vital to the stability of neighborhoods and to the economic, social and physical well-being of their residents.  REO properties that are poorly maintained have significant, negative outcomes to a neighborhood, affecting the health and safety of surrounding residents and otherwise interfering with the rights of homeowners in communities of color to enjoy their homes in a manner free of discrimination. Academic and government reports acknowledge the negative effects of neglected vacant properties on nearby homeowners, neighborhoods and local governments.  See e.g., Government Accountability Office, Vacant Properties:  Growing Number Increases Communities' Costs and Challenges, GAO-12-34 (Nov. 4, 2011), at p. 27-48 (available at http://www.gao.gov/products/GAO-12-34).

240.    REO properties that are poorly maintained lead to increased crime.  A home with unsecured doors, broken windows, overgrown grass or trash around the property signals to vandals and looters that the property is abandoned and makes the home and neighborhood a target for illegal activity.

241.    REO properties that are poorly maintained create health and safety issues.   Poorly maintained REO properties lead to an increase in accidents, rodent and insect infestations and decay.  According to a report by the American Heart Association, living near a foreclosed home can also increase a person's blood pressure "due in part to unhealthy stress from residents' perception that their own properties are less valuable, their streets less attractive or safe and their neighborhoods less stable."[2]

242.    REO properties that are poorly maintained and marketed stigmatize communities and significantly diminish home values for surrounding homeowners.  Failure to carry out basic maintenance of REO properties decreases the likelihood of timely sales and decreases the value and sale price of REO properties, which, in turn, decreases property values in the neighborhood. Homes that appear abandoned and look unsightly due to poor maintenance will often deter real estate agents from showing the REO properties or surrounding homes to owner-occupant homebuyers.  As shoddy maintenance and neglect result in deteriorating appearances and physical conditions for REO properties, their availability for sale is adversely affected, constraining housing options in impacted communities.

243.    Poor maintenance and marketing of an REO property makes the property significantly more likely to end up in the hands of an investor, rather than an owner-occupant. Investor purchased REOs often result in a number of negative outcomes for the surrounding area, including a decrease in property values and a higher risk of abandonment.  Communities with

---

[2] http://m.newsroom.heart.org/news/living-near-foreclosed-property-linked-to-higher-blood-pressure

high investor ownership are more likely to become high rental, less stable communities, and afford fewer opportunities for owner-occupied purchases. Investor-owned properties detrimentally affect property values and encourage disinvestment in neighborhoods.

244. Deutsche Bank's auction-based sales model with Ocwen/Altisource requires buyers to pay cash for a property. This model is designed to attract primarily investors who have cash resources for purchase. The typical owner-occupant buyer must secure a mortgage loan, which limits such purchases of Deutsche Bank-owned foreclosures.

245. Based upon a review of property records for the sale outcomes of 79 properties in Memphis, Tennessee, 70% of REO properties that were poorly maintained (ie., had 10 or more maintenance or marketing deficiencies) were sold to investors, while only 46% of well-maintained homes went to investors. In communities of color, homes that were poorly maintained and marketed were significantly more likely to have been sold to investors as opposed to owner-occupants.

246. Considering this data together with neighborhood race, of the REOs in communities of color, 70% went to investors while only 18% in white communities were sold to investors. Only 24% of the REOs in communities of color went to owner-occupants, while 78% of REOs in predominantly white communities were purchased directly by owner-occupants.

247. Poorly maintained foreclosure properties also impose a heavy burden on local municipalities in terms of code violations and other public safety issues. Local governments are forced to spend millions of dollars to address code violations, perform maintenance mitigation because of dangerous or blighted conditions, demolish unsafe structures and to identify and contact those responsible for vacant properties. A Woodcock Institute study documents that the

amount spent by local governments on a vacant and unmaintained property averaged $5,358 per property per year.

### D. INJURIES CAUSED BY DEFENDANTS' CONDUCT CONTINUES

248.    Until remedied, Defendants' unlawful, discriminatory actions will continue to injure Plaintiffs by, *inter alia*:  (a) interfering with Plaintiffs' efforts and programs intended to bring about equality of opportunity in housing; (b) requiring the commitment of scarce resources, including substantial staff time and funding, to counteract Defendants' discriminatory conduct in the communities identified above, thus diverting resources away from Plaintiffs' usual activities and services, such as education, outreach and counseling; (c) frustrating Plaintiffs' missions and purposes of promoting the equal availability of housing to all persons without regard to any protected category, including race and the racial composition of a neighborhood; (d) frustrating Plaintiffs' missions and purposes of promoting racial integration and eliminating racial segregation in their communities; and (e) impeding the numerous accomplishments of Plaintiffs' investment programs.

249.    All of these injuries flow directly from Defendants' conduct.  All of these injuries are fairly traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision.  The injuries suffered by Plaintiffs fall directly within the zone of interests protected by the Fair Housing Act.

### E. CONTINUING VIOLATION

250.    Defendants engaged in the conduct alleged herein on a continuing and ongoing basis from at least June 22, 2011 to the present.  The Defendants' alleged conduct involves discriminatory violations that injured Plaintiffs within the two-year Fair Housing Act statute of limitations and the evidence in this investigation that occurred prior to the two-year statute of limitations is of a similar pattern to the evidence put forward within the statute of limitations

period.  The two-year statute of limitations period has been tolling under the pending HUD

administrative complaint since it was filed on February 26, 2014.

## VI.  VIOLATIONS OF THE FAIR HOUSING ACT

251.     Plaintiffs adopt and re-allege each of the preceding paragraphs of this Complaint

as to each count set forth below.

252.     The Deutsche Bank REO properties investigated by Plaintiffs are "dwelling[s]"

within the meaning of 42 U.S.C. §3602(b).

253.     The term "person" in the FHA is defined to include "one or more individuals,

corporations, partnerships, associations, labor organizations, legal representatives, mutual

companies, joint stock companies, trusts, unincorporated organizations, trustees, trustees in cases

under Title 11, receivers and fiduciaries."  42 U.S.C. §3602(d).

254.     Under the express provisions of the FHA and applicable agency principles, banks,

trustees, investors, servicers, and any other responsible contractors or vendors must maintain and

market REO properties without regard to the race or national origin of the residents of a

neighborhood.  It is unlawful to treat a neighborhood or its residents differently because of the

race or national origin of the residents.

### A.  COUNT I - DEFENDANTS HAVE VIOLATED SECTION 3604(a) OF THE FHA

255.     Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make

unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C.

§3604(a).  HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race

[or] national origin . . . to discourage or obstruct choices in a community, neighborhood or

development."  24 C.F.R. 100.70(a).  Such acts "include, but are not limited to: (1) Discouraging

any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or]

national origin. . . of persons in a community, neighborhood or development." 24 C.F.R. 100.70(c)(1).

256.     The discriminatory provision of maintenance and marketing services to the Deutsche Bank REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable; (2) by discouraging buyers from looking at or purchasing the property; and (3) by interfering with the closing of a sale where the appraisal does not support the loan amount requested.

257.     In addition, by using a marketing business model to sell the majority of its REOs via the Hubzu auction site through Ocwen/Altisource, Deutsche Bank has shown a preference or limitation to cash buyers, who are typically investors, thereby making housing unavailable in communities of color by changing neighborhoods from homeownership communities into investor communities, with detrimental financial consequences for current homeowners and new owner-occupants.

258.     The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin.

259.     The Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abrogate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

260.     Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of §3604(a).

**B. COUNT II - DEFENDANTS HAVE VIOLATED SECTION 3604(b) OF THE FHA**

261.    Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin.  42 U.S.C. §3604(b).

262.    HUD's regulations implementing Section 804(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin.  24 C.F.R. 100.65.

263.    The maintenance of REO properties constitutes "the provision of services" in connection with dwellings.  Moreover, sales transactions involving poorly maintained REOs in communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of remedying delayed maintenance and upkeep of the property to avoid code violations.

264.    The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin.

265.    The Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abrogate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

266.    Accordingly, Defendants have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. §3604(b).

## C. COUNT III - DEFENDANTS HAVE VIOLATED SECTION 3605 OF THE ACT

267.     Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction because of race or national origin.  42 U.S.C. §3605.

268.     The Defendants are persons whose business includes engaging in residential real estate-related transactions.

269.     As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates significant barriers to the sale or purchase of these properties.

270.     The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin.

271.     The Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abrogate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

272.     Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of 42 U.S.C. §3605.

## D. COUNT IV - DEFENDANTS HAVE VIOLATED THE FHA BY PERPETUATING SEGREGATION

273.     The Fair Housing Act is also violated by discriminatory conduct that perpetuates or furthers segregation.

274.    Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods. It is a proximate and foreseeable consequence of such conduct that white buyers will be discouraged from purchasing homes in the affected communities of color.

275.    Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners.  This, in turn, restricts the ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

276.    The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin.

277.    The Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abrogate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

278.    Accordingly, Defendants' conduct and practices perpetuating and encouraging patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. §3601, et seq.

## E.  COUNT V - DEFENDANTS HAVE VIOLATED SECTION 3617 OF THE FHA

279.    Section 818 of the Fair Housing Act makes it unlawful, among other things, to "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by" other provisions of the Act."  42 U.S.C. §3617.

280.    Persons living in communities adversely affected by Defendants' practices and conduct have seen their property values and enjoyment of their homes diminished.  By poorly maintaining and marketing REO properties in predominantly minority communities, Defendants

have interfered with the rights of neighboring residents and homeowners (predominantly persons of color) to use and enjoy their homes and communities.

281. The health and safety risks created by Defendants with respect to the Deutsche Bank REO properties in communities of color and the deleterious effects of those properties on their surrounding neighborhoods create a hostile living environment for neighborhood residents.

282. The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin.

283. The Defendants' policies and practices have had an unlawful disproportionate impact on communities of color.

284. Accordingly, Defendants have interfered with the exercise of rights granted or protected by the FHA, in violation of 42 U.S.C. §3617.

## VII.  JURY TRIAL DEMAND

285. Plaintiffs hereby demand a trial by jury on all counts.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court grant judgment in their favor, and against Defendants, as follows:

a)      Declare, pursuant to 28 U.S.C. §2201, that the conduct of Defendants in the maintenance of the Deutsche Bank REO properties in communities of color, as alleged herein, violates the Fair Housing Act, 42 U.S.C. §3601, et seq., and the applicable regulations.

b)      Enjoin, pursuant to 42 U.S.C. §3613(c)(1), Defendants, their officers, directors, employees, agents, successors, assigns and all other persons in active concert or

participation with any of them, both temporarily during the pendency of this action and permanently, from violating the Fair Housing Act.

c)     Award such damages as would fully compensate Plaintiffs for their injuries incurred as a result of Defendants' discriminatory housing practices and conduct pursuant to 42 U.S.C. §3613(c)(1).

d)     Award such punitive damages against Defendants as is proper under the law pursuant to 42 U.S.C. §3613(c)(1).

e)     Award Plaintiffs their costs and attorney's fees incurred herein pursuant to 42 U.S.C. §3613(c)(2).

f)     Award Plaintiffs such other relief as this Court deems just and proper.

Respectfully Submitted,

_s/ Jennifer K. Soule_                                                        _s/ Stephen M. Dane_

Jennifer K. Soule                                                        Stephen M. Dane*
James G. Bradtke                                                        Yiyang Wu*
Kelly K. Lambert                                                        _Relman, Dane & Colfax PLLC_
_Soule, Bradtke & Lambert_                                1225 19th Street, N.W., Suite 600
533 S. Division Street, Suite B                          Washington, DC 20036
Elmhurst, IL 60126

_s/ Morgan Williams_

Morgan Williams*
_National Fair Housing Alliance_
1101 Vermont Ave. NW, Suite 710
Washington, DC 20005

Dated: February 1, 2018                         *Application for admission _pro hac vice_ to be filed

84

## APPENDIX A: PROPERTIES EXAMINED (Alphabetical by State)

**CALIFORNIA**

1. 808 Condor Court, Antioch CA 94509
2. 3354 Hacienda Way, Antioch CA 94509
3. 510 West 10th Street, Antioch CA 94509
4. 1781 Helane Court, Benicia CA 94510
5. 71 Carolina Drive, Benicia CA 94510
6. 939 Country Glen Lane, Brentwood CA 94513
7. 468 Princeton Way, Fairfield CA 94533
8. 892 Sunset Court, Fairfield CA 94533
9. 907 Johnson Street, Fairfield CA 94533
10. 1393 James Street, Fairfield CA 94533
11. 1419 Kansas Street, Fairfield CA 94533
12. 2608 Monterey Avenue, Martinez CA 94553
13. 531 O'Hara Avenue, Oakley CA 94561
14. 1601 Pecan Lane, Oakley CA 94561
15. 66 Arlington Drive, Pittsburgh CA 94565
16. 373 Oceana Drive, Pittsburgh CA 94565
17. 2101 Sugartree Drive, Pittsburgh CA 94565
18. 28 Barrie Drive, Pittsburgh CA 94565
19. 1522 Bella Vista Drive, Suisun City CA 94585
20. 1211 Halsey Street, Vallejo CA 94590
21. 1810 Chanslor Avenue, Richmond CA 94801
22. 2900 Salvino Court, Richmond CA 94803

**COLORADO**

1. 487 Empire Street, Aurora CO 80010
2. 2272 Macon Street, Aurora CO 80010
3. 11724 Montview Boulevard, Aurora CO  80010
4. 1681 Lima Street, Aurora CO 80010
5. 4721 South Biscay Court, Aurora CO 80015
6. 4637 South Flanders Way, Centennial CO 80015
7. 17473 East Bellewood Circle, Aurora CO 80015
8. 15968 East Radcliff Place A, Aurora CO 80015
9. 5302 South Cedar Street, Littleton CO 80120
10. 6450 South Windermere Street, Littleton CO 80120
11. 5250 South Logan Street, Littleton CO 80121
12. 6732 South Clayton Way, Centennial CO 80122
13. 3811 East 26th Ave Parkway, Denver CO 80205
14. 3641 North Cook Street, Denver CO 80205
15. 1391 Raleigh Street, Denver CO 80219

16. 2250 South Lowell Boulevard, Denver CO 80219
17. 1205 Verbena Street, Denver CO 80220
18. 12862 Elmendorf Place, Denver CO 80239
19. 5035 Titan Court, Denver CO 80239
20. 13051 East 48th Avenue, Denver CO 80239
21. 5542 Abilene Street, Denver CO 80239

**CONNECTICUT**

1. 50 Jackson Road, Bloomfield CT 06002
2. 75 School Street, Bloomfield CT 06002
3. 14 Glenwood Avenue, Bloomfield CT 06002
4. 12 Mitchell Drive, Bloomfield CT  06002
5. 33 Birch Street, Manchester CT 06040
6. 129 Wells Street, Manchester CT 06040
7. 266 White Street, Hartford CT 06106
8. 125 Chipper Drive, East Hartford CT 06108
9. 14 Fairway Court, East Hartford CT 06108
10. 44 Driver Drive, East Hartford CT 06108
11. 453 Burnside Avenue, East Hartford CT 06108
12. 21 Lexington Street, Wethersfield CT 06109
13. 179 Sidney Avenue, West Hartford CT 06110
14. 14 Foley Street, West Hartford CT 06110
15. 103 Baltimore Street, Hartford CT 06112
16. 267 - 269 Preston Street, Hartford CT 06114

**DISTRICT OF COLUMBIA**

1. 421 Q Street Northwest, Washington DC 20001
2. 5703 14th Street Northwest, Washington DC 20011
3. 5222 42nd Street Northwest, Washington DC 20015
4. 3207 Chestnut Street Northeast, Washington DC 20018
5. 3829 26th Street Northeast, Washington DC 20018
6. 1326 S Street Southeast, Washington DC 20020

**FLORIDA**

1. 800 Westshore Court, Casselberry FL 32707
2. 463 South Triplet Lake Drive, Casselberry FL 32707
3. 1205 Park Green Place, Winter Park FL 32789
4. 1307 Formosa Avenue, Winter Park FL 32789
5. 1673 Mayfield Avenue, Winter Park FL 32789
6. 1100 North Denning Drive, Winter Park FL 32789
7. 1648 Cypress Point Lane, Winter Park FL 32792
8. 1008 South Lakemont Avenue, Winter Park FL 32792

A2

9. 1511 East Robinson Street, Orlando, FL 32801
10. 2423 East Washington Street, Orlando FL 32803
11. 2508 East Church Street, Orlando FL 32803
12. 1315 Shady Lane Drive, Orlando FL 32804
13. 1154 Adair Park Place, Orlando FL 32804
14. 621 South Lakeland Avenue, Orlando FL 32805
15. 501 South Lee Avenue, Orlando FL 32805
16. 2428 Marzel Avenue, Orlando FL 32806
17. 6107 Yucatan Drive, Orlando FL 32807
18. 236 Lavender Court, Orlando FL 32807
19. 5903 Fernhill Drive, Orlando FL 32808
20. 5229 Gold Tree Court, Orlando FL 32808
21. 5012 Danny Boy Circle, Orlando FL 32808
22. 4212 Seybold Avenue, Orlando FL 32808
23. 3910 Timber Trail, Orlando FL 32808
24. 4413 Debord Avenue, Orlando FL 32808
25. 5509 Ferdinand Drive, Orlando FL 32808
26. 4820 Pat Ann Terrace, Orlando FL 32808
27. 4118 West Pine Hill Circle, Orlando FL 32808
28. 1244 Queensway Road, Orlando FL 32808
29. 4000 Orkney Avenue, Orlando FL 32809
30. 1317 Nevada Avenue, Orlando FL 32809
31. 1223 Harbour Island Road, Orlando FL 32809
32. 5921 Brookgreen Avenue, Orlando FL 32809
33. 9108 Ava Lake Drive, Orlando FL 32810
34. 5422 Brownell Street, Orlando FL 32810
35. 5169 Pope Road, Orlando FL 32810
36. 6006 Powder Post Drive, Orlando FL 32810
37. 7193 Starlite Drive, Orlando FL 32810
38. 4988 Clarcona Ocoee Road, Orlando FL 32810
39. 4521 Bridgeton Lane, Orlando FL 32817
40. 4010 Lake Mirage Boulevard, Orlando FL 32817
41. 4024 Stonehaven Road, Orlando FL 32817
42. 11425 Judge Avenue, Orlando FL 32817
43. 7034 Lake Long Drive, Orlando FL 32818
44. 5205 Macadamia Court, Orlando FL 32818
45. 2774 Lake Stanley Road, Orlando FL 32818
46. 4703 Spaniel Street, Orlando FL 32818
47. 9100 Montevello Drive, Orlando FL 32818
48. 1500 Village Green Road, Orlando FL 32818
49. 7612 Colebrook Drive, Orlando FL 32818
50. 6759 Sugarbush Drive, Orlando FL 32819
51. 6234 Orange Cove Drive, Orlando FL 32819

A3

52. 9612 Hollyhill Drive, Orlando FL 32824
53. 504 Fahey Court, Orlando FL 32824
54. 13043 Phoenix Woods Lane, Orlando FL 32824
55. 901 Ocala Woods Lane, Orlando FL 32824
56. 2358 Cedar Garden Drive, Orlando FL 32824
57. 9606 6th Avenue, Orlando FL 32824
58. 851 Alabama Woods Lane, Orlando FL 32824
59. 5625 Lake Champlain Drive, Orlando FL 32829
60. 8722 Hastings Beach Boulevard, Orlando FL 32829
61. 222 Southwest 7th Street, Dania Beach FL 33004
62. 410 West 56th Street, Hialeah FL 33012
63. 1015 West 50th Place, Hialeah FL 33012
64. 3169 West 70th Street, Hialeah FL 33018
65. 3349 West 72nd Place, Hialeah FL 33018
66. 2126 North 32nd Avenue, Hollywood FL 33021
67. 5016 Johnson Street, Hollywood FL 33021
68. 5500 Fillmore Street, Hollywood FL 33021
69. 6760 Petunia Drive, Miramar FL 33023
70. 7804 Miramar Parkway, Miramar FL 33023
71. 620 Southwest 69th Terrace, Pembroke Pines FL 33023
72. 1011 Southwest 72nd Avenue, Pembroke Pines FL 33023
73. 6545 Southwest 21st Street, Miramar FL 33023
74. 401 Southwest 70th Avenue, Pembroke Pines FL 33023
75. 9641 Northwest 28th Street, Hollywood FL 33024
76. 16000 Northwest 27th Place, Opa-locka FL 33054
77. 2901 Northwest 135th Street, Opa-locka FL 33054
78. 1256 Dunad Avenue, Opa-locka FL 33054
79. 2170 Grant Avenue, Opa-locka FL 33054
80. 13851 Northwest 24th Avenue, Opa-locka FL 33054
81. 15730 Northwest 18th Avenue, Opa-locka FL 33054
82. 11241 Southwest 177th Street, Miami FL 33157
83. 18920 Belmont Drive, Cutler Bay FL 33157
84. 11210 Southwest 154th Terrace, Miami FL 33157
85. 11360 Southwest 164th Street, Miami FL 33157
86. 8990 Southwest 177th Terrace, Palmetto Bay FL 33157
87. 1220 Northwest 189th Terrace, Miami FL 33169
88. 1180 Northwest 179th Terrace, Miami FL 33169
89. 13351 Southwest 46th Lane, Miami FL 33175
90. 4327 Southwest 134th Place, Miami FL 33175
91. 2290 Southwest 141st Avenue, Miami FL 33175
92. 1642 Southwest 138th Court, Miami FL 33175
93. 6140 Northwest 32nd Way, Fort Lauderdale FL 33309
94. 1131 Northwest 14th Court, Fort Lauderdale FL 33311

A4

95. 1301 Northwest 12th Street, Fort Lauderdale FL 33311
96. 910 Northwest 16th Terrace, Fort Lauderdale FL 33311
97. 641 Northwest 22nd Road, Fort Lauderdale FL 33311
98. 751 Northwest 33rd Avenue, Fort Lauderdale FL 33311
99. 806 Northwest 15th Avenue, Fort Lauderdale FL 33311
100. 2100 Northwest 61st Avenue, Sunrise FL 33311
101. 1413 Northwest 13th Court, Fort Lauderdale FL 33311
102. 1553 N Northwest W 15th Avenue, Fort Lauderdale FL 33311
103. 420 Northwest 12th Avenue, Fort Lauderdale FL 33311
104. 3407 Willow Court, Lauderdale Lakes FL 33311
105. 3811 Northwest 27th Court, Lauderdale Lakes FL 33311
106. 1580 Northwest 32nd Avenue, Fort Lauderdale FL 33311
107. 2407 Cat Cay Lane, Fort Lauderdale FL 33312
108. 5321 Southwest 30th Avenue, Fort Lauderdale FL 33312
109. 3841 Southwest 47th Court, Fort Lauderdale FL 33312
110. 2519 Southwest 30th Avenue, Fort Lauderdale FL 33312
111. 2241 Northwest 51st Avenue, Lauderhill FL 33313
112. 4901 Northwest 14th Street, Lauderhill FL 33313
113. 7401 Northwest 23rd Street, Sunrise FL 33313
114. 6881 Northwest 30th Street, Sunrise FL 33313
115. 39 Ann Lee Lane, Tamarac FL 33319
116. 7089 Northwest 49th Court, Lauderhill FL 33319
117. 8313 Northwest 59th Place, Tamarac FL 33321
118. 1001 Bayberry Point Drive, Plantation FL 33324
119. 10151 Southwest 3rd Street, Plantation FL 33324
120. 8781 Cleary Boulevard, Plantation FL 33324
121. 568 North University Drive, Plantation FL 33324
122. 7860 Northwest 5th Place, Plantation FL 33324
123. 8820 Southwest 49th Place, Cooper City FL 33328
124. 1635 Woodbridge Lakes Circle, West Palm Beach FL 33406
125. 4335 Palm Avenue, West Palm Beach FL 33406
126. 1827 Palm Acres Drive, West Palm Beach FL 33406
127. 2083 Florida Mango Road, West Palm Beach FL 33406
128. 4285 Barbridge Road, West Palm Beach FL 33406
129. 6601 Lake Clarke Drive, West Palm Beach FL 33406
130. 3165 Frost Road, Palm Springs FL 33406
131. 3089 Meadow Road, Palm Springs FL 33406
132. 3206 Meadow Road, Palm Springs FL 33406
133. 120 Sandpiper Avenue, Royal Palm Beach FL 33411
134. 1243 McDermott Lane, Royal Palm Beach FL 33411
135. 1454 Ryan Lane, Royal Palm Beach FL 33411
136. 113 Sevilla Avenue, Royal Palm Beach FL 33411
137. 307 Las Palmas Street, Royal Palm Beach FL 33411

138. 229 Monterey Way, Royal Palm Beach FL 33411
139. 191 Bobwhite Road, Royal Palm Beach FL 33411
140. 3013 Rockville Lane, West Palm Beach FL 33411
141. 118 Bobwhite Road, Royal Palm Beach FL 33411
142. 434 Midsummer Court, Royal Palm Beach FL 33411
143. 1050 Aviary Road, Wellington FL 33414
144. 13733 Exotica Lane, Wellington FL 33414
145. 587 Carnation Court, Wellington FL 33414
146. 5686 Elder Drive, West Palm Beach FL 33415
147. 5302 Garden Hills Circle, West Palm Beach FL 33415
148. 1164 Southwest 27th Avenue, Boynton Beach FL 33426
149. 525 Northeast 2nd Street, Boynton Beach FL 33435
150. 9312 Sun Pointe Drive, Boynton Beach FL 33437
151. 1514 6th Avenue South, Lake Worth FL 33460
152. 402 South A Street, Lake Worth FL 33460
153. 1525 South Palmway, Lake Worth FL 33460
154. 805 North C Street, Lake Worth FL 33460
155. 107 North B Street, Lake Worth FL 33460
156. 3696 Coconut Road, Palm Springs FL 33461
157. 921 Rudolph Road, Lake Worth FL 33461
158. 1413 High Ridge Road, Lake Worth FL 33461
159. 3856 7th Avenue North, Lake Worth FL 33461
160. 3960 Lakewood Road, Lake Worth FL 33461
161. 4689 Poseidon Place, Lake Worth FL 33463
162. 5534 3rd Road, Lake Worth FL 33467
163. 7960 Lakewood Cove Court, Lake Worth FL 33467
164. 16931 86th Street North, Loxahatchee FL 33470
165. 710 East Windhorst Road, Brandon FL 33510
166. 1916 Tinker Drive, Lutz FL 33559
167. 3255 Spring Green Drive, Lutz FL 33559
168. 1221 Citrus Hill Court, Seffner FL 33584
169. 5301 McCranie Street, Seffner FL 33584
170. 807 East Conover Street, Tampa FL 33603
171. 1511 West Hollywood Street, Tampa FL 33604
172. 2531 West Spruce Street, Tampa FL 33607
173. 1715 West Saint Conrad Street, Tampa FL 33607
174. 2924 West Dewey Street, Tampa FL 33607
175. 6401 North 23rd Street, Tampa FL 33610
176. 6912 Senoj Street, Tampa FL 33610
177. 3216 East Fern Street, Tampa FL 33610
178. 4816 Limerick Drive, Tampa FL 33610
179. 10011 North 25th Street, Tampa FL 33612
180. 1334 Eckles Drive, Tampa FL 33612

A6

181. 8004 North Cameron Avenue, Tampa FL 33614
182. 2813 Lorraine Street, Tampa FL 33614
183. 7606 Sharon Drive, Tampa FL 33617
184. 13929 Cherry Dale, Lane Tampa FL 33618
185. 3204 Clifford Sample Drive, Tampa FL 33619
186. 1704 Waikiki Way, Tampa FL 33619
187. 10358 Delmar Circle, Tampa FL 33624
188. 15701 Warbler Place, Tampa FL 33624
189. 12701 Barrett Drive, Tampa FL 33624
190. 3905 Venetian Way, Tampa FL 33634
191. 8709 Somersworth Place, Tampa FL 33634
192. 2460 Tall Maple Loop, Ocoee FL 34761
193. 115 Hopewell Drive, Ocoee FL 34761
194. 2334 Laurel Blossom Circle, Ocoee FL 34761
195. 2249 Laurel Blossom Circle, Ocoee FL 34761

## ILLINOIS

1. 8800 Robin Drive Unit A, Des Plaines IL 60016
2. 8828 Dee Road, Des Plaines IL 60016
3. 1699 East Algonquin Road, Des Plaines IL 60016
4. 1267 East Walnut Avenue, Des Plaines IL 60016
5. 337 North East River Road, Des Plaines IL 60016
6. 1078 South Wolf Road, Des Plaines IL 60016
7. 1825 Victoria Avenue, North Chicago IL 60064
8. 1404 20th Street, North Chicago IL 60064
9. 2013 Seymour Avenue, North Chicago IL 60064
10. 1063 Busse Highway, Park Ridge IL 60068
11. 1035 North Dee Road, Park Ridge IL 60068
12. 4519 Main Street, Skokie IL 60076
13. 2728 Harrison Place, Waukegan IL 60085
14. 1009 Woodlawn Avenue, Waukegan IL 60085
15. 906 Leith Avenue, Waukegan IL 60085
16. 37565 Lyons Woods Court, Waukegan IL 60087
17. 342 Mannheim Road, Bellwood IL 60104
18. 311 Englewood Avenue, Bellwood IL 60104
19. 446 Sherman Avenue, Elgin IL 60120
20. 380 Yarwood Street, Elgin IL 60120
21. 664 Dickie Avenue, Elgin IL 60120
22. 661 Saint Charles Street, Elgin IL 60120
23. 56 South Liberty Street, Elgin IL 60120
24. 100 Seneca Street, Elgin IL 60120
25. 227 Perry Street, Elgin IL 60120
26. 1399 Cimmaron Court, Elgin IL 60120

A7

27. 302 Center Street, Elgin IL 60120
28. 503 La Salle Place, Elgin IL 60123
29. 2090 Royal Boulevard, Elgin IL 60123
30. 924 Scott Drive, Elgin IL 60123
31. 1790 Indian Wells Circle, Elgin IL 60123
32. 3050 Hughsdale Street, Elgin IL 60124
33. 100 Hugh Muir Lane, Maywood IL 60153
34. 1510 South 2nd Avenue, Maywood IL 60153
35. 785 North Water Street, South Elgin IL 60177
36. 565 Ingraham Avenue, Calumet City IL 60409
37. 15536 Maryland Avenue, Dolton IL 60419
38. 14900 Evans Avenue, Dolton IL 60419
39. 14821 La Salle Street, Dolton IL 60419
40. 20557 Hunter Drive, Frankfort IL 60423
41. 441 Meadow Avenue, Frankfort IL 60423
42. 10926 Pembrook Court, Frankfort IL 60423
43. 14922 Marshfield Avenue, Harvey IL 60426
44. 16722 Sherman Drive, Harvey IL 60426
45. 17327 Throop Street, Hazel Crest IL 60429
46. 16973 Western Avenue, Hazel Crest IL 60429
47. 3549 Marseilles Lane, Hazel Crest IL 60429
48. 4238 Pinewood Lane, Matteson IL 60443
49. 912 Willow Road, Matteson IL 60443
50. 735 Campus Avenue, Matteson IL 60443
51. 5236 Park Lane, Midlothian IL 60445
52. 20047 Edgewood Court, Mokena IL 60448
53. 26016 South Linden Avenue, Monee IL 60449
54. 7821 Sheffield Drive, Palos Hills IL 60465
55. 9943 South 88th Avenue, Palos Hills IL 60465
56. 14301 South California Avenue, Posen IL 60469
57. 5053 Harbor Lane, Richton Park IL 60471
58. 1217 King Avenue, South Holland IL 60473
59. 7901 172nd Street, Tinley Park IL 60477
60. 4200 188th Street, Country Club Hills IL 60478
61. 18931 Loras Lane, Country Club Hills IL 60478
62. 17761 Harvard Lane, Country Club Hills IL 60478
63. 11245 South Natoma Avenue, Worth IL 60482
64. 6836 West 114th Place, Worth IL 60482
65. 935 Riverstone Drive, Aurora IL 60502
66. 2347 Avalon Court, Aurora IL 60503
67. 1140 MIddlebury Drive, Aurora IL 60504
68. 1011 Autumn Lane, Aurora IL 60505
69. 1426 North Avenue, Aurora IL 60505

A8

70. 326 5th Street, Aurora IL 60505
71. 429 Grant Place, Aurora IL 60505
72. 1161 Lebanon Street, Aurora IL 60505
73. 714 Sexton Street, Aurora IL 60505
74. 1340 Lone Oak Trail, Aurora IL 60506
75. 410 Weston Avenue, Aurora IL 60506
76. 305 North Evanslawn Avenue, Aurora IL 60506
77. 2041 Richard Street, Aurora IL 60506
78. 7753 South Aberdeen Street, Chicago IL 60620
79. 8121 South Claremont Avenue, Chicago IL 60620
80. 7717 South Ada Street, Chicago IL 60620
81. 1635 West 92nd Place, Chicago IL 60620
82. 2016 West 80th Street, Chicago IL 60620
83. 7747 South May Street, Chicago IL 60620
84. 9044 South Loomis Street, Chicago IL 60620
85. 7918 South Wood Street, Chicago IL 60620
86. 10029 South Indiana Avenue, Chicago IL 60628
87. 6639 South Washtenaw Avenue, Chicago IL 60629
88. 7015 South Rockwell Street, Chicago IL 60629
89. 6623 Kominsky Avenue, Chicago IL 60629
90. 6030 South Campbell Avenue, Chicago IL 60629
91. 7332 South Talman Avenue, Chicago IL 60629
92. 6605 South Albany Avenue, Chicago IL 60629
93. 6336 South Talman Avenue, Chicago IL 60629
94. 6315 South Washtenaw Avenue, Chicago IL 60629
95. 6036 South Mozart Street, Chicago IL 60629
96. 6234 South Talman Avenue, Chicago IL 60629
97. 5031 West Gunnison Street, Chicago IL 60630
98. 6951 South Elizabeth Street, Chicago IL 60636
99. 5159 West Barry Avenue, Chicago IL 60641
100. 8026 South Sawyer Avenue, Chicago IL 60652
101. 1623 South 59th Court, Chicago IL 60804
102. 1842 South 61st Court, Cicero IL 60804
103. 2812 Ridgeway Avenue, Rockford IL 61101
104. 903 North Sunset Avenue, Rockford IL 61101
105. 702 Iroquois Avenue, Rockford IL 61102
106. 208 South London Avenue, Rockford IL 61104

**INDIANA**

1. 13079 Cirrus Drive, Indianapolis IN 46037
2. 324 North Rural Street, Indianapolis IN 46201
3. 4907 Ralston Avenue, Indianapolis IN 46205
4. 6527 West 15th Street, Indianapolis IN 46214

A9

5. 3430 Adams Street, Indianapolis IN 46218
6. 5610 East 21st Street, Indianapolis IN 46218
7. 3155 North Norfolk Street, Indianapolis IN 46224
8. 4533 Devon Court, Indianapolis IN 46226
9. 5118 Thornleigh Drive, Indianapolis IN 46226
10. 8718 Catalina Drive, Indianapolis IN 46226
11. 4475 North Pasadena Street, Indianapolis IN 46226
12. 3844 North Graham Avenue, Indianapolis IN 46226
13. 3930 North Graham Avenue, Indianapolis IN 46226
14. 3301 Busy Bee Lane, Indianapolis IN 46227
15. 11420 East 59th Street, Indianapolis IN 46235
16. 4455 East Edgewood Avenue, Indianapolis IN 46237
17. 7633 Tinsel Avenue, Indianapolis IN 46237
18. 4525 Phoenix Drive, Indianapolis IN 46241
19. 8078 Patterson Court, Dyer IN 46311
20. 1733 North Rensselaer Street, Griffith IN 46319
21. 147 North Wright Street, Griffith IN 46319
22. 3328 Farmer Drive, Highland IN 46322
23. 2628 Hart Road, Highland IN 46322
24. 8102 5th Street, Highland IN 46322
25. 3450 Garfield Avenue, Highland IN 46322
26. 7227 Marshall Avenue, Hammond IN 46323
27. 6414 Jackson Avenue, Hammond IN 46324
28. 400 Center Street, Hobart IN 46342
29. 2425 East Cleveland Avenue, Hobart IN 46342
30. 3721 Montgomery Street, Hobart IN 46342
31. 1162 South Virginia Street, Hobart IN 46342
32. 5401 West 155th Avenue, Lowell IN 46356
33. 6622 Ash Place, Gary IN 46403
34. 4237 East 10th Avenue, Gary IN 46403
35. 1717 Fillmore Street, Gary IN 46407
36. 2385 Ohio Street, Gary IN 46407
37. 2577 Connecticut Street, Gary IN 46407
38. 1421 Pennsylvania Street, Gary IN 46407
39. 4275 Tennessee Street, Gary IN 46409
40. 4827 Connecticut Street, Gary IN 46409

**KANSAS**

1. 91 South 17th Street, Kansas City KS 66102
2. 8212 Ohio Avenue, Kansas City KS 66112
3. 7010 Horton Street, Overland Park KS 66204
4. 11568 Earnshaw Street, Overland Park KS 66210
5. 10227 Long Street, Lenexa KS 66215

A10

6. 7335 Meadowsweet Lane, Shawnee KS 66227

**LOUISIANA**

1. 7016 Hastings Street, Metairie LA 70003
2. 1312 Elm Street, Metairie LA 70003
3. 940 Homestead Avenue, Metairie LA 70005
4. 3008 Kent Avenue, Metairie LA 70006
5. 106 Bolton Street, Gretna LA 70053
6. 918 Richard Street, Gretna LA 70053
7. 11 Azalea Drive, Gretna LA 70053
8. 2404 Hero Drive, Gretna LA 70053
9. 1488 Alison Street, Gretna LA 70056
10. 345 Briargrove Street, Gretna LA 70056
11. 4017 Deerpark Drive, Harvey LA 70058
12. 2401 Lynnbrook Drive, Harvey LA 70058
13. 1648 Maplewood Drive, Harvey LA 70058
14. 3310 Marquette Drive, Kenner LA 70065
15. 3101 Huntsville Street, Kenner LA 70065
16. 3600 East Devereaux Court, Avondale LA 70094
17. 3105 Indiana Street, New Orleans LA 70114
18. 1 Belleville Court, New Orleans LA 70114
19. 3113 North Derbigny Street, New Orleans LA 70117
20. 2424 Benton Street, New Orleans LA 70117
21. 1741 Desire Street, New Orleans LA 70117
22. 3147 Urquhart Street, New Orleans LA 70117
23. 1905 Mandeville Street, New Orleans LA 70117
24. 1332 Port Street, New Orleans LA 70117
25. 4335 Cartier Avenue, New Orleans LA 70122
26. 4765 Western Street, New Orleans LA 70122
27. 231 Citrus Road, New Orleans LA 70123
28. 7621 Newcastle Street, New Orleans LA 70126
29. 4775 Francisco Verret Drive, New Orleans LA 70126
30. 4653 Warren Drive, New Orleans LA 70127
31. 8020 Parry Street, New Orleans LA 70128
32. 7866 Scottwood Drive, New Orleans LA 70128
33. 7211 East Renaissance Drive, New Orleans LA 70128
34. 7648 Jonlee Drive, New Orleans LA 70128
35. 7073 Tamaron Boulevard, New Orleans LA 70128
36. 13 Point Coupee Place, New Orleans LA 70129
37. 3141 Preston Place, New Orleans LA 70131
38. 1632 Steeple Chase Lane, New Orleans LA 70131
39. 3815 Pin Oak Avenue, New Orleans LA 70131
40. 6501 Brunswick Court, New Orleans LA 70131

A11

41. 6625 Brunswick Court, New Orleans LA 70131
42. 3301 Dickens Drive, New Orleans LA 70131
43. 36005 Wedgewood Drive, Denham Springs LA 70706
44. 9913 Destrehan Avenue, Denham Springs LA 70706
45. 38289 Oakleigh Lane, Prairieville LA 70769
46. 3146 Washington Avenue, Baton Rouge LA 70802
47. 706 North 37th Street, Baton Rouge LA 70802
48. 4035 Clayton Drive, Baton Rouge LA 70805
49. 5755 North Foster Drive, Baton Rouge LA 70805
50. 6153 Alexander Avenue, Baton Rouge LA 70805
51. 1746 78th Avenue, Baton Rouge LA 70807
52. 10591 Avenue D, Baton Rouge LA 70807
53. 1915 General Adams Avenue, Baton Rouge LA 70810
54. 8511 Rush Avenue, Baton Rouge LA 70810
55. 9330 Bimini Drive, Baton Rouge LA 70810
56. 10830 Clearview Avenue, Baton Rouge LA 70811
57. 5387 Monarch Ave, Baton Rouge LA 70811
58. 3814 West Caribou Court, Baton Rouge LA 70814
59. 12034 West England Avenue, Baton Rouge LA 70814
60. 15741 Confederate Avenue, Baton Rouge LA 70817
61. 16722 Chadsford Avenue, Baton Rouge LA 70817
62. 18424 Jefferson Highway, Baton Rouge LA 70817

**MARYLAND**

1. 6101 Cipriano Road, Lanham MD 20706
2. 12315 Stafford Lane, Bowie MD 20715
3. 12726 Millstream Drive, Bowie MD 20715
4. 12405 Melody Turn, Bowie MD 20715
5. 1131 Kayak Avenue, Capitol Heights MD 20741
6. 4712 Mann Street, Capitol Heights MD 20743
7. 1108 Mentor Avenue, Capitol Heights MD 20743
8. 462 Possum Court, Capitol Heights MD 20743
9. 4618 Heath Street, Capitol Heights MD 20743
10. 5029 Emo Street, Capitol Heights MD 20743
11. 708 Nova Avenue, Capitol Heights MD 20743
12. 1200 Capitol Heights Boulevard, Capitol Heights MD 20743
13. 803 Cedar Heights Drive, Capitol Heights MD 20743
14. 505 Dateleaf Avenue, Capitol Heights MD 20743
15. 7200 Joplin Street, Capitol Heights MD 20743
16. 5400 Dole Street, Capitol Heights MD 20743
17. 725 Nova Avenue, Capitol Heights MD 20743
18. 5926 Beacon Hill Place, Capitol Heights MD 20743
19. 7002 Yellow Amber Court, Capitol Heights MD 20743

20. 1207 Balboa Avenue, Capitol Heights MD 20743
21. 322 Carmody Hills Drive, Capitol Heights MD 20743
22. 5524 Walker Mill Road, Capitol Heights MD 20743
23. 1908 Saint Bernadines Way, Capitol Heights MD 20743
24. 2539 Fairhill Drive, Suitland-Silver Hill MD 20746
25. 1525 Karen Boulevard, District Heights MD 20747
26. 2712 Ocala Avenue, District Heights MD 20747
27. 3240 Forest Run Drive, Forestville MD 20747
28. 2804 Boones Lane, District Heights MD 20747
29. 2918 Norman Drive, District Heights MD 20747
30. 3135 Dynasty Drive, District Heights MD 20747
31. 5306 Stoney Meadows Drive, District Heights MD 20747
32. 6515 Walters Place, District Heights MD 20747
33. 5806 Cheryl Lane, District Heights MD 20747
34. 6217 East Hil Mar Circle, District Heights MD 20747
35. 8307 Laura Lane, District Heights MD 20747
36. 5524 Stoney Meadows Drive, District Heights MD 20747
37. 6501 Hansford Street, District Heights MD 20747
38. 6511 Marlboro Pike, District Heights MD 20747
39. 3012 Viceroy Avenue, District Heights MD 20747
40. 6005 Walnut Street, Temple Hills MD 20748
41. 2608 Buckner Lane, Temple Hills MD 20748
42. 6301 Middleton Lane, Temple Hills MD 20748
43. 2802 Kernal Lane, Temple Hills MD 20748
44. 2113 Willowtree Lane, Temple Hills MD 20748
45. 6106 Claridge Road, Temple Hills MD 20748
46. 2115 North Anvil Lane, Temple Hills MD 20748
47. 4007 21st Avenue, Temple Hills MD 20748
48. 2117 Robert Bowie Drive, Upper Marlboro MD 20774
49. 6915 Forest Terrace, Landover MD 20785
50. 7103 E Ridge Drive, Landover MD 20785
51. 7507 Willow Hill Drive, Hyattsville MD 20785
52. 7808 Suiter Way, Landover MD 20785
53. 419 Reading Avenue, Rockville MD 20852
54. 8 Brighton Terrace, Gaithersburg MD 20877
55. 11 Glazebrook Court, Gaithersburg MD 20878
56. 14002 Great Notch Terrace, North Potomac MD 20878
57. 313 Ladson Road, Silver Spring MD 20901
58. 7313 Little Bird Path, Columbia MD 21046
59. 10 Wendover Road, Glen Burnie MD 21060
60. 464 Norvelle Court, Glen Burnie MD 21061
61. 6108 Downs Avenue, Elkridge MD 21075
62. 2016 Cooper Point Court, Odenton MD 21113

A13

63. 1740 Floral Court, Crofton MD 21114
64. 1761 Tyrone Street, Crofton MD 21114
65. 750 225th Street, Pasadena MD 21122
66. 9921 Hoyt Circle, Randallstown MD 21133
67. 4130 Eierman Avenue, Baltimore MD 21206
68. 5540 Silverbell Road, Baltimore MD 21206
69. 3808 Parkmont Avenue, Baltimore MD 21206
70. 6108 Ridgeview Avenue, Baltimore MD 21206
71. 6607 Hilltop Avenue, Baltimore MD 21206
72. 5429 Omaha Avenue, Baltimore MD 21206
73. 4806 Midline Road, Baltimore MD 21206
74. 4611 Ridgeway Avenue, Baltimore MD 21206
75. 4711 Elison Avenue, Baltimore MD 21206
76. 4202 Hamilton Avenue, Baltimore MD 21206
77. 4222 Belmar Avenue, Baltimore MD 21206
78. 3485 Hillsmere Road, Gwynn Oak MD 21207
79. 613 Glenwood Avenue, Baltimore MD 21212
80. 710 McCabe Avenue, Baltimore MD 21212
81. 1649 Normal Avenue, Baltimore MD 21213
82. 3406 Mary Avenue, Baltimore MD 21214
83. 5014 Pembridge Avenue, Baltimore MD 21215
84. 2410 West Garrison Avenue, Baltimore MD 21215
85. 4052 Annellen Road, Baltimore MD 21215
86. 3310 Dorithan Road, Baltimore MD 21215
87. 3141 Sequoia Avenue, Baltimore MD 21215
88. 3415 Olympia Avenue, Baltimore MD 21215
89. 4115 Norfolk Avenue, Baltimore MD 21216
90. 4016 Woodhaven Avenue, Baltimore MD 21216
91. 2544 West Lanvale Street, Baltimore MD 21216
92. 1103 Poplar Grove Street, Baltimore MD 21216
93. 2209 Elsinore Avenue, Baltimore MD 21216
94. 3211 Carlisle Avenue, Baltimore MD 21216
95. 1900 North Payson Street, Baltimore MD 21217
96. 2121 Bolton Street, Baltimore MD 21217
97. 3632 Ellerslie Avenue, Baltimore MD 21218
98. 1515 Oakridge Road, Baltimore MD 21218
99. 2022 Saint Paul Street, Baltimore MD 21218
100. 7660 Old Battle Grove Road, Dundalk MD 21222
101. 1928 Willow Spring Road, Dundalk MD 21222
102. 6 Wheeler Avenue, Baltimore MD 21223
103. 835 Ponca Street, Baltimore MD 21224
104. 29 South Robinson Street, Baltimore MD 21224
105. 405 South Robinson Street, Baltimore MD 21224

A14

106. 204 North Milton Avenue, Baltimore MD 21224
107. 504 Rossiter Avenue, Baltimore MD 21224
108. 2314 East Fairmount Avenue, Baltimore MD 21224
109. 347 South Macon Street, Baltimore MD 21224
110. 117 North Ellwood Avenue, Baltimore MD 21224
111. 7936 Eastdale Road, Baltimore MD 21224
112. 1022 Elton Avenue, Baltimore MD 21224
113. 3236 East Baltimore Street, Baltimore MD 21224
114. 1121 Gloria Avenue, Halethorpe MD 21227
115. 2202 Gaylawn Drive, Halethorpe MD 21227
116. 161 North Monastery Avenue, Baltimore MD 21229
117. 130 South Culver Street, Baltimore MD 21229
118. 1014 Leeds Avenue, Baltimore MD 21229
119. 4645 Coleherne Road, Baltimore MD 21229
120. 1636 North Forest Park Avenue, Baltimore MD 21230
121. 39 North Eden Street, Baltimore MD 21231
122. 3117 Orlando Avenue, Baltimore MD 21234
123. 8 Running Brooke Drive, Windsor Mill MD 21244

**MICHIGAN**

1. 23759 Piper Avenue, Eastpointe MI 48021
2. 22300 Ivanhoe Lane, Southfield MI 48034
3. 34072 Little Mack Avenue, Charter Township of Clinton MI 48035
4. 26236 Clancy Street, Roseville MI 48066
5. 501 South Edgeworth Avenue, Royal Oak MI 48067
6. 26365 Dartmouth Street, Madison Heights MI 48071
7. 18826 Hilton Drive, Southfield MI 48075
8. 16965 Coral Gables Street, Southfield MI 48076
9. 29828 Spring Hill Drive, Southfield MI 48076
10. 11096 Jewett Avenue, Warren MI 48089
11. 26803 Palomino Avenue, Warren MI 48089
12. 8104 Westminster Avenue, Warren MI 48089
13. 8454 Centralia Street, Dearborn Heights MI 48127
14. 31276 Birchlawn Street, Garden City MI 48135
15. 32629 Donnelly Street, Garden City MI 48135
16. 4090 Durand Court, Inkster MI 48141
17. 26648 Monticello Street, Inkster MI 48141
18. 954 Lincoln Avenue, Lincoln Park MI 48146
19. 18996 Whitby Street, Livonia MI 48152
20. 34984 Michelle Drive, Romulus MI 48174
21. 30406 Dorset Street, Romulus MI 48174
22. 10713 William Street, Taylor MI 48180
23. 5862 Westpoint Street, Taylor MI 48180

A15

24. 6910 Syracuse Street, Taylor MI 48180
25. 4302 Randolph Street, Wayne MI 48184
26. 21840 Gardner Street, Oak Park MI 48237
27. 23131 Sussex Street, Oak Park MI 48237
28. 24101 Seneca Street, Oak Park MI 48237
29. 22061 Jerome Street, Oak Park MI 48237
30. 21960 Beverly Street, Oak Park MI 48237
31. 12716 Sioux, Redford Charter Township MI 48239
32. 26077 Dover, Redford Charter Township MI 48239
33. 9931 Seminole, Redford Charter Township MI 48239
34. 12077 Beech-Daly Road, Redford Charter Township MI 48239
35. 13969 Farley, Redford Charter Township MI 48239
36. 15400 Lola Drive, Redford Charter Township MI 48239
37. 15506 Lola Drive, Redford Charter Township MI 48239
38. 24197 Broadview Street, Farmington MI 48336
39. 490 East Columbia Avenue, Pontiac MI 48340
40. 489 Colorado Avenue, Pontiac MI 48341
41. 489 Harvey Avenue, Pontiac MI 48341
42. 65 Illinois Avenue, Pontiac MI 48341
43. 30 Lewis Street, Pontiac MI 48342
44. 432 Lamoreaux Drive Northwest, Comstock Park MI 49321
45. 5532 Heights Ravenna Road, Fruitport MI 49415
46. 1453 Winchester Drive, Muskegon MI 49441
47. 3661 Wickham Drive, Norton Shores MI 49441
48. 882 Randall Road, Norton Shores MI 49441
49. 34 Porter Road, Muskegon MI 49441
50. 5678 Evanston Avenue, Muskegon MI 49442
51. 621 East Apple Avenue, Muskegon MI 49442
52. 7468 Evanston Avenue, Muskegon MI 49442
53. 846 Catherine Avenue, Muskegon MI 49442
54. 1347 Pine Street, Muskegon MI 49442
55. 1660 Terrace Street, Muskegon MI 49442
56. 2101 S Maple Island Road, Muskegon MI 49442
57. 2437 McLaughlin Avenue, Muskegon MI 49442
58. 5420 Circle Drive, Muskegon MI 49442
59. 1943 East Isabella Avenue, Muskegon MI 49442
60. 3659 Stephanie Lane, Muskegon MI 49444
61. 2317 Hoyt Street, Muskegon MI 49444
62. 3241 Maffett Street, Muskegon MI 49444
63. 2509 Howden Street, Muskegon Heights MI 49444
64. 3029 7th Street, Muskegon Heights MI 49444
65. 3100 Mona Street, Muskegon Heights MI 49444
66. 3128 Temple Street, Muskegon Heights MI 49444

67. 2228 9th Street, Muskegon Heights MI 49444
68. 2145 McIlwraith Street, Muskegon MI 49444
69. 2040 Whitehall Road, Muskegon MI 49445
70. 1455 Hansen Street, Muskegon MI 49445
71. 1460 Ann Street, Muskegon MI 49445
72. 1785 Russell Road, Muskegon MI 49445
73. 2568 Chippewa Trail, Muskegon MI 49445
74. 568 Madison Avenue Southeast, Grand Rapids MI 49503
75. 1355 Bristol Avenue Northwest, Grand Rapids MI 49504
76. 3135 Hoehn Street, Grand Rapids MI 49504
77. 837 Crosby Street Northwest, Grand Rapids MI 49504
78. 135 Indiana Avenue Southwest, Grand Rapids MI 49504
79. 1528 Alpine Avenue Northwest, Grand Rapids MI 49504
80. 1728 Lenora Terrace Northwest, Grand Rapids MI 49504
81. 2229 Blueberry Drive Northwest, Grand Rapids MI 49504
82. 1530 Milton Street Southeast, Grand Rapids MI 49506
83. 1530 Edward Avenue southeast. Grand Rapids MI 49507
84. 1922 Prospect Avenue Southeast, Grand Rapids MI 49507
85. 709 Griggs Street Southeast, Grand Rapids MI 49507
86. 946 Burton Street Southeast, Grand Rapids MI 49507

## MINNESOTA

1. 4729 Vincent Avenue South, Minneapolis MN 55410
2. 2611 Humboldt Avenue North, Minneapolis MN 55411
3. 2942 Russell Avenue North, Minneapolis MN 55411
4. 3102 Russell Avenue North, Minneapolis MN 55411
5. 2723 North 3rd Street, Minneapolis MN 55411
6. 621 Oliver Avenue North, Minneapolis MN 55411
7. 1324 Oliver Avenue North, Minneapolis MN 55411
8. 2716 21st Avenue North, Minneapolis MN 55411
9. 2125 Aldrich Avenue North, Minneapolis MN 55411
10. 2110 Irving Avenue North, Minneapolis MN 55411
11. 4327 Logan Avenue North, Minneapolis MN 55412
12. 3458 Newton Avenue North, Minneapolis MN 55412
13. 3443 Fremont Avenue North, Minneapolis MN 55412
14. 1914 Pierce Street Northeast, Minneapolis MN 55418
15. 2621 Fillmore Street Northeast, Minneapolis MN 55418
16. 641 19th Avenue Northeast, Minneapolis MN 55418
17. 5940 Emerson Avenue South, Minneapolis MN 55419
18. 4643 6th Street Northeast, Minneapolis MN 55421
19. 3508 Perry Avenue North, Crystal MN 55422
20. 4147 Beard Avenue North, Minneapolis MN 55422
21. 3669 Hubbard Avenue North, Robbinsdale MN 55422

A17

22. 4023 Zane Avenue North, Minneapolis MN 55422
23. 5045 Camden Avenue North, Minneapolis MN 55430
24. 5056 North Thomas Avenue, Minneapolis MN 55430

## MISSOURI

1. 410 North Quincy Avenue, Kansas City MO 64123
2. 133 North Van Brunt Boulevard, Kansas City MO 64123
3. 4545 Montgall Avenue, Kansas City MO 64130
4. 2203 East 68th Terrace, Kansas City MO 64132

## OHIO

1. 7683 Rippingale Street, Blacklick OH 43004
2. 6311 Whims Road, Canal Winchester OH 43110
3. 180 Charing Cross Street, Galloway OH 43119
4. 5756 Blanton Park Drive, Galloway OH 43119
5. 748 Prairie Road, Galloway OH 43119
6. 5695 Magna Carta Circle, Galloway OH 43119
7. 3841 Glenna Avenue, Grove City OH 43123
8. 4959 Johnanne Drive, Groveport OH 43125
9. 186 Haldy Avenue, Columbus OH 43204
10. 1155 Oakwood Avenue, Columbus OH 43206
11. 1240 South Ohio Avenue, Columbus OH 43206
12. 826 Kinsman Street, Columbus OH 43207
13. 2368 Taylor Avenue, Columbus OH 43211
14. 1574 Manchester Avenue, Columbus OH 43211
15. 1503 East 25th Avenue, Columbus OH 43211
16. 2388 Bancroft Street, Columbus OH 43211
17. 1118 Geneva Avenue, Columbus OH 43223
18. 1846 Rosemont Avenue, Columbus OH 43223
19. 2062 West Mound Street, Columbus OH 43223
20. 1548 Fall Brook Road, Columbus OH 43223
21. 3040 Janwood Drive, Columbus OH 43227
22. 1597 Zettler Road, Columbus OH 43227
23. 3945 Sexton Drive, Columbus OH 43228
24. 4447 Hickory Wood Drive, Columbus OH 43228
25. 362 Highbury Crescent, Columbus OH 43230
26. 5911 Balfour Road, Sylvania OH 43560
27. 1325 Palmetto Avenue, Toledo OH 43606
28. 4118 Jamesway Drive, Toledo OH 43606
29. 1128 Norwood Avenue, Toledo OH 43607
30. 1919 Richmond Road, Toledo OH 43607
31. 2058 Perth Street, Toledo OH 43607
32. 1839 Evansdale Avenue, Toledo OH 43607

A18

33. 3944 Estateway Road, Toledo OH 43607
34. 1402 Shenandoah Road, Toledo OH 43607
35. 2122 Richmond Road, Toledo OH 43607
36. 2808 Mulberry Street, Toledo OH 43608
37. 1420 Moore Street, Toledo OH 43608
38. 3503 Willow Brook Lane, Toledo OH 43611
39. 5120 Selma Street, Toledo OH 43613
40. 5851 Meadowvale Drive, Toledo OH 43613
41. 238 Leander Drive, Toledo OH 43615
42. 2910 Wilford Drive, Toledo OH 43615
43. 4940 Bancroft Street, Toledo OH 43615
44. 5110 South Willcrest Drive, Toledo OH 43615
45. 4349 Dorr Street, Toledo OH 43615
46. 1111 Bernath Parkway, Toledo OH 43615
47. 2829 Quincy Street, Oregon OH 43616
48. 3305 Starr Avenue, Oregon OH 43616
49. 1618 Landis Avenue, Oregon OH 43616
50. 1866 Sugarbush Road, Oregon OH 43616
51. 2804 Olde Curtis Road, Northwood OH 43619
52. 16 Machen Street, Toledo OH 43620
53. 12313 Farringdon Avenue, Cleveland OH 44105
54. 8713 Vineyard Avenue, Cleveland OH 44105
55. 3910 East 116th Street, Cleveland OH 44105
56. 1319 East 114th Street, Cleveland OH 44106
57. 1238 Donald Avenue, Lakewood OH 44107
58. 10810 Gooding Avenue, Cleveland OH 44108
59. 791 Thornhill Drive, Cleveland OH 44108
60. 15213 Ridpath Avenue, Cleveland OH 44110
61. 1136 East 169th Street, Cleveland OH 44110
62. 3455 Bosworth Road, Cleveland OH 44111
63. 11405 Saint Mark Avenue, Cleveland OH 44111
64. 3561 Hildana Road, Shaker Heights OH 44120
65. 3133 Keswick Road, Shaker Heights OH 44120
66. 3654 Pennington Road, Shaker Heights OH 44120
67. 3646 Daleford Raod, Shaker Heights OH 44120
68. 3358 Sutton Road, Shaker Heights OH 44120
69. 1028 Quilliams Road, Cleveland Heights OH 44121
70. 1059 Roanoke Road, Cleveland Heights OH 44121
71. 1080 Woodview Road, Cleveland Heights OH 44121
72. 3789 Montevista Road, Cleveland Heights OH 44121
73. 18053 Blanford Road, Cleveland OH 44121
74. 8807 Plymouth Avenue, Garfield Heights OH 44125
75. 4983 Henry Street, Garfield Heights OH 44125

A19

76. 10008 Edgepark Drive, Garfield Heights OH 44125
77. 8900 South Highland Avenue, Garfield Heights OH 44125
78. 13720 Rockside Road, Garfield Heights OH 44125
79. 14816 Lotus Drive, Cleveland OH 44128
80. 4280 East 167th Street, Cleveland OH 44128
81. 6684 Bunker Road, North Royalton OH 44133
82. 5258 Camden Road, Maple Heights OH 44137
83. 7325 Ira Avenue, Cleveland OH 44144
84. 4751 Brookwood Drive, Brooklyn OH 44144
85. 6949 Rushleigh Road, Englewood OH 45322
86. 127 Lodestone Drive, Englewood OH 45322
87. 5061 Farmersville-Germantown Pike, Dayton OH 45325
88. 724 Seibert Avenue, Miamisburg OH 45342
89. 4386 Bonnie Brae Avenue, Vandalia OH 45377
90. 10775 Frederick Pike, Vandalia OH 45377
91. 521 Damian Street, Vandalia OH 45377
92. 1042 Blakley Drive, Dayton OH 45403
93. 2022 Brandt Pike, Dayton OH 45404
94. 431 Delaware Avenue, Dayton OH 45405
95. 405 Kenwood Avenue, Dayton OH 45406
96. 2026 Burroughs Drive, Dayton OH 45406
97. 4400 Waymire Avenue, Dayton OH 45406
98. 4449 Saint Johns Avenue, Dayton OH 45406
99. 4808 Sugartree Drive, Dayton OH 45414
100. 4960 Alhambra Court, Dayton OH 45416
101. 38 North Meadow Drive, Dayton OH 45416
102. 3892 Dunn Place, Dayton OH 45416
103. 6147 Lorimar Street Dayton OH 45417
104. 613 Olive Road, Dayton OH 45417
105. 1196 Graystone Drive, Dayton OH 45417
106. 57 Strand Avenue, Dayton OH 45417
107. 416 Lorenz Avenue, Dayton OH 45417
108. 15 North Halloway Street, Dayton OH 45417
109. 4564 Dayview Avenue, Dayton OH 45417
110. 813 East Dorothy Lane, Dayton OH 45419
111. 2325 Rosemont Boulevard, Dayton OH 45420
112. 522 Morse Avenue, Dayton OH 45420
113. 1328-1330 Arbor Avenue, Dayton OH 45420
114. 8900 Swinging Gate Drive, Dayton OH 45424
115. 4300 Filbrun Lane, Trotwood OH 45426
116. 1124 Warburton Drive, Dayton OH 45426
117. 5270 Marshall Road, Dayton OH 45429
118. 249 Castle Drive, Dayton OH 45429

A20

119. 5613 Penn Avenue, Dayton OH 45432
120. 875 Heincke Road, Dayton OH 45449
121. 9076 Heather Lane, Centerville OH 45458

**PENNSYLVANIA**

1. 29 North Springfield Road, Clifton Heights PA 19018
2. 622 Swarthmore Avenue, Folsom PA 19033
3. 240 Hulmeville Avenue, Penndel PA 19047
4. 423 Burk Avenue, Ridley Park PA 19078
5. 104 Ivy Court, Upper Darby PA 19082
6. 139 Greyhorse Road, Willow Grove PA 19090
7. 275 West Wellens Street, Philadelphia PA 19120
8. 5913 North Lawrence Street, Philadelphia PA 19120
9. 157 East Albanus Street, Philadelphia PA 19120
10. 5110 Duffield Street, Philadelphia PA 19124
11. 1802 Dallas Road, Philadelphia PA 19126
12. 1211 West 65th Avenue, Philadelphia PA 19126
13. 2983 Edgemont Street, Philadelphia PA 19134
14. 4317 Disston Street, Philadelphia PA 19135
15. 6130 Walker Street, Philadelphia PA 19135
16. 6309 Marsden Street, Philadelphia PA 19135
17. 4750 Loring Street, Philadelphia PA 19136
18. 4534 Pennypack Street, Philadelphia PA 19136
19. 3517 Aldine Street, Philadelphia PA 19136
20. 5114 North 9th Street, Philadelphia PA 19141
21. 1310 Medary Avenue, Philadelphia PA 19141
22. 6843 Guyer Avevue, Philadelphia PA 19142
23. 7134 Theodore Street, Philadelphia PA 19142
24. 148 Manheim Street, Philadelphia PA 19144
25. 1403 East Weaver Street, Philadelphia PA 19150
26. 7321 Malvern Avenue, Philadelphia PA 19151
27. 1416 North Felton Street, Philadelphia PA 19151
28. 1201 Marlyn Road, Philadelphia PA 19151

**RHODE ISLAND**

1. 25 Armistice Boulevard, Pawtucket RI 2860
2. 411 Glenwood Avenue, Pawtucket RI 2860
3. 235 Rhodes Street, Providence RI 02905
4. 85 Adelaide Avenue, Providence RI 02907
5. 107 Hendrick Street, Providence RI 2908
6. 58 Sherwood Street, Providence RI 2908
7. 14 Amity Street, Providence RI 02908
8. 40 Erie Street, Providence RI 02908

A21

9.   146 Bowdoin Street, Providence RI 2909
10.  48 Rushmore Avenue, Providence RI 2909
11.  5 Avon Street, Providence RI 02909
12.  9 Erastus Street, Providence RI 02909
13.  11 Victoria Street, Providence RI 02909
14.  35 Zipporah Street, North Providence RI 2911
15.  88 Williams Avenue, East Providence RI 02914
16.  134 Dewey Avenue, East Providence RI 2914
17.  18 Parsons Street, East Providence RI 02914
18.  20 7th Street, East Providence RI 02914
19.  25 Intervale Avenue, East Providence RI 02914

**TENNESSEE**

1.   5535 Ewe Turn, Arlington TN 38002
2.   4301 Cool Springs Cove, Memphis TN 38002
3.   1603 Autumn Tree Cove, Memphis TN 38016
4.   2489 Spring Garden Cove, Memphis TN 38016
5.   8540 Gunner Hills Cove, Memphis TN 38016
6.   284 North Montgomery Street, Memphis TN 38104
7.   1041 Palmetto Avenue, Memphis TN 38107
8.   987 Sheridan Street, Memphis TN 38107
9.   1452 Reata Pass, Memphis TN 38109
10.  5138 Cana Road, Memphis TN 38109
11.  16 East Geeter Road, Memphis TN 38109
12.  257 Granville Avenue, Memphis TN 38109
13.  306 East Raines Road, Memphis TN 38109
14.  60 West Frank Avenue, Memphis TN 38109
15.  93 Mallory Heights Drive, Memphis TN 38109
16.  60 Sullivan Street, Memphis TN 38109
17.  959 Pope Street, Memphis TN 38112
18.  2540 Tutwiler Avenue, Memphis TN 38112
19.  2688 Filmore Avenue, Memphis TN 38114
20.  6869 Valley Park Drive, Memphis TN 38115
21.  6117 Mission Ridge Road, Memphis TN 38115
22.  1008 Brownlee Road, Memphis TN 38116
23.  1620 Butterworth Road, Memphis TN 38116
24.  5083 Boeingshire Drive, Memphis TN 38116
25.  914 Linwood Road, Memphis TN 38116
26.  2034 Linden Avenue, Memphis TN 38116
27.  1053 Alden Road, Memphis TN 38116
28.  1882 Janis Drive, Memphis TN 38116
29.  2030 Waskom Drive, Memphis TN 38116
30.  690 North Stevens Circle, Memphis TN 38116

31. 4947 Barfield Road, Memphis TN 38117
32. 1518 Flamingo Road, Memphis TN 38117
33. 5081 Wingdale Road, Memphis TN 38117
34. 3005 Christine Road, Memphis TN 38118
35. 4808 Cottonwood Road, Memphis TN 38118
36. 3056 Castleman Street, Memphis TN 38118
37. 2398 Syon Drive, Memphis TN 38119
38. 4701 Ridge Walk Lane, Memphis TN 38125
39. 4341 Spring Oak Cove, Memphis TN 38125
40. 1026 Cindy Lane, Memphis TN 38127
41. 2784 McGregor Avenue, Memphis TN 38127
42. 3632 Fiat Cove, Memphis TN 38127
43. 4432 Smith Ridge Cove, Memphis TN 38127
44. 845 Brandywine Boulevard, Memphis TN 38127
45. 3115 Morningside Street, Memphis TN 38127
46. 3289 University Street, Memphis TN 38127
47. 1733 Gowan Drive, Memphis TN 38127
48. 3642 Hallbrook Street, Memphis TN 38127
49. 3135 Gattling Street, Memphis TN 38127
50. 5144 Corkwood Drive, Memphis TN 38127
51. 3443 Obion Drive, Memphis TN 38127
52. 2999 Dumbarton Road, Memphis TN 38128
53. 4070 Kerwin Drive, Memphis TN 38128
54. 3856 Tessland Road, Memphis TN 38128
55. 3503 Christy Lane, Memphis TN 38135
56. 3653 Stonetrace Circle, Bartlett TN 38135
57. 5321 Bruton Avenue, Memphis TN 38135
58. 3955 Wildberry Court, Bartlett TN 38135
59. 6166 Scarlet Leaf Drive, Memphis TN 38141
60. 4356 Sunnyslope Drive, Memphis TN 38141
61. 5398 Stephen Forest Cove, Memphis TN 38141

**TEXAS**

1. 1022 Hawthorne Drive, Allen TX 75002
2. 1311 Grapevine Drive, Allen TX 75002
3. 2805 College Park Drive, Rowlett TX 75088
4. 8822 Miami Drive, Rowlett TX 75088
5. 3406 Juniper Court, Rowlett TX 75088
6. 5906 Mark Lane, Rowlett TX 75089
7. 8514 Sawgrass Lane, Rowlett TX 75089
8. 8214 Americas Cup, Rowlett TX 75089
9. 806 Easter Drive, Wylie TX 75098
10. 912 Matagorda Lane, Desoto TX 75115

A23

11. 1417 Mockingbird Drive, Desoto TX 75115
12. 1220 Regents Park Court, DeSoto TX 75115
13. 205 Jordan Drive, DeSoto TX 75115
14. 1009 Opal Drive, Desoto TX 75115
15. 1030 Shadywood Lane, DeSoto TX 75115
16. 832 Brockden Drive, Mesquite TX 75149
17. 1717 Wheatfield Drive, Mesquite TX 75149
18. 4317 Ridegdale Drive, Mesquite TX 75150
19. 820 Via Madonna, Mesquite TX 75150
20. 414 Wheatridge Avenue, Mesquite TX 75150
21. 202 Green Canyon Drive, Mesquite TX 75150
22. 3808 Hunters Trail, Mesquite TX 75150
23. 2806 Linhaven Drive, Mesquite TX 75150
24. 612 Via Altos, Mesquite TX 75150
25. 1509 Windsor Drive, Glenn Heights TX 75154
26. 1513 Windsor Drive, Glenn Heights TX 75154
27. 2006 Ridgeview Drive, Glenn Heights TX 75154
28. 203 Autumn Trail, Red Oak TX 75154
29. 122 Crest Brook Drive, Red Oak TX 75154
30. 12733 Hilltop Drive, Balch Springs TX 75180
31. 2609 Beau Drive, Mesquite TX 75181
32. 918 North Madison Avenue, Dallas TX 75208
33. 4668 Wyoming Street, Dallas TX 75211
34. 1208 South Cockrell Hill Road, Dallas TX 75211
35. 1603 Life Ave Dallas TX 75212
36. 1447 Mentor Avenue Dallas TX 75216
37. 2829 Seaton Drive, Dallas TX 75216
38. 2610 Easter Avenue, Dallas TX 75216
39. 2338 Volga Avenue, Dallas TX 75216
40. 2910 South Ewing Avenue, Dallas TX 75216
41. 1350 Cy Blackburn Circle, Dallas TX 75217
42. 1334 Hardned Lane, Dallas TX 75217
43. 1338 Hardned Lane, Dallas TX 75217
44. 530 Pleasant Oaks Drive, Dallas TX 75217
45. 7119 Clearpoint Drive, Dallas TX 75217
46. 6711 Woodhill Road, Dallas TX 75217
47. 9421 Frostwood Street, Dallas TX 75217
48. 9634 Rylie Road, Dallas TX 75217
49. 368 Ancestry Lane, Dallas TX  75217
50. 806 Amarosa Road, Dallas TX 75217
51. 3218 Perryton Drive, Dallas TX 75224
52. 3459 Navajo Circle, Dallas TX 75224
53. 620 Lacewood Drive, Dallas TX 75224

A24

54. 9837 Bluffcreek Road, Dallas TX 75227
55. 7040 Parkdale Drive, Dallas TX 75227
56. 2853 Vacherie Lane, Dallas TX 75227
57. 1934 Elm Shadows Drive, Dallas TX 75232
58. 1206 Sunny Glen Drive, Dallas TX 75232
59. 6226 Moonglow Drive, Dallas TX 75241
60. 7122 Amber Drive, Dallas TX 75241
61. 7001 Sorcey Road, Dallas TX 75249
62. 5963 Wisdom Creek Drive, Dallas TX 75249

**VIRGINIA**

1. 9326 Coleson Road, Glen Allen VA 23060
2. 9437 Willow Ridge Drive, Glen Allen VA 23060
3. 6232 Madonna Road, Mechanicsville VA 23111
4. 7991 Kenmore Drive, Mechanicsville VA 23111
5. 7402 Kenebeck Circle, Mechanicsville VA 23111
6. 12205 McKenna Circle, Midlothian VA 23112
7. 5614 Annette Drive, Sandston VA 23150
8. 16 West Sedgwick Street, Sandston VA 23150
9. 6713 Loco Lane, Sandston VA 23150
10. 5820 Snead Road, Richmond VA 23220
11. 3003 West Grace Street, Richmond VA 23221
12. 4409 Carpenter Road, Richmond VA 23222
13. 209 West Home Street, Richmond VA 23222
14. 2705 2nd Avenue, Richmond VA 23222
15. 619 Pollock Street, Richmond VA 23222
16. 3204 Carolina Avenue, Richmond VA 23222
17. 3201 Carolina Avenue, Richmond VA 23222
18. 3600 Springtime Court, Richmond VA 23223
19. 1703 Doron Lane, Richmond VA 23223
20. 3114 East Broad Street, Richmond VA 23223
21. 522 Lowell Street, Richmond VA 23223
22. 5400 Snead Road, Richmond VA 23224
23. 1309 Hopkins Road, Richmond VA 23224
24. 5712 Warwick Road, Richmond VA 23224
25. 5017 Troy Road, Richmond VA 23224
26. 2405 Oakland Avenue, Richmond VA 23224
27. 14 East 32nd Street, Richmond VA 23224
28. 6417 Fitzhugh Avenue, Richmond VA 23226
29. 1801 Hungary Road, Richmond VA 23228
30. 7510 Hines Place, Henrico VA 23231
31. 2214 National Street, Henrico VA 23231
32. 3600 Edinger Road, Richmond VA 23234

A25

33. 1211 Lotus Drive, North Chesterfield VA 23235
34. 10009 Bayham Drive, Richmond VA 23235
35. 9701 Buteshire Road, North Chesterfield VA 23236
36. 4206 Gloucestershire Street, Richmond VA 23236
37. 11208 Camshire Place, North Chesterfield VA 23236
38. 9257 Chatham Grove Lane, Richmond VA 23236
39. 9219 Rainwood Road, Richmond VA 23237
40. 5913 Northampton Boulevard, VA 23455
41. 2936 Sandpiper Road, Virginia Beach VA 23456
42. 2521 Druid Circle, Norfolk VA 23504
43. 2701 Marlboro Avenue, Norfolk VA 23504
44. 706 McLawhorne Drive, Newport News VA 23605
45. 305 Brightwood Avenue, Hampton VA 23661
46. 109 Alleghany Road, Hampton VA 23661
47. 91 Snug Harbor Drive, Hampton VA 23661
48. 803 Victoria Boulevard, Hampton VA 23661
49. 224 Libby Street, Hampton VA 23663
50. 1312 Curtin Court, Hampton VA 23666
51. 6 Rigsby Court, Hampton VA 23666
52. 12 Elizabeth Road, Hampton VA 23669
53. 606 Newport News Avenue, Hampton VA 23669
54. 3803 Van Patten Drive, Hampton VA 23669
55. 106 Marine Circle, Yorktown VA 23692
56. 343 Court Street, Portsmouth VA 23704

**WISCONSIN**

1. 1725 West Washington Street, Milwaukee WI 53204
2. 1905 South 9th Street, Milwaukee WI 53204
3. 1905 South 26th Street, Milwaukee WI 53204
4. 1125 South 11th Street, Milwaukee WI 53204
5. 2318 West Walnut Street, Milwaukee WI 53205
6. 4342 North 18th Street, Milwaukee WI 53205
7. 3615 North 97th Street, Milwaukee WI 53206
8. 2451 West Keefe Avenue, Milwaukee WI 53206
9. 2541 North 19th Street, Milwaukee WI 53206
10. 2861 North 20th Street, Milwaukee WI 53206
11. 2524 West Monroe Street, Milwaukee WI 53206
12. 3837 North 13th Street, Milwaukee WI 53206
13. 4354 South Pine Avenue, Milwaukee WI 53207
14. 2235 North 40th Street, Milwaukee WI 53208
15. 2144 North 56th Street, Milwaukee WI 53208
16. 3301 West Cherry Street, Milwaukee WI 53208
17. 2105 North High Mount Boulevard, Milwaukee WI 53208

18. 234 North 36th Street, Milwaukee WI 53208
19. 4458 North 38th Street, Milwaukee WI 53209
20. 4569 North Teutonia Avenue, Milwaukee WI 53209
21. 4510 North 41st Street, Milwaukee WI 53209
22. 4758 North 31st Street, Milwaukee WI 53209
23. 5922 North 42nd Street, Milwaukee WI 53209
24. 6583 North 42nd Street, Milwaukee WI 53209
25. 3731 West Rochelle Avenue, Milwaukee WI 53209
26. 4540 North 30th Street, Milwaukee WI 53209
27. 5531 North 41st Street, Milwaukee WI 53209
28. 3932 West Florist Avenue, Milwaukee WI 53209
29. 3925 West Good Hope Road, Milwaukee WI 53209
30. 2676 North 45th Street, Milwaukee WI 53210
31. 2763 North 50th Street, Milwaukee WI 53210
32. 2432 North 54th Street, Milwaukee WI 53210
33. 3046 North 38th Street, Milwaukee WI 53210
34. 2736 North 53rd Street, Milwaukee WI 53210
35. 2403 North 44th Street, Milwaukee WI 53210
36. 2837 North 39th Street, Milwaukee WI 53210
37. 2470 North 41st Street, Milwaukee WI 53210
38. 2715 North 48th Street, Milwaukee WI 53210
39. 2780 North 68th Street, Milwaukee WI 53210
40. 2417 North 33rd Street, Milwaukee WI 53210
41. 2854 North 28th Street, Milwaukee WI 53210
42. 2936 North 27th Street, Milwaukee WI 53210
43. 2576 North 35th Street, Milwaukee WI 53210
44. 2803 North 37th Street, Milwaukee WI 53210
45. 3375 North Buffum Street, Milwaukee WI 53212
46. 2330 North Holton Street, Milwaukee WI 53212
47. 3317 North 4th Street, Milwaukee WI 53212
48. 5823 West Siegfried Place, Milwaukee WI 53214
49. 1813 South 75th Street, West Allis WI 53214
50. 1803 South 63rd Street, Milwaukee WI 53214
51. 1580 South 73rd Street, West Allis WI 53214
52. 2176 South 28th Street, Milwaukee WI 53215
53. 2826 West Hayes Avenue, Milwaukee WI 53215
54. 1705 South 36th Street, Milwaukee WI 53215
55. 3332 South 17th Street, Milwaukee WI 53215
56. 4240 North 74th Street, Milwaukee, WI 53216
57. 5632 West Roosevelt Drive, Milwaukee WI  53216
58. 4427 West Melvina Avenue, Milwaukee WI 53216
59. 3708 North 37th Street, Milwaukee WI 53216
60. 4070 North 63rd Street, Milwaukee WI 53216

A27

61. 4813 West Lusher Avenue, Milwaukee WI 53218
62. 5415 North 73rd Street, Milwaukee WI 53218
63. 4586 North 51st street, Milwaukee WI 53218
64. 6920 West Medford Street, Milwaukee WI 53218
65. 4921 North 65th Street, Milwaukee WI 53218
66. 7909-7911 West Villard Avenue, Milwaukee WI 53218
67. 3248 South 51st Street, Milwaukee WI 53219
68. 1959 South 70th Street, Milwaukee WI 53219
69. 2463 South 59th Street, West Allis WI 53219
70. 2316 South 77th Street, Milwaukee WI 53219
71. 3470 South 66th street, Milwaukee WI 53219
72. 2728 South 75th Street, Milwaukee WI 53219
73. 2917 South 52nd Street, Milwaukee WI 53219
74. 4660 South 50th Street, Milwaukee WI 53220
75. 3821 South 51st Street, Milwaukee WI 53220
76. 1508 West Edgerton Avenue, Milwaukee WI 53221
77. 3407 North 88th Street, Milwaukee WI 53222
78. 3600 North 78th Street, Milwaukee WI 53222
79. 3435 North 86th Street, Milwaukee WI 53222
80. 3906 North 78th Street, Milwaukee WI 53222
81. 3364 North 95th Street, Milwaukee WI 53222
82. 6555 North 58th Street, Milwaukee WI 53223
83. 9451 North Carlotta Lane, Brown Deer WI 53223

## APPENDIX B: SUMMARY OF METROPOLITAN AREA FINDINGS

Plaintiffs have examined REO properties owned and maintained by Defendants in the following metropolitan areas: (1) Chicago, IL; (2) Memphis, TN; (3) Baltimore, MD; (4) Hampton Roads, VA; (5) Toledo, OH; (6) Orlando, FL; (7) Minneapolis, MN; (8) Indianapolis, IN; (9) Columbus, OH; (10) Cleveland, OH; (11) Baton Rouge, LA; (12) Dayton, OH; (13) Denver, CO; (14) Dallas, TX; (15) Gary, IN; (16) Hartford, CT; (17) Milwaukee, WI; (18) New Orleans, LA; (19) Grand Rapids, MI; (20) Muskegon, MI; (21) Greater Palm Beaches, FL; (22) Miami-Ft. Lauderdale, FL; (23) Tampa, FL (24) Richmond, VA; (25) Detroit, MI; (26) Philadelphia, PA; (27) Providence, RI; (28) Vallejo and Richmond, CA; and (29) Kansas City, MO/KS; (30) Prince George's County, MD and Washington, D.C. Plaintiffs have investigated a total of 1,141 properties in these 30 metropolitan areas.

## 1. CHICAGO, ILLINOIS

In the Chicago, IL metropolitan area, Plaintiffs investigated 106 REO properties owned by the Deutsche Bank Defendants. Of these 106 REO properties, 42 were located in predominantly African-American neighborhoods; 25 were located in predominantly Latino neighborhoods; 11 were located in predominantly non-White neighborhoods, and 28 were located in predominantly White neighborhoods.

- 35.7% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 17.9% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 82.1% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 64.3% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 30.8% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 7.1% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 64.1% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 26.9% of the REO properties in neighborhoods of color had accumulated mail, while only 17.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 42.3% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.1% of the REO properties in neighborhoods of color had 10% to 50% of the property covered in dead grass, while only 3.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 29.5% of the REO properties in neighborhoods of color had 10% to 50% of the property covered in invasive plants, while only 21.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 28.2% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 17.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 19.2% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 7.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 46.2% of the REO properties in neighborhoods of color had broken or boarded windows, while only 10.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.6% of the REO properties in neighborhoods of color had wood rot, while only 21.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 9.0% of the REO properties in neighborhoods of color had graffiti, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 59.0% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 11.5% of the REO properties in neighborhoods of color had broken or hanging gutters, while only 3.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 12.8% of REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 7.1% of the REO properties in predominantly White neighborhoods had the same problem.

## 2. MEMPHIS, TENNESSEE

In the Memphis, TN metropolitan area, Plaintiffs investigated 61 REO properties owned

by the Deutsche Bank Defendants. Of these 61 REO properties, 47 were located in predominantly African-American neighborhoods; 2 were located in predominantly non-White neighborhoods, and 12 were located in predominantly White neighborhoods.

- 50.0% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 2.0% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 98.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 50.0% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 57.1% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 8.2% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 69.4% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 8.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 67.3% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 57.1% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 16.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.8% of the REO properties in neighborhoods of color had 10% to 50% of the property covered in invasive plants, while only 16.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 22.4% of the REO properties in neighborhoods of color had a broken mailbox, while only 8.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 63.3% of the REO properties in neighborhoods of color had unsecured or broken doors, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 67.3% of the REO properties in neighborhoods of color had broken or boarded windows, while only 8.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 14.3% of the REO properties in neighborhoods of color had a damaged roof, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 55.1% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 53.1% of the REO properties in neighborhoods of color had wood rot, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 51.0% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 41.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 51.0% of the REO properties in neighborhoods of color had damaged siding, while only 16.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 10.2% of the REO properties in neighborhoods of color had missing or damaged shutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 22.4% of REO properties in neighborhoods of color had obstructed gutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 49.0% of the REO properties in neighborhoods of color had a small amount of mold, while only 41.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 16.3% of the REO properties in neighborhoods of color had pervasive mold, while none of the REO properties in predominantly White neighborhoods had the same problem.

B4

- 61.2% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 8.3% of the REO properties in predominantly White neighborhoods had the same problem.

## 3. BALTIMORE, MARYLAND

In the Baltimore, MD metropolitan area, Plaintiffs investigated 63 REO properties owned by the Deutsche Bank Defendants. Of these 63 properties, 39 were located in predominantly African-American neighborhoods, 3 were located in predominantly non-White neighborhoods, and 21 were located in predominantly White neighborhoods.

- 42.9% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 23.8% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 76.2% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 57.1% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 21.4% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 4.8% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 73.8% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 52.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 35.7% of the REO properties in neighborhoods of color had accumulated mail, while only 19.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 54.8% of the REO properties in neighborhoods of color had overgrown grass or accumulated leaves, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.5% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 42.9% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 19.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 11.9% of the REO properties in neighborhoods of color had a broken mailbox, while only 4.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 31.0% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 23.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 21.4% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.1% of the REO properties in neighborhoods of color had broken or boarded windows, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 59.5% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 23.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 11.9% of the REO properties in neighborhoods of color had broken or discarded signage, while only 4.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 35.7% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 26.2% of the REO properties in neighborhoods of color had damage siding, while only 19.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had a small amount of mold on the property, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

## 4. HAMPTON ROADS, VIRGINIA

In the Hampton Roads, VA metropolitan area, Plaintiffs investigated 17 REO properties owned by the Deutsche Bank Defendants. Of these 17 properties, 10 were located in predominantly African-American neighborhoods and 7 were located in predominantly White neighborhoods.

- 42.9% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 10.0% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 90.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 57.1% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 40.0% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 10 or more deficiencies</u>.

- 20.0% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 50.0% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 20.0% of the REO properties in neighborhoods of color had accumulated mail, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 50.0% of the REO properties in neighborhoods of color had overgrown grass or accumulated leaves, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 60.0% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 20.0% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 30.0% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 30.0% of the REO properties in neighborhoods of color had damaged steps and handrails, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 60.0% of the REO properties in neighborhoods of color had a damaged fence, while only 28.6% of the REO properties in White neighborhoods had the same problem.

- 50.0% of the REO properties in neighborhoods of color had holes in the structure of the home, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 30.0% of the REO properties in neighborhoods of color had wood rot, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 80.0% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 42.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 70.0% of the REO properties in neighborhoods of color had damaged siding, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 30.0% of the REO properties in neighborhoods of color had broken or hanging gutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had pervasive mold, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 30.0% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

## 5. TOLEDO, OHIO

In the Toledo, OH metropolitan area, Plaintiffs investigated 27 REO properties owned by the Deutsche Bank Defendants. Of these 27 REO properties, 9 were located in predominantly African-American neighborhoods; 2 were located in a predominantly non-White neighborhoods, and 16 were located in predominantly White neighborhoods.

- 43.8% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 9.1% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 90.9% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 56.3% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 63.6% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 6.3% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 18.2% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 36.4% of the REO properties in neighborhoods of color had substantial amounts of trash or debris, while only 31.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 9.1% of the REO properties in neighborhoods of color had accumulated mail, while only 6.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 36.4% of the REO properties in neighborhoods of color had overgrown grass or leaves, while only 18.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 63.6% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 31.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 27.3% of the REO properties in neighborhoods of color had 10% to 50% of the property covered in invasive plants, while only 6.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 36.4% of the REO properties in neighborhoods of color had a broken mailbox, while only 6.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.5% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 18.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.5% of the REO properties in neighborhoods of color had damaged steps or handrails, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 72.7% of the REO properties in neighborhoods of color had broken or boarded windows, while only 31.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 18.2% of the REO properties in neighborhoods of color had a damaged roof, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 54.5% of the REO properties in neighborhoods of color had a damaged fence, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.5% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 54.5% of the REO properties in neighborhoods of color had wood rot, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 9.1% of the REO properties in neighborhoods of color were marketed as distressed properties, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 63.6% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 72.7% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.5% of the REO properties in neighborhoods of color had missing or out of place gutters, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 63.6% of the REO properties in neighborhoods of color had broken or hanging gutters, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 27.3% of the REO properties in neighborhoods of color had obstructed gutters, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 18.2% of REO properties in neighborhoods of color had exposed or tampered-with utilities, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

## 6. ORLANDO, FLORIDA

In the Orlando, FL metropolitan area, Plaintiffs evaluated 64 REO properties owned by the Deutsche Bank Defendants. Of these 64 REO properties, 19 were located in predominantly African-American neighborhoods; 9 were located in predominantly Latino neighborhoods; 9 were located in predominantly non-White neighborhoods, and 27 were located in predominantly White neighborhoods.

- 14.8% of the REO properties in White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 2.7% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 97.3% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 85.2% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 70.3% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 40.7% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 37.8% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 86.5% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 51.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 64.9% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 40.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 62.2% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 44.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 43.2% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in dead grass, while only 18.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.5% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 29.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 29.7% of the REO properties in neighborhoods of color had 50% or more of the property covered in invasive plants, while only 18.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.9% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 29.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 54.1% of the REO properties in neighborhoods of color had broken or boarded windows, while only 25.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 21.6% of the REO properties in neighborhoods of color had a damaged roof, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 59.5% of the REO properties in neighborhoods of color had a damaged fence, while only 48.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 43.2% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 29.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 64.9% of the REO properties in neighborhoods of color had wood rot, while only 48.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 24.3% of the REO properties in neighborhoods of color had trespassing or warning signs displayed on the property, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 5.4% of the REO properties in neighborhoods of color were marketed as a distressed property, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 10.8% of the REO properties in neighborhoods of color had graffiti, while only 3.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 64.9% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 44.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 43.2% of the REO properties in neighborhoods of color had damaged siding, while only 22.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 21.6% of REO properties in neighborhoods of color had missing or out of place gutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 40.5% of the REO properties in neighborhoods of color had obstructed gutters, while only 22.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.9% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 29.6% of the REO properties in predominantly White neighborhoods had the same problem.

## 7. MINNEAPOLIS, MINNESOTA

In the Minneapolis, MN metropolitan area, Plaintiffs investigated 24 REO properties owned by the Deutsche Bank Defendants. Of these 24 REO properties, 6 were located in predominantly African-American neighborhoods; 9 were located in predominantly non-White neighborhoods, and 9 were located in predominantly White neighborhoods.

- 33.3% of REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while none of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 100.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 66.7% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 60.0% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 93.3% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 55.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had accumulated mail, while only 33.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 80.0% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 44.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 80.0% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 44.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 13.3% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in dead grass, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 53.3% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 6.7% of the REO properties in neighborhoods of color had a broken mailbox, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 53.3% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 44.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 66.7% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 22.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 66.7% of the REO properties in neighborhoods of color had broken or boarded windows, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had a damaged fence, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 22.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 13.3% of the REO properties in neighborhoods of color had graffiti, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 33.3% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 22.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had damaged siding, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 46.7% of REO properties in neighborhoods of color had missing or out of place gutters, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had obstructed gutters, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 13.3% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

## 8. INDIANAPOLIS, INDIANA

In the Indianapolis, IN metropolitan area, Plaintiffs investigated 18 REO properties owned by the Deutsche Bank Defendants. Of these 18 REO properties, 9 were located in predominantly African-American neighborhoods; 2 were located in predominantly non-White neighborhoods; and 7 were located in predominantly White neighborhoods.

- 42.9% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 9.1% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 90.9% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 57.1% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 36.4% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 14.3% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 9.1% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 63.6% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 27.3% of the REO properties in neighborhoods of color had accumulated mail, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 90.9% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 57.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 36.4% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.5% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.5% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 54.5% of the REO properties in neighborhoods of color had broken or boarded windows, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 36.4% of the REO properties in neighborhoods of color had holes in the structure of the home, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 27.3% of the REO properties in neighborhoods of color had wood rot, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 18.2% of the REO properties in neighborhoods of color had trespassing or warning signs, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 18.2% of the REO properties in neighborhoods of color were marketed as distressed properties, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 45.5% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 72.7% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 57.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 36.4% of the REO properties in neighborhoods of color had damaged siding, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 27.3% of the REO properties in neighborhoods of color had missing or out of place gutters, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 27.3% of the REO properties in neighborhoods of color had broken or hanging gutters, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 27.3% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

## 9. COLUMBUS, OHIO

In the Columbus, OH metropolitan area, Plaintiffs investigated 25 REO properties owned by the Deutsche Bank Defendants. Of these 25 REO properties, 9 were located in predominantly African-American neighborhoods; 2 were located in predominantly non-White neighborhoods, and 14 were located in predominantly White neighborhoods.

- 28.6% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, <u>while none of the REO properties in neighborhoods of color had fewer than 5 deficiencies.</u>

- 100.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 71.4% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 54.5% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 28.6% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 18.2% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, while only 7.1% of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 54.5% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 35.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 54.5% of the REO properties in neighborhoods of color had accumulated mail, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 72.7% of the REO properties in neighborhoods of color had overgrown grass or dead leaves, while only 57.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 63.6% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 42.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 36.4% of the REO properties in neighborhoods of color had 10% to 50% of the property covered in invasive plants, while only 7.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.5% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 35.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 27.3% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

B18

- 45.5% of the REO properties in neighborhoods of color had broken or boarded windows, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 63.6% of the REO properties in neighborhoods of color had a damaged fence, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 81.8% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 42.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 54.5% of the REO properties in neighborhoods of color had damaged siding, while only 7.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 18.2% of REO properties in neighborhoods of color had broken or hanging gutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 18.2% of REO properties in neighborhoods of color had obstructed gutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 18.2% of REO properties in neighborhoods of color had a small amount of mold, while only 7.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.5% of REO properties in neighborhoods of color had pervasive mold, while only 35.7% of the REO properties in predominantly White neighborhoods had the same problem.

**10. CLEVELAND, OHIO**

In the Cleveland, OH metropolitan area, Plaintiffs investigated 32 REO properties owned by the Deutsche Bank Defendants. Of these 32 REO properties, 21 were located in predominantly African-American neighborhoods and 11 were located in predominantly White neighborhoods.

- 45.5% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while none of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 100.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 54.5% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 33.3% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 18.2% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 14.3% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 47.6% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 27.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.1% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 27.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 28.6% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 14.3% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 9.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 42.9% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 27.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.1% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 61.9% of the REO properties in neighborhoods of color had broken or boarded windows, while only 54.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.8% of the REO properties in neighborhoods of color had a damaged roof, while only 9.1% of the REO properties in predominantly White neighborhoods had the same problem.

B20

- 28.6% of the REO properties in neighborhoods of color had a damaged fence, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had wood rot, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 14.3% of the REO properties in neighborhoods of color had trespassing or warning signs, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 38.1% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 27.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 81.0% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 45.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 61.9% of the REO properties in neighborhoods of color had damaged siding, while only 36.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.1% of the REO properties in neighborhoods of color had broken or hanging gutters, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had a small amount of mold, while only 27.3% of the REO properties in predominantly White neighborhoods had the same problem.

## 11. BATON ROUGE, LOUISIANA

In the Baton Rouge, LA metropolitan area, Plaintiffs investigated 20 REO properties owned by the Deutsche Bank Defendants. Of these 20 REO properties, 14 were located in predominantly African-American neighborhoods and 6 were located in predominantly White neighborhoods.

- 33.3% of REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while none of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 100.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 66.7% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 92.9% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 16.7% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 57.1% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 92.9% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 33.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 64.3% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 16.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 57.1% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 33.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 42.9% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in dead grass, while only 33.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 35.7% of the REO properties in neighborhoods of color had damaged steps or handrails, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 78.6% of the REO properties in neighborhoods of color had broken or boarded windows, while only 16.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 28.6% of the REO properties in neighborhoods of color had a damaged roof, while only 16.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 57.1% of the REO properties in neighborhoods of color had a damaged fence, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

B22

- 42.9% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 33.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 64.3% of the REO properties in neighborhoods of color had wood rot, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 7.1% of the REO properties in neighborhoods of color had broken or discarded signage, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 21.4% of the REO properties in neighborhoods of color had graffiti, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 57.1% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 33.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 64.3% of the REO properties in neighborhoods of color had damaged siding, while only 16.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 28.6% of the REO properties in neighborhoods of color had pervasive mold, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 57.1% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while none of the REO properties in predominantly White neighborhoods had the same problem.

## 12. DAYTON, OHIO

In the Dayton, OH metropolitan area, Plaintiffs investigated 37 REO properties owned by the Deutsche Bank Defendants. Of these 37 REO properties, 15 were located in predominantly African-American neighborhoods and 22 were located in predominantly White neighborhoods.

- 31.8% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while none of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 100.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 68.2% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

B23

- 53.3% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 31.8% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 13.3% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 40.0% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 22.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 46.7% of the REO properties in neighborhoods of color had accumulated mail, while only 31.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 73.3% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 36.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 53.3% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 27.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 60.0% of the REO properties in neighborhoods of color had 10% to 50% of the property covered in invasive plants, while only 22.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had a broken mailbox, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 33.3% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 13.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had a damaged roof, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had a damaged fence, while only 22.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 46.7% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 22.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 46.7% of the REO properties in neighborhoods of color had wood rot, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 20.0% of the REO properties in neighborhoods of color had trespassing or warning signs, while only 13.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 13.3% of the REO properties in neighborhoods of color were marketed as distressed, while only 4.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 66.7% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 31.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 53.3% of REO properties in neighborhoods of color had damaged siding, while only 40.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 60.0% of REO properties in neighborhoods of color had missing or out of place gutters, while only 31.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 46.7% of REO properties in neighborhoods of color had a small amount of mold, while only 27.3% of the REO properties in predominantly White neighborhoods had the same problem.

### 13. DENVER, COLORADO

In the Denver, CO metropolitan area, Plaintiffs investigated 21 REO properties owned by the Deutsche Bank Defendants. Of these 21 REO properties, 2 were located in predominantly African-American neighborhoods; 8 were located in predominantly Latino neighborhoods; 3 were located in predominantly non-White neighborhoods, and 8 were located in predominantly White neighborhoods.

- 62.5% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, <u>while none of the REO properties in neighborhoods of color had fewer than 5 deficiencies.</u>

- 100.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 37.5% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 46.2% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 53.8% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.5% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 69.2% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 15.4% of the REO properties in neighborhoods of color had 10% to 50% of the property covered in dead grass, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 53.8% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 30.8% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 69.2% of the REO properties in neighborhoods of color had broken or boarded windows, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 23.1% of the REO properties in neighborhoods of color had trespassing or warning signs, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 61.5% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 15.4% of the REO properties in neighborhoods of color had broken or discarded signage, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 15.4% of the REO properties in neighborhoods of color had graffiti, while none of the REO properties in predominantly White neighborhoods had the same problem.
- 38.5% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 30.8% of the REO properties in neighborhoods of color had damaged siding, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 53.8% of REO properties in neighborhoods of color had missing or out of place gutters, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.5% of REO properties in neighborhoods of color had broken or hanging gutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

## 14. DALLAS, TEXAS

In the Dallas, TX metropolitan area, Plaintiffs investigated 62 REO properties owned by the Deutsche Bank Defendants. Of these 62 REO properties, 19 were located in predominantly African-American neighborhoods; 20 were located in predominantly Latino neighborhoods; 8 were located in predominantly non-White neighborhoods, and 15 were located in predominantly White neighborhoods.

- 40.0% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 12.8% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 87.2% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 60.0% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 51.1% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 6.7% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 8.5% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 61.7% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 61.7% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 53.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 19.1% of the REO properties in neighborhoods of color had 10% to 50% of the property covered in invasive plants, while only 6.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 21.3% of the REO properties in neighborhoods of color had a broken mailbox, while only 6.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 31.9% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 17.0% of the REO properties in neighborhoods of color had damaged steps or handrails, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 36.2% of the REO properties in neighborhoods of color had broken or boarded windows, while only 26.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 17.0% of the REO properties in neighborhoods of color had a damaged roof, while only 6.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 66.0% of the REO properties in neighborhoods of color had a damaged fence, while only 53.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 53.2% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 51.1% of the REO properties in neighborhoods of color had wood rot, while only 26.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 8.5% of the REO properties in neighborhoods of color were marketed as distressed properties, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 44.7% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 26.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 12.8% of the REO properties in neighborhoods of color had broken or discarded signage, while only 6.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 12.8% of the REO properties in neighborhoods of color had graffiti, while only 6.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 51.1% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 33.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 48.9% of the REO properties in neighborhoods of color had damaged siding, while only 6.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 17.0% of REO properties in neighborhoods of color had pervasive mold, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 31.9% of REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 26.7% of the REO properties in predominantly White neighborhoods had the same problem.

**15. GARY, INDIANA**

In the Gary, IN metropolitan area, Plaintiffs investigated 22 REO properties owned by the Deutsche Bank Defendants. Of these 22 REO properties, 8 were located in predominantly

B29

African-American neighborhoods; 1 was located in a predominantly non-White neighborhood, and 13 were located in predominantly White neighborhoods.

- 53.8% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, <u>while none of the REO properties in neighborhoods of color had fewer than 5 deficiencies.</u>

- 100.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 46.2% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 66.7% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 7.7% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 77.8% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 38.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 55.6% of the REO properties in neighborhoods of color had accumulated mail, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 66.7% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 15.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 77.8% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 38.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 22.2% of the REO properties in neighborhoods of color had 50% or more of the property covered in dead grass, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 33.3% of the REO properties in neighborhoods of color had 50% or more of the property covered in invasive plants, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

B30

- 44.4% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 23.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 44.4% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 23.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 88.9% of the REO properties in neighborhoods of color had broken or boarded windows, while only 30.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 22.2% of the REO properties in neighborhoods of color had a damaged roof, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 44.4% of the REO properties in neighborhoods of color had wood rot, while only 7.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 22.2% of the REO properties in neighborhoods of color had trespassing or warning signs, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 55.6% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 30.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 55.6% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 30.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 44.4% of the REO properties in neighborhoods of color had damaged siding, while only 15.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 55.6% of REO properties in neighborhoods of color had obstructed gutters, while only 15.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 7.7% of the REO properties in predominantly White neighborhoods had the same problem.

### 16. HARTFORD, CONNECTICUT

In the Hartford, CT metropolitan area, Plaintiffs investigated 16 REO properties owned by the Deutsche Bank Defendants. Of these 16 REO properties, 5 were located in predominantly African-American neighborhoods, 2 were located in predominantly Latino neighborhoods, 5 were located in predominantly non-White neighborhoods, and 4 were located in predominantly White neighborhoods.

- 75.0% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 16.7% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 83.3% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 25.0% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 8.3% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 58.3% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 91.7% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 58.3% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 50.0% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in dead grass, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 50.0% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 16.7% of the REO properties in neighborhoods of color had a broken mailbox, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 25.0% of the REO properties in neighborhoods of color had unsecured or broken doors, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 25.0% of the REO properties in neighborhoods of color had damaged steps or handrails, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 58.3% of the REO properties in neighborhoods of color had broken or boarded windows, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 16.7% of the REO properties in neighborhoods of color had holes in the structure of the home, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 33.3% of the REO properties in neighborhoods of color had wood rot, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 16.7% of the REO properties in neighborhoods of color had broken or discarded signage, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 58.3% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 41.7% of the REO properties in neighborhoods of color had damaged siding, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 33.3% of the REO properties in neighborhoods of color had missing or out of place gutters, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

**17. MILWAUKEE, WISCONSIN**

In the Milwaukee, WI metropolitan area, Plaintiffs investigated 83 REO properties owned by the Deutsche Bank Defendants. Of these 83 REO properties, 48 were located in predominantly African-American neighborhoods; 7 were located in predominantly Latino

B33

neighborhoods; 5 were located in predominantly non-White neighborhoods, and 23 were located in predominantly White neighborhoods.

- 69.6% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 13.3% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 86.7% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 30.4% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 16.7% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 58.3% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 21.7 % of the REO properties in predominantly White neighborhoods had the same problem.

- 45.0% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 8.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 46.7% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 21.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 5.0% of the REO properties in neighborhoods of color had a broken mailbox, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 13.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.3% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 4.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 58.3% of the REO properties in neighborhoods of color had broken or boarded windows, while only 13.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 21.7% of the REO properties in neighborhoods of color had a damaged roof, while only 8.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.3% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 17.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 10.0% of the REO properties in neighborhoods of color had wood rot, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 18.3% of the REO properties in neighborhoods of color had trespassing or warning signs displayed on the property, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 48.3% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 34.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 13.3% of the REO properties in neighborhoods of color had unauthorized occupancy on the premises, while only 4.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 48.3% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 39.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.0% of the REO properties in neighborhoods of color had damaged siding, while only 13.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 11.7% of REO properties in neighborhoods of color had broken or hanging gutters, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 25.0% of the REO properties in neighborhoods of color had obstructed gutters, while only 8.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.0% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

## 18. NEW ORLEANS, LOUISIANA

In the New Orleans, LA metropolitan area, Plaintiffs investigated 42 REO properties owned by the Deutsche Bank Defendants. Of these 42 REO properties, 29 were located in predominantly African-American neighborhoods; 5 were located in predominantly non-White neighborhoods, and 8 were located in predominantly White neighborhoods.

- 79.4% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 25.0% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 17.6% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 73.5% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 58.8% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 64.7% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 37.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 41.2% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in dead grass, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 52.9% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 37.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 14.7% of the REO properties in neighborhoods of color had 50% or more of the property covered in invasive plants, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 8.8% of the REO properties in neighborhoods of color had a broken mailbox, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 17.6% of the REO properties in neighborhoods of color had damaged steps or handrails, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 61.8% of the REO properties in neighborhoods of color had broken or boarded windows, while only 37.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.5% of the REO properties in neighborhoods of color had a damaged roof, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 67.6% of the REO properties in neighborhoods of color had a damaged fence, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 44.1% of the REO properties in neighborhoods of color had holes in the structure of the home, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 55.9% of the REO properties in neighborhoods of color had wood rot, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 20.6% of the REO properties in neighborhoods of color had broken or discarded signage, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 5.9% of the REO properties in neighborhoods of color had graffiti, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 52.9% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 76.5% of the REO properties in neighborhoods of color had damaged siding, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 8.8% of the REO properties in neighborhoods of color had damaged or missing shutters, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 70.6% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

## 19. GRAND RAPIDS, MICHIGAN

In the Grand Rapids, MI metropolitan area, Plaintiffs investigated 14 REO properties owned by the Deutsche Bank Defendants. Of these 14 REO properties, 3 were located in predominantly African-American neighborhoods; 2 were located in predominantly non-White neighborhoods; and 9 were located in predominantly White neighborhoods.

- 55.6% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 20.0% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 80.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 44.4% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 40.0% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 11.1% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 80.0% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 33.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 20.0% of the REO properties in neighborhoods of color had accumulated mail, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had a broken mailbox, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 40.0% of the REO properties in neighborhoods of color had damaged steps or handrails, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 80.0% of the REO properties in neighborhoods of color had a damaged fence, while only 22.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 20.0% of the REO properties in neighborhoods of color had trespassing or warning signs, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 80.0% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 44.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had damaged siding, while only 33.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of REO properties in neighborhoods of color had missing or out of place gutters, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 20.0% of REO properties in neighborhoods of color had broken or hanging gutters, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

## 20. MUSKEGON, MICHIGAN

In the Muskegon, MI metropolitan area, Plaintiffs investigated 29 REO properties owned by the Deutsche Bank Defendants. Of these 29 REO properties, 10 were located in predominantly African-American neighborhoods; 2 were located in predominantly non-White neighborhoods, and 17 were located in predominantly White neighborhoods.

- 52.9% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 8.3% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 91.7% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 47.1% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 33.3% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 11.8% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 16.7% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 75.0% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 29.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.0% of the REO properties in neighborhoods of color overgrown or dead shrubbery, while only 17.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 8.3% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 16.7% of the REO properties in neighborhoods of color had a broken mailbox, while only 5.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 50.0% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 35.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had broken or boarded windows, while only 23.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had a damaged roof, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 41.7% of the REO properties in neighborhoods of color had a damaged fence, while only 5.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.0% of the REO properties in neighborhoods of color had wood rot, while only 5.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 8.3% of the REO properties in neighborhoods of color were marketed as distressed properties, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 91.7% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 29.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.0% of the REO properties in neighborhoods of color had missing or out of place gutters, while only 5.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 8.3% of REO properties in neighborhoods of color had broken or hanging gutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 16.7% of the REO properties in neighborhoods of color had water damage, while only 5.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 16.7% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while none of the REO properties in predominantly White neighborhoods had the same problem.

## 21. GREATER PALM BEACHES, FLORIDA

In the Greater Palm Beaches, FL metropolitan area, Plaintiffs investigated 41 REO properties owned by the Deutsche Bank Defendants. Of these 41 REO properties, 1 was located in a predominantly African-American neighborhood; 11 were located in predominantly Latino neighborhoods; 9 were located in predominantly non-White neighborhoods; and 20 were located in predominantly White neighborhoods.

- 40.0% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 4.8% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 95.2% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 60.0% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 57.1% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 10.0% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 81.0% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 28.6% of the REO properties in neighborhoods of color had accumulated mail, while only 10.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 47.6% of the REO properties in neighborhoods of color had overgrown grass or leaves, while only 30.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 61.9% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 45.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.8% of the REO properties in neighborhoods of color had 50% or more of the property covered in dead grass, while only 5.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 52.4% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 30.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 61.9% of the REO properties in neighborhoods of color had broken or boarded windows, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 14.3% of the REO properties in neighborhoods of color had a damaged roof, while only 5.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 66.7% of the REO properties in neighborhoods of color had a damaged fence, while only 30.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 47.6% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 30.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.1% of the REO properties in neighborhoods of color had wood rot, while only 10.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 19.0% of the REO properties in neighborhoods of color had graffiti, while only 5.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 42.9% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.1% of the REO properties in neighborhoods of color had a small amount of mold, while only 10.0% of the REO properties in predominantly White neighborhoods had the same problem.

## 22. MIAMI-FT. LAUDERDALE, FLORIDA

In the Miami-Ft. Lauderdale, FL metropolitan area, Plaintiffs investigated 63 REO properties owned by the Deutsche Bank Defendants. Of these 63 REO properties, 27 were located in predominantly African-American neighborhoods; 11 were located in predominantly Latino neighborhoods; 9 were located in predominantly non-White neighborhoods, and 16 were located in predominantly White neighborhoods.

- 31.3% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 10.6% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 89.4% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 68.8% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 68.1% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 18.8% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 23.4% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 74.5% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 55.3% of the REO properties in neighborhoods of color had overgrown grass and leaves, while only 31.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 63.8% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 56.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 38.3% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in dead grass, while only 6.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 34.0% of the REO properties in neighborhoods of color had at least 50% or more of the property covered in invasive plants, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 19.1% of the REO properties in neighborhoods of color had a broken mailbox, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 10.6% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 6.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 55.3% of the REO properties in neighborhoods of color had broken or boarded windows, while only 31.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.4% of the REO properties in neighborhoods of color had a damaged roof, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 40.4% of the REO properties in neighborhoods of color had a damaged fence, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 57.4% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 57.4% of the REO properties in neighborhoods of color had wood rot, while only 12.5% of the REO properties in predominantly White neighborhoods had the same problem.

- 55.3% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 31.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 14.9% of the REO properties in neighborhoods of color had broken or discarded signage, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 66.0% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 29.8% of the REO properties in neighborhoods of color had damaged siding, while only 6.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 8.5% of the REO properties in neighborhoods of color had missing or damaged shutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 12.8% of REO properties in neighborhoods of color had broken or hanging gutters, while only 6.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 21.3% of the REO properties in neighborhoods of color had pervasive mold, while only 6.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 55.3% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 43.8% of the REO properties in predominantly White neighborhoods had the same problem.

## 23. TAMPA, FLORIDA

In the Tampa, FL metropolitan area, Plaintiffs investigated 27 REO properties owned by the Deutsche Bank Defendants. Of these 27 REO properties, 4 were located in predominantly African-American neighborhoods; 3 were located in Latino neighborhoods; 9 were located in Majority Non-White neighborhoods; and 11 were located in predominantly White neighborhoods.

- 72.7% of REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 6.3% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 93.8% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 27.3% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 43.8% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 9.1% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 12.5% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 68.8% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 27.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 62.5% of the REO properties in neighborhoods of color had overgrown grass or dead leaves, while only 36.4% of the REO properties in predominantly White neighborhoods had the same problem

- 75.0% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 27.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 50.0% of the REO properties in neighborhoods of color had unsecured or broken doors, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 43.8% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 9.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 43.8% of the REO properties in neighborhoods of color had broken or boarded windows, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 31.3% of the REO properties in neighborhoods of color had a damaged roof, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 31.3% of the REO properties in neighborhoods of color had a damaged fence, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 43.8% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 37.5% of the REO properties in neighborhoods of color had wood rot, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 12.5% of the REO properties in neighborhoods of color had broken or discarded signage, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 37.5% of the REO properties in neighborhoods of color had damaged siding, while only 9.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 31.3% of the REO properties in neighborhoods of color had missing or out-of-place gutters, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 50.0% of the REO properties in neighborhoods of color had obstructed gutters, while only 18.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.0% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 9.1% of the REO properties in predominantly White neighborhoods had the same problem.

## 24. RICHMOND, VIRGINIA

In the Richmond, VA metropolitan area, Plaintiffs investigated 39 REO properties owned by the Deutsche Bank Defendants. Of these 39 REO properties, 18 were located in predominantly African-American neighborhoods, 1 was located in a majority Non-White neighborhood, and 20 were located in predominantly White neighborhoods.

- 25.0% of REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 5.3% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 94.7% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 75.0% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 52.6% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 40.0% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

- 21.1% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 57.9% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 35.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 47.4% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 26.3% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 10.0% % of the REO properties in predominantly White neighborhoods had the same problem.

- 15.8% of the REO properties in neighborhoods of color had a broken mailbox, while only 5.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 36.8% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 31.6% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 10.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 68.4% of the REO properties in neighborhoods of color had broken or boarded windows, while only 15.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 47.4% of the REO properties in neighborhoods of color had a damaged fence, while only 35.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 42.1% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 57.9% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 47.4% of the REO properties in neighborhoods of color had damaged siding, while only 40.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 52.6% of the REO properties in neighborhoods of color had missing or out-of-place gutters, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 26.3% of the REO properties in neighborhoods of color had broken or hanging gutters, while only 10.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 21.1% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 10.0% of the REO properties in predominantly White neighborhoods had the same problem.

## 25. SUBURBAN DETROIT, MICHIGAN

In the Detroit, MI metropolitan area, Plaintiffs investigated 43 REO properties owned by the Deutsche Bank Defendants. Of these 43 REO properties, 11 were located in predominantly African-American neighborhoods; 6 were located in predominantly non-White neighborhoods, and 26 were located in predominantly White neighborhoods.

- 57.7% of REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 11.8% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 88.2% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 42.3% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 11.8% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 7.7% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

B49

- 5.9% of the REO properties in neighborhoods of color had 15 or more maintenance or marketing deficiencies, <u>while none of the REO properties in predominantly White neighborhoods had 15 or more deficiencies.</u>

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 64.7% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 26.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 70.6% of the REO properties in neighborhoods of color had overgrown grass or accumulated leaves, while only 34.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.5% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in dead grass, while only 19.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.5% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 19.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 41.2% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 19.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 41.2% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 7.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 41.2% of the REO properties in neighborhoods of color had broken or boarded windows, while only 3.8% of the REO properties in predominantly White neighborhoods had the same problem.

- 29.4% of the REO properties in neighborhoods of color had a damaged fence, while only 23.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.5% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 15.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 11.8% of the REO properties in neighborhoods of color had wood rot, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 41.2% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 34.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 29.4% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 7.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 23.5% of REO properties in neighborhoods of color had broken or hanging gutters, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 35.3% of the REO properties in neighborhoods of color had obstructed gutters, while only 15.4% of the REO properties in predominantly White neighborhoods had the same problem.

### 26. PHILADELPHIA, PENNSYLVANIA

In the Philadelphia, PA metropolitan area, Plaintiffs investigated 28 REO properties owned by the Deutsche Bank Defendants. Of these 28 properties, 13 were located in predominantly African-American neighborhoods, 3 were located in predominantly non-White neighborhoods, and 12 were located in predominantly White neighborhoods.

- 58.3% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 6.3% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 93.8% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 41.7% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 25.0% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 8.3% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 56.3% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 50.0% of the REO properties in neighborhoods of color had accumulated mail, while only 16.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 62.5% of the REO properties in neighborhoods of color had overgrown grass or accumulated leaves, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 37.5% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 18.8% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in dead grass, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 25.0% of the REO properties in neighborhoods of color had unsecured or broken doors, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 18.8% of the REO properties in neighborhoods of color had damaged steps or handrails, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 56.3% of the REO properties in neighborhoods of color had broken or boarded windows, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.0% of the REO properties in neighborhoods of color had wood rot, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 18.8% of the REO properties in neighborhoods of color had trespassing or warning signs, while only 8.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 62.5% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 41.7% of the REO properties in predominantly White neighborhoods had the same problem.

- 12.5% of the REO properties in neighborhoods of color had graffiti, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

B52

### 27. PROVIDENCE, RHODE ISLAND

In the Providence, RI metropolitan area, Plaintiffs investigated 19 REO properties owned by the Deutsche Bank Defendants. Of these 19 REO properties, 6 were located in predominantly Latino neighborhoods; 6 were located in predominantly non-White neighborhoods; and 7 were located in predominantly White neighborhoods.

- 28.6% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, <u>while none of the REO properties in neighborhoods of color had fewer than 5 deficiencies.</u>

- 100.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 71.4% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 75.0% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while only 28.6% of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 75.0% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 42.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had accumulated mail, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 75.0% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 16.7% of the REO properties in neighborhoods of color had 50% or more of the property covered in dead grass, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 41.7% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 58.3% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 66.7% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 83.3% of the REO properties in neighborhoods of color had broken or boarded windows, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 41.7% of the REO properties in neighborhoods of color had a damaged fence, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 66.7% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.0% of the REO properties in neighborhoods of color had wood rot, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 66.7% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 42.9% of the REO properties in predominantly White neighborhoods had the same problem.

- 83.3% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 14.3% of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had damaged siding, while only 28.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 25.0% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while none of the REO properties in predominantly White neighborhoods had the same problem.

### 28. VALLEJO AND RICHMOND, CALIFORNIA

In the Vallejo and Richmond, CA metropolitan area, Plaintiffs investigated 22 REO properties owned by the Deutsche Bank Defendants. Of these 22 properties, 5 were located in predominantly Latino neighborhoods, 13 were located in predominantly non-White neighborhoods, and 4 were located in predominantly White neighborhoods.

- 25.0% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 16.7% of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 83.3% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 75.0% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 22.2% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 61.1% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 50.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 44.4% of the REO properties in neighborhoods of color had accumulated mail, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 50.0% of the REO properties in neighborhoods of color had 50% or more of the property covered in dead grass, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 33.3% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 50.0% of the REO properties in neighborhoods of color had broken or boarded windows, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 66.7% of the REO properties in neighborhoods of color had a damaged fence, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 16.7% of the REO properties in neighborhoods of color had holes in the structure of the home, while none of the REO properties in predominantly White neighborhoods had the same problem.

B55

- 11.1% of the REO properties in neighborhoods of color were marketed as distressed, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 44.4% of the REO properties in neighborhoods of color had no professional "for sale" sign marketing the home, while only 25.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 11.1% of the REO properties in neighborhoods of color had damaged siding, while none of the REO properties in predominantly White neighborhoods had the same problem.

## 29. KANSAS CITY, MISSOURI / KANSAS

In the Kansas City, MO/KS metropolitan area, Plaintiffs investigated 10 REO properties owned by the Deutsche Bank Defendants. Of these 10 REO properties, 2 were located in predominantly African-American neighborhoods, 1 was located in a predominantly Latino neighborhood; 2 were located in predominantly non-White neighborhoods; and 5 were located in predominantly White neighborhoods.

- 80.0% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while none of the REO properties in neighborhoods of color had fewer than 5 deficiencies.

- 100.0% of the REO properties in neighborhoods of color had 5 or more maintenance or marketing deficiencies, while only 20.0% of the REO properties in predominantly White neighborhoods had 5 or more deficiencies.

- 40.0% of the REO properties in neighborhoods of color had 10 or more maintenance or marketing deficiencies, while none of the REO properties in predominantly White neighborhoods had 10 or more deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods. Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 60.0% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had accumulated mail, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

B56

- 80.0% of the REO properties in neighborhoods of color had overgrown grass or dead leaves, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 40.0% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 20.0% of the REO properties in neighborhoods of color had unsecured or broken doors, while <u>none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 40.0% of the REO properties in neighborhoods of color had damaged steps or handrails, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 60.0% of the REO properties in neighborhoods of color had broken or boarded windows, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 40.0% of the REO properties in neighborhoods of color had holes in the structure of the home, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 20.0% of the REO properties in neighborhoods of color had wood rot, while <u>none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 40.0% of the REO properties in neighborhoods of color had a trespassing or warning sign, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 40.0% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 60.0% of the REO properties in neighborhoods of color had damaged siding, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 40.0% of the REO properties in neighborhoods of color had broken or hanging gutters, while only 20.0% of the REO properties in predominantly White neighborhoods had the same problem.

- 40.0% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

### 30. PRINCE GEORGE'S COUNTY, MARYLAND & WASHINGTON, DISTRICT OF COLUMBIA

In the Washington, D.C. metropolitan area, Plaintiffs investigated 66 REO properties owned by the Deutsche Bank Defendants.  Of these 66 REO properties, 52 were located in African-American neighborhoods, 5 were located in predominantly non-White neighborhoods, and 9 were located in predominantly White neighborhoods.

- 55.6% of the REO properties in predominantly White neighborhoods had fewer than 5 maintenance or marketing deficiencies, while only 10.5% of the REO properties in neighborhoods of color had fewer than 5 maintenance or marketing deficiencies.

- 89.5% of REO properties in neighborhoods of color had 5 or more marketing or maintenance deficiencies, while only 44.4% of the REO properties in White neighborhoods had 5 or more marketing or maintenance deficiencies.

- 36.8% of REO properties in neighborhoods of color had 10 or more marketing or maintenance deficiencies, while only 11.1% of the REO properties in White neighborhoods had 5 or more marketing or maintenance deficiencies.

REO properties in neighborhoods of color were far more likely to have certain types of deficiencies or problems than REO properties in predominantly White neighborhoods.  Plaintiffs found significant racial disparities in the majority of the objective factors they measured, including the following:

- 64.9% of the REO properties in neighborhoods of color had substantial amounts of trash on the premises, while only 44.4% of the REO properties in predominantly White neighborhoods had the same problem.

- 19.3% of the REO properties in neighborhoods of color had accumulated mail, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 45.6% of the REO properties in neighborhoods of color had overgrown grass or dead leaves, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 61.4% of the REO properties in neighborhoods of color had overgrown or dead shrubbery, while only 55.6% of the REO properties in predominantly White neighborhoods had the same problem.

- 5.3% of the REO properties in neighborhoods of color had 50% or more of the property covered in dead grass, while none of the properties in predominantly White neighborhoods had the same problem.

B58

- 50.9% of the REO properties in neighborhoods of color had at least 10% to 50% of the property covered in invasive plants, while only 11.1% of REO properties in predominantly White neighborhoods had the same problem.

- 8.8% of the REO properties in neighborhoods of color had 50% or more of the property covered in invasive plants, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 10.5% of the REO properties in neighborhoods of color had a broken mailbox, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 42.1% of the REO properties in neighborhoods of color had unsecured or broken doors, while only 11.1% of the properties in predominantly White neighborhoods had the same problem.

- 17.5% of the REO properties in neighborhoods of color had damaged steps or handrails, while only 11.1% of the properties in predominantly White neighborhoods had the same problem.

- 45.6% of the REO properties in neighborhoods of color had broken or boarded windows, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 7.0% of the REO properties in neighborhoods of color had a damaged roof, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 29.8% of the REO properties in neighborhoods of color had holes in the structure of the home, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 15.8% of the REO properties in neighborhoods of color had wood rot, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 12.3% of the REO properties in neighborhoods of color had broken or discarded signage, <u>while none of the REO properties in predominantly White neighborhoods had the same problem.</u>

- 43.9% of the REO properties in neighborhoods of color had peeling or chipped paint, while only 22.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 31.6% of the REO properties in neighborhoods of color had damaged siding, while only 22.2% of the REO properties in predominantly White neighborhoods had the same problem.

- 35.1% of the REO properties in neighborhoods of color had missing or out of place gutters, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.

- 14.0% of the REO properties in neighborhoods of color had broken or hanging gutters, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 7.0% of the REO properties in neighborhoods of color had water damage, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 8.8% of the REO properties in neighborhoods of color had pervasive mold, while none of the REO properties in predominantly White neighborhoods had the same problem.

- 40.4% of the REO properties in neighborhoods of color had exposed or tampered-with utilities, while only 11.1% of the REO properties in predominantly White neighborhoods had the same problem.