# EXHIBIT A



**U.S. Department of Housing and Urban Development**

**Office of the Regional Administrator**
Thomas P. O'Neil Jr. Federal Building
10 Causeway Street – Room 301
Boston, MA  02222-1092

(617) 994-8223
(617) 565-6558 Fax

April 19, 2018

Sara Norval
Mayer Brown LLP
SNorval@mayerbrown.com
71 S. Wacker Dr.
Chicago, IL 60606

RE:    Freedom of Information Act Request
       NFHA v. US Bank Determination
       FOIA Control No.: 18-FI-RO1-01324

Dear Ms. Norval:

This letter is in response to your Freedom of Information Act (FOIA) request dated April 6, 2018.  In that request, you asked for a copy of the Determination of No Reasonable Cause in case number 01-12-0283-8, National Fair Housing Alliance, et al v. U.S. Bank N.A.

When responding to a FOIA request, HUD searches for responsive documents existing up to the date the request was received in the proper office.  Your request is granted in its entirety.  Enclosed is the Determination of No Reasonable Cause in case number 01-12-0283-8, National Fair Housing Alliance, et al v. U.S. Bank N.A.

Your request is granted in full at no cost to you.

For your information, your FOIA request, including your identity and the information made available, is releasable to the public under subsequent FOIA requests.  In responding to these requests, the Department does not release personal privacy information such as home address, telephone number, or social security number, all of which are protected from disclosure under FOIA Exemption 6.

You may appeal this determination within 30 days from the date of this letter.  Your appeal should include copies of your original request and this response, as well as a discussion of the reason(s) supporting the appeal.  The envelope should be plainly marked to indicate that it contains a Freedom of Information Act request for appeal.  If you should decide to appeal, please send your appeal to:

Department of Housing and Urban Development
FOIA Appeals
Senior Counsel, Office of General Counsel
Portals Building – Suite 200
1250 Maryland Avenue, SW
Washington, D.C.  20024


Thank you for your interest in the Department's programs and policies.

Sincerely,

Kara Norman
Acting FOIA Officer

Enclosures

## United States Department of Housing and Urban Development

## <u>DETERMINATION OF NO REASONABLE CAUSE</u>

CASE NAME:    National Fair Housing Alliance, et al v U.S. Bank N.A.
CASE NUMBER:   01-12-0283-8

## 1.    JURISDICTION

Complainants, National Fair Housing Alliance[1] (NFHA) et al., allege that Respondents, U.S. Bank N.A., U.S. Bancorp, or any subsidiary or division of U.S. Bank or U.S. Bancorp,[2] differently maintained properties upon which they had foreclosed based on the racial and ethnic composition of the neighborhood in which a foreclosed upon property was located.

The complaint alleges violations of Sections 804(a), 804(b), 804(c), and 804(d) of Title VIII of the Civil Rights Act of 1968 as amended by the Fair Housing Act of 1988. In relevant part, Section 804(a) makes it unlawful to refuse to sell on the basis of race, color, or national origin. Section 804(b) makes it unlawful to discriminate in the terms, conditions, or privileges of sale of a dwelling, or in the provision of services or facilities because of race, color, or national origin. Section 804(c) makes it unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement, with respect to the sale of a dwelling that indicates any preference, limitation, or discrimination based on race, color or national origin, or intention to make any such preference, limitation, or discrimination. Section 804(d) makes it unlawful to represent to any person because of race, color, or national origin that any dwelling is not available for inspection or sale when such dwelling is in fact so available.

Complainants filed their initial complaint on June 11, 2012 and subsequently amended the complaint on: October 15, 2013; March 11, 2014; October 10, 2014; and November 18, 2014. The last date of alleged discrimination was November 13, 2014. The complaint was timely filed and no Respondents receive federal funding.

---

[1] Complainants are the National Fair Housing Alliance and 19 of its member organizations: Miami Valley Fair Housing Center in Dayton, Ohio; Metro Fair Housing Services in Atlanta, Georgia; Fair Housing Center of Central Indiana in Indianapolis, Indiana; Greater New Orleans Fair Housing Action Center in New Orleans, Louisiana; Metropolitan Milwaukee Fair Housing Council in Milwaukee, Wisconsin; Open Communities in Winnetka, Illinois; South Suburban Housing Center in Homewood, Illinois; Connecticut Fair Housing Center in Hartford, Connecticut; HOME of Virginia in Richmond, Virginia; North Texas Fair Housing Center in Dallas Texas; Denver Metro Fair Housing Center in Denver Colorado; Fair Housing Center of the Greater Palm Beaches in Lantana, Florida; Fair Housing Continuum in Melbourne, Florida; HOPE Fair Housing Center in Wheaton, Illinois; Metropolitan Milwaukee Fair Housing Council; Housing Research and Advocacy Center in Cleveland, Ohio; and Fair Housing Center of West Michigan in Grand Rapids, Michigan. Hereinafter, the determination will reference all 20 complainants as 'Complainants' or 'NFHA'.

[2] Hereinafter referred to collectively as 'Respondents,' 'U.S. Bank,' or 'the Bank.'

## 2.     COMPLAINANTS' ALLEGATIONS

Complainants allege that Respondents maintain properties in African-American and Latino communities to a lesser extent than they do in predominantly white, non-Hispanic[3] communities. The first two amendments to the complaint added properties and metropolitan areas that brought the total scope of the complaint to 20 metropolitan areas (MSAs) and 394 properties. Complainants, through their most recent amendment, now allege that they investigated 650 properties. None of the amendments added new allegations, only additional MSAs and properties. Complainants allege that in each metropolitan area they investigated, they selected ZIP codes that contained predominantly white or predominantly minority populations and "ha[d] foreclosure rates that [we]re high for those metropolitan areas,"[4] inspected the physical condition of the property on one day, and assessed the property based on a list, created by Complainants, of 39 potential 'deficiencies' in the care of a property.[5] Complainants allege that properties in white communities were less likely to have deficiencies compared to properties in minority communities. Complainants allege that they have documented a practice of differential treatment in maintenance and marketing based on race, color, and/or national origin.

## 3.     RESPONDENTS' DEFENSES

Respondents deny the allegations. Respondents assert that for 275 of the 394 properties they acted only as an indenture trustee for the properties' owners. Respondents claim that, as indenture trustee, they had no obligations regarding any individual property or knowledge of any action taken by the mortgage originator, servicer,[6] or property preservation contractors (PPCs). Respondents claim that the originators, servicers, and/or PPCs of such properties were contractually obligated to collect mortgage and escrow payments, pay escrow account obligations, convey title upon payoff, initiate foreclosure proceedings upon loan default,

---

[3] Hereinafter the determination will refer to white, non-Hispanic ethnicities as "white," recognizing that, while there may be sub-populations within the Caucasian, non-Hispanic community that are minorities in certain regards or distinctions within that generic population, the primary categories referenced in the complaint pertain only to race, and more specifically the distinctions between African-American, Latino, and Caucasian, non-Hispanic populations.

[4] Complaint (November 18, 2014) at 6. The threshold for a "high foreclosure neighborhood" is not defined by Complainant.

[5] Including: trash accumulation, mail accumulation, grass/leaf overgrowth, shrubbery dead or overgrown, dead grass (10-50% and 50% or more), invasive plants (10-50% and 50% or more), broken mailbox, curb appeal (miscellaneous), unsecured or broken doors, damaged steps and handrails, damaged windows, damaged roof, damaged fence, holes, wood rot structure (miscellaneous), trespassing or warning sign, marketed as distressed, 'for sale' sign missing, broken or discarded signage, unauthorized occupancy, signage/occupancy (miscellaneous), graffiti, peeling or chipped paint, damaged siding, missing shutters, paint (miscellaneous), missing gutters, broken gutters, obstructed gutters, gutters (miscellaneous), water damage, small amount of mold, pervasive mold, water damage (miscellaneous), and exposed or tampered with utilities.

[6] An indenture servicer is an entity that performs servicing obligations for the benefit of investors in a trust indenture. In the case of trust indentures that include mortgages, the servicer performs most of the duties associated with a mortgage, such as accepting payments, calculating variable rates, maintaining accounting services, negotiating on default, and foreclosing and maintaining properties after foreclosure. For a trust indenture, it is the servicer, not the trustee, who controls properties within the trust. In contrast, the indenture trustee is more like a legal placeholder with ministerial duties that are defined by the original indenture agreement. See *infra*, fn. 21.

maintain properties upon conversion to Real Estate Owned[7] (REO) status, and dispose of properties with a fiduciary duty to the Trust. Respondents claim they have a policy of maintaining properties in the REO portfolio regardless of the racial or ethnic makeup of the neighborhood, and that their ultimate goal is to return the property to private ownership as quickly as possible. Respondents also claim that a majority of the properties in the complaint that they serviced are Federal Housing Administration (FHA) insured properties and, as such, Respondents followed FHA conveyance rules in their maintenance of the property in order to submit a successful insurance claim to the U.S. Department of Housing and Urban Development.[8]

## 4. FINDINGS AND DATA ANALYSIS

Complainants allege that Respondents have engaged in differential treatment in the maintenance and marketing of properties based on the racial, color, and national origin composition of the neighborhood where a given property is located. During their investigation, Complainants visited each property once, taking pictures of the property to support the claim that Respondents maintained properties differentially according to the racial and ethnic makeup of the neighborhood in which each property was located. Complainants claim that this 'point in time' visit and associated pictures prove their allegations. Taking Complainants' testing evidence as factual to support the claims makes the mistake of equating the testing of a single visit to an REO property with the testing of a single visit to a landlord. The evidence obtained during a point in time visit to a landlord ('one-dimensional' evidence) can support an allegation that a landlord discriminates because the allegation relates to disparate treatment at a single point in time (a 'one-dimensional' act). A claim that a landlord refuses to rent, or steers, can be proven based on a single instance because the discriminatory act occurs during that specific interaction.[9] In the allegations here—that the Bank discriminated by failing to maintain properties—the disparate treatment does not take place at a single point in time, but over the course of time (the discrimination is 'two-dimensional' rather than one-dimensional). Any testing sufficient to prove disparate treatment due to a lack of maintenance must likewise be two-dimensional (occur over time), where maintenance is defined as activity that serves to both maintain the quality of a property and, when applicable, bring it to a habitable or conveyable standard.[10] A single testing visit does not provide sufficient facts to assert such a claim. The facts presented are claimed to show the condition of a given property— but only on a single day. Just as it takes time for a property to fall into ill-repair, so too does it take time to address the maintenance needs of a property and bring it up to a habitable condition. 'Maintenance' is an ongoing, two dimensional,

---

[7] Real Estate Owned (REO) is an industry used term to designate a property owned by a lender following foreclosure. This includes properties owned by a Trustee through securitization.

[8] Hereinafter 'the Department'.

[9] Although point in time evidence can be used as proof that a series of instances of discrimination have occurred, those instances are still one-dimensional/point in time acts of discrimination occurring in a series rather than multi-dimensional acts that occur over time.

[10] Using one dimensional evidence to prove a two dimensional act is equivalent to trying to fill a square hole with a square of paper. Although it may fit the allegation, it lacks sufficient depth to prove the claim.

process, and a single test visit does nothing to show whether the condition of a property is improving or deteriorating.



Condition of two properties over time

Take for example Property 1 and Property 2. This chart illustrates the condition of these properties on the Y-axis, and time on the X-axis. Although Property 1 (dashed line) is in better condition at the time photographs of it are taken, it is receiving less maintenance and falling into worse condition. Meanwhile Property 2 (solid line) is in worse condition at the time of the photographs, yet maintenance is taking place that will bring this second property into better condition over time. Point in time sampling only addresses one dimension of analysis.

Complainants differentiated between minority neighborhoods and white neighborhoods, defining minority neighborhoods as those where minority residents comprise more than fifty percent of the population or white residents comprise more than fifty percent of the population, respectively.[11] The Department has accepted Complainants' definition for purposes of this determination.[12]

The primary basis of Complainants' allegation is that properties in minority and white neighborhoods were maintained differently according to their own list of 39 potential external

---

[11] Hereinafter, 'predominantly minority neighborhoods' (where 51% or more of residents are non-white) will be referred to as 'minority neighborhoods,' and 'predominantly white neighborhoods' (where 51% or more of residents are white) will be referred to as 'white neighborhoods' for the sake of brevity.

[12] Outside of this determination, the Department has used other more subtle definitions. The Department's Office of Policy Development and Research defined a neighborhood as a white neighborhood if its population was at least 90% white, and a neighborhood as a minority neighborhood if its population was at least 50% minority, in its 2012 HOUSING DISCRIMINATION AGAINST RACIAL AND ETHNIC MINORITIES report. This definition accounts for the existence of an 'integrated neighborhood,' classified as neither white nor minority. An 'integrated neighborhood' is a third category of neighborhood racial composition which recognizes that the perception of a neighborhood that is 51% white is not starkly different than the perception of a neighborhood that is 51% minority; assigning a racially based differential in treatment of properties in two such neighborhoods on Complainants' suggested *de minimis* difference would be specious at best. Some use the threshold that residents be at least 75% white or minority when racially classifying a neighborhood. See Ingrid Gould Ellen, Keren Horn, Katherine O'Regan, *Pathways to Integration: Examining Changes in the Prevalence of Racially Integrated Neighborhoods*, 14 CITYSCAPE 33 (2012); George Galster, *A Stock/Flow Model of Defining Racially Integrated Neighborhoods*, 20 J. OF URBAN AFFAIRS 43 (1998).

deficiencies.[13] The Department reviewed this list of deficiencies, and compared it to the legal obligations that Respondents had to the variety of properties with which they were associated within the pool of inspected properties. While Complainants' deficiencies may very well be related to the external aesthetic qualities of a property, Respondents did not have legal obligations to address many of them, and often spent significant resources addressing both external and internal facets of REO maintenance, as documented later in the Determination. More so, Complainants mark as deficiencies acts that the Bank was legally obligated to perform. For example, Complainants marked the presence of a 'vacant property' or a 'no trespassing' sign as evidence of discrimination without taking into account that, in some cases, municipalities require these for vacant properties.[14]. Likewise, some municipalities require that owners of vacant properties board, rather than replace, broken windows.[15] Again, though the Bank was legally obligated to board windows, Complainants would list the boarded window as a deficiency and evidence of discrimination. Complainants could not assess the internal condition of properties, and thus were unable to assess many maintenance factors that contribute significantly to the value of a home. Complainants list of deficiencies is both under- and over-inclusive when used to assess whether Respondents violated the Fair Housing Act.

Respondents' relationship with the properties that they maintained is governed by either FHA guidelines (if the property is being transferred to the Department in exchange for an FHA insurance payment, below) or 'private label' contractual obligations (undertaken by Respondents as servicers on behalf of the owner of title to a particular property). In either case, the list of contractually obligatory maintenance actions ("MAs") is far shorter and significantly different than the list of deficiencies produced by Complainants.[16] While Complainants' deficiencies

---

[13] See footnote 5, *supra*.

[14] In Milwaukee, for example, the city requires vacant lots to have signage saying: "No Parking. No Trespassing. No Dumping." City of Milwaukee Vacant Lot Handbook 11. Such signage is required to be affixed to every property entrance. Milwaukee Building Maintenance Ordinances 200-22(8)(e).

[15] Again, in Milwaukee, the city requires owners of vacant properties to board "all doors and windows on ground level, those doors and windows accessible to grade by stairs or permanently fixed ladders or within 10 feet of grade and any other doors, windows or other means of ingress or egress as directed by the commissioner." Milwaukee Building Maintenance Ordinances 275-32(7)(a-1).

[16] FHA insurance guidelines require: initial property inspection to determine occupancy and once vacant; ongoing inspections every 25-35 days or more frequently as authorized, but not more than 13 in a calendar year; securing against vandal and weather damage, including replacing doors, broken windows, and broken window panes (re-glazing) or boarding of holes; rekeying locks; removal of interior and exterior debris; roof repairs including patching or replacing loose shingles (with expenditure limitation that may be exceeded with Departmental approval); draining and securing hot tubs, pools, and spas; grass cuts, geographically and seasonally dependent within conveyance dates; snow removal; and winterization.

US Bank's Handling of Real Estate Owned, Vacant and Abandoned property contract requires: prompt security of the REO property unless prohibited by law; re-keying all locks; draining, covering, or maintaining and restricting access to any pool or water feature; taking pictures of personal property before removal, obtaining estimates of personal property worth, and determining if personal property eviction or auction is required prior to disposal; storing, if required by law, or disposing of all personal items in the REO property; removing all trash and hazardous materials, except if the REO property is being sold 'as is' and legal requirements do not require removal of trash and hazardous materials; and scheduling periodic maintenance, including lawn service, winterizing or de-winterizing, emergency securing, and debris removal.

focused on the appearance of the home and specific aspects of its maintenance that may impact the external, observational impression of a house, Respondents' obligations addressed health and safety concerns, ongoing surveillance, long-term/preventative maintenance, and the livability of a home, as well as compliance with local and federal housing codes and regulations. The evidence documented below shows that Respondents did not perform work outside or above their obligations in any area or on any property.

Over the course of its investigation, the Department reviewed Complainants' photographs, obtained maintenance records from Respondents, and reviewed the condition of each property for which Respondents were owner or servicer throughout its REO status. The maintenance record evidence primarily consisted of invoices that detailed the amount of money spent on each property that Complainants surveyed, maintenance records with descriptions of the maintenance work performed, and photographs taken both before and after Complainants' inspection of the property that documented deficiencies in the property and work that was performed.

This review included Complainants' evidence in the 20 metropolitan areas where Complainants alleged Respondents discriminated. Each property was evaluated according to its relevant governing contract. By calculating the amount of money spent by Respondents on a given property, the Department approximated the resources Respondents allocated to performing MAs on that property, allowing for an objective and comparable measure of Respondents' relative treatment of properties in various areas. All calculated expenditures were backed up with before and after photographic documentation.

In addition to focusing on completion of MAs, the Department extensively examined each of the 24 properties that were directly serviced by Respondents. These were the properties over which Respondents had complete control and no external contractual obligations to govern their actions. These properties were analyzed by use of the same types of photo-verified invoices for work performed on the other properties.[17] Given the degree of Respondents' control over these properties, the Department also compared these properties in a direct, narrative fashion on an MA by MA basis, as they were the most likely to show culpable behavior on the part of Respondents.

Finally, in those communities where significant numbers[18] of both minority area and white area properties were located – Milwaukee, WI; Dayton, OH; Indianapolis, IN; and Baton Rouge, LA – the Department analyzed criteria that served to distinguish, among all properties located in each city and serviced by Respondents, the properties that were similarly situated and eligible for a comparative analysis.[19] Determining what factors allow properties to be classified as similarly

---

[17] When Respondents maintain and market REO properties, they do so by contracting with PPCs to perform MAs. The PPC performs a maintenance act, and sends invoices to Respondents to be reimbursed.

[18] At least two homes from each racial category of neighborhood.

[19] The Department chose to analyze this complaint by using census tract level data rather than block level data (as Complainant did) for two reasons. First, tract level data are more widely available than block level data, and thus a wider array of variables could be explored in a layered analysis. Second, tract level data are more widely used and allow for broader applicability of this analysis in other forums. It is worth noting that the shift from block to tract data had a minimal effect on the classifications used by Complainant, and did not disturb the underlying basis of

situated is highly dependent on the facts of a given case. With the set of facts at hand, the Department looked at: property crime rates, because these rates could correlate to damage to property caused by vandals when comparing properties; housing value estimates; and median tract income. Using these three factors, the Department established pairs of properties that were similarly situated in most material aspects other than the racial composition of the neighborhood. Where pairings of properties in differently racially classified areas were found to be similar, the Department examined the adequacy or inadequacy of, or potential extra attention paid to, each property to determine if any similarly situated properties were treated differently depending on the racial classification of the neighborhoods in which they were found.

Although Complainants identified a large number of properties in their complaint, only a portion of them were actually Respondents' responsibility. Of the 394 properties identified in the complaint,[20] approximately two thirds of the properties had loans that had been securitized in various indentured trusts for which U.S. Bank was the indentured trustee, but not the actual servicer of the property, and thus not the decision-maker in a number of important regards.[21] As indenture trustee, Respondents had no authority to control or select servicers or make decisions regarding these properties such as foreclosure or maintenance scheduling.

Additionally, the FHA operates a loan guarantee program whereby the FHA insures approved lenders against loss on particular home loans, provided that the borrowers of such loans meet certain Departmental requirements. After foreclosure, the lender may, at its option, elect to convey the foreclosed home to the Department in exchange for an insurance pay-out (subject to the above requirements) or dispose of the property via sale in the private market.[22] FHA

---

their allegations significantly (e.g. only three of the 119 relevant properties would have been classified differently as to racial context).

[20] The Department focused on the properties in the original complaint and first two amendments. The October and November 2014 amendments added additional properties to review, but did not add any new allegations of discrimination. The Department determined that the properties in the original complaint and first two amendments were sufficient to make a finding regarding the allegations. Had the evidence showed any tendency towards a finding of discrimination, the Department would have reviewed additional properties.

[21] Trust indentures differ from ordinary trusts, and are governed by a separate set of laws, namely the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa through 15 U.S.C. § 77bbbb. A trust indenture involves an agreement in a bond contract that represents a bondholder's interests by laying out the rules for and responsibilities of the indenture trustee. These individual contractual relations dictate the relationship of the trustee to the trust in a manner that differs from the relationships between a trustee and a trust beneficiary in an ordinary trust (such as found in a trust held for the benefit of a child). In this context, the assets of a trust indenture consist of residential mortgage backed securities, and it is usually created by the originators of the underlying loans. That same originator also services the mortgage loans or hires a servicer. The servicer, after foreclosure and conversion to REO, hires a PPC to maintain the property on behalf of the trust. There can be many servicers or one servicer for the entire trust. When there are multiple servicers, there is one designated master servicer. The obligations of these parties are spelled out in a pooling and servicing agreement (PSA). Per the terms of the PSA, it is the servicers of the individual properties that make decisions to foreclose and then maintain foreclosed properties. For a definition of servicer, see footnote 6, *supra*. The indenture trustee differs from an ordinary trustee, and performs generally non-discretionary, ministerial duties.

[22] Five properties were transferred to the Bank's Real Estate Owned portfolio, and were sold to private owners, rather than transferred to HUD. Four of these properties are in minority neighborhoods and one is in a white neighborhood.

insurance will reimburse lenders for a portion of incurred losses in the event that their FHA-insured loans default with subsequent foreclosure sale.

Of the 394 properties inspected by Complainants, 119 were serviced by U.S. Bank Home Mortgage, a wholly owned subsidiary of Respondents.[23] Of the 119 properties serviced by Respondents, 95 were insured by the FHA. In order for the Respondents' to preserve the FHA insurance claim for these properties, the properties must be maintained subject to FHA regulations. The remaining 24 properties that were not FHA insured were serviced by Respondents and subject to maintenance standards set by Respondents.



The Department analyzed these 119 properties for any evidence of differential treatment. Each property analysis spanned Respondents' ownership of a given property up to the point the property was transferred to the subsequent owner or until the time that the complaint was filed. Each property was individually analyzed for evidence of discrimination. When the investigation showed that the expenditures and work performed on some properties varied dramatically from the average (either above or below), such outliers were reanalyzed for evidence of discriminatory treatment by direct line-item comparison. Where a sufficient number of eligible properties from each group were located and non-FHA properties were present (Milwaukee and Dayton), the Department engaged in the three part analysis outlined above: examination of total resource expenditure and MAs, narrative accounts of individual property treatment, and comparisons between similarly situated properties. Where no non-FHA properties were held by Respondents (Indianapolis), only the first and third components were analyzed. Many MSAs lacked sufficient properties for comparison and analysis, and that deficit is addressed as well.

---

[23] Complainant inspected 13 out of these 119 properties more than 60 days after Respondents had sold the property to a new owner.

### 4.1 Milwaukee

Complainants inspected a total of 34 properties in the Milwaukee metropolitan area – all located in the City of Milwaukee. Respondents serviced 25 of those 34 properties, which the Department reviewed.

Respondents addressed maintenance issues at every property they serviced in Milwaukee, and performed all MAs as described in the FHA guidelines or servicing contracts. Respondents maintained each property's yard on the same schedule and to the same standards. In cases where a property was below standard because it contained debris, Respondents performed the MA of removing debris. In cases where a property was deficient because it contained a broken door or window, Respondents performed the MA of repairing the door or window.



In both white and minority neighborhoods, Respondents addressed maintenance issues that corresponded to all FHA and REO obligations. At properties in white neighborhoods, Respondents performed an average of 2.7 MAs to address corresponding maintenance issues each month, while at properties in minority neighborhoods, Respondents performed an average of 3.4 MAs per month to address maintenance issues. Respondents spent an average of $11,175 to maintain properties in minority neighborhoods, and an average of $10,733 to maintain properties in white neighborhoods. Respondents spent an average of $786 per month to maintain properties in minority neighborhoods, and an average of $484 per month to maintain properties in white neighborhoods.[24] Although Respondents devoted more of their resources to address deficiencies in minority neighborhoods than they did in white neighborhoods, they assessed properties in both white and minority neighborhoods using the same standards – their FHA and REO obligations.

### 4.1.1 *Milwaukee: Non-FHA Insured, Respondent-Serviced Properties*

Non-FHA insured, Respondent-serviced properties are, amongst all in the complaint, those for which Respondents had the most direct responsibility and least amount of external oversight or obligation. By examining the individual actions taken or denied by Respondents, the Department

---

[24] While the overall amount spent on these properties differs by only two percent, Respondents held onto properties in white Milwaukee neighborhoods more than five months longer than in minority Milwaukee neighborhoods. Because Respondents held onto properties in minority neighborhoods for a shorter duration, but spent nearly the same amount on these properties as properties in white neighborhoods, they actually spent 62% more per month on properties in minority neighborhoods than on properties in white neighborhoods.

attempted to provide direct narrative comparability of a range of properties that were similarly situated in at least one significant regard.

Respondents owned 3209 21st Street from January 14, 2013 until November 14, 2013. Complainant inspected the property on August 7, 2013. It is in a minority neighborhood. Respondents regularly inspected this property. Property assessments noted personal debris and a leaking foundation causing mold in the basement. Respondents resealed the foundation and removed moldy components in both January and August of 2013. Inspections note neglect, water, and mold damage for two months before being addressed. During their ownership of the property, Respondents winterized the property, paid utility bills, re-secured the property after the lock box was found missing, mowed the lawn, and provided snow clearance.

Respondents owned 2424 29th Street from March 18, 2013 until October 16, 2013. Complainant inspected the property on July 24, 2013. It is in a minority neighborhood. Respondents regularly inspected this property. The property was occupied until June 2013. The property was identified as vacant and was physically secured in late June of 2013. A July inspection noted that the property had a roof leak, interior mold, broken windows, foundation seepage, loose siding, damaged fascia, overgrown grass, debris, and gutters that needed cleaning and repair. Respondents looked for a source of damage to kitchen ceiling tiles, repaired loose siding, removed interior debris, used bleach to treat mold, replaced a window, cleaned clogged gutters that were causing interior damage, replaced vinyl, trimmed excessive growth in the yard, cut the grass, trimmed shrubs, capped the gas line, made a roof repair, and made a window repair. Respondents' PPC bid on and performed yard work. Respondents identified a broken window at the property and a lock box was found to be missing. The property was re-secured in the following days but it is unclear to what extent window repairs were included. Respondents winterized the property and paid the utility bills. Respondents' inspections consistently identified exterior damage from neglect, storms, and water as well as interior mold. Bids to address mold and foundation seepage in the basement, discoloration in a closet, a damaged roof, and a rotting shower were rejected.

Respondents owned 3308 Galena Street from January 14, 2013 until July 31, 2013. Complainant inspected the property on August 12, 2013. It is in a minority neighborhood. Respondents regularly inspected this property. For a period of one month, a 'stop all work' order was put in place because the sheriff had not cleared Respondents to take possession of the property due to Wisconsin property laws. Respondents continued to make inspections and remove snow during this stop work order. During their ownership of the property, Respondents cleared snow, mowed the grass, installed a lockbox, re-secured the property after multiple break-ins, capped wires, winterized the home, removed carpet, removed a damaged ceiling, and tarped the roof. Inspection indicated that the home was missing handrails on the stairs going both upstairs and downstairs, but these were not installed. Inspection also noted that some of the rooms "needed trim." Respondents did not add trim. When the PPC requested a new roof for the property, Respondents requested additional information.

Respondents owned 3351 N. 79th Street from April 22, 2013 until March 21, 2014. Complainant inspected the property on August 26, 2013. It is in a white neighborhood. Respondents regularly inspected this property. Respondents winterized and de-winterized, removed snow, performed

lawn maintenance, removed debris, replaced locksets, and installed a water meter. Respondents rejected bids to replace the water heater's drain valve and to clean the gutters.

Respondents owned 3230 Mount Vernon Avenue from April 1, 2013 until September 13, 2013. Complainant inspected the property on August 21, 2013. It is in a minority neighborhood. Respondents regularly inspected, performed lawn maintenance, ordered plumbing inspections, removed carpet, removed moldy drywall, installed a dehumidifier, and repaired the sump pump in this property. Respondents did not deny any maintenance act bids from the PPC.

Respondents owned 604 N. 30th Street from January 14th, 2013 until February 11, 2015. Complainant inspected the property on August 12, 2013. It is in a minority neighborhood. Upon receiving the property, the initial inspection showed that the cabinets were destroyed, most of the pipes and wiring were missing, and the toilets were smashed. So much debris had to be removed that the initial contractor hired to remove trash left without completing its contract, and a replacement contractor had to be found. Respondents removed all debris, boarded windows per municipal law, installed a lock box, repaired the front door, winterized the home, and performed regular lawn maintenance and snow removal. Respondents denied bids to repair gutters and downspouts, replace defective roof boards, replace handrails on the porch, and replace defective porch boards.

Respondents owned 1930 Windlake Avenue from April 1, 2013 until December 10, 2013. Complainant inspected the property on August 7, 2013. It is in a minority neighborhood. Respondents obtained a "cash for keys" agreement with the tenants living in the property, allowing them to reside in the property until July 6, 2013. When Respondents gained possession of the property there were no personal items or debris present. Respondents winterized the house, regularly maintained the lawn, and shoveled snow. Respondents did not deny any maintenance act requests from the PPC.

Respondents owned 1243 S. 26th Street from October 24, 2011 through March 19, 2013. Complainant inspected the property on November 15, 2012. It is in a minority neighborhood. The property was occupied by the mortgagor's wife until August 2012. In August 2012, Respondents noted that they were having difficulty getting bids for debris removal because most of the property was so heavily infested with cockroaches. Respondents performed inspections, rekeyed doors, cut the grass, performed snow removal, removed trash and debris, exterminated pests, performed winterization, paid utility bills, capped wires, repaired and installed handrails, repaired a step, and installed a safety rail. In January 2013, the city of Milwaukee cited the property for issues regarding the paint, a window reframe, and a porch. Respondents solicited bids for and repaired all hazardous conditions.

Respondents owned 8531 W. Olive Street from January 14, 2013 until July 17, 2013. Complainant inspected the property on July 31, 2013. It is in a minority neighborhood. The property was occupied until June 2013, and Respondents sold the property the following month. The June 22 inspection report that first identified the property as vacant states there was exterior neglect damage and that the lawn height was over 10 inches. A July inspection report notes opening an order to clean and repair gutters, the chimney, the roof, and the sump pump, and states there is a bid pending to remove debris. This inspection identified exterior damage from neglect, water, and a roof leak as well as interior mold. During the month Respondents possessed

the property, Respondents secured the property, cut the overgrown grass, trimmed the shrubs, trimmed a tree touching the garage, paid the electric and gas bills, repaired a step, repaired a sump pump, completed a roof repair where the roof was actively leaking, installed a missing adjustable chimney cap, installed gutters on the detached garage, and cleaned the clogged gutters on the house.

Respondents owned 2113 S. 14th Street from February 11, 2013 through October 21, 2013. Complainant inspected the property on August 7, 2013. It is located in a minority neighborhood. Respondents inspected the property, rekeyed the locks, capped a gas line, removed interior and exterior debris which included hazardous materials, installed smoke detectors, performed lawn care, paid utility bills, replaced shingles and windows, and painted trim. A bid to install a dehumidifier was approved to reduce moisture in the home. Bids to trim trees, remove trees, and cap and seal a water valve were denied. A note next to the water valve bid states "water [utilities are] off." Two bids were submitted to handle mold, and Respondents requested resubmission of these bids. Respondents also requested resubmission of bids to replace a window and clean gutters. Respondents denied bids for debris removal and cleaning the refrigerator as unnecessary.

### 4.1.2 *Milwaukee: Similarly Situated Properties*

Of the 25 properties in the Milwaukee MSA, four similarly situated pairings of minority and white area properties were found. Of those, two pairings evidenced greater spending on the minority area property, one had a negligible spending differential in favor of the white property, and one had greater spending in the white area property relative to the minority area property.[25]

421 South 64th Street, located in a white neighborhood, incurred an overall expense of $16,666. 2424 29th Street South, located in a minority neighborhood incurred an overall expense of $7,359. When looking at the amount spent on a monthly basis, 2424 29th Street South incurred $1,752 per month in expenses versus South 64th Street's $663 per month.[26] Because 421 South 64th Street was received by Respondents in extremely poor condition, including exterior paint peeling to the extent that the city cited the property for a code violation, Respondents were forced to spend $10,669 just to perform MAs addressing city violations.

---

[25] Although for purposes of this determination these properties are being treated as similarly situated, the white neighborhood property in this instance is FHA insured, while the two minority area properties are not. As these properties are governed by different contracts, they are actually not similarly situated and, in actuality, there are no sufficiently similarly situated pairings of properties between white and minority area properties in Wisconsin for comparison. Nevertheless, the one potentially similar pairing was addressed for the sake of argument.

[26] Respondents possessed 2424 29th Street South for 4.2 months while it possessed 421 South 64th Street for 25.1 months.

4.2   Dayton

Complainants inspected a total of 50 properties in the Dayton metropolitan area: 40 in Dayton, one in Farmersville, one in Kettering, six in Miamisburg, and one in West Carrollton. Respondents serviced 34 of those 50 properties: 27 in Dayton, one in Farmersville, one in Kettering, four in Miamisburg, and one in West Carrollton. The properties with both the highest and lowest expenditures were in white neighborhoods.



Respondents addressed maintenance issues at all properties by performing the corresponding MAs, as described in the FHA guidelines or servicing contracts, at every property they serviced in the Dayton MSA. Respondents maintained each property's yard on the same schedule and to the same standards. In cases where a property had issues with debris, Respondents performed the MA of removing debris. In cases where a property was deficient because it contained a broken door or window, Respondents responded by performing the necessary MA of repairing the door or window. At properties in white neighborhoods, Respondents performed an average of 2.72 MAs to address corresponding property deficiencies each month, and at properties in minority neighborhoods Respondents performed an average of 3.02 MAs per month to address maintenance issues. Respondents spent an average of $8,439 to maintain properties in minority neighborhoods, and an average of $11,472 to maintain properties in white neighborhoods. Respondents spent an average of $306 per month on properties in minority neighborhoods and $367 per month in white neighborhoods. While Respondents spent more money in white neighborhoods than in minority neighborhoods, this was due largely to two outlier properties in white neighborhoods, both of which had serious maintenance issues for Respondents to address. When these two properties are removed, Respondents spent an average of $8,825 ($298 per month) in white neighborhoods, virtually equal to the spending in minority neighborhoods. Respondents assessed properties in both white and minority neighborhoods using the same standards, the FHA and REO obligations.

4.2.1   *Dayton: Non-FHA Insured, Respondent-Serviced Properties*

Non-FHA insured, Respondent-serviced properties are, amongst all in the complaint, those for which Respondents had the most direct responsibility and least amount of external oversight or obligation. By examining the individual actions taken or denied by Respondents, the Department attempted to provide direct narrative comparability of a range of properties that were similarly situated in at least one significant regard.

Respondents owned 503 Clifton Drive in Dayton from August 23, 2010 until November 3, 2010 and it is in a minority neighborhood. Complainant inspected the property, secured and resecured the property, and cleared the property of internal and external debris on September 15, 2010. The property was sold 59 days after it was found to be vacant.

Respondents owned 2537 Bushnell Avenue in Dayton from May 21, 2010 until February 23, 2011. Complainant inspected the property on February 16, 2011. It is located in a white neighborhood. Respondents regularly inspected this property, which was identified as vacant and physically secured in late July, 2009. A large roof leak had caused a moldy interior. The leak was tarped seventeen days after discovery, and re-tarped throughout Respondents' possession. The house had debris throughout; suffered break-ins; possessed wet and moldy carpet; suffered from additional roof leaks; and had multiple broken windows in the main residence and the garage. Debris and carpeting were removed, entrances were secured, floors were scrubbed to eliminate mold, roof leaks were tarped, and broken windows were boarded. Respondents winterized, inspected, and re-secured the property.

### 4.2.2  Dayton: Similarly Situated Properties

Of the 33 properties in the Dayton MSA, 15 similarly situated pairings of minority and white area properties were found for comparison. Of those, seven pairings evidenced a greater expenditure on the minority area property than on the white area property, and one pairing, although with greater expenditure on the white area property, was of a negligible difference.[27]

Four of the seven remaining white neighborhood positive expenditure differential pairings involved two of the three largest expenditure properties on the list—those expenditures that presented themselves as outliers. 233 N. Lansdowne Ave, located in a predominately white neighborhood, incurred the highest expense. Records show that the property had a damaged roof, damaged foundation, and a basement which flooded on multiple occasions (inspectors noted up to 4 inches of water in the basement more than once). This property also contained debris including furniture, a car, a boat, a camper, and trash. While in Respondents' possession, this property was broken into and vandalized multiple times. Vandals stole copper wires, opened gas lines, stole a sump pump, ripped out drywall, and damaged the plumbing—all of which had to be replaced over the possession of the property. 1622 Meriline Ave., located in a white area, incurred the third highest overall expenditure.[28] Respondents spent two years removing debris from this property. Additionally, this property contained damage and hazardous conditions,

---

[27] Because the Department is tasked with investigating the allegations of the complaint, that U.S. Bank treated properties in white neighborhoods better than properties in minority neighborhoods, this analysis is tailored to that purpose. In the interest of economy, this determination omits devoting resources to explaining the details of the eight pairings that show more resources were devoted to minority properties, since discrimination cannot be shown against a minority group when that group is treated demonstrably better than the majority group to which it is being compared. The Department did thoroughly investigate and analyze the treatment of these properties, and this can be seen in the final investigative report.

[28] This paragraph analyzes the four referenced pairings, by discussing two significant outlier properties, since 233 N. Lansdowne Ave pairs with a single minority property and 1622 Meriline pairs together with three separate similarly situated minority properties: 125 Sandhurst Drive, 4575 Nevada Ave, and 1112 McArthur Ave. This section only discusses the white properties because "when the investigation showed that the expenditures and work performed on some properties varied dramatically [above or below] the average ... these properties were reanalyzed on the chance that they evidenced discriminatory treatment." (Supra, p. 7) In the similarly situated analysis, we dove deeper into these white properties because they deviated from the average in terms of resources devoted by the bank to maintenance activities. The minority properties did not deviate from the average, so were not reanalyzed in narrative (although they were checked for 'normalcy' of associated maintenance action patterns).

including exposed wires and missing handrails, and debris including rotting food, urine and feces stained carpet, shards of glass, a vermin infested stove, a moldy dishwasher, and chemicals in the basement. The roof of this property had an active leak, the gutters were damaged and falling off, and the front porch steps were crumbling. A tree was damaging the property from the outside and had to be removed. Exterminators treated this property for fleas, roaches, rats, and mice.

The three remaining similar property pairings warrant more extensive comparison on a house by house basis. 509 W. Parkwood Pl. is located in a predominately minority neighborhood. 233 S. Wright is located in a predominately white neighborhood. Both properties received regular inspections, roof repairs, yard maintenance, debris removal, and other mandated MAs. The debris removal in Wright was more expensive, and many of the items removed were marked as health hazards. Additionally, Wright required a one-time repair which cost $11,643.85, more than half the ultimate expenditure on the property, which included an entirely new HVAC, A/C, heating, and electrical system, dishwasher, and bathroom refit. Both properties were eventually conveyed to HUD, and each was in conveyance condition under the FHA guidelines at that time. There is no evidence of differential treatment between these two properties, only differential initial condition.

1641 Pell Dr. is located in a white neighborhood. 1451 Canfield Ave. is located in a minority neighborhood. Both properties were secured, regularly inspected and received regular grass cutting in addition to the rest of the contractually obligated MAs. Both properties were cleaned of debris after Respondents took possession. Pell required greater expense to remove debris. Respondents had to clear out multiple items marked as health hazards, including personal hygiene products, moldy debris, soiled mattresses, motor oil, paint, moldy carpet, and other items. Respondents addressed a city violation at Pell for overgrown grass and weeds at the time they took possession. At Canfield, Respondents performed MAs that included removing a damaged wood floor, cutting and capping damaged pipes, capping exposed wires, installing a missing outlet, removing interior and exterior debris including trash, wood, and a gas tank. At Canfield, Respondents also boarded a damaged step, exterminated, installed a dehumidifier, installed a vent cover, and installed a sump pump. There is no evidence of differential treatment between these two properties, only differential condition.

4550 Berquist Drive is located in a minority neighborhood, and 328 Dean Drive is located in a predominately white neighborhood. Respondents performed the standard set of contractual MAs on both properties. The Dean property was acquired in different condition, and required more than $9,000 in additional interior debris removal (accounting for nearly all of the difference in expenditure).

4.3    Indianapolis

Complainants inspected a total of twelve properties in the Indianapolis MSA: eleven in Indianapolis and one in Lawrence. Respondents serviced nine of those twelve properties: eight in Indianapolis and one in Lawrence.

Respondents performed MAs, as described in the FHA guidelines or servicing contracts, at every property suffering maintenance issues that they serviced in the Indianapolis MSA. Respondents maintained each property's yard on the same schedule and to the same standards. In cases where a property was deficient because it contained debris, Respondents performed the MA of removing debris. In cases where a property was deficient because it contained a broken door or window, Respondents responded by performing the MA of repairing the door or window. In cases in both white and minority neighborhoods, Respondents addressed maintenance issues that corresponded to FHA and REO obligations. At properties in white neighborhoods, Respondents performed an average of 2.0 MAs to address corresponding property deficiencies each month, and at properties in minority neighborhoods, Respondents performed an average of 2.9 MAs per month to address corresponding property deficiencies. Each of these maintenance acts corresponded to an FHA or REO obligation. Respondents spent an average of $12,553 ($606 per month) to maintain properties in minority neighborhoods, and an average of $9,359 ($556 per month) to maintain properties in white neighborhoods. While Respondents devoted more of their resources to address deficiencies in minority neighborhoods than they did in white neighborhoods by spending more money and requesting more maintenance actions, they addressed properties in both white and minority neighborhoods by the same standards, their FHA and REO obligations.



Only one similarly situated pairing of white area and minority area properties was examined for comparison in Indianapolis. 8050 East 48th Street, located in a white neighborhood, incurred an overall expense of $19,597. 6048 Meadowlark Drive, located in a minority neighborhood, incurred an overall expense of $7,384. Respondents incurred a greater overall expenditure for 8050 East 48th Street due to its initial condition. The ceiling had collapsed in many locations due to mold damage, with a significant amount of its insulation falling through. The carpet was a safety hazard due to mold damage. Much of the property's foundational structure was rotten, and feces had to be removed.

### 4.4    Louisiana



Complainants have indicated to the Department that what they believe to be their strongest evidence is in Louisiana. Complainants inspected a total of 43 properties in Louisiana: 13 in Baton Rouge, six in Denham Springs, one in Mandeville, 19 in New Orleans, two in Prairieville, and two in Slidell. Respondents serviced 25 of those 43 properties: eight in Baton Rouge, four in Denham Springs, and 13 in New Orleans. Baton Rouge and New Orleans are approximately 80 miles apart, and Denham Springs is about 12 miles from Baton Rouge.[29] The white neighborhoods are all located in Denham Springs. Respondents spent an average of $9,917 to maintain properties in minority neighborhoods in Louisiana, and an average of $7,077 to maintain properties in white neighborhoods. Of the twelve properties in the Baton Rouge MSA, only one similarly situated pairing of minority and white area properties presented itself when controlling for neighborhood composition and value of property. Between the two properties in that pairing, the minority area property received nearly three times as much spending on MAs as the white area property. The MAs Respondents performed were consistent throughout the life of each property in the MSA, without regard as to whether the property was FHA or private label or the date of Complainants' observations. Respondents visited and performed MAs, as described in the FHA guidelines or servicing contracts, in white neighborhoods at an average of 2.32 times a month and in minority neighborhoods at an average of 2.72 times a month.

### 4.5    Other Areas

In California and Virginia, Respondents did not service any of the properties inspected by Complainants. In Florida, Washington, D.C., and Georgia, Respondents did not service any of the properties in white neighborhoods inspected by Complainants and, as such, there are no properties for comparison to the properties in those respective minority neighborhoods. In Maryland, the sole property serviced by Respondents was in a white neighborhood, and there are no properties serviced by Respondent in minority neighborhoods for comparison. In Connecticut, Illinois, Texas, and Tennessee, Respondents serviced only one white area property in the sample inspected by Complainants, allowing for only anecdotal comparison. Connecticut and Tennessee each contained only a single property in a white neighborhood and in both instances the property

---

[29] For purposes of this analysis, properties in New Orleans were eliminated from consideration because it is a separate MSA, more than eighty miles from Baton Rouge. Properties in Denham Springs were included in the Baton Rouge MSA. Denham Springs, however, is a predominantly rural community outlying Baton Rouge, and represents a poor comparator to Baton Rouge proper. However, for purposes of argument, Denham Springs properties were compared to Baton Rouge properties without regard for this difference. The analysis presents totals and comparison based on the Baton Rouge/Denham Springs area only.

in the white neighborhood received the lowest maintenance expenditure of all of the properties serviced by Respondent.

4.6     Marketing

Complainants have alleged that Respondents marketed properties differently based on the racial composition of the neighborhood in which a property is located. Complainants base this allegation on whether or not the property contained a "for sale" sign at the time of Complainants' inspection. As previously discussed, properties subject to FHA loans are not marketed by Respondents but are transferred to the Department, and Respondents are not directly involved in the marketing of trust properties for which they are not the servicer. Respondents serviced 24 properties in eight metropolitan areas not subject to FHA loans. Respondents were responsible for overseeing marketing of these properties.

The 24 properties are located in eight metropolitan areas. Connecticut, Georgia, Maryland,[30] and Louisiana each have only one property marketed by Respondents and consequently do not have a second property for comparison. The two properties in the Washington, D.C. area were both located in minority neighborhoods. Illinois, Ohio, and Wisconsin have one property in a white neighborhood, making only anecdotal comparison possible. In Wisconsin, the two properties with signs in place were in minority neighborhoods, and the sole property in a white neighborhood did not have a "for sale" sign. In Ohio, the sole white property did not contain a "for sale" sign at the time of inspection. The sole property in a white neighborhood in Illinois had already been sold prior to Complainant's inspection.

Collectively, 18 of the 24 properties were in minority neighborhoods, and six were in white neighborhoods. According to Complainants' inspection reports, six of the 24 properties contained "for sale" signs at the time of inspection: two in white neighborhoods and four in minority neighborhoods. Title for five of these properties had been conveyed by Respondents prior to Complainants' inspection, four of which were in minority neighborhoods. Since title for both properties in white neighborhoods which contained "for sale" signs had been conveyed prior to Complainant's inspection, it was the case that none of the properties in white neighborhoods that were owned by Respondents at the time of inspection contained a "for sale" sign.

The investigation has also analyzed whether the presence of a "for sale" sign is a reliable indicia of Respondents' marketing of a property. Because the complaint alleges a failure to market on a particular day, the investigation has analyzed whether there is an observable delay in the sale of a property lacking a "for sale" sign. Two properties had not been sold by Respondents at the start of the investigation, one in a white neighborhood and one in a minority neighborhood. Respondents successfully sold the remaining 22 properties either before or after Complainants' inspection. Title for three properties, two in minority neighborhoods, was transferred in thirty

---

[30] While three properties are located in the state of Maryland, Complainants have clarified to the Department that two of these properties, located in Suitland and Capitol Heights, are considered part of the Washington, D.C. metropolitan area and one of these properties, located in Annapolis, is considered part of the Baltimore metropolitan area. The Suitland and Capitol Heights properties are located in minority neighborhoods, and the Annapolis property is located in a white neighborhood. The properties are, thus, geographically incomparable.

days or fewer following Complainant's inspection. None of these properties contained "for sale" signs at the time of inspection. Unsold properties that did not contain a "for sale" sign on the inspection date sold an average of 95 days following the inspection, and those containing "for sale" signs at the time of inspection sold an average of 115 days later.[31] Further, properties in minority neighborhoods sold an average of 100 days following Complainant's inspection, while properties in white neighborhoods sold an average of 107 days following the inspection.

## 5.    DISCUSSION

The complaint relies largely upon photographic evidence to demonstrate maintenance act-related discrimination. On their face, the photographs alone do not prove discrimination—the evidence that they provide requires further investigation. The data collected by the Department show no discernible pattern or practice of discrimination in any market, nor do they indicate a discernable difference in treatment when viewing this case through a testing lens.

### 5.1    Photographic Evidence Submitted by Complainants

Complainants submitted photographs for each REO property they investigated as the primary evidence to substantiate their claim of discrimination. These photographs, taken of the exterior of each property by Complainants' inspectors, purport to show the maintenance (or lack thereof) of each property, thereby proving that properties in minority neighborhoods were not treated as well as those in white neighborhoods.

Complainants' theory of the case relies upon the assumption that overall property condition can be determined exclusively by a single snapshot view of the external maintenance level of a property. Complainants' methodology, however, does not take into account the possibility of change over time, shown by their reliance on photographs taken at a single point in time rather than over a longer period of time. Because Complainants took these photographs at a single point in time and not over a period of time, they do not demonstrate Respondents' treatment of the properties or the effect of the property on the other homes in the neighborhood or community. At most, they show whether a particular deficiency existed at a particular time on a particular day.[32]

The photographs do not differentiate between properties that required prior exterior maintenance and those that did not; do not take into account the condition of properties at the time they came into Respondents' possession; and do not account for the level or lack of upkeep by the mortgagor and whether Respondents had to rehabilitate the property to reach the state shown in the photographs (i.e. they one-dimensionally address a two-dimensional issue).

---

[31] This may partially indicate a difference in the manner in which property is sold. The modern property market is no longer reliant on passer-by sales, and 'for sale' signs are not a predominant, or possibly even important indicator of marketing success. Most home sales and advertisements have moved online, making physical indicators of saleable status obsolete.

[32] This is important in the context of Complainants' analysis of a property. Problems like broken windows or doors are far more common in areas of high property crime, and much less common in areas of low crime, a statistic that can vary by a factor of nearly 50 (see FN 47, *infra*). The likelihood that Complainant noted a broken, untreated window on a particular day is far greater in a very high property crime area than in a very low property crime area. However, the evidence indicates that broken windows and doors were routinely repaired by Respondents.

The photographs fail to demonstrate action or inaction by Respondents. It was unclear from the photographs when or how a deficiency came into being, and the lack of a deficiency at a different property does not mean that Respondents have made or would make a repair at that other property, either as it stands alone or relative to other properties. Additionally, the photographs only demonstrate the condition of the exterior of the property and fail to account for MAs performed on the interior of the property. Beyond that, reasonable minds may differ about the quality of a property's exterior conditions based on what is shown in a photograph.[33] The photographs are of varying quality and the weather conditions presented in the photographs often inhibit the ability of investigators to rely solely on the photographs to assess a property's exterior condition.

In order to use photographs to assess the properties identified by Complainants, the Department obtained from Respondents hundreds of exterior and interior photographs of each property taken over the course of Respondents' maintenance of the properties.[34] The Department reviewed these photographs alongside Complainants' photographs, creating a photographic timeline spanning the entirety of Respondents' ownership of each property. Even with photographic documentation spanning months and often years, the photographs failed to show that properties were treated differently based on neighborhood composition over time or at any given point in time. The photographs, taken together, did not provide evidence showing that Respondents maintained properties in minority neighborhoods poorly. Nor did these photographs provide evidence of any properties' effect on nearby homes. No objective assessment of the treatment of the property based on photographs can be made because there are too many variables to come to any concrete conclusion.[35] The photographs, standing alone, do not provide the necessary context for a finding of discrimination on the basis of race, color, or national origin.

The Department conducted its own small survey in 2013 in an attempt to replicate Complainants' survey. Using the Fulton County, Georgia property records website,[36] investigators identified three foreclosed properties transferred to Respondents upon foreclosure in the Atlanta-Sandy Springs-Marietta, Georgia Metropolitan Statistical Area (MSA), and then visited these properties on June 26, 2013. The Department photographed each home from several angles to obtain a complete picture of the property. The Department excluded all non-single family properties and

---

[33] It is worth noting that the photographic coding engaged in by Complainant often credited 'deficiencies' for instances as minimal as a single piece of light weight trash, such as a candy wrapper, that may have just blown onto a property, and may likely blow away before the Respondent would have ever known of its presence or had an opportunity to address it.

[34] The photographs provided by Respondent were taken by the PPC at each property on every visit, and detailed conditions before and after every maintenance act. They justified standard, approved items and were also used to justify bids on outlying expenditures that had to be approved beyond standard costs. The photographs essentially provided a month to month, and sometimes week to week, visual timeline of the interior and exterior condition of the property.

[35] Given the variability in many of the deficiencies that Complainant explored, controls for such variables as crime, rainfall, proximity to major bodies of water, neighborhood density, and even wind speed may have been required to accurately assess the attribution of deficiencies. The Department did not, however, differentiate properties to that extent for purposes of this determination.

[36] FULTON COUNTY BOARD OF ASSESSORS WEB ACCESS TO PROPERTY RECORDS, *available at* http://qpublic9.qpublic.net/ga_search_dw.php?county=ga_fulton (last visited on March 3, 2015).

analyzed three properties (one in a white neighborhood and two in minority neighborhoods) in the same manner as Complainants conducted their investigation. The assessment of these properties by multiple investigators demonstrated wide variability in potential coding outcomes based on the same objective information, and led the Department to believe that Complainants' documentation of evidence may have been subjective in many instances.

### 5.2    No Statistical Pattern or Practice

Another way to show discrimination in the maintenance and marketing of foreclosed properties would be to prove Respondents had a pattern or practice of discriminating in the way they maintained and marketed their properties. In the present case, Complainants allege that "in each of the metropolitan areas, Complainants observed a *systemic and particularized practice* of engaging in different treatment in maintaining and/or marketing REO properties on the basis of race, color[,] and/or national origin," (emphasis added).[37] This allegation from Complainants alleges a 'pattern or practice' of disparate treatment.

Respondents act to maintain and market REO properties through contractors. Looking at the amount of money spent by Respondents on each property approximates maintenance acts performed by Respondents on that property, and approximately accounts for the severity of the remedial action that needed to be taken on a given property. In this case, the photographs provide a timeline that documents every maintenance act performed on a property. While this photographic timeline shows no pattern on its own, it provides evidence confirming that maintenance acts were in fact performed.

The complaint alleges that Respondents "maintain REO properties that are located in white census tracts better than properties located in predominately African-American and Latino neighborhoods in the same metropolitan area"[38] and is alleged to be supported by systemic testing. Complainants allege this discrimination occurred in 24 metropolitan areas, and identified 650 properties as evidence of disparate treatment. This allegation requires comparing how the bank treated white area properties in a particular MSA with how the bank treated minority area properties in the same MSA. Restricting comparisons to MSA is further necessary because each MSA has its own municipal codes governing foreclosed properties, because each MSA's rates for maintenance tasks varies, and because of the unique climate of each MSA, both economically and geographically. Further, Complainant selected for consideration only homes in certain ZIP codes without a firm set of criteria, and often eliminated relevant properties from consideration "unless they were already occupied or under renovation at the time of the site visit."[39] Additionally, the number of properties identified in each MSA is too small to rule out sampling error. When restricting comparisons internally to MSAs, all but four MSAs have information on only one or no properties in white areas. Without properties in both white and minority

---

[37] Complaint (November 18, 2014) at 7.

[38] Id.

[39] Id.

neighborhoods, analyzing the allegations in these MSAs is not possible, since comparisons are impossible.[40]

The lack of comparable properties was compounded when taking into consideration the differences in Respondents' obligations between FHA insured and indenture trustee properties.[41] In order to properly compare Respondents' treatment of properties in white neighborhoods with properties in minority neighborhoods, FHA insured properties in white neighborhoods have to be compared to FHA insured properties in minority neighborhoods, and likewise for non-FHA insured properties. This further subdivides the number of properties in each MSA that can be reliably compared directly to each other. This necessary differentiation would reduce the numbers of comparable properties to such a degree that no comparisons could be drawn in any MSA in this case. For the sake of argument, however, the Department conducted this analysis by comparing all 119 properties serviced by Respondents, regardless of their insurance status. Even with this argumentative concession, the analysis does not show a pattern of spending or maintenance that would support a conclusion that there was discriminatory treatment based on the minority composition of a neighborhood.

As demonstrated in the charts below, there is no pattern of spending disparity between properties in white neighborhoods and minority neighborhoods. In Milwaukee, the Bank spent an average of $11,175 per property in minority neighborhoods, and an average of $10,743 per property in white neighborhoods.[42] Per month, the Bank spent an average of $773 to maintain properties in minority neighborhoods and $484 in white neighborhoods.[43] In Dayton, the Bank spent an average of $8,439 on properties in minority neighborhoods and an average of $11,472 on properties in white neighborhoods, while in Indianapolis, the Bank spent an average of $12,553 on properties in minority neighborhoods and an average of $9,359 on properties in white neighborhoods. The amount spent per property shows no pattern, and varies dramatically based on the unique needs of any given property.

Not only is there no differential spending pattern, but deeper analysis reveals that spending varies dramatically based on the unique needs of any given property. The amount the bank spent on properties within Milwaukee varied by an average of $566. The amount the bank spent on properties within Dayton varied by an average of $10,007. The amount the bank spent on properties within Indianapolis varied by an average of $6,075. This wide range of spending was consistent for properties in both white neighborhoods and minority neighborhoods. Even if the average amount spent on properties showed a disparity in spending, the disparity would be

---

[40] A number of MSAs were surveyed such that data was only collected on one valid property for a particular racial category. A comparison based on a single property would require a generous, and legally dubious, presumption of coincidental representativeness. Such anecdotal comparisons were not pursued in this investigation.

[41] See generally footnote 16 for the differences between FHA- and non-FHA insured properties. In addition to the practical differences in their care, their varied legal status prevents direct consideration.

[42] When calculating the amount spent on each property while it was in Respondents' possession.

[43] See footnote 24, above. Although average spending was very close, Respondents sold minority neighborhood properties more quickly than white neighborhood properties, so the time corrected minority neighborhood spending averages are higher.

statistically illusory since there were too few properties from which to draw any valid conclusion given the wide variation in spending.



**Total Spent Milwaukee**

51% / 49%

■ White: $10,733
▣ Minority: $11,175

**Total Spent Dayton**

42% / 58%

■ White: $11,472
▣ Minority: $8,439

**Total Spent Indianapolis**

57% / 43%

■ White: $9,359
▣ Minority: $12,553

**Avg. Spent Milwaukee**

62% / 38%

■ White: $484
▣ Minority: $786

**Avg. Spent Dayton**

45% / 55%

■ White: $367
▣ Minority: $306

**Avg. Spent Indianapolis**

52% / 48%

■ White: $556
▣ Minority: $606

Although the information available, taken at face value, fails to present evidence of discrimination, the nature of how Complainants selected properties as evidence also prevents statistically valid conclusions from being drawn. Complainants first limited property selection to ZIP codes that have "high foreclosure rates," and further by eliminating properties that "were already occupied or under renovation at the time of the site visit."[44] Eliminating properties under renovation at the time of Complainants' site visit could skew the data by excluding the very properties that show evidence of Respondents maintaining that particular property. In addition to eliminating properties from consideration, ten percent of the properties Complainants identified were no longer owned by Respondents at the time of Complainants' assessment, and had been conveyed to a new owner an average of two months prior to the examination.[45] Including these properties for consideration would skew the data by attributing the condition of these properties to Respondents' action when the property was no longer within Respondent's control.[46]

---

[44] Complaint (November 18, 2014) at 7.

[45] See footnote 23, *supra*.

[46] Given that Complainant also attributes point in time responsibility to the owner of a property and does not account for prior condition by previous owners, including such properties also fails Complainant's internal logic.

## 5.3 Comparability of Properties: Testing Evidence.

As an alternative to pattern and practice analysis, the Department investigated the complaint through a testing analysis. The evidence at hand is insufficient, however, to meet the evidentiary standard necessary to carry a cause determination.

The analysis of this case presents a novel interpretation of traditional testing methodology. Since, similar houses cannot be moved from one neighborhood to another to assess their treatment by Respondents, the testing model involves finding similarly situated REOs and assessing their treatment as a proxy for Respondents' treatment of the relevant neighborhoods. Given our analysis of the variables involved in the assessment of any REO, at a minimum, similarly situated REOs would require: (1) similar property value at the time of bank acquisition; (2) similar property condition at the point of acquisition; (3) similar time in private ownership (since mortgage issuance); (4) similar time in possession of Respondent; and (5) similar age of property. In addition, any analysis would also have to control for neighborhood characteristics such as: (1) crime rate; (2) local zoning ordinances; (3) neighborhood income; and (4) environmental characteristics.

Factors like the property crime rate (which, for example, varied between Ohio tracts from 14% and 673% of the national average for property crime) would imply variation in the frequency and severity of vandal damage to a property. Such a difference which would often run into multiple thousands of dollars and sometimes months of additional work on a given property, particularly when electrical and plumbing systems were stripped for the value of the copper, or air conditioning units were repeatedly stolen.[47] This particular factor would also affect the likely incidence of damage[48] to a property. The age of a property and the condition at its point of acquisition create issues of work prioritization and of a servicer's capacity to fund addressing issues of varying severity. Environmental characteristics speak to the kinds of wear and tear on a home as well as how that damage occurs. Longitudinal housing value also plays into the standard against which the treatment of the home would be measured – if the home's condition is to impact the value of the neighborhood, its value must generally fall below that of the neighborhood, and do so for a sufficient period of time such that it has an impact on the property value of nearby homes. Average local home value would have to be sampled over time to obtain at least a rough estimate of the impact of that particular foreclosed home in the neighborhood. Such evidence was not provided and could not be supplied by one time testing.

---

[47] E.g. 233 N. Lansdowne Ave in Dayton, *supra* at page 14.

[48] Criminal incidence is illustrative of the type of comparability issues faced in this analysis. Property crimes require both a repair response from the servicer and re-securing of the property, both of which take time and increase expenditure on a property beyond the time to and cost of repair of standard maintenance issues. If a given property is in an area where a property crime is five or six times more likely to happen, it stands to reason that, if surveyed on any given day, that REO is five or six times more likely to evidence a property crime through no fault of the servicer. The property is also far more likely to incur increased expense and prioritization of different maintenance acts than an REO not requiring such attention. This is dramatized in the case of Dayton, where property crime rates in the highest crime rate neighborhood were more than 48 times higher than those in the lowest crime rate neighborhood.

In the in-depth case study of Dayton, even with generous definitions of similarity, only ten pairs of properties were located that could be considered sufficiently similarly situated for purposes of this comparison. Of those ten, six exhibited greater expenditure on the properties in minority neighborhoods and one exhibited no appreciable difference in expenditure. When analyzed further, the three pairs of properties where more was spent on the white area property showed no significant difference in treatment, but were instead all treated the same according to the terms of the FHA and REO contracts that governed their maintenance, with differences in expenditure attributable to idiosyncratic exigencies (e.g. extensive cleanup requirements, intense neglect, or repeated vandalism). The lack of adequate difference in treatment in the few comparable properties available provides strong evidence against the likelihood of discriminatory treatment of the subject properties when analyzing this case under a testing methodology.

Similar results were obtained for the other two MSAs where similarly situated properties were located. Wisconsin had four similarly situated pairings of two white area and two minority area properties, all of which had justifiable differences in expenditure, and only one of which could have potentially supported Complainants' claim of discrimination. The only similarly situated pairing in the Baton Rouge area had an expenditure differential of nearly 200% in favor of the minority property. In Indianapolis there was only a single pair of comparable properties, and more was spent on the property in the white neighborhood than on the property in the minority neighborhood. In that example, the spending differential was justified by the facts that the property in the minority neighborhood required only debris removal, while the property in the white neighborhood required a new roof, new siding, and had a rotting interior with significant water damage. Both were FHA properties and were treated according to the terms of the FHA contract that governed their maintenance.

Even ignoring the problems with how Complainants compared properties and accepting for argument their comparability, the evidence does not show any evidence of difference in treatment of the properties based on the racial and ethnic makeup of the neighborhoods. A testing analysis of this data does not support the conclusion that discrimination occurred.

### 5.4 The Question of Trustee Liability and Additional Servicer Maintenance

This analysis covered all of the 119 properties serviced by U.S. Bank, including both the 24 Bank owned properties and the 95 FHA insured properties. One might argue that 119 properties is not enough to complete the investigation, and that the additional 275 trust properties should be examined in order to increase the scope of the investigation. The remaining 275 properties were part of securities for which U.S. Bank served as indenture trustee. A 'trust indenture' is different from an ordinary trust, and is not governed by trust law.[49] Because of the indenture trustee's lack of agency in such an arrangement, U.S. Bank had no knowledge of the maintenance history for any of these properties. They were serviced by servicers that were not controlled by U.S. Bank. Since U.S. Bank had no access to this information, the investigation focused on the properties serviced by U.S. Bank. However, the Department found no evidence that U.S. Bank exercised control over the maintenance of any trust properties in the complaint, that it was in regular

---

[49] See discussion above at footnote 21.

communication with the servicers, or that it received reports concerning trust property maintenance.

Evidence shows that when U.S. Bank received correspondence regarding a trust property, the Bank forwarded this correspondence to the servicer and notified the servicer of its responsibility as the servicer. In addition, according to the terms of the PSAs, if the servicer of a trust property ever were to default, those servicer's duties would then be imposed on the trustee. No evidence exists showing that such a servicer default ever occurred for any of the properties named in the complaint.

For the sake of completeness, the Department analyzed the 275 remaining properties in case the Bank did exert some control over these servicers. These 275 trust properties were scattered among 28 servicers. The maintenance procedures performed by one servicer will, by their very nature, be different from the maintenance procedures performed by another servicer, and any comparison between properties must necessarily occur within the portfolio of a single servicer. A number of servicers serviced only a single property – lacking any properties for comparison, the Department necessarily eliminated these properties from consideration. 97 properties were serviced by Wells Fargo, which has already settled its liability in regards to the alleged failure to maintain foreclosed properties. These properties were also eliminated from consideration.

The Department then sorted the properties of the remaining servicers by geography and neighborhood racial classification for, while ABC Mortgage Servicer might service more than one property, if it has one property in Miami and another in San Francisco, the Department cannot compare these properties to one another.[50] After sorting by servicer, geography, and race, 257 properties were eliminated from analysis, leaving the Department with only 18 properties eligible for comparison. These were properties serviced by Ocwen in the Dayton and Virginia Beach metropolitan statistical areas, and Select Portfolio in Chicago.[51] Ocwen and Select Portfolio Servicing (SPS) provided maintenance records for the properties in these areas to the Department for review.

Despite the unlikelihood of Respondents' liability, the Department analyzed these 18 properties for the signs of discrimination outlined above.

Six properties in Virginia Beach, Virginia held in trust by Respondents were serviced by Ocwen. Four of these properties were located in minority neighborhoods, and two were located in white neighborhoods. All properties were assessed using the same forms and standards, and all properties were regularly inspected, photographed, and received maintenance. All properties were winterized in September or October, and all properties received regular yard maintenance with the exception of one property in a majority white neighborhood (where Ocwen serviced the property only during winter months). The treatment of these properties varied depending on the needs of the property. For example, debris removal was needed beyond the initial work when a property was vandalized. A review of the maintenance records did not demonstrate any noticeable differences in treatment that were not attributable to the particular condition of the

---

[50] See discussion of inter-geographic comparisons above at *supra* page 21.

[51] A chart illustrating this breakdown is included in the final investigative report.

property at the time it was conveyed to US Bank. It is notable that the two properties with the fewest deficiencies identified by Complainant were both in minority neighborhoods.

Ocwen serviced four properties in Dayton, Ohio held in trust by Respondents. Two of these properties were located in minority neighborhoods, and two were located in white neighborhoods. All properties were assessed using the same forms and standards, and all properties were regularly inspected, photographed, and received maintenance. For example, two properties, one in a minority area and another in a white area, were occupied prior to the servicer taking possession and, in both cases; routine visits were made to document inspection and verify occupancy of the property. The other two properties also had inspections and significant damage was noted on the property in the white community with no documentation of corrective action taken. A review of the maintenance records did not demonstrate any differences in treatment.

Complainant inspected eight properties in the Chicago MSA held in trust by Respondent and serviced by SPS. Four of these properties were located in minority neighborhoods, and four were located in white neighborhoods. The records demonstrated that the properties were assessed using the same forms and standards. All properties were inspected regularly and photographed, were winterized in the fall, and received regular yard maintenance. The expenses at the properties varied depending on the needs of the property.

There is no evidence that U.S. Bank exerted control over any of the trust properties named in the complaint, and the maintenance records that were analyzed contained no evidence of disparate treatment.

### 5.5    Disparate Treatment *Prima Facie* Approach

This case can also be analyzed as an unequal treatment case under the burden shifting approach.

### 5.5.1    *804(a)*

To establish a claim under Section 804(a) for otherwise denying or withholding property because of the racial or ethnic composition of a neighborhood, the evidence must show that (1) activities involving maintenance or marketing of dwelling occurred; (2) properties in minority areas were maintained or marketed less well than properties in white areas; and (3) the discriminatory conduct in maintenance or marketing activities rendered housing unavailable or denies housing in minority areas because of race.

The second and third criteria have not been met. The evidence supports the conclusion that Respondents were engaging in maintenance and marketing of some properties, and the evidence does not support a conclusion that maintenance or marketing activities were different based on the racial or ethnic composition of a neighborhood. In addition, there is no evidence that the alleged discriminatory maintenance or marketing resulted in housing becoming unavailable.

Complainants alleged that the conduct in the complaint was the result of unequal treatment. The investigation has not found any evidence to support this allegation.

### 5.5.2  *804(b)*

To establish a claim under Section 804(b) for discrimination in the terms or conditions of housing because of the racial or ethnic composition of a neighborhood, the evidence must show that (1) activities involving maintenance or marketing of a dwelling occurred; (2) unfavorable terms or conditions of maintenance or marketing were imposed on properties because of the racial or ethnic composition of the neighborhood in which they were located; and (3) similar properties in other areas were maintained or marketed on more favorable terms. 24 C.F.R. 100.65(b)(2).

The second and third elements have not been met. The evidence does not support a conclusion that maintenance and marketing services were extended unequally based on the racial composition of the neighborhoods in which they were located.

Respondents' maintenance records revealed that Respondents performed regular inspections and maintenance on properties in neighborhoods of all racial compositions and that these activities were consistent with existing policies. In addition, an analysis of maintenance and marketing activities indicates that similar activities and expenditures occurred regardless of the racial or ethnic composition of the neighborhoods. There is no evidence that Respondents gave instructions for its agents to treat properties differently based on race, color, or national origin.

### 5.5.3  *804(c)*

To establish a claim under Section 804 (c), the evidence must show: (1) Complainants are a member of a protected class; (2) Respondents made, printed, or published a notice, statement, or advertisement with respect to the sale of a dwelling; and (3) the notice, statement, or advertisement indicated a preference, limitation, or discrimination based on a protected class.

Complainants contend that Section 804(c) was violated where Respondents allegedly selectively placed "for sale" signs on their REO properties based on neighborhood racial composition.

Where a "for sale" sign was not placed at a property, the second and third elements have not been met, as no statements were made with regard to the sale of a dwelling.

Where a "for sale" sign was placed at the property, the third element has not been met, as these signs do not indicate a preference or limitation based on a protected class. None of the "for sale" signs are alleged to contain preferences or limitations based on a protected class.

Putting a for sale sign on one property and failing to put one on another property does not satisfy element three indicating a preference, limitation, or discrimination based on a protected class. For FHA insured properties, Respondents are prohibited from placing "for sale" signs at the properties during their period of conveyance to the Department, and the properties are not for sale during this period. Where Respondents were responsible for marketing the properties, there is no evidence of failure to market based on the racial composition of the neighborhood. Additionally, the presence or absence of a "for sale" sign does not appear to have a material effect on whether or after how long a property was sold.

The investigation did not uncover any statements expressing preference, limitation, or discrimination based on a protected class in relation to the properties in the complaint.

### 5.5.4   *804(d)*

To establish a claim under Section 804(d) of the Act, the evidence must show: (1) Complainants are members of a protected class; (2) Complainants requested information on the availability of particular housing; (3) Respondents failed or refused to provide truthful information as to the availability of such housing; and (4) the housing remained available thereafter.

Based upon the evidence, the second, third, and fourth elements have not been met. Complainants do not claim to have requested from Respondents information on the availability of any properties, and the investigation has not uncovered any such request. The investigation has not found any instances where Respondents refused to provide truthful information to inquirers regarding property availability. While some properties lacked a "for sale" sign, there is no evidence that these occurrences were motivated by neighborhood racial or ethnic composition.

While Complainants contend that Respondents has an obligation to improve the properties to increase their resale value, this is not an obligation imposed by the Fair Housing Act. No housing was made unavailable, and suspected disinvestment in a community is not equivalent to making housing unavailable.

### 6.   **CONCLUSION**

Based upon the information set forth above, there is no reasonable cause to believe that Respondents engaged in a pattern or practice of discriminatory treatment as alleged, engaged in individual instances of discrimination as would be indicated by testing, or violated Sections 804(a), (b), (c), or (d) of the Fair Housing Act.

7.    **ADDITIONAL INFORMATION**

Notwithstanding this determination by HUD, the Fair Housing Act provides that Complainants may file a civil action in an appropriate federal district court or state court within two years after the occurrence or termination of the alleged discriminatory housing practice. The computation of this two-year period does not include the time during which this administrative proceeding was pending. In addition, upon the application of either party to such civil action, the court may appoint an attorney, or may authorize the commencement of or continuation of the civil action without the payment of fees, costs, or security, if the court determines that such party is financially unable to bear the costs of the lawsuit.

The Department's regulations implementing the Act require that a dismissal, if any, be publicly disclosed, unless a party requests that no such release be made. 24 CFR 103.400(a)(2)(ii). Such request must be made within thirty (30) days of receipt of the determination to Director, Office of Enforcement, Office of Fair Housing and Equal Opportunity, 451 Seventh Street, S.W. Washington, D.C. 20410.  Notwithstanding such request by the Respondent, the fact of a dismissal, including the names of all parties, is public information and is available upon request.

For a copy of the Final Investigation Report for this case contact:

> U.S. Department of Housing & Urban Development
> Mark Butler
> Office of Fair Housing and Equal Opportunity
> Thomas P. O'Neil Jr. Federal Building
> 10 Causeway Street, Room 321
> Boston, Ma 02222

> On behalf of the Department of
> Housing and Urban Development

_Susan M. Farward_

1-8-2016

Susan M. Forward          Date
Region I Director
Office of Fair Housing and Equal Opportunity