**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; HOUSING RESEARCH & ADVOCACY CENTER; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-00839<br><br>Judge Harry D. Leinenweber |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DEUTSCHE BANK; DEUTSCHE BANK AG; DEUTSCHE BANK NATIONAL TRUST; DEUTSCHE BANK TRUST COMPANY AMERICAS; OCWEN FINANCIAL CORP.; and ALTISOURCE PORTFOLIO SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

SUMMARY OF THE COMPLAINT'S ALLEGATIONS ................................ 4

ARGUMENT ..................................................................................................... 5

I.    The Complaint Inadequately Pleads Discrimination ............................. 6

    A.    Plaintiffs' Disparate-Impact Theory Fails ............................... 6

        1.    The Complaint does not adequately allege racial disparities ..................... 7

        2.    The Complaint does not adequately identify a policy that caused the alleged disparities ............................... 11

    B.    Plaintiffs' Disparate-Treatment Theory Fails ....................... 13

        1.    The Complaint inadequately pleads discriminatory intent ...................... 13

        2.    The disparate-treatment claim against Ocwen and Altisource fails for additional reasons. ............................... 15

II.    The Complaint Inadequately Pleads Proximate Causation ................. 16

III.    The Complaint Inadequately Pleads Additional Claim-Specific Elements ..................... 19

    A.    Plaintiffs Do Not Adequately Plead A Section 3604 Or 3605 Claim .................. 19

    B.    Plaintiffs Do Not Adequately Plead A Claim For Perpetuation Of Segregation .. 21

    C.    Plaintiffs Do Not Adequately Plead A Section 3617 Claim ................................. 22

IV.    The Complaint Is Untimely ................................................................ 23

CONCLUSION.................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................ *passim*

*Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) ............................................17, 18, 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................................................6, 11, 23

*Bloch v. Frischholz*, 587 F.3d 771 (7th Cir. 2009) .................................................................21, 22

*Chin v. Port Auth.*, 685 F.3d 135 (2d Cir. 2012) .........................................................................14

*City of L.A. v. JPMorgan Chase & Co.*,
    2014 WL 3854332 (C.D. Cal. Aug. 5, 2014)........................................................................15

*City of L.A. v. Wells Fargo & Co.*, 2015 WL 4398858 (C.D. Cal. July 17, 2015),
    *aff'd*, 691 F. App'x 453 (9th Cir. 2017).................................................................................24

*City of Miami v. Bank of Am. Corp.*,  171 F. Supp. 3d 1314 (S.D. Fla. 2016) .................10, 23, 24

*Cnty. of Cook v. Bank of Am. Corp.*,
    2018 WL 1561725 (N.D. Ill. Mar. 30, 2018).............................................................17, 18, 19

*Cnty. of Cook v. Wells Fargo & Co.*,
    2018 WL 1469003 (N.D. Ill. Mar. 26, 2018)................................................................ *passim*

*Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439 (7th Cir. 1994) .................................................24

*Fornalik v. Perryman*, 223 F.3d 523 (7th Cir. 2000).....................................................................6

*Gilty v. Vill. of Oak Park*, 919 F.2d 1247 (7th Cir. 1990) ...........................................................14

*Godbole v. Ries*, 2017 WL 219506 (N.D. Ill. Jan. 19, 2017)........................................................23

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..........................................................15, 25

*Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1 (2010) ..................................................................19

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
    2017 WL 2984048 (N.D. Tex. July 13, 2017) ........................................................................7

*La Playita Cicero, Inc. v. Town of Cicero*,
    2014 WL 944859 (N.D. Ill. Mar. 11, 2014)...........................................................................24

*Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797 (7th Cir. 2008)......................................25

*Matsunaga v. Century 21 Stanmeyer Realtors,*
   1985 WL 1113 (N.D. Ill. May 7, 1985) ...................................................................269

*Merritt v. Countrywide Fin. Corp.,*
   2015 WL 5542992 (N.D. Cal. Sept. 17, 2015) ...........................................................7

*Minch v. City of Chi.*, 486 F.3d 294 (7th Cir. 2007) ...........................................................6

*Moore v. FDIC*, 2009 WL 4405538 (N.D. Ill. Nov. 30, 2009) ...........................................21

*Munguia v. Ill.*, 2010 WL 3172740 (N.D. Ill. Aug. 11, 2010) .............................................7

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n,*
   2018 WL 1411106 (N.D. Cal. Mar. 21, 2018) ............................................11,12, 14

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) .........................................26

*O'Neal v. Ore. Dep't of Justice*, 2015 WL 7722413 (D. Ore. Nov. 30, 2015) ..................7

*Ponticiello v. Aramark Unif. & Career Apparel Servs., Inc.,*
   2006 WL 2699416 (N.D. Ill. Sept. 19, 2006) ...........................................................25

*Puffer v. Allstate Ins. Co.*, 675 F.3d 709 (7th Cir. 2012) .................................................15

*Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553 (7th Cir. 2001) ..............................................8

*SEC v. Ustian*, 229 F. Supp. 3d 739 (N.D. Ill. 2017) ........................................................6

*Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696 (7th Cir. 2001) .............................24

*Soto v. City of W. Chi.*, 2010 WL 4810612 (N.D. Ill. Nov. 19, 2010) ..............................13

*Southend Neighborhood Improvement Ass'n v. St. Clair Cnty.,*
   743 F.2d 1207 (7th Cir. 1984) ................................................................................21

*Speer v. Rand McNally & Co.*, 123 F.3d 658 (7th Cir. 1997) .....................................24, 25

*TBS Group, LLC v. City of Zion*, 2017 WL 5129008 (N.D. Ill. Nov. 6, 2017) ...........7, 13, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...................................6

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,*
   135 S. Ct. 2507 (2015) ................................................................................ *passim*

*Wetzel v. Glen St. Andrew Living Cmty., LLC,*
   2017 WL 201376 (N.D. Ill. Jan. 18, 2017) ..............................................................13

**Statutes and Rules**

42 U.S.C. § 3604.................................................................................................................21

42 U.S.C. § 3604(a)................................................................................................6, 19, 21

42 U.S.C. § 3604(b)..............................................................................................6, 19, 20

42 U.S.C. § 3605............................................................................................6, 19, 20, 21

42 U.S.C. § 3613(a)(1)(A)...........................................................................................10, 23

42 U.S.C. § 3613(a)(1)(B)................................................................................................23

42 U.S.C. § 3617...................................................................................................6, 19, 22, 23

Fed. R. Civ. P. 12(b)(6).................................................................................................5, 7

## INTRODUCTION

Defendants Deutsche Bank National Trust Company, Deutsche Bank Trust Company Americas (together, the "Trustee Defendants"), "Deutsche Bank," and Deutsche Bank AG (together, with the Trustee Defendants, the "Deutsche Bank Defendants"),[1] Ocwen Financial Corp. ("Ocwen"), and Altisource Portfolio Solutions, Inc.[2] ("Altisource") categorically deny Plaintiffs' claim that Defendants violated the Fair Housing Act ("FHA") by purportedly committing race discrimination in maintaining and marketing certain real-estate owned ("REO") properties. Defendants acted properly and without regard to race. That is precisely what the U.S. Department of Housing and Urban Development ("HUD") concluded when many of the same Plaintiffs here filed substantially similar FHA claims against another bank, with HUD finding that the evidence refuted Plaintiffs' claims of race discrimination. But the Court need not delve into any of the evidence here because Plaintiffs face a threshold problem: the Complaint fails to state a claim.

First, the Complaint inadequately pleads discrimination. Plaintiffs assert a disparate-impact theory against the Deutsche Bank Defendants alone based on Plaintiffs' study of some "Deutsche Bank-owned" REO properties in select cities, which purportedly found that properties in predominantly white neighborhoods were better maintained and marketed than properties in predominantly minority neighborhoods. In rejecting a nearly identical study, HUD concluded that Plaintiffs' statistical methodology contains fundamental flaws. Because those same

---

[1] As discussed in the Supplemental Memorandum in Support of Motion to Dismiss filed concurrently on behalf of "Deutsche Bank" (an entity that does not exist), Deutsche Bank AG (an entity that does not have any connection to the facts alleged in the Complaint), Deutsche Bank National Trust Company (incorrectly named as Deutsche Bank National Trust), and Deutsche Bank Trust Company Americas, each of those four Defendants was improperly named here.

[2] Plaintiffs have served and improperly named Altisource Portfolio Solutions, Inc. ("APSI") as a defendant in the caption of its Complaint. APSI is a holding company that has not conducted business in this jurisdiction and has no other connection to the facts in this case. For this independent reason, APSI should be dismissed from this case.

1

methodological flaws are apparent on the face of the Complaint, they require dismissal.

Specifically, Plaintiffs' "study" consisted of a single visit to some properties and recording information about their condition.  Of course, a study based on one-time visits can show only the condition of a property at a particular time on a particular day, not whether the property's condition is improving.  Moreover, Plaintiffs did not control for the property's condition when a Defendant acquired the right to maintain it.  Absent that baseline, Plaintiffs do not and cannot plausibly plead that Defendants spent less time or money on properties in minority communities.  Worse, Plaintiffs ignored properties where maintenance work and repairs were actively occurring at the time of the visit—ignoring the very conduct that Plaintiffs purported to study.  And Plaintiffs allegedly found statistically significant disparities only by aggregating data about properties in 30 metropolitan areas over a 7-year period.  This was improper: some cities actually ***require*** the actions that Plaintiffs declare discriminatory, and data collected outside the FHA's two-year statute of limitations cannot be used to plead discrimination within the limitations period.

Plaintiffs' disparate-treatment theory also fails.  Unlike disparate impact, a disparate-treatment claim requires a showing of discriminatory intent.  Plaintiffs principally base their allegations of discriminatory intent on Defendants' supposed knowledge of the alleged statistical disparities.  But Plaintiffs have not adequately alleged that statistical disparities existed, so by definition Plaintiffs cannot plead that Defendants knew about any disparities.  In any case, the Supreme Court has held that mere knowledge of a disparate impact is insufficient to plead discriminatory intent, and Plaintiffs offer no other allegations demonstrating a racial motive.

Plaintiffs' disparate-treatment claims against Ocwen and Altisource suffer from yet another flaw: Plaintiffs concede they do not know whether the properties that they studied were

maintained or marketed by Ocwen, Altisource, or some third party. Plaintiffs cannot assert that Ocwen discriminated based on the condition of properties maintained by Altisource or a third party, just as they may not assert that Altisource discriminated based on the condition of properties maintained by Ocwen or a third party.

Second, the Complaint inadequately pleads proximate cause. The Supreme Court has held that FHA claims generally may not reach beyond the first step in the causal chain, yet Plaintiffs' theory implicates many links and third-party decisions. For example, Plaintiffs allege the Trustee Defendants delegated discretion to servicers like Ocwen and vendors like Altisource, which allegedly resulted in subcontractors failing to properly maintain and market properties, which allegedly caused third parties to decline to buy or rent those properties, which allegedly decreased neighboring property values, which allegedly necessitated Plaintiffs' investigation, which allegedly diverted resources from Plaintiffs' missions. Plaintiffs' purported diversion of resources is thus far too remote from Defendants' alleged conduct to plead proximate cause.

Third, the Complaint inadequately pleads other required elements. The FHA provisions underlying Counts I-III require discrimination in "real estate-related transactions" or the "sale or rental" of property. Plaintiffs plead no facts to support their conclusory assertion that discrimination in maintaining and marketing REO properties made those properties unavailable for sale or rental. Plaintiffs' statistics, for example, do not even purport to show a racial disparity in the availability of properties. Count IV, asserting the "perpetuation" of racial segregation, similarly fails to plead facts supporting its assertion that Defendants' conduct perpetuated segregation—something that Plaintiffs' statistics again do not even purport to measure. Finally, Count V asserts violations of the FHA's anti-retaliation provision. But the Complaint provides no plausible basis to support the conclusion that Defendants' alleged conduct was an intentional

3

attempt to retaliate against Plaintiffs for engaging in FHA-protected conduct.

Fourth, the Complaint is untimely.  This 2018 lawsuit challenges conduct dating back to 2011, but Plaintiffs offer nothing beyond conclusory allegations to plead discrimination within the FHA's two-year limitations period.  At the very least, Plaintiffs' claims should be dismissed insofar as they challenge conduct more than two years before the dates when Plaintiffs named Defendants as respondents in an administrative action with HUD.

## SUMMARY OF THE COMPLAINT'S ALLEGATIONS

The Complaint alleges that the Trustee Defendants held title to various foreclosed properties in trust across the United States.  Compl. ¶ 35.[3]  When a borrower defaults on a mortgage owned by a Trustee Defendant, the property may ultimately be sold at a foreclosure sale.  If no third party buys the property at the foreclosure sale, a Trustee Defendant obtains title to the property,[4] which is then referred to as "Real Estate Owned" or "REO" property.  *Id.* ¶ 3. The Complaint alleges (incorrectly) that the Trustee Defendants "contracted with Ocwen and/or Altisource to provide property maintenance services for most of the REOs owned or controlled" by the Trustee Defendants.  *Id.* ¶ 35; *see id.* ¶¶ 56-59.

Plaintiffs are a collective of twenty housing organizations from around the country.  *Id.* ¶¶ 14-33.  From 2011 to 2017, Plaintiffs allege they conducted a study of "Deutsche Bank REO properties" by visiting properties in parts of 30 metropolitan areas with "the highest foreclosure rates."  *Id.* ¶¶ 67-68.  Plaintiffs say they inspected each of these properties unless the properties "appeared to be occupied" or "work was actively occurring at the time of the site visits."  *Id.* ¶

---

[3] The Complaint fails to distinguish between any of the Deutsche Bank Defendants, or to identify the residential mortgage-backed securitization ("RMBS") trusts on whose behalf the Trustee Defendants were allegedly acting.  The significance of this failure is addressed in the Deutsche Bank Defendants' Supplemental MTD Memorandum.  For purposes of this summary, Defendants refer to "Trustee-affiliated entities" to indicate where Plaintiffs' imprecise allegations inaccurately refer to "Deutsche Bank."

[4] As explained in the Deutsche Bank Defendants' supplemental brief, this is performed by the servicer or an agent appointed by the servicer.

68. For the properties they inspected, Plaintiffs evaluated 39 "maintenance and marketing conditions," such as trash on the property, boarded windows, and graffiti on the home. *Id.* ¶¶ 5, 72. From this, Plaintiffs contend that "Deutsche Bank REO properties" in predominantly minority neighborhoods contained more maintenance and marketing "deficiencies" than properties in predominantly white communities. *Id.* ¶ 79. Plaintiffs assert these alleged disparities are statistically significant if measured "[o]n an aggregate basis across the communities investigated." *Id.* ¶ 80.

Based primarily on the purported results of their study, Plaintiffs assert five counts under the FHA. *Id.* ¶¶ 255-84. Plaintiffs do not contend they have any interest in the properties at issue. Instead, they allege that Defendants' purported violations injured Plaintiffs by, *inter alia*, "requiring" them to divert time and resources to their investigation. *Id.* ¶¶ 133-238. Plaintiffs also allege injuries to communities they supposedly serve, asserting that Defendants' purported conduct resulted in increased crime, reduced property values, and other ills. *Id.* ¶¶ 239-47.

On February 26, 2014, Plaintiffs filed an administrative action against the Deutsche Bank Defendants with HUD. *Id.* ¶ 89. On February 14, 2017, Plaintiffs amended that complaint to add Ocwen and Altisource as respondents. *Id.* Plaintiffs filed this suit in February 2018, adding to a long line of similar actions that Plaintiffs have filed against owners of REO properties across the country,[5] and dismissed their administrative action before HUD shortly thereafter.

## ARGUMENT

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility" only "when the plaintiff pleads factual content that allows the

---

[5] *See NFHA v. Fed. Nat'l Mortg. Ass'n*, No. 16-6969 (N.D. Cal.); http://www.dsnews.com/news/01-14-2016/score-one-victory-for-us-bank; http://nationalfairhousing.org/case-settlement-information/.

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts require "'specificity in pleading' … to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope'" of success. *Id.* at 558-59.[6]

## I. The Complaint Inadequately Pleads Discrimination.

Plaintiffs' claims all require plausible allegations of discrimination. Compl. ¶¶ 255-84 (alleging violations of 42 U.S.C. §§ 3604(a)-(b), 3605, 3617); *Iqbal*, 556 U.S. at 678. Plaintiffs assert discrimination under two theories: a disparate-impact theory against the Deutsche Bank Defendants alone (Compl. ¶ 124), and a disparate-treatment theory against all Defendants. The Complaint fails to state a claim under either theory.

### A. Plaintiffs' Disparate-Impact Theory Fails.

To "protect potential defendants against abusive disparate-impact claims" and ensure their "prompt resolution," the Supreme Court has emphasized that in assessing FHA claims like those at issue here, it is "important" to "examine with care whether a plaintiff has made out a prima facie case … at the pleading stage." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523-24 (2015) ("*Inclusive Communities*"). *Inclusive Communities* thus placed "limitations on disparate-impact liability" under the FHA and established the pleading requirements for such a claim. *Id.* at 2524. A plaintiff must (1) present statistical evidence of an adverse "disparate impact," (2) identify a specific, race-neutral "policy"

---

[6] In resolving this motion, the Court may consider matters subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Exhibit A to the accompanying Declaration of Stephen J. Kane ("Kane Dec.") is judicially noticeable because it is a HUD decision produced under FOIA. *See Fornalik v. Perryman*, 223 F.3d 523, 529 (7th Cir. 2000) ("agency determinations are subject to judicial notice"); *SEC v. Ustian*, 229 F. Supp. 3d 739, 763 (N.D. Ill. 2017). Exhibit B is judicially noticeable because it is a compilation of city ordinances implicated by Plaintiffs' claims, each publicly available through government websites. *See Minch v. City of Chi.*, 486 F.3d 294, 300 n.3 (7th Cir. 2007).

of the defendant, and (3) establish a "robust" "causal connection" between the two.  *Id.* at 2523-24.  A "plaintiff who fails to allege facts at the pleading stage" supporting these elements cannot proceed.  *Id.* at 2523.  The Complaint fails to do so and should therefore be dismissed.

### 1.    The Complaint does not adequately allege racial disparities.

Several years before the Supreme Court reached a similar conclusion in *Inclusive Communities*, this Court held that a complaint must "demonstrate a disparate effect using some appropriate measure that can adequately capture how a plaintiff is treated differently as a member of a protected group." *Munguia v. Ill.*, 2010 WL 3172740, at \*9 (N.D. Ill. Aug. 11, 2010).  Applying Rule 12(b)(6), the Court dismissed a disparate-impact claim alleging race discrimination in public-transit funding because the statistics upon which plaintiffs based their claim "fail[ed] to capture highly relevant aspects of the funding scheme." *Id.* at \*11.  Since *Inclusive Communities*, courts have increasingly invoked Rule 12(b)(6) to dismiss disparate-impact claims based on alleged statistical disparities where the complaint revealed a "flawed" statistical methodology. *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 2017 WL 2984048, at \*9-\*10 (N.D. Tex. July 13, 2017) (on remand from Supreme Court); *e.g.*, *TBS Group, LLC v. City of Zion*, 2017 WL 5129008, at \*10 (N.D. Ill. Nov. 6, 2017); *O'Neal v. Ore. Dep't of Justice*, 2015 WL 7722413, at \*3-\*5 (D. Ore. Nov. 30, 2015); *Merritt v. Countrywide Fin. Corp.*, 2015 WL 5542992, at \*18 (N.D. Cal. Sept. 17, 2015). *Compare Cnty. of Cook v. Wells Fargo & Co.*, 2018 WL 1469003 at \*11 (N.D. Ill. Mar. 26, 2018) (upholding FHA disparate-impact claim "alleg[ing] a ***bona fide*** [statistical] disparity") (emphasis added).

Plaintiffs base a disparate-impact claim on their study's finding of alleged statistical racial disparities in the maintenance and marketing of "Deutsche Bank REO properties." Compl. ¶ 119.  The Complaint makes clear, however, that Plaintiffs' statistical methodology contains

fundamental flaws precluding Plaintiffs from stating a claim based on the alleged results.

First, Plaintiffs visited each property just once. *Id.* ¶¶ 68, 84. As HUD found in rejecting substantially similar claims brought by many of the Plaintiffs here against U.S. Bank, a study based on one-time visits "does nothing to show whether the condition of a property is improving or deteriorating." Kane Dec., Ex. A at 4.[7] "At most," HUD observed, such a study shows "whether a particular deficiency existed at a particular time on a particular day." *Id.* at 19.[8] For example, Plaintiffs' study considered whether graffiti was found on a property. Compl. ¶ 72. But a servicer could properly perform property maintenance, including graffiti removal, only for graffiti to be painted on the property again the very next day. Yet if Plaintiffs visited the property after the graffiti was added, Plaintiffs would incorrectly attribute the graffiti to race discrimination.

Second, any statistical analysis must "take 'into account nondiscriminatory explanations.'" *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 559 (7th Cir. 2001). As HUD noted, a study based on one-time visits does not (a) "differentiate between properties that required prior exterior maintenance and those that did not," (b) "take into account the condition of properties at the time they came into [the owner's] possession," or (c) control "for the level or lack of upkeep by the mortgagor and whether [the owner] had to rehabilitate the property to reach the state" displayed during the visit. Kane Dec., Ex. A at 19. In other words, Plaintiffs assume discrimination if they found a property in a predominantly white neighborhood to be in better condition than a property in a predominantly minority neighborhood. But the former property may have been in pristine condition when the borrower left, while the latter may have

---

[7] HUD based its determination in part on evidence showing that Plaintiffs' allegations of discrimination were false. *E.g.*, Kane Dec., Ex. A at 9-19. Defendants do not rely on HUD's evidence-based findings here. Rather, Defendants rely on HUD's determination only insofar as HUD found inadequacies in Plaintiffs' statistical methodology that were apparent on the face of the complaint.

[8] Defendants do not concede any deficiencies were present at the REO properties.

been left in disrepair. Plaintiffs' unsound study does not even purport to control for this non-discriminatory explanation for the disparities that Plaintiffs allegedly found. *See* Compl. ¶ 84.

In an apparent attempt to remedy this failure, Plaintiffs allege they waited an unspecified "period of time for the property to be owned by Deutsche Bank so initial maintenance and security could be performed" before Plaintiffs visited the property. *Id.* ¶ 75. But Plaintiffs' delay in visiting properties does nothing to control for the condition of the properties when any Trustee-affiliated entity obtained title. And Plaintiffs do not and cannot allege that it would be ***discriminatory*** for Defendants to decline to spend disproportionate time and money on properties that borrowers left in poor condition, regardless of the racial composition of the surrounding neighborhood. Indeed, for all that we can tell from Plaintiffs' study, Defendants could have spent ***more*** time and money maintaining and marketing properties in predominantly minority neighborhoods because those properties may have been in worse condition when they became REO.

Third, by their own admission, Plaintiffs ignored properties that "appeared to be occupied" or where repair "work was actively occurring." *Id.* ¶ 68. Naturally, properties occupied by borrowers are likely to be in better condition than abandoned properties. Plus, as HUD observed, ignoring properties that were under renovation when Plaintiffs visited "could skew the data by excluding the very properties that show evidence of [the owner] maintaining that particular property." Kane Dec., Ex. A at 23. Plaintiffs cannot plead that Defendants improperly maintained properties based on a study that ignored instances where Defendants were—as evidenced by Plaintiffs' own observations—actively maintaining properties.

Fourth, the Complaint alleges that racial disparities are "statistically significant" when measured on "an aggregate basis across the communities investigated" (Compl. ¶ 80), but are

9

merely "prevalent in each of the cities included." *Id.* ¶ 81. Plaintiffs thus do not allege statistically significant disparities in any one city. Nor could they. Plaintiffs visited just 10 properties in Kansas City (*id.* ¶ 105), for example, far too few to provide statistically significant results. Moreover, Plaintiffs confined their study to "zip codes within the metropolitan area … with the highest foreclosure rates" (*id.* ¶ 68), but do not and apparently cannot allege that the results can be extrapolated to the area at large.

The principal problem with Plaintiffs' aggregation, as HUD noted, is that each city "has its own municipal codes." Kane Dec., Ex. A at 21. For instance, Plaintiffs assert discrimination based on "boarded windows" and "trespassing or warning signs." Compl. ¶ 72. Beyond Plaintiffs' failure to explain how this would be discriminatory, many of the cities at issue ***require*** owners of vacant properties to board windows and/or install signs warning against trespassing. *See* Kane Dec., Ex. B (attaching sample ordinances). Plaintiffs cannot base a discrimination claim on aggregated statistics encompassing "acts that [Defendants were] legally obligated to perform." *Id.*, Ex. A at 5.

Finally, the FHA has a two-year statute of limitations (42 U.S.C. § 3613(a)(1)(A)), but Plaintiffs' study aggregates data from 2011 through 2017. Compl. ¶ 82. Even if the limitations period were tolled by Plaintiffs' administrative action, Plaintiffs are at the very least barred from challenging the Deutsche Bank Defendants' conduct before February 26, 2012. *See* Section IV, *supra* (Plaintiffs' claims against all Defendants are untimely). Statistics aggregated over a seven-year period say nothing about whether disparities existed within the limitations period. *See City of Miami v. Bank of Am. Corp.*, 171 F. Supp. 3d 1314, 1320 n.3 (S.D. Fla. 2016) (dismissing FHA claim because complaint's "[l]umping" of "eight years of data … to allege a disparity does not make out a plausible claim that … there was any disparate impact during the

10

two year limitations period"). The Complaint alleges that disparities are "statistically significant" on "an aggregate basis" (Compl. ¶ 80), but it conspicuously does not allege statistically significant disparities within the limitations period, asserting only "the same pattern … on a year-to-year basis." *Id.* ¶ 82.

Defendants acknowledge that a California court upheld a similar disparate-impact claim filed against Fannie Mae by many of the Plaintiffs here. *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 2018 WL 1411106 (N.D. Cal. Mar. 21, 2018) ("*Fannie Mae*"). Citing the "breadth and extensive coverage" of Plaintiffs' study, the court held that arguments about "deficiencies" in Plaintiffs' "methodology" went to "the weight of the evidence" and "are best reserved for … summary judgment." *Id.* at *5. Defendants respectfully submit that this aspect of the court's ruling was incorrect. The size and scope of a statistical study bear no relationship whatsoever to the adequacy of the study's methodology. Where, as here, fatal flaws in Plaintiffs' methodology are apparent from the face of the Complaint, deferring dismissal until summary judgment would make *Inclusive Communities* meaningless. That kick-the-can-down-the-road approach would serve only to impose needless discovery costs on Defendants and unnecessarily consume the resources of the Court—precisely what *Iqbal* and *Twombly* sought to avoid. Plaintiffs' disparate-impact claim should therefore be dismissed.

### 2. The Complaint does not adequately identify a policy that caused the alleged disparities.

Plaintiffs' disparate-impact claim also falls short under *Inclusive Communities* because Plaintiffs inadequately plead the existence of a specific policy that caused the alleged harm. As a preliminary matter, Plaintiffs fail to allege *any* policy that is *specific to* any of the named Deutsche Bank Defendants. Instead, Plaintiffs vaguely allege that the Deutsche Bank Defendants *collectively* adopted a "policy" of "disavowing legal responsibility for compliance

11

with laws related to REO exterior maintenance" and "sought to 'outsource'" their alleged obligations to third parties. Compl. ¶ 114. Plaintiffs further allege the Deutsche Bank Defendants *collectively* have the "policy" of "disavowing" and "abrogating their legal obligations as real property owners." *Id.* ¶¶ 115-16. Those are not policies. Those are conclusory allegations that, in Plaintiffs' view, the Deutsche Bank Defendants should be found liable for failing to comply with unspecified laws related to property ownership obligations.

The only allegations Plaintiffs offer about these "policies" are two public statements made by Deutsche Bank entities. In one, the Trustees Defendants accurately stated that "loan servicers," not Deutsche Bank entities acting in their capacity as trustees of RMBS trusts, "are responsible for maintaining foreclosed properties." *Id.* ¶ 117. The other was an accurate statement that parties other than the Trustee Defendants paid a settlement in a separate lawsuit. *Id.* ¶ 118. These allegations in no way identify a "policy" to which the Deutsche Bank Defendants' allegedly discriminatory maintenance or marketing practices could be attributed.

The insufficiency of Plaintiffs' policy allegation is further evidenced by comparing the allegations in this case with those made to support their similar disparate-impact claim against Fannie Mae. The plaintiffs alleged in *Fannie Mae*—and Fannie Mae did not deny—that Fannie Mae had maintenance obligations for the subject REO properties. 2018 WL 1411106, at *1-*2. The complaint was "replete with allegations that [Fannie Mae's] maintenance decisions were delegated to low-level employees and agents," including the allegation that Fannie Mae failed to provide its employees and agents the same type of detailed instructions regarding exterior REO maintenance that it gave regarding other REO services. *Id.* at *2. On those allegations, as well as cases upholding FHA claims based on companies' delegation of tasks to low-level employees or abandonment of internal procedures that had an alleged discriminatory impact, the California

12

court found plaintiffs identified a policy sufficient to state a disparate-impact claim. *Id.* at *5.

No such allegations are present here. Plaintiffs identify no specific maintenance or marketing policies that any of the Deutsche Bank Defendants—individually *or* collectively—are improperly delegating to their employees or agents, or that they are implementing inconsistently. That is because, unlike Fannie Mae, the Deutsche Bank Defendants (including the Trustee Defendants) have no maintenance or marketing duties in the first place as set forth in the Deutsche Bank Defendants' Supplemental MTD Memorandum. Plaintiffs' disparate-impact claims should therefore be dismissed.

### B. Plaintiffs' Disparate-Treatment Theory Fails.

The Complaint alleges that all Defendants engaged in a pattern and practice of disparate treatment in maintaining and marketing the Trustee Defendants' REO properties. Compl. ¶¶ 6, 94-106. These allegations fail to state a claim for several reasons.

### 1. The Complaint inadequately pleads discriminatory intent.

Unlike a disparate-impact claim, a disparate-treatment claim requires Plaintiffs to plead, *inter alia*, that Defendants "'had a discriminatory intent or motive.'" *Inclusive Communities*, 135 S. Ct. at 2513. "If an actor makes a decision based on reasons other than a protected category, there is no disparate-treatment liability." *Id.* at 2521.

Plaintiffs devote only 6 paragraphs of their 175-page Complaint to Defendants' purported "discriminatory intent," offering 4 types of allegations in a failed attempt to plead that intent. Compl. ¶¶ 107-12. First, Plaintiffs make conclusory allegations that Defendants' conduct was "based on race." *Id.* ¶ 109. Under *Iqbal*, this is not enough; a complaint must plausibly allege facts demonstrating racial animus. 556 U.S. at 686-87. Indeed, courts in this District have repeatedly applied *Iqbal* to dismiss FHA claims based on conclusory allegations of discriminatory intent. *E.g.*, *TBS Group*, 2017 WL 5129008, at *5; *Wetzel v. Glen St. Andrew*

13

*Living Cmty., LLC*, 2017 WL 201376, at \*2 (N.D. Ill. Jan. 18, 2017); *Soto v. City of W. Chi.*, 2010 WL 4810612, at \*7 (N.D. Ill. Nov. 19, 2010).

Second, Plaintiffs cite their flawed statistical allegations and Defendants' purported knowledge of those alleged disparities. *E.g.*, Compl. ¶¶ 109(a)-(c), (f)-(g). Plaintiffs similarly alleged "'differing maintenance'" in support of their disparate-treatment claim against Fannie Mae, which the court dismissed for inadequately pleading "discriminatory intent." 2018 WL 1411106, at \*6. On this point, *Fannie Mae* was correct: "purposeful discrimination requires more than … 'awareness of consequences.'" *Iqbal*, 556 U.S. at 676. Rather, a disparate-treatment claim "involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." *Id.* at 676-77 (internal quotations omitted).

Third, Plaintiffs suggest that discriminatory intent may be inferred from various other allegations, such as assertions about unspecified "historical" discrimination, conclusory and baseless attacks on Defendants' corporate cultures, and mischaracterizations of Defendants' settlement of unrelated litigation matters. *E.g.*, Compl. ¶¶ 109(i)-(k), 110-12. If these sorts of allegations were enough to plead discriminatory intent, then ***any*** plaintiff could simply recycle them to state a claim. But they are not enough. None of the allegations are in any way connected to the maintenance or marketing of REO properties, so they cannot support an inference that racial animus motivated the conduct challenged here. *See, e.g.*, *TBS Group*, 2017 WL 5129008, at \*5-\*8 (dismissing FHA disparate-treatment claim because allegations about an unrelated suit and the "historical background" preceding defendant's purported discriminatory conduct were insufficient to plead that defendant was motivated by racial animus).

Fourth, Plaintiffs assert a "pattern or practice" of discrimination. Compl. ¶ 94. However,

the "pattern-or-practice method of proof is not available to private, nonclass plaintiffs" like Plaintiffs here. *Chin v. Port Auth.*, 685 F.3d 135, 149 (2d Cir. 2012) (Title VII); *accord Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990). *Compare Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 n.23 (1982) (FHA does not limit pattern-or-practice claims to suits brought by government). Even if it were, that would do nothing to alleviate Plaintiffs' burden to plead discriminatory intent. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716-17 (7th Cir. 2012).

Lacking non-conclusory allegations showing that Defendants' challenged conduct was motivated by racial animus, Plaintiffs' disparate-treatment claim should be dismissed.

### 2. The disparate-treatment claim against Ocwen and Altisource fails for additional reasons.

As explained above, Plaintiffs' statistical allegations do not support a disparate-treatment claim against any Defendant. They also fail to support a disparate-treatment claim against Ocwen or Altisource for several other reasons. First, Plaintiffs admit they cannot "identify which" company was "retained for any specific REO property." Compl. ¶ 64. Rather, the Complaint alleges only that "Ocwen and/*or* Altisource" were retained "to provide property-maintenance services for *most* of the REOs owned or controlled by … Deutsche Bank." *Id.* ¶ 35 (emphases added).

Plaintiffs thus do not know whether Ocwen, Altisource, or some other company maintained or marketed the properties that Plaintiffs studied. But Plaintiffs cannot assert that Altisource's property-preservation services caused racial disparities based in part on properties serviced by Ocwen or another company. Nor can Plaintiffs assert that Ocwen's servicing caused racial disparities based in part on properties maintained or marketed by Altisource or another company. Because a statistical study cannot lump together the alleged conduct of two separate Defendants and an unspecified number of third parties, Plaintiffs' disparate-treatment claim

15

against Ocwen and Altisource should be dismissed. *See City of L.A. v. JPMorgan Chase & Co.*, 2014 WL 3854332, at *7-*8 (C.D. Cal. Aug. 5, 2014) (dismissing FHA claim based on "regression analysis that lumps loans issued by both Chase and WaMu together" because complaint against Chase was "tainted" by "allegations of conduct related to WaMu's lending").

Second, as discussed above, Plaintiffs try to justify their one-time visit study by alleging they waited an unspecified "period of time for the property to be owned by Deutsche Bank" before visiting the property. Compl. ¶ 75. The Complaint does not allege, however, that Plaintiffs delayed property visits until Ocwen was supposedly retained to service the loans at issue or until Ocwen purportedly retained Altisource to maintain the properties. Plaintiffs therefore base their allegations of discriminatory intent on property visits that could have occurred ***before*** Ocwen or Altisource had any authority to maintain the properties.

Third, the non-statistical allegations that Plaintiffs cite in an attempt to plead discriminatory intent are even weaker as to Ocwen and Altisource. Whereas the Complaint identifies lawsuits the Deutsche Bank-affiliated entities purportedly settled—lawsuits that for reasons described above cannot be used to plead discriminatory intent—the Complaint simply asserts that "Ocwen and Altisource have similar histories" without offering any supporting allegations. *Id.* ¶¶ 110-12.

Fourth, the Complaint concedes that Plaintiffs lack information about the "details" of Ocwen's and Altisource's policies. *Id.* ¶ 122. In the disparate-impact context, *Inclusive Communities* requires allegations that the defendant's policy caused the alleged statistical disparities. Because Plaintiffs principally base their disparate-treatment claim on alleged statistical disparities, Plaintiffs should likewise be required to identify an Ocwen and Altisource policy that caused the alleged disparities. Plaintiffs' failure to do so requires dismissal.

16

II.     **The Complaint Inadequately Pleads Proximate Causation.**

The Supreme Court recently emphasized that FHA claims should be dismissed where, as here, plaintiffs fail to allege a "'direct relation between the injury asserted and the injurious conduct alleged.'"  *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017).  The Court explained that "[t]he housing market is interconnected with economic and social life.  A violation of the FHA may, therefore, 'be expected to cause ripples of harm to flow' far beyond the defendant's misconduct."  *Id.*  Nothing in the FHA, however, "suggests that Congress intended to provide a remedy wherever those ripples travel."  *Id.*  The applicable proximate cause standard generally does not permit going "'beyond the first step'" in the causal chain, regardless of whether the plaintiff's claimed losses are "foreseeable."  *Id.*

Two courts in this District recently applied the Supreme Court's proximate cause requirements in dismissing in relevant part FHA claims where the plaintiffs' claimed injuries were too remote from the alleged discriminatory acts.  In *County of Cook v. Wells Fargo*, 2018 WL 1469003, at *8-*9 (N.D. Ill. Mar. 26, 2018), the court found that, even if the defendant's conduct caused a disproportionate increase in foreclosures in minority communities, the plaintiff county could *not* bring FHA claims based on attenuated harms such as lost property tax revenue, increased demand for county services, and diminished racial stability.  The court explained that those alleged harms are "precisely the 'ripples' that *City of Miami* cautions 'flow far beyond the defendant's misconduct.'"  *Id.* at *8.

Similarly, in *County of Cook v. Bank of America Corp.*, 2018 WL 1561725, at *5 (N.D. Ill. Mar. 30, 2018), the court dismissed the portion of the plaintiff's FHA claims where plaintiff's asserted injuries did not "flow directly from the discrimination it allege[d]."  The court emphasized that the plaintiff's allegations "reveal both the contingent nature of the County's

17

injuries (with *'can lead,' 'contribute to,'* and *'can create'* all suggesting that other conditions also bear upon the asserted causal chain) as well as their temporal and causal remoteness (with *'in turn'* indicative of both)." *Id.* (emphasis in original).

Here, Plaintiffs allege the same sort of attenuated, chain-link causation that the Supreme Court in *City of Miami* and the courts in the recent *County of Cook* decisions found insufficient to satisfy proximate cause requirements for FHA claims. Plaintiffs allege that the Trustee Defendants "adopted a uniform policy of disavowing any legal responsibility for compliance with [] laws pertaining to REO exterior maintenance" and "sought to 'outsource'" their alleged obligations to "third parties." Compl. ¶ 114. This, in turn, allegedly "cause[d] retention of unqualified and unsupervised third parties who lack incentives to comply with legal obligations regarding the maintenance of the Deutsche Bank REO properties." *Id.* ¶ 119. This, in turn, allegedly caused servicers like Ocwen and vendors like Altisource to employ practices that "have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color." *Id.* ¶ 122. This, in turn, resulted in Defendants' alleged "fail[ure] to perform adequate routine exterior maintenance and marketing of the Deutsche Bank REO properties in communities of color, thereby leaving those … homes in a state of neglect." *Id.* ¶ 78. This, in turn, allegedly led to "complaints and feedback from neighbors living in proximity to these properties," asserting that the properties caused increased crime, decreased property values, and other ailments. *Id.* ¶¶ 133, 239-47. This, in turn, led Plaintiffs to "investigate[] this anecdotal information." *Id.* ¶ 134. Ultimately, this attenuated chain of events—which Plaintiffs contend can be traced back to Defendants' purported misconduct—"undermine[d] Plaintiffs' education, advocacy and training programs," "require[d] Plaintiffs to divert scarce resources away from their usual activities" toward their study, and "imped[ed] Plaintiffs' community

investment programs to stabilize neighborhoods of color." *Id.* ¶ 136.

In other words, Plaintiffs allege that Defendants' conduct set in motion a chain reaction of events that, after several links in the chain, led Plaintiffs to (voluntarily) devote more resources to programs that already existed and would still exist in the absence of Defendants' alleged misconduct. To make matters worse, Plaintiffs' causation theory "rests on the independent actions of third and even fourth parties." *Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1, 15 (2010). For example, the Complaint's allegation that Defendants' conduct caused "crime and blight … runs through too many other factors—from the underlying condition of specific vacant or abandoned properties, to the number of nearby vacant homes, the conduct of criminals and criminal gangs, the underlying characteristics of the neighborhoods in question, and broader economic difficulties stemming from the 2008 financial crisis and the resulting Great Recession—to satisfy proximate cause." *Cnty. of Cook*, 2018 WL 1469003, at \*9. Like most of the alleged harms at issue in *City of Miami* and the two *County of Cook* decisions, therefore, Plaintiffs' claimed injuries are too remote from the alleged discriminatory conduct to satisfy the proximate cause requirement for FHA claims.

## III. The Complaint Inadequately Pleads Additional Claim-Specific Elements.

Plaintiffs allege violations of 42 U.S.C. §§ 3604(a), 3604(b), 3605, 3617, and a claim for "perpetuating segregation" under the FHA. Compl. ¶¶ 255-78. For the following reasons, the Complaint fails to allege facts that, even if true, are sufficient to state each claim.

### A. Plaintiffs Do Not Adequately Plead A Section 3604 Or 3605 Claim.

Counts I-III assert violations of Sections 3604(a), 3604(b), and 3605. Those Sections prohibit discrimination in "real estate-related transactions" or the "sale or rental" of property:

- Section 3604(a) makes it unlawful "[t]o refuse to *sell or rent* after the making of a bona fide offer, or to refuse to negotiate for the *sale or rental* of, or otherwise make unavailable or

19

deny, a dwelling to any person because of race" or other protected status. (Emphasis added).

• Section 3604(b) prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of *sale or rental* of a dwelling, or in the provision of services or facilities *in connection therewith*, because of race" or other protected status. (Emphasis added).

• Section 3605 makes it unlawful "for any … entity whose business includes engaging in *real estate-related transactions* to discriminate against any person in making available *such a transaction*, or in the terms or conditions *of such a transaction*, because of race" or other protected status. (Emphasis added).

Counts I-III fail because Plaintiffs' claims concern neither "real estate-related transactions" nor the "sale or rental" of properties. The Complaint alleges (inadequately, as explained above) racial disparities in the maintenance and marketing of REO properties. But conclusory allegations aside (Compl. ¶¶ 256, 263, 268), the Complaint does not allege that these purported disparities actually affected even a single identified real-estate transaction. Absent is any allegation that Defendants denied the sale or rental of any REO properties in predominantly minority communities. And Plaintiffs do not allege that properties with maintenance or marketing "deficiencies" are unavailable for sale or rental as a result.

In fact, Plaintiffs' lengthy "findings" include *no alleged disparity* in the availability of properties for sale or rental in predominantly minority communities as compared to "white communities." *See id.*, App. B. To the contrary, Plaintiffs implicitly acknowledge that the REO properties at issue are *available* for sale or rental. *See id.* ¶ 242 (making the conclusory allegation that "[f]ailure to carry out basic maintenance of REO properties decreases the likelihood of *timely* sales and decreases the value and sale *price* of REO properties," but including no factual allegations to suggest that improperly maintained properties were

20

unavailable for sale or rental) (emphasis added); *compare* ¶¶ 245-46 (alleging that 79 REO properties in Memphis were *sold* in both communities of color and white communities) *with id.*, App. A at A2-3 *and* App. B at B2-3 (identifying 61 REO properties that Plaintiffs investigated).

In short, any purported flaws in maintaining and marketing REO properties cannot support a claim under Sections 3604 or 3605 absent allegations that those purported flaws affected the sale or rental of a particular property. *See Bloch v. Frischholz*, 587 F.3d 771, 777 (7th Cir. 2009) ("Availability, not simply habitability, is the right that § 3604(a) protects."). Because the Complaint makes no such allegations, Counts I-III should be dismissed. *See Southend Neighborhood Improvement Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1210 (7th Cir. 1984) (rejecting Section 3604 claim alleging that county failed to maintain properties in plaintiffs' neighborhood because the FHA "does not protect the intangible interests in the already-owned properties"); *Moore v. FDIC*, 2009 WL 4405538, at *5 (N.D. Ill. Nov. 30, 2009) (dismissing Section 3605 claim because plaintiffs failed to "allege that they attempted to engage in a real estate-related transaction … as the term is defined in the FHA").

### B.    Plaintiffs Do Not Adequately Plead A Claim For Perpetuation Of Segregation.

Count IV alleges that "[r]acial disparities in REO maintenance and marketing act to perpetuate segregation" because "white buyers will be discouraged from purchasing homes in the affected communities of color." Compl. ¶ 274. Nowhere in the Complaint, however, do Plaintiffs allege that prospective "white buyers" are less likely to purchase a home with marketing or maintenance "deficiencies" than prospective minority buyers. To the contrary, Plaintiffs allege that *all* prospective buyers—regardless of their race—"are deterred from purchasing properties in neighborhoods with poorly maintained REO properties." *Id.* ¶ 130.

Moreover, as Judge Feinerman noted in a similar context, "it is not clear" that any "loss of racial balance and stability … is the kind of injury that 'fall[s] within the zone of interests that

21

the FHA protects.'" *Cnty. of Cook*, 2018 WL 1469003, at \*9. The FHA focuses on "*economic injuries*" such as a "decline in property values," so Plaintiffs cannot state a claim based on an alleged perpetuation of segregation. *Id.* Regardless, Count IV faces proximate cause obstacles going even beyond those discussed above: "The racial character of neighborhoods depends on numerous variables—including individual preferences for diversity in housing, the history of both governmental and private efforts to maintain (and then to dismantle) residential segregation, and continuing racial disparities in income and wealth." *Id.* To sort through each link in the causal chain and "[i]solat[e] the effect" of Defendants' alleged conduct "on patterns of racial segregation … would require the very kind of 'massive and complex damages litigation' against which the Supreme Court has strongly cautioned." *Id.* (quoting *City of Miami*, 137 S. Ct. at 1306). Count IV implicates the same factors and should therefore be dismissed.

## C. Plaintiffs Do Not Adequately Plead A Section 3617 Claim.

To state a Section 3617 claim, Plaintiffs must allege that FHA-protected individuals were engaged in the exercise or enjoyment of their fair housing rights, that Defendants "coerced, threatened, intimidated, or interfered" with those individuals on account of their protected activity under the FHA, and that Defendants "were motivated by an intent to discriminate." *Bloch*, 587 F.3d at 783. Count V alleges that Defendants violated Section 3617 by purportedly "interfer[ing]" with the rights of minorities and "creat[ing] a hostile living environment." Compl. ¶¶ 280-81. As discussed in Section I.B.1, however, Plaintiffs fail to allege sufficient facts to infer that Defendants' conduct was motivated by an intent to discriminate. Plaintiffs also fail to allege that Defendants subjected them (or anyone else) to any adverse action *because* they engaged in activity protected under the FHA. In short, Plaintiffs have not alleged anything close to the type of intentional, retaliatory conduct that Section 3617 is meant to address. *See*, *e.g.*,

*Godbole v. Ries*, 2017 WL 219506, at *3-*5 (N.D. Ill. Jan. 19, 2017) (dismissing Section 3617 claim for failing to allege "'threatening,'" "'violent,'" or similar retaliatory conduct).

## IV.    The Complaint Is Untimely.

FHA claims must be filed "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice."  42 U.S.C. § 3613(a)(1)(A).  The time during which an administrative proceeding is pending based on the alleged discriminatory housing practice is excluded from this calculation.  *Id.* § 3613(a)(1)(B).

Plaintiffs filed an administrative complaint against the Deutsche Bank Defendants on February 26, 2014, adding Ocwen and Altisource on February 14, 2017.  Compl. ¶¶ 13, 89.  Therefore, the limitations period for the Deutsche Bank Defendants began no earlier than February 26, 2012, and for Ocwen and Altisource it began no earlier than February 14, 2015.[9]

Plaintiffs' claims span beyond the applicable limitations periods, as Plaintiffs challenge conduct that occurred from 2011 to the present.  Compl. ¶¶ 4, 82, 250.  But Plaintiffs do not plausibly allege discrimination within the limitations period.  As demonstrated in Section I.A.1, Plaintiffs' study allegedly found statistical disparities only by including data from outside the limitations period.  Plaintiffs thus cannot rely on their study to plead a timely claim.  *See Miami v. Bank of Am.*, 171 F. Supp. 3d at 1320 n.3.  Plaintiffs' only other allegations of discrimination within the limitations period—such as their assertions of discrimination from 2011 to the present (Compl. ¶ 4)—are "too conclusory to meet the *Twombly/Iqbal* pleading standard."  *Miami*, 171 F. Supp. 3d at 1318.  As in *Miami*, Plaintiffs merely list properties that they studied and allege

---

[9] To the extent Plaintiffs contend that the statute of limitations on their claims against Ocwen or Altisource was tolled from the date when Plaintiffs filed their HUD action against the Deutsche Bank Defendants (*see, e.g.*, Compl. ¶ 250), that is incorrect.  The Complaint does not and cannot dispute that Ocwen and Altisource are separate entities from the Deutsche Bank Defendants.  Thus, under the plain language of 42 U.S.C. § 3613(a)(1)(B), tolling could not begin until Plaintiffs' administrative action "was pending" against Ocwen and Altisource—which did not occur until Plaintiffs added them as respondents.

that some of these properties were discriminatorily maintained or marketed "on unidentified dates." *Id.* at 1319. Because the Complaint fails to provide any way of differentiating between timely and untimely claims, the Complaint should be dismissed in its entirety.

At the very least, Plaintiffs' claims should be dismissed insofar as Plaintiffs challenge the Deutsche Bank Defendants' conduct before February 26, 2012 and Ocwen's and Altisource's conduct before February 14, 2015. In an attempt to salvage their claims, Plaintiffs seem to invoke the "continuing violation" doctrine by alleging that Defendants engaged in discriminatory conduct "on a continuing and ongoing basis from at least June 22, 2011 to the present." Compl. ¶ 250. But the Seventh Circuit has placed substantial "limitations on the continuing violation doctrine." *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 703 (7th Cir. 2001). Three such limitations independently preclude application of the doctrine here.

First, the continuing violation doctrine is inapplicable absent a "violation during the limitation period that can serve as the anchor for the earlier conduct." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir. 1994); *accord Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir. 1997). As explained above, Plaintiffs have not adequately pled an act of discrimination within the limitations period that could serve as an "anchor" for purposes of the continuing violation doctrine. *See, e.g.*, *City of L.A. v. Wells Fargo & Co.*, 2015 WL 4398858, at *5-*8 (C.D. Cal. July 17, 2015), *aff'd*, 691 F. App'x 453 (9th Cir. 2017) (continuing violation doctrine did not apply because plaintiff failed to show FHA violation within limitations period).

Second, the continuing violation doctrine does not apply where a plaintiff was, or through exercise of reasonable diligence should have been, aware of the basis of its claims before the limitations period expired. *See La Playita Cicero, Inc. v. Town of Cicero*, 2014 WL 944859, at *8 (N.D. Ill. Mar. 11, 2014) ("Plaintiffs knew or should have known that they had a[] … claim

24

based upon the events that took place prior to [the limitations period] and thus the continuing violation doctrine does not apply."); *Ponticiello v. Aramark Unif. & Career Apparel Servs., Inc.*, 2006 WL 2699416, at *7 (N.D. Ill. Sept. 19, 2006); *see also Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008).

Plaintiffs concede they were on notice of their claims at least seven years ago, precluding application of the continuing violation doctrine. Specifically, Plaintiffs admit that in 2011, they "held a national news conference and released a report analyzing and describing the discriminatory maintenance and marketing of white and non-white REO properties." Compl. ¶ 88; *see also id.* ¶ 134. Further, and more tellingly, Plaintiffs allege that their "release of this [2011] comprehensive report placed Defendants on notice *of the fact that their discriminatory conduct and practices violate the Fair Housing Act.*" *Id.* ¶ 88 (emphasis added).

These allegations establish that Plaintiffs were aware, or at the very least should have been aware, of their FHA claims *no later than 2011* when they released their "comprehensive report." Having waited years to sue, Plaintiffs cannot now invoke the continuing violation doctrine to challenge conduct outside the limitations period. *See Speer*, 123 F.3d at 664 (if plaintiff "knows or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed him, he may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one") (internal quotation and citation omitted); *Shanoff*, 258 F.3d at 703.

Third, the continuing violation doctrine does not apply to discrete acts. In *Havens Realty*, the Supreme Court established that an adequately alleged pattern of discrimination may revive otherwise stale acts if these acts are part of an ongoing FHA violation that continues into the limitations period; however, "discrete act[s]" are accorded different treatment. 455 U.S. at 380-

25

81. The Supreme Court reaffirmed this point in the employment discrimination context, holding that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges" because "each discrete act starts a new clock for filing charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see id.* at 114-15 (while claimant "alleged that he suffered from numerous discriminatory and retaliatory acts from the date that he was hired through … the date he was fired, only incidents that took place within the timely filing period are actionable"; "[a]ll prior discrete discriminatory acts are untimely").

Here, Plaintiffs' allegations challenge "discrete acts" because each instance of alleged discriminatory property maintenance or marketing is "separate[ly] actionable." *Id.* at 114-15. Thus, each purported act starts "a new clock" for statute of limitation purposes, precluding application of the continuing violation doctrine. *See, e.g.*, *Matsunaga v. Century 21 Stanmeyer Realtors*, 1985 WL 1113, at *1 (N.D. Ill. May 7, 1985) (dismissing FHA claim as untimely finding, *inter alia*, that the plaintiffs alleged a discrete act rather than a continuing violation).

**CONCLUSION**

Defendants respectfully request that the Court dismiss Plaintiffs' Complaint.

Dated: May 9, 2018                  Respectfully submitted,

By: /s/ Debra Bogo-Ernst
Debra Bogo-Ernst
Stephen J. Kane
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600

*Counsel to Defendant Ocwen Financial Corp.*

By: /s/ Kenneth M. Kliebard
Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: (312) 324-1000

Elizabeth A. Frohlich (*pro hac vice* application to
be submitted)
MORGAN, LEWIS & BOCKIUS LLP
One Market
Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

*Counsel to Defendants "Deutsche Bank," Deutsche
Bank AG, Deutsche Bank National Trust Company,
and Deutsche Bank Trust Company Americas*

By: /s/ Kristine M. Schanbacher
Kristine M. Schanbacher
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Email: kristine.schanbacher@dentons.com

Lisa Krigsten (*pro hac vice* application pending)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
Telephone: (816) 460-2400

Email: lisa.krigsten@dentons.com

Nathan Garroway (admitted *pro hac vice*)
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com

*Counsel to Defendant Altisource Solutions, Inc. improperly also named as Altisource Portfolio Solutions, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for Northern District of Illinois' Electronic Filing System on May 9, 2018.

/s/      Debra Bogo-Ernst