**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; HOUSING RESEARCH & ADVOCACY CENTER; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA. | Case No. 18-cv-00839<br><br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier |
|       Plaintiffs, | |
|          v. | |
| DEUTSCHE BANK; DEUTSCHE BANK NATIONAL TRUST; DEUTSCHE BANK TRUST COMPANY AMERICAS; OCWEN FINANCIAL CORP.; and ALTISOURCE PORTFOLIO SOLUTIONS, INC. | |
|       Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

SUMMARY OF FACTS ........................................................................................................... 4

ARGUMENT ............................................................................................................................ 7

   I.     PLAINTIFFS ADEQUATELY PLEAD A DISPARATE IMPACT CLAIM UNDER THE
FAIR HOUSING ACT ......................................................................................................... 7

       A.    The Complaint Adequately Pleads Disparate Outcomes Based on Race ............................... 7

       B.    The Complaint Adequately Alleges a Policy Causing the Alleged Disparities ................... 11

       C.    Plaintiffs Adequately Plead Proximate Causation ................................................................ 12

   II.    PLAINTIFFS ADEQUATELY PLEAD A DISPARATE TREATMENT CLAIM UNDER
THE FAIR HOUSING ACT ............................................................................................... 14

       A.    The Complaint Alleges Facts Well-Recognized To Support An Inference Of Intentional
Discrimination ........................................................................................................................ 14

       B.    The Complaint Alleges Sufficient Facts to Support the Culpability of Ocwen and
Altisource ............................................................................................................................... 18

   III.   THE COMPLAINT ALLEGES DEPRIVATION OF RIGHTS PROTECTED BY THE FAIR
HOUSING ACT ................................................................................................................. 19

       A.    The Discriminatory Maintenance of REO Properties in Communities of Color Adversely
Affects Their Availability for Purchase in Violation of Sections 3604 and 3605 of the FHA ...... 20

       B.    The Discriminatory Maintenance of REO Properties in Communities of Color Perpetuates
Segregation in Violation of the FHA ..................................................................................... 22

       C.    The Complaint States a Claim under 42 U.S.C. § 3617 ....................................................... 23

   IV.   PLAINTIFFS' ALLEGATIONS ARE TIMELY FILED ...................................................... 24

   V.    THE DEUTSCHE BANK TRUSTEE OWNERS CAN BE HELD LIABLE FOR FAIR
HOUSING ACT VIOLATIONS ......................................................................................... 26

       A.    The Act Expressly Includes "Trustees" Within Its Coverage .............................................. 27

       B.    A Trustee Taking Title to an REO Property Assumes Owner Duties and Obligations ......... 27

       C.    Obligations Under the FHA Cannot Be Offloaded Through Private Contracts ..................... 29

       D.    HUD Region I's Interpretation of the Law Was Erroneous ................................................. 31

VI.   THE COURT SHOULD ALLOW PLAINTIFFS LEAVE TO AMEND THE COMPLAINT WITH REGARD TO THE PROPER CORPORATE DEFENDANTS ............................................. 32

    A.   Ocwen Financial Corp. .......................................................................................................... 33

    B.   Deutsche Bank ......................................................................................................................... 33

    C.   Altisource ................................................................................................................................ 34

CONCLUSION ........................................................................................................................................ 35

## TABLE OF AUTHORITIES

**CASES**

*Allen v. Muriello*, 217 F.3d 517 (7th Cir. 2000) .................................................................7

*Ave. 6E Invs. v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016).................................................19

*Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) .........................................12

*Briscoe v. Deutsche Bank Nat'l Tr. Co.*, No. 08 C 1279, 2008 WL 4852977 (N.D. Ill. Nov. 7, 2008)......34

*Byrd v. United States*, 138 S.Ct. 1518, 1529 (2018) .............................................................30

*Chapman v. Yellow Cab Coop.*, 875 F.3d 846 (7th Cir. 2017) .............................................25

*Chin v. Port Auth.,* 685 F.3d 135 (2d Cir. 2012) ...................................................................17

*City of Chicago Matchmaker Real Estate Sales Ctr., Inc.,* 982 F.2d 1086 (7th Cir. 1992) .................13, 17

*City of Cincinnati v. Deutsche Bank Nat'l. Tr. Co.*, 897 F.Supp.2d 633 (S.D. Ohio 2012) ......................28

*City of L.A. v. JPMorgan Chase & Co.,* 2014 WL 3854332 (C.D. Cal. Aug. 5, 2014)..............................18

*City of Los Angeles v. Citigroup, Inc.*, 24 F. Supp. 3d 940 (C.D. Cal. 2014) .............................................25

*City of Philadelphia v. Wells Fargo & Co.,* No. 17-2203, 2018 WL 424451 (E.D. Pa. Jan. 16, 2018) . 8, 12

*County of Cook v. Bank of Am. Corp.,* 181 F. Supp. 3d 513 (N.D. Ill. 2015)......................................25, 26

*County of Cook v. HSBC North America Holdings, Inc.*, 136 F. Supp.3d 952 (N.D. Ill. 2015)............. 8, 14

*County of Cook v. Wells Fargo & Co.*, No. 14 C9549, 2018 WL 1469003

  (N.D. Ill. Mar. 26, 2018)........................................................................... 12, 13, 14, 19, 25, 26

*Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, 125 F.3d 1281 (9th Cir. 1997) ..........................27

*Davis v. District of Columbia*, 949 F.Supp.2d 1 (D.D.C. 2013) ...................................................18

*Equal Employment Opportunity Commission v. O & G Spring and Wire Forms Specialty Company,*

  38 F.3d 872 (7th Cir. 1994)..........................................................................................16

*Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 678 F. Supp.2d 576 (E.D. Mich. 2009).....................27

*Gilty v. Vill. of Oak Park*, 919 F.2d 1247 (7th Cir. 1990)........................................................17

*Grady v. Bd. of Trustees of North. Ill. Univ.*, 78 F. Supp.3d 768 (N.D. Ill. 2015)......................................25

*Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982) ............................................... 1, 3, 13, 17

*Hazelwood School District v. United States*, 433 U.S. 299 (1977) ............................................ 16

*Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135 (6th Cir. 1985) ............................ 21, 30

*Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988) ...................... 23

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 2017 WL 2984048 (N.D. Tex. July 13, 2017) ........... 8

*La Playita Cicero, Inc. v. Town of Cicero*, 2014 WL 944859 (N.D. Ill. Mar. 11, 2014) ........................ 26

*Langlois v. Abington Hous. Auth.*, 207 F.3d 43 (1st Cir. 2000) .................................................. 10

*Limestone Dev. Corp. v. Vill. Of Lemont, Ill.*, 520 F.3d 797 (7th Cir. 2008) ............................... 26

*Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632 (6th Cir. 2017) .............................................. 24

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.2d 482 (7th Cir. 2012) ................ 12

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283 (7th Cir. 1977)

    (Arlington Heights II) ............................................................................... 22, 23, 35

*Metropolitan Fair Housing Council of Oklahoma v. Pelfrey*, 292 F.Supp. 3d 1250 (W.D. Okla. 2017) ... 30

*Meyer v. Holley*, 537 U.S. 280 (2003) ........................................................................... 31

*Michon v. Ugarte*, 2017 WL 622236 (N.D. Ill., Feb. 15, 2017) ................................................ 31

*Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251 (D. Mass. 2008) ...................................... 12

*Moore v. FDIC*, 2009 WL 4405538 (N.D. Ill. Nov. 30, 2009) .................................................... 22

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375 (3d Cir. 2011) ............ 10

*Munguia v. Ill.*, 2010 WL 3172740 (N.D. Ill. Aug. 11, 2010) ................................................... 8

*NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) ....................................... 21

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940 (N.D. Cal. 2018) ............... 7, 8, 12

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) .................................................. 26

*Old West End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100 (N.D. Oh. 1987) ...................... 18

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) .............................................. 14

*Pacific Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013) ...................... 15

iv

*People of the State of California v. U.S. Bank National Association*, Case No. BC488436 (Sup. Ct. Cal. Jan. 25, 2013)..................................................................................................................28

*Ponticiello v. Aramark Unif. & Career Apparel Servs., Inc.*, 2006 WL 2699416 (N.D. Ill. Sept. 19, 2006) ...............................................................................................26

*Rummery v. Illinois Bell Telephone Company*, 250 F.3d 553 (7th Cir. 2001)...............................8

*Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696 (7th Cir. 2001) .........................................25

*Southend Neighborhood Improvement Association v. County of St. Clair*, 743 F.2d 1207 (7th Cir. 1984)..............................................................................................................21

*Stevens v. Hollywood Towers and Condominium Ass'n*, 836 F. Supp.2d 800 (N.D. Ill. 2011)...................1

*Tex. Dep't Hous. & Com. Aff. v. Inclusive Com. Project, Inc.* 135 S. Ct. 2507 (2015) .......................1, 7, 8

*U.S. v. Cochran*, 39 F. Supp. 3d 719 (E.D. N.C. 2014) ...............................................................22

*United States v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992) .........................................................17

*United States v. Big D Enters., Inc.*, 184 F.3d 924 (8th Cir. 1999) ............................................17

*United States v. Matusoff Rental Co.*, 494 F. Supp. 2d 740 (S.D. Ohio 2007) ...........................22

*United States v. West Peachtree Tenth Corp.*, 437 F.2d 221(5th Cir. 1971) ..............................16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).......................15, 17

*Village of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990)..................................................16

*Walker v. City of Lakewood*, 272 F.3d 1114 (9th Cir. 2011) .......................................................24

*Walker v. Crigler*, 976 F.2d 900 (4th Cir. 1992) ........................................................................30

*Wallace v. Chicago Housing Authority*, 321 F. Supp. 2d 968 (N.D. Ill. 2004) ....................18, 26

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................................11

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) ........................................................11

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)...............................................................................31

*Wigginton v. Bank of Am. Corp.*, 770 F.3d 521 (7th Cir. 2014) .................................................15

*Willborn v. Sabbia*, No. 10 C5382, 2011 WL 1900455 (N.D. Ill. May 19, 2011)................15, 24

## STATUTES, RULES & REGULATIONS

42 U.S.C. § 3601 ........................................................................................................... 35

42 U.S.C. § 3602(d) ................................................................................................. 27, 30

42 U.S.C. § 3604(a) ..................................................................................................... 20

42 U.S.C. § 3605 .......................................................................................................... 20

42 U.S.C. §§ 3604(a)-(b), 3605, and 3617 .................................................................. 20

24 C.F.R. § 100.500 ..................................................................................................... 23

24 C.F.R. § 100.65(b)(2) ....................................................................................... 1, 21, 22

24 C.F.R. § 100.70(a), (c) ............................................................................................ 21

Fed. R. Civ. P. 15(a)(2) ................................................................................................. 32

Fed. R. Civ. P. 8 ........................................................................................................... 14

## OTHER AUTHORITIES

http://nationalfairhousing.org/case-settlement-information/ .......................................... 6

http://www.gao.gov/products/GAO-12-34 ............................................................. 21, 23

http://www.nber.org/papers/w18353.pdf .................................................................... 23

https://www.consumerfinance.gov/about-us/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-

    billion-in-relief-to-homeowners-for-servicing-wrongs/ ........................................... 19

## INTRODUCTION AND SUMMARY OF ARGUMENT

Over the course of several years of investigation, the Plaintiffs in this case accumulated substantial evidence that various Deutsche Bank corporate entities and their agents provided favorable treatment to white neighborhoods, and less favorable treatment to neighborhoods of color. It is a familiar tale—acts of redlining and neighborhood-based discrimination by lenders and their agents have permeated the nation's financial markets for decades, and were one of the driving forces for enactment of the Fair Housing Act ("FHA" or "the Act"). *Tex. Dep't Hous. & Com. Aff. v. Inclusive Com. Project, Inc.* 135 S. Ct. 2507, 2515 (2015); Compl. ¶¶ 38-51.

The allegations of this Complaint, which must be assumed true for now, *Stevens v. Hollywood Towers and Condominium Ass'n*, 836 F. Supp.2d 800, 804 (N.D. Ill. 2011), focus on a particular type of activity covered by the Act: the maintenance of residential property being marketed and held for sale. *See* 24 C.F.R. § 100.65(b)(2) ("[p]rohibited actions . . . include, but are not limited to . . . [f]ailing or delaying maintenance or repairs of sale or rental dwellings" because of race). According to the Complaint, Defendants discriminated against communities of color in the exterior maintenance and marketing of foreclosed properties owned by Deutsche Bank entities in Chicago and numerous other metropolitan areas. It is alleged that Defendants' conduct (a) constitutes intentional discrimination; (b) has a disproportionate adverse impact on minority communities that is not justified by any valid business purpose; (c) perpetuates segregation; and (d) otherwise interferes with the enjoyment of rights protected under the FHA. If proven true, any one of these would be a violation of the Act. Compl. ¶¶ 255-78.

Plaintiffs—whose legal standing to bring these claims is not challenged by Defendants, *see Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982)—include the National Fair Housing Alliance ("NFHA") and nineteen of its member organizations, several of whom are from the Chicago area. Plaintiffs copiously documented Defendants' treatment of Deutsche's REO

properties through one of the most comprehensive testing programs ever undertaken. Over six years, Plaintiffs inspected Defendants' exterior maintenance of more than 1,100 properties in 30 metropolitan areas, photographing and documenting vast disparities between maintenance performed in white and minority neighborhoods, even within the same cities. As alleged in the Complaint, these observed disparities are statistically significant, even after accounting for other potentially explanatory variables.

Although the Complaint describes this evidence in detail, Defendants now move to dismiss the Complaint on a variety of grounds. In shotgun fashion, and without pausing long enough to apply the appropriate standard of review, they repeatedly contend that the 84-page Complaint and accompanying exhibits fail to adequately plead sufficient facts to support any cause of action under the Fair Housing Act. They are wrong.

First, Defendants argue that Plaintiffs have not adequately pleaded facts sufficient to support FHA liability based on a disparate impact theory. Defendants' argument that the Complaint fails to plead disparate outcomes based on race relies primarily on a variety of criticisms of the methodology of Plaintiffs' examination of their properties. None of these criticisms are properly the basis of a motion to dismiss, nor do they have merit. The Complaint identifies specific policies causing the disparate impact—the inappropriate abrogation of responsibility compounded with delegation of authority without appropriate safeguards, which under case law spanning three decades can be challenged as a "policy" causing discriminatory effects.

Second, Defendants assert that Plaintiffs have inadequately pleaded intentional discrimination. In fact, the Complaint could not be clearer. Plaintiffs repeatedly allege anecdotal and statistical facts demonstrating an intent to treat REO properties differently depending on the

2

racial composition of the neighborhood within which they are located. Many of the facts courts have declared sufficient to infer an intent to discriminate are alleged here, including but not limited to the differing treatment of similarly situated comparators, gross statistical disparities (after controlling for non-racial factors), a history of prior intentional discriminatory conduct toward African-Americans and Latinos, and other circumstantial evidence. These factual allegations are more than enough to satisfy pleading standards and put Defendants on notice of an intentional discrimination claim.

Third, Defendants unsuccessfully argue that Plaintiffs have failed to plead causation. But to support this argument, Defendants slip links into a causal chain that Plaintiffs do not plead, and completely ignore the direct causal link that is alleged between Defendants' behavior— neighborhood-based racial discrimination—and the harm caused to the Plaintiffs' institutional interests. The causal chain alleged here is the same one involved in any FHA case brought by fair housing organizations, and remains proper under long-standing precedent (*e.g.*, *Havens Realty*).

Fourth, Defendants argue that their discriminatory failure to maintain REO properties in minority neighborhoods as compared to white neighborhoods does not violate the FHA. In fact, the alleged conduct violates several separate provisions of the FHA, all of which are broad enough to include the neighborhood-based discrimination involved here.

Fifth, Defendants complain that Plaintiffs' evidence of discrimination includes events outside the FHA limitations period. In fact, it is well-established both that a continuing violation of the FHA can include such events and that such events can serve as background evidence informing the significance of acts occurring within the limitations period.

Sixth, the Deutsche Bank Defendants believe they are immune from liability under the FHA because they own REO properties as a "trustee," and that under their trust instruments,

maintenance duties for such properties after foreclosure are delegated to third party servicers. But the terms of private agreements cannot alter legal obligations to third parties or to the public under the Fair Housing Act, which expressly includes "trustees" within its coverage.

Finally, both Ocwen and the Deutsche Defendants raise additional objections not on substance, but on the Plaintiffs' naming the wrong members of their corporate families. Plaintiffs are prepared to cure these perceived defects, and propose a solution to do so.

Plaintiffs are confident that, after reviewing Plaintiffs' detailed responses below and applying the correct legal standard, the Court will deny Defendants' Motions to Dismiss.

## SUMMARY OF FACTS

Plaintiffs are private, fair housing organizations dedicated to ending housing discrimination and to promoting residential integration in their communities and around the nation. Compl. ¶ 2. Plaintiffs work to eliminate housing discrimination and to ensure equal housing opportunity for all persons through education, outreach, membership services, public policy initiatives, advocacy, investigation of fair housing violations, investment in community development and stabilization projects, and fair housing enforcement. Compl. ¶¶ 14-34.

Defendants Deutsche Bank, Deutsche Bank AG, Deutsche Bank National Trust and Deutsche Bank Trust Company Americas (the "Deutsche Bank Defendants") are the owners of record, as trustee, of thousands of foreclosed homes in metropolitan areas across the country, commonly referred to as "real estate owned" or "REO" properties. Compl. ¶¶ 3, 35. Defendants Ocwen Financial Corp. ("Ocwen") and Altisource Portfolio Solutions, Inc., ("Altisource") provide property preservation and maintenance and other services for REO properties owned by the Deutsche Bank Defendants ("the Deutsche Bank REO properties" or "Deutsche Bank-owned homes"). Compl. ¶¶ 3, 36-37.

In the wake of the national foreclosure crisis, and in response to complaints, public

outcry, and industry trends and observations regarding the maintenance of foreclosed properties in African-American/Latino communities, Plaintiffs investigated[1] Defendants' activities related to Deutsche Bank REO properties in communities of color (predominantly African-American and/or Latino neighborhoods), and in predominantly white neighborhoods in Chicago and 29 other metropolitan areas.  Compl. ¶¶ 4-9, 66-77.

Plaintiffs' investigation revealed that there are highly significant disparities in the routine exterior maintenance and marketing of the Deutsche Bank-owned homes in communities of color as compared to white communities. Compl. ¶¶ 78-87, 94-106, App. B.  Defendants treated properties differently depending upon the racial/ethnic composition of the neighborhoods in which they were located. In each of the 30 metropolitan areas examined, the Deutsche Bank-owned homes located in predominantly white census block groups were better-maintained and exhibited fewer objective routine maintenance and marketing deficiencies than the Deutsche Bank-owned properties that were located in neighborhoods comprised primarily of African-Americans and/or Latinos. *Id.* Across the board, properties located in communities of color were much more likely to have numerous objective routine maintenance and marketing deficiencies

---

[1] Defendants repeatedly mischaracterize the foundation of this litigation as a "study," MTD at 1, 2, 4-11, in a not-so-subtle attempt to tee up arguments on causation, statistical significance, methodological flaws, and the like. Plaintiffs do not allege, and make no attempt to characterize, their investigation as an academic "study." Plaintiffs applied traditional fair housing testing methodologies—including identification and selection of appropriate neighborhoods for comparison, the standardization of investigation protocols, extensive training of investigators, the documentation of all evidence collected, etc.— to the specific housing market behavior investigated here. Compl. ¶¶ 72-76, 107. *See, e.g.,* S. Tomkowiak, *Using Testing Evidence in Mortgage Lending Discrimination Cases*, The Urban Lawyer, Vol. 41, No. 2, at 319-337 (Spring 2009) (outlining the history and uses of fair housing testing, and observing how testing for research purposes differs from testing for enforcement purposes).  Plaintiffs examined 1,141 properties owned by the Deutsche Bank Defendants after foreclosure, collected evidence on 39 objective aspects of the routine exterior maintenance of each property, and accumulated over 29,900 photographs of the pertinent conditions, such as unsecured doors, damage to steps, handrails, windows and fences, graffiti, the accumulation of trash and mail, and overgrown grass and shrubbery. Compl. ¶¶ 5, 67.

than the Deutsche Bank-owned homes located in white areas.   *Id.* at ¶¶ 83-84.

The disparities observed between the maintenance of the Deutsche Bank-owned homes in white communities and the Deutsche Bank-owned homes in communities of color are stark, highly probative, and statistically significant. But these are not the only facts alleged in the Complaint. Plaintiffs also allege that Defendants were well aware of the results of Plaintiffs' investigation, and that Plaintiffs met with Deutsche Bank representatives, yet the Defendants continued their discriminatory policies and practices. Compl. ¶¶ 88-93. Defendants also knew that Deutsche REO properties often failed to comply with state and local laws regarding property maintenance, that Defendants often deviated from well-established practices concerning property maintenance in communities of color, and that Defendants have been sued under "slumlord" ordinances as systemic violators. Compl. ¶¶ 99-100, 109. Plaintiffs allege a lack of credible, non-pretextual explanations for the disparities observed, even after accounting for such possible explanatory variables. Compl. ¶ 109. Plaintiffs allege facts reflecting a "general pattern and corporate culture" of intentional unlawful conduct toward minorities and others. Compl. ¶¶ 110-112. Plaintiffs also allege that Defendants have adopted policies that have an unjustified and unsupportable "disparate impact" on communities of color, an impact that is reflected in the statistical disparities and regression analysis described in the Complaint. Compl. ¶¶ 113-124. The Complaint pleads facts demonstrating that the communities in which Defendants do business are highly segregated, and that Defendants' discriminatory maintenance activities necessarily perpetuate these pre-existing patterns of segregation, which is an independent basis for liability under the Act. Compl. ¶¶ 125-132.[2]

---

[2] Defendants also assert that this litigation adds to "a long line of similar actions" that Plaintiffs have filed against owners of REO properties "across the country." MTD at 5, n.5.  This is irrelevant and misleading. A list of Plaintiffs' other REO investigations, at http://nationalfairhousing.org/case-settlement-information/, names four lenders against which such claims have been filed, in addition to Defendants

## ARGUMENT

### I.  Plaintiffs Adequately Plead A Disparate Impact claim Under THE FAIR Housing Act

Plaintiffs properly plead a disparate impact claim.  The Supreme Court has made clear that disparate impact claims are necessary to achieve the FHA's "central purpose." *Tex. Dep't Hous. & Com. Aff. v. Inclusive Com. Project, Inc.* 135 S. Ct. 2507, 2521 (2015).  Disparate impact claims permit plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment and may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping. *Id.* at 2522. As Defendants belatedly admit, MTD at 11, another court recently rejected essentially the same arguments they make here regarding Plaintiffs' disparate impact claims. *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 947-48 (N.D. Cal.  2018). This Court should follow suit.

#### A.  The Complaint Adequately Pleads Disparate Outcomes Based on Race

Defendants' argument that the Complaint fails to plead disparate outcomes based on race rests on incorrect and premature criticisms of the methodology of Plaintiffs' extensive testing of Defendants' properties. MTD at 7-10.   Although Defendants invoke case law regarding what is necessary to sufficiently plead a disparity based on race, MTD at 7, Defendants do not actually dispute (nor could they) that Plaintiffs have adequately pleaded the alleged disparity, *i.e.*, that Plaintiffs' investigation found Defendants' REO properties in predominantly minority neighborhoods in much poorer condition than comparable properties in white neighborhoods. Rather, their argument is directed entirely at the *cause* of this disparity, as they quibble in various ways that Plaintiffs have failed to account for alternative, innocent explanations. None of this is properly before this Court now. *See, e.g.*, *Allen v. Muriello*, 217 F.3d 517, 522 (7th Cir. 2000)

---

here. One of them has already resulted in a substantial settlement benefitting Plaintiffs' constituents. *See* "Wells Fargo settles complaint on foreclosed homes," Wall Street Journal, June 6, 2013.

(FHA defendant's explanation for differing treatment is a jury question); *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n,* supra, 294 F. Supp. 3d at 948 (Defendants' criticisms of Plaintiffs' REO investigation methodology is a question of proof best reserved for summary judgment, not a motion to dismiss); *County of Cook v. HSBC North America Holdings, Inc.*, 136 F. Supp.3d 952, 961, 965 (N.D. Ill. 2015) (adjudication of causality is better left for summary judgment).

Plaintiffs are not required, *at the pleading stage*, to defend every nuance of their investigative methodology as though they were submitting a study for peer-reviewed publication. Plaintiffs need not fully prove causation using statistical details at the outset, but have established there is a plausible path to prove causation, *see Tex. Dep't Hous. & Com. Aff. v. Inclusive Com. Project, Inc.* 135 S. Ct. 2507, 2523 (2015). Plaintiffs have far exceeded what is required at this stage. *See City of Philadelphia v. Wells Fargo & Co.,* No. 17-2203, 2018 WL 424451 at *6 (E.D. Pa. Jan. 16, 2018) (plausible allegations of statistical significance enough at pleading stage).

Defendants can point to no case to support dismissal of the Complaint on this basis. The first set of cases they cite relate to whether Plaintiffs established a racial disparity in outcomes, MTD at 7, which (as noted above) is not what Defendants say the complaint lacks.[3] Similarly inapposite is *Rummery v. Illinois Bell Telephone Company*, 250 F.3d 553 (7th Cir. 2001), which found statistical evidence inadequate *at the summary judgment stage* to establish that an employer's proffered reasons for firing someone were pretextual. Tellingly, Defendants

---

[3] The complaint in *Munguia v. Ill.*, 2010 WL 3172740 (N.D. Ill. Aug. 11, 2010), was dismissed because it "fail[ed] to capture highly relevant aspects of the funding scheme" being challenged. *Id.* at *11. Here, in contrast, Plaintiffs' allegations account for all possible explanations for the observed differing outcomes. Compl. ¶¶ 84, 119. The complaint in *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 2017 WL 2984048, at *9-*10 (N.D. Tex. July 13, 2017), was dismissed because the plaintiffs had not "proved" that the landlord's "no-voucher" policy at its housing complex caused any statistical disparity in the number of voucher holders in the surrounding census tract; in other words, the relevant populations were not comparable. Here, in contrast, Plaintiffs compare outcomes within the same relevant population, *i.e.*, Defendant Deutsche's REO properties.

predominantly rely not on case law, but on an unrelated HUD office determination regarding evidence rather than pleadings.[4]

In any event, Defendants' criticisms are baseless. Defendants complain that Plaintiffs "visited each property just once," MTD at 8. They suggest that Plaintiffs may have thus examined properties where Defendants had just cleaned up graffiti only to have it "painted on the property again the very next day." *Id.* In fact, a regression analysis of Plaintiffs' data accounted for how long inspected REOs were in Deutsche Bank's possession, and determined this factor did not explain identified disparities. Compl. ¶¶ 68-73. Moreover, much of the disrepair observed could not have been the result of unfortunate timing, but rather took considerable time to accumulate. *See, e.g.,* Compl., Figure 3 (p. 22) (overgrown grass). Whether unusual timing coincidences *ever* occurred—and nothing in the Complaint supports such speculation—they are unlikely to constitute a significant portion of the vast number of examined properties.

For similar reasons, there is no basis for Defendants' unsupported speculation that the disparities Plaintiffs documented were caused by differences in the properties' condition *before* Defendants took control. MTD at 8. Because Plaintiffs' investigation was carefully circumscribed to evaluate only "routine exterior maintenance that Defendants are required to perform on *all* REO properties," such as removing trash and debris, securing doors, windows and holes, mowing grass, weeding and edging, etc., Compl. ¶ 63, the initial condition of the property upon transfer of possession is irrelevant. Even if the properties, when acquired, were in worse condition in neighborhoods of color and needed some time for repairs to be made (an assumption that underscores racial stereotypes and ought not be made), the maintenance factors Plaintiffs strategically tested take very little time to complete. These sorts of deficiencies can be cured

---

[4] This HUD Determination is discussed at pp. 31-32 *infra.* *See also,* Soule Decl., Ex. A, Request for Reconsideration.

immediately and regularly, which is why the evidence here concerning failures in routine exterior maintenance is so strong; there is no reason why it should matter when testers visited after Defendants took ownership and responsibility.

Next, pointing out that "properties occupied by borrowers are likely in better condition than abandoned properties," Defendants claim a fatal methodological flaw by virtue of Plaintiffs not inspecting or making assessments of properties that were occupied by borrowers or where repair work was being done. MTD at 9. But Plaintiffs did not purport to investigate occupied properties, a circumstance that (post-foreclosure) is exceedingly rare. Plaintiffs' investigation was by design limited exclusively to vacant REO properties *owned by the Deutsche Defendants* after foreclosure. Moreover, there is no suggestion by Defendants as to how the omission of properties occupied by homeowners in both white and minority neighborhoods—regardless of how many there actually were—would skew the racial outcomes.

Defendants next raise two objections to the various statistical summaries contained in the Complaint. MTD at 9-10. They first claim that, because Plaintiffs analyzed their nationwide dataset to a certain level of statistical significance, the Complaint is deficient for not alleging the same level of significance in each individual city. But there is no legal requirement that a complaint allege, or that a plaintiff prove, any level of statistical significance to support a disparate impact claim. Courts have long cautioned against establishing such rigid requirements. *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375, 382 (3d Cir. 2011) ("no single test controls in measuring disparate impact"); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000). Defendants' second objection—that each municipality might have code sections that address property maintenance—is hardly grounds for a motion to dismiss in view of the demonstrated deficiencies in routine exterior maintenance and is likely to cut against

10

Defendants in the end. Even if one or more municipalities have code sections that specifically address a maintenance item that Plaintiffs have investigated in a way that impacts assessment of that item in a particular location, any final statistical analysis of the data can simply account for or ignore REO properties from those cities with those specific maintenance flags. Whatever relevance the minutiae of some municipal codes might have on the presentation of final proof of Plaintiffs' claims, it does not defeat the sufficiency of Plaintiffs' overall allegations.

### B. The Complaint Adequately Alleges a Policy Causing the Alleged Disparities

There is similarly no basis for Defendants' contention that the Complaint fails to plead a policy that caused the disparities described above. MTD at 11-13. The Complaint alleges that the Deutsche Bank Defendants have a self-proclaimed policy of outsourcing all decisions regarding—and attempting to disclaim all liability and responsibility for—the exterior maintenance of REO properties. Compl. ¶¶ 114-19. Plaintiffs further allege that Defendants compounded their abrogation policy by outsourcing, without any quality control, decisionmaking and responsibility to companies lacking community knowledge and experience to adequately service REO properties in communities of color. Compl. ¶ 121. This is exactly the sort of inappropriate delegation of authority without appropriate safeguards that can be challenged as a "policy" causing discriminatory effects under case law spanning three decades. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011) (reaffirming *Watson*). As *Watson* reasoned in the employment context, "an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination." 487 U.S. at 991.

Accordingly, practices such as permitting brokers to form their own teams—rather than having management do so—can be challenged as having a disparate impact based on race, given the foreseeable resulting discrimination. *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith,*

11

*Inc.*, 672 F.2d 482, 489-90 (7th Cir. 2012). Courts have frequently allowed challenges to policies of inappropriate delegation of discretion and authority under the FHA, *see, e.g.*, *County of Cook v. Wells Fargo & Co.*, No. 14 C9549, 2018 WL 1469003, at *12-13 (N.D. Ill. Mar. 26, 2018); *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n,* 294 F. Supp. 3d at 948; *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251, 255-57 (D. Mass. 2008); *City of Philadelphia v. Wells Fargo & Co.,* No. 17-2203, 2018 WL 424451 at *4 (E.D. Pa. Jan. 16, 2018). Defendants do not acknowledge any of this precedent. Instead, they attempt to rewrite the Complaint as trying to find them "liable for failing to comply with unspecified laws related to property ownership obligations." MTD at 12. This is not the policy Plaintiffs challenge. It is just another unfortunate *result* of Defendants' discriminatory conduct.[5]

### C. Plaintiffs Adequately Plead Proximate Causation

Defendants also contend that the Complaint fails to establish that their conduct proximately caused Plaintiffs' injuries because the former is too far removed from the latter. MTD at 17-19. This argument is based on a mischaracterization of the Complaint, which pleads a causal connection that is much more straightforward than Defendants suggest. Indeed, the causal chain is essentially the same one involved in any disparate impact FHA case brought by fair housing organizations, under long-standing precedent that was reaffirmed in *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017).

---

[5] Defendants also argue that their admitted outsourcing policy is justified because they do not have a legal responsibility to do otherwise. See MTD at 13 (Deutsche Defendants "have no maintenance or marketing duties in the first place"); *id.* at 12 (acknowledging that Defendants disclaim responsibility for maintenance of foreclosed properties or paying settlements for lawsuits from failed maintenance but arguing that these disclaimers are not "policies" because they are "accurate"). This argument, which simply spotlights the policy challenged by Plaintiffs, is legally unfounded, as set out in Section V below. It is further irrelevant because an entity may be held liable under the Fair Housing Act for the racially disproportionate impact of its decisions even if those decisions otherwise would be lawful.

The Complaint alleges that Defendants have policies of inappropriate abrogation of responsibility and delegating authority with regard to the REO properties. Then it alleges that these policies had foreseeable discriminatory results based on the delegees' predictable actions. These are the elements of a standard disparate impact claim based on delegation of discretion under well-established case law, as described above. *County of Cook v. Wells Fargo & Co.*, No. 14 C9549, 2018 WL 1469003, at *12-13. Then, and separately, the Complaint alleges that Plaintiffs were forced to divert resources into investigating and combatting the effects of Defendants' actions. *See Havens*, 455 U.S. at 379 (organization had to "devote significant resources to identify and counteract the defendant's racially discriminatory steering practices"). In other words, the Complaint pleads organizational harm and standing under the line of cases that begins with *Havens* and that *Bank of America* reaffirmed. 137 S. Ct. at 1303-1305.

Defendants' exaggerated portrayal of these allegations, *see* MTD at 18-19, suggests that there is something untoward in this causal chain. Defendants assert that somehow it is improper to allege that their actions "led Plaintiffs to (voluntarily) devote more resources to programs that already existed." MTD at 19. If Defendants actually thought this was too attenuated to establish harm to Plaintiffs, they would have challenged Plaintiffs' standing directly, which they wisely did not. *See City of Chicago Matchmaker Real Estate Sales Ctr., Inc.,* 982 F.2d 1086, 1095 (7th Cir. 1992) (conducting an investigation is a cognizable injury to fair housing organizations and is therefore sufficient to confer standing). Similarly, while Defendants complain that Plaintiffs' theory encompasses the actions of third parties, MTD at 19, they make no attempt to explain why this makes it any different from any other disparate impact claim involving delegation of authority.

Unable to otherwise support their proximate cause argument, Defendants attempt to slip links into the causal chain that Plaintiffs do not plead. Plaintiffs do not seek to recover damages for "such attenuated harms as lost property tax revenue, increased demand for county services, and diminished racial stability." MTD at 17. Plaintiffs' allegations do not call on a fact-finder to rule on the extent to which Defendants' actions caused specific crime and blight. MTD at 19. Moreover, under all circumstances, Defendants' argument that the "chain of causation" is too attenuated is also a fact question, and not appropriate for decision on a motion to dismiss. *County of Cook v. HSBC North America Holdings, Inc.,* 136 F. Supp.3d at 965.

## II. PLAINTIFFS ADEQUATELY PLEAD A DISPARATE TREATMENT CLAIM UNDER THE FAIR HOUSING ACT

### A. The Complaint Alleges Facts Well-Recognized To Support An Inference Of Intentional Discrimination

The Defendants next argue that Plaintiffs have failed to state a disparate treatment claim[6], complaining that only six paragraphs of the Complaint supposedly relate to discriminatory intent. MTD at 13. This argument is untenable: viewed as a whole, the Complaint is rife with allegations from which discriminatory motive can be inferred.

In this Circuit, the legal standard for proving discriminatory intent is simply whether the evidence would permit a reasonable factfinder to conclude that race (or another protected characteristic) motivated discriminatory conduct, and probative evidence of all types is considered as a whole in making this determination. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The requirements for pleading intentional discrimination are not onerous: as the Seventh Circuit noted in a fair housing case, "[it] does not take much to allege

---

[6] The fact that the Complaint pleads both a disparate treatment and a disparate impact theory is entirely permissible under the Federal Rules of Civil Procedure. Fed. R. Civ. P. 8; *see also County of Cook v. Wells Fargo & Co.*, No. 14 C9549, 2018 WL 1469003 at *13 (N.D. Ill. Mar. 26, 2018)

discrimination." *Wigginton v. Bank of Am. Corp.*, 770 F.3d 521, 522 (7th Cir. 2014). Disputes regarding knowledge and motives are premature at the pleading stage. *Willborn v. Sabbia*, No. 10 C5382, 2011 WL 1900455, at *6 (N.D. Ill. May 19, 2011).

The Complaint here (*i.e.*, the totality of the actual allegations and not just a few of the paragraphs) sets forth a very detailed and plausible disparate treatment claim based upon all the following types of evidence: (a) the differing treatment of similarly situated comparators, Compl. ¶¶ 78-87, 94-106, App. B; (b) gross statistical disparities (after controlling for non-racial factors), ¶¶ 83-84; (c) Defendants' knowledge of systemic racial disparities in the maintenance and marketing of the Deutsche Bank REO properties, but failure to change its behavior, ¶¶ 88-93; (d) a history of prior intentional discriminatory conduct toward African-Americans and Latinos, ¶¶ 38-51; (e) Defendants' deviation in minority communities from applicable laws, industry standards and normal practices regarding exterior property maintenance, ¶¶ 99-100; (f) the pronounced segregative effect of Defendants' conduct, ¶¶ 125-32, 273-78; (g) the absence of credible explanations for the observed disparities and conduct, ¶¶ 84-109; and (h) evidence of a pattern of unlawful corporate conduct. ¶¶ 110-12.

It is fundamental that discriminatory intent can be pleaded and proven from the totality of such facts and circumstances. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977); *Pacific Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158-59 (9th Cir. 2013). Evidence of these allegations, as developed through discovery, would easily permit a reasonable factfinder to find intentional discrimination.

Defendants' various objections are baseless. First, the claim that the Complaint makes only "conclusory" allegations of discriminatory intent, MTD at 13, does not jibe with the Complaint's very detailed allegations, especially concerning disparities in the maintenance of

REO properties in minority communities and Defendants' failure to address discrimination of which it was aware.

Second, Defendants' attempt to brush off Plaintiffs' statistical analysis as "flawed" and lacking probative weight as to intent is incorrect. MTD at 14. As discussed above, the testing conducted by Plaintiffs was comprehensive, meticulously implemented, and documented vast disparities between maintenance performed in white and minority neighborhoods. In disparate treatment cases, courts have routinely cited statistical evidence as an important part of the proof of intentional discrimination; as the Seventh Circuit has noted, "in some cases, statistical disparities alone may prove intent." *Equal Employment Opportunity Commission v. O & G Spring and Wire Forms Specialty Company*, 38 F.3d 872, 876 (7th Cir. 1994). *See also, e.g., Hazelwood School District v. United States*, 433 U.S. 299, 307-8 (1977). Even when statistical evidence on its own is insufficient to establish intentional discrimination, it may suffice to do so when combined with other evidence. *See e.g., Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1038 (N.D. Ill. 2003).

Defendants' attack on Plaintiffs' statistical allegations is doubly misplaced considering that no statistical demonstration of any particular type is required to plead or prove unlawful housing discrimination. *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("[n]o mathematical formula is workable, nor was any intended. Each case must turn on its own facts."). The Complaint invokes the type of comparative evidence that is frequently used in fair housing cases: tests performed on similarly situated properties have always sustained fair housing claims. *See Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1531 (7th Cir. 1990) (the "principal evidence" that the defendants were intentionally discriminating was "the comparative experience of white and black testers"); *City of Chicago v. Matchmaker Real Estate*

16

*Sales Ctr., Inc.,* 982 F.2d 1086, 1095 (7th Cir. 1992) (affirming liability based on differing treatment of white and black testers).

As to proof of a "pattern or practice" of discrimination, courts have found that such a showing may be made even based upon a small number of proven incidents. *See United States v. Balistrieri*, 981 F.2d 916, 929-930 (7th Cir. 1992) (finding pattern or practice when five black testers were treated unfavorably relative to five white testers); *United States v. Big D Enters., Inc.*, 184 F.3d 924, 930-31 (8th Cir. 1999) (finding pattern or practice based on evidence of three victims of discriminatory policy). Measured by these standards, the testing here—which considered over 1,100 Deutsche-owned REO properties in the examined neighborhoods—is sufficient to support an inference of discriminatory intent, with or without expert analysis.

Third, Defendants criticize the Complaint's allegations concerning historical patterns of discrimination against minority homeowners as if those allegations were presented in a vacuum. MTD at 14. These allegations are offered as one kind of circumstantial evidence of intent, along with all the other facts alleged. This evidence is one of several types of allegations criticized by Defendants that the Supreme Court expressly identified as indicia of discriminatory intent. *See Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266-68 (1977)

Fourth, Defendants make a frivolous argument that the allegations of the Complaint fail to state a claim for disparate treatment because pattern or practice proof can only be utilized in cases brought by the Government. MTD at 15. Defendants must admit that the Supreme Court expressly noted that the FHA does not limit pattern or practice claims to suits brought by the Government. *Id. See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 n.23 (1982).[7] This

---

[7] The two cases cited by Defendants in support of this supposed proposition are individual, nonclass Title VII cases, where the courts nonetheless noted that evidence of an employer's general practice of discrimination may be relevant to disparate treatment. *See Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990); *Chin v. Port Auth.*, 685 F.3d 135, 149 (2d Cir. 2012).

District has also recognized the ability of private parties to prove FHA claims though pattern or practice evidence. *See Wallace v. Chicago Housing Authority*, 321 F. Supp. 2d 968, 971-72 (N.D. Ill. 2004). The broader point is that pattern and practice claims are a subset of disparate treatment claims, *Davis v. District of Columbia*, 949 F.Supp.2d 1, 8 (D.D.C. 2013), and that no matter how this Complaint is characterized, the alleged pattern of statistical disparities render Plaintiffs' disparate treatment claims sufficiently "plausible" at the pleading stage.[8]

### B. The Complaint Alleges Sufficient Facts to Support the Culpability of Ocwen and Altisource

Defendants Ocwen and Altisource make several additional unpersuasive arguments why the disparate treatment claims against them should fail. First, these Defendants attempt to gain some advantage from the absence of publicly available information regarding which specific Deutsche Bank properties are serviced by which Defendant. MTD at 15; see Compl. ¶ 64. While this would be a novel way for *both* of these Defendants to escape liability, the number of tested properties and magnitude of the disparities indicate there is ample comparative evidence of disparate treatment. The exact parameters of the involvement of each Defendant is a factual matter that will be revealed through discovery, at which point Defendants will be free to point the finger at each other.[9]

---

[8] The Complaint also sufficiently states a claim if evaluated under the *McDonnell-Douglas Corp. v. Green* standard as applied in fair housing cases: (1) the housing at issue was in a minority neighborhood; (2) the housing was eligible for the services at issue (in this case maintenance); and (3) the services were either not provided, or were not provided in the same way as at similarly situated properties in white neighborhoods. *Cf. Old West End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100, 1103 (N.D. Oh. 1987) (*McDonnell Douglas* framework applied in neighborhood racial composition case). Although not required, Plaintiffs have preemptively anticipated Defendants' possible "explanations" for the differing treatment of similarly situated properties by conducting a regression analysis considering potential non-discriminatory explanatory variables.

[9] As such, the situation here differs greatly from the circumstances in *City of L.A. v. JPMorgan Chase & Co.*, 2014 WL 3854332 (C.D. Cal. Aug. 5, 2014), where the Court directed the plaintiffs to excise from a statistical analysis allegations of unlawful conduct known to have been committed by a defendant over whom the Court lacked jurisdiction.

Second, Ocwen and Altisource argue that the testing evidence cannot be used against them, speculating that some of the test visits may have been conducted prior to Ocwen or Altisource being retained to service a particular property. MTD at 16. Again, this conveniently unknowable (prior to discovery) information is very unlikely to have any substantial impact on the overall extensive analysis. Given that properties were tested over a period of years, it would be very surprising if most or all of the over 1,100 tested properties were visited before Ocwen or Altisource was engaged. This is certainly not a "plausible" assumption at the pleadings stage.

Third, Ocwen and Altisource complain that the background allegations of corporate misconduct against them are not as detailed as such allegations made with respect to the Deutsche Bank defendants. MTD at 16. This argument ignores that such evidence is just one aspect of the disparate treatment claim against them, which for the reasons discussed in Section II. A. easily suffices at the pleading stage.[10]

Finally, Ocwen and Altisource make a frivolous argument that Plaintiffs cannot state a disparate treatment claim without identifying a discriminatory policy. MTD at 16. Defendants cite no case adopting this approach, which would blur two theories of liability long recognized as conceptually distinct. *Ave. 6E Invs. v. City of Yuma*, 818 F.3d 493, 503 (9th Cir. 2016); *County of Cook v. Wells Fargo & Co.*, No. 14 C9549, 2018 WL 1469003 at *13 (N.D. Ill. Mar. 26, 2018) )

### III. THE COMPLAINT ALLEGES DEPRIVATION OF RIGHTS PROTECTED BY THE FAIR HOUSING ACT

---

[10] Ocwen in particular does not appear to be a shining example of a mortgage servicer. *CFPB v. Ocwen*, D.D.C. Case No. 13 cv 2025 ($2.1 billion 2013 CFPB resolution of claims of systemic misconduct throughout the mortgage servicing process); *see also* https://www.consumerfinance.gov/about-us/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-billion-in-relief-to-homeowners-for-servicing-wrongs/.

Defendants next dispute the manner in which Plaintiffs' allegations demonstrate violations of particular sections of the Fair Housing Act. MTD at 19-23. As discussed below, Plaintiffs sufficiently allege violations of 42 U.S.C. §§ 3604(a)-(b), 3605, and 3617, and also adequately allege a claim under the FHA for engaging in the perpetuation of segregation.

### A. The Discriminatory Maintenance of REO Properties in Communities of Color Adversely Affects Their Availability for Purchase in Violation of Sections 3604 and 3605 of the FHA

Like racial steering by real estate agents, the discriminatory maintenance of REO properties in minority neighborhoods undermines the availability of housing in neighborhoods of color in violation of 42 U.S.C. § 3604(a), which makes it unlawful "to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race[.]" Compl. ¶¶ 8, 242, 255-260. For the same reason, the conduct violates 42 U.S.C. § 3605, under which is it is illegal for entities "whose business includes engaging in real estate-related transactions," like purchasing and selling REO properties, to discriminate "in making available such a transaction, or in the terms or conditions of such a transaction."

Defendants mostly ignore Plaintiffs' allegations that the failure to maintain REO properties makes housing unavailable. Compl. ¶¶ 5-6, 9, 59, 78-80, 84, 96-98, 102, 109, 122, 267-72. The Complaint details different ways in which Defendants' conduct operates to make properties and real estate transactions unavailable in minority communities. In some instances, damage resulting from discriminatory neglect may be so severe that the premises are uninhabitable, *id* ¶ 256, rendering REO properties literally "unavailable." If an REO property is not rendered uninhabitable, it may still suffer from physical damage that is costly to repair. *Id.* ¶ 72. Such damage impedes a dwelling's sale (makes housing unavailable) by discouraging buyers from looking at it (and real estate agents from showing it). *Id.* ¶ 242. Physical damage may also preclude the closing of a sale where the appraisal does not support the loan amount requested. *Id.*

¶ 256. All these conditions and barriers to sale discourage people from buying affected REO homes, making them "unavailable" within the meaning of the FHA. *See Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985) (deteriorated conditions "would have an untoward effect on a reasonable person" seeking housing in a community); 24 C.F.R. § 100.70(a), (c) (conditions acting to discourage a person from inspecting or purchasing a property "obstruct" housing choices).[11]

    Defendants incorrectly cite to *Southend Neighborhood Improvement Association v. County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1984) for the proposition that failure to maintain properties is generally not a cognizable claim under Section 3604. *Southend* is not applicable here—not least of all because that decision pre-dates HUD's issuance of regulations in 1989 interpreting § 3604 differently, *see* 24 C.F.R. § 100.65(b)(2). In addition, § 3605 of the Act was substantially rewritten in the Fair Housing Amendments Act of 1988, and now uses language broad enough to encompass the claims alleged here. Third, the primary case relied upon by *Southend* is itself no longer good law. *See NAACP v. American Family Mut. Ins. Co*., 978 F.2d 287, 301 (7th Cir. 1992). In any event, the allegations here are much broader than the limited claims asserted by the plaintiffs in *Southend,* where the Court considered only the neighbor-plaintiffs' claims about the effect on the value of their homes (not a claim in this case) and did not consider the impact of poor maintenance on the prospective "availability" for sale of

---

[11] Buyers may also be discouraged by the prospect of costly repairs to remediate the damage from improper and inconsistent maintenance. *See* Compl. ¶ 239, citing U.S. Gov't Accountability Office, GAO-12-34, *Vacant Properties: Growing Number Increases Communities' Costs And Challenges,* at 54-55 (2011) (high costs of rehabilitating damaged properties sometimes make such efforts infeasible), *available at* http://www.gao.gov/products/GAO-12-34.

vacant properties. "Plaintiffs here do not allege they have been hindered in an effort to acquire a dwelling." *Southend*, 743 F.2d at 1210. [12]

Regarding Plaintiffs' § 3604(b) claim, Defendants offer no additional arguments. Section 3604(b) of the Fair Housing Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race[.]" HUD's implementing regulations specify that "[p]rohibited actions under this section include, but are not limited to . . . [f]*ailing or delaying maintenance* or repairs of sale or rental dwellings" because of race. 24 C.F.R. § 100.65(b)(2) (emphasis added). The courts agree. *See, e.g.*, *U.S. v. Cochran*, 39 F. Supp. 3d 719, 725, 734 (E.D. N.C. 2014) (landlord refusal to provide maintenance or repairs to tenants because of race violated § 3604(b) and § 3617); *United States v. Matusoff Rental Co.*, 494 F. Supp. 2d 740, 743, 745, 747-48 (S.D. Ohio 2007) (violations of § 3604(b) where landlord deferred maintenance on apartments occupied by African-Americans). Plaintiffs' allegations fall squarely within the scope of Section 3604(b) and the implementing regulations. [13]

### B. The Discriminatory Maintenance of REO Properties in Communities of Color Perpetuates Segregation in Violation of the FHA

Defendants' alleged conduct also has the effect of perpetuating housing segregation, which well-settled Circuit law and the pertinent HUD regulation provide is sufficient to violate the FHA. Compl. ¶¶ 125-132, 273-78; *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558

---

[12] Defendants also incorrectly cite *Moore v. FDIC*, 2009 WL 4405538 (N.D. Ill. Nov. 30, 2009) in support of their argument. Unlike the REO properties at issue here, the property in *Moore* was not being put on the market for sale, and so there was no "residential real estate-related" transaction sufficient to trigger coverage under § 3605.

[13] Plaintiffs further note that where discriminatory neglect results in physical damage or a deterioration of the property (as alleged throughout the Complaint), the buyer in any sales transaction is denied the same "privileges" of maintenance afforded in similar sales transactions in white neighborhoods. Thus, poorly maintained REOs in neighborhoods of color transfer title under less favorable "terms" and "conditions" that place on buyers the responsibility of undertaking repairs and cleaning up the property and violate § 3604(b) on this basis.

F.2d 1283, 1289-90 (7th Cir. 1977) (Arlington Heights II); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 937-38 (2d Cir. 1988); 24 C.F.R. § 100.500 ("A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, *or perpetuates segregated housing patterns* because of race, color, religion, sex, handicap, familial status, or national origin.") (emphasis added).

As alleged in the Complaint, racial disparities in REO property maintenance perpetuate segregation by deterring buyers from purchasing homes in minority communities, thereby freezing existing racial segregation patterns in these neighborhoods. Compl. ¶ 130. They also reduce property values and stability in minority neighborhoods. Compl. ¶¶ 274-275.[14] This reduces minority homeowners' equity and thus their ability to move into majority white or integrated neighborhoods. *Id.* ¶¶ 131, 275; *see Arlington Heights II*, 558 F.2d at 1290.

Defendants mistakenly focus on the fact that Plaintiffs do not allege that white buyers are less likely to purchase a home with marketing or maintenance deficiencies than non-white buyers. MTD at 21. This misses the point, which is that where *all* buyers are deterred by Defendants' conduct in minority communities, Defendants' actions perpetuate segregation.

### C. The Complaint States a Claim under 42 U.S.C. § 3617

Finally, Defendants' argument opposing Plaintiffs' claims under 42 U.S.C. § 3617 is inapposite and misconstrues the broad prohibition of that section against "interference" with "any right granted or protected" by the FHA, which is what Plaintiffs sufficiently allege. Compl. ¶ 279. Defendants argue Plaintiffs must allege that Defendants "subjected them...to any adverse action *because* they engaged in activity protected under the FHA." MTD at 22 (emphasis in

---

[14] *See also* GAO-12-34, supra, at 1 ("vacant foreclosed properties may have reduced prices of nearby homes by $8,600 to $17,000 per property in specific cities."); Gerardi, et al., *Foreclosure Externalities: Some New Evidence,* at 33 ("nearby houses trade at lower prices when the lender-owned property is in below-average condition and at higher prices when it is in above average condition."), *available at* http://www.nber.org/papers/w18353.pdf.

original).  In fact, courts have been clear that § 3617 covers conduct beyond "retaliation" *per se*, does not require a showing of threatening or violent conduct, and covers actions like those alleged here that obstruct, impede, or hinder the ability to sell one's property, and other practices which interfere with housing rights.  *See Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 638 (6th Cir. 2017); *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2011); *Willborn v. Sabbia*, No. 10 C5382, 2011 WL 1900455, at *7 (N.D. Ill. May 19, 2011).

Here, the Complaint alleges that Defendants' discriminatory maintenance of REO properties based on racial composition "interferes with" the rights of homeowners and residents in communities of color to use and enjoy their homes free of discrimination. Compl. ¶¶ 239, 280-81. It also alleges that Defendants' conduct directly "interfered with" Plaintiffs' efforts and programs intended to bring about equality of opportunity in housing and designed to promote compliance with fair housing laws. *Id.* ¶¶ 10, 248 (and *passim*).  This is more than sufficient.

## IV. PLAINTIFFS' ALLEGATIONS ARE TIMELY FILED

Defendants also argue, erroneously, that the Complaint must be dismissed because it includes some facts that are outside the FHA's limitations period. MTD at 23-26.

First, Defendants' assertion that Plaintiffs "do not plausibly allege discrimination within the limitations period," MTD at 23, is patently false. Defendants concede that any acts of discrimination occurring after February 26, 2012 are timely as against the Deutsche Defendants, and after February 14, 2015 as against the Ocwen and Altisource Defendants. *Id.*  Yet the Complaint alleges ongoing and repetitive discriminatory activity after these dates. *See, e.g.*, Compl. ¶¶ 4-6, 82, 250.  Accordingly, the Complaint plausibly alleges discrimination occurring within the limitations period. [15]

---

[15] Under Defendants' best case argument, only acts of discrimination occurring between 2011 and February 2012 would be timebarred and not actionable standing on their own. Even so, any acts of

Next, Defendants complain that to the extent Plaintiffs' allegations cover "spans of time" as opposed to specific dates, they are "too conclusory to meet the *Twombly/Iqbal* pleading standard." MTD at 23. But as this Court has observed, "the only way for Defendants to prevail on their statute of limitations argument at the motion to dismiss stage is if the [plaintiff] pleaded itself out of court." *County of Cook v. Bank of Am. Corp.,* 181 F. Supp. 3d 513, 520 (N.D. Ill. 2015). In *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017), for example, the Seventh Circuit made clear that *Twombly* and *Iqbal* require only that a complaint plead a "plausible claim," and do not require the pleading of "all facts" required to prevail. *See also Grady v. Bd. of Trustees of North. Ill. Univ*., 78 F. Supp.3d 768, 776-77 (N.D. Ill. 2015). [16]

Continuing violations are frequently aspects of FHA neighborhood discrimination cases, including those involving housing lenders. In almost all such cases, courts have acknowledged the appropriateness of accepting continuing violation allegations and have rejected motions to dismiss on statute of limitations grounds at the pleading stage. See, e.g., *County of Cook v. Wells Fargo & Co.*, No. 14 C9549, 2018 WL 1469003, at *14 (N.D. Ill. Mar. 26, 2018) )*County of Cook v. Bank of Am. Corp.*, 181 F. Supp. at 520; *City of Los Angeles v. Citigroup, Inc*., 24 F. Supp. 3d 940, 951-52 (C.D. Cal. 2014).

There is no parallel here to the line of cases relied upon by Defendants in which the plaintiff "should have known" that an actionable claim existed, but waited too long to file suit. In

---

discrimination occurring within that period would be relevant and admissible evidence of Defendants' discriminatory intent and the effects of their practices. *See, e.g., Malin v. Hospira, Inc.,* 762 F.3d 552, 561 (7th Cir. 2014) (timebarred discriminatory actions may be evidence of discriminatory intent underlying non-timebarred actions); *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 705 (7th Cir. 2001) (same).

[16] In *City of Miami v. Bank of America Corp*., 171 F. Supp. 3d 1314 (S.D. Fla. 2016), upon which Defendants rely, MTD at 10, 23, the Complaint failed to satisfy the *Twombly/Iqbal* pleading standard, and for that reason could not invoke the continuing violations doctrine. *Id.* at 1318-19. As noted above, the Complaint at bar satisfies the *Twombly/Iqbal* pleading standard as applied in this Circuit. Moreover, in contrast to the Complaint at bar, the complaint in *City of Miami* alleged no activity at all by the Defendants within the relevant limitations year. *Id.* at 1320, n. 3.

each of those cases, the plaintiff tried to salvage an admittedly stale claim by invoking the continuing violations doctrine, but those cases did not involve any actionable conduct within the limitations period (nor do they address the FHA).[17] Likewise, Defendants' argument that Plaintiffs "were aware" of possible fair housing violations when they published their first market-wide study—which does not refer to Defendants at all—cannot support dismissal.

Finally, Defendants observe that the continuing violation doctrine does not apply to discrete acts. MTD at 25-26, citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 114-15 (2002).[18] Defendants suggest that "each act" of discriminatory maintenance is separately actionable, such that a "new clock" starts for statute of limitations purposes. *Id.* But the Plaintiffs here are alleging a "pattern and practice" of discrimination, either established and carried out over time intentionally, Compl. ¶¶ 94-106, or as the unintended consequence of one or more policies having a racially disparate impact, Compl. ¶¶ 113-124. These allegations are by definition dependent on multiple related acts of discrimination which "reveal an allegedly discriminatory pattern," and not on any single, individual act of discriminatory maintenance. *County of Cook v. Wells Fargo & Co.*, No. 14 C9549, 2018 WL 1469003, at *14); *County of Cook v. Bank of America Corp.,* 181 F. Supp. at 520.

## V.  THE DEUTSCHE BANK TRUSTEE OWNERS CAN BE HELD LIABLE FOR FAIR HOUSING ACT VIOLATIONS

The Deutsche Bank Trustee Defendants ("DBNT" and "DBCTA") argue that they are

---

[17] *E.g., La Playita Cicero, Inc. v. Town of Cicero*, 2014 WL 944859, at *12 (N.D. Ill. Mar. 11, 2014) (no allegedly unlawful act occurred within the limitations period); *Ponticiello v. Aramark Unif. & Career Apparel Servs., Inc.*, 2006 WL 2699416, at *7 (N.D. Ill. Sept. 19, 2006) (three of four discrete adverse employment actions were time-barred; the remaining discrete employment decision was not a violation); *Limestone Dev. Corp. v. Vill. Of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008) (predicate acts supporting RICO and equal protection claims did not occur within the limitations period).

[18] It is doubtful that the holding and reasoning of *Morgan*, a Title VII case, applies with any force to Fair Housing Act cases, mainly because the language of the statutes of limitations of each act differ. *Wallace*, 321 F. Supp. 2d  at 972-73.

insulated from liability by the terms of their contractual Pooling and Servicing Agreements, ("PSAs") even though they were legal owners of record of the REO properties. Deutsche Bank MTD at 4-7. This is contrary to the terms of the FHA, at odds with case law addressing the legal status and duties of trustee property owners, and would impair enforcement of the FHA.

### A. The Act Expressly Includes "Trustees" Within Its Coverage

In the first place, the proposition that trustee entities of any kind are immune from liability under the FHA is contrary to the wording of the statute. The term "person" is defined to include: "[O]ne or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, *trusts,* unincorporated organizations, *trustees*, trustees in cases under Title 11, receivers and fiduciaries." 42 U.S.C. § 3602(d) (emphasis added). Consistent with this language, trustees are routinely named as defendants in claims brought under the FHA without any suggestion that they enjoy immunity thereunder, or that the terms of the trust agreement bear on their liability. *See Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, *on denial of reh'g*, 125 F.3d 1281 (9th Cir. 1997); *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 678 F. Supp.2d 576 (E.D. Mich. 2009).

### B. A Trustee Taking Title to an REO Property Assumes Owner Duties and Obligations

A trustee's legal status changes as soon as it steps outside its role as administrator of pooled mortgage loans (its contractual status under a PSA) and assumes the mantle of a property owner. See Compl. ¶¶ 57-60. Once title to a property becomes vested in the name of the trustee after foreclosure, *i.e.*, once the property becomes an REO property, the trustee assumes rights and exposes itself to liabilities, including responsibility for real estate taxes, zoning and code compliance, nuisance avoidance and abatement, and compliance with other laws imposing duties on landowners, such as the FHA. *See In re Foreclosure Cases*, 2007 WL 3232430, at *3, n.3 (N.D. Ohio Oct. 31, 2007) ("the financial institutions know the law charges the one with title . . .

27

with maintaining the property"). A PSA can lawfully allocate and assign duties and responsibilities between the parties to the PSA; however, it cannot change the legal obligations of a trustee to third parties, to persons who come into contact with properties owned by the trust, or to the public at large.

This precise conclusion was reached on two occasions by the district court in *City of Cincinnati v. Deutsche Bank Nat'l. Tr. Co.*, 897 F.Supp.2d 633 (S.D. Ohio 2012), litigation involving the Deutsche Bank defendants (but which Defendants fail to cite to with respect to the trustee issue). The plaintiff sought to abate nuisances on REO properties owned by the Deutsche Bank defendants and other banks as trustees. The Deutsche Bank defendants sought dismissal of the complaint on the pleadings, "claim[ing] that they are not responsible for trust-owned properties because unnamed servicers are responsible for property maintenance." *Id. at* 643-44. The Court rejected the argument, observing that the servicers were not identified in property title documents, and that the PSAs did not confer property ownership on them. *Id. at* 644. Later in the litigation, the Court rejected similar arguments made after discovery by another defendant, Wells Fargo, stating:

> In denying Defendants' motion to dismiss an earlier version of the City's complaint, this Court noted that the servicers are not identified in any property title documents, and that the PSAs do not confer property ownership on the servicers. These observations have been borne out by the summary judgment motions and evidence submitted by both parties. . . . Servicers may well have contractual obligations to the trustee, and/or RMBS trust, its investors and certificate holders. But it is clear to the Court that servicers are not owners of property.

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 2897472, at *7 (S.D. Ohio May 18, 2016) Similarly, in *People of the State of California v. U.S. Bank National Association*, Case No. BC488436 (Sup. Ct. Cal. Jan. 25, 2013), the Superior Court of the State of California rejected an argument made by the defendant bank that it was not responsible for the maintenance

of REO properties to which it had taken title in its capacity as trustee for various RMBS trusts. In that case, the Court granted the State summary judgment on the issue of trustee liability, refusing to accept the Bank's contention that securitization trusts are "different legal animals." (Soule Decl., Ex. B, Mem. Op. at 2-5; Reply Br. at 5).

These holdings comport with regulatory guidance regarding the obligations of financial institutions who assume ownership responsibilities with respect to foreclosed properties. According to the Office of the Comptroller of the Currency, "In acquiring title to foreclosed properties, a bank assumes the primary responsibilities of an owner, including providing maintenance and security, paying taxes and insurance, and serving as landlord for rental properties." Soule Decl., Ex. C, Office of the Comptroller of the Currency, Comptroller's Handbook: "Other Real Estate Owned" at 14 (Sept. 2013). The Federal Reserve Board has similarly observed:

> Institutions should have policies and procedures in place to ensure that properties are maintained in compliance with federal, state, and local laws, including laws governing health and safety, property preservation, fair housing and property registration. . . . Further, institutions engaging third-party vendors to carry out functions related to these requirements should ensure that vendors maintain appropriate compliance controls. Reliance on third-party vendors does not relieve an institution of its compliance responsibilities or liability.

Soule Decl., Ex. D, Federal Reserve Board, Questions and Answers For Federal Reserve-Regulated Institutions Related to the Management of Other Real Estate Owned (OREO) Assets, at 11.

### C. Obligations Under the FHA Cannot Be Offloaded Through Private Contracts

As the authorities discussed in the prior section indicate, titled owners of real property are liable for violations of the FHA relating to properties that they own. It is a basic tenet of Fair Housing law that the terms of contractual arrangements between defendants cannot serve to

limit, and have no bearing on, their liability to third persons. *See e.g., Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 141 (6th Cir. 1985) ("Defendants also object that the District Court erred in finding that Hilltop had 'the power to control the acts of its agents' . . . and hence was liable for the violations committed by those agents. It argues that its agents were independent contractors, over whom under common law it has no control. This argument has been consistently rejected in Fair Housing Act cases.").[19]

Compliance with the Fair Housing Act is non-delegable: regardless of the written terms of the relationship two parties might establish, a principal can be held liable for the conduct of the agent. For example, in *Walker v. Crigler*, 976 F.2d 900 (4th Cir. 1992), the jury found a real estate agent liable under the FHA, but cleared the owner of any liability. The Fourth Circuit found the district court's entry of judgment based on the jury verdict to be reversible error, holding that even if the real estate agent was acting outside the scope of her authority, the owner "could not insulate himself from liability for . . . discrimination . . . by relinquishing the responsibility for preventing such discrimination to another party." *Id.* at 904.

Similarly, in *Metropolitan Fair Housing Council of Oklahoma v. Pelfrey*, 292 F.Supp. 3d 1250 (W.D. Okla. 2017), the court held that a trustee for certain rental properties could be held vicariously liable for unlawful conduct in violation of the FHA committed by a person engaged in operating the properties. The Court specifically noted that the FHA definition of a "person" includes trustees, 42 U.S.C. § 3602(d), *id.* at *2, and cited Section 246 of the Restatement (Second) of Trusts, stating that "a trustee is subject to personal liability to third persons for torts

---

[19] The Supreme Court very recently reiterated the principle that contractual arrangements made by private parties do not generally trump applicable legal doctrines. In *Byrd v. United States*, 138 S.Ct. 1518, 1529 (2018), the Court held that the provisions of a private rental agreement that identified the authorized drivers of a vehicle did not control whether other persons driving the vehicle had an expectation of privacy under the Fourth Amendment.

committed in the course of the administration of the trust to the same extent that he would be liable if he held the property free of trust." *Id.*

It is not even necessary for liability under the FHA to show that a principal was aware of or ordered an agent's conduct, so long as the agent was acting in the scope of authority delegated to him. As the Supreme Court explained in *Meyer v. Holley*, 537 U.S. 280, 285-86 (2003), "[t]he principal is liable for the acts and negligence of the agent . . . although he did not authorize or did not know of the acts complained of."

### D. HUD Region I's Interpretation of the Law Was Erroneous

The Deutsche Bank Defendants' arguments about immunity from the FHA are premised almost entirely on a demonstrably erroneous "No Cause" determination made by one HUD regional office with respect to a charge brought against U.S. Bank serving as trustee, HUD Case No. 01-12-0283-8. Deutsche Bank MTD at 6-7. A Request for Reconsideration of that determination was filed but later withdrawn from HUD, and the HUD Region I finding is neither binding nor instructive in the present case. As discussed in that Request for Reconsideration,[20] the HUD Region's determination is plagued by fundamental errors of law and fact, and its views on trustee liability are no exception. In this regard, HUD erred by failing to acknowledge that a PSA cannot change the trustee property-owner's legal obligations under the language of the

---

[20] Defendants have attached the HUD Determination as an exhibit in support of their Motion. See Kane Decl., Dkt. 29-1, Exh. A. Plaintiffs object that matters outside the pleadings are inappropriate in ruling on a motion to dismiss. *Michon v. Ugarte*, 2017 WL 622236, at * 3 (N.D. Ill., Feb. 15, 2017) (Leinenweber, J.). While the question is not before this Court now, Plaintiffs respectfully submit that the HUD determination to which Defendants cling will prove unavailing when the time comes to litigate the granular details. As demonstrated in the attached "Request for Reconsideration," also filed in that HUD investigation, the HUD Regional office that issued the determination applied legal principles that are inconsistent with accepted law, incorrectly exempted securitizaton trusts from liability under the Fair Housing Act, used an inappropriate test for establishing a prima facie case of discrimination, expressly refused to review all of the evidence submitted by the complainants, relied upon evidence that the complainants never saw, and collected its own "evidence" without following proper protocols. See Ex. A, attached to Declaration of Jennifer K. Soule. HUD investigations have not been immune from investigatory abuses in the past. See *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) (the manner and content of investigation by HUD regional office was unreasonable).

FHA, common law principles, regulatory guidance, and precedent interpreting the FHA.

This erroneous interpretation of the law would have serious consequences at odds with the purposes of the FHA. A rule that a bank as trustee is shielded from liability as a matter of law, taken together with the lack of available public information about servicers, would lead to the practical result that no one in the financial services industry could be held accountable for a pernicious form of discrimination against neighborhoods of color.[21]

## VI. THE COURT SHOULD ALLOW PLAINTIFFS LEAVE TO AMEND THE COMPLAINT WITH REGARD TO THE PROPER CORPORATE DEFENDANTS

Each of the three sets of corporate Defendants (Deutsche Bank, Ocwen[22] and Altisource) have moved for dismissal of the Complaint on its merits. In addition, Ocwen and Deutsche Bank have filed motions asserting that some of the corporate entities named in the Complaint are not properly named.

Plaintiffs request leave to amend the Complaint under Fed. R. Civ. P. 15(a)(2) as to the identity of certain corporate defendants, namely:

(a) to dismiss Ocwen Financial Corp. and substitute an appropriate Ocwen operating subsidiary;

(b) to dismiss Defendants Deutsche Bank and Deutsche Bank AG; and

(c) to substitute in the caption "Altisource Solutions, Inc." for Altisource Portfolio Solutions, Inc.

---

[21] We note that in addition to the legal errors requiring the rejection of Defendants' arguments as to trustee liability, there are outstanding factual issues that would also preclude granting the motion. In support of their motion, Defendants cite to one PSA purportedly relating to one property referred to in the Complaint, which Defendants ask the Court to take judicial notice of as a basis for its argument. The hyperlink to this PSA does not appear operative, and even if this PSA is accurately portrayed as far as the excerpts quoted in Defendants' brief, there is no reason to conclude that the language of other PSAs would be the same as to matters such as authority, liability, agency, etc. These gaping factual issues are an additional reason for denying the motion as to trustee liability.

[22] Contrary to Ocwen's representation (Suppl. Mem., Dkt. 31, at p. 1, fn. 1), Relman, Dane & Colfax ("RDC") did not previously represent Ocwen in a "substantially related" matter. RDC's unrelated engagement by Ocwen ended many years ago. In any event, any arguable disqualification was waived by Ocwen's counsel during prior HUD administrative proceedings.

Each proposed amendment is discussed in greater detail below and is proper under Rule 15(a)(2)'s standard that leave should be granted "freely . . . when justice so requires.".

### A. Ocwen Financial Corp.

Ocwen Financial Corp.'s motion represents that this entity is a holding company which does not conduct business in the State of Illinois, but which directly or indirectly controls the activities of various "Ocwen" subsidiaries. Ocwen MTD at 2. Based on the declaration provided to this effect, Plaintiffs agree to dismissal of Ocwen Financial Corp. and respectfully request leave to add parties affiliated with Ocwen Financial Corp. that engaged in the conduct at issue.

### B. Deutsche Bank

The Deutsche Bank Defendants make several assertions as to whom the appropriate corporate defendants are. First, Deutsche Bank's motion accurately recounts a prior agreement with Plaintiffs that "Deutsche Bank" (apparently a trade name) should be dismissed from the case. Deutsche Bank MTD at 1. Second, Deutsche Bank represents that Deutsche Bank AG is a foreign bank that does not serve as trustee for residential mortgage-backed properties secured by mortgages on U.S. properties, and thus does not hold title to such properties as trustee. Deutsche Bank MTD at 2. Based on these representations, Plaintiffs agree to the dismissal of Deutsche Bank and Deutsche Bank AG from this action, but request that this dismissal be without prejudice in the event that discovery reveals that Deutsche Bank AG has engaged in conduct or facilitated policies bearing on the claims here.

Third, the Deutsche Bank Defendants assert that defendants Deutsche Bank National Trust ("DBNT") and Deutsche Bank Trust Company Americas ("DBTCA") have not been named in the proper legal capacities in which they hold title to REO properties, *i.e.* as trustees of specific Residential Mortgage-Backed Security ("RMBS") trusts. Deutsche Bank MTD at 3-4.

The Deutsche Bank Defendants cite cases involving more limited claims related to specific trust property.  *E.g., Briscoe v. Deutsche Bank Nat'l Tr. Co.*, No. 08 C 1279, 2008 WL 4852977 (N.D. Ill. Nov. 7, 2008) (TILA violations as to loans in trust); *City of Cincinnati v. Deutsche Bank Nat. Trust Co.*, 897 F. Supp. 2d 633 (S.D. Oh. 2012) (properties in trust in violation of City code).

The allegations in the present case are distinguishable from these cases inasmuch as Plaintiffs are challenging an overarching pattern or practice of conduct of DBNT and DBTCA failing to maintain REO properties in minority neighborhoods.  Compl. ¶¶ 94-106 & App. B. The corporate entities responsible for this conduct, DBNT and DBTCA, are proper defendants alleged to be liable for this conduct without reference to the particular RMBS trusts for which they have held property.  The identity of the RMBS trusts is irrelevant under Plaintiffs' theory, which depends upon proving the conduct of DBNT and DBTCA, not on proving the identity of the RMBS trusts.  An apt analogy would be to a case involving a real estate agent who "steers" prospective purchasers to different neighborhoods based on race.  Even though the agent is the representative of many different owners/sellers of properties, a case against the agent would not need to name each individual owner/seller the agent represents.

In the present case, the Complaint might be amended at most to refer to DBNT and DBTCA "as trustees," without referencing or making individual trusts part of the case.  In this regard, however, we note that the allegations of the Complaint already reference the Deutsche Bank Defendants "as trustees" throughout.  Compl. ¶¶ 3, 35, 54, 59.

### C.  Altisource

Altisource did not file a motion to dismiss regarding the appropriate Altisource corporate defendant in the case, but suggests in a footnote that Altisource Portfolio Solutions, Inc. (referenced in the caption and served) is a holding company and should be dismissed, apparently in lieu of Altisource Solutions, Inc., which is referred to throughout the Complaint.  MTD at 1,

34

n.2.  Based on this representation, Plaintiffs are agreeable to this amendment.

## **CONCLUSION**

The purpose of Congress in enacting the Fair Housing Act was "to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601.  Our Court of Appeals has directed that the Act must be interpreted expansively.  *Metropolitan Housing Develop Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1289 (7th Cir. 1977;.  It would confound these purposes if the massive and significant disparities alleged in the Complaint were found to somehow fall outside the purview of the Act.


Respectfully Submitted,

*s/ Jennifer K. Soule*

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
533 S. Division Street, Suite B
Elmhurst, IL 60126

*s/ Stephen M. Dane*

Stephen M. Dane
Yiyang Wu
*Relman, Dane & Colfax PLLC*
1225 19th Street, N.W., Suite 600
Washington, DC 20036


*s/ Morgan Williams*

Morgan Williams
*National Fair Housing Alliance*
1101 Vermont Ave. NW, Suite 710
Washington, DC 20005


Dated:  June 6, 2018

35