IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATIONAL FAIR HOUSING ALLIANCE;
HOPE FAIR HOUSING CENTER, OPEN
COMMUNITIES; SOUTH SUBURBAN
HOUSING CENTER; HOUSING
OPPORTUNITIES MADE EQUAL OF
VIRGINIA; FAIR HOUSING
OPPORTUNITIES OF NORTHWEST OHIO,
INC.; FAIR HOUSING CONTINUUM;
GREATER NEW ORLEANS FAIR HOUSING
ACTION CENTER; DENVER METRO FAIR
HOUSING CENTER; METROPOLITAN
MILWAUKEE FAIR HOUSING COUNCIL;
FAIR HOUSING CENTER OF WEST
MICHIGAN; THE MIAMI VALLEY FAIR
HOUSING CENTER; HOUSING RESEARCH
& ADVOCACY CENTER; FAIR HOUSING
CENTER OF THE GREATER PALM
BEACHES; FAIR HOUSING CENTER OF
CENTRAL INDIANA; CENTRAL OHIO                    Case No. 18 C 0839
FAIR HOUSING ASSOCIATION;
HOUSING OPPORTUNITIES PROJECT                    Judge Harry D. Leinenweber
FOR EXCELLENCE, INC.;
CONNECTICUT FAIR HOUSING CENTER;
NORTH TEXAS FAIR HOUSING CENTER;
and FAIR HOUSING ADVOCATES OF
NORTHERN CALIFORNIA,

                         Plaintiffs,

              v.

DEUTSCHE BANK; DEUTSCHE BANK AG;
DEUTSCHE BANK NATIONAL TRUST;
DEUTSCHE BANK TRUST COMPANY
AMERICAS; OCWEN FINANCIAL CORP.;
and ALTISOURCE PORTFOLIO
SOLUTIONS, INC.,

                         Defendants.

## MEMORANDUM OPINION AND ORDER

Defendants Deutsche Bank, Deutsche Bank AG, Deutsche Bank National

Trust, Deutsche Bank Trust Company Americas, Ocwen Financial Corp., and

Altisource Portfolio Solutions, Inc. move to dismiss the Complaint in

its entirety for failure to state a claim. Ocwen also moves separately for its dismissal from the case for lack of personal jurisdiction. For the reasons stated herein, the Court grants both Motions and allows Plaintiffs forty-five (45) days to amend their Complaint.

## I. BACKGROUND

Plaintiffs are a group of fair housing organizations whose collective mission is to end housing discrimination and promote integration across the country. In this suit, Plaintiffs contend that Defendants maintain policies which caused certain Defendant-owned properties to be disparately maintained in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604, 3605, 3617.

Specifically, Plaintiffs contend that Defendants Deutsche Bank, Deutsche Bank AG, Deutsche Bank National Trust, and Deutsche Bank Trust Company Americas are the trustees and thus owners of record of thousands of "real-estate owned" (or "REO") properties in thirty major metropolitan areas, including Chicago. Defendants Ocwen Financial Corp. and Altisource Portfolio Solutions, Inc. are the servicers allegedly charged with maintaining those REO properties.

Following the housing collapse in 2008, Plaintiffs undertook an investigation of Defendants' property maintenance activities across the country. The ostensible goal of that investigation was to compare how Defendants maintained those properties in predominantly white neighborhoods against those properties in communities of color—specifically, in predominantly African-American and Hispanic neighborhoods. The investigation lasted from 2011 to 2017. During that time, Plaintiffs visited Defendant-owned REO properties and inspected

thirty-nine "maintenance and marketing conditions" such as curb appeal, signage and occupancy, paint and siding, yard and lawn conditions, graffiti, and water damage. (Compl. ¶¶ 5, 72, Dkt. No. 1.) Plaintiffs inspected the condition of each REO property only once, though they chose not to include in their data those properties that "appeared to be occupied or [where] work was actively occurring at the time of the site visits." (Compl. ¶ 68.) According to Plaintiffs, their data shows, in aggregate, "highly significant disparities" between the routine exterior maintenance and marketing of Defendant-owned properties in communities of color and those in white communities. (Compl. ¶¶ 78-87, 94-106.)

Based on those disparities, Plaintiffs bring a five-count Complaint, charging Defendants with violating 42 U.S.C. § 3604(a), § 3604(b), § 3605, § 3617, and with violating the FHA generally by perpetuating segregation. Though the Complaint does not clearly state as much, Plaintiffs explain in response that they pursue these claims under two theories of harm: disparate impact and disparate treatment.

Defendants move collectively to dismiss Plaintiffs' Complaint for failure to state a claim, and Defendant Ocwen moves separately to dismiss the claims against it for lack of personal jurisdiction. For the reasons stated herein, the Court grants both Motions but permits Plaintiffs leave to amend.

## II.  LEGAL STANDARD

In ruling on a motion to dismiss, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiff. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018) (citation omitted). To survive a

motion to dismiss, the complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. DISCUSSION

The parties have generated over 100 pages of briefing in their dispute over Plaintiffs' 84-page Complaint. For efficiency's sake, the Court has organized its ruling to address Defendants' threshold arguments first and so winnow the Complaint down to its substance. Below, the Court addresses: (1) ministerial cleanup required of the Complaint; (2) a timeliness objection; (3) whether certain Defendants must be dismissed from the case; (4) count-specific objections; and, finally, (5) Defendants' objections to Plaintiffs' disparate impact and disparate treatment theories.

### A. Ministerial Cleanup

The Court begins with three housekeeping matters. First, Defendant Ocwen contends that the Court lacks personal jurisdiction over it because Ocwen never actually conducted any property-maintenance activities within this Court's jurisdiction. Rather, Owen's *subsidiaries* conducted that maintenance—whether disparately administered or otherwise. Defendants cite the rule that "[w]here two corporations are in fact separate, permitting the activities of the subsidiary to be used as a basis for personal jurisdiction over the parent violates . . . due

process." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000). Plaintiffs do not challenge the 12(b)(2) Motion and instead agree to remedy the problem by replacing Ocwen with the "appropriate Ocwen operating subsidiary." (Pls.' Resp. 32-33, Dkt. No. 41.) The Court accordingly grants Ocwen's 12(b)(2) Motion and permits Plaintiffs leave to enter the amendment they propose.

Next, Defendants contend that neither Deutsche Bank nor Deutsche Bank AG are proper defendants in this case. The former is simply a trade name and does not identify any particular legal entity. The latter is simply a bank; Deutsche Bank AG does not serve as trustee of any of the REO properties (and so, Defendants reason, the bank is not responsible for any of the conduct alleged). Again, Plaintiffs bow to Defendants' objections; Plaintiffs agree to dismiss Deutsche Bank and Deutsche Bank AG from the case.

Finally, Plaintiffs wish to replace "Altisource Solutions, Inc." in the caption with that entity's proper name, "Altisource Portfolio Solutions, Inc." Defendants apparently have no problem with that correction, though they note in passing that Altisource is a holding company that conducts no business in Illinois and so should be ejected from the case. That argument, however, appears in Defendants' collective 35-page memoranda in support of dismissal only once—in a footnote. Arguments appearing only in footnotes are waived, and the Court will not delve further into this passing remark. *See Bakalis v. Golembeski*, 35 F.3d 318, 326 n.8 (7th Cir. 1994) (deeming argument made only in footnote in opening brief waived).

## B. Timeliness of Allegations

Defendants begin their assault on the Complaint by arguing that many of Plaintiffs' allegations are untimely. Judging the merits of that objection requires a consideration of the FHA's statute of limitations and the so-called "continuing violation" doctrine.

A civil enforcement action under the FHA must be filed "not later than 2 years after the occurrence *or the termination* of an alleged discriminatory housing practice . . . whichever occurs last[.]" 42 U.S.C. § 3613(a)(1)(A) (emphasis added). The italicized language was added to the FHA in 1988 to codify the continuing violation doctrine. *See Cty. of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d 513, 520 (N.D. Ill. 2015) (describing legislative history). The typical 2-year period is tolled so long as the allegations in question pend in an administrative proceeding. *See* 42 U.S.C. § 3613(a)(1)(B).

Here, Plaintiffs filed an administrative complaint with the U.S. Department of Housing and Urban Development ("HUD") against the Deutsche Bank Defendants on February 26, 2014. Plaintiffs then added Ocwen and Altisource as respondents to the complaint on February 14, 2017. Those administrative proceedings were still pending as of Plaintiffs' filing of the Complaint in this case. As such, Defendants contend that Plaintiffs' timely-allegation window extends back no further than two years prior to the date the HUD action was filed, meaning Plaintiffs may only complain of the Deutsche Bank Defendants' actions dating back to February 26, 2012, and of Ocwen and Altisource's actions dating back to February 14, 2015.

Plaintiffs disagree, arguing that because their lawsuit challenges Defendants' alleged discriminatory *policies* (which are still allegedly in effect today), Plaintiffs' claims within the above-mentioned continuing violation doctrine. Plaintiffs are mistaken. The Seventh Circuit has explained that the doctrine has no application where the time-barred incident put the plaintiff on notice that his rights were being violated. *See EEOC v. N. Gibson Sch. Corp.*, 266 F.3d 607, 617 (7th Cir. 2001), *overruled in part on unrelated grounds by EEOC v. Waffle House*, 534 U.S. 279 (2002); *see Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008) (stating that the doctrine allows "suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought . . . . It is thus a doctrine not about a continuing, but about a cumulative, violation"). In other words, a plaintiff seeking the doctrine's application must show that it was reasonable of him not to perceive the impingement of his rights until the discriminatory acts had, "through repetition or cumulation, reached the requisite level of severity." *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 703 (7th Cir. 2001) (internal quotation marks and citations omitted).

Plaintiffs resist this notice limitation, citing *City of Los Angeles v. Citigroup, Inc.*, 24 F. Supp. 3d 940, 951-52 (C.D. Cal. 2014), *County of Cook v. Wells Fargo & Co.*, No. 14 C9549, 2018 WL 1469003, at *14 (N.D. Ill. Mar. 26, 2018), and *County of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d 513, 520 (N.D. Ill. 2015). Relying on these cases, Plaintiffs stress that "courts have acknowledged the appropriateness of accepting continuing violation allegations and have rejected motions to

dismiss on statute of limitations grounds at the pleading stage." (Pls.'
Resp. 25, Dkt. No. 41.)  That is true, but not in a way that helps
Plaintiffs' argument.

First, *City of Los Angeles* is inapposite.  That opinion noted that
under Ninth Circuit precedent, a strict notice limitation "has never
been the 'litmus test' for application of the continuing violation
doctrine."  24 F. Supp. 3d at 952 (quoting *Douglas v. Cal. Dep't of
Youth Auth.*, 271 F.3d 812, 824 n.13 (9th Cir. 2001)).  The Seventh
Circuit *has* strictly required the notice limitation, however, so *City
of Los Angeles*' contrary proclamation can be put aside.  *See, e.g.*,
*Shanoff*, 258 F.3d at 703 ("[I]f the [discriminatory] conduct that
occurred before the limitations period was sufficient to notify the
plaintiff that he had a substantial claim . . . the continuing violation
doctrine does not apply and he can only base his claim on conduct that
occurred within the limitations period.").

Second, though Plaintiffs' two other cases are from this District,
those cases are distinguishable in a key way.  In both, the judges found
they could not discern from the complaint alone when each plaintiff knew
or should have known about the alleged FHA-violative misconduct.  *Wells
Fargo*, 314 F. Supp. 3d at 996 ("At minimum, because it is not apparent
from the pleadings when Cook County 'knew or should have known' that the
equity-stripping practice constituted an actionable cumulative violation
under the FHA, the motion to dismiss on the ground that the FHA's two-
year statute of limitations has run is premature."); *Bank of Am. Corp.*,
181 F. Supp. 3d at 521 ("I cannot determine on the basis of the complaint
whether the County knew or should have known [of the alleged violations].

In support of their statute of limitations argument, Defendants ask me to consider documents that are beyond the scope of a motion to dismiss."). That is not the case here.

Plaintiffs state clearly in their Complaint that in 2011, during the course of their investigative efforts, they held a national news conference "and released a report analyzing and describing the discriminatory maintenance and marketing of white and non-white REO properties. The release of this comprehensive report placed Defendants on notice of the fact that their discriminatory conduct and practices violate the Fair Housing Act." (Compl. ¶ 88.) Plaintiffs intend this allegation to show that Defendants were on notice of their alleged misconduct, but it ends up having the opposite effect as well. Accepting these allegations are true, as the Court must, the Plaintiffs knew back in 2011 that Defendants' conduct transgressed the FHA. Because Plaintiffs' own allegations demonstrate their clear knowledge of their FHA claims back in 2011, the continuing violation doctrine is unavailable to them. As such, the ordinary two-year statute of limitations applies.

After tolling that period for the duration of the still-pending HUD proceedings, Plaintiffs' actionable allegations window dates to February 26, 2012, for the Deutsche Bank Defendants, and to February 14, 2015, for Ocwen and Altisource. *See La Playita Cicero, Inc. v. Town of Cicero*, No. 11 CV 1702, 2014 WL 944859, at *8 (N.D. Ill. Mar. 11, 2014) (explaining that because plaintiffs filed an on-point counterclaim in 2007, they could not contend that defendants' actions prior to 2009 were too trivial to constitute a claim); *see also Ponticiello v. Aramark Unif. & Career Apparel Servs., Inc.*, No. 05 C 1137, 2006 WL 2699416, at *7

(N.D. Ill. Sept. 19, 2006) (finding continuing violation doctrine inapplicable because plaintiff was aware of the alleged discriminatory acts before the limitations period).

This ruling shears off a significant part of the dataset from which Plaintiffs draw their statistics. Further, those statistics are presented, at present, only in the form of conclusions predicated on the *aggregate* data. (Compl. ¶¶ 78-87 (putting forth "aggregate findings").) The Court has no way to discern whether Plaintiffs' statistics-based allegations are rendered less plausible by the subtraction this ruling imposes. Should Plaintiffs amend the Complaint to keep this case alive, they must replead their statistical findings and base them upon the usable dataset alone.

## C. The Deutsche Bank Defendants

Once Plaintiffs strike Deutsche Bank and Deutsche Bank AG from the Complaint, as they have agreed to do, two Deutsche Bank Defendants remain: Deutsche Bank National Trust and Deutsche Bank Trust Company Americas. Those Defendants take issue with their inclusion in this case on two grounds. First, Plaintiffs have failed to sue those Defendants specifically in their trustee capacities, and it is only in that role that said Defendants hold title to the at-issue REO properties. This objection has merit. *See Briscoe v. Deutsche Bank Nat. Tr. Co.*, No. 08 C 1279, 2008 WL 4852977, at *5 (N.D. Ill. Nov. 7, 2008) (dismissing claims against Deutsche Bank entity sued in individual capacity when said entity only held the plaintiff's mortgage as trustee); *see also City of Cincinnati v. Deutsche Bank Nat. Tr. Co.*, 897 F. Supp. 2d 633, 638 (S.D. Ohio 2012) (substantially same). Nothing in the Complaint

suggests Plaintiffs mean to sue the Deutsche Bank Defendants in any capacity other than as trustees (*see* Compl. ¶¶ 3, 35, 55 (reciting Deutsche Bank Defendants' ownership of the REO properties as trustee)), so the case caption should be cleaned up to reflect that.

Defendants' second objection is trickier. Defendants contend that even if Plaintiffs clean up the caption and sue the remaining two Deutsche Bank Defendants in their trustee capacities, those Defendants *still* could not remain in this case because, as trustees, the Deutsche Bank Defendants never performed any of the challenged conduct, *i.e.*, maintaining the REO properties. Defendants emphasize that as trustees, their only responsibility is to hold REO property titles in trust, and the responsibility for property maintenance lay with the servicers alone. Here the Court pauses to expand on the relevant background before considering Defendants' responsibilities in greater depth.

The REO properties at issue here all have mortgages which have been pooled together to form residential mortgage-backed securities ("RMBS"). Such securities are created when an investment bank purchases thousands of residential mortgages and then pools them together. (*See* Compl. ¶ 41.) Upon the creation of an RMBS, a document called a Pooling and Servicing Agreement ("PSA") is drafted to allocate responsibilities related to the security among certain parties. (*See* Compl. ¶ 53.) The PSA designates a trustee to hold title to the real estate securing the RMBS, and the PSA also designates a servicer to preserve and manage the property. (*See* Compl. ¶¶ 53-56.) In this case, the Deutsche Bank Defendants are the PSA-designated trustees; Ocwen and Altisource are the servicers. Against this backdrop, the question is whether the Deutsche

Bank Defendants may escape FHA liability given that the relevant PSAs allocate all responsibility for property maintenance to the servicers alone.

Plaintiffs cry foul. They emphasize the general rule that a property owner may not delegate to another its duty to obey the laws relating to racial discrimination. *Coates v. Bechtel*, 811 F.2d 1045, 1051 (7th Cir. 1987) (citing *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 552 (9th Cir. 1980)). Under that rule, a property owner cannot foist upon its agent the responsibility for FHA compliance and then close its eyes to that agent's shortcomings. *See, e.g.*, *Walker v. Crigler*, 976 F.2d 900, 904 (4th Cir. 1992) (ruling that property owner could not insulate himself from FHA liability merely by "relinquishing the responsibility for preventing such discrimination to another party"); *Metro. Fair Hous. Council of Okla., Inc. v. Pelfrey*, 292 F. Supp. 3d 1250, 1253 (W.D. Okla. 2017) (finding trustee vicariously liable for agent's FHA-violative actions in renting properties owned by the trust); *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1059 (E.D. Va. 1987) ("Under the Fair Housing Act, a corporation and its officers are responsible for the acts of a subordinate employee . . . even though these acts were neither directed nor authorized[.] Courts have followed this rule even where 'it seems harsh to punish innocent and well-intentioned employers' because the statutory duty not to discriminate is non-delegable.") According to Plaintiffs, that rule ends the debate. They argue that because Defendants (as trustees) owned the REO properties in this case, Defendants are stuck on the hook for FHA compliance no matter what. However, case law does not support that argument.

In *Hamilton v. Svatik*, 779 F.2d 383, 387-88 (7th Cir. 1985), the Seventh Circuit affirmed a property owner's liability for the discriminatory acts of her brother, who acted as her agent in handling and approving would-be renters. But in reaching that conclusion, the Seventh Circuit drew a contrast with *Hollins v. Kraas*, 369 F. Supp. 1355, 1356 (N.D. Ill. 1973), in which the court found contract buyers liable for FHA violations even though those buyers did not hold title to the property at issue. As the *Hamilton* court described it: "In *Hollins* the contract buyers had sole and exclusive rights of possession, management, use and control of the building. *The contract buyers were not the agents of the owners or of the bank holding title to the property in trust*." 779 F.2d at 389 n.3 (emphasis added). Thus, property ownership is not a trump card in FHA suits; rather, when the alleged FHA malfeasant is not an agent of the owner, the owner may indeed escape liability.

True, *Hollins* was a clearer case than this one. It is nowhere alleged that Ocwen and Altisource had exclusive rights of possession, use, and control of the REO properties. But those servicers might have had exclusive responsibilities to *manage* the properties, which could provide an escape hatch, á la *Hollins,* for the Deutsche Bank Defendants. In support of that theory, Defendant ask the Court to consider one of the PSAs at the heart of this case.

As a threshold matter: The Court may consider the cited-to PSA without converting the pending motion to dismiss into a motion for summary judgment. Under Federal Rule of Evidence 201, the Court may take judicial notice of facts "not subject to reasonable dispute," meaning said facts "can be accurately and readily determined from sources

whose accuracy cannot reasonably be questioned." FED. R. EVID. 201. Matters of public record can fall within the category of judicially-noticeable facts. *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 771 (N.D. Ill. 2011) (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082-83 (7th Cir. 1997)). Defendants' cited-to PSA is publicly available on a government website. *See* Deutsche Bank National Trust Co. PSA, *https://www.sec.gov/Archives/edgar/data/ 1384691/000090514807000184/efc7-0019_6006707ex991.txt.* The PSA's accuracy cannot reasonably be questioned, so the Court will take judicial notice of it here.

True to the Complaint, the PSA vests in the Deutsche Bank Defendant the responsibility to act as trustee in holding title to the contemplated properties, *id.* § 2.01, and in the servicer the responsibility to "protect and conserve" the properties, *id.* § 3.12. The PSA adds that "the Trustee . . . shall [not] have any responsibility or liability for any action or failure to act by the Servicer nor shall the Trustee . . . be obligated to supervise the performance of the Servicer under this Agreement of otherwise." *Id.* § 3.03. It adds also: "[T]he duties and obligations of the trustee shall be determined solely by the express provisions of this Agreement[.]" *Id.* § 8.01.

The language of the PSA certainly seems to strip the trustee of the responsibility for property maintenance. So: Is this an impermissible delegation of legal duties, as in *Hamilton*, or an indication that because the servicer, alone, held the legal right and responsibility to maintain the property, it and not the trustee is liable, as in *Hollins*? As Defendants would tell it, the key to this

question is that they held title to the REO properties as *indenture* trustees, a role that calls home to a unique place in the law.

True enough, ordinary and indenture trustees are different. In a trust indenture, the trustee "shall not be liable except for the performance of such duties as are specifically set out in such indenture." 15 U.S.C. § 77ooo(a)(1). As such, the scope of an indenture trustee's duties and liabilities is dictated by the express terms of the indenture agreement. *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1308-09 (11th Cir. 2006) (citing *Baker v. Summit Bank*, 46 Fed. App'x 689, 690 (3d Cir. 2002) ("It is well settled that under the Trust Indenture Act, the obligations of the Indenture Trustee are limited to the terms of the Indenture."); *Elliott Assocs. v. J. Henry Schroder Bank & Tr., Co.*, 838 F.2d 66, 71 (2d Cir. 1988) ("[I]t is clear from the express terms of the [Trust Indenture] Act and its legislative history that no implicit duties . . . are imposed on the trustee to limit its pre-default conduct."); *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) (stating that "[u]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement")). "The Indenture Trustee is therefore a creature created and governed by contract." *In re Sunshine Jr. Stores*, 456 F.3d at 1309.

A recent HUD determination backs up this distinction. In that proceeding, the complainants alleged—much like here—that U.S. Bank, as indenture trustee, engaged in an FHA-violative pattern or practice of discrimination by disparately maintaining REO properties it held in

trust.  In finding no reasonable cause to support those allegations, HUD noted that the FHA claims could not be asserted against the indenture (RMBS) trustee.  As HUD explained: "it is the servicers, not the trustee, who controls properties within the trust," and "[i]n contrast, the indenture trustee is more like a legal placeholder with ministerial duties that are defined by the original indenture agreement."  (HUD Determination of No Reasonable Cause 2 n.6, 7 n.21, Dkt. No. 29-2.)

To hear Defendants tell it, the servicers were not agents of the indenture trustees, but rather separately siloed entities which, under the PSA, carried certain responsibilities for the properties discrete from those carried by the trustees.  Under that reasoning, the obligations for non-FHA-violative property maintenance fell squarely upon the servicers; the Deutsche Bank Defendants, as indenture trustees, neither shared in those obligations nor delegated them, and so said Defendants cannot be held responsible for failure of those obligations.

But this is a motion to dismiss.  To win dismissal from this case, the Deutsche Bank Defendants must establish via judicially-noticeable documentation that the allegations concerning their property-maintenance responsibilities are inaccurate and thus may be disregarded.  *See Alexander v. Deutsche Bank Nat. Tr. Co.*, No. 13-CV-407-MMA WVG, 2013 WL 3320455, at *2 (S.D. Cal. July 1, 2013) ("The court may disregard allegations in a complaint that are contradicted by matters properly subject to judicial notice.") (citation omitted).  Though those Defendants have pointed the Court to the one PSA described above, that document alone cannot win them the dismissal they seek.

That PSA is just one of many in this case. As Defendants describe it, that PSA "[was] selected *as an example* PSA that governs *one of the trusts* that holds *a property* identified in the Complaint." (Supp. Mem. in Supp. of Mot. 5 n.6, Dkt. No. 33 (emphasis added); *accord* Kliebard Declaration ¶ 2, Dkt. 33-1 (describing this PSA as related to the RMBS trust holding title to *one* of the thousands of complained-of properties).) So, while this particular PSA delegates all property-maintenance responsibilities to the servicers alone, nothing before the Court indicates that all of the pertinent PSAs mimic that allocation. Add to this Plaintiffs' unrebutted allegation that the trustees act as "back-up servicer" (Compl. ¶ 54), and Defendants' hopes that the Court will kick the Deutsche Bank entities from this suit are quashed. It is not clear, in light of the PSA provided, what a "back-up servicer" is, or when the responsibilities implied by that term vest in the trustee. But these are issues of fact to be sussed out later. For now, the Court takes Plaintiffs' allegations as true unless flatly controverted by judicially-noticeable materials.

In summary, as far as the two remaining Deutsche Bank Defendants are concerned: They may remain in the case for now, but Plaintiffs must amend the Complaint to name these Defendants in their trustee capacities only.

### D. § 3604 Claims (Counts I and II)

Plaintiffs pursue claims under both § 3604(a) and § 3604(b). Respectively, those provisions make it unlawful:

- "[T]o refuse to sell or rent after the making of a bona fide offer, to refuse to negotiate for the sale or rental of, or

otherwise make unavailable or deny, a dwelling to any person because of race or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a);

- "[T]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

Defendants do not levy challenges particular to either § 3604(a) or § 3604(b), but instead lump those objections together in their briefing. Generally, Defendants argue that case law precludes FHA claims for failing to maintain property. Then, when confronted with a HUD regulation confirming the availability of such claims, Defendants maintain that regulation does not apply to the present case. As set forth below, the Court is not persuaded by either of those arguments and yet still finds Plaintiffs' § 3604 allegations to be deficient.

Defendants' central argument for dismissing the § 3604 counts is that Plaintiffs' failure-to-maintain allegations fall short of claiming, as required, that the REO properties were rendered "unavailable." *See* 42 U.S.C. § 3604(a). Defendants rely on *Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1984), which Defendants hold out for the proposition that no FHA claim may lie for a "failure to maintain homes [which] made [those homes] unavailable." (Defs.' Joint Reply 13, Dkt. No. 46.) In *Southend*, the Seventh Circuit considered the FHA claims of seven non-profit organizations and five individual homeowners who alleged that the defendant county failed to maintain the properties it held by tax deed in predominately black neighborhoods. *Id.* at *1208. The plaintiffs

alleged that the defendant's failures "diminished the value of [the plaintiffs'] properties in these neighborhoods and prevented them from securing loans and making other contracts related to their properties." *Id.* The *Southend* plaintiffs alleged that the county's failure to maintain certain properties deflated the value of the neighboring, plaintiff-owned properties. This theory did not pass muster with the court, which observed that § 3604(a) "is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons, but it does not protect the intangible interests in the already-owned property raised by the plaintiffs' allegations." *Id.* at 1210. The Court remanded with instructions to dismiss the § 3604 claims.

There is a problem with applying *Southend* to this case. Since *Southend,* HUD has issued new regulations that set forth a more expansive definition of the conduct prohibited by the FHA. According to one such regulation, the FHA prohibits "[f]ailing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.65(b)(2). Plaintiffs rely on that regulation in contending that a failure to maintain can, when severe enough, render a property effectively unavailable. (Pls.' Resp. 20-21, Dkt. No. 41 (arguing that an REO property is rendered unavailable when, for example, it "suffer[s] from physical damage that is costly to repair[, which] discourage[s] buyers from looking at it"); *cf. Bloch v. Frischholz*, 587 F.3d 771, 777 (7th Cir. 2009) (en banc) (analogizing FHA claims to constructive eviction and describing that to be rendered "unavailable," a property must be "unfit for occupancy").)

Defendants counter Plaintiffs' reliance on 24 C.F.R. § 100.65(b)(2) by claiming that that regulation—and for that matter, § 3604(b) itself—are inapplicable here because those provisions have no effect until after the tenant comes into possession of the property. They cite *Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 713-14 (9th Cir. 2009), in support of that proposition. But Defendants have it backwards. *City of Modesto* wrestled with whether § 3604 reaches discrimination occurring *post*-acquisition, not the other way around. Indeed, that case, as well as the two Seventh Circuit authorities it cites, all roundly agree that FHA claims lie for pre-acquisition claims. *City of Modesto*, 583 F.3d at 712 (citing *Bloch v. Frischholz*, 533 F.3d 562, 563-64 (7th Cir. 2008), *reversed and remanded in unrelated part on rehearing en banc*, *Bloch v. Frischholz*, 587 F.3d 771, 787 (7th Cir. 2009); *Halprin v. Prairie Single Family Homes of Dearborn Park Assoc.*, 388 F.3d 327, 329 (7th Cir. 2004)).

Defendants' abstract challenges to Plaintiffs' § 3604 claims fail. A plaintiff may indeed state an FHA claim if the disparate effects caused by the defendant's failures to maintain render the property unavailable. *Cf. Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 947-48 (N.D. Cal. 2018); 24 C.F.R. § 100.65(b)(2). But Plaintiffs cannot maintain such a claim here unless they plausibly allege its components. Even putting aside the question of whether Plaintiffs have alleged a disparate effect (*see supra* at Part III.B (observing that Plaintiffs' statistical allegations require amendment)), Plaintiffs have still failed to allege the REO properties were neglected to such an extent as to dissuade purchasers from buying them. *Cf. Bloch*, 587 F.3d

at 777 (stating that FHA plaintiffs must show "more than a mere diminution in property values" and "more than just that their properties would be less desirable to a certain group"). This disconnect is a problem, and until it is cured, Plaintiffs' § 3604 claims cannot proceed. The § 3604 claims are dismissed without prejudice.

### E.  § 3605 Claims (Count III)

Plaintiffs also pursue claims § 3605, which makes it unlawful:

> for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605. The FHA defines "residential real estate-related transactions" as "[t]he making or purchasing of loans or providing other financial assistance" related to residential real estate and "[t]he selling, brokering, or appraising of residential real property." 42 U.S.C. § 3605(b). The applicable HUD regulation states that practices prohibited under this section include: "failing or refusing to provide . . . information regarding the availability of loans or other financial assistance" and "providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.120(b). As such, a plaintiff cannot state an actionable claim under § 3605 without alleging that he "attempted to engage in a real estate-related transaction." *Moore v. FDIC*, No. 08 C 596, 2009 WL 4405538, at *5 (N.D. Ill. Nov. 30, 2009) (citing *Gaona v. Town & Country Credit*, 324 F.3d

1050, 1056-57 (8th Cir. 2003) (citing *Mich. Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 346 (6th Cir. 1994)).

Plaintiffs have failed that requirement here. They have not alleged any specific real-estate transactions impeded by Defendants' conduct. Instead, they essentially try to bootstrap their § 3605 claim into their § 3604 theory—that by failing to maintain the REO properties, Defendants effectively made those properties unavailable to prospective purchasers, meaning, in turn, that Defendants prevented any possible purchases of those properties. This is a stretch too far. § 3605 demands that Plaintiffs allege a specific real estate-related transaction, *Moore*, 2009 WL 4405538, at *5, yet no such allegation appears in Plaintiffs' Complaint. The § 3605 count accordingly cannot stand and is dismissed without prejudice.

### F.  § 3617 Claims (Count V)

To state a claim under 42 U.S.C. § 3617, a plaintiff must allege that the defendant "coerced, threatened, intimidated, or interfered with her on account of her protected activity under the FHA." *Herndon v. Hous. Auth. of S. Bend*, 670 F. App'x 417, 419 (7th Cir. 2016) (quoting *White v. U.S. Dep't of Hous. & Urban Dev.*, 475 F.3d 898, 907 (7th Cir. 2007)). Here, however, the Complaint leaves to the imagination what the alleged "protected activity" was that brought about Defendants' property mismanagement. The Complaint explains that the § 3617-relevant harms were felt by (presumably racial minority) community members whose property values fell and whose living environments were rendered "hostile" by Defendants' mismanagement. (Compl. ¶¶ 279-84.) But nowhere does the Complaint explain some predicate, FHA-protected activity these

community members engaged in.  The claim at the heart of this Complaint is that Defendants caused a racial disparity in property maintenance. Without a retaliatory element—*i.e.*, that Defendants acted discriminatorily "on account of" some FHA-protected activity—there is no § 3617 claim.  *See Godbole v. Ries*, No. 15 C 5191, 2017 WL 219506, at *3 (N.D. Ill. Jan. 19, 2017) (stating that unlawful conduct under § 3617 includes "[i]ntimidating or threatening any person because that person is engaging in activities designed to make other persons aware of, or encouraging such other persons to exercise, [FHA] rights" or retaliating because the person "has made a complaint, testified, assisted, or participated in any manner in a [FHA] proceeding" (quoting 24 C.F.R. § 100.400(c)(4)-(5))); *cf. Linkletter v. W. & S. Fin. Grp. Inc.*, 851 F.3d 632, 638 (6th Cir. 2017) (remarking that § 3617 protects against "retribution").  The § 3617 claim is dismissed without prejudice.

### G.  Perpetuating Segregation (Count IV)

In Count IV, Plaintiffs seek to hold Defendants accountable under the FHA for perpetuating segregation.  Defendants object that there is no such claim under the FHA, but they are mistaken.  The Seventh Circuit has explained that conduct that "perpetuates segregation and thereby prevents interracial association . . . will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups."  *Wallace v. Chi. Hous. Auth.*, 321 F. Supp. 2d 968, 974 (N.D. Ill. 2004) (quoting *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977)) (permitting claim for perpetuation of segregation); *see also Boykin v. Gray*, 895 F. Supp. 2d 199, 213 (D.D.C. 2012)

(collecting cases describing that FHA claims may lie for perpetuation of segregation), *aff'd sub nom. Boykin v. Fenty*, 650 F. App'x 42 (D.C. Cir. 2016); *cf.* 24 C.F.R. § 100.500(a) ("A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, *or* perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." (emphasis added)).

Plaintiffs thus could conceivably pursue a cause of action for perpetuation of segregation. But the availability of such a claim does not mean Plaintiffs have plausibly alleged it here. To do so, they must allege segregation that has been perpetuated as a result of Defendants' conduct. *See Wallace*, 321 F. Supp. 2d at 974. In this case, alleging such a claim depends in large part on Plaintiffs' statistics. But, as recited above, Plaintiffs' statistics have been undercut due to their reliance on barred conduct. (*See supra* at Part III.B.) None of Plaintiffs' claims can rely on those statistics until they are adjusted and the allegations relying upon them are amended. Accordingly, the perpetuation of segregation claim is dismissed without prejudice.

### H. Theories of Harm

In contending Defendants violated the FHA, Plaintiffs make use of both theories of harm available to them: disparate impact and disparate treatment. Plaintiffs do not ascribe either theory to any particular count, but rather pursue both in the abstract. The Court addresses those theories below.

### 1. *Disparate Impact Theory*

A plaintiff states an FHA disparate impact claim by alleging (1) a statistical disparity and (2) that the defendant maintained a specific policy which (3) caused the disparity. *Cty. of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018) (citing *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523-24 (2015)). Unsurprisingly, Defendants claim Plaintiffs have failed to allege all of those elements.

### a. *Statistical Disparity*

Defendants start by challenging Plaintiffs' statistics. They question their accuracy given, among other things, that: (1) Plaintiffs recite having collected data on each REO property only once—meaning Plaintiffs never returned to these properties to see, for example, whether Defendants later serviced them and brought their condition up to par; (2) Plaintiffs excluded from their dataset those properties that were currently undergoing maintenance when Plaintiffs happened to visit; (3) the Plaintiffs' statistical "findings" are presented only in the aggregate—meaning the averaged level of maintenance for all REO properties, nationwide, across all years of Plaintiffs' inquiry, from 2011 to 2017; and (4) those aggregate statistics also fail to break out which Defendants were responsible for which properties (and thus for which portion of the disparities alleged).

These objections might be enough individually or all together to undermine Plaintiffs' purported statistical findings. But the Court cannot decide that now. As described earlier, the FHA's statute of limitations effectively shears off much of Plaintiffs' allegations

period.  It is limited to February 26, 2012, for the Deutsche Bank Defendants, and to February 14, 2015, for Ocwen and Altisource.  Given the opacity of Plaintiffs' statistics at present, the Court is in no position to judge whether that shearing-off affects Plaintiffs' ability to rely on their statistics in good faith.  The Court must take all well-pled allegations as true, but, given that the Court just cut down on Plaintiffs' dataset with this ruling, Plaintiffs have not alleged that the newly reduced dataset evinces the same disparate effects as the original.  Until they do so, the Court cannot and will not presume as much.  For now, that means Plaintiffs have failed to allege a statistical disparity as required.  If Plaintiffs believe in good faith that the disparate-effect bottom line is unchanged despite their dataset being shorn down, they may reallege these claims.

For efficiency's sake—should Plaintiffs amend the Complaint and this litigation proceed—the Court also considers the other disparate impact elements: whether Defendants maintained a "policy" and whether proximate cause exists between said policy and the alleged disparate impact.

### b. Defendants' Policy

Plaintiffs contend that the Deutsche Bank Defendants had an "abrogation" policy whereby they relinquished and outsourced to the servicers—entities allegedly undertrained and underexperienced—all responsibility for maintaining the REO properties.  First, a quibble over nomenclature: It strikes the Court that the policy alleged here is not so much a policy of "evading responsibility" (*i.e.*, "abrogating"), but rather of giving up responsibility all together (*i.e.*, "abdicating").

"Abdicating" thus seems a more fitting description for Defendants'
alleged conduct, so the Court will refer below to this conduct as such.

Nomenclature aside, the currently pled practice suffices as a
"policy." *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011)
("[G]iving discretion to lower-level supervisors can be the basis of
Title VII liability under a disparate-impact theory."); *Cty. of Cook v.
Wells Fargo & Co.*, 314 F. Supp. 3d 975, 993 (N.D. Ill. 2018) (finding
substantially same and citing *City of Phila. v. Wells Fargo & Co.*, No.
17-2203, 2018 WL 424451, at *4 (E.D. Pa. Jan. 16, 2018) ("[A] policy
that gives a defendant's employees discretion *can* be the basis for a
disparate impact claim.")). But this abdication policy passes muster
only so long as property maintenance was the Deutsche Bank Defendants'
responsibility to outsource in the first place. If, as Defendants
hypothesize and the Court recounts above, the Deutsche Bank Defendants
always acted as indenture trustees upon whom the responsibility for
property maintenance never fell, Plaintiffs' allegations concerning the
abdication policy might have a problem. Currently, however, according
to reasonable inferences taken in Plaintiffs' favor, the Deutsche Bank
Defendants acted as "back-up servicers" and thus were responsible for
some measure of property servicing. The policy as alleged passes muster
for now.

### c. Proximate Causation

The Supreme Court recently took up the issue of proximate causation
for FHA claims, concluding that "in the context of the FHA,
foreseeability alone does not ensure the close connection that proximate
cause requires. The housing market is interconnected with economic and

social life. A violation of the FHA may, therefore, 'be expected to cause ripples of harm to flow' far beyond the defendant's misconduct." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 534 (1983)).  Rather, "proximate cause under the FHA requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).  In weighing whether a complaint satisfactorily alleges proximate cause, the question is whether the misfeasance charged and the harms felt are connected at the "first step" in the chain of reasoning.  *Id.* (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10 (2010)).

*County of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 978 (N.D. Ill. 2018), provides a good example of the line-drawing involved here. There, Cook County challenged Wells Fargo's equity-stripping practice, whereby the bank allegedly steered minority borrowers to nonprime mortgages and then foreclosed on them.  *Id.* at 979-80.  The County alleged a rash of injuries stemming from that conduct, and the Court found proximate causation for some, but not others.  Falling within the first category were the County's economic harms arising from increased costs of administration and processing foreclosures, namely "[costs associated with] the use of the Cook County Sheriff's Office to post foreclosure and eviction notices, serve summonses, and evict borrowers, and the use of the Cook County Circuit Court to process foreclosure suits[.]"  *Id.* at 984.  Simply enough, the policy increased the number of foreclosures, which increased the County's associated costs.  That

harm manifested at the "first step" of the causal chain, and thus passed the bar reiterated by *City of Miami*. *Wells Fargo*, 314 F. Supp. 3d at 984. In contrast, the *Wells Fargo* court found too attenuated harms including "lost property tax revenue, increased demand for county services, and diminished racial balance and stability." *Id.* at 988. Those harms reached the County only after some intermediate step and so failed the causation requirement (*e.g.*, foreclosed-upon owners no longer pay property taxes, *ergo* the County's revenue decreases).

Here, Plaintiffs charge they were harmed by Defendants' abdication policy, whereby Defendants allegedly foisted the responsibility of property maintenance onto allegedly undertrained and underqualified servicers. Said delegation resulted in racially-disparate property maintenance, which harmed Plaintiffs by (1) undermining their education, advocacy, and training programs; (2) requiring them to divert scarce resources away from their usual activities; and (3) impeding their community investment programs, which aim to stabilize neighborhoods of color. Most charitably, Plaintiffs' causation argument is that they spend their money seeking to combat segregation, and Defendants' policy (in a roundabout way) buoys it.

Defendants, however, charge that this "chain-link causation" is too attenuated to pass muster under *City of Miami*. (Defs.' Joint Mem. in Supp. 18, Dkt. No. 30.) And Plaintiffs, oddly, respond to that charge with a characterization that affronts *City of Miami*'s holding. As noted, *City of Miami* states clearly that foreseeability alone does not suffice for proximate cause in FHA cases. Even so, Plaintiffs characterize their causation argument thusly: "The Complaint alleges that Defendants have

[abdication] policies with regard to the REO properties[, and that] *these policies had foreseeable discriminatory results based on the delegees' predictable actions*." (Pls.' Resp. 13, Dkt. No. 41 (emphasis added).) Unfortunately for Plaintiffs, the Court agrees with their characterization of the complaint.

Plaintiffs have not alleged that their injuries resulted directly from Defendants' practice. Instead, as with the too-attenuated allegations in *Wells Fargo*, Plaintiffs experience harm only after (impermissible) intermediate steps. Their theory is that Defendants' delegation practice resulted in poorly-executed property maintenance, which led to racially-disparate effects, *ergo* Plaintiffs had to invest more heavily (or simply saw less return on their preexisting investments) to combat those effects. Climbing this chain requires more steps than the FHA permits.

Finally, Plaintiffs emphasize that by being forced to divert their resources to combat the disparate effects of Defendants' policies, Plaintiffs have been harmed just like the plaintiffs in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). That comparison does not get Plaintiffs very far, however. When *Havens* observed that the defendants' practices allegedly caused a "drain on the [plaintiff's] resources," the Court was weighing a challenge to the injury-in-fact component of *standing*. *Id.* at 369. That analysis did not speak to proximate causation, so *Havens* does not compel a plaintiff-friendly result here. *Cf. City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1281 (11th Cir. 2015) (observing that *Havens* found injury-in-fact when the plaintiff alleged "impairment of its organizational mission and a

drain on its resources," not "direct discrimination"), *vacated and remanded on other grounds sub nom. Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017).

Plaintiffs have not met the mark for alleging a direct relation between their injury and Defendants' conduct. If for no other reason, their disparate impact theory is dismissed without prejudice. *City of Miami*, 137 S. Ct. at 1306.

### 2. *Disparate Treatment Theory*

To state a disparate treatment claim under the FHA, Plaintiffs must plausibly allege that Defendants had a discriminatory intent or motive. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (citation omitted). "Proof of discriminatory motive . . . can in some situations be inferred from the mere fact of differences in treatment." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977) (citation omitted). "Where a plaintiff challenges a defendant's policy, the plaintiff must establish that the defendant implemented the policy 'because of, and not merely in spite of,' its adverse effect on the protected group." *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 949 (N.D. Cal. 2018) (quoting *Garcia v. Country Wide Fin. Corp.*, No. EDVC 07-1161-VAP (JCRx), 2008 WL 7842104, at *7 (C.D. Cal. Jan. 17, 2008) (citing *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, (1979))).

Plaintiffs have fallen short of that mark. Though Plaintiffs cobble together discriminatory-intent allegations in their Complaint, this opinion has stripped away—at least for now—the foundation of those allegations. At bottom, Plaintiffs rely on their statistical evidence, noting that, in some cases, "statistical disparities alone may prove

intent." *EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994). But, once again, Plaintiffs' statistics have been undermined and so cannot be relied upon for now. Plaintiffs also rely on the Deutsche Bank Defendants' alleged history of discriminatory housing practices, but, given the Court's finding that the bulk of these years-old allegations is barred by the FHA's statute of limitations, this reliance, too, is misplaced. *See* 42 U.S.C. § 3613(a)(1)(A).

In short, Plaintiffs have failed to allege plausibly that Defendants *intentionally* discriminated. That dooms the disparate treatment theory. *See TBS Grp., LLC v. City of Zion*, No. 16-CV-5855, 2017 WL 5129008, at *8 (N.D. Ill. Nov. 6, 2017); *see also Nat'l Fair Hous. All.*, 294 F. Supp. 3d at 949. The Court accordingly dismisses that theory without prejudice.

### IV. CONCLUSION

For the reasons stated herein, Defendants' Motion (Dkt. No. 29) is granted and Plaintiffs' Complaint is dismissed without prejudice. Plaintiffs shall amend their Complaint within forty-five (45) days and, as part of that amendment: (1) replace Defendant Ocwen with an appropriate Ocwen subsidiary; (2) drop Defendants Deutsche Bank and Deutsche Bank AG from the case; and (3) edit the caption to reflect suit against Defendants Deutsche Bank National Trust and Deutsche Bank Trust Company Americas in their trustee capacities only.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: 11/19/2018