IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; HOUSING RESEARCH & ADVOCACY CENTER; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA. | Case No. 18-cv-00839<br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier<br><br>Jury Trial Demanded |
| Plaintiffs, | |
| v. | |
| DEUTSCHE BANK; DEUTSCHE BANK NATIONAL TRUST; DEUTSCHE BANK TRUST COMPANY AMERICAS; OCWEN FINANCIAL CORP.; and ALTISOURCE PORTFOLIO SOLUTIONS, INC. | |
| Defendants. | |

**PLAINTIFFS' AMENDED[1] MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY**

Plaintiffs, by their counsel, move for leave to file the attached opinion, *Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856 (Aug. 27, 2018) as supplemental authority in

---

[1] Corrected signature line.

1

opposition to the motions to dismiss filed by defendants in this case. In support of this motion, plaintiffs state as follows:

1. In this case, defendants have filed motions to dismiss challenging, *inter alia*, whether plaintiffs' complaint sufficiently alleges intentional discrimination under the Fair Housing Act.

2. Subsequent to completion of the briefing on these motions, the United States Court of Appeals for the Seventh Circuit issued its opinion in *Wetzel v. Glen St. Andrew Living Community, LLC,* 901 F.3d 856 (Aug. 27, 2018). The case addresses the standards in this Circuit governing liability for intentional discrimination under the Fair Housing Act, holding that a defendant may be liable for intentional discrimination under the Fair Housing Act in circumstances where the defendant has knowledge of discrimination but acts with deliberate indifference in failing to address it. 901 F.3d at 864-865.

3. The foregoing authority bears upon the issues raised in defendants' motions.

Respectfully Submitted,

s/ *Jennifer K. Soule*
Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell, Suite 100
Geneva, Illinois 60134
630-333-9144

Stephen M. Dane
Yiyang Wu
*Relman Dane & Colfax, PLLC*
1225 19th Street, N.W., Suite 600
Washington, DC 20036

Morgan Williams
*National Fair Housing Alliance*
1101 Vermont Ave., N.W., Suite 710
Washington, DC 20005

2

Dated: November 19, 2018

901 F.3d 856
United States Court of Appeals, Seventh Circuit.

Marsha WETZEL, Plaintiff-Appellant,
v.
GLEN ST. ANDREW LIVING COMMUNITY, LLC, et al., Defendants-Appellees.

No. 17-1322
|
Argued February 6, 2018
|
Decided August 27, 2018

**Synopsis**
**Background:** Lesbian resident of private community for older adults brought action against operator of community, alleging that operator failed to provide her with non-discriminatory housing when its staff failed to address her complaints of abuse from other residents and retaliated against her for filing those complaints, each in violation of Fair Housing Act (FHA). The United States District Court for the Northern District of Illinois, No. 16 C 7598, Samuel Der-Yeghiayan, J., 2017 WL 201376, granted operator's motion to dismiss for failure to state claim. Resident appealed.

**Holdings:** The Court of Appeals, Wood, Chief Judge, held that:

resident alleged that she suffered severe and pervasive harassment;

as a matter of apparent first impression, FHA duty not to discriminate in housing conditions encompasses duty not to permit known harassment on protected grounds;

resident alleged that operator's failure to respond to harassment from other residents affected provision of services and facilities connected to her rental; and

discriminatory animus is not an element of a retaliation claim under the FHA.

Reversed and remanded.

*859 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 16 C 7598—**Samuel Der-Yeghiayan**, *Judge.*

**Attorneys and Law Firms**

Karen Lee Loewy, Attorney, Lambda Legal Defense & Education Fund, New York, NY, John L. Litchfield, Attorney, Ellen M. Wheeler, Attorney, Foley & Lardner LLP, Chicago, IL, for Plaintiff-Appellant.

James Hayes Ryan, Attorney, Lindsay A. Watson, Attorney, Gordon & Rees Scully Mansukhani, LLP, Lisa A. Hausten, Attorney, Clausen Miller, Chicago, IL, for Defendants-Appellees.

Dara Smith, Attorney, AARP Foundation Litigation, Washington, DC, for Amici Curiae American Association of Retired Persons, AARP Foundation.

Yiyang Wu, Attorney, Relman, Dane & Colfax PLLC, Washington, DC, for Amicus Curiae National Fair Housing Alliance.

Before Wood, Chief Judge, and Kanne and Hamilton, Circuit Judges.

**Opinion**

Wood, Chief Judge.

Within months of her arrival at Glen St. Andrew Living Community ("St. Andrew"), Marsha Wetzel faced a torrent of physical and verbal abuse from other residents because she is openly lesbian. Time and again, she implored St. Andrew's staff to help her. The staff's response was to limit her use of facilities and build a case for her eviction.

Wetzel sued St. Andrew, alleging that it failed to provide her with non-discriminatory housing and that it retaliated against her because of her complaints, each in violation of the Fair Housing Act (FHA or Act), 42 U.S.C. §§ 3601–3619. St. Andrew insists that the Act affords Wetzel no recourse, because it imposes liability only on those who act with discriminatory animus, an allegation Wetzel had not expressly made of any defendant. The district court agreed and dismissed Wetzel's suit. We read the FHA more broadly. Not only does it create liability when a landlord intentionally discriminates against a tenant based on a protected characteristic; it also creates liability

against a landlord that has actual notice of tenant-on-tenant harassment based on a protected status, yet chooses not to take any reasonable steps within its control to stop that harassment. We therefore reverse the district court's grant of St. Andrew's motion to dismiss and remand for further proceedings.

I

After her partner of 30 years died, Wetzel moved into St. Andrew, a residential community for older adults; she continues to live there today. Her tenancy, presumably like that of St. Andrew's other residents, is governed by a form Tenant's Agreement ("Agreement"). Beyond a private apartment, the Agreement guarantees three meals daily served in a central location, access to a community room, and use of laundry facilities. It conditions tenancy at St. Andrew on refraining from "activity that [St. Andrew] determines unreasonably interferes with the peaceful use and enjoyment of the community by other tenants" or that is "a direct threat to the health and safety of other individuals." It also requires compliance with the "Tenant *860 Handbook," which may "be amended from time to time." The Agreement authorizes St. Andrew to institute eviction proceedings against a tenant in breach, and if St. Andrew prevails, the breaching tenant must also reimburse St. Andrew for its attorney's fees. (Indeed, the Agreement requires reimbursement of St. Andrew's fees related to an alleged violation or breach even if suit has not been instituted.)

After arriving at St. Andrew, Wetzel spoke openly to staff and other residents about her sexual orientation. She was met with intolerance from many of them. The following is just a sample of what Wetzel has alleged that she endured. At this early stage of the litigation, we accept her account as true, recognizing that St. Andrew will have the right to contest these assertions at a trial.

Beginning a few months after Wetzel moved to St. Andrew and continuing at least until she filed this suit (a 15-month period), residents repeatedly berated her for being a "fucking dyke," "fucking faggot," and "homosexual bitch." One resident, Robert Herr, told Wetzel that he reveled in the memory of the Orlando massacre at the Pulse nightclub, derided Wetzel's son for being a "homosexual-raised faggot," and threatened to "rip [Wetzel's] tits off." Herr was the primary, but not sole, culprit. Elizabeth Rivera told Wetzel that "homosexuals will burn in hell."

There was physical abuse too. Wetzel depends on a motorized scooter. Herr at one time rammed his walker into Wetzel's scooter forcefully enough to knock her off a ramp. Rivera bashed her wheelchair into a dining table that Wetzel occupied, flipping the table on top of Wetzel. In yet another incident, Wetzel was struck in the back of the head while alone in the mailroom; the blow was hard enough to push her from her scooter, and she suffered a bump on her head and a black eye. She did not see the assailant, but the person said "homo" when attacking her. Following this mugging, Herr taunted Wetzel, rubbing his head and saying "ouch." Wetzel also had two abusive trips in the elevator. During the first, Rivera spat on her and hurled slurs. During the second, Wetzel, Herr, and another resident, Audrey Chase, were together in the elevator when Herr again hit Wetzel's scooter with his walker.

Wetzel routinely reported the verbal and physical abuse to St. Andrew's staff, including Carolyn Driscoll, Sandra Cubas, and Alyssa Flavin (the "management defendants"). Wetzel's initial complaints won her a brief respite, prompting her to draft a thank-you note. But the management defendants, among whom we need not distinguish for purposes of this appeal, otherwise were apathetic. They told Wetzel not to worry about the harassment, dismissed the conduct as accidental, denied Wetzel's accounts, and branded her a liar. Wetzel's social worker accompanied her to one meeting about the harassment; despite that, the managers denounced Wetzel as dishonest.

Had the management defendants done nothing but listen, we might have a more limited case. But they took affirmative steps to retaliate against Wetzel for her complaints. For example, they relegated Wetzel to a less desirable dining room location after she notified them about being trampled by Rivera. Following other complaints, they barred her from the lobby except to get coffee and they halted her cleaning services, thus depriving her of access to areas specifically protected in the Agreement. They falsely accused Wetzel of smoking in her room in violation of St. Andrew's policy. Early one morning, two staff members woke Wetzel up and again accused her of smoking in her room. When she said that she had been sleeping, one of them slapped her across

the face. One *861 month, Wetzel did not receive the customary rent-due notice, though other tenants did. She remembered to pay on time, but she had to pry a receipt from management.

In response, Wetzel changed her daily routine. She ate meals in her room, forgoing those included as part of the Agreement. She stopped visiting the third floor of St. Andrew, where Herr lived. She did not use the laundry room at hours when she might be alone. And she stayed away from the common spaces from which she had been barred by management.

Eventually Wetzel brought this action against the management defendants and the entities that own and operate St. Andrew (the "corporate defendants"). Unless the distinction matters, we refer to the group collectively as defendants or St. Andrew. She alleged that St. Andrew failed to ensure a non-discriminatory living environment and retaliated against her for complaining about sex-based harassment, each in violation of the FHA. The complaint included related state claims.

All of the defendants moved for dismissal, contending that the FHA does not make a landlord accountable for failing to stop tenant-on-tenant harassment unless the landlord's in-action was animated by discriminatory animus. In the alternative, the defendants argued that Wetzel's harassment claim must be dismissed insofar as it relied on 42 U.S.C. § 3604(b) because that section does not cover post-acquisition harassment claims—in other words, harassment claims brought by a tenant already occupying her home. The defendants also asserted that Wetzel's retaliation claim failed because it too lacked an allegation that the defendants were motivated by discriminatory animus. The district court agreed with each of the defendants' arguments and dismissed the harassment claim. It dismissed the retaliation claim without further discussion. With the federal claims gone, the court chose to relinquish supplemental jurisdiction over the state claims. Wetzel appeals the dismissal of her suit.

II

A

As we recognized in *Bloch v. Frischholz*, 587 F.3d 771 (7th Cir. 2009) (*en banc*), the protections afforded by the Fair Housing Act do not evaporate once a person takes possession of her house, condominium, or apartment. The question before us, while an important one, is thus narrow: does the Act cover the particular kinds of post-acquisition discrimination that Wetzel suffered?

Under 42 U.S.C. § 3604(b), it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." In addition, the Act makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of ... any right granted or protected by section ... 3604 ... of this title." 42 U.S.C. § 3617. Among other things, these sections prohibit discriminatory harassment that unreasonably interferes with the use and enjoyment of a home—by another name, a hostile housing environment. *Krueger v. Cuomo*, 115 F.3d 487, 491 (7th Cir. 1997); *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996); see also *Bloch*, 587 F.3d at 781 (recognizing that the protections under sections 3604(b) and 3617 may be coextensive).

A hostile-housing-environment claim requires a plaintiff to show that: (1) she endured unwelcome harassment based on a protected characteristic; (2) the harassment was severe or pervasive *862 enough to interfere with the terms, conditions, or privileges of her residency, or in the provision of services or facilities; and (3) that there is a basis for imputing liability to the defendant. See *DiCenso*, 96 F.3d at 1008; see also *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017) (listing elements of a Title VII hostile-workplace claim); *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993) (adopting elements of a Title VII hostile-workplace claim for the FHA).

B

St. Andrew agrees that our ruling in *Hively v. Ivy Tech Community College of Indiana*, 853 F.3d 339 (7th Cir. 2017) (*en banc*), holding that discrimination based on sexual orientation qualifies as discrimination based on sex under Title VII, applies with equal force under the FHA. We therefore move directly to the second element of the case: whether the harassment from which Wetzel

suffered was severe or pervasive enough to interfere with her enjoyment of her dwelling. Harassment is severe or pervasive if it objectively interferes with the enjoyment of the premises or inhibits the privileges of rental. *DiCenso*, 96 F.3d at 1008. That standard requires us to consider the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, and whether it is physically threatening or humiliating rather than merely offensive. *Alamo*, 864 F.3d at 549–50. There is no "magic number of instances" that must be endured before an environment becomes so hostile that the occupant's right to enjoyment of her home has been violated. *Id.* at 550. While isolated minor affronts are not enough, *DiCenso*, 96 F.3d at 1008, either a small number of "severe episode[s]" or a "relentless pattern of lesser harassment" may suffice, *Alamo*, 864 F.3d at 550 (quoting *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005) ).

Though it need be only one or the other, the harassment Wetzel describes plausibly can be viewed as both severe and pervasive. For 15 months, she was bombarded with threats, slurs, derisive comments about her family, taunts about a deadly massacre, physical violence, and spit. The defendants dismiss this litany of abuse as no more than ordinary "squabbles" and "bickering" between "irascible," "crotchety senior resident[s]." A jury would be entitled to see the story otherwise. (We confess to having trouble seeing the act of throwing an elderly person out of a motorized scooter as one of the ordinary problems of life in a senior facility.) Wetzel has presented far more than "a simple quarrel between two neighbors or [an] isolated act of harassment." See *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004).

C

That takes us to the main event: Is there a basis to impute liability to St. Andrew for the hostile housing environment? This question is new to our circuit. Our response begins, as it must, with the text of the statute. *Duncan v. Walker*, 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). Again, 42 U.S.C. § 3604(b) makes it unlawful "[t]o discriminate ... because of ... sex," and 42 U.S.C. § 3617 forbids a housing provider to "interfere with any person in the exercise or enjoyment of ... any right granted or protected by section ... 3604 ... of this title." The focus on the actor rather than the benefitted class, St. Andrew deduces, confines the world of possible defendants under these sections to those accused of carrying discriminatory animus. But St. Andrew relies on language defining the substantive contours of an FHA action to ascertain a landlord's potential liability for actionable abuse—in other words, it is looking at **\*863** *what* is prohibited, not *who* is subject to those prohibitions. As the Supreme Court's cases in analogous areas demonstrate, the questions are different. See *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (distinguishing the scope of behavior proscribed under Title IX from availability of private suit); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788–89, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (separating the analysis of the substantive contours of a forbidden hostile environment claim under Title VII from the rules for determining employer liability); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (telling lower courts to look to common-law principles for guidance on employer liability under Title VII). True, a sex-harassment claim under the FHA demands sex-based discrimination, but Wetzel has alleged such discrimination. On its face, the Act does not address who may be liable when sex-based discrimination occurs or under what circumstances. *Cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754–55, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (considering proper vicarious liability standard for an employer for purposes of Title VII).

Because the text of the FHA does not spell out a test for landlord liability, we look to analogous anti-discrimination statutes for guidance. One natural point of reference is Title VII, which governs discrimination in employment. It and the FHA have been described as "functional equivalent[s]" to be "given like construction and application." *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000); see also *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, — U.S. ——, 135 S.Ct. 2507, 2516, 192 L.Ed.2d 514 (2015) (comparing section 3604(a) of the FHA to Title VII); *Bloch*, 587 F.3d at 779 (noting that section 3604(b) mirrors Title VII). The Supreme Court's interpretation of Title VII's parallel section is illuminating. That section makes it unlawful "to discriminate against any individual ... because of ... sex." 42 U.S.C. § 2000e-2(a)(1). Under operative language in Title VII identical to that of the 42 U.S.C. § 3604(b), an employer may be liable under some circumstances when its own negligence is a cause of prohibited harassment. *Burlington Indus.*, 524

U.S. at 758–59, 118 S.Ct. 2257. Indeed, "when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005). The FHA followed Title VII by four years. See Civil Rights Act of 1964 § 703; Civil Rights Act of 1968 § 804. St. Andrew provides no reason why the FHA requires in all instances that the defendant acted with discriminatory animus when an identically worded statute has not been read in such a manner. As a textual matter, we see none.

We recognize, however, that there are some potentially important differences between the relationship that exists between an employer and an employee, in which one is the agent of the other, and that between a landlord and a tenant, in which the tenant is largely independent of the landlord. We thus refrain from reflexively adopting the Title VII standard and continue our search for comparable situations.

That takes us to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688. Like the FHA and Title VII, Title IX aims to eradicate sex-based discrimination from a sector of society—education. The Supreme Court has held that Title IX supports a private right of action on the part of a person who experiences sex discrimination in an education program or activity receiving federal financial *864 aid. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688–89, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). In *Davis v. Monroe County Board of Education*, the Court confronted the question whether a school district's "failure to respond to student-on-student harassment in its schools can support a private suit for money damages." 526 U.S. at 639, 119 S.Ct. 1661. Because Title IX was enacted pursuant to the Spending Clause, private damages were available against a funding recipient only if it had adequate notice of its potential liability. *Id.* at 640, 119 S.Ct. 1661. Applying that limiting principle, the Court held that the district could be held accountable only for its own misconduct. *Id.* But that is just what the *Davis* plaintiff was trying to do. As the Court put it, "petitioner attempts to hold the Board liable for its *own* decision to remain idle in the face of known student-on-student harassment in its schools." *Id.* at 641, 119 S.Ct. 1661. Indeed, the district itself subjected the plaintiff to discrimination by remaining "deliberately indifferent to known acts of student-on-student sexual harassment [when] the harasser is under the school's disciplinary authority." *Id.* at 646–47, 119 S.Ct. 1661. It emphasized that the recipient of funds exercised substantial control over both the harasser and the premises on which the misconduct took place. *Id.* at 645, 119 S.Ct. 1661.

Much of what the Court said in *Davis* can be applied readily to the housing situation. In *Davis*, the fund recipient's own misconduct subjected the student to actionable sex-based harassment. Here, we need look only to the management defendants themselves, asking whether they had actual knowledge of the severe harassment Wetzel was enduring and whether they were deliberately indifferent to it. If so, they subjected Wetzel to conduct that the FHA forbids. (We say nothing about the situation in a setting that more closely resembles custodial care, such as a skilled nursing facility, or an assisted living environment, or a hospital. Any of those are different enough that they should be saved for another day.) Wetzel may be in unchartered territory, but the Supreme Court's interpretation of analogous anti-discrimination statutes satisfies us that her claim against St. Andrew is covered by the Act.

D

St. Andrew offers several reasons why, in its view, we should not adopt the analysis we have just laid out. We respond to the most important points. It argues that there is no agency or custodial relationship between a landlord and tenant, and from that it reasons that a landlord has no duty to protect its tenants from discriminatory harassment. But we have not gone that far: we have said only that the duty not to discriminate in housing conditions encompasses the duty not to permit *known* harassment on *protected* grounds. The landlord does have responsibility over the common areas of the building, which is where the majority of Wetzel's harassment took place. And the incidents within her apartment occurred precisely because the landlord was exercising a right to enter. More broadly, St. Andrew has a statutory duty not to discriminate. As the Supreme Court said, the FHA "defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Curtis v. Loether*, 415 U.S. 189, 195, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). The same is true of an action under Title VII or Title IX. See *Dunn v.*

*Washington*, 429 F.3d 689, 691 (7th Cir. 2005); *Davis*, 526 U.S. at 643, 119 S.Ct. 1661.

We need not address St. Andrew's arguments about vicarious liability, because it is irrelevant here to the management defendants' possible liability. (The Supreme ***865** Court has held already that the Act imposes vicarious liability on a corporation, but not upon its officers or owners. See *Meyer v. Holley*, 537 U.S. 280, 285–86, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003).) The management defendants' liability, if any after a full trial, would be direct—the result of standing pat as Wetzel reported the barrage of harassment. Because liability is direct, "it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer.... The genesis of inequality matters not; what *does* matter is how the employer handles the problem." *Dunn*, 429 F.3d at 691. A school district's liability under Title IX is the same. *Davis*, 526 U.S. at 640–43, 119 S.Ct. 1661.

St. Andrew complains that it would be unfair to hold it liable for actions that it was incapable of addressing, but we are doing no such thing. We have no quarrel with the idea that direct liability for inaction makes sense only if defendants had, but failed to deploy, available remedial tools. *Id.* at 644, 119 S.Ct. 1661; *Dunn*, 429 F.3d at 691. St. Andrew protests that it can only minimally affect the conduct of its tenants because tenants expect to live free from a landlord's interference.

Control in the absolute sense, however, is not required for liability. Liability attaches because a party has "an arsenal of incentives and sanctions ... that can be applied to affect conduct" but fails to use them. *Id.* St. Andrew brushes aside the many tools for remedying harassment that it has pursuant to the Agreement. For example, the Agreement allows St. Andrew to evict any tenant who "engages in acts or omissions that constitute a direct threat to the health and safety of other individuals" or who "engage[s] in any activity that [St. Andrew] determines unreasonably interferes with the peaceful use and enjoyment of the community by other tenants." The mere reminder that eviction (along with liability for attorneys' fees) was a possibility might have deterred some of the bad behavior. St. Andrew also could have updated the Tenant Handbook to clarify the anti-harassment and anti-abuse provisions. With respect to the common areas, St. Andrew could have suspended privileges for tenants who failed to abide by the anti-harassment policies, instead of taking a blame-the-victim approach.

If liability is possible here, St. Andrew warns, then landlords may just renounce control of the premises altogether. But unless the rental unit is a detached, single-family dwelling, such total abandonment is not a practical possibility. St. Andrew itself had a common living area, a common dining area, common laundry facilities, and hallways. It is hard to believe that a total disclaimer of liability would be in its own best interest. In addition, contract law is not the exclusive source of a landlord's duties or powers. Property law governs landlord-tenant relations as well. A landlord typically must provide its tenants a residence that is free from "interfer[ence] with a permissible use of the leased property by the tenant." RESTATEMENT (SECOND) OF PROP.: LAND. & TEN. § 6.1. The obligation is breached even if a third party causes the interference, so long as the disturbance was "performed on property in which the landlord has an interest" and the "conduct could be legally controlled by [the landlord]." *Id.* § 6.1 cmt. d. Inherent powers spring from that obligation. *Cf. id.* § 6.1 cmt. d, illus. 10–11 (illustrating that a landlord breaches its obligation to a tenant if the landlord fails to act after learning that conduct performed on the owned property interferes with the tenant's permissible use of the leased property). And if need be, there is always the right of exclusion, which is **\*866** "[o]ne of the main rights attaching to property." *Byrd v. United States*, –– U.S. ––, 138 S.Ct. 1518, 1527, 200 L.Ed.2d 805 (2018) (citing 2 W. Blackstone, Commentaries on the Laws of England, ch. 1). The same kinds of steps we already mentioned could have been justified as a matter of property law.

Seeking a broader ruling, Wetzel points to a rule interpreting the FHA that the U.S. Department of Housing and Urban Affairs (HUD) published in 2016. The HUD rule interprets the FHA to make a landlord directly liable for failing to "take prompt action to correct and end a discriminatory housing practice by a third party" if the landlord "knew or should have known of the discriminatory conduct and had the power to correct it." 24 C.F.R. § 100.7(a)(1)(iii). HUD's rule mirrors the scope of employee liability under Title VII for employee-on-employee harassment. We have no need, however, to rely on this rule. As we noted earlier, there are salient differences between Title VII and the FHA. In the end, it is possible that they could be overcome, but more analysis

than HUD was able to offer is necessary before we can take that step. It is enough for present purposes to say that nothing in the HUD rule stands in the way of recognizing Wetzel's theory.

It is important, too, to recognize that the facts Wetzel has presented (which we must accept at this stage) go far beyond mere rudeness, all the way to direct physical violence. This case is thus not, as St. Andrew would have it, one about good manners. Courts around the country have policed that line for years in the context of Title VII, for which they have ensured that the standard is "sufficiently demanding to ensure that Title VII does not become a general civility code," and "filter[s] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted). We have no reason not to expect the same discipline here.

### III

In the alternative, St. Andrew urges that Wetzel's section 3604(b) claim falls outside the scope of post-acquisition actions available under that section of the FHA. Our treatment of this argument might have little effect on the outcome of this case, because Wetzel's harassment claim invokes the protections of both section 3604(b) and section 3617. And a claim alleging a post-acquisition pattern of harassment can proceed under section 3617 even if there is no route for relief under section 3604. *Halprin*, 388 F.3d at 330. St. Andrew nonetheless maintains that Wetzel's section 3604(b) claim is unavailable post-acquisition.

In *Bloch*, the *en banc* court took a careful look at the availability of post-acquisition claims under section 3604(b). 587 F.3d at 779–81. We identified two situations in which such a claim could proceed: (1) when discriminatory conduct constructively evicts a resident, and (2) when occupancy is governed by discriminatory terms (in that case, a condo association rule that prohibited hanging mezzot and thus discriminated against Jews). *Id.* at 779–80. As to the first situation, we reasoned that habitation is a "privilege of sale." *Id.* As to the second, the Bloch family's adherence to the discriminatory rule was a "condition of sale." *Id.* St. Andrew reads *Bloch* as identifying the exclusive set of post-acquisition claims that would be possible under section 3604(b). But we said no such thing. Instead, as courts do, we were addressing the case before us, and so we simply noted that those were "two possibilities for relief in [the present] case." *Id.* at 779. St. Andrew's argument **\*867** also ignores that section 3604(b) protects not only against discrimination in the "terms, conditions, or privileges of sale or rental," but also discrimination "in the provision of services or facilities in connection therewith." As the Ninth Circuit has recognized, the latter language most naturally encompasses conduct that follows acquisition. *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 713 (9th Cir. 2009). Few "services or facilities" are provided prior to the point of sale or rental; far more attach to a resident's occupancy. *Id.*

In this case, Wetzel has alleged that while the management defendants sat on their hands, residents' harassment confined her to her room for prolonged stretches. Regular harassment also impeded her from eating the meals she had paid for at the dining hall, visiting the lobby and other common spaces, and obtaining access to the laundry room. These were concrete violations of the Agreement, which guarantees "three-well balanced meals per day to be served in a central location," a community room, and available laundry facilities. At a minimum then, Wetzel has a cognizable post-acquisition claim because discrimination affected the provision of services and facilities connected to her rental.

Beyond that, the discrimination diminished the privileges of Wetzel's rental. Though she has not been constructively evicted from her apartment, occupancy of the unit is not the only privilege of rental. Use of the totality of the rented premises is another. See RESTATEMENT (SECOND) OF PROP.: LAND. & TEN. § 4.3; A. JAMES CASNER ET AL., 1 AMERICAN LAW OF PROPERTY § 3.49 (1952). So too is the covenant of quiet enjoyment. See *City of Modesto*, 583 F.3d at 713; CASNER, *supra*, § 3.47.

Contrary to St. Andrew's assertion, this case is unlike *Halprin*. There, the Halprin family sued its homeowners' association because the association's president incessantly harassed them because they were Jewish. *Halprin*, 388 F.3d at 328. The *Halprin* opinion took a limited approach to post-acquisition claims under section 3604(b), and so it had no reason to reach the question whether the harassment was connected to a term, condition,

or privilege, or the provision of services, related to homeownership. In *Bloch*, however, the *en banc* court distinguished *Halprin* as a case in which the homeowners' association had no contractual relationship to the Halprin family. *Bloch*, 587 F.3d at 780. St. Andrew tries to use *Halprin* by noting that there was no contractual relationship between Wetzel and any other *tenant*. True enough, but that is not the relevant comparator. It is between Wetzel and St. Andrew, and that relationship was governed by the Agreement and the Tenant Handbook. Nothing in *Halprin* supports the dismissal of Wetzel's case at this time.

## IV

Wetzel separately alleged that after she complained about the harassment, the management defendants restricted her access to facilities and common spaces, downgraded her dining seat, halted her cleaning services, and attempted to build a case for her eviction. In doing so, she says, they retaliated against her in violation of 42 U.S.C. § 3617. St. Andrew offers several reasons to affirm the district court's dismissal of this claim. It argues that the alleged retaliatory conduct was not adverse action; if it was adverse, it was not causally related to Wetzel's complaints; and there is no allegation of discriminatory animus. St. Andrew conceded at oral argument that it argued in the district court only that Wetzel's retaliation claim lacked an allegation of discriminatory animus. We thus limit our remark to that argument. *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010).

**\*868** To prove retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two. See, *e.g.*, *Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 668 (7th Cir. 2017) (elements of a Title VII retaliation claim); *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016) (same for ADEA); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012) (same for Title IX). Proof of discriminatory animus is not on the list. We have said that a claim under section 3617 requires showing intentional discrimination only when considering an *interference* claim. See *Bloch*, 587 F.3d at 783; *East-Miller v. Lake Cnty. Highway Dep't*, 421 F.3d 558, 562–63 (7th Cir. 2005); see also *Halprin*, 388 F.3d at 330–31 (recognizing that section 3617 creates different types of claims).

Indeed, if we were to read the FHA's anti-retaliation provision to require that a plaintiff allege discriminatory animus, it would be an anomaly. The FHA's anti-retaliation provision makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, ... any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. Like all anti-retaliation provisions, it provides protections not because of who people are, but because of what they do. See *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

## V

The district court's judgment is REVERSED and the case is REMANDED for further proceedings consistent with this opinion. We also instruct the district court to reinstate the state-law claims that were dismissed for want of jurisdiction.

**All Citations**

901 F.3d 856

---