**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER; OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-00839 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Judge Harry D. Leinenweber
Magistrate Judge Sidney I. Schenkier |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION
TO DISMISS AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

SUMMARY OF THE AMENDED COMPLAINT'S ALLEGATIONS ...................................... 3

PROCEDURAL HISTORY................................................................................................ 4

ARGUMENT ................................................................................................................. 5

I.      THE AMENDED COMPLAINT INADEQUATELY PLEADS
DISCRIMINATION. ................................................................................................ 5

      A.      Plaintiffs' Disparate Impact Theory Against The Trustees Fails.......................... 5

              1.      The Amended Complaint Does Not Adequately Allege Racial
Disparities. ........................................................................................ 6

              2.      The Amended Complaint Does Not Adequately Identify A Policy
That Caused The Alleged Disparities. .................................................... 10

      B.      Plaintiffs' Disparate Treatment Theory Fails. .................................................. 12

              1.      The Amended Complaint Still Fails Plausibly to Allege
Discriminatory Intent. ........................................................................ 13

              2.      Plaintiffs' Disparate Treatment Claims Against Ocwen And
Altisource Fail For Additional Reasons.................................................. 15

II.     THE AMENDED COMPLAINT'S SUPERFICIAL CHANGES FAIL TO CURE
PLAINTIFFS' LEGALLY INSUFFICIENT PROXIMATE CAUSATION
ALLEGATIONS.................................................................................................... 17

      A.      The Court Properly Applied the *City Of Miami* Proximate Cause Standard. ...... 18

      B.      Plaintiffs' Theory And Allegations Of Indirect Harm Are Unchanged............... 19

      C.      Plaintiffs' Limited New Allegations and Reorganization Are Insufficient
To Overcome the Court's Prior Proximate Cause Ruling. ................................. 21

III.    THE AMENDED COMPLAINT INADEQUATELY PLEADS ADDITIONAL
CLAIM-SPECIFIC ELEMENTS. ............................................................................. 24

      A.      Plaintiffs Fail To State A Section 3604 Claim.................................................. 24

      B.      Plaintiffs Fail To State A Section 3605 Claim.................................................. 25

      C.      Plaintiffs Fail To State A Claim For Perpetuating Segregation........................... 26

IV.    PLAINTIFFS' ALLEGATIONS OUTSIDE OF THE APPLICABLE TWO-
YEAR STATUTE OF LIMITATIONS WARRANT DISMISSAL............................... 26

CONCLUSION............................................................................................................. 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................................5, 10, 14, 17

*Bank of America Corp. v. City of Miami,*
137 S. Ct. 1296 (2017)..................................................................2, 18, 19, 21, 23

*Bastian v. Petren Res. Corp.,*
892 F.2d 680 (7th Cir. 1990) .......................................................................27

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).........................................................................5, 10, 16

*City of L.A. v. JPMorgan Chase & Co.,*
2014 WL 3854332 (C.D. Cal. Aug. 5, 2014).........................................16

*Cnty. of Cook v. Wells Fargo & Co.,*
314 F. Supp. 3d 975 (N.D. Ill. 2018) ..............................................6, 19

*County of Cook v. Bank of America Corp.,*
2018 WL 1561725 (N.D. Ill. Mar. 30, 2018)...........................................19

*County of Cook v. Wells Fargo,*
2018 WL 1469003 (N.D. Ill. Mar. 26, 2018)............................19, 24, 26

*Demos v. City of Indianapolis,*
302 F.3d 698 (7th Cir. 2002) .............................................................5

*Hemi Group, LLC v. City of N.Y.,*
559 U.S. 1 (2010)..............................................................................24

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.,*
2017 WL 2984048 (N.D. Tex. July 13, 2017) ........................................6

*Menominee Indian Tribe of Wisc. v. Thompson,*
161 F.3d 449 (7th Cir. 1998) ............................................................5

*Merritt v. Countrywide Fin. Corp.,*
2015 WL 5542992 (N.D. Cal. Sept. 17, 2015) ......................................6

*Munguia v. Ill.,*
2010 WL 3172740 (N.D. Ill. Aug. 11, 2010) ........................................6

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*,
  2018 WL 1411106 (N.D. Cal. Mar. 21, 2018).............................................10, 12, 14

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*,
  294 F. Supp. 3d 940 (N.D. Cal. 2018) ...........................................................13, 15

*O'Neal v. Ore. Dep't of Justice*,
  2015 WL 7722413 (D. Ore. Nov. 30, 2015) ..........................................................6

*Ricci v. DeStefano*,
  557 U.S. 557 (2009)...........................................................................................13

*Rummery v. Ill. Bell Tel. Co.*,
  250 F.3d 553 (7th Cir. 2001) ...............................................................................8

*Serritella v. Markum*,
  119 F.3d 506 (7th Cir. 1996) .............................................................................27

*Smith v. Nat'l Health Care Servs. of Peoria*,
  934 F.2d 95 (7th Cir. 1991) ...............................................................................27

*Soto v. City of W. Chi.*,
  2010 WL 4810612 (N.D. Ill. Nov. 19, 2010) ......................................................14

*TBS Group, LLC v. City of Zion*,
  2017 WL 5129008 (N.D. Ill. Nov. 6, 2017) ................................................6, 14, 15

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
  135 S. Ct. 2507 (2015)..........................................................5, 6, 10, 13, 17

*Wetzel v. Glen St. Andrew Living Cmty., LLC*,
  2017 WL 201376 (N.D. Ill. Jan. 18, 2017) ........................................................14

**Statutes**

42 U.S.C. § 3604.......................................................................................2, 24, 25

42 U.S.C. § 3605.................................................................................3, 24, 25, 26

42 U.S.C. § 3617.................................................................................................24

**Other Authorities**

24 C.F.R. § 100.120(b) .......................................................................................26

Fed. R. Civ. P. 12(b)(6)......................................................................................5, 6

Fed. R. Civ. P. 12(f).............................................................................................13

## INTRODUCTION

Plaintiffs' Amended Complaint falls far short of curing the deficiencies identified by the Court in previously dismissing Plaintiffs' Fair Housing Act ("FHA") claims. *See* ECF No. 54 ("MTD Order"). Specifically, while the Court provided Plaintiffs with a roadmap of what they would have to allege to state a claim, Plaintiffs' superficial changes—including conclusory assertions and only modest substantive changes—are still insufficient to prevent dismissal of their claims. *See* Sostrin Dec. Ex. A (redline showing changes in Amended Complaint). Moreover, the statistical analysis underlying all of Plaintiffs' FHA claims is fundamentally flawed and cannot support a claim. That is precisely what the U.S. Department of Housing and Urban Development ("HUD") concluded when many of the same Plaintiffs here filed substantially similar FHA claims against another bank. Accordingly, Defendants, Deutsche Bank National Trust Company, as Trustee, Deutsche Bank Trust Company Americas, as Trustee (together, the "Trustees"), Ocwen Loan Servicing, LLC ("Ocwen"), and Altisource Solutions, Inc. ("Altisource"), ask the Court to dismiss Plaintiffs' renewed FHA claims with prejudice.

*First*, the Amended Complaint inadequately pleads discrimination. Plaintiffs assert a disparate impact theory against the Trustees alone based on Plaintiffs' study of some real-estate owned ("REO") properties in select cities, which purportedly found that properties in predominantly white neighborhoods were better maintained and marketed than properties in predominantly minority neighborhoods. In rejecting a nearly identical study, HUD concluded that Plaintiffs' methodology contains fundamental flaws. Because those same methodological flaws are apparent on the face of the Amended Complaint, they require dismissal.

Plaintiffs' disparate treatment theory against the Trustees, Ocwen, and Altisource also fails. Unlike disparate impact, a disparate treatment claim requires a showing of discriminatory intent. Plaintiffs principally base their allegations of discriminatory intent on Defendants' supposed

knowledge and disregard of the alleged statistical disparities. But Plaintiffs have not adequately alleged that statistical disparities existed, so by definition Plaintiffs cannot plead that Defendants knew about or were indifferent to any disparities. In any case, the Supreme Court has held that mere knowledge of a disparate impact is insufficient to plead discriminatory intent, and Plaintiffs offer no other allegations to demonstrate a racial motive. Plaintiffs' claims against Ocwen and Altisource suffer from additional flaws, including Plaintiffs' concession that they do not know whether the properties that they studied were maintained or marketed by Ocwen, Altisource, or some third party. Thus, despite making the very serious allegation that Ocwen and Altisource purportedly intentionally discriminated based on race, Plaintiffs have not provided *any* statistical evidence whatsoever that is specific to either Ocwen or Altisource.

*Second*, the Amended Complaint continues to inadequately plead proximate cause. The Supreme Court in *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017), held that proximate cause requires a "direct relation" between the injurious conduct and alleged injury and that proximate cause generally may not reach beyond the "first step" in the causal chain. As this Court previously recognized, Plaintiffs' theory implicates many links and third-party decisions. MTD Order at 28-31. Plaintiffs' theory and allegations of indirect harm are unchanged in the Amended Complaint. Plaintiffs continue to rely on the same attenuated, chain-link causation that the Supreme Court and this Court have each rejected. Plaintiffs' superficial changes in the Amended Complaint do not cure the fatal deficiencies in their FHA claims.

*Third*, the Amended Complaint still inadequately pleads other claim-specific elements. The Court previously held that to maintain a Section 3604 claim (Counts I-IV), Plaintiffs must plausibly allege that properties were "neglected to such an extent as to dissuade purchasers from buying them." MTD Order at 20. Plaintiffs have not remedied this fatal flaw. The Court also

held that to maintain a Section 3605 claim (Counts V-VI), Plaintiffs must allege "specific real estate transaction[s]" purportedly impeded by Defendants. MTD Order at 21-22. Plaintiffs have not remedied this fatal flaw either. Plaintiffs' claim for perpetuating discrimination (Count VII) also fails because it relies on the same, fundamentally-flawed statistical analysis.

*Finally*, despite this Court's prior statute of limitations ruling requiring Plaintiffs to "shear[] off" the data set underlying their statistical analysis to include only post-February 26, 2012 data for the Trustees and post-February 14, 2015 data for Ocwen and Altisource, Plaintiffs continue to plead—apparently in the alternative—the same time-barred data set dating back to 2011. These alternative, time-barred claims should again be dismissed.

## SUMMARY OF THE AMENDED COMPLAINT'S ALLEGATIONS

The Amended Complaint alleges that the Trustees held title to various foreclosed properties in trust across the United States. Am. Compl. ¶ 35. When a borrower defaults on a mortgage owned by a Trustee, the property may ultimately be sold at a foreclosure sale. If no third party buys the property at the foreclosure sale, a Trustee obtains title to the property, which is then referred to as "Real Estate Owned" or "REO" property. *Id.* ¶¶ 3, 57. The Amended Complaint alleges that the Trustees "utilized Ocwen and/or Altisource to provide property maintenance services for most of the REOs owned or controlled" by the Trustees. *Id.* ¶ 35; *see id.* ¶¶ 56-59.

Plaintiffs are a collective of twenty housing organizations from around the country. *Id.* ¶¶ 14-33. From 2011 to 2017, Plaintiffs allege they conducted a study of "Deutsche Bank REO properties" by visiting properties in parts of 30 metropolitan areas with "the highest foreclosure rates." *Id.* ¶¶ 85-86. Plaintiffs say they inspected each of these properties unless the properties "appeared to be occupied" or "work was actively occurring at the time of the site visits." *Id.* ¶ 86. For the properties they inspected, Plaintiffs evaluated 39 "maintenance and marketing conditions," such as trash on the property, boarded windows, and graffiti on the home. *Id.* ¶¶ 5, 89. From this,

3

Plaintiffs contend that "Deutsche Bank REO properties" in predominantly minority neighborhoods contained more maintenance and marketing "deficiencies" than properties in predominantly white communities. *Id.* ¶¶ 97-99. Plaintiffs assert these alleged disparities are statistically significant if measured "[o]n an aggregate basis across all … properties investigated." *Id.* ¶ 100.

Based primarily on the purported results of their study, Plaintiffs assert seven counts under the FHA. *Id.* ¶¶ 303-349. Plaintiffs do not contend they have any interest in the properties at issue. Instead, they allege that Defendants' purported violations injured Plaintiffs by, *inter alia*, "requiring" Plaintiffs to divert time and resources to their investigation. *Id.* ¶¶ 167-285. Plaintiffs also allege injuries to communities they supposedly serve, asserting that Defendants' purported conduct resulted in increased crime, reduced property values, and other ills. *Id.* ¶¶ 286-95.

On February 26, 2014, Plaintiffs filed an administrative action against the Trustees with HUD. *Id.* ¶ 120. On February 14, 2017, Plaintiffs amended that complaint to add Ocwen and Altisource as respondents. *Id.* Plaintiffs filed this suit in February 2018 and dismissed their administrative action before HUD shortly thereafter.

## PROCEDURAL HISTORY

Defendants filed joint and supplemental motions to dismiss Plaintiffs' original Complaint on May 9, 2018. ECF Nos. 30-33. On November 19, 2018, after full briefing, this Court granted Defendants' motions and dismissed Plaintiffs' original Complaint in its entirety without prejudice. *See* MTD Order at 32. Plaintiffs filed their Amended Complaint on January 3, 2019. ECF No. 58. Pursuant to the Court's February 10, 2019 order, Defendants respectfully submit this joint motion to dismiss Plaintiffs' Amended Complaint. *See* ECF No. 59.[1]

---

[1] Pursuant to that order, the Trustees also are filing a separate supplemental memorandum addressing issues specific to the Trustees as defendants. *See* ECF No 59.

**ARGUMENT**

Rule 12(b)(6) requires that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts require "'specificity in pleading' … to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope'" of success. *Id.* at 558-59.[2]

**I.     The Amended Complaint Inadequately Pleads Discrimination.**

To survive a motion to dismiss, Plaintiffs' FHA claims must plead plausible allegations of discrimination. *Iqbal*, 556 U.S. at 678. Plaintiffs assert discrimination under two theories: a disparate impact theory against the Trustees alone (Am Compl. ¶¶ 308-312, 319-323, 331-337, 345-349), and a disparate treatment theory against all Defendants (*id.* ¶¶ 303-307, 313-318, 324-330, 338-344). The Amended Complaint fails to state a claim under either theory.

**A.     Plaintiffs' Disparate Impact Theory Against The Trustees Fails.**

To "protect potential defendants against abusive disparate-impact claims" and ensure their "prompt resolution," the Supreme Court has emphasized that in assessing FHA claims like those at issue here, it is "important" to "examine with care whether a plaintiff has made out a prima facie case … at the pleading stage." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities*

---

[2] In resolving this motion, the Court may consider public records subject to judicial notice, including housing ordinances in the metropolitan areas studied by Plaintiffs and the HUD ruling rejecting substantially similar claims brought by many of the same Plaintiffs here against U.S. Bank. *See, e.g., Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002) (city ordinances); *Menominee Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449 (7th Cir. 1998) (reports of administrative bodies).

5

*Project, Inc.*, 135 S. Ct. 2507, 2523-24 (2015). *Inclusive Communities* thus placed "limitations on disparate-impact liability" under the FHA and established the pleading requirements for such a claim. *Id.* at 2524. A plaintiff must (1) present statistical evidence of an adverse "disparate impact," (2) identify a specific, race-neutral "policy" of the defendant, and (3) establish a "robust" "causal connection" between the two. *Id.* at 2523-24. A "plaintiff who fails to allege facts at the pleading stage" supporting these elements cannot proceed. *Id.* at 2523. Like the original Complaint before it, the Amended Complaint fails to do so and should be dismissed.

### 1. The Amended Complaint Does Not Adequately Allege Racial Disparities.

Several years before the Supreme Court reached a similar conclusion in *Inclusive Communities*, this Court held that a complaint must "demonstrate a disparate effect using some appropriate measure that can adequately capture how a plaintiff is treated differently as a member of a protected group." *Munguia v. Ill.*, 2010 WL 3172740, at *9 (N.D. Ill. Aug. 11, 2010). Applying Rule 12(b)(6), the Court dismissed a disparate impact claim alleging race discrimination in public-transit funding because plaintiffs' statistics "fail[ed] to capture highly relevant aspects of the funding scheme." *Id.* at *11. Since *Inclusive Communities*, courts have increasingly invoked Rule 12(b)(6) to dismiss disparate impact claims based on alleged statistical disparities where the complaint revealed a "flawed" methodology. *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 2017 WL 2984048, at *9-*10 (N.D. Tex. July 13, 2017) (on remand from Supreme Court); *e.g.*, *TBS Group, LLC v. City of Zion*, 2017 WL 5129008, at *10 (N.D. Ill. Nov. 6, 2017); *O'Neal v. Ore. Dep't of Justice*, 2015 WL 7722413, at *3-*5 (D. Ore. Nov. 30, 2015); *Merritt v. Countrywide Fin. Corp.*, 2015 WL 5542992, at *18 (N.D. Cal. Sept. 17, 2015). *Cf. Cnty. of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 992 (N.D. Ill. 2018) (upholding disparate impact claim "alleg[ing] a ***bona fide*** [statistical] disparity") (emphasis added).

6

As with their original Complaint, Plaintiffs base their disparate impact claims on their study's finding of alleged statistical racial disparities in the maintenance and marketing of "Deutsche Bank REO properties." Am. Compl. ¶ 153. Defendants highlighted the significant flaws in Plaintiffs' methodology in their prior motion to dismiss. In dismissing the original Complaint, this Court noted that "[t]hese objections might be enough individually or all together to undermine Plaintiffs' purported statistical findings," but the Court declined to decide the issue until Plaintiffs had a chance to "sh[ear] down" their dataset to remove inspections from the period in which Plaintiffs claims are time barred. MTD Order at 25-26. The Amended Complaint makes clear, however, that Plaintiffs' statistical methodology continues to contain fundamental flaws precluding Plaintiffs from stating a claim based on the purported results of that study.

First, Plaintiffs' study is fundamentally flawed because Plaintiffs visited each property just once. Am. Compl. ¶¶ 86, 106. As HUD concluded in rejecting substantially similar claims brought by many of the same Plaintiffs here against U.S. Bank, a study based on one-time visits "does nothing to show whether the condition of a property is improving or deteriorating." Sostrin Dec., Ex. B at 4.[3] "At most," HUD observed, such a study shows "whether a particular deficiency existed at a particular time on a particular day." *Id.* at 19.[4] These same flaws doom Plaintiffs' study in this case. For example, Plaintiffs' study considered whether graffiti was found on a property. Am. Compl. ¶ 89. But a servicer could properly perform property maintenance, including graffiti removal, only for graffiti to be painted again the very next day. Yet, if Plaintiffs visited the property after the graffiti was added, Plaintiffs' study based on a single temporal

_____

[3] HUD based its determination in part on evidence showing that Plaintiffs' allegations of discrimination were false. *E.g.*, Sostrin Dec., Ex. B at 9-19. Defendants do not rely on HUD's evidence-based findings here. Rather, Defendants rely on HUD's determination only insofar as HUD found inadequacies in Plaintiffs' statistical methodology that were apparent on the face of the complaint.

[4] Defendants do not concede any deficiencies were present at the REO properties.

snapshot would incorrectly attribute the graffiti to discriminatory maintenance practices.

Second, Plaintiffs' study is flawed because any statistical analysis must "take 'into account nondiscriminatory explanations.'" *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 559 (7th Cir. 2001). As HUD noted in rejecting a similar study by many of the same Plaintiffs, a study based on one-time visits does not (a) "differentiate between properties that required prior exterior maintenance and those that did not," (b) "take into account the condition of properties at the time they came into [the owner's] possession," or (c) control "for the level or lack of upkeep by the mortgagor and whether [the owner] had to rehabilitate the property to reach the state" displayed during the visit. Sostrin Dec., Ex. B at 19. In other words, Plaintiffs assume discrimination if they found a property in a predominantly white neighborhood to be in better condition than a property in a predominantly minority neighborhood. But that assumes too much. The former property may have been in pristine condition when the borrower left, while the latter may have been left in disrepair when the property became REO. Plaintiffs' unsound study does not even purport to control for this non-discriminatory explanation for the disparities that Plaintiffs allegedly found. *See* Am. Compl. ¶ 106. These flaws provide ample grounds for this Court to conclude, like HUD, that this type of one-time study is insufficient to support a plausible disparate impact claim.

In an apparent attempt to remedy this failure, Plaintiffs allege they waited an unspecified "period of time for the property to be owned by Deutsche Bank so initial maintenance and security could be performed" before Plaintiffs visited the property. *Id.* ¶ 92. But Plaintiffs' unspecified delay does nothing to control for the condition of the properties when any Trustee-affiliated entity obtained title. And Plaintiffs do not and cannot allege that it would be ***discriminatory*** for the Defendants to decline to spend disproportionate time and money on properties that borrowers left in poor condition, regardless of the racial composition of the surrounding neighborhood. Indeed,

8

for all that we can tell from Plaintiffs' study, Defendants could have spent *more* time and money maintaining and marketing properties in predominantly minority neighborhoods because those properties may have been in worse condition when they became REO. Thus, Plaintiffs' attempt to shore-up their flawed methodology established nothing.

Third, by their own admission, Plaintiffs are unable to overcome the study's flawed approach of ignoring properties that "appeared to be occupied" or where repair "work was actively occurring" "by a new owner," *including the Trustees. Id.* ¶ 86. Naturally, properties occupied by borrowers are likely to be in better condition than abandoned properties. Plus, as HUD observed, ignoring properties that were under renovation when Plaintiffs visited "could skew the data by excluding the very properties that show evidence of [the owner] maintaining that particular property." Sostrin Dec., Ex. B at 23. Plaintiffs cannot plead that Defendants improperly maintained properties based on a study that ignored instances where Defendants were—as evidenced by Plaintiffs' own observations—actively maintaining properties.

Finally, the Amended Complaint alleges that racial disparities are "statistically significant" when measured on "an aggregate basis across all Deutsche Bank REO properties investigated" (Am. Compl. ¶ 100), but are merely "prevalent in each of the cities included." *Id.* ¶ 101. Plaintiffs thus do not allege statistically significant disparities in any one city. Nor could they. Plaintiffs visited just ten properties in Kansas City (*id.* App'x C58), for example, far too few to provide statistically significant results. In many metropolitan areas, Plaintiffs visited three or fewer properties for a particular demographic. *Id.* App'x C. Moreover, Plaintiffs confined their study to "zip codes within the metropolitan area … with the highest foreclosure rates" (*id.* ¶ 86), but do not and apparently cannot allege that the results can be extrapolated to the area at large.

The principal problem with Plaintiffs' aggregation, as HUD noted, is that each city "has its

own municipal codes." Sostrin Dec., Ex. B at 21. For instance, Plaintiffs assert discrimination based on "boarded windows" and "trespassing or warning signs." Am. Compl. ¶ 89. Beyond Plaintiffs' failure to explain how this would be discriminatory, many of the cities at issue affirmatively *require* owners of vacant properties to board windows and/or install signs warning against trespassing. *See* Sostrin Dec., Ex. C (attaching sample ordinances). As HUD explained, Plaintiffs cannot base a discrimination claim on aggregated statistics encompassing "acts that [Defendants were] legally obligated to perform." *Id.*, Ex. B at 5.

Although Defendants acknowledge that a California court upheld a similar disparate impact claim filed against Fannie Mae, Defendants respectfully submit that the California court's ruling is legally incorrect on this point. *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 2018 WL 1411106 (N.D. Cal. Mar. 21, 2018) ("*Fannie Mae*"). The court held that arguments about "deficiencies" in plaintiffs' "methodology" went to "the weight of the evidence" and "are best reserved for … summary judgment." *Id.* at *1, *5. It is important to note, however, that the size and scope of a study bear no relationship whatsoever to the adequacy of the study's methodology. Where, as here, fatal flaws in Plaintiffs' methodology are apparent from the face of the Amended Complaint, deferring dismissal until summary judgment would make *Inclusive Communities* meaningless because it obviates the need to plead discrimination at the outset. That kick-the-can-down-the-road approach would serve only to impose needless discovery costs on Defendants and unnecessarily consume the resources of the Court—precisely what *Iqbal* and *Twombly* sought to avoid. Plaintiffs' disparate-impact claim should therefore be dismissed.

**2. The Amended Complaint Does Not Adequately Identify A Policy That Caused The Alleged Disparities.**

Plaintiffs' disparate impact claim also falls short under *Inclusive Communities* because Plaintiffs inadequately plead the existence of a specific policy that caused the supposed harm.

Plaintiffs' policy allegations are materially unchanged from the original Complaint. Their claim still relies on the conclusory allegation that the "Deutsche Bank Defendants" collectively or generally adopted a "policy" of "disavowing any legal responsibility for compliance with federal, state or local laws pertaining to REO exterior maintenance," and "sought to 'outsource'" their alleged obligations to third parties. Am. Compl. ¶ 148; *see also id.* ¶¶ 149-50 (same).

In finding that Plaintiffs' above-described allegation "suffices as a 'policy,'" this Court emphasized that its holding was conditional: "Plaintiffs contend that the Deutsche Bank Defendants had an '[abdication]' policy whereby they relinquished and outsourced to the servicers—entities allegedly undertrained and underexperienced—all responsibility for maintaining the REO properties. . . . But this abdication policy passes muster *only so long as property maintenance was the Deutsche Bank Defendants' responsibility to outsource in the first place*." MTD Order at 26-27 (emphasis added). This Court went on to explain:

> [i]f, as Defendants hypothesize . . . the Deutsche Bank Defendants always acted as indenture trustees upon whom the responsibility for property maintenance never fell, *Plaintiffs' allegations concerning the abdication policy might have a problem*. Currently, . . . according to reasonable inferences taken in Plaintiffs' favor, the Deutsche Bank Defendants acted as 'back-up servicers' and thus were responsible for some measure of property servicing. The policy as alleged passes muster *for now*.

*Id.* at 27 (emphasis added). Defendants incorporate by reference the arguments in the Trustees' contemporaneously-filed supplemental memorandum in support of Defendants' joint motion to dismiss—separately filed at the direction of this Court—which clearly establish that the Trustees had no such property maintenance or servicing responsibility under the applicable governing agreements. Absent that sole basis for the Court's prior holding in Plaintiffs' favor, Plaintiffs' conclusory, unsupported policy allegation no longer "passes muster."

Moreover, Plaintiffs' "policy" allegations are unsupported by their limited factual

11

allegations.  Plaintiffs have alleged these same policy allegations to support their disparate impact claim against Fannie Mae.  In *Fannie Mae*, the plaintiffs alleged—and Fannie Mae acknowledged—that Fannie Mae had maintenance obligations for the subject REO properties. 2018 WL 1411106, at *1-*2.  The *Fannie Mae* complaint was "replete with allegations that [Fannie Mae's] maintenance decisions were delegated to low-level employees and agents," including the allegation that Fannie Mae failed to provide its employees and agents the same type of detailed instructions regarding exterior REO maintenance that it gave regarding other REO services.  *Id.* at *2.  Here, by contrast, Plaintiffs identify no specific maintenance or marketing policies that either Trustee—individually *or* collectively—improperly delegated to their employees or agents, or that they are implementing inconsistently.   Rather, Plaintiffs' policy allegation boils down to the singular, all-encompassing allegation that the Trustees improperly "disavow[] or abdicat[e] their legal obligations as real property owners" and leave them "to the discretion of retained third parties."  Am. Compl. ¶¶ 149-150.  The reason for the stark contrast between Plaintiffs' allegations in *Fannie Mae* versus this case is that, unlike Fannie Mae, the Trustees never had any property maintenance or servicing responsibilities to delegate or outsource in the first place.  Plaintiffs' disparate impact claim should be dismissed accordingly.

## B. Plaintiffs' Disparate Treatment Theory Fails.

The Amended Complaint alleges that all Defendants engaged in a pattern and practice of disparate treatment in maintaining and marketing the Trustees' REO properties.  Am. Compl. ¶¶ 303-307, 313-318, 324-330, 338-344.   This Court previously dismissed Plaintiffs' disparate treatment claims because their "cobble[d] together discriminatory-intent allegations" "[fell] short."  MTD Order at 31.  Plaintiffs' disparate treatment claims in the Amended Complaint fare no better.  For this and additional reasons, Plaintiffs fail to state a claim.

1.    **The Amended Complaint Still Fails Plausibly to Allege Discriminatory Intent.**

Like the original Complaint before it, Plaintiffs' Amended Complaint lacks sufficient allegations of discriminatory intent to support a disparate treatment claim. "To state a disparate treatment claim under the FHA, Plaintiffs must plausibly allege that Defendants had a discriminatory intent or motive." MTD Order at 31 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). "If an actor makes a decision based on reasons other than a protected category, there is no disparate-treatment liability." *Inclusive Communities*, 135 S. Ct. at 2521. Crucially, "'[w]here a plaintiff challenges a defendant's policy, the plaintiff must establish that the defendant implemented the policy *'because of, and not merely in spite of,'* its adverse effect on the protected group." MTD Order at 31 (citing *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 949 (N.D. Cal. 2018) (internal citations omitted; emphasis added)).

The discriminatory intent allegations in Plaintiffs' original Complaint spanned only six paragraphs. *See* Compl. ¶¶ 107-12. The Amended Complaint includes the same sparse factual allegations (Am. Compl. ¶¶ 140-46), but with one impertinent addition: Plaintiffs added the singular allegation that the "Deutsche Bank headquarters was targeted in a massive police raid related to money laundering activities implicated in the 'Panama Papers.'" *Id.* ¶ 145. This new allegation is entirely irrelevant and prejudicial to the Trustees. It has nothing to do with the facts, claims, or legal theories alleged in this case and should be stricken. *See* Fed. R. Civ. P. 12(f). Rather than bolstering Plaintiffs' original, insufficient allegations of discriminatory intent, Plaintiffs' addition of this superfluous allegation emphasizes that Plaintiffs have *no* acts to support their claim that any of the Trustees' (let alone Ocwen's or Altisource's) conduct or policies challenged in this case were motived by discriminatory intent.

In the absence of any actual allegations of discriminatory intent, Plaintiffs ask this Court

to "infer" discriminatory intent. But the allegations in the Amended Complaint from which Plaintiffs would have this Court "infer" discriminatory intent still fall short of stating a claim. First, Plaintiffs still offer the conclusory allegation that Defendants' conduct was "based on race." *Compare* Compl. ¶ 109 *with* Am. Compl. ¶ 142. Under *Iqbal* and its progeny, this is not enough: a complaint must plausibly allege facts demonstrating racial animus. *Iqbal*, 556 U.S. at 686-87. That is why courts in this District have repeatedly applied *Iqbal* to dismiss FHA claims based on conclusory allegations of discriminatory intent. *E.g.*, *TBS Group*, 2017 WL 5129008, at *5 (allegation that housing ordinance was selectively enforced was conclusory, not factual); *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 2017 WL 201376, at *2 (N.D. Ill. Jan. 18, 2017); *Soto v. City of W. Chi.*, 2010 WL 4810612, at *7 (N.D. Ill. Nov. 19, 2010) (plaintiff failed to allege the city treated him differently from others outside his protected class).

Second, Plaintiffs still rely on their flawed statistical allegations and Defendants' purported knowledge of those alleged disparities, adding conclusory allegations of "reckless disregard." *Compare* Compl. ¶¶ 109(a)-(c), (f)-(g) *with* Am. Compl. ¶¶ 124, 142(a)-(c), (f)-(g). In the *Fannie Mae* case, plaintiffs alleged a similar theory of "'differing maintenance'" in support of their disparate treatment claim, and the court dismissed plaintiffs' claim for failing to plead "discriminatory intent." *Fannie Mae*, 2018 WL 1411106, at *6. On this point, *Fannie Mae* was correct: "purposeful discrimination requires more than … 'awareness of consequences.'" *Iqbal*, 556 U.S. at 676. Rather, a disparate treatment claim "involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." *Id.* at 676-77 (internal quotations omitted). Plaintiffs' "reckless disregard" allegations do not save their claims that Defendants acted with discriminatory intent.

Finally, Plaintiffs still hope to infer discriminatory intent from allegations of Defendants'

unspecified "historical" discrimination, baseless attacks on Defendants' corporate cultures, and mischaracterizations of Defendants' settlement of unrelated litigation matters. *Compare* Compl. ¶¶ 109(i)-(k), 110-12 *with* Am. Compl. ¶¶ 142 (i)-(k), 143-146. The Court already rejected the sufficiency of these allegations, and the new "Panama Papers" allegation discussed above changes nothing. *See* MTD Order at 32 (identifying Plaintiffs "misplaced" reliance on "the Deutsche Bank Defendants' alleged history of discriminatory housing practices" as being insufficient to "allege plausibly that Defendants *intentionally* discriminated.") (citing *TBS Group*, 2017 WL 5129008, at *8; *Nat'l Fair Hous. Al.*, 294 F. Supp. 3d at 949). Because Plaintiffs still fail to allege plausible, factually-supported allegations to show that Defendants' challenged conduct was motivated by racial animus, Plaintiffs' disparate treatment claims should be dismissed again on that basis.

### 2. Plaintiffs' Disparate Treatment Claims Against Ocwen And Altisource Fail For Additional Reasons.

As explained above, Plaintiffs' statistical allegations do not support a discrimination claim against any Defendant. *See supra* at 7-10, 14. They also fail to support a disparate treatment claim against Ocwen or Altisource for several additional reasons.

First, Plaintiffs admit they cannot "identify which" company was "retained for any specific REO property." Am. Compl. ¶ 64. Rather, the Amended Complaint alleges only that "Ocwen and/*or* Altisource" acted as the "primary servicers" for the Trustee REO properties at issue and were retained "to provide property-maintenance services for ***most*** of the REOs owned or controlled by … Deutsche Bank." *Id.* ¶¶ 35, 64 (emphases added). Plaintiffs thus do not know whether Ocwen, Altisource, or some other company maintained or marketed the particular properties that Plaintiffs studied. As a result, despite accusing Ocwen and Altisource of *intentional* race-based discrimination using almost exclusively statistical data, Plaintiffs have not offered ***any*** statistical data whatsoever that is specific to either Ocwen or Altisource.

Plaintiffs cannot assert that Altisource's property-preservation services intentionally discriminated based in part on properties serviced by Ocwen or another company. Nor can Plaintiffs assert that Ocwen's servicing intentionally discriminated based in part on properties maintained or marketed by Altisource or another company. Because a statistical study cannot lump together the alleged conduct of two separate defendants and an unspecified number of third parties, Plaintiffs' disparate treatment claim against Ocwen and Altisource should be dismissed. *See City of L.A. v. JPMorgan Chase & Co.*, 2014 WL 3854332, at *7-*8 (C.D. Cal. Aug. 5, 2014) (dismissing FHA claim based on "regression analysis that lumps loans issued by both Chase and WaMu together" because complaint against Chase was "tainted" by "allegations of conduct related to WaMu's lending"). A complaint "must allege facts" stating a claim "before proceeding to discovery," *Twombly*, 550 U.S. at 563, and Plaintiffs have not done so.

Second, as discussed above, Plaintiffs do not allege statistically significant disparities in any one city with respect to any Defendant. This flaw is only amplified with respect to Ocwen and Altisource. As a result of the Court's statute of limitations ruling, Plaintiffs were required to "shear down" their original data set of 1,141 properties across 30 metropolitan areas to only 650 properties visited after February 2015—an average of around 20 properties per area. *Compare* Am. Compl. App'x B *with* App'x D. In Kansas City, for example, of the 10 properties visited, Plaintiffs visited **only 3** properties post-2015, including 1 property each in a predominantly African-American, Latino, and White neighborhood. *Id.* App'x D53. Because Plaintiffs' post-2015 data set was nearly shorn in half, even more of the metropolitan areas studied involved visits to 3 or fewer properties for a particular demographic. *Id.* App'x D.

Third, as discussed above, Plaintiffs try to justify their one-time visit study by alleging they waited an unspecified "period of time for the property to be owned by Deutsche Bank" before

visiting the property. Am. Compl. ¶ 92. The Amended Complaint does not allege, however, that Plaintiffs delayed property visits until Ocwen was supposedly retained to service the loans at issue or until Ocwen purportedly retained Altisource to maintain the properties. Plaintiffs therefore base their allegations of discriminatory intent on property visits that could have occurred *before* Ocwen or Altisource had any authority to maintain the properties.

Fourth, the non-statistical allegations Plaintiffs cite in an attempt to plead discriminatory intent are weak as to the Trustees but even weaker as to Ocwen and Altisource. Whereas the Amended Complaint identifies lawsuits the Trustee-affiliated entities purportedly settled and other Trustee-related issues—allegations that for reasons described above cannot be used to plead discriminatory intent—the Amended Complaint simply asserts that "Ocwen and Altisource have similar histories" without offering any supporting allegations. *Id.* ¶¶ 143-46. This conclusory allegation falls short of alleging facts demonstrating racial animus. *Iqbal*, 556 U.S. at 686-87.

Fifth, the Amended Complaint concedes that Plaintiffs lack information about the "details" of Ocwen's and Altisource's policies. *Id.* ¶ 156. In the disparate impact context, *Inclusive Communities* requires allegations that the defendant's policy caused the alleged statistical disparities. Because Plaintiffs principally base their disparate treatment claim on alleged statistical disparities, Plaintiffs must likewise be required to identify an Ocwen and Altisource policy that caused the alleged disparities. Plaintiffs' repeated failure to do so requires dismissal.

## II.      The Amended Complaint's Superficial Changes Fail to Cure Plaintiffs' Legally Insufficient Proximate Causation Allegations.

In dismissing the disparate impact theory in Plaintiffs' original complaint, the Court observed that "Plaintiffs have not met the mark for alleging a direct relationship between their injury and Defendants' conduct." MTD Order at 30-31. Although the Court provided a detailed roadmap for Plaintiffs to cure these deficiencies if there was any factual basis for doing so,

17

Plaintiffs' modest additions in the Amended Complaint fall far short of addressing the Court's concerns. Indeed, rather than adding substantive allegations, the "new and improved" proximate cause allegations in the Amended Complaint reveal that Plaintiffs merely attempted to disguise this pleading deficiency by reorganizing and renaming some of their original allegations of harm. Yet, the substance of Plaintiffs' attenuated harm allegations remains unchanged. Therefore, in the Amended Complaint, as in the original Complaint, "Plaintiffs have not alleged that their injuries resulted directly from Defendants'" alleged misconduct. MTD Order at 30.

A.    **The Court Properly Applied the *City Of Miami* Proximate Cause Standard.**

In rejecting the adequacy of the proximate cause allegations in the original Complaint, this Court correctly applied controlling Supreme Court precedent. In particular, in *City of Miami*, the Supreme Court was clear: FHA claims should be dismissed where plaintiffs fail to allege a "***direct*** relation between the injury asserted and the injurious conduct alleged." 137 S. Ct. at 1306 (emphasis added; internal quotations omitted); *see also* MTD Order at 28 (citing same). The Supreme Court's rationale was this: The housing market is "interconnected with economic and social life" and "ripples of harm" from an FHA violation may "be expected to . . . flow far beyond the defendant's misconduct," but Congress did not "intend[] to provide a remedy wherever those ripples travel." *City of Miami*, 137 S. Ct. at 1306 (internal quotations omitted); *see* MTD Order at 27-28 (citing same). Thus, as this Court stated in applying the edict from *City of Miami*, "[i]n weighing whether a complaint satisfactorily alleges proximate cause, the question is whether the misfeasance charged and the harms felt are connected *at the 'first step' in the chain of reasoning*," and this holds true "regardless of whether the plaintiff's claimed losses are 'foreseeable.'" MTD Order at 28 (citing *City of Miami*, 137 S. Ct. at 1306) (emphasis added).

This Court's dismissal of Plaintiffs' disparate impact claims on proximate cause grounds also was consistent with two recent decisions in this District that applied *City of Miami* to dismiss

18

FHA claims where, as here, the plaintiffs' claimed injuries were too remote from the alleged discriminatory acts. *See County of Cook v. Wells Fargo*, 2018 WL 1469003, at *8-*9 (N.D. Ill. Mar. 26, 2018) (where defendant's conduct allegedly caused a disproportionate increase in foreclosures in minority communities, the plaintiff county could *not* bring FHA claims based on lost property tax revenue, increased demand for county services, or diminished racial stability because those alleged harms are "precisely the 'ripples' that *City of Miami* cautions 'flow far beyond the defendant's misconduct'"); *County of Cook v. Bank of America Corp.*, 2018 WL 1561725, at *5 (N.D. Ill. Mar. 30, 2018) (dismissing plaintiff's FHA claims to the extent the plaintiff's asserted injuries did not "flow directly from the discrimination it allege[d]").

Applying these holdings to the original Complaint, this Court correctly observed that as in *Wells Fargo*, Plaintiffs' proximate cause allegations were too attenuated. MTD Order at 30. That is because Plaintiffs' theory is that Defendants' delegation of maintenance supposedly resulted in poor property maintenance, which supposedly resulted in racially disparate effects in communities, which allegedly caused Plaintiffs to spend more (or receive less of a return on community investments) to combat these alleged effects, was impermissible under the FHA. *See id.* at 30 ("Climbing this chain requires more steps than the FHA permits."). On this basis, the Court held that Plaintiffs' proximate cause allegations failed as a matter of law.

### B. Plaintiffs' Theory And Allegations Of Indirect Harm Are Unchanged.

Like the original Complaint, Plaintiffs' Amended Complaint still alleges the same attenuated, chain-link causation that the Supreme Court in *City of Miami* and the courts in both Cook County decisions found insufficient to satisfy proximate cause requirements for FHA claims. In fact, Plaintiffs' Amended Complaint relies on the same allegations that Defendants cited when challenging Plaintiffs' proximate cause allegations in the original Motion to Dismiss:

- Plaintiffs still allege—without pleading any new facts—that the Trustees "adopted a uniform policy of disavowing any legal responsibility for compliance with [] laws pertaining to REO exterior maintenance" and "sought to 'outsource'" their alleged obligations to "third parties." *Compare* Am. Compl. ¶ 148 *with* Compl. ¶ 114.

- Plaintiffs still allege—without pleading any new facts—that this supposed policy, in turn, allegedly "cause[d] retention of unqualified and unsupervised third parties who lack incentives to comply with legal obligations regarding the maintenance of the Deutsche Bank REO properties." *Compare* Am. Compl. ¶ 153 *with* Compl. ¶ 119.

- Plaintiffs still allege—without pleading any new facts—that this retention of third parties, in turn, allegedly caused servicers like Ocwen and vendors like Altisource to employ practices that "have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color." *Compare* Am. Compl. ¶ 155 *with* Compl. ¶ 122.

- Plaintiffs still allege—without pleading any new facts—that these supposed practices by Ocwen and Altisource, in turn, resulted in Defendants' alleged "fail[ure] to perform adequate routine exterior maintenance and marketing of the Deutsche Bank REO properties in communities of color, thereby leaving those . . . homes in a state of neglect." *Compare* Am. Compl. ¶ 96 *with* Compl. ¶ 78.

- Plaintiffs still allege—without pleading any new facts—that this supposed failure to perform routine exterior maintenance, in turn, allegedly led to "complaints and feedback from neighbors living in proximity to these properties," asserting that the properties caused increased crime, decreased property values, and other ailments.

20

*Compare* Am. Compl. ¶ 167, 286-295 *with* Compl. ¶¶ 133, 239-47.

- Plaintiffs still allege—without pleading any new facts—that this supposed increase in crime and reduction in property values, in turn, led Plaintiffs to "investigate[] this anecdotal information." *Compare* Am. Compl. ¶ 168 *with* Compl. ¶ 134.

- Finally, Plaintiffs still allege—without pleading any new facts—that several steps later, this attenuated chain of events "undermine[d] Plaintiffs' education, advocacy and training programs," "require[d] Plaintiffs to divert scarce resources away from their usual … activities" toward its study, and impeded Plaintiffs' community investment programs to stabilize neighborhoods of color. *Compare* Am. Compl. ¶¶ 178, 181, 186 *with* Compl. ¶ 136.

In other words, Plaintiffs' chain-link theory of proximate causation that eventually connects Defendants' conduct to Plaintiffs' alleged harm is fundamentally unchanged from what this Court already held was insufficient in the original Complaint.

### C. Plaintiffs' Limited New Allegations and Reorganization Are Insufficient To Overcome the Court's Prior Proximate Cause Ruling.

Unable to alter the applicable proximate cause standard or their fundamental theory of harm, Plaintiffs half-heartedly make superficial amendments to a handful of allegations in the Amended Complaint in the apparent hope that Defendants and this Court would mistake *conclusory assertions* and a *reorganization or relabeling of their indirect harm allegations* for new, direct allegations of harm sufficient to pass muster under *City of Miami*.

Plaintiffs' first new conclusory (and wholly unsupported) allegation is that, contrary to the Court's informed analysis in its MTD Order, Plaintiffs' allegations "indicate[] a sufficiently direct causal connection between the abdication of duties and other policies and conduct of Defendants and the injuries suffered by Plaintiffs." Am. Compl. ¶ 170. Plaintiffs similarly added the

21

conclusory, argumentative assertion that "[t]o the extent the [Defendants] seek to rebut these allegations, factual questions are presented." *Id.* ¶ 171. That hardly does the trick because this Court, not Plaintiffs, decides whether Plaintiffs' allegations sufficiently allege proximate cause and whether factual questions are presented. And this Court has already done so.

Plaintiffs also insist that that the Defendants' conduct "directly caused differential property maintenance based on race." Am. Compl. ¶ 171. Even if this conclusory allegation was accurate— and it is not—the allegation merely highlights that even in Plaintiffs' view, the Trustees' alleged policies of "abdication" cause "differential property maintenance," not the multiple-steps-removed alleged harm to Plaintiffs that eventually flows from that alleged "differential property maintenance." Thus, Plaintiffs still "have not met the mark for alleging a direct relation between their injury and Defendants' conduct." MTD Order at 31.

That conclusion also is unaffected by the new conclusory allegation that "[t]he injuries flowing from Defendants' gross differential property maintenance on racial lines" "are immediate and inevitable consequences of Defendants' discriminatory policies and conduct." Am. Compl. ¶ 172. Here, again, Plaintiffs' allegation confirms that Plaintiffs' alleged injuries do *not* directly "flow" or result from any policies or actions of the Trustees. Rather, they allegedly "flow" (whether directly or indirectly) from *later* steps in the causal chain: Ocwen and Altisource's alleged "differential property maintenance on racial lines." *Id.* Plaintiffs' disparate impact claim is against the Trustees, not Ocwen and Altisource. For that reason, to plead sufficiently proximate cause for such a claim, the harm must result *directly* from the Trustees' alleged conduct and/or policies. That is (still) not what Plaintiffs allege.

Beyond these sparse new and unavailing conclusory allegations, Plaintiffs try to camouflage their lack of new substantive additions by simply reorganizing, re-naming, and/or

word-smithing their original allegations of indirect harm. Plaintiffs' original Complaint alleged "injury to all plaintiffs" in ten paragraphs. *See* Compl. ¶¶ 136-45. On its face, the Amended Complaint seems to expand on those allegations. It includes five separate subsections of allegations entitled "Loss of Economic Value and Impact of Community Investments," "Frustration of Mission," "Implementation of Counteractive Measures," "Diversion of Resources," and "Harms to Minority Neighborhoods Served by Plaintiffs." *See* Am. Compl. ¶¶ 170-93. Upon closer inspection, however, those five seemingly separate categories of allegations are just a reorganized version of same allegations that this Court held were insufficient to satisfy the *City of Miami* proximate cause standard. *See* Compl. ¶¶ 136(e) & 140 (alleging harm to "Plaintiffs' community investment programs"); ¶ 136(c)-(d) (alleging frustration of mission); ¶ 138 (alleging the diversion of scare resources to implement counteractive measures); ¶ 136(e) (alleging harm to "the communities that Plaintiffs serve"); *see also* ¶¶ 248-249 (same). Moreover, the 23-pages' worth of plaintiff-specific injuries alleged in the original Complaint are materially *unchanged* in the Amended Complaint.[5] Thus, to the extent this Court already ruled Plaintiffs' allegations of harm were insufficient to satisfy the proximate cause standard, no allegations in the "Injuries to Individual Plaintiffs" section of the Amended Complaint will change that analysis. *Compare* Compl. ¶¶ 147-238 *with* Am. Compl. ¶¶ 195-285.

In summary, just as they did in the original Complaint, the most charitable reading of Plaintiffs' Amended Complaint is that Defendants' conduct *set in motion a chain reaction of events* that, *after several links* in the chain, either led Plaintiffs to devote more resources to programs that already existed and would still exist in the absence of Defendants' alleged misconduct or otherwise

---

[5] The allegations of harm regarding the Fair Housing Center for Rights & Research reflect its name change from Housing Research & Advocacy Center, but the substance of the allegations remain unchanged. *Compare* Compl. ¶¶ 208-211 *with* Am. Compl. ¶¶ 255-258.

eventually had a "ripple" effect on their economic interests. *See* MTD Order at 29 ("Most charitably, Plaintiffs' causation argument is that they spend their money seeking to combat segregation, and Defendants' policy (in a roundabout way) buoys its.").

Moreover, Plaintiffs' attenuated causation theory still "rests on the independent actions of third and even fourth parties." *Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1, 15 (2010). For example, the Amended Complaint's allegation that Defendants' conduct caused or increased neighborhood "blight … [still] runs through too many other factors—from the underlying condition of specific vacant or abandoned properties, to the number of nearby vacant homes, the conduct of criminals and criminal gangs, the underlying characteristics of the neighborhoods in question, and broader economic difficulties stemming from the 2008 financial crisis and the resulting Great Recession—to satisfy proximate cause." *Cnty. of Cook*, 2018 WL 1469003, at *9. For these reasons, Plaintiffs' claimed injuries are still too remote from the alleged discriminatory conduct to satisfy the proximate cause requirement for FHA claim.

## III. The Amended Complaint Inadequately Pleads Additional Claim-Specific Elements.

Plaintiffs continue to allege violations of 42 U.S.C. §§ 3604(a), 3604(b), and 3605, and a claim for "perpetuating segregation." Am. Compl. ¶¶ 209-349.[6] As set forth below, the Amended Complaint fails to allege facts that, even if true, are sufficient to state each claim.

### A. Plaintiffs Fail To State A Section 3604 Claim.

The Court previously held that Plaintiffs failed to state a Section 3604 claim because the original Complaint did not "allege the REO properties were neglected to such an extent as to dissuade purchasers from buying them." MTD Order at 20–21. Plaintiffs' Amended Complaint fails to cure this fatal defect and, as a result, Plaintiffs re-alleged violations of 42 U.S.C. §§ 3604(a)

---

[6] Plaintiffs have abandoned their previously-dismissed Section 3617 claim. MTD Order at 22-23.

and 3604(b) should be dismissed.  Am. Compl. ¶¶ 303–337.

Counts I and II allege a violation of Section 3604(a), which makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race" or other protected status.  Am. Compl. ¶¶ 303-312.  Counts III and IV allege a violation of Section 3604(b), which prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race" or other protected status.  Am. Compl. ¶¶ 313-323.

The Amended Complaint fails to cure the disconnect between Plaintiffs' allegations and the requisite elements of a Section 3604 claim.  Plaintiffs still rely on the generalized (and inadequate) theory that Defendants' discriminated in maintaining and marketing REO properties. Nowhere does the Amended Complaint identify a specific instance where a property's condition or marketing made it unavailable to a person for sale or rental, nor does the Amended Complaint identify a specific instance where Defendants discriminated against a person in the terms and conditions of a sale or rental relating to any of the properties.  In fact, the Amended Complaint merely parrots the same allegations this Court previously rejected.  *Compare* Compl. ¶ 256 *with* Am. Compl. ¶¶ 304, 309 (unavailability); Compl. ¶ 263 *with* Am. Compl. ¶¶ 316, 322 (terms and conditions of sale or rental).  The introduction of conclusory allegations does not remedy the Complaint's fundamental problem—no specific purchaser or renter is identified as being discriminated against.  *See* Am. Compl. ¶¶ 308–312, 319–323.

## B.  Plaintiffs Fail To State A Section 3605 Claim.

The Amended Complaint's Section 3605 claims also fail to meet this Court's demand that "Plaintiffs allege a specific real estate-related transaction" frustrated by Defendants' alleged maintenance and marketing practices.  Am. Compl. ¶¶ 324–337; MTD Order at 22.  The addition

25

of conclusory allegations concerning terms and conditions (Am. Compl. ¶¶ 328, 336) does not save these claims, as Plaintiffs still fail to identify an instance where a person attempted to engage in a real estate-related transaction but was otherwise discriminated against in obtaining "loans or other financial assistance," or in the process of "selling, brokering, or appraising" a particular property. *See* MTD Order at 2 (citing 42 U.S.C. § 3605, 24 C.F.R. § 100.120(b)).

      **C.**      **Plaintiffs Fail To State A Claim For Perpetuating Segregation.**

Given Plaintiffs' failure to allege either specific instance of discrimination or statistics supported by a sound methodology, Plaintiffs also cannot plausibly state a claim that Defendants' alleged conduct nevertheless resulted in a perpetuation of segregation. The Amended Complaint still rests on the unsupported assumption that prospective "white buyers" are less likely to purchase a home with maintenance or marketing "deficiencies" than prospective minority buyers. Am. Compl. ¶¶ 340, 345. In addition, the Amended Complaint cannot plausibly allege the continuance of segregation over an extended period of time when Plaintiffs only inspected the homes in each neighborhood once. Am. Compl. ¶¶ 4–5, App'x B. The failure of Plaintiffs' statistics to account for these long-term trends, alongside the myriad factors affecting home sales and property conditions that exist independent of Defendants' alleged conduct, mean this claim cannot stand. *See* MTD Order at 24; *Cnty. of Cook v. Wells Fargo*, 2018 WL 1469003 (N.D. Ill. Mar. 26, 2018) (discussing the numerous variables affecting a neighborhood's racial character).

**IV.**      **Plaintiffs' Allegations Outside Of The Applicable Two-Year Statute Of Limitations Warrant Dismissal.**

The Court previously held that "Plaintiffs' actionable allegations window dates to February 26, 2012, for the Deutsche Bank Defendants, and to February 14, 2015, for Ocwen and Altisource." MTD Order at 9. With regard to amending the Complaint, the Court directed Plaintiffs to "replead their statistical findings and base them upon *the usable dataset alone*." *Id.* at 10 (emphasis added).

However, Plaintiffs seemingly disregard the Court's clear ruling, as they include allegations prior to February 26, 2012 for the Trustees and prior to February 14, 2015 for Ocwen and Altisource. *See* Am Compl. ¶¶ 97, 100, 102-03, 106, 127, 132, 135-36, 138-39, 163, 298; App'x B. These allegations are outside of the applicable statute of limitations and should be dismissed.[7]

Further, despite Plaintiffs' attempt to employ the continuing violation doctrine to save their untimely allegations (*see* Am. Compl. ¶ 298), the Court has already held that this doctrine is inapplicable (*see* MTD Order at 9), and Plaintiffs' Amended Complaint contains the same fatal flaws as the original Complaint, including that Plaintiffs had knowledge of their FHA claims years before filing suit in this matter. *See id.* ("Plaintiffs clearly state in their Complaint that in 2011, during the course of their investigation efforts, they held a national news conference 'and released a report analyzing and describing the discriminatory maintenance and marketing of white and non-white REO properties …. Plaintiffs intend this allegation to show that Defendants were on notice of their alleged misconduct, but it ends up having the opposite effect as well …. Plaintiffs knew back in 2011 that Defendants' conduct transgressed the FHA.") (emphasis added); *see also* Am. Compl. ¶ 112; ¶ 168 ("Plaintiffs Put Defendants On Notice Of The Defendants' Discriminatory Treatment" by publishing several reports starting in 2011 and holding a "news conference" regarding Plaintiffs' alleged determination that a purported "larger, systemic problem existed.").

Moreover, to the extent Plaintiffs contend that the statute of limitations applicable to the

---

[7] Plaintiffs state that the Amended Complaint "repleads for appeal, should it be necessary, certain allegations from the initial Complaint that the Court determined were insufficient." Am. Compl. at p. 1. It is unclear if Plaintiffs' continued reliance on pre-2012 and pre-2015 data was intended to be among those "certain allegations." However, the Seventh Circuit has repeatedly held that repleading dismissed claims is not necessary to preserve an issue for appeal. *See Serritella v. Markum*, 119 F.3d 506, 512 n.6 (7th Cir. 1996) ("[plaintiffs' counsel's] concern that he was required to replead the dismissed claim lest he be found to have waived the issue on appeal has no foundation in the law of this Circuit (or any other of which we are aware)"); *accord Smith v. Nat'l Health Care Servs. of Peoria*, 934 F.2d 95, 98 (7th Cir. 1991); *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683 (7th Cir. 1990).

Trustees applies to Ocwen and Altisource, (*see* Am. Compl. ¶¶ 122, 298) such contention is not only patently contrary to this Court's MTD Order, but it is also false. Ocwen and Altisource are separate, independent entities from either Trustee, and therefore, any administrative proceeding against the Trustees has no effect on the statute of limitation applicable to either Ocwen or Altisource. Rather, as this Court has already found, the date of the administrative proceeding against Ocwen or Altisource, February 14, 2017, controls the two-year statute of limitation applicable to Ocwen and Altisource. *See* MTD Order at 6-9.

Accordingly, Plaintiffs' actionable allegations period against the Trustees begins on February 26, 2012, and on February 14, 2015 for Ocwen and Altisource. Plaintiffs' allegations outside of these applicable time periods warrant dismissal as a matter of law.

## CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint.

Dated: February 28, 2019        Respectfully submitted,

By: /s/ Debra Bogo-Ernst
Debra Bogo-Ernst
Matthew C. Sostrin
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600

*Counsel to Defendant Ocwen Loan Servicing, LLC*

28

By: /s/ Kenneth M. Kliebard
Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone:  (312) 324-1000

Kevin M. Papay (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Market
Spear Street Tower
San Francisco, CA 94105
Telephone:  (415) 442-1000

*Counsel to Defendants Deutsche Bank National Trust Company, as Trustee, Deutsche Bank Trust Company Americas, as Trustee*

By: /s/ Kristine M. Schanbacher
Kristine M. Schanbacher
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone:  (312) 876-8000
Email: kristine.schanbacher@dentons.com

Lisa Krigsten (admitted *pro hac vice*)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
Telephone:  (816) 460-2400
Email: lisa.krigsten@dentons.com

Nathan Garroway (admitted *pro hac vice*)
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone:  (404) 527-4000
Email: nathan.garroway@dentons.com

*Counsel to Defendant Altisource Solutions, Inc.*

29

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for Northern District of Illinois' Electronic Filing System on February 28, 2019.

/s/  Debra Bogo-Ernst