IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA.<br><br>    Plaintiffs,<br><br>    v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>    Defendants. | Case No. 18 CV 839<br><br><br><br><br>Judge Harry D. Leinenweber<br><br>Magistrate Judge Sidney I. Schenkier<br><br><br>Jury Trial Demanded |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE ADDITIONAL
ALLEGATIONS AND CLAIMS**

Pursuant to Fed.R.Civ.P. Rule 15(a), Plaintiffs move for leave to file certain additional allegations and claims to supplement their previously filed Amended Complaint. In support of this motion, Plaintiffs state as follows:

1. This is an action seeking relief arising out of the Defendants' racially discriminatory conduct affecting communities of color in numerous cities across the country. The case is based upon overwhelming objective evidence that Defendants discriminated against communities of color in the exterior maintenance and marketing of properties owned by Deustche Bank, as trustee, after foreclosure.

2. On November 19, 2018, the Court dismissed the initial Complaint filed in this action without prejudice and granted to Plaintiffs 45 days in which to file an Amended Complaint.

3. On January 3, 2019, Plaintiffs filed their Amended Complaint. The Amended Complaint alleges claims under the Fair Housing Act based on theories of disparate treatment and disparate impact against the Deutsche Bank Defendants. As regards Defendants Ocwen Loan Servicing, LLC and Altisource Solutions, Inc., the Amended Complaint alleges claims based on a disparate treatment theory only. However, as to these defendants, the Amended Complaint notes that "The Ocwen and Altisource Defendants also appear to have employed standard policies and practices in connection with the operation of their businesses that have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color, although the details of their policies are not publicly disseminated." (Compl. Par. 156). The Amended Complaint further states that "Plaintiffs reserve the right to amend this complaint to set forth additional allegations regarding the disparate impact in communities of color caused by or contributed to by . . . REO maintenance policies and practices [of Ocwen and Altisource]." (Compl. Par. 158).

4. As a direct result of its community outreach and educational efforts relating to this case, Plaintiff National Fair Housing Alliance in Washington, D.C. was contacted by a witness on January 28, 2019 who claims to have significant information bearing on the activities of Ocwen and Altisource relating to the inferior exterior maintenance and marketing of REO properties in communities of color. As set forth in the Declaration of Jennifer Soule, attached as Ex. A to this motion, NFHA conducted additional investigation on behalf of the Plaintiffs to explore the information the witness initially provided. It is apparent to counsel for Plaintiffs that this information is relevant, material, credible, and bears consideration in connection with Defendants' motions.

5. In particular, based on the new evidence provided by the potential witness, Plaintiffs seek to add allegations supporting both their disparate treatment and disparate impact claims that Defendants deemed communities of color "low value" and carried out a policy and practice of refusing to fund or carry out maintenance at properties in communities of color, whereas, in contrast, Defendants ascribed "high value" to and proactively maintained properties in white communities.

6. Plaintiffs have drafted the attached proposed amendments, (Ex. B) which describe portions of the evidence provided by this witness as regards all Defendants and support claims based upon a disparate impact theory against Defendants Ocwen and Altisource. The amendments are discrete, in the sense that they do not significantly alter the other allegations contained in the Amended Complaint.

7. Plaintiffs are mindful of the ongoing briefing process, but believe that consideration of the proposed amendments at this time is the most efficient manner in which this information can be considered by the Court. The alternative would be to seek leave to amend the Amended

Complaint after Defendants' current motions are adjudicated, but this would likely cause duplication of work, unnecessary delay and could materially prejudice Plaintiffs.

8. Plaintiffs suggest that the Court should grant leave to file these amendments and allow Defendants a reasonable time to supplement their prior briefs to address them, allowing Plaintiffs a short time for reply. In all other respects, the current briefing schedule would remain in effect. The Court could then issue a ruling addressing the totality of Defendants' motions and arguments.

9. Under Fed.R.Civ.P. Rule 15(a), a court "should freely give leave when justice so requires." The Supreme Court has observed that leave to amend should be allowed except in circumstances involving (1) undue delay; (2) repeated failure to cure deficiencies by amendments previously allowed; (3) undue prejudice to the opposing party by virtue of allowance of the amendment; or (4) the futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Seventh Circuit has similarly observed that leave to amend should be liberally permitted and that judicial policy favors deciding cases on the merits rather than on technicalities. *See e.g., Stanard v. Nygren*, 658 F.3d 792, 800-801 (7th Cir. 2011); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2011); *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004).

10. The proposed Second Amended Complaint satisfies the requirements and intent of Fed.R.Civ.P. Rule 15(a), and leave to amend should be granted.

WHEREFORE, Plaintiffs respectfully request leave to file the attached additional allegations and claims to supplement their previously filed Amended Complaint.

Respectfully Submitted,

*/s/ Jennifer K. Soule*

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell Street, Suite 100
Geneva, IL 60134
*Attorneys for Plaintiffs*

| | |
|---|---|
| Stephen M. Dane<br>Yiyang Wu<br>*Relman, Dane & Colfax PLLC*<br>1225 19th Street, N.W., Suite 600<br>Washington, DC 20036<br>*Attorneys for Plaintiffs* | Morgan Williams<br>*National Fair Housing Alliance*<br>1331 Pennsylvania Ave, NW, Suite 650<br>Washington, DC 20004<br>*Attorney for Plaintiffs* |

Dated: April 12, 2019

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA.<br><br>    Plaintiffs,<br><br>        v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>    Defendants. | Case No. 18 CV 839<br><br><br><br>Judge Harry D. Leinenweber<br><br>Magistrate Judge Sidney I. Schenkier<br><br><br>Jury Trial Demanded |

## DECLARATION OF JENNIFER K. SOULE

I, Jennifer K. Soule, counsel for Plaintiffs in the above-captioned action, declare based on personal knowledge that the below facts are true and accurate.

1

1. I am lead counsel for the organizational Plaintiffs in this case, which alleges unlawful discrimination against Deutsche Bank, Ocwen and Altisource in the maintenance and preservation of Real Estate Owned (REO) properties in communities of color.

2. The National Fair Housing Alliance (NFHA) is a national organization located in Washington, D.C., that, as alleged in the Amended Complaint, undertook and facilitated an extensive investigation of maintenance of REO properties in numerous metropolitan areas around the United States.

3. In furtherance of its mission to educate the public and eradicate discrimination in housing concerning the matters that gave rise to this case, NFHA has released reports and information to the public regarding its investigations of discriminatory treatment of REO properties in communities across the United Sates, as well as about this particular case, filed in the United States District Court for the Northern District of Illinois.

4. As a result of NFHA's continued provision of publicly disseminated information and education concerning this case, a citizen witness contacted NFHA in Washington, D.C. by telephone on January 28, 2019 with personal knowledge of information relevant to this case, and concerning policies and practices of refusal of Altisource and Ocwen to perform maintenance and preservation of properties in communities of color considered "low value."

5. NFHA in-house counsel informed me of the call from the witness on January 28, 2019. I contacted the witness on January 29, 2019 to set up an additional interview with NFHA senior staff.

6. NFHA conducted an additional initial telephonic interview on February 1, 2019, in which I participated and during which it became evident that the witness was represented by counsel and was, in part, seeking legal advice.

3

      7.      I took steps to and did communicate with counsel for the witness on a privileged and confidential basis including on February 19, 2019.

      8.      I engaged in additional communications with and regarding this witness and information concerning the allegations in the proposed new allegations to Plaintiffs' Amended Complaint on at least February 21, 27, March 13 and April 2, 2019.

      9.      As a result of all of the above, I believe the information contained in Plaintiffs' proposed additional allegations is credible and relevant to Plaintiffs' claims.

                                Further Declarant Sayeth Not

                                  /s/ Jennifer K. Soule

Date: April 12, 2019

# EXHIBIT B

**[To be inserted after current paragraph 158]**

<u>**Defendants' Policies Treat Communities of Color As "Low Value"
and Provide Inferior Maintenance to REO Properties in These Areas**</u>

158A. As regards the Deutsche Bank properties, the Defendants utilize a policy of designating certain areas as "low value" and particular properties as "low value assets," ("LVAs"). On this basis, Defendants deny and refuse to undertake property standard preservation work as to properties in these areas:

> (1) Pursuant to this "low value" policy, properties in communities of color are likely to be designated to be listed and sold "as is." Beyond a short checklist of initial cleanout-related items, no work will be approved for low value, "as is" properties, regardless of the length of time the property is held before resale and regardless of the effects on the community.
>
> (2) Pursuant to this "low value" policy, Defendants fail and refuse to complete any work and repairs at properties with alleged local code violations.
>
> (3) If Asset Managers initially informally identify observable code violations in low value areas, Defendants will not approve Asset Managers' bids for work to correct code violations.
>
> (4) Once Defendants are in receipt of notice of local ordinance or zoning violations in areas they deem low value, which are typically communities of color, work on the properties including cutting grass and snow removal is disallowed and frozen by the Code Violation Department (CV Department), regardless of the length of time involved and regardless of continued deterioration of the property, and regardless of detrimental effect on blocks, neighborhoods and the value of the property or surrounding properties.

158B.  Whether a particular property is deemed and referred to as a low value asset is based in whole or part on the area in which they are located, such as a zip code, town, or neighborhood. Areas deemed by Defendants as low value are typically communities of color. Areas deemed by Defendants as high value are typically white communities.

158C.  Defendants treat "low value" areas and "high value" areas differently in terms of the quality and quantity of property maintenance and upkeep.  Defendants will not expend funds or approve bids to repair or maintain LVAs, regardless of negative impact on value and price of the property, safety issues, contribution to or acceleration of instability of neighborhoods, code violations, complaints of neighbors or Asset Managers, or repeated requests by assigned asset managers for approval of needed work.  Bids of Asset Managers for work in LVAs may be met with no response for months and even up through the sale of the property.

158D.  In contrast, Defendants will expedite, follow up on, repeatedly call Asset Managers and otherwise act in highly proactive ways to ensure even minor work items are timely completed in areas deemed high value or concerning properties deemed high value assets.  If neighbors or others in areas deemed high value areas complain or even could complain about an observed item, AltiSource aggressively pursues completing the work item and follows up on it, whereas complaints relating to low value areas are ignored and work items disallowed.  Defendants will review and scrutinize the details, timeliness, and quality of work in areas they deem high value. In contrast, Defendants will not approve or allow Asset Managers requests to complete work in areas Defendants deem low value.

158E.  Derogatory reference is made by AltiSource to "hot zones," in addition to "low value." Both of these terms are used to describe perceived stereotypes as to communities of color regarding value, crime and presumed undesirability of zip codes and other similarly defined areas that Defendants determine do not receive funds for property upkeep.  "Hot zones" are typically communities and neighborhoods of color.  Ocwen confirms and/or communicates to AltiSource that areas or properties are deemed "low value" or "low value assets."  Facilitating the consequences of the determination of a property as low value may be overseen by a Risk Services Coordinator, known as "RSC," employed by one or more of the Defendants to carry out their policy of ignoring properties in communities of color.

158F.  AltiSource oversees management of Deutsche Bank assets in part through PODs (Point Of Direction) employees located overseas, including in Bangladesh and the Philippines. High level management and oversight of AltiSource PODs, as well as approvals and payments to Asset Managers contracted by AltiSource that are located in the United States are overseen by regional offices in the United States, who are also overseen by high level management employed by AltiSource in offices in Uruguay, and Luxembourg.

158G.  Employees receive training and guidance from AltiSource and Ocwen that includes designating areas and properties as "low value" and disallowing work on properties in low value areas.  AltiSource contracts with Asset Managers throughout the United States who are assigned a portfolio of properties.  Asset Managers themselves perform work items and also engage subcontractors in various trades to complete necessary work.  Asset managers in the United States submit bids using a centralized uniform electronic system ("XactPRM") addressing work

3

items, bids and payments, to PODs oversees in Bangladesh, the Philippines, and potentially other locations.

158H. On each property, Asset Managers may complete a specified short list of initial items, corresponding to a pre-set payment schedule, after which they must submit bids using a system of estimating software provided by Defendants prior to completing non-standard line items (e.g. reglazing boarded up windows). The initial pre-approved list of items include boarding up windows, changing locks, initial trimming of shrubs, changing light bulbs, checking light fixtures, checking Carbon Monoxide detectors, and checking smoke detectors.

158I. To gain physical access to properties, AltiSource Asset Managers are equipped with judicial deeds demonstrating they are working on behalf of the property owner, e.g. Deutsche Bank. Likewise, Asset Managers provide evidence of their authority on the part of the owner shown on judicial deeds to municipalities during Point of Sale Inspections.

158J. Altisource uses an outside company for quality control inspections, but does not inspect or check on items contractors are prevented from completing. Quality control inspections in high value areas that discover incomplete work items will result in a call or email from Altisource to the assigned contractor to ensure the work is completed. In contrast, work is generally not approved or inspected for low value assets.

158K. AltiSource bid reviewers are trained by AltiSource and/or Ocwen to review asset managers' requests for approvals of work in accord with Defendants' policies regarding

properties deemed low value. If an Asset Manager assigned to a property in the United States inquires about ignored or denied bids for needed work to a property considered low value, they may receive one or more the following responses from Altisource: (a) The client said we are not approving these bids; or (b) The bids are pending investor approval, (c) LVA, property to be sold as is.

158L. The policy of designating areas and properties as "low value" and denying property preservation work to those areas.and properties has a disparate impact on communities of color. The cumulative effect of Defendants' policies and practices with respect to low value assets is to drive the market value of the particular properties further down, as well as to drive down the market value of other properties in neighborhoods and communities of color.

**[To be inserted after current paragraph 349]**

**I. COUNT IX – SECTION 3604(a) OF THE FHA – DISPARATE IMPACT (OCWEN AND ALTISOURCE)**

350. Plaintiffs incorporate and reallege the preceding paragraphs of this Amended Complaint.

351. Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. §3604(a). HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. 100.70(a). Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin. . . of persons in a community, neighborhood or development." 24 C.F.R. 100.70(c)(1).

352. The discriminatory provision of maintenance and marketing services by the Ocwen and Altisource Defendants to the Deutsche Bank REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable and/or undesirable; (2) by dissuading buyers from looking at or purchasing the property; and (3) by interfering with the closing of a sale where the appraisal does not support the loan amount requested.

353. In addition, by using a marketing business model to sell the majority of the Deutsche Bank REOs via the Hubzu auction site, Ocwen and Altisource have shown a preference for cash buyers, who are typically investors, thereby further making housing unavailable in communities of color by changing neighborhoods into investor communities, with detrimental financial consequences for current homeowners and new owner-occupants.

354. The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color.

355. Accordingly, Ocwen and Altisource have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of Section 3604(a) of the FHA.

### J. COUNT X – SECTION 3604(b) OF THE FHA -DISPARATE IMPACT (OCWEN AND ALTISOURCE)

356. Plaintiffs incorporate and reallege the preceding paragraphs of this Amended Complaint.

357. Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of

services or facilities in connection therewith, because of race or national origin. 42 U.S.C. §3604(b).

358. HUD's regulations implementing Section 804(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin. 24 C.F.R. 100.65.

359. The maintenance of REO properties constitutes "the provision of services" in connection with dwellings. Moreover, sales transactions involving poorly maintained REOs in communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of remedying delayed maintenance and upkeep of the property to avoid code violations.

360. The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color. These discriminatory policies and practices discriminate against minority persons "in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services of facilities in connection therewith," all in violation of Section 804(b) of the Fair Housing Act.

361. Accordingly, Ocwen and Altisource have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. §3604(b).

### K. COUNT XI – SECTION 3605 OF THE ACT – DISPARATE IMPACT (OCWEN AND ALTISOURCE

362. Plaintiffs incorporate and reallege the preceding paragraphs of this Amended Complaint.

7

363. Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction because of race or national origin. 42 U.S.C. §3605.

364. Ocwen and Altisource are persons whose business includes engaging in residential real estate-related transactions.

365. The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color.

366. As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates numerous substantial barriers to the sale or purchase of these properties.

367. The discriminatory policies and practices of Ocwen and Altisource have directly impeded real estate transactions and development in minority communities, and rendered properties in these communities unavailable. The experience of the Plaintiff Fair Housing Organizations is that minimal real estate sales and community development occur in areas where REO bight is prevalent.

368. For purposes of Section 3605, time on market, sales price, time between contract for purchase and closing, purchase loan viability and conditions affecting property inspection are terms and conditions of residential real-estate-related transactions, all of which are negatively impacted by deficient REO conditions and general neighborhood REO blight.

369. Accordingly, Ocwen and Altisource have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin or discriminated in the terms and conditions of such a transaction in violation of 42 U.S.C. §3605.

### L.  COUNT XII – CONDUCT PERPETUATING SEGREGATION – DISPARATE IMPACT (OCWEN AND ALTISOURCE)

370. Plaintiffs incorporate and reallege the preceding paragraphs of this Amended Complaint.

371. Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods.  It is a proximate and foreseeable consequence of such conduct that white buyers will be discouraged from purchasing homes in the affected communities of color, and this has occurred.

372. Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners.  This, in turn, restricts the ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

373. The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color. The disproportionate impact on communities of color is demonstrated by statistically significant disparities between the deficiencies in routine exterior maintenance and marketing of REO properties in white neighborhoods and in neighborhoods of color.

374. The policies and practices of Ocwen and Altisource have perpetuated segregation in minority communities.

375. Accordingly, the policies, conduct and practices of Ocwen and Altisource perpetuating and encouraging patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. §3601, et seq.