## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA. | Case No. 18 CV 839<br><br><br><br><br><br>Judge Harry D. Leinenweber<br><br>Magistrate Judge Sidney I. Schenkier<br><br><br>Jury Trial Demanded |
| Plaintiffs, | |
| v. | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC. | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

*Table of Contents*

*I. INTRODUCTION AND SUMMARY OF CLAIMS* .................................................. 2

*II. JURISDICTION* .................................................................................................... 6

*III. PARTIES* ............................................................................................................... 6

   **A.  PLAINTIFFS** ............................................................................................. 6

   **B.  DEFENDANTS** ...................................................................................... 18

*IV. FACTS* ................................................................................................................ 20

   **A.  BACKGROUND OF DISCRIMINATION AGAINST MINORITY
   NEIGHBORHOODS AND COMMUNITIES OF COLOR (HISTORICAL CONTEXT
   OF THE VIOLATIONS)** .............................................................................. 20

   **B.  DEFENDANTS' REO MAINTENANCE AND MARKETING CONDUCT
   DISCRIMINATES AGAINST COMMUNITIES OF COLOR** ......................... 23

      1.  The Deutsche Bank Defendants' Ownership as Trustee of the REO Properties .......... 23

      2.  Status of Servicer as Agent of Trustee and Trust ................................................ 28

      3.  Status of Deutsche Bank Defendants as Back-up Servicers ........................................ 30

      4.  Plaintiffs' Investigation of Defendants' Exterior Maintenance and Marketing of
      Properties .............................................................................................................. 31

      5.  Summary of the Overall Results of Plaintiffs' Investigation (Aggregate Findings) .... 36

   **C.  PLAINTIFFS PUT DEFENDANTS ON NOTICE OF THE DEFENDANTS'
   DISCRIMINATORY TREATMENT OF THE DEUTSCHE TRUST REO
   PROPERTIES, BUT DEFENDANTS HAVE NOT ALTERED THEIR
   DISCRIMINATORY BEHAVIOR** ................................................................. 43

   **D.  DEFENDANTS HAVE ENGAGED IN A PATTERN AND PRACTICE OF
   SYSTEMIC AND INTENTIONAL RACE DISCRIMINATION IN EACH OF THE
   CITIES SERVED BY PLAINTIFFS** ............................................................. 46

   **E.  DEFENDANTS HAVE ACTED WITH DISCRIMINATORY INTENT** ................. 50

   **F.  DEFENDANTS' REO MAINTENANCE AND MARKETING POLICIES AND
   PRACTICES HAVE A DISPROPORTIONATE DISCRIMINATORY IMPACT ON
   COMMUNITIES OF COLOR** ...................................................................... 53

   **G.  DEFENDANTS' DISCRIMINATORY MAINTENANCE AND MARKETING OF
   REO PROPERTIES PERPETUATES SEGREGATION** ................................. 61

*V. INJURIES CAUSED BY DEFENDANTS' BEHAVIOR* .................................... 63

   **A.  INJURY TO ALL PLAINTIFFS** .............................................................. 64

   **B.  INJURIES TO INDIVIDUAL PLAINTIFFS** ............................................. 70

i

C.   INJURIES TO NEIGHBORHOOD RESIDENTS AND COMMUNITIES ............ 92

D.   INJURIES CAUSED BY DEFENDANTS' CONDUCT CONTINUES ................... 95

E.   CONTINUING VIOLATION ........................................................................... 96

VI.  *VIOLATIONS OF THE FAIR HOUSING ACT* ............................................................ 96

A.   COUNT I - SECTION 3604(a) OF THE FHA – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS) .......................................................... 97

B.   COUNT II – SECTION 3604 (a) OF THE FHA – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS) ................................................................ 98

C.   COUNT III - SECTION 3604(b) OF THE FHA – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS) .......................................................... 99

D.   COUNT IV – SECTION 3604 (b) OF THE FHA – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS) .............................................................. 100

E.   COUNT V - SECTION 3605 OF THE FHA – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS) ........................................................ 101

F.   COUNT VI – SECTION 3605 OF THE FHA – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS) .............................................................. 102

G.   COUNT VII - CONDUCT PERPETUATING SEGREGATION – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS) ......................................................... 104

H.   COUNT VIII – CONDUCT PERPETUATING SEGREGATION – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS) .................................................. 105

I.   COUNT IX – SECTION 3604(a) OF THE FHA – DISPARATE IMPACT (OCWEN AND ALTISOURCE) .................................................................................... 106

J.   COUNT X – SECTION 3604(b) OF THE FHA - DISPARATE IMPACT (OCWEN AND ALTISOURCE) .................................................................................... 107

K.   COUNT XI – SECTION 3605 OF THE FHA – DISPARATE IMPACT (OCWEN AND ALTISOURCE ...................................................................................... 108

L.   COUNT XII – CONDUCT PERPETUATING SEGREGATION – DISPARATE IMPACT (OCWEN AND ALTISOURCE) ........................................................ 109

VII.  *JURY TRIAL DEMAND* ......................................................................................... 110

VIII.  *PRAYER FOR RELIEF* ........................................................................................ 110

**APPENDIX A: METROPOLITAN AREA ANALYSIS - PROPERTIES EXAMINED (Alphabetical by State)** …………..……………………………………...……………. A1-A28

**APPENDIX B: SUMMARY OF METROPOLITAN AREA FINDINGS – ALL ASSESSMENTS**………..…………………………………………………….…..B1-B60

**APPENDIX C: SUMMARY OF METROPOLITAN AREA FINDINGS – FEBRUARY 26, 2012 TO PRESENT**……………………………………………………………C1-C60

**APPENDIX D: SUMMARY OF METROPOLITAN AREA FINDINGS – FEBRUARY 14, 2015 TO PRESENT**……………………………………………………………D1-D55

On November 19, 2018, the Court dismissed the initial Complaint filed in this action without prejudice and granted Plaintiffs 45 days in which to file an Amended Complaint. Subsequently, on May 2, 2019, the Court granted Plaintiffs leave to file a Second Amended Complaint taking into account certain additional factual information that Plaintiffs became aware of after the filing of the Amended Complaint. Plaintiffs believe that this Second Amended Complaint remedies any deficiencies the Court believed existed in the original Complaint. In summary, and without limitation, the Second Amended Complaint: (a) modifies the corporate entities named as parties; (b) adds allegations pertinent to and clarifying Plaintiffs' continuing violations allegations; (c) makes additional allegations with regard to statistical disparities existing during the time periods identified in the Court's opinion; (d) adds allegations related to and clarifying Plaintiffs' allegations regarding trustee liability; (e) alleges additional facts related to the elements of Plaintiffs' Fair Housing Act claims; (f) adds allegations pertinent to and clarifying Plaintiffs' assertions regarding the direct causative link between the Defendants' practices and policies and the unnecessary disparate racial impact that those policies and practices have (g) separates counts alleging intentional discrimination and disparate impact; (h) eliminates the count brought under Section 3617 of the Fair Housing Act; (i) adds allegations bearing on the activities of Ocwen and Altisource relating to the inferior exterior maintenance and marketing of REO properties in communities of color; (j) adds claims based upon a disparate impact theory against Defendants Ocwen and Altisource; and (k) makes various other revisions and rewordings. The Second Amended Complaint repleads for appeal, should it be necessary, certain allegations from the initial Complaint that the Court determined were insufficient.

1

## I.  INTRODUCTION AND SUMMARY OF CLAIMS

1.      This complaint is filed under the Fair Housing Act of 1968, as amended, 42

U.S.C. §3601, et seq. ("FHA"), for compensatory and injunctive relief arising out of the

Defendants' racially discriminatory conduct affecting communities of color in numerous cities

around the country.  The case is based on overwhelming objective evidence that Defendants

discriminated against communities of color in the exterior maintenance and marketing of

properties owned by Deutsche Bank after foreclosure in thirty metropolitan areas.  Defendants'

actions have had a devastating impact on these communities, and Defendants refuse to alter their

behavior.  Defendants' policies and conduct (a) constitute intentional discrimination; (b)

perpetuate segregation; and (c) have a disproportionate adverse impact on minority communities

that is not justified by any valid business purpose.

2.      Plaintiffs are private, fair housing organizations dedicated to ending housing

discrimination and to promoting residential integration in their communities and around the

nation.  Plaintiffs work to eliminate housing discrimination and to ensure equal housing

opportunity for all persons through education, outreach, membership services, public policy

initiatives, advocacy, investigation of fair housing violations, investment in community

development and stabilization projects, and fair housing enforcement.

3.      Defendants Deutsche Bank National Trust, as Trustee, and Deutsche Bank Trust

Company Americas, as Trustee, (the "Deutsche Bank Defendants") are the owners of record, as

trustee, of thousands of foreclosed homes in metropolitan areas across the country, commonly

referred to as "REO" or "real estate owned" properties.   Defendants Ocwen Loan Servicing,

LLC ("Ocwen") and Altisource Solutions, Inc., ("Altisource") provide property preservation and

maintenance and other services for REO properties owned by the Deutsche Bank Defendants

("the Deutsche Bank REO properties" or "Deutsche Bank-owned homes").

2

4. In the wake of the national foreclosure crisis, and in response to complaints, public outcry and industry trends and observations regarding the maintenance of foreclosed properties in African-American/Latino communities, Plaintiffs investigated and examined the routine exterior maintenance and marketing of the Deutsche Bank-owned homes in an attempt to determine whether all neighborhoods in certain cities were being treated equally, regardless of racial composition. Between 2011 and the present, Plaintiffs investigated Defendants' activities related to foreclosed properties in communities of color, (predominantly African-American and/or Latino neighborhoods), and in predominantly white neighborhoods in the metropolitan areas that are the subject of this Complaint.

5. During the course of the investigation, Plaintiffs examined 1,141 properties owned by the Deutsche Bank Defendants after foreclosure, collected evidence on 39 objective aspects of the routine exterior maintenance of each property investigated, and accumulated over 29,900 photographs of the pertinent conditions, such as unsecured doors, damage to steps, handrails, windows and fences, graffiti, the accumulation of trash and mail, and overgrown grass and shrubbery. Plaintiffs' investigation also documented marketing deficiencies, such as the failure to post or maintain appropriate "For



**Figure 1: Deutsche Bank REO in AA neighborhood in Indianapolis, IN**

Sale" signage, permitting negative signage and warnings to deter prospective buyers (e.g. "Bank-owned," "Auction" or "Foreclosed" signs), failure to identify a real estate agent/broker or point of contact, failure to adequately display property listings on Realtor/Multiple Listing Services or other web sites, and displaying on-line or other auction sites in different states in lieu of utilizing

3

a local real estate agent/company familiar with the neighborhood. Plaintiffs' investigation revealed that there are highly significant disparities in the routine exterior maintenance and marketing of the Deutsche Bank-owned homes in communities of color as compared to white communities.

6. Plaintiffs' investigation of the properties in these metropolitan areas indicates that Defendants treated properties differently depending upon the racial/ethnic composition of the neighborhoods in which they were located. In each of the 30 metropolitan areas examined, the Deutsche Bank-owned homes located in predominantly white census block groups were better-maintained and exhibited fewer objective routine maintenance and marketing deficiencies than the Deutsche Bank-owned properties that were located in neighborhoods comprised primarily of African-Americans and/or Latinos. Across the board, and during all time periods, properties located in communities of color were much more likely to have numerous objective routine maintenance and marketing deficiencies than the Deutsche Bank-owned homes located in white areas. Accordingly, in each of the metropolitan areas and across the country, Plaintiffs observed a systemic and particularized pattern of differential treatment by Defendants in maintaining and/or marketing REO properties on the basis of race, color, and/or national origin.

7. The disparities observed between the maintenance of the Deutsche Bank-owned homes in white communities and the Deutsche Bank-owned homes in communities of color are stark, highly probative and statistically significant.

8. As a result of Defendants' discriminatory conduct and perpetuation of residential segregation, municipalities, individuals, neighbors and homeowners in the communities served by Plaintiffs have been: (a) denied housing opportunities and had housing made unavailable; (b) subjected to deteriorating and dilapidated living conditions in their neighborhoods; (c) denied

4

opportunities for neighborhood stabilization and economic recovery; and (d) harmed in the value of their home investments.

9.　　Plaintiffs allege herein that Defendants' systemic and particularized practice of maintaining and marketing bank-owned properties in a state of disrepair in communities of color, while maintaining and marketing similar properties in predominantly white communities in materially better condition, violates the Fair Housing Act, 42 U.S.C. §§3604(a), (b), (c) and (d), §3605, and HUD's implementing regulations.  Defendants' discriminatory conduct has also had the effect of perpetuating segregated conditions.



**Figure 2: Deutsche Bank REO in AA neighborhood in Milwaukee, WI**

10.　　Defendants' conduct has caused particularized and concrete injury to the Plaintiffs.  Defendants' discriminatory practices of failing to maintain and effectively market bank-owned homes have interfered with Plaintiffs' activities and programs designed to promote compliance with fair housing laws, and have frustrated Plaintiffs' missions by perpetuating the unlawful discrimination and segregation they use their limited resources to dismantle.  Plaintiffs' purposes and interests fall squarely within the zone of interests protected by the Fair Housing Act.  Defendants' discriminatory behavior has caused Plaintiffs to divert substantial time and resources away from their usual activities and instead to detecting, investigating, and counteracting Defendants' unlawful conduct, and engaging in outreach and education efforts to address Defendants' ongoing discrimination.  These efforts go above and beyond Plaintiffs' normal operational activities and expenses.

5

## II. JURISDICTION

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 2201 and 2202, and 42 U.S.C. §3613(a).

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the Defendants do business in this District, the Defendants are subject to personal jurisdiction in this District, a substantial part of the events giving rise to these claims occurred in this District, and a substantial portion of the property that is the subject of these claims is located in this District.

13.     The Plaintiffs originally filed an administrative housing discrimination complaint with the U.S. Department of Housing and Urban Development Office of Fair Housing and Equal Opportunity ("HUD FHEO") concerning Defendants' conduct on February 26, 2014.  The complaint was subsequently amended to update the results of Plaintiffs' ongoing investigation on April 30, 2014, August 7, 2014, January 22, 2015, August 5, 2016, February 14, 2017 and July 26, 2017. This administrative complaint was withdrawn after the filing of this action.

## III. PARTIES

### A. PLAINTIFFS

14.     Plaintiff National Fair Housing Alliance, Inc. ("NFHA") is a national, nonprofit public service organization founded in 1988 and incorporated under the laws of the Commonwealth of Virginia with its principal place of business at 1101 Vermont Avenue NW, Suite 710, Washington, D.C. 20005.  NFHA is a nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 30 states and the District of Columbia. NFHA is the only national organization dedicated solely to ending housing discrimination and promoting residential integration and neighborhood stabilization.  NFHA works throughout the United States to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives,

6

advocacy, investigation of fair housing violations, investment in community development and stabilization projects, and enforcement. One of NFHA's goals is the elimination of segregation in housing and the promotion of residential integration. NFHA has launched numerous educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. NFHA implemented a community development program using grants to homeowners and persons living in rental properties to make homes accessible to persons with disabilities and to senior homeowners in Washington, D.C.'s African-American neighborhoods to bring their homes up to code, so that their homes would be safe and could qualify for replacement coverage from homeowner's insurance companies. This program was expanded to several states and added grant assistance to veterans with disabilities.  Its most recent program implemented in 2013, the Inclusive Communities Grant Programs, provide grants to ameliorate some of the adverse effects of discriminatory practices during and after the foreclosure crisis.  Focusing on predominantly African-American and Latino neighborhoods and clients, these grants promote homeownership through direct down payment and closing cost assistance, funding for emergency repairs, grants to homeowners to prevent foreclosure in order to preserve existing homeownership, and home renovation programs to reduce neighborhood blight.  The grants also provide accessible housing opportunities for persons with disabilities and facilitate general quality of life improvements to support greenspace development, pocket parks and fresh food access.

15.    Plaintiff Fair Housing Advocates of Northern California (formerly Fair Housing of Marin) is a nonprofit fair housing organization incorporated under the laws of the State of California with its principal place of business in San Rafael, California in the Northern District

of California. Fair Housing Advocates of Northern California's primary objectives are: to promote equal opportunity in the renting, purchasing, financing and advertising of housing; to educate persons regarding federal and state fair housing laws; to promote racially integrated communities and neighborhood diversity; and to eliminate discriminatory housing practices. It is engaged in several different activities to further its mission of promoting equal housing opportunities, including: education programs in schools and in the community regarding fair housing and diversity; training programs for real estate professionals; research regarding housing discrimination in the community; pre-purchase education for homebuyers; advocacy for affordable housing; and foreclosure prevention and fair housing counseling. FHANC also provides grants to homeowners and renters to make their living space accessible and to promote both racial and economic integration.

16.     Plaintiff Central Ohio Fair Housing Association ("COFHA") is a private, nonprofit corporation based in Columbus, Ohio. COFHA recognizes the importance of "home" as a component of the American dream and seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under federal, state or local laws. One of COFHA's goals is the elimination of segregation in housing and the promotion of residential integration. COFHA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

17.     Plaintiff Connecticut Fair Housing Center ("CFHC") is a nonprofit organization dedicated to ensuring that all persons have equal access to housing opportunities in Connecticut. CFHC provides investigative and legal services to those who believe that they have been the

8

victims of housing discrimination and additionally works with state and local government, as well as housing providers, to promote compliance with federal fair housing laws. One of CFHC's goals is the elimination of segregation in housing and the promotion of residential integration. CFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. CFHC provides grants to persons with disabilities to make their housing accessible and allow them to remain in the neighborhood, thereby promoting both economic and racial integration.

18.     Plaintiff Denver Metro Fair Housing Center ("DMFHC"), established in 2012, is a private, nonprofit fair housing enforcement agency serving six Denver Metro Counties: Adams, Arapahoe, Broomfield, Denver, Douglas, and Jefferson. DMFHC is dedicated to eliminating housing discrimination and promoting housing choice for all through education, advocacy, and enforcement of fair housing laws. DMFHC's goals include the elimination of segregation in housing and the promotion of residential integration. DMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. DMFHC established the Fair Housing Action Fund to promote neighborhood development and stabilization. The Fund has supported construction of new homes in partnership with Habitat for Humanity and other local nonprofits, and it provides grants for critical repair of existing homes, including grants to make homes and apartments accessible.

9

19.     Plaintiff Fair Housing Center of Central Indiana ("FHCCI") is a private, nonprofit fair housing organization based in Indianapolis, Indiana and primarily serves 24 counties in Central Indiana.  FHCCI's mission is to ensure equal housing opportunities by eliminating housing discrimination through advocacy, enforcement, education and outreach.  One of FHCCI's goals is the elimination of segregation in housing and the promotion of residential integration. FHCCI has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  FHCCI's inclusive communities work includes connecting neighborhood partners to help, serve, revitalize, stimulate and invest resources to rebuild an affordable, safe and vital community.  In its targeted neighborhood, FHCCI funds acquisition and major rehabilitation of single-family homes to be sold to owner-occupants.  It provides grants to ensure rehabbed homes are accessible and grants for persons with disabilities to afford them full access to their homes and yards.  Grants are used to modify and improve pocket parks to beautify the neighborhood and provide recreational space.

20.     Plaintiff Fair Housing Center of the Greater Palm Beaches ("FHCGPB") is a nonprofit corporation dedicated to ensuring fair and affordable housing opportunities for all persons, by promoting culturally diverse communities, through open housing and the elimination of all barriers to that goal. The FHCGPB's primary purpose is the elimination of housing discrimination on the basis of race, color, national origin, religion, sex, familial status, disability, marital status, age, sexual orientation, and gender identity or expression throughout the Greater Palm Beaches area.  The FHCGPB seeks the eradication and elimination of direct and indirect obstacles that limit full access to the housing market throughout Florida and seeks to end

10

unlawful housing discrimination through enforcement, education, public awareness, and helping victims enforce their rights. One of FHCGPB's goals is the elimination of segregation in housing and the promotion of residential integration. FHCGPB has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

21.     Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a private, non-profit organization established in 1980 to ensure equal housing opportunity as guaranteed under federal, state, and local fair housing laws.  Based in Grand Rapids, Michigan, FHCWM works cooperatively throughout Michigan with governmental and community-based agencies to further fair housing goals.  In particular, FHCWM investigates claims of illegal housing discrimination; assists claimants in litigation and/or administrative enforcement actions; conducts testing to determine compliance with federal and state laws; and provides practical education to rental, sales, and lending professionals, organizations for professionals with a role in the housing industry, and home-seekers.

22.     Plaintiff Fair Housing Continuum, Inc. is a private, nonprofit fair housing agency dedicated to the elimination of housing discrimination in Florida. Fair Housing Continuum serves Brevard, Indian River, Seminole, Osceola, Orange, and Volusia Counties. One of Fair Housing Continuum's goals is the elimination of segregation in housing and the promotion of residential integration. Fair Housing Continuum has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  The Continuum has an Inclusive Communities

11

Program that provides grants for down payments, loan reduction, and home rehabilitation and modification to support homeownership and neighborhood stabilization. If the buyer is a veteran, active duty military, disabled, or willing to be the owner-occupant of a home in a distressed neighborhood, the Continuum will provide a grant to assist with the purchase or building of a home.

23. Plaintiff Greater New Orleans Fair Housing Action Center ("GNOFHAC") is a private, nonprofit civil rights organization established in 1995. For more than 20 years, GNOFHAC has been dedicated to eradicating housing discrimination throughout Southeast Louisiana. Its service area now includes the entire state of Louisiana. GNOFHAC has been responsible for fighting housing discrimination that arose in the wake of Hurricane Katrina and, in recent years, from the effects of the economic recession. One of GNOFHAC's goals is the elimination of segregation in housing and the promotion of residential integration. GNOFHAC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. GNOFHAC's Inclusive Communities Program has been instrumental in addressing longstanding patterns and promoting fair housing choice in the metropolitan Baton Rouge area, through activities designed to stabilize poor and minority neighborhoods impacted by predatory lending and high foreclosure rates and support affordable rental housing and homeownership opportunities in communities of color.

24. Plaintiff HOPE Fair Housing Center ("HOPE"), established in 1968, is the oldest fair housing center in Illinois. HOPE represents 30 counties in Northern and North Central Illinois. HOPE works to end the negative effects of housing discrimination and segregation

because of race, color, religion, national origin, sex, disability, familial status, or any other characteristics protected under federal, state or local laws. One of HOPE's goals is the elimination of segregation in housing and the promotion of residential integration. HOPE has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. HOPE provides grants to renovate homes, creates marketing materials to affirmatively market communities of color, and provides homebuying counseling.

      25.    Plaintiff Housing Opportunities Made Equal of Virginia ("HOME of Virginia") is a fair housing and housing counseling organization founded in 1971 to fight discrimination in housing access. HOME of Virginia offers a variety of programs and services designed to ensure equal access to housing for all Virginians. One of HOME's goals is the elimination of segregation in housing and the promotion of residential integration. HOME has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. HOME provides grants to create accessible housing in the Richmond area. Home is a HUD Approved Housing Counseling Agency that works to eliminate racial and ethnic disparities in homeownership through extensive foreclosure prevention and home ownership counseling.

      26.    Plaintiff Housing Opportunities Project for Excellence, Inc. ("HOPE, Inc.") is the first nonprofit fair housing agency organized in the state of Florida. HOPE, Inc.'s mission is to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida. One of HOPE, Inc.'s goals is the elimination of segregation in

13

housing and the promotion of residential integration. HOPE, Inc. has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. HOPE, Inc.'s Inclusive Communities Programs include providing grants to local non-profits to conduct homeownership training workshops, down payment assistance and repairs, including making homes accessible for persons with disabilities. In partnership with churches, government and corporations, HOPE, Inc.'s grants helped transform an empty lot into a park and garden area.

27.     Plaintiff Fair Housing Center for Rights & Research ("FHCRR") (formerly known as Housing Research & Advocacy Center[1]) is a private, non-profit organization, incorporated under the laws of Ohio and located in Cleveland, Ohio. Its mission is to promote fair housing and diverse communities, and to work to eliminate housing discrimination in Northeast Ohio by providing effective research, education, and advocacy. In furthering this goal, FHCRR provides counseling, guidance and support to individuals who encounter discrimination in their search for housing. This may include investigation of their complaints. FHCRR also engages in activities designed to encourage fair housing practices by educating consumers regarding their rights and professionals regarding their responsibilities under the FHA, and by working with elected and government representatives to protect and improve fair housing laws. FHCRR also conducts research into housing and lending patterns, and related fair housing matters, throughout Northeast Ohio in order to educate government officials, individuals who work in the housing industry, and the public as a whole regarding housing discrimination and segregation.

---

[1] The organization's name change is reflected in the above caption.

14

28.     Plaintiff Miami Valley Fair Housing Center ("MVFHC") is a private, nonprofit corporation based in Dayton, Ohio.  MVFHC seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under federal, state or local laws.  One of MVFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MVFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. MVFHC established the Inclusive Communities Fund, which provides grants for down payment assistance, closing costs and critical home repairs.  The grant program also supports recreational programs for children and major renovations for a community center.

29.     Plaintiff Metropolitan Milwaukee Fair Housing Council ("MMFHC"), established in 1977, is a private, nonprofit organization that operates a full-service fair housing program. MMFHC serves numerous counties in Wisconsin and works to combat illegal housing discrimination by creating and maintaining racially and economically integrated housing patterns.  One of MMFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  MMFHC's inclusive communities projects include providing grants to neighborhood non-profit partners to expand access to affordable and responsible homeownership while improving neighborhoods that were damaged by the foreclosure crisis.

15

30.     Plaintiff North Texas Fair Housing Center ("NTFHC") is a nonprofit organization dedicated to eliminating housing discrimination in North Texas. The organization provides counseling, discrimination complaint investigation, and outreach and education programs with the goal of ensuring that all persons have the opportunity to secure the housing they desire and can afford. One of NTFHC's goals is the elimination of segregation in housing and the promotion of residential integration. NTFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. NTFHC offers grants to persons with disabilities so that they can remain in their homes by making them safe and accessible. NFTHC's Inclusive Communities Program offers down payment assistance to purchase homes and grants for neighborhood groups in communities of color to make housing repairs.

31.     Plaintiff Open Communities is a nonprofit organization that serves seventeen north suburban communities in the Chicago, Illinois area. Open Communities works to promote economically and culturally diverse communities that welcome all persons in north suburban Chicago. Open Communities educates, advocates, and organizes in the name of social justice. One of Open Communities' goals is the elimination of segregation in housing and the promotion of residential integration. Open Communities has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

32.     Plaintiff South Suburban Housing Center ("SSHC") is a nonprofit community organization that primarily serves the south metropolitan Chicago area, including underserved

areas of northwest Indiana.  SSHC is dedicated to eliminating all forms of discrimination in the housing market through the operation of fair housing enforcement and affirmative housing counseling programs to foster stable, racially and economically, diverse communities. SSHC's primary goal is the elimination of segregation in housing and the promotion of residential integration through expanding housing and mortgage lending choices. SSHC has launched multiple educational activities to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.   SSHC provides grants to first-time homebuyers to purchase housing, to persons in housing payment distress, allowing them to stabilize home ownership, and to persons forced to rent due to displacement caused by foreclosure, in recovering communities of color.

33.     Plaintiff Fair Housing Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair Housing Center ("TFHC") is a non-profit public service agency organized under the laws of the State of Ohio, with its principal place of business in Toledo, Ohio.  The purposes of the Toledo Fair Housing Center are to identify and eliminate all forms of unlawful discrimination in housing in the greater Toledo area, including discriminatory advertising, marketing, sales and lending practices; to educate the public about housing discrimination laws, discriminatory housing practices, and the availability of administrative and legal remedies to challenge discriminatory practices; to provide counseling and referral services to the public with respect to housing discrimination matters; and to expand equal housing opportunities for all persons.  TFHC operated the MLK Inclusive Communities Program from 2014 through 2015 to provide grants to help homeowners in African-American and Latino neighborhoods with roof replacement and other renovations to their homes to stabilize neighborhoods and remove blight.  TFHC also

17

provided emergency mortgage assistance grants and foreclosure prevention counseling to homeowners in communities of color to become current and remain current on their mortgage payments. Finally, through the MLK Inclusive Communities Program, TFHC partnered with Ability Center of Greater Toledo to provide home accessibility modification grants to homeowners with disabilities to allow them to age in place and/or to fully enjoy their dwelling.

34. All Plaintiffs are "aggrieved persons" within the meaning of the Fair Housing Act, and are authorized to commence litigation to obtain appropriate relief against Defendants. 42 U.S.C. §§3602, 3612, 3613. All Plaintiffs fall within the zone of interests protected by the Fair Housing Act. All Plaintiffs have suffered concrete and particularized injuries in fact that are fairly traceable to Defendants' policies and conduct in their communities, and that are likely to be redressed by a favorable judicial decision.

## B. DEFENDANTS

35. Defendants Deutsche Bank National Trust, as trustee, and Deutsche Bank Trust Company Americas, as trustee, (the "Deutsche Bank Defendants") own and maintain REO properties as trustee in metropolitan areas in Washington, D.C.; Memphis, TN; Chicago, IL; Baltimore, MD; Hampton Roads, VA; Toledo, OH; Orlando, FL; Minneapolis, MN; Indianapolis, IN; Columbus, OH; Cleveland, OH; Baton Rouge, LA; Dayton, OH; Denver, CO; Dallas, TX; Gary, IN; Hartford, CT; Milwaukee, WI; New Orleans, LA; Grand Rapids, MI; Muskegon, MI; Greater Palm Beaches, FL; Miami-Ft. Lauderdale, FL; Tampa, FL; Richmond, VA; Detroit, MI; Philadelphia, PA; Providence, RI; Vallejo and Richmond, CA; and Kansas City, MO/KS. Plaintiffs allege that the Deutsche Bank Defendants engaged in a pattern and practice of discrimination in maintaining and marketing REO properties that are located in white communities more favorably than similar REO properties located in predominantly African-American and Latino neighborhoods in the same metropolitan area. During the time period of

18

this Complaint, the Deutsche Bank Defendants have utilized Ocwen and/or Altisource to provide property maintenance services for most of the REOs owned or controlled by the Deutsche Bank Defendants.

36.     Defendant Ocwen Loan Servicing, LLC ("Ocwen") is a Florida corporation that maintains its principal place of business in West Palm Beach, Florida.  At all times relevant to this Complaint, Ocwen has conducted business in this District and in the metropolitan areas that are the subject of this Complaint.  Ocwen's business activities include providing services and products related to the management, preservation, maintenance and marketing of REO properties.  Plaintiffs allege that Ocwen has engaged in a pattern and practice of discrimination through the discriminatory performance of activities with regard to the Deutsche Bank REO properties.

37.     Defendant Altisource Solutions Inc. ("Altisource") was incorporated in 2009 and has its headquarters in Atlanta, Georgia.  Altisource is a subsidiary of Altisource Portfolio Solutions S.A., a publicly traded corporation which is incorporated in Luxembourg and was spun off from defendant Ocwen in 2009.  Altisource continues to derive substantial revenue from defendant Ocwen and to engage in activities with Ocwen.  At all times relevant to this Complaint, Altisource has conducted business in this District and in the metropolitan areas that are the subject of this Complaint.  Altisource's business activities include providing services and products related to the management, preservation, maintenance and marketing of REO properties.  Plaintiffs allege that Altisource has engaged in a pattern and practice of discrimination through the discriminatory performance of activities with regard to the Deutsche Bank REO properties.

19

## IV.  FACTS

**A. BACKGROUND OF DISCRIMINATION AGAINST MINORITY NEIGHBORHOODS AND COMMUNITIES OF COLOR (HISTORICAL CONTEXT OF THE VIOLATIONS)**

38.     The failure to maintain real estate owned by banks (REO) in minority communities is a continuation of the well-documented history of residential discrimination against minorities and minority neighborhoods in this country by many financial institutions: first, mortgages were withheld from neighborhoods of color by redlining; more recently, neighborhoods of color were targeted for expensive, predatory and unfair mortgages; and now a few financial institutions, like Deutsche Bank, are allowing bank-owned homes in neighborhoods of color to deteriorate, become eyesores and lose value due to lack of maintenance. The failure of Defendants to take the minimal actions necessary to equally maintain and monitor bank-owned homes in African-American and Latino communities occurred with their full knowledge that their actions and omissions would severely harm minority communities which have been repeatedly damaged by discriminatory housing practices and conditions in the past.

39.     Discrimination against persons of color by financial institutions and mortgage lenders is entrenched.  For much of the 20th century, banks did not issue mortgages in minority neighborhoods, literally drawing a red line around these neighborhoods on lending maps and thereby forcing minority homebuyers into the high priced lending arms of finance companies, hard money lenders and land contracts.

40.     Although the Fair Housing Act of 1968 sought to eliminate these practices, decades later communities of color still lacked access to sound and fair lending products available to white communities.  As such, these minority communities were ripe for exploitation by predatory lenders during the subprime lending boom of the 1990's and early 2000's.

20

41.     During this period, some lenders and investment banks, including the Deutsche Bank Defendants, sought to profit from the exploding mortgage securitization business.  When a residential mortgage is securitized, the original mortgage note is sold immediately to an investment bank, which pools the mortgage with thousands of others to create a Residential Mortgage-Backed Security.  This security is then sold to investors, including hedge funds.

42.     Deutsche Bank played key funding and trustee roles in the securitized loan pools that fueled the lending boom.[2]

43.     In order to profit from this market, certain lenders sought to expand markets for subprime mortgage products.  These lenders pushed subprime mortgage products, with increasingly unfavorable and risky loan terms, in minority neighborhoods ("reverse redlining").

44.     With reverse redlining, borrowers in African-American neighborhoods who qualified for prime loans were deliberately steered into more onerous subprime and predatory loans.  As a result, borrowers who would have been able to keep up with mortgage payments under the terms of a less expensive prime loan became unable to make the more demanding payments required by subprime loans.  This practice caused foreclosures and eventual vacancies in properties that otherwise would have remained occupied had the borrowers been given prime loans.

45.     During the subprime boom, African-American and Latino borrowers were nearly twice as likely as white borrowers to have one or more "high risk" features or conditions in their loans, such as higher interest rates, teaser rates, interest only mortgages or a prepayment penalty.  Even after controlling for factors such as credit scores and income, African-American and Latino

---

[2] Lindsey, Thompson, Cohen, Williamson, National Consumer Law Center (2012), *Why Responsible Mortgage Lending Is a Fair Housing Issue, n. 34.*

home buyers were 80% and 70% more likely respectively to receive a subprime loan than white home buyers.

46. In 2003, subprime lending accounted for 8% of all mortgage lending. By 2006, subprime lending accounted for 28% of the market. The disparate subprime lending to persons of color was reflected in Home Mortgage Disclosure Act ("HMDA") data.

47. The subprime lending boom collapsed in 2008, leading to an unprecedented foreclosure crisis. The crisis hit minority communities especially hard. During the first years of the crisis, African-Americans and Latinos were nearly 50% more likely to be facing foreclosure than whites, regardless of income. Foreclosure rates were also directly related to residential segregation: the more segregated a metropolitan area, the higher its foreclosure rate. Parties, such as the Deutsche Bank Defendants, became unexpected and reluctant owners of properties in communities of color that were disproportionately affected by the foreclosure crisis.

48. The foreclosure crisis continues to have significant effects across the country. Since mid-2007, more than 7.5 million foreclosures have been completed and 5 million properties are reported to be substantially underwater, meaning that owners owed 25% more on their mortgages than their homes were worth.

49. The large volume of foreclosures created a large inventory of vacant homes possessed by banks. These REO properties surfaced in unprecedented numbers in communities of color after the advent of the foreclosure crisis. REO properties present a substantial obstacle for recovery in the communities in which they are located, which suffer negative effects such as a depleted tax base, neighborhood blight, health and safety concerns and decreased market values resulting in wealth loss for homeowners who live near foreclosed homes.

50.     Because African-American and Latino homeowners faced disproportionately adverse actions on their loans, the neighborhoods and communities they lived in disproportionately felt the impact.  Estimates are that families affected by nearby foreclosures have lost or will lose a total of 8.8% of their home value.  For residents in African-American or Latino communities, that number doubles to 16% of home value.  The total loss in home equity stripped from communities of color is estimated to be approximately $1.1 trillion.

51.     The Defendants in this case knew or should have known the foregoing facts, including that a large proportion of the Deutsche Bank-owned homes were in neighborhoods of color. Against this historical backdrop, the Defendants in this case, are now allowing REO properties in minority communities to deteriorate due to a lack of proper routine exterior maintenance and marketing, causing more damage to these communities.

**B.  DEFENDANTS' REO MAINTENANCE AND MARKETING CONDUCT DISCRIMINATES AGAINST COMMUNITIES OF COLOR**

   **1.  The Deutsche Bank Defendants' Ownership as Trustee of the REO Properties**

52.     The Deutsche Bank Defendants are part of Deutsche Bank AG, a large German global banking and financial services conglomerate headquartered in Frankfurt, Germany.  The Deutsche Bank Defendants engage in a wide variety of banking and financial services activities, including those related to mortgage lending and packaging.  Deutsche Bank has been one of the financial institutions with



**Figure 3: Deutsche Bank REO in AA neighborhood in Milwaukee, WI**

the greatest involvement in the formation and development of mortgage-backed securities transactions, serving as an underwriter with regard to these transactions and in other capacities.

23

53.     A mortgage-backed security is a type of asset-backed security that is secured by a mortgage or collection of mortgages.  The mortgages are sold to an investment bank (or other entity) that securitizes or packages the loans together in a security for purchase by investors.  A document called a Pooling and Servicing Agreement ("PSA") designates certain parties to play roles in connection with the mortgage-backed securities.  A PSA allocates and assigns duties and responsibilities only as between the parties to the PSA.  A PSA does not, and cannot, change the legal obligations of the parties to the PSA to third parties, to persons who come into contact with properties owned by the trust, or to the public at large.

54.     One of the parties to mortgage-backed securities transactions is a trustee, who typically receives the assets in exchange for certificates issued to investors evidencing beneficial interests in the assets.  The Deutsche Bank Defendants have frequently acted in this capacity. The trustee in an asset-backed securities transaction is the legal owner of the assets underlying the transaction for the benefit of the holders of the asset-backed securities.  The trustee performs various functions, including serving as authenticating agent, issuing and paying agent, securities registrar and transfer agent, custodian of the assets, analytics provider and back-up servicer. (See section B.2, infra) The trustee of an asset-backed securities transaction typically performs more numerous and complex duties than trustees for traditional corporate and municipal debt transactions.  A trustee negotiates compensation for its activities in this capacity and is paid for them.  The Deutsche Bank Defendants frequently serve in the capacity of a non-indentured trustee under PSAs related to REO properties.

55.     Foreclosure and other legal actions with respect to trust properties must be brought in the name of the trustee as the legal owner of the loans.  Any claims against the trust must be brought against the trustee as the trust's legal representative.   When a foreclosure

occurs on a property that has been packaged under the security, the trustee becomes the legal owner of record of the property and becomes responsible for all legal obligations as owner.

56.    Another party to a mortgage-backed securities transaction is the loan servicer.  A loan servicer has various pre-foreclosure responsibilities related to managing the loans, such as collecting income from the assets, paying interest on the securities and taking actions related to the underlying properties.  Defendants Ocwen and Altisource have acted in this capacity with regard to the Deutsche Bank REO properties.  Servicer obligations after foreclosure, including property preservation and management, may be carried out through retained subcontractors.  The servicer's fee is usually structured as a percentage of the outstanding balance of the asset pool. After foreclosure on a property, the servicer acts as agent of the trustee, the property's legal owner.

57.    A dwelling as to which a financial institution takes legal title after a completed foreclosure is referred to as a Real Estate Owned or "REO" dwelling.  As a consequence of the foreclosure crisis, Deutsche Bank has obtained title as trustee to hundreds of REO dwellings across the country covered by the Fair Housing Act.

58.    Once title to a property becomes vested in the name of the trustee after foreclosure, i.e., once the property becomes an REO property, the trustee has ultimate responsibility and liability for real estate taxes, zoning and code compliance, nuisance avoidance and abatement, and compliance with all other federal and state laws imposing duties on landowners, including the Fair Housing Act.

59.    Once a dwelling becomes an REO property that is owned by the Deutsche Bank Defendants (as trustee), the Deutsche Bank Defendants assume all duties and responsibilities of ownership, including routine exterior maintenance, while the property is marketed for sale.  As a

property owner, a trustee of an REO property has an affirmative duty to know the conditions existing at the foreclosed properties to which it holds title, to maintain all such properties in compliance with all of the applicable laws, and to take all actions necessary to prevent or abate any unlawful conditions at such properties.

60.　　The trustee, as legal owner of the property, is required, under the Fair Housing Act, to maintain all REO properties, regardless of their location, without regard to race, color, religion, sex, handicap, familial status or national origin.  The express provisions of the Fair Housing Act specifically identify "trustees" as "persons" subject to the Act.  42 U.S.C. §3602(d). This responsibility is non-delegable under the Fair Housing Act, whether or not there has been a contractual designation of maintenance and marketing responsibilities under a Pooling and Serving Agreement.

61.　　Other parties tasked under a PSA or otherwise with preserving and maintaining a REO property, such as Defendants Altisource and Ocwen, also bear responsibility for complying with local laws and regulations, and the requirements of the Fair Housing Act.

62.　　According to the Federal Reserve Board, "[i]nstitutions should have policies and procedures in place to ensure that properties are maintained in compliance with federal, state and local laws, including laws governing health and safety, property preservation, fair housing, and property registration. . . . Further, institutions engaging third-party vendors to carry out functions related to these requirements should ensure that vendors maintain appropriate compliance controls.  Reliance on third party vendors does not relieve an institution of its compliance responsibilities or liability."  Federal Reserve, Q&A's re REOs, No. 20.

63.　　Under generally accepted industry practices, the routine exterior maintenance that Defendants are required to perform on all REO properties is objectively measurable, verifiable

and externally visible. Such maintenance activities include, but are not limited to, mowing,

weeding and edging; trimming shrubs and trees;

removing snow, trash and debris; securing doors and

windows; repairing or replacing loose handrails and

steps; and covering holes in the dwelling. These

routine exterior maintenance functions must be

addressed readily and regularly at every REO

property, regardless of the condition of the property.

Post-foreclosure routine exterior maintenance is



**Figure 4: Deutsche Bank REO in AA neighborhood in District Heights, MD**

cost-neutral between properties in white neighborhoods and properties in communities of color.

64.     The Ocwen and/or Altisource Defendants acted as primary servicers for the

Deutsche Bank REO properties during the period covered by this Complaint. There is no public

data available to identify which servicer (and its subcontractors or agents) has been contractually

retained for any particular REO property titled in the name of a bank as trustee. REO trustees do

not make this information available to the public. It is not retrievable from tax or land records.

If any other servicers acted with regard to the Deutsche Bank REO properties, their activities

were de minimis as compared to Ocwen and/or Altisource.

65.     Borrowers do not choose mortgage servicers or property preservation providers

and have no control over whether and how such entities conduct their business.

### 2. Status of Servicer as Agent of Trustee and Trust

66. The relationship between the Deutsche Bank Defendants with regard to the REOs it owns as Trustee and Defendants Ocwen and Altisource as services with regard to those properties is one of principal and agent. The relationship is confirmed by the terms of the PSA.[3]

67. For example, under the PSA, the Servicer is "authorized and empowered by the Depositor and the Trustee" under the PSA to take various actions . . . "on behalf of the Trustee, the Depositor, the Certificateholders, or any of them . . ." (Section 3.01, p. 47, e.g., instruments of cancellation or satisfaction)

68. Under the PSA, the servicer is required to "actively market[]" REO properties for sale for the benefit of the Trust, (Section 3.01, p. 56), and "either through itself or through an agent selected by the Servicer protect and conserve the REO property in accordance with the Servicing Standard." (Section 3.01, p.56) The Servicing Standard requires "that degree of skill and care exercised by the Servicer with respect to mortgage loans comparable to the Mortgage Loans serviced by the Servicer for itself or others." (Definitions, p. 31)

69. Under the PSA, Definitions, p. 8, accounts created by the Servicer with a depository institution are maintained "for the benefit of the Trustee on behalf of the Certificateholder." (Definition of "Certificate Account")

70. Under the PSA, the Servicer is required to "promptly deliver to the Trustee . . . the originals of other documents or instruments constituting the Mortgage File that come into the possession of the Servicer . . . (Section 2.02, p. 43)

---

[3] The references herein are to the sample PSA submitted by the Deutsche Bank Defendants with their reply brief on their prior motion to dismiss. (Docket #47, Ex. F) While all PSAs contain terms confirming an agency relationship, other PSAs may not have the identical language to the PSA submitted by Defendants. The PSA relied upon by Defendants establishes a non-indenture trust arrangement.

71.     Under the PSA, the Servicer is "authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee" to register loans on the MERS(R) system (Mortgage Electronic Registration System) or remove them from it.  (Section 3.01, p. 47)

72.     Under the PSA, in connection with its activities as Servicer, the Servicer agrees to present on behalf of itself, the Trustee and the Certificateholders, insurance claims and to take actions in connection with such claims.  (Section 3.10, p. 54)

73.     Under the PSA, with respect to REO property, the Servicer is required to "ensure that the title to the REO property references the PSA and the Trustee's capacity [t]hereunder." (Section 3.12, p. 56)

74.     Under the PSA, all mortgage files and funds collected or held by, or under the control of, the Servicer in respect of any Mortgage Loans (a term which includes "REO properties," Definitions, p. 17), whether from the collection of principal and interest payments or from liquidation proceeds, including any funds on deposit in the Certificate Account, shall be held by the Servicer for and on behalf of the Trustee.  (Section 3.14, p. 58)

75.     Under the PSA, the Servicer shall account fully to the Trustee for any funds it receives or otherwise collects as Liquidation Proceeds or Insurance Proceeds in respect of any Mortgage Loan.  (Section 3.14, p. 58)

76.     Under the PSA, the Servicer acknowledges and agrees that "the Servicer shall hold and retain possession of the Documents in trust for the benefit of the Trustee, solely for the purposes provided in the Agreement.   (PSA Ex. M at M-2)

77.      Other provisions of standard PSAs, under which the Deutsche Bank Defendants serve as Trustee, reflect responsibilities they can assume for managing, performing or monitoring the servicing activities of Ocwen, Altisource or other servicers.  For example, a "Form of

29

performance Certification (Trustee)" often required to be signed by Deutsche Bank as Trustee refers to Deutsche Bank's "compliance with the Servicing Criteria of Regulation AB," and requires the Deutsche Bank representative to certify that s/he is "responsible for reviewing the activities performed by the Trustee as a person 'performing a servicing function' under the Pooling and Servicing Agreement." (PSA Ex. R)

78.     Considering the scope of their relationship in fact, duties imposed as a matter of law and confirmatory language of the PSA, servicers (i.e., Ocwen and Altisource) act as agents for the trustee (i.e., the Deutsche Bank Defendants) and may subject it to liability for their own violations of the Fair Housing Act.

### 3. Status of Deutsche Bank Defendants as Back-up Servicers

79.     Under the typical PSA, under which the Deutsche Bank Defendants serve as a back-up servicer, the Trustee (i.e., Deutsche Bank) assumes "all of the rights and obligations of the Servicer" under the PSA in the event of an event of default or other or "if for any reason" the Servicer is no longer the Servicer under the PSA.  (Section 3.05, p. 48)

80.     Adequate backup servicing arrangements are central to a securitization transaction.  As evident from the difficulties faced in various securitization transactions during the financial crisis, the portability of servicing is a significant problem.  As such, a backup servicer uploads and shadows collateral data from the servicer in order to maintain itself in readiness to take over servicing obligations as needed.

81.     Under Section 7.01 of the PSA, an "event of default" includes any material failure by the Servicer to observe or perform any "of the covenants or agreements on the part of Servicer contained in [the PSA]."  (Section 7.01, p. 79)

82.     Under Section 7.02 of the PSA, "on or after the time the Servicer receives a notice of termination pursuant to Section 7.01, the Trustee shall, subject to and to the extent provided in

Section 3.05, be the successor to the Servicer in its capacity as Servicer under this Agreement and the transactions set forth or provided herein shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms hereof and applicable law. . . ."(Section 7.02, p. 80).

83. Considering their mandatory obligations as back-up servicer and the material failures of the servicer Defendants, the Deutsche Bank Defendants are properly accountable, as trustee, for discriminatory conduct and conditions relating to the Deutsche Bank REO properties.

   **4. Plaintiffs' Investigation of Defendants' Exterior Maintenance and Marketing of Properties**

84. In the aftermath of the foreclosure crisis, Plaintiffs received complaints and concerns regarding the maintenance and marketing of REO properties in communities of color and became aware of the existence of serious inequities in the manner in which REO properties in communities of color were maintained and marketed as compared to the maintenance and marketing of REO properties in white communities. Consistent with the mission of the plaintiff organizations, Plaintiffs acted to investigate the existence and scope of this problem.

85. In one of the most extensive fair housing investigations conducted under the Fair Housing Act, Plaintiffs investigated Defendants' maintenance and marketing of Deutsche Bank-owned homes in certain metropolitan areas from 2011 to December 2017. Plaintiffs' investigation focused on the following metropolitan areas: Washington, D.C.; Memphis, TN; Chicago, IL; Baltimore, MD; Hampton Roads, VA; Toledo, OH; Orlando, FL; Minneapolis, MN; Indianapolis, IN; Columbus, OH; Cleveland, OH; Baton Rouge, LA; Dayton, OH; Denver, CO; Dallas, TX; Gary, IN; Hartford, CT; Milwaukee, WI; New Orleans, LA; Grand Rapids, MI; Muskegon, MI; Greater Palm Beaches, FL; Miami-Ft. Lauderdale, FL; Tampa, FL; Richmond, VA; Detroit, MI; Philadelphia, PA; Providence, RI; Vallejo and Richmond, CA; and Kansas

31

City, MO/KS.  The investigation included 1,141 residential dwellings in these metropolitan areas

covered by the Fair Housing Act.  The properties that were investigated are identified in

Appendix A to this Complaint.  For purposes of this Complaint, and the statistical analyses set

out below, the phrase "predominantly white neighborhoods" refers to those census block groups

with more than 50% non-Hispanic white residents and the phrase "communities of color" refers

to census block groups with less than 50% non-Hispanic white residents.

86.     In each of these metropolitan areas, Plaintiffs identified the zip codes within the

metropolitan area that were racially concentrated (e.g. predominantly white or communities of

color) with the highest foreclosure rates.  Plaintiffs then inspected all (100%) of the Deutsche

Bank REO properties in those zip codes within the same relative time period, unless the

properties appeared to be occupied or work was actively occurring at the time of the site visits.

The exclusion of properties where work was ongoing was to avoid recording adverse conditions

that might be temporary or related to the work being conducted by a new owner.

87.     Deutsche Bank's ownership of the properties was determined by using county

property records, records kept by the clerks of courts, RealtyTrac, and other database sources.

The data was also crosschecked with other records in order to verify the ownership of the homes

because county recorders occasionally delay recording ownership titles.  The number of

properties excluded on this basis was minimal.

88.     Plaintiffs evaluated Defendants' maintenance and marketing of these properties

according to specific and objective routine exterior requirements that are standard in the REO

maintenance industry and clearly visible by exterior inspection.  Plaintiffs' list of exterior

deficiencies is based on standard industry practice as to what constitutes "routine" maintenance,

or "minimal" property safety conditions, and is consistent with Freddie Mac and Federal

32

Housing Administration requirements, as well as various appropriate updated policies of private institutions.

89.     Whatever other issues that a particular property may have (e.g., interior renovation or other non-routine repair needs), all properties can be equally maintained in terms of these routine exterior maintenance requirements.  No reason exists to expect racial disparities in terms of the observed routine exterior maintenance of properties. At the same time, exterior maintenance failures drastically affect property sales rates, values and quality of life in these neighborhoods. Plaintiffs'



**Figure 5: Deutsche Bank REO in AA neighborhood in Baltimore, MD**

investigators observed, recorded and photographed the routine exterior maintenance and marketing conditions of the Deutsche Bank-owned homes with respect to over three dozen exterior features. Plaintiffs examined the Deutsche Bank REO properties for the following maintenance or marketing categories: curb appeal, structure, signage and occupancy, paint and siding, gutters, water damage, and utilities. Curb appeal factors included trash and/or debris, accumulated mail, overgrown grass, accumulated dead leaves, overgrown or dead shrubbery, invasive plants, dead grass, and broken or missing mailboxes.  Structural factors included unsecured, broken, or boarded doors; damaged steps or handrails; unsecured, broken, or boarded windows; damaged roofs; damaged fences; holes in the structure of the home; and wood rot. Signage and occupancy factors included trespassing or warning signs, signage marketing the home as a distressed property, the absence of a professional "for sale" sign, broken or discarded signage, and unauthorized occupancy of the REO property. Paint and siding factors included

graffiti, peeling or chipped paint, damaged siding, and missing or damaged shutters. Gutter factors included missing or out of place gutters, broken or hanging gutters, and obstructed gutters. Water damage factors included water damage and the presence of mold, algae, or discoloration. Utility factors included utilities that were exposed, damaged, or missing. Plaintiffs also utilized a miscellaneous factor under each category for any maintenance or marketing issue that did not fall into any of the other factors (e.g. failure to shovel snow or an unsecured and undrained swimming pool).

90.    To ensure consistency, investigators were thoroughly trained and provided with examples and field terminology. Training included classroom and field investigations where new investigators were accompanied by NFHA staff or experienced staff from the local fair housing center. NFHA staff taught investigators how to evaluate a deficiency, complete forms, take photographs and upload all photos into a central database. Investigators utilized a glossary of terminology developed by plaintiff NFHA and its partners at the beginning of this investigation with pictures and descriptions to illustrate various examples for documenting deficiencies. The glossary took into account and illustrated variations in severity for certain deficiency criteria.

91.    The investigators also photographed the routine exterior maintenance and marketing conditions observed. The investigators took photographs of the front of each property, both sides of the property, and the back view of the property when access was available. These photographs were taken whether or not there were deficiencies documented in order to show the state of REO maintenance at the time of the visit. Investigators also took photographs of the homes across the street and on both sides of the bank-owned foreclosure to provide context regarding general routine maintenance of homes in the neighborhood. The investigators' reports

34

and pictures were uploaded into a central database, and each property was assigned a

neighborhood designation based on racial or ethnic makeup of the Census block group where the

address was located.

92. The Plaintiffs' tests were conducted over time at different Deutsche Bank-owned

homes. In addition, Plaintiffs allowed a period of time for the property to be owned by Deutsche

Bank so initial maintenance and security could be performed. This grace period provided

Deutsche Bank the opportunity to complete its initial maintenance procedures and bring the

home up to sale condition standards as well as to compensate for any routine exterior

maintenance problems in the condition of the home at the time the bank took possession.

93. Plaintiffs' testing was designed and implemented so as to assess whether any

patterns of differing treatment were apparent across a

particular metropolitan area between predominately white

neighborhoods and neighborhoods that were

predominantly African-American and/or Latino, as well as

whether, when aggregated, the evidence showed a pattern

of differing treatment.



**Figure 6: Deutsche Bank REO in
AA neighborhood in Chicago, IL**

94. Deutsche Bank used a marketing business

model to sell the majority of its REOs via the Hubzu auction site through Ocwen/Altisource,

showing a preference or limitation to cash buyers, who are typically investors, thereby making

housing unavailable in communities of color by changing neighborhoods from homeownership

communities into investor communities, with detrimental financial consequences for current

homeowners and new owner-occupants.

95.     The unequal and poor routine exterior maintenance and the unequal and poor marketing of the Deutsche Bank-owned homes in communities of color directly caused and resulted in the various harms alleged in this Complaint.

### 5.  Summary of the Overall Results of Plaintiffs' Investigation (Aggregate Findings)

96.     On a consistent basis, testers examining Deutsche Bank REO properties were far more likely to observe a lack of routine exterior maintenance in neighborhoods of color than in predominantly white neighborhoods.  In their totality, the data and pictures collected by Plaintiffs establish that Defendants failed to perform adequate routine exterior maintenance and marketing of the Deutsche Bank REO properties in communities of color, thereby leaving those Deutsche-owned homes in a state of neglect, while satisfactorily performing routine exterior maintenance and marketing of the Deutsche Bank REO properties in white neighborhoods, thereby leaving those Deutsche-owned homes in a materially better condition.  Although widespread national patterns of discrimination involving Deutsche Bank's REO properties could not be discerned from the existing data during the early stages of the Plaintiffs' investigation, eventually Plaintiffs accumulated sufficient data to show that such patterns exist.

97.     Examples of the disparate maintenance and marketing in these metropolitan areas based upon the predominant race or national origin of a neighborhood for the entire period during which tests were conducted include the following aggregate findings:

        a)     44.8 % of the Deutsche Bank REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 14.3% of the Deutsche Bank REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

      b)     90.9% of the Deutsche Bank REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 57.2% of the Deutsche Bank REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

      c)     66.6% of the Deutsche Bank REO properties in communities of color had trash or debris visible on the property, while only 31.7% of the Deutsche Bank REO properties in predominantly white neighborhoods had trash visible on the property.

      d)     39.4% of the Deutsche Bank REO properties in communities of color had unsecured or broken doors, while only 22.1% of the Deutsche Bank REO properties in predominantly white neighborhoods had unsecured or broken doors.

      e)     53.4% of the Deutsche Bank REO properties in communities of color had damaged, boarded, or unsecured windows, while only 21.9% of the Deutsche Bank REO properties in white neighborhoods had damaged, boarded or unsecured windows.

98.    Considering only assessments conducted between February 26, 2012 and the present, examples of disparate maintenance and marketing based upon the predominant race or national origin of a neighborhood include the following findings:

      a)     46.3% of the Deutsche Bank REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 14.1% of the Deutsche Bank REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

b)  92.1% of the Deutsche Bank REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 57% of the Deutsche Bank REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

c)  67.5% of the Deutsche Bank REO properties in communities of color had trash or debris visible on the property, while only 31.5% of the Deutsche Bank REO properties in predominantly white neighborhoods had trash visible on the property.

d)  41.4% of the Deutsche Bank REO properties in communities of color had unsecured or broken doors, while only 22% of the Deutsche Bank REO properties in predominantly white neighborhoods had unsecured or broken doors.

e)  55.5% of the Deutsche Bank REO properties in communities of color had damaged, boarded or unsecured windows, while only 22.3% of the Deutsche Bank REO properties in predominantly white neighborhoods had damaged boarded or unsecured windows.

99.  Considering only assessments conducted between February 14, 2015 and the present, examples of disparate maintenance and marketing based upon the predominant race or national origin of a neighborhood include the following findings:

a)  47.3% of the Deutsche Bank REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 12.6% of the Deutsche Bank REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

b)      93.8% of the Deutsche Bank REO properties in communities of color had

5 or more maintenance or marketing deficiencies, while only 59.2% of the

Deutsche Bank REO properties in predominantly white neighborhoods had 5 or

more maintenance or marketing deficiencies.

c)      71.5% of the Deutsche Bank REO properties in communities of color had

trash or debris visible on the property, while only 32.8% of the Deutsche Bank

REO properties in predominantly white neighborhoods had trash visible on the

property.

d)      41.7% of the Deutsche Bank REO properties in communities of color had

unsecured or broken doors, while only 24.4% of the Deutsche Bank REO

properties in predominantly white neighborhoods had unsecured or broken doors.

e)      55.1% of the Deutsche Bank REO properties in communities of color had

damaged, boarded or unsecured windows, while only 22.7% of the Deutsche

Bank REO properties in predominantly white neighborhoods had damaged

boarded or unsecured windows.

100.     On an aggregate basis across all Deutsche Bank REO properties investigated, and

across all time periods during which investigations were conducted, the disparities between the

routine exterior maintenance and marketing of the Deutsche Bank-owned homes in communities

of color and the routine exterior maintenance and marketing of Deutsche Bank-owned homes in

predominantly white neighborhoods are extremely substantial and statistically significant.

101.     Defendants' racially discriminatory treatment of the Deutsche Bank REO

properties is prevalent in each of the cities included herein.   In each of the metropolitan areas

visited, the REO properties located in predominantly white neighborhoods were better

39

maintained and exhibited fewer routine exterior maintenance deficiencies than the REO properties located in communities of color.

102.    Defendants' racially discriminatory treatment of REO properties is continuous throughout the period of Plaintiffs' investigation.  When analyzed during each of the following periods, Defendants' policies and conduct provided inferior routine exterior maintenance and marketing to REO properties in communities of color, while providing better routine exterior maintenance and marketing to REO properties in predominantly white neighborhoods:

        a)      the period from 2011 to the present;

        b)      the period from February 26, 2012 to the present, and

        c)      the period from February 14, 2015 to the present.

103.    Statistical analysis of Plaintiffs' evidence shows a large difference in the average number of exterior maintenance and marketing deficiencies between communities of color and predominantly white neighborhoods.  Considering the entirety of the evidence obtained by Plaintiffs from all Deutsche Bank REO properties inspected, the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in communities of color is well over nine, while the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in white neighborhoods is less than six.   In addition, the percentage of Deutsche Bank REO properties with ten or more deficiencies is approximately three times greater in nonwhite block groups than in white block groups.

104.    Limiting the evidence to the period from February 26, 2012 to the present, the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in communities of color remains over nine, while the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in white

neighborhoods remains less than six. In addition, the percentage of Deutsche Bank REO properties with ten or more deficiencies is more than three times greater in nonwhite block groups than in white block groups.

105.    Limiting the evidence to the period from February 14, 2015 to the present, the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in communities of color remains over nine, while the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in white neighborhoods remains less than six. In addition, the percentage of Deutsche Bank REO properties with ten or more deficiencies is almost four times greater in nonwhite block groups than in white block groups.

106.    The disparities in the maintenance and marketing of the Deutsche Bank-owned homes are not explained by non-racial factors. As regards the entirety of the evidence obtained by Plaintiffs[4], a regression analysis taking into account and controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until Plaintiffs' site visit and property values), indicates that routine exterior maintenance and marketing deficiencies at the Deutsche Bank REO properties in communities of color remain higher by a statistically significant margin as compared to the routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in predominantly white neighborhoods.

107.    As regards the evidence from site visits between February 26, 2012 to the present, a regression analysis taking into account and controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data,

---

[4] The regression analysis includes a nominal number of properties assessed in metropolitan areas where there were not sufficient numbers of comparative properties to include in the metropolitan area analysis.

property age, dwelling size, lot size, the length of time from ownership until Plaintiffs' site visit and property values), indicates that routine exterior maintenance and marketing deficiencies at the Deutsche Bank REO properties in communities of color remain higher by a statistically significant margin as compared to the routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in predominantly white neighborhoods.

108.    As regards the evidence from site visits between February 14, 2015 to the present, a regression analysis taking into account and controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until Plaintiffs' site visit and property values), indicates that routine exterior maintenance and marketing deficiencies at the Deutsche Bank REO properties in communities of color remain higher by a statistically significant margin as compared to the routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in predominantly white neighborhoods.

109.    These statistical disparities are merely representative of the numerous forms of data and observational evidence establishing the differential treatment by Defendants of communities of color as compared to predominantly white neighborhoods.

110.    No valid business purposes are served by, or constitute valid excuses for, Defendants' differing maintenance of REO properties based on neighborhood racial composition.

111.    The disparities identified above flow directly from Defendants' discriminatory conduct.  They are traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision.  They are directly related to the zone of interests protected by the Fair Housing Act.  Based on the familiarity of the Plaintiffs

with REO properties in their service areas, and the factors recognized as bearing upon marketability of residential real estate, Defendants' failure to maintain and market REO properties in communities of color has had the effect of impeding community development and dissuading purchasers from buying these properties.

## C. PLAINTIFFS PUT DEFENDANTS ON NOTICE OF THE DEFENDANTS' DISCRIMINATORY TREATMENT OF THE DEUTSCHE TRUST REO PROPERTIES, BUT DEFENDANTS HAVE NOT ALTERED THEIR DISCRIMINATORY BEHAVIOR

112.    In April 2011, NFHA published a report titled, "Here Comes the Bank, There Goes Our Neighborhood." The Report examined the differing ways in which financial institutions treated foreclosed properties in only four metropolitan areas. The Report was based upon an aggregate review of REO properties of eight different lenders which preliminarily suggested a pattern of disparate maintenance of REO properties; however, at this time, NFHA had assessed only 624 properties, which were distributed among the eight lenders.

113.    As regards Deutsche Bank, as of April 2011, NFHA had not assessed any Deutsche Bank REO properties.

114.    The Report made several recommendations for banks and servicers in terms of changing their business models for disposing of REO properties and establishing standards and oversight mechanisms. The Report should have alerted the Defendants to review their maintenance and marketing practices with respect to REO properties, but Defendants did not take effective investigative and/or remedial actions.

115.    In April 2012, NFHA published a report titled, "The Banks are Back – Our Neighborhoods are Not," which updated the 2011 Report. At this time, however, NFHA's review was limited to only nine metropolitan areas and remained an aggregate review of eight

different lenders.  Less than 500 additional properties, distributed among eight different banks, had been reviewed.

116.    As regards Deutsche Bank, as of April 2012, NFHA had assessed only 99 Deutsche Bank REO properties.  The process of collecting evidence to assess any patterns evident in Deutsche Bank's maintenance of REO properties was ongoing.  Any widespread national patterns of discrimination involving Deutsche Bank's REO properties could not be discerned from the existing data at that time.  Eventually Plaintiffs accumulated sufficient data, summarized above, to show that these Defendants were engaged in ongoing discriminatory behavior.

117.    The 2012 Report reiterated several recommendations for banks and servicers in terms of changing their business models for disposing of REO properties and establishing standards and oversight mechanisms.  The Report should have alerted the Defendants to review their maintenance and marketing practices with respect to REO properties, but Defendants did not take effective investigative and/or remedial actions.

118.    A third report on disparities in REO maintenance was published by NFHA on August 27, 2014, and was entitled, "Zip Code Inequality:  Discrimination by Banks in the Maintenance of Homes in Neighborhoods of Color."  By the time of this report, and subsequent to the 2012 report, Plaintiffs had assessed 2,400 properties.

119.    As regards Deutsche Bank, as of August 2014, NFHA had now assessed 420 REO properties.

120.    On February 26, 2014, Plaintiffs filed with the U.S. Department of Housing and Urban Development ("HUD") an administrative complaint of discrimination against the Deutsche Bank Defendants' pursuant to 42 U.S.C. Sect. 3610.  Plaintiffs' administrative

complaint was subsequently amended on April 30, 2014, August 7, 2014, January 22, 2015, August 5, 2016, February 14, 2017 and July 26, 2017, and Ocwen and Altisource were added as respondents. The administrative complaint was withdrawn, as is customary, when this case was filed.

121. Plaintiffs have met with Deutsche Bank representatives and informed them of their findings with regard to the discriminatory conditions of the Deutsche Bank REO properties. Plaintiffs requested that the Deutsche Bank Defendants cease and remedy their discriminatory behavior.

122. On information and belief, the Deutsche Bank Defendants have kept Defendants Ocwen and Altisource informed regarding Plaintiffs' findings, contentions and allegations.

123. After meeting with the Deutsche Bank representatives, Plaintiffs conducted additional investigations of Deutsche Bank REO properties. The results of these additional investigations confirm no change in the pattern of disparities between maintenance and marketing of REO properties in predominantly white neighborhoods and neighborhoods of color.

124. Despite Plaintiffs' attempts to persuade the Deutsche Bank Defendants to voluntarily comply with the Fair Housing Act, the Deutsche Bank Defendants and the other Defendants did not and have not changed their behavior. With deliberate indifference and reckless disregard to the purpose and effects of their discriminatory policies, practices and conduct, Defendants have continued to maintain Deutsche Bank REO properties in a discriminatory manner based on the predominant race and national origin of neighborhoods. Defendants' discriminatory maintenance and marketing of REO properties in communities of color violates the rights of homeowners and residents in these neighborhoods, causes

particularized and concrete injury to these homeowners and residents, and otherwise makes housing unavailable in communities of color.

**D. DEFENDANTS HAVE ENGAGED IN A PATTERN AND PRACTICE OF SYSTEMIC AND INTENTIONAL RACE DISCRIMINATION IN EACH OF THE CITIES SERVED BY PLAINTIFFS**

125.    A "pattern or practice" of discrimination refers to systemic intentional discrimination affecting a large group of persons.  Statistical evidence of a sufficiently gross disparity over time between the affected population and the general population may establish an inference of intentional discrimination.

126.    To prove systemic discrimination, a plaintiff must show that the discrimination was the defendant's standard operating procedure, more than the mere occurrence of isolated or sporadic discriminatory acts.  A plaintiff can establish that discrimination was the defendant's standard operating procedure by, among other things, presenting statistical evidence of similarly situated persons not in the protected class who were treated better than those in the protected class.

127.    Plaintiffs' findings by metropolitan area, time period and violations reveal Defendants' systemic pattern and practice of providing manifestly inferior routine exterior maintenance and marketing services for REO properties in African-American and Latino communities, and thereby discriminating on the basis of race, and national origin.  The extensive testing evidence generated by Plaintiffs displays a clear and consistent pattern and regular practice of differing routine exterior maintenance and marketing during all time periods based on neighborhood racial composition.  There is no business or other justification for this conduct.

128.    Defendants' policies, practices and intentional conduct are the direct and proximate cause of the gross statistical disparities in the maintenance and marketing of properties in neighborhoods with different racial and ethnic compositions.

46

129.     The differences in routine exterior maintenance and marketing at the Deutsche Bank REO properties are consistent in metropolitan areas regardless of their location in the country.  Whether analyzed on a national or metropolitan area basis, the same pattern and practice of discriminatory treatment is evident.  The consistent and repetitive pattern of discriminatory treatment across cities and over the span of time indicates that practices resulting in discrimination at the Deutsche Bank REO properties were approved, occurred or condoned at a high level of management.

130.     Defendants failed to comply with state and local laws regarding property maintenance in that: (a) observations by Plaintiffs of various deficiencies during their investigation of the Deutsche Bank-owned homes included many examples of conduct typically violating local codes and ordinances; and (b) Defendants have been sued under "Slumlord" ordinances as systemic violators, such as in Los Angeles, California.

131.     Defendants deviated from well-established practices concerning property maintenance and preservation in communities of color, which include upkeep of the routine exterior maintenance items Plaintiffs visually investigated at Deutsche Bank-owned homes.

132.     Appendix B to this Complaint, incorporated herein by reference, sets forth Plaintiffs' detailed findings by Metropolitan Area and violation type, as tabulated for the entire period during which assessments were conducted.

133.     Appendix C to this Complaint, incorporated herein by reference, sets forth Plaintiffs' detailed findings by Metropolitan area and violation type, as tabulated for assessments conducted during the period from February 26, 2012 to the present.

134.     Appendix D to this Complaint, incorporated herein by reference, sets forth Plaintiffs' detailed findings by Metropolitan area and violation type, as tabulated for assessments conducted during the period from February 14, 2015 to the present.

135.     In all areas and across all time periods during which tests were conducted, there were substantially less REO properties in white neighborhoods than in neighborhoods of color that had fewer than 5 routine exterior maintenance or marketing deficiencies.

136.     In all areas, and across all time periods during which tests were conducted, there were substantially more REO properties in neighborhoods of color than in predominantly white neighborhoods that had more than 10 deficiencies.

137.     In many cities, certain REO properties in neighborhoods of color had more than 15 deficiencies (a condition seen far less often in white communities).

138.     As indicated on the following table, throughout the course of their entire investigation, Plaintiffs investigated Deutsche Bank REO properties in each of the following metropolitan areas and found substantial differing treatment and disparities in properties as between neighborhoods of color and white neighborhoods (a) having fewer than 5 deficiencies (b) having more than 5 deficiencies, and (c) having more than 10 deficiencies, as follows:


*[the remainder of this page is intentionally left blank]*


48

| Metro Area/City | # Deutsche REOs Investigated | More White REOs with Less than 5 Deficiencies | More Minority REOs with More than 5 Deficiencies | More Minority REOs with More than 10 Deficiencies |
|---|---|---|---|---|
| Chicago | 106 | X | X | X |
| Milwaukee | 83 | X | X | X |
| Cleveland | 32 | X | X | X |
| Detroit (Suburban) | 43 | X | X | X |
| Dayton | 37 | X | X | X |
| Toledo | 27 | X | X | X |
| Columbus | 25 | X | X | X |
| D.C. & Prince George's | 66 | X | X | X |
| Memphis | 61 | X | X | X |
| Baltimore | 63 | X | X | X |
| Hampton Roads | 17 | X | X | X |
| Orlando | 64 | X | X | X |
| Minneapolis | 24 | X | X | X |
| Indianapolis | 18 | X | X | X |
| Baton Rouge | 20 | X | X | X |
| Denver | 21 | X | X | X |
| Dallas | 62 | X | X | X |
| Gary | 22 | X | X | X |
| Hartford | 16 | X | X | |
| New Orleans | 42 | | | X |
| Grand Rapids | 14 | X | X | X |
| Muskegon | 29 | X | X | X |
| Greater Palm Beaches | 41 | X | X | X |
| Miami | 63 | X | X | X |
| Tampa | 27 | X | X | X |
| Richmond | 39 | X | X | X |
| Philadelphia | 28 | X | X | X |
| Providence | 19 | X | X | X |
| Vallejo and Richmond CA | 22 | X | X | X |
| Kansas City | 10 | X | X | X |

139.    As detailed in Appendices B, C and D, in all metropolitan areas investigated, and across all time periods, Plaintiffs found substantial differences between the occurrence of

various particular deficiencies observed at REO properties in white neighborhoods and the occurrence of the same deficiencies observed at REO properties in neighborhoods of color (e.g. in Denver, during the course of the investigation, 38.5% of REO properties in neighborhoods of color had broken or hanging gutters while none of the REO properties in predominantly white neighborhoods had the same problem).

### E. DEFENDANTS HAVE ACTED WITH DISCRIMINATORY INTENT

140.    Fair housing testing evidence, by itself or in conjunction with other evidence, is a well-established method of proving discrimination in cases alleging violations of the FHA. The facts revealed by fair housing testing evidence are often sufficient alone to establish intentional discrimination.

141.    Intentional discrimination occurs when a defendant or its agents acts, at least in part, because of the actual or perceived race or national origin of the alleged targets of discriminatory treatment. A defendant under the Fair Housing Act may also be liable for intentional discrimination where the defendant has knowledge of discrimination by its agents but acts with deliberate indifference in failing to address it. Various factors are probative of intent to discriminate, including, but not limited to, statistics demonstrating a clear pattern unexplainable on grounds other than discriminatory ones, the historical background of a decision, the specific sequence of events leading up to the challenged decision, and the defendant's departures from its normal procedures or substantive considerations. Evidence of a consistent pattern of actions that have a much greater harm on minorities than non-minorities is highly probative. Evidence of acts or conditions, even if time-barred, may be properly considered as evidence of intent.

142.    The acts and omissions of the Defendants and their agents with regard to the inferior and unequal routine exterior maintenance and marketing provided to the Deutsche Bank REO properties in communities of color were taken based on race and national origin and

50

constitute intentional discrimination as evidenced by various facts, including, but not limited to
the following:

a)      the severity and pervasiveness of the disparities found throughout
comparative testing between the maintenance and marketing of the Deutsche
Bank REO properties in communities of color and the maintenance and marketing
of the Deutsche Bank REO properties in white neighborhoods;

b)      the absence of credible, non-pretextual explanations for the disparities
other than race;

c)      Defendants' knowledge of systemic racial disparities between the
maintenance and marketing of the Deutsche Bank REO properties in communities
of color and the maintenance and marketing of the Deutsche Bank REO properties
in white neighborhoods, but deliberate indifference and refusal to take remedial
actions;

d)      Defendants' failure to comply with state and local laws with regard to
property maintenance in African-American and Latino communities;

e)      Defendants' lack of responsiveness to complaints regarding REO
maintenance in communities of color;

f)      rigorous statistical analysis during all relevant time periods controlling for
non-racial factors, (prior sales dates and prices, additional property transfer
history, local crime statistics, local housing market data, property age, dwelling
size, lot size, the length of time from ownership until Plaintiffs' site visit and
property values), which indicates that routine exterior maintenance and marketing

51

deficiencies at Deutsche Bank REO properties in communities of color cannot be explained on the basis of factors other than race;

g)　　Defendants' knowledge of the foreseeable and continuing consequences of Defendants' conduct on communities of color;

h)　　Defendants' deviation in minority communities from well-established standards and practices regarding exterior property maintenance;

i)　　evidence of prior intentional discriminatory conduct by the Defendants toward African–Americans and Latinos, including, but not limited to, predatory loan practices, which created the conditions upon which the discriminatory conduct in this case could occur;

j)　　Defendants' knowledge of the historical and continuing pattern of discrimination against African-Americans and Latinos by the financial and property service provider industries, including Defendants;

k)　　evidence of a general pattern of intentional unlawful conduct and corrupt corporate culture with respect to defendant Deutsche Bank extending to such matters as race discrimination, money laundering, market rigging, securities fraud, violating United States Government imposed sanctions, fake transactions and concealing financial losses.

143.　　In 2013, Deutsche Bank subsidiary MortgageIT paid $12.1 million to settle claims brought by the United States Department of Housing and Urban Development that: (a) it charged Black and Hispanic borrowers higher fees than white customers; and (b) it more frequently refused loan applications from Black or Hispanic borrowers. According to HUD, the MortgageIT loan data from 2007 and 2008 indicated that there was a 65% greater chance of

African-American borrowers being issued more expensive loans than similar white borrowers. HUD also found that Hispanic borrowers had a 72% greater chance of being issued more expensive loans than similar white borrowers.

144.    In January 2017, Deutsche Bank agreed to a multi-billion settlement with the Justice Department resolving federal claims that Deutsche Bank misled investors in the packaging, securitization, marketing, sale and issuance of residential mortgage-backed securities (RMBS).  This represents the single largest RMBS resolution for the conduct of a single entity. $4.1 billion of the relief was in the form of relief to consumers harmed by its unlawful conduct, including loan modifications, loan forbearance and forgiveness, and financing for affordable rental and for-sale housing throughout the country.

145.    The systemic unlawful activities of Deutsche Bank continue to prompt investigation for criminal and regulatory violations.  In November 2018, Deutsche Bank headquarters was targeted in a massive police raid related to money laundering activities implicated in the "Panama Papers."

146.    Defendants Ocwen and Altisource also have histories of regulatory violations, allegations of unlawful corporate conduct and intentional bad acts, requiring the payment of millions of dollars to resolve claims that they have intentionally violated consumer finance, civil rights and securities laws, and defrauded borrowers with respect to their mortgage loans.

F.  **DEFENDANTS' REO MAINTENANCE AND MARKETING POLICIES AND PRACTICES HAVE A DISPROPORTIONATE DISCRIMINATORY IMPACT ON COMMUNITIES OF COLOR**

147.    Policies and practices based on race-neutral factors may cause an unjustified adverse impact on homeowners in communities of color.  In this case, the pervasiveness of the discriminatory conditions relating to the Deutsche Bank REO properties indicates that

Defendants operate under policies and practices with regard to the maintenance of REO properties that have an unjustified adverse disparate impact on communities of color.

148.    As regards the Deutsche Bank Defendants, these Defendants have adopted a uniform policy of disavowing any legal responsibility for compliance with federal, state or local laws pertaining to REO exterior maintenance. In connection with this policy, Defendants have sought to "outsource" to third parties compliance with the statutory and common law obligations that are placed on owners of real property.

149.    The Deutsche Bank Defendants have the policy of disavowing and abdicating their legal obligations as real property owners without appropriate investigation or assessment of the fitness or ability of the retained third parties to act in compliance with obligations imposed under the Fair Housing Act.

150.    The Deutsche Bank Defendants have the policy of disavowing and abdicating their legal obligations as real property owners without guidance, oversight or review of the activities left to the discretion of retained third parties.

151.    On June 28, 2013, Deutsche Bank publicly confirmed its policies of outsourcing and abdicating legal responsibilities with regard to REO properties in the course of a $10,000,000.00 settlement with the City of Los Angeles in a so-called "slum lord" case regarding the deterioration of foreclosed Deutsche Bank REO properties in Los Angeles.  In this context, Deutsche Bank stated, "[a]s we have said from the outset, loan servicers are responsible for maintaining foreclosed properties."

152.    Deutsche Bank also asserted on June 28, 2013 that the settlement with Los Angeles would "be paid by the servicers responsible for the Los Angeles properties at issue *and*

54

*by the securitization trusts that hold the properties"* (emphasis supplied), further evidencing its

obligations as trustee.

153.    The foregoing policies of the Deutsche Bank Defendants have a disproportionate

adverse impact on communities of color, as shown by the statistical disparities and regression

analysis described in this complaint.  These policies have operated in combination with the

known higher foreclosure rates in neighborhoods of color resulting from predatory lending to

minority borrowers during the subprime lending boom.   The policies and practices of the

Deutsche Bank Defendants cause an adverse impact on communities of color by causing

retention of unqualified and unsupervised third parties who lack incentives to comply with legal

obligations regarding the maintenance of the Deutsche Bank REO properties in communities of

color and who are unsupervised and unmonitored by a property owner in the performance of

their duties.

154.    No valid business purposes are served by the foregoing policies, and there is no

business justification for failing to undertake basic maintenance of REO properties in

communities of color.

155.    Based on available information, it appears that Deutsche Bank Defendants have

employed other standard policies and practices in connection with the operation of their

businesses that have had a disparate impact on the routine exterior maintenance and marketing of

REO properties in communities of color.  For example, the Deutsche Bank Defendants have

deliberately outsourced routine exterior maintenance work to large national companies without

community ties, knowledge or expertise to service REO properties in communities of color.

Furthermore, based on the PSA submitted with Defendants' reply brief, at least some PSAs

relating to Deutsche Bank REO properties reference a servicing standard for property

maintenance that is unduly vague and subjective. (See PSA "Definitions," p. 31, requiring only "that degree of skill and care exercised by the Servicer with respect to mortgage loans comparable to the Mortgage Loans serviced by the Servicer for itself or others").

156. The Ocwen and Altisource Defendants also appear to have employed standard policies and practices in connection with the operation of their businesses that have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color, although the details of their policies are not publicly disseminated. Based on available information, it appears that these policies include:

a) adopting and following the Deutsche Bank policy of abdicating and outsourcing REO maintenance to third parties without appropriate monitoring or review;

b) employing arbitrary methods of allocating resources to the maintenance of REO properties;

c) avoiding customary real estate brokers, listings and channels in favor of Internet sites, such as Hubzu, used primarily for auctions and by investors, with the predictable result of cash sales or bulk sales by investors, which adversely impact neighborhoods of color by decreasing sales to the homeowner occupants;

d) allowing third party contractors and lower level employees to exercise very significant levels of discretion with inappropriately minimal input or oversight from Defendants; and

e) designating certain areas as "low value" and particular properties as "low value assets".

157.    The parameters of these policies are material to this litigation and constitute proper subjects of discovery.  Based upon the pervasiveness of the discriminatory conditions relating to the Deutsche Bank REO properties, there is a substantial likelihood that additional policies and practices of Defendants have had a disproportionately adverse impact on communities of color.

158.    The policy of designating areas and properties as "low value" and limiting property preservation work in those areas has a disparate impact on communities of color.

158A.  As regards the Deutsche Bank properties, the Defendants utilize a policy of designating certain areas as "low value" and particular properties as "low value assets," ("LVAs").  On this basis, Defendants deny and refuse to undertake property standard preservation work as to properties in these areas:

(1)  Pursuant to this "low value" policy, properties in communities of color are likely to be designated to be listed and sold "as is."  Beyond a short checklist of initial cleanout-related items, no work will be approved for low value, "as is" properties, regardless of the length of time the property is held before resale and regardless of the effects on the community.

(2)  Pursuant to this "low value" policy, Defendants fail and refuse to complete any work and repairs at properties with alleged local code violations.

(3)  If Asset Managers initially informally identify observable code violations in low value areas, Defendants will not approve Asset Managers' bids for work to correct code violations.

(4)  Once Defendants are in receipt of notice of local ordinance or zoning violations in areas they deem low value, which are typically communities of color, work on the

properties including cutting grass and snow removal is disallowed and frozen by the

Code Violation Department (CV Department), regardless of the length of time involved

and regardless of continued deterioration of the property, and regardless of detrimental

effect on blocks, neighborhoods and the value of the property or surrounding properties.

158B.  Whether a particular property is deemed and referred to as a low value asset is

based in whole or part on the area in which they are located, such as a zip code, town, or

neighborhood.  Areas deemed by Defendants as low value are typically communities of color.

Areas deemed by Defendants as high value are typically white communities.

158C.  Defendants treat "low value" areas and "high value" areas differently in terms of

the quality and quantity of property maintenance and upkeep.  Defendants will not expend funds

or approve bids to repair or maintain LVAs, regardless of negative impact on value and price of

the property, safety issues, contribution to or acceleration of instability of neighborhoods, code

violations, complaints of neighbors or Asset Managers, or repeated requests by assigned asset

managers for approval of needed work.  Bids of Asset Managers for work in LVAs may be met

with no response for months and even up through the sale of the property.

158D.  In contrast, Defendants will expedite, follow up on, repeatedly call Asset

Managers and otherwise act in highly proactive ways to ensure even minor work items are timely

completed in areas deemed high value or concerning properties deemed high value assets.  If

neighbors or others in areas deemed high value areas complain or even could complain about an

observed item, AltiSource aggressively pursues completing the work item and follows up on it,

whereas complaints relating to low value areas are ignored and work items disallowed.

Defendants will review and scrutinize the details, timeliness, and quality of work in areas they

deem high value. In contrast, Defendants will not approve or allow Asset Managers requests to complete work in areas Defendants deem low value.

158E. Derogatory reference is made by AltiSource to "hot zones," in addition to "low value." Both of these terms are used to describe perceived stereotypes as to communities of color regarding value, crime and presumed undesirability of zip codes and other similarly defined areas that Defendants determine do not receive funds for property upkeep. "Hot zones" are typically communities and neighborhoods of color. Ocwen confirms and/or communicates to AltiSource that areas or properties are deemed "low value" or "low value assets." Facilitating the consequences of the determination of a property as low value may be overseen by a Risk Services Coordinator, known as "RSC," employed by one or more of the Defendants to carry out their policy of ignoring properties in communities of color.

158F. AltiSource oversees management of Deutsche Bank assets in part through PODs (Point Of Direction) employees located overseas, including in Bangladesh and the Philippines. High level management and oversight of AltiSource PODs, as well as approvals and payments to Asset Managers contracted by AltiSource that are located in the United States are overseen by regional offices in the United States, who are also overseen by high level management employed by AltiSource in offices in Uruguay, and Luxembourg.

158G. Employees receive training and guidance from AltiSource and Ocwen that includes designating areas and properties as "low value" and disallowing work on properties in low value areas. AltiSource contracts with Asset Managers throughout the United States who are assigned a portfolio of properties. Asset Managers themselves perform work items and also engage subcontractors in various trades to complete necessary work. Asset managers in the United States submit bids using a centralized uniform electronic system ("XactPRM")

59

addressing work items, bids and payments, to PODs oversees in Bangladesh, the Philippines, and potentially other locations.

158H.   On each property, Asset Managers may complete a specified short list of initial items, corresponding to a pre-set payment schedule, after which they must submit bids using a system of estimating software provided by Defendants prior to completing non-standard line items (e.g. reglazing boarded up windows).   The initial pre-approved list of items include boarding up windows, changing locks, initial trimming of shrubs, changing light bulbs, checking light fixtures, checking Carbon Monoxide detectors, and checking smoke detectors.

158I.   To gain physical access to properties, AltiSource Asset Managers are equipped with judicial deeds demonstrating they are working on behalf of the property owner, e.g. Deutsche Bank.  Likewise, Asset Managers provide evidence of their authority on the part of the owner shown on judicial deeds to municipalities during Point of Sale Inspections.

158J.   Altisource uses an outside company for quality control inspections, but does not inspect or check on items contractors are prevented from completing.  Quality control inspections in high value areas that discover incomplete work items will result in a call or email from Altisource to the assigned contractor to ensure the work is completed.  In contrast, work is generally not approved or inspected for low value assets.

158K.   AltiSource bid reviewers are trained by AltiSource and/or Ocwen to review asset managers' requests for approvals of work in accord with Defendants' policies regarding properties deemed low value.  If an Asset Manager assigned to a property in the United States inquires about ignored or denied bids for needed work to a property considered low value, they may receive one or more the following responses from Altisource:  (a)  The client said we are not

approving these bids; or (b) The bids are pending investor approval, (c) LVA, property to be sold as is.

158L.   The policy of designating areas and properties as "low value" and denying property preservation work to those areas and properties has a disparate impact on communities of color.  The cumulative effect of Defendants' policies and practices with respect to low value assets is to drive the market value of the particular properties further down, as well as to drive down the market value of other properties in neighborhoods and communities of color.

### G. DEFENDANTS' DISCRIMINATORY MAINTENANCE AND MARKETING OF REO PROPERTIES PERPETUATES SEGREGATION

159.   One of the fundamental purposes of the Fair Housing Act is to eliminate segregated housing patterns and to increase integration.

160.   The "dissimilarity index" is a well-recognized standard for evaluating a community's level of segregation.  The index measures whether one particular racial group is distributed across census tracts in the metropolitan area in the same way as another racial group. A high dissimilarity index indicates that the two groups tend to live in different tracts.  The index ranges from 0 to 100.  A value of 60 or more is considered a very high level of segregation.  It means that 60% (or more) of the members of one group who reside in the area would need to move to a different tract within that area in order for the two groups to be equally distributed. Values between 40 and 50 demonstrate a moderate level of segregation, and values of 30 or below indicate a low level of segregation.

161.   The cities in which Plaintiffs investigated Defendants' maintenance of the Deutsche Bank REO properties are located in metropolitan areas that are racially segregated, as indicated by have the following dissimilarity indexes:

| Metro Area/City | 2010 Black-White Dissimilarity Index | 2010 Hispanic-White Dissimilarity Index |
|---|---|---|
| Chicago | 75.2 | 56.3 |
| Milwaukee | 79.6 | 57.0 |
| Cleveland | 72.6 | 52.3 |
| Detroit (Suburban) | 74.0 | 43.3 |
| Dayton | 63.3 | 27.3 |
| Toledo | 63.2 | 31.4 |
| Columbus | 60.0 | 41.4 |
| D.C. & Prince George's | 61.0 | 48.3 |
| Memphis | 62.2 | 50.7 |
| Baltimore | 64.3 | 39.8 |
| Hampton Roads | 46.9 | 32.2 |
| Orlando | 49.3 | 40.2 |
| Minneapolis | 50.2 | 42.5 |
| Indianapolis | 64.5 | 47.3 |
| Baton Rouge | 57.2 | 32.7 |
| Denver | 59.4 | 48.8 |
| Dallas | 55.5 | 50.3 |
| Gary | 76.8 | 43.7 |
| Hartford | 62.3 | 58.4 |
| New Orleans | 63.3 | 38.3 |
| Grand Rapids | 61.4 | 50.4 |
| Muskegon | 71.2 | 30.4 |
| Greater Palm Beaches | 57.3 | 42.6 |
| Miami | 64.0 | 57.4 |
| Tampa | 54.3 | 40.7 |
| Richmond | 51.6 | 44.9 |
| Philadelphia | 67.0 | 55.1 |
| Providence | 50.8 | 60.1 |
| Vallejo and Richmond CA | 41.5 | 29.2 |
| Kansas City | 58.6 | 44.4 |

162.     The cities in which the Defendants' maintenance and marketing of the Deutsche Bank REO properties were investigated are moderately or highly segregated under the dissimilarity index measure.  The fact of high rates of segregation in these cities was known to the Deutsche Bank Defendants, Altisource and Ocwen.

163.     As described above in Section IV.B., in all the cities examined and across all time periods, Defendants have failed to maintain and market REO dwellings in communities of color

to the same standards as REO dwellings in predominantly white neighborhoods. By failing to maintain and market REO dwellings in communities of color to the same standards as REO dwellings in predominantly white neighborhoods were maintained, Defendants have perpetuated segregation in several ways.

164.    The failure to maintain and market REO dwellings in communities of color according to the same standards as REO dwellings in predominantly white neighborhoods were maintained has stigmatized communities of color as less desirable than predominantly white communities. The prospects for integration in the affected communities have been reduced because buyers are deterred from purchasing properties in neighborhoods with poorly maintained REO properties, leaving the segregated racial composition of these neighborhoods unchanged.

165.    The existence of poorly maintained REO dwellings in minority neighborhoods diminishes home values for surrounding homeowners. Lower home values in communities of color restrict the ability of minority homeowners to move to majority-white or integrated neighborhoods by reducing the equity they can utilize to buy a new home.

166.    As a result of Defendants' discriminatory maintenance and marketing of the Deutsche Bank REO properties, Defendants have perpetuated segregation in the foregoing metropolitan areas and thwarted Congressional efforts to eradicate segregated housing patterns, and neighborhood residents have been deprived of the social, economic and professional benefits of living in an integrated community.

## V.  INJURIES CAUSED BY DEFENDANTS' BEHAVIOR

167.    In the context of the national foreclosure crisis, the Plaintiffs became aware of disparities in the routine exterior maintenance and marketing of REO properties in communities of color. Plaintiffs received complaints and feedback from neighbors living in proximity to these

properties and observed firsthand problems in communities that they serviced and had invested funds into for neighborhood stabilization and increasing homeownership. An important part of the missions of the Plaintiff organizations is to monitor and respond to conduct and conditions in the housing market that are indicative of discrimination.

168.    Based on this information and consistent with the missions of the Plaintiff agencies, Plaintiffs investigated this anecdotal information and determined that a larger, systemic problem existed. Prior to pursuing administrative action or litigation directed toward this problem, Plaintiff NFHA published and disseminated reports describing Plaintiffs' preliminary findings and held news conferences in the hope that Defendants would investigate and voluntarily undertake any needed remedial actions.

169.    As described in more detail below, the failure of Defendants to respond to this situation has led Plaintiffs to incur substantial injuries, damages and expenditures that might have otherwise been avoided.

## A.  INJURY TO ALL PLAINTIFFS

170.    The quantitative, qualitative, anecdotal and other supporting evidence pleaded by Plaintiffs indicates a sufficiently direct causal connection between the abdication of duties and other policies and conduct of Defendants and the injuries suffered by Plaintiffs.

171.    The Defendants' abdication and other policies and conduct directly caused differential property maintenance based on race. The regression analysis conducted by Plaintiffs rules out various potential non-racial explanations for the differing maintenance between REOs owned by the Deutsche Bank Defendants in minority and non-minority neighborhoods. To the extent that the Deutsche Bank Defendants seek to rebut these allegations, factual questions are presented.

64

172.    The injuries flowing from Defendants' gross differential property maintenance on racial lines are immediate and inevitable consequences of Defendants' discriminatory policies and conduct.   These direct consequences include:  (a) the loss of  the economic value and negative impact on Plaintiffs' investments in minority communities to promote fair housing and community stabilization; (b) the frustration of Plaintiffs' mission as fair housing organizations; (c) the necessary initiation and implementation of costly and time-consuming investigations and counteractive measures by Plaintiffs in response to Defendants' conduct; (d) the diversion of resources from other  programs central to Plaintiffs' mission;  and (e) harm to minority neighborhoods in terms of diminished property value, safety and habitability, including offices of Plaintiffs located in affected neighborhoods.

173.    Plaintiffs will offer expert and anecdotal evidence at trial establishing that each of these injuries is an immediate and direct result of Defendants' discriminatory conduct.  Aspects of this evidence are described in the allegations below.

**1.  Loss of Economic Value and Impact of Community Investments**.

174.    The organizational plaintiffs made very significant financial investments totaling millions of dollars in the neighborhoods affected by REO blight, including neighborhoods where assessments of Deutsche Bank REOs were performed.  These investments included down payment, match funds and closing cost assistance to homeowners, property rehabilitation assistance, rent assistance and community revitalization.  For example, NFHA has made investments in many cities across the United States via its Inclusive Communities and Community development initiatives, including:  Oakland, CA; Napa, CA; San Raphael, CA; Denver, CO; Indianapolis, IN; Dallas/Fort Worth, TX; Prince George's County, MD;

Washington, D.C., Melbourne, FL; Rockledge, FL; Miami, FL; West Palm Beach, FL , Savannah, GA; Minneapolis, MN and Philadelphia, PA.

175.     Another organizational plaintiff, the Continuum, worked with the Community Housing Initiative in Brevard, Florida, to match or exceed the match on funds with already existing programs to purchase, rehab and sell dozens of REO properties to first time homeowners in Melbourne, Titusville, Orlando, Palm Bay and Winter Garden, Florida.

176.     Plaintiff HOPE Fair Housing Center made significant investments in Elgin Illinois ad in the Austin neighborhood of Chicago.  In Elgin, HOPE provided funds to overcome the "appraisal gap": work needed to rehabilitate a home despite the anticipated property appraisal given that foreclosures diminished values in the local market.  Such programs are representative of the financial investments made by the Plaintiff Fair Housing Organizations.  Investments of this nature have been leveraged to obtain additional corporate funding and foundation grants.

177.     Cities and municipalities served by the Plaintiff Fair Housing organizations also receive substantial funding to meet Fair Housing Act goals of affirmatively furthering fair housing, rebuilding neighborhoods, creating suitable living environments, providing for safer neighborhoods, and combatting discriminatory and segregated housing conditions.  Fair Housing organizations, including the Plaintiffs, receive and utilize funds and take actions to assist municipalities in meeting these goals.

178.     Plaintiffs' various financial investments in minority communities have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank-owned homes in the same communities.  For example, as a direct result of poorly maintained REO properties in minority neighborhoods, lowered property values of nearby homes have interfered with sales going forward, negatively impacting community redevelopment

66

efforts.  In addition, private developers have been thwarted and deterred from investing in minority neighborhoods affected by REO blight, further diminishing community redevelopment.

**2.  Frustration of Mission**.

179.    The fundamental missions of the Plaintiff Fair Housing Organizations are eradicating housing discrimination and segregation, investing substantially in minority communities to improve their conditions, investigating and responding to discriminatory conduct and conditions in the housing market, and conducting education, outreach and counteractive measures in response to discriminatory conduct.

180.    The Plaintiff Fair Housing Organizations' core missions are frustrated by defendants' unlawful conduct negatively impacting the ability of minorities to sell and purchase homes, diminishing the availability of housing in minority communities and interfering with the integration of racially segregated communities.  By creating conditions antithetical to the mission of the Plaintiff Fair Housing Organizations, the Defendants impeded the Plaintiffs' organizational goals and diminished the effects of their efforts to carry out their mission.

181.    Defendants' widespread unlawful conduct had the direct effect of undermining the efficacy of Plaintiffs' education, advocacy and training programs designed to promote fair housing.

**3.  Implementation of Counteractive Measures.**

182.    Plaintiff Fair Housing Organizations are obligated to affirmatively further fair housing as required by the FHA, their contractual obligations and their organizational purposes. Based on complaints and information received regarding REO blight, the Plaintiffs investigated, tested and responded to poorly maintained REOs in minority neighborhoods.  For example, NFHA received complaints from community neighbors related to serious problems caused by the

condition of Deutsche Bank REO properties. For example, NFHA received a letter from eleven

neighbors living near the Deutsche Bank REO property at 6515 Walters Place in District

Heights, Maryland about a property that had been set on fire by squatters living there while it

was under Deutsche Bank ownership.

183.    The counteractive measures engaged in by Plaintiffs include community outreach

and public efforts to raise awareness of these discriminatory practices in the communities served

by Plaintiffs in order to diminish the effects of Defendants' conduct. Plaintiffs specifically

developed and implemented programs designed to ameliorate the effects of REO blight.

184.    Defendants' failure to address concerns raised by the Plaintiff Fair Housing

Organizations regarding REO blight necessitated additional efforts to counteract Defendants'

conduct through testing, litigation and the design of strategies targeted toward curbing

Defendants' unlawful behavior.

**4. Diversion of Resources.**

185.    As a direct result of Defendants' discriminatory practices, the Plaintiff Fair

Housing Organizations were forced to divert resources and delay, suspend or forgo other existing

programs or projects. For example, NFHA had to forgo conducting sales investigations to

combat racial steering because staff was needed to conduct REO investigations across the

country. Despite this effect on Plaintiffs' other programs and services, Plaintiffs nevertheless

shifted resources to these counteractive measures because, if left unaddressed, Defendants'

discriminatory policies would detrimentally impact Plaintiffs' communities and the constituents

they serve.

186.    Defendants' unlawful practices have forced the Plaintiff Fair Housing

Organizations to divert scarce resources away from their usual education, counseling,

68

investigation, and capacity-building activities and services. As Defendants' discriminatory activities persist, addressing and counteracting Defendants' discriminatory conduct will continue to require a substantial diversion of resources by Plaintiffs away from their usual activities.

187. Examples of the diversion and expenditure of financial resources and staff time, include, but are not limited to: time and costs associated with drafting and distributing educational materials; mailing costs and graphic design expenses; travel time and expenses; expert fees, investigative and analytic activities; and litigation support.

**5. Harms To Minority Neighborhoods Served by Plaintiffs.**

188. Plaintiff Fair Housing Organizations serve minority neighborhoods that have been severely impacted by REO blight and operate offices in areas where investigations of Deutsche Bank REOs were performed.

189. Defendants' unlawful practices have harmed these minority neighborhoods in terms of diminished property values, safety, habitability, housing opportunities and community redevelopment. The experience of the Plaintiff Fair Housing Organizations in their service areas is that minimal real estate development and community development occurs in areas where REO blight is prevalent. The Plaintiff Fair Housing Organizations are further informed about the difficulties facing purchasers seeking to obtain loans to purchase homes in communities suffering from REO blight because poorly maintained REO properties impact appraisal values. The Plaintiff Fair Housing Organizations are further informed about dangerous conditions at REO properties maintained by Defendants that Defendants failed to remedy.

190. The detrimental effects of deficient REO properties on neighborhoods and real estate transactions were known to the Plaintiff organizations and the communities and individuals they serve as described herein, and have been widely reported concerning the

neighborhoods at issue in this case where the Plaintiff organizations investigated Deutsche Bank property addresses. (*See e.g.* https://www.mydaytondailynews.com/news/local-govt--politics/one-six-structures-sit-empty-city/z1KjsBNlkaDorQlcemD9tO/("Vacant homes and buildings drag down property values, attract criminal activity and provide neighbors with a disincentive to invest in their properties"); https://www.daytondailynews.com/news/crime--law/neighborhoods-where-women-found-plagued-blight-vacant-homes/buuQivwUO8QAL4Op00iSAL/; https://www.baltimoresun.com/news/maryland/politics/bs-me-ci-vacant-house-rehabs20180906-story.html.

191.    The foregoing injuries (summarized in subsections 1 through 5 above) have caused Plaintiffs to incur costs that are above and beyond the operational activities and costs normally expended by Plaintiffs.

192.    The foregoing injuries that Plaintiffs have suffered as a result of Defendants' conduct fall within the zone of interests protected by the Fair Housing Act.

193.    The foregoing injuries that Plaintiffs have suffered are neither speculative nor hypothetical, but are direct, inevitable and severe consequences of Defendants' unlawful conduct.

**B.  INJURIES TO INDIVIDUAL PLAINTIFFS**

194.    Each Plaintiff has suffered direct, particularized and concrete injuries caused by Defendants' discriminatory conduct. As discussed below, many of the Plaintiffs have made direct financial investments in the communities against which Defendants have discriminated, which have been negatively impacted. The negative effects of Defendants' discrimination include effects related to CDBG funding and grants received by many of the Plaintiffs.

**National Fair Housing Alliance**

195.   As a national organization with the mission of eradicating housing discrimination and segregation, NFHA works to monitor, investigate and respond to evolving conditions in the housing market that indicate the presence of discriminatory conduct.  In this capacity, NFHA became aware of complaints and conditions relating to the inequitable maintenance of REO properties in communities of color.  As a result, and consistent with its mission, NFHA undertook to evaluate the scope and causes of this problem.

196.   Over the course of eight years, Plaintiff NFHA has conducted hundreds of inspections of Deutsche Bank REO properties across the nation.  NFHA has also conducted joint inspections with all of the other Plaintiffs listed below.  In total, NFHA has expended over 2044 hours on its investigation into Defendants' discriminatory maintenance and marketing of the Deutsche Bank REO properties and resulting from and attributable to Defendants' conduct.

197.   As a result of this expenditure of time and resources, NFHA diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused NFHA to forgo opportunities, including executing new fair housing advocacy projects and investigations, conducting additional consulting and training of housing providers, applying for new grants and funding sources, and attending conferences and professional staff development.

198.   In addition, NFHA engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct.  NFHA's efforts include:  meeting with local, state, and federal government officials (including the Federal Reserve Board, legislators, and at least ten local governments/jurisdictions); authoring and distributing reports about discrimination in the maintenance of REO properties, which were subsequently provided to local and state

71

governments; presenting numerous fair housing trainings regarding REO maintenance to real estate professionals and bank employees; planning and sponsoring a national conference on REO maintenance; and serving as keynote speaker and making presentations on numerous panels regarding the economic impact of discriminatory REO maintenance.

199.    Defendants' actions have also frustrated the mission and purpose of NFHA.  As described in greater detail above, NFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices impede its efforts and frustrate its mission.

200.    Finally, NFHA has expended at least $5.5 million of its own funds to engage in community development, home ownership promotion, and neighborhood stabilization efforts across the nation.  NFHA's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in those communities.

**Fair Housing Advocates of Northern California (formerly Fair Housing of Marin)**

201.    Plaintiff Fair Housing Advocates of Northern California conducted inspections of Deutsche Bank REO properties across the greater Solano and Contra Costa counties, expending over 215 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

202.    As a result of this expenditure of time and resources, FHANC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: consulting opportunities, professional staff development, coalition and advocacy meetings, work on local and regional housing policies, expansion of fair housing programs, and new or additional funding applications.

203. In addition, FHANC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: meeting with government officials regarding REO maintenance, including visits to senators and representatives on Capitol Hill; meeting with local service providers such as Housing and Economic Rights Advocates; creating and distributing public service announcements and conducting radio campaigns; publishing advertisements in local newspapers; sending specialized mailings to neighbors of REO properties; participating in community events; and engaging with media to raise awareness of REO-related issues.

204. Defendants' actions have also frustrated the mission and purpose of FHANC. As described in greater detail above, FHANC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

205. Finally, FHANC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including foreclosure prevention, counseling and education. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in neighborhoods of color in the greater Solano and Contra Costa counties.

**Central Ohio Fair Housing Association**

206. Plaintiff Central Ohio Fair Housing Association conducted inspections of Deutsche Bank REO properties, expending over 59 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

207. As a result of this expenditure of time and resources, COFHA diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or

even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: community and coalition meetings, professional staff development, and new funding applications.

208.    In addition, COFHA engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting outreach and trainings for real estate agents in the greater Columbus metropolitan region; providing educational materials and meeting with local code or government officials regarding REO maintenance; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events, including presentations to Habitat for Humanity Mid-Ohio, Somali Community Association of Ohio, Legal Aid Society of Columbus, and Columbus Realtists Association; engaging with media to raise awareness of REO-related issues; and meeting with officials from the City of Columbus and Franklin County, Ohio.

209.    Defendants' actions have also frustrated the mission and purpose of COFHA. As described in greater detail above, COFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

210.    Finally, COFHA has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in neighborhoods of color in the greater Columbus metropolitan region.

**Connecticut Fair Housing Center**

211.    Plaintiff Connecticut Fair Housing Center, Inc. conducted inspections of Deutsche Bank's REO properties throughout Connecticut, expending over 285 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

212.    As a result of this expenditure of time and resources, CFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including, but not limited to, developing new or additional fair housing investigations, community and coalition meetings, consulting and training opportunities, new funding applications, and professional staff development.

213.    In addition, CFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: conducting classes for more than 100 real estate agents on their obligations to maintain REO properties in a non-discriminatory manner; testifying at legislative hearings at the Connecticut legislature on blight bills to raise awareness of the problems caused by differential treatment of REO properties; meeting with the Mayor of New Haven to highlight problems with REO properties in her city; and discussing REO maintenance with Connecticut's Congressional delegation during meetings on fair housing problems in Connecticut.

214.    Defendants' actions have also frustrated the mission and purpose of CFHC. As described in greater detail above, CFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

75

**Denver Metro Fair Housing Center**

215.    Plaintiff Denver Metro Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Denver metropolitan area, expending over 250 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

216.    As a result of this expenditure of time and resources, DMFHC diverted limited resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including consulting and training opportunities, new funding applications, professional staff development, and new or additional fair housing investigations.

217.    In addition, DMFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. DMFHC's efforts include: organizing and conducting trainings regarding REO maintenance for housing providers, municipal housing employees, HUD housing counseling agency staff, and the general public in the greater Denver Metro region; meeting with local government officials regarding REO issues, including the Denver Regional Council of Governments, City and County of Denver, City of Aurora, and the State of Colorado Division of Housing; preparing and publishing brochures/reports; creating public service announcements and advertising; designing specialized mailings; participating in community events, including the Montbello 50th Anniversary Fair; and engaging with media to raise awareness for REO-related issues.

218.    Defendants' actions have also frustrated the mission and purpose of DMFHC. As described in greater detail above, DMFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance

practices directly impede its efforts and frustrate its mission. Finally, DMFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Denver metropolitan region.

**Fair Housing Center of Central Indiana**

219.     Plaintiff Fair Housing Center of Central Indiana, Inc. conducted inspections of Deutsche Bank REO properties across the greater Indianapolis metropolitan region, expending over 161 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

220.     As a result of this expenditure of time and resources, FHCCI diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: fair housing training opportunities, new funding applications, professional staff development, and expanded forms of education and outreach.

221.     In addition, FHCCI engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. FHCCI's efforts include organizing and conducting trainings for community development and neighborhood organizations in the greater Indianapolis region; meeting with local community development organizations and government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; creating public service announcements for local print and radio; designing specialized mailings; and engaging with media to raise awareness of REO-related issues and answer media related inquiries.

222.    Defendants' actions have also frustrated the mission and purpose of FHCCI. As described in greater detail above, FHCCI's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

223.    Finally, FHCCI has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Indianapolis metropolitan region.

**Fair Housing Center of the Greater Palm Beaches**

224.    Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. conducted inspections of Deutsche Bank REO properties across the greater Palm Beach metropolitan region and expended over 168 hours over the course of this investigation and resulting from and attributable to Defendants' conduct.

225.    As a result of this expenditure of time and resources, FHCGPB diverted resources and time away from other intended projects and programs, and was required to suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including fair housing education and consulting opportunities with housing providers and municipalities and new funding applications.

226.    In addition, FHCGPB engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: presenting over a dozen workshops to community service providers and local housing providers regarding REO maintenance; disseminating anti-

78

discrimination literature; and counseling citizens of the greater Palm Beach metropolitan region on their fair housing rights under federal, state, and local fair housing laws.

227.    Defendants' actions have also frustrated the mission and purpose of FHCGPB. As described in greater detail above, FHCGPB's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Fair Housing Center of West Michigan**

228.    Plaintiff Fair Housing Center of West Michigan conducted inspections of Deutsche Bank's REO properties across the western Michigan region, expending over 200 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

229.    As a result of this expenditure of time and resources, FHCWM diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including community meetings and collaborative efforts, consulting opportunities, conferences and staff development, other systemic investigations, and funding applications.

230.    In addition, FHCWM engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: holding workshops regarding REO issues at its Fair Housing Luncheon & Workshop Series; meeting with local code or government officials regarding REO maintenance; meeting with local service providers, stakeholders and community groups; preparing and publishing newsletters; participating in community events; and engaging with media to raise awareness of REO-related issues.

231.    Defendants' actions have also frustrated the mission and purpose of FHCWM. As described in greater detail above, FHCWM's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

232.    Finally, FHCWM has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the Western Michigan region.

**Fair Housing Continuum**

233.    The Fair Housing Continuum, Inc. conducted inspections of Deutsche Bank REO properties in the central Florida region, expending over 940 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

234.    As a result of this expenditure of time and resources, the Continuum diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: new or additional fair housing investigations, individual complaint enforcement, fair housing training opportunities, and professional staff development.

235.    In addition, the Continuum engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include 141 presentations or speaking engagements related to REO issues from July 2013 through Sept. 2016 as well as engaging with media to raise awareness of REO-related issues.

236.     Defendants' actions have also frustrated the mission and purpose of the
Continuum. As described in greater detail above, the Continuum's mission is to ensure equal
housing opportunities and to fight unlawful discrimination and segregation. Defendants'
discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Greater New Orleans Fair Housing Action Center**

237.     Plaintiff Greater New Orleans Fair Housing Action Center conducted inspections
of Deutsche Bank REO properties across the New Orleans and Baton Rouge metropolitan areas,
expending over 200 hours throughout the course of this investigation and resulting from and
attributable to Defendants' conduct.

238.     As a result of this expenditure of time and resources, GNOFHAC diverted
resources and time away from other intended projects and programs, and was required to delay
or suspend such programming. Defendants' discriminatory conduct caused Plaintiff to forgo
opportunities including presenting fair housing courses and to delay work related to its annual
outreach and education events, as well as planned investigations.

239.     In addition, GNOFHAC engaged in significant community outreach and public
efforts in order to address and attempt to counteract the effects of Defendants' conduct.
GNOFHAC's efforts include: organizing and conducting trainings to groups of service providers
in the Greater New Orleans area, including meeting with BlightsOut, an organization dedicated
to eradicating blight; meeting with government officials regarding REO maintenance; creating
public service announcements and advertising in local print and radio; participating in
community events, including the Mission Possible Conference with over 100 conference
attendees, and engaging with media to raise awareness of REO-related issues.

240.     Defendants' actions have also frustrated the mission and purpose of GNOFHAC.
As described in greater detail above, GNOFHAC's mission is to ensure equal housing

opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

241.    Finally, GNOFHAC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater New Orleans metropolitan region.

**HOPE Fair Housing Center**

242.    Plaintiff H.O.P.E. Inc. d/b/a HOPE Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Chicago metropolitan region, expending over 1115 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

243.    As a result of this expenditure of time and resources, HOPE diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: consulting opportunities, new funding applications, professional staff development, and community and coalition meetings.

244.    In addition, HOPE engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for a regional coalition of housing providers, non-profit service providers and government staff in the greater Chicago metropolitan region; meeting with local code or government officials regarding REO maintenance in Elgin and other local municipalities; meeting with local service providers and real estate trade organizations; preparing and publishing brochures/reports; designing targeted

websites and specialized mailings; participating in community events, including the Chicago Urban League Homebuyers Fair, among others; and engaging with media to raise awareness of REO-related issues.

245.    Defendants' actions have also frustrated the mission and purpose of HOPE.  As described in greater detail above, HOPE's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

246.    HOPE has also expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Chicago metropolitan region.

**Housing Opportunities Made Equal of Virginia**

247.    Plaintiff Housing Opportunities Made Equal of Virginia trained to gain necessary expertise and conducted inspections of Deutsche Bank's REO properties in Virginia, expending over 561 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

248.    As a result of this expenditure of time and resources, HOME of Virginia diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including education and outreach activities that would have furthered its mission, training on volunteer recruitment, fair housing planning consulting work, community meetings and collaborative efforts, advocacy efforts to add sexual orientation protections to the Virginia Fair Housing Act, and the delay of its internal strategic planning exercises.

249.     In addition, HOME of Virginia engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: extensive work to prevent foreclosures by providing foreclosure prevention counseling to hundreds of Virginians beyond any contract to do so and expending its own funds; corresponding with City officials regarding REO maintenance and ongoing costs to the localities; meeting with community development corporations; and engaging with media to raise awareness of REO-related issues.

250.     Defendants' actions have also frustrated the mission and purpose of HOME of Virginia. As described in greater detail above, HOME of Virginia's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Housing Opportunities Project for Excellence (HOPE Inc.)**

251.     Plaintiff Housing Opportunities Project for Excellence, Inc., conducted inspections of Deutsche Bank REO properties across the state of Florida (including its Miami-Dade and Broward Counties service area and assisting in Greater Palm Beaches area investigations) and expended over 179 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

252.     As a result of this expenditure of time and resources, HOPE, Inc. diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including resource development, public policy advocacy, identifying opportunities to educate underserved and unserved populations, utilizing research and technology to identify discriminatory trends in housing, and furtherance of the organization's Strategic Plan.

84

253.    In addition, HOPE, Inc. engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include:  preparation and publication of newsletter articles promoting community awareness; engagement with media to raise awareness of REO-related issues; and development of educational presentations inclusive of REO-related topics, including homebuyer/foreclosure prevention workshops, housing provider trainings, and local (Miami-Dade and Broward County) and statewide (Florida) fair housing workshops.

254.    Defendants' actions have also frustrated the mission and purpose of HOPE, Inc. As described in greater detail above, HOPE Inc.'s mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Fair Housing Center for Rights & Research**

255.    Plaintiff Fair Housing Center for Rights & Research conducted inspections of Deutsche Bank REO properties across the greater Cleveland metropolitan area between July 2014 and February 2017, expending over 162 hours over the course of this investigation and resulting from and attributable to Defendants' conduct.

256.    As a result of this expenditure of time and resources, FHCRR diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such activities.

257.    In addition, FHCRR engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. FHCRR's efforts include: the discussion of REO maintenance issues in more than 250 presentations to housing providers and real estate agents in Northeast Ohio; and engaging with media to raise awareness of REO-related issues.

85

258.     Defendants' actions have also frustrated the mission and purpose of FHCRR. As described in greater detail above, FHCRR's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Miami Valley Fair Housing Center**

259.     Plaintiff Miami Valley Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Miami Valley region, expending over 114 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

260.     As a result of this expenditure of time and resources, MVFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: consulting and training opportunities, community and coalition meetings, new funding applications, and professional staff development.

261.     In addition, MVFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for real estate agents, property managers, municipal government employees, and the general public in the greater Miami Valley region; meeting with local code or government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events (including presentations to the Latino Connection, the Dayton Area Realtists, Catholic Social Services, the Dayton Mortgage Broker's Association, and the Ahiska Turkish American Community Center);

86

and engaging with media to raise awareness of REO-related issues. MVFHC has also been responsible for maintaining the database on which the results of the investigation in this case have been maintained.

262. Finally, MVFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Miami Valley region.

263. Defendants' actions have also frustrated the mission and purpose of MVFHC. As described in greater detail above, MVFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**North Texas Fair Housing Center**

264. Plaintiff North Texas Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Dallas-Fort Worth metropolitan region, expending over 240 hours throughout the course of the investigation and resulting from and attributable to Defendants' conduct.

265. As a result of this expenditure of time and resources, NTFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including expanded forms of outreach and coalition-building, professional staff development, and new funding applications.

266. In addition, NTFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct.

87

Plaintiff's efforts include: organizing and conducting trainings for social service providers and property management personnel in the Dallas-Fort Worth region; meeting with local government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures; creating public service announcements and advertising in local print and radio; designing specialized mailings; participating in community events, including community resource fairs; and engaging with media to raise awareness of REO-related issues.

267.    Defendants' actions have also frustrated the mission and purpose of NTFHC. As described in greater detail above, NTFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

268.    NTFHC has also spent its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Dallas-Fort Worth region.

**Metropolitan Milwaukee Fair Housing Council**

269.    Plaintiff Metropolitan Milwaukee Fair Housing Council conducted inspections of Deutsche Bank REO properties across the greater Milwaukee metropolitan area, expending over 102 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

270.    As a result of this expenditure of time and resources, MMFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo

opportunities including fair lending outreach and education, fair housing outreach and education, fair housing investigations, data collection activities, and housing industry trainings.

271. In addition, MMFHC engaged in community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include conducting REO-related presentations and meetings with government officials, community organizations, academic institutions, housing providers, individual realtors and realtors' associations, neighborhood associations, lending institutions, community activists, faith-based institutions, and homeowners and residents of neighborhoods affected by discriminatory REO maintenance and marketing practices.

272. Defendants' actions have also frustrated the mission and purpose of MMFHC. As described in greater detail above, MMFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Open Communities**

273. Plaintiff Open Communities conducted inspections of Deutsche Bank REO properties in the greater Chicago metropolitan region, expending over 60 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

274. As a result of this expenditure of time and resources, Open Communities diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including conducting fair housing testing and investigations, holding landlord and tenant mediation services, performing community outreach and professional staff development.

275.    Defendants' actions have also frustrated the mission and purpose of Open Communities. As described in greater detail above, Open Communities' mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**South Suburban Housing Center**

276.    Plaintiff South Suburban Housing Center conducted inspections of Deutsche Bank REO properties across the greater Chicago metropolitan area, and the Gary, northwest Indiana area, expending over 288 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

277.    As a result of this expenditure of time and resources, SSHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including additional fair housing complaint intakes and investigations, fair housing presentations for the general public and housing providers, counseling and advocacy on behalf of mortgage-distressed discrimination victims, and expanded forms of outreach and coalition-building.

278.    In addition, SSHC has engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct.  Plaintiff's efforts include conducting REO-related presentations and meetings with municipal and county officials, community organizations, housing providers, individual realtors and realtors' associations, lending institutions, community service agencies, faith-based institutions, and homeowners and residents of communities affected by discriminatory REO maintenance and marketing practices.

279.     Defendants' actions have also frustrated the mission and purpose of SSHC. As described in greater detail above, SSHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

280.     Finally, SSHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including down payment assistance and mortgage distress assistance programs. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Chicago and Gary, Indiana metropolitan areas.

**Toledo Fair Housing Center**

281.     Plaintiff, Toledo Fair Housing Center, conducted inspections of Deutsche Bank REO properties across the greater Toledo metropolitan area, expending over 78 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

282.     As a result of this expenditure of time and resources, TFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including providing fair housing training to community partners, attending conferences and other forms of professional staff development, and advocating for housing discrimination victims.

283.     In addition, TFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for housing industry

91

professionals and the general public in the Northwest Ohio region; meeting with government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; participating in community events and meetings; engaging with media to raise awareness of REO-related issues; interviewing neighbors; and participating in neighborhood beautification and revitalization efforts.

284.    Defendants' actions have also frustrated the mission and purpose of TFHC. As described in greater detail above, TFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

285.    Finally, TFHC has expended its own funds to engage in community development, homeownership promotion, neighborhood stabilization, foreclosure prevention and beautification efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Toledo metropolitan region.

## C.  INJURIES TO NEIGHBORHOOD RESIDENTS AND COMMUNITIES

286.    The appropriate maintenance and marketing of REO dwellings is vital to the stability of neighborhoods and to the economic, social and physical well-being of their residents. REO properties that are poorly maintained have significant, negative outcomes to a neighborhood, affecting the health and safety of surrounding residents and otherwise interfering with the rights of homeowners in communities of color to enjoy their homes in a manner free of discrimination.  Academic and government reports document the negative effects of neglected vacant properties on nearby homeowners, neighborhoods and local governments.  See e.g., Government Accountability Office, Vacant Properties:  Growing Number Increases

92

Communities' Costs and Challenges, GAO-12-34 (Nov. 4, 2011), at p. 27-48 (available at http://www.gao.gov/products/GAO-12-34).

287.    REO properties that are poorly maintained lead to increased crime. A home with unsecured doors, broken windows, overgrown grass or trash around the property signals to vandals and looters that the property is abandoned and makes the home and neighborhood a target for illegal activity.

288.    REO properties that are poorly maintained create health and safety issues. Poorly maintained REO properties lead to an increase in accidents, rodent and insect infestations and decay. According to a report by the American Heart Association, living near a foreclosed home can also increase a person's blood pressure "due in part to unhealthy stress from residents' perception that their own properties are less valuable, their streets less attractive or safe and their neighborhoods less stable."[5]

289.    REO properties that are poorly maintained and marketed stigmatize communities and significantly diminish home values for surrounding homeowners. Failure to carry out basic maintenance of REO properties decreases the likelihood of timely sales and decreases the value and sale price of REO properties, which, in turn, decreases property values in the neighborhood. Homes that appear abandoned and look unsightly due to poor maintenance will often deter real estate agents from showing the REO properties or surrounding homes to owner-occupant homebuyers. As shoddy maintenance and neglect result in deteriorating appearances and physical conditions for REO properties, their availability for sale is adversely affected, constraining housing options in impacted communities.

---

[5] http://m.newsroom.heart.org/news/living-near-foreclosed-property-linked-to-higher-blood-pressure

290.    Based on the familiarity of the Plaintiffs with REO properties in their service

areas, and the factors that bear upon marketability of residential real estate, Defendants' failure

to maintain and market REO properties in communities of color has had the effect of dissuading

purchasers from buying these properties.  For example, in Baltimore, developments were

hindered and developers did not want to pursue projects in areas where there was REO blight.  In

the Park Heights neighborhood, over $775,000 of public funds was invested in renovating vacant

homes across from a renovated elementary-middle school.  Even after these home and school

renovations, the renovations still sat vacant.

(https://www.baltimoresun.com/news/maryland/politics/bs-me-ci-vacant-house-rehabs20180906-

story.html).  NFHA investigated six (deficient) Deutsche Bank REO properties in this

neighborhood's zip code, 21215, and specifically investigated two properties only two blocks

away from the City's renovation.

291.    Poor maintenance and marketing of an REO property makes the property

significantly more likely to end up in the hands of an investor, rather than an owner-occupant.

Investor-purchased REOs often result in a number of negative outcomes for the surrounding

area, including a decrease in property values and a higher risk of abandonment.  Communities

with high investor ownership are more likely to become high rental, less stable communities, and

afford fewer opportunities for owner-occupied purchases.  Investor-owned properties

detrimentally affect property values and encourage disinvestment in neighborhoods.

292.    Deutsche Bank's auction-based sales model with Ocwen/Altisource requires

buyers to pay cash for a property.  This model is designed to attract primarily investors who have

cash resources for purchase.  The typical owner-occupant buyer must secure a mortgage loan,

which limits such purchases of Deutsche Bank-owned foreclosures.

293.    Based upon a review of property records for the sale outcomes of 79 properties in Memphis, Tennessee, 70% of REO properties that were poorly maintained (i.e., had 10 or more maintenance or marketing deficiencies) were sold to investors, while only 46% of well-maintained homes went to investors.  In communities of color, homes that were poorly maintained and marketed were significantly more likely to have been sold to investors as opposed to owner-occupants.

294.    Considering this data together with neighborhood race, of the REOs in communities of color, 70% went to investors while only 18% in white communities were sold to investors.  Only 24% of the REOs in communities of color went to owner-occupants, while 78% of REOs in predominantly white communities were purchased directly by owner-occupants.

295.    Poorly maintained foreclosure properties also impose a heavy burden on local municipalities in terms of code violations and other public safety issues. Local governments are forced to spend substantial sums of money to address code violations, perform maintenance mitigation because of dangerous or blighted conditions, demolish unsafe structures and to identify and contact those responsible for vacant properties.  A Woodcock Institute study documents that the amount spent by local governments on a vacant and unmaintained property averaged $5,358 per property per year.

### D.  INJURIES CAUSED BY DEFENDANTS' CONDUCT CONTINUES

296.    Until remedied, Defendants' unlawful, discriminatory actions will continue to injure Plaintiffs by, *inter alia*:  (a) interfering with Plaintiffs' efforts and programs intended to bring about equality of opportunity in housing; (b) requiring the commitment of scarce resources, including substantial staff time and funding, to counteract Defendants' discriminatory conduct in the communities identified above, thus diverting resources away from Plaintiffs' usual activities and services, such as education, outreach and counseling; (c) frustrating Plaintiffs' missions and

95

purposes of promoting the equal availability of housing to all persons without regard to any protected category, including race and the racial composition of a neighborhood; (d) frustrating Plaintiffs' missions and purposes of promoting racial integration and eliminating racial segregation in their communities; (e) impeding the impact of Plaintiffs' investment programs; and (f) harming the neighborhoods served by Plaintiffs and in which Plaintiffs are situated and operate.

297.    All of these injuries flow directly from Defendants' conduct.  All of these injuries are fairly traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision.  The injuries suffered by Plaintiffs fall directly within the zone of interests protected by the Fair Housing Act.

## E.  CONTINUING VIOLATION

298.    Defendants engaged in the conduct alleged herein on a continuing and ongoing basis prior to February 26, 2012, and from February 26, 2012 to the present.  The Defendants' alleged conduct involves discriminatory violations that injured Plaintiffs within the two-year Fair Housing Act statute of limitations and the evidence in this investigation that occurred prior to the two-year statute of limitations is of a similar pattern to the evidence put forward within the statute of limitations period.  The two-year statute of limitations period was tolled under the HUD administrative complaint filed on February 26, 2014.

## VI.  VIOLATIONS OF THE FAIR HOUSING ACT

299.    Plaintiffs adopt and re-allege each of the preceding paragraphs of this Second Amended Complaint as to each count set forth below.

300.    The Deutsche Bank REO properties investigated by Plaintiffs are "dwelling[s]" within the meaning of 42 U.S.C. §3602(b).

96

301.    The term "person" in the FHA is defined to include "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers and fiduciaries."  42 U.S.C. §3602(d).

302.    Under the express provisions of the FHA and applicable agency principles, banks, trustees, investors, servicers, and any other responsible contractors or vendors must maintain and market REO properties without regard to the race or national origin of the residents of a neighborhood.  It is unlawful to treat a neighborhood or its residents differently because of the race or national origin of the residents.

## A. COUNT I - SECTION 3604(a) OF THE FHA – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS)

303.    Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. §3604(a).  HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development."  24 C.F.R. 100.70(a).  Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin. . . of persons in a community, neighborhood or development."  24 C.F.R. 100.70(c)(1).

304.    The discriminatory provision of maintenance and marketing services to the Deutsche Bank REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable and/or undesirable; (2) by dissuading potential buyers from looking at or purchasing the property; and

(3) by interfering with the closing of sales where the appraisal does not support the loan amount requested.

305.    Defendants' marketing model for REO properties, which uses Internet auction sites such as Hubzu, prefers cash buyers, who are typically investors, further makes housing unavailable in communities of color by changing neighborhoods into investor communities, with detrimental financial consequences for current homeowners and new owner-occupants.

306.    The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin and deliberate indifference to discrimination against persons of color.

307.    Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of §3604(a).

### B.  COUNT II – SECTION 3604 (a) OF THE FHA – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS)

308.    Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. §3604(a).  HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development."  24 C.F.R. 100.70(a).  Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin. . . of persons in a community, neighborhood or development."  24 C.F.R. 100.70(c)(1).

309.    The discriminatory provision of maintenance and marketing services to the Deutsche Bank REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable and/or

undesirable; (2) by dissuading potential buyers from looking at or purchasing the property; and (3) by interfering with the closing of sales where the appraisal does not support the loan amount requested.

310. Defendants' marketing model for REO properties, which uses Internet auction sites such as Hubzu, prefers cash buyers, who are typically investors, further makes housing unavailable in communities of color by changing neighborhoods into investor communities, with detrimental financial consequences for current homeowners and new owner-occupants.

311. The Deutsche Bank Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abdicate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

312. Accordingly, the Deutsche Bank Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of §3604(a).

## C. COUNT III - SECTION 3604(b) OF THE FHA – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS)

313. Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin. 42 U.S.C. §3604(b).

314. HUD's regulations implementing Section 804(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin. 24 C.F.R. 100.65.

315.    The maintenance of REO properties constitutes "the provision of services" in connection with dwellings.  Moreover, sales transactions involving poorly maintained REOs in communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of remedying delayed maintenance and upkeep of the property to avoid code violations.

316.    The discriminatory provision of routine maintenance and marketing services to the Deutsche Bank REO properties in communities of color discriminates against minority persons "in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," all in violation of Section 804(b) of the Fair Housing Act.

317.    The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin and deliberate indifference to discrimination against persons of color.

318.    Accordingly, Defendants have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. §3604(b).

### D.  COUNT IV – SECTION 3604 (b) OF THE FHA – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS)

319.    Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin.  42 U.S.C. §3604(b).

320.    HUD's regulations implementing Section 804(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin.  24 C.F.R. 100.65.

321.    The maintenance of REO properties constitutes "the provision of services" in connection with dwellings.  Moreover, sales transactions involving poorly maintained REOs in communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of remedying delayed maintenance and upkeep of the property to avoid code violations.

322.    The Deutsche Bank Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abdicate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.  These discriminatory policies and practices discriminate against minority persons "in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services of facilities in connection therewith," all in violation of Section 804(b) of the Fair Housing Act.

323.    Accordingly, the Deutsche Bank Defendants have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. §3604(b).

**E.  COUNT V - SECTION 3605 OF THE FHA – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS)**

324.    Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction because of race or national origin.  42 U.S.C. §3605.

325.    The Defendants are persons whose business includes engaging in residential real estate-related transactions.

326.    As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates numerous substantial barriers to the sale or purchase of these properties.

327.    Defendants' discriminatory provision of maintenance to REOs in communities of color has impeded real estate transactions and development in minority communities, and rendered properties in these communities unavailable.  The experience of the Plaintiff Fair Housing Organizations in their service areas is that minimal real estate sales and community development occur in areas where REO blight is prevalent.

328.    For purposes of Section 3605, time on market, sales price, time between contract for purchase and closing, purchase loan viability and conditions affecting property inspection are terms and conditions of residential real-estate-related transactions, all of which are impacted by deficient REO conditions and general neighborhood REO blight.

329.    The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin and deliberate indifference to discrimination against persons of color.

330.    Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin or discriminated in the terms or conditions of such a transaction in violation of 42 U.S.C. §3605.

**F.  COUNT VI – SECTION 3605 OF THE FHA – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS)**

331.    Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction because of race or national origin.  42 U.S.C. §3605.

102

332.     The Defendants are persons whose business includes engaging in residential real estate-related transactions.

333.     The Deutsche Bank Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abdicate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

334.     As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates numerous substantial barriers to the sale or purchase of these properties.

335.     Defendants' discriminatory policies and practices have impeded real estate transactions and development in minority communities, and rendered properties in these communities unavailable.  The experience of the Plaintiff Fair Housing Organizations is that minimal real estate sales and community development occur in areas where REO blight is prevalent.

336.     For purposes of Section 3605, time on market, sales price, time between contract for purchase and closing, purchase loan viability and conditions affecting property inspection are terms and conditions of residential real-estate-related transactions, all of which are impacted by deficient REO conditions and general neighborhood REO blight.

337.     Accordingly, Deutsche Bank Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin or discriminated in the terms or conditions of such a transaction in violation of 42 U.S.C. §3605.

### G. COUNT VII - CONDUCT PERPETUATING SEGREGATION – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS)

338.     The Fair Housing Act is violated by discriminatory conduct that perpetuates or furthers segregation.

339.     As described above, Defendants have engaged in intentional conduct causing racial disparities in REO maintenance and marketing.

340.     Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods. It is a proximate and foreseeable consequence of such conduct that white buyers will be discouraged from purchasing homes in the affected communities of color, and this has occurred in communities affected by Defendants' unlawful conduct.

341.     Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners.  This, in turn, restricts the ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

342.     The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin and deliberate indifference to discrimination against persons of color. The intentional discrimination against persons of color and reckless disregard of their rights is demonstrated by the conduct described in this Second Amended Complaint, including, but not limited to evidence of statistically significant disparities between the deficiencies in routine exterior maintenance and marketing of REO properties in white neighborhoods and in neighborhoods of color.

343.     The Defendants' intentional conduct has perpetuated segregation in minority communities.

344.    Accordingly, Defendants' conduct and practices perpetuating and encouraging patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. §3601, et seq.

## H. COUNT VIII – CONDUCT PERPETUATING SEGREGATION – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS)

345.    Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods. It is a proximate and foreseeable consequence of such conduct that white buyers will be discouraged from purchasing homes in the affected communities of color, and this has occurred in communities affected by Defendants' unlawful conduct.

346.    Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners. This, in turn, restricts the ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

347.    The Deutsche Bank Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abdicate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color. The disproportionate impact on communities of color is demonstrated by statistically significant disparities between the deficiencies in routine exterior maintenance and marketing of REO properties in white neighborhoods and in neighborhoods of color.

348.    The Deutsche Bank Defendants' unlawful policies and practices have perpetuated segregation in minority communities.

349.    Accordingly, Deutsche Bank Defendants' conduct and practices perpetuating and encouraging patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. §3601, et seq.

## I.  COUNT IX – SECTION 3604(a) OF THE FHA – DISPARATE IMPACT (OCWEN AND ALTISOURCE)

350.    Plaintiffs incorporate and reallege the preceding paragraphs of this Second Amended Complaint.

351.    Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. §3604(a).  HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development."  24 C.F.R. 100.70(a).  Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin. . . of persons in a community, neighborhood or development."  24 C.F.R. 100.70(c)(1).

352.    The discriminatory provision of maintenance and marketing services by the Ocwen and Altisource Defendants to the Deutsche Bank REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable and/or undesirable; (2) by dissuading buyers from looking at or purchasing the property; and (3) by interfering with the closing of a sale where the appraisal does not support the loan amount requested.

353.    In addition, by using a marketing business model to sell the majority of the Deutsche Bank REOs via the Hubzu auction site, Ocwen and Altisource have shown a preference for cash buyers, who are typically investors, thereby further making housing unavailable in communities of color by changing neighborhoods into investor communities, with detrimental financial consequences for current homeowners and new owner-occupants.

354.    The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color.

355.    Accordingly, Ocwen and Altisource have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of Section 3604(a) of the FHA.

### J.  COUNT X – SECTION 3604(b) OF THE FHA - DISPARATE IMPACT (OCWEN AND ALTISOURCE)

356.    Plaintiffs incorporate and reallege the preceding paragraphs of this Second Amended Complaint.

357.    Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin.  42 U.S.C. §3604(b).

358.    HUD's regulations implementing Section 804(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin.  24 C.F.R. 100.65.

359.    The maintenance of REO properties constitutes "the provision of services" in connection with dwellings.  Moreover, sales transactions involving poorly maintained REOs in communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of remedying delayed maintenance and upkeep of the property to avoid code violations.

107

360.    The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color. These discriminatory policies and practices discriminate against minority persons "in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services of facilities in connection therewith," all in violation of Section 804(b) of the Fair Housing Act.

361.    Accordingly, Ocwen and Altisource have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. §3604(b).

### K.  COUNT XI – SECTION 3605 OF THE FHA – DISPARATE IMPACT (OCWEN AND ALTISOURCE

362.    Plaintiffs incorporate and reallege the preceding paragraphs of this Second Amended Complaint.

363.    Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction because of race or national origin.  42 U.S.C. §3605.

364.    Ocwen and Altisource are persons whose business includes engaging in residential real estate-related transactions.

365.    The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color.

366.    As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates numerous substantial barriers to the sale or purchase of these properties.

367.    The discriminatory policies and practices of Ocwen and Altisource have directly impeded real estate transactions and development in minority communities, and rendered properties in these communities unavailable.  The experience of the Plaintiff Fair Housing Organizations is that minimal real estate sales and community development occur in areas where REO bight is prevalent.

368.    For purposes of Section 3605, time on market, sales price, time between contract for purchase and closing, purchase loan viability and conditions affecting property inspection are terms and conditions of residential real-estate-related transactions, all of which are negatively impacted by deficient REO conditions and general neighborhood REO blight.

369.    Accordingly, Ocwen and Altisource have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin or discriminated in the terms and conditions of such a transaction in violation of 42 U.S.C. §3605.

## L.  COUNT XII – CONDUCT PERPETUATING SEGREGATION – DISPARATE IMPACT (OCWEN AND ALTISOURCE)

370.    Plaintiffs incorporate and reallege the preceding paragraphs of this Second Amended Complaint.

371.    Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods. It is a proximate and foreseeable consequence of such conduct that white buyers will be discouraged from purchasing homes in the affected communities of color, and this has occurred.

109

372.    Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners.  This, in turn, restricts the ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

373.    The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color. The disproportionate impact on communities of color is demonstrated by statistically significant disparities between the deficiencies in routine exterior maintenance and marketing of REO properties in white neighborhoods and in neighborhoods of color.

374.    The policies and practices of Ocwen and Altisource have perpetuated segregation in minority communities.

375.    Accordingly, the policies, conduct and practices of Ocwen and Altisource perpetuating and encouraging patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. §3601, et seq.

## VII.  JURY TRIAL DEMAND

376.    Plaintiffs hereby demand a trial by jury on all counts.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court grant judgment in their favor, and against Defendants, as follows:

a)      Declare, pursuant to 28 U.S.C. §2201, that the conduct of Defendants in the maintenance of the Deutsche Bank REO properties in communities of color, as alleged

110

herein, violates the Fair Housing Act, 42 U.S.C. §3601, et seq., and the applicable regulations.

b)        Enjoin, pursuant to 42 U.S.C. §3613(c)(1), Defendants, their officers, directors, employees, agents, successors, assigns and all other persons in active concert or participation with any of them, both temporarily during the pendency of this action and permanently, from violating the Fair Housing Act.

c)        Award such damages as would fully compensate Plaintiffs for their injuries incurred as a result of Defendants' discriminatory housing practices and conduct pursuant to 42 U.S.C. §3613(c)(1).

d)        Award such punitive damages against Defendants as is proper under the law pursuant to 42 U.S.C. §3613(c)(1).

e)        Award Plaintiffs their costs and attorney's fees incurred herein pursuant to 42 U.S.C. §3613(c)(2).

f)        Award Plaintiffs such other relief as this Court deems just and proper.


Respectfully Submitted,

_/s/ Jennifer K. Soule_

| | | |
|---|---|---|
| Jennifer K. Soule | Stephen M. Dane | Morgan Williams |
| James G. Bradtke | Yiyang Wu | *National Fair Housing Alliance* |
| Kelly K. Lambert | *Relman, Dane & Colfax PLLC* | 1331 Pennsylvania Ave, NW |
| *Soule, Bradtke & Lambert* | 1225 19th Street, N.W. | Suite 650 |
| 402 Campbell Street | Suite 600 | Washington, DC 20004 |
| Suite 100 | Washington, DC 20036 | *Attorney for Plaintiffs* |
| Geneva, IL 60134 | *Attorneys for Plaintiffs* | |
| *Attorneys for Plaintiffs* | | |


Dated: May 8, 2019

111