# EXHIBIT D

# THE BANKS ARE BACK — OUR NEIGHBORHOODS ARE NOT



## Discrimination in the Maintenance and Marketing of REO Properties

April 4, 2012



National Fair Housing Alliance
1101 Vermont Avenue, Suite 710
Washington DC, 20005
(202) 898-1661

www.nationalfairhousing.org

2012

# PARTNERS





Founded in 1988 and headquartered in Washington, DC, **The National Fair Housing Alliance (NFHA)** is a consortium of more than 220 private, non-profit fair housing organizations, state and local civil rights agencies, and individuals from throughout the United States. Through comprehensive education, advocacy and enforcement programs, NFHA protects and promotes equal access to apartments, houses, mortgage loans and insurance policies for residents of the nation.

**The Miami Valley Fair Housing Center** is a comprehensive full-service fair housing center in Dayton, Ohio, with experience in auditing and testing activities, anti-predatory lending investigation and remedy, mortgage rescue scam intervention, foreclosure prevention counseling, mortgage modifications as well as fair housing and fair lending education and outreach. MVFHC works throughout the Miami Valley to eliminate housing discrimination and ensure equal housing opportunity for all people in its region.



**Metro Fair Housing Services, Inc.** is a 38-year-old non-profit civil rights organization whose primary objective is to fight housing discrimination in metropolitan Atlanta and promote equal housing opportunities throughout the state of Georgia. The agency's mission is to promote social justice and eliminate housing and lending inequities for all people through leadership, education and outreach, public policy advocacy and enforcement of federal and state Fair Housing laws. In the wake of the foreclosure crisis, Metro expanded its homebuyer education services to include foreclosure prevention counseling.



**Housing Opportunities Project for Excellence, Inc. (HOPE)** was established in 1988 as the first non-profit fair housing agency in the state of Florida. Today, it is the only private, non-profit, full-service fair housing organization in the Miami-Dade and Broward markets. It provides one-of-a-kind education services to the community-at-large, housing providers, lenders and advertisers of housing opportunities. Having remained a local and national leader in the fight against housing discrimination, it is the only such entity in the two counties engaged in testing for fair housing law violations and pursuing the enforcement of meritorious claims.



**The North Texas Fair Housing Center's (NTFHC)** mission is to eliminate housing discrimination in the North Texas region. NTFHC serves the counties of: Collin, Dallas, Delta, Denton, Ellis, Hunt, Johnson, Kaufman, Parker, Tarrant, Rockwall and Wise. Services include: (1) investigation of housing discrimination complaints, (2) housing rights counseling, and (3) outreach and education. Our services are available in English and Spanish and are free of charge. For more information call our toll-free number (877) 471-1022 or visit us on the web at www.northtexasfairhousing.org.





# TABLE OF CONTENTS 

Executive Summary.....................................2

Introduction...................................................4

Background...................................................6

Methodology...............................................16

Findings........................................................20

Recommendations....................................41

Conclusions................................................48



The work that provided the basis for this publication was supported by funding under a grant with the U.S. Department of Housing and Urban Development. The substance and findings of the work are dedicated to the public. The author and publisher are solely responsible for the accuracy of the statements and interpretations contained in this publication. Such interpretations do not necessarily reflect the views of the Federal Government.

Fannie Mae has supported NFHA's REO investigations since 2010 and provided a grant to support this investigation as well as to provide education to the real estate industry on promoting the sale of REO properties in compliance with the Fair Housing Act.  NFHA and its partners also used their own resources to supplement and expand this investigation.

NFHA would like to thank Freddie Mac for providing us with information on its best practices and helping us better understand the REO disposition process.

Baltimore, MD



# EXECUTIVE SUMMARY

As the foreclosure crisis continues to affect 1 in 69 households across the United States, or roughly 2.7 million families in 2011, banks are repossessing an unprecedented number of properties.[1]  As a result, a related crisis has emerged — one in which vacant and poorly maintained bank-owned properties mar once vibrant, well-maintained neighborhoods.  But this problem has not affected all neighborhoods equally.  This report documents an alarming pattern by many of the banks, lenders, investors and other entities that manage Real Estate Owned (REO) assets.  They have engaged in substandard maintenance of REO properties in communities of color, while maintaining REO properties in predominantly white communities in a superior manner.

Proper REO maintenance is a key factor in both the marketability and value of a home as well as the sustainability and viability of communities.  Poor maintenance practices can result in a property remaining vacant for longer periods of time.  Poor maintenance also increases the likelihood that a property will be purchased by an investor at a discounted price, rather than by an owner-occupant, because of the cost to rehabilitate the home.  Thus, the inferior way in which banks[2] maintain and market their REO properties in communities of color actually changes the character of and serves to degrade the quality of life in these neighborhoods.

The National Fair Housing Alliance (NFHA) conducted an examination of REO maintenance and marketing practices of several major lenders and investors in targeted neighborhoods in nine metropolitan areas.  NFHA and its partners evaluated more than 1,000 REO properties in neighborhoods with predominantly Latino and African-American residents, as well as those with a majority of White residents. The evaluations took into account 39 different aspects of the maintenance and marketing of each property, including curb appeal, structure, signage, indications of water damage, and condition of paint, siding and gutters.  NFHA's partners in this investigation included the Miami Valley Fair Housing Center in Dayton, Ohio; Housing Opportunities Project for Excellence (HOPE) working in Miami-Dade and Broward Counties, Florida; Metro Fair Housing of Atlanta in Atlanta, Georgia; and North Texas Fair Housing Center in Dallas, Texas, serving the greater Dallas/Fort Worth area.

The findings of the investigation revealed extremely troubling disparities in maintenance and marketing practices.  REO homes in White neighborhoods were cared for in a substantially better manner than those in communities of color.  While REO properties in predominantly White neighborhoods were more likely to have neatly manicured lawns, securely locked doors, and attractive "for sale" signs out front, homes in communities of color were more likely to have overgrown yards littered with trash, unsecured doors, broken windows, and indications of marketing as a distressed sale.  REO properties in communities of color generally appeared vacant, abandoned, blighted and unappealing to real estate agents who might market the unit to homebuyers.  On the other hand, REOs in White communities generally appeared inhabited, well-maintained and attractive to real estate agents and homebuyers.

The findings included significant differences, such as:

- REOs in communities of color were 42 percent more likely to have more than 15 maintenance problems than properties in White communities.

- Trash and debris were 34 percent more likely to be found on REO properties located in communities of color than on REO properties in White neighborhoods.

**1**   2011 Year End Foreclosure Report, RealtyTrac, February 13, 2012, Available at: http://www.realtytrac.com/content/foreclosure-market-report/2011-year-end-foreclosure-market-report-6984

**2**  The financial institution that owns the property (REO) following foreclosure is responsible for maintaining and selling it. In many cases, the institution responsible for selling the property is a bank, servicer or a Government Sponsored Enterprise (GSE) such as Fannie Mae or Freddie Mac. For the purposes of this report, we will be using the term "bank" to refer to all these financial institutions.

- REO properties in communities of color were 82 percent more likely than REO properties in White communities to have broken or boarded windows.

- REO properties in predominantly White neighborhoods were 33 percent more likely to be marketed with a professional "For Sale" sign than their counterparts in African-American or Latino communities.

- In the Washington, DC, metropolitan area, nearly 60 percent of REO homes in African-American neighborhoods had broken or boarded windows, while the same was true for only 39 percent of REO properties in predominantly White areas.

- In the Baltimore, MD, metropolitan area, 43 percent of REO properties in African-American neighborhoods had boarded up windows, while this only occurred in 28 percent of homes evaluated in predominantly White neighborhoods.

- In Philadelphia, PA, more than 10 distinct maintenance or marketing problems were documented in 41 percent of homes in African-American communities, while none of the properties in White communities had more than 10 maintenance or marketing problems.

- In Phoenix, AZ, 73 percent of REO properties evaluated in Latino neighborhoods were missing a "For Sale" sign, while only 31 percent of homes in predominantly White neighborhoods were missing a "For Sale" sign.

- In Oakland, Richmond, and Concord, CA, REOs in the African-American communities were 3.45 times more likely to be missing a "For Sale" sign than their white counterparts.

- In Dayton, OH, 60 percent of homes in African-American communities had broken or unsecured doors, while only 18 percent of homes in White communities had this problem.

- In Miami, FL, 46 percent of REO homes in African-American communities had boarded or broken windows while the same was true for only 16 percent of REO properties in White communities.

- In Dallas, TX, 60 percent of REOs in African-American neighborhoods, 68 percent of REOs in Latino neighborhoods, and 73 percent of REOs in communities with a majority of residents of color had substantial amounts of trash on their properties, while only 37 percent of communities in White areas had the same problem.

- In Atlanta, GA, 32 percent of REOs in African-American communities had more than 10 deficits, while not a single property in a White area was subject to such poor maintenance.

The federal Fair Housing Act requires banks, investors, servicers or any other responsible party to maintain and market properties that are for sale or rent without regard to the race or national origin of the residents of a neighborhood. It is illegal to treat a neighborhood differently because of the race or national origin of the residents. Moreover, these laws obligate banks, investors and servicers to monitor the actions of vendors engaged to perform housing-related transactions to ensure that those third party entities are complying with fair housing laws and regulations.

Banks, federal regulators, local communities and law enforcement must work together to ensure that these sorts of discriminatory practices are stopped as the foreclosure crisis continues in the coming years. Banks must completely restructure their maintenance and marketing models to ensure equal treatment of REO properties in all neighborhoods so that all communities have a fair opportunity to recover and prosper.

# SECTION 1: INTRODUCTION

In recent years, our nation has experienced its worst foreclosure crisis since the Great Depression when 25 percent of American homeowners lost their houses. The financial crisis and collapse of the housing market has had an untold effect on millions of people. To date, more than 4 million families have lost their homes and nearly 3 times as many families are seriously delinquent on their mortgages and face a real threat of foreclosure.[3] Although foreclosure activity in the past year was at its lowest since 2007, this decline is symptomatic of a dysfunctional foreclosure process clogged by issues related to documentation, the robo signing scandal, and the legal process—not of a market that is on its way to recovery. Foreclosure activity is only expected to increase once again in the years to come; some estimates suggest that we are not even halfway through the foreclosure crisis. [4]

As families are forced to leave their homes due to foreclosure, their properties are repossessed by the lender or investor. These foreclosed properties, known as Real Estate Owned (REO), have surfaced in unprecedented numbers in communities throughout America since the advent of the foreclosure crisis in 2007. The Federal Reserve estimates that this number could be as high as 1 million properties per year in 2012 and 2013.[5] These properties present a huge obstacle for recovery as the municipalities in which these REOs are located suffer negative effects, such as a depleted tax base, neighborhood blight, and decreased market values that result in wealth loss by homeowners who live near foreclosed homes.

While the foreclosure crisis has had a negative impact on all Americans, communities of color have borne a disproportionate amount of the burden. Since subprime loans were concentrated in communities of color[6], foreclosures in these neighborhoods have occurred at a faster rate and have resulted in devastating losses in wealth for these communities. Approximately 25 percent of Latino and African-American homeowners have either received foreclosure filings from their lender or are seriously delinquent, while only 12 percent of White homeowners fall into this category.[7] Within this context, the ever-increasing number of REO properties and how well they are maintained and marketed presents itself as an extremely critical civil rights and fair housing issue.

The proper maintenance and marketing of REOs is essential to bolstering property values, stabilizing neighborhoods, and stopping the decline in the nation's homeownership rate. In light of the significance of this issue, NFHA began to look into the issue of REO maintenance and marketing in 2009. The initial investigation uncovered a stark disparity between the treatment of REO properties in White neighborhoods and REO properties in neighborhoods of color. Differential treatment because of race, national origin, religion, color, sex, familial status, or disability violates the Fair Housing Act, as well as state and local fair housing laws. In April 2011, NFHA published the initial findings of its REO maintenance investigations in the report, "Here Comes the Bank, There Goes the Neighborhood,"[8] which included data from 624 REO investigations in four cities and highlighted a troubling trend of apparent discriminatory practices with respect to REO properties.

Over the last year, NFHA entered into partnerships with four of its member organizations to investigate the maintenance and marketing of more than 1,000 REO properties in nine metropolitan areas. These investigations were completed in cooperation with Metro Fair Housing Services in Atlanta, Georgia; North Texas Fair Housing Center in Dallas, Texas; Miami Valley Fair Housing Center in Dayton, Ohio; and Housing Opportunities Project for Excellence (HOPE) working in Miami-Dade and Broward Counties, Florida. Additionally, NFHA investigated REO properties in:

**3** 2012 Foreclosure Market Outlook, RealtyTrac, February 13, 2012, Available at: http://www.realtytrac.com/content/news-and-opinion/slideshow-2012-foreclosure-market-outlook-7021?accnt=219663

**4** RealtyTrac Year End Foreclosure Report, – http://www.realtytrac.com/content/foreclosure-market-report/2011-year-end-foreclosure-market-report-6984

**5** Federal Reserve White Paper on the U.S. Housing Market, January 4, 2012 – Available at: http://www.federalreserve.gov/publications/other-reports/files/housing-white-paper-20120104.pdf

**6** Recent fair lending actions underscore the unnecessary and discriminatory targeting of communities of color for unsustainable and higher cost subprime mortgages.

**7** Bocia, Reid, & Quercia, "Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures," Center for Responsible Lending, November 2011

**8** Here Comes the Bank, There Goes the Neighborhood, National Fair Housing Alliance, 2011. Report available at: http://www.nanworld.org/pdf/There%20Goes%20Our%20Neighborhood%20-%20REO%20report.pdf

- Metro Baltimore, Maryland, including Anne Arundel County, Baltimore County, and Howard County

- Oakland, California

- Richmond, California

- Concord, California

- Philadelphia, Pennsylvania

- Phoenix, Arizona

- Metro Washington, D.C., including Prince George's County, Montgomery County, the District of Columbia, and Falls Church, Virginia

This report documents the findings of these investigations and outlines clear recommendations for policy makers, community stakeholders, banks, investors and servicers to eliminate the alarming disparities in the treatment of REO homes because of the racial or ethnic composition of the neighborhood.

# SECTION 2: BACKGROUND

A substantial body of research has documented the harmful effects of foreclosures on the communities in which they are located. Overall, this research suggests that the visible deterioration and poor maintenance of properties that are vacant and bank-owned lead to increasingly lower property values and an overall reduction of investment in the neighborhoods by the families that remain in their homes.[9] These spillover effects on neighboring properties are an increasingly important civil rights issue as foreclosures continue to be concentrated in African-American, Latino, and immigrant communities.

## Devastating Wealth Loss in Communities of Color

The foreclosure crisis has disproportionately affected communities of color. This can be attributed to a variety of factors, but the progression of events at the onset of the homeownership process has a substantial influence on potential outcomes for any borrower. Borrowers who receive predatory or subprime mortgages are more susceptible to becoming delinquent and defaulting on their loans. Studies have demonstrated that African-American and Latino borrowers – two groups with the lowest homeownership rates – were far more likely to be steered into sub-prime mortgages, thus leaving them vulnerable to the inherent pitfalls of these volatile and unsustainable products. The Center for Responsible Lending (CRL) reported that for mortgages originated between 2004 and 2008, African-American and Latino borrowers were nearly twice as likely as White borrowers to have one or more "high risk" features or conditions in their loans. Such features included higher interest rates, option Adjustable Rate Mortgages (ARMs) or a prepayment penalty.

Latinos and African-Americans have seen their net worth plummet. According to a recent study by the Pew Research Center, the foreclosure crisis has had a larger effect on African-Americans and Latinos. Between 2005 and 2009, Latino families and African-American families lost 66 percent and 53 percent of their household wealth, respectively. This compares to a 16 percent drop in wealth for White households. The bulk of this decline in net worth is attributed to the loss of home equity.[10]

The dramatic loss in household wealth, when multiplied by the large percentage of African American and Latino homeowners experiencing foreclosure, will result in the largest loss of wealth for these communities in modern history. From 2009 through 2012, African-Americans are projected to lose $194 billion in housing equity. Latinos are expected to lose $177 billion.[11] Areas with a high concentration of African Americans, such as Prince George's County, MD, or a high concentration of Latinos, such as Phoenix, AZ, have consequently suffered higher losses of wealth.

Because African-American and Latino homeowners were disproportionately steered to worse loans, the neighborhoods and communities they lived in disproportionately felt the impact. One study estimates that properties located on the same block with just one REO property will decline in value by 0.9 and 1.13 percentage points. In low and moderate income areas, the estimates of decline jump to 1.44 percent.[12] Neighbors of bank-owned properties have been powerless to stop the depreciation of their own property values—even though many neighbors remove trash, mow the lawns and notify police when unauthorized people enter an REO.

## Erosion of the Property Tax Base and Cost to Local Municipalities

Local municipalities are burdened with heavy costs of each foreclosed property within their jurisdiction,

9 Chan, Sewin, Michael Gedal, Vicki Been, Andre Haughwout, "The Role of Neighborhood Characteristics in Mortgage Default Risk: Evidence From New York City," Furman Center for Real Estate & Urban Policy, 2010

10 Kochhar, Rakesh, Richard Fry and Paul Taylor, "Twenty to One: Wealth Gaps Rise to Record Highs Between Whites, Blacks, Hispanics" Pew Research Center, July 26, 2011.

11 "Foreclosures by Race and Ethnicity: The Demographics of a Crisis," Center for Responsible Lending, June 18, 2010

12 Immergluck, Dan, "There Goes the Neighborhood: The Effect of Single Family Mortgage Foreclosure on Property Values," Woodstock Institute, June 2005.

and these costs can increase exponentially when the particular local jurisdiction has a high rate of foreclosures. If banks do not properly maintain their assets, many of the related expenses become the burden of the local government. These costs may include exterior maintenance, rodent abatement, demolition, and administrative and judicial costs. In severely neglected homes, issues like boarding broken windows or doors, maintaining the front and back yards to curb the spread of rodents, or clearing public hazards also arise. Such costs can add up quickly; according to the Government Accountability Office (GAO) report 12-34, the city of Detroit, MI, estimated spending $1.4 million just to board and secure 6,000 properties in 2010. Another Chicago-based study from 2005 calculated the various costs to five different municipalities and found that local government spending on these properties ranged from $430 for a short-term vacant foreclosed home up to $34,199 in the case of one fire-damaged property. [13]

Additionally, demolition costs become necessary when much of the foreclosed housing stock is uninhabitable or not worth renovating for another owner-occupant. The City of Baltimore, which has a large stock of foreclosed row houses, estimated it would cost between $13,000 and $40,000 to demolish each row house.[14] Beyond the tangible costs of demolition and maintenance, other administrative expenses–such as the increased dispatching of police or fire services, code enforcement, and other public safety personnel to vacant properties–add more stress to a local government's bottom line.

Tax revenues also suffer as a result of depreciating property values. The surplus in housing stock due to the foreclosure crisis has sharply decreased homebuyer demand which depresses property values, particularly more acutely in areas with multiple foreclosed properties. The National League of Cities reports that property tax revenue dropped by 2 percent in 2010, the first decline of its type in over 15 years, and projects that 2011 property tax revenues will decline an additional 3.7 percent.[15]

As cities absorb the rising maintenance costs and declining tax revenues resulting from unmaintained foreclosed properties, local municipalities may find the strain on their budget too much to bear. The need to allocate additional funds towards this housing stock, during a time when many municipalities are seeing their budgets cut, leaves less funding available for critical government services such as police and fire protection, public education, water service or trash pick-up.

### REO Maintenance Overview

During the foreclosure process, properties that are unoccupied and not located in states with redemption laws are generally maintained by the servicer of the loan to a standard outlined by the lender or owning entity. These standards require keeping the home in compliance with local ordinances to protect its value and include actions such as mowing lawns and removing trash. The servicer is also responsible for paying taxes, holding a valid homeowners insurance policy and paying homeowners association fees and related expenses.

Once foreclosure proceedings are completed, it becomes real estate owned by a bank, the Federal Housing Administration, or a Government Sponsored Enterprise (GSE) such as Fannie Mae or Freddie Mac. Each institution utilizes its own particular system for maintaining an REO. Some companies contract with a real estate broker or national vendor who is tasked with the maintenance,

**13** Apgar, William and Mark Duda, "Collateral Damage: The Municipal Impact of Today's Mortgage Foreclosure Boom," Homeownership Preservation Foundation, May 11, 2005. GAO 12-34

**14** GAO-12-34, Vacant Properties: Growing Number Increases Communities' Costs and Challenges, November 2011.

**15** Christopher W. Hoene and Michael A. Pagano, "Research Brief on America's Cities", September 2011. National League of Cities.

# WHAT IF THIS WERE YOUR STREET?

Many of the REO properties that NFHA staff and its members evaluated were within close proximity to each other, a fact that highlights the potential negative impacts the properties have on a particular community. The presence of just one REO in a community can result in several adverse effects on neighboring properties, including: a decrease in property values of neighboring homes; an increase in homeowner's insurance premiums as a result of increased crime and vandalism to the neighborhood brought about by an unsecure or abandoned property and increased property taxes as local governments attempt to recoup money spent on maintaining or securing an REO property in a community. The worse the condition of the home, the more adverse the impact these properties have on a community. In this particular case, NFHA staff evaluated three REO properties on the same street, within a block of each other. Each was poorly maintained and scored an F grade. The above stated negative effects felt by a community are multiplied in cases like these, and too often the communities in question tend to be neighborhoods of color.







*Capitol Heights, MD*



marketing and sale of the home.  The broker or vendor may be required to oversee securing the property, assessing the value of property, subcontracting with a preservation maintenance provider and developing a marketing strategy for selling the property.

The real estate broker or vendor also may be responsible for requesting interior and exterior repairs.  Often, these brokers/vendors are not located in the community, which can be problematic when it comes to determining the proper pricing, marketing and maintenance of the REO. Some lenders also contract with nationwide asset managers or field service vendors who make the decisions about repairs and become the final arbitrator regarding all repairs.

Though the specific models of maintenance and marketing may vary, routine yard maintenance, securing of the property, trash removal and cleaning are generally contracted to a property maintenance and preservation company or asset management company. This contractor may be a national company that subcontracts at the regional, state or local level, or may be a local small business that works directly within the lender's network of vendors. The specific requirements for these vendors differ by lender, but typically these vendors are expected to visit the property weekly and conduct maintenance to ensure that the REO property complies with local building and public safety standards.

REO properties that are not properly maintained by these vendors are subject to a host of harmful effects.  A home with unsecured doors, broken windows, overgrown grass, or trash all over the property signals to vandals and looters that the property is abandoned and makes the home and neighborhood a target for criminal activity.  In addition, homes that appear vacant and look unsightly due to poor maintenance will often deter potential real estate agents from showing the REO to homebuyers— thus, the poor condition of the home reduces the potential homebuyer market and negatively affects the price of the home.

### Banks May Fail to Maintain REOs Based on Faulty Perceptions

A bank's failure to adequately maintain an REO property may be due to a false perception of the house's actual value or the bank's erroneous assumptions about a potential return on its investment.  These impressions could be based upon an inaccurate appraisal of the property's market value and/or faulty perceptions about the neighborhood in which the property is located.

 An REO property is typically priced using a Broker Price Opinion (BPO) to determine the value of the home before it is put on the market for sale.  Depending upon state law requirements, either an appraiser or a real estate agent conducts the BPO.  An Internal BPO examines the inside of the home, which is viewed and photographed, and a Drive-by BPO includes photographs of the exterior and estimates about the interior features.

 A Drive-by BPO might be appropriate for some homes.  However, a Drive-by BPO lessens the likelihood that the estimated value will be appropriate especially in cases where renovations or improvements have been made to the home.  An internal BPO or full appraisal gives a bank the best estimate of a property's actual condition and value.  The Federal Housing Administration requires a full appraisal on all of its REO homes.

Banks may also determine the type or extent of maintenance actions for a property based on the bank's perceived return on investment.  In other words, some banks weigh the cost of any maintenance or repair against the projected income the bank will receive from the sale of the property.  Moreover, some banks may even set a lower maintenance standard for properties the bank presumes will be sold to an investor.   The presumption of whether or not a property will be sold to an investor can be based on the trend of previous REO sales in the neighborhood.



# SNAPSHOT:  DAYTON, OHIO

As part of this investigation, staff from the Miami Valley Fair Housing Center visited and evaluated REO properties in the Dayton, Ohio area. Upon scoring the property below, located in a predominantly White neighborhood, staff found that the home had no structural damage and high curb appeal. It was also being properly marketed, with a "For Sale" sign posted in the front yard, and its maintenance was consistent with neighboring homes.




Neighborhood: Predominantly White

An REO property (pictured below) in the predominantly African-American neighborhood, on the other hand, was marketed with a "For Sale" sign, but had very poor curb appeal.  There was excessive trash on the lawn, the grass had not been cut, and overgrown and dead shrubbery on the property indicated that the property had been neglected, even while neighbors' homes were well-maintained.







Neighborhood: Predominantly African-American

Neighboring property to the left

# SNAPSHOT: BALTIMORE AND PHILADELPHIA





Neighborhood: Predominantly African-American

NFHA staff visited properties in Philadelphia, Pennsylvania and Baltimore, Maryland, urban areas where row-houses were commonplace. Because these types of homes share adjacent walls with their neighbors, problems with REO rowhouses can have an immediate and substantial effect on their neighbors. This was especially true regarding the properties found on this page. Both properties were found to have unsecured and open front doors, and residents of neighboring homes of both properties in question complained that these homes were frequently occupied by squatters. Unauthorized occupancy of an REO property can leave the property and surrounding community more susceptible to crime and public safety and health hazards. Both homes also had overgrown shrubbery and pervasive trash, indicating they had not been maintained in quite some time.





Neighborhood: Predominantly African-American

Sadly, this practice may have extremely harmful outcomes for communities of color. NFHA's pilot research on this issue (discussed in more detail later in this report) reveals that because poorly maintained properties are more heavily concentrated in Latino and African-American communities, a higher percentage of REOs in these neighborhoods are being sold to investors as opposed to owner-occupants. If banks adopt a practice of setting inferior maintenance standards for properties they believe will be more likely to sell to investors, banks are creating substandard communities with poorly maintained properties where values will continue to decline.

Freddie Mac, for example, implements policies and programs in their REO disposition process that are designed to preserve neighborhood home values and stabilize communities. As a result, they sold a record number of REO properties last year and were able to do so at 94 percent of the market value. Additionally, 70 percent of these properties were sold to owner-occupants.[16] When financial institutions use the right models for pricing REO properties and make good maintenance a high priority, the results are extremely favorable for the community.

## REO Maintenance and the Application of the Fair Housing Act

President Lyndon B. Johnson signed the federal Fair Housing Act into law on April 11, 1968, one week after the assassination of Dr. Martin Luther King, Jr. In 1988, President Ronald Reagan signed the Fair Housing Amendments Act, which provided the U.S. Department of Housing and Urban Development (HUD) and the U.S. Department of Justice with a much-needed federal enforcement mechanism.

The Fair Housing Act has two goals: to eliminate housing discrimination and to promote residential integration.[17] HUD's regulations interpreting the Fair Housing Act state:

> It shall be unlawful because of race, color, religion, national origin, sex, familial status or disability to restrict or attempt to restrict the choices of a person by word or conduct in seeking, negotiating for, buying or renting a dwelling so as to perpetuate segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development.[18]

The differing maintenance of REO properties based on the racial composition of neighborhoods is a violation of the Fair Housing Act.

- HUD's regulations clearly state that "failing or delaying maintenance or repairs of sale or rental dwellings because of race" is a prohibited action under the Fair Housing Act.[19]

- Steering by real estate agents based on neighborhood racial composition is illegal and other behavior in the housing sale or rental market that operates to discourage potential buyers from purchasing or renting homes in neighborhoods of color, such as by failing adequately to maintain properties in minority neighborhoods, can also violate the Act.

- In addition, the Fair Housing Act makes it unlawful to "make unavailable or deny" housing to any person because of race.[20] If the poor maintenance of an REO property in a neighborhood of color makes it difficult for a potential purchaser to obtain a mortgage loan for the property, the poor maintenance has made the housing"unavailable" within the meaning of the Act.[21]

16  Gaffney, Jacob, "Freddie Mac sells record-number REO at 94 percent market value", November 14, 2011. Available at: http://www.housingwire.com/article/freddie-mac-sells-record-number-reo-94-market-value.

17  Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205 (1972)

18  4 CFR 100.70 (a)

19  24 C.F.R. 100.65(b)(2)

20  42 U.S.C. § 3604.

21  See N.A.A.C.P. v. American Family Mutual Insurance Co., 978 F.2d 287, 297 (7th Cir. 1992) (discriminatory insurance practices can violate §3604 because "no insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."). It is important to note that municipalities and neighborhood residents have standing under the Act to challenge discriminatory behavior occurring in their cities and neighborhoods. Gladstone Realtors v. City of Bellwood, 441 U.S.91 (1979).

If the federal government, especially the financial regulators, had responded to the foreclosure crisis promptly, there is a possibility that some of these fair housing concerns could have been mitigated. Civil rights advocates tried to alert the Federal Reserve and bankers to the looming crisis in April 2007, when they called for an immediate six month moratorium on foreclosures of single-family homes in order to devise programs to modify unsustainable and toxic loans. However, the request for a moratorium fell upon deaf ears: regulators and the banking industry said advocates were exaggerating the potential for deep economic harm, and Federal Reserve Chairman Ben Bernanke argued the crisis would be limited to the subprime market. [22]

[22] On April 4, 2007, NFHA and other national civil rights groups, including the Leadership Conference on Civil and Human Rights, the NAACP, the National Council of La Raza, and the Center for Responsible Lending held a news conference and called for mortgage lenders, loan servicers and loan investors to institute an immediate sixmonth moratorium on subprime homeforeclosures resulting from reckless and unaffordable loans in the subprime market.

# SNAPSHOT: DALLAS, TEXAS





Neighborhood: Predominantly Latino

Staff from NFHA and the North Texas Fair Housing Center evaluated this property in the Dallas area in February 2012. The REO had multiple structural and curb appeal issues. The lawn was not maintained, trash littered the yard, windows and doors were boarded up, and there were multiple holes in the siding of the property. Although the property did have a "For Sale" sign posted on one of the front windows, it also had an "Unsecured dwelling" code violation, meaning the local government had inspected the property and determined it to be in violation of local ordinance. Such inspections and the subsequent enforcement can become a financial and administrative burden on local jurisdictions, especially in the case of areas with a high foreclosure rate.  Pictured below are the neighbors of this property – both neighbors have clearly taken good care of their lawns and homes, but are forced to live next door to an eyesore.




Neighboring Property to the Left

The neighbor to the left has taken good care of their property, with attractive plants and trimmed shrubbery.  Trash and overgrown grass from the REO can be seen in the foreground of the picture to the right, while the lawn of the neighboring home to the right has been well-maintained.

# SNAPSHOT: MIAMI, FLORIDA




Neighborhood: Predominantly White

HOPE Fair Housing Center staff visited these two properties in January 2012. The home above had been obviously maintained recently, as the lawn was mowed and the front of the house was in good condition. Meanwhile, the home below was in poor condition. There was damage to the siding/ outer walls both in the front and back of the home, as well as water related damage (i.e. wood rot, mold, etc.) and unsecured entrances to the home. Homes such as the one below are susceptible to a variety of issues for the property itself, as well as the community as a whole. These properties face vandalism, unauthorized occupancy, and criminal activity when not secured and maintained properly. Furthermore, rodent and other types of infestations brought about by openings to the property can create a nuisance for neighboring homes, and can become a serious problem if not addressed. These issues contribute to these homes remaining vacant, which can cause damage to the community for a sustained amount of time.






Neighborhood: Predominantly Latino

# SECTION 3: METHODOLOGY

NFHA and its members investigated REO maintenance practices in nine metropolitan areas, selecting neighborhoods with either predominantly White residents or neighborhoods in which residents were predominantly Latino, African-American, or a combination of both. These neighborhoods were also selected because their recent foreclosure rates were high in comparison to other neighborhoods in the same metropolitan area. This is an investigation for enforcement purposes, where applicable. It is important to note that this investigation did not limit its data collection to a random sampling of the REO properties in each neighborhood. Rather, all properties owned by the banks investigated within each selected area (100 percent coverage) were visited and, when possible, evaluated. Homes that were clearly occupied were not evaluated.

Once the neighborhoods were identified for the investigation, data providing the addresses of REO homes, as well as the banks listed as the owners of the homes, were collected in each of the areas. These lists were compiled using county property records, records kept by the clerk of courts, RealtyTrac and other database sources. The data was also crosschecked with other reliable records in order to verify the status of the homes visited as bank-owned properties. Several banks were identified as the major owners of REO properties in the subject communities and thus became the focus of this investigation.

Between May 2011 and February 2012, NFHA staff, along with staff from partner organizations, visited more than 1,000 single-family and townhome properties owned by these banks. Upon visiting the property, staff evaluated each property on a pre-determined 100-point scale that included 39 factors such as curb appeal, structure, signage and occupancy, paint and siding, gutters, water damage, and utilities (See Table 1). Evaluators answered "yes" or "no" to indicate whether each of these factors was or was not present on the property, and took pictures of the property and surrounding area. For example, next to "Trash" on the score sheet, the evaluator would mark "yes" if there was a visible amount of trash on the REO property, which would then translate into a deduction from the overall score. A lack of certain criteria, like a missing "For Sale" sign, also would constitute a deduction. Table 1 shows an overview of the scoring categories and point values assigned to each.

To ensure consistency, evaluators utilized a glossary of terminology developed by NFHA and its partners at the beginning of this investigation using pictures and descriptions to illustrate various examples that would constitute a "yes" answer for each of the components needed to score the properties. The glossary also took into account and illustrated variations in severity for a few of the scoring criteria. For example, if a property had a small amount of dead grass, it would receive a smaller deduction than if the entire lawn was filled with dead grass. Similarly, the severity of invasive plants and mold was also taken into account when evaluating an REO property.

The data and pictures were uploaded into a central database which then assigned a score to the REO property. Each property was assigned a neighborhood designation based on racial/ethnic makeup of the Census Block Group in which the address was located using the ArcView mapping tool.[23] REO properties could fall into one of four neighborhood designations: (1) African-American, (2) Latino, (3) White, or (4) predominantly non-White. [24] Both the overall scores of each property, as well as the scores for each individual category and subcategory, were then compared against one other.

In its first round of investigations, staff members evaluating homes were often approached by

[23] U.S. Census Bureau block group data 2010

[24] Neighborhoods were defined as "White" if the surrounding block group was greater than 50% white, "African-American" if the surrounding block group was greater than 50% African-American, "Latino" if the block group contained 50% or more Hispanic residents, and "Predominantly Non-White" if the White population of the surrounding block group was less than 50% and no other race comprised more than 50% of the population alone.

neighbors of the REO properties. The neighbors provided staff with accounts of their experiences and concerns regarding the REO property. In an attempt to capture some of this information, NFHA developed a short survey that asked a few key questions about the care, maintenance, and marketing of the REO property. These surveys were mailed to neighbors on either side of the REO, as well as the neighbor directly across the street. The main trends captured by this survey will be outlined further in the findings section of this report.

Although the properties visited were listed as bank-owned, investigators sometimes found that properties were occupied upon their arrival. When staff was able to make inquiries of the occupant, we found that sometimes the REO had been sold. Other times we learned an eviction was in process or the family was just starting to move out following the foreclosure. In these situations, evaluators documented the visit but did not score or evaluate the property. We also did not evaluate properties when investigators arrived at homes undergoing some type of repair or renovation. As a result, these properties are not included in the results of this investigation.

Investigators evaluated the state of the REO property at the time of the visit. Accordingly, this investigation could not and did not take into account the condition of the property at the time of transfer to the bank. The owner—the bank–is responsible for securing the property, preserving and selling the asset, and maintaining the lawn and exterior to meet local standards from the time the home becomes vacant following the foreclosure. Therefore, the condition of the home at any point when the property is vacant and bank-owned should be consistent between neighborhoods regardless of the race or ethnicity of the residents.

| Category | Deficiencies | Point Value |
|---|---|---|
| Curb Appeal | Trash<br>Mail Accumulated<br>Overgrown Grass & Leaves<br>Overgrown or Dead Shrubbery<br>Dead Grass<br>Invasive Plants<br>Broken Mailbox | 20 |
| Structure | Unsecured or Broken Doors or Locks<br>Damaged Steps or Handrails<br>Damaged Windows<br>Damaged Roof<br>Damaged Fence<br>Holes<br>Wood Rot | 25 |
| Signage & Occupancy | Trespassing or Warning Signs<br>Marketed as Distressed<br>"For Sale" sign Missing<br>Broken and Discarded Signage<br>Unauthorized Occupancy | 13 |
| Paint & Siding | Graffiti<br>Peeling or Chipped Paint<br>Damaged Siding<br>Missing Shutters | 12 |
| Gutters | Missing or Out of Place<br>Broken or Hanging<br>Obstructed | 16 |
| Water Damage | Water Damage<br>Mold | 13 |
| Utilities | Exposed or Tampered with | 1 |

Table 1 - Breakdown of points over 7 categories

# SNAPSHOT: OAKLAND, CALIFORNIA





Neighborhood: Predominantly African-American



This property, in a predominantly African-American neighborhood in Oakland, was poorly maintained and had multiple curb appeal and structural issues. Chipped paint was found in various areas around and in front of the house, and there were damaged steps and damaged gutters found on the property. The "For Sale" sign was propped up on the front porch with a phone book, and a door was kicked in that allowed unfettered access to the property.







Neighborhood: Predominantly White

NFHA staff visited the Oakland, CA, area in October 2011. This property, located in a primarily White neighborhood in the Oakland Hills, was maintained as well or better than the neighboring properties. A damaged fence was the only curb appeal or structural issue found on the property, and the property featured an attractive "For Sale" sign and carefully mowed lawn.



# SECTION 4: FINDINGS

Analysis of the scores for each of the 1,036 properties evaluated for this investigation revealed a pattern of consistently poorer maintenance in communities of color than in White communities. This section will discuss the overall trends uncovered by this investigation in all areas and then outline some of the most striking disparities NFHA and its members documented in each metropolitan area.

## REO properties in White communities were more likely to be marketed with the proper signage than communities of color

Properties in communities of color were found to be marketed in a substandard fashion when compared to communities with primarily White residents, a practice that extends the amount of time REO properties remain vacant and for sale. This has extremely harmful effects on local property markets. Staff routinely found that REO properties in communities of color were far less likely to have a functional, attractive "For Sale" sign out front than REO properties in communities of color. When the 1,036 overall properties evaluated for the purposes of this investigation were analyzed, we found that homes in White neighborhoods were 32.2 percent more likely than African-American properties and 37.5 percent more likely than REO properties in Latino neighborhoods to have been properly marketed with a "For Sale" sign.

## The banks investigated owned significantly fewer REO properties in White neighborhoods than in communities of color in the majority of the regions investigated

People of color have been disproportionately affected by the foreclosure crisis. Correspondingly, the majority of the REO properties that NFHA staff identified and visited in nearly every market were located in predominantly African-American and Latino neighborhoods.

Of the total REO properties visited for the purposes of this investigation, only 21.2 percent were located in predominantly White neighborhoods. As explained in the Methodology section of this report, this result was not due to a biased process in identifying the properties which were visited and evaluated. NFHA and its partners investigated the same number of zip codes containing predominantly White neighborhoods as it did for neighborhoods of color, but consistently found fewer REO properties in predominantly White communities.

## REO properties in White neighborhoods were more likely to be occupied than REO properties in communities of color

The number of occupied REO properties visited within neighborhoods of color and predominantly White areas in the Washington DC metropolitan region revealed a trend that further demonstrates how racial disparities in maintenance and marketing of REO properties have had an adverse impact on communities of color. For example, in the Maryland / DC metropolitan region, African-American neighborhoods—many of which have been hard hit by the foreclosure crisis—had far fewer occupied properties in proportion to the total number of REO properties visited than homes in predominantly White neighborhoods. NFHA staff visited nearly four times the number of REO properties in these neighborhoods than in predominantly White neighborhoods. The rate of dwellings that were occupied when NFHA visited them was substantially higher in predominantly White areas (39.6 percent) than in African-American areas (24.1 percent). Thus, REO properties in White neighborhoods were 64 percent more likely than REO properties in African-American neighborhoods to be occupied by a recent purchaser or by an owner who was challenging the foreclosure at the time that NFHA staff visited them.

### Newer homes generally scored higher than older homes, but racial disparities persisted with non-structural factors such as curb appeal and signage

As NFHA observed that the age of a particular REO property tends to influence its maintenance score on the 100-point scale, NFHA considered whether racial maintenance and marketing disparities persist among newer properties. To this end, we examined maintenance and marketing trends of REO properties in all racial/ethnic neighborhoods built after 1990, and found that disparities in maintenance scores between newer properties (built after 1990) and older ones were essentially the same. The data revealed that newer REO properties in White neighborhoods received more consistent care and were marketed better than newer properties in neighborhoods of color. Specifically, REOs built after 1990 in predominantly White communities received an average score of 90, while the overall score for REO properties built after 1990 in African-American communities was an 81. This indicates that lenders are failing to consistently maintain properties in neighborhoods of color at the same standard as homes in White areas, regardless of the age of the home.

NFHA also found that maintenance and marketing were consistently superior for newer REO properties in White neighborhoods than those in communities of color. Among newer homes, properties in communities of color were 32 percent more likely to have trash on the premises. This sort of disparity is detrimental to the curb appeal of the house and is a clear indicator of neglect by the banks in communities of color.

Newer REO properties in White communities were also found to be 37.2 percent more likely to have a "For Sale" sign posted on the property than those in African-American or Latino neighborhoods. This is a more significant disparity than the presence of trash, as it indicates that newer properties in neighborhoods of color–homes which may be more likely to attract potential homeowners–are not being advertised as available to potential homeowners at the same rate as properties in predominantly White neighborhoods. By not marketing REO properties as for sale in an equal manner in neighborhoods with different racial/ethnic demographics, banks are committing a form of racial steering and are restricting housing choice for prospective purchasers who want to live in communities of color.

### Owner-occupants are more likely to purchase well maintained and marketed homes

In order to measure how poor maintenance affects the sale of REO properties, NFHA staff analyzed the property records of 90 REOs in the DC metropolitan area that were evaluated prior to August 2011. Each of these 90 homes was (1) purchased by a primary resident, presumably by an owner-occupant, (2) purchased by an investor who did not list the home as a primary residence, or (3) remained a bank-owned property.

The results of this inquiry can be seen in the pie charts on the following page. Alarmingly, poorly maintained REOs were much less likely to be sold after at least 6 months had passed, and if they were purchased, these poorly maintained REO properties were far more likely to be purchased by investors rather than owner-occupants. Specifically, REO properties that were well maintained, scoring 80 out of 100 points or better, were 6.25 times more likely to be purchased by owner-occupants than REO properties that scored below 60 points. Similarly, 59 percent of REO properties that were poorly maintained were purchased by investors rather than owner-occupants, while only 36 percent of REO properties receiving high scores were purchased by investors.

These sales patterns are extremely troubling when coupled with the findings above that homes in communities of color are more likely to be subject to poor maintenance and marketing practices in regional markets across the nation. In fact, this same inquiry revealed that REO properties in White neighborhoods that NHFA evaluated prior to August 2011 were sold to owner-occupants 74 percent more frequently than REO properties in communities of color that NFHA evaluated before August 2011. Moreover, 52 percent of the REO properties in African-American neighborhoods

in Prince George's County, MD were purchased by investors, whereas only 33 percent of REO properties in White neighborhoods in Montgomery County, MD, were purchased by investors.

Investor purchases can be detrimental to the overall health of a community and thwart would-be owner-occupants from purchasing homes. One study notes that 20 percent of REOs and short sales are being purchased by investors. This number jumps to 60 percent when focused on REOs that have been damaged. Therefore, the patterns of neglect and poor maintenance in communities of color that we have documented here have only led to investors representing a disproportionately large share of property owners in those same communities.

Predatory investor ownership occurs most often in low-income communities of color and can include bulk purchasing of homes with the intention of renting them out with little or no maintenance or rehabilitation.[25] These harmful practices by investors can deeply affect the character of the neighborhood and drive down the prices of neighboring homes. The troubling trend in investor purchases in communities of color documented here will make it even more difficult for these communities to recover, particularly as the REO inventory increases in years to come. This is not to condemn all investors. Certainly, there are non-profit organizations buying REOs and reselling to owner-occupants. There are also good investors purchasing REOs who renovate them and place



**REO Disposition Outcomes - by Maintenance Score and Race**

Maintenance Score A or B

Maintenance Score D or F

White

African American

■ Purchased by Investor

■ REO

■ Purchased by Owner-Occupant

25 Treuhaft, Sarah, Kalima Rose, and Karen Black. "When Investors Buy up the Neighborhood," Policy Link, May 5th 2010, Available at: www.policylink.org/BuyUp

them back on the owner-occupied market. [26]

## Neighbor Survey Findings

NFHA staff distributed surveys to neighbors of each REO property that was evaluated since May 2011.  Neighboring properties received surveys in the mail requesting their input on a variety of topics related to the REO. The purpose of the surveys was to learn if the REO had any detrimental impact on their taxes or homeowners insurance policies and to find out if neighbors were doing any maintenance of the REO.

Overall, the feedback from neighbors in the surveys confirmed what staff observed while visiting and evaluating REO properties: lenders are not sufficiently maintaining the properties in communities of color. Of the 165 surveys received by NFHA, slightly more than 60 percent were received from neighbors in communities of color, and the rest were received from residents in predominantly White neighborhoods. This provided a sufficient sample size from each demographic from which to draw comparisons.

In comparing feedback from the surveys, neighbors of properties in both communities of color and predominantly White neighborhoods took it upon themselves to perform maintenance on the outside of neighboring REO properties when necessary. Roughly one-third of residents surveyed reported mowing the lawn of a neighboring REO property or even paying to have it mowed. Approximately one-third of those surveyed also reported removing trash from the neighboring REO property.

Although neighbors of REO properties in all demographic communities complained of having to fulfill the obligations of banks in mowing lawns and removing trash, residents of neighborhoods of color disproportionately faced other issues brought about by the inferior care of REO properties in their communities. Only 30 percent of those surveyed in communities of color stated that they had observed routine and consistent maintenance of their neighboring REO properties; nearly 54 percent of the surveys from residents in predominantly White communities reported observing routine work being conducted on the REO in their vicinity. Similarly, only 20 percent of residents in communities of color reported seeing home improvement contractors working on the neighboring REO property, while nearly 40 percent of neighbors in predominantly White areas stated they had seen home improvement contractors at the property.  In this case, the nexus is again clear: a lack of routine maintenance work on an REO property will lead to its deterioration, which can lead to a decreased incentive for a lender to repair or improve the home in any way.  A neglected REO property thus becomes perpetually vacant, leading to an increased susceptibility to the pitfalls of abandoned and vacant homes: crime, structural damage, public hazards, and millions of dollars in lost wealth for communities of color.

26    Ibid

## Findings By Metropolitan Area

The charts on the following pages present the REO grades in each metropolitan area in which investigations were conducted. The charts are followed by a brief summary of differential treatment noted in each metropolitan area.

| City | Predominantly White Neighborhoods | Predominantly African American Neighborhoods | Predominantly Latino Neighborhoods | Difference Between White and African-American | Difference Between White and Latino |
|---|---|---|---|---|---|
| Baltimore, MD | 71.1 | 69.9 | | -1.2 | |
| Washington, DC | 76.7 | 71.5 | | -5.2 | |
| Philadelphia, PA | 82.3 | 71.6 | 85.0 | -10.6 | 2.8 |
| East Bay, CA | 84.6 | 76.9 | 71.0 | -7.7 | -13.6 |
| Phoenix, AZ | 90.3 | | 77.2 | | -13.1 |
| Miami, FL | 79.6 | 79.0 | 73.2 | -0.6 | -6.4 |
| Atlanta, GA | 80.9 | 73.7 | 65 | -7.2 | -15.9 |
| Dayton, OH | 77.0 | 68.6 | | -8.5 | |
| Dallas, TX | 80.9 | 74.1 | 73.9 | -6.8 | -7.0 |

Table 2 - Average Maintenance Score By Region and Neighborhood Racial Composition

## Washington, DC, Metropolitan Area

NFHA staff visited and evaluated 235 properties in the Washington, DC, metropolitan area for this investigation. This area includes REO properties in Montgomery County, Maryland, Prince George's County, Maryland, and Falls Church, Virginia as well as the District of Columbia. While the Washington, DC, property market has been less stagnant than many across the nation, the adjoining suburb of Prince George's County, MD, has had soaring foreclosure rates. In the Washington metropolitan region, 83 percent of REO properties in African-American neighborhoods had more than five maintenance problems documented, while five maintenance issues occurred in only 61 percent of REO properties in White neighborhoods.

Investigators also documented particularly large disparities in the categories of curb appeal and structure in this area. For example, 59 percent of REO properties in African-American neighborhoods were found to have broken or boarded windows, while only 39 percent of homes in White neighborhoods were subject to the same maintenance problem. Similarly, 47 percent of homes in African-American neighborhoods had broken locks or unsecured doors, while this deficit was only documented in 33 percent of homes in White neighborhoods.

Other structural problems were more frequently identified in communities of color in the DC metropolitan region. For example, 36 percent of REOs in African-American neighborhoods had broken gutters and 20 percent of REOs in the same neighborhoods had missing gutters. Only 11 percent of homes in White areas exhibited either broken or missing gutters. Overall, REOs in African-American neighborhoods were nearly 5 times more likely to have a broken gutter and 2 times more likely to have a missing gutter than REOs in White neighborhoods. Leaving broken or missing gutters unaddressed for an extended amount of time generally leads to water damage both inside and outside the home and the growth of mold—a serious and expensive repair. Neglecting these types of structural maintenance issues in communities of color devalues the homes and can lead to a significant decline in neighborhood property values.

## Baltimore, MD, Metropolitan Area

The NFHA staff evaluated 120 properties in Baltimore City and the surrounding region, including Anne Arundel, Howard, and Baltimore Counties. Trash on REO properties was one of the major issues documented by investigators: 72 percent of REO properties in African-American neighborhoods had a significant amount of trash on the premises, compared to 62 percent of homes in White areas. Forty-three percent of Baltimore REOs in African-American neighborhoods had boarded up windows, while this only occurred in 28 percent of homes evaluated in White neighborhoods. NFHA staff documented that in urban African-American neighborhoods in Baltimore, whole blocks were boarded up and visibly vacant, with poor curb appeal, and minimal signage. Poor maintenance practices by banks with respect to their REO inventory in these areas only serves to further degrade and depress these neighborhoods.

## Philadelphia, PA

Unlike other geographical regions where many of the REO homes were single-family structures, the REO properties evaluated in Philadelphia were all row houses. Ninety-one percent of homes in African-American neighborhoods were subject to more than 5 deficits, compared to only 63 percent of REOs in White neighborhoods. Similarly, over 10 maintenance or marketing problems were documented in 41 percent of homes in African-American neighborhoods, while none of the homes in White areas had more than 10 maintenance or marketing problems. In other words, REOs in African-American neighborhoods were 44.4 percent more likely to have more than 5 maintenance problems and 310 percent more likely to have more than 10 maintenance problems than REOs in White neighborhoods.

## East Bay Area, CA

NFHA staff evaluated 140 REO properties in Oakland, Richmond, and Concord, California.  Because this is a particularly diverse region, properties were evaluated in communities that were predominantly White, Latino and African-American, as well as some diverse communities with an Asian American population of up to 33 percent. Seventy-six percent of REOs in African-American neighborhoods, 75 percent of REOs in Latino Neighborhoods, and 77 percent of REOs in neighborhoods with a majority of non-white residents had more than 5 deficits, whereas only 46 percent of homes in White communities had comparable numbers.  In other words, each minority community was at least 63 percent more likely then White communities to experience over 5 maintenance problems per home.

When examining the number of properties with more than 10 deficits, only 5 percent of homes in White neighborhoods were affected.  This compared to 42 percent of REO properties in Latino neighborhoods, 15 percent of African-American REO homes, and 23 percent of homes in communities with a majority of residents of color.  Accordingly, REOs in Latino neighborhood were 740 percent more likely to experience more than 10 deficits, REOs in African-American homes were 200 percent more likely to experience more than 10 deficits, and REOs in other communities of color were 360 percent more likely to experience more than 10 deficits, compared to REOs in White neighborhoods.

REOs in the African-American neighborhoods in the East Bay region were 3.45 times more likely to not have a "For Sale" sign than their White counterparts.  Similarly, Latino homes were 92 percent less likely to be marketed with a for sale sign.  Communities of color also experienced a higher number of curb appeal problems.  For example, 55 percent of REOs in African-American neighborhoods had overgrown shrubs and 60 percent of homes had trash on their lawns, while only 18 percent of REOs in White neighborhoods had overgrown or dead shrubbery, and only 36 percent were littered with trash.

## Phoenix, AZ

Phoenix, Arizona, is one of the markets hit hardest by the foreclosure crisis, and Latino communities in the region are no exception.  The investigation in this region examined 72 REO properties, including a number from the predominantly Latino community of Maryvale, which has an extremely high vacancy rate and is subject to vast amounts of blight due to abandonment and neglect of REOs by banks.  Seventy-three percent of REOs in Latino communities had more than 5 maintenance problems, compared to only 25 percent of homes in White neighborhoods.  And 19 percent of REOs in Latino neighborhoods had more than 10 problems, while none of the REOs in the White areas showed comparable deficits.

Signage and marketing was particularly problematic in Phoenix, with 73 percent of REO properties evaluated in Latino neighborhoods missing a "For Sale" sign.  Only 31 percent of homes in predominantly White neighborhoods were not marketed as being for sale with signage.  Similarly, 11 percent of REOs in Latino areas were marketed as distressed with a bank-owned, auction, or foreclosure sign, while only one property in a White neighborhood was marketed as distressed.

Homes in Latino areas in Phoenix were also left unsecured more frequently than their counterparts in White neighborhoods–40 percent of homes in Latino neighborhoods had unsecured or broken doors and locks and 43 percent had broken or boarded windows, while only 6 percent and 19 percent, respectively, of homes in White neighborhoods were subject to the same problems.

## Miami/Fort Lauderdale, FL

Miami's housing market is also one of the hardest hit by foreclosures in the nation, with a glut of REOs sitting on the market in neighborhoods of all races. Seventy-one properties were evaluated in the Miami area for this investigation, and disparities in maintenance were documented between Latino neighborhoods, African -American neighborhoods, and White neighborhoods. For example, 46 percent of REO properties evaluated in African -American neighborhoods in the Miami-Fort Lauderdale area had broken windows and 25 percent had broken or unsecured doors. Fifty percent of REOs in Latino communities had unsecured or broken doors and 30 percent had broken or boarded windows, while in White areas, only 16 percent of homes had unsecured doors and only 16 percent had broken windows.

## Dayton, OH

The Miami Valley Fair Housing Center has been examining the fair housing issues regarding REO property maintenance for several years, and patterns of poor maintenance in Dayton's African-American neighborhoods compared to White neighborhoods persist. Not a single property in African-American neighborhoods scored above 90 on the 100-point scale, and 44 percent of homes in African-American neighborhoods reviewed in Dayton had more than 10 maintenance deficits, while none of the homes in White areas had over 10 problems.

Our investigation revealed a particularly large disparity in Dayton with respect to structural and security issues. Sixty percent of REOs in African-American neighborhoods had broken or unsecured doors, while only 18 percent of REOs in White neighborhoods suffered from this problem. 40 percent of REOs in African-American neighborhoods had broken or boarded windows, while only 21 percent of the REO homes in predominantly White areas had their windows broken or boarded.

Disparities with regard to signage were also consistent in this area. An alarming 84 percent of homes in African-American neighborhoods had no "For Sale" sign out front, while only 64 percent of homes in White areas had the same problem.

## Dallas, TX

There were significant disparities in the Dallas/Forth Worth region. In this region, the North Texas Fair Housing Center and NFHA evaluated 115 REO properties in Latino, African-American, and White neighborhoods, as well as in predominantly non-White neighborhoods.

Curb appeal issues were particularly problematic. Sixty percent of REOs in African-American neighborhoods, 68 percent of REOs in Latino neighborhoods, and 73 percent of REOs in predominantly non-White neighborhoods had trash on their properties, while only 37 percent of communities in White areas had the same problem. Similarly, 75 percent of REOs in African-American neighborhoods had overgrown grass and poorly maintained lawns, while this was the case for only 32 percent of properties in White areas.

## Atlanta, GA

It comes as no surprise that Atlanta, a metropolitan region in which foreclosed homes make up 24 percent of all home sales,[27] is home to an exorbitant number of REO properties. Metro Fair Housing in Atlanta and NFHA staff visited 187 REO properties in the region and found striking racial disparities across all maintenance categories. Seventy-four percent of REOs in African-American neighborhoods were documented to have more than 5 maintenance deficits,

while this was the case for 57 percent of REO properties in White neighborhoods. This disparity increased substantially when considering properties with more than 10 problems. Thirty-two percent of REOs in African-American neighborhoods had more than 10 deficits, while not a single property in a White neighborhood was subject to such poor maintenance.

REO properties in African-American neighborhoods were nearly 4.65 times more likely than homes in White neighborhoods to be missing a "For Sale" sign on the property. Curb appeal issues were also a huge problem in communities of color: 31 percent of homes in all communities of color had overgrown lawns, while less than 10 percent of REOs in White neighborhoods had unmaintained lawns; and 31 percent of REOs in African-American neighborhoods had unsecured or broken doors, while only 14 percent of REOs in white areas had the same problem.

27  Rich, Motoko, "In Atlanta, Housing Woes Reflect Nation's Pain," New York Times, January 31, 2012, Available at: http: //www. nytimes.com/2012/02/01/ business/economy/in-atlanta-housing-woes-reflect-nations-economic-pain.html?pagewanted=all

# WASHINGTON, DC



**Figure 1 -** REO Properties by Maintenance Score, Washington DC
*Source: U.S. Census Bureau 2010*

## Number of REO Properties By Grade and Neighborhood Racial Composition

|                          | A  | B  | C  | D  | F  | Total |
|--------------------------|----|----|----|----|----|-------|
| African American         | 14 | 47 | 58 | 51 | 37 | 207   |
| Predominantly Non-White  | 2  | 1  | 4  | 3  | 0  | 10    |
| White                    | 3  | 4  | 5  | 6  | 0  | 18    |
| **Total**                | **19** | **52** | **67** | **60** | **37** | **235** |

# BALTIMORE, MARYLAND



**Figure 2 -** REO Properties by Maintenance Score, Baltimore, MD
*Source: U.S. Census Bureau 2010*

### Number of REO Properties By Grade and Neighborhood Racial Composition

|                         | A | B  | C  | D  | F  | Total |
|-------------------------|---|----|----|----|----|-------|
| African American        | 1 | 16 | 20 | 18 | 12 | 67    |
| Predominantly Non-White | 1 | 1  | 2  | 2  | 0  | 6     |
| White                   | 4 | 14 | 10 | 8  | 12 | 48    |
| **Total**               | 6 | 31 | 32 | 28 | 24 | 121   |

# PHILADELPHIA, PENNSYLVANIA



**Figure 3** - REO Properties by Maintenance Score, Philadelphia, PA
*Source: U.S. Census Bureau 2010*

## Number of REO Properties By Grade and Neighborhood Racial Composition

|                          | A | B  | C  | D  | F | Total |
|--------------------------|---|----|----|----|---|-------|
| African American         | 1 | 5  | 6  | 8  | 2 | 22    |
| Latino                   | 0 | 1  | 0  | 0  | 0 | 1     |
| Predominantly Non-White  | 0 | 2  | 4  | 2  | 0 | 8     |
| White                    | 0 | 6  | 2  | 0  | 0 | 8     |
| **Total**                | 1 | 14 | 12 | 10 | 2 | 39    |

# EAST BAY AREA, CALIFORNIA



**Figure 4** - REO Properties by Maintenance Score, Bay Area, CA
*Source: U.S. Census Bureau 2010*

### Number of REO Properties By Grade and Neighborhood Racial Composition

|  | A | B | C | D | F | Total |
|---|---|---|---|---|---|---|
| African American | 4 | 12 | 7 | 9 | 1 | **33** |
| Latino | 1 | 8 | 4 | 5 | 6 | **24** |
| Predominantly Non-White | 4 | 15 | 12 | 7 | 6 | **44** |
| White | 14 | 14 | 8 | 2 | 1 | 39 |
| **Total** | **23** | **49** | **31** | **23** | **14** | **140** |

# PHOENIX, ARIZONA



**Figure 5** - REO Properties by Maintenance Score, Phoeniz, AZ
*Source: U.S. Census Bureau 2010*

### Number of REO Properties By Grade and Neighborhood Racial Composition

|                         | A  | B  | C  | D | F | Total |
|-------------------------|----|----|----|---|---|-------|
| Latino                  | 5  | 9  | 16 | 4 | 3 | 37    |
| Predominantly Non-White | 12 | 5  | 2  | 0 | 0 | 19    |
| White                   | 10 | 4  | 2  | 0 | 0 | 16    |
| **Total**               | **27** | **18** | **20** | **4** | **3** | **72** |

# MIAMI / FT. LAUDERDALE, FLORIDA



**Figure 6** - REO Properties by Maintenance Score, Miami / Ft. Lauderdale, FL
*Source: U.S. Census Bureau 2010*

|  | A | B | C | D | F | Total |
|---|---|---|---|---|---|---|
| African American | 4 | 6 | 11 | 2 | 1 | 24 |
| Latino | 3 | 2 | 0 | 2 | 3 | 10 |
| Predominantly Non-White | 1 | 7 | 6 | 4 | 0 | 18 |
| White | 5 | 3 | 7 | 3 | 1 | 19 |
| **Total** | **13** | **18** | **24** | **11** | **5** | **71** |

# DAYTON, OHIO



**Figure 7** - REO Properties by Maintenance Score, Dayton, OH
*Source: U.S. Census Bureau 2010*

|  | A | B | C | D | F | Total |
|---|---|---|---|---|---|---|
| African American | 0 | 5 | 7 | 9 | 4 | **25** |
| White | 3 | 10 | 14 | 3 | 3 | 33 |
| **Total** | **3** | **15** | **21** | **12** | **7** | **58** |

# DALLAS, TEXAS



**Figure 8** - REO Properties by Maintenance Score, Dallas, TX
*Source: U.S. Census Bureau 2010*

**Number of REO Properties By Grade and Neighborhood Racial Composition**

|  | A | B | C | D | F | Total |
|---|---|---|---|---|---|---|
| African American | 0 | 20 | 18 | 6 | 4 | **48** |
| Latino | 0 | 11 | 7 | 11 | 8 | **37** |
| Predominantly Non-White | 0 | 2 | 5 | 1 | 3 | **11** |
| White | 11 | 5 | 3 | 0 | 0 | 19 |
| **Total** | **11** | **38** | **33** | **18** | **15** | **115** |

36

# ATLANTA, GEORGIA



**Figure 5 -** REO Properties by Maintenance Score, Atlanta, GA
*Source: U.S. Census Bureau 2010*

**Number of REO Properties By Grade and Neighborhood Racial Composition**

|  | A | B | C | D | F | Total |
|---|---|---|---|---|---|---|
| African American | 18 | 34 | 39 | 34 | 23 | **148** |
| Latino | 0 | 0 | 1 | 0 | 1 | **2** |
| Predominantly Non-White | 2 | 2 | 5 | 6 | 1 | **16** |
| White | 3 | 9 | 8 | 0 | 1 | **21** |
| **Total** | **23** | **45** | **53** | **40** | **26** | **187** |



# SECTION 5: RECOMMENDATIONS

The findings outlined in this report point to a disconcerting pattern of discriminatory practices in communities across the country. There are a number of sound actions that the various key players in the REO disposition practice can undertake to ensure that REO properties are maintained without regard to the racial or ethnic composition of the neighborhood, as outlined below.

Banks must have a comprehensive understanding of the Fair Housing Act – which protects people on the basis of race, color, religion, national origin, familial status, disability, and sex–as well as state and local fair housing laws which may include protections for sexual orientation, gender identity and source of income. The Fair Housing Act also prohibits discrimination because of the race or national origin of the residents in a neighborhood. The process of REO disposition has many key players and many stages in which housing discrimination can occur. It is the responsibility of the banks to make sure that all parties involved are trained in the Fair Housing Act and that strict adherence to the law is enforced. All vendors selected to work on the disposition of REOs should receive high-quality fair housing training, not be the subject of pending complaints of discrimination, and have successfully resolved any past complaints of discrimination.

Each entity that owns an REO is liable for the actions of its contractors and their subcontractors. The banks have an obligation to implement sound quality control practices to guarantee that REOs are maintained and marketed without regard to the racial or ethnic composition of the neighborhoods in which REOs are located.

## Selection of Vendors by the Banks

Some banks hire national companies to dispose of their REOs in specific regions of the country. This often results in money trickling down to subcontractors at a local level to address the maintenance and marketing of REOs. NFHA has observed that banks with direct contracts with local vendors typically have better onsite maintenance of REOs.

An REO listing broker's local expertise is vital to the proper treatment of REOs, and banks must enact policies to ensure that the broker assigned to an REO property (a) has an office that is located in close proximity to the home, and (b) has the capacity to closely manage and oversee the treatment of the REO. Using this type of selection criteria will ensure that REO brokers are familiar with the community and are committed to its recovery. Banks should also maintain and routinely train a network of diverse and multilingual agents who can work to provide equal access for non-English speaking buyers and promote residential integration.

Equally important in the fair treatment of REO properties is the selection of the preservation and maintenance companies that provide routine maintenance. These companies should be selected by the banks using geographic parameters similar to those used to select brokers. This will ensure that companies with local offices are hired for this work, and it also provides a unique opportunity to engage small businesses from the community.

## Detailed Expectations and Oversight of all Vendors in the REO Disposition Process

Banks should ensure that they provide clear guidelines for all vendors that includes detailed agreements, policies, and procedures to ensure high quality property maintenance regardless of the racial or ethnic composition of a neighborhood. These documents should clearly outline expectations for speedy and thorough processing of properties from the time they become bank-owned through the point of sale. For example, Freddie Mac implements a policy that requires properties to be secured, trash and debris to be cleaned out, and the yard brought up to an acceptable standard within 72 hours of the REO becoming vacant.

Banks should also empower their vendors to address maintenance and safety issues that may surface by ensuring

that reimbursement for work on the property is timely. Some vendors report waiting up to six months for reimbursements. Preservation maintenance vendors ought to have a certain amount of financial leeway to address emergency issues arising at the REO. For example, a vendor ought to have authority to immediately repair leaking water pipes, running toilets, and broken gutters, doors or windows without having to go through a lengthy administrative process for approval of expenditures. Access to an emergency repair fund with guidelines for what constitutes an emergency would be a good practice.

These practices should be reinforced with a vigorous system of quality control. Banks should hire inspectors that visit a substantial percentage of properties, especially homes located in integrated and minority neighborhoods and modestly prices homes, to check overall quality in maintenance and whether or not "For Sale" signs are posted. For example, Freddie Mac implements a monthly inspection of 25 percent of its REOs using a 13-point checklist. NFHA observed that Freddie Mac properties in all neighborhoods appeared to be properly maintained and professionally marketed. High quality maintenance can be due, in part, to Freddie Mac's practice of posting an 800 hotline number so neighbors can report issues requiring immediate action. Additionally, disciplinary procedures should be in place to take regular action against any vendor with performance problems—including terminating the contract with that vendor. These best practices minimize the negative impact REOs can have on a neighborhood.

## Marketing and Sale of the Property

Banks must utilize robust valuation practices and price homes at fair market value in order to prevent discriminatory impacts in communities of color. If a bank uses a Broker Price Opinion (BPO) rather than a full appraisal, the BPO should include interior inspections accompanied by photographs. When setting the list price for an REO, a broker cannot include any consideration of the race or ethnicity of the neighborhood's residents.

REO properties should be advertised broadly. The real estate company listing the home should reach out to people living inside and outside the neighborhood in which the REO is located. Expansive free advertising on the internet, local blogs, listservs and other online social media can tap into a market segment that may not be familiar with the neighborhood and its opportunities for homeownership. This method of marketing promotes residential integration In addition to listing properties on the online Multiple Listing Service (MLS), brokers should have standardized signage to use in all communities. NFHA observed some real estate companies using cardboard "For Sale" signs in neighborhoods of color while placing professionally constructed metal or wooden signs in White neighborhoods

## Make REO Data Transparent and Publicly Accessible

Each bank should have an online publicly-accessible, regularly-updated database of its REO listings, including the name of the asset manager or vendor(s) responsible for listing, maintaining and selling the property. The availability of these data in real time would empower communities to monitor REO disposition practices and enable them to contact the bank's representative when problems are identified. Publicly accessible data about REOs will also facilitate the purchase of these properties by prospective owner-occupants rather than investors.

## Conduct Major Investigation of Bank Policies and Practices

Federally regulated banks play a major role with respect to REOs, both as owners of these foreclosed properties and as managers of other institutions' REO portfolios. Federal banking regulators, including the Consumer Financial Protection Bureau and federal law enforcement agencies, should use their authority to conduct a major, nationwide investigation of bank and servicer policies and practices with regard to REO properties, similar to this nine-city investigation. The investigation should look especially for any discriminatory policies and practices in the management and marketing of

# SNAPSHOT: PHOENIX, ARIZONA





Neighborhood: Predominantly Latino



NFHA staff visited properties in the Phoenix area in November, 2011. Given the climate in the Southwest, many of the homes in this area did not have lawns and even fewer had gutters. The property shown on this page had multiple structural and curb appeal issues, as many of the property's windows were boarded up, and the garage door was also covered in boards. Trash littered the front lawn, which was patchy and overgrown in some areas and dead in others. There was also damage to the roof and dead, overgrown shrubbery on the side of the house.








Neighborhood: Predominantly Latino

NFHA staff also visited this property in the Maryvale suburb of Phoenix. Graffiti covered the sides and back of the home, and boarded up windows were a clear indication that the home was vacant and uncared for. One broken window was left shattered and discarded on the side of the property as well, and there was no signage marketing the property for sale. This sort of treatment in Phoenix's Latino neighborhoods is unacceptable, especially when REO properties owned by the same lenders in the neighboring white suburb of Peoria had manicured lawns, clear and attractive for sale signs, and minimal structural damage.

REOs, including policies or practices that may have a disparate impact on members of protected classes. In addition to the issues specifically addressed in this report, a larger investigation should examine whether and to what extent vendor contracts are made available to minority and women-owned enterprises.

Congress should also investigate discrimination in the REO arena. While Congress has held extensive hearings on the housing crisis, this particular issue and its implications on the national debt and our nation's economic health have not been sufficiently addressed.

## Make Provisions for Local Guidance and Assistance

The vision for rebuilding communities affected by the foreclosure crisis rests at the local level, with agencies and institutions whose mission it is to create healthy and vibrant neighborhoods of opportunity. Investors who pursue bulk purchases of REOs may not share or be guided by that vision. By making sure that some of these foreclosed homes are put in the hands of non-profit community development organizations, community land trusts, and other community-based and community-minded institutions, the federal government and banks can facilitate the realization of that vision. Of course, fair housing principles and requirements should be followed at every step.

One way to address this issue is to give prospective owner-occupants and non-profit community organizations greater opportunities to purchase foreclosed homes. Some policies offer only a 15-day period for such buyers before opening sales up to investors. We recommended that these homes be available exclusively to owner-occupants and non-profit organizations for at least 30 days to put down an offer before they are available to the entire market. (Additional time is necessary to close on the loan.)

In addition, communities that have been hard hit by foreclosures are struggling to devise ways to help neighborhoods recover from the damage they have suffered. Many have developed revitalization plans, using federal funds under the Neighborhood Stabilization, Community Development Block Grant, HOME and other programs, as well as other sources. The disposition of REO properties, both at the point of sale to investors and the point at which investors resell these homes, should be coordinated with these local plans so as to leverage a positive impact rather than undermine it.

## Use REOs to Expand Housing Opportunities

Many REO properties are located in communities that offer access to quality education, good jobs and transportation, parks and recreation facilities, healthy grocery stores and many such amenities. Yet many of these communities are largely segregated, with few families of color among their residents. This is, in part, a function of the discriminatory practices that persist in the real estate and banking industries. Banks and investors purchasing these properties must be required to take affirmative steps to market these homes to a wide range of households, including families of color, families with children, people with disabilities and others, to expand the range of housing options available to all families and begin to make a dent in the patterns of segregation that have marred our country.

## Create a Path Back to Homeownership

Over 4 million families have lost their homes to foreclosure in the last five years. Evidence from a variety of federal enforcement actions tells us that in many cases, families were steered into loans more risky and more expensive than their financial qualifications should have dictated.28 In other cases, people have been caught between record high levels of sustained unemployment and falling home prices that have made it impossible for them to sell or refinance their homes. Offering these families a path back to homeownership is an important component of rebuilding stable, vibrant communities.

# SNAPSHOT: ATLANTA, GEORGIA

 

Neighborhood: Predominantly African-American

Staff from Metro Fair Housing and NFHA visited these two homes in the Atlanta area in February, 2012. Both REOs are located in predominantly African-American neighborhoods and are indicative of the kind of poor maintenance practices rampant in Atlanta. The first house (shown above) was completely overrun with weeds, vines, and overgrown grass, and the home had been subject to severe damage to its siding and frame. The second proprety (pictured below) was covered in trash and unraked leaves, and had boarded up doors and windows, The photograph of back of the house shows that there were unsecured holes and openings in to the back of the property that left the interior vulnerable to mold and water damage. Neither home was marketed with a "for sale" sign.

 

Neighborhood: Predominantly African-American



When an REO is acquired at a price below the previous mortgage balance, the new owner can set a new sales price that is based on the property's market value, eliminating the burden of excess debt that was fueled by unsustainable mortgage products. Many REO properties are expected to be put back into use as rentals. Some of these may remain rental properties for the foreseeable future, while others are likely to be resold within a few years. The first group may help address the country's growing need for rental units. The second group may offer a path to homeownership for families who have been through foreclosure and others who have difficulty qualifying for a mortgage in the current mortgage market.

Non-profit, community-based development organizations and community development financial institutions are exploring the use of lease-purchase programs for these REO properties. Under such programs, a portion of each month's rent is set aside to build a down payment, and the rental period gives the tenant (who may be the previous owner) time to repair their credit with the goal of ultimately purchasing the home. With the proper protections built in for the tenant/potential purchaser, this may be a promising path to rebuilding financial security for families knocked low by foreclosure. NFHA recommends that banks and other investors who hold REO portfolios work with appropriate non-profit and/or local government agencies to make some REO properties available through such lease-purchase programs.

# AN OPPORTUNITY FOR DIVERSITY



*Opportunity Levels provided by The Kirwan Institute: For the Study of Race and Ethnicity (http://www.kirwaninstitute.org/)*
*REO properties between July 2009 and June 2010 in Montgomery County, Ohio*

*Sources: U.S. Department of Housing and Urban Development, Neighborhood Stabilization Data and Census 2010 Block Group Data*

While African-American and Latino families have faced foreclosure in disproportionately high numbers, the problem of foreclosures is widespread and has affected families of all types. The map above illustrates that REO properties are located in many different neighborhoods across the Dayton area, including a number that have high-performing schools, good access to jobs, health care, grocery stores and other amenities, and low crime rates. These are neighborhoods that have been described as "high opportunity" areas. Many are also highly segregated. The federal Fair Housing Act mandates an effort to break down the barriers that have led to such segregation, and these REO properties offer a unique vehicle for carrying out that mandate. Setting a goal of creating diverse neighborhoods, and pairing that goal with an aggressive campaign to market foreclosed homes in high opportunity areas in Dayton to a broad array of prospective homebuyers could give a wider range of families access to those opportunities, while at the same time addressing the seemingly intractable problem of segregation.



# SECTION 6: CONCLUSIONS

This investigation by staff from NFHA and its member organizations was conducted to examine the disparities in the maintenance and marketing practices implemented and used by major lenders and servicers in the care of REO properties. Overall, bank-owned properties have suffered from a disproportionate amount of negligence and maltreatment by lenders and services in communities of color, and it has resulted in a litany of adverse effects on the residents of these neighborhoods. Financially and otherwise, the blight brought upon African-American and Latino neighborhoods as a result of poor maintenance and marketing practices of REOs has also affected and harmed potential homeowners, individuals who have purchased REO properties, and the local governments that have jurisdiction over these communities of color.

This investigation revealed many disturbing and consistent trends in the maintenance and marketing of REO properties by lenders and servicers depending on the racial composition of the neighborhoods in which they were located. Across various categories, REO homes in African-American and Latino neighborhoods were routinely found to be in substandard condition, and thus were found to be more likely to remain vacant and continue inflicting damage on their neighborhoods. Investigations in each region that NFHA visited revealed specific trends regarding the marketing and maintenance of the REO housing stock, though specific trends were driven by specific regional factors. However, the primary, negative role that contributed to these trends was played by the lenders and servicers responsible who are responsible for maintaining these properties, as their negligence and inconsistent practices resulted in the findings outlined in this report.

NFHA and its member agencies hope that the recommendations outlined in this report are not only taken into account, but also implemented and enforced nationally by all entities who have responsibility for REO properties. Those responsible for the Fair Housing Act with respect to REO properties must be held accountable for a seemingly omnipresent environment of negligence and mismanagement of REOs in neighborhoods of color. By failing to provide consistent and equal maintenance and marketing practices to their portfolio of REO properties in both communities of color and White communities, lenders and servicers commit housing discrimination in violation of federal law. More importantly, these actions have caused substantial harm to individuals and families of all races across throughout America, and for this reason NFHA and its member agencies hope that future foreclosure properties in communities of color will not cause deterioration of those properties or cause further harm to those communities.

This report benefited greatly from the knowledge, expertise and wisdom of a number of people working within the fair housing movement.  The National Fair Housing Alliance and its partners would like to thank:

- **Steve Dane** from Relman, Dane & Colfax, PLLC and **Peter Romer-Friedman** from Cohen, Milstein, Sellers & Toll PLLC for their trusted legal assistance throughout the investigation aand incisive analysis of legal issued uncovered; and

- **David Lauri** and **Jim McCarthy** of the Miami Valley Fair Housing Center for their outstanding technical suppoer in developing a database used by all the members involved in this project nationwide; and

- **Shanti Abedin**, for taking the lead in compiling the contents and designing the layout of this report

This report would not have been possible without the commitment and dedication of staff at both NFHA and its partner agencies.

*Report Issued on April 4, 2012, reissued December 4, 2012*





