**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-00839<br><br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
SECOND AMENDED COMPLAINT BY DEFENDANTS DEUTSCHE BANK
NATIONAL TRUST COMPANY, AS TRUSTEE, AND DEUTSCHE BANK TRUST
COMPANY AMERICAS, AS TRUSTEE**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    BACKGROUND ................................................................................. 2

III.   ARGUMENT ...................................................................................... 5

    A.     Plaintiffs' Claims Fail Because the Trustees Do Not Maintain or Market the REO Properties at Issue ...................................................... 5

         1.     The Trustees Have Limited, Contractually Defined Duties...................... 5

         2.     Servicers Are Not "Agents" of an RMBS Trustee.................................... 7

         3.     The Conditional "Back-Up" Servicing Role in the Governing Agreements Does Not Saddle the Trustees With Any Responsibility for REO Properties .......................................... 12

    B.     The 2016 HUD Decision Confirms That the Trustees Cannot Be Responsible for Any of the Conduct at Issue........................................ 14

    C.     Plaintiffs' Claims Should Be Dismissed as to Nine Properties to Which Plaintiffs Admit the Trustees Did Not Hold Title................................. 15

    D.     Plaintiffs' Claims Should Be Dismissed as to Two Properties for Which the SAC Lacks Sufficient Information to Identify the Governing Agreements ............................................................ 15

IV.   CONCLUSION.................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Deutsche Bank Nat. Trust Co.*,
  2013 WL 3320455 (S.D. Cal. July 1, 2013) ....................................................4, 10

*Bakal v. U.S. Bank N.A.*,
  15-cv-6976, 2018 WL 1726053 (S.D.N.Y. Apr. 2, 2018) .......................................6

*Creek v. Village of Westhaven*,
  144 F.3d 441 (7th Cir. 1998) ................................................................................7

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*,
  838 F.2d 66 (2d Cir. 1988) ...................................................................................5

*Faith Assembly v. Titledge of N.Y. Abstract, LLC*,
  961 N.Y.S.2d 542 (N.Y. App. Div. 2013) .............................................................10

*Fixed Income Shares: Series M v. Citibank, N.A.*,
  69 N.Y.S.3d 288 (N.Y. App. Div. 2018) ................................................................5

*In re Amaranth Natural Gas Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008).....................................................................8

*Johnson v. Fed. Home Loan Mortg. Corp.*,
  No. C12-1712 TSZ, 2013 WL 2445367 (W.D. Wash. June 5, 2013), *aff'd*, 793
  F.3d 1005 (9th Cir. 2015) .....................................................................................8

*Jones v. Aegis Wholesale Corp.*,
  No. 2:15-cv-01134-JAM-CKD, 2015 WL 9260837 (E.D. Cal. Dec. 18, 2015).......................8

*Kinda Lake Towing, L.P. v. Donat Insurance Services, LLC*,
  2016 WL 5339438 (N.D. Ill. Sept. 20, 2016) .............................................8, 9, 10

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)..............................................................................................15

*Magnini v. Centegra Health System*,
  34 N.E.3d 1115 (Ill. App. 2015) ......................................................................8, 11

*Nat'l Fair Hous. All. v. Bank of America, N.A.*,
  1:18-cv-01919-CCB, ECF No. 1 (D. Md. June 26, 2018).................................4, 14

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*,
  294 F. Supp. 3d 940 (N.D. Cal. 2018) .................................................................14

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Peak Partners, LP v. Republic Bank*,
  191 F. App'x 118 (3d Cir. 2006) ........................................................5

*Peoples v. U.S.*,
  403 F.3d 844 (7th Cir. 2005) ..........................................................7

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*,
  109 F. Supp. 3d 587, 589 (S.D.N.Y. 2015)...............................................6

*Spano v. V & J Nat'l Enterprises, LLC*,
  264 F. Supp. 3d 440 (W.D.N.Y.) ..................................................8, 9, 10

*STS Partners Fund, L.P. v. Deutsche Bank Securities, Inc.*,
  53 N.Y.S.3d 632 (N.Y. App. Div. 2017) .................................................6

*Tobin v. Nationstar Mortgage Inc.*,
  No. 16-cv-00836, 2016 WL 1948786 (C.D. Cal. May 2, 2016).............................8

*Wisconsin Central Ltd. v. TiEnergy, LLC*,
  894 F.3d 851 (7th Cir. 2018) ......................................................8, 10

*Wright v. Associated Ins. Cos. Inc.*,
  29 F.3d 1244 (7th Cir. 1994) .........................................................4

### REGULATIONS

17 C.F.R. 229.1122 ......................................................................12

## I.        INTRODUCTION

Plaintiffs' claims concern alleged wrongdoing arising from the maintenance and sale of residential properties (the "REO properties") held in RMBS trusts (the "Trusts").  Defendants Deutsche Bank National Trust Company[1] and Deutsche Bank Trust Company Americas serve as trustees (in such capacities, each a "Trustee," and collectively, the "Trustees") of certain of those Trusts.  Plaintiffs do not allege that the Trustees themselves undertook the challenged conduct, which the Complaint alleges was performed by Ocwen Loan Servicing, LLC ("Ocwen") and Altisource Solutions, Inc. ("Altisource," and collectively with Ocwen, the "Servicers").[2]  Instead, Plaintiffs again assert what amounts to a strict liability theory against the Trustees by virtue of the Trustees holding bare legal title to the REO properties on behalf of the Trusts and Trust beneficiaries, a theory this Court squarely rejected in an opinion that serves as the law of this case. Namely, the Court already rejected Plaintiffs' contention that the Trustees "are stuck on the hook for FHA compliance" merely because legal title to the REO properties at issue is held in their names.  In the Second Amended Complaint (ECF No. 70) ("SAC"), Plaintiffs attempt to plead their way around this holding by adding allegations to support their incorrect assertions that (1) the Servicers are the Trustees' agents, or (2) the Trustees are somehow responsible for servicing because of their alleged roles as "back-up" servicers.  Both arguments miss the mark.

The detailed contracts governing the Trusts do not designate a Servicer as an "agent" of any Trustee.  Plaintiffs attempt to conjure such a relationship from contracts that actually show the *opposite*:  Servicers and Trustees are independent, arms-length service providers for the Trusts,

---

[1] In each complaint filed in this action, DBNTC is incorrectly named as "Deutsche Bank National Trust."
[2] The Trustees refer to Ocwen and Altisource as "Servicers" with respect to these Trusts based on Plaintiffs' allegations in the SAC that these entities "acted as primary servicers for the Deutsche Bank REO properties during the period covered by this Complaint."  SAC ¶ 64.  This, and other allegations described below, are assumed true solely for the purposes of this motion.

and the Trustee of a given Trust does not select or appoint the Trust's Servicer(s). The supposed "agency" allegations in the SAC demonstrate that the contracts, not the Trustee, dictate the terms of the Servicers' duties and performance, and they leave any gaps to the Servicer's own discretion in accordance with the "Servicing Standard." This standard requires the Servicers to service REO properties owned by the Trusts as they would service properties owned by themselves. Plaintiffs' own allegations make clear that the Servicers' actions with respect to the REO properties—the only actions relevant to Plaintiffs' claims—are governed by the Servicing Standard, and *not* the Trustees, eviscerating any suggestion the Trustees are somehow controlling the Servicers' conduct.

Plaintiffs' arguments concerning "back-up" servicing are similarly undercut by Plaintiffs' own factual allegations. As Plaintiffs allege, the role of "back-up" servicer is a purely contingent one: a "back-up" servicer does not take on any servicing duties unless the applicable Servicer is first terminated. Plaintiffs allege that Ocwen and Altisource directly undertook the allegedly wrongful servicing actions, so on the facts alleged, the Trustees could not have taken on any contingent "back-up" servicing duties with respect to the REO properties because the Servicers were still performing their servicing roles. Thus, Plaintiffs have pled their own legal theory into irrelevance.

For these reasons and the reasons stated in the contemporaneously filed Memorandum in Support of Defendants' Joint Motion to Dismiss the Second Amended Complaint, Plaintiffs' claims against the Trustees should be dismissed.

## II. BACKGROUND

For the Court's convenience, the Trustees provide the following brief background information regarding the Trustees' roles and responsibilities with respect to the REO properties at issue. Where such information already was reflected in the Trustees' original motion to dismiss (ECF No. 33) or this Court's November 19, 2018 Memorandum Opinion and Order (ECF No. 54)

("Order"), the Trustees have cited or quoted it to limit duplicative briefing.

Plaintiffs base their claims on an examination of 1,141 properties alleged to be "owned" by the Trustees "after foreclosure" ("REO properties"). *See* SAC ¶¶ 3, 5; *id.* App'x A (listing the properties). As this Court stated, "[t]he REO properties at issue here all have mortgages which have been pooled together to form residential mortgage-backed securities ('RMBS'). Such securities are created when an investment bank purchases thousands of residential mortgages and then pools them together." Order at 11.

Plaintiffs do not allege that the Trustees engaged in the allegedly discriminatory property maintenance services at the heart of their claims. Rather, Plaintiffs allege that the Trustees "utilized Ocwen and/or Altisource to provide property maintenance services" for the properties at issue. SAC ¶ 35. Plaintiffs acknowledge that the Trustees—acting in their distinct legal capacity as RMBS trustees—have different roles and responsibilities with respect to these REO properties than Ocwen and Altisource. *See* SAC ¶¶ 54, 56 (alleging that "a trustee" and a "loan servicer" are different parties to an RMBS transaction that perform different functions).

RMBS trusts are governed by various pooling and servicing agreements ("PSAs"), indentures, trust agreements, and servicing agreements (collectively, and with respect to the Trusts at issue, the "Governing Agreements"), which allocate responsibilities among the parties to those agreements. *See* ECF No. 33 at 8, n. 6; Order at 11. The Governing Agreements designate "a trustee to hold title to the real estate securing the RMBS," on the one hand, and they separately designate one or more "servicer[s] to preserve and manage the property," on the other. Order at 11. "In this case, the Deutsche Bank Defendants are the PSA-designated trustees; Ocwen and Altisource are the servicers." *Id.*

The PSA governing IndyMac INDX Mortgage Loan Trust 2006-AR41 ("AR41 Trust

PSA"), which the Trustees cited in their original motion to dismiss and which this Court took judicial notice of in its Order, is an example of a Governing Agreement relevant to the issues involved in this litigation. *See* ECF No. 47-1, Ex. F (attaching a copy of the publicly available AR41 Trust PSA); Order at 14;[3] *see also* accompanying Declaration of Kenneth Kliebard ("Kliebard Decl."), Ex. B (attaching the same AR41 Trust PSA). The Trustees' limited duties and responsibilities set forth in the AR41 Trust PSA are representative of the types of duties and responsibilities of the Trustees in the Governing Agreements for the RMBS trusts identified as associated with the REO properties. *See* Kliebard Decl. ¶¶ 8-14 (comparing the relevant provisions in the AR41 Trust PSA—discussed at length in the Court's Order and below—to identical or similar provisions in the governing agreements for the trusts that encompass the other properties at issue in the SAC). Crucially, those duties and responsibilities do ***not*** include the activities that form the basis of Plaintiffs' claims, *i.e.* maintaining and marketing for sale REO properties.

In dismissing Plaintiffs' claims in the Order, the Court rejected theories still relied on by Plaintiffs after two amendments. Namely, the Court rejected Plaintiffs' contention that the Trustees "are stuck on the hook for FHA compliance" by virtue of the Trustees' status as title holders of the REO properties at issue. Order at 12-13. The Court was not prepared at that stage to dismiss Plaintiffs' claims as they relate to *all* Trusts without "a sufficient basis to hold that all of the pertinent PSAs mimic that allocation." *Id.* at 17. The Court now has a basis to do so because, as demonstrated in Section III and the Trustees' accompanying declaration, those contract terms

---

[3] Courts routinely take judicial notice of PSAs as publicly available records whose authenticity cannot reasonably be questioned. *See, e.g.*, *Alexander v. Deutsche Bank Nat. Trust Co.*, 2013 WL 3320455, at *3 (S.D. Cal. July 1, 2013) (taking judicial notice of a PSA available on the SEC's website). Moreover, "documents attached to a motion to dismiss are considered part of the pleadings if they are referenced in the plaintiff's complaint and are central to his claim." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (citation omitted). The Governing Agreements are central to Plaintiffs' claims against the Trustees, as it is those contracts that assign these defendants to "serve in the capacity of a . . . trustee . . . related to REO Properties." *See* SAC ¶ 54.

are standard in residential mortgage loan securitization contracts, including the Governing Agreements for the REO properties at issue. *See* Kliebard Decl. ¶¶ 6, 8-14. Plaintiffs have added no allegations plausibly suggesting that the Trustees for some reason assumed responsibility for servicing REO properties. The Court also raised a question in the Order concerning the Trustees' alleged designation as "back-up" servicers, and whether that role could support any of Plaintiffs' legal theories. Order at 17. However, as explained below, Plaintiffs' attempts to bolster their allegations concerning "back-up" servicing only demonstrate the irrelevance of any "back-up" servicing role.

## III.    ARGUMENT

### A.    Plaintiffs' Claims Fail Because the Trustees Do Not Maintain or Market the REO Properties at Issue.

#### 1.    The Trustees Have Limited, Contractually Defined Duties.

As observed by a number of courts, using the term "trustee" to describe the role of a corporate trustee under an indenture or PSA is inapt and can create confusion and misperceptions about the duties of an RMBS trustee's role. One court labeled a corporate trustee a "different legal animal" than an ordinary trustee. *Peak Partners, LP v. Republic Bank*, 191 F. App'x 118, 122 (3d Cir. 2006). As explained by the Second Circuit, in contrast to an ordinary trustee, "an indenture trustee is more like a stakeholder whose duties and obligations are *exclusively defined* in the terms of the indenture agreement." *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988) (emphasis added); *see also Fixed Income Shares: Series M v. Citibank, N.A.*, 69 N.Y.S.3d 288, 289 (N.Y. App. Div. 2018) (no implied duties could be read into PSA against the trustee); Order at 15-16 (discussing how "ordinary and indenture trustees are different" under applicable case law and HUD's recent determination).

In the SAC, Plaintiffs add the allegation that "[t]he Deutsche Bank Defendants frequently

serve in the capacity of non-indentured trustee under PSAs related to REO properties." SAC ¶ 54. The SAC does not explain how the structure of a securitization—whether a common law trust governed by a PSA or a statutory trust governed by an indenture—is relevant to Plaintiffs' claims or a trustee's duties. Regardless of whether a Governing Agreement is formally titled as an "indenture" or a "PSA," and regardless of whether or not they are governed by the Trust Indenture Act (which typically applies to indentures, but not PSAs), they contain nearly identical limitations on trustee duties and responsibilities, and courts have repeatedly recognized that these limitations apply *regardless* of the securitization structure. *See Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 589 (S.D.N.Y. 2015) (an indenture trustee's duties are limited to those expressly set forth in its governing agreement "regardless of whether the trust is an indenture trust or a PSA [trust]"); *Bakal v. U.S. Bank N.A.*, No. 15-cv-6976, 2018 WL 1726053, at *11-12 (S.D.N.Y. Apr. 2, 2018) (no duties can be implied against RMBS trustee under trust governed by PSA); *STS Partners Fund, L.P. v. Deutsche Bank Securities, Inc.*, 53 N.Y.S.3d 632, 669-70 (N.Y. App. Div. 2017) (dismissing claims against indenture trustee).

Under the express terms of the Governing Agreements (regardless of how they are titled), the Trustees play no role in the day-to-day servicing of the mortgage loans within the Trusts. That role is specifically granted to the Servicers alone: the Governing Agreements charge the Servicers with "servic[ing] and administer[ing] the Mortgage Loans in accordance with this Agreement and the Servicing Standard" "[f]or and on behalf of Certificateholders." *See* AR41 Trust PSA § 3.01; *see* Order at 17 (acknowledging that this PSA "designates all property-maintenance responsibilities to the servicers alone"). While loans are performing, the Servicers are responsible for sending statements and correspondence, handling escrow and insurance payments, performing customer service, and collecting payments. *See* AR41 Trust PSA §§ 3.01-3.02. When loans

6

become delinquent, the Servicers are responsible for notifying borrowers of their delinquencies, working with borrowers to cure defaults or modify loans, instituting and prosecuting foreclosure actions, and then repairing, as necessary, and selling foreclosed properties. *Id.*

Consistent with this contractually specified breakdown of responsibilities, the SAC alleges that defendants Ocwen and Altisource are responsible for "property preservation and maintenance and other services for REO properties . . . ." SAC ¶ 3; *see also id.* ¶ 56. Plaintiffs continue to assert that the Trustees, as bare legal title holders, are liable for servicing actions taken with respect to the REO properties (SAC ¶ 60), but in dismissing the original Complaint, the Court already ruled that "property ownership is not a trump card in FHA suits; rather, when the alleged FHA malfeasant is not an agent of the owner, the owner may indeed escape liability." Order at 13. This ruling is the law of the case, which the Plaintiffs cannot avoid without a showing of either (1) a change in controlling law handed down subsequent to the Order, or (2) manifestly clear error of this Court in reaching its conclusions. *See Creek v. Village of Westhaven*, 144 F.3d 441, 446 (7th Cir. 1998) (courts to follow prior rulings unless "clearly erroneous"); *Peoples v. U.S.*, 403 F.3d 844, 847 (7th Cir. 2005) (denying request to deviate from law of the case where, *inter alia*, "the law is unchanged" following prior ruling). There has been neither. Based on its own prior ruling, and the numerous cases establishing that RMBS trustees like the Trustees do not undertake the duties asserted by Plaintiffs, the Court could end its inquiry here and dismiss Plaintiffs' claims.

Plaintiffs vainly seek to amend their way around this Court's ruling in two ways: (1) by asserting that the Servicers are agents of the Trustees (SAC ¶¶ 66-78); and (2) by alleging that the Trustees were "back-up" servicers (SAC ¶¶ 79-83). Neither tactic withstands scrutiny.

### 2.    Servicers Are Not "Agents" of an RMBS Trustee.

The law is settled that a principal/agent relationship exists only if the principal has the right to control the manner and method in which the agent performs his work *and* the agent has the

ability to subject the principal to personal liability. *See Kinda Lake Towing, L.P. v. Donat Insurance Services, LLC*, No. 16 C 3916, 2016 WL 5339438, at *5 (N.D. Ill. Sept. 20, 2016) (Leinenweber, J.; quotations omitted)); *see also Wisconsin Central Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 858 (7th Cir. 2018) ("A hallmark of the principal/agent relationship is the principal's right to control the conduct of the agent." (citation omitted)); *accord Spano v. V & J Nat'l Enterprises, LLC*, 264 F. Supp. 3d 440, 451 (W.D.N.Y. 2017) (Under New York Law, "[e]ssential to the agency relationship is the notion that the agent acts subject to the principal's direction and control."); *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 532 (S.D.N.Y. 2008) (principal-agent relationship requires the principal's manifestation of intent to grant authority to the agent, agreement by the agent, and maintenance by principal of control over key aspects of the undertaking.). For liability to attach, the alleged conduct must fall within the "scope of the agency." *Magnini v. Centegra Health System,* 34 N.E.3d 1115, 1121 (Ill. App. 2015).

Fatal to Plaintiffs' claim, the SAC contains no well-pled facts suggesting that the Trustees have the right to control the manner and method of the Servicers' actions with respect to the REO properties. *See Jones v. Aegis Wholesale Corp.*, No. 2:15-cv-01134-JAM-CKD, 2015 WL 9260837, at *2 (E.D. Cal. Dec. 18, 2015) (dismissing complaint for failure to allege facts showing trustee exercised control over loan servicer); *Tobin v. Nationstar Mortgage Inc.*, No. 16-cv-00836, 2016 WL 1948786, at * 11 (C.D. Cal. May 2, 2016); *cf. Johnson v. Fed. Home Loan Mortg. Corp.*, No. C12-1712 TSZ, 2013 WL 2445367, at *3–5 (W.D. Wash. June 5, 2013), aff'd, 793 F.3d 1005 (9th Cir. 2015) (granting loan purchaser's motion to dismiss complaint for failure to allege facts showing purchaser assumed an agency relationship with the servicer).

More specifically, the Governing Agreements are detailed contracts that set forth the rights and duties of the various parties and beneficiaries. The Servicers and the Trustees are independent

parties to those securitization agreements, each selected by a "sponsor" of the securitization transaction to perform separate and distinct roles within their respective core competencies. *See* Section II, above; Order at 11. Plaintiffs do not plead any provision in the Governing Agreements designating a Servicer as a Trustee's agent for purposes of undertaking the Servicer's duties to manage, conserve, and dispose of REO Properties. To the contrary, the Governing Agreements make clear that the Trustee does not control the Servicer with respect to REO maintenance, or any other mortgage loan servicing duty. *See* Kliebard Decl. ¶¶ 11-14. Indeed, in the performance of its duties, a Servicer occasionally may demand that the Trustee take certain actions because the Trustee holds legal title to the mortgage loans. *See* AR41 Trust PSA § 3.13. The notion that the Servicers can compel action by the Trustee and other terms of the PSA cited above are impossible to square with Plaintiffs' conclusory legal assertion that the Servicers serve as the Trustees' agents. The manner in which the Servicers service a particular REO property is controlled not by the Trustees, but instead—as Plaintiffs themselves allege—by the contractual Servicing Standard, which requires the Servicer to maintain properties with the same degree of care as mortgage loans the Servicer services "for itself or others." SAC ¶ 68. The Trustees cannot "control the manner and method" in which the Servicers perform their work, *Kinda Lake Towing,* 2016 WL 5339438, at *5, if the manner and method is established by the Servicers' own conduct with respect to loans they service for their own accounts. Plaintiffs' theory of agency falls apart because it is bereft of supporting facts, and therefore Plaintiffs' claims are subject to dismissal. *See Spano*, 264 F.Supp.3d at 451 (on motion to dismiss, "[a] full showing of agency supported by an accepted theory of agency or contract law is required, and generalized allegations of affiliation are insufficient." (internal quotations omitted)).

Nonetheless, Plaintiffs try to cobble together a principal/agent relationship from various

provisions in the AR41 Trust PSA. These cited provisions, however, only undercut Plaintiffs' conclusory assertion of agency because they do not grant the Trustee *any* control over the Servicer. *See* SAC ¶¶ 66-78. Indeed, numerous of the added allegations define *by contract*, rather than Trustee discretion, the interactions between the Trustee and the Servicer. *See* SAC ¶¶ 70-71, 75.

For starters, Plaintiffs' allegations that Servicers undertake certain servicing actions "for the benefit of," or "on behalf of," entities other than the Servicers themselves, only demonstrate the unremarkable point that the Servicers are service providers who are undertaking their roles for the benefit of the Trusts and their beneficiaries. *See*, *e.g.*, SAC ¶¶ 67-69. Because none of the cited sections suggests that the Trustees have *control* over work done allegedly on their "behalf," those sections do not suggest agency. *See Wisconsin Central,* 894 F.3d at 858 (control is "hallmark" of principal/agent relationship); *Kinda Lake Towing,* 2016 WL 5339438, at *5. Moreover, some of Plaintiffs' cited sections provide that the Servicers are acting on behalf of, or for the benefit of, numerous parties *other than the Trustees*. *See* SAC ¶ 67 (Servicer can take "various actions" "on behalf of the Trustee, the Depositor, the Certificateholders, or any of them . . . ."); ¶ 68 (Servicers "actively market" REO properties "for the benefit of the *Trust*" (emphasis added)). Even if working "on behalf of" an entity could be equated with control—which it cannot—these allegations undercut any suggestion that the Trustees themselves can exercise such control, because that supposed control is granted to numerous parties other than the Trustees. *See Spano*, 264 F. Supp. 3d at 451 (work on behalf of alleged principal *and* control are necessary to allege principal agent relationship (citing *Faith Assembly v. Titledge of N.Y. Abstract, LLC*, 961 N.Y.S.2d 542 (N.Y. App. Div. 2013)).

Other allegations added in the SAC to support alleged Servicer agency have nothing to do with REO properties. Even if they could support some limited agency relationship (which for the

reasons stated above, they do not), these allegations are irrelevant to the servicing actions alleged in the SAC because, for liability to attach, the wrongful actions must fall within the scope of the agency. *See Magnini*, 34 N.E.3d at 1121. For example, Plaintiffs allege that a Servicer is to "promptly deliver to the Trustee . . . the originals of other documents or instruments constituting the Mortgage File that come into the possession of the Servicer . . . ." SAC ¶ 70. Putting aside that delivering papers does not demonstrate agency or control, Plaintiffs do not allege that this duty has anything to do with the maintenance or disposition of REO properties, which is the entire basis of their claims. Plaintiffs' other allegations suffer similar irrelevance. *See* SAC ¶ 67 (Servicer authorized to undertake "various actions" such as the execution of instruments of cancellation or satisfaction); ¶ 69 (maintenance of "Certificate Account"); ¶ 71 (MERS registration); ¶ 72 (pursuit of insurance claims); ¶ 76 (holding of documents). Even those allegations that *mention* REO properties in no way connect the maintenance or disposition of those properties to Trustee control. *See* SAC ¶ 73 (titling of REO property); ¶ 74 (mortgage files and funds, including for REO properties, held "on behalf of the Trustee").

Finally, Plaintiffs selectively, and misleadingly, quote a Regulation AB ("Reg. AB") certification form attached as an exhibit to the AR41 Trust PSA for the proposition that the Trustees are required to "review[]" servicing activities. SAC ¶ 77 (citing AR41 Trust PSA, Ex. R). In doing so, Plaintiffs improperly conflate mortgage loan servicing as described in the SAC with servicing for the purposes of Reg. AB, which is defined entirely differently. The Trustees' Reg. AB certification does not recite compliance with *mortgage loan* servicing activities generally, or *REO servicing* specifically, but rather "the servicing criteria set forth in Item 1122(d) of" Reg. AB. AR 41 Trust PSA, Ex. R. Under Reg. AB, the term "servicing" encompasses securitization-level activities unrelated to the servicing of individual mortgage loans, such as maintaining custody of

mortgage loan files and distributing payments to certificateholders. 17 C.F.R. 229.1122(d)(1)-(4). In promulgating Reg. AB, the U.S. Securities and Exchange Commission made clear that a party's compliance with Reg. AB disclosure requirements only extends to those criteria "applicable to it," 17 C.F.R. 229.1122(a)(1), based on the contractual duties it assumed under the governing agreements and does not create new duties other than disclosure. As explained above, the Trustees did not assume mortgage loan servicing duties in the Governing Agreements. *See* AR41 Trust PSA § 8.01. Thus, the Trustees' certification of compliance with Reg. AB "servicing criteria" would not certify their compliance with REO property maintenance, since the Governing Agreements do not charge the Trustee with such duties. *See* AR41 Trust PSA, Ex. R.

Plaintiffs also omit language in the Reg AB. certification that, to the extent the Trustee's certification concerns Servicer activities, the Trustee is not monitoring, supervising, or reviewing Servicer conduct. Rather, the Trustee is merely performing a ministerial function by which it receives and passes on *unverified* information from the Servicer: the Trustee provides its response "[b]ased solely on the information delivered to the Trustee by the Servicer" and does "not certify[] as to the accuracy, completeness or correctness of the information it received from the Servicer." AR41 Trust PSA, Ex. R. This is consistent with the express limitations on Trustee duties under the Governing Agreements, which provide that a Trustee is *not* required to make any investigation "into the facts or matters stated" in such reports provided to it. *See* AR41 Trust PSA § 8.02(d).

### 3. The Conditional "Back-Up" Servicing Role in the Governing Agreements Does Not Saddle the Trustees With Any Responsibility for REO Properties.

The term "back-up servicer" typically does not appear in the Governing Agreements. Rather, it is a colloquial label used to describe a contingent role that *could* be (but is not necessarily) undertaken by an RMBS trustee in the limited circumstance that (1) the Servicer is formally terminated under the detailed procedures set forth in the Governing Agreements, and

12

(2) no replacement servicer is selected to take the Servicer's place, in which case the Trustee becomes the servicer until such time as a successor is named.[4]

*Unless and until* a Trustee actually becomes the servicer, it is not charged with undertaking *any* servicing activities, including maintaining REO properties. *See* PSA §§ 7.01-7.02. What Plaintiffs describe is the theoretical possibility that a Trustee *could* become a servicer (if the Trustee is a "back-up"). SAC ¶¶ 79-83. Plaintiffs allege *no* facts suggesting that either Trustee ever became a servicer, let alone that, upon doing so, they committed any violation in that capacity with respect to the REO properties at issue. Indeed, undermining entirely their back-up servicer argument, Plaintiffs allege that, with respect to the "Deutsche Bank REO properties," it was Ocwen and Altisource that "acted in this [Servicer] capacity"—***not the Trustees***. SAC ¶ 56; *see also* SAC ¶ 3 ("Ocwen . . . and Altisource . . . provide property preservation and maintenance and other services for REO properties owned by the Deutsche Bank Defendants."); ¶ 64 ("The Ocwen and/or Altisource Defendants acted as primary servicers for the Deutsche Bank REO properties during the period covered by this Complaint. . . . If any other servicers acted with regard to the Deutsche Bank REO properties, their activities were de minimis as compared to Ocwen and/or Altisource.").

Stated differently, even if the Governing Agreements contain mechanisms by which a Trustee theoretically *could* become a Servicer if specific events occur, Plaintiffs allege no facts suggesting this ever happened. If Plaintiffs' allegations are assumed to be true, the SAC forecloses this possibility. Thus, any "back-up" servicing role contemplated by any Governing Agreements is legally irrelevant for the purposes of Plaintiffs' claims and surviving this motion to dismiss.

---

[4] *See* AR41 Trust PSA § 7.01 (if one of six specific "Events of Default" occurs, several of which grant the Servicer a right of up to 60 days to remedy, the Trustee *may*, or *if directed* by two-thirds of Certificateholders, shall, provide a "notice in writing to the Servicer (with a copy to each Rating Agency)" that terminates the Servicer's servicing rights; AR41 Trust PSA § 7.02 (if, after the termination procedures under Section 7.01 of the PSA are followed, the Trustee may, if "unwilling to act" as Servicer itself, appoint another party to so serve in that role).

**B.    The 2016 HUD Decision Confirms That the Trustees Cannot Be Responsible for Any of the Conduct at Issue.**

Though acknowledged by this Court in its Order, it bears repeating that the government entity designated to police Fair Housing Act violations like those alleged by Plaintiffs already determined that the Plaintiffs' claims *cannot* be asserted against RMBS trustees like the Trustees. *See* Order at 15-16.  In 2016, HUD issued a Determination of No Reasonable Cause (ECF No. 29-2) regarding a similar complaint brought by some of the same plaintiffs in this action, including the NFHA, against U.S. Bank.  To the extent that U.S. Bank "acted only as an indenture trustee for the properties' owners" for most of the properties at issue, HUD found no reasonable cause to support the plaintiffs' allegations.  ECF No. 29-2 at 2.[5]  HUD acknowledged that "[f]or a trust indenture, *it is the servicer, not the trustee, who controls properties within the trust.*" *Id.* at 2, n.6 (emphasis added); *see also id.* at 7, n.21 (discussing how an indenture trustee differs from an ordinary trustee).  Thus, HUD's investigation continued with a focus only on the subset of properties that were *serviced* by U.S. Bank in its individual capacity, and not properties for which U.S. Bank's sole connection was that it acted as trustee for a trust that happened to hold the loan or REO property.  *Id.* at 8, 25.

Here, as discussed above, the Trustees are not alleged to (and do not) act as servicer for any of the REO properties at issue.  That distinguishes the Trustees from other financial institutions, such as Fannie Mae and Bank of America, against whom Plaintiffs have brought similar lawsuits.  *E.g.*, *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940 (N.D. Cal. 2018); *Nat'l Fair Hous. All. v. Bank of America, N.A.*, 1:18-cv-01919-CCB, ECF No. 1 (D.Md. June 26, 2018).  Thus, even though Plaintiffs cured their standing defect by amending their original Complaint to allege claims against Deutsche Bank National Trust Company and Deutsche

---

[5] Citations to the HUD Determination correspond to its internal pagination (e.g., "Page 2 of 30").

Bank Trust Company Americas in their proper capacities as trustees of the Trusts that hold the properties at issue, Plaintiffs nevertheless still fail to state a claim.

### C. Plaintiffs' Claims Should Be Dismissed as to Nine Properties to Which Plaintiffs Admit the Trustees Did Not Hold Title.

Contrary to their own allegations in the SAC (or any prior version of the complaint), in their opposition to the now-mooted motion to dismiss the First Amended Complaint, Plaintiffs *admitted* that nine of the 1,141 properties identified in Appendix A to the SAC were held in trusts for which a different financial institution—***not*** the Trustees—served as the RMBS trustee.  *See* Kliebard Decl. ¶ 4; ECF No. 67-1 ¶ 5 (identifying six properties for which "Deutsche Bank appears not to have been the owner at the time of the NFHA inspection"); *id.* ¶ 7 (identifying three additional properties for which the Trustees were not "the trustee o[f] record").  Because the Trustees have no relevant connection to these properties, Plaintiffs' claims should be dismissed with respect to them.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (Article III standing requires an injury in fact fairly traceable to the defendant's challenged conduct).

### D. Plaintiffs' Claims Should Be Dismissed as to Two Properties for Which the SAC Lacks Sufficient Information to Identify the Governing Agreements

The Trustees were unable to tie two properties to a particular RMBS trust based on public property records.  *See* Kliebard Decl. ¶ 7.  Plaintiffs allege no facts to suggest that the governing agreements for the RMBS trusts that held title to these two properties have non-standard provisions that (unlike every other agreement) impose servicing obligations on the Trustees.  If this Court dismisses Plaintiffs' claims against the Trustees as to the 1,100+ properties addressed in Exhibit A to the Kliebard Declaration, then it should do so with respect to these two properties as well.

## IV. CONCLUSION

For these reasons, all of Plaintiffs' claims against the Trustees should be dismissed with prejudice.

Dated: June 6, 2019        Respectfully submitted,

By: /s/ Kenneth M. Kliebard
Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: (312) 324-1000

Kevin M. Papay (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Market
Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

*Counsel to Defendants Deutsche Bank National*
*Trust Company, as Trustee, and Deutsche Bank*
*Trust Company Americas, as Trustee*

16

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for Northern District of Illinois' Electronic Filing System on June 6, 2019.


/s/  Kenneth M. Kliebard

17