**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA. | Case No. 18 CV 839 |
| | Judge Harry D. Leinenweber |
| Plaintiffs, | Magistrate Judge Sidney I. Schenkier |
| v. | Jury Trial Demanded |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC. | |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS**
**SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

I.    Plaintiffs Adequately Plead A FHA Disparate Impact Claim ........................................... 3

      A.    The Pleading Standards That Apply to Disparate Impact Claims ........................... 4

      B.    The Second Amended Complaint Addresses This Court's Statute Of Limitations
            Concerns And Adequately Pleads Disparate Racial Outcomes ........................................ 4

      C.    Plaintiffs Adequately Allege Policies Causing Disparities ..................................... 7

            1.    Plaintiffs Sufficiently Allege A Policy Of The Deutsche Bank Defendants ......... 7

            2.    Plaintiffs Sufficiently Allege A Policy Of The Servicer Defendants ................... 9

      D.    Plaintiffs Adequately Plead Proximate Causation .................................................. 11

            1.    The Relevant Legal Standard ............................................................................ 11

            2.    The Actual Allegations Regarding Causation And Injury ................................. 13

            3.    The Second Amended Complaint Sufficiently Alleges Causation .................... 14

      E.    There Are No "Methodological Flaws" In Plaintiffs' Investigation ....................... 18

            1.    Defendants' Arguments Cannot Support Dismissal At The Pleading Stage ...... 18

            2.    Defendants' Methodological Criticisms Are Erroneous .................................... 19

            3.    The Statistical Allegations Against the Servicers Are Not Flawed for Any Other
                  Reasons ........................................................................................................... 22

II.   CONSIDERATION OF THE HUD NO CAUSE DETERMINATION IS
      INAPPROPRIATE .......................................................................................................... 23

      A.    Plaintiffs Object To Any Consideration Of The HUD No Cause Determination ... 24

      B.    The No Cause Determination Is Riddled With Error .............................................. 25

III.  PLAINTIFFS ADEQUATELY PLEAD A DISPARATE TREATMENT CLAIM .... 26

      A.    The Second Amended Complaint Alleges Facts Well-Recognized As Supporting
            An Inference Of Intentional Discrimination ......................................................... 27

      B.    Plaintiffs Also State A Claim For Intentional Discrimination Under The

McDonnell Douglas Burden-Shifting Framework.............................................................. 31

IV.    Plaintiffs State Causes of Action Under the Fair Housing Act.................................... 32

    A.    Plaintiffs State A Section 3604 Claim ..................................................... 32

    B.    Plaintiffs State A Section 3605 Claim ..................................................... 34

    C.    Plaintiffs State A Claim For Perpetuating Segregation .......................... 35

CONCLUSION........................................................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**

*Access Living of Metropolitan Chicago, Inc. v. City of Chicago,* 2019 WL 1429647 (N.D. Ill. March 29, 2019) ............................................................................................. 7, 8, 19, 35

*ADAPT v. HUD*, 170 F.3d 381 (3d Cir. 2006) .................................................................. 24

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996) ............................. 29

*Anderson v. Cornejo*, 284 F. Supp. 2d 1008 (N.D. Ill. 2003) ....................................... 29

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) .............................................................. 29

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................... 10

*Avenue 6E Invs., LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016) ........................... 29

*Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) ................................... 11, 16

*City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.,* 982 F.2d 1086 (7th Cir. 1992)..........
.............................................................................................................................. 29, 30

*City of L.A. v. JPMorgan Chase & Co.,* 2014 WL 3854332 (C.D. Cal. Aug. 5, 2014) ............... 23

*City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019) ................. 11, 12, 13, 15, 17

*City of Philadelphia v. Wells Fargo & Co.,* 2018 WL 424451 (E.D. Pa. Jan. 16, 2018)…………..
........................................................................................................ 8, 13, 15, 18, 19

*County of Cook v. Bank of Am. Corp.*, 181 F.3d 513 (N.D. Ill. 2015) ............................ 7

*County of Cook v. HSBC North America Holdings, Inc.*, 136 F. Supp.3d 952 (N.D. Ill. 2015)... 18

*County of Cook v. Wells Fargo & Co.*, 2018 WL 1469003 (N.D. Ill. Mar. 26, 2018) ............ 8, 15

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ............................................... 30

*Equal Employment Opportunity Commission v. O & G Spring and Wire Forms Specialty Company*, 38 F.3d 872 (7th Cir. 1994) ..................................................................... 29

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) .................................... 34

*Heckler v. Chaney,* 470 U.S. 821 (1985) ........................................................................ 24

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) .......................... 12

*In re Foreclosure Cases*, 2007 WL 3232430 (N.D. Oh. Oct. 31, 2007) .......................... 9

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 2017 WL 2984048 (N.D. Tex. July 13, 2017)
.............................................................................................................................. 19

*Lexmark International Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014) ............... 12

*Malin v. Hospita, Inc.*, 762 F.3d 552 (7th Cir. 2014) ....................................................... 7

*McDonnell Douglas,* 411 U.S. 792 (1973) ................................................................... 31

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.2d 482 (7th Cir. 2012) ......... 8

*MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) .......................................... 29

*Michon v. Ugarte*, 2017 WL 622236 (N.D. Ill., Feb. 15, 2017) .................................................... 24

*Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022 (9th Cir. 1998) .................................. 30

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375 (3d Cir. 2011)... 21

*Munguia v. Ill.*, 2010 WL 3172740 (N.D. Ill. Aug. 11, 2010) ...................................................... 19

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940 (N.D. Cal.
     2018)……………………………………………………………………………….4, 8, 15, 17, 18

*Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp.2d 46 (D.D.C. 2002) ...... 10

*Old W. End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100 (N.D. Oh. 1987)............... 31

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) .......................................... 27, 28

*Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447 (4th Cir. 1990) ........................................ 31

*Rummery v. Illinois Bell Telephone Company*, 250 F.3d 553 (7th Cir. 2001) .............................. 19

*Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696 (7th Cir. 2001) ........................................... 7

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ................................................................... 11

*Tex. Dep't Hous. & Com. Aff. v. Inclusive Com. Project, Inc.,* 135 S. Ct. 2507 (2015)..... 4, 17, 18

*United States v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992) .................................................... 21, 30

*United States v. Big D Enters., Inc.*, 184 F.3d 924 (8th Cir. 1999) ............................................. 30

*United States v. DiMucci*, 879 F.2d 1488 (7th Cir. 1989) ........................................................... 21

*United States v. West Peachtree Tenth Corp.*, 437 F.2d 221 (5th Cir. 1971) ............................. 29

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ....................... 28, 31

*Village of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990) ................................................. 30

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................................. 8

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) .......................................................... 8

*Wetzel v. Glen St. Andrew Living Center, LLC,* 901 F.3d 856 (7th Cir. 2018) ....................... 1, 30

*Wigginton v. Bank of Am. Corp.*, 770 F.3d 521 (7th Cir. 2014) ................................................. 27

**Statutes**

42 U.S.C. § 3604 ................................................................................................ 3, 32

42 U.S.C. § 3605 ................................................................................................ 3, 34

42 U.S.C. § 3613(a)(1)(A) ...................................................................................... 7

**Other Authorities**

*Asst. Sec'y for Fair Housing and Equal Opp., HUD v. Wells Fargo Bank, N.A.,* Case No. 00-13-

    0001-8, Conciliation Agreement (June 5, 2013) ................................................ 25

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiffs' Second Amended Complaint ("SAC," ECF 70) addresses all the deficiencies identified in the Court's previous ruling, Mem. Op., ECF 54, and takes into account the Seventh Circuit's recent decision applying the Fair Housing Act in *Wetzel v. Glen St. Andrew Living Center, LLC,* 901 F.3d 856 (7th Cir. 2018), *cert. dismissed,* 139 S. Ct. 1249 (2019).

Specifically, Plaintiffs amended their allegations of Defendants' widespread discrimination by: (1) Making ministerial corrections to name the proper party Defendants (*see* ECF 54 at 4-5, 10-11); (2) Adding allegations regarding Plaintiffs' notice of Defendants' conduct that warrant application of the continuing violation doctrine; (3) Refining their statistical analyses of investigation data to comport with the Court's discussion of the "timeliness" of Plaintiffs' allegations (*see* ECF 54 at 6-10, 23-26, 31-32); (4) Clarifying the causative "direct relation" between the Defendants' behavior and the Plaintiffs' injuries (*see* ECF 54 at 27-31); (5) Introducing new and more detailed facts establishing the Servicers' role as "agents" of the Trustee property owners (*see* ECF 54 at 11-17); (6) Adding allegations (including disparate impact claims against the Servicer Defendants) based upon Defendants' policy of deeming communities of color "low value" and refusing to fund or execute maintenance on this basis; and (7) Adding facts that address the required elements of claims under Sections 3604 and 3605 of the Fair Housing Act (*see* ECF 54 at 17-22). The SAC also (8) eliminates a claim originally brought under Section 3617 of the Fair Housing Act; and (9) makes various other revisions and clarifications.

Despite these extensive changes, Defendants blithely characterize Plaintiffs' allegations as "superficial" (Defs. Joint Mem., ECF 72, at 1, 19), and essentially re-argue their previous motion without adequately accounting for the new allegations included in the SAC. This time, the Defendants' Motion must be denied in its entirety.

*First*, Defendants argue that Plaintiffs have not adequately alleged facts supporting FHA liability based on a disparate impact theory, in part because the SAC does not allege any "racial disparities."  ECF 72 at 6.  But the SAC clearly alleges such disparities, and those allegations must be accepted as true on this motion.  Defendants' argument relies primarily on criticisms of the *methodology* of Plaintiffs' investigation.   None of these contentions are properly the basis of a motion to dismiss, nor do they have merit.

*Second*, Defendants argue that any "allegations" of misconduct outside the relevant limitations periods must be dismissed. ECF 72 at 29.  But the Court does not dismiss "allegations;" it considers whether to dismiss legal "claims," a remedy Defendants do not seek on limitations grounds.  The SAC has now cured the defects perceived by the Court relating to the statute of limitations and the Fair Housing Act's well-established "continuing violation" doctrine.  The SAC alleges additional facts indicating that, back in 2011 and for some time thereafter, Plaintiffs could not have discerned with reasonable certainty the widespread patterns of discrimination at Deutsche Bank REO properties from the available information.  Without such "notice" to Plaintiffs, the statute of limitations could not have commenced as early as 2011. The SAC also contains a new statistical analysis, *confined to the time periods originally thought relevant by this Court*, demonstrating that, as to either time frame, the Defendants' policies have a statistically significant disparate effect based on neighborhood racial composition.

*Third,* Defendants claim that Plaintiffs have not identified a specific "policy" that could explain the disparities supporting a disparate impact claim. ECF 72 at 12.  Yet the Court has already conditionally determined that one policy identified in the original Complaint (the so-called "abdication policy") was sufficient to support a disparate impact claim against the Trustee Defendants. Moreover, Plaintiffs have added allegations and asserted disparate impact claims

against the Servicer Defendants based upon Defendants' policy and practice of deeming communities of color "low value" and maintaining properties in these communities in an inferior manner compared to properties in "high value" white communities.

*Fourth,* Defendants complain that the revisions to the Amended Complaint relating to causation are "superficial," ECF 72 at 1, 19, but ignore or gloss over the actual new or revised allegations. The new direct-line-of-causation facts are set out in 20 new or revised paragraphs in the SAC. These allegations are direct, straightforward and far from attenuated.

*Fifth,* contrary to Defendants' arguments, ECF 72 at 16-19, the SAC alleges facts well-recognized as supporting an inference of intentional discrimination. These allegations go beyond the statistical evidence gathered by Plaintiffs, and include other indicia of intent. The allegations include, but are not limited to, the differing treatment of similarly situated comparators, gross statistical disparities (after controlling for non-racial factors), the failure to respond to complaints, a history of prior intentional discriminatory conduct toward minorities, and other circumstantial evidence.

*Finally,* the SAC includes several new allegations that this Court found to be necessary to state claims under Sections 3604 and 3605 of the Fair Housing Act. The SAC alleges that Defendants' conduct makes REO properties less sellable, has deterred purchasers from buying them, and that surrounding homes suffer injury as well. Defendants do not seriously address the sufficiency of these new allegations.

## I. PLAINTIFFS ADEQUATELY PLEAD A FHA DISPARATE IMPACT CLAIM

The Court previously acknowledged that Plaintiffs had pled a policy (which the Court dubbed the "abdication policy") that could be the basis for a disparate impact challenge (ECF 54 at 26-27). It nevertheless dismissed Plaintiffs' disparate impact claims against the Deutsche Bank Defendants, on the grounds that: (a) Plaintiffs' allegations of a statistical disparity were

insufficient in light of the Court's statute of limitations findings (p. 26); and (b) Plaintiffs did not allege a sufficiently direct relationship between their injury and the Defendants' conduct. (pp. 30-31). Plaintiffs' Second Amended Complaint addresses these issues. In addition, the allegations of the SAC now set forth disparate impact claims against Ocwen and Altisource.

A.   **The Pleading Standards That Apply to Disparate Impact Claims**

A plaintiff states an FHA disparate impact claim by alleging (1) a statistical disparity and (2) that defendant maintained a policy which (3) caused the disparity. *Tex. Dep't Hous. & Com. Aff. v. Inclusive Com. Project, Inc. ("ICP"),* 135 S. Ct. 2507, 2523-24 (2015). In *ICP*, the Supreme Court emphasized that disparate impact claims are necessary to achieve the FHA's "central purpose." *Id.* at 2521. Disparate impact claims permit plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment and may cause discriminatory and segregated housing patterns. *Id.* at 2522. Defendants concede, ECF 72 at 10 n.5, that another court recently rejected the same arguments they make regarding Plaintiffs' disparate impact claims. *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 947-48 (N.D. Cal. 2018).

B.   **The Second Amended Complaint Addresses This Court's Statute Of Limitations Concerns And Adequately Pleads Disparate Racial Outcomes**

In its prior Opinion, the Court concluded Plaintiffs did not sufficiently allege a statistical disparity because the Court found that Plaintiffs' claims against the Deutsche Bank Defendants were time-barred with respect to acts before February 26, 2012, and that Plaintiffs' claims against Ocwen and Altisource were time-barred with respect to acts before February 14, 2015. ECF 54 at 6-10. The Court reasoned Plaintiffs were on notice of Defendants' conduct at those times and so cannot invoke the continuing violation doctrine. *Id.* at 7-9. The Court further held that Plaintiffs could not rely for indicia of discriminatory impact and intent on a statistical

analysis that mixed time-barred and non-time-barred actions, and that Plaintiffs had to "replead their statistical findings." *Id.* at 10.

The SAC satisfies all possible arguments relating to the FHA's statute of limitations and the continuing violation doctrine. First, Plaintiffs have added allegations regarding their investigation into Defendants' conduct demonstrating that they did not have early notice of that conduct, thus permitting application of the continuing violation doctrine. Defendants completely ignore these new allegations, which contradict the premise of the Court's prior ruling on this subject, and assert in conclusory fashion that the "Second Amended Complaint contains the same fatal flaws as the original Complaint." ECF 72 at 30. In its prior decision, this Court pointed to allegations that Plaintiffs had knowledge in 2011 of discriminatory maintenance of REO properties generally and inferred that Plaintiffs had the requisite knowledge of Defendants' participation in that discrimination to start the statute of limitations running. *See* ECF 54 at 9. In fact, as the SAC's allegations demonstrate, Plaintiffs had insufficient data concerning the condition of Deutsche Bank properties at that time (and for a substantial period thereafter). In particular, the SAC adds that: (a) as of NFHA's 2011 Report, Plaintiffs had assessed only 624 properties among eight banks, but *none of them* were Deutsche Bank properties (ECF 70 ¶¶112-113); (b) as of April 2012, when NFHA updated its Report, Plaintiffs' review was limited to nine metropolitan areas and Plaintiffs had been able to assess only 99 Deutsche Bank properties (ECF 70 ¶¶115-116); and (c) at the time of NFHA's August 2014 Report on REO property maintenance, Plaintiffs had then assessed 420 Deutsche Bank REO properties. (ECF 70 ¶¶118-119). The point is that, back in 2011 and for some time thereafter, Plaintiffs could not have discerned with reasonable certainty the widespread patterns of discrimination involving Deutsche Bank REO properties from the available data. (ECF 70 ¶¶116). Not until 2014, when Plaintiffs

initial HUD Complaint was filed, (ECF 70 ¶120), did Plaintiffs' investigation accumulate sufficient data indicating that Defendants – as opposed to other banks holding REO properties – were engaging in ongoing discriminatory conduct, and so the factual premise for not applying the continuing violation doctrine is lacking.

Defendants make a frivolous argument that a statement in NFHA's 2012 Report that the "investigation revealed many disturbing and consistent trends in the maintenance and marketing of REO properties by lenders and servicers . . ." shows that Plaintiffs were aware or should have been aware of their claims against *these* Defendants at that time. (ECF 72 at 31). But Plaintiffs' general observation hardly equates to completion of the thorough development of evidence against the specific Defendants here.

Second, the SAC contains a new statistical analysis, confined to the time periods identified by this Court, demonstrating that – even using this smaller dataset – the Defendants' policies had a significant disparate effect based on the racial composition of the neighborhoods in which properties were located. *See, e.g.*, ECF 70 ¶¶98-99, 107-108.

Defendants do not appear to argue that this repleading fails to meet the requirements that this Court imposed. ECF 72 at 29-32. Instead, they complain that the SAC *also* includes the longer-term analysis that this Court held was insufficient to support Plaintiffs' claims. Defendants take the illogical and unsupported position that inclusion of these *additional* allegations merits dismissal of Plaintiffs' otherwise meritorious claims.

Third, Plaintiffs respectfully submit that this Court's prior opinion erred in applying non-Fair Housing Act precedent to cabin the scope of liability for continuing violations under the uniquely worded Fair Housing Act. *See* ECF 54 at 7 (citing only cases decided under the ADEA, Title VII, and §1983). As this Court recognized, Congress provided that the two-year statute of

limitations under the FHA does not *begin* running until "the *termination* of an alleged discriminatory housing *practice*." *Id.* at 6 (quoting 42 U.S.C. § 3613(a)(1)(A)) (emphasis added). By contrast, claims under Title VII and the ADEA begin running for each discriminatory "act." Under the FHA, the statute of limitations does not begin with respect to an ongoing practice, regardless of when Plaintiffs knew about it. Once it does begin, the limitations period may *also* be extended by the continuing violations doctrine, but its starting point does not mirror that of the Title VII limitations period. *See* e.g.*, Access Living of Metropolitan Chicago, Inc. v. City of Chicago,* 2019 WL 1429647 at *6 (N.D. Ill. March 29, 2019) (Judge Dow). Here, there is no allegation in the SAC that the challenged practices have ceased, such that there is any basis at this point for applying the Act's limitations period *at all*. *See County of Cook v. Bank of Am. Corp.*, 181 F.3d 513, 520 (N.D. Ill. 2015)

Finally, Plaintiffs are permitted to rely on events *prior* to the limitations period to demonstrate the impact and intent of actions taken *within* the limitations period. This is settled in FHA cases, but even in non-FHA cases, it is clear that time-barred discriminatory acts can be relevant and admissible evidence of the intent and effects of events that occurred within the limitations period. *See Malin v. Hospita, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014); *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 705 (7th Cir. 2001). Here, Plaintiffs allege that Defendants acted pursuant to the *same* policy, with the *same* disparate impact, throughout the *entire* time period described in the SAC. *See, e.g.*, ECF 70 ¶¶102, 298. Actions taken pursuant to that same policy and with the same discriminatory impact prior to the limitations period are relevant and properly included, even if they cannot be, standing alone, the basis for liability.

### C. Plaintiffs Adequately Allege Policies Causing Disparities

#### 1. Plaintiffs Sufficiently Allege A Policy Of The Deutsche Bank Defendants

Defendants' continued argument that the SAC does not identify a policy of the Deutsche

Bank Defendants (ECF 72 at 12-14) flies in the face of Plaintiffs' allegations that the following policies discriminatorily impact communities of color: (a) outsourcing to third parties compliance with Defendants' statutory and common law obligations as property owners without appropriate monitoring or review; (b) failing to investigate or assess the fitness or ability of retained third parties to comply with fair housing obligations; (c) failing to provide guidance, oversight or review of the activities left to the discretion of retained third parties; and (d) permitting agents to implement maintenance policies that severely shortchange communities of color. ECF 70 ¶¶148-155,158A-L, 311, 322, 333, 347. As the Court observed in its prior Opinion, ECF 54 at 26-27, Defendants' alleged "abdication" of responsibility without appropriate safeguards states a basis for a disparate impact challenge. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011).

Consistent with this precedent, practices such as permitting brokers to form their own teams — rather than having management do so — can be challenged as having a disparate impact, given the resulting discrimination. *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.2d 482, 489-90 (7th Cir. 2012). Courts have frequently allowed challenges to policies delegating discretion and authority under the FHA, *see, e.g.*, *County of Cook v. Wells Fargo & Co.*, 2018 WL 1469003, at *12-13 (N.D. Ill. Mar. 26, 2018); *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d at 948; *City of Philadelphia v. Wells Fargo & Co.*, 2018 WL 424451 at *4 (E.D. Pa. Jan. 16, 2018); *Access Living of Metropolitan Chicago, Inc. v. City of Chicago*, 2019 WL 1429647 at *5 (N.D. Ill. March 29, 2019).

Defendants do not acknowledge or address any of this, but argue that a disparate impact claim against Deutsche Bank does not lie because the Deutsche Bank Defendants as trustees

8

purportedly have no responsibility related to maintenance of their REO properties. (ECF 72 at 14, "unlike Fannie Mae, the Trustees never had any property maintenance or servicing responsibilities to delegate or outsource in the first place"). This misses the point that the Deutsche Bank Defendants, as legal owners of a property, are alleged to have (and as a matter of law do have) undelegable responsibilities in this regard. As discussed in response to the Trustees' separate memorandum, when the Trustees step outside their role as administrators of pooled mortgage loans, and assume title as a property owner after foreclosure, they assume rights and expose themselves to liabilities, including the responsibility for real estate taxes, zoning and code compliance, nuisance avoidance and abatement, and compliance with other laws imposing duties on property owners, such as the FHA. *See In re Foreclosure Cases*, 2007 WL 3232430, at *3, n.3 (N.D. Oh. Oct. 31, 2007). A PSA cannot change the meaning of what it is to "own" property, and it cannot change the legal obligations of an owner.

### 2. Plaintiffs Sufficiently Allege A Policy Of The Servicer Defendants

Based upon information received by NFHA from a third party witness, the SAC now asserts disparate impact claims against the Servicer Defendants. Contrary to Defendants' assertion that Plaintiffs "have alleged no policy at all" against the Servicers, ECF 72 at 14, these claims are based on the following policies: (a) allocating maintenance resources disparately to "high value" and "low value" areas and properties;[1] (b) outsourcing maintenance obligations to third parties without appropriate monitoring or review; (c) failing to provide appropriate guidance, oversight or review of the activities left to the discretion of retained third parties; (d) employing arbitrary methods of allocating resources to the maintenance of REO properties; (e) terminating maintenance and upkeep in low value areas when a property is cited for code

---

[1] Plaintiffs are entitled to pursue discovery as to which entities, including the Deutsche Bank Defendants, decided which properties to favor or ignore, and the criteria on which such decisions have been based.

9

violations; and (f) avoiding customary real estate brokers in favor of internet sites, with the predictable result of cash or bulk sales adversely impacting minority neighborhoods. ECF 70, ¶¶156-158 A-L. These types of policies clearly suffice as a basis for disparate impact claims against the Servicers. *See e.g., Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp.2d 46, 50 (D.D.C. 2002)(disparate impact claim sustained where homeowners' insurance policies considered age and market value of home and racial makeup of neighborhood).

Defendants' main argument regarding these allegations (other than omitting or mischaracterizing the facts alleged) seems to be that Plaintiffs have not identified to Defendants' satisfaction who the policies are attributable to or all the details of their application. ECF 72 at 14-16. This argument falls flat because Plaintiffs have clearly alleged the basic parameters of these discriminatory policies and have asserted that they have been applied collectively by the Defendants as to the Deutsche Bank REO properties. ECF 70 ¶¶156-158 A-L. Other relevant facts will undoubtedly be fleshed out in discovery, but simply because more detailed information is within Defendants' exclusive possession hardly makes Plaintiffs' claims implausible.

Defendants' next contention, that Plaintiffs have not sufficiently alleged that the Servicer Defendants' policies are arbitrary and unnecessary, is also disingenuous. The SAC expressly alleges that the methods employed by Ocwen and Altisource are "arbitrary," ECF 70 ¶156(b), an allegation actually referenced in Defendants' memorandum. ECF 72 at 15. The SAC further specifically alleges that "there is no business justification for failing to undertake basic maintenance of REO properties in communities of color." ECF 70 ¶¶ 110, 154. These are factual allegations which provide the Defendants with "fair notice of what the plaintiff's claim is and the grounds upon which it relies," which are the operative standards of review under Rules 8 and 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Swierkiewicz v. Sorema N.A.*, 534

U.S. 506, 513 (2002). Moreover, Defendants' suggestion that the SAC should be dismissed based on some inference that policies shortchanging minority communities are inevitable as a matter of business justification invokes racial stereotypes and is not well taken. ECF 72 at 16.

### D. Plaintiffs Adequately Plead Proximate Causation

The Court previously concluded that Plaintiffs had not "met the mark" for alleging a direct relation between their injury and the Deutsche Bank Defendants' conduct, and granted Plaintiffs leave to amend the Complaint. (ECF 54 at 31) The SAC addresses this issue.

#### 1. The Relevant Legal Standard

In *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017), the Supreme Court observed that "proximate cause under the FHA requires some direct relation between the injury asserted and the injurious conduct alleged." *Id.* Without drawing a bright line as to what constitutes sufficient causation, the Court cautioned that a defendant's conduct in violation of the FHA may "cause ripples of harm to flow beyond the defendant's misconduct." *Id.* While *City of Miami* establishes limits to the injuries for which a defendant in a disparate impact case can be called to answer, it is not a "get out of jail free" card whenever defendants can imaginatively portray probable or even inevitable consequences of their policies as somehow being "indirect." Nor does it stand for the proposition that the types of harm suffered by organizational plaintiffs that have long sufficed for disparate impact claims, including non-economic injuries, no longer satisfy the FHA's causation requirement simply because defendants' conduct also harms others.

Notably, while Defendants discuss the Supreme Court's decision in *City of Miami*, they do not even mention the Eleventh Circuit's remand opinion applying the proximate cause standard. *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019). In this recent decision, the Court of Appeals concluded that the City had adequately pleaded proximate cause

in relation to certain alleged economic injuries when measured against the standard required by the FHA. *Id.* at 1264. The Court of Appeals observed:

> Proximate cause asks whether there is a direct, logical and identifiable connection between the injury sustained and its alleged cause. If there is no discontinuity to call into question whether the alleged misconduct led to the injury, proximate cause will have been adequately pled. The question for now is whether, accepting the allegations as true, as we must, the City has said enough to make out a plausible case – not whether it will probably prevail. Considering the broad and ambitious scope of the FHA, the statute's expansive test, the exceedingly detailed allegations found in the complaints, and the application of the administrative feasibility factors laid out by the Supreme Court in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), we are satisfied that the pleadings set out a plausible claim. *Id.*

The Court held that the City's allegations that it had suffered a substantial injury to its tax base from the Bank's conduct met this standard because the injury was not merely reasonably foreseeable, but necessarily and directly connected to the Banks' conduct in redlining and reverse-redlining throughout the City. *Id.* The Court further noted that "Supreme Court precedent makes crystal clear that an intervening step does not necessarily mean that proximate cause has not been plausibly alleged," and held that "intervening steps in a causal chain cannot automatically and invariably end the [proximate cause] analysis." *Id.* at 1273-1274, *citing Lexmark International Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)

> Further, the Court emphasized that proximate cause under the FHA applies broadly:

> It does not go too far to suggest, at least at a high order of abstraction, that in setting a standard for proximate cause the FHA looks far beyond the single most immediate consequence of a violation. Limiting the proximate cause calculus in that way would not be consonant with the powerful remedial purposes animating the bill. The Act took aim at "the segregated neighborhood" in general, not just at the prejudiced building owner. This is all to say that, notwithstanding issues of proof that might arise later in litigation, the FHA was written in broad terms and was aimed at broad problems. We can discern no reason to think as a general matter that the City's claims are out of step with the 'nature of the statutory cause of action' and the remedial scheme that Congress created." *Id at 1280-1281.*

Other cases interpreting *City of Miami* have found that it applies not only to economic injuries proximately caused by a defendants' discriminatory policies, but also to non-economic

injuries occasioned by defendant's conduct. In *City of Philadelphia v. Wells Fargo*, 2018 WL 424451, at \*4-6 (E.D. Pa. Jan 16, 2018), the district court found the plaintiffs sufficiently pled proximate cause under *City of Miami* by alleging that Wells Fargo's discriminatory lending practices frustrated the City's "goal of promoting fair housing as part of an integrated community." *Id.* at \*5. Because such non-economic injuries are cognizable under the FHA, especially when a plaintiff expends resources to combat that harm, the court found a direct relation between the discriminatory practices and the harms to the City's goals. *Id.* at \*5-6.

### 2. The Actual Allegations Regarding Causation And Injury

Defendants complain that the revisions to the SAC relating to causation are "superficial," ECF 72 at 19, but gloss over or distort the actual allegations. The SAC identifies and elaborates in detail five categories of injuries suffered as a result of Defendants' unlawful conduct: (1) diversion of resources; (2) frustration of mission; (3) costs of counteractive measures; (4) loss of economic value and impact of community investments; and (5) harms to minority neighborhoods served by Plaintiffs. (ECF 70 ¶¶170-297)

The SAC enumerates the following detailed allegations regarding causation and direct injury to the Plaintiffs: (a) the regression analysis conducted by Plaintiffs on both datasets controls for non-racial explanations for the disparities in REO maintenance, thereby evidencing direct causation of injury (ECF 70 ¶171); (b) Defendants' conduct has frustrated the fundamental missions of the Plaintiffs to eradicate housing discrimination and segregation, to investigate and respond to discriminatory conduct, and to conduct education, outreach and counteractive measures to discriminatory conduct (ECF 70 ¶179); (c) Plaintiffs' resources have been drained by the need to respond to specific complaints they have received regarding REO blight and by testing and investigation conducted pursuant to their organizational purposes, contractual obligations, and obligations to affirmatively further fair housing (ECF 70 ¶¶182-184); (d)

Defendants' conduct undermines the efficacy of Plaintiffs' education, advocacy and training programs designed to further fair housing (ECF 70 ¶181); (e) Defendants' conduct has necessitated the implementation of specific counteractive programs developed by Plaintiffs to diminish the effects of Defendants' conduct and REO blight (ECF 70 ¶¶183-184); (f) millions of dollars in community investments made by the Plaintiffs have been undermined by the REO blight caused by Defendants (ECF 70 ¶¶174-178); (g) Defendants' unlawful conduct and REO blight has caused the diversion of organizational resources (ECF 70 ¶¶185-187); (h) Plaintiffs' operational offices are located in impacted areas harmed by Defendants' unlawful conduct (ECF 70 ¶188); (i) Defendants' unlawful conduct has harmed minority neighborhoods in terms of diminished property values, safety, habitability, housing opportunities, lending opportunities, and community redevelopment (ECF 70 ¶189); (j) the Plaintiff Organizations have been negatively impacted by Defendants' discrimination in terms of effects related to CDBG funding and grants received; (ECF 70 ¶194);  (k) private investors have been thwarted and deterred from investing in minority neighborhoods as a result of REO blight (ECF 70 ¶178); (l) based upon Plaintiffs' familiarity with REO properties in their service areas, and the factors bearing upon marketability of residential real estate, Defendants' failure to maintain and market REO properties in communities of color has had the effect of dissuading purchasers from buying these properties; (ECF 70 ¶290); and (m) the discriminatory provision of maintenance and marketing services to the Deutsche Bank REO properties in communities of color has adversely affected their availability for purchase (ECF 70 ¶309).

### 3.  The Second Amended Complaint Sufficiently Alleges Causation

Defendants' argument regarding proximate causation boils down to the following contention:  Plaintiffs have not alleged facts relating to a direct injury suffered from Defendants' conduct and their theory of liability "rests on the independent actions of third or even fourth

parties." ECF 72 at 26. On the extensive facts alleged, under the relevant case law, and under *any* reasonable interpretation of the *City of Miami* standard, this argument is untenable.

First, the SAC contains allegations of causation and injury that are direct, and not attenuated or merely foreseeable. For example, the SAC alleges that that Plaintiffs' organizational mission is promoting fair housing, and Defendants' unlawful conduct regarding REO properties frustrated that mission. The SAC also alleges that Plaintiffs' financial efforts to improve housing in the minority communities they serve are directly harmed by Defendants' treatment of REO properties in these communities. Or, to take another example, Defendants failed to maintain REO properties in minority neighborhoods, so the Plaintiffs were required to spend time and money in response to complaints received.

These are not attenuated allegations of causation, nor are plaintiffs' injuries derivative of others' injuries. Rather, they are just as directly caused by Defendants' actions as those injuries that passed muster in *City of Miami, City of Philadelphia, Fannie Mae* and *County of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975 (N.D. Ill. 2018), on which this Court relied heavily in its initial decision. Contrary to Defendants' position, *County of Cook did* find that the defendant's discriminatory conduct, which caused foreclosures, also proximately caused the county's need to spend more on carrying out those foreclosures. It dismissed the claims only because it also found that conduct was not the proximate cause of the foreclosed-upon *homeowners*' failing to pay property taxes, which ultimately led to a property tax shortfall, a circumstance not pertinent here. *See* ECF 54 at 28-29.

Plaintiffs' allegations of injury here are as directly related to the Defendants' conduct as the injuries that *County of Cook* and the other relevant cases found to be proximately caused by the defendant's conduct. For example, just like the county, Plaintiffs allege here that Defendants'

conduct directly forced them to expend money that they otherwise would not have spent. Their injuries are not derivative of the injuries of others, such as would add an extra step to the causal chain. Rather, their injuries — frustration of mission, the need to divert resources in response, etc. — are essentially the same that are involved in any disparate impact FHA case brought by fair housing organizations, under long-standing precedent that was reaffirmed in *City of Miami*.

In order to claim otherwise, Defendants attempt to slip links into the causal chain upon which Plaintiffs rely by incorrectly lumping together Plaintiffs' burdens with respect to standing and the merits. *See* ECF 72 at 22-23, 26. To show that Defendants' conduct proximately caused their injuries, Plaintiffs' claim, first, is that Defendants' policies produced poor property maintenance in minority communities, just as Wells Fargo's policies resulted in foreclosures. Plaintiffs' claim, second, is that this poor property maintenance in minority communities directly forced them to incur additional expenses and otherwise caused them to suffer the various damages described above, just as the foreclosures in *County of Cook* caused the county to incur extra expense. The Defendants' conduct *also* caused various negative effects on homeowners and others in the minority communities in which it was concentrated—and thus violated the Fair Housing Act in a variety of ways — but *Plaintiffs' injuries* that provide them with standing are independent of those effects. Put another way, Plaintiffs can prove that they diverted resources in response to Defendants' conduct without the intermediate step of proving that Defendants' conduct actually damaged the affected communities in particular ways. The damage to the communities (which proves the violation on the merits) and the damage to plaintiffs (which proves standing) are distinct, rather than one being a causal step removed from the other.

Second, as to Defendants' vague assertions about the intervening conduct (regarding properties they own) of third or fourth parties or factors, the failure to perform adequate

maintenance in communities of color did not occur in an idiosyncratic fashion.  The pattern
recurred in every metropolitan area where Plaintiffs investigated the condition of REO
properties, thus establishing that Defendants' policies, and not some intervening conduct, is the
direct cause.  Plaintiffs' regression analysis of the observational data ruled out other possible
alternative causes for the differing outcomes, including crime rates, dwelling size, prior sales
price and lot size.  (ECF 70 ¶¶106-108) Thus, at the pleadings stage, the regression analysis
establishes that the Defendants and their policies (the only common denominators) directly
caused these effects.  *See City of Miami*, 923 F.3d at 1283-84 ("the complaint's allegation that
regression analysis can pinpoint causation is sufficient at this stage").  As the Court of Appeals
noted on remand in *City of Miami*, "There could be a battle of experts down the line over
whether the regression analysis really shows what the City says it does, but, as we see it, that
would be for a later stage of the litigation."  *Id.* at 1283

   Third, given that the SAC gives rise to a fair inference of causation, whether the effects
are sufficiently direct as opposed to mere "ripples" is a factual question of proof for trial or
summary judgment.  *See NFHA v. Fannie Mae*, 294 F. Supp. 3d at 948 (On a motion to dismiss,
"the question of causation – to what extent the discrepancy is explainable by objective data or
race – is premature.") While a plaintiff asserting a disparate impact claim must "allege facts at
the pleading stage or produce statistical evidence demonstrating a causal connection," to ensure
that defendants are not "held liable for racial disparities they did not create," *ICP*, 135 S. Ct. at
2523, Plaintiffs have more than satisfied that standard:  Plaintiffs have alleged facts regarding the
results of their investigation of over 1,100 properties and provided statistical evidence showing a
profound causal connection between Defendants' policies and the disparate outcomes observed.
*See NFHA v. Fannie Mae*, 294 F. Supp. 3d at 948 ("Plaintiffs have sufficiently alleged statistical

evidence demonstrating a causal connection between the delegation of duties and the differential maintenance"); *City of Philadelphia*, 2018 WL 424451 at *6 (plaintiff's statistical evidence sufficient to show causation at the pleadings stage).

### E.   There Are No "Methodological Flaws" In Plaintiffs' Investigation

Defendants incorrectly assert that the Plaintiffs' investigation and analysis of Defendants' REO maintenance practices was "fundamentally flawed."   ECF 72 at 1, 7.

#### 1.   Defendants' Arguments Cannot Support Dismissal At The Pleading Stage

Defendants' critique of Plaintiffs' investigative methodology is premature.  Although Defendants invoke case law regarding what is necessary to sufficiently plead a disparity based on race, Defendants do not actually dispute (nor could they) that Plaintiffs have adequately pleaded the alleged disparity, *i.e.*, that Plaintiffs' investigation found Defendants' REO properties in predominantly minority neighborhoods in much poorer condition than comparable properties in white neighborhoods. (ECF 70 ¶¶96-109) Rather, their argument is directed entirely at whether Plaintiffs have conclusively *proven* that Defendants' policies are the *cause* of this disparity, as they quibble in various ways that Plaintiffs have failed to account for alternative, innocent explanations. None of this is properly before this Court now. *See, e.g.*, *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n,* 294 F. Supp. 3d at 948 (Defendants' criticisms of Plaintiffs' REO investigation methodology is a question of proof best reserved for summary judgment); *County of Cook v. HSBC North America Holdings, Inc.*, 136 F. Supp.3d 952, 961, 965 (N.D. Ill. 2015) (adjudication of causality is better left for summary judgment).

Plaintiffs are not required, *at the pleading stage*, to defend every nuance of their investigative methodology. What Plaintiffs are required to do and have done here is to show there is a plausible path to prove causation, *see Tex. Dep't Hous. & Com. Aff. v. Inclusive Com. Project, Inc.* 135 S. Ct. 2507, 2523 (2015). *See also City of Philadelphia v. Wells Fargo & Co.,*

2018 WL 424451 at *6 (Jan. 16, 2018) (plausible allegations of statistical significance sufficient at pleading stage); *Access Living of Metropolitan Chicago,* 2019 WL 142967 at *6 (challenges to Plaintiffs' investigation methodology are not appropriate under Rule 8 standards).

Defendants can point to no case to support dismissal of the SAC on this basis. The first set of cases they cite relate to whether Plaintiffs established a racial disparity in outcomes, ECF 72 at 6-7, which (as noted above) is not what Defendants say the SAC lacks.[2] Similarly inapposite is *Rummery v. Illinois Bell Telephone Company*, 250 F.3d 553 (7th Cir. 2001), which found statistical evidence inadequate *at the summary judgment stage* to establish that an employer's proffered reasons for firing someone were pretextual.

### 2. Defendants' Methodological Criticisms Are Erroneous

In any event, Defendants' criticisms are baseless. Defendants first complain that Plaintiffs "visited each property just once." ECF 72 at 7-8. They suggest that Plaintiffs may have thus examined properties where Defendants had just cleaned up graffiti only to have it "painted on the property again the very next day." *Id.* at 8. In fact, Plaintiffs' regression analysis accounted for how long inspected REOs were in Deutsche Bank's possession, and determined this factor did not explain identified disparities. ECF 70 at ¶¶106-108, 171. Moreover, the SAC makes clear that much of the disrepair observed could not have been the result of unfortunate timing, but rather took considerable time to accumulate. *See, e.g.,* ECF 70 at Figure 3 p. 23.

---

[2] The complaint in *Munguia v. Ill.*, 2010 WL 3172740 (N.D. Ill. Aug. 11, 2010), was dismissed because it "fail[ed] to capture highly relevant aspects of the funding scheme" being challenged. *Id.* at *11. Here, in contrast, Plaintiffs' allegations account for possible explanations for the observed differing outcomes. ECF 70 at ¶¶106-108. The complaint in *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 2017 WL 2984048, at *9-*10 (N.D. Tex. July 13, 2017) *aff'd.*, 920 F.3d 890 (5th Cir. 2019), was dismissed because the plaintiffs had not "proved" that the landlord's "no-voucher" policy at its housing complex caused any statistical disparity in the number of voucher holders in the surrounding census tract; in other words, unlike in this case, the relevant populations were not comparable.

Whether unusual timing coincidences *ever* occurred—and nothing in the SAC supports such speculation—they are unlikely to constitute a significant portion of the vast number of examined properties.[3]

For similar reasons, there is no basis for Defendants' speculation that the disparities Plaintiffs documented were caused by differences in the properties' condition *before* Defendants took control. ECF 72 at 8. Because Plaintiffs' investigation was carefully circumscribed to evaluate only "routine exterior maintenance that Defendants are required to perform on *all* REO properties," such as removing trash and debris, securing doors, windows and holes, mowing grass, weeding and edging, etc., ECF 70 at ¶63, the initial condition of the property upon transfer of possession is largely irrelevant. Even if the properties, when acquired, were in worse condition in neighborhoods of color and needed some time for repairs to be made (an assumption that underscores racial stereotypes and ought not be made), the maintenance factors Plaintiffs strategically tested take very little time to complete. These sorts of deficiencies can be cured by Defendants immediately and regularly, which is why the evidence here concerning routine exterior maintenance is so strong.

Next, pointing out that "properties occupied by borrowers are likely in better condition than abandoned properties," Defendants claim a fatal methodological flaw by virtue of Plaintiffs not inspecting or making assessments of properties that were occupied by borrowers or where repair work was being done. ECF 72 at 9. But Plaintiffs did not purport to investigate occupied

---

[3] Moreover, a single "snapshot in time" of a defendants' behavior is normal testing methodology. A typical rental test, for example, is not designed to capture a rental agent's behavior over the course of time. Plaintiffs carefully designed their testing protocols here to ensure that their visits and photographs collected evidence that are representative of any given point on the timeline of an REO in Deutsche Bank's possession. ECF 70 at ¶¶86, 92. *See also Access Living of Metropolitan Chicago,* 2019 WL 1429647 at *6 (defendant's argument that complaint did not identify when inspections occurred is insufficient to support dismissal under Rule 12(b)(6)).

properties, ECF 70 at ¶86, a circumstance that (post-foreclosure) is exceedingly rare. Moreover, why would the exclusion of occupied properties affect the observed racial disparities? Defendants do not explain how the omission of properties occupied by homeowners in both white and minority neighborhoods would skew the overall outcomes.

Defendants next raise two objections to the "aggregate" statistical summaries contained in the SAC. ECF 72 at 9-10. They first claim that, because Plaintiffs analyzed their nationwide dataset to a certain level of statistical significance, the SAC is deficient for not alleging the same level of significance in each individual city. This case challenges a nationwide practice, not one confined to a particular city. There is no legal requirement that a complaint allege, or that a plaintiff prove, a particular level of statistical significance to support a claim that a policy has discriminatory effect overall, much less in arbitrary subsets. Courts have long cautioned against establishing such rigid requirements. *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375, 382 (3d Cir. 2011) ("no single test controls in measuring disparate impact").

Moreover, whether and how data from different cities should be aggregated cannot be resolved on the pleadings, where this Court must accept as true Plaintiffs' allegations that Defendants applied the same discriminatory policies across the board. Even if Plaintiffs' claims were limited to specific cities, and their national aggregate findings were ignored, it would only take a small number of instances of "differing treatment" to sustain a claim of discrimination in each of those cities. *See, e.g., United States v. Balistrieri*, 981 F.2d 916, 929-30 (7th Cir. 1992) (Five tests were sufficient to prove a "pattern of discrimination"); *United States v. DiMucci*, 879 F.2d 1488, 1492, 149 (7th Cir. 1989) (six housing tests can establish a pattern or practice).

Defendants' second objection — that each municipality might have code sections that

address property maintenance — is hardly grounds for a motion to dismiss in view of the demonstrated deficiencies in routine exterior maintenance and is likely to cut against Defendants in the end.[4]  Even if one or more municipalities have code sections that specifically address a maintenance item that Plaintiffs have investigated in a way that impacts assessment of that item in a particular location, any final statistical analysis of the data can simply account for or ignore REO properties from those cities with those specific maintenance flags.  Whatever relevance the minutiae of some municipal codes might have on the presentation of final proof of Plaintiffs' claims, it does not defeat the sufficiency of Plaintiffs' overall allegations.

### 3. The Statistical Allegations Against the Servicers Are Not Flawed for Any Other Reasons

Defendants Ocwen and Altisource offer several unpersuasive arguments regarding Plaintiffs' statistical allegations.  ECF 72 at 11-12.  First, the Servicer Defendants attempt to secure some advantage from the absence of publicly available information regarding the particular Deutsche Bank properties that were maintained by each Servicer.  ECF 72 at 11; *see* ECF 70 ¶64.  Their reasoning is that because this information is not publicly available, both Servicers should get off the hook since the ultimate parameters of the evidence relating to them cannot be fully determined at this point.  While this would be a novel way for Defendants to immunize their conduct, the number of tested properties and magnitude of the disparities indicate there is ample comparative evidence of disparities to go around.  The precise parameters of the

---

[4] For example, Defendants attach a section of the Milwaukee Zoning Code that requires owners of abandoned properties, including REO mortgagees, to mow grass, eliminate weeds, and eliminate conditions presenting a public safety risk. *See* ECF 72-4, Sostrin Dec., Ex. C (attaching sample ordinances). According to Plaintiffs' investigation, in the City of Milwaukee the Defendants failed to comply with these local zoning requirements substantially more often in neighborhoods of color than in predominantly White neighborhoods. *See* ECF 70-1 at B33-B35, C36-C38, D30-D32. In discovery, a neighborhood-based examination of non-compliance citations to the Deutsche Defendants by the City of Milwaukee could very well cut against Defendants and add support to Plaintiffs' claims.

involvement of each Defendant is a factual matter that will be revealed through discovery, at which point Defendants will be free to point the finger at each other.[5]

Second, the Servicers repeat the argument that the SAC does not allege statistically significant disparities in each city. ECF 72 at 12. As previously noted, whether data is appropriately aggregated cannot reasonably be resolved on the pleadings, and no requirement exists that a statistical determination of any particular type is required to plead or prove unlawful discrimination. *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971).

Third, Ocwen and Altisource speculate that some of the test visits may have been conducted prior to Ocwen or Altisource being retained to service a particular property. ECF 72 at 12. Again, this conveniently unknowable (prior to discovery) information is very unlikely to substantially impact the overall analysis and is hardly a sound basis for allowing the Defendant Servicers to be dismissed at the pleading stage. Given that properties were tested over a period of years, it would be astonishing if many of the over 1,100 tested properties were visited before Ocwen or Altisource was engaged. Certainly that highly remote possibility does not prevent allegations directed against Ocwen and Altisource from being "plausible".

## II.    CONSIDERATION OF THE HUD NO CAUSE DETERMINATION IS INAPPROPRIATE

The Defendants ask the Court to consider, and give substantial weight to, a HUD regional office's decision not to prosecute an REO maintenance discrimination administrative complaint against another bank in 2012 (the HUD "No Cause Determination" or "Determination;" Sostrin Decl., ECF 72-4, Ex. B). The Defendants' Joint Memorandum relies upon the HUD No Cause

---

[5] As such, the situation here is vastly different from *City of L.A. v. JPMorgan Chase & Co.,* 2014 WL 3854332 (C.D. Cal. Aug. 5, 2014), where the Court directed the plaintiffs to excise from a statistical analysis allegations of unlawful conduct known to have been committed by a defendant over whom the Court lacked jurisdiction.

Determination numerous times (ECF 72 at 1, 7, 8, 9, 10), and the Trustees devote an entire

section of their Supplemental Memorandum solely to it. (ECF 73 at 14-15)

Although this Court made a passing reference to that HUD decision in its previous Order

(ECF 54 at 15), it did not have the benefit of full briefing as to why that HUD decision should

play no role in the consideration of this Motion to Dismiss.  The HUD Regional office involved

did not investigate the allegations actually made, applied legal principles that are inconsistent

with accepted law, expressly refused to review all of the evidence submitted by the

complainants, relied upon evidence that the complainants never saw, and collected its own

"evidence" without following proper procedural protocols.  Plaintiffs here previously provided

this Court a Request for Reconsideration that was filed in that case, which addresses in detail the

HUD Region's erroneous Determination.  *See* Soule Declaration, Ex. A-1.

### A.  Plaintiffs Object To Any Consideration Of The HUD No Cause Determination

The faulty HUD Determination is a matter outside the pleadings inappropriate to

consider in ruling on a motion to dismiss. *Michon v. Ugarte*, 2017 WL 622236 at * 3 (N.D. Ill.,

Feb. 15, 2017) (Leinenweber, J.).  An administrative agency's decision not to prosecute or

enforce is presumptively unreviewable, due to "the general unsuitability for judicial review of

agency decisions to refuse enforcement."  *Heckler v. Chaney,* 470 U.S. 821, 831 (1985); *ADAPT*

*v. HUD*, 170 F.3d 381, 384-87 (3d Cir. 2006).

Moreover, Defendants' reliance on HUD's decision in the U.S. Bank matter paints an

incomplete picture in light of HUD's negotiation of a substantial settlement in a case against

Wells Fargo for similar alleged acts of discrimination. The conciliation agreement reached

between HUD and Wells Fargo concerning racial disparities in the exterior maintenance of Wells

Fargo-owned REOs reflects HUD's belief that such disparities can violate the Fair Housing Act.

*See Asst. Sec'y for Fair Housing and Equal Opp., HUD v. Wells Fargo Bank, N.A.,* Case No. 00-

13-0001-8, Conciliation Agreement (June 5, 2013).[6]  The U.S. Bank No Cause Determination

from a HUD regional office should carry no greater weight.

### B.   The No Cause Determination Is Riddled With Error

In the U.S. Bank HUD matter, complainants found that testers showing up at a U.S.

Bank-owned REO property in neighborhoods of color were far more likely to find a lack of basic

exterior maintenance, like well-kept lawns and trash cleared from the property, even though such

maintenance tasks are part of standard industry practice and required in virtually all jurisdictions.

Soule Decl., Ex. A-1 at 1.  The testers' observations of exterior conditions were corroborated by

over 13,000 photographs. *Id.* at 16.  This evidence met the standard of "sufficiency" required by

HUD's own Investigation Manual, as well as meeting traditional standards of proof.  Rather than

analyzing the actual complaint before it, HUD Region I conjured up an imaginary investigation

and decided that complainants should have tested an entirely different and vastly larger kind of

discrimination altogether – discrimination in the "overall condition" writ large of REO

properties, including any decisions by U.S. Bank to make structural repairs, engage in

rehabilitation, and provide *interior* maintenance. Ex. A-1 hereto, at 6-19.  Region I then

compounded its error by evaluating whether the evidence complainants collected (exterior

maintenance issues) succeeded in showing that the Bank discriminated in making structural

repairs and interior improvements, which was not complainants' allegation.  Based on this

flawed logic, it was inevitable that Region I's resulting conclusion would also be flawed. *Id.*

Having unmoored its decision-making entirely from the actual allegations of the

administrative complaint before it, and from the rigorous testing and analysis that complainants

had performed, HUD Region I proceeded to conduct its own analysis under the alternative theory

---

[6] Available at https://www.hud.gov/sites/documents/HUDVWFCONCILIATION.PDF

that it preferred. This analysis was flawed in numerous ways summarized in the Complainants' Request for Reconsideration. *Id.* at 19-21. Complainants were never allowed to see the U.S. Bank data as required in the HUD Handbook during a Final Interview. *Id.* at 3-6. The little information revealed in the Determination was shown by the Complainants to be demonstrably false. *Id.* at 30-33.

Compounding these conceptual errors were equally serious legal errors. Ex. A-1, at 34-49. Region I both misunderstood and misapplied fundamental legal principles courts apply to assess evidence of discrimination in testing cases. It incorrectly stated the legal standard required for proving a "pattern or practice" of discrimination under the Fair Housing Act. It assumed wrongly that U.S. Bank could be legally responsible under the Fair Housing Act for discriminatory maintenance of its own REO properties only if it had "knowledge" of the discrimination. And Region I improperly gave legal immunity to "trustee" owners of REO properties, without any factual or legal support for such immunity. *Id.* at 35-42.

## III.    PLAINTIFFS ADEQUATELY PLEAD A DISPARATE TREATMENT CLAIM

In its prior Opinion, the Court dismissed Plaintiffs' disparate treatment claims because the Court's interpretation of the applicable limitations period had "stripped away – at least for now – the foundation of those allegations." (ECF 54 at 31). Plaintiffs have now provided additional factual allegations that support a finding by the Court that the continuing violation theory applies and that the applicable statute of limitations extends back to 2011. (ECF 70 ¶¶112-123) Plaintiffs also analyzed the smaller dataset that the Court found was appropriate in its prior opinion, and, on the basis of this analysis, alleged that highly statistically significant disparities exist (even after controlling for non-racial causes). (ECF 70 ¶¶98-99, 107-108).

### A. The Second Amended Complaint Alleges Facts Well-Recognized As Supporting An Inference Of Intentional Discrimination

Defendants repeat their prior arguments about disparate treatment, complaining of "sparse factual allegations" relating to discriminatory intent. ECF 72 at 17. In fact, the SAC is rife with allegations from which discriminatory motive can be inferred.

In this Circuit, the legal standard for alleging discriminatory intent is simply whether the evidence alleged would permit a reasonable factfinder to conclude that race (or another protected characteristic) motivated discriminatory conduct, and probative evidence of all types is considered as a whole in making this determination. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The requirements for pleading intentional discrimination are not onerous: as the Seventh Circuit noted in a fair housing case, "[it] does not take much to allege discrimination." *Wigginton v. Bank of Am. Corp.*, 770 F.3d 521, 522 (7th Cir. 2014).

The SAC (i.e., the totality of the actual allegations, not just the few paragraphs that Defendants mention) sets forth a very detailed and plausible disparate treatment claim based upon all the following types of evidence: (a) the differing treatment of similarly situated comparators, ECF 70, ¶¶96-105, 127-139 and App. B, C, D; (b) statistically significant disparities (after controlling for non-racial factors), ¶¶97-99, 106-108; (c) Defendants' knowledge of systemic racial disparities in the maintenance and marketing of the Deutsche Bank REO properties, but failure to respond to complaints or change its behavior, ¶¶112-124, 142(e); (d) a history of prior intentional discriminatory conduct toward African-Americans and Latinos with respect to housing and lending, ¶¶38-51; (e) Defendants' deviation in minority communities from applicable laws, industry standards and normal practices regarding exterior property maintenance, ¶¶88, 130-131, 142(d), 142(h); (f) the pronounced segregative effect of Defendants' conduct, ¶¶160-166, 338-344; (g) the absence of credible explanations for the

27

observed disparities and conduct, ¶¶97-99, 106-108, 110, 142(b); and (h) evidence of a significant pattern of unlawful corporate conduct.[7]  ¶¶142(k)-146.

Under Supreme Court precedent, discriminatory intent can be pleaded and proven from this totality of facts and circumstances.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977).  Defendants' objections to Plaintiffs' disparate treatment claim are unpersuasive.  First, the argument that the SAC makes only "conclusory" allegations of discriminatory intent, ECF 72 at 18, is contradicted by the SAC's detailed *factual* allegations that bear on discriminatory intent, especially concerning vast disparities in the maintenance of REO properties in minority communities (i.e., disparate treatment), and Defendants' failure to address discrimination they knew about.

Defendants' contention that there are not "actual allegations of discriminatory intent," ECF 72 at 18, presumably refers to racial slurs or admissions of discriminatory motive, but those are hardly required elements of an intentional discrimination claim.  *See Ortiz v. Werner Enterprises*, 834 F.3d at 765 ("few discrimination cases are . . . straightforward – indeed they are often factually complex and require sifting through ambiguous pieces of evidence").  Moreover, the additional allegations of the SAC based upon third party witness information regarding the use of code words, such as "hot zones," "low value assets" and "low value areas" for allocating maintenance resources, provide important new evidence of the sort Defendants criticize is missing.  ECF 70 ¶¶158A-L.  Courts have routinely interpreted facially race-neutral comments, such as remarks about the "character" and "flavor" of an area, as "code words for racial animus."

---

[7] Defendants' brief wastes time pretending that the only allegations of discriminatory intent against them relate to the "Panama Papers," while ignoring all of the other pointed circumstantial facts that are alleged. In this case, the allegations concerning Defendants' stupefying record of unlawful and discriminatory conduct is relevant to dispelling any notion that large corporate entities such as Defendants should benefit from some informal presumption that they are unlikely to have engaged in improper conduct.

*See MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 608-09 (2d Cir. 2016); *Avenue 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 506 (9th Cir. 2016). Challenged language need not contain "talismanic expressions" in order to demonstrate racial animus. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996). Instead, courts may use factors such as "context, inflection, tone of voice, local custom, and historical usage" to identify racially coded language. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). *See, e.g., City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.,* 982 F.2d 1086, 1090, 1096 (7th Cir. 1992) (defendant's agents characterized some neighborhoods as "nice" and others as "wouldn't want to live there").

Second, Defendants' attempt to brush off Plaintiffs' statistical analysis as "flawed" and lacking probative weight as to intent is incorrect. ECF 72 at 18. As discussed above, the testing conducted by Plaintiffs was comprehensive, meticulously implemented, and documented vast disparities between maintenance performed in white and minority neighborhoods. In disparate treatment cases, courts have routinely cited statistical evidence as proof of intentional discrimination, and, as the Seventh Circuit has noted, "in some cases, statistical disparities alone may prove intent." *Equal Employment Opportunity Commission v. O & G Spring and Wire Forms Specialty Company*, 38 F.3d 872, 876 (7th Cir. 1994). Even when statistical evidence on its own is insufficient to establish intentional discrimination, it may suffice when combined with other evidence. *See e.g., Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1038 (N.D. Ill. 2003).

Defendants' attack on Plaintiffs' statistical allegations is doubly misplaced considering that no statistical demonstration of any particular type is required to plead or prove unlawful housing discrimination. *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("[n]o mathematical formula is workable, nor was any intended. Each case must turn on its own facts."). The SAC here utilizes the type of comparative evidence that is frequently

used in fair housing cases:  tests performed on similarly situated properties have always sustained fair housing claims.  *See Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1531 (7th Cir. 1990) (the "principal evidence" that the defendants were intentionally discriminating was "the comparative experience of white and black testers"); *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.,* 982 F.2d 1086, 1095 (7th Cir. 1992) (same).

As to proof of a "pattern or practice" of discrimination, courts have found that such a showing may be made even based upon a small number of proven incidents.  *See United States v. Balistrieri*, 981 F.2d 916, 929-930 (7th Cir. 1992) (finding pattern or practice when five black testers were treated unfavorably relative to five white testers); *United States v. Big D Enters., Inc.*, 184 F.3d 924, 930-31 (8th Cir. 1999) (finding pattern or practice based on evidence of three victims of discriminatory policy).  Measured by these standards, the testing here—which considered over 1,100 Deutsche-owned REO properties—is easily sufficient.

Third, Defendants continue to mischaracterize the applicable standard for proving discriminatory intent, ignoring the Court of Appeals decision in *Wetzel v. Glen St. Andrew Living Center, LLC*, 901 F.3d 856, 864 (7th Cir. 2018).  In *Wetzel*, the Seventh Circuit held that the Fair Housing Act creates liability against a landlord who has knowledge of tenant-on-tenant harassment, but is deliberately indifferent to that harassment.  *Id.*  The *Wetzel* court looked to cases interpreting Title VII and Title IX in adopting the deliberate indifference standard for intentional discrimination, *See id.* at 863-64; *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)(school district's deliberate indifference to known acts of discrimination constitutes an intentional violation of Title IX); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998)(school districts liable under Title VI for failure to respond adequately to student-on-student racial harassment). Here, the SAC alleges that Defendants knew of the

ongoing discrimination at REO properties, but chose to ignore that behavior. (ECF 70 ¶¶112-124). While far from the only facts bearing on intent, these allegations evidence deliberate indifference and state a claim for intentional discrimination.

Fourth, Defendants criticize allegations concerning historical patterns of discrimination against minority homeowners and other unlawful conduct as if those allegations were presented in a vacuum. ECF 72 at 19. These allegations are one type of circumstantial evidence of intent, along with all the other facts alleged. The dark and recurring history of discrimination against minority communities by lenders and financial institutions with regard to housing in this country does not establish that these Defendants acted with discriminatory intent, but is certainly a factor bearing on the plausibility that this occurred. Moreover, consideration of this sort of background evidence was approved the Supreme Court as an indicia of discriminatory intent. *See Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266-68 (1977).

### B. Plaintiffs Also State A Claim For Intentional Discrimination Under The McDonnell Douglas Burden-Shifting Framework

An FHA plaintiff may also rely on the burden-shifting framework of *McDonnell Douglas,* 411 U.S. 792 (1973). *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir. 1990)(*McDonnell Douglas* "is routinely used in housing and employment discrimination cases alike"). A plaintiff in a case such as the present makes the required initial showing of discriminatory animus by alleging (1) the housing at issue is in a minority neighborhood; (2) the housing was eligible for the services at issue (here, routine exterior maintenance and marketing); and (3) the services were not provided in the same way as for similarly situated properties. *See Old W. End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100, 1103 (N.D. Oh. 1987).

Here, the SAC alleges that the inspected properties (1) were located in minority neighborhoods, (2) were owned by the Deutsche Bank Defendants and serviced by Ocwen and/or

Altisource and thus eligible for routine exterior maintenance and marketing by Defendants, but (3) did not receive the same level of routine exterior maintenance care and marketing as properties owned and serviced by Defendants in white neighborhoods.  *See* ECF 70 ¶¶84-111). Plaintiffs have also preemptively anticipated Defendants' possible explanations for this differing treatment by conducting a regression analysis taking into account other, non-racial explanatory variables, such as property value and age, local crime statistics, dwelling lot and size, and length of time the property was in Defendants' possession.  *Id.* at ¶¶102-108.   This suffices to state a disparate treatment claim under *McDonnell Douglas.*

## IV.   PLAINTIFFS STATE CAUSES OF ACTION UNDER THE FAIR HOUSING ACT

### A.  Plaintiffs State A Section 3604 Claim

Previously, this Court rejected most of Defendants' arguments that Plaintiffs failed to state a Section 3604 claim. *See* ECF 54 at 17-21. It agreed with Plaintiffs that Defendants' discriminatory failure to maintain properties could constitute a Section 3604 violation "if the disparate effects caused by the defendants' failures to maintain render the property unavailable." *Id.* at 20. The only defect it detected (other than the now resolved cross-cutting issue regarding the time period of Plaintiffs' evidence) was that Plaintiffs "failed to allege the REO properties were neglected to such an extent as to dissuade purchasers from buying them." *Id.*

Plaintiffs have added the allegations that this Court found necessary, and more. The SAC clearly alleges that Defendants' conduct makes the REO properties themselves less sellable, has deterred purchasers from buying them, and that surrounding homes suffer as well, with cascading effects in the market and multiple specific types of transactions impeded.  *See* ECF 70 ¶164 ("buyers are deterred from purchasing properties in neighborhoods with poorly maintained REO properties"); *id.* ¶304 (discriminatory maintenance and marketing makes properties "uninhabitable and/or undesirable" and dissuad[es] potential buyers from looking at or

purchasing the property"); *id.* ¶309 (same); *id.* ¶289 (poorly maintained REO properties "deter real estate agents from showing the REO properties . . .[and] their availability for sale is adversely affected); *id.* ¶290 (Plaintiffs' knowledge of properties in service areas indicates "Defendants' failure to maintain and market REO properties in communities of color has had the effect of dissuading purchasers from buying these properties); *id.* ¶165 ("The existence of poorly maintained REO dwellings in minority neighborhoods diminishes home values for surrounding homeowners," thus restricting their ability to draw on equity and acquire a home in another neighborhood); *id.* ¶178 ("as a direct result of poorly maintained REO properties in minority neighborhoods, lowered property values of nearby homes have interfered with sales going forward . . . . In addition, private developers have been thwarted and deterred from investing in minority neighborhoods affected by REO blight . . . ."); *id.* ¶189 ("poorly maintained REO properties impact appraisal values"). Thus, Plaintiffs not only "allege the REO properties were neglected to such an extent as to dissuade purchasers from buying them," ECF 54 at 20, they allege that Defendants' conduct has made other homes unavailable for purchase and sale as well.

Defendants do not argue that any of these allegations are insufficient. In lieu of addressing Plaintiffs' actual allegations, Defendants advance an entirely new argument that has nothing to do with this Court's earlier dismissal of Plaintiffs' Section 3604 claim. They contend that the SAC fails because it does not "identify a *specific instance* where a property's condition or marketing made it unavailable to a person for sale or rental." ECF 72 at 28 (emphasis added). Defendants do not explain why Plaintiffs should have to identify a "specific instance" in their complaint other than suggesting that this Court said so earlier (it did not). No such requirement exists.

This case is a challenge to a broad-based practice that affects thousands of properties.

Accordingly, Plaintiffs' obligation is to plead the contours of that challenged practice, and the disparate impact it has overall, not to plead the details of "specific instances", which are neither necessary nor sufficient to make out Plaintiffs' claim. For that reason, "both the Supreme Court and lower courts have permitted organizational plaintiffs to proceed by identifying the category of persons who will be harmed by the challenged policy without naming the specific impacted [persons]." *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 31 (D.D.C. 2017) (citing *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) and other cases). To be sure, "specific instances" will ultimately be relevant as *evidence* of the existence and effects of the larger practice, but there is no requirement to plead such evidence in a complaint.[8] *Id.*

### B. Plaintiffs State A Section 3605 Claim

Previously, this Court found allegations that Defendants' practices effectively made housing unavailable were insufficient to state a Section 3605 claim, as that would amount to "bootstrap[ping] their § 3605 claim into their § 3604 theory." ECF 54 at 22. The Court held that Plaintiffs must allege the type of "specific real-estate transactions impeded by Defendants' conduct." *Id.* Plaintiffs have done that. They have alleged not only that Defendants' conduct ultimately makes housing unavailable, but that specific real-estate transactions are impeded by Defendants' conduct — including preventing the ability to draw on home equity, the ability to obtain a purchase loan and the ability to get a strong appraisal. *E.g., id.* at ¶¶189, 328, 336.

Once again, Defendants ignore these directly responsive allegations. Instead, they misread the opinion as requiring allegations about *specific people*, even though none of the

---

[8] Defendants' assertion that the allegation that Defendants maintained and marketed "low value" properties differently "does not equate to a claim that the difference is "because of race or national origin," ECF 72 at 28, turns a blind eye to the allegations that these code word designations were disproportionately and arbitrarily applied to minority communities. *See* ECF 70¶¶158A-L.

claims seek damages related to particular home buyers or sellers. *See* ECF 72 at 28 ("Plaintiffs still fail to identify an instance where a person attempted to engage in a real estate-related transaction . . ..."). This Court did not require that, nor could it have, consistent with the precedent above.[9] *See also Access Living of Metropolitan Chicago,* 2019 WL 1429647 at *6 ("The City cites no case law indicating that Plaintiff was required to provide development-by-development or unit-by-unit level detail on its investigation").

### C. Plaintiffs State A Claim For Perpetuating Segregation

This Court already rejected all of Defendants' arguments specific to Plaintiffs' perpetuation-of-segregation claim. *See* ECF 54 at 23-24. It dismissed this claim only because it found Plaintiffs needed to replead their statistical analysis to separate facts from before and after the statute of limitations period. *Id.* at 24. Plaintiffs have done so, and Defendants' argument for dismissing this claim based upon purported errors in Plaintiffs' statistical analysis is insufficient. ECF 72 at 28-29. Defendants' argument fails for the reasons stated previously in Section I.E.

### CONCLUSION

For the foregoing reasons, the Joint Motion should be denied.

Respectfully Submitted,

Dated: July 8, 2019          /s/ *Jennifer K. Soule*

| | | |
|---|---|---|
| Jennifer K. Soule | Stephen M. Dane | Morgan Williams |
| James G. Bradtke | Yiyang Wu | *National Fair Housing Alliance* |
| Kelly K. Lambert | *Relman, Dane & Colfax PLLC* | 1331 Pennsylvania Ave, NW |
| *Soule, Bradtke & Lambert* | 1225 19th St., N.W. | Suite 650 |
| 402 Campbell St., Suite 100 | Suite 600 | Washington, DC 20004 |
| Geneva, IL 60134 | Washington, DC 20036 | *Attorney for Plaintiffs* |
| *Attorneys for Plaintiffs* | *Attorneys for Plaintiffs* | |

---

[9] Plaintiffs have further buttressed their allegations regarding their FHA claims by reference to their knowledge regarding the real estate market and real estate transactions in the specific areas that they serve.   *See* ECF 70 ¶¶189, 290, 327, 335.