# Exhibit A

# to Plaintiffs' Response to Defendants' Joint Motion to Dismiss

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA.<br><br>      Plaintiffs,<br><br>          v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>      Defendants. | Case No. 18 CV 839<br><br><br><br>Judge Harry D. Leinenweber<br><br>Magistrate Judge Sidney I. Schenkier<br><br><br>Jury Trial Demanded |

**DECLARATION OF JENNIFER K. SOULE IN OPPOSITION TO
DEFENDANTS' JOINT MOTION TO DISMISS**

Jennifer K. Soule, under penalty of perjury, states based upon personal knowledge that the following facts are true and correct:

1.     I am a partner at Soule, Bradtke & Lambert, and am lead counsel for Plaintiffs in this matter. I have personal knowledge of the facts stated herein and could and would competently testify thereto if called as a witness.

2.     Attached as Exhibit 1 is a true and correct copy (exhibits excluded) of the February 8, 2016, Request for Reconsideration submitted to the U.S. Department of Housing and Urban Development ("HUD") by the complainants in *Nat'l Fair Hous. Alliance et al. v. U.S. Bank, N.A.,* HUD Case No. 01-12-0283-8.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge from information in my personal possession and information conveyed to me.


Dated: July 8, 2019     By:      */s/ Jennifer K. Soule*

# Exhibit 1 to Jennifer K. Soule Declaration

RELMAN, DANE & COLFAX PLLC

1225 19TH STREET NW SUITE 600
WASHINGTON, DC 20036-2456

TEL 202-728-1888
FAX 202-728-0848
WEBSITE WWW.RELMANLAW.COM

February 8, 2016

**Via Federal Express**

Gordon Patterson
Director, Office of Enforcement
FHEO
U.S. Department of Housing and Urban Development
Room 5226
451 7th Street, SW
Washington, D.C. 20410-2000

> **Re:** Housing Discrimination Complaint
> National Fair Housing Alliance and 19 others v. U.S. Bank
> Inquiry No. 342347
> HUD Case No. 01-12-0283-8

**REQUEST FOR RECONSIDERATION**

Dear Mr. Patterson:

On January 12, 2016, our clients received from Susan Forward, Region I Director, Office of Fair Housing and Equal Opportunity, a Closure Letter and "Determination of No Reasonable Cause" regarding the matter referenced above.

In accordance with Ms. Forward's transmittal letter and pursuant to U.S. Department of Housing and Urban Development policy, the Complainants **Request Reconsideration of Region I's Determination** for the reasons set forth in the enclosed.

Moreover, the seriousness and magnitude of the analytical and legal flaws in the Determination cannot be overlooked. They suggest that Region I is either incapable of investigating a matter of this novelty, is unfamiliar with legal precedents, or cannot be objective in its assessment of the facts, many of which it explicitly chose to ignore for unsubstantiated reasons. We therefore ask that when the matter is re-opened, it be assigned to HUD's Systemic Unit to complete the investigation.

Sincerely,

/s/ S. Dane                                   /s/ M. Williams
S. Dane                                          M. Williams

# REQUEST FOR RECONSIDERATION
## HUD Case No. 01-12-0283-8

### Table of Contents

I.      INTRODUCTION............................................................................................1

II.    REGION I FAILED TO FOLLOW HUD'S INVESTIGATION
      MANUAL. THIS ERROR RESULTED IN A DEFICIENT
      AND ERRONEOUS DETERMINATION..................................................3

      A.    Region I Did Not Review With Complainants the Evidence It Received From
           the Respondents. Region I Did Not Request Responses From Complainants
           to Any Evidence Provided by U.S. Bank.............................................4

      B.    The March 30, 2015 Conference Call With Complainants Did Not Contain
           Any of the Elements of, and Was Not, a "Final Interview" Within the
           Meaning of HUD's Manual................................................4

      C.    After Its March 30, 2015 Conference Call With Complainants, Region I
           Gathered Additional Evidence from U.S. Bank That It Never Revealed or
           Discussed With Complainants. ..........................................5

III.   REGION I DID NOT INVESTIGATE OR ANALYZE THE
      ALLEGATIONS AND EVIDENCE OF DISCRIMINATION
      SUBMITTED BY COMPLAINANTS. ..........................................6

      A.    Region I Arbitrarily Rejected the Very Specific Testing Design and
           Methodology Used in this Case..........................................9

      B.    Region I's "Comparative Analysis" of the REOs It Unilaterally
           Determined to be "Similarly Situated" Applies a Historical
           Form of Racial Redlining. Region I's Analysis Also Cannot Be
           Verified By the Facts Available. .......................................19

           1. Region I Relied on Traditional Forms of Racial Redlining..............................20

           2. Region I Relied on Subjective Data That Cannot Be Verified..........................21

C.     Even an Analysis of the REOs Region I Determined Were Serviced by U.S. Bank Directly Show a Stark Repetitive Pattern of Differing Treatment. ...................................................................24

IV.     REGION I'S ANALYSIS OF EVIDENCE SUPPLIED BY U.S. BANK CANNOT BE VERIFIED. ..................................................................28

A.     Complainants Were Not Allowed to See or Respond to Any Evidence Submitted in Defense as Required by the HUD Handbook. ...........................................................................................29

B.     Region I's Analysis Cannot Be Verified. ...................................29

C.     Region I's Analysis of U.S. Bank's Evidence is Demonstrably False. ...................................................................................... 30

D.     Region I's "Marketing" Analysis is Flawed for Independent Reasons. ...................................................................................33

V.     REGION I APPLIED IMPROPER LEGAL PRINCIPLES WHICH ADVERSELY AFFECTED THE DETERMINATION. .............................................34

A.     Region I Articulated Legal Principles That Are Inconsistent With Accepted Law. .......................................................................34

1.     *Region I improperly analyzed the exposure of "trustee" owners of properties to liability under the Fair Housing Act.* ...................................34

A. The exemption of securitization trusts from any liability under the Fair Housing Act is wrong as a matter of fact. ............................35

B. The exemption of securitization trusts from any liability under the Fair Housing Act is wrong as a matter of law. ...............................38

2.     *Region I assumed wrongly that U.S. Bank can only be legally responsible under the Fair Housing Act for discriminatory maintenance of which it had "knowledge." This is an error of law.* ..........................................................................42

3.     *Region I's understanding of what evidence is sufficient to constitute a "pattern or practice" of discrimination under the Fair Housing Act is legally incorrect.* ................................................44

4.     *Region I's interpretation of what evidence is required to establish a "prima facie inference" of discrimination under the Fair Housing Act was inappropriately restrictive and conflicts with established law.* .................................................................................46

**B.**    **Region I's Legal Errors Tainted the Entire Determination Decision.** ......................................................................................47

**VI.**    **CONCLUSION.**.................................................................................49

## I. INTRODUCTION.

The factual, legal, and conceptual errors contained in the Determination of No Reasonable Cause issued on January 8, 2016, by Susan M. Forward, Region I Director, Office of Fair Housing and Equal Opportunity (hereafter "Det."), are so frequent in number, and so vast in scope, that the Determination must be withdrawn, and responsibility for completion of this investigation be assigned to HUD's Systemic Unit.

Complainants investigated an important but narrowly focused concern: whether foreclosed homes owned by U.S. Bank (Real Estate Owned, or "REO" properties, hereafter "REOs") were being provided *routine exterior maintenance* (such as mowing the lawn, removing trash, securing the property, etc.) consistently, regardless of the racial or ethnic composition of the neighborhood in which the bank's REOs were located. The complainants' investigation and testing methodology recorded evidence of routine exterior maintenance and marketing practices of U.S. Bank-owned REOs in predominantly White, African-American and Latino neighborhoods in 24 metropolitan areas across the United States. The complainants' investigation focused on middle and working class neighborhoods with high or formerly high homeownership rates and high foreclosure rates. Complainants followed well-accepted testing protocols and practices and found, over and over, that testers showing up at U.S. Bank-owned properties in neighborhoods of color were far more likely to find a lack of basic exterior maintenance, like well-kept lawns and trash cleared from the property, even though such maintenance tasks are part of standard industry practice and required in virtually all jurisdictions.

Complainants submitted tester inspection reports for 650 U.S. Bank-owned REO properties in 24 different cities to substantiate their claims. The testers' observations of exterior condition were corroborated by over 13,000 photographs. Not only did this evidence meet the standard of "sufficiency" required by HUD's own Investigation Manual, this evidence overwhelmingly met the traditional standards of proof recognized by the courts to prove differing treatment and a pattern or practice of discrimination. As shown by the charts attached as exhibits to this request and explained below, the difference in treatment of U.S. Bank owned REO properties in White neighborhoods as compared to neighborhoods of color is consistent, repetitive, and stark.

Rather than analyzing the actual complaint before it, Region I decided that complainants should have tested an entirely different and vastly larger kind of discrimination altogether – discrimination in the "overall condition" writ large of REO properties, including any decisions by U.S. Bank to make structural repairs, engage in rehabilitation, and provide interior maintenance. Unsurprisingly, it found that complainants should have designed their investigation differently in order to test that very different proposition. Region I then compounded its error by evaluating whether the evidence complainants did collect (exterior maintenance issues) succeeded in showing that U.S. Bank discriminated in making structural repairs and interior improvements. Based on this flawed logic, it was inevitable that Region I's resulting conclusion would be flawed as well.

Region I's criticisms of complainants' testing methodology, and its insistence that the testing should have been conducted in an entirely different manner (a necessary consequence of

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 2

its decision to disregard the purpose of the testing in the first place), conflict with all accepted notions of how testing evidence is to be evaluated. The U.S. Department of Justice and the courts reject the rigid application of fixed rules in the analysis of testing evidence – precisely what Region I has done here. Testing methods need to adapt in order to capture emerging forms of discrimination. There can be no *de jure* declaration of whether a particular testing methodology is right or wrong. Factfinders are fully capable of weighing non-racial variations in tests, without the imposition of Region I's limitations and requirements on how the evidence should be weighted and analyzed. And the more tests are conducted, the more weight can be provided to any patterns the testing demonstrates. It would be an extreme case where testing evidence was so lacking in probative value that a court would refuse to allow a jury to consider it. Yet that is exactly what Region I did here.

Having unmoored its decision-making entirely from the actual allegations of the complaint, and from the rigorous testing and analysis that complainants had performed, Region I proceeded to conduct its own analysis under the alternative theory that it preferred complainants to have filed. Its analysis was flawed in numerous ways. In addition to reviewing only a part of the entire record, Region I used a standard for "similarly situated" REOs that is unsupportable by either logic or fact. Remarkably, it applied "control factors" that are themselves vestiges of historical bank and government redlining practices. For example, it insisted that in order for REO properties to be considered "similarly situated" for purposes of its analysis, the neighborhoods in which they are located must have similar "crime rates" and "neighborhood incomes," and the REO properties themselves must be of "similar age" and "similar value" when they came into U.S. Bank's possession. Nor did it identify critical databases it used to determine its definition of "similarity." Even applying Region I's own confused interpretation of how "similarly situated" properties should be compared, we demonstrate below that the evidence still shows a stark and repetitive pattern of differing treatment. Region I willfully chose not to see this pattern.

Region I also purported to conduct an analysis of information and data supplied by U.S. Bank that is unverifiable. Complainants have not been allowed to see or respond to the U.S. Bank data as required in the HUD Handbook during a Final Interview. Region I does not reveal sufficient detail to determine whether its analysis of U.S. Bank's data is valid. And the little information that is revealed in the Determination is demonstrably false, as shown by the photographs below.

By the Region's own admission, the investigation is incomplete. The Determination admits that the investigators chose not to consider or analyze 256 (40%) of the 650 properties in the evidentiary database. Instead, they chose only to analyze 394 of those properties, and even within that subset chose to do a comparative analysis of only 136 REO properties. More significantly, HUD's Handbook requires that complainants be given the opportunity to respond to defenses asserted by a respondent. That process did not occur here. No "Final Interview" of complainants was ever conducted. If such a Final Interview had been conducted, the many errors that we point out below would not have infected the Determination's erroneous conclusions. Perhaps because Region I did not conduct this Final Interview, its analysis and conclusion were based on a fundamental misunderstanding of the complaint, leading Region I to consider

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 3

evidence that was irrelevant, and to fault complainants for failing to submit evidence that has little to do with the allegations they made.

Augmenting these conceptual errors were equally serious legal errors. Region I both misunderstood and misapplied several fundamental legal principles the courts have applied in assessing evidence of discrimination in testing cases. It incorrectly stated the legal standard required for proving a "pattern or practice" of discrimination under the Fair Housing Act. It assumed wrongly that U.S. Bank can be legally responsible under the Fair Housing Act for discriminatory maintenance of its own REO properties only if it had "knowledge" of the discrimination. Its interpretation of what evidence is required to establish a "prima facie inference" of discrimination under the Fair Housing Act was inappropriately restrictive and conflicts with well-established law. And Region I has improperly given legal immunity to "trustee" owners of REO properties, without any factual or legal support for such immunity.

The Determination of No Cause must be withdrawn. The evidence must be re-examined against the allegations of discrimination that were actually made, not against a theory of misbehavior that was never alleged or investigated by complainants. We ask that the investigation be reopened and reassigned to HUD's Systemic Unit.

## II.    REGION I FAILED TO FOLLOW HUD'S INVESTIGATION MANUAL. THIS ERROR RESULTED IN A DEFICIENT AND ERRONEOUS DETERMINATION.

HUD's Title VIII Complaint Intake, Investigation, and Conciliation Handbook (8024.01 REV-2)[1] provides direction to regional offices in the planning and execution of investigations of complaints of discrimination, including complaints of widespread or systemic discrimination like the one involved here.

What the Handbook describes as an essential "Basic Step" required *prior to* the issuance of a determination is the "Final Interview" of the parties. Section 7-5, Part I provides:

**Final Interviews of the Complainant and the Respondent**

The investigator *requests responses to*, or clarification *of all of the evidence* collected in the case *from the* complainant and the *respondent*. If no reasonable cause determination is recommended, *the investigator must review the respondent's defenses and the evidence supporting those defenses with the complainant* to determine if the complainant has additional information that would prove the defense(s) operate to conceal unlawful discrimination. If a reasonable cause determination is recommended, the investigator must summarize the evidence of the investigation and solicit any rebuttal evidence from the respondent. *Whenever a respondent* or complainant *provides additional information,*

---

[1]    (available at
http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/handbooks/fheo/80241 )

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 4

*the other party should be given an opportunity to respond to the new information or evidence.* (Emphasis added).

Despite the novelty of the allegations made here, this "Basic Step" was not followed by Region I. No final interview as described by this section was ever conducted with the complainants. No meeting with the Complainants was ever described as a final interview either.

**A.** **Region I Did Not Review With Complainants the Evidence It Received From the Respondents. Region I Did Not Request Responses From Complainants to Any Evidence Provided by U.S. Bank.**

Specifically, none of the complainants or their legal representatives were ever:

- Made aware of what evidence had been collected from U.S. Bank
- Requested to respond to U.S. Bank's photographic evidence (heavily relied upon by Det. at 6, 20, 21, 26-27)
- Requested to respond to U.S. Bank's maintenance records, which apparently included invoices and descriptions of services (heavily relied upon by Det. at 6, 11-17, 21-23, 24-25)
- Requested to respond to *any* evidence collected from U.S. Bank (heavily relied upon throughout the entire Determination)
- Made aware of, or requested to respond to, U.S. Bank's "maintenance policy" (Det. at 3)
- Made aware of, or requested to respond to, U.S. Bank's "Handling of Real Estate Owned, Vacant and Abandoned Property" contract (Det. at 5, fn. 16)
- Made aware of, or requested to respond to, U.S. Bank's alleged compliance with FHA maintenance standards and regulations as a defense (Det. at 3, 5, fn. 16, 7-8, 9-12, 13-15, 16-18, 22-12, 24-25, 28)
- Made aware of, or requested to respond to, U.S. Bank's reliance on a defense based on "spending" evidence and patterns (Det. at 12-17, 21-25)
- Requested to respond to any Pooling and Servicing Agreements purportedly limiting the legal exposure of U.S. Bank as trustee under the Fair Housing Act (Det. at fn. 21)
- Made aware that Region I intended not to look at evidence concerning 256 additional properties complainants submitted in 2014 (Det. at fn. 20)
- Made aware that HUD had conducted its own "small survey" of properties in Fulton County, Georgia, or to respond to that survey evidence (Det. at 20-21)

**B.** **The March 30, 2015 Conference Call With Complainants Did Not Contain Any of the Elements of, and Was Not, a "Final Interview" Within the Meaning of HUD's Manual.**

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 5

The last substantive communication the complainants had with HUD Region I occurred on March 30, 2015.[2] In attendance from HUD Region I during that conference call were Dan Weaver, Mark Butler, and other HUD representatives. In attendance on behalf of complainants were Stephen Dane, Shanna Smith, Morgan Williams, Jean Zachariasiewicz, Lindsay Augustine, and Casey Graetz. As the Final Investigative Report ("FIR") acknowledges, Mr. Weaver started the conversation by stating: "Hi hello everyone. We are *nearing the end* of the information gathering stage of the investigation." And the Final Investigative Report indicates that the *only* topics discussed during that call were:

- Clarification of whether the Nov. 18, 2014, amended complaint included 19 metro areas or 24 metro areas
- Complainants' §804(c) claims
- Clarification of three methodological concepts; specifically, how complainants defined "unauthorized occupancy;" how and when complainants determined rates of foreclosure to select neighborhoods for REO inspection; and whether complainants used a "national" foreclosure rate for any purpose
- A Powerpoint NFHA presented earlier that day concerning another investigation involving Cyprexx, and not involving U.S. Bank.

Nothing beyond these topics was raised or discussed in that March 30, 2015 conference call with HUD. More to the point, none of U.S. Bank's defenses were mentioned, nor was any evidence U.S. Bank had submitted to HUD, nor any of the other subjects listed in the bullet points above. Moreover, the Final Investigative Report ("FIR") acknowledges that complainants were told during this interview that Region I was "nearing the end of the information gathering stage." (FIR at p. 46). Complainants' representatives were right to conclude that Region I's investigation information gathering was not yet completed and that information was still being gathered. Complainants correctly believed that there would be a subsequent "Final Interview" during which they could respond to U.S. Bank's evidence, as is customary and required by the Handbook.

Because not a single element required by the "Final Interview" Section of HUD's Investigation Manual was a part of this March 30 conference call with HUD, it could not possibly be interpreted as – and complainants never considered it to be – a "Final Interview" within the meaning of that Section of the Manual. And yet, Region I now claims this March 30, 2015 conference was the Final Interview.

**C.     After Its March 30, 2015 Conference Call With Complainants, Region I Gathered Additional Evidence from U.S. Bank That It Never Revealed or Discussed With Complainants.**

---

[2]     The Final Investigative Report ("FIR") asserts that this call took place on March 31, 2015. This is incorrect. The call occurred on March 30.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 6

The Final Investigative Report ("FIR") indicates that on three occasions after its conference call with complainants on March 30, 2015 – April, September, and October, 2015 – Region I collected additional evidence from U.S. Bank representatives. (FIR at pp. 64-65). While Region I was engaging in these additional communications with U.S. Bank and possibly gathering additional evidence or clarifying existing evidence received from U.S. Bank, Region I had no further communications with complainants during this 10 month period.

As demonstrated below, Region I's Determination is riddled with conceptual, factual, and legal errors. These errors were preventable. They could have been avoided – and an opposite Cause conclusion reached – if Region I had communicated with complainants its analytical approach and theory of investigation, had conducted this "Basic Step" in the Manual, and conducted a full and complete "Final Interview" with the complainants. Without being made aware of what U.S. Bank's factual defenses were, or the evidence supporting them, complainants were not provided the opportunity to demonstrate how those facts might nevertheless reveal discrimination, or how those facts might be concealing unlawful discrimination. If given the opportunity, complainants could have corrected the many mistakes, set forth more fully below, that are now apparent in Region I's Determination.[3]

### III.  REGION I DID NOT INVESTIGATE OR ANALYZE THE ALLEGATIONS AND EVIDENCE OF DISCRIMINATION SUBMITTED BY COMPLAINANTS.

All the amended complaints filed in this matter – from the initial complaint filed on April 17, 2012 through the last amended complaint filed on November 18, 2014 – alleged a fairly straightforward claim, one which Region I failed to properly characterize or analyze. Each of the original and amended complaints alleged this fundamental claim:

> In these [24 cities], Respondents maintain properties located in White neighborhoods in a substantially better manner than they maintain properties located in majority non-White neighborhoods. While Respondents' REO properties in White neighborhoods are *more likely to have well-maintained lawns, secured entrances, and professional sales marketing*, REO properties in majority non-White neighborhoods are more likely to have *poorly maintained yards, unsecured entrances, appear to be vacant or abandoned, and have poor curb appeal*.

> In each of the twenty-four metropolitan areas where Complainants investigated a number of REO properties owned by Respondents, *REO properties in White communities were far more likely to have a small number of maintenance deficiencies or problems as*

---

[3]      See also Handbook, Section 7-7, subsection B (Denial or Dispute of Complainant's Facts) which requires investigators to "Interview the complainant's witnesses and *ask questions about the defenses*." (Emphasis added).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 7

*compared to REO properties in communities of color*, while REO properties in communities of color were far more likely to have large numbers of such deficiencies or problems than those in White communities. (Emphasis added).

Complainants' initial and amended complaints identified over three dozen *exterior* factors – such as accumulation of trash and mail, overgrown grass and shrubbery, unsecured doors, damaged steps and windows and fences, broken or missing signage – organized into seven general categories: Curb Appeal, Structure, Signage, Painting and Siding, Gutters, Water Damage, and Exposed Utilities. Complainants' evidence included tester/inspector observations of these exterior factors, with every observation corroborated by photographic evidence of the property's exterior condition.

Clearly the focus of complainants' investigation was on *routine services that are considered ordinary and necessary* in the property preservation industry, and maintenance tasks that are visible solely by *exterior inspection*. This focus is consistent with the theory of harm to neighborhoods caused by inferior maintenance – that the degradation in external appearance is what affects the desirability and marketing of the overall neighborhood. No one can see the condition of the interior plumbing, for example, and so it does not have the same effect. The checklist of maintenance items that complainants used and included in their complaints is based on standard industry practice as to what constitutes "routine" exterior maintenance, or "minimal" property safety conditions, and is consistent with Fannie Mae, Freddie Mac, and FHA requirements. Moreover, the complaints are premised on the legal theory that *the owner of REO property* is legally responsible under the Fair Housing Act for the consistent and equal maintenance of the REO properties it owns, regardless of whether the owner knows of or directs others to engage in the inconsistent treatment.

Despite the complaints' limited focus, Region I misinterpreted them as alleging differences in "overall property condition." (Det. at 19). Consistent with this misinterpretation, its analyses and comparisons took into account U.S. Bank's "overall expenses" involving an REO property (Det. at 9-16, 21-23), even those expenses incurred for *internal* maintenance and *repairs* (Det. at 5, 9-16, 19-20, 24), which have nothing to do with the discrimination alleged. Similarly, Region I declared that the complainants should have investigated each REO property's overall condition "over the course of time" (Det. at 3-4) in order to control for the possibility that properties in neighborhoods of color were in worse condition when U.S. Bank took ownership. It did not explain why such prolonged study of the properties would be necessary to assess whether U.S. Bank was performing tasks such as mowing lawns, which do not depend on the condition of the property when U.S. Bank took over. And Region I faulted complainants for not conducting an analysis that controlled for such variables as age of dwelling, condition at initial ownership, and neighborhood income that have absolutely no bearing on whether an REO property's lawn has been mowed or trash removed from the premises *after* the bank obtains title to the property.

The bottom line is that Region I's misinterpretation of complainants' theory of the case set Region I off on an investigation and analyses of the evidence that varied significantly from

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 8

the allegations of the complaint here. And then Region I compounded that fundamental error by making a number of other legal errors – none of which it gave complainants the opportunity to address and correct. As explained below, Region I ended up analyzing U.S. Bank's compliance with its largely unrelated contractual and regulatory duties instead of looking at its performance of the targeted exterior maintenance services investigated by complainants. It confused U.S. Bank's limited duties as a securitization trustee with its broader legal obligations to the public as a property owner. It assumed that U.S. Bank could only be legally culpable under the Fair Housing Act for discriminatory actions it knew about or directed. The evidence submitted to Region I that it should have evaluated, but did not, shows repeated and consistent disparities in routine exterior maintenance of U.S. Bank-owned REO properties. These disparities are spelled out in great detail in the amended complaint filed November 18, 2014 (at pp. 7-41). They are also graphically portrayed in the Charts attached hereto as Ex. 1. In almost all cities, and in almost all categories of routine exterior maintenance, U.S. Bank's exterior maintenance of REO properties in neighborhoods of color is worse than its maintenance of REO properties in White neighborhoods. And when aggregated together on a national basis, the pattern remains the same. Ex. 1.

## U.S. Bank – Nationwide Systemic Findings

Legend:
- Communities of color have more egregious percentage – at least 10% difference in proportion to the White percentage
- No significant difference observed in percentages
- White communities have more egregious percentage – at least 10% difference in proportion to the Communities of color percentage

| Category | Communities of color | White | Category | Communities of color | White |
|---|---|---|---|---|---|
| Less than 5 deficiencies | 11.4% | 33.9% | Trespassing / warning sign | 21.9% | 23.0% |
| 5 or more deficiencies | 88.6% | 66.1% | Marketed as distressed | 6.1% | 3.8% |
| 10 or more deficiencies | 48.2% | 16.7% | No for sale sign | 69.6% | 64.4% |
| 15 or more deficiencies | 10.2% | 2.5% | Broken or discarded signage | 7.3% | 1.7% |
| Trash | 67.6% | 28.0% | Unauthorized occupancy | 1.7% | 1.7% |
| Mail accumulated | 26.8% | 22.2% | Signage misc | 2.4% | 3.8% |
| Overgrown grass or leaves | 48.9% | 39.5% | Graffiti | 6.5% | 0.8% |
| Overgrown/dead shrubbery | 49.0% | 36.0% | Peeling / chipped paint | 63.7% | 45.2% |
| Dead grass (10-50%) | 22.1% | 13.0% | Damaged siding | 44.0% | 24.7% |
| Dead grass (50% or more) | 10.0% | 4.6% | Missing / damaged shutters | 2.6% | 2.5% |
| Invasive plants (10-50%) | 32.1% | 17.2% | Paint/siding misc | 3.0% | 4.0% |
| Invasive plants (50% or more) | 10.7% | 6.7% | Missing / out of place gutters | 20.4% | 16.3% |
| Broken mailbox | 10.4% | 10.9% | Broken or hanging gutters | 18.7% | 13.7% |
| Curb appeal miscellaneous | 22.1% | 19.7% | Obstructed gutters | 23.4% | 20.1% |
| Unsecured / broken doors | 29.4% | 15.5% | Gutters misc | 2.4% | 4.2% |
| Damaged steps and handrails | 27.0% | 17.2% | Water damage | 13.4% | 3.8% |
| Damaged windows | 47.0% | 22.6% | Small amount of mold | 25.8% | 21.8% |
| Damaged roof | 19.0% | 8.8% | Pervasive mold | 8.8% | 6.5% |
| Damaged fence | 43.6% | 31.8% | Water damage misc | 1.5% | 0.0% |
| Holes | 29.4% | 12.1% | Exposed utilities | 29.0% | 15.0% |
| Wood rot | 31.6% | 20.1% | | | |
| Structure miscellaneous | 37.0% | 30.1% | | | |

3

If Region I had discussed its theory of approach and plan with complainants at any point in time, complainants could have kept its investigation and analyses on track and confined to the parameters of what the complaints actually alleged. And if Region I had conducted the Final Interview required by HUD's Investigation Handbook, virtually all of the subsequent mistakes that appear in the Determination could have been avoided.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 9

**A.    Region I Arbitrarily Rejected the Very Specific Testing Design and Methodology Used in this Case.**

Region I essentially dictated a specific testing methodology that it deemed must be used in REO differing treatment cases, even where (as here) the discrimination alleged is targeted to the provision of very specific forms of exterior maintenance. But testing design and methodology is unique to each investigation, and imposing rigid parameters of testing design on a complaint alleging a type of discrimination not suited to them was inappropriate. Esteemed researchers Margery Turner and Stephen Ross have correctly cautioned that:

> In the ongoing fight against housing discrimination, paired testing is certain to play a critical role, both in enforcement and in measurement and monitoring. But because market conditions and practices are likely to evolve over time, testing methods need to adapt in order to capture emerging forms of discrimination. New approaches should include . . . extending the testing process into later stages of the housing transaction.[4]

The U.S. Department of Justice has rejected the rigid application of such fixed rules in the analysis of testing evidence. It correctly takes the position that fair housing testing evidence can be presented in many forms, and that factfinders are fully capable of weighing non-racial variations in tests, without the imposition of "expert" rules on how the evidence should be weighted and analyzed:

> First, Defendant challenges the methodology of EHOC's fair housing tests arguing, in part, that the failure of EHOC to "use a test which has been recognized as valid and reliable" renders the test invalid and irrelevant. . . . Defendants argue EHOC should have used the test methodology utilized by the plaintiffs in *Hilltop Community Congress et al. v. Hilltop Realty Inc. et al.*, 629 F. Supp. 1232 (N.D. Ohio 1983), *rev'd in part*, 774 F.2d 135 (6th Cir. 1985) (hereinafter "*Hilltop*"). . . . The court in *Hilltop*, sitting as a factfinder, found discrimination, but did not hold that a particular type of testing methodology must always be used. See *Hilltop*, 629 F. Supp. at 1248. Fair housing testing has multiple uses and can come in multiple forms. Assuming for the purposes of this argument that plaintiffs did not use the methodology in *Hilltop*, a failure to use a particular type of testing does not render fair housing tests inadmissible. The Defendant is free to raise this issue, as well as any other issue on cross examination and in rebuttal. The jury would weigh that evidence in determining whether the tests were reliable, and if reliable, whether they showed that the defendant violated the Fair Housing Act.

> [It] would be an extreme case where testing evidence was so lacking in probative value that it could be excluded under Rule 403. There is no requirement under Rule 403 that plaintiffs produce data showing that fair housing tests have scientific validity.

---

[4]    M. Turner and S. Ross, *How Racial Discrimination Affects the Search for Housing*, in The Geography of Opportunity: Race and Housing Choice in Metropolitan America, at 81, 98-99 (X. Briggs, Ed., 2005).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 10

Amicus Brief of the United States in *Metropolitan St. Louis Equal Housing Opportunity Council v. Gundaker Real Estate Co.*, Case No. 4:98CV00837 (E.D. Mo. 2001), available at http://www.justice.gov/crt/housing-and-civil-enforcement-cases-documents-331.

Rather than assess complainants' evidence to see if it supported complainants' actual allegations, Region I engaged in what looks more like a traditional defense bar broadside rather than the objective assessment a neutral investigative agency should apply.[5] For example:

1.     The Determination asserts that complainants did not define what constituted a "high" rate of foreclosure in each of the metropolitan areas they investigated. (Det. at 2, fn. 4). Yet complainants explained several times, including in their presentation to investigators on December 9, 2014, that zip codes selected as having "high" rates of foreclosure were those whose *rates of foreclosure were higher than the foreclosure rate relative to the surrounding community*; i.e., those that exceeded the average rate of foreclosure in that metropolitan area. These foreclosure rates – and the relative rankings above and below the area norm – were obtained from www.realtytrac.com.

On this point the FIR (p. 34) states that complainants "omitted . . . zip codes from the evaluation because NFHA believed these zip codes would not effectively display disparate treatment. From the zip codes, they selected areas with recent high foreclosure rates. Within those areas, they determined five or ten zip codes with the most foreclosures." These statements misrepresent what complainants told Region I, in writing and in Powerpoint presentations. Complainants first used RealtyTrac to identify zip codes in each metropolitan area with high foreclosure rates, using the standard described above. Once they derived that list, complainants identified those zip codes that were 50%+ white or 50%+ communities of color. It then inspected 100% of U.S. Bank owned REO properties in those zip codes.

The FIR also states (pp. 34-35): "NFHA excluded zip codes deemed low-income, because they observed only slight disparity or no racial disparity at all in those neighborhoods. They reasoned that the higher incidences of foreclosures in low-income neighborhoods contribute to this finding. NFHA did not employ a strict cut-off standard to determine which zip codes covered low-income areas, because there were so many differences in properties around the country. Rather, they used high rates of investors as a proxy for low-income zip codes. With the exception of the Grand Rapids properties, NFHA only evaluated properties in neighborhoods they deemed to be middle-class."

These statements also misrepresent what complainants told Region I. Complainants have repeatedly stated, both to Region I investigators and in public statements, that their REO

---

[5]    "At trial, the defendants desperately pounced upon every stray fact which might distinguish these black applicants from their white counterparts." *Davis v. Mansards*, 597 F. Supp. 334, 345 (N.D. Ind. 1984).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 11

investigation targeted zip codes with *high homeownership rates*. The consequence was that many low income neighborhoods, which tend to have lower homeownership rates, would not have made the list of zip codes to be inspected. As further confirmation that Region I misrepresented complainants' position, a number of zip codes investigated by complainants did indeed include lower income census tracts and census blocks with U.S. bank owned REO properties. Investor neighborhoods were not the focus of the complainants' investigation because the greater impact of failed REO maintenance is on homeowners. The focus of complainants' investigation was on REOs located in middle and working class neighborhoods, which has been repeatedly stated by complainants. That Region I would have preferred a different focus or allegation is not a sufficient basis for misrepresenting complainants' position.[6]

2.      The Determination states that 'point in time' evidence, which it described as 'one-dimensional,' was inadequate (Det. at 3-4). Region I criticized complainants' testing methodology for failing to inspect and gather evidence of each property over the course of time, what it described as 'two-dimensional' evidence. (Det. at 3-4). As discussed earlier, this objection was based on Region I's fundamental misunderstanding of the discrimination alleged, which was of conduct that could indeed be observed and measured by a single visit to a property. Region I's paradigm is particularly problematic because it demands that investigators perform unusually extensive testing, such as would dramatically increase the cost of such testing and make almost any complaint impossible to bring.[7]

A single "snapshot in time" of the respondents' behavior is normal testing methodology. A typical rental test, for example, is not designed to capture a rental agent's behavior over the course of time. And complainants carefully designed their testing protocols here to ensure that their visits and photographs collected evidence that are representative of any given time on the

---

[6]      Region I's obsession with what zip codes might have been "omitted" from the testing design is flatly inconsistent with normal testing design, including HUD's own HDS 2000 testing methodology. There HUD chose to test only properties that were advertised in local newspapers. HUD acknowledged that not all housing units for sale or rental are advertised in newspapers, not all real estate or rental agents use newspaper advertising, and not all homeseekers rely on newspaper advertisements. Yet HUD had no qualms about limiting its testing to only such units, or drawing national and local conclusions about the existence of discrimination in the rental and sales markets. Likewise, complainants here focused their investigation on an important segment of the relevant market – middle and working class neighborhoods with high homeownership and foreclosure rates.

[7]      This criticism is particularly dubious because in this situation U.S. Bank was given the addresses of the REO properties forming the basis of the original complaint in June 2012, as well as the addresses of the REO properties in the amended complaints. It is not standard testing protocol to continue testing a respondent's same property once it knows a complaint has been filed involving that property. In this instance, complainants did continue to test more U.S. Bank REOs in the same cities and continued to identify U.S. Bank's failure to provide routine exterior maintenance in communities of color.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 12

timeline of an REO in U.S. Bank's possession.. Some may be 2 months into U.S. Bank's possession and others may be 18 months into its possession. It does not matter what condition the property was in when U.S. Bank took possession because all properties examined had been REO for at least 30 days, meaning that the properties should appear to be under regular maintenance. The point at which complainants looked at the property on U.S. Bank's timeline of possession (after the initial 30 days) is therefore not relevant for test design and implementation purposes. The snapshots from all of the different U.S. Bank owned properties as a collective set of data show a pattern that properties in neighborhoods of color are neglected more often. If exterior maintenance is generally being done on a regular basis, there is no business reason for REO properties to be in such poor general condition, have overgrown grass, long-standing trash, fallen leaves still on the ground in January, auction signs from a year ago laying in the bushes, etc. Even if the properties, when acquired, were in worse condition in neighborhoods of color and needed some time for repairs to be made (an assumption that ought not be made), the measures complainants tested, such as locked doors or mowed lawns, take very little time to complete. These are the sorts of deficiencies that can be cured immediately and regularly; there is no reason why it should matter when testers visited the properties.

Based on its erroneous assumption that complainants were investigating the type of maintenance that results in a property's overall condition improving while under U.S. Bank's ownership, Region I included at p. 4 a chart of a hypothetical investigation that complainants did not conduct, plotting hypothetical facts that do not exist. It then explained textually why such a chart could not prove discrimination "over time." Rather than investigate what complainants' *did* test, and the evidence submitted in support of *their* claims, Region I declared a different kind of investigation that complainants *should* have conducted, and then concluded that because they didn't conduct such an investigation, complainants proved nothing.

In contrast to the hypothetical chart appearing at p. 4 of the Determination, the following chart more accurately depicts the investigation complainants undertook and what the facts in this case support:



Avg. Number of Maintenance Deficiencies

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 13

In any event, the tests conducted here were clearly done over time, if not of the same property. In its analysis of the so-called matched pairs in the four Metropolitan Statistical Areas ("MSAs") it reviewed, Region I showed that it had the dates when U.S. Bank acquired each REO as well as the date on which complainants tested each pair of properties. Even within each MSA, tests were done at different times. In addition, U.S. Bank owned the properties for some time before the tests were conducted, allowing for any actions that could compensate for the original property condition and bring all REOs up to comparable levels of exterior maintenance. Collectively, the number of tests over a long period of time would also counter any individual case where Region I's "hypothetical graph" on the weaknesses of a "one-dimensional" (point in time) testing might confuse patterns of improving or declining exterior maintenance levels.

And while Region I ignored tests in later amended complaints, if U.S. Bank was increasing its level of maintenance to reach equality in all areas, then the later tests should not have found any significant difference. Yet they still do. In sum, if U.S. Bank is required to maintain and market all properties equally, and if it had been working to increase its exterior maintenance and eliminate the differences in white and minority areas, then the tests done later should have revealed no differences or fewer differences over time. They did not.

Finally, under Region I's approach, discriminating less over the course of time would constitute a valid defense to a fair housing claim. HUD's concept of requiring two-dimensional testing carries with it a subtle assumption that an improvement in differential treatment – even if disparities still exist – may be adequate to dismiss a fair housing claim. A claim that one is getting better at not discriminating should not be a defense to liability for earlier malfeasance.

Dismissing complainants' evidence as "one-dimensional" absolves U.S. Bank and its servicers of any responsibility on any given day throughout the REO's timeline. Region I was wrong to construe it as such.

3.      Region I concluded early on that complainants' list of 39 deficiencies "is both under- and over-inclusive when used to assess whether Respondents violated the Fair Housing Act." (Det. at 5). Region I based this conclusion on its assessment of U.S. Bank's "legal obligations" under FHA regulations and trustee contracts. (Det. at 5). It apparently believed that complainants were required to allege deficiencies in U.S. Bank's conduct that precisely match up to U.S. Bank's other obligations. There was no basis for this belief. The allegation here is discriminatory treatment, not failure to meet FHA or trustee contract obligations. Complainants can validly allege that U.S. Bank failed to meet only *some* of its legal obligations with respect to REO properties in neighborhoods of color, or that it went beyond its legal obligations in White neighborhoods but not in neighborhoods of color.

In any event, complainants' list of exterior deficiencies is based on standard industry practice as to what constitutes "routine" maintenance, or "minimal" property safety conditions, and is consistent with Fannie Mae, Freddie Mac, and FHA requirements. Even Pooling and Servicing Agreements ("PSAs") "typically direct servicers to manage and dispose of REO

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 14

properties according to . . . generally accepted servicing practices . . . ." [8] The list used by complainants is virtually identical to the "Field Services Checklist" used by Fannie Mae (attached hereto as Ex. 2).[9] Fannie Mae's list of "Exterior Services" requires removal of trash/debris, cut grass and removal of clippings, removal or treatment of weeds from fence lines, foundations and structures, removal of hanging vines, hedging of shrubs, removal of fallen leaves, removal of dead shrubs, removal of mailings and door drops from entry and porch areas, and secure and clear real estate signage. These are the same items included on complainants' REO Field Evaluation Form. As to "Safety Hazards," Fannie Mae requires securement of broken doors and windows, securement of broken steps and handrails, filling open holes, making gutter repairs, stabilizing and repairing fences, painting over graffiti, reattaching hanging shutters – also included on complainants' REO Field Evaluation Form.

As to FHA properties, there is a significant distinction between the FHA "conveyance" rules and regulations highlighted by the Determination[10] and the routine "property preservation" maintenance tasks required of the REO owner while in its possession.[11] Prior to conveyance to HUD, the REO property must be repaired and undamaged, and must be secured, winterized, and the property's interior maintained in broom-swept condition. These are not requirements complainants' investigation was designed to test. In contrast, the routine "property preservation" requirements of an FHA REO owner contain the "ordinary maintenance" tasks that complainants actually investigated, such as mowing the lawn, removing trash, trimming shrubs, eliminating safety hazards, boarding windows and doors, etc.[12] Region I insisted that complainants' investigation and any allegations resulting therefrom be restricted solely to FHA "conveyance" guidelines. It had no basis for doing so.

---

[8]    Government Accountability Office, *Vacant Properties: Growing Number Increases Communities' Costs and Challenges*, GAO-12-34 (Nov. 4, 2011), at p. 35, n. 42 (available at http://www.gao.gov/products/GAO-12-34 ).

[9]    Available at https://homepath-activedt.netdna-ssl.com/content/pdf/Field_Services_Checklist.pdf.

[10]    *See* Det. at 3, "Respondents also claim [they] followed FHA *conveyance rules* in the maintenance of the property in order to submit a successful insurance claim" and Det. at 15, "Both properties were . . . in *conveyance condition* under the HUD guidelines." (Emphasis added).

[11]    Both sets of requirements are available at http://portal.hud.gov/hudportal/documents/huddoc?id=10-18ml.pdf

[12]    See also Government Accountability Office, *Vacant Properties: Growing Number Increases Communities' Costs and Challenges*, GAO-12-34 (Nov. 4, 2011), at pp. 29-30 (available at http://www.gao.gov/products/GAO-12-34 ) (noting the similarity of property maintenance requirements required by Fannie Mae, FHA, and private securitization trusts).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 15

Moreover, Region I wrongly criticized complainants' list of maintenance items for noting as "deficiencies" elements that it determined conflicted with local zoning requirements. For example, in footnotes 14 and 15, Region I asserted that the City of Milwaukee "requires vacant lots to have [specified] signage" and requires owners of vacant properties only to board, but not replace, broken windows. (Det. at p. 5, fn. 14, 15). But the City of Milwaukee Vacant Lot Handbook referenced by Region I *relates only to city-owned vacant lots*.[13] This Handbook is totally irrelevant to U.S. Bank-owned REO properties, as City-owned vacant lots are obviously not REO homes. And the City of Milwaukee's zoning ordinance does not require vacant buildings to be boarded. Rather, the City requires vacant buildings to be locked and secured. It might order boarding in individual and appropriate situations, but generally discourages the practice.[14]

Region I also believed that because of assumed variations between local zoning ordinances, only comparisons within the same MSA can be probative of pattern and practice allegations. But whether one needs to compare treatment in geographically close areas or not depends upon whether the actual housing service is dependent upon local conditions. To our knowledge, there are no local zoning requirements that Region I introduced that actually impinge on the physical attributes of a properly maintained REO property. So differences in local zoning regulations should not translate to differences in routine maintenance. Any such differences also cannot explain away the overall pattern of differing treatment when all of complainants' evidence is aggregated at a national level.

Regardless of what maintenance services U.S. Bank may have been required to perform in order to be paid an FHA insurance claim, and regardless of which maintenance services another company may have contractually agreed to perform for the benefit of U.S. Bank, the list of exterior maintenance items used in complainants' investigation is generally accepted in the property preservation industry. The Region's pejorative characterization of the list as complainants' "own" list (Det. at 4) illustrates the manner in which the Region refused to accept and analyze the actual allegations of discriminatory treatment before it. The discriminatory failure to perform certain industry standard exterior maintenance tasks only in certain neighborhoods because of racial composition is a violation of the Fair Housing Act, regardless of whether U.S. Bank performed *other* required tasks, and regardless of whether those other tasks happened to derive from other contractual or legal commitments.

---

[13]    See http://city.milwaukee.gov/ImageLibrary/Groups/cityDCD/planning/pdfs/VacantLotHandbook.pdf.

[14]    See http://city.milwaukee.gov/ImageLibrary/Groups/ccClerk/Ordinances/Volume-2/CH275.pdf) (http://city.milwaukee.gov/DNS/VBR#.Vp6RZPkrLcs), which summarizes Milwaukee's vacant building ordinance and states "...*a boarded building sends a negative signal about a community. These buildings can attract criminal activity. Often the buildings must be re-boarded at city expense and can make it difficult for neighbors next door to get fire insurance. The presence of a boarded building can bring down the value of other properties in the area.*"

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 16

     4.     The Determination misstated the purpose and use of complainants' photographic evidence (pp. 19-21).

     Complainants made available to Region I over 13,000 photographs depicting the exterior maintenance of U.S. Bank owned REO properties, along with additional data (such as property address, date of inspection, inspector observations, etc.). Because addresses of the tested properties were provided, the racial composition of the neighborhood within which any specific REO property was located was determinable from publicly available census data. Region I correctly noted that these photographs were taken to document the maintenance (or lack thereof) of each property, thereby proving that REO properties in neighborhoods of color were not treated as well as those in White neighborhoods. (Det. at 19).

     But the Determination's analysis of these photographs veered seriously off course in several ways.

     First, Region I refused to credit "single point in time" photographs as sufficient to demonstrate any differing treatment between neighborhoods. (Det. at 19). It faulted the complainants for failing to build a photographic record for each property tested "over a longer period of time." (Det. at 19). Because complainants did not do so, it was inevitable that Region I would eventually conclude that the photographic record was "insufficient" to raise any inference of differing treatment.

     Second, Region I faulted complainants' photographic record for not including photographs of: (1) the level of maintenance or upkeep provided by the *mortgagor* prior to foreclosure, (2) the condition of the property at U.S. Bank's *initial possession*,[15] (3) whether *rehabilitation* of the REO was required. (Det. at 19). But when the testing investigation is about the current exterior maintenance of the REO, it does not matter how the mortgagor maintained the home, it does not matter what the condition of the property was when U.S. Bank took possession, and it does not matter if the property was going to be rehabilitated. Complainants' allegations were clearly focused on evaluating whether or not the lawn was mowed, trash was removed, windows and doors secured, holes covered, leaves removed, snow removed, etc. All of these exterior maintenance items were supposed to be completed within days of U.S. Bank's

---

[15]     The FIR claimed (p. 37) that "NFHA assumes the properties were all in good condition when U.S. Bank assumed ownership." Complainants never made such an assumption, or conveyed that to Region I. Complainants never made any representations about the condition of REO properties before or after foreclosure. Complainants' position has always been that the initial condition of the REO property is irrelevant. Rather, what is relevant is whether routine exterior maintenance has been conducted on the property after ownership attached. Is the lawn mowed? Are shrubs overgrown or dead? Does trash remain on the property? Has the property been secured? There is no basis for these deficiencies to exist after regular exterior maintenance has begun, regardless of the "initial condition" of the property at possession.

possession. Again, once Region I concluded that this other evidence was somehow relevant and necessary to current maintenance, it was inevitable that Region I would eventually conclude that the complainants' photographic record was "insufficient" to raise any inference of differing treatment.

Third, Region I believed that for each set of photographs showing a deficiency in maintenance at an REO property, complainants were required to submit additional evidence demonstrating *when* the particular deficiency came into being, *how* the deficiency came into being, and whether U.S. Bank would have (or have not) made any *repair* based on that deficiency. (Det. at 20). This information is not publicly available. Some of this information may not even be available from U.S. Bank itself: for example, how or when a deficiency "came into being." By requiring the submission of evidence that is not discoverable – and indeed, may not even exist – it is impossible to satisfy Region I's evidentiary requirements for REO maintenance discrimination claims under any circumstances.

Fourth, Region I declared that "the photographs fail to demonstrate action or inaction by Respondents." (Det. at 20). This is a blatantly incorrect statement. Attached hereto as Exhibit 3 are just a few of the thousands of sample photographs provided to Region I that clearly demonstrate either "action or inaction" by U.S. Bank.[16] Despite this feckless statement, Region I concedes that "reasonable minds may differ about the quality of a property's exterior conditions based on what is shown in a photograph." (Det. at 20). Isn't this enough for a reasonable factfinder to conclude that the photographs *did* demonstrate "action or inaction" for any particular REO property?

Fifth, Region I concluded that the "quality" of the photographs and "weather conditions" presented in the photographs might "inhibit the ability of the investigators to rely solely on the photographs" to assess condition. (Det. at 20). It believed the photographs "standing alone" do not provide sufficient context for a finding of discrimination. (Det. at 20). But the *tester's statement* of condition or deficiency presents equally valid evidence, even if a few particular photographs are unclear. Region I completely ignored or dismissed the contemporaneous *written assessment by the tester* – documented in the database – of property maintenance. The two forms of evidence are not mutually exclusive. Either one or the other should suffice to demonstrate condition, and if consistent with each other should be conclusive on the issue. Whatever

---

[16]     The Determination also attempts to trivialize the value of the photographic record by suggesting that complainants coded deficiencies "as minimal as a single piece of light weight trash, such as a candy wrapper, that may have just blown onto the property, and may likely blow away . . . ." (Det. at 20, fn. 33). Region I did not identify which specific property to which it was referring. However, attached hereto as Exhibit 4 are several examples of "candy wrapper" photographs to which Region I could have been referring. Clearly the deficiencies complainants noted at these properties were not based on single candy wrapper, and were not trivial.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 18

weaknesses Region I may have believed the photographic record exhibited, it had no legitimate
basis for rejecting the tester's own observations of deficiencies (or lack thereof).[17]

Sixth, Region I was only interested in "overall" property condition, (Det. at 19), and
therefore concluded that the photographic record provided by complainants was deficient
because the photographs "only demonstrate the condition of the exterior of the property and fail
to account for MAs[18] performed on the interior of the property." (Det. at 20). But as noted and
discussed elsewhere (*supra* at 6-8), this complaint does not purport to examine "overall property
condition." Rather, the testing investigation here was designed to determine basic exterior
maintenance factors that are normative for bank REO owners, that are observable by potential
buyers and real estate agents, and that could affect the marketability and availability of properties
for sale. The testing was not designed to assess interior maintenance or condition. The testing
was not designed to address discretionary repairs or improvements. By criticizing the
photographic record for failing to capture data not even intended to be tested by complainants,
Region I dictated an inevitable outcome to its assessment of that photographic record.

Finally, Region I rejected the objectivity and evidentiary value of the 13,000 photographs
supplied to it by complainants based on its own "small survey" of three properties in Fulton
County, Georgia. (Det. at 20-21). Region I photographed the three homes "from several angles"
and then had multiple investigators provide "coding outcomes." Based on this effort, Region I
concluded that complainants' investigation must have been "subjective." But Region I does not
reveal whether close up photos were taken of the property or whether or not doors were secured,
nor does it reveal the quality or level of tester training these evaluators received, whether that
training was valid, what inspection methodology they followed, what training they were
provided regarding coding protocols, how the properties were selected, or what other controls
(proper or irrelevant) Region I applied. Whereas complainants' testers were rigorously trained
according to accepted protocols, there is no suggestion that Region I's testers were trained at all.

Without doubt, Region I's rejection of the quality and relevance of the photographic
evidence provided by complainants tainted its ultimate conclusions. Region I dedicated an entire
section of its analytical discussion (Section 5.1) to criticism of this evidence. It was inevitable,
therefore, that it found that the photographs "do not provide the necessary context for a finding

---

[17]    See *Metropolitan St. Louis Equal Housing Opportunity Council v. Gordon A. Gundaker
Real Estate Co.*, 132 F. Supp. 2d 1210, 1211-12 (E.D. Mo. 2001) (finding contested evidence
from housing testers as relevant and therefore admissible since "[i]t is up to a jury to assess the
credibility of the testers and agents, and ultimately, the credibility of the information contained in
the [testing] forms," and that "[a]ny inconsistencies or 'flaw' goes to the weight of the evidence,
not its admissibility.")

[18]    The Maintenance Actions (MAs) Region I thought were relevant are different from those
tested by complainants. See discussion at 7-10, 17-23 *supra*.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 19

of discrimination." (Det. at 20). If instead Region I had given complainants' photographic evidence the weight it warranted, Region I would have reached an opposite conclusion.

     5.    Having concluded that complainants' testing methodology was "wrong" on all these levels, Region I then simply refused to analyze the evidence at a national level or across metropolitan areas. It admittedly chose not to consider or analyze several hundred of the 650 properties in the evidentiary database and restricted its analysis to only a portion of the national testing data (Det. at 2, 25-26; direct analysis included only 119 properties serviced by U.S. Bank and indirect analysis include only 275 trust properties = 394 total properties reviewed). At the metropolitan level, it looked only at the evidence in 5 of the 24 metropolitan areas from which evidence was obtained, and not the others (Det. at 9-17).

    But complainants' testing was designed and implemented so as to assess whether any patterns of differing treatment were apparent across a specific metropolitan area, as well as whether, when aggregated, the evidence showed a national pattern consistent with metropolitan results. [19] As starkly shown by the attached Tables, Ex. 1, the evidence of differing treatment is consistent across most metropolitan areas, as well as nationally. When Region I's arbitrary restrictions on property type, trustee status, maintenance actions, and comparability are removed, the evidence proves a consistent and repetitive pattern of differing treatment based on neighborhood racial composition. And had Region I looked at the additional evidence complainants made available to it with their November 2014 amended filing, Region I would have seen a continuing violation of the Fair Housing Act that spanned years. By refusing to accept the testing design and methodology followed by complainants in response to this most recent manifestation of the financial abuses of the past, i.e., lender maintenance of REO properties, Region I has effectively foreclosed enforcement in this area.

    **B.**    **Region I's "Comparative Analysis" of the REOs It Unilaterally Determined to be "Similarly Situated" Applies a Historical Form of Racial Redlining. Region I's Analysis Also Cannot Be Verified By the Facts Available.**

    Region I purported to set forth an "in-depth" analysis of the REO properties tested by complainants, ultimately finding that the testing evidence was "insufficient to meet the evidentiary standard necessary to carry a cause determination." (Det. at pp. 6-17, 24-25).

---

[19]    "Although [in the HDS 2000 survey] patterns of differential treatment vary across metropolitan areas, overall levels of treatment favoring whites are generally not significantly different from the national average." M. Turner and S. Ross, *How Racial Discrimination Affects the Search for Housing*, in The Geography of Opportunity: Race and Housing Choice in Metropolitan America, at 81, 98-99 (X. Briggs, Ed., 2005).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 20

Region I only compared properties in the testing database that it believed were "similarly situated" based on factors that it did not define and data it did not share with complainants:

"Similarly situated REOs . . . require: (1) similar property value at the time of bank acquisition; (2) similar property condition at the point of acquisition; (3) similar time in private ownership (since mortgage issuance); (4) similar time in possession of Respondent; and (5) similar age of property. In addition, any analysis would also have to control for neighborhood characteristics such as: (1) crime rate; (2) local zoning ordinances; (3) neighborhood income; and (4) environmental characteristics."

(Det. at 24). Amazingly, Region I describes this laundry list of requirements as a "generous definition of similarity." (Det. at 25).

### 1. Region I Relied on Traditional Forms of Racial Redlining.

As explained previously, complainants do not agree that any of these factors are relevant to any assessment of "similarity" for purposes of comparison under the theory of this case. None of these factors should influence whether an owner of REO property will or will not conduct the routine exterior maintenance services investigated by complainants. None of them need to be "controlled for" in order to assess whether REO properties in communities of color are having their lawns mowed, trash removed, doors secured, windows fixed, or otherwise systematically being provided less exterior maintenance than REO properties in White neighborhoods. To complainants' knowledge, none of Region I's requirements has ever been required as a "similarity" factor in any known testing investigation, whether focused on neighborhood steering, mortgage or insurance redlining, or similar "neighborhood" style testing investigations.

But no matter how subtle and masked as legitimate and necessary, these comparator controls imposed by Region I reintroduce a form of racial redlining. Region I's belief that home values, crime, age of properties, and other similar characteristics are required as controls is a reintroduction by HUD of the kinds of neighborhood ratings that supported racial discrimination in the housing markets until recent times. These factors are well known to have disparate outcomes based on neighborhood racial composition. Consideration of such factors as dwelling age, neighborhood crime rates, and neighborhood income have resulted in successful disparate impact lawsuits against homeowners insurance companies who could not demonstrate that such factors were business justified. Yet Region I now declares that these same factors are "relevant" business considerations that can justify a lender's differing maintenance of REO properties, and so must be "controlled" for in any analysis. These same factors have also been used in the past to discriminate surreptitiously against minorities. They are often surrogates for race and ethnicity. Region I obviously did not understand this, and its comparative analyses are therefore fatally unsound.

More hints of this attitude appear elsewhere in the Determination. Region I says (Det. at p. 25) that it is somehow expected that an REO owner will spend more in minority areas (because they are older, have high crime rates, have properties that come into the pool in worse condition, etc.), and if it spends more in a white area, that is just an outlier or anomaly because of

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 21

the unusually poor condition of the property, which one simply expects to be better maintained. Region I is almost saying that being in a white area can only require additional maintenance in an unusual situation while it is more the norm in minority areas.

If the fair housing obligation to treat all communities equally in the maintenance of REO properties is conditioned on a neighborhood having a low crime rate, stable and relatively high housing values, higher incomes, and newer homes, as Region I has decided, then HUD is condoning a new pathway to neighborhood discrimination by REO owners.

2. *Region I Relied on Subjective Data That Cannot Be Verified.*

Setting aside the conceptual errors in Region I's consideration of irrelevant factors to conduct its analysis of similarly situated REO properties, Region I does not explain how these factors can be considered objective, or how they are to be determined for comparative purposes. For example, Region I provides no explanation of what parameters were used to determine "similar property value" or "similar property condition." Must such values be within a certain dollar amount of each other for appropriate comparability under Region I's standard? If not defined in terms of absolute dollars, must they be within a certain percentage range of variation? Are there objective factors that dictate similarity of property condition? Or is that a subjective determination upon which "reasonable minds" could differ? If complainants knew the answers to these questions, they would be able to address them.

Nor is there any explanation in the Determination as to what databases Region I utilized to determine either the comparability or the contents of neighborhood "crime rates." Do those databases segregate property crimes from other categories of crimes? Do they segregate property crimes involving residential dwellings from property crimes involving commercial establishments? Do they distinguish between property crimes involving occupied residential dwellings from property crimes involving vacant residential dwellings? Do they distinguish property-only crime rates involving vacant, but non-REO properties from property-only crime rates involving vacant, REO properties? One can easily see that the answers to these questions could have a significant impact on the "comparability" or "similarity" of REO properties Region I chose to include in its analysis.

Moreover, although not included in its list of eight "control" factors, Region I also apparently believed that an REO property's "impact on the value of properties in the surrounding neighborhood" was an important factor to its analysis. In one (incomprehensible) paragraph, it stated:

> *Longitudinal housing value also plays into the standard* against which the treatment of the home would be measured - *if the home's condition is to impact the value of the neighborhood,* its value must generally fall below that of the neighborhood, and do so for a sufficient period of time such that *it has an impact on the property value of nearby homes. Average local home value would have to be sampled over time to obtain at least a rough estimate of the impact of that particular foreclosed home in the neighborhood. Such evidence was not provided* and could not be supplied by one time testing.

(Det. at 24) (emphasis added). Complainants are at a loss to understand why any individually tested REO's "impact on the value of the neighborhood" has any bearing on the determination of "similarity" or "comparability" of REO properties for purposes of assessing differing treatment in this case, or why such evidence was required to be provided by complainants. Did Region I decide that an REO with a value less than the average home value in its neighborhood cannot be "similarly situated" to an REO with a value more than the average home value in its neighborhood? Did Region I conclude that only those REOs that "impact the value of nearby homes" can be compared to each other? The Answer appears to be Yes – i.e., Region I concluded that U.S. Bank had an objective defense to providing differing maintenance of REO properties (i.e., it could treat them differently) based on an assessment of its REO's home value in relation to average neighborhood value, or in relation to the value of nearby homes. According to Region I, if those two factors were not similar, U.S. Bank's inconsistent maintenance of the two properties could not validly be compared for differing treatment analysis.

In addition, Region I would not compare REO properties titled in U.S. Bank's name as trustee with REO properties titled in its name, but not as trustee. (Det. at 7-8). It would not compare REO properties where U.S. Bank was not the "decisionmaker," even if the property was titled in U.S. Bank's name. (Det. at 7). It would not compare REO properties titled in U.S. Bank's name if servicing responsibilities were assigned by contract to another party (Det. at 7). It adhered to erroneous legal standards regarding trustee liability, principal liability, necessity of knowledge, and other errors, which fatally infected its ultimate conclusions. See discussion *infra* at 34-49.

Region I would not compare exterior maintenance of REO properties if they originated as FHA loans as opposed to conventional loans. (Det. at 7-8). This was based in large measure on the assumption that "Respondents followed FHA conveyance rules in the maintenance of their properties in order to submit a successful insurance claim" to HUD. (Det. at 3). Region I took U.S. Bank's word that it "addressed maintenance issues at every property . . . and performed all MAs as described in FHA guidelines or servicing contracts." (Det. at 9, 13, 16). This is a shocking assumption for a HUD regional office to make, considering that HUD and the Department of Justice have previously determined that U.S. Bank has *not* complied with HUD's FHA requirements in other respects. In June, 2014 – while this complaint was pending in Region I – U.S. Bank agreed to pay $200 million to resolve FHA underwriting violations. "As part of the settlement, *U.S. Bank admitted* that, from 2006 through 2011, it repeatedly certified for FHA insurance mortgage loans that *did not meet HUD underwriting requirements. U.S. Bank also admitted that its quality control program did not meet FHA requirements,* and as a result, it failed to identify deficiencies in many of the loans it had certified for FHA insurance, failed to self-report many deficient loans to HUD, and failed to take the corrective action required under

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 23

the program." [20] An earlier audit of U.S. Bank also found violations of FHA requirements.[21] There is no indication in the FIR that Region I contacted HUD's FHA staff to review U.S. Bank's compliance with FHA conveyance and maintenance guidelines. Despite this historical record of repeated non-compliance with FHA guidelines and requirements, Region I cavalierly determined that U.S. Bank met FHA maintenance standards for every single FHA REO property in this record. [22]

Thus, it is absolutely impossible to verify the accuracy or completeness of Region I's "comparative analysis" of what *it* considered "similarly situated" REO properties. Even overlooking the flaws in approach, the fundamental legal errors, and the irrelevant factors used to screen out comparable properties, Region I did not provide or direct complainants to any of the data or information upon which it relied to conducts its comparative analysis. Complainants are not told what data it used, what data it considered but chose not to use, or what data it refused to consider entirely. This is just one more reason why HUD must reconsider this Determination in its entirety.[23]

---

[20]   http://www.justice.gov/opa/pr/us-bank-pay-200-million-resolve-alleged-fha-mortgage-lending-violations (emphasis added).

[21]   HUD settled other FHA violation claims against U.S. Bank in 2011: "Under the terms of the settlement announced today, U.S. Bank will pay $1.2 million to resolve allegations that *it failed to comply with FHA requirements* in connection with 27 mortgage loans…The agreement follows a 2006 audit by HUD's Office of Inspector General, which concluded that U.S. Bank failed to meet FHA underwriting standards in connection with mortgage loans originated in 2003 and 2004."
http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2011/HUDNo.11-095. (Emphasis added).

[22]   Moreover, in its comprehensive study of vacant properties, including FHA REO properties, the Government Accountability Office determined that oversight of mortgage servicers' activities regarding foreclosed loans has not been a major focus among federal regulators, and that federal guidance and examinations address institutions' overall policies for managing loans, but not necessarily actions on individual properties. Thus, federal examiners typically do not review actions servicers take on individual properties: "Not much oversight is done specifically related to maintenance of vacant foreclosed properties." Government Accountability Office, *Vacant Properties: Growing Number Increases Communities' Costs and Challenges*, GAO-12-34 (Nov. 4, 2011), at pp. 72-74 (available at http://www.gao.gov/products/GAO-12-34 ).

[23]   There are hints of other potential flaws in Region I's analysis that complainants have not had sufficient opportunity to review, in large part because they were not provided with the evidence. For example, Region I clearly bases its no cause decision on its own assessment that aside from cases where there were white "outliers" creating higher costs for whites in similarly situated pairs, U.S. Bank tended to spend the same or more on minority REOs. Region I's position is that spending more in minority REOs refutes a claim of discrimination, where more

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 24

**C.    Even an Analysis of the REOs Region I Determined Were Serviced by U.S. Bank Directly Show a Stark Repetitive Pattern of Differing Treatment.**

As we just explained, it is impossible to determine just how Region I conducted a "comparative analysis" of the properties it determined to be "similarly situated."

Nevertheless, complainants have examined the evidence using Region I's unduly restrictive standards for what constitute "similarly situated" REO properties. Even adopting Region I's definitions, a comparative analysis of the evidence shows stark and repeated patterns of differing treatment.

Based on Appendix 1 attached to the Determination, Region I identified 136 properties that U.S. Bank either serviced directly or Region I determined were located in an area where enough properties were held by the same servicer to perform some analysis. According to Appendix 1:

- One-hundred eighteen (118) of the REO properties were serviced directly by US Bank
  - Ninety-five (95) of these 118 REO properties are serviced by US Bank and are FHA or VA backed mortgages
  - Twenty three (23) of the 118 REO properties were serviced by US Bank but were not FHA or VA backed mortgages
- The remaining eighteen (18) of the 136 properties were allegedly serviced by Ocwen Loan Servicing LLC or Select Portfolio Services, although it appears they were nevertheless owned by U.S. Bank.[24]

Regardless of which of these datasets is analyzed, the original disparities in maintenance between REOs in communities of color and REOs in predominantly White neighborhoods persisted and in some cases even increased. These findings are summarized below and visually presented in the attached Exhibit 5.

**(1) Looking at the entire set of 136 properties (both US Bank Serviced and Serviced by Ocwen or Select Portfolio Services):**

---

severe conditions are evidently assumed to exist. So, in Dayton where extreme conditions exist for white homes they are excused as unrepresentative outliers. *See* Det. at 14-15. But when Region I compared the one similarly situated pair it found for Louisiana (Det. at 17), it treated the higher costs for the minority REO (3 times the white costs) as consistent with contract obligations and did not indicate this as an "outlier."

[24]    These properties were extracted from the 275 trust properties because Region I eliminated the 97 properties serviced by Wells Fargo and then eliminated all of the properties where the particular servicer only serviced one property. The remaining properties were then sorted by servicer, geography and race to whittle the list down to 18.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 25

- 51 properties were in predominantly White communities and 85 were in communities of color

- Disparities in maintenance remained significant and unchanged from the initial allegations outlined in the complaint in the following categories:
  - Five or fewer deficiencies overall
  - More than five deficiencies overall
  - More than 10 deficiencies overall
  - More than 15 deficiencies overall
  - Substantial Trash
  - Invasive Plants
  - Unsecured/Broken Doors
  - Boarded or Broken Windows
  - Damaged Fences
  - Wood Rot
  - Graffiti
  - Peeling and Chipped Paint
  - Water Damage
  - Utilities Exposed or Tampered with

- Disparities in maintenance between properties in communities of color and those in White communities actually were *larger than complainants alleged* in the following categories:
  - Overgrown and dead shrubbery
  - Damaged steps and handrails
  - Holes
  - Damaged siding
  - Missing shutters
  - Small Amount of mold or pervasive mold

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 26

REO Properties Included in "NFHA V. U.S. Bank Appendix 1": 136 total

| | Communities of color | White | | Communities of color | White |
|---|---|---|---|---|---|
| Less than 5 deficiencies | 10.6% | 33.3% | Trespassing / warning sign | 37.6% | 56.8% |
| 5 or more deficiencies | 89.4% | 66.7% | Marketed as distressed | 0.0% | 0.0% |
| 10 or more deficiencies | 47.1% | 21.2% | No fee sale sign | 85.9% | 82.4% |
| 15 or more deficiencies | 12.9% | 2.0% | Broken or discarded signage | 8.9% | 0.0% |
| Trash | 88.3% | 25.5% | Unauthorized occupancy | 2.4% | 2.0% |
| Mail accumulated | 23.5% | 25.5% | Signage misc | 3.2% | 2.0% |
| Overgrown grass or leaves | 44.7% | 49.1% | Graffiti | 8.2% | 2.0% |
| Overgrown/dead shrubbery | 51.8% | 31.4% | Peeling / chipped paint | 63.5% | 49.0% |
| Dead grass (10-50%) | 25.9% | 11.8% | Damaged siding | 47.1% | 17.6% |
| Dead grass (50% or more) | 3.5% | 2.0% | Missing / damaged shutters | 4.7% | 2.0% |
| Invasive plants (10-50%) | 28.2% | 19.6% | Paint/siding misc | 3.5% | 2.0% |
| Invasive plants (50% or more) | 4.7% | 0.0% | Missing / part of place gutters | 17.6% | 23.5% |
| Broken exterior | 38.8% | 17.6% | Broken or hanging gutters | 20.0% | 15.7% |
| Curb appeal miscellaneous | 20.0% | 11.8% | Obstructed gutters | 27.1% | 25.5% |
| Unsecured / broken doors | 28.2% | 13.7% | Gutters misc | 7.1% | 0.0% |
| Damaged steps and handrails | 24.7% | 9.8% | Water damage | 7.1% | 2.0% |
| Damaged windows | 47.1% | 35.3% | Small amount of mold | 28.2% | 21.6% |
| Damaged roof | 18.8% | 13.6% | Pervasive mold | 17.6% | 7.8% |
| Damaged fence | 58.8% | 27.5% | Water damage misc | 1.2% | 0.0% |
| Holes | 25.9% | 9.8% | Exposed utilities | 25.9% | 13.7% |
| Wood rot | 30.6% | 17.6% | | | |
| Structure miscellaneous | 22.1% | 17.6% | | | |

*Communities of color have more egregious percentage — at least 20% difference in proportion to the White percentage*

*No significant difference observed in percentages*

*White communities have more egregious percentage — at least 20% difference in proportion to the Communities of color percentage*

**(2) Looking at the 118 properties that were serviced directly by US Bank ONLY (without Ocwen or SPS involvement):**

- 42 properties were in predominantly White communities and 76 were in communities of color

- Disparities in maintenance remained significant and unchanged from the initial allegations outlined in the complaint in the following categories:
    - Five or fewer deficiencies overall
    - More than five deficiencies overall
    - More than 10 deficiencies overall
    - More than 15 deficiencies overall
    - Substantial Trash
    - Invasive Plants
    - Broken Doors
    - Boarded or Broken Windows
    - Peeling or Chipped Paint
    - Utilities Exposed or Tampered with

- Disparities in maintenance between properties in communities of color and those in White communities were *larger than complainants alleged* in the following categories:
    - Overgrown and Dead Shrubbery
    - Damaged Steps and Handrails
    - Damaged Fences
    - Holes
    - Wood Rot

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 27

- o Graffiti
- o Damaged Siding
- o Small amount of mold or pervasive mold

**(3) Looking at the 95 properties that U.S. Bank serviced directly and were FHA or VA backed mortgages subject to FHA regulations:**

Conveyance standards for FHA state that "…the property must be secured, the lawn maintained, winterized (as applicable), and interior and exterior debris must be removed with the property's interior maintained in broom-swept condition. This includes the removal of any vehicles and removal of any personal property in accordance with local and state requirements."
[25]

- 38 of these properties were in predominantly White communities and 57 were in communities of color

- Of these 95 properties:
  - o 73.7% of REO properties in communities of color had **trash on the premises**, compared to only 23.7 percent in predominantly White communities.
  - o 54.4% of REO properties in communities of color had **overgrown or dead shrubbery**, compared to only 28.9 percent in predominantly White communities.
  - o 28.1% of properties in communities of color had **unsecured or broken doors** compared to only 15.8 percent in predominantly White communities
    - Additionally, the photographs complainants provided to Region I show that 18% (3 out of 16) of the properties in communities of color were **open and/or broken** (not boarded securely), therefore not meeting the FHA standards), while all of the properties in White neighborhoods that had this deficiency were secured well with boards, as is required by FHA (100%, 6 out of 6).
  - o 47.4 percent of properties in communities of color had **broken or boarded windows**, while only 34 percent of properties in White communities had broken or boarded windows.
    - Additionally, the photographs complainants provided to Region I show that 26% (7 of 27) of the properties in communities of color with this deficiency were **not boarded or secured, but rather were left broken or open and unsecured** while only 15% of the properties (2 in 14) in White neighborhoods were not boarded and left unsecured. FHA standards require the boarding and securing of properties when windows cannot be replaced entirely.

---

[25]     http://portal.hud.gov/hudportal/documents/huddoc?id=10-18ml.pdf

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | **28**

(4) **Looking at the 23 properties that US Bank serviced directly but are *not* FHA
insured:**

- 4 properties were in predominantly White communities and 19 were in communities of
color

- Disparities remained significant and unchanged from the initial allegations outlined in the
complaint in the following categories:
  - o Five or fewer deficiencies overall
  - o More than five deficiencies overall
  - o More than 10 deficiencies overall
  - o More than 15 deficiencies overall
  - o Substantial Trash
  - o Mail accumulated
  - o Unsecured or Broken Doors
  - o Damaged Steps and Handrails
  - o Boarded or Broken Windows
  - o Holes
  - o For sale sign missing
  - o Graffiti
  - o Peeling or Chipped Paint
  - o Damaged Siding
  - o Obstructed Gutters
  - o Pervasive mold
  - o Water Damage

## IV. REGION I'S ANALYSIS OF EVIDENCE SUPPLIED BY U.S. BANK CANNOT VERIFIED.

We have explained above how Region I's analysis of the evidence submitted by
complainants in support of their allegations is fatally flawed because of factual mistakes,
conceptual errors, rejection of the overall testing design and implementation, and inadequate
evaluation of the evidence. Later we show that Region I applied incorrect legal standards that
also corrupted its final decision.

Region I's ultimate Determination also relied, however, on evidence submitted by U.S.
Bank. Throughout the Determination there are repeated references to U.S. Bank's photographs
(p. 6, 20, 21, 26-27), maintenance records (p. 6, 14, 26-28), invoices (p. 6), maintenance policies
and contracts (p. 3, 5, fn. 16), spending data (p. 12-17, 21-25), and trustee agreements (p. 7, fn.
21). It is unknown whether U.S. Bank submitted additional evidence not mentioned in the
Determination.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 29

### A. Complainants Were Not Allowed to See or Respond to Any Evidence Submitted in Defense as Required by the HUD Handbook.

Complainants never had an opportunity to respond to this evidence. See discussion *supra* at 3-6. Indeed, complainants were never made aware that much of this evidence had even been submitted to Region I. It is therefore impossible for complainants to assess whether Region I's understanding and analysis of U.S. Bank's evidence is valid, contains errors, or is being used to conceal unlawful discrimination.

### B. Region I's Analysis Cannot Be Verified.

Nor is it possible to validate from either the Determination or the Final Investigative Report whether Region I's review of U.S. Bank's evidence in defense is valid, conceptually or factually.

For example: Region I reviewed maintenance records provided by U.S. Bank, but only for those REOs for which U.S. Bank "was owner or servicer," and where there were "no external contractual obligations." (Det. at 6). It expressly did not consider the maintenance records of REO properties for which U.S. Bank was a trustee owner. According to complainants' theory of the case and proper analysis of evidence, there is no valid distinction between such records for purposes of liability under the Fair Housing Act. It is not known whether Region I obtained or analyzed those records, and we cannot determine whether such an analysis would have resulted in a different outcome.

As to the maintenance records that Region I did analyze, did those records include "internal maintenance" services and costs? If so, such an analysis included data elements that did not form any portion of complainants' allegations (since internal maintenance was not tested) and that are unavailable to complainants for response or analysis. Moreover, Region I admittedly only analyzed the costs associated with maintenance items *it* believed were relevant, which were not equivalent to those maintenance items investigated by complainants. (*See* Det. at 6: "each property was evaluated according to its relevant governing contract" and evaluated only for performing "contractually obligatory maintenance actions (MAs)").

Moreover, presumably the amount of money spent included the initial rehabilitation or remedial actions needed to bring a property up to "acceptable standards", i.e., the spending records may have been more indicative of the condition in which the property came to U.S. Bank than an indication of whether routine exterior maintenance was performed. Region I also fails to identify any information concerning the frequency, timing, and nature of the MAs included in the analysis, which might more accurately demonstrate routine maintenance.

And when Region I calculated the amount of money spent by U.S. Bank on a given property, the Department merely "approximated" the resources U.S. Bank spent on a given property. (Det. at 6). How were those "approximations" derived, and what formulas and assumptions were used to make such approximations?

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 30

As to U.S. Bank's photographic evidence (Det. at 20), complainants have never had an opportunity to see or respond to this evidence. If complainants were provided such an opportunity, "reasonable minds" might come to a different conclusion about the consistency and/or quality of exterior maintenance visible in the photographs.

Region I also purported to conduct a sophisticated "statistical analysis" of the amount of money U.S. Bank spent on each property. (Det. at 21-23). As noted above, complainants were unaware that Region I was relying on an "equal spending" defense, and never had an opportunity to review or respond to that evidence. In any event, Region I's analysis apparently took into account "the *severity of the remedial action* that needed to be taken on a given property." (Det. at 21) (emphasis added). This obviously tainted the outcome of the entire analysis, as necessary "remedial actions" were not a part of complainants' investigation or allegations, which focused exclusively on basic exterior maintenance items that standard industry practices require.[26]

Moreover, the focus on gross money spent could easily mask disparities in treatment. For example, did Region I account for longevity of ownership? As another example, if the amount of money spent included major renovations or repairs (not investigated by complainants), as distinct from ordinary maintenance (the subject of this complaint), the total dollars spent on average per property could turn out to be equivalent as between minority and white REOs, but the amount spent specifically on ordinary exterior maintenance tasks only could be significantly less for minority REOs. These are just some of the unknown, and unanswerable, questions that arise from Region I's treatment of the evidence submitted by U.S. Bank.

And one final example: Region I assumed (without explicit analysis) that none of U.S. Bank's trust indentures or related pooling and servicing agreements created an agency relationship between U.S. Bank as titled owner of the REO, and the servicer who performed maintenance on the REO pursuant to those agreements. Although complainants believe those contractual terms are irrelevant to U.S. Bank's liability under the Fair Housing Act, without knowing the terms of such agreements for any specific REO, it is impossible to determine if Region I's analysis is correct. In any event, as explained below, complainants have examined a sample PSA to which U.S. Bank is a party and explained why they do create such an agency relationship with U.S. Bank as trustee. See discussion *infra* at 35-42.

**C.    Region I's Analysis of U.S. Bank's Evidence is Demonstrably False.**

---

[26]    In addition, prior to submission of a claim for FHA insurance, U.S. Bank is required to make certain repairs and bring the interior of the property into "broom-swept" condition. These obligations disproportionately contribute to the overall costs associated with FHA properties prior to conveyance to HUD. This explains why on average the GSEs spend less on overall maintenance costs on their REO properties compared to what FHA pays for preconveyance maintenance costs. Government Accountability Office, *Vacant Properties: Growing Number Increases Communities' Costs and Challenges*, GAO-12-34 (Nov. 4, 2011), at pp. 31-33 (available at http://www.gao.gov/products/GAO-12-34 ).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 31

In one section of the Determination, Region I explained the process by which it assessed and compared the relative maintenance condition of a sample of specific properties, providing addresses for those properties. (Section 4.1-4.5). The Determination concluded that its assessment showed full compliance of maintenance standards by U.S. Bank. But at least some of the evidence from U.S. Bank on which Region I accepted as true, was in fact false.

For example, the Determination states the following about *604 N. 30th St in Milwaukee, WI*:

"Respondents owned 604 N. 30th Street from January 14, 2013 until February 11, 2015. Complainant inspected the property on August 12, 2013. It is in a minority neighborhood. Upon receiving the property, the initial inspection showed that the cabinets were destroyed, most of the pipes and wiring were missing, and the toilets were smashed. So much debris had to be removed that the initial contractor hired to remove trash left without completing its contract, and a replacement contractor had to be found. **Respondents removed all debris, boarded windows per municipal law, installed a lock box, repaired the front door, winterized the home, and performed regular lawn maintenance and snow removal.** Respondents denied bids to repair gutters and downspouts, replace defective roof boards, replace handrails on the porch, and replace defective porch boards."



These photographs, taken on 8/12/2013 at the property, show that many windows were open, broken and not boarded at the property. At least one was boarded poorly in a manner that does not actually secure the property at all.

Here is another example: Region I stated the following about *1930 W Windlake Avenue in Milwaukee, WI*:

"Respondents owned 1930 Windlake Avenue from April 1, 2013 until December 10, 2013. Complainant inspected the property on August 7, 2013. It is in a minority neighborhood. Respondents obtained a "cash for keys" agreement with the tenants living in the property, allowing them to reside in the property until July 6, 2013. **When Respondents gained possession of the property there were no personal items or debris present. Respondents winterized the house, regularly maintained the lawn, and shoveled snow.** Respondents did not deny any maintenance act requests from the PPC."

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 33



This photograph taken on 8/7/2013 at the property shows that there was still debris present on the property that had not been cleared, even though this photograph was taken more than 30 days after the previous tenants vacated the property.

It appears, then, that when photographic evidence supplied by complainants conflicted with U.S. Bank's official position in regard to each property, Region I uncritically accepted U.S. Bank's position. Region I never asked complainants to respond to U.S. Bank's position or evidence. (See discussion *supra* at 3-6 regarding Region I's refusal to follow HUD's Investigation Manual).

### D.    Region I's "Marketing" Analysis is Flawed for Independent Reasons.

Region I unilaterally determined that "for sale" signs are an obsolete form of marketing and irrelevant to the time on market/successful marketing of the REO. (Det. at 19, fn. 31). There is no evidence to support this assertion and we disagree with it. Not all homebuyers use on-line listings as their sole source of information for properties on the market. If for sale signs are an obsolete marketing tool, why are there so many in communities across America? Neighbors interested in buying REOs near their homes told complainants' testers that they were unable to find information about the property due to lack of for sale signage.

Region I also erroneously examined the average time properties with for sale signs vs. without for sale signs sold *after complainants' inspection date*, instead of from the time US Bank listed the REO for sale. (Det. at 19). Region I stated that properties in minority neighborhoods sold an average of 100 days after complainants' inspection was conducted, while in White neighborhoods they sold an average of 107 days after such an inspection. (Det. at p. 19). But this analysis is flawed because complainants' inspections were not all done on Day 1 of the REO's listing for sale. Region I should have looked at the average time an REO was on the market as measured from U.S. Bank's initial listing date to the time of its disposition. There is no justification for looking at time on market only from the complainants' inspection date.

Region I also failed to identify if it took into account the methods and outcomes of REO disposition in this "analysis," i.e., whether U.S. Bank sold its REOs directly to owner occupants, through auctions, or to investors through bulks sales. It might be problematic to consider bulk sales and auctions "sales" in the same dataset as owner occupant purchases, the latter of which might take longer and require more effort in marketing, etc., but would have better outcomes for

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 34

both the neighborhood and U.S. Bank. If Region I had discussed this point with the complainants, complainants would have put it in touch with experienced companies working on REO sales and investor versus owner-occupant outcomes.

## V. REGION I APPLIED IMPROPER LEGAL PRINCIPLES WHICH ADVERSELY AFFECTED THE DETERMINATION.

### A. Region I Articulated Legal Principles That Are Inconsistent With Accepted Law.

Region I adopted and applied several principles of law that are flatly inconsistent with well-established legal precedent, even precedent HUD has adopted as its own. And to the extent this matter may present the application of the Fair Housing Act to a new or novel fact situation, Region I has interpreted the Act in a manner that, if embraced by HUD, will severely hamper future HUD and Department of Justice enforcement efforts against owners of REO properties, whether "trustee" owners or otherwise.

*1.   Region I improperly analyzed the exposure of "trustee" owners of properties to liability under the Fair Housing Act.*

As a primary defense to the claims of discrimination asserted here, U.S. Bank claimed that "as an indenture trustee, [we] had no obligations regarding any individual property or knowledge of any action taken by" the companies that performed maintenance work. (Det. at 2).

Region I accepted this concept in its entirety. The Determination repeatedly emphasized that "as indenture trustee, Respondents had no authority to control or select servicers or make decisions regarding these properties . . . ." (Det. at 7, fn. 21). Region I highlighted the "differences in Respondents' obligations" as an indenture trustee that owns title to real estate, as compared to non-trustees who own title to real estate. (Det. at 22).[27] The Determination embraced U.S. Bank's assertion that there is a "lack of agency" in the relationship between an indenture trustee that owns REO property in its name and the companies that perform maintenance services on that REO property. (Det. at 25-26). Region I concluded, therefore, that whatever liability might otherwise arise under the Fair Housing Act for discriminatory maintenance of REO properties, that liability cannot apply to "indenture trustees." [28]

---

[27]    The Determination even opined on the legal differences between "indenture" trustees on the one hand, and "ordinary" trustees on the other, concluding that differences in "trust law" will dictate differences in potential liability under the Fair Housing Act. (Det. at fn. 21, p. 25, fn. 49). The only authority cited for this proposition is the Trust Indenture Act of 1939. We do not agree that liability under the Fair Housing Act is dependent on such a distinction, but regardless, the Trust Indenture Act does not even apply to this matter. See discussion below at 40.

[28]    In an attempt to salvage the No Cause Determination in case this legal analysis was in error, Region I purportedly analyzed the 275 "trust" properties anyway "for sake of

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 35

The blanket exemption Region I has provided to U.S. Bank's "securitization trusts" –
legal fictions created by the financial services industry to conceal and dissipate any responsibility
for underperforming mortgage loans – is wrong both as a matter of fact, and as a matter of law.

    A.  The exemption of securitization trusts from any liability under the Fair
         Housing Act is wrong as a matter of fact.

We have not been made privy to whatever evidence Respondents made available to
Region I on the issue of agency,[29] but attached hereto as Exhibit 6 is a "sample" PSA to which
U.S. Bank is a party as trustee. Presumably this is substantially similar to, or contains essentially
identical terms as, the PSA referenced and relied upon by Region I on page 7 and in footnote 21
of the Determination. Under the terms of the attached PSA, the servicers who are responsible for
maintenance of properties that become REO properties *act as agents for, and owe corresponding
duties and obligations to, U.S. Bank serving as trustee.*[30]

For example, the definitions section stipulates that the servicer named in the trust
document maintains all collection accounts for mortgages in the trust "*as Servicer for U.S. Bank
National Association as trustee.*" (Ex. 6, p. 26) (emphasis added). The entity acting as the
custodian of the mortgage files does so "*on behalf of and for the benefit of the trustee.*" (Ex. 6,
p. 28) (emphasis added). Moreover, all "right, title, and interest in" the mortgage loans in the
trust, including the mortgage Notes themselves, are assigned and conveyed to the lender as

---

completeness" and "despite the unlikelihood of Respondents' liability." (Det. at 26). But that
analysis of 275 trust properties is flawed for a number of independent factual reasons,
independent of any legal determination under the Fair Housing Act. See discussion *infra* at 19-
28.

[29]    See discussion *supra* at 3-6, noting the failure of Region I to "review the evidence" with
complainants in support of defenses asserted by the Respondents.

[30]    We cannot say with certainty that the attached PSA designating U.S. Bank as trustee
involves an "indentured trust" as that term is used in the Determination. U.S. Bank has in other
contexts pointed out the factual and legal differences between "indenture trustees" and "RMBS
trustees." See attached Exhibit 7 (Brief of U.S. Bank in *Blackrock Allocation Target Shares v.
U.S. Bank National Ass'n*, Case No. 1:14-cv-09401, S.D.N.Y., filed 2/27/2015). If there is a
distinction between the two, then Region I has erroneously assumed that all of the trust
properties involved in this investigation are the spawn of indentured trusts, when in fact they
could involve RMBS trusts. If there is not a distinction between the two types of trusts for
purposes of legal exposure to liability under the Fair Housing Act, then the discussion in the text
above is fully applicable.

securitization trustee. (Ex. 6, p. 62). Lenders like U.S. Bank serving as trustees become the legal owner of record of all mortgages in the trust.[31]

All original loan level documents are held by the Depositor in trust "for the benefit of the trustee." (Ex. 6, p. 64). The parties to the PSA "intend that the assignment and transfer herein contemplated constitute *a sale of the Mortgage Loans*, the related Mortgage Notes . . . , conveying good title thereto free and clear of any liens and encumbrances, from the Depositor *to the trustee . . . .*" (Ex. 6, p. 65) (emphasis added). Thus, the duties and obligations of the servicers and others under the PSA are performed on *behalf of and for the benefit of* U.S. Bank as the trustee. The servicers and maintenance contractors are acting as U.S. Bank's agents.

This agency relationship between the servicer and U.S. Bank as trustee is expanded upon in several sections of the PSA. For example, the servicer is required to service and administer the Mortgage Loans, and to institute foreclosure proceedings, "*on behalf of the trust.*" [32] (emphasis added). In addition,

> [T]he Servicer in its own name or in the name of a Sub-Servicer or in the name of the trustee, solely in its capacity as trustee of the trust, is hereby *authorized and empowered by the trustee* when the Servicer believes it appropriate in its best judgment in accordance with the servicing standards set forth above, *to execute and deliver, on behalf of . . . the trustee, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Mortgage Loans* and the Mortgaged Properties *and to institute foreclosure proceedings* or obtain a deed-in-lieu of foreclosure *so as to convert the ownership of such properties, and to hold or cause to be held title to such properties, on behalf of the trustee . . . .* The Servicer shall service and administer the Mortgage Loans in accordance with applicable state and federal law . . . .

(Ex. 6, p. 73) (emphasis added). Also:

> The Servicer further is *authorized and empowered by the trustee . . .* to execute and deliver, *on behalf of the trustee . . .* any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the trustee and its successors and assigns.

---

[31]     Government Accountability Office, *Vacant Properties: Growing Number Increases Communities' Costs and Challenges*, GAO-12-34 (Nov. 4, 2011), at p. 30, n. 37 (available at http://www.gao.gov/products/GAO-12-34 ).

[32]     See also Government Accountability Office, *Vacant Properties: Growing Number Increases Communities' Costs and Challenges*, GAO-12-34 (Nov. 4, 2011), at p. 30, n. 37 (available at http://www.gao.gov/products/GAO-12-34 ) ("Any legal action a servicer takes on behalf of the trust, such as foreclosure, generally may be brought in the name of the trustee.")

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 37

(Ex. 6, p. 73) (emphasis added). In other words, the servicer "is authorized and empowered by" the trustee to perform certain acts relating to specific mortgage loans in the trust and does so "on behalf of the trustee." This is the classic language of an agency relationship.

In connection with REO properties in particular, the servicer maintains REO properties for the benefit of the U.S. Bank as trustee. The PSA specifically addresses the situation in which title to the real estate used as collateral for a foreclosed loan becomes vested in the name of U.S. Bank – i.e., the property becomes an REO. For example, in the event that title to an REO property in the trust is acquired through foreclosure, the PSA requires U.S. Bank, as trustee, to take and hold title to the REO property. (Ex. 6, p. 88). The servicer is thereafter required to "*manage, conserve, and protect each REO property*" and must separately account for all funds collected and received in connection with an REO property "*for the trustee. . . .*" (Ex. 6, p. 89) (emphasis added). In fulfillment of its duties to U.S. Bank as trustee, the servicer may contract with any independent contractor for the operation and management of any REO property; provided that none of the actions taken through any such independent contractor "shall be deemed to relieve the Servicer *of any of its duties and obligations to the trustee* . . . with respect to the operation and management of any such REO Property." (Ex. 6, p. 90).

Region I concluded with no analysis that the PSAs or indenture trusts defining U.S. Bank's relationship with its REO properties and servicers are clear, unambiguous, and unequivocal on this critical issue of agency. Yet industry lawyers openly acknowledge that "securitization trustees have been confronted with an array of issues that the governing securitization transaction documentation either did not anticipate or did not address adequately."[33] These trust documents "lack specific direction" and "lack guidance" on several important issues, and "do not detail the required treatment" of matters encompassed within the trust documents themselves. (*Id.*). Moreover, federal programs and regulators such as the Department of Treasury (through HAMP) and the FDIC have "highlighted the interpretive difficulties faced by trustees" under these trust instruments and have issued regulations that effectively dictate how they are to be interpreted. (*Id.*) In other situations, such as the bankruptcy or insolvency of servicers who are party to a PSA, trustees "have assumed various administrative duties as necessary to protect and preserve the trust estate." (*Id.*). It is no surprise, therefore, that "due to

---

[33] Kevin J. Buckley, "Securitization Trustee Issues," The Journal of Structured Finance, 16:2 (2010), available at https://www.hunton.com/files/Publication/12b5518a-d560-4673-a4da-ebc82f334f95/Presentation/PublicationAttachment/4d859711-32c3-4331-9946-4b755cbc05bc/Securitization_Trustee_Issues.pdf . *See also* R. Oppenheim and J. Trask-Rahn, *Deconstructing the Black Magic of Securitized Trusts: How the Mortgage-Backed Securitization Process Is Hurting the Banking Industry's Ability to Foreclose and Proving the Best Offense for a Foreclosure Defense*, 41 Stetson L. Rev. 745 (2012) (discussing the securitization of mortgages and some of the problems foreclosing lenders face, and highlighting several areas where securitization lawyers and private sector lawyers disagree on even the most basic legal implications of PSAs).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 38

the . . . ambiguity of PSA provisions, servicers and trustees may disagree on which party has the primary responsibility" for certain obligations under those PSAs. (*Id.*).

In addition, complainants have discovered that U.S. Bank's Global Corporate Trust Services (GCTS) has a dedicated team to assist external parties in addressing issues specific to Residential Mortgage Backed Securities (RMBS) where the Bank serves as trustee, including those situations where mortgage loans originally held in trust are foreclosed upon and converted to REO properties. This team facilitates collaboration between loan servicers, borrowers, cities, community groups, and other interested parties on property specific issues. U.S. Bank's Trust Services team can research information received from a third party and identify the related trust, loan servicer, and any important facts that require further action. It then shares the information with the appropriate contacts, with the objective of facilitating a resolution of the issue. The Bank acts as a conduit in RMBS matters to help achieve a reasonable solution. Before other financial regulators, U.S. Bank has bragged that for RMBS trusts, once issues are identified, it can promptly bring the matter to the attention of the responsible parties for timely resolution. See attached Ex. 8 (Sept. 9, 2013 Letter from Lisa L. Glover to Barry Wides, Deputy Comptroller, Office of the Comptroller of the Currency).

The Determination contains no factual analysis to support its legal conclusion that U.S. Bank's trustee agreements lack the necessary indicia of agency sufficient to support legal liability under the Fair Housing Act for discriminatory maintenance of properties titled in its name. The minimal factual evidence complainants have been able to discover from public sources supports the opposite conclusion; i.e., as a matter of fact, servicers and others providing maintenance services on REO properties do so as agents for, and for the benefit of, the indenture or securitization trustee who owns the properties.

    B. The exemption of securitization trusts from any liability under the Fair Housing Act is wrong as a matter of law.

Region I's conclusion that U.S. Bank's exposure to liability under the Fair Housing Act is controlled by the terms of its "indenture trustee" contract is also wrong as a matter of law.

It was a fundamental premise of Region I's Determination that U.S. Bank's exposure to liability under the Fair Housing Act for discriminatory maintenance behavior was confined by the terms of U.S. Bank's written contracts with servicers or by FHA regulations. "Respondents' relationship with the properties that they maintained is governed by either FHA guidelines . . . or 'private label' contractual obligations . . . ." (Det. at 5). See generally the discussion at pp. 5-17 of the Determination. Region I decided to "tak[e] into consideration the differences in [U.S. Bank's] obligations between FHA and indenture trustee properties." (Det. at 22). See also (Det. at 12, fn. 25: "As these properties were governed by different contracts, they are not . . . similarly situated.") (Det. at 25: analyzing comparable evidence only "according to the terms of the FHA and REO contracts that governed their maintenance.").

First, the PSA allocates and assigns duties and responsibilities only *as between the parties to the PSA*. It does not, and cannot, change the legal obligations of the trustee to third

parties, to persons who come into contact with properties owned by the trust, or to the public at large. Courts have refused to permit indenture trustees to foreclose on loans to which they cannot prove ownership, despite the intent of the PSA under which they claim title.[34] In other circumstances, courts have not allowed the terms of contractual arrangements between defendants in fair housing cases to serve as limitations, or even to have any bearing, on their liability to third persons.[35]

Second, a trustee's legal status changes as soon as it steps outside its role as administrator of a trust of pooled mortgage loans – its contractual status – and assumes the mantle of a property owner. Once title to a property becomes vested in the name of a lender as trustee after foreclosure, i.e., once the property becomes an REO property, the legal and relational dynamics change significantly. As soon as it becomes a titled owner of the real estate, the lender as trustee exposes itself to ultimate liability to third parties on many fronts, including responsibility for real estate taxes, zoning and code compliance, nuisance avoidance and abatement, and compliance with all other federal and state laws imposing duties on landowners – including the Fair Housing Act. As one court has explicitly observed, "The financial institutions know the law charges the one with title . . . with maintaining the property." [36]

Third, Region I cites no authority – whether in the case law, the implementing regulations, or the statute itself – for the proposition that trustee entities of specific kinds are automatically shielded from liability under the Fair Housing Act. To the contrary, the term "person" in the Act is defined to include:

---

[34]   E.g., *In re Foreclosure Cases*, 2007 U.S. Dist. LEXIS 84011 (N.D. Ohio 2007).

[35]   See, e.g., *Heights Community Congress v. Hilltop Realty, Inc.,* 774 F.2d 135, 141 (6th Cir. 1985) ("Defendants also object that the District Court erred in finding that Hilltop had the power to control the acts of its agents, and hence was liable for the violations committed by those agents. It argues that its agents were independent contractors, over whom under common law it has no control. This argument has consistently been rejected in Fair Housing Act cases.").

[36]   *In re Foreclosure Cases*, 2007 U.S. Dist. LEXIS 84011 (N.D. Ohio 2007). *See also National Fair Housing Alliance, Inc. v. S.C. Bodner Co.*, 844 F. Supp. 2d 940 (S.D. Ind. 2012) (purchaser of property not constructed in compliance with the Fair Housing Act can be liable even though it was not involved in design or construction of non-compliant property); *Office of the Comptroller of the Currency*, Comptroller's Handbook: "Other Real Estate Owned" at 14 (Sept. 2013) ("In acquiring title to foreclosed properties, *a bank assumes the primary responsibilities of an owner, including providing maintenance* and security, paying taxes and insurance, and serving as landlord for rental properties.") (emphasis added); Federal Reserve Board, Questions and Answers For Federal Reserve-Regulated Institutions Related to the Management of Other Real Estate Owned (OREO) Assets, at 11 ("Institutions should have controls in place to comply with all federal, state, and local laws, *including fair housing laws*.") (emphasis added), available at http://www.federalreserve.gov/bankinforeg/srletters/sr1210.htm.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 40

> One or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, *trusts*, unincorporated organizations, *trustees*, trustees in cases under Title 11, receivers, and fiduciaries.[37]

Trustees are often named as defendants in claims brought under the Fair Housing Act without any suggestion that they enjoy any immunity thereunder, or that the terms of the trust agreement bear on their liability.[38]

Fourth, the only legal authority Region I *does* cite is the Trust Indenture Act of 1939, 15 U.S.C. §§77aaa. (Det. at 7, fn. 21) ("TIA"). In that footnote and accompanying text, Region I asserts that trust indentures subject to the TIA are "governed by a separate set of laws." *Id.* But Region I failed to mention (or did not know) that *the TIA does not apply to trustees of residential mortgage-backed securities (RMBS) governed by Pooling and Servicing Agreements. Ret. Bd. Of the Policemen's Ann. and Ben. Fund v. Bank of N.Y. Mellon*, 775 F.3d 154, 163-69 (2nd Cir. 2014) ("*BNYM*"). This has been the position of the Security and Exchange Commission since 1997. *Id.* at 169. It is also the previous position of U.S. Bank, having argued to the U.S. District Court for the Southern District of New York as recently as 2015 that "under *BNYM*, the TIA does not apply to PSA trusts." (Ex. 7 at p. 10).

Fifth, it is well settled that compliance with the Fair Housing Act is non-delegable. Regardless of the written terms of the relationship two parties might establish, the principal can be held liable for the conduct of the agent that is within the scope of the authority the principal delegates to the agent. For example, in *Walker v. Crigler*, 976 F.2d 900 (4th Cir. 1991), the jury found a real estate agent liable under the Fair Housing Act but cleared the owner of any liability. The Fourth Circuit found the district court's entry of judgment based on the jury verdict to be reversible error, holding that even if the real estate agent was acting outside the scope of her authority, the owner "could not insulate himself from liability for . . .discrimination . . . merely by relinquishing the responsibility for preventing such discrimination by another party." *Id.* at 904, *quoted in Equal Rights Ctr. v. Nile Bolton Assocs.*, 602 F.3d 597 (4th Cir. 2010).[39] The

---

[37]    42 U.S.C. § 3602(d) (emphasis added).

[38]    *See, e.g., Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, opinion amended on denial of reh'g, 125 F.3d 1281 (9th Cir. 1997); *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 678 F. Supp. 2d 576 (E.D. Mich. 2009); *MHANY Mgmt. Inc. v. County of Nassau*, 81 Fed. R. Serv. 3d 1231 (E.D.N.Y. 2012); *Sporn v. Ocean Colony Condo. Ass'n*, 173 F. Supp. 2d 244 (D.N.J. 2001).

[39]    Relatedly, many courts have held that the Fair Housing Act does not allow a claim for contractual or common law indemnity. *Equal Rights Ctr.*, 602 F.3d at 602 (holding that defendant housing provider was not entitled to seek indemnity from architect); *Miami Valley Fair Hous. Ctr., Inc. v. Campus Vill. Wright State, LLC*, No. 3:10CV00230, 2012 WL 4473236, at *4 (S.D. Ohio Sept. 26, 2012) ("The comprehensive character of the FHA precludes a finding that a federal common law right to indemnity and/or contribution exists under the FHA." (citing cases).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 41

legal proposition that contractual arrangements cannot be used in defense to civil rights violations against others is well-established in other federal laws as well.[40]

The contractual "trustee" concepts and defenses that Region I relied on are ill-suited to address the many potential issues of legal liability to third parties that flow from the ownership of land. PSAs were created to address the complexities and nuances of *loan* ownership and consequent *loan* securitization, complying with IRS regulations for the creation of REMICs, insuring favorable tax treatment of mortgage-backed securities, managing the different levels of risk associated with various loan pools, servicing and managing those loans, etc. By definition the primary concern of PSAs is the *ownership and servicing of loans*. Their focus is *not* to circumscribe, delimit, chronicle, or account for the legal responsibilities of the *ownership of real estate property* securing those loans. Indeed, one must assume that the underlying loans themselves were originated in good faith with the understanding that they would be performing loans, and that the resulting REO inventory would be minimal. Typical PSA provisions governing the legal consequences of owning REO property are therefore extremely minimal and sorely deficient. They are largely silent as to the trustee's exposure to liability in its *status as a landowner*, e.g., for real estate taxes, nuisances on the property, zoning and code compliance, environmental pollution, and the like.

PSAs were created with a complete lack of foresight as to the legal consequences that flow to the trustee as the owner of land, as distinct from the trustee as the owner of loans.[41] Once it becomes owner of an REO property, the lender as trustee is technically the owner of record of the real estate secured by a mortgage that has been bundled into a mortgage-backed security. The PSAs typically designate the loan servicers as responsible for maintenance of REO property. But the PSAs are just contracts that bind the parties to them; they do not change, alter, or affect the rights of persons who are not party to them.[42] Court cases deciding issues between trusts,

---

[40] The Rehabilitation Act and the ADA specifically prohibit discrimination based on disability through contractual arrangements. *Hewitt v. U.S. Office of Personnel Mgmt.*, 390 F. Supp. 2d 685, 690 (N.D. Ill. 2005) (addressing the Rehabilitation Act); 42 U.S.C. § 12182(b)(1)(A)(ii); *Currier v. Whim Co.*, 2004 WL 1212058, at n.2 (N.D. Cal. May 25, 2004) (addressing the ADA); *see also Independent Living Ctr. of S. Cal. v. City of Los Angeles*, 973 F. Supp. 2d 1139, 1149 (C.D. Cal. 2013) (holding that under the ADA, "'a public entity may not, directly or through contractual arrangements'" engage in conduct that has the purpose or effect of discriminating on the basis of disability (quoting 28 C.F.R. § 35.130(b)(3)(i), (ii))).

[41] *See, e.g.*, R. Coughlin, "Caught in the Cross-fire: Securitization Trustees and Litigation During the Subprime Crisis" (2009) (observing that securitization trustees are now "addressing situations not anticipated by transactions structures and not adequately addressed in transaction documents"), available at
http://www.nixonpeabody.com/files/securitization_litigation_subprime_crisis.pdf

[42] The fact that PSAs are lengthy, complicated, contain terms of art, and must comply with IRS regulations does not alter their fundamental character as contracts between private parties.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 42

servicers, insurers and other parties to their private arrangements, where only those parties are involved in the litigation, routinely fall back on the PSAs in assigning liability for issues arising from the business deals or the agreement. However, any action against the servicer ultimately goes against the trustee, which still retains title and reporting responsibilities to various financial agencies and to the trust.

By validating U.S. Bank's legal defense based on its trustee ownership status, Region I has made it impossible for anyone – including HUD or the Department of Justice – to investigate or test the racially discriminatory maintenance of REO properties held by banks as trustees. There is no public database available to identify what servicer might be contractually responsible for any specific REO property titled in the name of a bank "as trustee." The trustee does not make this information available to the public. It is not retrievable from tax or land records. If the bank as trustee is shielded from liability as a matter of law, and the actual servicer is shielded from exposure by the lack of available public data, then no one in the financial services industry will be accountable for this pernicious form of discrimination against neighborhoods of color.

> 2. *Region I assumed wrongly that U.S. Bank can only be legally responsible under the Fair Housing Act for discriminatory maintenance of which it had "knowledge." This is an error of law.*

Another defense asserted by U.S. Bank was that as a trustee owner it "had no . . . knowledge of any action taken by" the companies that performed maintenance work on its REO properties. (Det. at 2). Region I accepted this legal defense, and consequently determined that U.S. Bank "had no knowledge of the maintenance history for any of these properties. They were serviced by servicers that were not controlled by U.S. Bank. *Since U.S. Bank had no access to this information, the investigation focused on the properties serviced by U.S. Bank.*" (Det. at 25) (emphasis added).[43]

Complainants' theory of liability is not, and never was, contingent on U.S. Bank's "knowledge" of the inconsistent manner in which its REO properties were being maintained by its agents. Perhaps U.S. Bank was aware that its property preservation servicers were treating neighborhoods of color poorly as compared to White neighborhoods; perhaps it was not. It is possible that U.S. Bank explicitly directed its agents to cut corners in neighborhoods of color, and not in White neighborhoods, but U.S. Bank's liability for its agents' actions is not dependent on such evidence. Once differing treatment because of race is demonstrated by the evidence,

---

See *In re Foreclosure Cases*, 2007 U.S. Dist. LEXIS 84011 (N.D. Ohio 2007) ("Neither the fluidity of the secondary mortgage market, nor monetary or economic considerations of the parties, nor the convenience of the litigants supersede . . . obligations" under federal law).

[43]    In fact, U.S. Bank does have access to such information. That is how it addresses nuisance abatement violations and other violations of local ordinances the bank receives as owner of the property. It contacts the servicer and requires the servicer to remediate the violation(s) and payment of fines. See Ex. 8 hereto (Sept. 9, 2013, Letter from Lisa L. Glover to Barry Wides, Deputy Comptroller, Office of the Comptroller of the Currency).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 43

U.S. Bank is exposed to liability by virtue of its REO ownership status, not because of its knowledge that discrimination is occurring.

As a general matter, it is never required to show that a defendant knew it was violating the Fair Housing Act in order to find it liable. *See, e.g.*, *United States v. Taigen & Sons, Inc.*, 303 F. Supp. 2d 1129, 1137 (D. Idaho 2003). This is true even for punitive damages. *See United States v. Balistrieri*, 981 F.2d 916, 936 (7th Cir. 1992) (requirement that liability be founded on reckless disregard for plaintiff's rights "does not mean that the defendant had to know he was violating the law").

The same holds where liability turns on an agency relationship. A principal can be held liable under the Fair Housing Act for the discriminatory acts of its agent under traditional federal common law principles of vicarious liability. *Meyer v. Holley*, 537 U.S. 280, 285, 290-91 (2003); *Harris v. Itzhaki*, 183 F.3d 1043, 1055 (9th Cir. 1999); Schwemm, *Housing Discrimination Law and Litigation* § 12B:2 ("The general rule in fair housing cases is that a principal is legally responsible for the acts, conduct, and statements of its agent done within the scope of the agent's apparent authority." ). [44]

It is not necessary to show that the principal was aware of or ordered the agent's conduct, so long as the agent was acting in the scope of the authority delegated to him or her by the principal. As the Supreme Court explained in *Meyer*, a "principal is liable for the acts and negligence of the agent . . . *although he did not authorize or did not know of the acts complained of* . . . ." *Meyer*, 537 U.S. at 285-86 (emphasis added) (internal quotation marks omitted); *see also Cange v. Stotler & Co., Inc.*, 826 F.2d 581, 589 (7th Cir. 1987) (holding that vicarious liability may apply even where "nothing could be done by the [principal] to prevent the agent's wrongdoing" (citing *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 967 (7th Cir. 1986); *CFTC v. Premex, Inc.*, 655 F.2d 779, 784 n.10 (7th Cir. 1981))). In a Fair Housing Act case, the Fourth Circuit likewise held that an owner was liable for the discriminatory actions of its real estate agent, even though the jury found that the owner did not confer on the real estate agent a right to discriminate, because the agent was acting within the scope of the authority delegated to her by the owner at the time of the discriminatory act. *See Walker v. Crigler*, 976 F.2d 900, 904 (4th Cir. 1992).

Region I intentionally limited its investigation only to those REO properties which U.S. Bank acknowledged having "knowledge" of the maintenance being performed. Region I did so because it believed that a "lack of knowledge" was a defense to claims under the Fair Housing Act. This was a fundamental error of law. Region I's ultimate conclusion was infected as a result.

---

[44]     An agency relationship can be actual or apparent. In an actual agency relationship, the agent and principal have agreed to have the agent act on the principal's behalf, subject to the principal's control. For apparent agency, the question is whether "the principal has acted in a way that would make it reasonable for a third party dealing with the agent to believe that the agent is authorized to act for the principal." Schwemm, § 12B:2.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 44

> 3. *Region I's understanding of what evidence is sufficient to constitute a "pattern or practice" of discrimination under the Fair Housing Act is legally incorrect.*

Region I assumed that only a valid and sophisticated "statistical" showing can establish a "pattern or practice" of discrimination under the Fair Housing Act. (Det. at 21-22). It believed the 650 examples of tested properties in 24 metropolitan areas was "too small" to rule out "sampling error" (Det. at 21). By requiring that there must be "statistically valid conclusions" to be drawn from testing data before a "pattern or practice" of discrimination under the Fair Housing Act can be established, Region I applied a legal standard that effectively precludes any pattern or practice case to be brought, even by the Department of Justice, based on testing data. This was an egregious legal error.

First we point out Region I's misunderstanding of how statistical concepts apply in testing cases. Region I claimed that, because of the alleged limitations in the number of properties in each MSA tested by complainants, Region I could not make "statistically valid conclusions." (Det. at 23). In other words, Region I believed that the results required some statistical testing. Statistical testing, however, is designed and required only in cases where one is dealing with samples from the full population. The purpose of the statistical tests is purely to determine if the samples reasonably represent the distribution of measures in the full population – or whether taking account of random error in the sampling (which is heavily influenced by the size of the sample), one can conclude that the differences found in the test results would be representative of the real differences if one had tested the full population. In this case, once the targeted neighborhoods were selected according to the criteria defined, complainants tested the full population. Therefore, no statistical testing was required. Any differences in result are the actual, real differences for the entire population tested, and are not appropriate for or conditioned by statistical tests.[45]

In any event, no statistical sampling or showing of any kind is required to prove a pattern or practice of discrimination. Courts have consistently held that the determination of whether a "pattern or practice" of housing discrimination sufficient to justify enforcement action is a highly fact-specific consideration. *United States v. Balistrieri*, 981 F.2d 916, 930 (7th Cir. 1992) ("[A] finding of pattern is a factual finding, and each case must stand on its own facts."). When the government brings a pattern or practice case, its burden is to show a preponderance of the evidence that the defendant's discriminatory conduct was a "regular practice." *Id.* at 929; *United States v. Big D Enters., Inc.,* 184 F.3d 924, 930 (8th Cir. 1999) (citing *Int'l Brotherhood*

---

[45] Moreover, experienced fair housing researchers have noted how fair housing testing audits "avoid many of the pitfalls facing regression studies" and that by following accepted testing procedures testing investigations "can minimize, if not eliminate, the possibility of omitted, included , and diverting variable biases" that can occur in statistical regression studies. J. Yinger, *Evidence on Discrimination in Consumer Markets*, J. of Economic Perspectives, Vol. 12, No. 2, at p. 28 (Spring 1998).

*of Teamsters v. United States*, 431 U.S. 324, 336 (1977)). While "isolated or sporadic acts of discrimination are insufficient to prove a pattern or practice under the FHA," courts have found a pattern or practice based on only a few incidents of discrimination. *See Balistrieri*, 981 F.2d at 929-30 (finding pattern or practice when five black testers were treated unfavorably relative to white testers in a one-month period); *Big D Enters.*, 184 F.3d at 930-31 (finding pattern or practice established by testimony that defendants had a discriminatory policy and evidence about three identified victims of that policy); *United States v. DiMucci*, 879 F.2d 1488, 1492, 1499 (7th Cir. 1989) (finding evidence from six housing tests sufficient to establish a pattern or practice, noting, "courts have granted relief based on fewer incidents than these") (citing *United States v. Pelzer Realty*, 484 F.2d 438 (5th Cir. 1973)); *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) (noting that another court had found that three FHA violations were sufficient to establish a pattern or practice in a blockbusting case). The requirement that a pattern or practice be based on defendant's regular practices and procedures "does not mean that the defendant must have engaged uniformly in unlawful acts." *City of Parma*, 494 F. Supp. at 1095.

"[N]o mathematical formula is workable, nor was any intended. Each case must turn on its own facts." *West Peachtree Tenth Corp.*, 437 F.2d at 227. "[W]hile statistical proof is relevant in housing discrimination actions, it does not carry dispositive weight . . . [and] must be weighed along with all other evidence presented to determine if a pattern or practice exists." *Id.* at 423. The government's initial burden in a pattern or practice case "can be met 'by statistics alone, . . . or by a cumulation of evidence, including statistics, patterns, practices, general policies, or specific instances of discrimination. Under a proper analysis, all of the evidence, statistical and nonstatistical, tending to establish a prima facie case should first [be] assessed on a cumulative basis.'" *United States v. Cochran*, 39 F. Supp. 3d 719, 730, 733 (E.D.N.C. 2014) (quoting *EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1188 (4th Cir. 1981)) (finding that government met its burden of alleging a pattern or practice where no statistical evidence of discrimination was introduced but relied on anecdotal and circumstantial evidence). In short, while statistical evidence may be helpful, it is not required. *See United States v. East River Housing Corp.*, 90 F. Supp. 3d 118, 159 (S.D.N.Y. 2015) (rejecting defendant's argument that government was required to include statistical evidence in its pleadings because "even if such statistical analysis were possible at this juncture, it is not essential," since a pattern or practice showing "depends on all of the surrounding facts and circumstances").

Moreover, HUD's own Investigation Handbook instructs that "data analysis can be useful and helpful circumstantial evidence of disparate treatment *even if the data pool is too small to run a reliable statistical test.*" HUD Handbook, at p. 7-47. The Handbook provides an example of an investigation having data elements that "may not create a large enough pool for statistical comparison," but nevertheless would be sufficient circumstantial evidence in a disparate treatment case. *Id.*

Attached hereto in Exhibit 1 are charts visually displaying the evidence of differing treatment of U.S. Bank owned REO properties. They show a consistent and clear pattern and

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 46

regular practice of differing exterior maintenance based on neighborhood racial composition. The evidence was clearly sufficient to support a pattern or practice cause finding here.

        4.     *Region I's interpretation of what evidence is required to establish a "prima facie inference" of discrimination under the Fair Housing Act was inappropriately restrictive and conflicts with established law.*

    HUD's Investigation Handbook clearly indicates that a cause finding is appropriate if there is "sufficient evidence" of a prima facie case of discrimination. HUD Handbook, at p. 7-7). Page 7-11 states that the "totality of the circumstances determines the outcome of the case."

    Region I appeared to use only a single legal standard for determining how a "prima facie" case of discrimination can be established. It applied a sort of modified *McDonnell Douglas* standard. (Det. at 27-29). It did not consider the evidence here under any other standard. It also did not, by its own admission, take into account "the totality" of the evidence reflected in the 13,000 photographs complainants submitted concerning the 650 properties investigated.

    But there are numerous other ways of establishing a "prima facie" case of discrimination to support an inference of unlawful activity. The *McDonnell Douglas* approach adopted by Region I is not the only one. *Lindsay v. Yates*, 578 F.3d 407, 417-18 (6th Cir. 2009). In a housing discrimination case, "the key question [a] court must answer is whether the plaintiffs have presented sufficient evidence to permit a reasonable jury to conclude they suffered an adverse housing action under circumstances giving rise to an inference of unlawful discrimination, *not* whether the *prima facie* elements specifically articulated in *McDonnell Douglas* . . . could be established." *Id.* at 416.

    As the U.S. Court of Appeals for the Ninth Circuit has explained:

In lieu of satisfying the elements of a prima facie case, a plaintiff may also "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the challenged decision. *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1122–23 (9th Cir.2004) ("[I]t is not particularly significant whether [a plaintiff] relies on the *McDonnell Douglas* presumption or, whether he relies on direct or circumstantial evidence of discriminatory intent to meet his [initial] burden"); *see also Metoyer v. Chassman,* 504 F.3d 919, 931 (9th Cir.2007) (stating that a plaintiff suing under 42 U.S.C. § 1981, like a plaintiff bringing a suit for disparate treatment, may proceed under the *McDonnell Douglas* framework or by producing direct or circumstantial evidence showing that a discriminatory reason "more likely than not" motivated the employer) (citing *McGinest,* 360 F.3d at 1122); *Lowe v. City of Monrovia,* 775 F.2d 998, 1006 (9th Cir.1985), *amended on other grounds by* 784 F.2d 1407 (9th Cir.1986) ("[A] plaintiff can establish a prima facie case of disparate treatment without satisfying the *McDonnell Douglas* test." ).

*Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008).

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 47

If not all the *McDonnell Douglas* elements for a prima facie case are present, as Region I apparently concluded here, a plaintiff may still establish a prima facie housing discrimination claim if there is "'additional evidence' from which a reasonable juror could find an inference of discrimination," the nature of which depends on the specific facts and circumstances of the case. *Lindsay v. Yates*, 578 F.3d 407, 416, 418. In other words, "[a] *prima facie* case is established whenever the actions taken by the property owner lead one to reasonably 'infer, if such actions remain unexplained, that it is more likely than not that such actions were based on discriminatory criterion' such as race." *Id.* at 417-18 (quoting *Furnco Const. Co. v. Waters*, 438 U.S. 567, 577 (1978)). For disparate treatment cases, a prima facie case requires a showing of discriminatory intent, but that intent may be inferred by the totality of the circumstances. *See L.C. v. LeFrak Organization, Inc.*, 987 F. Supp. 2d 391, 400 (S.D.N.Y. 2013); HUD Title VIII Complaint Intake, Investigation, and Conciliation Handbook (8024.01 REV-2) ("The totality of the collected evidence determines the outcome of the case.").

Moreover, the interpretation of facts revealed by testing evidence in particular can satisfy the elements of a prima face case of discrimination. Testing evidence can reveal "subtle or discrete" behavior not otherwise apparent. In *Darby v. Heather Ridge*, 806 F. Supp. 170 (E.D. Mich. 1992), for example, the court did not hesitate to conclude that the testing evidence there made out a prima facie case of discrimination: "Questions of interpretation are best resolved by the trier of fact when a fine line separates subtle discrimination from lawful behavior." *Id.* at 175.

Even when applying the *McDonnell Douglas* burden-shifting analysis in evaluating circumstantial evidence of disparate treatment and discriminatory intent, courts have generally applied a flexible approach. The *McDonnell Douglas* prima facie requirement "was never intended to be rigid, mechanized, or ritualistic." *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal quotation marks omitted). "[T]he precise requirements of a prima facie case can vary depending on the context." *Lindsay v. Yates*, 498 F.3d 434, 439-40 (6th Cir. 2007)). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Region I did not adhere to these legal principles. Instead, it intentionally chose to restrict its analysis to only a limited number of facts, and then to apply only a single legal standard to those facts. The legal standard it did apply was unduly rigid under the circumstances of this case. Region I's conclusion was corrupted as a result.

## B. Region I's Legal Errors Tainted the Entire Determination Decision.

The legal errors identified above tainted Region I's entire Determination and ultimate conclusions.

We begin with Region I's selection of "similarly situated" REO properties available for its primary analysis in this investigation record. Region I initially correctly observed that the determination of "what factors allow properties to be classified as similarly situated is highly dependent on the facts of a given case." (Det. at pp. 6-7). With this proposition, all would agree.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 48

But Region I then applied the erroneous legal predicates discussed above to unilaterally limit those factors of "similarity." It would not compare REO properties titled in its name as trustee with REO properties titled in its name, but not as trustee. (Det. at 7-8). Obviously the impact of this decision on Region I's ultimate analysis was overwhelming. It resulted in 275 REO properties and 16 entire metropolitan markets being eliminated from Region I's comparative assessments. It would not compare REO properties where U.S. Bank was not the "decisionmaker," even if the property was titled in U.S. Bank's name. (Det. at 7). It would not compare REO properties titled in U.S. Bank's name if servicing responsibilities were assigned by contract to another party (Det. at 7). It would not compare REO properties if they originated as FHA loans as opposed to conventional loans. (Det. at 7-8). It took into account property crime rates, housing value estimates, and median census tract income to establish comparability. (Det. at 7). Clearly, Region I's adherence to erroneous legal standards regarding trustee liability, principal liability, necessity of knowledge, and other errors, fatally infected its analysis of the evidence available to it.

In addition, Region I's "pattern and practice" analysis, both within specific MSAs and across all MSAs, was corrupted by its misunderstanding of the legal standard for such claims. (Det. at 21-22). The title of Section 5.2 assumes that a "statistical" showing is required to establish a "pattern or practice" of discrimination under the Fair Housing Act, which is flat wrong. Region I's discussion here acknowledges that it was "restricting comparisons" for purposes of this section based on various factors that are not relevant, such as municipal codes and economic climate. (Dec. at 21). It believed the 650 examples of tested properties in 24 metropolitan areas was "too small" to rule out "sampling error" (Det. at 21), even though as few as three instances of discrimination are sufficient to establish a pattern and practice of discrimination. It further restricted its "pattern and practice" analysis based on its improper distinctions between trustee properties, FHA properties, and other properties. (Det. at 22). It did so to such an extent that it finally conceded this differentiation "would reduce the numbers of comparable properties to such a degree that *no comparisons could be drawn in any MSA in this case*." (Det. at 22) (emphasis added).[46] By requiring that there must be "statistically valid conclusions" to be drawn from testing data before a "pattern and practice" of discrimination under the Fair Housing Act can be established, Region I applied a legal standard that effectively precludes any pattern or practice case to be brought, even by the Department of Justice, based on testing data.

Region I's misapplication of "prima facie case" doctrinal principles is just as egregious, and By Region I's own admission adversely influenced the outcome here. The Determination acknowledges that its analysis of the testing evidence involves "a novel interpretation of traditional testing" methodologies, and that under its interpretation of the prima facie case model "the evidence at hand is insufficient . . . to meet the evidentiary standard" it was applying. (Det. at 24). In order to meet the second prong of its version of the prima facie case analysis, i.e., "properties in minority areas were maintained or marketed less well than properties in white

---

[46]    Although Region I purported to compare 119 of the 650 REO properties, in fact the only pattern and practice "analysis" it conducted was limited to "differential spending pattern[s]," (Det. at 22-23), an approach and analysis that itself has serious factual deficiencies. See discussion at 19-28 *infra*.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | 49

areas," (Det. at 27), or "similar properties . . . were maintained or marketed on more favorable terms" in white areas (Det. at 28), Region I imposed no less than nine requirements that needed to be "matched" for comparison purposes:

> "Similarly situated REOs . . . require: (1) similar property value at the time of bank acquisition; (2) similar property condition at the point of acquisition; (3) similar time in private ownership (since mortgage issuance); (4) similar time in possession of Respondent; and (5) similar age of property. In addition, any analysis would also have to control for neighborhood characteristics such as: (1) crime rate; (2) local zoning ordinances; (3) neighborhood income; and (4) environmental characteristics."

(Det. at 24). Once these nine "similarity" factors were deemed required in order to meet the Region I's prima facie case analysis standard, it was inevitable that Region I would find the standard unfulfilled.

Region I's entire discussion, as well as its ultimate conclusion, was infected by its errors of law, and its misapplication of well-worn legal precedent. The Determination must be withdrawn on this basis alone, and the investigation reopened, regardless of the many errors described elsewhere in this Request for Reconsideration.

## VI.   CONCLUSION.

Region I had all the evidence it needed to make a cause determination against U.S. Bank for differing maintenance of REO properties in communities of color, both on a national level and on a metropolitan basis. It refused to investigate the allegations that were made, and the investigation it did conduct was the result of flawed factual and legal analyses. Upon reconsideration, the Department should reassign the U.S. Bank REO investigation to HUD's Systemic Unit.

HUD Case No. 01-12-0283-8
NFHA v. U.S. Bank
Request for Reconsideration
Page | **50**

# EXHIBITS

Original Pivot Tables Analysis (April 2015)

Field Services Checklist (July 2015)

Sample photographs in direct contradiction to Region I's statement that the photographs do not demonstrate either "action or inaction" by U.S. Bank (p. 20).

All photographs of the property involving the "candy wrapper" photograph which complainants believe Region I was referring to in fn. 33.

Additional Pivot Tables Analysis (January 2016)

Sample U.S. Bank Pooling and Servicing Agreement (PSA)

Brief of U.S. Bank in *Blackrock Allocation Target Shares v. U.S. Bank National Ass'n*, Case No. 1:14-cv-09401 (S.D. N.Y., filed 2/27/2015).

Sept. 9, 2013, Letter from Lisa L. Glover to Barry Wides, Deputy Comptroller, Office of the Comptroller of the Currency.