IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA.<br><br>    Plaintiffs,<br><br>             v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>    Defendants. | Case No. 18 CV 839<br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier<br><br>Jury Trial Demanded |

**PLAINTIFFS' RESPONSE TO SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT FILED BY DEFENDANTS DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE, AND <u>DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE</u>**

I.  **THE TRUSTEE OWNERS CAN BE HELD LIABLE FOR FAIR HOUSING ACT VIOLATIONS COMMITTED BY THEIR REO MAINTENANCE SERVICERS**

The Supplemental Memorandum filed by the Deutsche Bank Trustee Defendants[1] ("Trustees"), ECF 73, does not support their dismissal as defendants. Whether or not an agency relationship exists between the Trustees and the Servicers, the Trustees as owners of REO properties are legally responsible for the discriminatory acts of the Servicers of those properties. Moreover, the Second Amended Complaint (SAC) has been updated to allege clearly that Ocwen and Altisource did act as the "agents" of the Trustees with respect to the maintenance of the Trustees' REO properties, e.g., ECF 70 at ¶¶56, 66-78.

The Trustees argue that the Servicers are *not* their agents for REO maintenance purposes, and therefore they have no exposure for FHA violations. The sole basis for this argument is that, because the REO maintenance function is actually performed by the Servicers pursuant to Pooling and Servicing Agreements ("PSAs"), the Trustees cannot be liable for the Servicers' discrimination. ECF 73 at 5-12. Specifically, the Trustees claim that under the terms of typical PSAs,[2] "the Trustees play no role in the day-to-day servicing of the mortgage loans." ECF 73 at 6.

This argument fails for several reasons. For one thing, according to a recent decision from the Seventh Circuit, no agency relationship is required under the FHA for liability to attach

---

[1] Defendants indicate at footnote 1 of their memorandum, ECF 73 at 1, that "Deutsche Bank National Trust" should actually be referred to as "Deutsche Bank National Trust Company," but have not moved for dismissal on this basis (and did not previously move for dismissal on this ground).

[2] The Trustees requested an agreement that, to avoid filing many thousands of pages of PSAs, they could refer to the PSA included with their first Motion as a sample, so long as (a) they supplied a Declaration confirming the provisions on which it chose to rely are typical, and (b) the remaining PSAs were provided to Plaintiffs. Thus, the parties generally refer to this "sample" PSA (the "AR41 Trust PSA") for purposes of this Motion to Dismiss. ECF 70 at ¶66; ECF 73 at 4. However, as discussed below at 11, Plaintiffs have now preliminarily identified certain additional PSA provisions not in the Trustees "sample PSA," or set forth in their declaration which are material to the issues here.

to the Trustees. As the owners of REO properties at issue, the Trustee Defendants are responsible for discriminatory maintenance activity regardless of the terms of any contract or written instrument they entered. Absolving trustee owners of liability under the FHA for servicer misbehavior would be contrary to the language of the FHA, at odds with case law addressing the legal status and duties of trustee property owners, and would impair enforcement of the FHA.

In any event, the SAC sufficiently alleges the existence of an agency relationship between the Trustees and the Servicers. Many express terms of the PSAs, considered independently or combined with facts alleged regarding the actual operational relationship between the Trustees and the Servicers, confirm the existence of an agency relationship.

### A. A Trustee Taking Title To An REO Property Assumes Owner Duties And Obligations, Regardless Of The Existence Of An Agency Relationship Or The Terms Of Any Trust Agreement

In its prior opinion, the Court rejected Plaintiffs' argument that, as an owner of real property, a trustee can become legally responsible for racially discriminatory maintenance. ECF 54 at 12-16. The Court believed that a trustee's exposure for legal liability under the Fair Housing Act depends on the existence of an "agency" relationship between the property owner and the maintenance servicer: "[W]hen the alleged FHA malfeasant is not an agent of the owner, the owner may indeed escape liability" under the FHA. *Id.* at 13. The Court also suggested that "FHA claims could not be asserted against the indenture RMBS trustee," citing the Trust Indenture Act ("TIA") and HUD's No Cause Determination against U.S. Bank. *Id.* at 15-16.

Plaintiffs respectfully request that the Court revisit this issue for two reasons.[3] First, as to

---

[3] Although the Trustee Defendants make passing reference to it, ECF 73, at p. 7, the law of the case doctrine does not bar the Court's reconsideration of a prior decision when there has been a change in controlling authority, or when the prior decision was clearly erroneous. *Evans v. City of Chicago*, 873 F.2d 1007, 1014 (7th Cir. 1989); *Napoli v. Sears, Roebuck & Co*, 858 F. Supp. 101, 102 (N.D. Ill. 1994); *Cygnar v. City of Chicago*, 1990 WL 17111 at *3 (N.D. Ill., Feb. 7, 1990) (Leinenweber, J.) (intervening change in law justified reconsideration). As explained above, both of these exceptions apply here.

requiring an agency relationship, the Seventh Circuit has recently come to the opposite conclusion. *Wetzel v. Glen St. Andrew Living Community, LLC,* 901 F.3d 856 (7th Cir. 2018), *cert. dismissed*, 139 S. Ct. 1249 (2019). According to *Wetzel*, no agency relationship is required for an owner defendant to be found liable under the FHA for the bad acts of a third party.[4] Second, to the extent the Court's previous opinion relied upon the Trust Indenture Act ("TIA") and cases thereunder, it did so without the benefit of briefing. The Trustee Defendants have never relied on the TIA, and still do not. As shown below, the TIA has no bearing on the PSAs like those involved in this case, and the Court's reliance on the TIA was clearly erroneous.

1. ***Wetzel* Establishes That No Agency Relationship Is Required To Sustain Liability Under The Fair Housing Act**

In *Wetzel v. Glen St. Andrew Living Community, LLC*, the Seventh Circuit held that the FHA permits liability to be imposed on a landlord who has knowledge of tenant-on-tenant harassment but is deliberately indifferent to that harassment. 901 F.3d at 864. The Seventh Circuit expressly rejected the argument, raised by the Trustees here and assumed by this Court in its prior opinion, that an agency relationship is required. "[W]e have not gone that far: we have said only that the duty not to discriminate in housing conditions encompasses the duty not to permit known harassment on protected grounds." *Id.* "It makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer…," liability attaches if the defendant had available means to affect the conduct, but failed to do so. *Id.* at 865, *quoting Dunn v. Washington,* 429 F.3d 689, 691 (7th Cir. 2005).

---

[4] The *Wetzel* decision was issued after the parties here had completed briefing on the Defendants' Motion to Dismiss the original complaint. Unfortunately, the Court's opinion was issued the same day that Plaintiffs attempted to bring the *Wetzel* decision to the Court's attention, *see* ECF 52, 53, 55, 56.

3

Here, once the Trustees became the owners of real estate after foreclosure, they assumed all the rights of ownership and control inherent in that capacity,[5] and also exposed themselves to the liabilities all property owners face, including responsibility for real estate taxes, zoning and code compliance, nuisance avoidance and abatement, and compliance with other laws imposing duties on landowners, such as the FHA. *E.g., Wetzel, supra*, 901 F. 3d at 864 (landlord has control over premises); *Culli v. Marathon Petroleum Co.,* 862 F.2d 119, 123 (7th Cir. 1988) (owners of property have duty to maintain property in reasonably safe condition); *In re OBT Partners*, 214 B.R. 863, 868 (N.D. Ill. 1997), *motion for leave to appeal denied*, 218 B.B. 418 (N.D. Ill. 1998)(property owner is liable for payment of taxes); *See In re Foreclosure Cases*, 2007 WL 3232430, at *3, n.3 (N.D. Ohio Oct. 31, 2007) ("the financial institutions know the law charges the one with title . . . with maintaining the property"). These legal responsibilities that flow from title ownership exist by operation of law, and are not constrained by the terms of private contractual arrangements, such as trustee documents: "Contract law is not the exclusive source of a landlord's duties or powers. Property law governs [these] relations as well." *Wetzel,* 901 F.3d at 865. A PSA can lawfully allocate and assign duties and responsibilities between the parties to the PSA; however, it cannot change the legal obligations of a trustee to third parties, to persons who come into contact with properties owned by the trust, or to the public at large.[6]

---

[5] As titled owners of property after foreclosure, the Trustees had the absolute right to possess, control, and maintain the properties. "One of the main rights attaching to property is the right to exclude others." *Byrd v. U.S.,* 138 S. Ct. 1518, 1527 (2018); *Wetzel,* 901 F.3d at 866. As owners of the REO properties at issue, the Trustees could have maintained them, paid taxes due, or removed nuisances existing on them, regardless of the existence or terms of the PSAs.

[6] It is a basic tenet of fair housing law that the terms of contractual arrangements between defendants cannot serve to limit, and have no bearing on, their liability to third persons. See cases cited by the Court in ECF 54 at 12; *Cato v. Jilek*, 779 F. Supp. 937, 946 n. 21 (N.D. Ill. 1991) (owner of property who defers to agent's discriminatory behavior is liable under the FHA). The FHA's prohibition against a party offloading its responsibilities under the Act is also reflected in cases holding that the owner or developer of a property cannot assert an indemnity claim against the project's architect for FHA design violations. *Equal Rights Center v. Niles Bolton Associates*, 602 F.3d 597 (4th Cir. 2010); *United States v. Shanrie Co., Inc.*, 610 F. Supp.2d 958 (S.D. Ill. 2009); *Chicago Housing Authority v. DeStefano and Partners*, 45

*Hollins v. Kraas*, 369 F. Supp. 1355 (N.D. Ill. 1973), does not suggest otherwise. In *Hollins* the allegedly discriminatory behavior had nothing to do with the bank trustee's ownership of title, and there were no duties attendant to title ownership that related to the discriminatory acts. Here, in contrast, the duty at issue (property maintenance) is imposed by law upon the titled owner of the property. Moreover, the SAC now expressly alleges an agency relationship between the Servicers and the Trustees, a fact not alleged in *Hollins*. 369 F. Supp. at 1358 ("[T]he defendants . . .never authorized the Kraases to act as their agents . . . .").

The Trustee Defendants have no answer to *Wetzel*. Despite their awareness of it and the Plaintiffs' extensive reliance on it, see ECF 52, 53, 55, 56, 66, 67, they do not mention it or address its underlying rationale in their Supplemental Memorandum.

The conclusion that the PSAs do not alter the Trustees' legal responsibilities for REO maintenance is confirmed by two decisions from the Southern District of Ohio. In *City of Cincinnati v. Deutsche Bank Nat'l. Tr. Co.*, 897 F.Supp. 2d 633 (S.D. Ohio 2012), the plaintiff city sought to abate nuisances on REO properties owned by Deutsche Bank and other banks holding title as trustees. The Deutsche Bank Trustee Defendants sought dismissal of the complaint on the pleadings, "claim[ing] that they are not responsible for trust-owned properties because unnamed servicers are responsible for property maintenance." *Id. at* 643-44. The Court rejected the argument, observing that the servicers were not identified in property title documents, and that the PSAs did not confer property ownership on them. *Id. at* 644. Subsequently, the Court rejected similar arguments made by another bank defendant, stating:

In denying Defendants' motion to dismiss an earlier version of the City's complaint,

---

N.E. 3d 767 (Ill. App. 1st Dist. 2016). These decisions reason compliance with the FHA is "non-delegable," and it would thwart the statutory purposes if a party could insulate himself from liability for discrimination by shifting the responsibility for preventing it to someone else. *Niles Bolton Assoc.*, 602 F.3d at 602. As in the present case, allowing the property owner to transfer liability to a third party would be "antithetical" to the purposes of the Act and diminish incentives to insure compliance. *Id.*

5

> this Court noted that the servicers are not identified in any property title documents, and that the PSAs do not confer property ownership on the servicers. These observations have been borne out by the summary judgment motions and evidence submitted by both parties. . . . Servicers may well have contractual obligations to the trustee, and/or RMBS trust, its investors and certificate holders. But it is clear to the Court that servicers are not owners of property.

*City of Cincinnati v. Deutsche Bank National Trust Co.*, 2016 WL 2897472, at *7 (S.D. Ohio May 18, 2016). Similarly, in *People of the State of California v. U.S. Bank National Association*, Case No. BC488436 (Sup. Ct. Cal. Jan. 25, 2013), the Court rejected the defendant bank's argument that it was not responsible for the maintenance of REO properties the bank owned as trustee for various RMBS trusts. In that case, the Court granted the State summary judgment as to trustee liability, refusing to accept the Bank's contention that securitization trusts are "different legal animals." (Ex. A, Soule Decl., Ex. 1, Mem. Op. at 2-5; Reply Br. at 5).

These holdings effectuate regulatory guidance regarding the obligations of financial institutions who assume ownership of foreclosed properties. According to the Office of the Comptroller of the Currency, "In acquiring title to foreclosed properties, a bank assumes the primary responsibilities of an owner, including providing maintenance and security, paying taxes and insurance, and serving as landlord for rental properties." Ex. A-2, Office of the Comptroller of the Currency, Comptroller's Handbook: "Other Real Estate Owned" at 19 (Sept. 2013). The Federal Reserve Board has similarly observed:

> Institutions should have policies and procedures in place to ensure that properties are maintained in compliance with federal, state, and local laws, including laws governing health and safety, property preservation, fair housing and property registration. . . . .Further, institutions engaging third-party vendors to carry out functions related to these requirements should ensure that vendors maintain appropriate compliance controls. Reliance on third-party vendors does not relieve an institution of its compliance responsibilities or liability.

Ex. A-3, Federal Reserve Board, Questions and Answers For Federal Reserve-Regulated Institutions Related to the Management of Other Real Estate Owned Assets, at 11.

## 2. The Trust Indenture Act Does Not Apply

The Trustee Defendants place weight on the legal distinctions between "indenture" trustees and "ordinary" trustees. ECF 73 at 5-7. In its previous opinion the Court also relied on the notion that "ordinary and indenture trustees are different," and proceeded to examine the duties and obligations imposed on "indenture trustees" by the Trust Indenture Act, 15 U.S.C. §77ooo(a)(1) ("TIA"). ECF 54 at 15.

Plaintiffs submit that any such distinction is irrelevant under the FHA, because the FHA does not distinguish between the two kinds of trustees for purposes of compliance with the Act. The cases relied upon by the Trustee Defendants, ECF 73 at 5-6, all involve disputes between parties to the trust agreements or claimed beneficiaries thereunder. In such disputes, the terms and limitations of the trust at issue might be relevant. However, "a contract cannot bind a non-party." *Northbound Group, Inc. v. Norvax, Inc.,* 795 F.3d 647, 650 (7th Cir. 2015).[7]

In any event, a further problem with the Court's prior analysis is that the TIA does not apply to trustees of residential mortgage-backed securities (RMBS) governed by Pooling and Servicing Agreements. *Ret. Bd. Of the Policemen's Ann. and Ben. Fund v. Bank of N.Y. Mellon*, 775 F.3d 154, 163-69 (2nd Cir. 2014) ("BNYM"). *Accord, Phoenix Light SF Ltd v. Deutsche Bank Trust Co.*, 172 F. Supp.3d 700, 706 n. 1 (S.D. N.Y. 2018) (TIA does not apply to claims

---

[7] Distinguishing between "types" of trustees would conflict with the plain language of the Fair Housing Act, which contains no such distinction, and specifically identifies "trustees" and "fiduciaries" as persons subject to the Act. 42 U.S.C. § 3602(d). The Act's broad definitional language has been held to include any entities that can be reasonably interpreted as coming within its scope. *See Village of Bellwood v. Gladstone Realtors*, 569 F.2d 1013, 1020 n.8 (7th Cir. 1978), *aff'd in part*, 441 U.S. 191 (1979)(interpreting FHA as extending to "municipal corporations," although only "corporations" are referred to in the Section 3602(d)). Consistent with the language of the statute, trustees are routinely named as defendants in claims brought under the FHA without any suggestion that they are immune under the Act, or that the terms of the trust agreement govern their liability. *See Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, *on denial of reh'g*, 125 F.3d 1281 (9th Cir. 1997); *Metropolitan Fair Housing Council of Oklahoma v. Pelfrey*, 292 F.Supp.3d 1250 (W.D. Okla. 2017).

7

against trusts covered by PSAs); *American Fidelity Assurance Co. v. Bank of New Mellon*, 2018 WL 6582381 at *4 (W.D. Okla. Oct. 31, 2018); *Royal Park Investments SA v. HSBC Bank USA*, 109 F. Supp. 3d 587, 611 (S.D. N.Y. 2015). This is also the position of the U.S. Securities and Exchange Commission. *BNYM,* 775 F.3d at 169. All the cases relied upon by the Court in its previous opinion interpreted the TIA, which does not apply. At issue in those cases was whether the trustee had only limited obligations to trust beneficiaries under the TIA, or whether the trustees owed them additional state law common law duties beyond those set forth in the TIA. None of those cases dealt with the question of what duties and obligations trustees – indenture or otherwise – have to third parties under other laws.[8] As noted above, other courts have allowed claims relating to the maintenance of REO properties to proceed against RMBS trustees, without noting any supposed bar in the TIA.[9]

On top of all this, the "sample" PSA is *not* an indenture trust. *See* ECF 73-3, Kliebard Decl. Ex. B; ECF 70 ¶66 fn. 3, nor are many other PSAs relating to the Deutsche Bank REO properties that Plaintiffs have reviewed. Tellingly, the Trustees never cite to, or rely in any way upon, the Trust Indenture Act. *See* ECF 72, 73.

### B. The PSAs Confirm an Agency Relationship

Although *Wetzel* does not require it, Plaintiffs have added allegations to their SAC, clearly asserting that the Servicer Defendants acted as the agents for the Trustee Defendants in connection with REO maintenance. The terms of the typical PSAs confirm such an agency

---

[8] Even if the TIA applied to the RMBS trusts involved in this case, it would not preempt application of the Fair Housing Act. *See, e.g., United Farm Bureau v. Metropolitan Human Relations Comm'n,* 24 F.3d 1008, 1016 (7th Cir. 1994) (McCarran-Ferguson Act does not preclude application of the FHA to claims of redlining).

[9] The Court also referenced the HUD No Cause Determination to support its analysis on this issue, and the Trustees continue to do so as well. ECF 73 at 14. As demonstrated in Plaintiffs' Memorandum in Response to Joint Motion, the accompanying HUD Determination is neither admissible nor authoritative.

relationship. ECF 70 at ¶¶66-78. And as shown in Section C, below, an agency relationship is also alleged as a matter of fact by virtue of the manner in which the Defendants interacted with each other, aside from the existence or terms of the PSAs. ECF 70 at ¶¶35, 60, 64, 125, 292.

Whether an agency relationship exists for purposes of the FHA is a question of federal law, *City of Chicago v. Matchmaker Real Estate Sales Center, Inc*., 982 F.2d 1086, 1097 (7th Cir. 1992), which can be resolved as a matter of law only if the undisputed facts support one conclusion. *Clarendon Nat. Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011). Here, according to the terms of the sample PSA referenced in the SAC, the Servicer is "*authorized and empowered by . . . the Trustee*" to take various actions . . . "*on behalf of the Trustee . . .*" ECF 70 at ¶67. The Servicer is required to "actively market[]" REO properties for sale *for the benefit of the Trust*. *Id*. ¶68. Accounts created by the Servicer with a depository institution are maintained "*for the benefit of the Trustee* on behalf of the Certificateholder." (Definition of "Certificate Account"). *Id*. ¶69. In addition, the Servicer is required to "promptly deliver to the Trustee . . . the originals of other documents or instruments constituting the Mortgage File that come into the possession of the Servicer," and the Servicer is "*authorized and empowered by the Trustee*, on behalf of the Certificateholders and the Trustee," to register loans on the MERS(R) system (Mortgage Electronic Registration System) or remove them from it. *Id*. ¶¶70-71.

The sample PSA further provides that "all mortgage files and funds collected or held by, or under the control of, the Servicer in respect of any Mortgage Loans (a term which includes 'REO properties,' Definitions, p. 17)", are held by the Servicer "*for and on behalf of the Trustee*." ECF 70 at ¶74. The Servicer must *account fully to the Trustee* for any funds it receives or otherwise collects as Liquidation Proceeds or Insurance Proceeds in respect of any Mortgage Loan. ECF 70 at ¶75. The Servicer agrees to hold and retain possession of documents *for the*

9

*benefit of the Trustee*, solely for the purposes provided in the Agreement. ECF 70 at ¶76.[10]

Besides the "sample" PSA, the Deutsche Bank Defendants also produced to Plaintiffs tens of thousands of pages of additional PSA documents that may apply to the properties investigated by Plaintiffs. (*See* ECF 73-1, ¶9). This is the kind of massive document production a party would expect to receive *in discovery* and carefully review and probe through depositions. In such circumstances, Plaintiffs would also seek to discover from an operational perspective what pertinent emails and other communications were transmitted between Deutsche Bank, other parties to the PSAs and the ultimate servicers at the inception of the PSA, at junctures when servicers were hired for REO property maintenance, and during the course of REO property ownership by the Deutsche Bank Defendants. Relevant information would include instances of discussion, consultation or oversight regarding the maintenance of REO properties, including communications in the wake of the NFHA reports that were disseminated. Even during the short time that this cache of PSAs has been in Plaintiffs' possession, and without the benefit of related necessary discovery, it has become apparent that the new PSA documents contain even stronger language indicating an agency relationship. For example, some of these PSAs require the Servicer to "manage, conserve, protect and operate REO property *for the Trustee*" for the

---

[10] In addition, the Trustee Defendants can assume responsibilities for managing, performing or monitoring the servicing activities of Ocwen, Altisource or other servicers, as a sort of "back-up" servicer. ECF 70 at ¶¶77, 79-83. For example, the Trustee Defendants must execute a "Performance Certification" certifying "compliance with the Servicing Criteria of Regulation AB," and requiring the Deutsche representative to certify that s/he is "responsible for reviewing the activities performed by the Trustee *as a person 'performing a servicing function'* under the Pooling and Servicing Agreement." *Id.* at 77. Other provisions of the PSA require the Trustee (i.e., Deutsche Bank) to assume "all of the rights and obligations of the Servicer" under the PSA in the event of an event of default or or "if for any reason" the Servicer is no longer the Servicer under the PSA. ECF 70, at ¶79. The Trustees' own Exhibit, ECF 73-2 Ex. A, Col. 4 confirms the requirement that the Trustee may be required to serve as "back-up servicer." The Trustee Defendants argue that these "back-up servicer" provisions of the PSA (1) are irrelevant because they are only theoretical possibilities which are not triggered until a default occurs, and (2) are not alleged to have been triggered in fact. ECF 73 at 12-13. But of course their very *existence* in the PSA is important, because they affirm the notion that the Servicers' activities are *for the benefit of the Trustee*.

purpose of its prompt disposition and sale. (Ex. A-4 to attached Soule Decl. at DBNFHA61183; DBNFHA24036; DBNFHA50406). Others state that the Servicer "remains *obligated and primarily liable to the Trustee*" … for the servicing and administration of loans. (*Id.* at DBNFHA23222; DBNFHA61169; DBNFHA100607-8; DBNFHA32932). Still others require the Servicer to periodically notify Deutsche of "the status of each REO property" and provide annual reports to the Trustee regarding compliance with applicable servicing criteria. (*Id.* at DBNFHA32949; DBNFHA85250; DBNFHA61788; DBNFHA87560).

This language bears the hallmarks of an agency relationship and strongly weighs against dismissal of the Deutsche Bank Defendants. *Muick v. Glenayre Electronics,* 280 F.3d 741, 742-43 (7th Cir. 2002) (agency relationship created when the agreement obligates the agent to act "on behalf of" the principal); *Midwest Trading Group, Inc. v. GlobalTranz Enterprises, Inc.*, 59 F. Supp.3d 887, 892-893 (N.D. Ill. 2014), *opinion denying reconsideration*, 2015 WL1043554 (N.D. Ill. Mar. 15, 2015) (agent is one who undertakes to manage some affairs for another and to render an account). While the Trustees acknowledge that PSAs delegate "property maintenance responsibilities" to the Servicer Defendants, ECF 73 at 6-7, 9, their position appears to be that the existence of this written delegation of responsibility *destroys* any agency relationship between the owners of REO property and the servicers who maintain it. This position is neither logical nor supportable by the law, and the Trustees cite none.

Finally, the Trustees argue that no agency relationship can exist under the sample PSA provisions because the parties to the PSAs are "independent parties" with "separate and distinct roles" and because under the PSAs the Trustees "cannot control the manner and method" by which the servicers perform maintenance[11] duties. ECF 73 at 7-9. But of course any

---

[11] The Trustees argue that none of the sample PSA provisions cited by Plaintiffs in their SAC suggest any agency responsibilities expressly relating to "maintenance" of REO properties. ECF 73 at 10-11. The

11

"independent contractor" nature of a relationship is irrelevant: "[T]his argument has consistently been rejected in Fair Housing cases." *City of Chicago v. Matchmaker,* 982 F.2d at 1097. And to establish a principal-agent relationship, it is not necessary that the principal actually *exercise* any control; rather, the test is whether the principal has the *right* to control. *Schutz v. Arrow Financial Services, LLC*, 465 F. Supp.2d 872, 877 (N.D. Ill. 2006). Nor is it relevant whether under the terms of the PSA the Trustees "play no role in the day-to-day servicing" of the mortgage loans within the trust. ECF 73 at 6. *See Reed v. Michael Realty & Associates, Inc.,* 1994 WL 559225 at *2 (N.D. Ill., Oct. 7, 1994) (summary judgment denied to owner of property who had "no involvement in the day-to-day management" of the building). A person may be an agent although the principal lacks the right to control the *full range* of the agent's activities. *U.S. v. Pangang Group Co., Ltd.*, 879 F. Supp. 2d 1052, 1063 (N.D. Cal. 2012); cf. *Wetzel,* 901 F. 3d at 865 ("control in the absolute sense, however, is not required for liability" under the FHA).[12]

  Further contradicting Defendants' argument is the fact that the PSAs typically empower the Trustee to notify a Servicer of a breach of material provisions of the agreement, which include non-compliance with applicable laws, (thereby terminating servicer rights and obligations). (Ex. A-4; DBNFHA50390, 50435, 50436) Again, this reflects Trustee control over

---

provisions of the additional PSA's made available to Plaintiffs contradict this assertion. *See* DBFHA61183 ("Servicer shall manage, conserve, protect and operate REO property for the Trustee . . ."); DBNFHA24036 (same)(Soule Decl. Ex. A-4). Moreover, Plaintiffs' position is that the PSA creates an agency relationship between the parties with respect to servicing functions *in general*, which Defendants admit include REO maintenance. *See also* ECF 73-3 ¶73-4, Ex. B at §3.12 (REO maintenance) and p. 35 (Definition of "Servicing Advances").

[12] This Court's decision in *Kindra Lake Towing, L.P. v. Donat Ins. Servs, LLC*, 2016 WL 5339438 at *2 (N.D. Ill., Sept. 20, 2016) (Leinenweber, J.), has no application here. For one thing, the claims asserted in that case arose under state law, and the Court was constrained to apply Illinois law to the facts alleged. Here, in contrast, Plaintiffs' claims arise under the FHA, and so federal law controls. Second, it was significant to the Court that the purported principals in *Kindra Lake* "contracted away their right" to the property in question (a barge). *Id.* at *6. Here, of course, the Trustee Defendants are the sole owners of, and control title to, the property being maintained by the Servicers. Finally, the Plaintiffs in *Kindra Lake* "expressly disavowed" reliance on an apparent agency theory. *Id.* at *8. Plaintiffs have not done so here.

the Servicers.[13]

### C. The SAC Alleges an Operational Agency Relationship Between the Trustee Defendants and the Servicer Defendants

The SAC also alleges that an operational agency relationship exists between the Trustee Defendants and the Servicer Defendants with respect to the maintenance of REO properties, regardless of the existence or terms of the PSAs. *See, e.g., Whitley v. Taylor Bean & Whitacker Mortgage Corp.*, 607 F. Supp.2d 885, 895 (N.D. Ill. 2009) (combination of written contract and operational relationship between defendants sufficient to allege agency); *Santora v. Starwood Hotel and Resorts Worldwide, Inc.,* 580 F. Supp.2d 673, 675 (N.D. Ill. 2008) (appearance of authority to act on principal's behalf is sufficient to allege agency). For example, the SAC alleges that the trustee, as legal owner of the property, is required under the FHA to maintain all REO properties in a non-discriminatory manner "whether or not there has been a contractual designation of maintenance and marketing responsibilities under a Pooling and Serving Agreement." ECF 70 at ¶60. Without reference to the PSA, the SAC alleges that "the *Deutsche Bank Defendants have utilized* Ocwen and/or Altisource to provide property maintenance services" for the Deutsche REO properties, ECF 70 at ¶¶35, 64, and that Ocwen and Altisource "provide property preservation and maintenance and other services for REO properties owned by the Deutsche Bank Defendants," ECF 70 at ¶3. The SAC also alleges that Deutsche used a marketing business model to sell the majority of its REOs via the Hubzu auction site through Ocwen/Altisource. ECF 70 at ¶¶94, 156, 292, 305. Of course, the Hubzu auction site or model is nowhere mentioned in any PSA. As to the relevance of the PSAs, the SAC alleges that the terms of any applicable PSAs "confirm" the existence of an agency relationship. ECF 70 at ¶66.

---

[13] Plaintiffs note that the summary table submitted by Defendants with their Supplemental Memorandum is limited to subjects Defendants seek to rely upon and does not address relevant provisions such as this.

13

Finally, one must ask: If the Servicer Defendants are not acting as the agents for the Trustee owners of the REO after foreclosure, for whom are they performing REO maintenance services? The Servicers must be maintaining REO properties for someone.

Considering the scope of their relationship in fact, duties imposed as a matter of law, and confirmatory language of the PSA, Plaintiffs have sufficiently alleged that the Servicer Defendants (i.e., Ocwen and Altisource) act operationally as agents for the trustee (i.e., the Deutsche Bank Defendants), and so their discriminatory behavior may subject the Trustee Defendants to liability on this basis, irrespective of provisions of the PSAs.[14]

## II.    THE HANDFUL OF FACTUAL DISCREPANCIES REGARDING TITLE OWNERSHIP OF INDIVIDUAL REO PROPERTIES OR THE TERMS OF INDIVIDUAL PSA AGREEMENTS ARE NOT GROUNDS FOR DISMISSAL

Finally, the Trustee Defendants contend that Plaintiffs' claims must be dismissed as to REO properties to which the Trustees did not hold title at the time of Plaintiffs' inspection, or as to properties for which the exact address listed in Appendix A to the SAC lacked sufficient details for Defendants to locate records, ECF 73 at 15.

These are strictly factual disputes or discrepancies that can be resolved after discovery is complete. They are not appropriate grounds for dismissal under Rule 12(b)(6). *George v. Colony Lake Property Owners Ass'n*, 2006 WL 1735345 at *2 (N.D. Ill. 2006) (Leinenweber, J.) (Rule 12(b)(6) is designed only to "test the sufficiency of the complaint, not to decide its merits"). And regardless of the accuracy of the Trustees' assertions, the omission of a few REO properties

---

[14] For many of the same reasons why *Kindra Lake* does not apply here, the other state law-based decisions relied upon by the Trustees also do not apply. *See* ECF 73 at 7-9. In the case most frequently cited by the Trustees, *Spano v. V&J National Enterprises, LLC*, 264 F. Supp. 3d 440 (S.D. N.Y. 2017), the plaintiff presented no facts or evidence in support of an agency relationship. No contract connecting the defendants to each other was alleged. No facts were alleged clothing the defendant with apparent authority. "Plaintiff's argument amounts to mere speculation." *Id.* at 451. In contrast, the Plaintiffs here rely on both the terms of a written document and the operational relationship of the parties.

14

would not affect the overall plausibility of Plaintiffs' claims. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Moreover, as addressed in the Declaration of Lindsay Augustine (Ex. B, attached), some of the discrepancies identified in the Kliebard Declaration are the result of simple typographical errors in the lengthy list of addresses in Appendix A to the SAC. Other assertions in the Kliebard Declaration are disputed, as Plaintiffs' investigation indicates that the properties were titled in Deutsche's name. (*Id.* at 9). These disputes about factual minutiae in the SAC have no bearing on whether Plaintiffs have sufficiently stated a claim for relief under the Fair Housing Act.

## CONCLUSION

For all the foregoing reasons, the Deutsche Bank Defendants' Motion should be denied.

Respectfully Submitted,

   */s/ Jennifer K Soule*

| | | |
|---|---|---|
| Jennifer K. Soule | Stephen M. Dane | Morgan Williams |
| James G. Bradtke | Yiyang Wu | *National Fair Housing Alliance* |
| Kelly K. Lambert | *Relman, Dane & Colfax PLLC* | 1331 Pennsylvania Ave, NW |
| *Soule, Bradtke & Lambert* | 1225 19th Street, N.W. | Suite 650 |
| 402 Campbell Street | Suite 600 | Washington, DC 20004 |
| Suite 100 | Washington, DC 20036 | *Attorney for Plaintiffs* |
| Geneva, IL 60134 | *Attorneys for Plaintiffs* | |
| *Attorneys for Plaintiffs* | | |

Dated: July 8, 2019