**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, et al.,<br><br>    Plaintiffs,<br><br>            v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>    Defendants. | Case No. 18-cv-00839<br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier<br><br>Jury Trial Demanded |

## NOTICE OF FILING

Pursuant to the Court's July 24, 2019 Order, Plaintiffs hereby file the attached opinion in

*National Fair Housing Alliance, et al. v. Bank of America, et al.*, 2019 WL 3241126 (D. Md.

July 18, 2019).

                                                                       Respectfully Submitted,

                                                                      */s/ Jennifer K Soule*

| | | |
|---|---|---|
| Jennifer K. Soule<br>James G. Bradtke<br>Kelly K. Lambert<br>*Soule, Bradtke & Lambert*<br>402 Campbell Street<br>Suite 100<br>Geneva, IL 60134<br>*Attorneys for Plaintiffs* | Stephen M. Dane<br>Yiyang Wu<br>*Relman, Dane & Colfax PLLC*<br>1225 19th Street, N.W.<br>Suite 600<br>Washington, DC 20036<br>*Attorneys for Plaintiffs* | Morgan Williams<br>*National Fair Housing Alliance*<br>1331 Pennsylvania Ave, NW<br>Suite 650<br>Washington, DC 20004<br>*Attorney for Plaintiffs* |

Dated: July 25, 2019

2019 WL 3241126
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

NATIONAL FAIR HOUSING ALLIANCE, et al.,

v.

BANK OF AMERICA, N.A., et al.,

Civil No. CCB-18-1919
|
Signed 07/18/2019

**Attorneys and Law Firms**

Andrew David Freeman, Jean Mary Zachariasiewicz, Brown Goldstein and Levy LLP, Baltimore, MD, Morgan Williams, Pro Hac Vice, National Fair Housing Alliance, Washington, DC, for National Fair Housing Alliance.

Andrew David Freeman, Jean Mary Zachariasiewicz, Brown Goldstein and Levy LLP, Baltimore, MD, for Housing Opportunities Project for Excellence, Inc., Metro Fair Housing Services, Inc., North Texas Fair Housing Center, Fair Housing Center of West Michigan, Fair Housing Continuum, Inc., South Suburban Housing Center, H.O.P.E. Inc., Metropolitan Milwaukee Fair Housing Council, Fair Housing Center of Central Indiana, Denver Metro Fair Housing Center, Fair Housing Opportunities of Northwest Ohio, Inc., Greater New Orleans Fair Housing Action Center, Inc., Fair Housing Advocates of Northern California, Housing Research and Advocacy Center, Fair Housing Center of Northern Alabama, Miami Valley Fair Housing Center, Connecticut Fair Housing Center, Fair Housing Council of Greater San Antonio, Fair Housing Center of the Greater Palm Beaches, Inc., Wanda Onafuwa, Chevelle Bushnell, Jalen Bushnell.

Anthony Michael Alexis, Sr., Pro Hac Vice, Brooks Brown, Pro Hac Vice, Keith Eric Levenberg, Thomas M. Hefferon, Goodwin Procter LLP, Washington, DC, Ava E. Lias Booker, Melissa O. Martinez, McGuireWoods LLP, Baltimore, MD, Bradley R. Kutrow, Pro Hac Vice, McGuireWoods LLP, Charlotte, NC, for Bank of America, National Association.

Maryan Alexander, Wilson Elser Moskowitz Edelman and Dicker LLP, Baltimore, MD, David M. Holmes, Pro Hac Vice, Wilson Elser Moskowitz Edelman and Dicker LLP, Chicago, IL, for Safeguard Properties Management, LLC.

**Memorandum**

Catherine C. Blake, United States District Judge

*1 This is a large-scale effort to hold Bank of America, N.A. and its primary home-maintenance contractor, Safeguard Properties Management LLC ("Safeguard"), liable for deteriorating conditions found in many foreclosed bank-owned real estate properties. The central claim here is that Bank of America and Safeguard disproportionately neglect their home-maintenance duties in communities of color, while tending more closely to foreclosed properties in white neighborhoods. In addition to the National Fair Housing Alliance ("NFHA"), the plaintiffs are private fair housing organizations and individual home-owners who allegedly have been harmed by the defendants' conduct. The lead claims are the plaintiffs' allegations of intentional discrimination and disparate impact brought under various sections of the Fair Housing Act ("FHA"), which are accompanied by ancillary arguments under the FHA and two addendum common law nuisance claims. At issue here are the defendants' motions to dismiss this action, which are argued both on the merits and, for certain claims (and certain plaintiffs), on standing, jurisdiction, and timeliness grounds. The facts pled raise a reasonable inference that the defendants violated anti-discrimination provisions of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and the threshold legal arguments for dismissal are not persuasive at this stage of the case. Therefore, the motions will be denied.

**BACKGROUND**

The bundling of subprime mortgages into prime-rated securities contributed to a financial crisis in 2008 that left in its wake an era of widespread bank-owned real estate. Known as "real estate owned" properties ("REOs"), at issue here are homes upon which Bank of America foreclosed and which the bank, in turn, was unable to sell at a foreclosure sale. Bank of America P&A Mot. Dismiss at p. 12, ECF No. 44-1.[1] This case concerns an extensive seven-year (2011-2018) investigation by the plaintiffs into Bank of America's "maintenance and marketing" of REOs in its possession. Compl. ¶ 6. The investigation concluded that "[a]cross the board, properties located in communities of color were much more likely to have numerous objective routine maintenance and marketing deficiencies than the

Bank of America-owned homes located in white areas[ ]" and concluded that there has been a "systemic and particularized pattern of differential treatment ... on the basis of race, color, and/or national origin." Compl. ¶ 7.

1     All citations to the record will refer to the ECF pagination.

The data collected by the plaintiffs, presumed to be true here, are copious. A somewhat rough recitation goes like this: The plaintiffs developed a list of 37 "objective aspects" of routine exterior maintenance and marketing of REO properties. Compl. ¶ 6. They then examined 1,677 properties owned by Bank of America after foreclosure in both "predominantly white communities" and "communities of color." Compl. ¶¶ 5-6, 64. They conducted this investigation in 37 different metropolitan areas, including Baltimore and Prince George's County/Washington, D.C. Compl. ¶ 7, 65. The plaintiffs selected zip codes within each of the 37 metropolitan areas that were "racially concentrated with the highest foreclosure rates, and from those zip codes chose the ones with high homeownership rates that qualified as working- or middle-class neighborhoods, based on comparing the zip codes' median income to those of the metropolitan statistical area and the state" to conduct their study. Pls' Opp'n Defs' Mot. Dismiss at p. 13, ECF No. 55; Compl. ¶ 67. Within them they "inspected 100% of the Bank of America-owned homes ... in the same time period, unless the properties appeared to be occupied, someone at the property said they were the new owners, or work was actively occurring at the time of the testers' visit." Pls' Opp'n Defs' Mot. Dismiss at p. 13, ECF No. 55; Compl. ¶ 67. Once collected, they subjected these data to regression analyses, ostensibly to isolate any independent variable(s). Compl. ¶ 87.

\*2 The plaintiffs derive one central conclusion from their investigation: there are "significant disparities in the routine exterior maintenance and marketing of Bank of America-owned homes in communities of color as compared to white communities" that cannot be explained by factors other than the racial composition of the community in which the property is located. Compl. ¶ 6, 87. They found that in each metropolitan area examined, "Bank of America-owned homes located in predominantly white census block groups were better-maintained and exhibited fewer objective routine maintenance and marketing deficiencies than Bank of America-owned homes located in neighborhoods comprised primarily of African Americans and/or Latinos." Compl. ¶ 7. Their regression analyses controlled for myriad factors including prior sale prices, dwelling size, and lot size, and concluded that "the disparities uncovered by the Organizational Plaintiffs' testing cannot be explained by non-racial factors." Compl. ¶ 8, 87. It is upon this conclusion that the plaintiffs' claims are predicated.

The plaintiffs advance seven claims in their detailed 113-page Complaint. Counts I-V allege that the defendants; actions violate 42 U.S.C. § 3604(a), § 3604(b), § 3605, § 3617, and the FHA's general prohibition on actions perpetuating housing segregation. The plaintiffs make their case for discrimination under both intentional discrimination (disparate treatment) and disparate impact theories, which they outline first (and at length) before asserting specific discrimination allegations in their more abbreviated count-specific arguments. Count VI and Count VII are private nuisance claims brought by individual plaintiffs only. Bank of America and Safeguard both move to dismiss the complaint for failure to state a claim under the operative pleading standard. They put forth standing, jurisdiction, and timeliness grounds for dismissal for a substantial subset of the plaintiffs' claims.

## ANALYSIS

### I. Standard of Review

When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must

allege sufficient facts to establish those elements." *Walters*, 684 F.3d at 439 (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.' " *Id.* (quoting *Twombly*, 550 U.S. at 570).

**II. Discussion**

At issue in the present motions to dismiss are both merits arguments pertaining to the sufficiency of the plaintiffs' pleadings and a variety of threshold legal questions concerning standing, personal jurisdiction, and timeliness. While not purported to be dispositive of the entire case, these latter concerns are best discussed first to properly define the contours of the merits inquiry to follow.

A. Threshold Matters

*a. Standing*

**\*3** The defendants contend that the organizational plaintiffs, fair housing groups from around the country that together mounted the investigation, lack standing because they have not sufficiently traced the defendants' alleged wrongdoing to their respective injuries. The plaintiffs argue that diversion of resources and frustration of mission are cognizable injuries under the FHA, that all plaintiffs in this case have incurred some amount of injury, and that requiring a precise accounting of their respective loss at this stage is more than Article III requires. A ruling to the contrary, they say, would lead to claim splitting and redundant litigation. While the defendants do not concede that even the National Fair Housing Alliance has standing, their primary dispute relates to the smaller organizational plaintiffs, who, they say, may have had no part in the investigation of REOs in Maryland.

An organization can establish standing either as a representative of its members or on its own behalf. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). The tests are different. Here, the plaintiffs contend that they have direct standing in their own right, *see* Pls' Opp'n Defs' Mot. Dismiss at pp. 51-54, ECF No. 55, and thus the test to be applied is "the same inquiry as in the case of an individual[.]" *Havens Realty Corp.*, 455 U.S. at 378. *Lujan*'s tripartite framework governs. The plaintiffs must present (1) an injury-in-fact, (2) causation (the injury's connection to the actions of the defendant), and (3) the likelihood of redress in federal court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). But additional prudential standing requirements need not be satisfied because this is a fair housing action. *Havens Realty Corp.*, 455 U.S. at 372 ("courts ... lack the authority to create prudential barriers to standing" in FHA cases). Instead, organizational standing in FHA cases exists to the outer limits of Article III's case or controversy requirement. *Id.* Here, while the parties spar over all three standing requirements, the lion's share of the briefing concerns injury-in-fact.

The plaintiffs have sufficiently pled an injury-in-fact to establish standing at this stage. In *Havens*, the organizational plaintiff alleged that it had been "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. [The organization] has had to devote significant resources to identify and counteract the defendant's *[sic]* racially discriminatory steering practices." *Id.* at 379. The court then reasoned, "[i]f, as broadly alleged [the defendants'] steering practices have *perceptibly impaired* [the organizational plaintiff's] ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact." *Id.* (emphasis added). It concluded: "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests[.]" *Id.* (contrasting the specificity of the injury alleged with that alleged in *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). In *Equal Rights Ctr. v. Equity Residential*, the court noted that plaintiffs must only allege facts showing that "the defendants' actions either have caused the organization to divert resources to identify and counteract the defendants' unlawful practices, or that the challenged actions have frustrated plaintiff's mission." 483 F. Supp. 2d 482, 486-87 (D. Md. 2007) (adding further that "the very fact that plaintiff undertook a nationwide investigation of defendants' violations is proof positive of plaintiff's concrete injury; the resources devoted to the two-year investigation were clearly 'diverted.' Nothing more is required."); *see also Ragin v. Harry Macklove Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (reasoning that the investigation which formed the basis of the complaint was also an independent activity aimed at identifying and counteracting the discriminatory actions); *Williams v. Poretsky Mgmt, Inc.*, 955 F. Supp. 490, 494 (D. Md. 1996) (plaintiff established organizational standing by alleging it had "devoted significant resources to identifying and counteracting the defendant's practices, and because time was spent on these efforts, the organization was prevented from spending time on other efforts to end discrimination in

the housing area"); *Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 720-25 (D. Md. 2011) (addressing proof of standing at the summary judgment stage).

 ***4** Here, the defendants' actions have perceptibly impaired the organizational plaintiffs' varied efforts to stem segregated housing in American cities. *See Havens Realty Corp.*, 455 U.S. at 379. The defendants' effort to distinguish *Havens* and the cases that apply it in this district are not persuasive. Bank of America argues that the plaintiffs were not conscripted to perform this investigation, that they must plead affirmative losses beyond the cost of litigation (like the cost of additional counseling services in *Havens*), and that, in essence, the harm pled is merely a setback to the plaintiffs' "abstract social interest." *Havens Realty Corp.*, 455 U.S. at 379. Most circuits to have contemplated the issue have held that the costs of investigating discriminatory conduct alone can give fair housing organizations standing. *Compare Ragin*, 6 F.3d at 905; *Alexander v. Riga*, 208 F.3d 419, 427 n.4 (3d Cir. 2000); *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993); *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990); *Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co.*, 160 F.3d 433, 434-35 (8th Cir. 1998); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002); *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 640-42 (11th Cir. 2000) *with Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994); [2] *La. ACORN Fair Horn. v. LeBlanc*, 211 F.3d 298, 305-06 (5th Cir. 2000). And yet even if the cost of investigation alone does not confer standing (each organizational plaintiff specifies down to the hour the time spent on this investigation, *see* Compl. ¶¶ 161-252), the plaintiffs have adequately pled the diversion of resources away from other pursuits, frustration of mission, impairment to their community investment programs, and educational and advocacy efforts that were needed to mitigate the downstream effects of the defendants' allegedly discriminatory home maintenance. Compl. ¶¶ 150-159. Under *Havens* and its application in the Fourth Circuit, the facts pled are sufficient to confer organizational standing for purposes of the present motion to dismiss. Any additional argument that the plaintiffs must disaggregate costs incurred goes not to the presence of an injury but to its extent—and is thus best saved for summary judgment.

2   The D.C. Circuit has since cabined *BMC*, noting that "while the diversion of resources to litigation or investigation in anticipation of litigation does not constitute an injury in fact sufficient to support standing, ... alleged diversion of resources to programs designed to counteract the injury to its interest in promoting fair housing could constitute such an injury." *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011).

Bank of America's redressability argument is only that compensating the plaintiffs for the costs of bringing this lawsuit will not promote their mission of eliminating racial segregation. Bank of America P&A Mot. Dismiss at pp.42-43, ECF No. 44-1. Safeguard additionally contends that both the injury-in-fact and its possible avenues of redress are "too remote and speculative" for standing purposes, *Greengael, LC v. Bd. of Supervisors*, 313 Fed. App'x. 577, 581 (4th Cir. 2008), [3] because "no specific person or group of persons was allegedly denied access to housing because of race[.]" Safeguard P&A Mot. Dismiss at p. 33, ECF No. 41-1. While the appropriate type and scale of any remedy may require further discussion, it is within the court's power to issue the injunctive, declaratory, and monetary relief sought. Thus, as a constitutional matter, there is no redressability impediment to permitting this case to proceed.

3   Unpublished cases are cited not for their precedential value but for the persuasiveness of their reasoning.

*b. Personal Jurisdiction*

The personal jurisdiction challenge in the present motions is similarly unavailing. There is no contention in this case that there is general jurisdiction over Bank of America or Safeguard in Maryland. They are not at home here—neither company is incorporated in Maryland or principally located here. *Goodyear Dumlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919, 924 (2011); *Daimler AG v. Bauman*, 571 U.S. 117, 137-39 (2014). Specific jurisdiction is therefore the jurisdictional hook. The defendants invoke *Bristol Myers* for the proposition that specific jurisdiction must exist independently for each plaintiff's claims. Bank of America's P&A Mot. Dismiss, p. 38, ECF No. 44-1; Safeguard's P&A Mot. Dismiss, p. 34, ECF No. 41-1. The Supreme Court held in *Bristol Myers* that California courts lack personal jurisdiction over out-of-state plaintiffs' claims in a mass pharmaceutical tort case because there was not a sufficient connection between the forum and the out-of-state plaintiffs' claims. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017). Here, none of the organizational plaintiffs are Maryland entities. And the only alleged connection to this

forum is that Baltimore and Prince George's County were included in the plaintiffs' investigation.

**\*5** The *Bristol Myers* court explicitly withheld judgment as to its holding's applicability in federal court. *Id.* at 1783-84 (explaining that "since our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court.") Nor has the Fourth Circuit opined on the issue.[4] Lower courts to have contemplated its application in federal court, and to federal question cases specifically, note that the animating federalism concerns that drove the Court to divest California of the power to hear certain claims of out-of-state plaintiffs may apply differently in federal court where the forum tribunal and any alternative tribunal represent the same sovereign. *See, e.g., Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 856-64 (N.D. Cal 2018). The *Bristol-Myers* Court was also careful to distinguish its holding from that in *Keeton v. Hustler Magazine*, where the Court found personal jurisdiction existed over a New York libel plaintiff's claims against Hustler Magazine brought in New Hampshire alleging nationwide harm. *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1782; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984). In *Keeton*, jurisdiction was present because there was a connection between the defendants' actions and damage allegedly caused within the state of New Hampshire, as well as the rest of the country. It did not concern the Court that the plaintiff resided out-of-state, because the proper focus was on the sufficiency of the defendant's contacts with the state. *Keeton*, 465 U.S. at 779-80. In *Bristol-Myers*, by contrast, "the nonresident's claims involve no harm in California and no harm to California residents." *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1782.[5]

---

[4] The only Fourth Circuit citation to *Bristol-Myers* is in an unpublished contracts case involving a single plaintiff. *PTA-FLA, Inc. v. ZTE Corp.*, 715 F. App'x 237, 242 (4th Cir. 2017).

[5] *Bristol-Myers* did not cast doubt on the principle that specific jurisdiction exists where suit arises out of, or relates to, a defendant's contact with the forum state. *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780.

Even if *Bristol-Myers* applies to federal question actions in federal court—a question that this court does not reach —the claims pled here by nonresidents involve injuries that occurred in Maryland and harm to Marylanders, to a degree sufficient to establish personal jurisdiction.[6] The fact that some of the alleged harm happened here renders this case more closely analogous to *Keeton* than to *Bristol-Myers*. In *Bristol-Myers*, the Court found that there was no personal jurisdiction because the nonresident plaintiffs' claims "involv[ed] no in-state injury and no injury to residents of the forum State." *Id.* Here, by contrast, as in *Keeton*, the claims made by nonresident plaintiffs involve harm that is alleged to have occurred in Maryland and to residents of Maryland as a result of actions taken by the defendants in or directed at Maryland. Under the same logic, this court has jurisdiction to entertain this case because it involves in-state injuries and injuries to residents of Maryland, irrespective of the precise fraction of nationwide harm that occurred in Maryland.[7]

---

[6] The investigation involved inspection of REOs in Baltimore and Prince George's County. At oral argument, plaintiffs' counsel represented to the court that NFHA conducted the investigations in Maryland itself as part of this nationwide investigation.

[7] At oral argument the plaintiffs raised the additional contention that if one organizational plaintiff has personal jurisdiction to raise these claims, there is personal jurisdiction over all other organizational plaintiffs, for claims arising out of the same nucleus of operative fact, under the doctrine of pendent jurisdiction. *See Sloan*, 287 F. Supp. 3d at 859-864. The general criteria for specific jurisdiction is not disputed in this case. There are minimum contacts, the defendants purposefully availed themselves of the forum state, the claim arises out of the defendants' contacts with Maryland, and jurisdiction is not purported to unduly burden the defendants. *See Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310 (1945) and its progeny. Nor, as discussed above, is personal jurisdiction defeated by *Bristol-Myers*. Thus, while the court need not pass on the pendent personal jurisdiction issue at this time, it does note that the doctrine is recognized in the Fourth Circuit as to state-law claims. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 628 (4th Cir. 1997) (stating that "judicial economy and convenience of the parties is best facilitated by a consideration of all legal theories arising from a single set of operative facts.... Once that set of facts and defendants are legitimately before th[e] court ... little would be gained by not requiring a defendant to defend against a certain type of theory superimposed upon those facts." (quoting *Sohns v. Dahl*, 392 F. Supp. 1208, 1218 (W.D. Va. 1975))).

### c. Timeliness

**\*6** The final threshold concern is the timeliness of the plaintiffs' claims. All parties agree that the FHA has a two-year statute of limitations, *see* 42 U.S.C. §. 3613(a)(1)(A), but that most claims, against Bank of America were tolled by the filing of the administrative action with HUD. *See* Bank of America Reply at p. 20, ECF No. 57; Pls' Opp'n Defs' Mot. Dismiss at pp. 54-55, ECF No. 55. Instead, the dispute here is over the fate of four organizational plaintiffs who were not parties to the HUD action—whose claims, the defendants assert, are untimely unless they concern actions postdating June 26, 2016, two years before the filing of this lawsuit. Safeguard argues, for its part, that it was never subject to a related HUD action and thus all claims against it should be time-barred. Countering both Bank of America and Safeguard, the plaintiffs insist that any statute of limitations concern is obviated by the continuing violation doctrine. Pls' Opp'n to Defs' Mot. Dismiss at pp. 54-56, ECF No. 55. "A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991).

The plaintiffs are right on this score for two reasons. First, while it provides for a two-year statute of limitations, the plain text of the FHA also expressly announces that the period commences "after the occurrence of termination of an alleged discriminatory housing practice." 42 U.S.C. 3613(a)(1). Noting that the policy reasons for limiting the time to sue over discrete acts of discrimination are different from those challenging ongoing housing practices, the *Havens* Court remarked: "we ... conclude that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice." *Havens Realty Corp.*, 455 U.S. at 380-81. Plainly, there is no contention here that the allegedly unlawful practice ended two years before this suit was filed, and the plaintiffs' home maintenance grievances are squarely the kind of unlawful practice contemplated by the statute. In no way is the harm complained of here a discrete act of discrimination or "just one incident of conduct violative of the Act." *Id.* at 381. Because the plaintiffs allege a continuing unlawful practice, the full scope of its investigation is timely.

Second, there is no notice restriction to the doctrine's application in the Fourth Circuit. In *Deutsche Bank*, a Northern District of Illinois case involving substantially similar claims by NFHA against Deutsche Bank, the district court limited the actionable allegations window to two years before the suit was filed. But, the court noted, "the Seventh Circuit has explained that the [continuing violation] doctrine has no application where the time-barred incident put the plaintiff on notice that his rights were being violated." *Nat'l Fair Hous. All. v. Deutsche Bank*, 2018 WL 6045216, at \*3 (N.D. Ill. Nov. 19, 2018) (quoting *EEOC v. N. Gibson Sch. Corp.*, 266 F.3d 607, 617 (7th Cir. 2001)). Other circuits do not impose such a notice restriction. In the Ninth Circuit, for example, "a strict notice limitation 'has never been the 'litmus test' for application of the continuing violation doctrine.' " *Id.* at \*4 (quoting *City of Los Angeles v. Citigroup Inc.*, 24 F. Supp. 3d 940, 952 (CD. Cal. 2014)). Courts in this District hew closer to the Ninth Circuit rule. *See Equal Rights Ctr. v. Camden Prop. Tr.*, 2008 WL 8922896, at \*10 (D. Md. Sept. 22, 2008) (noting that discrimination claims pertaining to the design and construction of hundreds of properties brought under the FHA constitutes a continuing violation and is different from mere continuing effects of past violations); *see also The Equal Rights Ctr. v. AvalonBay Communities, Inc.*, 2009 WL 1153397, at \*9 (D. Md. March 23, 2009); *Balt. Neighborhoods, Inc. v. Rommel Builders, Inc.*, 40 F. Supp. 2d 700, 710 (D. Md. 1999). The fact that the plaintiffs were on notice of the allegedly discriminatory practice in 2011 when they chartered their investigation does not curtail their ability to challenge that ongoing practice in 2018. The plaintiffs' claims are timely.

### B. The Merits

**\*7** There are two questions that constitute the merits inquiry at this stage in the case. (1) Are there sufficient facts pled to show discrimination under the Fair Housing Act? (2) If so, have the plaintiffs otherwise pled cognizable FHA claims? Affirmative answers to both questions are necessary for this case to proceed. Finally, there are arguments specific to Safeguard and private nuisance claims brought by the individual plaintiffs that also must be addressed.

#### a. Facts Sufficient to Plead Discrimination

There are two theories of discrimination cognizable under the Fair Housing Act: disparate treatment (or intentional discrimination) and disparate impact. *Texas Dep't of Hous. &*

*Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507 (2015). Plaintiffs allege them both. They do not divide their discrimination arguments between separate counts brought under the FHA, rather, they argue disparate treatment and disparate intent discrimination as alternative predicates to the specific FHA counts. *See Deutsche Bank*, 2018 WL 6045216, at *11. In the Fourth Circuit, an "FHA claim can proceed under either a disparate-treatment or a disparate-impact theory of liability, and a plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018). Therefore, for purposes of a motion to dismiss for lack of legally cognizable discrimination, the court must discern if either predicate theory of discrimination is sufficiently pled. Because the plaintiffs have sufficiently pled disparate impact, there is no need to resolve any separate disparate treatment arguments at this time. [8]

[8] The court does note, however, that to plead disparate treatment, a plaintiff must raise plausible factual allegations of a discriminatory intent or motive. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). It must be "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," and plaintiffs must show "that racial discrimination was the [defendant]'s standard operating procedure—the regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). That said, it can be demonstrated "directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test," *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 325 (4th Cir. 2013), and shown from the totality of the circumstances. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). Under *Arlington Heights* (an equal protection case), the factors to be assessed in this inquiry include: (1) action that bears more heavily on one race than another, (2) clear patterns of action that are unexplainable on grounds other than race, (3) historical background of the action in question, (4) the sequence of events leading to the defendant's actions, (5) departures from a defendant's regular course of action. *Arlington Heights*, 429 U.S 266-67; *see also Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 348 F. Supp. 2d 398, 417 (D. Md. 2005) (finding that "intent" under the Fair Housing Act "is defined consistently with the definition used in Equal Protection Cases"). Here, the plaintiffs claim that their investigation reveals a discriminatory motive. This is not a case where plaintiffs have uncovered a hidden trove of direct evidence evincing discriminatory motives. Instead, their claim is that the investigation shows that because race is the only remaining explanation for the disparate maintenance practices, the defendants must have had a discriminatory intent. No allegations of intent or motive are pled here beyond the statistics themselves. And while statistical disparities alone may be sufficient in some circumstances to prove intent, *see Int'l Bhd. of Teamsters*, 431 U.S. at 339-40, n.20; *EEOC v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994), the nature of the plaintiffs' claims seem closer to a disparate impact theory. As explained above, that is not to say their discrimination claims cannot be recast as disparate treatment at a later stage.

**\*8** In 2015, Justice Kennedy, in a 5-4 opinion, held that disparate impact claims are cognizable under the FHA. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2520-21. Hewing closely to regulations promulgated by HUD in 2013, 24 C.F.R. § 100.500, the Court announced a three-step burden shifting framework for disparate impact claims brought under the FHA. First, "the plaintiff must demonstrate a robust causal connection between the defendants' challenged policy and the disparate impact on the protected class." *See Reyes*, 903 F.3d at 424. Thus, for disparate impact claims relying on a statistical disparity, a plaintiff must identify a specific, race-neutral policy held by the defendant that creates arbitrary, artificial, and unnecessary barriers, present statistical evidence of a disparate adverse impact, and establish a robust causal connection between the specific policy and the demonstrated adverse impact. *See Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2523. [9] Second, the burden shifts to the defendant to "state and explain the valid interest served by their policies." *Reyes*, 903 F.3d at 424 (quoting *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2522). Third, the burden shifts back to the plaintiff to show that the interests proffered by the defendants at step two "could be served by another practice that has a less discriminatory effect." *Id.* (quoting *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2515). Here, the defendants argue that the plaintiffs cannot meet their burden at step one, the prima facie stage, because they have neither (1) alleged a sufficiently specific policy, nor (2) met the demanding causality requirement.

[9] As Kennedy explained in full:
[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that racial imbalance ... does not, without more, establish a prima facie case of disparate impact and thus protects

defendants from being held liable for racial disparities they did not create.... Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas, and serious constitutional questions then could arise.

*Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2523 (internal citations omitted).

#### i. **Arbitrary, artificial, and unnecessary policy**

The plaintiffs must point to a specific policy implemented by the defendants that caused the racial disparity alleged. *See Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2523 (explaining that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity"). "Disparate impact liability requires the identification of a specific ... *practice* that caused racially disparate results." *Brown v. Nucor Corp.*, 785 F.3d 895, 915 (4th Cir. 2015) (a Title VII employment discrimination case) (emphasis preserved). [10] A policy that gives employees discretion exercised in a common or consistent manner can provide the basis for a disparate impact claim. *See Wal-Mart v. Dukes*, 564 U.S. 338, 355 (2011); *Brown*, 785 F.3d at 915-16.

10   While Title VII cases may not be binding here, they are instructive. *See, e.g., Reyes*, 903 F.3d at 431.

Plaintiffs put forth four facially neutral policies attributed to Bank of America that allegedly have a discriminatory impact on communities of color: (1) "outsourcing to third parties compliance with the statutory and common law obligations that are placed on owners of real property, without appropriate monitoring or review[,]" Compl. ¶ 129; (2) failing to investigate or assess "the fitness or ability of retained third parties" to comply with fair housing obligations, Compl. ¶ 130; (3) failing to provide "guidance, oversight, or review of the activities left to the discretion of retained third parties," Compl. ¶ 131; and (4) basing maintenance practices "on the age and/or the value of properties[.]" Compl. ¶ 135. They allege that Safeguard employed similar policies and practices. Compl. ¶ 136. The defendants argue that the first alleged policy fails because delegating discretion only is cognizable as a disparate treatment claim, the second and third fail because they are allegations of a *lack* of policy, and the fourth fails because it is too vague. *See* Bank of America P&A Mot. Dismiss at p. 30, ECF No. 44-1. Safeguard contends that under *Dukes*, a policy of discretion is not enough. Safeguard Reply at pp. 15-16, ECF No. 56. Much of the briefing on both sides of this issue runs through Title VII cases testing the sufficiency of pleaded employment policies.

**\*9** The plaintiffs have sufficiently pled a policy and practice by the defendants of abdicating their responsibility to maintain REOs. Whether articulated as undue delegation of maintenance discretion (and discrimination by the parties handed discretion) or a failure to properly supervise maintenance responsibilities, the policy alleged is sufficiently concrete for purposes of this motion to dismiss. The defendants are wrong to contend that inaction cannot provide the basis for a policy under the disparate impact framework, *see, e.g., Brown v. Nucor Corp.*, 785 F.3d at 917, and it is not the case that undue discretion is only cognizable as a disparate treatment claim. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488-90 (7th Cir. 2012), *Cty. of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 993 (N.D. Ill. 2018); *City of Phila. v. Wells Fargo & Co.*, No. 17-2203, 2018 WL 424451, at \*4 (E.D. Pa. Jan. 16, 2018). As the other courts to have similarly reckoned with iterations of this fair housing investigation have found, there is enough of a policy pled here to shepherd the plaintiffs to the second, and more entangled, step in the disparate impact analysis: robust causality. [11]

11   *See*, e.g., the *Deutsche Bank* court's articulation of the policy at issue:
> Plaintiffs contend that the Deutsche Bank Defendants had an "abrogation" policy whereby they relinquished and outsourced to the servicers—entities allegedly undertrained and underexperienced—all responsibility for maintaining the REO properties. First, a quibble over nomenclature: It strikes the Court that the policy alleged here is not so much a policy of "evading responsibility" (*i.e.*, "abrogating"), but rather of giving up responsibility all together (*i.e.*, "abdicating"). "Abdicating" thus seems a more fitting description for Defendants' alleged conduct, so the Court will refer below to this conduct as such.
> Nomenclature aside, the currently pled practice suffices as a "policy." *Cf. Wal-Mart, Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011) ("[G]iving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory."); *Cty. of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 993 (N.D. Ill. 2018) (finding substantially same and citing *City of Phila. v. Wells Fargo & Co.*, No. 17-2203, 2018 WL 424451, at \*4 (E.D. Pa. Jan. 16, 2018) ("[A] policy that gives a defendant's employees discretion

*can* be the basis for a disparate impact claim.")). But this abdication policy passes muster only so long as property maintenance was the Deutsche Bank Defendants' responsibility to outsource in the first place. If, as Defendants hypothesize and the Court recounts above, the Deutsche Bank Defendants always acted as indenture trustees upon whom the responsibility for property maintenance never fell, Plaintiffs' allegations concerning the abdication policy might have a problem. Currently, however, according to reasonable inferences taken in Plaintiffs' favor, the Deutsche Bank Defendants acted as "back-up servicers" and thus were responsible for some measure of property servicing. The policy as alleged passes muster for now.

*Deutsche Bank*, 2018 WL 6045216, at *12.

### ii. **Causality**

In recognizing disparate impact claims under the FHA, the *Inclusive Communities* Court took great pains to cabin its holding to cases in which the defendant's action created the racial disparity. *See Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2523 ("[i]t would be paradoxical to construe the FHA to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable"). A series of safeguards were thus installed to limit FHA disparate impact claims, including "a robust causality requirement under the first step of the framework" in which a plaintiff must "demonstrate that the disparity they complain of is the result of one or more of the [ ] practices that they are attacking ... specifically showing that each challenged practice has a significantly disparate impact on the protected class." *Reyes*, 903 F.3d at 425 (citing *Wards Cove*, 490 U.S. 642, 656 (1989)). "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Inclusive Cmtys. Project, Inc.*, 135 S.Ct. at 2523. "A robust causality requirement ensures that '[r]acial imbalance ... does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove*, 490 U.S. at 653, 109 S.Ct. 2115). The *Deutsche Bank* court reasoned that, by extension, in "weighing whether a complaint satisfactorily alleges proximate cause, the question is whether the misfeasance charged and the harms felt are connected at the 'first step' in the chain of reasoning." 2018 WL 6045216, at *12 (citing *City of Miami*, 137 S. Ct. at 1306). In *City of Miami*, the Supreme Court explained that in "the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires.... [Instead], proximate cause under the FHA requires some direct relation between the injury asserted and the injurious conduct alleged." 137 S. Ct. at 1306 (internal quotations and citation omitted). But the Court declined "to draw the precise boundaries of proximate cause under the FHA." *Id.* On remand, the Eleventh Circuit reasoned, "[p]roximate cause asks whether there is a direct, logical, and identifiable connection between the injury sustained and its alleged cause. If there is no discontinuity to call into question whether the alleged misconduct led to the injury, proximate cause will have been adequately pled." *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1264 (11th Cir. 2019).

**\*10** The plaintiffs urge that they have sufficiently pled a direct connection between the injuries alleged and the defendant's arbitrary, artificial, and unnecessary policy of delegating maintenance duties. The regression analyses laid out in the complaint, they submit, root out any intermediary variables that might explain the maintenance discrepancies, *see Deutsche Bank*, 2018 WL 6045216; at *13, thus raising a fair inference that communities of color are disproportionately affected by the defendants' policies. Compl. ¶ 132. The extent of the link and its statistical proof, they say, are issues best reserved for summary judgment because the methodological criticisms submitted by the defendants go to the weight of the evidence, not its sufficiency. The defendants argue that under *Inclusive Communities*, the causal link must be demonstrated here and now, and they proceed to attack the plaintiffs' investigation variable by variable, contending that the plaintiffs' purportedly-objective 37 criteria are instead arbitrary and subjective variables that, at times, quantify disrepair by criteria inconsistent with local law. *See, e.g.*, Bank of America P&A Mot. Dismiss at pp. 18-23, ECF No. 44-1. A minimal examination, the defendants say, reveal plaintiffs' preliminary assertions of causality to be methodologically flawed.

The courts to have contemplated similar fair housing investigations under an FHA disparate impact theory have split on the causality question. In *Deutsche Bank*, the court held that proximate cause was missing. "Plaintiffs have not alleged that their injuries resulted directly from Defendants' practice. Instead ... Plaintiffs experience harm only after (impermissible) intermediate steps. Their theory is that Defendants' delegation practice resulted in poorly-executed property maintenance, which led to racially-disparate effects,

ergo Plaintiffs had to invest more heavily (or simply saw less return on their preexisting investments) to combat those effects. Climbing this chain requires more steps than the FHA permits." *Deutsche Bank*, 2018 WL 6045216, at *13. The *Fannie Mae* court, by contrast, reasoned, "Plaintiffs have sufficiently alleged statistical evidence demonstrating a causal connection between the delegation of duties and the differential maintenance. Ultimately, the question of causation—to what extent the discrepancy is explainable by objective data or race—is premature. It seems clear that Plaintiff's complaint gives rise to a fair inference of causation; the question of proof will become an issue at later stages in the proceedings." *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n ("Fannie Mae")*, 294 F. Supp. 3d 940, 948 (N.D. Cal. 2018) (internal citations omitted). In their effort to have this court side with the analysis in *Deutsche Bank*, the defendants point to *Mayor and City Council of Balt. v. Wells Fargo Bank, N.A.*, a standing case in which the court found an insufficient causal connection between alleged reverse redlining and the many types of damages, including increased crime, claimed by the City. 677 F. Supp. 2d 847, 851 (D. Md. 2010). The defendants rely on *Wells Fargo* for the proposition that the requisite causal connection must be apparent as a matter of common sense and not merely the product of intricate mathematics. *Id.* (explaining that an expert's opinion must have "a coherent relationship to the underlying facts."). While that proposition is sound, this case is distinguishable from *Wells Fargo* and is closer to *Reyes*.[12]

12  The court also notes that in *Wells Fargo*, the plaintiffs' third amended complaint alleged, for the first time, that the loan practices at issue were a but-for cause of the specific alleged harm. This complaint survived the defendants' motion to dismiss. *Mayor and City Council of Balt. v. Wells Fargo Bank*, N. A., 2011 WL 1557759, at *3-5 (D. Md. Apr. 22, 2011). Here, the plaintiffs allege that race is a but-for cause of the alleged discrepancy in REO maintenance. *See, e.g.*, Compl. ¶¶ 77-79.

In *Reyes*, Latino couples who lived in a mobile home park challenged under a disparate impact theory the park's policy of requiring occupants to provide documentation of legal status in the United States, arguing that the practice "disproportionately ousts Latinos as compared to non-Latinos." *Reyes*, 903 F.3d at 419. The district court dismissed the claim, holding that the plaintiffs had failed to adequately show causality between the policy and disparate impact on Latinos. *Id.* at 423. On appeal, the "robust causality requirement [was] at the crux" of the case. *Id.* at 425. "In their Complaint," the Fourth Circuit reasoned, "Plaintiffs provided statistical evidence that Latinos constitute 64.6% of the total undocumented immigrant population in Virginia, and that Latinos are ten times more likely than non-Latinos to be adversely affected by the Policy ..." *Id.* at 428. "Accepting these statistics as true," the Circuit held that "Plaintiffs sufficiently alleged a prima facie case of disparate impact." *Id.* It continued: "Plaintiffs satisfied the robust causality requirement by asserting that the specific Policy requiring all adult Park tenants to provide certain documents proving legal status was likely to cause Latino tenants at the Park to be disproportionately subject to eviction compared to non-Latino tenants at the Park." *Id.* at 429.

**\*11**  Tasked on remand with discerning a workable proximate cause standard in the FHA context, the Eleventh Circuit in *City of Miami* held that while there was a sufficient causal link pled between allegedly discriminatory lending practices and injury to the Miami tax base, there was an insufficient causal nexus between the same practices and the City's claimed increase in expenditures on municipal services. 923 F.3d at 1263-65. The court first laid out a series of governing rules. First, as decreed by the Supreme Court, foreseeability of harm, while necessary, is not sufficient to establish proximate cause. *Id.* at 1272. Second, explicating the Supreme Court's edict that there be "some direct relation," the panel reasoned: "an intervening step will not vitiate proximate cause in all instances. What is more important, precedent reveals, is the certainty with which we can say an injury is fairly attributable to the statutory violation. An extended causal chain often makes attribution more difficult, but may not be the final word." *Id.* at 1273. Third, the statutory cause of action should be understood in light of its remedial purpose; "the FHA has a broad remedial purpose, is written in decidedly far-reaching terms, and is perfectly capable of accommodating the type of aggregative causal connection that the City has identified between the Banks' alleged misconduct and financial harm to Miami." *Id.* at 1278. Fourth, tracing causation must be administratively feasible. *Id.* at 1281 ("we find it entirely practicable and not unduly inconvenient for the courts to handle damages like the City's tax revenue injury"); *see also Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

Distinguishing the plausibly-pled causal link between the statutory violation and the alleged injury to the tax base from the insufficient causal link to municipal expenditures injury, the *City of Miami* court derived from *Holmes* three "factors against which to measure the directness of the relationship." 923 F.3d at 1282. First, the injury must be sufficiently

attributable to the defendants' conduct, *id.* at 1286; second, it must be possible to apportion damages among "plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries," *id.*, and third, there is not a more directly injured plaintiff who is better situated to vindicate the law as a private attorney general and to deter wrongdoing. *Id.* at 1287-88.

In *City of Miami*, the first factor proved to be the fault line between the plaintiffs' claims. "The City has plausibly alleged that it can present an [Hedonic regression] analysis of reduced tax revenue that is precise enough to avoid difficulties with isolating the role of the Banks' alleged violations. It has not done so for its municipal expenditures." *Id.* at 1282. And while "[t]he City does not go so far as to conduct this analysis and attach the results to its pleadings, ... [it] describe[s] the analysis in far more than speculative or conclusory fashion." *Id.* at 1283. "There could be a battle of the experts down the line over whether the regression analysis really shows what the City says it does, but, as we see it, that would be for a later stage of the litigation." *Id.* In addition, "the aggregative nature of the City's claims also helps eliminate any discontinuity between the statutory violation and the injury." *Id.* at 1284. The increased municipal expenditure claim, by contrast, "fail[s] to explain how we can ascertain with any level of detail or precision which expenditures will be attributable to the Banks," and was thus too conclusory to survive. *Id.* at 1285. "If any direct connections exist between the foreclosure and [increased police, fire, building code enforcement expenditures], the City has not explained them, and they are not so obvious as to be self-evident. We also see no explanation of how the City will identify the amount of increase attributable to the foreclosures or the Banks' conduct." *Id.* at 1286. The second and third factors posed no barrier to the prima facie finding of proximate cause because only the City claimed to be injured, *id.* at 1287, and while homeowners were also injured, they were "less well suited to prosecute a global claim[,] ... and the City's suit could achieve better deterrence." *Id.* at 1289.

To assess proximate causation in this case, the first step is to isolate the alleged harms incurred. Here, the plaintiffs allege that housing in communities of color has been rendered unavailable within the meaning of the FHA and corresponding HUD regulations. Compl. ¶ 9-12. Disrepair discourages buyers from purchasing REOs, hurting the property values of current residents and financially harming current homeowners. *Id.* Additionally, the dilapidated state of many REOs, the plaintiffs say, curtails (on the basis of race) the choices of those individuals who want to move in by limiting viable housing stock and the economic prospects of moving to that particular neighborhood. Blight, frozen segregation patterns, and economic stagnation are allegedly added harms imposed by deficient REO maintenance. *Id.* The organizational plaintiffs, as discussed in the context of standing above, allegedly are injured by the significant diversion of resources that was required to conduct the nationwide investigation and by the concrete harm allegedly imposed by the defendants' actions to their mission to end racially segregated housing and its effects. Compl. ¶¶ 150-59; *Havens*, 455 U.S. at 379; *see also Deutsche Bank*, 2018 WL 6045216, at *13 (recognizing similar injuries although finding proximate cause deficient as pled).

**\*12** Here, the scope and specificity of the plaintiffs' investigation and the alleged precision with which its proffered regression analysis can attribute the plaintiffs' injuries to the defendants' actions, provide plausible proximate cause.[13] The statistical evidence offered, like the differential impact of the mobile home park's documentation policy in *Reyes* and the costs incurred by the tax base in *City of Miami*, is precisely the kind of statistical evidence of disparate effects that is cognizable under the FHA. The statistics and regression analyses presented in the complaint raise a fair inference of causation. While the defendants' critique of the investigation's composite variables also may have some merit, *see NFHA v. U.S. Bank, N.A.*, No. 01-12-0283-8 (HUD Jan. 8, 2016), Bank of America Mot. Dismiss, Ex. 1, ECF No. 44-3, they do not defeat the well-pled factual contention that the defendants' delegation of its maintenance responsibilities—in the aggregate—caused disparate racial impact. The other factors considered in the *City of Miami* proximate cause calculus do not change this result. While the risk of additional plaintiffs and multiple recoveries may be marginally greater than that in *City of Miami* where the city was the only injured party, the risk is mitigated by the necessary investigative depth and statistical sophistication required to bring a disparate impact claim. *See City of Miami*, 923 F.3d 1286-87. By the same token, it is hard to imagine a plaintiff better situated to bring these claims than a group of the nation's preeminent nonprofit fair housing organizations. *See id.* at 1288-89. In sum, the complaint surmounts the causality hurdle imposed by *Inclusive Communities*, but the extent of the investigation's accuracy, and the plaintiffs' statistical methodology, will be subjected to rigorous factual analysis at the summary judgment stage.

13   The plaintiffs plead, for example, that "45.0 % of the Bank of America REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 11.0% of the Bank of America REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies." Compl. ¶ 79. And: "the average number of deficiencies in neighborhoods that are over 75% minority is 9.4, the average in neighborhoods that are 25-75% minority is 7.6, and the average in neighborhoods that are less than 25% minority is only 5.9." Compl. ¶ 84.

### b. Other statutory requirements for FHA claims

The dispute at this stage of the case centers on discrimination and, specifically, proximate causation. But while the bulk of the briefing is devoted to discrimination, the plaintiffs also must plead facts sufficient to support relief under the remaining text of the statute; discrimination alone, in the abstract, is not sufficient to support relief. To the extent that the defendants contest the sufficiency of the pleadings under the FHA apart from the discrimination dispute however, their arguments also prove unavailing.

### i. Count I

Section 804(a) of the Fair Housing Act makes it unlawful to "refuse to sell or rent after making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). HUD's implementing regulations states that "[i]t shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R § 100.70(a). Furthermore, the HUD regulations prohibit, among other things, "discouraging any person from inspecting, purchasing or renting a dwelling because of race, color, religion, sex, handicap, familial status, or national origin, or because of the race, color, religion, sex, handicap, familial status, or national origin of persons in a community, neighborhood or development." 24 C.F.R. § 100.70(c)(1).

The defendants argue that the statute is inapplicable to the facts at hand because not all the REOs in question are for sale or rental, and because the plaintiffs have insufficiently alleged that the defendants' actions have rendered unavailable the REOs that are on the market. The first contention can be dealt with quickly. REOs by their nature are properties that the bank has attempted to sell, but that it failed to sell at the foreclosure sale. Bank of America P&A Mot. Dismiss at p. 12, ECF No. 44-1. The houses in question remain empty, and it is fair to presume that, even if they are not actively listed for sale, the bank's maintenance responsibilities are conducted while the property awaits a permanent owner or tenant. Moreover, even if the property is not for sale or available for rental under the meaning of the statute, the statute applies where a defendant has allegedly "otherwise [made housing] unavailable." 42 U.S.C. § 3604(a). This is the subject of the defendants' second attempt to defeat this claim.

**\*13** In *Jersey Heights Neighborhood Ass'n v. Glendening*, the Fourth Circuit explained that "[s]ection 3604(a) is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons." 174 F.3d 180, 192 (4th Cir. 1999) (citing *Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1984)). "To that end" the Circuit explained, "courts have considered claims under this provision in cases of, for example, racial steering by real estate agents ... and discriminatory rental policies[.]" *Id.* (citing *Vill of Belhwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990) and *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984)). In that case, the construction of a highway through a neighborhood of color did not render housing unavailable because the harm was merely a diminution in housing value and the plaintiffs failed to show that the construction project would "make housing 'unavailable' on racial grounds." *Jersey Heights*, 174 F.3d at 192-93.

The allegedly discriminatory policies in this case are "housing-related," like racial steering and discriminatory rental practices, and are distinguishable from the more remote causal link posed by the placement of a highway. The practice of delegating REO maintenance has neither a remote nor an indirect relationship to housing availability; its effect is far more immediate. The plaintiffs have alleged that the policy in question renders REOs uninhabitable. Compl. ¶ 310. While some home purchasers and real estate investors might consider a home's disrepair an advantage toward obtaining a cut-rate acquisition, it is fair to conclude that, on the whole, the kind of systemic neglect pled dissuades

prospective purchasers from buying REOs. This is the link that was missing in *Jersey Heights*. But it is present here. In *Reyes*, which also concerned a challenge brought under 42 U.S.C. § 3604, the plaintiffs' claim survived a motion to dismiss because, in part, "[t]he plaintiffs ... demonstrated that the specific rezoning policy disproportionately decreased the availability of housing for minorities as compared to whites[.]" *Reyes*, 903 F.3d at 427; *see also Deutsche Bank*, 2018 WL 6045216, at *8-9 (holding that 3604(a) and 3604(b) claims could survive if the plaintiffs provided amended statistics and noting that "[a] plaintiff may indeed state an FHA claim if the disparate effects caused by the defendant's failures to maintain render the property unavailable"). Here, while buyers may be of any race, the defendants' maintenance practices allegedly act upon housing availability to a degree decided by the racial demographics of the neighborhood in which an REO stands. The plain text of the statute forbids them to do so. The plaintiffs have sufficiently pled unavailability under Section 804(a).

### ii. **Count II**

Section 804(b) of the Fair Housing Act makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, familial status, or national origin." 42 U.S.C. 3604(b). The HUD regulations interpreting Section 804 apply to both 804(a) and 804(b), *see* 24 C.F.R. § 100.50, but the plaintiffs point to a crucial provision of the agency's regulations interpreting, ostensibly, the phrase "provision of services or facilities in connection therewith." 42 U.S.C. 3604(b). HUD states: "It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling. Prohibited actions under this section include, but are not limited to ... [f]ailing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.65(a)-(b)(2).

 ***14** While the defendants do not divide their arguments against the plaintiffs' Section 804 claims between 804(a) and 804(b), they submit that Count II, like Count I, is foreclosed because their actions are insufficiently connected to the sale or rental of a particular house to a particular buyer or tenant. In *Jersey Heights*, the Fourth Circuit reasoned that the plaintiffs failed to state a claim under Section 804(b) because the highway construction project did not implicate "the terms, conditions, or privileges of sale or rental of a dwelling, or ... the provision of services or facilities in connection therewith." *Jersey Heights*, 174 F.3d at 192. Instead, the court held, "[t]his provision by its terms extends only to housing and housing-related services ... [and] simply requires that such things as garbage collection and other services of the kind usually provided by municipalities not be denied on a discriminatory basis.... It does not extend to every activity having any conceivable effect on neighborhood residents." *Id.* at 193 (citing *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 720 (D.C. Cir. 1991); *Southend Neighborhood Improvement Ass'n*, 743 F.2d 1207, 1210 (7th Cir. 1984); and *Laramore v. Illinois Sports Facilities Auth.*, 722 F. Supp. 443, 452 (N.D. Ill. 1989)).

The factual allegations here, by contrast, fit well within the language of Section 804(b), which explicitly extends the purview of the FHA to "the provision of services or facilities" in connection with the sale or rental of houses. 42 U.S.C. § 3604(b). The fact that HUD interprets this language to include maintenance merely ratifies the conclusion that allegedly discriminatory maintenance of REOs falls within the statute's reach. 24 C.F.R. § 100.65. Unlike the highway in *Jersey Heights*, the service in question here, as explained above, is sufficiently "housing-related" to render the FHA applicable. Indeed, it pertains to the homes' physical integrity.

### iii. **Count III**

Section 805 of the FHA states that "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.... As used in this section, the term "residential real-estate transaction means ... [t]he selling, brokering, or appraising or residential real property." 42 U.S.C. § 3605. The defendants do not levy any Count III-specific arguments except to say that plaintiffs have failed to point to a particular home-purchaser discriminated against and that Section 805 is cabined to real-estate lending or "selling transactions." Bank of America P&A Mot. Dismiss at p. 37, ECF No. 44-1; Safeguard Reply at p. 7, ECF No. 56. The former argument suffers the same fate as it did under Counts I and II. The

plaintiffs have sufficiently alleged that housing transactions have been affected by the defendants' practices. Requiring the plaintiffs to replead their case to list the name of one person who decided not to purchase a particular REO because of its dilapidated state—many of whom necessarily exist if the plaintiffs' factual contentions are assumed to be true—would be a gratuitous and wasteful exercise. The second argument, that the defendants are not selling residential real property, similarly strains credulity. While Safeguard, as discussed below, may be one step further removed from real-estate related transactions, the entire REO-maintenance enterprise is a component of a real-estate transaction. These are homes that were for sale by the bank. That did not find a buyer. That remain empty. That remain in the lenders' portfolio. And that, very often, will again be listed for sale by the same seller. Momentarily taking certain REOs off the market does not negate the defendants' status as "business[es] ... engaging in residential real estate-related transactions." 24 C.F.R. § 100.115. The plaintiffs' claims under Section 805 (42 U.S.C § 3605) are sufficiently pled.

#### iv. Count IV

**\*15**  Count IV is an attempt by the plaintiffs to bring a generalized "perpetuation of segregation" claim under the FHA. They point again to the HUD implementing regulations, this time for the general proposition that discriminatory conduct that perpetuates segregation violates the FHA. Compl. ¶¶ 329-31. The regulations state: "Liability may be established under the Fair Housing Act based on a practice's discriminatory effect[.] ... A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500.

The defendants address this count only briefly, asserting that plaintiffs have failed to plead a segregative effect.[14] Perpetuation of segregation is, in effect, an alternate avenue of pleading disparate impact under the FHA. *See Graoch Associates # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 378 (6th Cir. 2007). If the paradigmatic disparate impact claim alleges that a policy has a greater adverse impact on one group over another, a perpetuation of segregation claim concerns the effect of the decision on the subject community. "[I]f a policy perpetuates segregation and thereby prevents interracial association, it will be considered invidious under the Fair Housing Act notwithstanding the fact that it may have no immediate impact." *Turtle Creek Assocs.*, 736 F.2d at 987 n.3; *see also Boykm v. Gray*, 895 F. Supp. 2d 199, 213-14 (D.D.C. 2012), *aff'd sub nom. Boykin v. Fenty*, 650 F. App'x 42 (D.C. Cir. 2016); *Deutsche Bank*, 2018 WL 6045216, at \*10-11. In this case, the plaintiffs have alleged, using detailed dissimilarity indices as a baseline, that the defendants' policies forestall housing integration and freeze existing racial segregation patterns. Compl. ¶ 144-46. Indeed, among those most affected by the defendants' allegedly discriminatory actions in this case are those already living in the neighborhoods where REOs are disproportionately left in disrepair, which, as the plaintiffs have proffered, are predominately communities of color. Such factual allegations are enough to survive a motion to dismiss.

14   Bank of America argues that 42 U.S.C. § 3601 does not create a cause of action but the claim is brought under § 3601 *et seq.* and 24 C.F.R. § 100.500(a).

#### v. Count V

Section 818 of the Fair Housing Act specifies that it "shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed ... any right protected by section 803, 804, 805, or 806 of this title." 42 U.S.C. § 3617. The defendants contend that only retaliation claims are cognizable under this provision and that because there are no allegations of retaliation pled here, the claim must be dismissed. *See Deutsche Bank*, 2018 WL 6045216, at \*10. The plaintiffs, by contrast, insist that the statute "covers conduct beyond retaliation, does not require a showing of threatening or violent conduct, and covers actions ... that obstruct, impede, or hinder the ability to sell one's property, and other practices that interfere with housing rights." Pls' Opp'n Defs' Mot. Dismiss at p. 41, ECF No. 55; *see, e.g., Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994).

Despite the defendants' arguments to the contrary, they have cited no case law, nor can this court locate any, for the proposition that, in the Fourth Circuit, § 3617 is limited to retaliation claims. *Hall v. Greystar Mgmt. Servs., L.P.* merely recognized that retaliation claims *can be* brought under § 3617. 637 F. App'x 93, 98 (4th Cir. 2016).[15]  It does not stand for the reverse proposition, as the defendants would have it

that, that *only* retaliation claims are cognizable under § 3617. Indeed, allegations of interference with rights protected by the FHA have been permitted to proceed under § 3617. *See, e.g., McCauley v. City of Jacksonville, N.C.*, 829 F.2d 36, 1987 WL 44775, at *2 (4th Cir. Sept. 8, 1987) (holding that "the complaint sufficiently alleges [that the plaintiff] has offered to provide racially integrated housing, the city has denied him sewer services because of race in violation of § 3604(b) and interfered in violation of § 3617 with his aiding and encouraging prospective minority tenants to rent the housing that he proposes."). In this case the plaintiffs have alleged that the defendants' REO maintenance practices interfere with the rights of homeowners and prospective buyers in communities of color. Compl. ¶¶ 11, 338-39. And while this contention also will be subject to more exacting factual scrutiny on summary judgment, the claim meets the plausibility pleading standard.

15   "To state a claim for retaliation under 42 U.S.C. § 3617 of the FHA," the *Hall* court explained, a plaintiff "must establish that (1) she was engaged in protected activity; (2) GMS was aware of that activity; (3) GMS took adverse action against her; and (4) a causal connection existed between the protected activity and the asserted adverse action." *Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 98 (4th Cir. 2016) (citing *King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003)). These elements have not been pled in the present case.

### c. Merits Arguments Specific to Safeguard

**\*16** So far, Bank of America and Safeguard's arguments in favor of dismissal have been considered in tandem. Safeguard makes the additional argument, however, that because it is not involved in the selling or renting of property, and only renders exterior property services, it is not liable under the FHA. Safeguard, P&A Mot. Dismiss at p. 11, ECF No. 41. Safeguard argues that, irrespective of any discrimination, the plain language of the FHA forecloses its liability. It asserts that, in contrast to Bank of America, it neither sells nor rents real estate and did not otherwise make property unavailable to anyone because of their race. Safeguard P&A Mot. Dismiss at p. 12, ECF No. 41. It makes a new iteration of this argument for each FHA claim. Furthermore, Safeguard attempts to differentiate itself from Ocwen Financial Corp. and Altisource, the third-party maintenance companies in *Deutsche Bank*, which, in contrast to Safeguard, were "servicers," held REO management responsibilities, and were treated for motion to dismiss purposes as indistinguishable from *Deutsche Bank* itself. Safeguard Reply p. 6 n.1, ECF No.

56. [16] Relying on *Clifton Terrace*, Safeguard argues that the FHA does not apply to private maintenance vendors whose services go to habitability, not availability, of housing. *Clifton Terrace*, 929 F.2d at 719-721 (deciding that 804(a) did not apply to an elevator contractor who refused to service a federally-funded housing complex because the service went to the habitability, not the availability, of housing).

16   At oral argument, counsel for Safeguard represented that Cyprexx, the maintenance provider initially sued in the Fannie Mae case, was voluntarily dismissed. Plaintiffs' counsel explained that Cyprexx was dismissed because it was responsible for maintaining only a subset of Fannie Mae REOs, unlike in the present case where Safeguard maintains all Bank of America REOs at issue.

The plaintiffs contend that maintenance of REOs is much closer to the sale of property than Safeguard would have it. The plaintiffs then analogize their present discrimination contentions to the racial steering case law and say that, as in the racial steering context, discriminatory maintenance of REOs discourages the sale and rental of real estate, Pls' Opp'n Defs' Mot. Dismiss at p. 35, ECF No. 55, which, in turn, pulls the defendants within the FHA's reach. Derelict maintenance is a barrier to sale, they assert. *See Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985) (in the racial steering context, "one looks to whether the statement or conduct would have *an untoward effect on a reasonable person under the circumstances who is seeking housing* and behind the statement or conduct to the intent of the agent. If a statement or act would have a discriminatory effect and is made with the intent to steer, it violates § 3604(a)." (emphasis added); 24 C.F.R. § 100.70(a), (c) (conditions discouraging a person from inspecting or purchasing a property obstruct housing choices). Further, the plaintiffs distinguish *Southend Neighborhood*, noting that it preceded the now-applicable HUD regulations interpreting the FHA (*Jersey Heights* similarly did not apply the new interpretation), and contending that the neighbor-plaintiffs' claims in that case, which alleged that poor maintenance impacted the value of their homes, is less connected to the sale of real estate than the alleged hindrance of the acquisition of housing at issue here. *Southend Neighborhood Imp. Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1210 (7th Cir. 1984) (noting that "[c]ourts have applied [Section 3604(a)] ... to actions having a direct impact on the ability of potential homebuyers or renters to locate in a particular area, and to indirectly related actions arising from efforts to secure housing[, but that] the plaintiffs [in *Southend*] do not allege that they have been hindered in an effort to acquire a dwelling"). The

plaintiffs also contest Safeguard's general argument that it is not liable under the FHA as a private vendor. They attempt to distinguish *Clifton Terrace* on the grounds that elevator maintenance goes to habitability, whereas the maintenance deficiencies here are much more severe and go to housing availability. The *Clifton Terrace* court found that § 3604(b) is limited to "services ... provided in connection with the sale or rental of housing," but maintenance of REOs in preparation for their sale, the plaintiffs proclaim, fits well within that holding. *See Clifton Terrace*, 929 F.2d at 720. Moreover, there is the added distinguishing fact that in *Clifton Terrace* the repair company declined to enter into a contract with the owner of the building, whereas here, Safeguard agreed to perform, but allegedly did so in a discriminatory manner.

**\*17** The alleged routine failure to maintain REOs goes deeper than mere habitability. As the *Clifton Terrace* court noted, while "[a] lack of elevator service is a matter of habitability, not availability ... the denial of certain essential services relating to a dwelling, such as ... sewer hookups ... or basic utilities, might result in the denial of housing[.]" *Id.* at 719-20. Basic maintenance of REOs is an essential housing service. Section 804(b), furthermore, does usher certain habitability concerns within the purview of the FHA. *Id.* at 720. Safeguard is in charge of maintaining all of the 1,677 properties subject to this lawsuit. It has substantial business pertaining to REOs. Its job, simply put, is to maintain REOs in a state in which, one day, they may be sold to a resident homeowner. Accordingly, the plaintiffs' allegations are sufficient to state a plausible claim against Safeguard at this stage of the case.

### d. Private Nuisance Claims (Count VI, Count VII)

The individual plaintiffs in this case attach two state-law private nuisance claims. The elements of a private nuisance cause of action under Maryland state law are: "(1) [the plaintiff's] injury was of such 'a character as to diminish materially the value of the property for' use as a dwelling *and* (2) [the defendant's] actions caused 'serious interference with the ordinary comfort and enjoyment' of the [plaintiff's] property." *Echard v. Kraft*, 159 Md. App. 110, 122 (2004) (quoting *Slaird v. Klewers*, 260 Md. 2, 9 (1970)).

The defendants argue that most of the alleged interference occurred outside its ownership, Bank of America P&A Mot. Dismiss at p. 43, ECF No. 44-1. The plaintiffs disagree, Pls' Opp'n Defs' Mot. Dismiss at pp. 56-57, ECF No. 55, asserting, in part, that the Bank is conflating the purchase date of the property with the timing of deed transfers. The defendants further contend that plaintiffs have failed to alleged material devaluation of property value and that mere contamination does not necessitate material devaluation.

The plaintiffs have pled facts in their complaint that, if assumed to be true, are sufficient to establish their plausible right to relief under a private nuisance theory. Both in isolation and when considered in tandem, the nature and extent of the interference pled raises the reasonable inference that the values of the individual plaintiffs' homes were materially diminished by the defendants' actions and that they incurred serious interference with the ordinary comfort and enjoyment of their homes. The facts alleged are not minor, temporary, or localized. Among the myriad harms Ms. Onafuwa allegedly suffered from the Bank of America-owned REO next door were water in her basement for months, accumulated and unsightly disrepair next door, and a rat-infested garage next door that was condemned by the City of Baltimore. Compl. ¶¶ 261-64. The Bushnells suffered an equally appalling litany of harms—routine commotion from squatters next door, unmitigated disrepair, squirrels in their attic, an unsightly abandoned building next door with holes in the side and roof. Compl. ¶¶ 284-89. The facts alleged pertaining to the private nuisance claims are sufficient to survive a motion to dismiss.

### CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss the plaintiffs' claims will be denied.

A separate order follows.

**All Citations**

Slip Copy, 2019 WL 3241126

---

**End of Document**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.