IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | |
| Plaintiffs, | |
| v. | |
| DEUTSCHE BANK NATIONAL TRUST, as trustee; DEUTSCHE BANK TRUST COMPANY AMERICAS, as trustee; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC., | Case No. 18 CV 839 Judge Harry D. Leinenweber |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This Fair Housing Act lawsuit alleges discriminatory housing maintenance in communities of color. Defendants Deutsche Bank National Trust, Deutsche Bank Trust Company Americas, Ocwen Loan Servicing, LLC, and Altisource Solutions, Inc., move to dismiss Plaintiffs' Second Amended Complaint. For the reasons stated below, the Motion to Dismiss (Dkt. No. 71) is granted in part and denied in part.

## I.  BACKGROUND

In addition to reciting the relevant pleadings herein, the Court incorporates the facts and holdings from its opinion granting Defendants' prior motion to dismiss this case. *See Nat'l Fair Hous.*

*All. v. Deutsche Bank*, No. 18 C 0839, 2018 WL 6045216 (N.D. Ill. Nov. 19, 2018). The following facts are taken as true for the purpose of Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).

## A. Facts

Plaintiffs are national and local fair housing organizations whose mission is to end housing discrimination and promote integration. Defendants Deutsche Bank National Trust and Deutsche Bank Trust Company Americas (collectively, the "Deutsche Bank Defendants") are financial institutions that own mortgages, and consequently, foreclosed homes, across the country. Defendants Ocwen Loan Servicing, LLC ("Ocwen") and Altisource Solutions, Inc. ("Altisource") (collectively, the "Servicer Defendants") provide property preservation, maintenance, and other services for properties that the Deutsche Bank Defendants own.

During the 1990s and early 2000s, many lenders sought to expand markets for "subprime" home mortgage products—that is, mortgages with unfavorable and risky loan terms, often issued to borrowers with low credit ratings. The subprime lending boom collapsed in 2008, leading to a foreclosure crisis in the U.S. When a home mortgage that a bank owns goes into default and foreclosure, the bank obtains title to the home, which is then referred to as "Real Estate Owned" (REO). *See Nat'l Fair Hous.*

*All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 943 (N.D. Cal. 2018). Essentially, an REO property is a vacant home possessed by a bank. The large volume of foreclosures beginning in 2008 created many REO properties, which were and are disproportionately located in communities of color (predominately African-American and Hispanic neighborhoods). As a result of the subprime mortgage market collapse, the Deutsche Bank Defendants became owners of a large inventory of REO properties in communities of color.

Beginning in 2011, Plaintiffs undertook an investigation of Defendants' maintenance of the REO properties they owned across the country. Plaintiffs sought to measure the extent to which Defendants maintained REOs in communities of color and in predominately white neighborhoods. Plaintiffs examined 1,141 REO properties owned by the Deutsche Bank Defendants. For each property investigated, Plaintiffs collected evidence on 39 objective aspects of routine exterior maintenance such as graffiti, damage to windows, and overgrown grass. Plaintiffs' investigation revealed "highly significant disparities" in the exterior maintenance and marketing of Deutsche Bank-owned homes in communities of color compared to white communities. (SAC ¶ 5.)

### B. Procedural History

In February 2018, Plaintiffs filed suit against Defendants under the Fair Housing Act of 1968 (FHA), 42 U.S.C. § 3601, *et*

*seq.* Plaintiffs' Complaint centered on Defendants' practices with respect to the REO properties they own in thirty metropolitan areas, including Chicago. Plaintiffs alleged that Defendants violated 42 U.S.C. §§ 3604(a), 3604(b), 3605, 3617, and violated the FHA generally by perpetuating segregation.

Defendants moved to dismiss the Complaint. The Court granted that motion in full and made the following relevant holdings: (1) a significant portion of the dataset Plaintiffs relied on must be removed as it was untimely under the FHA's two-year statute of limitations; (2) Plaintiffs' § 3604 claims must be dismissed because they failed to allege that the REO properties were neglected to such an extent as to dissuade purchasers from buying them; (3) Plaintiffs' § 3605 claims must be dismissed because Plaintiffs failed to allege any specific real-estate transaction impeded by Defendants' conduct; (4) Plaintiffs' perpetuating segregation claim must be dismissed because the Court did not yet have the properly sheared dataset upon which this claim is based; and (5) Plaintiffs failed to state either a disparate impact or discriminatory intent theory of discrimination under the FHA. *See Nat'l Fair Hous. All.,* 2018 WL 6045216.

Plaintiffs filed their Second Amended Complaint (SAC) in May 2019. They dropped their 42 U.S.C. § 3617 claim, but otherwise assert the same claims against Defendants as in their original

Complaint. Plaintiffs again allege that Defendants' exterior maintenance of REO properties constitutes unlawful racial discrimination, in the form of both disparate impact and disparate treatment, under the FHA. They seek a declaratory judgment that Defendants' conduct violates the FHA, an injunction that prohibits Defendants from violating the FHA, compensatory and punitive damages, and attorneys' fees. Plaintiffs contend that they have added allegations that render the SAC sufficient under Rule 12(b)(6). Defendants again move to dismiss for failure to state a claim.

## II.  LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) challenges the sufficiency of a complaint by arguing that it fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6); *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). When considering a motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Trujillo v. Rockledge Furniture LLC*, 926 F.3d 395, 397 (7th Cir. 2019). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide enough

factual information to "state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A complaint is facially plausible when a plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III. DISCUSSION

Defendants assert four primary arguments in favor of dismissal: (1) Plaintiffs' allegations do not establish proximate cause; (2) the Deutsche Bank Defendants are not liable under the FHA; (3) Plaintiffs fail to plead either a disparate impact or disparate treatment theory of discrimination; and (4) Plaintiffs failed to plead claim-specific elements. The Court will address each argument in turn.

### A. Proximate Causation

First, the Court examines whether Plaintiffs have alleged proximate cause under the FHA. As the Court noted in its previous opinion, the recent Supreme Court decision *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296 (2017), controls this issue. In *City of Miami*, the Supreme Court considered FHA claims brought by the City of Miami against two banks that allegedly intentionally issued mortgages with less favorable terms to African-American and

Hispanic borrowers than to similarly situated white borrowers. *Id.* at 1301. The Court examined what degree of causation is required to state a claim under the FHA. *Id.* at 1305-06. In all cases of loss, courts must attribute loss to the proximate cause, not to "any remote cause." *Id.* at 1305. The Court found that a claim for damages under the FHA is "akin to a tort action" and therefore a plaintiff must establish proximate cause in order to recover damages for a violation of the FHA. *Id.* (internal quotation and citation omitted). Proximate cause analysis is "controlled by the nature of the statutory cause of action," which in turn is governed by an inquiry into whether the harm alleged has a "sufficiently close connection" to the conduct the statute prohibits. *Id.* at 1305 (citation omitted).

In *City of Miami,* the city sought damages to account for the loss of property tax revenue and the need to spend more on municipal services, caused by the increase in foreclosures, which were caused by the banks' discriminatory lending practices. The Eleventh Circuit had held that the City's injuries were sufficient to satisfy the proximate cause requirement because they were "foreseeable." *City of Miami*, 137 S. Ct. at 1305-06. The Supreme Court disagreed and held that to establish proximate cause in an FHA case, a plaintiff must do more than show that its injuries foreseeably flowed from the statutory violation. *Id.* at 1306. While

the Court declined to define a standard of proximate cause under the FHA, it did note that proximate cause under the FHA requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 1306 (citation omitted). The Court further observed that for statutes with common-law foundations, the "general tendency… in regard to damages at least, is not to go beyond the first step." *Id.* (citing *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 10 (2010)). Courts should also consider "what is administratively possible and convenient." *City of Miami*, 137 S. Ct. at 1306 (citation omitted).

In this case, Plaintiffs' original Complaint asserted the following injuries: Defendants' conduct had undermined their education and advocacy programs, diverted their scarce resources, and damaged their community investments. When this Court considered proximate cause in its dismissal opinion, it found that Plaintiffs' injuries did not "result[] directly from" Defendants' actions and thus ran afoul of *City of Miami*'s warning about proximate cause. *See Nat'l Fair Hous. All.*, 2018 WL 6045216, at *13. The Court found that, fatal to proximate cause, Plaintiffs' harm only materialized after "intermediate steps":

> [Plaintiffs'] theory is that Defendants' delegation practice resulted in poorly-executed property maintenance, which led to racially-disparate effects, *ergo* Plaintiffs had to invest more heavily (or simply saw less return on their preexisting investments) to

combat those effects. Climbing this chain requires more
steps than the FHA permits.

*Id*.

Plaintiffs now allege that Defendants' failure to maintain
REO properties in communities of color injured them in the
following ways: (1) it required them to divert resources away from
their usual activities; (2) frustrated their mission of
eradicating housing discrimination; (3) required them to spend
money on counteractive measures; (4) undermined the economic value
and impact of Plaintiffs' community investments; and (5) harmed
minority neighborhoods that Plaintiffs serve. Defendants again
argue that Plaintiffs have failed to allege a "direct relation"
between their injury and Defendants' conduct.

However, this Court has reason to reconsider its earlier
analysis on this issue. In *City of Miami*, the Supreme Court
emphasized that it would not "draw the precise boundaries of
proximate cause under the FHA," and instructed that lower courts
"should define, in the first instance, the contours of proximate
cause under the FHA." *City of Miami*, 137 S. Ct. at 1306. This
Court now has the benefit of Seventh and Eleventh Circuit opinions
applying *City of Miami* and will reconsider the proximate cause
issue with this binding and persuasive precedent in mind.

After the Court issued its first dismissal opinion in this
case, the Seventh Circuit published *Kemper v. Deutsche Bank AG*,

911 F.3d 383 (7th Cir. 2018), a decision that clarified the Seventh Circuit's thinking about proximate cause post-*City of Miami*. In *Kemper*, the mother of a U.S. servicemember who was killed in Iraq sued Deutsche Bank for providing material support to terrorism, in violation of the Anti-Terrorism Act. *Kemper*, 911 F.3d at 392-93. The plaintiff claimed that the Bank provided financial services to Iranian businesses, those Iranian entities went on to provide services to terrorist groups, and Iran was ultimately responsible for the terrorist attack in Iraq that killed her son. *Id.* at 386. Citing *City of Miami*, the Seventh Circuit held that the Anti-Terrorism Act requires proximate cause for liability. *Kemper*, 911 F.3d at 391. The court observed that "simply stating that the ATA requires proof of 'proximate cause' does not help much. A firm definition for the term 'proximate cause' has escaped judges, lawyers, and legal scholars for centuries." *Id.* The Seventh Circuit noted that there is no precise formula for proximate cause; rather, it is a "flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." *Id.* at 392 (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)). Several factors are relevant to the proximate cause inquiry, which the court referred to as a "catch-all approach": foreseeability, directness, whether the defendant's actions were a "substantial factor in the sequence of events" leading to the

plaintiff's injuries, and other established principles of tort causation. *Id.* at 392.

The *Kemper* court held that the plaintiff failed to plead facts that indicated Deutsche Bank's actions were the proximate cause of her son's death. *Id.* at 393-94. The Seventh Circuit found several important facts key to its decision: plaintiff did not allege that Deutsche Bank ever serviced a terrorist group directly; plaintiff could not show that the money Deutsche Bank facilitated into Iran was used specifically to fund terrorism; one of the links in the "causal chain" was Iran, a sovereign state with many legitimate operations and programs to fund; and plaintiff could not overcome the traditional tort doctrine of superseding cause—in that case, the numerous criminal intervening acts that separated Deutsche Bank from the terrorist attack. *Id.* at 392-93. Post-*Kemper,* district courts in the Seventh Circuit should not follow a strict "first step" test for proximate cause, but rather assess a variety of factors.

Additionally, the Court now has the benefit of the Eleventh Circuit's decision on remand in *City of Miami*. *See City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019). Taking up the Supreme Court's instruction to define the contours of proximate cause under the FHA, the Eleventh Circuit held that "proximate cause does not always cut off at the first step after a violative

act." *Id*. at 1273. That court noted that "Supreme Court precedent makes crystal clear that an intervening step does not necessarily mean proximate cause has not been plausibly alleged." *Id*. (citing *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014)). More important is "the certainty with which we can say the injury is fairly attributable to the statutory violation." *Id*. The Eleventh Circuit emphasized that the Supreme Court's statement that proximate cause requires "some direct *relation*" is distinct from a requirement of "some direct causation." *Id*. at 1272 (emphasis added). Indeed, the court noted that if there were a "hard and fast 'only the first step' rule" limiting liability:

> [A] plaintiff homeowner who was forced into foreclosure on account of a predatory bank loan that violated the Fair Housing Act would never be able to plausibly allege that the foreclosure was proximately caused by the bank's predation. By [defendant's] lights, there are *two* critical steps in the chain of causation between the act of redlining and foreclosure: the middle and distinct step being a homeowner's default. So inexorable a rule would even bar the homeowner from seeking redress for the foreclosure under the FHA, since the foreclosure only occurs after the homeowner takes the independent step of failing to make payments on the predatory loan.

*Id*. at 1276. Ultimately, the Eleventh Circuit found that the City of Miami had adequately pled proximate cause relating to its tax-base injury because the Bank's redlining practices "bear some direct relation to the City's fiscal injuries." *Id*. at 1294. However, the Eleventh Circuit found that the City's increased

municipal expenditures injury did not directly result from the Bank's conduct—there was "too much opportunity in the causal chain between foreclosure and increased expenditures for intervening actors and causes to play a role, and there has been no explanation by the City of how we might conceivably isolate the injury attributable to the Banks." *Id*. Thus, the Eleventh Circuit emphasized that whether a court can practically determine damages is an important consideration in a proximate cause determination.

So too did the Supreme Court in *City of Miami* emphasize that when assessing proximate cause under the FHA, courts must consider "what is administratively possible and convenient." *City of Miami*, 137 S. Ct. at 1306 (citing *Holmes v. Sec. Inv'r Prot. Corp.,* 503 U.S. 258, 268 (1992)). Administrative feasibility is "most closely connected to the policy judgments upon which proximate cause standards necessarily depend." *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1281 (11th Cir. 2019); *see also Holmes,* 503 U.S. at 268 ("[P]roximate cause reflects ideas of what justice demands, or of what is administratively possible and convenient."). For this reason, the Eleventh Circuit on remand in *City of Miami* found "in no small part" that the City plausibly plead proximate cause because it was "entirely practicable and not unduly inconvenient" for a court to "handle damages like the City's tax revenue injury." *City of Miami*, 923 F.3d at 1281.

Thus, the Court should consider the policy implications at hand in this case. Apart from municipalities themselves, a fair housing organization is likely in the "best position to allege and litigate this peculiar type of injury, to deter future violations, and, theoretically, to actually remedy its distinctive injury." *See City of Miami*, 923 F.3d at 1281. This is because:

> [I]n the fair housing context the initial victims, such as home-seekers or borrowers, may be less aware of the harm and less able to remedy it than entities such as a housing counseling organization or a municipal economic development office. These are entities that can identify a pattern of discrimination invisible to any individual victim and that also suffer a distinct, additional harm in the diversion of their resources and the frustration of their missions… [I]ndividuals who have been directly discriminated against cannot be counted on to vindicate their rights in the same way because: (1) any one individual's damages may be minimal; (2) home-seekers turned away may decide it is not worth the effort to vindicate a right to live among those who seek to exclude them; and, most fundamentally, (3) they may not know that they were victims of discrimination.

Justin P. Steil & Dan Traficonte, *A Flood—Not A Ripple—of Harm: Proximate Cause Under the Fair Housing Act,* 40 Cardozo L. Rev. 1237, 1256, 1267 (2019).

Defendants maintain that Plaintiffs' injuries are impermissibly "indirect." They characterize Plaintiffs' causal theory as a many-linked chain, as follows: the Deutsche Bank Defendants decided they were not responsible for maintaining the exterior of their REO properties; the Deutsche Bank Defendants then retained servicers (Altisource and Ocwen) who were

- 14 -

unqualified and disincentivized to properly maintain the REO properties; the Servicers then maintained the properties in a discriminatory manner; that lack of maintenance caused a decrease in property value, increased crime, and other neighborhood problems; and finally, Plaintiffs were injured by their need to divert resources into investigating and redressing this matter. However, the Seventh and Eleventh Circuit both rejected this method of counting "steps" between an action and an injury. *See Kemper*, 911 F.3d at 392; *City of Miami*, 923 F.3d at 1277-78. As the Eleventh Circuit explained, the defendant's "step-counting is self-evidently conducted so as to identify as many steps as possible… the ease with which we can count far fewer steps reinforces our view that step-counting is of limited value and cannot alone settle the challenging questions of proximate cause here." *City of Miami*, 923 F.3d at 1277-78. So too can this Court, by less thinly slicing the "steps" between Defendant's conduct and Plaintiffs' injuries, view a more direct causal relationship, *e.g.*: Defendants discriminatorily failed to maintain REO in minority neighborhoods; Plaintiffs then had to spend time and money investigating and combatting the problems created by the REO properties in disrepair.

Accordingly, the Court turns to its assessment of whether Defendants' conduct was the proximate cause of each category of injuries Plaintiffs allege—holistically and considering tort

principles, as the Seventh Circuit instructs. *See Kemper*, 911 F.3d at 392.

## 1. **Diversion of Resources**

First, Plaintiffs assert that they have suffered damages by their need to divert resources away from existing programs to address Defendants' discriminatory conduct. (*See* SAC ¶ 185.) For example, Plaintiff National Fair Housing Alliance (NFHA) had to forgo its usual investigations into housing sales discrimination so that its staff could address the Defendant-owned and serviced REO properties that were falling into disrepair in communities of color. This Court originally found that Defendants were not the proximate cause of these injuries, based on the assessment that Plaintiffs' harms were not connected at the "first step" in a causal chain. As the Court outlined above, the Seventh Circuit has clarified that this is not the appropriate test in a proximate cause analysis.

The Court now finds that the damages Plaintiffs incurred in the form of diversion of resources meet the three foremost factors in a proximate cause analysis: foreseeability, directness, and substantiality. *See Kemper*, 911 F.3d at 392. The variety of factors that a court might worry would independently explain a housing rights organization's damages are not present here. Here, there is a "clear, direct and immediate" path between Defendants' alleged

discriminatory lack of maintenance and Plaintiffs' response to that lack of maintenance through investigations, reporting, and advocacy. *See City of Miami*, 923 F.3d at 1277 (finding proximate cause when "we can discern no obvious intervening roadblocks").

In this way, the injuries that Plaintiffs incurred responding to Defendants' failure to maintain their REO properties differ materially from those in *City of Miami*, where the City relied solely on the defendant bank's initial loan origination practices. *See Cty. of Cook v. HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d 950, 961 (N.D. Ill. 2018). That left open the possibility that "the foreclosures in Miami could have been caused by a wide array of factors outside of the lenders' control." *Id*. at 962. In contrast, here, Plaintiffs point to Defendants' allegedly discriminatory REO property maintenance, which is directly linked to losses Plaintiffs have suffered trying to rectify that discriminatory maintenance. *See id*. These injuries bear a sufficiently direct relationship to the alleged wrongs to survive Defendants' Motion to Dismiss.

### 2. Costs of Counteractive Measures

Next, Plaintiffs seek damages for the expenses they incurred in implementing measures to counteract Defendants' alleged discrimination. Plaintiffs developed and implemented programs designed to ameliorate the effects of Defendants' failure to

maintain REO properties in communities of color. (SAC ¶ 184.) For the same reasons as diversion of resources—indeed, it appears that this "category" of damages is not meaningfully distinguishable from the diversion of resources category—this is sufficient to plead proximate cause. Assuming the truth of Plaintiffs' allegations, the relationship between Defendants' discriminatory actions and the additional costs to Plaintiffs is clear: Defendants' discriminatory conduct left more REO properties in minority neighborhoods in disrepair, causing Plaintiffs to incur more costs responding to this problem than they otherwise would have. *HSBC N. Am. Holdings*, 314 F. Supp. 3d at 962.

### 3. Frustration of Mission

Plaintiffs also seek the costs of Defendants having "frustrated" their organizational mission of eradicating housing discrimination and segregation. Plaintiffs assert that by creating "conditions antithetical to [their] mission," Defendants impeded Plaintiffs' organizational goals and effects. (SAC ¶ 180.) Again, this category closely resembles "diversion of resources"—to the extent it differs, it is because it would be more difficult to measure the amount of damages Plaintiffs incurred in their mission and programs being "frustrated" and "undermined." (SAC ¶ 181.)

As the Supreme Court counseled in *City of Miami*, whether an injury satisfies proximate cause depends in large part on (1) the

nature of the statutory cause of action; and (2) what is administratively possible and convenient. *City of Miami*, 137 S. Ct. at 1299. The Court is satisfied that the first factor is met. The Supreme Court construes the FHA as defining potential plaintiffs "broadly." *Id.* at 1303 (noting that the definition of "person aggrieved" in the original version of the FHA "showed a congressional intention to define standing as broadly as is permitted by Article III of the Constitution"); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) ("The language of the [FHA] is broad and inclusive."). The FHA has a "broad remedial purpose[,] written in decidedly far-reaching terms," and "prohibits a wide range of conduct." *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1278 (11th Cir. 2019). Defendants do not dispute that Plaintiffs are "aggrieved persons" within the meaning of the FHA. *See* 42 U.S.C. §§ 3602, 3612, 3613. The text and history of the FHA indicate that the Act is capable of accommodating the type of causal connection that Plaintiffs have identified between the Defendants' misconduct and damage to Plaintiffs' mission of furthering fair housing. The second factor is more tenuous. Plaintiffs have not identified how they would quantify the damages caused by "frustration" of their mission. This type of injury seems likely to present difficulty in assessing and attributing damages— and again, may be an unnecessary extension of the "diversion of

resources" category. Ultimately, Plaintiffs' allegations are sufficient to survive the pleading stage. But Plaintiffs will have to specify how they intend to measure damages (without using the two excluded categories below) before the Court will award them.

**4. Loss of Economic Value and Impact of Community Investments**

Plaintiffs seek damages for the loss of economic value and impact of their community investments. Plaintiffs have invested millions of dollars in neighborhoods "affected by REO blight" in the form of down payments, matching funds, closing cost assistance, property rehabilitation assistance, rent assistance, and community revitalization. (SAC ¶ 174.) Plaintiffs assert that their various financial investments in minority communities are undermined by deteriorating and poorly maintained Deutsche Bank-owned REO properties.

The Court must adhere to its earlier conclusion on this matter. Even under a broader understanding of proximate cause that looks beyond simple "step counting," the line from Defendants' alleged discriminatory conduct to the "undermining" of Plaintiffs' investments winds through too many other potential causes. *See HSBC N. Am. Holdings*, 314 F. Supp. 3d at 964. Here, only two of the three factors the Seventh Circuit has held most important in a proximate cause analysis are satisfied. *See Kemper*, 911 F.3d at 392 (foreseeability, directness, and whether the defendant's

actions were a "substantial factors in the sequence of events" leading to a plaintiff's injuries). This type of injury was surely foreseeable from the type of discrimination alleged, which discrimination was also a substantial factor in Plaintiffs' injuries. But directness is lacking. And it would be administratively difficult to measure and apportion these damages. *HSBC N. Am. Holdings*, 314 F. Supp. 3d at 964 (a municipality cannot allege proximate cause under the FHA for the diminution of property values of the homes surrounding the homes defendant allegedly led into foreclosure because the plaintiff's "injuries would be derivative of any number of external factors as well as the conduct of other homeowners and lenders"). Therefore, Defendants' Motion to Dismiss this claim of injury is granted.

### 5. Harms to Minority Neighborhoods

Finally, Plaintiffs seek to recover damages for harms to minority neighborhoods that Plaintiffs serve. Such harms include: diminished properly values, safety, habitability, housing opportunities, lending opportunities, and community redevelopment. (*See* SAC ¶ 189.) This collection of harms is not sufficiently directly related to Defendants' conduct to satisfy proximate cause under the FHA. These harms are precisely the "ripples" that *City of Miami* cautions "flow far beyond [a] defendant's misconduct," which risk massive and complex damages litigation, and involve too

many intricate, uncertain inquiries to establish proximate cause. *Cty. of Cook, Illinois v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 988 (N.D. Ill. 2018) (citing *City of Miami*, 137 S. Ct. at 1306); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) (noting that proximate cause's "motivating principle" is "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action").

Additionally, this type of injury raises issues of duplicative recovery and other possible plaintiffs. Courts often find proximate cause when the court is satisfied that the injuries alleged are "not shared by *any* other possible plaintiff." *See City of Miami*, 923 F.3d at 1287. It may be that the injuries inflicted on neighborhood residents are *also* inflicted on Plaintiffs. *See id*. at 1277 ("[I]f the Banks' predatory lending practices injured homeowners and led to foreclosures on a massive scale, these injuries inflicted on multiple homeowners in the same city must almost surely have injured the City as well."). However, it would be exceedingly difficult for the Court to apportion damages for the widespread economic harms inflicted on minority neighborhoods as between Plaintiffs and the actual residents of those neighborhoods. Thus, Defendants' motion to dismiss this claim of injury is granted. The Court turns to the liability of the Deutsche Bank Defendants.

## B. Deutsche Bank Defendants' FHA Liability

The Deutsche Bank Defendants own the REO properties at issue as trustees. As the Court explained in its prior opinion, the REO properties at issue here all have mortgages that were pooled together to form residential mortgage-backed securities (RMBS). Upon the creation of an RMBS, a document called a Pooling and Servicing Agreement (PSA) is used to allocate responsibilities related to the security among certain parties. The PSA designates a trustee to hold title to the real estate securing the RMBS, and designates a servicer to preserve and manage the property. In this case, the Deutsche Bank Defendants are the PSA-designated trustees; Ocwen and Altisource are the servicers. The Court has taken judicial notice of one of the many PSAs between the Deutsche Bank Defendants and the Servicers. *Nat'l Fair Hous. All.,* 2018 WL 6045216, at *6. Citations in this opinion to "the PSA" correspond to that example PSA. (*See* PSA, Ex. F to Defs.' Reply, Dkt. No. 47-7.)

In their prior and current Motions to Dismiss, the Deutsche Bank Defendants contend that they cannot be liable under the FHA because they contractually delegated all responsibility for maintaining the REO properties to the Servicers. Plaintiffs argue that, despite the fact that the Deutsche Bank Defendants hold the REO properties in trust, they are still legally responsible for

the discriminatory acts of the Servicers in maintaining those properties.

The Court ruled in its last dismissal opinion that in order for the Deutsche Bank Defendants to succeed in this argument, they must establish via judicially-noticeable documentation that the allegations concerning their property maintenance responsibilities are inaccurate. *Nat'l Fair Hous. All.*, 2018 WL 6045216, at *7. Specifically, the Court held that "property ownership is not a trump card in FHA suits; rather, when the alleged FHA malfeasant is not an agent of the owner, the owner may indeed escape liability." *Id*. at *6. The Court also discussed the Deutsche Bank Defendants' argument that they held title to the REO properties as *indenture* trustees, a particular type of property ownership that Defendants contend affects liability under the FHA. Plaintiffs now argue that the Court should reconsider its ruling for two reasons: (1) the type of trust in which Deutsche Bank Defendants hold the REO properties is irrelevant to whether they are liable under the FHA; and (2) a recent Seventh Circuit case counsels that no agency relationship is required for FHA liability.

## 1. Indenture Trustees

In its earlier opinion, the Court noted the difference between ordinary and indenture trustees. An indenture trustee's fiduciary duties are more limited in scope than the duties of an ordinary

trustee, and the duties of an indenture trustee are generally "strictly defined and limited to the terms of the indenture." *Williams v. Cont'l Stock Transfer & Tr. Co.*, 1 F. Supp. 2d 836, 840 (N.D. Ill. 1998) (citing *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988)). While the Court acknowledged the difference between ordinary and indenture trusts, it did not hold that indenture trustees are excluded from FHA liability. Nor could it. The FHA does not distinguish between different types of trusts. *See* 42 U.S.C. § 3602(d) (defining "person" to include "trusts," "trustees, "trustees in cases under Title 11," "receivers," and "fiduciaries"). The FHA's broad language has been held to include entities that can be reasonably interpreted as coming within its scope. *See Vill. of Bellwood v. Gladstone Realtors,* 569 F.2d 1013, 1020 n.8 (7th Cir. 1978), *aff'd in part*, 441 U.S. 91 (1979), *and abrogated by Vill. of Bellwood v. Dwivedi,* 895 F.2d 1521 (7th Cir. 1990) (interpreting the FHA as covering "municipal corporations" though only "corporations" are covered in Section 3602(d)). Simply put, nothing in the FHA indicates that indenture trustees are immune from liability.

## 2. Agency and Control

Regardless of whether a governing agreement is an indenture trust, ordinary trust, or a "PSA," what governs the Deutsche Bank

Defendants' liability under the FHA is the extent to which they had control and/or influence over the Servicers.

### a. Agency and Disparate Treatment Discrimination

The FHA permits both indirect and direct liability. Principals can be liable for discrimination of their agents under the FHA. *Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("[I]t is well established that the Act provides for vicarious liability" and "traditional vicarious liability rules ordinarily make principals… vicariously liable for acts of their agents… in the scope of their authority[.]") In *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856 (7th Cir. 2018), *cert. dismissed sub nom. Glen St. Andrew Living Com. v. Wetzel*, 139 S. Ct. 1249 (2019), the Seventh Circuit held, in the context of intentional discrimination FHA claim, that a court need not find a strict principal-agent relationship in order to find liability under the FHA. In *Wetzel*, the plaintiff alleged that her landlord, the defendant, discriminatorily harassed and retaliated against her based on her sexual orientation. The plaintiff contended that the landlord was aware that other tenants in the building were harassing her on the basis of her sexual orientation yet did nothing to curb the harassment. The defendant argued that a landlord cannot be liable under the FHA for the actions of its tenants, because there is "no agency or

custodial relationship between a landlord and tenant." *Wetzel,* 901 F.3d at 864. The Seventh Circuit rejected that argument, holding:

> [W]e need look only to the management defendants themselves, asking whether they had actual knowledge of the severe harassment [plaintiff] was enduring and whether they were deliberately indifferent to it. If so, they subjected [plaintiff] to conduct that the FHA forbids… [Defendant] complains that it would be unfair to hold it liable for actions that it was incapable of addressing, but we are doing no such thing. We have no quarrel with the idea that direct liability for inaction makes sense only if defendants had, but failed to deploy, available remedial tools. [Defendant] protests that it can only minimally affect the conduct of its tenants… *Control in the absolute sense, however, is not required for liability. Liability attaches because a party has "an arsenal of incentives and sanctions… that can be applied to affect conduct" but fails to use them.*

*Id*. at 865 (internal citations omitted) (emphasis added).

Thus, under *Wetzel*, a plaintiff need not establish a principal-agent relationship in order to allege discriminatory intent via a deliberate indifference theory. If Plaintiffs can establish that the Deutsche Bank Defendants had knowledge of the Servicers' discriminatory REO maintenance, and the ability to affect that discriminatory conduct, but failed to do so, Plaintiffs can hold the Deutsche Bank Defendants liable for intentional discrimination under the FHA.

Defendants argue that the Court should disregard *Wetzel*, as Plaintiffs brought this case to the Court's attention several days before it issued its earlier ruling. (*See* Pl.'s Mot. to Suppl.

Authority, Nov. 15, 2018, Dkt. No. 52.) The same day the Court issued its Opinion, the Court briefly noted that *Wetzel* "does not materially change the Court's perspective on today's ruling." (*See* Nov. 19, 2018, Docket Entry, Dkt. No. 54.) At the time, the Court did not have the benefit of full briefing on this case and its implications. The Court now has had the opportunity to consider *Wetzel* fully, and reconsider its ruling accordingly. The Court now holds that property ownership alone is not a trump card in FHA suits, but neither is an agency relationship required in all cases.

This brings the Court to the question of whether the Deutsche Bank Defendants hold incentives and/or sanctions over the Servicer Defendants that confer the requisite (not absolute) amount of control to incur liability for deliberate indifference.

To determine whether Deutsche Bank Defendants had available "incentives and sanctions" that they could have used to "affect the conduct" of the Servicers, the Court looks to the terms of the PSA. *Wetzel*, 901 F.3d at 865. The PSA requires that the Servicers "actively market" REO properties for sale for the benefit of the Trust. (PSA § 3.12.) "Pursuant to its efforts to sell the REO property, the Servicer shall either itself or through an agent selected by the Servicer protect and conserve the REO Property in accordance with the Servicing Standard." (*Id.*) The Servicing Standard requires "that degree of skill and care exercised by the

Servicer with respect to mortgage loans comparable to the Mortgage Loans serviced by the Servicer for itself or others." (PSA § 1.01) In the event of Servicer default, the Deutsche Bank Defendants "assume all of the rights and obligations" of the Servicer under the PSA. (PSA § 3.05.) The PSA defines an "event of default" to include "any failure by the Servicer to observe or perform in any material respect any… covenants or agreements on the part of the Servicer contained in this Agreement." (PSA §7.01.) Vague as the Servicing Standard may be, any reasonable degree of skill or care would include not violating federal discrimination laws. Thus, the Deutsche Bank Defendants could have given notice to the Servicers that their "protecting and conserving" the REO properties was in violation of the Servicing Standard, putting them at risk of a default under the PSA.

The Deutsche Bank Defendants had another "remedial tool" that they could have deployed. *Wetzel*, 901 F.3d at 865. They owned the REO properties at issue. As such, the Deutsche Bank Defendants maintained a right to possess, control, and exclude others from their properties. *See Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018) ("One of the main rights attaching to property is the right to exclude others.") The Deutsche Bank Defendants repeatedly assert that they hold "bare legal title" to the REO properties to indicate that they cannot be liable under the FHA. (Defs.' Suppl.

Mem. at 1, Dkt. No. 63.) But under *Wetzel*, Deutsche Bank Defendants apparently had incentives, sanctions, and remedial tools that they could have used but choose not to. Therefore, at this stage, Plaintiffs have alleged sufficient facts to indicate that the Deutsche Bank Defendants can be liable for failure to prevent recurring discrimination.

However, *Wetzel* only involved a claim of intentional discrimination under the FHA. The Court declines to extend *Wetzel* to disparate impact theories of liability under the FHA. Therefore, to hold the Duetsche Bank Defendants liable under a disparate impact theory, Plaintiffs still must allege a principal-agent relationship.

**b. Agency and Disparate Impact Discrimination**

Whether an agency relationship exists for purposes of the FHA is determined by federal law. *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1097 (7th Cir. 1992). The Seventh Circuit has observed that "the federal common law of agency, Illinois agency law, and the Restatement of Agency are all in accord on general agency principles." *NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1058 (7th Cir. 2013). The question of whether a principal-agent relationship exists is typically a question of fact, and a court should decide the issue as a matter of law if "only one conclusion

may be drawn from the undisputed facts." *Clarendon Nat. Ins. Co.*
*v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011); *see also Chemtool,*
*Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 743 (7th Cir. 1998)
(in which the district court found no agency relationship between
the parties after a bench trial). Generally, an agency relationship
arises when one person (a principal) manifests assent to another
person (an agent) that the agent shall act on the principal's
behalf and subject to the principal's control, and the agent
manifests assent or otherwise consents so to act. *Medina*, 645 F.3d
at 935 (citing Restatement (Third) of Agency § 1.01 (2006)). A
person manifests such asset or intention through written or spoken
words or other conduct. Restatement (Third) Of Agency § 1.03.

Plaintiffs allege that the Servicers are agents of the
Deutsche Bank Defendants. In support of this claim, Plaintiffs
cite to various terms in the PSA that they contend indicate a
principal-agent relationship. (SAC ¶¶ 66-78.) In return, the
Deutsche Bank Defendants cite to provisions in the PSA that they
argue prove no such relationship exists. In particular, Defendants
emphasize that the PSA does not designate a Servicer as an "agent"
of any Trustee. However, whether a relationship is characterized
as agency in an agreement between parties or in the context of
industry of popular usage is not controlling. *Washington v. Kass*
*Mgmt. Servs.*, No. 10 C 4409, 2011 WL 1465581, at *2-3 (N.D. Ill.

Apr. 18, 2011) (citing Restatement (Third) Of Agency § 1.02). The Court simply does not have enough undisputed facts before it that indicate whether the Deutsche Bank Defendants had the right to control the manner and method in which the Servicers carried out their maintenance work. Presently, it is plausible, not purely speculative, that an agency relationship exists or existed between Deutsche Bank Defendants and the Servicers. Of course, the extent of that agency relationship remains to be determined as this case moves forward. *Washington*, 2011 WL 1465581, at *4. Because Plaintiffs have plausibly alleged a theory of liability for both their intentional discrimination and disparate impact claims against the Deutsche Bank Defendants, their motion to be dismissed from this case is denied.

### C. Timeliness

Plaintiffs ask the Court to reconsider its ruling on the statute of limitations in this case. *See Nat'l Fair Hous. All.*, 2018 WL 6045216, at *4 (holding that the two-year statute of limitations under the FHA starts Plaintiffs' actionable allegations on February 26, 2012, for the Deutsche Bank Defendants and on February 14, 2015, for the Servicer Defendants). The Court found that Plaintiffs were on notice in 2011 that the Deutsche Bank Defendants were violating the FHA, and as such, could not rely on the continuing violation doctrine to bypass the ordinary

two-year statute of limitations. *Id.* The continuing violation doctrine states that when a plaintiff challenges "not just one incident of conduct violative of the [FHA], but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 365 (1982). The Seventh Circuit has held that the doctrine has no application where the time-barred incident put the plaintiff on notice that his rights were being violated. *See Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008).

The basis for the Court's holding was Plaintiffs' allegations in their original Complaint that during their "initial investigation" into maintenance of REO properties throughout the lending industry, "Plaintiffs observed that many REO properties exhibiting poor maintenance in communities of color were owned by Deutsche Bank." (Compl. ¶ 88, Dkt. No. 1.) As part of Plaintiffs' investigatory efforts, in 2011 NFHA held "a national news conference and released a report analyzing and describing the discriminatory maintenance and marketing of white and non-white REO properties. The release of this comprehensive report placed Defendants on notice of the fact that their discriminatory conduct and practices violate the Fair Housing Act." (*Id.*) The Court held

that because "Plaintiffs' own allegations demonstrate their clear knowledge of their FHA claims back in 2011, the continuing violation doctrine is unavailable to them." *Nat'l Fair Hous. All.,* 2018 WL 6045216, at *4.

Plaintiffs now ask the Court to reconsider its holding on timeliness, arguing that they had "insufficient data" on the condition of Deutsche Bank's REO properties in 2011. (Pls.' Resp. at 5, Dkt. No. 77.) Plaintiffs place a lot of weight on the notion that they had not yet accumulated adequate data to say with "reasonable certainty" that the Deutsche Bank Defendants were violating the FHA. However, this is not the standard for when notice of a violation cuts off the availability of the continuing violation doctrine. As the Court has already explained, a plaintiff seeking the doctrine's application must show that it was reasonable of him not to perceive the impingement of his rights until the discriminatory acts had, "through repetition or cumulation, reached the requisite level of severity." *Id.* (citing *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 703 (7th Cir. 2001)). Plaintiffs did not need to have "thorough[ly] develop[ed]" evidence to have perceived the impingement of their rights. (Pl.'s Resp. at 6.) Thus, this argument fails to satisfy the relevant standard.

Plaintiffs also now claim that at the time of NFHA's 2011 Report, Plaintiffs had not assessed *any* Deutsche Bank REO properties. This will not do. Plaintiffs previously relied on the allegation in their Complaint that during their "initial investigation" of REO properties throughout the lending industry, they "observed that many REO properties exhibiting poor maintenance in communities of color were *owned by Deutsche Bank*." (Compl. ¶ 88 (emphasis added).) Liberally construing Plaintiffs' Complaint, the Court did not begin the clock at this "observation" early on in the investigation, but rather allowed the statute of limitations to begin to run at the time NFHA first published their report on this matter. Generally, an amended complaint supersedes the prior pleading, *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1057 (7th Cir. 1998), and will not be dismissed based on inconsistencies between it and the original, *Whitehouse v. Piazza*, 397 F. Supp. 2d 935, 941 (N.D. Ill. 2005) (citation omitted). But where the amended allegations appear to flatly contradict the originals, and there is no suggestion that the originals were made in error, courts may consider the different complaints together in the interest of justice. *See, e.g., Aasen v. DRM, Inc.*, No. 09C50228, 2010 WL 2698296, at *2 (N.D. Ill. July 8, 2010). Here, it appears Plaintiffs directly contradict their earlier pleadings to avoid

the Court's ruling on timeliness. Plaintiffs do not suggest that their original pleadings were mistaken. Therefore, the Court disregards Plaintiffs' new contention that in 2011 they had no information about Deutsche Bank-owned REO properties.

Accordingly, the Court's prior finding that Plaintiffs were on notice shall stand. The Court notes that while the time-barred conduct itself is not actionable, Plaintiffs may use Defendants' activity outside the limitations period as evidence of the discriminatory intent for actions that occurred within the limitations period. See *Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014).

## D. Disparate Impact Theory

A plaintiff states a *prima facie* FHA disparate impact claim by alleging (1) a statistical disparity and (2) that the defendant maintained a specific policy that (3) caused the disparity. *Cty. of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018) (citing *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523-24 (2015)). Defendants argue that Plaintiffs have failed to allege all of these elements. The Court will first assess the validity of Plaintiffs' data before turning to the causal connection between Defendants' policies and the alleged disparity.

### 1. Racial Disparity

As before, the Defendants challenge Plaintiffs' statistics. Some of the primary conclusions from Plaintiffs' study of the Deutsche Bank Defendants' REO properties during the relevant time period include: 46.3% of REO properties in minority communities had 10 or more maintenance or marketing deficiencies, while only 14.1% of REO properties in white communities had 10 or more deficiencies; 92.1% of REO properties in minority neighborhoods had five or more deficiencies, while 57% of REO properties in white communities had five or more deficiencies. (SAC ¶ 98.)

When the Court last considered this issue, it declined to rule on the merits of any of Defendants' challenges to Plaintiffs' statistics because it had just sheared off several years' worth of data due to the statute of limitations, and so could not assess adequately whether the remaining dataset stated a claim. *Nat'l Fair Hous. All.*, 2018 WL 6045216, at *11. Defendants now assert that Plaintiffs' data is fatally flawed in the following ways: (1) Plaintiffs collected data on each REO property only once; (2) Plaintiffs failed to account for non-discriminatory explanations for the disparities; (3) Plaintiffs excluded from their dataset properties that were occupied or currently undergoing maintenance; and (4) Plaintiffs present disparities in the aggregate, without alleging significant disparities in any one city.

The Court notes at the outset that Plaintiffs are not required, at the pleading stage, to defend every nuance of their methodology. Indeed, Plaintiffs are not strictly required to include statistics to state a disparate impact claim under the FHA. *See Inclusive Cmtys.*, 135 S. Ct. at 2523 (a plaintiff states a *prima facie* case of disparate impact by alleging facts *or* producing statistical evidence demonstrating a causal connection). Thus, the Court will not engage in a wholesale review of the investigative methodology in this case, but rather briefly examine each of Defendants' methodological challenges to see if any renders the statistical allegations unreliable or implausible.

First, Defendants argue that because Plaintiffs inspected each REO property only once, their study failed to capture improvements that Defendants may have made after Plaintiffs' visits. Plaintiffs counter that taking a single "snapshot in time" of a defendant's behavior is a normal testing methodology. That is true in the context of employment discrimination. *See Movement for Opportunity & Equal. v. Gen. Motors Corp.*, 622 F.2d 1235, 1244-45 (7th Cir. 1980). However, Plaintiffs' method appears not to be a true "snapshot" of each property at the same stage of its lifetime as a Deutsche Bank-owned REO property, as Plaintiffs describe their testing protocol as "collect[ing] evidence that [is]representative of any given point on the timeline of an REO in Deutsche Bank's

possession." (Pls.' Resp. at 20 n.3.) To establish liability, Plaintiffs will have to show how their methodology controls for potential discrepancies caused by the amount of time a property has been in Defendants' possession. However, the Court will not require such a showing at this stage. *Access Living of Metro. Chicago, Inc. v. City of Chicago*, 372 F. Supp. 3d 663, 671 (N.D. Ill. 2019) (Plaintiff investigated a random sample of 300 housing developments to assess compliance with the FHA and ADA; defendant moved for 12(b)(6) dismissal on the basis that plaintiff did not identify when each inspection occurred; the court denied the motion because "all of the details that the City claims are lacking go to the substantiation of Plaintiff's [] methodology, which the City is free to explore in discovery.") (internal quotations omitted). Therefore, for now, this argument fails.

Second, Defendants contend that Plaintiffs' study is fatally flawed because they did not consider potential nondiscriminatory explanations for the disparity they found. For instance, Defendants claim, REO properties in majority-white neighborhoods "may have been in pristine conditions when the borrower left," while the homes in minority neighborhoods "may have been left in disrepair when the property became REO." (Defs.' Mem. at 8, Dkt. No. 72.) However, because Plaintiffs' investigation was restricted to routine exterior maintenance that Defendants were required to

perform on all REO properties (such as removing debris, securing doors and windows, and mowing grass), the initial condition of the house upon transfer of possession is not as relevant in this case at it would be in a case that concerned the condition of the house as a whole.

To support their proposition that Plaintiffs must consider potential nondiscriminatory reasons for the maintenance disparity, Defendants cite *Rummery v. Illinois Bell Tel. Co.*, 250 F.3d 553 (7th Cir. 2001). *Rummery* was a disparate treatment case under the Age Discrimination in Employment Act (ADEA) and Americans with Disabilities Act(ADA)—not a disparate impact case. *Rummery* held that while an ADEA plaintiff can use statistical evidence to show that an employer's proffered reason for discharge is pretextual, statistics standing alone do not establish a case of individual disparate treatment. *Id.* at 559. The court noted that to establish disparate *treatment* under the ADEA, statistics must also take into account nondiscriminatory explanations. *Id*. *Rummery* does not require a plaintiff asserting disparate impact under the FHA to exclude potential nondiscriminatory reasons before stating a prima facie claim.

Defendants may have confused Plaintiff's burden with their own. After a plaintiff establishes a *prima facie* showing of disparate impact, the burden shifts to the defendant to "prove

that the challenged practice is necessary to achieve… [a] legitimate, nondiscriminatory interest[.]" *Inclusive Cmtys.*, 135 S. Ct. at 2514-15. It is not Plaintiffs' burden at the pleading stage to explain potential nondiscriminatory reasons for Defendants' conduct. Moreover, Plaintiffs' method accounted for how long the inspected REOs had been in the Deutsche Bank Defendants' possession in order to avoid assessing REO properties before Defendants had the opportunity to perform maintenance. Thus, at the pleading stage, Defendants' argument fails.

Essentially, the first and second methodological challenges assert that Defendants may have in fact maintained REO properties in communities of color to a far better degree than Plaintiffs' study captured. This is a fine argument to make—at summary judgment. Defendants are free to rebut Plaintiffs' data with evidence of the time and resources they spent maintaining properties in minority neighborhoods and will be free to argue that such maintenance was appropriate given the condition and value of the homes at issue. *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 948 (N.D. Cal. 2018) ("Considering the breadth and extensive coverage of the investigation, [defendant's] contentions regarding whether the Plaintiffs' methodology is flawed are best reserved for resolution at summary judgment. The Court finds the specific contentions about

alleged deficiencies in methodology go to the weight of the evidence and are not dispositive of the determination whether Plaintiffs have adequately pled discrimination at this procedural stage.")

Third, Defendants assert that Plaintiffs collected skewed data by excluding REO properties that appeared to be occupied or currently undergoing maintenance, as such properties would be more likely to be in better condition. However, Plaintiffs did not purport to investigate occupied properties, or to compare the maintenance of occupied versus unoccupied properties. As for Plaintiffs' exclusion of properties currently undergoing repair— such properties were excluded from study in both white and minority neighborhoods, which prevents any obvious skewing of the data.

Fourth, Defendants attack Plaintiffs' assertion that racial disparities are statistically significant when measured on an aggregate basis. Defendants argue that Plaintiffs must present statistical disparities broken down by each city, because each city has its own municipal codes, and some of the criteria Plaintiffs used to measure exterior maintenance might have treated differently by local regulations. By way of example, Defendants Plaintiffs counted boarded windows as a failure to maintain a property (SAC ¶ 89), but the municipal code of Columbus, Ohio, requires property owners to board windows in a vacant building.

*See* Columbus, Ohio Mun. Code § 4707.03. This type of final statistical proof is inappropriate on a Rule 12(b)(6) motion to dismiss. For the time being, it suffices that Plaintiffs have alleged a national policy, and have supported it with national statistics.

## 2. Servicer-Specific Data

Plaintiffs allege that "Ocwen and/or Altisource" acted as the primary servicers for the Deutsche Bank Defendant's REO properties. (SAC ¶ 64.) Defendants argue that Plaintiffs' disparate impact claims against Ocwen and Altisource must fail because Plaintiffs do not offer any statistical data that is specific to either of the Servicer Defendants.

There "is no 'group pleading' doctrine, *per se*, that either permits or forbids allegations against defendants collectively." *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019). Rule 8(a)(2) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the notice pleading standard, specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). "Group pleading" does not violate Rule 8 so long as the complaint "provides sufficient detail to put the defendants on

notice of the claims." *Robles*, 354 F. Supp. 3d at 875 (citation omitted). With respect to the notice required to a particular defendant, there is no bright line rule; the Seventh Circuit has simply cautioned that "at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Id.* (quoting *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007)).

Moreover, Plaintiffs contend—and Defendants do not dispute—that there is no publicly available information about which Servicer maintained which REO property. It does not strike the Court as appropriate, or practical, to immunize two defendants from liability when a plaintiff cannot determine in advance what percentage of the conduct is attributable to one defendant or the other.

Defendants cite *City of Los Angeles v. JPMorgan Chase & Co.*, No. 2:14-CV-04168, 2014 WL 3854332, at *7 (C.D. Cal. Aug. 5, 2014) for the proposition that a statistical study cannot "lump together" the alleged conduct of two separate defendants. *JP Morgan* concerned a city's attempt to recover damages under the FHA for lost property tax revenue and increased municipal services stemming from foreclosures that resulted from allegedly discriminatory lending practices by Chase Bank. The court noted that "[u]nique to this

case is the relationship between Chase and Washington Mutual Bank ('WaMu')"—WaMu failed and was placed into receivership, and Chase assumed some of WaMu's assets and liabilities. *Id*. at *1. The plaintiffs then sued Chase for FHA violations that included loans that originated from WaMu without distinguishing which bank was responsible for which loans. *Id*. The court held that it lacked subject matter jurisdiction over Chase Bank and dismissed the disparate impact claim because the city's statistics, which constituted a "key aspect" of its disparate impact claim, were "based on a detailed regression analysis that lumps loans issued by both Chase and WaMu together." *Id*. at *7. *JP Morgan* is not relevant precedent because it concerned a statistical study that included the conduct of a party over which the court had no jurisdiction.

Plaintiffs have included more than enough factual detail in the SAC to put the Servicer Defendants on notice of Plaintiffs' claims. The extent of Ocwen and Altisource's respective responsibility for the REO properties at issue is a factual matter to be revealed through discovery.

### 3. Policy that Caused the Disparities

A disparate impact claim that relies on a statistical disparity fails if the plaintiff cannot point to a defendant's

policy or policies that caused the disparity. *Inclusive Cmtys.,* 135 S. Ct. at 2523.

First, Defendants contend that Plaintiffs failed to identify a specific policy of the Deutsche Bank Defendants that caused the disparity. This Court previously held that Plaintiffs' allegation of an "abdication" policy whereby the Deutsche Bank Defendants relinquished and outsourced all responsibility for maintaining the REO properties to servicers suffices to state a "policy" for a disparate impact claim. *Nat'l Fair Hous. All.*, 2018 WL 6045216, at *12 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011) ("[G]iving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory.")). The Court noted that this policy passes muster only so long as property maintenance was the Deutsche Bank Defendants' responsibility to outsource in the first place. *Id*. Accordingly, Defendants revive their argument that the Deutsche Bank Defendants cannot be liable for REO property maintenance or servicing. The Court has already rejected this argument and need not address it further. Plaintiffs have alleged a policy by the Deutsche Bank Defendants sufficient to survive a motion to dismiss.

Plaintiffs have added a disparate impact claim against the Servicer Defendants. Plaintiffs allege that the Servicer Defendants, like the Deutsche Bank Defendants, outsource

maintenance to third parties without appropriate monitoring, "abdicating" their responsibility for REO maintenance. (SAC ¶ 156.) As with the Deutsche Bank Defendants, this suffices to allege a policy that caused the disparity.

Plaintiffs also allege that Ocwen and Altisource had a policy of designating certain areas as "low value" and particular properties as "low value assets," then limiting or completely disallowing maintenance work on REO properties that receive such labels. (SAC ¶¶ 156-58.) Areas that Defendants deem "low value" are typically communities of color, while areas that Defendants deem "high value" are typically white communities. (*Id.* ¶ 158.) (Altisource apparently used the term "hot zones" interchangeably with "low value.") Plaintiffs allege that Defendants' REO properties in "high value" areas receive better quality and higher quantity property maintenance than properties in "low value" areas.

Defendants' primary objection to Plaintiffs' allegations regarding the low/high value policy is that Plaintiffs did not sufficiently identify whether the Deutsche Bank Defendants, Ocwen, or Altisource are responsible for this policy. Defendants contend that Plaintiffs' inability to identify from which of the four named defendants this policy originated necessitates dismissal for lack of plausibility, per *Iqbal*, 556 U.S. at 678. Defendants' concern

is overstated. Despite the fact that Plaintiffs cannot identify precisely whether Ocwen, Altisource, or the Deutsche Bank Defendants initiated the low/high value system (as this information is not publicly available), Defendants are still on notice of Plaintiffs' disparate impact theory and the grounds upon which is rests. *Iqbal*, 556 U.S. at 678. And Plaintiffs have satisfied the pleading requirements set forth by the Supreme Court for a disparate impact policy. A policy that causes a disparate impact must be "artificial, arbitrary, and unnecessary" to violate the FHA. Plaintiffs have alleged that the low/high value policy is arbitrary (SAC ¶ 156) and that "there is no business or other justification" for "failing to undertake basic maintenance of REO properties in communities of color." (*Id*. ¶¶ 110, 154.) Therefore, the alleged abdication and low/high value policies are sufficiently plead at this stage.

Finally, the Court turns to the "robust causality requirement" in disparate impact FHA claims, which ensures that defendants are not held liable for racial disparities they did not create. *Inclusive Cmtys.*, 135 S. Ct. at 2523. The "robust causality" required in a disparate impact claim is distinct from the proximate cause analysis required of all claims under the FHA per *City of Miami*, 137 S. Ct. 1296. *See Cty. of Cook, Illinois v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 990, 994 (N.D. Ill. 2018)

(analyzing proximate cause and the robust causality requirement separately); *City of Miami v. Bank of Am. Corp.*, 171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016) (making an "adequate showing" of proximate cause is insufficient to meet the separate "robust causality requirement" for a disparate impact claim). The former concerns whether a defendant's conduct in an FHA suit is properly pleaded as the proximate cause of a plaintiff's damages; the latter involves an examination of whether a defendant's policies were properly pleaded as the cause of the discriminatory impact. *See Alston v. City of Madison*, 853 F.3d 901, 907-08 (7th Cir. 2017), *cert. denied sub nom. Alston v. City of Madison, Wis.*, 138 S. Ct. 1571 (2018), *reh'g denied*, 138 S. Ct. 2714 (2018) ("Disparate impact alone is almost always insufficient to prove discriminatory purpose. … Only in rare cases are statistics alone enough to prove discriminatory purpose. And even when equipped with such statistics, a plaintiff must always "point to a defendant's policy or policies causing that disparity.") (citing *Inclusive Cmtys.*, 135 S. Ct. at 2523).

Defendants' policies of abdicating responsibility, and designating areas low/high value, have the requisite robust causal connection to the statistical disparity Plaintiffs allege. These policies allegedly pushed REO properties in minority communities into disrepair, while REO properties in white neighborhoods were

disproportionately likely to receive resources and attention. And the statistics presented in the SAC raise "a fair inference of causation." *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, No. CV 18-1919, 2019 WL 3241126, at *12 (D. Md. July 18, 2019). Plaintiffs have stated a *prima facie* case of disparate impact decimation against all Defendants. *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 948 (N.D. Cal. 2018) (finding "robust cause" where plaintiffs alleged that a policy of "delegation of discretion or failure to supervise and differential maintenance based on the properties' age and value" caused a discriminatory impact.") This is not a case in which Plaintiffs attempt to hold Defendants liable for a racial imbalance that they did not create. *See Inclusive Cmtys.*, 135 S. Ct. at 2523. Rather, Plaintiffs seek to hold Defendants responsible for only that imbalance that they did cause: the disparity in REO maintenance between white and minority neighborhoods. The Court turns to Plaintiffs' intentional discrimination theory.

### E.  Disparate Treatment Theory

To state a disparate treatment claim under the FHA, Plaintiffs must plausibly allege that Defendants had a discriminatory intent or motive. *Ricci v. DeStefano,* 557 U.S. 557, 577 (2009) (citation omitted). Proof of discriminatory motive "can in some situations be inferred from the mere fact of differences in treatment." *Int'l*

*Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (citation omitted). A disparate treatment claim under the FHA requires allegations "of intentional discrimination, provable via either direct or circumstantial evidence." *HSBC N. Am. Holdings*, 314 F. Supp. 3d at 966 (citing *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F. Supp. 2d 987, 997 (N.D. Ill. 2013)). Courts considering discriminatory intent should look at evidence and pleadings as a whole and ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's" protected characteristic caused the discharge or other adverse employment action. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). *Ortiz* is a Title VII case, but Title VII is a "natural point of reference" in FHA cases, as Title VII and the FHA have been described as "functional equivalents" to be given "like construction and application." *Wetzel*, 901 F.3d at 863. Additionally, the Seventh Circuit has observed that it "does not take much to allege discrimination" in an FHA case. *Wigginton v. Bank of Am. Corp.*, 770 F.3d 521, 522 (7th Cir. 2014) (stating that an FHA plaintiff must allege that defendant treated protected-status individuals differently from others).

The Court previously held that Plaintiffs failed to allege plausibly that Defendants intentionally discriminated, largely because Plaintiffs' dataset had been undermined by timeliness

problems. *Nat'l Fair Hous. All.*, 2018 WL 6045216, at *14. Plaintiffs have since amended their complaint to include a dataset without any time-barred data, which continues to show a stark statistical disparity. While statistics alone may prove intent "in some cases," *E.E.O.C. v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994), the Court is not convinced this is one such case. However, "statistics combined with other evidence may be sufficiently probative of discriminatory intent." *Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1038 (N.D. Ill. 2003). That is what Plaintiffs have accomplished here. In addition to Plaintiffs' statistics, they allege that Defendants used terms like "hot zone" and "low value area" to distinguish between minority and white neighborhoods, and allocated resources to REO maintenance accordingly. "Racially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016); *see also Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010); *Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505 (9th Cir. 2016). Moreover, as the Court explained in its analysis of *Wetzel*, Plaintiffs have alleged a deliberate indifference theory of intentional discrimination. (SAC ¶¶ 112-124.) Read as a whole, the SAC identifies policies and practices

by which Defendants intentionally favored REO properties in white neighborhoods for exterior maintenance. Thus, Plaintiffs have sufficiently plead a disparate treatment theory.

### F.  Claim-Specific Elements

Defendants also assert that Plaintiffs have failed to state a claim under 42 U.S.C. §§ 3604(a), 3604(b), and 3605, and for perpetuating segregation generally under the FHA. The Court will consider each in turn.

### 1.  § 3604 Claims

Plaintiffs pursue claims under both § 3604(a) and § 3604(b). Respectively, those provisions make it unlawful:

- "[T]o refuse to sell or rent after the making of a bona fide offer, to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a);

- "[T]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

Plaintiffs contend that Defendants' discriminatory failure to maintain their REO properties constitutes a violation of §§ 3604(a) and 3604(b). Defendants argue Plaintiffs have failed to state a claim under § 3604. This is not the first time the Court has heard Defendants' arguments regarding Plaintiffs' § 3604

claims. Previously, the Court held that a plaintiff may "indeed state an FHA claim if the disparate effects caused by the defendant's failures to maintain render the property unavailable." *Nat'l Fair Hous. All.*, 2018 WL 6045216, at *9 (citing *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 947-48 (N.D. Cal. 2018). HUD regulation 24 C.F.R. § 100.65(b)(2) states that FHA prohibits "[f]ailing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin." *See also* 24 C.F.R. § 100.70(a) ("It shall be unlawful, because of race, color, [or] national origin… to discourage or obstruct choices in a community, neighborhood or development."); 24 C.F.R. § 100.70(c)(1) (such acts include but are not limited to "Discouraging any person from inspecting, purchasing, or renting a dwelling… because of the race [or] national origin… of persons in a community, neighborhood or development.").

The Court dismissed Plaintiffs' § 3604 claims without prejudice because they failed to allege that the REO properties were neglected to such an extent as to dissuade purchasers from buying them. *Id.* (citing *Bloch v. Frischholz*, 587 F.3d 771, 777 (7th Cir. 2009) (FHA plaintiffs must show "more than a mere diminution in property values" and "more than just that their properties would be less desirable to a certain group")). The SAC

now includes allegations that Defendants' conduct dissuades buyers from purchasing the REO properties in minority neighborhoods. (SAC ¶¶ 164, 304, 289.) This suffices to cure the Court's earlier concerns, and Plaintiffs' § 3604 claims may proceed.

## 2. § 3605 Claims

Plaintiffs also advance § 3605 claims, which makes it unlawful:

> for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3605.

The Court dismissed Plaintiffs' first attempt at § 3605 claims because they failed to allege "specific real-estate transactions impeded by Defendants' conduct." *Nat'l Fair Hous. All.*, 2018 WL 6045216, at *10. Accordingly, Plaintiffs added allegations of the *types* of transactions in minority communities that were impeded by Defendants' conduct: the ability to draw on home equity, obtain a purchase loan, and get a strong appraisal. (*See* SAC ¶¶ 189, 328, 335-36.) Defendants argue that Plaintiffs have misconstrued the Court's opinion, which they read as requiring allegations about specific *occurrences* in which a real estate transaction was impeded (naming the people and homes involved).

Perhaps the Court was unclear; it will clarify its holding and reasoning now.

As the Court noted previously, the FHA defines "residential real estate-related transactions" as "[t]he making or purchasing of loans or providing other financial assistance" related to residential real estate and "[t]he selling, brokering, or appraising of residential real property." 42 U.S.C. § 3605(b). The cases the Court cited for the proposition that Plaintiffs must allege specific real estate transactions under § 3605 all involved individual, not organizational, plaintiffs. *See Moore v. FDIC*, No. 08 C 596, 2009 WL 4405538, at *5 (N.D. Ill. Nov. 30, 2009) (married couple sued bank under § 3605 because, after they couple defaulted on their mortgage, the bank ignored their requests for loan documentation and made rude comments; court found no specific real estate-related transaction because allegations all involve post-default action by the bank); *Gaona v. Town & Country Credit*, 324 F.3d 1050, 1056-57 (8th Cir. 2003) (deaf married couple sued bank under § 3605 because bank did not provide reasonable accommodations to disabled borrowers; court found the bank "did not refuse to transact business" with the plaintiffs because they were provided all required notices and disclosures); *Mich. Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 346 (6th Cir. 1994) (state agency and individuals with mental disabilities sued a

homeowner for violating § 3605 because the owner did not rent the house as a group home for mentally disabled adults, but rather sold the house to a neighbor; court found the defendants were not a business that engaged in residential real estate-related transaction). None of these cases suggest that organizational plaintiffs must name specific people or properties in order to plead a § 3605 claim. Such a requirement would extend beyond notice pleading in a case that involves a broad national practice that allegedly affects thousands of people.

A district court recently came to a similar conclusion when assessing whether an organizational plaintiff bringing a disparate impact claim under the FHA must name a specific tenant that has been harmed by the defendant's policy. The court reasoned:

> [Defendant] points out that [plaintiff] has not identified any specific tenant who has been or would be harmed by [defendant's] policy. It is true that [the] complaint does not identify any individual tenant who has (or is likely to) lose housing due [defendant's] policy, nor has [plaintiff] identified any building that ceased (or will cease) renting to tenants who receive vouchers. But this has little legal relevance here. … For the purpose of *stating a claim,* [defendant] does not cite any case holding that an organizational plaintiff must identify a specific tenant harmed by the challenged policy. To the contrary, both the Supreme Court and lower courts have permitted organizational plaintiffs to proceed by identifying the category of persons who will be harmed by the challenged policy without naming the specific impacted tenants ([]once standing has been demonstrated).

*Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 31 (D.D.C. 2017) (citing *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 97–98, 109-111 (1979)). The Court agrees with this reasoning and concludes that by alleging specific types of real estate transactions impeded by Defendants' conduct, Plaintiffs have stated a claim under § 3605.

### 3. **Perpetuating Segregation**

Plaintiffs allege Defendants violated the FHA by perpetuating segregation. Conduct that "perpetuates segregation and thereby prevents interracial association" violates the FHA "independently of the extent to which it produces a disparate effect on different racial groups." *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977) (permitting claim for perpetuation of segregation); *Wallace v. Chi. Hous. Auth.*, 321 F. Supp. 2d 968, 974 (N.D. Ill. 2004); *see also* 24 C.F.R. § 100.500(a) ("A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."). Plaintiffs must allege segregation that has been perpetuated as a result of Defendants' conduct. See *Wallace*, 321 F. Supp. 2d at 974.

The Court dismissed Plaintiffs' first attempt at this claim because their pleadings depended in large part on a dataset that mixed time-barred and timely conduct. Now that Plaintiffs have amended their allegations with the appropriate dataset, their statistics appropriately support their claim. Plaintiffs assert that Defendants' failure to maintain and market REO properties in minority neighborhoods according to the same standards as REO properties in white neighborhoods perpetuates segregation in several ways: it stigmatizes communities of color as less desirable than white communities; deters buyers from purchasing properties in communities of color; and diminishes home value for surrounding homes in communities of color, reducing the equity minority homeowners have in their house and thereby restricting the ability of minority homeowners to move to integrated or white neighborhoods. (SAC ¶¶ 164-166.) While any one of these theories will have to be borne out with more definitive evidence before the Court can find liability on that basis, at this stage, Plaintiffs have plausibly alleged that the effect of Defendants' poor maintenance of REO properties in minority communities had the effect of perpetuating segregation. *See Arlington Heights*, 558 F.2d at 1292-93, n.11.

### G.  Disputed REO Properties

Finally, Defendants argue that Plaintiffs' claims should be dismissed as to nine properties to which the Deutsche Bank Defendants do not hold title—and claim Plaintiffs do not dispute this. Plaintiffs respond that they *do* dispute this, and ask the Court to refrain from ruling on a factual dispute until discovery is complete. The Court is inclined to agree, as Rule 12(b)(6) is not designed to test the merits of a complaint. Defendants further seek to dismiss all claims as to two properties for which the SAC lacks sufficient information to identify the governing agreements. This too is premature at the pleading stage. The plausibility of Plaintiffs' claims, and whether Defendants are sufficiently on notice of those claims, is not affected by whether a tiny fraction of REO properties were properly included in the study. *See Iqbal*, 556 U.S. at 696; Fed. R. Civ. P. 8(a). The Court declines to strike these properties from the SAC.

### III.  <u>CONCLUSION</u>

For the reasons stated herein, Defendants' Motion to Dismiss (Dkt. No. 71) is granted in part and denied in part. Plaintiffs cannot recover damages corresponding to the lost economic value and impact of their community investments, or for harms to minority

neighborhoods.  Otherwise,  Plaintiffs'  Second  Amended  Complaint survives the Motion to Dismiss.

**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 11/13/2019