**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) |
| | ) |
| Defendants. | ) |

Case No. 1:18-cv-00839

Judge Harry D. Leinenweber
Magistrate Judge Sidney I. Schenkier

**DEFENDANT OCWEN LOAN SERVICING, LLC'S ANSWER AND DEFENSES TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendant Ocwen Loan Servicing, LLC ("Ocwen") hereby answers Plaintiffs' Second Amended Complaint ("SAC").[1] Ocwen answers only on its own behalf, and not on behalf of any other Defendant. To the extent any allegations are not expressly admitted, they are denied. In accordance with Fed. R. Civ. P. 8(b), any averment that Ocwen lacks knowledge or information sufficient to form a belief about the truth of an allegation has the effect of a denial.

For the convenience of the reader, Ocwen has included headings from the SAC. Ocwen does not consider headings to constitute allegations requiring an answer. To the extent the headings are allegations and require an answer, Ocwen denies them. Ocwen has not included pictures embedded in the SAC. Ocwen does not consider pictures to constitute allegations requiring an answer. To the extent pictures require an answer, Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies them.

Plaintiffs have not yet provided Ocwen a list of the properties that Plaintiffs purportedly visited after February 14, 2015 which form the basis of Plaintiffs' claims against Ocwen. As a result, Ocwen's ability to investigate Plaintiffs' claims has necessarily been limited.

## I. INTRODUCTION AND SUMMARY OF CLAIMS

1. This complaint is filed under the Fair Housing Act of 1968, as amended, 42 U.S.C. §3601, et seq. ("FHA"), for compensatory and injunctive relief arising out of the Defendants' racially discriminatory conduct affecting communities of color in numerous cities around the country. The case is based on overwhelming objective evidence that Defendants discriminated against communities of color in the exterior maintenance and marketing of properties owned by Deutsche Bank after foreclosure in thirty metropolitan areas. Defendants' actions have had a devastating impact on these communities, and Defendants refuse to alter their behavior. Defendants' policies and conduct (a) constitute intentional discrimination; (b) perpetuate segregation; and (c) have a disproportionate adverse impact on minority communities that is not justified by any valid business purpose.

---

[1] On June 1, 2019, Ocwen Loan Servicing, LLC merged with PHH Mortgage Corporation, a New Jersey corporation, with PHH Mortgage Corporation surviving the merger.

**ANSWER:** Ocwen admits that Plaintiffs purport to assert claims under the Fair Housing Act seeking compensatory and injunctive relief. Ocwen denies the remaining allegations in paragraph 1 and specifically denies any and all allegations of wrongdoing. Ocwen cares about communities and is committed to maintaining the necessary quality control standards to consistently handle maintenance of bank-owned homes no matter where they are located in the United States. Ocwen will continue to vigorously defend itself against these allegations.

2. Plaintiffs are private, fair housing organizations dedicated to ending housing discrimination and to promoting residential integration in their communities and around the nation. Plaintiffs work to eliminate housing discrimination and to ensure equal housing opportunity for all persons through education, outreach, membership services, public policy initiatives, advocacy, investigation of fair housing violations, investment in community development and stabilization projects, and fair housing enforcement.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 and, on that basis, denies them.

3. Defendants Deutsche Bank National Trust, as Trustee, and Deutsche Bank Trust Company Americas, as Trustee, (the "Deutsche Bank Defendants") are the owners of record, as trustee, of thousands of foreclosed homes in metropolitan areas across the country, commonly referred to as "REO" or "real estate owned" properties. Defendants Ocwen Loan Servicing, LLC ("Ocwen") and Altisource Solutions, Inc., ("Altisource") provide property preservation and maintenance and other services for REO properties owned by the Deutsche Bank Defendants ("the Deutsche Bank REO properties" or "Deutsche Bank-owned homes").

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 3 concerning the Deutsche Bank Defendants and, on that basis, denies them. Ocwen admits that it has provided, and continues to provide, services to certain REO properties to which Deutsche Bank National Trust Company, as Trustee, and Deutsche Bank Trust Company America, as Trustee, (the "Trustees") hold title on behalf of certain residential mortgage-backed securitization trusts ("DB Trustee-Titled Properties"). Ocwen further admits that it contracts with Altisource to provide property

preservation and maintenance services to certain DB Trustee-Titled Properties. Ocwen denies any

remaining allegations in paragraph 3.

4.      In the wake of the national foreclosure crisis, and in response to complaints, public outcry and industry trends and observations regarding the maintenance of foreclosed properties in African-American/Latino communities, Plaintiffs investigated and examined the routine exterior maintenance and marketing of the Deutsche Bank-owned homes in an attempt to determine whether all neighborhoods in certain cities were being treated equally, regardless of racial composition. Between 2011 and the present, Plaintiffs investigated Defendants' activities related to foreclosed properties in communities of color, (predominantly African-American and/or Latino neighborhoods), and in predominantly white neighborhoods in the metropolitan areas that are the subject of this Complaint.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 4 and, on that basis, denies them.

5.      During the course of the investigation, Plaintiffs examined 1,141 properties owned by the Deutsche Bank Defendants after foreclosure, collected evidence on 39 objective aspects of the routine exterior maintenance of each property investigated, and accumulated over 29,900 photographs of the pertinent conditions, such as unsecured doors, damage to steps, handrails, windows and fences, graffiti, the accumulation of trash and mail, and overgrown grass and shrubbery. Plaintiffs' investigation also documented marketing deficiencies, such as the failure to post or maintain appropriate "For Sale" signage, permitting negative signage and warnings to deter prospective buyers (e.g. "Bank-owned," "Auction" or "Foreclosed" signs), failure to identify a real estate agent/broker or point of contact, failure to adequately display property listings on Realtor/Multiple Listing Services or other web sites, and displaying on-line or other auction sites in different states in lieu of utilizing a local real estate agent/company familiar with the neighborhood. Plaintiffs' investigation revealed that there are highly significant disparities in the routine exterior maintenance and marketing of the Deutsche Bank-owned homes in communities of color as compared to white communities.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 5 and, on that basis, denies them. Ocwen also specifically

denies any and all allegations of wrongdoing.

6.      Plaintiffs' investigation of the properties in these metropolitan areas indicates that Defendants treated properties differently depending upon the racial/ethnic composition of the neighborhoods in which they were located. In each of the 30 metropolitan areas examined, the Deutsche Bank-owned homes located in predominantly white census block groups were better-maintained and exhibited fewer objective routine maintenance and marketing deficiencies than the Deutsche Bank-owned properties that were located in neighborhoods comprised primarily of African-Americans and/or Latinos. Across the board, and during all time periods, properties located in communities of color were much more likely to have numerous objective routine maintenance

and marketing deficiencies than the Deutsche Bank-owned homes located in white areas. Accordingly, in each of the metropolitan areas and across the country, Plaintiffs observed a systemic and particularized pattern of differential treatment by Defendants in maintaining and/or marketing REO properties on the basis of race, color, and/or national origin.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

7. The disparities observed between the maintenance of the Deutsche Bank-owned homes in white communities and the Deutsche Bank-owned homes in communities of color are stark, highly probative and statistically significant.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

8. As a result of Defendants' discriminatory conduct and perpetuation of residential segregation, municipalities, individuals, neighbors and homeowners in the communities served by Plaintiffs have been: (a) denied housing opportunities and had housing made unavailable; (b) subjected to deteriorating and dilapidated living conditions in their neighborhoods; (c) denied opportunities for neighborhood stabilization and economic recovery; and (d) harmed in the value of their home investments.

**ANSWER:** Ocwen denies the allegations in paragraph 8.

9. Plaintiffs allege herein that Defendants' systemic and particularized practice of maintaining and marketing bank-owned properties in a state of disrepair in communities of color, while maintaining and marketing similar properties in predominantly white communities in materially better condition, violates the Fair Housing Act, 42 U.S.C. §§3604(a), (b), (c) and (d), §3605, and HUD's implementing regulations. Defendants' discriminatory conduct has also had the effect of perpetuating segregated conditions.

**ANSWER:** Ocwen denies the allegations in paragraph 9.

10. Defendants' conduct has caused particularized and concrete injury to the Plaintiffs. Defendants' discriminatory practices of failing to maintain and effectively market bank-owned homes have interfered with Plaintiffs' activities and programs designed to promote compliance with fair housing laws, and have frustrated Plaintiffs' missions by perpetuating the unlawful discrimination and segregation they use their limited resources to dismantle. Plaintiffs' purposes and interests fall squarely within the zone of interests protected by the Fair Housing Act. Defendants' discriminatory behavior has caused Plaintiffs to divert substantial time and resources away from their usual activities and instead to detecting, investigating, and counteracting

Defendants' unlawful conduct, and engaging in outreach and education efforts to address Defendants' ongoing discrimination. These efforts go above and beyond Plaintiffs' normal operational activities and expenses.

> **ANSWER:** Ocwen denies the allegations in paragraph 10.

## II. JURISDICTION

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 2201 and 2202, and 42 U.S.C. §3613(a).

> **ANSWER:** Ocwen admits that this Court has subject matter jurisdiction over this matter. Ocwen denies any remaining allegations in paragraph 11.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the Defendants do business in this District, the Defendants are subject to personal jurisdiction in this District, a substantial part of the events giving rise to these claims occurred in this District, and a substantial portion of the property that is the subject of these claims is located in this District.

> **ANSWER:** Ocwen denies the allegations in paragraph 12.

13.     The Plaintiffs originally filed an administrative housing discrimination complaint with the U.S. Department of Housing and Urban Development Office of Fair Housing and Equal Opportunity ("HUD FHEO") concerning Defendants' conduct on February 26, 2014. The complaint was subsequently amended to update the results of Plaintiffs' ongoing investigation on April 30, 2014, August 7, 2014, January 22, 2015, August 5, 2016, February 14, 2017 and July 26, 2017. This administrative complaint was withdrawn after the filing of this action.

> **ANSWER:** Ocwen admits that, on or about February 14, 2017, Plaintiffs amended their administrative complaint filed with HUD FHEO to name Ocwen as a respondent. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13 and, on that basis, denies them.

## III. PARTIES

### A.     PLAINTIFFS

14.     Plaintiff National Fair Housing Alliance, Inc. ("NFHA") is a national, nonprofit public service organization founded in 1988 and incorporated under the laws of the Commonwealth of Virginia with its principal place of business at 1101 Vermont Avenue NW, Suite 710, Washington, D.C. 20005. NFHA is a nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 30 states and the District of Columbia. NFHA is the only national organization dedicated solely to ending housing discrimination and promoting

residential integration and neighborhood stabilization. NFHA works throughout the United States to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, investigation of fair housing violations, investment in community development and stabilization projects, and enforcement. One of NFHA's goals is the elimination of segregation in housing and the promotion of residential integration. NFHA has launched numerous educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. NFHA implemented a community development program using grants to homeowners and persons living in rental properties to make homes accessible to persons with disabilities and to senior homeowners in Washington, D.C.'s African-American neighborhoods to bring their homes up to code, so that their homes would be safe and could qualify for replacement coverage from homeowner's insurance companies. This program was expanded to several states and added grant assistance to veterans with disabilities. Its most recent program implemented in 2013, the Inclusive Communities Grant Programs, provide grants to ameliorate some of the adverse effects of discriminatory practices during and after the foreclosure crisis. Focusing on predominantly African-American and Latino neighborhoods and clients, these grants promote homeownership through direct down payment and closing cost assistance, funding for emergency repairs, grants to homeowners to prevent foreclosure in order to preserve existing homeownership, and home renovation programs to reduce neighborhood blight. The grants also provide accessible housing opportunities for persons with disabilities and facilitate general quality of life improvements to support greenspace development, pocket parks and fresh food access.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 and, on that basis, denies them.

15. Plaintiff Fair Housing Advocates of Northern California (formerly Fair Housing of Marin) is a nonprofit fair housing organization incorporated under the laws of the State of California with its principal place of business in San Rafael, California in the Northern District of California. Fair Housing Advocates of Northern California's primary objectives are: to promote equal opportunity in the renting, purchasing, financing and advertising of housing; to educate persons regarding federal and state fair housing laws; to promote racially integrated communities and neighborhood diversity; and to eliminate discriminatory housing practices. It is engaged in several different activities to further its mission of promoting equal housing opportunities, including: education programs in schools and in the community regarding fair housing and diversity; training programs for real estate professionals; research regarding housing discrimination in the community; pre-purchase education for homebuyers; advocacy for affordable housing; and foreclosure prevention and fair housing counseling. FHANC also provides grants to homeowners and renters to make their living space accessible and to promote both racial and economic integration.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 and, on that basis, denies them.

16.     Plaintiff Central Ohio Fair Housing Association ("COFHA") is a private, nonprofit corporation based in Columbus, Ohio. COFHA recognizes the importance of "home" as a component of the American dream and seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under federal, state or local laws. One of COFHA's goals is the elimination of segregation in housing and the promotion of residential integration. COFHA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

        **ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 16 and, on that basis, denies them.

17.     Plaintiff Connecticut Fair Housing Center ("CFHC") is a nonprofit organization dedicated to ensuring that all persons have equal access to housing opportunities in Connecticut. CFHC provides investigative and legal services to those who believe that they have been the victims of housing discrimination and additionally works with state and local government, as well as housing providers, to promote compliance with federal fair housing laws. One of CFHC's goals is the elimination of segregation in housing and the promotion of residential integration. CFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. CFHC provides grants to persons with disabilities to make their housing accessible and allow them to remain in the neighborhood, thereby promoting both economic and racial integration.

        **ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 17 and, on that basis, denies them.

18.     Plaintiff Denver Metro Fair Housing Center ("DMFHC"), established in 2012, is a private, nonprofit fair housing enforcement agency serving six Denver Metro Counties: Adams, Arapahoe, Broomfield, Denver, Douglas, and Jefferson. DMFHC is dedicated to eliminating housing discrimination and promoting housing choice for all through education, advocacy, and enforcement of fair housing laws. DMFHC's goals include the elimination of segregation in housing and the promotion of residential integration. DMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. DMFHC established the Fair Housing Action Fund to promote neighborhood development and stabilization. The Fund has supported construction of new homes in partnership with Habitat for Humanity and other local nonprofits, and it provides grants for critical repair of existing homes, including grants to make homes and apartments accessible.

        **ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 18 and, on that basis, denies them.

19.     Plaintiff Fair Housing Center of Central Indiana ("FHCCI") is a private, nonprofit fair housing organization based in Indianapolis, Indiana and primarily serves 24 counties in Central Indiana. FHCCI's mission is to ensure equal housing opportunities by eliminating housing discrimination through advocacy, enforcement, education and outreach. One of FHCCI's goals is the elimination of segregation in housing and the promotion of residential integration. FHCCI has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. FHCCI's inclusive communities work includes connecting neighborhood partners to help, serve, revitalize, stimulate and invest resources to rebuild an affordable, safe and vital community. In its targeted neighborhood, FHCCI funds acquisition and major rehabilitation of single-family homes to be sold to owner-occupants. It provides grants to ensure rehabbed homes are accessible and grants for persons with disabilities to afford them full access to their homes and yards. Grants are used to modify and improve pocket parks to beautify the neighborhood and provide recreational space.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 19 and, on that basis, denies them.

20.     Plaintiff Fair Housing Center of the Greater Palm Beaches ("FHCGPB") is a nonprofit corporation dedicated to ensuring fair and affordable housing opportunities for all persons, by promoting culturally diverse communities, through open housing and the elimination of all barriers to that goal. The FHCGPB's primary purpose is the elimination of housing discrimination on the basis of race, color, national origin, religion, sex, familial status, disability, marital status, age, sexual orientation, and gender identity or expression throughout the Greater Palm Beaches area. The FHCGPB seeks the eradication and elimination of direct and indirect obstacles that limit full access to the housing market throughout Florida and seeks to end unlawful housing discrimination through enforcement, education, public awareness, and helping victims enforce their rights. One of FHCGPB's goals is the elimination of segregation in housing and the promotion of residential integration. FHCGPB has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 20 and, on that basis, denies them.

21.     Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a private, nonprofit organization established in 1980 to ensure equal housing opportunity as guaranteed under federal, state, and local fair housing laws. Based in Grand Rapids, Michigan, FHCWM works cooperatively throughout Michigan with governmental and community-based agencies to further fair housing goals. In particular, FHCWM investigates claims of illegal housing discrimination; assists claimants in litigation and/or administrative enforcement actions; conducts testing to determine compliance with federal and state laws; and provides practical education to rental, sales, and lending professionals, organizations for professionals with a role in the housing industry, and home-seekers.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 and, on that basis, denies them.

22. Plaintiff Fair Housing Continuum, Inc. is a private, nonprofit fair housing agency dedicated to the elimination of housing discrimination in Florida. Fair Housing Continuum serves Brevard, Indian River, Seminole, Osceola, Orange, and Volusia Counties. One of Fair Housing Continuum's goals is the elimination of segregation in housing and the promotion of residential integration. Fair Housing Continuum has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. The Continuum has an Inclusive Communities Program that provides grants for down payments, loan reduction, and home rehabilitation and modification to support homeownership and neighborhood stabilization. If the buyer is a veteran, active duty military, disabled, or willing to be the owner-occupant of a home in a distressed neighborhood, the Continuum will provide a grant to assist with the purchase or building of a home.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 and, on that basis, denies them.

23. Plaintiff Greater New Orleans Fair Housing Action Center ("GNOFHAC") is a private, nonprofit civil rights organization established in 1995. For more than 20 years, GNOFHAC has been dedicated to eradicating housing discrimination throughout Southeast Louisiana. Its service area now includes the entire state of Louisiana. GNOFHAC has been responsible for fighting housing discrimination that arose in the wake of Hurricane Katrina and, in recent years, from the effects of the economic recession. One of GNOFHAC's goals is the elimination of segregation in housing and the promotion of residential integration. GNOFHAC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. GNOFHAC's Inclusive Communities Program has been instrumental in addressing longstanding patterns and promoting fair housing choice in the metropolitan Baton Rouge area, through activities designed to stabilize poor and minority neighborhoods impacted by predatory lending and high foreclosure rates and support affordable rental housing and homeownership opportunities in communities of color.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 and, on that basis, denies them.

24. Plaintiff HOPE Fair Housing Center ("HOPE"), established in 1968, is the oldest fair housing center in Illinois. HOPE represents 30 counties in Northern and North Central Illinois. HOPE works to end the negative effects of housing discrimination and segregation because of race, color, religion, national origin, sex, disability, familial status, or any other characteristics protected under federal, state or local laws. One of HOPE's goals is the elimination of segregation in housing and the promotion of residential integration. HOPE has launched multiple educational

campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. HOPE provides grants to renovate homes, creates marketing materials to affirmatively market communities of color, and provides homebuying counseling.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 24 and, on that basis, denies them.

25.    Plaintiff Housing Opportunities Made Equal of Virginia ("HOME of Virginia") is a fair housing and housing counseling organization founded in 1971 to fight discrimination in housing access. HOME of Virginia offers a variety of programs and services designed to ensure equal access to housing for all Virginians. One of HOME's goals is the elimination of segregation in housing and the promotion of residential integration. HOME has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. HOME provides grants to create accessible housing in the Richmond area. Home is a HUD Approved Housing Counseling Agency that works to eliminate racial and ethnic disparities in homeownership through extensive foreclosure prevention and home ownership counseling.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 25 and, on that basis, denies them.

26.    Plaintiff Housing Opportunities Project for Excellence, Inc. ("HOPE, Inc.") is the first nonprofit fair housing agency organized in the state of Florida. HOPE, Inc.'s mission is to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida. One of HOPE, Inc.'s goals is the elimination of segregation in housing and the promotion of residential integration. HOPE, Inc. has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. HOPE, Inc.'s Inclusive Communities Programs include providing grants to local non-profits to conduct homeownership training workshops, down payment assistance and repairs, including making homes accessible for persons with disabilities. In partnership with churches, government and corporations, HOPE, Inc.'s grants helped transform an empty lot into a park and garden area.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 26 and, on that basis, denies them.

27.    Plaintiff Fair Housing Center for Rights & Research ("FHCRR") (formerly known as Housing Research & Advocacy Center) is a private, non-profit organization, incorporated under the laws of Ohio and located in Cleveland, Ohio. Its mission is to promote fair housing and diverse communities, and to work to eliminate housing discrimination in Northeast Ohio by providing

effective research, education, and advocacy. In furthering this goal, FHCRR provides counseling, guidance and support to individuals who encounter discrimination in their search for housing. This may include investigation of their complaints. FHCRR also engages in activities designed to encourage fair housing practices by educating consumers regarding their rights and professionals regarding their responsibilities under the FHA, and by working with elected and government representatives to protect and improve fair housing laws. FHCRR also conducts research into housing and lending patterns, and related fair housing matters, throughout Northeast Ohio in order to educate government officials, individuals who work in the housing industry, and the public as a whole regarding housing discrimination and segregation.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 27 and, on that basis, denies them.

28.    Plaintiff Miami Valley Fair Housing Center ("MVFHC") is a private, nonprofit corporation based in Dayton, Ohio. MVFHC seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under federal, state or local laws. One of MVFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MVFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. MVFHC established the Inclusive Communities Fund, which provides grants for down payment assistance, closing costs and critical home repairs. The grant program also supports recreational programs for children and major renovations for a community center.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 28 and, on that basis, denies them.

29.    Plaintiff Metropolitan Milwaukee Fair Housing Council ("MMFHC"), established in 1977, is a private, nonprofit organization that operates a full-service fair housing program. MMFHC serves numerous counties in Wisconsin and works to combat illegal housing discrimination by creating and maintaining racially and economically integrated housing patterns. One of MMFHC's goals is the elimination of segregation in housing and the promotion of residential integration. MMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. MMFHC's inclusive communities projects include providing grants to neighborhood non-profit partners to expand access to affordable and responsible homeownership while improving neighborhoods that were damaged by the foreclosure crisis.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 29 and, on that basis, denies them.

30.     Plaintiff North Texas Fair Housing Center ("NTFHC") is a nonprofit organization dedicated to eliminating housing discrimination in North Texas. The organization provides counseling, discrimination complaint investigation, and outreach and education programs with the goal of ensuring that all persons have the opportunity to secure the housing they desire and can afford. One of NTFHC's goals is the elimination of segregation in housing and the promotion of residential integration. NTFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. NTFHC offers grants to persons with disabilities so that they can remain in their homes by making them safe and accessible. NFTHC's Inclusive Communities Program offers down payment assistance to purchase homes and grants for neighborhood groups in communities of color to make housing repairs.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 30 and, on that basis, denies them.

31.     Plaintiff Open Communities is a nonprofit organization that serves seventeen north suburban communities in the Chicago, Illinois area. Open Communities works to promote economically and culturally diverse communities that welcome all persons in north suburban Chicago. Open Communities educates, advocates, and organizes in the name of social justice. One of Open Communities' goals is the elimination of segregation in housing and the promotion of residential integration. Open Communities has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 31 and, on that basis, denies them.

32.     Plaintiff South Suburban Housing Center ("SSHC") is a nonprofit community organization that primarily serves the south metropolitan Chicago area, including underserved areas of northwest Indiana. SSHC is dedicated to eliminating all forms of discrimination in the housing market through the operation of fair housing enforcement and affirmative housing counseling programs to foster stable, racially and economically, diverse communities. SSHC's primary goal is the elimination of segregation in housing and the promotion of residential integration through expanding housing and mortgage lending choices. SSHC has launched multiple educational activities to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. SSHC provides grants to first-time homebuyers to purchase housing, to persons in housing payment distress, allowing them to stabilize home ownership, and to persons forced to rent due to displacement caused by foreclosure, in recovering communities of color.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 and, on that basis, denies them.

33. Plaintiff Fair Housing Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair Housing Center ("TFHC") is a non-profit public service agency organized under the laws of the State of Ohio, with its principal place of business in Toledo, Ohio. The purposes of the Toledo Fair Housing Center are to identify and eliminate all forms of unlawful discrimination in housing in the greater Toledo area, including discriminatory advertising, marketing, sales and lending practices; to educate the public about housing discrimination laws, discriminatory housing practices, and the availability of administrative and legal remedies to challenge discriminatory practices; to provide counseling and referral services to the public with respect to housing discrimination matters; and to expand equal housing opportunities for all persons. TFHC operated the MLK Inclusive Communities Program from 2014 through 2015 to provide grants to help homeowners in African-American and Latino neighborhoods with roof replacement and other renovations to their homes to stabilize neighborhoods and remove blight. TFHC also provided emergency mortgage assistance grants and foreclosure prevention counseling to homeowners in communities of color to become current and remain current on their mortgage payments. Finally, through the MLK Inclusive Communities Program, TFHC partnered with Ability Center of Greater Toledo to provide home accessibility modification grants to homeowners with disabilities to allow them to age in place and/or to fully enjoy their dwelling.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 and, on that basis, denies them.

34. All Plaintiffs are "aggrieved persons" within the meaning of the Fair Housing Act, and are authorized to commence litigation to obtain appropriate relief against Defendants. 42 U.S.C. §§3602, 3612, 3613. All Plaintiffs fall within the zone of interests protected by the Fair Housing Act. All Plaintiffs have suffered concrete and particularized injuries in fact that are fairly traceable to Defendants' policies and conduct in their communities, and that are likely to be redressed by a favorable judicial decision.

**ANSWER:** Ocwen denies the allegations in paragraph 34.

**B. DEFENDANTS**

35. Defendants Deutsche Bank National Trust, as trustee, and Deutsche Bank Trust Company Americas, as trustee, (the "Deutsche Bank Defendants") own and maintain REO properties as trustee in metropolitan areas in Washington, D.C.; Memphis, TN; Chicago, IL; Baltimore, MD; Hampton Roads, VA; Toledo, OH; Orlando, FL; Minneapolis, MN; Indianapolis, IN; Columbus, OH; Cleveland, OH; Baton Rouge, LA; Dayton, OH; Denver, CO; Dallas, TX; Gary, IN; Hartford, CT; Milwaukee, WI; New Orleans, LA; Grand Rapids, MI; Muskegon, MI; Greater Palm Beaches, FL; Miami-Ft. Lauderdale, FL; Tampa, FL; Richmond, VA; Detroit, MI; Philadelphia, PA; Providence, RI; Vallejo and Richmond, CA; and Kansas City, MO/KS. Plaintiffs allege that the Deutsche Bank Defendants engaged in a pattern and practice of discrimination in maintaining and marketing REO properties that are located in white communities more favorably

than similar REO properties located in predominantly African-American and Latino neighborhoods in the same metropolitan area. During the time period of this Complaint, the Deutsche Bank Defendants have utilized Ocwen and/or Altisource to provide property maintenance services for most of the REOs owned or controlled by the Deutsche Bank Defendants.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of paragraph 35 concerning the Deutsche Bank Defendants and, on that basis, denies them. Ocwen admits that it has provided, and continues to provide, services to certain DB Trustee-Titled Properties. Ocwen further admits that it contracts with Altisource to provide property preservation and maintenance services to certain DB Trustee-Titled Properties. Ocwen denies any remaining allegations in paragraph 35 and specifically denies any and all allegations of wrongdoing.

36. Defendant Ocwen Loan Servicing, LLC ("Ocwen") is a Florida corporation that maintains its principal place of business in West Palm Beach, Florida. At all times relevant to this Complaint, Ocwen has conducted business in this District and in the metropolitan areas that are the subject of this Complaint. Ocwen's business activities include providing services and products related to the management, preservation, maintenance and marketing of REO properties. Plaintiffs allege that Ocwen has engaged in a pattern and practice of discrimination through the discriminatory performance of activities with regard to the Deutsche Bank REO properties.

**ANSWER:** Ocwen denies the allegations in the first sentence of paragraph 36. Further answering, Ocwen states that on June 1, 2019, Ocwen merged with PHH Mortgage Corporation, a New Jersey corporation, with PHH Mortgage Corporation surviving the merger. With respect to the remaining allegations in paragraph 36, Ocwen admits that it has provided, and continues to provide, services to certain DB Trustee-Titled Properties. Ocwen denies any remaining allegations in paragraph 36 and specifically denies any and all allegations of wrongdoing.

37. Defendant Altisource Solutions Inc. ("Altisource") was incorporated in 2009 and has its headquarters in Atlanta, Georgia. Altisource is a subsidiary of Altisource Portfolio Solutions S.A., a publicly traded corporation which is incorporated in Luxembourg and was spun off from defendant Ocwen in 2009. Altisource continues to derive substantial revenue from defendant Ocwen and to engage in activities with Ocwen. At all times relevant to this Complaint, Altisource has conducted business in this District and in the metropolitan areas that are the subject of this Complaint. Altisource's business activities include providing services and products related to the management, preservation, maintenance and marketing of REO properties. Plaintiffs allege that

14

Altisource has engaged in a pattern and practice of discrimination through the discriminatory performance of activities with regard to the Deutsche Bank REO properties.

**ANSWER:** Ocwen admits that Altisource was spun off from Ocwen in 2009 and that it contracts with Altisource to provide property preservation and maintenance services to certain DB Trustee-Titled Properties. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 37 concerning Altisource and, on that basis, denies them. Ocwen denies any remaining allegations in paragraph 37 and specifically denies any and all allegations of wrongdoing.

## IV. FACTS

### A. BACKGROUND OF DISCRIMINATION AGAINST MINORITY NEIGHBORHOODS AND COMMUNITIES OF COLOR (HISTORICAL CONTEXT OF THE VIOLATIONS)

38. The failure to maintain real estate owned by banks (REO) in minority communities is a continuation of the well-documented history of residential discrimination against minorities and minority neighborhoods in this country by many financial institutions: first, mortgages were withheld from neighborhoods of color by redlining; more recently, neighborhoods of color were targeted for expensive, predatory and unfair mortgages; and now a few financial institutions, like Deutsche Bank, are allowing bank-owned homes in neighborhoods of color to deteriorate, become eyesores and lose value due to lack of maintenance. The failure of Defendants to take the minimal actions necessary to equally maintain and monitor bank-owned homes in African-American and Latino communities occurred with their full knowledge that their actions and omissions would severely harm minority communities which have been repeatedly damaged by discriminatory housing practices and conditions in the past.

**ANSWER:** Ocwen denies paragraph 38 to the extent that it purports to apply to Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 38 concerning entities other than itself and, on that basis, denies them. Ocwen denies any remaining allegations in paragraph 38.

39. Discrimination against persons of color by financial institutions and mortgage lenders is entrenched. For much of the 20th century, banks did not issue mortgages in minority neighborhoods, literally drawing a red line around these neighborhoods on lending maps and thereby forcing minority homebuyers into the high priced lending arms of finance companies, hard money lenders and land contracts.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and, on that basis, denies them.

40. Although the Fair Housing Act of 1968 sought to eliminate these practices, decades later communities of color still lacked access to sound and fair lending products available to white communities. As such, these minority communities were ripe for exploitation by predatory lenders during the subprime lending boom of the 1990's and early 2000's.

**ANSWER:** The Fair Housing Act of 1968 speaks for itself as to its contents, and Ocwen denies any allegations or characterizations contrary thereto. Further answering, Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 40 and, on that basis, denies them.

41. During this period, some lenders and investment banks, including the Deutsche Bank Defendants, sought to profit from the exploding mortgage securitization business. When a residential mortgage is securitized, the original mortgage note is sold immediately to an investment bank, which pools the mortgage with thousands of others to create a Residential Mortgage-Backed Security. This security is then sold to investors, including hedge funds.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 and, on that basis, denies them.

42. Deutsche Bank played key funding and trustee roles in the securitized loan pools that fueled the lending boom.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 and, on that basis, denies them.

43. In order to profit from this market, certain lenders sought to expand markets for subprime mortgage products. These lenders pushed subprime mortgage products, with increasingly unfavorable and risky loan terms, in minority neighborhoods ("reverse redlining").

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 and, on that basis, denies them.

44. With reverse redlining, borrowers in African-American neighborhoods who qualified for prime loans were deliberately steered into more onerous subprime and predatory loans. As a result, borrowers who would have been able to keep up with mortgage payments under the terms of a less expensive prime loan became unable to make the more demanding payments

required by subprime loans. This practice caused foreclosures and eventual vacancies in properties that otherwise would have remained occupied had the borrowers been given prime loans.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 44 and, on that basis, denies them.

45. During the subprime boom, African-American and Latino borrowers were nearly twice as likely as white borrowers to have one or more "high risk" features or conditions in their loans, such as higher interest rates, teaser rates, interest only mortgages or a prepayment penalty. Even after controlling for factors such as credit scores and income, African-American and Latino home buyers were 80% and 70% more likely respectively to receive a subprime loan than white home buyers.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 45 and, on that basis, denies them.

46. In 2003, subprime lending accounted for 8% of all mortgage lending. By 2006, subprime lending accounted for 28% of the market. The disparate subprime lending to persons of color was reflected in Home Mortgage Disclosure Act ("HMDA") data.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 46 and, on that basis, denies them.

47. The subprime lending boom collapsed in 2008, leading to an unprecedented foreclosure crisis. The crisis hit minority communities especially hard. During the first years of the crisis, African-Americans and Latinos were nearly 50% more likely to be facing foreclosure than whites, regardless of income. Foreclosure rates were also directly related to residential segregation: the more segregated a metropolitan area, the higher its foreclosure rate. Parties, such as the Deutsche Bank Defendants, became unexpected and reluctant owners of properties in communities of color that were disproportionately affected by the foreclosure crisis.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 47 and, on that basis, denies them.

48. The foreclosure crisis continues to have significant effects across the country. Since mid-2007, more than 7.5 million foreclosures have been completed and 5 million properties are reported to be substantially underwater, meaning that owners owed 25% more on their mortgages than their homes were worth.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 48 and, on that basis, denies them.

49.     The large volume of foreclosures created a large inventory of vacant homes possessed by banks. These REO properties surfaced in unprecedented numbers in communities of color after the advent of the foreclosure crisis. REO properties present a substantial obstacle for recovery in the communities in which they are located, which suffer negative effects such as a depleted tax base, neighborhood blight, health and safety concerns and decreased market values resulting in wealth loss for homeowners who live near foreclosed homes.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 and, on that basis, denies them.

50.     Because African-American and Latino homeowners faced disproportionately adverse actions on their loans, the neighborhoods and communities they lived in disproportionately felt the impact. Estimates are that families affected by nearby foreclosures have lost or will lose a total of 8.8% of their home value. For residents in African-American or Latino communities, that number doubles to 16% of home value. The total loss in home equity stripped from communities of color is estimated to be approximately $1.1 trillion.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 and, on that basis, denies them.

51.     The Defendants in this case knew or should have known the foregoing facts, including that a large proportion of the Deutsche Bank-owned homes were in neighborhoods of color. Against this historical backdrop, the Defendants in this case, are now allowing REO properties in minority communities to deteriorate due to a lack of proper routine exterior maintenance and marketing, causing more damage to these communities.

**ANSWER:**     Ocwen denies the allegations in paragraph 51.

**B.     DEFENDANTS' REO MAINTENANCE AND MARKETING CONDUCT DISCRIMINATES AGAINST COMMUNITIES OF COLOR**

**1.     The Deutsche Bank Defendants' Ownership as Trustee of the REO Properties**

52.     The Deutsche Bank Defendants are part of Deutsche Bank AG, a large German global banking and financial services conglomerate headquartered in Frankfurt, Germany. The Deutsche Bank Defendants engage in a wide variety of banking and financial services activities, including those related to mortgage lending and packaging. Deutsche Bank has been one of the financial institutions with the greatest involvement in the formation and development of mortgage-backed securities transactions, serving as an underwriter with regard to these transactions and in other capacities.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52 and, on that basis, denies them.

53.     A mortgage-backed security is a type of asset-backed security that is secured by a mortgage or collection of mortgages. The mortgages are sold to an investment bank (or other entity) that securitizes or packages the loans together in a security for purchase by investors. A document called a Pooling and Servicing Agreement ("PSA") designates certain parties to play roles in connection with the mortgage-backed securities. A PSA allocates and assigns duties and responsibilities only as between the parties to the PSA. A PSA does not, and cannot, change the legal obligations of the parties to the PSA to third parties, to persons who come into contact with properties owned by the trust, or to the public at large.

**ANSWER:**     The allegations in paragraph 53 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that PSAs speak for themselves and denies any allegations or characterizations contrary thereto.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 53 and, on that basis, denies them.

54.     One of the parties to mortgage-backed securities transactions is a trustee, who typically receives the assets in exchange for certificates issued to investors evidencing beneficial interests in the assets. The Deutsche Bank Defendants have frequently acted in this capacity. The trustee in an asset-backed securities transaction is the legal owner of the assets underlying the transaction for the benefit of the holders of the asset-backed securities. The trustee performs various functions, including serving as authenticating agent, issuing and paying agent, securities registrar and transfer agent, custodian of the assets, analytics provider and back-up servicer. (See section B.2, infra) The trustee of an asset-backed securities transaction typically performs more numerous and complex duties than trustees for traditional corporate and municipal debt transactions. A trustee negotiates compensation for its activities in this capacity and is paid for them. The Deutsche Bank Defendants frequently serve in the capacity of a non-indentured trustee under PSAs related to REO properties.

**ANSWER:**     The allegations in paragraph 54 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that PSAs speak for themselves and denies any allegations or characterizations contrary thereto.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 54 and, on that basis, denies them.

55.     Foreclosure and other legal actions with respect to trust properties must be brought in the name of the trustee as the legal owner of the loans. Any claims against the trust must be brought against the trustee as the trust's legal representative. When a foreclosure occurs on a property that has been packaged under the security, the trustee becomes the legal owner of record of the property and becomes responsible for all legal obligations as owner.

**ANSWER:** The allegations in paragraph 55 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that PSAs speak for themselves and denies any allegations or characterizations contrary thereto. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 55 and, on that basis, denies them.

56. Another party to a mortgage-backed securities transaction is the loan servicer. A loan servicer has various pre-foreclosure responsibilities related to managing the loans, such as collecting income from the assets, paying interest on the securities and taking actions related to the underlying properties. Defendants Ocwen and Altisource have acted in this capacity with regard to the Deutsche Bank REO properties. Servicer obligations after foreclosure, including property preservation and management, may be carried out through retained subcontractors. The servicer's fee is usually structured as a percentage of the outstanding balance of the asset pool. After foreclosure on a property, the servicer acts as agent of the trustee, the property's legal owner.

**ANSWER:** The allegations in paragraph 56 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that PSAs speak for themselves and denies any allegations or characterizations contrary thereto. Ocwen admits that it has provided, and continues to provide, services to certain DB Trustee-Titled Properties. Ocwen further admits that it contracts with Altisource to provide property preservation and maintenance services to certain DB Trustee-Titled Properties. Ocwen denies any remaining allegations in paragraph 56.

57. A dwelling as to which a financial institution takes legal title after a completed foreclosure is referred to as a Real Estate Owned or "REO" dwelling. As a consequence of the foreclosure crisis, Deutsche Bank has obtained title as trustee to hundreds of REO dwellings across the country covered by the Fair Housing Act.

**ANSWER:** Ocwen admits that properties to which banks obtain title after foreclosure are often referred to as Real Estate Owned or REO properties. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 57 concerning the Deutsche Bank Defendants and, on that basis, denies them.

58.     Once title to a property becomes vested in the name of the trustee after foreclosure, i.e., once the property becomes an REO property, the trustee has ultimate responsibility and liability for real estate taxes, zoning and code compliance, nuisance avoidance and abatement, and compliance with all other federal and state laws imposing duties on landowners, including the Fair Housing Act.

**ANSWER:**     The allegations in paragraph 58 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that PSAs speak for themselves and denies any allegations or characterizations contrary thereto.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 58 and, on that basis, denies them.

59.     Once a dwelling becomes an REO property that is owned by the Deutsche Bank Defendants (as trustee), the Deutsche Bank Defendants assume all duties and responsibilities of ownership, including routine exterior maintenance, while the property is marketed for sale. As a property owner, a trustee of an REO property has an affirmative duty to know the conditions existing at the foreclosed properties to which it holds title, to maintain all such properties in compliance with all of the applicable laws, and to take all actions necessary to prevent or abate any unlawful conditions at such properties.

**ANSWER:**     The allegations in paragraph 59 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that PSAs speak for themselves and denies any allegations or characterizations contrary thereto.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 59 and, on that basis, denies them.

60.     The trustee, as legal owner of the property, is required, under the Fair Housing Act, to maintain all REO properties, regardless of their location, without regard to race, color, religion, sex, handicap, familial status or national origin. The express provisions of the Fair Housing Act specifically identify "trustees" as "persons" subject to the Act. 42 U.S.C. §3602(d). This responsibility is non-delegable under the Fair Housing Act, whether or not there has been a contractual designation of maintenance and marketing responsibilities under a Pooling and Serving Agreement.

**ANSWER:**     The allegations in paragraph 60 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that the Fair Housing Act

speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies

any remaining allegations in paragraph 60.

61.     Other parties tasked under a PSA or otherwise with preserving and maintaining a REO property, such as Defendants Altisource and Ocwen, also bear responsibility for complying with local laws and regulations, and the requirements of the Fair Housing Act.

**ANSWER:**     The allegations in paragraph 61 state legal conclusions, to which no

response is required. To the extent a response is required, Ocwen states that the Fair Housing Act,

local laws and regulations, and PSAs speak for themselves and denies any allegations or

characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 61.

62.     According to the Federal Reserve Board, "[i]nstitutions should have policies and procedures in place to ensure that properties are maintained in compliance with federal, state and local laws, including laws governing health and safety, property preservation, fair housing, and property registration. . . . Further, institutions engaging third-party vendors to carry out functions related to these requirements should ensure that vendors maintain appropriate compliance controls. Reliance on third party vendors does not relieve an institution of its compliance responsibilities or liability." Federal Reserve, Q&A's re REOs, No. 20.

**ANSWER:**     Ocwen states that Federal Reserve Board guidance referenced in paragraph

62 speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies

any remaining allegations in paragraph 62.

63.     Under generally accepted industry practices, the routine exterior maintenance that Defendants are required to perform on all REO properties is objectively measurable, verifiable and externally visible. Such maintenance activities include, but are not limited to, mowing, weeding and edging; trimming shrubs and trees; removing snow, trash and debris; securing doors and windows; repairing or replacing loose handrails and steps; and covering holes in the dwelling. These routine exterior maintenance functions must be addressed readily and regularly at every REO property, regardless of the condition of the property. Post-foreclosure routine exterior maintenance is cost-neutral between properties in white neighborhoods and properties in communities of color.

**ANSWER:**     Ocwen denies the allegations in paragraph 63.

64.     The Ocwen and/or Altisource Defendants acted as primary servicers for the Deutsche Bank REO properties during the period covered by this Complaint. There is no public data available to identify which servicer (and its subcontractors or agents) has been contractually retained for any particular REO property titled in the name of a bank as trustee. REO trustees do not make this information available to the public. It is not retrievable from tax or land records. If

22

any other servicers acted with regard to the Deutsche Bank REO properties, their activities were de minimis as compared to Ocwen and/or Altisource.

**ANSWER:** Ocwen admits that it has provided, and continues to provide, services to certain DB Trustee-Titled Properties. Ocwen further admits that it contracts with Altisource to provide property preservation and maintenance services to certain DB Trustee-Titled Properties. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 64 and, on that basis, denies them.

65. Borrowers do not choose mortgage servicers or property preservation providers and have no control over whether and how such entities conduct their business.

**ANSWER:** Ocwen admits that as a mortgage servicer, it generally is not retained by borrowers. Ocwen denies any remaining allegations in paragraph 65.

### 2. Status of Servicer as Agent of Trustee and Trust

66. The relationship between the Deutsche Bank Defendants with regard to the REOs it owns as Trustee and Defendants Ocwen and Altisource as services with regard to those properties is one of principal and agent. The relationship is confirmed by the terms of the PSA.

**ANSWER:** The allegations in paragraph 66 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that PSAs speak for themselves and denies any allegations or characterizations contrary thereto. Ocwen further denies that it is a party to the "sample PSA" referenced by Plaintiffs in footnote 3 (Dkt. 47, Ex. F), which is between INDYMAC MBS, Inc., IndyMac Bank, F.S.B., and Deutsche Bank National Trust Company. Ocwen denies any remaining allegations in paragraph 66.

67. For example, under the PSA, the Servicer is "authorized and empowered by the Depositor and the Trustee" under the PSA to take various actions . . . "on behalf of the Trustee, the Depositor, the Certificateholders, or any of them . . ." (Section 3.01, p. 47, e.g., instruments of cancellation or satisfaction)

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 67.

68. Under the PSA, the servicer is required to "actively market[]" REO properties for sale for the benefit of the Trust, (Section 3.01, p. 56), and "either through itself or through an agent selected by the Servicer protect and conserve the REO property in accordance with the Servicing Standard." (Section 3.01, p.56) The Servicing Standard requires "that degree of skill and care exercised by the Servicer with respect to mortgage loans comparable to the Mortgage Loans serviced by the Servicer for itself or others." (Definitions, p. 31)

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 68.

69. Under the PSA, Definitions, p. 8, accounts created by the Servicer with a depository institution are maintained "for the benefit of the Trustee on behalf of the Certificateholder." (Definition of "Certificate Account")

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 69.

70. Under the PSA, the Servicer is required to "promptly deliver to the Trustee . . . the originals of other documents or instruments constituting the Mortgage File that come into the possession of the Servicer . . . (Section 2.02, p. 43)

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 70.

71. Under the PSA, the Servicer is "authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee" to register loans on the MERS(R) system (Mortgage Electronic Registration System) or remove them from it. (Section 3.01, p. 47)

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 71.

72. Under the PSA, in connection with its activities as Servicer, the Servicer agrees to present on behalf of itself, the Trustee and the Certificateholders, insurance claims and to take actions in connection with such claims. (Section 3.10, p. 54)

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 72.

73. Under the PSA, with respect to REO property, the Servicer is required to "ensure that the title to the REO property references the PSA and the Trustee's capacity [t]hereunder." (Section 3.12, p. 56)

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 73.

74. Under the PSA, all mortgage files and funds collected or held by, or under the control of, the Servicer in respect of any Mortgage Loans (a term which includes "REO properties," Definitions, p. 17), whether from the collection of principal and interest payments or from liquidation proceeds, including any funds on deposit in the Certificate Account, shall be held by the Servicer for and on behalf of the Trustee. (Section 3.14, p. 58)

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 74.

75. Under the PSA, the Servicer shall account fully to the Trustee for any funds it receives or otherwise collects as Liquidation Proceeds or Insurance Proceeds in respect of any Mortgage Loan. (Section 3.14, p. 58)

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 75.

76.     Under the PSA, the Servicer acknowledges and agrees that "the Servicer shall hold and retain possession of the Documents in trust for the benefit of the Trustee, solely for the purposes provided in the Agreement. (PSA Ex. M at M-2)

**ANSWER:**     Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 76.

77.     Other provisions of standard PSAs, under which the Deutsche Bank Defendants serve as Trustee, reflect responsibilities they can assume for managing, performing or monitoring the servicing activities of Ocwen, Altisource or other servicers. For example, a "Form of performance Certification (Trustee)" often required to be signed by Deutsche Bank as Trustee refers to Deutsche Bank's "compliance with the Servicing Criteria of Regulation AB," and requires the Deutsche Bank representative to certify that s/he is "responsible for reviewing the activities performed by the Trustee as a person 'performing a servicing function' under the Pooling and Servicing Agreement." (PSA Ex. R)s

**ANSWER:**     The allegations in paragraph 77 state legal conclusions, to which no response is required.  To the extend a response is required, Ocwen states that so-called "standard PSAs" speak for themselves and denies any allegations or characterizations contrary thereto. Further answering, Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77 concerning PSAs to which it is not a party and, on that basis, denies them.  Ocwen denies any remaining allegations in paragraph 77.

78.     Considering the scope of their relationship in fact, duties imposed as a matter of law and confirmatory language of the PSA, servicers (i.e., Ocwen and Altisource) act as agents for the trustee (i.e., the Deutsche Bank Defendants) and may subject it to liability for their own violations of the Fair Housing Act.

**ANSWER:**     The allegations of paragraph 78 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen denies the allegations in paragraph 78.

### 3.     Status of Deutsche Bank Defendants as Back-up Servicers

79.     Under the typical PSA, under which the Deutsche Bank Defendants serve as a back-up servicer, the Trustee (i.e., Deutsche Bank) assumes "all of the rights and obligations of the

Servicer" under the PSA in the event of an event of default or other or "if for any reason" the Servicer is no longer the Servicer under the PSA. (Section 3.05, p. 48)

**ANSWER:** The allegations in paragraph 79 state legal conclusions, to which no response is required. To the extend a response is required, Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 79.

80. Adequate backup servicing arrangements are central to a securitization transaction. As evident from the difficulties faced in various securitization transactions during the financial crisis, the portability of servicing is a significant problem. As such, a backup servicer uploads and shadows collateral data from the servicer in order to maintain itself in readiness to take over servicing obligations as needed.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 and, on that basis, denies them.

81. Under Section 7.01 of the PSA, an "event of default" includes any material failure by the Servicer to observe or perform any "of the covenants or agreements on the part of Servicer contained in [the PSA]." (Section 7.01, p. 79)

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 81.

82. Under Section 7.02 of the PSA, "on or after the time the Servicer receives a notice of termination pursuant to Section 7.01, the Trustee shall, subject to and to the extent provided in Section 3.05, be the successor to the Servicer in its capacity as Servicer under this Agreement and the transactions set forth or provided herein shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Servicer by the terms hereof and applicable law. . . ."(Section 7.02, p. 80).

**ANSWER:** Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 82.

83. Considering their mandatory obligations as back-up servicer and the material failures of the servicer Defendants, the Deutsche Bank Defendants are properly accountable, as trustee, for discriminatory conduct and conditions relating to the Deutsche Bank REO properties.

27

**ANSWER:** The allegations in paragraph 83 state legal conclusions, to which no response is required. To the extend a response is required, Ocwen states that the sample PSA speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 83 and specifically denies any and all allegations of wrongdoing.

### 4. Plaintiffs' Investigation of Defendants' Exterior Maintenance and Marketing of Properties

84. In the aftermath of the foreclosure crisis, Plaintiffs received complaints and concerns regarding the maintenance and marketing of REO properties in communities of color and became aware of the existence of serious inequities in the manner in which REO properties in communities of color were maintained and marketed as compared to the maintenance and marketing of REO properties in white communities. Consistent with the mission of the plaintiff organizations, Plaintiffs acted to investigate the existence and scope of this problem.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 and, on that basis, denies them.

85. In one of the most extensive fair housing investigations conducted under the Fair Housing Act, Plaintiffs investigated Defendants' maintenance and marketing of Deutsche Bank-owned homes in certain metropolitan areas from 2011 to December 2017. Plaintiffs' investigation focused on the following metropolitan areas: Washington, D.C.; Memphis, TN; Chicago, IL; Baltimore, MD; Hampton Roads, VA; Toledo, OH; Orlando, FL; Minneapolis, MN; Indianapolis, IN; Columbus, OH; Cleveland, OH; Baton Rouge, LA; Dayton, OH; Denver, CO; Dallas, TX; Gary, IN; Hartford, CT; Milwaukee, WI; New Orleans, LA; Grand Rapids, MI; Muskegon, MI; Greater Palm Beaches, FL; Miami-Ft. Lauderdale, FL; Tampa, FL; Richmond, VA; Detroit, MI; Philadelphia, PA; Providence, RI; Vallejo and Richmond, CA; and Kansas City, MO/KS. The investigation included 1,141 residential dwellings in these metropolitan areas covered by the Fair Housing Act. The properties that were investigated are identified in Appendix A to this Complaint. For purposes of this Complaint, and the statistical analyses set out below, the phrase "predominantly white neighborhoods" refers to those census block groups with more than 50% non-Hispanic white residents and the phrase "communities of color" refers to census block groups with less than 50% non-Hispanic white residents.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85 and, on that basis, denies them.

86. In each of these metropolitan areas, Plaintiffs identified the zip codes within the metropolitan area that were racially concentrated (e.g. predominantly white or communities of color) with the highest foreclosure rates. Plaintiffs then inspected all (100%) of the Deutsche Bank

REO properties in those zip codes within the same relative time period, unless the properties appeared to be occupied or work was actively occurring at the time of the site visits. The exclusion of properties where work was ongoing was to avoid recording adverse conditions that might be temporary or related to the work being conducted by a new owner.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 86 and, on that basis, denies them.

87.     Deutsche Bank's ownership of the properties was determined by using county property records, records kept by the clerks of courts, RealtyTrac, and other database sources. The data was also crosschecked with other records in order to verify the ownership of the homes because county recorders occasionally delay recording ownership titles. The number of properties excluded on this basis was minimal.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 87 and, on that basis, denies them.

88.     Plaintiffs evaluated Defendants' maintenance and marketing of these properties according to specific and objective routine exterior requirements that are standard in the REO maintenance industry and clearly visible by exterior inspection. Plaintiffs' list of exterior deficiencies is based on standard industry practice as to what constitutes "routine" maintenance, or "minimal" property safety conditions, and is consistent with Freddie Mac and Federal Housing Administration requirements, as well as various appropriate updated policies of private institutions.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 88 and, on that basis, denies them.

89.     Whatever other issues that a particular property may have (e.g., interior renovation or other non-routine repair needs), all properties can be equally maintained in terms of these routine exterior maintenance requirements. No reason exists to expect racial disparities in terms of the observed routine exterior maintenance of properties. At the same time, exterior maintenance failures drastically affect property sales rates, values and quality of life in these neighborhoods. Plaintiffs' investigators observed, recorded and photographed the routine exterior maintenance and marketing conditions of the Deutsche Bank-owned homes with respect to over three dozen exterior features. Plaintiffs examined the Deutsche Bank REO properties for the following maintenance or marketing categories: curb appeal, structure, signage and occupancy, paint and siding, gutters, water damage, and utilities. Curb appeal factors included trash and/or debris, accumulated mail, overgrown grass, accumulated dead leaves, overgrown or dead shrubbery, invasive plants, dead grass, and broken or missing mailboxes. Structural factors included unsecured, broken, or boarded doors; damaged steps or handrails; unsecured, broken, or boarded windows; damaged roofs; damaged fences; holes in the structure of the home; and wood rot. Signage and occupancy factors included trespassing or warning signs, signage marketing the home as a distressed property, the absence of a professional "for sale" sign, broken or discarded signage, and unauthorized occupancy

of the REO property. Paint and siding factors included graffiti, peeling or chipped paint, damaged siding, and missing or damaged shutters. Gutter factors included missing or out of place gutters, broken or hanging gutters, and obstructed gutters. Water damage factors included water damage and the presence of mold, algae, or discoloration. Utility factors included utilities that were exposed, damaged, or missing. Plaintiffs also utilized a miscellaneous factor under each category for any maintenance or marketing issue that did not fall into any of the other factors (e.g. failure to shovel snow or an unsecured and undrained swimming pool).

**ANSWER:** Ocwen denies the allegations in the first three sentences of paragraph 89.

Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 89 and, on that basis, denies them.

90. To ensure consistency, investigators were thoroughly trained and provided with examples and field terminology. Training included classroom and field investigations where new investigators were accompanied by NFHA staff or experienced staff from the local fair housing center. NFHA staff taught investigators how to evaluate a deficiency, complete forms, take photographs and upload all photos into a central database. Investigators utilized a glossary of terminology developed by plaintiff NFHA and its partners at the beginning of this investigation with pictures and descriptions to illustrate various examples for documenting deficiencies. The glossary took into account and illustrated variations in severity for certain deficiency criteria.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 90 and, on that basis, denies them.

91. The investigators also photographed the routine exterior maintenance and marketing conditions observed. The investigators took photographs of the front of each property, both sides of the property, and the back view of the property when access was available. These photographs were taken whether or not there were deficiencies documented in order to show the state of REO maintenance at the time of the visit. Investigators also took photographs of the homes across the street and on both sides of the bank-owned foreclosure to provide context regarding general routine maintenance of homes in the neighborhood. The investigators' reports and pictures were uploaded into a central database, and each property was assigned a neighborhood designation based on racial or ethnic makeup of the Census block group where the address was located.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 91 and, on that basis, denies them.

92. The Plaintiffs' tests were conducted over time at different Deutsche Bank-owned homes. In addition, Plaintiffs allowed a period of time for the property to be owned by Deutsche Bank so initial maintenance and security could be performed. This grace period provided Deutsche Bank the opportunity to complete its initial maintenance procedures and bring the home up to sale condition standards as well as to compensate for any routine exterior maintenance problems in the condition of the home at the time the bank took possession.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 92 and, on that basis, denies them.

93. Plaintiffs' testing was designed and implemented so as to assess whether any patterns of differing treatment were apparent across a particular metropolitan area between predominately white neighborhoods and neighborhoods that were predominantly African-American and/or Latino, as well as whether, when aggregated, the evidence showed a pattern of differing treatment.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 93 and, on that basis, denies them.

94. Deutsche Bank used a marketing business model to sell the majority of its REOs via the Hubzu auction site through Ocwen/Altisource, showing a preference or limitation to cash buyers, who are typically investors, thereby making housing unavailable in communities of color by changing neighborhoods from homeownership communities into investor communities, with detrimental financial consequences for current homeowners and new owner-occupants.

**ANSWER:** Ocwen denies that it directly marketed DB Trustee-Titled Properties.

Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations

in paragraph 94 concerning cash buyers and, on that basis, denies them. Ocwen denies any

remaining allegations in paragraph 94.

95. The unequal and poor routine exterior maintenance and the unequal and poor marketing of the Deutsche Bank-owned homes in communities of color directly caused and resulted in the various harms alleged in this Complaint.

**ANSWER:** Ocwen denies the allegations in paragraph 95.

### 5. Summary of the Overall Results of Plaintiffs' Investigation (Aggregate Findings)

96. On a consistent basis, testers examining Deutsche Bank REO properties were far more likely to observe a lack of routine exterior maintenance in neighborhoods of color than in predominantly white neighborhoods. In their totality, the data and pictures collected by Plaintiffs establish that Defendants failed to perform adequate routine exterior maintenance and marketing of the Deutsche Bank REO properties in communities of color, thereby leaving those Deutsche-owned homes in a state of neglect, while satisfactorily performing routine exterior maintenance and marketing of the Deutsche Bank REO properties in white neighborhoods, thereby leaving those Deutsche-owned homes in a materially better condition. Although widespread national patterns of discrimination involving Deutsche Bank's REO properties could not be discerned from

the existing data during the early stages of the Plaintiffs' investigation, eventually Plaintiffs accumulated sufficient data to show that such patterns exist.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 96.

97.    Examples of the disparate maintenance and marketing in these metropolitan areas based upon the predominant race or national origin of a neighborhood for the entire period during which tests were conducted include the following aggregate findings:

    a)    44.8 % of the Deutsche Bank REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 14.3% of the Deutsche Bank REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

    b)    90.9% of the Deutsche Bank REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 57.2% of the Deutsche Bank REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

    c)    66.6% of the Deutsche Bank REO properties in communities of color had trash or debris visible on the property, while only 31.7% of the Deutsche Bank REO properties in predominantly white neighborhoods had trash visible on the property.

    d)    39.4% of the Deutsche Bank REO properties in communities of color had unsecured or broken doors, while only 22.1% of the Deutsche Bank REO properties in predominantly white neighborhoods had unsecured or broken doors.

    e)    53.4% of the Deutsche Bank REO properties in communities of color had damaged, boarded, or unsecured windows, while only 21.9% of the Deutsche Bank REO properties in white neighborhoods had damaged, boarded or unsecured windows.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 concerning the specifics of Plaintiffs' alleged investigation

or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 97.

98.     Considering only assessments conducted between February 26, 2012 and the present, examples of disparate maintenance and marketing based upon the predominant race or national origin of a neighborhood include the following findings:

    a)     46.3% of the Deutsche Bank REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 14.1% of the Deutsche Bank REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

    b)     92.1% of the Deutsche Bank REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 57% of the Deutsche Bank REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

    c)     67.5% of the Deutsche Bank REO properties in communities of color had trash or debris visible on the property, while only 31.5% of the Deutsche Bank REO properties in predominantly white neighborhoods had trash visible on the property.

    d)     41.4% of the Deutsche Bank REO properties in communities of color had unsecured or broken doors, while only 22% of the Deutsche Bank REO properties in predominantly white neighborhoods had unsecured or broken doors.

    e)     55.5% of the Deutsche Bank REO properties in communities of color had damaged, boarded or unsecured windows, while only 22.3% of the Deutsche Bank REO properties in predominantly white neighborhoods had damaged boarded or unsecured windows.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs.

Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 98.

99.     Considering only assessments conducted between February 14, 2015 and the present, examples of disparate maintenance and marketing based upon the predominant race or national origin of a neighborhood include the following findings:

> a)     47.3% of the Deutsche Bank REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 12.6% of the Deutsche Bank REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

> b)     93.8% of the Deutsche Bank REO properties in communities of color had 5 or more maintenance or marketing deficiencies, while only 59.2% of the Deutsche Bank REO properties in predominantly white neighborhoods had 5 or more maintenance or marketing deficiencies.

> c)     71.5% of the Deutsche Bank REO properties in communities of color had trash or debris visible on the property, while only 32.8% of the Deutsche Bank REO properties in predominantly white neighborhoods had trash visible on the property.

> d)     41.7% of the Deutsche Bank REO properties in communities of color had unsecured or broken doors, while only 24.4% of the Deutsche Bank REO properties in predominantly white neighborhoods had unsecured or broken doors.

> e)     55.1% of the Deutsche Bank REO properties in communities of color had damaged, boarded or unsecured windows, while only 22.7% of the Deutsche Bank REO properties in predominantly white neighborhoods had damaged boarded or unsecured windows.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 99.

100.     On an aggregate basis across all Deutsche Bank REO properties investigated, and across all time periods during which investigations were conducted, the disparities between the

routine exterior maintenance and marketing of the Deutsche Bank-owned homes in communities of color and the routine exterior maintenance and marketing of Deutsche Bank-owned homes in predominantly white neighborhoods are extremely substantial and statistically significant.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 100.

101. Defendants' racially discriminatory treatment of the Deutsche Bank REO properties is prevalent in each of the cities included herein. In each of the metropolitan areas visited, the REO properties located in predominantly white neighborhoods were better maintained and exhibited fewer routine exterior maintenance deficiencies than the REO properties located in communities of color.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 101.

102. Defendants' racially discriminatory treatment of REO properties is continuous throughout the period of Plaintiffs' investigation. When analyzed during each of the following periods, Defendants' policies and conduct provided inferior routine exterior maintenance and marketing to REO properties in communities of color, while providing better routine exterior maintenance and marketing to REO properties in predominantly white neighborhoods:

35

> a) the period from 2011 to the present;
>
> b) the period from February 26, 2012 to the present, and
>
> c) the period from February 14, 2015 to the present.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 102.

103. Statistical analysis of Plaintiffs' evidence shows a large difference in the average number of exterior maintenance and marketing deficiencies between communities of color and predominantly white neighborhoods. Considering the entirety of the evidence obtained by Plaintiffs from all Deutsche Bank REO properties inspected, the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in communities of color is well over nine, while the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in white neighborhoods is less than six. In addition, the percentage of Deutsche Bank REO properties with ten or more deficiencies is approximately three times greater in nonwhite block groups than in white block groups.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 103.

104.     Limiting the evidence to the period from February 26, 2012 to the present, the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in communities of color remains over nine, while the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in white neighborhoods remains less than six. In addition, the percentage of Deutsche Bank REO properties with ten or more deficiencies is more than three times greater in nonwhite block groups than in white block groups.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 104 concerning the specifics of Plaintiffs' alleged

investigation or findings and, on that basis, denies them.  Ocwen also specifically denies that it

failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings

show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged

by Plaintiffs.   Ocwen further denies that Plaintiffs' flawed study is capable of identifying

discrimination in the maintenance of REO properties.  Ocwen denies any remaining allegations in

paragraph 104.

105.     Limiting the evidence to the period from February 14, 2015 to the present, the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in communities of color remains over nine, while the average number of deficiencies in exterior maintenance and marketing for Deutsche Bank REO properties in white neighborhoods remains less than six. In addition, the percentage of Deutsche Bank REO properties with ten or more deficiencies is almost four times greater in nonwhite block groups than in white block groups.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 105 concerning the specifics of Plaintiffs' alleged

investigation or findings and, on that basis, denies them.  Ocwen also specifically denies that it

failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings

show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged

by Plaintiffs.   Ocwen further denies that Plaintiffs' flawed study is capable of identifying

discrimination in the maintenance of REO properties.  Ocwen denies any remaining allegations in

paragraph 105.

106. The disparities in the maintenance and marketing of the Deutsche Bank-owned homes are not explained by non-racial factors. As regards the entirety of the evidence obtained by Plaintiffs, a regression analysis taking into account and controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until Plaintiffs' site visit and property values), indicates that routine exterior maintenance and marketing deficiencies at the Deutsche Bank REO properties in communities of color remain higher by a statistically significant margin as compared to the routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in predominantly white neighborhoods.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 106.

107. As regards the evidence from site visits between February 26, 2012 to the present, a regression analysis taking into account and controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until Plaintiffs' site visit and property values), indicates that routine exterior maintenance and marketing deficiencies at the Deutsche Bank REO properties in communities of color remain higher by a statistically significant margin as compared to the routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in predominantly white neighborhoods.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying

discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 107.

108.    As regards the evidence from site visits between February 14, 2015 to the present, a regression analysis taking into account and controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until Plaintiffs' site visit and property values), indicates that routine exterior maintenance and marketing deficiencies at the Deutsche Bank REO properties in communities of color remain higher by a statistically significant margin as compared to the routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in predominantly white neighborhoods.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 108.

109.    These statistical disparities are merely representative of the numerous forms of data and observational evidence establishing the differential treatment by Defendants of communities of color as compared to predominantly white neighborhoods.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying

discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in

paragraph 109.

110. No valid business purposes are served by, or constitute valid excuses for, Defendants' differing maintenance of REO properties based on neighborhood racial composition.

**ANSWER:** Ocwen denies the allegations in paragraph 110.

111. The disparities identified above flow directly from Defendants' discriminatory conduct. They are traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision. They are directly related to the zone of interests protected by the Fair Housing Act. Based on the familiarity of the Plaintiffs with REO properties in their service areas, and the factors recognized as bearing upon marketability of residential real estate, Defendants' failure to maintain and market REO properties in communities of color has had the effect of impeding community development and dissuading purchasers from buying these properties.

**ANSWER:** Ocwen denies the allegations in paragraph 111.

### C. PLAINTIFFS PUT DEFENDANTS ON NOTICE OF THE DEFENDANTS' DISCRIMINATORY TREATMENT OF THE DEUTSCHE TRUST REO PROPERTIES, BUT DEFENDANTS HAVE NOT ALTERED THEIR DISCRIMINATORY BEHAVIOR

112. In April 2011, NFHA published a report titled, "Here Comes the Bank, There Goes Our Neighborhood." The Report examined the differing ways in which financial institutions treated foreclosed properties in only four metropolitan areas. The Report was based upon an aggregate review of REO properties of eight different lenders which preliminarily suggested a pattern of disparate maintenance of REO properties; however, at this time, NFHA had assessed only 624 properties, which were distributed among the eight lenders.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 112 and, on that basis, denies them.

113. As regards Deutsche Bank, as of April 2011, NFHA had not assessed any Deutsche Bank REO properties.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 113 and, on that basis, denies them.

114. The Report made several recommendations for banks and servicers in terms of changing their business models for disposing of REO properties and establishing standards and oversight mechanisms. The Report should have alerted the Defendants to review their maintenance

and marketing practices with respect to REO properties, but Defendants did not take effective investigative and/or remedial actions.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 114 and, on that basis, denies them.

Ocwen denies the remaining allegations in paragraph 114.

115. In April 2012, NFHA published a report titled, "The Banks are Back – Our Neighborhoods are Not," which updated the 2011 Report. At this time, however, NFHA's review was limited to only nine metropolitan areas and remained an aggregate review of eight different lenders. Less than 500 additional properties, distributed among eight different banks, had been reviewed.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115 and, on that basis, denies them.

116. As regards Deutsche Bank, as of April 2012, NFHA had assessed only 99 Deutsche Bank REO properties. The process of collecting evidence to assess any patterns evident in Deutsche Bank's maintenance of REO properties was ongoing. Any widespread national patterns of discrimination involving Deutsche Bank's REO properties could not be discerned from the existing data at that time. Eventually Plaintiffs accumulated sufficient data, summarized above, to show that these Defendants were engaged in ongoing discriminatory behavior.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 116 and, on that basis, denies them.

117. The 2012 Report reiterated several recommendations for banks and servicers in terms of changing their business models for disposing of REO properties and establishing standards and oversight mechanisms. The Report should have alerted the Defendants to review their maintenance and marketing practices with respect to REO properties, but Defendants did not take effective investigative and/or remedial actions.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 117 and, on that basis, denies them.

Ocwen denies the remaining allegations in paragraph 117.

118. A third report on disparities in REO maintenance was published by NFHA on August 27, 2014, and was entitled, "Zip Code Inequality: Discrimination by Banks in the Maintenance of Homes in Neighborhoods of Color." By the time of this report, and subsequent to the 2012 report, Plaintiffs had assessed 2,400 properties.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 118 and, on that basis, denies them.

119. As regards Deutsche Bank, as of August 2014, NFHA had now assessed 420 REO properties.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 119 and, on that basis, denies them.

120. On February 26, 2014, Plaintiffs filed with the U.S. Department of Housing and Urban Development ("HUD") an administrative complaint of discrimination against the Deutsche Bank Defendants' pursuant to 42 U.S.C. Sect. 3610. Plaintiffs' administrative complaint was subsequently amended on April 30, 2014, August 7, 2014, January 22, 2015, August 5, 2016, February 14, 2017 and July 26, 2017, and Ocwen and Altisource were added as respondents. The administrative complaint was withdrawn, as is customary, when this case was filed.

**ANSWER:** Ocwen admits that, on or about February 14, 2017, Plaintiffs amended their administrative complaint filed with HUD FHEO to name Ocwen as a respondent. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 120 and, on that basis, denies them.

121. Plaintiffs have met with Deutsche Bank representatives and informed them of their findings with regard to the discriminatory conditions of the Deutsche Bank REO properties. Plaintiffs requested that the Deutsche Bank Defendants cease and remedy their discriminatory behavior.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 121 and, on that basis, denies them.

122. On information and belief, the Deutsche Bank Defendants have kept Defendants Ocwen and Altisource informed regarding Plaintiffs' findings, contentions and allegations.

**ANSWER:** Ocwen denies the allegations in paragraph 122.

123. After meeting with the Deutsche Bank representatives, Plaintiffs conducted additional investigations of Deutsche Bank REO properties. The results of these additional investigations confirm no change in the pattern of disparities between maintenance and marketing of REO properties in predominantly white neighborhoods and neighborhoods of color.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 123.

124. Despite Plaintiffs' attempts to persuade the Deutsche Bank Defendants to voluntarily comply with the Fair Housing Act, the Deutsche Bank Defendants and the other Defendants did not and have not changed their behavior. With deliberate indifference and reckless disregard to the purpose and effects of their discriminatory policies, practices and conduct, Defendants have continued to maintain Deutsche Bank REO properties in a discriminatory manner based on the predominant race and national origin of neighborhoods. Defendants' discriminatory maintenance and marketing of REO properties in communities of color violates the rights of homeowners and residents in these neighborhoods, causes particularized and concrete injury to these homeowners and residents, and otherwise makes housing unavailable in communities of color.

**ANSWER:** Ocwen denies the allegations in paragraph 124.

**D.     DEFENDANTS HAVE ENGAGED IN A PATTERN AND PRACTICE OF SYSTEMIC AND INTENTIONAL RACE DISCRIMINATION IN EACH OF THE CITIES SERVED BY PLAINTIFFS**

125. A "pattern or practice" of discrimination refers to systemic intentional discrimination affecting a large group of persons. Statistical evidence of a sufficiently gross disparity over time between the affected population and the general population may establish an inference of intentional discrimination.

**ANSWER:** The allegations in paragraph 125 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that the Fair Housing Act and the case law interpreting it speak for themselves and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 125.

126.    To prove systemic discrimination, a plaintiff must show that the discrimination was the defendant's standard operating procedure, more than the mere occurrence of isolated or sporadic discriminatory acts. A plaintiff can establish that discrimination was the defendant's standard operating procedure by, among other things, presenting statistical evidence of similarly situated persons not in the protected class who were treated better than those in the protected class.

**ANSWER:**    The allegations in paragraph 126 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that the Fair Housing Act and the case law interpreting it speak for themselves and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 126.

127.    Plaintiffs' findings by metropolitan area, time period and violations reveal Defendants' systemic pattern and practice of providing manifestly inferior routine exterior maintenance and marketing services for REO properties in African-American and Latino communities, and thereby discriminating on the basis of race, and national origin. The extensive testing evidence generated by Plaintiffs displays a clear and consistent pattern and regular practice of differing routine exterior maintenance and marketing during all time periods based on neighborhood racial composition. There is no business or other justification for this conduct.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them.  Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs.  Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties.  Ocwen denies any remaining allegations in paragraph 127.

128.    Defendants' policies, practices and intentional conduct are the direct and proximate cause of the gross statistical disparities in the maintenance and marketing of properties in neighborhoods with different racial and ethnic compositions.

**ANSWER:**    Ocwen denies the allegations in paragraph 128.

129.    The differences in routine exterior maintenance and marketing at the Deutsche Bank REO properties are consistent in metropolitan areas regardless of their location in the country. Whether analyzed on a national or metropolitan area basis, the same pattern and practice

of discriminatory treatment is evident. The consistent and repetitive pattern of discriminatory treatment across cities and over the span of time indicates that practices resulting in discrimination at the Deutsche Bank REO properties were approved, occurred or condoned at a high level of management.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 129 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 129.

130.     Defendants failed to comply with state and local laws regarding property maintenance in that: (a) observations by Plaintiffs of various deficiencies during their investigation of the Deutsche Bank-owned homes included many examples of conduct typically violating local codes and ordinances; and (b) Defendants have been sued under "Slumlord" ordinances as systemic violators, such as in Los Angeles, California.

**ANSWER:** Ocwen denies the allegations in paragraph 130.

131.     Defendants deviated from well-established practices concerning property maintenance and preservation in communities of color, which include upkeep of the routine exterior maintenance items Plaintiffs visually investigated at Deutsche Bank-owned homes.

**ANSWER:** Ocwen denies the allegations in paragraph 131.

132.     Appendix B to this Complaint, incorporated herein by reference, sets forth Plaintiffs' detailed findings by Metropolitan Area and violation type, as tabulated for the entire period during which assessments were conducted.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 132 and Appendix B concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or

findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 132.

133. Appendix C to this Complaint, incorporated herein by reference, sets forth Plaintiffs' detailed findings by Metropolitan area and violation type, as tabulated for assessments conducted during the period from February 26, 2012 to the present.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133 and Appendix C concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 133.

134. Appendix D to this Complaint, incorporated herein by reference, sets forth Plaintiffs' detailed findings by Metropolitan area and violation type, as tabulated for assessments conducted during the period from February 14, 2015 to the present.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134 and Appendix D concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 134.

135.     In all areas and across all time periods during which tests were conducted, there were substantially less REO properties in white neighborhoods than in neighborhoods of color that had fewer than 5 routine exterior maintenance or marketing deficiencies.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them.  Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs.  Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties.  Ocwen denies any remaining allegations in paragraph 135.

136.     In all areas, and across all time periods during which tests were conducted, there were substantially more REO properties in neighborhoods of color than in predominantly white neighborhoods that had more than 10 deficiencies.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them.  Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs.  Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties.  Ocwen denies any remaining allegations in paragraph 136.

137.     In many cities, certain REO properties in neighborhoods of color had more than 15 deficiencies (a condition seen far less often in white communities).

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 137 concerning the specifics of Plaintiffs' alleged

investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 137.

138. As indicated on the following table, throughout the course of their entire investigation, Plaintiffs investigated Deutsche Bank REO properties in each of the following metropolitan areas and found substantial differing treatment and disparities in properties as between neighborhoods of color and white neighborhoods (a) having fewer than 5 deficiencies (b) having more than 5 deficiencies, and (c) having more than 10 deficiencies, as follows:

| Metro Area/City | # Deutsche REOs Investigated | More White REOs with Less than 5 Deficiencies | More Minority REOs with More than 5 Deficiencies | More Minority REOs with More than 10 Deficiencies |
|---|---|---|---|---|
| Chicago | 106 | X | X | X |
| Milwaukee | 83 | X | X | X |
| Cleveland | 32 | X | X | X |
| Detroit (Suburban) | 43 | X | X | X |
| Dayton | 37 | X | X | X |
| Toledo | 27 | X | X | X |
| Columbus | 25 | X | X | X |
| D.C. & Prince George's | 66 | X | X | X |
| Memphis | 61 | X | X | X |
| Baltimore | 63 | X | X | X |
| Hampton Roads | 17 | X | X | X |
| Orlando | 64 | X | X | X |
| Minneapolis | 24 | X | X | X |
| Indianapolis | 18 | X | X | X |
| Baton Rouge | 20 | X | X | X |
| Denver | 21 | X | X | X |
| Dallas | 62 | X | X | X |
| Gary | 22 | X | X | X |
| Hartford | 16 | X | X | |
| New Orleans | 42 | | | X |
| Grand Rapids | 14 | X | X | X |

48

| Muskegon | 29 | X | X | X |
|---|---|---|---|---|
| Greater Palm Beaches | 41 | X | X | X |
| Miami | 63 | X | X | X |
| Tampa | 27 | X | X | X |
| Richmond | 39 | X | X | X |
| Philadelphia | 28 | X | X | X |
| Providence | 19 | X | X | X |
| Vallejo and Richmond CA | 22 | X | X | X |
| Kansas City | 10 | X | X | X |

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 138 concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 138.

139. As detailed in Appendices B, C and D, in all metropolitan areas investigated, and across all time periods, Plaintiffs found substantial differences between the occurrence of various particular deficiencies observed at REO properties in white neighborhoods and the occurrence of the same deficiencies observed at REO properties in neighborhoods of color (e.g. in Denver, during the course of the investigation, 38.5% of REO properties in neighborhoods of color had broken or hanging gutters while none of the REO properties in predominantly white neighborhoods had the same problem).

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 139 and Appendices B, C, and D concerning the specifics of Plaintiffs' alleged investigation or findings and, on that basis, denies them. Ocwen also specifically denies that it failed to properly maintain REO properties and denies that Plaintiffs' investigation or findings show that Ocwen discriminated in the maintenance of REO properties or

caused the harms alleged by Plaintiffs. Ocwen further denies that Plaintiffs' flawed study is capable of identifying discrimination in the maintenance of REO properties. Ocwen denies any remaining allegations in paragraph 139.

### E. DEFENDANTS HAVE ACTED WITH DISCRIMINATORY INTENT

140. Fair housing testing evidence, by itself or in conjunction with other evidence, is a well-established method of proving discrimination in cases alleging violations of the FHA. The facts revealed by fair housing testing evidence are often sufficient alone to establish intentional discrimination.

**ANSWER:** The allegations in paragraph 140 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that the Fair Housing Act and the case law interpreting it speak for themselves and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 140.

141. Intentional discrimination occurs when a defendant or its agents acts, at least in part, because of the actual or perceived race or national origin of the alleged targets of discriminatory treatment. A defendant under the Fair Housing Act may also be liable for intentional discrimination where the defendant has knowledge of discrimination by its agents but acts with deliberate indifference in failing to address it. Various factors are probative of intent to discriminate, including, but not limited to, statistics demonstrating a clear pattern unexplainable on grounds other than discriminatory ones, the historical background of a decision, the specific sequence of events leading up to the challenged decision, and the defendant's departures from its normal procedures or substantive considerations. Evidence of a consistent pattern of actions that have a much greater harm on minorities than non-minorities is highly probative. Evidence of acts or conditions, even if time-barred, may be properly considered as evidence of intent.

**ANSWER:** The allegations in paragraph 141 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that the Fair Housing Act and the case law interpreting it speak for themselves and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 141.

142. The acts and omissions of the Defendants and their agents with regard to the inferior and unequal routine exterior maintenance and marketing provided to the Deutsche Bank REO properties in communities of color were taken based on race and national origin and constitute intentional discrimination as evidenced by various facts, including, but not limited to the following:

a)      the severity and pervasiveness of the disparities found throughout comparative testing between the maintenance and marketing of the Deutsche Bank REO properties in communities of color and the maintenance and marketing of the Deutsche Bank REO properties in white neighborhoods;

b)      the absence of credible, non-pretextual explanations for the disparities other than race;

c)      Defendants' knowledge of systemic racial disparities between the maintenance and marketing of the Deutsche Bank REO properties in communities of color and the maintenance and marketing of the Deutsche Bank REO properties in white neighborhoods, but deliberate indifference and refusal to take remedial actions;

d)      Defendants' failure to comply with state and local laws with regard to property maintenance in African-American and Latino communities;

e)      Defendants' lack of responsiveness to complaints regarding REO maintenance in communities of color;

f)      rigorous statistical analysis during all relevant time periods controlling for non-racial factors, (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until Plaintiffs' site visit and property values), which indicates that routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in communities of color cannot be explained on the basis of factors other than race;

g)      Defendants' knowledge of the foreseeable and continuing consequences of Defendants' conduct on communities of color;

h)      Defendants' deviation in minority communities from well-established standards and practices regarding exterior property maintenance;

i)      evidence of prior intentional discriminatory conduct by the Defendants toward African–Americans and Latinos, including, but not limited to, predatory loan practices, which created the conditions upon which the discriminatory conduct in this case could occur;

j)      Defendants' knowledge of the historical and continuing pattern of discrimination against African-Americans and Latinos by the financial and property service provider industries, including Defendants;

k)      evidence of a general pattern of intentional unlawful conduct and corrupt corporate culture with respect to defendant Deutsche Bank extending to such matters as race discrimination, money laundering, market rigging, securities fraud, violating United States Government imposed sanctions, fake transactions and concealing financial losses.

51

**ANSWER:**    Ocwen denies the allegations in paragraph 142.

143.    In 2013, Deutsche Bank subsidiary MortgageIT paid $12.1 million to settle claims brought by the United States Department of Housing and Urban Development that: (a) it charged Black and Hispanic borrowers higher fees than white customers; and (b) it more frequently refused loan applications from Black or Hispanic borrowers. According to HUD, the MortgageIT loan data from 2007 and 2008 indicated that there was a 65% greater chance of African-American borrowers being issued more expensive loans than similar white borrowers. HUD also found that Hispanic borrowers had a 72% greater chance of being issued more expensive loans than similar white borrowers.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 143 and, on that basis, denies them.

144.    In January 2017, Deutsche Bank agreed to a multi-billion settlement with the Justice Department resolving federal claims that Deutsche Bank misled investors in the packaging, securitization, marketing, sale and issuance of residential mortgage-backed securities (RMBS). This represents the single largest RMBS resolution for the conduct of a single entity. $4.1 billion of the relief was in the form of relief to consumers harmed by its unlawful conduct, including loan modifications, loan forbearance and forgiveness, and financing for affordable rental and for-sale housing throughout the country.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 144 and, on that basis, denies them.

145.    The systemic unlawful activities of Deutsche Bank continue to prompt investigation for criminal and regulatory violations. In November 2018, Deutsche Bank headquarters was targeted in a massive police raid related to money laundering activities implicated in the "Panama Papers."

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 145 and, on that basis, denies them.

146.    Defendants Ocwen and Altisource also have histories of regulatory violations, allegations of unlawful corporate conduct and intentional bad acts, requiring the payment of millions of dollars to resolve claims that they have intentionally violated consumer finance, civil rights and securities laws, and defrauded borrowers with respect to their mortgage loans.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the vague, ambiguous, and imprecise allegations in paragraph 146 that are unrelated to the

conduct alleged by Plaintiffs here and, on that basis, denies them.

## F. DEFENDANTS' REO MAINTENANCE AND MARKETING POLICIES AND PRACTICES HAVE A DISPROPORTIONATE DISCRIMINATORY IMPACT ON COMMUNITIES OF COLOR

147. Policies and practices based on race-neutral factors may cause an unjustified adverse impact on homeowners in communities of color. In this case, the pervasiveness of the discriminatory conditions relating to the Deutsche Bank REO properties indicates that Defendants operate under policies and practices with regard to the maintenance of REO properties that have an unjustified adverse disparate impact on communities of color.

**ANSWER:** The allegations in the first sentence of paragraph 147 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that the Fair Housing Act and the case law interpreting it speak for themselves and denies any allegations or characterizations contrary thereto. Ocwen denies the remaining allegations in paragraph 147 and specifically denies any and all allegations of wrongdoing.

148. As regards the Deutsche Bank Defendants, these Defendants have adopted a uniform policy of disavowing any legal responsibility for compliance with federal, state or local laws pertaining to REO exterior maintenance. In connection with this policy, Defendants have sought to "outsource" to third parties compliance with the statutory and common law obligations that are placed on owners of real property.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 148 and, on that basis, denies them.

149. The Deutsche Bank Defendants have the policy of disavowing and abdicating their legal obligations as real property owners without appropriate investigation or assessment of the fitness or ability of the retained third parties to act in compliance with obligations imposed under the Fair Housing Act.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 149 and, on that basis, denies them.

150. The Deutsche Bank Defendants have the policy of disavowing and abdicating their legal obligations as real property owners without guidance, oversight or review of the activities left to the discretion of retained third parties.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 150 and, on that basis, denies them.

151.    On June 28, 2013, Deutsche Bank publicly confirmed its policies of outsourcing and abdicating legal responsibilities with regard to REO properties in the course of a $10,000,000.00 settlement with the City of Los Angeles in a so-called "slum lord" case regarding the deterioration of foreclosed Deutsche Bank REO properties in Los Angeles. In this context, Deutsche Bank stated, "[a]s we have said from the outset, loan servicers are responsible for maintaining foreclosed properties."

    **ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 151 and, on that basis, denies them.

152.    Deutsche Bank also asserted on June 28, 2013 that the settlement with Los Angeles would "be paid by the servicers responsible for the Los Angeles properties at issue *and by the securitization trusts that hold the properties*" (emphasis supplied), further evidencing its obligations as trustee.

    **ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 152 and, on that basis, denies them.

153.    The foregoing policies of the Deutsche Bank Defendants have a disproportionate adverse impact on communities of color, as shown by the statistical disparities and regression analysis described in this complaint. These policies have operated in combination with the known higher foreclosure rates in neighborhoods of color resulting from predatory lending to minority borrowers during the subprime lending boom. The policies and practices of the Deutsche Bank Defendants cause an adverse impact on communities of color by causing retention of unqualified and unsupervised third parties who lack incentives to comply with legal obligations regarding the maintenance of the Deutsche Bank REO properties in communities of color and who are unsupervised and unmonitored by a property owner in the performance of their duties.

    **ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in the first and second sentences of paragraph 153 and, on that basis, denies

them.  Ocwen denies the remaining allegations in paragraph 153.

154.    No valid business purposes are served by the foregoing policies, and there is no business justification for failing to undertake basic maintenance of REO properties in communities of color.

    **ANSWER:**    Ocwen denies the allegations in paragraph 154.

155.    Based on available information, it appears that Deutsche Bank Defendants have employed other standard policies and practices in connection with the operation of their businesses that have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color. For example, the Deutsche Bank Defendants have deliberately outsourced routine exterior maintenance work to large national companies without community

ties, knowledge or expertise to service REO properties in communities of color. Furthermore, based on the PSA submitted with Defendants' reply brief, at least some PSAs relating to Deutsche Bank REO properties reference a servicing standard for property maintenance that is unduly vague and subjective. (See PSA "Definitions," p. 31, requiring only "that degree of skill and care exercised by the Servicer with respect to mortgage loans comparable to the Mortgage Loans serviced by the Servicer for itself or others").

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 155 and, on that basis, denies them. Ocwen denies the allegations in the second sentence of paragraph 155. With respect to the third sentence of paragraph 155, Ocwen states that the sample PSA (and other PSAs) speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 155.

156. The Ocwen and Altisource Defendants also appear to have employed standard policies and practices in connection with the operation of their businesses that have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color, although the details of their policies are not publicly disseminated. Based on available information, it appears that these policies include:

> a) adopting and following the Deutsche Bank policy of abdicating and outsourcing REO maintenance to third parties without appropriate monitoring or review;

> b) employing arbitrary methods of allocating resources to the maintenance of REO properties;

> c) avoiding customary real estate brokers, listings and channels in favor of Internet sites, such as Hubzu, used primarily for auctions and by investors, with the predictable result of cash sales or bulk sales by investors, which adversely impact neighborhoods of color by decreasing sales to the homeowner occupants;

> d) allowing third party contractors and lower level employees to exercise very significant levels of discretion with inappropriately minimal input or oversight from Defendants; and

> e) designating certain areas as "low value" and particular properties as "low value assets".

**ANSWER:** Ocwen denies the allegations in paragraph 156.

157.    The parameters of these policies are material to this litigation and constitute proper subjects of discovery. Based upon the pervasiveness of the discriminatory conditions relating to the Deutsche Bank REO properties, there is a substantial likelihood that additional policies and practices of Defendants have had a disproportionately adverse impact on communities of color.

**ANSWER:**    Ocwen denies the allegations in paragraph 157.

158.    The policy of designating areas and properties as "low value" and limiting property preservation work in those areas has a disparate impact on communities of color.

**ANSWER:**    Ocwen denies that it has a policy of designating properties in community of color as "low value" or limiting property preservation work in communities of color and denies any remaining allegations in paragraph 158.

158A. As regards the Deutsche Bank properties, the Defendants utilize a policy of designating certain areas as "low value" and particular properties as "low value assets," ("LVAs"). On this basis, Defendants deny and refuse to undertake property standard preservation work as to properties in these areas:

(1)    Pursuant to this "low value" policy, properties in communities of color are likely to be designated to be listed and sold "as is." Beyond a short checklist of initial cleanout-related items, no work will be approved for low value, "as is" properties, regardless of the length of time the property is held before resale and regardless of the effects on the community.

(2)    Pursuant to this "low value" policy, Defendants fail and refuse to complete any work and repairs at properties with alleged local code violations.

(3)    If Asset Managers initially informally identify observable code violations in low value areas, Defendants will not approve Asset Managers' bids for work to correct code violations.

(4)    Once Defendants are in receipt of notice of local ordinance or zoning violations in areas they deem low value, which are typically communities of color, work on the properties including cutting grass and snow removal is disallowed and frozen by the Code Violation Department (CV Department), regardless of the length of time involved and regardless of continued deterioration of the property, and regardless of detrimental effect on blocks, neighborhoods and the value of the property or surrounding properties.

**ANSWER:**    Ocwen denies that it has a policy of designating properties in community of color as "low value" or "low value assets" or denying or refusing to undertake property

56

preservation work in communities of color and denies any remaining allegations in paragraph 158A.

158B. Whether a particular property is deemed and referred to as a low value asset is based in whole or part on the area in which they are located, such as a zip code, town, or neighborhood. Areas deemed by Defendants as low value are typically communities of color. Areas deemed by Defendants as high value are typically white communities.

**ANSWER:** Ocwen denies that it has a policy of designating properties in community of color as "low value" or limiting property preservation work in communities of color and denies any remaining allegations in paragraph 158B.

158C. Defendants treat "low value" areas and "high value" areas differently in terms of the quality and quantity of property maintenance and upkeep. Defendants will not expend funds or approve bids to repair or maintain LVAs, regardless of negative impact on value and price of the property, safety issues, contribution to or acceleration of instability of neighborhoods, code violations, complaints of neighbors or Asset Managers, or repeated requests by assigned asset managers for approval of needed work. Bids of Asset Managers for work in LVAs may be met with no response for months and even up through the sale of the property.

**ANSWER:** Ocwen denies that it has a policy of designating properties in community of color as "low value" or limiting property preservation work in communities of color and denies any remaining allegations in paragraph 158C.

158D. In contrast, Defendants will expedite, follow up on, repeatedly call Asset Managers and otherwise act in highly proactive ways to ensure even minor work items are timely completed in areas deemed high value or concerning properties deemed high value assets. If neighbors or others in areas deemed high value areas complain or even could complain about an observed item, AltiSource aggressively pursues completing the work item and follows up on it, whereas complaints relating to low value areas are ignored and work items disallowed. Defendants will review and scrutinize the details, timeliness, and quality of work in areas they deem high value. In contrast, Defendants will not approve or allow Asset Managers requests to complete work in areas Defendants deem low value.

**ANSWER:** Ocwen denies that it has a policy of designating properties in community of color as "low value" or limiting property preservation work in communities of color and denies any remaining allegations in paragraph 158D.

158E. Derogatory reference is made by AltiSource to "hot zones," in addition to "low value." Both of these terms are used to describe perceived stereotypes as to communities of color

regarding value, crime and presumed undesirability of zip codes and other similarly defined areas that Defendants determine do not receive funds for property upkeep. "Hot zones" are typically communities and neighborhoods of color. Ocwen confirms and/or communicates to AltiSource that areas or properties are deemed "low value" or "low value assets." Facilitating the consequences of the determination of a property as low value may be overseen by a Risk Services Coordinator, known as "RSC," employed by one or more of the Defendants to carry out their policy of ignoring properties in communities of color.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 155E concerning statements allegedly made by Altisource and, on that basis, denies them. Ocwen denies that it has a policy of designating properties in community of color as "low value" or "low value assets" or limiting property preservation work in communities of color and denies any remaining allegations in paragraph 158E.

158F. AltiSource oversees management of Deutsche Bank assets in part through PODs (Point Of Direction) employees located overseas, including in Bangladesh and the Philippines. High level management and oversight of AltiSource PODs, as well as approvals and payments to Asset Managers contracted by AltiSource that are located in the United States are overseen by regional offices in the United States, who are also overseen by high level management employed by AltiSource in offices in Uruguay, and Luxembourg.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 158F and, on that basis, denies them.

158G. Employees receive training and guidance from AltiSource and Ocwen that includes designating areas and properties as "low value" and disallowing work on properties in low value areas. AltiSource contracts with Asset Managers throughout the United States who are assigned a portfolio of properties. Asset Managers themselves perform work items and also engage subcontractors in various trades to complete necessary work. Asset managers in the United States submit bids using a centralized uniform electronic system ("XactPRM") addressing work items, bids and payments, to PODs oversees in Bangladesh, the Philippines, and potentially other locations.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Altisource in paragraph 158G and, on that basis, denies them. Ocwen denies that it has a policy of designating properties in community of color as "low value" or limiting property preservation work in communities of color and denies any remaining allegations in paragraph 158G.

158H. On each property, Asset Managers may complete a specified short list of initial items, corresponding to a pre-set payment schedule, after which they must submit bids using a system of estimating software provided by Defendants prior to completing non-standard line items (e.g. reglazing boarded up windows). The initial pre-approved list of items include boarding up windows, changing locks, initial trimming of shrubs, changing light bulbs, checking light fixtures, checking Carbon Monoxide detectors, and checking smoke detectors.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Altisource in paragraph 158H and, on that basis, denies them.

Ocwen denies any remaining allegations in paragraph 158H.

158I. To gain physical access to properties, AltiSource Asset Managers are equipped with judicial deeds demonstrating they are working on behalf of the property owner, e.g. Deutsche Bank. Likewise, Asset Managers provide evidence of their authority on the part of the owner shown on judicial deeds to municipalities during Point of Sale Inspections.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 158I and, on that basis, denies them.

158J. Altisource uses an outside company for quality control inspections, but does not inspect or check on items contractors are prevented from completing. Quality control inspections in high value areas that discover incomplete work items will result in a call or email from Altisource to the assigned contractor to ensure the work is completed. In contrast, work is generally not approved or inspected for low value assets.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 158J and, on that basis, denies them

158K. AltiSource bid reviewers are trained by AltiSource and/or Ocwen to review asset managers' requests for approvals of work in accord with Defendants' policies regarding properties deemed low value. If an Asset Manager assigned to a property in the United States inquires about ignored or denied bids for needed work to a property considered low value, they may receive one or more the following responses from Altisource: (a) The client said we are not approving these bids; or (b) The bids are pending investor approval, (c) LVA, property to be sold as is.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Altisource in paragraph 158K and, on that basis, denies them.

Ocwen denies any remaining allegations in paragraph 158K.

158L. The policy of designating areas and properties as "low value" and denying property preservation work to those areas and properties has a disparate impact on communities of color.

59

The cumulative effect of Defendants' policies and practices with respect to low value assets is to drive the market value of the particular properties further down, as well as to drive down the market value of other properties in neighborhoods and communities of color.

**ANSWER:** Ocwen denies that it has a policy of designating properties in community of color as "low value" or limiting property preservation work in communities of color and denies any remaining allegations in paragraph 158L.

### G. DEFENDANTS' DISCRIMINATORY MAINTENANCE AND MARKETING OF REO PROPERTIES PERPETUATES SEGREGATION

159. One of the fundamental purposes of the Fair Housing Act is to eliminate segregated housing patterns and to increase integration.

**ANSWER:** The allegations in paragraph 159 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 159.

160. The "dissimilarity index" is a well-recognized standard for evaluating a community's level of segregation. The index measures whether one particular racial group is distributed across census tracts in the metropolitan area in the same way as another racial group. A high dissimilarity index indicates that the two groups tend to live in different tracts. The index ranges from 0 to 100. A value of 60 or more is considered a very high level of segregation. It means that 60% (or more) of the members of one group who reside in the area would need to move to a different tract within that area in order for the two groups to be equally distributed. Values between 40 and 50 demonstrate a moderate level of segregation, and values of 30 or below indicate a low level of segregation.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 160 and, on that basis, denies them.

161. The cities in which Plaintiffs investigated Defendants' maintenance of the Deutsche Bank REO properties are located in metropolitan areas that are racially segregated, as indicated by have the following dissimilarity indexes:

| Metro Area/City | 2010 Black-White Dissimilarity Index | 2010 Hispanic-White Dissimilarity Index |
|---|---|---|
| Chicago | 75.2 | 56.3 |
| Milwaukee | 79.6 | 57.0 |
| Cleveland | 72.6 | 52.3 |

| | | |
|---|---|---|
| Detroit (Suburban) | 74.0 | 43.3 |
| Dayton | 63.3 | 27.3 |
| Toledo | 63.2 | 31.4 |
| Columbus | 60.0 | 41.4 |
| D.C. & Prince George's | 61.0 | 48.3 |
| Memphis | 62.2 | 50.7 |
| Baltimore | 64.3 | 39.8 |
| Hampton Roads | 46.9 | 32.2 |
| Orlando | 49.3 | 40.2 |
| Minneapolis | 50.2 | 42.5 |
| Indianapolis | 64.5 | 47.3 |
| Baton Rouge | 57.2 | 32.7 |
| Denver | 59.4 | 48.8 |
| Dallas | 55.5 | 50.3 |
| Gary | 76.8 | 43.7 |
| Hartford | 62.3 | 58.4 |
| New Orleans | 63.3 | 38.3 |
| Grand Rapids | 61.4 | 50.4 |
| Muskegon | 71.2 | 30.4 |
| Greater Palm Beaches | 57.3 | 42.6 |
| Miami | 64.0 | 57.4 |
| Tampa | 54.3 | 40.7 |
| Richmond | 51.6 | 44.9 |
| Philadelphia | 67.0 | 55.1 |
| Providence | 50.8 | 60.1 |
| Vallejo and Richmond CA | 41.5 | 29.2 |
| Kansas City | 58.6 | 44.4 |

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 161 and, on that basis, denies them.

162. The cities in which the Defendants' maintenance and marketing of the Deutsche Bank REO properties were investigated are moderately or highly segregated under the dissimilarity index measure. The fact of high rates of segregation in these cities was known to the Deutsche Bank Defendants, Altisource and Ocwen.

**ANSWER:** Ocwen denies that it marketed Deutsche Bank REO properties or that Plaintiffs investigated Ocwen's purported marketing of Deutsche Bank REO properties. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 162 and, on that basis, denies them.

61

163.    As described above in Section IV.B., in all the cities examined and across all time periods, Defendants have failed to maintain and market REO dwellings in communities of color as REO dwellings in predominantly white neighborhoods. By failing to maintain and market REO dwellings in communities of color to the same standards as REO dwellings in predominantly white neighborhoods were maintained, Defendants have perpetuated segregation in several ways.

**ANSWER:**    Ocwen denies the allegations in paragraph 163.

164.    The failure to maintain and market REO dwellings in communities of color according to the same standards as REO dwellings in predominantly white neighborhoods were maintained has stigmatized communities of color as less desirable than predominantly white communities. The prospects for integration in the affected communities have been reduced because buyers are deterred from purchasing properties in neighborhoods with poorly maintained REO properties, leaving the segregated racial composition of these neighborhoods unchanged.

**ANSWER:**    Ocwen denies the allegations in paragraph 164.

165.    The existence of poorly maintained REO dwellings in minority neighborhoods diminishes home values for surrounding homeowners. Lower home values in communities of color restrict the ability of minority homeowners to move to majority-white or integrated neighborhoods by reducing the equity they can utilize to buy a new home.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165 and, on that basis, denies them.

166.    As a result of Defendants' discriminatory maintenance and marketing of the Deutsche Bank REO properties, Defendants have perpetuated segregation in the foregoing metropolitan areas and thwarted Congressional efforts to eradicate segregated housing patterns, and neighborhood residents have been deprived of the social, economic and professional benefits of living in an integrated community.

**ANSWER:**    Ocwen denies the allegations in paragraph 166.

## V.  INJURIES CAUSED BY DEFENDANTS' BEHAVIOR

167.    In the context of the national foreclosure crisis, the Plaintiffs became aware of disparities in the routine exterior maintenance and marketing of REO properties in communities of color. Plaintiffs received complaints and feedback from neighbors living in proximity to these properties and observed firsthand problems in communities that they serviced and had invested funds into for neighborhood stabilization and increasing homeownership. An important part of the missions of the Plaintiff organizations is to monitor and respond to conduct and conditions in the housing market that are indicative of discrimination.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 167 and, on that basis, denies them.

168.    Based on this information and consistent with the missions of the Plaintiff agencies, Plaintiffs investigated this anecdotal information and determined that a larger, systemic problem existed. Prior to pursuing administrative action or litigation directed toward this problem, Plaintiff NFHA published and disseminated reports describing Plaintiffs' preliminary findings and held news conferences in the hope that Defendants would investigate and voluntarily undertake any needed remedial actions.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 168 and, on that basis, denies them.

169.    As described in more detail below, the failure of Defendants to respond to this situation has led Plaintiffs to incur substantial injuries, damages and expenditures that might have otherwise been avoided.

**ANSWER:**    Ocwen denies the allegations in paragraph 169.

**A.    INJURY TO ALL PLAINTIFFS**

170.    The quantitative, qualitative, anecdotal and other supporting evidence pleaded by Plaintiffs indicates a sufficiently direct causal connection between the abdication of duties and other policies and conduct of Defendants and the injuries suffered by Plaintiffs.

**ANSWER:**    Ocwen denies the allegations in paragraph 170.

171.    The Defendants' abdication and other policies and conduct directly caused differential property maintenance based on race. The regression analysis conducted by Plaintiffs rules out various potential non-racial explanations for the differing maintenance between REOs owned by the Deutsche Bank Defendants in minority and non-minority neighborhoods. To the extent that the Deutsche Bank Defendants seek to rebut these allegations, factual questions are presented.

**ANSWER:**    Ocwen denies the allegations in paragraph 171.

172.    The injuries flowing from Defendants' gross differential property maintenance on racial lines are immediate and inevitable consequences of Defendants' discriminatory policies and conduct. These direct consequences include: (a) the loss of the economic value and negative impact on Plaintiffs' investments in minority communities to promote fair housing and community stabilization; (b) the frustration of Plaintiffs' mission as fair housing organizations; (c) the necessary initiation and implementation of costly and time-consuming investigations and counteractive measures by Plaintiffs in response to Defendants' conduct; (d) the diversion of resources from other programs central to Plaintiffs' mission; and (e) harm to minority neighborhoods in terms of diminished property value, safety and habitability, including offices of Plaintiffs located in affected neighborhoods.

**ANSWER:**    Ocwen denies the allegations in paragraph 172.

173. Plaintiffs will offer expert and anecdotal evidence at trial establishing that each of these injuries is an immediate and direct result of Defendants' discriminatory conduct. Aspects of this evidence are described in the allegations below.

**ANSWER:** Ocwen denies the allegations in paragraph 173.

### 1. Loss of Economic Value and Impact of Community Investments.

174. The organizational plaintiffs made very significant financial investments totaling millions of dollars in the neighborhoods affected by REO blight, including neighborhoods where assessments of Deutsche Bank REOs were performed. These investments included down payment, match funds and closing cost assistance to homeowners, property rehabilitation assistance, rent assistance and community revitalization. For example, NFHA has made investments in many cities across the United States via its Inclusive Communities and Community development initiatives, including: Oakland, CA; Napa, CA; San Raphael, CA; Denver, CO; Indianapolis, IN; Dallas/Fort Worth, TX; Prince George's County, MD; Washington, D.C., Melbourne, FL; Rockledge, FL; Miami, FL; West Palm Beach, FL , Savannah, GA; Minneapolis, MN and Philadelphia, PA.

**ANSWER:** The Court dismissed Plaintiffs' claims seeking damages alleged in

paragraphs 174-78 (Dkt. 97 at 20-21) and, therefore, no response is required.

175. Another organizational plaintiff, the Continuum, worked with the Community Housing Initiative in Brevard, Florida, to match or exceed the match on funds with already existing programs to purchase, rehab and sell dozens of REO properties to first time homeowners in Melbourne, Titusville, Orlando, Palm Bay and Winter Garden, Florida.

**ANSWER:** The Court dismissed Plaintiffs' claims seeking damages alleged in

paragraphs 174-78 (Dkt. 97 at 20-21) and, therefore, no response is required.

176. Plaintiff HOPE Fair Housing Center made significant investments in Elgin Illinois ad in the Austin neighborhood of Chicago. In Elgin, HOPE provided funds to overcome the "appraisal gap": work needed to rehabilitate a home despite the anticipated property appraisal given that foreclosures diminished values in the local market. Such programs are representative of the financial investments made by the Plaintiff Fair Housing Organizations. Investments of this nature have been leveraged to obtain additional corporate funding and foundation grants.

**ANSWER:** The Court dismissed Plaintiffs' claims seeking damages alleged in

paragraphs 174-78 (Dkt. 97 at 20-21) and, therefore, no response is required.

177. Cities and municipalities served by the Plaintiff Fair Housing organizations also receive substantial funding to meet Fair Housing Act goals of affirmatively furthering fair housing, rebuilding neighborhoods, creating suitable living environments, providing for safer neighborhoods, and combatting discriminatory and segregated housing conditions. Fair Housing

organizations, including the Plaintiffs, receive and utilize funds and take actions to assist municipalities in meeting these goals.

**ANSWER:** The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 174-78 (Dkt. 97 at 20-21) and, therefore, no response is required.

178.    Plaintiffs' various financial investments in minority communities have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank-owned homes in the same communities. For example, as a direct result of poorly maintained REO properties in minority neighborhoods, lowered property values of nearby homes have interfered with sales going forward, negatively impacting community redevelopment efforts. In addition, private developers have been thwarted and deterred from investing in minority neighborhoods affected by REO blight, further diminishing community redevelopment.

**ANSWER:** The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 174-78 (Dkt. 97 at 20-21) and, therefore, no response is required.

### 2.    Frustration of Mission.

179.    The fundamental missions of the Plaintiff Fair Housing Organizations are eradicating housing discrimination and segregation, investing substantially in minority communities to improve their conditions, investigating and responding to discriminatory conduct and conditions in the housing market, and conducting education, outreach and counteractive measures in response to discriminatory conduct.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 179 and, on that basis, denies them.

180.    The Plaintiff Fair Housing Organizations' core missions are frustrated by defendants' unlawful conduct negatively impacting the ability of minorities to sell and purchase homes, diminishing the availability of housing in minority communities and interfering with the integration of racially segregated communities. By creating conditions antithetical to the mission of the Plaintiff Fair Housing Organizations, the Defendants impeded the Plaintiffs' organizational goals and diminished the effects of their efforts to carry out their mission.

**ANSWER:** Ocwen denies the allegations in paragraph 180.

181.    Defendants' widespread unlawful conduct had the direct effect of undermining the efficacy of Plaintiffs' education, advocacy and training programs designed to promote fair housing.

**ANSWER:** Ocwen denies the allegations in paragraph 181.

### 3.    Implementation of Counteractive Measures.

182.    Plaintiff Fair Housing Organizations are obligated to affirmatively further fair housing as required by the FHA, their contractual obligations and their organizational purposes. Based on complaints and information received regarding REO blight, the Plaintiffs investigated, tested and responded to poorly maintained REOs in minority neighborhoods. For example, NFHA received complaints from community neighbors related to serious problems caused by the condition of Deutsche Bank REO properties. For example, NFHA received a letter from eleven neighbors living near the Deutsche Bank REO property at 6515 Walters Place in District Heights, Maryland about a property that had been set on fire by squatters living there while it was under Deutsche Bank ownership.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 182 and, on that basis, denies them.

183.    The counteractive measures engaged in by Plaintiffs include community outreach and public efforts to raise awareness of these discriminatory practices in the communities served by Plaintiffs in order to diminish the effects of Defendants' conduct. Plaintiffs specifically developed and implemented programs designed to ameliorate the effects of REO blight.

**ANSWER:**    Ocwen denies the first sentence of paragraph 183.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 183 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of wrongdoing.

184.    Defendants' failure to address concerns raised by the Plaintiff Fair Housing Organizations regarding REO blight necessitated additional efforts to counteract Defendants' conduct through testing, litigation and the design of strategies targeted toward curbing Defendants' unlawful behavior.

**ANSWER:**    Ocwen denies the allegations in paragraph 184.

### 4. Diversion of Resources.

185.    As a direct result of Defendants' discriminatory practices, the Plaintiff Fair Housing Organizations were forced to divert resources and delay, suspend or forgo other existing programs or projects. For example, NFHA had to forgo conducting sales investigations to combat racial steering because staff was needed to conduct REO investigations across the country. Despite this effect on Plaintiffs' other programs and services, Plaintiffs nevertheless shifted resources to these counteractive measures because, if left unaddressed, Defendants' discriminatory policies would detrimentally impact Plaintiffs' communities and the constituents they serve.

**ANSWER:**    Ocwen denies the allegations in paragraph 185.

186. Defendants' unlawful practices have forced the Plaintiff Fair Housing Organizations to divert scarce resources away from their usual education, counseling, investigation, and capacity-building activities and services. As Defendants' discriminatory activities persist, addressing and counteracting Defendants' discriminatory conduct will continue to require a substantial diversion of resources by Plaintiffs away from their usual activities.

**ANSWER:** Ocwen denies the allegations in paragraph 186.

187. Examples of the diversion and expenditure of financial resources and staff time, include, but are not limited to: time and costs associated with drafting and distributing educational materials; mailing costs and graphic design expenses; travel time and expenses; expert fees, investigative and analytic activities; and litigation support.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 187 and, on that basis, denies them.

### 5. Harms To Minority Neighborhoods Served by Plaintiffs.

188. Plaintiff Fair Housing Organizations serve minority neighborhoods that have been severely impacted by REO blight and operate offices in areas where investigations of Deutsche Bank REOs were performed.

**ANSWER:** The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 188-90 (Dkt. 97 at 21-22) and, therefore, no response is required.

189. Defendants' unlawful practices have harmed these minority neighborhoods in terms of diminished property values, safety, habitability, housing opportunities and community redevelopment. The experience of the Plaintiff Fair Housing Organizations in their service areas is that minimal real estate development and community development occurs in areas where REO blight is prevalent. The Plaintiff Fair Housing Organizations are further informed about the difficulties facing purchasers seeking to obtain loans to purchase homes in communities suffering from REO blight because poorly maintained REO properties impact appraisal values. The Plaintiff Fair Housing Organizations are further informed about dangerous conditions at REO properties maintained by Defendants that Defendants failed to remedy.

**ANSWER:** The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 188-90 (Dkt. 97 at 21-22) and, therefore, no response is required.

190. The detrimental effects of deficient REO properties on neighborhoods and real estate transactions were known to the Plaintiff organizations and the communities and individuals they serve as described herein, and have been widely reported concerning the neighborhoods at issue in this case where the Plaintiff organizations investigated Deutsche Bank property addresses. (*See e.g.* https://www.mydaytondailynews.com/news/local-govt--politics/one-six-structures-sit-empty-city/z1KjsBNlkaDorQlcemD9tO/("Vacant homes and buildings drag down property

values, attract criminal activity and provide neighbors with a disincentive to invest in their properties"); https://www.daytondailynews.com/news/crime--law/neighborhoods-where-women-found-plagued-blight-vacant-homes/buuQivwUO8QAL4Op00iSAL/; https://www.baltimoresun.com/news/maryland/politics/bs-me-ci-vacant-house-rehabs20180906-story.html.

**ANSWER:** The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 188-90 (Dkt. 97 at 21-22) and, therefore, no response is required.

191. The foregoing injuries (summarized in subsections 1 through 5 above) have caused Plaintiffs to incur costs that are above and beyond the operational activities and costs normally expended by Plaintiffs.

**ANSWER:** Ocwen denies the allegations in paragraph 191.

192. The foregoing injuries that Plaintiffs have suffered as a result of Defendants' conduct fall within the zone of interests protected by the Fair Housing Act.

**ANSWER:** Ocwen denies the allegations in paragraph 192.

193. The foregoing injuries that Plaintiffs have suffered are neither speculative nor hypothetical, but are direct, inevitable and severe consequences of Defendants' unlawful conduct.

**ANSWER:** Ocwen denies the allegations in paragraph 193.

## B. INJURIES TO INDIVIDUAL PLAINTIFFS

194. Each Plaintiff has suffered direct, particularized and concrete injuries caused by Defendants' discriminatory conduct. As discussed below, many of the Plaintiffs have made direct financial investments in the communities against which Defendants have discriminated, which have been negatively impacted. The negative effects of Defendants' discrimination include effects related to CDBG funding and grants received by many of the Plaintiffs.

**ANSWER:** Ocwen denies the allegations in paragraph 194.

**National Fair Housing Alliance**

195. As a national organization with the mission of eradicating housing discrimination and segregation, NFHA works to monitor, investigate and respond to evolving conditions in the housing market that indicate the presence of discriminatory conduct. In this capacity, NFHA became aware of complaints and conditions relating to the inequitable maintenance of REO properties in communities of color. As a result, and consistent with its mission, NFHA undertook to evaluate the scope and causes of this problem.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 195 and, on that basis, denies them.

196. Over the course of eight years, Plaintiff NFHA has conducted hundreds of inspections of Deutsche Bank REO properties across the nation. NFHA has also conducted joint inspections with all of the other Plaintiffs listed below. In total, NFHA has expended over 2044 hours on its investigation into Defendants' discriminatory maintenance and marketing of the Deutsche Bank REO properties and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff NFHA's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 196 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

197. As a result of this expenditure of time and resources, NFHA diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused NFHA to forgo opportunities, including executing new fair housing advocacy projects and investigations, conducting additional consulting and training of housing providers, applying for new grants and funding sources, and attending conferences and professional staff development.

**ANSWER:** Ocwen denies the second sentence of paragraph 197. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 197 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

198. In addition, NFHA engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. NFHA's efforts include: meeting with local, state, and federal government officials (including the Federal Reserve Board, legislators, and at least ten local governments/jurisdictions); authoring and distributing reports about discrimination in the maintenance of REO properties, which were subsequently provided to local and state governments; presenting numerous fair housing trainings regarding REO maintenance to real estate professionals and bank employees; planning and sponsoring a national conference on REO maintenance; and serving as keynote speaker and making presentations on numerous panels regarding the economic impact of discriminatory REO maintenance.

**ANSWER:** Ocwen denies the first sentence of paragraph 198. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 198 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

199.    Defendants' actions have also frustrated the mission and purpose of NFHA. As described in greater detail above, NFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices impede its efforts and frustrate its mission.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 199 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 199 and specifically denies any and all allegations of wrongdoing.

200.    Finally, NFHA has expended at least $5.5 million of its own funds to engage in community development, home ownership promotion, and neighborhood stabilization efforts across the nation. NFHA's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in those communities.

**ANSWER:**    Ocwen denies the second sentence of paragraph 200. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 200 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of wrongdoing.

**Fair Housing Advocates of Northern California (formerly Fair Housing of Marin)**

201.    Plaintiff Fair Housing Advocates of Northern California conducted inspections of Deutsche Bank REO properties across the greater Solano and Contra Costa counties, expending over 215 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:**    Ocwen denies that any of Plaintiff Fair Housing Advocates of Northern California's time spent on the investigation results from, or is attributable to, Ocwen.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 201 and, on that basis, denies them.

202.    As a result of this expenditure of time and resources, FHANC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: consulting opportunities, professional staff development, coalition and

advocacy meetings, work on local and regional housing policies, expansion of fair housing programs, and new or additional funding applications.

**ANSWER:** Ocwen denies the second sentence of paragraph 202. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 202 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

203. In addition, FHANC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: meeting with government officials regarding REO maintenance, including visits to senators and representatives on Capitol Hill; meeting with local service providers such as Housing and Economic Rights Advocates; creating and distributing public service announcements and conducting radio campaigns; publishing advertisements in local newspapers; sending specialized mailings to neighbors of REO properties; participating in community events; and engaging with media to raise awareness of REO-related issues.

**ANSWER:** Ocwen denies the first sentence of paragraph 203. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 203 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

204. Defendants' actions have also frustrated the mission and purpose of FHANC. As described in greater detail above, FHANC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 204 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 204 and specifically denies any and all allegations of wrongdoing.

205. Finally, FHANC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including foreclosure prevention, counseling and education. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in neighborhoods of color in the greater Solano and Contra Costa counties.

**ANSWER:** Ocwen denies the second sentence of paragraph 205. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 205 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

**Central Ohio Fair Housing Association**

206. Plaintiff Central Ohio Fair Housing Association conducted inspections of Deutsche Bank REO properties, expending over 59 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff Central Ohio Fair Housing Association's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 206 and, on that basis, denies them.

207. As a result of this expenditure of time and resources, COFHA diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: community and coalition meetings, professional staff development, and new funding applications.

**ANSWER:** Ocwen denies the second sentence of paragraph 207. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 207 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

208. In addition, COFHA engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting outreach and trainings for real estate agents in the greater Columbus metropolitan region; providing educational materials and meeting with local code or government officials regarding REO maintenance; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events, including presentations to Habitat for Humanity Mid-Ohio, Somali Community Association of Ohio, Legal Aid Society of Columbus, and Columbus Realtists Association; engaging with media to raise awareness of REO-related issues; and meeting with officials from the City of Columbus and Franklin County, Ohio.

**ANSWER:** Ocwen denies the first sentence of paragraph 208. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 208 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

209. Defendants' actions have also frustrated the mission and purpose of COFHA. As described in greater detail above, COFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 209 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 209 and specifically denies any and all allegations of wrongdoing.

210. Finally, COFHA has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in neighborhoods of color in the greater Columbus metropolitan region.

**ANSWER:** Ocwen denies the second sentence of paragraph 210. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 210 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

**Connecticut Fair Housing Center**

211. Plaintiff Connecticut Fair Housing Center, Inc. conducted inspections of Deutsche Bank's REO properties throughout Connecticut, expending over 285 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff Connecticut Fair Housing Center, Inc.'s time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

211 and, on that basis, denies them.

212.     As a result of this expenditure of time and resources, CFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including, but not limited to, developing new or additional fair housing investigations, community and coalition meetings, consulting and training opportunities, new funding applications, and professional staff development.

**ANSWER:**     Ocwen denies the second sentence of paragraph 212.  Ocwen lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

paragraph 212 and, on that basis, denies them.  Ocwen also specifically denies any and all

allegations of wrongdoing.

213.     In addition, CFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: conducting classes for more than 100 real estate agents on their obligations to maintain REO properties in a non-discriminatory manner; testifying at legislative hearings at the Connecticut legislature on blight bills to raise awareness of the problems caused by differential treatment of REO properties; meeting with the Mayor of New Haven to highlight problems with REO properties in her city; and discussing REO maintenance with Connecticut's Congressional delegation during meetings on fair housing problems in Connecticut.

**ANSWER:**     Ocwen denies the first sentence of paragraph 213.  Ocwen lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

213 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of

wrongdoing.

214.     Defendants' actions have also frustrated the mission and purpose of CFHC. As described in greater detail above, CFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in the second sentence of paragraph 214 and, on that basis, denies them.

Ocwen denies the remaining allegations in paragraph 214 and specifically denies any and all allegations of wrongdoing.

**Denver Metro Fair Housing Center**

215.     Plaintiff Denver Metro Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Denver metropolitan area, expending over 250 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:**     Ocwen denies that any of Plaintiff Denver Metro Fair Housing Center's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 215 and, on that basis, denies them.

216.     As a result of this expenditure of time and resources, DMFHC diverted limited resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including consulting and training opportunities, new funding applications, professional staff development, and new or additional fair housing investigations.

**ANSWER:**     Ocwen denies the second sentence of paragraph 216. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 216 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

217.     In addition, DMFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. DMFHC's efforts include: organizing and conducting trainings regarding REO maintenance for housing providers, municipal housing employees, HUD housing counseling agency staff, and the general public in the greater Denver Metro region; meeting with local government officials regarding REO issues, including the Denver Regional Council of Governments, City and County of Denver, City of Aurora, and the State of Colorado Division of Housing; preparing and publishing brochures/reports; creating public service announcements and advertising; designing specialized mailings; participating in community events, including the Montbello 50th Anniversary Fair; and engaging with media to raise awareness for REO-related issues.

**ANSWER:**     Ocwen denies the first sentence of paragraph 217. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

217 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

218. Defendants' actions have also frustrated the mission and purpose of DMFHC. As described in greater detail above, DMFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission. Finally, DMFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Denver metropolitan region.

**ANSWER:** Ocwen denies the first, third, and fifth sentences of paragraph 218. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 218 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

**Fair Housing Center of Central Indiana**

219. Plaintiff Fair Housing Center of Central Indiana, Inc. conducted inspections of Deutsche Bank REO properties across the greater Indianapolis metropolitan region, expending over 161 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff Fair Housing Center of Central Indiana, Inc.'s time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 219 and, on that basis, denies them.

220. As a result of this expenditure of time and resources, FHCCI diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: fair housing training opportunities, new funding applications, professional staff development, and expanded forms of education and outreach.

**ANSWER:** Ocwen denies the second sentence of paragraph 220. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

paragraph 220 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

221. In addition, FHCCI engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. FHCCI's efforts include organizing and conducting trainings for community development and neighborhood organizations in the greater Indianapolis region; meeting with local community development organizations and government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; creating public service announcements for local print and radio; designing specialized mailings; and engaging with media to raise awareness of REO-related issues and answer media related inquiries.

**ANSWER:** Ocwen denies the first sentence of paragraph 221. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 221 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

222. Defendants' actions have also frustrated the mission and purpose of FHCCI. As described in greater detail above, FHCCI's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 222 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 222 and specifically denies any and all allegations of wrongdoing.

223. Finally, FHCCI has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Indianapolis metropolitan region.

**ANSWER:** Ocwen denies the second sentence of paragraph 223. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 223 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

**Fair Housing Center of the Greater Palm Beaches**

224.     Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. conducted inspections of Deutsche Bank REO properties across the greater Palm Beach metropolitan region and expended over 168 hours over the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:**     Ocwen denies that any of Plaintiff Fair Housing Center of the Greater Palm

Beaches, Inc.'s time spent on the investigation results from, or is attributable to, Ocwen.  Ocwen

lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 224 and, on that basis, denies them.

225.     As a result of this expenditure of time and resources, FHCGPB diverted resources and time away from other intended projects and programs, and was required to suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including fair housing education and consulting opportunities with housing providers and municipalities and new funding applications.

**ANSWER:**     Ocwen denies the second sentence of paragraph 225.  Ocwen lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

paragraph 225 and, on that basis, denies them.  Ocwen also specifically denies any and all

allegations of wrongdoing.

226.     In addition, FHCGPB engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: presenting over a dozen workshops to community service providers and local housing providers regarding REO maintenance; disseminating anti-discrimination literature; and counseling citizens of the greater Palm Beach metropolitan region on their fair housing rights under federal, state, and local fair housing laws.

**ANSWER:**     Ocwen denies the first sentence of paragraph 226.  Ocwen lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

226 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of

wrongdoing.

227.     Defendants' actions have also frustrated the mission and purpose of FHCGPB. As described in greater detail above, FHCGPB's mission is to ensure equal housing opportunities and

to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 227 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 227 and specifically denies any and all allegations of wrongdoing.

**Fair Housing Center of West Michigan**

228. Plaintiff Fair Housing Center of West Michigan conducted inspections of Deutsche Bank's REO properties across the western Michigan region, expending over 200 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff Fair Housing Center of West Michigan's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 228 and, on that basis, denies them.

229. As a result of this expenditure of time and resources, FHCWM diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including community meetings and collaborative efforts, consulting opportunities, conferences and staff development, other systemic investigations, and funding applications.

**ANSWER:** Ocwen denies the second sentence of paragraph 229. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 229 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

230. In addition, FHCWM engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: holding workshops regarding REO issues at its Fair Housing Luncheon & Workshop Series; meeting with local code or government officials regarding REO maintenance; meeting with local service providers, stakeholders and community groups; preparing and publishing newsletters; participating in community events; and engaging with media to raise awareness of REO-related issues.

**ANSWER:** Ocwen denies the first sentence of paragraph 230. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 230 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

231. Defendants' actions have also frustrated the mission and purpose of FHCWM. As described in greater detail above, FHCWM's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 231 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 231 and specifically denies any and all allegations of wrongdoing.

232. Finally, FHCWM has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the Western Michigan region.

**ANSWER:** Ocwen denies the second sentence of paragraph 232. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 232 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

**Fair Housing Continuum**

233. The Fair Housing Continuum, Inc. conducted inspections of Deutsche Bank REO properties in the central Florida region, expending over 940 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff The Fair Housing Continuum, Inc.'s time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 233

and, on that basis, denies them.

234.    As a result of this expenditure of time and resources, the Continuum diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: new or additional fair housing investigations, individual complaint enforcement, fair housing training opportunities, and professional staff development.

**ANSWER:**    Ocwen denies the second sentence of paragraph 234.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 234 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of wrongdoing.

235.    In addition, the Continuum engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include 141 presentations or speaking engagements related to REO issues from July 2013 through Sept. 2016 as well as engaging with media to raise awareness of REO-related issues.

**ANSWER:**    Ocwen denies the first sentence of paragraph 235. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 235 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of wrongdoing.

236.    Defendants' actions have also frustrated the mission and purpose of the Continuum. As described in greater detail above, the Continuum's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 236 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 236 and specifically denies any and all allegations of wrongdoing.

**Greater New Orleans Fair Housing Action Center**

237.    Plaintiff Greater New Orleans Fair Housing Action Center conducted inspections of Deutsche Bank REO properties across the New Orleans and Baton Rouge metropolitan areas, expending over 200 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:**    Ocwen denies that any of Plaintiff Greater New Orleans Fair Housing Action Center's time spent on the investigation results from, or is attributable to, Ocwen.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 237 and, on that basis, denies them.

238.    As a result of this expenditure of time and resources, GNOFHAC diverted resources and time away from other intended projects and programs, and was required to delay or suspend such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including presenting fair housing courses and to delay work related to its annual outreach and education events, as well as planned investigations.

**ANSWER:**    Ocwen denies the second sentence of paragraph 238. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 238 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of wrongdoing.

239.    In addition, GNOFHAC engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendants' conduct. GNOFHAC's efforts include: organizing and conducting trainings to groups of service providers in the Greater New Orleans area, including meeting with BlightsOut, an organization dedicated to eradicating blight; meeting with government officials regarding REO maintenance; creating public service announcements and advertising in local print and radio; participating in community events, including the Mission Possible Conference with over 100 conference attendees, and engaging with media to raise awareness of REO-related issues.

**ANSWER:**    Ocwen denies the first sentence of paragraph 239.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 239 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of wrongdoing.

240.    Defendants' actions have also frustrated the mission and purpose of GNOFHAC. As described in greater detail above, GNOFHAC's mission is to ensure equal housing

opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 240 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 240 and specifically denies any and all allegations of wrongdoing.

241. Finally, GNOFHAC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater New Orleans metropolitan region.

**ANSWER:** Ocwen denies the second sentence of paragraph 241. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 241 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

**HOPE Fair Housing Center**

242. Plaintiff H.O.P.E. Inc. d/b/a HOPE Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Chicago metropolitan region, expending over 1115 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff H.O.P.E. Inc. d/b/a HOPE Fair Housing Center's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 242 and, on that basis, denies them.

243. As a result of this expenditure of time and resources, HOPE diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: consulting opportunities, new funding applications, professional staff development, and community and coalition meetings.

**ANSWER:** Ocwen denies the second sentence of paragraph 243. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 243 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

244. In addition, HOPE engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for a regional coalition of housing providers, non-profit service providers and government staff in the greater Chicago metropolitan region; meeting with local code or government officials regarding REO maintenance in Elgin and other local municipalities; meeting with local service providers and real estate trade organizations; preparing and publishing brochures/reports; designing targeted websites and specialized mailings; participating in community events, including the Chicago Urban League Homebuyers Fair, among others; and engaging with media to raise awareness of REO-related issues.

**ANSWER:** Ocwen denies the first sentence of paragraph 244. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 244 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

245. Defendants' actions have also frustrated the mission and purpose of HOPE. As described in greater detail above, HOPE's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 245 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 245 and specifically denies any and all allegations of wrongdoing.

246. HOPE has also expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Chicago metropolitan region.

**ANSWER:** Ocwen denies the second sentence of paragraph 246. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 246 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

**Housing Opportunities Made Equal of Virginia**

247. Plaintiff Housing Opportunities Made Equal of Virginia trained to gain necessary expertise and conducted inspections of Deutsche Bank's REO properties in Virginia, expending over 561 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff Housing Opportunities Made Equal of Virginia's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 247 and, on that basis, denies them.

248. As a result of this expenditure of time and resources, HOME of Virginia diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including education and outreach activities that would have furthered its mission, training on volunteer recruitment, fair housing planning consulting work, community meetings and collaborative efforts, advocacy efforts to add sexual orientation protections to the Virginia Fair Housing Act, and the delay of its internal strategic planning exercises.

**ANSWER:** Ocwen denies the second sentence of paragraph 248. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 248 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

249. In addition, HOME of Virginia engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: extensive work to prevent foreclosures by providing foreclosure prevention counseling to hundreds of Virginians beyond any contract to do so and expending its own funds; corresponding with City officials regarding REO maintenance and ongoing costs to the localities; meeting with community development corporations; and engaging with media to raise awareness of REO-related issues.

**ANSWER:** Ocwen denies the first sentence of paragraph 249. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 249 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

250. Defendants' actions have also frustrated the mission and purpose of HOME of Virginia. As described in greater detail above, HOME of Virginia's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 250 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 250 and specifically denies any and all allegations of wrongdoing.

**Housing Opportunities Project for Excellence (HOPE Inc.)**

251. Plaintiff Housing Opportunities Project for Excellence, Inc., conducted inspections of Deutsche Bank REO properties across the state of Florida (including its Miami-Dade and Broward Counties service area and assisting in Greater Palm Beaches area investigations) and expended over 179 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff Housing Opportunities Project for Excellence, Inc.'s time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 251 and, on that basis, denies them.

252. As a result of this expenditure of time and resources, HOPE, Inc. diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including resource development, public policy advocacy, identifying opportunities to educate underserved and unserved populations, utilizing research and technology to identify discriminatory trends in housing, and furtherance of the organization's Strategic Plan.

**ANSWER:** Ocwen denies the second sentence of paragraph 252. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

86

paragraph 252 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

253. In addition, HOPE, Inc. engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: preparation and publication of newsletter articles promoting community awareness; engagement with media to raise awareness of REO-related issues; and development of educational presentations inclusive of REO-related topics, including homebuyer/foreclosure prevention workshops, housing provider trainings, and local (Miami-Dade and Broward County) and statewide (Florida) fair housing workshops.

**ANSWER:** Ocwen denies the first sentence of paragraph 253. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 253 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

254. Defendants' actions have also frustrated the mission and purpose of HOPE, Inc. As described in greater detail above, HOPE Inc.'s mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 254 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 254 and specifically denies any and all allegations of wrongdoing.

**Fair Housing Center for Rights & Research**

255. Plaintiff Fair Housing Center for Rights & Research conducted inspections of Deutsche Bank REO properties across the greater Cleveland metropolitan area between July 2014 and February 2017, expending over 162 hours over the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff Fair Housing Center for Rights & Research's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 255 and, on that basis, denies them.

256.    As a result of this expenditure of time and resources, FHCRR diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such activities.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 256 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

257.    In addition, FHCRR engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. FHCRR's efforts include: the discussion of REO maintenance issues in more than 250 presentations to housing providers and real estate agents in Northeast Ohio; and engaging with media to raise awareness of REO-related issues.

**ANSWER:**    Ocwen denies the first sentence of paragraph 257. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 257 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

258.    Defendants' actions have also frustrated the mission and purpose of FHCRR. As described in greater detail above, FHCRR's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 258 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 258 and specifically denies any and all allegations of wrongdoing.

**Miami Valley Fair Housing Center**

259.    Plaintiff Miami Valley Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Miami Valley region, expending over 114 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:**    Ocwen denies that any of Plaintiff Miami Valley Fair Housing Center's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 259

and, on that basis, denies them.

260.     As a result of this expenditure of time and resources, MVFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including: consulting and training opportunities, community and coalition meetings, new funding applications, and professional staff development.

**ANSWER:**     Ocwen denies the second sentence of paragraph 260.   Ocwen lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

paragraph 260 and, on that basis, denies them.   Ocwen also specifically denies any and all

allegations of wrongdoing.

261.     In addition, MVFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for real estate agents, property managers, municipal government employees, and the general public in the greater Miami Valley region; meeting with local code or government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events (including presentations to the Latino Connection, the Dayton Area Realtists, Catholic Social Services, the Dayton Mortgage Broker's Association, and the Ahiska Turkish American Community Center); and engaging with media to raise awareness of REO-related issues. MVFHC has also been responsible for maintaining the database on which the results of the investigation in this case have been maintained.

**ANSWER:**     Ocwen denies the first sentence of paragraph 261. Ocwen lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

261 and, on that basis, denies them.   Ocwen also specifically denies any and all allegations of

wrongdoing.

262.     Finally, MVFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Miami Valley region.

**ANSWER:**     Ocwen denies the second sentence of paragraph 262.   Ocwen lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

paragraph 262 and, on that basis, denies them.   Ocwen also specifically denies any and all

allegations of wrongdoing.

263.     Defendants' actions have also frustrated the mission and purpose of MVFHC. As described in greater detail above, MVFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:**     Ocwen lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in the second sentence of paragraph 263 and, on that basis, denies them.

Ocwen denies the remaining allegations in paragraph 263 and specifically denies any and all

allegations of wrongdoing.

**North Texas Fair Housing Center**

264.     Plaintiff North Texas Fair Housing Center conducted inspections of Deutsche Bank REO properties across the greater Dallas-Fort Worth metropolitan region, expending over 240 hours throughout the course of the investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:**     Ocwen denies that any of Plaintiff North Texas Fair Housing Center's time

spent on the investigation results from, or is attributable to, Ocwen.   Ocwen lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 264

and, on that basis, denies them.   Ocwen also specifically denies any and all allegations of

wrongdoing.

265.     As a result of this expenditure of time and resources, NTFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including expanded forms of outreach and coalition-building, professional staff development, and new funding applications.

**ANSWER:**     Ocwen denies the second sentence of paragraph 265.   Ocwen lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

paragraph 265 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

266. In addition, NTFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for social service providers and property management personnel in the Dallas-Fort Worth region; meeting with local government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures; creating public service announcements and advertising in local print and radio; designing specialized mailings; participating in community events, including community resource fairs; and engaging with media to raise awareness of REO-related issues.

**ANSWER:** Ocwen denies the first sentence of paragraph 266. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 266 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

267. Defendants' actions have also frustrated the mission and purpose of NTFHC. As described in greater detail above, NTFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 267 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 267 and specifically denies any and all allegations of wrongdoing.

268. NTFHC has also spent its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Dallas-Fort Worth region.

**ANSWER:** Ocwen denies the second sentence of paragraph 268. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 268 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

**Metropolitan Milwaukee Fair Housing Council**

269.    Plaintiff Metropolitan Milwaukee Fair Housing Council conducted inspections of Deutsche Bank REO properties across the greater Milwaukee metropolitan area, expending over 102 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:**    Ocwen denies that any of Plaintiff Metropolitan Milwaukee Fair Housing Council's time spent on the investigation results from, or is attributable to, Ocwen.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 269 and, on that basis, denies them.

270.    As a result of this expenditure of time and resources, MMFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including fair lending outreach and education, fair housing outreach and education, fair housing investigations, data collection activities, and housing industry trainings.

**ANSWER:**    Ocwen denies the second sentence of paragraph 270. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 270 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of wrongdoing.

271.    In addition, MMFHC engaged in community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include conducting REO-related presentations and meetings with government officials, community organizations, academic institutions, housing providers, individual realtors and realtors' associations, neighborhood associations, lending institutions, community activists, faith-based institutions, and homeowners and residents of neighborhoods affected by discriminatory REO maintenance and marketing practices.

**ANSWER:**    Ocwen denies the first sentence of paragraph 271. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 271 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of wrongdoing.

272.    Defendants' actions have also frustrated the mission and purpose of MMFHC. As described in greater detail above, MMFHC's mission is to ensure equal housing opportunities and

to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:**    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 272 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 272 and specifically denies any and all allegations of wrongdoing.

**Open Communities**

273.    Plaintiff Open Communities conducted inspections of Deutsche Bank REO properties in the greater Chicago metropolitan region, expending over 60 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:**    Ocwen denies that any of Plaintiff Open Communities's time spent on the investigation results from, or is attributable to, Ocwen.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 273 and, on that basis, denies them

274.    As a result of this expenditure of time and resources, Open Communities diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including conducting fair housing testing and investigations, holding landlord and tenant mediation services, performing community outreach and professional staff development.

**ANSWER:**    Ocwen denies the second sentence of paragraph 274. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 274 and, on that basis, denies them.  Ocwen also specifically denies any and all allegations of wrongdoing.

275.    Defendants' actions have also frustrated the mission and purpose of Open Communities. As described in greater detail above, Open Communities' mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 275 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 275 and specifically denies any and all allegations of wrongdoing.

**South Suburban Housing Center**

276. Plaintiff South Suburban Housing Center conducted inspections of Deutsche Bank REO properties across the greater Chicago metropolitan area, and the Gary, northwest Indiana area, expending over 288 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff South Suburban Housing Center's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 276 and, on that basis, denies them.

277. As a result of this expenditure of time and resources, SSHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including additional fair housing complaint intakes and investigations, fair housing presentations for the general public and housing providers, counseling and advocacy on behalf of mortgage-distressed discrimination victims, and expanded forms of outreach and coalition-building.

**ANSWER:** Ocwen denies the second sentence of paragraph 277. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 277 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

278. In addition, SSHC has engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include conducting REO-related presentations and meetings with municipal and county officials, community organizations, housing providers, individual realtors and realtors' associations, lending institutions, community service agencies, faith-based institutions, and homeowners and residents of communities affected by discriminatory REO maintenance and marketing practices.

**ANSWER:** Ocwen denies the first sentence of paragraph 278. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 278 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

279. Defendants' actions have also frustrated the mission and purpose of SSHC. As described in greater detail above, SSHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 279 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 279 and specifically denies any and all allegations of wrongdoing.

280. Finally, SSHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including down payment assistance and mortgage distress assistance programs. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Chicago and Gary, Indiana metropolitan areas.

**ANSWER:** Ocwen denies the second sentence of paragraph 280. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 280 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

**Toledo Fair Housing Center**

281. Plaintiff, Toledo Fair Housing Center, conducted inspections of Deutsche Bank REO properties across the greater Toledo metropolitan area, expending over 78 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

**ANSWER:** Ocwen denies that any of Plaintiff Toledo Fair Housing Center's time spent on the investigation results from, or is attributable to, Ocwen. Ocwen lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 281 and, on that basis, denies them.

282. As a result of this expenditure of time and resources, TFHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forgo opportunities including providing fair housing training to community partners, attending conferences and other forms of professional staff development, and advocating for housing discrimination victims.

**ANSWER:** Ocwen denies the second sentence of paragraph 282. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 282 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

283. In addition, TFHC engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for housing industry professionals and the general public in the Northwest Ohio region; meeting with government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; participating in community events and meetings; engaging with media to raise awareness of REO-related issues; interviewing neighbors; and participating in neighborhood beautification and revitalization efforts.

**ANSWER:** Ocwen denies the first sentence of paragraph 283. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 283 and, on that basis, denies them. Ocwen also specifically denies any and all allegations of wrongdoing.

284. Defendants' actions have also frustrated the mission and purpose of TFHC. As described in greater detail above, TFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation. Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**ANSWER:** Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 284 and, on that basis, denies them. Ocwen denies the remaining allegations in paragraph 284 and specifically denies any and all allegations of wrongdoing.

285.    Finally, TFHC has expended its own funds to engage in community development, homeownership promotion, neighborhood stabilization, foreclosure prevention and beautification efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Deutsche Bank REO properties in communities of color in the greater Toledo metropolitan region.

**ANSWER:**    Ocwen denies the second sentence of paragraph 285.    Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 285 and, on that basis, denies them.    Ocwen also specifically denies any and all allegations of wrongdoing.

### C.    INJURIES TO NEIGHBORHOOD RESIDENTS AND COMMUNITIES

286.    The appropriate maintenance and marketing of REO dwellings is vital to the stability of neighborhoods and to the economic, social and physical well-being of their residents. REO properties that are poorly maintained have significant, negative outcomes to a neighborhood, affecting the health and safety of surrounding residents and otherwise interfering with the rights of homeowners in communities of color to enjoy their homes in a manner free of discrimination. Academic and government reports document the negative effects of neglected vacant properties on nearby homeowners, neighborhoods and local governments. See e.g., Government Accountability Office, Vacant Properties: Growing Number Increases Communities' Costs and Challenges, GAO-12-34 (Nov. 4, 2011), at p. 27-48 (available at http://www.gao.gov/products/GAO-12-34).

**ANSWER:**    The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required.  To the extent a response is required, Ocwen denies that it poorly maintained REO properties in communities of color and denies that it injured neighborhood residents and communities.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 286 and, on that basis, denies them.

287.    REO properties that are poorly maintained lead to increased crime. A home with unsecured doors, broken windows, overgrown grass or trash around the property signals to vandals and looters that the property is abandoned and makes the home and neighborhood a target for illegal activity.

**ANSWER:**    The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required.  To the extent a

response is required, Ocwen denies that it poorly maintained REO properties in communities of color and denies that it injured neighborhood residents and communities. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 287 and, on that basis, denies them.

288.    REO properties that are poorly maintained create health and safety issues. Poorly maintained REO properties lead to an increase in accidents, rodent and insect infestations and decay. According to a report by the American Heart Association, living near a foreclosed home can also increase a person's blood pressure "due in part to unhealthy stress from residents' perception that their own properties are less valuable, their streets less attractive or safe and their neighborhoods less stable."

**ANSWER:**    The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required. To the extent a response is required, Ocwen denies that it poorly maintained REO properties in communities of color and denies that it injured neighborhood residents and communities. Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 288 and, on that basis, denies them.

289.    REO properties that are poorly maintained and marketed stigmatize communities and significantly diminish home values for surrounding homeowners. Failure to carry out basic maintenance of REO properties decreases the likelihood of timely sales and decreases the value and sale price of REO properties, which, in turn, decreases property values in the neighborhood. Homes that appear abandoned and look unsightly due to poor maintenance will often deter real estate agents from showing the REO properties or surrounding homes to owner-occupant homebuyers. As shoddy maintenance and neglect result in deteriorating appearances and physical conditions for REO properties, their availability for sale is adversely affected, constraining housing options in impacted communities.

**ANSWER:**    The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required. To the extent a response is required, Ocwen denies that it poorly maintained REO properties in communities of color and denies that it injured neighborhood residents and communities. Ocwen lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

289 and, on that basis, denies them.

290.    Based on the familiarity of the Plaintiffs with REO properties in their service areas, and the factors that bear upon marketability of residential real estate, Defendants' failure to maintain and market REO properties in communities of color has had the effect of dissuading purchasers from buying these properties. For example, in Baltimore, developments were hindered and developers did not want to pursue projects in areas where there was REO blight. In the Park Heights neighborhood, over $775,000 of public funds was invested in renovating vacant homes across from a renovated elementary-middle school. Even after these home and school renovations, the renovations still sat vacant. (https://www.baltimoresun.com/news/maryland/politics/bs-me-ci-vacant-house-rehabs20180906-story.html). NFHA investigated six (deficient) Deutsche Bank REO properties in this neighborhood's zip code, 21215, and specifically investigated two properties only two blocks away from the City's renovation.

**ANSWER:**    The Court dismissed Plaintiffs' claims seeking damages alleged in

paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required.  To the extent a

response is required, Ocwen denies that it poorly maintained REO properties in communities of

color and denies that it injured neighborhood residents and communities.  Ocwen lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

290 and, on that basis, denies them.

291.    Poor maintenance and marketing of an REO property makes the property significantly more likely to end up in the hands of an investor, rather than an owner-occupant. Investor-purchased REOs often result in a number of negative outcomes for the surrounding area, including a decrease in property values and a higher risk of abandonment. Communities with high investor ownership are more likely to become high rental, less stable communities, and afford fewer opportunities for owner-occupied purchases. Investor-owned properties detrimentally affect property values and encourage disinvestment in neighborhoods.

**ANSWER:**    The Court dismissed Plaintiffs' claims seeking damages alleged in

paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required.  To the extent a

response is required, Ocwen denies that it poorly maintained REO properties in communities of

color and denies that it injured neighborhood residents and communities.  Ocwen lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

291 and, on that basis, denies them.

292.     Deutsche Bank's auction-based sales model with Ocwen/Altisource requires buyers to pay cash for a property. This model is designed to attract primarily investors who have cash resources for purchase. The typical owner-occupant buyer must secure a mortgage loan, which limits such purchases of Deutsche Bank-owned foreclosures.

**ANSWER:**     The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required.  To the extent a response is required, Ocwen denies that it poorly maintained REO properties in communities of color and denies that it injured neighborhood residents and communities.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 292 and, on that basis, denies them.

293.     Based upon a review of property records for the sale outcomes of 79 properties in Memphis, Tennessee, 70% of REO properties that were poorly maintained (i.e., had 10 or more maintenance or marketing deficiencies) were sold to investors, while only 46% of well-maintained homes went to investors. In communities of color, homes that were poorly maintained and marketed were significantly more likely to have been sold to investors as opposed to owner-occupants.

**ANSWER:**     The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required.  To the extent a response is required, Ocwen denies that it poorly maintained REO properties in communities of color and denies that it injured neighborhood residents and communities.  Ocwen lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 293 and, on that basis, denies them.

294.     Considering this data together with neighborhood race, of the REOs in communities of color, 70% went to investors while only 18% in white communities were sold to investors. Only 24% of the REOs in communities of color went to owner-occupants, while 78% of REOs in predominantly white communities were purchased directly by owner-occupants.

**ANSWER:**     The Court dismissed Plaintiffs' claims seeking damages alleged in paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required.  To the extent a response is required, Ocwen denies that it poorly maintained REO properties in communities of

color and denies that it injured neighborhood residents and communities. Ocwen lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

294 and, on that basis, denies them.

295.     Poorly maintained foreclosure properties also impose a heavy burden on local
municipalities in terms of code violations and other public safety issues. Local governments are
forced to spend substantial sums of money to address code violations, perform maintenance
mitigation because of dangerous or blighted conditions, demolish unsafe structures and to identify
and contact those responsible for vacant properties. A Woodcock Institute study documents that
the amount spent by local governments on a vacant and unmaintained property averaged $5,358
per property per year.

**ANSWER:**     The Court dismissed Plaintiffs' claims seeking damages alleged in

paragraphs 286-95 (Dkt. 97 at 21-22) and, therefore, no response is required. To the extent a

response is required, Ocwen denies that it poorly maintained REO properties in communities of

color and denies that it injured neighborhood residents and communities. Ocwen lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

295 and, on that basis, denies them.

### D.     INJURIES CAUSED BY DEFENDANTS' CONDUCT CONTINUES

296.     Until remedied, Defendants' unlawful, discriminatory actions will continue to
injure Plaintiffs by, *inter alia*: (a) interfering with Plaintiffs' efforts and programs intended to bring
about equality of opportunity in housing; (b) requiring the commitment of scarce resources,
including substantial staff time and funding, to counteract Defendants' discriminatory conduct in
the communities identified above, thus diverting resources away from Plaintiffs' usual activities
and services, such as education, outreach and counseling; (c) frustrating Plaintiffs' missions and
purposes of promoting the equal availability of housing to all persons without regard to any
protected category, including race and the racial composition of a neighborhood; (d) frustrating
Plaintiffs' missions and purposes of promoting racial integration and eliminating racial segregation
in their communities; (e) impeding the impact of Plaintiffs' investment programs; and (f) harming
the neighborhoods served by Plaintiffs and in which Plaintiffs are situated and operate.

**ANSWER:**     Ocwen denies the allegations in paragraph 296.

297.     All of these injuries flow directly from Defendants' conduct. All of these injuries
are fairly traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they
are likely to be redressed by a favorable judicial decision. The injuries suffered by Plaintiffs fall
directly within the zone of interests protected by the Fair Housing Act.

**ANSWER:** Ocwen denies the allegations in paragraph 297.

### E.    CONTINUING VIOLATION

298.    Defendants engaged in the conduct alleged herein on a continuing and ongoing basis prior to February 26, 2012, and from February 26, 2012 to the present. The Defendants' alleged conduct involves discriminatory violations that injured Plaintiffs within the two-year Fair Housing Act statute of limitations and the evidence in this investigation that occurred prior to the two-year statute of limitations is of a similar pattern to the evidence put forward within the statute of limitations period. The two-year statute of limitations period was tolled under the HUD administrative complaint filed on February 26, 2014.

**ANSWER:** Ocwen denies the allegations in paragraph 298.

## VI.  VIOLATIONS OF THE FAIR HOUSING ACT

299.    Plaintiffs adopt and re-allege each of the preceding paragraphs of this Second Amended Complaint as to each count set forth below.

**ANSWER:** Ocwen adopts and incorporates by reference its responses to the preceding paragraphs of the Second Amended Complaint as its response to paragraph 299 as if fully restated herein.

300.    The Deutsche Bank REO properties investigated by Plaintiffs are "dwelling[s]" within the meaning of 42 U.S.C. §3602(b).

**ANSWER:** The allegations in paragraph 300 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 300.

301.    The term "person" in the FHA is defined to include "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers and fiduciaries." 42 U.S.C. §3602(d).

**ANSWER:** The allegations in paragraph 301 state legal conclusions, to which no response is required. To the extent a response is required, Ocwen states that Fair Housing Act

speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 301.

302.    Under the express provisions of the FHA and applicable agency principles, banks, trustees, investors, servicers, and any other responsible contractors or vendors must maintain and market REO properties without regard to the race or national origin of the residents of a neighborhood. It is unlawful to treat a neighborhood or its residents differently because of the race or national origin of the residents.

**ANSWER:**    The allegations in paragraph 302 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that Fair Housing Act and common law agency principles speak for themselves and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 302.

A.    **COUNT I - SECTION 3604(a) OF THE FHA – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS)**

303.    Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. §3604(a). HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. 100.70(a). Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin. . . of persons in a community, neighborhood or development." 24 C.F.R. 100.70(c)(1).

**ANSWER:**    Ocwen states that the Fair Housing Act and HUD regulations speak for themselves and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 303.

304.    The discriminatory provision of maintenance and marketing services to the Deutsche Bank REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable and/or undesirable; (2) by dissuading potential buyers from looking at or purchasing the property; and (3) by interfering with the closing of sales where the appraisal does not support the loan amount requested.

**ANSWER:**    Ocwen denies the allegations in paragraph 304.

305.    Defendants' marketing model for REO properties, which uses Internet auction sites such as Hubzu, prefers cash buyers, who are typically investors, further makes housing unavailable

in communities of color by changing neighborhoods into investor communities, with detrimental financial consequences for current homeowners and new owner-occupants.

**ANSWER:** Ocwen denies the allegations in paragraph 305.

306. The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin and deliberate indifference to discrimination against persons of color.

**ANSWER:** Ocwen denies the allegations in paragraph 306.

307. Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of §3604(a).

**ANSWER:** Ocwen denies the allegations in paragraph 307.

**B.** **COUNT II – SECTION 3604 (a) OF THE FHA – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS)**

308. Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. §3604(a). HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. 100.70(a). Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin. . . of persons in a community, neighborhood or development." 24 C.F.R. 100.70(c)(1).

**ANSWER:** Count II is directed to other Defendants and, therefore, no response is required.

309. The discriminatory provision of maintenance and marketing services to the Deutsche Bank REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable and/or undesirable; (2) by dissuading potential buyers from looking at or purchasing the property; and (3) by interfering with the closing of sales where the appraisal does not support the loan amount requested.

**ANSWER:** Count II is directed to other Defendants and, therefore, no response is required.

310. Defendants' marketing model for REO properties, which uses Internet auction sites such as Hubzu, prefers cash buyers, who are typically investors, further makes housing unavailable in communities of color by changing neighborhoods into investor communities, with detrimental financial consequences for current homeowners and new owner-occupants.

**ANSWER:** Count II is directed to other Defendants and, therefore, no response is required.

311. The Deutsche Bank Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abdicate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

**ANSWER:** Count II is directed to other Defendants and, therefore, no response is required.

312. Accordingly, the Deutsche Bank Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of §3604(a).

**ANSWER:** Count II is directed to other Defendants and, therefore, no response is required.

## C. COUNT III - SECTION 3604(b) OF THE FHA – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS)

313. Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin. 42 U.S.C. §3604(b).

**ANSWER:** Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 313.

314. HUD's regulations implementing Section 804(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin. 24 C.F.R. 100.65.

**ANSWER:** Ocwen states that HUD regulations implementing the Fair Housing Act speaks for themselves and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 314.

315. The maintenance of REO properties constitutes "the provision of services" in connection with dwellings. Moreover, sales transactions involving poorly maintained REOs in

communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of remedying delayed maintenance and upkeep of the property to avoid code violations.

**ANSWER:** The allegations in paragraph 315 state legal conclusions, to which no

response is required. To the extent a response is required, Ocwen states that the Fair Housing Act

and HUD regulations speak for themselves and denies any allegations or characterizations contrary

thereto. Ocwen denies any remaining allegations in paragraph 315.

316. The discriminatory provision of routine maintenance and marketing services to the Deutsche Bank REO properties in communities of color discriminates against minority persons "in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," all in violation of Section 804(b) of the Fair Housing Act.

**ANSWER:** Ocwen denies the allegations in paragraph 316.

317. The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin and deliberate indifference to discrimination against persons of color.

**ANSWER:** Ocwen denies the allegations in paragraph 317.

318. Accordingly, Defendants have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. §3604(b).

**ANSWER:** Ocwen denies the allegations in paragraph 318.

**D.    COUNT IV – SECTION 3604 (b) OF THE FHA – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS)**

319. Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin. 42 U.S.C. §3604(b).

**ANSWER:** Count IV is directed to other Defendants and, therefore, no response is

required.

320. HUD's regulations implementing Section 804(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin. 24 C.F.R. 100.65.

**ANSWER:** Count IV is directed to other Defendants and, therefore, no response is required.

321. The maintenance of REO properties constitutes "the provision of services" in connection with dwellings. Moreover, sales transactions involving poorly maintained REOs in communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of remedying delayed maintenance and upkeep of the property to avoid code violations.

**ANSWER:** Count IV is directed to other Defendants and, therefore, no response is required.

322. The Deutsche Bank Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abdicate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color. These discriminatory policies and practices discriminate against minority persons "in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services of facilities in connection therewith," all in violation of Section 804(b) of the Fair Housing Act.

**ANSWER:** Count IV is directed to other Defendants and, therefore, no response is required.

323. Accordingly, the Deutsche Bank Defendants have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. §3604(b).

**ANSWER:** Count IV is directed to other Defendants and, therefore, no response is required.

**E. COUNT V - SECTION 3605 OF THE FHA – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS)**

324. Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction because of race or national origin. 42 U.S.C. §3605.

**ANSWER:** Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 324.

325.     The Defendants are persons whose business includes engaging in residential real estate-related transactions.

**ANSWER:**     The allegations in paragraph 325 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 325.

326.     As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates numerous substantial barriers to the sale or purchase of these properties.

**ANSWER:**     Ocwen denies the allegations in paragraph 326.

327.     Defendants' discriminatory provision of maintenance to REOs in communities of color has impeded real estate transactions and development in minority communities, and rendered properties in these communities unavailable. The experience of the Plaintiff Fair Housing Organizations in their service areas is that minimal real estate sales and community development occur in areas where REO blight is prevalent.

**ANSWER:**     Ocwen denies the allegations in paragraph 327.

328.     For purposes of Section 3605, time on market, sales price, time between contract for purchase and closing, purchase loan viability and conditions affecting property inspection are terms and conditions of residential real-estate-related transactions, all of which are impacted by deficient REO conditions and general neighborhood REO blight.

**ANSWER:**     The allegations in paragraph 328 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 328.

329.     The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin and deliberate indifference to discrimination against persons of color.

**ANSWER:**     Ocwen denies the allegations in paragraph 329.

330.     Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin or discriminated in the terms or conditions of such a transaction in violation of 42 U.S.C. §3605.

**ANSWER:** Ocwen denies the allegations in paragraph 330.

F. **COUNT VI – SECTION 3605 OF THE FHA – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS)**

331. Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction because of race or national origin. 42 U.S.C. §3605.

**ANSWER:** Count VI is directed to other Defendants and, therefore, no response is required.

332. The Defendants are persons whose business includes engaging in residential real estate-related transactions.

**ANSWER:** Count VI is directed to other Defendants and, therefore, no response is required.

333. The Deutsche Bank Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abdicate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

**ANSWER:** Count VI is directed to other Defendants and, therefore, no response is required.

334. As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates numerous substantial barriers to the sale or purchase of these properties.

**ANSWER:** Count VI is directed to other Defendants and, therefore, no response is required.

335. Defendants' discriminatory policies and practices have impeded real estate transactions and development in minority communities, and rendered properties in these communities unavailable. The experience of the Plaintiff Fair Housing Organizations is that minimal real estate sales and community development occur in areas where REO blight is prevalent.

**ANSWER:** Count VI is directed to other Defendants and, therefore, no response is required.

336.    For purposes of Section 3605, time on market, sales price, time between contract for purchase and closing, purchase loan viability and conditions affecting property inspection are terms and conditions of residential real-estate-related transactions, all of which are impacted by deficient REO conditions and general neighborhood REO blight.

**ANSWER:**    Count VI is directed to other Defendants and, therefore, no response is required.

337.    Accordingly, Deutsche Bank Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin or discriminated in the terms or conditions of such a transaction in violation of 42 U.S.C. §3605.

**ANSWER:**    Count VI is directed to other Defendants and, therefore, no response is required.

## G.    COUNT VII - CONDUCT PERPETUATING SEGREGATION – INTENTIONAL DISCRIMINATION (ALL DEFENDANTS)

338.    The Fair Housing Act is violated by discriminatory conduct that perpetuates or furthers segregation.

**ANSWER:**    The allegations in paragraph 338 states legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 338.

339.    As described above, Defendants have engaged in intentional conduct causing racial disparities in REO maintenance and marketing.

**ANSWER:**    Ocwen denies the allegations in paragraph 339.

340.    Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods. It is a proximate and foreseeable consequence of such conduct that white buyers will be discouraged from purchasing homes in the affected communities of color, and this has occurred in communities affected by Defendants' unlawful conduct.

**ANSWER:**    Ocwen denies the allegations in paragraph 340.

341.    Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners. This, in turn, restricts the

ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

**ANSWER:** Ocwen denies the allegations in paragraph 341.

342. The conduct of Defendants constitutes intentional discrimination on the basis of race and national origin and deliberate indifference to discrimination against persons of color. The intentional discrimination against persons of color and reckless disregard of their rights is demonstrated by the conduct described in this Second Amended Complaint, including, but not limited to evidence of statistically significant disparities between the deficiencies in routine exterior maintenance and marketing of REO properties in white neighborhoods and in neighborhoods of color.

**ANSWER:** Ocwen denies the allegations in paragraph 342.

343. The Defendants' intentional conduct has perpetuated segregation in minority communities.

**ANSWER:** Ocwen denies the allegations in paragraph 343.

344. Accordingly, Defendants' conduct and practices perpetuating and encouraging patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. §3601, et seq.

**ANSWER:** Ocwen denies the allegations in paragraph 344.

## H. COUNT VIII – CONDUCT PERPETUATING SEGREGATION – DISPARATE IMPACT (DEUTSCHE BANK DEFENDANTS)

345. Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods. It is a proximate and foreseeable consequence of such conduct that white buyers will be discouraged from purchasing homes in the affected communities of color, and this has occurred in communities affected by Defendants' unlawful conduct.

**ANSWER:** Count VIII is directed to other Defendants and, therefore, no response is required.

346. Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners. This, in turn, restricts the ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

**ANSWER:** Count VIII is directed to other Defendants and, therefore, no response is required.

347.    The Deutsche Bank Defendants' policies and practices, including the policy of the Deutsche Bank Defendants to disavow and abdicate their responsibilities as real property owners, without guidance, oversight or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color. The disproportionate impact on communities of color is demonstrated by statistically significant disparities between the deficiencies in routine exterior maintenance and marketing of REO properties in white neighborhoods and in neighborhoods of color.

**ANSWER:**    Count VIII is directed to other Defendants and, therefore, no response is required.

348.    The Deutsche Bank Defendants' unlawful policies and practices have perpetuated segregation in minority communities.

**ANSWER:**    Count VIII is directed to other Defendants and, therefore, no response is required.

349.    Accordingly, Deutsche Bank Defendants' conduct and practices perpetuating and encouraging patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. §3601, et seq.

**ANSWER:**    Count VIII is directed to other Defendants and, therefore, no response is required.

## I.    COUNT IX – SECTION 3604(a) OF THE FHA – DISPARATE IMPACT (OCWEN AND ALTISOURCE)

350.    Plaintiffs incorporate and reallege the preceding paragraphs of this Second Amended Complaint.

**ANSWER:**    Ocwen adopts and incorporates by reference its responses to the preceding paragraphs of the Second Amended Complaint as its response to paragraph 350 as if fully restated herein.

351.    Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. §3604(a). HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. 100.70(a). Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin. . . of persons in a community, neighborhood or development." 24 C.F.R. 100.70(c)(1).

**ANSWER:** Ocwen states that the Fair Housing Act and HUD regulations speak for themselves and denies any allegations or characterizations contrary thereto. Ocwen denies any remaining allegations in paragraph 351.

352. The discriminatory provision of maintenance and marketing services by the Ocwen and Altisource Defendants to the Deutsche Bank REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable and/or undesirable; (2) by dissuading buyers from looking at or purchasing the property; and (3) by interfering with the closing of a sale where the appraisal does not support the loan amount requested.

**ANSWER:** Ocwen denies the allegations in paragraph 352.

353. In addition, by using a marketing business model to sell the majority of the Deutsche Bank REOs via the Hubzu auction site, Ocwen and Altisource have shown a preference for cash buyers, who are typically investors, thereby further making housing unavailable in communities of color by changing neighborhoods into investor communities, with detrimental financial consequences for current homeowners and new owner-occupants.

**ANSWER:** Ocwen denies the allegations in paragraph 353.

354. The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color.

**ANSWER:** Ocwen denies the allegations in paragraph 354.

355. Accordingly, Ocwen and Altisource have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of Section 3604(a) of the FHA.

**ANSWER:** Ocwen denies the allegations in paragraph 355.

**J.     COUNT X – SECTION 3604(b) OF THE FHA - DISPARATE IMPACT (OCWEN AND ALTISOURCE)**

356. Plaintiffs incorporate and reallege the preceding paragraphs of this Second Amended Complaint.

**ANSWER:** Ocwen adopts and incorporates by reference its responses to the preceding paragraphs of the Second Amended Complaint as its response to paragraph 356 as if fully restated herein.

357.    Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin. 42 U.S.C. §3604(b).

**ANSWER:**    Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 357.

358.    HUD's regulations implementing Section 804(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin. 24 C.F.R. 100.65.

**ANSWER:**    Ocwen states that HUD regulations implementing the Fair Housing Act speak for themselves and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 358.

359.    The maintenance of REO properties constitutes "the provision of services" in connection with dwellings. Moreover, sales transactions involving poorly maintained REOs in communities of color result in the transfer of title to the dwelling under less favorable "terms" and "conditions" that place on buyers the responsibility of remedying delayed maintenance and upkeep of the property to avoid code violations.

**ANSWER:**    The allegations in paragraph 359 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that the Fair Housing Act and HUD regulations speak for themselves and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 359.

360.    The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color. These discriminatory policies and practices discriminate against minority persons "in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services of facilities in connection therewith," all in violation of Section 804(b) of the Fair Housing Act.

**ANSWER:**    Ocwen denies the allegations in paragraph 360.

114

361.    Accordingly, Ocwen and Altisource have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. §3604(b).

**ANSWER:**    Ocwen denies the allegations in paragraph 361.

## K.    COUNT XI – SECTION 3605 OF THE FHA – DISPARATE IMPACT (OCWEN AND ALTISOURCE)

362.    Plaintiffs incorporate and reallege the preceding paragraphs of this Second Amended Complaint.

**ANSWER:**    Ocwen adopts and incorporates by reference its responses to the preceding paragraphs of the Second Amended Complaint as its response to paragraph 362 as if fully restated herein.

363.    Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction because of race or national origin. 42 U.S.C. §3605.

**ANSWER:**    Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 363.

364.    Ocwen and Altisource are persons whose business includes engaging in residential real estate-related transactions.

**ANSWER:**    The allegations in paragraph 364 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 364.

365.    The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color.

**ANSWER:**    Ocwen denies the allegations in paragraph 365.

366.     As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates numerous substantial barriers to the sale or purchase of these properties.

**ANSWER:**     Ocwen denies the allegations in paragraph 366.

367.     The discriminatory policies and practices of Ocwen and Altisource have directly impeded real estate transactions and development in minority communities, and rendered properties in these communities unavailable. The experience of the Plaintiff Fair Housing Organizations is that minimal real estate sales and community development occur in areas where REO bight is prevalent.

**ANSWER:**     Ocwen denies the allegations in paragraph 367.

368.     For purposes of Section 3605, time on market, sales price, time between contract for purchase and closing, purchase loan viability and conditions affecting property inspection are terms and conditions of residential real-estate-related transactions, all of which are negatively impacted by deficient REO conditions and general neighborhood REO blight.

**ANSWER:**     The allegations in paragraph 368 state legal conclusions, to which no response is required.  To the extent a response is required, Ocwen states that the Fair Housing Act speaks for itself and denies any allegations or characterizations contrary thereto.  Ocwen denies any remaining allegations in paragraph 368.

369.     Accordingly, Ocwen and Altisource have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin or discriminated in the terms and conditions of such a transaction in violation of 42 U.S.C. §3605.

**ANSWER:**     Ocwen denies the allegations in paragraph 369.

**L.     COUNT XII – CONDUCT PERPETUATING SEGREGATION – DISPARATE IMPACT (OCWEN AND ALTISOURCE)**

370.     Plaintiffs incorporate and reallege the preceding paragraphs of this Second Amended Complaint.

**ANSWER:**     Ocwen adopts and incorporates by reference its responses to the preceding paragraphs of the Second Amended Complaint as its response to paragraph 370 as if fully restated herein.

371.     Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods. It is a

116

proximate and foreseeable consequence of such conduct that white buyers will be discouraged from purchasing homes in the affected communities of color, and this has occurred.

**ANSWER:** Ocwen denies the allegations in paragraph 371.

372. Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners. This, in turn, restricts the ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

**ANSWER:** Ocwen denies the allegations in paragraph 372.

373. The policies and practices of Ocwen and Altisource, including the policy of designating communities of color and properties in these communities as "low value," and then withholding routine maintenance services afforded to properties in majority neighborhoods, have had an unlawful disproportionate impact on communities of color. The disproportionate impact on communities of color is demonstrated by statistically significant disparities between the deficiencies in routine exterior maintenance and marketing of REO properties in white neighborhoods and in neighborhoods of color.

**ANSWER:** Ocwen denies the allegations in paragraph 373.

374. The policies and practices of Ocwen and Altisource have perpetuated segregation in minority communities.

**ANSWER:** Ocwen denies the allegations in paragraph 374.

375. Accordingly, the policies, conduct and practices of Ocwen and Altisource perpetuating and encouraging patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. §3601, et seq.

**ANSWER:** Ocwen denies the allegations in paragraph 375.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without assuming any burden of proof it would not otherwise bear, Ocwen asserts the following affirmative and additional defenses, reserving the right to supplement these defenses as discovery proceeds.

### First Defense

Plaintiffs lack standing under Article III of the United States Constitution.

### Second Defense

Plaintiffs' asserted claims against Ocwen are not cognizable claims under the Fair Housing Act and do not fall within the zone of interests protected by the relevant sections of the Fair Housing Act.

### Third Defense

Plaintiffs' asserted claims against Ocwen are barred because Ocwen did not proximately cause any loss recognized by the Fair Housing Act.

### Fourth Defense

Plaintiffs' asserted claims against Ocwen are barred, in whole or part, by the doctrine of remoteness.

### Fifth Defense

Ocwen did not engage in any lending, sales, rental, marketing, or real estate transaction services in connection with any dwellings and so cannot be held liable for any of the acts or omissions that are the subject of the Second Amended Complaint.

### Sixth Defense

The alleged conduct or omissions, if any, that are the source of Plaintiffs' claims arose as a result, in whole or in part, of the conduct of third parties or was the result of actions or omissions of third parties, including but not limited to the property owners, tenants, occupiers, vandals,

squatters, trespassers, neighbors, abutting property owners, and/or governmental authorities, for whom Ocwen has no responsibility and over which Ocwen had no control.

### Seventh Defense

Plaintiffs' claims are barred, in whole or in part, because they are not prosecuted by or in the names of the real parties in interest.

### Eighth Defense

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to join necessary or indispensable parties to the Second Amended Complaint.

### Ninth Defense

Plaintiffs' claim under 42 U.S.C. § 3604 is barred, because 42 U.S.C. § 3605 is the exclusive federal remedy for the conduct alleged.

### Tenth Defense

Plaintiffs' claim under 42 U.S.C. § 3605 is barred, because Ocwen never engaged in "real estate-related transactions," the making or purchasing of loan, providing financial assistance, or selling, brokering, or appraising of residential real property.

### Eleventh Defense

Plaintiffs are not "aggrieved persons" under the Fair Housing Act.

### Twelfth Defense

Plaintiffs' asserted claims against Ocwen are barred, in whole or in part, by the applicable statute of limitations.

### Thirteenth Defense

Plaintiffs' recovery is barred, in whole or part, under principles of double recovery, set-off, recoupment, or unjust enrichment, and to the extent that Plaintiffs have already recouped costs

associated with the alleged damages, because, among other things, certain of the Plaintiffs have reached settlement with other parties in relation to the same alleged injuries.

## Fourteenth Defense

Plaintiffs' claims are barred or limited by the defenses available under the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*, and the implementing regulations.

## Fifteenth Defense

Plaintiffs' claims are barred because Ocwen's actions, omissions, or policies were supported by race-neutral, non-discriminatory, objective, substantial, and/or legitimate business rationales.

## Sixteenth Defense

The Second Amended Complaint fails to state facts sufficient to constitute a valid claim for punitive damages, including claims for disparate impact for which punitive damages are not recoverable. Plaintiffs' punitive damages claim is barred because Ocwen did not intentionally discriminate or act with malice or reckless indifference, and was not motivated by evil motive or intent.

## Seventeenth Defense

The Second Amended Complaint fails to state a claim for which relief can be granted.

## Eighteenth Defense

Some or all of Plaintiffs' claims are barred, in whole or in part, to the extent administrative procedures in municipal law provide the exclusive remedy for Plaintiffs' recovery or must be complied with and completed before resorting to suit is allowed. Thus, Plaintiffs have failed to exhaust their administrative remedies.

**Nineteenth Defense**

Plaintiffs' claims are barred by the doctrines of issue preclusion and claim preclusion.

**Twentieth Defense**

Plaintiffs unjustifiably delayed in commencing this action, such delay has prejudices the rights of Ocwen, and, therefore, the Second Amended Complaint should be barred by the doctrine of laches.

**Twenty-First Defense**

Plaintiffs' claims under 42 U.S.C. § 3604(a) are barred because Ocwen's services did not otherwise make housing unavailable and are not connected with the sale or rental of properties.

**Twenty-Second Defense**

Plaintiffs' claims under 42 U.S.C. § 3604(b) are barred because Ocwen does not, and it is not alleged to, provide housing or control the provisions of housing services and facilities.

**Twenty-Third Defense**

Plaintiffs' disparate impact claims fail because Plaintiffs have not identified or alleged a specific or actionable policy of Ocwen which may form the basis of such a claim.

**Twenty-Fourth Defense**

Plaintiffs' disparate impact and treatment claims against Ocwen fail because Plaintiffs' investigation and corresponding information and statistics are unsound and do not demonstrate the alleged disparity in the maintenance and marketing of REO properties.

**Twenty-Fifth Defense**

Plaintiffs' claims are barred, in whole or in part, by lack of personal jurisdiction.

## Twenty-Sixth Defense

Plaintiffs are estopped, and/or should be equitably estopped, from obtaining the relief sought from Ocwen.

## Twenty-Seventh Defense

Some or all of Plaintiffs' claims for relief are grounded in equity and are barred or limited by Plaintiffs inequitable conduct, including undue delay, waiver, concealment, unclean hands, and by Plaintiffs' own conduct in causing and contributing to the circumstances at issue.

## Twenty-Eighth Defense

Plaintiffs voluntarily and knowingly failed to take action to protect Plaintiffs' rights and thus have waived such rights.

## Twenty-Ninth Defense

Any recovery by Plaintiff is barred by Plaintiffs' failure to mitigate damages or must be reduced by the amount of damages Plaintiffs failed to mitigate.

## Thirtieth Defense

Ocwen has performed and discharged every obligation it owed, if any, at all times including all duties and obligations that Ocwen undertook in the governing agreements.

## Thirty-First Defense

Plaintiffs' alleged damages are uncertain, speculative, and incapable of measurement.

## Thirty-Second Defense

The actions and omissions by Ocwen were consistent with, permitted by, or dictate by, and in certain respects required by, applicable federal, state, and local laws, and to that extent, cannot be the subject of recovery in this action.

### Thirty-Third Defense

Ocwen is entitled to indemnification and/or apportionment against all parties, persons, or entities whose acts or omissions directly or proximately caused or contributed to the incidents alleged in the Second Amended Complaint, or to the damages allegedly sustained by Plaintiffs, if any, either as alleged in the Second Amended Complaint or otherwise.

### Thirty-Fourth Defense

Plaintiffs' claims for injunctive relief are barred because Plaintiffs have an adequate remedy at law and because such relief would be moot as the allegations in the Second Amended Complaint relate to alleged past acts.

### Thirty-Fifth Defense

The Second Amended Complaint improperly cumulates disparate claims against multiple defendants and so should be dismissed, or the disparate defendants served, due to improper joinder.

### Thirty-Sixth Defense

The Second Amended Complaint is too vague for Ocwen to ascertain the factual basis for any claim that Plaintiffs attempt to allege. Plaintiffs have, therefore, failed to plead their claims with sufficient particularity or fair notice to Ocwen. This failure may precludes Ocwen from raising all appropriate defenses, and Ocwen reserves the right to raise any such additional defenses as their applicability appears.

### Thirty-Seventh Defense

To the extent any of Plaintiffs' claims are based on vacancy and property management, or other matters of loan or post-foreclosure services, such conduct is not within the scope of the Fair Housing Act.

### Thirty-Eighth Defense

The Second Amended Complaint fails to allege facts, or a cause of action, sufficient to support a valid claim for attorneys' fees and costs.

### Thirty-Ninth Defense

The alleged conduct or omissions, if any, and injuries, if any, were the result of events, factors, occurrences, or conditions which were in no way caused by Ocwen and for which Ocwen is not liable, including but not limited to weather, infestation, and acts of god.

### Fortieth Defense

Plaintiffs' claims are barred, in whole or in part, because they violate the Due Process Clause of the United States Constitution to the extent that they seek to impose liability on Ocwen or seek to deprive Ocwen of traditional means of proving that Ocwen's allege unlawful conduct did not cause the alleged maintenance deficiencies with respect to properties as to which plaintiffs claim to have incurred injuries, damages, costs, and/or other expenses.

### Forty-First Defense

This action does not present a justiciable case or controversy between plaintiffs and Ocwen.

### Forty-Second Defense

Plaintiffs' claims are barred, in whole or in part, by the doctrine of comparative fault, including the fault of plaintiffs and third parties who have not yet been identified.

### Forty-Third Defense

If Plaintiffs have sustained any injuries or incurred any expenses, such injuries or expenses, if any, were the result of intervening or superseding events, factors, occurrences, or conditions, which were in no way caused by Ocwen and for which Ocwen is not liable.

### Forty-Fourth Defense

Plaintiffs' claims are barred, in whole or in part, because the proximate cause of any injury allegedly sustained is Plaintiffs' voluntary decision to pay certain expenses or costs.

### Forty-Fifth Defense

Plaintiffs' claims are barred to the extent that Ocwen would prevail on any claims that might have been brought against Ocwen by those individuals who owned, controlled, or occupied that properties about which Plaintiffs now complain.

### Forty-Sixth Defense

Plaintiffs' claims are barred because they are not ripe and rest upon future contingent events that may not occur.

### Forty-Seventh Defense

Plaintiffs' claims are barred to the extent that the alleged conduct of Ocwen was privileged or subject to license, in whole or in part.

### Forty-Eighth Defense

Plaintiffs' claims are barred, in whole or in part, because of impracticability of performance due to, among other things, an excessive and unreasonable difficulty or expense.

### Forty-Ninth Defense

Plaintiffs' claims are barred, in whole or in part, because of impossibility of performance due to, among other reasons, the actions by local, state, or federal officials.

### Fifty Defense

Plaintiffs' claims are barred, in whole or in part, because Ocwen owed no legal duty to Plaintiffs and, if Ocwen did owe a legal duty to Plaintiffs, it did not breach that duty.

### Fifty-First Defense

Ocwen's alleged conduct was privileged, justified, and/or undertaken in good faith.

### Fifty-Second Defense

To the extent that Plaintiffs have suffered any legally cognizable injuries, damages, or harm, which Ocwen denies, Plaintiffs' claims are barred, in whole or in part, because at all relevant times Ocwen has operated its business incompliance with applicable laws and regulations, including local laws, local ordinances, and federal law mandates from HUD.

### Fifty-Third Defense

Plaintiffs caused or contributed to their loss and/or damages, including but not limited to the frustration of their mission, their expenditures, and their change in programming.

### Fifty-Fourth Defense

Plaintiffs are not entitled to declaratory relief against Ocwen because such judgment or decree, if rendered, would not terminate the uncertainty or controversy giving rise to the proceeding.

### Fifty-Fifth Defense

Plaintiffs' claim for injunctive relief is barred to the extent it seeks to prevent conduct which has ceased.

### Fifty-Sixth Defense

Plaintiffs are barred from recovering punitive damages to the extent that such damages would violate provisions of the United States Constitution including, but not limited to, the Due Process Clause.

## **PRAYER FOR RELIEF**

WHEREFORE, Ocwen respectfully requests that this Honorable Court enter judgment in its favor and against Plaintiffs with respect to all of Plaintiffs' claims, award Ocwen its attorneys' fees and expenses, and provide such other and further relief as is just and equitable.

Dated:  December 18, 2019

Respectfully Submitted,

Ocwen Loan Servicing, LLC

By: /s/ Debra Bogo-Ernst
        One of Its Attorneys

Debra Bogo-Ernst
Matthew Sostrin
Jacey Norris
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel: (312) 701-7403
Fax: (312) 706-8474
dernst@mayerbrown.com
msostrin@mayerbrown.com
jnorris@mayerbrown.com

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for Northern District of Illinois' Electronic Filing System on December 18, 2019.

/s/ Debra Bogo-Ernst