# Exhibit D

大成 DENTONS

Nathan L. Garroway

nathan.garroway@dentons.com
D  +1 404-527-4391

Dentons US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA  30308
United States

dentons.com

December 2, 2020

**BY E-MAIL**

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell Street
Suite 100
Geneva, IL 60134

Stephen M. Dane
*Dane Law LLC*
312 Louisiana Ave.
Perrysburg, OH 43551

Yiyang Wu
*Relman, Dane & Colfax PLLC*
1225 19th Street, N.W.
Suite 600
Washington, DC 20036

Morgan Williams
*National Fair Housing Alliance*
1331 Pennsylvania Ave., NW
Suite 650
Washington, DC 20004

Re:   Rule 37 Correspondence Regarding Plaintiffs' Production and Interrogatory Responses

Dear Counsel:

We appreciate your November 2 letter addressing some of the outstanding items that pertain to our Interrogatories and Requests for Production. While this letter addresses some of the outstanding items we have previously conferred on, many others remain, as addressed below.

**1.  Damages (Interrogatories 3 and 20; RFPs 41, 46, 50, and 53)**

First, the letter did not address Defendants' concerns regarding damages. Plaintiffs have individually compiled and produced diversion summaries that detail their "diversion of resource" damages. Plaintiffs have also provided exhibits to their interrogatory answers summarizing their damage categories. Despite this information, no calculation of damages has been provided in response to the Interrogatories, and in fact the produced damages summaries begin to raise more questions than they answer. However,

Durham Jones & Pinegar ► LEAD Advogados ► Rattagan Macchiavello Arocena ► Jiménez de Aréchaga, Viana & Brause ► Lee International ► Kensington Swan ► Bingham Greenebaum ► Cohen & Grigsby ► Sayarh & Menjra ► Larraín Rencoret ► For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

US_Active\116039026\V-1

we are mindful that you communicated you would not be able to assess the completeness and accuracy of the various organizations' records.

We understand that the frustration of mission damages will be established by expert testimony, and that you will advise us if you are withholding damages-related information based on an expert privilege, or some other objection. To date, we have not received any such advisement. Please confirm there is currently no information you are withholding or intend to withhold in this respect.

Despite the information you have provided to date, we still seek clarity on the calculation of damages regarding each plaintiff's diversion of resources. The need for clarity is made even more acute by apparent discrepancies between the interrogatory diversion summaries and the produced diversion summaries.

For example, Plaintiff Greater New Orleans Fair Housing Action Center ("GNOFHAC") states in its interrogatory responses that it attended community events, including the Mission Impossible Conference, "prompted in part by Deutsche Bank's discriminatory maintenance and marketing practices." However, GNOFHAC also states that it undertook remedial activities "prompted in part by Fannie Mae's discriminatory maintenance and marketing practices." *See* Plaintiffs' Response to Defendants' Joint Interrogatories, Ex. D p. 73. In its produced diversion summary, GNOFHAC lists that it attended a Mission Impossible Conference for a collective 9 hours at a total cost of $1,035. *See* GNOFHAC_0000021.

This example highlights (as does the below example concerning Plaintiff Fair Housing & Advocacy Center (""HRAC")), the deficiencies in Plaintiffs' diversion summaries included in their interrogatory responses and production. The responses do not provide an intelligible calculation of their damages or a clear demarcation as to how Defendants' alleged conduct caused them. Unfortunately, the information produced to date does not make this calculation any more clear. As the examples show, it can in fact be conflicting. Defendants cannot be expected to calculate the damages for 18 Plaintiffs with this information, especially when it has been incumbent on Plaintiffs to provide this information at the outset. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii).

In light of the above, please let us know whether Plaintiffs intend to amend their interrogatory responses, or supplement their production in order to resolve these discrepancies.

2. **Statistical Information (Interrogatories 11 and 14; RFPs 31-36)**

You have objected to provide information related to your statistical analysis requested by Interrogatories 11 and 14 and RFPs 31-36 beyond the single regression analysis produced to date. You claim that the only persons who reviewed or communicated about the statistical information were attorneys and the Plaintiffs' expert(s). Given the centrality of this issue in the case, we requested written confirmation of the privileged communications at issue. We repeat that request here and ask Plaintiffs log each piece of information in a manner sufficient to enable the Defendants to assess the asserted claim of privilege. Please let us know if you intend to provide a privilege log for the information you are withholding on the basis of this privilege.

While we request a privilege log for this specific subject matter, we do not believe the privilege claims should stand. We reiterate our prior response concerning these Interrogatories as set forth in our September 17, 2020 letter. On our call, you mentioned a ruling obtained on a similar issue presented in the

Fannie Mae case. The original position of plaintiffs in that case was to withhold *all* statistical-regression related information on the basis it was privileged, except for the regression analysis itself. *National Fair Housing Alliance et al. v. Federal National Mortgage Association*, 4:16-cv-06969-JSW, ECF 90 at 4–6 (Mar. 27, 2020). However, Fannie Mae argued "that Plaintiffs waived any privilege by referring to the regression analysis in the Amended Complaint," and the court agreed. *Id*. at ECF 95 at 2 (Apr. 13, 2020).

The *Fannie Mae* court ultimately held production of the regression analysis was sufficient. But, the defendant did not argue (and the court did not consider) that other information relevant to the development of the regression analysis was at issue in the complaint, such that it would be relevant to the dispute. *See generally*, *id*. As noted in our September 17 letter, Plaintiffs have put more than just the single regression analysis at issue in their complaint. The claims in this case are not centered on a single output attained from a single regression. The claims squarely encompass how the regression was modeled, evaluated, and modified in order to demonstrate a pattern of discrimination.

For example, Plaintiffs have put at issue the timing of when they were made aware of the alleged patterns of discrimination. This timing is based on whether Plaintiffs were able to accumulate "sufficient data…to show that these Defendants were engaged in ongoing discriminatory behavior." SAC ¶ 116. Unless Plaintiffs conducted a regression analysis just one time, and became aware of a pattern on that same day, prior testing of the collected data would have been necessary to determine when the data became "sufficient" to show a pattern. Plaintiffs' knowledge of what the data showed (and when) over various intervals is made all the more relevant by the Court's initial order dismissing this case based on the applicable statute of limitations—which Plaintiffs have indicated they may challenge. Plaintiffs have also put the validity and soundness of the regression at issue. SAC ¶ 143. The Fannie Mae court did not consider these issues, which are relevant to resolving this dispute irrespective of what final "version" of the regression Plaintiffs may choose to use at trial.

Please confirm whether Plaintiffs are still unwilling to identify any further information pertaining to the statistical analysis beyond the regression analysis they have previously produced.

### 3. Non-party Information (Interrogatories 21 and 22; RFPs 26, 27, and 46)

You have indicated you will not produce information regarding the scope of other investigations outside of a document that identifies the number of properties inspected by lender. While this is an encouraging start, we disagree that additional information pertaining to other investigations is irrelevant. A significant amount of the information provided by Plaintiffs so far provides extremely general depictions of activities taken across geographies and time periods. Information pertaining to Plaintiffs' other investigations is a missing variable that is necessary to understand the extent of any damages Defendants may owe and/or liability Defendants may have.

For example, HRAC is claiming damages based on an education and outreach campaign it undertook as a result of "Deutsche Bank's discriminatory maintenance and marketing of REO properties." *See* Plaintiffs' Response to Defendants' Joint Interrogatories, Ex. D p. 99. This campaign included "outreach to media and giving over 250 presentations to housing providers and real estate agents in Northeast Ohio" from December 4, 2012 to October 11, 2018. *Id*. However, HRAC only investigated 50 alleged Deutsche Bank properties between December 4, 2013 and March 1, 2017. *Id*. Defendants cannot determine what proportion of liability they may have for this campaign without understanding the extent to which it addressed the conduct of other parties HRAC investigated (unless it is HRAC's position that all 250

大成 DENTONS

December 2, 2020
Page 4

dentons.com

presentations over the nearly 6 year period were exclusively directed to countervail Deutsche Bank's alleged conduct).

We thus strongly disagree with your objection that this type of information is not relevant. This example. as well as GNOFHAC's responses, make it clear that Plaintiffs' investigations overlapped amongst parties involved in similar investigations. This overlap is connected to the damages Plaintiffs' seek to recover in both resources diverted and missions frustrated. E.g., if HRAC recovered any costs for its 250 presentations from another party, or stands to recover these costs, this would bear on the amount defendants may ultimately be expected to owe.

This overlap also bears on issues of Defendants' liability. For example, if Plaintiffs inspected 100 Bank A properties in a minority neighborhood, but only 10 Bank B properties in the same neighborhood, Bank B's liability for "perpetuating segregation" in that neighborhood would be significantly different than in a case where the properties were evenly distributed. Plaintiffs' claims are based in large part on the collective effects of the alleged discriminatory practices, and thus these entanglements cannot be avoided.

We also disagree that producing this information would result in an undue burden to Plaintiffs. We understand that the investigation-related information is all stored in a single electronic database. To the extent the information pertains to a party plaintiffs have litigated against or engaged in discussions, the vast majority of responsive information should likely already have been collected and organized for production.

In light of the above, please confirm whether you intend to continue withholding information regarding your investigation of other parties, including any settlement or damage awards you may have received.

Thank you again for the follow up information you have provided thus far. We look forward to your amended interrogatory responses. Please let us know if you have any questions regarding the foregoing.

Sincerely,

/s/ *Nathan Garroway*
Counsel for Altisource Solutions, Inc.

/s/ *Debra Bogo-Ernst*
Mayer Brown LLP
Counsel for Ocwen Loan Servicing n/k/a PHH Mortgage Company

Cc: Kenneth Kliebard
David Monterio
Victor Cruz
Kevin Papay
Kurt Rademacher
Jacey Norris
Matthew Sostrin
Nathan Garroway
Cody Wood
Lisa Krigsten
Shannon Shin

US_Active\116039026\V-1