# Exhibit A

# SOULE, BRADTKE & LAMBERT

## ATTORNEYS AT LAW

402 Campbell Street, Suite 100, Geneva, Illinois 60134
Tel: 630.333.9144  Fax: 630.607.0266
www.soulebradtkeandlambert.com
Office@SBLLegal.com

Jennifer K. Soule
JSoule@SBLLegal.com

Kelly K. Lambert
KLambert@SBLLegal.com

James G. Bradtke
JBradtke@SBLLegal.com
*Of Counsel*

Steven P. Schneck
SSchneck@SBLLegal.com
*Special Counsel*

December 4, 2020

*Sent via e-mail*

Debra Bogo-Ernst
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
*Email: dernst@mayerbrown.com*

Nathan L. Garroway
Dentons US LLP
303 Peachtree Street, NE, Suite 5300
Atlanta, GA 30308
*Email: Nathan.garroway@dentons.com*

Matthew C. Sostrin
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
*Email: msostrin@mayerbrown.com*

Lisa M. Krigsten
Dentons US LLP
4520 Main Street, Suite 1100
Kansas City, MO 64111
*Email: lisa.krigsten@dentons.com*

Jacey D. Norris
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
*Email: jnorris@mayerbrown.com*

Shannon Shin
Dentons US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
*Email: shannon.shin@dentons.com*

Re:  *Plaintiffs' Document Productions and Interrogatory Responses*

Dear Counsel:

The purpose of this letter is to respond to Defendants' December 2, 2020 letter regarding Plaintiffs' Document Productions and Interrogatory Responses.

## 1. Responses Regarding Damages

We have provided detailed information regarding damages in the form of:  (a) diversion summaries providing line item details as to activities involved; (b) interrogatory answers identifying activities conducted by Plaintiffs for which they seek damages; and (c) back-up information relating to Plaintiffs' claimed damages.  More specifically, interrogatory answers were provided in July and August for each Plaintiff.  In addition, we have produced diversion

1

summaries as to almost all the Plaintiffs, and the remainder of the diversion summaries will be produced shortly.  Furthermore, back-up information is being produced on a rolling basis from each Plaintiff organization.

In any event, we remain open to addressing questions raised by Defendants regarding damages issues and, where possible, providing additional information and documents, if any exist.  Defendants' December 2 letter (p. 1) states that Plaintiffs' Interrogatory Answers do not provide a calculation of damages for each of the Plaintiffs.  We disagree.  As to diversion of resources, the diversion summaries provide a calculation of damages in an understandable format.  As to frustration of resources, as you noted, we will be providing expert testimony.  We will make their reports available in accord with whatever expert discovery schedule is set by the Court.  In response to your question, we are not currently withholding responsive information in this respect.

In terms of Defendants' concerns regarding "discrepancies" in the Plaintiffs' interrogatory answers regarding damages, it is not unusual that out of the thousands of time entries provided, there may be some that appear unclear to Defendants or reflect minor administrative or typographical errors.  Certainly, that is the case with the entry for GNOFHAC cited in your letter (p. 2).  The Plaintiffs can provide amended interrogatory responses to correct any such errors that you identify or that we notice.   We are also willing to provide a summary tabulation within amended interrogatory answers as to the claimed diversion damages of each Plaintiff organization, if that is your preference.  While we are willing to work with you informally to answer specific questions about particular damages claimed, we believe that detailed questions regarding the methodology and scope of the damages claimed by the Plaintiff organizations are best explored through depositions.

### 2. Statistical Information

With regard to documents relating to the regression analyses[1]  that were performed on behalf of the Plaintiffs, we will log privileged communications.  To date, none of the parties have provided privilege logs.  Accordingly, we suggest that the parties confer as to an agreed format and scope of such logs.

We also believe that the parties have different views of the *Fannie Mae* discovery ruling concerning the production of pre-Complaint statistical analyses.  For example, we note that the Court's ruling in *Fannie Mae* focused more on relevance than privilege, as the Court stated that Fannie Mae's argument regarding the validity of the pre-Complaint statistical analysis "will only be relevant if plaintiffs decide to rely on that expert's regression analysis in opposition to summary judgment or at trial."  *National Fair Housing Alliance v. Federal National Mortgage Association*, 4:16-cv-06969-JSW, ECF 95 at 2-3 (April 13, 2020).  By producing the regression analyses supporting the Second Amended Complaint (i.e., at an earlier juncture), we have gone beyond what is reasonably required.  Furthermore, considering the additional information regarding property ownership and servicing that we have also produced, it is a certainty that the

---

[1] The regression analyses produced to Defendants cover two different time periods and, as such, we describe them in the plural.

regression analyses performed before the filing of the Second Amended will not be the analyses that Plaintiffs rely on at trial or in opposition to any summary judgment motion. Also, so that there is no confusion, an expert regression analysis is only one type of evidence that will be offered in support of Plaintiffs' claims. We will also offer traditional modes of proof in fair housing cases. Lastly, as to this subject, we are willing to disclose the date prior to the filing of the initial Complaint on which an expert was engaged to perform a first regression analysis, although we do not believe this information is relevant to the statute of limitations issue.

### 3. Non-Party Information

We understand that Defendants disagree with Plaintiffs regarding the scope of information to be produced regarding other investigations. So there is no confusion, we summarize here the scope of this information that Plaintiffs have agreed to produce and are producing. First, we are producing information concerning other investigations that relates generally to all the various REO investigations conducted by Plaintiffs (e.g., a testing protocol that applies across the investigations), because such information also relates to the investigation of Deutsche Bank-owned properties. Second, we are producing documents that contain information related to the inspection of Deutsche Bank properties even if the documents also make extraneous and/or irrelevant references to properties not owned by Deutsche Bank (e.g., lists of properties to be inspected that reference Deutsche Bank properties and properties owned by other banks). Third, to satisfy Defendants' stated concerns, and to avoid unnecessary Court intervention, we are working on preparing and producing a document that identifies the total number of properties inspected by Plaintiffs.

We have considered your assertion that there is some inherent overlap among the various investigations and remedial measures undertaken by the Plaintiff organizations, including as to damages (e.g., outreach and advocacy campaigns addressing REO issues). However, we do not believe that producing the entirety of the investigative data relating to other investigations is a reasonable or appropriate manner of addressing this issue. Instead, in addition to the considerable information already being provided, we believe that this issue can be best addressed through depositions of the individual Plaintiff organizations (or additional written discovery regarding their identified activities and timekeeping practices). In this regard, we note our understanding that most of the Plaintiffs made an allocation among the cases as to General REO time based on the number of cases or number of properties inspected. We are willing to ask the Plaintiff organizations to provide more specific information if necessary.

As to settlements and damage awards, we stand by our objection on grounds of relevance to producing all settlement agreements of any sort obtained by the Plaintiff organizations during the time period when REO investigations were conducted.

### 4. Conclusion

We are working to promptly provide Amended Interrogatory Responses and the additional information noted above. If you believe it would be useful to have a conference to discuss these matters further, please let us know.

Thank you for your cooperation.

Very truly,

James G. Bradtke

cc: Counsel of Record

# Exhibit B

# SOULE, BRADTKE & LAMBERT

### ATTORNEYS AT LAW

402 Campbell Street, Suite 100, Geneva, Illinois 60134
Tel: 630.333.9144  Fax: 630.607.0266
www.soulebradtkeandlambert.com
Office@SBLLegal.com

Jennifer K. Soule
JSoule@SBLLegal.com

James G. Bradtke
JBradtke@SBLLegal.com
*Of Counsel*

Kelly K. Lambert
KLambert@SBLLegal.com

Steven P. Schneck
SSchneck@SBLLegal.com
*Special Counsel*

February 10, 2021

*Sent via e-mail*

Kurt Rademacher
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Email: kurt.rademacher@morganlewis.com

Kevin M. Papay
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Email: kevin.papay@morganlewis.com

Kenneth M. Kliebard
Morgan, Lewis & Bockius LLP
77 W. Wacker Drive, Suite 500
Chicago, IL 60601
Email: kenneth.kliebard@morganlewis.com

Victor Cruz
Morgan, Lewis & Bockius LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
Email: victor.cruz@morganlewis.com

David Monteiro
Morgan, Lewis & Bockius LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
Email: david.monteiro@morganlewis.com

Ajani Brown
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Email: ajani.brown@morganlewis.com

Re: NFHA v. Deutsche Bank National Trust, et al.

Dear Kurt:

This letter responds to your February 9, 2021 letter (delivered via email less than 24 hours ago) regarding Plaintiffs' discovery responses.   It is unreasonable for Defendants to demand that Plaintiffs respond "in the next day" regarding your letter when Defendants have routinely taken weeks to discuss discovery concerns raised by Plaintiffs.  In any event, we hereby respond to you in less than 24 hours as a courtesy.

**A.  Request for Production No. 15.**  As you noted, we have indicated that we will produce resumes, applications and job descriptions related to the persons who conducted investigations for this case.  We are not attempting to "shield" from production documents that relate to the process by which persons were selected for such positions or assignments, but do

1

not see how many documents that are tangentially related to this request, (e.g., applications of persons not hired, schedules for interviews, etc.), are likely to lead to pertinent evidence. As you know, many of the persons conducting inspections were already employees of the Plaintiff organizations and were tasked with conducting REO inspections simply because it fell within their pre-existing investigatory job duties. We strongly doubt that Defendants, for their part, are willing to produce resumes, job applications and all documents related to the process whereby each of their employees with duties regarding the properties inspected in this case was selected for these positions. In any event, we will not withhold (and were not withholding) any documents that discuss why certain persons were chosen to conduct inspections in this case.

**B. Regression Analyses.** As previously indicated, with regard to documents relating to the regression analyses performed, while maintaining our objection to the substance of these requests, we have provided the following: the final regression analyses performed by Plaintiffs prior to filing the Second Amended Complaint, which are explicitly referenced in the Second Amended Complaint, including the data dictionary in .pdf format, the dataset in Excel and the regression commands as of 12/19/2018 and output, each in Stata formats that may be opened with a text editor such as notepad in Microsoft Windows.

We disagree that the database "misidentifies" the person inspecting particular properties or is a "late disclosure" - it is simply the case that the database identifies the person who uploaded the information into the database, who may or may not have been the individual who took the pictures and gathered the data. There was not any mistake; we proactively sought out and provided information to Defendants during the course of our Rule 37 conference. There are also no "omissions" from the dataset that we produced to Defendants – we provided the entire dataset that the analyses were based upon. Contrary to your letter, we also believe that it is tautologic that these analyses are in fact "preliminary" inasmuch as they will not be the final analyses that will be developed and used by Plaintiffs as evidence to prove our claims at trial, and no experts have even been disclosed at this time.

**C. Information Related to Other Lawsuits Involving Plaintiffs (Request No. 44).**
As I stated during our call, Plaintiffs believe that this request, seeking documents related "to each lawsuit, arbitration, or other legal proceeding in which Plaintiff" was ever a party is plainly overbroad and unlikely to lead to the discovery of admissible evidence. We have also clearly indicated our position that as to information overlapping the other REO cases, we will produce information as follows: First, we are producing information concerning other investigations that relates generally to all the various REO investigations conducted by Plaintiffs (e.g., a testing protocol that applies across the investigations), because such information also relates to the investigation of Deutsche Bank-owned properties. Second, we are producing documents that contain information related to the inspection of Deutsche Bank properties even if the documents also make extraneous and/or irrelevant references to properties not owned by Deutsche Bank (e.g., lists of properties to be inspected that reference Deutsche Bank properties and properties owned by other banks). Third, to provide information to Defendants regarding the scope of other testing, we are working on preparing and producing a document that identifies the total number of properties inspected by Plaintiffs.

With respect to there being a more limited set of information related to other lawsuits that might be produced, we have not said that we would not consider such a request – the point is that this is not the request that Defendants made, and Defendants have not specifically indicated what this more limited set of information might be. If you want to narrow Request No. 44 in some particularized way, or submit another request (as Defendants have required of Plaintiffs in the past as to certain issues) please do so and we will respond.

**D. Copies of Depositions and Testimony (Request No. 45).** Our objection that this request seeking copies all deposition transcripts and transcribed testimony of any of the Plaintiffs is overbroad is well-founded. Again, we are willing to consider a much more limited request for transcripts having something to do with the issues in this case, but that is not what was requested.

If what Defendants are interested in is transcripts related to the *Fannie Mae or Bank of America* cases, as I indicated during the call, no depositions have been taken to date (or even scheduled) in those cases. My observation that there are protective orders in those cases, as in this case, that would raise issues related to production of these transcripts after depositions actually occur is accurate. The protective orders in those cases (like the present one) were entered into at the insistence and with the concurrence of those Defendants, and we disagree with the suggestion that Plaintiffs entered into protective orders in those cases to "shield" testimony from discovery in this matter. In any event, this is an issue that can be further discussed and dealt with at an appropriate time.

If you have questions, please feel free to contact me.

Very truly,

James G. Bradtke

cc: Counsel of Record

3

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Jury Trial Demanded |
| Defendants. | |

**PLAINTIFFS' SECOND AMENDED AND SUPPLEMENTAL RESPONSE TO
DEFENDANTS' JOINT INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure, Rule 33, Plaintiffs, by their undersigned

counsel, respond to Defendants' Joint Interrogatories to All Plaintiffs as follows:

**GENERAL STATEMENT AND OBJECTIONS**

The information in these Answers is provided in accordance with the provisions and

intent of the Federal Rules of Civil Procedure, which require the disclosure of non-privileged

facts with the recipient's custody or control that may be relevant to the claims or defenses at

issue or may lead to the discovery of relevant and admissible evidence.

By providing the information requested, Plaintiffs do no waive any objections to its

admission into evidence, nor do they submit to the instructions and definitions listed at the

beginning of the Interrogatories, except as those instructions and definitions specifically conform

to the requirements of the Federal Rules and applicable law.

The word usage and structure herein may be that of the attorney assisting in preparation

of these Answers, and thus they do not necessarily purport to be the precise language of the

1

executing parties. The answers set forth herein are based upon information that has been collected and/or reviewed for the purpose of responding to these Interrogatories.

Plaintiffs' objections and answers to the Interrogatories are based upon information now available to them. Plaintiffs reserve the right to amend, modify, or supplement these objections and answers if they obtain additional information.

Subject to and without waiver of the above general qualifications which are hereby incorporated into each response, Plaintiffs respond to Defendants' Joint Interrogatories to All Plaintiffs as follows:

**INTERROGATORY NO. 1:** Identify each person with knowledge of any fact that supports or refutes any allegation of the Second Amended Complaint. For each such person identified, describe with particularity the nature of the person's knowledge**.**

**RESPONSE TO INTERROGATORY NO. 1:** Plaintiffs object to this Interrogatory as premature, overbroad and unduly burdensome to the extent that it seeks, at this early stage of the litigation, a description with particularity of the knowledge of all persons aware of information that supports or refutes the allegations of the Complaint. A complete response to this Interrogatory would require a long narrative with information pertaining to scores of witnesses involved in the Investigations. Given the reference to "all persons" aware of information relating to the Complaint, it further calls for information regarding the identity of scores of other persons having extremely tangential knowledge regarding the case who are extremely unlikely witnesses (e.g., an administrative assistant who typed the Complaint). Moreover, the universe of witnesses with actual knowledge of the facts of the case includes many persons affiliated with Defendants, whose identities are unknown to Plaintiffs at this time. Plaintiffs further object to this

2

Interrogatory to the extent it seeks information subject to the attorney-client privilege, work produce doctrine, common interest doctrine or other applicable privileges or protections.

Subject to these objections, Plaintiffs provide amended Exhibit A, listing persons presently known to Plaintiffs whom they have believe have significant, substantive knowledge related to the Investigations and/or Plaintiffs' damages.

**INTERROGATORY NO. 2:** Other than communications with Plaintiffs' counsel, identify all persons with whom Plaintiff consulted, conferred, or discussed in any manner whatsoever regarding the factual allegations in the Second Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 2:** Plaintiffs object to this Interrogatory as overbroad and unduly burdensome to the extent that it seeks information at to persons who discussed the factual allegations of the Complaint "in any manner whatsoever" with Plaintiffs, which would include scores of persons with minimal and irrelevant information regarding the Complaint. (e.g., a friend asking an employee of a Plaintiff what he/she is working on and receiving a sixty second response). A complete response to this Interrogatory would require a pointless recitation of scores of other persons having extremely tangential knowledge regarding the case who are extremely unlikely witnesses. In addition, Plaintiffs have had conversations with potential experts who may be utilized by Plaintiffs in the case, and the identities and opinions of these experts will be disclosed in accord with the Federal Rules of Civil Procedure and/or such schedule as is set by the Court.

Subject to these objections, Plaintiffs state that the persons identified in Exhibit B have all consulted, conferred or discussed the factual allegations of the Complaint.

3

**INTERROGATORY NO. 3:**  Identify all facts and evidence (including each document, if the fact or evidence is contained in a document) that supports, refutes, or otherwise forms the basis for your contention in the Second Amended Complaint that Plaintiffs have been injured by Defendants' conduct, including but not limited to a calculation of such alleged damages; the basis for that calculation; any mathematical formula used; whether the element of damages is general, special, or consequential damages; identify each document used or relied upon by you to support that calculation; and identify each witness with knowledge of the alleged damages, including the subject of each such witness's knowledge.

**RESPONSE TO INTERROGATORY NO. 3:**  Plaintiffs object to this Interrogatory as unduly burdensome and inappropriate in terms of it requesting a description of a vast amount of evidence in an extremely detailed narrative form (i.e., identification of all facts, evidence, documents, witnesses, subjects of knowledge).  Courts have held that asking parties to describe extensive subjects in response to a single interrogatory is improper and unduly burdensome.  *See e.g., Gravestock v. Abilene Motor Express, Inc.*, 2017 WL 10592155 at *5-6 (C.D. Cal. Sept. 14, 2017)(interrogatory asking Defendant to state "every fact" on which its argument relied would require Defendant to "go into excruciating detail" and was "overly broad and unduly burdensome").  Plaintiffs further object to this Interrogatory as a contention interrogatory, as it asks Plaintiffs, at the outset of discovery, to identify all facts, evidence and documents that form the basis of the contention that Plaintiffs have been injured by Defendants' conduct.  Courts disfavor contention interrogatories asked before substantial documentary or testimonial evidence has been completed.  *See, e.g.*, *In re eBay Seller Antitrust Litig.*, 2008 WL5212170 at *1-2 (N.D. Cal. Dec. 11, 2008).  Plaintiffs further object to this Interrogatory on grounds that discovery is ongoing and Plaintiffs anticipate adducing further information that may be responsive to this

Interrogatory as additional damages accrue. Plaintiffs further object to the extent that this Interrogatory calls for premature disclosure of expert opinions that may be presented in an expert report on damages. Plaintiffs further object that the Interrogatory is impermissibly compound.

Subject to these objections, Plaintiffs are providing information and documents on a rolling basis related to the damages they have incurred, including: (a) a summary of diversion of resources for each of the organizational Plaintiffs; (b) information regarding the persons whose time was diverted and their hourly rates; (c) narrative and other information provided in Exs. D and E in the interrogatory responses from each of the Plaintiffs regarding damages incurred; (d) back-up information relating to Plaintiffs' claimed damages; and (e) information regarding the frustration of Plaintiffs' missions and other pertinent documents and information. As to frustration of mission damages and other damages related matters, Plaintiffs anticipate providing expert testimony. Plaintiffs will make expert reports available in accord with the Federal Rules of Civil Procedure and whatever expert discovery schedule is set by the Court.

**INTERROGATORY NO. 4:** Identify all Properties that you contend were serviced by Ocwen and any Documents or information supporting your contention.

**RESPONSE TO INTERROGATORY NO. 4**: Plaintiffs object to this Interrogatory as seeking information that is easily accessible to Defendants in the sense that they should be aware of which Properties they serviced. Plaintiffs further object that the word "serviced" is vague inasmuch as it may refer to loan servicing, property preservation or maintenance, property marketing or other activities.

Further answering, Plaintiffs refer Defendants to paragraph 64 of the Complaint, indicating that there is no public data available to definitively identify which servicer (and its

contractors or agents) has been contractually retained for any particular REO property titled in the name of a bank or trustee.  Moreover, REO trustees do not make this information available to the public, and it is not retrievable from tax or land records.  As such, Defendants should refer to information in their own possession in response to this Interrogatory.  Further responding, while discovery in this case is not limited in this way, on March 3, 2020, Plaintiffs produced a list of properties they investigated and referenced in the Second Amended Complaint, along with inspection dates.  This production was by agreement of the parties.  In addition, Plaintiffs have provided information and data to Defendants regarding an additional 139 REO properties that were not addressed in the Complaint but were believed to be owned by Deutsche Bank as Trustee at the time of property inspection and were inspected by Plaintiffs.  Some of these properties were serviced by Defendant Ocwen, which should have identifying information in its possession.  Investigation continues.

**INTERROGATORY NO. 5**:  Identify all Properties that you contend were owned by either Trustee and any Documents or information supporting your contention.

**RESPONSE TO INTERROGATORY NO. 5**:  Plaintiffs object to this Interrogatory to the extent that it seeks information as to the identity of properties owned by Defendant Deutsche Bank, as Trustee, information as to which Defendants, as owners, clearly have superior knowledge and access to supporting documents.  Subject to this objection, Plaintiffs state that properties investigated by Plaintiffs are believed by Plaintiffs at this time to have been owned by Defendant Deutsche Bank, as Trustee are identified in Appendix A to the Complaint, as revised by Plaintiffs' letter to counsel dated March 3, 2020.  Further responding, Plaintiffs refer Defendants to documents produced by Deutsche Bank as governing agreements pertaining to Plaintiffs' list of properties.

In addition, Plaintiffs have provided information and data to Defendants regarding an additional 139 REO properties that were inspected, but not addressed in the Complaint and were believed to be owned by Deutsche Bank as Trustee at the time of property inspection and were inspected by Plaintiffs. (See answer to Interrogatory No. 7).

Finally, prior to the investigation that provides the basis for this case, in late 2010 and early 2011, NFHA and a few of its partners (aka the "Rescue Partnership"), preliminarily investigated REOs to inform, develop and finalize the REO methodology. These preliminary properties were not scored using the finalized REO methodology and were not utilized in any of the targeted investigations or analyses that formed the basis of the complaints filed. Nonetheless, a portion of these properties were owned by Deutsche Bank, and to avoid any confusion, we are producing any available information that can be located relating to them.

**INTERROGATORY NO. 6:** Identify all facts and evidence (including each document, if the fact or evidence is contained in a document) describing how Plaintiffs selected the metropolitan areas in which to conduct Inspections of Properties, including the reasoning behind the selections and the determination of the boundaries of those metropolitan areas.

**RESPONSE TO INTERROGATORY NO. 6:** Plaintiffs object to this Interrogatory as a contention interrogatory, as it asks Plaintiffs, at the outset of discovery, to identify all facts, evidence and documents relating to the selection of areas in which inspections would be conducted. Courts disfavor contention interrogatories asked before substantial documentary or testimonial evidence has been completed. *See, e.g.*, *In re eBay Seller Antitrust Litig.*, 2008 WL5212170 at *1-2 (N.D. Cal. Dec. 11, 2008). Plaintiffs further object to this Interrogatory as unduly burdensome to the extent that it requests a detailed narrative response (e.g., "the reasoning behind selections") to a far-ranging question. Plaintiffs further object to this

7

Interrogatory to the extent that it seeks information protected by the attorney-client privilege, work product doctrine, common interest doctrine or any other applicable privileges or protections.

Subject to these objections, Plaintiffs state that NFHA initially identified the major metropolitan areas throughout the United States in which it desired to conduct its investigation of REO maintenance activity. These metropolitan areas were selected based upon the presence of a NFHA member with capacity to conduct an investigation of this magnitude, population size, and geographic distribution across the country. The metropolitan areas generally correspond with the Metropolitan Statistical Areas as defined by the 2010 U.S. Census. Metropolitan areas were also selected where there was no NFHA member but foreclosure rates were very high, and NFHA wanted to use its HUD funds or own resources to investigate the condition of REOs in those metropolitan areas.

**INTERROGATORY NO. 7:** Identify all facts and evidence (including each document, if the fact or evidence is contained in a document) describing how Plaintiffs identified Properties in metropolitan areas for Inspection.

**RESPONSE TO INTERROGATORY NO. 7:** Plaintiffs object to this Interrogatory as a contention interrogatory, as it asks Plaintiffs, at the outset of discovery, to identify all facts, evidence and documents relating to the selection of properties in metropolitan areas for inspection. Courts disfavor contention interrogatories asked before substantial documentary or testimonial evidence has been completed. *See, e.g.*, *In re eBay Seller Antitrust Litig.*, 2008 WL5212170 at *1-2 (N.D. Cal. Dec. 11, 2008). Plaintiffs further object to this Interrogatory as unduly burdensome to the extent that it requests a detailed narrative response to a far-ranging question. Plaintiffs further object to this Interrogatory to the extent that it seeks information

protected by the attorney-client privilege, work product doctrine, common interest doctrine or any other applicable privileges or protections.

Subject to these objections, Plaintiffs state that within in each metropolitan area selected for investigation, Plaintiffs selected zip codes in which to conduct the investigation by (1) reviewing foreclosure data from RealtyTrac.com to determine rates of foreclosure by zip code; (2) identifying the zip codes with the highest rates of foreclosure compared to the metropolitan area overall; (3) reviewing race and ethnicity data from the U.S. Census Bureau to determine which zip codes were racially concentrated; and (4) selecting zip codes in middle and working class neighborhoods with high home ownership rates. Zip code level data was used because zip codes are the smallest levels of geography for which foreclosure data and REO listings are available. There was not a hard and fast cutoff or rule with regard the determination of zip codes as middle or working class, but NFHA exercised its judgment to avoid median income from being disproportionately high or low in comparison to the metropolitan area's median income.

Further answering, Plaintiffs state that they identified the zip codes in a given metropolitan area that were racially concentrated by, inter alia, using ArcGIS mapping software, in particular ArcMap, to visualize race and ethnicity data spatially by zip code. GIS, or geographic information systems, are computer-based tools used to store, visualize, analyze, and interpret geographic data. Geographic data (also called spatial, or geospatial data) identifies the geographic location of features. These data include anything that can be associated with a location on the globe, or more simply anything that can be mapped. For example, roads, country boundaries, and address are all types of spatial data. NFHA uses ArcGIS specifically, and Esri defines ArcGIS as follows: "ArcGIS is a platform for organizations to create, manage, share, and analyze spatial data. It consists of server components, mobile and desktop

9

applications, and developer tools. This platform can be deployed on-premises or in the cloud
(Amazon, Azure) with ArcGIS Enterprise, or used via ArcGIS Online which is hosted and
managed by Esri."  Specifically, NFHA utilizes the desktop application, ArcMap, which is part
of ArcGIS Desktop.  NFHA used ArcMap to visualize 2010 Census race and ethnicity data, and
to overlay REO property data on top of this race data. The output of this visualization was
typically a PDF.  "Racially concentrated" zip codes generally consisted of a population that was
at least 50% white or 50% non-white.  Plaintiff reviewed additional demographic data by zip
code including homeownership data and median household income data using U.S. Census
Bureau figures.

Plaintiffs identified the list of REO properties to visit by utilizing their list of identified
zip codes and determining which properties within those identified zip codes were owned by
Deutsche Bank.  Plaintiff determined Deutsche Bank's ownership by using county property
records, including but not limited to property assessor records, register or recorder of deeds
records, foreclosure auction records, and vacant property registers.  Plaintiffs also utilized
foreclosure records maintained on RealtyTrac, Zillow.com and other database sources.

In some instances, properties that were visited were not scored for various reasons.
Properties visited were not scored if there were signs of residency at the home.  It could be that
the foreclosure sale had taken place and was reflected in the property records, but the vacancy
status of the REO was in limbo due to eviction or personal property issues.  It could also be that
tenants, for example, were permitted to remain in the home while it was an REO.  (Hubzu.com,
as well as Auction.com and other listing sites, allow one to filter a search for bank-owned homes
by vacant or occupied status). If the property was listed as occupied on Hubzu.com, it was not
included in the property list per Plaintiffs' methodology, but the properties were not always

10

accurately categorized by HUBZU or other sources, so occupied properties at times were included on Plaintiffs' list of Deutsche Bank REO properties to visit, but would ultimately not be scored. It could also be that the case that a home on Plaintiffs' visit list was observed to be already sold out of REO status, but the property records were not yet up to date. Other reasons that a property was not scored include that it was a vacant lot when visited; it was a gated community and access could not be obtained; it was a condo/multi-family unit; or there was work in progress.

Finally, as to the 139 properties referenced above that were tested but not addressed in the Complaint, comparative information regarding these properties was not included in the Complaint for various reasons as follows: Birmingham, AL – small number of Deutsche Bank REOs in metro area, small number of white REO comparators; Phoenix AZ – small number of Deutsche Bank REOs in metro area, no local FHC partner, insufficient additional resources; San Diego CA - small number of Deutsche Bank REOs in metro area, no local FHC partner, insufficient additional resources; New Haven, CT – small number of Deutsche Bank REOs in metro area; Waterbury, CT – small number of scored properties; Atlanta, GA – small number of white REO comparators; Louisville, KY -small number of non-white REO comparators; Newark, NJ – no local FHC partner, incomplete results; Albuquerque, NM – small number of white REO comparators; Charleston, SC - small number of Deutsche Bank REOs in metro area; Fort Worth, TX – incomplete results, insufficient additional resources; San Antonio, TX – small number of white REO comparators, insufficient additional resources.

**INTERROGATORY NO. 8:** Identify each "investigator" who conducted the Inspections.

**RESPONSE TO INTERROGATORY NO. 8:** Plaintiffs object to this Interrogatory as vague and ambiguous, inasmuch as NFHA staff sometimes accompanied staff of other Plaintiffs on

visits to properties. Subject to this objection, Plaintiffs provide Exhibit C, listing persons affiliated with various Plaintiffs who conducted investigations.

**INTERROGATORY NO. 9:** Identify the "NFHA staff" who taught investigators how to evaluate a deficiency, complete forms, take photographs and upload all photos into a central database" referenced in Paragraph 90 of the Second Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 9:** The following persons working for NFHA taught investigators to perform activities identified in paragraph 90 of the Complaint: Shanti Abedin; Shanna Smith; Lisa Rice; Lindsay Augustine; Pablo Zatarain; Quisharn Hamilton; Justin Monteiro; Lisa Govoni; Shivaughn Ferguson; Madeline Hoffman; Katie Sullivan.

**INTERROGATORY NO. 10:** Identify each person responsible for management and maintenance of the "central database" referenced in Paragraphs 90 and 91 of the Second Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 10:** Plaintiffs object to this Interrogatory as ambiguous on grounds that the phrase "management and maintenance" can be interpreted in different ways. Subject to this objection, Plaintiffs state that the person with primary responsibility for operating and maintaining the central database referenced in paragraphs 90 and 91 of the Complaint is Jim McCarthy.

**INTERROGATORY NO. 11:** Identify each person who conducted or participated in conducting Plaintiffs' Statistical Analysis.

**RESPONSE TO INTERROGATORY NO. 11**: Plaintiffs object to this Interrogatory as premature to the extent it seeks information concerning Plaintiffs' Statistical Analysis inasmuch as expert reports and expert documents will be generated and produced in this litigation in accord

with such schedule as is set by the Court and/or provided by the Federal Rules of Civil

Procedure. Plaintiffs' further object that this Request seeks information and documents that are

not discoverable pursuant to Fed.R.Civ.P. 26(b)(4)(C) and are not discoverable under pertinent

case law. See *National Fair Housing Alliance v. Federal National Mortgage Association*, 4:16-

cv-06969-JSW, ECF 95 at 2-3 (April 13, 2020) (pre-Complaint statistical analysis "will only be

relevant if plaintiffs decide to rely on that expert's regression analysis in opposition to summary

judgment or at trial"). Subject to these objections, Plaintiffs state that in anticipation of litigation

with Deutsche Bank, Plaintiffs consulted with an expert who conducted regression analyses of

Deutsche Bank's REO maintenance practices by analyzing the occurrence of exterior

maintenance and marketing deficiencies by the race/ethnicity of the property's neighborhood and

controlling for non-racial factors. Plaintiffs note regression analysis is only one type of evidence

that will be offered in support of Plaintiffs' claims, and that Plaintiffs will further rely on

evidence comporting with the traditional modes of proof in fair housing cases. Without waiving

Plaintiffs' objections, Plaintiffs have produced the final regression analysesperformed by

Plaintiffs prior to filing the Second Amended Complaint, which are explicitly referenced in the

Second Amended Complaint, including the data dictionary in .pdf format, the dataset in Excel

and the regression commands as of 12/19/2018 and output, each in Stata formats that may be

opened with a text editor such as notepad in Microsoft Windows. Plaintiffs further state that the

date prior to the filing of the initial Complaint on which an expert performed a first regression

analysis was July 24, 2017.

**INTERROGATORY NO. 12:** Identify all facts and evidence (including each document, if the

fact or evidence is contained in a document) describing how Plaintiffs determined whether a

community was a "community of color" or a "white community" including the criteria used to make that determination and the boundaries of those communities.

**RESPONSE TO INTERROGATORY NO. 12:** Plaintiffs object to this Interrogatory to the extent that Defendants have access equal to that of the Plaintiffs to all data in the public domain (e.g., U.S. Census Data). Subject to and without waiver of this objection, Plaintiffs state the following: Plaintiffs refer Defendants to their Answer to Interrogatory No. 7 above and to Paragraphs 85 and 86 of the Complaint, which address how the Plaintiffs describe the criteria they used to categorize a property as being located in a "predominantly white neighborhood" or in a "community of color." This was based on 2010 U.S. Census data. NFHA downloaded 2010 racial demographic data from the U.S. Census website and then employed ArcGIS (specifically ArcMap, the desktop version of ArcGIS, a continually updated GIS mapping software) to conduct an analysis that determined the Census Block Group in which an REO property was located. If an REO property was located in a Census Block Group that was greater than 50.0% white, it was designated as being located in a predominantly white neighborhood; if an REO property was located in a Census Block Group that was less than 50.0% white, it was designated as being located in a majority non-white neighborhood.

**INTERROGATORY NO. 13:** Identify and describe all criteria used during your Inspection of the Properties including each of the "39 objective aspects of . . . routine exterior maintenance" referenced in Paragraph 5 of the Second Amended Complaint to determine the sufficiency of the Property's exterior maintenance and identify all Related Documents.

**RESPONSE TO INTERROGATORY NO. 13:** Plaintiffs object to this Interrogatory as unduly burdensome and inappropriate in terms of it requesting a description of a very substantial amount of information in a detailed narrative form. *See e.g., Gravestock v. Abilene Motor*

14

*Express, Inc.*, 2017 WL 10592155 at \*5-6 (C.D. Cal. Sept. 14, 2017)(interrogatory asking

Defendant to state "every fact" on which its argument relied would require Defendant to "go into

excruciating detail" and was "overly broad and unduly burdensome").  Subject to this objection,

Plaintiffs respond to this Interrogatory as follows:  NFHA first created a routine exterior

maintenance list in 2009 using common sense, knowledge, and experience regarding how an

owner maintains a house.  The development of the initial checklist was also based on NFHA's

30-plus years of experience working in real estate and housing markets, engaging with real estate

professionals, and providing consulting services and training to real estate professionals on a

range of topics, including the marketing of properties.  In 2009 and 2010, through confidential

discussions with mortgage market participants, NFHA learned industry standards that it used to

refine its checklist.  Additionally, NFHA held discussions with Freddie Mac to develop its

expertise and understanding about what should be included in its exterior maintenance checklist.

The checklist is contained in NFHA's public reports and matches up almost exactly with

checklists used by government-sponsored enterprises (GSEs) and several banks.  In 2010, NFHA

finalized its "Survey Tool," which includes maintenance items, and NFHA used the final version

of the Survey Tool from 2010 onward without change, including sharing it with the other

Organizational Plaintiffs so they could participate in the REO investigation.  NFHA developed a

glossary of terms with photographs to demonstrate to investigators the criteria listed in the

Survey Tool.  The glossary was first finalized in 2010 and updated in 2013.

Further answering, NFHA directs Defendants to the glossary document that has been

produced in discovery.  Multiple copies of this document have been produced.  (e.g. SSHC 1355,

NFHA 33771).  This document was used when organizations were trained to conduct the

investigations and is directly tied to the REO evaluation forms used in the investigations.

**INTERROGATORY NO. 14:** Describe the regression analyses referenced in Paragraphs 106, 107, and 108 of the Second Amended Complaint including, but not limited to, any preliminary or interim versions of the regression analysis, any variations in the regression analysis's model formulation or use of explanatory variables, any assessment of the regression analysis's statistical assumptions, and any regression diagnostics (including goodness of fit testing, testing of statistical significance of the estimated parameters, and any other regression diagnostics) or any other tests of assessments of the regression analysis's validity.

**RESPONSE TO INTERROGATORY NO. 14:** Plaintiffs object to this Interrogatory as premature to the extent it seeks information concerning Plaintiffs' Statistical Analysis inasmuch as expert reports and expert documents will be generated and produced in this litigation in accord with such schedule as is set by the Court and/or provided by the Federal Rules of Civil Procedure. Plaintiffs' further object that this Request seeks information and documents that are not discoverable pursuant to Fed.R.Civ.P. 26(b)(4)(C) and are not discoverable under pertinent case law. See *National Fair Housing Alliance v. Federal National Mortgage Association*, 4:16-cv-06969-JSW, ECF 95 at 2-3 (April 13, 2020) (pre-Complaint statistical analysis "will only be relevant if plaintiffs decide to rely on that expert's regression analysis in opposition to summary judgment or at trial"). Subject to these objections, Plaintiffs state that in anticipation of litigation with Deutsche Bank, Plaintiffs consulted with an expert who conducted regression analyses of Deutsche Bank's REO maintenance practices by analyzing the occurrence of exterior maintenance and marketing deficiencies by the race/ethnicity of the property's neighborhood and controlling for non-racial factors. Plaintiffs note this expert regression analysis is only one type of evidence that will be offered in support of Plaintiffs' claims, and that Plaintiffs will further rely on evidence comporting with the traditional modes of proof in fair housing cases. Without

16

waiving Plaintiffs' objections, Plaintiffs have produced the final regression analyses performed

by Plaintiffs prior to filing the Second Amended Complaint, which are explicitly referenced in

the Complaint, including the data dictionary in .pdf format, the dataset in Excel and the

regression commands as of 12/19/2018 and output, each in Stata formats that may be opened

with a text editor such as notepad in Microsoft Windows. Plaintiffs further state that the date

prior to the filing of the initial Complaint on which an expert first performed a regression

analysis was July 24, 2017.

.**INTERROGATORY NO. 15**: Identify and describe Your methodology for designing and

implementing testing to assess "patterns of treatment" as alleged in Paragraph 93 of the Second

Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 15:** Plaintiffs object to this Interrogatory as

unduly burdensome and inappropriate in terms of it requesting a description of a very substantial

amount of information in a detailed narrative form. *See e.g., Gravestock v. Abilene Motor*

*Express, Inc.*, 2017 WL 10592155 at *5-6 (C.D. Cal. Sept. 14, 2017)(interrogatory asking

Defendant to state "every fact" on which its argument relied would require Defendant to "go into

excruciating detail" and was "overly broad and unduly burdensome"). Subject to this objection,

Plaintiffs refer Defendants to the information provided in the Responses to Interrogatories Nos.

7, 11-14.

Further answering, Plaintiffs state Plaintiffs conducted analyses of Defendants' REO

maintenance and marketing practices by analyzing the occurrence of exterior maintenance and

marketing deficiencies (outlined in Plaintiffs' exterior routine maintenance checklist) by the

race/ethnicity of the property's neighborhood. Plaintiffs assigned a racial designation to each

investigated REO property based on the demographics of the U.S. Census Block Group in which

17

it was located. If an REO property was located in a Census Block Group that was >50.0% white, it was designated as being located in a predominantly white neighborhood; if an REO property was located in a Census Block Group that was >50.0% non-white, it was designated as being located in a majority non-white neighborhood. Plaintiffs downloaded 2010 racial demographic data from the U.S. Census website and then used ArcGIS mapping software (specifically, ArcMap) to determine the Census Block Group in which an REO property was located. Plaintiffs analyzed each exterior maintenance and marketing deficiency on its exterior routine maintenance checklist individually by race/ethnicity, and also analyzed the occurrence of less than five, five or more, ten or more, and fifteen or more deficiencies by race/ethnicity.

**INTERROGATORY NO. 16**: Identify all Communications between You and any Defendant regarding Your Inspection of the Properties or the findings of Your Inspections.

**RESPONSE TO INTERROGATORY NO. 16**:  Plaintiffs object to this Interrogatory on grounds that as to communications with Defendants, Defendants have equal access to such documents and information, and it is unduly burdensome for Plaintiffs to "identify" responsive communications that Defendants are equally aware of.  Subject to this objection, Plaintiffs state that Lisa Rice and Diane Cipollone met with Ocwen during a consulting training meeting. During that consultation, Ms. Rice discussed REO issues with Ocwen, including NFHA's general findings that REOs in communities of color were not being well maintained as compared to REOs in White communities.  Ms. Rice and Shanna Smith also met with Paul Koches, an Ocwen representative, regarding the deficiencies NFHA found in its investigations.  NFHA and its counsel also held at least two settlement negotiation meetings with Deutsche Bank representatives.  There was also an attempt at settlement with Ocwen and Altisource that included Marc Fleischaker serving as mediator.  Further answering, Plaintiffs' search for

documents relating to this Interrogatory is ongoing, and Plaintiffs will produce such documents on a rolling basis.

**INTERROGATORY NO. 17**:  Identify all facts and Documents in support of Your claim that any Defendant intentionally discriminated on the basis of race relating to any Property.

**RESPONSE TO INTEROGATORY NO. 17:**  Plaintiffs object to this Interrogatory as a contention interrogatory, as it asks Plaintiffs, at the outset of discovery, to identify all facts and documents supporting their claim of intentional race discrimination.  Courts disfavor contention interrogatories asked before substantial documentary or testimonial evidence has been completed.  *See, e.g., In re eBay Seller Antitrust Litig.*, 2008 WL5212170 at *1-2 (N.D. Cal. Dec. 11, 2008).  Plaintiffs further object to this Interrogatory as unduly burdensome to the extent that it requests a detailed narrative response to a far-ranging question.   Plaintiffs further object to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, work product doctrine, common interest doctrine or any other applicable privileges or protections.  Subject to the foregoing objections, Plaintiffs direct defendants to the evidence referred to in the detailed allegations in paragraphs 140 to 146 of the Complaint.  This evidence, indicative of intentional discrimination, includes:  (a) the severity and pervasiveness of the disparities found throughout comparative testing between the maintenance and marketing of the Deutsche Bank REO properties in communities of color and the maintenance and marketing of the Deutsche Bank REO properties in white neighborhoods; (b) the absence of credible, non-pretextual explanations for the disparities other than race; (c) Defendants' knowledge of systemic racial disparities between the maintenance, management and marketing of the Deutsche Bank REO properties in communities of color and the maintenance, management and marketing of the Deutsche Bank REO properties in white neighborhoods, but deliberate indifference and refusal

19

to take remedial actions; (d) Defendants' failure to comply with state and local laws with regard to property maintenance in African-American and Latino communities; (e) Defendants' lack of responsiveness to complaints regarding REO maintenance in communities of color; (f) rigorous statistical analysis during all relevant time periods controlling for non-racial factors, indicating that routine exterior maintenance and marketing deficiencies at Deutsche Bank REO properties in communities of color cannot be explained on the basis of factors other than race; (g) Defendants' knowledge of the foreseeable and continuing consequences of Defendants' conduct on communities of color; (h) Defendants' deviation in minority communities from well-established standards and practices regarding exterior property maintenance; (i) evidence of prior intentional discriminatory conduct by the Defendants toward African–Americans and Latinos, including, but not limited to, predatory loan practices, which created the conditions upon which the discriminatory conduct in this case could occur; (j) Defendants' knowledge of the historical and continuing pattern of discrimination against African-Americans and Latinos by the financial and property service provider industries, including Defendants; and (k) evidence of a general pattern of intentional unlawful conduct and corrupt corporate culture with respect to defendant Deutsche Bank extending to such matters as race discrimination, money laundering, market rigging, securities fraud, violating United States Government imposed sanctions, violating regulations relating to concealing criminal transactions (e.g. sex trafficking), fake transactions and concealing financial losses. Plaintiffs will further respond to this Interrogatory after substantial documentary and testimonial discovery is completed and reserve the right to supplement its response as necessary.

**INTERROGATORY NO. 18:** Identify and describe the "grace period" You allegedly used prior to inspecting any Property as alleged in Paragraph 92 of the Second Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 18**:  Plaintiffs object to this Interrogatory as vague and ambiguous to the extent it asks Plaintiffs to "identify" the grace period.  Subject to this objection, Plaintiffs state that if property records were being used from which it could be determined when Deutsche Bank took ownership, Deutsche Bank was given a one-month grace period.  Many sources list the date that Deutsche Bank took ownership so this grace period could be implemented.  This grace period provided Deutsche Bank the opportunity to complete its initial maintenance procedures and bring the house up to sale condition standards as well as to compensate for any routine exterior maintenance problems in the condition of the home at the time that possession was taken.

If NFHA identified a property from a property assessor website, Corelogic or Realty Trac, it applied a 30-day grace period.  The only time NFHA did not apply this grace period was if the property was actively listed (e.g, on Hubzu.com or Auction.com) because it was already offered for sale.  The main purpose of the grace period was to allow for a trash out and initial exterior maintenance to be conducted, so it was assumed that if a property was actively listed these activities had already been conducted.

**INTERROGATORY NO. 19**:  Identify the "witness" described in Plaintiffs' Motion for Leave to File Additional Allegations and Claims (Doc. 64  4-5), including the "witness's" employer and dates of employment, and any documents provided to You by the "witness."

**RESPONSE TO INTERROGATORY NO. 19:**  The witness described in Plaintiffs' Motion for Leave to File Additional Allegations and Claims (Doc. 64, 4-5) is Nakia Hayes Agnew.  She was employed by Agnew Field Services, which performed property maintenance and quality control as a prime vendor on properties serviced/managed by Altisource for a period of approximately 5 years, ending in September 2018.  Plaintiffs have provided to Defendants a copy

21

of a document subpoena served on Ms. Agnew by Plaintiffs.    Plaintiffs provided the witness

with their Complaint, Plaintiffs' April 12, 2019 Motion and allegations Plaintiffs sought to add at

paragraphs 158A-158L, 350-355, 356-361, 362-369 and 370-375, the Court's 11/13/19 Order

and Plaintiffs' Second Amended Complaint.  Copies of documents received from this witness

pursuant to subpoena have been provided to Defendants.

**INTERROGATORY NO. 20:**  Identify all facts in support of Your claim for damages

including a computation of the total amount of these damages and any mathematical formula

used in creating that computation.

**RESPONSE TO INTERROGATORY NO. 20**:  Plaintiffs object to this Interrogatory as

unduly burdensome and inappropriate in terms of it requesting a description of a vast amount of

evidence in an extremely detailed narrative form (i.e., identification of all facts, evidence,

documents, witnesses, subjects of knowledge).  Courts have held that asking parties to describe

extensive subjects in response to a single interrogatory is improper and unduly burdensome.  *See*

*e.g., Gravestock v. Abilene Motor Express, Inc.*, 2017 WL 10592155 at *5-6 (C.D. Cal. Sept. 14,

2017)(interrogatory asking Defendant to state "every fact" on which its argument relied would

require Defendant to "go into excruciating detail" and was "overly broad and unduly

burdensome").  Plaintiffs further object to this Interrogatory on grounds that discovery is

ongoing and Plaintiffs anticipate adducing further information that may be responsive to this

Interrogatory as additional damages accrue.  Plaintiffs further object to the extent that this

Interrogatory calls for premature disclosure of expert opinions that may be presented in an expert

report on damages.  The parties may agree to an earlier presentation of damages sought by

Plaintiffs in the context of a mediation process.

22

Subject to these objections, Plaintiffs state that they seek to recover damages for diversion of resources, frustration of mission, lost opportunities, loss of economic value and impact of community investments, implementation of corrective measures and damage to minority communities served by Plaintiffs. Plaintiffs also seek to recover punitive damages. Plaintiffs are providing information and documents on a rolling basis related to these categories of damages, including, but not limited to information and documents reflecting a summary of diversion of resources relating to damages and identifying, activities, staff involved, time spent and hourly rates; back-up information relating to claimed damages; information and documents relating to foregone opportunities and funding, the achievement of which would have substantially furthered Plaintiffs' organizational goals; information and documents relating to actions taken to counteract Defendants' discriminatory conduct; information and documents describing the harm through frustration of Plaintiffs' mission as a result of interference with Plaintiffs' activities, programs and services; information and documents describing the harm to Plaintiffs' clients and client communities; and information and documents relating to impairment of Plaintiffs' broader goals. In this regard, Plaintiffs have also provided the detailed narrative and other information contained in Exhibits D and E.

As to frustration of mission damages and other damages related matters, Plaintiffs anticipate providing expert testimony. Plaintiffs will make expert reports available in accord with the Federal Rules of Civil Procedure and whatever expert discovery schedule is set by the Court.

**INTERROGATORY NO. 21:** Identify any individuals and entities other than the Trustees, Ocwen, and Altisource whose REO property preservation, maintenance, or marketing practices

investigated or whose REO properties You inspected during the time when Your Inspections of the Properties was ongoing.

**RESPONSE TO INTERROGATORY NO. 21:** Plaintiffs object to this Interrogatory on grounds that it is overbroad and not likely to lead to admissible evidence because it relates to REO preservation, maintenance and marketing practices related solely to other individuals and entities. Without waiving this objection, Plaintiffs are producing: (a) information concerning other investigations that relates generally to all the various REO investigations conducted by Plaintiffs (e.g., a testing protocol that applied across the investigations), because such information also relates to the investigation of Deutsche Bank-owned properties; (b) documents that contain information related to the inspection of Deutsche Bank properties even if the documents also make extraneous and/or irrelevant references to properties not owned by Deutsche Bank (e.g., lists of properties to be inspected that reference Deutsche Bank properties and properties owned by other banks); and (c) a document identifying the total number of properties inspected by Plaintiffs.

**INTERROGATORY NO. 22:** Identify and describe all damage awards that You have received, including any settlement payments, from any individual or entity for alleged Fair Housing Act violations or property maintenance and/or marketing deficiencies in the "30 metropolitan areas" included in Your Inspections. Identify each and every person who responded to, supplied information requested by, or assisted in the preparation of the answers to, these Interrogatories.

**RESPONSE TO INTERROGATORY NO. 22:** Plaintiffs object to the first part of this request relating damage awards received for Fair Housing Act violations as seeking information that is not relevant nor likely to lead to the discovery of relevant evidence. Plaintiffs object to the

24

second (and topically unrelated) part of this interrogatory regarding the identity of persons

involved in the preparation of the answers to these interrogatories as impermissibly compound.

Subject to this objection, Plaintiffs identify the following persons Involved in responding to these

Interrogatories as follows:

| Plaintiff Organization | Persons assisting in preparation of answers to interrogatories |
|---|---|
| National Fair Housing Alliance | Lisa Rice, Lindsay Augustine, Salome Aringo, Cat Cloud, Shanna Smith, Sherrill Frost-Brown and Morgan Williams |
| HOPE Fair Housing Center | Carol O'Neill, Anne Houghtaling |
| Open Communities | Sheryl Ring, Chris Riehlmann |
| South Suburban Housing Center | John Petruszak |
| House Opportunities Made Equal of Virginia | Heather Crislip |
| Fair Housing Opportunities of Northwest Ohio | George Thomas, Christina Rodriguez, Karen Plocek |
| Fair Housing Continuum | David Baade |
| Greater New Orleans Fair Housing Action Center | Elizabeth Owens |
| Denver Metro Fair Housing Center | Rita Lewis, Janeth Juarez, Arturo Alvarado |
| Metropolitan Milwaukee Fair Housing Council | William Tisdale, Megan Wanke |
| Fair Housing Center of West Michigan | Elizabeth Stoddard, Nancy Haynes |
| The Miami Valley Fair Housing Center | Jim McCarthy |
| Fair Housing Center for Rights & Research | Kris Keniray |
| Fair Housing Center of the Greater Palm Beaches | Vince Larkins |
| Fair Housing Center of Central Indiana | Amy Nelson |
| Central Ohio Fair Housing Association | Jim McCarthy |
| Housing Opportunities Project for Excellence | Keenya Robertson and Daniel Howe |
| Connecticut Fair Housing Center | Erin Kemple |
| North Texas Fair Housing Center | Frances Espinoza |
| Fair Housing Advocates of Northern California | Caroline Peattie, Casey Epp, Annya Maskey |

Respectfully Submitted,

*/s/ Jennifer K. Soule*

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
Steven P. Schneck
*Soule, Bradtke & Lambert*

Yiyang Wu, *pro hac vice*
Tara Ramchandani, *pro hac vice*
*Relman Colfax PLLC*
1225 19th Street, N.W.
Suite 600

Morgan Williams, *pro hac vice*
*NFHA*
1331 Pennsylvania Ave, NW
Suite 650
Washington, DC 20004

25

402 Campbell Street, Suite 100   Washington, DC 20036         *Attorney for Plaintiff NFHA*
Geneva, IL 60134                 *Attorneys for Plaintiffs*
*Attorneys for Plaintiffs*

Stephen M. Dane, *pro hac vice*
*Dane Law LLC*
312 Louisiana Avenue
Perrysburg, OH 43551
*Attorney for Plaintiffs*


Dated: January 5, 2021

## CERTIFICATE OF SERVICE

I, Jennifer K. Soule, one of Plaintiffs' attorneys, certify that on January 5, 2021, I caused a copy of **Plaintiffs' Amended Response To Defendants' Joint Interrogatories** to be served via electronic mail upon:

Kenneth M. Kliebard
*Morgan, Lewis & Bockius LLP*
77 W. Wacker Drive, Suite 500
Chicago, IL 60601
Email: *kenneth.kliebard@morganlewis.com*

Kurt Rademacher
*Morgan, Lewis & Bockius LLP*
One Market, Spear Street Tower
San Francisco, CA 94105
Email: *kurt.rademacher@morganlewis.com*

David Monteiro
*Morgan, Lewis & Bockius LLP*
1717 Main Street, Suite 3200
Dallas, TX 75201
Email: *david.monteiro@morganlewis.com*

Kevin M. Papay
*Morgan, Lewis & Bockius LLP*
One Market, Spear Street Tower
San Francisco, CA 94105
Email: *kevin.papay@morganlewis.com*

Victor Cruz
*Morgan, Lewis & Bockius LLP*
1717 Main Street, Suite 3200
Dallas, TX 75201
Email: *victor.cruz@morganlewis.com*

Cody Wood
Dentons US LLP
4520 Main Street, Suite 1100
Kansas City, MO 64111
Email: *cody.n.wood@dentons.com*

Debra Bogo-Ernst
*Mayer Brown LLP*
71 S. Wacker Drive
Chicago, IL 60606
Email: *dernst@mayerbrown.com*

Matthew C. Sostrin
*Mayer Brown LLP*
71 S. Wacker Drive
Chicago, IL 60606
Email: *msostrin@mayerbrown.com*

Jacey D. Norris
*Mayer Brown LLP*
71 S. Wacker Drive
Chicago, IL 60606
Email: *jnorris@mayerbrown.com*

Shannon Shin
*Dentons US LLP*
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606
Email: *shannon.shin@dentons.com*

Lisa M. Krigsten
*Dentons US LLP*
4520 Main Street, Suite 1100
Kansas City, MO 64111
Email: *lisa.krigsten@dentons.com*

Nathan L. Garroway
*Dentons US LLP*
303 Peachtree Street, NE, Suite 5300
Atlanta, GA 30308
Email: *Nathan.garroway@dentons.com*

*/s/ Jennifer K. Soule*
*One of Plaintiffs' Attorneys*

*Soule, Bradtke & Lambert*

27

402 Campbell Street, Suite 100
Geneva, IL 60134

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NATIONAL FAIR HOUSING ALLIANCE; HOPE
FAIR HOUSING CENTER, et al.,

      Plaintiffs,

v.

DEUTSCHE BANK NATIONAL TRUST, AS
TRUSTEE, et al.,

      Defendants.

Case No. 18 CV 839

Judge Harry D. Leinenweber

Jury Trial Demanded

## DECLARATION OF MARVIN ADAMS

I, Marvin Adams, state as follows:

1. This Declaration is based on my personal knowledge and is true and correct.

2. I am 45 years old, African-American, and work as a federal police officer for the Treasury Department, in the Bureau of Engraving. I have worked for the Treasury Department for approximately 20 years.

3. Since approximately 2008, I have owned and lived in a home at 6513 Walters Place, in District Heights, Maryland.

4. The District Heights neighborhood in which I live is predominately African-American.

5. Attached to this Declaration is a two-page survey I received from the National Fair Housing Alliance and filled out on August 2, 2016, which is the date that I wrote on the form. The purpose of this Declaration is to provide information supplementing the attached survey.

6. The home at 6515 Walters Place is next door to my home in District Heights. For convenience, I will refer in this Declaration to 6515 Walters Place as "6515."

7. When I first moved into my home on Walters Place, the house at 6515 was owned by a young man who lived there with his girlfriend. At some point, the young man lived there by himself. Thereafter, the bank foreclosed on the property and it was vacant.

1

8.    For at least a few years while I lived next door, the home at 6515 was vacant and in foreclosure. During the time when the property was in foreclosure, the home was neglected and an obvious invitation for people to use for criminal activities.

9.    Having to live next to a foreclosed property that was neglected to the extent of the home at 6515 was very difficult for me emotionally. It was an eye sore and embarrassing. My parents and sister live in Baltimore, Maryland, approximately 45 minutes away from my home in District Heights. I did not want to have company at my home, including my parents or sister who lived nearby, because I did not want to have to deal with people asking questions about the home next door at 6515.

10.   There was a notice on the front door and the garage of the home at 6515 indicating that the home was in foreclosure. However, I never saw a "for sale" sign in front of the home as is typically the case when a home is for sale. I also never saw a real estate agent/broker sign on the property at 6515. From my experience, it does not take much of an effort to list a home for sale.

11.   As discussed below, a fire occurred at 6515 in July 2015. Before then, my neighbors and I found squatters living in the house at 6515. On at least one occasion, one of my neighbors went in the house with a dog to run squatters out of the house.

12.   Unfortunately, squatters continued to stay at 6515 and left the door open so my neighbors and I went inside the property when the squatters were not there and we locked the house.

13.   I typically stay up late at night to exercise in my basement. One night after exercising, I heard lots of noise coming from the outside. When I went outside, I then saw a group of people with a pickup truck moving things into 6515. Within the next couple of days, I called the local electric utility company and asked whether anyone was living in the home at 6515. I was informed by the utility company that nobody was supposed to be living in the property. After I learned that information, I called the Prince George's County government office and complained about squatters moving into 6515. After I called, the squatters who had been parking vehicles on the driveway at 6515, parked on the street instead.

14.   Approximately once every two weeks during the spring and summer, I cut the grass at 6515 because it was growing wild. I also cut the grass at 6515 in the fall, but less often because it did not grow as fast during that time of the year. In addition, I secured the front door at least twice and the windows at least once.

15.   Because of the notice on the front door at 6515, I found out that Deutsche Bank owned the home, so I called the bank at least once to complain that the "grass was crazy, the front door was being left open and there were squatters living in the house. Eventually, and long after my call to the bank, someone came to 6515 and cut some of the grass.

However, that was the only thing done by the bank or anyone on its behalf to maintain the property at 6515. I also called the Prince George's County local government office to complain about the condition of the home.

16. In July 2015, while I was away on vacation, a fire occurred at 6515. I learned about the fire after I came home. Attached to this Declaration is a photograph that I took of the home at 6515 on July 28, 2015, in order to have a picture of the after effects of the fire. As shown in the photo, the garage door was not closed all the way, windows were broken and window spaces in the outside walls were open without any windows. The photo also shows that there was a notice on the front door and a notice on the garage. The house had suffered terrible damage from the fire. For an extended period long after the fire, the broken windows were not repaired or boarded up. Instead, they were left open to the weather and anyone who wanted to come inside. The doors were also not boarded up.

17. My handwritten comments on the attached two-page survey I filled out about the home at 6515 include the following: "TEENAGERS INSIDE[.] IT WILL BECOME A STASH HOUSE SOON. ... I REPORTED THE ACTIVITY BEFORE THE FIRE TO THE PG COUNTY POLICE AND THE COUNTY INSPECTORS. THE PROPERTY REMAINED UNSECURED ASKING FOR CRIMINAL ACTIVITY. IT IS AN ABSOLUTE SHAME HOW THIS PROPERTY HAS BEEN NEGLECTED. I HAD TO CALL COUNTLESS TIME[S] JUST TO GET THE BOTTOM LEVEL BOARDED UP."

18. During the years that the home and property at 6515 was neglected and allowed to remain in the condition described in this Declaration and shown in the attached photo, I felt that this condition continued because of the race of the community residents (African-American), which was consistent with how I observed that African-Americans living in District Heights, Maryland were generally treated by Prince George's County. For example, in other areas of Maryland where the residents are predominantly white, the County government maintains public medians and the grass on the public spaces in much better condition.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of ___OCT___, 2020, in District Heights, Maryland.

Marvin Adams

3

*Deutsche Bank*

**NATIONAL FAIR HOUSING ALLIANCE**
1101 Vermont Ave, Suite 710
Washington, DC 20005
T: 202-898-1661
6515 Walters Place, District Heights MD 20747 F: 202-371-9744
www.nationalfairhousing.org



The National Fair Housing Alliance is conducting a review of how well banks maintain and sell foreclosed homes. As a close neighbor to one of these foreclosed properties, we would greatly appreciate a few minutes of your time to answer some questions. Please complete the short survey below with reference to the property located at:

<u>6515 Walters Place, District Heights MD 20747</u>

You may return your completed survey form to us in the enclosed, self-addressed stamped envelope or by fax at 202-371-9744. If you do not wish to share your telephone number or email address, that is fine. If you have any questions, please feel free to contact Shanna Smith or Lindsay Augustine at 202-898-1661. Thank you for your time.

**Name:** MARVIN ADAMS

**Address:** 6513 WALTERS PLACE 20747

**Phone:** (443) 690-0666

**E-mail Address:** MARVIN.ADAMS@BEP.GOV  **Date:** 8/2/16

**Are you a homeowner or a renter?**  HOMEOWNER

**How long have you lived at your current address?**  8 YRS

**What is your best estimate of how long the foreclosed home has been vacant?**
Since July 18, 2015

**Have you or any of your neighbors been maintaining the home or yard in any way? (check all that apply):**

- ☐ Removing trash
- ☐/ Removing accumulated mail
- ☑/ Mowing the lawn
- ☑ Raking Leaves
- ☐ Shoveling snow
- ☐/ Trimming shrubs or trees
- ☑ Securing doors or windows
- ☐ Making any structural adjustments to the property
- ☐ Other (please describe):

**OVER >>**

**Have you noticed any of the following activity since the home has been vacant:**

- ☐ Home improvement contractors
- ☑ Unauthorized occupancy or activity in the home
- ☑ Police activity
- ☐ Children playing in/around vacant property
- ☑ Vandalism

- ☐ Routine yard maintenance or landscaping
- ☐ Prospective buyers viewing the home
- ☐ Other activity (please describe):

TEENAGERS INSIDE IT WILL BECOME A STASH HOUSE SOON.

**Have real estate agents been trying to sell the home?  If yes, please describe (for example, have you received a flyer about the home, has an "Open House" been held, etc.)**

NO

**Have "For Sale," "Bank-Owned," "Open House," "No Trespassing," or "Auction" signs been posted?  If yes, please list which sign(s) you have noticed:**

NO

**Has your homeowners' insurance premium increased since the home has been vacant or boarded up?**

- · (Yes)
- · No

**Have your real estate taxes increased since the foreclosure?**

- · (Yes)
- · No

**Is there a Homeowners Association (HOA) in this neighborhood?  If yes, do you know if the HOA has been maintaining the property?  Do you have contact information for the HOA?**

NO

**Would you like to share any other information concerning the property that has not been covered in the questions above?**

I REPORTED THE ACTIVITY BEFORE THE FIRE TO PG COUNTY POLICE + THE COUNTY INSPECTORS. THE PROPERTY REMAINED UNSECURED ASKING FOR CRIMINAL ACTIVITY. IT IS AN ABSOLUTE SHAME HOW THIS PROPERTY HAS BEEN NEGLECTED, I HAD TO CALL COUNTLESS TIME JUST TO GET THE BOTTOM LEVEL BOARDED UP.



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, et al., | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Jury Trial Demanded |
| Defendants. | |

## DECLARATION OF CECILIA YOUNG

I, Cecilia Young, state as follows:

1.  This Declaration is based on my personal knowledge and is true and correct.

2.  I am a 40 year-old Asian woman and live with my husband at 261 Washburn Ave., North Minneapolis, MN 55405. From March 31, 2005 through September 16, 2016, we lived at 2720 21st Avenue, North Minneapolis, Minnesota 55411.

3.  For the past four years, I have worked as an insurance underwriter for Chubb Insurance. I have been employed in the insurance industry for the past 18 years.

4.  Attached to this Declaration is a two-page survey I received from the National Fair Housing Alliance and completed on September 12, 2014, which is the date that I wrote on the form. The purpose of this Declaration is to provide information supplementing the attached survey.

5.  During the time when my husband and I lived on 21st Avenue, the home next door on one side of our house was at 2716 21st Avenue. For convenience, I will refer in this Declaration to 2716 21st Avenue North Minneapolis as "2716."

6.  The North Minneapolis neighborhood on 21st Avenue where my husband and I lived for 11 ½ years was predominately African-American.

7.    The comments that I wrote on the attached survey include the following about the home at 2716: "people dump trash in the space between our houses, … the side door bangs open and closed with heavy wind … there might be some kind of foreclosure notice on one of the windows… There were squatters living in the garage. We are concerned about squatters in this house – we try to check to make sure there hasn't been signs of forced entry. Yard maintenance rarely gets done on this property."

8.    The home at 2716 was vacant for about two years before I completed the attached survey and remained vacant for approximately two more years thereafter, for a total of approximately four years. Based on a notice that I saw on one of the windows, it was my understanding that the home at 2716 was in foreclosure during most of the period that it was vacant.

9.    My comment on the attached survey about dumping trash was based on events during at least two occasions. On the first occasion, the amount of trash was so bad that the city issued a fine to my husband and me before we cleaned it up. Soon after the second dumping, my husband removed the trash so that we would avoid another fine. My husband and I did not know who dumped the trash, but it was significant and offensive.

10.    Because the side door at 2716 was banging open and closed, my husband secured it shut.

11.    When there was snow on the ground, my husband shoveled snow on the sidewalk path so people could walk safely in front of 2716. He also mowed a portion of the lawn there as well, when it was often way overgrown near our home. I neglected to add those two points to my survey answers. If I had consulted with my husband about the survey before completing it, I would have included his snow shoveling and grass mowing in the survey, which he recently reminded me about.

12.    Based on my experiences and observations, I believe that the condition of the foreclosed and vacant home at 2716 was neglected because of the race of the community, predominantly African American. In fact, I have seen photographs of foreclosed homes in predominantly White neighborhoods that were listed for sale that looked to be in far better condition than the home at 2716 when it was vacant and in foreclosure. For example, during the time that the home at 2716 was vacant, the roof shingles significantly deteriorated, with far less than half of them remaining. Whenever it rained, I understood that water and moisture were likely to enter and stay inside the home at 2716 and thereby cause a health hazard (from mold) to neighbors nearby, including me and my husband.

13.    Because squatters were living in the garage next door at 2716 when the home was vacant, I felt very unsafe. As noted in the attached survey, my husband and I often looked for signs of forced entry. The situation made us very uncomfortable.

2

14.     Finally, living next door to the vacant and neglected home in a predominantly African-American community made me feel sad for the residents of our community. It seemed that the financial crisis of the country several years ago had a disproportionate effect on African American communities, including where we lived. It was unfair that predominantly African-American neighborhoods were particularly hurt so hard and that there was not more done to care for such neighborhoods or their residents.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of December , 2020, in North Minneapolis, Minnesota.

Cecilia Young

*Deutsche*

# NATIONAL FAIR HOUSING ALLIANCE

1101 Vermont Ave, Suite 710
Washington, DC 20005
T: 202-898-1661
F: 202-371-9744
www.nationalfairhousing.org



The National Fair Housing Alliance is conducting a review of how well banks maintain and sell foreclosed homes. As a close neighbor to one of these foreclosed properties, we would greatly appreciate a few minutes of your time to answer some questions. Please complete the short survey below with reference to the property located at:

<u>2716 21st Ave N, Minneapolis MN 55411</u>

You may return your completed survey form to us in the enclosed, self-addressed stamped envelope or by fax at 202-371-9744. If you do not wish to share your telephone number or email address, that is fine. If you have any questions, please feel free to contact Shanna Smith or Shanti Abedin at 202-898-1661. Thank you for your time.

**Name:** Cecilia Young

**Address:** 2720 21st Ave N Minneapolis

**Phone:** 952 818 1839

**E-mail Address:** cecilacyoung@gmail.com **Date:** 9/12/14

**Are you a homeowner or a renter?** homeowner

**How long have you lived at your current address?** 9 years.

**What is your best estimate of how long the foreclosed home has been vacant?** 2 years

**Have you or any of your neighbors been maintaining the home or yard in any way? (check all that apply):**

(Removing trash) yes - people dump trash in the space near between our houses
Removing accumulated mail
Mowing the lawn
Raking Leaves
Shoveling snow
Trimming shrubs or trees
Securing doors or windows yes - the side door bangs open + closed with heavy wind
Making any structural adjustments to the property
Other (please describe):

**OVER >>**

**Have you noticed any of the following activity since the home has been vacant:**

Home improvement contractors
Unauthorized occupancy or activity in the home
Police activity
Children playing in/around vacant property
Vandalism

Routine yard maintenance or landscaping
Prospective buyers viewing the home
Other activity (please describe):

**Have real estate agents been trying to sell the home? If yes, please describe (for example, have you received a flyer about the home, has an "Open House" been held, etc.)** No.

**Have "For Sale," "Bank-Owned," "Open House," "No Trespassing," or "Auction" signs been posted? If yes, please list which sign(s) you have noticed:**

I think there might be some kind of foreclosure notice on one of the windows but I have not looked at it up close to be sure

**Has your homeowners' insurance premium increased since the home has been vacant or boarded up?**

· Yes
· No

not sure.

**Have your real estate taxes increased since the foreclosure?**

· Yes
· No

Not sure.

**Is there a Homeowners Association (HOA) in this neighborhood? If yes, do you know if the HOA has been maintaining the property? Do you have contact information for the HOA?** No.

**Would you like to share any other information concerning the property that has not been covered in the questions above?**

There were squatters living in the garage. We are concerned about squatters in this house - we try to check to make sure there hasn't been signs of forced entry. Yard maintenance rarely gets done on this property

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, et al., | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Jury Trial Demanded |
| Defendants. | |

## DECLARATION OF ANNICK JOELE NGAMENI

I, Annick Joele Ngameni, state as follows:

1. This Declaration is based on my personal knowledge and is true and correct.

2. I am 48 years old, African-American, and a single mother of four children. For the past 14 years, I have worked as a Registered Nurse, with the most recent 5 years on the campus at Holy Cross Hospital in Silver Spring, Maryland.

3. Since May 2015, I have lived with my four children and my mother in my home at 320 Carmody Hills Drive, Capital Heights, MD 20743. My children are currently 26, 18, 16 and 13 years old. My granddaughter was born in September 2015 and she has lived with us in my house since then.

4. Attached to this Declaration is a two-page survey I received from the National Fair Housing Alliance and filled out on January 26, 2018, which is the date that I wrote on the form. The purpose of this Declaration is to provide information supplementing the attached survey.

5. The Capital Heights neighborhood where we have lived since May 2015 has always been predominately African-American.

6. The home at 322 Carmody Hills Drive is next to my home. For convenience, I will refer in this Declaration to 322 Carmody Hills Drive as "322."

1

7. The home at 322 was vacant for a significant period of time, from before my family moved into our home in May 2015 through sometime after I completed the attached survey in 2018.

8. During the entire time when my family and I were living next door to a vacant home, I was fearful on a daily basis for myself and my family because of the dangerous condition and clear opportunity for unlawful activities presented next door. For example, the front door at 322 was boarded, sometimes with a padlock, but there were several occasions when the board in place of the front door was broken, which allowed anyone to see inside the house from the outside. From the outside, the home at 322 looked dark inside. It appeared to me that nobody was taking care of the home.

9. In addition, on many occasions, my children saw other children from their same school going in and coming out of the home at 322 when it was vacant.

10. On at least two occasions when it was vacant, fires were started inside the home at 322. Thankfully, the Fire Department extinguished the fires. The police also arrived at the scene when the first occurred.

11. One of the fires started on a Sunday morning, while my family and I were getting ready to go to our church for a regular service. As we were about to leave our house, we noticed that there was a fire and fire trucks were arriving next door. I was grateful that our home did not burn down. On another occasion, my family saw smoke coming from the house at 322, so I called the fire department and firefighters arrived to put out the fire.

12. There were other occasions that did not involve fires when the police arrived to investigate activities inside and around the house at 322. Because the situation at 322 made me feel very scared and threatened, I did not volunteer to talk with the police when they arrived to investigate. I did not want to do anything that might further jeopardize the safety of my family. Instead, I prayed for our safety.

13. As I indicated on the attached survey, my son (now age 16) and I shoveled in front of the home at 322 when there was snow on the ground so that it would not be a hazard, especially for children who walked up and down the block to get to or from their school bus. We also shoveled the snow to keep the sidewalk safe for the many elderly residents who live in our neighborhood.

14. While the home at 322 was vacant, I felt helpless because I did not have anything better to offer my family. I am generally protective of my children, some might say that I am overprotective. But the situation and conditions next-door, including trespassing, fires and a broken boarded front, caused me to be even more protective of my mother, children and grandchild. For example, I regularly made my children stay inside and did not allow them to socialize in the neighborhood. I kept them sheltered as best I could.

2

15. When the home at 322 was vacant, I saw a signed advertising that the house was for sale but I do not remember any details about it. Periodically, I noticed two individuals mowing the lawn at 322. They arrived in a red pickup truck which did not have the name of any company. That was the only positive activity I noticed at 322 when it was vacant.

16. I believe that race was definitely a significant factor in the prolonged and profound neglect of the home at 322 while it was vacant, especially given that the neighborhood where we live is predominantly African American and the prevalence of racial disparities throughout our neighborhood and society generally.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of December, 2020, in Capital Heights, Maryland.

Annick Joele Ngameni

3

*Deutsche*

# NATIONAL FAIR HOUSING ALLIANCE

1101 Vermont Ave, Suite 710
Washington, DC 20005
T: 202-898-1661
F: 202-371-9744
www.nationalfairhousing.org



The National Fair Housing Alliance is conducting a review of how well banks maintain and sell foreclosed homes. As a close neighbor to one of these foreclosed properties, we would greatly appreciate a few minutes of your time to answer some questions. Please complete the short survey below with reference to the property located at:

<u>322 Carmody Hills Drive, Capitol Heights MD 20743</u>

You may return your completed survey form to us in the enclosed, self-addressed stamped envelope or by fax at 202-371-9744. If you do not wish to share your telephone number or email address, that is fine. If you have any questions, please feel free to contact Shanna Smith or Lindsay Augustine at 202-898-1661. Thank you for your time.

**Name:** Annick Ngameni

**Address:** 320 Carmody Hills dr

**Phone:** 301 257 1537

**E-mail Address:** Annickjoele @ hotmail.com **Date:** 07/26/2018

**Are you a homeowner or a renter?** Homeowner

**How long have you lived at your current address?** 2½ yrs

**What is your best estimate of how long the foreclosed home has been vacant?**

N/A

**Have you or any of your neighbors been maintaining the home or yard in any way? (check all that apply):**

- ☐ Removing trash
- ☐ Removing accumulated mail
- ☐ Mowing the lawn
- ☐ Raking Leaves
- ☒ Shoveling snow
- ☐ Trimming shrubs or trees
- ☐ Securing doors or windows
- ☐ Making any structural adjustments to the property
- ☐ Other (please describe):

**OVER >>**

**Have you noticed any of the following activity since the home has been vacant:**

- ☐ Home improvement contractors
- ☒ Unauthorized occupancy or activity in the home
- ☒ Police activity
- ☒ Children playing in/around vacant property
- ☒ Vandalism
- ☒ Routine yard maintenance or landscaping
- ☐ Prospective buyers viewing the home
- ☒ Other activity (please describe):

Fires

**Have real estate agents been trying to sell the home? If yes, please describe (for example, have you received a flyer about the home, has an "Open House" been held, etc.)**

N/A

**Have "For Sale," "Bank-Owned," "Open House," "No Trespassing," or "Auction" signs been posted? If yes, please list which sign(s) you have noticed:**

"For Sale"

**Has your homeowners' insurance premium increased since the home has been vacant or boarded up?**

- Ⓨes
- No

**Have your real estate taxes increased since the foreclosure?**

- Ⓨes
- No

**Is there a Homeowners Association (HOA) in this neighborhood? If yes, do you know if the HOA has been maintaining the property? Do you have contact information for the HOA?**

No

**Would you like to share any other information concerning the property that has not been covered in the questions above?**

No

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, et al., | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Jury Trial Demanded |
| Defendants. | |

**DECLARATION OF LORIE KOEHLER**

I, Lorie Koehler, state as follows:

1. This Declaration is based on my personal knowledge and is true and correct.

2. I am 66 years old, White, and have lived most of my life in Milwaukee, Wisconsin.

3. I live in my home at 5826 N. 38th Street, Milwaukee, WI 53209. My husband and I purchased our home in 1982, and I have lived here ever since then. My husband and I have two children, currently ages 27 and 29. My husband passed away four years ago, and I currently live with my daughter.

4. I graduated from the University of Wisconsin, Milwaukee, with a Bachelor of Arts in Applied Design. After obtaining my Bachelor's degree, I studied heating, ventilation and air conditioning (HVAC) systems at a Milwaukee technical school and then worked for over 25 years in the Milwaukee public school system, as a school engineer in elementary schools, taking care of HVAC systems. I have also worked periodically for the Census Bureau, participating in census collection work every 10 years and setting up data collection systems at various locations. Finally, I have spent several years doing volunteer work at our community center and through my church. I am currently retired.

5. Milwaukee is a very racially segregated city. The neighborhood I have lived in since 1982 is called Thurston Woods. I grew up about 1 mile from where I live now. The demographics and racial composition of our neighborhood have changed dramatically over the past several decades, as it has become increasingly African American and populated by fewer homeowners. Since at least 2000, our neighborhood has been predominantly African American. During the past 10-12 years, the percentage of homeowners has significantly decreased, and the percentage of renters has correspondingly increased.

1

6.  For decades, I have spent significant time at a large neighborhood garden located at the southeast corner of the intersection of North 40th Street and West Florist Avenue, which is approximately 3 blocks from my home. There is a church on the southwest corner of this intersection. I am not a member of this church, but I have spent time there because of the work I have done with the church's pastors on neighborhood concerns, including my involvement with a community group of which I was the Vice President, the Greater Thurston Woods Neighborhood Association, which worked with several neighborhood churches. On the northeast corner of this same intersection is a home and property with the address of 3932 West Florist Avenue. For purposes of this Declaration, the home at 3932 West Florist Avenue will be referred to as "3932."

7.  Florist Avenue is a main street for automobile traffic, bicyclists and pedestrians. It is also part of a public bus route. I regularly drive, bicycle and walk on Florist Avenue. Because the home at 3932 is at the intersection that includes the neighborhood garden and church that I frequented, I have often driven, bicycled and walked near the property and home at 3932.

8.  For decades until approximately 2013 or 2014, the home and property at 3932 were in great condition and very well maintained. In fact, the owner(s) of the home, who I did not know, kept a trash can in the area between the sidewalk and street (the parkway) for neighbors and pedestrians to leave garbage so that the area would not be littered.

9.  Unfortunately, starting in around 2013 or 2014, the care for the property at 3932 noticeably deteriorated. For example, the grass was not cut, the trees and bushes were overgrown, there was litter outside, and windows and doors were broken and later covered with wood boards. The home had windows on all four sides. At some point, there were probably at least 12 windows at the home that were broken and boarded. The yard outside was littered with garbage, some in bags and some out in the open. There was junk in the yard as well, such as discarded and rusted metal. It looked like someone may have been squatting on the property or inside the home.

10. In addition, I often saw vehicles driving into or exiting from the property and I did not observe any work being done on the home, which made me nervous about who might be coming on the property and going inside the home.

11. On several occasions, wood boards covering the windows and doors at 3932 were broken and not replaced or resecured for several months. Sometimes a second layer of wood boards was secured over the initial boards covering broken windows, meaning that there were two sets of boards, which looked terrible. I knew from experience and observations that when the City of Milwaukee boarded broken windows and doors, it typically used green-colored wood boards. The boards used to cover the windows and doors at 3932 included green boards.

12. The worsening condition of the home and property at 3932 was a regular topic of conversation at Agape Community Center, which was our local community center where I socialized and attended meetings. People attending those meetings were racially mixed

and from different perspectives, including homeowners, renters, public housing residents and members and leaders of Americorps. Based on comments shared at these meetings, the condition of this home and the property outside was considered a nuisance by the people attending these meetings.

13. Around 2015 or 2016, because of my concerns about the condition of the home and property at 3932 and its negative effect on the quality of life for myself and my neighbors, including fellow neighbors who visited the garden across the street, I did some investigating. I learned from the Milwaukee Neighborhood Services Department that the home at 3932 was in foreclosure and owned by Deutsche Bank.

14. While I continued to investigate, I discovered that Deutsche Bank was a German company, located in Germany. Soon thereafter, I sent an email to Deutsche Bank (in English) explaining the situation and asking that they take care of the property at 3932. Unfortunately, Deutsche Bank's German office was not cooperative and did not make any effort to help, which was very disappointing. I did not keep the email that I sent or whatever response (letter or email) I received. But, it was clear that the bank was not going to do anything to improve the condition of the home and property.

15. Because I was so upset by Deutsche Bank's response and refusal to take care of the situation, I investigated further and found an address for Deutsche Bank in California and I sent a letter to that office location. If there was a Deutsche Bank office in Milwaukee or Wisconsin at that time, I was not aware of it. A copy of my letter, dated April 26, 2016, is attached to this Declaration. My letter quoted from Deutsche Bank's website and stated as follows:

> Deutsche Bank
> Residential Property Foreclosure
> 1761 E St Andrew Place
> Santa Ana, CA 92704
>
> To Whom It Should Concern:
>
> "Deutsche Bank's commitment to Communities in the Americas is grounded in a long standing tradition of social responsibility."
>
> Deutsch Bank owns a foreclosed home in my neighborhood at 3932 West Florist Avenue Milwaukee WI.
>
> There are 52 code violations on this property as well as $305 in unpaid snow removal charges.
>
> Most of the windows are broken and the yard is littered with trash. An on-going parade of cars – probably dealing drugs – is evident.

Across the street is our community garden.

"Our high performance culture must go hand-in-hand with a culture of responsibility."

What are you going to do about this situation? The quotes are from your company website.

Lorie Koehler
5826 N. 38th St
Milwaukee, WI 53209

Cc: Milwaukee Mayor Tom Barrett
State Representative Mandela Barnes

16. The reference in my letter to 52 code violations and $305 in unpaid snow removal was based on information I obtained from the City of Milwaukee's website, "My Milwaukee Home," which unfortunately no longer provides descriptions of code violations issued. I recall that the code violations for the home at 3932 were for several conditions including: (a) the home not secure; (b) doors were open; (c) windows were broken; (d) there was trash and debris outside; and (e) vehicles were unlawfully parked.

17. I never received a response from Deutsche Bank to my April 2016 letter. I also never received a response from Mayor Barrett or Representative Barnes, to whom I sent a copy of my letter.

18. While the home at 3932 was vacant and abandoned, which I recall lasted for several years, I did not do anything to take care of the condition of the property outside the home because I was nervous and uncomfortable doing so. I was not sure if anyone was inside the home and I know that many people have guns, so I feared for my safety. I also did not feel comfortable trespassing. For several years until the home was recently purchased and renovated, I never saw anyone do anything to maintain, repair or take care of the outside of the property.

19. On a few occasions, by coincidence, I was near the home at 3932 and noticed police outside the property. This seemed to occur after I or someone complained about cars going in and out of the property, but I did not receive any information from the police or talk with police officers, as I was uncomfortable doing so.

20. During the winter for the years when 3932 was vacant and abandoned, when snow accumulated, which is common in Milwaukee, I never saw anyone shovel snow on the walkway or sidewalks around 3932. Because snow and ice were not removed from the sidewalk at 3932, conditions for walking there were dangerous.

21. Over the growing seasons for the years when 3932 was vacant and abandoned, I never saw anyone cut the grass, do any landscaping work or rake leaves. Fallen leaves remained on the property unless they were swept away by the wind. Before the recent renovations, I also never saw anyone pick up trash outside the property at 3932. The situation was disgusting.

22. The poor condition of the home at 3932 affected my quality of life. During the years when the home at 3932 was vacant and abandoned, the poor condition of the home and neglect by its owner absolutely made me feel that "our neighborhood doesn't matter anymore" because of its racial composition. I have always worked and worshiped in racially diverse settings. The situation created by the home at 3932 being vacant and abandoned for several years made me feel disturbed, sad and angry. Not getting any response to my complaints about the problems was also very distressing.

23. I believe that the home at 3932 was neglected while its condition deteriorated because of the race of the community. I have lived all of my life in Milwaukee, and I know what majority White neighborhoods are like. For example, everyone in my husband's family lives in predominantly (or exclusively) white neighborhoods, as do my other relatives. I do not believe that the deteriorating conditions of nearby homes that my neighbors and I experienced, plus the closing our community center in around 2017, would be tolerated in communities that are predominantly White.

24. Based on my observations, other than the fact that windows and doors were boarded, and reboarded, I never saw anyone do any work to take care of the property at 3932 during the several years that it was vacant and abandoned, including cutting the lawn, picking up trash, and removing fallen leaves and accumulated snow.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this _8_ day of _April_, 2021, in Milwaukee, Wisconsin.


_____
Laurie Koehler

5



April 26, 2016

Deutsche Bank

Residential Property Foreclosure

1761 E ST Andrew Place

Santa Ana, CA 92705

To Whom It Should Concern:

" Deutsche Bank's commitment to Communities in the Americas is grounded in a long standing tradition of social responsibility."

Deutsche Bank owns a foreclosed home in my neighborhood at 3932 West Florist Avenue Milwaukee WI.

There are 52 code violations on this property as well as $305 in unpaid snow removal charges.

Most of the windows are broken and the yard is littered with trash. An on-going parade of cars - probably dealing drugs- is evident.

Across the street is our community garden.

"Our high performance culture must go hand –in-hand with a culture of responsibility."

What are you going to do about this situation? The quotes are from your company website.

Lorie Koehler

*Lorie Koehler*

5826 North 38th ST

Milwaukee, WI 53209

CC: Milwaukee Mayor Tom Barrett

State Representative Mandela Barnes

HIGHLY CONFIDENTIAL

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA.<br><br>      Plaintiffs,<br><br>         v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>      Defendants. | Case No. 18 CV 839<br><br><br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier<br><br>Jury Trial Demanded |

## DECLARATION OF JENNIFER K. SOULE PURSUANT TO LOCAL RULE 37.2

      I, Jennifer K. Soule, under penalty of perjury and based on personal knowledge state that

the following facts are true and accurate:

1

1.    I am one of the attorneys representing the Plaintiffs in the case entitled *National Fair Housing Alliance, et al. v. Deutsche Bank National Trust, As Trustee, et al., Case No. 18 CV 839.*

2.    The facts as set forth in Plaintiffs' Response to Defendants' Motion To Compel Discovery concerning the parties' efforts to reach an accord on production of information about Plaintiffs' pre-suit expert consultation and concerning a high level summary of certain information obtained through Rule 30(b)(6) depositions to date are correct.

3.    The exhibits submitted with Plaintiffs' Response are true and correct copies of the documents referenced in Plaintiffs' memorandum.

Respectfully Submitted,

*/s/ Jennifer K. Soule*

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
Steven P. Schneck
*Soule, Bradtke & Lambert*
402 Campbell Street, Suite 100
Geneva, IL 60134
*Attorneys for Plaintiffs*

Stephen M. Dane
*Dane Law LLC*
312 Louisiana Avenue
Perrysburg, OH 43551
*Attorney for Plaintiffs*

Morgan Williams
*National Fair Housing Alliance*
1331 Pennsylvania Ave, NW
Suite 650
Washington, DC 20004
*Attorney for Plaintiff NFHA*

Tara Ramchandani
Rebecca Livengood
Soohyun Choi
Reed Colfax
Lila Miller
Yiyang Wu
*Relman Colfax PLLC*
1225 19th Street, N.W., Suite 600
Washington, DC 20036
*Attorneys for Plaintiffs*

Dated: April 13, 2021