# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA.<br><br>    Plaintiffs,<br><br>           v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>    Defendants. | Case No. 18 CV 839<br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier<br><br>Jury Trial Demanded |

**PLAINTIFFS' MOTION TO COMPEL DEFENDANTS OCWEN AND ALTISOURCE TO PRODUCE ELECTRONIC DATA RELATING TO DEUTSCHE BANK REO PROPERTIES SERVICED BY OCWEN AND ALTISOURCE IN THE SAME ZIP CODES AS THE DEUTSCHE BANK PROPERTIES TESTED BY PLAINTIFFS**

Plaintiffs seek an Order compelling Defendants Ocwen Loan Servicing, LLC and Altisource Solutions, Inc. ("the Servicer Defendants") to produce certain electronic data directly relating to Plaintiffs' claims concerning the Servicer Defendants' maintenance, marketing and sales of Deutsche Bank REOs for the time period of January 1, 2011 through January 31, 2017. The Servicer Defendants have already produced the same categories of electronic data for properties tested by Plaintiffs, but refuse to produce the data for additional properties. This is a pattern and practice case alleging violations of the Fair Housing Act, 42 U.S.C. §3601, et seq. The limited data requested is clearly discoverable under Rule 26, narrowly tailored to address any proportionality concerns, and indisputably accessible to the Servicer Defendants.

In support of their Motion, Plaintiffs are submitting a Declaration of Counsel (Ex. A), demonstrating that (a) the discovery sought is responsive to Plaintiffs' Rule 34 document requests; (b) the parties have engaged in discovery conferences and exchanged correspondence related to this dispute; (c) Plaintiffs have reasonably limited the form and scope of the information sought; and (d) Defendants refuse to produce the data requested. Thus, consistent with Local Rule 37.2, the parties are unable to reach an agreement, necessitating the filing of the instant motion to compel.

I. **BACKGROUND**

This is a pattern and practice fair housing case brought by twenty non-profit fair housing organizations that service communities throughout the United States. Plaintiffs allege that Defendants engaged in unlawful discrimination violating the Fair Housing Act with respect to maintenance, preservation, marketing and sales of foreclosed properties owned by the Deutsche Bank Defendants ("Deutsche Bank"), known as "Real Estate Owned" (REO) properties. Pursuant to Deutsche Bank trust agreements, Defendant Ocwen services the majority of

1

Deutsche Bank REOs. Defendant Altisource, a company spun off from Ocwen, is used by Ocwen to conduct valuation, preservation, maintenance and marketing/real estate sales work on Deutsche Bank REO properties. As alleged, Defendants engaged in systemic racially discriminatory conduct, and acted with reckless disregard and deliberate indifference to the purposes and effects of their discriminatory conduct, all constituting unlawful disparate treatment and resulting in disparate impacts. Plaintiffs also allege that Defendants' conduct (a) resulted in substantial damages to Plaintiffs; (b) negatively impacted housing values in communities of color within Plaintiffs' serviced communities; (c) perpetuated segregation; and (d) exacerbated the present effects of entrenched systemic racial discrimination in housing. (ECF No. 70, 2nd Am. Cpl. ¶¶1, 4-9, 38-51, 93, 124-139, 163-168).

The cornerstone of Plaintiffs' case is their nationwide fair housing investigation. As detailed in the Second Amended Complaint ("SAC"), Plaintiffs tested over 1,200 Deutsche Bank REO properties across 30 U.S. metropolitan areas[1] exhibiting high rates of existing segregation. Plaintiffs' testing was designed and implemented to assess whether patterns of discriminatory treatment existed with regard to routine exterior maintenance and marketing. (SAC ¶93). Plaintiffs' inspections revealed systemic disparities in Defendants' treatment of these properties in communities of color as compared to similar predominantly White communities. (SAC ¶¶96-109, 125-139). The investigatory evidence and Plaintiffs' claims are additionally corroborated by evidence from community members in affected municipalities (including Declarations produced in discovery), a former African-American vendor of Defendant Altisource who personally observed Defendants' role in discriminatory REO maintenance and

---

[1] The Second Amended Complaint identifies 1141 Deutsche Bank REO properties tested by Plaintiffs. Through discovery, the number was increased to 1275 and the Servicer Defendants have acknowledged servicing 676 of those properties. (Ex. A, ¶ 9)

2

marketing in minority neighborhoods,[2] and by evidence obtained in discovery concerning Defendants' policies and procedures and their effects.

## II. THE SERVICER DEFENDANT DATA SOUGHT IN THIS MOTION

Both Servicer Defendants utilize electronic data systems to inspect, maintain, market and sell Deutsche Bank REOs and to implement their policies and procedures at issue. The data sought directly relates to Defendants' activities, Plaintiffs' allegations and Plaintiffs' analysis of the systemic effects of Defendants' policies and practices. Plaintiffs' request is narrowly tailored, seeking electronic data for additional Deutsche Bank REO properties limited to the same zip codes as the properties that Plaintiffs inspected. The electronic data sought, listed in Exhibit A at ¶¶ 67-73, also contains information related to preliminary findings described below about property "values" and REO sales prices, which are key factors relating to the discriminatory outcomes Plaintiffs allege. Plaintiffs seek data for the time period of January 1, 2011 through January 31, 2017, consistent with the time frame of Plaintiffs' investigation which began in 2011, the 2012 statute of limitations that applies to Deutsche Bank, and the Court's November 13, 2019 Ruling (ECF No. 97, p. 36, "Plaintiffs may use Defendants' activity outside the limitations period as evidence of the discriminatory intent for actions that occurred within the limitations period"). Further, Plaintiffs believe data from the earlier portion of the period is highly probative in light of failure of Ocwen to have any written policies and procedures concerning REO oversight prior to 2015. (Ex. A, ¶ 64-65).

---

[2] Regional Altisource vendor Nakia Agnew testified she was assigned to Black neighborhoods and towns based on her race, that REOs were not properly maintained in minority communities which drove down values for the whole community, that a climate of poorer treatment and work in minority areas existed, that Altisource addressed neighbor complaints more readily in White communities, that her bids to perform work were routinely denied in communities of color, that properties in Black neighborhoods in Chicago were disparately demolished instead of refurbished to increase their value, and that properties in communities of color were more often considered "low value" or "as is." (Ex. B, Agnew Dep. Vol I, pp.71-83; 86-93; 108-115; 118-119; 122; 134-136; 163-167)

Significantly, a set of the property level electronic data sought by Plaintiffs has previously been produced by the Servicer Defendants as to the 676 Deutsche Bank REO properties that they acknowledge servicing. Thus, there is no question that production for additional properties is feasible. (Ex. A, ¶ 15-16, 23-24, 47-52). The prior production of data for the tested properties by Altisource was produced with voluminous supporting documents for the tested properties, but Plaintiffs now seek the additional electronic data *only*. The electronic data already produced was in the form of Excel workbooks and this same format would be acceptable for the additional production sought, estimated to cover about 20,000 REOs. (Ex. A, ¶ 62).

### III. THE DATA SOUGHT IS CONSISTENT WITH THE SCOPE OF PLAINTIFFS' CLAIMS

A Plaintiff is presumptively entitled to discovery that reflects the scope of the allegations in the Complaint. Here, the Plaintiffs have unambiguously pled systemic pattern and practice claims that are *not* limited to the properties tested by Plaintiffs. For example, Plaintiffs allege that "across the board, and during all time periods, properties located in communities of color were more likely to have numerous objective routine maintenance and marketing deficiencies than the Deutsche Bank-owned homes located in white areas." (SAC ¶ 6). Plaintiffs assert "a systemic and particularized pattern of differential treatment by Defendants in maintaining and/or marketing REO properties on the basis of race, color, and/or national origin." (SAC ¶¶ 6, 9). Section IV.D. of the Second Amended Complaint specifically alleges that "Defendants have engaged in a pattern and practice of systemic and intentional race discrimination in each of cities served by Plaintiffs." (SAC ¶¶125-139).

Where Plaintiffs allege systemic pattern and practice violations, Defendants' efforts to limit discovery to the properties tested on-site in Plaintiffs' pre-litigation investigation would essentially rewrite and unfairly limit Plaintiffs' Complaint, contradicting the Federal Rules of

4

Civil Procedure. In numerous contexts where plaintiffs have alleged a pattern and practice of discrimination, courts have routinely ordered discovery of information and documents relating properties, loans, accounts, policies or other matters, without restrictions to properties, loans, accounts or other matters specifically referenced in the Complaint. *See e.g., Todd v. Ocwen Loan Servicing, Inc.*, 2020 WL 1328640 at*3-5 (S.D. Ind. Jan. 30, 2020)(in case alleging pattern and practice of mortgage servicing misconduct, plaintiff holding loan serviced by Ocwen was entitled to reports providing information as to other loans serviced by Ocwen that could show Ocwen's awareness of widespread servicing problems and failure to engage in corrective action); *Independent Living Ctr. of S. California v. City of Los Angeles*, 296 F.R.D. 632, 636 (C.D. Cal. 2013)(in case alleging pattern or practice of discrimination by City and defendant property owners against persons with disabilities, court ordered discovery relating to properties not identified in complaint and properties owned by non-parties); *Janis v. Nelson*, 2009 WL 5216898 at *4 (D.S.D. 2009)(plaintiffs removed from voter list after felony conviction were entitled to discovery as to state's general practice); *Buchanan v. Consolidated Stores Corp.*, 206 F.R.D. 123, 125 (D. Md. 2002)(company-wide information was relevant where defendant allegedly had a policy or pattern of declining checks based on race); *Hubbard v. Rubbermaid, Inc.*, 78 F.R.D. 631, 639 (D. Md. 1978) (company-wide discovery was appropriate in case alleging employment discrimination in one division).

### IV. DISCOVERY TO DATE CONFIRMS THE IMPORTANCE OF THE DATA

The additional data sought in this motion is highly important based on Plaintiffs' investigation and additional evidence obtained in discovery and further substantiates Plaintiffs' allegations that many of Defendants' policies and practices – from REO maintenance to sales – *that were applied based upon Defendants' notions and characterizations of the purported*

*"value" of properties* -- operated with discriminatory intent and had a disparate impact on communities of color. The effects were two-fold: first, Defendants' discriminatory determinations with regard to REO "values" in communities of color, operating cumulatively with their policies and practices with regard to maintenance, enabled and exacerbated the effects of discriminatory maintenance practices in those communities. Second, Defendants' disparate reductions of REO "values" in communities of color, standing alone and coupled with Defendants' inferior maintenance and marketing practices in those communities, negatively impacted sales prices and neighborhood property values, causing further neighborhood deterioration and continued segregation, as Plaintiffs allege. Markedly decreased low REO sales prices is also evidence of the failure of Defendants to properly care for these bank-owned properties as observed by Plaintiffs.

Exhibit C identifies over fifteen initial examples of Defendants' policies regarding REO property "values," which operate in combination causing negative consequences for REO properties in communities of color.[3] In brief, the Servicer Defendants internally set and reduce "values" for REO properties and then explicitly apply various policies based upon dollar value thresholds (such as $250,000, $100,000, $50,000, $40,000, etc.), that have cumulative negative effects on REO properties in communities of color. The discriminatory values Defendants set for REO properties in communities of color extend to: (a) rejection or deferral of needed repairs, (b) failure to remediate code violations, (c) utilities shut-offs, (d) use of less favorable marketing methods, (e) thresholds for larger value variations by lower dollar values (f) sales of lower priced REOs to investors at cut rates without listing the properties for homeowner purchase, (g) inferior

---

[3] Ex. C excludes citations to Defendants' policies and procedures because Defendants designated them confidential. Ex. D, *filed under seal*, is the same Exhibit unredacted, including citations and all supporting attachments. Exs. C and D will be cited simultaneously. §II of Exs. C and D includes an index of citations in the body of this motion also required by Defendants' designations to be filed under seal.

6

repair methods, i.e. "layover method,"[4] and (h) triggering of more frequent and greater seller price reductions for on-line auctions. (Exs. C, D)

The effects of Defendants' discriminatory policies are compounded by the practice of Altisource staff and vendors working in a climate where minority communities receive poorer treatment (Ex. B, Agnew Vol. I p.109), and Ocwen-authorized Altisource employees, known as asset managers or Residential Sales Consultants ("RSC"), most from India, subjectively apply value perceptions such as "high value," "low value" or "as-is" in order to (a) reject work requests as "not required," (b) influence marketing plans, (e.g., sell "as-is" or "as repaired"), (c) influence list prices, and (d) approve sales prices. (Exs. C, D, §II, Cite #1). These RSC criteria and decisions are essentially undocumented.

As Plaintiffs further allege, Defendants used a proprietary on-line listing and auction platform ("Hubzu"), which circumvented local real estate markets and sales to owner-occupying individuals and allowed discretion to approve REO sales prices in communities of color at discriminatorily low levels. (SAC ¶¶ 94, 156, 305, 310, 353; Exs. C, D §II Cite #2, 3) In order to create a "strategy" for marketing and selling REOs, to set Hubzu list prices and, ultimately justify sales prices, Defendants created and utilized a back-office valuations enterprise, staffed in part by Altisource offshore employees who, in turn, utilized appraisals or Broker Price Opinions by Altisource contractors to create reduced "reconciled" or "reviewed" property "values" during the REO life cycle. (Exs. C, D, §II, Cite #3). Defendants' "value" based REO policies and procedures were applied regardless of local home prices. (Exs. C, D, §II, Cite #4). This unsound framework disadvantaged communities of color.

---

[4] Former Altisource vendor Nakia Agnew testified that "layover" of a tarp or shingles, rather than actually repairing or replacing roofs was permitted for REOs deemed "low value." (Ex. B, Agnew Vol. I p. 115; Exs. C, D, Attachment 20, AFS_000124)

7

Plaintiffs' preliminary tabulation of the data produced by Ocwen and Altisource (limited to the 676 properties these Defendants serviced and Plaintiffs investigated) shows that Defendants devalued REO properties in African-American communities by an average of 51.75%, and in Communities of Color by an average of 48.84% from Defendants' "Book Value" to the first REO "list price" during the REO life cycle. In contrast, Defendants devalued REO properties in majority White communities by an average of 33.12% from Book Value to the first REO list price during the REO life cycle. In addition, focusing on REO sales prices, Defendants devalued REO properties in African-American communities by 61.70%, and in Communities of Color by an average of 57.17%, from Book Value to REO sales price. In contrast, Defendants devalued REO properties in majority White Communities by an average of 41.94% from Book Value to REO sales price. (Ex. A, ¶87, *See also*, Ex. A , *See also*, Ex. A ¶¶ 77-79, 85-91).

Disparities in devaluation were even greater from Original Appraised Value to REO Sales price, with REOs in African-American communities decreasing by 63.79% compared to 45.95% average decreases in Majority White communities. (Ex. A, ¶85). Further, while Defendants' conduct increased concentration of REOs in minority communities in lower value bands (Ex. A, ¶¶ 92-117), Defendants intentionally ignored the effects of pre-foreclosure crisis historic discrimination and failed to consider whether their policies had disparate effects on minority communities. (Ex. D, §II, Cite # 5; Ex. E Ocwen 30(b)(6) #7, pp. 123, 143-144). Ocwen also admitted that it did not provide training to its employees regarding the impact of the foreclosure crisis on Communities of Color, stating: "No. Again, that's just irrelevant." (Ex. F, Ocwen 30(b)(6) #13, p. 27).

Furthermore, consistent with Plaintiffs' allegations of systemic poor effects on minority neighborhoods of Defendants' conduct, a preliminary tabulation also indicates that 56.6% of Deutsche Bank REOs in Communities of Color were sold to investors. In contrast, 39.64% of Deutsche Bank REOs in majority White communities were sold to investors. (Ex. A, ¶¶ 83-84).

In fact, even for tested properties with a Book Value of $100,000 or greater, 57.64% of REO properties in communities of color were sold to investors, whereas 35.3% of REO properties in majority White communities were sold to investors. (Ex. A, ¶ 84). REO Sales to investors (as opposed to residential home-owners) lead to predictable negative effects on the surrounding community. (*See*, *When Investors Buy Up The Neighborhood: Preventing Investor Ownership from Causing Neighborhood Decline,* Treuhaft, Rose, Black, PolicyLink, Community Investments, Spring 2011, Issue 1, p. 19).

### V. PLAINTIFFS HAVE LIMITED THE SCOPE OF THE DATA SOUGHT

As detailed in Ex. A, in response to Defendants' objections to producing the discovery sought and in order to avoid receiving unnecessary data, Plaintiffs have attempted to limit the scope of the data sought in the instant motion. These efforts included reviewing exemplar documents and data sets to refine the scope of what has been sought, excluding voluminous documents associated with Altisource's systems from what is sought, and limiting the data sought to Deutsche Bank REO properties that were serviced by the Defendants in the zip codes where Plaintiffs inspected properties, as opposed to all Deutsche Bank REO properties serviced by the Servicer Defendants throughout the country. (Ex. A, ¶¶ 10-66).

### VI. PLAINTIFFS HAVE SATISFIED THE REQUIREMENTS OF RULE 26

#### A. The Applicable Legal Standards.

The federal discovery rules permit liberal discovery to facilitate the trial or settlement of legal disputes. *Miner v. Gov't Payment Serv., Inc.*, 2017 WL 3909508, at *3 (N.D. Ill. Sep. 5, 2017). Rule 26(b)(1) provides that the "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense;" discoverable information is not limited to evidence admissible at trial. *See Belcastro v. United Airlines*, 2019 WL

9

1651709 at *2. (N.D. Ill. April 17, 2019), *objection overruled*, 2020 WL 1248343 (N.D. Ill. Mar. 15, 2020). The party opposing discovery bears the burden of showing why it should be disallowed. Id. at *3.

Under Rule 26(b)(1), the discovery sought should also be "proportional" to the needs of the case, "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Proportionality, like other discovery concepts, "requires a common sense and experiential assessment." *Todd v. Ocwen Loan Servicing, Inc.*, 2020 WL 1328640 at *4 (S.D. Ind. Jan. 30, 2020). A court will not sustain a proportionality objection without a specific showing of the burden the objecting party would endure and why it is disproportionate to the needs of the case. *Belcastro*, 2019 WL 1651709 at *6. In considering discovery issues in this case, this Court has specifically observed that, "as far as . . . discovery is concerned, I think I've made it pretty clear that I'm in favor of liberal discovery." (Ex. G, Feb. 11, 2021 Tr. at p. 9).

### B. The Electronic Data Sought By Plaintiffs is Highly Relevant.

In discovery, relevance is "a low bar to meet," *DeLeon-Reyes v. Guevara v. City of Chicago*, 2020 WL 1429521 at *4 (N.D. Ill. March 18, 2020), and one that is easily satisfied here. As discussed above, the electronic data sought by Plaintiffs would provide information bearing on Plaintiffs' systemic allegations of discriminatory maintenance and the Servicer Defendants' marketing policies and practices and their effects.

Defendants suggest that discovery should be limited to the Deutsche Bank REO properties tested by Plaintiffs that are identified in the Second Amended Complaint. Again,

Defendants' view ignores Plaintiffs' allegations and the scope of discovery in a pattern and practice case. For example, we note the following:

- Plaintiffs challenge Defendants' conduct, across "communities of color" in thirty metropolitan areas around the Country, constituting intentional discrimination and having a disproportionate adverse impact on minority communities. (SAC ¶1).

- Plaintiffs allege that their investigation "revealed that there are highly significant disparities in the routine exterior maintenance and marketing of the Deutsche Bank-owned homes in communities of color as compared to white communities." (SAC ¶¶ 4-7, 84).

- Plaintiffs allege that the "cumulative effect of Defendants' policies and practices with respect to low value assets is to drive the market value of the particular properties further down, as well as to drive down the market value of other properties in neighborhoods and communities of color." (SAC ¶ 158L)[5]

- Plaintiffs allege that "the statistical disparities demonstrated by their investigative results "are merely representative of the numerous forms of data and observational evidence establishing the differential treatment by Defendants of communities of color as compared to predominantly white neighborhoods," referring to analyses by Plaintiffs of sales of REOs to investors and to pre-suit and post-suit analyses of property values and sales prices. (SAC ¶¶ 109, 293-294)

- Plaintiffs allege that "REO properties present a substantial obstacle for recovery in the communities in which they are located, which suffer negative effects such as a depleted tax base, neighborhood blight, health and safety concerns and decreased market values." (SAC ¶ 49)

- Plaintiffs allege that exterior maintenance failures drastically affect property sales rates, values and quality of life in these neighborhoods. (SAC ¶ 89)

- Plaintiffs allege that the "existence of poorly maintained REO dwellings in minority neighborhoods diminishes home values for surrounding homeowners." (SAC ¶ 165, 189, 190, 289)

- Plaintiffs allege that Defendants designate areas and properties "low value," having various disparate impacts. (SAC ¶ 156 e), 158, 158A, 158B, 158C, 158D, 158E, 158L).

- Plaintiffs allege that work is generally not approved or inspected for assets perceived as "low value," whereas properties perceived as "high value" receive preferential treatment. (SAC ¶¶ 158J, 158D).

---

[5] Additional information obtained in discovery further informs and would refine some terminology used in the Second Amended Complaint, paragraph 158.

- Plaintiffs allege that the "cumulative effect of Defendants' policies and practices with respect to low value assets is to drive the market value of the particular properties further down, as well as to drive down the market value of other properties in neighborhoods and communities of color." (SAC ¶ 158L)

- Plaintiffs allege that Defendants used a marketing business model to sell REOs via a proprietary on-line auction site, Hubzu, showing preference to cash buyers, typically investors, with detrimental consequences to communities of color. (SAC ¶¶ 94, 156, 305, 310, 353)

- Plaintiffs allege that the Deutsche Bank Defendants as owner of REOs assumed all duties of ownership including maintenance acted with deliberate indifference and reckless disregard in maintaining REO properties in communities of color. (SAC¶¶ 3, 9, 35, 51, 53-55, 60, 66-83, 124, 148-155, Counts I-VIII)

Based on the scope of Plaintiffs' allegations and relevance of the substantive data fields sought (produced by Defendants without objection as to the properties identified in the SAC), the initial relevance inquiry is easily satisfied.

### C. The Proportionality Inquiry Weighs Heavily in Favor of Production.

#### 1. The Issues at Stake are Important.

One factor considered in analyzing proportionality under Rule 26(b)(1) is whether the issues at stake are important. Plaintiffs allege systemic racial discrimination in a field (housing) in which discrimination has plagued this country for over a century and segregated and discriminatory housing patterns continue unabated. Thus, the issues raised in the case are clearly significant. In fact, this Court specifically observed that this case is "important litigation." Ex. H, December 17, 2020 Tr. at 24.

#### 2. The Magnitude of the Controversy is Substantial.

A second factor considered is whether the amount in controversy is substantial. *Velez v. City of Chicago*, 2021 WL 1978364 at *4 (N.D. Ill. May 18, 2021). As in other civil rights litigation, the amount in controversy here "cannot measure the claimed loss." *Id.* However, it is

12

also true that substantial monetary amounts are at stake, including Plaintiffs' claims for diversion of resources, frustration of mission damages, and punitive damages. The remedial actions that Plaintiffs will seek to have Defendants implement if Plaintiffs prevail would also entail substantial monetary expenditures. Moreover, as stated in the 2015 Committee Notes to Rule 26, "monetary stakes are only one factor, to be balanced against other factors," and "many cases in public policy spheres . . .may have importance far beyond the monetary amount involved."

### 3. Plaintiffs Have No Other Access to the Information Sought.

The parties' relative access to the information sought also weighs heavily in favor of production. The data sought is in the exclusive possession and control of the Servicer Defendants and can only be obtained by Plaintiffs through discovery.

### 4. The Parties' Relative Resources Favors Production.

The fourth proportionality factor considered is the relative resources of the parties. Here, while not impecunious, the Plaintiffs are relatively small not-for-profit organizations organized to address fair housing issues. In contrast, the Servicer Defendants are large corporations that are part of publicly traded entities with vast resources. The discovery sought is electronic data readily accessible to Defendants, especially within the framework of Plaintiffs' proposed compromise. Accordingly, the relative resources favor production.

### 5. The Discovery Sought is Important to Resolving the Issues

A fifth factor regarding proportionality under Rule 26(b)(1) is the importance of the discovery sought in terms of resolving the issues. Here, the electronic data sought includes fields of information central to the resolution of Plaintiffs' allegations regarding Defendants' practices, particularly as to property values and REO sales prices, which are key factors explaining

discriminatory outcomes. Under any reasonable view of the scope of the issues in this case, the electronic discovery sought by the Plaintiffs is important to resolving the issues presented.[6]

### 6. The Benefit of the Proposed Discovery Outweighs Any Burden or Expense

A final factor that courts consider regarding proportionality is whether the benefit from the proposed discovery outweighs the burden or expense of production. *Todd v. Ocwen Loan Servicing*, 2020 WL 1328640 at *4. True enough, the production of the requested electronic data will require some additional effort by the Servicer Defendants. However, for several reasons the burden of production is not undue and will not outweigh the benefits of the proposed discovery.

First, as discussed above, this is not a discovery "fishing trip" -- the requested discovery will provide significant information regarding the claims and defenses in the case. While not essential to Plaintiffs' motion, the preliminary analysis of the Servicer Defendants' data, described above, shows the relevance and significance of the data sought.

Second, any burden in producing the requested discovery has been mitigated by Plaintiffs' efforts to distill and limit the information requested, noted above and detailed in the Declaration of Counsel. (Ex. A) By proceeding through the review of exemplar files, and taking discovery step by step, Plaintiffs have excluded from the current request paper documents, irrelevant data fields and information that, (for assorted reasons related to Defendants' electronic recordkeeping systems), would entail more significant efforts.

Third, the electronic data requested has already been produced for the Deutsche Bank REO properties tested by Plaintiffs, which strongly indicates that additional production can be reasonably accomplished. To the extent that any special efforts are necessitated by virtue of the

---

[6] Defendants' refusal to produce information on the basis of their assertion that the case is limited to inspected properties identified in the Complaint is also disingenuous considering that defense counsel have asked questions at Plaintiffs' depositions about the "sample size" of Plaintiffs' fair housing investigation, thus presaging a future argument that Plaintiffs' investigation did not include *enough* data.

shortcomings or complexities of Defendants' electronic storage systems, this does not constitute an undue burden that would relieve the Servicer Defendants of their discovery obligations. *See Wagoner v. Lewis Gale Medical Center*, 2016 WL 3893135 at *3 (W.D. Va. July 13, 2016).

Finally, the issue of benefit versus burden of the requested discovery needs to be considered in the context of the ongoing discovery, including substantial discovery efforts by Defendants thus far. For example, to date, Defendants have served discovery requests that have resulted in the review and/or production of hundreds of thousands of documents. Plaintiffs' limited request for the electronic data sought in this motion is reasonable and appropriate.

## CONCLUSION

For all the foregoing reasons, Plaintiffs request that the Court enter an Order compelling the Servicer Defendants to produce the data sets identified in Exhibit A, ¶¶ 67-73 for all Deutsche Bank REOs in the same zip codes as Deutsche Bank REOs tested by Plaintiffs.

Respectfully Submitted,

/s/    Jennifer K. Soule

| | |
|---|---|
| Jennifer K. Soule | Stephen M. Dane |
| James G. Bradtke | *Dane Law LLC* |
| Kelly K. Lambert | 312 Louisiana Avenue |
| Steven P. Schneck | Perrysburg, OH 43551 |
| *Soule, Bradtke & Lambert* | *Attorney for Plaintiffs* |
| 402 Campbell Street, Suite 100 | |
| Geneva, IL 60134 | |
| *Attorneys for Plaintiffs* | |
| | |
| Morgan Williams | Reed Colfax |
| *National Fair Housing Alliance* | Jennifer Klar |
| 1331 Pennsylvania Ave, NW | Yiyang Wu |
| Suite 650 | *Relman Colfax PLLC* |
| Washington, DC 20004 | 1225 19th Street, N.W., Suite 600 |
| *Attorney for Plaintiff NFHA* | Washington, DC 20036 |
| | *Attorneys for Plaintiffs* |

Dated: November 5, 2021