# Exhibit B

*Plaintiffs' Motion to Compel Defendants Ocwen and Altisource to Produce Electronic Data Relating to Deutsche Bank REO Properties Serviced by Ocwen and Altisource in the Same Zip Code as the Deutsche Bank Properties Tested by Plaintiffs*

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
     NATIONAL FAIR HOUSING            )
 4   ALLIANCE; HOPE FAIR HOUSING      )
     CENTER, et al.,                  )
 5                                    )
                                      )
 6                   Plaintiffs,      )
                                      )
 7            vs.                     ) No. 1:18-cv-00839
                                      )
 8   DEUTSCHE BANK NATIONAL           )
     TRUST, as trustee, et al.,       )
 9                                    )
                                      )
10                   Defendants.      )

11

12            The videotaped deposition of NAKIA HAYES

13   AGNEW, Volume 1, called by the Plaintiffs for

14   examination, taken remotely pursuant to notice and

15   pursuant to the Federal Rules of Civil Procedure for the

16   United States District Courts pertaining to the taking

17   of depositions, taken before April M. Metzler, Certified

18   Shorthand Reporter, Registered Professional Reporter,

19   Certified Realtime Reporter, and Notary Public, at

20   Country Club Hills, Illinois, commencing at 9:33 a.m.

21   Central Standard Time on the 28th day of April, 2021.

22

23

24
```



1    knew something that I didn't, pertaining to the way that

2    they were running things there, and it was probably best

3    that I didn't get involved at the time.  So I didn't

4    push the issue further.

5         Q.   Getting back to your territory in terms of,

6    you were initially assigned these ten properties, did

7    the number of properties -- I think you said that a -- a

8    large number of properties followed the initial ten.

9              How soon after the initial ten did -- did

10   their property inventory increase?

11        A.   Within seven days, and then again within 30

12   days.  Per what I recall, and the analysis that I was

13   doing on my business at the time, I was growing in

14   between 30 to 40 percent continuously per month.  There

15   was more and more property being added to the portfolio.

16        Q.   In terms of where the properties were, was

17   there any specific concentration of the territory or how

18   it grew over time from where you started?

19        A.   Absolutely.  As a statewide vendor, we were --

20   I was required to cover the whole state, though I did

21   have properties throughout the whole State of Illinois.

22   However, the majority of the properties that I did have

23   was in the City of Chicago:  Markham, Harvey, Hazel

24   Crest, Dolton.  All of the 606 ZIP codes -- to anybody



1    that's not from Chicago, all of the city ZIP codes start

2    with 606.

3              All of the 606 ZIP codes.

4         Q.   And with respect to the assignments, so they

5    were City of Chicago and then certain of the south --

6    some of the southern suburbs of Chicago?

7         A.   Yes, the Southwest suburbs.

8         Q.   Were there some Southwest suburbs that you

9    were not assigned to?

10        A.   Yes.  Technically as a statewide vendor, I was

11   assigned to -- I was open and available to work in every

12   ZIP code in the state.  However, there were certain

13   areas that I didn't receive properties in.

14        Q.   And what were those areas?

15        A.   Nonminority areas such as Orland Park, Tinley

16   Park, Frankfort, Mokena, New Lennox, Hoffman Estates.

17   The outskirts of the City of Chicago, where the city

18   moves into the northern suburbs, those areas, like

19   Evanston, Rolling Meadows and things of that nature.

20             Although I did have portfolio in certain areas

21   that weren't minority areas, it was a fraction of the

22   volume I received in the minority areas.

23        Q.   So your assignments were predominantly --

24   would it be African-American or African-American and



1    Hispanic areas?

2         A.   Correct.  African-American and Hispanic areas.

3         THE WITNESS:  May we take a break?

4         MS. SOULE:  Yes.  I should have mentioned that,

5    because I have a tendency to just go for hours.  So any

6    time you need a break, that's fine.

7              So you want to say ten minutes or 15 minutes

8    or how long do you need?

9         THE WITNESS:  Five minutes is fine.  I just need to

10   use the ladies' room.

11

12             THE VIDEOGRAPHER:  Time is 11:24.  We are now

13   going off the record.

14                      (A short break was had.)

15        THE VIDEOGRAPHER:  Time is 11:33 a.m.  We are now

16   back on the record.

17   BY MS. SOULE:

18        Q.   In terms of the territory that you were

19   assigned, you said you were ready and available to do

20   work throughout the state, but you were assigned to

21   minority areas except for a small fraction.

22             Is that what you were saying before the break?

23        A.   Correct.  If you look at my portfolio as a

24   whole, and where the -- the geographic area in which



 1    those properties were assigned to me because as a

 2    vendor, it was my job to analyze and overanalyze and

 3    then overanalyze my analysis, see where those properties

 4    were located, how strong that service territory was

 5    covered, where other vendors might have been needed.

 6    There was not a lot of properties that were assigned to

 7    me in specific counties or certain suburban areas that

 8    were not minority areas.

 9         Q.   Would that include White communities in the

10    Southwest suburbs?

11         A.   Correct.

12         Q.   And will you give me an example of some of

13    them that you most of the time did not get assigned

14    properties in?

15         A.   Absolutely.  Orland Park.  Tinley Park.  You

16    have the village of Country Club Hills, which is where I

17    reside, and Country Club Hills, shares a ZIP code with

18    Tinley Park.  I would receive properties in Country Club

19    Hills but I wouldn't receive properties in Tinley Park.

20              The municipality adjacent to Tinley Park is

21    Orland Park.  I -- during my tenure, I don't recall

22    receiving more than five, and that's being generous,

23    properties in that area.  Frankfort, Mokena, New Lennox

24    areas that I was familiar with because I had serviced



1    those areas during my time as a residential cleaner.

2    Mokena, New Lennox.

3              However, areas like Bourbonnais, which is

4    pretty adjacent to the New Lennox area, but it's a

5    predominantly minority area, I would receive properties

6    in that area.  Oak Lawn.

7              However, I did have a very strong territory

8    presence in Lake County.

9         Q.   And Lake County is in the northern part of the

10   Chicago metropolitan area?

11        A.   It is.

12        Q.   And how did you develop that presence?

13        A.   I had a very strong team of vendors that were

14   in that area that were servicing Altisource's portfolio

15   before I came along that I was working with.

16        Q.   And did you -- so you made contact with

17   preexisting Altisource contractors in Lake County?

18        A.   Yes, ma'am.  They were my associates.  We --

19   working in the field, you meet so many people.  You meet

20   realtors, you meet inspectors, you meet village

21   inspectors, technicians, electricians, general

22   contractors, landscapers.

23              And when you're signing in, especially, as an

24   FSM for HUD, when I was doing postconveyance work, you



1    would have to list when you came into the property.  And

2    if the door was locked or if the property was

3    winterized, you would have to put your company

4    information there.

5              So you start to get familiar with the

6    servicers in that area, so I was very familiar with the

7    servicers in Lake County, and I pushed to get them a

8    sustainable amount of work out there.

9         Q.   And who did you push with for that to happen?

10        A.   My PODs.  And asked for more -- a formal

11   portfolio and asked them for more work in those areas.

12        Q.   And did you feel that your status as a

13   minority contractor was the reason that you were

14   assigned to properties in minority communities and in

15   the minority areas of Chicago?

16        MS. KRIGSTEN:  Objection, form.

17        MS. SOULE:  You can answer.

18   BY THE WITNESS:

19        A.   Yes, I do.

20        Q.   And on what do you base that belief?

21        A.   A few different reasons, to be honest.  It

22   seems like there's an unspoken industry standard that

23   most minorities service those minority areas.  The

24   associates in which I came into contact with during my



1    time working in the field were more minorities.  And

2    because I could get that area covered, and there were

3    certain vendors that would not cover those areas --

4    certain nonminority vendors that I even subcontracted

5    that would not go into those areas.

6         Q.   And when you say those areas and subcontracts,

7    are you referring to white vendors and subcontractors

8    that would not go to black or Hispanic areas in

9    Illinois?

10        A.   Correct.  I had certain white or European

11   vendors that would not go into minority areas.  Although

12   I had a few that would, I had more that would not.

13        Q.   How did you handle that?

14        A.   I -- they are my subcontractors.  They are not

15   my children.  I can't force anyone to go or do anything

16   if you refuse work.  If you're refusing work from my

17   company and I'm sending you to a minority area and

18   you're telling me to reassign that property, as a

19   subcontractor, you have the right to refuse that.  I

20   would just reassign the work.

21        Q.   And in terms of your territory being assigned,

22   did you believe that Altisource assigned you or didn't

23   assign you certain areas because of your race?

24        MS. KRIGSTEN:  Objection, form.



1    BY THE WITNESS:

2          A.    Yes.

3          Q.    And with respect to that, what efforts did you

4    take to try to address that, if any?

5          A.    I didn't make any efforts to address that, as

6    it was just an observation.  The properties that were

7    managed by Altisource in those areas were my associates,

8    and those associates were not minorities.

9          Q.    So there were suburban areas, besides Lake

10   County -- I guess you're saying to the northwest and to

11   the west and things, where you received only a tiny

12   amount of properties in your total portfolio?

13         A.    Correct.

14         Q.    Was there -- were there occasions where you

15   had subcontractors that would refuse to go to minority

16   areas where you had to reassign particular people to go

17   to those areas?

18         A.    Absolutely.  That happened frequently.  We --

19   the vendor that I had in Lake County has had -- has

20   impeccable work quality, and I really needed some

21   assistance in that area.  But he refused to go.  And so

22   I had to do some more grassroots campaigning in those

23   minority areas to get people that were already in the

24   community to come and work and train them.

1        Q.    And what are some of the areas -- what was the

2   area that the Lake County contractor refused to go to?

3        A.    Chicago.

4        Q.    And what particular parts of Chicago?

5        A.    That particular vendor, all of it, the whole

6   Chicago -- Chicagoland area, although I had some vendors

7   that were working other regions that would service the

8   northern portions of Chicago -- of the City of Chicago,

9   the North Side, which is not a minority area, but they

10  would not service the minority area or accept any work

11  in those areas.

12       Q.    And you had talked earlier about having

13  developed a number of subcontractors from the particular

14  communities in question.

15            Did you develop minority contractors

16  specifically in order to get people to work in the

17  minority areas?

18       A.    Yes.  I had a particular vendor that I met in

19  the field.  We actually started off in this industry at

20  the same time.  That vendor was New Face Development.

21  We met during an in-field training course for HUD, and

22  when I received my Altisource contract, she wasn't very

23  happy with the amount of work that she was receiving

24  from the FSM at that time.  I hired her and her husband

1    full time, showed them how to do certain documentations,

2    and I had been assisting them with their HUD work as

3    well as far as the requirements go, HOAs and things of

4    that nature.

5             So I did in-field training with her husband

6    pertaining to different guidelines, expectations, and

7    things of that nature.  And really put a lot of emphasis

8    on training this particular contract, because they had

9    pretty good quality.

10            And they were my largest vendors.

11       Q.   And so those individuals, you were able to

12   send to locations regardless of what the racial makeup

13   was of the location?

14       A.   Absolutely.

15       Q.   And so I wanted to clarify, because I know we

16   had that objection come in, and my question I think had

17   two parts.

18            One part was that you -- let me just ask it

19   again; I want to make sure the record's clear -- that

20   you believe that you were assigned to areas that were

21   minority areas because you are a black contractor?

22       A.   Yes, I do believe that to be true.

23       Q.   And the second part of the question was:  Do

24   you believe that you were not assigned other areas that



1    are nonminority areas or white areas because of the fact

2    that you are a black contractor?

3          A.    Yes, I do believe that to be true.

4          Q.    And with respect to the portfolio and how the

5    portfolio grew over time, was the consistency of how you

6    were assigned, in terms of racial makeup of the

7    communities, did that remain true while your portfolio

8    grew?

9          A.    Yes, they did remain true.  When the -- let me

10   just try to figure out the proper way to phrase this.

11          The times where I saw my portfolio literally

12   double in volume would be times where Altisource might

13   have terminated a regional company such as myself.

14   However, when a regional company is terminated, it is

15   broken -- the full portfolio is broken up into certain

16   portions and distributed amongst the current vendors

17   that have the highest-ranking scores in that area.  So I

18   always qualified for those areas.  However, what was

19   assigned to me was more in those minority areas.

20          Q.    In terms of learning about the litigation that

21   we're here about today, and it's brought by National

22   Fair Housing Alliance and many other plaintiff fair

23   housing groups around the country, how did you learn

24   about this litigation?



1    A.    I saw an associate of mine post the article

2    from the National Fair Housing Alliance on LinkedIn.  I

3    clicked on the link and saw the press release, if that's

4    what the correct language is, from the National Fair

5    Housing Alliance website, with what was -- with what was

6    going on with the lawsuit and why Altisource or Ocwen

7    and Deutsche were being sued by the National Fair

8    Housing Alliance.

9    Q.    And when you saw that, what was your reaction

10   to it?

11   A.    I -- it really confirmed things that I was

12   already suspicious of, things that I had witnessed

13   firsthand and things that sometimes I knew about but

14   didn't speak on because I didn't know who to speak on it

15   to, and even things that I had spoken on and it had fell

16   upon deaf ears.  It really confirmed something that I

17   had been noticing with these particular servicers over

18   my whole tenure as a vendor.

19   Q.    And what were the specific things that were

20   confirmed to you, or that resonated with you?

21   A.    There were two things that resonated with me

22   most.  The first thing that resonated with me was the

23   amount of bid approvals that we receive in minority

24   areas versus nonminority areas.  This was something that



1   I had been trying to wiggle and work around and get

2   approvals for for years with Altisource in the way I saw

3   certain arrangements being made in minority areas versus

4   nonminority areas.

5           And then the second thing that stood out to

6   me -- which I think is the most important thing to me,

7   not only as a vendor but as an American, as a

8   homeowner -- how the failure to properly maintain a

9   property in a minority area is driving down the property

10  value of the whole community.

11          When you have a municipality with 40 vacant

12  properties and 20 of them are owned by a servicer that

13  is refusing to do any work to increase the property

14  value, or at the very least maintaining the integrity of

15  the property in the condition that it is in when it's

16  conveyed or foreclosed or evicted upon, and it's being

17  sold at a substantial discount, that whole community is

18  going to suffer from that, because now you have lower

19  property values.

20          And over time, it got worse and worse and

21  worse and worse and worse, and I witnessed this

22  firsthand.

23      Q.   And in terms of witnessing that firsthand,

24  you're talking about in terms of your experience as a



1    that property for more than what the mortgage defaulted

2    for, but instead of us doing the repairs or demolishing

3    the property, the City of Chicago demolished the

4    property.

5                Now, I'm sending my client an invoice that the

6    City of Chicago sent me from their demolition contractor

7    for $60,000 that now is the responsibility of my client.

8    So as a vendor, it was my function and my job to protect

9    the interests of my client.

10               And so I reached out to the manager of the

11   Department of Buildings at the City of Chicago and I

12   stated to her that, you know, I'm a vendor, I'm an asset

13   manager, I have several properties that are located in

14   the City of Chicago that are under code violation, I'm

15   spending in between five to six hours every other day at

16   the Department of Buildings with paperwork, which is

17   much more than what I was sent as an exhibit

18   (indicating) trying to stop the demolition that's going

19   to take place in a week, or get on the right track with

20   the inspector, or to stop the fines from happening and

21   confirming what properties are registered under the

22   vacant property registration, which is a requirement for

23   the City of Chicago, and making sure that I'm working

24   with the code violation department at Altisource that



1    handles the registration of properties, and this is too

2    much.

3              My client is looking -- we're looking for a

4    better way to handle these properties that are under

5    code violation, Can you guys meet with me?

6              And so I met with the manager of the

7    Department of Buildings.  She had a few of her

8    inspectors in there.  And we were sitting, you know, at

9    a table, when I get up and I got my properties and I

10   give her my spiel:  This is who I am; this is who my

11   major client is; I'm going to have so many properties

12   under code violation; this is bogging down my staff;

13   this is bogging down the Altisource source staff, the

14   code violation department; they have attorneys going

15   back and forth to demo court.  Would you guys be able to

16   assign a liaison to my company specifically -- because I

17   cannot speak on my competitors -- so that we can find a

18   healthy medium and a specific liaison that the code

19   violation department at Altisource can talk to, that I

20   can talk to, someone from the vacant property

21   registration department that we can talk to, how we're

22   getting our inspections scheduled, the reinspections,

23   and things of that nature.

24              And she said, Sure, I can do that.  You want



1    to get a special inspector?  Okay.  That's fine.  I'm

2    going to assign Dave here to do that.  We're going to

3    submit the bids and then we're going to come back and

4    we're going to need somebody to, you know, help us with

5    our permit requirements.

6           And she said to me:  Yeah, Altisource isn't

7    going to approve any of these bids.

8           And I said:  No, I talked to my client and all

9    we really need is a pipeline to get here from point A to

10   point B.  We just need better communication with you

11   guys because of the, you know, amount of personnel over

12   there and the amount of personnel over here, we just --

13   I'm the go-between, so we're just going to get this a

14   little bit more organized.

15          And she said:  You're going to be able to keep

16   the doors locked, you're going to be able to keep the

17   doors boarded, make sure there's no immediate

18   life/safety issues or blight in the front of the yard.

19   But you're not going to get your bids approved.  We

20   really appreciate you coming out.  We appreciate your

21   enthusiasm, but you're still a bit green in this aspect.

22   They don't approve bids in the City of Chicago.  They're

23   not investing in the community.

24          And I guess that was the first time I, kind



1    of, got a little less green about what the requirements

2    are, but, you know, still being optimistic, went back

3    and I spoke to Altisource.

4              And I said:  I met with them.  This is what

5    we're doing.  This is Dave.  This is going to be our

6    inspector, and this is how we're going to get this done,

7    it's how we're going to get this done, and so we're

8    going to start submitting these bids.

9              And it was at the end of the day just, you

10   know, not getting approved.  Even though the bids were

11   comprehensive, even though we have the people on

12   standby, even though I was a licensed general contractor

13   with the City of Chicago and I had another licensed

14   demolition contractor that was willing to do demolition

15   for a discount for the portfolio, if a property was

16   approved to be demolished, even though I had all of this

17   in place, that still was not something that I saw.

18             So if we had a property where the property

19   value was $17,000, where maybe six years ago it would

20   have been worth $86,000 if we would have put that --

21   well, if the client would have approved that 10- or

22   15-thousand-dollar bid, we would have seen a sale for a

23   higher amount than what we sold it for.

24             But I would get these -- pushback on the bids.

1    I would get the push- -- it would get put on hold

2    awaiting RSD review.  It really just depended on the POD

3    and, you know, how the situation went and what was said.

4    But ultimately, those bids were not approved.  I only

5    got one full scope bid approved in the City of Chicago

6    to do that type of work.

7                And so -- I'm sorry I went off on a bit of a

8    tangent.

9         Q.    That's okay.  Sometimes it happens.

10               A couple follow-up questions.

11               When you were talking about the manager at the

12   Department of Buildings in Chicago and she said they are

13   not going to approve the bids, was she talking about

14   Altisource, is that what you understood?

15        A.    Yes.

16        Q.    And did you understand from her comments in

17   that meeting that you were green, that she was conveying

18   to you her experience with Altisource not investing in

19   the City of Chicago?

20        A.    Yes, ma'am.

21        Q.    And in terms of the demolition and who pays

22   for the cost, if the City ends up demolishing the

23   property, who pays the bill for that?

24        A.    That bill is sent to Altisource, per my

1    knowledge, although I have had some of those invoices

2    sent to me.

3         Q.   And in terms of the cost of the demolition, is

4    that something that goes -- is paid by Altisource or is

5    it paid by the owner of the property?

6         MS. KRIGSTEN:  Object to form.

7         MS. SOULE:  You can answer.

8    BY THE WITNESS:

9         A.   Of that, I'm not 100 percent sure of who

10   ultimately pays for that.  If we received a bid

11   approval, it would come in the form of a contract order

12   from Altisource, if we were to demolish a property --

13   because we have demolished properties.

14        Q.   And if Altisource doesn't take action on a

15   property and the City itself demolishes the property, do

16   you know who pays for that?

17        A.   No, ma'am.  Again, I don't know who would pay

18   that.  But I know that the City of Chicago charges a lot

19   more than the contractor that we had to do the initial

20   demolition if it didn't get approved and the City would

21   do it, but I don't know who would have paid for it.

22        Q.   Did you observe black communities or Hispanic

23   communities in Chicago having a greater number of

24   demolitions happen during this time period you worked



1    for Altisource than other areas in the City of Chicago?

2         A.   Yes.

3         MS. KRIGSTEN:  Object to form.

4    BY MS. SOULE:

5         Q.   And what is it that you observed?

6         A.   I observed that we did more demolitions in the

7    City of Chicago than we did in other areas.

8         Q.   And what about in particular, the areas of

9    Chicago that you have described or would consider to be

10   minority communities in Chicago?

11        A.   Yes, ma'am.  That is correct.  I don't recall

12   ever doing a demolition in the City of Chicago in a

13   nonminority area.

14        Q.   Did you have a concern about the volume or

15   effect of demolitions of properties -- residential

16   properties in the City of Chicago?

17        MS. KRIGSTEN:  Object to form.

18   BY THE WITNESS:

19        A.   Absolutely.

20        Q.   I'm sorry.  Every time we get to an important

21   question, we get an objection that we can't remember

22   what the question was.  So let me rephrase it.  And

23   maybe we can have it go question-answer, in that order.

24             With respect to the -- did you have a concern



1   that there was a greater amount of demolition

2   demolitions in minority communities in Chicago than

3   nonminority communities in Chicago?

4       A.   Yes.

5       Q.   And what do you base that concern on?

6       A.   That that's what the situation was at hand.

7   We would be more -- pushing more towards demolishing a

8   property in a minority area versus a nonminority area.

9            With the City of Chicago, you have to -- if

10  the City finds you in violation, they are going to

11  process it through demo court, although demolishing the

12  property is the last step for the City of Chicago.

13  They're going to use the violations.  They are going to

14  continually inspect the properties and will be able to

15  go on the portal and look at all of those inspections

16  that the inspector performed to see if your asset was in

17  compliance.

18           We would submit a bid to Altisource to either

19  repair or demolish the property.  So if we had a

20  property under code violation, we're required to submit

21  a demolition bid with it.

22      Q.   And was -- did you have a concern that repairs

23  could have been made to properties in minority areas in

24  Chicago but were not made, and instead the property was

1  an approved contractor, can we substitute the air

2  quality test for that?

3          And then they said:  Absolutely, this is just

4  fine.

5          So then we were submitting the

6  discoloration/remediation plans, which were in the

7  allowable for -- we were already doing for Altisource.

8          So then the inspector would go out there and

9  inspect the property.  If they found any violations that

10  needed to be cured or anything that was in the

11  discoloration/remediation plan, those were usually

12  approved fairly quickly, and the work was done on the

13  property, and then the property was reinspected, and

14  eventually sold.

15      Q.   And so you feel that Altisource -- or did you

16  feel that Altisource approached the problem in

17  Romeoville differently than it did in Harvey?

18      A.   I do feel that way.  I presented a means to an

19  end or a resolution to the situation that they had with

20  both of those municipalities without bias, but I do feel

21  like it was handled with bias.

22      Q.   And that would be handled to the detriment of

23  the properties in Harvey?

24      A.   Yes.



1          Q.    And did you have a concern that that was

2     related to the predominant racial makeup of Harvey?

3          A.    Yes.

4          Q.    And with respect to other areas that, you

5     know, you had concerns about or other issues or types of

6     concerns you had that came to mind when you read the

7     NFHA press release, what else comes to mind in terms of

8     your concern and racial disparities?

9          A.    Well, as I stated -- as I stated, if we are

10    doing work in certain areas and repainting, the housing

11    prices and the comps in those areas and we are

12    completely not doing that in minority areas, it created

13    a, sort of, climate.  This is something that I witnessed

14    firsthand, again, when I met with the Village inspector

15    for the City of Harvey.  She told me -- I'm sorry for

16    the City of Chicago.  And she told me that I was green,

17    I really didn't fully understand what she was saying

18    until later on, until I started to really dig deep into,

19    how are we going to help these communities?  How are we

20    going to maintain the integrity of these communities?

21    How are we going to fix these properties and actually

22    make a profit for the client, which is what we're

23    supposed to do in the first place?  How are we going to

24    get these properties out of the portfolio?  How are we

1   going to get people moved into these properties?  Are we

2   giving them a property that is even fit to be lived in

3   at this point?

4             All of these things, as a vendor, you know,

5   went through my mind.  I put a few feelers out there.

6   However, after my experiences with the village -- the

7   City of Harvey and Village of Romeoville, and that

8   example was actually highlighted during the presentation

9   during one of Altisource's vendor summits, about how I

10  went in and, you know, found a way to get the work done

11  and get these properties moved, that was actually

12  highlighted.

13            And so me thinking that this is something that

14  is going to get done, I initiated that in the minority

15  areas and did not find that my client was as open to

16  doing the same thing in those areas and working with the

17  municipalities.

18            And so when I looked at that complaint, I kind

19  of just, you know -- I wasn't the only one that noticed

20  that this was happening.

21       Q.   In terms of making a property even fit to live

22  in or to work on the marketability of the property,

23  what's the role, what do you see the role of the vendor

24  in that scenario?

1      A.   Well, quite frankly, my role as a vendor is

2   limited to what I'm able to submit a vendor estimate for

3   and what is in the allowable.

4           My job is to submit a comprehensive bid to my

5   client, to explain to them what the possible -- what the

6   potential of that asset could possibly be.  Sometimes I

7   would have meetings or phone calls with the bids team

8   and say, well, you know, this property is -- it's a

9   low-value asset, right now it is.  However, six years

10  ago this property was worth, you know, $35,000 more than

11  what it is now.  So if we invest 7- -- or I get a bid

12  approved for $8,000 to fix the gaping hole in the floor

13  or, you know, put the railing back on the -- put the

14  railing back on the porch, or even give them a good

15  roof, because we were tarping so many roofs, give them a

16  good roof, replace the shingles or the rafters on the

17  property or the gutters and the downspouts or removing

18  the mold from the basement and doing things of that

19  nature, when the realtor goes back out to do the BPO,

20  that realtor is going to say, Well, this looks a lot

21  better, I can tell that this porch is new.  I can tell

22  there's a mold remediation done here.

23          And so when they're doing that BPO, that

24  broker price opinion is going to come in for more.  And



1  slowly, if we were actively doing this in the minority

2  areas, we would have seen an increase in the property

3  values, because so many properties were -- are owned by

4  banks in those areas.

5          So by us not doing the work, we are slowly

6  decreasing the property value because the realtors are

7  going off of comps.  So by us not being able to do that

8  work, again, we are submitting bids without bias.  We

9  are submitting bids every day for properties in minority

10 areas and nonminority areas with the same amount of

11 integrity, no matter what area it's in, and the client

12 has the opportunity to choose which line items they

13 wanted to approve versus not approve.  But they just

14 weren't willing to invest in those areas.

15     Q.   And those areas would include the minority

16 suburbs and the areas of Chicago that you described

17 earlier in your testimony, right?

18     A.   The City of Chicago, the minority areas in the

19 City of Chicago, the Englewood ZIP codes, you know,

20 60643, 60616, 60617, both predominantly -- all minority

21 areas, as opposed to properties that were in the city

22 limits but were not minority areas, because we have

23 those too, the downtown and in the northern portion of

24 Chicago, the Village of Harvey, the Village of Markham,



1    Dalton, Hazel Crest, Pilsen, Phoenix, Robbins, Illinois,

2    which are all minority areas.

3         Q.   And are some of the average sale prices or

4    list prices for those communities at times lower than

5    they would be, say, in a Hoffman Estates or a Palatine

6    or Rolling Meadows?

7         A.   Yes.

8         MS. KRIGSTEN:  Objection, form.

9    BY MS. SOULE:

10        Q.   And with respect to that, you know, does

11   Altisource, in terms of assessing what properties are

12   low value, did it adjust its threshold for what's low

13   value based upon the specific values in a community or

14   neighborhood at all?

15        A.   I'm not certain how they classified what was

16   low value versus what was not low value.  However, I

17   have not ever seen a bid be disapproved stating that it

18   was a low-value asset, outside of a minority area.

19        Q.   And with respect to you as a vendor -- let's

20   say you get a property in your portfolio -- and I take

21   it you can go on the system, like the VMS system, and

22   you can start to see, okay, this property's in my

23   portfolio now, and you can see information about that

24   property, right?  Is that how it works in a, sort of,



```
 1    bird's-eye view?

 2         A.   Yes.

 3         Q.   When you do that, does it say -- right when

 4    you're assigned to a property, does it say oh, low

 5    value, or sell as-is, or anything like that right when

 6    you get on the system?

 7         A.   No.

 8         Q.   Is it the case that it's only after you submit

 9    your vendor estimate or proposal to do work and you get

10    a response of some kind to that, then that's the point

11    at which the vendor is told it's as-is or low value, so,

12    no, can't do the work?

13         A.   That's correct.

14         Q.   And is that system, does the system reflect

15    that, or is it just in the -- we've seen, you know, some

16    of the exhibits, you know, today we have -- we've seen

17    some of the comments come back, low value or is going to

18    sell as-is or RSC, you know, going to deny, like there's

19    several ways, I guess, they could be denied, and it's in

20    sort of a "comment" section in some kind of

21    communication thing; does it get recorded somewhere

22    else, do you know?

23         MS. KRIGSTEN:   Object to form.

24    BY THE WITNESS:
```



1        A.    Per what I was -- the information that I was

2   privy to as a vendor, I did not see that anywhere else,

3   other than the reason for the bid being rejected.

4        Q.    With respect to roofing, you mentioned that

5   there's a lot of issues with roofing and earlier you

6   mentioned when you were talking about the HUD

7   requirements and those properties, that roofs are

8   important, right?

9        A.    Yes.

10        Q.    Can we agree on that?

11        A.    Yes.  The structure of the roof and the

12   integrity of the roof is on the list as a condition for

13   conveyance.

14        Q.    And so in general, applying your experience as

15   a manager of properties and assets, it's not just HUD

16   that thinks it's important, right, it's just important.

17   It's just basically, you know, irrefutably important

18   that the roof have integrity, right?

19        A.    Correct.

20        MS. KRIGSTEN:  Form.

21   BY MS. SOULE:

22        Q.    Okay.  And with respect to that, I noticed

23   something in some of the emails that you had between

24   yourself and Agnew Field Services and Altisource about a



1  layover method being suggested, in terms of correcting a

2  roof problem, can you explain what a "layover method"

3  is?

4      MS. KRIGSTEN:  Object to form.

5  BY THE WITNESS:

6      A.  Well, per what my roofers would classify as a

7  layover would be not actually removing the shingles that

8  were already there, installing other shingles on top of

9  it, putting some type of tarp on top of it and then

10 putting the tarp on top of it.

11     Q.  Did you observe that with respect to

12 properties that Altisource deemed were low value, would

13 be some way that a repair of a roof would be rejected in

14 favor of a layover method to correct a roof problem?

15     A.  That --

16     MS. KRIGSTEN:  Object to form.

17     MS. SOULE:  You can answer.

18 BY THE WITNESS:

19     A.  That is correct, I observed that as well.

20     Q.  And can you explain where that -- you know,

21 give an example of when that occurred?

22     A.  Well, I'll go back to the Village of Harvey.

23 I had a property in the Village of Harvey -- please

24 excuse me, I can't recall the address at this very



1  moment -- however, we went out there and did an

2  inspection on the roof.  There was some work that needed

3  to be done, but it wasn't in the worst condition.  And

4  so we were told to tarp the roof or lay it over or just

5  cover it up and -- which is basically what a tarp is.

6  Realistically, a tarp does not protect the integrity of

7  the roof from rain or snow, it's just a tarp.

8          And so we submitted the bid to do that.  And

9  we went back and forth with the client that at times

10 pertaining to that property.  Again, I apologize.  I

11 can't remember the exact address.  However, I watched

12 that roof deteriorate over the course of a year and a

13 half until the whole awning in the front just came down

14 because the whole roof was soggy.

15          So this could have been something that would

16 have been able to get fixed from maybe 800 to $1,200.

17 And now it's, you know, exacer- -- and now the awning is

18 falling in, now the roof is caved in.  And where there's

19 a roof leak, there's mold.

20     Q.   And did you -- did you believe that the fact

21 that Altisource deemed the property "low value" was the

22 cause of -- the ultimately cause of that?

23     MS. KRIGSTEN:  Object to form.

24 BY THE WITNESS:



1    A.    Per what I had already experienced with

2  Altisource and knowing that that property was located in

3  the Village of Harvey and that they deemed that whole

4  area low value, yes.

5    Q.    And when you said that they would deem a whole

6  area low value, did you -- why do you say that?  What's

7  the basis for you saying that?

8    A.    Two reasons -- particularly for the Village of

9  Harvey, number 1, they weren't willing to work with the

10  Village at all to abide by the guidelines set by that

11  Village for what the requirements were for an asset

12  manager to conduct business in their village, as opposed

13  to other areas where we were very eager and willing to

14  do so.

15        And the number 2, the bids weren't getting

16  approved, so there was no movement there at all.  So per

17  my observation, yes, I believe that they considered that

18  whole area low value.

19    Q.    And with respect to something they consider

20  low value, did that mean in your experience that even

21  bids for minor repairs and other things like that would

22  be rejected?

23    MS. KRIGSTEN:  Object to form.

24  BY THE WITNESS:

1      A.   Yes.

2      Q.   And with respect to minor repairs, or -- let's

3  look at -- let's just focus for a minute on exterior

4  maintenance and marketability, because that's something

5  that the NFHA lawsuit really focuses in on.

6           Was there an emphasis across the board

7  regardless of area that, you know, minor repairs or

8  maintenance of exterior of the property should be taken

9  care of as a standard item?

10     A.   There were specific items that were already

11 reapproved in the system that we had the opportunity to

12 complete without getting prior approval from the client.

13 We had a list of preapproved items, such as trimming the

14 shrubs, we had an allowable in the amount of times we

15 could go and do that once per month.

16          But other than cutting the grass and trimming

17 the shrubs for the exterior, that was the only thing

18 that was preapproved, per what I recall, because there

19 was a substantial list of line items.

20          A roof is classified as an exterior repair in

21 VMS.  It's classified as "exterior repair needed."  So

22 that falls into that category, when you are submitting

23 the bid and you're classifying what you're doing, the

24 estimate -- create vendor estimate, exterior repair, and

1         Sometimes when we didn't get the proposal

2    request within a certain amount of time, we would create

3    a vendor estimate or create a case in VMS stating:  This

4    is becoming a problem.  You know, before it was just one

5    wall, now we're looking at three walls down here.  This

6    is really affecting the property.  Spraying isn't, you

7    know, working.  We need to remediate.  We need to cut

8    this drywall out.

9         So -- but it's ultimately up to the client

10   whether or not that bid would be approved.  It's

11   nonstandard.

12        Q.   Did you -- inclusive of the mold issue and the

13   other types of repairs and upgrades or maintenance items

14   that are nonstandard, did you observe that those bids

15   for those things were not approved at the same rate in

16   minority communities as in nonminority communities?

17        A.   Yes.

18        Q.   And with respect to the initial time that you

19   go to the property, at what point do you submit your

20   vendor estimate, the -- or I've heard it also referred

21   to as the "all-inclusive estimate."

22        Have you heard of that as well?

23        A.   I have.  However, working with Altisource, we

24   had our own system of managing our bids.  We had

1  name, which would have been my name with -- my direct

2  contact information would be on there.

3          So there was a different department that

4  handled people that called in about the properties,

5  specifically neighbors complaining.  So I would be

6  getting calls from the call center pertaining to any

7  neighbors complaining about any issues that they

8  received at the property.  So that was a completely

9  different department.

10          I would, you know, see maybe in a nonminority

11  area, you know, where a neighbor might be complaining

12  about, you know, a tree looks like it's dead, it could

13  be dead, and it might fall any day.  And then you're

14  going out there and, you know, removing the tree for,

15  you know, $4,200.  And, you know, a neighbor might be

16  calling in in a minority community because they're

17  concerns of vandalism or things of that nature, and

18  we're needing to make the proper repairs or secure the

19  property in a proper fashion, or even if, you know,

20  there's vandalism, the door has been damaged, replacing

21  the door, replacing the doorframe because replacing the

22  door was a standard line item, you could put a boarded

23  door up there, but actually -- you know, replacing a

24  full door, and things of that nature.



1              Weeds needing to be removed.  Weeds that are

2    growing, you know, in excess of six to ten feet in

3    minority areas, and you're still waiting for, you know,

4    weed removals to get approved or, you know, things of

5    that nature.  And then we are out, you know, picking

6    paint colors to replace a piece of a gate in a

7    nonminority area, because the neighbor doesn't like the,

8    you know -- wants it to match the rest of the gate, so

9    it's not causing any blight on that block.

10        Q.   And so the areas where people would

11   complain -- well, just take this back.

12              There's something posted on a door that has

13   your number, right, the vendor, right?

14        A.   Yes.

15        Q.   Did you also receive calls from neighbors at

16   times?

17        A.   Yes.  The majority of the calls that I got

18   were from people wanting to purchase the property, Hey,

19   is the property for sale?

20              But, yes, I did receive neighbor complaints at

21   times as well.  Some neighbors were -- I have formed

22   relationships with these neighbors, especially if we're

23   in an area where there's -- where that neighbor used to

24   call a lot.



1          So I did, you know, develop some relationships

2    with some of these neighbors over time and, you know,

3    went out there and met with them and things of that

4    nature.

5          So, yes, my information was available there as

6    well, and that was a cell phone that I had available 24

7    hours a day.  So if anybody had any immediate complaints

8    at the property, they could call 24 hours a day and get

9    in touch with someone at Agnew.

10        Q.   Did Altisource ever give you requirements for,

11   Hey, you have to have this phone, it has to be a cell

12   phone, you know, you have to have such-and-such voice

13   message on there, so if you get a complaint and you have

14   to report to us, anything like that?

15        A.   Not that I recall.  Not that I recall.

16             When you submit your application it is, you

17   know, a tab there where you need to put your cell phone.

18             I do think at one point in time that was

19   required, I just can't recall exactly how it came about.

20   I'm sorry.

21        Q.   You talked about the replacing a door being a

22   standard or preapproved item, or I may not have

23   understood.

24             Is there a difference between putting a board

```
 1    little ten minutes or, you know, so break, if that's

 2    okay?  It's been about time.

 3         MR. PRINCE:  I have no problem with that.

 4         MS. SOULE:  Thank you.

 5         THE VIDEOGRAPHER:  Time is 1:55 p.m.  We are now

 6    off the record.

 7                     (A short break was had.)

 8         THE VIDEOGRAPHER:  The time is now 2:07 p.m.  We

 9    are now back on the record.  Thank you.

10    BY MS. SOULE:

11         Q.   Have you heard the term "high-value area" or

12    "high-value asset" with respect to your work with

13    Altisource?

14         A.   Yes.

15         Q.   And what is that?

16         A.   A high-value asset is a property that the

17    client considers to be high value in its marketability

18    in the cost of the property, and it's a priority.

19         Q.   And what are the ways that a property that is

20    considered high value are treated differently than other

21    properties?

22         A.   Well --

23         MS. KRIGSTEN:  Object to form.

24    BY THE WITNESS:
```



1        A.    -- during my tenure at Altisource, I was able

2   to, you know, word an email stating that a property was

3   high value; meaning, that the listing price or its

4   market costs would be more, so I would be able to get a

5   quicker response or a quicker bid turnaround with that.

6              Around the time that my tenure with Altisource

7   came to a close, they wrote out a new program called:

8   High-value asset property training, or something of that

9   nature.  I submitted that information during my

10  subpoena.  There was some training that they were doing

11  for properties that they considered to be high value.

12       Q.    During the period of time that you worked with

13  Altisource, beginning in 2013, going through some -- or,

14  you know, part of 2018, was the concept of high value

15  something that was in place from the beginning, or was

16  that something that just came into being at the very

17  tail end?

18       A.    I would say from the beginning, I heard that

19  verbiage early on.

20       Q.    And in what context did you hear it?

21       A.    Over the phone, speaking with coordinators in

22  regards to the turnaround time with work being completed

23  or the priority of taking care of something at a

24  property where it was considered to be a high-value



 1   asset and, you know, requesting updates and getting

 2   updates or information bid approvals, bid submissions,

 3   photos, follow-ups, and things of that nature,

 4   pertaining to property that they considered to be high

 5   value.

 6        Q.    So things were -- was it more attention was

 7   given to high value properties or more quick attention;

 8   how would you characterize it?

 9        MS. KRIGSTEN:  Object to form.

10        MR. PRINCE:  Yeah.  If I can, I know you have a

11   question that's outstanding.  I don't know if you guys

12   are agreeable to it, do we want to get a standing

13   objection to form?

14             There's been a lot of objections related to

15   form today.  You know, and in Federal Court, you have to

16   preserve your objections.  I would be okay with it if it

17   allows it to flow better.  And you get more substantive

18   questions answered in your -- you know, the time that's

19   allotted today.

20             I don't think if you guys are willing to do

21   amongst yourselves?  That's a you guys, probable- -- are

22   you okay with that, Lisa?

23        MS. KRIGSTEN:  Yeah.

24             I mean, Jennifer, you know, as long as you



1    I apologize.

2        MS. SOULE:  Yeah.  With respect to -- I don't

3    really remember now what my question was.

4    BY MS. SOULE:

5        Q.   I think I was trying to get at whether -- with

6    respect to high-value assets, whether the approach and

7    your impression or your understanding of the approach

8    was that things would be done more quickly.  There are

9    would be more approvals and things of that nature.

10       MS. KRIGSTEN:  And object to form.

11   BY THE WITNESS:

12       A.   And, yes, that was my observation.  There were

13   many times where I would be able to subject an email

14   stating that it was a high-value asset.  And my

15   coordinators were a bit more open or quickly to approve

16   a bid, or at the very least give me some type of update

17   pertaining to one, or if we had an emergency at a

18   property that was considered a high-value asset.

19       Q.   There's an email that we had in the exhibits,

20   which we could show, but maybe if I could just ask you.

21   I'm on a short time frame, so I'm cognizant of the fact

22   that using documents sometimes takes a lot of time.

23           With respect to high value orders, I noticed a

24   couple of emails where you were given a list of high



1    value orders and asked to prioritize those.

2            And I wanted to understand the difference

3    between a high-value asset and a high value order, if

4    you could explain that?

5        A.    A high-value asset is a property again

6    considered by Altisource to be more valuable, even if

7    the property hadn't been listed.  Even if the property

8    hadn't been listed yet, if we're looking at the

9    community or if we're looking at the area or the

10   condition of the home and stating this is a high-value

11   asset, we need to, you know, not -- we need to preserve,

12   because that's my job.

13           However, a high-value work order or a

14   high-value line item is something that goes over --

15   usually goes over the threshold of what the standard bid

16   approvals are.  So you have the zero to $8,000.  And

17   then you have an 8- to -- the 8- to 16-thousand-dollar

18   threshold and then higher.

19           So work items that were approved that had a

20   higher threshold that were over that standard price

21   would be something that they would want us to treat as a

22   priority because of the amount of money that they're

23   investing in it.

24       Q.    And so is are those things that are typically

1   related to bids, items that had to be bid on or that a

2   contract order would be received from Altisource to the

3   vendor?

4          A.   Yes, ma'am.

5          Q.   And why would it be the case that Altisource

6   would give you, the vendor or any vendor, a list of high

7   value orders and indicate that they should be performed

8   in order to increase Altisource's revenue and your

9   revenue?

10         MS. KRIGSTEN:   Object to form.

11  BY THE WITNESS:

12         A.   Well, I can only give my observation from my

13  side as the vendor.

14              I know that if the investor or the owner of

15  the property, whoever the higher-up is, approves that

16  bid, there was probably a specific coordinator or

17  specific manager that went and got that bid approved for

18  that particular price, meaning, that they have to

19  provide those updates to whoever approved it and to be

20  able to justify that we're on top of it; that this isn't

21  just you guys throwing money in the garbage, we're on

22  top of it.

23              We might have a bid approval to do three

24  different things, but we only have a permit to do the

1    second thing -- the first thing, and we're still waiting

2    for the other two permits or maybe one part of the job

3    had already been done and we're still waiting for it to

4    turn around.

5              Per my recollection, there was a certain time

6    threshold pertaining to the amount of money that was

7    being spent on a work order, meaning, that if it was

8    issued with an SLA -- SLA, it was issued with an SLA of

9    a specific time, depended on the price amount of what

10   the approval was for.

11             And I do believe that because we are, you

12   know, talking about a substantial amount of money or

13   however much it was or they considered to be high-value

14   line items were submitted that they had managers that

15   they needed to go and provide updates with, which is why

16   that was something that was usually put on my desk early

17   in the daytime, along with work orders that were in late

18   status or in pending collection.

19        Q.   So they, not only are -- the high-value work

20   orders are -- they're prioritized, right?

21        A.   Mm-hmm (nodding).

22        Q.   And they -- there are things that are of a

23   dollar amount that needed a bid to be approved, the

24   higher dollar amounts, right?



1    A.   Yes.

2    Q.   And so they would be, for whatever reason,

3  prioritized over, you know, standard work or bids

4  that -- or work on bids that were of the smaller dollar

5  amount?

6    MS. KRIGSTEN:  Object to form.

7  BY THE WITNESS:

8    A.   I'm so sorry.  Sorry.

9         That is true per my observation, yes.

10    Q.   And are you familiar with the term -- or the

11  acronym "RSC"?

12    A.   Yes.

13    Q.   And what did you understand -- or when was

14  that acronym used in your experience with Altisource?

15    A.   If I submit a vendor estimate, a proposal

16  request, or a bid request, in the system and that was

17  put on hold, I would -- it would trigger an email.

18         So any movement with my estimates or my bids

19  or my proposals, if there was a change in VMS, then it

20  would auto-trigger an email.  And so that email would

21  say "proposal requested" or put on -- "bid item put on

22  hold," vendor estimate -- "vendor estimate on hold," and

23  then that would come with the property ID, the unique

24  work item that was created when you submit it in VMS,



1    and then it would say "on hold."

2           And a lot of that would be because it was an

3    awaiting RSC approval.

4    Q.    Were you told as a vendor what this RSC was or

5    who they worked for or anything of that nature?

6    A.    No, never.

7    Q.    And did you receive emails that indicated that

8    RSC, you know, approved or denied things, and those

9    circumstances where you had a proposal request, a bid

10   item, or a vendor estimate, did you receive then

11   feedback -- or RSC approved or denied or something along

12   those lines?

13   A.    If it was approved, it would come in the form

14   of a contract order.  If it was rejected, I don't recall

15   ever any comments from the coordinator stating that the

16   RSC denied.  Or even if they requested a secondary bid,

17   which happened a lot, it would have came back -- maybe

18   someone came in, you know, cheaper than what we

19   originally estimated, and it would come in and say:

20   Most qualified bid process.

21          And I did ask what that meant because, you

22   know, as a vendor competing, I'm like, Well, once it's

23   qualified, it's qualified, and how can I overqualify?

24          And they told me that, you know, "most

1    qualified" usually means whoever came in at the lowest

2    price.

3              So I knew that most qualified bid process

4    means that they had had a secondary vendor come out and

5    bid.  And if it came in lower, then that's the one that

6    they would use.

7              But I don't ever recall receiving a bid

8    rejection proposal request or a bid estimate rejection

9    or cancellation, because sometimes they wouldn't give us

10   any explanation and just cancel the order.  But I

11   never -- I can't recall seeing the comments stating that

12   RSC had specifically rejected it.

13       Q.   And when you received comments that were

14   mentioned earlier in your testimony and that were in

15   some of the exhibits we circulated for today that a

16   property was low value or would be sold as is, did

17   that -- did you understand that that information may

18   have come from RSC, or did you know who may have said

19   that, may have decided as-is or low value?

20       MS. KRIGSTEN:  Object to form.

21   BY THE WITNESS:

22       A.   It was my understanding that it did, and that

23   is because that could have been rejected or came back a

24   month later after that bid had been placed on hold,



1  awaiting approval from RSC.  And then it will, like,

2  come back later, stating that it had been bid order

3  rejected, asset is very low value, please only proceed

4  with a need for, or not needed at this time or something

5  of that nature, specifically pertaining to Harvey,

6  Illinois, because I was keeping an eye on that

7  portfolio.

8       Q.   You also mentioned earlier that there was a

9  broker price opinion or a BPO.

10          What is that in the context of working for

11 Altisource?

12      A.   I didn't have direct communication with the

13 realtors that performed the BPO, however I do know

14 realtors that performed BPOs, and I've worked with them

15 in the past.  This isn't something that Altisource and

16 its vendors didn't -- we didn't have a direct

17 communication with the realtor that performed the broker

18 price opinion.  However, I do know they were being

19 performed, because they weren't going out and getting

20 full appraisal on the property.

21          So as opposed to getting a full appraisal on

22 an asset, you would send a licensed realtor out there to

23 give you a broker price opinion on what that property

24 value might be.



1      Q.   And with respect to your termination and your

2   having attended the summit in 2018 where there was

3   emphasis placed on minority communities and building up

4   those communities, how do you see the termination of

5   your company by Altisource in relationship to or in the

6   light of that summit?

7      A.   I found it ironic that Altisource put such

8   emphasis on minority communities and minority vendors

9   during that summit and, you know, had me accept all of

10  these different awards and things of that nature.  I was

11  the only minority working with Altisource with perfect

12  scores for years in a row and outstanding bid management

13  in the tenure that I had with them.  I found it very

14  ironic that I was terminated shortly after that summit.

15     Q.   In terms of your contact -- your reviewing the

16  NFHA press release and your decision to contact NFHA,

17  what if the company says, Well, you were just mad

18  because you were terminated after all this happened, and

19  that's why, that's the only reason you really contacted

20  NFHA; what would you say to that?

21     MS. KRIGSTEN:  Object to form.

22     MR. PRINCE:  You can answer.

23  BY THE WITNESS:

24     A.   To that, I would say I'm not just an



1    Altisource vendor or an asset manager.  I am an actual

2    resident of this community.  Although I do feel like I

3    was treated unfairly and I know that I was sexually

4    harassed.  I still am literally living in the community

5    which is being highlighted right now.  Especially

6    pertaining to me being underwater in my mortgage because

7    my property is now worth $120,000 less than what it was

8    when I purchased it, because of this climate of

9    underselling and undermanaging and mismanaging

10   properties that are in minority-owned areas.  I worry

11   about my own community.

12           And this is a pretty nice community.  However,

13   we've seen our property values decrease in our

14   subdivision over the course of the past few years

15   because we had foreclosures that were managed in this

16   area, and -- so for pennies on the dollar, and it

17   affected our communities.

18           So when you see something that you've been

19   trying to highlight and do your part in taking some

20   initiative with, that's what I did in whatever capacity

21   that I had the power to do so, and that's what I'm going

22   to continue to do so.

23           As a lifelong resident of Illinois looking at

24   my community, especially in the Village of Harvey, the



1   way it looked then versus the way it looks now, the

2   property values then versus the property values now,

3   looking in the City of Chicago when I was an inspector

4   at FSM we're doing occupancy verification inspections

5   and the properties are now over in REO, this is a

6   problem in our country.  This is a problem.

7           We need to really reconsider the way that we

8   are managing properties in these minority areas.  This

9   is blighting our communities.  This is a problem.  This

10  needs to be highlighted.  And some things need to be

11  changed because eventually it's going to affect

12  everybody not just minorities.

13      Q.   What would you see as a way forward?  I mean,

14  what would you see the management of these properties or

15  the mortgage servicing industry, you know, how do you

16  see it changing going forward to address the problem

17  that you just described?

18      A.   Aside from, you know, wagging my fingers at

19  some senior executives about the way these guidelines

20  are being put in place, there really needs to be a

21  conversation about how properties in minority

22  communities are being mismanaged.  If these investors or

23  trustees or whoever is making the decisions or writing

24  the checks will take into consideration that the



1   property values are low because you guys are selling

2   them low, and this is according to your own comps and

3   your own BPOs.  This is a problem you're creating.  This

4   is a problem that wasn't there before you got there.

5             And just as easily as we just went down a

6   slippery slope and now the properties are blighted and

7   the community is blighted and the property values are

8   low, we still have time to turn that around and let that

9   housing market increase, really take some time to get

10  these investors to understand, even though this property

11  might be $7,000 on your BPO right now, by you investing

12  $5,000 in it, you'll be able to go back and sell it for

13  25.  And then the person behind you might be able to

14  sell it for 50.  And the person behind them might be

15  able to sell it for 150.

16            Now, we have people living in the communities.

17  Now, we have stores opening back up.  Now, we have

18  people wanting to actually live and participate in these

19  communities because nobody wants to move on to a block

20  where there's only two properties that are occupied, and

21  the rest of them are boarded and dangerous, quite

22  frankly, because we don't want to invest in a new door

23  or invest in a new roof or invest in a new porch to get

24  the property sold.



1          So there really needs to be some change in

2    guidelines in the industry.  I've witnessed this

3    firsthand, not only as an asset manager, but also as a

4    resident of these areas.  There really needs to be some

5    change in guidelines of how investors are reviewing and

6    making decisions on the properties in the areas that

7    need the most attention right now, because a high-value

8    asset is going to remain a high-value asset if it's the

9    only property that's foreclosed on the block.  It's

10   still going to close for a high-valued amount.

11          The properties that need the most attention

12   are being completely alienated right now, and that's

13   what we're seeing.

14   Q.   I wanted to talk about a property that we saw

15   in the emails on Ashland Avenue in Chicago.

16          And do you know before -- I take my very few

17   allotted remaining minutes to get an exhibit out, do you

18   know what address number I'm talking about on Ashland

19   Avenue?

20   A.   8748 South Ashland Avenue.  I still have

21   nightmares about this property.

22   Q.   Can you tell us the story about what happened

23   with this property?

24          How did it first -- was it -- how did it first

```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
       NATIONAL FAIR HOUSING            )
 4     ALLIANCE; HOPE FAIR HOUSING      )
       CENTER, et al.,                  )
 5                                      )
                                        )
 6                     Plaintiffs,      )
                                        )
 7             vs.                      ) No. 1:18-cv-00839
                                        )
 8     DEUTSCHE BANK NATIONAL           )
       TRUST, as trustee, et al.,       )
 9                                      )
                                        )
10                     Defendants.      )

11

12             The videotaped deposition of NAKIA HAYES

13     AGNEW, Volume 2, called by the Defendant for

14     examination, taken remotely pursuant to notice and

15     pursuant to the Federal Rules of Civil Procedure for the

16     United States District Courts pertaining to the taking

17     of depositions, taken before April M. Metzler, Certified

18     Shorthand Reporter, Registered Professional Reporter,

19     Certified Realtime Reporter, and Notary Public, at

20     Country Club Hills, Illinois, commencing at 9:04 a.m.

21     Central Standard Time on the 3rd day of May, 2021.

22

23

24
```



1       Q.   Yes.

2       MS. SOULE:   I just want to -- same objection as I

3   had stated before.

4   BY MS. KRIGSTEN:

5       Q.   So in your experience, routine services

6   occurred regardless of the type of neighborhood a

7   property was in?

8       A.   Yes.

9       Q.   Let's talk about the concept of a high-value

10  order.

11          Do you know what orders would be considered

12  high-value orders?

13      A.   High-value orders, per my understanding, were

14  orders that exceeded a certain bid approval amount.

15      Q.   Do you know what that amount was?

16      A.   Per my training and what I was told by the

17  bids team, those were orders that exceeded $8,000, which

18  would be the threshold of what they were allowed to

19  approve.

20      Q.   So you understood that any order under $8,000

21  was not a high-value order, right?

22      A.   In the eyes of my follow-up coordinator?

23      Q.   I'm asking for your understanding, and then

24  I'll ask you where you got that understanding.



1          So let's start with what your understanding

2     was.  Did you understand that everything up to $8,000

3     was not a high-value order?

4          A.   That's subjective.

5          Q.   I think your testimony was that anything

6     $8,000 and above was a high-value order.

7               Is that what you just testified about?

8          A.   Yes.

9          Q.   Was anything below $8,000 considered a

10    high-value order, in your experience?

11         A.   High-value order in the guidelines of the

12    price point versus whether or not it was an escalated

13    issue or a high-priority order, I don't recall seeing a

14    high-value order underneath $8,000, not that I can

15    recall.

16         Q.   Is it right to say that a high-value order

17    could occur at any property?

18         A.   Is that right to say?

19         Q.   Yes.

20         A.   No, it's not right to say.

21         Q.   Could a high-value order occur in a property

22    that was in a majority white neighborhood?

23         A.   It could, if it was approved.

24         Q.   And I'm not talking about approval, I'm just

1   talking about -- let's talk about -- is there a

2   difference between an order and approval, or is an order

3   something that's approved, in your mind?

4        A.   A work -- a contract order is something that

5   has been approved and issued to be completed.

6        Q.   So a high-value order could occur in a

7   majority white neighborhood, correct?

8        A.   It could.

9        Q.   And could a majority -- could a high-value

10  order also occur in a majority-minority neighborhood?

11       A.   Yes, if it was approved --

12       Q.   The -- understood --

13                  (Stenographer clarification.)

14  BY THE WITNESS:

15       A.   -- and a contract order was issued.

16       Q.   Could a high-value order occur in an asset

17  that was, let's say, over $500,000?

18       A.   It could.

19       Q.   Could a high-value order occur in an asset

20  that was less than -- that was valued less than

21  $500,000?

22       A.   It could.

23       Q.   Is it fair to say that a high-value order

24  could occur at any property in the REO portfolio?



1       A.   It's fair to say that it is in the realm of

2   possibility if the order was issued.

3       Q.   Understood.

4            But high-value orders weren't only for

5   majority white neighborhoods, were they?

6       A.   High-value orders were issued at properties

7   where the bid was approved.

8       Q.   Yes.

9            So high-value orders could occur in majority

10  white neighborhoods and majority-minority neighborhoods;

11  is that right?

12      A.   Depending on the specific property and the

13  situation at the property, what was submitted and what

14  was approved, yes, it is in the realm of possibility

15  that a high-value order could be issued in a minority

16  area.

17      Q.   And I've been using the term

18  "majority-minority."

19           What does that mean to you?

20      A.   Non -- not minority, Hispanic, Latino, African

21  American, predominantly areas.

22      Q.   So areas that are predominantly minority, is

23  what that means to you?

24      A.   Yes.



1    your follow-up coordinator, and I think you mentioned

2    the follow-up role earlier today.

3             Did the follow-up coordinators follow up on

4    all open work orders?

5         A.   If it was not on hold, yes.

6         Q.   And so the follow-up coordinators would follow

7    up on all work orders whether it was a high-value order

8    or not a high-value order; is that right?

9         A.   Yes.

10        Q.   And when you were scored -- you knew you were

11   being scored at Altisource for completion of your works;

12   is that right?

13        A.   Yes.

14        Q.   And you were scored on the completion of all

15   your work orders, right?

16        A.   Yes.

17        Q.   So you testified you heard people in the

18   industry refer to communities of color as low value.

19             Do you remember that testimony?

20        A.   I stated in my testimony that I had bids that

21   were disapproved in certain areas, stating that they

22   were low value in VMS.

23        Q.   Well, I'm going to put that aside for a

24   moment.



1          Do you recall providing testimony that you

2    heard people within the industry refer to communities of

3    color as "low value"?

4          A.    I heard people at Altisource disapproving bids

5    stating that they were low value.

6          Q.    Did you hear anyone outside of Altisource in,

7    any of your experience, use the term "low value" in

8    reference to communities?

9          A.    Outside of Altisource?

10         Q.    Yes.

11         A.    No.   However, there were different verbiage

12   that was used.

13         Q.    What did you hear outside of Altisource?

14         A.    From different asset managers or field

15   technicians or -- specifically?  Can you be more

16   specific?

17         Q.    Well, let me ask you a different question.

18         You talked about people in the industry using

19   certain terms.  When we talk about the "industry," when

20   you provided that testimony about people in the

21   industry, what industry were you referring to?

22         A.    The mortgage default industry, the asset

23   management industry.

24         Q.    And that industry is more than simply your



```
 1    work with Altisource, correct, that encompasses other

 2    companies?

 3         A.    That encompasses other companies, other

 4    vendors, inspectors, realtors, and field technicians,

 5    specialty contractors and things of that nature.

 6         Q.    Did you hear people in that industry, that

 7    broad industry refer to communities as "low value"?

 8         A.    No.

 9         Q.    What did you -- what other terms did you hear

10    them use?

11         A.    I've heard the term "hot zone" be used for

12    specific areas.  And I've heard people just again not

13    want to go into certain minority areas.

14         Q.    So now let's talk about Altisource

15    specifically.

16               You testified that you heard people within

17    Altisource use the term "low value"; is that right?

18         A.    Yes.

19         Q.    And I understand from your testimony that

20    they've used the term "low-value asset," right?

21         A.    Yes.

22         Q.    And that's a term that I think you've

23    testified about.

24               Did they also refer to community -- your
```



1   testimony also refer to communities as low value?

2      A.   I've heard the term referred specifically to

3   assets.

4      Q.   So the times where you heard someone within

5   Altisource refer to low value, they were calling it

6   asset a low-value asset; is that right?

7      A.   Yes.

8      Q.   And is that the context in which you heard the

9   term "low value" is when people were talking about a

10  specific asset?

11     A.   Yes.

12     Q.   You also a few minutes ago testified that

13  you've heard the term "hot zones" referenced in the

14  industry?

15     A.   Yes.

16     Q.   Did you ever hear anyone within Altisource use

17  the term "hot zone"?

18     A.   Not that I can recall specifically.

19     Q.   In your testimony last week you talked about a

20  property located at 8748 Ashland.

21          Do you remember that testimony?

22     A.   Yes.

23     Q.   And just to clarify, that was a commercial

24  testify- -- commercial property, wasn't it?

