**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-00839<br><br><br><br><br><br><br><br><br><br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
OPINIONS OF DEAVAY TYLER**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 2

    A.    Tyler's Opinions Regarding the Effects of Defendants' Policies and Practices Should be Stricken as Unreliable. ........................................ 2

        1.    Tyler Failed to Assess Whether Value-Based Decisions Affected the Subject Properties. ............................................................... 3

        2.    Tyler's Opinions Are Unreliable Because he Failed to Assess the Effects of Defendants' Quality Control and Oversight Practices. ............. 5

        3.    Tyler's Opinions About Altisource's Use of Offshore Employees in REO Preservation Practices Are Impermissibly Speculative Because He Did Not Assess the Suitability or Effects of that Practice. ................................................................................... 6

        4.    Tyler's Opinions on Whether Defendants' Policies and Practices Actually Caused Disparities in the Provision of Maintenance and Marketing Services Lack Analysis and are Unreliable. ............................ 7

    B.    Tyler is not Qualified to Apply the Situation-Specific, Local Practices He Observed to Defendants' Nationally Focused Operations. .................................... 7

    C.    Tyler's Opinion Regarding the Accuracy of Plaintiffs' Photos of Scored Deficiencies Is Not Reliable. .......................................................... 11

        1.    Tyler's Photo Review Was Not Implemented With Any Relevant Standards and Instead Just Echoes Plaintiffs' Preferred Scoring. ........... 11

        2.    Tyler Admits His Review of the 4,157 Photographs Does Not Rely on Any Expertise. ................................................................... 13

        3.    Tyler's Photo Review Is Demonstrably Unreliable. ............................... 14

CONCLUSION .................................................................................................. 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998)..................................................4

*Driver v. AppleIllinois, LLC*, No. 06 C 6149, 2011 WL 4007337 (N.D. Ill. Sept. 9, 2011) ........ 11

*Garrit v. City of Chi.*, No. 16-CV-7319, 2022 WL 124554 (N.D. Ill. Jan. 13, 2022) .................. 14

*George v. Kraft Foods Glob., Inc.*, 800 F. Supp. 2d 928 (N.D. Ill. 2011)......................................4

*Hunt ex rel. Chiovari v. Dart*, 754 F. Supp. 2d 962, 972 (N.D. Ill. 2010)......................................7

*In re Minerva IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016)............................ 12

*In re Opana ER Antitrust Litig.*, MDL No. 2580, 2021 WL 2291067 (N.D. Ill. June 4, 2021) . 3, 7

*Kirk v. Clark Equip. Co.*, 991 F.3d 865 (7th Cir. 2021) ................................................................5

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................. 14

*Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19-cv-7092, 2023 WL 1970303 (N.D. Ill. Feb. 13, 2023)
....................................................................................................................................................8

*Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794 (N.D. Ill. 2005) ....................... 12

*Nat'l Fair Hous. All. v. Bank of Am., N.A.*, No. 18-cv-1919, 2023 WL 1816902 (D. Md. Feb. 8,
2023) ................................................................................................................................... 2, 3, 4

*Richman v. Sheahan,* 415 F. Supp. 2d 929 (N.D. Ill. 2006) .........................................................8

*Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 07528, 2014 WL 3558690 (N.D. Ill. July 17,
2014) ......................................................................................................................................... 13

*Thomas v. Sheahan*, 514 F. Supp. 2d 1083 (N.D. Ill. 2007).........................................................6

*United States v. Shipp*, 422 F. Supp. 3d 762 (E.D.N.Y. 2019)................................................... 14

**Rules**

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Fed. R. Evid. 702(b)..........................................................................................................................3

## INTRODUCTION

Plaintiffs offer the opinions of Deavey Tyler, a supposed expert in "property preservation and maintenance," to prop up various aspects of their flawed investigation of Defendants' practices for maintaining foreclosed residential properties. Tyler, whose relevant experience consists of a single job at a single property maintenance company in a single city, seeks to generalize his narrow experience to all areas across the country, *i.e.* to every maintenance company, to every servicer, and to every property owner no matter the property ownership structure and myriad other factors. Unlike other cases Plaintiffs filed based on the same property investigation, this case involves real-estate-owned ("REO") properties with loans held in residential mortgage-backed securities (RMBS) trusts. Further, Tyler opines about the duties of the securitization parties and servicing vendor named as Defendants in this case, but Tyler knew nothing about their roles under the governing trust documents and applicable industry practices.

Facing criticism from Defendants that Plaintiffs had improperly skewed their data under the guise of photo-driven "quality control," Tyler offers a rebuttal opinion that Plaintiffs' deficiency scores were supported by photographic evidence. But in doing so, Tyler is merely a mouthpiece for Plaintiffs' preferred outcome. Tyler did not conduct his photographic review consistent with any accepted practices and admittedly never previously graded deficiencies from photographs. Tyler did nothing to inform himself of the standards applicable to determining whether a photo showed—or did not show—a deficiency and claimed to be confirming Plaintiffs' scoring accuracy while applying entirely different standards than Plaintiffs applied themselves. Based on similar shortcomings, a number of Tyler's opinions here were excluded as lacking any real analysis in a case Plaintiffs filed against Bank of America, and the same outcome is warranted here.

## BACKGROUND

Tyler submitted his first expert report on September 19, 2022 ("TR 1") asserting opinions on Defendants' purported property maintenance, oversight, and business practices. Opinions expressed in that report mirror those submitted by Tyler in a separate case Plaintiffs filed, and in that case, they were excluded. *See Nat'l Fair Hous. All. v. Bank of Am., N.A.*, No. 18-cv-1919, 2023 WL 1816902, at *9-10 (D. Md. Feb. 8, 2023) ("*NFHA-BofA*"). Tyler was first deposed in this case on December 12, 2022 ("Tyler Dep. I"), and deposed a second time after submitting his second expert report ("TR 2") on June 14, 2023 ("Tyler Dep. II").[1]

Defendants served several expert reports rebutting issues raised by Tyler and Plaintiffs' other experts, including a report by trustee expert Eve Kaplan opining on the structure of the mortgage loan securitization industry ("Kaplan Report")[2]. Defendants also served an expert report by economist and Columbia Law School Professor Justin McCrary ("MR"). McCrary demonstrated that Plaintiff National Fair Housing Alliance ("NFHA"), and potentially other Plaintiffs, had corrupted their inspection data by disproportionately removing deficiencies scores from majority White block group properties to create the appearance of racial disparities. While Tyler claims no expertise in investigatory processes or methods, he nonetheless prepared a rebuttal report that, among other things, responded to McCrary's findings by introducing a "race-blind" photo review that he claims confirms Plaintiffs' deficiency scoring.

## ARGUMENT

### A. Tyler's Opinions Regarding the Effects of Defendants' Policies and Practices Should be Stricken as Unreliable.

---

[1] The Reports and Depositions are attached as Exhibits to this Brief, respectively, as Exhibit 1 (TR 1), Exhibit 2 (Tyler Dep. I), Exhibit 3 (TR 2), and Exhibit 4 (Tyler Dep. II).
[2] The Kaplan Report is attached as Exhibit 5 to this Brief.

Tyler makes multiple conclusory criticisms of Defendants' policies and practices. But Tyler admits he never analyzed whether those policies actually caused the consequences he complains of. As the court in *NFHA-BofA* held regarding Tyler's testimony, "[w]ithout any defendant-specific evidence to form the basis for this opinion, the court cannot conclude it 'is based on sufficient facts or data." 2023 WL 1816902, at *10 (citing Fed. R. Evid. 702(b)). Moreover, because Tyler is relying solely or primarily on experience, he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *In re Opana ER Antitrust Litig.*, MDL No. 2580, 2021 WL 2291067, at *22 (N.D. Ill. June 4, 2021). This Court should similarly exclude Tyler's testimony for lacking any reliable connection between the conclusions reached and the facts at issue.

      **1.**      **Tyler Failed to Assess Whether Value-Based Decisions Affected the Subject Properties.**

Tyler opines on the effects property values had on Defendants' maintenance and marketing decisions. TR 11. His opinion refers to policies and practices driven by whether the property was deemed "high value," "low value," or "as is." *Id*. at 10-11. Tyler asserts that "[t]he Ocwen–Altisource system does not treat all properties equally, and instead prioritizes providing property-preservation and inspection ("PPI") services to "high-value" properties," where high value properties "receive different and better care than properties deemed 'low value' or below various thresholds stated in procedure documents." *Id*. Tyler speculates this distinction "sends both explicit and implicit messages to local vendors that less care is needed for properties in communities with lower perceived values" and "creates a clear second-class citizenry among Deutsche Bank REO assets" resulting in worse maintenance for REOs with low perceived values. *Id*. at 11.

Tyler's speculation is not grounded in any analysis of how Defendants actually maintained

or marketed REOs. Tyler could not testify whether any of the properties at issue fell within Altisource's "High Value Assets" policy, admitting such a determination "wasn't within the scope of what I was reviewing or opining on." *Id*. at 189:10-14. Likewise, Tyler could not identify if "low value" and "high value" distinctions were actually applied to the properties at issue. *Id*. at 212:8-19. Tyler performed no statistical analysis of whether the high value/low value distinction actually impacted a community based on its racial demographics. Tyler Dep. I at 209:4-9. Tyler did not assess whether "as-is" properties were receiving maintenance and preservation work based on their value, *Id*. at 215-216. and he "didn't review any actual properties or decisions being made by Altisource employees" to determine if those decisions were based on a property being "high value." *Id*. at 199-200. Tyler did not do any analysis to connect Defendants' quality control processes to a property's value. *Id*. 238-239:13.

More broadly, Tyler "didn't do an analysis" to compare what services were performed for the properties at issue. *Id*. at 198:8-14. Absent any consideration of the actual effects property values had on property maintenance and preservation activity, Tyler's opinion at best speculates about the "explicit" or "implicit" motives underlying maintenance decisions based on the "low perceived value" of properties. TR 11. Such sweeping conclusions about the rationale underlying Defendants' decisions is unsupported—and therefore impermissible—expert testimony. *George v. Kraft Foods Glob., Inc.*, 800 F. Supp. 2d 928, 932 (N.D. Ill. 2011) (rejecting opinion about defendants' intent and beliefs); *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (expert could opine on whether decision saved money, and whether the decision was sound, but could not testify that saving money was motive for a particular decision). Tyler's general opinions on what vendors would do based on their beliefs about a neighborhood, or the value of repairs, were struck, as they should be here, in the *NFHA-B of A* case, 2023 WL 1816902, at *10.

-4-

### 2. Tyler's Opinions Are Unreliable Because he Failed to Assess the Effects of Defendants' Quality Control and Oversight Practices.

Tyler testified that any analysis connecting "a defendant's quality control processes to a property's value" "wasn't within the scope of what I was asked to do for this report." Tyler Dep. I at 238:20-24. When asked whether a lack of oversight resulted in deficiencies, Tyler could only speculate (circuitously) that "if…the alleged deficiencies existed, then there definitely was a lack of oversight, which is how they happened." *Id*. at 241-242. Tyler reviewed just *one* scorecard (the process by which vendor performance is evaluated) involving Ocwen to determine whether *all three* Defendants had proper quality controls, *Id*. 251:4-14. and did not look at *any* Altisource scorecards to assess whether its vendors were receiving accurate grades. *Id*. 252:18-24. Tyler also testified that determining whether Altisource and Ocwen's oversight resulted in disparate effects was outside of the scope of his opinion. *Id*. 255:2-11.

Even on specific criticisms, Tyler's analysis falls short. Tyler's report assesses Altisource's Regional Field Services Managers ("RFSMs"), who have certain managerial roles for REO preservation activities relating to oversight of property maintenance. TR 20-21. Tyler did not assess the RFSM's performance in managing the properties at issue. *Id*. 259:17-20. Instead, he speculates that RFSMs were "highly unlikely" to exercise appropriate oversight of its vendors, even though he did not "do any actual analysis to determine whether or not they were able to meet" their oversight goals. *Id*. 256:11-14.

This testimony highlights the massive "analytical gap" between Tyler's assessment of Defendants' oversight policies in the abstract, and his opinion that alleged property deficiencies would have been caused by oversight failures. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 876 (7th Cir. 2021). Tyler's testimony on this causal relationship, which purports to bear on an ultimate question of fact in this case, is unsubstantiated given his failure to do anything beyond reading and

interpreting Defendants' policies. *Id*; *see also Thomas v. Sheahan*, 514 F. Supp. 2d 1083, 1093-97 (N.D. Ill. 2007) (excluding expert opinion on effects of certain conduct where expert only reviewed policies and procedures that went to ultimate issue in case). As a result, it must be excluded as unreliable. *Id.*

> **3. Tyler's Opinions About Altisource's Use of Offshore Employees in REO Preservation Practices Are Impermissibly Speculative Because He Did Not Assess the Suitability or Effects of that Practice.**

Tyler offers the opinion that Altisource's use of offshore employees was "the core" of its "unorthodox" business model. *Id*. 264:20-24; 265:1-13. But Tyler is not an expert in, and is unfamiliar with the standards concerning, the use of global workforces or what effect, if any, that would have on Altisource's role as a maintenance vendor to Ocwen. He could only speculate that the offshore model, which "seems kind of strange to [him]…can cause deficiencies potentially." *Id*. But Tyler did not connect any deficiencies to offshore decision-making, *Id*. and was not aware of any studies or reports supporting his conclusion the offshore model was "unorthodox." *Id*. 267:13-23. His lack of experience is highlighted by the fact Government Sponsored Entities, such as Freddie Mac (whom he holds out as a leader in industry practices) and Fannie Mae, expressly contemplate the use of offshore work within the industry.[3] And Tyler did not assess whether Altisource's offshore decisions caused maintenance disparities. *Id*. 266:16-24; 267:1-12.

The absence of these assessments highlights the extent of Tyler's speculation. Tyler admits that "given the right technology, the right support, the right direction, and the right management…it's possible that foreign employees can do a great job" performing remote

---

[3] See, e.g., Freddie Mac, Seller/Servicer Guide, § 8102.1 (April 2023), https://guide.freddiemac.com/app/guide/section/8102.1; Fannie Mae, Seller/Service Risk Self-Assessment: Vendor and Third-Party Oversight, p. 3 (2020), https://capitalmarkets.fanniemae.com/media/20831/display). These materials were conspicuously absent from Tyler's opinion, once again underscoring his lack of familiarity with the standards and practices applicable to the operations of national REO servicers and preservation vendors.

preservation work. *Id*. 272:19-24; 273:1-2. Nor could Tyler explain why a remote worker outside of the U.S. would perform worse than a remoter worker in the U.S. Tyler Dep I at 270-73. Beyond that, Tyler did not look at these aspects of Altisource's operations. *Id*. As a result, Tyler cannot opine on whether Altisource's offshore employees were doing a "great job" or a "poor job." Such an opinion "carefully tailored to support plaintiffs' position but devoid of analysis," is "inadmissible when based on speculation and argument unsupported by evidence." *Hunt ex rel. Chiovari v. Dart*, 754 F. Supp. 2d 962, 972 (N.D. Ill. 2010).

### 4. Tyler's Opinions on Whether Defendants' Policies and Practices Actually Caused Disparities in the Provision of Maintenance and Marketing Services Lack Analysis and are Unreliable.

Tyler was asked to identify examples of Defendants' properties that show delays in the provision of preservation services. *Id*. 233:13-23. Tyler identified "only" one property that he had "observed or looked into." *Id*. Tyler's opinion did not consider Defendants' policies and statements regarding nondiscrimination and fair housing (*id*. 254:8-23) and he did not analyze whether Altisource and Ocwen's oversight practices were discriminatory or resulted in discrimination. *Id*. 255:2-6. Tyler's failure to "apply his analysis to the facts of this case" makes his opinions as to the effects of Defendants' policies unreliable. *Opana*, 2021 WL 2991067, at *17 (quotations omitted).

### B. Tyler is not Qualified to Apply the Situation-Specific, Local Practices He Observed to Defendants' Nationally Focused Operations.

Tyler attempts to transform his limited personal experience in a single market (Chicago) TR 1. into supposed "industry standards" that he claims Defendants failed to follow. Tyler has only a narrow field of purported experience, and provides no basis and undertook no analysis to determine whether his limited observations actually constitute industry standards or could have possibly applied to Defendants in this case. Indeed, Tyler admits that he is not an expert on the

structure of national operations in the REO preservation industry. Tyler Dep. I 45:23-24; 46:1-2. Experts cannot offer "an opinion far outside the realm of their expertise..." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 941 (N.D. Ill. 2006); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19-cv-7092, 2023 WL 1970303, at *4 (N.D. Ill. Feb. 13, 2023) ("[F]or [the expert's] opinions to be reliable, they must be grounded in his area of expertise"). As a result, Tyler's opinions regarding "industry standards" should be stricken.

Many of the supposed industry standards Tyler offers are simply the practices of a single market participant, Freddie Mac, that had retained Tyler's prior employer. Without any studies or literature to support this point, Tyler asserts Freddie Mac's practices constitute industry standards. Tyler conducted no research at all to determine whether his narrow practical experience with Freddie Mac actually reflected the practices of a broader industry that includes the Defendants in this case, particularly because Freddie Mac's standards unequivocally did not apply to a single property at issue in this case (*i.e.*, properties that secured loans held in private label-RMBS trusts). *See* Tyler Dep. I 111:2-20.

Unlike the loans on which Tyler focuses, a majority of mortgage loans issued and securitized during this period were held in private-label RMBS trusts.[4] Yet Tyler expressed near total ignorance of how mortgage loans (and resulting REO properties) in those trusts were serviced. Plaintiffs allege that RMBS trusts at issue in this case are governed by "Pooling and Servicing Agreements" or "PSAs," *see* SAC ¶ 53, but Tyler didn't review any of the hundreds such agreements produced in this case and professed he'd "need to consult a lawyer" about the meaning of one shown to him at his deposition. Tyler Dep. I 48:14-17. When asked what role other securitization parties, such as a master servicer, might have played, Tyler oddly confessed that

---

[4] *See* Richard J. Rosen, Chicago Fed Letter: The Role of Securitization in Mortgage Lending 2 (2007), https://www.chicagofed.org/publications/chicago-fed-letter/2007/november-244.

determination was "way above my pay grade." *Id*. When asked how an RMBS trustee's responsibilities for REO preservation and maintenance may differ from a bank that holds REO properties directly, Tyler responded: "You could have said that in Spanish and I would not have understood it more." Tyler Dep. I 49:3-10. It is harder to imagine a more glaring admission that Tyler is not qualified to opine on property preservation standards utilized by RMBS participants with respect to securitized loans.

Indeed, at his deposition, Tyler was unable to describe how a practice could become an industry standard, and instead conflated his personal view of "best practices" with "industry standards":

> Q. What percentage of an industry must have adopted a given standard for it to be considered the industry standard?
>
> A. I don't know if there's a percentage. Just if it's a generally accepted practice or best practices to achieve the goal of the industry, then that can be considered an industry standard.
>
> Q. So in your view, a best practice could be an industry standard even if, say, 60 percent of the industry had not adopted that standard?
>
> A. So in my view, a best practice can be a goal for industry standard because best practice and minimal industry standards are two different things. And even if it's not highly adopted, we look now at our current world is early adopters sometimes drive things if it's working well for that industry. *Id*. 280:3-18.
> ……
> Q. In 2014, what percentage of REO properties were maintained to the standards you describe in your report?
>
> A. I wouldn't have any information on that. I can speak to what my experience was and my counterparts particularly working with Freddie Mac on the standards that we were maintaining properties to. *Id*. 281:13-19.

As a result, Tyler's opinions and testimony fault Defendants for failing to operate consistent with standards that Tyler himself could not confirm had been adopted in the relevant market -- private label securitized loans and REO properties.

For example, Tyler claims the "industry" recognizes a "three-legged stool" model that assigns specific responsibilities to property owners, a real estate agent, and a property services

vendor, and then criticizes Defendants for failing to observe the "three-legged stool." TR1 p. 8. But Tyler's assertion that the "three-legged stool" was actually an industry standard fell apart under questioning at his deposition, when he admitted he had heard the term only from Freddie Mac and its vendors. Tyler Dep. I 147:5-148:22. When asked if other vendors used this model, Tyler testified that he "couldn't tell you if they do or not," even if they maintained Freddie Mac properties. *Id*. 17-22.

Moreover, Tyler did not know "what [Freddie Mac] is doing now, or if they've changed" the "three-legged stool" since he left his organization in 2017. *Id*. 4-9. Tyler's "three-legged stool" completely ignores the role of the RMBS servicer (here, Ocwen), even though Plaintiffs themselves allege that the servicer is the securitization party charged with "property preservation and management". SAC ¶ 56. Tyler provides no basis to conclude that the practices of a single company, servicing loans it owned itself, establishes a standard applicable to the larger nationwide industry, particularly with respect to securitized loans, which require a different division of responsibilities. *See* Kaplan Report ¶¶ 7.1-7.6. His assertion that this model did or should apply elsewhere falls entirely outside his knowledge and experience, and the opinions that flow from it should therefore be excluded.

Similarly, Tyler describes in his report a "local vendor model," in which the property owner directly contracts with local and regional vendors, specific to the locality of the property," TR 1 at 4, and which constituted Tyler's exclusive work experience, *see* Tyler Dep. I. 68:7-10. Tyler describes the "local model" as something Freddie Mac "brought up in one of their vendor trainings" for his company in 2010. Tyler Dep 1 147:5-24, 148:1-3. Tyler contrasts the "local model" with what he characterizes as the less favorable "national model" supposedly employed by Defendants, in which an "owner of the property contracts with a national vendor to oversee the

management and maintenance of REO assets," TR at 4. But Tyler never worked for a company employing the "national model." Tyler Dep. I 68:7-9. Even if Tyler's opinion on the "national model" were premised on "expertise," he did not review any actual evidence as to whether Defendants' "national model" interfered with the provision of maintenance services for the properties at issue. Tyler Dep. I at 230:6-15. And instead of comparing Altisource to other national vendors, Tyler compared apples to oranges by applying expectations of a "local model" vendor to Altisource's national practices. *Id*. 304:24, 305:1-5. Tyler's experience provides "an insufficient basis from which to opine or testify about the entire [national] segment of the [REO preservation industry], and he lacks a reliable basis to opine that" Defendants' practices fail to conform with generally accepted practices or industry standards. *Driver v. AppleIllinois, LLC*, No. 06 C 6149, 2011 WL 4007337, at *6 (N.D. Ill. Sept. 9, 2011). Like the expert in *Driver*, Tyler's "proffered opinions are significantly broader than his experience supports." *Id.*

In sum, Tyler's opinion on the applicability of a "three-legged stool" model and "industry standards" to Defendants' conduct, "extrapolates that his experience is representative of" the industry. *Id.* Like the expert in *Driver*, Tyler's opinions are made "without evidentiary support for that extrapolation," outside of his own testimony, and should be excluded. *Id.*

**C. Tyler's Opinion Regarding the Accuracy of Plaintiffs' Photos of Scored Deficiencies Is Not Reliable.**

In his rebuttal, Tyler tries at length to undermine Prof. McCrary's criticisms of Plaintiffs' deficiency scoring methodology—namely that they did not uniformly score them using established standards. *See* TR2 at 23-24. Tyler purports to undertake a review of "over 4,000 deficiencies scored across 793 properties" to conclude that Plaintiffs were properly scoring. But Tyler's photo analysis is subject to exclusion for the reasons that follow.

**1. Tyler's Photo Review Was Not Implemented With Any Relevant**

**Standards and Instead Just Echoes Plaintiffs' Preferred Scoring.**

For starters, Tyler opines that Plaintiffs were properly applying uniform standards to their deficiency scoring, but he admitted when deposed that he had *no idea* what Plaintiffs' scoring standards actually were—*i.e.,* how much trash there had to be to constitute an "accumulated trash" deficiency, or how tall grass had to be to constitute an "overgrown grass" deficiency. Instead, Tyler testified, "I couldn't tell you personally what the plaintiffs – what scope they looked at [the deficiencies] through." Tyler Dep. II 117:22-23 Indeed, for at least one deficiency category, "invasive plants," Tyler graded the photos using not only a different standard than what the Plaintiffs applied but also a different deficiency altogether. He stated that plants were considered "invasive" only if they grew on the home itself, and that "if it's in the yard, it's [sic] not invasive." Tyler Dep. II 82:1-6.

Tyler's assertion that the photographs he reviewed met the standards for a deficiency therefore cannot be based on any analysis because he had no idea what those standards actually were. Instead, Tyler was impermissibly "given a conclusion by lawyers and worked backwards to hypothesize a mechanism by which it might occur." *In re Minerva IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016). An analysis that "consisted of reverse-engineering a theory to fit the desired outcome" does not "rise to the level of intellectual rigor" required of expert analyses. *Id.* (citing *Kumho Tire*, 526 U.S. at 152). Tyler is simply serving as a mouthpiece for Plaintiffs' own asserted deficiency findings, subjecting his photo analysis to exclusion. *See Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) (excluding opinions where sought to "become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." (citations omitted)).

Moreover, Tyler's photo review does not follow any accepted methodology in his field, or any other. When Tyler was charged by Plaintiffs with confirming a deficiency Plaintiffs told him

-12-

to find, he opines that Plaintiffs were correct nearly all of the time (98%). Yet, Plaintiffs rather conspicuously avoided having Tyler review any photos of the deficiency scores (in White block group properties) they chose to delete. *See* TR2 at 23-24. Tyler omitted that analysis even though Defendants produced unrefuted evidence that Plaintiffs had disproportionately *deleted* initially-made deficiency scores from White block group properties to create the appearance of disparities. *See* MR ¶¶ 36, 43. Testing only the deficiency scores one wishes to find is not an accepted methodology in any field, and Tyler does not cite anyone else who has ever conducted such an analysis (including Tyler himself, who is doing so for the first time in this case). This subjects his analysis to exclusion. *See Cty. of Cook v. Bank of America Corp.*, 584 F. Supp. 3d 562, 577 (N.D. Ill. 2022) (excluding expert analysis in Fair Housing Act case where expert could not identify "any regulators, industry participants, or academics who have employed his methodology to conduct a fair lending analysis such as his any time in the past thirty years.").

## 2. Tyler Admits His Review of the 4,157 Photographs Does Not Rely on Any Expertise.

Tyler's review was not, as his Rebuttal Report implies, confirming whether 4,157 photos accurately showed the "deficiencies" Plaintiffs scored. *Id*. 65:2-8. Rather, Tyler's review of these photos simply sought, as he conceded when deposed, "to validate that the plaintiffs were seeing what they stated they saw." *Id*. 15:12-24; see also 40:11-24; 41-42. But Tyler *agreed* this exercise was not undertaken "from my view as an expert" but rather "if a reasonable person would review that picture, a set of photos, and see that the deficiency existed." Tyler Dep. II 16:3-6. Tyler's inexpert rubberstamping of Plaintiffs' scoring is "at best, offering a gratuitous opinion, and at worst [] exerting undue influence on the jury." *Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 07528, 2014 WL 3558690, at *6 (N.D. Ill. July 17, 2014). Because Tyler is not actually bringing expertise to bear, Tyler's photo review is an inadmissible invasion of the province of the jury and

should be excluded. *See Garrit v. City of Chi.*, No. 16-CV-7319, 2022 WL 124554, at *9 (N.D. Ill. Jan. 13, 2022) (opinion about whether photo of evidence actually showed the object in question "would only serve to improperly tell the jurors how they should interpret the evidence before them.").

### 3. Tyler's Photo Review Is Demonstrably Unreliable.

Tyler's inability to replicate his opinions during his deposition when he did not know what Plaintiffs' preferred scoring was proves that they are not reliable. To be admissible under *Daubert*, an expert analysis must be reliable, one hallmark of which is that it is *repeatable*. *See United States v. Shipp*, 422 F. Supp. 3d 762, 774-75 (E.D.N.Y. 2019).

Tyler's professed substantiation of Plaintiffs' scoring 98% of the time collapsed when he was shown photos at his deposition but not told how Plaintiffs wanted them scored. During his deposition, Tyler was shown 22 separate exhibits containing photographs from properties in majority-white neighborhoods that were originally scored as reflecting deficiencies but that Plaintiffs later deleted. *See* Exhibit 6 (Excerpt from Dr. Ian Ayres's Working Paper (AYRES_000009) showing reported scores and demographics). Of those 22, upon reviewing the related photos at his deposition, Tyler testified that *16,* or over 72%, showed evidence of the deficiency Plaintiffs had deleted from their scoring. Tyler Dep. II 178:9, 180:1-2; 185:19-24, 186:1-11, 187:15, 190:23-24, 191:8-9, 196:12-13, 201:6-8, 206:2-3. Tyler testified that he could not decide from the remaining six photos. Tyler Dep. II 188:11-190:1, 194:16-17, 202:7-22, 207:22. In short, when attempting to confirm Plaintiffs' score deletions, Tyler did substantially worse than a coin flip. This shows a material "rate of error," (*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)), and proves Tyler's opinions regarding consistency of scoring are unsupportable. They should be excluded.

## CONCLUSION

For the reasons stated herein, Defendants request that this Court exclude the opinions and testimony of Deavay Tyler to the extent those opinions seek to address (1) the existence and applicability of industry standards or general practices to Defendants' operations; (2) whether a property's value affected its maintenance or marketing; (3) whether Defendants employed effective quality control and oversight practices; (4) Defendants' use of offshore employees; (5) the effects of Defendants' policies and practices for the properties at issue; and (6) the analysis and conclusions reached from Tyler's review of property photos in his Rebuttal Report.

Dated:  September 19, 2023                    Respectfully submitted,


By: */s/ Nathan Garroway*
Nathan Garroway
**DENTONS US LLP**
303 Peachtree Street, NE, Suite 5300
Atlanta, Georgia 30308
Telephone: (404) 527-4000
nathan.garroway@dentons.com

Lisa Krigsten (admitted *pro hac vice*)
**DENTONS US LLP**
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
Telephone: (816) 460-2400
lisa.krigsten@dentons.com

*Attorneys for Defendant Altisource Solutions, Inc.*

By: */s/ Debra Bogo-Ernst*
Debra Bogo-Ernst
Jacey Norris
**WILLKIE FARR & GALLAGHER LLP**
300 N. LaSalle Dr.
Chicago, IL 60654
(312) 728-9000
dernst@willkie.com
jnorris@willkie.com

*Attorneys for Defendant Ocwen Loan Servicing, LLC*

By: /s/ *Kenneth M. Kliebard*
Kenneth M. Kliebard
Michael W. Fakhoury
**MORGAN, LEWIS & BOCKIUS LLP**
77 W. Wacker Drive, 5th Floor
Chicago, Illinois 60601
Telephone: 312.324.1000
kenneth.kliebard@morganlewis.com
micheal.fakhoury@morganlewis.com

Kurt W. Rademacher (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Telephone: 215.963.4981
Kurt.rademacher@morganlewis.com

*Attorneys for Defendants Deutsche Bank National Trust Company, as trustee, and Deutsche Bank Trust Company Americas, as trustee*

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for Northern District of Illinois' Electronic Filing System on September 19, 2023.

/s/  Nathan Garroway