# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:18-cv-00839 |
| v. | ) | |
| | ) | Honorable Harry Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST | ) | |
| COMPANY, AS TRUSTEE; DEUTSCHE BANK | ) | Magistrate Judge Sidney I. Schenkier |
| TRUST COMPANY AMERICAS, AS TRUSTEE; | ) | |
| OCWEN FINANCIAL CORP.; and ALTISOURCE | ) | |
| PORTFOLIO SOLUTIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REPORT OF EVE KAPLAN**

# TABLE OF CONTENTS

**Page**

1. INTRODUCTION ........................................................................................... 1

2. QUALIFICATIONS ....................................................................................... 3

3. SUMMARY OF MY OPINIONS ................................................................... 7

4. OVERVIEW OF A SECURITIZATION STRUCTURE ............................... 10

   A. PURPOSE AND STRUCTURE OF A SECURITIZATION TRANSACTION ........................................................................ 10

   B. PARTIES TO A SECURITIZATION TRANSACTION .................................. 11

   C. CUSTOMARY ROLE OF THE SERVICER AND MASTER SERVICER....... 14

   D. CUSTOMARY ROLE OF THE RMBS TRUSTEE ........................................ 19

   E. BREACHES, DEFAULTS AND EVENTS OF DEFAULT .............................. 25

5. RMBS TRUSTEE CUSTOM AND PRACTICE ........................................... 29

   A. TRUSTEES REVIEW AND NEGOTIATE GOVERNING AGREEMENT PROVISIONS COVERING THEIR DUTIES AND PROTECTIONS OR AFFECTING THE PERFORMANCE OF THEIR DUTIES. ......................................................................... 29

   B. TRUSTEES PERFORM EXPRESS DUTIES AND ADMINISTER TRANSACTIONS ON A TRUST-BY-TRUST BASIS IN ACCORDANCE WITH THE GOVERNING AGREEMENT AND HAVE POLICIES AND PROCEDURES TO PROVIDE HIGH-LEVEL GUIDANCE FOR PERFORMING THEIR ORDINARY ACTIVITIES. ......... 31

   C. TRUSTEES UNDERSTAND SERVICERS & MASTER SERVICERS TO BE INDEPENDENT DEAL PARTIES, WITH DISTINCT AND SPECIALIZED ROLES AND PRESUME THEY PERFORM IN ACCORDANCE WITH THE GOVERNING AGREEMENT. .......................... 33

   D. TRUSTEES' REVIEW AND USE OF LOAN-LEVEL DATA, DELIVERED BY THE SERVICER OR MASTER SERVICER, IS UNDERTAKEN SOLELY IN CONNECTION WITH THEIR ADMINISTRATION OF THE TRUST'S WATERFALL AND RELATED REPORTING TO INVESTORS........................................................ 37

   E. WHEN TRUSTEES RECEIVE A LOAN-LEVEL NOTICE (OR INQUIRY), THEY TYPICALLY REFER THE MATTER TO THE RESPONSIBLE SERVICER OR MASTER SERVICER FOR HANDLING (OR RESPONSE). ........................................................ 39

# TABLE OF CONTENTS
### (continued)

**Page**

F.    TRUSTEES REVIEW COMPLIANCE CERTIFICATES & 1122 REPORTS DELIVERED BY SERVICERS OR MASTER SERVICERS TO DETERMINE WHETHER, ON THEIR FACE, THE DOCUMENTS APPEAR TO MEET THE REQUIREMENTS OF THE GOVERNING AGREEMENT. ................................................................................... 42

G.    TRUSTEES' POST-EOD ADMINISTRATION IS BASED UPON VARIOUS FACTORS INCLUDING, BUT NOT LIMITED TO, THE UNIQUE CIRCUMSTANCES OF A TRUST, THE RIGHTS AND AUTHORITY OF THE TRUSTEE AND OTHER DEAL PARTIES, ADVICE OF COUNSEL AND INPUT AND/OR DIRECTION FROM TRUST INVESTORS. ......................................................................... 44

H.    TRUSTEES DO NOT HAVE POLICIES AND PROCEDURES COVERING PROPERTY MAINTENANCE OR REO MARKETING (OR OTHER LOAN SERVICING FUNCTIONS). ............................................. 46

6.    THE KISCH REPORT MISCONSTRUES THE ROLE OF THE TRUSTEE AND IGNORES THE BROAD AND INDEPENDENT AUTHORITY OF THE SERVICER AND/OLR MASTER SERVICER. ................................................. 47

7.    THE TYLER REPORT CONFLATES AND/OR MISCONTRUES THE ROLES OF THE SERVICER, ISSUER, AND TRUSTEE. ......................................... 50

1. **INTRODUCTION**

1.1    I have worked in the corporate trust field for more than 33 years. Most recently, for 15 years, I was a Senior Vice President in the Global Corporate Trust Services division of U.S. Bank National Association ("U.S. Bank"). I have been retained as an expert witness in this matter by Morgan, Lewis & Bockius LLP, counsel for Deutsche Bank National Trust Company ("DBNTC"), as trustee, and Deutsche Bank Trust Company Americas ("DBTCA"), as trustee (in such capacities and collectively, the "Trustees"), in connection with a lawsuit that more than a dozen fair housing organizations, including National Fair Housing Alliance (collectively, "Plaintiffs"), filed against the Trustees (the "Lawsuit").

1.2    In their complaint, Plaintiffs allege that, as "owners" of real estate owned ("REO") properties held in the residential mortgage-backed securitization ("RMBS") trusts at issue in the Lawsuit (the "Trusts"), the Trustees were responsible for servicing (*i.e.*, performance of property maintenance and marketing services) those properties and that the Trustees abdicated legal obligations (a) "without appropriate investigation or assessment of the fitness or ability of the retained third parties" to comply with Fair Housing Act obligations  and (b) "without guidance, oversight or review of the activities left to the discretion of retained third parties."  Second Amended Complaint, ¶¶149-150. Plaintiffs assert that the "Deutsche Bank Defendants engaged in a pattern and practice of discrimination in maintaining and marketing REO properties that are located in white communities more favorably than similar REO properties located in

predominantly African-American and Latino neighborhoods in the same metropolitan area." Second Amended Complaint, ¶35. Plaintiffs alleged that "Defendant Ocwen Loan Servicing, LLC ('Ocwen') and Altisource Solutions, Inc. ('Altisource') provide property preservation and maintenance and other services for REO properties owned by" the Trustees, *id.* at ¶ 3, while activities of other servicers "were de minimis," *id.* at ¶ 64, and I understand that the lawsuit has been focused on those properties that are serviced by Ocwen.

1.3    I have been asked by the Trustees' counsel to offer my opinions relating to custom and practice of trustees in administering RMBS trusts and how trustees perform their responsibilities and interact with other transaction parties. The Trustees' counsel also asked me to (1) review the expert reports of Deavey Tyler and Pamela Kisch, and (2) offer my opinions in response to the opinions set forth in those expert reports.

1.4    In preparing this Report, I have relied on my general knowledge, training, broad experience, and other expertise. I have also considered the documents that appear in Exhibit A. My work on this matter is ongoing, and I may review additional materials and/or update, refine, or revise my opinions.

1.5    I understand that Plaintiffs identified certain Trusts during their depositions of the Trustees' witnesses and/or in opposition to the Trustees' motions to dismiss the Lawsuit. The Trustees' counsel provided to me certain agreements governing those Trusts and other Trusts (the "Governing

Agreements"), which I reviewed and identified on Exhibit A. In my experience, the types of provisions appearing in RMBS governing agreements are fairly consistent, but can vary in terminology and phrasing. When PSA provisions vary more substantively, that often reflects differences in the responsibilities that the sponsor family allocates to particular deal parties or accounts for other unique features of a given Trust. Where particular language of the Governing Agreements differs substantially from what, in my experience, is common in the RMBS industry, I endeavor to note it in this Report.

1.6     My services in this litigation include the preparation of this Report and any testimony I might provide at deposition or in court. I am being compensated at an hourly rate of $750, and I receive reimbursement for reasonable expenses such as travel. The compensation for my work in this matter is not contingent upon the nature of my findings or on the outcome of the Lawsuit.

## 2.     **QUALIFICATIONS**

2.1     I have a Bachelor of Arts degree in psychology and a Master's degree in social work from Washington University in St. Louis.

2.2     I was employed by U.S. Bank between 1986 and 2021. In 1992, I began working in the Structured Finance Group (now called Global Structured Finance ("GSF")) in U.S. Bank's Global Corporate Trust Services ("GCTS") division. From 1992 through 2006, I served as an account manager and as a team lead for account managers, and I was directly involved in negotiating contractual provisions relating to GSF's duties and

protections, closing new transactions, overseeing the set-up trust records and accounts, and administering transactions[1] across a variety of asset classes, including but not limited to RMBS trusts. From 2007 until June 2017, I was a Senior Vice President and head of GSF. In that role, I managed the department that was responsible for all aspects of RMBS administration, for which U.S. Bank served as trustee or indenture trustee, including the receipt and review of servicer compliance reports and the interaction with servicers in connection with the trustee's performance of its contractual duties. From July 2017 through 2021, I was a Senior Vice President responsible for a GCTS unit that provided support and guidance to GSF on administrative risk issues, acted as business-line lead involving GSF disputes and/or litigation matters, and delivered other specialized services. In that role I worked closely with the GSF managers, U.S. Bank's Law Division and outside counsel on various matters focused on the role of the trustee.

2.3     In several of my GSF roles, I was responsible for the review and acceptance of new RMBS transactions. My responsibilities in that role included reviewing new transactions to ensure the contemplated services were consistent with the trustee role and that the proposed fees were customary and appropriate given the scope of the bank's duties; negotiating contractual provisions affecting the duties and/or performance of the

---

[1] This included, starting in 2010, responsibility for the unit administering trust waterfalls and producing monthly reports to securityholders.

trustee's duties; and establishing and maintaining internal records and controls to support the trustee's ongoing administration of each trust in accordance with its Governing Agreements.

2.4    As an account manager, I closed and administered hundreds of diverse transactions before assuming responsibility to lead a team of account managers who administered transactions. In my capacity as team lead and as a GSF executive, I provided guidance on questions or issues that arose in connection with GSF's administration of the trusts, and I regularly interacted with transaction parties, investors and other market participants related to specific trusts or, more generally, industry practice. In contrast, I almost never interacted with borrowers whose loans were held in the trusts.

2.5    Following the onset of the mortgage crisis more than a decade ago, in my role as head of GSF, I established a centralized unit, known as Specialized RMBS Services ("SMBS"), in response to increased inquiries, notices, and media coverage involving mortgage loans and REO property for which the bank, as trustee, was the nominal owner. This unit handled loan-level correspondence and inquiries received by GSF as trustee, including interactions with servicers and other external parties.

2.6    As a senior manager within GCTS, I participated in due diligence and business integration activities in connection with the bank's consideration of and ultimate acquisition of another institution's corporate trust business. In this process I was responsible for reviewing the nature and composition of the designated portfolio of securitization transactions under

5

administration (including RMBS trusts) as well as evaluating the institution's administrative practices and historical satisfaction of its contractual duties as trustee for those transactions. After the acquisition transaction closed, I was responsible for the transition and integration of staff and processes to administer the acquired trusts on behalf of GCTS in accordance with contractual and regulatory requirements applicable to corporate trustees and U.S. Bank's trust administration policies, procedures, and practices.

2.7    For over 15 years I have participated in various trade group activities that implicated the role of a trustee in administering securitization trusts. In particular, I actively participated in the activities of the American Bankers Association's Corporate Trust Committee ("ABA CTC")[2], the Asset Securitization Forum ("ASF")[3], and the Structured Finance Association ("SFA")[4].

2.7.1    As part of the ABA CTC, I led various working groups and initiatives focused on the role of the trustee in securitization transactions and in evaluating regulatory and market developments relevant to the trustee role. I contributed to the drafting of and

---

[2] The CTC is comprised of representatives from approximately 11 trustee institutions, who are members of the American Bankers Association.

[3] ASF is an association dedicated to the securitization market to advocate for the common interests of its diverse members on legal, regulatory, and market practice issues.

[4] SFA is a trade association dedicated to the structured finance industry. SFA's mission is to help members and public policymakers grow credit availability and the real economy in a responsible manner.

updates to the ABA CTC's white paper entitled "The Trustee's Role in Asset-Backed Securities."

2.7.2 My involvement with ASF and SFA regularly included participation in various committees and working groups focused on topics or issues relevant to the role of a securitization trustee. I also served on SFA's Board of Directors from 2016 through 2020 and as Co-Chair of its Trustee Committee from 2015 through 2020. Through my participation in these groups, I regularly collaborated with industry colleagues (trustees, servicers, master servicers, sponsors, investors, rating agencies, regulators), which has provided me insight into and greater understanding of the practices of RMBS trustees, the roles of the various transaction parties, and the expectations and understandings of the various RMBS industry participants as to the role of an RMBS trustee.

2.8 My full resume is attached as Exhibit B to this Report.

## 3. SUMMARY OF MY OPINIONS

3.1 RMBS trustees performing their role in accordance with industry custom and practice perform only the express duties assigned to them under the governing agreements. As a matter of industry custom and practice, trustees understand that their role does not involve any implied duties, and they expect each other deal party to perform the duties assigned to it under the governing agreements. As relevant here, the Trustees focus on performing their assigned trust administration duties, and not participating

7

in servicing duties that were assigned to servicers, which is consistent with industry custom and practice.

3.2   RMBS trustees understand, under standard industry custom and practice, that Governing Agreements are drafted to afford the servicer and/or master servicer broad authority and discretion to perform loan servicing functions (including REO maintenance and marketing).

3.3   Congruent with industry custom and practice, I would not expect the Trustees to direct, monitor or investigate Ocwen's performance unless directed to do so by investors in the trust who had sufficient holdings and offered indemnity. I would, however, expect the Trustees to cooperate with Ocwen (as they are required to do under typical RMBS governing agreements) to enable Ocwen to perform its duties, and I am not aware of any facts that suggest that the Trustees did not provide the customary level of cooperation.

3.4   Under industry custom and practice, if a trustee receives inquiries or correspondence relating to loan-level matters (*e.g.*, service of litigation filings, property violations, utility invoices, etc.), the trustee forwards them to the contractual party responsible for servicing the particular loan to handle as the servicer deems appropriate. The Trustees' practices in this regard appear generally consistent with industry custom and practice of RMBS trustees. Based on my review of the Trustees' procedures that I received from counsel relating to their handling of loan-level notices and

citations, those policies and procedures appear generally consistent with industry custom and practice.

3.5     The Trustees' policies and procedures related to the Trustees' review of new transactions focus on those provisions governing the Trustees' duties and protections, and not on issues related to the duties of other deal parties, including loan servicing practices (including to REO maintenance and marketing). This is consistent with industry custom and practice.

3.6     The Trustees, as is typical, did not have policies setting forth specific action required to be undertaken following an event of default, as each situation is unique and not capable of being accounted for in a standard way. In those situations, trustees typically escalate to management, provide notice to investors, and seek the advice of counsel.

3.7     Plaintiffs' experts Deavey Tyler and Pamela Kisch acknowledged that they have no familiarity with RMBS securitization or the role of the RMBS trustee. As a result, they apparently did not appreciate that RMBS trustees act as a nominee with respect to the interest held in an RMBS trust's property and personally have no economic interest in either the loans or trust. As a result, their conclusions concerning the Trustees, which were based on inaccurate and unfounded assumptions about the Trustees' role in connection with REO maintenance and marketing or, alternatively, oversight and/or control over Ocwen (or its vendor Altisource), are incorrect.

9

4.    **OVERVIEW OF A SECURITIZATION STRUCTURE**

    A.    <u>Purpose and Structure of a Securitization Transaction</u>

        4.1    The term securitization refers to common financial transactions that play a key role in the capital markets and are a critical source of funding that makes credit available to consumers.

        4.2    From an economic perspective, a securitization transaction enables a lender (or other entity) that holds financial instruments with a future payment stream (such as thousands of mortgage loans) to sell the instruments—and accordingly the right to future payments and all corresponding risk of ownership—to investors. In a simplified version of the mechanics: (i) at the closing of the transaction, the owner of the financial instruments transfers them to a trust in exchange for securities, and (ii) sophisticated investors purchase those securities, which give those investors an undivided interest in the assets held by the trust.

        4.3    Securitization enables lenders to deploy the proceeds from the sale of the securities to originate new loans—*i.e.*, to extend more credit. Borrowers, in turn, have increased access to credit offered by banks and other finance companies, who use securitization as a financing tool for their origination businesses, so that those borrowers can buy a home, finance their educations, purchase a vehicle, and create and support a business. These are just some of the examples illustrating the impact and importance of securitization to the U.S. economy.

B.     <u>Parties to a Securitization Transaction</u>

4.4     At or around the time of closing of the securitization transaction, parties execute agreements that work together and specify the duties and protections of all deal parties. Examples of the core documents relevant to an RMBS include, but are not limited to, the following: Indenture, Pooling and Servicing Agreement ("PSA"), Sale & Servicing Agreement ("SSA"), Transfer & Servicing Agreement ("TSA") and Trust Agreement (separately and/or together will be referred to as a governing agreement).

4.5     Those governing agreements typically create a special purpose trust (*i.e.*, a real estate mortgage investment conduit ("REMIC") as defined by the Internal Revenue Service, such as a New York common law trust) or a Delaware statutory trust. Regardless of the legal structure, an RMBS trust is not an operating entity and has no employees. Instead, one or more deal parties perform the day-to-day operations of the trust pursuant to their contractual duties. The operation of the trust, and the obligations of the deal parties, are spelled out in the governing agreements drafted in connection with the creation of the trust and the closing of the securitization. Deal parties have distinct and independent roles that rely on their unique expertise, systems, personnel, and business processes.

4.6     Before the transaction, **<u>sponsors</u>**, who own (and may have originated) the loans, select the pool of loans to be securitized; create the legal and economic structure of the transaction (including all legal, regulatory and tax-related documentation); define the roles of the transaction parties to

11

administer the trust and to service the assets of the trust; select and engage parties to perform those roles; draft the agreements and securities filings; and market the securities issued by the trust to qualified investors. After the securitization transaction closes, the sponsor (or an affiliate thereof) may perform certain ongoing roles for the trust, as servicer, master servicer or trust administrator, but does not (and cannot) act as the trustee.

4.7 The sponsor selects **servicers** to administer the trust's assets (*e.g.*, mortgage loans for an RMBS securitization) for the benefit of investors and other beneficiaries. Sometimes the pre-securitization servicer continues to serve in that role post-closing. Servicers handle all loan-specific and property-specific activities and maintain the trust's records as to each mortgage loan. RMBS transactions may have a single servicer, responsible for all mortgage loans, or may have multiple servicers who have responsibility for a designated group of mortgage loans.

4.8 Sponsors may also engage a deal party known as the **master servicer** when a trust acquires a pool of loans that has multiple servicers who will continue in that role post-closing. Master servicers, who may or may not engage in direct loan servicing activities, are responsible for monitoring, overseeing, and enforcing servicers' performance and ensuring that each servicer complies with its contractual servicing obligations.

4.9 When a securitization transaction closes, the sponsor (or an affiliate) typically conveys to an entity (typically a bank) acting as **trustee** legal title to the securitized assets to hold solely in its trustee capacity (which is

separate from its individual capacity as a bank) as nominee exclusively for the benefit of the trust and its beneficiaries.[5] As described more fully below, the governing agreements identify other specific ministerial functions that the trustee performs for the benefit of the investors and any other trust beneficiaries, which may include, among other tasks, administering the trust waterfall, making payments to investors, preparing monthly investor reports, and maintaining a list of registered securityholders (*i.e.*, investors). The trustee role is primarily an investor-facing function and does not involve servicing loans or engaging with borrowers or dealing with property-level issues.

4.10    As noted above, **<u>investors</u>**, through ownership of the securities issued by the trust, are entitled to all of the economic benefits and risks associated with the assets. The trustee holds assets and other rights of the trust on behalf of investors, and any rights granted under the governing agreement must, therefore, be exercised through the trustee. The investors have substantial rights under the governing agreement, which may include, in defined circumstances, the right to direct the actions of the trustee— including, in certain transactions, to terminate the servicer. In addition, based upon the structure of the securitization, other deal parties (*e.g.*, a bond insurer) may have substantive rights and/or obligations.

---

[5] RMBS trustees hold legal title to all assets conveyed by the sponsor, which is not limited to the mortgage loans.

4.11    The sponsor may also assign other administrative tasks to one of the parties referenced above or, instead, appoint an additional party to an independent role. As I understand the Lawsuit, the disputed issues do not center around these roles or parties, so I do not address them further in this report. If I learn otherwise or if the disputed issues change, I may opt to supplement this report to address them.

C.    Customary Role of the Servicer and Master Servicer

4.12    I understand that the Lawsuit primarily relates to allegations concerning servicing issues—namely the maintenance and marketing of REO properties—and also whether the trustee can control and/or be liable for that servicing activity. Accordingly, I describe in this section loan servicing functions, the typical role of an RMBS trustee, defaults, and thereafter cover industry custom and practice relating to the trustee's administration of RMBS transactions. Thereafter, the typical role of an RMBS trustee. These topics will provide an important foundation upon which I can then cover industry custom and practice of trustees in the administration of RMBS transactions.

4.13    Residential mortgage loan servicing is a highly specialized and heavily regulated industry requiring specific skills, systems and licensing. Sponsors select and engage servicers based upon several factors including, but not limited to, the following: which party is servicing the mortgage loans pre-securitization; the servicer's experience in administering similar mortgage loans and in acting as a servicer for RMBS transactions, and the then-

14

applicable servicer rating assigned by the rating agency the sponsor engaged to rate the securities issued by the trust.

4.14    Servicers handle all aspects of administering the mortgage loans. While a borrower satisfies its obligations under the note, the servicer collects payments and deposits them into an account for distribution, by the trustee, paying agent, or securities administrator, to investors (net of expenses) and may handle tax and insurance escrows. If a borrower falls behind on payments, the servicer engages with the borrower on any loan modification and/or initiates a foreclose on the property. Following the completion of any foreclosure action, the servicer registers title of the REO property in the name of the trustee for the benefit of the investors, updates any foreclosure registry with its contact information, and, itself or through vendors, assumes responsibility for REO maintenance, marketing, and ultimately sale.  Below is an example of typical governing agreement provisions covering the titling of REO property.

4.14.1    "With respect to any REO Property, the deed or certificate of sale shall be taken in the name of the Trustee for the benefit of the Certificateholders [i.e., investors], or its nominee, on behalf of the Certificateholders.  The Trustee's name shall be placed on the title to the REO Property solely as the Trustee hereunder and not in its individual capacity.  The Servicer shall ensure that the title to the REO Property references the Pooling and Servicing Agreement and

15

the Trustee's capacity hereunder." (INDYMAC 2006-AR7 PSA §3.12)

4.15 The governing agreements typically provide that the servicer perform its obligations in accordance with "Accepted Servicing Practices" and without regard to the servicer's own economic interests.[6] While the specific language may vary slightly, the typical governing agreement provisions state that the servicer will service the mortgage loans in accordance with each of the following standards:

4.15.1 In the same manner it services other similar mortgage loans in its own portfolio;

4.15.2 Giving due consideration to the customary and usual standards of prudent mortgage lenders and loan servicers administering similar mortgage loans;

4.15.3 In compliance with applicable state and federal law; and

4.15.4 To the extent consistent with all of the above, seek to maximize the timely and complete recovery of principal and interest on the mortgage loans.

4.16 Governing agreements grant servicers broad and complete authority to administer, in all respects, the mortgage loans in accordance with their terms. Below are relevant Governing Agreement excerpts for two Trusts in this Lawsuit. These provisions are typical, in my experience. Trustees

---

[6] Excluding any relationship with any sub-servicer or affiliate; interest in any of the trust's securities; obligation to make certain advances; and right to receive compensation for its work as servicer.

16

understand that these provisions enable servicers and master servicers to perform their duties independently and without involvement (or interference) of the trustee.

4.16.1 "The Servicer, acting directly or through one or more subservicers as provided in Section 4.09, shall service and administer the Mortgage Loans from and after the Closing Date and, except where prior consent or approval of the Master Servicer is required under this Agreement, shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable, consistent with the terms of this Agreement and with the Servicing Standard." (Aames 2005-4 TSA §4.02).

4.16.2 "The Servicer shall have full power and authority, subject only to the specific requirements and prohibitions of this Agreement, to do any and all things in connection with any REO Property as are consistent with the manner in which the Servicer manages and operates similar property owned by the Servicer or any of its Affiliates, all on the terms and for each period (subject to the requirement of prompt disposition set forth in Section 3.23(a)) as the Servicer deems to be in the best interests of Certificateholders [*i.e.* investors]." (Soundview 2006-EQ2 PSA §3.23(c)).

4.17 In my extensive experience, governing agreements state that servicers have the right to (and they often do) retain sub-servicers and vendors to perform

17

servicing functions, subject solely to their oversight and control, on their behalf, for the benefit of the trust and consistent with the governing agreement. The governing agreements also customarily provide that the trustee has no contractual relationship with a servicer's sub-servicers or vendors.

4.18    Servicers are compensated, for loan servicing activities, from trust funds collected on the mortgage loans and deducted from amounts remitted to the trustee or paying agent. That compensation includes a servicing fee (expressed as a percentage of the outstanding principal balance of each mortgage loan), any economic benefit derived from collections held in accounts it maintains, and allowable expenses and indemnification amounts. Given the breadth and technical nature of loan servicing, the associated fee rate is significantly higher than the fee rate of other deal parties, such as the master servicer, trust administrator and trustee, as discussed below.[7]

4.19    Master servicers maintain independent records as to each mortgage loan and updated monthly based on loan-level information provided by servicers. Pursuant to the governing agreement, servicers may seek guidance, direction and consent from the master servicer in connection with an action on a particular loan or on the servicing standard for a trust.

---

[7] In my many years of experience, the servicing fee rate falls within a range of 25-50 basis points (depending on whether the loans are prime, Alt-A or subprime loan). Master servicer compensation is highly variable depending on whether the master servicer services mortgage loans, administers the trust waterfall and/or is responsible for the fees of other deal parties (*e.g.*, securities administrator, trustee, paying agent).

Master servicers oversee, monitor and enforce the performance of servicers utilizing the servicer-provided information, reports or audits. I understand that master servicers typically conduct a periodic review of servicers, for which they have oversight responsibility and leverage their observations in assessing a servicer's adherence to the servicing standard.[8] Master servicer compensation is comprised of the same components as described above with respect to servicers (¶4.18).

4.20    Servicers and master servicers are required to deliver annual compliance documents to the trustee and other designated recipients (*e.g.*, investors, rating agencies, bond insurer) attesting to (i) the satisfaction, in all material respects, of their contractual obligations, and (ii) their compliance, as to an identified portfolio of RMBS transactions, with specified servicing criteria as required under SEC Regulation AB.[9] Servicers deliver the certificate and report to the trustee or master servicer and master servicers deliver their certificate and report to the trustee.[10] (*See* §5F for information on trustee custom and practice).

D.    <u>Customary Role of the RMBS Trustee</u>

4.21    Trustees are engaged by the sponsor as independent deal parties (*i.e.*, unaffiliated with or controlled by the sponsor or the servicer(s)) to perform

---

[8] If a transaction does not involve a master servicer, neither the trustee nor any other transaction party performs these roles.

[9] This report is required under Item 1122 of Regulation AB and covers a uniform set of servicing criteria, for the designated platform (*i.e.*, is not trust-specific), which may or may not be the same as the servicing duties specified in a governing agreement.

[10] Governing agreements may provide that annual certificates and reports are to be provided to other deal parties and made available to investors.

administrative functions as specified in the governing agreement for the benefit of investors. Those functions include holding, solely for the beneficiaries, legal title to the trust's assets; maintaining certain trust records (but not including servicing records on the mortgage loans); and, in limited circumstances, exercising contractual rights on behalf of and at the direction of investors. As explained above, those administrative functions may also include calculating and making payments to investors, preparing monthly investor reports, and maintaining a register identifying the holders of the securities.

4.22    Sponsors select and engage trustees based upon their experience, in acting as a corporate trustee for RMBS transactions, *after* designating other deal parties, including the servicer, and determining the legal and economic structure of the transaction.

4.23    Performance of the trustee's duties, and its exercise of any rights, are determined and guided by contractual provisions typically found in the governing agreement sections entitled "Duties of the Trustee" and "Certain Matters Affecting the Trustee." Consistent with its customary role, the following provisions relating to the trustee are typically present in a trust's governing agreement:

4.23.1    The trustee's contractual duties are only those expressly provided for in the contract. Any right, including the ability to exercise discretion, is not understood to be a duty and is not required to be considered or exercised absent receipt of a qualified investor

20

direction and/or an event of default as defined in the governing agreement.

4.23.2   The trustee is indemnified against potential liability and for fees and expenses in the absence of willful misconduct, bad faith or negligence.

4.23.3   The trustee is not required to risk or expend its own funds or subject itself to personal liability in the performance of its duties or in the exercise of any right.

4.23.4   The trustee is also not required to investigate any fact or matter unless directed to do so by a threshold percentage of investors.

4.23.5   The trustee is entitled to rely on the truth and accuracy of the contents of documents that are required by the governing agreements to be delivered to the trustee so long as, on their face, they appear to conform to the required form.

4.23.6   The trustee is not subject to liability under the agreement for actions taken or omitted if it reasonably believed in good faith belief that it was entitled to take (or not take) them unless it was negligent in ascertaining the pertinent facts.

4.23.7   The trustee is not subject to liability under the agreement for actions taken or omitted in reliance on the advice of counsel or at the direction of a threshold percentage of the investors.

4.23.8  The trustee shall not be deemed to have knowledge of a default unless a responsible officer of the trustee shall have actual knowledge or received written notice.

4.24    The trustee customarily receives the following from the servicer or master servicer: (a) monthly information on the mortgage loans necessary to perform its duties, and and/or (b) periodic documentation (*e.g.*, reports, certificates, notices) as required by the governing agreement. The former is data[11] required by the trustee if it calculates the waterfall and creates reports for investors and other parties with prescribed information on the mortgage loans (per the governing agreement). The latter is typically delivered annually to the trustee as part of its responsibility to hold certain trust records and to furnish such documents to other designated or authorized parties.

4.25    Trustee duties do not include loan servicing-related activities, and its interaction with servicers, in this regard, is limited to executing documents or delivering a power of attorney (due to holding legal title to the mortgage loans). Governing agreements require the trustee to cooperate with servicers and master servicers, pursuant to their request and/or direction, to enable them to independently perform in accordance with their authority. Other typical governing agreement provisions provide that the trustee is not responsible or liable for the performance of a servicer. Examples of typical provisions from certain Governing Agreements are outlined below.

---

[11] See ¶5.18 above, which describes loan-level data delivered for this purpose.

4.25.1 "The Trust and the Securities Administrator, prior to the occurrence of an Event of Default and after the curing of all Events of Default that may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. During an Event of Default, the Trustee and Securities Administrator shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise our use under the circumstances in the conduct of such person's own affairs. Any permissive right of the Trustee and Securities Administrator enumerated in this Agreement shall not be construed as a duty."
(Bravo 2006-1 PSA § 8.01)

4.25.2 "The Trustee shall furnish the Servicer and the Master Servicer with a separate power of attorney in the standard form used by the Trustee in the form of Exhibit R to the extent necessary and appropriate to enable the Servicer and the Master Servicer to service and administer the Mortgage Loans and REO Property. The Trustee shall not be liable for the actions of any Servicer or the Master Servicer under such powers of attorney." (American Home 2007-5 PSA §8.01(a))

4.26 Because the trustee is listed in certain public records as the legal titleholder to property, it may receive information (*e.g.*, through a notice or inquiry) for circumstances that may require action by the servicer with respect to a

23

particular loan level issue. As a result, based on its understanding of the requirements of the governing agreements, trustees typically forward loan-level information requests or notices to the applicable servicer—as long as the information it receives is sufficiently detailed to enable the trustee to identify the trust and the relevant servicer.

4.27    Trustee compensation is typically comprised of the same elements as those described above for servicers (*i.e.*, fees, economic benefit of trust account balances, expenses, indemnification amounts) but is a fraction of the servicer and master servicer compensation in light of the trustee's much more limited role. Depending on the terms of the governing agreements, amounts due to the trustee may be paid from the trust waterfall or instead paid by another deal party.

4.28    Trustees' fees are based upon the scope and nature of its role, structure of the trust, timing of any funds deposited to a trust account (*i.e.*, number of business days prior to payment date) and whether the funds will be invested or held uninvested. If a trustee is not the paying agent and does not administer the trust waterfall, its compensation tends to be a flat annual amount typically in the range of $2,500 - $3,500.

4.29    Trustee fees, when administering the waterfall and acting as paying agent, are typically comprised of a basis point fee rate and/or a certain number of days to hold uninvested the monthly amount received from the servicer or master servicer. Basis point fees, in my experience, range from a fraction of a basis point to a couple of basis points depending on the amount of the

original pool balance. Illustrated below are two examples of trustee compensation:

4.29.1 A trustee fee rate of 0.002% applied to an original pool balance of $900 million equates to an initial monthly fee of $1500 (or $18,000/year). The monthly fee declines in accordance with the actual pool balance, so if by year 15 of the trust, the pool balance had dropped to $10,000,000, then the monthly fee would be less than $17.

4.29.2 A trustee fee rate of 0.00% and the right to retain the economic benefit of the monthly deposit for two business days preceding each payment date. The economic benefit would vary based on fluctuations in the monthly deposit, calendar days the deposit is held, and the rate the trustee earns on deposits. A monthly deposit of $6 million held for two calendar days would be equate to a fee of ~$1,479/month or ~$17,753 annually(assuming Fed Funds less FDIC insurance equals a rate of 4.5%).

E.    Breaches, Defaults and Events of Default

4.30    Each governing agreement specifies particular circumstances that constitute a default and other conditions, such as written notice and then passage of a specified time period without a cure, before an event of default ("EOD") may be determined or declared. Governing agreements may contain different types of defaults and EODs depending on the transaction structure and deal party roles. The types of defaults that could arise are further explained below:

25

    4.30.1  Indenture defaults typically involve a failure by the issuer to perform or observe a covenant (*e.g.*, make required distributions or deliver compliance certificates and/or reports);

    4.30.2  Servicer defaults typically involve a failure to perform (*e.g.*, to deposit funds, to deliver reports and/or certificates) or to service the mortgage loans in accordance with the governing agreement[12]; and

    4.30.3  Master servicer defaults typically involve a failure to perform master servicing duties, including in accordance with the governing agreement, but not as a consequence of a servicer default.

4.31    Each RMBS must be administered pursuant to its governing agreement; therefore, a default or an EOD must also be specific to a trust. This means, of course, that any servicing-related default must implicate the mortgage loans in the particular trust. When the trustee has actual knowledge or notice of a servicer default, it would (when required) provide notice of the specific default to the servicer.

4.32    In addition, RMBS governing agreements typically state that a failure by the servicer or master servicer to observe a covenant or perform a duty may become an EOD if the breach and/or default is material to the interests of the investors and if the breach or default remains after the servicer or master servicer has been given written notice and an opportunity to cure. An example of typical governing agreement provisions is below.

---

[12] Servicer defaults may also occur as a result of a rating downgrade, the results of a collateral performance test specified in the governing agreement, or a bankruptcy filing. After a servicer or master servicer files for bankruptcy, enforcement of the contract would violate the automatic stay.

4.32.1 "any failure by the Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in this Agreement, which failure materially affects the rights of Securityholders [*i.e.*, investors], which failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have be given to the Servicer …" (Saxon 2005-3 SSA §6.1.)

4.33 Following the occurrence of certain EODs[13] (*e.g.*, an indenture EOD, a master servicer EOD under a PSA), a trustee typically is expected to perform its duties and exercise those rights (as provided in the governing agreement) as a prudent person would under similar circumstances. Prior to or following the resolution of an EOD, the trustee's duties are only those expressly required under the particular governing agreement.

4.34 Under typical RMBS governing agreements, the trustee is only charged with its post-EOD "prudent person" duties if it has actual knowledge or receives written notice of the EOD. The trustee may obtain actual knowledge of certain defaults, such as a failure of the servicer to make a required deposit, if the trustee maintains the account into which the funds were required to be deposited. Trustee knowledge of other types of defaults (*i.e.*, a material failure to perform in accordance with the standard of care) generally occurs only after the trustee receives written notice from a

---

[13] This is a function of the structure (*i.e.*, indenture versus PSA) and deal party roles (*i.e.*, if the governing agreements appoint a master servicer to oversee a servicer, a servicer EOD typically does not trigger a higher standard of care for the trustee nor a right for the trustee to terminate the master servicer).

transaction party that has made a subjective determination of a breach by the servicer or master servicer. Governing agreements typically identify the transaction party (*e.g.*, trustee, master servicer, and/or requisite percentage of investors) able or obligated to provide a breach or default notice to the servicer. Delivery of such notice then triggers a specified cure period, for the servicer or master servicer to resolve each breach or default, which must elapse (and unresolved) before an EOD may be determined and declared by the enforcing party.

4.35    When an EOD has occurred, with respect to the servicer, governing agreements typically provide that the master servicer may, or shall at the direction of the requisite investors, terminate the servicer subject to other specified rights and conditions. When it is an EOD with respect to the master servicer, the provisions typically provide the same with the trustee as the enforcing party authorized to terminate the master servicer (but not the servicer). There are also transactions where another deal party (*e.g.*, an insurer or trust administrator) is specified as either a consent party[14] or the party with the contractual authority to terminate the servicer or master servicer.

4.36    The termination of a servicer results in the transition of servicing functions and records from one servicer to another. A servicing transfer is, therefore, a significant and impactful event for the trust (*i.e.*, potential disruption to

---

[14] Typically, a certificate insurer, if any, has a right to consent, or object, to the termination or other remedy after an EOD has occurred.

servicing activities and incurring costs from the transition) and for all of the borrowers whose loans are owned by a trust (*e.g.*, changes in contact and to whom payments are made; delay to in-process modification requests). Governing agreements may specify a certain transition period, and, if not, the transfer of servicing duties will occur within a timeframe (*i.e.*, 90 days or longer) sufficient to enable servicers to comply with all regulatory notice requirements and to otherwise provide for an orderly transition.

## 5. <u>RMBS TRUSTEE CUSTOM AND PRACTICE</u>

5.1     In this section I identify and explain industry custom and practice of trustees, in their administration of RMBS trusts. In connection with each custom and practice, and based on my review of the Trustees' testimony and the policies identified in Exhibit A, I provide an opinion regarding the conformance of the Trustees' trust administration practices and procedures to industry custom and practice. My opinions are solely based on my extensive corporate trust and RMBS administration experience (as outlined in Report §2) as well as my review of the materials listed in Exhibit A. I reserve the right to revise and/or supplement my opinions if I am provided with additional information.

A.     <u>Trustees Review and Negotiate Governing Agreement Provisions Covering Their Duties and Protections or Affecting the Performance of Their Duties.</u>

5.2     When reviewing and negotiating new contracts, Trustees focus solely on those provisions that (a) cover or affect the performance of their duties (including limitations of their duties); (b) provide protection in the appointed role; and/or (c) create potential liability in serving in the

appointed role. Trustees review draft agreements provided by the sponsor's counsel and work with their own counsel to ensure the provisions are typical, consistent with the scope of the role(s) contemplated and comply with any internal standards. In addition, trustees review some provisions covering other deal parties' duties but solely to the extent that they could affect the trustee's ability to timely and effectively perform its own duties (*e.g.*, timing for servicer's delivery and sufficiency of mortgage loan level data necessary for the trustee to produce a report to investors).

5.3    Internal document standards, and related guidance, employed by trustees typically focus on potential risk and liability and are designed to ensure that its standard business processes could consistently satisfy its contractual duties (*e.g.*, timing to post monthly investor reports to its website). Any deviation from the standard and/or unique provisions typically requires further review and approval at a more senior level.

5.4    Lastly, trustees may read portions of the draft agreements to understand, at a high-level, the structure and operation of the trust, but custom and practice is to refrain from making comments on aspects affecting the rights or duties of other parties and, particularly, any economic considerations (other than their own compensation and protection against liability).

5.5    I reviewed the procedures and guidelines that the Trustee prepared for its employees to utilize when negotiating new contracts.[15] The Trustees' guidance for the review of new contracts, is generally consistent with the

---

[15] *See* Exhibit A, Document Review Guides; Document Review Outlines; Document Review Procedures.

custom and practice described above. Therefore, in my opinion, to the extent the procedures were followed, the Trustees' negotiation of new governing agreements conformed to the industry custom and practice set forth above in this section. Finally, based on my review, it is my opinion that the document provisions and scope of trustee duties (including the limitations and protections afforded the role) in the Governing Agreements listed in Exhibit A are typical for an RMBS trustee.

B.  Trustees Perform Express Duties and Administer Transactions on a Trust-By-Trust Basis in Accordance with the Governing Agreement and Have Policies and Procedures to Provide High-Level Guidance for Performing their Ordinary Activities.

5.6     In the administration of any trust, trustees customarily understand that they are obligated to perform only their express duties (pre-EOD), and they rely upon the typical limitations and protections afforded them in the governing agreement (and at times, consultation with counsel) in determining the manner by which they discharge their obligations. This general approach is manifest in every other pre-EOD custom and practice. For example (and as further explained below), loan-level data delivered to the trustee for waterfall administration, prior to the occurrence of an EOD, is only utilized in connection with its intended purpose.

5.7     Trustees employ policies and procedures ("P&P") to provide high-level guidance on processes that may be regularly applied by staff to administer securitization transactions. P&P are not, consistent with custom and practice, intended to supplant or override the express contractual provisions to which each trust must be administered. It is understood that if any

31

conflict arises, between P&P and a governing agreement, trustees follow the terms of the governing agreement.

5.8 Trustees' P&P typically identify potential issues to be escalated, including to whom, but do not offer guidance when a subjective assessment and/or considered decision may be necessary because the circumstances and/or terms of the applicable governing agreement could affect the analysis and decision. When trustees encounter unique circumstances, they often seek out others, including management and/or internal or external counsel, to leverage an appropriate level and scope of experience (as well as any specialized expertise) to satisfactorily perform the trustee's contractual role.

5.9 I reviewed the Trustees' procedures for use by their officers and employees when performing their ordinary (as opposed to post-EOD) administration responsibilities.[16] In my opinion, the Trustees' P&P in this regard are generally consistent with this industry custom and practice in: (a) its guidance to administer a trust in accordance with the governing agreement(s), (b) its presumption that, prior to an EOD, the Trustee is only required to perform its express contractual duties, and (c) its direction to employees that when unusual circumstances and/or potential servicing-related breaches occur, they should escalate the issue and seek the advice of counsel (internal and/or external) prior to taking further action. If the Trustees administer their RMBS trusts in accordance with these P&Ps, it is

---

[16] *See* Exhibit A, Deutsche Bank Documents & Governing Agreements.

my opinion that they administered them in a manner that is consistent with industry custom and practice.

C.   Trustees Understand Servicers & Master Servicers to be Independent Deal Parties, With Distinct and Specialized Roles and Presume They Perform in Accordance with the Governing Agreement.

5.10    As previously mentioned, sponsors select and engage servicers and master servicers based upon their qualifications and experience. In addition, rating agencies assess servicer and master servicer qualifications and performance, assign servicer or master servicer ratings, and account for these considerations when assigning ratings to the trust's securities[17] Trustees, therefore, generally expect that the entities named as servicer or master servicer are qualified to act in these roles.

5.11    Servicers and/or master servicers are appointed under the governing agreements to independently perform loan servicing functions, including REO maintenance and marketing, for the benefit of the trust and its beneficiaries (i.e., investors). As servicers and master servicers are autonomous transaction parties, with broad authority granted under the governing agreements, trustees do not consider servicers and/or master servicers to be their vendors or agents. Trustees cooperate and furnish documents and/or information that may be required or requested by the servicer or master servicer, including a power of attorney, to perform their loan servicing activities. Powers of attorney, furnished by the trustee as

---

[17] A rating agency confirmation that its rating of a trust's securities will not be downgraded, solely as a result of any servicing transfer (i.e., a change from one entity to another) is typically required.

33

required under RMBS governing agreements, are drafted to confirm the authority granted to the servicer under the governing agreement and typically indemnify the trustee for any and all actions that the servicer (or a sub-servicer of the servicer) takes thereunder.

5.12  The nature and frequency of the trustee's interaction with servicers is largely determined by the scope of the trustee's functions in administering the trust. By way of illustration, where a trustee administers the waterfall, the interaction is regular (*i.e.*, during the monthly reporting cycle) and transactional in nature (*e.g.*, delivery of monthly loan-level data), enabling the parties to perform the respective functions assigned to them in the governing agreement. When the trustee performs a more limited trustee role (*i.e.*, when the governing agreement appoints a securities administrator to perform functions sometimes performed by trustees), the interaction is intermittent and also transactional in nature (e.g., request for powers of attorney; delivery of annual compliance documents).

5.13  In the absence of actual knowledge or written notice of a servicer or master servicer default and/or EOD, governing agreements entitle trustees to presume that no default or EOD has occurred. Consistent with these provisions, trustees expect that the entity servicing the mortgage loans has performed or will perform under the governing agreement accordingly. Below is an example of typical governing provisions:

5.13.1  "For purposes of this Section 7.01, the Trustee shall not be deemed to have knowledge of a Servicer Event of Default unless a

Responsible Officer of Trustee assigned to and working in the Trustee's Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such a Servicer Event of Default is received by the Trustee and such notice references the Certificates, any of the Trust REMICs or this Agreement." (Long Beach 2006-6 PSA §7.01)

5.14    Trustees do not monitor, oversee or investigate[18] the performance of servicers (as that is not a trustee duty) as a matter of custom and practice and manage their interactions with servicers and master servicers accordingly (*i.e.*, limited to express duties and/or cooperation requested or directed by the servicer). Relatedly, governing agreements typically state that trustees need not investigate any matters unless directed to do so by investors and may presume, absent actual knowledge or written notice, that no default or EOD has occurred. RMBS trustee custom and practice, therefore, presumes servicer and master servicer compliance with their contractual obligations in the absence of notice or actual knowledge as defined under the governing agreement.

5.15    Corporate trust departments are typically staffed and managed by personnel with trust administration and/or operations experience. Consequently, even if trustees had a contractual right or authority to direct servicers' conduct and performance (and had access to information on the mortgage loans and

---

[18] An investigation undertaken by a trustee at the direction of securityholders is not a custom and practice covered by this report and is handled on a case-by-case basis.

the borrowers necessary to make appropriate servicing determinations, which they do not), they typically lack the requisite expertise in mortgage loan servicing. As such, it is also custom and practice of trustees to refer any inquiry or documentation related to loan servicing to the servicer and/or master servicer.

5.16    Finally, consistent with typical RMBS governing agreement provisions, rights (as opposed to express duties) the trustee may have as the nominal owner of a mortgage loan for the benefit of investors typically would not, as a matter of custom and practice, be exercised absent a qualified direction from investors.[19]

5.17    Based on my review of the deposition testimony of Ronaldo Reyes (who testified as the Trustees' corporate representative) and the testimony of Reyes's former supervisor, David Co,[20] it appears to me that the Trustees understood the servicer has broad authority to service the mortgage loans and were not expecting the Trustee to play a role in servicing activities. In my opinion, these understandings and expectations are consistent with how RMBS trustees view the servicing function. By providing Ocwen a power of attorney per the terms of the Governing Agreements and cooperating on loan-level inquiries, requests and/or potential issues, the Trustees' processes are consistent with a typical RMBS trustee's understanding of its role (as explained above)—which would neither require trustees to direct

---

[19] The exercise of any rights or remedies with respect to the servicer is covered in ¶¶5.35-5.36 below.

[20] *See* Exhibit A, Deutsche Bank Depositions.

the servicer nor to undertake loan servicing functions (prior to assuming the role as servicer, if applicable). None of the activities addressed in the Trustees' P&P cover any activities that I would construe as monitoring, oversight or investigation of a servicer's or master servicer's conduct.

D.    <u>Trustees' Review and Use of Loan-Level Data, Delivered by the Servicer or Master Servicer, is Undertaken Solely in Connection With their Administration of the Trust's Waterfall and Related Reporting to Investors.</u>

5.18    A trustee requires certain loan-level and other information when responsible for administering the monthly waterfall.[21] Under those circumstances, the trustee typically receives a data file[22] on a specified date with information such as: the beginning and ending loan balance; scheduled and unscheduled payments; paid through date; if a foreclosure was initiated or if related to an REO property; and indication that the loan terms were modified. The file does not contain qualitative servicing-related information, such as the servicer's communications with the borrower, the condition of property, the servicer's REO property maintenance, or the servicer's practices for marketing and/or selling REO property. Trustees, as a matter of custom and practice, review the contents of the data file(s), as part of the monthly "tie out" process, to confirm with the servicer and/or master servicer the beginning and ending balance of each mortgage loan and the amount the servicer or master servicer will remit to the trustee for

---

[21]Throughout the remainder of this section, references to information received by the trustee or roles it performs only refers to RMBS transactions in which the trustee is responsible for administering the monthly waterfall. Otherwise, it typically does not receive such data and does not perform these functions.

deposit to a trust account. This process is not an analysis of the data but instead a comparison to certain information from the prior period and following the application of the reported data elements. Any discrepancy (*e.g.*, being unable to tie out to an ending balance of a mortgage loan) identified by the trustee is reported to the servicer or master servicer— which then provides an explanation or updated data whereby the trustee may complete the tie out process and proceed with administering the waterfall.

5.19 Loan-level information provided for reporting-only purposes (*i.e.*, needed for the report to investors and not waterfall administration) is, by custom and practice, reviewed only to confirm the required data is present and can be tied out with any aggregate reporting provided. Reporting-only data is then complied, organized and/or otherwise integrated, without further review or analysis, into the report produced by the trustee. When a trustee receives inquiries about this information, the trustee typically refers them to the servicer or master servicer for a response.

5.20 Trustees retain servicer-provided data only as support for their waterfall calculations and investor reporting and to make it available to other parties as authorized and/or contemplated by the governing agreements.

5.21 Based on my review of the documents in Exhibit A, I am not aware of any evidence indicating that the Trustees utilized loan-level data received by it for any purpose other than in connection with its administration of the waterfall, preparation of investor reports, or, as discussed in the next

section, to identify the applicable servicer. If the Trustees did not analyze or leverage loan-level information that it received, other than for these purposes, that would in my opinion be consistent with industry custom and practice.

E.    When Trustees Receive a Loan-Level Notice (or Inquiry), They Typically Refer the Matter to the Responsible Servicer or Master Servicer for Handling (or Response).

5.22    Prior to the credit crisis, trustees rarely, if ever, received property-specific correspondence, notices (including citations) or inquiries. This changed, starting in or around 2009, when borrowers or their counsel began inquiring about loan modifications, and municipalities began to reach out directly to trustees, because servicers were initiating foreclosures in the name of the trustee (as the legal titleholder of the note and mortgage).

5.23    Since trustees are only required to perform their express duties, RMBS trustee custom and practice is to refer all loan servicing matters (*e.g.*, borrower correspondence; notice of unpaid taxes; utility bills; citations or alleged code violations) to the servicer and/or master servicer. This practice is consistently applied by trustees (other than escalated matters as explained below) without regard to the location or value of the property.[23] Over time, as inquiries became more frequent, trustees began to track items received, date forwarded to the servicer, and servicing contact to whom an item was forwarded.

---

[23] Information as to property value is not information typically available to trustees unless included in investor reports when prepared by the trustee.

5.24 Trustees utilize information contained in a loan-level notice or that they otherwise received (*e.g.*, mortgage loan schedules received at the inception of a transaction, monthly files received from the servicer for waterfall administration) or conduct simple research of public property records to identify the responsible servicer. This custom and practice typically enables trustees to identify, and then forward the documentation or refer the party to an appropriate contact of, the servicer or master servicer. Written materials are typically forwarded with a request to respond if they have no record of the loan or are no longer the servicer.

5.25 In certain circumstances, the trustees may receive requests or follow up from municipalities or other governmental entities (with respect to a property or list of properties). Consistent with the practice described above, trustees identify the responsible servicer or master servicer, send the servicer or master servicer its portion of the list (if properties tied to more than one servicer or master servicer appear on the list), and provide the list, identifying the responsible servicer and contact information, to the inquiring representative. As needed, trustees work cooperatively with certain municipalities or government representatives to facilitate communication with servicers and master servicers—always within the limits of and consistent with their role as trustee.

5.26 When a trustee receives litigation-related documentation (*e.g.*, filings from a court of law; correspondence relating to litigation), those items are typically reviewed by dedicated staff with relevant experience (*e.g.*, a

paralegal). These items are read to identify whether the trust or trustee is a named defendant and, more generally, to apply relevant internal guidance to identify potential issues or circumstances to be escalated to managers and/or counsel for further review.[24] RMBS trustee custom and practice, other than for escalated items (i.e., those that do not involve ordinary trustee duties or that involve unusual circumstances), is to forward and tender litigation to the servicer to manage on behalf of the trust and trustee. When the matter requires, servicers retain outside counsel to defend the trust and the trustee against claims relating to servicing activity. These litigation-related documents, as well, are tracked and copies retained as part of the trust's records.

5.27   As covered above (¶5.13), governing agreements typically provide that trustees are entitled to presume that no default or EOD has occurred absent written notice or actual knowledge. Given trustees lack the requisite loan servicing expertise and specific information on any REO property, citations or lists of alleged violations it receives are understood to be potential (*i.e.*, not yet established), breaches that the servicer is responsible, and best positioned, to address—and does not require any investigation, monitoring or oversight by the trustee.

5.28   I have reviewed the Trustees' P&P and deposition testimony concerning its processes for, and handling of, loan-level inquiries and notices (including

---

[24] Trustees work closely with their counsel, internal or external, in developing guidance on the review used to identify items for escalation.

citations or litigation related matters),[25] and, in my opinion, they are generally consistent with industry custom and practice.

F.     <u>Trustees Review Compliance Certificates & 1122 Reports Delivered by Servicers or Master Servicers to Determine Whether, on Their Face, the Documents Appear to Meet the Requirements of the Governing Agreement.</u>

5.29     As previously explained, trustees maintain certain records of the trust, which include compliance documents delivered by the servicer and/or master servicer. Consistent with the typical RMBS provisions outlined above (¶4.23.5), these documents can be relied upon by the trustee in the performance of its duties. Trustee custom and practice, with respect to any certificate or report to be delivered to the trustee on a specified date, is to establish a tickler as a reminder of the due date and from whom and what documents are required under the governing agreement.

5.30     On an annual basis, servicers and master servicers typically are required to deliver two documents: (a) an annual statement of compliance covering its obligations for a trust ("Compliance Certificate"); and (b) management's assessment of compliance, for a portfolio of trusts, with SEC Regulation AB Item 1122 servicing criteria ("1122 Report").[26] Upon receipt, in accordance with custom and practice, trustees review the items to confirm, on their face, these documents satisfy the terms of the governing agreement

---

[25] *See* Exhibit A, Deutsche Bank Depositions; Deutsche Bank Documents.
[26] For some RMBS issued prior to 2006, servicers or master servicers may deliver a report on management's assessment, and accountant's attestation, as to compliance with the Uniform Single Attestation Program for Mortgage Bankers (i.e., a report required for RMBS prior to the effective date of Regulation AB).

and (in the case of the Compliance Certificate) were signed by the appropriate officer(s) of the relevant party.

5.31    When a servicer's or master servicer's Compliance Certificate includes a disclosure of material noncompliance (*i.e.*, performance under the governing agreement which occurred during the period covered), trustee custom and practice is to consider the substance of the disclosure and/or consult with others (*i.e.*, escalate). In considering the substance of the disclosure, the trustee simply determines whether, based upon the statements made, the noncompliance disclosed has been resolved or in the process of being resolved. The reported status and nature of the noncompliance disclosed, along with consideration of the governing agreement provisions, are factors trustees consider in determining whether it should take any additional steps, such as escalate the issue, potentially disclose it to investors, or take no further action.

5.32    Noncompliance disclosed in the 1122 Report does not relate to each trust itemized in the attached schedule. Rather, in preparing its 1122 Reports, servicers and master servicers (and independent accountants who provide an attestation) test a sample of transactions and render opinions that are platform-wide (*i.e.*, not trust-specific) based on that sample. Therefore, as a matter of custom and practice, trustees do not typically take further action as to any given trust (other than making reports available to investors) based on reported noncompliance included in the 1122 Report – as the

1122 Report is not specific to the particular trust (or mortgage loans held by the trust) at issue.

5.33    I have reviewed the Trustees' P&P and deposition testimony concerning its review of annual compliance documents (which would include those received from servicers and master servicers) that were delivered to the Trustees,[27] and, in my opinion, that review is generally consistent with industry custom and practice.

G.    Trustees' Post-EOD Administration is Based Upon Various Factors Including, But Not Limited to, the Unique Circumstances of a Trust, the Rights and Authority of the Trustee and Other Deal Parties, Advice of Counsel and Input and/or Direction from Trust Investors.

5.34    After the trustee has actual knowledge (or, if the governing agreement requires, written notice) that a default and/or EOD has occurred and is continuing; trustees (or another deal party) may be required to provide a notice of the default or EOD to trust investors and/or to other parties. The notice describes the nature of the default and often provides to investors a trustee contact for questions, to discuss and/or provide a direction to the trustee, and/or to express their views.

5.35    In connection with a servicer or master servicer-related ongoing EOD, the governing agreements provide the trustee with a right, but not an obligation, to terminate the relevant entity. Here is an example of typical governing agreement provisions:

---

[27] *See* Exhibit A, Deutsche Bank P&P §1E Ticklers (DB_NFHA00121190); Reyes Deposition Subject 8 Dated December 5, 2021 (pages 11 – 20).

5.35.1 "[T]he Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by the Certificate Insurer, or by Holders of Certificates [*i.e.* investors] evidencing not less than 25% of the Voting Rights allocated to each Class of Certificates;" (CDC 2003-HE4 PSA §8.02(d)).

5.36 Whether to exercise this right depends upon some of the following: the nature of the EOD, the circumstances of the trust, the trustee's receipt of a qualified direction and/or the views expressed by investors. As a matter of custom and practice, trustees consult with their counsel (to consider all of the above) and typically await direction from investors. Absent exigent circumstances, under trustee custom and practice, Trustees would not terminate a servicer without first receiving a qualified direction from investors (or other deal parties with consent or direction rights)—as those entities hold the economic interests in the trust and suffer the costs and risks associated with such determination.

5.37 When a trustee receives notice from a transaction party alleging a servicing related default, these circumstances are typically elevated and, often, counsel is engaged to assess the information received and to review the provisions of the governing agreement. Following consultation with counsel, trustees may take further action including a notice to investors. In

these circumstances, trustees summarize the information and circumstances and typically state that they have not yet concluded that a default occurred. The purpose of the notice is to provide important information to investors and to provide instructions on how any direction (consistent with the terms of the governing agreement) may be provided to the trustee.

H.    Trustees Do Not Have Policies and Procedures Covering Property Maintenance or REO Marketing (or Other Loan Servicing Functions).

5.38    As explained above (¶5.7), trustees' policies and procedures provide guidance on administrative processes used in the performance of the trustee's contractual duties. Throughout my career in the corporate trust industry, I have never encountered an RMBS trust where the trustee is required to perform loan servicing functions—as those activities are solely performed by servicers and/or master servicers.[28]  In addition, I have never encountered a corporate trust department that has any policies or procedures covering loan servicing functions, including property maintenance and REO marketing. Accordingly, it did not surprise me that my review of the Trustees' P&P did not reveal any guidance and/or processes concerning property maintenance, REO marketing, or other functions that are solely performed by servicers and not by trustees.

---

[28] RMBS governing agreements often provide that following an EOD and termination of the servicer or master servicer, the trustee shall be the successor servicer or master servicer – unless another entity is appointed as successor.  In this limited circumstance, were it to occur, the trustee could assume loan servicing duties at least temporarily.

6.  **THE KISCH REPORT MISCONSTRUES THE ROLE OF THE TRUSTEE AND IGNORES THE BROAD AND INDEPENDENT AUTHORITY OF THE SERVICER AND/OR MASTER SERVICER.**

6.1     I have reviewed the expert report and deposition testimony of Pamela Kisch, an executive director of a fair housing center.

6.2     The Kisch report includes assumptions and/or conclusions that are inconsistent with the purpose and scope of a trustee's contractual role in an RMBS trust and its contractual relationship with servicers and/or master servicers (and any vendors of the servicer or master servicer).

6.3     Ms. Kisch says "Deutsche Bank is obligated to insure that their REO properties met the basic standards of upkeep," and that "Deutsche Bank had a duty to insure the properties were brought into compliance with minimum standards within 30 days."

6.3.1     As explained above (¶4.9), trustees are the nominal owner of an RMBS trust's property, which is held pursuant to the governing agreements and solely for the benefit of trust investors. Trustees understand that they are only required to perform their express duties outlined in the governing agreement, which do not include loan servicing functions—as those are obligations of the servicer and/or master servicer.

6.3.2     As previously stated, typical RMBS governing agreements provide the servicer and/or master servicer for the Trusts with independent authority and obligation to perform all loan servicing functions, including maintenance of REO properties, for the benefit of the trust and its beneficiaries. Based on my review, the Governing

Agreements identified on Exhibit A are consistent with typical RMBS governing agreements. Consistent with industry custom and practice, I would expect the Trustees presume that Ocwen would perform in a manner consistent with the applicable servicing standard of care, which includes applicable regulations.

6.3.3   Consistent with industry custom and practice, I would not expect the Trustees to oversee Ocwen's (or Ocwen's vendor's) fair housing compliance.

6.4   Ms. Kisch also states that "the responsibility for fair housing compliance cannot be delegated away."

6.4.1   For securitized loans like those at issue in this case, fair housing compliance is inextricably linked to loan servicing activities, which are independently performed by servicers and master servicers, on behalf of the trust and its beneficiaries, in accordance with the terms of the governing agreement. In my experience, RMBS trustees do not perform functions related to the acquisition, maintenance, or sale of REO properties and do not supervise or oversee any of these functions.

6.4.2   To the extent that Ms. Kisch is referring to customary terms of RMBS governing agreements, in my experience, these agreements do not contain any provisions that address these alleged trustee duties. To the contrary, having reviewed hundreds of RMBS governing agreements (and managed a department responsible for

administering several thousand RMBS trusts),[29] I have never encountered terms that require a trustee to perform loan servicing functions (subject to n. above) or to provide guidance or direction to a servicer or master servicer regarding the manner by which they perform those activities for the trust. This makes sense in light of the distinct responsibilities of trustees versus those of servicers; the limited ministerial duties of the trustee; the specialized core competencies of trustees versus those of servicers; and the servicers' access to servicing-related information and systems (that the trustee does not have).

6.4.3   Instead, at closing, governing agreements themselves authorize and direct servicers or master servicers to perform their servicing functions. Thus, trustees would not, as a matter of custom and practice, construe servicers' responsibility to comply with fair housing requirements (including property maintenance and marketing) to be duties that the trustee delegated to a servicer and/or master servicer. Trustees do not, and cannot, "delegate away" servicing duties that were never assigned to them by the transaction sponsor, at the inception of the trust in the governing agreements. (*See* ¶¶4.7-4.8 above.)

6.5     To the extent Ms. Kisch is opining on the Trustees' legal or other contractual duties (as opposed to industry custom and practice), my opinion

---

[29] In contrast, Ms. Kisch conceded during her deposition that she has no experience at all with RMBS trusts or trustees.

does not address that aspect of her report because I understand it is not

permissible for an expert report to opine on the law (and not because I

agree with her).

### 7. THE TYLER REPORT CONFLATES AND/OR MISCONTRUES THE ROLES OF THE SERVICER, ISSUER, AND TRUSTEE.

7.1     I have reviewed the report and deposition testimony of Deavay Tyler, an

executive vice president and chief financial officer of a property

preservation and maintenance company.

7.2     Mr. Tyler opines on the roles of property owners, broker or listing agents,

and preservation and maintenance vendors in REO maintenance. Because

the Trustees hold legal title to the property, he assumes trustees play the

same role in all respects as an ordinary property owner with which he is

familiar. Mr. Tyler disregards the fact that title to the property is held in the

name of the Trustees solely for the benefit of "XYZ Trust [and the

Certificateholders]." As explained above (¶4.9), trustees (including the

Trustees here for the Trusts) have no economic interest in the Trusts'

property,[30] and the agreements under which trustees agree to hold title

typically state that servicers, not trustees, agree to perform the servicing

functions that Mr. Tyler assumes belong to the Trustees. Mr. Tyler's

confusion is understandable given his inexperience, by his own admission,

with RMBS transactions and deal party roles.[31] Accordingly, his

explanation of the customary role of the owner is inapplicable to the facts

---

[30] As explained in ¶ 4.27, trustee compensation may be paid from the cashflows and that is their sole economic interest in the trust property.
[31] *See* Tyler Dep. 49:3-18; 283:3-284:8.

50

of this case—which involves trustees' and servicers' performance of their distinct duties on behalf of RMBS trusts (and its beneficiaries).

7.3   Given his misunderstanding of the role of an RMBS trustee, Mr. Tyler ascribes responsibility, in part, for his observed "dysfunctionality" to "Deutsche Bank's demonstrated lack of interest in its REO portfolio." He goes further to state that "Deutsche Bank would rather have a servicer like Ocwen make a wrong decision than for Deutsche Bank to get involved." (Tyler Report §4.) Mr. Tyler's conclusions are misapplied as the Trustees' practices are easily understood by persons familiar with RMBS transactions and deal party roles. Consistent with industry custom and practice, trustees perform only their required duties, and they exercise discretionary rights in very limited circumstances (*see* ¶5.6 and ¶¶5.35-5.36 above), most commonly if directed by investors who offer indemnity. In my experience, a trustee administering RMBS trusts pursuant to governing agreements like the Governing Agreements that I reviewed (listed on Exhibit A) would have understood it was not required to perform loan servicing functions and did not have a right to instruct Ocwen as to the manner by which it should perform its duties.

7.4   Mr. Tyler's failure to account for securitization also leads him to misconstrue the Trustees' adherence to the customary practices of RMBS trustees (*i.e.*, not "hav[ing]a presence in the process to ensure the value of the underlying investment (in this case, the homes) is being protected, properly managed, and properly serviced" as a "demonstrated lack of

interest." (p. 15). The testimony cited by Tyler that the Trustees did not believe they had a duty to monitor Ocwen or to remediate code violations is fully consistent with the custom and practice of RMBS trustees (*i.e.*, only required and not implied duties).

7.5 In paragraph 1, Tyler discusses "the type of routine property preservation and maintenance work that mortgage servicing companies like [Ocwen], through vendors like [Altisource] should conduct regularly, regardless of the value of the property." Notably, Tyler does not mention the Trustees as having this responsibility. Based on industry custom and practice, I agree with Tyler that a trustee would not be expected to perform these functions.

7.6 In other places in his report, Tyler lumps together the Defendants and discusses their vendors (Tyler Report, ¶3), models for property preservation (Tyler Report, ¶4 and p. 15). In my experience, corporate trust departments acting as RMBS trustee do not have servicing vendors or property preservation models. If I am shown documents that indicate otherwise, I reserve the right to re-review these paragraphs of Tyler's report and supplement this report. Otherwise, I will continue to assume that Tyler is actually referring to Ocwen's and/or Altisource's, and not the Trustees', vendors and models.

Dated: February 13, 2023

_____
Eve Kaplan

52

## **EXHIBIT A**

Court Filings
- Second Amended Complaint Dated May 8, 2019 (Dkt. No. 70)
- Memorandum Opinion and Order Dated November 13, 2019 (Dkt. No. 97)
- Responses and Objections of Defendants Deutsche Bank National Trust Company, as Trustee, and Deutsche Bank Trust Company Americas, as Trustee, to Plaintiffs' First Set of Interrogatories Dated August 17, 2020
- Responses and Objections of Defendants Deutsche Bank National Trust Company, as Trustee, and Deutsche Bank Trust Company Americas, as Trustee, to Plaintiffs' Second Set of Interrogatories Dated October 1, 2020

Deutsche Bank Depositions
- Transcript for Rule 30(b)(6) Deposition by Ronaldo Reyes – Subject 1 Dated August 04, 2021
- Transcript for Rule 30(b)(6) Deposition by Ronaldo Reyes – Subject 3-Vol I Dated August 4, 2021
- Transcript for Rule 30(b)(6) Deposition by Ronaldo Reyes – Subject 3-Vol II Dated August 4, 2021
- Transcript for Rule 30(b)(6) Deposition by Ronaldo Reyes – Subject 8-Vol I Dated December 8, 2021
- Transcript for Rule 30(b)(6) Deposition by Ronaldo Reyes — Subject 8-Vol II Dated December 8, 2021
- Transcript for Deposition of David Co Dated April 7, 2022

Deutsche Bank Documents
- Policies and Procedures Revised 2012 (DB_NFHA00121148)
- Document Review Guides (DB_NFHA00307308); (DB_NFHA00307349); (DB_NFHA00307418); (DB_NFHA00307460)
- Document Review Outlines (DB_NFHA00307398); (DB_NFHA00307406); (DB_NFHA00307505); (DBNFHA_00307513); (DB_NFHA00307521)
- Document Review Procedures – Corporate Trust US Dated October 1, 2015 (DB_NFHA00307390); Dated October 3, 2016 (DB_NFHA00307394); Dated October 2, 2017 (DB_NFHA00307414); Dated January 16, 2018 (DB_NFHA00307501)
- Trust & Agency Services Americas Corporate Trust Transaction Management and Defaults Group Document Outline (DB_NFHA00307459)

Governing Agreements
- Aames Mortgage Investment Trust 2005-4 Indenture Dated September 1, 2005 (DB_NFHA00000652)
- Ames Mortgage Investment Trust 2005-4 Transfer & Servicing Agreement Dated September 1, 2005 (DB_NFHA00000719)
- Aames Mortgage Investment Trust 2005-4 Trust Agreement Dated September 6, 2005 (DB_NFHA00000645)

- American Home Mortgage 2007-5 Pooling & Servicing Agreement Dated June 1, 2007 (DB_NFHA00025803)
- Bravo Mortgage Asset Trust (BMAT) 2006-1 Pooling & Servicing Agreement Dated April 1, 2006 (DB_NFHA00027375)
- CDC Mortgage Capital Trust 2003-HE4 Pooling & Servicing Agreement Dated November 1, 2003 (DB_NFHA00030814)
- HarborView Mortgage Loan Trust 2006-8 Dated August 1, 2006 (DB_NFHA00169325)
- INDYMAC Mortgage Loan Trust 2006-AR7 Pooling & Servicing Agreement Dated March 1, 2006 (DB_NFHA00200275)
- IXIS Real Estate Capital Trust 2005-HE3 Pooling & Servicing Agreement Dated August 1, 2005 (DB_NFHA00079852)
- Long Beach Mortgage Loan Trust 2006-7 Pooling & Servicing Agreement Dated August 1, 2006 (DB_NFHA00300013)
- Saxon Asset Securities Trust 2005-3 Indenture Dated September 1, 2005 (DB_NFHA00134509)
- Saxon Asset Securities Trust 2005-3 Sale & Servicing Agreement Dated September 1, 2005 (DB_NFHA00117410)
- Soundview Home Loan Trust 2006-EQ2 Dated May 1, 2007 (DB_NFHA00042371)

Plaintiffs' Experts
- Expert Report of Pamela A. Kisch, Executive Director Fair Housing Center of Southeast & Mid Michigan
- Transcript for Deposition by Pamela Kisch Dated December 19, 2022
- Expert Report of Deavay Tyler, DTJ Consulting Ltd.
- Transcript for Deposition by Deavay Tyler Dated December 12, 2022

## EXHIBIT B

### EVE D. KAPLAN

### CONSULTANT

Accomplished and impactful corporate trust professional with extensive securitization experience, including negotiating contractual provisions and ongoing administration of broad variety of transactions. Proven record of success collaborating with in-house counsel, outside counsel, business managers and risk management to identify and address contractual and industry-related risks, litigation matters and compliance with regulatory requirements.

### AREAS OF EXPERTISE

Leadership | Relationship Management | Business Growth & Consolidation | Change Agent | Securitization Structures | Negotiate Contracts | Trust Administration & Operations

### Experience

**U.S. Bank National Association**
**Corporate Trust / Structured Finance Group**

**Contract Work, January 2022 – June 2022**
Provided transitional support to structured finance business managers related to activities below.

**Disputes and Portfolio Risk, June 2017 – December 2021**
Coordinated and managed business line activities with internal and outside counsel across a variety of disputes, including litigation, associated with RMBS and other similar transactions.
- Oversaw a group of 20+ employees including hiring, coaching, and evolution of specialized functions.
- Managed elevated risk issues decreasing the financial and reputational risk to the business.
- Targeted portfolio review to assess risk and develop actions plans to tackle potential issues.
- Evolved business processes to address market and regulatory developments.
- Strategized and coordinated action plans to support the business in navigating LIBOR cessation.

**Structured Finance Group Manager, June 2006 – May 2017**
Managed division responsible for delivery of trustee & agency services for mortgage and asset backed securities (MBS & ABS).
- Oversaw a group of 250+ employees across six sites administering over 7000 appointments and consistently delivered strong financial results.
- Managed and acted in a number of roles and functions over the years, which included relationship management, account acceptance, contract negotiation & onboarding, account administration, investor reporting and cash management, Regulation AB compliance, backup servicing, and other support functions.
- Headed and coordinated business line activities with the internal and outside counsel across a variety of disputes, including litigation, associated with RMBS or similar transactions mitigating financial and reputational risk.

55

- Worked with business development officers and marketing group to expand client base through developing leads, providing subject matter expertise, and creating requests for proposals for opportunities in the MBS, ABS, and government sectors.
- Led project team, including external consultants and outside counsel, to develop and implement internal processes to support the bank's contractual obligations related to SEC Regulation AB.
- Actively participated in industry trade groups on issues arising from new or updated regulations, market developments or emerging developments that involve, in part, the role played by MBS & ABS trustees.

**ADDITIONAL ROLES**

Senior Account Manager/Team Leader
Account Manager
Operations Manager
Human Resources Generalist

## PROFESSIONAL ASSOCIATIONS

**Structured Finance Association**
Board of Directors, July 2016 – June 2020
Co-Chair of the Trustee Committee, 2015 – 2020

**American Bankers Association**
Member of Corporate Trust Committee, 2010 – 2021
Ex-Officio Member of Corporate Trust Committee July 2022 to present

## EDUCATION

**Washington University, St. Louis, MO**
George Warren Brown
Master of Social Work, MSW

**Washington University, St. Louis, MO**
Arts & Sciences
Bachelor of Arts, A.B.