**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NATIONAL FAIR HOUSING ALLIANCE; HOPE )
FAIR HOUSING CENTER, OPEN )
COMMUNITIES; SOUTH SUBURBAN HOUSING )
CENTER; HOUSING OPPORTUNITIES MADE ) Case No. 1:18-cv-00839
EQUAL OF VIRGINIA; FAIR HOUSING )
OPPORTUNITIES OF NORTHWEST OHIO, INC.; )
FAIR HOUSING CONTINUUM; GREATER NEW )
ORLEANS FAIR HOUSING ACTION CENTER; )
DENVER METRO FAIR HOUSING CENTER; )
METROPOLITAN MILWAUKEE FAIR HOUSING )
COUNCIL; FAIR HOUSING CENTER OF WEST )
MICHIGAN; THE MIAMI VALLEY FAIR )
HOUSING CENTER; FAIR HOUSING CENTER )
FOR RIGHTS & RESEARCH; FAIR HOUSING )
CENTER OF THE GREATER PALM BEACHES; ) Judge Harry D. Leinenweber
FAIR HOUSING CENTER OF CENTRAL ) Magistrate Judge Sidney I. Schenkier
INDIANA; CENTRAL OHIO FAIR HOUSING )
ASSOCIATION; HOUSING OPPORTUNITIES )
PROJECT FOR EXCELLENCE, INC.; )
CONNECTICUT FAIR HOUSING CENTER; )
NORTH TEXAS FAIR HOUSING CENTER; and )
FAIR HOUSING ADVOCATES OF NORTHERN )
CALIFORNIA, )
)
Plaintiffs, )
)
v. )
)
DEUTSCHE BANK NATIONAL TRUST, AS )
TRUSTEE; DEUTSCHE BANK TRUST )
COMPANY AMERICAS, AS TRUSTEE; OCWEN )
LOAN SERVICING, LLC; and ALTISOURCE )
SOLUTIONS, INC., )
)
Defendants. )

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE EXPERT REPORT,
DECLARATION, AND TESTIMONY OF DEAVAY TYLER**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

A. Tyler's Experience at a Local Property Preservation Company Does Qualify Him to Opine on Defendants' Policies and Practices. ............................ 2

1. Tyler has no experience qualifying him to opine on what standards apply to Defendants' policies and practices. ............................................. 2

2. Tyler has no experience qualifying him to opine on the purported industry standards and "model" that apply to Defendants' policies and practices. ........................................................................................... 4

B. Tyler's Qualifications and Experience Do Not Excuse his Failure to Apply that Experience to the Facts of this Case. ............................................. 6

1. Tyler's assessment of Defendants' purported "value-based" policies and procedures fails to apply any expertise to the facts of this case as required to be admissible under Rule 702 and *Daubert* ......... 6

2. Tyler's assessment of Defendants' "quality control" policies and procedures also fails to apply his expertise to the facts of this case as required to be admissible under Rule 702 and *Daubert* ...................... 9

3. Tyler's opinions about the "perceptions," "beliefs," and "understandings" of Defendants and their vendors is not rooted in any factual basis and is impermissible expert testimony ........................ 11

C. Tyler Has no Experience Regarding the use of Offshore Employees and Offers no Factual Basis to Support his Opinions about the Practice's Efficacy in the Provision of Preservation and Maintenance Services. ................ 12

D. Tyler's Review of Photographs is Unreliable and Not Expert Testimony. ......... 13

1. Tyler admitted his review of Plaintiffs' 4,157 photographs was not expert testimony. ...................................................................................... 13

2. Tyler's photo review was demonstrated to be unreliable according to both his and Plaintiffs' own methods, not "skullduggery" ................. 13

CONCLUSION .................................................................................................... 15

## INTRODUCTION

Defendants' underlying Motion[1] seeks to exclude the unsupported opinions and testimony of Plaintiffs' purported property maintenance expert, Deavay Tyler, regarding (1) the existence and applicability of industry standards or general practices to Defendants' operations; (2) whether a property's value affected its maintenance or marketing; (3) whether Defendants employed effective quality control and oversight practices; (4) Defendants' use of offshore employees; (5) the effects of Defendants' policies and practices for the REO properties at issue; and (6) the analysis and conclusions reached from Tyler's review of property photos in his Rebuttal Report.

Plaintiffs' Opposition ("Opp.") attempts to rebut the first five of these issues by seeking to broadly characterize Tyler's narrow experience as a mid-level manager at a local preservation company. But Plaintiffs' reliance on Tyler's general experience gained from his time working at one ground-level preservation vendor in a single locality is misplaced, as Tyler's testimony and case law both make clear his background does not qualify him to opine on the internal policies, practices, and roles applicable to the entirely different category of nationally-operating RMBS trustees, mortgage servicers, and field service providers upon which he opines, and with which Tyler lacks any meaningful experience or expertise. Moreover, even if Tyler were qualified to proffer these opinions, Plaintiffs' appeals to his experience fail to cure his consistent inability to reliably apply that knowledge to the facts of the case. As a result, these opinions must be excluded.

As to the sixth opinion, Plaintiffs ignore Tyler's own statements that the photo review he conducted was not expert analysis. *See* Ex. 1 ("Tyler Dep. II") 163:3–6. Moreover, Plaintiffs offer no explanation or support for how this review could be considered reliable, given that Tyler could

---

[1] References and abbreviations in this brief are the same as those contained in Defendants' "Memorandum of Law in Support of Defendants' Motion to Exclude Opinions of Deavay Tyler" (Dkt. 319, "Motion" or "Defs. Br."), unless otherwise noted.

not reproduce its results when asked to evaluate photos at his subsequent deposition. As shown in the Motion and below, Tyler's review of 4,157 photos must be excluded because it is *not* expert testimony and is demonstrably unreliable under any reasonable standard.

## ARGUMENT

### A.   Tyler's Experience at a Local Property Preservation Company Does Qualify Him to Opine on Defendants' Policies and Practices.

Plaintiffs tout Tyler's experience working at a REO preservation company in the Chicago area as a panacea, asserting that background provides sufficient expertise to opine on national-scale corporate practices in jurisdictions with which Tyler has no experience. But Plaintiffs' overstatement of the breadth of Tyler's background cannot overcome what one court has already held and this Court should confirm—Tyler is qualified as an expert on issues that fall outside of his limited experience. After reviewing opinions similar to those challenged here, the court in Plaintiffs' parallel case asserted against Bank of America, N.A., held that Tyler's "general industry knowledge…does not equip him with specialized experience [to] opine on which variables actually influenced disparities between the specific housing tracts at issue." *Nat'l Fair Hous. All. v. Bank of Am., N.A., No. SAG-18-1919*, 2023 WL 1816902, at *10 (D. Md. Feb. 8, 2023) ("*BANA*"). As in *BANA*, Tyler offers numerous opinions in this case that go far beyond his expertise.

### 1.   Tyler has no experience qualifying him to opine on what standards apply to Defendants' policies and practices

When assessing the admissibility of Tyler's opinions, the question "is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *In re Testosterone Replacement Therapy Prod. Liab. Litig.*, No. 14 C 1748, 2023 WL 7182750, at *4 (N.D. Ill. Nov. 1, 2023) (alterations omitted). When assessing Tyler's qualifications to opine on the specific issues in this case, Plaintiffs "must explain how that

experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *In re Opana ER Antitrust Litig.*, No. 14 C 10150, 2021 WL 2291067, at *7 (N.D. Ill. June 4, 2021). Plaintiffs' repeated appeals to Tyler's "extensive experience working in the property preservation and maintenance industry" may qualify him to opine on the *types of repair and preservation work* that participants perform, but that experience does not qualify him to opine on the *specific* subjects related to Defendants' responsibilities, policies and procedures, and operations for the properties at issue.

Plaintiffs seek to wave away Defendants' demonstration of Tyler's lack of relevant experience as "strawman" or "talisman" arguments. Opp. at 6. But Tyler's admitted unfamiliarity with key aspects of Defendants' business, such as any knowledge of what an RMBS trustees even is, or the operations of national REO servicers and preservation vendors, highlight his lack of qualifications and his opinion's lack of basis.[2]

For example, Plaintiffs argue Tyler's lack of familiarity with RMBS trustee obligations is of no significance because "the ownership structure of an REO property is irrelevant to the PPI activities that should be completed at that property." *Id.* Tyler, however, claims exactly the opposite—describing in his Report that the Trustees must serve as a vital leg of the "three-legged stool" model at the root of his opinions. TR 1 at 15 ("Defendants' PPI model lacks the stability provided by the three-legged stool….Dysfunctionality starts with Deutsche Bank's demonstrated lack of interest in its REO portfolio.").

---

[2] *See* Tyler Dep. I 49:19-50:8 ("Q. [D]o you know what Deutsche Bank National Trust Company as a trustee's responsibilities would be for REO preservation and maintenance for the pool of REOs that it's responsible for under this [agreement?] A. No. . .in general, what I do know from the basic operational structure. . .I have to go basic from my experience, there is an owner, there's a preservation company, and there's a sales arm. . . I don't know what agreement they do. But in my mind, they're the owner. They're like Freddie Mac. They're like Wells Fargo. That's all I've got.").

Tyler claims that the Trustee Defendants lack "any interest in the care and preservation of [their] REO portfolio" in supposed dereliction of "[t]he standard of care for REO properties according to industry standards and generally accepted business practices." *Id.* But Tyler and Plaintiffs readily concede he has no knowledge of what an RMBS trustee's REO-facing responsibilities actually entail—leaving a massive chasm between what Tyler claims are "industry standards" and the distribution of ownership and maintenance responsibilities amongst the Defendants. While Tyler may have experience with REO preservation activities generally, he lacks the experience necessary to opine *specifically* on the appropriate role each Defendant plays in this case—making his "three-legged stool" analogy, and the conclusions he draws from its comparison, inapposite. While Plaintiffs may "insist[] that an industry-wide standard exists because [Tyler] says that one does," "[s]uch a circular argument does not carry Plaintiff[s'] burden" demonstrating Tyler's qualifications under *Daubert. Calvente v. Ghanem*, No. 20-cv-03366, 2022 WL 4272779, at *8 (N.D. Ill. Sept. 15, 2022).

### 2. Tyler has no experience qualifying him to opine on the purported industry standards and "model" that apply to Defendants' policies and practices

Even if Tyler is able to provide general descriptions of what "industry standards" apply to REO preservation, his lack of experience prevents him from assessing whether Defendants' policies and practices aligned with those standards. Plaintiffs concede, for example, that Tyler's purported "national model"[3] and "local model" for PPI activity can both be successful. Opp. at 7. This admission demonstrates the self-defeating nature of Tyler's opinion. On the one hand, Tyler argues that Defendants fail to meet industry standards because they didn't adopt the "local model" of providing services with which Tyler is familiar. TR 1 at 20–21. But he concedes that much of

---

[3] Tyler describes the "national model" as seeking to "have a vendor that could cover all 50 states . . . at the time." Tyler Dep. I 67:8-10.

the industry does not operate on a "local model," and declined to explain how Defendants' operations deviated from the way the majority of the industry allocates responsibilities for property preservation services, if they did at all. *See* Ex. 2 (Tyler Dep. I) 138:6-10.

These issues go directly to the admissibility of Tyler's opinion. Unlike in *BANA*, where defendants only challenged the appropriateness of Tyler's *conclusion* that the "national model" of property preservation is inferior to his "local model," Tyler has demonstrated in this case that he has no experience to opine on the applicability of *either model* to Defendants' operations. 2023 WL 1816902 at *10.[4] Despite testifying that the national and local models are "not the only approaches," for REO preservation, Tyler acknowledged he was unaware of a "third approach." Tyler Dep. I 136:10–24, 137:1–5. Further, Tyler refused to characterize Defendants as following a "national model," only stating they "align most with the national model," but "by definition" did not follow a "local model" approach. *Id.* 138:3–10. But the artifice of Tyler's "definition" is clear, as he claimed it required a trustee to interact "directly with the preservation vendors" on the ground. *Id.* 139:5–15. Yet Tyler couldn't identify a *single* example of whether that ever happened in the industry, because, apparently, his "opinion was not on that." *Id.* 139:18–141:23.

Tyler's inability to substantiate his assertions about Defendants' respective responsibilities under *any* model demonstrates he is unqualified to opine on them. His assertion that local models are superior is derived from (i) his personal experience working in a local market, and (ii) the fact

---

[4] The *BANA* court held that many of Tyler's opinions were outside of his expertise, despite the fact he had familiarity with the policies and practices of the property owner, Bank of America, which Tyler's company worked for in 2011, and which did not hold the properties as trustee. Moreover, the relationships and responsibilities of the two defendants in *BANA* are more straightforward (a property owner who contracted directly with its vendor) than here, where three Defendants (a trustee, servicer, and portfolio management company) and other relevant non-parties parties (which Tyler did not even know were involved, such as a master servicer or sponsor (Motion at 9–10)) all perform different roles with which Tyler lacks familiarity. *See* 2023 WL 1816902 at *1-3 (describing roles); *9 (noting Tyler's company worked for Bank of America).

that Plaintiffs sued other nationally-operating entities for similar preservation and maintenance claims. *Id.* 142:11–144:17. Tyler had not "reviewed any studies or reports that describe the effectiveness of a national model versus a local model" (*id.* 145:2–6), and was unaware of any industry standards describing what local or national models must look like. *Id.* 146:1–7.

In addition, Plaintiffs' Opposition cites "no evidentiary support," that allows Tyler to make the broad extrapolations about Defendants' respective roles (or lack thereof) in the REO preservation industry. *Driver v. AppleIllinois, LLC*, No. 06 C 6149, 2011 WL 4007337, at *6 (N.D. Ill. Sept. 9, 2011). This lack of experience is especially apparent given Plaintiffs' failure to dispute that ownership of the *majority* of residential properties throughout the country during the relevant period was held by RMBS trusts, whereas Tyler's experience informing his understanding of the purported "three-legged stool" model was gleaned in the limited arrangements that arose where "[he] would know who the owner was." Tyler Dep. I at 140:14–141:4. Tyler's unsupported opinion regarding what "'best industry practices' should dictate in particular circumstances is not transformed into a reliable expert opinion simply by his [nine] years of experience, in the absence of some connection to specific regulations or specific expressions of 'best industry practices.'" *Langenbau v. Med-Trans Corp.*, 167 F. Supp. 3d 983, 1001 (N.D. Iowa 2016).

**B.    Tyler's Qualifications and Experience Do Not Excuse his Failure to Apply that Experience to the Facts of this Case.**

Plaintiffs concede Tyler did not assess "how Defendants actually maintained or marketed REOs," and likewise agree that Tyler performed no analysis to determine whether his criticism of Defendants' purported "value-based policies" actually applied to the properties at issue in this case. Opp. at 11. Accordingly, the opinions that Tyler offers on these subjects should be excluded as set forth in Defendants' underlying Motion.

**1.    Tyler's assessment of Defendants' purported "value-based" policies and**

**procedures fails to apply any expertise to the facts of this case as required to be admissible under Rule 702 and *Daubert***

Plaintiffs point to the *BANA* decision to support their claim that Tyler's opinions are reliable, asserting that the *BANA* court was only addressing whether it was appropriate for Tyler to opine on what defendants in that case "apparently believe[d]" about neighborhood characteristics when making repair decisions. Opp. at 8–9. But Plaintiffs' attempt to distinguish *BANA's* holding is inapposite. Tyler's testimony in *BANA* sought to explain the incidence of quality control issues, which he opined was higher "in areas where [defendants'] apparently believe neighbors are less likely to complain." *BANA*, 2023 WL 1816902 at *10. The court rejected this explanation because it was only "informed by his experience," and lacked "any defendant-specific evidence" for the court to conclude it was "based on sufficient facts or data." *Id.*

Plaintiffs also omit that this was just one of several Tyler opinions the *BANA* court rejected because they were "too generalized" and lacked any factual basis aside from his experience. *Id.* The *BANA* court also precluded Tyler from opining on the effect maintenance expenditures have on quality, the financial incentives vendors have to repair properties, and what variables influenced disparities between the properties at issue. *Id.* Plaintiffs offer no explanation for why *BANA's* logic does not apply to Tyler's broad and unsupported opinions in this case, which is unsurprising given the dearth of analysis Tyler performed in his review of a handful of pre-selected policy documents.

For example, Plaintiffs re-frame Tyler's opinion as evidence that "value redlining" (a term he never uses) runs through Defendants' policies and procedures in derogation of "industry standards requiring essential PPI services for all REO properties." Opp. at 10. But *Tyler never opined Defendants' policies fail to provide essential PPI services based on REO property value.*[5]

---

[5] Notably, Plaintiffs' witness Nakia Agnew, who like Tyler managed a Chicago preservation vendor, testified that Altisource *did* provide "essential PPI services" (e.g., mowing the grass,

The entirety of Tyler's testimony about differing preservation services for "high value" assets is rooted in his review of a single Altisource policy—implemented in June 2016—from which Tyler made sweeping conclusions about the type of services *all three* Defendants provided *even though Tyler did not know if the High Value policy applied to any of the properties at issue*. Tyler Dep. I at 186:4–11; 189:5–9.

Tyler cannot provide a reliable opinion about how Defendants' policies and procedures affected the provision of essential PPI services. The fact that services appearing in the "High Value Program" "closely mirror the industry standards for providing PPI services at all properties" (TR 1 at 12) *is not* evidence these services were not *also provided to every REO regardless of value*. Tyler did not make this assessment, and when asked what supports his opinion that "[t]reating properties differently based on their perceived value does not accord with industry standards," he replied: "That wasn't a part of what I was to opine on." Tyler Dep. I at 203:16–204:15.[6]

Tyler's testimony makes clear that he has no basis (and that it was not within his opinion's scope) to assess whether Defendants' policies and practices led to differences in preservation services based on property value. Tyler also testified he did not assess what maintenance was performed for "as is" properties. *Id.* at 215:6–20. And when asked what analysis he did to "determine which properties were actually perceived of as being of low value," Tyler made the same appeal to his generalized experience that was rejected in *Bank of America*. *Id.* at 212:8–19.

---

removing snow, and maid services) regardless of value. Ex. 3 (Agnew Tr. 279: 21-280:21).

[6] Actual industry practice undermines the reliability of Tyler's claims. HUD and the Federal Reserve Banks routinely used the term "low value" to describe services for REOs during the relevant time frame. *See* Ex. 4 "FHA/HUD Presents: FHA Webinar on HUD REO 203-K Standard 203-K Streamline," at p. 3 ("A flat fee commission of $2500 ($1250 each) will be offered on predetermined low valued properties."); Ex. 5 "Land Banks: One Tool for Housing Market Recovery," Fed. Res. Bank of Atlanta, Kevin Mahoney, "'Low-value properties,' in particular, often carry a repair or demolition cost that exceeds market value, demanding a more creative approach…").

Contrary to Plaintiffs' claim, Defendants did not argue that Tyler "should have conducted other *additional* analyses" to support his opinions. Opp. at 9 (emphasis added). Instead, Defendants demonstrated that Tyler conducted no analysis at all. *See* Defs. Br. at 3-4. Tyler's failure to explain "how his experience leads to the conclusion reached, why that experience is a sufficient basis for [his] opinion, and how that experience is reliably applied to the facts" renders his conclusions inadmissible. *In re Opana ER Antitrust Litig.*, 2021 WL 2291067, at *7. To qualify Tyler as an expert, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Plaintiffs have not shown that Tyler made such a link.

### 2. Tyler's assessment of Defendants' "quality control" policies and procedures also fails to apply his expertise to the facts of this case as required to be admissible under Rule 702 and *Daubert*

Tyler also purports to opine that Defendants lacked adequate quality control practices, but he never investigated whether the policies and procedures he reviewed actually resulted in inadequate quality control. For example, when comparing Defendants' quality control practices to industry standards, Tyler testified that "Altisource's inspection checklist…directly aligns with industry standards. And then Altisource's quality control procedure…also mirrors what my understanding and my experience of minimum standards are." Tyler Dep. I at 238:6–19. Despite the fact Altisource met these standards, Tyler concluded "Altisource's quality control over its vendors was inadequate." TR 1 at 20. He goes on to explain that quality control was inadequate despite meeting industry standards simply because Altisource Regional Field Service Managers were given "an insurmountable collection of job responsibilities." *Id.* at 21.

But Tyler admitted to conducting no analysis that would "bridge the analytical gap" necessary to show these responsibilities *were* "insurmountable," nor did he undertake any analysis

to determine whether there were any quality control failures for the properties at issue. Tyler Dep. I at 198:8-14, 238:1-239:13. Plaintiffs claim Tyler did not need to make these connections because he provided a "well-considered analysis of Defendants' policies and procedures." Opp. at 12. Yet Tyler himself testified that the standard for evaluating quality control practices requires evaluating "what a property should look like if it's being properly maintained. That's the standard you hold it to." Tyler Dep. I 237:8–14. Likewise, Tyler testified that when evaluating the adequacy of the single scorecard he reviewed, "the industry standard is to have the work done." *Id.* 244:8–245:2.

Absent any review to determine whether Defendants' policies and procedures actually resulted in quality control lapses, Tyler's "analysis" is speculation, and thus inadmissible. *Hunt ex rel. Chiovari v. Dart*, 754 F. Supp. 2d 962, 972 (N.D. Ill. 2010). Based on Tyler's own professed "standards" for evaluating the efficacy of quality control, Tyler's failure to assess the performance of preservation activity and circuitous testimony that "if…the alleged deficiencies existed, then there definitely was a lack of oversight, which is how they happened" goes to the admissibility of his testimony and not, as Plaintiffs argue, its weight. Opp. at 13.

Plaintiffs cite no explanation by Tyler to show how his experience leads to his conclusions, is a sufficient basis for his opinion, and is reliably applies to the facts, which makes his opinions on the propriety of Defendants' policies and practices inadmissible. Fed. R. Evid. 702, Adv. Comm. Notes; *see also*, *Potts v. Manos*, No. 11 C 3952, 2017 WL 4365948, at *5 (N.D. Ill. Sept. 29, 2017) (excluding expert who did not explain "how he reached his conclusions that particular policies and actions of [defendants] were reasonable…other than to cite his experience."). And Plaintiffs do not cite a single external authority that supports Tyler's opinions regarding the propriety of Defendants' policies—written or otherwise. *See e.g.*, *Est. of McCoy v. City of Milwaukee*, No. 22-CV-320-JPS, 2023 WL 7386237, at *7 (E.D. Wis. Nov. 8, 2023) (absent

"national standards or authorities" or examples of successful policies, opinion that defendants lacked adequate policies was unreliable when based only on expert's experience). As such, Tyler has not rendered the qualified and reliable opinions necessary to be admissible under *Daubert*.

### 3. Tyler's opinions about the "perceptions," "beliefs," and "understandings" of Defendants and their vendors is not rooted in any factual basis and is impermissible expert testimony

Plaintiffs claim that Defendants' Motion mischaracterizes Tyler's "report as opining on *Defendants'* motives for their value-based policies." Opp. at 11 (emphasis in original). But this is not what Defendants argue (*see* Defs. Br. at 3–4), nor is it an accurate (re)characterization of Tyler's opinion. Tyler *clearly* attempts to opine on the intent and beliefs of Defendants and their vendors. *See e.g.*, TR 1 at 11 ("Treating properties differently based on their *perceived* value does not accord with industry standards…The Ocwen-Altisource value-based model sends both explicit and *implicit messages*…that less care is needed for properties in communities with lower *perceived values*." (emphasis added)). And Plaintiffs concede as much by (incorrectly) stating it is within the scope of Tyler's experience "to explain how PPI vendors *would likely react to Defendants' value-based policies*." Opp. at 10 (emphasis added).

Such extrapolations—based on speculations as to a parties' intent, beliefs, or motive—were rejected in *BANA* and are likewise inadmissible under binding Seventh Circuit case law and other caselaw from this District. *See Kraft Foods Glob., Inc.*, 800 F. Supp. 2d 928, 932–33 (N.D. Ill. 2011); *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). In *BANA*, the court held Tyler couldn't speculate that Defendants didn't perform maintenance due to beliefs about the likelihood of certain neighborhoods to complain, nor could he opine on the connection between maintenance and vendors' financial incentives. 2023 WL 1816902, at *10. The opinions Tyler espouses here, based on what he believes Defendants or others "perceived," "implicitly"

understood, or would have "likely reacted" to, such as Tyler's claim that Defendants' "explicit and implicit messages to local vendors…would create a clear second-class citizenry among Deutsche Bank REO assets…and depress the completion of work on properties in communities with *low perceived values*…" merit the same treatment. TR 1 at 11.

### C. Tyler Has no Experience Regarding the use of Offshore Employees and Offers no Factual Basis to Support his Opinions about the Practice's Efficacy in the Provision of Preservation and Maintenance Services.

Tyler's opinion as to the suitability of using "offshore" employees in managing REO preservation work is fraught with the same lack of experience and reliability issues. Plaintiffs claim that Defendants didn't "argue that Mr. Tyler's considered opinions about the unorthodoxy of Altisource's offshore operations are outside of his industry experience" (Opp. at 13) is wrong. The *first thing* the Defendants argue on this point is that Tyler is "not an expert in, and is unfamiliar with the standards concerning, the use of global workforces." Defs. Br. at 6. Yet despite Plaintiffs' misapprehension, they go on to confirm Tyler's lack of experience by stating offshore operations are something he "had never seen in the industry." Opp. at 13 (quoting Tyler Dep I at 270:16–271:1). This admission is especially telling, given Plaintiffs do not dispute that Fannie Mae and Freddie Mac (who held REOs in Tyler's own maintenance portfolio) recognize that offshore employees are used in the REO preservation industry. Defs. Br. at 7.

Plaintiffs' failure to identify *any* examples, standards, or analysis on the impropriety of offshoring, beyond Tyler's limited personal experience, makes their claim that Defendants "fault Mr. Tyler for not being an entirely different kind of expert than he is" more appropriately read as conceding he is actually just "not an expert" on this topic at all. Opp. at 13; *see e.g.*, *Driver*, 2011 WL 4007337 at *6 (excluding opinions on national industry practices that were "significantly broader" than expert's local experience). His opinion on this subject must be excluded.

### D.  Tyler's Review of Photographs is Unreliable and Not Expert Testimony.

#### 1.  Tyler admitted his review of Plaintiffs' 4,157 photographs was not expert testimony.

In their Opposition, Plaintiffs are silent on the fact that Tyler repeatedly stated his review of their 4,157 photographs purportedly showing property deficiencies was not expert testimony—but instead represented his views that "a reasonable person" would review certain photos "and see that the deficiency existed." Defs. Br. at 13; Tyler Dep. II 163:3–6. This is not, as Plaintiffs dismiss it, a "gotcha" moment. Opp. at 16. At the outset of his deposition on this very issue, Tyler testified:

> **Q:** Do you know why you were asked to conduct this review?
> **A:** To validate that the plaintiffs were seeing what they stated they saw in deficiencies…
> **Q:** When you say validate, what do you mean by that term?
> **A:** So I think it would be that ***not from my view as an expert but if a reasonable person would*** review that picture, a set of photos, and see that the deficiency existed.

Tyler Dep. II at 15:12–16:6 (emphasis added).

Tyler's admission that his review brings no expertise beyond a reasonable juror's own is alone grounds to exclude these opinions. Defs. Br. at 13–14. Perhaps recognizing Tyler's photo review is not expert testimony, Plaintiffs suggest his analyses could instead be admitted to "provide efficient vehicles for presentation of evidence at trial." Opp. at 16. But "using [an expert] to present what amounts to the [Plaintiffs'] own testimony, without putting [Plaintiffs'] on the stand, is not a reliable or appropriate use of either expert or summary testimony under the Rules of Evidence." *United States v. Batio*, No. 21-3195, 2023 WL 8446388, at *3 (7th Cir. Dec. 6, 2023).

#### 2.  Tyler's photo review was demonstrated to be unreliable according to both his and Plaintiffs' own methods, not "skullduggery"

Aside from conceding that Tyler's photo review was not expert testimony, Plaintiffs mischaracterize the exercise's reliability. Tyler's analysis did not find "that the photographs in [Plaintiffs'] database provided conclusive verification of 4,068 of the 4,157 deficiencies he

reviewed." Opp. at 15. Tyler instead testified that he had no "understanding as to whether or not plaintiffs were taking photos that meet [his] criteria of adequate evidence of a property condition," (Tyler Dep. II at 25:24–26:3), and that he did not "do anything to confirm independently whether or not these photos accurately represented the properties that plaintiffs investigated." *Id.* 41:23–42:2. Tyler's photo review was also not independent; Plaintiffs simply told him what deficiencies they wished him to find and Tyler worked backward from that preferred result to search for photos that might substantiate Plaintiffs' preferred scoring. *See* Tyler Dep. II 14:6-14, 15:17-19 (review was of photos "associated with 4,000 deficiencies scored" by Plaintiffs, undertaken to "validate that the plaintiffs were seeing what they stated they saw in deficiencies.").

Defendants noted in their Motion that when Tyler was shown photos of deficiencies Plaintiffs had *deleted* from their scoring, the overwhelming majority of the time, Tyler opined Plaintiffs had been incorrect to do so. Defs. Br. at 14-15. In response, Plaintiffs attack Defendants' counsel, blaming Tyler's failure to reproduce his agreement rate with Plaintiffs on "misleading deposition questioning," and Defendants "refus[al] to show Mr. Tyler the full set of photographs associated with a deficiency." Opp. at 16. Plaintiffs do not explain how seeing *more* photos of a property would have changed Tyler's testimony that there were deficiencies on the properties that Plaintiffs incorrectly did not score, or that there *were not* deficiencies on properties that Plaintiffs incorrectly *did* score. Indeed, the photo review Tyler conducted under oath aligned with the one he described in his expert report, where he described that "instead of going through and finding every instance of [a] deficiency, if I found through that set of photos one deficiency, then I noted it and then I stopped and moved on to the next property." Tyler Dep. II at 53:1–15. Tyler even agreed this was similar to the way he reviewed the 4,157 photos for Plaintiffs. *Id.* at 163:14:23.

And when Tyler was asked to confirm, based on a "full set" of photos that Plaintiffs

-14-

associated with a deficiency, what deficiency a "reasonable person" (i.e., not an expert) would identify, Tyler was unable to repeat his rate of agreement with Plaintiffs. Tyler Dep. II 178:9, 180:1-2; 185:19-24, 186:1-11, 187:15, 190:23-24, 191:8-9, 196:12-13, 201:6-8, 206:2-3, 188:11-190:1, 194:16-17, 202:7-22, 207:22. Indeed, his review results *flipped* while under oath, with Tyler finding that 72% of the time, Plaintiffs were scoring incorrectly. Defs. Br. at 14. The only material difference between the review Tyler conducted when deposed and the one he conducted under Plaintiffs' auspices was that Tyler did not know at his deposition what answer Plaintiffs wanted him to give. Plaintiffs have no response for why his review of *their* preferred scoring is somehow more reliable given he serves as nothing more than a "mouthpiece" for confirming their own work. *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

Plaintiffs also misconstrue the review Tyler took of photos for scores Plaintiffs *deleted*, arguing he did not seek to undertake such an exercise in his original analysis. Opp. at 17. While it is unsurprising that Plaintiffs did not ask Tyler to confirm their spoliative activities altered their investigation's results, it is undisputed that Tyler reviewed photos that a "reasonable person" (the inspector) determined *did* show a deficiency that a *second* "reasonable person" (the "quality control" reviewer) later determined did *not* show a deficiency. This is not an exercise where Tyler "confirmed Plaintiffs' score deletions;" it is one where Tyler "confirmed Plaintiffs' original scoring" using the same criteria as the other 4,157 photos. That three different people could look at 22 of the same photo sets and come to different conclusions about whether it shows a deficiency for 16 them is conclusive evidence that Tyler's review is wholly unreliable.

## CONCLUSION

For the reasons stated herein, as well as those set forth in the underlying Motion, Defendants request this Court exclude the opinions and testimony of Deavay Tyler.

Dated: January 26, 2024                    Respectfully submitted,


                                           By: */s/ Nathan Garroway* _____
                                           Nathan Garroway
                                           **DENTONS US LLP**
                                           303 Peachtree Street, NE, Suite 5300
                                           Atlanta, Georgia 30308
                                           Telephone: (404) 527-4000
                                           nathan.garroway@dentons.com

                                           Lisa Krigsten (admitted *pro hac vice*)
                                           **DENTONS US LLP**
                                           4520 Main Street, Suite 1100
                                           Kansas City, Missouri 64111
                                           Telephone: (816) 460-2400
                                           lisa.krigsten@dentons.com

                                           *Attorneys for Defendant Altisource Solutions, Inc.*

                                           By: */s/ Debra Bogo-Ernst* _____
                                           Debra Bogo-Ernst
                                           Jacey Norris
                                           **WILLKIE FARR & GALLAGHER LLP**
                                           300 N. LaSalle Dr.
                                           Chicago, IL 60654
                                           (312) 728-9000
                                           dernst@willkie.com
                                           jnorris@willkie.com

                                           *Attorneys for Defendant Ocwen Loan Servicing, LLC*

                                           By: */s/ Kenneth M. Kliebard* _____
                                           Kenneth M. Kliebard
                                           Michael W. Fakhoury
                                           **MORGAN, LEWIS & BOCKIUS LLP**
                                           77 W. Wacker Drive, 5th Floor
                                           Chicago, Illinois 60601
                                           Telephone: 312.324.1000
                                           kenneth.kliebard@morganlewis.com
                                           micheal.fakhoury@morganlewis.com

                                           Kurt W. Rademacher (admitted *pro hac vice*)
                                           **MORGAN, LEWIS & BOCKIUS LLP**

-16-

1701 Market Street
Philadelphia, PA 19103
Telephone:  215.963.4981
Kurt.rademacher@morganlewis.com

*Attorneys for Defendants Deutsche Bank*
*National Trust Company, as trustee, and*
*Deutsche Bank Trust Company Americas, as*
*trustee*

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for Northern District of Illinois' Electronic Filing System on January 26, 2024.


/s/ Nathan Garroway