Page 188

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

   NATIONAL FAIR HOUSING         )
 4 ALLIANCE; HOPE FAIR HOUSING   )
   CENTER, et al.,               )
 5                               )
                                 )
 6               Plaintiffs,     )
                                 )
 7        vs.                    ) No. 1:18-cv-00839
                                 )
 8 DEUTSCHE BANK NATIONAL        )
   TRUST, as trustee, et al.,    )
 9                               )
                                 )
10               Defendants.     )

11

12        The videotaped deposition of NAKIA HAYES

13 AGNEW, Volume 2, called by the Defendant for

14 examination, taken remotely pursuant to notice and

15 pursuant to the Federal Rules of Civil Procedure for the

16 United States District Courts pertaining to the taking

17 of depositions, taken before April M. Metzler, Certified

18 Shorthand Reporter, Registered Professional Reporter,

19 Certified Realtime Reporter, and Notary Public, at

20 Country Club Hills, Illinois, commencing at 9:04 a.m.

21 Central Standard Time on the 3rd day of May, 2021.

22

23

24
```



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021                                              Pages 189..192

Page 189

```
 1   APPEARANCES:
 2        SOULE, BRADTKE & LAMBERT
          MS. JENNIFER K. SOULE
 3        MR. STEVEN P. SCHNECK
          402 Campbell Street
 4        Suite 100
          Geneva, Illinois 60134
 5        Phone:  (630) 333-9144
          E-Mail:  jsoule@sbllegal.com
 6
              On behalf of the Plaintiffs,
 7            appeared remotely;
 8   DENTONS US LLP
          MS. LISA KRIGSTEN
 9        MR. CODY WOOD
          4520 Main Street
10        Suite 1100
          Kansas City, Missouri 64111
11        Phone:  (816) 460-2400
          E-Mail:  lisa.krigsten@dentons.com
12        E-Mail:  cody.n.wood@dentons.com
13            On behalf of Defendant,
              Altisource Solutions, Inc.,
14            attended remotely;
15   DENTONS US LLP
          MR. NATHAN L. GARROWAY
16        303 Peachtree Street, NE
          Suite 5300
17        Atlanta, Georgia 30308
          Phone:  (404) 527-4000
18        E-Mail:  nathan.garroway@dentons.com
19            On behalf of the Defendant,
              Altisource Solutions, Inc.,
20            attended remotely;
21
22
23
24
```

Page 190

```
 1   APPEARANCES (Continued):
 2        MORGAN, LEWIS & BOCKIUS, LLC
          MR. KENNETH M. KLIEBARD
 3        77 West Wacker Drive
          Chicago, Illinois 60601
 4        Phone:  (312) 324-1000
          E-Mail:  kenneth.kliebard@morganlewis.com
 5
              On behalf of Defendant,
 6            Deutsche Bank National Trust, as trustee,
              attended remotely;
 7
          MAYER BROWN LLP
 8        MS. DEBRA L. BOGO-ERNST
          MS. JACEY D. NORRIS
 9        71 South Wacker Drive
          Chicago, Illinois 60606
10        Phone:  (312) 782-0600
          E-Mail:  dernst@mayerbrown.com
11
              On behalf of Defendant,
12            Ocwen Loan Servicing, LLC,
              appeared remotely;
13
          CERVANTES CHATT & PRINCE P.C.
14        MR. ROBERT M. PRINCE
          100 North LaSalle Street
15        Suite 2207
          Chicago, Illinois 60602
16        Phone:  (312) 606-9529
          E-Mail:  rprince@ccpchicago.com
17
              On behalf of the Deponent,
18            appeared remotely.
19   ALSO PRESENT:
20        Mr. Andrew Kim, videographer
          attended remotely
21
22              *  *  *  *  *  *
23
24
```

Page 191

```
 1                I N D E X
 2   WITNESS                                    PAGE
 3   NAKIA HAYES AGNEW
 4
 5        Cross-Examination By Ms. Krigsten.......... 193
 6        Cross-Examination By Ms. Norris........... 365
 7        Cross-Examination By Mr. Kliebard......... 370
 8        Redirect Examination By Ms. Soule......... 377
 9
10
11                E X H I B I T S
12   DEFENDANTS' EXHIBIT                         PAGE
13
14        No. 5001 (VMS Communications Log Excel).... 233
15        No. 5003 (Biweekly Inspection Exterior).... 240
16        No. 5004 (Debris Removal)................. 242
17        No. 5007 (Not Described)................. 255
18        No. 5008 (Reo Evaluation Form)............ 255
19        No. 5009 (Checklist)...................... 256
20        No. 5010 (Not Described)................. 257
21        No. 5013 (Photograph)..................... 287
22        No. 5032 (Not Described)................. 303
23
24
```

Page 192

```
 1                E X H I B I T S
 2   PLAINTIFFS' EXHIBIT                         PAGE
 3
 4        No. 516 (Email)........................... 378
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   (Exhibits attached.)
```



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 193..196

Page 193

1     THE VIDEOGRAPHER:  We are now recording.  And we
2  are now on the record for the continuing video
3  deposition of Nakia Hayes Agnew, conducted remotely via
4  LegalView.
5     Today's date is May 3rd, 2021, and the time is
6  9:04 a.m. Central Standard Time.
7     The witness is still under oath.
8     Counsel, you may proceed.
9     MS. KRIGSTEN:  Thank you.
10  WHEREUPON:
11     NAKIA HAYES AGNEW,
12  called as a witness herein, having been first duly
13  sworn, was examined and testified as follows:
14     CROSS-EXAMINATION
15  BY MS. KRIGSTEN:
16     Q.  Good afternoon, Ms. Agnew.
17     A.  Good morning.
18     Q.  I am Lisa Krigsten.  I am one of the lawyers
19  for Altisource.  And I will be asking most of the
20  questions today on behalf of Altisource, as well as
21  Ocwen and both Deutsche Banks, so our plan was to make
22  that easier on you.  Now, maybe at the end of our time,
23  lawyers for those other parties may have a few
24  questions.  But for the most part, I'm going to be

Page 194

1  asking you the questions.
2     A.  Okay.
3     Q.  So you've been through this now at least once.
4  Was last Wednesday your first deposition?
5     A.  It was.
6     Q.  So you're getting to be an expert here.  Let
7  me just go over a couple ground rules that I think you
8  probably know.
9     So if you don't understand a question I ask,
10  I'd like you to tell me.  And if you answer a question,
11  I'm going to assume you understood it.  So you should
12  always feel free to tell me that you don't understand
13  it, and I'll do my best to rephrase or we'll figure out
14  a way to get through it.
15     A.  Okay.
16     Q.  Just like we did last week, we'll take breaks.
17  We can take as many breaks as you think necessary.  If
18  you want a break, all you have to do is say.  If there's
19  a question pending, so if I've already asked a question
20  and you haven't answered, we'll probably wait till we
21  have you answer.
22     But again you just let us know --
23     A.  Okay.
24     Q.  -- and we'll take a break.

Page 195

1     And obviously just like last week, Ms. Metzler
2  is here, she's transcribing everything we say.  And
3  so -- I have a tendency to talk fast, I have to slow
4  myself down, so she can get all that.
5     And I also have a tendency to jump in when
6  people are talking, and that makes it hard for her.
7  It's a bad conversational habit on my part -- it makes
8  it hard for her to make notes -- to transcribe.
9     And so I'll ask that you wait to answer till I
10  finish talking, and I'm going to do my very best to wait
11  until you finish your answer before I ask a question.
12     A.  Fair enough.
13     Q.  Okay.  And then I think you know that this
14  deposition is just like last week is being videotaped.
15  So?
16     A.  Mm-hmm (nodding).
17     Q.  Do you have any questions before we begin?
18     A.  I do not.
19     Q.  Terrific.
20     So do you have any notes with you today?  Have
21  you taken any notes that you have with you?
22     A.  All I have is these -- the exhibits that you
23  sent me (indicating).
24     Q.  Great.

Page 196

1     A.  And so it's in a binder, so I don't have it
2  sitting down across the table.
3     Q.  Understood.  Understood.
4     And when you testified last week, on
5  April 28th, did you have any notes with you at that
6  time?
7     A.  I have the exhibits that were sent to me by my
8  attorney.
9     Q.  So let's go over the parties just really
10  briefly in this litigation, so we make sure we have a
11  common understanding.  So when I'm going to use the term
12  "Altisource" and when I talk about Altisource, I'm
13  referring to the company that you had the contract with
14  to perform field servicing.
15     So does that make sense to you?
16     A.  It does.
17     Q.  And we're going to talk -- I'm going to have a
18  lot of questions about Altisource, so I'm going to go on
19  from them for the moment.  I also may mention Deutsche
20  Bank.
21     Have you ever communicated with anyone at
22  Deutsche Bank?
23     A.  No.
24     Q.  Have you ever worked directly with anyone at



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 197..200

Page 197

1   Deutsche Bank?

2       A.   No, ma'am, I have not.

3       Q.   What about Ocwen, when I refer to Ocwen, do
4   you know who I'm speaking about?

5       A.   I do.

6       Q.   Have you ever communicated directly with
7   anyone at Ocwen?

8       A.   I recall one escalated property, I believe,
9   back in 2016 where I may have had some direct email
10  communication, but I don't recall exactly what property
11  or situation that was.  But I do recall having one,
12  perhaps, communication with Ocwen pertaining to a
13  property.

14      Q.   Do you happen to remember who you spoke to at
15  Ocwen or who you communicated with?

16      A.   I don't remember the name.  Pertaining to the
17  situation, per what I recall, this was pertaining to
18  someone who, I guess, was in a transition.  It could
19  have been a preforeclosed home, but it was occupied.
20  And the homeowner had been in contact directly with
21  someone from Ocwen, and I believe we were receiving
22  different directives, per what Altisource wanted us to
23  do and what the neighbor had -- well, the homeowner had
24  received confirmation for from Ocwen.

Page 198

1            And I believe that was the only time.  Other
2   than that, no, I don't recall any other times.

3       Q.   Okay.  Thank you.

4            So then I just have the plaintiffs -- so when
5   I refer to the plaintiffs, that's both the -- or that is
6   the National Fair Housing Alliance and then all of the
7   other entities that are part of this lawsuit.

8            And for the questions I'm going to ask you
9   now, I want you to consider that to include lawyers and
10  staff members, right; so, for example, Ms. Soule and
11  others who use the --

12      MS. SOULE:  Soule, Counsel, just --

13      MS. KRIGSTEN:  I'm sorry.  I --

14      MS. SOULE:  That's okay.  I just thought I'd say it
15  early, so we don't hear it a hundred times before --

16      MS. KRIGSTEN:  Since I have a
17  difficult-to-pronounce name, I appreciate that.

18  BY MS. KRIGSTEN:

19      Q.   So, Ms. Agnew, how many times have you
20  communicated with someone who is affiliated with the
21  plaintiffs, that would either be someone at one of the
22  plaintiff's organizations or who works with a lawyer or
23  works with one of the lawyers?

24      A.   Can you rephrase the question?  I'm not sure I

Page 199

1   understand you completely.

2       Q.   Sure.

3            How many times have you communicated with the
4   plaintiffs, which includes their lawyers and their staff
5   members?

6       A.   You're asking me for a direct number of times,
7   a specific number?

8       Q.   Yes.

9       MR. PRINCE:  To the best of your ability to
10  remember.

11  BY THE WITNESS:

12      A.   I would say more than ten.

13      Q.   And I may ask you some more questions about
14  those contacts, but before we get there, let me ask you
15  some other things.

16           So have you ever provided a written document
17  to plaintiffs, for example, have you ever written out or
18  have you typed out any sort of document or explanation
19  of something or information for plaintiffs and emailed
20  it or handed it to them?

21      A.   Yes.  When I received my subpoena, I believe I
22  gave a hand-typed head [sic] stating what was in those
23  documents:  Per the subpoena I'm sending these documents
24  to you.

Page 200

1       Q.   And is that the only time that you've either
2   typed something or handwritten something and given it to
3   plaintiffs?

4       A.   Per what I can recall at the moment, yes.

5       Q.   When you talk about the subpoena, are you
6   talking about the subpoena -- which subpoena are you
7   talking about?

8       A.   I am talking about the subpoena that I
9   received requesting the documentation that I had
10  pertaining to my tenure with Altisource.

11      Q.   And was this the subpoena that you received
12  back in 2020?

13      A.   Yes.

14      Q.   Do you know what an affidavit is?  Does that
15  word mean anything to you?

16      A.   Generally speaking, yes.

17      Q.   So an affidavit or sometimes people -- a
18  similar document called a declaration, is a document
19  where some information is typed up, and then someone
20  signs it at the bottom to say yes this seems correct.

21           Is there any time that you signed anything
22  like that, so an affidavit or a declaration or another
23  piece of paper for plaintiff?

24      A.   Stating that the information that I sent was

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021                                    Pages 201..204

Page 201

1  correct?
2      Q.   Yes.  So either the information you sent or
3  the information you told them when you were talking with
4  them?
5      MR. PRINCE:  Lisa, maybe it would be better to
6  break it down into two segments, our deposition -- or
7  about her records requests perhaps, and then about
8  anything else, maybe it would be easier for her to
9  answer then --
10     MS. KRIGSTEN:  Okay.
11     MR. PRINCE:  -- because it's kind of compound
12  you're asking two things.
13         Maybe if we broke it down into the individual
14  things.
15     MS. KRIGSTEN:  Why don't we do this.
16  BY MS. KRIGSTEN:
17     Q.   Why don't you just put aside any of your
18  document production.  So I know you've produced
19  documents in this case.  Just set that aside in your
20  mind.
21     A.   Okay.
22     Q.   So separately from producing documents --
23  separately from handing -- ever producing emails, that
24  sort of thing -- have you ever signed any documents

Page 202

1  related -- that had information in them related to what
2  you testified about in this case or anything having to
3  do with Altisource?
4      A.   Not that I can recall, ma'am.
5      Q.   Have you received any money from plaintiffs?
6      A.   No.
7      Q.   Do you anticipate receiving any funds from
8  them?
9      A.   No.
10     Q.   Are you involved in assisting plaintiffs with
11  any other cases?
12     A.   No.
13     Q.   So before we move on from just identifying the
14  parties, sometimes in my questions I'm going to say
15  "you."  So I'm going to say, you know, what did you do,
16  that sort of thing.
17         When I use the term "you," I mean you
18  personally, Ms. Agnew, and your company, Agnew Field
19  Servicing [sic].  So there's a difference, right.  So if
20  it becomes confusing, because you don't know if you
21  should answer for you, Ms. Agnew, or Agnew Field
22  Servicing, just let me know --
23     A.   Okay.
24     Q.   -- but otherwise in my questions, I may just

Page 203

1  have the habit of referring to Agnew Field Servicing as
2  "you."
3      A.   Okay.
4      Q.   So to begin with, speaking about you,
5  Ms. Agnew, did you share all of your work history up
6  through 2013, if that's the last time you testified?
7      A.   Yes.  However, work history that I had via
8  records in my email, that did not include work items
9  that were completed in VMS or my sister system, Property
10  Preservation Wizard, I did not have access to those at
11  the time.
12     Q.   Got it.
13         And I -- this is an example of me asking a
14  question that I need to clarify.  So let's talk -- this
15  question is just about you, okay, you, Ms. Agnew.
16     A.   Okay.
17     Q.   So when you testified on April 28, do you
18  remember sharing your work history up through the year
19  2013, the jobs you had held and your work experience; do
20  you remember sharing that?
21     A.   Yes.
22     Q.   Was there anything that you left out of that?
23  Is there -- did you tell us about all the jobs you had
24  and all of the work experience you had up through 2013?

Page 204

1      A.   I did not go through every job that I had, no.
2      Q.   So let's back up then and talk about the jobs
3  you had.
4         So I believe that you started your testimony
5  that day -- explained that you had been a
6  kindergarten teacher?
7      A.   Yes, I was a teacher's aide.
8      Q.   Teacher's aide, terrific.
9         What years were you a teacher's aide?
10     A.   2008.  I believe it was the end of 2008, the
11  end of the school year, and then the 2009-2010 school
12  year.
13     Q.   What was the position or what was the job you
14  had right before becoming a teacher's aide?
15     A.   I used to do sales for Security Solutions,
16  which is an authorized user of -- well, dealer of ADT.
17  So I used to sell security systems.
18     Q.   And how long did you sell security systems?
19     A.   For about, I want to say, eight months.
20     Q.   Was that there in Chicago?
21     A.   It was.
22     Q.   In the Chicago area?
23     A.   Yes, the Chicagoland area.
24     Q.   Understood.

Page 205

1    Q.    What was the job you had immediately before
2  that position?
3        A.    My second job ever, I worked at a thrift
4  store.
5        Q.    Was that also in the Chicagoland area?
6        A.    No.  Actually that was in Markham, Illinois.
7  So that's a southwest suburb.
8        Q.    What was the name of the thrift store?
9        A.    Unique.
10       Q.    How long did you work at Unique?
11       A.    I worked at Unique -- I worked at Unique
12  thrift store for about six months, and then my -- then I
13  had to, you know, take care of my son.  He had an
14  accident, so I had to stop working then.
15       Q.    And what was the position you had or what was
16  the job you had immediately before working at Unique?
17       A.    I wasn't old enough to work.
18       Q.    Okay.
19       A.    But I did work off the record at my
20  grandfather's convenience store.
21       Q.    Also in the Chicagoland area?
22       A.    In the Southwest suburbs in Robbins, Illinois,
23  he had a little convenience store there.
24       Q.    Okay.  So --

Page 206

1        MR. PRINCE:  -- you have to tell me about that next
2  time, so we can -- the right to not self-incriminate
3  ourselves.
4  BY MS. KRIGSTEN:
5        Q.    Up through 2013 then, up through 2013, have we
6  talked about all the jobs you had?
7        A.    I had other -- I had other clients.
8        Q.    Clients in what sense?
9        A.    I'm sorry.  In the asset management industry,
10  there were other clients and other portfolios I serviced
11  as well.
12       Q.    So let's talk about your clients in asset
13  management.
14            You testified -- well, why don't I have you
15  tell us.
16            Who did you work for?
17       A.    I discussed P.K. Management Group.  I
18  discussed AMS.  I discussed VLM REO.  And I also went
19  into explaining how I, you know, came about the mortgage
20  default industry and learned it to, you know, know of
21  this industry even existing.  And we were doing -- I was
22  doing inspections at the time under that franchise, as I
23  explained during the first part of the deposition.
24            There was another company that we did door

Page 207

1  signage for where we would install marketing signs for
2  auction.
3        Q.    What was the name of that company?
4        A.    I can't recall.  It was so long ago.  I'm
5  sorry.  I was trying to think of the name of that
6  company.  But I know that we did inspections with them
7  as well.
8            I did some work with an Altisource vendor as
9  well.
10       Q.    What was the name of that vendor?
11       A.    Swift Resolutions.
12            I did -- we did some -- I signed up for
13  SafeGuard, we did a few orders with them, and that
14  didn't pan out.
15            I do think that there was another regional
16  company that held that HUD transitional contract for a
17  very short time, but I can't recall that name either.
18  I'm sorry.  This was so long ago.
19       Q.    When did you do work for SafeGuard?
20       A.    I did -- well, we signed up in 2011 I want to
21  say.  And so the work would have -- I'm sorry -- the
22  work would have completed in 2011.
23       Q.    And why didn't that work out?
24       A.    SafeGuard is very notorious for back-charging

Page 208

1  their vendors.  I had heard some really bad reviews
2  about that.  Went out and did a work order for them and
3  saw that firsthand.  It just wasn't a good fit for me,
4  this model.
5        Q.    Understood.
6            Let's talk about when you were doing work for
7  Altisource.  So as I understand it, that was between
8  2013 and 2018, right?
9        A.    Correct.
10       Q.    Between 2013 and 2018, did you also do work
11  for other companies?
12       A.    I did.
13       Q.    What companies were those?
14       A.    I worked with Five Brothers, National Field
15  Representatives, Northsight development -- I'm sorry --
16  Northsight Management, Northsight Management.  And then
17  an estimate company I was working with as well doing
18  some asset management, RLS -- RLS Loans, I believe it
19  was the name.
20       Q.    And what did you do for Five Brothers?
21       A.    The same scope of work, just with different
22  guidelines, because every company has different
23  guidelines, evictions, landscape, winterizations, grass
24  cuts, bid approvals, and things of that nature.



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 209..212

Page 209

1    Q.   Is that the same type of work did you for
2  National Field Representatives?
3    A.   Correct.
4    Q.   And also Northsight Management?
5    A.   Correct.
6    Q.   And then the RLS loans, is that the same type
7  of work did you for them?
8    A.   Yes.
9    Q.   Anyone else who you worked with during those
10 years?
11   A.   Yes.  There was a company -- there it is --
12 there was a company that I was working with doing
13 insurance inspections, loss drafts.  And the name of
14 that company -- so many acronyms, I apologize --
15 Assurant, Assurant, that was the name.
16   Q.   Any other company you were working with
17 between 2013 and 2016?
18   A.   Not that I can recall.
19   Q.   Have you now shared all of the experience that
20 you have in field servicing work?
21   A.   Yes.
22   Q.   Is it right to say that you have never worked
23 in residential sales or marketing?
24   A.   That's fair.

Page 210

1    Q.   So to be clear, you're not a licensed real
2  estate agent, right?
3    A.   I am not.
4    Q.   You've never taken classes in real estate
5  sales or real estate marketing?
6    A.   No.
7    Q.   You don't have any experience in valuing real
8  estate properties, do you?
9    A.   Other than the research that I've done to
10 provide information to my clients, no, nothing official.
11 But I have done the research.
12   Q.   Are you an appraiser?
13   A.   No.
14   Q.   Have you ever taken any classes about
15 appraising property?
16   A.   No.
17   Q.   Have you ever been hired to do either an
18 appraisal or a broker's price opinion on a property?
19   A.   No.
20   Q.   When you say the work that you've done for
21 your clients or the research you've done, what would
22 that research consist of?
23   A.   The research would consist of me giving a bid
24 to a client and demonstrating what that previous

Page 211

1  property value might have been, the recent property
2  value, the comparisons around the neighborhood and the
3  surrounding communities and what that possible potential
4  would be if we invested -- once the client invested the
5  money in doing the work on the property.
6    Q.   And how many times have you done activities
7  like that?
8    A.   Countless.
9    Q.   Who did you do that for?  What company?
10   A.   Altisource.
11   Q.   Anyone else?
12   A.   My staff has given certain informations to
13 other clients pertaining to that when submitting bids.
14   Q.   When you're talking about your "staff," who
15 are you referring to?
16   A.   My bids team.
17   Q.   Who are those --
18            (Multiple speakers simultaneously
19            speaking.)
20 BY THE WITNESS:
21   A.   -- that I had at the time.  I'm sorry.
22        My bid team was Kelly Bishop.
23   Q.   Did she at some point change her name?
24   A.   Yes, she did.  She got married.

Page 212

1    Q.   And is it Kelly Cutsinger, maybe?
2    A.   Yes.
3    Q.   Got it.
4        And going back to the work you say you did for
5  Altisource in this, did you ever do any BOPs for
6  Altisource, broker price opinion for Altisource?
7    A.   No, we never performed BOPs.
8    Q.   And you never --
9    A.   There's another vendor that does that.
10   Q.   Right.
11       And you never did appraisals for Altisource,
12 right?
13   A.   No.
14   Q.   And you were never involved in setting the
15 price for a property that was going on the market, were
16 you?
17   A.   No.
18   Q.   You were never involved in actually marketing
19 one of Altisource's properties, were you?
20   A.   Can you clarify what you mean by "marketing"?
21   Q.   Were you involved in ever showing a property
22 to a potential purchaser?
23   A.   No.
24   Q.   Were you involved in deciding where or how to



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 213..216

Page 213

1  market the property to the general public?
2      A.   No.
3      Q.   Other than what you've shared so far, do you
4  have any experience in the mortgage industry?
5      A.   No.
6      Q.   So let's talk for a few more minutes about
7  your background.
8           I believe you testified -- with Altisource.
9      I believe you testified in 2013 that you
10 sought Altisource out so you could be a vendor with
11 them; is that right?
12     A.   Yes.
13     Q.   Why did you pursue serving as a vendor for
14 Altisource?
15     A.   Because Altisource had a number of properties
16 in my area.  There was volume there, them amongst other
17 companies.  And, again, I had a lot of experience with
18 postconveyance properties, and I wanted to move over to
19 the preconveyance side.
20     Q.   What do you mean by "conveyance"?
21     A.   When a property is conveyed over to the U.S.
22 Department of Housing and Urban Development.
23     Q.   What did you know about Altisource at the
24 time?

Page 214

1      A.   I had seen some Altisource signs on some
2  properties that were conveyed amongst other
3  preconveyance national vendors, and I had heard about
4  them through some of my associates.
5      Q.   What had you heard?
6      A.   That they had work.
7      Q.   You -- I just want to clarify this, in your
8  prior testimony you referred to yourself as asset
9  manager and you talked about working in asset
10 management; do you remember that?
11     A.   Yes.
12     Q.   In Altisource, there are field service --
13 there's a field service component, used to be called
14 PPI, and then it transitioned into Altisource field
15 servicing.
16          Are you familiar with that?
17     A.   Yes.
18     Q.   Is that the component of Altisource that you
19 did your work for?
20     A.   PPI and inspection.
21     Q.   Understood.
22          So there's another component of Altisource
23 that does the sales and the marketing, and Altisource
24 internally refers to those individuals as asset

Page 215

1  managers; are you familiar with that?
2      A.   Yes.  I've had some communication with some
3  asset managers along the way at -- internally with
4  Altisource.
5      Q.   Understood.
6           So your testimony, when you talk about working
7  with asset management and being in asset management,
8  were you referring to your work with PPI or Altisource
9  Field Services?
10     A.   I was referring to my work as a whole in my
11 career, because Altisource doesn't give the title to its
12 subcontractors, the category in which it should fall in.
13 It is an asset that I am managing when I review a photo,
14 when I go out and visit a property, when I am performing
15 services, I am managing that asset.
16     Q.   Understood.
17          So Altisource never gave you the title "asset
18 manager"?
19     A.   No.
20     Q.   You didn't hold that position within
21 Altisource or for Altisource?
22     A.   No, I am not an employee of Altisource or at
23 the time was an employee of Altisource.  I was a
24 subcontractor.

Page 216

1      Q.   Right.
2           And you said that primarily your work with
3  Altisource was with the field servicing; so PPI and
4  Altisource Field Services?
5      A.   And inspections.
6      Q.   And inspections.
7           And so the sales and the marketing component
8  of Altisource, that was separate from the day-to-day
9  work that you did?
10     A.   Yes.
11     Q.   You testified that when you began as an
12 Altisource vendor you had to fill out some
13 questionnaires?
14     A.   Correct.
15     Q.   What were those questionnaires?
16     A.   Can you clarify the -- can you clarify the
17 question?
18          Are we discussing the pretraining material or
19 the original vendor packet that was sent to me at the
20 time of my applying?
21     Q.   That's a good question.
22          So I'm talking about after you applied and
23 when you were becoming a vendor, so the pretraining
24 or -- you know, whatever that time period is -- what



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 217..220

Page 217

1   were those questionnaires?
2       A.   Those were pertaining to properties, different
3   guidelines, expectations.  I believe, per what I recall,
4   you received a score for those.  It was more along the
5   lines of a test as opposed to a questionnaire because
6   there was a right and wrong answer, per what I recall.
7       Q.   Do you still have copies of those?
8       A.   No -- no.
9       Q.   Do you have access to them?
10      A.   No.
11      Q.   So, for example, they're not in your email, or
12  they're not in records that you have access to?
13      A.   If I received a confirmation email for that, I
14  have not went to do the research in my emails to see if
15  I could find a hard copy.  That's not something that I
16  have looked into.
17      Q.   You also said that you took tests.
18           Are you saying that the questionnaires are the
19  payment tests, or are there tests that are different?
20      A.   Per what I recall, there were two different
21  systems that we had to log in to, some were tests; some
22  had training materials.  And per what I recall, there
23  was a questionnaire on there.
24      Q.   Let me see if I understand -- I think I

Page 218

1   understand your testimony.  I'm going to ask you some
2   questions and see if I do.
3           So when you began as a vendor for Altisource,
4   Altisource gave you some questionnaires to test your --
5   or to assess your level of knowledge?
6       A.   Yes.
7       Q.   Is that right?
8       A.   Correct.
9       Q.   And at the same time, Altisource also provided
10  you tests to also see how your learning or, you know,
11  assess your level of knowledge in the field servicing
12  area?
13      A.   Yes.  This was a requirement before they
14  started to issue properties, assign properties.
15      Q.   Understood.
16           So all of the assessment about your knowledge
17  occurred before you actually did any work on Altisource
18  properties?
19      A.   Correct.  I don't recall any of those being
20  sent to me after I started to receive properties in my
21  portfolio.
22      Q.   Understood.
23           And do you know if you passed those tests?
24      A.   I do believe I passed those tests.

Page 219

1       Q.   You also received some training material
2   manuals from Altisource, didn't you?
3       A.   Yes.
4       Q.   I think you said that some of the manuals that
5   you received, you actually removed the Altisource logo
6   and put your logo on them; is that right?
7       A.   Some of the slides that they had in the VMS
8   document repository pertaining landscape, changing
9   guidelines and things of that nature.
10      Q.   Did anyone at Altisource give you permission
11  to put your logo -- remove Altisource's logo and put
12  your logo on there?
13      A.   Yes.
14      Q.   Who was that?
15      A.   I believe it was my coordinator at the time.
16      Q.   Who was that person?
17      A.   His name was Virgil.
18      Q.   And what was Virgil's last name?
19      A.   Karim.  I believe I'm pronouncing that right.
20      Q.   Where was he located?
21      A.   India.
22      Q.   How would you evaluate your work as an
23  Altisource Field Services vendor?
24      A.   How would I evaluate my work as an Altisource

Page 220

1   field service vendor as a whole?
2       Q.   Mm-hmm (nodding).
3       A.   I performed to the best of our ability, not
4   just in the field and in-field quality, but the
5   customer service and the communication in between my
6   staff and Altisource's staff.  We performed to the best
7   of our ability.
8       Q.   Were you good at your job?
9       A.   Per Altisource, yes.
10      Q.   Did you believe you were good at your job?
11      A.   I do.
12      Q.   Is there any reason that Altisource should not
13  have hired you as a field services vendor?
14      A.   No.
15      Q.   Is there any reason that Altisource shouldn't
16  have relied on your ability as a field services vendor?
17      A.   No.
18      Q.   Is there any reason that Altisource shouldn't
19  have trusted the quality of your work as a field
20  services vendor?
21      A.   No.
22      Q.   If we wanted to verify the quality of your
23  work within -- with employees who, either did work or
24  currently work at Altisource, who should we speak to?



Page 221

1    A.  My original VMO representative, Giancarlo
2  Fontanini; Paul Manraj- -- I can't remember his last
3  name right now, I apologize -- Rohip (phonetic) in the
4  bids team; Ronald Priest (phonetic), who was in charge
5  of training; Mergesh Nadar (phonetic), who was in charge
6  of the landscape program; my follow-up coordinators; my
7  PODs; the code violation department.
8    Q.  Are some of the people that you mentioned
9  located in India?
10   A.  Yes.
11   Q.  Overall, the people who you mentioned who were
12 in India, did they seem to understand the job?
13   A.  Yes.
14   Q.  Did they seem good at their job?
15   A.  Yes.
16   Q.  Are some of the people who you mentioned also
17 located in Uruguay?
18   A.  Yes.
19   Q.  And did those individuals seem to understand
20 their job?
21   A.  I can't speak on that.  I --
22   Q.  Which individuals who you mentioned were
23 located in Uruguay?
24   A.  Giancarlo Fontanini, I believe.

Page 222

1    Q.  And how often would you interact with
2  Giancarlo Fontanini?
3    A.  In the beginning of my tenure with Altisource,
4  we spoke regularly pertaining to expectations and things
5  of that nature.  I had regular communication with him,
6  not as often as I was communicating with the follow-up
7  teams and the coordinators, the code violation
8  departments and things of that nature.
9    Q.  And when you spoke to Giancarlo Fontanini, did
10 he seem to understand his job?
11   A.  I don't know exactly what his job description
12 entailed.
13   Q.  Did he seem knowledgeable about the issues you
14 were speaking to him about?
15   A.  We weren't speaking about issues, per se.
16   Q.  Were you speaking to him about your work as an
17 Altisource field vendor?
18   A.  Yes.  We were speaking about our work, on-time
19 percentages, and things of that nature.  But pertaining
20 to specific properties and those guidelines, no.
21   Q.  The topics that you did speak to him about,
22 did he seem knowledgeable about them?
23   A.  Yes.
24   Q.  And your follow-up coordinators that you

Page 223

1  referenced, were those individuals located in India?
2    A.  Yes.
3    Q.  I believe you testified that you were in touch
4  with them daily; is that right?
5    A.  Correct.
6    Q.  And did they seem knowledgeable about the
7  position that you had, the field service position, and
8  what was required?
9    A.  Yes.
10   Q.  Were they helpful?
11   A.  Within the guidelines of what their
12 capabilities were, yes.
13   Q.  Is there anything about your territory for
14 Altisource that you didn't share in your prior
15 testimony?
16   A.  Can you rephrase the question?
17   Q.  When you testified on April 28th, you
18 testified about your territory for Altisource; do you
19 remember that?
20   A.  Yes.
21   Q.  Is there anything that you didn't share about
22 your territory on that day?
23   A.  I was assigned the State of Illinois, and
24 that's what I stated during my testimony.

Page 224

1    Q.  Is all of your experience with Altisource
2  limited to the State of Illinois?
3    A.  Firsthand, yes.
4    Q.  Did you perform services for Altisource in any
5  other state?
6    A.  I had a coordinator.  I don't recall what her
7  position was.  She had an escalated property in the
8  State of Wisconsin that she needed immediate assistance
9  with, it was an emergency.  And we took care of that
10 property for her.
11   Q.  Other than that example in Wisconsin, is all
12 of your experience as a vendor with Altisource in the
13 State of Illinois?
14   A.  Yes.
15   Q.  While working as a field services vendor for
16 Altisource, approximately how many properties did you
17 perform services on?
18   A.  I would estimate the complete portfolio to be
19 over 30,000 properties over the course of five years.
20   Q.  Out of those properties, do you know how many
21 were in preforeclosure, what ratio or what percentage
22 were in preforeclosure?
23   A.  I received the preforeclosure portfolio in
24 2015.  I would estimate that to be around 4,000, per



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 225..228

Page 225

1  what I recall, was the amount of the property drop that
2  I received.
3      Q.    And between 2013 and 2015, did you work on any
4  preforeclosure properties?
5      A.    No, I don't recall working on any
6  preforeclosure properties, unless -- I was an REO vendor
7  at that time.
8      Q.    You've also testified that you at some point
9  had the Wells Fargo portfolio; is that right?
10     A.    Yes.
11     Q.    And what year did you begin working on the
12 Wells Fargo portfolio?
13     A.    Per what I recall, we were anticipating that
14 portfolio for quite some time.  I believe we started to
15 receive that first portfolio in 2017.  Could have been
16 the last quarter of 2016, per what I recall.
17     Q.    Once you began working on the Wells Fargo
18 portfolio, did you work on any other investor
19 portfolios?
20     A.    What do you mean by "investment portfolio"?
21 I don't understand --
22     Q.    Sure.  So let me rephrase that.
23          When you became the -- when you began working
24 on Wells Fargo, did you only work on Wells Fargo

Page 226

1  properties?
2      A.    No.
3      Q.    Were -- I believe you testified that you're
4  familiar with different investors, so I'm going to use
5  the term "investors" to refer to Wells Fargo and other
6  institutions that may have owned these properties,
7  right, have title to properties.
8          So some of the investors, Wells Fargo or
9  others, have different requirements for maintaining an
10 REO; is that right?
11     A.    Correct.
12     Q.    And when you talk about Wells Fargo getting
13 ready for that portfolio, was part of learning the
14 requirements that Wells Fargo was going to have for
15 their portfolio?
16     A.    Yes.
17     Q.    So other investors who you worked with, do you
18 remember how -- do you remember names of other investors
19 who you performed services -- whose properties you
20 worked on?
21     A.    I understand what you're asking.  In VMS,
22 there's a tab when you log in to manage the property,
23 and you can see the individual investor code in the VMS
24 tab.  So there were other investors, such as HSBC --

Page 227

1  HSBC, Litton.  You have the OCN code for Ocwen.
2          There were several other investors, I just --
3  I can't recall those individual acronyms at this time.
4      Q.    Understood.
5          Is it correct for me to say that the different
6  investors had different requirements?
7      A.    Yes.
8      Q.    So if you were working, for example, on a HSBC
9  property, you had to follow HSBC requirements, right?
10     A.    Yes.
11     Q.    The same would be for Litton; is that right?
12     A.    Yes.
13     Q.    Do you remember Deutsche Bank being one of
14 those codes or one of those investors?
15     A.    Excuse me.
16          I've never seen an investor code in VMS that
17 was specific to Deutsche Bank, I only saw the OCN code
18 for Ocwen.
19     Q.    Is it right for me to say that you don't know
20 how many Deutsche Bank properties you worked on?
21     A.    Correct.  That's something that I wasn't privy
22 to.
23     Q.    So I know we've been going just a little under
24 an hour, but I would like to take a quick break, if

Page 228

1  that's okay.  You can come back in about ten minutes.
2  Is that okay?
3      THE WITNESS:  That's all right.
4      MR. PRINCE:  That's fine.
5      MS. KRIGSTEN:  Thank you.
6      THE VIDEOGRAPHER:  Time is 9:55 a.m.  We are now
7  going off the record.
8              (A short break was had.)
9      THE VIDEOGRAPHER:  The time is 10:06 a.m.  We are
10 now back on the record.
11 BY MS. KRIGSTEN:
12     Q.    So, Ms. Agnew, I want to go through some
13 information about a particular property with you.  So my
14 colleagues, Cody Wood, is going to pull up a document.
15          As he does that, I just want to confirm:
16 You're familiar with VMS; is that right?
17     A.    Yes.
18     Q.    And that was the system -- vendor management
19 system, is that what VMS stands for?
20     A.    Yes, vendor management system.
21     Q.    I think that you said that you had a shadow
22 system to VMS, what was that called?
23     A.    Property Preservation Wizard.
24     Q.    Is that a program that you had the license to?

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021
Pages 229..232

Page 229

1  A.  No.  It's a system where you -- work is
2  integrated from VMS, and it goes directly to Property
3  Preservation Wizard so that we have an ability to assign
4  into an individual contractor.
5  Q.  Understood.
6     Is that a program that was provided by
7  Altisource?
8  A.  No.
9  Q.  Is it a program that you had separate from
10 whatever Altisource provided to you?
11 A.  Correct.
12 Q.  Got it.
13    So you communicated with Altisource via the
14 VMS system; is that right?
15 A.  Yes.
16 Q.  When did you communicate with VMS versus,
17 let's say, email, like, how would you know whether to
18 send something versus -- in VMS versus when you would
19 send it in an email?
20 A.  Well, there are two main ways to communicate
21 in VMS.  Pertaining to a specific property, you would
22 create a case.  And pertaining to a specific word order,
23 there's something called a work item case log.
24 Q.  So would you also -- go ahead.  I'm sorry.

Page 230

1  A.  No.  It's fine.  I just wanted to make sure
2  that everyone understands.
3     So when you update the work item case log,
4  that's individual to -- that's specific to that
5  particular work order.
6  Q.  And would you also send emails to individuals
7  at Altisource?
8  A.  Yes.
9  Q.  When would you send an email to someone at
10 Altisource, as opposed to putting something into the VMS
11 system?
12 A.  There was constant email communication between
13 myself, my staff, and the Altisource points of contact,
14 our follow-up coordinators.  Every day there was
15 communication, even if there was something updated in
16 the work item case log, that particular coordinator
17 might download the whole list of properties or work
18 orders that were impending correction, and go ahead and
19 send that to us via email to verify the information to
20 see if something needed to be updated or we would get
21 into a discussion pertaining those particular work
22 orders.
23    So even if it was updated in the work item
24 case log, it would usually be followed up with an email.

Page 231

1  Q.  Did you keep every email that you received
2  from Altisource between 2013 and 2018?
3  A.  I have access to a vast amount of those.  I
4  don't have every last email.
5  Q.  Would you sometimes delete emails?
6  A.  No, I wouldn't delete emails.  However, all of
7  the emails weren't coming to me directly.
8  Q.  Where were they going?
9  A.  My staff.
10 Q.  Did your staff have their own emails then that
11 they used for work purposes?
12 A.  Correct.
13 Q.  So let's back up for a second.
14    Did Agnew Field Servicing have its own email
15 domain?
16 A.  Yes.
17 Q.  Where there ...
18    And did all of your staff have emails on the
19 Agnew Field Services domain?
20 A.  Yes.
21 Q.  Are those the email addresses that your staff
22 used to communicate with Altisource?
23 A.  My staff -- the way we set it up, my staff had
24 their own individual email addresses, and we would have

Page 232

1  those emails ported from the host to those emails via
2  Gmail email forwarding.
3  Q.  Who handles your email retention or hosting?
4  A.  Google, Gmail.
5  Q.  Do you have access to all of the Agnew Field
6  Services emails that were ever received by Altisource?
7  A.  No, I do not.
8  Q.  Why not?
9  A.  Because my staff had emails that I no longer
10 have access to.
11 Q.  Did you keep all of the emails that you
12 personally sent to Altisource?
13 A.  Yes.
14 Q.  Have you produced all of the emails that you
15 ever sent to Altisource, have you produced those in this
16 case?
17 A.  Yes, to the best of my ability.
18 Q.  And have you produced all of the emails that
19 you, Nakia Agnew, received from Altisource?
20 A.  Yes, to the best of my ability.
21 Q.  Have you produced any emails that your staff
22 either sent or received from Altisource?
23 A.  If I was CC'd in the email, then it would --
24 there would be record of it in Gmail, yes.



National Fair Housing Alliance vs Deutsche Bank National Trust

Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 233..236

Page 233

1     Q.   And if you weren't CC'd, does that mean that
2 you don't have access to those emails?
3     A.   Unfortunately, I do not.
4     Q.   So let's go back to VMS for a moment.
5     So on the screen, do you see a spreadsheet in
6 front of you that's labeled: Exhibit 5001, VMS
7 communications log Excel?
8     A.   Yes.
9     Q.   Have you ever seen the VMS communication
10 system put in a spreadsheet like this? Are you familiar
11 with this format?
12     A.   I have seen something similar on the vendor
13 scorecard.
14     Q.   So I want to talk about a couple of these
15 categories, just to make sure I understand what they
16 represent. So if you look at column T on this list, it
17 says the primary vendor name.
18     Do you see that?
19     A.   Yes.
20     Q.   And what would a primary vendor be?
21     A.   The primary vendor is the vendor that is
22 assigned to that property at the time.
23     Q.   So I'm going to represent to you that these
24 communications relate to one particular property.

Page 234

1 They've been -- they're forwarded from a larger document
2 by Mr. Wood here, and they pertain to the address at
3 16722 Sherman Place in Harvey, Illinois.
4     So with that representation, it says that the
5 primary vendor here is Swift Resolutions Inc.; is that
6 right?
7     A.   Yes, that's what it says.
8     Q.   And I think you testified earlier that you
9 previously worked for Swift Resolutions; is that right?
10     A.   Yes, I did.
11     Q.   And what did you do for Swift?
12     A.   I did the same type of services that I
13 performed directly for Altisource.
14     Q.   So here it says Swift Resolutions is the
15 primary vendor, and then if you go over to column V, it
16 says the work -- or I'm sorry -- column -- yeah, column
17 V, the work order vendor name, it has Agnew Field
18 Servicing.
19     Do you see that?
20     A.   Yes.
21     Q.   So does that mean that Agnew Field Servicing
22 actually performing the work orders that the vendor
23 overall responsible for the property was Swift
24 Resolutions Inc.?

Page 235

1     A.   Pertaining this spreadsheet sheet, this would
2 have been something Altisource would have been reviewing
3 internally so I wouldn't have access to this. We were
4 assigned to this property as primary vendors.
5     If these are work orders in which Swift
6 Resolutions was the primary vendor, then that would have
7 been something that I didn't have access to. This
8 property was in my portfolio as a primary vendor.
9     Q.   Who owns Swift Resolutions Inc.?
10     A.   Chase Gochnauer.
11     Q.   And is that who you worked with when you
12 worked for Swift?
13     A.   Yes.
14     Q.   Anyone else who you remember from Swift
15 Resolutions?
16     A.   Yes. There was a secretary that I had some
17 communications with. I can't recall her name, though.
18 I'm sorry.
19     Q.   Let's look at a couple of other columns here.
20 So if we go back to column I on this spreadsheet, do you
21 see that there's a line item that calls -- the name of
22 it is: Line item name; do you see that?
23     A.   Yes.
24     Q.   And then under line item name on each line, it

Page 236

1 gives what I would consider a task or an activity. So,
2 for example, biweekly inspection or CFR mailing address
3 request, CFR document collection; those sorts of things.
4     Are those the individual activities that were
5 performed in connection with a property?
6     A.   Yes, those are work contract orders.
7     Q.   And then in column N, there is a user name or
8 a user number.
9     Did you have a vendor number with Altisource?
10     A.   Yes.
11     Q.   Do you remember if the number that you see in
12 column N is your vendor number?
13     A.   It is.
14     Q.   And then column P here, there's communication
15 log comments.
16     Do you see that?
17     A.   Yes.
18     Q.   And these comments look as if they are
19 comments that were either sent to Agnew Field Service
20 [sic] from Altisource or received by Altisource from
21 Agnew Field Servicing.
22     Does that look right if you look at these
23 comments?
24     A.   In column P --



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021
Pages 237..240

Page 237

1  Q.  Yes.
2  A.  -- the communications log comments is the work
3  item case log that I was referring to.
4  Q.  So those are the communications that you as a
5  vendor would have about a particular property with
6  Altisource?
7  A.  Correct.
8  Q.  Understood.
9      And then looking at column R, there is work
10  item type.
11     Do you see that?
12  A.  Mm-hmm.
13  Q.  And many of those, at least the ones we see on
14  the screen says contract order.
15     What does contract order mean?
16  A.  A contract order is an order that was issued
17  directly by Altisource.
18  Q.  And then there's also -- Mr. Wood has just
19  pulled up, there's also some other entries in that
20  column further down:  Bid order and proposal request.
21     Do you see those?
22  A.  Yes.
23  Q.  What is a bid order?
24  A.  A bid order is a request for a bid.

Page 238

1  Q.  And that is Altisource requesting a bid from a
2  vendor; is that right?
3  A.  Yes.
4  Q.  And then a proposal request.  What is that?
5  A.  It's a request for a proposal, i.e., a bid.
6  Q.  And that's Altisource requesting that
7  information from a vendor; is that right?
8  A.  (Nodding.)
9  Q.  Okay.  Okay.  So let's look at this property,
10  which is the Sherman Place property.  Its address was
11  16722 Sherman Place.
12     Do you see that in column C?
13  A.  Yes.
14  Q.  Do you remember this property?
15  A.  Yes.
16  Q.  What do you remember about it?
17  A.  I remember that we were -- we were assigned
18  the property per the exhibits that I reviewed.  It was
19  initiated as a CFR, cash for relocation.
20     I remember -- I didn't -- my staff handled the
21  cash for relocations, so I don't recall taking any part
22  or having any direct communication with Altisource as
23  pertaining to a standard cash for relocation.
24     I remember my conversations with my

Page 239

1  coordinators pertaining to the permits that needed to be
2  pulled in order to receive the sales stamps from the
3  City of Harvey, because at that time it was escalated.
4  Q.  So let's talk about the details of this
5  property.
6      So if we go to an entry on August 15th of
7  2015, as we scroll down, it seems as if -- and I don't
8  know if you can tell from here -- it seems as if this
9  might be the first time that the property was vacant, at
10  least from what you see on the log.
11     Does that seem accurate?
12  MR. PRINCE:  Can you going to slide it over,
13  because part of column P is not on our screen, at least
14  not on mine.
15  MS. KRIGSTEN:  It's on our screen --
16  MR. PRINCE:  Oh, you know, it's because Zoom view
17  is blocking.  I apologize.
18  MS. KRIGSTEN:  Okay.  Understood.
19  BY MS. KRIGSTEN:
20  Q.  So to orient you --
21  MS. KRIGSTEN:  If you can scroll back down,
22  Mr. Wood.
23  BY MS. KRIGSTEN:
24  Q.  -- it looks like on July 16th, the property

Page 240

1  was still occupied.  And then if you keep going down, by
2  August 15th, it looks like there's initial work being
3  done such as a clean-out and property review, janitorial
4  services.
5      Do you see that?
6  A.  Yes.
7  Q.  So does it seem -- at least from this
8  document -- that the property became vacant sometime
9  around August 15th or immediately before August 15th?
10  A.  Yes.  However, the signed CFR documents would
11  give us the exact date and time that the CFR was
12  completed.
13  Q.  Understood.
14     So on August 21st -- well, let's back up.
15     So you were sent some exhibits.
16     Do you have that binder with you?
17  A.  Yes, ma'am.
18  Q.  So I want to look at what is Exhibit 5003,
19  which in your binder should be tab 12.
20  A.  I have it.
21  Q.  So this is -- Exhibit 5003 is titled:
22  Biweekly inspection exterior.
23     Do you see that?
24     The document in front of you, not what's on



Page 241

1   the screen.
2       A.    We're referring to the exhibit, which would be
3   Exhibit 11?
4       Q.    Right.  Up in the left-hand corner, it will
5   say Defendants' Exhibit 5003, and it should be at tab
6   12.
7       A.    Gotcha.
8       Q.    Is that right?  Does it say:  Biweekly
9   inspection exterior?
10      A.    Yes.
11      Q.    So this is the type of inspection that would
12  be done biweekly.  And I believe, based on your
13  testimony, one of the purposes of that inspection would
14  be to determine whether the residence is vacant; is that
15  right?
16      A.    That is to verify.
17      Q.    Looking at that exhibit, the property photos
18  that are on -- that are contained within Exhibit 5003,
19  how would you characterize the exterior of this
20  property?
21      A.    So if we're analyzing the exterior of a
22  property, we would not only be looking at the exterior
23  property conditions, but we would also be looking at the
24  landscape.  So that would be two separate things.

Page 242

1           The landscape, it appeared that the landscape
2   would be -- there needed to be work done on the
3   landscape.  But the overall property condition is fair.
4       Q.    And when you say work needed to be done on the
5   landscape, it seemed like there are overgrown bushes; is
6   that right?
7       A.    Yes.  And there also appears to be some
8   exterior debris.
9       Q.    So let's move to the next exhibit, which is
10  debris removal; so that is Exhibit 5004.  And I believe
11  that should be tab 13 in your notebook.
12          Do you see that?
13      A.    Yes.
14      Q.    So was debris removal a standard preassigned
15  work item for properties at Altisource?
16      A.    It was up to a certain cubic yard.  However,
17  in a cash for relocation, the cash for relocation was
18  broke up into three different checks.  And one of those
19  checks would be for the debris, meaning, that if we were
20  initiating a successful cash for relocation -- I'm
21  sorry -- if we were doing the successful cash for
22  relocation, that -- that property would have been put
23  in broom-swept condition, meaning that there would be no
24  interior or exterior debris.

Page 243

1           (Stenographer clarification.)
2       THE WITNESS:  Broom-swept.  I'm so sorry,
3   Ms. April.  Broom-swept condition.
4           (Discussion off the record.)
5   BY MS. KRIGSTEN:
6       Q.    So looking at Exhibit 5004, and looking at the
7   photographs that are part of that, does this appear that
8   there is a great deal of debris to be removed from that
9   property?
10      A.    I just wanted to look through all of the
11  papers before I spoke.
12          It didn't exceed the allowable.  However,
13  there was debris on the premises, on the interior and
14  the exterior.
15      Q.    Understood.
16          And your team, the individuals who were
17  working for Agnew Field Services went in and they
18  removed that debris; is that right?
19      A.    Correct.
20      Q.    And that was at Altisource's request?
21      A.    If a contract order was issued, yes.
22      Q.    And so if you look back at the screen and you
23  see Exhibit 5001, do you see that there was several
24  activities that occurred.

Page 244

1           So there was the REO gutter cleaning 1.1, do
2   you see that?
3       A.    Yes.
4       Q.    And there was the REO clean-out, right?
5           And then if you scroll down, you see paint and
6   oil cans were removed; do you see that?
7       A.    Yes.
8       Q.    And do you see tire disposal?
9       A.    Yes.
10      Q.    And all of those things occurred at
11  Altisource's request; is that right?
12      A.    No.  These were vendor estimates that were
13  created by my team.  These are within the allowables.
14  This is a standard initial service.
15      Q.    Right.
16          And maybe I phrased that incorrectly then.
17          So this is a standard service that was
18  expected by Altisource to be performed at its
19  properties?
20      A.    This was a standard service that Altisource
21  has in their guidelines as preapproved line items for
22  the vendors to complete on-site without prior approval.
23      Q.    Understood.
24          Do you know anything about the value of this

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 245..248

Page 245

1  property at the time that it went into REO status?
2      A.    No.
3      Q.    Is it fair to say that some properties come
4  into REO status with work items that need to be
5  complete?
6      A.    Yes.
7      Q.    There are differences in how mortgage holders
8  preserve their properties, aren't there?
9      A.    Yes.
10     Q.    So, for example, in your experience, some
11 properties come into REO status and they're well
12 preserved; is that right?
13     A.    Yes.
14     Q.    And then in your experience, other properties
15 come into REO status and they're not well preserved,
16 right?
17     A.    Correct.
18     Q.    They may have significant repairs that are
19 needed?
20     A.    Yes.
21     Q.    Are some of them -- in your experience, are
22 some of the properties that come into REO status
23 uninhabitable?
24     A.    If there's a substantial amount of mold or,

Page 246

1  you know, roofing issues and things of that nature, that
2  would make it hazardous, yes.
3      Q.    So some properties come into REO status, and
4  they have significant hazards --
5      A.    Correct.
6      Q.    So do some properties coming into REO status
7  need to be completely rehabbed?
8      A.    What do you mean by "completely rehabbed."
9      Q.    Well, I think that you've said in prior
10 testimony that there are times that a property needs to
11 be rehabbed, so it needs to be completely redone; is
12 that right?
13     A.    That is subjective.  We give a list of any
14 deficiency that we note at a property, and then we
15 submit that to the client and let them review it.  That
16 really is subjective, though.
17          A complete rehab -- if you have a property
18 with ten major deficiencies but only one deficiency
19 might make it uninhabitable, then that one deficiency
20 could be approved and make it habitable while there are
21 just other things that might bring down the market
22 value.
23     Q.    Understood.
24          So let me ask that a different way.

Page 247

1      Q.    So some of the hazards that exist when a
2  property comes into REO status could make it
3  uninhabitable; is that right?
4      A.    Yes.
5      Q.    And some properties that come into REO status
6  need significant work done to make them habitable; is
7  that right?
8      A.    Yes.
9      Q.    It is it fair to say that no two properties
10 are alike when they come into REO status?
11     A.    No two properties are built the same, that is
12 correct.
13     Q.    And no two properties are preserved the same,
14 are they?
15     A.    Yes, they are because we have a standard list
16 of preapproved work items that can be completed at a
17 property.
18          So if this was any other property which needed
19 those initial services, then they would have been
20 preserved the same.
21     Q.    Understood.  That was a bad question on my
22 part.  What I mean is that the property not being
23 preserved the same, is by a mortgage holder.
24          So mortgage holders preserve properties

Page 248

1  differently, depending on who they are, right?
2      A.    They have different guidelines.  However, this
3  initial service bundle is still a preapproved items in
4  VMS that can be completed with the vendor estimate
5  tab --
6      Q.    Understood.
7      A.    -- because it exceeds -- unless it exceeds the
8  allowable.
9      Q.    And I'm going to have some more questions
10 about that.
11          Is it right to say that some repairs cost more
12 than others?
13     A.    That's very fair to say.
14     Q.    Yeah.  Okay.
15          So let's talk about this -- this Sherman Place
16 property again.
17          You said in your last testimony that you're
18 familiar with the City of Harvey; is that right?
19     A.    Yes.
20     Q.    And I believe that your testimony was that it
21 had become blighted, that the City had become blighted
22 over the years; is that right?
23     A.    Yes, with foreclosures.
24     Q.    And would that blight have occurred, let's

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 249..252

Page 249

1  say, between -- well, when did the blight begin, in your
2  experience -- in your -- if you know?
3      A.   Per my observation, it would be in -- it would
4  be in alignment with when we saw the housing market
5  crash in around 2008, when people were losing their
6  homes.
7          I'm sorry, can we take a quick break?  I do
8  apologize.
9      MS. KRIGSTEN:  Yes, of course.  How much time would
10 you like?
11     THE WITNESS:  Just give me two minutes.  I'm so
12 sorry.
13     MS. KRIGSTEN:  Sure, of course.
14     THE VIDEOGRAPHER:  Time is 10:35 a.m.  We are
15 thousand going off the record.
16              (Discussion off the record.)
17     THE VIDEOGRAPHER:  The time is 10:40 a.m.  We are
18 now back on the record.
19 BY MS. KRIGSTEN:
20     Q.   So, Ms. Agnew, we were talking about the City
21 of Harvey, and I think that one of the things that you
22 said is that after the housing market crash, you started
23 to see blocks that had several boarded-up homes on them;
24 is that right?

Page 250

1      A.   Yes.
2      Q.   And so it was, sort of, widespread blight
3  throughout the city that you were observing?
4      A.   That didn't happen right way.  We gradually
5  saw it deteriorate over time.
6      Q.   Had it deteriorated around 2014 or 2015?
7      A.   Well, I wasn't a resident of the Village of
8  Harvey at that time, nor was I working in the Village of
9  Harvey; so I wasn't in the community as much.  But we
10 started to see that just as, you know, residents of the
11 area, I would say maybe around, yeah, 2000- -- 2012,
12 around that time.
13     Q.   It must have been difficult to see?
14     A.   Yes, yes.
15     Q.   So let's go back to this, the property that we
16 were speaking about on Sherman Place.
17     A.   Mm-hmm.
18     Q.   When we talk about initial service -- when you
19 testify about initial services -- and I think you
20 testified that there were some standard preapproved
21 items that were considered initial services; is that
22 right?
23     A.   Yes.
24     Q.   Is one of, those the initial securing and

Page 251

1  putting a digital or mechanical lock on that property?
2          And Mr. Wood has pulled up Exhibit 5001 on the
3  screen, so that you can see -- for the Sherman Place
4  property what was classified initial inspection?
5      MS. SOULE:  Could -- this is Jennifer, I just
6  wanted to point out that the hard copies have Sherman
7  Drive, and this is showing Sherman Place.  So I'm
8  assuming it's the same, but I just want to make sure.
9  It seems like it would be with the street number.
10     MS. KRIGSTEN:  Understood.  And for our purposes, I
11 will represent that we have checked to ensure they are
12 the same, and I can provide you further assurances if --
13     MS. SOULE:  That's fine.  That's fine.
14     MS. KRIGSTEN:  And Mr. Wood wrote me a note that
15 the loan numbers match, the VMS loan numbers match.
16     MS. SOULE:  Okay.
17 BY MS. KRIGSTEN:
18     Q.   So looking at what was done at this property,
19 do you see that there was a digital or a mechanical lock
20 done to secure the property; do you see that?
21     A.   Yes.
22     Q.   And that was a standard initial service that
23 was done on properties, right?
24     A.   That would have been a work order issued

Page 252

1  directly by Altisource.  I can't recall whether or not a
2  digital mechanical lock was a preapproved line item, but
3  the digital lock would have been issued as the -- with
4  the CFR bundle.
5      Q.   There's also an entry for a gutter cleaning;
6  do you see that?
7      A.   Yes.
8      Q.   Was that a standard service that was expected
9  for properties?
10     A.   Yeah, it's a preapproved line item.
11     Q.   The REO clean-out we've already talked about,
12 correct, that is up to a certain number of cubic yards
13 of preapproved items; is that right?
14     A.   Yes.
15     Q.   There was an initial property review.  What is
16 that?
17     A.   What is a very detailed inspection report with
18 what we're seeing at the property at the time of the
19 initial services.
20     Q.   And that was done on this property as we see,
21 correct?
22     A.   Yes.
23     Q.   And then we get to initial janitorial
24 services.  That was a preapproved standard work item; is

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 253..256

Page 253

1    that right?
2        A.    Initial janitorial services, per what I
3    recall, those were not preapproved line items.  However,
4    because this was a cash for relocation, it would have
5    been issued along with the digital mechanical lock
6    order.
7        Q.    And then there's point -- or paint and oil
8    condition removal.
9            Do you see those entries?
10       A.    Yes.
11       Q.    And that was an approved activity at this
12   property; is that right?
13       MS. SOULE:  To the extent -- this is Jennifer
14   again.  To the extent that other columns might show what
15   was approved or not, I don't know if you want to show
16   that or let the witness have control over the screen
17   potentially.
18       MS. KRIGSTEN:  Yeah, I guess we're just going to go
19   on.
20   BY MS. KRIGSTEN:
21       Q.    Ms. Agnew, from what you can see, do you agree
22   that it was an initial service that was done at this
23   property?
24       A.    It was an initial service done at the

Page 254

1    property.  But pertaining to the question that you asked
2    me specifically about it being a preapproved line item,
3    I just wanted to, before I spoke, recall whether or not
4    we needed to create a vendor estimate, and then have
5    that converted over to a contract order at a later date.
6            I think there was something pertaining to a
7    change of guidelines pertaining to have those removals.
8    And I just wanted to -- I was just trying to recall
9    whether or not that had taken effect at this time.
10           However, if we were removing debris from a
11   property -- separating hazards -- such as the
12   electrical, TVs, and things of that nature, paint cans
13   and things of that nature and creating separate vendor
14   estimates for those.
15       Q.    So if we look at what's on the screen right
16   now, maybe -- just to be clear, at this property there
17   were paint and oil cans that were removed; is that
18   correct?
19       A.    Yes.
20       Q.    And tires were disposed of; is that right?
21       A.    Correct.
22       Q.    And then there was a tarp put on the roof of
23   the property; is that right?
24       A.    Correct.

Page 255

1        Q.    And then tree and shrub trimming; is that
2    right?
3        A.    There was a bid submitted for it.
4        Q.    Do you recall if that was completed?
5        A.    I reviewed the exhibits when I received them,
6    and I saw the service that was completed, yes.
7        Q.    And that was completed sometime -- if we look
8    at Exhibit 5007, this shows it was completed on
9    September 13th; is that right?
10           So that's tab 16 in your notebook.
11       A.    Thank you.
12           Yes, that would have been September the 9th,
13   per the dates on the photos.
14       Q.    Understood.
15           And then one other exhibit I'd like you to
16   look at, if you would look at Exhibit 5008, which is at
17   tab 17 in your -- not 17 -- tab 17 in your notebook,
18   that talks about leaf removal.
19           That was completed at this property as well?
20       A.    That -- yes, that was completed November 20th
21   of 2015, per the date on the photo.
22       Q.    So is it accurate to say that all the standard
23   exterior maintenance activity that is done on properties
24   was performed at this property?

Page 256

1        A.    Can you repeat the question?
2        Q.    Right.
3            Is it fair to say that all of the standard
4    exterior maintenance -- or lawn care items that are
5    expected to be done at properties were done on this
6    property?
7        A.    Without reviewing the full grass cut list for
8    this property and when those grass cuts were performed,
9    it's safe to say the grass cuts were completed when they
10   were assigned by Altisource.
11       Q.    Understood.
12           So what I'd like to do is have you turn to
13   Exhibit 5009, which is Exhibit 18 -- or at tab 18 in
14   your notebook.
15           Mr. Wood is telling me I have the wrong
16   exhibit.  Paper is not my forte here.
17           Okay.  So do you see an exhibit that's 5009,
18   marked Defendants' Exhibit 5009 at the top?
19       A.    Yes.
20       Q.    Do you see that this is a checklist; is that
21   right?
22       A.    Correct.
23       Q.    Have you ever seen a checklist like this?
24       A.    An REO evaluation form like this, I have seen

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021
Pages 257..260

Page 257

1  this before during my tenure, I just can't recall where.
2  But I have seen this form before.
3      Q.  You don't remember where you've seen this
4  form?
5      A.  Unfortunately, no.  But I have seen this form.
6      Q.  So according to this form, it was completed --
7  I'm going to represent to you that this was completed on
8  October -- or I'm sorry -- on November 4th, 2015, and we
9  know that because this was completed in connection with
10  the next exhibit, which is Defendants' Exhibit
11  5010, 5 0 1 0.
12          So --
13      A.  -- 26?
14  MR. PRINCE:  -- 19.
15  THE WITNESS:  20- -- 2019?  I'm sorry.
16  MS. KRIGSTEN:  '19.
17  BY MS. KRIGSTEN:
18      Q.  Just so we're clear, Ms. Agnew, do you see at
19  the top of the document where it says:  Defendants'
20  Exhibit 5010?
21      A.  Yes, I have it.
22      Q.  And it says date of visit, and that says
23  October 4th, 2015; do you see that?
24      A.  Yes.

Page 258

1      Q.  So going back to Defendants' Exhibit 5009,
2  which I'm going to represent was completed around that
3  same time, do you see that there is a checkmark next to
4  trash?
5          If you go halfway down the page, and it says
6  trash, and there's a checkmark, do you see that?
7      A.  Yes.
8      Q.  Had Agnew Field Services already removed a
9  significant amount of trash from the property by this
10  date?
11      A.  SB- -- initial services had been completed
12  with the REO clean-out back in August; so three months
13  prior.
14      Q.  You had referenced different grass cuts that
15  occur at a property.
16          Do you recall that those grass cuts occurred
17  every two weeks?
18      A.  Yes, they were issued every two weeks.
19      Q.  And when a grass cut occurred, would the
20  individuals who were performing the grass cut also pick
21  up any loose debris or trash at the property as they
22  performed that grass cut?
23      A.  No.  We would have to -- I believe, with that
24  being a preapproved line item, I don't believe that's a

Page 259

1  preapproved line item, unless this would have been an
2  exterior service pertaining to leaf removal.
3          So if we were going to the property doing a
4  leaf removal and we accumulated debris, in that aspect,
5  if we went to the property to perform a grass cut and
6  there was debris or things that had accumulated around
7  the yard over time or things of that nature, we already
8  had the REO clean-out; so we were already in the
9  allowables.  I do believe we would have had to get
10  approval to do that.
11          I can't recall for certain if you create a
12  vendor estimate in VMS, if it converts directly over to
13  a contract order or if we have to get an approval for
14  it.
15      Q.  So let me ask this a different way.
16          If one of Agnew Field Services, individuals or
17  contractors, were performing a grass cut and there's
18  trash in the yard, are they allowed to pick up that
19  trash?
20      A.  I don't recall debris removal being a
21  preapproved line item, especially after we've already
22  performed the debris removal on the initial services.  I
23  do believe that's something we needed to go back and get
24  approval for.

Page 260

1      Q.  So just to put this in the simplest terms, if
2  a piece of paper had blown on to the lawn, right, at the
3  property, would the individual mowing the property pick
4  up that piece of paper or would they mow around it?
5      A.  They would probably not mow around it.  They
6  would probably pick the piece of paper up.
7      Q.  In your experience as a field services vendor,
8  are there times where debris blows onto a property from
9  a neighboring lawn or a neighboring property?
10      A.  Can you repeat that question?
11      Q.  Sure.
12          There are times where paper can blow onto a
13  property; is that right?
14          So something from a neighbor's property blows
15  onto the property that's being serviced by Agnew Field
16  Servicing?
17      A.  That is in the realm of possibility, yes.
18      Q.  You've seen that happen?
19      A.  I can't recall any time I've had a vendor
20  contact me or a representative from any of my clients
21  contact me and say, you know, We've had specifically
22  some debris from another neighbor's yard that blew into
23  ours.
24      Q.  Do you remember the circumstance in which a



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 261..264

Page 261

1 neighbor dumped their shingles from their remodels onto
2 an REO property that you were servicing?
3      A.   Specifically that scenario?
4      Q.   Yes.  Do you remember that?
5      A.   No, I don't recall that.  However, I do
6 consider it within the realm of possibility.  We see a
7 lot in the field every day.
8      Q.   Sure.
9           So if there was trash on the yard -- on the
10 lawn of this property on November 4th, 2015, was it
11 trash that was left there that Agnew Field Servicing
12 didn't pick up?
13     A.   There's no way for me to be able to tell you
14 exactly what took place.  What I can do is review the
15 after photos that my vendor gave, during the services
16 that were performed, our last visit at the property, and
17 give you an evaluation for that.
18     Q.   So let's look at the photos for the service
19 that occurred immediately after November 4th of 2020,
20 and that is, I believe, exhibit --
21     MS. KRIGSTEN:   Cody, do you know?
22 BY MS. KRIGSTEN:
23     Q.   -- Exhibit 5008, which is leaf removal.
24 That's tab 17 in your binder.

Page 262

1      A.   Yes.  However, if this inspection -- this
2 inspection form was November the 4th, you stated?
3      Q.   Yes.
4      A.   This REO evaluation form.  This is November
5 the 4th?
6      Q.   Mm-hmm.
7      A.   Okay.
8      Q.   Yes.
9           So do you see that on November 4th, 2015 Agnew
10 Field Services performed leaf removal?
11     A.   I see it on November the 20th, November
12 the 20th.
13     Q.   November the 20th, and that's Exhibit 5008,
14 correct?
15     A.   Correct.
16     Q.   And at that time, looking at those photos, you
17 don't see any trash on the property, do you?
18     A.   No.  However, if there was trash present on
19 the property, because there was a grass cut performed
20 here as well as displayed in the before photos of the
21 leaf removal, then that would have removed before the
22 grass was cut.
23     Q.   Understood.
24          Going back to Exhibit 5009 for a moment, do

Page 263

1 you see that, if you turn to the page -- the back page,
2 so the Bates number on the bottom is SSHC 0000374.
3           Do you see that page?
4      A.   Yes.
5      Q.   Do you see that it's marked that there were --
6 under gutters -- that there were broken and hanging
7 gutters; do you see that checkmark?
8      A.   Yes.
9      Q.   And you see there's also a checkmark next to
10 obstructed gutters; is that right?
11     A.   Yes.
12     Q.   Now, we already saw that Agnew Field Services
13 had cleaned out the gutters -- had done a clean-out of
14 the gutters in August of 2015.
15          Do you remember seeing that on Exhibit 5001?
16     A.   Correct.
17     Q.   And leaves actually do fall in the Chicago
18 area in October and November, don't they?
19     A.   They do.
20     Q.   So if you turn to page -- turn to
21 Exhibit 5013, which in your notebook should be in tab
22 22, do you see in Exhibit 5013 that the gutters are
23 being repaired at the property?
24          Ms. Agnew, do you want time to study these

Page 264

1 before I ask you questions about them?
2      A.   Well, I just wanted to review the photos
3 before I start -- and shuffle the papers before I
4 started to speak --
5      Q.   Uh-huh.
6      A.   -- so that Ms. April could hear us, okay.
7      Q.   Understood.
8      A.   But, yes, I reviewed all the pages of the
9 exhibits.
10     Q.   So we can agree, can't we, that the gutters
11 actually were repaired on November 30th, 2015?
12     A.   Yes, they were.
13     Q.   And at that time, they were also cleaned out,
14 right?
15     A.   Yes.  They were vacuumed out.
16     Q.   So -- let's turn back to Exhibit 5008 for a
17 moment -- I'm sorry, 5009, which is your tab 18.
18     A.   Thank you.
19     Q.   Is it accurate for me to say that work was
20 done on the property before November 4th that's not
21 reflected on this document?
22     A.   Can you repeat the question?
23     Q.   Sure.
24          If we look at Defendants' Exhibit 5009, is



Page 265

1   that the document you have in front of you?
2       A.   Yes.
3       Q.   That document doesn't reflect all of the work
4   that was done prior to November 4th, 2015, does it?
5       MS. SOULE:   I'm going to object, just so -- I don't
6   think the purpose of the NFHA's REO field evaluation
7   form is -- it's not consistent with reflecting all
8   entire work.   It's like apples and oranges.
9       MS. KRIGSTEN:   I appreciate that.   I'd ask that you
10  not -- I appreciate that.   Thank you.
11  BY MS. KRIGSTEN:
12      Q.   I'm still going to ask -- have you answer my
13  question, Ms. Agnew.
14           It's accurate to say that Defendants'
15  Exhibit 5009 does not reflect all of the work that was
16  done prior to November 4th, 2015, does it?
17      A.   You're asking me if it reflects the work -- if
18  it reflects the work that was done prior to the time
19  that this inspection was done?
20      Q.   Let me rephrase it.
21           So if this inspection was done on
22  November 4th, 2015 -- we can agree on that, right?
23      MR. PRINCE:   Well, you're stating that, right?
24           You said that that was complete that day.

Page 266

1       THE WITNESS:   There's no --
2       MS. KRIGSTEN:   I understand.
3   BY MS. KRIGSTEN:
4       Q.   I'm asking to us to just agree -- for purposes
5   of these questions, I'm going to represent here and ask
6   that you just accept that this was done on November 4th,
7   2015?
8       MR. PRINCE:   Right.   We're assuming that fact, as
9   of November 4th, REO field evaluation form; is what
10  you're saying?
11      MS. KRIGSTEN:   That is what I said, yes.
12      MR. PRINCE:   Okay.
13      MS. KRIGSTEN:   That is what I'm saying.
14  BY MS. KRIGSTEN:
15      Q.   So this doesn't reflect -- this form does not
16  reflect, Ms. Agnew, the work that was done in August of
17  2015, does it?
18      A.   That's subjective, because there were gutters
19  that were cleaned prior to the inspection and after the
20  inspection as well, so I'm not quite sure how to answer
21  that question.
22           In pertaining to the gutters, or a specific
23  line item that was highlighted on this inspection form?
24      Q.   Well, let's just --

Page 267

1           (Multiple speakers simultaneously
2                    speaking.)
3       MS. KRIGSTEN:   I'm sorry.   I didn't mean to
4   interrupt you.   I thought you were done.
5   BY MS. KRIGSTEN:
6       Q.   Anything else you want to say?
7       A.   I was saying a particular deficiency or
8   overall, because this evaluation form reflects several
9   different deficiencies.   And so we're going over work
10  that was done previous to the inspection.   We're going
11  over work that was done after the inspection.   However,
12  that's subjective, because you're asking me work done
13  prior.   What work is that that we're talking about
14  exactly?   Because there are deficiencies on this
15  inspection form that "worked" (phonetic) and "worked."
16      Q.   Let me ask the question a different way, so
17  put all of that out of your mind.
18           Can you -- is it fair to assess the work done
19  on the property if you just look at the property on one
20  day?   If you just show up to a property on one day, can
21  you tell all of the work that was done at that property?
22      A.   That's subjective as well.   If the gutters are
23  damaged, you can tell that they weren't -- that they are
24  damaged.   If the grass was cut 72 hours prior, it may

Page 268

1   appear that the property may be in need of a grass cut
2   or that it wasn't edged properly.   If those -- that's
3   subjective, because we're -- again, we're discussing
4   several different deficiency, not just one deficiency.
5           So this is particular to -- are you referring
6   particular to the gutters?
7       Q.   I'm going to ask you to put Sherman Place out
8   of your mind, right.   So let's put the property we've
9   been talking about out of your mind.   Okay.   I'm going
10  to ask you questions not based on that particular
11  property.
12      A.   Okay.
13      Q.   If I were to show up at a property that Agnew
14  Field Services had done work at on one day, would I be
15  able to tell any bid orders that are in process of being
16  evaluated by Altisource?
17      A.   No, you wouldn't be able to tell that, because
18  that's not done in -- a bid evaluation is done in the
19  office, as opposed to in the field.   It's only in the
20  field when it's being executed upon approval and a
21  contract order being issued.
22      Q.   Understood.
23           So I wouldn't be able to see that a bid order
24  had been issued on a particular property, if I just

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 269..272

Page 269

1 showed up and looked at the property?
2    A.   Correct. Unless there was a permit required,
3 and the permit was posted in the window.
4    Q.   Understood.
5       If I showed up at a property one day that had
6 a grass mowing that was due the next day, all right, so
7 the grass was going to be mowed the next day, is there
8 anything I could see at that property that would alert
9 me to the fact that the grass was going to be mowed the
10 very next day?
11    A.   No.
12    Q.   If I show up to a property -- or someone were
13 to show up at a property and look at a property on one
14 particular day, would they be able to see that a leaf
15 removal is scheduled, an upcoming leaf removal is
16 scheduled?
17    A.   No.
18    Q.   And if someone were to show up on a property
19 at one particular day, would they be able to see or
20 understand all of the trash that already had been
21 removed from the property prior to that day?
22    A.   No.
23    Q.   So it's fair to say that looking at a property
24 on one particular day doesn't tell the whole story of

Page 270

1 what's going on at that property; is that right?
2    A.   That's correct. If you're looking at a
3 property on a particular day, you're not looking at the
4 history of the property; you're looking at the current
5 deficiencies.
6    Q.   Understood.
7       So deficiencies could have been addressed
8 prior to that one day; is that right?
9    A.   It's possible, but it would depend upon the
10 deficiency.
11    Q.   Right. It's possible --
12    A.   -- gutter. A fixed gutter is a fixed gutter.
13    Q.   Understood.
14       But if a deficiency is addressed, that
15 doesn't -- you can't tell that from a property when you
16 show up, can you?
17    A.   No.
18    Q.   And if a property has a deficiency that is
19 about to be addressed, there wouldn't be anything at
20 that property that would be able to be seen. You
21 couldn't see that a deficiency is about to be addressed,
22 could you?
23    A.   No, not unless it was permitted work, and the
24 permit would need to be posted in the window before the

Page 271

1 work would be able to be started.
2    Q.   You wouldn't want Agnew Field Services work
3 just to be judged on one particular day at a property,
4 would you?
5    A.   Yes. I did it every day as an inspector,
6 doing quality control inspections on my own property and
7 reviewing the work that my vendors were doing in the
8 field. And if we repaired three things at a property
9 and there were six other deficiencies, then that is what
10 I would be judging off of, not only with my internal bid
11 review team, but with my vendors as well.
12    Q.   So if someone were to look at a property,
13 let's say -- and I'm going to make up a date here, all
14 right.
15       So let's say we're looking at a property on
16 March 15th and there's overgrown grass, okay -- are you
17 with me?
18    A.   Mm-hmm.
19    Q.   And you're scheduled to -- Agnew Field
20 Servicing is scheduled to cut the grass on March 16th.
21 You with me so far?
22    A.   I am.
23    Q.   Would it be fair to say that Agnew Field
24 Servicing had failed to do their work because the grass

Page 272

1 wasn't cut on March 16th?
2    A.   Well, if it was me inspecting the property, I
3 would be privy to my own grass cut schedule; so I would
4 know that a scheduled grass cut was already in the queue
5 and on schedule for completion.
6    Q.   So someone who's looking at this property that
7 doesn't have access to that information, so they show up
8 on March 15th and the grass needs cutting, okay? Are
9 you with me?
10    A.   I am.
11    Q.   That person showing up at the property
12 wouldn't know that there's going to be a grass cut the
13 very next day, would they?
14    A.   No, they would not.
15    Q.   Someone showing up to a property on March 15th
16 and they saw leaves, they -- that person may not
17 understand that there is leaf removal scheduled the very
18 next week; they wouldn't know that, would they?
19    A.   No.
20    Q.   Someone showing up to a property on one
21 particular day, let's just say it's March 15th, they
22 wouldn't know all of the improvements that already had
23 been made at that property prior to March 15th, would
24 they?



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 273..276

Page 273

1    MR. PRINCE:  Object asked and answered.
2         You can answer again, Nakia.
3  BY THE WITNESS:
4    A.  No.
5    Q.  So let's go back to the City of Harvey for a
6  moment.
7         Do you know that the -- do you know the
8  average home value in the City of Harvey in 2015?
9    A.  Per my research, it varied, because there's
10 different areas in Harvey, some with smaller homes, some
11 with larger vintage homes; so it really would depend on
12 the area.
13        We don't give properties evaluation placed off
14 of a municipality as a whole, but you do the comparables
15 of maybe that subdivision or that -- different
16 properties on the block.
17   Q.  Going back to the question I asked:  Do you
18 know the average home value in the City of Harvey in
19 2015?
20   A.  It would have varied in between, I believe it
21 was, 4- to 40,000, per the research that I've done.
22   Q.  And when did you do this research?
23   A.  I did this research periodically, depending on
24 whatever property I was working with at the time.

Page 274

1    Q.  Specifically what research did you do?  What
2  records did you look at?
3    A.  Just different listings and different
4  properties that have been sold, specifically
5  foreclosures sold -- specifically foreclosures -- and
6  the average value of properties around the area in which
7  the -- in the property that I serviced.  Trulia, Zillow,
8  sales -- different sales, and Freedom of Information
9  requests from the City of Harvey, Village of Harvey.
10   Q.  You made Freedom of Information requests to
11 the City of Harvey?
12   A.  Yes.  I've made several Freedom of Information
13 requests from the City of Harvey pertaining to a variety
14 of issues with properties that I manage, including water
15 bills, list of code violations, and things like that.
16 So usually those type of -- that type of information
17 came in the package.
18   Q.  And where are the records related to those
19 Freedom of Information requests?
20   A.  Per the records that I obtained?
21   Q.  Yes.
22   A.  Usually we would go pick them up from the City
23 of Harvey, yeah.  I don't -- the Village of Harvey
24 doesn't have a portal; the City of Chicago did.

Page 275

1         But the Village of Harvey, that would either
2  be emailed to you or you could go and pick it up from
3  the Village.
4    Q.  I guess my question is:  Where are they now?
5  Where are the records that you had obtained from the
6  City of Harvey, while working for Altisource?
7    A.  I have some old files.  Some of those would
8  have been sent to our coordinators; some of those would
9  have been uploaded in VMS or --
10   Q.  What --
11   A.  -- emailed to the coordinators.
12   Q.  What old files do you have?
13   A.  Just -- different things.  I used to print out
14 a lot of my work orders.  I have copies, hard copies of
15 old code violations with inspections that I personally
16 attended were for escalated properties.
17        I have printed things like --
18   Q.  Have you --
19        (Multiple speakers simultaneously
20             speaking.)
21 BY THE WITNESS:
22   A.  -- VMS.
23   Q.  Have you produced any of those documents to
24 the plaintiffs in this matter?

Page 276

1    A.  Those would be in my emails.
2    Q.  The printed hard copy documents, have you
3  produced any of those to the plaintiffs?
4    A.  Well, yes, because it would have been in the
5  subpoena.  If I got the copy back from the City, then I
6  needed to -- it was to give to the client.  So it would
7  have been emailed or uploaded into VMS.  So that would
8  be in the email -- or in VMS.
9    Q.  Is it your testimony that every printed
10 document that you ever had related to any properties is
11 in your emails that you've produced; is that your
12 testimony?
13   MR. PRINCE:  You're saying the time period is ever?
14   MS. KRIGSTEN:  Right.  The time period is during
15 the time she worked for Altisource, yes.
16 BY THE WITNESS:
17   A.  I would -- other than the work items that I
18 printed out in VMS or maybe spreadsheets in my sister
19 system, but -- I would confidently say "yes," because
20 the purpose of retrieving those documents would be to
21 give to the client.
22   Q.  Is it accurate to say any research you did
23 about the value of properties within the City of Harvey
24 between 2013 and 2018 also would be in your email?



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 277..280

Page 277

1     A.   No. I did some training -- at that time, I
2 was, you know, training Kelly Cutsinger/Bishop on how to
3 do my bids. So this is something that I trained her on
4 how to do, so I didn't do everything hands-on at that
5 time.
6          So that would have been part of the emails
7 that she would have had.
8     Q.   Do you have documents in your possession,
9 either hard copy or electronic, related to any research
10 you did about value of properties between 2013 and 2018?
11     A.   No. This was just -- this would just be
12 research.
13     Q.   I understand it's just research.
14          Do you have copies of any of that research or
15 records of any of that research?
16     A.   As far as me searching home values or as far
17 as me receiving information back about property values
18 and what a property was previously worth at a different
19 time in the pipeline of it being a mortgage that I would
20 have received with the Freedom of Information Act, is
21 that what you're referring to?
22     Q.   I'm referring to any information you have
23 about the value of properties between 2013 and 2018.
24     A.   No, I don't have any hard copies of that. I

Page 278

1 didn't make any presentation or anything of that nature.
2     Q.   And do you have any of that, if not hard copy
3 but that is stored electronically?
4     A.   No.
5     Q.   You have no access to any of the information
6 that you researched or obtained during 2013 and 2018
7 about home values, about property values?
8     A.   Personally, no. If we were doing a bid
9 pertaining to a property, we would sometimes go back and
10 look at the market value of it.
11     Q.   So going back to the City of Harvey for a
12 moment, we've looked at the address 16722 Sherman Drive
13 in the City of Harvey.
14          That's the property we were just looking at;
15 is that right?
16     A.   Correct.
17     Q.   Do you know anything about the value of that
18 property?
19     A.   No. I didn't do this bid.
20     Q.   Do you know if this would be -- Well, let me
21 back up. Strike that.
22          You previously testified that individuals
23 occasionally referred to something called a low-value
24 asset --

Page 279

1     A.   Correct.
2     Q.   -- you remember that testimony?
3          Would the address -- the property at address
4 16722 Sherman Place be considered a low-value asset?
5     A.   This is what I was told by Altisource.
6     Q.   You were specifically told that this address
7 was a low-value asset?
8     A.   I do believe, per what I recall, that my bid
9 was rejected under beneath that particular reason, that
10 the property was a low-value asset.
11     Q.   So if this was a low-value asset, we can agree
12 that the initial standard services were still done at
13 the property, right? We've already talked about those
14 initial standard services that were done, right?
15     A.   Absolutely.
16     Q.   And the preservation work continued throughout
17 the time that the property was within REO status, didn't
18 it?
19     A.   The routine services?
20     Q.   Yes.
21     A.   If there was no point that the property was
22 placed in a litigation status, then I wouldn't see why
23 not.
24     Q.   So even when a property would be characterized

Page 280

1 by Altisource as a low-value asset, that standard
2 preservation work would continue; is that right?
3     A.   Routine services, yes.
4     Q.   And those routine services would include grass
5 mowing; is that right?
6     A.   Yes.
7     Q.   And routine service would include snow
8 removal; is that right?
9     A.   Mm-hmm.
10     Q.   And routine service would include removing
11 leaves; is that right?
12     A.   I'm sorry. I don't recall if a leaf removals
13 were issued as a routine service or if we had to create
14 vendor estimates for those. It could have possibly have
15 been, the guidelines could have changed on that. I'm
16 sorry --
17     Q.   Would a routine service include maid service?
18     A.   Yes.
19     Q.   So there's several routine services that would
20 occur, regardless of the value of the property, right?
21     A.   Yes.
22     Q.   When you talk about work that wouldn't be done
23 at a property, you're talking about bids that were
24 submitted that were not approved; is that right?



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 281..284

Page 281

1    A.   Correct.
2    Q.   **And the bids would be for things, such as,**
3  **repairing or replacing a roof; is that right?**
4    A.   Yes.
5    Q.   **Or doing sort of substantial work on the**
6  **structure of a residence?**
7    A.   Substantial is subjective if we're talking
8  about doing a roof repair, because depending on the
9  amount of the square footage that needed to be repaired
10 would determine whether or not that would be substantial
11 or just a smaller repair.  It would depend on the amount
12 of damage.
13   Q.   **What else would be included in bids that you**
14 **would submit?**
15   A.   Any deficiencies that we noted at the property
16 during any time.
17   Q.   **Other than the standard -- other than the**
18 **standard area -- or the standard services, right?**
19        So it wouldn't include mowing the lawn or
20 things like that.
21        **So give us some examples of the bids that**
22 **you're talking about?**
23   A.   Gutter downspout, fascia, soffit, roof repair,
24 mold, discoloration remediation, repairing floors,

Page 282

1  replacing electrical deficiencies, electric inspections,
2  substantial plumbing repairs that needed to be
3  completed, bursted pipes; things of that nature.
4    Q.   **Did some of those bids require a permit from**
5  **the City?**
6    A.   Are we speaking specifically about Harvey?
7    Q.   **Just in general, in your experience, would**
8  **some of that require permits from the City?**
9    A.   It would depend on the work that needed to be
10 done.  Some of them did; some of them did not.  It would
11 depend on the individual municipality and their
12 guidelines.
13   Q.   **Do you recall that some cities were more**
14 **difficult to get permits from than others?**
15   A.   That's subjective as well.  The municipalities
16 that I worked with, I was on their register the
17 contractors list, so it was fairly easy for me to pull
18 permits on work that needed to be done.
19   Q.   **Well, let's talk specifically about the city**
20 **of Harvey then.**
21        **Do you remember it being difficult to get a**
22 **permit to do work within the city of Harvey?**
23   A.   I don't remember it being difficult to get a
24 permit as long as you were on the registered contractors

Page 283

1  list.  I do recall however they had specific
2  requirements pertaining to plumbing, a standard work
3  item with the -- in VMS, a standard work item for
4  Altisource which would have required a permit.
5    MS. KRIGSTEN:  So I'm going to have Mr. Wood pull
6  up Exhibit 5001 again and have us look at an entry that
7  is -- it was entered on -- if you can scroll up -- okay.
8        It was entered -- or the line that you see, it
9  says that it was issued on March 30th, 2016, and it says
10 completed on April 16, 2016.
11 BY MS. KRIGSTEN:
12   Q.   **Do you see that entry?**
13   A.   Yes.  However, could you possibly slide it to
14 the side, because we have the camera to the right of me.
15 Thank you so much.
16   Q.   **So there is an entry in the communications**
17 **log, column P, that says:  This property is located in**
18 **the Village -- if you start down -- part of it says:**
19 **The property is located in the Village of Harvey who is**
20 **extremely difficult to deal with.  Initially we had been**
21 **advised that exempt stamp can be received if we get the**
22 **permits from the Village to complete the repairs.**
23 **However, it is not clear if the permits will be**
24 **sufficient or if repairs need to be done as well.  The**

Page 284

1  **cost of the permit itself is $5,000, and I'm not able to**
2  **approve this request.**
3        **Village official advised that it would be**
4  **easier to get the stamp if we had a buyer.  Once we have**
5  **the buyer for the house who will take responsibility for**
6  **the repairs, we can get the stamp for STD together with**
7  **the stamp for SWD.**
8        **Do you see that?**
9    A.   Yes.
10   Q.   **So at least according to this entry, there was**
11 **a situation in which the Village of Harvey was difficult**
12 **to deal with; is that right?**
13   A.   According to the team lead of foreclosure deed
14 from Altisource.
15   Q.   **That's right.**
16        **And that the team had reached out to the City**
17 **of Harvey to talk about the potential to repair the**
18 **property; is that what it appears to be?**
19   A.   Yes.
20   Q.   **And that the City of Harvey or the Village of**
21 **Harvey indicated to this individual that it would be**
22 **easier to get the stamp to make the repairs if there**
23 **were a buyer for the residence or for the property.**
24        **Do you see that?**

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 285..288

Page 285

1    A.   Yes.
2    Q.   So at least in this situation, for this asset,
3  Altisource was asking questions about the potential to
4  repair this property; is that right?
5    MR. PRINCE:  Objection, hearsay.
6         You can answer.
7  BY THE WITNESS:
8    A.   Well, again, this is the opinion of Christina,
9  which would have been -- I thought Christina was in
10 the code violation department.
11        However, this is her opinion.  This isn't what
12 was explained to me when I went and met with the Village
13 of Harvey pertaining to their guidelines.
14   Q.   Understood.
15        There may have been conversations that you
16 weren't even aware of, right, with the City of Harvey,
17 as evidenced by this entry, right?
18   A.   Correct.
19   Q.   So you can't testify as to everything that
20 Altisource did to explore the possibility of repairing
21 properties, can you?
22   A.   I can attest to the experience that I had and
23 the advice that I gave, the services that I performed,
24 and the steps that I took to assist Altisource in that

Page 286

1  aspect.  I'm speaking with my individual experience, not
2  things that were taking place that I was not privy to.
3    Q.   Understood.
4         Who -- what other vendors service the same
5  territory that you serviced for Altisource?
6    A.   Well, there were several vendors that were in
7  the State of Illinois.  There were certain vendors
8  during my time with Altisource that were there when I
9  got there, and then they weren't in the vendor network
10 at the time of my termination.
11        So there were several vendors that serviced
12 those areas, as well as inspection vendors.
13   Q.   When you say "several vendors," were there --
14 and I'm going to limit this question to the City of
15 Chicago and surrounding area, so the Chicagoland area
16 and the suburbs.
17   A.   Okay.
18   Q.   Were there other vendors that serviced that
19 area while you were a vendor?
20   A.   Yes.
21   Q.   And did those other vendors also work in the
22 City of Harvey?
23   A.   Yes.
24   Q.   And, in fact, we saw that -- the gutter repair

Page 287

1  that we looked at in that exhibit, that was actually
2  done by another vendor, wasn't it?
3    A.   Well, I couldn't tell from the photos, if it
4  was done by another vendor or if there was somebody in
5  the field.  But if you wanted me to take another look at
6  the exhibit and confirm that ...
7    Q.   I may, but let me ask you this first.
8         Were there other vendors who performed
9  services in the area [sic] codes that you say -- that
10 you testified about to begin with, 606?
11   A.   Yes.
12   Q.   Who are some of those other vendors?
13   A.   Per what I recall, Home Shield.  I remember
14 pulling some secondary bids in that area for home- --
15 where properties where I believe Home Shield would have
16 been the primary vendor.
17   Q.   Who else?
18   A.   I can't recall.
19   Q.   Going back to the exhibit that showed the
20 repair of the gutters, which was Exhibit 5013 -- in your
21 notebook, it should be tab 22 -- there is an individual
22 shown in those -- in the photograph in Exhibit 5013.
23        Do you know who that individual is?
24   A.   No.

Page 288

1    Q.   He didn't work for you, he did?
2    A.   I can't verify that, because I had vendors
3  that worked in the field that had helpers in the field.
4         So I don't know every single subcontractor,
5  although I do not recognize this individual.
6    MS. KRIGSTEN:  Okay.  Why don't we take a break?
7    THE WITNESS:  Okay.
8    MS. KRIGSTEN:  Let's say ten minutes.
9    THE WITNESS:  Sounds good.
10   THE VIDEOGRAPHER:  Time is 11:37.  We are now going
11 off the record.
12        (A short break was had.)
13   THE VIDEOGRAPHER:  Time is 11:55 a.m.  We are now
14 back on the record.
15 BY MS. KRIGSTEN:
16   Q.   Ms. Agnew, I want to go through your contact
17 with the plaintiffs.
18        So you've testified that you initially
19 contacted the plaintiffs after you saw the press release
20 that was in the news about this litigation; is that
21 right?
22   A.   Absolutely.
23   Q.   And you didn't know anything about the
24 litigation prior to seeing that press release?



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 289..292

Page 289

1    A.   No.

2    Q.   When you contacted the plaintiffs, you
3  actually were, at least in part, seeking legal advice;
4  is that right?

5    A.   In part, yes.

6    Q.   And what type of legal advice were you
7  seeking?

8    MR. PRINCE:  Objection attorney-client privilege.

9    MS. KRIGSTEN:  That -- I'm not aware of an
10  attorney-client privilege that existed at that time with
11  the plaintiffs.

12    MR. PRINCE:  Well, no.  You're specifically asking
13  her -- wait.  I'm sorry, Lisa.  Let me make the record
14  good.

15    MS. KRIGSTEN:  Yeah.

16    MR. PRINCE:  You're specifically asking her what
17  legal advice she was seeking.  I don't know how that
18  does not attach a privilege to it.

19    MS. KRIGSTEN:  Let me rephrase the question, see if
20  this ...

21    MR. PRINCE:  Yeah.

22  BY MS. KRIGSTEN:

23    Q.   When you contacted the plaintiffs, did you --
24  did someone associated with the plaintiffs become a

Page 290

1  lawyer for you?

2    A.   Become a lawyer for me?

3    Q.   Yes.

4    A.   No.

5    Q.   Has anyone associated with the plaintiffs ever
6  acted as your lawyer?

7    A.   No.

8    Q.   Like, they've never been an attorney-client
9  privilege relationship with you; is that right?

10    MR. PRINCE:  Just for clarification, are you saying
11  still, plaintiffs, meaning, the 20-enumerated Fair
12  Housing Alliances, plus their attorneys and agents, or
13  are you just saying those companies and their agents?

14    MS. KRIGSTEN:  I'm saying anyone associated with
15  those companies.

16  BY MS. KRIGSTEN:

17    Q.   So the plaintiffs -- let's go back to
18  definitions, right, we talked about the plaintiffs, and
19  then we also know that the plaintiffs are represented by
20  certain law firms and have lawyers who work with them,
21  right?

22    A.   (No response.)

23    Q.   You understand that Ms. Agnew?

24    A.   I'm sorry.  Yes, I do.

Page 291

1    Q.   Has any lawyer associated with this
2  litigation, who's worked with the plaintiffs, ever
3  served as your lawyer?

4    A.   No.

5    Q.   Okay.

6    MR. PRINCE:  I --

7  BY MS. KRIGSTEN:

8    Q.   Ms. Soule is a lawyer who works with the
9  plaintiffs, right, represents the plaintiffs; is that
10  right?

11    A.   Yes.

12    Q.   And you've spoken to Ms. Soule?

13    A.   Yes, I've spoken to her.

14    Q.   Did you understand that she was your lawyer at
15  any time?

16    A.   I've never --

17    MR. PRINCE:  Objection -- objection.  It's a legal
18  terminology of what "your lawyer" means.  I just want to
19  make sure we're clear, in the State of Illinois, a
20  lawyer is someone who provides and receives information
21  from a client and provides legal advice associated with
22  that information.

23    So are you asking whether or not she retained
24  an attorney, or whether or not legally somebody was her

Page 292

1  attorney?

2    MS. KRIGSTEN:  I'll clarify my question.

3    I understand, Mr. Prince, that you're trying
4  to define this, but I'm asking the laymen's -- I'm
5  asking for Ms. Agnew's understanding, her understanding
6  of who's served as her lawyer --

7    MR. PRINCE:  But --

8    MS. KRIGSTEN:  -- that's what I'm asking, yeah.

9    MR. PRINCE:  But I want to make sure it's clear.

10    Is -- "lawyer" doesn't in this state always
11  mean "retained," right.  "Lawyer" is anybody who -- in
12  which an attorney-client relationship has been created
13  by the transaction of any information in seeking any
14  legal advice.

15    So I --

16    MS. KRIGSTEN:  I understand your comments on the
17  record.

18    MR. PRINCE:  Right.

19    MS. KRIGSTEN:  And I will ask her questions, based
20  on what I need to know, and you can interject and
21  object, if you choose to.

22  BY MS. KRIGSTEN:

23    Q.   So, Ms. Agnew, have you ever considered in
24  talking to Ms. Soule, Ms. Soule being your lawyer; is



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021
Pages 293..296

Page 293

1    that anything that you have believed?
2        A.    I've never signed any retainer agreement for
3    Ms. Soule to represent me, no.
4        Q.    Have you ever sought legal advice from
5    Ms. Soule?
6        A.    Yes.
7        Q.    And did Ms. Soule provide you legal advice?
8        A.    Ms. Soule provided me with the --
9        MR. PRINCE:  Don't talk about the legal advice
10    provided, that's attorney-client privilege.  You can
11    talk about whether or not she provided you legal advice.
12    BY THE WITNESS:
13        A.    Yes.
14        Q.    So Ms. Soule herself has provided you,
15    Ms. Agnew, with legal advice?
16        A.    Yes.
17        Q.    Who else associated with the plaintiffs has
18    provided you, Ms. Agnew, with legal advice?
19        A.    I don't recall receiving any other legal
20    advice from anyone else pertaining to this.
21        Q.    And when did you receive this legal advice
22    from Ms. Soule?
23        A.    This would have been during my initial
24    communications with the National Fair Housing Alliance

Page 294

1    number that was on the press release, and I had a
2    conversation with them.
3        Q.    And what was the topic upon which you asked
4    for legal advice?
5        A.    Pertaining to my legal issues and what was
6    considered -- considered what -- how do I best phrase
7    this? -- pertaining to my legal issues versus what was
8    going on pertaining to this case.
9        Q.    Did you ask for legal advice pertaining to
10    anything having to do with Altisource?
11        MR. PRINCE:  Objection, attorney-client privilege.
12        MS. KRIGSTEN:  Mr. Prince, are you giving an
13    instruction to your client, or are you going to allow
14    the answer.
15        MR. PRINCE:  I'll give you an opportunity to
16    explain to me how it's not.
17        MS. KRIGSTEN:  But -- I'm, what we're trying to
18    understand here is, there appears to be an
19    attorney-client privilege that is shielding information
20    that could be relevant to this matter.  And in candor,
21    it's the first time that we are hearing that Ms. Soule,
22    who represents the plaintiffs in this case, also
23    apparently has the legal client -- or an attorney-client
24    privileged relationship with this witness.

Page 295

1        So we're trying to find out the contours of
2    that.
3        So this is, you know -- I will -- if you
4    instruct her not to answer, we can deal with this, you
5    know, in another forum.  I just need to ask the
6    question.
7        MR. PRINCE:  Well, I appreciate the threat of
8    putting out a motion to compel.  But what I'm saying is,
9    if you're asking her about legal advice related to her
10    issues that is separate and apart from NFHA's issues,
11    that is attorney-client privileged information that you
12    do not have a right to hear.  And I doubt any judge in
13    the State or in the Federal Court would say you do.
14        If you're asking about what she -- what was
15    directed to her about and any discussions related to
16    NFHA, that is not subject to an attorney-client
17    privilege.
18        So if what you're asking is topics and
19    information of what she said and what was received from
20    Ms. Soule's office related to any issue pertaining Nakia
21    Hayes Agnew, I think is privileged, unless you can show
22    me how it's not.
23        MS. KRIGSTEN:  So let me begin by saying this is
24    not a threat.  I've not threatened you, and I do not

Page 296

1    appreciate you treating these legitimate questions in
2    that manner.
3        MR. PRINCE:  No.  You just --
4            (Multiple speakers simultaneously
5                speaking.)
6        MS. KRIGSTEN:  I have the right to ask questions
7    that could affect my client's interests in this
8    litigation.  So that's what I'm trying to do.  I don't
9    want to get beyond what my client's interests are in
10    this litigation.  But the answer that's been given so
11    far is unclear, and so I'm trying to ask questions to
12    clarify the answer.
13        And my question was:  Did the legal advice
14    pertain to Altisource?
15        Now, that is the question.  Whether it gets
16    answered here or whether we have to figure out how we
17    get that addressed, that's for another day.
18        MR. PRINCE:  Ms. Agnew, you can answer the
19    question.  You can answer the question about whether
20    legal advice received pertained to Altisource.
21        THE WITNESS:  Okay.
22    BY THE WITNESS:
23        A.    So it was explained to me the difference
24    between -- I was very candid about what I witnessed in



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 297..300

Page 297

1  the field --
2       MR. PRINCE:  Okay.  So hold on, hold on.
3       You can answer about whether or not it
4  pertained to Altisource.
5       THE WITNESS:  Okay.
6       MR. PRINCE:  Did your legal advice pertain to
7  Altisource?
8  BY THE WITNESS:
9       A.  Yes.
10      MR. PRINCE:  I apologize.  And I'm not trying to
11 take over your deposition, Lisa.
12      MS. KRIGSTEN:  Right.
13      MR. PRINCE:  I'm just trying to make sure we
14 protect a privilege, if it exists, and if it's -- a
15 question is outside of privilege, it is entirely fair
16 game.
17      MS. KRIGSTEN:  Understood.
18 BY MS. KRIGSTEN:
19      Q.  The information that you sought legal advice
20 about, does it relate to the topics in the litigation?
21      A.  No.
22      Q.  Does it relate to your time as serving as an
23 Altisource Field Services vendor?
24      A.  Yes.

Page 298

1       Q.  And does it relate to activity you performed
2  as an Altisource Field Services vendor?
3       A.  No.
4       Q.  So in addition to Ms. Soule providing you
5  legal advice, your testimony is that no one else
6  associated with the plaintiffs has provided legal
7  advice?
8       A.  No.
9       Q.  Maybe I need to ask that a different way.
10      MR. PRINCE:  How about the double negative?
11      MS. KRIGSTEN:  Yeah.
12 BY MS. KRIGSTEN:
13      Q.  Has anyone else associated with the plaintiffs
14 provided legal advice?
15      A.  No.
16      Q.  So your initial contact with the plaintiffs
17 occurred somewhere around February 1st of 2019, maybe
18 your initial contact -- I'm sorry -- was -- January 28th
19 of 2019; does that sound right?
20      A.  It does.
21      Q.  And then you had a more substantive
22 conversation on February 1st of 2019?
23      A.  That sounds accurate.
24      Q.  What was discussed during that conversation?

Page 299

1       A.  My tenure with Altisource, what I witnessed in
2  the field, what I witnessed that I -- the experiences
3  that I had in the areas, and how I had been witnessing
4  this firsthand for quite some time.
5       And my termination, I spoke about that as
6  well.
7       Q.  Who was on that telephone conversation?
8       A.  I don't recall everyone that was on that phone
9  conversation.  I'm sorry.
10      Q.  Do you remember anyone who was on it?
11      A.  The person that I initially made contact with
12 at the National Fair Housing Alliance, I believe.  I
13 can't recall her name at this time.  I'm sorry.
14      Q.  So then when was your next telephone
15 conversation?
16      A.  I don't recall exactly when -- the exact date
17 of the next conversation.  I believe I received an
18 email.
19      Q.  And what email address have you used in your
20 correspondence with the plaintiffs or persons associated
21 with the plaintiffs?
22      A.  That would have been
23 agnewfieldservices@gmail.com.
24      Q.  Has all of your communications with the

Page 300

1  plaintiffs, all the email communications been produced
2  in this matter?
3       A.  Yes.  All of my emails were submitted with the
4  subpoena.
5       Q.  Including the ones with the plaintiffs?
6       A.  Yes.
7       Q.  Did you personally produce those emails?
8       A.  No.  I had assistance.  I tried to create
9  something that was user-friendly, but I had trouble
10 doing that, and so I had an assistant with someone that
11 assisted me with downloading all of those emails and
12 making them more user friendly.
13      Q.  Was that someone who was associated with the
14 plaintiffs, a staff member at one of the law firms
15 assisted you?
16      A.  I'm not sure if he was a third party
17 contractor or anything like that.  But he had knowledge
18 of the -- of Gmail and how to export emails, but I'm not
19 sure if he was an attorney.
20      Q.  Was his name Travis Beck?
21      A.  Yes, ma'am.
22      Q.  So when you talk about you produced emails in
23 this case, is it accurate to say that you gave Mr. Beck
24 access to your emails?

LEXITAS

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 301..304

Page 301

1    A.   Yes.

2    Q.   And that Mr. Becks [sic] then selected which
3  ones were going to be extracted from -- which emails
4  would be extracted to be produced; is that right?

5    A.   I selected the emails that were to be
6  extracted.  I just didn't know how to extract them.

7    Q.   So let's talk about -- I'm going to come back
8  to your contact with NFHA.  But let's talk about your
9  emails, just so we're clear.

10       What access -- what email addresses did you
11  give Mr. Beck access to?

12    A.   I gave him access to my email, which would
13  have been agnewfieldservices@gmail.com.  However, as I
14  stated earlier in the deposition, I had several emails
15  from my server, which would have been
16  agnewfieldservices.com, that were ported over to my
17  Gmail email.

18       So -- (background noise) -- that came in from
19  different email address.

20    Q.   What are all the different email addresses you
21  used between 2013 and 2018?

22    A.   I used nagnew@agnewfieldservices.com and
23  agnewfieldservices@gmail.com.

24    Q.   Any other emails you used in those years?

Page 302

1    A.   I had access to wagnew@agnewfieldservices.com.
2  And I -- I just want to make sure.

3       I had access to my employees' email addresses
4  on my server in between 2013 and 2018.  However, I was
5  not able to retrieve those emails.

6    Q.   Did you physically have a server in those
7  years, a physical server that you maintained?

8    A.   Just Google Gmail.

9    Q.   So when we talk about emails that would have
10  been available to be produced in this litigation, were
11  emailed related to wagnew@agnewfieldservicing.com [sic],
12  would those have been included in the emails that were
13  produced?

14    A.   Yes, I stated that, yes:
15  wagnew@agnewfieldservices.com,
16  nagnew@agnewfieldservices.com, and then the main email,
17  which would have been agnewfieldservices@gmail.com.

18    Q.   Now, you testified a few minutes ago that you
19  selected the emails for Mr. Beck to access.

20       What exactly did you do in selecting those
21  emails?

22    A.   I went in and created a list of emails which
23  didn't work.  I used the tab just to Altisource.  So
24  anything pertaining to Altisource, and that was too

Page 303

1  broad for a Gmail search.  And so I went in and narrowed
2  those emails down to emails that were coming from VMS.

3       The key search terms, I provided the key
4  search terms too.

5    Q.   Can you look at Defendants' Exhibit 5032,
6  which in your binder should be tab 41.

7       Looking at Defendants' Exhibit 5032, it looks
8  as if there are certain search terms listed in this
9  email; is that correct?

10    A.   Yes.  As I stated, yeah.

11    Q.   Who developed this list of search terms?

12    A.   I did.

13    Q.   Did you have input from anyone else in
14  developing this list of search terms?

15    A.   No.

16    Q.   So, for example, when it says Romeoville
17  Altisource, you developed that search term?

18    A.   Yes.

19    Q.   Did you consult anyone to determine whether
20  this was the correct list of search terms to use in this
21  matter?

22    A.   Well, I spoke with Travis pertaining to this,
23  because the list that I was creating under the search
24  term "Altisource" was not producing everything, so

Page 304

1  that's why I grouped it.  And so we didn't want to
2  export the same email over and over again or have a list
3  that wasn't user-friendly.

4       So I did get some technical advice as to how
5  to try to create folders.

6    Q.   And who provided that technical advice?

7    A.   Travis did.

8    Q.   So looking at this list of search terms, we'll
9  take the first one, Altisource.

10       How did you identify the documents that would
11  be responsive to that search term?  What did you do to
12  identify those documents?

13    A.   Well, they wouldn't have been documents, they
14  would have been actual emails.

15       So with that particular search term, it
16  just -- anything where Altisource was ever mentioned,
17  whether it was pertaining to properties or
18  communications or even, you know, just regular emails
19  that didn't have anything to do with this case came up.

20       So I started to try to figure out a way to do
21  this myself to make it so that I didn't miss anything in
22  the subpoena, so that all of the emails were included.
23  So I started to create different search terms based off
24  of the emails that came up with Altisource, including



Page 305

1  the PO box which was specifically included
2  communications from anyone at Altisource with that email
3  signature on it.
4      Q.   So looking at the list of search terms in
5  exhibit -- Defendants' Exhibit 5032, is it your
6  testimony that you provided Mr. Beck access to these
7  particular emails, the emails that were responsive or
8  that hit these search terms?
9      A.   Yes.
10      Q.   And those were the emails that you believe
11  Mr. Beck then uploaded into a system and produced; is
12  that right?
13      A.   No.  I believe that -- because we tried this
14  once and it didn't work, when I was submitting the
15  information for the subpoena, we ended up exporting
16  everything with the search tab of Altisource on it.
17      Q.   By "search tab," you mean the word
18  "Altisource," or do you mean something else?
19      A.   Yeah.  I'm sorry.  That's exactly what I
20  meant.  I know that could have sounded confusing.
21  Anything that had Altisource on it.
22      Q.   So one of the reasons I'm going to ask you
23  this question is, because when I go through the
24  documents, when I've looked through your documents, I've

Page 306

1  looked at "low-value asset Altisource," right, so that's
2  one of the search terms.
3          Do you see that?
4      A.   Yes.
5      Q.   And here you have the number 45.  Does that
6  mean that there are 45 emails that show up if you put
7  those words in like that?
8      A.   Yes.
9      Q.   And is it your testimony that, for example, if
10  you type in "Romeoville Altisource," there should be
11  2,463 [sic] documents?
12      A.   2,483 emails.
13      Q.   And '83 emails.
14          Did you ever look to see -- after Mr. Beck
15  uploaded those documents, did you ever look at those --
16  the uploaded documents or the uploaded emails to confirm
17  these numbers in what Mr. Beck took?
18      A.   I confirmed these numbers by doing my own --
19  creating this list and doing my own individual research,
20  when I was trying to produce the information requested
21  in the subpoena.
22          So I already had this -- all this information.
23  But I did not have access to their servers to see if a
24  search would have had the same number.

Page 307

1      Q.   So you can't confirm that what Mr. Beck took
2  is actually the information that's shown on Defendants'
3  Exhibit 5032?
4      A.   The amount of emails that was extracted was in
5  alignment with the numbers -- all of these numbers put
6  together.
7      Q.   Did you actually look at the emails that were
8  extracted; is that what your testimony is?
9      A.   Well, I have access to the emails that were
10  extracted on my Gmail to this day.  I know the number of
11  emails that he ended up extracting was in alignment with
12  the total amount that I was able to give in my
13  individual search in this exhibit.
14      Q.   Is it your testimony that you are confident
15  that Mr. Beck extracted these emails from your email?
16          I understand you intended him to do it, I'm
17  just wondering if you have confirmation that that's what
18  he sent?
19      A.   I am confident that Mr. Beck was able to
20  extract all of the emails and then some.
21      Q.   What do you mean "and then some"?
22      A.   There were certain emails, again, that were
23  not relevant to this case.
24      Q.   What emails are those?

Page 308

1      A.   Such as attorney-client privileged emails
2  between myself and my attorney.
3      Q.   That Mr. Beck extracted?
4      A.   Everything was extracted and all of the emails
5  that I sent that were not pertaining to this case was
6  deleted.
7      Q.   But just to be clear, Mr. Beck had access to
8  all of your attorney-client privileged emails?
9      A.   Mr. Beck had access to all of my emails while
10  he was extracting those emails.
11      Q.   And those would have included emails between
12  you and your attorney; is that right?
13      A.   Yes.
14      Q.   And once Mr. Beck extracted the documents, did
15  you actually see what was produced to the defendants in
16  this case?
17      A.   No.
18      Q.   So you cannot confirm that everything that was
19  in your emails have been produced to the defendants in
20  this case?
21      A.   I can only go off of the total number of
22  emails that were extracted versus the number amount that
23  I was able to determine was available in my email.
24      Q.   Did you ever see any reports or emails from



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 309..312

Page 309

1    Mr. Beck confirming how many emails he extracted?
2        A.   Yes.
3        Q.   And is that the exhibit we're looking at, or
4    is there another exhibit -- or is there another
5    document?
6        A.   I had a phone conversation with Mr. Beck, and
7    he told me the amount of emails that he was -- he
8    extracted.  I believe it was over 80,000.  And I gave
9    him the emails that my attorneys addresses and things of
10   that nature, that were not -- that were attorney-client
11   privileged that needed to be deleted.
12            We tried to do it another way, but this was
13   the most efficient way to do it, was to extracts
14   everything at once and then delete what was not
15   pertaining to this case.
16       Q.   Let's back up from emails a second and go back
17   to your contact with NFHA.
18            So you've represented that you've had at least
19   ten conversations with NFHA, since you initially
20   contacted them; is that right?
21       A.   When you say "NFHA," you mean the National
22   Fair Housing Alliance?
23       Q.   Right -- or the plaintiff.  Why don't I
24   rephrase that.

Page 310

1            You've had at least ten conversations with the
2    plaintiffs or their lawyers since you initially
3    contacted them?
4        A.   Yes.
5        Q.   Who have you spoken to, associated with the
6    plaintiffs or their lawyers?
7        A.   I've spoken to the -- I've spoken with
8    Jennifer pertaining to the subpoena.  And I spoke with
9    Travis quite a bit pertaining to extracting these emails
10   and the difficulty that I was having with providing the
11   information requested in the subpoena.
12       Q.   Who else?
13       A.   I believe I might have received some email
14   communications from paralegals as well.  I believe her
15   name is Maggie, I believe, those email communications.
16            I don't recall any other conversations --
17       Q.   Okay.
18       A.   -- including any other phone calls.
19       Q.   Have you spoken to anyone else or communicated
20   with anyone else associated with the plaintiffs, other
21   than who you were talking -- other than who you
22   referenced?
23       A.   No, no.  I haven't received any phone calls or
24   anything like that.

Page 311

1        Q.   Have you ever met in person with anyone
2    associated with the plaintiffs?
3        A.   Yes.
4        Q.   Who have you met with?
5        A.   I met with Jennifer.
6        Q.   When is the first time you met with Jennifer?
7        A.   I don't recall the date, but it was in 2019.
8        Q.   And when we talk about Jennifer, we're talking
9    about counsel who's here, Jennifer Soule?
10       A.   Yes, Soule, Jennifer Soule.
11       Q.   Where did you meet her?
12       A.   I met her downtown in the federal building.
13       Q.   And what did you do during that meeting?
14       A.   We spoke about the -- my experience that I
15   had.
16       Q.   Who else was a part of that conversation?
17       A.   There was some- -- there was someone else
18   there.  I believe she was another attorney.  She was --
19   I believe she was African American.
20       Q.   And you said this was at the federal building
21   in downtown?
22       A.   Yes, ma'am.
23       Q.   Was it in any particular office at the federal
24   building?

Page 312

1        A.   I don't believe so.  It was a lobby.
2        Q.   Why did you meet at the federal building?
3        A.   We went over what I stated on the phone.  And
4    it was basically just the same conversation that I had
5    with them on the phone previously pertaining to my
6    experience in the field and the properties that I
7    highlighted and the experiences that I had with
8    Altisource.
9        Q.   Why did you meet at the federal building?
10       A.   To discuss what I had experienced and what I
11   had stated over the phone.
12       Q.   There are lots of buildings downtown, right?
13   Why that particular building?
14       A.   I don't know.  That's where we decided to
15   meet.  That's where she asked me to meet her.
16       Q.   So not -- you didn't go to her office?
17       A.   I'm not sure if she had an office in the
18   building, because we were in the lobby.
19       Q.   How long was the meeting you had at the
20   federal building?
21       A.   I was not really feeling well.  I was just
22   getting over a really bad cold.  I don't think that
23   meeting exceeded maybe 30, 35, to 40 minutes.
24       Q.   Do you know if that meeting was recorded?

Page 313

1    A.   I don't think so.
2    Q.   When is the next time that you met in person
3  with someone associated with the plaintiff?
4    A.   I hadn't.
5    Q.   Is that the only in-person meeting that you've
6  had?
7    A.   Yes.
8    Q.   Are you aware of any of your meetings being
9  recorded?
10    A.   The first meeting could have been.  I'm not
11  sure.  It was some time ago.  It could have been
12  disclosed.
13    Q.   So I have a list of dates that it's been
14  represented that you spoke with individuals at NFHA, so
15  I'm going to go through them and find out what you
16  remember about them.
17         So January 28th and 29th, do you remember
18  anything from those conversations?
19    MR. PRINCE:  Can you specify what year, please?
20    MS. KRIGSTEN:  2019.
21    MR. PRINCE:  Thank you.
22  BY THE WITNESS:
23    A.   Again, I went over my experience and the
24  things that I saw in the field and the -- my thoughts

Page 314

1  pertaining to my experiences.
2    Q.   When did the meeting happen at the federal
3  building?
4    A.   I'm not sure.  I don't recall.  Again, I was
5  kind of sick at the time.  I know that that took place
6  in 2019.
7    Q.   So you also met with the plaintiffs, someone
8  associated with the plaintiffs on February 21st, 2019,
9  what do you remember about that meeting or that
10  conference, that discussion?
11    A.   Again, I'm just speaking about what I had seen
12  in the field.  And I believe I had requested a -- I
13  received a long motion around that time with the list of
14  properties that were actually inspected.
15    Q.   You received the list of properties that were
16  inspected by the plaintiffs?
17    A.   It was in a -- yes.  It was in a document.
18    Q.   Why did you receive that document?
19    A.   Because I had serviced those properties and I
20  wanted to know which of those properties my company had
21  personally serviced that were on the list.
22    Q.   And what did you do once you received that
23  list?
24    A.   I looked at it and just went and looked back

Page 315

1  at my emails to assist me in recalling which
2  properties -- you know, the -- whether or not I had
3  actually serviced those properties and just for research
4  purposes.  But, you know, after that, I didn't go visit
5  the properties or anything like that.  It was just, I
6  reviewed it, I reviewed the document.
7    Q.   After reviewing the document, did you discuss
8  any of it with the plaintiffs or their lawyers?
9    A.   I was asked which of the properties I
10  serviced.  However, I didn't have access to my sister
11  servicing portal, which was Property Preservation
12  Wizard; so I couldn't say which ones were and which ones
13  were not.
14    Q.   What else did you tell -- what, if anything,
15  did you tell the plaintiffs or their lawyers about the
16  properties that you serviced?
17    A.   I didn't because I didn't tell them which
18  properties those were.
19    Q.   Did you review any other properties that were
20  on the list?
21    A.   I went through my email to see if I had
22  serviced those properties.
23    Q.   Did plaintiffs ask you to look at documents
24  related to any properties that were on that list?

Page 316

1    A.   No.
2    Q.   Did they ask you about any particular
3  properties that were on that list?
4    A.   No.
5    Q.   Did you keep any notes from your meetings with
6  plaintiffs or their lawyers?
7    A.   Other than me, you know, setting a reminder
8  or -- a reminder to myself or jotting it down to verify
9  which of those properties on that list that I had
10  serviced, no.
11    Q.   Did you ever take notes when you were talking
12  with plaintiffs or their lawyers?
13    A.   No.
14    Q.   And do you still have the information that you
15  jotted down during your discussions or related --
16    A.   It was just more so of a reminder to verify
17  which properties that I serviced that was on that list.
18    Q.   And from what I understand, from your
19  testimony is, you were unable to verify which properties
20  you serviced; is that right?
21    A.   At that time, no, I was not able to verify.
22    Q.   Have you since been able to verify --
23    A.   Yes.
24    Q.   -- those properties that you serviced?



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 317..320

Page 317

1    A.    Yes.
2    Q.    How did you do that?
3    A.    I contacted Property Preservation Wizard and
4    asked them for access to the portal.
5    Q.    And by access to the portal what did that
6    provide you?
7    A.    Well, with Property Preservation Wizard, I
8    would not have just had the emails to go off of without
9    access to VMS, being able to verify if I had serviced
10   that property or even visited that property or had any
11   knowledge of it.  Property Preservation Wizard would
12   give me all of the work item history, as well as the
13   photo documentation of that.  And whether or not I was
14   the primary vendor, I would still be able to review
15   those records.  Whereas maybe, if I wasn't the primary
16   vendor, I would not have had any records of it in my
17   email.
18   Q.    You testified that Property Preservation
19   Wizard took information from VMS; is that right?
20   A.    Right.
21   Q.    It's connected to the VMS -- it's connected to
22   the VMS system; is that right?
23   A.    Yes.
24   Q.    So when you went back to Property Preservation

Page 318

1    Wizard, did that give you access to the VMS information?
2    A.    It gave me access to the photos.  It would --
3    it didn't give me access to anything in VMS.
4    Q.    Where were those photos stored?
5    A.    In Property Preservation Wizard.
6    Q.    Do you have an account with Property
7    Preservation Wizard?
8    A.    I did.
9    Q.    When is the last time you accessed that
10   account?
11   A.    I believe that would have been in 2020.  I
12   can't remember the exact date, so ...
13   Q.    And in Property Preservation Wizard, by
14   accessing your account, you're able to obtain
15   information that you had obtained during your time as a
16   vendor with Altisource; is that right?
17   A.    I have access to the work items that were
18   issued out to the vendors and the work item items
19   associated with them.
20   Q.    Okay.
21   A.    And the bids and proposals as well.
22   Q.    What else would you have access to via
23   Property Preservation Wizard?
24   A.    My vendor's proven codes and the photos.

Page 319

1    Whether or not I was a primary vendor for a property, if
2    I was assigned let's say, for example, a secondary bid
3    for an asset, then I would have that bid number or work
4    item number or a proposal request number.
5    Q.    Who is your point of contact at Property
6    Preservation Wizard?
7    A.    His name is Matt, at the time.  I don't have
8    one now.
9    Q.    Matt?
10   A.    Yes.  Matt.
11   Q.    And Matt, what was his last name?
12   A.    Zoldowski.
13   Q.    Did you take documents from Property
14   Preservation Wizard and provide them to the plaintiffs?
15   A.    I tried to print some documents from there,
16   and then I printed them off.  And it wasn't
17   user-friendly, meaning, that what I printed off we
18   weren't able to clearly see the work history, the
19   photos, the comments and things of that nature, as
20   opposed to the Excel sheet that we reviewed in the
21   exhibit.
22   Q.    So going back to my original question:  did
23   you provide the plaintiffs with any information, any
24   documents from Property Preservation Wizard?

Page 320

1    A.    No, not any documents.
2    Q.    What about information from Property
3    Preservation Wizard?
4    A.    The work item history for the properties.
5    Q.    How did you provide that to plaintiffs?
6    A.    I originally printed that out, and I sent it
7    via FedEx.
8    Q.    And do you have copies of what you sent?
9    A.    Yes.  They're in the emails.
10   Q.    And do you have information -- do you have
11   paper copies of the information that you sent via FedEx?
12   A.    I could possibly have that in my email, what I
13   downloaded.
14   MS. KRIGSTEN:  Okay.  Let's go ahead and take a
15   lunch break now, and we'll come back and finish up.
16   Okay?
17   MR. PRINCE:  All right.  So --
18   MS. KRIGSTEN:  How long do you want to take for
19   lunch?
20   MR. PRINCE:  You want to say come back at 1:45?
21   MS. KRIGSTEN:  Sure.  Sounds good.
22   MS. SOULE:  Thank you.
23   THE VIDEOGRAPHER:  Time is 12:44.  We are now off
24   the record.



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 321..324

Page 321

1            (Lunch break.)
2      THE VIDEOGRAPHER:  And the time is 1:47 p.m.  We
3  are now back on the record.
4  BY MS. KRIGSTEN:
5      Q.   Ms. Agnew, I want to go back to a topic we
6  were talking about right before our break.  So I had
7  been asking you about meetings with the plaintiffs or
8  their lawyers.
9            How many times did you meet with the
10  plaintiffs or their lawyers in preparation for your
11  deposition?
12      A.   I didn't.
13      Q.   How many times did you speak with them in
14  preparation for your deposition?
15      A.   I received the emails pertaining when the
16  deposition was going to take place, and I was in the
17  process of switching some things around pertaining to
18  attorneys; and so I disclosed that an attorney would be
19  reaching out.
20      Q.   So going back to the question I asked, how
21  many times did you communicate with plaintiffs in
22  preparation for your deposition?
23      A.   In preparation, pertaining to the day of the
24  deposition?

Page 322

1      Q.   Let's start there.
2            How many times did you communicate about the
3  day of the deposition?
4      A.   Once.
5      Q.   And who did you communicate with?
6      A.   Ms. Soule.
7      Q.   And how many times did you communicate about
8  the questions that you would be asked at the deposition?
9      A.   None.
10      Q.   What have you done to prepare for your
11  deposition?
12      A.   Well, again, I -- when I received the
13  subpoena, I went back and verified which properties that
14  I serviced.  And doing the research, per our previous --
15  per the previous questions about the individual search
16  tabs and things of that nature that I had in my email
17  was the extent to it.
18      Q.   Did anyone share with you what types of
19  questions would be asked during your deposition?
20      A.   No.
21      Q.   Have you paid Ms. Soule any money, in terms of
22  obtaining legal advice from her or in connection with
23  obtaining legal advice from her?
24      A.   No.

Page 323

1      Q.   And who is paying for Mr. Prince as your
2  lawyer?
3      A.   I am.
4      Q.   Going back to the email collection that you
5  did, your testimony is, when we look at the search terms
6  that are on Defendants' Exhibits 5032, those are terms
7  that you selected to search for; is that right?
8      A.   Yes.
9      Q.   So, for example, going to Romeoville
10  Altisource, how would -- did you type in to some search
11  bar, Romeoville and Altisource?
12      A.   Yes.
13      Q.   If I were to represent to you that when we do
14  those searches on the documents, we don't come up with
15  those same numbers.
16            Do you have any idea why that would be?
17      A.   No.
18      Q.   So had we received all of the documents that
19  you had identified, the numbers -- and those documents
20  were produced to the defendants -- we should be able to
21  replicate these numbers, shouldn't we?
22      A.   Those weren't documents.  Those were emailed.
23      Q.   Understood.
24            If we were to do the same search, looking for

Page 324

1  individual email, we should be able to replicate these
2  same numbers, right?
3      A.   If they weren't duplicate emails.
4      Q.   Did you take out duplicate emails?
5      A.   I did not take out duplicate emails.  The
6  duplicate emails were taken out after the information
7  was extracted, because I didn't know how.
8      Q.   And who do you understand took out duplicate
9  emails?
10      A.   The associate that assisted me with extracting
11  the emails, Travis.
12      Q.   And what else do you understand -- so, so far,
13  you've told us that Travis has taken out duplicate
14  emails, correct and -- is that correct?
15      A.   (Nodding.)
16      Q.   He's the ones who took those out?
17      A.   Per my understanding.
18      Q.   And you also understand that Travis had your
19  attorney-client communications, and he took those out
20  from what was going to be produced; is that right?
21      A.   Yes.
22      Q.   What else do you understand that Travis Beck
23  took out of your emails before it was produced to the
24  defendants?

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 325..328

Page 325

1   A.   The specific email addresses that I gave him.

2   Q.   Which email addresses are those?

3   A.   My attorneys'.

4   Q.   And which -- what are those email addresses?

5   A.   I --

6   Q.   Or what -- who are those attorneys, maybe

7   that's an easier question?

8   A.   Attorneys that I've consulted with.

9   Q.   Who are those individuals?

10   A.   There were several attorneys that I've

11  consulted with.

12   Q.   And who are they?

13   A.   I -- Adam, who is an attorney of mine that

14  I've been working with; Deane Brown; and different

15  attorneys in different law firms that I've spoken with

16  pertaining to my own personal legal issues.

17   Q.   So did you provide a list of those names to

18  Travis Beck?

19   A.   The emails, of the email addresses

20  specifically.

21   Q.   And did you send Mr. Beck that email address

22  list?

23   A.   Yes.

24   Q.   So do you still have that email?

Page 326

1   A.   That I sent Mr. Beck?

2   Q.   Yes.

3   A.   Yes.

4   Q.   I'm also going to represent to you that I

5  don't believe that we have any communications, other

6  than the ones that are in this notebook, between you and

7  the plaintiffs or their lawyers.

8     So do you believe that Mr. Beck took those out

9  of the production as well?

10   A.   I wouldn't know that.

11   Q.   If those emails existed, they should have been

12  in the documents -- or in the email that Mr. Beck had

13  access to, right?

14   A.   If it was prior to -- if it was prior to what

15  was submitted the day that it was submitted.

16   Q.   Understood.

17     So you wouldn't yet have produced any

18  communications that are after the day it was submitted;

19  is that right?

20   A.   Correct.

21   Q.   Going back to your meeting at the federal

22  building, have you ever spoken to anyone associated with

23  the government about the litigation or allegations in

24  the litigation?

Page 327

1   A.   Outside of the communications that I've had

2  pertaining to this case?

3   Q.   Well -- so you understand that the plaintiffs

4  aren't the government, right?

5   A.   Yes.

6   Q.   Have you communicated with anyone other than

7  the plaintiffs, any government -- anyone associated with

8  the government, other than the plaintiffs about the

9  allegations in this case?

10   A.   No.

11   Q.   And so when you were meeting at the federal

12  building, it wasn't to meet with someone associated with

13  the government?

14   A.   When we met at the federal building, it was

15  to, again, discuss what I had previously disclosed

16  during the initial phone conversation.

17   Q.   So let's turn to the areas in which you

18  provided service for Altisource.

19     You have testified that you primarily provided

20  service to Altisource for properties that were in the

21  majority-minority census tracks or majority-minority

22  areas; is that right?

23   A.   I testified that I serviced the State of

24  Illinois and any property that was assigned to me by

Page 328

1  Altisource within the state lines.

2   Q.   Yes.

3     And in addition to that testimony, you have

4  testified that primarily the properties assigned to you

5  were in majority-minority neighborhoods -- or

6  majority-minority communities; is that right?

7   A.   Yes.

8   Q.   Is that what you believe that you were

9  assigned primarily majority-minority communities to

10  provide services to?

11   A.   Yes.  There were certain -- again, certain

12  areas, per my previous testimony, where I pushed for

13  more volume, such as Lake County, Illinois.

14   Q.   And is that a majority-minority community or

15  is that a majority white community?

16   A.   It's a majority white community.

17   Q.   What other majority white communities did you

18  provide services in?

19   A.   Any white community that would have fell

20  within the State of Illinois.

21   Q.   So if we're to look at the ratio of properties

22  that you were assigned, how many of them were in

23  majority-minority communities as opposed majority white

24  communities?



Page 329

1     A.   A majority of them.

2     Q.   When you say "a majority," is that 50 percent?

3 Is that more than 50 percent?

4     A.   It's more than 50 percent.

5     Q.   How much more?

6     A.   I don't have that analysis in front of me,

7 over the tenure of five years, properties coming in and

8 out of the portfolio.

9     Q.   So the most you can say at this point is more

10 than 50 percent of your properties were in

11 majority-minority neighborhoods; is that right?

12     A.   Correct.

13     Q.   How many of the neighborhoods that you worked

14 in would you have considered economically -- facing

15 economic challenges?

16     A.   During what time exactly? Overall?

17     Q.   Overall.

18     A.   There were several communities that were

19 facing financial crisis and housing crisis in the

20 beginning of my tenure with Altisource. As it

21 progressed, we saw different neighborhoods that were

22 facing economic impact, whether it be a minority area or

23 not.

24     Q.   So let's think about, let's say, when you

Page 330

1 first started with Altisource in 2013, how many of the

2 communities that you were providing services in had some

3 sort of economic crisis related to housing?

4     A.   Can you rephrase the question?

5     Q.   Sure.

6        Starting in 2013, how many of the communities

7 you were providing services in were facing housing

8 crisis or economic crisis related to housing?

9     A.   When you say "how many," you're asking me for

10 a specific number of municipalities that were facing

11 economic crisis due to some type of analysis that I

12 performed as a vendor?

13     Q.   Are you able to provide that number -- or did

14 you do that sort of analysis?

15     A.   No. We serviced our communities without bias

16 pertaining to the property and how to service it fairly

17 across the board; so that wasn't something that we were

18 concerned with.

19     Q.   When Ms. Soule was asking you questions last

20 week, you spoke about the ZIP codes that began with 606.

21        Do you remember that?

22     A.   Yes.

23     Q.   And you spoke very knowledgeably, and you

24 shared a lot of information about those ZIP codes.

Page 331

1        Do you remember providing that testimony?

2     A.   Yeah, I do.

3     Q.   Let's talk about those ZIP codes then.

4        You're familiar with those ZIP codes, based on

5 the work you've done in the field servicing area?

6     A.   Yes.

7     Q.   How many of those ZIP codes in, let's say,

8 2013 to 2015, had -- were facing economic challenges or

9 had -- related to housing or had housing issues?

10     A.   A 606 ZIP code would consist of a property

11 that fell within the limits of the City of Chicago. And

12 at that time, I would say, not based upon the amount of

13 REO properties that we had in the portfolio, but the

14 amount of occupancy verification inspections that we

15 completed for properties that were in mortgage default,

16 it was across the board; everyone was having difficulty,

17 especially around that time.

18     Q.   So there were lots of communities, lots of ZIP

19 codes or lots of communities that had lots of

20 foreclosures or people who were facing foreclosure?

21     A.   Yes -- or delinquent mortgages.

22     Q.   That are -- yes, that are delinquent

23 mortgages.

24        Were some of those properties also in

Page 332

1 majority-minority areas?

2     A.   Specifically in the City of Chicago?

3     Q.   In the 606 ZIP codes we're talking about.

4     A.   The 606 ZIP codes are the City of Chicago.

5     Q.   Mm-hmm.

6     A.   Honestly, I would have to say that varied,

7 because different clients had different mortgages, and

8 some clients had more volume in some areas as opposed to

9 other areas or they were in different area -- different

10 pipelines pertaining to the mortgage default.

11        So you had some areas where there were more

12 inspections or more delinquent mortgages versus more

13 properties that were REO versus more properties where we

14 were doing cash for relocation.

15     Q.   Let me see if I can make it easier for you to

16 answer the question.

17        Were there some majority-minority

18 neighborhoods that also had high delinquency rates?

19     A.   Yes, there were high delinquency rates in

20 minority areas well.

21     Q.   And were there some majority-minority areas

22 that had high foreclosure rates?

23     A.   Yes.

24     Q.   There's some of the area [sic] codes that



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 333..336

Page 333

1 began with 606, the City of Chicago area codes.
2         Were some of those areas ones that you would
3 consider blighted?
4     A.   At what time?
5     Q.   At any time between 2013 and 2018.
6     A.   Yes.
7     Q.   So let's talk about the work that you did for
8 properties.
9         You've talked about some of the standard --
10 what I'm going to call the "standard work items," right,
11 and I think we've gone through some of those.
12         I think we've already established, but I want
13 to make sure, standard work items that Altisource had
14 were done for every property, regardless of the
15 property's value; is that right?
16    A.   Correct.
17    Q.   And standard work items were done regardless
18 of whether the property was in a majority-minority
19 census track or a majority white census track?
20    A.   Correct.
21    Q.   And they were also done even if there was --
22 the bid workers had been declined -- standard activity
23 occurred even after bid orders were declined?
24    A.   Yes.

Page 334

1     Q.   So preservation just continued throughout a
2 property's life cycle -- REO life cycle, regardless of
3 where it was located?
4     A.   Routine services and preapproved line items
5 did continue, unless the property was in litigation.
6     Q.   Understood.
7         So if the property was in litigation -- we're
8 just going to set that aside, because there might be
9 reasons that standard work items wouldn't be done at
10 those places; is that right?
11    A.   Routine services weren't done, either,
12 standard and routine services.
13    Q.   Understood.
14         Is there a difference in your mind between
15 standard and routine?
16    A.   Yes.  A routine service would consist of grass
17 cutting, the inspections, and the interior maid service
18 on the property and confirming whether or not the
19 property is secure.
20    Q.   So that was grass cutting, maid service,
21 securing.  What was the fourth thing?
22    A.   The lock changing, confirming that the
23 property was secured; so making sure the property is
24 secured, the maid service, and cutting the grass, and

Page 335

1 the inspection.
2     Q.   So when we talk about those things, that's
3 what you're calling "routine services;" is that right?
4     A.   Yes.
5     Q.   And routine services happen for every property
6 within the REO life cycle; is that right?
7     A.   Correct.
8     Q.   Then when we talk about "standard services,"
9 what are you referring to when you use that term?
10    A.   Those are preapproved line items, that can be
11 completed on site at a property, and we will go back
12 into the system and create the vendor estimate for it as
13 a preapproved work order.
14         A routine service is a work item that's
15 auto-triggered by Altisource's system.  So we're talking
16 about orders that we have been issued versus orders that
17 we're creating in the office; that's the difference.
18    Q.   I think I -- so standard preapproved items,
19 you still have to communicate with Altisource about the
20 fact that you've done them; is that right?
21    A.   Yes, we have to create a vendor estimate in
22 VMS.
23    Q.   But because they're preapproved, you don't
24 have to wait for that estimate to be approved, do you,

Page 336

1 to perform the work item?
2     A.   No.
3     Q.   Let me make sure I asked the right question.
4         Did you have to wait for Altisource to approve
5 that for you to perform the work item?
6     A.   No.  You could create the vendor estimate in
7 VMS, and we did not have to wait for the contract order.
8     Q.   So what are the standard preapproved items
9 that would be done for each REO?
10    A.   Well, Altisource had a long list of
11 preapproved items.  I don't recall every single item
12 that was on that list.  And the list was changed quite
13 frequently, and items that were previously preapproved
14 over time became nonstandard items.  However, what I
15 will give you is what I recall to be preapproved line
16 items.
17         You have spring antimicrobial solution at a
18 property up to a certain amount of square footage,
19 installing smoke detectors, capping gas and water lines,
20 capping electrical wires loose electrical wires,
21 installing dehumidifier -- which I believe was moved
22 over to a nonstandard item later on -- boarding the
23 door, boarding windows, installing padlocks and halves
24 (phonetic) on the exterior doors that did not have a



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 337..340

Page 337

1  digital mechanical lock.
2      I do believe that the winterization was a
3  preapproved item at one point in time -- or a re-wint,
4  meaning, a refresh; so if the winterization had been
5  compromised.
6      That's all I can remember.
7  Q.  So that's a helpful list.
8      So is it your testimony that every REO
9  property, a vendor was allowed to do a standard
10  preapproved work item?
11  A.  Yes.
12  Q.  And a vendor could do a standard preapproved
13  work item regardless of the value of the property?
14  A.  If it didn't exceed the TPC or if it was not
15  in litigation status, yes.
16  Q.  So I'm going to ask you about TPC in a second,
17  but let's -- I understand litigation status.
18      Is it right that the standard preapproved work
19  items would be approved in majority-minority areas?
20  A.  Well, standard preapproved items was something
21  that you could create in VMS on a property and wasn't
22  grouped by minority area versus nonminority area in VMS.
23  Q.  So I think your testimony is that these items
24  would be performed in minority areas; is that right?

Page 338

1  A.  Yes.
2  Q.  And the standard preapproved list, that was a
3  list that applied to all REO properties, as you
4  understood it, right?
5  A.  As I understood it, yes.
6  Q.  There wasn't a separate list depending on
7  vendor, for example?
8  A.  No.
9  Q.  And there wasn't --
10  A.  There were certain guidelines pertaining to
11  different clients outside the Ocwen portfolio, though.
12  Q.  Understood.
13      So the standard preapproved list -- so, for
14  example, let's talk about vendors for a second, Agnew
15  Field Servicing would have its own preapproved list, it
16  was -- right?
17  A.  Yes, we had a standard preapproved list based
18  off of what was preapproved in VMS.
19  Q.  And your list would be the same -- or Agnew
20  Field Servicing list would be the same as any other
21  vendor who may service a property in that portfolio; is
22  that right?
23  A.  I'm not sure how other vendors structured
24  their preapproval systems.

Page 339

1  Q.  Understood.
2      So let's talk about TPC.
3      What do you understand TPC to represent?
4  A.  TPC, per what my understanding is, is the
5  amount of money that the investor has invested into that
6  particular property.
7  Q.  And do you know what TPC stands for?
8  A.  No.
9  Q.  Were there sometimes that you saw TPC put
10  on -- put into VMS or put on to a work order?
11  A.  The TPC would not be visible on the work
12  order.  However, when you go into VMS to manage that
13  particular property, the TPC would be visible on all the
14  properties.
15  Q.  And what was your understanding of -- what did
16  you -- Let me strike that.
17      What did you do with the TPC information?
18  A.  Nothing.
19  Q.  Was there any reason for you to pay attention
20  as a vendor to the TPC?
21  A.  Well, when you go and search the property,
22  it's on the main page of the property; so, yes, I did
23  note how much the client was investing into a particular
24  asset.

Page 340

1  Q.  Are you aware of times that an asset -- I'm
2  going to give you an example.  So, for example, an asset
3  would be worth $10,000, but the investor actually
4  invested $12,000 into the property.
5      Are you aware of those situations?
6  A.  I can't recall a property specifically being
7  worth $10,000 and $12,000 being invested into it.
8  Q.  Did you pay attention to see whether that was
9  ever the case, whether the investment in a property was
10  more than the TPC -- or more than the value of the
11  property?
12  A.  Well, if you create a vendor estimate for the
13  property and the TPC has been exceeded, then it would
14  trigger a message stating that it was.
15  Q.  So which -- which portfolios would you
16  get a message that TPC had been exceeded?
17  A.  Well, per my understanding, because I had a
18  team submitting these bids and vendor estimates, I can't
19  say for certain that it was not exclusive to the Ocwen
20  portfolio.
21  Q.  Could it be, for example, that some portfolios
22  didn't ever have that TPC exceeded message, is that a
23  possibility?
24  A.  Can you rephrase that question?



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 341..344

Page 341

1   Q.   Yes.
2        Is it possible that some portfolios did not
3   have a TPC exceeded message that would come back when a
4   bid was submitted?
5   A.   A TPC message wouldn't come back on a bid was
6   submitted, it would be in the form of a vendor estimate.
7   Q.   So let me reask the question with that
8   information.
9        So is it possible that some portfolios did not
10  have a message that would come back TPC exceeded in
11  response to a vendor estimate?
12  A.   I don't recall ever seeing that not happen or
13  seeing a property that did not have a TPC on it
14  firsthand.
15  Q.   So -- I guess, my question is a little bit
16  different than you saying that you didn't see it.
17       Is it possible there are some portfolios where
18  it never came back for a vendor estimate?
19  A.   Based off of my experience, I can't say that
20  it was possible because I've never seen it any other
21  way.
22  Q.   And when you talk about TPC and something
23  would come back saying that the vendor estimate exceeded
24  TPC, what would happen at that point?

Page 342

1   A.   You were asked if I wanted to create the
2   vendor estimate anyway.
3   Q.   Were these communications about the TPC done
4   via email?
5   A.   These were messages that would pop up directly
6   in VMS.
7   Q.   So to see what -- to see when the TPC exceeded
8   message would come up, we could search through VMS is
9   what you're saying, and we could see when those pop
10  up -- we could see when those pop up so those
11  communications occurred?
12  A.   I just wanted to make sure that I'd never made
13  any communication, per your question, to any
14  coordinators pertaining to a property specifically
15  having the TPC exceeded, before I answer the next
16  question.
17       However, that may very well be possible that I
18  had made communication or someone in my staff made
19  communication with someone at Altisource stating that we
20  had a property where the TPC had been exceeded.
21       Now, to answer your question, I wouldn't know
22  where you would be able to find that information
23  pertaining to what properties TPC had been exceeded,
24  because that wasn't something that I was privy to.  If

Page 343

1   you specifically tried to create a vendor estimate
2   specifically on a property whose TPC had been exceeded,
3   that is the only time that you would see that message.
4   Q.   So putting aside TPC for a moment, is it
5   accurate -- well, there are inspections that are done,
6   right, on properties that are in REO status?
7   A.   Can you clarify what you ...
8   Q.   Sure.
9        Are there certain inspections that are done on
10  REO properties?
11  A.   Yes.
12  Q.   And those are, for example, biweekly
13  inspections?
14  A.   Yes.
15  Q.   And sometimes initial property inspection is
16  something that was done?
17  A.   And initial property review, yes.
18  Q.   Initial property review.  Okay.
19       And Altisource expected those inspections to
20  occur, regardless of the value of the property; is that
21  right?
22  A.   A biweekly inspection is triggered when a
23  property is moved into REO before we -- before the REO
24  vendor has confirmed whether or not the property is

Page 344

1   vacant or occupied.
2   Q.   And Altisource expected vendors to go out and
3   do those biweekly inspections, regardless of the value
4   of a property?
5   A.   That was not one of the -- that's not the
6   reason we would do a biweekly inspection.  We would do a
7   biweekly inspection to confirm the occupancy, not the
8   value.
9        So I ...
10  Q.   So is it right to say that every REO property
11  had an inspection done?
12  A.   Yes.
13  Q.   Understood.
14       Is it also right to say that every REO
15  property was secured, once it became vacant?
16  A.   Yes.
17  Q.   Is it accurate to say that:  Every REO
18  property had its grass cut every two weeks during
19  grass-cutting season?
20  MS. SOULE:  I'm going to object to the extent this
21  is completely beyond the witness' knowledge, in terms of
22  her ability to testify --
23  MS. KRIGSTEN:  Jennifer, you can object, but your
24  speaking objections, I think, are inappropriate.  So if

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 345..348

Page 345

1  you could just make your objection without --
2       MS. SOULE:  Well, you're asking her --
3       MS. KRIGSTEN:  -- coaching the witness --
4       MS. SOULE:  -- to verify what's actually done for
5  all the properties.  You might want to limit it to
6  either the policy or what she did on her properties.
7       MS. KRIGSTEN:  Candidly, I don't believe that you
8  did that when you were asking your questions, but I'm
9  happy to do so here.
10 BY MS. KRIGSTEN:
11      Q.   So in your experience, Ms. Agnew, did
12 grass-cutting occur every two weeks on a property during
13 grass-cutting season?
14      A.   On the properties that we serviced, yes.
15      Q.   And in your experience, did snow removal then
16 occur every two weeks on properties during snow removal
17 season?
18      A.   Snow removals had different guidelines.
19      Q.   Is it accurate to say that:  In your
20 experience, the preservation activities on REO
21 properties occurred regardless of the type of
22 neighborhood it was in?
23      A.   What do you mean by REO preservation activity?
24 Routine services?  Such as grass cut --

Page 346

1       Q.   Yes.
2       MS. SOULE:  I just want to -- same objection as I
3  had stated before.
4  BY MS. KRIGSTEN:
5       Q.   So in your experience, routine services
6  occurred regardless of the type of neighborhood a
7  property was in?
8       A.   Yes.
9       Q.   Let's talk about the concept of a high-value
10 order.
11      Q.   Do you know what orders would be considered
12 high-value orders?
13      A.   High-value orders, per my understanding, were
14 orders that exceeded a certain bid approval amount.
15      Q.   Do you know what that amount was?
16      A.   Per my training and what I was told by the
17 bids team, those were orders that exceeded $8,000, which
18 would be the threshold of what they were allowed to
19 approve.
20      Q.   So you understood that any order under $8,000
21 was not a high-value order, right?
22      A.   In the eyes of my follow-up coordinator?
23      Q.   I'm asking for your understanding, and then
24 I'll ask you where you got that understanding.

Page 347

1       So let's start with what your understanding
2  was.  Did you understand that everything up to $8,000
3  was not a high-value order?
4       A.   That's subjective.
5       Q.   I think your testimony was that anything
6  $8,000 and above was a high-value order.
7            Is that what you just testified about?
8       A.   Yes.
9       Q.   Was anything below $8,000 considered a
10 high-value order, in your experience?
11      A.   High-value order in the guidelines of the
12 price point versus whether or not it was an escalated
13 issue or a high-priority order, I don't recall seeing a
14 high-value order underneath $8,000, not that I can
15 recall.
16      Q.   Is it right to say that a high-value order
17 could occur at any property?
18      A.   Is that right to say?
19      Q.   Yes.
20      A.   No, it's not right to say.
21      Q.   Could a high-value order occur in a property
22 that was in a majority white neighborhood?
23      A.   It could, if it was approved.
24      Q.   And I'm not talking about approval, I'm just

Page 348

1  talking about -- let's talk about -- is there a
2  difference between an order and approval, or is an order
3  something that's approved, in your mind?
4       A.   A work -- a contract order is something that
5  has been approved and issued to be completed.
6       Q.   So a high-value order could occur in a
7  majority white neighborhood, correct?
8       A.   It could.
9       Q.   And could a majority -- could a high-value
10 order also occur in a majority-minority neighborhood?
11      A.   Yes, if it was approved --
12      Q.   The -- understood --
13           (Stenographer clarification.)
14 BY THE WITNESS:
15      A.   -- and a contract order was issued.
16      Q.   Could a high-value order occur in an asset
17 that was, let's say, over $500,000?
18      A.   It could.
19      Q.   Could a high-value order occur in an asset
20 that was less than -- that was valued less than
21 $500,000?
22      A.   It could.
23      Q.   Is it fair to say that a high-value order
24 could occur at any property in the REO portfolio?



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 349..352

Page 349

1    A.    It's fair to say that it is in the realm of
2  possibility if the order was issued.
3    Q.    Understood.
4          But high-value orders weren't only for
5  majority white neighborhoods, were they?
6    A.    High-value orders were issued at properties
7  where the bid was approved.
8    Q.    Yes.
9          So high-value orders could occur in majority
10 white neighborhoods and majority-minority neighborhoods;
11 is that right?
12   A.    Depending on the specific property and the
13 situation at the property, what was submitted and what
14 was approved, yes, it is in the realm of possibility
15 that a high-value order could be issued in a minority
16 area.
17   Q.    And I've been using the term
18 "majority-minority."
19         What does that mean to you?
20   A.    Non -- not minority, Hispanic, Latino, African
21 American, predominantly areas.
22   Q.    So areas that are predominantly minority, is
23 what that means to you?
24   A.    Yes.

Page 350

1    Q.    And how would you know if an area was
2  predominantly minority?
3    A.    The neighborhood.  Specifically --
4    Q.    What does that mean?
5    A.    The neighborhood, the amount of experience
6  that I had being in these neighborhoods and knowing the
7  type of neighborhood it was, I'm pretty familiar with
8  minority versus nonminority areas in the territory in
9  which I serviced.
10   Q.    Is there anything about what is in VMS that
11 would have told you whether a property was in a minority
12 neighborhood or not in a minority neighborhood?
13   A.    In VMS?
14   Q.    Yes.
15   A.    No.
16   Q.    Are there any documents that Altisource gave
17 you that would tell you if a property was in a minority
18 neighborhood or not?
19   A.    I would have to review exactly what's in the
20 VMS document repository to say for certain.  However, I
21 don't recall receiving any specific training materials
22 to minority-specific areas.
23   Q.    Understood.
24         In your testimony last week you talked about

Page 351

1  your follow-up coordinator, and I think you mentioned
2  the follow-up role earlier today.
3          Did the follow-up coordinators follow up on
4  all open work orders?
5    A.    If it was not on hold, yes.
6    Q.    And so the follow-up coordinators would follow
7  up on all work orders whether it was a high-value order
8  or not a high-value order; is that right?
9    A.    Yes.
10   Q.    And when you were scored -- you knew you were
11 being scored at Altisource for completion of your works;
12 is that right?
13   A.    Yes.
14   Q.    And you were scored on the completion of all
15 your work orders, right?
16   A.    Yes.
17   Q.    So you testified you heard people in the
18 industry refer to communities of color as low value.
19         Do you remember that testimony?
20   A.    I stated in my testimony that I had bids that
21 were disapproved in certain areas, stating that they
22 were low value in VMS.
23   Q.    Well, I'm going to put that aside for a
24 moment.

Page 352

1          Do you recall providing testimony that you
2  heard people within the industry refer to communities of
3  color as "low value"?
4    A.    I heard people at Altisource disapproving bids
5  stating that they were low value.
6    Q.    Did you hear anyone outside of Altisource in,
7  any of your experience, use the term "low value" in
8  reference to communities?
9    A.    Outside of Altisource?
10   Q.    Yes.
11   A.    No.  However, there were different verbiage
12 that was used.
13   Q.    What did you hear outside of Altisource?
14   A.    From different asset managers or field
15 technicians or -- specifically?  Can you be more
16 specific?
17   Q.    Well, let me ask you a different question.
18         You talked about people in the industry using
19 certain terms.  When we talk about the "industry," when
20 you provided that testimony about people in the
21 industry, what industry were you referring to?
22   A.    The mortgage default industry, the asset
23 management industry.
24   Q.    And that industry is more than simply your



Page 353

1    work with Altisource, correct, that encompasses other
2    companies?
3         A.    That encompasses other companies, other
4    vendors, inspectors, realtors, and field technicians,
5    specialty contractors and things of that nature.
6         Q.    Did you hear people in that industry, that
7    broad industry refer to communities as "low value"?
8         A.    No.
9         Q.    What did you -- what other terms did you hear
10   them use?
11        A.    I've heard the term "hot zone" be used for
12   specific areas.  And I've heard people just again not
13   want to go into certain minority areas.
14        Q.    So now let's talk about Altisource
15   specifically.
16              You testified that you heard people within
17   Altisource use the term "low value"; is that right?
18        A.    Yes.
19        Q.    And I understand from your testimony that
20   they've used the term "low-value asset," right?
21        A.    Yes.
22        Q.    And that's a term that I think you've
23   testified about.
24              Did they also refer to community -- your

Page 354

1    testimony also refer to communities as low value?
2         A.    I've heard the term referred specifically to
3    assets.
4         Q.    So the times where you heard someone within
5    Altisource refer to low value, they were calling it
6    asset a low-value asset; is that right?
7         A.    Yes.
8         Q.    And is that the context in which you heard the
9    term "low value" is when people were talking about a
10   specific asset?
11        A.    Yes.
12        Q.    You also a few minutes ago testified that
13   you've heard the term "hot zones" referenced in the
14   industry?
15        A.    Yes.
16        Q.    Did you ever hear anyone within Altisource use
17   the term "hot zone"?
18        A.    Not that I can recall specifically.
19        Q.    In your testimony last week you talked about a
20   property located at 8748 Ashland.
21              Do you remember that testimony?
22        A.    Yes.
23        Q.    And just to clarify, that was a commercial
24   testify- -- commercial property, wasn't it?

Page 355

1         A.    Correct.
2         Q.    Do you know who the investor was or who
3    actually the owner was of that property?
4         A.    At one point in time, I do believe I had a
5    chance to review the judicial deed.  However, I don't
6    recall.
7         Q.    And did you testify that that property ended
8    up in litigation?
9         A.    Yes.
10        Q.    And is that one of the reasons that -- Well,
11   strike that.
12              Was it in litigation when you were disallowed
13   work -- when you couldn't do any work on it, was the
14   property in litigation during that time?
15        A.    No.  We were doing work on that property via
16   court orders issued from the City of Chicago, while the
17   property was in litigation status.
18        Q.    So the court was involved in directing what
19   was to be done at that property; is that right?
20        A.    They were requesting certain works to be done.
21        Q.    Understood.
22              You also testified about the demolition of
23   properties.
24              Do you remember that testimony?

Page 356

1         A.    Yes.
2         Q.    There were times -- I believe your testimony
3    was, there were times where the City, maybe the City of
4    Chicago, would order demolition; is that right?
5         A.    Yes.
6         Q.    And was it your view that Altisource should
7    have done the demolition instead of the City of Chicago,
8    is that what I understood from your testimony?
9         A.    Per my testimony, when we have a property that
10   is in demolition court, we give a bid to repair and
11   demolish the property.
12        Q.    And so the properties that you're referring
13   to, approximately -- Strike that.
14              Approximately how many properties do you
15   believe that you dealt with that were in demolition
16   court?
17        A.    Thousands.
18        Q.    Out of those properties, do you know how many
19   were ultimately owned by Deutsche Bank?
20        A.    No.
21        Q.    Did each of those properties get demolished?
22        A.    No.
23        Q.    Were there some properties that were in
24   demolition court that ultimately weren't demolished?

Page 357

1　　A.　Yeah, there were properties that weren't
2　demolished.
3　　Q.　And were they not demolished -- or did they
4　come out of demolition court because repairs were done
5　on them?
6　　A.　They never came out of demolition court.  They
7　were still under violation, they just hadn't reached the
8　point of demolition at that time.
9　　Q.　Understood.
10　　　And out of those properties, do you know how
11　many of them came into REO status in the condition that
12　they were found when they were in demolition court?
13　　A.　I wouldn't be able to give an approximate
14　number on that.
15　　MS. KRIGSTEN:  Why don't we take a short break?
16　Ten minutes or so.  Thanks.
17　　THE VIDEOGRAPHER:  Time is 2:40 p.m.  We are now
18　going off the record.
19　　　　　(A short break was had.)
20　　THE VIDEOGRAPHER:  Time is 2:57 p.m.  We are now
21　back on the record.
22　BY MS. KRIGSTEN:
23　　Q.　Ms. Agnew, I want to go back to the testimony
24　that you had given about demographics of different

Page 358

1　neighborhoods.
2　　　You're familiar with changing demographics,
3　right, so some communities change over time in the level
4　of -- or in the amount of minority individuals who live
5　in those communities; is that right?
6　　A.　Yes, I've seen communities gentrify.
7　　Q.　And does it go both ways; so sometimes
8　communities will be primarily white, and then they may
9　become predominantly minority?  You've seen those
10　situations, haven't you?
11　　A.　Are you asking pertaining to -- during my
12　tenure with Altisource or just in general.
13　　Q.　Let's just say in general, so, yes.
14　　　So some properties are minority may become
15　majority white; is that right?
16　　A.　I've seen it happen before.
17　　Q.　Did you ever do any research about the census
18　data or the demographics of any particular areas within
19　the Chicagoland -- Chicago or Chicago suburbs?
20　　A.　No, I've never done any census demographics on
21　what was minority versus what was not minority, just
22　what I experienced firsthand by seeing the people in the
23　communities.
24　　Q.　Sure.

Page 359

1　　　So when you talk about a community being
2　predominantly minority, you're relying on your own
3　experience in that community; is that right?
4　　A.　I'm relying on my experience of servicing that
5　community or living in that community or working in that
6　community, yes.
7　　Q.　And those communities also could change over
8　time, couldn't they?
9　　A.　In what way?
10　　Q.　They could either grow in the number of
11　minority individuals who live in there; is that a
12　possibility?
13　　A.　Yes --
14　　　　　(Multiple speakers simultaneously
15　　　　　　speaking.)
16　BY MS. KRIGSTEN:
17　　Q.　Could they also have -- I didn't mean to
18　interrupt you.
19　　A.　It's fine.  I said --
20　　THE WITNESS:  April, I said:  It was a possibility.
21　BY MS. KRIGSTEN:
22　　Q.　Could there also be a decline in the number of
23　minority individuals who live in a particular community?
24　　A.　It's possible.

Page 360

1　　Q.　Let's talk for a moment about your business.
2　　　So when you began with Altisource, how many
3　employees did you have?
4　　A.　Two.
5　　Q.　And who were those employees?
6　　A.　Donesha Solassi and Kelly Cutsinger.
7　　Q.　And how did you know -- Ms. Solassi, is that
8　her last name?
9　　A.　Mm-hmm (nodding).
10　　Q.　How did you know her?
11　　A.　Donesha Solassi was a coordinator for Assurant
12　Field Services of property -- a property management
13　company that specialized in insurance inspections that I
14　had worked with previously.  And she was my coordinator,
15　and she was very talented.  And I -- when she decided to
16　depart with the company, I offered her a position with
17　us.
18　　Q.　Then you testified you also had Kelly Bishop
19　or Kelly Cutsinger.
20　　A.　Mm-hmm.
21　　Q.　And how did you know Ms. Bishop?
22　　A.　Well, Mrs. Cutsinger, her and I knew each
23　other when I had my residential cleaning service.  She
24　worked for a payroll company that processed my payroll.



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 361..364

Page 361

1    Q.    By the end of your time as a vendor with
2  Altisource, how many employees did you have?
3    A.    14 full-time employees.
4    Q.    So you grew significantly in those years as an
5  Altisource vendor?
6    A.    Absolutely.
7    Q.    Did you also have subcontractors that you
8  worked with when you began as an Altisource vendor?
9    A.    I had subcontractors, yes.
10   Q.    And how many did you begin with?
11   A.    I had around -- I would say three to six
12  subcontractors that I used here and there outside of the
13  inspectors that I had subcontractors that did
14  specifically property preservation and field service
15  work.
16   Q.    By the time that you finished your tenure as
17  an Altisource develop door, how many subcontractors were
18  you working with?
19   A.    I had about 38 contractors in my network, 38
20  companies.
21   Q.    When you began as an Altisource vendor, let's
22  say in 2013, do you remember what your revenue was?
23   A.    My review for 2013 -- to be able to give you a
24  specific amount, I'd have to go back and look at my tax

Page 362

1  records, but it was anywhere in between 100- to about
2  maybe 120,000 -- I'd have to look back and look at my
3  profit and loss statements from my tax documents to tell
4  you the exact amount.
5    Q.    Right.
6          But if we -- if we were just talking rough
7  numbers, let's say 100- to 120,000 sounds approximate to
8  you?
9    A.    It sounds fair.
10   Q.    And what about in 2017, which was your last
11  full year as an Altisource vendor, do you remember
12  approximately what your revenue was?
13   A.    My gross revenue was around 3.5 million.
14   Q.    In your time with Altisource, you became a
15  pretty -- you became pretty successful, didn't you?
16   A.    I had a successful contract with Altisource,
17  although I considered myself to be successful prior.
18   Q.    Sure.
19          And when you were with Altisource, Altisource
20  actually -- I think we've heard some testimony about
21  this -- gave you awards; is that right?
22   A.    Yes.
23   Q.    And you went to conferences and you accepted
24  those awards, didn't you?

Page 363

1    A.    Yes.
2    Q.    And when you accepted the awards, were you
3  proud of the work that you had been doing with
4  Altisource?
5    A.    I was proud of my on-time percentages.
6    Q.    Generally, were you proud to be an Altisource
7  vendor?
8    A.    Generally, yes.
9    Q.    And how many conferences did you attend?
10          I think you testified -- let me back up.
11          I think you testified there were vendor
12  conferences that Altisource put on.
13          How many conferences did you attend?
14   A.    They were annual, and so I want to say four --
15  I recall four.
16   Q.    And during those conferences, was there
17  education about how to become a better -- or how to
18  improve your -- the quality of services as a vendor?
19   A.    In what aspect?
20   Q.    Well, let me just ask you.
21          What were the topics covered in those
22  conferences?
23   A.    Pertaining to the workshops, the topics varied
24  between different guidelines, changes that they were

Page 364

1  making in VMS, changes that they were making in the
2  systems, onboarding of clients, things of that nature,
3  the way you were scored based off of work, speaking
4  about in-field quality and connecting us with our
5  coordinators and people that we may have just
6  communicated with previously over the phone or via
7  email.
8    Q.    Is it fair to say it was an educational
9  opportunity for you to attend the conferences?
10   A.    With regards to the questions that I would ask
11  and getting confirmation on certain things, yes.
12   Q.    Is that why you went to the conferences, is
13  for the educational opportunity?
14   A.    We went to the conferences, not only for the
15  educational opportunity, but to also connect with the
16  other nationwide network of vendors, our PODs, the
17  coordinators that we worked with, the bids team, to
18  accept our awards as well.
19   Q.    Understood.  Okay.
20          So at this time, I believe my codefendants
21  have a couple of questions, and so I'm going to turn it
22  over to Ocwen, I believe.  They have some questions at
23  this time?
24   MR. PRINCE:  If we could, just to make sure we're

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 365..368

Page 365

1  on the same page, Andrew, how much time do you have
2  showing left?
3         I show about a half hour to 40 minutes, but
4  I'm -- I've never been a stopwatch-guy in my entire
5  career.
6     THE VIDEOGRAPHER:  We were at 4 hours 12 minutes
7  when we started this.  And we started at 2:57, so --
8     MR. PRINCE:  So you're telling me I'm way off?
9     THE VIDEOGRAPHER:  Unless I missed something.
10 Yeah, we're right at four and a half hours.
11    MR. PRINCE:  Okay.  Thank you.
12    THE VIDEOGRAPHER:  No problem.
13    MS. NORRIS:  Okay.  Ms. Agnew, can you hear me
14 okay?
15    THE WITNESS:  I can.
16    MS. NORRIS:  Hi.  My name is Jacey Norris.  I'm one
17 of the attorneys for Ocwen.  I just have a few questions
18 for you.  It'll be, hopefully, quick and painless.
19                 CROSS-EXAMINATION
20 BY MS. NORRIS:
21    Q.   So earlier you indicated that you serviced
22 about 30,000 properties as a field service vendor for
23 Altisource; is that right?
24    A.   Assigned, roughly 30,000 --

Page 366

1     Q.   Okay.
2     A.   -- some properties were inactive in VMS.
3     Q.   And what percentage of the properties you
4  serviced on behalf of the Altisource were Ocwen
5  properties?
6     A.   I would say the majority of properties that
7  were serviced for the majority of my tenure with
8  Altisource were Ocwen portfolio.
9     Q.   And by "majority," do you mean over
10 50 percent?  Over 70 percent?
11    A.   I would say over 75 percent.
12    Q.   And how could you tell that a property was an
13 Ocwen property?
14    A.   There was an OCN code on the -- when you go
15 into VMS to manage the property.
16    Q.   And could you tell if any of the properties in
17 the Ocwen portfolio were owned by another investor?
18    A.   No.  The only way I could tell that was if I
19 received the judicial deed to it.
20    Q.   So you wouldn't, for example, know if a
21 property was owned by Deutsche Bank in the Ocwen
22 portfolio?
23    A.   That's correct, I would not know that.
24    Q.   And earlier you testified that you remember

Page 367

1  speaking to just one person in Ocwen, right, just one
2  conversation?
3     A.   That I can recall.
4     Q.   And that was about an occupied property?
5     A.   It was -- yes, it was pertaining to an
6  occupied property where the neighbor -- where the
7  mortgagor was in direct communication with someone from
8  Ocwen.
9     Q.   Do you know if that was an REO property?
10    A.   It would have been somewhere on one of the
11 work orders, however, I can't recall at this time.  I'm
12 sorry.
13    Q.   Fair enough.
14         Is there anything about that conversation you
15 remember that you haven't already testified to today?
16    A.   No.
17    Q.   Were there unique requirements for properties
18 in the Ocwen portfolio?
19    A.   The majority of the portfolio I serviced and
20 managed for Altisource was Ocwen's portfolio; therefore,
21 I would consider a unique requirement to be a client
22 outside of Ocwen.
23    Q.   So, for example, if Wells Fargo had a
24 requirement that differed from Ocwen, that would be

Page 368

1  unique?
2     A.   Correct.
3     Q.   Do you remember any Ocwen-specific
4  requirements that struck you as nonstandard for the REO
5  industry?
6     A.   Can you repeat the question?
7     Q.   Sure.
8         You've testified that each investor, each
9  portfolio had some unique requirements, right?
10    A.   Correct.
11    Q.   Were any of the requirements for the Ocwen
12 portfolio something you wouldn't consider fairly
13 standard for the industry?  You know, for example, would
14 Wells Fargo have grass cut every week and Ocwen had it
15 cut every two and that was strange, or was it fairly
16 uniform?
17    A.   The only thing I can recall being unique to
18 that would be the digital mechanical locks, the locks we
19 installed on the Ocwen properties; that wasn't something
20 that we did for the Wells Fargo portfolio.
21    Q.   Do you recall any unique requirements for
22 Deutsche Bank properties?
23    A.   No.
24    Q.   When you received field service assignments,



Page 369

1 did those come from Altisource?
2     A.   Yes, ma'am.
3     Q.   And when you submitted work bids, were those
4 approved or denied by Altisource?
5     A.   That's correct, they were approved or denied
6 by Altisource.
7     Q.   Did anyone at Altisource ever tell you that
8 the decision to approve or deny a work item came from
9 Ocwen?
10    A.   The verbiage that I would hear more than
11 anything would be the RSC or the asset manager, but I
12 wasn't given specific names and titles to exactly who
13 was making those decisions.
14    Q.   Did you understand an RSC to be someone who
15 worked for Altisource?
16    A.   I assumed that the RSC worked for Altisource.
17    Q.   And is the same true of an asset manager?
18    A.   Yes.
19    Q.   Did you ever receive any training from Ocwen?
20    A.   Directly, no.
21    Q.   Have you ever seen any of Ocwen's policy and
22 procedure documents?
23    A.   Not that I recall.
24    Q.   Have you ever discussed a specific policy

Page 370

1 related to low-value properties with anyone at Ocwen?
2     A.   No.
3     Q.   Did anyone from Ocwen ever talk to you about
4 the racial demographics of a specific neighborhood?
5     A.   No.
6     Q.   Did anyone at Ocwen ever instruct you to
7 provide inferior maintenance services to homes in
8 majority-minority communities?
9     A.   No.
10    MS. NORRIS:  Thank you.  That's all the questions I
11 have.  I think we may have some from Deutsche Bank.
12    MR. PRINCE:  Ken, we can't hear you.  You have to
13 unmute yourself first.
14             (Discussion off the record.)
15             CROSS-EXAMINATION
16 BY MR. KLIEBARD:
17    Q.   Good afternoon, Ms. Agnew.  Thank you for your
18 patience today.  I'm Ken Kliebard.  I represent the
19 Deutsche Bank defendants, which are Deutsche Bank
20 National Trust as Trustee and Deutsche Bank Trust
21 Company Americas as Trustee.
22         If it's okay with you, I'll refer to them
23 collectively as "Deutsche Bank" in my questions.  Is
24 that okay with you?

Page 371

1     A.   That's fine.
2     Q.   I think you testified at the start of the
3 deposition that you have not communicated with Deutsche
4 Bank; is that correct?
5     A.   That's correct.
6     Q.   Do you know what Deutsche Bank's relationship
7 is with Altisource?
8     A.   Per what I've come to understand, Deutsche
9 Bank received certain properties and holds those
10 properties as trustee.  Ocwen purchases the MSR, which
11 is the mortgage servicing right.  And they hire
12 Altisource to do the preservation and field service work
13 on those properties.  That's my understanding.
14    Q.   Did you obtain that understanding before or
15 after your contractor work with Altisource terminated?
16    A.   During.
17    Q.   Who informed you of that?
18    A.   I've done my research.
19    Q.   Is that something you found on your own
20 research then?
21    A.   Yes.
22    Q.   Do you know what Deutsche Bank's relationship
23 is with -- Well, strike that.
24         Did you receive any communications, so

Page 372

1 letters, emails, phone conversations, reports, from
2 Deutsche Bank?
3     A.   No.
4     Q.   Did you ever provide reports or communications
5 to Deutsche Bank?
6     A.   No.
7     Q.   Did you ever anyone at Altisource or any
8 independent contractors working for Altisource mention
9 Deutsche Bank?
10    A.   No.
11    Q.   Have you ever seen any of Deutsche Bank's
12 policy and procedure documents as relates to this
13 lawsuit?
14    A.   No.
15    Q.   Did you testify in day one that you live in
16 Country Club Hills or Olympia Fields?  I got them mixed
17 up.
18    A.   Country Club Hills.
19    Q.   Do you believe that the defendants' practices
20 for REO properties resulted from the decline of property
21 values in Country Club Hills?
22    A.   I do.
23    Q.   And do you believe that the defendants'
24 practices for REO properties resulted in a decline of



Page 373

1  the property values in Harvey, Illinois?
2      A.    I do believe that.
3      Q.    And Harvey is a minority community, correct?
4      A.    Correct.
5      Q.    And you testified you grew up in Harvey and
6  are familiar with the City of Harvey, correct?
7      A.    Correct.
8      Q.    Is it a fair statement that the population of
9  Harvey, Illinois has declined every year since the
10  1990s?
11      A.    The population?
12      Q.    Yeah, the total number of people that live in
13  Harvey, Illinois.
14      A.    Overall, I'd say there was a slight decline.
15      Q.    I assume you're familiar with the Dixie Square
16  Mall in Harvey, Illinois, famous for the "Blues
17  Brothers" movie being filmed there?
18      A.    Yes.
19      MR. PRINCE:  Object on relevance, Ken.
20  BY MR. KLIEBARD:
21      Q.    That movie -- or that mall -- that movie --
22  that mall closed in 1978, correct, or thereabouts?
23      A.    Thereabouts.  I wasn't born then.
24      Q.    Okay.  Has it been closed ever since you were

Page 374

1  born?
2      A.    Yes.
3      Q.    And the closure of that mall was not the fault
4  of the defendants, correct?
5      A.    No.
6      Q.    Harvey, Illinois is close to where the steel
7  mills used to be in Indiana, correct?
8      A.    I'm not familiar with the steel mills in
9  Indiana.
10      Q.    Okay.
11      A.    I'm sorry.  I want be able to give an educated
12  answer on that.
13      Q.    Do you know one way or another whether Harvey,
14  Illinois was predominantly a town that was dependent on
15  manufacturing jobs up until the 1980s?
16      A.    No.
17      Q.    Don't know?
18      Are you aware that as of even a few years ago
19  approximately 20 percent of the residential homes in
20  Harvey, Illinois are abandoned?
21      A.    They're foreclosed, yes, yes.
22      Q.    Well, abandoned, not necessarily foreclosed;
23  abandoned.
24      A.    In what capacity?  As in --

Page 375

1      Q.    People don't live there anymore, it's a vacant
2  house.
3      A.    Okay.
4      With no mortgage?
5      Q.    I'm just referring to abandoned homes.  There
6  could be a mortgage; there might not be a mortgage.
7      Are you aware that approximately 20 percent of
8  Harvey's homes, as of even a few years ago, are
9  abandoned?
10      A.    When you say "abandoned," we see foreclosures
11  or properties that are vacant.  I'm just trying to get,
12  I guess, a better understanding, if you could rephrase
13  the question what you mean by "abandoned"; meaning that
14  the property had a mortgage at one point in time, it's
15  bank-owned, or it's just considered abandoned meaning
16  it's vacant?
17      Q.    Meaning, it's vacant.
18      A.    Yes.  Okay.  I understand.  Okay.
19      Q.    Are you able to answer the question with that
20  clarification?
21      A.    Yes.
22      Q.    And what's your answer?
23      A.    The answer is yes.
24      Q.    The city of Harvey, Illinois faces a severe

Page 376

1  financial crisis, correct?
2      A.    Correct.
3      Q.    Are you aware in 2018 Harvey, Illinois became
4  the first city in Illinois to have revenue garnished by
5  the state in order to fund the City's pension liability;
6  have you ever heard that?
7      A.    I believe I heard something about that --
8      Q.    Okay.
9      A.    -- in passing --
10      Q.    So the people that remain in Harvey, Illinois
11  have to foot the bill for the services offered by the
12  City, right?
13      A.    Yes.
14      Q.    And that comes through property taxes, in
15  part, correct?
16      A.    I would assume so.
17      Q.    Do you know what the property taxes are in
18  Harvey, Illinois for residential and commercial as a
19  percentage of value of the home?
20      A.    I haven't done any research pertaining to
21  property taxes in the Village of Harvey in several years
22  since I serviced properties in that area.
23      Q.    Are you aware that the burdensome property
24  taxes in Harvey, Illinois are among the highest in the



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 377..380

Page 377

1   state?
2       A.   I did not know that.  And that's today?
3       Q.   Today, yes.
4       A.   Okay.
5       Q.   Have you ever heard anyone say that the
6   property taxes in Harvey will eat you up or words to
7   that effect?
8       A.   No, I've never heard anyone say that.
9       Q.   Have you ever heard, in relation to Harvey's
10  property taxes, anyone say that even investors don't
11  want to touch the property there?
12      A.   No.
13      MR. KLIEBARD:  I don't have any further questions.
14      MS. KRIGSTEN:  So at this time, the defendants will
15  reserve their remaining time for after Ms. Soule
16  finishes her questioning.
17      MR. PRINCE:  I assume there will be rebuttal to
18  whatever she asked questions on?
19      MS. KRIGSTEN:  I think ...
20      MS. SOULE:  Okay.  I do just have a couple of
21  clarifying questions.
22                   REDIRECT EXAMINATION
23  BY MS. SOULE:
24      Q.   In the set of exhibits that the plaintiffs

Page 378

1   produced last week, there was an email from you to
2   Ocwen.
3            And do you recall that?  Did you see that
4   exhibit from the group last week?
5       THE WITNESS:  You're asking me?  I'm sorry.
6       MR. PRINCE:  Yeah.
7   BY THE WITNESS:
8       A.   I don't recall, although, I didn't get a
9   chance to review every exhibit.
10      Q.   Okay.
11      A.   But I do have them.
12      Q.   Yeah.  We could pull it up, because -- you
13  know, it would be faster.
14      MS. SOULE:  Steve, did you want did you want to
15  pull up Exhibit 516.
16  BY MS. SOULE:
17      Q.   This -- Exhibit 516 is an email that has got a
18  date, August 7, 2020, and it appears to be from you to
19  someone at Ocwen.  And I just wanted to show you this
20  because there's a -- just some other questions about --
21  and I know that the questions were designed to focus on
22  the period of time you were servicing properties.
23           But this is a communication between you and
24  Ocwen; is that right?

Page 379

1       A.   Yes, it is.
2       Q.   And just briefly, can you explain what the
3   purpose was of you engaging in this communication,
4   Plaintiffs' Exhibit 516, with Ocwen?
5       A.   I have been having a payment dispute with
6   Altisource since my termination.  I've been working with
7   my attorney utilizing what is required pertaining to
8   disputes for nonpayment for services provided.  And I
9   started to escalate the issue because I was not
10  receiving any communication from Altisource; so I
11  escalated it.
12      Q.   Did you receive a response in Ocwen --
13      A.   No.
14      Q.   -- to this?
15      A.   No.
16      Q.   I want to say that --
17      MS. SOULE:  Okay.  I think we're done with that
18  exhibit, Steve.
19  BY MS. SOULE:
20      Q.   I also wanted to refer back -- you mentioned
21  earlier in your testimony that you had sent a FedEx
22  package of documents to my office.
23           Was that in response to the subpoena for
24  documents?

Page 380

1       A.   Yes, it was.
2       Q.   And was that the initial documents -- we have
3   it as -- we Bates-numbered them -- not sure that your
4   counsel may or may not have a copy of the Bates numbers,
5   your current counsel, but we Bates-numbered those AFS 1
6   through 158.  And I'll just represent to make clear for
7   the record that that was the first time that you sent
8   any -- or provided any documents to NFHA or the
9   plaintiffs; is that right?
10      A.   That is correct.
11      Q.   And I also wanted to go over the time -- you
12  testified about how we met in person at the federal
13  building, and I want to see if I can prompt your memory.
14           I know you testified that we met one time in
15  2019, and you were recovering from an illness.  That was
16  an introduction, you know, somewhat brief meeting.  And
17  I remember that meeting as well.
18           I want to ask whether it's possible that you
19  might recall a second meeting that we had in the
20  courthouse in early 2020 where I was with another
21  individual, an African American woman?
22      A.   Yes.  Okay.
23      Q.   Okay.
24           So now that I'm, sort of, asking you, are you

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 381..384

Page 381

1  now recalling that we've actually met in person two
2  times in the federal building; is that right?
3      A.   Yeah, I think I put those two meetings
4  together in my mind.  My apologies, yes.
5      Q.   I thought that too, but I didn't want the
6  record to be unclear.
7          Do you remember that it happened to have been
8  a court appearance that I was in the courthouse for for
9  this case, and that I had somebody from the National
10 Fair Housing Alliance with me to meet you?
11     A.   Okay.  Yes.
12     Q.   So is that -- is your memory refreshed now
13 about the two meetings?
14     A.   Yes.
15     Q.   Okay.
16     A.   Yes.
17     Q.   And I also wanted to ask you -- and you've
18 mentioned today the cash for relocation bundle.  And I
19 wanted to you to explain, if you can, what this is, because
20 it sounded like there were some similarities in a way to
21 the initial services bundle, but it was a cash for
22 relocation bundle, and if you could explain that,
23 please.
24     A.   So when -- I'm actually going to start from

Page 382

1  the beginning with the CFR.
2          If we go to do a biweekly inspection on a
3  property that we deem to be occupied at the time, we are
4  going to automatically leave a cash for relocation
5  letter on the door for the mortgagor.  The mortgagor
6  then has the option to call the servicer, which would
7  have been Altisource, and express their interest in
8  receiving the cash for relocation deal.
9          The coordinators at Altisource would negotiate
10 that cash for relocation amount.  Once something was
11 settled in between Altisource and the occupant -- it
12 could have been a mortgagor or it could have been an
13 occupant depending on the situation -- then we would get
14 a CFR -- sometimes we get a CFR document collection,
15 where Altisource will request we send over the -- get
16 the copies signed of the cash for relocation agreement,
17 if that tenant or that occupant or mortgagor didn't have
18 the means to do so, copies -- sometimes copies of
19 Socials or, i.e., identification IDs, driver's licenses,
20 and I believe either a -- and a tax document, which
21 could have been a, W-9, I believe, per what I recall.
22         So we would get a CFR document collection.
23 Once all of those documents were submitted and the
24 Altisource coordinators had that, then they would agree

Page 383

1  on a vacate date.
2          And so on that vacate date, that would trigger
3  the work orders that we would receive in the field to
4  complete where we would go to the property and we would
5  meet with whoever was occupying the property at that
6  time.  They would give us the keys to the property.  We
7  would go do a walk-through inspection to determine
8  whether or not the property was left in broom-swept
9  condition, because you had a check that they would
10 deliver for the trash, for the property being in
11 broom-swept condition, and for -- it was either the
12 actual -- it was either the document collection or just
13 a regular cash for relocation assistance check.
14 However, it would come in the form of more than one
15 check.
16         The trash check would be separate, depending
17 on what we saw in the field, if a property had been less
18 than broom-swept condition.  If a property was not left
19 in broom-swept condition, then we would reach out to our
20 CFR coordinator in the field and let them know that
21 there still was trash left in the property or around the
22 property and let them decide whether or not we wanted to
23 deliver the trash check or not to the occupant.
24         And then that's what would trigger that order;

Page 384

1  so we'd have the CFR document collection, the actual
2  cash for relocation order, which came with an initial
3  secure, and an initial janitorial.
4          We would do an REO clean-out, if the property
5  was not left in broom-swept condition.  Also, the grass
6  would be cut at that time.  And any deficiencies that we
7  saw inside the property, a bid would be submitted at
8  that time.
9      Q.   So there's some, kind of, nuances, because
10 you're waiting to see when you go in to meet these
11 people are some of the things that they could receive a
12 check for in order to relocation done or not; would that
13 be fair?
14     A.   Specifically the debris or any trash left at
15 the property.
16     Q.   And so if they -- if the occupant did not
17 remove all the trash and the vendor had to do it, then,
18 in that context, is that when this order would be
19 triggered for trash out?
20     A.   Correct.
21     Q.   And when the keys are turned over, then
22 that's -- for the cash for relocation, that's when the
23 vendor does the initial services for the cash for
24 relocation property?



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 385..388

Page 385

1    A.  That's correct.  Although we receive the keys
2  for whatever lock is on the door, we would at that time
3  install the digital mechanical lock on the front door.
4    Q.  Did you make it a practice at Agnew Field
5  Services to undertake all the standard preapproved items
6  that you could on -- when you initially took over a
7  property?
8    A.  Yes.
9    Q.  And did you continue to try to observe -- when
10  you went back to the property, on occasions that you
11  might have gone back, to see if there were any other
12  standard preapproved items that could be done on an
13  ongoing basis?
14    A.  That's correct.  It was part of my training
15  with my vendor.
16    Q.  And when you did see those -- you mentioned
17  earlier that even though something is standard or
18  preapproved, you have to as the vendor create a vendor
19  estimate in VMS for those?
20    A.  Correct.
21    Q.  And why is that the case?
22  MS. KRIGSTEN:  I'm going to object to form.
23  MR. PRINCE:  You could answer, Nakia.
24  BY THE WITNESS:

Page 386

1    A.  Per my understanding, with the amount of
2  portfolios that Altisource had at the time and in
3  regards to resources, the client took the stance of
4  allowing certain items to be created with the
5  preapproval process.  And even going back to the
6  training, this was an easier way for Altisource to not
7  have to go in and look at the photos and create
8  individual work orders and send them out in that aspect
9  with resources.
10    So we had the ability to create those vendor
11  estimates for specific items at any time at a property
12  as long as it didn't exceed the TPC or if it wasn't in
13  litigation status.
14    Q.  So is it the case then that the reason the
15  vendors created it was -- that was how it would be
16  initiated; so they're initiated by the vendor?
17    A.  Yes.
18  MS. KRIGSTEN:  So, Jennifer, are you limiting your
19  question to what she knows?  Are you asking her
20  specifically, like, her experiences here?
21  MS. SOULE:  Yes.
22  BY MS. SOULE:
23    Q.  What I want to know is your understanding of
24  the Altisource policy or practice.

Page 387

1    A.  Yes.
2    Q.  So let me reask the question.
3    Based on your experience with Altisource and
4  its process, was it the case that the standard
5  preapproved items that were not specifically in the
6  initial services bundle that were not the routine
7  services, that those -- in order for those to get done,
8  the vendor would initiate the estimate?
9    A.  Correct.  And that is part of the training as
10  well.  If I spoke to a coordinator after a successful
11  cash for relocation and pointed out some deficiencies,
12  then I would be told to create the vendor estimate.
13    Q.  And so can you -- do you know or can you vouch
14  for what other vendors besides you did?  You testified
15  that you made a point to try to identify standard
16  preapproved line items and initiate these vendor
17  estimates.
18    But do you know whether all the other vendors
19  did the same thing?
20    A.  No, I --
21  MS. KRIGSTEN:  Object to form.
22  MS. SOULE:  I'm sorry.  Your answer was?
23  BY THE WITNESS:
24    A.  No.  I don't know that for certain.  I don't

Page 388

1  know how they had their system structured to how they
2  handled their vendor estimates.
3    Q.  And with respect to then the category of
4  nonstandard work items, we've, kind of, had some lists
5  that were brought out today, there's the routine
6  services, then there was a standard preapproved items
7  that you listed.
8    Other than -- is there a list of nonstandard
9  items out there?
10    A.  Correct.  The nonstandard line items are more
11  than the standard items.  There is, during my tenure and
12  per what I recall, over -- in between 50 -- I would
13  safely say in between 50 to 100 nonstandard items in
14  VMS.
15    Q.  And with respect to those, are those also of
16  the nature that the vendor would initiate a vendor
17  estimate in order to get those done?
18    A.  Yes.  However, when you create a vendor
19  estimate for a preapproved line item, you can submit at
20  that time the before, the during, and the after photos
21  as a preapproved item.  When you're creating a vendor
22  estimate for a nonstandard item, you are giving the
23  before photos and the bid and waiting for the approval.
24  MS. SOULE:  That's all the questions that



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 389..392

Page 389

1  plaintiffs have in follow-up.
2      MS. KRIGSTEN:  Okay.  I'd like an opportunity to
3  consult with my co-counsel.  So why don't we take a
4  ten-minute break, and we'll come back.  Thanks.
5      THE VIDEOGRAPHER:  Time is 3:40 p.m.  We are now
6  going off the record.
7              (A short break was had.)
8      THE VIDEOGRAPHER:  The time is 3:51 p.m.  We are
9  now back on the record.
10     MS. KRIGSTEN:  At this point, we would like to
11 leave the record open to address the privilege issues
12 that have not been resolved through the testimony.  It
13 seems as if there's some questions about privilege and
14 potential waiver that we're going to need to sort
15 through.  And so other than that topic, we don't have
16 any questions, but we'd like to leave the record open to
17 address those issues.
18     MS. SOULE:  Well, I mean, I guess you can take
19 position, we don't agree with it.  But obviously we'll,
20 you know, work with Ms. Agnew's counsel in that regard.
21 If you have some specific concern, I invite you to -- on
22 any front, I invite you to bring it to our attention,
23 and then we can hopefully finally resolve it.
24     MR. PRINCE:  I'd like to talk about it right now,

Page 390

1  so we don't have to talk about another potential
2  deposition, which I will object to sitting for anything
3  more than we already have.
4          So if there is an issue you'd like to discuss,
5  I think now is the appropriate time to do that.
6      MS. KRIGSTEN:  I understand you think that.  But I
7  think that we've gone as far as we can, without
8  understanding more from Ms. Soule and getting some
9  additional records potentially from Ms. Agnew on this
10 topic.
11         And so for today, I think we're done with the
12 questions on it, we'll leave the record open.  And if we
13 have to address it, you know, in a different forum, we
14 can do that.  But there are definite issues that have to
15 be resolved outside of this conversation.
16     MR. PRINCE:  That's fine.  You do what you want to
17 do.
18     MS. KRIGSTEN:  Thanks.  Okay.  Thank you.
19     THE VIDEOGRAPHER:  Is that it for everyone, before
20 I take us off the record?
21     MS. SOULE:  Yes.
22     MS. KRIGSTEN:  Yes.
23     THE VIDEOGRAPHER:  Okay.  The time is 3:53 p.m.
24 This concludes today's deposition.

Page 391

1              (Discussion off the record.)
2      THE STENOGRAPHER:  Ms. Krigsten, same order as last
3  time?
4      MS. KRIGSTEN:  Yes, please.
5      THE STENOGRAPHER:  And will you be forwarding the
6  exhibits that you mentioned to attach, or are you going
7  to retain them?
8      MS. KRIGSTEN:  We can forward them, so that they're
9  attached, that's fine.
10     THE STENOGRAPHER:  And, Ms. Soule, same order as
11 last time?
12     MS. SOULE:  Yes.  Thank you.
13              (Discussion off the record.)
14     THE STENOGRAPHER:  And, Mr. Kliebard, same order as
15 last time?
16     MR. KLIEBARD:  Yes, thank you, same order.
17              (Witness excused.)
18
19
20
21
22
23
24

Page 392

1          IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION
3  NATIONAL FAIR HOUSING        )
   ALLIANCE; HOPE FAIR HOUSING  )
4  CENTER, et al.,              )
                                )
5                               )
                                )
6          Plaintiffs,          )
                                )
7      vs.                      )  No. 1:18-cv-00839
                                )
8  DEUTSCHE BANK NATIONAL       )
   TRUST, as trustee, et al.,   )
9                               )
                                )
10         Defendants.          )
11
       I, NAKIA HAYES AGNEW, state that I have read
12 the foregoing transcript of the testimony given by me at
   my Volume 2 videotaped remote deposition on the 3rd day
13 of May, 2021, and that said transcript constitutes a
   true and correct record of the testimony given by me at
14 the said deposition except as I have so indicated on the
   errata sheets provided herein.
15
16
17        _____
                 NAKIA HAYES AGNEW
18 No corrections (Please initial) _____
   Number of errata sheets submitted ____ (pgs.)
19
   SUBSCRIBED AND SWORN to
20 before me this _____ day
   of _____, _____.
21
22 _____
        NOTARY PUBLIC
23
24



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

Pages 393..395

**Page 393**

```
1    UNITED STATES OF AMERICA      )
     NORTHERN DISTRICT OF ILLINOIS )
2    EASTERN DIVISION              )   SS.
     STATE OF ILLINOIS             )
3    COUNTY OF COOK                )

4

5

6           I, April M. Metzler, Certified Shorthand
7    Reporter, Registered Merit Reporter, Certified Realtime
8    Reporter, do hereby certify that NAKIA HAYES AGNEW was
9    first duly sworn by me to testify to the whole truth and
10   that the above videotaped remote deposition was reported
11   stenographically by me and reduced to typewriting under
12   my personal direction.
13          I further certify that the said remote
14   deposition was taken at the time and place specified and
15   that the taking of said deposition commenced on the
16   3rd day of May, 2021, at 9:04 a.m. CST.
17          I further certify that I am not a relative or
18   employee or attorney or counsel of any of the parties,
19   nor a relative or employee of such attorney or counsel,
20   nor financially interested directly or indirectly in
21   this action.
22
23
24
```

**Page 394**

```
1           In witness whereof, I have hereunto set my
2    hand and affixed my seal of office at Chicago, Illinois,
3    this 14th of May, 2021.

4

5

6

7

             APRIL M. METZLER, CSR, RMR, CRR, CRC, FCRR
8            180 North LaSalle Street
             Suite 2800
9            Chicago, Illinois 60601
             Phone:  (312) 236-6936
10
11   CSR No. 084-004394
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 395**

```
1    Errata Sheet
2
3    NAME OF CASE: National Fair Housing Alliance vs Deutsche Bank National Trust
4    DATE OF DEPOSITION: 05/03/2021
5    NAME OF WITNESS: Nakia Agnew Hayes, Vol. II
6
7    Page _____ Line _____ Reason _____
8    From _____ to _____
9    Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   _____

     SIGNATURE OF DEPONENT
```



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021                                    1

**Exhibits**

**EXHIBITS Agnew, Nakia Hayes - Vol. II - 791139**

**$**

**$10,000** 340:3,7
**$12,000** 340:4,7
**$5,000** 284:1
**$500,000** 348:17, 21
**$8,000** 346:17,20 347:2,6,9,14

**0**

**0** 257:11
**0000374** 263:2

**1**

**1** 257:11 380:5
**1.1** 244:1
**100** 388:13
**100-** 362:1,7
**10:06** 228:9
**10:35** 249:14
**10:40** 249:17
**11** 241:3
**11:37** 288:10
**11:55** 288:13
**12** 240:19 241:6 365:6
**120,000** 362:2,7
**12:44** 320:23
**13** 242:11
**13th** 255:9
**14** 361:3
**158** 380:6

**15th** 239:6 240:2,9 271:16 272:8,15, 21,23
**16** 255:10 283:10
**16722** 234:3 238:11 278:12 279:4
**16th** 239:24 271:20 272:1
**17** 255:17 261:24
**18** 256:13 264:17
**19** 257:14,16
**1978** 373:22
**1980s** 374:15
**1990s** 373:10
**1:45** 320:20
**1:47** 321:2
**1st** 298:17,22

**2**

**2,463** 306:11
**2,483** 306:12
**20** 374:19 375:7
**20-** 257:15
**20-enumerated** 290:11
**2000-** 250:11
**2008** 204:10 249:5
**2009-2010** 204:11
**2011** 207:20,22
**2012** 250:11
**2013** 203:6,19,24 206:5 208:8,10 209:17 213:9 225:3 231:2 276:24 277:10,23 278:6 301:21 302:4 330:1,6 331:8 333:5 361:22,23
**2014** 250:6
**2015** 224:24 225:3

**239:7** 250:6
**255:21** 257:8,23 261:10 262:9 263:14 264:11 265:4,16,22 266:7, 17 273:8,19 331:8
**2016** 197:9 225:16 283:9,10
**2017** 225:15 362:10
**2018** 208:8,10 209:17 231:2 276:24 277:10,23 278:6 301:21 302:4 333:5 376:3
**2019** 257:15 298:17,19,22 311:7 313:20 314:6,8 380:15
**2020** 200:12 261:19 318:11 378:18 380:20
**2021** 193:5
**20th** 255:20 262:11,12,13
**21st** 240:14 314:8
**22** 263:22 287:21
**26** 257:13
**28** 203:17
**28th** 196:5 223:17 298:18 313:17
**29th** 313:17
**2:40** 357:17
**2:57** 357:20 365:7

**3**

**3.5** 362:13
**30** 312:23
**30,000** 224:19 365:22,24
**30th** 264:11 283:9
**35** 312:23
**38** 361:19

**3:40** 389:5
**3:51** 389:8
**3:53** 390:23
**3rd** 193:5

**4**

**4** 365:6
**4,000** 224:24
**4-** 273:21
**40** 312:23 365:3
**40,000** 273:21
**41** 303:6
**45** 306:5,6
**4th** 257:8,23 261:10,19 262:2,5, 9 264:20 265:4,16, 22 266:6,9

**5**

**5** 257:11
**50** 329:2,3,4,10 366:10 388:12,13
**5001** 233:6 243:23 251:2 263:15 283:6
**5003** 240:18,21 241:5,18
**5004** 242:10 243:6
**5007** 255:8
**5008** 255:16 261:23 262:13 264:16
**5009** 256:13,17,18 258:1 262:24 264:17,24 265:15
**5010** 257:11,20
**5013** 263:21,22 287:20,22
**5032** 303:5,7 305:5 307:3 323:6
**516** 378:15,17 379:4

**6**

**606** 287:10 330:20 331:10 332:3,4 333:1

**7**

**7** 378:18
**70** 366:10
**72** 267:24
**75** 366:11

**8**

**80,000** 309:8
**83** 306:13
**8748** 354:20

**9**

**9:04** 193:6
**9:55** 228:6
**9th** 255:12

**A**

**a.m.** 193:6 228:6,9 249:14,17 288:13
**abandoned** 374:20,22,23 375:5,9,10,13,15
**ability** 199:9 220:3,7,16 229:3 232:17,20 344:22 386:10
**Absolutely** 279:15 288:22 361:6
**accept** 266:6 364:18
**accepted** 362:23 363:2
**access** 203:10 217:9,12 231:3 232:5,10 233:2



235:3,7 272:7
278:5 300:24
301:10,11,12
302:1,3,19 305:6
306:23 307:9
308:7,9 315:10
317:4,5,9 318:1,2,
3,17,22 326:13

**accessed** 318:9

**accessing** 318:14

**accident** 205:14

**account** 318:6,10,
14

**accumulated**
259:4,6

**accurate** 239:11
255:22 264:19
265:14 276:22
298:23 300:23
343:5 344:17
345:19

**acronyms** 209:14
227:3

**Act** 277:20

**acted** 290:6

**activities** 211:6
236:4 243:24
345:20

**activity** 236:1
253:11 255:23
298:1 333:22
345:23

**actual** 304:14
383:12 384:1

**Adam** 325:13

**addition** 298:4
328:3

**additional** 390:9

**address** 234:2
236:2 238:10
278:12 279:3,6
299:19 301:19
325:21 389:11,17
390:13

**addressed** 270:7,
14,19,21 296:17

**addresses**

231:21,24 301:10,
20 302:3 309:9
325:1,2,4,19

**ADT** 204:16

**advice** 285:23
289:3,6,17 291:21
292:14 293:4,7,9,
11,15,18,20,21
294:4,9 295:9
296:13,20 297:6,
19 298:5,7,14
304:4,6 322:22,23

**advised** 283:21
284:3

**affect** 296:7

**affidavit** 200:14,
17,22

**affiliated** 198:20

**African** 311:19
349:20 380:21

**AFS** 380:5

**afternoon** 193:16
370:17

**agent** 210:2

**agents** 290:12,13

**Agnew** 193:3,11,
16 198:19 202:18,
21 203:1,5,15
228:12 231:14,19
232:5,19 234:17,
21 236:19,21
243:17 249:20
253:21 257:18
258:8 259:16
260:15 261:11
262:9 263:12,24
265:13 266:16
268:13 271:2,19,
23 288:16 290:23
292:23 293:15,18
295:21 296:18
321:5 338:14,19
345:11 357:23
365:13 370:17
385:4 390:9

**Agnew's** 292:5
389:20

**agnewfieldservic
es.com** 301:16

**agnewfieldservic
es@gmail.com.**
299:23 301:13,23
302:17

**agree** 253:21
264:10 265:22
266:4 279:11
382:24 389:19

**agreement** 293:2
382:16

**ahead** 229:24
230:18 320:14

**aide** 204:7,8,9,14

**alert** 269:8

**alignment** 249:4
307:5,11

**alike** 247:10

**allegations**
326:23 327:9

**Alliance** 198:6
293:24 299:12
309:22 381:10

**Alliances** 290:12

**allowable** 243:12
248:8

**allowables**
244:13 259:9

**allowed** 259:18
337:9 346:18

**allowing** 386:4

**Altisource**
193:19,20 196:12,
18 197:22 200:10
202:3 207:8 208:7
211:10 212:5,6,11
213:8,10,14,15,23
214:1,12,14,18,22,
23 215:4,8,11,17,
21,22,23 216:3,4,
8,12 218:3,4,9,17
219:2,5,10,23,24
220:9,12,15,18,24
222:3,17 223:14,
18 224:1,4,12,16
229:7,10,13 230:7,
10,13 231:2,22
232:6,12,15,19,22
234:13 235:2
236:9,20 237:6,17

238:1,6,22 242:15
244:18,20 252:1
256:10 268:16
275:6 276:15
279:5 280:1 283:4
284:14 285:3,20,
24 286:5,8 294:10
296:14,20 297:4,7,
23 298:2 299:1
302:23,24 303:17,
24 304:9,16,24
305:2,16,18,21
306:1,10 312:8
318:16 323:10,11
327:18,20 328:1
329:20 330:1
333:13 335:19
336:4,10 342:19
343:19 344:2
350:16 351:11
352:4,6,9,13
353:1,14,17 354:5,
16 356:6 358:12
360:2 361:2,5,8,
17,21 362:11,14,
16,19 363:4,6,12
365:23 366:4,8
367:20 369:1,4,6,
7,15,16 371:7,12,
15 372:7,8 379:6,
10 382:7,9,11,15,
24 386:2,6,24
387:3

**Altisource's**
212:19 219:11
220:6 243:20
244:11 335:15

**American** 311:19
349:21 380:21

**Americas** 370:21

**amount** 225:1
231:3 245:24
258:9 281:9,11
307:4,12 308:22
309:7 331:12,14
336:18 339:5
346:14,15 350:5
358:4 361:24
362:4 382:10
386:1

**AMS** 206:18

**analysis** 329:6
330:11,14

**analyzing** 241:21

**Andrew** 365:1

**annual** 363:14

**anticipate** 202:7

**anticipating**
225:13

**antimicrobial**
336:17

**anymore** 375:1

**apologies** 381:4

**apologize** 209:14
221:3 239:17
249:8 297:10

**apparently**
294:23

**appearance**
381:8

**appeared** 242:1

**appears** 242:7
284:18 294:18
378:18

**apples** 265:8

**applied** 216:22
338:3

**applying** 216:20

**appraisal** 210:18

**appraisals** 212:11

**appraiser** 210:12

**appraising**
210:15

**approval** 244:22
259:10,13,24
268:20 346:14
347:24 348:2
388:23

**approvals** 208:24

**approve** 284:2
336:4 346:19
369:8

**approved** 246:20
253:11,15 280:24
335:24 337:19
347:23 348:3,5,11
349:7,14 369:4,5



**approximate**
357:13 362:7

**approximately**
224:16 356:13,14
362:12 374:19
375:7

**April** 196:5 203:17
223:17 243:3
264:6 283:10
359:20

**area** 204:22,23
205:5,21 213:16
218:12 250:11
263:18 273:12
274:6 281:18
286:15,19 287:9,
14 329:22 331:5
332:9,24 333:1
337:22 349:16
350:1 376:22

**areas** 273:10
286:12 299:3
327:17,22 328:12
332:1,8,9,11,20,21
333:2 337:19,24
349:21,22 350:8,
22 351:21 353:12,
13 358:18

**Ashland** 354:20

**aspect** 259:4
286:1 363:19
386:8

**assess** 218:5,11
267:18

**assessment**
218:16

**asset** 206:9,12
208:18 214:8,9,24
215:3,7,13,15,17
278:24 279:4,7,10,
11 280:1 285:2
306:1 319:3
339:24 340:1,2
348:16,19 352:14,
22 353:20 354:6,
10 369:11,17

**assets** 354:3

**assign** 218:14
229:3

**assigned** 223:23

233:22 235:4
238:17 256:10
319:2 327:24
328:4,9,22 365:24

**assignments**
368:24

**assist** 285:24
315:1

**assistance** 224:8
300:8 383:13

**assistant** 300:10

**assisted** 300:11,
15 324:10

**assisting** 202:10

**associate** 324:10

**associates** 214:4

**assume** 194:11
373:15 376:16
377:17

**assumed** 369:16

**assuming** 251:8
266:8

**assurances**
251:12

**Assurant** 209:15
360:11

**attach** 289:18
391:6

**attached** 391:9

**attend** 363:9,13
364:9

**attended** 275:16

**attention** 339:19
340:8 389:22

**attest** 285:22

**attorney** 196:8
291:24 292:1
300:19 308:2,12
311:18 321:18
325:13 379:7

**attorney-client**
289:8,10 290:8
292:12 293:10
294:11,19,23
295:11,16 308:1,8
309:10 324:19

**attorneys** 290:12
309:9 321:18
325:6,8,10,15
365:17

**attorneys'** 325:3

**auction** 207:2

**August** 239:6
240:2,9,14 258:12
263:14 266:16
378:18

**authorized**
204:16

**auto-triggered**
335:15

**automatically**
382:4

**average** 273:8,18
274:6

**awards** 362:21,24
363:2 364:18

**aware** 285:16
289:9 313:8 340:1,
5 374:18 375:7
376:3,23

---

**B**

**back** 197:9 200:12
204:2 212:4 228:1,
10 231:13 233:4
235:20 239:21
240:14 243:22
249:18 250:15
258:1,12 259:23
262:24 263:1
264:16 273:5,17
276:5 277:17
278:9,11,21
287:19 288:14
290:17 301:7
309:16 314:24
317:24 319:22
320:15,20 321:3,5,
20 322:13 323:4
326:21 335:11
341:3,5,10,18,23
357:21,23 361:24
362:2 363:10
379:20 385:10,11
386:5 389:4,9

**back-charging**
207:24

**background**
213:7 301:18

**bad** 195:7 208:1
247:21 312:22

**Bank** 196:20,22
197:1 227:13,17,
20 356:19 366:21
368:22 370:11,19,
20,23 371:4,9
372:2,5,9

**Bank's** 371:6,22
372:11

**bank-owned**
375:15

**Banks** 193:21

**bar** 323:11

**based** 241:12
268:10 292:19
304:23 331:4,12
338:17 341:19
364:3 387:3

**basically** 312:4

**basis** 385:13

**Bates** 263:2 380:4

**Bates-numbered**
380:3,5

**Beck** 300:20,23
301:11 302:19
305:6,11 306:14,
17 307:1,15,19
308:3,7,9,14
309:1,6 324:22
325:18,21 326:1,8,
12

**Becks** 301:2

**began** 216:11
218:3 225:17,23
330:20 333:1
360:2 361:8,21

**begin** 195:17
203:4 225:11
249:1 287:10
295:23 361:10

**beginning** 222:3
329:20 382:1

**behalf** 193:20
366:4

**believed** 293:1

**beneath** 279:9

**bias** 330:15

**bid** 208:24 210:23
211:22 237:20,23,
24 238:1,5 255:3
268:15,18,23
271:10 278:8,19
279:8 319:2,3
333:22,23 341:4,5
346:14 349:7
356:10 384:7
388:23

**bids** 211:13,16
221:4 277:3
280:23 281:2,13,
21 282:4 287:14
318:21 340:18
346:17 351:20
352:4 364:17
369:3

**bill** 376:11

**bills** 274:15

**binder** 196:1
240:16,19 261:24
303:6

**Bishop** 211:22
360:18,21

**bit** 310:9 341:15

**biweekly** 236:2
240:22 241:8,12
343:12,22 344:3,6,
7 382:2

**blew** 260:22

**blight** 248:24
249:1 250:2

**blighted** 248:21
333:3

**block** 273:16

**blocking** 239:17

**blocks** 249:23

**blow** 260:12

**blown** 260:2

**blows** 260:8,14



**Blues** 373:16

**board** 330:17
331:16

**boarded-up**
249:23

**boarding** 336:22,
23

**BOPS** 212:5,7

**born** 373:23 374:1

**bottom** 200:20
263:2

**box** 305:1

**break** 194:18,24
201:6 227:24
228:8 249:7 288:6,
12 320:15 321:1,6
357:15,19 389:4,7

**breaks** 194:16,17

**briefly** 196:10
379:2

**bring** 246:21
389:22

**broad** 303:1 353:7

**broke** 201:13
242:18

**broken** 263:6

**broker** 212:6

**broker's** 210:18

**broom-swept**
242:23 243:2,3
383:8,11,18,19
384:5

**Brothers** 208:14,
20 373:17

**brought** 388:5

**Brown** 325:14

**building** 311:12,
20,24 312:2,9,13,
18,20 314:3
326:22 327:12,14
380:13 381:2

**buildings** 312:12

**built** 247:11

**bundle** 248:3

252:4 381:18,21,
22 387:6

**burdensome**
376:23

**bursted** 282:3

**bushes** 242:5

**business** 360:1

**buyer** 284:4,5,23

---

**C**

**call** 333:10 382:6

**called** 193:12
200:18 214:13
228:22 229:23
278:23

**calling** 335:3
354:5

**calls** 235:21
310:18,23

**camera** 283:14

**candid** 296:24

**Candidly** 345:7

**candor** 294:20

**cans** 244:6
254:12,17

**capabilities**
223:12

**capacity** 374:24

**capping** 336:19,
20

**care** 205:13 224:9
256:4

**career** 215:11
365:5

**case** 201:19 202:2
229:22,23 230:3,
16,24 232:16
237:3 294:8,22
300:23 304:19
307:23 308:5,16,
20 309:15 327:2,9
340:9 381:9
385:21 386:14
387:4

**cases** 202:11

**cash** 238:19,21,23
242:17,20,21
253:4 332:14
381:18,21 382:4,8,
10,16 383:13
384:2,22,23
387:11

**categories**
233:15

**category** 215:12
388:3

**CC'D** 232:23 233:1

**census** 327:21
333:19 358:17,20

**Central** 193:6

**CFR** 236:2,3
238:19 240:10,11
252:4 382:1,14,22
383:20 384:1

**challenges**
329:15 331:8

**chance** 355:5
378:9

**change** 211:23
254:7 358:3 359:7

**changed** 280:15
336:12

**changing** 219:8
334:22 358:2

**characterize**
241:19

**characterized**
279:24

**charge** 221:4,5

**Chase** 235:10

**check** 383:9,13,
15,16,23 384:12

**checked** 251:11

**checklist** 256:20,
23

**checkmark** 258:3,
6 263:7,9

**checks** 242:18,19

**Chicago** 204:20,

22 263:17 274:24
286:15 331:11
332:2,4 333:1
355:16 356:4,7
358:19

**Chicagoland**
204:23 205:5,21
286:15 358:19

**choose** 292:21

**Christina** 285:8,9

**circumstance**
260:24

**cities** 282:13

**city** 239:3 248:18,
21 249:20 250:3
273:5,8,18 274:9,
11,13,22,24 275:6
276:5,23 278:11,
13 282:5,8,19,22
284:16,20 285:16
286:14,22 331:11
332:2,4 333:1
355:16 356:3,7
373:6 375:24
376:4,12

**City's** 376:5

**clarification**
243:1 290:10
348:13 375:20

**clarify** 203:14
212:20 214:7
216:16 292:2
296:12 343:7
354:23

**clarifying** 377:21

**classes** 210:4,14

**classified** 251:4

**clean-out** 240:3
244:4 252:11
258:12 259:8
263:13 384:4

**cleaned** 263:13
264:13 266:19

**cleaning** 244:1
252:5 360:23

**clear** 210:1 254:16
257:18 283:23
291:19 292:9

301:9 308:7 380:6

**client** 210:24
211:4 246:15
276:6,21 291:21
294:13,23 339:23
367:21 386:3

**client's** 296:7,9

**clients** 206:7,8,10,
12 210:10,21
211:13 260:20
332:7,8 338:11
364:2

**close** 374:6

**closed** 373:22,24

**closure** 374:3

**Club** 372:16,18,21

**co-counsel** 389:3

**coaching** 345:3

**code** 221:7 222:7
226:23 227:1,16,
17 274:15 275:15
285:10 331:10
366:14

**codefendants**
364:20

**codes** 227:14
287:9 318:24
330:20,24 331:3,4,
7,19 332:3,4,24
333:1

**Cody** 228:14
261:21

**cold** 312:22

**colleagues**
228:14

**collection** 236:3
323:4 382:14,22
383:12 384:1

**collectively**
370:23

**color** 351:18 352:3

**column** 233:16
234:15,16 235:20
236:7,12,14,24
237:9,20 238:12
239:13 283:17



**columns** 235:19
253:14

**comments**
236:15,18,19,23
237:2 292:16
319:19

**commercial**
354:23,24 376:18

**common** 196:11

**communicate**
229:16,20 231:22
321:21 322:2,5,7
335:19

**communicated**
196:21 197:6,15
198:20 199:3
229:13 310:19
327:6 364:6 371:3

**communicating**
222:6

**communication**
197:10,12 215:2
220:5 222:5
230:12,15 233:9
236:14 238:22
342:13,18,19
367:7 378:23
379:3,10

**communications**
233:7,24 235:17
237:2,4 283:16
293:24 299:24
300:1 304:18
305:2 310:14,15
324:19 326:5,18
327:1 342:3,11
371:24 372:4

**communities**
211:3 328:6,9,17,
23,24 329:18
330:2,6,15 331:18,
19 351:18 352:2,8
353:7 354:1 358:3,
5,6,8,23 359:7
370:8

**community** 250:9
328:14,15,16,19
353:24 359:1,3,5,
6,23 373:3

**companies**
208:11,13 213:17

290:13,15 353:2,3
361:20

**company** 196:13
202:18 206:24
207:3,6,16 208:17,
22 209:11,12,14,
16 211:9 314:20
360:13,16,24
370:21

**comparables**
273:14

**comparisons**
211:2

**compel** 295:8

**complete** 224:18
244:22 245:5
246:17 265:24
283:22 383:4

**completed** 203:9
207:22 240:12
247:16 248:4
255:4,6,7,8,19,20
256:9 257:6,7,9
258:2,11 282:3
283:10 331:15
335:11 348:5

**completely** 199:1
246:7,8,11 344:21

**completion** 272:5
351:11,14

**component**
214:13,18,22
216:7

**compound**
201:11

**compromised**
337:5

**concept** 346:9

**concern** 389:21

**concerned**
330:18

**concludes** 390:24

**condition** 242:3,
23 243:3 253:8
357:11 383:9,11,
18,19 384:5

**conditions**
241:23

**conducted** 193:3

**conference**
314:10

**conferences**
362:23 363:9,12,
13,16,22 364:9,12,
14

**confident** 307:14,
19

**confidently**
276:19

**confirm** 228:15
287:6 306:16
307:1 308:18
344:7

**confirmation**
197:24 217:13
307:17 364:11

**confirmed** 306:18
343:24

**confirming** 309:1
334:18,22

**confusing** 202:20
305:20

**connect** 364:15

**connected**
317:21

**connecting** 364:4

**connection** 236:5
257:9 322:22

**considered**
250:21 279:4
292:23 294:6
329:14 346:11
347:9 362:17
375:15

**consist** 210:22,23
331:10 334:16

**consistent** 265:7

**constant** 230:12

**consult** 303:19
389:3

**consulted** 325:8,
11

**contact** 197:20
230:13 260:20,21

288:16 298:16,18
299:11 301:8
309:17 319:5

**contacted** 288:19
289:2,23 309:20
310:3 317:3

**contacts** 199:14

**contained** 241:18

**context** 354:8
384:18

**continue** 280:2
334:5 385:9

**continued** 279:16
334:1

**continuing** 193:2

**contours** 295:1

**contract** 196:13
207:16 236:6
237:14,15,16
243:21 254:5
259:13 268:21
336:7 348:4,15
362:16

**contractor** 229:4
300:17 371:15

**contractors**
259:17 282:17,24
353:5 361:19
372:8

**control** 253:16
271:6

**convenience**
205:20,23

**conversation**
294:2 298:22,24
299:7,9,15,17
309:6 311:16
312:4 327:16
367:2,14 390:15

**conversational**
195:7

**conversations**
238:24 285:15
309:19 310:1,16
313:18 372:1

**converted** 254:5

**converts** 259:12

**conveyance**
213:20

**conveyed** 213:21
214:2

**coordinator**
219:15 224:6
230:16 346:22
351:1 360:11,14
383:20 387:10

**coordinators**
221:6 222:7,24
230:14 239:1
275:8,11 342:14
351:3,6 364:5,17
382:9,24

**copies** 217:7
251:6 275:14
277:14,24 320:8,
11 382:16,18

**copy** 217:15
276:2,5 277:9
278:2 380:4

**corner** 241:4

**correct** 200:20
201:1 208:9 209:3,
5 216:14 218:8,19
223:5 226:11
227:5,21 229:11
231:12 237:7
243:19 245:17
246:5 247:12
252:12,21 254:18,
21,24 256:22
262:14,15 263:16
269:2 270:2
278:16 279:1
281:1 285:18
303:9,20 324:14
326:20 329:12
333:16,20 335:7
348:7 353:1 355:1
366:23 368:2,10
369:5 371:4,5
373:3,4,6,7,22
374:4,7 376:1,2,15
380:10 384:20
385:1,14,20 387:9
388:10

**correction** 230:18

**correspondence**
299:20



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

6

**cost** 248:11 284:1

**counsel** 193:8
198:12 311:9
380:4,5 389:20

**Countless** 211:8

**Country** 372:16,
18,21

**County** 328:13

**couple** 194:7
233:14 235:19
364:21 377:20

**court** 295:13
355:16,18 356:10,
16,24 357:4,6,12
381:8

**courthouse**
380:20 381:8

**covered** 363:21

**crash** 249:5,22

**create** 229:22
254:4 259:11
280:13 300:8
304:5,23 335:12,
21 336:6 337:21
340:12 342:1
343:1 385:18
386:7,10 387:12
388:18

**created** 244:13
292:12 302:22
386:4,15

**creating** 254:13
303:23 306:19
335:17 388:21

**crisis** 329:19
330:3,8,11 376:1

**CROSS-
EXAMINATION**
193:14 365:19
370:15

**cubic** 242:16
252:12

**current** 270:4
380:5

**customer** 220:5

**cut** 256:7 258:19,
20,22 259:5,17

262:19,22 267:24
268:1 271:20
272:1,3,4,12
344:18 345:24
368:14,15 384:6

**cuts** 208:24 256:8,
9 258:14,16

**Cutsinger** 212:1
360:6,19,22

**Cutsinger/bishop**
277:2

**cutting** 272:8
334:17,20,24

**cycle** 334:2 335:6

---

**D**

**daily** 223:4

**damage** 281:12

**damaged** 267:23,
24

**data** 358:18

**date** 193:5 240:11
254:5 255:21
257:22 258:10
271:13 299:16
311:7 318:12
378:18 383:1,2

**dates** 255:13
313:13

**day** 204:5 223:22
230:14 261:7
265:24 267:20
268:14 269:5,6,7,
10,14,19,21,24
270:3,8 271:3,5
272:13,21 296:17
307:10 321:23
322:3 326:15,18
372:15

**day-to-day** 216:8

**deal** 243:8 283:20
284:12 295:4
382:8

**dealer** 204:16

**dealt** 356:15

**Deane** 325:14

**debris** 242:8,10,
14,19,24 243:8,13,
18 254:10 258:21
259:4,6,20,22
260:8,22 384:14

**decide** 383:22

**decided** 312:14
360:15

**deciding** 212:24

**decision** 369:8

**decisions** 369:13

**declaration**
200:18,22

**decline** 359:22
372:20,24 373:14

**declined** 333:22,
23 373:9

**deed** 284:13 355:5
366:19

**deem** 382:3

**default** 206:20
331:15 332:10
352:22

**defendants**
308:15,19 323:20
324:24 370:19
374:4 377:14

**defendants'**
241:5 256:18
257:10,19 258:1
264:24 265:14
303:5,7 305:5
307:2 323:6
372:19,23

**deficiencies**
246:18 267:9,14
270:5,7 271:9
281:15 282:1
384:6 387:11

**deficiency**
246:14,18,19
267:7 268:4
270:10,14,18,21

**define** 292:4

**definite** 390:14

**definitions**
290:18

**dehumidifier**
336:21

**delete** 231:5,6
309:14

**deleted** 308:6
309:11

**delinquency**
332:18,19

**delinquent**
331:21,22 332:12

**deliver** 383:10,23

**demographics**
357:24 358:2,18,
20 370:4

**demolish** 356:11

**demolished**
356:21,24 357:2,3

**demolition**
355:22 356:4,7,10,
15,24 357:4,6,8,12

**demonstrating**
210:24

**denied** 369:4,5

**deny** 369:8

**depart** 360:16

**department**
213:22 221:7
285:10

**departments**
222:8

**depend** 270:9
273:11 281:11
282:9,11

**dependent**
374:14

**depending** 248:1
273:23 281:8
338:6 349:12
382:13 383:16

**deposition** 193:3
194:4 195:14
201:6 206:23
297:11 301:14
321:11,14,16,22,
24 322:3,8,11,19
371:3 390:2,24

**description**
222:11

**designed** 378:21

**detailed** 252:17

**details** 239:4

**detectors** 336:19

**deteriorate** 250:5

**deteriorated**
250:6

**determine** 241:14
281:10 303:19
308:23 383:7

**Deutsche** 193:21
196:19,22 197:1
227:13,17,20
356:19 366:21
368:22 370:11,19,
20,23 371:3,6,8,22
372:2,5,9,11

**develop** 361:17

**developed**
303:11,17

**developing**
303:14

**development**
208:15 213:22

**differed** 367:24

**difference** 202:19
296:23 334:14
335:17 348:2

**differences** 245:7

**differently** 248:1

**difficult** 250:13
282:14,21,23
283:20 284:11

**difficult-to-
pronounce**
198:17

**difficulty** 310:10
331:16

**digital** 251:1,19
252:2,3 253:5
337:1 368:18
385:3

**direct** 197:9 199:6
238:22 367:7



**directed** 295:15

**directing** 355:18

**directives** 197:22

**directly** 196:24 197:6,20 229:2 231:7 234:13 237:17 252:1 259:12 342:5 369:20

**disallowed** 355:12

**disapproved** 351:21

**disapproving** 352:4

**disclosed** 313:12 321:18 327:15

**discoloration** 281:24

**discuss** 312:10 315:7 327:15 390:4

**discussed** 206:17,18 298:24 369:24

**discussing** 216:18 268:3

**discussion** 230:21 243:4 249:16 314:10 370:14 391:1,13

**discussions** 295:15 316:15

**displayed** 262:20

**disposal** 244:8

**disposed** 254:20

**dispute** 379:5

**disputes** 379:8

**Dixie** 373:15

**document** 199:16,18 200:18 201:18 219:8 228:14 234:1 236:3 240:8,24 257:19 264:21 265:1,3 276:10

309:5 314:17,18 315:6,7 350:20 382:14,20,22 383:12 384:1

**documentation** 200:9 317:13

**documents** 199:23 201:19,22, 24 240:10 275:23 276:2,20 277:8 304:10,12,13 305:24 306:11,15, 16 308:14 315:23 319:13,15,24 320:1 323:14,18, 19,22 326:12 350:16 362:3 369:22 372:12 379:22,24 380:2,8 382:23

**domain** 231:15,19

**Donesha** 360:6,11

**door** 206:24 336:23 361:17 382:5 385:2,3

**doors** 336:24

**double** 298:10

**doubt** 295:12

**download** 230:17

**downloaded** 320:13

**downloading** 300:11

**downspout** 281:23

**downtown** 311:12,21 312:12

**drafts** 209:13

**Drive** 251:7 278:12

**driver's** 382:19

**drop** 225:1

**due** 269:6 330:11

**duly** 193:12

**dumped** 261:1

**duplicate** 324:3,4, 5,6,8,13

---

### E

**earlier** 234:8 301:14 351:2 365:21 366:24 379:21 385:17

**early** 198:15 380:20

**easier** 193:22 201:8 284:4,22 325:7 332:15 386:6

**easy** 282:17

**eat** 377:6

**economic** 329:15, 22 330:3,8,11 331:8

**economically** 329:14

**edged** 268:2

**educated** 374:11

**education** 363:17

**educational** 364:8,13,15

**effect** 254:9 377:7

**efficient** 309:13

**electric** 282:1

**electrical** 254:12 282:1 336:20

**electronic** 277:9

**electronically** 278:3

**email** 197:9 203:8 217:11,13 229:17, 19 230:9,12,19,24 231:1,4,14,21,24 232:2,3,23 276:8, 24 299:18,19 300:1 301:10,12, 17,19,20 302:3,16 303:9 304:2 305:2 307:15 308:23 310:13,15 315:21 317:17 320:12

322:16 323:4 324:1 325:1,2,4, 19,21,24 326:12 342:4 364:7 378:1, 17

**emailed** 199:19 275:2,11 276:7 302:11 323:22

**emails** 201:23 217:14 230:6 231:5,6,7,10,18 232:1,6,9,11,14, 18,21 233:2 276:1, 11 277:6 300:3,7, 11,18,22,24 301:3, 5,9,14,24 302:5,9, 12,19,21,22 303:2 304:14,18,22,24 305:7,10 306:6,12, 13,16 307:4,7,9, 11,15,20,22,24 308:1,4,8,9,10,11, 19,22,24 309:1,7, 9,16 310:9 315:1 317:8 320:9 321:15 324:3,4,5, 6,9,11,14,23 325:19 326:11 372:1

**emergency** 224:9

**employee** 215:22, 23

**employees** 220:23 360:3,5 361:2,3

**employees'** 302:3

**encompasses** 353:1,3

**end** 193:22 204:10,11 361:1

**ended** 305:15 307:11 355:7

**engaging** 379:3

**ensure** 251:11

**entailed** 222:12

**entered** 283:7,8

**entire** 265:8 365:4

**entities** 198:7

**entries** 237:19 253:9

**entry** 239:6 252:5 283:6,12,16 284:10 285:17

**escalate** 379:9

**escalated** 197:8 224:7 239:3 275:16 347:12 379:11

**established** 333:12

**estate** 210:2,4,5,8

**estimate** 208:17 224:18,24 248:4 254:4 259:12 335:12,21,24 336:6 340:12 341:6,11,18,23 342:2 343:1 385:19 387:8,12 388:17,19,22

**estimates** 244:12 254:14 280:14 340:18 386:11 387:17 388:2

**evaluate** 219:22, 24

**evaluated** 268:16

**evaluation** 256:24 261:17 262:4 265:6 266:9 267:8 268:18 273:13

**evictions** 208:23

**evidenced** 285:17

**exact** 240:11 299:16 318:12 362:4

**EXAMINATION** 377:22

**examined** 193:13

**examples** 281:21

**exceed** 243:12 337:14 386:12

**exceeded** 312:23 340:13,16,22 341:3,10,23 342:7,



15,20,23 343:2
346:14,17

**exceeds** 248:7

**Excel** 233:7
319:20

**exclusive** 340:19

**Excuse** 227:15

**excused** 391:17

**executed** 268:20

**exempt** 283:21

**exhibit** 233:6
240:18,21 241:2,3,
5,17,18 242:9,10
243:6,23 251:2
255:8,15,16
256:13,16,17,18
257:10,20 258:1
261:20,23 262:13,
24 263:15,21,22
264:16,24 265:15
283:6 287:1,6,19,
20,22 303:5,7
305:5 307:3,13
309:3,4 319:21
378:4,9,15,17
379:4,18

**exhibits** 195:22
196:7 238:18
240:15 255:5
264:9 323:6
377:24 391:6

**exist** 247:1

**existed** 289:10
326:11

**existing** 206:21

**exists** 297:14

**expectations**
217:3 222:4

**expected** 244:18
252:8 256:5
343:19 344:2

**experience**
203:19,24 209:19
210:7 213:4,17
224:1,12 245:10,
14,21 249:2 260:7
282:7 285:22
286:1 311:14

312:6 313:23
341:19 345:11,15,
20 346:5 347:10
350:5 352:7 359:3,
4 387:3

**experienced**
312:10 358:22

**experiences**
299:2 312:7 314:1
386:20

**expert** 194:6

**explain** 294:16
379:2 381:19,22

**explained** 204:5
206:23 285:12
296:23

**explaining** 206:19

**explanation**
199:18

**explore** 285:20

**export** 300:18
304:2

**exporting** 305:15

**express** 382:7

**extent** 253:13,14
322:17 344:20

**exterior** 240:22
241:9,19,21,22
242:8,24 243:14
255:23 256:4
259:2 336:24

**extract** 301:6
307:20

**extracted** 301:3,4,
6 307:4,8,10,15
308:3,4,14,22
309:1,8 324:7

**extracting** 307:11
308:10 310:9
324:10

**extracts** 309:13

**extremely** 283:20

**eyes** 346:22

**F**

**faces** 375:24

**facing** 329:14,19,
22 330:7,10 331:8,
20

**fact** 266:8 269:9
286:24 335:20

**failed** 271:24

**fair** 195:12 198:6
209:24 242:3
245:3 247:9
248:13 256:3
267:18 269:23
271:23 290:11
293:24 297:15
299:12 309:22
348:23 349:1
362:9 364:8
367:13 373:8
381:10 384:13

**fairly** 282:17
330:16 368:12,15

**fall** 215:12 263:17

**familiar** 214:16
215:1 226:4
228:16 233:10
248:18 331:4
350:7 358:2 373:6,
15 374:8

**famous** 373:16

**Fargo** 225:9,12,
17,24 226:5,8,12,
14 367:23 368:14,
20

**fascia** 281:23

**fast** 195:3

**faster** 378:13

**fault** 374:3

**February** 298:17,
22 314:8

**federal** 295:13
311:12,20,23
312:2,9,20 314:2
326:21 327:11,14
380:12 381:2

**Fedex** 320:7,11

379:21

**feel** 194:12

**feeling** 312:21

**fell** 328:19 331:11

**field** 196:14
202:18,21 203:1
208:14 209:2,20
214:12,13,14
215:9 216:3,4
218:11 219:23
220:1,4,13,16,19
222:17 223:7
224:15 231:14,19
232:5 234:17,21
236:19,21 243:17
258:8 259:16
260:7,15 261:7,11
262:10 263:12
265:6 266:9
268:14,19,20
271:2,8,19,23
287:5 288:3 297:1,
23 298:2 299:2
312:6 313:24
314:12 331:5
338:15,20 352:14
353:4 360:12
361:14 365:22
368:24 371:12
383:3,17,20 385:4

**Fields** 372:16

**figure** 194:13
296:16 304:20

**files** 275:7,12

**fill** 216:12

**filmed** 373:17

**finally** 389:23

**financial** 329:19
376:1

**find** 217:15 295:1
313:15 342:22

**fine** 228:4 230:1
251:13 359:19
371:1 390:16
391:9

**finish** 195:10,11
320:15

**finished** 361:16

**finishes** 377:16

**firms** 290:20
300:14 325:15

**firsthand** 208:3
224:3 299:4
341:14 358:22

**fit** 208:3

**fixed** 270:12

**floors** 281:24

**focus** 378:21

**folders** 304:5

**follow** 227:9
351:3,6

**follow-up** 221:6
222:6,24 230:14
346:22 351:1,2,3,6
389:1

**Fontanini** 221:2,
24 222:2,9

**foot** 376:11

**footage** 281:9
336:18

**foreclosed**
374:21,22

**foreclosure**
284:13 331:20
332:22

**foreclosures**
248:23 274:5
331:20 375:10

**form** 256:24 257:2,
4,5,6 262:2,4
265:7 266:9,15,23
267:8,15 341:6
383:14 385:22
387:21

**format** 233:11

**forte** 256:16

**forum** 295:5
390:13

**forward** 391:8

**forwarded** 234:1

**forwarding** 232:2
391:5



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021                                                           9

**found** 357:12
371:19

**fourth** 334:21

**franchise** 206:22

**free** 194:12

**Freedom** 274:8,
10,12,19 277:20

**frequently** 336:13

**friendly** 300:12

**front** 233:6 240:24
265:1 329:6 385:3
389:22

**full** 256:7 362:11

**full-time** 361:3

**fund** 376:5

**funds** 202:7

---

**G**

**game** 297:16

**garnished** 376:4

**gas** 336:19

**gave** 199:22
215:17 218:4
261:15 285:23
300:23 301:12
309:8 318:2 325:1
350:16 362:21

**general** 213:1
282:7 358:12,13

**Generally** 200:16
363:6,8

**gentrify** 358:6

**get all** 195:4

**Giancarlo** 221:1,
24 222:2,9

**give** 215:11
219:10 240:11
246:13 249:11
261:17 273:13
276:6,21 281:21
294:15 301:11
307:12 317:12
318:1,3 336:15
340:2 356:10

**found** 357:13 361:23
374:11 383:6

**giving** 210:23
294:12 388:22

**Gmail** 232:2,4,24
300:18 301:17
302:8 303:1
307:10

**Gochnauer**
235:10

**good** 193:16,17
208:3 216:21
220:8,10 221:14
288:9 289:14
320:21 370:17

**Google** 232:4
302:8

**Gotcha** 241:7

**government**
326:23 327:4,7,8,
13

**gradually** 250:4

**grandfather's**
205:20

**grass** 208:23
256:7,8,9 258:14,
16,19,20,22 259:5,
17 262:19,22
267:24 268:1
269:6,7,9 271:16,
20,24 272:3,4,8,12
280:4 334:16,20,
24 344:18 345:24
368:14 384:5

**grass-cutting**
344:19 345:12,13

**great** 195:24 243:8

**grew** 361:4 373:5

**gross** 362:13

**ground** 194:7

**group** 206:17
378:4

**grouped** 304:1
337:22

**grow** 359:10

**guess** 197:18
253:18 275:4

**341:15** 375:12
389:18

**guidelines**
208:22,23 217:3
219:9 222:20
223:11 244:21
248:2 254:7
280:15 282:12
285:13 338:10
345:18 347:11
363:24

**gutter** 244:1 252:5
270:12 281:23
286:24

**gutters** 263:6,7,
10,13,14,22
264:10 266:18,22
267:22 268:6
287:20

---

**H**

**habit** 195:7 203:1

**habitable** 246:20
247:6

**half** 365:3,10

**halfway** 258:5

**halves** 336:23

**hand-typed**
199:22

**handed** 199:20

**handing** 201:23

**handled** 238:20
388:2

**handles** 232:3

**hands-on** 277:4

**handwritten**
200:2

**hanging** 263:6

**happen** 197:14
250:4 260:18
314:2 335:5
341:12,24 358:16

**happened** 381:7

**happy** 345:9

**hard** 195:6,8
217:15 251:6
275:14 276:2
277:9,24 278:2

**Harvey** 234:3
239:3 248:18
249:21 250:8,9
273:5,8,10,18
274:9,11,13,23
275:1,6 276:23
278:11,13 282:6,
20,22 283:19
284:11,17,20,21
285:13,16 286:22
373:1,3,5,6,9,13,
16 374:6,13,20
375:24 376:3,10,
18,21,24 377:6

**Harvey's** 375:8
377:9

**Hayes** 193:3,11
295:21

**hazardous** 246:2

**hazards** 246:4
247:1 254:11

**head** 199:22

**hear** 198:15 264:6
295:12 352:6,13
353:6,9 354:16
365:13 369:10
370:12

**heard** 208:1 214:3,
5 351:17 352:2,4
353:11,12,16
354:2,4,8,13
362:20 376:6,7
377:5,8,9

**hearing** 294:21

**hearsay** 285:5

**held** 203:19
207:16

**helpers** 288:3

**helpful** 223:10
337:7

**high** 332:18,19,22

**high-priority**
347:13

**high-value** 346:9,

**12,13,21** 347:3,6,
10,11,14,16,21
348:6,9,16,19,23
349:4,6,9,15
351:7,8

**highest** 376:24

**highlighted**
266:23 312:7

**Hills** 372:16,18,21

**hire** 371:11

**hired** 210:17
220:13

**Hispanic** 349:20

**history** 203:5,7,18
270:4 317:12
319:18 320:4

**hit** 305:8

**hold** 215:20 297:2
351:5

**holder** 247:23

**holders** 245:7
247:24

**holds** 371:9

**home** 197:19
273:8,18 277:16
278:7 287:13,15
376:19

**home-** 287:14

**homeowner**
197:20,23

**homes** 249:6,23
273:10,11 370:7
374:19 375:5,8

**Honestly** 332:6

**host** 232:1

**hosting** 232:3

**hot** 353:11 354:13,
17

**hour** 227:24 365:3

**hours** 267:24
365:6,10

**house** 284:5 375:2

**housing** 198:6
213:22 249:4,22



290:12 293:24
299:12 309:22
329:19 330:3,7,8
331:9 381:10

**HSBC** 226:24
227:1,8,9

**HUD** 207:16

**hundred** 198:15

_____

**I**

_____

**i.e.** 238:5 382:19

**idea** 323:16

**identification**
382:19

**identified** 323:19

**identify** 304:10,12
387:15

**identifying**
202:13

**IDS** 382:19

**Illinois** 205:6,22
223:23 224:2,13
234:3 286:7
291:19 327:24
328:13,20 373:1,9,
13,16 374:6,14,20
375:24 376:3,4,10,
18,24

**illness** 380:15

**immediately**
205:1,16 240:9
261:19

**impact** 329:22

**impending**
230:18

**improve** 363:18

**improvements**
272:22

**in-field** 220:4
364:4

**in-person** 313:5

**inactive** 366:2

**inappropriate**
344:24

**include** 198:9
203:8 280:4,7,10,
17 281:19

**included** 281:13
302:12 304:22
305:1 308:11

**includes** 199:4

**including** 274:14
300:5 304:24
310:18

**incorrectly**
244:16

**independent**
372:8

**India** 219:21
221:9,12 223:1

**Indiana** 374:7,9

**indicating** 195:23

**individual** 201:13
226:23 227:3
229:4 230:4
231:24 236:4
260:3 282:11
284:21 286:1
287:21,23 288:5
306:19 307:13
322:15 324:1
380:21 386:8

**individuals**
214:24 221:19,22
223:1 230:6
243:16 258:20
259:16 278:22
313:14 325:9
358:4 359:11,23

**industry** 206:9,20,
21 213:4 351:18
352:2,18,19,21,22,
23,24 353:6,7
354:14 368:5,13

**inferior** 370:7

**information**
199:19 200:19,24
201:2,3 202:1
210:10 228:13
230:19 238:7
272:7 274:8,10,12,
16,19 277:17,20,
22 278:5 291:20,
22 292:13 294:19

**include** 295:11,19 297:19
305:15 306:20,22
307:2 310:11
316:14 317:19
318:1,15 319:23
320:2,10,11 324:6
330:24 339:17
341:8 342:22

**informations**
211:12

**informed** 371:17

**initial** 240:2
244:14 247:19
248:3 250:18,19,
21,24 251:4,22
252:15,19,23
253:2,22,24
258:11 259:22
279:12,14 293:23
298:16,18 327:16
343:15,17,18
380:2 381:21
384:2,3,23 387:6

**initially** 283:20
288:18 299:11
309:19 310:2
385:6

**initiate** 387:8,16
388:16

**initiated** 238:19
386:16

**initiating** 242:20

**input** 303:13

**inside** 384:7

**inspected** 314:14,
16

**inspecting** 272:2

**inspection**
214:20 236:2
240:22 241:9,11,
13 251:4 252:17
262:1,2 265:19,21
266:19,20,23
267:10,11,15
286:12 335:1
343:15,22 344:6,7,
11 382:2 383:7

**inspections**
206:22 207:6
209:13 216:5,6

271:6 275:15
282:1 331:14
332:12 334:17
343:5,9,13,19
344:3 360:13

**inspector** 271:5

**inspectors** 353:4
361:13

**install** 207:1 385:3

**installed** 368:19

**installing** 336:19,
21,23

**institutions** 226:6

**instruct** 295:4
370:6

**instruction**
294:13

**insurance** 209:13
360:13

**integrated** 229:2

**intended** 307:16

**interact** 222:1

**interest** 382:7

**interests** 296:7,9

**interior** 242:24
243:13 334:17

**interject** 292:20

**internal** 271:10

**internally** 214:24
215:3 235:3

**interrupt** 267:4
359:18

**introduction**
380:16

**invested** 211:4
339:5 340:4,7

**investing** 339:23

**investment**
225:20 340:9

**investor** 225:18
226:23 227:16
339:5 340:3 355:2
366:17 368:8

**investors** 226:4,5,
8,17,18,24 227:2,
6,14 377:10

**invite** 389:21,22

**involved** 202:10
212:14,18,21,24
355:18

**issue** 218:14
295:20 347:13
379:9 390:4

**issued** 237:16
243:21 251:24
252:3 253:5
258:18 268:21,24
280:13 283:9
318:18 335:16
348:5,15 349:2,6,
15 355:16

**issues** 222:13,15
246:1 274:14
294:5,7 295:10
325:16 331:9
389:11,17 390:14

**item** 229:23 230:3,
16,23 235:21,22,
24 237:3,10
242:15 252:2,10,
24 254:2 258:24
259:1,21 266:23
283:3 317:12
318:18 319:4
320:4 335:14
336:1,5,11,22
337:3,10,13 369:8
388:19,21,22

**items** 203:8
244:21 245:4
247:16 248:3
250:21 252:13
253:3 256:4
276:17 318:17,18
333:10,13,17
334:4,9 335:10,18
336:8,11,13,14,16
337:19,20,23
385:5,12 386:4,11
387:5,16 388:4,6,
9,10,11,13

_____

**J**

_____

**Jacey** 365:16



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021                                        11

janitorial 240:3
252:23 253:2
384:3

January 298:18
313:17

Jennifer 251:5
253:13 310:8
311:5,6,8,9,10
344:23 386:18

job 204:1,13
205:1,3,16 220:8,
10 221:12,14,20
222:10,11

jobs 203:19,23
204:2 206:6
374:15

jotted 316:15

jotting 316:8

judge 295:12

judged 271:3

judging 271:10

judicial 355:5
366:19

July 239:24

jump 195:5

_____

          K

Karim 219:19

Kelly 211:22 212:1
277:2 360:6,18,19

Ken 370:12,18
373:19

key 303:3

keys 383:6 384:21
385:1

kind 201:11 314:5
384:9 388:4

kindergarten
204:6

Kliebard 370:16,
18 373:20 377:13
391:14,16

knew 351:10
360:22

knowing 350:6

knowledge 218:5,
11,16 300:17
317:11 344:21

knowledgeable
222:13,22 223:6

knowledgeably
330:23

Krigsten 193:9,
15,18 198:13,16,
18 201:10,15,16
206:4 228:5,11
239:15,18,19,21,
23 243:5 249:9,13,
19 251:10,14,17
253:18,20 257:16,
17 261:21,22
265:9,11 266:2,3,
11,13,14 267:3,5
276:14 283:5,11
288:6,8,15 289:9,
15,19,22 290:14,
16 291:7 292:2,8,
16,19,22 294:12,
17 295:23 296:6
297:12,17,18
298:11,12 313:20
320:14,18,21
321:4 344:23
345:3,7,10 346:4
357:15,22 359:16,
21 377:14,19
385:22 386:18
387:21 389:2,10
390:6,18,22 391:2,
4,8

_____

          L

labeled 233:6

Lake 328:13

landscape 208:23
219:8 221:6
241:24 242:1,3,5

larger 234:1
273:11

Latino 349:20

law 290:20 300:14
325:15

lawn 256:4 260:2,9
261:10 281:19

lawsuit 198:7
372:13

lawyer 198:22
290:1,2,6 291:1,3,
8,14,18,20 292:6,
10,11,24 323:2

lawyers 193:18,23
198:9,23 199:4
290:20 310:2,6
315:8,15 316:6,12
321:8,10 326:7

laymen's 292:4

lead 284:13

leaf 255:18 259:2,4
261:23 262:10,21
269:14,15 272:17
280:12

learned 206:20

learning 218:10
226:13

leave 382:4
389:11,16 390:12

leaves 263:17
272:16 280:11

left 203:22 261:11
365:2 383:8,18,21
384:5,14

left-hand 241:4

legal 289:3,6,17
291:17,21 292:14
293:4,7,9,11,15,
18,19,21 294:4,5,
7,9,23 295:9
296:13,20 297:6,
19 298:5,6,14
322:22,23 325:16

legally 291:24

Legalview 193:4

legitimate 296:1

letter 382:5

letters 372:1

level 218:5,11
358:3

liability 376:5

license 228:24

licensed 210:1

licenses 382:19

life 334:2 335:6

limit 286:14 345:5

limited 224:2

limiting 386:18

limits 331:11

lines 217:5 328:1
336:19

Lisa 193:18 201:5
289:13 297:11

list 230:17 233:16
246:13 247:15
256:7 274:15
282:17 283:1
302:22 303:11,14,
20,23 304:2,8
305:4 306:19
313:13 314:13,15,
21,23 315:20,24
316:3,9,17 325:17,
22 336:10,12
337:7 338:2,3,6,
13,15,17,19,20
388:8

listed 303:8 388:7

listings 274:3

lists 388:4

litigation 196:10
279:22 288:20,24
291:2 296:8,10
297:20 302:10
326:23,24 334:5,7
337:15,17 355:8,
12,14,17 386:13

Litton 227:1,11

live 358:4 359:11,
23 372:15 373:12
375:1

living 359:5

loan 251:15

loans 208:18
209:6

lobby 312:1,18

located 219:20
221:9,17,23 223:1

licensed 283:17,19 334:3
354:20

lock 251:1,19
252:2,3 253:5
334:22 337:1
385:2,3

locks 368:18

log 217:21 226:22
229:23 230:3,16,
24 233:7 236:15
237:2,3 239:10
283:17

logo 219:5,6,11,12

long 204:18
205:10 207:4,18
282:24 312:19
314:13 320:18
336:10 386:12

longer 232:9

looked 217:16
269:1 278:12
287:1 305:24
306:1 314:24

loose 258:21
336:20

losing 249:5

loss 209:13 362:3

lot 196:18 213:17
261:7 275:14
330:24

lots 312:12
331:18,19

low 351:18,22
352:3,5,7 353:7,17
354:1,5,9

low-value 278:23
279:4,7,10,11
280:1 306:1
353:20 354:6
370:1

lunch 320:15,19
321:1

_____

          M

made 272:23
274:10,12 299:11
342:12,18 387:15



**Maggie** 310:15

**maid** 280:17
334:17,20,24

**mailing** 236:2

**main** 229:20
302:16 339:22

**maintained** 302:7

**maintaining**
226:9

**maintenance**
255:23 256:4
370:7

**major** 246:18

**majority** 328:15,
16,17,23 329:1,2
333:19 347:22
348:7,9 349:5,9
358:15 366:6,7,9
367:19

**majority-minority**
327:21 328:5,6,9,
14,23 329:11
332:1,17,21
333:18 337:19
348:10 349:10,18
370:8

**make** 193:21
195:8 196:10,15
230:1 233:15
246:2,19,20 247:2,
6 251:8 271:13
278:1 284:22
289:13 291:19
292:9 297:13
302:2 304:21
332:15 333:13
336:3 342:12
345:1 364:24
380:6 385:4

**makes** 195:6,7

**making** 300:12
334:23 364:1
369:13

**mall** 373:16,21,22
374:3

**manage** 226:22
274:14 339:12
366:15

**managed** 367:20

**management**
206:9,13,17
208:16,18 209:4
214:10 215:7
228:18,20 352:23
360:12

**manager** 214:9
215:18 369:11,17

**managers** 215:1,3
352:14

**managing** 215:13,
15

**manner** 296:2

**Manraj-** 221:2

**manuals** 219:2,4

**manufacturing**
374:15

**March** 271:16,20
272:1,8,15,21,23
283:9

**marked** 256:18
263:5

**market** 212:15
213:1 246:21
249:4,22 278:10

**marketing** 207:1
209:23 210:5
212:18,20 214:23
216:7

**Markham** 205:6

**married** 211:24

**match** 251:15

**material** 216:18
219:1

**materials** 217:22
350:21

**Matt** 319:7,9,10,11

**matter** 275:24
294:20 300:2
303:21

**meaning** 242:19,
23 290:11 319:17
337:4 375:13,15,
17

**means** 291:18
349:23 382:18

**meant** 305:20

**mechanical**
251:1,19 252:2
253:5 337:1
368:18 385:3

**meet** 311:11
312:2,9,15 321:9
327:12 381:10
383:5 384:10

**meeting** 311:13
312:19,23,24
313:5,10 314:2,9
326:21 327:11
380:16,17,19

**meetings** 313:8
316:5 321:7 381:3,
13

**member** 300:14

**members** 198:10
199:5

**memory** 380:13
381:12

**mention** 196:19
372:8

**mentioned** 221:8,
11,16,22 304:16
351:1 379:20
381:18 385:16
391:6

**Mergesh** 221:5

**message** 340:14,
16,22 341:3,5,10
342:8 343:3

**messages** 342:5

**met** 285:12 311:1,
4,5,6,12 313:2
314:7 327:14
380:12,14 381:1

**Metzler** 195:1

**million** 362:13

**mills** 374:7,8

**mind** 201:20
267:17 268:8,9
334:14 348:3
381:4

**mine** 239:14
325:13

**minority** 329:22
332:20 337:22,24
349:15,20,22
350:2,8,11,12,17
353:13 358:4,9,14,
21 359:2,11,23
373:3

**minority-specific**
350:22

**minutes** 213:6
228:1 249:11
288:8 302:18
312:23 354:12
357:16 365:3,6

**missed** 365:9

**mixed** 372:16

**Mm-hmm** 195:16
220:2 233:12
250:17 262:6
271:18 280:9
332:5 360:9,20

**model** 208:4

**mold** 245:24
281:24

**moment** 196:19
200:4 233:4
262:24 264:17
273:6 278:12
343:4 351:24
360:1

**money** 202:5
211:5 322:21
339:5

**months** 204:19
205:12 258:12

**morning** 193:17

**mortgage** 206:19
213:4 245:7
247:23,24 277:19
331:15 332:10
352:22 371:11
375:4,6,14

**mortgages**
331:21,23 332:7,
12

**mortgagor** 367:7
382:5,12,17

**mine** 239:14
325:13

**motion** 295:8
314:13

**move** 202:13
213:18 242:9

**moved** 336:21
343:23

**movie** 373:17,21

**mow** 260:4,5

**mowed** 269:7,9

**mowing** 260:3
269:6 280:5
281:19

**MSR** 371:10

**multiple** 211:18
267:1 275:19
296:4 359:14

**municipalities**
282:15 330:10

**municipality**
273:14 282:11

---

**N**

**Nadar** 221:5

**nagnew@
agnewfieldservic
es.com** 301:22
302:16

**Nakia** 193:3,11
232:19 273:2
295:20 385:23

**names** 226:18
325:17 369:12

**narrowed** 303:1

**national** 198:6
208:14 209:2
214:3 293:24
299:12 309:21
370:20 381:9

**nationwide**
364:16

**nature** 208:24
219:9 222:5,8,19
246:1 254:12,13
259:7 278:1 282:3
309:10 319:19
322:16 353:5



364:2 388:16

**necessarily**
374:22

**needed** 224:8
230:20 239:1
242:2,4 245:19
247:18 254:4
259:23 276:6
281:9 282:2,9,18
309:11

**negative** 298:10

**negotiate** 382:9

**neighbor** 197:23
261:1 367:6

**neighbor's**
260:14,22

**neighborhood**
211:2 345:22
346:6 347:22
348:7,10 350:3,5,
7,12,18 370:4

**neighborhoods**
328:5 329:11,13,
21 332:18 349:5,
10 350:6 358:1

**neighboring**
260:9

**network** 286:9
361:19 364:16

**news** 288:20

**NFHA** 295:16
301:8 309:17,19,
21 313:14 380:8

**NFHA's** 265:6
295:10

**nodding** 195:16
220:2 238:8
324:15 360:9

**noise** 301:18

**nonminority**
337:22 350:8

**nonpayment**
379:8

**nonstandard**
336:14,22 368:4
388:4,8,10,13,22

**Norris** 365:13,16,
20 370:10

**Northsight**
208:15,16 209:4

**note** 246:14
251:14 339:23

**notebook** 242:11
255:10,17 256:14
263:21 287:21
326:6

**noted** 281:15

**notes** 195:8,20,21
196:5 316:5,11

**notorious** 207:24

**November** 255:20
257:8 261:10,19
262:2,4,9,11,13
263:18 264:11,20
265:4,16,22 266:6,
9

**nuances** 384:9

**number** 199:6,7
213:15 236:8,9,11,
12 251:9 252:12
263:2 294:1 306:5,
24 307:10 308:21,
22 319:3,4 330:10,
13 357:14 359:10,
22 373:12

**numbers** 251:15
306:17,18 307:5
323:15,19,21
324:2 362:7 380:4

___

**O**

**oath** 193:7

**object** 265:5 273:1
292:21 344:20,23
373:19 385:22
387:21 390:2

**objection** 285:5
289:8 291:17
294:11 345:1
346:2

**objections**
344:24

**observation**
249:3

**observe** 385:9

**observing** 250:3

**obstructed**
263:10

**obtain** 318:14
371:14

**obtained** 274:20
275:5 278:6
318:15

**obtaining** 322:22,
23

**occasionally**
278:23

**occasions** 385:10

**occupancy**
331:14 344:7

**occupant** 382:11,
13,17 383:23
384:16

**occupied** 197:19
240:1 344:1 367:4,
6 382:3

**occupying** 383:5

**occur** 258:15
280:20 343:20
345:12,16 347:17,
21 348:6,10,16,19,
24 349:9

**occurred** 218:17
243:24 244:10
248:24 258:16,19
261:19 298:17
333:23 342:11
345:21 346:6

**OCN** 227:1,17
366:14

**October** 257:8,23
263:18

**Ocwen** 193:21
197:3,7,12,15,21,
24 227:1,18
338:11 340:19
364:22 365:17
366:4,8,13,17,21
367:1,8,18,22,24
368:11,14,19
369:9,19 370:1,3,6
371:10 378:2,19,

24 379:4,12

**Ocwen's** 367:20
369:21

**Ocwen-specific**
368:3

**offered** 360:16
376:11

**office** 268:19
295:20 311:23
312:16,17 335:17
379:22

**official** 210:10
284:3

**oil** 244:6 253:7
254:17

**Olympia** 372:16

**on-site** 244:22

**on-time** 222:18
363:5

**onboarding**
364:2

**ongoing** 385:13

**open** 351:4
389:11,16 390:12

**opinion** 210:18
212:6 285:8,11

**opportunity**
294:15 364:9,13,
15 389:2

**opposed** 217:5
230:10 268:19
319:20 328:23
332:8

**option** 382:6

**oranges** 265:8

**order** 208:2
229:22 230:5
234:17 237:14,15,
16,20,23,24 239:2
243:21 251:24
253:6 254:5
259:13 268:21,23
335:13 336:7
339:10,12 346:10,
20,21 347:3,6,10,
11,13,14,16,21
348:2,4,6,10,15,

16,19,23 349:2,15,
351:7,8 356:4
376:5 383:24
384:2,12,18 387:7
388:17 391:2,10,
14,16

**orders** 207:13
230:18,22 234:22
235:5 236:6
268:15 275:14
333:23 335:16
346:11,12,13,14,
17 349:4,6,9
351:4,7,15 355:16
367:11 383:3
386:8

**organizations**
198:22

**orient** 239:20

**original** 216:19
221:1 319:22

**originally** 320:6

**overgrown** 242:5
271:16

**owned** 226:6
356:19 366:17,21

**owner** 355:3

**owns** 235:9

___

**P**

**P.K.** 206:17

**p.m.** 321:2 357:17,
20 389:5,8 390:23

**package** 274:17
379:22

**packet** 216:19

**padlocks** 336:23

**pages** 264:8

**paid** 322:21

**painless** 365:18

**paint** 244:5 253:7
254:12,17

**pan** 207:14

**paper** 200:23
256:16 260:2,4,6,

National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021
14

12 320:11

**papers** 243:11
264:3

**paralegals** 310:14

**part** 193:24 195:7
198:7 206:23
226:13 238:21
239:13 243:7
247:22 277:6
283:18 289:3,5
311:16 376:15
385:14 387:9

**parties** 193:23
196:9 202:14

**party** 300:16

**passed** 218:23,24

**passing** 376:9

**patience** 370:18

**Paul** 221:2

**pay** 339:19 340:8

**paying** 323:1

**payment** 217:19
379:5

**payroll** 360:24

**pending** 194:19

**pension** 376:5

**people** 195:6
200:17 221:8,11,
16 249:5 331:20
351:17 352:2,4,18,
20 353:6,12,16
354:9 358:22
364:5 373:12
375:1 376:10
384:11

**percent** 329:2,3,4,
10 366:10,11
374:19 375:7

**percentage**
224:21 366:3
376:19

**percentages**
222:19 363:5

**perform** 196:14
224:4,17 259:5
336:1,5

**performed** 212:7
220:3,6 226:19
234:13 236:5
244:18 255:24
256:8 258:22
259:22 261:16
262:10,19 285:23
287:8 298:1
330:12 337:24

**performing**
215:14 234:22
258:20 259:17

**period** 216:24
276:13,14 378:22

**periodically**
273:23

**permission**
219:10

**permit** 269:2,3
270:24 282:4,22,
24 283:4 284:1

**permits** 239:1
282:8,14,18
283:22,23

**permitted** 270:23

**person** 219:16
272:11,16 299:11
311:1 313:2 367:1
380:12 381:1

**personal** 325:16

**personally**
202:18 232:12
275:15 278:8
300:7 314:21

**persons** 299:20

**pertain** 234:2
296:14 297:6

**pertained** 296:20
297:4

**pertaining**
197:12,16,17
200:10 211:13
217:2 219:8 222:4,
19 229:21,22
230:21 235:1
238:23 239:1
254:1,6,7 259:2
266:22 274:13
278:9 283:2

285:13 293:20
294:5,7,8,9 295:20
302:24 303:22
304:17 308:5
309:15 310:8,9
312:5 314:1
321:15,17,23
325:16 327:2
330:16 332:10
338:10 342:14,23
358:11 363:23
367:5 376:20
379:7

**phone** 299:8
309:6 310:18,23
312:3,5,11 327:16
364:6 372:1

**phonetic** 221:3,4,
5 267:15 336:24

**photo** 215:13
255:21 317:13

**photograph**
287:22

**photographs**
243:7

**photos** 241:17
255:13 261:15,18
262:16,20 264:2
287:3 318:2,4,24
319:19 386:7
388:20,23

**phrase** 294:6

**phrased** 244:16

**physical** 302:7

**physically** 302:6

**pick** 258:20
259:18 260:3,6
261:12 274:22
275:2

**piece** 200:23
260:2,4,6

**pipeline** 277:19

**pipelines** 332:10

**pipes** 282:3

**place** 234:3
238:10,11 248:15
250:16 251:3,7
261:14 268:7

279:4 286:2 314:5
321:16

**places** 334:10

**plaintiff** 200:23
309:23 313:3

**plaintiff's** 198:22

**plaintiffs** 198:4,5,
21 199:4,17,19
200:3 202:5,10
275:24 276:3
288:17,19 289:2,
11,23,24 290:5,11,
17,18,19 291:2,9
293:17 294:22
298:6,13,16
299:20,21 300:1,5,
14 310:2,6,20
311:2 314:7,8,16
315:8,15,23 316:6,
12 319:14,23
320:5 321:7,10,21
326:7 327:3,7,8
377:24 380:9
389:1

**Plaintiffs'** 379:4

**plan** 193:21

**plumbing** 282:2
283:2

**PO** 305:1

**PODS** 221:7
364:16

**point** 211:23 225:3
251:6 253:7
279:21 319:5
329:9 337:3
341:24 347:12
355:4 357:8
375:14 387:15
389:10

**pointed** 387:11

**points** 230:13

**policy** 345:6
369:21,24 372:12
386:24

**pop** 342:5,9,10

**population** 373:8,
11

**portal** 274:24

315:11 317:4,5

**ported** 232:1
301:16

**portfolio** 218:21
224:18,23 225:9,
12,14,15,18,20
226:13,15 235:8
329:8 331:13
338:11,21 340:20
348:24 366:8,17,
22 367:18,19,20
368:9,12,20

**portfolios** 206:10
225:19 340:15,21
341:2,9,17 386:2

**position** 204:13
205:2,15 215:20
223:7 224:7
360:16 389:19

**possession**
277:8

**possibility** 260:17
261:6 285:20
340:23 349:2,14
359:12,20

**possibly** 280:14
283:13 320:12

**postconveyance**
213:18

**posted** 269:3
270:24

**potential** 211:3
212:22 284:17
285:3 389:14
390:1

**potentially**
253:17 390:9

**PPI** 214:14,20
215:8 216:3

**practice** 385:4
386:24

**practices** 372:19,
24

**preapproval**
338:24 386:5

**preapproved**
244:21 247:16
248:3 250:20



252:2,10,13,24
253:3 254:2
258:24 259:1,21
334:4 335:10,13,
18,23 336:8,11,13,
15 337:3,10,12,18,
20 338:2,13,15,17,
18 385:5,12,18
387:5,16 388:6,19,
21

**preassigned**
242:14

**preconveyance**
213:19 214:3

**predominantly**
349:21,22 350:2
358:9 359:2
374:14

**preforeclosed**
197:19

**preforeclosure**
224:21,22,23
225:4,6

**premises** 243:13

**preparation**
321:10,14,22,23

**prepare** 322:10

**present** 262:18

**presentation**
278:1

**preservation**
203:10 228:23
229:3 279:16
280:2 315:11
317:3,7,11,18,24
318:5,7,13,23
319:6,14,24 320:3
334:1 345:20,23
361:14 371:12

**preserve** 245:8
247:24

**preserved**
245:12,15 247:13,
20,23

**press** 288:19,24
294:1

**pretraining**
216:18,23

**pretty** 350:7
362:15

**previous** 210:24
267:10 322:14,15
328:12

**previously** 234:9
277:18 278:22
312:5 327:15
336:13 360:14
364:6

**price** 210:18
212:6,15 347:12

**Priest** 221:4

**primarily** 216:2
327:19 328:4,9
358:8

**primary** 233:17,
20,21 234:5,15
235:4,6,8 287:16
317:14,15 319:1

**Prince** 199:9
201:5,11 206:1
228:4 239:12,16
257:14 265:23
266:8,12 273:1
276:13 285:5
289:8,12,16,21
290:10 291:6,17
292:3,7,9,18 293:9
294:11,12,15
295:7 296:3,18
297:2,6,10,13
298:10 313:19,21
320:17,20 323:1
364:24 365:8,11
370:12 373:19
377:17 378:6
385:23 389:24
390:16

**print** 275:13
319:15

**printed** 275:17
276:2,9,18 319:16,
17 320:6

**prior** 214:8 223:14
244:22 246:9
258:13 265:4,16,
18 266:19 267:13,
24 269:21 270:8
272:23 288:24
326:14 362:17

**privilege** 289:8,
10,18 290:9
293:10 294:11,19
295:17 297:14,15
389:11,13

**privileged** 294:24
295:11,21 308:1,8
309:11

**privy** 227:21 272:3
286:2 342:24

**problem** 365:12

**procedure** 369:22
372:12

**proceed** 193:8

**process** 268:15
321:17 386:5
387:4

**processed**
360:24

**produce** 300:7
306:20

**produced** 201:18
232:14,15,18,21
275:23 276:3,11
300:1,22 301:4
302:10,13 305:11
308:15,19 323:20
324:20,23 326:17
378:1

**producing**
201:22,23 303:24

**production**
201:18 326:9

**profit** 362:3

**program** 221:6
228:24 229:6,9

**progressed**
329:21

**prompt** 380:13

**pronouncing**
219:19

**properly** 268:2

**properties** 210:8
212:19 213:15,18
214:2 217:2
218:14,18,20
222:20 224:16,19,

20 225:4,6 226:1,
6,7,19 227:20
230:17 242:15
244:19 245:3,8,11,
14,22 246:3,6
247:5,9,11,13,24
251:23 252:9
255:23 256:5
273:13,16 274:4,6,
14 275:16 276:10,
23 277:10,23
285:21 287:15
304:17 312:6
314:14,15,19,20
315:2,3,5,9,16,18,
19,22,24 316:3,9,
17,19,24 320:4
322:13 327:20
328:4,21 329:7,10
331:13,15,24
332:13 333:8
338:3 339:14
342:23 343:6,10
345:5,6,14,16,21
349:6 355:23
356:12,14,18,21,
23 357:1,10
358:14 365:22
366:2,3,5,6,16
367:17 368:19,22
370:1 371:9,10,13
372:20,24 375:11
376:22 378:22

**property** 197:8,
10,13 203:9
210:15,18 211:1,5
212:15,21 213:1,
21 215:14 224:7,
10 225:1 226:22
227:9 228:13,23
229:2,21 233:22,
24 234:23 235:4,8
236:5 237:5 238:9,
10,14,18 239:5,9,
24 240:3,8 241:17,
20,22,23 242:3,22
243:9 245:1
246:10,14,17
247:2,17,18,22
248:16 250:15
251:1,4,18,20
252:15,18,20
253:12,23 254:1,
11,16,23 255:19,
24 256:6,8 258:9,
15,21 259:3,5

260:3,8,9,13,14,15
261:2,10,16
262:17,19 263:23
264:20 267:19,20,
21 268:1,8,11,13,
24 269:1,5,8,12,
13,18,21,23 270:1,
3,4,15,18,20
271:3,6,8,12,15
272:2,6,11,15,20,
23 273:24 274:7
277:17,18 278:7,9,
14,18 279:3,10,13,
17,21,24 280:20,
23 281:15 283:17,
19 284:18,23
285:4 315:11
317:3,7,10,11,18,
24 318:5,6,13,23
319:1,5,13,24
320:2 327:24
330:16 331:10
333:14,18 334:5,7,
18,19,23 335:5,11
336:18 337:9,13,
21 338:21 339:6,
13,21,22 340:4,6,
9,11,13 341:13
342:14,20 343:2,
15,17,18,20,23,24
344:4,10,15,18
345:12 346:7
347:17,21 348:24
349:12,13 350:11,
17 354:20,24
355:3,7,14,15,17,
19 356:9,11
360:12 361:14
366:12,13,15,21
367:4,6,9 372:20
373:1 375:14
376:14,17,21,23
377:6,10,11 382:3
383:4,5,6,8,10,17,
18,21,22 384:4,7,
15,24 385:7,10
386:11

**property's** 333:15
334:2

**proposal** 237:20
238:4,5 319:4

**proposals** 318:21

**protect** 297:14

**proud** 363:3,5,6




**proven** 318:24

**provide** 210:10
251:12 293:7
317:6 319:14,23
320:5 325:17
328:10,18 330:13
370:7 372:4

**provided** 199:16
218:9 229:6,10
293:8,10,11,14,18
298:6,14 303:3
304:6 305:6
327:18,19 352:20
379:8 380:8

**providing** 298:4
310:10 330:2,7
331:1 352:1

**public** 213:1

**pull** 228:14 282:17
283:5 378:12,15

**pulled** 237:19
239:2 251:2

**pulling** 287:14

**purchaser** 212:22

**purchases**
371:10

**purpose** 265:6
276:20 379:3

**purposes** 231:11
241:13 251:10
266:4 315:4

**pursue** 213:13

**pushed** 328:12

**put** 201:17 219:6,
11 233:10 242:22
254:22 260:1
267:17 268:7,8
306:6 307:5 339:9,
10 351:23 363:12
381:3

**putting** 230:10
251:1 295:8 343:4

**Q**

**quality** 220:4,19,
22 271:6 363:18
364:4

**quarter** 225:16

**question** 194:9,
10,19 195:11
198:24 203:14,15
216:17,21 223:16
247:21 254:1
256:1 260:10
264:22 265:13
266:21 267:16
273:17 275:4
286:14 289:19
292:2 295:6
296:13,15,19
297:15 305:23
319:22 321:20
325:7 330:4
332:16 336:3
340:24 341:7,15
342:13,16,21
352:17 368:6
375:13,19 386:19
387:2

**questioning**
377:16

**questionnaire**
217:5,23

**questionnaires**
216:13,15 217:1,
18 218:4

**questions** 193:20,
24 194:1 195:17
196:18 198:8
199:13 202:14,24
218:2 248:9 264:1
266:5 268:10
285:3 292:19
296:1,6,11 322:8,
15,19 330:19
345:8 364:10,21,
22 365:17 370:10,
23 377:13,18,21
378:20,21 388:24
389:13,16 390:12

**queue** 272:4

**quick** 227:24
249:7 365:18

**R**

**racial** 370:4

**rates** 332:18,19,22

**ratio** 224:21
328:21

**re-wint** 337:3

**reach** 383:19

**reached** 284:16
357:7

**reaching** 321:19

**ready** 226:13

**real** 210:1,4,5,7

**realm** 260:17
261:6 349:1,14

**realtors** 353:4

**reask** 341:7 387:2

**reason** 220:12,15,
18 279:9 339:19
344:6 386:14

**reasons** 305:22
334:9 355:10

**rebuttal** 377:17

**recall** 197:8,10,11,
17 198:2 200:4
202:4 207:4,17
209:18 217:3,6,20,
22 218:19 224:6
225:1,5,13,16
227:3 235:17
238:21 252:1
253:3 254:3,8
255:4 257:1
258:16 259:11,20
260:19 261:5
279:8 280:12
282:13 283:1
287:13,18 293:19
299:8,13,16
310:16 311:7
314:4 336:11,15
340:6 341:12
347:13,15 350:21
352:1 354:18
355:6 363:15
367:3,11 368:17,
21 369:23 378:3,8
380:19 382:21
388:12

**recalling** 315:1
381:1

**receive** 218:20
225:15 239:2

293:21 314:18
369:19 371:24
379:12 383:3
384:11 385:1

**received** 197:24
199:21 200:9,11
202:5 217:4,13
219:1,5 224:23
225:2 231:1 232:6,
19,22 236:20
255:5 277:20
283:21 295:19
296:20 299:17
310:13,23 314:13,
15,22 321:15
322:12 323:18
366:19 368:24
371:9

**receives** 291:20

**receiving** 197:21
202:7 277:17
293:19 350:21
379:10 382:8

**recent** 211:1

**recognize** 288:5

**record** 193:2
205:19 228:7,10
232:24 243:4
249:15,16,18
288:11,14 289:13
292:17 320:24
321:3 357:18,21
370:14 380:7
381:6 389:6,9,11,
16 390:12,20
391:1,13

**recorded** 312:24
313:9

**recording** 193:1

**records** 201:7
203:8 217:12
274:2,18,20 275:5
277:15 317:15,16
362:1 390:9

**recovering**
380:15

**REDIRECT**
377:22

**redone** 246:11

**refer** 197:3 198:5
226:5 351:18
352:2 353:7,24
354:1,5 370:22
379:20

**reference** 352:8

**referenced** 223:1
258:14 310:22
354:13

**referred** 214:8
278:23 354:2

**referring** 196:13
203:1 211:15
215:8,10 237:3
241:2 268:5
277:21,22 335:9
352:21 356:12
375:5

**refers** 214:24

**reflect** 265:3,15
266:15,16

**reflected** 264:21

**reflecting** 265:7

**reflects** 265:17,18
267:8

**refresh** 337:4

**refreshed** 381:12

**regard** 389:20

**regional** 207:15

**register** 282:16

**registered** 282:24

**regular** 222:5
304:18 383:13

**regularly** 222:4

**rehab** 246:17

**rehabbed** 246:7,
8,11

**rejected** 279:9

**relate** 233:24
297:20,22 298:1

**related** 202:1
274:18 276:10
277:9 295:9,15,20
302:11 315:24
316:15 330:3,8



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

17

331:9 370:1

**relates** 372:12

**relation** 377:9

**relationship**
290:9 292:12
294:24 371:6,22

**release** 288:19,24
294:1

**relevance** 373:19

**relevant** 294:20
307:23

**relied** 220:16

**relocation**
238:19,23 242:17,
20,22 253:4
332:14 381:18,22
382:4,8,10,16
383:13 384:2,12,
22,24 387:11

**relocations**
238:21

**relying** 359:2,4

**remain** 376:10

**remaining** 377:15

**remediation**
281:24

**remember**
197:14,16 199:10
203:18,20 214:10
221:2 223:19
226:18 227:13
235:14 236:11
238:14,16,17,20,
24 257:3 260:24
261:4 263:15
279:2 282:21,23
287:13 299:10
313:16,17 314:9
318:12 330:21
331:1 337:6
351:19 354:21
355:24 361:22
362:11 366:24
367:15 368:3
380:17 381:7

**reminder** 316:7,8,
16

**remodels** 261:1

**remotely** 193:3

**removal** 242:10,
14 253:8 255:18
259:2,4,20,22
261:23 262:10,21
269:15 272:17
280:8 345:15,16

**removals** 254:7
280:12 345:18

**remove** 219:11
384:17

**removed** 219:5
243:8,18 246:6
254:17 258:8
262:21 269:21

**removing** 254:10
280:10

**REO** 206:18 225:6
226:10 244:1,4
245:1,4,11,15,22
246:3,6 247:2,5,10
252:11 256:24
258:12 259:8
261:2 262:4 265:6
266:9 279:17
331:13 332:13
334:2 335:6 336:9
337:8 338:3 343:6,
10,23 344:10,14,
17 345:20,23
348:24 357:11
367:9 368:4
372:20,24 384:4

**repair** 281:8,11,23
284:17 285:4
286:24 287:20
356:10

**repaired** 263:23
264:11 271:8
281:9

**repairing** 281:3,
24 285:20

**repairs** 245:18
248:11 282:2
283:22,24 284:6,
22 357:4

**repeat** 256:1
260:10 264:22
368:6

**rephrase** 194:13

198:24 223:16
225:22 265:20
289:19 309:24
330:4 340:24
375:12

**replacing** 281:3
282:1

**replicate** 323:21
324:1

**report** 252:17

**reports** 308:24
372:1,4

**repository** 219:8
350:20

**represent** 233:16,
23 251:11 257:7
258:2 266:5 293:3
323:13 326:4
339:3 370:18
380:6

**representation**
234:4

**representative**
221:1 260:20

**Representatives**
208:15 209:2

**represented**
290:19 309:18
313:14

**represents** 291:9
294:22

**request** 236:3
237:20,24 238:4,5
243:20 244:11
284:2 319:4
382:15

**requested** 306:20
310:11 314:12

**requesting** 200:9
238:1,6 355:20

**requests** 201:7
274:9,10,13,19

**require** 282:4,8

**required** 223:8
269:2 283:4 379:7

**requirement**
218:13 367:21,24

**requirements**
226:9,14 227:6,9
283:2 367:17
368:4,9,11,21

**research** 210:9,
11,21,22,23
217:14 273:9,21,
22,23 274:1
276:22 277:9,12,
13,14,15 306:19
315:3 322:14
358:17 371:18,20
376:20

**researched** 278:6

**reserve** 377:15

**residence** 241:14
281:6 284:23

**resident** 250:7

**residential**
209:23 360:23
374:19 376:18

**residents** 250:10

**Resolutions**
207:11 234:5,9,14,
24 235:6,9,15

**resolve** 389:23

**resolved** 389:12
390:15

**resources** 386:3,
9

**respect** 388:3,15

**response** 290:22
341:11 379:12,23

**responsibility**
284:5

**responsible**
234:23

**responsive**
304:11 305:7

**resulted** 372:20,
24

**retain** 391:7

**retained** 291:23
292:11

**retainer** 293:2

**retention** 232:3

**retrieve** 302:5

**retrieving** 276:20

**revenue** 361:22
362:12,13 376:4

**review** 215:13
240:3 246:15
252:15 261:14
264:2 271:11
315:19 317:14
343:17,18 350:19
355:5 361:23
378:9

**reviewed** 238:18
255:5 264:8 315:6
319:20

**reviewing** 235:2
256:7 271:7 315:7

**reviews** 208:1

**RLS** 208:18 209:6

**Robbins** 205:22

**Rohip** 221:3

**role** 351:2

**Romeoville**
303:16 306:10
323:9,11

**Ronald** 221:4

**roof** 254:22 281:3,
8,23

**roofing** 246:1

**rough** 362:6

**roughly** 365:24

**routine** 279:19
280:3,4,7,10,13,
17,19 334:4,11,12,
15,16 335:3,5,14
345:24 346:5
387:6 388:5

**RSC** 369:11,14,16

**rules** 194:7

**S**

**safe** 256:9



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021                                                    18

**Safeguard** 207:13,19,24

**safely** 388:13

**sales** 204:15 209:23 210:5 214:23 216:7 239:2 274:8

**SB-** 258:11

**scenario** 261:3

**schedule** 272:3,5

**scheduled** 269:15,16 271:19, 20 272:4,17

**school** 204:11

**scope** 208:21

**score** 217:4

**scorecard** 233:13

**scored** 351:10,11, 14 364:3

**screen** 233:5 237:14 239:13,15 241:1 243:22 251:3 253:16 254:15

**scroll** 239:7,21 244:5 283:7

**search** 303:1,3,4, 8,11,14,17,20,23 304:8,11,15,23 305:4,8,16,17 306:2,24 307:13 322:15 323:5,7,10, 24 339:21 342:8

**searches** 323:14

**searching** 277:16

**season** 344:19 345:13,17

**secondary** 287:14 319:2

**secretary** 235:16

**secure** 251:20 334:19 384:3

**secured** 334:23, 24 344:15

**securing** 250:24

334:21

**security** 204:15, 17,18

**seeking** 289:3,7, 17 292:13

**segments** 201:6

**selected** 301:2,5 302:19 323:7

**selecting** 302:20

**self-incriminate** 206:2

**sell** 204:17,18

**send** 229:18,19 230:6,9,19 325:21 382:15 386:8

**sending** 199:23

**sense** 196:15 206:8

**separate** 216:8 229:9 241:24 254:13 295:10 338:6 383:16

**separately** 201:22,23

**separating** 254:11

**September** 255:9, 12

**served** 291:3 292:6

**server** 301:15 302:4,6,7

**servers** 306:23

**service** 214:12,13 220:1,5 223:7 236:19 244:14,17, 20 248:3 250:18 251:22 252:8 253:22,24 255:6 259:2 261:18 280:7,10,13,17 286:4 327:18,20 330:16 334:16,17, 20,24 335:14 338:21 360:23 361:14 365:22 368:24 371:12

**serviced** 206:10 260:15 274:7 286:5,11,18 314:19,21 315:3, 10,16,22 316:10, 17,20,24 317:9 322:14 327:23 330:15 345:14 350:9 365:21 366:4,7 367:19 376:22

**servicer** 382:6

**services** 215:9,15 216:4 219:23 220:13,16,20 224:4,15,17 226:19 231:19 232:6 234:12 240:4 243:17 247:19 250:19,21 252:19,24 253:2 258:8,11 259:16, 22 260:7 261:15 262:10 263:12 268:14 271:2 279:12,14,19 280:3,4,19 281:18 285:23 287:9 297:23 298:2 328:10,18 330:2,7 334:4,11,12 335:3, 5,8 345:24 346:5 360:12 363:18 370:7 376:11 379:8 381:21 384:23 385:5 387:6,7 388:6

**servicing** 196:14 202:19,22 203:1 209:20 214:15 216:3 218:11 231:14 234:18,21 236:21 260:16 261:2,11 271:20, 24 315:11 331:5 338:15,20 359:4 371:11 378:22

**serving** 213:13 297:22

**set** 201:19 231:23 334:8 377:24

**setting** 212:14 316:7

**settled** 382:11

**severe** 375:24

**shadow** 228:21

**share** 203:5 223:14,21 322:18

**shared** 209:19 213:3 330:24

**sharing** 203:18,20

**sheet** 235:1 319:20

**Sherman** 234:3 238:10,11 248:15 250:16 251:3,6,7 268:7 278:12 279:4

**Shield** 287:13,15

**shielding** 294:19

**shingles** 261:1

**short** 207:17 228:8 288:12 357:15,19 389:7

**show** 253:14,15 267:20 268:13 269:12,13,18 270:16 272:7 295:21 306:6 365:3 378:19

**showed** 269:1,5 287:19

**showing** 212:21 251:7 272:11,15, 20 365:2

**shown** 287:22 307:2

**shows** 255:8

**shrub** 255:1

**shuffle** 264:3

**sic** 199:22 202:19 236:20 287:9 301:2 302:11 306:11 332:24

**sick** 314:5

**side** 213:19 283:14

**signage** 207:1

**signature** 305:3

**signed** 200:21 201:24 207:12,20 240:10 293:2 382:16

**significant** 245:18 246:4 247:6 258:9

**significantly** 361:4

**signs** 200:20 207:1 214:1

**similar** 200:18 233:12

**similarities** 381:20

**simplest** 260:1

**simply** 352:24

**simultaneously** 211:18 267:1 275:19 296:4 359:14

**single** 288:4 336:11

**sister** 203:9 276:18 315:10

**site** 335:11

**sitting** 196:2 390:2

**situation** 197:11, 17 284:11 285:2 349:13 382:13

**situations** 340:5 358:10

**slide** 239:12 283:13

**slides** 219:7

**slight** 373:14

**slow** 195:3

**smaller** 273:10 281:11

**smoke** 336:19

**snow** 280:7 345:15,16,18



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021                                                                    19

**Socials** 382:19

**soffit** 281:23

**Solassi** 360:6,7, 11

**sold** 274:4,5

**solution** 336:17

**Solutions** 204:15

**some-** 311:17

**son** 205:13

**sort** 199:18 201:24 202:16 250:2 281:5 330:3,14 380:24 389:14

**sorts** 236:3

**sought** 213:10 293:4 297:19

**Soule** 198:10,12, 14 251:5,13,16 253:13 265:5 291:8,12 292:24 293:3,5,7,8,14,22 294:21 298:4 311:9,10 320:22 322:6,21 330:19 344:20 345:2,4 346:2 377:15,20, 23 378:14,16 379:17,19 386:21, 22 387:22 388:24 389:18 390:8,21 391:10,12

**Soule's** 295:20

**sound** 298:19

**sounded** 305:20 381:20

**sounds** 288:9 298:23 320:21 362:7,9

**southwest** 205:7, 22

**speak** 220:24 221:21 222:21 264:4 321:13

**speakers** 211:18 267:1 275:19 296:4 359:14

**speaking** 197:4 200:16 203:4 211:19 222:14,15, 16,18 250:16 267:2 275:20 282:6 286:1 296:5 314:11 344:24 359:15 364:3 367:1

**specialized** 360:13

**specialty** 353:5

**specific** 199:7 222:20 227:17 229:21,22 230:4 266:22 283:1 325:1 330:10 349:12 350:21 352:16 353:12 354:10 361:24 369:12,24 370:4 386:11 389:21

**specifically** 254:2 260:21 261:3 274:1,4,5 279:6 282:6,19 289:12, 16 305:1 325:20 332:2 340:6 342:14 343:1,2 350:3 352:15 353:15 354:2,18 361:14 384:14 386:20 387:5

**spoke** 197:14 222:4,9 243:11 254:3 299:5 303:22 310:8 311:14 313:14 330:20,23 387:10

**spoken** 291:12,13 310:5,7,19 325:15 326:22

**spreadsheet** 233:5,10 235:1,20

**spreadsheets** 276:18

**spring** 336:17

**square** 281:9 336:18 373:15

**SSHC** 263:2

**staff** 198:10 199:4 211:12,14 220:6 230:13 231:9,10, 18,21,23 232:9,21 238:20 300:14 342:18

**stamp** 283:21 284:4,6,7,22

**stamps** 239:2

**stance** 386:3

**standard** 193:6 238:23 242:14 244:14,17,20 247:15 250:20 251:22 252:8,24 255:22 256:3 279:12,14 280:1 281:17,18 283:2,3 333:9,10,13,17,22 334:9,12,15 335:8, 18 336:8 337:9,12, 18,20 338:2,13,17 368:13 385:5,12, 17 387:4,15 388:6, 11

**stands** 228:19 339:7

**start** 264:3 283:18 322:1 347:1 371:2 381:24

**started** 204:4 218:14,20 225:14 249:22 250:10 264:4 271:1 304:20,23 330:1 365:7 379:9

**Starting** 330:6

**state** 223:23 224:2,5,8,13 286:7 291:19 292:10 295:13 327:23 328:1,20 376:5 377:1

**stated** 223:24 262:2 301:14 302:14 303:10 312:3,11 346:3 351:20

**statement** 373:8

**statements** 362:3

**stating** 199:22 200:24 265:23 340:14 342:19 351:21 352:5

**status** 245:1,4,11, 15,22 246:3,6 247:2,5,10 279:17, 22 337:15,17 343:6 355:17 357:11 386:13

**STD** 284:6

**steel** 374:6,8

**stenographer** 243:1 348:13 391:2,5,10,14

**steps** 285:24

**Steve** 378:14 379:18

**stop** 205:14

**stopwatch-guy** 365:4

**store** 205:4,8,12, 20,23

**stored** 278:3 318:4

**story** 269:24

**strange** 368:15

**street** 251:9

**strike** 278:21 339:16 355:11 356:13 371:23

**struck** 368:4

**structure** 281:6

**structured** 338:23 388:1

**study** 263:24

**subcontractor** 215:24 288:4

**subcontractors** 215:12 361:7,9,12, 13,17

**subdivision** 273:15

**subject** 295:16

**subjective** 246:13,16 266:18 267:12,22 268:3 281:7 282:15 347:4

**submit** 246:15 281:14 388:19

**submitted** 255:3 280:24 300:3 326:15,18 341:4,6 349:13 369:3 382:23 384:7

**submitting** 211:13 305:14 340:18

**subpoena** 199:21, 23 200:5,6,8,11 276:5 300:4 304:22 305:15 306:21 310:8,11 322:13 379:23

**substantial** 245:24 281:5,7,10 282:2

**substantive** 298:21

**suburb** 205:7

**suburbs** 205:22 286:16 358:19

**successful** 242:20,21 362:15, 16,17 387:10

**sufficient** 283:24

**surrounding** 211:3 286:15

**SWD** 284:7

**Swift** 207:11 234:5,9,11,14,23 235:5,9,12,14

**switching** 321:17

**sworn** 193:13

**system** 203:9 228:18,19,20,22 229:1,14 230:11 233:10 276:19 305:11 317:22 335:12,15 388:1



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021                                           20

**systems** 204:17,
18 217:21 338:24
364:2

---

**T**

**tab** 226:22,24
240:19 241:5
242:11 248:5
255:10,17 256:13
261:24 263:21
264:17 287:21
302:23 303:6
305:16,17

**table** 196:2

**tabs** 322:16

**taking** 238:21
286:2

**talented** 360:15

**talk** 195:3 196:12,
17 200:5 203:14
204:2 206:12
208:6 213:6 215:6
226:12 233:14
239:4 248:15
250:18 280:22
282:19 284:17
293:9,11 300:22
301:7,8 302:9
311:8 331:3 333:7
335:2,8 338:14
339:2 341:22
346:9 348:1
352:19 353:14
359:1 360:1 370:3
389:24 390:1

**talked** 206:6 214:9
252:11 279:13
290:18 333:9
350:24 352:18
354:19

**talking** 195:6,10
200:6,7,8 201:3
211:14 216:22
249:20 267:13
268:9 280:23
281:7,22 292:24
310:21 311:8
316:11 321:6
332:3 335:15
347:24 348:1
354:9 362:6

**talks** 255:18

**tarp** 254:22

**task** 236:1

**tax** 361:24 362:3
382:20

**taxes** 376:14,17,
21,24 377:6,10

**teacher** 204:6

**teacher's** 204:7,8,
9,14

**team** 211:16,22
221:4 243:16
244:13 271:11
284:13,16 340:18
346:17 364:17

**teams** 222:7

**technical** 304:4,6

**technicians**
352:15 353:4

**telephone** 299:7,
14

**telling** 256:15
365:8

**ten** 199:12 228:1
246:18 288:8
309:19 310:1
357:16

**ten-minute** 389:4

**tenant** 382:17

**tendency** 195:3,5

**tenure** 200:10
222:3 257:1 299:1
329:7,20 358:12
361:16 366:7
388:11

**term** 196:11
202:17 226:5
303:17,24 304:11,
15 335:9 349:17
352:7 353:11,17,
20,22 354:2,9,13,
17

**terminated**
371:15

**termination**
286:10 299:5

379:6

**terminology**
291:18

**terms** 260:1 303:3,
4,8,11,14,20
304:8,23 305:4,8
306:2 322:21
323:5,6 344:21
352:19 353:9

**terrific** 195:19
204:8

**territory** 223:13,
18,22 286:5 350:8

**test** 217:5 218:4

**testified** 193:13
196:4 202:2 203:6,
17 206:14 213:8,9
216:11 223:3,17,
18 225:8 226:3
234:8 250:20
278:22 287:10
288:18 302:18
317:18 327:19,23
328:4 347:7
351:17 353:16,23
354:12 355:22
360:18 363:10,11
366:24 367:15
368:8 371:2 373:5
380:12,14 387:14

**testify** 250:19
285:19 344:22
355:7 372:15

**testify-** 354:24

**testimony** 204:4
214:8 215:6 218:1
223:15,24 241:13
246:10 248:17,20
276:9,12 279:2
298:5 305:6 306:9
307:8,14 316:19
323:5 328:3,12
331:1 337:8,23
347:5 350:24
351:19,20 352:1,
20 353:19 354:1,
19,21 355:24
356:2,8,9 357:23
362:20 379:21
389:12

**tests** 217:17,19,21

218:10,23,24

**thereabouts**
373:22,23

**thing** 201:24
202:16 334:21
368:17 387:19

**things** 199:15
201:12,14 208:24
219:9 222:4,8,19
236:3 241:24
244:10 246:1,21
249:21 254:12,13
259:6,7 271:8
274:15 275:13,17
281:2,20 282:3
286:2 309:9
313:24 319:19
321:17 322:16
335:2 353:5 364:2,
11 384:11

**thought** 198:14
267:4 285:9 381:5

**thoughts** 313:24

**thousand** 249:15

**Thousands**
356:17

**threat** 295:7,24

**threatened**
295:24

**threshold** 346:18

**thrift** 205:3,8,12

**till** 194:20 195:9

**time** 193:5,6,22
196:6 198:1 200:1,
21 203:6,11 206:2,
22 207:17 211:21
213:24 215:23
216:20,24 218:9
219:15 225:7,14
227:3 228:6,9
233:22 239:3,9
240:11 245:1
249:9,14,17 250:5,
8,12 252:18 254:9
258:3 259:7
260:19 262:16
263:24 264:13
265:18 273:24
276:13,14,15
277:1,5,19 279:17

281:16 286:8,10
288:10,13 289:10
291:15 294:21
297:22 299:4,13
311:6 313:2,11
314:5,13 316:21
318:9,15 319:7
320:23 321:2
329:16 331:12,17
333:4,5 336:14
337:3 343:3 355:4,
14 357:8,17,20
358:3 359:8 361:1,
16 362:14 364:20,
23 365:1 367:11
375:14 377:14,15
378:22 380:7,11,
14 382:3 383:6
384:6,8 385:2
386:2,11 388:20
389:5,8 390:5,23
391:3,11,15

**times** 198:2,15,19
199:3,6 211:6
246:10 260:8,12
321:9,13,21 322:2,
7 340:1 354:4
356:2,3 381:2

**tire** 244:8

**tires** 254:20

**title** 215:11,17
226:7

**titled** 240:21

**titles** 369:12

**today** 193:20
195:20 351:2
367:15 370:18
377:2,3 381:18
388:5 390:11

**today's** 193:5
390:24

**told** 201:3 279:5,6
309:7 324:13
346:16 350:11
387:12

**top** 256:18 257:19

**topic** 294:3 321:5
389:15 390:10

**topics** 222:21
295:18 297:20



363:21,23

**total** 307:12
308:21 373:12

**touch** 223:3
377:11

**town** 374:14

**TPC** 337:14,16
339:2,3,4,7,9,11,
13,17,20 340:10,
13,16,22 341:3,5,
10,13,22,24 342:3,
7,15,20,23 343:2,4
386:12

**track** 333:19

**tracks** 327:21

**trained** 277:3

**training** 217:22
219:1 221:5 277:1,
2 346:16 350:21
369:19 385:14
386:6 387:9

**transaction**
292:13

**transcribe** 195:8

**transcribing**
195:2

**transition** 197:18

**transitional**
207:16

**transitioned**
214:14

**trash** 258:4,6,9,21
259:18,19 261:9,
11 262:17,18
269:20 383:10,16,
21,23 384:14,17,
19

**Travis** 300:20
303:22 304:7
310:9 324:11,13,
18,22 325:18

**treating** 296:1

**tree** 255:1

**trigger** 340:14
383:2,24

**triggered** 343:22

384:19

**trimming** 255:1

**trouble** 300:9

**true** 369:17

**Trulia** 274:7

**Trust** 370:20

**trusted** 220:19

**trustee** 370:20,21
371:10

**turn** 256:12 263:1,
20 264:16 327:17
364:21

**turned** 384:21

**TVS** 254:12

**type** 209:1,6
234:12 237:10
241:11 274:16
289:6 306:10
323:10 330:11
345:21 346:6
350:7

**typed** 199:18
200:2,19

**types** 322:18

___

**U**

**U.S.** 213:21

**Uh-huh** 264:5

**ultimately** 356:19,
24

**unable** 316:19

**unclear** 296:11
381:6

**underneath**
347:14

**understand**
194:9,12 199:1
208:7 217:24
218:1 221:12,19
222:10 225:21
226:21 233:15
266:2 269:20
272:17 277:13
290:23 291:14
292:3,16 294:18

307:16 316:18
324:8,12,18,22
327:3 337:17
339:3 347:2
353:19 369:14
371:8 375:18
390:6

**understanding**
196:11 292:5
324:17 339:4,15
340:17 346:13,23,
24 347:1 371:13,
14 375:12 386:1,
23 390:8

**understands**
230:2

**understood**
194:11 196:3
204:24 208:5
214:21 215:5,16
218:15,22 227:4
229:5 237:8
239:18 240:13
243:15 244:23
246:23 247:21
248:6 251:10
255:14 256:11
262:23 264:7
268:22 269:4
270:6,13 285:14
286:3 297:17
323:23 326:16
334:6,13 338:4,5,
12 339:1 344:13
346:20 348:12
349:3 350:23
355:21 356:8
357:9 364:19

**undertake** 385:5

**uniform** 368:16

**uninhabitable**
245:23 246:19
247:3

**unique** 205:9,10,
11,16 367:17,21
368:1,9,17,21

**unmute** 370:13

**upcoming** 269:15

**update** 230:3

**updated** 230:15,
20,23

**uploaded** 275:9
276:7 305:11
306:15,16

**Urban** 213:22

**Uruguay** 221:17,
23

**user** 204:16 236:7,
8 300:12

**user-friendly**
300:9 304:3
319:17

**utilizing** 379:7

___

**V**

**vacant** 239:9
240:8 241:14
344:1,15 375:1,11,
16,17

**vacate** 383:1,2

**vacuumed** 264:15

**valued** 348:20

**values** 277:16,17
278:7 372:21
373:1

**valuing** 210:7

**varied** 273:9,20
332:6 363:23

**variety** 274:13

**vast** 231:3

**vendor** 207:8,10
212:9 213:10,13
216:12,19,23
218:3 219:23
220:1,13,16,20
222:17 224:12,15
225:6 228:18,20
233:12,17,20,21
234:5,15,17,22
235:6,8 236:9,12
237:5 238:2,7
244:12 248:4
254:4,13 259:12
260:7,19 261:15
280:14 286:9,19
287:2,4,16 297:23
298:2 317:14,16
318:16 319:1
330:12 335:12,21

336:6 337:9,12
338:7,21 339:20
340:12,18 341:6,
11,18,23 342:2
343:1,24 361:1,5,
8,21 362:11 363:7,
11,18 365:22
384:17,23 385:15,
18 386:10,16
387:8,12,16 388:2,
16,18,21

**vendor's** 318:24

**vendors** 208:1
214:3 235:4
244:22 271:7,11
286:4,6,7,11,12,
13,18,21 287:8,12
288:2 318:18
338:14,23 344:2
353:4 364:16
386:15 387:14,18

**verbiage** 352:11
369:10

**verification**
331:14

**verified** 322:13

**verify** 220:22
230:19 241:16
288:2 316:8,16,19,
21,22 317:9 345:4

**versus** 229:16,18
294:7 308:22
332:12,13 335:16
337:22 347:12
350:8 358:21

**video** 193:2

**view** 239:16 356:6

**Village** 250:7,8
274:9,23 275:1,3
283:18,19,22
284:3,11,20
285:12 376:21

**vintage** 273:11

**violation** 221:7
222:7 285:10
357:7

**violations** 274:15
275:15

**Virgil** 219:17



National Fair Housing Alliance vs Deutsche Bank National Trust
Nakia Agnew Hayes, Vol. II - 05/03/2021

22

Virgil's 219:18

visible 339:11,13

visit 215:14
257:22 261:16
315:4

visited 317:10

VLM 206:18

VMO 221:1

VMS 203:9 219:7
226:21,23 227:16
228:16,19,22
229:2,14,16,18,21
230:10 233:4,6,9
248:4 251:15
259:12 275:9,22
276:7,8,18 283:3
303:2 317:9,19,21,
22 318:1,3 335:22
336:7 337:21,22
338:18 339:10,12
342:6,8 350:10,13,
20 351:22 364:1
366:2,15 385:19
388:14

volume 213:16
328:13 332:8

vouch 387:13

_____
W
_____

W-9 382:21

wagnew@
agnewfieldservic
es.com 302:15

wagnew@
agnewfieldservic
es.com. 302:1

wagnew@
agnewfieldservic
ing.com 302:11

wait 194:20 195:9,
10 289:13 335:24
336:4,7

waiting 384:10
388:23

waiver 389:14

walk-through

383:7

wanted 197:22
213:18 220:22
230:1 243:10
251:6 254:3,8
264:2 287:5
314:20 342:1,12
378:19 379:20
380:11 381:17,19
383:22

water 274:14
336:19

ways 229:20 358:7

Wednesday
194:4

week 194:16
195:1,14 196:4
272:18 330:20
350:24 354:19
368:14 378:1,4

weeks 258:17,18
344:18 345:12,16

Wells 225:9,12,17,
24 226:5,8,12,14
367:23 368:14,20

white 328:15,16,
17,19,23 333:19
347:22 348:7
349:5,10 358:8,15

widespread
250:2

window 269:3
270:24

windows 336:23

winterization
337:2,4

winterizations
208:23

wires 336:20

Wisconsin 224:8,
11

witness' 344:21

witnessed 296:24
299:1,2

witnessing 299:3

Wizard 203:10
228:23 229:3

315:12 317:3,7,11,
19 318:1,5,7,13,23
319:6,14,24 320:3

woman 380:21

wondering
307:17

Wood 228:14
234:2 237:18
239:22 251:2,14
256:15 283:5

word 200:15
229:22 305:17

words 306:7 377:6

work 203:5,7,8,18,
19,24 205:10,17,
19 206:16 207:8,
19,21,22,23 208:2,
6,10,21 209:1,7,20
210:20 211:5
212:4 214:6,19
215:8,10 216:2,9
218:17 219:22,24
220:19,23,24
222:16,18 225:3,
18,24 229:1,23
230:3,5,16,17,21,
23 231:11 234:16,
17,22 235:5 236:6
237:2,9 240:2
242:2,4,15 245:4
247:6,16 251:24
252:24 264:19
265:3,8,15,17,18
266:16 267:9,11,
12,13,18,21
268:14 270:23
271:1,2,7,24
275:14 276:17
279:16 280:2,22
281:5 282:9,18,22
283:2,3 286:21
288:1 290:20
302:23 305:14
317:12 318:17,18
319:3,18 320:4
331:5 333:7,10,13,
17 334:9 335:13,
14 336:1,5 337:10,
13,18 339:10,11
348:4 351:4,7,15
353:1 355:13,15
361:15 363:3
364:3 367:11
369:3,8 371:12,15

383:3 386:8 388:4
389:20

worked 196:24
205:3,11 208:14
209:9,22 226:17,
20 227:20 234:9
235:11,12 267:15
276:15 282:16
288:3 291:2
329:13 360:14,24
361:8 364:17
369:15,16

workers 333:22

working 205:14,
16 208:17 209:12,
16 214:9 215:6
224:15 225:5,11,
17,23 227:8
243:17 250:8
273:24 275:6
325:14 359:5
361:18 372:8
379:6

works 198:22,23
291:8 351:11
355:20

workshops
363:23

worth 277:18
340:3,7

written 199:16,17

wrong 217:6
256:15

wrote 251:14

_____
Y
_____

yard 242:16 259:7,
18 260:22 261:9

yards 252:12

year 203:18
204:11,12 225:11
313:19 362:11
373:9

years 204:9
209:10 224:19
248:22 301:24
302:7 329:7 361:4
374:18 375:8
376:21

_____
Z
_____

Zillow 274:7

ZIP 330:20,24
331:3,4,7,10,18
332:3,4

Zoldowski 319:12

zone 353:11
354:17

zones 354:13

Zoom 239:16

