IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; LOUISIANA FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA.<br><br>    Plaintiffs,<br><br>                v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>    Defendants. | Case No. 18 CV 839<br><br>Judge Manish S. Shah<br>Magistrate Judge Sidney I. Schenkier<br><br>Jury Trial Demanded |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS
FOR LACK OF ARTICLE III STANDING**

## PRELIMINARY STATEMENT

Plaintiffs are twenty non-profit fair housing organizations ("FHOs") that operate within their respective regions and undertake activities to fulfill their shared purpose of facilitating open access to housing. Plaintiffs' core work—as described in greater detail below—includes consumer counseling and referrals, neighborhood stabilization, homeownership promotion, and REO-specific education and training. Their work in minority neighborhoods became all the more urgent when the housing market cratered in 2008.

In the years following the foreclosure crisis, Plaintiff National Fair Housing Alliance ("NFHA") received complaints about real estate owned ("REO") maintenance and marketing, including complaints about Deutsche Bank-owned REOs. Plaintiffs subsequently implemented a systemic investigation across thirty metropolitan areas. Plaintiffs' investigation uncovered highly significant disparities in the exterior maintenance and marketing of Deutsche Bank-owned homes in communities of color compared to white communities.

Defendants' discriminatory maintenance and marketing of its real estate-owned properties interfered with Plaintiffs' ongoing work, and leaving Defendants' conduct unaddressed would have consigned Plaintiffs to continued impairment of their operations. Because of this harm, Plaintiffs were forced to expend time and resources to identify and counteract Defendants' unlawful conduct. The harm to Plaintiffs' mission-driven activities and the consequent drain on their resources have been recognized forms of organizational injury in the fair housing context for over forty years. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

In this Motion to Dismiss (their fourth dispositive motion overall), Defendants attempt to turn a recent decision, *Food & Drug Admin. v. All. for Hippocratic Medicine* ("*FDA*"), on its head, arguing that *FDA* overturned *Havens* when in fact a unanimous Supreme Court did the opposite.

1

602 U.S. 367, 377 (2024). The reality is that Plaintiffs' injuries-in-fact are the exact sorts of harms that under *Havens* establish Article III standing. Because Defendants' unlawful REO practices inflicted cognizable harm on Plaintiffs' core, mission-driven activities, Defendants' Motion must be denied.

## LEGAL STANDARD

A Rule 12(b)(1) motion to dismiss may assert either a facial attack or a factual attack. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009). Where a facial attack is made, the district court takes the allegations in the complaint as true, and merely considers the sufficiency of the pleading. *Id.* at 443. Where a factual attack is made, "the Court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established subject matter jurisdiction by a preponderance of the evidence." *Giles v. Sabert Corp.*, No. 24 C 2996, 2025 WL 274326, at *2 (N.D. Ill. Jan. 21, 2025) (citing *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015)).

Defendants do not specify whether they lodge a facial or a factual challenge. Defendants make *no reference* to either the operative complaint or the factual record, large swaths of which have been filed as part of the dispositive motions briefing. Defendants' Motion instead cites the Court's motion to dismiss decisions, the Parties' memoranda of law, and, oddly, a minute entry. *See* Dkt. 410 (Defendants' Memorandum in Support of Defendants' Motion to Dismiss for Lack of Article III Standing or "Def. Br."). In any event, both the allegations of the Second Amended Complaint and the factual record in this case demonstrate the impairment of Plaintiffs' core activities sufficient to establish Article III standing.[1]

---

[1] *See* Dkt. 70, Second Amended Complaint ("SAC"), Dkt. 70, ¶¶ 8, 10, 167-194, 286-297 (All Plaintiffs); 14, 195-200 (NFHA); 15, 201-205 (FHANC); 16, 206-210 (COFHA); 17, 211-214 (CFHC); 18, 215-218 (DMFHC); 19, 219-223 (FHCCI); 20, 224-227 (FHCGPB); 21, 228-232 (FHCWM); 22, 228-232 (FHC;

2

# ARGUMENT

Supreme Court precedent new and old confirms that perceptible impairment to an organization's core activities is an injury-in-fact for Article III purposes. Plaintiffs' allegations and evidence establish that Defendants perceptibly impaired at least four categories of their core activities: counseling and referral services, neighborhood stabilization, homeownership promotion, and REO-specific education and outreach. Defendants' citation to inapposite authority does not displace the extensive record of harm,[2] nor can Defendants defeat standing by mischaracterizing Plaintiffs' injuries as purely diversion of resources.

## I. The Supreme Court Has Affirmed Standing in the Fair Housing Context

In *Havens*, the Supreme Court held that a fair housing organization, HOME of Virginia, had Article III standing to bring suit under the Fair Housing Act where it had been "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services." 455 U.S. at 379. HOME alleged that the defendants' conduct had impaired HOME's activities conducted in furtherance of its mission. *Id.* It described one activity as its "counseling and referral services for low- and moderate-income homeseekers," *id.*, which HOME undertook as part of its "noneconomic interest in encouraging open housing," *id.* at n. 20. Because the alleged discriminatory acts—steering homeseekers from homes that otherwise would have been available—reduced the choices HOME could offer as part of its

---

23, 237-241 (LAFHAC); 24, 242-246 (HOPE FHC); 25, 247-250 (HOME of VA); 26, 251-254 (HOPE Miami); 27, 255-258 (FHCRR); 28, 259-263 (MVFHC); 29, 269-272 (MMFHC); 30, 264-268 (NTFHC); 31, 273-275 (OC); 32, 276-280 (SSHC); 33, 281-285 (TFHC); *see also* Dkt. 361, Plaintiffs' Local Rule 56.1(b)(3) Statement of Additional Facts ("PSAF"), ¶¶ 19-26, 309-315 (All Plaintiffs); 322 (NFHA); 323 (FHANC); 324 (COFHA); 325 (CFHC); 326 (DMFHC); 327 (FHCCI); 328 (FHCGPB); 329 (FHCWM); 330 (FHC); 331 (LAFHAC); 332 (HOPE FHC); 333 (HOME of VA); 334 (HOPE Miami); 335 (FHCRR); 336 (MVFHC); 337 (MMFHC); 338 (NTFHC); 339 (OC); 340 (SSHC); 341 (TFHC).
[2] Plaintiffs' LR 56.1(b)(3) facts concerning core activities in furtherance of their mission were not contradicted by Defendants under LR 56.1(c)(2). Dkt. 397.

services, it "perceptibly impaired" HOME's services. *See id.* ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."). This injury "constitute[d] far more than simply a setback to the organization's abstract social interests," and was sufficient to satisfy Article III.

That holding remains good law. The case Defendants rely on, *FDA*, makes this clear. In *FDA*, the Supreme Court reviewed the Fifth Circuit's decision concluding that a group of anti-abortion medical associations had standing to enjoin the U.S. Food and Drug Administration's regulation of two abortion drugs. 602 U.S. at 385. Because the plaintiffs were organized with the goal of issue advocacy, offering no counseling or other business activities whatsoever, their standing argument rested on the time sought lodging their "sincere legal, moral, ideological, and policy objections to mifepristone being prescribed and used by others." *Id.* at 386. Indeed, the lead plaintiff in *FDA* was incorporated just three months before initiating the lawsuit.

The Court held that abstract objections alone were insufficient to confer standing. *See id.* at 374 ("[A] plaintiff's desire to make a drug less available for others does not establish standing to sue."). In doing so, the *FDA* Court unanimously reaffirmed the validity of the Court's previous finding that the FHO in *Havens* had standing to sue a realtor for racial discrimination when the discriminatory conduct "directly affected and interfered with HOME's core business activities— not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 395. It placed no limit on the type of "core business activity" the FHO claimed harm upon; instead, it sought to distinguish issue-advocacy groups, like the *FDA* plaintiffs, from groups like FHOs that also had core business activities, like the plaintiff in *Havens*. *Id.*

4

*Havens* and *FDA* make clear that when an organization's core business activities are perceptibly injured by defendant's actions, such injury confers Article III standing. Notably, the Supreme Court has never limited the *type* of core business activity that an organizational plaintiff may allege was injured; *Havens* provides HOME's counseling and referral services as an example, but *FDA* makes clear that the operative inquiry is whether an any of the organization's "core business activities" were impacted. Since *FDA*, three courts of appeal have affirmed that a perceptible injury to any of an organization's core business activities confers standing. *See Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024) (where defendants' actions had required organization to divert their resources away from core activities like voter outreach towards combatting election fraud and plaintiffs had established that their "core mission is directly affected and interfered with," this was sufficient basis for standing); *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992–93 (6th Cir. 2025) ("[T]he court must find that the organization has alleged and shown that the conduct challenged in the suit interfered with the organization's 'core business activities.' If, *for example*, a defendant's actions interfered with the counseling and referral services that a housing organization provided, that conduct could suffice to establish standing.") (emphasis added); *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165, 1177 (9th Cir. 2024) (petition for rehearing *en banc* pending) (distinguishing instances where organizations "define their missions with hydra-like or extremely broad aspirational goals" from instances, as in *Havens*, of "direct interference with the organization's core activities").

## II.  Defendants' REO Practices Perceptibly Impaired Plaintiffs' Core Activities

The factual record establishes that the injuries the FHO Plaintiffs assert here are the same type of injuries recognized in *Havens* and affirmed in *FDA*. As in *Havens*, the Plaintiffs here are non-profit corporations "whose purpose [is] 'to make equal opportunity in housing a reality.'" 455

5

U.S. at 368. As in *Havens*, Plaintiffs achieve this purpose through specific activities and services. *Id.* at 379. Here, the relevant core activities include each Plaintiffs' counseling and referral services, neighborhood stabilization activities, homeownership promotion and retention programs, and their REO-specific training and education.[3] Because Defendants' discriminatory REO maintenance "perceptibly impaired" Plaintiffs' core business activities and services, "there can be no question that the organization has suffered injury in fact." *Id.* [4]

Consumer Counseling & Referrals: All Plaintiffs engage in consumer counseling and referral work. *See* Appx. A. Defendants' REO discrimination impaired Plaintiffs' counseling and referrals by limiting the available housing stock and by stigmatizing and destabilizing communities of color.

In the fair housing context, "consumer counseling and referrals" includes consumer workshops across subject matters (e.g., pre- and post-purchase education, foreclosure prevention, landlord-tenant issues), and individual counseling to help people find housing and navigate housing-related issues, and intakes (e.g., complaint). *See generally,* Dkt. 308-1, Seicshnaydre Report, describing the intake arm of FHOs' business activities at p. 4. *See also,* https://www.hud.gov/program_offices/housing/sfh/hcc/what_kinds_housing_counseling_services_are_available. Here, all Plaintiffs undertake core counseling activities as part of their mission-driven operations. Appx. A. For example, HOME of Virginia—the same organizational plaintiff as in *Havens*—continues to provide "mobility counseling" to help low- and moderate-income homeseekers find housing. HOME of VA 30(b)(6) p. 35. Illinois Plaintiff Open Communities

---

[3] Plaintiffs attach Appendix A to this brief, docket citations to SAC allegations, Plaintiffs' LR 56.1(b)(3) Statement, and other evidentiary materials regarding four areas of impaired core activities of each Plaintiff.
[4] Although all 20 Plaintiffs have suffered impairment to their core activities, when assessing injury-in-fact, if at least one plaintiff has demonstrated standing, the inquiry ends there. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 & n.9 (1977).

6

("OC") similarly provides counseling to consumers who are attempting to purchase and retain their homes. PSAF ¶ 339. Plaintiff Louisiana Fair Housing Action Center operates a free, HUD-certified counseling program where they advise individuals on budget, credit, insurance, and many other post-purchase issues. *Id.* ¶ 331. The Plaintiffs also conduct consumer intakes to provide guidance on fair housing questions and concerns. *See e.g.,* HOPE FHC 30(b)(6) p. 21; FHCCI 30(b)(6) pp. 39-40; PSAF Ex. 44, Dkt. 369-4, PageID #29235, regarding thousands of FHO-processed fair housing concerns annually. Likewise, NFHA received and responded to complaints about REO practices and properties affected by Deutsche REO practices. SAC ¶ 182, PSAF ¶¶ 126, 132; NFHA 30(b)(6) (Rice) Vol I pp. 51-53.[5]

Defendants' conduct directly impaired Plaintiffs' counseling and referral work. As HOME of Virginia testified, "counseling [work] relies on there being properties on the market that are available to first-time home buyers, which was directly impeded by the fact that Deutsche Bank . . . [allowed] properties that would have been available to our first-time home buyers to decay and didn't properly market them." HOME of VA 30(b)(6) p. 157. Plaintiff Metropolitan Milwaukee Fair Housing Council made the same point: "The actions of Deutsche Bank took houses off the market. There's a lack of affordable housing in Milwaukee. And these boardups are unusable. You can't sell them." MMFHC 30(b)(6) (Tisdale), pp. 140. Even when Defendants sold their REOs, they frequently sold the properties to investors instead of owner occupants. *See, e.g.*, NFHA 30(b)(6) (Augustine) Vol I p. 198 ("REOs with ten or more deficiencies, were more likely to sell to investors [as opposed to homeowners], and they were more likely to be located in communities of color.").[6] Defendants also made communities of color less desirable and less safe, which

---

[5] *See also,* https://nationalfairhousing.org/what-is-housing-discrimination/.
[6] For ease of reference, Appendix B includes deposition pages cited herein and index of same.

interfered with all Plaintiffs' core mission of neighborhood equality, integration and fair housing choice[7] and efforts to refer homebuyers to those neighborhoods. As Plaintiff Central Ohio Fair Housing Association testified, "the blight on the neighborhoods caused by the poor maintenance, and the lack of marketing made those neighborhoods more segregated, made people not want to move there, not want to invest there…it reinforced the segregation that's there. It affected communities of color. So it made our job harder and our goals harder to achieve." COFHA 30(b)(6) pp. 158-159. And from Plaintiff Open Communities: "[Our] counseling program…promotes home ownership, foreclosure assistance, prepurchasing-postpurchasing counseling, making sure that people stay in their homes…can refinance, and…have access to whatever they need to build their own wealth in their homes….Deutsche Bank interfered with…ensuring that we had clients who could own homes in healthy neighborhoods[.]" OC 30(b)(6) p. 146.

<u>Neighborhood Stabilization Activities</u>: Many of the Plaintiffs also engage in boots-on-the-ground efforts to support and revitalize underinvested communities. Defendants' REO practices foiled these programs by actively generating more blight.

For example, Plaintiffs undertake beautification projects, repurpose vacant lots, renovate blighted properties, and create community programming. *See. e.g.*, Dkt 369-4, PageID #29168-29200 (*Inclusive Communities Report*). For example, Plaintiff Denver Metro Fair Housing Center developed recreation areas, and Plaintiff Fair Housing Center of Central Indiana developed parks and gardens and sponsored community engagement programs, like summer camps. PSAF ¶¶ 326-27. Plaintiff NFHA has increased critical resources in underserved neighborhoods, such as parks,

---

[7] Defendants' practices "prevent individuals from living wherever they want….individuals are unable to live in healthy, well financed, good-looking communities. People don't want to live in blighted communities." OC 30(b)(6) p. 126. Race-based REO maintenance and marketing thus impairs Plaintiffs' mission of residential integration as well as harms their counseling and neighborhood stabilization programs. *See also* Dkt. 308-1 for a description of Plaintiffs' broad fair housing mission and core activities.

8

recreational facilities, bank branches, healthcare facilities, and fresh food sites. PSAF ¶ 322. All of this work aims to create stable, integrated communities in areas that were hit hard by the foreclosure crisis.

In addition to stigmatizing neighborhoods and devaluing properties, *see supra*, Defendants' REO discrimination perceptibly impaired Plaintiffs' neighborhood stabilization work by increasing neighborhood blight in precisely the same areas that Plaintiffs were working to improve. As one of Plaintiffs' experts explained, "inadequate maintenance of properties negatively affects neighborhood property values, public health, and municipal revenues, and even seemingly minor issues, if not addressed in a timely fashion, may quickly result in the property falling into disrepair and becoming an ongoing and persistent drain on the community." PSAF ¶ 303. Plaintiff Fair Housing Center of West Michigan can attest to this phenomenon, having experienced something of a blight whack-a-mole: the organization invested significant resources in revitalizing the neighborhood and rehabilitating blighted properties in a majority-Black zip code through its "49507!" project only to find that Defendants neglected their REO properties in that same area, undoing their good work. FHCWM 30(b)(6) pp. 216-217. As Plaintiff Metropolitan Milwaukee Fair Housing Council put it, "they were creating blight in our neighborhoods, creating -- everything that we're trying to fight against to create the stabilization of neighborhoods, [Defendants'] activities were thwarting our efforts." MMFHC 30(b)(6) (Tisdale) pp. 140. Plaintiffs that are in the core business of stabilizing neighborhoods are perceptibly impaired when Defendants' actions destabilize them.

Homeownership Promotion: Many of the Plaintiffs undertake homeownership promotion activities, which are designed to increase housing opportunities and to help people retain their homes. *See* Appx. A. In addition to the above-described harms of decreased housing stock and

9

neighborhood stigmatization, Defendants' REO discrimination impaired Plaintiffs' homeownership promotion activities by devaluing homes in minority neighborhoods and limiting access to credit.

To create new housing opportunities, Plaintiffs make large-scale financial investments in their service areas that facilitate the purchase of homes for occupancy by Plaintiffs' clients and constituents. *See* PSAF Ex. 42, Dkt. 369-4, PageID #29168-29200 (describing activities by thirteen Plaintiffs); *see also* SAC ¶¶ 174-178; Appx. A. For example, Plaintiff South Suburban Housing Center and Fair Housing Continuum provide grants for down payment assistance, closing costs assistance, and loan-to-debt-reduction. FHC 30(b)(6) p. 131; SSHC 30(b)(6) pp. 60-62. The Continuum also purchases REO properties to renovate for sale. FHC 30(b)(6) p. 131. Similarly, to help members of their communities retain existing housing, Plaintiffs perform home retention work, including foreclosure prevention, accessibility modifications, and code compliance repairs. *See* Dkt 369-4, PageID #29168-29200 (*Inclusive Communities Report*); SSHC 30(b)(6) pp. 60-62. For example, Plaintiff Fair Housing Center of Central Indiana makes grants to community groups helping seniors and low-income property owners make repairs to achieve code compliance and maintain ownership. FHCCI 30(b)(6) pp. 179-180. Plaintiffs also make grants to those in mortgage distress. SSHC 30(b)(6) pp. 60-62. In short, Plaintiffs' services help people get into homes and stay in them.

In addition to the above-described impairments, *see supra* (describing limited housing stock, investor purchases, stigmatizing and destabilizing neighborhoods), Defendants' REO practices harmed Plaintiffs' homeownership promotion activities by devaluing homes in minority neighborhoods and limiting access to credit. Defendants' actions decrease the likelihood of new homeseekers moving into the neighborhood. As HOME of Virginia explained, "when a property

10

is allowed to decay and isn't maintained at . . . a bare minimum level, it can be difficult for a home buyer – for a brand-new individual home buyer . . . to get financing." HOME of VA 30(b)(6) p. 180. It also impairs Plaintiffs' ability to keep homeseekers in the homes. As Plaintiff Open Communities testified, Defendants' conduct "lowers the property values for those who do live there, harming their ability to improve their own home through either refinancing or home equity, lines of credit." OC 30(b)(6) p. 125-128.

<u>REO-Specific Training and Education</u>: Finally, recognizing the gravity of the harm posed by REO discrimination, many Plaintiffs also channeled their ongoing training and education activities toward addressing this problem. By flouting their REO responsibilities in minority neighborhoods, Defendants undermined Plaintiffs' efforts to reform the industry and elicit compliance.

Central to Plaintiffs' mission is sharing fair housing knowledge through education and outreach, so that housing providers and consumers alike are singing from the same songbook. And many Plaintiffs had a songbook dedicated *specifically to REO maintenance.* Plaintiffs developed industry best practices for REO maintenance and marketing; trained industry stakeholders on these practices; met with local governments to encourage code violation enforcement for REOs; and issued reports to the industry and public beginning in 2011 on REO discrimination to raise awareness of the deleterious effects. Dkt. 369-5, Ex 48, PageID #29398-29594 (Ex. D to Amended Joint Interrogatory Responses, regional Plaintiffs, Ex. E to Amended Joint Interrogatory Responses, NFHA), (describing each Plaintiff's education and training activities). For example, Plaintiff Louisiana Fair Housing Action Center trained service providers in the Greater New Orleans area and met with a non-profit dedicated to eliminating blight. Dkt. 369-5, Ex. 48, PageID #29470 (Ex. D to Amended Joint Interrogatory Reponses). Plaintiff Denver Metro Fair Housing

Center organized and conducted trainings on REO maintenance for housing providers, municipal housing employees, HUD housing counseling staff, and the general public in its service area. Ex *Id.* p. 27.

Defendants' visibly inferior treatment of REOs in minority neighborhoods diluted, if not cancelled out, this education and outreach. Dkt. 308-1, Seicshnaydre, pp. 24, 27; NTFHC 30(b)(6) pp. 47, 193, 251; MMFHC 30(b)(6) (Tisdale) pp. 139-140; OC 30(b)(6) p. 127. This flouting of obligations, by some of the largest owners of REO properties, sent a message directly contrary to the one Plaintiffs were trying to send, signaling that compliance is optional. Indeed, despite their efforts, Plaintiffs struggled to encourage lenders and other institutions to invest in minority neighborhoods given the readily apparent blight. Nor were Plaintiffs able to effectively elicit local governments to enforce their housing codes in the wake of overwhelming violations caused by Defendants' REOs. MMFHC 30(b)(6) (Tisdale) pp. 139-140; Appendix A, generally. In other words, while Plaintiffs' core activities included education and outreach to amplify their REO gospel, Defendants' discriminatory practices drowned them out.

### III. Defendants' Arguments and Citation to Inapposite Authority Do Not Change the Outcome

Plaintiffs have demonstrated that, consistent with *Havens* and *FDA*, they have met standing requirements by showing that Defendants' actions perceptibly impaired their missions and the core activities furthering their missions. Defendants' arguments to the contrary fail.

First, Defendants incorrectly assert that, since *FDA*, "courts have repeatedly found organizational standing has been dramatically constricted for organization[al] plaintiffs." Def. Br. at 4-5.[8] Tellingly, Defendants have not pointed to a single case where a court has applied *FDA* to

---

[8] In support, they cite three unpublished opinions, none of which involve FHOs or the harm to mission-driven activities implicated here. *See Sarafin v. Hawai'i Pub. Hous. Auth.*, No. CV 24-00066 LEK-WRP,

12

deny organizational standing to a traditional FHO combatting housing discrimination. This is because there are none. Defendants fail to cite to *Fair Housing Center of Central Indiana v. M&J Mgmt. Co., LLC*, No. 1:22-cv-00612, 2024 WL 3859997, at *3 (S.D. Ind. Aug. 19, 2024), where the court held that its previous ruling that "[a] fair housing organization may also suffer redressable injury to its non-economic interest in encouraging open housing, or frustration of mission" remains good law under *FDA*. Because the FHO plaintiff—also a Plaintiff here—had to respond to and investigate defendants' actions in furtherance of that non-economic interest, this was more than sufficient to find standing. *Id.* at *3-4; *see also Access Living of Metropolitan Chicago, Inc. v. City of Chicago*, 2024 WL 4346630 at *3 (N.D. Ill. Sept. 20, 2024) (post-*FDA* case upholding standing for disability rights advocacy group); *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th at 397 (same, for voter registration group); *Get Loud Arkansas v. Thurston*, 2024 WL 4142754, at *6-7 (W.D. Ark. Sept. 9, 2024) (standing found for voter registration non-profit organization because the defendant "perceptibly impaired" the mission of the organization as prescribed by *Havens* and *FDA*); *Caicedo v. DeSantis*, 2024 WL 4729160, at *5 (M.D. Fla. Nov. 8, 2024) (finding standing where defendant's removal of voters from the rolls "caused many

---

2024 WL 5246597, at *4 (D. Haw. Dec. 30, 2024) (dismissing claims of "a nonprofit law firm," Legal Aid Society of Hawaii, whose "claimed mission" is to "provide legal assistance to qualified applicants" in a variety of areas); *RNC v. Benson*, --- F. Supp. 3d ---, No. 24-0262, 2024 WL 4539309, at *12 (W.D. Mich. Oct. 22, 2024), *appeal docketed*, No. 24-1985 (6th Cir. Nov. 8, 2024) (distinguishing cases involving political organizations from those involving FHOs and finding that the RNC did not have standing because it "allege[d] only the potential of a diversion of resources" and because it diverted resources "to discover whether any controversy exists" and not to "ameliorate and counteract the challenged practices" like in *Havens* and *Miami Valley v. Connor Group*); *Coal. on Homelessness v. City & Cnty. of San Francisco*, No. 22-CV-05502-DMR, 2024 WL 4982989, at *11 (N.D. Cal. Dec. 4, 2024) (dismissing nonprofit advocacy organization on standing grounds because organization conceded that it had not alleged a harm to its core business activities apart from those undertaken in "direct response to the City's actions").

13

voters . . . to feel as if their votes did not matter," which harmed plaintiff's mission of encouraging members of marginalized communities to engage in politics).

Second, Defendants spend significant time proclaiming that an organization that does not otherwise have standing cannot subsequently "spend its way into standing." *Id.* at 5-7. As discussed *infra*, Plaintiffs have never relied on diversion alone to establish standing, so Defendants' argument has no bearing on the outcome on this Motion.

Finally, citing the Ninth Circuit decision, *Mayes*, and a district court decision, *Legal Aid Chicago v. Hunter Properties, Inc.*, Defendants claim that Plaintiffs' damages are too generalized and abstract to pass muster. Def. Br. at 8. As discussed *supra*, *Mayes* actually reinforced the key principles from *Havens* that Plaintiffs identified, *see, e.g.*, 117 F.4th at 1175 ("*Havens* never discussed frustrating an abstract organizational mission;" instead, "it discussed the direct impact of racial steering on HOME's 'core business activities'"). And *Mayes*' holding that particular Ninth Circuit cases had over the years "loosened" standing requirements purports to describe the state of Ninth Circuit law and does not apply to the cases and precedent cited here. *Id.* at 1175. In *Legal Aid*, the court held that a legal services organization lacked standing when "the gist of the alleged injury" was that it was "harder for [plaintiff] to accomplish its mission." No. 23-CV-4809, 2024 WL 4346615, at *12 (N.D. Ill. Sept. 30, 2024). The *Legal Aid* plaintiff alleged that defendant's policy "cause[d] the group to spend more time and resources working on eviction cases," which the court found were too close to "baseline," "ordinary" expenditures to demonstrate "perceptible" injury. *Id.* at *10. Setting aside whether the holding comports with *Havens*—it does not[9]—

---

[9]In *Legal Aid*, Judge Seeger appeared to conclude that an organization can only establish direct impairment if "it force[d the organization] to stop its work and do something well outside of [its] job description before [it] could resume" its original work, and that one demonstration of such an impairment was if *Legal Aid* had had tenants who had applied to live in one of the defendant's properties. 2024 WL 4346615, at *10-11. But in another case cited by Defendants, *Judicial Watch, Inc. v. Illinois State Bd. of Elections*, No. 24 C

14

Defendants' argument ignores Plaintiffs' actual allegations. Here, Plaintiffs received complaints from its constituents about Defendant-owned REOs, interacted with Defendants in an effort to remediate the issue, and invested significant pre-litigation time designing and implementing a systemic investigation—thousands of hours that they would have otherwise expended on other work were it not for defendants' harm to its core, mission-driven activities. This is more than enough to support a finding of perceptible impairment under *FDA* and otherwise.

### IV.  The Consequent Drain on Plaintiffs' Resources Is Relevant to the Injury Analysis

Much of Defendants' inapposite authority, and the bulk of their brief, is spent arguing against a straw man. Namely, Defendants devote much attention to FDA's statement that an organization's diversion of resources, without more, is not an Article III injury. *See* Def. Br. at 5-7. True, but irrelevant. Plaintiffs here have never asserted just diversion of resources; Plaintiffs have alleged and proven perceptible impairment to their core activities, *see supra* Section II. Plaintiffs therefore cannot be said to have spent their way into standing. *Cf.* FDA, 602 U.S. at 395. Plaintiffs' showing satisfies *Havens*, *FDA*, and their progeny, conclusively resolving the standing inquiry. *See supra* Section II.

What Defendants fail to mention, however, is that *Havens* squarely held that where a defendant has perceptibly impaired an organization's core activities, a "consequent drain on resources" is part of the harm. 455 U.S. at 368. In those circumstances, the injury analysis extends to the organization's expenditure of "resources to identify and counteract the defendant's [conduct]." *Id.* at 379. Notably, *FDA* neither addressed nor disturbed this portion of *Havens*, and

---

1867, 2024 WL 4721512, at *6 (N.D. Ill. Oct. 28, 2024), the district court noted that "an organization's diversion of resources from one aspect of its mission to another also can establish that organization's economic injury." 2024 WL 4721512, at *6. The holding in *Legal Aid* is thus far narrower than what was contemplated in *Havens* and *FDA*, but in any event, Plaintiffs meet it.

15

it remains the law of the land. *See, e.g., Republican Nat'l Comm. v. Benson,* 2024 WL 4539309 at *12 (W.D. Mich. Oct. 22, 2024) (stating that plaintiffs in *Havens* and *Miami Valley* sufficiently alleged "personal stake in the outcome of a controversy" because plaintiffs' resources were required "to ameliorate and counteract the challenged practices").

Here, Plaintiffs have alleged and proven that they expended significant resources to identify and counteract the impairment of their core activities caused by Defendants' REO practices. *See e.g.,* PSAF ¶ 317 (citing Plaintiffs' diversion logs, which include dated entries explaining the time spent as a direct consequence of Defendants' REO practices); SAC ¶¶ 170-285 (detailing injury to Plaintiffs collectively and individually). Plaintiffs have also alleged and demonstrated that this expenditure of resources took time away from their other mission-driven activities. SAF ¶ 318 (citing record evidence of Plaintiffs' opportunity costs); SAC ¶¶ 172 (alleging injury in the form of "the diversion of resources from other programs central to Plaintiffs' mission"). Because this diversion of resources is tethered to the perceptible impairment Defendants caused, it is part of the harm, and it will be part of the measure of damages.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Respectfully Submitted,

| /s/ Jennifer K. Soule | /s/ Lila Miller |
|---|---|
| Jennifer K. Soule | Lila Miller |
| James G. Bradtke | Yiyang Wu |
| Kelly K. Lambert | Jennifer Klar |
| Steven P. Schneck | *Relman Colfax PLLC* |
| *Soule, Bradtke & Lambert* | 1225 19th Street, N.W., Suite 600 |
| PO Box 231 | Washington, DC 20036 |
| Geneva, IL 60134 | |
| | |
| Morgan Williams | Stephen M. Dane |
| *National Fair Housing Alliance* | *Dane Law LLC* |
| 1331 Pennsylvania Ave, NW, STE. 650 | P.O. Box 1011 |
| Washington, DC 20004 | Perrysburg OH 43552 |

Dated: February 21, 2025