# APPENDIX B

**Plaintiffs' Response to Defendants' Motion to Dismiss for Lack of Article III Standing
Case No. 18-CV-00839, N.D. IL**

<u>Excerpts from cited Plaintiffs' Depositions</u>

| Deposition | Docket Cite | Deposition Transcript Page No. | Appendix B PDF Page No. |
|---|---|---|---|
| Alvarado, DMFHC 30(b)(6) | | 80, 83-84 | 2-5 |
| Augustine, NFHA 30(b)(6) Vol. I | | 198 | 6-7 |
| Baade, FHC 30(b)(6) | | 131 | 8-9 |
| Crislip, HOME of VA 30(b)(6) | | 35, 157, 178, 180 | 10-14 |
| Espinoza, NTFHC 30(b)(6) | Dkt. 369-8 | 47, 193, 227-229, 251 | 15-21 |
| Houghtaling, HOPE FHC 30(b)(6) | Dkt. 369-8 | 21 | 22-23 |
| McCarthy, COFHA 30(b)(6) | Dkt. 369-26 | 158-159 | 24-26 |
| Nelson, FHCCI 30(b)(6) | Dkt. 369-8 | 39-40, 179-180 | 27-31 |
| Petruszak, SSHC 30(b)(6) | Dkt. 370-27 | 60-62 | 32-25 |
| Rice, NFHA 30(b)(6) Vol. I | Dkt. 369-4 | 51-53 | 36-39 |
| Riehlmann, OC 30(b)(6) | Dkt. 369-26 | 125-128, 146 | 40-45 |
| Stoddard, FHCWM 30(b)(6) | Dkt. 370-27 | 216-217 | 46-48 |
| Tisdale, MMFHC 30(b)(6) | Dkt. 369-8 | 139-140 | 49-51 |

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
    NATIONAL FAIR HOUSING          )
 4  ALLIANCE; HOPE FAIR HOUSING    )
    CENTER, et al.,                )
 5                                 )
                                   )
 6                  Plaintiffs,    )
                                   )
 7         vs.                     ) No. 1:18-cv-00839
                                   )
 8  DEUTSCHE BANK NATIONAL         )
    TRUST, as trustee, et al.,     )
 9                                 )
                                   )
10                  Defendants.    )

11

12         The videotaped deposition of ARTURO ALVARADO,

13  called by the Defendants for examination, taken remotely

14  pursuant to notice and pursuant to the Federal Rules of

15  Civil Procedure for the United States District Courts

16  pertaining to the taking of depositions, taken before

17  April M. Metzler, Certified Shorthand Reporter,

18  Registered Merit Reporter, Certified Realtime Reporter,

19  and Notary Public, at Thornton, Colorado, commencing at

20  9:01 a.m. Central Standard Time on the 20th day of

21  May, 2022.

22

23

24
```



1    HUD housing counseling.

2              Does the Fair Housing Center provide HUD

3    housing counseling?

4         A.   That's an interesting question there, because

11:00:29   5    there is a specific designation with HUD to be a

6    certified HUD housing counseling agency.

7              So the Denver Metro Fair Housing Center

8    provided fair housing directly counseling and education.

9    But for this document, this was intended for working

11:00:48   10   with HUD certified housing counseling agency.

11        Q.   So if I understand correctly, the Fair Housing

12   Center was not HUD-certified; is that right?

13        A.   Correct.  Not for -- we're not a HUD-certified

14   counseling agency.

11:01:08   15        Q.   Did you ever seek that certification?

16        A.   No.

17        MR. RADEMACHER:  Let's pull up Exhibit 7841, a

18   document bearing Bates number DMFHC 952.

19   BY MR. RADEMACHER:

11:01:44   20        Q.   Do you recognize this document?

21        A.   It's an assistance award.  I've seen these --

22   this format.  It's an award format on a number of

23   grants, yes.

24        MR. RADEMACHER:  Let's pull up Exhibit 7842.  This



 1   our fair housing action fund.

 2        Q.   And that's the fund that you said was funded

 3   with Wells Fargo settlement money, right?

 4        A.   Correct.

11:06:17  5        Q.   And on this first page, it says:  Program

 6   areas:  Neighborhood stabilization housing counseling.

 7             Did the Fair Housing Center provide housing

 8   counseling?

 9        MS. WU:  Objection to form.

11:06:38 10   BY THE WITNESS:

11        A.   You said the first page?

12             I don't --

13        Q.   Yeah.  It's -- there's a horizontal line here,

14   and it's three lines up from that horizontal line in the

11:06:50 15   middle of the page:  Program areas.

16        A.   And what was the question about that?

17        Q.   One of the program areas is housing

18   counseling.  And my question is:  Does the Fair Housing

19   Center provide housing counseling?

11:07:07 20        A.   I think I answered that earlier, but I will

21   try to answer that again.

22             There's specifically different types of

23   counseling.  When you're asking, does Denver Metro Fair

24   Housing Center provide housing counseling, we provide



1    counseling around fair housing.

2           So, yes, the Denver Metro Fair Housing Center

3    does provide counseling around fair housing.

4           Q.   And does this grant agreement -- when it says

11:07:30  5    "housing counseling," does that refer to the kind of

6    counseling that requires HUD certification?

7           A.   You're asking about this group's providing

8    housing counseling, if it requires HUD certification?

9           Q.   Yes.

11:07:45 10          A.   Yes.   They are a HUD-certified agency check

11   [sic] for housing counseling.

12          MR. RADEMACHER:   Let's pull up Exhibit 7834.

13          MS. WU:   Sorry can you repeat that?

14          MR. RADEMACHER:   7834.   It's a document bearing

11:08:22 15   Bates number DMFHC 594, which I'd like to mark as

16   Exhibit 7834.

17   BY MR. RADEMACHER:

18          Q.   When you have this open, if you could please

19   tell us what this document is.

11:08:42 20          A.   Looks like our third quarter report to HUD

21   from the period of 10/1/16 through 12/31/16.

22          Q.   So at the bottom of the page ending in 599 and

23   then continuing on to the next page ending in 600,

24   there's a section, 2.7, which says -- reads:   Continue



Case: 1:18-cv-00839 Document #: 435-2 Filed: 02/21/25 Page 6 of 51 PageID #:48281

National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA Lindsay Augustine - Vol 1 - 10/01/2021                    Page 1

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3
     NATIONAL FAIR HOUSING              )
4    ALLIANCE; HOPE FAIR HOUSING        )
     CENTER, et al.,                    )
5                                       )
                                        )
6                     Plaintiffs,       )
                                        )
7           vs.                         ) No. 1:18-cv-00839
                                        )
8    DEUTSCHE BANK NATIONAL             )
     TRUST, as trustee, et al.,         )
9                                       )
                                        )
10                   Defendants.        )

11

12           The videotaped Fed. R. Civ. P. Rule 30(b)(6)

13   deposition on behalf of National Fair Housing Alliance,

14   called by the Defendants for examination, taken remotely

15   pursuant to notice and pursuant to the Federal Rules of

16   Civil Procedure for the United States District Courts

17   pertaining to the taking of depositions, taken before

18   April M. Metzler, Certified Shorthand Reporter,

19   Registered Merit Reporter, Certified Realtime Reporter,

20   and Notary Public, at Royersford, Pennsylvania,

21   commencing at 9:05 a.m. on the 1st day of October, 2021.

22

23

24



1    disparities in the disposition of REO properties.  So in

2    Memphis and in Prince George's County, we found that

3    following the REO afterwards, poorly maintained REOs.

4    And then when we're looking, we were looking at REOs

5    with ten or more deficiencies, were more likely to sell

6    to investors, and they were more likely to be located in

7    communities of color.  And so we did do that review that

8    that analysis showed because, you know, of the poor

9    maintenance led to an outcome of being sold to

10   investors.

11       Q.   And so, I guess, I just want to make sure I'm

12   clear.

13            Other than the information in the REO database

14   and other than the information that you've now described

15   that you're calling the disposition review that was

16   done, is there any other evidence that NFHA collected

17   about communities of color being less desirable than

18   predominantly white communities?

19       MR. BRADTKE:  Objection, form.

20   BY THE WITNESS:

21       A.   I would refer -- I mean, I think those would

22   be NFHA's main sources of evidence, the evidence in the

23   complaint.  By maintaining them to a substandard level

24   in communities of color, they have become less



Case: 1:18-cv-00839 Document #: 435-2 Filed: 02/21/25 Page 8 of 51 PageID #:48283

National Fair Housing Alliance vs Deutsche Bank National Trust
David Baade 30(b)(6) Fair Housing Continuum Rep  - 11/03/2021                    Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION


 3
     NATIONAL FAIR HOUSING          )
 4   ALLIANCE; HOPE FAIR HOUSING    )
     CENTER, et al.,                )
 5                                  )
                                    )
 6                     Plaintiffs,  )
                                    )
 7            vs.                   ) No. 1:18-cv-00839
                                    )
 8   DEUTSCHE BANK NATIONAL         )
     TRUST, as trustee, et al.,     )
 9                                  )
                                    )
10                     Defendants.  )

11

12            The Fed. R. Civ. P. Rule 30(b)(6) deposition

13   on behalf of Fair Housing Continuum, called by the

14   Defendants for examination, taken remotely pursuant to

15   notice and pursuant to the Federal Rules of Civil

16   Procedure for the United States District Courts

17   pertaining to the taking of depositions, taken before

18   April M. Metzler, Certified Shorthand Reporter,

19   Registered Merit Reporter, Certified Realtime Reporter,

20   and Notary Public, at Ormond Beach, Florida, commencing

21   at 9:00 a.m. CST on the 3rd day of November, 2021.

22

23

24
```



National Fair Housing Alliance vs Deutsche Bank National Trust
David Baade 30(b)(6) Fair Housing Continuum Rep  - 11/03/2021

Page 131

1              Is that what I understand your testimony to

2    be?

3         A.    That was one of the things, yes.

4         Q.    How else were those Wells Fargo funds used?

5         A.    Down payment assistance, loan-to-debt ratio

6    reduction so you can qualify to a home loan,

7    rehabilitation of specific properties, purchase of REO

8    properties.  We found out we didn't have the impact

9    there that we wanted either.  Investors snapped those up

10   before we even know how to get them.

11        Q.    Would it be accurate to say that Continuum was

12   able to engage more with the community because it had

13   the Wells Fargo funds to work with?

14        A.    Yes, ma'am.

15        Q.    And --

16                   (Multiple speakers simultaneously

17                    speaking.)

18   BY THE WITNESS:

19        A.    -- come out of the woodwork.

20        Q.    Would it be accurate to say that those Wells

21   Fargo funds assisted Continuum in meeting what it

22   considered to be its mission and its goals for the

23   organization?

24        A.    Yes, ma'am.



```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
    NATIONAL FAIR HOUSING          )
 4  ALLIANCE; HOPE FAIR HOUSING    )
    CENTER, et al.,                )
 5                                 )
                                   )
 6                   Plaintiffs,   )
                                   )
 7          vs.                    ) No. 1:18-cv-00839
                                   )
 8  DEUTSCHE BANK NATIONAL         )
    TRUST, as trustee, et al.,     )
 9                                 )
                                   )
10                   Defendants.   )

11

12              The Fed. R. Civ. P. Rule 30(b)(6) deposition

13  on behalf of Housing Opportunities Made Equal of

14  Virginia, called by the Defendants for examination,

15  taken remotely pursuant to notice and pursuant to the

16  Federal Rules of Civil Procedure for the United States

17  District Courts pertaining to the taking of depositions,

18  taken before April M. Metzler, Certified Shorthand

19  Reporter, Registered Merit Reporter, Certified Realtime

20  Reporter, and Notary Public, at Richmond, Virginia,

21  commencing at 9:25 a.m. CST on the 1st day of

22  February, 2022.

23

24
```



Case: 1:18-cv-00839 Document #: 435-2 Filed: 02/21/25 Page 11 of 51 PageID #:48286

NFHA vs Deutsche Bank National Trust
Heather Crislip 30(b)(6) for Housing Opportunities Made Equal of VA   - 02/01/2022                    Page 35

1          Q.    Where are HOME of Virginia's offices located?

2          A.    We're in Richmond, Virginia.

3          Q.    Has it always been located there?

4          A.    Yes.  Various places within the city, but

5     currently at 626 East Broad Street.

6          Q.    What is HOME of Virginia's service area?

7          A.    That -- for fair housing, we serve the entire

8     state of Virginia.  So we are looking for instances of

9     housing discrimination and assist people with complaints

10    from across the state.

11              Fair housing counseling and foreclosure

12    prevention, we do work across the state, because most of

13    that work can be done remotely, when we're assisting

14    individuals who are facing foreclosure.

15              Our home ownership programs are Metro

16    Richmond, so we can provide down payment assistance and

17    consulting to first-time home buyers that are within,

18    probably, like a six-county service area, within --

19    right around in Central Virginia.

20              We also do mobility counseling, which is just

21    within, probably, the three-county area surrounding

22    Richmond.  And then we do a lot of policy and research

23    work that has statewide scope.

24          Q.    So for purposes of the REO investigation in



Case: 1:18-cv-00839 Document #: 435-2 Filed: 02/21/25 Page 12 of 51 PageID #:48287

NFHA vs Deutsche Bank National Trust
Heather Crislip 30(b)(6) for Housing Opportunities Made Equal of VA    - 02/01/2022                        Page 157

1    discriminatory maintenance practices directly impede its

2    efforts and frustrate its mission.

3              How do you know that defendants'

4    discriminatory maintenance practices directly impeded

5    the HOME of Virginia's efforts and frustrated its

6    mission?

7         A.   Well, first of all, any time there's illegal

8    housing discrimination, that frustrates HOME's mission

9    of ensuring equal access to housing.  That is our

10   primary purpose; it is what we were founded on.  And

11   enforcing the Fair Housing Act in Virginia is central to

12   our mission.

13             In addition to enforcing the Fair Housing Act,

14   we also ensure equal access to housing through extensive

15   housing counseling, and that relies on there being

16   properties on the market that are available to

17   first-time home buyers, which was directly impeded by

18   the fact that Deutsche Bank bought those properties and

19   properties that would have been available to our

20   first-time home buyers to decay and didn't properly

21   market them.  You know, given our mission, often those

22   properties then aren't available to first-time home

23   buyers.

24             We also, because of the lingering issues of



1   private market?

2        A.   Well, as we found in our investigation, the

3   neighborhoods that were in African American communities

4   were not maintained.  So often for our first-time home

5   buyer, that makes them not achievable with grants and

6   other ways in which they leverage down payment

7   assistance in order to live -- to purchase a property.

8             It was also the case that we saw an

9   astonishing number of properties that had been in

10  minority neighborhoods that had been traditionally

11  owner-occupied were sold to investors, so were, kind of,

12  permanently taken off the home ownership track and

13  became rental properties in those neighborhoods;

14  meaning, that they ultimately probably wouldn't be as

15  well maintained in to the future.  And just the lag of

16  time for those properties to be properly cleaned up and

17  marketed made them unavailable to our clients.

18       Q.   Do you know how many Deutsche Bank properties

19  ultimately became rental properties?

20       MS. DONOFRIO:  Objection to form.

21  BY THE WITNESS:

22       A.   We did not track ultimately -- I mean, I do

23  know, right, how many properties that we personally had

24  knowledge of that were not maintained well in African



1    assistance grants that come through CDBG or HOME

2    Investment Partnership Act dollars.  And those dollars

3    don't really allow for someone to buy a fixer-upper

4    property, or a property that needs a lot of work.  They

5    have to be able to pass an inspection.

6            So when a property is allowed to decay and

7    isn't maintained at, kind of, a bare-minimum level, it

8    makes them unachievable for a first-time home buyer.

9        Q.   And were you able to connect defendants'

10   conduct to the inability of potential homes for

11   first-time home owners to not pass inspections?

12       MS. DONOFRIO:  Objection to form.

13   BY THE WITNESS:

14       A.   I mean, I can affirmatively tell you that the

15   properties that I was aware of, that I -- you know, the

16   ones that I went out on and did inspections on and the

17   ones that I reviewed pictures of, of the ones that came

18   back in, would not have passed an inspection.

19       Q.   Do you have any idea the number of properties

20   that were maintained and marketed by defendants that

21   would have failed inspections after being sold?

22       MS. DONOFRIO:  Objection to form.

23   BY THE WITNESS:

24       A.   It looked to me like all of them.

```
1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION


3
     NATIONAL FAIR HOUSING         )
4    ALLIANCE; HOPE FAIR HOUSING   )
     CENTER, et al.,               )
5                                  )
                                   )
6                     Plaintiffs,  )
                                   )
7           vs.                    ) No. 1:18-cv-00839
                                   )
8    DEUTSCHE BANK NATIONAL        )
     TRUST, as trustee, et al.,    )
9                                  )
                                   )
10                    Defendants.  )

11

12           The Fed. R. Civ. P. Rule 30(b)(6) deposition

13   on behalf of North Texas Fair Housing Center, called by

14   the Defendants for examination, taken remotely pursuant

15   to notice and pursuant to the Federal Rules of Civil

16   Procedure for the United States District Courts

17   pertaining to the taking of depositions, taken before

18   April M. Metzler, Certified Shorthand Reporter,

19   Registered Merit Reporter, Certified Realtime Reporter,

20   and Notary Public, at Dallas, Texas, commencing at

21   9:05 a.m. CST on the 24th day of January, 2022.

22

23

24
```



1   by the defendants?

2        A.   I don't think that it was responsive to any of

3   those questions in any of those document requests.

4        Q.   Why not?

5        A.   I don't know.

6        Q.   Could you describe the current organizational

7   structure of the North Texas Fair Housing Center.

8        A.   Could you clarify that?

9        Q.   Yeah, sure.

10            I guess, if you had some sort of employee

11  chart, how would you describe the various roles that are

12  assigned to North Texas Fair Housing Center employees?

13       A.   Okay.  Well, there's me, the executive

14  director, and then I have two staff, and one staff is

15  primarily focused on investigation and one staff is

16  primarily focused on client counseling and advocacy and

17  education.

18       Q.   Do you have any other staff?

19       A.   No, there's just three of us.

20       Q.   And are all three of you full-time employees?

21       A.   Yes.

22       Q.   Has this staffing model changed since North

23  Texas Fair Housing Center's founding?

24       A.   Yes.



 1  repairs;

 2          And from September 2013 to February 2015,

 3  plaintiffs' programs and activities included housing

 4  accessibility modifications.

 5          Were there any other neighborhood

 6  stabilization programs, activities, or services, other

 7  than those listed here, that you allege defendants'

 8  conduct frustrated?

 9      MS. CHOI:  Objection to form.

10  BY THE WITNESS:

11      A.   Yes.  Deutsche's conduct also frustrated our

12  mission as far as conducting outreach and education for

13  the community.

14      Q.   How did that frustrate your mission?

15      A.   Well, one of our mission -- a piece of our

16  mission is to educate the community on housing

17  discrimination, you know, the hope that that will --

18  people will assert their rights or it will prevent

19  instances of housing discrimination.  And while we're

20  doing that, Deutsche is engaging in discrimination

21  contrary to our mission.

22          So it's frustrating our mission.  And it means

23  that we'll have to do more work regarding education and

24  outreach to counteract Deutsche's discrimination.



1      A.   Well, we were first -- I think what we're

2   skipping over is the fact that what Deutsche is

3   continuing to do is frustrating North Texas Fair Housing

4   Center's mission.  So while we're using these funds to

5   invest in these neighborhoods, Deutsche is further

6   destabilizing them.  Not that they're in there just

7   destabilizing the exact properties that we're investing

8   in, they're destabilize -- their discrimination is

9   destabilizing the neighborhood that we're trying to

10  invest in.

11      Q.   Is there any connection between defendants'

12  maintenance and marketing practices and the 36

13  homeowners you provided down payment assistance to?

14      A.   Again, it's not --

15      MS. CHOI:  Objection to form.

16  BY THE WITNESS:

17      A.   Frustration is not --

18      Q.   I'm sorry.  I'm going to cut you off because I

19  don't want to spin the wheels.  I'm not asking about

20  frustration of mission damages or anything else.

21           I'm just asking very plainly, yes or no, is

22  there any connection, that you can think of, between

23  defendants' maintenance and marketing practices and

24  these 36 loan modifications that you provided assistance

 1    for -- or sorry --

 2         MS. CHOI:  Objection --

 3                   (Multiple speakers simultaneously

 4                    speaking.)

 5         MR. WOOD:  Is there any --

 6    BY THE WITNESS:

 7         A.    -- our mission being frustrated is a part of

 8    that equation.

 9              I mean, I think what I'm not agreeing to is

10    the parsing out of, you know, how is Deutsche

11    destabilizing these 36 homeowners; it's not about that.

12    It's about our overarching mission to help stabilize

13    neighborhoods and prevent segregation and

14    discrimination.  And they're causing more of that

15    damage, while we're trying to make the neighborhood more

16    stable.  So it is about our frustration of mission.

17         Q.  Right.  Well, I'll repeat --

18         A.  I mean, you're kind of parsing it out and --

19         Q.  Right.  You're right, I am parsing it out

20    because I want just a very specific yes-or-no answer to

21    this --

22         A.  Frustrating our mission is causing damage, not

23    damage to the people that we're helping with the Wells

24    money, but more damage that's going to have to be



 1   remedied at some point or needs to be remedied.  I mean,

 2   I think the distinction you're trying to draw is not --

 3   doesn't make any sense if you're looking at the

 4   overarching frustration of housing discrimination, of

 5   our mission to eliminate housing discrimination.

 6        Q.   Right.

 7             Well, I'm not trying to draw a connection, I'm

 8   trying to ask if one exists, specifically between the

 9   down payment assistance you provided and defendants'

10   maintenance and marketing practices; yes or no?

11        MS. CHOI:  Objection to form, asked and answered.

12   BY THE WITNESS:

13        A.   Well, I -- I think that I'm not viewing it the

14   way you are, because what frustration of mission is, is,

15   they're causing us to not be able to see our mission

16   succeed, right.  We're trying to invest in this

17   community that's been destabilized, and here they are

18   causing more problems.

19             Are they causing problems for these 36

20   homeowners?  No.  But they're causing problems that need

21   to be remedied --

22        MR. WOOD:  Okay.  That's all I wanted to know.

23   Thanks.  That's it.

24   BY MR. WOOD:



1    the REO investigation?

2         A.   She did not.

3         Q.   So then why was there no time to hold these

4    clinics, if Diana Terry was not constrained by the REO

5    investigation?

6         A.   Because she had to take on other duties

7    related to our fair housing programs so that someone

8    else could do the REO investigations.

9         Q.   Whose duties did she take?

10        A.   She took over some of Nashla Kalifa's

11   responsibilities.

12        Q.   What responsibilities were those?

13        A.   Discrimination complaint intake and client

14   counseling.

15        Q.   Do you have any documents that support the

16   allegations in this first bullet point?

17        MS. CHOI:  Objection to the form.

18   BY THE WITNESS:

19        A.   I don't think so.

20        Q.   Then how would we know that it was your

21   participation in the REO investigations for the banks

22   that required you to cease providing these fair housing

23   clinics?

24        MS. CHOI:  Objection to form.



```
 1               IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   NATIONAL FAIR HOUSING        )
     ALLIANCE; HOPE FAIR HOUSING  )
 4   CENTER, et al.,              )
                                  )
 5              Plaintiffs,       )
                                  )
 6       -vs-                     )    No. 1:18-cv-00839
                                  )
 7   DEUTSCHE BANK NATIONAL TRUST, )
     AS TRUSTEE, ET AL.,          )
 8              Defendants.       )

 9

10                    DEPOSITION OF:

11                   ANNE HOUGHTALING

12

13          The deposition of ANNE HOUGHTALING,

14   called as a witness pursuant to notice and pursuant to

15   the provisions of the Federal Rules of Civil Procedure

16   and the Rules of the Supreme Court thereof pertaining

17   to the taking of depositions; taken before ISAIAH

18   ROBERTS, CSR, RPR, a Certified Shorthand Reporter in

19   the State of Illinois, via Zoom videoconference on

20   April 29th, 2022, commencing at 9:03 a.m.

21

22

23

24
```



09:23:00  1    opportunities for people to live in the homes and

09:23:02  2    communities of their choices regardless of race, color,

09:23:09  3    religion, national origin, sex, disability, sexual

09:23:12  4    orientation, or any other protected class under state or

09:23:16  5    local law.

09:23:17  6        Q.    Okay.  And how -- I'll probably use the

09:23:20  7    present tense, but if it's changed in the last two years

09:23:24  8    and you need to clarify that in your answer, please do.

09:23:27  9    How does HOPE go about accomplished that stated mission?

09:23:33 10    What types of things does it do?

09:23:36 11        A.    HOPE has a variety of programs and services

09:23:39 12    from public education, education and outreach, training

09:23:43 13    events for the public or caseworkers or lenders or

09:23:47 14    others.  And then we also do complaint intake,

09:23:52 15    investigation advocacy, and pursue -- pursue advocacy,

09:24:00 16    if that's the appropriate route.  For a period of the

09:24:05 17    time that I was there, we also did some community

09:24:09 18    development investments as well.

09:24:12 19        Q.    I'm sorry.  What was the last thing?

09:24:16 20    Community --

09:24:16 21        A.    Community development investments.

09:24:19 22        Q.    What does that mean?

09:24:20 23        A.    So we invested in communities, like the

09:24:27 24    neighborhood of Austin in the city of Chicago and Elgin,



1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3
     NATIONAL FAIR HOUSING          )
4    ALLIANCE; HOPE FAIR HOUSING    )
     CENTER, et al.,                )
5                                   )
                                    )
6                        Plaintiffs,  )
                                    )
7            vs.                    ) No. 1:18-cv-00839
                                    )
8    DEUTSCHE BANK NATIONAL         )
     TRUST, as trustee, et al.,     )
9                                   )
                                    )
10                       Defendants.  )

11

12            The Fed. R. Civ. P. Rule 30(b)(6) deposition

13   on behalf of Central Ohio Fair Housing Association,

14   called by the Defendants for examination, taken remotely

15   pursuant to notice and pursuant to the Federal Rules of

16   Civil Procedure for the United States District Courts

17   pertaining to the taking of depositions, taken before

18   April M. Metzler, Certified Shorthand Reporter,

19   Registered Merit Reporter, Certified Realtime Reporter,

20   and Notary Public, at Dayton, Ohio, commencing at

21   9:32 a.m. CST on the 14th day of March, 2022.

22

23

24



1      Q.    58.

2      A.    All right.

3      Q.    On the middle of page 58, there's a section

4  entitled:  COFHA frustration of mission.  That says:

5  Deutsche Bank has frustrated plaintiffs' mission since

6  at least 2014.  Right?

7      A.    Yes.

8      Q.    And then a little bit later on, it lists -- it

9  states:  Deutsche Bank's discriminatory maintenance and

10 marketing practices frustrated plaintiffs' missions and

11 goals of -- along with a list of four bullet points.

12 Right?

13     A.    Yes.

14     Q.    Do you have any records that show that each of

15 the listed items in this section are related to Deutsche

16 Bank REO properties specifically?

17     A.    No.

18     Q.    What proof do you have that Deutsche Bank's

19 alleged discriminatory maintenance frustrated its

20 missions and goals?

21     A.    Well, we're alleging that the blight on the

22 neighborhoods caused by the poor maintenance, and the

23 lack of marketing made those neighborhoods more

24 segregated, made people not want to move there, not want



 1  to invest there, and kept them, you know -- certainly

 2  did not invite homeowners, maybe attractive investors

 3  that could come and scoop them up for a song, but it

 4  reinforced the segregation that's there.

 5         It affected communities of color.  So it made

 6  our job harder and our goals harder to achieve.

 7      Q.   Have you calculated a precise amount of

 8  damages for frustration of mission?

 9      A.   No.

10      Q.   What evidence do you intend to give to an

11  expert witness to support these damages?

12      A.   I don't know.  We haven't settled upon that

13  yet.

14      Q.   So if you could go to page 59, there's another

15  list of four bullet points.  And that list says:

16  Deutsche Bank's discriminatory maintenance and marketing

17  practices undermine plaintiffs' efforts to advance its

18  missions and goals through education, advocacy, and

19  training programs -- following with a list.

20         Do you have any evidence or records that show

21  that the Deutsche Bank investigation stopped COFHA from

22  meeting any of these four bullet points -- or sorry --

23  attempting to complete any of these -- the actions in

24  these four bullet points?

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
        NATIONAL FAIR HOUSING          )
 4      ALLIANCE; HOPE FAIR HOUSING    )
        CENTER, et al.,                )
 5                                     )
                                       )
 6                        Plaintiffs,  )
                                       )
 7             vs.                     ) No. 1:18-cv-00839
                                       )
 8      DEUTSCHE BANK NATIONAL         )
        TRUST, as trustee, et al.,     )
 9                                     )
                                       )
10                        Defendants.  )

11

12             The Fed. R. Civ. P. Rule 30(b)(6) deposition

13      on behalf of Fair Housing Center of Central Indiana,

14      called by the Defendants for examination, taken remotely

15      pursuant to notice and pursuant to the Federal Rules of

16      Civil Procedure for the United States District Courts

17      pertaining to the taking of depositions, taken before

18      April M. Metzler, Certified Shorthand Reporter,

19      Registered Merit Reporter, Certified Realtime Reporter,

20      and Notary Public, at Indianapolis, Indiana, commencing

21      at 9:58 a.m. on the 23rd day of September, 2021.

22

23

24
```



 1    were just the Indiana metro area.  We have -- we did

 2    expand within our first five years to include an

 3    additional counties going to the Ohio border as well.

 4        Q.    What is the mission of The Center?

 5        A.    To ensure -- to ensure people opportunity in

 6    housing through advocacy, enforcement, education, and

 7    outreach.

 8        Q.    And that mission is stated on your website; is

 9    that right?

10        A.    Yes.

11        Q.    Does your website have the most up-to-date

12    information on The Center's mission and objective?

13        A.    On our mission.  I'm not sure what you mean

14    about "objective."  It has our vision statement, as well

15    as our program areas.

16        Q.    By "objectives," I meant goals.

17              So where would be the best place for me to

18    find what The Center's goals are?

19        A.    Probably through how we defined our program

20    areas.

21        Q.    And how do you define your program areas?

22        A.    So we have four main program areas that are

23    visible to the public, that is our advocacy program,

24    which is where we conduct investigations, both



1  allegation-based as well as systemic; we help people

2  gain an understanding whether or not there's evidence or

3  claims that they may or may not have been discriminated

4  against; and then we do systemic investigations as well.

5           Our education program, which is where we try

6  to get the word out about fair housing laws through

7  conferences, social media, websites, training,

8  et cetera.

9           We have an inclusive communities program,

10  which is where we give back; that is where we have at

11  different times secured pass-through grants or funding

12  through our work that we've given out to other

13  organizations.  And that's also where we're active on

14  other organizations' boards or committees.  And then our

15  board and staff also do some volunteer events each year.

16           And then we have our public policy program,

17  which is where we're active primarily within the Indiana

18  state General Assembly but also to some extent at the

19  federal and local levels.

20           We have a fifth program area, which is

21  administrative.  That's not something that, you know, we

22  put up on the website because it's really boring, and

23  people really don't care about that.  But it's, you

24  know, certainly how we make all those programs, kind of,



Case: 1:18-cv-00839 Document #: 435-2 Filed: 02/21/25 Page 30 of 51 PageID #:48305

National Fair Housing Alliance vs Deutsche Bank National Trust
Amy Nelson - 30(b)(6) Corp Rep - Central IN  - 09/23/2021                    Page 179

 1    Deutsche.

 2         Q.    So looking for the REO inspection forms with

 3    those dates; is that right?

 4         A.    And then matching it with the list that had

 5    the bank names on it.

 6         Q.    So when The Center says here that Deutsche

 7    Bank's alleged discriminatory maintenance and marketing

 8    practices impeded community investment and neighborhood

 9    stabilization programs activities and services, what do

10    you mean by that?

11         A.    So typically work that we were doing under the

12    Wells Fargo settlement as well as, you know, more

13    broadly as, you know, that continued post Wells Fargo,

14    you know, settlement as well.

15         Q.    On page 58 there, the first bullet point says:

16    From 2014 to 2015, plaintiff's programs and activities

17    included emergency repairs.

18              What repairs are you talking about there?

19         A.    So we had given a couple grants to some

20    community groups to do emergency repairs; so, for

21    instance, we gave a group called NeighborLink, that was

22    helping seniors and those of low income who need -- who

23    had code enforcement issues to get their homes repaired

24    so that they weren't at risk for losing their home, for

 1   instance.

 2          And I believe we had two other grants where

 3   emergency repairs were included as part of some other

 4   work that was being done.

 5        Q.   And how did Deutsche Bank itself specifically

 6   impede these programs?

 7        A.   Well, because if -- at the time of the Wells

 8   Fargo settlement, we tried to do a lot of press, provide

 9   a lot of information, you know, to the public about the

10   settlement and then the work that we were doing

11   throughout those subsequent years, it was certainly our

12   hope at the time that other lenders would see that and

13   make sure then that what they were doing was what was

14   being -- what they were required to do.

15        Q.   So the tie to Deutsche Bank is just that you

16   hope that they were paying attention to what you were

17   doing with other people?

18        A.   Well, my understanding was -- is that, there

19   were some groups who were meeting with them.  I was not

20   involved in that.  All I know is that in my particular

21   area, a lender or an REO, owner who continued to allow

22   their property to not be adequately marketed and

23   maintained, ended up then working against the work that

24   we were doing here with Wells Fargo to try to address



```
 1            IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3
     NATIONAL FAIR HOUSING          )
 4   ALLIANCE; HOPE FAIR HOUSING    )
     CENTER, et al.,                )
 5                                  )
                                    )
 6                    Plaintiffs,   )
                                    )
 7            vs.                   ) No. 1:18-cv-00839
                                    )
 8   DEUTSCHE BANK NATIONAL         )
     TRUST, as trustee, et al.,     )
 9                                  )
                                    )
10                    Defendants.   )

11

12            The Fed. R. Civ. P. Rule 30(b)(6) deposition

13   on behalf of South Suburban Housing Center, called by

14   the Plaintiffs for examination, taken remotely pursuant

15   to notice and pursuant to the Federal Rules of Civil

16   Procedure for the United States District Courts

17   pertaining to the taking of depositions, taken before

18   April M. Metzler, Certified Shorthand Reporter,

19   Registered Merit Reporter, Certified Realtime Reporter,

20   and Notary Public, at Village of Homewood, Illinois,

21   commencing at 10:32 a.m. CST on the 17th day of

22   November, 2021.

23

24
```



National Fair Housing Alliance vs Deutsche Bank National Trust
John Petruszak - 30(b)(6) South Suburban Housing Ctr Corp Rep  - 11/17/2021

Page 60

1   organizational damages and 1.42 million.

2            Have all of those amounts been spent now?

3        A.   There's still over a million dollars in grants

4   that have been awarded by the housing center, SSHC,

5   since that fund was established.  That fund is still

6   operative, and there's still a balance of a quarter of a

7   million dollars in the inclusive communities fund.

8        Q.   Who were those inclusive community grant --

9   program grants intended to help?

10       A.   They're intended to help individuals in

11   distressed communities.  We've identified 30 distressed

12   communities in our service area.  All of those except

13   for, I think, one on majority African American, but one

14   community is substantially African American population

15   of over 40 percent.

16            But in order to be eligible for a grant, you

17   have to live in one of those communities or be buying a

18   property in one of those communities.

19       Q.   And what was the problem those grants were

20   intend to ameliorate or solve?

21       A.   To kick-start the housing market in the south

22   suburb, and make sure people who were able to buy

23   properties had the ability to do that.  And more

24   importantly, with the distressed -- mortgage distress



National Fair Housing Alliance vs Deutsche Bank National Trust
John Petruszak - 30(b)(6) South Suburban Housing Ctr Corp Rep  - 11/17/2021                    Page 61

1    grants, to help people that were having problems, they

2    stay with a roof over their heads to stabilize the

3    housing market in those distressed communities.

4           We're involved in other programs that provided

5    monetary relief -- much more substantial monetary relief

6    in Illinois, the Hardest Hit program -- or counseling

7    programs administered that program for four and a half

8    years here.  And we were able to provide direct

9    assistance to people in mortgage distress through that

10   program.

11          Our own program, we -- dealing with mortgage

12   distress, we dealt with areas that wasn't covered by

13   Hardest Hit.  For instance, Hardest Hit did not cover

14   people that got into problems and were in distress

15   because of not being able to pay their real estate

16   taxes.

17          So we concentrated in assisting people with

18   real estate tax arrearages in administering those funds,

19   and we're able to -- approximately half of the money was

20   divided between down payment assistance, which we did in

21   the first phase of the program in the earlier years,

22   from 2014 through '16.  And then from '16 on, we've been

23   concentrating on the mortgage distress assistance grants

24   and providing those -- that assistance.



1          It's been difficult for us to be doing that

2   because of doing other things that we do here, including

3   investigating REO properties.

4          Q.    How did SSHC come to learn that there was an

5   investigation of Deutsche Bank-owned REO properties?

6          A.    Well, we had already become involved earlier

7   with the first investigation that we became involved in

8   was the Wells Fargo, and that was followed by --

9   actually, I mean, I think at the time that we started

10  doing investigations of Wells Fargo, NFHA asked us and

11  assigned us properties that were involved in several

12  different lenders.  And it probably went back to when we

13  first started doing the testing back in 2012 where we

14  did, in fact, start doing site visits at Deutsche Bank

15  properties in 2012, based upon these assignments that

16  NFHA gave us.

17         Q.    Before your involvement in that investigation,

18  did you have any opinions of how Deutsche Bank-owned REO

19  properties were being maintained?

20         MR. SCHNECK:  Objection -- I don't mean

21  "objection."

22         Can you just -- I think I missed the first

23  word of your question, Kurt.  Did you say "before"?

24         MR. RADEMACHER:  Yes.



```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
     NATIONAL FAIR HOUSING            )
 4   ALLIANCE; HOPE FAIR HOUSING      )
     CENTER, et al.,                  )
 5                                    )
                                      )
 6                     Plaintiffs,    )
                                      )
 7          vs.                       ) No. 1:18-cv-00839
                                      )
 8   DEUTSCHE BANK NATIONAL           )
     TRUST, as trustee, et al.,       )
 9                                    )
                                      )
10                     Defendants.    )

11

12            The Fed. R. Civ. P. Rule 30(b)(6) videotaped

13   deposition on behalf of National Fair Housing Alliance,

14   called by the Defendants for examination, taken remotely

15   pursuant to notice and pursuant to the Federal Rules of

16   Civil Procedure for the United States District Courts

17   pertaining to the taking of depositions, taken before

18   April M. Metzler, Certified Shorthand Reporter,

19   Registered Merit Reporter, Certified Realtime Reporter,

20   and Notary Public, at Washington, D.C., commencing at

21   9:03 a.m. CST on the 8th day of October, 2021.

22

23

24
```



1    that have to be complied with.

2           And so those -- in that context, those

3    standards may not exist, for example, in the case of an

4    owner occupant who is putting their house on the market.

5    So from that context, there may be some variances.

6           But, generally speaking, the variances are not

7    that large, they're not that great, when it comes to

8    marketing an REO asset as compared to, you know, an

9    asset that may not be an REO asset.

10       MS. KRIGSTEN:  Well, we've been talking here for

11   about an hour and a half.  Why don't we take a

12   ten-minute break, and then stretch our legs, and we'll

13   come back and resume.

14       THE VIDEOGRAPHER:  The time is 10:28 a.m.  We are

15   now going off the record.

16                   (A short break was had.)

17       THE VIDEOGRAPHER:  Time is 10:41 a.m.  We are now

18   back on the record.

19   BY MS. KRIGSTEN:

20       Q.   Ms. Rice, how did the REO investigation begin?

21   What was the basis for starting it?

22       A.   We began receiving complaints from industry

23   professionals.  We received complaints from

24   community-based groups, organizations around, I want to



1   say, 2009, the early part of 2009, about improper

2   maintenance and differences in treatment with respect to

3   the maintenance, management, and marketing of REO units

4   based on the racial compensation of the neighborhood.

5          So at conferences that we attended, the NAACP,

6   the National Association of Real Estate Brokers,

7   National Association of Hispanic Real Estate

8   Professionals, fair housing conferences, fair lending

9   conferences, we just were peppered with complaints and

10  comments from people working on the ground,

11  community-based organization, neighborhood

12  revitalization groups, real estate professionals.

13         We were peppered with these complaints that

14  properties in communities of color that had been

15  foreclosed upon were not being properly maintained.

16         We even were getting complaints that these

17  properties were not being sold to owner occupants so

18  that it was very, very difficult for hardworking

19  families to be able to purchase these single-family

20  assets, and that they seemed to be disproportionately

21  going to investors.

22         And so based upon those kinds of complaints,

23  we began engaging in further discussions with anybody

24  that we came across working in the real estate sales



1   community, working in the servicing community,

2   investors, anybody that we knew we just started having

3   conversations with people about what was really

4   happening.

5          And then we conducted, sort of, a preliminary

6   analysis of properties -- REO properties -- in different

7   communities in and around the Washington, D.C. area to

8   see if we could observe any differences in terms of the

9   external treatment of these properties.  And we did, in

10  our preliminary analysis, the information we gleaned

11  seemed to buttress and support the intelligence that we

12  were getting from industry professionals, all of the

13  folks that I heretofore mentioned.

14         And so we designed the investigation and began

15  implementing it.

16     Q.   So you referenced conversations with

17  individuals from various entities, community entities,

18  real estate professionals; that sort of thing.

19         Where are those discussions -- or how are

20  those discussions memorialized?

21     A.   Well, most of them were not memorialized; in

22  fact, I don't know that any of them were.

23         Again, we -- I might be speaking at an NAACP

24  conference.  And after the conference was over, someone

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
       NATIONAL FAIR HOUSING          )
 4     ALLIANCE; HOPE FAIR HOUSING    )
       CENTER, et al.,                )
 5                                    )
                                      )
 6                     Plaintiffs,    )
                                      )
 7            vs.                     ) No. 1:18-cv-00839
                                      )
 8     DEUTSCHE BANK NATIONAL         )
       TRUST, as trustee, et al.,     )
 9                                    )
                                      )
10                     Defendants.    )

11

12             The Fed. R. Civ. P. Rule 30(b)(6) deposition

13     on behalf of Open Communities, called by the Defendants

14     for examination, taken remotely pursuant to notice and

15     pursuant to the Federal Rules of Civil Procedure for the

16     United States District Courts pertaining to the taking

17     of depositions, taken before April M. Metzler, Certified

18     Shorthand Reporter, Registered Merit Reporter, Certified

19     Realtime Reporter, and Notary Public, at Chicago,

20     Illinois, commencing at 10:07 a.m. CST on the 12th day

21     of January, 2022.

22

23

24
```



1      Q.   Understood.

2           So let's go to the second amended complaint

3   again, Exhibit 5341.

4      A.   Okay.

5      Q.   And so if we're looking at the second amended

6   complaint, paragraph 275 reads:  Defendants' actions

7   have also frustrated the mission and purpose of Open

8   Communities.  As described in greater detail above, Open

9   Communities' mission is to ensure equal housing

10  opportunities and to fight unlawful discrimination and

11  segregation.  Defendants' discriminatory maintenance

12  practices directly impede its efforts and frustrate its

13  mission.

14          Is that an accurate statement of how

15  defendants' conduct impeded Open Communities' mission?

16      MS. WU:  Objection to form.

17  BY THE WITNESS:

18      A.   It is accurate, but it is not comprehensive.

19      Q.   So what would be the broader description that

20  would encompass the totality of what you claim was

21  frustrated as a result of defendants' conduct?

22      A.   Well, I would say that our mission is pretty

23  accurately described in the complaint.  Our mission is

24  to eradicate housing discrimination, to fight against



 1   any sort of policy that landlords, company, banks would

 2   have that would prevent individuals from living wherever

 3   they want, as well as ensuring that we live in an

 4   integrated society and diverse communities; that's what

 5   our mission is.

 6          And if we were frustrated by Deutsche Bank and

 7   Altisource's actions, in a variety of ways.  First of

 8   all, it's a direct discrimination and harming our

 9   communities.  Additionally, it's harming the communities

10   that we live in by preventing diverse communities.

11   Individuals are unable to live in healthy, well

12   financed, good-looking communities.  People don't want

13   to live in blighted communities.

14          I don't think that's the entirety of the

15   frustration of mission, but that's a start.

16      Q.   I mean, do you want to elaborate?

17      A.   Sure.

18      Q.   Is there --

19      A.   Sure.

20          So when it comes down to our frustration of

21   mission, it's in our name.  We're Open Communities.  We

22   want to look -- we are fighting for diverse communities.

23   People should be able to own homes and be able to build

24   wealth and live in diverse communities.  And when



 1   buildings are left to be blighted and abandoned and so

 2   on, it lowers the property values for those who do live

 3   there, harming their ability to improve their own home

 4   through either refinancing or home equity, lines of

 5   credit, and then it prohibits individuals from moving

 6   into these neighborhoods as well.

 7             So it creates a stagnated group of people

 8   living in these areas.

 9             So we want vibrant full communities for our

10   clients and for our service area.

11        Q.   Is there anything else that you describe as

12   Open Communities' mission that was frustrated as a

13   result of defendants' conduct?

14        A.   Again, it's direct discrimination in our

15   opinion.  We educate the community of what proper, fair

16   housing procedures are.  And by failing to live up to

17   those standards, it's frustrating the mission of Open

18   Communities by not listening to our education and

19   directly discriminating against our residents.

20        Q.   How did the defendants directly discriminated

21   residents in your service area?

22        A.   By choosing to not to -- choosing to not

23   perform proper maintenance in the communities that need

24   it the most, in the communities that are minority --



1   maintenance neighborhoods, while at the same time

2   choosing to maintain and upkeep the ones that are in

3   nonminority neighborhoods.

4        Q.   How do you measure that defendants' conduct

5   directly discriminates against residents in your service

6   area?

7        MS. WU:  Objection to form.

8   BY THE WITNESS:

9        A.   Well, we can measure it by seeing which places

10  were actually maintained, the ones in nonminority

11  neighborhoods, and the ones that were not maintained,

12  the ones that were in minority neighborhoods.  We've got

13  that data.

14            But in order to draw like the bigger picture

15  nationwide, I would probably defer to NFHA and all of

16  their statistics.  They would have a better view than I

17  would.

18            But at least in our service area, the

19  nonminority neighborhoods were maintained properly were

20  at the expense of the minority neighborhoods.

21       Q.   And so then what evidence exists that shows

22  this direct connection for properties and residents

23  specifically in Open Communities' service area?

24       MS. WU:  Objection to form.

```
 1   has previously described Open Communities' mission, no.
 2        Q.   So what activities were you frustrated with as
 3   a result of defendants' frustration -- Or sorry.
 4             What activities were interfered with by
 5   defendants' conduct?
 6        A.   The activities that were interfered with were
 7   healthy and diverseful [sic] ownership in our service
 8   area, all of the things that I mentioned previously that
 9   Deutsche Bank has frustrated.
10        Q.   Sorry.  I mean, specifically what, like, Open
11   Communities' activities were interfered with?
12        A.   Oh.  As a part of -- in conjunction with
13   fighting against housing discrimination, we also have a
14   housing counseling program, which promotes home
15   ownership, foreclosure assistance, prepurchasing --
16   postpurchasing counseling, making sure that people stay
17   in their homes.  And they can refinance, and they have
18   access to whatever they need to build their own wealth
19   in their homes.  And I would say that Deutsche Bank
20   interfered with those activities, ensuring that we had
21   clients who could own homes in healthy neighborhoods and
22   have appraisals that properly show how much their home
23   is worth.
24        Q.   How did defendants' conduct interfere with
```



National Fair Housing Alliance vs Deutsche Bank National Trust
Elizabeth Stoddard 30(b)(6) - 09/22/2021                                    Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
     NATIONAL FAIR HOUSING         )
 4   ALLIANCE; HOPE FAIR HOUSING   )
     CENTER, et al.,               )
 5                                 )
                                   )
 6                    Plaintiffs,  )
                                   )
 7         vs.                     ) No. 1:18-cv-00839
                                   )
 8   DEUTSCHE BANK NATIONAL        )
     TRUST, as trustee, et al.,    )
 9                                 )
                                   )
10                    Defendants.  )

11

12             The videotaped Fed. R. Civ. P. Rule 30(b)(6)

13   deposition on behalf of Fair Housing Center of West

14   Michigan, called by the Defendants for examination,

15   taken remotely pursuant to notice and pursuant to the

16   Federal Rules of Civil Procedure for the United States

17   District Courts pertaining to the taking of depositions,

18   taken before April M. Metzler, Certified Shorthand

19   Reporter, Registered Merit Reporter, Certified Realtime

20   Reporter, and Notary Public, at Grand Rapids, Michigan,

21   commencing at 10:09 a.m. CST on the 22nd day of

22   September, 2021.

23

24
```



1  agency research fund.  It was not a grant or contract

2  activity.

3          And so it was diverting our time that we had

4  for activities that were creative or innovative or any

5  activities that were not under a specific grant or

6  contract, and that includes something like the book

7  club.

8      Q.   So moving on to community outreach, which is

9  page 54 through 64, how was this information gathered?

10     A.   This information was gathered from those

11 education and outreach spreadsheets that I had mentioned

12 before.

13     Q.   The first entry that says September -- or I'm

14 sorry -- July 8, 2013, that:  The Fair Housing Center of

15 Western Michigan staff met with a representative of

16 Friends of Grand Rapids Parks to discuss the 49507

17 exclamation point project.

18          What was that project?

19     A.   The 49507 project was a project for -- it was

20 a project to invest in a particular region identified in

21 the 49507 ZIP code to specifically try to address the

22 outcomes of -- well, the purpose of the program -- I

23 believe we provided more information about that.  I

24 don't -- I didn't oversee that project.  But it was

```
1    essentially a neighborhood stabilization program.  It

2    had a lot of different components to try to invest in an

3    area.

4         Q.   So 49507 is a specific ZIP code in Grand

5    Rapids; is that right?

6         A.   That's correct.

7         Q.   Is it right that the funding came from the

8    Wells Fargo grant -- or the Wells Fargo settlement?

9         A.   That's correct.

10        Q.   So as a result of the money that the Fair

11   Housing Center received, it engaged in this 49507

12   exclamation point project?

13        A.   That's correct.

14        Q.   And did that grant pay for all the expenses

15   associated with the project?

16        A.   I don't know if it covered all the expenses.

17        Q.   Did Wells Fargo have a lot of the REO

18   properties in the ZIP code referenced?

19        A.   I don't know.  And we didn't search for REO

20   properties ourselves.

21        Q.   Do you know why the Wells Fargo funds were

22   used specifically for a project in that ZIP code?

23        A.   I believe it was, in part, due to the fact

24   that there had been -- it was determined that there had
```

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
     NATIONAL FAIR HOUSING          )
 4   ALLIANCE; HOPE FAIR HOUSING    )
     CENTER, et al.,                )
 5                                  )
                                    )
 6                     Plaintiffs,  )
                                    )
 7            vs.                   ) No. 1:18-cv-00839
                                    )
 8   DEUTSCHE BANK NATIONAL         )
     TRUST, as trustee, et al.,     )
 9                                  )
                                    )
10                     Defendants.  )

11

12            The Fed. R. Civ. P. Rule 30(b)(6) deposition

13   on behalf of Metropolitan Milwaukee Fair Housing

14   Council, called by the Defendants for examination, taken

15   remotely pursuant to notice and pursuant to the Federal

16   Rules of Civil Procedure for the United States District

17   Courts pertaining to the taking of depositions, taken

18   before April M. Metzler, Certified Shorthand Reporter,

19   Registered Merit Reporter, Certified Realtime Reporter,

20   and Notary Public, at Milwaukee, Wisconsin, commencing

21   at 9:02 a.m. CST on the 4th day of March, 2022.

22

23

24
```



Case: 1:18-cv-00839 Document #: 435-2 Filed: 02/21/25 Page 50 of 51 PageID #:48325

NFHA vs Deutsche Bank National Trust
William Robert Tisdale 30 (b)(6) Corp Rep Metro Milwaukee FHC  - 03/04/2022                    Page 139

1    the mid-2000s and were attempting to identify funding

2    and attempting to put a program in place that we could

3    do a pilot here, reestablish a pilot here in Milwaukee.

4    We were unable to devote any attention or time to that,

5    which deferred our mission and frustrated our mission to

6    create and maintain racially and economically integrated

7    communities.  We had to STOPP program, which Lemuel was

8    a part of.  STOPP is an acronym, S T O P P, for

9    Strategies to Overcome Predatory Practices.

10            Lemuel had worked for some time, at least as

11   our education and outreach under the fair lending

12   program, dealing with homeowners, dealing with

13   community-based organizations, dealing with lenders and

14   others in the community, including government, to

15   develop ways that we could provide information to folks

16   who already owned homes and those who were planning to

17   own homes.

18            Again, part of our mission, to create

19   stabilized neighborhoods racially and economically, and

20   those activities were frustrated; we were not able to

21   get those underway.

22            There were a whole realm of education and

23   outreach that we needed to establish and develop,

24   including developing PowerPoint presentations



1   specifically for REOs, once we identified the vastness

2   of the magnitude of the issues going on with properties

3   that were abandoned, properties that were boarded-up,

4   properties that basically devalued neighborhoods,

5   disinvestment, created issues for areas that we were

6   concentrating on to stabilize, Deutsche Bank was one of

7   the main actors, if not a major actor, in frustrating

8   our mission to carry those out.

9           There were more than, at one point, 17,000

10  code violations for Deutsche Bank properties that were

11  owned in Milwaukee, and that was -- there were only

12  1,402 properties but there were 17,000 violations.

13          So our mission to stabilize neighborhoods, to

14  essentially provide economic resource for individuals

15  looking for housing, was frustrated.

16          The actions of Deutsche Bank took houses off

17  the market.  There's a lack of affordable housing in

18  Milwaukee.  And these boardups are unusable.  You can't

19  sell them.  You can't tear them down.  It costs money

20  for the City to do that.  And they were creating blight

21  in our neighborhoods, creating -- everything that we're

22  trying to fight against to create the stabilization of

23  neighborhoods, these activities were thwarting our

24  efforts.

