**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-00839 Honorable Manish S. Shah |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS'
MOTION TO DISMISS FOR LACK OF ARTICLE III STANDING**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.      HAVENS, HIPPOCRATIC MEDICINE, AND OTHER AUTHORITY
DEMONSTRATE THAT PLAINTIFFS HAVE NO ARTICLE III STANDING ............ 2

II.     DEFENDANTS DID NOT IMPAIR PLAINTIFFS' PURPORTED CORE
ACTIVITIES ...................................................................................................... 7

     A.     Plaintiffs Have Not Demonstrated That Defendants Impaired Plaintiffs'
Consumer Counseling And Referral Services ...................................................... 7

     B.     Defendants Did Not Impede Plaintiffs' "Neighborhood Stabilization
Activities." ...................................................................................................... 10

     C.     Plaintiffs Fail to Show That Defendants Impaired Plaintiffs'
"Homeownership Promotion" Operations ......................................................... 11

     D.     Plaintiffs' "REO-Specific Training and Education" Cannot Support
Standing .......................................................................................................... 12

III.    THE PURPORTED "DRAIN" ON PLAINTIFFS' RESOURCES IS
IRRELEVANT TO THE QUESTION OF STANDING ................................................. 13

CONCLUSION .................................................................................................................. 13

## INTRODUCTION

Plaintiffs lack Article III standing. Nothing in Plaintiffs' Opposition demonstrates otherwise. The Court provided clear and explicit instruction at the presentment hearing directing Plaintiffs to explain how Defendants' alleged conduct specifically "affects" or impairs Plaintiffs' counseling and other services. *See* Ex. A, Tr. of Feb. 19, 2024 Status Hearing, at 4:1–6:14. Nevertheless, Plaintiffs simply restate, again and again throughout their 110-page submission: (i) their organizations' desired *ends* or aspirations, and (ii) that Plaintiffs provide services related to those ends. Plaintiffs then claim that Defendants' conduct impaired those services without providing any specific examples demonstrating how that alleged impairment was specifically caused by Defendants' conduct. Plaintiffs' lack of specificity contravenes the Court's clear instructions and is fatal to Article III standing here.

Moreover, contrary to Plaintiffs' precedent-defying assertions, standing is not established simply because a defendant purportedly caused extra work for an organization or created a setback to an organization's abstract social interests. Plaintiffs are required to show that Defendants' actions specifically impaired their core business activities, and they have not done so.

Plaintiffs' 43-page chart also does not help Plaintiffs save their lawsuit. Rather than provide the information requested by this Court, it simply lists generic services provided by each plaintiff and summarily declares that "Defendants' REO conduct impairs [the listed] core activity." *See, e.g.*, Dkt. 435-1. As set forth below, these conclusory assertions do not demonstrate impairment. Accordingly, there is no Article III standing, and Plaintiffs' lawsuit should be dismissed.

## LEGAL STANDARD

Plaintiffs cannot meet the following Article III standing requirements: "(i) that [they have] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused

by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."

*FDA v. Alliance for Hippocratic Medicine, et al.*, 602 U.S. 367, 380 (2024).

## ARGUMENT

I. ***Havens*, *Hippocratic Medicine*, And Other Authority Demonstrate That Plaintiffs Have No Article III Standing.**

Plaintiffs do not (and cannot) meet the stringent Article III standing requirements enumerated by *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *Hippocratic Medicine*. To start, *Havens* held that an organization's advocacy for abstract social goals is not enough for standing; there must be an *impairment* by defendant of the plaintiff organization's core activity:

> Havens had provided HOME's black employees false information about apartment availability—a practice known as racial steering. [*Havens*, 455 U.S.] at 366 and n. 1, 368, 102 S.Ct. 1114. Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service. *Id.*, at 368, 102 S.Ct. 1114. And when Havens gave HOME's employees false information about apartment availability, HOME sued Havens because ***Havens "perceptibly impaired HOME's ability to provide counseling and referral services*** for low- and moderate-income homeseekers." *Id.*, at 379.

*Hippocratic Medicine*, 602 U.S. at 395 (emphasis added). With *Havens*'s narrow holding in mind, the Supreme Court declined to find Article III standing in *Hippocratic Medicine* because the defendant there did not impose an "impediment to the [plaintiff's] advocacy business" but rather simply made it "more difficult for" the plaintiff organization to accomplish its objectives. *Id.* at 395–96 (noting that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context").

Faced with this daunting Supreme Court authority, Plaintiffs resort to misstating *Havens* by claiming it establishes standing where there is a "reduc[tion in] the [housing] choices [the plaintiff] could offer as part of its services." Opp. at 3–4. That is wrong. Standing is not created based on abstract social goals like assuring there is enough affordable housing for all populations; rather, it comes from an action that impairs an organization's core activities, *e.g.*, racial steering

in *Havens*.

While NFHA contends that the holding in *Havens* is still untouched and applies broadly, courts considering this issue limit *Havens* to its specific facts and interpret both *Havens* and *Hippocratic Medicine* as adopting a specific impairment standard that organizational plaintiffs must satisfy to establish Article III standing. Indeed, courts generally find that standing requires some *impairment* or *interference* with an organization's existing (not aspirational) core activities. The Fourth, Sixth, and Ninth Circuit cases cited in Plaintiffs' Opposition all underscore this point and demonstrate that standing is not appropriate here.[1] *Republican Nat'l Comm. v. N. Carolina State Bd. Of Elections*, 120 F.4th 390, 395–97 (4th Cir. 2024) (finding that defendant's refusal to strike "certain registered voters from NC's voter rolls … **concretely impaired** [plaintiffs'] core missions" of election security, voter integrity, and "counseling interested voters and volunteers on election participation") (emphasis added); *Fair Hous. Ctr. of Metro Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992–93 (6th Cir. 2025) (remanding case for further discovery "on defendants' alleged interference with the [plaintiff's] core business activities" to enable the court to "address on a complete record whether [plaintiff] has shown **interference** with its core business activities") (emphasis added); *Az. Alliance for Retired Americans v. Mayes*, 117 F.4th 1165, 1178 (9th Cir. 2024) (finding no standing because law challenged by plaintiffs did not "**directly affect**" plaintiffs' "pre-existing core activities [and, w]ith or without the [law], the plaintiffs c[ould] still … continue their core activities that they have always engaged in") (emphasis added).

---

[1] Even the district court cases cited by Plaintiffs from other jurisdictions (*see* Opp. at 13–14) demonstrate that, in order to have standing, Plaintiffs must show impairment or interference by Defendants of Plaintiffs' pre-existing core business activities. *See, e.g.*, *Caicedo v. DeSantis*, No. 6:23-cv-2303, 2024 WL 4729160, at *5 (M.D. Fla. Nov. 8, 2024) (finding standing where Defendant "interfered with [plaintiff's] core business activities"); *Get Loud Arkansas v. Thurston*, No. 5:24-cv-5121, 2024 WL 4142754, at *13 (W.D. Ark. Sept. 9, 2024) (finding standing where challenged rule's "direct effect and interference with [plaintiff's] organizational activities has 'perceptively impaired' [plaintiff's] ability to provide" certain services to Arkansans).

In this jurisdiction, *Legal Aid Chicago* provides an excellent post-*Hippocratic Medicine* roadmap for analyzing standing Article III standing in a Fair Housing Act lawsuit. *Legal Aid Chicago v. Hunter Properties, Inc.*, No. 23-cv-4809, 2024 WL 4346615 (N.D. Ill. Sept. 30, 2024). In *Legal Aid*, the public interest organization alleged that the defendant's "policy of denying applicants with any prior eviction filings [from renting properties] ha[d] a disparate impact on black renters" and impaired the organization's mission of "'maximizing low-income Cook County residents' access to safe, decent and affordable housing[.]'" *Id.* at *4, 6. In examining these allegations, the court analyzed *Havens and Hippocratic Medicine* and applied Seventh Circuit law to summarize the applicable Article III standard:

> [A]n organization suffers a concrete injury if it devotes resources to combatting a discrete regulation or policy, at the expense of its other work….But the impact must be real and measurable – it must be "perceptible." And an organization cannot allege an injury in fact based on "baseline" or "ordinary program costs" of the work that it is already doing….In other words, alleging an injury doesn't require a diversion of resources to an entirely different topic. But it does require the organization to have undertaken activities outside its usual or normal work….An organization does not have standing because a defendant has "impaired" its "ability to provide services and achieve their organizational missions." The Supreme Court affirmed that a "plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'"

*Id.* at 9–10 (internal citations omitted). Using this standard, the *Legal Aid* Court analogized the defendant's purported impact on Legal Aid Chicago's work to making the job of a streetsweeper harder. *Id.* at *11. Throwing a few extra candy wrappers on the ground (*i.e.*, defendant creating more eviction-related housing denials) does not "impair the streetsweeper's ability to *work toward* his job," it just makes the job more difficult. *Id.* (emphasis in original). That is not injury. A parked car on the road blocking the streetsweeper's ability to do his job would be an injury. *Id.* Notably, the *Legal Aid* Court found that causation between the purported injury and defendant's conduct also was "lacking" because Legal Aid Chicago failed to allege that it "dealt directly with [the

defendant], or spent any resources helping potential tenants who dealt with [the defendant]." *Id.*

As demonstrated below, just like the extra candy wrapper to the streetsweeper, Plaintiffs have not demonstrated that Defendants' alleged actions do anything more than make their job harder. Plaintiffs would be doing the same activities regardless of Defendants' actions. *Id.* at *12 ("Legal Aid Chicago has not pled a perceptible impairment of its *ability* to provide services.") (emphasis in original). Likewise, Plaintiffs have not demonstrated that any specific individual whom they represent in their counseling efforts was deterred from seeking housing near or within any specific neighborhood which supposedly was not maintained by Defendants. Thus, just like in *Legal Aid*, causation is lacking here.

Plaintiffs have no good answer for *Legal Aid*. They try to brush it off by saying that it does not "comport[] with *Havens*" and then they attempt to argue around the facts. Opp. at 14–15. Neither works. While Plaintiffs say they "received complaints from its constituents about Defendant-owned REOs," Plaintiffs solicited those complaints from neighbors of properties within the communities at issue while they were on location performing their self-initiated investigation of those same properties; the complaints are not from people attempting to find affordable housing within those communities. *See, e.g.*, Ex. B, Tr. of Oct. 8, 2021 NFHA 30(b)(6) (Lisa Rice) Dep., at 51:20–54:17 (stating that the REO investigation began because NFHA received generalized complaints at conferences from "industry professionals," "community-based groups," and "organizations around" – rather than specific REO complaints from prospective affordable housing clients or REO neighbors – and that those complaints "were not memorialized"); *id.*, at 128:24–130:5 (after the REO investigation began, NFHA reached out to neighbors "to solicit more information and feedback … regarding the maintenance and marketing of the REO asset").

But dealing with complaints from neighbors as to property maintenance on the same

property it is already investigating does not establish standing; it is analogous to the streetsweeper dealing with a candy wrapper, but this time the streetsweeper is simply picking up the same candy wrapper identified previously. And, Plaintiffs' claimed interactions with certain Defendants as part of a litigation strategy occurred long after Plaintiffs launched their investigation, and therefore Plaintiffs did not interact with Defendants in an attempt to remedy any particular property maintenance issue for the purpose of placing one of their identified clients into housing in that neighborhood. *See* Ex. C, Tr. of Oct. 1, 2021 NFHA 30(b)(6) (Lindsay Augustine) Dep., at 220:21–225:4 (NFHA corporate designee explaining that NFHA had "no other contacts" with Defendants other than "HUD complaint-related discussions"). Those interactions centered around Plaintiffs' attempt to force Defendants into a pre-litigation settlement. *See* Ex. D, Tr. of Jun. 15, 2021 Lindsay Augustine Dep., at 14:5–27:7. Likewise, while Plaintiffs say they are not trying to use diversion of resources damages as a basis for standing, in an attempt to get around *Legal Aid*, they cite their time "designing and implementing a systematic investigation – thousands of hours" as a basis for standing. Opp. at 15. Again, the case law is clear – Plaintiffs cannot spend their way into standing, and this time accordingly must be disregarded for purposes of standing. *Hippocratic Medicine*, 602 U.S. at 395.

Finally, Plaintiffs attempt to fault Defendants for not citing a magistrate judge's decision from the Southern District of Indiana in its opening brief. Opp. at 13 (referencing *Fair Housing Center of Central Indiana, Inc. v. M&J Management Company, LLC*, No. 1:22-cv-612, 2024 WL 3859997 (S.D. Ind. Aug. 19, 2024)). As the *M&J* court noted, the parties to that action "briefed the issue of standing before the Supreme Court published its recent decision in [] *Hippocratic Medicine*." *Id.* at *3. Contrary to Plaintiffs' assertions regarding the surviving breadth of *Havens*, even if the *M&J* court characterized *Hippocratic Medicine* as a case in which the Supreme Court

"declined to extend *Havens*," *M&J* went on to find standing on the basis of pre-*Hippocratic Medicine* precedents that "diversion of resources as equivalent to the opportunity costs of pursuing the investigation of the defendant's practices" were sufficient to confer standing. *Id.* at *3–4. *M&J* therefore provides no support to Plaintiffs because: (i) Plaintiffs have expressly *disclaimed* diversion of recourses as the basis for standing in their Opposition brief (Opp. at 15–16), and (ii) numerous authorities in this District recognize that "opportunity costs" of undertaking litigation cannot confer standing (Def. Op. Br. at 5–7).

## II.    Defendants Did Not Impair Plaintiffs' Purported Core Activities.

Plaintiffs have not (and cannot) demonstrate that Defendants' alleged conduct impaired Plaintiffs' ability to provide their core activities. They cite four areas purportedly impacted by Defendants' alleged conduct, but unpacking each of them demonstrates that Plaintiffs are mistaken. And, Plaintiffs' related chart, which simply declares that "Defendants' REO conduct impairs [the listed] core activity," is nothing more than a superficial recitation of Plaintiffs' activities and/or aspirations, without any concrete tie to conduct by Defendants. *See, e.g.*, Dkt. 435-1. Accordingly, Plaintiffs' lawsuit must be dismissed for lack of standing.

### A.    Plaintiffs Have Not Demonstrated That Defendants Impaired Plaintiffs' Consumer Counseling And Referral Services.

Plaintiffs' lawsuit is not saved by their claim that Defendants' alleged actions "impaired Plaintiffs' counseling and referrals by limiting the available housing stock and by stigmatizing and destabilizing communities of color." Opp. at 6–8. To start, Plaintiffs are describing harm to their ultimate aims, not to their ability to continue to operate nor to any particular action taken by Defendants. As in *Mayes*, with or without Defendants' alleged conduct, Plaintiffs can "continue their core activities that they have always engaged in." 117 F.4th at 1178. The only thing that was allegedly "impaired" was Plaintiffs' chance of success – the goals, not the operations.   And,

importantly, Plaintiffs have not explained with any detail the "counseling and referrals" allegedly impaired by Defendants' conduct.

Moreover, the testimony cited by Plaintiffs in their Opposition, rather than supporting Plaintiffs, only serves to demonstrate that Plaintiffs do not have standing. Opp. at 7–8. The Central Ohio Fair Housing Association representative testified that Defendants' alleged actions "made our job harder and our goals harder to achieve." Opp. at 8. As demonstrated in Part I *supra*, it is not enough to say that Defendants made Plaintiffs jobs harder – Defendants must have impaired Plaintiffs' core business activities. Likewise, saying that Defendants took available homes off the market, sold homes to investors rather than owner occupants, "made communities of color less desirable and less safe," and "interfered with … ensuring that we had clients who could own homes in healthy neighborhoods" (Opp. at 7–8) does not create standing for Plaintiffs. This, too, boils down to an allegation that Defendants purportedly reduced available housing, thereby making Plaintiffs' jobs purportedly harder.

And, Plaintiffs cannot demonstrate causation between Defendants' actions and these alleged harms. *Hippocratic Medicine*, 602 U.S. at 380. There are a myriad of reasons why access to affordable, safe housing in communities of color is a challenge. Crime, unemployment, historical segregation, economic disparity, and other factors all contribute to this problem. Moreover, Plaintiffs have never identified a specific constituent with whom they have worked who has been unable to find housing due to Defendants' alleged actions in failing to maintain a particular neighborhood or property. Nor can they do so. This case is about a self-initiated investigation conducted, designed, and funded by Plaintiffs, *i.e.*, an attempt to spend their way into standing. Plaintiffs picked properties to investigate, not because their constituents complained about their inability to find housing there or because Plaintiffs could not find housing for a

particular family in those neighborhoods, but because those properties were in geographic areas with the highest foreclosure rates. *See* Ex. C, Tr. of Oct. 1, 2021 NFHA 30(b)(6) (Lindsay Augustine) Dep., at 74:11–75:9 ("… if NFHA was … evaluating … where to target our investigations … the main pieces of information [were] the foreclosure rate for the metropolitan areas as a whole compared to the state and the nation, as well as the racial concentration of communities within that metropolitan area."). This investigation, carefully orchestrated by Plaintiffs, differs from the racial steering that occurred in *Havens*, which tied the defendant's actions to a perceptive impairment of plaintiff's ability to execute on its core mission. 455 U.S. at 379.

Plaintiffs' chart further demonstrates why they cannot establish standing. Without addressing each of the 342 lines on the chart, Plaintiffs broadly claim that Defendants' alleged actions impaired: (i) various education efforts, (ii) "[f]acilitat[ion] of 10,000 financial literacy workshops," (iii) "foreclosure prevention," (iv) "participat[ion] in community events, including Habitat for Humanity Mid-Ohio," (v) "[p]roviding advice at volunteer attorney tables in courthouses," (vi) "[a]ppearing for homeowners in foreclosure at Attorney for a Day programs," (vii) "[f]air housing counseling," (viii) "[a]ward[ing] grant funds," (ix) "[c]onduct[ing] community outreach," (x) "[b]uilding an understanding of the value of fair housing," (xi) "[i]mplementation of community branding strategy," and (xii) "[o]peration and facilitat[ion] of a consumer complaint intake program." Dkt. 435-1. These generic activities were not stopped or impeded because of Defendants' actions. These are normal activities and/or aspirations of all fair housing organizations that exist without regard to any of the alleged conduct by Defendants in this case and that continued throughout the time period relevant to this lawsuit and likely continue today. Thus, Plaintiffs failed

to establish Article III standing both for lack of a concrete injury and for missing causation. *Hippocratic Medicine*, 602 U.S. at 380–85.

### B. Defendants Did Not Impede Plaintiffs' "Neighborhood Stabilization Activities."

Plaintiffs' attempt to use "neighborhood stabilization activities" to demonstrate standing also fails. Specifically, Plaintiffs generically assert that Defendants disrupted their efforts to engage in "beautification projects, repurpos[ing of] vacant lots, renova[tion of] blighted properties, and creat[ion of] community programming." Opp. at 8. Plaintiffs claim that they invested resources in revitalizing neighborhoods and renovating properties but found that Defendants "neglect[ed] their REO properties in that same area." *Id.* at 9. Yet, Plaintiffs never explain how Defendants' alleged failure to maintain properties stopped Plaintiffs from engaging in these activities. At best, Defendants' alleged misconduct only would have increased the need for Plaintiffs to undertake *more* such operations, which as *Legal Aid* explained, does not give rise to standing. 2024 WL 4346615, at *10. Organizational standing can arise when the organization is stopped from doing its work, not when the organization does more work.

Plaintiffs also do not establish standing based on their conclusory assertion that Defendants' alleged actions impaired the "neighborhood stabilization activities" of: (i) "[i]ncreasing critical resources, like parks … in under-serviced communities," (ii) "[i]ncreasing the supply of safe, affordable, quality housing," (iii) "[a]dvancing policies," (iv) "[a]dvocacy/outreach to city and state governments," (v) educational efforts, (vi) "[h]elping create the Qualified Mortgage Salon," (vii) providing grants, (viii) "[t]raining programs for real estate professionals," (ix) "[p]articipation in community events," (x) "[a]ccessibility modifications," (xi) "[s]upport[ing] existing long-term homeowners with home repairs that ensured their ability to remain in their homes," and (xii) "[r]epurposing blighted vacant lots." Dkt. 435-1. As with the

counseling efforts described above, these generic "neighborhood stabilization" activities or aspirations were not impeded because of Defendants' actions. Again, at most, Defendants' alleged actions made Plaintiffs' job harder, but the listed activities are normal for fair housing organizations. Such activities began without regard to Defendants, continued throughout the time period relevant to this lawsuit, and likely continue today. Accordingly, Plaintiffs' purported "neighborhood stabilization" activities do not support Article III standing.

### C.  Plaintiffs Fail to Show That Defendants Impaired Plaintiffs' "Homeownership Promotion" Operations.

Plaintiffs cannot demonstrate standing by alleging that that Defendants impaired their "homeownership promotion" operations. More specifically, Plaintiffs alleged that Defendants' actions "devalue[ed] homes in minority neighborhoods and limit[ed] access to credit." Opp. at 9–10. This alleges harm to community members, not injury to Plaintiffs' *operations*. Again, Plaintiffs could go on promoting homeownership as they always had. Moreover, Plaintiffs' claimed "investment[] in their service area" would have taken place with or without Defendants' alleged property preservation actions. *Id.* at 10. So, this "investment" cannot operate to give Plaintiffs' standing.

Likewise, Plaintiffs do not demonstrate standing based on their threadbare allegation that Defendants' alleged actions impaired the "homeownership promotion" activities of: (i) "[i]ncreasing homeownership access for communities of color," (ii) "[p]reventing displacement and housing instability," (iii) "[i]mplement[ing] a community development program by providing grants," (iv) "[a]ssisting and/or obtaining housing security and fair housing services," (v) "[f]acilitating rehabilitation of … abandoned homes," (vi) "[f]oreclosure prevention," (vii) grants, (viii) "[r]epresenting homeowners in foreclosure," (ix) advocacy efforts with state legislators; (x) "[f]und[ing] and facilit[ating] emergency home repairs," (xi) "[p]rogram[s] to connect

neighborhood partners," and (xii) "[r]epurposing blighted vacant lots." Dkt. 435-1. As with Plaintiffs' other claimed operations, these generic activities were not impeded because of Defendants' actions. For example, Plaintiffs cannot show impairment by suggesting there is a need to rehabilitate vacant lots. The above-listed items are normal activities of all fair housing organizations that would exist regardless of anything that Defendants did or did not do and such activities continued throughout the time period relevant to this lawsuit and likely continue today. Accordingly, Plaintiffs' cannot assert standing on these grounds.

### D. Plaintiffs' "REO-Specific Training and Education" Cannot Support Standing.

Plaintiffs' REO-specific training and education also does not provide a basis for standing. Plaintiffs describe this alleged harm as "underm[ining] Plaintiffs' efforts to reform the industry and elicit compliance." Opp. at 11. Such "reform" efforts, on their face, amount to nothing other than abstract goals, not description of operational harms. Plaintiffs concede this when they describe the purported harm to their operations: "Defendants' visibly inferior treatment of REOs . . . diluted, if not cancelled out, this education and outreach." *Id.* at 12. Plaintiffs fail to mention their operations at all here, and instead fall back again on faulting Defendants' speculative effect on Plaintiffs' *goals.* This does not support standing.

Plaintiffs also do not establish standing based on their conclusory assertion that Defendants' alleged actions impaired the following generic training and education efforts: (i) "[e]stablishment of industry best practices for REO maintenance and marketing," (ii) "[t]raining of industry stakeholders," (iii) "[c]omplaint intake," (iv) advocacy to governments; (v) education and outreach materials; (vi) "[e]ngag[ing] with media," and (vii) "[w]orking with other fair housing advocates to establish industry best practices for REO maintenance and marketing." Dkt. 435-1. As with Plaintiffs' other claimed core activities, these generic activities were not impeded because of Defendants' actions. They are normal activities of fair housing organizations that began

without regard to Defendants, continued throughout the time period relevant to this lawsuit, and likely continue today. Accordingly, they do not serve as a basis for standing, and Plaintiffs' lawsuit must be dismissed.

### III. The Purported "Drain" On Plaintiffs' Resources Is Irrelevant To The Question of Standing.

Plaintiffs cannot "spend [their] way into standing" by manufacturing an injury and then using their purported investigation costs as a basis for standing. *Hippocratic Medicine*, 602 U.S. at 394; *Legal Aid*, 2024 WL 4346615 at *12–13. In their Opposition, Plaintiffs first fault Defendants for arguing that Plaintiffs' purported investigation costs cannot provide standing, but then they argue such costs are still "[r]elevant to the [i]njury [a]nalysis." Opp. at 15. They cannot have it both ways. The law is clear that injury cannot be created by an organization's self-initiated spending, so Defendants certainly were correct to emphasize that Plaintiffs' investigation costs cannot support standing.

Nevertheless, Plaintiffs appear to be arguing that "expend[ing] significant resources" is somehow relevant. *Id.* at 16. To the extent Plaintiffs are suggesting that they can achieve standing simply by virtue of the "significant" *extent* of their spending, they cite no authority for the proposition, which is contrary to all authority. *Hippocratic Medicine*, 602 U.S. at 394; *Legal Aid*, 2024 WL 4346615 at *12–13. This argument has no relevance to a standing analysis and should be rejected.

### CONCLUSION

For the foregoing reasons and those stated in Defendants' opening brief, Defendants respectfully request that the Court dismiss Plaintiffs' claims pursuant to FED. R. CIV. P. 12(b)(1) and 12(h)(3).

Dated: March 7, 2025                     Respectfully submitted,


By: */s/ Kenneth M. Kliebard*
Kenneth M. Kliebard
Michael W. Fakhoury
**MORGAN, LEWIS & BOCKIUS LLP**
110 North Wacker Drive, Suite 2800
Chicago, Illinois 60606-1511
Telephone: (312) 324-1000
kenneth.kliebard@morganlewis.com
michael.fakhoury@morganlewis.com

Kurt W. Rademacher (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, Pennsylvania 19103-3007
Telephone: (215) 963-5000
kurt.rademacher@morganlewis.com

*Counsel for Defendants Deutsche Bank National*
*Trust Company, as Trustee, and Deutsche Bank*
*Trust Company Americas, as Trustee*

By:  */s/ Debra Bogo-Ernst*
Debra Bogo-Ernst
Brandon E. Villa
**WILLKIE FARR & GALLAGHER LLP**
300 N. LaSalle Dr.
Chicago, IL 60654
(312) 728-9000
dernst@willkie.com
bvilla@willkie.com

*Counsel for Defendant Ocwen Loan Servicing, LLC,*
*n/k/a Onity Group Inc.*

By: */s/ Nathan Garroway*
Nathan Garroway
**DENTONS US LLP**
303 Peachtree Street, NE, Suite 5300
Atlanta, Georgia 30308
Telephone: (404) 527-4000
nathan.garroway@dentons.com

*Counsel for Defendant Altisource Solutions, Inc.*

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via the U.S. District Court for Northern District of Illinois' Electronic Filing System on March 7, 2025.


/s/ *Debra Bogo-Ernst*