# EXHIBIT B

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
      NATIONAL FAIR HOUSING        )
 4    ALLIANCE; HOPE FAIR HOUSING  )
      CENTER, et al.,              )
 5                                 )
                                   )
 6                 Plaintiffs,     )
                                   )
 7           vs.                   ) No. 1:18-cv-00839
                                   )
 8    DEUTSCHE BANK NATIONAL       )
      TRUST, as trustee, et al.,   )
 9                                 )
                                   )
10                 Defendants.     )

11

12           The Fed. R. Civ. P. Rule 30(b)(6) videotaped

13    deposition on behalf of National Fair Housing Alliance,

14    called by the Defendants for examination, taken remotely

15    pursuant to notice and pursuant to the Federal Rules of

16    Civil Procedure for the United States District Courts

17    pertaining to the taking of depositions, taken before

18    April M. Metzler, Certified Shorthand Reporter,

19    Registered Merit Reporter, Certified Realtime Reporter,

20    and Notary Public, at Washington, D.C., commencing at

21    9:03 a.m. CST on the 8th day of October, 2021.

22

23

24
```



```
 1   APPEARANCES:

 2        SOULE, BRADTKE & LAMBERT
          MR. JAMES G. BRADTKE
 3        402 Campbell Street
          Suite 100
 4        Geneva, Illinois 60134
          Phone:  (630) 333-9144
 5        E-Mail:  jgbvjd@aol.com

 6            On behalf of the Plaintiffs,
              appeared remotely;
 7
          DANE LAW LLC
 8        MR. STEPHEN DANE
          312 Louisiana Avenue
 9        Perrysburg, Ohio 43551
          Phone:  (419) 873-1814
10        E-Mail:  sdane@fairhousinglaw.com

11            On behalf of the Plaintiffs,
              appeared remotely;
12
          RELMAN COLFAX PLLC
13        MR. REED COLFAX
          1225 19th Street, N.W.
14        Suite 600
          Washington, District of Columbia 20036
15        Phone:  (202) 728-1888
          E-Mail:  rcolfax@relmanlaw.com
16
              On behalf of the Plaintiffs,
17            appeared remotely;

18        DENTONS US LLP
          MR. NATHAN L. GARROWAY
19        303 Peachtree Street, NE
          Suite 5300
20        Atlanta, Georgia 30308
          Phone:  (404) 527-4000
21        E-Mail:  nathan.garroway@dentons.com

22            On behalf of the Defendant,
              Altisource Solutions, Inc.,
23            appeared remotely;

24
```



```
 1   APPEARANCES (Continued):

 2       DENTONS US LLP
         MS. LISA KRIGSTEN
 3       MR. CODY WOOD
         4520 Main Street
 4       Suite 1100
         Kansas City, Missouri 64111
 5       Phone:  (816) 460-2400
         E-Mail:  lisa.krigsten@dentons.com
 6       E-Mail:  cody.n.wood@dentons.com

 7            On behalf of Defendant,
              Altisource Solutions, Inc.,
 8            appeared remotely;

 9       MORGAN, LEWIS & BOCKIUS, LLC
         MR. KENNETH M. KLIEBARD
10       77 West Wacker Drive
         Chicago, Illinois 60601
11       Phone:  (312) 324-1000
         E-Mail:  kenneth.kliebard@morganlewis.com
12
              On behalf of Defendant,
13            Deutsche Bank National Trust, as trustee,
              appeared remotely;
14
         MORGAN, LEWIS & BOCKIUS, LLC
15       MR. VICTOR H. CRUZ
         1717 Main Street
16       Suite 3200
         Dallas, Texas 75201
17       Phone:  (214) 466-4000
         E-Mail:  victor.cruz@morganlewis.com
18
              On behalf of Defendant,
19            Deutsche Bank National Trust, as trustee,
              appeared remotely;
20
         MAYER BROWN LLP
21       MS. DEBRA L. BOGO-ERNST
         71 South Wacker Drive
22       Chicago, Illinois 60606
         Phone:  (312) 782-0600
23       E-Mail:  dernst@mayerbrown.com
              On behalf of Defendant,
24            Ocwen Loan Servicing, LLC,
              appeared remotely.
```



```
 1   ALSO PRESENT:

 2       Mr. Morgan Williams, NFHA General Counsel
         attended remotely
 3
         Mr. Andrew Kim, videographer
 4       attended remotely

 5                   *   *   *   *   *   *
```



1   that have to be complied with.
2           And so those -- in that context, those
3   standards may not exist, for example, in the case of an
4   owner occupant who is putting their house on the market.
5   So from that context, there may be some variances.
6           But, generally speaking, the variances are not
7   that large, they're not that great, when it comes to
8   marketing an REO asset as compared to, you know, an
9   asset that may not be an REO asset.
10      MS. KRIGSTEN:  Well, we've been talking here for
11  about an hour and a half.  Why don't we take a
12  ten-minute break, and then stretch our legs, and we'll
13  come back and resume.
14      THE VIDEOGRAPHER:  The time is 10:28 a.m.  We are
15  now going off the record.
16                  (A short break was had.)
17      THE VIDEOGRAPHER:  Time is 10:41 a.m.  We are now
18  back on the record.
19  BY MS. KRIGSTEN:
20      Q.  Ms. Rice, how did the REO investigation begin?
21  What was the basis for starting it?
22      A.  We began receiving complaints from industry
23  professionals.  We received complaints from
24  community-based groups, organizations around, I want to



1  say, 2009, the early part of 2009, about improper
2  maintenance and differences in treatment with respect to
3  the maintenance, management, and marketing of REO units
4  based on the racial compensation of the neighborhood.
5           So at conferences that we attended, the NAACP,
6  the National Association of Real Estate Brokers,
7  National Association of Hispanic Real Estate
8  Professionals, fair housing conferences, fair lending
9  conferences, we just were peppered with complaints and
10 comments from people working on the ground,
11 community-based organization, neighborhood
12 revitalization groups, real estate professionals.
13          We were peppered with these complaints that
14 properties in communities of color that had been
15 foreclosed upon were not being properly maintained.
16          We even were getting complaints that these
17 properties were not being sold to owner occupants so
18 that it was very, very difficult for hardworking
19 families to be able to purchase these single-family
20 assets, and that they seemed to be disproportionately
21 going to investors.
22          And so based upon those kinds of complaints,
23 we began engaging in further discussions with anybody
24 that we came across working in the real estate sales



1 community, working in the servicing community,
2 investors, anybody that we knew we just started having
3 conversations with people about what was really
4 happening.
5     And then we conducted, sort of, a preliminary
6 analysis of properties -- REO properties -- in different
7 communities in and around the Washington, D.C. area to
8 see if we could observe any differences in terms of the
9 external treatment of these properties. And we did, in
10 our preliminary analysis, the information we gleaned
11 seemed to buttress and support the intelligence that we
12 were getting from industry professionals, all of the
13 folks that I heretofore mentioned.
14     And so we designed the investigation and began
15 implementing it.
16   Q.   So you referenced conversations with
17 individuals from various entities, community entities,
18 real estate professionals; that sort of thing.
19     Where are those discussions -- or how are
20 those discussions memorialized?
21   A.   Well, most of them were not memorialized; in
22 fact, I don't know that any of them were.
23     Again, we -- I might be speaking at an NAACP
24 conference. And after the conference was over, someone

1  would come up to me and say, Hey, I've been noticing
2  this in my community, and I'm really concerned about it.
3             Our president and CEO at the time, Shanna
4  Smith, the same thing would happen to her.  Other
5  members of our team might be speaking at a conference
6  for ORELA (phonetic) or NAREB or NAHREP or NAR -- and I
7  am so sorry.  Members of our team might have been
8  speaking at a conference sponsored by the National
9  Association of Real Estate Brokers or the National
10 Association of Hispanic Real Estate Professionals, or
11 the National Association of Realtors.
12            And afterwards, people would come up and make
13 comments about what they were observing in predominantly
14 communities of color and would comment to us that there
15 were differences in treatment based on what they were
16 observing because communities of color and predominantly
17 white communities.
18      Q.    So you've listed several organizations that
19 could have had conferences.
20            And the way you phrased your answer is this
21 could have happened, you know, it could have been at
22 this, it could have been at that conference.
23            Are there any specific conferences that you
24 can testify to right now in which those comments were

```
1        A.   Not that I recall.
2        MS. KRIGSTEN:  So I -- before I turn to the next
3   section in my outline, I'd like to take a bit of a
4   break.  So why don't we take about 15 minutes.
5        THE WITNESS:  Okay.  That's fine with me.
6        MS. KRIGSTEN:  Thank you.
7        THE VIDEOGRAPHER:  Time is 1:41.  We are now going
8   off the record.
9                   (A short break was had.)
10       THE VIDEOGRAPHER:  Time is 1:58 p.m.  We are now
11  back on the record.
12  BY MS. KRIGSTEN:
13       Q.   Ms. Rice, you wanted to say something?
14       A.   I have a clarifying question.  I think I may
15  have misunderstood a question that you asked me with
16  respect to paragraph 109 in Exhibit 5341.
17       Q.   What do you believe you misunderstood?
18       A.   I think that I understood you to be asking me
19  what were the numerous forms of data and observational
20  evidence upon which the statistical analyses was based.
21  And now that I reread that paragraph, I think you might
22  have been asking me about something broader, and I just
23  wanted to clarify that.
24       Q.   So I can go back -- we can go back to that
```



1 paragraph.
2     My question had been: Other than the
3 statistical disparities, so setting those aside, what
4 are the other forms of data and observational evidence
5 that establish the differential treatment of defendants
6 in communities of color as compared to predominantly
7 white neighborhoods?
8     A.    Thank you.
9     Q.    Can you -- yes.
10     A.    I did misinterpret it.
11     So I think I mentioned we have the
12 photographs. We have the evaluation forms. We also
13 conducted neighborhood surveys.
14     So we, either while we were out physically
15 inspecting the properties or at a later time, we mailed
16 neighborhood surveys to neighbors in the communities to
17 solicit more information and feedback from them about
18 the -- about information regarding the maintenance and
19 marketing of the REO asset.
20     And so we also have information contained in
21 those neighborhood surveys.
22     Q.    Anything else?
23     A.    That's all I can recall at this time.
24     Q.    So let's talk about the neighbor surveys for a



1  moment.
2       Those surveys were sent to individuals who
3  resided nearby one of the REOs that was being inspected;
4  is that right?
5       A.   That's correct.
6       Q.   Is there anything about those surveys or
7  responses to those surveys that would provide
8  information that neighborhoods in majority-white
9  communities were treated differently than properties in
10 communities of color?
11      A.   It may have that; it may have, yes.
12      Q.   And where would we find that information?
13      A.   In the actual neighbor survey itself.  And if
14 I'm not mistaken, I believe we produced those to you
15 all.
16      Q.   Any other evidence that NFHA is aware of
17 regarding defendants' approach to communities of color?
18      MR. COLFAX:  I'll just clarify, because I gave
19 instruction before.  Assume the -- the question presumes
20 that she's not going to reveal information that has been
21 gathered by her counsel and through that prior counsel.
22      MS. KRIGSTEN:  You know, you've made that -- I
23 guess, Mr. Colfax, you've made that objection before and
24 essentially instructed this witness not to answer



```
 1   UNITED STATES OF AMERICA           )
     NORTHERN DISTRICT OF ILLINOIS      )
 2   EASTERN DIVISION                   )    SS.
     STATE OF ILLINOIS                  )
 3   COUNTY OF COOK                     )

 4

 5

 6            I, April M. Metzler, Certified Shorthand

 7   Reporter, Registered Merit Reporter, Certified Realtime

 8   Reporter, and Notary Public, do hereby certify that LISA

 9   RICE was first duly sworn by me to testify to the whole

10   truth and that the above remote deposition was reported

11   stenographically by me and reduced to typewriting under

12   my personal direction.

13            I further certify that the said remote

14   deposition was taken at the time and place specified and

15   that the taking of said deposition commenced on the

16   8th day of October, 2021, at 9:03 a.m. CST.

17            I further certify that I am not a relative or

18   employee or attorney or counsel of any of the parties,

19   nor a relative or employee of such attorney or counsel,

20   nor financially interested directly or indirectly in

21   this action.

22

23

24
```



```
 1        In witness whereof, I have hereunto set my
 2   hand and affixed my seal of office at Chicago, Illinois,
 3   this 22nd of October, 2021.
 4
 5                    [NOTARY SEAL]           /s/ April M Metzler
 6
 7        _____
 8        APRIL M. METZLER, CSR, RMR, CRR, CRC, FCRR
          180 North LaSalle Street
          Suite 2800
 9        Chicago, Illinois 60601
          Phone:  (312) 236-6936
10
11   CSR No. 084-004394
```

APRIL M METZLER
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
January 24, 2025

National Fair Housing Alliance vs Deutsche Bank National Trust
312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com

