**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NATIONAL FAIR HOUSING ALLIANCE, et al.,

        Plaintiffs,

    v.

DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al.,

        Defendants.

No. 18 CV 839

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are a group of twenty private fair housing organizations that conducted a multi-year, multi-city investigation into the allegedly discriminatory maintenance and marketing of real estate owned properties in the wake of the 2008 financial crisis. That investigation spurred this lawsuit and others. *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F.Supp.3d 940 (N.D. Cal. 2018), *and Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 401 F.Supp.3d 619 (D. Md. 2019). The properties at issue in this lawsuit were owned by defendants Deutsche Bank National Trust and Deutsche Bank Trust Company Americas and serviced by defendants Ocwen Loan Servicing and Altisource Solutions. Plaintiffs allege that defendants violated the Fair Housing Act by discriminatorily maintaining and marketing the properties based on race.

Most of plaintiffs' claims survived defendants' second motion to dismiss. *See Nat'l Fair Hous. All. v. Deutsche Bank*, No. 18-cv-839, 2018 WL 6045216 (N.D. Ill.

Nov. 19, 2018), *and Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18-cv-839, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019). Defendants move to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1). All defendants move for summary judgment on liability under the Fair Housing Act. The Deutsche Bank defendants move for summary judgment on the issue of vicarious liability. Both sides move to exclude expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## I. Legal Standards

A plaintiff must demonstrate standing "at every stage of litigation." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021). As the party invoking federal jurisdiction, plaintiffs bear the burden of establishing Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the summary judgment stage, plaintiffs must "set forth by affidavit or other evidence specific facts supporting their standing to sue." *Alicea v. Cnty. of Cook*, 88 F.4th 1209, 1215 (7th Cir. 2023) (citation omitted).

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022).

## II.  Background

### A.  The Parties

Plaintiffs are twenty national and regional fair housing organizations seeking to eliminate housing discrimination and to ensure equal housing opportunities.[1] [362] at 2–4 (¶¶ 1–20); [398] ¶¶ 19, 322–41.[2] Defendants Deutsche Bank National Trust and Deutsche Bank Trust Company Americas act as trustees for residential mortgage-backed securitization trusts. [362] at 4 (¶ 1). As trustees, they hold legal title to certain "real estate owned properties." [405] ¶ 2. An REO property generally refers to a foreclosed property owned by the lender.[3] In a residential mortgage-backed securities transaction, mortgage loans are pooled together and interests in the money generated from those loans are sold to investors. [352] ¶ 2. After the 2008 financial crisis, financial institutions like Deutsche Bank foreclosed on the residential

---

[1] Plaintiffs are National Fair Housing Alliance, Inc., Fair Housing Advocates of Northern California (formerly Fair Housing of Marin), the Central Ohio Fair Housing Association, the Connecticut Fair Housing Center, the Denver Metro Fair Housing Center, the Fair Housing Center of Central Indiana, Fair Housing Center of the Greater Palm Beaches, Fair Housing Center of West Michigan, Fair Housing Continuum, Inc., Greater New Orleans Fair Housing Action Center, HOPE Fair Housing Center, Housing Opportunities Made Equal of Virginia, Housing Opportunities Project for Excellence, Inc., the Fair Housing Center for Rights & Research (formerly known as Housing Research & Advocacy Center), the Miami Valley Fair Housing Center, Metropolitan Milwaukee Fair Housing Council, North Texas Fair Housing Center, Open Communities, the South Suburban Housing Center, Fair Housing Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair Housing Center. [362] at 2–4 (¶¶ 1–20).

[2] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. In the case of citations to depositions, I also use the deposition transcript's original page numbers. The facts are largely taken from the parties' responses to Local Rule 56.1 statements of material fact and additional fact where both the asserted fact and response are set forth in one document. [352]; [362]; [398]; [405].

[3] There are stages after a mortgage loan is in default and before it formally becomes an "REO" property. *See* [398] ¶ 8. The parties use the term "REO properties" throughout their briefs to refer to the properties identified in this lawsuit.

properties securing mortgages and took title. [398] ¶ 1. Generally, REO properties are serviced by mortgage loan servicers like defendant Ocwen Loan Servicing, LLC. [362] at 4 (¶¶ 1–2). In 2009, Ocwen acquired the mortgage-servicing rights for the REO properties titled to Deutsche Bank and identified in this lawsuit. [398] ¶ 8. Defendant Altisource Solutions, Inc. operated as a subsidiary of Ocwen until 2009 when it entered into long-term servicing contracts with Ocwen. [398] ¶ 9. As Ocwen's exclusive third-party vendor, Altisource serviced the majority of the REO properties in this lawsuit. [398] ¶¶ 8, 10. Ocwen's and Altisource's loan servicing activities run the gamut, but two categories are relevant here. "Maintenance" activities encompass the physical management and oversight of a property: default vacancy inspection surveillance; preservation, maintenance, and repair; and inspections. [398] ¶¶ 8, 10, 16. "Marketing" and "sales" activities relate to the valuation and sale of the property: pre-foreclosure appraisals and valuations; marketing; auctioning; brokering sales; and providing title services. [398] ¶ 10.

Plaintiffs launched an investigation in 2011 to determine whether a neighborhood's racial makeup affected the quality of the maintenance and marketing of REO properties. [398] ¶ 26. They identified metropolitan areas based on foreclosure rates (compared to the state and national levels) and the racial concentration of communities. [398] ¶ 27. Within each metropolitan area, plaintiffs identified zip codes with the highest rates of foreclosure compared to the metropolitan area, racial concentration within the zip code, and selected zip codes in middle- and working-class neighborhoods with high home ownership rates. [398] ¶ 28. Plaintiffs classified a zip

4

code as predominantly "white" or "non-white" if it had greater than 50% of that demographic. [398] ¶ 38. They limited their investigation of REO properties owned by Deutsche Bank and serviced by Ocwen and Altisource to 30 metropolitan areas. [398] ¶ 30. Based on publicly available data, plaintiffs identified Deutsche Bank-owned REO properties within selected zip codes to investigate. [398] ¶ 34

Plaintiffs developed a checklist of 35 criteria representing categories of possible deficiencies in exterior maintenance, marketing, or "overall curb appeal." [398] ¶ 39. The categories included, for example: trash; accumulated mail; overgrown grass and leaves; unsecured or broken doors and locks; damaged roof; "marketed as distressed property"; "'for sale' sign missing"; unauthorized occupancy; graffiti; water damage; or mold.[4] [398] ¶ 39. Local plaintiffs conducted on-site investigations of properties and uploaded their inspection data, including property scoring and photographs, into the NFHA's centralized "REO database."[5] [398] ¶ 48. The statistical analyses conducted from the REO database became the basis for this lawsuit.

---

[4] The full checklist included categories for: trash; accumulated mail; overgrown grass and leaves; overgrown or dead shrubbery; dead grass; invasive plants; broken mailbox; miscellaneous curb appeal; unsecured or broken doors and locks; damaged steps/handrails; damaged windows; damaged roof; damaged fence; holes; wood rot; miscellaneous structure; trespassing or warning signs; marketed as distressed property; "for sale" sign missing; broken or discarded signage; unauthorized occupancy; miscellaneous signage and occupancy; graffiti; peeling or chipped paint; damaged siding; missing shutters; miscellaneous paint & siding; missing or out of place gutters; broken or hanging gutters; obstructed gutters; miscellaneous gutters; water damage; mold; miscellaneous gutters; and exposed or tampered with utilities. [398] ¶ 39.

[5] The parties dispute whether these "deficiency" categories are consistent with industry standards; reflect subjective or objective criteria; and the qualifications of investigators to apply the criteria. *See* [362] ¶¶ 2–5. These disputes are the subject of plaintiffs' experts Deavay Tyler's and Albert Poche's proposed testimony. *See below* V.C. and V.F.

### B.    Procedural History

Plaintiffs initially filed an administrative complaint with the Department of Housing and Urban Development on February 26, 2014, alleging that defendants' maintenance and marketing of REO properties violated the Fair Housing Act. [405] ¶ 64. Plaintiffs withdrew their administrative complaint after filing this lawsuit on February 1, 2018.[6] [1]; [70] ¶ 13.

Judge Leinenweber granted defendants' first motion to dismiss. *See Nat'l Fair Hous. All. v. Deutsche Bank*, No. 18-cv-839, 2018 WL 6045216 (N.D. Ill. Nov. 19, 2018). Plaintiffs amended the complaint, and after a second motion to dismiss, Judge Leinenweber allowed three claims under the Fair Housing Act, 42 U.S.C. §§ 3604(a), (b), and 3605, and a "perpetuation of segregation" claim to proceed. *See Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18-cv-839, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019). Defendants did not challenge plaintiffs' Article III standing. *See NFHA II*, 2018 WL 6045216, at *13 (referencing *Havens* but distinguishing its application to the question of proximate cause under the Act). Judge Leinenweber addressed plaintiffs' injury and proximate cause as a merits question and barred plaintiffs from recovering damages based on their community investments and for harms to the minority neighborhoods that plaintiffs serve. *NFHA II*, 2019 WL 5963633, at **6–8 (citing *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189 (2017)).

---

[6] HUD issued a no-cause finding in NFHA's administrative complaint against U.S. Bank in 2016. *See* [320-32]. Plaintiffs object to the relevance of that opinion. [362] ¶ 31. That objection is sustained.

Defendants now move to dismiss under Rule 12(b)(1) for lack of standing following *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024). [429]. Defendants move to exclude all seven of plaintiffs' expert witnesses. [303], [305], [307], [318], [323], [326], [327]. Plaintiffs move to exclude four of defendants' expert witnesses. [311]. Defendants jointly move for summary judgment on liability under the Fair Housing Act. [315]. The Deutsche Bank defendants move for summary judgment on vicarious liability. [332].

### C. Law of the Case Doctrine

The law of the case doctrine creates a presumption that a second judge will refrain from revisiting prior rulings merely based on a "different view of the law or facts" from the first judge. *Williams v. Comm'r*, 1 F.3d 502, 503 (7th Cir. 1993). The presumption reflects the "rightful expectations of litigants that a change of judges mid-way through a case will not mean going back to square one." *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997). But a second judge may reconsider a prior ruling based on an error of law or "new development, such as a new appellate decision." *Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012). The doctrine also applies with less force in cases like this one where the issues presented at the summary judgment stage may be different than how they were presented at the motion to dismiss stage. *See Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). To the extent that I depart from the legal framework that Judge Leinenweber laid out for plaintiffs to pursue their remaining claims, I limit my reconsideration to correct any manifest errors or to reflect intervening developments in the law.

D.     **The Fair Housing Act**

Plaintiffs' remaining claims arise under three provisions of the Fair Housing Act*, see* [70] ¶¶ 303–75, "each with its own text and governing precedent." *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 98 (2d Cir. 2024).

Section 3604(a) of the Act makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of [race]." 42 U.S.C. § 3604(a). "Availability of housing is at the heart of § 3604(a)." *Bloch v. Frischholz*, 587 F.3d 771, 776 (7th Cir. 2009) (en banc).

Section 3604(b) prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of [race]." 42 U.S.C. § 3604(b). HUD regulations define prohibited conduct under § 3604(b) to include "[f]ailing or delaying maintenance or repairs of sale or rental dwellings because of [race]." 29 C.F.R. § 100.65(b)(2).

Section 3605 makes it unlawful for "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of [race]." 42 U.S.C. § 3605(a). Residential real estate-related transactions include "[t]he selling, brokering, or appraising of residential real property." *Id.* § 3605(b)(2).

Plaintiffs also bring claims for "conduct perpetuating segregation" under the Fair Housing Act generally. *See* [70] ¶¶ 338–49, 370–75. Judge Leinenweber permitted plaintiffs to pursue a claim for perpetuation of segregation under

*Metropolitan Housing Development Corp. v. Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977). *See NFHA II*, 2019 WL 5963633, at *20. "Perpetuation of segregation" is better understood as framework to establish liability under the Fair Housing Act rather than a standalone discriminatory practice proscribed by the statute. In *Arlington Heights*, the Seventh Circuit held that a violation of § 3604(a) could be established "by a showing of discriminatory effect without a showing of discriminatory intent." 558 F.2d at 1291. The court explained that a facially neutral decision can produce two types of racially discriminatory effects if it: (1) has a greater adverse impact on a particular racial group or (2) "perpetuates segregation and thereby prevents interracial association" in a community. *Id.* at 1290. At the time, the Supreme Court had not yet addressed whether the Fair Housing Act recognizes disparate-impact liability. In *Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 533–34 (2015), the Supreme Court held that it does. Rather than treating "perpetuation of segregation" as a standalone claim, I apply *Arlington Heights* as an alternative framework for plaintiffs to prove a discriminatory effect under §§ 3604 or 3605 of the Act. *See Arlington Heights*, 558 F.2d at 1290 (listing four relevant factors); *Bloch,* 587 F.3d at 784 (referring to the *Arlington Heights* factors as a "modified disparate impact theory"); *see also* 24 C.F.R. § 100.500(a) (2023).[7]

---

[7] This is consistent with HUD's classification of "perpetuation of segregation" as a type of discriminatory effect that may give rise to liability under the Fair Housing Act. *See* Reinstatement of HUD's Discriminary Effects Standard, 88 Fed. Reg. 19,450, 19,454 (Mar. 31, 2023) (amending 24 C.F.R. § 100.500) (explaining that the 2023 rule "does not impose any new liability, but merely provides a consistent, nationwide framework for determining

Plaintiffs pursue all claims under disparate-treatment and disparate-impact theories of liability. In a disparate-treatment case, a "plaintiff must establish that the defendant had a discriminatory intent or motive." *Inclusive Communities*, 576 U.S. at 524–25 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). A disparate-impact claim "challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Id.*

Disparate treatment, or intentional discrimination, under the Fair Housing Act can be proved through "direct or circumstantial evidence, or indirectly, through the [*McDonnell Douglas* burden-shifting framework]." *E.-Miller v. Lake Cnty. Highway Dep't*, 421 F.3d 558, 563 (7th Cir. 2005). Plaintiffs seek to prove intentional discrimination through (1) the *McDonnell Douglas* burden-shifting framework; (2) the multi-factor inquiry in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252 (1977)[8]; and (3) the deliberate-indifference standard in *Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856 (7th Cir. 2018). [360] at 47–48. Judge Leinenweber observed that the Deutsche Bank defendants could be held directly liable for discriminatory conduct that the Bank "had the ability to affect[] but failed to do so" under *Wetzel. See NFHA II*, 2019 WL 5963633, at **9–11. But *Wetzel* does

---

[8] whether a given practice has an unjustified discriminatory effect, leading to liability under the Act"). A practice has a discriminatory effect and violates the Act "where it actually or predictably results in a disparate impact on a group of persons *or creates, increases, reinforces, or perpetuates segregated housing patterns* because of [race]." 24 C.F.R. § 100.500(a) (emphasis added).

[8] The relevant factors include: the historical background of the challenged decision, the sequence of events leading up to the decision, departure from normal procedures, and relevant legislative or administrative history. *See Arlington Heights,* 429 U.S. at 267–68.

not describe a method of proving the underlying discriminatory conduct under §§ 3604(b) and 3617 of the Fair Housing Act. *See Wetzel*, 901 F.3d at 862–63 (framing the question as "*who* is subject to [the Act's] prohibitions" rather than "*what* is prohibited") (emphasis in original). Plaintiffs may proceed under the *McDonnell Douglas* burden-shifting framework or the Supreme Court's *Arlington Heights* inquiry to prove intentional discrimination.

To establish disparate-impact liability, Judge Leinenweber held that plaintiffs must establish a prima facie case showing: "(1) a statistical disparity and (2) that the defendant[s] maintained a specific policy that (3) caused the disparity." *NFHA II*, 2019 WL 5963633, at *13 (citing *Cty. of Cook v. Wells Fargo & Co.*, 314 F.Supp.3d 975, 990 (N.D. Ill. 2018)). I apply that framework now, recognizing that courts disagree on whether the Supreme Court implicitly adopted HUD's burden-shifting framework for disparate-impact liability.[9] *Compare Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019) (finding that the Supreme Court's decision in *Inclusive Communities* articulated "a more demanding test than set forth in the HUD regulation"), *with Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016) ("The Supreme Court implicitly adopted HUD's approach…"), *and Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424

---

[9] Two questions were presented on petition for a writ of certiorari in *Inclusive Communities*: (1) "Are disparate-impact claims cognizable under the Fair Housing Act?" and (2) "If disparate-impact claims are cognizable under the Fair Housing Act, what are the standards and burdens of proof that should apply?" The Court granted certiorari only as to the first question. *See Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affs.*, 747 F.3d 275 (5th Cir.), *cert. granted*, 573 U.S. 991 (2014).

n.4 (4th Cir. 2018) (applying the burden-shifting framework from *Inclusive Communities* without deciding whether there are meaningful differences between the Supreme Court's and HUD's frameworks). The Seventh Circuit has not squarely addressed this issue. *See City of Joliet v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir. 2016) (under *Inclusive Communities,* "[d]isparate-impact analysis looks at the effects of policies, not one-off decisions"); *Tri-Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir. 2016).

If plaintiffs prove discriminatory conduct by Ocwen or Altisource, Deutsche Bank could be liable for that harm. The Fair Housing Act recognizes direct and vicarious liability. *Meyer v. Holley*, 537 U.S. 280, 285 (2003); *see also* 24 C.F.R. § 100.7. Vicarious liability can be established through ordinary agency principles, while direct liability may be proven through Deutsche Bank's "deliberate indifference" to the discriminatory conduct committed by others. *See Wetzel*, 901 F.3d at 856; *NFHA II*, 2019 WL 5963633, at **9–11.

To sum up, three substantive provisions of the Fair Housing Act remain in this case: 42 U.S.C. §§ 3604(a), (b), and 3605. These provisions define what conduct is prohibited by the Act. Plaintiffs may prove a violation of these provisions by showing that: (1) defendants were motivated by discriminatory intent (disparate treatment) and caused housing to be unavailable, failed to maintain housing, or discriminated in selling, brokering, or appraising or (2) defendants' policies caused a discriminatory effect in housing availability, maintenance, or selling, brokering, or appraising (disparate impact or perpetuation of segregation). These are alternative theories of

liability, each with different standards. If plaintiffs provide sufficient evidence of discriminatory conduct under any of these theories, the doctrines of direct and vicarious liability determine the Deutsche Bank defendants' liability.

## III.    Article III Standing

Defendants argue that the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), forecloses plaintiffs' lawsuit. [430] at 5. Because plaintiffs sue defendants "in [their] own right," individual standing requirements apply. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *Hippocratic Med.*, 602 U.S. at 393–94. Plaintiffs must demonstrate an injury in fact that is fairly traceable to the challenged conduct of defendants and likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Each plaintiff must demonstrate Article III standing for each form of relief sought, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), but "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academ. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) ("If at least one plaintiff has standing, the suit may proceed."). Standing is separate from the merits. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022); *Arreola v. Godinez*, 546 F.3d 788, 794–95 (7th Cir. 2008) ("Standing is a prerequisite to *filing suit*, while the underlying merits of a claim (and the laws governing its resolution) determine whether the

plaintiff is *entitled to relief*.") (emphasis in original); *see also Pit Row, Inc. v. Costco Wholesale Corp.*, 101 F.4th 493, 501 (7th Cir. 2024).

In *Havens*, the plaintiff Housing Opportunities Made Equal alleged that Havens Realty, the owner and operator of two apartment complexes, and one of its employees violated § 3604 of the Fair Housing Act by engaging in racial steering. 455 U.S. at 366–67. Havens Realty told a Black renter that no apartments were available. *Id.* at 368. Two HOME employees, acting as testers, asked about the availability of apartments. *Id.* Havens lied. *Id.* It told the Black tester that there were no apartments available and gave the opposite information to the white tester. *Id.* HOME's activities included operating a housing counseling service and investigating and referring housing discrimination complaints. *Id.* HOME alleged that defendants' racial steering practices "frustrated" the organization's "efforts to assist equal access to housing through counseling and other referral services" and caused them "to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices." *Id.* at 369. The Court found that HOME adequately alleged injury:

> If, as broadly alleged, [defendants'] steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

*Id.* at 379. The Court also noted that HOME's "noneconomic interest in encouraging open housing does not effect [*sic*] the nature of the injury suffered… and accordingly

14

does not deprive [it] of standing." *Id.* at 379 n.20 (citing *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263 (1977)).

The Supreme Court considered *Havens* in *Hippocratic Medicine*. Plaintiffs were individual doctors and medical associations challenging FDA regulations for the prescription and use of mifepristone. *Hippocratic Med.*, 602 U.S. at 372–74. Invoking *Havens*, the medical associations asserted that the FDA "impaired their ability to provide services and achieve their organizational missions." *Id.* at 394 (internal quotation marks omitted). Their theory of standing was based on costs incurred to oppose the FDA's regulations: conducting studies on mifepristone to better inform members and the public about the drug's risks as well as expending "time, energy, and resources" to draft citizen petitions and engage in public advocacy and public education. *Id.* The Court rejected the medical associations' expansive reading of *Havens. Id.* at 395. An organization cannot "manufacture" injury and "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* The Court drew several distinctions between the medical associations suing the FDA and HOME suing Havens Realty:

> Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service. And when Havens gave HOME's employees false information about apartment availability, HOME sued Havens because Havens 'perceptibly impaired HOME's ability to provide counseling and referral services…'. In other words, Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer. That is not the kind of injury that the medical associations have alleged here. FDA's actions relaxing regulation of mifepristone have not imposed any similar impediment to the medical associations' advocacy businesses.

15

*Id.* "*Havens* was an unusual case," and the Court cautioned against "extend[ing] the *Havens* holding beyond its context." *Id.* at 396.

I do not read *Hippocratic Medicine* as upending the landscape of standing. *Havens* tells us what type of organizational injury is legally cognizable, and *Hippocratic Medicine* tells us what's not. The Court in *Havens* noted that mere setbacks to an organization's "abstract social interests" are insufficient to demonstrate a concrete harm. *Havens*, 455 U.S. at 379. *Hippocratic Medicine* further underscores that principle. An organization's "general legal, moral, ideological, and policy concerns do not suffice on their own to confer Article III standing to sue in federal court." *Hippocratic Med.*, 602 U.S. at 386.

Defendants cite to *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), *reh'g en banc granted and op. vacated*, No. 22-16490, 2025 WL 843314 (9th Cir. Mar. 18, 2025), which overruled Ninth Circuit precedent in light of *Hippocratic Medicine*. The panel held that circuit precedent "went astray" of *Havens* by applying a "more forgiving two-part test" and requiring only that an organization demonstrate (1) frustration of an organizational mission and (2) diversion of resources to combat the challenged conduct. *See Arizona All.*, 117 F.4th at 1176. That opinion was vacated, and in any case, is not controlling. The Seventh Circuit never adopted that test. In *Common Cause Indiana v. Lawson*, 937 F.3d 944, 952 (7th Cir. 2019), the court of appeals held that a voting organization had standing to challenge an election law because it would be forced to divert resources to counter harms such

16

as erroneous registration removal and "displace other projects" that the organization would "normally undertake." The court clarified important limits:

> Organizations [do not] have standing based solely on the baseline work they are already doing. They cannot convert ordinary program costs into an injury in fact. The question is what additional or new burdens are created by the law the organization is challenging. It must show that the disruption is real and its response is warranted.

*Common Cause Indiana*, 937 F.3d at 955 (cleaned up). *Common Cause* does not conflict with *Hippocratic Medicine*, and the standing principles articulated in *Havens* remain authoritative.

Under *Havens*, plaintiffs demonstrate concrete injury if defendants' conduct impaired (i.e., "directly affected and interfered with") their ability to provide services (i.e., a "core business activity"). *See Havens*, 455 U.S. at 379, *and Hippocratic Med.*, 602 U.S. at 396. A mere setback to an organization's "abstract social interests" isn't sufficient to establish a concrete injury under *Havens* or *Hippocratic Medicine*, and it isn't sufficient under this circuit's precedent. Unlike the medical associations in *Hippocratic Medicine*, all twenty plaintiff organizations do more than advocacy work; they all operate housing counseling and referral services. *See* [435] at 7; [398] ¶¶ 322–41. The same organizational plaintiff in *Havens*, HOME of Virginia, is a plaintiff in this lawsuit. [398] ¶ 333. Plaintiffs identify four categories of "core business activities and services" that were allegedly impaired by defendants' conduct: (1) consumer counseling and referrals, (2) neighborhood stabilization activities, (3) homeownership promotion, and (4) REO-specific training and education. [435] at 7–16. I focus on plaintiffs' consumer counseling and referral services—the type of services squarely

addressed in *Havens*—and something that all plaintiff organizations offer.[10] Plaintiffs say that defendants' discriminatory REO practices limited the available housing stock for the people they serve. [435] at 7. Defendants' failure to maintain properties in non-white neighborhoods, in other words, effectively made those properties "unavailable." In turn, fewer housing options impaired plaintiffs' ability to assist clients in finding suitable homes.[11]

Plaintiffs offer specific examples of how their counseling services have been impaired. HOME of Virginia provides "'mobility counseling' to help low- and moderate-income homeseekers find housing." [435] at 7; [398] ¶ 333. HOME explained the impact of defendants' REO practices on its counseling services:

> [W]e also ensure equal access to housing through extensive housing counseling, and that relies on there being properties on the market that are available to first-time home buyers, which was directly impeded by the fact that Deutsche Bank bought those properties and [allowed] properties that would have been available to our first-time home buyers to decay and didn't properly market them… You know, given our mission, often those properties then aren't available to first-time home buyers.

[435-2] at 12 (157:13–23). Metropolitan Milwaukee Fair Housing Council attested to similar impediments to their counseling services, [369-8] at 740 (140:9–19):

> There were more than, at one point, 17,000 code violations for Deutsche Bank properties that were owned in Milwaukee… there were only 1,402 properties but there were 17,000 violations. So our mission to stabilize neighborhoods, to

---

[10] Defendants do not dispute the fact that all plaintiffs offer counseling and referral services. *See* [398] ¶¶ 322–41.

[11] Plaintiffs also argue that defendants impaired their counseling and referral work by "stigmatizing and destabilizing communities of color." [435] at 7. Concrete injuries include intangible harms, but it's unclear whether stigmatic injury alone is sufficient under Article III. *Cf. TransUnion*, 594 U.S. at 436 n.7 ("We take no position on whether or how such an emotional or psychological harm could suffice for Article III purposes."). So, I focus my analysis on plaintiffs' injuries tied to housing availability for their clients.

essentially provide economic resource for individuals looking for housing, was frustrated. The actions of Deutsche Bank took houses off the market. There's a lack of affordable housing in Milwaukee. And these boardups are unusable. You can't sell them. You can't tear them down.

These facts are sufficient to demonstrate that defendants' REO conduct perceptibly impaired the organizations' core counseling activities. The dilapidated REO properties are akin to the "defective goods" sold by a manufacturer to a retailer and passed off to a consumer. *See Hippocratic Med.*, 602 U.S. at 395 (analogizing HOME in *Havens* to "a retailer who sues a manufacturer for selling defective goods to the retailer"). Defendants say plaintiffs fail to identify a specific constituent who was unable to find housing due to defendants' maintenance conduct. [440] at 10. They point out that other social factors like crime, unemployment, historical segregation, and economic inequality created the barriers to housing. [440] at 11. Defendants argue that plaintiffs are attempting to spend their way into standing by identifying a housing harm that doesn't actually exist, making it inapposite to HOME's activities to combat racial steering in *Havens*. These arguments blur the Article III standing inquiry with the merits inquiry. Plaintiff organizations adequately identify Deutsche Bank-owned properties in their communities that were unsuitable for their clients due to inadequate maintenance and code compliance. *Havens* involved housing unavailability based on false information, which made the harm to HOME's clients more like an outright form of housing denial. Here, plaintiffs' legal theory under § 3604(a) is different because it involves unavailability based on poor maintenance. And plaintiffs separately pursue a claim for defendants' failure to maintain and repair properties under § 3604(b), which does not require a showing of unavailability.

19

*See* 42 U.S.C. § 3604(b); 29 C.F.R. § 100.65(b)(2). Whether a prospective homeseeker failed to find a home because a property was truly made unavailable under the meaning of § 3604(a) goes to the merits of plaintiffs' legal theory (i.e., whether plaintiffs have a statutory cause of action or present sufficient evidence of a discriminatory effect caused by defendants' maintenance conduct). I do not scrutinize the merits of that legal theory to evaluate plaintiffs' standing. Defendants' argument that other social factors are responsible for the housing barriers that impede plaintiffs' counseling activities goes to causation on the merits, namely, whether plaintiffs establish a prima facie case of disparate-impact liability. On the Article III standing inquiry, the evidence in the record is sufficient to establish that the harm to plaintiffs' counseling and referral services was "real" and their responses "warranted." *See Common Cause Indiana*, 937 F.3d at 955.

To be sure, plaintiffs also claim injury to "abstract social interests" that would be insufficient to confer standing under *Havens* or *Hippocratic Medicine*. Plaintiffs' core business activities related to REO-specific education include training industry stakeholders on best practices; meeting with local governments to encourage code violation enforcement for REOs; and issuing reports on REO discrimination to raise awareness of the issue. [435] at 11–12. I agree with defendants that these are the kinds of "issue advocacy" efforts that relate to plaintiffs' broad social or policy goals rather than defendants' specific REO conduct. But unlike the medical associations in *Hippocratic Medicine*, issue advocacy is only part of the activities that the plaintiff organizations expend resources on. I need not decide whether these injuries are

sufficient to support standing.[12] *See Common Cause Indiana*, 937 F.3d at 956 ("We need not decide here whether all the injuries to which the [o]rganizations point are enough to support standing; it is enough that some do.").

Plaintiffs also provide sufficient evidence at this stage of a "consequent drain on resources."[13] *Havens*, 455 U.S. at 379. Specifically, they produce evidence of expenditures in the form of "diversion logs," [362] ¶¶ 38–57, though defendants disagree with the method of calculating those costs and identify legitimate concerns with overbilling and sloppy accounting. [316] at 38–56. There is no dispute, however, that plaintiffs incurred costs to their counseling and referral programs. I remind plaintiffs that each organization must demonstrate standing to recover individual damages. *See TransUnion*, 594 U.S. at 431 ("Article III does not give federal courts

---

[12] Defendants cite to *Legal Aid Chicago v. Hunter Properties, Inc.*, No. 23-CV-4809, 2024 WL 4346615 (N.D. Ill. Sept. 30, 2024), where the court found that a non-profit organization providing housing-related legal services lacked Article III standing to challenge a private landlord's "No-Evictions Policy." The facts of that case are distinguishable. There, plaintiff Legal Aid Chicago alleged that the defendant-landlord's blanket policy of screening tenants for past evictions risked erroneous rejections of applicants and forced the organization to expend more resources to "more aggressively litigate cases" and "seal all types of eviction records." 2024 WL 4346615, at **1–4. The court noted that Legal Aid Chicago's alleged injury was abstract and generalized, describing its "efforts to fight evictions and no-eviction policies generally" rather than its efforts to oppose defendant's conduct specifically. *Id.* at *6. Legal Aid Chicago's alleged injury to divert resources to fight evictions and eviction-related housing denials was the type of "baseline" work to further its "broader mission" of housing advocacy. *Id.* at **10–11 (citing *Common Cause Indiana*, 937 F.3d at 955). Here, plaintiffs do more than identify activities undertaken to oppose general housing harm caused by the type of policies that defendants engage in. They provide specific evidence of impairment to their housing and counseling services based on defendants' maintenance of actual REO properties in their respective communities. That's different than the high level of abstraction that the court in *Hunter Properties* found inadequate to support Legal Aid Chicago's claim of concrete injury.

[13] A showing of a "consequent drain on resources" under *Havens* is sufficient "not only for causation but for the redressability element of standing, since without [the challenged action] there will be less drain on [the organization's] resources." *Common Cause Indiana*, 937 F.3d at 956.

the power to order relief to any uninjured plaintiff."). To the extent the claims survive summary judgment, each plaintiff must be prepared to support individual standing "by the evidence adduced at trial." *Id.*

Finally, plaintiffs seek injunctive relief in their second amended complaint. [70] at 115 (request to permanently enjoin defendants from violating the Act). Defendants do not move to dismiss plaintiffs' claim for injunctive relief, and plaintiffs do not raise any facts in support of that claim. To establish standing for injunctive relief, however, plaintiffs must allege a "real and immediate" threat of future violations. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013). Because plaintiffs do not present any evidence in the record of defendants' ongoing REO conduct that suggest a risk of future violations, any claim for injunctive relief is dismissed for lack of standing.

## IV. Local Rule 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). The moving party must file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *See Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a)(2). The nonmoving party must file a response to that statement and may provide a separate statement of additional facts. N.D. Ill. Local R. 56.1(b)(2)–(3). Both statements of fact and statements of

additional fact must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* N.D. Ill. Local R. 56.1(d)(1)–(2).

### A. Motions to Strike

Defendants move to strike dozens of plaintiffs' statements of additional facts for containing compound facts, asserting legal arguments, and failing to cite to specific evidentiary material in violation of Local Rule 56.1. [391]. The court granted both parties' motions for leave to file additional statements of fact. *See* [302] (240 statements of fact for defendants' joint motion for summary judgment), *and* [371] (83 additional facts to respond to the Deutsche Bank defendants' motion for summary judgment and 345 additional facts to respond to the joint motion).

Many of plaintiffs' statements of additional fact violate the Local Rules by combining several facts into a single statement, including one statement of fact that spans eight pages with over two dozen subsections. *See, e.g.*, [398] ¶¶ 122, 200, 236; [405] ¶ 68. Some of defendants' statements also include compound facts. *See, e.g.*, [352] ¶ 2. The Local Rules require "concise" statements of fact, and these statements violate that requirement. Because striking lengthy statements risks throwing out material facts, I decline to strike noncompliant statements. *See* N.D. Ill. Local R. 56.1(e)(2) (motions to strike are generally disfavored).

Plaintiffs also violate the Local Rules by failing to cite to specific page numbers and citing instead to entire exhibits. *See, e.g.*, [398] ¶¶ 231, 300. I disregard any facts not properly supported by specific citations to the record. *See* N.D. Ill. Local R. 56.1(d)(2). An asserted fact not controverted by reference to specific, admissible

23

evidence is also deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *see, e.g.*, [398] ¶¶ 8, 51, 237, 276, 332.

Both parties present legal arguments in their statements of fact. For example, both sides assert legal conclusions about defendants' duties and liabilities under the Governing Agreements. Striking these statements is unnecessary—I disregard any legal arguments presented in statements of fact. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006); *see, e.g.*, [352] ¶¶ 4–5, 7, 15, 21, 23, 25; [362] ¶ 18; [398] ¶¶ 3, 71, 138, 258, 316; [405] ¶¶ 6, 68.

Finally, general objections to the characterization of facts are also sustained. I omit characterizations and instead rely on the language of the cited material when possible. *See, e.g.*, [352] ¶¶ 4–5; [398] ¶¶ 7, 20, 39, 121, 212, 239. Many of the disputes in the parties' Rule 56.1 statements implicate contested expert testimony. I rule on the admissibility of expert testimony separately. *See below* V; *see, e.g.*, [352] ¶¶ 32–33; [362] ¶¶ 7, 19–22; [398] ¶¶ 42, 72–94, 181, 280–315; [405] ¶¶ 76–79. Any admissibility objections raised by the parties in the Rule 56.1 statements that are not addressed in the *Daubert* rulings are deemed immaterial to resolving the pending motions for summary judgment. The parties dispute many facts but not all of them are material. I disregard immaterial facts. *See, e.g.*, [398] ¶¶ 20–22, 24, 46, 138. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include them in the light most favorable to plaintiffs.

### B.     Admissibility of the REO Investigation Database

Defendants broadly seek to exclude plaintiffs' investigation database as inadmissible hearsay. [316] at 9–10, 17–19. The REO database contains plaintiffs'

scoring of properties and photographs from on-site inspections. [362] ¶¶ 11–13; [398] ¶ 48. Plaintiffs seek to admit inspection records from the REO database under the business records exception, Fed. R. Evid. 803(6), and photographs of properties as non-hearsay evidence of property conditions. [360] at 29. Plaintiffs separately seek to admit the database records under Fed. R. Evid. 1006. [360] at 30.

Rule 1006 permits the use of summaries or charts "to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. It is not, however, "an end around to introducing evidence that would otherwise be inadmissible." *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009). Plaintiffs' underlying inspection records must be independently admissible, *see id.*, even if they are not separately admitted into evidence. *See* Fed. R. Evid. 1006 advisory committee's notes on 2024 amendment ("[A] properly supported summary may be admitted into evidence whether or not the underlying voluminous materials reflected in the summary have been admitted.").

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). The property photographs contained in the database are not "statements," so they are not hearsay.[14] *See* Fed. Evid. 801(a) (defining "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion"). Plaintiffs agree that the other inspection records in the database are hearsay. [360] at 29.

---

[14] Defendants also object because the photographs in the database have not been authenticated. [408] at 17. Plaintiffs bear the burden at trial to establish authenticity, for example, through testimony of a witness with knowledge. *See* Fed. R. Evid. 901(b)(1).

The business records exception to hearsay applies if a record of an act or event: (1) "was made at or near the time by—or from information transmitted by—someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of [an organization]"; (3) "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of the custodian or another qualified witness"; and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). "Litigation generally is not a regularly conducted business activity," and documents prepared in anticipation of litigation raise "serious trustworthiness concerns because there is a strong incentive to deceive (namely, avoiding liability)." *Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2013); *see also Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021) ("[W]e presume the reliability of business records based on the lack of deceitful incentive and the habitual accuracy implicit within regularity.").

Plaintiffs note that courts routinely admit fair housing testing evidence under the business records exception. *See, e.g.*, *Fair Hous. Ctr. of Washtenaw Cnty., Inc. v. Town & Country Apartments*, No. 07-10262, 2009 WL 497402, at *5 (E.D. Mich. Feb. 26, 2009), *as amended* (Feb. 27, 2009); *see NFHA v. Bank of Am., N.A.*, 2023 WL 2633636, at *13 (D. Md. Mar. 24, 2023) (overruling hearsay objection of the same REO database because there was "no evidence of bad faith or untrustworthy circumstances"). But in this case, defendants say the business records exception is inapplicable because (1) alterations made to the original inspection forms defeat the

contemporaneity requirement; (2) many records were created by the NFHA rather than local plaintiffs who conducted the inspections; and (3) the records (including photographs) were made in anticipation of litigation after plaintiffs filed their HUD complaint. [316] at 18–19.

The business records that plaintiffs seek to admit are the REO database entries—not the original inspection forms or the entries submitted by the local plaintiffs. Rule 803(6) doesn't require a custodian or witness to have "personally gathered" the record, they need only be familiar with the organization's recordkeeping practices. *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006) (internal citation marks omitted); *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995) (business records exception requires only that 'it was the business entity's regular practice to get information' from the person who created the document."). Local plaintiffs and Lindsay Augustine (NFHA's Senior Associate Director of Enforcement and Investigations) testified as to the initial data entry procedure. [398] ¶ 48. Augustine and another senior NFHA staff member testified to NFHA's subsequent review and standardization of the local database entries. [398] ¶¶ 48–68. So long as Augustine is familiar with each step of the REO database process, it's not fatal that some of the records were generated by NFHA rather than the local organizations who conducted the physical investigations. Local plaintiffs followed NFHA's protocol to create database entries.

- First, a local plaintiff would create a new record for a property and input the property address, year built, date of visit, and lender information.

- Next, photographs taken during the inspection were uploaded. For photographs associated with a specific deficiency, the photograph was

uploaded with a drop-down menu where the deficiency would be selected (e.g., a photograph of a broken window would correspond with a "Structure" and "Damaged Windows (Broken or Boarded)" tag). For photographs not associated with an observed deficiency, the photograph was uploaded with a general description.

- After a photograph was uploaded and a deficiency was selected, the REO database "automatically tallied the total number of deficiencies observed at a property and arrived at a score for the property."

[398] ¶¶ 50–58. Local plaintiffs typically entered information into the REO database soon after the on-site investigation.[15] *See* [398] ¶ 51. Once a local plaintiff entered information into the REO database, NFHA reviewed those entries and conducted a quality-control review. [398] ¶ 61. NFHA compared property photographs to the selected deficiencies and would make edits:

- Removing a marked deficiency if it was not visible in the photograph(s).

- Adding a deficiency if it was visible in the photograph(s) but not marked.

- Reviewing if the correct deficiency was selected. For example, if the investigator marked a deficiency as a "trespassing or warning sign" (a deficiency category), but the actual photograph showed a "winterization sign" (not a deficiency category), NFHA removed the deficiency.

[398] ¶¶ 62–65. NFHA typically conducted quality-control review shortly after a local plaintiff uploaded the photographs and accompanying data. [398] ¶ 66. After NFHA's

---

[15] Defendants dispute that plaintiffs' uploading process was always contemporaneous with the property inspections. [398] ¶ 51. While NFHA conceded that certain edits were made after the initiation of this litigation, the local plaintiff organizations attested that the upload process was contemporaneous with inspections. That assertion hasn't been refuted. For example, Michelle Morgan of the Louisiana Fair Action Housing Center stated that she would typically enter the inspection information into the database soon after the on-site inspection. [369-8] at 218 (173:6–173:20) ("As time went on, we were very quick, usually it was the next day. I think at the beginning, there was a little more of a lag time, couple of days, you know, possibly a week. And then -- again, NFHA had wanted us to enter them sooner, and so I made it my practice to enter it… typically the next day, after doing the investigations in the field.").

review and edits, the paper inspection forms were destroyed as a part of the organization's document retention policy. [362] ¶ 14; [370-6] at 446 (615:6–615:9).

The contemporaneity requirement is satisfied so long as NFHA's review (and "creation" of the database entry) was conducted close to the time that the local plaintiffs transmitted the inspection data. Plaintiffs concede 45 properties were reviewed for quality control after plaintiffs brought this lawsuit. [369-9] at 2 (list of properties). The database records for those 45 properties are inadmissible under Rule 803(6) because they were not made close in time to the local plaintiffs' submission of the data.

Defendants contend that the database was created in anticipation of litigation, so the business records exception does not apply. Plaintiffs assert—and defendants do not dispute—that it is a regularly conducted activity of plaintiffs to conduct investigations and document the results of those investigations with "testing records, photographs, and other documentation." [398] ¶ 23. So long as a qualified witness testifies that each step in the process, including NFHA's editing, was consistent with the regular process of reviewing and documenting investigation data, the business records exception may still apply. *See United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008) (finding that "no link in the trustworthiness chain was broken" where museum curator testified to the process of transferring the museum's paper records to a computerized database and also testified to the process by which database records were updated). Moreover, because of the availability of original REO property photographs and Judge Leinenweber's finding that plaintiffs' document destruction

29

was not in bad faith, I do not find that other circumstances of untrustworthiness justify exclusion under Rule 803(6).

The REO database records are admissible for purposes of summary judgment. Plaintiffs still bear the burden to lay the proper foundation for the database records to be admitted under Rule 803(6) at trial. *See Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420–21 (7th Cir. 2016). They also bear the burden to establish the authenticity of the REO property photographs. *See* Fed. R. Evid. 901. Finally, excluding portions (or all) of the REO database as inadmissible hearsay would not bar plaintiffs' experts from relying on the database in forming their opinions if it is the type of information reasonably relied upon by other experts in their field. *See United States v. Brownlee*, 744 F.3d 479, 481–82 (7th Cir. 2014) (reiterating that an expert witness may rely on inadmissible evidence as long as they do not merely "parrot[] an out-of-court statement").

## C. Spoliation Issues

During discovery, defendants moved for sanctions based on spoliation of plaintiffs' handwritten inspection forms. [225]. Defendants alleged that plaintiffs destroyed original handwritten inspection forms after inputting the evidence into the REO database and moved to exclude plaintiffs' investigation evidence in its entirety. [227]. Judge Leinenweber found that spoliation had occurred, but the record did not support a finding of bad faith. *See* 2023 WL 5535313, at **1–2 (N.D. Ill. Mar. 29, 2023). The court credited plaintiffs' explanation that (1) the notes were destroyed because the information would be redundant after being entered into the database and (2) the destruction of original forms was consistent with NFHA's document

retention policies. *Id.* at *2. The same conduct was at issue in *Bank of America. See* [263-1]. There, the court determined spoliation had occurred but that a modest sanction would be appropriate. "[D]efendants can cure much of the harm themselves: they can attack the database's accuracy by reference to the more than 30,000 photographs the plaintiffs produced, and they can test the objectivity of the plaintiffs' metrics through independent witness examination. In the end, the problem is that they will be doing so with incomplete information." [263-1] at 16. To fill this gap, the Maryland court would permit all parties to present argument and evidence at trial regarding the spoliated surveys. [263-1] at 16. Judge Leinenweber concluded the same sanction to be appropriate in this case. "All parties may present argument and evidence regarding the spoliated notes at trial." 2023 WL 5535313, at *3. Disputes about the significance of the data in the original inspection forms are raised in defendants' pending motion to exclude Dr. Ian Ayres's testimony and defendants' expert Dr. Justin McCrary's testimony. *See below* V.B.

### D. Time-Barred Conduct

Based on the Act's two-year statute of limitations for private lawsuits, 42 U.S.C. § 3613(a)(1)(A), plaintiffs' allegations were limited to conduct after February 26, 2012, for the Deutsche Bank defendants, and to conduct after February 14, 2015, for Ocwen and Altisource. *NFHA I*, 2018 WL 6045216, at **3–5. Because plaintiffs were on notice of defendants' conduct as early as 2011, the continuing violation doctrine did not apply. Judge Leinenweber declined to reconsider that holding. *NFHA II*, 2019 WL 5963633, at *12. He noted, however, that plaintiffs would not be barred from using defendants' conduct outside the limitations period as evidence of

discriminatory intent for conduct that occurred within the limitations period. *Id.* (citing *Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014)).

Plaintiffs ask that I reconsider that holding in light of recent case law and new information revealed during discovery. [360] at 64–66. Plaintiff cites to *Fulton County v. Wells Fargo & Co.*, No. 1:21-CV-1800-MLB, 2023 WL 2634042, at *6 (N.D. Ga. Mar. 23, 2023), where another district court held that the Act's text does not support a notice limitation to the application of the continuing violations doctrine. The Georgia district court offers a different interpretation of the statute, but its decision is not controlling, so there is no manifest error in Judge Leinenweber's ruling. Plaintiffs also cite to new information revealed during discovery demonstrating statistically significant racial disparities throughout 2011 to 2017 as well as evidence of defendants' policies of value redlining and delegation of discretion dating back to 2011. [360] at 65–66. This information does not alter the factual basis underlying the previous rulings. Judge Leinenweber found that plaintiffs were on notice of violations in 2011 when they held a press conference and published a report; he remained unpersuaded by inconsistent allegations in the amended complaint that suggested this knowledge wasn't specific to the Deutsche Bank-owned properties. *NFHA* II, 2019 WL 5963633, at *12. I defer to that finding now.

## V.    Motions to Exclude Expert Testimony

Defendants move to exclude seven of plaintiffs' expert witnesses: Dr. Ian Ayres, Pamela Kisch, Albert Poche, Dr. Stacy Seicshnaydre, Deavay Tyler, Dr. Elizabeth Korver-Glenn, and Dr. Timothy Guetterman. *See* [303], [305], [307], [318], [323],

[326], [327]. Plaintiffs move to exclude four of defendants' expert witnesses: Dr. David Skanderson, Marcel Bryar, Sharon Stedman, and Mark Linné. [311]. Because ruling on the admissibility of defendants' expert witnesses is not essential to resolving the pending motions for summary judgment, [316] at 11–12, I deny plaintiffs' motions without prejudice to renewal if necessary. Defendants do not dispute that plaintiffs are entitled to some damages should they prevail on liability, but they dispute the scope of recovery. [316] at 11, 39–54. Because determining damages is not essential to resolving liability at this stage, I deny defendants' motion to exclude plaintiffs' damages expert, Stacy Seicshnaydre, without prejudice to renewal if necessary.

### A. Legal Standards

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), expert testimony is admissible only if relevant and reliable. Rule 702 and *Daubert* require me to evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). "The focus is on the expert's methodology, not [their] ultimate conclusions." *Kopplin v. Wisconsin Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019). My role is to be an evidentiary gatekeeper, determining whether the proposed expert testimony crosses the threshold of admissibility, but I may not take the place of the jury to decide issues of credibility or accuracy. *Artis v. Santos*, 95 F.4th 518, 527 (7th Cir. 2024) (quoting *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012)). The party seeking to introduce the expert testimony bears the burden of establishing that it satisfies the *Daubert* standard. *Gopalratnam*, 877 F.3d at 782. If expert

testimony crosses the threshold, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the appropriate tools to challenge the evidence. *Daubert*, 609 U.S. at 596.

An expert may be qualified by their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citing *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Reliability hinges on "the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). Factors that bear on reliability include: (1) whether the particular theory or technique can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique is generally accepted in the relevant scientific or expert community. *See Anderson v. Raymond Corp.*, 61 F.4th 505, 509 (7th Cir. 2023). An expert's testimony is relevant if it "will assist the trier of fact with its analysis of any of the issues involved in the case." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

An expert is generally barred from offering legal opinions. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) ("It is the role of the judge, not an expert

witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence."). But an expert "may offer [their] opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied" so long as they do not testify "as to whether the legal standard has been satisfied." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212–13 (D.C. Cir. 1997). Expert testimony that merely states legal conclusions is separately excludable because it is unhelpful to the jury. Fed. R. Evid. 702(a); *United States v. Richter*, 796 F.3d 1173, 1195–96 (10th Cir. 2015) ("[A]n expert may not simply tell the jury what result it should reach without providing… any means by which the jury can exercise independent judgment."). Exclusion is appropriate when an expert uses a term with "a separate, distinct and specialized meaning in the law" apart from its vernacular meaning. *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985).

The Fair Housing Act provides the applicable legal standards in this case. The parties' experts may not testify as to the meaning or purpose of the Act. *See Antrim Pharms. LLC v. Bio-Pharm, Inc.*, 950 F.3d 423, 430 (7th Cir. 2020) (an expert is barred from testifying on "pure issues of law, such as the meaning of statutes or regulations"). They are also barred from applying the law to the facts of this case to conclude certain conduct violated the Act. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (affirming exclusion of expert's legal conclusions that city's actions violated the FHAA). Many terms carry legal weight in the context of the Act, and expert testimony relying on such terms may be

inadmissible. *See United States v. Perkins*, 470 F.3d 150, 158 (4th Cir. 2006) ("[C]onclusory testimony that a company engaged in 'discrimination,' that a landlord was 'negligent,' or that an investment house engaged in a 'fraudulent and manipulative scheme' involves the use of terms with considerable legal baggage."); *Torres*, 758 F.2d at 151 ("Discrimination... has specialized meaning in the law and in lay use the term has a distinctly less precise meaning."); *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019) ("pretext" or "discrimination" carries specialized meaning in the disability discrimination context).

## B.    Dr. Ian Ayres

### 1.    Background

Ayres, plaintiffs' statistical expert, is a law professor and economist at Yale Law School. [340-1] at 10. Ayres conducted a statistical analysis of plaintiffs' inspection data and opines that Deutsche Bank-owned REO properties in non-white neighborhoods were more likely to have maintenance and marketing deficiencies than Deutsche Bank-owned REO properties in majority-white neighborhoods with similar characteristics. [340-1] at 12. They conducted two regression analyses showing statistically significant disparities between REO properties in white and non-white communities: (1) an analysis of deficiencies that controlled for non-race variables that showed REO properties in non-white neighborhoods had more deficiencies than properties in white communities and (2) an analysis of the decline in value of REO properties during the foreclosure lifecycle that showed a greater

number of deficiencies was associated with a greater value decline of properties in non-white block groups compared to white block groups.[16] [340-1] at 12–13.

Ayres relied on the following sources: plaintiffs' investigation data of 1,276 properties; servicing data limited to 699 REO properties that Ocwen acknowledged servicing and Altisource managed during the investigation period, which included appraisals and valuations of properties, the date the property became REO, and the date the property was sold; U.S. Census Bureau Data from 2010; and third-party county recorder data, county assessor data, and community data from ATTOM Data Solutions, which included historical information on property sales, identities of sellers and buyers, mortgage information, and property characteristics collected by municipalities. [340-1] at 25–27.

Ayres began with a full set of 1,276 properties and whittled the sample to subsets. To start, they identified properties owned by Deutsche Bank at the time of plaintiffs' inspection. [340-1] at 27–28. Ayres recognized that plaintiffs' data set might be overinclusive of properties that were sold between the time plaintiffs identified them and the date of the inspection or before a property's sale was publicly recorded. They classified 893 properties as being owned by Deutsche Bank if the inspection date was on or after the REO date or sale date. If those dates were not available, they used third-party data from ATTOM to identify start and end dates of Deutsche Bank's ownership. [340-1] at 28. Then, Ayres further excluded 68 properties

---

[16] Ayres classified a Census block group as a "white" block group if at least 50% of the 2010 population was non-Hispanic white alone and a Census block group as a "non-white" block group if less than 50% of the 2010 population was non-Hispanic white alone. [340-1] at 26.

identified on a list of 139 disputed properties in metropolitan areas not at issue in this case. [340-1] at 28–29. Next, Ayres identified a subset based on the 699 agreed-upon property list serviced by Ocwen and Altisource. [340-1] at 29. Finally, Ayres distinguished each subset of properties by inspection dates, accounting for Judge Leinenweber's ruling on the statute of limitations: (1) all inspection dates (May 25, 2011 – May 21, 2018); (2) inspections on or after February 26, 2012; and (3) inspections on or after February 14, 2015. [340-1] at 29.

Ayres ran a regression based on each subset of properties, controlling for 85 non-race variables in the initial regression analysis. [340-1] at 34. Some of the explanatory, non-race variables included: the age of the home, the size of the home or property lot, the length of time the property had been owned by the lender, the year and season of the inspection, neighborhood property crime rates, and neighborhood home values. [340-1] at 33–34.

Across all samples, Ayres found that deficiencies in REO properties in non-white block groups were greater than the number observed in white block groups and that those differences were statistically significant even when controlling for non-race factors. [340-1] at 33–38. They found that plaintiffs' inspection data "in conjunction with property records and Census data, shows that REO properties in minority neighborhoods had a statistically significant greater number of deficiencies in routine maintenance and marketing than similarly situated REO properties in White neighborhoods." [340-1] at 38. Ayres concludes that these findings are

consistent with the hypothesis that defendants engaged in "race-contingent practices" alleged by plaintiffs.

Ayres also performed a logistic regression analysis to measure the explanatory variables' effect on an REO property having at least ten deficiencies, expressed as an "odds ratio." [340-1] at 38. They found that REO properties in non-white block groups were more likely to have at least ten deficiencies than properties in white block groups; these results were statistically significant even when controlling for non-race factors. [340-1] at 38–42. Ayres concludes that these findings were consistent with plaintiffs' hypothesis. [340-1] at 42.

Ayres then examined the relationship between changes in REO property values, neighborhood race, and deficiencies. [340-1] at 42–43. Based on their review of servicer-limited data (699 agreed-upon properties), Ayres opines that REO properties in non-white neighborhoods experienced greater declines in real property value during the foreclosure and REO processes than those in white neighborhoods. [340-1] at 43. They examined price changes over four windows of time during the foreclosure process: (1) origination of mortgage through REO sale; (2) first pre-foreclosure appraisal through REO sale; (3) first pre-foreclosure appraisal through last post-foreclosure appraisal; and (4) last pre-foreclosure appraisal through REO sale. [340-1] at 44–46. Ayres found statistically significant relationships between deficiencies and property value declines across all four windows. [340-1] at 48. They opine that these findings are consistent with plaintiffs' allegations that defendants' maintenance deficiencies drove the decline in property values. [340-1] at 50.

39

In a supplemental report, Ayres addressed whether legitimate business justifications could explain disparities in the deficiencies observed in non-white neighborhoods. [340-2]. In their rebuttal report, Ayres conducted a review of property photographs and addressed defendants' criticisms with revised regression models. [340-9].

Defendants move to exclude Ayres's expert testimony in its entirety (including deposition testimony) and to strike Ayres's most recent November 2023 declaration as untimely. [323], [406].

### 2.    *Motion to Strike Ayres's November Declaration*

Plaintiffs attached the Ayres Declaration to their Local Rule 56.1 statement of additional facts on November 17, 2023, in response to defendants' joint motion for summary judgment. *See* [351-1] at 623–74. In their declaration, Ayres responds to arguments raised in defendants' summary-judgment filings related to the proper subset of REO properties included in their analyses. Defendants submitted a declaration by counsel for defendants identifying groups of properties that were not titled to Deutsche Bank, subject to master-servicer agreements authorizing termination of Ocwen as a servicer, or subject to termination of Ocwen as a servicer based on third-party consent. [320-1] at 2–28. Ayres recalculated regression analyses excluding each of these three subsets identified by defendants and found that the exclusion of these properties did not change their original conclusions. [351-1] at 629. Defendants move to strike the declaration arguing that plaintiffs did not seek leave to file an additional expert report, the declaration is a new expert report in the guise

of a supplemental report, and that its introduction would unfairly prejudice them at this late stage. [407].

Rule 26(a)(2)(D) requires parties to make expert witness disclosures "at the time and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Rule 37(c)(1) provides automatic sanctions for untimely disclosures. "If a party fails to provide information… as required by Rule 26(a) or (e), the party is not allowed to use that information… to supply evidence on [a motion or at trial], unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In determining whether a Rule 26(a) violation was substantially justified or harmless, I may consider: "(1) the prejudice or surprise to [defendants]; (2) the ability of [defendants] to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996).

Judge Leinenweber amended the scheduling order for expert witness discovery several times. [255] (initial scheduling order); [257]; [261]; [269]. The final amended scheduling order required Ayres's initial written report to be submitted by October 13, 2022, [259], and their rebuttal report by April 26, 2023. [287]. Plaintiffs did not seek leave to file the Ayres Declaration, but they say that the November 2023

declaration is a supplement under Rule 26(e) that addresses factual assertions raised for the first time by defendants in their attorney's declaration. [410].

Plaintiffs submitted the Ayres Declaration after the court's deadline for expert disclosures, so I deem it untimely under Rule 26(a). Plaintiffs characterize the declaration as a supplement. But a supplement under the meaning of Rule 26(e)(1)(A) supplements or corrects disclosures that are in some material respect "incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). The declaration includes new regression analyses that may be consistent with Ayres's past testimony and their bottom-line conclusions may be unchanged, but it nevertheless presents new calculations based on a new data set. Moreover, the revised calculations and accompanying analysis exceeds 50 pages. [351-1] at 623–74. The declaration is more appropriately characterized as a rebuttal report that defuses defendants' criticisms. *See Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) ("The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of evidence offered by an adverse party."). Without leave from this court to file an additional expert report after the deadline, the declaration is untimely.

Rule 37(c)(1) bars untimely disclosures unless substantially justified or harmless. I find that neither exception applies. Plaintiffs contend that the declaration is substantially justified to address new arguments raised in defendants' Local Rule 56.1 statements related to the proper data set of properties. Because defendants did not raise this argument through their experts and instead attempt to do so through an attorney, plaintiffs point out that Ayres never had the opportunity to offer revised

42

regressions through rebuttal. To the extent that defendants rely on their counsel rather than their own experts to attack plaintiffs' data sets, plaintiffs need not rebut defendants' Rule 56.1 statement with revised regression analyses. Given the nature of the attorney declaration, plaintiffs' response is not sandbagging defendants. *See Berkheimer v. Hewlett-Packard Co.*, No. 12 C 9023, 2016 WL 3030170, at *5 (N.D. Ill. May 25, 2016) (supplementation under Rule 26(e) "does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report") (citation omitted). Still, I find that defendants would be prejudiced by being unable to respond to Ayres's revised regression analyses. And curing that prejudice would come at the cost of defendants reengaging expert witnesses. Finally, I decline to reopen expert discovery at this late stage of the case, which would further delay this years-long litigation. The dispute between the parties' experts involves competing statistical models and data sets that lend itself to endless iterations of regression analyses. At some point, that back-and-forth must come to an end. Defendants' motion to strike Ayres's November declaration, [406], is granted.

### 3. *Deficiency Analysis*

The parties do not dispute Ayres's qualifications, nor do they dispute that multiple regression analysis is an appropriate statistical method to employ in this case. Defendants challenge Ayres's deficiency analysis for their: (1) opinion on the quality of data; (2) reliance on an "unedited data" set; (3) review of property photographs to rebut claims of bias; (4) and use of data sets that aggregate defendants' conduct with non-party actors. [400] at 4–5.

Some of defendants' objections to Ayres's testimony go to the accuracy and quality of the data underlying the regression analyses rather than the methodology they used. My role is not to second-guess the quality of the data that Ayres or other experts in this case relied on—admissibility depends on whether "there is sufficient data to justify the use of the methodology." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). The *Daubert* inquiry is concerned with the expert's *use* of the data whereas issues about quality or accuracy typically go to the factual underpinnings of an expert's testimony and are reserved for the jury. *See Manpower*, 732 F.3d at 809 ("Assuming a rational connection between the data and the opinion… an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility."). "In the quantitative sense, sufficient facts or data means that the expert considered sufficient data to employ the methodology." *Gopalratnam*, 877 F.3d at 781 (internal quotation marks omitted). To be qualitatively sufficient, "an expert must employ 'those kinds of facts or data' on which experts in the field would reasonably rely." *Id.*

The proper inquiry is whether plaintiffs' deficiency data is the type of data that experts in Ayres's field reasonably rely on. Ayres testified that they were not asked to opine on the accuracy or representativeness of plaintiffs' inspection data, but they represented that they "did review evidence, including reports of plaintiffs' experts, to look for indicia of survey quality… that would be a standard part of trying to assess whether it was reasonable for me to undertake the kinds of analyses that I have done." [340-3] at 32:19–33:7; *see also* [340-1] at 10 n. 7 (citation to expert reports of

Guetterman, Kisch, Tyler, and Poche). Defendants say Ayres's testimony is contradictory because it offers an opinion on the accuracy of plaintiffs' data. [324] at 8–9. Read in context, Ayres's conclusions about plaintiffs' data are not opinions about its accuracy but attestations as to the sufficiency of data. *See* [340-3] at 33:4–33:7 (referring to "sufficient indicia quality to make what I did fall within the norms of the social science profession."). Defendants also say Ayres did not undertake any analysis related to the "indicia" of data "quality," but Ayres adequately states the bases for their conclusion throughout their testimony. *See, e.g.*, [340-3] at 33:10–33:13 (listing "the training materials" and "the expert testimony… concluding that the methodology was well designed and had adequate quality control"), 44:1–44:4 ("[T]hey preserved the thousands of photographs that are available for subsequent researchers and litigants to test, and… that preservation of the raw data is an important indicia."). Ayres relied on the type of data generally accepted in their field.

Similarly, the parties' dispute about an "unedited" dataset goes to the accuracy of the underlying data. Defendants' expert Justin McCrary opines that plaintiffs' data is fundamentally unreliable because of data changes to plaintiffs' original inspection forms. [340-4] at 23–31. McCrary created a subset of 267 properties for which original inspection forms still existed. [340-4] at 24. He found that changes from handwritten forms to plaintiffs' deficiency data were not evenly distributed among white and majority minority neighborhoods. [340-4] at 25. He then applied Ayres's regression analyses with the same controls and found that the statistically significant

relationship between neighborhood race and number of deficiencies disappeared. [340-4] at 25–28.

In rebuttal to McCrary, Ayres noted that (1) original photographs taken by inspectors existed to support observations of deficiencies and (2) they understood the changes made to the inspection forms to be a result of a quality control process. [340-9] at 25–26. Ayres noted that recording, editing, and coding inspection data is a generally accepted protocol to ensure accuracy and consistency before survey data can be analyzed. They also explained that "[w]hen underlying evidence supporting the data is available, as is present in this case through photographs taken by inspectors, this underlying, direct evidence can best ensure the accuracy and consistency of the quality control process and the coded data." [340-9] at 26. Ayres referenced Guetterman's and Tyler's separate reviews of plaintiffs' photographs and deficiency data in the inspection database. Separate from those photograph reviews, Ayres ran regressions on properties "for which no edits were made to the data after the deficiencies were originally recorded in Plaintiffs' database." [340-9] at 27. Ayres categorized a property as unedited "if every record in the Deficiency Log for that property has the same creation date, the same creator name, and, if any edits are present, those edits were all made on the same date as the creation date by the same editor as the record creator." [340-9] at 27. Based on revised regression analyses on the 256 properties ("Unedited Property Sample"), Ayres maintains that racial disparities remain robust and statistically significant. [340-9] at 28.

46

Defendants take issue with Ayres's unedited property set, arguing that Ayres merely "took Plaintiffs' word for it." [400] at 12. In justifying the use of plaintiffs' inspection data, Ayres accepted that plaintiffs' data edits were the result of a standard quality-control process. Ayres's concerns were also mitigated by the existence of original property photographs to confirm the accuracy of the data. Defendants say this an unreliable use of data because Ayres should have independently verified information provided by plaintiffs before using it. *See* [400] at 12 (citing *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 07-cv-341, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009)). Defendants' cited case references the general principle that testimony from an expert witness who "merely parrots information provided" by a party should be excluded. *King-Indiana Forge*, 2009 WL 3187685, at *2. In *King-Indiana Forge*, the court barred a damages calculation proffered by plaintiff's expert because the expert relied entirely on calculations for costs incurred provided by a manager at plaintiff's company. *Id.* The court acknowledged that the expert could rely on outside information, but his conclusions were unreliable because he did not independently review the information and formulate calculations consistent with his expertise. *Id.* Here, Ayres relied on plaintiffs' data, but they chose the parameters for data selection and performed independent regression analyses. "An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him—information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented." *Matter of James Wilson*

47

*Assocs.*, 965 F.2d 160, 172–73 (7th Cir. 1992). But that latitude isn't boundless. An expert may not simply serve as the "mouthpiece" of another expert or witness. *See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002); *James Wilson*, 965 F.2d at 173 (finding that an architecture expert who consulted an engineer "could not testify for the purpose of vouching for the truth" of what the engineer told him). Ayres selected an "unedited property" data set based on their own selection criteria before conducting the regression analyses. *See* [340-9] at 27 (including properties where deficiency log showed the "same creation date, the same creator name, and, if any edits are present, those edits were all made on the same date as the creation date by the same editor as the record creator"). Defendants' expert McCrary offers a different "unedited property" set based on comparisons between original handwritten inspection forms and plaintiffs' inspection database conducted by his team. [340-4] at 24.

The parties' disagreement on the proper "unedited data set" goes to the factual underpinnings of Ayres's statistical analysis. *Manpower*, 732 F.3d at 809 (whether an expert "selected the best data set to use" is a question for the jury). A jury is entitled to conclude that plaintiffs' inspection database is riddled with problems that cast serious doubts on its accuracy—doubts that may be compounded by the absence of original inspection forms.[17] *See Stollings*, 725 F.3d at 766 ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a

---

[17] As discussed above, the spoliation of plaintiffs' handwritten inspection forms goes to credibility but does not warrant exclusion of the database.

conclusion that is subject to doubt."). Nevertheless, Ayres relied on a generally accepted type of data and employed a reliable method to opine that statistical disparities persist. That is the focus of the *Daubert* inquiry. Ayres's analysis related to the unedited property set is admissible.

Defendants also seek to exclude Ayres's analysis of property photographs. [324] at 9–13. In their rebuttal, Ayres conducted a race-blind review of front-view photographs of randomly sampled properties to address criticisms of plaintiffs' investigation data. [340-7] at 11–23. Ayres directed two consultants to review front-view photos of REO properties to score 26 deficiencies. [340-7] at 16–17. The consultants were trained in plaintiffs' deficiency identification methodology by NFHA's Lindsay Augustine. [340-7] at 17. Based on the coders' deficiency scoring, Ayres opines that "statistically significant disparities in deficiencies continue to exist when standardized non-subjective photos are reviewed by race-blind coders." [340-7] at 19–20. In reviewing photographs, Ayres's emphasized that their findings did not depend on Guetterman's and Tyler's photograph reviews of REO properties. [340-7] at 21. Defendants do not object to Ayres's qualifications or the methodology of the photo review and coding, but they say Ayres's statistical analysis is unreliable and potentially misleading to a jury because it does not use any of the control variables applied in the primary regression analyses. [324] at 10. Plaintiffs say this misses the point of the front-photo review, which purports to address accusations of bias in deficiency scoring rather than demonstrate that race explains the observed disparities. [355] at 13.

Plaintiffs' justification about the purpose of Ayres's front-photo review has little bearing on whether the statistical analysis is reliable and supports Ayres's bottom-line conclusion. Based on the front-photo review, Ayres's opines that some deficiencies were more likely to be observed in front-view photos of non-white block group properties than in white block group properties. [340-7] at 20. That is still a conclusion about the statistical relationship between neighborhood race and deficiencies. Typically, an expert's "failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring). But Ayres's primary regression analyses controlled for a panoply of variables not controlled for in this regression. This renders Ayres's statistical analysis of the front-view photographs unreliable. This portion of Ayres's testimony is excluded.

Finally, defendants argue that Ayres's statistical regressions are unreliable because they rely on "jumbled, agglomerated data" that fails to distinguish defendants' practices from non-party actors. [400] at 14–20. In *County of Cook v. Wells Fargo & Co.*, the court considered the admissibility of an expert statistician's testimony in a discriminatory mortgage lending case brought under the Fair Housing Act. 2022 WL 17752387, at **5–8 (N.D. Ill. Dec. 19, 2022) (Feinerman, J.). Plaintiff Cook County's expert statistician sought to opine that, "Wells Fargo originated loans on less favorable terms to, and was more likely to foreclose on, minority borrowers than white borrowers." *Id.* at *5. The statistician performed regression analyses based on a pool of 350,000 loans originated or purchased by Wells Fargo (and

Wachovia Bank, which Wells Fargo acquired). *Id.* The court identified a critical flaw with the expert's data set that permeated his methodology:

> The amalgamation of different categories of loans—(1) those that Wells Fargo originated but sold and did not service, (2) those that Wells Fargo purchased and serviced but did not originate, and (3) those that Wells Fargo both originated and serviced—casts serious doubt on the ability of [the expert's] analysis to reliably determine whether the company engaged in discriminatory practices and, if so, the extent to which those practices impacted loans made to minority borrowers in Cook County.

*Id.* at *6. The County's expert could not identify any other lending studies or approaches that combined loans originated by an entity and loans purchased by that entity. *Id.* In fact, federal guidance advised examiners analyzing potential disparities in loan terms to "tailor their sample and subsequent analysis to the specific factors that the institution considers when determining its pricing, terms, and conditions." *Id.* The County's expert ran afoul of generally accepted methodology by aggregating loans across originating and servicing entities that might employ different parameters for mortgage lending and servicing decisions than Wells Fargo. *Id.* Because the expert's analysis encompassed the conduct of other entities rather than singling out Wells Fargo, the court found his analysis could not support a finding specific to Wells Fargo. *Id.* at **7–9.

Another court excluded Cook County's experts for substantially similar reasons in its case against Bank of America. *See Cnty of Cook v. Bank of Am. Corp.*, 584 F.Supp.3d 562, 584 (N.D. Ill. 2022) (Bucklo, J.), *aff'd sub nom. Cnty. of Cook v. Bank of Am. Corp.*, 78 F.4th 970 (7th Cir. 2023) ("[The expert's] inclusion of loan data that is not probative of defendants' practices (as opposed to other lenders' practices)

in an analysis putatively designed to ascertain the impact of defendants' practices on various populations is indeed a methodological flaw.").

Defendants assert that the same data aggregation problems identified in *County of Cook v. Wells Fargo* plague Ayres's methodology in this case. Defendants say Ayres impermissibly aggregated data across multiple different property owners, servicers, master servicers, and maintenance companies. [324] at 15–18. The data aggregation concerns raised in that case are instructive, but it's worth noting the differences between the discriminatory lending and servicing conduct at issue in that case and the discriminatory maintenance practices challenged here. In *County of Cook v. Wells Fargo*, the Bank's alleged predatory and discriminatory practices began at the point of loan origination (e.g., higher interest rates and less favorable loan terms such as prepayment penalties and balloon payments) and extended to discriminatory servicing practices (e.g., denial of loan modification requests). 2022 WL 17752387, at **1–2. It was a clear problem, then, that the loan data included loans that Wells Fargo originated but later sold and was serviced by another entity, loans that Wells Fargo purchased from another entity and merely serviced, and loans that Wells Fargo both originated and serviced. That data set cast far too wide of a net on discriminatory origination and servicing practices by entities other than Wells Fargo. Here, plaintiffs seek to introduce Ayres's analysis to prove discriminatory maintenance practices. In this sense, the universe of discriminatory decisions plaintiffs seek to measure is more confined. To start, Ayres's "full analysis sample" includes only properties owned by the Deutsche Bank defendants at the time of

plaintiffs' inspection. Defendants argue that Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas are separate legal entities, but the Deutsche Bank defendants concede that the same "policies, practices, and documents" applied irrespective of the specific Deutsche Bank entity acting as trustee. [405] ¶ 81. Here, there's no issue of improper aggregation across different property owners. Deutsche Bank is the only "owner" whose conduct should be measured, and the data is properly tailored to exclude properties titled to other banks.

Ayres's "full analysis sample" includes properties that were not managed by Altisource or serviced by Ocwen. Relying on the full sample to trace alleged discriminatory maintenance practices to Altisource and Ocwen would capture the conduct of other servicer entities and render those conclusions unreliable, but Ayres's analysis further identified a subset of 699 "agreed-upon properties." [340-1] at 23–24. At this point in the chain, the parties dispute whether, and to what degree, Deutsche Bank should be held liable for the conduct of the servicing defendants, Ocwen and Altisource, and other non-party servicers. There is a legal dispute about agency and authority under the parties' contracts, but that is not a methodological flaw in data aggregation. In *County of Cook v. Wells Fargo*, the court rejected the County's successor liability theory to hold the Bank liable for loans purchased from lenders that discriminatorily originated them (even if Wells Fargo acted properly in servicing them) because it had no support; nor would a successor liability theory explain how Wells Fargo might be liable for discriminatory servicing decisions for properly

originated loans that were sold to other entities to service. 2022 WL 17752387, at *7. The court also rejected a theory of aiding-and-abetting liability as unsupported by the law. *Id.* at *8. But the court accepted the County's appeal for successor liability as to loans obtained through its acquisition of Wachovia Bank—those loans could be properly included in the data set. *Id.* Here, plaintiffs' theory of vicarious liability links Deutsche Bank's conduct to the maintenance practices of servicing entities. If that theory is viable, there is no methodological concern raised by deficiency data that aggregates across master-servicers and servicers. *See below* VI.B.1. That chain in discretion and delegation is what plaintiffs seek to establish.

### 4.    *Value-Drop Analysis*

Defendants challenge Ayres's value-drop analysis because the time periods Ayres analyzed included substantial periods prior to foreclosure, i.e., before any defendant maintained the property and could have influenced maintenance and marketing activities. This is critical, defendants say, because (1) the run-up to a foreclosure is particularly destructive for property values in non-white block groups and (2) comparative value-decline trend reverses after the servicer gains access to the property to begin maintenance. [324] at 7. Defendants' expert Skanderson replicated Ayres's property value regression based solely on post-REO valuation data (comparing the first post-REO valuation to the REO sale) and found that no statistically significant relationship existed between the number of deficiencies and changes in property values. [340-13] at 76. Defendants assert that Ayres had at their disposal post-foreclosure valuation data that would permit a fifth window capturing the time when the properties were under defendants' control. [324] at 7.

In rebuttal, Ayres adjusted the fourth window (the last pre-foreclosure appraisal through REO sale date) to properties with a latest pre-foreclosure valuation within 30 days, 60 days, or 90 days of the REO date. [340-7] at 85. The results of the regression analyses for the 60-day and 90-day window remained statistically significant, but the results for the narrowest 30-day window was not. [340-7] at 87. Ayres rejected the suggestion of a fifth window limited to post-REO valuations as being affected by defendants' conduct and further critiqued Skanderson's analysis for using a window of more than three months between the REO date and first post-foreclosure appraisal. [340-7] at 89.

The dispute about the proper window to reliably capture the effect of defendants' maintenance on property values rests in part on factual and legal disputes raised in the Deutsche Bank defendants' motion for summary judgment. The parties disagree about when Deutsche Bank became responsible for the maintenance of a property, that is to say, what point in time it is appropriate to attribute property maintenance deficiencies to the Bank. Defendants assert that they could not conduct any property maintenance before a property entered REO status and was vacated; therefore, a reliable analysis must be limited to the time period after a property becomes an REO. But plaintiffs assert that defendants bore responsibility for maintenance before the property entered REO status. [355] at 9. And as a factual matter, they point out that Ayres relied on Ocwen's and Altisource's own appraisals and valuations for the properties during the pre-foreclosure process *and* during the period it was in REO status. They also note that plaintiffs began collecting deficiency

data after the properties became vacant and defendants were responsible (under plaintiffs' theory of vicarious liability) for maintaining the properties. [355] at 10. If defendants had no ability to control a property before it entered REO status, then Ayres's regression necessarily includes a period of time during which defendants could not have affected REO conditions or would not have been responsible for REO conditions. Either condition could make the value-drop analysis unreliable and excludable. For now, I view the facts in the light most favorable to plaintiffs and draw inferences in their favor, which would likely make this piece of Ayers's analysis a matter for cross-examination and impeachment. But resolving the issue of disparate-impact liability does not depend on the admissibility of the value-drop analysis. *See below* VI.B. I defer a final ruling on whether this part of Ayres's testimony passes the Rule 702 threshold.

The following portions of Ayres's testimony are excluded: regression analyses in the November Declaration and their review of property photographs. Ayres's deficiency analysis is admissible. Though defendants do not raise this objection, Ayres must refrain from using terms with specialized legal meaning in the context of the Fair Housing Act. *See, e.g.*, [340-1] at 13 ("I report statistical evidence that is consistent with the hypothesis of the disparate racial impact and treatment on minority neighborhoods."). I recognize that the terms "disproportionate" or "disparate" are commonly used to express statistical comparisons between groups (i.e., to express a simple ratio), but the use of these terms in the context of disparate-impact and disparate-treatment liability under the Fair Housing Act risks confusing

the jury. Whether Ayres's regression analyses were "consistent" with plaintiffs' legal theory is a matter for attorney argument, not witness testimony.

## C. Deavay Tyler

Tyler served as the Executive Vice President and Chief Financial Officer for A&D Property Services for over nine years. [319-1] at 1. In that role, he oversaw the preservation and maintenance of properties after foreclosure when they became real estate owned properties. He seeks to testify on the preservation and maintenance of REOs, including industry standards, policies, and procedures. [319-1] at 2.

He offers eight opinions: (1) plaintiffs' investigation criteria generally reflect industry standards for routine property preservation and maintenance work that mortgage servicing companies like Ocwen through vendors like Altisource should conduct regularly regardless of property value; (2) contrary to Ocwen's and Altisource's system of prioritizing property and maintenance services to high-value properties, essential services should be completed on all REO properties regardless of property value; (3) various deficiencies identified in plaintiffs' investigation should have been fixed or resolved regardless of the condition of the property when it became an REO; (4) contrary to industry standards, defendants' property preservation and maintenance fails to include necessary stakeholders; (5) defendants' oversight and quality control practices were inadequate at every level; (6) Altisource's offshore model contributed to the poor services it provided; (7) defendants' models, policies, and practices demonstrate a lack of awareness of the Fair Housing Act and their responsibility to provide services in a nondiscriminatory manner; and (8) properly

maintained properties should not lose value while in a lender's REO portfolio. [319-1] at 2–4.

Defendants move to exclude Tyler's testimony in its entirety based on his: (1) qualifications to opine on industry standards; (2) opinions related to defendants' practices and policies; and (3) review of plaintiffs' investigation photographs.[18] [319].

Tyler opines that defendants' "national" model of property preservation and maintenance deviates from industry best practices, which he refers to as the "three-legged stool" model. [319-1] at 8, 15–18. In Tyler's view, property preservation and maintenance services require collaboration across the owner, servicer, and vendors, but he believes that defendants failed to collaborate at the local level. Defendants contend that Tyler lacks the qualification to extrapolate his experiences in a local market to opine on defendants' nationally focused operations. [319] at 11–15. Tyler's experience in a local market does not render him unqualified to testify on national industry standards. *See, e.g.*, *Lorillard Tobacco Co. v. Elston Self Serv. Wholesale Groceries, Inc.*, No. 03 C 4753, 2008 WL 4681917 (N.D. Ill. May 13, 2008) (admitting expert with regional experience in cigarette wholesaling to testify on practices in the cigarette marketing industry generally). Tyler adequately demonstrates familiarity with differences between the national and local vendor model. *See* [319-1] at 4. He opines that the local model generally yields better results, but "both models–when

---

[18] Both parties cite to the district court's ruling on the admissibility of Tyler's testimony in *NFHA v. Bank of Am., N.A.*, No. CV SAG-18-1919, 2023 WL 1816902, at **9–11 (D. Md. Feb. 8, 2023*)*. The Maryland district court admitted in part and excluded in part Tyler's proffered testimony on the same topics proposed here. While Tyler seeks to testify on substantially similar topics in this case, some of his opinions and the issues presented by the parties in this case differ.

operated with fidelity and with proper checks and quality control–have the potential to meet minimum industry standards." [319-1] at 5. Defendants raise several other objections to Tyler's qualifications, but their criticisms go to the weight rather than admissibility of Tyler's testimony. *See Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("The fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility."). Defendants argue that Tyler relied on just a single example of a market participant, Freddie Mac, to assert that those practices constitute industry standards. [319] at 12. But in his deposition, Tyler identified other sources, including HUD guidelines and his professional experience working with banks and companies. [319-2] at 89:9–89:23. He referenced Freddie Mac and Fannie Mae as "industry leaders" that informed his opinions on industry standards, but he didn't represent their practices as the sole basis for his opinions. [319-2] at 90:4–91:11. Nor is Tyler's lack of knowledge on residential mortgage-backed securities trusts a reason to exclude his opinions on general industry standards, which Tyler opines apply regardless of specific ownership. *See* [319-2] at 49:19–50:8 ("[T]here is an owner, there's a preservation company, and there's a sales arm."). To the extent that Tyler's articulation of industry standards fails to account for differences in responsibilities based on a bank's direct ownership or trusteeship of a property, his lack of familiarity

goes to the credibility of his testimony as an expert on property maintenance rather than his qualifications to provide that testimony.[19]

Defendants also raise objections about the reliability of Tyler's view on industry standards. For example, they point out that the term "low value" to describe properties appears in webinar materials presented by HUD. *See, e.g.*, [393] at 10 n.6. Defendants are free to disagree about what constitutes actual industry practice and whether Tyler appropriately identifies those standards, but these disputes similarly go to weight of his testimony rather than its admissibility. *See Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013) (defendant's arguments that certain guidelines used by plaintiff's security expert "should not be taken as persuasive on the standard of care" go to weight of testimony).

Second, defendants contend that Tyler offers conclusory opinions about the effects of property values on defendants' policies and conduct. [319] at 7–11. Based in part on his review of Ocwen's and Altisource's various policy and procedure manuals, Tyler opines that Ocwen and Altisource differentiate between low- and high-value properties; those deemed "high value… receive different and better care than properties deemed low value." [319-1] at 10–11. Under Tyler's view, a "value-based model" like the one used by Ocwen and Altisource does not accord with industry standards to treat properties equally regardless of perceived value. [319-1] at 11. He

---

[19] Defendants also argue that Tyler conflated his view of "best practices" with "industry standards." [319] at 13. In his deposition, Tyler clarified that "a best practice can be a goal for industry standard because best practice and minimal industry standards are two different things." [319-2] at 280:3–280:13. Tyler adequately explains the difference between aspirational standards and minimum standards.

further concludes that Ocwen's and Altisource's value-based model "sends both explicit and implicit messages to local vendors that less care is needed for properties in communities with lower perceived values" and this messaging "would create a clear second-class citizenry among Deutsche Bank REO assets managed by Ocwen and Altisource and depress the completion of work on properties in communities with low perceived values, even when preservation and maintenance work may be desperately needed." [319-1] at 11. Defendants object that Tyler does not offer any analysis to connect defendants' procedures to property values because he did not, for example, assess what services were actually performed for properties. [319] at 8.

Tyler's assessment of Altisource's and Ocwen's policies and procedures as a "value-based" model that departs from industry standards reasonably flows from his comparison of the two. But Tyler's conclusion about the effects of the value-based model on vendors is not supported by any evidence he reviewed in Altisource's and Ocwen's manuals or based on his own experience. Plaintiffs point out that Tyler is not proposing to testify on how defendants maintained or marketed specific properties, but purports only to explain how defendants' policies "would be received by property preservation and maintenance vendors." [357] at 15. But the potential for policies to encourage certain behaviors and the practical effect of those policies on vendors' behavior are distinct questions. The latter requires some analysis of actual conduct (or at the very least, some reasonable basis for an inference).[20] Tyler does,

---

[20] Moreover, questions about the perception and impact of messaging in the context of housing discrimination are often complex and subject to a separate cottage industry of social science research. *Cf. Tyus v. Urb. Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (discussing the

for example, explain how Ocwen's and Altisource's system for work orders "incentivized [vendors] to complete frivolous, 'low-hanging fruit' work… because they do not need to seek prior authorization to perform this work." [319-1] at 13. He opines that these complicated processes "could have the effect of encouraging vendors to hit the maximum limit on routine or standard items" rather than "identifying and performing necessary preservation and maintenance work on the property." [319-1] at 13. Tyler may opine based on his professional experience how Ocwen's and Altisource's policies create an incentive structure for vendors to forgo maintenance work on certain properties. But that's different from conclusively stating that Ocwen's and Altisource's policies "create a clear second-class citizenry among Deutsche Bank REO assets managed by Ocwen and Altisource and depress the completion of work on properties in communities with low perceived values." [319-1] at 11. That's an unsupported causal conclusion.

Defendants raise similar objections to Tyler's opinions on (1) defendants' quality control practices and (2) Altisource's "offshore" model. [319] at 9–11. Generally, Tyler opines that defendants' oversight and quality control mechanisms were insufficient at every level. *See* [319-1] at 18–25. Defendants argue that Tyler doesn't explain how quality oversight practices resulted in quality control lapses. [393] at 12. For the most part, Tyler's testimony on this topic is confined to his views about whether quality control procedures were sufficient in light of industry

---

relevance of an expert psychologist's testimony on "the way an advertising campaign sends a message to its target market and how an all-White campaign affects African-Americans").

standards. For example, Tyler explains that it is standard for code violations to be remedied promptly and without fail, but Altisource adopted a coding system after 2015 where code violations were marked as "closed" when they were not, including when a property's asset manager decided to leave the property "as is." [319-1] at 20. This is admissible testimony informed by Tyler's review of the manuals. In another part, Tyler compares the number of Deutsche Bank-owned properties with work orders to properties that received quality control inspections from Regional Field Service Managers. [319-1] at 22. Altisource's work order information for 630 properties were distributed as follows: 43.88% in majority Black neighborhoods, 37.68% in majority white neighborhoods, 10.17% in majority non-white neighborhoods, and 8.27% in Latino neighborhoods. Only 51 of those properties with work orders received inspections, which Tyler opines is an insufficient level of quality control. Tyler further analyzes the racial makeup of neighborhoods of the inspected properties:

> Of the 51 unique properties that received a RFSM quality control inspection, 47% (24) were in majority white neighborhoods, 25% (13) were in majority Black neighborhoods, 16% (8) were in majority non-white neighborhoods, and 12% (6) were in majority Latino neighborhoods… When compared to the overall breakdown of NFHA-tested properties discussed above, it is apparent that *completed* RFSMS quality control inspections, disproportionately occur in majority white neighborhoods. This is concerning to me.

[319-1] at 23 (emphasis in original). Defendants mischaracterize Tyler's testimony as opining that "Altisource and Ocwen's oversight resulted in disparate effects." [319] at 9. Tyler's comparison points out a discrepancy in properties needing maintenance and properties that actually received a quality control inspection. That comparison is fine,

so long as he does not characterize this difference as a statistical disparity explained by defendants' conduct.

As to Altisource's business model, Tyler opines that Altisource's system of remote-managing properties from outside the country contributed to poor property preservation services. [319-1] at 25–28. He notes that Altisource's model is specific to its work with Deutsche Bank properties serviced by Ocwen—other clients did not permit offshore management of REO properties. [319-1] at 25. Here too, Tyler may offer his views about the industry standard and how Altisource's model departs from those norms.[21] But Tyler may not testify on the effects of Altisource's model on the delivery of services absent a sufficient basis for making the link. For example, Tyler concludes that Altisource's "all-remote PPI services through unwieldy and cumbersome procedure manuals introduces unnecessary complications and necessarily leads to the ineffective delivery of PPI services." [319-1] at 26. Altisource's value-based policies and remote management "leads to the plainly inadequate preservation and management services observed by Plaintiffs in their investigation." [319-1] at 26. A chain in the causal link is missing. Tyler does not point to any examples of how the all-remote system impeded services for a property, either specific to the Altisource-managed properties or more generally from his experience observing the outcomes of remote-service operations. Tyler cannot reliably conclude that

---

[21] Defendants point out that Freddie Mac and Fannie Mae contemplate the use of offshore work within the industry. [319] at 10 n.3. Defendants are free to challenge Tyler's characterization of Altisource's model as a deviation from industry standards, but that goes to the weight rather than admissibility of Tyler's testimony.

Altisource's business model is responsible for the "plainly inadequate" services observed by plaintiffs.

There are other parts of Tyler's testimony that overreach to conclusions about the effects of defendants' maintenance and preservation policies on property values. For example, Tyler opines that properly managed properties should not lose value while in a lender's REO portfolio:

> I am aware from reviewing the report of Elizabeth Korver-Glenn that there was a sharp reduction in value of Deutsche Bank REO properties serviced by Ocwen, especially as to properties in communities of color and Black neighborhoods. It is my opinion that the issues discussed [in the report] significantly contributed to this loss of value.

[319-1] at 29. Tyler is not barred from testifying that servicer and vendor activities prevent loss of value or how adhering to proper maintenance activities would have ameliorated the type of deficiencies observed in the REO properties. That's an admissible opinion about what parties in defendants' shoes should have done but did not do. But Tyler is barred from then concluding that such loss of value was attributable to defendants' practices. That's an assessment of causation that is unsupported. Tyler did not perform any analysis connecting the deviations from industry standards to the property value declines in Korver-Glenn's report. This portion of Tyler's testimony is excluded.

Finally, defendants challenge Tyler's review of plaintiffs' investigation photographs as (1) not based on his expertise and (2) unreliable. [319] at 15–18. In his rebuttal, Tyler reviewed photographs with 4,167 deficiencies across 793 properties and opines that plaintiffs "consistently scored deficiencies in the criteria that they assessed" and "in accordance with PPI industry standards." [319-3] at 24.

He reviewed deficiencies by checklist item for a blinded property. He reviewed photographs shown with a listed deficiencies "until [he] found one photograph that substantiated the scoring of the deficiency for that property." [319-3] at 25. He would then circle photographic evidence of the deficiency and "indicate directly on the PDF document based on my experience and opinion that a 'reasonable person would mark' the deficiency." [319-3] at 25.

Defendants emphasize that Tyler does not cite to any other similar study, experience conducting a similar photo review, or accepted methodology in the field. That's a rigid view of the reliability factors. Expert testimony based on professional experience need not be subject to "scientific methodologies" or "peer review." *United States v. Parkhurst*, 865 F.3d 509, 516 (7th Cir. 2017). Of course, such an expert must adequately explain the basis of his conclusions that demonstrate a reliable application of his experience. Defendants point out that Tyler testified he was *not* applying his expertise in reviewing the photographs:

> Q. When you say validate, what do you mean by that term?
>
> A. So I think it would be that not from my view as an expert but if a reasonable person would review that picture, a set of photos, and see that the deficiency existed.

[319-4] at 16:1–16:6. Conclusions based on Tyler's nonspecialized review would be unhelpful to a jury. A jury can identify deficiencies that a "reasonable person" would mark without Tyler's help. *But see NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 788 (7th Cir. 2000) (affirming admission of expert testimony interpreting aerial photos of waste disposal site based on generally accepted use of photo analysis in the field and expert's specialized knowledge). Plaintiffs contend that defendants isolate

66

the deposition testimony as a "gotcha" moment, but Tyler testified to viewing the photographs "based on [his] expertise, a reasonable person would have seen the same things." [319-4] at 118:2–118:3. This explanation of his review is confusing and unhelpful to a jury, so it is excluded. There are other problems with Tyler's photo review, but only one is worth mentioning. Tyler explains that he was provided a checklist for a property with a category of deficiencies. He would then identify evidence in photographs to match deficiencies. In other words, Tyler merely confirms what he knows plaintiffs had already identified and works backward. That result-driven process is unsound. *See Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F.Supp.2d 811, 820 (C.D. Ill. 2009) ("Preparation by an expert which involves beginning with a goal (finding a similarity between the marks) and working backwards to meet the goal (evaluating only the given words, looking for a link) is the antithesis of reliable and scientific."). Tyler's photo review is excluded.

In sum, Tyler's testimony is confined to opinions on industry standards for property preservation and maintenance and how defendants' policies and procedures departed from those standards. *See Jimenez*, 732 F.3d at 721–22. He may not offer conclusions as to (1) the effect of property values on defendants' maintenance decisions or (2) the negative effect of defendants' maintenance conduct on property values. His photo review of properties based on nonspecialized expertise is excluded.

### D.    Dr. Timothy Guetterman

Guetterman is the Associate Director of the Mixed Methods Program at the University of Michigan. [341-1] at 2. Mixed-methods research is an approach to social science research that integrates quantitative and qualitative methods. [341-1] at 6.

Guetterman assessed the methodology used in plaintiffs' investigation and opines that: (1) the investigation was well-designed and conducted consistent with standards for a rigorous mixed-methods research study; (2) data collection was reliable, including standardized forms, detailed instructions, and quality control reviews comparing data to photographs of property; (3) defendants' concerns about missing original paper-based data forms was unfounded and plaintiffs' used "clean data"; (4) the aggregated sample size across different cities was reasonable; and (5) plaintiffs' cross-sectional design (a single time point per REO property) was sound. [341-1] at 4–5.

Defendants move to exclude Guetterman's testimony in its entirety. [328] at 5. Defendants challenge Gutterman's (1) evaluation of plaintiffs' study and research methodology and (2) his review of the investigation photographs.

Defendants object to the relevance of Guetterman's general opinion that plaintiffs' study was "well-designed and conducted consistently with expectations for a rigorous mixed methods research study for its intended aim." [328] at 15–16. Defendants tie the relevance of Guetterman's testimony to Ayres's statistical analysis. Because Ayres's analysis is "purely quantitative" rather than mixed methods, defendants argue that there is no mixed-methods study for Guetterman to evaluate. [328] at 16.

Guetterman's evaluation of plaintiffs' investigation methods is probative of whether the type of data plaintiffs collected is appropriate to use in this type of study. Defendants' relevance objection depends on their characterization of plaintiffs' study

as a purely quantitative one. It is a disagreement with Guetterman's characterization of plaintiffs' investigation as a mixed-methods study. Defendants are entitled to disagree with Guetterman's characterization, but that criticism goes to the weight of his testimony. Guetterman noted that plaintiffs collected data through photographs ("a well-accepted type of qualitative data") in addition to structured forms scoring deficiencies based on a yes/no rating that were later tabulated and aggregated. [341-1] at 6, 8–9 ("Quantitative investigators in social sciences use methods…. such as collecting data using structured, closed-ended forms with a defined set of possible responses, such as checking yes/no."). He also opines that a regression analysis would be "an appropriate statistical test for data collected through observations and photographs in field-based research." [341-1] at 10. Defendants object that plaintiffs never intended to design a mixed-methods study from the outset, but nothing in Guetterman's testimony suggests this is a requirement in the field of mixed-methods research. Guetterman opines on whether plaintiffs' data collection, standardization, and quality-control strategies conformed with standards in mixed-methods research. He seeks to testify on one link in plaintiffs' investigation. *See Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000) ("No one piece of evidence has to prove every element of the plaintiffs' case; it need only make the existence of 'any fact that is of consequence' more or less probable.").

Defendants also object to Guetterman's opinion that plaintiffs "used multiple sampling strategies for rigor." [328] at 17. Guetterman cited peer-reviewed literature on common sampling methods as well as NFHA testimony describing plaintiffs'

sampling procedures. [341-1] at 8. According to Guetterman, "[s]electing metropolitan areas based on foreclosures in addition to racial segregation or concentration" as plaintiffs did is consistent with the commonly used "purposeful sampling" method to identify sites that are "information rich." [341-1] at 8. Defendants identify Guetterman's admissions in his deposition that: (1) his own practice was to record his sampling approach at the outset of the study, but he did not ask whether plaintiffs did so; (2) it would be a problem if local organizations influenced the sampling of selection criteria, but he did not review any information about local organizations' involvement in sampling; (3) he believed plaintiffs selected majority-white and minority neighborhoods with comparable income levels, but he did not review any data to support the belief; and (4) he would have recorded income cutoffs for his sample. [341-1].

Guetterman's admission that plaintiffs' sampling methods did not conform to his personal methods does not make his conclusions unreliable. Unless otherwise conflated, whether plaintiffs followed widely accepted sampling methods or Guetterman's sampling methods are different questions. Defendants also reasonably point out weaknesses in plaintiffs' sampling methods that Guetterman apparently gave little thought to. Defendants may raise these points to challenge Guetterman's ultimate conclusion that plaintiffs' sampling methods were "robust," and Guetterman cannot vouch for the credibility of another witness. But he adequately explains how plaintiffs' methods align with widely accepted standards based on his review of materials and his expertise.

Defendants also object to Guetterman's opinions related to his review of plaintiffs' photographs based on his lack of relevant experience, application of methodology not generally accepted in the field, and reliability. [328] at 6–15. To address defendants' expert McCrary's criticism of plaintiffs' data, Guetterman reviewed photographs of 30 randomly sampled properties to test the accuracy of plaintiffs' scoring. [341-3] at 3–4. He compared each deficiency to photographic evidence and found evidence for 189 or 190 deficiencies noted. [341-3] at 3. Plaintiffs say the purpose of the photo review is not to opine that plaintiffs accurately identified maintenance deficiencies but to help a jury understand plaintiffs' methodology and quality control. [365] at 9–10. Even if Guetterman is qualified to opine on quality-control procedures, the photo review required him to assess deficiencies based on property photographs and plaintiffs' checklist. And Guetterman concedes that he has no background or training in REO maintenance or housing. [328] at 8. Guetterman's photo review exceeds the scope of his expertise and is excluded.

Because he is barred from conducting a photo review, Guetterman's testimony is limited to his evaluation of plaintiffs' investigation methodologies, without commenting on the credibility or reliability of evidence.

### E.    Pamela Kisch

Kisch is the Executive Director of the Fair Housing Center of Southeast & Mid Michigan and a fair housing tester. [336-1] at 5. Kisch's opinion relates to: (1) the use of testers and the role of fair housing organizations in uncovering illegal discrimination and (2) the design and execution of fair housing tests. [336-1] at 6. She offers four general opinions: (1) "[t]esting for enforcement purposes comports with the

71

meaning and intent of the FHA"; (2) "[p]laintiffs' investigation is consistent with traditional enforcement testing and furthers the goals of the FHA"; (3) "[p]laintiffs' investigation methodology is not flawed"; and (4) "[r]equiring FHA testing to comport with the requirements suggested by Defendants would frustrate the purpose of the FHA and harm fair housing efforts." [336-1] at 6–8.

Defendants seek to exclude Kisch's testimony in part: opinions related to the Fair Housing Act that constitute impermissible legal conclusions and opinions related to loan servicing standards. [304] at 2.

Three of Kisch's overarching opinions invoke the meaning, purpose, and goals of the Act, but not all of the conclusions supporting her general opinions constitute inadmissible legal opinions. Kisch is not barred from opining on the use of fair housing testing to investigate complaints of discrimination (subject to a relevance or Rule 403 objection based on a waste of time) or whether plaintiffs' investigation methodology comports with established testing standards (which defendants do not seek to exclude, *see* [304] at 3 n.1).

Parts of Kisch's testimony veer into the territory of legal conclusions. For example, she opines that "[i]n a common testing scenario to prove race discrimination under the Fair Housing Act, one merely has to show that a housing provider violated one or more elements of the FHA based on race." [336-1] at 6. This is an articulation of the legal standard under the Act, and Kisch is barred from testifying on it. In other parts, Kisch opines on defendants' conduct and liability under the Act:

> It would be of little relevance if a property owner or agent denied housing to ten Black tenants in June and denied housing to only five Black tenants in

72

> July when compared to similarly-situated white tenants. These are both
> violations of the Federal Fair Housing Act. From day one, or day 30 in this
> case, the owner is responsible for training staff and laying out the expectation
> of zero tolerance of unequal treatment. Deutsche Bank was responsible to hire,
> train and supervise the work done by their service providers.

[336-1] at 24. Kisch's opinion that Deutsche Bank may not delegate its duties under

the Act to agents is a legal conclusion as to liability under the Act. Kisch also opines

that, "it makes no difference whether the owner of the property being investigated

knew or did not know that its agent was discriminatory." *See* [336-2] at 8 (rebuttal to

Kaplan report). That statement also crosses the line into legal opinion about the

relevance and significance of property ownership in determining liability for housing

discrimination. Similarly, Kisch may not opine that HUD's "no cause" determination

in NFHA's administrative complaint against U.S. Bank is "of little relevance." [349-

1] at 16. Statements of this ilk constitute inadmissible legal opinions.[22]

Kisch is also barred from testifying that fair housing testing can be used to

develop evidence of discrimination. "Discrimination" in the fair housing context has

legal implications. *See Perkins*, 470 F.3d at 158. For example, Kisch opines that

"photographs taken and stored during this investigation *are* the audit trail and can

stand on their own as evidence." [336-2] at 6. Kisch may not be opining that plaintiffs'

investigation data stands on their own as evidence of discrimination in this case, but

her opinion raises the possibility of juror confusion. What constitutes sufficient

---

[22] Defendants identify 18 statements that should be excluded as impermissible legal opinions.
[304] at 3–5. I agree. Those statements are inadmissible.

evidence of discrimination is a question for the jury and the admissibility of evidence is a question for the court.

Defendants also move to exclude Kisch from testifying on loan servicing standards as beyond the scope of her expertise. [304] at 6–7. Kisch opines that "Deutsche Bank had 30 days to bring the properties up to a basic standard – they are ultimately responsible for the outcome." [336-1] at 22–23. Defendants object that Kisch is no expert on maintenance and marketing of properties in REO status, so she is not qualified to answer questions about maintenance standards in the industry. [304] at 6. Plaintiffs counter that Kisch is not opining on any REO maintenance standards but instead addressing defendants' criticism that NFHA's 30-day "grace period" was a flaw in the investigation design. [349] at 6. To the extent that Kisch frames the 30-day window as a standard deadline for maintenance compliance, Kisch conceded that she had no background in property maintenance standards and such a conclusion would fall outside the scope of her expertise. But in other parts, Kisch discusses the 30-day period in the context of reasonable investigation protocols:

> Plaintiffs' single-point-in-time investigation and providing the REO owner a 30-day grace period after foreclosure were reasonable investigation protocols. After 30 days, the racial makeup of the neighborhood should not have an impact on the basic level of maintenance and marketing of REO properties owned by Deutsche Bank. After 30 days, the number of all deficiencies should be close to zero and consistent across neighborhoods, regardless of race.

[336-2] at 5 (rebuttal to Stedman report). It is within Kisch's expertise to opine on what constitutes a reasonable investigation protocol in the context of fair housing testing design. The problem is that she never explains why the 30-day period is a reasonable design protocol. To support her conclusion that the point-in-time

investigation design was reasonable, Kisch points to best practices of fair housing testing (e.g., avoiding detection) and her experience with testing based on one-time visits. *See* [336-1] at 19–20. She does not offer similar support for her conclusion on the 30-day window.[23] Kisch's opinions regarding the 30-day window, whether framed as a standard for maintenance compliance or a reasonable investigation protocol, are not reliable. *See Joiner*, 522 U.S. at 146.

Kisch's testimony is excluded in part. She may not offer legal opinions related to the Act, and she may not opine on the 30-day grace period. That leaves Kisch's testimony on fair housing testing design and plaintiffs' investigation methodology as admissible topics, subject to a relevance or Rule 403 objection based on a waste of time at trial.

### F.    Albert Poche

Poche is the Program Director for the Bloomberg Harvard City Leadership Initiative. [337-1] at 2. He previously worked as the Director of Code Enforcement for the City of New Orleans where he oversaw thirteen full-time inspectors responsible for collecting and documenting photographic evidence of distressed properties for use in judicial hearings. Poche seeks to testify on the impact of property neglect and distress in neighborhoods; the impact of improper maintenance of REO properties; and the adequacy of the tools used by plaintiffs in assessing maintenance of

---

[23] Defendants argue that Kisch is merely endorsing a 30-day window "invented by NFHA." [304] at 6–7. The fact that plaintiffs "invented" the window would not necessarily be grounds for exclusion if Kisch explained, for example, that a grace period necessarily imposes arbitrary cut-offs, and such timing constraints are common to testing design. The problem doesn't lie with Kisch's ultimate conclusion but how she supports it.

defendants' REO properties (i.e., the deficiency checklist used in the investigation). [337-1] at 5. In addition to reviewing plaintiffs' photographs, Poche reviewed defendants' photographs of REO properties and offers conclusions on disparities in maintenance based on neighborhood race. [337-1] at 13.

Defendants move to exclude Poche's testimony in part: parts of Poche's reports that constitute legal opinions and Poche's testimony related to his review of plaintiffs' photographic evidence. [306] at 2.

Defendants challenge parts of Poche's testimony that opine on the level of maintenance required under local municipal laws. [306] at 3–4. For example, Poche concludes in one part: "[I]f the Defendants would have addressed these deficiencies either when they occurred or upon acquisition of the properties, as they are required to by local law, there is strong evidence to suggest that neighboring communities would have experienced less violent crime." [337-1] at 16. Poche also uses the terms "willful negligence" or "negligence" to describe defendants' neglect of properties. *See, e.g.*, [337-2] at 12. Plaintiffs respond that they are not seeking to hold defendants reliable for code violations, so Poche's statements to this effect are not impermissible legal conclusions. [358] at 11.

Many of Poche's statements are legal conclusions, but they do not "define the legal parameters within which the jury must exercise its fact-funding function" in this case. *Specht v. Jensen*, 853 F.2d 805, 809–10 (10th Cir. 1988). The Fair Housing Act—not local ordinances—provides the applicable legal standards. Poche's testimony does not impermissibly articulate legal standards or offer conclusions as to

liability under the Act, but for this reason, the statements also have limited relevance as to unlawful discrimination under federal law. *Cf. Montes v. Town of Silver City*, 2005 WL 8163860, at *2 (D.N.M. July 12, 2005) (excluding expert testimony on hiring policies under state and local law in a § 1983 suit because the legal standards for unlawful hiring would be defined by the First and Fourteenth Amendments). In weighing the relevance and possibility of confusion under Fed. R. Evid. 403, those parts of Poche's testimony that describe defendants' conduct in terms of "negligence" are excluded. Poche is not barred from opining that properties in defendants' care suffered from maintenance deficiencies that should have been remedied under local code, but he must exercise caution to avoid terms with legal baggage that do not define the standard under the Act. At trial, a limiting instruction may also be necessary to prevent proof of code violations from being used as proof of discrimination. *See* 7th Cir. Civ. Jury Instr. 2017 ed. § 7.04 (Limiting Instruction Concerning Evidence of Statutes, Administrative Rules, Regulations, and Policies); 7th Cir. Crim. Jury Instr. 2023 ed. § 3.11 (Evidence of Other Acts by Defendant).

Defendants seek to exclude Poche's review of defendants' photographs based on Poche's qualifications and his use of unreliable methodology. [306] at 4–12. Poche reviewed photographs for 100 Deutsche Bank REO properties with quality control work orders: half the properties were in white neighborhoods and the other half were located in Black and Brown neighborhoods. [337-1] at 14. Plaintiffs provided race-blinded photographs to Poche, i.e., he did not know the racial makeup of the neighborhoods when reviewing photographs. Poche used plaintiffs' deficiency

checklist against defendants' property photos to identify an average of 2.96 deficiencies for properties in white neighborhoods and 4.78 deficiencies in communities of color. [337-1] at 15. Poche also conducted a *t*-test and found the results to be statistically significant with a p-value of 0.0016. [337-1] at 15.

Poche has professional experience in identifying maintenance deficiencies through property inspections, including through photographic documentation, so he is qualified to offer conclusions about the deficiencies he observed in photographs. But that experience doesn't extend to conducting statistical tests of the observed deficiencies. Plaintiffs point out that an expert need not be a statistician to perform a statistical test. To be sure, courts generally reject imposing inflexible requirements that an expert have a particular credential to offer technical testimony. *See Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (rejecting notion that *Daubert* requires an expert to have certain credentials as "radically unsound"). But Poche doesn't mention any knowledge gained through training or experience while working in code enforcement relevant to statistical analysis. More importantly, his methodology is unsound. A *t*-test is a commonly used statistical test, but Poche never explains what a *t*-test is or why it's appropriate for the sampled data. *See* David H. Kaye & David A. Freeman, *Reference Guide on Statistics* in Reference Manual on Scientific Evidence 30 (Fed. Jud. Ctr. 3d ed. 2011) ("A *t*-test is not appropriate for small samples drawn from a population that is not normal."). He explains only that the results are "statistically significant (P=0.0016, t-test), indicating that the difference is not statistical noise and that we can conclude

with a high degree of certainty that homes within communities of Color were not being maintained to the same standard." [337-1] at 15. Poche's statistical analysis is unreliable and excluded. Poche is limited to opining on deficiencies he observes in the photographs of properties.

Defendants seek to exclude Poche's opinion that defendants' inspection photographs of properties were of inferior quality to plaintiffs' photographs. [390] at 11–12. Poche criticizes defendants' photographs as "grainy, unclear, and wholly inadequate to demonstrate evidence of neglect." [337-1] at 16. A jury presented with defendants' and plaintiffs' photographs would be able to make those determinations without the assistance of an expert. *See Burns v. Sherwin-Williams Co.*, 78 F.4th 364, 374 (7th Cir. 2023) (affirming exclusion of expert witness's opinion on the risk posed by oversized pallets because photographs from the accident site "speak for themselves"); *Harris v. Hixon*, 102 F.4th 1120, 1132 (11th Cir. 2024). ("Jurors don't need expert testimony to help them understand how [the investigators] compared photographs or to compare photos for themselves."). This portion of Poche's testimony would not be helpful to the jury and is excluded. Similarly, portions of Poche's rebuttal report that merely restate third-party witness accounts about the poor condition of Deutsche Bank-owned properties are excluded. [337-2] at 12. Those third-party statements speak for themselves, and Poche does not add any value as an expert by contextualizing them.

Poche's testimony is limited to evaluation of plaintiffs' deficiency criteria and industry standards for code compliance, but any opinions crossing the line into legal

conclusions are barred. He may evaluate property photographs based on his professional experience in code compliance, but he may not offer any conclusions based on his statistical analysis. He is also barred from simply restating third-party witness testimony.

### G. Dr. Elizabeth Korver-Glenn

Korver-Glenn is professor of sociology at Washington University in St. Louis. [347-1] at 6. Her research focuses on racial and economic inequality. She wrote a book on housing markets and segregation in the 21st century, and she regularly speaks on topics related to racial inequality in real estate markets at industry panels, seminars, and trainings. She also has experience providing feedback and input to regulatory entities, including the Federal Housing Finance Agency and the Appraisal Foundation. Korver-Glenn seeks to opine on issues of implicit and explicit racial bias, racialized discretion, value-based policies and procedures, and Ocwen's and Altisource's lack of quality oversight and quality control. [347-1] at 2.

Korver-Glenn's report covers eight topics, including a historical background to contextualize defendants' valuation and value-based policies. [347-1] at 6–7. Defendants do not seek to exclude her opinions on historical background, but they move to exclude Korver-Glenn's opinions related to: (1) Ocwen's and Altisource's "Statements of Work" (contracts); (2) Altisource's value-based policies and procedures; (3) Ocwen's quality control efforts; (4) Altisource's marketing and sales activity; (5) the readability of certain Altisource policies; and (6) the quantitative effect of defendants' policies and procedures. [329] at 5.

80

Defendants challenge Korver-Glenn's qualifications to opine on Statements of Work between Ocwen and Altisource because she lacks professional experience in the real-estate industry. [329] at 6. Based on her review of Statements of Work between Ocwen and Altisource, Korver-Glenn identifies problems and omissions in the contractual provisions related to property valuation, preservation, training and equity that, in her view, were "unduly vague and deficient."[24] [347-1] at 27. Korver-Glenn may rely on her academic and research experience to explain historical or contemporary real-estate appraisal practices in the context of housing inequality. But she treads outside the scope of her expertise when she opines that Altisource's or Ocwen's policies and procedures were "deficient." *See, e.g.*, [347-1] at 27. That type of conclusion typically requires some benchmark for comparison. Korver-Glenn concedes that she has never reviewed a Statement of Work before reviewing Altisource's and Ocwen's materials.[25] *See* [346-1] at 25 (92:3–92:7). She explained

---

[24] Korver-Glenn identified the following problems and omissions: "incorporating property value-based policies; failing to include non-discrimination requirements in policies or references to the Fair Housing Act; failing to ensure fair housing training of Altisource's vendors, or fair housing training of Ocwen and Altisource employees that addressed REO maintenance, preservation and valuations; failing to adequately delineate the nature of the work Altisource was to do, resulting in Altisource taking actions that Ocwen denied approving; and failing to ensure Altisource used the same valuation procedures for all REO homes." [347-1] at 27.

[25] Korver-Glenn described the following approach, [346-1] at 25 (92:8–23):

> Q. [I]f we were going to decide whether a statement of work is adequate or inadequate, where do we find that criteria?

> A. I have been trained to read, engage, understand, and evaluate large bodies of data. In this case, written data. And specifically in the context of this case, their relationship to fair housing… Although reading is a shorthand way of saying it… I analyzed these statements of work for what they included and as someone who studies housing and is an expert in fair housing and race, what they did or did not include that were -- could be -- would be important in discussions with fair housing.

that she was not relying on any specific industry criteria to evaluate the Statements of Work but rather her "knowledge of how racial bias and racial inequality happen." [346-1] at 26 (94:5–94:6). Plaintiffs respond that Korver-Glenn relies on the accepted methodology of "case-based logic sampling," where a researcher draws from large troves of data until themes or patterns emerge and reach a "saturation" point. [347] at 6–7. Defendants say this is just another way of characterizing an expert's "intuition" and that courts have rejected similar "totality of the information" approaches. [396] at 11–12 (citing *J&V Development, Inc. v. Athens-Clarke Cnty.*, 387 F.Supp.2d 1214, 1218–19 (M.D. Ga. 2005)). Whether or not case-based logic sampling is generally accepted in the social science field, the problem here is that Korver-Glenn's expertise and methodology is not applied to the specific facts of this case and the testimony she seeks to offer. An appeal to general knowledge without explanation renders many parts of her testimony unreliable and unhelpful. For example, Korver-Glenn opines that the Statements of Work did not contain any instructions related to nondiscrimination or fair housing training for Ocwen or Altisource employees. [347-1] at 28. She also notes that Statements of Work were "largely silent on the process of selecting which valuation products were to be used," which along with the "lack of guidance resulting from a failure to provide a valuations 'Business Requirements Document'… meant that the SOWs did not provide adequate guidance on Altisource valuation product decision-making." [347-2] at 29. She does not explain why these provisions should be contained in Statements of Work. Without specific support and in light of her lack of experience reviewing similar contracts, her opinions evaluating

Ocwen's and Altisource's policies are not reliable conclusions based on her specialized expertise. Conclusions that a policy is "problematic" or "inadequate" will not assist the finder of fact. Similar statements in other parts of her report where she expresses deficiencies or inadequacies in defendants' policies and procedures are inadmissible. *See, e.g.*, [347-1] at 59 (summarizing a lack of quality control by Ocwen of Altisource and lack of oversight of third-party vendors), 62 (opining that important charts were "extremely vague, confusing, or indecipherable").[26]

Korver-Glenn draws on her academic research to criticize defendants' practices. For example, she opines that Altisource's mandatory use of its proprietary auction site Hubzu (as opposed to listing REO properties on Multiple Listing Services) "discourages open-market transactions of REO properties, limiting access to a smaller subset of prospective buyers and dampening local home values/prices, and consequently, hurting local markets where Hubzu auctions off properties." [347-1] at 71. She points to academic research, including her own, that suggest local MLS platforms are "foundational for supporting an open housing market." [347-1] at 72. In contrast, research shows that "limited service listings" (for which real estate agents and brokers do not perform the "full suite of services") are associated with "negative price effects." [347-1] at 74. Here, Korver-Glenn adequately explains the basis of her opinion within the scope of her expertise. That type of testimony is admissible, though she may not cross the line and attribute causation to defendants'

---

[26] Korver-Glenn includes an example of a confusing map with a legend that is "virtually impossible to read." [347-1] at 63. A jury doesn't need an expert to point that out.

conduct or use terms with specialized legal meaning. *See, e.g.*, [347-1] at 74 ("Along with research that shows institutional/corporate investors' purchasing, rental, and eviction practices disproportionately harm Black renters and the history and contemporary realities of racial segregation, it is also therefore my opinion that these listing practices *disproportionately harmed* Black communities.") (emphasis added).

The final two sections of Korver-Glenn's initial report offer an analysis of property valuations by neighborhood race, which informs her bottom-line conclusion that defendants "contributed to inequities in consequential ways during Plaintiffs' investigation period." [347-1] at 94–124 (sections VII–VIII). She opines that "REO properties in Black neighborhoods were disproportionately categorically downgraded in terms of their condition, described in categorically distinct ways… and, as a result, disproportionately devalued." [347-1] at 116. Based on the pool of agreed-upon properties, Korver-Glenn reviewed the REO properties' appraisal values (original appraisal, first pre-foreclosure value, last post-foreclosure value) and average sales price by neighborhood race. [347-1] at 103. Generally, she found that the Ocwen and Altisource properties in Black neighborhoods experienced greater declines in property value than properties in white neighborhoods. [347-1] at 103–06. Based on a random sample of 50 properties, she offers "descriptive findings" comparing variables: average REO sales price, average price classification, average days on market, average number of photos on MLS listing, number of properties with fewer than 8 marketing photos, and the number of properties with no MLS comments or description. [347-1] at 108. She opines, for example, that Ocwen's and Altisource's

average REO property market value was more than $58,000 lower for properties in Black neighborhoods. [347-1] at 109. She also offers case studies of specific REO properties in Black vs. white neighborhoods to support her analyses. [347-1] at 113–16.

Defendants object that Korver-Glenn lacks the qualifications to conduct statistical analyses and fails to apply generally accepted methodology to come to her conclusions. [396] at 5. Plaintiffs justify Korver-Glenn's approach as a form of "descriptive statistics" rather than a statistical model. [347] at 13. Descriptive statistics, like "the mean, median, and standard deviation," is a way to summarize data. Kaye & Freeman, *Reference Guide in Statistics* in Reference Manual on Scientific Evidence 213 (Fed. Jud. Ctr. 3d ed. 2011); *see also Stender v. Lucky Stores, Inc.*, 803 F.Supp. 259, 295 (N.D. Cal. 1992) ("Descriptive statistics simply report or summarize counts, percentages, or averages based upon a given data set."). Descriptive statistics serve as "building blocks" for most statistical analyses. Daniel L. Rubinfeld, *Reference Guide on Multiple Regression* in Reference Manual on Scientific Evidence 213 (Fed. Jud. Ctr. 3d ed. 2011). But descriptive statistics do not have inferential value by itself, that is, it cannot be used to draw conclusions about a broader population. Put another way, descriptive statistics can identify disparities among groups, but it cannot explain why those disparities exist.

Korver-Glenn's "descriptive findings" may be characterized as a form of descriptive statistics, but her methodology and the conclusions flowing from them are unsound. *See Ram v. New Mexico Dep't of Env't*, No. CIV 05-1083 JB/WPL, 2006 WL

4079623, at *13 (D.N.M. Dec. 15, 2006) ("[E]ven if descriptive statistical analysis does not have to meet all the rigorous requirements that the courts have imposed on other types of statistical analysis, descriptive statistics must still be reliable."). Korver-Glenn never addresses how her property sample comports with accepted methodology. It's unclear if the selection of 100 properties is an appropriate sample size or adequately representative of the universe of properties. She does not cite to any research conducted by herself or others employing a similar methodology. More importantly, Korver-Glenn's descriptive analysis is fundamentally unreliable because there is a gap between the type of analysis performed and the bottom-line conclusions offered. Her descriptive findings cannot support inferences outside of the 100-property sample, yet she concludes that, "Altisource treated Ocwen properties in Black neighborhoods significantly worse than Ocwen properties in White neighborhoods across a host of measures" and that lack of quality assurance and discretion in the valuation process "create[s] racial inequality in property condition and property value." [347-1] at 122. This is a conclusion about causation—it opines on the effect of defendants' conduct on value disparities between properties in white and non-white neighborhoods. In her rebuttal report, Korver-Glenn asserts that qualitative analyses need not control for variables. [347-2] at 24. That's true only to the extent that opinions drawn from qualitative analyses are not presented in the form of causal conclusions. Korver-Glenn plainly offers causation evidence but fails to control for potentially explanatory variables before linking defendants' conduct with the value disparities. Her analysis and conclusions are unreliable. *See* Fed. R.

Evid. 702 advisory committee's note to 2000 amendment (reliability factors may include "[w]hether the expert has adequately accounted for obvious alternative explanations"); *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (excluding expert statistician's testimony for "equating a simple statistical correlation to a causal relation" and failing to control for explanatory variables). Her use of descriptive statistics and her opinions are unreliable, and this portion of her testimony (and related parts that offer causal conclusions) are excluded. *See generally* [347-1] at 94–124.

Finally, defendants say Korver-Glenn's testimony should generally be excluded because of bias. [329] at 18–19. They argue that Korver-Glenn has written extensively about how the "entire industry is biased against properties in communities of color" and that this bias infects her methodology and testimony. Questions of an expert's bias go to their credibility rather than admissibility of their testimony. *See Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 613 F.3d 54, 59 (1st Cir. 2010) ("Assessing the potential bias of an expert witness, as distinguished from his or her specialized training or knowledge or the validity of the scientific underpinning for the expert's opinion, is a task that is 'properly left to the jury.'"). Defendants may explore this issue through adversarial presentation, but it's not a basis to exclude her testimony.

Korver-Glenn is barred from testifying on Ocwen's and Altisource's "Statements of Work"; opining on the adequacy of Ocwen's and Altisource's manuals and policies; characterizing certain policies or documents as "confusing" or

"indecipherable"; and presenting a descriptive statistical analysis on the "effects" of the servicer defendants' marketing and sales policies on REO values. The scope of her testimony is confined to topics drawing on her academic and research expertise, so long as she does not cross the line into attributing causation to defendants' practices. In light of the remaining claim in this case that may proceed to trial, her testimony will be subject to Federal Rules of Evidence 402 and 403.

## VI.    Defendants' Motions for Summary Judgment

### A.    Actionable Claims Under the Fair Housing Act

Plaintiffs' claims arise under three separate provisions of the Fair Housing Act, each proscribing different kinds of conduct. The statute is "broad and inclusive" and its provisions subject to "generous construction." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209–12 (1972). "Courts have recognized that [the Fair Housing Act] is the functional equivalent of Title VII, and so the provisions of these two statutes are given like construction and application." *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000) (internal citations omitted).

Defendants do not dispute that §§ 3604(b) and 3605 are applicable in this case, though they dispute whether plaintiffs present sufficient evidence of discrimination to support these claims. They argue that plaintiffs' claim under § 3604(a) related to housing availability fails both as a matter of law and fact. [316] at 26–27.

Section 3604(a) of the Act makes it unlawful to "refuse to sell or rent… or otherwise make unavailable or deny, a dwelling to any person because of [race]." 42 U.S.C. § 3604(a). This provision requires that a "dwelling be made truly unavailable, or that defendants deprived plaintiffs of their privilege to inhabit their dwelling."

*Bloch*, 587 F.3d at 782. Housing can be "made unavailable" under § 3604(a) through practices like "mortgage 'redlining,' insurance redlining, racial steering, exclusionary zoning decisions, and other actions by individuals or governmental units which directly affect the availability of housing to minorities." *Southend Neighborhood Imp. Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1209 (7th Cir. 1984). Section 3604(a) generally prohibits pre-acquisition conduct ("discrimination at the point of sale or rental"), but it also extends to post-acquisition conduct that renders housing unavailable, "somewhat like a constructive eviction."[27] *See Bloch*, 587 F.3d at 776. To succeed on a § 3604(a) claim, plaintiffs must "show more than a mere diminution in property values" and "more than just that their properties would be less desirable to a certain group." *Id.* at 777 (citations omitted). That's because "[a]vailability, not simply habitability, is the right that § 3604(a) protects." *Id.*

Plaintiffs' theory of unavailability under § 3604(a) rests on pre-acquisition conduct. They argue that defendants' maintenance and marketing of REO properties "dissuaded purchasers from buying nonwhite REOs." [360] at 58. Plaintiffs do not argue that defendants' failure to maintain REO properties affected the *habitability* of those REO properties. Instead, they argue that the REO deficiencies "by definition... would have been observable—and discouraging—to potential buyers." [360] at 59; *see* [398] ¶ 39 (investigation was limited to exterior maintenance

---

[27] The constructive eviction standard articulated in *Bloch* applies to post-acquisition conduct under § 3604(a), which is a more demanding standard. The court's discussion of "habitability," however, was in the context of pre- and post-acquisition conduct under the Act. *Bloch*, 587 F.3d at 777.

deficiencies, marketing, and "overall curb appeal"). Exterior maintenance deficiencies or signs of neglect may reduce the availability of desirable housing, but that doesn't render housing "unavailable" under the meaning of § 3604(a). Courts have been reluctant to extend the scope of § 3604(a) to conduct that impacts the desirability of housing. *See Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 158 n.3 (3d Cir. 2002) (observing that no court has "stretched" § 3604(a) to encompass actions that "do not actually make it more *difficult* (as opposed to less *desirable*) to obtain housing") (emphasis in original); *see also Cox v. City of Dallas, Tex.*, 430 F.3d 734, 744 (5th Cir. 2005). Plaintiffs' theory of desirable housing does not violate § 3604(a).

But even if § 3604(a) encompasses plaintiffs' theory of availability based on exterior maintenance deficiencies, plaintiffs do not raise a genuine issue of material fact that such conduct dissuaded potential buyers. They cite to evidence from Ayres's regression analysis to assert that REO properties in non-white neighborhoods were more likely to have deficiencies than REO properties in white communities. [360] at 59. But that statistic says nothing about whether those deficiencies had the effect of discouraging potential buyers. *See Southend*, 743 F.2d at 1209–10 ("Of course, the alleged illegal actions must lead to discriminatory effects on the availability of housing.").

Plaintiffs also advance a theory of unavailability based on defendants' marketing practices such as: Altisource's use of the Hubzu platform, which imposes barriers on prospective buyers; inferior marketing practices for REO properties in non-white neighborhoods; leaving utilities turned off in lower-value REOs, which

90

discourages on-site real estate showings for those properties; and the Cash for Deed Sales model, which sold REO properties to investors rather than individual buyers. [360] at 59. Defendants' use of a specific sales platform does not take those properties off the market and make them truly unavailable under § 3604(a). *See Southend*, 743 F.2d at 1210 ("Section 3604(a) is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons."). Section 3605, on the other hand, encompasses discriminatory real estate-related transactions. It also relates to "availability," but its focus is different—it prohibits discrimination "in making available such a *transaction*" rather than the dwelling itself. 42 U.S.C. § 3605(a) (emphasis added). That's a better fit for what plaintiffs are trying to prove here. In any case, even if § 3604(a) encompasses the type of sales and marketing practices at issue, plaintiffs rely on inadmissible causation evidence to establish that defendants' marketing and sales practices discouraged potential buyers. *See, e.g.*, [398] ¶ 181 (relying on inadmissible causation evidence from Korver-Glenn to assert "[d]isproportionately more properties in communities of color were sold to investors than in white communities").

Defendants are entitled to judgment as a matter of law on plaintiffs' cause of action under § 3604(a).[28]

---

[28] Alternatively, as discussed below, plaintiffs do not satisfy their prima facie burden under a disparate-impact theory of liability or produce admissible evidence to support a perpetuation of segregation or disparate-treatment theory under § 3604(a).

### B.    Disparate Impact

Disparate-impact liability "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment," and "may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping." *Inclusive Communities*, 576 U.S. at 540. It "mandates the 'removal of artificial, arbitrary, and unnecessary barriers.'" *Id.* (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Supreme Court articulated important limiting principles for plaintiffs relying on a showing of statistical disparity. Such a claim "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* at 542. "A robust causality requirement ensures that racial balance does not, without more, establish a prima facie case of disparate impact." *Id.* (cleaned up).

Plaintiffs bear the burden of showing that a challenged practice "actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of [race]." 24 C.F.R. § 100.500(a). To establish a prima facie case, plaintiffs must show: "(1) a statistical disparity and (2) that [defendants] maintained a specific policy that (3) caused the disparity." *NFHA II*, 2019 WL 5963633, at *13; *see also Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 148–49 (2d Cir. 2025) (requiring a plaintiff to show: "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practice."); *Ohio House, LLC v. City of Costa Mesa*, 122 F.4th 1097, 1120 (9th Cir. 2024) (requiring a plaintiff to show: (1) an outwardly

neutral policy, (2) "a significant, adverse, and disproportionate effect on a protected class"; and (3) "robust causality, beyond mere evidence of a statistical disparity, that the challenged policy… caused the disproportionate effect")

If plaintiffs establish a prima facie case, the burden shifts to defendants to show that the policy is justified by a "substantial, legitimate, nondiscriminatory interest[]." 24 C.F.R. § 100.500(c)(2). The burden then shifts back to plaintiffs to show a less discriminatory alternative. *Id.* § 100.500(c)(3). Because defendants do not present any arguments about valid business justifications, *see* [316] *and* [408], the only dispute at this stage is whether plaintiffs establish a prima facie showing of a discriminatory effect. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 705 (7th Cir. 2010) (undeveloped arguments are waived).

### 1. *Statistical Disparities*

Plaintiffs rely on Ayres's regression analyses to demonstrate two statistically significant disparities between Deutsche Bank-owned REO properties in white and non-white communities: (1) a disparity in maintenance deficiencies of REO properties and (2) a disparity in the decline of REO property values in defendants' portfolio. [360] at 25–26.

The parties dispute the proper sample of REO properties underlying Ayres's statistical regression. [316] at 13–15. Defendants contend that Ayres's sample impermissibly includes: (1) properties not serviced or maintained by Ocwen and Altisource; (2) properties not titled to Deutsche Bank at the time of inspection; and (3) properties inspected outside of the limitations period. [316] at 9. Recall that Ayres began with 1,276 properties, from which they excluded properties that were not titled

to Deutsche Bank at the time of inspection (based on servicers' data or public records),
properties with titles in dispute and properties not serviced by Ocwen and Altisource.
*See* [340-1] at 29 (sample subsets). Defendants identify 45 additional properties not
titled to Deutsche Bank at the time of inspection and assert that plaintiffs also fail to
produce sufficient evidence for another 173 properties. [316] at 14–15. These
implicate factual disputes that cannot be resolved at this stage. First, there's a
dispute as to what source of ownership data is accurate as to the 45 additional
properties that defendants identify. Ayres relied on servicer-provided data and public
records, which defendants say are controverted by other property records or
documents. [362] ¶ 9; [320-1] at 6. Defendants do not attach those documents to their
declaration, but they produce a spreadsheet. They also explain that they "did not
conduct this review for every property, so the absence of a '0' with respect to any
particular property does not necessarily mean the absence of evidence showing it was
not titled to a Trustee at the time of Plaintiffs' inspection." [320-1] at 6. Without
specific evidence to controvert ownership, I view the facts in the light most favorable
to plaintiffs and draw the inference in their favor. The other 173 properties that
defendants seek to exclude are based on Governing Agreements that contain master-
servicer provisions (authorizing an entity other than Deutsche Bank to terminate a
servicer) or third-party termination provisions (requiring consent for Deutsche Bank
to terminate a servicer). These properties are subject to a factual dispute on the
existence of an agency relationship and resolved in plaintiffs' favor. *See below* VI.E.

94

The sample must, however, be confined to properties serviced by Ocwen and Altisource. Plaintiffs say there is no reason to confine the sample to only those properties serviced by Ocwen and Altisource because Deutsche Bank is responsible for *all* servicer conduct resulting in the observed disparities. [360] at 20. Because plaintiffs' theory of vicarious liability for Deutsche Bank necessarily relies on establishing an underlying violation of the Act, the proper sample must be limited to the REO properties serviced by Ocwen and Altisource. Apart from the statistical data, plaintiffs introduce evidence only as to Ocwen's and Altisource's policies, procedures, and practices. Plaintiffs never identified specific policies of non-party servicing entities—another essential element of a prima facie case—so any disparate-impact analysis is necessarily limited to Ocwen and Altisource. Ayres conducted separate regression analyses on a sample limited to properties acknowledged by Ocwen and Altisource, and the statistical disparities attributable to defendants must be based on that limited sample.

The sample must also be limited based on the statute of limitations period. Because Ayres separately conducted aggression analyses based on the limitations period (no earlier than 2012 for Deutsche Bank and 2015 for Ocwen and Altisource), any conclusions drawn from those subsets are admissible to support disparate-impact liability. This limitation does not bar Ayres's statistical analyses based on conduct outside the limitations period that may provide evidence of intentional discrimination. *See NFHA II*, 2019 WL 5963633, at *12.

A statistical disparity between groups may raise an inference of discrimination, but "statistical comparators must be directly comparable… in all material respects, though they need not be identical in every conceivable way." *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 603 (7th Cir. 2020) (internal quotation marks omitted)*; see also Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 963 (9th Cir. 2021) ("Before any statistical disparate-impact analysis can proceed, the correct comparative populations must be identified."). Here, plaintiffs do not compare groups of people. Instead, their statistical analyses compare REO properties at the neighborhood-level (or more specifically, census block groups). [360] at 25. Defendants argue that flaws in the research design and sampling render any statistical comparisons unusable. [316] at 19–23.

Defendants assert that the aggregation of data across 30 metropolitan areas dooms plaintiffs' case because they alleged in their second amended complaint that they would prove disparities in "each" metropolitan area and have failed to do so. [316] at 19–22; [408] at 18. Plaintiffs respond that this an "unfair" attempt to disaggregate data to the point where it would be difficult to demonstrate statistical significance. [360] at 31. Plaintiffs cite to *Capaci vs. Katz & Besthoff, Inc.*, 711 F.2d 647, 654–56 (5th Cir. 1983), where the court rejected the defendant-employer's attempt to fragment hiring data geographically and by year because the employer's hiring decisions were made centrally, and liability was "premised on 'across-the-board' practices" occurring at all locations. Whether data aggregation or "pooling" is

appropriate depends on the facts and theory of the case. *See Paige v. California*, 291 F.3d 1141, 1148 (9th Cir. 2002) (recognizing the "generally accepted principle that aggregated statistical data may be used where it is more probative than subdivided data" and suggesting that "stratification should be upheld only if the [defendant] can demonstrate that 'the stratification is appropriate, and that the stratifying variable is business justified.'"). Here, plaintiffs' theory of liability is premised on defendants' "national model" of servicing REO properties. Defendants do not identify any localized variations in national policies that would render aggregation across cities improper. *See Paige*, 291 F.3d at 1149 ("[P]laintiffs' theory is that the… practices have the identical discriminatory effect upon members of all minority groups… Right or wrong, they are entitled to attempt to prove their case."); *Connecticut Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F.Supp.3d 259, 292 (D. Conn. 2020) ("[N]ational or state statistics are appropriate [as comparison groups] where 'there is no reason to suppose' that the local characteristics would differ from the national statistics.") (citing *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977)).

But defendants are raising a different issue here. Their objection is not so much about the improper aggregation of data based on localized policies, but rather the improper aggregation across cities that were "already in severe economic distress" when they were selected as sites for plaintiffs' investigation. [316] at 21. This boils down to a problem of comparable neighborhood characteristics and a statistical analysis that can control for those preexisting differences. In *County of Cook v. Wells Fargo*, the court recognized that "similarly situated" neighborhoods with high and

97

low concentrations of minority borrowers could be valid comparators. 2022 WL 17752387, at *11. The problem, however, was that the County's expert failed to compare "similarly situated" communities. His statistical analysis did not control for "relevant, non-racial characteristics—such as income, wealth, or credit score—that might impact foreclosure rates for different communities." *Id.*

Here, Ayres accounted for relevant neighborhood characteristics in their regression analyses, including neighborhood property home values and crime rates. [340-1] at 34. The 85 non-race variables Ayres initially controlled for included: property land value, census tract median property value, census tract poverty rate, census tract vacancy rate, block group burglary index, block group larceny index, and block group vehicle theft index. *See* [340-1] at 98–102. In rebuttal, Ayres also accounted for the initial condition of a property by (1) limiting the sample based on the length of ownership at the time of inspection (after being vacant or entering REO status) and (2) controlling for a property's "condition code" in the servicer defendants' records. [340-7] at 44–49. Even when controlling for all 86 non-race variables, Ayres observed that non-white block groups had 2.278 more deficiencies than similarly situated REO properties in white block groups. Ayres also ran an odds-ratio analysis controlling for these variables and opines that the odds of an REO property in a non-white block group having at least ten deficiencies was 10.552 times the odds of an REO property in a white block group having the same number of deficiencies. These results were statistically significant at the 99% confidence level. [398] ¶ 78; [340-7] at 49; *see ATA Airlines, Inc. v. Fed. Exp. Corp.*, 665 F.3d 882, 895 (7th Cir. 2011)

("Confidence intervals… are statistical estimates of the range within which there can be reasonable confidence that a correlation or prediction is not the result of chance variability in the sample on which the correlation or prediction was based; 95 percent confidence is the standard criterion of reasonable confidence used by statisticians."). By controlling for non-race characteristics at the neighborhood and property level that might otherwise explain the REO property conditions, a reasonable jury could find that the statistical disparities are based on valid comparison groups.

### 2.   *Challenged Policies*

Plaintiffs must identify the specific policy or policies that are responsible for the observed statistical disparities and prove that these policies exist. *See City of Joliet*, 825 F.3d at 830 ("Disparate-impact analysis looks at the effects of policies, not one-off decisions, which are analyzed for disparate treatment."); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988). "A combination of subjective and objective determinants… can count as a sufficiently specific [practice]." *Davis v. D.C.*, 925 F.3d 1240, 1249 (D.C. Cir. 2019). An "undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011).

Plaintiffs identify two categories of policies: affirmative and abdicative. [360] at 36. They say that defendants affirmatively implemented policies and practices that amount to "value redlining," essentially "singling out lower-value REO properties for different and worse treatment." [360] at 36–37. Plaintiffs contend that defendants' abdicative policies manifested in a delegation of discretion, lack of oversight, and a

national model of property preservation that resulted in maintenance and preservation disparities. [360] at 38–44.

On the maintenance side, plaintiffs identify the following policies: the categorization of certain REO properties as "low-value" and the prioritization of maintenance and preservation work for "high-value" properties; the rejection of routine maintenance requests for low-value properties; failure to remediate code violations for low-value properties; and insufficient quality control and oversight mechanisms for third-party vendors conducting maintenance and preservation work. [360] at 36–37.

On the marketing and sales side, plaintiffs identify the following policies: using lower quality listings and fewer marketing photos for low-value properties; auction programs like "Last Chance Auction" and "Dynamic Pricing" that "increased investor-centric outcomes"; mandatory use of the Hubzu auction site for low-value REO properties; the "Cash for Deed" sales that limited public listings; and appraisal and valuation of low-value REO properties that "trapped" them "in a spiral of deterioration and devaluation." [360] at 37. Plaintiffs say these marketing and sales practices "effectively removed" REO properties owned by Deutsche Bank and serviced by Ocwen from "open real estate markets." [360] at 38.

Plaintiffs rely on Ocwen's and Altisource's manuals, guides, and policies to demonstrate that properties were classified as high- or low-value in the context of both maintenance and marketing/sales policies. *See, e.g.*, [362] ¶ 27 (Ocwen's "high value asset policy" was implemented in 2016 and applied to properties valued at more

than \$500,000); [398] ¶ 215 (Ocwen's "Real Estate Owned Oversight Procedure" distinguishing "reserve price logic" for "low-value properties" below \$250,000 and "high value properties" above \$250,000). Plaintiffs also point to evidence that Ocwen delegated property management and marketing/sales to Altisource through its policies and procedures. *See, e.g.*, [398] ¶¶ 221–22. For example, Ocwen's and Altisource's contracts from 2015 provide: "Altisource's determination that an Asset requires a PPI Service shall be made by Altisource using its reasonable business judgment and in accordance with Altisource's standard operating procedures, industry standard practices and the Business Requirements Document, as may be amended from time to time." [398] ¶ 224. Ocwen also granted Altisource the discretion to approve or deny repair bids. *See* [398] ¶ 235. A Chicago-based Altisource vendor, Nakia Agnew, attested that bids for maintenance work for low-value assets were routinely rejected in minority areas.[29] [398] ¶ 205. Taken together, these facts are sufficient to raise a factual dispute as to the existence and operation of defendants' policies that allegedly caused the observed disparities.

Many of the factual disputes about Altisource's and Ocwen's policies rest on disagreements about characterization. *See, e.g.*, [398] ¶ 212 (plaintiffs listing examples of Altisource's Residential Sales Consultants' decisions informed by "value redlining"). At this stage, I draw inferences in plaintiffs' favor, but at trial, while

---

[29] Defendants' hearsay objection is overruled. [398] ¶ 205. Agnew is qualified to testify based on her personal experience as a vendor how bids were granted. Defendants note that Agnew used the term "low value" in reference to assets, not the communities those properties were located in.

plaintiffs' proffered experts may summarize admissible evidence and opine on industry standards, they may not supply the inference to establish the existence of a policy.

### 3. Causation

A robust causality requirement "protects defendants from being held liable for racial disparities they did not create." *Inclusive Communities*, 576 U.S. at 542. Courts have not uniformly interpreted the causation requirement. *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 903–09 (5th Cir. 2019) (summarizing circuit precedent as four different views of "robust causation"). The underlying concern reflected in *Inclusive Communities* is to ensure that "the adverse effect… is not some broad social condition." *Sw. Fair Hous. Council*, 17 F.4th at 965 (9th Cir. 2021); *see also Inclusive Communities*, 576 U.S. at 543 (suggesting that causation may be difficult to establish if "multiple factors… go into investment decisions about where to construct or renovate housing units").

Plaintiffs must show that the REO disparities do not simply reflect existing economic and social inequalities in neighborhoods. Regression analyses must properly account for "major" factors that otherwise explain differences between groups. *See Bazemore*, 478 U.S. at 400 (observing that a regression analysis accounting for major factors may be sufficient evidence even if it does not account for every measurable variable). What counts as a "major factor" depends on the specific facts and theory of a case. *Coward v. ADT Sec. Sys., Inc.*, 140 F.3d 271, 274 (D.C. Cir. 1998). A regression analysis showing pay disparities based on race or sex, for example, should adequately control for differences in employees' qualifications such

as years of experience and education—factors that most commonly explain pay differentials. *See E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 326–27 (7th Cir. 1988). Here, Ayres sought to control for potential social determinants on property conditions. The initial control variables included 85 potential characteristics that are "widely considered in the literature to be useful in predicting property conditions" including factors like the "length of bank ownership, season of the inspection, the age of the home, the size of the home, neighborhood home values, and neighborhood crime." [340-1] at 37, 98–102. In rebuttal, Ayres ran additional regression analyses to account for the initial condition of a property and found that statistically significant disparities persist. [340-7] at 44–49. To the extent that defendants suggest that other "potential" variables explain the results without specifying them, *see* [316] at 23, the omission of those variables goes to the probative value of the regression analyses. *See Bazemore*, 478 U.S. at 400. A reasonable jury could find that plaintiffs' regression analyses adequately account for alternative factors and conclude that race explains the disparities. But a reasonable jury could also find that the regression analyses fail to capture important race-neutral, social determinants and conclude that race is not the cause. At this stage, plaintiffs are entitled to the former inference in their favor. Summary judgment on this issue is inappropriate.

That doesn't get plaintiffs all the way there. There's still a question of what discriminatory effect is captured by Ayres's statistical analyses. Plaintiffs' claims arise under §§ 3604(a), (b), and 3605, so their statistical evidence must show discriminatory effects related to the prohibited conduct. Otherwise, the statistical

disparities would simply be robust evidence of a difference in outcomes that do not give rise to liability under the Act. Under § 3604(a), that means "the alleged illegal actions must lead to discriminatory effects on the availability of housing." *Southend*, 743 F.2d at 1209–10. Under § 3604(b), that means showing that defendants' conduct created discriminatory effects on the maintenance and repair of REO properties. *See* 42 U.S.C. § 3604(b); 29 C.F.R. § 100.65(b)(2). And under § 3605, that means showing that defendants' conduct created discriminatory effects on the availability of real estate-related transactions. 42 U.S.C. § 3605(a).

The glaring gap is that Ayres's statistical analyses do not present evidence of disparities to support all three claims. Neither regression analysis purports to measure discriminatory effects on the availability of housing under § 3604(a) or the availability of real estate-related transactions under § 3605. Ayres's regressions rely on plaintiffs' inspection data that measured exterior maintenance and marketing deficiencies (e.g., the absence or presence of a "distressed properties sign"). But plaintiffs challenge defendants' marketing and sales policies that were not captured by those measures. Their theories under §§ 3604(a) and 3605 are premised on defendants' policies creating unnecessary restrictions and barriers to REO home ownership in non-white communities. They argue, for example, that the mandatory use of Altisource's Hubzu platform or the Cash for Deeds sales model created unnecessary red tape, took REO properties off the "open" market, and dissuaded potential buyers. But Ayres's data doesn't capture the impact of defendants' conduct on REO property sales or availability in the market. Put another way, there's a

fundamental mismatch between defendants' *marketing* and *sales* policies, the observed statistical disparities, and the causal link that plaintiffs present. Taken together, plaintiffs' evidence of defendants' REO preservation and maintenance policies, the inspection data capturing exterior REO deficiencies, and Ayres's statistical analysis of the deficiency data establish a prima facie case of disparate impact based on illegal *maintenance* conduct under § 3604(b). But the regression analyses do not create a genuine issue of material fact of disparate impact on the availability of housing or real estate-related transactions under § 3604(a) or § 3605. Without admissible evidence of disparate impact on those terms, plaintiffs are limited to their § 3604(b) claim. Because plaintiffs rely on the same statistical evidence to support their claims under both the disparate-impact and disparate-treatment theories of liability, summary judgment is granted in favor of defendants on the §§ 3604(a) and 3605 claims under either framework.

### C.    Perpetuation of Segregation

Plaintiffs' disparate-impact claim includes a perpetuation of segregation theory that does not rely on Ayres's statistical analyses. *See Arlington Heights*, 558 F.2d at 1290 (a facially neutral decision may have a racially discriminatory effect on a community "if it perpetuates segregation and thereby prevents interracial association"); 24 C.F.R. § 100.500(a) (a practice has a discriminatory effect if it "creates, increases, reinforces, or perpetuates segregated housing patterns because of [race]"). The Seventh Circuit articulated four considerations: (1) the strength of a plaintiff's showing of discriminatory effect; (2) evidence of discriminatory intent; (3) a defendant's interest in the challenged action; and (4) whether a plaintiff "seek[s] to

compel [a defendant] to affirmatively provide housing for members of minority groups or merely to restrain [a] defendant from interfering with individual property owners who wish to provide such housing." *Arlington Heights*, 558 F.2d at 1290. *Arlington Heights* involved a challenge to the Village's zoning decision that blocked an affordable housing development. That makes it an odd fit to this case challenging defendants' private conduct over the span of several years. Still, nothing in this circuit's precedent forecloses its application. *See Bloch,* 587 F.3d at 784 (referencing the *Arlington Heights* inquiry but declining to apply it on appeal because the parties had not addressed it below). In *Arlington Heights*, the court noted the racial concentration of the area ("overwhelmingly white") and the possibility that constructing a housing development would "be a significant step toward integrating the community." 558 F.2d at 1291. The court weighed the other three factors in favor of the Village but determined that the possibility of integration tipped the balance in favor of the plaintiffs. *Id*. at 1294 ("[W]e must decide close cases in favor of integrated housing.").

Defendants argue that plaintiffs do not present evidence on the segregative effect of defendants' REO conduct. [408] at 28–29. Plaintiffs do not dispute that, but they point out that it's unclear under *Arlington Heights* whether specific data of neighborhood racial segregation is required. Plaintiffs instead argue that they provide sufficient evidence that defendants' REO conduct stigmatized communities of color, deterred buyers from purchasing properties in those neighborhoods, and diminished value in surrounding homes in non-white neighborhoods. [360] at 63. But

106

plaintiffs rely on inadmissible expert testimony to support their argument. Korver-Glenn's expert testimony on the impact of defendants' marketing and sales policies on REO property values is excluded because it offers inadmissible causation opinions. *See above* V.G. Plaintiffs also point to testimony from Korver-Glenn, Ayres, and Poche on a "contagion effect" that "would depress the values of surrounding homes." *See* [398] ¶¶ 94, 291, 303. None of these experts offer admissible testimony on a "contagion effect" linked to defendants' conduct—they all refer to generalized social and economic patterns linked to poor property maintenance. The cited portion of Ayres's report refers only to literature that "neglected or poorly maintained foreclosures reduce the prices of nearby non-distressed sales through a contagion effect." [398] ¶ 94; [340-1] at 17. Ayres does not purport to quantify the impact of defendants' maintenance conduct on surrounding home values. Poche also opines on a "contagion effect" based on his professional experience and social science literature that suggest poorly maintained properties contribute to neighborhood blight and negatively impact surrounding property values. [398] ¶ 303; [337-1] at 5–6. But Poche's opinions on general social forces that may perpetuate segregation do not relate to defendants' specific REO conduct either, and in any case, Poche does not offer admissible causation evidence linking defendants' REO conduct to deficiencies, surrounding home values, or increased racial segregation. Because plaintiffs do not rely on admissible evidence, they do not raise a genuine issue of material fact that defendants' conduct perpetuates racial segregation in the selected communities. Defendants are entitled to judgment as a matter of law on this theory of liability.

### D. Disparate Treatment

Plaintiffs elect to proceed under the *McDonnell Douglas* burden-shifting framework and the Supreme Court's *Arlington Heights* test to prove intentional discrimination. Because the disparate-impact liability framework borrows from the *McDonnell Douglas* framework in the Title VII context, the facts supporting disparate-impact and disparate-treatment theories of liability often overlap. *See Inclusive Communities*, 576 U.S. at 521 ("[D]isparate-impact liability under the FHA plays an important role in uncovering discriminatory intent."); *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1533 (7th Cir. 1990) ("[Discriminatory] effect is probative of intent, so that an unexplained discriminatory effect may by itself support an inference of discriminatory intent—an insight at the heart of the *McDonnell Douglas* method of proving disparate treatment.") (internal citations omitted). The same goes for facts supporting disparate-impact liability that may be relevant to the Supreme Court's *Arlington Heights* inquiry. *See Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 507–08 (9th Cir. 2016) (noting that "statistics on the disparate impact caused by a decision and the historical background of the decision [] tend to make [] disparate-treatment claims plausible").

Ultimately, these "tests" are just different ways of determining "whether a reasonable jury could find that the relevant decision was motivated in part by an unlawful criterion." *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022) (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). In short, to prove intentional racial discrimination, plaintiffs must present evidence that race was a "motivating factor" in defendants' conduct. *Id.* at 743.

Statistical evidence of a disparity otherwise unexplained by race-neutral factors may raise an inference of discrimination in disparate-treatment cases. *See Adams,* 231 F.3d at 424; *Sears*, 839 F.2d at 309 & n.22. Plaintiffs point to statistical disparities based on differential REO maintenance in non-white neighborhoods as compared to white neighborhoods. While statistical disparities alone are generally insufficient to prove disparate treatment, defendants do not raise any valid business justifications.[30] *See* [408] at 25; *cf. Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981) (a prima facie case "raises an inference of discrimination only because… these acts, if otherwise unexplained, are [presumed to be] more likely than not based on the consideration of impermissible factors"). Plaintiffs present evidence to suggest that differential maintenance based on REO property values, including cost-cutting conduct for REO properties deemed low-value, has no profit justification—in other words, that it is pretextual. [360] at 46–47. Tyler opines that industry standards require REO property owners to remedy certain code violations no matter the property value or initial property condition. [319-1] at 9–14. Ayres opines that a company's decision to forgo remediating a deficiency may be business justified if the resale price of a lower-valued property is inelastic as to that deficiency. [340-2] at 3; [340-7] at 78–80. For example, defendants may have a legitimate business justification for failing to cut an overgrown lawn if an overgrown lawn doesn't affect resale value of a property. A cost justification may provide a race-neutral reason for

---

[30] The issue of valid business justifications is raised in the parties' expert reports, *see, e.g.*, [340-7] at 79, but defendants do not articulate any arguments in their briefs. *See* [408] at 25.

defendants' failure to remediate deficiencies, but in the absence of any justifications, a reasonable jury could infer that neighborhood race played an impermissible role in defendants' decisions to remediate deficiencies for some REO properties and not others.

In applying the *Arlington Heights* factors to determine whether defendants' conduct was motivated by discriminatory purpose, a court may examine circumstantial evidence of the historical background of the challenged decision, the sequence of events leading up to the decision, departure from normal procedures, and relevant legislative or administrative history. *Arlington Heights*, 429 U.S. at 266–68. Plaintiffs point to (1) the historical background of the foreclosure crisis in non-white neighborhoods; (2) notice to defendants that Deutsche Bank-owned REO properties were being poorly maintained; (3) departures from defendants' own internal compliance audits and its stated obligations to maintain and market all REOs equally; and (4) failure to impose non-discrimination policies and training. [360] at 48–54. Of these factors, plaintiffs provide admissible evidence in support of the second point—that defendants were aware that REO maintenance conduct affected communities of color more heavily. *See Avenue 6E Invs.*, 818 F.3d at 508 (a relevant factor included city officials' awareness that a zoning decision would bear more heavily on one race "in light of historical patterns of segregation by race"). For example, the manager of Deutsche Bank National Trust Company's Mortgage-Backed Securities Trust Administration group attended a meeting with Chicago officials to discuss foreclosure conditions and crime surrounding vacant homes where

a building inspector and police department representative were also in attendance. [398] ¶ 120. The same Deutsche Bank representative also attended meetings in Los Angeles, Boston, and New Haven to discuss foreclosures with servicers in those cities. Defendants assert that the cited evidence do not amount to concessions that Deutsche Bank or the servicer defendants knew about the impact of their conduct on racial segregation in communities.[31] [398] ¶ 121. That's fair enough. Nothing in the record suggests that any of the Deutsche Bank representatives liaising with local officials and groups commented on—or expressed awareness of—neighborhood race or minority populations in the impacted communities. Plaintiffs also identify Altisource's directive to remove inappropriate comments from vendor systems, including comments about race, as probative evidence of the servicer defendants' awareness of the potential for race-based discrimination. [360] at 53 (citing [398] ¶ 146); *see Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 974 (8th Cir. 2012) ("[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications.") (internal quotation marks omitted). Defendants point out that this

---

[31] Plaintiffs assert that Deutsche Bank's denial that it was aware of REO maintenance issues disproportionately affecting non-white communities was "not credible." [398] ¶ 121. They cite to deposition testimony of a Deutsche Bank representative. *See* [369-1] at 21 (41:5–41:8):

> Q. And in each of these cities that we mentioned, Chicago, Los Angeles, Boston, Milwaukee, and New Haven, is it correct that there was a considerable minority population in those cities?

> A. I don't know.

Although credibility is matter for trial, not summary judgment, plaintiffs must point to evidence to controvert Deutsche Bank's lack of knowledge. The cited material does not suggest a credibility dispute. Defendants' objection is sustained.

training notice was not in response to a particular comment but rather a prophylactic measure to prohibit discriminatory comments.[32] [398] ¶ 146. Plaintiffs' case under *Arlington Heights* is based on minimally probative evidence, but it's not clear as a matter of law that plaintiffs fail to meet their burden of proof. *See Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir. 2013) (stating that, for the purposes of summary judgment, "any indication of discriminatory motive may suffice to raise a question that can only be resolved by a factfinder"). Based on all the evidence in the record and drawing inferences in plaintiffs' favor, a reasonable jury could find that Ocwen's and Altisource's REO maintenance conduct was motivated in part by race, either under the *McDonnell Douglas* framework or under *Arlington Heights*. Plaintiffs raise genuine issues of material fact as to intentional discrimination, and they may pursue their § 3604(b) claim under a disparate-treatment theory of liability.

## E.    The Deutsche Bank Defendants' Liability

The Fair Housing Act encompasses direct and vicarious liability. *Meyer*, 537 U.S. at 285. Traditional vicarious liability rules apply, which "ordinarily make principals or employers vicariously liable for acts of their agents or employees in the

---

[32] Defendants object to the fact as immaterial and an improper characterization of the underlying exhibits. [398] ¶ 146. Defendants assert that the "Inappropriate Comments" policy was not directed at removing orders but as a preventative measure. Plaintiffs cite to two different exhibits, which may or may not be a part of the same email chain. *Compare* [370-9] at 9 (Altisource memorandum dated December 12, 2018, to vendor partners that they should not include "remarks about the community, its people and/or the residents, that could be considered discriminatory" in their work orders), *with* [370-9] at 11 (Altisource email also dated December 12, 2018, with example of inappropriate "comments" circled that do not appear to be race-based). To the extent that plaintiffs assert this fact as evidence of past racially derogatory comments, defendants' objection is sustained.

scope of their authority or employment." *Id.* Whether an agency relationship exists under the Fair Housing Act is determined under federal law. *City of Chicago v. Matchmaker Real Est. Sales Ctr., Inc.*, 982 F.2d 1086, 1097 (7th Cir. 1992); *see also NECA-IBEW Rockford Loc. Union 364 Health & Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1058 (7th Cir. 2013) (no choice-of-law issue where Illinois law, federal common law, and the Restatement of Agency are all in accord). "[T]he test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 640 (7th Cir. 2021) (citing *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998)). Questions about agency are typically reserved for the jury unless the undisputed facts are insufficient to establish agency as a matter of law. *Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999). "A principal cannot free itself of liability by delegating to an agent the duty not to discriminate." *Matchmaker Real Est.*, 982 F.2d at 1096.

The Deutsche Bank defendants disclaim a principal-agent relationship with Ocwen and Altisource. Specifically, they argue that the REO properties in this lawsuit were (1) titled to the trustees only in their capacity as trustees of a specific residential mortgage-backed securities trust by action of the servicers; (2) were maintained by the servicers during the time they were held by the RMBS Trusts; and (3) were subsequently conveyed to third parties by action or direction of the servicers. [333] at 9.

In a residential mortgage-backed securities transaction, mortgage loans are pooled together and interests in the money generated from those loans are sold to investors. [352] ¶ 2. The transaction begins with an "originator" making a mortgage loan to a borrower. [352] ¶ 2.2. Those loans are conveyed to a "sponsor" who bundles them into a loan pool and conveys the pool to a "depositor." [352] ¶ 2.3. The depositor conveys the loan pool to the trust in exchange for certificates and sells those certificates to investors. [352] ¶ 2.3. The certificates entitle investors to a share of payments from the loan pool. [352] ¶ 2.3. A sponsor selects the trustee and servicer. [352] ¶ 2.4. Servicers are generally responsible for servicing the loans in the trust by collecting loan payments or enforcing the terms of the loan. [352] ¶ 2.5. In some situations, sponsors may also engage "master servicers" that monitor servicers and enforce compliance with their obligations. [352] ¶ 2.6.

Governing Agreements define the rights and obligations of the parties. [352] ¶ 3 (variations of contracts include Pooling & Servicing Agreements, Trust Agreements, Indenture Agreements), ¶ 10. As trustees, the Deutsche Bank defendants hold legal title to the REO properties. [405] ¶ 4. Some of the REO properties that plaintiffs investigated were serviced by an entity other than Ocwen.[33] [352] ¶ 17. The parties dispute many facts about the specific terms and provisions in the Governing Agreements and how they allocate responsibilities among the trustee,

---

[33] Plaintiffs admit that some of the REO properties in the investigation pool were serviced by a party other than Ocwen, but they assert that all REO properties were titled to Deutsche Bank. [352] ¶ 17. Whether some of the REO properties belonged to Deutsche Bank at the time of plaintiffs' on-site investigation is subject to a separate factual dispute. *See above* VI.B.1.

servicer, and in some cases, a master servicer. [405] ¶ 8. The parties acknowledge that there is substantial variation among Governing Agreements. [405] ¶ 8. I focus on material issues of fact, recognizing that no single Governing Agreement applies to every REO property at issue in this lawsuit.

An agency relationship can be formed by contract or conduct, though "not all contracts create agency relationships and not all conduct creates agency relationships." *Sosa*, 8 F.4th at 640. "The requirement that an agent be subject to the principal's control assumes that the principal is capable of providing instructions to the agent and of terminating the agent's authority." Restatement (Third) Of Agency § 1.01, cmt c. (2006). Many of the Governing Agreements contained provisions outlining a servicer's responsibilities on behalf of the trustee. [405] ¶ 47. These responsibilities included: managing, conserving, protecting, and/or operating REO property; marketing, selling, and transferring REO properties; instituting foreclosure proceedings; and reporting to the trustee regarding the status of an REO property. [405] ¶ 47(c), (d), (e), and (f). Here's an example:

> The Servicer shall manage, conserve, protect and operate each REO Property for the Trustee solely for the purpose of its prompt disposition and sale. The Servicer, either itself or through an agent selected by the Servicer, shall manage, conserve, protect and operate the REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. The Servicer shall attempt to sell the same (and may temporarily rent the same for a period not greater than one year, except as otherwise provided below) on such terms and conditions as the Servicer deems to be in the best interest of the Trustee. The Servicer shall notify the Trustee from time to time as to the status of each REO Property

[351-1] at 40. Here's another example:

115

> The Servicer shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless the Servicer determines, and gives an appropriate notice to the Trustee to such effect, that a longer period is necessary for the orderly liquidation of such REO Property. If a period longer than one year is permitted under the foregoing sentence and is necessary to sell any REO Property, the Servicer shall report monthly to the Trustee as to the progress being made in selling such REO Property. The Trustee has no obligation with respect to REO dispositions.

[351-1] at 28. Deutsche Bank does not dispute that some of the Governing Agreements contained this language, though they assert that some agreements omitted such provisions. [405] ¶ 47. The contractual language provides evidence that the trustees, at least under some Governing Agreements, had the right to control the terms of a servicer's REO property management, including requiring servicers to provide the trustees with appropriate notice of REO conditions.

The parties also dispute the extent to which Deutsche Bank could enforce a default and terminate servicers. Some of the agreements authorized a master servicer to enforce a default, while others authorized a trustee to enforce a default and sometimes step into the servicer's shoes as a "successor servicer." *Compare* [352] ¶ 13 *and* ¶ 14; *see also* [405] ¶ 74. The language in one Governing Agreement provided that in the event of a default,

> the [Master Servicer] may… by notice in writing to the applicable Servicer or Countrywide Servicer… terminate all of the rights and obligations of the applicable Servicer under this Agreement…

[369-12] at 12. Another Governing Agreement provided that in the event of a default,

> the Trustee may… terminate all of the rights and obligations of the Servicer under this Agreement and in and to the Mortgage Loans… On and after the receipt by the Servicer of [written notice of default] all authority and power of the Servicer hereunder, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the Trustee.

116

[342-6] at 114. In situations involving a master servicer, Deutsche Bank asserts that the right to control the manner and method of servicers' activities did not rest with the trustees.[34] [333] at 11. The undisputed facts show, that at least in some situations, the trustees had the right to enforce a default and terminate an agreement with a servicer. And in some situations, the trustees would become responsible for servicer duties. [405] ¶ 74. Agreements where a master servicer had the right to enforce a default might support an inference in favor of Deutsche Bank. But other agreements where trustees could enforce the default and terminate a servicer support the opposite inference. No conclusive inference is apparent from the record.

Plaintiffs also point to the Limited Powers of Attorney provision in all Governing Agreements as evidence of an agency relationship. [405] ¶ 62. Deutsche Bank emphasizes that the provision granted limited powers of attorney only as to foreclosure proceedings and loan modifications, which confirms the absence of an agency relationship as to *maintenance* activities. [333] at 10–11. Deutsche Bank's point goes to the scope of the agency relationship rather than its existence. *See* Restatement (Third) Of Agency § 1.01, cmt c. (a common form of agency is the relationship created by a power of attorney). In any case, this provision is probative, even if not dispositive, of the relationship between Deutsche Bank and the master servicer and servicers. Viewing all the facts in a light most favorable to plaintiffs, a

---

[34] The parties dispute what constitutes a default, but they agree that default was typically defined in the terms of the applicable agreement. [405] ¶ 32.

reasonable jury could find an agency relationship based on express contractual terms.[35]

Still, the language of a contract is not dispositive. Deutsche Bank argues that it did not exercise control over the everyday activities of servicers. [403] at 12–15. Plaintiffs introduce sufficient evidence of Deutsche Bank communicating with the servicers related to REO maintenance violations. [405] ¶¶ 50–58. On several occasions, Deutsche Bank sent memorandums to loan servicers addressing REO maintenance and servicing issues. [405] ¶¶ 37–41. Deutsche Bank sent a memo to "Securitization Loan Servicers" on July 28, 2010:

> The Trustee has received a number of inquiries and complaints from government officials and community groups about the physical condition of REO properties. Such inquiries and complaints also are receiving increasing attention from the media, law enforcement agencies, and courts. Under standard securitization documentation, loan servicers are expressly responsible for managing all aspects of the REO disposition process, including appropriate maintenance of REO properties. Failure to fulfill these responsibilities may expose the Trusts to financial losses, potentially depressing the value of Trust property and exposing the Trusts to legal and financial liability. Because title to REO properties typically includes the name of the Trustee institution, these failures also expose the Trustee to legal claims and reputational harm. To protect against such consequences, which are likely to give rise to indemnification claims against servicers, the Trustee urges servicers to exercise heightened diligence with respect to REO maintenance and disposition. In addition, we urge Servicers to engage property managers who will take proactive steps to protect REO properties, including when they are vacant for extended periods of time.

---

[35] To the extent that Deutsche Bank argues that an agency relationship does not exist down the chain because of Ocwen's contract with Altisource, [333] at 9, sufficient evidence in the record belies that argument. Some of the Governing Agreements contained language authorizing servicers to delegate its responsibilities, including through "subservicing agreements" between a servicer and subservicer. *See, e.g.,* [369-12].

[405] ¶ 41. Deutsche Bank also communicated directly with Ocwen about REO code violations. An email from a Deutsche Bank representative to Ocwen representatives in 2014 demanded answers for violations related to an REO property in Milwaukee:

> [The property] has 27 violations and Milwaukee's Department of Neighborhood Services (DNS) confirmed that this property was in a press release today by Mayor Barrett. The press release was regarding long-term vacant properties. DB needs to know:
>
> 1. What steps Ocwen is taking to resolve these violations?
> 2. What is the property's status: charge-off, foreclosure or reo?
> 3. Who at Ocwen and when will Ocwen be calling DNS to discuss next steps regarding the property? This needs to be done by next week. I can be on the call if you need me to be.

[405] ¶ 51; [353-1] at 13. Another email from a Deutsche Bank executive to Ocwen in 2017 demanded action related to an REO property in Ohio and specifically mentioned Altisource:

> [He] called me again this morning very frustrated and claiming negligence by DB, Ocwen and Altisource. [He] wants to talk to a stateside agent and claims that his reimbursement request for $1,000 has not been addressed. [He] stated that if his issues are not resolved today, he will walk away. Please have an agent call [him] today.

[353-1] at 21. Deutsche Bank downplays the significance of these emails as evidence of control over the manner of servicing activities. [403] at 14. It cites to *Kolchinsky v. W. Dairy Transp., LLC*, 949 F.3d 1010, 1013 (7th Cir. 2020), where the court found that a company's requirement that a truck driver "contact it at various times... including a daily status call" was insufficient to establish agency as a matter of law. The court noted in *Kolchinsky* that these requirements were plaintiffs' "strongest facts in support of an agency relationship," but it did not support a finding of control to the degree required in similar cases involving truck drivers. 949 F.3d at

119

1013–14. That case involved the application of Illinois law specific to independent drivers and the right to control the manner of delivery, and in any case, there's other evidence in this record to suggest that Deutsche Bank exerted control over maintenance conduct with the threat of enforcement. *See, e.g.*, [405] ¶ 41 (reminding servicers that "failures also expose the Trustee to legal claims and reputational harm… which are likely to give rise to indemnification claims against servicers"). Additionally, the emails related to meetings with Milwaukee's municipal officials suggest that third parties viewed Deutsche Bank as responsible for the servicers' maintenance conduct. [405] ¶ 51; *cf.* Restatement (Third) Of Agency § 2.01, cmt. c ("A principal's manifestation to an agent may be expressed in a form that is observable by third parties."). A jury could reasonably infer the existence of an agency relationship based on conduct when viewing these facts together.

In sum, there's sufficient evidence in the record for a jury to infer the existence of an agency relationship, whether by contract or conduct, between the Deutsche Bank defendants as principals and the servicer defendants as their agents. Summary judgment on the issue of Deutsche Bank's vicarious liability under the Fair Housing Act is denied. If a jury concludes that Ocwen and Altisource engaged in discriminatory conduct under § 3604(b), there is evidence in the record to allow it to further conclude that Deutsche Bank is vicariously liable for the servicers' violations committed in the scope of their servicing agreements.

Judge Leinenweber also left the door open for plaintiffs to establish direct liability by showing that Deutsche Bank held "incentives, sanctions, and remedial

tools that they could have used but chose not to." *NFHA II*, 2019 WL 5963633, at *10 (citing *Wetzel*, 901 F.3d at 856). The parties dispute the standard for direct liability. Deutsche Bank argues that plaintiffs must demonstrate "unusual supervisory control" to satisfy *Wetzel*. [403] at 18–19. In *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 77 (2d Cir. 2021), the Second Circuit found a landlord could not be held liable for tenant-on-tenant discrimination because, unlike the resident in *Wetzel* who lived in a residential community for older adults, the plaintiff did not allege facts giving rise to a plausible inference that the "defendant-landlord had unusual supervisory control over both the premises and the harassing tenants." But the Seventh Circuit did not articulate a standard of "unusual" supervisory control in *Wetzel*. It noted that "[c]ontrol in the absolute sense… is not required for liability" and recognized that a property owner's control could arise from contract or property law. *Wetzel*, 901 F.3d at 865–66. The standard under *Wetzel*, not *Francis*, is controlling.

Many of the facts that apply to the agency analysis are relevant to the question of control under *Wetzel*: Governing Agreements authorizing Deutsche Bank to enforce a default and terminate servicers either directly or with third-party consent; memorandums sent to loan servicers on REO property conditions and servicer compliance; directives by Deutsche Bank representatives to Ocwen to address municipal inquiries and remediate code violations. *See* [352] ¶ 14; [405] ¶¶ 41, 50. And the record is clear on what Deutsche Bank didn't do. Deutsche Bank admits that it never terminated Ocwen as a servicer for failing to maintain REO properties and that it never sought third-party consent to initiate the termination process. [405]

121

¶ 35. Together, these facts are sufficient to support an inference that Deutsche Bank had the requisite control to affect servicers' maintenance conduct yet failed to do so.

But focusing on the question of Deutsche Bank's ability to control servicer conduct sidesteps a key principle underlying *Wetzel*. Direct liability depends on a defendant's inaction in the face of known discriminatory conduct. "[W]e have said only that the duty not to discriminate in housing conditions encompasses the duty not to permit *known* harassment on *protected* grounds." *Wetzel*, 901 F.3d at 864 (emphasis in original). The court also drew from analogous Title IX cases holding schools directly liable for remaining "deliberately indifferent to known acts of student-on-student sexual harassment [when] the harasser is under the school's disciplinary authority." *Id.* In *Wetzel*, there was no question that management "had actual knowledge of the severe harassment" based on the plaintiff's sexual orientation. *Id.* Here, the evidence in the record shows Deutsche Bank was on notice of Ocwen's and Altisource's failure to maintain REO properties, but the record does not suggest that Deutsche Bank had knowledge that the servicers' maintenance conduct was based on neighborhood race. In situations where Deutsche Bank was put on notice of maintenance-related issues and acted on that information, the records at most reveal that Deutsche Bank was responding to complaints about REO property conditions and code compliance. *See* [405] ¶ 41 ("The Trustee has received a number of inquiries and complaints from government officials and community groups about the physical condition of REO properties."); ¶ 51 ("What steps [is] Ocwen is taking to resolve these violations?"); ¶ 53 ("I sent [Ocwen] a monthly report from the City of

Milwaukee regarding properties that either needed to be registered or has [*sic*] outstanding violations. Can you verify if you received this report and provide an update for the following properties?"). Plaintiffs present circumstantial evidence that the servicers' failure to maintain REO properties affected non-white neighborhoods more heavily than white neighborhoods, but that's not enough to infer Deutsche Bank's knowledge under a deliberate-indifference standard. The record may support a finding that Deutsche Bank had the ability to control Ocwen's and Altisource's maintenance conduct, was put on notice of servicers' maintenance failures, and failed to stop it—but it does not ultimately support an inference that Deutsche Bank failed to act based on *known* race discrimination by the servicers. The Deutsche Bank defendants are entitled to judgment as a matter of law on plaintiffs' theory of deliberate indifference to Ocwen's and Altisource's discriminatory conduct.

## VII.  Conclusion

Defendants' motion to dismiss for lack of standing, [429], is granted in part and denied in part. Plaintiffs lack standing to pursue injunctive relief, but they have standing to pursue monetary damages.

Defendants' motion to strike plaintiffs' statements of additional material fact, [391], is denied. Defendants' motion to strike Ayres's November Declaration, [406], is granted. Defendants' motions to exclude the expert testimony of Pamela Kisch, [303], Albert Poche, [305], Deavay Tyler, [318], Ian Ayres, [323], Elizabeth Korver-Glenn, [326], and Timothy Guetterman, [327] are granted in part and denied in part. Defendants' motion to exclude Stacy Seicshnaydre's testimony, [307], is denied

without prejudice and subject to renewal if necessary. Plaintiffs' motions to exclude, [311], are denied without prejudice and subject to renewal if necessary.

The Deutsche Bank defendants' motion for summary judgment, [315], is granted in part and denied in part. The joint motion for summary judgment, [332], is granted in part and denied in part. Plaintiffs' only remaining claim is under § 3604(b), which they may pursue under either disparate-impact (excluding perpetuation of segregation) or disparate-treatment theories of liability, and against Deutsche Bank under vicarious liability.

ENTER:

Manish S. Shah
United States District Judge

Date: March 31, 2025