IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; LOUISIANA FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA.<br><br>    Plaintiffs,<br><br>    v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>    Defendants. | Case No. 18 CV 839<br><br>Judge Manish S. Shah<br><br>Jury Trial Demanded |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR CLARIFICATION ON STANDING AND DAMAGES ISSUES AND DEFENDANTS' RENEWED *DAUBERT* MOTION**

**INTRODUCTION**

As demonstrated below, Defendants' Motion for Clarification on Standing and Damages Issues and Defendants' Renewed *Daubert* Motion are without merit and should be denied.

As to standing, Defendants ask the Court to "clarify" its March 31, 2025 Memorandum Opinion and Order (the "March 31 Opinion") regarding standing. The Court unequivocally held that Plaintiffs have Article III standing. Yet, according to Defendants, the Court really meant that Plaintiffs do not have standing to pursue their Section 3604(b) claim, which the Court held that Plaintiffs may pursue. Essentially, Defendants suggest that the Court's right hand was unaware of what its left hand was doing regarding standing, and its left hand was wrong. (Def. Br pp. 7-11) To the contrary, the Court's finding that Plaintiffs have an Article III injury-in-fact (establishing standing) is completely consistent with the Court's determination as to which claims may proceed to trial. Each claim is based on the same factual predicate: Defendants' discriminatory maintenance and marketing of REO properties in minority neighborhoods resulted in inferior terms and conditions of housing for those properties and neighborhoods, which harmed Plaintiffs' counseling and referral activities, among other impairments.

Defendants' arguments for limiting damages fare no better. Plaintiffs' frustration of mission damages are noneconomic damages that will ultimately be assessed by a jury. During discovery, Plaintiffs produced voluminous information from each Plaintiff organization regarding the myriad ways in which Defendants' conduct harmed their missions, programs, and activities. While that information fully satisfied Plaintiffs' discovery obligations, in response to Defendants' requests, Plaintiffs produced reports from their damages expert identifying and describing a framework that a jury could use to consider frustration of mission damages and suggesting aggregate ranges of potential reasonable awards. Defendants' present attempt to exclude these opinions and argue that no damages can be recovered is unconvincing sleight of hand. Similarly,

1

Defendants' contentions that the Court's dismissal of Plaintiffs' secondary claims limits the scope of damages that jury can award under Section 3604(b) are superficial and unfounded.

Finally, Defendants' request that the Court revisit their *Daubert* motion regarding Professor Seicshnaydre, which becomes even less persuasive when viewed in light of Defendants' misguided arguments about standing and damages generally, is without merit and should be denied.

I. **THE COURT'S MARCH 31 RULING DEFINITIVELY RESOLVED STANDING**

**A. The Court's Opinion on Standing Was Well-Reasoned and Resolved Standing.**

In the March 31 Opinion regarding standing, the Court began by underscoring, "I do not read *Hippocratic Medicine* as upending the landscape of standing. *Havens* tells us what type of organizational injury is legally cognizable, and *Hippocratic Medicine* tells us what's not." (Dkt. 442, March 31 Opinion at 16). Based on a record replete with factual evidence regarding the impairment of Plaintiffs' core activities, the Court concluded that Plaintiffs have standing to pursue their claims. The Court presented its analysis in the context of Plaintiffs' claim under 28 U.S.C. §3604(a) ("Section 3604(a)"), focusing on undisputed Plaintiff-wide consumer counseling and referral services - the type of services squarely considered in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). (*Id.* at 19). Quite understandably, and considering that the facts underlying all of Plaintiffs' claims are basically identical, and Defendants never suggested that there was anything unique about standing between or among Plaintiffs' different claims, the Court did not separately analyze standing for each legal claim asserted. Likewise, the Court did not consider Plaintiffs' substantial additional evidence concerning their core activities impacted by Defendants' discriminatory REO maintenance and marketing conduct other than Plaintiffs' counseling services. (Dkt. 435, Pltfs' Resp. and Dkt. 435-1, App. A to Plaintiffs' Response to Defendants' Motion to Dismiss for Lack of Article III Standing, with record cites)

2

Notwithstanding that the Court's substantive view of standing as presented in the March 31 Opinion is crystal clear, Defendants launch another attempt to obtain dismissal by repackaging their rejected standing arguments as somehow succeeding with regard to Plaintiffs' Section 3604(b) claim because Plaintiffs' claim under Section 3604(a) was dismissed. These arguments are inconsistent with the Court's March 31 Opinion and completely unfounded.

### B. The Court's Rationale for Finding that Standing Exists Applies Directly to Plaintiffs' Claim Under Section 3604(b).

In finding that standing exists, the Court referenced Plaintiffs' evidence that their counseling services were impaired by Defendants' poor REO maintenance and marketing as housing stock for the communities Plaintiffs serve was reduced. (Dkt. 442, March 31 Opinion at 18-19) While the Court dismissed Plaintiffs' claim under Section 3604(a), that was on the basis that Plaintiffs had not met the narrow technical statutory requirements under that subsection, requiring evidence that specific dwellings were made "truly unavailable" (i.e., a showing that specific dwellings simply could not be purchased). In addition, the Court clearly distinguished the requirements of Section 3604(a) from the more commonly understood meaning of "unavailable":

> Exterior maintenance deficiencies or signs of neglect may reduce the availability of desirable housing, but that doesn't render housing "unavailable" *under the meaning of §3604(a)*. (*Id*. at 90) (emphasis added)

> . . .plaintiffs separately pursue a claim for defendants' failure to maintain and repair properties under §3604(b), which does not require *a showing of unavailability*. *See* 42 U.S.C. §3604(b); 29 C.F.R. §100.65(b)(2). Whether a prospective homeseeker failed to find a home because a property was *truly made unavailable under the meaning of §3604(a)* goes to the merits of plaintiffs' legal theory [and] I do not scrutinize the merits of that legal theory to evaluate plaintiffs' standing. (Dkt. 442, March 31 Opinion at 19-20; emphasis added)

Clearly, the Court's dismissal of Plaintiffs' Section 3604(a) claim in no way undermines standing with respect to Plaintiffs' Section 3604(b) claim. The Court did not find that a reduction in housing stock for the communities served by Plaintiffs did not occur as a result of

Defendants' discriminatory REO maintenance and marketing, or that this did not cause an impairment of Plaintiffs' activities.  *The Court's exact reasoning regarding standing applies to Plaintiffs' Section 3604(b) claim*.   How could it not?  Plaintiffs did not allege one set of underlying facts concerning Defendants' discriminatory conduct or its effects on their missions in connection with their Section 3604(b) claim that was different from the underlying facts in connection with their Section 3604(a) claim.

Moreover, as the Court noted, Section 3604(b) provides a broad cause of action not subject to the technical requirements under Section 3604(a), (Dkt. 442, March 31 Opinion at 19), and one which easily extends to Plaintiffs' claims and alleged injuries.  *See also* 29 C.F.R. 100.65(b)(2) (regulation related to Section 3604(b) prohibiting discrimination in the terms, conditions or privileges of the sale or rental of a dwelling, including failing or delaying maintenance or repairs of such dwellings on account of race) *See also e.g.*, Bloch v. Frischholz, 587 F.3d 771, 779 (7th Cir. 2009)("Subsection (b)'s language is broad, mirroring Title VII); Wetzel v. Glen St. Andrew Living Cmty., LLC, 901 F.3d 856, 861, 866-867 (7th Cir. 2018) (Section 3604(b) protects against discrimination "in the provision of services or facilities" in connection with a sale or rental).  In short, Defendants' attempt to convince the Court that dismissal of Plaintiffs' Section 3604(a) claim negates the Court's ruling on standing never gets to first base.

### C. Plaintiffs Have Also Demonstrated Standing Under Section 3604(b) Based on Defendants' Impairment of Their Other Core Activities.

Plaintiffs' response to Defendants' previously filed Motion to Dismiss regarding standing, including in Plaintiffs' Appendix A, (Dkt. 435 and 435-1), extensively documented and described the evidence in the record of how their core activities extending *beyond* counseling and referral services were also "perceptibly impaired" by various aspects of Defendants' conduct.  Because

4

the Court determined that Plaintiffs established standing in view of the alleged impact of Defendants' conduct on their counseling and referral services, the Court concluded that "I need not decide whether these [other] injuries are sufficient to support standing." (Dkt. 442, March 31 Opinion at 20-21)

While Plaintiffs believe that the Court's prior analysis of standing requires no additional refinement or elaboration, we briefly summarize some additional core activities that Plaintiffs engaged in (detailed in Plaintiffs' response to Defendants' previously filed motion) that were negatively impacted by discriminatory maintenance and marketing in violation of Section 3604(b), thereby further establishing standing:

      **1. Neighborhood Stabilization Activities**. Plaintiffs engage in boots on the ground activities to support and revitalize communities, including the investment of time and money in programs such as renovation of blighted properties, repurposing of vacant lots and beautification projects. Defendants' discriminatory maintenance practices impaired these programs by increasing neighborhood blight in the exact areas Plaintiffs were seeking to improve. (Dkt. 435, Pltfs' Resp. at 8-9; Dkt. 435-1, App. A)

      **2. Homeownership Promotion**. Plaintiffs undertake homeownership promotion activities designed to increase housing opportunities and help people retain their homes. Defendants' conduct impaired these activities by decreasing housing stock, stigmatizing neighborhoods and devaluing homes in minority neighborhoods. (Dkt. 435, Pltfs' Resp. at 8-9; Dkt. 435-1, App. A)

      **3. REO-Specific Training and Education**. Faced with the severe harm caused by Defendants' REO discrimination, Plaintiffs conducted activities to train and educate industry stakeholders, local governments and housing providers regarding REO issues. Defendants continued discriminatory treatment of REOs in minority neighborhoods diluted and diminished the effects of these activities. (Dkt. 435, Pltfs' Resp. at 8-9; Dkt. 435-1, App. A)

Based on all of the above, Defendants' arguments that this Court's March 31 Opinion necessitates a finding that Plaintiffs lack standing to pursue their Section 3604(b) claim are unfounded and should be denied.

**II.**    <u>**DEFENDANTS' ARGUMENTS CONCERNING PROFESSOR SEICSHNAYDRE AND FRUSTRATION OF MISSION DAMAGES ARE BASELESS.**</u>

Defendants make a scattershot series of loosely related and equally baseless arguments regarding frustration of mission of damages, and restate their request that the Court revisit and

grant Defendants' *Daubert* motion relating to Professor Seicshnaydre. Each of these arguments should be rejected.

### A. Plaintiffs Are Not Precluded From Seeking Frustration of Mission Damages.

Defendants suggest that Plaintiffs are precluded from seeking frustration of mission damages because although Professor Seicshnaydre's expert report provides a framework for calculating such damages and a suggested range of damages among the aggregate Plaintiffs, her report does not estimate these damages individually for each Plaintiff organization. In addition to the fact that this argument was not mentioned in any of Defendants' hundreds of pages of prior summary judgment filings and can be rejected on that basis alone, Plaintiffs respond below to the substance of Defendants' new contention, beginning with a brief discussion of the nature of frustration of mission damages.

A fair housing organization may suffer redressable injury to its "non-economic interest in encouraging open housing," or impairment of frustration of its organizational mission. *Havens,* 455 U.S. at 379 n.20. *See also Fair Hous. Ctr. of Cent. Ind., Inc. v. M&J Mgmt. Co.*, No. 1:22-CV-00612-TAB-JPH, 2024 WL 3859997, at *3 (S.D. Ind. Aug. 19, 2024); *Fair Hous. Ctr. of Cent. Ind., Inc. v. Smitley*, No. 1:16-CV-880-WTL-DML, 2018 WL 3237860, at *2 (S.D. Ind. July 3, 2018). As described by Professor Seicshnaydre in her report:

> Frustration of mission damages are a distinct form of compensatory damages available to an organizational plaintiff…. Frustration of mission damages… function like other forms of *non-pecuniary losses* requiring a more fact-intensive assessment. Similar to mental anguish, pain and suffering, humiliation, and loss of reputation, frustration of mission damages may not be susceptible to precise calculation, but this does not render them beyond measurement.... Like other forms of non-pecuniary damages, frustration of mission damages may substantially exceed economic damages like diversion of resources. The purpose of compensatory damages is to make the Plaintiffs whole, and frustration of mission damages are integral in fulfilling this mission. (Dkt. 308-1, 9-14-22 Seicshnaydre Expert Report at 20)

6

Like other strains of non-economic damages, frustration of mission damages are not susceptible to precise "calculation," and when the scope of non-economic damages arises in discovery, Courts "will not require Plaintiffs to provide such a computation." *Smith v. City of Chicago*, No. 15 CV 3467, 2020 WL 13599000, at *4 (N.D. Ill. Nov. 4, 2020) (citing cases). Such compensatory damages "are necessarily vague and are generally considered a fact issue for the jury…and may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C). *Williams v. Trader Publ'g, Co.*, 218 F.3d 481, 486 n.3 (5th Cir. 2000)(citation omitted).

Here, Defendants argue that because (a) Plaintiffs' corporate representatives did not quantify frustration of mission damages at their depositions and some Plaintiffs indicated expert testimony would be provided on the subject, and (b) Professor Seicshnaydre's report provided a framework for these damages and considered them on an aggregate basis, then (c) Plaintiffs are precluded from recovering such damages. For several reasons, Defendants are wrong.

First, as noted in the cases cited above, unlike pecuniary damages (*e.g.*, lost sales, lost income, lost benefits), courts recognize that determining damages like frustration of mission are fact issues for the jury not reasonably contemplated under discovery provisions. It would hardly inform or facilitate the jury's calculation of such damages if each Plaintiff at their deposition gave a monetary amount for their frustration of mission damages.[1]

> Second, in response to Defendants' discovery requests, Plaintiffs produced a *mountain* of evidence concerning their operations, missions, programs and services that relate to frustration of mission damages. For example, each Plaintiff produced lengthy, particularized and detailed initial and amended sworn interrogatory responses regarding specific activities and specific alleged harms suffered as a result of Defendants' conduct. (Dkt. 369-5 PageID 29336, Plaintiffs'

---

[1] In contrast, as to the pecuniary diversion of resources damages claimed, each Plaintiff organization provided a detailed diversion of resources log identifying each person involved, the tasks they performed, the dates the tasks were performed and the person's billing rate. Defendants fail to mention this fact or that they had the opportunity to depose each organization regarding its diversion log.

7

> 6-28-2022 Third Amended Supplemental Interrogatory Responses to Defendants' Joint Interrogatories, Ex. D, pp. 1-150, ECF PageID 29398-29547 and Ex. E, pp. 1-47, ECF PageID 29548-29594  Plaintiffs each also produced thousands of pages of documents concerning their programs, including reports on their activities in neighborhoods and communities to advance equal housing markets. *See e.g.*, Dkt. 361, 56.1 PSAF §VIII, pp. 107-133.  Each Plaintiff also produced (at least) a Rule 30(b)(6) corporate representative to testify about their organizations, programs, services and involvement in the investigation of Defendants. (*Id*.) Plaintiffs synthesized this information in their initial and amended Rule 26(a)(1) Disclosures, which clearly described Plaintiffs' frustration of mission damages sought and, summarized the information in the very detailed interrogatory answers and other documentary evidence Plaintiffs provided regarding several aspects of their missions and programs that were harmed by Defendants' conduct.

(*Ex. 1, 26(a)(1) at pp. 10-14; See also,* Dkt. 369-5, Plaintiffs' 6-28-22 Third Amended and Supplemental Interrogatory Responses to Defendants' Joint Interrogatories, Ex. D, pp. 1-150, ECF PageID 29398-29547 (each regional Plaintiff) and Ex. E, pp 1-47, ECF PageID 29548-29594 (NFHA))

Third, Plaintiffs retained an expert witness who presented and analyzed detailed information concerning Plaintiffs' missions, operations and activities and offered opinions related to the determination of frustration of mission damages.  Professor Seicshnaydre's September 14, 2022 report discusses the work and missions of FHOs in detail, and proposes a framework that could aid a jury in understanding and assessing impacts of Defendants' conduct resulting in non-pecuniary damages. (Dkt. 308-1, 9-14-22 Seicshnaydre Report)

Fourth, in response to Defendants' request during discovery for a monetary estimate of Plaintiffs' frustration of mission damages (not focused on particular monetary estimates per Plaintiff), Plaintiffs reiterated that assessing non-economic damages was for the jury at trial, but Plaintiffs provided a package of updated damages information, including (a) supplementation of discovery responses, (b) amended Rule 26(a)(1) disclosures, and (c) a supplemental report from Professor Seicshnaydre. (Ex. 1, Soule 11-18-22 cover email to Defendants, including updated 11-

8

18-22 26(a)(1) disclosure and Dkt. 308-2, 11-18-22 Seicshnaydre Supplemental Expert Report) In addition, pursuant to Defendants' request, Professor Seicshnaydre's supplemental report applied the framework for frustration of mission damages that she proposed in her initial report to the Plaintiffs' organizations, missions and activities, arriving at an aggregate "estimate" of frustration of mission damages, acknowledging the complexity at hand and the reasonable "range" a "fact finder" "could award".[2] (Dkt. 308-2, 11-18-22 Seicshnaydre Supp. Report, *Id.* at 9)

Plaintiffs' November 2022 updated Rule 26(a)(1) disclosure (following the parties' Rule 37 conference and correspondence specifically referenced therein) reiterated other detailed damages-related information and carefully did not characterize Professor Seicshnaydre's supplemental report as limiting the frustration of mission damages that might be awarded by a jury at trial:

> Plaintiffs' damages resulting from the conduct of the Defendants in this litigation have further been described in the Expert Report submitted by Stacy Seicshnaydre on September 14, 2022, as supplemented on November 18, 2022, and incorporated herein by reference.
>
> . . . . It is estimated that, at a minimum and based upon very conservative assumptions, the range of damages attributable to these Defendants and to impairment of mission yields a minimum range of $28,000,000 to $30,000,000. Plaintiffs expect that a jury award of substantially greater damages for impairment of mission and lost opportunities

---

[2] On the subject of her supplemental report and frustration of mission damages being allocated amongst particular Plaintiffs, Professor Seicshnaydre carefully explained at her deposition that, in view of the joint nation-wide investigation and harm in this case, she was comfortable approaching frustration of mission in her Supplemental Report on a nationwide basis. (Dkt. 369-14, Seicshnaydre Dep., pp. 116-117, ECF PageID 33077) Professor Seicshnaydre testified that her estimate was "designed to be helpful to a jury to address the entirety of the discrimination that defendants have engaged in occurring across 30 metro areas and 20 fair housing organizations." Professor Seicshnaydre further testified, "this is a national picture that …the jury will be asked to address, a national footprint and discrimination occurring on a national level. So it will be up to the jury to decide – perhaps…a jury may decide to make some adjustments to this methodology, but it is fair and reasonable to provide the jury some concrete ability to determine how to place a value on programs and services necessary to repair the harm." (*Id.* at 193-204 )

> could readily be justified based upon the facts in the record and the conduct of all of the defendants.
>
> The estimate of damages for impairment of mission and lost opportunities in this litigation against these Defendants is exclusive of damages for (a) diversion of resources to be updated and presented at trial, (b) punitive damages, (c) Plaintiffs' attorney's fees expended through the final termination of the litigation, (d) expenses and other categories of damages and compensation recoverable under the Fair Housing Act.
>
> Evidence adduced through discovery supports punitive damages awards against all named Defendants, to be sought at trial.
>
> Plaintiffs specifically reserve the ability to seek at trial the maximum amount of damages available in all of the above described categories.

(*See* Ex. 1, Amended 26(a)(1) Disclosures, pp. 13-14)

Significantly, Defendants did not respond or ask to extend Rule 37 discussions about any category of damages after Plaintiffs' November 18, 2022 supplemental production. Presumably, if Defendants had genuine concerns about frustration of mission damages, they could have requested another Rule 37 conference.[3]

In the wake of all the above information and evidence, and considering the nature of frustration of mission damages, it is baseless for Defendants to contend that because Professor Seicshnaydre's November 18, 2022 Supplemental Report did not contain specific estimates for frustration of mission for each Plaintiff separately, Plaintiffs should be barred from seeking any frustration of mission damages. Likewise, since there is no basis for excluding Plaintiffs' claims

---

[3] The only case cited by Defendants in support of their argument, *Taylor Made Express, Inc. v. Kidd*, No. 21 CV 2903, 2024 WL 4835900 at *2 (N.D. Ill. Nov. 20, 2024)(Alonso, J.) is completely inapposite. There, the plaintiff corporation claimed *pecuniary* damages relating to overpayment of salary incurred as a result of a breach of fiduciary duty. Unlike this case, the Plaintiff in *Taylor* promised its expert would "itemiz[e] all damages." (*Id.* at *1) Also unlike here, the Plaintiff in that case offered "no other grounds or evidence for damages." (*Ibid*). When the expert in *Taylor* provided a lackluster undetailed "report," the Court excluded Plaintiff's damages expert's "calculations" because he did not explain why he applied certain adjustments and values, either in his report or at his deposition. (*Id*. at *2) In addition, after the "calculations" were excluded, the Plaintiff did not seek to present a new expert opinion regarding damages, or to otherwise amend its damages-related disclosures, but waited until "the final weeks before trial" to seek presentment of a completely new damages theory. (*Ibid*)

10

for frustration of mission, it follows that Defendants' related argument that Plaintiffs no longer have standing is equally unfounded.

### B. There is No Basis for the Court to Find That Plaintiffs' Frustration of Mission Damages Have Been Diminished or Eliminated.

As demonstrated at the outset, the Court's March 31 Opinion finding that Plaintiffs have standing applies to their Section 3604(b) claim and Defendants' arguments to the contrary are without merit. Defendants also contend in their new filing that Plaintiffs' recoverable damages under Section 3604(b) should be limited because of the dismissal of their secondary claims. These arguments are similarly unfounded.

### 1. The Factual and Legal Basis for Determining Plaintiffs' Frustration of Mission Damages Remains Unchanged.

Defendants make a facially implausible argument that Plaintiffs' frustration of mission damages have been severely reduced or eliminated because the Court dismissed Plaintiffs' Section 3604(a) claim and their claim for perpetuation of segregation. Defendants similarly suggest that the unlawful conduct alleged in connection with Plaintiffs' Section 3604(b) claim is disconnected from any damages for impairment of their missions. To the contrary, if liability is proven at trial, the compensable effects of Defendants' discriminatory REO maintenance and marketing in the affected neighborhoods on Plaintiffs' programs, services and missions are the same under Section 3604(b) as under the other FHA subsections Plaintiffs alleged that Defendants violated.

Regardless of the legal framework under which Plaintiffs' claims go to trial, the evidence regarding Defendants' conduct and its effect on Plaintiffs' missions are essentially unchanged. *Neither Plaintiffs nor their damages expert ever raised or conceived damages to be different whether sought under one or other provisions of the FHA or legal theories.* The discriminatory

11

conduct animating all the claims remains the same and the impairment of Plaintiffs' missions is the same.

Moreover, it would be ironic at best if proceeding to trial on Section 3604(b), the much *broader* FHA provision, resulted in eliminating *all* aspects of Plaintiffs' frustration of mission activities (whether or not referenced in their expert's proposed damages framework). *See e.g.*, *Wetzel*, 901 F.3d 856 at 861 (discriminatory harassment interfering with use and enjoyment of home actionable under Section 3604(b)); *Bloch*, 587 F.3d at 779-781 (constructive eviction actionable under Section 3604(b); *Huskey v. State Farm Fire & Cas. Co.,* No. 22 C 7014, 2023 WL 5848164, at *5 (N.D. Ill. Sept. 11, 2023) (Kendall, J.) ("'Subsection (b)'s language is broad' -- covering both pre- and post- acquisition housing discrimination")(citation omitted); *HOPE, Inc. v. Lake Greenfield Homeowners Ass'n,* No. 16-5422, 2017 WL 1493708, at *5 (N.D. Ill. Apr. 26, 2017)(Pallmeyer, J.) (Section 3604(b) covers Homeowners Association's attempt to prevent owner from using land as they had planned); *Mehta v. Beaconridge Improvement Ass'n*, 432 F. App'x 614, 616-617 (7th Cir. 2011)(HOA "failing to provide maintenance services or … limiting the use of privileges, services, or facilities associated with the homeowner's dwelling" are actionable under Section 3604(b)).

2. <u>Frustration of Mission Damages Should be Decided by the Jury.</u>

Defendants ask the Court to wade in, analyze and exclude various categories of damages without the benefit of any trial testimony regarding the scope and effect of Defendants' discriminatory conduct. This is a completely backwards approach to damages.

In addition, Defendants' exclusive focus on Dr. Seicshnaydre's report incorrectly assumes that evidence of Plaintiffs' frustration of mission damages can *only* be presented to the jury through an expert or not at all, and/or through their expert's *supplemental report* or not at all, which is not correct. While it would be extremely efficient to present this information at trial

through a combination of testimony from Plaintiffs and their expert, Plaintiffs are not limited at trial by the organization of the expert report, and there are no grounds for a categorical reduction in Plaintiffs' damages on that basis ahead of trial.

      3.  <u>Defendants' Superficial Discussion of Damages Categories is Baseless.</u>

In their brief, Defendants attempt to exclude whole categories of damages based on out of context snippets from Plaintiffs' expert report and mischaracterize Plaintiffs' activities and the nature of impairment by Defendants' conduct. Plaintiffs respond briefly *in seriatim* below:

    (i.)  **Impairment of broader mission of overcoming neighborhood stereotypes to achieve housing choice and integration.** (Dkt. 308-1, 9-14-22 Seicshnaydre Report, pp. 3-12, 20-23; Dkt. 308-2, 11-18-22 Seicshnaydre Supp. Report, pp. 2-4). Defendants' discriminatory REO conduct causing harm to this aspect of Plaintiffs' broader missions relates to Section 3604(b) because it centrally impedes Plaintiffs' services that promote housing choice. (Id.) Defendants' incorrect characterization at Def Br p. 4, §i., referencing a partial discussion of "neighborhood-based discrimination that perpetuated neighborhood stereotypes that derailed the FHO's broader mission," does not reference an expert discussion of liability under a legal theory of "perpetuation of segregation," merely because the word "perpetuated" was used.

    (ii.)  **Impairment of programs designed to train and marshal the housing industry to market and invest in neighborhoods equally.** (Dkt. 308-1, 9-14-22 Seicshnaydre Report, pp. 3-12, 20, 24; Dkt. 308-2, 11-18-22 Seicshnaydre Supp. Report, pp. 2-3, 4-5). Defendants' discriminatory REO maintenance and marketing conduct causing harm to Plaintiffs' industry training and marshaling activities relates to Section 3604(b) because every aspect of Defendants' conduct thwarted these activities of Plaintiffs and directly opposed Plaintiffs' remedial efforts – including those directed at these very Defendants. Defendants conflate and misuse the standing analysis term "issue advocacy" to describe these activities, when "issue advocacy" means bringing litigation to advance only "issues," not to address specific organizational harms, which is the case here.

    (iii.)  **Impairment of services designed to increase access to homeownership and promote equalization/stabilization of neighborhoods.** (Dkt. 308-1, 9-14-22 Seicshnaydre Report, pp. 3-12, 20, 25-27; Dkt. 308-2, 11-18-22 Seicshnaydre Supp. Report, pp. 2-3, 5-7) Defendants' discriminatory REO conduct causing harm to this type of Plaintiffs' core services directly implicates Section 3604(b) because this type of core activity addresses the effects of discrimination in the terms and conditions of housing and provision of maintenance and marketing services that cause neighborhood inequality and destabilization of neighborhoods. Defendants also make misguided attempts to call this "issue advocacy" (from the standing context) and rehash their complaints about the aggregation of Professor Seicshnaydre's damages estimate. At trial, each Plaintiff, alone

13

or with the aid of the expert, will present evidence of their non-pecuniary compensatory damages (frustration of mission) for the jury to consider.

        (iv.) **Diminishment of past complaint-based and consumer outreach services.** (Dkt. 308-1, 9-14-22 Seicshnaydre Report, pp. 3-12, 20, 27; Dkt. 308-2, 11-18-22 Seicshnaydre Supp. Report, pp. 7-8). Defendants' discriminatory REO conduct causing harm to this aspect of Plaintiffs' core services also falls under Section 3604(b) because discriminatory REO maintenance and marketing pattern and practice conduct: (a) diminished Plaintiffs' efforts to increase fairness in housing markets over time, (b) reduced the capacity of FHO testing programs to identify the nature and extent of discrimination across housing sectors, (c) reduced the capacity and effectiveness of educational and outreach programs to raise awareness and increase fair housing literacy among consumers, and (d) reduced the capacity and effectiveness of counseling programs to assist housing consumers in obtaining and maintaining housing and homeownership opportunities. None of these matters are, as Defendants argue, mere "issue advocacy."

        (v.) **Lost opportunities and special initiatives.** (Dkt. 308-1, 9-14-22 Seicshnaydre Report, pp. 3-12, 2, 28-30; Dkt. 308-2, 11-18-22 Seicshnaydre Supp. Report, pp. 8-9). Defendants' REO conduct causing harm to this aspect of Plaintiffs' services relates to the ways discriminatory maintenance and marketing conduct in neighborhoods under §3604(b) impeded Plaintiffs' opportunities, pathways for increasing their effectiveness, and impacted various special initiatives. Again, Defendants wrongly attempt to characterize the detailed activities that each Plaintiff engaged in as "issue advocacy" rather than as core Plaintiff activities.[4]

Based on all of the above, Defendants' arguments regarding Professor Seicshnaydre and Plaintiffs' frustration of mission damages are baseless and should be rejected.

## III. THE COURT SHOULD REJECT DEFENDANTS' REQUEST TO REVISIT DEFENDANTS' *DAUBERT* MOTION AS TO PROFESSOR SEICSHNAYDRE.

In its March 31 Opinion, the Court held that "Because determining damages is not essential to resolving liability at this stage, I deny defendants' motion to exclude plaintiffs' damages expert, Stacy Seicshnaydre, without prejudice to renewal if necessary." (Dkt. 442, March 31 Opinion at 33) In further support of this determination, the incomplete and dubious

---

[4] Finally, although Defendants argued for dismissal of all of Plaintiffs' claims in their summary judgment motions and included lengthy and various attacks on Plaintiffs' damages, they did not argue that certain legal theories had certain specific impacts on Plaintiffs' damages. Such arguments raised now should be deemed waived. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency*, 845 F.3d 313, 321-322 (7th Cir. 2017). Defendants similarly failed to raise such a concept in their *Daubert* motion.

information reflected in Defendants' Renewed Motion counsels against resolving particular damages issues before trial. When and if the Court determines that it is appropriate to address Defendants' *Daubert* motion, for the reasons previously shown by Plaintiffs in their initial response to that motion and the additional grounds demonstrated in the instant response to Defendants' request to renew, Defendants' motion should be denied and Professor Seicshnaydre should be allowed to testify.

## **CONCLUSION**

For all the foregoing reasons, Defendants' Motion for Clarification on Damages Issues and Standing and Renewed *Daubert* Motion should be denied.

Respectfully submitted,

/s/ Jennifer K. Soule

| | |
|---|---|
| Jennifer K. Soule | Lila Miller |
| James G. Bradtke | Yiyang Wu |
| Kelly K. Lambert | Jennifer Klar |
| Steven P. Schneck | *Relman Colfax PLLC* |
| *Soule, Bradtke & Lambert* | 1225 19th Street, N.W., Ste. 600 |
| PO Box 231 | Washington, DC 20036 |
| Geneva, IL 60134 | |
| | |
| Janell Byrd-Chichester | Stephen M. Dane |
| Morgan Williams | *Dane Law LLC* |
| *National Fair Housing Alliance* | P.O. Box 1011 |
| 1331 Pennsylvania Ave, NW, Ste. 650 | Perrysburg OH 43552 |
| Washington, DC 20004 | |

Dated: May 29, 2025

15