UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., <br><br> Defendants. | No. 18 CV 839 <br><br> Judge Manish S. Shah |

ORDER

Defendants' motion for clarification, understood to be in part a renewed motion to dismiss for lack of standing, [453] at 8–12, is denied. Defendants' motion for clarification on the statistical scope issue, [451], and to file a reply brief, [456], are granted. The court considered the reply brief attached to defendants' motion and it need not be filed as a separate entry on the docket. Defendants' renewed motion to exclude Stacy Seicshnaydre's expert testimony, [452], is granted.

STATEMENT

I assume familiarity with the earlier order granting in part and denying in part defendants' joint motion for summary judgment, defendants' motions to exclude expert testimony, and the Deutsche Bank defendants' motion for summary judgment on vicarious liability. *See Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18-cv-839, 2025 WL 975967 (N.D. Ill. Mar. 31, 2025).

In advance of mediation, defendants seek clarification on plaintiffs' standing to bring the remaining § 3604(b) claim; renew their motion to exclude the testimony of plaintiffs' damages expert Stacy Seicshnaydre; and seek clarification on a statistical sampling issue related to REO properties in plaintiffs' investigation. [338], [451], [452].[1]

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. In the case of citations to depositions, I also use the deposition transcript's original page numbers.

I.  **Motions for Clarification**

   A.  **Article III Standing**

   Now that plaintiffs' claim under § 3604(a) is dismissed, defendants say, "the alleged injury that formed the basis for standing is gone." [453] at 9.

   Defendants continue to conflate standing with the merits. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006) ("Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief—a merits-related determination.") (citation omitted); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–27 (2021) (distinguishing between "a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law" and "a plaintiff's suffering concrete harm because of the defendant's violation of federal law"). Failure to establish an essential element of a statutory cause of action doesn't mean the Article III injury drops out after the claim is dismissed. *See Owsley v. Gorbett*, 960 F.3d 969, 971 (7th Cir. 2020) ("The district judge evidently believed that [plaintiff's claim] [was] not worth anything, but that concerns the merits rather than subject-matter jurisdiction. Otherwise[,] every losing suit would be dismissed for lack of jurisdiction.") (internal citation omitted).

   Defendants also misconstrue my ruling on standing to be confined to plaintiffs' § 3604(a) claim; they argue that impairment to counseling and referral services based on housing unavailability under § 3604(a) does not establish injury in fact under § 3604(b) for discrimination in the provision of maintenance and repair services. [453] at 9. A plaintiff bears the burden of establishing standing for each form of relief sought (i.e., monetary or injunctive relief); and, in cases where statutory provisions give rise to different kinds of injuries, they must separately establish injury in fact for each statutory claim. *See Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 663 (7th Cir. 2015). All plaintiffs pursue monetary relief and their claimed injuries in fact—impairment to core counseling and referral services—are common across all three statutory causes of action; though, as I pointed out, the proof required to succeed on the merits of each claim varies. *See NFHA III*, 2025 WL 975967, at *8.

   An illustration of that distinction in the fair housing context is *Village of Bellwood v. Dwivedi*, a racial-steering lawsuit brought by a municipality, fair housing organization, and testers against real estate brokers under §§ 3604(a), (b), and (d) of the Fair Housing Act. 895 F.2d 1521, 1525 (7th Cir. 1990). The court found that the fair housing agency demonstrated injury in fact based on "deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Id.* at 1526. As for the tester-plaintiffs, "[n]o misrepresentations were proved," but "the logic of *Havens* embraces discrimination in the provision of services, forbidden explicitly by section 3604(b) and implicitly by section 3604(a)." *Id.* at 1527. Here too, plaintiffs' injuries relate to different statutory causes of action, but the nature of the

2

injury itself is the same under §§ 3604(a), (b), or 3605. *See id.* at 1529 (explaining how the same racial steering conduct could violate §§ 3604(a), (b), or (d)); *see also* 13A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3531 (3d ed.) ("The focus is on the party, not the claim itself," though the analysis "may take account of the relationship between the party and the claim being advanced.").

There is no question that the plaintiff organizations were aware of—and responded to—problems with Deutsche Bank-owned properties in their respective communities. *See NFHA III*, 2025 WL 975967, at *7–*8 (citing *Common Cause Indiana v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019)). That the properties were not "unavailable" under the meaning of § 3604(a) does not mean the plaintiffs were not injured by discriminatory services under § 3604(b).

### B. Statistical Scope

Defendants ask that I clarify whether "[p]laintiffs' inspection results can[] be extrapolated beyond the specific properties inspected to draw conclusions about properties titled to a DB Trustee more broadly." [451-1] at 3. As plaintiffs point out, [455] at 7, this issue goes to liability rather than the scope of damages, which are not tied to specific REO properties. *See below* II.C.

The parties' experts disputed sampling methodologies and the appropriate statistical conclusions that could be drawn from inspection data, but I did not squarely address Skanderson's opinions on the issue.[2] *See NFHA III*, 2025 WL 975967, at *28 (denying motion to exclude Guetterman's testimony on "purposeful sampling"), *37–*38 (addressing selection bias and aggregation concerns). Skanderson opines that, [320-25] at 9:

> Plaintiffs' inspection results cannot be extrapolated beyond the specific properties inspected to draw conclusions about Trustee-owned properties more broadly – either to overall metropolitan areas or nationally – because their approach to selecting both metropolitan areas to review and properties to inspect inherently results in a non-representative data sample. Plaintiffs' property inspection sample for each individual metropolitan area is quite small and is insufficient for drawing statistical conclusions regarding discrimination within a metropolitan area. As a result, there is no statistical basis for any of the individual community organization plaintiffs, standing alone, to support a claim of discrimination specific to its service area.

There are two levels of extrapolation at issue—whether statistical disparities observed in the inspected REO properties can be inferred to non-inspected Deutsche

---

[2] I denied without prejudice plaintiffs' motion to exclude Dr. Skanderson's "matched pair" analysis. *See* [311] (consolidated motions); [384] at 5–11. The challenged portion of Skanderson's testimony is not at issue here.

Bank-owned properties (1) outside of the 30 investigated metropolitan areas and (2) outside of the subset of REO properties specifically investigated *within* each metropolitan area. (Recall that plaintiffs attempted to investigate all Deutsche Bank-owned REO properties within a selected zip code. [398] ¶ 37.)

The first is not in dispute. Plaintiffs' expert Guetterman testified that he would not "generalize" plaintiffs' inspection data to metropolitan areas outside of the 30 investigated areas, [341-2] at 65:10–66:1, and plaintiffs do not seek to hold defendants liable for REO conduct outside of those areas. [455] at 5.

Guetterman did not opine one way or the other on the second issue; and more importantly, plaintiffs disclaimed proving statistical disparities in a *single* service area. *See* [341-1] at 5; [341-2] at 85:15–19 (Guetterman's "understanding is… [plaintiffs'] goal was not to look at any particular city to test for a statistical significance but rather to look at REO properties as a whole across the metropolitan areas"); *NFHA III*, 2025 WL 975967, at *37. Plaintiffs pursue a method based on geographical aggregation that necessarily limits the scope of inferences to inspected properties. No inference can be drawn about disparity in uninspected Deutsche Bank-owned properties.

Defendants' motion for clarification on the statistical scope issue is granted. Plaintiffs' inspection results cannot be extrapolated to infer the existence of maintenance disparities across all Deutsche Bank-owned REO properties within a broader metropolitan area.[3]

## II. Motion to Exclude the Expert Testimony of Stacy Seicshnaydre

### A. Legal Standards

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), expert testimony is admissible only if relevant and reliable. Rule 702 and *Daubert* require me to evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). "The focus is on the expert's methodology, not [their] ultimate conclusions." *Kopplin v. Wisconsin Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir.

---

[3] Plaintiffs point to an earlier discovery ruling denying their motion to compel documents related to 9,000 Deutsche Bank-owned and Ocwen-serviced REO properties in the 30 metropolitan areas. *See* [205]. Plaintiffs say they "attempt[ed] to obtain information regarding additional properties within the metropolitan areas sampled" including property photographs or work orders. [455] at 7. In denying that motion, Judge Leinenweber observed that evidence on every single REO property may provide a more accurate record, but "[t]he whole idea of statistics is so that you can avoid this massive amount of data." [205] at 12. That wasn't an endorsement of how plaintiffs could use statistical evidence in this case, and at this stage, plaintiffs have come up with their analysis of available information.

4

2019). My role is to be an evidentiary gatekeeper, determining whether the proposed expert testimony crosses the threshold of admissibility, but I may not take the place of the jury to decide issues of credibility or accuracy. *Artis v. Santos*, 95 F.4th 518, 527 (7th Cir. 2024) (quoting *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012)). The party seeking to introduce the expert testimony bears the burden of establishing that it satisfies the *Daubert* standard. *Gopalratnam*, 877 F.3d at 782. If expert testimony crosses the threshold, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the appropriate tools to challenge the evidence. *Daubert*, 609 U.S. at 596.

An expert may be qualified by their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. An expert's testimony is relevant if it "will assist the trier of fact with its analysis of any of the issues involved in the case." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). A court may exclude expert testimony as unhelpful "[i]f a layperson is capable of understanding an issue without the aid of an expert." *United States v. Navedo-Ramirez*, 781 F.3d 563, 568 (1st Cir. 2015). Reliability hinges on "the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013).

**B.     Background**

Stacy Seicshnaydre is a law professor at Tulane Law School where she teaches and conducts research on fair housing and civil litigation. [338-1] at 32. She previously worked at the Greater News Orleans Fair Housing Action Center (a plaintiff organization, [398] ¶ 331), first as founding Executive Director and later as General Counsel. [338-1] at 32. She seeks to opine on: (1) the background and history of fair housing organizations in furthering the purpose of the Fair Housing Act; (2) the types of harm that fair housing organizations sustain as a result of discriminatory conduct; and (3) damages sustained by plaintiffs as a result of defendants' maintenance and marketing of REO properties within plaintiffs' service areas. [338-1] at 4.

On diversion-of-resource damages, she opines that the counteractive measures plaintiffs undertook—and the rates at which they seek compensation—are appropriate and reasonable.[4] [338-1] at 10–21. On frustration-of-mission damages, she opines that plaintiffs are entitled to damages for: (1) impairment of "broader mission of overcoming neighborhood stereotypes to achieve housing choice and integration"; (2) impairment of "programs designed to train and marshal the housing industry to market and invest in neighborhoods equally"; (3) impairment of "services designed to increase access to homeownership and promote" neighborhood stabilization; (4) "[d]iminishment of past complaint-based and consumer outreach

---

[4] Defendants do not challenge Seicshnaydre's opinions that staff compensation rates were appropriate and reasonable. *See* [308] at 2 n.1.

5

services"; and (5) "[l]ost opportunities and special initiatives." [338-1] at 23–31. In her supplemental report, Seicshnaydre presents methods to calculate damages for each subcategory. [338-2] at 4–10.

### C. Analysis

Defendants renew their motion to exclude Seicshnaydre's testimony and raise new objections based on the summary judgment rulings. [453]. They challenge Seicshnaydre's: (1) qualifications to provide damages testimony; (2) impermissible legal opinions; (3) unreliable damages calculations; and (4) bias.[5] [308].

The ruling on standing did not "eliminate" Seicshnaydre's five frustration-of-mission damages categories. *See* [453] at 5–8. As Judge Leinenweber explained, plaintiffs may only recover damages proximately caused by defendants' conduct, and that analysis is governed by *City of Miami*, not *Havens*. *See NFHA I*, 2018 WL 6045216, at *13, *and NFHA II*, 2019 WL 5963633, at *3–*8; *see also Bond v. United States*, 564 U.S. 211, 218–19 (2011) ("[If] the person alleging injury is remote from the zone of interests a statute protects, whether there is a legal injury at all and whether the particular litigant is one who may assert it can involve similar inquiries. Still, the [former question] 'goes to the merits'… not the justiciability of a dispute.").

Judge Leinenweber permitted plaintiffs to pursue frustration-of-mission damages, noting that the injury "may be an unnecessary extension of the 'diversion of resources' category" and advising plaintiffs "to specify how they intend to measure damages" without relying on the two excluded categories (loss of economic value and impact of community investments and harm to minority neighborhoods). *NFHA II*, 2019 WL 5963633, at *7. He did not impose a requirement, as defendants suggest, that plaintiffs present an expert to quantify those damages. *See* [453] at 3 n.2 (citing 30(b)(6) deposition testimony deferring to expert witness's calculation of frustration-of-mission damages).

Seicshnaydre identifies three categories of frustration damages that are the kind of harm too tenuously connected with defendants' conduct: impairment of the services promoting housing choice and integration, programs for equal investment in the housing industry, and services promoting home ownership and neighborhood stability. *Compare NFHA II*, 2019 WL 5963633, at *7–*8, with [338-1] at 23–28. Judge Leinenweber's proximate-cause ruling bars recovery for those damages. That leaves two "frustration" categories for diminishment of complaint-based and consumer outreach services and for lost opportunities and special initiatives, both of which overlap with plaintiffs' diversion damages.

---

[5] Seicshnaydre's potential bias as a former director of a plaintiff organization goes to the weight rather than admissibility of her testimony. *See Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 613 F.3d 54, 59 (1st Cir. 2010) ("Assessing the potential bias of an expert witness, as distinguished from his or her specialized training or knowledge or the validity of the scientific underpinning for the expert's opinion, is a task that is 'properly left to the jury.'").

The problem with Seicshnaydre's testimony isn't her inexperience providing damages testimony or lack of an accounting or economics degree. *See* [308] at 3–4; *see Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (rejecting notion that *Daubert* requires an expert to have certain credentials as "radically unsound"). Plaintiffs seek monetary damages that aren't tied to the values of specific REO properties; instead, their organizational damages can be measured as the "opportunity costs of discrimination."[6] *See Dwivedi*, 895 F.2d at 1526; 42 U.S.C. § 3613(c)(1) (permitting a private plaintiff to recover actual and punitive damages for a discriminatory housing practice).

In *United States v. Balistrieri*, the court affirmed a jury award of $5,000 in damages to the Metropolitan Milwaukee Fair Housing Council based on testimony from its associate director on the costs of conducting tests at an apartment complex where the discrimination occurred and following up on results of testing. 981 F.2d 916, 933 (7th Cir. 1992). It was enough that the director "testified about the staff time spent on that effort and the cost of that effort[] and explained her figures to the jury." *Id.* In *City of Chicago v. Matchmaker Real Estate Sales Center*, the court affirmed a damages award to the Leadership Council For Metropolitan Open Communities that included: $3,000 for audits performed in the investigation of the case; $5,000 for expected costs to monitor defendant's records for a five-year period; $6,000 for continued auditing of defendant's sales practices; and $2,500 for costs of training seminars it would perform. 982 F.2d 1086, 1099 (7th Cir. 1992). The court reversed the magistrate judge's award of $16,500 for frustration of purpose because the magistrate judge doubled the compensatory damages without explanation. *Id.*

Plaintiffs' damages for counteractive measures can be established at trial through testimony. *See* [338-1] at 11. The jury doesn't need Seicshnaydre to review plaintiffs' mission statements and activities to "confirm[] that they are each dedicated to promoting and enforcing an equal housing market and counteracting residential racial segregation in their respective communities." [338-1] at 9. Each plaintiff can explain its mission and how the shoddy maintenance of Deutsche Bank-owned properties frustrated community-based missions.[7] And each plaintiff can (and must, for purposes of establishing the fact of injury) testify to out-of-pocket expenses, including staff compensation, spent to combat defendants' REO conduct.

---

[6] Judge Leinenweber found that harm to minority neighborhoods in the form of diminished property values was not sufficiently related to defendants' conduct to satisfy the proximate-cause requirement. *NFHA II*, 2019 WL 5963633, at *7.

[7] Seicshnaydre's testimony on the mission and purpose of fair housing organizations also veers into the territory of legal conclusions and are separately inadmissible. *See, e.g.*, [338-1] at 7 (opining that fair housing organizations "are in the best position to further the purposes of the FHA beyond the level of individual housing transactions"); *Antrim Pharms. LLC v. Bio-Pharm, Inc.*, 950 F.3d 423, 430 (7th Cir. 2020) (an expert is barred from testifying on "pure issues of law, such as the meaning of statutes or regulations").

To the extent that Seicshnaydre's frustration damages category for the "diminishment of complaint-based and consumer outreach services" captures "nonpecuniary damages" not compensated by out-of-pocket expenses in the diversion category, [338-1] at 28, her method of calculation is excluded as unreliable. Seicshnaydre calculates a total of $1,194,000 in this category by taking 3% of average annual programmatic staffing expenses ($9,950,000) multiplied by four years. [338-2] at 8. She calculates additional damages totaling $600,000 by multiplying the number of plaintiffs by a base amount of $7,500 for four years. [338-2] at 9. She explains that a jury could assign damages "in the amount of a certain percentage of the FHO's annual budget (for complaint and outreach services) multiplied by the number of years in which it was engaged in investigation of the Defendants' discriminatory practices to reflect the diminishment of the FHO's ability… to increase fairness and reduce segregation in the housing market over time." [338-2] at 8–9. She does not explain why 3% of average expense costs would be a reasonable amount, the basis for the $7,500 figure, and more importantly, why damages would be the same for each organization given different operations and REO conduct in their respective communities. Her conclusions are unreliable. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Seicshnaydre opines that "lost opportunities" related to diversion damages reflect services or activities that plaintiffs had to "pause or abandon" to address defendants' discriminatory conduct. [338-1] at 13. She observes that organizations do not document lost opportunities "in the same manner as they record their counteractive efforts," but organizations may identify "lost opportunities based on personal knowledge of [] management and staff, and in some instances by reviewing planning documents or grant applications and deliverables." [338-1] at 13. Here too, plaintiffs can testify to the cost or value of forgone activities, and a jury may weigh their credibility in determining appropriate damages. *See, e.g.*, [338-1] at 30 (Plaintiff North Texas Fair Housing was unable to develop a fair housing certification program because of diminished capacity; Plaintiff Fair Housing Continuum withdrew from an architectural conference).

Her method of calculating "lost opportunities" as frustration damages is separately excluded as unreliable. She points to the overlap in measuring lost opportunities as both diversion and frustration damages, [338-1] at 29–31, and clarifies in her supplemental report that she calculates a total of $1,600,000 in this category. [338-2] at 9. She gets to this number by taking the base amount of $10,000 per year, multiplied by four years, then by the number of plaintiffs. She then doubles the pool of $800,000 as a reasonable estimate based on plaintiffs that documented "forgone activities of a scope warranting an additional award in this category." She also calculates additional "nonpecuniary losses" by taking a base amount of $7,500, multiplied by four years, then by the number of plaintiffs for a total of $600,000. [338-2] at 10. She does not explain why multiplying the same base number by the total number of plaintiff organizations would provide a reasonable estimate, despite

acknowledging that these types of costs would be organization-specific and supported by personal knowledge from staff. *See* [338] at 13. Without any explanation or evidence to support her conclusions, her estimates amount to speculation.

  To sum up, Seicshnaydre's testimony is excluded, but plaintiffs need not rely on expert testimony to establish damages at trial. Each plaintiff may testify to its organizational missions and activities undertaken or forgone, though plaintiffs are barred from recovering damages based on: impairment to services promoting housing choice and integration; programs for equal investment in the housing industry; and services promoting home ownership and neighborhood stability. *See NFHA II*, 2019 WL 5963633, at *7.

ENTER:

Date: July 9, 2025

                  Manish S. Shah
                  U.S. District Judge