# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA,<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.,<br><br>　　　　　　　　Defendants. | **Case No. 1:18-cv-00839**<br><br>**REBUTTAL EXPERT REPORT OF IAN AYRES** |

APRIL 26, 2023

TABLE OF CONTENTS

I.    Introduction ........................................................................................................... 1

II.   Summary of Conclusions ..................................................................................... 2

III.  Defendants' Experts Fail to Show that Disparities in Observed Deficiencies Are Affected by Alleged Flaws in Plaintiffs' Inspection Methodology ................................... 4

    A.   Defendants Have Not Presented their Own Race-Blind Review of Inspection Photos ............................................................................................ 5

    B.   Disparities in Deficiencies Are Present in My Race-Blind Review of Front View Photographs of a Random Sample of Properties ........................... 6

        1.   Methodology for Selecting Properties and Photos for Random Sample ..... 7

        2.   Selection of Deficiencies to Score in Front View Photos of Random Sample ........................................................................................ 9

        3.   Deficiency Scoring Methodology ................................................ 9

        4.   The Front View Photos Alone Reveal Disparities in Deficiencies between REO Properties in White versus Non-White Block Groups ...................... 12

    C.   Differences between Mr. Tyler's Race-Blind Review of Deficiency Photos and Plaintiffs' Coding of Deficiencies Are Statistically Similar for White and Non-White Neighborhoods ................................................................. 14

    D.   Disparities Persist in Unedited Data ........................................................ 17

    E.   Defendants' Experts Fail to Show that Plaintiffs' Classification of Boarded Doors and Windows Has Any Effect on Racial Disparities in Deficiencies ........ 25

    F.   Curb Appeal Is Appropriately Considered by Plaintiffs When Evaluating Deficiencies in Maintenance and Marketing ........................................... 33

IV.  Defendants' Experts Fail to Show that Disparities in Observed Deficiencies Can Be Explained by Factors They Suggest Should Have Been Accounted For in My Models ... 36

    A.   Defendants' Experts Fail to Show that Initial Condition of the Property Explains the Disparities in Deficiencies ................................................... 37

        1.   Disparities Persist When Regressions Are Limited to Properties Inspected Months After Defendants' Initial Ownership Period or Initial Vacancy ... 38

        2.   Disparities Persist When Regressions Control for the Initial Condition of the Property as Recorded in Latest Pre-REO Appraisals ........................... 41

    B.   Differences in Crime Do Not Explain the Disparities in Deficiencies ................. 42

        1.   Statistical Analysis of Subset of Deficiency Categories Likely Not Caused by Crime ........................................................................................ 43

            a)   REO Properties in Communities of Color Had More Deficiencies in Categories Likely Not Caused by Crime than REO Properties in White Communities ........................................ 45

            b)   Regression Models Show that REO Properties in Communities of Color Had More Deficiencies in Categories Likely Not Caused by Crime than REO Properties in White Communities Even When Controlling for Other Potential Explanatory Factors ................................................................................ 48

         2.     Disparities in Observed Deficiencies Persist When Controlling for Crime Reports at the Subject Property..............................................................59

         3.     Crime and Property Deficiencies Can Be Endogenous, in that Each Can Be a Factor that Results in the Other ..........................................61

   C.     Disparities Persist When Controlling for Other Potential Explanatory Factors Identified by Defendants' Experts ...........................................62

         1.     Block Group Level Data ..................................................................64

         2.     Neighborhood Income ....................................................................65

         3.     Neighborhood Homeownership Rate ............................................67

         4.     Population Density..........................................................................67

         5.     Neighborhood Foreclosure Rate ...................................................68

   D.     Dr. Skanderson's Matched Pair Analysis Fails to Contradict my Findings of Disparities ...............................................................................................69

V.     Defendant Has Not Produced Credible Evidence that the Disparate Racial Impacts Were Business Justified ........................................................................................................71

VI.    Servicing Data Shows Disparities in Expenditures on REO Property Preservation..........73

   A.     Defendants' Experts Analysis of Work Orders Reveal Disparities in Expenditures on Properties in Majority Non-White Areas Relative to Expenditures on Properties in Majority White Areas .............................................73

   B.     Defendants' Experts Review of Work Order Expenditures Relative to Property Value Is Flawed.......................................................................74

   C.     Defendants' Experts Analysis of Work Order Expenditures Does Not Account for Variation in Maintenance Needs Across Properties .........................75

VII.   Dr. Skanderson's Analysis Fails to Contradict Plaintiffs' Claims that Defendants' Policies Perpetuated Segregation ............................................................................76

VIII.  My Valuation Regressions Appropriately use Pre-Foreclosure Property Values and Are Robust to Adjustments for Market Factors ......................................................................77

IX.    Conclusion ........................................................................................................84

Appendix 1: Materials Considered .........................................................................85

Exhibits ....................................................................................................................87

# LIST OF FIGURES

Figure 1: Summary of Race-Blind Review of Front View Photo Sample ................................... 14

Figure 2: Summary of Mr. Tyler's Race-Blind Review of Photographic Support for Plaintiffs' Deficiency Classification ........................................................................................... 16

Figure 3: OLS Regression Results for Number of Deficiencies in the Full Analysis Sample, Unedited Subsamples ......................................................................................... 23

Figure 4: Logistic Regression Odds Ratio Results for Presence of at Least Ten Deficiencies in the Full Analysis Sample, Unedited Subsamples ........................................................ 25

Figure 5: Presence of Door & Window Deficiencies Among REO Properties in Full Analysis Sample of Plaintiffs' Inspection Data Based on Different Treatments of Boarding .................... 31

Figure 6: Regression Results for Number of Deficiencies in the Full Analysis Sample Based on Different Treatments of Boarding ................................................................................. 33

Figure 7: OLS Regression Results for Number of Deficiencies in the Full Analysis Sample, Other Subsamples ............................................................................................... 39

Figure 8: Logistic Regression Odds Ratio Results for Presence of at Least Ten Deficiencies, Other Subsamples ............................................................................................... 40

Figure 9: Mean Number of Deficiencies & Share of REO Properties with At Least 5 Deficiencies in Categories Likely Not Caused by Crime in Plaintiffs' Inspection Data .................................. 46

Figure 10: OLS Regression Results for Number of Selected Deficiencies in Categories Not Likely Caused by Crime in the Full Analysis Sample ................................................................. 50

Figure 11: Logistic Regression Odds Ratio Results for Presence of at Least Five Deficiencies in Categories Likely Not Caused by Crime in the Full Analysis Sample ........................................ 53

Figure 12: OLS Regression Results for Number of Selected Curb Appeal Deficiencies in Categories Likely Not Caused by Crime in the Full Analysis Sample ........................................ 56

Figure 13: Logistic Regression Odds Ratio Results for Presence of at Least Three Curb Appeal Deficiencies in Categories Likely Not Caused by Crime in the Full Analysis Sample ............... 58

Figure 14: Disparities in Number of Deficiencies in the Full Analysis Sample Using Alternative Explanatory Controls in Regression Model ................................................................. 63

Figure 15: Matched Pairs Excluded from Dr. Skanderson's Analysis ......................................... 71

Figure 16: Average Property Preservation Expenditure Amounts ............................................... 74

Figure 17: Changes in Dissimilarity Indices from 2010 to 2020 ................................................ 77

Figure 18: Average Annual % Change from Last Pre-Foreclosure Appraisal Value to REO Sale Price ................................................................................................................................. 80

Figure 19: Relationship between Deficiencies Observed in Plaintiffs' Inspection Data and Real Property Value Declines from Last Pre-Foreclosure Appraisal Value to REO Sale Price........... 81

Figure 20: Relationship between Deficiencies Observed in Plaintiffs' Inspection Data and Real Property Value Declines from Last Pre-Foreclosure Appraisal Value to REO Sale Price, After Controlling for More Local Factors ............................................................................................. 83

## <u>LIST OF EXHIBITS</u>

Exhibit 1:     List of REO Property Deficiencies Scored in Plaintiffs' Inspection Data & Deficiencies Scored in My Front View Photo Review

Exhibit 2:     Presence of Deficiencies Among Front Photo Sample

Exhibit 3:     OLS Regression Results Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms (Outcome = Total Number of Deficiencies)

Exhibit 4:     Logistic Regression Odds Ratios Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms (Outcome = Presence of 10+ Deficiencies)

Exhibit 5:     Presence of Door & Window Deficiencies Among REO Properties in Full Analysis Sample of Plaintiffs' Inspection Data Based on Different Treatments of Boarding

Exhibit 6:     Presence of Deficiencies Unlikely to be Caused by Crime Among REO Properties in Plaintiffs' Inspection Data, by Block Group Race

-1-

## I.  Introduction

1.      I have been asked by Plaintiffs' counsel in *National Fair Housing Alliance et al. v. Deutsche Bank National Trust et al.*, Case No. 1:18-cv-00839 (N.D. Ill.) to review and comment upon the expert reports filed on February 21, 2023 on behalf of Deutsche Bank National Trust, Deutsche Bank Trust Company Americas (collectively, "Deutsche Bank"), Ocwen Loan Servicing, LLC ("Ocwen"), and Altisource Solutions, Inc. ("Altisource") (collectively, the "Defendants").

2.      I previously provided written reports dated October 13, 2022[1] and December 16, 2022[2] in this matter, and I was deposed by Defendants' counsel on January 10, 2023. On March 15, 2023, I provided a Declaration[3] responding to certain assertions made by Defendants and one of their experts related to Defendants' Memorandum dated February 28, 2023.[4]

3.      A list of the materials that I rely upon in forming my opinions is listed in Appendix 1.[5] My curriculum vitae was included as Appendix 2 of my October 13, 2022 report.[6] Appendix 3 of my October 13, 2022 report consisted of a list of cases in which I have given sworn testimony.

4.      I file this report in my individual capacity and have no financial stake in the outcome of this case. My hourly rate in this matter is $500. My compensation is not contingent on any action or event resulting from the analyses, opinions or conclusions in, or the use of, this report.

---

[1] Expert Report of Ian Ayres, Oct. 13, 2022 [hereinafter *Ayres Report*].
[2] Supplemental Expert Report of Ian Ayres, Dec. 16, 2022 [hereinafter *Ayres Supplemental Report*].
[3] Declaration of Ian Ayres in Support of Plaintiffs' Opposition to Defendants' Motion to Exclude Plaintiffs' Property Specific Investigation, Mar. 15, 2023.
[4] Defendants' Memorandum in Support of Motion to Submit Newly Developed Expert Evidence Relevant to Motion to Exclude (filed Feb. 28, 2023); Declaration of Prof. Justin McCrary, Ph.D. in Support of Defendants' Motion to Exclude Plaintiffs' Property Specific Investigation, Feb. 28, 2023.
[5] Consultants from Precision Economics provided assistance in the preparation of this report.
[6] Expert Report of Ian Ayres, Oct. 13, 2022 [hereinafter *Ayres Report*], at Appendix 2.

## II. SUMMARY OF CONCLUSIONS

5.       I have reviewed five expert reports submitted by Defendants on February 21, 2013: (a) the Rebuttal Expert Report of Marcel Bryar ("Bryar Report"), (b) the Rebuttal Expert Report of Mark Linné ("Linné Report"), (c) the Expert Report of Professor Justin McCrary ("McCrary Report"), (d) the Expert Report of David M. Skanderson ("Skanderson Report"), and (e) the Expert Report of Sharon Stedman ("Stedman Report"). The Defendants' experts make several critiques of Plaintiffs' inspection methodology and the analyses presented in my reports. However, the arguments made by Defendants' experts either suffer from numerous flaws or do not change the conclusions I drew from the analyses presented in my expert reports.

- Defendants' experts criticize the methodology used by Plaintiffs to investigate REO property conditions. However, Defendants' experts do not attempt to correct any of the alleged shortcomings in Plaintiffs' methodology. In this report, I conduct additional analyses of the underlying data in an attempt to address the alleged flaws put forward by Defendants' experts. I find that addressing these matters does not change my conclusions that disparities in routine REO maintenance and marketing were observed in Non-White communities relative to White communities.[7]

- Defendants' experts claim that the regression model I use to measure disparities in deficiencies observed by Plaintiffs' inspectors is flawed. Defendants' experts criticize the omission of certain non-race factors they allege would provide a business justification for the disparities observed by Plaintiffs' inspectors.

---

[7] As in my original report, I classify an area to be a "White" area if at least 50 percent of the population in the area is non-Hispanic white alone. I classify an area to be a "Non-White" area if less than 50 percent of the population in the area is non-Hispanic white alone. *Ayres Report*, ¶ 44.

However, Defendants' experts fail to show that addressing these alleged omissions would have any effect on my conclusions. In this report, I test the effect of adding the explanatory factors suggested by Defendants' experts to my model, and I find that my conclusions do not change. In addition, Dr. Skanderson conducts a matched pair analysis in which he compares REO properties in Non-White block groups to REO properties in White block groups with similar non-race characteristics. Dr. Skanderson finds that the matched pair examples he reviews have individual differences not controlled for in my model that could explain the racial disparities I measure. However, I find that Dr. Skanderson's conclusions are based on the most extreme examples of matched pair properties, in terms of the large differences in observed deficiencies among similarly-situated properties, that he could have chosen, and, therefore, fail to alter my conclusions.

- Defendants' experts allege that I do not substantiate Plaintiffs' claim that there was no business justification for Defendants' policies, but fail to produce credible evidence that the disparate racial impacts were business justified.

- Defendants' experts allege that Defendants spent more on the maintenance of REO properties in Non-White areas than on REO properties in White areas. However, Defendants inappropriately focus on the ratio of work order expenditures to post-foreclosure appraisal values, which could be suppressed by the alleged failure by Defendants' to properly maintain the properties. Further, Defendants' experts' focus on the ratio of maintenance expenditures to appraised value is biased by the predominance of low-valued properties in Non-White communities. In this report,

I show that Defendants spent more, on average, to maintain REO properties in White communities than REO properties in Non-White communities.

- Dr. Skanderson argues that Plaintiffs' claims of the perpetuation of segregation are unsupported. Dr. Skanderson's evidence does not show that residential segregation reduced in the communities affected by the alleged practices. In this report, I find that the share of home purchasers who were Non-White increased in Non-White neighborhoods during the foreclosure lifecycle of the inspected properties, a measure of evidence for the perpetuation of segregation.

- Defendants' experts criticize my models measuring the deterioration of property values during the foreclosure lifecycle. In particular, they criticize my use of pre-REO appraisal values as the starting point for measuring declines in property value, and they criticize the absence of other potential explanatory market factors from my models that could affect changes in property value. In this report, I evaluate these alleged flaws and continue to reach my original conclusion that additional property deficiencies were associated with larger declines in property value during the foreclosure lifecycle.

### III. DEFENDANTS' EXPERTS FAIL TO SHOW THAT DISPARITIES IN OBSERVED DEFICIENCIES ARE AFFECTED BY ALLEGED FLAWS IN PLAINTIFFS' INSPECTION METHODOLOGY

6.     Defendants' experts criticize alleged flaws in Plaintiffs' inspection methodology and my methodology for analyzing the results of those inspections. Despite making these criticisms, Defendants' experts offer little to no analysis of their own to adjust my methodology or Plaintiffs' methodology to correct for these alleged flaws. Here, I analyze the effect of making adjustments that address the criticisms Defendants' experts levied, and I find that my original

conclusions of finding statistically significant disparities in REO property maintenance in Non-White areas are consistent with the adjusted analyses.

**A.** **Defendants Have Not Presented their Own Race-Blind Review of Inspection Photos**

7. Ms. Stedman's criticisms of Plaintiffs' inspection methodology included allegations that inspectors could suffer from implicit bias,[8] and that coders were sometimes aware of the racial demographics of the neighborhoods in which the REO properties were located.[9] Dr. McCrary also alleges that Plaintiffs' inspection process was flawed because the inspectors were not blinded to the racial demographics of the neighborhoods they inspected, either due to first-hand knowledge and/or observations, or, in some cases, to potential disclosure from Plaintiffs.[10]

8. Despite their focus on these alleged shortcomings in Plaintiffs' inspection methodology, Defendants' experts present no effort to adjust the analysis to account for these criticisms. Because photographic evidence from each REO property inspection included in my analysis has been maintained by Plaintiffs and produced in discovery, Defendants' experts could have undertaken their own race-blind review of that evidence to determine whether disparities in maintenance existed between properties in White and Non-White areas. I understand that other experts retained by Plaintiffs have or are presenting analyses based on race-blind reviews of this photographic evidence, and I present my own analyses of race-blind evidence review in this section.

---

[8] *Stedman Report*, ¶¶ 111-118.
[9] *Stedman Report*, ¶¶ 119-121.
[10] *McCrary Report*, ¶¶ 62-71.

**B.** **Disparities in Deficiencies Are Present in My Race-Blind Review of Front View Photographs of a Random Sample of Properties**

9.      Bias in the scoring of deficiencies could arise through the actions taken by the inspector who visits a property. Defendants' experts allege that the inspector may be more likely to score the property with a deficiency if the inspector is aware of racial composition of the neighborhood and has an incentive to find disparities that favor properties in White neighborhoods. Relatedly, Defendants' experts allege that the inspector may be biased in favor of taking more photographs of alleged deficiencies for properties in Non-White areas and taking fewer photographs of alleged deficiencies for properties in White areas.[11]

10.      Although Defendants cite to no specific instances of these biases occurring in this case, to address these potential biases, I have conducted a race-blind review of only the photographs taken of the front of the house ("front view photos") for a stratified random sample of the properties in my Full Analysis Sample.[12] I understand that inspectors were instructed to take a photograph of the front view of each inspected house.[13] Additionally, inspectors may have taken additional photographs that they labeled as being photographs of the front of the house.[14] Because these are the most standardized photographs taken by Plaintiffs' inspectors, these front view photos are the least likely to have been subject to any inspector bias that conceivably could have resulted

---

[11] As discussed further below, Plaintiffs' standardized training and centralized quality control processes undermine these assertions. *See also* Rebuttal Expert Report of Albert Poche; Rebuttal Expert Report of Timothy Guetterman.

[12] As defined in my original report, my "Full Analysis Sample" consists of the 893 REO properties in Plaintiffs' Inspection Data I identified as having been owned by Deutsche Bank at the time of the visits of Plaintiffs' inspectors. *Ayres Report*, ¶ 50.

[13] NFHA REO Investigation Photo Protocols, FHANC_0002240 – 2241, at FHANC_0002240; NFHA_0043860 – 43976, at NFHA_0043894.

[14] NFHA Guidelines to Using the REO Investigation Database, NFHA_0044207 – 44209, at NFHA_0044208.

in inspectors taking photographs of varying locations on the property based on the racial composition of the neighborhood.

### 1. Methodology for Selecting Properties and Photos for Random Sample

11. To analyze whether disparities in deficiencies were present in the most unbiased evidence available, I asked Plaintiffs for the front photographs of a stratified random sample of REO properties in my Full Analysis Sample. To create the stratified random sample, I first requested from Plaintiffs a list of all properties from my Full Analysis Sample with front view photos available in Plaintiffs' database. Plaintiffs provided me a list of the 888 of the 893 properties from my Full Analysis Sample that they identified as having front view photos in their database.[15] The spreadsheet included the property ID, the photo IDs for the front view photos for each property, an indicator showing whether each photo was marked by the inspector as the main photo for the property in Plaintiffs' database, and the inspector's description of each photo if a description was present in the database.[16] Next, I selected from those 888 properties the photos that were either (1) marked by the inspector as the main photo for the property, or (2) included language in the description indicating the photo was a front view photo.[17] Thus, each photo could be identified in Plaintiffs' database, without visual review of the photo, as a front view photo because it was either

---

[15] Declaration of Lindsay Augustine – Front View Photo List and Broken & Boarded Doors and Windows Count, Apr. 18, 2023, Appendix A.

[16] *Id*. I understand that all these photos have been produced to Defendants in discovery. *Id*.

[17] I selected a photo as a potential front view photo to include in my random sample if its description was "main photo", "front view", "street view", "full front view", "property fullview", "view of house", "front view 2", "front view – close up", "front right angle", or "front left angle." I also selected a photo as a potential front view photo to select in my random sample if its description included the terms "main picture of X", "main photo of X", "front picture of X", or "main X photo", where X could be "home", "house", or "property." I also selected a photo as a potential front view photo to select in my random sample if its description included the terms "X view of the Y", "X view of Y", "X view of eval Y", "X view Y", "X Y view", "X of the Y", "X of Y", or "X of eval Y", where X could be "street", "front", or "wide", and Y could be "home", "house", or "property."

marked as the main photo for the property or was described in the database as a front view photo. This selection resulted in a list of 915 photos for 855 properties.

12.     I designed the random sample such that the sample would be equally balanced by block group race (White or Non-White) and pre-foreclosure property value. I use the latest pre-foreclosure property value identified in the analysis from my original report.[18] Thus, the set of properties available for my sample was reduced from 855 to 418 due to the availability of properties with pre-foreclosure appraisal values in the Servicer-Limited Data.[19] I divided these 418 properties into ten subgroups, or strata: one for each combination of two block group race categories (White or Non-White) and five pre-foreclosure property value bands (less than $50,000, $50,001 to $80,000, $80,001 to $100,000, $100,001 to $150,000, and greater than $150,000). Each value band can be said to have two strata of properties – one for White block groups, and one for Non-White block groups. For each value band, I select for my random sample all the properties in the strata (White or Non-White) that had the fewer properties.[20] To ensure the random sample was equally balanced by block group race (White or Non-White) and by property value, I then randomly select an equal number of properties from the other strata in the value band, with priority given to properties in the same metropolitan area.[21] This process yielded a sample of 304 properties. Of these 304 properties, I selected 20 properties at random (two from each of the ten

---

[18] *Ayres Report*, ¶¶ 72-74.

[19] As in my original report, I refer to the spreadsheets produced by Ocwen and Altisource on its servicing activities as "Servicer-Limited Data."

[20] For example, of the 418 properties with front view photos and pre-foreclosure values, 83 had pre-foreclosure values of $50,000 or less. Of these 83, 14 were in White block groups, and 69 were in Non-White block groups. I selected all 14 of the White block group properties for my random sample, and then selected 14 of the 69 Non-White block group properties for my random sample. This process was repeated for the other four value bands.

[21] Within each value band, an equal number of properties in each MSA from the smaller strata were randomly selected from the larger strata. If there were fewer properties in an MSA from the larger strata than the smaller strata, then properties from other MSAs (that had not already been selected in the first step) were randomly selected.

strata) to be used for coder training purposes ("Training Sample") (described later in this section), with the remaining 284 properties left for my analysis ("Evaluation Sample"). The number of Evaluation Sample properties in each of the ten strata is listed later in this section in **Figure 1**.

>    **2.    Selection of Deficiencies to Score in Front View Photos of Random Sample**

13.    **Exhibit 1** lists the 26 deficiencies scored in my front view photo analysis, alongside the list of 38 deficiencies from Plaintiffs' REO Inspection Data. These 26 deficiencies largely overlap with many of the deficiencies scored by Plaintiffs. I selected all deficiency categories related to property maintenance from Plaintiffs' REO Inspection Data to score for my front photo analysis, with the exception of the "miscellaneous" deficiency categories and dead grass.[22]

14.    In my front photo review, in some instances I grouped multiple deficiency categories into a single category due to the limitations of reviewing only front view photos. For example, Plaintiffs' REO Inspection Data included separate categories for water damage, small amount of mold, and pervasive mold. I grouped these into a single "mold / discoloration" category in my front view photo analysis. In other instances, I scored some deficiencies into multiple categories in instances when Plaintiffs' REO Inspection Data grouped them into a single category. For example, I scored broken or open windows separately from boarded windows, whereas Plaintiffs REO Inspection Data grouped broken, open, or boarded windows in a single score.

>    **3.    Deficiency Scoring Methodology**

15.    Two consultants, working under my direction, reviewed the front view photos to score the 26 deficiencies shown in **Exhibit 1**. Each coder scored one-half of the properties from

---

[22] Because the focus of my front photo review was property maintenance, I did not score deficiencies from the Signage and Occupancy category of deficiencies from Plaintiffs' REO Inspection Data.

the Evaluation Sample. Before reviewing any photos, these consultants and I met with Plaintiffs'

representative Lindsay Augustine via an online video conference. During this conference, Ms.

Augustine walked us through the Plaintiffs' deficiency identification methodology to help educate

us on the deficiency characteristics and the process of reviewing photos for property deficiencies.[23]

16.     After this call, we conducted two rounds of training. For the first round, I selected

ten of the twenty Training Sample properties (one property from each of the ten Census block

group race / property value band strata) and instructed the two coders to each independently score

25 of the 26 deficiencies[24] for each of the front-view photos of those ten properties. Each

deficiency for each photograph was scored as a "yes" or a "no" depending on whether the

photograph showed evidence of the deficiency. For broken or boarded windows or doors, the

number of windows that were broken or boarded were also scored, as well as the total number of

windows observed in the photograph. After the coders completed the first round of training, I

compared the deficiency scores for each coder and found that the coders agreed on 95 percent of

the "yes/no" deficiencies they scored.[25] We then conducted another video conference call with Ms.

Augustine to review the discrepancies between the two coders' scores to evaluate the reasons for

disagreements. Next, we conducted the second round of training in which the two coders

independently scored the front view photos for the remaining ten Training Sample properties. The

_____

[23] Specifically, we reviewed the NFHA REO Property Investigation Glossary (NFHA_0043860 – 43976, at NFHA_0043897 – 43935), which included example photos and descriptions for each non-miscellaneous deficiency category scored by Plaintiffs' inspectors. We also reviewed sample photographs of deficiencies scored by Plaintiffs in other litigation matters; these photographs were taken of properties not included in Plaintiffs' Inspection Database.

[24] The coders did not score broken mailboxes in the first round of training, but did score this deficiency in the second round.

[25] The coders scored 25 deficiencies for eleven photos (one property had two front photos) in the first round of training, yielding 275 scores for each coder. Of the 275 deficiencies scored in the first round of training, the coders agreed on 261 (95 percent).

deficiency scores were the same for 95 percent of the "yes/no" deficiencies they scored.[26] In each round of training, the agreement between coders' deficiency scores was favorable using standard intercoder reliability measures that account for agreements happening by chance.[27]

17.     After determining that the agreements between the two coders was acceptable for the Training Sample, I assigned each coder to score the front view photos for half (142) of the 284 properties in the Evaluation Sample, with each coder scoring 71 properties in White block groups and 71 properties in Non-White block groups.[28] At the time of their review of Training Sample photographs and Evaluation Sample photographs, the coders were unaware of the racial demographics of the neighborhood or any other characteristics of the property they observed in the photograph, besides the ID code it was assigned in Plaintiffs' REO Property Data.

18.     Once the coders completed their deficiency scoring, I aggregated their scoresheets into a single deficiency database for the Evaluation Sample. Based on their scores, I scored a property as having a given deficiency if the coders scored at least one of the front view photos for the property as having the deficiency. For the window deficiency counts, I used the greatest number recorded among the front view photos for the property as the window deficiency count for that property.

---

[26] The coders scored 26 deficiencies for ten photos (one property had two front photos) in the first round of training, yielding 260 scores for each coder. Of the 260 deficiencies scored in the first round of training, the coders agreed on 247 (95 percent).

[27] Intercoder reliability is often measured using agreement coefficients, of which there are several. *See, e.g.*, Daniel Klein, *Implementing a general framework for assessing interrater agreement in Stata*, 18 STATA J. 871 (2018). Both Gwet's coefficient and the Brennan-Prediger coefficient indicate an almost perfect agreement according to the standard Landis & Koch scale for benchmarking chance-corrected agreement coefficients. Other standard agreement coefficients, such as Cohen/Conger's kappa and Krippendorff's alpha, indicate moderate agreement between the two coders in each training round.

[28] One coder reviewed 156 photos covering 142 properties, and the other coder reviewed 150 photos covering 142 properties. The photographs were sorted in a random order, and I instructed the coders to score the photographs in that random order.

### 4. The Front View Photos Alone Reveal Disparities in Deficiencies between REO Properties in White versus Non-White Block Groups

19.     **Exhibit 2** includes the results of the presence of each individual deficiency based on the racial makeup of the Evaluation Sample properties' Census block groups. For each of the 26 deficiencies listed in **Exhibit 1**, **Exhibit 2** lists the share of REO properties in each Census block group racial category for which my assistants recorded that deficiency in the Front Photo Sample. For example, boarded windows were observed in the front view photos for 4 percent of the Evaluation Sample properties in White block groups, whereas boarded windows were observed in the front view photos for 14 percent of the Evaluation Sample properties in Non-White block groups. Trash was observed in the front view photos for 13 percent of the Evaluation Sample properties in White block groups, whereas trash was observed in the front view photos for 23 percent of the Evaluation Sample properties in Non-White block groups.

20.     The incidence of nearly every deficiency in **Exhibit 1** is lower than Plaintiffs' inspectors' scoring of the same deficiency for the Full Analysis Sample, as shown in Exhibit 3 of my original report. This difference is due to the reduced detail of review of the property. Only one side of the property is observed in the front view photos, whereas the Plaintiffs' inspectors viewed and took photographs of all sides of the property when possible. Plaintiffs' inspectors also viewed the properties close-up (and took close-up photos of deficiencies when observed), whereas the front view photos my assistants reviewed may not always capture enough detail to identify a deficiency. These front view photographs represented 3.9% of photos in Plaintiff's database for these properties (306 photos out of 7,854 photos).[29]

---

[29] The measured disparities in the Evaluation Sample may also be reduced, relative to what was observed in the Full Analysis Sample, because of the manner in which my random sample is stratified by race and property value.

21.    **Figure 1** summarizes the results shown in **Exhibit 2**.[30] As **Figure 1** shows, 16 of the 26 deficiencies were more likely to be observed in front view photos of Non-White block group properties than in White block group properties in the Evaluation Sample. Of those 16 deficiencies, the difference between the incidence in Non-White block group properties and the incidence in White block group properties was statistically significant at the 5 percent level of significance for five of the deficiencies. Seven of the 26 deficiencies were more likely to be observed in front view photos of White block group properties than in Non-White block group properties in the Evaluation Sample. The difference in incidence between White and Non-White block group properties for those seven deficiencies is not statistically significant.

---

[30] The disparities shown in **Exhibit 2** and summarized in **Figure 1** do not control for any explanatory factors besides the majority race of the block group.

**Figure 1: Summary of Race-Blind Review of Front View Photo Sample**

| Last Pre-Foreclosure Value | Total Properties Reviewed in Front Photo Sample | | |
|---|---|---|---|
| | Non-White Block Groups | White Block Groups | Total |
| Value ≤ $50,000 | 12 | 12 | 24 |
| $50,000 < Value ≤ $80,000 | 21 | 21 | 42 |
| $80,000 < Value ≤ $100,000 | 19 | 19 | 38 |
| $100,000 < Value ≤ $150,000 | 44 | 44 | 88 |
| Value > $150,000 | 46 | 46 | 92 |
| **Total** | 142 | 142 | 284 |
| | | | |
| Total Types of Deficiencies Recorded | 26 | 26 | |
| # of Deficiencies that Were More Likely to Be Observed for REO Properties in the Given Minority Block Group than REO Properties in the Other Block Group Category | 16 | 7 | |
| # where Difference is Statistically Significant at 5% | 5 | 0 | |
| # where Difference is Statistically Significant at 1% | 1 | 0 | |

*Note*: See **Exhibit 2** for additional details.

22.     These results from my analysis of the stratified random sample show that statistically significant disparities in deficiencies continue to exist when standardized non-subjective photos are reviewed by race-blind coders.

**C.     Differences between Mr. Tyler's Race-Blind Review of Deficiency Photos and Plaintiffs' Coding of Deficiencies Are Statistically Similar for White and Non-White Neighborhoods**

23.     I understand that Plaintiffs' expert Deavay Tyler also responds to Defendants' expert criticisms of alleged flaws in Plaintiffs' inspection process with regards to the alleged lack of race-blind identification of deficiencies.[31] I understand that Mr. Tyler has reviewed photographs associated with 4,157 deficiencies scored across 36 of the 38 types of deficiencies included in

---

[31] Rebuttal Expert Report of Deavay Tyler, Apr. 19, 2023, at 23-28 [hereinafter *Tyler Rebuttal Report*].

Plaintiffs' inspection data, touching 793 different investigated properties in my Full Analysis Sample. I also understand that these deficiencies were selected on a randomized basis by Plaintiffs, and that Mr. Tyler's review of these photographs was race-blind, in that he was only aware of an identification number when reviewing the photographs. Mr. Tyler discusses his analysis in more detail in his rebuttal expert report, which includes the results of his photograph review.[32] Mr. Tyler found that the photographs were sufficient evidence to support the deficiency classification in 4,061 (97.7 percent) of the instances he reviewed. Of the remaining instances he reviewed, Mr. Tyler judged that the photographs were inconclusive in 80 instances (1.9 percent), and that 16 instances (0.4 percent) were not supported by the photographs. Thus, Mr. Tyler found that an overwhelming majority of the deficiencies recorded by Plaintiffs was supported by his race-blind review of the photographic evidence for those deficiencies.

24.     After Mr. Tyler's review of the photographs was complete, I understand that Plaintiffs and Mr. Tyler overlayed his results with the racial composition of the Census block groups in which each property was located. This overlay showed that the error rates were roughly equal for White block group properties and Non-White block group properties. **Figure 2** summarizes these results.

---

[32] *Tyler Rebuttal Report,* Exhibit 5.

**Figure 2: Summary of Mr. Tyler's Race-Blind Review of Photographic Support for Plaintiffs' Deficiency Classification**

|  | Total | White Block Group Properties | Non-White Block Group Properties |
|---|---|---|---|
| **Total Instances of Deficiencies Reviewed** | 4,157 | 1,495 | 2,662 |
| **Mr. Tyler's Judgments from Review of Plaintiffs' Photo Evidence** | | | |
| **Sufficient Evidence to Confirm Deficiency** | 4,061 | 1,467 | 2,594 |
| *% of Total* | *97.7%* | *98.1%* | *97.4%* |
| **Inconclusive** | 80 | 25 | 55 |
| *% of Total* | *1.9%* | *1.7%* | *2.1%* |
| **No Evidence of Deficiency** | 16 | 3 | 13 |
| *% of Total* | *0.4%* | *0.2%* | *0.5%* |

25.     Mr. Tyler found that the photographs for 1.9 percent of the deficiencies for White block group properties were either inconclusive (1.7 percent) or showed no evidence (0.2 percent) of the deficiencies, whereas he found that 2.6 percent of the deficiencies for Non-White block group properties were either inconclusive (2.1 percent) or showed no evidence (0.5 percent) of the deficiencies. The difference between these rates is not statistically significant at standard significance levels.[33,34]

---

[33] I measure statistical significance by calculating a z-test of proportions. The p-value of the z-test for the difference between the White block group rate of inconclusive or no evidence (1.9 percent) and the Non-White block group rate of inconclusive or no evidence (2.6 percent) is 0.16. The p-value of the z-test for the difference between the White block group rate of no evidence (0.2 percent) and the Non-White block group rate of no evidence (0.5 percent) is 0.15. The p-value would need to be less than or equal to 0.1 for the difference to be statistically significant at the 10 percent significance level, and less than or equal to 0.05 for the difference to be statistically significant at the 5 percent significance level.

[34] I also measure the differences between Mr. Tyler's rates of no evidence for White block group properties and Non-White block group properties for each of the 36 categories of deficiencies he reviewed. These results are included in my workpapers, which show that the differences between these rates for White block group properties and Non-White block group properties are not statistically significant for nearly every deficiency. The only deficiency category for which the difference is marginally statistically significant (at the 10 percent significance level) is the difference between the rate of no evidence for Unsecured, Broken, or Boarded Doors for White block group properties (5.0 percent) and Non-White block group properties (3.2 percent).

### D.    Disparities Persist in Unedited Data

26.    In his expert report, Professor McCrary alleges that Plaintiffs failed to properly process the results of their inspections into the database that was used in my analysis.[35] He states that Plaintiffs failed to preserve many of the original handwritten inspection forms, that many of the records in Plaintiffs' inspection database were edited and overwritten over time, and that some inspection data initially input into the Plaintiffs' database differs from the data recorded on the inspectors' original handwritten forms.[36]

27.    Professor McCrary identifies 267 properties for which the original handwritten inspection forms remained available for review.[37] His research team counted the deficiencies coded on these forms to create an alternate inspection database.[38] When comparing the number of deficiencies from the original handwritten inspection forms to the number of deficiencies in the spreadsheet upon which I relied for the analysis in my expert report ("Plaintiffs' Inspection Database"), Professor McCrary finds that, on average, more deficiencies were removed for properties in majority white neighborhoods than were removed for properties in majority non-white neighborhoods.[39] Professor McCrary then estimates regression models, using the same controls used in my analysis, on this sample of properties to measure the relationship between the number of property deficiencies originally recorded on the handwritten forms and the racial composition of the property's neighborhood. He alleges that his regressions show that the relationship between the non-white status of a neighborhood and the number of deficiencies

---

[35] *McCrary Report*, ¶ 31.
[36] *McCrary Report* ¶ 43.
[37] *McCrary Report* ¶ 38.
[38] *McCrary Report* ¶ 39 n.58.
[39] *McCrary Report* ¶ 39.

recorded on the original handwritten forms is not statistically significant, contrary to my findings of statistically significant disparities in property deficiencies in non-white neighborhoods.[40]

28.     Based on Plaintiffs' alleged failure to preserve the handwritten inspection forms for every property inspected, the inconsistencies between the deficiencies recorded on the handwritten forms and the database, and the results of his model estimated using the original deficiency form records, Professor McCrary criticizes Plaintiffs' research methodology, going so far as to suggest that research misconduct may have occurred[41] and that the changes were "seemingly targeted at a finding of discrimination."[42]

29.     However, Plaintiffs have maintained the original photographs taken by inspectors that they used to support any observations of deficiencies. I understand from Plaintiffs' counsel that the differences between the deficiencies shown on the original handwritten inspection forms and the Plaintiffs' Inspection Database are the result of a quality control process by which the deficiencies recorded by inspectors on their handwritten and electronic forms were compared to the photographs taken by inspectors to determine whether the deficiencies recorded were consistent with the photographs.[43]

30.     Before data from inspections can be analyzed, it must first be recorded, edited, and/or coded. The data should undergo quality control to ensure the accuracy and consistency of the data.[44] When underlying evidence supporting the data is available, as is present in this case

---

[40] *McCrary Report* ¶¶ 41-42.
[41] *McCrary Report*, ¶ 35.
[42] *McCrary Report*, ¶ 36.
[43] Deposition of Lindsay Augustine (Vols. II and III), Oct. 15, 2021, & May 17, 2022, at 408-409, 556-557, 569-572, 574-575, 577, 765; Expert Report of Timothy Guetterman, PhD, MA, Sept. 13, 2022, at 8-9.
[44] *See, e.g.*, Shari Seidman Diamond, *Reference Guide on Survey Research, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 412-413 (3rd ed., 2011) ("Analyzing the results of a survey requires that the data obtained on each sampled element be recorded, edited, and often coded before the results can be tabulated and processed.

through photographs taken by inspectors, this underlying, direct evidence can best ensure the accuracy and consistency of the quality control process and the coded data.

31.     Professor McCrary does not dispute the accuracy of Plaintiffs' quality control in his expert report. Although his entire analysis and conclusions on this point are based on alleged inconsistencies between the "original data" (as maintained on handwritten forms) and Plaintiffs Inspection Database, Professor McCrary apparently neglected to examine whether Plaintiffs Inspection Database was consistent with the other form of original data collected by Plaintiffs – the photographs of the properties.[45]

32.     I understand from Plaintiffs' counsel that another expert, Dr. Tim Guetterman, has independently examined the photographs for a random sample of thirty properties for which the original handwritten forms were maintained to determine whether the evidence in the photographs was consistent with either (1) the deficiencies recorded in the original handwritten forms, or (2) the deficiencies recorded in Plaintiffs' Inspection Database that formed the basis for my analysis. I understand that based on his race-blind review of these photographs (in which he was ignorant of the racial composition of the neighborhood in which the property was located), Dr. Guetterman concludes that the photographs were consistent with the deficiencies recorded in Plaintiffs' Inspection Database for each deficiency for each of the thirty properties. As I discussed in the previous section, I also understand that Plaintiffs' expert Deavay Tyler found that the photographs

---

Procedures for data entry should include checks for completeness, checks for reliability and accuracy, and rules for resolving inconsistencies.").

[45] Professor McCrary does acknowledge the fact that a quality control process, by which deficiency recordings were compared to photographs, occurred. *McCrary Report*, ¶ 46. However, he dismisses this process because he alleges Plaintiffs have not provided the criteria used to edit entries after their initial upload and have not preserved the original handwritten entries in all cases. *Id*.

maintained by Plaintiffs were sufficient evidence to support the deficiency classification of 97.7 percent of the 4,157 instances of recorded deficiencies he reviewed.

33.     Separate from Dr. Guetterman's review and Mr. Tyler's review, I have estimated my regression models on subsamples of my Full Analysis Sample (the 893 properties from Plaintiffs' Inspection Database for which I determined were visited during the period of Deutsche Bank's ownership of the property) to test whether my findings of statistically significant disparities in property deficiencies based on the neighborhood's racial composition robustly hold when examining only those properties for which no edits were made to the data after the deficiencies were originally recorded in Plaintiffs' database.[46]

34.     Plaintiffs' counsel has provided me a delimited text file showing the edits made to the deficiencies recorded in Plaintiffs' Inspection Data over time ("Deficiency Log").[47] The Deficiency Log includes the creation date and time of the record for each deficiency for each property in Plaintiffs' database, the name of the creator of the electronic record, and the date and time (if any) and identity of the editor of any edits made to the deficiency record. I identify a property as having no edits to its deficiency data in Plaintiffs' Inspection Database ("Unedited Property") if every record in the Deficiency Log for that property has the same creation date, the same creator name, and, if any edits are present, those edits were all made on the same date as the creation date by the same editor as the record creator. Using these criteria, I identify 256 properties

---

[46] As Professor McCrary notes, the number of deficiencies recorded in Plaintiffs' Inspection Database among properties with no edits shown may differ from the number of deficiencies recorded on the handwritten inspection forms because the uploaders could adjust the deficiency coding from the forms if the deficiencies recorded on the forms were inconsistent with the photographs. *McCrary Report*, ¶¶ 42-45. Nevertheless, this analysis is instructive with regards to Professor McCrary's allegation that Plaintiffs revised deficiency evidence after the fact in order to achieve predetermined findings of discrimination.

[47] "Exhibit 7693 - MVFHC_0014025.CSV"

from my Full Analysis Sample as being Unedited Properties ("Unedited Property Sample"). When I re-estimate my regressions on the number of deficiencies in the Unedited Property Sample, I find that the racial disparities are robust and statistically significant. For example, REO properties in non-white neighborhoods had 4.438 more deficiencies than REO properties in white neighborhoods in the Unedited Property Sample, compared to a disparity of 3.360 among the Full Analysis Sample. When I control for all the factors used in my "All Controls" specification of my original report, I find that the racial disparity is 4.846 among the Unedited Property Sample, compared to the disparity of 2.278 among the Full Analysis Sample in my original report.[48] All these disparities are statistically significant at the 99 percent confidence level. These disparities are summarized in **Figure 3**.

35.     As a conservatism, I also estimate models using both the Unedited Properties and the set of properties from my Full Analysis Sample for which Professor McCrary coded deficiencies from the original handwritten inspection forms. Of the 236 properties coded by Professor McCrary, 188 are in my Full Analysis Sample. I add to this sample of 188 properties the 247 Unedited Properties that are not already present in Professor McCrary's sample, yielding a total sample of 435 ("McCrary Handwritten + Unedited Properties"). For the 188 properties from Professor McCrary's sample, I use his recording of the count of total deficiencies from the handwritten forms. For the 247 Unedited Properties, I use the count of total deficiencies from Plaintiffs' Inspection Database. When I estimate my regression models on this sample of 435 properties, I find that the racial disparities are robust and statistically significant. For example, REO properties in non-white neighborhoods had 3.147 more deficiencies than REO properties in

---

[48] *Ayres Report*, ¶ 61, Figure 5.

white neighborhoods in the McCrary Handwritten + Unedited Property Sample, compared to a disparity of 3.360 among the Full Analysis Sample. When I control for all the factors used in my "All Controls" specification of my original report, I find that the racial disparity is 2.257 among the Unedited Property Sample, compared to the disparity of 2.278 among the Full Analysis Sample in my original report.[49] All these disparities are statistically significant at the 99 percent confidence level. These disparities are summarized in **Figure 3**.

36.     In addition, Plaintiffs' counsel has provided me a spreadsheet showing the deficiencies recorded on the handwritten inspection forms reviewed by Professor McCrary *and* the deficiencies recorded on printouts of the electronic inspection forms in instances where inspectors completed their inspections electronically rather than on handwritten forms.[50] Of my Full Analysis Sample of 893 properties, 309 were present on this spreadsheet. I add to this sample of 309 properties the 241 Unedited Properties that are not already present in Plaintiffs' sample of properties with original handwritten forms and inspection form printouts, yielding a total sample of 550 ("Handwritten & Printout + Unedited Properties"). For the 309 properties from Plaintiffs' sample of properties with handwritten and printout forms, I use their recordings of the count of total deficiencies from the handwritten forms. For the 241 Unedited Properties, I use the count of total deficiencies from Plaintiffs' Inspection Database. When I estimate my regression models on this sample of 550 properties, I find that the racial disparities are robust and statistically significant. For example, REO properties in non-white neighborhoods had 2.885 more deficiencies than REO properties in white neighborhoods in the Handwritten & Printout Properties + Unedited Property Sample, compared to a disparity of 3.360 among the Full Analysis Sample. When I control for all

---

[49] *Ayres Report*, ¶ 61, Figure 5.
[50] "Copy of Deutsche Bank Paper Evaluation Form Review- Para Review.xlsx."

the factors used in my "All Controls" specification of my original report, I find that the racial disparity is 1.275 among the Unedited Property Sample, compared to the disparity of 2.278 among the Full Analysis Sample in my original report.[51] All these disparities are statistically significant at the 95 percent confidence level. These disparities are summarized in **Figure 3**.[52]

**Figure 3: OLS Regression Results for Number of Deficiencies in the Full Analysis Sample, Unedited Subsamples**

| Sample | Racial Disparity: Non-White Block Group Coefficient | | Number of Observations in Model | |
|---|---|---|---|---|
| | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls |
| Full Analysis Sample | 3.360*** | 2.278*** | 893 | 715 |
| Unedited Properties | 4.438*** | 4.846*** | 256 | 188 |
| McCrary Handwritten + Unedited Properties | 3.147*** | 2.257*** | 435 | 325 |
| Handwritten & Printout + Unedited Properties | 2.885*** | 1.275** | 550 | 429 |

Note: *** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%. Coefficients and p-values for other explanatory variables in these OLS models are included in **Exhibit 3**.

37.     I include in **Figure 3** the disparity results from the regressions that include unedited deficiency counts from the handwritten inspection forms or the original printouts of electronic inspection forms to show that even under conservative assumptions that statistically significant racial disparities persist. The results from these models are not as reliable as the models estimated using the disparities coded after Plaintiffs' quality control process, and therefore I give more

---

[51] *Ayres Report*, ¶ 61, Figure 5.
[52] **Exhibit 3** reports the results of analogous regressions testing whether alternative neighborhood racial composition variables are statistically significant.

weight to the results from the models estimated in my original report using deficiency data that underwent that quality control process.

38.     I similarly re-estimate my logistic regressions using these subsamples and alternative measurements of deficiencies for the likelihood of properties having 10 or more deficiencies at the time of Plaintiffs' inspection. The disparities measured in these regressions are stated in terms of an "odds ratio", which is the ratio of the odds of a non-white neighborhood property having at least 10 deficiencies to the odds of a white neighborhood property having at least 10 deficiencies.[53] An odds ratio greater than one indicates that a non-white neighborhood property has greater odds of having at least 10 deficiencies observed than a white neighborhood property. The disparities measured over these subsamples and the disparities measured in my expert report over the Full Analysis Sample[54] are summarized in **Figure 4**.[55]

---

[53] *Ayres Report*, ¶ 65.
[54] *Ayres Report*, ¶¶ 66-67, Figure 6.
[55] **Exhibit 4** reports the results of analogous regressions testing whether alternative neighborhood racial composition variables are statistically significant.

**Figure 4: Logistic Regression Odds Ratio Results for Presence of at Least Ten Deficiencies in the Full Analysis Sample, Unedited Subsamples**

| Sample | Racial Disparity: Non-White Block Group Odds Ratio | | Number of Observations in Model | |
|---|---|---|---|---|
| | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls |
| Full Analysis Sample | 4.762*** | 4.895*** | 893 | 643 |
| Unedited Properties | 8.556*** | 3,931.128*** | 256 | 155 |
| McCrary Handwritten + Unedited Properties | 3.007*** | 4.072** | 435 | 289 |
| Handwritten & Printout + Unedited Properties | 2.448*** | 1.998* | 550 | 383 |

Note: *** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%. Coefficients and p-values for other explanatory variables in these OLS models are included in **Exhibit 4**.

39. **Figure 4** shows that the likelihood of a property having at least 10 deficiencies observed by Plaintiffs' inspectors is greater for properties in non-white neighborhoods than properties in white neighborhoods. When measured over the Full Analysis Sample, as done in my original report, the odds of a property in a non-white neighborhood of having at least 10 deficiencies was 4.895 times the odds of a property in a white neighborhood having at least 10 deficiencies, after controlling for the non-race factors discussed in my expert report. This disparity is statistically significant at the 99 percent confidence level. When measured over the subsamples of Unedited Properties and properties that have handwritten inspection forms or printouts of electronic inspection forms available, these disparities persist and remain statistically significant at the 90 percent confidence level or greater.

**E.    Defendants' Experts Fail to Show that Plaintiffs' Classification of Boarded Doors and Windows Has Any Effect on Racial Disparities in Deficiencies**

40.    Defendants' experts criticize the Plaintiffs' criteria for considering boarded doors and windows as deficiencies in all cases. Dr. Skanderson argues that "Plaintiffs' inspection process

did not take into account requirements of local ordinances regarding such things as boarding of windows, or whether boarding may have been necessary due to break-ins or vandalism."[56] Therefore, Dr. Skanderson argues that the observed differences in the incidence of boarded windows cannot be explained by regression analysis. However, even if a boarded door or window is a result of vandalism, the appearance of a boarded door or window is evidence of a previously unsecure or broken door or window that the servicer elected not to repair.

41.     Dr. Skanderson and Ms. Stedman also argue that Plaintiffs' process for treating boarded windows as deficiencies was flawed because local codes in some communities required windows to be boarded.[57] However, they fail to identify any communities in which codes require windows to be boarded for REO properties. Instead, Dr. Skanderson cites as an example an Altisource Vendor Operational Guide that suggests that "some" municipalities require boarding on a property's first floor or boarding in high-vandalism areas if boarding is the only reasonable means to protect property security.[58] However, the effective year of this document is 2020, whereas the latest property inspection conducted by Plaintiffs was in 2018.

42.     Earlier Altisource Vendor Operational Guides effective during the period when Plaintiffs conducted their inspections list only one specific locality – Chicago, Illinois – as a locality in which boarding was required that was also covered by Plaintiffs in their inspections of Deutsche Bank owned REO properties.[59] Further, only 23 Chicago zip codes are listed as being

---

[56] *Skanderson Report*, ¶ 69.

[57] *Skanderson Report*, ¶ 69; *Stedman Report*, ¶ 72.

[58] *Skanderson Report*, ¶ 69 n.33.

[59] *See* AFS_00011075 – 11222, at AFS_00011123 – 11124 (Altisource REO Vendor Guide for VMS, effective 10/16/2013); ASI000584493 – 584608 (Altisource REO Vendor Guide, effective 2014); ASI000580950 – 580957 (Altisource REO Vendor Guide, effective 2015; ASI000584312 – 584492 (Altisource REO Vendor Guide, effective 9/14/2016); ASI000571735 – 571990, at ASI000571759 – 571767, 571923 – 571926 (Altisource REO Operational Vendor Guide, effective 10/25/2017). Each of these vendor guides list the following zip codes in which boarding was

applicable to the boarding requirements, and the Chicago boarding requirements described in the Altisource guide appear to apply only to openings on the first floor or accessible via an exterior stairway.

43.     I understand that Plaintiffs researched local ordinances for purposes of responding to similar criticisms from the defendants' experts in Plaintiffs' litigation against Bank of America. During the course of their research, they found evidence of ten communities that could arguably have been said to have boarding mandates, whereas the dozens of other municipalities researched either prohibited boarding, permitted but did not require boarding, or had local codes that made no mention of boarding or had no express prohibition against boarding.[60] I understand from Plaintiffs' counsel that the servicer in the Bank of America case was not seen to operate, as Altisource did with Deutsche Bank in this litigation, based on application of extensive Vendor Operational Guides directing specific minutia of local vendor work. Additionally, Plaintiffs' list of localities that could be said to mandate boarding included Chicago on the whole, whereas in actuality Altisource's Vendor Operational Guides list a limited number of Chicago zip codes in which boarding was required.

44.     Although they allege that the treatment of boarded doors and windows as deficiencies in every instance is inappropriate, Defendants' experts do not analyze whether the

---

required: 60608, 60609, 60610, 60612, 60615, 60616, 60617, 60619, 60620, 60085, 60621, 60622, 60623, 60624, 60627, 60628, 60636, 60637, 60643, 60644, 60649, 60651, and 60653). Babylon, New York is also cited as a municipality in which boarding was required, but no Babylon, New York properties are included in Plaintiffs' REO Inspection Data.

[60] Exhibit 10 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment Case No. 1:18-cv-01919-CCB (D. Md.). These municipalities were Atlanta, GA; Baltimore, MD; Baton Rouge, LA; Capitol Heights, MD; Chicago, IL; Columbus, OH; East Point, GA; Garfield Heights, OH; Memphis, TN; and Newark, NJ.

results of my analysis would change if boarded windows were not considered to be deficiencies in routine maintenance and marketing in the applicable communities.

45.     Although Plaintiffs' treatment of boarded windows and doors as deficiencies is reasonable, I undertake an analysis of deficiencies in which boarded doors and windows of the subject REO properties are not considered to be deficiencies under a few varying assumptions. Plaintiffs' representative Lindsay Augustine reviewed the photos supporting the door and window deficiencies recorded for each of the REO properties in my Full Analysis Sample of 893 properties to determine for each property (1) the number of damaged doors (broken, boarded, or unsecured), (2) the number of boarded doors, (3) the number of broken or unsecured doors, (4) the number of damaged windows (broken or boarded), (5) the number of boarded windows, (6) the number of broken windows, and (7) whether all first-floor windows were boarded.[61] Plaintiffs have provided me a document that shows the results of Ms. Augustine's review of these photos of door and window deficiencies.[62]

46.     To analyze whether classifying boarded doors and windows as deficiencies affects the conclusions of my analysis, I estimate my regression models using modified deficiency scores from Plaintiffs' REO Inspection Data, modified to account for Ms. Augustine's photo review. Two of the 38 categories of deficiencies used in my analysis are applicable to boarding: "unsecured/broken doors and locks", and "damaged windows (broken, boarded)". I modify the data on these two deficiency categories to exempt boarding as a deficiency under the following alternate scenarios:

---

[61] Declaration of Lindsay Augustine – Front View Photo List and Broken & Boarded Doors and Windows Count, Apr. 18, 2023. The racial demographics of the neighborhoods for the REO properties were not visible to Ms. Augustine during her review. *Id*.

[62] *Id*., Appendix B.

1) *Boarding is always a deficiency*: This is the assumption used in the analysis from my original report, and I make no changes to the data in the REO Inspection Data.

2) *Boarding is not a deficiency if the only boarding is on the first floor*: I change the scoring of "unsecured/broken doors and locks" for a property from "Yes" to "No" if the number of boarded doors is equal to the number of damaged doors, and the first floor was entirely boarded. I change the scoring of "damaged windows (broken, boarded)" for a property from "Yes" to "No" if the number of boarded windows is equal to the number of damaged windows, and the first floor was entirely boarded.

3) *Boarding is never a deficiency*: I change the scoring of "unsecured/broken doors and locks" for a property from "Yes" to "No" if the number of boarded doors is equal to the number of damaged doors. I change the scoring of "damaged windows (broken, boarded)" for a property from "Yes" to "No" if the number of boarded windows is equal to the number of damaged windows.

47.    I then apply these three scenarios of modified boarding deficiency categorization to properties based on their location under three geographic scenarios:

1) Apply modified boarding categorization to properties in all areas,

2) Apply modified boarding categorization only to properties in the Chicago zip codes listed in the Altisource REO Vendor Guides, or

3) Apply modified boarding categorization only to properties in the Chicago zip codes listed in the Altisource REO Vendor Guides and properties in the other municipalities identified by Plaintiffs as requiring boarding.

48.    **Figure 5** summarizes the results of the incidence of door and window deficiencies among White and Non-White block group properties, based on the varying treatment of boarding

as deficiencies.[63] For example, when boarding is always considered to be a deficiency (as was the categorization in the analysis from my original report), **Figure 5** shows that 23 percent of White block group properties had unsecured/broken doors or locks, whereas 41 percent of Non-White block group properties had unsecured/broken doors or locks – a statistically significant disparity of 18 percent. When boarding is *not* considered to be a deficiency in certain circumstances, the incidence of "unsecured/broken doors and locks" and "damaged windows (broken, boarded)" as deficiencies, by definition, decreases. However, the disparities between White block group properties and Non-White block group properties in the incidence of these deficiencies remain statistically significant. For example, when boarding is considered to be a deficiency *unless* the first floor is completely boarded and the property is in one of the designated Chicago zip codes, then the disparity for unsecured/broken doors and locks remains a statistically significant 18 percent.

---

[63] **Exhibit 5** reports additional results of differences in the incidence of door and window deficiencies, based on varying treatment of boarding, among the alternate minority racial classifications I examine.

**Figure 5: Presence of Door & Window Deficiencies Among REO Properties in Full Analysis Sample of Plaintiffs' Inspection Data Based on Different Treatments of Boarding**

| % of REO Properties with Individual Deficiencies: | White Block Group Properties (n=346) | Non-White Block Group Properties (n=547) | *Difference* [1] |
|---|---|---|---|
| **Unsecured/broken doors and locks:** | | | |
| **Boarding always a deficiency** | 23% | 41% | *18%* |
| **Boarding not a deficiency if:** | | | |
| **only boarding is on 1st floor** | 22% | 38% | *16%* |
| **boarding is never a deficiency** | 18% | 26% | *8%* |
| **Boarding not a deficiency, but only for properties in selected Chicago zip codes[2], if:** | | | |
| **only boarding is on 1st floor** | 23% | 41% | *18%* |
| **boarding is never a deficiency in these locations** | 23% | 40% | *17%* |
| **Boarding not a deficiency, but only for properties in selected Chicago zip codes and other municipalities[3], if:** | | | |
| **only boarding is on 1st floor** | 23% | 40% | *18%* |
| **boarding is never a deficiency in these locations** | 22% | 37% | *15%* |
| | | | |
| **Damaged windows (broken, boarded):** | | | |
| **Boarding always a deficiency** | 24% | 52% | *29%* |
| **Boarding not a deficiency if:** | | | |
| **only boarding is on 1st floor** | 23% | 49% | *26%* |
| **boarding is never a deficiency** | 16% | 27% | *12%* |
| **Boarding not a deficiency, but only for properties in selected Chicago zip codes[2], if:** | | | |
| **only boarding is on 1st floor** | 24% | 52% | *28%* |
| **boarding is never a deficiency in these locations** | 24% | 52% | *28%* |
| **Boarding not a deficiency, but only for properties in selected Chicago zip codes and other municipalities[3], if:** | | | |
| **only boarding is on 1st floor** | 24% | 52% | *28%* |
| **boarding is never a deficiency in these locations** | 23% | 47% | *24%* |

Note: **Exhibit 5** includes comparisons of incidence of these deficiencies between White Block Groups, African American Block Groups, and Hispanic Block Groups.

[1] All differences are statistically significant at 1% significance level (p<0.01).

[2] During the period of Plaintiffs' inspections, the only locations specified by the Altisource REO Vendor Operational Guides as requiring boarding are the following zip codes in Chicago, IL: 60608, 60609, 60610, 60612, 60615, 60616, 60617, 60619, 60620, 60085, 60621, 60622, 60623, 60624, 60627, 60628, 60636, 60637, 60643, 60644, 60649, 60651, and 60653. See AFS_00011075 – 11222, at AFS_00011123 – 11124 (Altisource REO Vendor Guide for VMS, effective 10/16/2013); ASI000584493 – 584608 (Altisource REO Vendor Guide, effective 2014); ASI000580950 – 580957 (Altisource REO Vendor Guide, effective 2015; ASI000584312 – 584492 (Altisource REO Vendor Guide, effective 9/14/2016); ASI000571735 – 571990, at ASI000571759 – 571767, 571923 – 571926 (Altisource REO Operational Vendor Guide, effective 10/25/2017).

[3] The other municipalities are Atlanta, GA; Baltimore, MD; Baton Rouge, LA; Capitol Heights, MD; Columbus, OH; East Point, GA; Garfield Heights, OH; Memphis, TN; and Newark, NJ. *See* Exhibit 10 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Case No. 1:18-cv-01919-CCB (D. Md.).

49.　　Using the alternate treatments as boarding as a deficiency, I re-estimate my regressions for the number of total deficiencies and the incidence of at least ten deficiencies that I estimated in my original report. The regression results for the number of deficiencies and likelihood of at least ten deficiencies using these alternate treatments of boarding are summarized in **Figure 6**.[64] As **Figure 6** shows, the disparities between the number of deficiencies for White block group properties and Non-White block group properties remain statistically significant, regardless of the alternate treatments of boarding as a deficiency.

---

[64] Additional regression results of the racial disparities in deficiencies, based on varying treatments of boarding, alternate minority racial classifications (e.g., African American/Hispanic Block Groups, African American Block Groups, Hispanic Block Groups), and alternate samples (Full Analysis Sample, the Analysis Sample excluding the 139 Disputed Properties, and the Analysis Sample including only the 699 Agreed Upon Properties) are included in my workpapers. These additional models show that the disparities in deficiencies continue to be statistically significant regardless of the racial classifications used, the sample examined, or the treatment of boarded windows as deficiencies.

**Figure 6: Regression Results for Number of Deficiencies in the Full Analysis Sample Based on Different Treatments of Boarding**

| Boarding Deficiency Scoring | Outcome: Number of Deficiencies Racial Disparity: Non-White Block Group Coefficient | | Outcome: At Least 10 Deficiencies Racial Disparity: Non-White Block Group Odds Ratio | |
|---|---|---|---|---|
| | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls |
| Boarding always a deficiency | 3.360*** | 2.278*** | 4.762*** | 4.895*** |
| Boarding not a deficiency if: | | | | |
| only boarding is on 1st floor | 3.312*** | 2.284*** | 4.693*** | 4.915*** |
| boarding is never a deficiency | 3.094*** | 2.155*** | 4.172*** | 4.443*** |
| Boarding not a deficiency, but only for properties in selected Chicago zip codes[1], if: | | | | |
| only boarding is on 1st floor | 3.358*** | 2.278*** | 4.762*** | 4.895*** |
| boarding is never a deficiency | 3.349*** | 2.268*** | 4.762*** | 4.895*** |
| Boarding not a deficiency, but only for properties in selected Chicago zip codes and other municipalities[2], if: | | | | |
| only boarding is on 1st floor | 3.351*** | 2.282*** | 4.762*** | 4.895*** |
| boarding is never a deficiency | 3.280*** | 2.260*** | 4.590*** | 4.723*** |

Note: *** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%. Coefficients, odds ratios, and p-values for other explanatory variables in these models and models using other racial classifications and samples (including samples that exclude the 139 Disputed Properties and include only the 699 Agreed Upon Properties) are included in my workpapers.

[1] During the period of Plaintiffs' inspections, the only locations specified by the Altisource REO Vendor Operational Guides as requiring boarding are the following zip codes in Chicago, IL: 60608, 60609, 60610, 60612, 60615, 60616, 60617, 60619, 60620, 60085, 60621, 60622, 60623, 60624, 60627, 60628, 60636, 60637, 60643, 60644, 60649, 60651, and 60653. See AFS_00011075 – 11222, at AFS_00011123 – 11124 (Altisource REO Vendor Guide for VMS, effective 10/16/2013); ASI000584493 – 584608 (Altisource REO Vendor Guide, effective 2014); ASI000580950 – 580957 (Altisource REO Vendor Guide, effective 2015; ASI000584312 – 584492 (Altisource REO Vendor Guide, effective 9/14/2016); ASI000571735 – 571990, at ASI000571759 – 571767, 571923 – 571926 (Altisource REO Operational Vendor Guide, effective 10/25/2017).

[2] The other municipalities are Atlanta, GA; Baltimore, MD; Baton Rouge, LA; Capitol Heights, MD; Columbus, OH; East Point, GA; Garfield Heights, OH; Memphis, TN; and Newark, NJ. See Exhibit 10 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Case No. 1:18-cv-01919-CCB (D. Md.)

## F. Curb Appeal Is Appropriately Considered by Plaintiffs When Evaluating Deficiencies in Maintenance and Marketing

50. Defendants' experts appear to deny that curb appeal is considered an important factor regarding REO property maintenance and preservation. For example, Mr. Bryar argues that

Defendants' work on the REO properties was "limited by generally accepted mortgage industry standards"[65] and that the requirement that Defendants preserve the property did not obligate them to "address issues that, for example, affect a property's 'curb appeal,' as Plaintiffs put it."[66]

51.     However, marketability, improving the asset appearance, and keeping the property clean – all curb appeal factors – are an important part of Defendants' policies in preserving REO properties. Altisource's policies overtly and directly link Property Preservation and Inspection ("PPI") with marketing and sales. For example, the introduction to a 2014 Altisource sales consultant procedure document states "[t]he Residential Sales consultant (RSC) plays an important role in the Marketing and Sale of foreclosed residential properties. Each RSC will focus on achieving the maximum return for the Owner/Seller. Each RSC will focus on converting all marketable properties, especially the aged in their portfolio to a solid sustainable sales contract. Each RSC will also work closely with the Property Preservation and Transaction Coordination teams who play an important role towards the marketing and closing of the properties."[67]

52.     Altisource's inspectors are instructed to measure the marketability of its servicing portfolio of REO properties. According to Altisource's Vendor Operational Guide for monthly quality control inspections, the inspection form's marketability section "includes an evaluation of recurring sales cleanings and general 'curb appeal' items such as missed landscaping items. This is a subjective evaluation of the property in comparison to other properties within the same

---

[65] *Bryar Report*, ¶ 87.
[66] *Bryar Report*, ¶ 88.
[67] REO Residential Sales Consultant Procedure (effective date 9/1/2011 and reviewed 10/15/2014) (Pltffs.' Ex. 361, ASI000046373 – 46512, at ASI0000046377).

neighborhood/subdivision. If there are any suggestions to improve the marketability of the property, those suggestions will be made in the "Notes/Comments" section."[68]

53.     Several management witnesses from Altisource have testified that maintaining curb appeal of REOs is a key requirement for properly maintaining an REO property. Mason Legendre, Altisource's Vice President of Marketplace Operations,[69] testified that "[d]raw on curb appeal would help drive a more rapid disposition for a greater sum."[70] Thomas Blake, a former Vice President of Asset Management at Altisource,[71] testified that maintaining curb appeal was important to maintain property value and to sell the property as quickly as possible.[72] Ryan Solohub, a former Director of Asset Management at Altisource, testified that curb appeal was important when selling any property, regardless of the property's value.[73]

54.     These documents and testimonies support Plaintiffs' contention that the curb appeal characteristics observed by Plaintiffs' inspectors are appropriate factors when evaluating deficiencies in routine REO maintenance and marketing.

---

[68] REO Vendor Guide for VMS (effective date 10/16/2013) (Pltffs.' Ex. 765, AFS_00011075 – 11222, at ASI00011110).

[69] Deposition of Mason Legendre, Apr. 14, 2022, at 77.

[70] Deposition of Mason Legendre, Apr. 14, 2022, at 22.

[71] Deposition of Thomas Blake, Apr. 7, 2022, at 11.

[72] Deposition of Thomas Blake, Apr. 7, 2022, at 125 ("A. Our goal was to sell assets as fast as we could. The reason for that, from my perspective, was every day an asset was on the market it could be subject to a weather event, vandalism, an animal, and not only did that decrease, any of those types of events, decrease the value, but simply would detract from the curb appeal and, you know, we knew nobody wanted to live next to a place that was getting rundown. So selling it faster limited those potential risks."); 127 ("Q. Okay. Well, the things do kind of mix, right? Damages that are -- damages can affect curb appeal. What else can affect curb appeal, in your experience with Altisource Asset Management? A. I don't know that my answer would be any different than anything you would see at the house in your neighborhood that would affect -- that would be affected by curb appeal, broken windows, grass, kempt lawn, trash, those kind of things.").

[73] Deposition of Ryan Solohub, Apr. 16, 2022, at 261-262 ("Q. Yeah. Curb appeal, things you can see from the curb, was that considered more important under this program for properties 500,000 and above than properties under that? A. I don't believe that to be the case, no. I mean, curb appeal was important in general. Otherwise, you wouldn't sell any property, regardless of its value.").

## IV. DEFENDANTS' EXPERTS FAIL TO SHOW THAT DISPARITIES IN OBSERVED DEFICIENCIES CAN BE EXPLAINED BY FACTORS THEY SUGGEST SHOULD HAVE BEEN ACCOUNTED FOR IN MY MODELS

55.     In my initial report, I estimated the marginal effect of the racial demographics of a property's Census block group on the number of routine maintenance deficiencies observed by Plaintiffs' inspectors.[74] In those regressions, I controlled for a variety of factors that could explain variations in deficiencies observed across properties, such as the age of the home, the number of months the property was owned by the lender as of the inspection date, the property's land value, and neighborhood vacancy rates.[75]

56.     Defendants' experts have alleged that additional variables not included in my analysis could have helped explain the observed disparities in my initial analysis of Defendants' REO property deficiencies. In this section, I present adjusted regression models to respond to these critiques. I estimate these additional models to respond to Defendants' experts to measure whether adopting their critiques changes my conclusions. However, I note that including too many variables in a regression model that measures for disparate impact can be problematic when the included variables are correlated with race but not are business justified.[76]

---

[74] *Ayres Report,* ¶¶ 56-70.

[75] The full list of controls is listed in *Ayres Report*, Exhibit 4.

[76] A regression testing for unjustified disparate impacts should control for only those variables that would provide a plausible valid business justification. It is my opinion that only attributes related to a decisionmaker's expected marginal cost provide a valid business justification – and hence only such attributes should be included in the business justification regression. This standard resonates with the standard approach in the literature. For example, John Yinger succinctly describes (i) the problem of "included variable bias" (what he calls "diverting variable bias"); (ii) the need to purposefully exclude certain non-legitimate controls from a regression; and (iii) what constitutes "legitimate" controls: "Diverting variable bias arises when a variable that is not a legitimate control variable, but that is correlated with race or ethnicity, is included in the regression. The key issue, of course, is how to define what variables are "legitimate." Under most circumstances, economists are taught to err on the side of including too many variables. In this case, however, illegitimate controls may pick up some of the effect of race or ethnicity and lead one to conclude that there is no discrimination when in fact there is." John Yinger, *Evidence of Discrimination in Consumer Markets*, 12 J. ECON PERSPECTIVES 23, 27 (1998). See also Ian Ayres, *Testing for Discrimination and the Problem of "Included Variable Bias"* (working paper 2010), *available at*

A. **Defendants' Experts Fail to Show that Initial Condition of the Property Explains the Disparities in Deficiencies**

57. One criticism levied by Defendants' experts against my regression model for REO property maintenance and marketing deficiencies is that my model did not account for the initial condition of the property at the time Deutsche Bank took ownership of the property. Ms. Stedman alleges that Plaintiffs' inspection analysis should have considered the initial condition of the property because the presence of a deficiency could have predated Deutsche Bank's period of ownership.[77] Dr. Skanderson argues that if the initial condition of REO properties at the time Deutsche Bank took ownership in Non-White neighborhoods tended to be worse, on average, than the initial condition of REO properties in White neighborhoods, then more time may be required to address the deficiency issues, on average, in Non-White neighborhoods, thus leading to an increased likelihood of Plaintiffs' inspectors observing deficiencies that had not yet been addressed.[78]

58. Despite levying these criticisms, none of Defendants' experts presented any analyses that would suggest that the initial condition of Deutsche Bank's REO properties explained away the disparities in deficiencies in Non-White block groups that I calculated in my regression models. In this section, I present additional regression analyses of deficiencies that account for the initial condition of the property. The results show that models accounting for the initial condition

---

https://ianayres.yale.edu/sites/default/files/files/Testing%20for%20Discrimination%20and%20the%20Problem%20of%20_Included%20Variable.pdf.

[77] *Stedman Report*, ¶¶ 74-76.

[78] *Skanderson Report*, ¶ 73; *but see* Expert Reports and Rebuttal Expert Reports of Deavay Tyler and Albert Poche (discussing maintenance and preservation obligations incumbent on servicers and owners regardless of pre-foreclosure property conditions).

of the property reveal disparities that are very similar to the disparities I measured in my original models, and these disparities continue to be statistically significant.

### 1. Disparities Persist When Regressions Are Limited to Properties Inspected Months After Defendants' Initial Ownership Period or Initial Vacancy

59.     I first account for the initial condition of the property by estimating regressions using only the properties that had been owned by Deutsche Bank for varying periods of time after the property either entered REO status or became vacant (after entering REO status). Limiting the sample to properties that had been owned for some period after the REO or vacancy dates allows Defendants the time required to address deficiencies in the property's initial condition at entering REO or vacancy status. Further, excluding properties owned for any period longer than a few days after REO or vacancy status is conservative. Plaintiffs' expert Mr. Tyler shows in his rebuttal report that short time frames apply when addressing any deficiencies present upon a property's entry into REO status.[79]

60.     **Figure 7** shows the disparities measured in my Plaintiff inspection deficiency regressions when the samples are limited to those properties that had been in either REO status or were vacant for at least 7 days, 14 days, 30 days, 45 days, and 60 days.

---

[79] *Tyler Rebuttal Report*, at 6-8 (citing Ocwen and Altisource documents showing that initial services are to be completed within twenty-four hours, three to five days, or no more than thirty days).

**Figure 7: OLS Regression Results for Number of Deficiencies in the Full Analysis Sample, Other Subsamples**

| Sample | Racial Disparity: Non-White Block Group Coefficient | | Number of Observations in Model | |
|---|---|---|---|---|
| | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls |
| Full Analysis Sample | 3.360*** | 2.278*** | 893 | 715 |
| | | | | |
| Full Analysis Sample inspected by Plaintiffs at least __ days after REO date: | | | | |
| 7+ days | 3.347*** | 2.278*** | 891 | 713 |
| 14+ days | 3.342*** | 2.262*** | 889 | 711 |
| 30+ days | 3.306*** | 2.248*** | 881 | 703 |
| 45+ days | 3.264*** | 2.190*** | 865 | 690 |
| 60+ days | 3.226*** | 2.098*** | 834 | 665 |
| | | | | |
| Full Analysis Sample inspected by Plaintiffs at least __ days after vacancy date: | | | | |
| 0+ days (All loans with vacancy date present in data) | 3.290*** | 2.398*** | 461 | 352 |
| 7+ days | 3.429*** | 2.486*** | 449 | 342 |
| 14+ days | 3.413*** | 2.380*** | 443 | 337 |
| 30+ days | 3.357*** | 2.388*** | 408 | 308 |
| 45+ days | 3.304*** | 2.269*** | 363 | 276 |
| 60+ days | 3.427*** | 2.534*** | 318 | 240 |

Note: *** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%. Coefficients and p-values for other explanatory variables in these OLS models and models estimated on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties) are included in my workpapers.

61.    As **Figure 7** shows, the disparities in the number of deficiencies recorded for properties inspected by Plaintiffs days or weeks after the properties entered REO or vacancy status are similar to the disparities measured for all properties inspected by Plaintiffs after entering REO status. The disparities between deficiencies in White block group properties and Non-White block group properties remain statistically significant in these alternate samples.[80]

---

[80] Disparities measured from models estimated on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties) are included in my workpapers, and also remain statistically significant.

62. **Figure 8** includes analogous results for the regression models that measure the disparities between the presence of at least ten deficiencies observed days or weeks after the REO or vacancy dates. Again, the disparities between the presence of a high number of deficiencies in White block group properties and Non-White block group properties remain statistically significant in these alternate samples.[81]

**Figure 8: Logistic Regression Odds Ratio Results for Presence of at least Ten Deficiencies, Other Subsamples**

| Sample | Racial Disparity: Non-White Block Group Odds Ratio | | Number of Observations in Model | |
|---|---|---|---|---|
| | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls |
| Full Analysis Sample | 4.762*** | 4.895*** | 893 | 643 |
| | | | | |
| Full Analysis Sample inspected by Plaintiffs at least __ days after REO date: | | | | |
| 7+ days | 4.727*** | 4.873*** | 891 | 640 |
| 14+ days | 4.724*** | 4.817*** | 889 | 638 |
| 30+ days | 4.649*** | 4.729*** | 881 | 630 |
| 45+ days | 4.529*** | 4.520*** | 865 | 619 |
| 60+ days | 4.256*** | 4.122*** | 834 | 598 |
| | | | | |
| Full Analysis Sample inspected by Plaintiffs at least __ days after vacancy date: | | | | |
| 0+ days (All loans with vacancy date present in data) | 5.256*** | 8.626*** | 461 | 324 |
| 7+ days | 5.853*** | 10.389*** | 449 | 316 |
| 14+ days | 5.684*** | 9.068*** | 443 | 310 |
| 30+ days | 5.456*** | 8.475*** | 408 | 281 |
| 45+ days | 5.459*** | 10.770*** | 363 | 250 |
| 60+ days | 5.968*** | 16.405*** | 318 | 217 |

Note: *** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%.
Odds ratios and p-values for other explanatory variables in these models and models using other racial classifications and samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed Upon Properties) are included in my workpapers.

---

[81] Disparities measured from models estimated on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties) are included in my workpapers, and also remain statistically significant.

### 2. Disparities Persist When Regressions Control for the Initial Condition of the Property as Recorded in Latest Pre-REO Appraisals

63.     Another adjustment I make to my regression models to account for the potential effect of the property's initial condition is to include a control for the initial condition of the property. The series of servicing data spreadsheets produced by Ocwen that I used in my valuation analysis in my initial report[82] includes a column labeled "CONDITIONCDE."[83] When populated, this field includes the entries "Excellent", "Average", "Good", "Fair", "Poor", and "Uninhabitable." In their response to Plaintiffs' inquiries about the meaning of this field, Ocwen's counsel stated that the CONDITIONCDE field represented the condition of the property and was "likely populated or calculated by Altisource" and that the policies governing the condition codes "likely would be governed by an Altisource procedure/policy document."[84] In these adjusted regression models, I add a control for the property's condition code as observed from the latest appraisal prior to the REO date as a proxy for the initial condition as the property when it entered REO status. To identify condition codes that are most likely to be associated with the condition at the time of the property's entry into REO status, I limit my sample to those properties for which the latest pre-REO appraisal is between 0 and 90 days before the REO date. Because I use condition codes from the Servicer-Limited Data, these adjusted regressions that control for initial property condition are also limited to the 699 Agreed Upon Properties that were also part of my Full Analysis Sample.

---

[82] *Ayres Report*, ¶ 73 n. 56.

[83] OCWEN_0015564.xlsx; OCWEN_0015564_001.xlsx' OCWEN_0015564_002.xlsx; OCWEN_0015565.xlsx' OCWEN_0015565_001.xlsx.

[84] Letter from Debra Bogo-Ernst, Mayer Brown LLP, to Jennifer Soule, Soule, Bradtke & Lambert (Mar. 14, 2022), at 44-45.

64.     When I add this initial condition code control to my regression models, the disparities in deficiencies in White block group properties and Non-White block group properties remain statistically significant. When controlling for the latest condition code in Ocwen's data prior to the REO date (as well as the other explanatory factors used in my "All Controls" model of my original report), REO properties in Non-White block groups had 2.227 more deficiencies that REO properties in White block groups. This disparity is statistically significant at the 99% confidence level. Further, even when controlling for the initial condition of the property as well as the host of other non-race variables that might provide business justified, non-discriminatory explanations for the high number of deficiencies used in my original report, the odds of an REO property in a Non-White block group having at least ten deficiencies was 10.552 times the odds of an REO property in a White block group having at least ten deficiencies.[85]

**B.      Differences in Crime Do Not Explain the Disparities in Deficiencies**

65.     My original regressions included controls for neighborhood property crime rate, as measured by the relative risk of burglaries, larcenies, and motor vehicle thefts in the properties' Census block groups.[86] But notwithstanding my use of these controls, Defendants' experts allege that there may be other dimensions of deficiency-related crime that might explain part of the racial disparities estimated in my original report. Ms. Stedman notes that crime may affect property

---

[85] These disparities are shown below in row (11) of **Figure 14**. My workpapers includes coefficients, odds ratios, and p-values for my regression explanatory variables and disparities measured by these regressions on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties). I continue to find statistically significant disparities when controlling for the initial condition of the property in each of these alternative samples.

[86] For example, my model's control for burglary was a burglary index for current burglary risk for the property's Census block group, obtained from ATTOM Data Solutions. The index represents the risk of burglary relative to the average nationwide risk of burglary, such that a value of 1 equals the nationwide risk of burglary, 1.5 represents the risk is 1.5 times the nationwide risk of burglary, etc. Historical burglary index data for block groups was not available from ATTOM Data Solutions at the time I obtained the data. *See Ayres Report*, Exhibit 4.

cleanliness, the state of the property at foreclosure, and the ability for the servicer to maintain the property.[87] Dr. Skanderson acknowledges that my models include a control for neighborhood crime, but notes that my models did not control for crime against the subject REO properties.[88]

66. Despite raising these concerns with the accounting of crime as an explanatory factor in my original analysis, Defendants' experts present no analyses of property maintenance deficiencies that attempt to control for crime as an explanatory factor. In this section, I respond to the concerns of Defendants' experts by adjusting my regression models to further account for crime as a potentially explanatory factor for the observed property deficiencies.

### 1. Statistical Analysis of Subset of Deficiency Categories Likely Not Caused by Crime

67. To respond to the concerns of Defendants' experts that crime can cause the presence of certain deficiencies, I assess in this section whether there are neighborhood racial disparities with regard to deficiencies that are less likely to be influenced by neighborhood crime. For example, a lawn is unlikely to become overgrown because of vandalism or other forms of neighborhood crime.[89]

68. In my original report, I analyzed 38 characteristics observed and recorded by Plaintiffs' inspectors as deficiencies in the routine marketing and maintenance of REO properties.[90] These 38 characteristics are listed in Exhibit 1 of my original report. For any given

---

[87] *Stedman Report*, ¶ 63.
[88] *Skanderson Report*, ¶ 73. At deposition, Dr. Skanderson also testified that the level of property crime in a neighborhood could provide an alternative explanation for the disparities observed by Plaintiffs. *See* Skanderson Dep. Tr. at 107:21-108:8.
[89] It should be noted that the prevalence of other deficiencies that might be the product of neighborhood crime might be caused in part by the failure to cut the grass and undertake other forms of maintenance. For example, overgrown grass may signal that a property is unoccupied and unguarded, and thereby invite certain forms of vandalism.
[90] *Ayres Report*, ¶ 37, Exhibit 1.

property, each of these 38 characteristics could have arisen due to reasons unrelated to crime. For example, broken windows at a property could have been caused by criminal activity or stormy weather. However, there are certain deficiencies that are highly unlikely to have been affected by crime for any property. I identify 14 of the 38 characteristics to be deficiencies unlikely to have been caused by crime for any REO property. These deficiencies consist of seven deficiencies related to the property's curb appeal, and seven deficiencies related to other property conditions. The curb appeal deficiencies I categorize as unlikely to have been caused by crime are:

- Mail accumulated
- Overgrown grass and leaves
- Overgrown or dead shrubbery
- Dead grass (10%-50%)
- Dead grass (50% or more)
- Invasive plants (10%-50%)
- Invasive plants (50% or more)

The other seven deficiencies I consider to have not likely been caused by crime are:

- Structure: Wood rot
- Signage & Occupancy: Trespassing or warning signs
- Signage & Occupancy: Marketed as distressed property
- Paint/Siding: Peeling/chipped paint
- Gutters: Obstructed
- Water damage: Small amount of mold
- Water damage: Pervasive mold.

> **a) REO Properties in Communities of Color Had More Deficiencies in Categories Likely Not Caused by Crime than REO Properties in White Communities**

69. As I discussed in my original report, regression analysis is the primary tool I use to estimate disparities in REO property maintenance and marketing between communities of color and white communities because regression analysis can control for the non-race characteristics of the neighborhood and property and other characteristics that could plausibly influence REO property maintenance and marketing.[91] Before performing the regression analysis of the categories of deficiencies likely not caused by crime, I first examine the simple mean differences between deficiencies observed in REO properties in communities of color and deficiencies observed in white communities.

70. **Figure 9** shows the mean number of maintenance and marketing deficiencies in categories likely not caused by crime, as recorded by Plaintiffs' inspectors for the REO properties in the Full Analysis Sample,[92] based on the racial composition of the Census block groups in which the properties were located. As **Figure 9** shows, the average number of deficiencies in categories likely not caused by crime among REO properties in White block groups[93] was 2.5, whereas the average number of deficiencies among REO properties in Non-White block groups was 3.8 – a disparity of 1.2 deficiencies. The differences between REO property deficiencies in White block groups and African American block groups and/or Hispanic block groups are similar. The mean

---

[91] *Ayres Report*, ¶¶ 24-34
[92] As in the *Ayres Report*, the "Full Analysis Sample" consists of the 893 properties I identify from Plaintiffs' Inspection Data that were visited by Plaintiffs' inspectors during the period of Deutsche Bank's ownership of the property. *Ayres Report*, ¶¶ 48-50.
[93] As in the *Ayres Report*, I classify a Census block group as a "White" block group if its 2010 population is at least 50 percent non-Hispanic white alone. I classify all other Census block groups as "Non-White" block groups. *Ayres Report*, ¶ 44.

number of deficiencies for REO properties in African American/Hispanic block groups, African American block groups, and Hispanic block groups was 3.8, 3.8, and 3.9, respectively.[94]

**Figure 9: Mean Number of Deficiencies & Share of REO Properties with At Least 5 Deficiencies in Categories Likely Not Caused by Crime in Plaintiffs' Inspection Data**



---

[94] The disparities in the average number of deficiencies and their statistical significance for the Full Analysis Sample and each of its subsamples I examine are included in my workpapers. Model (1) of these workpapers show that these disparities are also found in the subsets of the Analysis Sample that I examine (the Full Analysis Sample, Analysis Sample excluding the 139 Disputed Properties, or the Analysis Sample including only the 699 Agreed-Upon Properties) and in the three inspection periods I analyze (inspections on all dates, inspections occurring on or after February 26, 2012, or inspections occurring on or after February 14, 2015). Each subsample is described in *Ayres Report*, ¶¶ 38-39.

71.    **Figure 9** also shows the share of REO properties in each type of Census block group that had at least five deficiencies in categories likely not caused by crime.[95] Whereas 14 percent of REO properties in White block groups had at least five deficiencies in categories likely not caused by crime, 33 percent of REO properties in Non-White block groups had at least 5 deficiencies in categories likely not caused by crime. The share of REO properties in African American and/or Hispanic block groups with at least 5 deficiencies was even greater. For example, 38 percent of the REO properties in Hispanic block groups in the Full Analysis Sample had at least 5 deficiencies in categories likely not caused by crime.

72.    **Exhibit 6** includes additional details on the presence of individual deficiencies in categories likely not caused by crime based on the racial makeup of the REO properties' Census block groups.[96] **Exhibit 6** lists the share of REO properties in each Census block group racial category for which Plaintiffs' inspectors recorded that deficiency in the Full Analysis Sample. As **Exhibit 6** shows, *every one* of the 14 deficiencies likely not caused by crime was more likely to be observed if the REO property was in a Non-White block group than if the REO property was in a White block group. These differences between the likelihood of observing a deficiency in a property in a Non-White block group and the likelihood of observing that deficiency in a property in a White block group were statistically significant at the 5 percent significance level for 8 of the

---

[95] In the *Ayres Report*, I analyzed the likelihoods of properties having at least ten deficiencies. When limiting the deficiencies to only those fourteen categories likely not caused by crime, I lower this threshold to five deficiencies because the most deficiencies a property could possibly have among the fourteen categories is eleven. Eleven is the maximum possible count instead of fourteen because a property cannot be characterized as having both dead grass (10% - 50%) and dead grass (50% or more), a property cannot be characterized as having both invasive plants (10 – 50%) and invasive plans (50% or more), and a property cannot be characterized as having both a small amount of mold *and* pervasive mold.

[96] **Exhibit 6** is analogous to *Ayres Report*, Exhibit 3. **Exhibit 6** is limited to the 14 deficiencies I categorize as being likely not caused by crime, whereas *Ayres Report*, Exhibit 3 reports corresponding statistics for all 38 deficiencies.

14 deficiencies and were statistically significant at the 1 percent significance level for 6 of the 14 deficiencies. Collectively, the difference between the average total deficiencies in categories likely not caused by crime observed for properties in Non-White block groups (3.8) and the average total deficiencies observed for REO properties in White block groups (2.5) was highly statistically significant (1 percent significance level). Similarly, the differences between the share of REO properties with at least five deficiencies in categories likely not caused by crime in Non-White block groups (33 percent) and the share in White block groups (14 percent) was highly statistically significant (1 percent significance level).[97]

> **b)** **Regression Models Show that REO Properties in Communities of Color Had More Deficiencies in Categories Likely Not Caused by Crime than REO Properties in White Communities Even When Controlling for Other Potential Explanatory Factors**

73.     As discussed in my original report, regression analysis is the method by which I measure disparities because regression analysis can control for attributes that may result in more observable deficiencies under race-neutral property maintenance conduct. For the regressions in this report, I use the same explanatory factors I used in my original report, including the racial composition of the Census block groups in which the REO properties are located; objective characteristics of the property, prior owner(s), and community; and other plausible "business justification" factors to explain differences in observable deficiencies.[98] Should Defendants produce additional variables or data to Plaintiffs that I believe would be appropriate to incorporate in a disparate impact or treatment analysis, I will update my analysis accordingly.

---

[97] **Exhibit 6** also shows statistically significant disparities when the deficiencies are limited to curb appeal deficiencies likely not caused by crime. The mean number of curb appeal deficiencies likely not caused by crime for properties in Non-White block groups is 2.1 versus 1.3 for White block groups.

[98] *Ayres Report*, ¶ 56, Exhibit 4.

### (1) Number of Deficiencies in Categories Likely Not Caused by Crime

74. Estimating OLS regression models determines the marginal effect of each explanatory characteristic (including the majority race of the Census block group) on the number of deficiencies observed in an REO property.[99] As long as the marginal effects of the minority Census block group variables are greater than zero and statistically significant, then the model will show that Defendants' conduct resulted in disparities adversely affecting minority communities through the presence of REO properties with greater numbers of maintenance and marketing deficiencies than REO properties in white communities.

75. **Figure 10** shows the marginal effect of an REO property's presence in a Non-White block group (relative to a similarly situated REO property in a White block group) on the number of deficiencies observed by Plaintiffs' inspectors in categories that are not likely to be affected by neighborhood crime. These marginal effects are measured by estimating OLS regressions using different sets of explanatory variables and over the different inspection date subsamples of the Full Analysis Sample.[100] Each number (or "coefficient") measuring the marginal effect of the racial composition of the block group in **Figure 10** can be interpreted as the marginal increment by which the number of selected deficiencies for an REO property in a minority block group exceeded the number of selected deficiencies for an REO property counterpart in a White block group with the same non-race characteristics being controlled for in the regression.

---

[99] In this report and in the *Ayres Report*, I estimate all regression models with robust standard errors to account for any potential heteroscedasticity in the error term.

[100] My workpapers include coefficients and p-values for other explanatory variables, other models, and other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties).

**Figure 10: OLS Regression Results for Number of Selected Deficiencies in Categories Not Likely Caused by Crime in the Full Analysis Sample**

| *Inspection Dates* | **All Dates** | | **2/26/2012 or Later** | | **2/14/2015 or Later** | |
|---|---|---|---|---|---|---|
| *Regression Controls* | **(1)** Race Only | **(2)** All Controls | **(1)** Race Only | **(2)** All Controls | **(1)** Race Only | **(2)** All Controls |
| *Race Categories Used in Model (Relative to White Block Group)* | | | | | | |
| *Models Controlling for 1 Non-White Category* | | | | | | |
| **Non-White Block Group** | 1.234*** | 1.131*** | 1.309*** | 1.194*** | 1.204*** | 1.195*** |
| | | | | | | |
| *Models Controlling for 2 Non-White Categories* | | | | | | |
| **African American/Hispanic Block Group** | 1.238*** | 1.157*** | 1.317*** | 1.226*** | 1.187*** | 1.201*** |
| **Non-White Block Group (Exc. African American/Hispanic Block Group)** | 1.183*** | 0.963*** | 1.217*** | 1.014*** | 1.399*** | 1.162** |
| | | | | | | |
| *Models Controlling for 4 Non-White Categories* | | | | | | |
| **African American Block Group** | 1.289*** | 1.093*** | 1.372*** | 1.219*** | 1.203*** | 1.158*** |
| **Hispanic Block Group** | 1.423*** | 1.395*** | 1.517*** | 1.380*** | 1.718*** | 1.570*** |
| **African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group)** | 0.692*** | 1.104*** | 0.745*** | 1.102*** | 0.451* | 0.956** |
| **Non-White Block Group (Exc. African American/Hispanic Block Group)** | 1.183*** | 0.987*** | 1.217*** | 1.029*** | 1.399*** | 1.183** |
| | | | | | | |
| **Observations** | 893 | 715 | 826 | 651 | 531 | 422 |

\*\*\* Statistically significant at 1%, \*\* Statistically significant at 5%, \* Statistically significant at 10%.
The list of non-race explanatory variables for the "All Controls" models are shown in *Ayres Report,* Exhibit 4.
Coefficients and p-values for other explanatory variables in these OLS models and additional models (including those estimated on samples that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties) are included in my workpapers. Among the 38 deficiencies listed in *Ayres Report,* Exhibit 1, I consider 14 to be the selected deficiencies likely not caused by crime for use in these models: Mail accumulated; Overgrown grass and leaves; Overgrown or dead shrubbery; Dead grass (10%-50%); Dead grass (50% or more); Invasive plants (10%-50%); Invasive plants (50% or more); Wood rot; Trespassing or warning signs; Marketed as distressed property; Peeling/chipped paint; Obstructed gutters; Small amount of mold; and Pervasive mold.

76.     **Figure 10** reports robust and statistically significant racial disparities across all specifications and all samples with regard to the discrete controls for Census block groups with at least 50% Non-White population. For example, the "All Dates," "All Controls" specification (2)

results indicates that REO properties in Non-White block groups had 1.131 more deficiencies in categories not likely caused by crime than in White block groups, after controlling for ninety-nine non-race explanatory factors.[101] **Figure 10**'s finding of robust racial disparities across different time periods, different non-race controls, and different measures of racial Census block groups is a strong indication that differences in crime cannot explain statistical differences in the number of deficiencies observed.

### (2) Likelihood of Having a Large Number of Deficiencies in Categories Not Likely Caused by Crime

77. Analogous to the analysis in my original report that considered all deficiencies,[102] I also examine the differences in likelihood of an REO property having a high number of deficiencies in categories not likely caused by crime based on the racial composition of the property's Census block group population. Here, I estimate logistic regression models to measure the explanatory variables' effect on an REO property having at least five deficiencies in categories likely not caused by crime. The effect of an explanatory variable in a logistic regression can be expressed as an "odds ratio." The odds ratio is the ratio of the odds of success to the odds of failure. In this instance, the odds ratio is the ratio of the odds of having at least five deficiencies to the odds of having fewer than five deficiencies. As long as the marginal effects of the minority Census block group variables, in terms of odds ratios, are greater than one and statistically significant, then the model will show that Defendants' conduct resulted in disparities adversely affecting minority communities through the presence of REO properties with high numbers of maintenance and marketing deficiencies in categories not likely caused by crime.

---

[101] The full list of explanatory factors in the "All Controls" model is provided in *Ayres Report*, Exhibit 4.
[102] *Ayres Report*, ¶¶ 65-70.

78.     **Figure 11** shows the marginal effect of an REO property being in a minority block group (relative to being a similarly situated REO property in a White block group) on the presence of at least five deficiencies observed by Plaintiffs' inspectors in categories not likely caused by crime, as measured by estimating logistic regressions using different sets of explanatory variables and over the different inspection date subsamples of the Full Analysis Sample.[103] Each odds ratio in **Figure 11** can be interpreted as the marginal increment by which the odds of an REO property in the given minority block group exceeded the odds of an REO property counterpart in a White block group in having at least five observed deficiencies in categories not likely caused by crime.

---

[103] My workpapers include odds ratios and p-values for other explanatory variables, other models, and other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties).

**Figure 11: Logistic Regression Odds Ratio Results for Presence of at Least Five Deficiencies in Categories Likely Not Caused by Crime in the Full Analysis Sample**

| Inspection Dates | All Dates | | 2/26/2012 or Later | | 2/14/2015 or Later | |
|---|---|---|---|---|---|---|
| Regression Controls | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls |
| **Race Categories Used in Model (Relative to White Block Group)** | | | | | | |
| **Models Controlling for 1 Non-White Categories** | | | | | | |
| Non-White Block Group | 2.948*** | 4.175*** | 3.207*** | 4.835*** | 2.903*** | 4.367*** |
| | | | | | | |
| **Models Controlling for 2 Non-White Categories** | | | | | | |
| African American/Hispanic Block Group | 2.951*** | 4.174*** | 3.220*** | 4.791*** | 2.816*** | 3.925*** |
| Non-White Block Group (Exc. African American/Hispanic Block Group) | 2.918*** | 4.182** | 3.060*** | 5.038*** | 4.043*** | 7.125** |
| | | | | | | |
| **Models Controlling for 4 Non-White Categories** | | | | | | |
| African American Block Group | 3.056*** | 3.528*** | 3.450*** | 4.866*** | 2.841*** | 3.358** |
| Hispanic Block Group | 3.730*** | 5.598*** | 3.651*** | 4.441*** | 4.548*** | 6.858*** |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | 1.608 | 5.126*** | 1.695 | 4.974*** | 1.255 | 3.270 |
| Non-White Block Group (Exc. African American/Hispanic Block Group) | 2.918*** | 4.331** | 3.060*** | 5.012*** | 4.043*** | 7.686** |
| | | | | | | |
| Observations | 893 | 644 | 826 | 584 | 531 | 365 |

*** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%.
The list of non-race explanatory variables for the "All Controls" models are shown in *Ayres Report*, Exhibit 4.
Odds ratios and p-values for other explanatory variables in these regression models and additional models (including those estimated on samples that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties) are included in my workpapers. Among the 38 deficiencies listed in *Ayres Report*, Exhibit 1, I consider 14 to be deficiency categories not likely caused by crime for use in these models: Mail accumulated; Overgrown grass and leaves; Overgrown or dead shrubbery; Dead grass (10%-50%); Dead grass (50% or more); Invasive plants (10%-50%); Invasive plants (50% or more); Wood rot; Trespassing or warning signs; Marketed as distressed property; Peeling/chipped paint; Obstructed gutters; Small amount of mold; and Pervasive mold.

79. As **Figure 11** shows, REO properties in non-White block groups were more likely to have at least five deficiencies in categories not likely caused by crime than REO properties in White block groups. In the model estimated across all inspection dates, Model (1) (Race Only) shows that the odds of an REO property in a Non-White block group having at least five

deficiencies was 2.948 times the odds of an REO property in a White block group having at least five deficiencies in categories not likely caused by crime. This disparity corresponds to the result shown in **Figure 9** (showing the rate of at least five deficiencies in categories likely not caused by crime among REO properties in White block groups of 14 percent and the corresponding rate among REO properties in non-White block groups of 33 percent).[104] However, this result does not take into account any non-race characteristics, such as the age of the home, neighborhood property values, or the length of Deutsche Bank's ownership, that might provide a plausible business justification for the presence of at least five maintenance and marketing deficiencies in categories not likely caused by crime. Model (2), however, does include these explanatory control variables. Even when controlling for a host of non-race variables that might provide business justified, non-discriminatory explanations for the high number of deficiencies (such as neighborhood home values, home size, age of the home, and the season and year of inspection), the odds ratio is 4.175 and is statistically significant at the 99% confidence level. The Model (2) result for all inspection dates implies that the odds of having at least five deficiencies in categories not likely caused by crime for an REO property in a Non-White block group was 4.175 times the odds for an REO property with similar characteristics in a White block group.

### (3) Number of Curb Appeal Deficiencies in Categories Not Likely Caused by Crime

80. I also estimate regressions that consider only the seven deficiencies limited to curb appeal that are likely not caused by crime. The results of these regressions are summarized in

---

[104] In this instance, the odds ratio can be calculated as $(p_{m,s}/(1- p_{m,s})) / (p_{w,s}/(1- p_{w,s}))$, where $p_{m,s}$ is the percentage of REO properties in Non-White block groups having at least five deficiencies in categories likely not caused by crime, and $p_{w,s}$ is the percentage of loan REO properties in White block groups having at least five deficiencies in categories likely not caused by crime. The odds ratio of 2.948 can be calculated as $(0.33/(1-0.33))/(0.14/(1-0.14))$.

**Figure 12**. **Figure 12** can be interpreted as the marginal increment by which the number of the selected seven curb appeal deficiencies for an REO property in a minority block group exceeded the number of the selected seven curb appeal deficiencies for an REO property counterpart in a White block group with the same non-race characteristics being controlled for in the regression.

**Figure 12: OLS Regression Results for Number of Selected Curb Appeal Deficiencies in Categories Likely Not Caused by Crime in the Full Analysis Sample**

| Inspection Dates | All Dates | | 2/26/2012 or Later | | 2/14/2015 or Later | |
|---|---|---|---|---|---|---|
| Regression Controls | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls |
| **Race Categories Used in Model (Relative to White Block Group)** | | | | | | |
| **Models Controlling for 1 Non-White Category** | | | | | | |
| Non-White Block Group | 0.795*** | 0.881*** | 0.823*** | 0.847*** | 0.756*** | 0.817*** |
| | | | | | | |
| **Models Controlling for 2 Non-White Categories** | | | | | | |
| African American/Hispanic Block Group | 0.782*** | 0.877*** | 0.811*** | 0.836*** | 0.726*** | 0.789*** |
| Non-White Block Group (Exc. African American/Hispanic Block Group) | 0.962*** | 0.908*** | 0.968*** | 0.908*** | 1.101*** | 0.966*** |
| | | | | | | |
| **Models Controlling for 4 Non-White Categories** | | | | | | |
| African American Block Group | 0.787*** | 0.855*** | 0.816*** | 0.854*** | 0.735*** | 0.822*** |
| Hispanic Block Group | 0.840*** | 0.845*** | 0.884*** | 0.745*** | 0.907*** | 0.682*** |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | 0.678*** | 0.964*** | 0.685*** | 0.875*** | 0.450* | 0.805** |
| Non-White Block Group (Exc. African American/Hispanic Block Group) | 0.962*** | 0.906*** | 0.968*** | 0.899*** | 1.101*** | 0.958*** |
| | | | | | | |
| Observations | 893 | 715 | 826 | 651 | 531 | 422 |

*** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%.
The list of non-race explanatory variables for the "All Controls" models are shown in *Ayres Report*, Exhibit 4.
Coefficients and p-values for other explanatory variables in these OLS models and additional models (including those estimated on samples that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties) are included in my workpapers. Among the 38 deficiencies listed in *Ayres Report*, Exhibit 1, I consider 7 to be the Selected Deficiencies for use in these models: Mail accumulated; Overgrown grass and leaves; Overgrown or dead shrubbery; Dead grass (10%-50%); Dead grass (50% or more); Invasive plants (10%-50%); and Invasive plants (50% or more).

81. **Figure 12** reports robust and statistically significant racial disparities across all specifications and all samples with regard to the discrete controls for Census block groups with at least 50% Non-White population. For example, the "All Dates," "All Controls" specification (2)

results indicates after controlling for ninety-nine non-race variables that REO properties in Non-White block groups had 0.881 more selected curb appeal deficiencies in categories likely not caused by crime than REO properties in White block groups. **Figure 12**'s finding of robust racial disparities across different time periods, different non-race controls, and different measures of racial Census block groups is a strong indication that differences in crime cannot explain statistical differences in the number of deficiencies observed.

### (4)    Likelihood of Having a Large Number of Curb Appeal Deficiencies in Categories Likely Not Caused by Crime

82.    **Figure 13** shows the marginal effect of an REO property being in a minority block group (relative to being a similarly situated REO property in a White block group) on the presence of at least three[105] curb appeal deficiencies in categories likely not caused by crime observed by Plaintiffs' inspectors, as measured by estimating logistic regressions using different sets of explanatory variables and over the different inspection date subsamples of the Full Analysis Sample.[106] Each odds ratio in **Figure 13** can be interpreted as the marginal increment by which the odds of an REO property in the given minority block group exceeded the odds of an REO property counterpart in a White block group in having at least three observed curb appeal deficiencies in categories likely not caused by crime.

---

[105] I use three as the threshold for classifying properties as having a high number of deficiencies for this curb appeal analysis. Among the seven categories of curb appeal deficiencies that are likely not caused by crime, the maximum possible number of deficiencies an REO property could possibly have is 5 because a property cannot be characterized as having both dead grass (10% - 50%) and dead grass (50% or more), and a property cannot be characterized as having both invasive plants (10 – 50%) and invasive plans (50% or more).

[106] My workpapers include odds ratios and p-values for other explanatory variables, other models, and other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties).

**Figure 13: Logistic Regression Odds Ratio Results for Presence of at Least Three Curb Appeal Deficiencies in Categories Likely Not Caused by Crime in the Full Analysis Sample**

| Inspection Dates | All Dates | | 2/26/2012 or Later | | 2/14/2015 or Later | |
|---|---|---|---|---|---|---|
| Regression Controls | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls | (1) Race Only | (2) All Controls |
| *Race Categories Used in Model (Relative to White Block Group)* | | | | | | |
| *Models Controlling for 1 Non-White Categories* | | | | | | |
| **Non-White Block Group** | 3.063*** | 6.409*** | 3.191*** | 6.115*** | 3.004*** | 6.118*** |
| | | | | | | |
| *Models Controlling for 2 Non-White Categories* | | | | | | |
| **African American/Hispanic Block Group** | 2.954*** | 6.163*** | 3.081*** | 5.548*** | 2.826*** | 5.142*** |
| **Non-White Block Group (Exc. African American/Hispanic Block Group)** | 4.767*** | 8.115*** | 4.707*** | 11.278*** | 5.874*** | 16.097*** |
| | | | | | | |
| *Models Controlling for 4 Non-White Categories* | | | | | | |
| **African American Block Group** | 3.055*** | 7.393*** | 3.278*** | 8.148*** | 2.957*** | 8.798*** |
| **Hispanic Block Group** | 3.241*** | 5.038*** | 3.209*** | 3.449** | 3.462*** | 3.309* |
| **African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group)** | 2.106** | 4.887*** | 2.000** | 3.736** | 1.598 | 2.939 |
| **Non-White Block Group (Exc. African American/Hispanic Block Group)** | 4.767*** | 8.018*** | 4.707*** | 11.250*** | 5.874*** | 16.683*** |
| | | | | | | |
| **Observations** | 893 | 661 | 826 | 590 | 531 | 364 |

*** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%.
The list of non-race explanatory variables for the "All Controls" models are shown in *Ayres Report*, Exhibit 4. Odds ratios and p-values for other explanatory variables in these logistic models and additional models (including those estimated on samples that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties) are included in my workpapers. Among the 38 deficiencies listed in *Ayres Report*, Exhibit 1, I consider 7 to be the Selected Deficiencies for use in these models: Mail accumulated; Overgrown grass and leaves; Overgrown or dead shrubbery; Dead grass (10%-50%); Dead grass (50% or more); and Invasive plants (10%-50%).

83.     As **Figure 13** shows, REO properties in non-White block groups were more likely to have at least three curb appeal deficiencies in categories likely not caused by crime than REO properties in White block groups. In the model estimated across all inspection dates, Model (2) shows that even when controlling for a host of non-race variables that might provide business

justified, non-discriminatory explanations for the high number of deficiencies (such as neighborhood home values, home size, age of the home, and the season and year of inspection), the odds ratio for Non-White block groups is 6.409 and is statistically significant at the 99% confidence level. The Model (2) result for all inspection dates implies that the odds of having at least three curb appeal deficiencies in categories likely not caused by crime for an REO property in a Non-White block group was 6.409 times the odds for an REO property with similar characteristics in a White block group.

### 2. Disparities in Observed Deficiencies Persist When Controlling for Crime Reports at the Subject Property

84. As I noted above, Defendants' experts note that the models from my initial report did not control for crime specifically at the subject properties.[107] The Altisource work order data used by Defendants' experts includes work orders related to police and fire reports. It is my understanding that Altisource's policy when criminal activity was suspected at the property was to file a police report, and that this activity is reflected in the work order data produced by Altisource.[108] The work order data[109] includes the following line-item descriptions related to police reports:

---

[107] *See*, *e.g.*, *Skanderson Report*, ¶ 73.

[108] *See e.g.*, ASI000009519, line 25826, 525 N.E. 2d Street, Palm Beach, FLA (". . . we did the police report and there are squatters in the house the police removed them but they keep coming back. This house is a big drug house and is unsafe for any of our contractors to go to the property. the people that are staying in this home and the neighbors of this home are very dangerous"); ASI000584356, Real Estate Owned Operational Vendor Guide (police report to be filed for trespassers or squatters); Plaintiffs' Exhibit 210 (ASI000024271 – 25357), at ASI000024353 – 24355, 24429 – 24433, 24888 – 24892 (printout of spreadsheet showing partial vendor instructions for these line items such as "[t]he vendor is required to visit the Police or Fire department office and receive a copy of the incident report filed earlier" (description for work order line item "Police or Fire Document Collection"), "[p]lease provide a cost estimate to Meet Police or Fire and acquire a report to submit for insurance when vandalism, fire or natural disasters …" (description for work order line item "Police or Fire Loss Claims Report"), and "[t]he vendor is required to meet the Police or Fire department at the property and provide interior access to them to investigate the cause of …" (description for work order line item "Police or Fire Report Meeting.").

[109] I use the files ASI000009519, ASI000559101, ASI000053596, and ASI000053597 to identify police-related work orders for the REO properties.

- "Police or Fire Document Collection"
- "Police or Fire Loss Claims Report"
- "Police or Fire Report Meeting."

85.     To test whether the incidence of crime at the subject property has an explanatory effect on the neighborhood racial disparities in property deficiencies measured in my regression models, I add a control variable to my regressions equal to one if the property ever had a work order with a completed work order[110] that has a line-item description equal to one of the three police-related descriptions listed above. If the property did not have a completed work order but was present in the work order data, this crime control variable is equal to zero. If the property was not present in the work order data, then I exclude the property from these adjusted models. Because I use work orders from the Servicer-Limited Data, these adjusted regressions that control for property crime are also limited to the 699 Agreed Upon Properties that were also part of my Full Analysis Sample.

86.     When I add the property-specific crime control to my regression models, the disparities in deficiencies in White block group properties and Non-White block group properties remain statistically significant. When controlling for the presence of police or fire reports for the property (as well as the other explanatory factors used in my "All Controls" model of my original report), REO properties in Non-White block groups had 2.515 more deficiencies that REO properties in White block groups. This disparity is statistically significant at the 99% confidence level. Further, even when controlling for the presence of police or crime reports for the property as well as the host of other non-race variables that might provide business justified, non-

---

[110] The work order data includes a field for work order status, in which "closed" represents a completed work order, and "canceled" or "expired" represent work orders submitted by a vendor but not completed.

discriminatory explanations for the high number of deficiencies used in my original report, the odds of an REO property in a Non-White block group having at least ten deficiencies was 7.954 times the odds of an REO property in a White block group having at least ten deficiencies.[111]

### 3. Crime and Property Deficiencies Can Be Endogenous, in that Each Can Be a Factor that Results in the Other

87.     As mentioned above, some property deficiencies may be the result of criminal activity. For example, the broken windows observed by inspectors for a given property may have been broken by vandals. However, the academic literature has found that the relationship between foreclosures and crime can go both ways.[112] The presence of easily observable maintenance deficiencies can also result in increased criminal activity by providing a signal that a property is vacant. The deficiencies in routine property maintenance may signal a degree of social disorder. REO property deficiencies may also increase neighborhood turnover and social engagement, thus weakening the informal neighborhood ties that help prevent crime. Property deficiencies may also signal that the property is vacant, which influences the costs and benefits to criminals of theft and vandalism, provides a safe haven for criminal activity, and signal the presence of fewer "eyes on the street" looking out for criminal activity.

88.     Because of the endogenous ways that deficiencies may cause crime, there is a rationale to exclude crime rate as non-race controls in the foregoing regressions. But in an

---

[111] These disparities are shown below in row (10) of **Figure 14**. My workpapers includes coefficients, odds ratios, and p-values for my regression explanatory variables and disparities measured by these regressions on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties). I continue to find statistically significant disparities when controlling for property police or fire reports in each of these alternative samples.

[112] *See, e.g.*, Ingrid Gould Ellen, Johanna Lacoe, & Claudia Ayanna Sharygin *Do foreclosures cause crime?*, 74 J. URBAN ECON. 59 (2013); Lin Cui & Randall Walsh, *Foreclosure, vacancy and crime*, 87 J. URBAN ECON. 72 (2015).

abundance of cause, I have included them to show that statistically significant racial disparities persist even after controlling for Census block group variation in the crime rate.

### C. Disparities Persist When Controlling for Other Potential Explanatory Factors Identified by Defendants' Experts

89.     Defendants' experts raise other neighborhood characteristics that may vary by the majority race of the Census block group such that those variations could help explain the differences in deficiencies observed by Plaintiffs' inspectors. In this section, I re-estimate my deficiency regressions by adding or substituting the neighborhood characteristics cited by Defendants' experts. **Figure 14** summarizes the effects of adding these additional explanatory controls to my deficiency regressions. Row (1) of **Figure 14** represents the original specification of my "All Controls" regressions from my original report. As **Figure 14** shows, the disparities between the number of deficiencies observed in Non-White block group properties and the number of deficiencies observed in White block group properties remain statistically significant, even when controlling for these additional potentially explanatory factors put forward by Defendants' experts.[113]

---

[113] Summary statistics, coefficients, odds ratios, and p-values for the explanatory variables in these regression models and models estimated on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties) are included in my workpapers. Models using these alternate controls estimated on other samples also continue to show statistically significant disparities.

**Figure 14: Disparities in Number of Deficiencies in the Full Analysis Sample Using Alternative Explanatory Controls in Regression Model**

| Modifications to "All Controls" Model from *Ayres Report*: | OLS Regression Results for Number of Deficiencies (Disparity = Non-White Block Group Coefficient) | | Logistic Regression Odds Ratio Results for Presence of at Least Ten Deficiencies (Disparity = Non-White Block Group Odds Ratio) | |
|---|---|---|---|---|
| | Disparity | Number of Observations in Model | Disparity | Number of Observations in Model |
| (1) No modifications | 2.278*** | 715 | 4.895*** | 643 |
| (2) Substitute Median Property Value of Census Block Group for Median Property Value of Census Tract (2013-2017) | 2.196*** | 699 | 4.419*** | 625 |
| (3) Substitute Poverty Rate of Census Block Group for Poverty Rate of Census Tract (2013-2017) | 2.331*** | 715 | 5.072*** | 643 |
| (4) Substitute Vacancy Rate of Census Block Group for Vacancy Rate of Census Tract (2013-2017) | 2.286*** | 715 | 4.881*** | 643 |
| (5) Add Owner-occupancy rate of Census Block Group (owner-occupied housing units divided by total housing units) | 2.238*** | 715 | 4.863*** | 643 |
| (6) Add Log of Median Family Income of Census Tract (2013-2017) | 2.246*** | 714 | 4.853*** | 642 |
| (7) Add Controls for Census Tract Income Classification (Unknown, Low, Moderate, Middle, Upper) (2013-2017) | 2.202*** | 715 | 4.786*** | 642 |
| (8) Add Log of Population Density of Census Block Group (2013-2017) | 2.219*** | 715 | 4.576*** | 643 |
| (9) Add Zip Code Foreclosure Rate for Year of Inspection & Zip Code Foreclosure Rate in Prior Year | 2.265*** | 713 | 4.610*** | 643 |
| (10) Add presence of at least one closed Work Order with a line item related to fire or police activity | 2.515*** | 404 | 7.954*** | 372 |
| (11) Add control for property condition (Poor, Fair, Average, Good) from latest appraisal prior to REO (within 90 days of REO) | 2.227*** | 229 | 10.552*** | 182 |
| (12) All modifications from (2) to (9) | 2.043*** | 696 | 3.954*** | 624 |
| (13) All modifications from (2) to (10) | 2.169*** | 394 | 5.355*** | 364 |
| (14) All modifications from (2) to (11) | 1.627** | 220 | 8.470** | 174 |

*** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%.

Summary statistics, coefficients, odds ratios, and p-values for other explanatory variables in these regression models and models estimated on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties) are included in my workpapers.

Notes:
(6) Median family income is also available at the Census block group level for most, but not all, block groups covered in the Full Analysis Sample. I use tract-level median family income for this table because tract-level median family income is more widely reported by Census than block group level data, as noted by Dr. Skanderson. *Skanderson Report*, ¶ 58. Using block group-level median family income does not substantially change my results, as shown in my workpapers.
(7) Census tract income classifications are based on the tract income classifications as defined by federal regulations (see FFIEC, Geocoding System, https://www.ffiec.gov/geocode/help3.aspx). These are the same income classifications used by Dr. Skanderson in his review of the income levels of the neighborhoods in which the REO properties were located. Skanderson Report ¶¶ 58-60, Table 3. These income classifications are based on the ratio of the median Census tract income to the median metropolitan area income:
If the Median Family Income % is < 50% and > 0 then the Income Level is Low.
If the Median Family Income % is ≥ 50% and < 80% then the Income Level is Moderate.
If the Median Family Income % is ≥ 80% and < 120% then the Income Level is Middle.
If the Median Family Income % is ≥120% then the Income Level is Upper.
If the Median Family Income % is 0% then the Income Level is Unknown.

(9) Zip code level foreclosure rates are based on data from ATTOM Data Solutions, as produced in the backup materials for the *Skanderson Report*. Foreclosure rate is equal to the number of housing units with a foreclosure filing in the year divided by the total number of housing units in the zip code.

(10) Work order line items related to fire or police activity consist of "Police or Fire Document Collection"; "Police or Fire Loss Claims Report"; and "Police or Fire Report Meeting." Closed work orders are obtained from ASI000009519, ASI000559101, ASI000053596, and ASI000053597. The sample is limited to only those properties with work orders in ASI000009519, ASI000559101, ASI000053596, and ASI000053597.

## 1. Block Group Level Data

90. Dr. McCrary criticizes my use of Census tract-level data on certain explanatory factors rather than Census block group level data when block group level data was available.[114] Specifically, Dr. McCrary states that the tract-level data on poverty rates and vacancy rates may not reflect the poverty rate and vacancy rate of the specific block group in which the property is located.

91. As Dr. McCrary notes, Census block groups, which are subsets of Census tracts, are the second-smallest geographic unit used by the Census Bureau.[115] Census block groups

---

[114] *McCrary Report*, ¶ 109.
[115] *McCrary Report*, ¶ 20.

usually include between 600 and 3,000 people, whereas Census tracts generally include between 1,200 and 8,000 people.[116] Despite criticizing my use of tract-level data instead of block group-level data on poverty rates and vacancy rates, Dr. McCrary does not present any analyses showing the effect of using block group level data on these metrics in place of tract level data.

92.     To test whether using block group level data affects my conclusions, I have calculated alternate models that substitute the block group-level data for poverty rates and vacancy rates for the tract level measures of these characteristics in my regression model.[117] I also substitute block-level data on median property values, whereas I used tract-level data on median property values in my original report. As rows (1), (2), (3), and (4) of **Figure 14** show, the disparities measured by my regressions are very similar, and remain statistically significant at the 99 percent confidence level, regardless of whether the tract-level data or block group level data is used for poverty rates, vacancy rates, and median property values.[118]

### 2.     Neighborhood Income

93.     Ms. Stedman argues that the incomes and neighborhood incomes relative to MSA incomes should have been incorporated into Plaintiffs' analysis in the context of her sampling criticisms.[119] Dr. Skanderson presents median family income as a measure of the differences between white and non-white neighborhoods in each metropolitan area covered in Plaintiffs'

---

[116] U.S. Census Bureau, Geography Program, *Glossary*, https://www.census.gov/programs-surveys/geography/about/glossary.html.

[117] I use block group level data from the Census Bureau's 2013-2017 American Community Survey, the same source I used for tract level data in my original report.

[118] My workpapers includes coefficients, odds ratios, and p-values for my regression explanatory variables and disparities measured by these regressions on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties). I continue to find statistically significant disparities when controlling for block group level data in each of these alternative samples.

[119] *Stedman Report*, ¶¶ 65-66.

inspections.[120] Dr. McCrary argues that my deficiency regression models should control for median family income.[121]

94.     Although three of Defendants' experts allege that median family income should be accounted for when measuring disparities in deficiencies, none of them tested the effect of using median family income in my models. Here, I conduct that test by using two measures of income. First, I add the logarithm of the tract-level median family income as an explanatory control to my deficiency regressions (row (6) of **Figure 14**).[122] Second, I add the categorical variables of ranges of the ratio of the tract median family income to the MSA's median family income (row (7) of **Figure 14)**. These ranges correspond to ranges used by Dr. Skanderson in his analysis.[123] As these results show, adding family income controls slightly changes the disparities measured in my original "All Controls" model (row (1) of **Figure 14**).[124,125]

---

[120] *Skanderson Report,* Table A-2.

[121] *McCrary Report*, ¶ 100 n. 207 ("Note that Dr. Ayres includes a variable for poverty rate of the census tract in his regressions. However, he does not control for the median income of the neighborhoods in his regressions, and controlling for poverty rate is not a substitute.").

[122] I use median family income data from the Census Bureau's 2013-2017 American Community Survey.

[123] My Census tract income classifications are based on the tract income classifications as defined by federal regulations (see FFIEC, Geocoding System, https://www.ffiec.gov/geocode/help3.aspx). These are the same income classifications used by Dr. Skanderson in his review of the income levels of the neighborhoods in which the REO properties were located. *Skanderson Report* ¶¶ 58-60, Table 3. These income classifications are based on the ratio of the median Census tract income to the median metropolitan area income:

   If the Median Family Income % is < 50% and > 0 then the Income Level is Low.
   If the Median Family Income % is ≥ 50% and < 80% then the Income Level is Moderate.
   If the Median Family Income % is ≥ 80% and < 120% then the Income Level is Middle.
   If the Median Family Income % is ≥120% then the Income Level is Upper.
   If the Median Family Income % is 0% then the Income Level is Unknown.

[124] My workpapers includes coefficients, odds ratios, and p-values for my regression explanatory variables and disparities measured by these regressions on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties). I continue to find statistically significant disparities when controlling for median family income in each of these alternative samples.

[125] Median family income is also available at the Census block group level for most, but not all, block groups covered in the Full Analysis Sample. I use tract-level median family income for **Figure 14** because tract-level median family income is more widely reported by Census than block group level data, as noted by Dr. Skanderson. *Skanderson Report*, ¶ 58. Using block group-level median family income does not substantially change my results, as shown in my workpapers.

### 3. Neighborhood Homeownership Rate

95. Ms. Stedman argues that the homeownership rates should have been incorporated into Plaintiffs' analysis in the context of her sampling criticisms.[126] Dr. Skanderson presents owner-occupancy rate as a measure of the differences between white and non-white neighborhoods in each metropolitan area covered in Plaintiffs' inspections.[127]

96. To test whether using neighborhood homeownership rates affects my conclusions, I have calculated alternate regression models that add each property's block group level owner-occupancy rate as an explanatory control.[128] As row (1) and (5) of **Figure 14** show, the disparities measured by my regressions are very similar, and remain statistically significant at the 99 percent confidence level, regardless of whether the block group owner-occupancy rate is used as an explanatory control.[129]

### 4. Population Density

97. Dr. Skanderson presents population density as a measure of the differences between white and non-white neighborhoods in each metropolitan area covered in Plaintiffs' inspections.[130] To test whether controlling for population density affects my conclusions, I have calculated alternate regression models that add each property's block group level population density as an explanatory control.[131] As row (1) and (8) of **Figure 14** show, the disparities measured by my

---

[126] *Stedman Report*, ¶ 65.

[127] *Skanderson Report,* ¶ 54, Table A-2.

[128] I define owner-occupancy rate as the number of owner-occupied housing units divided by the total number of housing units, using data from the Census Bureau's 2013-2017 American Community Survey.

[129] My workpapers includes coefficients, odds ratios, and p-values for my regression explanatory variables and disparities measured by these regressions on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties). I continue to find statistically significant disparities when controlling for owner-occupancy rates in each of these alternative samples.

[130] *Skanderson Report,* ¶ 53, Table A-2.

[131] I use population data from the Census Bureau's 2013-2017 American Community Survey and land area data from U.S. Census Bureau, 2019 Planning Database to calculate population density (persons per square mile).

regressions are very similar, and remain statistically significant at the 99 percent confidence level, regardless of whether the block group population density is used as an explanatory control.[132]

### 5.  Neighborhood Foreclosure Rate

98.    Dr. Skanderson presents zip code foreclosure rate as a measure of the differences between white and non-white neighborhoods in each metropolitan area covered in Plaintiffs' inspections.[133] Dr. Skanderson produced annual zip code-level foreclosure rates from ATTOM data from 2009-2018. Ms. Stedman argues that the zip code foreclosure rates should have been incorporated into Plaintiffs' deficiency analysis in the context of her sampling criticisms.[134]

99.    To test whether controlling for foreclosure rates affects my conclusions, I have calculated alternate regression models that add each property's zip code level foreclosure rate in the year of Plaintiffs' inspection and the prior year's foreclosure rate as explanatory controls.[135] As row (1) and (9) of **Figure 14** show, the disparities measured by my regressions are very similar, and remain statistically significant at the 99 percent confidence level, regardless of whether the zip code foreclosure rates in the year of or year prior to the inspection are used as explanatory controls.[136]

---

[132] My workpapers includes coefficients, odds ratios, and p-values for my regression explanatory variables and disparities measured by these regressions on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties). I continue to find statistically significant disparities when controlling for population density in each of these alternative samples.

[133] *Skanderson Report,* Table A-2.

[134] *Stedman Report*, ¶¶ 63-67.

[135] I use the ATTOM Data Solutions zip code level data on foreclosure rates, produced by Dr. Skanderson with the backup materials to his report, in this analysis.

[136] My workpapers includes coefficients, odds ratios, and p-values for my regression explanatory variables and disparities measured by these regressions on other samples (including those that exclude the 139 Disputed Properties and include only the 699 Agreed-Upon Properties). I continue to find statistically significant disparities when controlling for the zip code foreclosure rate in each of these alternative samples.

**D.    Dr. Skanderson's Matched Pair Analysis Fails to Contradict my Findings of Disparities**

100.    Dr. Skanderson conducts a matched pair analysis in an attempt to identify property-specific factors omitted from my regression model that could have affected the number of deficiencies observed by Plaintiffs' experts.[137] However, Dr. Skanderson's analysis is limited to examining matched pairs in which the Non-White block group properties had the most unexplained variation of all possible matched pairs that he could have examined based on his criteria.

101.    Dr. Skanderson's matched pairs are based on matching each Non-White block group property with a White block group property with similar non-race characteristics.[138] For purposes of identifying matched pairs, Dr. Skanderson's classifies two properties as having similar non-race characteristics if the two properties are in the same MSA and if the predicted number of deficiencies calculated from my regression model for the two properties are within 1 deficiency *if both properties are assumed to have been in White block groups*.[139] He then eliminates any matches in which the White block group property had more deficiencies than the non-White block group property. These steps resulted in 267 potential matched pairs to review for 104 Non-White block group properties.

102.    At this stage of Dr. Skanderson's analysis, some Non-White block group properties were matched to multiple White block group properties. Dr. Skanderson chose to consider one matched pair per Non-White block group property for his evaluation, and he picked the White

---

[137] *Skanderson Report*, ¶¶ 125-133.
[138] *Skanderson Report*, ¶¶ 125 n.87. Dr. Skanderson also only considered properties that Deutsche Bank had admitted to owning for purposes of document availability for his manual review. *Id.*, ¶ 27, 125 n.87.
[139] Dr. Skanderson constructs his own merged dataset upon which to estimate my regression model, consisting of his geocoding of the properties and merging of data from the various sources used in my report. His dataset includes some differences from my dataset, but the results of the deficiency regressions are similar whether the regressions are estimated on my merged dataset or on Dr. Skanderson's merged dataset.

block group property with the smallest number of actual deficiencies if multiple White block group properties were matched to a Non-White block group property. This step resulted in a reduction of potential matched pairs to review from 267 to 104. Dr. Skanderson then chose to review only 20 of these 104 matched pairs, and he chose the pairs in which the Non-White block group properties had the greatest prediction errors (defined as the difference between the actual number of deficiencies observed and the predicted number of deficiencies if the property had been in a White block group) among the 104 Non-White block group properties.

103.    Dr. Skanderson's methodology of reducing the number of potential matched pairs to review from 267 to 20 resulted in finding 20 matched pairs in which the Non-White block group properties had much larger prediction errors than the other 84 possible Non-White block group properties. Thus, Dr. Skanderson's manual review of the 20 matched pairs is biased in favor of finding properties with the most unexplained variation from what my regression model explains. **Figure 15** summarizes the prediction error among the Non-White block group properties in the 20 matched pairs evaluated by Dr. Skanderson and the 104 possible Non-White block group properties he could have reviewed. As **Figure 15** shows, the average prediction error for the 20 Non-White block group properties reviewed by Dr. Skanderson was 7.57 – indicating that these properties had on average 7.57 more deficiencies than what my model predicted they would have had if they had been in White block groups. Among all 104 possible Non-White block group properties that could have been reviewed, the average prediction error is 3.62. Thus, it is not surprising that Dr. Skanderson would find factors excluded from my regression model that help explain the variation between the actual deficiencies and the regression predicted deficiencies when he only reviewed the Non-White block group properties with prediction errors greater than 81 percent of all Non-White block group properties that met his matched pair criteria.

**Figure 15: Matched Pairs Excluded from Dr. Skanderson's Analysis**

| | # of Non-White Block Group Properties with at Least One Match | # of Matched Pairs | Average Prediction Error for Non-White Block Group Properties | Average Prediction Error for White Block Group Properties |
|---|---|---|---|---|
| **Matched Pairs Reviewed by Skanderson** | 20 | 20 | 7.57 | -1.78 |
| **Potential Matched Pairs if Skanderson Had Not Restricted His Matched Pairs to those with the top 20** | 104 | 104 | 3.62 | -2.06 |
| **Matched Pairs Reviewed by Skanderson that Met His Criteria *except* being a top 20, allow multiple matches for each property in a Non-White Block Group** | 104 | 267 | 3.62 | -0.77 |

## V. DEFENDANT HAS NOT PRODUCED CREDIBLE EVIDENCE THAT THE DISPARATE RACIAL IMPACTS WERE BUSINESS JUSTIFIED

104.     The assertions of Dr. McCrary and Mr. Bryar disagreeing with my opinion that Defendants lack a legitimate business justification for following practices that result in disparate outcomes for the investigated Deutsche Bank REO properties based on race are flawed.

105.     First, Mr. Bryar alleges that I did not substantiate Plaintiffs' claim that there is no business justification for Defendants' policies.[140] This mischaracterizes the evidence I described in my Supplemental Report that properties with few deficiencies had significantly higher sale prices.[141] As I argued there, this evidence suggests that reducing the number of maintenance

---

[140] *Bryar Report*, ¶¶ 195-204.
[141] *Ayres Supplemental Report*, ¶¶ 4-5.

deficiencies makes economic sense. Mr. Bryar does not offer any competing analysis suggesting that maintenance and preservation costs incurred in reducing maintenance deficiencies would ultimately be unprofitable.

106.    Dr. McCrary also suggests, without performing an analysis of this subject, that I fail to analyze the cost of remedying deficiencies and asserts that, if properties with lower values had deficiencies that were more costly to remedy, then Defendants would have a business justification for not remedying these properties if it was not profitable.[142] But Defendants have failed to show that it is more costly to remedy particular kinds of remedies in minority neighborhoods than in non-minority neighborhoods. For example, it should not cost meaningfully different amounts to cut the grass in different neighborhoods. Indeed, there is evidence that defendants used standard fee schedules nationwide for particular types of remedial work.[143]

107.    As discussed below, I have analyzed Defendants' expenditures and find that deficiency-remedying expenditures on homes in non-minority neighborhoods exceeded expenditures on homes in minority neighborhoods (**Figure 16**). So even though there is evidence that homes in minority neighborhoods had more deficiencies than homes in non-minority neighborhoods, Defendants spent more on remedying deficiencies in non-minority neighborhoods.

108.    In sum, evidence suggests that (i) deficiencies were as cheap to remedy in minority neighborhoods as non-minority neighborhoods, (ii) remedying deficiencies tended to increase resale price, and (iii) even though there were more deficiencies in minority neighborhoods, defendants spent more on remedying deficiencies in non-minority neighborhoods than minority neighborhoods. Together, these findings do not provide substantial evidence that it was not cost-

---

[142] *McCrary Report*, ¶¶ 145-148.
[143] *See*, *e.g.*, Pltffs.' Ex. 315.

effective to remedy deficiencies in minority neighborhoods, because such a hypothesis is inconsistent with Defendants' own conduct in non-minority neighborhoods.

### VI. SERVICING DATA SHOWS DISPARITIES IN EXPENDITURES ON REO PROPERTY PRESERVATION

**A.    Defendants' Experts Analysis of Work Orders Reveal Disparities in Expenditures on Properties in Majority Non-White Areas Relative to Expenditures on Properties in Majority White Areas**

109.    Dr. Skanderson analyzes the expenditures on property preservation to claim that Defendants spent more on majority Non-White block group properties than majority White block group properties.[144] However, Dr. Skanderson reaches this conclusion by comparing expenditures *as a percentage of post-foreclosure appraised value*. Similarly, Mr. Bryar compares expenditures as a percentage of property value to allege that Defendants spent more on Non-White block group properties than White block group properties.[145]

110.    However, when the absolute dollar amounts are compared, Dr. Skanderson's results indicate that Defendants spent more on preserving White block group properties than Non-White block group properties. **Figure 16** shows the results of Dr. Skanderson's analysis of property preservation expenditures.

---

[144] *Skanderson Report*, ¶ 80-86, Table 4, Table 5.
[145] *Bryar Report*, ¶¶ 127-131, Chart 1, 198-204, Chart 2.

**Figure 16: Average Property Preservation Expenditure Amounts**

| *All Work Orders\** | Block Group Type | # of Properties | Avg. Total Work Order Amount | Difference | p-Value |
|---|---|---|---|---|---|
| **Excluding Fees** | Majority Non-White | 364 | $6,102 | ($875) | 0.13 |
| | Majority White | 225 | $6,977 | | |
| **Excluding Fees & Routine Maintenance** | Majority Non-White | 360 | $2,768 | ($459) | 0.24 |
| | Majority White | 223 | $3,227 | | |

*Source*: *Skanderson Report*, ¶¶ 80-86; Table 4, Table 5, and backup materials. Dr. Skanderson excludes work order expenditures from his analysis based on whether he classifies those expenditures as "fees" (such as legal fees, inspection fees, or code violation fines) or "routine maintenance" expenditures (such as boarding, landscaping, initial services, and winterization). *Skanderson Report*, ¶ 83.

111.     As **Figure 16** shows, Dr. Skanderson's own analysis of work order expenditures shows that Defendants spent more on White block group properties, on average, than Non-White block group properties. When fees are excluded following Dr. Skanderson's methodology, the average amount spent on Non-White block group properties was $875 less than the average amount spent on White block group properties. When fees and routine maintenance (as categorized by Dr. Skanderson) are excluded, the amount spent on Non-White block group properties was $459 less than the amount spent on White block group properties.

## B.     Defendants' Experts Review of Work Order Expenditures Relative to Property Value Is Flawed

112.     Dr. Skanderson's and Mr. Bryar's practice of dividing expenditures by property value before making their comparisons is flawed because many of the property preservation expenditures are the same regardless of the value of the property. For example, it should not cost meaningfully different amounts to cut the grass in different neighborhoods. Indeed, there is

evidence that defendants used standard fee schedules nationwide for particular types of remedial work.[146]

113.    An analysis of average expenditures as a percentage of property value also leads to skewed results because relatively small disparities in absolute amounts for low-value properties result in relatively high percentage disparities, and relatively large disparities in absolute amounts for high-value properties result in relatively low percentage disparities.

### C.    Defendants' Experts Analysis of Work Order Expenditures Does Not Account for Variation in Maintenance Needs Across Properties

114.    Dr. Skanderson's and Mr. Bryar's analysis of expenditures relative to property value fails to account for relevant factors that affect the amount of expenses incurred. For example, the time the property spends in REO will affect the amount of lawn mowing required.[147] Another common work order expenditure is snow removal, which would only be relevant in climates that experience snow. Dr. Skanderson also includes swimming pool expenditures, which are only applicable to properties with a swimming pool, but excludes work orders with the line item "Code Violations," despite including other work order line items within the "Code Violations" category in the data.[148]

---

[146] *See, e.g.*, Pltffs.' Ex. 315.

[147] I note that Dr. Skanderson does present analyses that exclude landscaping in his "routine maintenance" category.

[148] The property needs that would influence work order expenditures could also be evaluated using reliable inspection data. I note that other Plaintiffs' experts critique the quality of Defendants' inspection data and processes. I also note, as Dr. Skanderson does, the oddity that despite Altisource's remote/off shore operation of oversight via electronic systems and manuals, apparently no readily machine readable data was maintained on inspection findings. *Skanderson Report*, ¶ 120.

## VII.    DR. SKANDERSON'S ANALYSIS FAILS TO CONTRADICT PLAINTIFFS' CLAIMS THAT DEFENDANTS' POLICIES PERPETUATED SEGREGATION

115.    Dr. Skanderson examines the changes in the "dissimilarity index" in the MSAs that included the 699 Agreed-Upon Properties from 2010 to 2020 and concludes that segregation generally did not increase in these metropolitan areas of interest.[149] As Dr. Skanderson notes, the dissimilarity index is a measure of "how uniformly two racial/ethnic groups are distributed across the geographic subunits (such as census tracts) that make up a larger geographic unit (such as an MSA). The index can be interpreted as the proportion of a given race group that would need to move in order to create a uniform population distribution."[150] Although the dissimilarity index decreased from 2010 to 2020 in most MSAs in Dr. Skanderson's analysis, the dissimilarity index decreased nationwide over the same period at a similar rate. **Figure 17** summarizes the results.

---

[149] *Skanderson Report*, ¶¶ 161-164, Table A-11.
[150] *Skanderson Report*, ¶ 161 n. 114.

**Figure 17: Changes in Dissimilarity Indices from 2010 to 2020**

| | Aggregate across MSAs[1] | U.S. Total |
|---|---|---|
| **Index of Dissimilarity (White vs Black)** | | |
| **2010 Census** | 66.7% | 66.0% |
| **2020 Census** | 64.0% | 63.9% |
| **Difference** | -2.7% | -2.1% |
| | | |
| **Index of Dissimilarity (White vs Hispanic)** | | |
| **2010 Census** | 58.4% | 62.1% |
| **2020 Census** | 55.5% | 58.6% |
| **Difference** | -3.0% | -3.5% |
| | | |
| **Index of Dissimilarity (White vs Black + Hispanic)** | | |
| **2010 Census** | 59.2% | 59.2% |
| **2020 Census** | 56.3% | 56.5% |
| **Difference** | -3.0% | -2.7% |

Note: [1] MSAs are limited to the metropolitan areas listed in *Skanderson Report*, Table A-11, which are the MSAs in which the Agreed-Upon Properties are located.

116.    Because the dissimilarity index decreased by similar percentages nationwide as it did in the MSAs examined by Dr. Skanderson, the trends in these MSAs are not out of the ordinary relative to the experience nationwide. Further, the fact that the dissimilarity index declined, on average, across a ten-year period in these MSAs does not indicate that it would not have decreased even further but-for the alleged discriminatory practices by Defendants.

## VIII.   MY VALUATION REGRESSIONS APPROPRIATELY USE PRE-FORECLOSURE PROPERTY VALUES AND ARE ROBUST TO ADJUSTMENTS FOR MARKET FACTORS

117.    In my initial report, I compared the change in value of REO properties during the foreclosure lifecycle for White block group properties and Non-White block group properties.[151] I also measured the relationship between the number of deficiencies observed by Plaintiffs'

---

[151] *Ayres Report*, ¶¶ 71-82.

inspectors and that change in value. One of the windows I used to measure the change in value was the period beginning with the latest pre-foreclosure appraisal and ending with the REO sale.

118.    Dr. McCrary alleges that a pre-foreclosure valuation date is inappropriate to use for my analysis because the change in value during that window could be affected by value lost between that valuation and the REO date.[152] He notes that the average pre-foreclosure appraisal dates I used in my analysis occurred several months before the REO date.[153] Dr. Skanderson makes similar observations that some properties in my sample had pre-foreclosure dates many months before the REO date.[154] Mr. Bryar makes similar claims, and alleges that my valuation analysis includes value changes over periods before the property was vacant, and thus before Defendants could have taken measures to maintain the property.[155]

119.    To address these experts' concern that my pre-foreclosure valuations occurred too long before the REO date, I re-examine the change in value for properties from the latest pre-foreclosure date to the REO sale date, but limit my sample to only those properties with a latest pre-foreclosure valuation within 30 days, 60 days, or 90 days of the REO date. **Figure 18** summarizes the average decrease in real value, when measured in constant dollars, for REO properties from the date of their last pre-foreclosure appraisal to the date of their sale. In **Figure 18**, I include the results for the sample used in my initial report, and I also include the results when using only those REO properties with pre-foreclosure appraisals dated within 30, 60, or 90 days

---

[152] *McCrary Report*, ¶¶ 141-142.
[153] *McCrary Report*, ¶ 142.
[154] *Skanderson Report*, ¶ 145.
[155] *Bryar Report*, ¶¶ 118-119 ("He does not consider the occupancy status of any of the At-Issue REO, however. If he had considered the data, Dr. Ayres would have concluded that his correlation analysis does not tell him anything about Defendants' servicing of the properties because over 80% of the properties were occupied for between three months and two or more years after the last pre-foreclosure appraisal date.").

of the REO date. The property value changes shown in **Figure 18** represent average annual percent changes in real value. In most instances, the disparities between the declines in value for majority minority block group properties and the declines in value for majority white block group properties are greater when the sample is limited to pre-foreclosure appraisals occurring closer to the REO date.

**Figure 18: Average Annual % Change from Last Pre-Foreclosure Appraisal Value to REO Sale Price**

| | All Properties with Available Data | Only Properties with Last Pre-Foreclosure Appraisal between 0 and 30 Days before REO | Only Properties with Last Pre-Foreclosure Appraisal between 0 and 60 Days before REO | Only Properties with Last Pre-Foreclosure Appraisal between 0 and 90 Days before REO |
|---|---|---|---|---|
| **White Block Groups** | | | | |
| **# Properties** | 161 | 21 | 42 | 61 |
| **Avg. Annual % Change in Value** | -26.3% | -32.7% | -28.1% | -28.8% |
| | | | | |
| **Non-White Block Groups** | | | | |
| **# Properties** | 272 | 35 | 82 | 118 |
| Avg. Annual % Change in Value | -28.0% | -31.1% | -36.3% | -36.4% |
| *Difference from White* | *-1.7%* | *1.6%* | *-8.2%* | *-7.6%* |
| | | | | |
| **African American/Hispanic Block Groups** | | | | |
| # Properties | 253 | 34 | 76 | 110 |
| Avg. Annual % Change in Value | -28.4% | -30.5% | -36.3% | -36.2% |
| *Difference from White* | *-2.1%* | *2.2%* | *-8.2%* | *-7.4%* |
| | | | | |
| **African American Block Groups** | | | | |
| # Properties | 195 | 22 | 54 | 79 |
| Avg. Annual % Change in Value | -32.3% | -43.9% | -42.9% | -43.0% |
| *Difference from White* | *-6.0%\*\** | *-11.3%* | *-14.7%\*\** | *-14.1%\*\*\** |
| | | | | |
| **Hispanic Block Groups** | | | | |
| # Properties | 31 | 7 | 11 | 17 |
| Avg. Annual % Change in Value | -17.4% | -10.2% | -21.9% | -24.4% |
| *Difference from White* | *8.9%* | *22.4%* | *6.3%* | *4.5%* |

Note: *** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%. Statistical significance is calculated using a t-test of means assuming unequal variances.

Defendants' spreadsheets include "low", "mid", and "high" appraisal values. I use the "low" values to calculate the results of this table. Similar results are obtained when using the "mid" or "high" values.

Nominal appraisal and sale values are converted to real values using the Home Price Index (HPI) at the Three-Digit ZIP Code level, published by the FHFA. Federal Housing Finance Agency, House Price Index Datasets, All-Transactions Indexes (Estimated using Sales Prices and Appraisal Data), Three-Digit Zip Codes, https://www.fhfa.gov/DataTools/Downloads/Documents/HPI/HPI_AT_3zip.xlsx (accessed Oct. 12, 2022). Similar results are obtained if nominal values are converted to real values using the All-Transaction HPI at the metropolitan area level.

120.    I also estimate regressions that measure the relationships between the number of deficiencies and real property value declines by different value bands, using samples limited to those with pre-foreclosure appraisals dated more closely to the REO date. **Figure 19** summarizes the relationship measured in these regressions between the count of deficiencies recorded by Plaintiffs' inspectors and the change in real property values during the REO life cycle.

**Figure 19: Relationship between Deficiencies Observed in Plaintiffs' Inspection Data and Real Property Value Declines from Last Pre-Foreclosure Appraisal Value to REO Sale Price**

| | | Marginal Effect on Average Annual % Change in Real Property Value | | |
|---|---|---|---|---|
| | **All Properties with Available Data** | **Only Properties with Last Pre-Foreclosure Appraisal between 0 and 30 Days Before REO** | **Only Properties with Last Pre-Foreclosure Appraisal between 0 and 60 Days Before REO** | **Only Properties with Last Pre-Foreclosure Appraisal between 0 and 90 Days Before REO** |
| **Number of Deficiencies** | -1.255*** | -0.344 | -1.575* | -1.599** |
| | | | | |
| **Number of Deficiencies by Value Band (based on Property Value at Start of Window)** | | | | |
| **Value ≤ $50,000** | -1.998*** | -1.992 | -3.173*** | -2.188** |
| **$50,000 < Value ≤ $80,000** | -1.252* | 1.579 | -0.344 | -1.353 |
| **$80,000 < Value ≤ $100,000** | -1.707*** | -1.917 | -2.114** | -2.234** |
| **$100,000 < Value ≤ $150,000** | -1.076*** | -1.314 | -2.403*** | -2.085*** |
| **Value > $150,000** | -0.461 | -0.982 | -1.331 | -0.916 |
| | | | | |
| **# Properties in Regression** | 433 | 56 | 124 | 179 |

Note: Additional details of these regressions are shown in my workpapers.
*** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%.
Defendants' spreadsheets include "low", "mid", and "high" appraisal values. I use the "low" values to calculate the results of this table. Similar results are obtained when using the "mid" or "high" values.
Nominal appraisal and sale values are converted to real values using the Home Price Index (HPI) at the Three-Digit ZIP Code level, published by the FHFA. Federal Housing Finance Agency, House Price Index Datasets, All-Transactions Indexes (Estimated using Sales Prices and Appraisal Data), Three-Digit Zip Codes, https://www.fhfa.gov/DataTools/Downloads/Documents/HPI/HPI_AT_3zip.xlsx (accessed Oct. 12, 2022). Similar results are obtained if nominal values are converted to real values using the All-Transaction HPI at the metropolitan area level.

121.    Dr. Skanderson evaluates value changes from the first post-REO appraisal to the REO sale.[156] His analysis suffers from the flaws that any post-REO appraisal is affected by Defendants' alleged conduct that disparately impacted minority areas. In fact, the average time between the REO date and the first post-foreclosure appraisal used in Dr. Skanderson's analysis is more than three months.[157]

122.    Defendants' experts also attack my regression models measuring the effect of the number of deficiencies on value changes because the regressions treat each deficiency with the same weight. Mr. Linné alleges that each deficiency affects value differently, but he does not attempt to conduct an analysis to treat deficiencies differently in a valuation analysis.[158] In addition, Mr. Linné alleges many deficiencies are simple and inexpensive to remediate.[159] Whether simple or not, they can affect property values of neighboring properties of homeowners who have no authority to remedy the deficiencies.

123.    Dr. Skanderson alleges that my valuation regression models are flawed because I do not account for enough factors that could affect changes in housing market supply and demand.[160] He notes that the only factor included in my analysis that accounts for variation in values among different geographic markets is at the three-digit zip code level. Dr. Skanderson argues that the three-digit zip code level is too broad to distinguish differences in market factors and property value trends among local neighborhoods.[161]

---

[156] *Skanderson Report*, ¶¶ 146-148.
[157] *Skanderson Report*, ¶¶ 148, Table 7.
[158] *Linné Report*, ¶ 108.
[159] *Linné Report*, ¶ 104.
[160] *Skanderson Report*, ¶¶ 149-153.
[161] *Skanderson Report*, ¶¶ 150.

124.    To address Dr. Skanderson's criticisms, I add controls for neighborhood factors to my valuation regression models. These controls, listed in **Figure 20**, consist of factors included in my original regression model of deficiencies and factors used in the alternative models of this report (**Section IV.C**) to address Defendants' experts' critiques of my deficiency models. These factors include poverty rate, vacancy rate, median family income, crime rates, and foreclosure rates. **Figure 20** summarizes the relationship measured in these regressions between the count of deficiencies recorded by Plaintiffs' inspectors and the change in real property values during the REO life cycle.

**Figure 20: Relationship between Deficiencies Observed in Plaintiffs' Inspection Data and Real Property Value Declines from Last Pre-Foreclosure Appraisal Value to REO Sale Price, After Controlling for More Local Factors**

| | Marginal Effect on Average Annual % Change in Real Property Value | |
|---|---|---|
| | **Models Controlling Only for # of Deficiencies or # of Deficiencies by Value Band (1)** | **Models Controlling for Neighborhood Factors [1] & Either # of Deficiencies or # of Deficiencies by Value Band (2)** |
| **Number of Deficiencies** | -1.255*** | -0.786** |
| | | |
| **Number of Deficiencies by Value Band (based on Property Value at Start of Window)** | | |
| Value ≤ $50,000 | -1.998*** | -0.157 |
| $50,000 < Value ≤ $80,000 | -1.252* | -0.493 |
| $80,000 < Value ≤ $100,000 | -1.707*** | -0.969 |
| $100,000 < Value ≤ $150,000 | -1.076*** | -0.957** |
| Value > $150,000 | -0.461 | -1.080*** |
| | | |
| **# Properties in Regression** | 433 | 424 |

Note: Additional details of these regressions are shown in my workpapers.
*** Statistically significant at 1%, ** Statistically significant at 5%, * Statistically significant at 10%.
Defendants' spreadsheets include "low", "mid", and "high" appraisal values. I use the "low" values to calculate the results of this table. Similar results are obtained when using the "mid" or "high" values.
Nominal appraisal and sale values are converted to real values using the Home Price Index (HPI) at the Three-Digit ZIP Code level, published by the FHFA. Federal Housing Finance Agency, House Price Index Datasets, All-Transactions Indexes (Estimated using Sales Prices and Appraisal Data), Three-Digit Zip Codes, https://www.fhfa.gov/DataTools/Downloads/Documents/HPI/HPI_AT_3zip.xlsx (accessed Oct. 12, 2022). Similar results are obtained if nominal values are converted to real values using the All-Transaction HPI at the metropolitan area level.

[1] Neighborhood factors included as explanatory variables in model (2) are the Log of Census Block Group Median Property Value (2013-2017), Census Block Group Poverty Rate (2013-2017), Census Block Group Vacancy Rate (2013-2017), Block Group Burglary Index, Block Group Larceny Index, Block Group Motor Vehicle Theft Index, Block Group Owner-Occupancy Rate (2013-2017), Log of Census Tract Median Family Income (2013-2017), Low-Income Tract (Median Tract Family Income as % of MSA Median Family Income is > 0% and < 50%), Moderate - Income Tract (Median Tract Family Income as % of MSA Median Family Income is ≥ 50% and < 80%), Middle-Income Tract (Median Tract Family Income as % of MSA Median Family Income is ≥ 80% and < 120%), Log of Census Block Group Population Density (2013-2017), Zip Code Foreclosure Rate for Year of Last Pre-Foreclosure Appraisal, and Zip Code Foreclosure Rate for Year of REO Sale.

## IX. CONCLUSION

125.     Based on the analysis conducted for this rebuttal report, I continue to conclude that Deutsche Bank's REO properties exhibited more deficiencies in routine maintenance and marketing in communities of color than similar REO properties in majority white communities. The differences in the number of deficiencies observed by Plaintiffs' inspectors between properties in majority white communities and communities of color were statistically significant, and these conclusions hold even when the categories of deficiencies examined are those that are likely not caused by crime. Further, I have seen no evidence that the disparities in observed deficiencies are business justified.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on April 26, 2023.


_____

Ian Ayres

## APPENDIX 1: MATERIALS CONSIDERED

All Documents included in Appendix 1 to the Expert Report of Ian Ayres, Oct. 13, 2022.

All Documents included in Appendix 1 to the Supplemental Expert Report of Ian Ayres, Dec. 16, 2022.

*Pleadings, Decisions & Other Case Filings:*

- Exhibit 10 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, Case No. 1:18-cv-01919-CCB (D. Md.)
- Rebuttal Expert Report of Marcel Bryar, Feb. 21, 2023, and backup materials.
- Rebuttal Expert Report of Mark Linné, Feb. 21, 2023, and backup materials.
- Expert Report of Professor Justin McCrary, Ph.D., Feb. 21, 2023, and backup materials.
- Expert Report of David M. Skanderson, Ph.D., Feb. 21, 2023, and backup materials.
- Expert Report of Sharon Stedman, Feb. 21, 2023, and backup materials.
- Declaration of Prof. Justin McCrary, Ph.D. in Support of Defendants' Motion to Exclude Plaintiffs' Property Specific Investigation, Feb. 28, 2023.
- Declaration of Lindsay Augustine – Front View Photo List and Broken & Boarded Doors and Windows Count, Apr. 18, 2023.
- Rebuttal Expert Report of Timothy C. Guetterman, PhD, MA, Apr. 17, 2023.
- Supplemental Expert Report of Albert Poche, Apr. 19, 2023.
- Rebuttal Expert Report of Deavay Tyler, Apr. 19, 2023.

*Deposition Testimony:*

- Deposition of Lindsay Augustine, Oct. 1, 2021, Oct. 15, 2021, & May 17, 2022 (excerpts).
- Deposition of Thomas Blake, Apr. 7, 2022.
- Deposition of Mason Legendre, Apr. 14, 2022.
- Deposition of Ryan Solohub, Apr. 16, 2022.
- Deposition of David Skanderson, Mar. 21, 2023.
- Deposition of Marcel Bryar, Mar. 22, 2023.

*Literature:*

- Ian Ayres, *Testing for Discrimination and the Problem of "Included Variable Bias"* (working paper 2010), *available at* https://ianayres.yale.edu/sites/default/files/files/Testing%20for%20Discrimination%20and%20the%20Problem%20of%20_Included%20Variable.pdf.
- Lin Cui & Randall Walsh, *Foreclosure, vacancy and crime*, 87 J. URBAN ECON. 72 (2015).
- Ingrid Gould Ellen, Johanna Lacoe, & Claudia Ayanna Sharygin *Do foreclosures cause crime?*, 74 J. URBAN ECON. 59 (2013).
- Daniel Klein, *Implementing a general framework for assessing interrater agreement in Stata*, 18 STATA J. 871 (2018)
- Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359 (3rd ed., 2011).

- John Yinger, *Evidence of Discrimination in Consumer Markets*, 12 J. ECON PERSPECTIVES 23 (1998).

*Publicly Available Data:*

- Consumer Financial Protection Bureau, Home Mortgage Disclosure Act Loan/Application Register (HMDA LAR) Data.
- FFIEC, Geocoding System, https://www.ffiec.gov/geocode/help3.aspx
- U.S. Census Bureau, 2019 Planning Database.
- U.S. Census Bureau, Geography Program, *Glossary*, https://www.census.gov/programs-surveys/geography/about/glossary.html.
- U.S. Census Bureau, Census 2000 Tabulation Block to 2010 Census Tabulation Block Relationship Files.

*Document Production – Plaintiff Inspection Data:*

- MVFHC_0014025.csv
- Copy of Deutsche Bank Paper Evaluation Form Review- Para Review.xlsx

*Document Production – Servicer-Limited Data:*

- ASI000555512
- ASI000559101

*Document Production – Miscellaneous:*

- NFHA REO Investigation Photo Protocols, FHANC_0002240 – 2241
- AFS_00011075 – 11222
- ASI000571735 – 571990
- ASI000580950 – 580957
- ASI000584312 – 584492
- ASI000584493 – 584608
- Pltffs.' Ex. 210, ASI000024271 – 25357.
- Pltffs.' Ex. 361, ASI000046373 – 46512.
- Pltffs.' Ex. 765, AFS_00011075 – 11222.

- Any other materials not referenced above which are referenced in my report.

**EXHIBITS**

**Exhibit 1: List of REO Property Deficiencies Scored in Plaintiffs' Inspection Data & Deficiencies Scored in My Front View Photo Review**

| REO Property Deficiencies Reported in Plaintiffs' Inspection Data | Description of Deficiency Scored by Plaintiffs' Inspectors | Deficiency Scored in My Front View Photo Review | Differences between Plaintiffs' Deficiency Category and My Front View Photo Deficiency Category |
|---|---|---|---|
| *Curb Appeal:* | | | |
| Trash | Anything worthless, useless, or discarded on the subject property | Trash | |
| Mail accumulated | Letters, packages, flyers, etc. that have piled up | Mail accumulated | |
| Overgrown grass and leaves | -Lawns that have become overgrown -- high grass or weeds<br>-Any area where dead leaves have not been raked up and disposed of properly. | Overgrown grass<br><br>Leaves | Overgrown grass and leaves are scored separately in my front photo review. |
| Overgrown or dead shrubbery | Overgrown or dead shrubbery | Overgrown shrubbery<br><br>Dead shrubbery / tree branches | Overgrown shrubbery is scored separately from dead shrubbery / tree branches |
| Dead grass (10%-50%) | Lawns or large sections of lawns with dead grass | *Not scored* | |
| Dead grass (50% or more) | Lawns or large sections of lawns with dead grass | *Not scored* | |
| Invasive plants (10%-50%)<br>Invasive plants (50% or more) | Overgrown weeds, vines, etc. that are growing up the side of a house or taking over the shrubs/lawn | Invasive plants on structure | Only invasive plants on structure were scored in my front photo review, not invasive plants on lawn/shrubs/driveway/walkway |
| Broken mailbox | Ruptured, fractured, hanging, or missing mailboxes | Broken mailbox | |
| Miscellaneous | Miscellaneous curb appeal issues that do not fall under any other category | *Not scored* | |
| *Structure:* | | | |
| Unsecured/broken doors and locks | Doors that are open or off of the hinges<br>Missing locks, doorknobs, screens, etc.<br>Boarded doors | Unsecured/broken doors and locks<br>Boarded doors | Boarded doors are scored separately from unsecured/broken doors and locks in my front photo review. I scored the count of total doors, unsecured/broken doors, and boarded doors. |
| Damaged steps and handrails | Missing or broken steps<br>Any obstruction on the steps or porch<br>Missing or broken handrails | Damaged steps and handrails | |
| Damaged windows (broken, boarded) | Windows missing a glass, or covered in plastic or tarp<br>Boarded up windows | Broken / open windows & screens<br><br>Boarded windows | Boarded windows are scored separately from broken/open windows & screens in my front photo review. I scored the count of total windows, the count of broken/open windows & screens, and the count of boarded windows. |
| Damaged roof | Roofs with holes covered in tarp, with misplaced or broken shingles, or appearing unstable | Damaged roof | |

| REO Property Deficiencies Reported in Plaintiffs' Inspection Data | Description of Deficiency Scored by Plaintiffs' Inspectors | Deficiency Scored in My Front View Photo Review | Differences between Plaintiffs' Deficiency Category and My Front View Photo Deficiency Category |
|---|---|---|---|
| Damaged fence | Fences that are broken, hanging, or partially missing | Damaged fence | |
| Holes | Openings in the structure of the subject property | Holes | |
| Wood rot | Deterioration or decay found on the wooded areas of the subject property | Wood rot | |
| Miscellaneous | Miscellaneous structural issues that do not fall under any other category<br>Structural issues on buildings not attached to the main structure | *Not scored* | |

**Signage and Occupancy:**

| | | | |
|---|---|---|---|
| Trespassing or warning signs | Subject properties with signs prohibiting wrongful entry | *Not scored* | |
| Marketed as distressed property | Marketed as distressed property | *Not scored* | |
| For Sale sign missing | For Sale sign missing | *Not scored* | |
| Broken and discarded signage | Broken and discarded signage | *Not scored* | |
| Unauthorized occupancy | Truck or cars parked in driveway of vacant homes<br>People loitering or using premises | *Not scored* | |
| Miscellaneous | Miscellaneous signage issues that do not fall under any other category | *Not scored* | |

***Paint/Siding:***

| | | | |
|---|---|---|---|
| Graffiti | Any images or lettering scratched, painted, or marked on the subject property | Graffiti | |
| Peeling/chipped paint | Paint chipping or peeling on various surfaces of the subject property | Peeling/chipped paint | |
| Damaged siding | Missing, broken, seriously dented, or peeling siding material | Damaged siding | |
| Missing shutters (not attached/secure) | Hanging or partially unattached shutters and shutters that are missing entirely when it appears that shutters were originally part of the structure | Missing shutters (not attached/secure) | |
| Miscellaneous | Miscellaneous paint/siding issues that do not fall under any other category | *Not scored* | |

| REO Property Deficiencies Reported in Plaintiffs' Inspection Data | Description of Deficiency Scored by Plaintiffs' Inspectors | Deficiency Scored in My Front View Photo Review | Differences between Plaintiffs' Deficiency Category and My Front View Photo Deficiency Category |
|---|---|---|---|
| *Gutters:* | | | |
| Missing/out of place | Missing or out of place gutters or sections of gutters or downspouts | Missing/out of place | |
| Broken/hanging | Broken or hanging gutters damaged to the point where the no longer serve their function | Broken/hanging | |
| Obstructed | Obstructed gutters are clearly blocked with leaves or debris that is preventing the proper drainage of water | Obstructed | |
| Miscellaneous | Miscellaneous gutter issues that do not fall under any other category | *Not scored* | |
| *Water damage:* | | | |
| Water damage | Any demonstrated damages caused by water leaks or rainwater Water damages is evident from dark spots, rust, and/or standing water, puddles, and wet spots on the built areas of the property | Mold / Discoloration | Water damage / mold / discoloration scored as in a single deficiency category in my front photo review |
| Small amount of mold | The presence of mold is characterized by green or brown fungal growth on the property This is often found on siding, at the foundation of the building, etc. | | |
| Pervasive mold | The presence of mold is characterized by green or brown fungal growth on the property This is often found on siding, at the foundation of the building, etc. | | |
| Miscellaneous | Miscellaneous water damage issues that do not fall under any other category | *Not scored* | |
| *Utilities:* | | | |
| Exposed or tampered with | Include broken utility boxes and hanging or exposed wires | Exposed or tampered with | |
| Gas turned off | NOTE: This attribute is not treated as a deficiency in my analysis. | *Not scored* | |
| Meter turned off | NOTE: This attribute is not treated as a deficiency in my analysis. | *Not scored* | |

Source: Full Set - Deutsche Bank Properties.xlsx; NFHA_0043860 – 43976, at 43897 – 43935.

## Exhibit 2: Presence of Deficiencies Among Front Photo Sample

| | All Properties in Sample (n=284) | White Block Groups (n=142) | Non-White Block Groups (n=142) | | African American/Hispanic Block Groups (n=125) | | African American Block Groups (n=93) | | Hispanic Block Groups (n=13) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean # or % with Deficiency | Mean # or % with Deficiency | Mean # or % with Deficiency | *Difference from White Block Groups* | Mean # or % with Deficiency | *Difference from White Block Groups* | Mean # or % with Deficiency | *Difference from White Block Groups* | Mean # or % with Deficiency | *Difference from White Block Groups* |
| Total # of Deficiencies (Mean) | 2.8 | 2.5 | 3.0 | *0.5 *** | 3.1 | *0.6 *** | 3.3 | *0.8 *** | 3.2 | *0.6* |
| % of REO Properties with Total Deficiencies ≥ 10 | 0.35% | 0.00% | 0.70% | 0.70% | 0.80% | 0.80% | 1.08% | 1.08% | 0.00% | 0.00% |
| | | | | | | | | | | |
| ***% of REO Properties with Individual Deficiencies:*** | | | | | | | | | | |
| **Curb appeal:** | | | | | | | | | | |
| Trash | 18% | 13% | 23% | *10% *** | 23% | *11% *** | 25% | *12% *** | 38% | *26%* |
| Mail accumulated | 14% | 16% | 12% | *-4%* | 12% | *-4%* | 15% | *-1%* | 8% | *-9%* |
| Overgrown grass | 19% | 22% | 16% | *-6%* | 15% | *-7%* | 15% | *-7%* | 8% | *-14%* |
| Leaves | 25% | 27% | 24% | *-3%* | 23% | *-4%* | 27% | *0%* | 8% | *-19% *** |
| Overgrown shrubbery | 25% | 25% | 25% | *1%* | 24% | *-1%* | 22% | *-3%* | 38% | *14%* |
| Dead shrubbery / tree branches | 17% | 20% | 13% | *-6%* | 14% | *-5%* | 16% | *-4%* | 0% | *-20% **** |
| Invasive plants on structure | 9% | 5% | 13% | *8% *** | 14% | *9% *** | 15% | *10% *** | 8% | *3%* |
| Broken mailbox | 3% | 3% | 3% | *0%* | 2% | *0%* | 3% | *0%* | 0% | *-3% *** |
| | | | | | | | | | | |
| **Structure:** | | | | | | | | | | |
| Unsecured/broken doors and locks | 1% | 1% | 1% | *1%* | 2% | *1%* | 1% | *0%* | 8% | *7%* |
| Boarded doors | 2% | 1% | 4% | *4% ** | 4% | *3% ** | 4% | *4%* | 8% | *7%* |
| Damaged steps and handrails | 11% | 13% | 8% | *-5%* | 9% | *-5%* | 10% | *-4%* | 0% | *-13% **** |
| Broken / open windows & screens | 3% | 2% | 4% | *1%* | 3% | *1%* | 3% | *1%* | 8% | *6%* |
| # Broken / open windows & screens | 0.04 | 0.02 | 0.06 | *0.04* | 0.06 | *0.04* | 0.08 | *0.05* | 0.08 | *0.06* |
| # Broken / open windows & screens as % of total windows | 1% | 1% | 1% | *0%* | 1% | *0%* | 1% | *1%* | 2% | *1%* |
| Boarded windows | 9% | 4% | 14% | *10% **** | 16% | *12% **** | 16% | *12% **** | 23% | *19%* |
| # Boarded windows | 0.16 | 0.07 | 0.25 | *0.18 *** | 0.28 | *0.21 **** | 0.31 | *0.24 *** | 0.31 | *0.24* |
| # Boarded windows as % of total windows | 5% | 2% | 8% | *6% **** | 10% | *8% **** | 9% | *7% **** | 15% | *13%* |
| Damaged roof | 8% | 6% | 11% | *6% ** | 10% | *5%* | 13% | *7% ** | 8% | *2%* |
| Damaged fence | 9% | 8% | 9% | *1%* | 10% | *2%* | 11% | *2%* | 15% | *7%* |
| Holes | 1% | 0% | 3% | *3% *** | 3% | *3% *** | 3% | *3% ** | 8% | *8%* |
| Wood rot | 13% | 11% | 15% | *4%* | 15% | *5%* | 13% | *2%* | 23% | *13%* |
| | | | | | | | | | | |
| **Paint/siding:** | | | | | | | | | | |
| Graffiti | 1% | 1% | 1% | *-1%* | 1% | *-1%* | 1% | *0%* | 0% | *-1%* |
| Peeling/chipped paint | 32% | 27% | 36% | *8%* | 38% | *10% ** | 39% | *11% ** | 46% | *19% *** |
| Damaged siding | 6% | 3% | 9% | *6% *** | 10% | *8% *** | 12% | *9% *** | 8% | *5%* |
| Missing shutters (not attached/secure) | 4% | 3% | 4% | *1%* | 5% | *2%* | 5% | *3%* | 0% | *-3% *** |

| | All Properties in Sample (n=284) | White Block Groups (n=142) | Non-White Block Groups (n=142) | | African American/Hispanic Block Groups (n=125) | | African American Block Groups (n=93) | | Hispanic Block Groups (n=13) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean # or % with Deficiency | Mean # or % with Deficiency | Mean # or % with Deficiency | *Difference from White Block Groups* | Mean # or % with Deficiency | *Difference from White Block Groups* | Mean # or % with Deficiency | *Difference from White Block Groups* | Mean # or % with Deficiency | *Difference from White Block Groups* |
| **Gutters:** | | | | | | | | | | |
| Missing/out of place | 8% | 6% | 11% | *6% ** | 12% | *6% ** | 11% | *5%* | 31% | *25% ** |
| Broken/hanging | 10% | 10% | 10% | *0%* | 10% | *1%* | 13% | *3%* | 8% | *-2%* |
| Obstructed | 4% | 6% | 3% | *-3%* | 2% | *-3%* | 3% | *-2%* | 0% | *-6% **** |
| **Water damage:** | | | | | | | | | | |
| Mold / Discoloration | 22% | 18% | 26% | *8%* | 28% | *10% ** | 30% | *12% *** | 15% | *-3%* |
| **Utilities:** | | | | | | | | | | |
| Exposed or tampered with | 2% | 2% | 2% | *0%* | 2% | *0%* | 2% | *0%* | 0% | *-2% ** |

| Summary | Non-White Block Groups (n=142) | African American/Hispanic Block Groups (n=125) | African American Block Groups (n=93) | Hispanic Block Groups (n=13) |
|---|---|---|---|---|
| Total Types of Deficiencies Recorded | 26 | 26 | 26 | 26 |
| # of Deficiencies that Were More Likely to Be Observed for REO Properties in the Given Minority Block Group than REO Properties in White Block Groups | 16 | 17 | 19 | 14 |
| # where Difference is Statistically Significant at 5% | 5 | 5 | 5 | 1 |
| # where Difference is Statistically Significant at 1% | 1 | 1 | 1 | 0 |
| # of Deficiencies that Were Less Likely to Be Observed for REO Properties in the Given Minority Block Group than REO Properties in White Block Groups | 7 | 9 | 7 | 12 |
| # where Difference is Statistically Significant at 5% | 0 | 0 | 0 | 6 |
| # where Difference is Statistically Significant at 1% | 0 | 0 | 0 | 3 |

Note: Statistical significance of the differences between a given minority Block Group and Non-White Block Groups is determined using a t-test with unequal variances for the total number of deficiencies and a z-test of proportions for individual deficiencies.
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)
See Section III.B. for a description of the front photo review.

**Exhibit 3: OLS Regression Results Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms**
**(Outcome = Total Number of Deficiencies)**

| | Full Analysis Sample | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Race/Ethnicity of Block Group (Relative to White Block Group) | | | | | | |
| Non-White Block Group | 3.360*** | 2.278*** | | | | |
| | (0.000) | (0.000) | | | | |
| African American/Hispanic Block Group | | | 3.439*** | 2.389*** | | |
| | | | (0.000) | (0.000) | | |
| African American Block Group | | | | | 3.565*** | 2.127*** |
| | | | | | (0.000) | (0.000) |
| Hispanic Block Group | | | | | 3.881*** | 3.214*** |
| | | | | | (0.000) | (0.000) |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | | | | | 2.106*** | 2.317*** |
| | | | | | (0.000) | (0.000) |
| Non-White Block Group (Exc. African American/ Hispanic Block Group) | | | 2.352*** | 1.561** | 2.352*** | 1.647*** |
| | | | (0.000) | (0.013) | (0.000) | (0.010) |
| Age of Home | | 0.036*** | | 0.036*** | | 0.034*** |
| | | (0.000) | | (0.000) | | (0.000) |
| Size of Home (000 Sq. Ft.) | | 0.403* | | 0.410** | | 0.440** |
| | | (0.053) | | (0.048) | | (0.039) |
| Ratio of Home-to-Lot | | -2.811*** | | -2.816*** | | -2.926*** |
| | | (0.000) | | (0.000) | | (0.000) |
| Ever Previously REO | | -0.106 | | -0.135 | | -0.094 |
| | | (0.783) | | (0.725) | | (0.806) |
| New Construction | | -0.736 | | -0.832 | | -0.730 |
| | | (0.452) | | (0.397) | | (0.455) |
| Flipped Sale | | -0.304 | | -0.280 | | -0.284 |
| | | (0.585) | | (0.615) | | (0.604) |
| Deed-in-Lieu | | 0.242 | | 0.307 | | 0.408 |
| | | (0.700) | | (0.626) | | (0.523) |
| Home Purchase Loan | | -0.399 | | -0.430 | | -0.452 |
| | | (0.201) | | (0.169) | | (0.147) |
| Months Held by Lender | | 0.018 | | 0.019 | | 0.018 |
| | | (0.371) | | (0.349) | | (0.368) |
| Evaluated Spring (Apr - Jun) | | 0.405 | | 0.427 | | 0.497 |
| | | (0.287) | | (0.260) | | (0.186) |
| Evaluated Summer (Jul - Sep) | | 0.280 | | 0.318 | | 0.422 |
| | | (0.558) | | (0.510) | | (0.390) |
| Evaluated Fall (Oct - Dec) | | 0.301 | | 0.311 | | 0.327 |
| | | (0.423) | | (0.410) | | (0.386) |
| Evaluated in 2011 | | 0.532 | | 0.487 | | 0.434 |
| | | (0.506) | | (0.544) | | (0.588) |
| Evaluated in 2012 | | -1.100 | | -1.081 | | -1.114 |
| | | (0.188) | | (0.196) | | (0.181) |
| Evaluated in 2013 | | 0.072 | | 0.061 | | -0.021 |
| | | (0.910) | | (0.924) | | (0.974) |
| Evaluated in 2014 | | 0.711 | | 0.701 | | 0.620 |
| | | (0.200) | | (0.207) | | (0.271) |
| Evaluated in 2015 | | 1.009** | | 0.989** | | 1.032** |
| | | (0.043) | | (0.048) | | (0.041) |
| Evaluated in 2016 | | 1.034** | | 1.044** | | 1.006** |
| | | (0.037) | | (0.036) | | (0.045) |
| Log of Property Land Value (2015) | | -0.832*** | | -0.820*** | | -0.910*** |
| | | (0.001) | | (0.001) | | (0.001) |
| Log of Census Tract Median Property Value (2013-2017) | | -0.314 | | -0.259 | | -0.174 |
| | | (0.565) | | (0.635) | | (0.752) |
| Census Tract Poverty Rate (2013-2017) | | 0.023 | | 0.021 | | 0.021 |
| | | (0.222) | | (0.262) | | (0.267) |
| Census Tract Vacancy Rate (2013-2017) | | -0.011 | | -0.011 | | -0.004 |
| | | (0.652) | | (0.663) | | (0.875) |
| Block Group Burglary Index | | -0.143 | | -0.119 | | -0.069 |
| | | (0.561) | | (0.632) | | (0.778) |
| Block Group Larceny Index | | 0.833* | | 0.846* | | 0.895* |
| | | (0.073) | | (0.070) | | (0.056) |
| Block Group Motor Vehicle Theft Index | | -0.644 | | -0.628 | | -0.706 |
| | | (0.156) | | (0.167) | | (0.121) |
| State & County Controls? | NO | YES | NO | YES | NO | YES |
| Constant | 5.798*** | 15.419** | 5.798*** | 14.581** | 5.798*** | 14.528** |
| | (0.000) | (0.016) | (0.000) | (0.023) | (0.000) | (0.024) |
| Observations | 893 | 715 | 893 | 715 | 893 | 715 |
| R-squared | 0.17003 | 0.44669 | 0.17314 | 0.44803 | 0.18255 | 0.45181 |
| Adjusted R-squared | 0.16910 | 0.36790 | 0.17128 | 0.36841 | 0.17887 | 0.37073 |
| Root Mean Square Error (RMSE) | 3.62005 | 3.11756 | 3.61528 | 3.11628 | 3.59870 | 3.11057 |

Robust p-values in parentheses
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)
Coefficients and p-values for state and county are excluded from this table for brevity.

1 of 4

**Exhibit 3: OLS Regression Results Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms**
**(Outcome = Total Number of Deficiencies)**

| | Unedited Properties | | | | | |
|---|---|---|---|---|---|---|
| | (7) | (8) | (9) | (10) | (11) | (12) |
| Race/Ethnicity of Block Group (Relative to White Block Group) | | | | | | |
| Non-White Block Group | 4.438*** | 4.846*** | | | | |
| | (0.000) | (0.000) | | | | |
| African American/Hispanic Block Group | | | 4.417*** | 4.931*** | | |
| | | | (0.000) | (0.000) | | |
| African American Block Group | | | | | 4.347*** | 4.312*** |
| | | | | | (0.000) | (0.000) |
| Hispanic Block Group | | | | | 6.326*** | 8.032*** |
| | | | | | (0.000) | (0.000) |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | | | | | 3.016*** | 4.279*** |
| | | | | | (0.000) | (0.002) |
| Non-White Block Group (Exc. African American/ Hispanic Block Group) | | | 4.688*** | 4.311** | 4.688*** | 5.214*** |
| | | | (0.000) | (0.016) | (0.000) | (0.002) |
| Age of Home | | 0.043*** | | 0.044*** | | 0.030* |
| | | (0.004) | | (0.005) | | (0.065) |
| Size of Home (000 Sq. Ft.) | | 0.691 | | 0.721 | | 0.422 |
| | | (0.197) | | (0.182) | | (0.458) |
| Ratio of Home-to-Lot | | -2.182** | | -2.179** | | -2.363** |
| | | (0.040) | | (0.040) | | (0.042) |
| Ever Previously REO | | 0.124 | | 0.101 | | 0.034 |
| | | (0.879) | | (0.901) | | (0.964) |
| New Construction | | 1.771 | | 1.770 | | 1.264 |
| | | (0.249) | | (0.251) | | (0.430) |
| Flipped Sale | | -1.390 | | -1.390 | | -1.349 |
| | | (0.273) | | (0.274) | | (0.282) |
| Deed-in-Lieu | | -0.017 | | -0.030 | | 0.050 |
| | | (0.988) | | (0.978) | | (0.964) |
| Home Purchase Loan | | -0.486 | | -0.502 | | -0.399 |
| | | (0.444) | | (0.432) | | (0.524) |
| Months Held by Lender | | 0.047 | | 0.042 | | 0.044 |
| | | (0.357) | | (0.405) | | (0.401) |
| Evaluated Spring (Apr - Jun) | | -0.331 | | -0.376 | | -0.370 |
| | | (0.741) | | (0.707) | | (0.711) |
| Evaluated Summer (Jul - Sep) | | 0.125 | | 0.162 | | 0.335 |
| | | (0.918) | | (0.895) | | (0.775) |
| Evaluated Fall (Oct - Dec) | | 0.276 | | 0.272 | | 0.544 |
| | | (0.717) | | (0.720) | | (0.444) |
| Evaluated in 2011 | | | | | | |
| Evaluated in 2012 | | -0.603 | | -0.708 | | -1.421 |
| | | (0.807) | | (0.775) | | (0.544) |
| Evaluated in 2013 | | 0.450 | | 0.397 | | 0.124 |
| | | (0.714) | | (0.747) | | (0.921) |
| Evaluated in 2014 | | -1.743* | | -1.783** | | -2.016** |
| | | (0.053) | | (0.049) | | (0.031) |
| Evaluated in 2015 | | 0.831 | | 0.752 | | 0.859 |
| | | (0.424) | | (0.486) | | (0.432) |
| Evaluated in 2016 | | 1.609* | | 1.629* | | 1.416 |
| | | (0.089) | | (0.084) | | (0.139) |
| Log of Property Land Value (2015) | | -0.851 | | -0.876 | | -0.999* |
| | | (0.129) | | (0.120) | | (0.090) |
| Log of Census Tract Median Property Value (2013-2017) | | 0.364 | | 0.400 | | 0.861 |
| | | (0.770) | | (0.749) | | (0.472) |
| Census Tract Poverty Rate (2013-2017) | | -0.007 | | -0.008 | | -0.025 |
| | | (0.870) | | (0.850) | | (0.573) |
| Census Tract Vacancy Rate (2013-2017) | | 0.003 | | 0.001 | | 0.054 |
| | | (0.956) | | (0.981) | | (0.308) |
| Block Group Burglary Index | | 0.216 | | 0.217 | | 0.261 |
| | | (0.709) | | (0.710) | | (0.664) |
| Block Group Larceny Index | | -0.533 | | -0.526 | | -0.595 |
| | | (0.594) | | (0.602) | | (0.559) |
| Block Group Motor Vehicle Theft Index | | -0.520 | | -0.536 | | -0.640 |
| | | (0.583) | | (0.577) | | (0.485) |
| State & County Controls? | NO | YES | NO | YES | NO | YES |
| Constant | 4.562*** | 3.247 | 4.563*** | 3.195 | 4.563*** | 0.120 |
| | (0.000) | (0.825) | (0.000) | (0.828) | (0.000) | (0.993) |
| Observations | 256 | 188 | 256 | 188 | 256 | 188 |
| R-squared | 0.28669 | 0.61059 | 0.28689 | 0.61108 | 0.31199 | 0.63589 |
| Adjusted R-quared | 0.28388 | 0.44413 | 0.28125 | 0.44055 | 0.30102 | 0.46806 |
| Root Mean Square Error (RMSE) | 3.40196 | 2.97951 | 3.40821 | 2.98909 | 3.36100 | 2.91468 |

Robust p-values in parentheses
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)
Coefficients and p-values for state and county are excluded from this table for brevity.

2 of 4

**Exhibit 3: OLS Regression Results Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms**
**(Outcome = Total Number of Deficiencies)**

| | McCrary Handwritten + Unedited Properties | | | | | |
|---|---|---|---|---|---|---|
| | (13) | (14) | (15) | (16) | (17) | (18) |
| Race/Ethnicity of Block Group (Relative to White Block Group) | | | | | | |
| Non-White Block Group | 3.147*** | 2.257*** | | | | |
| | (0.000) | (0.003) | | | | |
| African American/Hispanic Block Group | | | 3.235*** | 2.421*** | | |
| | | | (0.000) | (0.002) | | |
| African American Block Group | | | | | 3.169*** | 1.803** |
| | | | | | (0.000) | (0.048) |
| Hispanic Block Group | | | | | 4.225*** | 3.602*** |
| | | | | | (0.000) | (0.004) |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | | | | | 2.404*** | 2.861*** |
| | | | | | (0.002) | (0.002) |
| Non-White Block Group (Exc. African American/ Hispanic Block Group) | | | 2.134** | 1.401 | 2.134** | 1.456 |
| | | | (0.031) | (0.239) | (0.032) | (0.225) |
| Age of Home | | 0.043*** | | 0.043*** | | 0.039*** |
| | | (0.000) | | (0.000) | | (0.001) |
| Size of Home (000 Sq. Ft.) | | 0.699 | | 0.718 | | 0.763 |
| | | (0.154) | | (0.146) | | (0.123) |
| Ratio of Home-to-Lot | | -1.673 | | -1.711* | | -2.079* |
| | | (0.103) | | (0.094) | | (0.052) |
| Ever Previously REO | | -0.522 | | -0.571 | | -0.503 |
| | | (0.375) | | (0.327) | | (0.389) |
| New Construction | | 3.129** | | 3.134** | | 2.997** |
| | | (0.016) | | (0.016) | | (0.023) |
| Flipped Sale | | -0.985 | | -0.977 | | -1.039 |
| | | (0.360) | | (0.359) | | (0.316) |
| Deed-in-Lieu | | -0.790 | | -0.789 | | -0.525 |
| | | (0.367) | | (0.358) | | (0.561) |
| Home Purchase Loan | | -0.113 | | -0.177 | | -0.249 |
| | | (0.831) | | (0.738) | | (0.646) |
| Months Held by Lender | | 0.006 | | 0.010 | | 0.009 |
| | | (0.832) | | (0.736) | | (0.763) |
| Evaluated Spring (Apr - Jun) | | -0.462 | | -0.486 | | -0.244 |
| | | (0.549) | | (0.525) | | (0.758) |
| Evaluated Summer (Jul - Sep) | | 1.082 | | 1.174 | | 1.363 |
| | | (0.217) | | (0.180) | | (0.132) |
| Evaluated Fall (Oct - Dec) | | -0.237 | | -0.234 | | -0.193 |
| | | (0.721) | | (0.724) | | (0.773) |
| Evaluated in 2011 | | | | | | |
| Evaluated in 2012 | | -2.713** | | -2.597* | | -3.003** |
| | | (0.043) | | (0.051) | | (0.020) |
| Evaluated in 2013 | | -0.719 | | -0.744 | | -0.878 |
| | | (0.439) | | (0.424) | | (0.355) |
| Evaluated in 2014 | | 0.046 | | -0.019 | | -0.192 |
| | | (0.955) | | (0.981) | | (0.817) |
| Evaluated in 2015 | | 1.705** | | 1.653** | | 1.648** |
| | | (0.021) | | (0.027) | | (0.030) |
| Evaluated in 2016 | | 1.763** | | 1.754** | | 1.632* |
| | | (0.039) | | (0.040) | | (0.058) |
| Log of Property Land Value (2015) | | -0.599 | | -0.587 | | -0.778 |
| | | (0.186) | | (0.196) | | (0.109) |
| Log of Census Tract Median Property Value (2013-2017) | | -2.250** | | -2.151** | | -2.006** |
| | | (0.017) | | (0.025) | | (0.038) |
| Census Tract Poverty Rate (2013-2017) | | -0.000 | | -0.001 | | 0.002 |
| | | (0.998) | | (0.971) | | (0.948) |
| Census Tract Vacancy Rate (2013-2017) | | -0.032 | | -0.031 | | -0.017 |
| | | (0.418) | | (0.442) | | (0.680) |
| Block Group Burglary Index | | -0.543 | | -0.518 | | -0.416 |
| | | (0.237) | | (0.265) | | (0.363) |
| Block Group Larceny Index | | 0.106 | | 0.145 | | 0.204 |
| | | (0.895) | | (0.859) | | (0.804) |
| Block Group Motor Vehicle Theft Index | | -0.708 | | -0.682 | | -0.843 |
| | | (0.339) | | (0.359) | | (0.253) |
| State & County Controls? | NO | YES | NO | YES | NO | YES |
| Constant | 6.275*** | 37.038*** | 6.275*** | 35.566*** | 6.275*** | 36.137*** |
| | (0.000) | (0.001) | (0.000) | (0.002) | (0.000) | (0.002) |
| Observations | 435 | 325 | 435 | 325 | 435 | 325 |
| R-squared | 0.13354 | 0.48773 | 0.13681 | 0.48941 | 0.14420 | 0.49710 |
| Adjusted R-squared | 0.13154 | 0.35418 | 0.13281 | 0.35379 | 0.13624 | 0.35851 |
| Root Mean Square Error (RMSE) | 3.87417 | 3.38342 | 3.87132 | 3.38445 | 3.86366 | 3.37206 |

Robust p-values in parentheses
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)
Coefficients and p-values for state and county are excluded from this table for brevity.

**Exhibit 3: OLS Regression Results Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms**
**(Outcome = Total Number of Deficiencies)**

| | Handwritten & Printout + Unedited Properties | | | | | |
|---|---|---|---|---|---|---|
| | (19) | (20) | (21) | (22) | (23) | (24) |
| Race/Ethnicity of Block Group (Relative to White Block Group) | | | | | | |
| Non-White Block Group | 2.885*** | 1.275** | | | | |
| | (0.000) | (0.027) | | | | |
| African American/Hispanic Block Group | | | 2.917*** | 1.244** | | |
| | | | (0.000) | (0.044) | | |
| African American Block Group | | | | | 2.958*** | 1.039 |
| | | | | | (0.000) | (0.135) |
| Hispanic Block Group | | | | | 3.529*** | 1.720* |
| | | | | | (0.000) | (0.068) |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | | | | | 1.840*** | 1.258 |
| | | | | | (0.009) | (0.159) |
| Non-White Block Group (Exc. African American/ Hispanic Block Group) | | | 2.520*** | 1.463 | 2.520*** | 1.501 |
| | | | (0.003) | (0.132) | (0.003) | (0.124) |
| Age of Home | | 0.042*** | | 0.042*** | | 0.040*** |
| | | (0.000) | | (0.000) | | (0.000) |
| Size of Home (000 Sq. Ft.) | | 0.293 | | 0.292 | | 0.310 |
| | | (0.422) | | (0.425) | | (0.410) |
| Ratio of Home-to-Lot | | -1.385 | | -1.381 | | -1.476 |
| | | (0.169) | | (0.171) | | (0.159) |
| Ever Previously REO | | -0.225 | | -0.220 | | -0.204 |
| | | (0.657) | | (0.664) | | (0.689) |
| New Construction | | 2.218* | | 2.226* | | 2.189* |
| | | (0.073) | | (0.073) | | (0.078) |
| Flipped Sale | | -0.492 | | -0.505 | | -0.521 |
| | | (0.566) | | (0.559) | | (0.544) |
| Deed-in-Lieu | | 0.269 | | 0.240 | | 0.379 |
| | | (0.830) | | (0.844) | | (0.758) |
| Home Purchase Loan | | -0.560 | | -0.546 | | -0.560 |
| | | (0.221) | | (0.237) | | (0.227) |
| Months Held by Lender | | 0.024 | | 0.023 | | 0.023 |
| | | (0.372) | | (0.406) | | (0.401) |
| Evaluated Spring (Apr - Jun) | | -0.206 | | -0.207 | | -0.126 |
| | | (0.765) | | (0.764) | | (0.857) |
| Evaluated Summer (Jul - Sep) | | 0.622 | | 0.613 | | 0.711 |
| | | (0.408) | | (0.415) | | (0.357) |
| Evaluated Fall (Oct - Dec) | | -0.163 | | -0.170 | | -0.141 |
| | | (0.793) | | (0.784) | | (0.820) |
| Evaluated in 2011 | | | | | | |
| Evaluated in 2012 | | -2.648** | | -2.664** | | -2.720*** |
| | | (0.011) | | (0.011) | | (0.008) |
| Evaluated in 2013 | | -0.619 | | -0.612 | | -0.668 |
| | | (0.480) | | (0.485) | | (0.450) |
| Evaluated in 2014 | | 0.970 | | 0.974 | | 0.900 |
| | | (0.229) | | (0.229) | | (0.275) |
| Evaluated in 2015 | | 1.957*** | | 1.973*** | | 1.984*** |
| | | (0.005) | | (0.005) | | (0.005) |
| Evaluated in 2016 | | 1.928** | | 1.928** | | 1.894** |
| | | (0.014) | | (0.014) | | (0.017) |
| Log of Property Land Value (2015) | | -0.449 | | -0.452 | | -0.522 |
| | | (0.266) | | (0.266) | | (0.223) |
| Log of Census Tract Median Property Value (2013-2017) | | -1.465* | | -1.481* | | -1.419* |
| | | (0.062) | | (0.062) | | (0.078) |
| Census Tract Poverty Rate (2013-2017) | | 0.025 | | 0.026 | | 0.027 |
| | | (0.346) | | (0.340) | | (0.316) |
| Census Tract Vacancy Rate (2013-2017) | | -0.030 | | -0.030 | | -0.028 |
| | | (0.427) | | (0.424) | | (0.459) |
| Block Group Burglary Index | | -0.173 | | -0.181 | | -0.141 |
| | | (0.654) | | (0.642) | | (0.715) |
| Block Group Larceny Index | | 0.114 | | 0.114 | | 0.146 |
| | | (0.873) | | (0.874) | | (0.840) |
| Block Group Motor Vehicle Theft Index | | -0.583 | | -0.591 | | -0.640 |
| | | (0.374) | | (0.365) | | (0.328) |
| State & County Controls? | NO | YES | NO | YES | NO | YES |
| Constant | 6.980*** | 26.725*** | 6.980*** | 26.972*** | 6.980*** | 27.015*** |
| | (0.000) | (0.003) | (0.000) | (0.003) | (0.000) | (0.003) |
| Observations | 550 | 429 | 550 | 429 | 550 | 429 |
| R-squared | 0.10160 | 0.48900 | 0.10199 | 0.48908 | 0.10825 | 0.49021 |
| Adjusted R-squared | 0.09996 | 0.38738 | 0.09871 | 0.38575 | 0.10170 | 0.38364 |
| Root Mean Square Error (RMSE) | 4.14266 | 3.48055 | 4.14555 | 3.48517 | 4.13866 | 3.49114 |

Robust p-values in parentheses
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)
Coefficients and p-values for state and county are excluded from this table for brevity.

**Exhibit 4: Logistic Regression Odds Ratios Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms**
**(Outcome = Presence of 10+ Deficiencies)**

| | Full Analysis Sample | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Race/Ethnicity of Block Group (Relative to White Block Group) | | | | | | |
| Non-White Block Group | 4.762*** | 4.895*** | | | | |
| | (0.000) | (0.000) | | | | |
| African American/Hispanic Block Group | | | 4.958*** | 5.646*** | | |
| | | | (0.000) | (0.000) | | |
| African American Block Group | | | | | 5.091*** | 4.199*** |
| | | | | | (0.000) | (0.000) |
| Hispanic Block Group | | | | | 6.066*** | 10.177*** |
| | | | | | (0.000) | (0.000) |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | | | | | 3.181*** | 7.766*** |
| | | | | | (0.000) | (0.000) |
| Non-White Block Group (Exc. African American/ Hispanic Block Group) | | | 2.785*** | 2.236 | 2.785*** | 2.341 |
| | | | (0.006) | (0.113) | (0.006) | (0.101) |
| Age of Home | | 1.028*** | | 1.027*** | | 1.026*** |
| | | (0.000) | | (0.000) | | (0.000) |
| Size of Home (000 Sq. Ft.) | | 1.584** | | 1.603** | | 1.695*** |
| | | (0.018) | | (0.015) | | (0.007) |
| Ratio of Home-to-Lot | | 0.030*** | | 0.029*** | | 0.022*** |
| | | (0.000) | | (0.000) | | (0.000) |
| Ever Previously REO | | 0.968 | | 0.919 | | 0.972 |
| | | (0.921) | | (0.800) | | (0.932) |
| New Construction | | | | | | |
| Flipped Sale | | 1.324 | | 1.378 | | 1.389 |
| | | (0.518) | | (0.459) | | (0.446) |
| Deed-in-Lieu | | 1.700 | | 1.825 | | 1.955 |
| | | (0.362) | | (0.313) | | (0.263) |
| Home Purchase Loan | | 0.638* | | 0.613* | | 0.589* |
| | | (0.096) | | (0.071) | | (0.056) |
| Months Held by Lender | | 1.029 | | 1.030* | | 1.029* |
| | | (0.109) | | (0.088) | | (0.100) |
| Evaluated Spring (Apr - Jun) | | 1.652 | | 1.726 | | 1.907* |
| | | (0.185) | | (0.151) | | (0.088) |
| Evaluated Summer (Jul - Sep) | | 2.008* | | 2.115** | | 2.280** |
| | | (0.061) | | (0.047) | | (0.030) |
| Evaluated Fall (Oct - Dec) | | 1.639 | | 1.657 | | 1.709 |
| | | (0.130) | | (0.126) | | (0.110) |
| Evaluated in 2011 | | 1.233 | | 1.196 | | 1.225 |
| | | (0.758) | | (0.795) | | (0.770) |
| Evaluated in 2012 | | 0.250** | | 0.263* | | 0.238** |
| | | (0.047) | | (0.051) | | (0.037) |
| Evaluated in 2013 | | 1.050 | | 1.056 | | 0.974 |
| | | (0.924) | | (0.915) | | (0.960) |
| Evaluated in 2014 | | 1.446 | | 1.415 | | 1.292 |
| | | (0.421) | | (0.453) | | (0.585) |
| Evaluated in 2015 | | 1.073 | | 1.072 | | 1.082 |
| | | (0.863) | | (0.865) | | (0.852) |
| Evaluated in 2016 | | 1.530 | | 1.544 | | 1.498 |
| | | (0.313) | | (0.309) | | (0.355) |
| Log of Property Land Value (2015) | | 0.510*** | | 0.516*** | | 0.486*** |
| | | (0.002) | | (0.003) | | (0.002) |
| Log of Census Tract Median Property Value (2013-2017) | | 1.938 | | 2.095 | | 2.132 |
| | | (0.147) | | (0.108) | | (0.110) |
| Census Tract Poverty Rate (2013-2017) | | 1.015 | | 1.014 | | 1.016 |
| | | (0.306) | | (0.359) | | (0.275) |
| Census Tract Vacancy Rate (2013-2017) | | 1.011 | | 1.010 | | 1.014 |
| | | (0.595) | | (0.595) | | (0.461) |
| Block Group Burglary Index | | 0.719 | | 0.733 | | 0.768 |
| | | (0.146) | | (0.172) | | (0.240) |
| Block Group Larceny Index | | 3.294*** | | 3.403*** | | 3.549*** |
| | | (0.002) | | (0.001) | | (0.001) |
| Block Group Motor Vehicle Theft Index | | 0.401** | | 0.416** | | 0.383*** |
| | | (0.010) | | (0.014) | | (0.007) |
| State & County Controls? | NO | YES | NO | YES | NO | YES |
| Constant | 0.173*** | 0.004 | 0.173*** | 0.001 | 0.173*** | 0.002 |
| | (0.000) | (0.320) | (0.000) | (0.234) | (0.000) | (0.284) |
| Observations | 893 | 643 | 893 | 643 | 893 | 643 |
| Pseudo R-squared | 0.08331 | 0.26517 | 0.08583 | 0.26862 | 0.08918 | 0.27359 |

Robust p-values in parentheses
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)
Coefficients and p-values for state and county are excluded from this table for brevity.

1 of 4

**Exhibit 4: Logistic Regression Odds Ratios Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms**
**(Outcome = Presence of 10+ Deficiencies)**

| | Unedited Properties | | | | | |
|---|---|---|---|---|---|---|
| | (7) | (8) | (9) | (10) | (11) | (12) |
| Race/Ethnicity of Block Group (Relative to White Block Group) | | | | | | |
| Non-White Block Group | 8.556*** (0.000) | 3,931.128*** (0.000) | | | | |
| African American/Hispanic Block Group | | | 8.614*** (0.000) | 4,557.606*** (0.000) | | |
| African American Block Group | | | | | 8.078*** (0.001) | 1,691.621*** (0.001) |
| Hispanic Block Group | | | | | 28.600*** (0.000) | 712,008.645*** (0.000) |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | | | | | 3.929** (0.032) | 1,589.483*** (0.001) |
| Non-White Block Group (Exc. African American/ Hispanic Block Group) | | | 7.857*** (0.003) | 1,559.336*** (0.003) | 7.857*** (0.003) | 12,038.432*** (0.001) |
| Age of Home | | 1.022 (0.120) | | 1.022 (0.115) | | 1.015 (0.343) |
| Size of Home (000 Sq. Ft.) | | 1.609 (0.477) | | 1.777 (0.408) | | 2.032 (0.377) |
| Ratio of Home-to-Lot | | 0.008*** (0.001) | | 0.008*** (0.001) | | 0.003*** (0.001) |
| Ever Previously REO | | 0.645 (0.577) | | 0.570 (0.482) | | 0.452 (0.343) |
| New Construction | | | | | | |
| Flipped Sale | | 0.822 (0.834) | | 0.855 (0.871) | | 0.417 (0.427) |
| Deed-in-Lieu | | 0.799 (0.848) | | 0.783 (0.833) | | 1.030 (0.982) |
| Home Purchase Loan | | 0.294 (0.154) | | 0.299 (0.156) | | 0.253 (0.150) |
| Months Held by Lender | | 1.078 (0.249) | | 1.072 (0.280) | | 1.097 (0.216) |
| Evaluated Spring (Apr - Jun) | | 0.669 (0.725) | | 0.591 (0.650) | | 0.454 (0.541) |
| Evaluated Summer (Jul - Sep) | | 2.814 (0.336) | | 2.914 (0.327) | | 3.247 (0.330) |
| Evaluated Fall (Oct - Dec) | | 2.841 (0.174) | | 2.568 (0.204) | | 6.216* (0.059) |
| Evaluated in 2011 | | | | | | |
| Evaluated in 2012 | | 0.144 (0.367) | | 0.142 (0.341) | | 0.007** (0.019) |
| Evaluated in 2013 | | 1.230 (0.858) | | 1.220 (0.860) | | 1.481 (0.773) |
| Evaluated in 2014 | | 0.077** (0.044) | | 0.076** (0.046) | | 0.051** (0.047) |
| Evaluated in 2015 | | 1.012 (0.993) | | 0.889 (0.930) | | 0.385 (0.593) |
| Evaluated in 2016 | | 2.155 (0.375) | | 2.365 (0.338) | | 3.172 (0.273) |
| Log of Property Land Value (2015) | | 0.523 (0.394) | | 0.497 (0.409) | | 0.296 (0.127) |
| Log of Census Tract Median Property Value (2013-2017) | | 39.490** (0.030) | | 44.950** (0.035) | | 185.575** (0.018) |
| Census Tract Poverty Rate (2013-2017) | | 0.962 (0.281) | | 0.959 (0.254) | | 0.955 (0.227) |
| Census Tract Vacancy Rate (2013-2017) | | 1.148** (0.016) | | 1.148** (0.017) | | 1.229*** (0.002) |
| Block Group Burglary Index | | 0.989 (0.988) | | 1.006 (0.993) | | 1.096 (0.913) |
| Block Group Larceny Index | | 1.139 (0.902) | | 1.211 (0.860) | | 0.815 (0.862) |
| Block Group Motor Vehicle Theft Index | | 0.371 (0.261) | | 0.348 (0.237) | | 0.254 (0.153) |
| State & County Controls? | NO | YES | NO | YES | NO | YES |
| Constant | 0.091*** (0.000) | 0.000*** (0.008) | 0.091*** (0.000) | 0.000*** (0.008) | 0.091*** (0.000) | 0.000** (0.012) |
| Observations | 256 | 155 | 256 | 155 | 256 | 155 |
| Pseudo R-squared | 0.12834 | 0.43094 | 0.12841 | 0.43312 | 0.15554 | 0.49123 |

Robust p-values in parentheses
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)
Coefficients and p-values for state and county are excluded from this table for brevity.

2 of 4

**Exhibit 4: Logistic Regression Odds Ratios Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms**
**(Outcome = Presence of 10+ Deficiencies)**

| | McCrary Handwritten + Unedited Properties | | | | | |
| | (13) | (14) | (15) | (16) | (17) | (18) |
|---|---|---|---|---|---|---|
| Race/Ethnicity of Block Group (Relative to White Block Group) | | | | | | |
| Non-White Block Group | 3.007*** (0.000) | 4.072** (0.015) | | | | |
| African American/Hispanic Block Group | | | 3.185*** (0.000) | 5.298*** (0.009) | | |
| African American Block Group | | | | | 3.045*** (0.000) | 3.233* (0.090) |
| Hispanic Block Group | | | | | 5.680*** (0.000) | 9.409*** (0.010) |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | | | | | 2.077* (0.089) | 8.458*** (0.003) |
| Non-White Block Group (Exc. African American/ Hispanic Block Group) | | | 1.498 (0.414) | 1.396 (0.717) | 1.498 (0.414) | 1.407 (0.721) |
| Age of Home | | 1.020** (0.027) | | 1.018** (0.036) | | 1.017** (0.049) |
| Size of Home (000 Sq. Ft.) | | 1.484 (0.246) | | 1.509 (0.235) | | 1.570 (0.192) |
| Ratio of Home-to-Lot | | 0.074** (0.018) | | 0.072** (0.017) | | 0.048*** (0.009) |
| Ever Previously REO | | 0.460 (0.119) | | 0.413* (0.075) | | 0.437* (0.093) |
| New Construction | | | | | | |
| Flipped Sale | | 1.392 (0.632) | | 1.434 (0.601) | | 1.398 (0.624) |
| Deed-in-Lieu | | 0.933 (0.940) | | 0.918 (0.925) | | 1.079 (0.935) |
| Home Purchase Loan | | 0.726 (0.436) | | 0.704 (0.394) | | 0.659 (0.310) |
| Months Held by Lender | | 1.012 (0.728) | | 1.010 (0.740) | | 1.010 (0.731) |
| Evaluated Spring (Apr - Jun) | | 1.447 (0.482) | | 1.464 (0.464) | | 1.732 (0.298) |
| Evaluated Summer (Jul - Sep) | | 2.703 (0.133) | | 3.137 (0.101) | | 3.461* (0.071) |
| Evaluated Fall (Oct - Dec) | | 1.470 (0.462) | | 1.509 (0.439) | | 1.582 (0.403) |
| Evaluated in 2011 | | | | | | |
| Evaluated in 2012 | | 0.150 (0.140) | | 0.192 (0.189) | | 0.132* (0.082) |
| Evaluated in 2013 | | 0.471 (0.375) | | 0.430 (0.329) | | 0.378 (0.272) |
| Evaluated in 2014 | | 1.091 (0.890) | | 0.951 (0.938) | | 0.843 (0.793) |
| Evaluated in 2015 | | 1.826 (0.295) | | 1.698 (0.362) | | 1.639 (0.423) |
| Evaluated in 2016 | | 1.768 (0.344) | | 1.736 (0.366) | | 1.592 (0.456) |
| Log of Property Land Value (2015) | | 0.699 (0.245) | | 0.699 (0.254) | | 0.618 (0.153) |
| Log of Census Tract Median Property Value (2013-2017) | | 0.634 (0.516) | | 0.756 (0.702) | | 0.800 (0.764) |
| Census Tract Poverty Rate (2013-2017) | | 1.019 (0.367) | | 1.018 (0.398) | | 1.022 (0.320) |
| Census Tract Vacancy Rate (2013-2017) | | 0.985 (0.629) | | 0.986 (0.661) | | 0.993 (0.820) |
| Block Group Burglary Index | | 0.517* (0.052) | | 0.527* (0.063) | | 0.560* (0.082) |
| Block Group Larceny Index | | 1.217 (0.732) | | 1.357 (0.599) | | 1.421 (0.551) |
| Block Group Motor Vehicle Theft Index | | 0.589 (0.299) | | 0.602 (0.325) | | 0.531 (0.235) |
| State & County Controls? | NO | YES | NO | YES | NO | YES |
| Constant | 0.311*** (0.000) | 968.895 (0.401) | 0.311*** (0.000) | 97.530 (0.590) | 0.311*** (0.000) | 244.397 (0.525) |
| Observations | 435 | 289 | 435 | 289 | 435 | 289 |
| Pseudo R-squared | 0.04571 | 0.25565 | 0.05031 | 0.26172 | 0.05758 | 0.26845 |

Robust p-values in parentheses
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)
Coefficients and p-values for state and county are excluded from this table for brevity.

**Exhibit 4: Logistic Regression Odds Ratios Estimated from Unedited Properties in Plaintiffs' Inspection Database, Original Handwritten Forms, and Printouts of Original Electronic Forms**
**(Outcome = Presence of 10+ Deficiencies)**

| | Handwritten & Printout + Unedited Properties | | | | | |
|---|---|---|---|---|---|---|
| | (19) | (20) | (21) | (22) | (23) | (24) |
| Race/Ethnicity of Block Group (Relative to White Block Group) | | | | | | |
| Non-White Block Group | 2.448*** | 1.998* | | | | |
| | (0.000) | (0.069) | | | | |
| African American/Hispanic Block Group | | | 2.461*** | 1.889 | | |
| | | | (0.000) | (0.112) | | |
| African American Block Group | | | | | 2.524*** | 1.610 |
| | | | | | (0.000) | (0.289) |
| Hispanic Block Group | | | | | 3.522*** | 2.734 |
| | | | | | (0.000) | (0.159) |
| African American/Hispanic Block Group (Exc. African American Block Group & Hispanic Block Group) | | | | | 1.294 | 1.817 |
| | | | | | (0.483) | (0.339) |
| Non-White Block Group (Exc. African American/ Hispanic Block Group) | | | 2.311** | 2.751 | 2.311** | 2.916 |
| | | | (0.040) | (0.170) | (0.040) | (0.160) |
| Age of Home | | 1.025*** | | 1.025*** | | 1.024*** |
| | | (0.001) | | (0.001) | | (0.001) |
| Size of Home (000 Sq. Ft.) | | 1.447 | | 1.438 | | 1.450 |
| | | (0.169) | | (0.174) | | (0.164) |
| Ratio of Home-to-Lot | | 0.154* | | 0.155* | | 0.143* |
| | | (0.067) | | (0.067) | | (0.070) |
| Ever Previously REO | | 0.825 | | 0.834 | | 0.842 |
| | | (0.624) | | (0.645) | | (0.662) |
| New Construction | | | | | | |
| Flipped Sale | | 1.680 | | 1.650 | | 1.630 |
| | | (0.361) | | (0.381) | | (0.391) |
| Deed-in-Lieu | | 1.259 | | 1.201 | | 1.312 |
| | | (0.777) | | (0.823) | | (0.742) |
| Home Purchase Loan | | 0.611 | | 0.621 | | 0.613 |
| | | (0.136) | | (0.151) | | (0.144) |
| Months Held by Lender | | 0.998 | | 0.999 | | 0.999 |
| | | (0.949) | | (0.961) | | (0.976) |
| Evaluated Spring (Apr - Jun) | | 1.066 | | 1.066 | | 1.134 |
| | | (0.898) | | (0.899) | | (0.808) |
| Evaluated Summer (Jul - Sep) | | 1.355 | | 1.329 | | 1.426 |
| | | (0.516) | | (0.540) | | (0.446) |
| Evaluated Fall (Oct - Dec) | | 1.315 | | 1.294 | | 1.340 |
| | | (0.546) | | (0.569) | | (0.529) |
| Evaluated in 2011 | | | | | | |
| Evaluated in 2012 | | 0.108** | | 0.101** | | 0.095** |
| | | (0.038) | | (0.039) | | (0.026) |
| Evaluated in 2013 | | 0.568 | | 0.577 | | 0.543 |
| | | (0.468) | | (0.480) | | (0.437) |
| Evaluated in 2014 | | 1.394 | | 1.405 | | 1.324 |
| | | (0.570) | | (0.559) | | (0.633) |
| Evaluated in 2015 | | 2.226 | | 2.284 | | 2.302 |
| | | (0.149) | | (0.138) | | (0.143) |
| Evaluated in 2016 | | 2.172 | | 2.170 | | 2.112 |
| | | (0.174) | | (0.173) | | (0.194) |
| Log of Property Land Value (2015) | | 0.749 | | 0.748 | | 0.718 |
| | | (0.264) | | (0.261) | | (0.208) |
| Log of Census Tract Median Property Value (2013-2017) | | 0.983 | | 0.952 | | 0.992 |
| | | (0.976) | | (0.931) | | (0.989) |
| Census Tract Poverty Rate (2013-2017) | | 1.028 | | 1.029 | | 1.031 |
| | | (0.132) | | (0.124) | | (0.115) |
| Census Tract Vacancy Rate (2013-2017) | | 0.984 | | 0.983 | | 0.986 |
| | | (0.546) | | (0.542) | | (0.593) |
| Block Group Burglary Index | | 0.670 | | 0.663 | | 0.678 |
| | | (0.136) | | (0.126) | | (0.143) |
| Block Group Larceny Index | | 1.686 | | 1.679 | | 1.717 |
| | | (0.283) | | (0.287) | | (0.271) |
| Block Group Motor Vehicle Theft Index | | 0.629 | | 0.620 | | 0.592 |
| | | (0.286) | | (0.272) | | (0.232) |
| State & County Controls? | NO | YES | NO | YES | NO | YES |
| Constant | 0.433*** | 1.668 | 0.433*** | 2.568 | 0.433*** | 2.520 |
| | (0.000) | (0.939) | (0.000) | (0.889) | (0.000) | (0.892) |
| Observations | 550 | 383 | 550 | 383 | 550 | 383 |
| Pseudo R-squared | 0.03175 | 0.26073 | 0.03178 | 0.26126 | 0.03917 | 0.26286 |

Robust p-values in parentheses
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)
Coefficients and p-values for state and county are excluded from this table for brevity.

**Exhibit 5: Presence of Door & Window Deficiencies Among REO Properties in Full Analysis Sample of Plaintiffs' Inspection Data Based on Different Treatments of Boarding**

| % of REO Properties with Individual Deficiencies: | All Properties in Sample (n=893) Mean # or % with Deficiency | White Block Groups (n=346) Mean # or % with Deficiency | Non-White Block Groups (n=547) Mean # or % with Deficiency | Difference from White Block Groups | African American/Hispanic Block Groups (n=507) Mean # or % with Deficiency | Difference from White Block Groups | African American Block Groups (n=361) Mean # or % with Deficiency | Difference from White Block Groups | Hispanic Block Groups (n=84) Mean # or % with Deficiency | Difference from White Block Groups |
|---|---|---|---|---|---|---|---|---|---|---|
| **Unsecured/broken doors and locks:** | | | | | | | | | | |
| **Boarding always a deficiency** | 34% | 23% | 41% | *18% \*\*\** | 42% | *19% \*\*\** | 42% | *20% \*\*\** | 45% | *22% \*\*\** |
| **Boarding not a deficiency if:** | | | | | | | | | | |
| only boarding is on 1st floor | 32% | 22% | 38% | *16% \*\*\** | 39% | *17% \*\*\** | 40% | *17% \*\*\** | 43% | *21% \*\*\** |
| boarding is never a deficiency | 23% | 18% | 26% | *8% \*\*\** | 27% | *9% \*\*\** | 28% | *10% \*\*\** | 26% | *8% \** |
| **Boarding not a deficiency, but only for properties in selected Chicago zip codes[1], if:** | | | | | | | | | | |
| only boarding is on 1st floor | 34% | 23% | 41% | *18% \*\*\** | 42% | *19% \*\*\** | 42% | *20% \*\*\** | 45% | *22% \*\*\** |
| boarding is never a deficiency in these locations | 33% | 23% | 40% | *17% \*\*\** | 41% | *18% \*\*\** | 42% | *19% \*\*\** | 45% | *22% \*\*\** |
| **Boarding not a deficiency, but only for properties in selected Chicago zip codes and other selected muncipalities[2], if:** | | | | | | | | | | |
| only boarding is on 1st floor | 33% | 23% | 40% | *18% \*\*\** | 41% | *19% \*\*\** | 42% | *19% \*\*\** | 45% | *23% \*\*\** |
| boarding is never a deficiency in these locations | 32% | 22% | 37% | *15% \*\*\** | 38% | *16% \*\*\** | 38% | *15% \*\*\** | 45% | *23% \*\*\** |
| | | | | | | | | | | |
| **Damaged windows (broken, boarded):** | | | | | | | | | | |
| **Boarding always a deficiency** | 41% | 24% | 52% | *29% \*\*\** | 54% | *30% \*\*\** | 55% | *31% \*\*\** | 58% | *35% \*\*\** |
| **Boarding not a deficiency if:** | | | | | | | | | | |
| only boarding is on 1st floor | 39% | 23% | 49% | *26% \*\*\** | 50% | *27% \*\*\** | 51% | *28% \*\*\** | 55% | *31% \*\*\** |
| boarding is never a deficiency | 23% | 16% | 27% | *12% \*\*\** | 28% | *13% \*\*\** | 28% | *13% \*\*\** | 33% | *18% \*\*\** |
| **Boarding not a deficiency, but only for properties in selected Chicago zip codes[1], if:** | | | | | | | | | | |
| only boarding is on 1st floor | 41% | 24% | 52% | *28% \*\*\** | 53% | *30% \*\*\** | 55% | *31% \*\*\** | 58% | *35% \*\*\** |
| boarding is never a deficiency in these locations | 41% | 24% | 52% | *28% \*\*\** | 53% | *29% \*\*\** | 54% | *31% \*\*\** | 57% | *33% \*\*\** |
| **Boarding not a deficiency, but only for properties in selected Chicago zip codes and other selected muncipalities[2], if:** | | | | | | | | | | |
| only boarding is on 1st floor | 41% | 24% | 52% | *28% \*\*\** | 53% | *29% \*\*\** | 54% | *30% \*\*\** | 58% | *35% \*\*\** |
| boarding is never a deficiency in these locations | 38% | 23% | 47% | *23% \*\*\** | 48% | *25% \*\*\** | 48% | *24% \*\*\** | 57% | *34% \*\*\** |

Exhibit 5 Note: Statistical significance of the differences between a given minority Block Group and Non-White Block Groups is determined using a z-test of proportions for individual deficiencies.

*** Statistically significant at 1% significance level (p<0.01)

** Statistically significant at 5% significance level (p<0.05)

* Statistically significant at 10% significance level (p<0.1)

[1] During the period of Plaintiffs' inspections, the only locations specified by the Altisource REO Vendor Operational Guides as requiring boarding are the following zip codes in Chicago, IL: 60608, 60609, 60610, 60612, 60615, 60616, 60617, 60619, 60620, 60085, 60621, 60622, 60623, 60624, 60627, 60628, 60636, 60637, 60643, 60644, 60649, 60651, and 60653. See AFS_00011075 – 11222, at AFS_00011123 – 11124 (Altisource REO Vendor Guide for VMS, effective date 10/16/2013); ASI000584493 – 584608 (Altisource REO Vendor Guide, effective 2014); ASI000580950 – 580957 (Altisource REO Vendor Guide, effective 2015; ASI000584312 – 584492 (Altisource REO Vendor Guide, effective 9/14/2016); ASI000571735 – 571990, at ASI000571759 – 571767, 571923 – 571926 (Altisource REO Operational Vendor Guide, effective date 10/25/2017).

[2] The other selected municipalities are the cities identified by Plaintiffs in *National Fair Housing Alliance v. Bank of America, N.A.* as being municipalities that required boarding that included Deutsche Bank REO properties inspected by Plaintiffs in this litigation:

     Atlanta, GA

     Baltimore, MD

     Baton Rouge, LA

     Capitol Heights, MD

     Columbus, OH

     Garfield Heights, OH

     Memphis, TN

     Newark, NJ

*See* Exhibit 10 to Plaintiffs' Opposition to Defendants' Motions for Summary Judgment Case No. 1:18-cv-01919-CCB (D. Md.).

**Exhibit 6: Presence of Selected Deficiencies in Categories Likely Not Caused by Crime Among REO Properties in Full Analysis Sample of Plaintiffs' Inspection Data**

| | All Properties in Sample (n=893) | White Block Groups (n=346) | Non-White Block Groups (n=547) | | African American/Hispanic Block Groups (n=507) | | African American Block Groups (n=361) | | Hispanic Block Groups (n=84) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean # or % with Deficiency | Mean # or % with Deficiency | Mean # or % with Deficiency | Difference from White Block Groups | Mean # or % with Deficiency | Difference from White Block Groups | Mean # or % with Deficiency | Difference from White Block Groups | Mean # or % with Deficiency | Difference from White Block Groups |
| Total # of Selected Deficiencies in Categories Not Caused by Crime (Mean) | 3.3 | 2.5 | 3.8 | *1.2 \*\*\** | 3.8 | *1.2 \*\*\** | 3.8 | *1.3 \*\*\** | 3.9 | *1.4 \*\*\** |
| % of REO Properties with Total Deficiencies in Categories Not Caused by Crime ≥ 5 | 26% | 14% | 33% | *19% \*\*\** | 33% | *19% \*\*\** | 34% | *19% \*\*\** | 38% | *24% \*\*\** |
| Total # of Selected Curb Appeal Deficiencies in Categories Unrelated to Crime (Mean) | 1.8 | 1.3 | 2.1 | *0.8 \*\*\** | 2.1 | *0.8 \*\*\** | 2.1 | *0.8 \*\*\** | 2.2 | *0.8 \*\*\** |
| % of REO Properties with Total Curb Appeal Deficiencies in Categories Unrelated to Crime ≥ 3 | 31% | 17% | 39% | *22% \*\*\** | 38% | *21% \*\*\** | 39% | *22% \*\*\** | 40% | *23% \*\*\** |
| ***% of REO Properties with Individiual Deficiencies in Categories Unrelated to Crime:*** | | | | | | | | | | |
| **Curb appeal:** | | | | | | | | | | |
| Mail accumulated | 26% | 21% | 28% | *7% \*\** | 28% | *7% \*\** | 27% | *6% \** | 35% | *13% \*\** |
| Overgrown grass and leaves | 46% | 34% | 54% | *21% \*\*\** | 54% | *21% \*\*\** | 55% | *22% \*\*\** | 48% | *14% \*\** |
| Overgrown or dead shrubbery | 48% | 35% | 56% | *21% \*\*\** | 55% | *20% \*\*\** | 58% | *23% \*\*\** | 51% | *16% \*\*\** |
| Dead grass (10%-50%) | 17% | 12% | 21% | *9% \*\*\** | 21% | *9% \*\*\** | 19% | *8% \*\*\** | 27% | *16% \*\*\** |
| Dead grass (50% or more) | 9% | 7% | 10% | *3% \** | 9% | *3%* | 6% | *-1%* | 20% | *14% \*\*\** |
| Invasive plants (10%-50%) | 27% | 18% | 32% | *14% \*\*\** | 32% | *14% \*\*\** | 33% | *15% \*\*\** | 27% | *9% \** |
| Invasive plants (50% or more) | 10% | 8% | 12% | *5% \*\** | 12% | *5% \*\** | 14% | *6% \*\*\** | 10% | *2%* |
| **Structure:** | | | | | | | | | | |
| Wood rot | 28% | 18% | 35% | *16% \*\*\** | 36% | *17% \*\*\** | 35% | *17% \*\*\** | 43% | *24% \*\*\** |
| **Signage and occupancy:** | | | | | | | | | | |
| Trespassing or warning signs | 10% | 8% | 11% | *3%* | 10% | *2%* | 10% | *2%* | 15% | *7% \*\** |
| Marketed as distressed property | 5% | 5% | 6% | *1%* | 6% | *1%* | 5% | *1%* | 12% | *7% \*\** |
| **Paint/siding:** | | | | | | | | | | |
| Peeling/chipped paint | 47% | 37% | 54% | *16% \*\*\** | 54% | *17% \*\*\** | 53% | *16% \*\*\** | 68% | *31% \*\*\** |
| **Gutters:** | | | | | | | | | | |
| Obstructed | 18% | 17% | 19% | *2%* | 19% | *2%* | 22% | *5% \** | 10% | *-8% \** |
| **Water damage:** | | | | | | | | | | |
| Small amount of mold | 27% | 26% | 28% | *2%* | 29% | *2%* | 32% | *5%* | 24% | *-2%* |
| Pervasive mold | 8% | 6% | 10% | *3% \** | 10% | *4% \*\** | 11% | *5% \*\** | 5% | *-1%* |

1 of 2

| Summary | Non-White Block Groups (n=547) | African American/Hispanic Block Groups (n=507) | African American Block Groups (n=361) | Hispanic Block Groups (n=84) |
|---|---|---|---|---|
| Total Types of Deficiencies Recorded | 14 | 14 | 14 | 14 |
| # of Deficiencies that Were More Likely to Be Observed for REO Properties in the Given Minority Block Group than REO Properties in White Block Groups | 14 | 14 | 13 | 11 |
|   # where Difference is Statistically Significant at 5% | 8 | 9 | 8 | 9 |
|   # where Difference is Statistically Significant at 1% | 6 | 6 | 7 | 5 |
| | | | | |
| # of Deficiencies that Were Less Likely to Be Observed for REO Properties in the Given Minority Block Group than REO Properties in White Block Groups | 0 | 0 | 1 | 3 |
|   # where Difference is Statistically Significant at 5% | 0 | 0 | 0 | 0 |
|   # where Difference is Statistically Significant at 1% | 0 | 0 | 0 | 0 |

Note: Statistical significance of the differences between a given minority Block Group and Non-White Block Groups is determined using a t-test with unequal variances for the total number of deficiencies and a z-test of proportions for individual deficiencies.
*** Statistically significant at 1% significance level (p<0.01)
** Statistically significant at 5% significance level (p<0.05)
* Statistically significant at 10% significance level (p<0.1)

# EXHIBIT B

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
      NATIONAL FAIR HOUSING          )
 4    ALLIANCE; HOPE FAIR HOUSING    )
      CENTER, et al.,                )
 5                                   )
                                     )
 6                    Plaintiffs,    )
                                     )
 7           vs.                     ) No. 1:18-cv-00839
                                     )
 8    DEUTSCHE BANK NATIONAL         )
      TRUST, AS TRUSTEE, et al.,     )
 9                                   )
                                     )
10                    Defendants.    )

11

12              The videotaped deposition of IAN AYRES, Ph.D.,

13    called by the Defendant for examination, taken pursuant

14    to notice and pursuant to the Federal Rules of Civil

15    Procedure for the United States District Courts

16    pertaining to the taking of depositions, at 1900

17    South 1st Street, Champaign, Illinois, commencing at

18    8:05 a.m. on the 19th day of June, 2023, taken before

19    Kathleene A. Tanksley, Certified Shorthand Reporter,

20    Registered Professional Reporter, and Notary Public, via

21    videoconference.

22

23

24
```



 1   was -- I don't really have a -- I don't have a clear

 2   memory of -- if it was finally resolved and what the

 3   resolution was.

 4        Q.   Okay.  Are you aware that the Court agreed

 5   with the defendants in this case that Plaintiffs

 6   spoliated evidence?

 7        A.   I don't have an opinion about that.  I -- Or I

 8   just don't really remember.

 9        Q.   Okay.  As a hypothetical, if there was an

10   adjudication in this lawsuit that the plaintiffs

11   spoliated evidence relevant to this case, would that

12   affect any of the opinions you've offered?

13        MS. SOULE:  Objection to form.

14   BY THE WITNESS:

15        A.   Could you give me some more foundation as to

16   what you mean by the term spoliate.

17        Q.   Destroyed documents that are relevant to

18   Plaintiffs' claims in this lawsuit.

19        A.   Well, I think the answer is, if my -- I think

20   the answer is no; that, as I said in my initial report,

21   that I am not giving -- In that report, I said I'm not

22   giving an opinion on the accuracy of Plaintiffs'

23   dataset.  But, as I -- But that, as an expert -- and I

24   said this in my deposition, too -- I -- I definitely



 1    looked for sufficient indicia of accuracy to make it

 2    reasonable for me to go forward and do the analysis that

 3    I did.

 4              And now, with the additional analyses -- the

 5    multiple different versions of analyses, there are now

 6    more -- substantially more indicia of credibility to the

 7    plaintiffs' dataset, so -- so that my opinions, I think,

 8    are -- would still remain the same, even if there was

 9    such a finding.

10                        (Brief pause.)

11    BY MR. KLIEBARD:

12         Q.   You've -- You've qualified some of your

13    answers today by saying that you don't offer an expert

14    opinion on whatever the question was.

15              Are -- Do you consider yourself an expert in

16    identifying REO maintenance deficiencies?

17         A.   I don't have an expert opinion on -- on

18    whether I'm an expert on identifying REO maintenance

19    deficiencies.

20         Q.   Do you hold yourself out as having expertise

21    in identifying REO maintenance deficiencies?

22         A.   Well, no, I don't think I -- I am holding

23    myself out as an expert in identifying REO maintenance

24    deficiencies.



1    standardized across houses -- and, on a race-blind

2    basis, look to see whether there are racial disparities

3    in these standardized houses so that one can't say:  Oh.

4    You just -- The original photographers failed to take

5    the -- the specific -- the deficiency-specific

6    photographs in the white neighborhoods, because let's

7    just look at the front standardized photographs and see

8    from the standardized photographs if there are racial

9    disparities.

10        Q.   Do you know what instructions were given to

11   the plaintiffs' inspectors for taking a front view photo

12   of the house?

13        A.   Well, as I state in paragraph ten, I

14   understand that inspectors were instructed to take a

15   photograph of the front view of the house.  And it is my

16   belief that, if you looked into the document cited in

17   Footnote 13 -- this REO investigation photo protocol --

18   that it -- it describes that as -- in its instructions

19   to the initial visitors to these properties.

20        Q.   Okay.  When you were listing out the three

21   buckets, the first bucket was to address concerns raised

22   by defendants over quality control bias over

23   Plaintiffs -- Strike that.

24             The first of the three buckets you listed was



1    Defendants' concern that there was quality control bias

2    in Plaintiffs' quality control process.

3              Did I get that correctly?

4        A.    Not quite.  I would just restate it to say

5    that there's a concern that the -- that the quality

6    control -- the edits that occurred as part of the

7    quality control process biased the tests of race

8    discrimination.  And this is a concern that is

9    particularly raised by what I -- I view as, ultimately,

10   incomplete analysis of Professor McCrary.

11       Q.    Okay.  Putting aside the expert work that you

12   performed in this case, will you admit that Plaintiffs

13   themselves, separate and apart from their experts, never

14   undertook a race-blind review of the property

15   inspectors' photographs to support their allegations of

16   racial disparities in the maintenance and marketing of

17   REO properties?

18       A.    Well, I don't know why it's characterized as

19   an admission of embarrassment, but I have a sense that

20   the only race- -- to my knowledge, the only race-blind

21   analyses have -- that have occurred are by the six --

22   are the six analyses done by Plaintiffs' experts; that I

23   don't have any knowledge of fair housing organizations

24   having done it or representatives of fair housing



1    organizations, even though we are contractors with.

2          So they have now had it done in response to

3    the concerns raised by Defendants.  But Defendants have

4    not -- and this includes the -- the -- what I would call

5    unmatched analysis of Defendants' expert Scanderson

6    (phonetic), which was --

7          Q.    Okay.

8          A.    -- definitely not race-blind.

9          Q.    So, speaking of race-blind, aside from your

10   own analysis of the front photos, do you know whether

11   any of Plaintiffs' other experts were blind as to how

12   Plaintiffs had previously scored those properties?

13         A.    Well, yes.  In the -- Oh.  Blind as to how

14   they -- Not race-blind, but blind to how it was scored.

15         Q.    Yes.

16         A.    So I think the answer is no.  But that was

17   reasonable for the purposes of deficiency validation

18   that they set out to do, and that they systematically

19   found support for the deficiencies in the -- in the

20   photos that they reviewed.  And that's why it -- it --

21   those -- many of those analyses respond powerfully to

22   that second bucket about whether there was an

23   over-categorization of deficiencies in minority

24   neighborhoods.



```
 1                    (Brief pause.)

 2    BY MR. KLIEBARD:

 3         Q.   Given your answer, will you agree with me that

 4    Plaintiffs themselves scored the properties, knowing the

 5    racial characteristics of the neighborhood, and then

 6    Plaintiffs' experts, other than you, scored those

 7    results with knowledge of the plaintiffs' preferred

 8    scoring for those properties?

 9         MS. SOULE:  Objection as to form.

10         THE WITNESS:  Yeah.

11    BY THE WITNESS:

12         A.   And I -- I keep stumbling over the -- the

13    framing of your question when you say Plaintiffs.  I --

14    I don't -- I have a sense that many of the plaintiffs

15    were organizations, and the organizations did not code,

16    but representatives of the organizations.  I ...  Went

17    out and coded.  And so, I'm not sure that --

18         Q.   Oh.

19         A.   -- Plaintiffs coded.

20              I'm not trying to be overly technical here,

21    but I --

22         Q.   Really?

23         A.   Not overly technical, but we are trying to

24    have a precise record for -- for trial or for -- for --
```



1      Q.   Okay.  Well, if we're trying to have a precise

2   record for trial, it would be helpful if you answered

3   yes-or-no questions with a yes or no rather than a two

4   page speech.  But I digress.

5                    (Brief pause.)

6   BY MR. KLIEBARD:

7      Q.   Why don't we go back to paragraph 11 of

8   Exhibit 46, which is your Rebuttal Report, the corrected

9   version.

10              One second here.  Uh ...  I lost my spot

11   there.  Hold on a second.  I'm sorry.  I got my exhibits

12   mixed up.  I -- I meant your Declaration.  Did I --

13   Which is Exhibit 46.  I said your record Rebuttal

14   Report, but I meant your Declaration.  So that's

15   Exhibit 46.

16              And in the -- in the middle of that document,

17   you say:  For the 309 properties from Plaintiffs' sample

18   of properties with handwritten and printout forms --

19      A.   That's all -- I'm sorry to interrupt, but are

20   we showing the document that you're trying to have me

21   focus on --

22      Q.   Yeah.  I'm -- I -- I misspoke earlier when I

23   said your report.  I meant to refer you to your

24   Declaration in this case.



1       A.   Right.

2       Q.   Which is -- I gave the right exhibit number --

3   46 -- but I -- I grabbed the wrong document myself.  And

4   it's up on the screen.

5       A.   Paragraph 11.  Okay.

6       Q.   Yes.

7            So, in the middle of that one paragraph, you

8   say:  For the 309 properties from Plaintiffs' sample of

9   properties with handwritten and printout forms, I used

10  the recording of the count of total deficiencies from

11  the handwritten forms.

12           See that?

13      A.   Yes.

14      Q.   Okay.  In undertaking your analysis in

15  connection with this Declaration and your Rebuttal

16  Report, did you observe any deficiencies between the

17  scoring of the electronic forms and the handwritten

18  forms?

19      A.   I'm not sure I understand the question; that

20  these are -- there are -- there are --

21      Q.   I think I can rephrase it.

22           Did you observe any discrepancies between the

23  scoring on the electronic forms and the handwritten

24  forms?

1        A.    Not that I recall.

2        Q.    Okay.  Would it be relevant to your opinions

3    in this case if, in fact, there were discrepancies

4    between the scoring on the electronic forms and the

5    handwritten forms?

6        A.    Not necessarily.

7              One would -- There are different samples, and

8    one would naturally expect there to be some differences

9    in the -- both the level of disparities in white

10   neighborhoods and -- and the level of disparities in

11   non-white neighborhoods from these two different

12   samples, and that -- and that the -- it's the combined

13   analysis that would be the -- the more relevant.

14             But I -- I -- I -- I -- But it -- to -- if

15   there were persuasive reasons why -- that there were

16   differences between the -- the samples, that's something

17   that -- that I would be willing to consider.  But it's

18   not necessary for the purposes that I undertook this

19   analysis, especially when combined with my race-blind

20   front flow -- photo analysis.

21       Q.    Okay.  Why don't we go back to Exhibit 44,

22   which is Professor McCrary's Declaration.  Because I

23   know you were chomping at the bit to talk about

24   paragraph 11, so I will give you that opportunity.

1      A.   Thank you.

2      Q.   Figured you might like it.

3      MR. KLIEBARD:   It's on page 4.  Yeah.  I think

4  you have to scroll up a little bit.

5      MR. FAKHOURY:  (Complying.)

6      MR. KLIEBARD:    There you go.

7  BY MR. KLIEBARD:

8      Q.   So, in what I think is the third sentence,

9  Professor McCrary writes:  Plaintiffs' deficiency

10  dataset had 1.29 fewer deficiencies on average than the

11  handwritten forms for the properties in majority white

12  neighborhoods, but only 0.11 fewer deficiencies for the

13  properties in majority minority neighborhoods.

14         Do you see that?

15      A.   Yes.

16      Q.   Okay.  Is there anything in your Declaration

17  submitted in this case or your Rebuttal Report that

18  contradicts that statement in Professor McCrary's

19  Declaration that I just read?

20      A.   Not the -- the -- the narrow claim of 1.92 or

21  0.11 applied to that subsample.  But the implication of

22  that for a trier of fact, I think, is substantially

23  undercut by the failure of Professor McCrary to actually

24  look at those deficiencies that were -- those 1.92

1   deficiencies -- the average of 1.92 fewer deficiencies

2   in white neighborhoods.

3          There were photograph evidence of the -- of

4   those alleged initial deficiencies that were preserved

5   in the data.  Specific photo- -- Not front photos, but

6   specific photos.  Hey.  I -- We think there's overgrown

7   grass here.

8          And the quality control process says:  No.

9   It's not sufficiently overgrown indicia to code that as

10  a deficiency.

11         And McCrary could have looked at the

12  deficiency-specific photographs for those deficiencies

13  that were recoded as non-deficiencies -- looked at them

14  on a race-blind basis.  Let -- Look at all of the

15  photographs of deficiencies that were recoded as

16  non-deficiencies in both minority and white

17  neighborhoods and see if -- on a race-blind basis,

18  whether a -- McCrary or someone that McCrary trained

19  disagreed with the quality control conclusion.

20         Or one could alternatively have taken -- and

21  this is a -- Let's say there were certain overgrown

22  grass deficiencies that were coded as -- through quality

23  control as not being deficiency.  Take a random set

24  of -- of overgrown grass that after -- that was



 1   continued to be coded as overgrown and mix it in on a

 2   race-blind basis, and have somebody say:  Well, which of

 3   these look like they have overgrown grass, and which

 4   don't, and which have an indicia of being overgrown?

 5       Q.   Uh-huh.

 6       A.   And if you could show that they were

 7   systematically taking photographs of deficiencies and

 8   miscoding them in white neighborhoods as

 9   non-deficiencies, that would -- that would have been

10   a -- a more powerful way of making the point.  It

11   ignored this powerful, preserved, original evidence of

12   deficiencies in doing McCrary's analysis.

13       Q.   Huh.  Okay.

14            Did you yourself confirm that Plaintiffs'

15   photographs actually depict the deficiencies deleted

16   from the white -- Strike that.

17            Did you yourself confirm that the photographs

18   showing deficiencies that were deleted from white

19   properties were correctly deleted?

20       A.   I did not do the race-blind analys- -- either

21   of the two race-blind analyses that I just proposed.

22       Q.   Thank you.

23       A.   But I did, and in -- and in part because I

24   thought that my alternative analysis of looking at

1   unedited and electronically created data spoke

2   powerfully to the -- to the quest- -- to the concern

3   that QC edits were responsible for the disparity.  And

4   look.  There's -- There's -- There is substantial work,

5   and I'm proud of the substantial work that I did to

6   credibly come up, train testers, make sure there was

7   intercoder reliability.  And I spent a substantial

8   amount of time to respond to this other concern that

9   would still be out there about whether there was, not

10  through the quality control edits, but whether they're

11  just in the -- whether the initial coding of white

12  properties failed to score actual deficiencies.

13          So I -- I instead, for my purposes, focused on

14  this other blind review to complement the -- the work

15  that I did on -- in responding to McCrary and the other

16  experts' blinded analyses.

17      Q.   Okay.  I will agree that there are indicia

18  that you're very proud of the work that you did here.

19          Do you know whether Plaintiffs' experts

20  undertook to look at the deficiencies that were deleted

21  from white properties in their review of the

22  photographs?

23      A.   Yes.  Yes.  Guetterson [SIC] looked at a

24  random sample, I believe, of -- of these properties on a

1      A.    Thank you.

2                  (Witness viewing document.)

3    BY THE WITNESS:

4      A.    One second.

5            No.   I -- As -- As described in Exhibit 2, I

6    undertook a number of statistical tests of differences

7    in mean.

8      Q.    I'm sorry.  Differences in -- What was ...

9      A.    In mean, M E A N.

10     Q.    Okay.  Why was the age of the house not

11   considered in your analysis of the front photos?

12     A.    I didn't feel it was necessary in order to

13   determine under this blinded analysis whether there were

14   more deficiencies that were being uncovered.  There's a

15   separate reason to then analyze whether those -- not the

16   number of deficiencies, but what's driving those

17   differences in deficiencies.  So my race-blind analysis

18   is to validate that the coding of deficiencies as in

19   indic- -- in the full dataset have indicia of

20   analyzes -- indicia of -- of accuracy.

21            And then, once you have that, which I have

22   established through Exhibit 2 and through the -- the

23   figure in the Rebuttal Report itself, then one can

24   separately analyze whether those deficiencies produce a



# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al.<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br><br>DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC; and ALTISOURCE SOLUTIONS, INC.<br><br>　　　　　　Defendants. | Case No. 18 CV 839 |

**EXPERT REPORT OF PROFESSOR JUSTIN MCCRARY, PH.D.**

February 21, 2023

**V.    Plaintiffs' Investigation Suffers from Critical Flaws That Render the Data Unreliable and Prone to Bias, which Invalidate Plaintiffs' Conclusions**

31.    In this section, I explain that Plaintiffs' methodology suffers from critical methodological flaws that bias and invalidate conclusions drawn from the investigation.  First, Plaintiffs failed to properly process the results of their inspections into the database that was used in their analyses (including the analyses conducted by Dr. Ayres and Dr. Korver-Glenn).  Specifically, Plaintiffs changed the findings of the original inspectors during data entry, destroyed or shredded many of the original forms,[48] and edited and overwrote records in their database months and even years after the fact.  *I show that, where it is possible to go back in time to the deficiency counts reported by the inspectors in their original forms, Dr. Ayres' regressions using his controls show that there is no relationship between maintenance deficiencies and racial composition of a neighborhood.*  Second, Plaintiffs' measurement of external property defects is based on the subjective judgment of inspectors employed by Plaintiffs, who, as the documentary evidence shows, frequently disagreed on the number of defects for a given property.  As a result, the score Plaintiffs' inspectors assigned to a given property is an unreliable measure of the number of deficiencies, much less property maintenance.  Further, Plaintiffs' investigation is not replicable due to the many unexplained choices that Plaintiffs made when selecting properties to investigate and when evaluating properties and uploading information into their database.  In addition, rather than ensuring inspectors were blinded to the purpose of the investigation, which is consistent with sound research design, Plaintiffs told inspectors that the purpose of their investigation was to find that properties in majority minority neighborhoods were more poorly maintained than properties in majority white neighborhoods.  This invites confirmation bias, as noted.

---

[48] Deposition of George Thomas, 30(b)(6), January 21, 2022, pp. 95:11–96:2 ("Q. Would the Fair Housing Center have the inspection forms that were actually used by the Fair Housing Center inspectors to inspect the Deutsche Bank REO properties? A. So the answer is basically no. So, obviously, when they went out into the field, they completed paper forms. And then when the person came back, that information was entered into the Miami Valley database that we've previously talked about. And once that was -- that upload of that information was confirmed and then audited, like, another person would look at the form, make sure the information that was uploaded is accurate, we destroyed the forms. We didn't have any more need for them because the information was then uploaded into the database."); Deposition of Megan Wanke, 30(b)(6), March 4, 2022, p. 21:3–21 ("Q. That's not -- I'm talking about the property inspection sheets -- A. No. These are the handwritten hard copy employee time records that underlie the diversion log. We did not retain, as an organization, the handwritten inspection sheets that employees completed in the field. Q. Just a second. When you say you did not retain them, what happened to them? A. All documents that are discarded that have any relation to anything confidential or an investigation are shredded in our office. Q. And when were these shredded? A. They would have been shredded after we entered the information from the handwritten scoring sheets in to the electronic scoring sheet, which we provided for the properties in question, and -- and that information was then subsequently uploaded to the REO database maintained by Miami Valley and NFHA."); Deposition of Heather Crislip, 30(b)(6), February 1, 2022, p. 65:6–12 ("Q. Were you able to find all of the original scorecards relating to Deutsche Bank properties that you inspected in this case? A. No. We had the practice of, once we got it in to the database that would allow NFHA to do the analysis, that we destroyed those. But there were still some that we produced.").

32.     Because of the way Plaintiffs conducted their investigation, many of the flaws regarding the reliability, replicability, validity, measurement, and bias in Plaintiffs' data collection process (discussed below) cannot be fully quantified or corrected for in analysis. These flaws render the conclusions regarding the effect of Defendants' REO maintenance practices that Plaintiffs' and Plaintiffs' experts draw from Plaintiffs' unreliable data likewise unreliable.

33.     Rather than considering or attempting to account for the impact of these flaws on Plaintiffs' investigation results, Plaintiffs' experts ignore, dismiss, or even endorse these flaws as features of Plaintiffs' investigation. As a result, these flaws invalidate Plaintiffs' conclusions and render their investigation unreliable and incapable of demonstrating the alleged discrimination.

### A.     Plaintiffs' Data Is Fundamentally Unreliable Due to How Plaintiffs Processed the Original Inspection Forms and the Original Inspection Forms Do Not Support Plaintiffs' Claims

34.     In empirical analysis, the underlying data is sacrosanct. As a matter of methodology, data changes—particularly those for which the original data are overwritten—are inherently suspect. As noted by the Reference Manual on Scientific Evidence:

> Scientific data are the coin of the realm in science, and they are always treated with reverence. Those rare instances in which scientists are found to have fabricated or altered their data in some way are always traumatic scandals of the first order.[49]

35.     As I will show in this section, Plaintiffs changed the data on maintenance deficiencies between the original handwritten forms used by inspectors when evaluating properties and the dataset that was produced by Plaintiffs—*and the changes were in the direction that would support their allegations*. In my opinion, the level of changes made to the Plaintiffs' data, and the direction of these changes, rises to a level that would require an investigation into whether research misconduct has occurred.[50] Bracketing the issue of whether the data changes constitute research misconduct, *the data changes make Plaintiffs' Deficiency Dataset unreliable.*

36.     Plaintiffs not only failed to maintain the integrity of the original forms that inspectors used to conduct their inspections, but there is also striking empirical evidence demonstrating the

---

[49] Goodstein, David, "How Science Works," in *Reference Manual on Scientific Evidence*, Third Edition, Washington, D.C.: The National Academies Press, 2011, 37–54 at p. 43.

[50] *See, e.g.*, "What You Need to Know About Research Misconduct," *Columbia University Office of Research Compliance and Training*, available at https://research.columbia.edu/sites/default/files/content/RCT%20content/Misconduct/RMPoster_FINAL_Red.pdf.

consequences of the *ex post* data changes ("Data Changes") Plaintiffs made to their data.[51]  *The consequences of the Data Changes are that the results are skewed towards a finding of racial disparities in property conditions.*  The impact of the Data Changes on the Plaintiffs' claims is not idiosyncratic but is instead nonrandom and seemingly targeted at a finding of discrimination. The result is also statistically significantly different from any potential claim that the Data Changes were the product of some random process.  These problems infect the analyses put forward by Plaintiffs based on the Plaintiffs' data, including those of Dr. Ayres.

37.     Bracketing all of the other problems with Plaintiffs' methodology that I discuss throughout this report, these problems mean that *Plaintiffs' data cannot be used to test in any reliable manner the allegations in this matter.*  For the subset of properties where the original data was not destroyed by Plaintiffs, I am able to revert Plaintiffs' data back to its original state —as reported by the inspectors who visited the properties in person.  When I do so and apply Dr. Ayres' analysis, I find no support for Plaintiffs' claims of alleged discrimination.[52]  Let me next explain in more detail some background context regarding what is known about these Data Changes.  Then I will turn to how I reach the conclusions above.

38.     Upon inspecting the property, Plaintiffs' inspectors entered information regarding each property into forms by hand.[53]  An example of one of these forms can be seen in **Exhibit 1**, which is the original inspection form for the investigated property at 1827 Palm Acres Drive in West Palm Beach, Florida.  Plaintiffs did not retain all of the original data forms;[54] however, I understand that 267 original handwritten forms remain, of which 236 are legible and internally consistent.[55]  I compared these original handwritten forms created by Plaintiffs' inspectors to the data produced by Dr. Ayres in AYRES_000009 and used in his regression models ("Plaintiffs'

---

[51] In this context, by *ex post* I mean after inspectors completed their evaluation forms.

[52] I do not endorse Dr. Ayres' models; Dr. Ayres' models fail to reliably identify racial disparities caused by Defendants' conduct for a variety of reasons, as discussed in Section VII.D.

[53] *See, e.g.*, Deposition of Shanti Abedin, May 25, 2022, with Exhibits ("Abedin Deposition"), p. 181:10–12 ("Q. The handwritten evaluation forms were completed on site at the property, right? A. Yes.").

[54] Augustine 30(b)(6) Deposition, Vol. 3, pp. 611:23–612:10 ("Q: If other plaintiff organizations in this lawsuit testified that it was important to retain the handwritten inspection forms, would NFHA disagree with that testimony? […] A. I can only speak for NFHA and how we viewed those forms. You know, again, we don't tell our fair housing center partners how to operate their organizations. So in NFHA's view of NFHA's form, we did not retain those, and we saw that as appropriate.").

[55] I understand from counsel that no other handwritten forms beyond these 267 were preserved.  I reviewed the 31 forms listed as illegible or internally inconsistent.  Based on my review, I agree that these 31 forms cannot be reliably scored due to the forms being illegible or containing inconsistencies in how the forms were filled out such that there is not a reliable interpretation of the number of deficiencies recorded on those forms.  *See* Defendants' Reply in Support of Their Motion to Exclude Plaintiffs' Property-Specific Investigation Due to Plaintiff's Spoliation of Evidence, *National Fair Housing Alliance, et al. v. Deutsche Bank National Trust, as Trustee, et al.*, July 20, 2022, with Exhibits, Exhibit 18.

Deficiency Dataset").[56]  The unedited data from the original handwritten forms tell a strikingly different story than the Plaintiffs' Deficiency Dataset.  The story that the unedited data tells is inconsistent with, and in fact is *contrary to*, Plaintiffs' allegations and Plaintiffs' experts' findings.

39.     First, apparent discrepancies between the original inspection forms[57] and Plaintiffs' Deficiency Dataset show that the Data Changes were not uniformly distributed across majority minority and majority white neighborhoods.[58]  Plaintiffs' Deficiency Dataset had 1.92 fewer deficiencies on average than the handwritten forms for the properties in majority white neighborhoods, but only 0.11 fewer deficiencies for the properties in majority minority neighborhoods.[59]  This difference in the change in deficiencies between properties in majority white and majority minority neighborhoods is statistically significant at the 99 percent confidence level.[60]  This means that, on average during the data entry and editing process, Plaintiffs removed 1.81 more deficiencies for properties in majority white neighborhoods as compared to properties in majority minority neighborhoods.

40.     To test whether changes from the handwritten forms to Plaintiffs' Deficiency Data were distributed equally across properties in majority minority and majority white neighborhoods, I regressed the net change in total deficiencies for a given property (*e.g.*, +3, –2) on the binary variable indicating whether the property was in a majority minority neighborhood and included

---

[56] *See* my workpapers.

[57] Of the 236 handwritten forms available, 188 of the forms were for properties that are in the Agreed-Upon Properties set.  Unless otherwise noted, my analysis in this section relates to these 188 properties.  However, I also conducted the analyses described in this section on the full 236 handwritten forms and all of my conclusions remain valid.  *See* my workpapers.

[58] To conduct the data entry from the handwritten forms, I instructed my team at Cornerstone Research to have two independent individuals review each handwritten form and fill out an Excel database that recorded the number of deficiencies by property.  The Excel database included a link to the handwritten form, but did not include any information related to whether that property was in a majority minority neighborhood or majority white neighborhood.  During the review of the handwritten forms, there were seven instances where the two independent reviewers coded the deficiencies in the handwritten forms differently due to ambiguity in how to interpret the handwritten form.  This means that the two coders agreed on the total number of deficiencies for 97 percent of the handwritten forms that they reviewed.  In the three percent of instances where coders did not agree, I have chosen the total number of deficiencies for that property that is closest to the total number of deficiencies as listed in Plaintiffs' Deficiency Dataset.  I also conducted a test of intercoder reliability using Cohen's Kappa which resulted in a Kappa statistic of 0.968.  *See* my workpapers.  This is considered an indicator of "Almost Perfect" agreement in literature on intercoder reliability.  *See* Landis, J. Richard and Gary G. Koch, "The Measurement of Observer Agreement for Categorical Data," *Biometrics* 33, 1 (1977), 159–174 at p. 165.

[59] *See* my workpapers.  Additionally, counsel for Defendants conducted a similar analysis on the 236 properties for which there existed a legible, handwritten form.  *See* Defendants' Reply in Support of Their Motion to Exclude Plaintiffs' Property-Specific Investigation Due to Plaintiff's Spoliation of Evidence, *National Fair Housing Alliance, et al. v. Deutsche Bank National Trust, as Trustee, et al.*, July 20, 2022, with Exhibits, p. 12.  In their analysis, they found that the Plaintiffs' inspection data as shown in NFHA_0000001 had 2.29 fewer deficiencies than the handwritten forms for properties in majority white neighborhoods, but only 0.35 fewer deficiencies for properties in majority minority neighborhoods.  I ran a statistical test on these results and found this difference in the change in the number of deficiencies is also statistically significant at the 99 percent confidence level.  *See* my workpapers.

[60] *See* my workpapers.

the full set of control variables from Dr. Ayres' regressions.[61]  I found that the estimated coefficient for whether the property was in a majority minority neighborhood was statistically significant and positive, meaning that properties in majority white neighborhoods had significantly more deficiencies removed, after controlling for the same variables that Dr. Ayres controls for, than properties in majority minority neighborhoods.[62]  This means that, relative to the original handwritten forms filled out at the time of the inspections, the Plaintiffs' Deficiency Dataset made it appear that properties in majority white neighborhoods had fewer deficiencies than properties in majority minority neighborhoods.  Moreover, this statistical analysis rejects the hypothesis that the changes Plaintiffs made to the data were consistent with random measurement error; to the contrary, *the changes Plaintiffs made to the findings from the original forms were significantly correlated with the neighborhood race of the property inspected*, even after controlling for other characteristics of the properties.  My model also shows that, controlling for the same set of factors that Dr. Ayres utilizes, a property located in a majority minority neighborhood has an estimated *2.939 more deficiencies that result purely from Plaintiffs' Data Changes* relative to a property in a majority white neighborhood.[63]  Plaintiffs do not provide any explanation or reason for the nonrandom disparities in how Plaintiffs changed the original findings of the property inspectors.[64]

41.     As discussed previously, Dr. Ayres' regressions use deficiency data that Plaintiffs modified from the original handwritten inspection forms.  To test whether Plaintiffs' Data Changes impact the conclusions one can draw from Dr. Ayres' regression analysis, I reran Dr. Ayres' regression models using the number of deficiencies as reported in the original handwritten inspection forms, instead of as reported in Plaintiffs' Deficiency Dataset, for the subset of properties for which the original forms still exist.  As shown in **Exhibit 2**, I find that

---

[61] I calculated the net change as the number of total deficiencies in Plaintiffs' Deficiency Dataset minus the number of total deficiencies in the original handwritten forms.  I calculated the number of total deficiencies using the same approach as Dr. Ayres—*i.e.*, I excluded "gas turned off" and "meter turned off" from the deficiency count, and counted as one deficiency each time "mold severity index," "invasive plants," or "dead grass" had a score higher than zero.

[62] For a description of this test of the null hypothesis of idiosyncratic measurement error, *see* Chalfin, Aaron and Justin McCrary, "Are U.S. Cities Underpoliced? Theory and Evidence," *Review of Economics and Statistics* 100, 1 (2018), 167–186 ("Chalfin and McCrary, 2018"), Online Appendix.  The results are also positive and statistically significant when using the alternative sets of controls found in the models Dr. Ayres presents in Exhibit 6-7 of the Ayres Report.  I also conducted a t-test of the average net change in the number of deficiencies between properties in majority minority and majority white neighborhoods for these properties and found the difference to be statistically significant.  *See* my workpapers.

[63] The same statistical test is used as a test of classical measurement error in Chalfin and McCrary, 2018.  *See* my workpapers.

[64] In his report, Dr. Ayres states that he has "not been asked to opine on the accuracy or representativeness of Plaintiffs' inspection data."  *See* Ayres Report, fn. 7.  Dr. Korver-Glenn also does not opine on the accuracy of Plaintiffs' inspection data.

the variable for whether the property is in a majority minority neighborhood is *not statistically significant* when using the data from the original handwritten inspection forms across all six of Dr. Ayres' regression models at the 95 percent confidence level.[65]  In fact, for Dr. Ayres' regression models that include his full set of controls, the estimated coefficient for majority minority neighborhood is negative.  Taking the data from the only handwritten forms that can reliably be used at face value, this would imply that properties in majority white neighborhoods had *more* deficiencies than properties in majority minority neighborhoods after using Dr. Ayres' full set of controls.

42.     To verify that these results are not due to differences between the properties for which the original handwritten inspection forms have been produced and the other properties in the set of Agreed-Upon Properties for which original handwritten inspection forms have not been produced, I ran Dr. Ayres' regression models using the measure of deficiencies from Plaintiffs' Deficiency Dataset (*i.e.*, the same exact (edited) deficiency data that Dr. Ayres uses) on the same *subset* of properties that have original handwritten inspection forms.  If the properties for which original inspection forms are available are similar to properties for which original inspection forms are not available, then one would expect Dr. Ayres' regressions, *using the edited measure of deficiencies in Plaintiffs' Deficiencies Dataset*, to provide similar estimates to those produced in his report.  When using the number of deficiencies from Plaintiffs' Deficiency Dataset, Dr. Ayres' regression results hold for this subset of properties for which the original inspection forms are available—*i.e.*, the majority minority variable is statistically significant and positive across all six of Dr. Ayres' regression specifications, which is consistent with the findings in Dr. Ayres' report (found in Exhibit 6-7 of the Ayres Report).[66]  However, as shown above and in

---

[65] In Dr. Ayres' base specification (without any controls), the coefficient is statistically significant at the 10 percent level. However, this model does not include any controls, and as stated by Dr. Ayres, "this result does not take into account any non-race characteristics, such as the age of the home, neighborhood property values, the length of Deutsche Bank's ownership, that might provide a plausible business justification for the presence of more maintenance and marketing deficiencies."  *See* Ayres Report, ¶ 61. As additional sensitivity analyses of my results, I also ran Dr. Ayres' regression models without fixed effects for states, counties, or year when a property was evaluated.  I also included observations with missing values by imputing a value of zero for any missing values and including indicator variables for missing data in the regressions.  I also ran Dr. Ayres' regression models on the full set of 236 handwritten forms (including observations with missing values by imputation).  The variable for whether the property is in a majority minority neighborhood is not statistically significant for any of these sensitivities.  *See* my workpapers.

[66] *See* my workpapers.  As with the prior set of regressions using deficiency counts from the handwritten forms, I also ran Dr. Ayres' regression models using deficiency counts from Plaintiffs' Deficiency Dataset without fixed effects for states, counties, or year when a property was evaluated.  I also included observations with missing values by imputing a value of zero for any missing values and including indicator variables for missing data in the regressions.  I also ran Dr. Ayres' regression models on the full set of 236 handwritten forms (including observations with missing values by imputation).  The variable for whether the property is in a majority minority neighborhood is statistically significant for all of these sensitivities in the same direction as in Dr. Ayres' report.  I also tested whether the estimated coefficient for the majority minority variable was statistically different for the set of properties without handwritten forms and the set of properties with

**Exhibit 2**, *when I use the number of deficiencies from the original handwritten forms, the purported relationship between neighborhood race and number of deficiencies <u>disappears</u>*— *i.e.*, the variable for whether the property is in a majority minority neighborhood no longer has a statistically significant effect on the number of purported maintenance deficiencies. In other words, the purported discriminatory effect that Dr. Ayres finds disappears.

43.     Moreover, based on my review of the handwritten forms, I find discrepancies in the counts of deficiencies between Plaintiffs' Deficiency Dataset and the original handwritten inspection forms *even for properties that are not listed in Plaintiffs' Deficiency Dataset as having been edited*.[67] For example, the property at 3455 Bosworth Road, Cleveland, Ohio with Property ID 10696, located in a majority white neighborhood, is reported as not having been edited after Michael Lepley entered the data on January 13, 2016.[68] For this property, Plaintiffs' Deficiency Dataset lists this property as having 11 total deficiencies.[69] However, based on my review of the form, there are clearly 18 total deficiencies listed.[70] This is perhaps most apparent when one reviews the "Structure" subcategory of the form. For this subcategory, the handwritten form includes seven "Ys," indicating that the inspector marked the property as having seven deficiencies in this "Structure" subcategory.[71] However, based on Plaintiffs' Deficiency Dataset, the property is only listed as having three deficiencies in the "Structure" subcategory.[72] Importantly, since this property is located in a majority white neighborhood, that the Plaintiffs' Deficiency Dataset lists only 11 deficiencies compared to the 18 deficiencies shown in the handwritten form will also tend to widen the gap in maintenance defects that Dr. Ayres concludes from his regression analyses and that Dr. Ayres attributes to the Defendant's alleged conduct. Thus, even for properties not listed as having been edited in Plaintiffs' Deficiency

---

handwritten forms using Dr. Ayres' regression model with his full set of controls. I find that there is no statistically significant difference between the coefficients from the two groups of properties (*i.e.*, those with handwritten forms vs. those without), which further shows that there is no difference in the effect of neighborhood race on the number of deficiencies between the two groups of properties. *See* my workpapers.

[67] Plaintiffs' representative Ms. Augustine testified in deposition that NFHA staff sometimes altered the inspectors' observations while uploading data into the Plaintiffs' database, based solely on the property photos taken by the in-person inspectors. Augustine 30(b)(6) Deposition, Vol. 3, pp. 573:18–574:3 ("Q. So as part of the QC process that NFHA had of the other plaintiff organization's submissions in to the REO database, did NFHA ever add deficiencies that the plaintiff organization did not have in their evaluation forms? A: We did, yes. We could have added a deficiency that was visible in their photograph or similarly removed one, if there was no photographic evidence – or if they had marked it incorrectly, we may have changed it to the correct deficiency.").

[68] *See* Plaintiffs' Deficiency Dataset, columns AI–AL. *See also* AYRES_0000047.

[69] *See* Plaintiffs' Deficiency Dataset, columns AM–BZ.

[70] HRAC_0000839–40.

[71] HRAC_0000839–40.

[72] *See* Plaintiffs' Deficiency Dataset, columns AW–BD.

Dataset, there are unexplained discrepancies between what was recorded in the handwritten form and what appears in Plaintiffs' Deficiency Dataset.

44.     I also find discrepancies for properties in majority minority neighborhoods.  For example, the property at 1827 Palm Acres, West Palm Beach, Florida with Property ID 11124, located in a majority minority neighborhood, is also listed as not having been edited.[73]  For this property, Plaintiffs' Deficiency Dataset lists this property as having 14 total deficiencies.[74]  However, based on my review of the form, there are only eight total deficiencies listed.[75]  Importantly, since this property is located in a majority minority neighborhood, that Plaintiffs' Deficiency Dataset lists 14 deficiencies compared to the eight deficiencies shown in the handwritten form will also tend to widen the gap in maintenance defects that Dr. Ayres concludes from his regression analyses and that Dr. Ayres attributes to the Defendants' alleged conduct.

45.     In total, based on my review of the handwritten forms, and as summarized in **Exhibit 3**, I find that in the vast majority of purportedly "unedited" properties in Plaintiffs' Deficiency Dataset for which a comparison is possible, Plaintiffs' Data Changes served to further widen the gap in maintenance defects that Plaintiffs and their experts attribute to the Defendants' alleged conduct.  There were 182 properties out of the 236 properties with an original handwritten form where the comparison of the number of deficiencies in Plaintiffs' Deficiency Data to the number of deficiencies in the handwritten forms would imply that an edit has been made.  Of these 182 properties, 21 are listed in Plaintiffs' Deficiency Dataset as not having been edited.[76]  For these 21 properties (reported in **Exhibit 3**), 15 are in majority minority neighborhoods and 6 are in majority white neighborhoods.  For the 15 properties in majority minority neighborhoods, I find that in 11 out of 15 properties (or 73 percent), the number of deficiencies in Plaintiffs' Deficiency Dataset is *higher* than in the handwritten form, by an average of 1.4 deficiencies.  For the 6 properties in majority white neighborhoods, I find that in 5 out of 6 properties (or 83 percent), the number of deficiencies in Plaintiffs' Deficiency Dataset is *lower* than in the handwritten form, by an average of 2.8 deficiencies.  That means that for 16 out of these 21 properties (or 76 percent) with no reported "Edit Date" in Plaintiffs' Deficiency Dataset, Plaintiffs' Data Changes served to further widen the gap in maintenance defects that Plaintiffs and their expert attribute to the Defendants' alleged conduct.  These findings mean that one

---

[73] *See* Plaintiffs' Deficiency Dataset, columns AI–AL.  *See also* AYRES_0000047.

[74] *See* Plaintiffs' Deficiency Dataset, columns AM–BZ.

[75] HOUSING_OPPS_00002463–4.

[76] *See* my workpapers.

cannot take the subset of records from the Plaintiffs' Deficiency Dataset that are listed as having no reported "Edit Data" as being, in actuality, unedited data.

46.     With the exception of the 267 records for which we have the original forms, it appears to be impossible to determine definitively what went wrong or how it went wrong in the handling of the data because of the flaws in Plaintiffs' processes.  At this time, the precise mechanism of the Data Changes is unclear.  As I explain below, Plaintiffs edited investigation results both while uploading them into the database and several months or even more than a year later.  As a matter of process, that makes the data unreliable in and of itself.  Plaintiffs' representative Ms. Augustine testified in deposition that NFHA staff sometimes altered the inspectors' observations while uploading data into the Plaintiffs' database, based solely on the property photos taken by the in-person inspectors.[77]  However, Plaintiffs' representatives have not explained what criteria employees used to edit entries so long after their initial upload, nor have Plaintiffs shown what the entries were before they were edited.  The demonstration above showing that the Data Changes skew the data towards the Plaintiffs' conclusion is a pattern consistent with requiring an investigation into whether research misconduct has occurred.

47.     To quantify the extent to which Plaintiffs' reviewers edited investigation results, I analyzed data produced by the Plaintiffs that showed many entries made by inspectors were "corrected" by persons tasked with entering Plaintiffs' data into a database.  As shown above, there are discrepancies between the original handwritten forms and Plaintiffs' Deficiency Dataset even for properties *without* a listed "Edited" date, and thus this analysis likely is conservative in its estimate of the magnitude of edits made by Plaintiffs' reviewers.  **Exhibit 4** shows the time that elapsed between when Plaintiffs' inspectors first uploaded property data into their database and the final data entry or modification.  The exhibit shows that 32.6 percent of all properties investigated had entries that were modified six months or more after being first uploaded and 26.8 percent had entries that were modified one year or more after the initial upload.[78]  These results suggest that inspectors and data entry personnel disagreed about how to categorize

---

[77] Augustine 30(b)(6) Deposition, Vol. 3, pp. 573:18–574:3 ("Q. So as part of the QC process that NFHA had of the other plaintiff organization's submissions in to the REO database, did NFHA ever add deficiencies that the plaintiff organization did not have in their evaluation forms? A: We did, yes. We could have added a deficiency that was visible in their photograph or similarly removed one, if there was no photographic evidence – or if they had marked it incorrectly, we may have changed it to the correct deficiency.").

[78] I also note that there are differences in deficiencies between Plaintiffs' database marked NFHA_0000001 and Plaintiffs' Deficiency Dataset.  Specifically, I find that there are 47 properties that have differences in the deficiencies marked between these two databases.  This indicates that Plaintiffs continued to make changes to the deficiency data over the course of this litigation, which further calls into question the reliability of the data as it currently exists.  *See* my workpapers.

various defects, many months or even years after the data was initially uploaded, which further suggests that Plaintiffs' investigation results are unreliable.

48.     Dr. Guetterman attempts to justify Plaintiffs' decision to edit records after they were uploaded by framing the edits as "quality control reviews" and stating that "quality control reviews improve data quality in research and strengthen the reliability and validity of measures."[79]  However, at his deposition, Dr. Guetterman testified that he did not know if there was a consistent standard that reviewers used when editing records or how many records were edited[80]—in fact, he testified that he did not even ask Plaintiffs for information on how many records were edited.[81]  If Plaintiffs are not able to explain how they made these decisions, then their data cannot be used in a scientific test of Plaintiffs' allegations in this matter.

### B.     Plaintiffs' Measurement of Maintenance and Marketing Defects Is Unreliable

49.     Plaintiffs' measure of purported maintenance and marketing defects present on the original handwritten forms is not reliable.  The concepts of reliability and validity play an important role in assessing how well a test or measure performs in the real world.  Reliability refers to how well a test or measure's conclusions can be consistently reproduced.[82]  Inter-rater reliability, or whether different raters evaluate observations in the same way, is especially important in investigations like Plaintiffs' that rely on raters' subjective interpretations to place observations in specific categories,[83] such as how many pieces of trash are enough to mark as a

---

[79] Guetterman Report, p. 4.

[80] Deposition of Timothy Guetterman, December 7, 2022, with Exhibits ("Guetterman Deposition"), p. 128:1–15 ("Q. What was the consistent standard that you mentioned that was applied during quality control? A. I'm not certain what that was. I -- you know, thinking it was a couple of individuals who were doing the quality control that, you know, they were being consistent in applying that. But I have not seen written what a particular standard was. Q. Do you know that all individuals conducting quality control work applied the same standard? A. I don't know for certain. It was my understanding that they were. Q. But you don't know what that standard was, correct? A. Correct --.").

[81] Guetterman Deposition, p. 174:8–23 ("Q. Are you aware of whether any data exists and how many modifications were made? […] A. No, I don't know. Q. Did you ask NFHA for information on how many modifications were made as part of the quality control process? […] A. No, I didn't. I mean, to me, simply a quantity of how many modifications were made wouldn't really tell me much as far as understanding their process for doing so, you know. As I was appraising the methodology, I focused more on their quality control processes.").

[82] Bryman, Alan, *Social Research Methods*, Fifth Edition, Oxford, UK: Oxford University Press, 2005 ("Bryman (2005)"), p. 157 ("Reliability refers to the consistency of a measure of a concept.").

[83] Bryman (2005), p. 157 ("Inter-rater reliability: When a great deal of subjective judgement is involved in such activities as the recording of observations or the translation of data into categories and where more than one 'rater' is involved in such activities, there is the possibility that there is a lack of consistency in their decisions. This can arise in a number of contexts, for example: in content analysis where decisions have to be made about how to categorize media items, when answers to open-ended questions have to be categorized; or in structured observation when observers have to decide how to classify participants' behavior.").

deficit.  Validity refers to how well the test actually measures what it is supposed to measure.[84] Unreliable tests are invalid.[85]  For example, a scale that reports a wildly different weight each time the same person steps on it is probably broken, and therefore is incapable of providing a valid measure of weight.

50.      Plaintiffs generally sent teams of two inspectors to evaluate each property in person; however, Plaintiffs only recorded one measurement for each team.[86]  This means that there is no way to quantify the extent to which Plaintiffs' inspectors disagreed on various property defects. This is particularly problematic because deposition testimony indicates that Plaintiffs' inspectors disagreed with each other regarding whether property condition defects were present based on looking at the same photographs that had been taken during the in-person property visit.  For example, when presented with the same set of photos of the same property at their depositions, Ms. Abedin indicated that the property had water damage, overgrown shrubbery, and a "structure miscellaneous" deficiency from a broken screen,[87] whereas Ms. Augustine did not indicate the property had any of these deficiencies.[88]  Further, the total number of deficiencies for the

---

[84] Bryman (2005), p. 158 ("Validity refers to the issue of whether an indicator (or set of indicators) that is devised to gauge a concept really measures that concept.").

[85] Bryman (2005), p. 162 ("It should also be borne in mind that, although reliability and validity are analytically distinguishable, they are related because validity presumes reliability. This means that, if your measure is not reliable, it cannot be valid.").

[86] Abedin Deposition, pp. 246:15–247:4 ("Q. How was the two inspectors decided upon as the right number? A. I mean, I don't know exactly how it was decided on. That was sort of the established practice when I -- when I arrived. If I had to guess where that came from, I think it was, one, logistically wanted someone taking the camera, taking pictures, and then, you know, for safety reasons and, you know, having pairs is also a good practice for this. Secondly, wanted two sets of eyes on the property at that time to you, you know, help remind them to take all the pictures and, you know, look at things that they wanted to document together. So those were some of the reasons that I would guess."); Augustine Deposition, Vol. 2, p. 345:12–16 ("Our methodology protocol was that two -- at least two inspectors generally should be present, and that was for logistics, for one reason, because it's, you know, taking the photos and filling out the form, it's difficult to do all at the same time."); Augustine Deposition, Vol. 1, Exhibit 5282 at NFHA_0033913; MacKenzie Deposition, p. 166:16–20 ("I mean, typically, it was a team effort with two people walking around the property; and one with the form and one with the camera. And there was often some discussion, one person would see something and say, Get a picture of that or mark that.").

[87] Abedin Deposition, p. 240:15–22 ("Q. Okay. What's the next deficiency that you would mark, if any? A. Invasive plants, small amount, No. 3 and No. 17. And -- sorry, one second. Wood rot in Picture No. 14.  Structure miscellaneous broken screen in No. 22 and No. 3. Warning sign in No. 11. Looked like some water damage in No. 13. And I also said overgrown shrubbery in No. 6.").

[88] Augustine Deposition, Vol. 2, pp. 451:9–453:23 ("Q. Ms. Augustine, can you walk us through the deficiencies that you would mark on this property, please. […] A. Yes. Today looking at the photograph, I would mark curb appeal miscellaneous for the cinder blocks in the driveway. I would mark structure wood rot. I would mark curb appeal overgrown grass or leaves, overgrown grass, in particular. I would mark paint and siding peeling and/or chipped paint. I would mark 10 to 50 percent invasive plants. And I would mark a trespassing or warning sign.").  Note that the photos of the property are referenced as Exhibit 5659 in the deposition testimony of Plaintiffs' inspectors.

property ranged from one[89] to seven,[90] depending on which of the Plaintiffs' inspectors was being asked about the same set of photos during their depositions.

51.     In addition to being unreliable, Plaintiffs' measure of external property condition was likely an invalid measure of maintenance defects, based on my review of available evidence, for at least two reasons. The first reason is that Plaintiffs' measure was not capable of uniform application by different inspectors evaluating different properties at different times. In fact, I understand that Plaintiffs' property inspectors, in their deposition testimony, provided different definitions of some alleged deficiencies that they were investigating or testified that an objective, quantifiable measure did not exist. For example, one tester testified that grass was overgrown if it was "over your shoes substantially,"[91] while another testified that grass was overgrown if it "[w]ent past [your] shins,"[92] and yet a third inspector testified that there was no benchmark or specific threshold because it depended on "the context of the property." [93] Similarly, inspectors testified that there was no "quantifiable instruction" or "diameter" for how big a hole needed to be for it to be counted as a "deficiency."[94] A measure of property condition deficiencies that is not objective and yields different results depending on the inspector is simply not useful. It is not useful in the same way that a broken scale is not useful for measuring someone's weight.

52.     The second reason Plaintiffs' measure is invalid is because Plaintiffs have not shown that their measure of external property condition is consistent with any standard criteria of evaluating

---

[89] Deposition of Michael Lepley, September 21, 2021 ("Lepley Deposition"), p. 181:8–12 ("Q. What is the first deficiency, if any, that you would mark based on these photos? A. I think I only found one deficiency with this house…").

[90] Augustine Deposition, Vol. 2, pp. 451:9–453:23 ("Q. Ms. Augustine, can you walk us through the deficiencies that you would mark on this property, please. […] A. Yes. Today looking at the photograph, I would mark curb appeal miscellaneous for the cinder blocks in the driveway. I would mark structure wood rot. I would mark curb appeal overgrown grass or leaves, overgrown grass, in particular. I would mark paint and siding peeling and/or chipped paint. I would mark 10 to 50 percent invasive plants. And I would mark a trespassing or warning sign.").

[91] Deposition of Daniel Howe, May 12, 2021 ("Howe Deposition"), p. 129:11–18 ("Q: When you were doing inspections, how did you personally determine whether grass was overgrown or not? A: Well, if you were standing in it and it was over your shoes substantially, then we'd take pictures of that, show how high it was.").

[92] MacKenzie Deposition, p. 205:8–10 ("Q: What constitutes 'overgrown grass'? A: Often it would be grass that went maybe past their shins, if you stick your foot in it.").

[93] Abedin Deposition, p. 197:1–13 ("Q. In your own opinion, was there an estimated height that you consider overgrown grass? A. No, not -- you know, not a measurement that I would specifically put out there as a benchmark. Q. Okay. Then how did property inspectors decide whether or not to mark overgrown grass? A. You know, they looked at the context of the property. Again, did it look like overgrown grass in the neighborhood, did it look like overgrown grass to them based on the photos that we had shown them, and did it look like the photos we had shown them that we all kind of agreed upon as overgrown grass. And if it did, then they would mark it as overgrown.").

[94] Deposition of Michelle Morgan, May 18, 2021 ("Morgan Deposition"), pp. 245:24–248:3 ("Q. Well, let's talk about holes in the house. How big of a hole would need to exist before it was scored as a deficiency? [ ...] A. Again, there was no quantifiable instructions on that. But, again, you would note if there was a hole. If there was a hole that was visible, we would take a picture of it. Sometimes we'd take a picture of it with, you know, our hand or something to scale to show how large the hole was."); Lepley Deposition, p. 185:1–5 ("Q. How -- how large does a hole need to be before it constitutes a deficit? A. I don't know that there's a diameter that – I don't think there's a diameter where we were like, Well, if you measured it, it's a hole.").

external property defects. Although Plaintiffs assert that they "evaluated Defendants' maintenance and marketing of these properties according to specific and objective routine exterior requirements that are standard in the REO maintenance industry and clearly visible by exterior inspection,"[95] I understand from counsel that one of Defendants' other experts in this matter opines that a number of the criteria marked as deficiencies in Plaintiffs' investigation (*e.g.*, boarded up windows) are actually required by law. Nonetheless, Plaintiffs' investigation characterizes these as maintenance defects and Plaintiffs (improperly) draw conclusions of discrimination in the Defendants' alleged REO maintenance practices based on these characterizations.

53.     Furthermore, Plaintiffs' experts' assertions that the measurement of defects was reliable do not make it so and are inconsistent with their testimony and the realities of Plaintiffs' investigation.

54.     Dr. Guetterman agrees that "[r]eliability is generally concerned with consistency of a measure. In other words, items within an instrument are consistently measured and the instrument will perform similarly across repeated administrations. Because humans are completing the instrument, reliability (consistency) of the individual data collectors is equally important."[96] He goes on to claim that in the NFHA investigation "[P]laintiffs' investigators collected evidence on objective aspects of the routine exterior maintenance of each REO property investigated."[97] However, Dr. Guetterman's deposition testimony contradicts his claim that Plaintiffs' measure is objective, valid, and reliable:

     a.  He was not able to articulate an objective standard under Plaintiffs' methodology for what qualified as overgrown grass[98] or what amount of an alleged deficiency

---

[95] Complaint, ¶ 88.

[96] Guetterman Report, pp. 3–4.

[97] Guetterman Report, p. 7.

[98] Guetterman Deposition, p. 146:6–21 ("Q. How can one objectively judge whether grass is overgrown sufficient to constitute a deficiency? […] A. I think overgrown grass is fairly obvious to see, actually. You know, in training, they had, you know, examples in the training. They also had the field-based training working with someone. I think all of those things can help, you know, individuals make that judgment determination of overgrown grass. Q. So if there's an objective standard for how much grass it takes to be overgrown, can you articulate that objective standard to me? A. No, I cannot articulate what the standard is.").

(*e.g.*, accumulated mail[99] or mold[100]) would reach the level of being scored as a deficiency. To the contrary, he testified that identifying a deficiency "would require some judgement."[101] Further, when asked to review a specific photo of mail taken by Plaintiffs' inspectors, Dr. Guetterman testified that he would score the photo as not having a defect whereas Plaintiffs scored the photo as having a defect.[102] This indicates that, even as shown by Plaintiffs' own expert, Plaintiffs' methodology is neither reliable nor objective.

b. Dr. Guetterman claims in his report that the "observational checklist was developed internally using rigorous procedures."[103] However, at his deposition he could not point to any specific "rigorous procedures" undertaken by Plaintiffs other than that "[Plaintiffs] had some expertise in the issue itself" and that "[he] believe[s] the form went through multiple iterations and different versions."[104] This does not qualify as a "rigorous procedure."

c. He also claims in his report that NFHA "bolster[ed] face validity and content-related validity of the evaluation from" by "gather[ing] input from local community-based fair housing organization and real estate professionals" and cites to the deposition testimony of one of Plaintiffs' employees, Ms. Shanti Abedin.[105] However, in the same deposition testimony that Dr. Guetterman cites,

---

[99] Guetterman Deposition, pp. 135:10–136:5 ("Q. So this reads: Letters, packages, flyers, et cetera, that have piled up. Does this item give inspectors any guidance on how much mail must be piled up to constitute a deficiency? A. No, it does not. It gives photographic examples of piled up mail. Q. Does this picture in the bottom left, do you know whether this picture is intended to demonstrate a piled up mail deficiency or mail that is present but not sufficiently piled up to constitute a deficiency? A. I don't know, just based on the slides. I don't know what was said about it. Q. What standard were inspectors trained to use, if any, regarding how to judge whether mail constituted a deficiency? […] A. I'm not certain what standard they were provided.").

[100] Guetterman Deposition, pp. 148:17–149:1 ("Q. Is the severity of mold on a property an objective measure, or does that require judgment? […] A. I -- I mean, I think it likely requires judgment. I mean, my understanding is that, they – if you can give me a moment -- my understanding is based on their rating of mold, that it would require some judgement.").

[101] *See, e.g.*, Guetterman Deposition, pp. 148:17–149:1.

[102] Guetterman Deposition, p. 140:1–21 ("Q. And what would that rating be? A. I'd probably say no deficiency. Q. Why is that? A. I don't see any evidence of accumulated mail or anything piled up or anything of that nature. I can't see, you know, if there's mail at the bottom of the mailbox or packaged tied so just based on this image. Q. So if you were doing a quality control of this property, how would you score the mail deficiency? […] A. I would probably score it as no, based on this photo. Q. And if I represent to you that this is the only photo that appears relevant to mail for this particular property, would you be surprised that it, in fact, was scored with a mail deficiency? A. Yes.").

[103] Guetterman Report, p. 7 ("The observational checklist was developed internally using rigorous procedures and piloted to further ensure rigor.").

[104] Guetterman Deposition, pp. 151:19–152:9 ("Q. So aside from internal discussion among employees of NFHA, was there anything else that constituted the rigorous procedures plaintiffs used internally? […] A. Well, for one, I mean, they had some expertise in the issue itself, so, you know, I think that's certain one marker of rigor. I don't want to misspeak. Just give me a moment, please. In addition to that, I believe the form went through multiple iterations and different versions, which also reinforces to me that they were thinking about it and trying to refine it as much as possible.").

[105] Guetterman Report, p. 7.

Ms. Abedin states that she does not believe that the evaluation form used by Plaintiffs was shared with the real estate agents she met with and that she did not recall any changes being made to the evaluation form based on conversations with the real estate agents.[106]

d. Lastly, Dr. Guetterman testified that it would have been helpful to review testimony from Plaintiffs' inspectors to understand how they were trained and instructed.[107] Further, Dr. Guetterman was not aware that Plaintiffs' inspectors disagreed on how to code properties and Dr. Guetterman agreed that it could have been helpful to know this information when writing his report.[108] It is unclear how Dr. Guetterman could have reached his conclusion that Plaintiffs' investigation methodology was reliable if he was not able to review this information.

55. Ms. Kisch was similarly unable to support her assertion that Plaintiffs' scoring was objective:

a. She stated in her report that the "criteria included in the investigation checklist were based on factors that a buyer would take into consideration when looking at a property such as whether there were broken windows, overgrown grass, or garbage in the yard."[109] However, at her deposition, Ms. Kisch testified that at least some of the deficiencies in the NFHA investigation were "subjective."[110]

---

[106] Abedin Deposition, pp. 155:21–156:14 ("Q. Did you discuss the particulars of your investigation protocol with the real estate agents that you just mentioned? A. No. It was a learning -- it was more of a learning -- we may have. I mean, we may have. I don't believe so. It's possible that we shared some of what we were thinking, but, you know, I think the exercise was always more around what are you seeing that we should be documenting to gather information. I don't think we necessarily shared it the other way around, but I can't remember exactly. Q. Do you recall making any changes to the REO form based on those conversations? A. I can't recall doing that. Q. Again, during the formation and creation of the methodology, do you recall communicating with any property appraisers? A. No.").

[107] Guetterman Deposition, p. 21:9–14 ("Q. Did you review testimony -- Sorry. Strike that. Did you review deposition testimony by any of those other fair housing organizations or their employees? A. No, not to my knowledge."), p. 148:10–12 ("Q. Would one way to figure that out be to ask the inspectors what standard they were actually applying? A. Yes.").

[108] Guetterman Deposition, p. 165:6–19 ("Q. Did plaintiffs share with you any of the deposition testimony in which various plaintiff witnesses scored the same properties using the same photos, using the same evaluation form but came to different conclusions? […] A. No, I don't believe so. Q. Would it have been helpful to see those depositions in connection with rendering your opinion on this? […] A. It could have been.").

[109] Kisch Report, p. 13.

[110] Deposition of Pamela Kisch, December 19, 2022, with Exhibits ("Kisch Deposition"), p. 127:1–14 ("Q. Other than the accumulation of garbage and mail, what other factors that NFHA looked at were subjective, in your view? A. I'd have to look at -- you know, again, those are the kinds of things I can see were subjective. You know, did the lawn need mowing? You know, that might be subjective. I don't know if NFHA said if it's more than -- if they gave them a ruler and said, If it's higher than three inches or four inches, then it's considered, you know, overgrown. I think there was some attempt to train people for, like, what -- you know, what is overgrown grass, and what is, you know, mail overflowing; so there are a few things like that.), p. 150:15–22 ("Q. Are you aware that multiple testers testified that certain inspection criteria were subjective? […] A. Well, clearly they're subjective. I mean, you know, if people -- reasonable people can disagree about how much mail is coming out of a mailbox or how long the grass is, you know, those things are subjective.").

b. She also compared the Plaintiffs' evaluation form to a form used to determine whether a property is accessible for someone who uses a wheelchair. To support this claim she states that an evaluation form for wheelchair accessibility "includes taking measurements to see if the widths and heights of different aspects of the building meet the requirements laid out by HUD, but the form also includes more subjective criteria like whether, in the trained tester's view, it appears that a person using a wheelchair would have difficulty accessing the toilet, sink or bathtub, and if so, to describe why—including measurements with diagrams, if possible."[111] This description points out the issues with Plaintiffs' evaluation method. As discussed above, there was no objective criteria for measuring potential deficiencies (*e.g.*, the length of grass, the amount of mold) and, as far as I am aware, there are no "measurements with diagrams" available from inspectors as Plaintiffs discarded handwritten notes made by inspectors.[112]

56. Finally, it should be noted that Plaintiffs' training materials that I have reviewed do not resolve the ambiguity in Plaintiffs' evaluation forms. Specifically, Plaintiffs' training material includes slides with the title "Glossary."[113] These slides include photos that appear to be examples of different property deficiencies on Plaintiffs' evaluation forms. For example, one slide shows three close-up images of properties with trash which the slide defines as "[a]nything worthless, useless, or discarded on the subject property."[114] However, there is no description of how much trash would need to be present in order for the inspector to score a property as having trash. Given that there is no objective instruction for the quantity of trash necessary to qualify as a deficiency, inspectors could easily come to different conclusions based on their understanding of how much trash qualifies as a deficiency, how much time they spent inspecting a property, and differences in which parts of a property they had access to (*e.g.*, if they were able to access the backyard). At her deposition, Ms. Augustine, who was involved in training inspectors, stated that there was no specific threshold for how much trash was necessary for an inspector to score a property as having trash, and in fact, stated that trash "could mean a lot of things."[115] A reliable

---

[111] Kisch Report, p. 14.

[112] Abedin Deposition, p. 184:12–18 ("Q. Okay. But the -- what was included in those handwritten notes wouldn't be available to defendants today, right? […] A. No. I mean, no, those were discarded for -- at least for our part at NFHA.").

[113] Augustine Deposition, Vol.1, Exhibit 5282, NFHA 0033882–4013 at 3917.

[114] Augustine Deposition, Vol.1, Exhibit 5282, NFHA 0033882–4013 at 3920.

[115] Augustine Deposition, Vol. 2, p. 378:8–12 ("Q. So could any amount of trash qualify as a deficiency on the field evaluation form? A. Again, you know, it was trash or debris. And so that was -- it could be a variety -- you know, that could mean a lot of different things.").

and objective measure would have addressed these ambiguities, and Plaintiffs' training materials fail to provide one.

57.     Overall, I conclude that Plaintiffs' measure of purported maintenance and marketing defects is not reliable.

### C.     Plaintiffs' Investigation Is Not Replicable

58.     A further issue with Plaintiffs' methodology is that it is not replicable because many decisions Plaintiffs made during the course of their investigation are unexplained or only partially explained.  Replicability is a core idea in the social and natural sciences.[116]  When an investigation is replicable, an independent researcher can use the original methodology as given, run all of the same analyses, and obtain the claimed result.[117]  If the findings of a published academic study cannot be replicated by following the same methodology, for example, the paper may be retracted because the inability to replicate renders the study's conclusions unreliable. Failing to clearly and transparently explain research decisions can render an investigation nonreplicable because an independent researcher could not recreate the decisions made by the original researchers, and those decisions may have influenced the original investigation's results.[118]

59.     Plaintiffs' selection of metropolitan areas to investigate would be difficult, if not impossible, for independent researchers to replicate.  Plaintiffs did not choose the metropolitan areas to include in their investigation based on any objective or quantifiable criteria, but rather according to whether the areas met a number of vague considerations important to the Plaintiffs, including whether Plaintiffs had a local fair housing agency that they could partner with.[119]

---

[116] *See, e.g.*, Christensen, Garret and Edward Miguel, "Transparency, Reproducibility, and the Credibility of Economics Research," *Journal of Economic Literature* 56, 3 (2018), 920–980; "Reproducibility and Replicability in Science," *National Academies of Sciences, Engineering, and Medicine*, 2019.

[117] *See, e.g.*, Bollen, Kenneth, *et al.*, "Social, Behavioral, and Economic Sciences Perspectives on Robust and Reliable Science," Report of the Subcommittee on Replicability in Science Advisory Committee to the National Science Foundation Directorate for Social, Behavioral, and Economic Sciences, May 2015 ("Bollen, *et al.* (2015)"), p. 4 ("Replicability refers to the ability of a researcher to duplicate the results of a prior study if the same procedures are followed but new data are collected.").

[118] *See, e.g.*, Bollen, *et al.* (2015), p. 4 ("When a single researcher is conducting his or her own study for a second time, it might seem easy to repeat the same data collection and analysis procedures, because the researcher is fully informed about the procedures. But when another researcher in another location did not observe the conduct of the first study and relies on a textual description of its data collection and analysis procedures, critical details may not be fully and effectively understood, so the procedures implemented second may not match the procedures implemented in the initial study. Thus, an apparent failure to replicate a finding may occur because importantly different procedures are used the second time.").

[119] *See* Section III.

# EXHIBIT D



**Expert Report of**

**David M. Skanderson, Ph.D.**

*National Fair Housing Alliance, et al., Plaintiffs,*

*v.*

*Deutsche Bank National Trust Company, as Trustee; Deutsche Bank Trust Company Americas, as Trustee; Ocwen Loan Servicing, LLC; and Altisource Solutions, Inc., Defendants*

**United States District Court**

**Northern District of Illinois, Eastern Division**

**Case No. 18 CV 839**

February 21, 2023

Expert Report of David M. Skanderson
February 21, 2023                                                    Charles River Associates

white and white neighborhoods). In my opinion, sampling bias invalidates the estimates of both disparities in alleged deficiencies and their statistical significance.

## 7.    Plaintiffs' Inspection Process Was Not Designed for an Unbiased Assessment of Potential Discrimination

### 7.1.    No Comparisons of Similarly Situated Properties

67.    Plaintiffs' property inspection program was not designed to evaluate whether similarly situated REO properties in majority white and majority non-white neighborhoods were treated differently by Defendants, which I understand to be a central aspect of evaluating claims of disparate treatment on a prohibited basis. In particular, Plaintiffs' investigation was not designed to be a matched-pair testing approach.[30] In addition, as I discuss in Section 9.4 of this report, the regression analysis performed by Plaintiffs' expert is insufficient to control for relevant factors that would allow one to infer whether or not properties that were similarly situated in relevant respects received different treatment in property preservation servicing.

68.    In particular, Plaintiffs' inspection process did not, and could not, evaluate whether properties possessing the same issues upon entry into REO status had those issue addressed (or not addressed, as applicable) in the same manner by Ocwen and Altisource.[31] For example, if a property in a majority non-white neighborhood entered REO with pre-existing peeling or chipped exterior paint which was not remedied, it is not possible to determine from Plaintiffs' inspection data whether any properties in majority white neighborhoods also entered REO with pre-existing peeling or chipped paint which was remedied. Indeed, Plaintiffs' own inspection data reveals that they cited peeling or chipped paint as a deficiency for 97 of the

_____

[30] Deposition of Lindsay Augustine, p. 126:5-19.

[31] *Id*., pp. 446-448, testifying that Plaintiffs did not know whether deficiencies cited were present at the time a property entered REO status.

Expert Report of David M. Skanderson
February 21, 2023                                    Charles River Associates

Agreed Properties in majority white block groups, which demonstrates that it was not an issue unique to properties in majority non-white neighborhoods. While the percentage frequency of that issue was higher for majority non-white block groups than for majority white block groups, Plaintiffs' data and Dr. Ayres' regression analysis are not capable of ruling out that this was simply due to a general practice of not repainting houses being sold "as is" regardless of their location.

69.     Similarly, because Plaintiffs' inspection process did not take into account requirements of local ordinances regarding such things as boarding of windows,[32] or whether boarding may have been necessary due to break-ins or vandalism, it is not possible to determine from Plaintiffs' inspection data or regression analysis whether the observed differential incidence of boarded windows was due to differential treatment, disparate impact, or simply the different pre-existing circumstances of the properties.[33] Similarly, Plaintiffs inspection process did not consider whether so-called "warning signs" or signs indicating a property was "marketed as distressed" were posted or mandated by a government agency. I delve into this topic with specific examples from matched-pair property comparisons in Section 9.4.3.

70.     In addition, because Plaintiffs inspected each property only once,[34] neither their inspection data nor their expert's regression analysis are capable of determining whether or not

---

[32] *Id*., pp. 467-469.

[33] For example, according to an Altisource procedure document, some municipalities require the entire first floor to be boarded, and a property in a high vandalism area may be required to be boarded if boarding is the only reasonable means to protect the security of the property. Altisource Field Services "Real Estate Owned Operational Vendor Guide," effective 6/30/2020, section II.C.1., ASI000010068.

[34] *Id*., p. 352: 3-24.

Expert Report of David M. Skanderson
February 21, 2023                                                     Charles River Associates

issues requiring or meriting remediation were similarly remediated subsequent to Plaintiffs'
inspections in majority white and majority non-white neighborhoods.

### 7.2.    Sources of Potential Bias

71.    In my opinion, the reliability of Plaintiffs' inspection results for the purpose of
supporting a discrimination claim hinges on Plaintiffs' inspection criteria and process, in
addition to the sampling issues noted above.  As discussed below, Plaintiffs cited as
"deficiencies" issues that Defendants likely would not have addressed in the normal course of
business for any property regardless of location.  If those issues that are outside the scope of
customary REO property preservation requirements happened to arise more frequently for
majority non-white neighborhood properties than for majority white neighborhood properties,
then claims concerning the existence or extent of an alleged disparity on that basis would be
mislaid, or at least overstated.

72.    Plaintiffs' inspectors applied their judgment regarding what would be considered
acceptable or deficient in an REO property from the perspective of their conception of a
potential homebuyer (i.e., "curb appeal" considerations, or whether they considered something
to be an "eyesore").[35]  It is not clear whether or not the hypothetical homebuyer whose
perspective the inspectors were channeling was a typical buyer of foreclosed homes, which are
typically in distressed condition.  Inspectors used judgment in determining whether or not to
mark as deficient such things as accumulated mail, overgrown grass or shrubs, and accumulated
trash (e.g., how much mail or trash was sufficient to be cited as a "deficiency" or what
constituted "overgrown" grass or shrubs), thus adding another layer of subjectivity.[36]

---

[35] Deposition of Lindsay Augustine, pp. 378:8-384:20, 389:2-392:4.  See also Guetterman Deposition,
pp. 125-149.

[36] *Id.*

Expert Report of David M. Skanderson
February 21, 2023

Charles River Associates

73.     Regarding the inspection process itself, there was no observation of properties over time that would allow Plaintiffs to evaluate whether the maintenance process was deficient or whether inspectors were merely observing issues that existed at a point in time and which may have been remedied later.[37]  A Plaintiff representative responsible for much of the inspection effort testified that they did not consider it necessary or reasonable to observe each property more than once.[38]  It cannot be assumed that a one-time-inspection approach necessarily results in equal and unbiased observation of property maintenance and marketing efforts in different areas.  For example, if the majority non-white neighborhoods Plaintiffs reviewed had a higher incidence and frequency of vandalism or other property crime, or of other neighborhood quality issues such as littering, than the majority white neighborhoods, then there would be a greater likelihood of issues arising in minority neighborhoods between a servicer's regular monthly maintenance visits, and thus a greater chance that Plaintiffs' inspectors would observe such issues.  Further, if the initial condition of REO properties at the time they came to be titled to one of the Trustees tended to be worse, on average, in the majority non-white neighborhoods than in the majority white neighborhoods, requiring more time to address property issues, then there is a greater chance that Plaintiffs' inspectors would have observed unaddressed issues in the non-white neighborhoods based on a one-time inspection. However, Plaintiffs' regression analysis does not account for such neighborhood differences (with the exception of an attempt to control for neighborhood crime measures which do not directly measure crime against the subject properties).

74.     The timing of inspections relative to a Trustee's acquisition of a property is also relevant to the reliability of Plaintiffs' data for evaluating allegations of discrimination in the property servicing process.  First, a NFHA representative testified that Plaintiffs employed a 30-

---

[37] *Id*., pp. 352-356.

[38] *Id*.

day "grace period" after a Trustee's acquisition of a property before inspecting it, but considered any property issue to be fair game to cite as a deficiency after a property had been Trustee-owned for at least 30 days, or once the property had been identified as listed for sale on Hubzu.com.[39]  While applying a "grace period" may seem on the surface like an attempt at fairness, it assumes that any and all property issues inherited by a Trustee could be readily remedied within 30 days after REO acquisition, regardless of how serious the issue, or would be remedied for any property regardless of how long it was in the REO inventory.  In Section 9.4.3 I provide examples that show why this is not a reasonable assumption.  Plaintiffs' grace period rule also assumes that property preservation vendors had immediate access to properties and an ability to perform services, which was not always the case because of the continued occupancy of a property.  However, common sense suggests that repairs take time and properties with more serious repair needs may take more time to repair, particularly given that industry and investor servicing standards require obtaining contractor bids for certain repairs.

75.     As discussed further in Section 9.3, Plaintiffs' inspection process did not account for the typical strategy of marketing REO properties "as is," subjecting decisions regarding property repairs and improvements to a "return on investment" business justification process in some circumstances, or discontinuing planned repairs once a buyer has been identified who is willing to purchase the property as is.

76.     Another issue with the reliability of Plaintiffs' inspection data is their admitted disregard of relevant legal requirements.  Plaintiffs' approach of applying the same inspection criteria consistently to all properties may seem reasonable on an abstract and superficial level, but it did not account for the fact that some alleged "deficiencies" were actually the result of compliance with relevant legal requirements, such as with respect to boarding windows, as noted above.  According to testimony from a NFHA representative responsible for its inspection

---

[39] Deposition of Lindsay Augustine, p. 477.

Expert Report of David M. Skanderson
February 21, 2023                                                    Charles River Associates

projects, " … to be consistent across jurisdictions, we did not account for any local code enforcement"[40] and "[s]o if there was a boarded window, regardless of where it was, it was marked as a boarded window."[41]  That NFHA representative testified that, "I would also just add that -- you know, that I see, and I believe, you know, NFHA sees boarded windows as a curb appeal issue.  You know, it's an eyesore.· It's a negative impact on the community.  So even if there are local jurisdictions that have boarding requirements, we still feel strongly that REOs should not be boarded -- or at least I do personally."[42]  Thus, complying with laws and regulations in this case was considered by Plaintiffs to be a "deficiency."  This statement illustrates how Plaintiffs' inspection process did not simply consider what an REO property servicer is required to do, or would do in the normal course of business based on industry standard or business justified practices, but instead took into account Plaintiffs' subjective beliefs about how a property should look or the standards to which Plaintiffs believe a servicer should rehabilitate REO properties.

77.     As another example of how Plaintiffs' inspection criteria were biased in favor of finding alleged deficiencies, Plaintiffs cited a missing "for sale" sign as a deficiency without regard to whether or not a property had yet been listed for sale, or whether it had been in a Trustee's REO inventory long enough to be ready for listing given the repairs that may have been required.  I noted such cases in the property review I discuss in Section 9.4.3

78.     As yet another example, some of the deficiencies cited by Plaintiffs appear merely to reflect Plaintiffs' aesthetic preferences or subjective judgments regarding how

---

[40] Deposition of Lindsay Augustine p. 467.

[41] Id., p. 469.

[42] Id., p. 468.  See also p. 469:  "Q.· ·Understood. And you testified that NFHA considers boarded windows to be a negative that affects marketability of properties, correct?· A.· ·That is my understanding of NFHA's belief, and that is my personal belief, yes."

Expert Report of David M. Skanderson
February 21, 2023                                        Charles River Associates

Plaintiffs' inspectors think a property should appear to make it attractive to a hypothetical homebuyer. Thus, Plaintiffs cited the presence of a "no trespassing," "warning," "distressed marketing," or "beware of dog" sign as an alleged deficiency (including officially posted signs, such as by a government agency),[43] apparently based on Plaintiffs' subjective judgment that such signs negatively affect "curb appeal." Plaintiffs did not consider who posted the sign or whether the signs in question may have pre-dated a Trustee's ownership of a property, and did not consider whether similar signs were present at or typical for non-vacant, owner-occupied properties in the same neighborhood. As I note in my property review in Section 9.4.3, Plaintiff appear to have cited as "deficiencies" signs posted by a municipal government official to warn people not to enter a structurally unsafe house or signs that appear to have been required by government-mandated foreclosure sale procedures.

79.     Similarly, Plaintiffs put a considerable weight on the subjective factor of "curb appeal," which accounted for about one-third of all the deficiencies cited, plus such other cosmetic issues such as peeling or chipped paint, damaged siding, or missing shutters, without regard to whether they were factors that the typical buyer of foreclosed properties would consider, whether they were truly an obstacle to marketing a foreclosed or distressed property, or whether they were issues an REO property servicer would normally address for any property, regardless of its location, in the normal course of business.

## 8.    Evidence Regarding Maintenance Expenditures Contradicts Plaintiffs' Allegations

80.     While neither Plaintiffs nor Defendants collected systematic measurements of pre-REO property condition, my analysis of property preservation expenditure data produced by Altisource provides evidence indicating that Ocwen and Altisource spent more on majority

---

[43] Deposition of Lindsay Augustine pp. 431:20 - 432:3 and inspection training materials (deposition Exhibit 5086, in particular GNOFHAC_0003128).