**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, et al., | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Manish S. Shah |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Jury Trial Demanded |
| Defendants. | |

**PLAINTIFFS' CONSOLIDATED FIRST-ROUND MOTIONS IN LIMINE**
**DECEMBER 19, 2025**

# TABLE OF CONTENTS

I.    MOTION FOR AN ORDER THAT RECORDS AND PHOTOGRAPHS IN THE REO DATABASE ARE SELF-AUTHENTICATED AND ADMISSIBLE UNDER RULES 902(11), 902(13), 902(14), AND 802(6) ..................................................................................... 1

II.   MOTION TO BAR DEFENDANTS' COUNSEL OR WITNESSES FROM MAKING UNSUPPORTED, UNTIMELY AND MISLEADING CLAIMS REGARDING THE AGREED UPON DATASET OF PROPERTIES SERVICED BY OCWEN AND ALTISOURCE AND ANALYZED BY PLAINTIFFS' STATISTICAL EXPERT ........................................................... 9

III.  MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REFERRING TO PURPORTED DISTINCTIONS BETWEEN THE DEUTSCHE BANK DEFENDANT ENTITIES AS BEARING ON DEFENDANTS' LIABILITY ..................................................... 20

IV.   MOTION TO PRECLUDE DEFENDANTS OCWEN AND ALTISOURCE FROM OFFERING EVIDENCE OF BUSINESS JUSTIFICATION ....................................................... 24

V.    MOTION TO PRECLUDE DEFENDANTS FROM IMPLYING BAD FAITH OR USING INFLAMMATORY TERMS REGARDING PLAINTIFFS' DOCUMENT RETENTION ........ 32

VI.   MOTION FOR AN ORDER THAT THE PLAINTIFFS' RECEIPT OF HUD FUNDING CANNOT BE USED TO OFFSET ANY AWARD OF DAMAGES ........................................... 36

VII.  MOTION FOR AN ORDER PERMITTING THE USE OF SUMMARIES, CHARTS, OR CALCULATIONS PURSUANT TO FEDERAL RULE OF EVIDENCE 1006 OR, IN THE ALTERNATIVE, FEDERAL RULE OF EVIDENCE 107 ........................................................ 38

I.  **MOTION FOR AN ORDER THAT RECORDS AND PHOTOGRAPHS IN THE REO DATABASE ARE SELF-AUTHENTICATED AND ADMISSIBLE UNDER RULES 902(11), 902(13), 902(14), AND 802(6)**

Plaintiffs respectfully move the Court for an order *in limine* that the records in the NFHA

REO Database are self-authenticated pursuant to Federal Rules of Evidence 902(11), 902(13)

and 902(14), and are admissible pursuant to Evidence Rule 803(6).  In support of this motion,

Plaintiffs state as follows:

**A.  Background.**

In its Memorandum Opinion and Order of March 31, 2025 (ECF 442), this Court

addressed—and overruled—Defendants' objections to the admissibility of the contents of the

REO Database. ECF 442, at pp. 24-30. The Court determined that the records contained in the

Database are admissible as business records under Rule 803(6), and that the photographs are

admissible as non-hearsay. *Id.* at 25, 30. The Court noted that Plaintiffs still bear the burden of

laying a proper foundation for the Database records to be admitted under Rule 803(6) *at trial*,

and to establish the authenticity of the REO property photographs. *Id*. at 30.

In lieu of calling one or more live witnesses at trial to authenticate the photographs and

files contained in the REO Database, Plaintiffs invoke the pre-trial self-authentication procedures

available under Rules of Evidence 902(11), 902(13), and 902(14).

**B.  Records in the Database Are Self-Authenticated Pursuant to FRE 902(11).**

Rule 902(11) streamlines the admission of business documents at trial by allowing a party

to authenticate a record of regularly conducted activity without live testimony, so long as the

proponent submits a proper written certification from a custodian or otherwise qualified person.

*United States v. Green*, 648 F.3d 569, 578-579 (7th Cir. 2011). "Rules 902(11) and 803(6) are

designed to work in tandem. Indeed, Rule 902(11) extends Rule 803(6) by allowing a written

foundation in lieu of an oral one." *United States v. Arrington*, 2022 U.S. Dist. LEXIS 160419 at *8, 2022 WL 4077685 (W.D.N.Y. 2022) (citations omitted).

The business records must meet the foundational requirements of Rule 803(6). As noted previously by the Court, ECF 442 at pp. 24-30, the REO Database meets those requirements. The facts supporting the testing methodology and collection of information used in this case "are not in dispute." ECF 282, at p. 2-3 (summarizing Plaintiffs' inspection protocol, the information collected, and the quality control process). Investigators would arrive at an REO property and take a set of photos of the property that captured the "address, front view, right side view, back view, left side view, neighbor to the left, neighbor to the right, and neighbor to the opposite side." *Id.* Investigators would also take photos of each deficiency they noted, as well as every sign posted on the property and positive maintenance and marketing features. *Id.* The conditions of the property, including any pictures taken, were then uploaded to an electronic database. *Id.* Once the information was entered into the database, a quality control team from NFHA reviewed the information and edited the entries to ensure that the deficiencies listed at each property were accurately reflected by the photographs. *Id.*

The attached Declarations of Lisa Rice, NFHA's President and Chief Executive Officer, and Lindsay Augustine, NFHA's Senior Associate Director of Enforcement, reaffirm that the investigation and testing methodology used by NFHA is part of its "regularly conducted activity." Rice Decl. ¶¶ 5-12, 22-24, 29-32.[1] Conducting investigations through testing and other means is a regular practice of NFHA and its members. *Id.* NFHA and its member organizations routinely conduct "testing" as part of their compliance investigations. *Id.* They have been hired

---

[1] This Declaration of Lisa Rice has previously been filed with the Court in Plaintiffs' response to the Defendants' Joint Motion for Summary Judgment and Defendants' Motion for Sanctions. ECF 274-7; ECF 369-4. It is re-filed here as Exhibit 1 for ease of reference.

by federal agencies, large financial service providers, national civil rights organizations, and others to conduct such investigations. *Id.* Their testing methodologies have been approved and often paid for by HUD. *Id.* This certification from NFHA's President and CEO meets all the requirements of Rule 902(11), which requires only that the certifying individual be familiar with the company's recordkeeping practices. *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006).

Ms. Rice's certification is confirmed by the extensive deposition testimony of Lindsay Augustine, her Declaration attached hereto as Exhibit 2,[2] and NFHA's former President and CEO, Shanna Smith.[3] It is unsurprising, then, that another federal court has also concluded that the records in the REO Database are admissible. *National Fair Housing Alliance v. Bank of America*, 2023 U.S. Dist. LEXIS 50904 at *46-47, 2023 WL 2633636 (D. Md. Mar. 24, 2023).

The REO Database records are no different than the other testing results that federal courts routinely accept as business records within the meaning of Federal Rule of Evidence. *See, e.g.*, *Laudon v. Loos*, 694 F. Supp. 253, 254 n.2 (E.D. Mich. 1988) (admitting tester reports of a fair housing advocacy center as business records pursuant to Rule 803(6)); *Fair Hous. Ctr. of Washtenaw Cty., Inc. v. Town & Country Apartments*, No. 07–10262, 2009 WL 497402, at *5 (E.D. Mich. Feb. 26, 2009) (same); *Open Hous. Ctr., Inc. v. Kessler Realty, Inc.*, 2001 U.S. Dist. LEXIS 17596, 2001 WL 1328446, at *7 (E.D.N.Y. Sept. 18, 2001) (same). These holdings are reasonable, given that Rule 803(6) permits records "kept in the course of a regularly conducted

---

[2] *See* ECF 369-4 (PJt Ex 47, NFHA 30(b)(6) L. Augustine Vol I pp. 95, 109-125, 213-214); ECF 369-5 (PJt Ex 49, NFHA 30(b)(6) L. Augustine Vol II pp. 310-313); ECF 369-8 (PJt Ex 56, NFHA 30(b)(6) L. Augustine Vol III pp. 523-524, 546); ECF 369-8, PageID #30286-30288, PJt Ex. 63 (Guidelines to using the REO Investigation Database, NFHA_0044207-0044209).

[3] Ex. 3, S. Smith Dep., 6/24/2022, at pp. 23-26 (describing routine business and recordkeeping practices used in fair housing investigations and testing).

activity of a business," where "making the record was a regular practice of that activity."[4] As Plaintiffs' testimony confirms, conducting investigations and documenting the results of those investigations with testing records, tape recordings, photographs, and other documentation is a "regularly conducted activity" and a "regular practice" of theirs. Augustine Decl. ¶¶ 3-4.

Rule 902(11) also requires the proponent of the business records to provide reasonable written notice to the adverse party of the intent to offer the records. The Pretrial Order and this Motion in Limine fulfills this requirement. The importance of the notice requirement is to allow the opposing party the opportunity to question the certificate's signer. *United States v. Green*, *supra*, 648 F.2d at 579; *United States v. Bledsoe*, 70 F. App'x 370, 372 (7th Cir. June 26, 2003). In this case, the Defendants have extensively examined both Ms. Rice and Ms. Augustine (as well as others) about the Database records over 5 days of deposition. The notice requirement is satisfied.

### C. Records in the Database, Including the Photographs, Are Self-Authenticated Pursuant to FRE 902(13) and 902(14).

New Federal Rules of Evidence 902(13) and 902(14) were adopted in 2017 to streamline the authentication of records contained in electronic systems or files. Such records are now self-authenticating and "require no extrinsic evidence of authenticity" to be admitted at trial. FRE 902. The notice and certification requirements of Rule 902(11) must still be met, but they can be established by written certification before trial so that live witness testimony at trial is unnecessary.

---

[4] Admission of the database is also consistent with caselaw, cited by the Court at summary judgment, admitting database evidence that was initially recorded on paper forms and that was updated by multiple individuals over time. *See* ECF 442 at 29 (citing *U.S. v. Ary*, 518 F.3d 775, 786 (10th Cir. 2008)).

In the words of the Advisory Committee, the new rules were enacted because "the expense and inconvenience of producing a witness to authenticate an item of electronic evidence is often unnecessary." *See* advisory committee's note to 2017 amendment. The new rules provide litigants with a notice-and-object mechanism that helps resolve authenticity objections well in advance of trial.

New Rules 902(13) and 902(14) provide for the self-authentication of two categories of electronic evidence via certification, rather than through live witness testimony: (1) Records generated by an electronic process or system; and (2) data copied from an electronic device, storage medium, or file. Rule 902(13) provides that "(a) record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11)" is self-authenticating. Similarly, new Rule 902(14) states that "(d)ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11)" is self-authenticating.

Notably, there is no requirement that a certification under Rules 902(13) or (14) meet the requirements of Rule 803(6). Advisory Committee Note; *United States v. Carter*, No. 21-CR-681-01-02-03 (NSR), 2024 U.S. Dist. LEXIS 12770 at *4, 2024 WL 268248 (S.D.N.Y. Jan. 24, 2024). Moreover, the photographs stored in the REO Database are "not hearsay," ECF 442, at p. 25, and so do not need to meet the requirements of Rule 803(6).

### 1. The Declaration of Lindsay Augustine Meets the Requirements of 902(11).

Various exhibits and photographs Plaintiffs intend to use at trial will be generated from the NFHA REO Database. The NFHA REO Database is an electronic storage medium containing

many files and data, including but not limited to photographs. Augustine Decl. ¶¶ 4, 8-14. The entire Database, including all of its data files and components, were produced in discovery to the Defendants in this case.

The photographs in the database are authenticated by the attached Augustine Declaration. All investigators were trained extensively on the procedures for taking and uploading photographs into the Database. *Id.* Standard procedure required each photograph to contain a date stamp, affixed by the device taking the photograph. *Id.* Accordingly, most of the photographs of Ocwen-Altisource-acknowledged properties in the REO database have a date-stamp indicating the day on which the photograph was taken, affixed to the photograph by the device taking the photograph, if a camera with date function was used (this feature was not automatic on iPads or phones). *Id.* In addition, the Database itself has recorded the date on which the photograph was uploaded to the Database. *Id.* Plaintiffs point out that the Defendants have their own database of photographs of the 697 REOs at issue in this case, and can verify that the photos taken by Plaintiffs are, in fact, REOs they owned or managed. *Id.* at ¶ 9.

Authentication of photographs under Rule 901 requires only evidence that the photograph is a fair and accurate representation of what it purports to depict. This can be established through witness testimony, evidence of the accuracy of the process or system used, or other methods outlined in Rule 901(b). A declaration that provides the approximate date and the event depicted in each photograph is sufficient for purposes of Rule 901. *Peak v. Laborers Union Loc. No. 1*, No. 19-cv-3351, 2024 U.S. Dist. LEXIS 9927 at *9, 2024 WL 216698 (N.D. Ill. Jan. 19, 2024). "Rule 901 requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997). The court exercises broad discretion in determining whether the

authentication requirement has been met, and any discrepancies or challenges to the photograph's accuracy can be addressed through cross-examination or additional foundational evidence. FRE 901; *United States v. Dombrowski*, 877 F.2d 520, 525 (7th Cir. 1989).

Many of the exhibits that Plaintiffs intend to use at trial will be generated from data in the database, usually on a property-specific basis. However, some may present the contents of the files or data in a "summary, chart, or calculation" under Rule 1006. That is, for each exhibit relating to a specific property that Plaintiffs will testify about at trial, the information on the exhibit has been extracted or copied from the Database itself. Such summary exhibits under Rule 1006 that are derived from business records that are self-authenticated under Rule 902(11) can be used and admitted at trial. *United States v. Brown*, 822 F.3d 966, 971-972 (7th Cir. 2016). A separate section of this Motion in Limine seeks an order regarding the summary exhibits they intend to present to the jury, and respectfully refer the court to that section for a more detailed discussion.

### 2. Compliance with Notice Requirements.

Pursuant to the terms of the Pretrial Order, and by virtue of this Motion, Plaintiffs have provided reasonable written notice to Defendants of their intent to use exhibits containing data and files extracted from the REO Database. The Database and all of its contents have been made available for inspection, ensuring that Defendants have had a fair opportunity to challenge the accuracy of any exhibits or contents thereof. Indeed, the Defendants themselves have created and utilized exhibits and files contained in the REO Database during discovery and at dozens of depositions. Accordingly, the notice requirements of Rules 902(13) and 902(14) have been met.

### 3. Caselaw Supports the Admission of Records in the NFHA REO Database as Self-Authenticating Evidence.

Courts have consistently upheld the self-authentication of electronic records under Rules 902(13) and 902(14) when accompanied by proper certifications.

For example, in *United States v. Carter*, 2024 WL 268248 at *2-4, the court permitted authentication by affidavit of decrypted iCloud account data under Rules 902(13) and 902(14), finding that the certification met the requirements of Rule 902(11). The certification affidavit stated that the process used to extract the data "was designed to produce a true and accurate . . . version of the data received." Similarly, in *United States v. Palmer*, No. 7:24-CR-00067-NSR-2, 2025 U.S. Dist. LEXIS 210586 (S.D.N.Y. Oct. 21, 2025), the court found that forensic extractions of phone data were self-authenticating under Rules 902(13) and 902(14) based on a certification from a government agent that he had used software and hardware tools to create a copy of the digital data contained on the cell phones. In *United States v. Bondars*, Case No. 1:16-cr-22, 2018 U.S. Dist. LEXIS 229393 (E.D. Va. Aug. 20, 2018), the court found that screenshots of the internet's Wayback Machine comported with the self-authentication requirements and purpose of Rule 902(13) by a certificate from an office manager archive official. In *United States v. Cooper*, 2025 U.S. Dist. LEXIS 14519 *7, 2025 WL 317650 (E.D. La. Jan. 28, 2025), the court relied upon Rules 902(11), 902(13), and 902(14) to self-authenticate camera footage, photographs, and videos copied from electronic devices. And in *Holtzman v. Turza*, 2009 U.S. Dist. LEXIS 95620 at *8-9, 2009 WL 3334909 (N.D. Ill. Oct. 14, 2009), a pre-Rule amendment case, the court rejected an authentication challenge to an analysis of database records.

Appellate courts have affirmed trial court rulings that data extractions from electronic files are self-authenticating under Rules 902(13) and 902(14*). See, e.g.*, *United States v.*

*Gasperini,* 729 F. App'x 112, 114-115 (2d Cir. Jul. 2, 2018); *United States v. Dunnican*, 961 F.3d 859, 871-872 (6th Cir. 2020). [5]

WHEREFORE, Plaintiffs respectfully request that the Court grant their motion *in limine* and rule that the NFHA REO Database is self-authenticated pursuant to Federal Rules of Evidence 901(11), 902(13) and 902(14), and its records are admissible pursuant under Evidence Rule 803(6).

## II. MOTION TO BAR DEFENDANTS' COUNSEL OR WITNESSES FROM MAKING UNSUPPORTED, UNTIMELY AND MISLEADING CLAIMS REGARDING THE AGREED UPON DATASET OF PROPERTIES SERVICED BY OCWEN AND ALTISOURCE AND ANALYZED BY PLAINTIFFS' STATISTICAL EXPERT

Plaintiffs, by their counsel, move the Court to limit testimony and bar statements from Defendants' counsel, witnesses, and experts asserting, suggesting or insinuating that the datasets used by Plaintiffs' expert, Dr. Ian Ayres, for statistical analyses were deficient based upon: (a) untimely and unfounded assertions by the Deutsche Bank Defendants' counsel, after the close of fact and expert discovery, regarding Trustee ownership at the time the properties were inspected; (b) assertions by Defendants regarding how the statute of limitations impacts the correct dataset; or (c) other potential and equally unfounded attempts to attack the datasets. To the extent that the Court does not grant this relief in its entirety and allows Defendants to offer untimely and unfounded assertions based on Defense counsel's testimony challenging Plaintiffs' statistical analyses, the Court should allow Plaintiffs a complete and fair opportunity to rebut Defendants' evidence at trial. In support of this motion, Plaintiffs state as follows:

---

[5] Additional cases prior to 2020 can be found in the general discussion of this issue in A. Schupanitz and J. Lem, *Judges' Treatment of Federal Rules of Evidence 902(13) and 902(14)*, 68 DOJ Journal of Federal Law and Practice 109-129 (May 2020).

### A. Background.

During the course of this litigation and as a result of the Court's various rulings on the scope of discovery and an extensive review of property data conducted by the parties and their experts, expert statistical analyses focused on certain sets of properties, including a subset of 699[6] "Agreed Upon" properties serviced by Ocwen and Altisource. ECF 442 at 37-38.

Among various other analyses, Plaintiffs' expert, Dr. Ian Ayres, ran a regression analysis regarding this set of properties (and subsets of these properties), controlling for 85 non-race variables. Across all samples, Dr. Ayres found that deficiencies in REO properties in non-white block groups were greater than the number of deficiencies observed in white block groups and that these differences were statistically significant even when controlling for non-race factors. *Id.* at 38.

Long after the close of fact discovery and the close of expert discovery, and in the midst of summary judgment briefing, the Deutsche Bank Defendants tendered a declaration from counsel attaching a 12-column multi-colored spreadsheet prepared under his supervision to argue—for the first time—that certain properties in the datasets analyzed by Dr. Ayres should not have been included in the analyses. *See* ECF 320-1. Counsel's declaration and the Defendants' Local Rule 56.1 Statement, ¶ 10, focused on Mr. Rademacher's proposed exclusion from the Agreed Upon Property Set of: (1) 130 properties serviced by Ocwen and Altisource but previously identified and acknowledged by Dr. Ayres as raising some titling questions relative to the date of Deutsche Bank post-foreclosure ownership; (2) an additional 45 properties identified

---

[6] The thoroughness of Dr. Ayres' examination of Deutsche Bank property ownership is evidenced by the fact that, even though Ocwen and Altisource agreed they serviced 699 Deutsche Bank REOs investigated by Plaintiffs, Dr. Ayres was not satisfied with regard to Deutsche Bank ownership as to two of the 699, and thus reduced this subset of properties to 697.

by Defendants for the first time in the Summary Judgment spreadsheet that Defendants claimed were not titled to Deutsche Bank when Plaintiffs inspected them; and (3) an additional 173 properties as to which the Deutsche Bank Defendants claimed Plaintiffs had not produced sufficient evidence of ownership, citing to Defendants' own Responses to Plaintiffs' Requests for Admission that indicated that the Deutsche Bank Defendants were unable to figure out which properties they owned as trustees and when. *See* ECF 320-1 (Ex. B, PageID #13663 et seq., DB Defs. Resp. to Plaintiffs' Requests for Admission regarding property ownership at time of inspection, responding "Insufficient Basis" several hundred times). In Defendants' Joint Memorandum, ECF 316 at p. 8, Defendants tacked on an additional argument to try to chop down the dataset based on statute-of-limitations provisions purportedly barring consideration of some more properties.

Defendants' assertions, accusations and criticisms of the data set used by Dr. Ayres in their statistical analyses were not previously raised or even mentioned by Defendants' experts, Dr. McCrary (who had "extensive experience analyzing statistical an econometric methodology, as well as study design, McCrary Report at p. 4) and Dr. Skanderson (whose "testimony has been based in large part on detailed statistical analysis and other data analysis," Skanderson Report at 3). Nowhere in their extremely lengthy expert reports responding to numerous aspects of Dr. Ayres' analysis is there even a peep of concern about the dataset. *See* ECF 325-4 (McCrary Report, 85 pages without exhibits); ECF 320-25 (Skanderson Report, 142 pages). None of Defendants' experts made any suggestions regarding alternative data sets that should have been used. Nor did any of Defendants' experts (nor, of course, Defendants' counsel) conduct a regression analysis for the purpose of opining whether these claimed issues would have even the slightest bearing on the validity of Dr. Ayres' conclusions that deficiencies in REO properties in

non-white block groups were greater than the number observed in white block groups and that these differences were statistically significant even when controlling for non-race factors.

In the context of summary judgment briefing, Plaintiffs responded to the Deutsche Bank Defendants' new arguments. For example, as to the factual assertions in the Rademacher Declaration regarding supposed ownership issues that counsel claimed related to 45 properties actively serviced by Ocwen and Altisource at the time of inspection, Plaintiffs identified in a Declaration from Dr. Ayres additional[7] factual information related to the ownership of these properties responding to Mr. Rademacher's assertions. In addition, although the untimely contentions raised by Defendants were factually unfounded, out of an abundance of caution Plaintiffs had Dr. Ayres run additional analyses demonstrating that whichever dataset was considered, statistically significant racial disparities persisted. ECF 351-1 (Ayres Declaration at 6). In a portion of its March 31, 2025 Opinion, the Court granted a motion filed by Defendants to exclude the Declaration of Dr. Ayres responding to the belated evidence and arguments presented by Defendants' counsel on the basis that "at some point the back and forth must come to an end." ECF 442 at 43. The Court's Opinion acknowledged that "given the nature of the attorney declaration, plaintiffs' response is not sandbagging defendants," but suggested that "to the extent that defendants rely on their counsel rather than their own experts to attack plaintiffs' data sets, plaintiffs need not rebut defendants' Rule 56.1 statement with revised regression analyses." *Id.*

**B. Argument**

The Court should put a stop to the endless, shifting and baseless efforts by Defendants to undermine the overwhelming statistical evidence in this case reflecting Defendants'

---

[7] As discussed below, the initial expert report of Dr. Ayres relied on an exhaustive review of publicly available records and Defendants' own documents in addressing titling issues.

discriminatory conduct in this case. To the extent that the Court still allows Defendants to suggest, insinuate or present evidence at trial attacking the dataset utilized by Dr. Ayres, it will serve to mislead and confuse the jury and require that Plaintiffs – and Dr. Ayres - be allowed a full and fair opportunity to clear up the waters muddied by Defendants.

### 1. Defendants' Untimely Claims Regarding Deutsche Bank Ownership of Properties Actively Serviced By Ocwen And Altisource Are No Longer Relevant to Statistical Analysis of Liability Issues

<u>The Entire Agreed Upon Set of 699 Properties Admittedly Serviced by Ocwen and Altisource is a Proper Subject for Statistical Analysis.</u>

As a result of Plaintiffs' discovery requests, conferencing between Plaintiffs, Ocwen and Altisource, Court rulings and an agreement between the parties, a list of 699 REO properties owned by the Deutsche Bank Defendants and serviced by Ocwen and Altisource and Ocwen was compiled and agreed to by Plaintiffs and the Servicer Defendants. *See e.g.*, Altisource 9/30/21 Amended Responses to Plaintiffs' First Set of Interrogatories, No. 3 and Ex. A. The root sources of the evidence relied on by the Servicer Defendants and Plaintiffs to arrive at this list are Ocwen's and Altisource's own pre- and post-foreclosure activities, data and records. As servicers of mortgages in default and, later, foreclosure under the Deutsche Bank trusts, Ocwen and Altisource maintain records of the properties, and themselves carry out pre-foreclosure services including pre-foreclosure appraisals/valuations, default vacancy inspection surveillance, pre-foreclosure vacant property securing if needed, and foreclosure borrower evictions services. ECF 369-3, PageID #29106-29123 (Ocwen's Responses to Plaintiffs' First Set of Interrogatories); ECF 369-3, PageID #28754 (Ocwen 30(b)(6) #15, Organization, pp. 38-39); ECF 370 (Attch. 2, PJT 23, Filed Under Seal, Pltf Ex. 105 Ocwen-Altisource Schedules, ASI000011494-ASI000011507); ECF 370 (Attch. 2, PJT 29, Filed Under Seal, Ocwen 30(b)(6) #9, Marketing/Liquidation, Vol. 1, p. 26-28).  Through Powers of Attorney, Deutsche Bank

authorizes Ocwen to carry out various local foreclosure activities on its behalf. ECF 353 (Attch. 1, PDB Ex. 22, Filed Under Seal, DBNFHA_00194442-54). If Ocwen is the servicer at the time of default, from its servicing and direct property-related activities, Ocwen and Altisource staff monitor and detect as soon as the defaulted property is vacant and are aware of when a foreclosure is effectuated (through a court order or through a "deed in lieu" agreement with the borrower negotiated by Ocwen and/or Altisource). If Ocwen assumes servicing duties from another servicer after foreclosure (e.g. Ocwen purchases another mortgage servicing company), all necessary data including REO date is "onboarded" into Ocwen's and Altisource's systems. Ex. 4, Ocwen REO Loan On-Boarding Procedure. In all cases, Ocwen and Altisource, through their staff, input on a continuing basis all mortgage and property statuses in their shared electronic database system (RealResolution, or "RealRes"), some of which may be related to data in Altisource's Vendor Management System and data ("VMS").

In short, the occasion of Deutsche Bank "titling" as it relates to Ocwen-Altisource REO conduct relevant in this case is best determined from the bottom up, not from the top down, and in any event Ocwen and Altisource begin their post-foreclosure work on the properties on the REO date they register in their systems. The REO date in their shared system triggers "PPI status" and immediate work requirements of Altisource. ECF 370, Attch. 2, Filed Under Seal, PJt Ex 22, Altisource New Hire Introduction Manual V2.0, ASI0000025775, ASI0000025785-ASI0000025791. Additionally, once a mortgage serviced by Ocwen is even in default, Altisource is automatically notified through a shared Ocwen-Altisource data system that instantly triggers orders electronically for pre-foreclosure valuations and potentially performing work to prevent damages to vacant pre-foreclosed properties (e.g. property securing). ECF 369-3 (PageID #28786, Ocwen 30(b)(6) #15, Organization, pp. 77, 82, 166-167). All of which is to say,

14

the Servicer Defendants' own processes and records animated the agreed-upon list of 699 properties.

Dr. Ayres' initial expert report analyzed this set of properties as well as a smaller set of 560 properties actively serviced by Ocwen and Altisource, the latter of which avoided the remote possibility of disputed issues regarding Deutsche Bank ownership at the time Plaintiffs inspected the properties. ECF 340-1 at 21. While the first step of Defendants' attempt during the summary judgment proceedings to reduce the dataset of properties cites the alternative dataset used and analyzed by Dr. Ayres to avoid Deutsche Bank titling claims, the basis for making such a reduction no longer exists. The Court's March 31, 2025, Opinion limited the liability of the Deutsche Bank Defendants to a theory of vicarious liability. ECF 442 at 112-23. *As such, for purposes of statistical analysis, the Deutsche Bank Defendants' liability is now dependent upon and directly tethered to an analysis of evidence and determination that Ocwen and Altisource are liable for discrimination in their servicing and marketing of REO properties.*

As to this issue and analysis, there can be no dispute that the "agreed upon" set of 699 properties that were being serviced as REOs by Ocwen and Altisource based on their records are relevant to assessing Ocwen-Altisource liability and are probative and admissible regardless of the particularities of any Deutsche Bank property ownership issues. The Servicer Defendants and their experts have offered no argument based on their servicing records that the 699 properties were not being actively serviced as REOs (i.e., not in PPI status) at the time of inspection.[8] And Dr. Ayres' initial report dated October 13, 2022 confirms use of the REO date identified in Ocwen-Altisource data: "I use the date in the REO_DATE column of "ASI000023621 RealRes

---

[8] Dr. Ayres conducted regression analyses across multiple datasets, including the dataset of the Agreed Upon 699 properties. ECF 340-1 at p. 47, n. 29.

Prop Details (Addl info-REOdate).xlxx" as the beginning date of Deutsche Bank's ownership of the property if the property is included in that file." ECF 340-1 (Ayres Report, n.43).

<u>Defendants' Newly Raised Titling Assertions About an Additional 45 Properties Are Demonstrably Baseless and Should Not Be Presented to the Jury.</u>

As to a small set of 45 additional properties serviced by Ocwen and Altisource, the Rademacher Declaration and Spreadsheet purported to dispute the titling of the properties to the Trustees at the time of inspection. The properties were identified with a "0" notation in Column J of the Rademacher Spreadsheet.

In their Initial Report, and as part and parcel of their statistical analysis, Dr. Ayres comprehensively addressed issues related to the ownership of these properties at the time of inspection, based upon County Recorder data publicly available and obtained from ATTOM Data Solutions, ("ATTOM DATA") as well as information regarding the continuing activity of the Defendant Servicers on inspected properties that was produced to Plaintiffs in discovery. ECF 340-1 (Ayres Initial Report, ¶ 49, nn. 43 –46). After Dr. Ayres' Report was served on Defendants, Defendants' experts did not mention, let alone challenge the conclusions of Dr. Ayres regarding ownership of these properties or try to connect them to the validity of the analysis of Dr. Ayres. Nonetheless, following the untimely assertions made by Deutsche Bank's counsel regarding these properties, Dr. Ayres prepared a Declaration (not considered by the Court) further responding to, addressing and identifying errors in Mr. Rademacher's Declaration. Dr. Ayres also re-ran the regression analyses confirming that exclusion of these denied properties would not affect their conclusions.

All of this evidence in its own right would clearly support barring Defendants from arguing about these properties to the jury, but there is now an additional and even simpler rationale for excluding the evidence: as with the rest of the properties in the Agreed Upon

Property set of actively serviced properties, Defendants' contentions regarding titling are irrelevant in light of the Court's ruling regarding vicarious liability.

<u>Defendants' Claims that an Additional 173 Agreed Upon Properties Supposedly Lack Sufficient Evidence of Deutsche Bank Ownership to Be Considered Are Even More Disingenuous.</u>

Defendants' summary judgment memorandum also went on to claim that an additional 173 serviced properties in the Agreed Upon Dataset should not have been considered because Plaintiffs supposedly failed to produce admissible evidence that they should be included. ECF 316, Defs. Mem. at 7. This argument represents an even more novel (and misguided) version of Defendants' arguments discussed above: in Plaintiffs' Requests for Admissions to the Deutsche Bank Defendants, plaintiffs sought admissions as to the ownership of various properties titled to the Deutsche Bank Defendants at the time of inspection. ECF 320-1 (Ex. B, PageID #13663 et seq.). Defendants' two-word response with regard to hundreds of these properties inspected by Plaintiffs—properties that the Trustees were the owners of—was "Insufficient Evidence."[9] *Id.* The Deutsche Bank Defendants then turned around and cited their asserted lack of knowledge regarding their own properties (and grossly inadequate discovery response) as the only support for claiming that there was no evidence about their ownership and excluding these properties that Dr. Ayres concluded were properly included based on their review of ownership records and servicing data. *See* ECF 320-1 (Rademacher Declaration, Column L.) Neither the Rademacher Declaration nor the Deutsche Bank Defendants' Local Rule 56.1 Statement or memorandum tried to offer additional evidence supporting their "Insufficient Evidence" response to Plaintiffs'

---

[9] Defendants' claims of ignorance about the properties they owned are even more dubious in view of a Declaration submitted by Deutsche Bank on February 28, 2019, ECF 63-1, PageID#1443 et seq., in which Defendants were able to identify the Governing Agreements corresponding to the inspected REOs listed by Plaintiffs in their Complaint when it facilitated their filing of a motion to dismiss.

Requests for Admission or for disregarding the analysis performed by Dr. Ayres regarding

property ownership. Not surprisingly, none of Defendants' experts signed up for this "house of

cards" theory, which the Court should also preclude Defendants from presenting to the jury.

<u>Defendants' Assertions Regarding Plaintiffs' Dataset and the Statute of Limitations Were
Accounted for in Dr. Ayres' Analyses.</u>

Defendants' last attempt during the summary judgment proceedings to reduce the size of

the dataset was an assertion that the relevant population of the dataset shrinks based upon

application of the statute of limitations to inspections conducted by Plaintiffs. There are several

major problems with this argument. First, both Judge Leinenweber and this Court have held that

the statute of limitations as to Deutsche Bank's vicarious liability is 2012, based on the 2014 date

of Plaintiffs' initial Complaint with the U.S. Department of Housing and Urban Development,

and hence the conduct of Ocwen and Altisource going back to 2012 provides a basis for liability.

ECF 442 at 31; ECF 97 at 32. Second, in all events, as the Court has held, the course of conduct

of Defendants with respect to REO properties is relevant to proving liability even if portions of

this conduct occurred prior to the statute of limitation. ECF 441 at 31-32. Third, Defendants

conveniently ignore the fact that Dr. Ayres' analyses accounted for the respective statutes of

limitations. *See e.g.*, Ayres Initial Report, Figures 5 and 6. Again, the Court should not permit

Defendants to try to confuse the jury by presenting arguments that are completely without

merit.[10]

---

[10] Plaintiffs anticipate that Defendants may seek to make further attempts to narrow the dataset
citing other facts asserted in the Rademacher Declaration regarding matters such as the presence
of Master Servicers under some trusts or limitations on Trustee authority to unilaterally terminate
a servicer. Such attempts to challenge the dataset under new theories should also be precluded by
the Court.

**2. If The Court Allows Defendants to Continue to Challenge the Dataset Analyzed By Dr. Ayres, It Would Be Highly Prejudicial to Preclude Dr. Ayres From Fully Responding to Such Assertions.**

As discussed above, the Court should not permit Defendants, their counsel or their experts to assert or suggest at trial that Plaintiffs' expert, Dr. Ayres, analyzed an incorrect data set based upon the various dubious grounds discussed above, or any new slice and dice attempts made after expert discovery. However, if the Court allows Defendants to persist in making such arguments, it is incumbent upon the Court to allow Dr. Ayres to present and fully discuss at trial their conclusions about the data set used and their conclusion that statistically significant disparities are present in all events. To rule otherwise would reward Defendants for belatedly presenting evidence through counsel after an extensive expert discovery period concluded, would withhold highly probative and persuasive evidence and would be extremely prejudicial to Plaintiffs.

By way of illustration, as regards ownership at the time of inspection of the 45 properties identified by Deutsche Bank's counsel with a "0" during the summary judgment proceedings, the trial would be tainted by a knowingly false presentation to the jury concerning the basis and scope of Dr. Ayres' opinions if Plaintiffs were not allowed to present responsive testimony from Dr. Ayres. Allowing Defense counsel to insinuate or outright claim to the jury that Plaintiffs' proof fails because the data set used by utilized by Dr. Ayres was supposedly deficient without allowing Dr. Ayres to fully respond, including on the basis of sworn and unchallenged testimony with regard to the supporting evidence and their unchanged expert opinion would basically sanction a trip through the looking glass.

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order limiting testimony and barring statements and suggestions from Defendants' counsel and witnesses, including experts, to the effect that the statistical analyses performed by Plaintiffs' expert, Dr. Ian

Ayres, were deficient for each of the reasons stated above or on the basis of any untimely new contentions first raised for trial. If the Court does not grant this relief in its entirety, the Court should allow Plaintiffs and their experts a full, fair and complete opportunity at trial to address Defendants' arguments.

### III. MOTION TO PRECLUDE EVIDENCE OR ARGUMENT REFERRING TO PURPORTED DISTINCTIONS BETWEEN THE DEUTSCHE BANK DEFENDANT ENTITIES AS BEARING ON DEFENDANTS' LIABILITY

Plaintiffs, by their counsel, move the Court to bar Defendants and their witnesses from presenting evidence, suggesting, or implying to the jury that distinctions exist between the Deutsche Bank Defendant entities for purposes of considering Defendants' liability, including in the context of testimony regarding statistical analyses. The Deutsche Bank Defendants have conceded, and this Court has held that the same policies and practices apply across the two entities. The Court should exclude any effort to distinguish among the entities at trial under Federal Rule of Evidence 403 because such effort would serve only to mislead and confuse the jury and would waste time. In support of this motion, Plaintiffs state as follows:

Two Deutsche Bank corporate entities are Defendants in this case: Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas. One or the other of these entities held title as trustee to the REO properties that were serviced by Defendants Ocwen and Altisource and inspected by the Plaintiffs in this case.

Whether one of the Deutsche Bank corporate entities or the other acted as the named Trustee for a particular transaction depended on client preference: some clients preferred a national banking association for their structure, whereas others preferred a New York State Banking corporation. (ECF 351-1, PageID #24562, PDB Ex. 3, Rule 30(b)(6) Dep. of DB Defendants, Organization, p. 35).

Regardless of which Deutsche Bank entity was named as trustee under a particular Governing Agreement, the exact same policies, practices and documents were utilized on behalf of the named Trustee to carry out the day-to-day duties of administering the Trust. *See e.g.*, DBNFHA121758, (identical Standard Form Tender and Indemnity Letter applies to both DBNTC and DBTCA: "INSERT CORRECT ENTITY NAME: Deutsche Bank National Trust Company ("DBNTC") and/or Deutsche Bank Trust Company Americas ("DBTCA")); Document Review Outline, DBNFHA121743 ("All appearances in the action are made on behalf of Deutsche Bank National Trust Company ("DBNTC") or Deutsche Bank Trust Company Americas ("DBTCA"), whichever is the Trustee of the relevant Trust at issue in the action)". Regardless of which Deutsche Bank Defendant was named as Trustee under a particular Governing Agreement, the policies, practices and day-to-day activities administering the Trust were carried out by Deutsche Bank National Trust Company. (ECF 351-1, PageID #24562-24563, PDB Ex. 3, Rule 30(b)(6) Dep. of DB Defendants, Organization, pp. 35-36). *These facts are admitted by the Deutsche Bank Defendants.* (ECF 404, PageID #47852-47853, Defendants' Response to Paragraph Nos. 80-82 of Plaintiffs' Rule 56.1 Statement)).

Accordingly, correspondence relating to code violations, litigation notices and other matters pertaining to the maintenance or marketing of REO properties owned by either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas were reviewed and forwarded to servicers by Deutsche Bank National Trust Company employees pursuant to the same procedures. (ECF 351-1, PageID #24562-24563, PDB Ex. 3, Rule 30(b)(6) Dep. of DB Defendants, Organization, pp. 35-36; ECF 404, PageID #47852, Deutsche Bank Defendants' Response to Paragraph No. 82 of Plaintiffs' Rule 56.1 Statement). These employees acted under the supervision of one manager, Ronaldo Reyes. (*Id.*)

21

Similarly, code violations at properties owned by either Trustee were maintained on the same spreadsheets kept by Deutsche Bank National Trust Company employees. (ECF 351-1, PageID #25035, PDB Ex. 28, Excerpts from Code violation log, DBNFHA 307530, line 75, Residential Accredit Loans, Inc Trust 2003-QA1, RF03QQ; (DBNTC Property, DBNFHA105848); DBNFHA 307530, line 21, IndyMac 2004-AR2 Trust (DBTCA Property, DBNFHA66662); ECF 404, PageID #47852-47853, Defendants' Response to Paragraph Nos. 80-82 of Plaintiffs' Rule 56.1 Statement).

Consistent with these policies and procedures, memoranda and notices sent to Servicers and Holders regarding foreclosures and REO conditions were transmitted under the names of both Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas. (ECF 353, Attach. 1, PDB Ex. 17, Filed Under Seal, Memos to Servicers and Holders, DBNFHA300611-20; ECF 404, PageID #47852-47853, Defendants' Response to Paragraph No. 83 of Plaintiffs' Rule 56.1 Statement).

Notwithstanding these uncontroverted facts, during briefing on the Deutsche Bank Defendants' Summary Judgment motions, the Deutsche Bank Defendants argued that Plaintiffs' statistical analyses improperly analyzed together the properties owned by the two Deutsche Bank Defendants, as Trustee. (ECF 333, Trustees Mem. at 12)

The Court rejected this argument: "Defendants argue that Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas are separate legal entities, but the Deutsche Bank defendants concede that the same "policies, practices, and documents" applied irrespective of the specific Deutsche Bank entity acting as trustee. [405] ¶ 81. Here, there's no issue of improper aggregation across different property owners. Deutsche Bank is the only

"owner" whose conduct should be measured, and the data is properly tailored to exclude properties titled to other banks." (ECF 42 at p. 53)

Rule 403 "allows the court to exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. . . . When the evidence appears to be of slight probative value, district courts may properly exclude it under Rule 403 to avoid a series of collateral trials within the trial' which would result in confusion and undue delay." *Abney v. Badger Mut. Ins. Co.*, No. 12 C 4467, 2014 WL 85986, at *1 (N.D. Ill. Jan. 9, 2014)(quoting *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 687 (7th Cir.1998)).

The instant scenario is precisely the type that Rule 403 exists to avoid. Any attempt by Defendants at trial to argue, assert, suggest or attempt to introduce evidence implying that distinctions exist between the Deutsche Bank Defendants for purposes of considering evidence of Defendants' liability, including in the context of statistical analyses, is unsupported by the record, contrary to the Court's prior determination, will mislead and confuse the jury, and will waste time. Accordingly, pursuant to Federal Rule of Evidence Rule 403, the Court should enter an Order barring Defendants from such conduct.

WHEREFORE, Plaintiffs respectfully request that the Court grant this motion barring Defendants from arguing, asserting, suggesting or attempting to introduce evidence purporting to imply that distinctions exist between the Deutsche Bank Defendant entities for purposes of considering evidence of Defendants' liability, including in the context of statistical analyses.

23

**IV.    MOTION TO PRECLUDE DEFENDANTS OCWEN AND ALTISOURCE FROM OFFERING EVIDENCE OF BUSINESS JUSTIFICATION**

Plaintiffs challenge the property maintenance and marketing practices of Defendants Ocwen and Altisource (collectively "the Servicer Defendants"), both of which asserted the affirmative defense that their conduct was supported by legitimate business justifications or rationales. Near the close of fact discovery, Plaintiffs timely served contention interrogatories on each Servicer Defendant, requesting the factual bases for these defenses. Ocwen's response included a single generalized basis—"to safeguard the interests of investors"—and Altisource merely reserved its right to supplement following expert discovery. Neither Ocwen nor Altisource supplemented its response, nor did they offer any arguments on this topic at summary judgment. Due to their failure in discovery to provide the factual bases for their business justifications, the Servicer Defendants should not be able to offer any evidence for this defense at trial. Plaintiffs accordingly move *in limine* for an order limiting the Servicer Defendants' evidence of a business justification.

**A.  Background.**

In support of their disparate impact theory of liability in this case, Plaintiffs will present evidence at trial establishing that certain of the Servicer Defendants' exterior maintenance and marketing business practices caused a disparate impact on minority neighborhoods. Those business practices include "value redlining," essentially singling out lower-value REO properties for different and worse treatment, as well as a delegation of discretion, lack of oversight, and a national model of property preservation that resulted in maintenance and preservation statistical disparities based on the racial composition of the neighborhood. *See* ECF 442 (Memorandum Opinion and Order) at pp. 99-100. In such disparate impact cases, the burden shifts to defendants to show that the policy is justified by a "substantial, legitimate, nondiscriminatory interest." *Id.* at

p. 93 (citing 24 C.F.R. § 100.500(c)(2).) A defendant has the burden of proof at this phase of the disparate impact analysis and must support its position with actual evidence. *Reyes v. Waples Mobile Home Park Limited Partnership*, 91 F.4th 270, 280 (4th Cir. 2024) (reversing summary judgment to defendant on business justification prong and noting that "[p]roof schemes depend on record evidence and the record here falls short of anything approaching business necessity.").

Plaintiffs also assert that the Servicer Defendants are liable for disparate treatment, i.e., intentional discrimination. On this front, Plaintiffs will "present evidence to suggest that differential maintenance based on REO property values, including cost-cutting conduct for REO properties deemed low-value, has no profit justification—in other words, that it is pretextual." *Id.* at 109. Thus, whether Defendants can prove a business justification is relevant to both of Plaintiffs' theories of liability.

In Ocwen's Answer to the Second Amended Complaint, its Fifteenth Affirmative Defense asserted: "Plaintiffs' claims are barred because Ocwen's actions, omissions, or policies were supported by race-neutral, non-discriminatory, objective, substantial, and/or legitimate business rationales." ECF 102 at 120. In Altisource's Answer to the Second Amended Complaint, its Thirty-Third Affirmative Defense asserted: "Plaintiffs' claims are barred because Altisource's actions were supported by race-neutral, objective, substantial, and legitimate business rationales in furtherance of Altisource's business objectives, and these interests could not be served equally by reasonably available alternative means." ECF 103 at 166. It is well recognized that a defendant asserting an affirmative defense carries the burden of producing evidence supporting and proving that defense. *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84 (2008) (an employer defending a disparate impact claim under the ADEA bears both the burden of production and the burden of persuasion for the "reasonable factors other than age" affirmative

defense); *Snyder v. Chi. Transit Auth.*, 2023 U.S. Dist. LEXIS 198724 at **, 2023 WL 7298943 (N.D. Ill. 2023) (Shah, J.) (burden of proof of an affirmative defense rests on the defendant).

On April 29, 2022, after nearly all document production and depositions had occurred, and with under three months left of fact discovery, and after Defendants had more than two years to develop their evidentiary record, Plaintiffs properly propounded contention interrogatories. With respect to Ocwen's Fifteenth Affirmative Defense, Plaintiffs asked Ocwen to "Describe the factual basis for this defense, including all of the specific actions, omissions, policies and rationales you are referring to, and identifying all witnesses and all documents that support that defense." The interrogatory defined "describe" as "set forth fully and unambiguously every fact that relates to the answer called for by the interrogatory of which you have knowledge."

On the last day to serve discovery responses, July 22, 2022, Ocwen objected to the interrogatory before responding as follows:

> Ocwen states that it serviced REO properties held in Deutsche Bank trusts (and oversaw Altisource's property preservation work) based on race-neutral, non-discriminatory, objective, substantial, and legitimate business rationales—in particular, to preserve and maintain REO properties to safeguard the interests of investors. Ocwen's services agreements, scopes of work, and policies and procedures applied to Altisource's property preservation work and marketing activities for REO properties.

> Pursuant to Federal Rule of Civil Procedure 33(d), Ocwen refers Plaintiffs to its services agreements, scopes of work, and policies and procedures (*see, e.g.*, Pls. Dep. Exs. 19, 54-55, 93-96, 100, 315, 320). Witnesses who may testify to Ocwen's race-neutral, non-discriminatory, objective, substantial, and legitimate business rationales, including Ocwen's services agreements, scopes of work, and policies and procedures, include Michael Hawks, Corey Carpenter, Jason Jastrzemski, Teresita Duran. and Michael Yanniello. Investigation continues, and Ocwen specifically reserves the right to supplement its response to this interrogatory, following the conclusion of expert discovery.

26

(Ex. 5, Ocwen's July 22, 2022 Interrogatory Responses, at 5). Ocwen never supplemented its response.

With respect to Altisource's Thirty-Third Affirmative Defense, Plaintiffs asked Altisource to "Describe the factual basis for this defense, including all of the specific actions, omissions, policies and rationales you are referring to, and identifying all witnesses and all documents that support that defense. Witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case." The interrogatory defined "describe" as "set forth fully and unambiguously every fact that relates to the answer called for by the interrogatory of which you have knowledge."

On the last day to serve discovery responses, July 22, 2022, Altisource objected to the interrogatory before responding as follows: "Altisource states that it will supplement and amend its responses to this interrogatory after the completion of expert discovery. For purposes of this response, Altisource states that its policies and practices are race-neutral, objective, and supported by substantial and legitimate business rationales." (Ex. 6, Altisource's July 22, 2022 Interrogatory Responses, at 14). Altisource never supplemented its response.

As the Court noted, neither Ocwen nor Altisource raised any arguments regarding their business rationales at summary judgment. ECF 442 at 93 ("Because defendants do not present any arguments about valid business justifications, *see* [316] *and* [408], the only dispute at this stage is whether plaintiffs establish a prima facie showing of a discriminatory effect. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 705 (7th Cir. 2010) (undeveloped arguments are waived)."); *id.* at 109 n.30 ("[D]efendants do not articulate any arguments in their briefs.").

27

### B. Argument.

The Servicer Defendants failed to articulate the factual bases for their purported business justifications when they had the opportunity and obligation to do so during the discovery process. They should accordingly be limited from offering any evidence in support of this defense at trial. To permit the Servicer Defendants from offering evidence of a business justification would severely prejudice Plaintiffs.

### 1. The Servicer Defendants Failed to Articulate Their Purported Business Justifications.

The basic idea of contention interrogatories is to require a party to commit to a position and to list the evidence they will present as support for that position. *Inojosa v. Bd. of Trustees of City Colleges of Chicago, Cmty. Coll. Dist. 508*, No. 20 C 1114, 2021 WL 4461579, at *3 (N.D. Ill. Apr. 12, 2021); *Bouto v. Guevara*, No. 19-CV-2441, 2020 WL 4437669, at *2 (N.D. Ill. Aug. 3, 2020) ("The entire purpose of interrogatories is to get opposing parties to identify a specific subset of evidentiary support for their claims and defenses."); *Abernathy v. Vill. of Park Forest*, No. 16 C 2128, 2018 WL 11651217, at *1 (N.D. Ill. Sept. 18, 2018); *Rejdak v. Worthington Cylinders Wisconsin, LLC*, No. 15 CV 9373, 2017 WL 11885185, at *3 (N.D. Ill. Jan. 23, 2017).

Contention interrogatories are "'used to elicit a description of the opposing party's theory ***and proof*** to be employed.'" *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18 C 864, 2019 WL 6498081, at *5 (N.D. Ill. Dec. 3, 2019) (quoting *Tragoszanos v. City of Algoma*, 2011 WL 2650852, at *1 (E.D. Wis. July 6, 2011)) (emphasis added); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers*, No. 18-CV-992-JDP, 2020 WL 7055883, at *1 (W.D. Wis. Feb. 7, 2020) (". . . in response to a proper contention interrogatory, a party must respond by laying out, in general terms, the basis for its litigation positions."); *Gregg v. Local 305 IBEW*, 2009 WL 1325103, at *6 (N.D. Ind. May 13, 2009) ("Contention interrogatories can

28

be classified as questions asking a party to: indicate what it contends or whether the party makes some specified contention[;] . . . state all facts or evidence upon which it bases some specific contention; take a position and apply law and facts in defense of that position; or explain the theory behind some specified contention."); *Milwaukee Elec. Tool Corp. v. Chervon N. Am. Inc.*, No. 14-CV-1289-JPS, 2017 WL 2445845, at *1 (E.D. Wis. June 6, 2017) (allowing contention interrogatory "to learn Plaintiffs' legal theories and the factual bases for their ... claims").

Neither Service Defendant provided a meaningful response to Plaintiffs contention interrogatories on their business justification defenses.

Defendant Ocwen stated that its policies and practices are supported by "safeguarding investor interests" before listing certain general documents and witnesses. Glaringly absent from this response are any facts, that would put Plaintiffs on notice of Ocwen's evidentiary support for this defense. This overarching deficiency is alone enough to foreclose Ocwen from trying to build out proof of this defense at trial, but there are other problems, too. It should go without saying that a defendant does not adequately "describe" a business interest by calling it an "investor interest." Such a response is essentially synonymous with the language in the Affirmative Defense itself. Ocwen has wholly failed to identify what the interests actually are, be they financial, reputational, or some other kind of interest. Rather, it has at most identified whose interests were furthered by its policies and practices, but nothing else. Even if Ocwen had identified a justification—and it has not—it has not explained how that justification is served by its policies or practices, meaning it in no way "describes" the basis for the defense, as Plaintiffs requested.

The inadequacy of Ocwen's response on its business justification is proven by its response to Plaintiffs' other contention interrogatories, which lay out arguments over the course

29

of multiple pages and which are supported by specific deposition and document citations. (Ex. 5, Ocwen's July 22, 2022 Interrogatory Responses, at 7-10.) Tellingly, Ocwen failed to provide this kind of response for its business justification defense.

Ocwen cannot salvage its response by saying that it listed certain general documents and witnesses. Ocwen did not explain what information in these documents describes the interest at stake nor how such interest is served—it is not even clear whether these documents are meant to be the policies and practices that Ocwen is justifying or whether they lay out the justification for other policies and practices. Ocwen's identification of witnesses fares no better—Ocwen did not identify what these witnesses said (or would say), let alone provide transcript cites. Further illustrating why this approach does not work, only one of these witnesses testified about only one of the documents that Ocwen identified. The combination of witnesses and documents, without specific citations or explanation, simply does not offer the factual basis for the asserted defense.

Altisource's response is even more straightforwardly insufficient. Altisource identified no interest, no document, no witness, nor any other kind of fact to support its business justification defense. To the extent Altisource planned to develop this defense through expert discovery, it failed to supplement its response to outline any expert evidence.

In sum: Neither Servicer Defendant offered a factual basis during discovery for their business justification.

### 2. The Servicer Defendants Cannot Offer Proof of a Business Justification at Trial.

Having failed to provide their theory and evidence of a business justification during discovery, the Servicer Defendants are foreclosed from doing so at trial.

One of the main purposes of contention interrogatories is to narrow the issues for trial. *In re Northfield Laboratories Inc. Securities Litigation*, 264 F.R.D. 407, 412 (N.D. Ill. 2009).

(internal citation and quotation marks omitted.). The Seventh Circuit has confirmed that excluding evidence at trial is an "appropriate sanction" under Federal Rule of Civil Procedure 37(b)(2)(B) for an inadequate response to a contention interrogatory. *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (affirming trial court's decision to ban damages evidence because the party "failed to respond to Zenith's contentions interrogatory with a description of its damages theory and the proof to be employed"). Courts routinely limit evidence for this reason. *See, e.g.*, *Sigle v. City of Chicago*, No. 10 C 04618, 2013 WL 1787579, at *7 (N.D. Ill. Apr. 25, 2013) (striking evidence offered at summary judgment because offering party did not supplement its response to contention interrogatories); *Westefer v. Snyder*, 2009 WL 3672500, at *1 (S.D. Ill. 2009) ("Pursuant to Rule 37(c) of the Federal Rules of Civil Procedure evidence of the lawsuits that were not disclosed by Plaintiffs in their responses to Defendants' interrogatories will be excluded from evidence at trial."); *ADC Telecommunications, Inc. v. Thomas & Betts Corp.*, 2001 WL 1381098, at *4–5 (D. Minn. 2001) (excluding information disclosed in untimely interrogatory responses).

The Servicer Defendants did not provide the factual bases for their business justification defenses, and the appropriate sanction is to preclude them from offering any such evidence at trial. To permit the Servicer Defendants to offer previously unarticulated evidence of a business justification would severely prejudice Plaintiffs. Plaintiffs have already been deprived of the chance to seek follow-up discovery on any proof the Servicer Defendants contemplate offering, nor do the Servicer Defendants preview their business justification evidence and argument at summary judgment. Plaintiffs now risk learning of Defendants' support for this defense for the first time ***at trial***. Indeed, because Plaintiffs have no idea how Ocwen or Altisource might

support this defense, they cannot identify counter-exhibits or witnesses in pre-trial disclosures to offer in their own case. Contention interrogatories are designed to avoid just this scenario.

Nor can the Servicer Defendants attempt to shift blame by saying that it was incumbent on Plaintiffs to move to compel more robust responses. Unlike traditional interrogatories, which are designed to elicit new information, contention interrogatories serve a different purpose: requiring the responding party to commit to a position. *See supra*. The Servicer Defendants declined to do so, and they cannot now benefit from their own obfuscation.

WHEREFORE, Plaintiffs respectfully request that the Court prohibit Defendants Ocwen and Altisource from offering evidence of a business justification at trial.

## V. MOTION TO PRECLUDE DEFENDANTS FROM IMPLYING BAD FAITH OR USING INFLAMMATORY TERMS REGARDING PLAINTIFFS' DOCUMENT RETENTION

Plaintiffs respectfully move the Court for an order *in limine* to preclude Defendants, their witnesses, and their experts from using inflammatory terminology that implies Plaintiffs acted in bad faith. Among other inaccurate and denigrating descriptors, Defendants have wrongly referred to "research misconduct" and "doctored data." Such language incorrectly implies that Plaintiffs acted in bad faith—a position the Court already found unsupported on the current record—and thus is unfairly prejudicial and should be excluded under Federal Rule of Evidence 403.

### A. Background.

The Court's previous resolution of Defendants' Motion to Exclude Plaintiffs' Property-Specific Investigation provides a useful factual overview:

> The following facts are not from the Court's previous opinions, but they are not in dispute. Each investigation proceeded as follows: Investigators would arrive to the property and fill out a form listing 37 categories of deficiencies in exterior management (for example, trash on the curb, broken gutters, water damage, graffiti, etc.). (Resp. to Mot. to Excl. at 6–7, ECF 249.) Investigators would take a set of photos of the property that captured the "address, front view, right side

> view, back view, left side view, neighbor to the left, neighbor to the right, and
> neighbor to the opposite side." (*Id.* at 10.) Investigators would also take photos of
> each deficiency they noted, "as well as every sign posted on the property and
> positive maintenance and marketing features." (*Id.*) While completing these
> forms, investigators sometimes took handwritten notes describing the property.
> (*Id.*) The results of that investigation, including any pictures taken, were then
> uploaded to an electronic database. (*Id.* at 9–10.) The handwritten notes were not
> always transferred verbatim into the database. (*Id.* at 11.) Once the information
> was entered into the database, a "quality control" team from Plaintiff National
> Fair Housing Association ("NFHA") reviewed the information. (*Id.* 12–13.) This
> team edited the entries, allegedly to ensure that the deficiencies listed at each
> property were accurately reflected by the photographs. (*Id.* at 13.) Once the
> information was input into the database, Plaintiffs often destroyed or discarded
> the paper forms with the investigators' handwritten notes. (*Id.* at 12.)

ECF 282 at 2-3.

Defendants have repeatedly attempted to paint Plaintiffs' routine discarding of hard copy

evaluation forms as purposeful to hide adverse information and to portray Plaintiffs' quality

control process as data doctoring. Neither is true. Defendants previously sought to exclude the

entire investigation based on Plaintiffs' failure to retain all hard copy forms. Defendants also

argued that Plaintiffs "manufacture[d] false evidence" by undertaking quality control of the

deficiency scores. ECF 271 at 2. Judge Leinenweber found that Plaintiffs were at fault for not

retaining all the hard copy forms, but specifically rejected Defendants' allegations of bad faith:

> As it stands now, the Court accepts Plaintiffs' explanation that they did not intend
> to hide information, but genuinely believed that the handwritten forms were
> duplicative of the information in the database. Currently, the record does not
> support a finding of bad faith.

*Id.* at 5. The Court also determined that the Parties' competing positions on the quality control

process—presented through experts—should be resolved at trial, where the jury could weigh the

experts' credibility. *Id.* at 7-8.

The District of Maryland reached the same conclusion in a case against a different

financial institution arising from the same investigation:

33

> There is no evidence of illicit motive here. To the contrary, NFHA's Senior Associate Director of Enforcement, Lindsay Augustine, represented in her declaration that NFHA disposed of the original copies of the evaluation forms to comply with its document retention policy, and instructed its partner organizations to follow their own document retention policies. Decl. of Lindsay Augustine ¶ 24. Ms. Augustine explained that NFHA considered the forms "preliminary drafts that contained rough notes" which "became duplicative" once "the relevant information on the forms . . . was saved to" NFHA's database. *Id.* NFHA President and Chief Executive Officer Shanna Smith corroborates this account, explaining in her declaration that NFHA's destruction of the forms is in line with the document retention protocol it has employed for over 30 years, one that, in its experience, has been consistently accepted for investigation and litigation purposes. *See* Decl. of Shanna L. Smith ¶ 10. NFHA's prior experience cannot contract the scope of its duty to preserve here, but it does suggest NFHA acted in good faith. Aside from the fact of the document destruction itself—which NFHA has explained adequately and under oath—the defendants have presented no direct or circumstantial evidence of improper motive.

*National Fair Housing Alliance v. Bank of America, N.A.*, No. SAG-18-1919, 2023 WL 4669560, at *5 (D. Md. Jan. 23, 2023).

Despite the Court's decision on the Motion to Exclude, Defendants have continued to use needlessly inflammatory language to describe the investigation. Defendants' Joint Motion for Summary Judgment referred to "doctored data," among other spurious attacks. ECF 16 at 19; *see also id.* at 17 ("As a result, Plaintiffs' REO database consists of an unreliable, second-hand mishmash of records created not as a routine business record, but as evidence designed to achieve Plaintiffs' desired litigation outcome"); *id.* at 8 ("Plaintiffs destroyed and manipulated evidence[.]"). And Defendants' pretrial materials show that they plan to continue their campaign at trial: Defendants will call Dr. Justin McCrary, who repeatedly referred to an investigation into "research misconduct" even though no such thing has occurred.

### B. Argument.

Rule 403 permits the exclusion of evidence "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury."

Fed. R. Evid. 403. The Advisory Committee Notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. Here, rather than focusing on the facts, Defendants have resorted to inflammatory language to imply bad faith even though the Court has thus far said that none exists. Defendants' needless slandering of Plaintiffs is unfairly prejudicial and should be excluded.

To be sure, both sides are entitled to put on evidence about the investigation at trial. Plaintiffs will testify to their inspection methodology, their database upload practices, their document retention policies, their understanding of the database as duplicative of the paper forms, and the quality control process. Defendants, too, may offer evidence regarding the evaluation forms. Both sides seem likely to offer expert testimony on these topics. But it is the exclusive province of the jury to weigh that evidence, and Defendants cannot attempt to skew that consideration by packaging their testimony in inflammatory terminology.

Courts apply Rule 403 to exclude inflammatory language that carries little probative value but risks substantial prejudice to a party. *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04 Civ. 10014(PKL), 2009 WL 3111766, at *7 (S.D.N.Y. Sept. 28, 2009) (prohibiting use of the term "tax haven"); *Highland Capital Mgmt., L.P., v. Schneider*, 551 F. Supp .2d 173, 191-93 (S.D.N.Y. 2008) (granting motion *in limine* precluding party from utilizing inflammatory phrases such as "securities fraud," "illegal," "inside information," or "market manipulation" in securities fraud case because those terms "may lead a juror to believe that the [Defendants] engaged in improper or illegal conduct").

That is precisely the case here: Defendants' denigration of Plaintiffs has no probative value but will substantially prejudice them. Defendants' use of words like "doctoring,"

"manipulating," and "manufacturing" connote bad faith, even though the Court previously rejected such a finding on the current record. The factual record has not changed in the time since Defendants filed their reply brief and supplemental briefs in support of their Motion to Exclude. Now, as before, the record does not support a finding of bad faith, and Defendants cannot indicate otherwise with disparaging language.

Dr. McCrary's references to an "investigation" into "research misconduct" should likewise be excluded. Defendants presented Dr. McCrary's analysis and claims of "research misconduct" to Judge Leinenweber to support their motion to exclude the database, and the Court still rejected the assertion of bad faith. Dr. McCrary can testify to Plaintiffs' inspection data and quality control edits, just as Dr. Ayres and Dr. Guetterman will do. But vague references to a hypothetical investigation that imply existence of a (non-existent) unspecified body do not assist the jury in assessing the quality of the inspection data and thus have no probative value. By contrast, such references will prejudice Plaintiffs by indicating that they somehow acted improperly, when there has been no such finding, nor any sort of inquiry.

WHEREFORE, Plaintiffs respectfully request that the Court preclude Defendants and their witnesses from using prejudicial and inflammatory language to describe their document retention and quality control, and specifically to preclude "data doctoring," "mishmash of records," "manipulate," "manufacture," "research misconduct" and any similar language.

## VI.    MOTION FOR AN ORDER THAT THE PLAINTIFFS' RECEIPT OF HUD FUNDING CANNOT BE USED TO OFFSET ANY AWARD OF DAMAGES

Plaintiffs respectfully move the Court for an order *in limine* that the Plaintiffs' receipt of grant funding from the U.S. Department of Housing and Urban Development (HUD) cannot be used to offset or reduce any award of damages by the jury, and to prohibit Defendants from making any such argument to the jury. In support of this motion, Plaintiffs state as follows:

### A. Background.

The collateral source rule is a legal doctrine that prevents a wrongdoer from reducing their liability by the amount of compensation the plaintiff receives from independent or collateral sources. The rule is designed to ensure that the wrongdoer does not benefit from payments or benefits the plaintiff receives from third parties and to avoid penalizing the plaintiff for having secured such benefits. The rule's primary purpose is not to prevent overcompensation of the plaintiff, but to ensure that the tortfeasor does not benefit from payments made by independent sources. *Perry v. Larson*, 794 F.2d 279, 286 (7th Cir. 1986). Courts examine whether the source of the payment is independent of the tortfeasor. This principle ensures that damages are measured by the injury and serve the deterrence purpose of civil rights laws . *Giuffre v. Jefferson*, 2017 U.S. Dist. LEXIS 57868 at *4-5; 2017 WL 1375536 (N.D. Ill. 2017). The principle applies in civil rights cases. *Id*.

### B. Application of the Collateral Source Rule in Fair Housing Cases.

More specifically, the collateral source rule applies to HUD grants or funding in fair housing cases by ensuring that damages awarded to a plaintiff agency are not offset by compensation received from other sources, such as government grants. *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F. Supp. 3d 259, 317-318 (D. Conn. 2020); *Southern S. Cal. Hous. Rights Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1152 (C.D. Cal. 2007); *Baltimore Neighborhoods, Inc. v. LOB, Inc.,* 92 F. Supp. 2d 456, 465 (D. Md. 2000); *Valley Hous. LP v. City of Derby*, 2011 U.S. Dist. LEXIS 57714 at *7-8; 2011 WL 2144633 (D. Conn. 2011).

In Fair Housing Act cases, if a fair housing organization receives HUD grants or funding, these funds are considered "collateral sources." *Southern S. Cal. Hous. Rights Ctr. v. Krug, supra*, 564 F. Supp. 2d at 1152. The rule prevents the discriminatory party from benefiting from the plaintiff's receipt of HUD funding, ensuring that the defendant remains fully accountable for

their discriminatory actions. It also promotes the deterrence function of the Fair housing Act. *Id.* Cf. *Miami Valley Fair Hous. Ctr., Inc. v. Connor Group*, 805 F. Supp. 2d 396, (S.D. Ohio 2011) (receipt of funding from HUD does not diminish a fair housing agency's injury).

Moreover, in this case the HUD grant funding received by the Plaintiffs was not even related specifically to these Defendants. The HUD grants received by Plaintiffs were related to "enforcement" or "investigations" generally, and some grants allowed funding to be used for the Plaintiffs' comprehensive "REO investigation" writ large. The funds were used to investigate many banks and servicers other than the Defendants here, so any offset or deduction from a damages award would be particularly inappropriate.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order *in limine* that the Plaintiffs' receipt of funding from the U.S. Department of Housing and Urban Development (HUD) cannot be used to offset or reduce any award of damages by the jury, and to prohibit Defendants from making any such argument to the jury

## VII.  MOTION FOR AN ORDER PERMITTING THE USE OF SUMMARIES, CHARTS, OR CALCULATIONS PURSUANT TO FEDERAL RULE OF EVIDENCE 1006 OR, IN THE ALTERNATIVE, FEDERAL RULE OF EVIDENCE 107

Plaintiffs respectfully move the Court for an order *in limine* that Plaintiffs' trial exhibits containing summaries, charts, or calculations are admissible pursuant to Federal Rule of Evidence 1006.  In the alternative, Plaintiffs seek an order that their exhibits containing summaries, charts, or calculations may be used as illustrative aids pursuant to Federal Rule of Evidence 107. In support of this motion, Plaintiffs state as follows:

**A. Background.**

Federal Rule of Evidence 1006 governs the introduction of summaries, charts, or calculations offered to prove the content of voluminous admissible writings, recordings, or photographs. Two recent developments are important to any application of Rule 1006.

First, Rule 1006 was amended recently, effective Dec. 1, 2024, "to correct misperceptions about the operation of the rule by some courts." Thus, any court decision applying the Rule prior to 2024 must be viewed with caution, to make sure it is not inconsistent with the current text.

Second, new Rule 107 has been added to the Federal Rules of Evidence, also effective Dec. 1, 2024. This new rule provides standards for the admission of illustrative aids, creates the possibility of using such evidence in jury deliberations based on all parties' consent or by the court for good cause, and when practicable, requires such illustrative evidence to be entered into the record. Rule 107 and Rule1006 interact and make reference to each other.

Plaintiffs have prepared, and are expected to move for admission at trial, exhibits containing summaries, charts, or calculations of voluminous documents and records in at least the following categories:[11]

     a.  Charts or summaries derived from the contents of the NFHA REO investigation database, including but not limited to:
         1.  Photographs
         2.  Plaintiffs' deficiency assessments
         3.  Other property-specific data
     b.  Charts, summaries and calculations of Plaintiffs' time records relating to investigation and counteraction measures.
     c.  Charts, summaries and calculations of Plaintiffs' investigation expenses.
     d.  Deutsche Bank Trustee Pooling & Servicing Agreements, Trust Agreements, Indenture Agreements (collectively PSAs).

---

[11] This list is not intended to be exhaustive, as there may be other categories of documents that warrant summarization or presentation in chart format.

### B. General Requirements – Text of Rule.

#### 1. The Summarized Documents Must Be Admissible.

The text Rule 1006 makes clear that the underlying documents themselves must be admissible. This means the underlying records (a) must be properly authenticated under the rules, and (b) must not be deemed inadmissible on any grounds (e.g., hearsay, relevance, Rule 403, etc.). *See, e.g.*, *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371 (7th Cir. 2008) (the admission of a summary under Fed. R. Evid. 1006 requires a proper foundation as to the admissibility of the material that is summarized).

The admissibility of each category of documents listed above is discussed in Section V below.

#### 2. The Summarized Documents Must Be Voluminous.

Rule 1006 applies when the underlying documents that are summarized or appear in a chart are voluminous. There is no dispute that the underlying documents involved in this case are voluminous. The REO Database contains over 30,000 photographs and thousands of record entries relating to Deutsche Bank Trustee-owned properties. Each of the 697 property records in the Database contains an assessment of property condition in 39 categories. Plaintiffs' time and expense records vary by Plaintiff, but typically include dozens of individual staff time entries over multiple years and/or hundreds of documents (such as receipts, payment vouchers, etc.) of investigation expenses. The Deutsche Bank Trustee Defendants produced hundreds of Governing Agreements and PSAs.

Even if the summarized documents are not voluminous, however, a chart or summary may be used as an illustrative aid under FRE 107. *United States v. White*, 737 F.3d 1121, 1134 (7th Cir. 2013); *United States v. Seleznev*, 2016 U.S. Dist. LEXIS 102848, 2016 WL 4140951 (W.D. Wash. 2016).

### 3. The Summarized Documents Must be Made Available for Examination or Copying.

The underlying originals or duplicates must be made available for inspection or copying by the opposing party. FRE 1006. In this case, all of the documents underlying Plaintiffs' summary and chart exhibits have been produced to, or produced by, the Defendants in discovery.

### C. Improper Objections.

Some objections typically made to the introduction of Rule 1006 summaries have been uniformly rejected by the courts.

### 1. The Chart is Incomplete, or Does Not Include All Information.

It is not a valid objection that a summary chart does not include every transaction or item of information contained in the underlying documents. In *United States v. White*, 737 F.3d 1121 (7th Cir. 2013), for example, the court rejected an objection that the summary chart did not include every single transaction during the relevant period. The government (the proponent) indicated at the bottom of the spreadsheet that only 236 of the 548 transactions were listed. Moreover,

> "to the extent that the defendants argue that the chart did not contain other types of information that they wished it did have—for instance, the spreadsheet did not list the amount of the down payment that EHNS provided for each transaction—the defendants were free to cross-examine the spreadsheet's creator to bring out that information."

737 F.3d at 1136. And of course, subject to the requirements of Rules 107 and 1006, Defendants remain free to compile their own chart with any additional records or documents they would prefer to see included.

### 2. The Underlying Documents Have Not Been Introduced Into Evidence.

This is one of the requirements prior court interpretations of Rule 1006 had imposed that the 2024 amendment expressly eliminated. Under the current text, an appropriate summary or chart can be admitted into evidence "whether or not" the underlying voluminous materials have

been introduced into evidence. According to the Advisory Committee Notes, "admission of the underlying voluminous materials is not required and the amendment so states."

Admitting a Rule 1006 summary does not prohibit the underlying documents to also be admitted. The underlying documents may be admitted in addition to the summary.[12]

### 3. The Summary Is "Not Evidence."

Contrary to some prior court rulings, the rule has been amended to clarify that a Rule 1006 summary is admitted "as evidence." The court may not instruct the jury that a summary admitted under this rule is not to be considered as evidence. See Advisory Committee Notes.

Moreover, the Seventh Circuit had previously held, prior to the 2024 amendment, that Rule 1006 summaries are evidence. Seventh Circuit Pattern Jury Instructions provide as follows:

> **1.23 SUMMARIES**
>
> *Stipulated*
> The parties agree that [*describe summary in evidence*] accurately summarizes the contents of documents, records, or books. You should consider these summaries just like all of the other evidence in the case.
>
> *Not Stipulated*
> Certain [*describe summary in evidence*] is/are in evidence. [The original materials used to prepare those summaries also are in evidence.] It is up to you to decide if the summaries are accurate.
>
> *     *     *
>
> "Charts" or "schedules" may be substituted for "summaries" in this instruction.

### 4. The Summary is Self-Serving.

An objection that a summary or chart is "self-serving" is not a legitimate basis for exclusion. *Yata v. BDJ Trucking Co.*, 2020 U.S. Dist. LEXIS 38107; 2020 WL 1062332 (N.D. Ill.

---

[12] Plaintiffs have listed the underlying expense and time records on their Exhibit List, and are prepared to move to admit them if necessary.

2020). A chart being self-serving does not preclude its admission so long as it accurately summarizes the underlying documents. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (noting that various forms of testimony are self-serving, but the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party presents its side of the story).

### D. Who May Testify About a Summary or Chart.

Testimony from the preparer of the summary usually is required to establish the foundational facts necessary for admission, including relevance and authentication. *Mont. Land & Mineral Owners Ass'n v. Devon Energy Corp.*, 2006 U.S. Dist. LEXIS 48742, 2006 WL 1876859 (D. Mont. 2006) (citing cases). *See also United States v. Toran*, 2016 U.S. Dist. LEXIS 121218, 2016 WL 4706922 (C.D. Ill. 2016) (makers of the summary charts testified at trial regarding the charts and were subject to cross-examination).

In some instances, other witnesses may have sufficient personal knowledge to testify to these facts. *Mont. Land & Mineral, supra* (citing *U.S. v. Behrens*, 689 F.2d 154, 161 (10th Cir. 1982), *cert. denied*, 459 U.S. 1088 (1982)). According to a leading evidentiary treatise, "Courts have facilitated the authentication process by allowing supervisory personnel to attest to the authenticity and accuracy of charts, summaries, or calculations in situations where many individuals, or possibly computers or other machines, are used to prepare the exhibits." 6 Weinstein's Federal Evidence § 1006.05[3], p. 1006-20 (2d ed. Rel. 93-10/2008 (cited in *NRRM, LLC v. Mepco Fin. Corp.*, *supra,* 2015 U.S. Dist. LEXIS 39058, 2015 WL 1501897 (N.D. Ill. 2015)).

In *Fosbinder-Bittorf v. SSM Health Care of Wis., Inc.*, 2013 U.S. Dist. LEXIS 91617, 2013 WL 3287634 (W.D. Wis. 2013), the defendant objected to the plaintiff's summary of time records, asserting it lacked sufficient information about the qualifications of the person who

analyzed the data or her methods. The court overruled the objection because the defendant had access to the raw data and had time to analyze it. *Id*. at fn. 6.

A summary chart meeting the criteria of Rule 1006 need not be prepared by an expert. In *Brand v. Comcast Corp*., 302 F.R.D. 201 (N.D. Ill. 2014), the defendant objected that the preparer of the summary search of a database, an attorney, was not qualified as an expert in statistical analysis of data. The preparer need not be qualified as an expert, the court held, because he was not testifying in the form of an expert opinion. *See also United States v. Lemire*, 720 F.2d 1327, 1347 (D.C. Cir. 1983) (non-expert summary testimony is permissible under FRE 1006).

Paralegals employed by counsel are often used to summarize voluminous records and testify about the preparation of the summary. *E.g., Coates v. Johnson & Johnson*, 756 F.2d 524, 550 (7th Cir. 1985) (summary prepared by defense attorneys' paralegal deemed admissible); *Yata v. BDJ Trucking Co*., 2020 U.S. Dist. LEXIS 38107; 2020 WL 1062332 (N.D. Ill. 2020) (summary prepared by counsel's paralegal deemed admissible); *EEOC v. Eagle Quick Stop, Inc.,* 2007 U.S. Dist. LEXIS 14138 (S.D. Miss. 2007) (summary prepared by plaintiff EEOC's paralegal deemed admissible*)*. In *Smith v. Vestavia Hills Bd. of Educ*., 2018 U.S. Dist. LEXIS 46281, 2018 WL 1408537 (N.D. Ala. 2018), the court noted that a proper foundation for the admission of a summary should come from the testimony of the witness who prepared it or supervised its preparation. In that case the summaries were prepared by a paralegal employed by the plaintiff's attorney and under the attorney's supervision and direction, and therefore could be authenticated at trial.

### E.  The Underlying Documents Are Admissible.

Each of the types of records from which Plaintiffs will introduce summaries or charts are admissible.

### 1. Records and Files Contained in the REO Database.

Plaintiffs have filed a separate Motion in Limine seeking an order that the files and records contained in the REO Database, including the photographs stored therein, have been properly authenticated and are admissible. Plaintiffs respectfully refer the Court to that separate motion.

### 2. Plaintiffs' Investigation Time Records and Expenses.

As part of their ordinary business practices, each Plaintiff has a system for recording time and expenses on a per-project basis. Each Plaintiff representative will testify at trial that their time records are created at or near the time by the staff person involved, are kept in the course of a regularly conducted activity, and making the record was a regular practice of each organization. FRE 803(6).

In this case, each Plaintiffs' time and expenses were generally recorded to "Deutsche REO" when the time and expense related to one of the specific 699 properties at issue here, or were recorded to a "General REO" category if the activity related to the REO investigation generally (such as training). Each Plaintiff was examined and testified at deposition about their timekeeping and recordkeeping practices, and established the necessary elements for admission as business records. Accordingly, the summaries or charts Plaintiffs have prepared for trial are admissible under Rule 1006.

### 3. Deutsche Bank Trustee Pooling and Services Agreements (PSAs).

The REO properties at issue here all have mortgages which have been pooled together to form residential mortgage-backed securities. Such securities are created when an investment bank purchases thousands of residential mortgages and then pools them together. Upon the creation of an RMBS, a document called a Pooling and Servicing Agreement ("PSA") is drafted

45

to allocate responsibilities related to the security among certain parties. The PSA designates a trustee to hold title to the real estate securing the RMBS, and the PSA also designates a servicer to preserve and manage the property. In this case, the Deutsche Bank Trustee Defendants are the PSA-designated trustees; Ocwen and Altisource are the servicers.

In its Memorandum Opinion and Order of Nov. 19, 2018, the Court took judicial notice of the Deutsche Bank Trustee PSAs involved in this case. *National Fair Housing Alliance v. Deutsche Bank*, 2018 U.S. Dist. LEXIS 196636, at *17-18; 2018 WL 6045216 (N.D. Ill. 2018) (Leinenweber, J.). The court specifically stated:

> Under Federal Rule of Evidence 201, the Court may take judicial notice of facts "not subject to reasonable dispute," meaning said facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201. Matters of public record can fall within the category of judicially-noticeable facts. *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 771 (N.D. Ill. 2011) (citing Gen. Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1082-83 (7th Cir. 1997)). Defendants' cited-to PSA is publicly available on a government website. See Deutsche Bank National Trust Co. PSA, https://www.sec.gov/Archives/edgar/data/1384691/000090514807000184/efc7-0019_6006707ex991.txt. The PSA's accuracy cannot reasonably be questioned, so the Court will take judicial notice of it here.

*Id. See also National Fair Housing Alliance v. Deutsche Bank*, 2019 U.S. Dist. LEXIS 196481 at *33; 2019 WL 5963633 (N.D. Ill. 2019) (Leinenweber, J.); *Deutsche Bank Nat'l Trust Co. v. Adolfo*, 2013 U.S. Dist. LEXIS 122805, 2013 WL 4552407 (N.D. Ill. 2013) (Gettleman, J.) (taking judicial notice of Deutsche Bank Trustee PSAs); *Gumapac v. Deutsche Bank Nat'l Trust Co.*, 2012 U.S. Dist. LEXIS 107810, 2012 WL 3150657 (C.D. Cal. 2012) (taking judicial notice of Deutsche Bank Trustee PSA).

Alternatively, contracts are admissible as "verbal acts" and are not objectionable on grounds of hearsay. *Irvin v. Exeter Fin. LLC*, 2024 U.S. Dist. LEXIS 122216 at *4, 2024 WL 3398348 (N.D. Ill. 2024) (Shah, J.); *Fox Valley Laborers' Health v. Hugh Henry Constr. Inc.*,

2017 U.S. Dist. LEXIS 239234 at *4 (N.D. Ill. 2017) (Shah, J.). The PSAs produced by the Deutsche Bank Trustee Defendants are admissible on this basis as well.

In any event, the PSAs clearly qualify as business records under Rule 803(6) or under Rules 803(15) (documents affecting an interest in property).

Accordingly, the summaries or charts of the Deutsche Bank Trustee PSAs that Plaintiffs have prepared for trial are admissible under Rule 1006.

WHEREFORE, Plaintiffs respectfully move the Court for an order in limine that Plaintiffs' trial exhibits containing summaries, charts, or calculations are admissible pursuant to Federal Rule of Evidence 1006. In the alternative, Plaintiffs seek an order that their exhibits containing summaries, charts, or calculations may be used as illustrative aids pursuant to Federal Rule of Evidence 107.

Respectfully submitted,

/s/ Jennifer K. Soule

Jennifer K. Soule
James G. Bradtke
Steven P. Schneck
*Soule & Bradtke, PLLC*
155 N. Michigan Avenue, Ste. 504
Chicago, IL 60601

Lila Miller
Edward Olds
Yiyang Wu
Jennifer Klar
*Relman Colfax PLLC*
1225 19th Street, N.W., Ste. 600
Washington, DC 20036

Janell M. Byrd
Morgan Williams
*National Fair Housing Alliance*
1331 Pennsylvania Ave, NW, Ste. 650
Washington, DC 20004

Stephen M. Dane
*Dane Law LLC*
P.O. Box 1011
Perrysburg OH 43552

Dated: December 19, 2025