# EXHIBIT 1

Exhibit 3

to Plaintiffs' Response to Defendants' February 28, 2023 Filings

## Declaration of Lisa Rice

1.      My name is Lisa Rice.  I am the President and Chief Executive Officer of the National Fair Housing Alliance ("NFHA") and have served in that position since April 1, 2018. I began working for NFHA in 2006 and previously held the positions of Vice-President and Executive Vice-President.  Prior to coming to NFHA, I was President and CEO of the Toledo Fair Housing Center, an organization that I worked for from 1985 until 2006 and President and CEO of the Northwest Ohio Development Agency, an organization which I helped found in 1998.  I have personal knowledge of the matters set forth herein.

2.      NFHA is a national, nonprofit, public service, civil rights organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, DC.  NFHA is a nationwide alliance of more than 170 private, nonprofit, fair housing organizations; and state and local civil rights agencies from throughout the United States.  NFHA's mission is to lead the fair housing movement and work to eliminate housing discrimination, ensure equitable housing opportunities for all people and communities, and help foster healthy, stable, diverse, well-resourced neighborhoods where people can thrive.

3.      Specifically, NFHA works to eliminate housing discrimination and to ensure equal housing opportunities for all people through leadership, education, outreach, membership services, public policy initiatives, community development, advocacy, and enforcement.

4.      NFHA's operating members also conduct activities related to fair housing, including conducting fair housing advocacy, enforcement, education, and outreach; fostering healthy, stable, well-resourced communities; engaging with local community leaders and members to affirmatively further fair housing; and training various groups about fair housing rights and

responsibilities, the harmful effects of segregation, the necessity of efforts to counteract discriminatory practices and policies, and the benefits of advancing fair housing principles.

5.      NFHA conducts fair housing training and compliance activities.  NFHA provides training and compliance activities for industry organizations, including some of the largest insurance, mortgage lending, real estate sales, and rental management companies in the country. A number of these training and/or compliance contracts with our industry colleagues have been renewed for many years; they are based on wide industry regard for NFHA's operations and trust in the integrity of our work.

6.      NFHA has been contracted by national civil rights organizations, a State Attorney General, federal agencies, and some of the largest financial services providers in the nation to conduct testing and/or "mystery shopping" activities to ensure compliance with the nation's civil rights statutes.

7.      NFHA has provided training for governmental agencies and trade associations for governmental officials since its inception on a range of fair housing issues including investigation methodologies and techniques, legal issues, technology, education and outreach, research, and public policy.

8.      NFHA also provides training to fair housing investigators across the country, including in the use of testing methodologies.  Since March 2000, NFHA has convened 48 fair housing training schools for 2,224 fair housing advocates.  These trainings have included Fair Housing Fundamentals, Intermediate Fair Housing School, Advanced Fair Housing School, Mortgage Lending Investigations, Real Estate Sales Investigations, Board Development/Agency Management, and Organizational Administration/Financials courses.

9.      NFHA has a long history with the U.S. Department of Housing and Urban Development (HUD) in administering grants and projects regarding fair housing investigations. Between 1991 and 2023, NFHA implemented 21 HUD Fair Housing Initiatives Program (FHIP) grants to perform fair housing investigations.   The investigations have focused on lending, insurance, real estate sales, rental, mortgage rescue scams, design and construction, Real Estate Owned properties, and other housing sectors. Grant ratings received from HUD have always been "excellent," and at no point has HUD sanctioned NFHA in the implementation of these investigation funds. NFHA also received a contract from HUD to conduct rental and real estate testing as a follow-up to HUD's 2000 Housing Discrimination Study, which was conducted by the Urban Institute, and was retained by the U.S. Department of Agriculture to conduct 1000 tests of rural housing providers.

10.      NFHA has also been a partner with HUD in administering fair housing education and outreach programs and initiatives, and as a subgrantee on several other education campaigns. Grant ratings NFHA received from HUD have always been "excellent" for the development and implementation of these education and outreach grants.   In 2003, NFHA and The Leadership Conference on Civil and Human Rights-Education Fund received the Golden Bell Award, the Ad Council's highest honor, for the "Accents" television PSA, which educated the public about the intersection of linguistic profiling and housing discrimination. NFHA has produced 23 education and outreach campaigns including public service announcements in 8 languages with over 5.1 billion audience impressions and over $165 million in donated media from media outlets, such as The Wall Street Journal, Time Magazine, Ebony, Vanity Fair, New York Post, Latina Magazine, People en Espanol, Essence Magazine, Conde Nast Publications, and many others.

11.    NFHA has been litigating fair housing cases since its inception in 1988, over 34 years ago.   In the 1990s and early-2000s, NFHA and NFHA-operating members brought pioneering cases against insurance companies alleging their policies and practices violated civil rights laws. These insurance redlining cases reshaped the operation of the industry.[1]  In the 2000's, NFHA brought pioneering real estate sales cases that informed the actions of the U.S. Department of Justice in challenging discrimination among sales agents.  NFHA's staff, including its first President and CEO, Shanna Smith, developed claims of sexual harassment under the federal Fair Housing Act that have informed how the U.S. Department of Housing and Urban Development, Department of Justice, and other government enforcement agencies pursue these cases.[2]  More recently, NFHA has pursued enforcement against technology-based real estate and advertising platforms that have shaped how federal agencies pursue compliance oversight of these kinds of market players.[3]

12.    Through its programmatic and enforcement activities, NFHA has improved housing security for millions of people including but not limited to: bringing dozens of cases to combat redlining, real estate steering, and other forms of discrimination; assisting and/or obtaining housing security and fair housing services for over 750,000 consumers; facilitating 10,000 financial literacy workshops for more than 200,000 consumers; assisting in the modification of

---

[1] See, Joseph Treaster, *Protest and Possible Profit Bring Back the Insurers*, New York Times, October 30, 1996. https://www.nytimes.com/1996/10/30/business/protest-and-possible-profit-bring-back-the-insurers.html; National Underwriter editorial, *State Farm Settlement Puts Heat On Industry*, August 12, 1996. In it's editorial, the National Underwriter (an insurance industry trade periodical) wrote "*A single 11-page document has changed the landscape of the homeowners insurance market in this country. That document is the conciliation agreement signed last month by State Farm, the U.S. Department of Housing and Urban Development, the National Fair Housing Alliance and the Toledo Fair Housing Center, which settles NFHA and TFHC allegations of redlining and a subsequent HUD investigation. State Farm has agreed to significantly alter its national underwriting practices, most notably in no longer using age and value minimums and offering full replacement cost coverage to any prospect with a home in good physical condition.*"
[2] *See Shellhammer v. Lewallen*, 770 F.2d 167 (6th Cir. 1985).
[3] *See National Fair Housing Alliance v. Facebook, Inc.*, Case No. 1:18-cv-02689 (S.D.N.Y.).

17,993 housing units to make them accessible for persons with disabilities; facilitating the rehabilitation of over 800 abandoned homes, assisting over 900 homeowners avoid foreclosure, helping provide grants to 898 people enabling them to become homeowners; helping create the Qualified Mortgage Salon[4] to develop an industry-civil rights-consumer protection coalition to establish an updated Qualified Mortgage Rule to improve credit access for millions of mortgage applicants in the United States; co-leading a major foreclosure prevention and loss mitigation initiative which resulted in Congress and federal agencies putting in place measures to assist millions of Americans impacted by the COVID pandemic; facilitating the improved maintenance of 750,000 foreclosed properties; co-leading the effort to procure a $10 billion Homeowners' Assistance Fund in COVID relief packages to assist homeowners hardest hit by the COVID pandemic; co-leading the effort to secure $46 billion in Emergency Rental Assistance Program funding and developing programs to help 4 million renters impacted by the COVID pandemic; helping write and pass federal, state, and local laws and rules to significantly expand equitable housing opportunities and stop discrimination, housing insecurity, and predatory lending; and creating hundreds of public service announcements in 8 languages with over 5 billion impressions, and over $165 million in donated media.

---

[4] The QM Salon was established in 2020 by the National Fair Housing Alliance, Housing Policy Council, and then-Quicken Loans (Quicken Loans has since changed its name to Rocket Mortgage). The Salon was later joined by the Mortgage Bankers Association, American Bankers Association, Bank Policy Institute, Consumer Bankers Association, Asian Real Estate Association of America, Center for Responsible Lending, National Association of Realtors®, The Leadership Conference on Civil and Human Rights, National Association of Hispanic Real Estate Professionals, National Association of Real Estate Brokers, National Community Reinvestment Corporation, National Housing Conference, and U.S. Mortgage Insurers. NFHA served as a major author for a consensus comment paper the QM Salon submitted to the CFPB in 2020 in response to the agency's Notice of Proposed Rulemaking on the General Qualified Mortgage as a part of the Bureau's Ability-To-Repay/Qualified Mortgage Rule. *See*, Comment Re: Notice of Proposed Rulemaking on changes to the General Qualified Mortgage ("QM") Definition, https://nationalfairhousing.org/wp-content/uploads/2021/04/QM-Coalition_ATR-QM-NPRM-Response_090520.pdf

13.     My own fair housing and fair lending work began at the local level.  Prior to joining NFHA, I was the President and CEO of the Fair Housing Center of Toledo, Ohio, a private non-profit civil rights agency.  I also served as the President and CEO of the Northwest Ohio Development Agency, a Community Development Financial Institution.

14.     I have personally helped to lead major enforcement initiatives that have resulted in expanding equal housing opportunities and civil rights protections for millions of people.  Those cases involved addressing algorithmic bias[5], digital real estate redlining[6], discrimination against people who are deaf or hard of hearing[7], unfair lending policies impacting pregnant women[8], fair lending violations[9], sexual harassment[10], lending and insurance redlining practices[11], steering in the real estate sales market[12], rental discrimination[13] and, as in the present action, racial disparities in the maintenance and management of Real Estate Owned properties.

15.     I led major efforts to try and stop the proliferation of predatory lending practices during the 2008 macro foreclosure and financial crisis in the United States in the following ways:

---

[5] *National Fair Housing Alliance v. Facebook, Inc.*, Case No. 1:18-cv-02689 (S.D.N.Y.).

[6] *National Fair Housing Alliance, et al. v. Redfin*, Case No. 2:2020 cv 01586 (D.Wash. 2020).

[7] *National Fair Housing Alliance v. Beehive Homes*, (2:20-cv-00312 (D. Ut. 2020).

[8] *Williams v. Countrywide Home Loans, Inc.*, 2007 Ohio 5353 (Ohio App. 10/5/2007).

[9] *Stevens v. Michael Patterson et al., including Midwest Financial and Mortgage Services, Inc., and Decision One Mortgage Company, LLC*,Case No. CI 0200101536, Lucas County, Ohio, Common Pleas.

[10] See, e.g., Why Equal Housing for Women will Continue to be a 'Tough Road', MSNBC, https://www.msnbc.com/know-your-value/why-equal-housing-women-will-continue-be-tough-road-n1038266 ; National Fair Housing Forum: A Conversation on Sexual Harassment in Housing Situations, U.S. Department of Housing and Urban Development, https://www.hudexchange.info/trainings/courses/national-fair-housing-forum-a-conversation-on-sexual-harassment-in-housing-situations/;  National Fair Housing Forum: Investigating Complaints of Sexual Harassment in Housing Situations, U.S. Department of Housing and Urban Development, https://www.hudexchange.info/trainings/courses/national-fair-housing-forum-investigating-complaints-of-sexual-harassment-in-housing-situations/

[11] *See Toledo Fair Housing Center v. Nationwide Mutual Insurance Company* https://caselaw.findlaw.com/oh-court-of-common-pleas/1236912.html; *Toledo Fair Housing Center v. Farmers Insurance Group* https://law.justia.com/cases/federal/district-courts/FSupp2/61/681/2500888/; *National Fair Housing Alliance, et al. v. Liberty Mutual*   https://www.washingtonpost.com/archive/politics/1999/06/10/insurer-settles-redlining-complaint/b6d9939e-1423-4328-9f88-a52ea75051fd/; *National Fair Housing Alliance v. Prudential Insurance Company*  https://casetext.com/case/national-fair-housing-alli-v-prudential-ins-co.

[12] *See NFHA et al. V. Redfin*, Case No. 2:2020 cv 01586 (D.Wash. 2020); *NFHA v. Joe T. Lane Realty, Inc. and Coldwell Banker*, Case No. 1:08-cv-03427 (N.D. Ga.).

[13] *NFHA v. Evolve, LLC*, 1:2019cv01147 (D.D.C.).

      a.     During and after my service on the Federal Reserve Board's Consumer Advisory Council, compelling the Federal Reserve to use its authority under the Home Ownership and Equity Protection Act to adopt policies and practices that my colleagues and I were championing to stop discriminatory, abusive, fraudulent, and predatory lending practices, including those conducted by Defendants in this matter[14];

      b.     Assisted in efforts to pass federal legislation to stop predatory lending practices including providing language for the legislation;

      c.     Co-led the effort to pass and helped draft anti-predatory lending legislation in the State of Ohio and City of Toledo, OH;

      d.     Collaborated with other consumer protection and civil rights advocates throughout the nation working to establish anti-predatory legislation in other states;

      e.     Facilitated many efforts to educate consumers, regulators, and government and elected officials about predatory and abusive practices including hosting a five-city educational tour throughout the state of Ohio centered on highlighting ways to combat harmful practices;

      f.     Conducted and led research illustrating the dramatic increase in foreclosures primarily due to subprime lending practices;

---

[14] *See Attorney Gen. of the State of Fla. v. Ocwen Fin. Corp.*, No. 9:17-CV-80495 (S.D. Fla. 2020); *In re: Altisource Portfolio Solutions, S.A. Securities Litigation*, No. 14-81156 CIV-WPD (S.D. Fla. 2018); *CFPB v. Ocwen Fin. Corp.*, No. 17-CIV-80495-MARRA (S.D. Fla. 2017); *In the Matter of the Comm'r of Bus. Oversight v. Ocwen Loan Servicing LLC* (Cal. Comm'r of Bus. Oversight 2017); *CFPB et al. v. Ocwen Fin. Corp.*, No. 1:13-cv-02025-RMC (D.D.C. 2014); *In the Matter of Ocwen Fin. Corp, Ocwen Loan Servicing LLC* (N.Y. Dep't of Fin. Serv. 2014); *People of State of Cal. v. Deutsche Bank*, No. BC 460878 (Cal. Sup. Ct. 2013); *United States v. Deutsche Bank*, No. 11 eiv. 2976 (LAK) (S.D.N.Y. 2012); *City of Cincinnati v. Deutsche Bank Nat'l Trust Co*, 897 F. Supp. 2d 633 (S.D. Ohio 2012).

       g.      Engaged in multiple efforts with industry players to strongly compel them to adopt fair lending practices;

       h.      Coordinated with Fannie Mae to create an anti-predatory lending underwriting guideline – Lender Letter 2003_00 – which helped prohibit Fannie from purchasing loans with certain predatory provisions or features, including product steering, borrower's inability to pay, excessive fees, single-premium credit life insurance policies, harmful prepayment premiums and penalties, no escrow accounts, and in situations where creditors do not report borrowers' information to credit repositories;

       i.      Partnered with Fannie Mae to implement the State of Ohio's first Anti-Predatory Lending Remediation Program which was operated by the Toledo Fair Housing Center;

       j.      Joined other civil rights leaders in issuing warnings to government officials and industry representatives about the impending foreclosure and financial crisis and voluminous increase in foreclosed homes and/or REO units;

       k.      Along with The Leadership Conference on Civil and Human Rights, NAACP, Center for Responsible Lending, and other groups, led the call for the then-Bush Administration to issue a 6-month foreclosure moratorium so our groups could work with housing industry organizations to implement a nationwide mortgage loss mitigation program[15]; and

       l.      Undertook other measures.

---

[15] See, National Civil Rights Groups Call for Immediate Moratorium on Foreclosure Resulting from Risky Subprime Loans - The Leadership Conference on Civil and Human Rights; National Civil Rights Groups Renew Call for Immediate Moratorium on all Home Foreclosures - The Leadership Conference on Civil and Human Rights.

16. I played a major role in helping to establish the Consumer Financial Protection Bureau which was created by the Dodd-Frank Wall Street Reform and Consumer Protection Act, in response to the 2008 foreclosure and financial crisis, and the establishment of the Office of Fair Lending and Equal Opportunity within the CFPB. This work included helping to draft sections of the legislation.

17. I led NFHA's effort in 2018-19 to spearhead the Commemoration of the 50th Anniversary of the Fair Housing Act – an 18-month campaign featuring events and activities across the country to mark the passage of the Fair Housing Act and to develop strategies for continuing the unfinished work of the law.

18. I help lead NFHA's efforts to address racial inequality and eliminate structural barriers that prohibit underserved groups from accessing the opportunities they need to thrive. To this end, in 2020, the organization launched its Keys Unlock Dreams Initiative designed to significantly reduce the racial wealth and homeownership gaps and the Tech Equity Initiative designed to eliminate bias in technologies used in the housing and financial services sectors.

19. I am a published author contributing to several books and journals addressing a range of fair housing issues including, *The Fight for Fair Housing: Causes, Consequences, and Future Implications of the 1968 Federal Fair Housing Act; Designed for the Future: 80 Practical Ideas for a Sustainable World; Discriminatory Effects of Credit Scoring on Communities of Color;* and *From Foreclosure to Fair Lending: Advocacy, Organizing, Occupancy, and the Pursuit of Equitable Credit.*

20. I am a member of the Leadership Conference on Civil and Human Rights Board of Directors, Center for Responsible Lending Board of Directors, FinRegLab Board of Directors, JPMorgan Chase Consumer Advisory Council, Mortgage Bankers Association's Consumer

Advisory Council, Freddie Mac Affordable Housing Advisory Council, Fannie Mae Affordable Housing Advisory Council, Quicken Loans Advisory Forum, Bipartisan Policy Center's Housing Advisory Council, and Berkeley's The Terner Center Advisory Council.

21. As NFHA's corporate representative in the present litigation, I am familiar with the details of the investigation. I was a part of discussions in pioneering a methodology to investigate the maintenance and marketing of REO properties. I was a part of the decision to bring the lawsuit and I have followed the litigation closely.

22. I am familiar with all NFHA staff involved in the investigation of this case. I served in a supervisory capacity for many of the principal investigation coordinators during the period of this investigation from 2012-2018. I am particularly aware that the staff involved in the REO investigations are of the highest integrity. I know that the staff who reviewed the results of the field investigation and performed quality control as necessary, primarily Lindsay Augustine and Shanti Abedin, and, secondarily, Shanna L. Smith have never been accused of misconduct in connection with their professional activities.

23. In the many hundreds of enforcement actions that NFHA has pursued, NFHA has never been subject to any sanction. In the legal actions I oversaw during my tenure at the Toledo Fair Housing Center, no matter was ever subject to any sanction. In any fair housing action, a court may find the plaintiffs' claims as sanctionable if the claims are based on false allegations, if plaintiffs failed to allege facts sufficient to support their claim, where the plaintiff filed claims under an inapplicable statute, or where plaintiffs knew facts that would defeat the claim at the time of filing. NFHA has never been sanctioned by a court for improper conduct and, simply put, NFHA operates with the highest degree of integrity such that our affairs would not warrant being sanctioned under such standards.

24.     NFHA has never been found to have acted in bad faith with regards to its investigations, discovery, or the documentation it has maintained. NFHA adheres to the highest professional standards in our investigative operations.  NHFA has been regarded with favorable reviews and favorable outcomes in NFHA's long-standing HUD fair housing investigation and education-outreach contracts, industry partner compliance contracts, and fair housing litigation.

25.     NFHA is familiar with each of the Plaintiff organizations in this case.  NFHA's operating membership is composed of full-service fair housing organizations. NFHA's board of directors is composed, principally, of the Executive Directors of local fair housing centers. NFHA has conducted systemic investigations in partnership with some of the Plaintiffs involved in this matter, including investigations involving rental, real estate sales, homeowners' insurance, design and construction, and other sectors of the housing market. NFHA operates a fair housing training academy, as detailed in paragraph 8, called Fair Housing School.  Many staff members of the Plaintiff organizations have attended Fair Housing School to receive state-of-the-art training on conducting fair housing investigations. NFHA works with the Plaintiff organizations on a range of issues, including education and outreach, advocacy, and communications.

26.     I understand that in the present litigation (National Fair Housing Alliance, et al. v. Deutsche Bank National Trust, et al. Case No.: 1:18-cv-00839) disagreements exist amongst the parties and experts concerning Plaintiffs' investigative methods. Genuine disputes about specific methodological decisions may arise in the context of NFHA's enforcement actions, but this does not serve as a basis to impugn the credibility of NFHA's operations and the actions of NFHA staff, which are performed with integrity.

27.     I have reviewed the defense filing in this case of February 28, 2023 and its supporting materials which contain inflammatory, erroneous, and disparaging language, including

the supplemental report by Professor Justin McCrary which inaccurately depicts NFHA's investigation as "research" and misrepresents NFHA's investigation.

28.     Defendants' accusations that NFHA and our partners carried out the investigation in this case in a fraudulent or otherwise unprofessional manner are entirely false.

29.     NFHA conducted the investigation of this matter in accordance with long-held investigative techniques and methodologies that have been approved in litigation and have never been found by any court to be fraudulent.

30.     When investigators used a paper form in the field to capture inspection information, it was NFHA's practice to transfer that data over to an Excel spreadsheet and enter the information into the REO database. It was our practice to not retain the paper form in those instances. When investigators used iPads in the field to capture data, it was NFHA's practice to electronically transfer the information onto an Excel spreadsheet and enter the information into the REO database. There were no paper records in the later instance.

31.     NFHA kept true and verifiable records documenting the status of properties owned and/or managed by Defendants, which document our physical inspection of each of the properties identified in this matter including:

        a.      Photographs of each property and the deficiencies inspectors noted during the physical investigation;

        b.      Excel spreadsheets for each property into which field findings were entered upon returning to the office after site visits that capture identified deficiencies (see e.g. NFHA_0044759);

        c.      Documentation of deficiencies contained in the REO database which were based on the physical inspection and observation of investigators;

        d.       Travel and mileage records; and

        e.       Other documentation.

32.     NFHA conducted quality control of each entry in the REO database. NFHA staff relied on photographic information to conduct the quality control, which is evidenced by the photographs and information in the NFHA REO data base.

33.     Allegations of the nature lodged against NFHA and the other fair housing organizational Plaintiffs by Defendants Deutsche Bank, Ocwen Loan Servicing and Altisource Solutions are unprecedented. These false allegations are damaging to NFHA's and the Plaintiffs' mission and reputation as fair housing organizations.

     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on March 14, 2023.

_Lisa Rice_

Lisa Rice

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE;  HOPE FAIR HOUSING CENTER, et al., | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Manish S. Shah |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Jury Trial Demanded |
| Defendants. | |

**<u>DECLARATION OF LINDSAY AUGUSTINE</u>**

I, Lindsay Augustine, state as follows:

1.      I am employed by the National Fair Housing Alliance ("NFHA") as Director of Enforcement.  I started working for NFHA in 2012.  During all of my employment with NFHA, I have been directly involved with the investigation that NFHA conducted into disparate maintenance and marketing of Real Estate Owned properties ("REOs") in communities of color.

2.      Within a few years after my initial employment with NFHA, I eventually became the NFHA employee principally responsible for the maintenance and quality control of the REO Database.  Others assisted me from time to time, but I eventually bore primary responsibility. I was extensively deposed by the Defendants in this case, over the course of three days, about the management and operation of the REO Database and its application to the specific REOs that are the subject of this litigation.

3.      Conducting investigations is a regularly conducted activity of NFHA. As part of its investigation and enforcement activities, including fair housing testing, NFHA regularly

1

gathers information and keeps records of its investigations and contacts with persons or companies being investigated. It is a regular practice of NFHA to create and maintain records as part of its investigation activities. NFHA's investigators are required to create and store their investigation records at or near the time their investigation activity has occurred. In addition, the terms of HUD's enforcement grants received by NFHA require NFHA to keep records of any investigations funded by HUD.

4.       Anticipating that the facts and information to be collected as part of the REO investigation would be voluminous, NFHA engaged with its member agency Miami Valley Fair Housing Center to set up an electronic database for the storage of information and photographs generated during the nationwide investigation of REO properties ("the REO Database"). See ECF 249, PageID# 9133—9134 and accompanying exhibits (providing more details regarding creation of REO Database).

5.       I and another NFHA employee, Shanti Abedin, conducted research of foreclosed properties (REOs) located in neighborhoods meeting investigation criteria [see ECF 249, PageID#9136 and accompanying exhibits], and confirmed ownership of foreclosed properties by lenders, including Deutsche Bank National Trust Companies.  To do this, I researched publicly available property records and accessed and analyzed CoreLogic data.  This data included property location, year built, and owner of record. The investigation criteria included that REOs would only be inspected at a point in time 30 days or longer after the date of bank ownership (REO date), or in this case, the date that Defendants deemed the REO suitable for market by listing it on Hubzu, the Ocwen-Altisource proprietary auction platform.

6.       In connection with this process, NFHA created lists of properties for site visits resulting in REO Database entries that had been pre-determined to meet the 30-day post REO

2

date criteria for property inspections or that had been deemed suitable for market by the REO owner by, for example, listing it for auction. Site visit property lists were most often generated in connection with dates on which NFHA or its local investigators determined they were available and prepared to conduct site visits. Local investigators would customarily contact NFHA confirming upcoming site visit date availability, which triggered NFHA research of REOs in their region meeting investigation criteria, and the generation of a list for their impending site visits for groups of zip codes. It was customary for local investigators to email or call NFHA in return, to confirm the properties on a particular list had been inspected and to confirm the data and photos were uploaded into the REO Database.

7.    Likewise, REO properties meeting investigation criteria for site visits were expected to be completed ideally within one week and ideally no later than 30 days after generation and transmission to the local investigators of property lists based on NFHA property research. In any event, property lists were deemed stale after three to four weeks and could be refreshed and re-sent by NFHA. This standing practice for the investigation was based on the facts that (a) publicly available sale and ownership information was not always immediately reflected in available records, and (b) as time went on, the property could be sold before the date of inspection and no longer under bank ownership.

8.    Local investigators were trained by NFHA concerning how to conduct site visits, denote observed deficiencies on the property evaluation checklist, and photograph the REO property. The training materials and investigation protocols have been previously filed in this action at ECF 249-18. In pertinent part:

    a.    Investigative photograph protocols were covered in NFHA training and are explained at ECF 249-18, PageID#9552-9556, Photograph Protocols, and ECF

249-18, PageID#9557-9595, Glossary.  Each property's photos consisted of a contiguous set of photographs of the REO property, that on their own as a set demonstrated they were taken of the property on the NFHA-generated list. This is self- evident from the REO Database, an example of which is shown in ECF 249-18, PageID#9596-9628.

    b.  Every REO property record in the REO Database contains a field showing the address of the property. Standard protocol, if followed, required that every REO property record contain at least one photograph displaying and thus verifying the address number of the property. Id.

    c.  Every photograph associated with that property address is contained in that property record.

    d.  Every property photograph was required to be taken on the day of inspection.

    e.  The REO Database contains a field indicating when the photograph was uploaded to the Database.

9.    My understanding is that Altisource produced in discovery its own photographs of the REO properties at issue in this case.  During the course of this litigation, I have accessed and viewed various of Altisource's property and inspection photographs. The Defendants' photographs can be used as verification that the properties in the REO Database are the same properties as those owned or managed by the Defendants.

10.    Most of the photographs of Ocwen-Altisource-acknowledged properties in the REO database have a date-stamp indicating the day on which the photograph was taken, affixed to the photograph by the device taking the photograph, if a camera with date function was used (this feature was not automatic on iPads or phones).

       a.     The photographs in this case of the Ocwen and Altisource-acknowledged Deutsche Bank REOs are further verified by documentation including: particular street number photographs, Defendants' Hubzu real estate auction signage apparent in most of the photographs (lack of proper signage by Defendants occurred in some instances), other notices posted by Defendants on certain REOs, NFHA property research data and information, time and date stamps, emails with site visit calendaring targets, and other confirmatory information including evaluation sheets, time records, neighbor surveys, defendants' data and property photos, and Plaintiff- specific site inspection property lists.

11.     NFHA also trained local investigators in how to upload information and photographs into the REO Database. ECF 249-16, PageID#9512-9514 (Guidelines to using the REO Investigation Database); ECF 249-18, PageID#9629. Any individual uploading information into the REO Database was either trained by NFHA or trained by a staff member at their organization who had been trained by NFHA in uploading information in the REO Database.

12.     NFHA's own practice concerning photographs was to upload property photographs from its iPad or camera into desktop PC folders sorted by lender and date of visit, and then to NFHA's internal organization shared drive. NFHA advised investigators to similarly upload and store their site visit photographs in this manner, from which location they could upload their site photos into the REO Database.

13.     The protocol for uploading information into the REO Database was as follows:

       a.   First, an investigator of a local plaintiff would create a new record for a property being inspected and input the property address, year built, date of

visit, and lender information. The Database also included an optional field for the investigator to add any additional notes or information about the property.

b. Next, photographs taken during the inspection were uploaded into the REO Database. For photographs associated with a specific deficiency, the photograph was uploaded using a drop-down menu where the deficiency would be selected (e.g., a photograph of a broken window would correspond with a "Structure" and "Damaged Windows (Broken or Boarded)" tag). A noted deficiency was only tagged once, regardless of the number of photos displaying the deficiency, all of which were uploaded and remain in the REO Database. For photographs not associated with an observed deficiency, the photograph was uploaded with a general description (e.g., "neighboring property").

c. Local investigators were instructed to enter the site visit photos and property data into the REO database as soon as they were able after the on-site investigation.

14.    Once a local investigator entered information into the REO database, NFHA reviewed those entries and conducted a quality-control review. See ECF 249, PageID#9139-9142 and accompanying exhibits. NFHA compared property photographs to the deficiencies originally selected and would make edits:

a. Removing a marked deficiency if it was not visible in the photograph(s).

b. Adding a deficiency if it was visible in the photograph(s) but not marked.

c. Reviewing if the correct deficiency was selected. For example, if the investigator marked a deficiency as a "trespassing or warning sign" (a

6

deficiency category), but the actual photograph showed a "winterization sign" (not a deficiency category), NFHA removed the deficiency.

d.   NFHA typically conducted its quality-control review shortly after a local investigator uploaded the photographs and accompanying data.

e.   In connection with this litigation, I prepared a chart verifying the accuracy of information in the REO Database relating to Deutsche Bank Trustee properties.   ECF 249-1 (a).

15.   In addition, for purposes of this lawsuit against the Deutsche Bank Trustee and Ocwen and Altisource Defendants, we conducted a rigorous quality-control review, as described in ECF 361 at PageID#26485 (Plaintiffs' L.R. 56.1 Statement of Additional Facts, Paras. 67, 68 and accompanying exhibits].  No photographs were altered or changed in any way during or as a result of the NFHA quality control process described above.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 19th day of December, 2025.


_Lindsay Augustine_
Lindsay Augustine
National Fair Housing Alliance

# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
      NATIONAL FAIR HOUSING          )
 4    ALLIANCE; HOPE FAIR HOUSING    )
      CENTER, et al.,                )
 5                                   )
                                     )
 6                     Plaintiffs,   )
                                     )
 7           vs.                     ) No. 1:18-cv-00839
                                     )
 8    DEUTSCHE BANK NATIONAL         )
      TRUST, as trustee, et al.,     )
 9                                   )
                                     )
10                     Defendants.   )

11

12              The deposition of SHANNA SMITH, called by the

13    Defendants for examination, taken remotely pursuant to

14    notice and pursuant to the Federal Rules of Civil

15    Procedure for the United States District Courts

16    pertaining to the taking of depositions, taken before

17    April M. Metzler, Certified Shorthand Reporter,

18    Registered Merit Reporter, Certified Realtime Reporter,

19    and Notary Public, at Washington, District of Columbia,

20    commencing at 9:02 a.m. CST on the 24th day of

21    June, 2022.

22

23

24
```



1          Q.   Okay.

2          A.   And in depositions also about damages and

3     injury and, you know, with rental, sales, lending,

4     homeowners' insurance.

09:31:39  5          We also developed the testing methodology for

6     sexual harassment in housing and with design and

7     construction cases, appraisal cases, mortgage lending

8     underwriting, private mortgage insurance.  We had a

9     lawsuit against the largest MI company.  And -- oh, the

09:32:26 10    major real estate sales cases in Toledo as well as at

11    NFHA.

12          Mortgage underwriting, mortgage servicing,

13    insurance -- the insurance that is required by some

14    servicers.  I can't remember the -- it's not like

09:33:09 15   regular insurance.  It's this other kind of insurance

16    that is put on the refinancing of a loan.  I'll have to

17    think about the name of that insurance.

18          But I've testified in cases that go from the

19    beginning of a lending practice, from advertising

09:33:36 20   outreach, bank locations, all the way through the MI

21    underwriting of those loans and their underwriting

22    processes.

23          Q.   Is your testimony about -- in your testimony

24    about testing methodologies, are there certain

1    principles that should apply to all testing, certain

2    foundational principles that you have testified that

3    should apply to every type of test, whether it's

4    mortgage origination or it's MI or all these different

09:34:17  5    things you've discussed?

6         A.    Whether -- it's a huge variety of ways to

7    conduct testing.  And we train testers and staff to the

8    objectives about gathering the information and report

9    objectively what happens during a test.

09:34:52 10         Q.    Do you --

11         A.    You have testing where you're talking to

12    people.  Then you have design and construction testing.

13    You have REO testing, which is very different from

14    rental, sales, and lending testing or sexual harassment

09:35:07 15    testing.

16         Q.    What does it mean to be "objective in

17    testing"?

18         A.    Not to insert your own opinions into your

19    final report.

09:35:23 20         Q.    And how should testers -- how should testing

21    be designed so that it encourages objectivity?

22         A.    Well, in rental, sales, lending testing, we do

23    what's called debriefing of the testers.  And the

24    testers come back with their notes and they write their



1    first draft of their narrative.  And we go step by step

2    through that narrative clarifying what they've written,

3    if there's any opinion in there; for example, they might

4    say, She was mean to me.

09:36:01  5         Well, no, you can't say that.  What actually

6    happened?  What did she do that you thought was mean?

7         And so they have to describe what was said or

8    done, so we debrief those testers.

9         In design and construction testing, you're

09:36:22 10  just going in and taking photographs and measuring, you

11   know, the width of doors, the heights of sinks, the

12   stairs -- steps, so you're just taking photographs.  And

13   the photographs then are the evidence that you have in

14   design and construction tests, very much like REO

09:36:47 15  testing:  The photographs are the evidence.

16        Q.   Any other well accepted or generally accepted

17   steps to be taken to ensure objectivity by the testers?

18        A.   Well, I feel part of it is training, and then

19   testers go out and do practice tests in rental, sales,

09:37:12 20  and lending and insurance cases.  And so that gives us

21   an opportunity to see how they write their report.  And

22   if they're -- during the debriefing if they understand

23   what it means to be objective and not insert your own

24   opinion and then if a tester, you know, is pushing back



1    that they're making judgment calls about, Oh, they must

2    have discriminated against me because I was told nothing

3    was available, those kinds of testers get weeded out

4    very politely.  And we make sure that we're screening

09:37:51   5    their ability to observe what happened and to accurately

6    report back.

7              And then the debriefing is one of the steps

8    that we use with testers.  And sometimes even with our

9    own staff, to make sure that they've dotted every "I"

09:38:17  10    and crossed every "T," in going through their final

11    written narrative, which is then the work product that

12    goes into the case file.

13         Q.   Is it best practices to inform testers that

14    you believe they're going to find discrimination when

09:38:37  15    they go out?  Is that part of --

16         A.   We didn't tell them they're going to find

17    discrimination when they're going out.

18         Q.   Why not?

19         A.   Because they're going out to make an inquiry

09:38:51  20    about the availability of an apartment.  Now, if we

21    assign those testers' children and they don't have

22    children, they may assume that this is an investigation

23    on familial status.  It doesn't matter, because they're

24    capturing the information and sharing it with us.



1    there was the electronic file that was maintained.  And

2    I believe that was on the S drive under the REO

3    folders -- folder and then the subfolders and the REO.

4         Q.   We've heard about -- we've heard testimony

11:47:28  5  about some sort of locked room where testing information

6    is kept.

7              Are you familiar with the room I'm talking

8    about?

9         A.   Yes.  There are closets that -- well, it's an

11:47:42 10  office -- now, it's an office about this large

11   (indicating) and that was for rental sales, lending,

12   insurance cases.  The REO investigation was all on

13   database, because there was -- it was so voluminous.

14        Q.   What information is maintained by NFHA in the

11:48:08 15  rental, sales, lending and insurance cases?

16        A.   The test report forms, the tester assignment

17   forms, the narratives, anything that was recorded, the

18   photographs from the design and construction

19   investigations.  I don't know -- yeah, those -- those

11:48:33 20  might have been electronic because I remember people

21   showing them to me electronically.  But whatever was in

22   the case file was retained.

23        Q.   What other investigations has NFHA done in

24   which it destroyed contemporaneous notes by an inspector



# EXHIBIT 4

PLTFF EXHIBIT 24



OCWEN

Ocwen Financial Corporation

# REO Loan On-boarding Procedure

Version 1

Document Owner: Director, Servicing Operations Oversight
Approved:  05/25/2016
Approved By:  Mortgage Servicing Oversight Control Director
Reference #: 15019

*Printed versions are for reference only. Please refer to the electronic copy for the latest version.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          OCWEN_0012928

**O C W E N**

## TABLE OF CONTENTS

I. PURPOSE OF THIS PROCEDURE ............................................................................ 3

II. SCOPE OF THIS PROCEDURE.............................................................................. 3

III. ROLES AND RESPONSIBILITIES .......................................................................... 3

IV. PROCEDURE ......................................................................................................... 3

    A. REO OVERSIGHT STAFF ................................................................................. 3

    B. VENDOR ............................................................................................................ 4

    C. GOVERNANCE .................................................................................................. 4

    D. EXCEPTIONS AND ESCALATIONS ................................................................. 4

V. RELATED POLICIES AND PROCEDURES.............................................................. 4

*Printed versions are for reference only. Please refer to the electronic copy for the latest version.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

OCWEN_0012929

**REO Loan On-boarding Procedure, V1**
APPROVED: 05/25/2016
APPROVED BY: Mortgage Servicing Oversight Control Director
REFERENCE #: 15019

# I. PURPOSE OF THIS PROCEDURE

The purpose of this REO Loan On-boarding Procedure ("Procedure") is to document the processes and activities performed by Ocwen Financial Corporation ("Ocwen") and all of its domestic and international subsidiaries (collectively "Ocwen" or "Company") related to Real Estate Owned ("REO") and to provide an overview of the REO boarding process when a servicing transfer occurs and define the roles of the parties involved.

# II. SCOPE OF THIS PROCEDURE

This Procedure applies to all Ocwen personnel and contractors involved in the processes and activities documented therein. For questions regarding the scope of this Procedure, always consult the Document Owner.

Ocwen Loan Servicing's REO Oversight Department is part of the Mortgage Servicing Oversight area, oversees the REO process, and acts as the REO business unit for Ocwen. Ocwen's vendor manages the REO process, including the boarding of service-transferred loans into their REO system.

# III. ROLES AND RESPONSIBILITIES

The Mortgage Servicing Oversight Department implements, maintains and administers this Procedure. Senior management of each affected department or Business Unit ("BU") is responsible for enforcing the standards and practices under this Procedure, including communicating compliance expectations, throughout the BU. When applicable, Corporate Compliance oversees and monitors adherence to the requirements set in this Procedure. For questions regarding the responsibilities for this Procedure, always consult the Document Owner.

# IV. PROCEDURE

REO Oversight will support Servicing Transaction Management ("STM") and the vendor to ensure all necessary data is provided to board the REO loans into the vendor's system so the vendor can proceed timely with the REO process.

## A. REO OVERSIGHT STAFF

- Oversee the boarding process to ensure all data is provided, and all loans listed as REO board into the vendor's system to manage.

- Support STM and Vendor during the process

- Verify by vendor sign off that vendor obtained all information necessary to board the REOs

- Ensure reconciliation was complete and vendor signed off that all properties boarded

- Approve vendor boarding policy and procedure

---

*Printed versions are for reference only. Please refer to the electronic copy for the latest version.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER　　　　　　　　　　　OCWEN_0012930

**REO Loan On-boarding Procedure, V1**
APPROVED:  05/25/2016
APPROVED BY:  Mortgage Servicing Oversight Control Director
REFERENCE #:  15019

**OCWEN**

## B. VENDOR

- Provide boarding data requirements and detailed boarding procedure document

- Provide contact list of persons responsible for the boarding process

- Ensure all required boarding data has been provided, and sign off once received

- Board all transferred loans into REO system, and reconcile to original list provided by STM team once complete.

- Provide sign off to both REO oversight and STM team that all loans boarded successfully

## C. GOVERNANCE

This Policy and Procedure will be reviewed and evaluated for accuracy and relevance by the REO Senior Management Team on an as needed basis and at least annually to ensure compliance.

## D. EXCEPTIONS AND ESCALATIONS

Any exceptions and/or escalations identified are processed and managed by the REO oversight staff, and senior manager as required.

## V. RELATED POLICIES AND PROCEDURES

The following documents are related to this Procedure. Accordingly, it is recommended that they are read and applied in combination with this Procedure.

- Servicing Operations Policy

- REO Oversight Procedure

---

**Tier 4 Procedure**          Page 4 of 5          **Next Review**:  05/25/2017

*Printed versions are for reference only. Please refer to the electronic copy for the latest version.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          OCWEN_0012931

**REO Loan On-boarding Procedure, V1**
**APPROVED:** 05/25/2016
**APPROVED BY: Mortgage Servicing Oversight Control Director**
**REFERENCE #: 15019**

## PROPERTIES SUMMARY

ORIGINAL CREATION DATE:  05/11/2016
APPROVAL DATE:  05/25/2016
SUPERSEDES:  Not Set
LAST REVIEW DATE:  05/25/2016
NEXT REVIEW DATE:  05/25/2017
LAST MODIFIED DATE:  05/18/2016
DEPARTMENT(S):  112405 - Servicing Operations Oversight, SERV: Operations - Servicing Oversight
BUSINESS UNIT:  Mortgage Servicing Oversight
DOCUMENT TYPE: Tier 4 Procedure
KEYWORDS:  Not Set
CUSTOM MARKERS:  Subcategories of EPMO Markers not selected.

*Printed versions are for reference only. Please refer to the electronic copy for the latest version.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    OCWEN_0012932

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Harry D. Leinenweber |
| | Magistrate Judge Sidney I. Schenkier |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Jury Trial Demanded |
| Defendants. | |

**DEFENDANT OCWEN LOAN SERVICING, LLC'S RESPONSES TO PLAINTIFFS'**
**APRIL 29, 2022 INTERROGATORIES REGARDING AFFIRMATIVE DEFENSES**

Defendant Ocwen Loan Servicing, LLC ("Ocwen"), by and through its attorneys, and pursuant to Fed R. Civ. P. 26 and 33, hereby submits its written objections and responses to Plaintiffs' April 29, 2022 interrogatories regarding affirmative defenses.

**PRELIMINARY STATEMENT**

Ocwen reserves its right to assert any and all applicable objections to the Interrogatories or the use of any responses thereto in any proceeding in any action (including any trial), including without limitation, objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, and the like, and any and all other objections on the grounds that it would require the exclusion of any responses herein if offered in Court.

No incidental or implied admissions are intended in these responses. Ocwen's response to any Interrogatory should not be taken as an admission that Ocwen accepts or admits the existence of any fact(s) set forth or assumed by such Interrogatory or that such response constitutes admissible evidence. Ocwen's response is not intended to be, and shall not be construed to be, any waiver by Ocwen of any or all objections(s) to the Interrogatory.

748927679.1

Ocwen has not yet completed its (a) investigation of the facts relating to this case, (b) expert discovery in this action, or (c) preparation for trial. The following interrogatory responses are based upon information known at this time and are given without prejudice to Ocwen's right to amend, supplement, and revise these responses with any subsequently discovered information. The following responses are provided subject to this Preliminary Statement, which Ocwen hereby incorporates by reference into each response.

## GENERAL OBJECTIONS

Ocwen incorporates its August 19, 2020 General Objections, Objections to Definitions, and Objections to Instructions from its Objections and Responses to Plaintiffs' First Set of Interrogatories as if fully set forth herein.

## INTERROGATORIES

**Interrogatory No. 1.** In your Sixth Affirmative Defense, you allege that "[t]he alleged conduct or omissions, if any, that are the source of Plaintiffs' claims arose as a result, in whole or in part, of the conduct of third parties or was the result of actions or omissions of third parties, including but not limited to the property owners, tenants, occupiers, vandals, squatters, trespassers, neighbors, abutting property owners, and/or governmental authorities, for whom Ocwen has no responsibility and over which Ocwen had no control." Describe the factual basis for this defense, including all of the third-party actors and actions you are referring to, and identifying all witnesses and all documents that support that defense.

**ANSWER:** Ocwen objects to Interrogatory No. 1 on the grounds that "factual basis," "actors," and "actions" are vague, ambiguous, and undefined. For example, the term "actions" could involve many activities or events that would require too much detail to describe in an interrogatory response. Ocwen further objects to this Interrogatory on the ground that it is premature, given the state of discovery. Expert discovery has not closed, and additional support for this defense may be uncovered. Ocwen also objects to Interrogatory No. 1 on the ground that it is an improper contention interrogatory that asks Ocwen to describe the applicability of its legal defenses to the facts of this case. In addition, Ocwen objects to Interrogatory No. 1 to the extent

that it seeks pre-February 2015 information, as that period of time is not relevant to Ocwen in this litigation. Ocwen also objects to Interrogatory No. 1 because it is overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it calls for Ocwen to respond on a property-by-property basis for each of the 699 Deutsche Bank REO properties serviced by Ocwen and Altisource Solutions, Inc. ("Altisource") that were part of Plaintiffs' investigation. For example, Ocwen objects to Interrogatory No. 1 to the extent it calls for Ocwen to identify by name "all … third-party actors" who caused damage to each REO property inspected by Plaintiffs. Ocwen also objects to Interrogatory No. 1 to the extent it seeks attorney-client privileged communications, attorney work product or other protected trial preparation materials that include the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of Ocwen.

Subject to and without waiving its objections, Ocwen states that the nature of Plaintiffs' claims and investigation in this action inherently involves the conduct of various third parties over whom Ocwen had no responsibility or control. To start, other financial institutions or GSEs, such as Wells Fargo, US Bank, and Fannie Mae, as well as Plaintiffs and government institutions, all took actions affecting REO properties and communities in the geographic areas "investigated" by Plaintiffs in this litigation. In addition, Plaintiffs assert claims related to the exterior maintenance and marketing of REO properties. That exterior maintenance and marketing of REO properties by definition addresses conditions caused by third parties—*e.g.*, property owners, tenants, occupiers, vandals, squatters, trespassers, neighbors, abutting property owners, and/or governmental authorities. Similarly, the inspection criteria invented by Plaintiffs also by definition examines conditions caused by third-parties—*e.g.*, graffiti, broken windows, etc. *See, e.g.,* Second Am. Compl. ¶¶ 5, 88-89. Ocwen witnesses who may provide testimony in support of

this defense include Corey Carpenter, Michael Hawkins, Jay Jastrzemski, and Teresita Duran, among others.

For specific exterior maintenance or marketing issues at particular properties, pursuant to Federal Rule of Civil Procedure 33(d), Ocwen refers Plaintiffs to: (1) inspection forms (to the extent they still exist) and results produced by Plaintiffs for particular properties; (2) complaints produced by Ocwen from its i-Case database, which may include information related to third-party damage to certain properties (OCWEN_0016098); (3) the RealServicing produced by Ocwen in this litigation (Ocwen_0015536-0015603; OCWEN_0015760-61, OCWEN_0016096-98) and (4) property-specific information produced by Altisouce from its servicing records for the inspected properties. Investigation continues, and Ocwen specifically reserves the right to supplement its response to this interrogatory, following the conclusion of expert discovery.

**Interrogatory No. 2.** In your Fifteenth Affirmative Defense, you allege that "Plaintiffs' claims are barred because Ocwen's actions, omissions, or policies were supported by race-neutral, non-discriminatory, objective, substantial, and/or legitimate business rationales." Describe the factual basis for this defense, including all of the specific actions, omissions, policies and rationales you are referring to, and identifying all witnesses and all documents that support that defense.

**ANSWER:** Ocwen objects to Interrogatory No. 2 on the ground that "factual basis," "actions," "omissions," "policies" and "rationales" are vague, ambiguous, and/or undefined. For example, the term "actions" could involve many activities or events that would require too much detail to describe in an interrogatory response. Ocwen further objects to this Interrogatory on the ground that it is premature, given the state of discovery. Expert discovery has not closed, and additional support for this defense may be uncovered. Ocwen also objects to Interrogatory No. 2 on the ground that it is an improper contention interrogatory that asks Ocwen to describe the applicability of its legal defenses to the facts of this case. Ocwen also objects to Interrogatory No. 2 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of

the case to the extent it seeks an exhaustive list of "all witnesses and all documents" relating to "specific actions, omissions, policies and rationales."  Ocwen also objects to Interrogatory No. 2 to the extent it seeks attorney-client privileged communications, attorney work product or other protected trial preparation materials that include the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of Ocwen.   In addition, Ocwen objects to Interrogatory No. 2 to the extent that it seeks pre-February 2015 information, as that period of time is not relevant to Ocwen in this litigation.

Subject to and without waiving its objections, Ocwen states that it serviced REO properties held in Deutsche Bank trusts (and oversaw Altisource's property preservation work) based on race-neutral, non-discriminatory, objective, substantial, and legitimate business rationales—in particular, to preserve and maintain REO properties to safeguard the interests of investors.  Ocwen's services agreements, scopes of work, and policies and procedures applied to Altisource's property preservation work and marketing activities for REO properties.

Pursuant to Federal Rule of Civil Procedure 33(d), Ocwen refers Plaintiffs to its services agreements, scopes of work, and policies and procedures (*see, e.g.*, Pls. Dep. Exs. 19, 54-55, 93-96, 100, 315, 320).  Witnesses who may testify to Ocwen's race-neutral, non-discriminatory, objective, substantial, and legitimate business rationales, including Ocwen's services agreements, scopes of work, and policies and procedures, include Michael Hawks, Corey Carpenter, Jason Jastrzemski, Teresita Duran. and Michael Yanniello.   Investigation continues, and Ocwen specifically reserves the right to supplement its response to this interrogatory, following the conclusion of expert discovery.

**Interrogatory No. 3.** In your Eighteenth Affirmative Defense, you allege that "[s]ome or all of Plaintiffs' claims are barred, in whole or in part, to the extent administrative procedures in municipal law provide the exclusive remedy for Plaintiffs' recovery or must be complied with and completed before resorting to suit is allowed. Thus, Plaintiffs have failed to exhaust their

administrative remedies." Describe the factual basis for this defense, including all specific administrative procedures you are referring to in all jurisdictions you are referencing, and identifying all witnesses and all documents that support that defense.

      **ANSWER:**    Ocwen objects to Interrogatory No. 3 because the term "factual basis" is undefined, vague, and/or ambiguous. Ocwen further objects to this Interrogatory on the ground that it is premature, given the state of discovery. Expert discovery has not closed, and additional support for this defense may be uncovered.  Ocwen also objects to Interrogatory No. 3  on the ground that it is an improper contention interrogatory that asks Ocwen to describe the applicability of its legal defenses to the facts of this case.  Ocwen also objects to Interrogatory No. 3 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks an exhaustive list of "all specific administrative procedures," "all jurisdictions," and "all witnesses and all documents."  Ocwen also objects to Interrogatory No. 3 to the extent it seeks attorney-client privileged communications, attorney work product or other protected trial preparation materials that include the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of Ocwen.   In addition, Ocwen objects to Interrogatory No. 3 to the extent that it seeks pre-February 2015 information, as that period of time is not relevant to Ocwen in this litigation.

      Subject to and without waiving its objections, Ocwen states that witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case. Investigation continues, and Ocwen specifically reserves the right to supplement its response to this interrogatory, following the conclusion of expert discovery.

      **Interrogatory No. 4.** In your Twenty-Fourth Affirmative Defense, you allege that "Plaintiffs' disparate impact and treatment claims against Ocwen fail because Plaintiffs' investigation and corresponding information and statistics are unsound and do not demonstrate the alleged disparity in the maintenance and marketing of REO properties." Describe the factual basis for this defense, including identifying all witnesses and all documents that support that defense.

**ANSWER:** Ocwen objects to Interrogatory No. 4 because the term "factual basis" is undefined, vague, and/or ambiguous. Ocwen objects to Interrogatory No. 4 as overly broad, unduly burdensome, and not proportionate to the needs of the case to the extent it calls for Ocwen to document each and every flaw in Plaintiffs' investigation and identify "all witnesses and all documents" relating to those flaws. Ocwen further objects to Interrogatory No. 4 to the extent it seeks expert analysis on the flaws in Plaintiffs' investigation before the Court orders a process and deadlines for expert disclosures. Plaintiffs have indicated that their investigation will be the subject of expert testimony (in resisting disclosure of certain aspects of their investigation), Ocwen has not yet had the opportunity to review Plaintiffs' expert disclosures and depose Plaintiffs' expert(s) (since they have not been identified yet), and Ocwen expects to proffer its own expert testimony on the flaws in the investigation (and related factual bases). Ocwen also objects to Interrogatory No. 4 to the extent it seeks attorney-client privileged communications, attorney work product or other protected trial preparation materials that include the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of Ocwen.

Ocwen further objects to Interrogatory No. 4 to the extent Plaintiffs' spoliation of evidence has impeded Ocwen's ability to discover additional facts concerning the unsoundness of Plaintiffs' investigation. Despite knowing that they would be initiating litigation based on their investigation, Plaintiffs failed to retain critical documentation from their investigation, including handwritten inspection forms detailing the results of each property inspection. Without this critical documentation, Ocwen's ability to meaningfully analyze Plaintiffs' investigation and the results of their property inspections has been significantly impaired. *See* ECF Nos. 226-28.

Subject to and without waiving its objections, Ocwen states that discovery has already shown that Plaintiffs' investigation of Deutsche Bank REO properties is not the meticulous, objective study they portrayed. *E.g.,* SAC ¶¶ 4-5, 84-95. To the contrary, depositions of Plaintiffs' representatives and inspectors have showed that inspections were performed by unqualified, inexperienced inspectors and were biased, results-driven, and highly subjective. Ocwen provides some examples below, but these examples are not intended to be an exhaustive list. Additional support for the flaws in Plaintiffs' investigation are set forth in the depositions of Plaintiffs' representatives and inspectors and the documents produced by Plaintiffs.

*Unqualified, Inexperienced Inspectors*. NFHA did not set *any* qualification or experience requirements for inspectors who examined REO properties for maintenance and marketing deficiencies. Augustine Dep. at 233-35. Many inspectors had no experience at all with residential property inspections and no training beyond limited instruction (if any) provided by NFHA as part of this investigation. *See, e.g.,* Houlihan Dep. 25-26; Lepley Dep. at 16, 54-55, 158-60; McKenzie Dep. at 47. Some inspectors were college students who were children of Plaintiffs' staff members and were paid $90 per property to perform inspections. Some inspectors did not receive any standardized training from NFHA at all. *See, e.g.,* Houlihan Dep. at 55-56; Lepley Dep. at 35-37, 170-72; Nelson Dep. at 197-98.

*Biased, Results-Driven Process*. Plaintiffs' inspectors concede that they should not know in advance what their inspections are testing (*e.g.*, comparing property conditions in predominantly white and predominantly minority neighborhoods) or the preferred outcome because it might bias the results. *See, e.g.,* Houlihan Dep. at 45; Lepley Dep. at 80-82, 150-53. Yet, inspectors knew that NFHA was investigating alleged discriminatory maintenance and marketing of REO properties in predominantly minority communities. *See, e.g.,* Houlihan Dep.

at 76-77; McKenzie Dep. at 151. Inspectors were even told the identity of lenders associated with properties they were inspecting and the racial makeup of the neighborhood in advance of performing the inspections. *See, e.g.,* Houlihan Dep. at 86-89; Lepley Dep. at 113-14, 176-77; McKenzie Dep. at 84, 112-115, 178-81. For example, inspectors were provided lists of properties in "white ZIP codes" to inspect. Augustine Dep. at 104-06, 123-24. NFHA also shared the identity of lenders with inspectors, prompting at least one local housing organization to question the integrity of the practice. FHONWO_0000765-766 ("I opened [the list], but then closed it immediately, because I believe that if I am going out to investigate any of these, then I should not have knowledge of what banks own them.").

The inspections were more than just biased, they were results-driven. To join NFHA's lawsuit, local housing organizations had to perform a certain number of inspections that *yielded the desired results*. If their inspections did not yield the desired results, their data was apparently omitted from NFHA's "study" (which of course would skew the results). Remarkably, Plaintiff Housing Opportunities Made Equal of Virginia, Inc. ("HOME of Virginia") wrote to one of its inspectors that in order to join this lawsuit, "we would need to conduct more evaluations …, and those evaluations *would have to show disparities of a level determined by NFHA.… To this point, according to our partners at NFHA, [our] evaluations have not shown levels of disparity necessary to join an amended complaint*." HOMEVA_0002651 (emphasis added). HOME of Virginia then discussed "[s]eek[ing] out additional REO properties" in a dubious attempt to obtain "evidence of discrimination that meets NFHA's criteria." *Id.*

***Highly Subjective Inspection Criteria.*** The unqualified, inexperienced inspectors and biased and results-driven process are especially problematic because Plaintiffs' "study" relied on highly subjective criteria. Inspectors admitted that there were no objective criteria for a host of

factors they scored—including curb appeal, excess trash, accumulated mail, unshoveled snow, dead or overgrown shrubbery, accumulated leaves, chipped paint, and water damage—leaving the scoring to the judgment of individual inspectors (who, again, knew the desired outcome). *See, e.g.,* Houlihan Dep. at 95-96, 98-99, 105-06, 112-13; Lepley Dep. at 187-89, 195, 215-17; McKenzie Dep. at 164-71, 186-87, 197-99, 200-03. Not surprisingly then, when inspectors were asked to re-score properties at their depositions based on photographs from the inspections, they frequently scored the properties quite differently. *See, e.g.,* Augustine Dep. at 437-441, 456-57 & 2688 Filmore Evaluation Form, 7332 S. Talman Evaluation Form. NFHA purportedly required that two people be present for every inspection, but that directive was not followed. *See, e.g.,* Houlihan Dep. at 65, 79-80 (Houlihan Dep.).

The inspection reports also reveal problems that go far beyond the realm of subjectivity. For example, inspectors found deficiencies for overgrown grass in minority communities when the ground was covered in snow and grass was not visible. *See, e.g.,* NFHA_0005234-5256. Inspectors conceded that they inspected properties in all seasons regardless of the presence of snow or other conditions that might impact their ability to accurately score certain measures. Ex. Houlihan Dep. at 113-14; Lepley Dep. at 117-18, 203-05, 219-20; McKenzie Dep. at 222-29.

***Structural flaws*.** Even if Plaintiffs had implement their investigation in a sound and objective manner (and they did not), Plaintiffs' methodology is structurally flawed. Plaintiffs visited each property just once, which at most shows whether an alleged deficiency existed at a particular point in time, and not whether the condition of a property was improving or deteriorating, or whether the servicer acted promptly to correct the deficiency. Plaintiffs also did not take into account nondiscriminatory explanations for deficiencies; they simply assumed discrimination if they found a property in a predominantly white neighborhood to be in better

condition than a property in a predominantly minority neighborhood. Moreover, Plaintiffs'

investigation ignored properties that appeared to be occupied or where repair work was actively

occurring, which skews the results by excluding the very properties that show evidence of the

owner and/or servicer actively maintaining it. In other words, if Plaintiffs visited a property in a

predominantly minority neighborhood *while Altisource was at the property* performing

maintenance work, they would have inexplicably excluded the property from their study.

Plaintiffs further purport to have found "statistically significant" disparities only on an aggregate

basis across all properties investigated, without alleging statistically significant disparities in any

one city. This is particularly problematic because Plaintiffs apparently excluded from their data

set inspections that would not have shown discrimination (HOMEVA_0002651), which would

have skewed the results and undermined any finding "statistical significance." The Court

declined to address these structural flaws at the motion to dismiss stage, but made clear that these

are "fine argument[s] to make" on summary judgment or at trial. *Nat'l Fair Housing Alliance v.*

*Deutsche Bank Nat'l Trust*, 2019 WL 5963633, at *14 (N.D. Ill. Nov. 13, 2019). Investigation

continues, and Ocwen specifically reserves the right to supplement its response to this

interrogatory.

> **Interrogatory No. 5.** In your Thirty-Third Affirmative Defense, you allege that "Ocwen
> is entitled to indemnification and/or apportionment against all parties, persons, or entities whose
> acts or omissions directly or proximately caused or contributed to the incidents alleged in the
> Second Amended Complaint, or to the damages allegedly sustained by Plaintiffs, if any, either as
> alleged in the Second Amended Complaint or otherwise." Describe the factual basis for this
> defense, including identifying all witnesses and all documents that support that defense.

**ANSWER:**    Ocwen objects to Interrogatory No. 5 because the term "factual basis" is

undefined, vague, and/or ambiguous. Ocwen also objects to Interrogatory No. 5 on the grounds

that it is overly broad, unduly burdensome, and not proportional to the needs of the case to the

extent it seeks an exhaustive list of "all witnesses and all documents" supporting the defense.

Ocwen also objects to Interrogatory No. 5 to the extent it seeks attorney-client privileged communications, attorney work product or other protected trial preparation materials that include the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of Ocwen. Ocwen objects to Interrogatory No. 5 because it is premature, as expert discovery has not closed.

Subject to and without waiving its objections, Ocwen states that Plaintiffs have already alleged multiple other entities engaged in similar discriminatory conduct in the same areas Plaintiffs "investigated" for this litigation. Moreover, Ocwen incorporates its response to Interrogatory No. 1 herein. In addition, Ocwen may have the right to seek indemnification for Plaintiffs' claims. Investigation continues, and Ocwen specifically reserves the right to supplement its response to this interrogatory, following the conclusion of expert discovery.

**Interrogatory No. 6.** In your Forty-Second Affirmative Defense, you allege that "Plaintiffs' claims are barred, in whole or in part, by the doctrine of comparative fault, including the fault of plaintiffs and third parties who have not yet been identified." Describe the factual basis for this defense, including all actors and actions whose fault you are referring to, and identifying all witnesses and all documents that support that defense.

**ANSWER:** Ocwen objects to Interrogatory No. 6 because the term "factual basis" is undefined, vague, and/or ambiguous. Ocwen also objects to Interrogatory No. 6 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks an exhaustive list of "all witnesses and all documents" supporting the defense. Ocwen also objects to Interrogatory No. 6 to the extent it seeks attorney-client privileged communications, attorney work product or other protected trial preparation materials that include the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of Ocwen. Ocwen objects to Interrogatory No. 6 because it is premature, as expert discovery has not closed.

Subject to and without waiving its objections, Ocwen incorporates its responses to Interrogatory Nos. 1 and 5 herein. Investigation continues, and Ocwen specifically reserves the right to supplement its response to this interrogatory, following the conclusion of expert discovery.

**Interrogatory No. 7.** In your Forty-Third Affirmative Defense, you allege that "[i]f Plaintiffs have sustained any injuries or incurred any expenses, such injuries or expenses, if any, were the result of intervening or superseding events, factors, occurrences, or conditions, which were in no way caused by Ocwen and for which Ocwen is not liable." Describe the factual basis for this defense, including all intervening or superseding events, factors, occurrences or conditions you are referring to, and identifying all witnesses and all documents that support that defense.

**ANSWER:** Ocwen objects to Interrogatory No. 7 because the term "factual basis" is undefined, vague, and/or ambiguous. Ocwen also objects to Interrogatory No. 7 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it calls for Ocwen to respond on a property-by-property basis for each of the 676 Deutsche Bank REO properties serviced by Ocwen and Altisource that were part of Plaintiffs' investigation. For example, Ocwen objects to Interrogatory No. 7 to the extent it calls for Ocwen to identify each and every "event[], factor[], occurrence[], or condition[]," and "all witnesses and all documents," for each REO property inspected by Plaintiffs. Ocwen also objects to Interrogatory No. 7 to the extent it seeks attorney-client communications, attorney work product or other protected trial preparation materials that include the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of Ocwen. Ocwen objects to Interrogatory No. 7 because it is premature, as expert discovery has not closed.

Subject to and without waiving its objections, Ocwen incorporates its response to Interrogatory No. 1. Investigation continues, and Ocwen specifically reserves the right to supplement its response to this interrogatory, following the conclusion of expert discovery.

**Interrogatory No. 8.** In your Forty-Seventh Affirmative Defense, you allege that "Plaintiffs' claims are barred to the extent that the alleged conduct of Ocwen was privileged or subject to license, in whole or in part." Describe the factual basis for this defense, including all privileges or licenses you are referring to, and identifying all witnesses and all documents that support that defense.

**ANSWER:** Ocwen objects to Interrogatory No. 8 because the term "factual basis" is undefined, vague, and/or ambiguous. Ocwen also objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it calls for Ocwen to respond on a property-by-property basis for each of the 676 Deutsche Bank REO properties serviced by Ocwen and Altisource that were part of Plaintiffs' investigation. For example, Ocwen objects to Interrogatory No. 8 to the extent it calls for Ocwen to identify alleged conduct, and "all witnesses and all documents" related thereto, for each REO property inspected by Plaintiffs. Ocwen also objects to Interrogatory No. 8 to the extent it seeks expert analysis on the flaws in Plaintiffs' investigation before the Court orders a process and deadlines for expert disclosures. Ocwen further objects to Interrogatory No. 8 to the extent it seeks attorney-client privileged communications, attorney work product or other protected trial preparation materials that include the mental impressions, conclusions, opinions or legal theories of any attorney for or other representative of Ocwen.

Subject to and without waiving its objections, Ocwen states that Plaintiffs' investigation encompassed property preservation and marketing activities on REO properties that Ocwen and Altisource were obligated to perform by local municipal codes and authorities. Yet, Plaintiffs' investigation improperly used those activities as evidence of purported discrimination. For example, Plaintiffs assert discrimination based on the presence of "boarded windows" and "trespassing or warning signs." Second Am. Compl. ¶ 89. Yet many cities affirmatively *require* owners of vacant properties to board windows and/or install signs warning against trespassing. In fact, as HUD has explained, defendants cannot be liable for purported discrimination based on

aggregated statistics encompassing "acts that [defendants were] legally obligated to perform." U.S. Dep't of Housing & Urban Dev., Determination of No Reasonable Cause, *National Fair Housing Alliance v. U.S. Bank N.A.*, HUD Case No. 01-12-0283-8 (Jan. 8, 2016).

For specific issues at particular properties, pursuant to Federal Rule of Civil Procedure 33(d), Ocwen refers Plaintiffs to: (1) inspection forms (to the extent they still exist) and results produced by Plaintiffs for particular properties; (2) property-specific information produced by Altisouce from its servicing records for the inspected properties; and (3) the RealServicing data produced by Ocwen in this litigation (Ocwen_0015536-0015603; OCWEN_0015760-61, OCWEN_0016096-98). Investigation continues, and Ocwen specifically reserves the right to supplement its response to this interrogatory, following the conclusion of expert discovery.

**Interrogatory No. 9.** Describe in detail any property preservation vendors who performed services with respect to REO properties owned by either of the Deutsche Bank Defendants, as Trustee, who were terminated by you between January 1, 2010, and December 31, 2018, including non-renewal of contracts, as a result of the vendor's provision or non-provision of property preservation services. As part of your answer, you should include the identity of the vendor, the services provided, the reason for termination or nonrenewal, and the date of termination or nonrenewal.

**ANSWER:** Ocwen objects to Interrogatory No. 9 as vague and ambiguous to the extent it seeks to define property preservation vendors who were "terminated" by Ocwen to include "non-renewal of contracts."

Subject to and without waiving its objections, Ocwen states that for the time period relevant to this litigation (February 2015 through June 2018), it has used only Altisource as a property preservation vendor with respect to REO properties held in trust by the Deusche Bank Defendants, and that it has not terminated Altisource or declined to renew Altisource's contracts to perform property preservation work on REO properties on those properties.

Dated: July 22, 2022

Respectfully Submitted,

By: /s/ Debra Bogo-Ernst
Debra Bogo-Ernst
Matthew Sostrin
Jacey Norris
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel: (312) 701-7403
Fax: (312) 706-8474
dernst@mayerbrown.com
msostrin@mayerbrown.com
jnorris@mayerbrown.com

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record on July 22, 2022.

/s/ Debra Bogo-Ernst
Debra Bogo-Ernst

# EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NATIONAL FAIR HOUSING ALLIANCE, et al.,

        Plaintiffs,

           v.

DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al.,

        Defendants.

Case No. 18 CV 839

Judge Harry D. Leinenweber
Magistrate Judge Sidney I. Schenkier

Jury Trial Demanded

## DEFENDANT ALTISOURCE SOLUTIONS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' APRIL 29, 2022 SET OF INTERROGATORIES

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, Defendant Altisource Solutions, Inc. ("Altisource"), by and through its undersigned counsel, provides its responses to Plaintiffs' April 29, 2022 Set of Interrogatories to Defendant Altisource Solutions, Inc. (the "Interrogatories"). The following responses are subject to the "Preliminary Statement" and "General Objections" contained in Altisource's Responses to Plaintiffs' First and Second Interrogatories, which are fully incorporated herein.

## INTERROGATORIES

**Interrogatory No. 1.** In your Twenty-Fifth Affirmative Defense, you allege that "Plaintiffs' claims are barred, in whole or in part, by the doctrine of comparative fault, including the fault of plaintiffs and third parties who have not yet been identified." Describe the factual basis for this defense, including all actors and actions whose fault you are referring to, and identifying all witnesses and all documents that support that defense.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to its General Objections, Altisource objects to this Interrogatory because the terms "factual basis," "actors," and "actions" are undefined, vague, and/or ambiguous. For example, the term "actions" could encompass any number of intermediate or intervening activities or events that would require inscrutable detail to identify and describe. Altisource further objects on the grounds that the Interrogatory is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking information relating to a description of Altisource's "factual basis" for its defense, as well as "all actors and actions" and "all witnesses and documents" that support it. For example, the request asks Altisource to identify and procure information that would subsequently require Altisource to investigate and describe the full basis for its legal defenses while expert discovery remains ongoing.

Altisource further objects on the basis that this is an improper contention interrogatory that asks Altisource to describe the applicability of its legal defenses to the facts of this case. Altisource also objects to the request as improper as expert discovery remains ongoing, and an investigation into the cause and extent of Plaintiffs' claims and damages is subject to further expert discovery and analysis that cannot be quantified at this time. Altisource also objects on the ground that the Interrogatory seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, or another recognized legal privilege. Altisource further objects to this Interrogatory as being overly broad in time, scope, and duration to the extent it seeks to identify or seeks information that existed prior to or no longer in use as of February 14, 2015. Altisource objects to this Interrogatory where it seeks information duplicative of, or produced in response to, any other Interrogatory, including but not limited to, Plaintiffs' First and Second Interrogatories to Altisource, or interrogatories made to other parties in this case.

3

In addition, Plaintiffs assert claims related to the exterior maintenance and marketing of REO properties. That exterior maintenance and marketing of REO properties by definition addresses conditions caused by third parties—e.g., property owners, tenants, occupiers, vandals, squatters, trespassers, neighbors, abutting property owners, and/or governmental authorities. Similarly, the inspection criteria invented by Plaintiffs also by definition examines conditions caused by third-parties—e.g., graffiti, broken windows, etc. See, e.g., Second Am. Compl. ¶¶ 5, 88-89.

Subject to and without waiving its objections, Altisource states that it will supplement and amend its responses to this interrogatory after the completion of expert discovery. For purposes of this response, Altisource states that the facts supporting its Twenty-Fifth Affirmative Defense include, but are not limited to, actions affecting REO properties and communities in the geographic areas where each Plaintiff operates that were undertaken by other financial institutions such as Wells Fargo, US Bank, and Fannie Mae, as well as Plaintiffs and government institutions. Other facts relating to this Affirmative Defense include actions and activities by these entities that affect Plaintiffs' investigation of REO properties, Plaintiffs' operations and mission, Plaintiffs' diversion of resources, and Plaintiffs' community outreach efforts.

**Interrogatory No. 2.** In your Twenty-Eighth Affirmative Defense, you allege that "[t]o the extent Plaintiffs have suffered any legally cognizable injuries, damages, or harm, which Altisource denies, any such injuries, damages, or harm were the direct and proximate result of actions or omissions of third parties, whether intentional, negligent, or otherwise, for which Altisource has no responsibility, or over which it has no control." Describe the factual basis for this defense, including all of the third party actors and actions you are referring to, and identifying

all witnesses and all documents that support that defense. Witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case.

**<u>RESPONSE TO INTERROGATORY NO. 2:</u>**

In addition to its General Objections, Altisource objects to this Interrogatory because the terms "factual basis," "third party actors," and "actions" are undefined, vague, and/or ambiguous. For example, the term "actions" could encompass any number of intermediate or intervening activities or events that would require inscrutable detail to identify and describe. Altisource further objects on the grounds that the Interrogatory is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking information relating to a description of Altisource's "factual basis" for its defense, as well as "all of the third party actors and actions" and "all witnesses and documents" that support it. For example, the request asks Altisource to identify and procure information that would subsequently require Altisource to investigate and describe the full  basis for its legal defenses while expert discovery remains ongoing.

Altisource further objects on the basis that this is an improper contention interrogatory that asks Altisource to describe the applicability of its legal defenses to the facts of this case. Altisource also objects to the request as improper as expert discovery remains ongoing, and an investigation into the cause and extent of Plaintiffs' claims and damages is subject to further expert discovery and analysis that cannot be quantified at this time. Altisource also objects on the ground that the Interrogatory seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, or another recognized legal privilege. Altisource further objects to this Interrogatory as being overly broad in time, scope, and duration to the extent it seeks to identify or seeks information that existed prior to or no longer in use as of February 14, 2015. Altisource

objects to this Interrogatory where it seeks information duplicative of, or produced in response to, any other Interrogatory, including but not limited to, Plaintiffs' First and Second Interrogatories to Altisource, or interrogatories made to other parties in this case. In addition, Plaintiffs assert claims related to the exterior maintenance and marketing of REO properties. That exterior maintenance and marketing of REO properties by definition addresses conditions caused by third parties—e.g., property owners, tenants, occupiers, vandals, squatters, trespassers, neighbors, abutting property owners, and/or governmental authorities. Similarly, the inspection criteria invented by Plaintiffs also by definition examines conditions caused by third-parties—e.g., graffiti, broken windows, etc. See, e.g., Second Am. Compl. ¶¶ 5, 88-89.

Subject to and without waiving its objections, Altisource states that it will supplement and amend its responses to this interrogatory after the completion of expert discovery. For purposes of this response, Altisource states that the facts supporting its Twenty-Eighth Affirmative Defense include, but are not limited to, actions affecting REO properties and communities in the geographic areas where each Plaintiff operates that were undertaken by other financial institutions such as Wells Fargo, US Bank, and Fannie Mae, as well as Plaintiffs and government institutions. Other facts relating to this Affirmative Defense include actions and activities by these entities that affect Plaintiffs' investigation of REO properties, Plaintiffs' operations and mission, Plaintiffs' diversion of resources, and Plaintiffs' community outreach efforts.

**Interrogatory No. 3.** In your Thirty-Second Affirmative Defense, you allege that "Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' investigation and corresponding findings and statistics are unsound, unreliable, and/or insufficient to demonstrate the alleged disparity in the maintenance and marketing of REO properties." Describe the factual basis for this defense, including identifying all witnesses and all documents that support that

defense. Witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to its General Objections, Altisource objects to this Interrogatory because the term "factual basis," is vague, and/or ambiguous. For example, the Affirmative Defense may rely on the use of expert analysis, which has yet to be performed. It is unclear if the request seeks the factual basis as determined by these experts, or if there is an alternate set of "facts" Plaintiffs want Altisource to describe based solely on the allegations in the Second Amended Complaint. Altisource further objects on the grounds that the Interrogatory is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking a description of information relating to a description of Altisource's "factual basis" for its defense, as well as the identification of "all witnesses and documents." For example, the request asks Altisource to identify and procure information that would subsequently require Altisource to investigate and describe the full basis for its legal defenses while expert discovery remains ongoing.

Altisource further objects on the basis that this is an improper contention interrogatory that asks Altisource to describe the applicability of its legal defenses to the facts of this case. Altisource also objects to the request as improper as expert discovery remains ongoing, and an investigation into the cause and extent of Plaintiffs' claims and damages is subject to further expert discovery and analysis that cannot be quantified at this time. Altisource also objects on the ground that the Interrogatory seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, or another recognized legal privilege. Altisource further objects to this Interrogatory as being overly broad in time, scope, and duration to the extent it seeks to identify or seeks information that existed prior to or no longer in use as of February 14, 2015. Altisource

objects to this Interrogatory where it seeks information duplicative of, or produced in response to, any other Interrogatory, including but not limited to, Plaintiffs' First and Second Interrogatories to Altisource, or interrogatories made to other parties in this case.

Altisource further objects to this interrogatory to the extent Plaintiffs' spoliation of evidence has impeded Altisource's ability to discover additional facts concerning the un the unsoundness of Plaintiffs' investigation. Despite knowing that they would be initiating litigation based on their investigation, Plaintiffs failed to retain critical documentation from their investigation, including handwritten inspection forms detailing the results of each property inspection. Without this critical documentation, Altisource's ability to meaningfully analyze Plaintiffs' investigation and the results of their property inspections has been significantly impaired. See ECF Nos. 226-28.

Subject to and without waiving its objections, Altisource states that it will supplement and amend its responses to this interrogatory after the completion of expert discovery. For purposes of this response, Altisource states that there appear to be numerous reasons why Plaintiffs' investigation is an insufficient and unsound manner of supporting an inference of discrimination. At the outset, the premise that the investigation can identify discriminatory maintenance and marketing practices is false.

The study is also not rigorous enough to allow for an inference of discriminatory conduct due to failures in its data and control mechanisms, many of which are detailed in the Department of Housing and Urban Development's Determination of No Reasonable Cause order issued in *National Fair Housing Alliance et al. v. US Bank*, No. 01-12-0238-8 on January 8, 2016. Further, deposition testimony and evidence collected from Plaintiffs shows there is a lack of underlying evidentiary support for the investigation and statistical study. This absence includes, *inter alia*, an

absence of score sheets that are fundamental to determining the accuracy of the dataset used. Plaintiffs' efforts to "account" for these missing pieces in their dataset are likewise deficient, as Plaintiffs' process of evaluating deficiencies from photographs is fraught with subjectivity and inconsistencies. ***Unqualified, Inexperienced Inspectors***. NFHA did not set *any* qualification or experience requirements for inspectors who examined REO properties for maintenance and marketing deficiencies. Augustine Dep. at 233-35. Many inspectors had no experience at all with residential property inspections and no training beyond limited instruction (if any) provided by NFHA as part of this investigation. *See, e.g.,* Houlihan Dep. 25-26; Lepley Dep. at 16, 54-55, 158-60; McKenzie Dep. at 47. Some inspectors were college students who were children of Plaintiffs' staff members and were paid $90 per property to perform inspections. Some inspectors did not receive any standardized training from NFHA at all. *See, e.g.,* Houlihan Dep. at 55-56; Lepley Dep. at 35-37, 170-72; Nelson Dep. at 197-98.

  ***Biased, Results-Driven Process***. Plaintiffs' inspectors concede that they should not know in advance what their inspections are testing (*e.g.*, comparing property conditions in predominantly white and predominantly minority neighborhoods) or the preferred outcome because it might bias the results. *See, e.g.,* Houlihan Dep. at 45; Lepley Dep. at 80-82, 150-53. Yet, inspectors knew that NFHA was investigating alleged discriminatory maintenance and marketing of REO properties in predominantly minority communities. *See, e.g.,* Houlihan Dep. at 76-77; McKenzie Dep. at 151. Inspectors were even told the identity of lenders associated with properties they were inspecting and the racial makeup of the neighborhood in advance of performing the inspections. *See, e.g.,* Houlihan Dep. at 86-89; Lepley Dep. at 113-14, 176-77; McKenzie Dep. at 84, 112-115, 178-81. For example, inspectors were provided lists of properties in "white ZIP codes" to inspect. Augustine Dep. at 104-06, 123-24. NFHA also shared the identity of lenders with inspectors,

prompting at least one local housing organization to question the integrity of the practice. FHONWO_0000765-766 ("I opened [the list], but then closed it immediately, because I believe that if I am going out to investigate any of these, then I should not have knowledge of what banks own them.").

The inspections were more than just biased, they were results-driven. To join NFHA's lawsuit, local housing organizations had to perform a certain number of inspections that *yielded the desired results*. If their inspections did not yield the desired results, their data was apparently omitted from NFHA's "study" (which of course would skew the results). Remarkably, Plaintiff Housing Opportunities Made Equal of Virginia, Inc. ("HOME of Virginia") wrote to one of its inspectors that in order to join this lawsuit, "we would need to conduct more evaluations …, and those evaluations *would have to show disparities of a level determined by NFHA…. To this point, according to our partners at NFHA, [our] evaluations have not shown levels of disparity necessary to join an amended complaint*." HOMEVA_0002651 (emphasis added). HOME of Virginia then discussed "[s]eek[ing] out additional REO properties" in a dubious attempt to obtain "evidence of discrimination that meets NFHA's criteria." *Id.*

***Highly Subjective Inspection Criteria***.  The unqualified, inexperienced inspectors and biased and results-driven process are especially problematic because Plaintiffs' "study" relied on highly subjective criteria. Inspectors admitted that there were no objective criteria for a host of factors they scored—including curb appeal, excess trash, accumulated mail, unshoveled snow, dead or overgrown shrubbery, accumulated leaves, chipped paint, and water damage—leaving the scoring to the judgment of individual inspectors (who, again, knew the desired outcome). *See, e.g.,* Houlihan Dep. at 95-96, 98-99, 105-06, 112-13; Lepley Dep. at 187-89, 195, 215-17; McKenzie Dep. at 164-71, 186-87, 197-99, 200-03. Not surprisingly then, when inspectors were

10

asked to re-score properties at their depositions based on photographs from the inspections, they frequently scored the properties quite differently.  *See, e.g.,* Augustine Dep. at 437-441, 456-57 & 2688 Filmore Evaluation Form, 7332 S. Talman Evaluation Form.  NFHA purportedly required that two people be present for every inspection, but that directive was not followed.  *See, e.g.,* Houlihan Dep. at 65, 79-80 (Houlihan Dep.).

The inspection reports also reveal problems that go far beyond the realm of subjectivity. For example, inspectors found deficiencies for overgrown grass in minority communities when the ground was covered in snow and grass was not visible.  *See, e.g.,* NFHA_0005234-5256. Inspectors conceded that they inspected properties in all seasons regardless of the presence of snow or other conditions that might impact their ability to accurately score certain measures.  Ex. Houlihan Dep. at 113-14; Lepley Dep. at 117-18, 203-05, 219-20; McKenzie Dep. at 222-29.

***Structural flaws.***  Even if Plaintiffs had implement their investigation in a sound and objective manner (and they did not), Plaintiffs' methodology is structurally flawed.  Plaintiffs visited each property just once, which at most shows whether an alleged deficiency existed at a particular point in time, and not whether the condition of a property was improving or deteriorating, or whether the servicer acted promptly to correct the deficiency.  Plaintiffs also did not take into account nondiscriminatory explanations for deficiencies; they simply assumed discrimination if they found a property in a predominantly white neighborhood to be in better condition than a property in a predominantly minority neighborhood.  Moreover, Plaintiffs' investigation ignored properties that appeared to be occupied or where repair work was actively occurring, which skews the results by excluding the very properties that show evidence of the owner and/or servicer actively maintaining it.  In other words, if Plaintiffs visited a property in a predominantly minority neighborhood *while Altisource was at the property* performing

maintenance work, they would have inexplicably excluded the property from their study. Plaintiffs further purport to have found "statistically significant" disparities only on an aggregate basis across all properties investigated, without alleging statistically significant disparities in any one city. This is particularly problematic because Plaintiffs apparently excluded from their data set inspections that would not have shown discrimination (HOMEVA_0002651), which would have skewed the results and undermined any finding "statistical significance." The Court declined to address these structural flaws at the motion to dismiss stage, but made clear that these are "fine argument[s] to make" on summary judgment or at trial. *Nat'l Fair Housing Alliance v. Deutsche Bank Nat'l Trust*, 2019 WL 5963633, at *14 (N.D. Ill. Nov. 13, 2019).

Witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case.

**Interrogatory No. 4.** In your Thirty-Third Affirmative Defense, you allege that "Plaintiffs' claims are barred because Altisource's actions were supported by race-neutral, objective, substantial, and legitimate business rationales in furtherance of Altisource's business objectives, and these interests could not be served equally by reasonably available alternative means." Describe the factual basis for this defense, including all of the specific actions, omissions, policies and rationales you are referring to, and identifying all witnesses and all documents that support that defense. Witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case.

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to its General Objections, Altisource objects to this Interrogatory because the terms "factual basis," "actions," "omissions," "policies" and "rationales" are vague, and/or ambiguous. For example, the Affirmative Defense may rely on the use of expert analysis, which

has yet to be performed. It is unclear if the request seeks the factual basis as determined by these experts, or if there is an alternate set of "facts" Plaintiffs want Altisource to describe based solely on the allegations in the Second Amended Complaint. The term "actions" could encompass any number of intermediate or intervening activities or events that would require inscrutable detail to identify and describe. Altisource further objects on the grounds that the Interrogatory is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking a description of information relating to a description of Altisource's "factual basis" for its defense, as well as the identification of "all of the specific actions, omissions, policies and rationales," and "all witnesses and documents." For example, the request asks Altisource to identify and procure information that would subsequently require Altisource to investigate and describe the full basis for its legal defenses while expert discovery remains ongoing. Moreover, the identification of which "policies" Plaintiffs believe to result in discrimination has not been articulated by Plaintiffs, which frustrates Altisource's ability to provide a complete response to this interrogatory.

Altisource further objects on the basis that this is an improper contention interrogatory that asks Altisource to describe the applicability of its legal defenses to the facts of this case. Altisource also objects to the request as improper as expert discovery remains ongoing, and an investigation into the cause and extent of Plaintiffs' claims and damages is subject to further expert discovery and analysis that cannot be quantified at this time. Altisource also objects on the ground that the Interrogatory seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, or another recognized legal privilege. Altisource further objects to this Interrogatory as being overly broad in time, scope, and duration to the extent it seeks to identify or seeks information that existed prior to or no longer in use as of February 14, 2015. Altisource objects to this Interrogatory where it seeks information duplicative of, or produced in response to,

any other Interrogatory, including but not limited to, Plaintiffs' First and Second Interrogatories to Altisource, or interrogatories made to other parties in this case.

Subject to and without waiving its objections, Altisource states that it will supplement and amend its responses to this interrogatory after the completion of expert discovery. For purposes of this response, Altisource states that its polices and practices are race-neutral, objective, and supported by substantial and legitimate business rationales.

**Interrogatory No. 5.** In your Forty-First Affirmative Defense, you allege that "Plaintiffs' claims are barred to the extent that the alleged conduct of Altisource was privileged or subject to license, in whole or in part." Describe the factual basis for this defense, including all privileges or licenses you are referring to, and identifying all witnesses and all documents that support that defense. Witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to its General Objections, Altisource objects to this Interrogatory because the term "factual basis," is vague, and/or ambiguous. For example, the Affirmative Defense may rely on the use of expert analysis, which has yet to be performed. It is unclear if the request seeks the factual basis as determined by these experts, or if there is an alternate set of "facts" Plaintiffs want Altisource to describe based solely on the allegations in the Second Amended Complaint. Altisource further objects on the grounds that the Interrogatory is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking a description of information relating to a description of Altisource's "factual basis" for its defense, as well as the identification of "all witnesses and documents." For example, the request asks Altisource to

14

identify and procure information that would subsequently require Altisource to investigate and describe the full basis for its legal defenses while expert discovery remains ongoing.

Altisource further objects on the basis that this is an improper contention interrogatory that asks Altisource to describe the applicability of its legal defenses to the facts of this case. Altisource also objects to the request as improper as expert discovery remains ongoing, and an investigation into the cause and extent of Plaintiffs' claims and damages is subject to further expert discovery and analysis that cannot be quantified at this time. Altisource also objects on the ground that the Interrogatory seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, or another recognized legal privilege. Altisource further objects to this Interrogatory as being overly broad in time, scope, and duration to the extent it seeks to identify or seeks information that existed prior to or no longer in use as of February 14, 2015. Altisource objects to this Interrogatory where it seeks information duplicative of, or produced in response to, any other Interrogatory, including but not limited to, Plaintiffs' First and Second Interrogatories to Altisource, or interrogatories made to other parties in this case.

Subject to and without waiving its objections, Altisource states that it will supplement and amend its responses to this interrogatory after the completion of expert discovery. For purposes of this response, Altisource states any conduct complained of by Plaintiffs was undertaken in compliance with the law and in accord with all applicable legal requirements in the jurisdictions in which Altisource operates. Plaintiffs' investigation encompassed property preservation and marketing activities on REO properties that Altisource was obligated to perform by local municipal codes and authorities. Yet, Plaintiffs' investigation improperly used those activities as evidence of purported discrimination. For example, Plaintiffs assert discrimination based on the presence of "boarded windows" and "trespassing or warning signs." Second Am. Compl. ¶ 89. Yet many

cities affirmatively require owners of vacant properties to board windows and/or install signs warning against trespassing. In fact, as HUD has explained, defendants cannot be liable for purported discrimination based on aggregated statistics encompassing "acts that [defendants were] legally obligated to perform." U.S. Dep't of Housing & Urban Dev., Determination of No Reasonable Cause, National Fair Housing Alliance v. U.S. Bank N.A., HUD Case No. 01-12-0283-8 (Jan. 8, 2016). Witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case.

**Interrogatory No. 6.** In your Forty-Seventh Affirmative Defense, you allege that "[s]ome or all of the Plaintiffs' claims are barred, in whole or in part, to the extent administrative procedures in municipal law provide the exclusive remedy for the Plaintiffs' recovery or must be complied with and completed before resort to suit is allowed." Describe the factual basis for this defense, including all specific administrative procedures you are referring to in all jurisdictions you are referencing, and identifying all witnesses and all documents that support that defense.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to its General Objections, Altisource objects to this Interrogatory because the term "factual basis," is vague, and/or ambiguous. For example, the Affirmative Defense may rely on the use of expert analysis, which has yet to be performed. It is unclear if the request seeks the factual basis as determined by these experts, or if there is an alternate set of "facts" Plaintiffs want Altisource to describe based solely on the allegations in the Second Amended Complaint. Altisource further objects on the grounds that the Interrogatory is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking a description of information relating to a description of Altisource's "factual basis" for its defense, as well as the identification of "all specific administrative procedures," "all jurisdictions," and "all witnesses and

documents." For example, the request asks Altisource to identify and procure information that would subsequently require Altisource to investigate and describe the full  basis for its legal defenses while expert discovery remains ongoing.

Altisource further objects on the basis that this is an improper contention interrogatory that asks Altisource to describe the applicability of its legal defenses to the facts of this case. Altisource also objects to the request as improper as expert discovery remains ongoing, and an investigation into the cause and extent of Plaintiffs' claims and damages is subject to further expert discovery and analysis that cannot be quantified at this time. Altisource also objects on the ground that the Interrogatory seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, or another recognized legal privilege. Altisource further objects to this Interrogatory as being overly broad in time, scope, and duration to the extent it seeks to identify or seeks information that existed prior to or no longer in use as of February 14, 2015. Altisource objects to this Interrogatory where it seeks information duplicative of, or produced in response to, any other Interrogatory, including but not limited to, Plaintiffs' First and Second Interrogatories to Altisource, or interrogatories made to other parties in this case.

Subject to and without waiving its objections, Altisource states that it will supplement and amend its responses to this interrogatory after the completion of expert discovery. Witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case.

**Interrogatory No. 7.** In your Fiftieth Affirmative Defense, you allege that "[t]he alleged conduct or omissions, if any, that are the source of Plaintiffs' claims arose as a result, in whole or in part, of the conduct of third parties or was the result of actions or omissions of third parties, including but not limited to the property owners, tenants, occupiers, vandals, squatters, trespassers,

neighbors or abutting property owners, and/or governmental authorities, for whom Altisource has no responsibility and over which Altisource had no control." Describe the factual basis for this defense, including all actors and actions (or omissions) you are referring to, and identifying all witnesses and all documents that support that defense.

### RESPONSE TO INTERROGATORY NO. 7:

In addition to its General Objections, Altisource objects to this Interrogatory because the terms "factual basis," "actors," "actions," and "omissions" are vague, and/or ambiguous. For example, the Affirmative Defense may rely on the use of expert analysis, which has yet to be performed. It is unclear if the request seeks the factual basis as determined by these experts, or if there is an alternate set of "facts" Plaintiffs want Altisource to describe based solely on the allegations in the Second Amended Complaint. The term "actions" could encompass any number of intermediate or intervening activities or events that would require inscrutable detail to identify and describe. Altisource further objects on the grounds that the Interrogatory is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking a description of information relating to a description of Altisource's "factual basis" for its defense, as well as the identification of "all actors and actions," "omissions," and "all witnesses and documents." For example, the request asks Altisource to identify and procure information that would subsequently require Altisource to investigate and describe the full  basis for its legal defenses while expert discovery remains ongoing.

Altisource further objects on the basis that this is an improper contention interrogatory that asks Altisource to describe the applicability of its legal defenses to the facts of this case. Altisource also objects to the request as improper as expert discovery remains ongoing, and an investigation into the cause and extent of Plaintiffs' claims and damages is subject to further expert discovery

and analysis that cannot be quantified at this time. Altisource also objects on the ground that the Interrogatory seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, or another recognized legal privilege. Altisource further objects to this Interrogatory as being overly broad in time, scope, and duration to the extent it seeks to identify or seeks information that existed prior to or no longer in use as of February 14, 2015. Altisource objects to this Interrogatory where it seeks information duplicative of, or produced in response to, any other Interrogatory, including but not limited to, Plaintiffs' First and Second Interrogatories to Altisource, or interrogatories made to other parties in this case.

Subject to and without waiving its objections, Altisource states that it will supplement and amend its responses to this interrogatory after the completion of expert discovery. For purposes of this response, Altisource states that the facts supporting its Fiftieth Affirmative Defense include, but are not limited to, actions affecting REO properties and communities in the geographic areas where each Plaintiff operates that were undertaken by other financial institutions such as Wells Fargo, US Bank, and Fannie Mae, as well as Plaintiffs and government institutions. Other facts relating to this Affirmative Defense include actions and activities by these entities that affect Plaintiffs' investigation of REO properties, Plaintiffs' operations and mission, Plaintiffs' diversion of resources, and Plaintiffs' community outreach efforts. Witnesses supporting this defense include all persons or entities identified by any party during the proceedings of this case.

**Interrogatory No. 8.** In your Fifty-Second Affirmative Defense, you allege that "[t]o the extent, Plaintiffs' claims for damages were caused or contributed to by the acts and/or omissions of some or all of Plaintiffs, or other parties or persons which are not chargeable to Altisource, Plaintiffs' damages, if any, are barred or must be reduced proportionally by the fault of Plaintiffs, or any such other parties or persons." Describe the factual basis for this defense, including all

Plaintiffs, third parties and actions or omissions you are referring to, and identifying all witnesses and all documents that support that defense.

**<u>RESPONSE TO INTERROGATORY NO. 8:</u>**

In addition to its General Objections, Altisource objects to this Interrogatory because the terms "factual basis," "third parties," "actions," and "omissions" are vague, and/or ambiguous. For example, the Affirmative Defense may rely on the use of expert analysis, which has yet to be performed. It is unclear if the request seeks the factual basis as determined by these experts, or if there is an alternate set of "facts" Plaintiffs want Altisource to describe based solely on the allegations in the Second Amended Complaint. The term "actions" could encompass any number of intermediate or intervening activities or events that would require inscrutable detail to identify and describe. Altisource further objects on the grounds that the Interrogatory is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking a description of information relating to a description of Altisource's "factual basis" for its defense, as well as the identification of all "third parties," "actions," and "omissions," and "all witnesses and documents." For example, the request asks Altisource to identify and procure information that would subsequently require Altisource to investigate and describe the full  basis for its legal defenses while expert discovery remains ongoing.

Altisource further objects on the basis that this is an improper contention interrogatory that asks Altisource to describe the applicability of its legal defenses to the facts of this case. Altisource also objects to the request as improper as expert discovery remains ongoing, and an investigation into the cause and extent of Plaintiffs' claims and damages is subject to further expert discovery and analysis that cannot be quantified at this time. Altisource also objects on the ground that the Interrogatory seeks documents that are protected from disclosure by attorney-client privilege, the

work product doctrine, or another recognized legal privilege. Altisource further objects to this Interrogatory as being overly broad in time, scope, and duration to the extent it seeks to identify or seeks information that existed prior to or no longer in use as of February 14, 2015. Altisource objects to this Interrogatory where it seeks information duplicative of, or produced in response to, any other Interrogatory, including but not limited to, Plaintiffs' First and Second Interrogatories to Altisource, or interrogatories made to other parties in this case.

Subject to and without waiving its objections, Altisource states that it will supplement and amend its responses to this interrogatory after the completion of expert discovery. For purposes of this response, Altisource states that Plaintiffs have already alleged multiple other entities engaged in similar discriminatory conduct in the same areas Plaintiffs investigated for this case. For example, the National Fair Housing Alliance's 2012 report "The Banks are Back" (Def's Exhibit 5083) details a number of alternative actors and historical causes that are alleged to contribute to the issues and damages Plaintiffs complain of.

**Interrogatory No. 9.** Describe in detail any property preservation vendors who performed services with respect to REO properties owned by either of the Deutsche Bank Defendants, as Trustee, who were terminated by you between January 1, 2010, and December 31, 2018, including non-renewal of contracts, as a result of the vendor's provision or non-provision of property preservation services. As part of your answer, you should include the identity of the vendor, the services provided, the reason for termination or nonrenewal, and the date of termination or nonrenewal.

In addition to its General Objections, Altisource objects to this Interrogatory because the terms "in detail," "performed services," "non-renewal of contracts," "provision or non-provision of property preservation services" are vague, and/or ambiguous. For example, "in detail" could

require a description that is subject to multiple interpretations as to length or content. Altisource further objects on the grounds that the Interrogatory is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking a description of information relating to a description of "identity of the vendor, the services provided, the reason for termination or nonrenewal, and the date of termination or nonrenewal" for "any" vendor. The number of properties at issue, and the length of time these properties were maintained, means Altisource could potentially be required to search hundreds or even thousands of records that are difficult to locate or access, and would not likely result in information that would be relevant to the claims or defenses at issue.

Altisource also objects on the ground that the Interrogatory seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, or another recognized legal privilege. Altisource further objects to this Interrogatory as being overly broad in time, scope, and duration to the extent it seeks to identify or seeks information that existed prior to or no longer in use as of February 14, 2015. This interrogatory is also, on its face, over broad in time, scope, and duration as it is not on its face limited to information related to the specific REO properties that are at issue in this case. Altisource objects to this Interrogatory where it seeks information duplicative of, or produced in response to, any other Interrogatory, including but not limited to, Plaintiffs' First and Second Interrogatories to Altisource, or interrogatories made to other parties in this case.

Subject to and without waiving its objections, Altisource states that the attached **Exhibit A**, designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and incorporated into this response by reference, is a list of vendors for properties at issue in this case who are no longer contracted by Altisource, as well as each vendor's respective service start and end date, the

type of services provided by each vendor, and the reason for each vendor's termination or non-renewal, to the extent such information was available.

Dated: July 22, 2022                            Respectfully submitted,

By: /s/ *Nathan Garroway*
Nathan Garroway
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com

Shannon Y. Shin
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Email: shannon.shin@dentons.com

Lisa Krigsten (admitted *pro hac vice*)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
Telephone: (816) 460-2400
Email: lisa.krigsten@dentons.com
*Counsel to Defendant Altisource Solutions, Inc.*

## CERTIFICATE OF SERVICE

I, Nathan Garroway hereby certify that on July 22, 2022, I caused a copy of the foregoing DEFENDANT ALTISOURCE SOLUTIONS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' APRIL 29, 2022 SET OF INTERROGATORIES to be served on the below counsel of record via email.

/s/ *Nathan Garroway*

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell Street #100
Geneva, IL 60134
jsoule@sbllegal.com
jbradtke@sbllegal.com
klambert@sbllegal.com

Tara K. Ramchandani
Yiyang Wu
Lila R. Miller
Rebecca J. Livengood
Reed N. Colfax
Soohyun Choi
*Relman Colfax PLLC*
1225 19th St NW, Suite 600
Washington, DC 20036
tramchandani@relmanlaw.com
ywu@relmanlaw.com
lmiller@relmanlaw.com
rlivengood@relmanlaw.com
rcolfax@relmanlaw.com
schoi@relmanlaw.com

Steven P. Schneck
Steve Schneck, Attorney at Law, LLC
2522 W. Lawrence Ave., #25081
Chicago, IL 60625
steve@steveschnecklaw.com

Morgan Whitney Williams
*National Fair Housing Alliance*
1101 Vermont Ave. NW #710
Washington, DC 20005
mwilliams@nationalfairhousing.org

Stephen Dane
*Dane Law LLC*
312 Louisiana Avenue
Perrysburg, OH 43551
sdane@fairhousinglaw.com

Kevin M. Papay
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
kevin.papay@morganlewis.com

Kenneth M. Kliebard
*Morgan, Lewis & Bockius LLP*
77 W. Wacker Drive, Suite 500
Chicago, IL 60601
kenneth.kliebard@morganlewis.com

Kurt W. Rademacher
*Morgan, Lewis & Bockius LLP*
1701 Market Street
Philadelphia, PA 19103
kurt.rademacher@morganlewis.com

David I. Monteiro
Victor H. Cruz
*Morgan, Lewis & Bockius LLP*
1717 Main Street, Suite 3200
Dallas, TX 75201
david.monteiro@morganlewis.com
victor.cruz@morganlewis.com

Debra Bogo-Ernst
Matthew C. Sostrin
Jacey D. Norris
*Mayer Brown LLP*
71 S. Wacker Drive
Chicago, IL 60606
dernst@mayerbrown.com
msostrin@mayerbrown.com
jnorris@mayerbrown.com