**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-00839<br><br><br><br><br><br><br><br><br><br><br><br>Judge Manish S. Shah |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' CONSOLIDATED FIRST ROUND MOTIONS IN LIMINE**

## INTRODUCTION

The Court has significantly narrowed this case through prior rulings, and only Plaintiffs' remaining claim under 42 U.S.C. § 3604(b) will proceed to trial. All other theories and causes of action have been dismissed, and the jury should hear only evidence that is relevant to the single claim that remains to be tried.

Plaintiffs have limited admissible proof to support their sole remaining claim, and much of the material they may offer is, among other things, irrelevant, cumulative, hearsay, or substantially more prejudicial than probative. In light of these constraints, Deutsche Bank National Trust and Deutsche Bank Trust Company Americas, as trustees (the "Trustee Defendants"), Ocwen Loan Servicing LLC n/k/a Onity Group Inc. ("Ocwen"), and Altisource Solutions Inc ("Altisource") anticipate that plaintiffs will seek to: (1) reintroduce allegations and evidence tethered to the dismissed claims; and (2) inflame or distract the jury with sensational, collateral, or character-based assertions that have no bearing on liability under § 3604(b). These categories of material warrant exclusion under Rules 401 and 402 (irrelevance), Rule 403 (unfair prejudice and confusion), Rule 602 (lack of personal knowledge), Rules 701–703 (improper lay or unreliable expert opinion), and the hearsay rules.

To ensure a fair and efficient trial focused on the issues properly before the jury, defendants submit this consolidated motions in limine to obtain clear pretrial rulings on discrete, incurable evidentiary defects in certain of plaintiffs' anticipated exhibits and testimony, and to preclude irrelevant and inflammatory matter that plaintiffs may seek to use to buttress their case. Addressing these issues now will streamline the presentation of evidence, avoid side litigation at trial, and provide the parties practical guidance for opening statements, witness examinations, and exhibit lists.

Accordingly, Defendants' motions address the following categories of materials the Court should exclude, including testimony, evidence, or argument: (1) related to defendants' sales and marketing practices, (2) not tied to specific properties at issue and limit the scope of statistical inferences, (3) related to plaintiffs' inadmissible expert witnesses, (4) related to altered database records, (5) related to non-party affiliates of the Trustee Defendants, (6) related to properties outside the scope of the remaining claim, (7) related to plaintiffs' time records and diversion logs, (8) related to purported damages already ruled improper, (9) related to local frustration of mission harm which plaintiffs' have disclaimed, (10) related to spoliated evidence, including a request for an adverse instruction, (11) related to irrelevant and inflammatory evidence, (12) related to the foreclosure crisis and foreclosure issues, and (13) references to Altisource's "Inappropriate Comments" policy.

Therefore, Defendants respectfully request that the Court grant each of Defendants' motions in limine in full for the following reasons.

## MEET-AND-CONFER STATEMENT

Pursuant to this Court's rules, Defendants have met and conferred with Plaintiffs as to whether Defendants could avoid brining any of the below motions in limine. Plaintiffs have not indicated that Defendants could avoid filing any of the following motions in limine.

## MOTION NO. 1:
## EXCLUDE EVIDENCE RELATED TO DEFENDANTS' SALES AND MARKETING PRACTICES

Defendants respectfully move this Court for an order in limine barring Plaintiffs, their counsel, and any witnesses called on Plaintiffs' behalf from introducing, eliciting, referring to, or otherwise placing before the jury any evidence and/or testimony pertaining to Defendants' marketing practices. Plaintiffs' claims based on marketing conduct under 42 U.S.C. §§ 3604(a), 3604(b), and 3605 were dismissed at summary judgment, and such evidence is irrelevant to any remaining issue for trial. See Fed. R. Evid. 401, 402.

Plaintiffs' proposed statement of uncontested facts confirms that Plaintiffs intend to introduce evidence relating to, among other things, property valuation; Altisource's use of the Hubzu real estate auction platform; marketing practices for REO properties in non-white neighborhoods; the turning on and off of utilities in lower-value REOs; the "Cash for Deed Sales: model; and property pricing.[1][2] None of that marketing evidence is admissible in light of the Court's prior rulings.

Marketing evidence is irrelevant to Plaintiffs' § 3604(a) claim. Plaintiff' § 3604(a) theory rested on the premise that Defendants' marketing practices rendered properties unavailable by allegedly imposing barriers on prospective buyers. (Dkt. No. 442 at 90-91). This Court squarely rejected that theory, holding that "Defendants' use of a specific sales platform does not take those properties off the market and make them truly unavailable under § 3604(a)." (Id. at 91 (internal citations omitted).

---

[1] See Declaration of Debra Bogo-Ernst ("Bogo-Ernst Decl."), Exhibit 1 Plaintiffs' Proposed Statement of Uncontested Facts ¶¶ 73, 150, 170, 173–74, 189, 193–96, 233-36, 245-46, 256, 262-70, 329.

[2] References to "Ex. __" herein refer to the exhibits to the Declaration of Debra Bogo-Ernst submitted herewith.

The Court further held that, "even if § 3604(a) encompasses the type of sales and marketing practices at issue, [P]laintiffs rel[ied] on inadmissible causation evidence to establish that [D]efendants' marketing and sales practices discouraged potential buyers." *Id.* (internal citation omitted). On that basis, the Court granted summary judgment to Defendants on the § 3604(a) claim. *Id.*

Because this Court has already ruled that marketing evidence cannot support a § 3604(a) claim as a matter of law, Plaintiffs may not introduce such evidence at trial in an effort to circumvent the Court's summary-judgment decision.

<u>Marketing evidence is also irrelevant to Plaintiffs' dismissed § 3605 claim</u>. Plaintiffs are expected to argue that such evidence should be allowed in support of their claim under § 3605, which encompasses discriminatory real estate related transactions. *Id.* at 91. But the Court rejected that theory as well.

Plaintiffs alleged that policies such as "using lower quality listings," "fewer marketing photos for low-value properties," "auction programs like 'Last Chance Auction' and "'Dynamic Pricing,'" and other alleged marketing decisions "'effectively removed' REO properties owned by Deutsche Bank and serviced by Ocwen from 'open real estate markets.'" *Id.* at 100 (citing Dkt. No. 360 at 38). While the Court acknowledged that a reasonable jury could credit Plaintiffs' regression analyses in the abstract, it emphasized that the evidence did not establish a causal link between Defendants' marketing conduct and the alleged disparities because the regression analysis "doesn't get [P]laintiffs all the way there." *Id.* at 103.

Critically, the Court held that because Plaintiffs' statistical evidence failed to "capture the impact of [D]efendants' conduct on REO property sales or availability in the market, resulting in a fundamental mismatch between [D]efendants' *marketing* and *sales* policies, the observed

statistical disparities, and the causal link that [P]laintiffs present." *Id*. at 104-105 (emphasis in original).

In short, Plaintiffs failed to present admissible evidence of disparate impact, limiting them to their § 3604(b) claim. *Id*. ("Because [P]laintiffs rely on the same statistical evidence to support their claims under both the disparate-impact and disparate-treatment theories of liability, summary judgment is granted in favor of [D]efendants on the §§ 3604(a) and 3605 claims under either framework.") Because this Court has already ruled that marketing evidence cannot support a § 3604(a) claim as a matter of law, Plaintiffs may not introduce such evidence at trial in an effort to circumvent the Court's summary-judgment decision.

Finally, as to Plaintiffs' sole remaining claim under § 3604(b), Plaintiffs were required to show that Defendants "conduct created discriminatory effects on the **maintenance and repair** of REO properties." *Id*. at 104 (emphasis added). This Court was explicit that Plaintiffs met this burden—if at all—only through evidence concerning Defendants' REO preservation and maintenance policies, inspection data capturing exterior maintenance deficiencies, and Ayres's statistical analysis of that deficiency data—not through evidence of marketing conduct. *Id*. at 105.

As the Court explained, Ayres's regressions relied on Plaintiffs' inspection data measuring exterior maintenance conditions and limited "marketing deficiencies" such as the presence or absence of a distressed-property sign. *Id*. But Plaintiffs simultaneously challenged Defendants' broader marketing and sales policies—policies that *were not captured by those measures and not tested by Ayres's analyses*. *Id*. (emphasis added). This disconnect was fatal. As the Court put it, "[t]he glaring gap is that Ayres's statistical analyses do not present evidence of disparities to support all three claims." *Id*. at 104.

That ruling foreclosed any attempt by Plaintiffs to introduce evidence of Defendants' marketing practices at trial to try to prop up their § 3604(b) claim. "[P]laintiffs' evidence of [D]efendant's REO preservation and maintenance policies, the inspection data capturing exterior REO deficiencies, and Ayres's statistical analysis of the deficiency data establish[ed] a prima facie case of disparate impact based on illegal *maintenance* conduct under § 3604 (b)," **not** marketing conduct. *Id.* at 105 (emphasis in original). Specifically, "Ayres's regressions rel[ied] on [P]laintiffs' inspection data that measured exterior maintenance and marketing deficiencies (e.g., the absence or presence of a 'distressed properties sign'). But [P]laintiffs challenge [D]efendants' marketing and sales policies that were not captured by those measures." *Id*. Simply put, '[t]he glaring gap is that Ayres's statistical analyses do not present evidence of disparities to support **all three** claims." *Id*. at 104 (emphasis added). Thus, evidence pertaining to Defendants' marketing practices is not relevant to any of Plaintiffs' claims.

Moreover, even if such marketing evidence were relevant–and it is not–any evidence of Defendants' marketing practices should be excluded under Rule 403. Trial is scheduled for nineteen days. The jury's time should not be consumed by evidence the Court has expressly found to be irrelevant to the remaining claims. Allowing such evidence would needlessly prolong the trial, risk confusing the jury, and would impermissibly undermine the Court's summary judgment ruling.

Damages evidence tied to these dismissed claims is irrelevant and prejudicial. The Court should similarly exclude damages evidence tied to claims it has dismissed. The Court dismissed all Plaintiffs' claims based on Defendants' marketing and sales policies, including claims under Sections 3604(a) and 3605. On March 31, 2025, the Court found that Plaintiffs' statistics did not show disparities and that their causal theory did not match the challenged marketing and sales

policies. Dkt. 442 at 103–04. As a result, damages evidence tied to marketing and sales topics such as Hubzu (a website utilized to conduct property sales), listing or pricing strategies, time on market, and other disposition practices has no bearing on any remaining claim or defense and is inadmissible under Rules 401 and 402. *Id.* at 104-05 ("… there's a fundamental mismatch between defendants' *marketing* and *sales* policies, the observed statistical disparities, and the causal link that plaintiffs present.") (emphasis in original). Even if any such evidence had marginal probative value, it would confuse the jury, invite mini-trials on dismissed issues, and unfairly prejudice Defendants. Rule 403 therefore requires exclusion. The same analysis applies to damages evidence aimed at the dismissed direct liability claims against the Trustee Defendants, including evidence about the Trustee Defendants' policies. The Court should exclude these categories of damages evidence to prevent the resurrection of dismissed claims and to keep the trial focused on the few issues that remain.

Courts routinely bar parties from using damages evidence to revive claims that have been resolved on summary judgment. *See DiPerna v. Chicago Sch. of Prof. Psychology*, No. 14 C 57, 2017 WL 11890933, at *2 (N.D. Ill. Oct. 13, 2017), aff'd, 893 F.3d 1001 (7th Cir. 2018); *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 713 (7th Cir. 2005). Because the Court has already held that Plaintiffs' statistical and causation showings do not tie any disparity to Defendants' marketing and sales policies, evidence concerning Hubzu, listing and pricing strategies, time on market, or other disposition practices "does not make any fact of consequence" on the surviving claims more or less probable. Fed. R. Evid. 401, 402. Allowing such evidence invites confusion on matters the Court has dismissed, warranting exclusion under Rule 403.

Accordingly, the Court should preclude Plaintiffs from introducing any evidence, testimony, or argument tied to (i) dismissed marketing and sales theories and (ii) dismissed direct liability claims against the Trustee Defendants.

**MOTION NO. 2:**
**TO EXCLUDE EVIDENCE NOT TIED TO SPECIFIC PROPERTIES AT ISSUE**
**AND LIMIT THE SCOPE OF STATISTICAL INFERENCES**

Defendants seek to exclude evidence that Plaintiffs failed to tie to (a) specific properties at issue and (b) limit the scope of statistical inferences, as set forth below.

**A.      Testimony That Defendants' Actions Caused Frustration of Local Plaintiffs' Missions Should Be Excluded As Irrelevant and Misleading**

The group of Plaintiffs in this case consists of one lead organization (the National Fair Housing Alliance ("NFHA")) with a purported national mission, and 19 local member organizations (collectively, the "Local Plaintiffs") with missions to serve their specific local service areas. While this case began as one asserting discrimination in each of these local service areas, based on a series of rulings from the Court that now constitute the law of the case, Plaintiffs can no longer assert discrimination occurred in any individual local service area, nor can they argue that the evidence of statistical disparities can be extrapolated from their study onto any local service area. As a result, any assertion by the Local Plaintiffs that any Local Plaintiff's mission was frustrated by any action of Defendants would be unsupported and unsupportable, and on that basis would risk confusing and misleading the jury. Because rulings of this Court already establish that there is no showing of statistical disparities for any of the Local Plaintiffs, Plaintiffs should be barred from making any assertion that the Local Plaintiffs' missions were frustrated.

**1.      The Law of the Case Establishes That There Was No Local Harm**

In its March 31, 2025 order on Defendants' motions for summary judgment and to exclude Plaintiffs' experts, the Court dismissed Plaintiffs' claims where the "discriminatory effects" were not connected to the particular purported harm required for the underlying claim. Dkt. No. 442 at 104-05. Following summary judgment, Plaintiffs' only remaining claims—the § 3604(b) claims— require that Plaintiffs prove that Defendants' actions caused a discriminatory effect as to the

maintenance and repair of REO properties. *See id.*

Clarifying the March 31, 2015 order, the Court issued further rulings in a July 9, 2025 order. Dkt. No. 460 ("Clarification Order"). In the Clarification Order, the Court noted, "[P]laintiffs disclaimed proving statistical disparities in a *single* service area." *Id*. at 4 (emphasis in original). The Court also held "Plaintiffs' inspection results cannot be extrapolated to infer the existence of maintenance disparities across all Deutsche Bank-owned REO properties within a broader metropolitan area." *Id.* Accordingly, Plaintiffs have no evidence of, and no means to prove, that Defendants' REO property maintenance caused a disparity within a specific service area.

### 2. The Local Plaintiffs' Missions Are Confined to Their Respective Service Areas

The Local Plaintiffs testified that their missions are to eliminate housing discrimination within their respective local operating areas. These localized areas, which are either statewide or limited to certain municipalities, are referred to as each Local Plaintiff's "service area." For example, the following are allegations in the Second Amended Complaint (Dkt. No. 70) and/or deposition testimony or produced documents regarding the Local Plaintiffs' missions and service areas:

| Local Plaintiff | Mission |
|---|---|
| South Suburban Housing Center | **Q.** What is the mission of the SSHC?<br><br>**A.** Our mission is to deal with all forms of housing discrimination that we find in our service area by conducting programs to counsel people and to investigate claims of discrimination to foster diverse communities throughout our service area. *See* Bogo-Ernst Decl., Ex. 2 SSHC 30(b)(6) Dep. Tr. at 45:5-10. |

| Local Plaintiff | Mission |
|---|---|
| Fair Housing Continuum | **Q.** … Plaintiff Fair Housing Continuum is a private nonprofit fair housing agency dedicated to the elimination of housing discrimination in Florida?<br><br>**A.** Yes, ma'am. The portion "dedicated to the elimination of housing discrimination in Florida," is the predominance of our mission statement. *See* Bogo-Ernst Decl., Ex. 3 FHC 30(b)(6) Dep. Tr. at 53:5-12. |
| Connecticut Fair Housing Center | **Q.** What is the mission of The Center?<br><br>**A.** The Center's mission is to insure [sic] that all Connecticut residents have access to the housing of their choice, free from housing discrimination. *See* Bogo-Ernst Decl., Ex. 4 CFHC 30(b)(6) Dep. Tr. at 49:16-19. |
| Louisiana Fair Housing Action Center | **Q.** What is the mission of LaFHAC?<br><br>**A.** The mission of LaFHAC is to eradicate housing discrimination and segregation across the State of Louisiana. *See* Bogo-Ernst Decl., Ex. 5 LaFHAC 30(b)(6) Dep. Tr. at 35:15-18. |
| Housing Opportunities Project For Excellence | **Q.** Do you have a mission statement at HOPE, Inc.?<br><br>**A.** We do.<br><br>**Q.** Do you know what it is currently or where I could find it?<br><br>**A.** It's a mission of HOPE Incorporated, to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunity throughout Florida. *See* Bogo-Ernst Decl., Ex. 6 HOPE 30(b)(6) Dep. Tr. at 43:16-23. |
| Fair Housing Center for Rights and Research | **Q.** What is the service area of the Fair Housing Center?<br><br>**A.** We're a nonprofit organization incorporated in the State of Ohio. Our primary service area includes Cuyahoga and Moraine Counties, but we definitely do research work on statewide issues and in other areas throughout the state as well. *See* Bogo-Ernst Decl., Ex. 7 FHCRR 30(b)(6) Dep. Tr. at 48:10-16.<br><br>Its mission is to promote fair housing and diverse communities, and to work to eliminate housing discrimination in Northeast Ohio . . . . SAC ¶ 27. |

| Local Plaintiff | Mission |
|---|---|
| Fair Housing Advocates of Northern California | **Q.** What is the service area of FHANC?<br><br>**A.** We provide full fair housing services to Marin County, Sonoma County, and Solano County. But we also have provided various levels of service to other areas as well, including parts of Alameda County, specifically Oakland, and the Richmond area. *See* Bogo-Ernst Decl., Ex. 8 FHANC Dep. Tr. at 38:3-8.<br><br>**Q.** What is the mission of Fair Housing Advocates of Northern California?<br><br>**A.** It is to ensure equal housing opportunity and promote the value of diversity in our neighborhoods. *Id.* at 39:4-7. |
| Metro Milwaukee Fair Housing Counsel | **Q.** What is the mission of Metro Milwaukee?<br><br>**A.** Metro Milwaukee's mission is to promote fair housing throughout the State of Wisconsin, and to combat illegal housing discrimination. We are also -- our mission also includes creating and maintaining racially and economically integrated communities. *See* Bogo-Ernst Decl., Ex. 9 MMFHC 30(b)(6) Dep. Tr. at 33:14-19. |
| Housing Opportunities Made Equal of Virginia | **Q.** What is HOME of Virginia's service area?<br><br>**A.** That -- for fair housing, we serve the entire state of Virginia. So we are looking for instances of housing discrimination and assist people with complaints from across the state. *See* Bogo-Ernst Decl., Ex. 10 HOMEVA 30(b)(6) Dep. Tr. at 35:6-10. |
| Fair Housing Center of Central Indiana | Fair Housing Center of Central Indiana ("FHCCI") is a private, nonprofit fair housing organization based in Indianapolis, Indiana and primarily serves 24 counties in Central Indiana.<br>…<br>In its targeted neighborhood, FHCCI funds acquisition and major rehabilitation of single-family homes to be sold to owner-occupants. SAC ¶ 19. |

| Local Plaintiff | Mission |
|---|---|
| Fair Housing Center of the Greater Palm Beaches | Plaintiff Fair Housing Center of the Greater Palm Beaches ("FHCGPB") is a nonprofit corporation dedicated to ensuring fair and affordable housing opportunities for all persons, by promoting culturally diverse communities, through open housing and the elimination of all barriers to that goal. The FHCGPB's primary purpose is the elimination of housing discrimination on the basis of race, color, national origin, religion, sex, familial status, disability, marital status, age, sexual orientation, and gender identity or expression throughout the Greater Palm Beaches area. The FHCGPB seeks the eradication and elimination of ***direct and indirect obstacles that limit full access to the housing market throughout Florida*** and seeks to end unlawful housing discrimination through enforcement, education, public awareness, and helping victims enforce their rights. SAC ¶ 20 (emphasis added). |
| Fair Housing Center of West Michigan | Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a private, non-profit organization established in 1980 to ensure equal housing opportunity as guaranteed under federal, state, and local fair housing laws. ***Based in Grand Rapids, Michigan, FHCWM works cooperatively throughout Michigan*** with governmental and community-based agencies to further fair housing goals. SAC ¶ 21 (emphasis added). |
| HOPE Fair Housing Center | HOPE Fair Housing Center ("HOPE"), established in 1968, is the oldest fair housing center in Illinois. HOPE represents 30 counties in Northern and North Central Illinois. SAC ¶ 24. |
| North Texas Fair Housing Center | North Texas Fair Housing Center ("NTFHC") is a nonprofit organization dedicated to eliminating housing discrimination in North Texas. SAC ¶ 30. |
| Open Communities | Open Communities is a nonprofit organization that serves seventeen north suburban communities in the Chicago, Illinois area. Open Communities works to promote economically and culturally diverse communities that welcome all persons in north suburban Chicago. SAC ¶ 31. |
| Fair Housing Opportunities of Northwest Ohio, Inc. | The purposes of the Toledo Fair Housing Center are to identify and eliminate all forms of unlawful discrimination in housing in the greater Toledo area. SAC ¶ 33. |
| Central Ohio Fair Housing Association | **A.** . . . And it says that: COFHA's mission is to eliminate housing discrimination and ensure equal housing opportunity for all people in our region.<br><br>**Q.** So that would be the mission statement to this then?<br><br>**A.** Yes. *See* Bogo-Ernst Decl., Ex. 11 COFHA 30(b)(6) Dep. Tr. 32:12-17. |

14

| Local Plaintiff | Mission |
|---|---|
| Denver Metro Fair Housing Center | Denver Metro Fair Housing Center ("DMFHC"), established in 2012, is a private, nonprofit fair housing enforcement agency serving six Denver Metro Counties: Adams, Arapahoe, Broomfield, Denver, Douglas, and Jefferson. SAC ¶ 18. |
| The Miami Valley Fair Housing Center | Mission: To eliminate housing discrimination and ensure equal housing opportunity for all people in our region. *See* Bogo-Ernst Decl., Ex. 12 MVFHC_0000023. |

Plaintiffs have produced no evidence in this case suggesting that the Local Plaintiffs had missions that were focused outside their local service areas. In short, implicit in any testimony by Plaintiffs that Defendants frustrated a Local Plaintiff's mission is the assertion that "Defendants created a discriminatory effect on housing in a *single service area*"—precisely what the Court ruled Plaintiffs have not and cannot prove. Dkt. No. 460 at 4.

### 3. Allowing the Local Plaintiffs to Assert That Defendants' Conduct Caused Frustration of Their Missions Will Needlessly Confuse the Jury and Risk an Improper Verdict.

The Local Plaintiffs should be precluded under Fed. R. Evid. 403 from asserting that Defendants' conduct caused frustration of their missions because such assertions would contradict the Court's ruling that there are no racial disparities—and therefore no wrongful conduct—occurring within any locality. These assertions would only serve to confuse the jury regarding the available evidence and risk a verdict based on improper grounds.

Assertions by Plaintiffs that Defendants' conduct caused frustration of the Local Plaintiffs' missions—missions that are tied to single service areas—would merely serve to confuse the jury and circumvent the Court's ruling. Critically, if the jury were to accept these assertions, the jury could return a verdict in direct contradiction to the Court's ruling; that is, that Plaintiffs proved Defendants caused a disparate impact in REO property maintenance within a specific service area. The risk that these assertions would confuse the jury and enable it to return a verdict on improper

15

grounds warrants their exclusion under FRE 403. *Ledford v. Lamartz,* 462 F. Supp. 3d 905, 910 (N.D. Ind. 2020) (granting motion in limine to preclude evidence that "would serve only to encourage the jury to base its verdict on improper grounds"); *see Gen. Citrus Int'l Inc. v. Remien*, 04-CV-6402, 2009 WL 2486164, at *4 (N.D. Ill. Aug. 10, 2009) (granting motion in liming to preclude the "rehashing [of] issues resolved on summary judgment through the introduction of exhibits and/or live testimony").

In addition to being prejudicial, Plaintiffs' assertions that Defendants' conduct caused frustration of Local Plaintiffs' missions has no probative value. The Court has already ruled that Plaintiffs have no proof Defendants' conduct caused disparate impact as to REO property maintenance within specific service areas. Therefore, conclusory assertions concerning Defendants' frustration of their missions would be counterfactual end-runs of the Court's ruling and have no probative value as to the issues remaining at trial. *See Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 713 (7th Cir. 2005) (affirming exclusion of damages evidence that was "irrelevant and inapplicable to [Plaintiff's] theory of liability").

**B.    Evidence Regarding Properties Excluded From the Operative Statistical Study Should be Excluded as Irrelevant and Inflammatory**

The theory of liability in this case is not about harms arising from isolated instances of poor property maintenance; rather, this is a case about harms arising from *racial disparities* in property maintenance. *See* Dkt. 442 at 10-11 (describing elements of Plaintiffs' claims). As the Court confirmed in its Clarification Order, the scope of liability is limited to the disparities identified in the specific statistical analysis submitted by Plaintiffs in this case. Clarification Order at 3-4.

Because of non-race factors entirely outside Defendants' control, like age of homes, crime rates, and other factors, properties in majority-minority communities are, on average, expected by *Plaintiffs'* own statistical model to exhibit more maintenance deficiencies than those in majority-

white communities. *See, e.g., See* Bogo-Ernst Decl. at Ex. 13 Declaration of Kurt Rademacher ("Rademacher Decl.") Ex. 14 Ayres Report I ¶¶ 53, 57, 60 (explaining control variables and demonstrating that, when applied, purported disparities in maintenance decrease from 3.36 to 2.278). As a result, any probative value of such evidence related to these isolated, out-of-study properties risks misleading the jury by suggesting, without statistical basis, that Defendants are responsible for property states that are attributable to non-race factors. *See* Fed. R. Evid. 403, Advisory Committee Notes ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."); *Tratree v. BP North America Pipelines, Inc.*, 390 Fed.Appx. 386, 389-90 (5th Cir. 2010) (affirming exclusion of evidence that lacked necessary linking data that would put it in "perspective" of relevant statistical study).

Nonetheless, at various stages of this case, Plaintiffs have offered evidence related to properties that are excluded from the operative statistical study. For example, in opposing summary judgment, Plaintiffs cited a declaration by a neighbor of a property located at 6217 E. Hil Mar Circle, *see* Dkt. No. 360 at 7-8 & Dkt. No. 361 at ¶ 130, despite the fact that there was no evidence it was serviced by Ocwen, and Plaintiffs *excluded* it from their study. *See, e.g.,* Ex. 15 [AYRES_000009 Excerpt, Entry for 6217 E. Hil Mar]. Plaintiffs similarly asserted testimony regarding a property located at 93 Mallory Heights Drive, *see* Dkt. No. 361 at ¶ 127. This property, too, was excluded from Plaintiffs study. *See* Ex. 16 [AYRES_000009 Excerpt, Entry for 93 Mallory]. Plaintiffs relied on testimony regarding 2716 21st Avenue, Dkt. No. 361 at ¶ 125, another property Ayres determined was not serviced by Ocwen, *see* Ex. 17 [AYRES_000009 Excerpt, Entry for 2716 21st Ave].

Similarly, Plaintiffs have offered numerous declarations from members of a non-party organization, Common Ground, which had undertaken a self-described campaign to "embarrass" Deutsche Bank AG, the indirect parent company of the two Trustee Defendants in this case. *See* Dkt. No. 369:41 at ¶ 7. The materials produced by Plaintiffs related to Common Ground include numerous photographs of properties purportedly titled to "Deutsche Bank" that were not included in Plaintiffs' statistical study and were generated prior to the applicable limitations period. *See, e.g., id.* at Ex. 18 WIT00001340.

None of these materials is probative of whether there are racial disparities in property maintenance within the operative statistical study. Instead, isolated instances of damaged homes pose the danger of inflaming the jury notwithstanding the fact that they do nothing to establish whether Defendants' practices caused the damage in the first place. Evidence regarding properties outside of that study should be excluded.

## C. Assertions Regarding Nationwide, Pervasive, Systematic, or Citywide Discrimination Should Be Barred as Contrary to the Law of the Case

Plaintiffs should be precluded from asserting that Defendants actions amounted to "nationwide," "pervasive," "systematic," "citywide," "metropolitan area," or similar conduct because such statements are contrary to the law of the case – which limits the potential damages to those properties were titled to one of the Trustee Defendants, serviced by Ocwen, and maintained by Altisource. Omnibus Order at 95. The risk that such language will be used is not hypothetical, Plaintiffs' Second Amended Complaint is replete with references to "systemic discrimination" and impact to entire metropolitan areas. *See e.g.*, SAC at ¶¶ 125–139. Such references should be excluded under Fed. R. Evid. 403 because they would leave the jury with the mistaken impression that they can award frustration of mission damages for unproven and, under the law of the case, unprovable wrongdoing that occurred outside of the "limited sample" of subject

properties. Omnibus Order at 95. Instead, Plaintiffs must follow the law of the case and identify how their mission was damaged by Defendants actions as to the specific properties at issue. Unsupportable statements about the scope of wrongdoing should be excluded.

## MOTION NO. 3
## TO CONFIRM *DAUBERT* LIMITATIONS ON PLAINTIFFS' EXPERTS

In its Omnibus Order, the Court imposed admissibility limitations on Plaintiffs' expert testimony under FRE 702 and *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Dkt. 442 at 32–88. Under the law of the case doctrine, "when an issue is once litigated and decided, that should be the end of the matter." *Creek v. Vill. of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998); *Minch v. City of Chi.*, 486 F.3d 294, 301 (7th Cir. 2007) ("[A] court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination."); *Sanders v. City of Chi. Heights*, No. 13 C 0221, 2016 WL 4398011, at *1 n.1 (N.D. Ill. Aug. 18, 2016) ("The Court's earlier rulings [on admissibility of expert testimony] control the present *Daubert* motion under the law of the case doctrine.").

Despite these rulings and case law, Plaintiffs have shown an intent to disregard the Court's *Daubert* limitations. Defendants request for the Court to reiterate that its rulings regarding D. Korver-Glenn will be enforced at trial. Plaintiffs may not rely on excluded or otherwise inadmissible evidence to prosecute their case. *See* Dkt. 442 at 106–07 (holding that "plaintiffs [cannot] rely on inadmissible evidence to support their argument.").

Dr. Korver-Glenn's opinions provide a concrete example. Her opinions concern issues such as "implicit and explicit racial bias, racialized discretion, value-based policies and procedures, and Ocwen and Altisource's lack of quality oversight and quality control." Dkt. 442 at 80. The Court, however, expressly barred Dr. Korver-Glenn from "testifying on [1] Ocwen and Altisource's 'Statements of Work'; [2] opining on the adequacy of Ocwen and Altisource's manuals and policies; [3] characterizing certain policies or documents as 'confusing' or 'indecipherable'; and [4] "presenting a descriptive statistical analysis on the 'effects' of the servicer defendants marketing and sales policies on REO values." Dkt. 442 at 87–88.

Notwithstanding these rulings, Plaintiffs' initial exhibit list by includes tables and figures lifted directly from the excluded potions of Korver-Glenn's expert reports. For example, even though the Court expressly prohibited Dr. Korver-Glenn from testifying that Ocwen and Altisource's documents were "confusing" or "indecipherable," Plaintiffs included the figures from Section V.B. of Dr. Korver-Glenn's report where she opines that important documents were indecipherable, vague, or confusing.[3] Dkt. 442 at 87–88. The Court rejected such testimony, noting that even if a document was confusing to read "[a] jury doesn't need an expert to point that out." Omnibus Order at 83 n.26. Similarly, despite Dr. Korver-Glenn being excluded from "presenting a descriptive statistical analysis on the 'effects' of the servicer defendants marketing and sales policies on REO values," Plaintiffs have included the tables from Section VII of her expert report.[4] Section VII is the part of Dr. Korver-Glenn's report utilizing "descriptive statistics." Omnibus Order at 85. The Court held that Dr. Korver-Glenn's "methodology and conclusions from [this section] were unsound" and therefore unreliable. Dkt. 442 at 85–86. Plaintiffs, however, seek to backdoor this excluded expert testimony in an effort to ignore this Court's ruling.

Defendants request that the Court clarify that its previous *Daubert* rulings on Plaintiff's experts will be enforced at trial.

---

[3] *See* Plaintiffs' Initial Exhibit List, Ex. Nos. 1420–1423 (Figures V.3, VII.4, VII.5, and VII.5 *continued* from the Korver-Glenn Expert Report).
[4] *See* Plaintiffs' Initial Exhibit List, Ex. Nos. 1430–1435 (Tables VII.5, VII.6, VII.7, VII.16, VII.17, VII.18 from the Korver-Glenn Expert Report).

**MOTION NO. 4:**
**TO EXCLUDE REO DATABASE RECORDS**

Defendants seek to exclude (a) altered database records based on Plaintiffs' changes that were made more than two weeks after the supposed inspection dates, (b) database records initially submitted by the Local Plaintiffs because they were not kept in the ordinary course business, and (c) database records initially created by Local Plaintiffs wherein revisions were made by NFHA, which are hearsay and do not fall within the business records exception.

**A.      Each Record in the "REO Database" Should Be Excluded as Hearsay Regarding the Facts Related to Purported Inspections**

Local Plaintiff Miami Valley Fair Housing Center ("Miami Valley") created an "REO database" for use by all of the Plaintiffs in the investigation that gave rise to this litigation. *See* Bogo-Ernst Decl. Ex. 19 Lauri Dep. Tr. at 70:3–5; id. Ex. 20 Abedin Dep. Tr. at 60:18–61:2. The remaining Local Plaintiffs entered data into the database, but only Miami Valley and NFHA could edit, delete, and overwrite entries. Ex. 19 Lauri Dep. Tr. at 16:7-12 & 40:21-41:6. Defendants anticipate that Plaintiffs will seek to introduce at trial individual REO database records to prove that Plaintiffs inspected particular properties on particular dates and that such properties had maintenance deficiencies.

In its Omnibus Order, the Court held that Plaintiffs "bear the burden to lay the proper foundation for the database records to be admitted under Rule 803(6) at trial." Dkt. 442 at 30. Plaintiffs have not, and it is now clear cannot, carry their burden, and these individual REO database records should be excluded at trial.

Under Fed. R. Evid. 803(6) (the business-records exception), hearsay evidence is admissible if: (1) the submitted record was made at or near the time (2) by—or from information transmitted by—someone with knowledge; and (3) the record was kept in the course of a regularly

22

conducted activity of a business, and making the record was a regular practice of that activity. *See Sprosty v. Collins*, No. 22-CV-3651, 2025 WL 2084217, at *2, n. 4 (N.D. Ill. July 24, 2025) (Shah, J.). Few, if any, REO database records satisfy this standard, and even if they did, the source of information or the method or circumstances of preparation indicate a lack of trustworthiness, independently barring admission. *See id.* (citing Fed. R. Evid. 803(6)(E)).

### 1. The Records Were Not Made At Or Near The Time of the Events They Purport to Evidence

Most entries in the REO database were created long after the inspections they purport to evidence.

Most records in the database were edited and, because of the design of the REO database itself, an edited record ***entirely overwrote*** the original one. The architect of the REO database explained that if "a property or a photo, if it was edited afterwards, you don't know what change was made" and that the database does not have any tracking of what values of fields were before. It only keeps the current values." Ex. 19 Lauri Dep. Tr. at 36:20-37:1; 39:20-40:1-14. As a result, edited records must be viewed as having been created in their edit date.

As this Court recently held, "corrections" constitute new records, and where those "corrections" were made "nearly a month" after the facts asserted therein, they were not sufficiently contemporaneous to meet the "at or near the time" requirement to qualify as business records. *Sprosty*, 2025 WL 2084217, at *3, n.4. Plaintiffs here waited far longer, sometimes as long as six years after the inspection. Of the 1,276 inspections, 349—more than a quarter—were edited at least a *year* after the inspections. *See* Rademacher Decl. ¶ 5. Nearly half of the records were "corrected" more than a month after the referenced inspection date. *Id.*

For these records, the Court need not consider the remaining Fed. R. Evid. 803(6) factors. They fail the threshold test of being created "at or near" the time of the events they purport to

describe. *See Sprosty*, 2025 WL 2084217, at \*3, n.4; *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2018 WL 1725802 (E.D. Pa. Apr. 9, 2018) (excluding record created 13 days after meeting described); *Quiles Quiles v. U.S.*, No. 19-cv-1207, 2021 WL 5549438, at \*3 (D.P.I. July 22, 2021) (records created 23 days after event were not created "at or near the time" of event); *Aguilera v. Baca*, 394 F.Supp.2d 1203, 1207, n.2 (C.D. Cal. 2005) (records created "two to three months" after events did not qualify as business records).

### 2. Edited REO Database Records Were Not Made By, Or From Information Transmitted By, Someone With Knowledge of the Events They Purport to Evidence

Nearly two thirds of the database records pertain to inspections purportedly made by Local Plaintiffs, not NFHA. *See* Rademacher Decl. ¶ 6.

Local Plaintiffs and NFHA are separate organizations, and therefore attestations by NFHA personnel about an inspection cannot qualify as business records statements by Local Plaintiffs. *See Datamatic Servs., Inc. v. U.S.*, 909 F.2d 1029, 1033 (7th Cir. 1990) ("If the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception." (alterations and quotations omitted)).

Because the database did not retain Local Plaintiffs' entries when NFHA overwrote them, Local Plaintiffs have no personal knowledge of the contents of any database entries that NFHA edited. Thus, to be admissible, Plaintiffs must, but cannot, establish a chain of hearsay exceptions. *See EEOC v. DHL Express (USA), Inc.*, No. 10-cv-6139, 2018 WL 11631172, at \*2 (N.D. Ill. July 19, 2018) (citing *Datamatic*, 909 F.2d at 1033).[5]

---

[5] It is now clear that the sole basis Plaintiffs have to offer for the authentication of thousands of the property photographs they have produced in this case are factual assertions contained in the REO database. Those REO database records purport to provide the "where, by whom, and under what circumstances" for these

### 3. The Individual REO Database Records Were Not Made in the Regular Course of a Regularly Conducted Business Activity

The individual records were not created in the regular course and thus fail to qualify as business records. A record made in the "regular course" must be "created with the kind of regularity or routine which gives business records their inherent reliability." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 909 (7th Cir. 2025) (quotations omitted). There was nothing regular or routine about Plaintiffs' entry of this information into a third-party database hosted by a single Local Plaintiff, as evidenced by the fact that NFHA had to provide investigation-specific training to each Local Plaintiff on how to operate the database. *See, e.g.,* Bogo-Ernst Decl. Ex. 21 Petruszak Dep. Tr. at 105:20-106:18. The Local Plaintiffs made a few dozen entries over the course of years, entering entries in spurts when NFHA requested additional reviews shortly before filing their complaint. For example, there are 32 entries by Plaintiff Housing Research and Advocacy Center spanning from 2014 to 2017, with periods of six months or a year in which no entries were made. Rademacher Decl. ¶ 7. Connecticut Fair Housing Center made a mere 29 entries between 2013 and 2018, with a 22-month period between six entries made in 2016 and a final four entries made in 2018. Rademacher Decl. ¶ 8. These entries fail to meet the requirements of Fed. R. Evid. 803(6). *See Lupescu v. Napolitano*, 700 F. Supp. 2d 962, 968 (N.D. Ill. 2010) ("unique and irregular" recording insufficient to qualify as "regular" under Fed. R. Evid. 803(6)). Because the records were not created in the regular course, they are not business records.

---

photographs—asserting they were taken at properties owned by the Trustee Defendants and serviced by Ocwen. *See, e.g.,* Rademacher Decl. Ex. 22 (NFHA_0000001 Record for 1326 S St SE showing "Lender_name" Deutsche Bank and "Servicer_Name" Ocwen). Because the individual records in the REO database are hearsay, the Court should also exclude the photographs supported by those excluded statements. *See U.S. v. Van Wyhe*, 965 F.2d 528, 532 (7th Cir. 1992) (affirming trial court's exclusion of photograph where there was no foundation established).

### 4. The Records Lack the Trustworthiness Necessary to Qualify as Business Records

As the Seventh Circuit opined in *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1045 (7th Cir. 1990), "documents prepared specifically for use in litigation are . . . 'dripping with motivations to misrepresent.'" Given that when NFHA trained Local Plaintiff personnel to submit records to the REO database, it also told them its goal was to achieve a $100 million settlement with a financial institution,[6] Plaintiffs' motivations were clear here.

Removing any remaining doubt about their motivations, Plaintiffs acknowledged that the purpose of NFHA's document destruction directive was to block Defendants' counsel from scrutinizing primary source data. *See* Bogo-Ernst Decl. Ex. 23 S. Smith Dep. Tr. at 105:23-106:16.[7] Judge Leinenweber ruled that Plaintiffs spoliated the inspection forms that purportedly contained information later entered into the database. *See* Dkt. No. 282 at 8. In that ruling, Judge Leinenweber cited the opinion of Defendants' expert, Prof. Justin McCrary, that an appearance of a racial disparity in this case arose only after changes were made to the database entries. *Id.* at 7. Judge Leinenweber declined to entirely exclude the database at that time because Plaintiffs had represented to the Court that they would be producing expert opinions with "contradictory conclusions," and *Daubert* motions challenging McCrary's opinion had not been filed.

---

[6] *See* Bogo-Ernst Decl. Ex. 24 CFHC_0000871 ("Bank of America is their [NFHA's] next target, they are hoping for a $100 million settlement".)

[7] **Q**. . . . Would there have been any harm in retaining them [the shredded documents]?
. . .
**A**. I think so, yeah.
**Q**. What would be the harm?
**A**. When you -- just taking my notes as an example, sometimes I would just put one word down, which for me, brought back to my memory a whole paragraph. And that one word could be used by defense counsel to say things like, Well, how do you remember that, or if this said -- I wish I could think of a word that I would use. But I know with some of the Fair Housing Centers who did keep their notes and then later changed their policy, *it was because defense lawyers would try to make a mountain out of a molehill* instead of looking towards what was said. (Emphasis added.)

The deadline to file *Daubert* motions passed two years ago, and Plaintiffs did not move to exclude Prof. McCrary's findings. In contrast, the Court granted Defendants' motions exclude analyses undertaken by Plaintiffs' experts, Prof. Ian Ayres and Prof. Timothy Guetterman, to undercut Prof. McCrary. Omnibus Order at 50 & 71.

Where the "circumstances suggested that the" proponent of the business record "may have had an incentive to create a favorable record in preparation for litigation," the reliability of the record is undermined. *Murphy*, 140 F.4th at, 909. As in *Murphy*, there is no "internal mechanism that would ensure these records are accurate." *Id*. Indeed, the opposite is true: by design, the REO database completely overwrite each record upon revision, and underlying data was destroyed. The individual database records should be excluded.

**MOTION NO. 5:**
**TO PRECLUDE PLAINTIFFS FROM PRESENTING EVIDENCE**
**RELATED TO NON-PARTY AFFILIATES OF THE DEUTSCHE BANK TRUSTEES**

Defendants seek to preclude Plaintiffs from presenting evidence related to non-party affiliates of the Deutsche Bank Trustees, including any evidence of business activities relating to residential mortgage loans and properties, regulatory actions or fines, settlements or other payments that otherwise do not involve the Deutsche Bank Trustees.

A.   **Plaintiffs Should Be Barred from Presenting Evidence Related to Non-Party Affiliates of Deutsche Bank, Including Any Evidence of Business Activities Relating to Residential Mortgage Loans and Properties, Regulatory Actions or Fines, Settlements or Other Payments That Do Not Involve the Trustee Defendants**

Plaintiffs' only remaining claims in this action, their § 3604(b) claims, require that Plaintiffs prove by preponderance of the evidence that Defendants Ocwen and Altisource caused, by their policies or practices, a discriminatory effect as to the maintenance of REO properties. With respect to the Trustee Defendants, Plaintiffs' only claims are for vicarious liability through an alleged principal-agency relationship between one or both of the Trustee Defendants, and Ocwen, as servicer. Dkt. 442 at 115. As a result, any evidence that does not relate to either i) Ocwen's—or its alleged subcontractor—Altisource's maintenance of REO properties or ii) the Trustee Defendants' alleged principal-agency relationship with Ocwen, is irrelevant to this action.

Despite this, Plaintiffs recent filings in this case suggest that they will seek to introduce evidence concerning non-party affiliates of the Trustee Defendants that are separate legal entities ("DB Affiliates")—including with respect to residential mortgage loans and properties, regulatory actions or fines, or settlements or other payments—that do not involve the Trustee Defendants. Such evidence is not only irrelevant but also unfairly prejudicial: it carries a significant risk that the jury will conflate the Trustee Defendants with DB Affiliates that are not parties to this action

28

(and, in some cases, were *dismissed* from this action after motions to dismiss), leading the jury to improperly consider the DB Affiliates' actions when determining the Trustee Defendants' liability.

To avoid undue prejudice to the Trustee Defendants, the Court should exclude this evidence from trial.

In their proposed exhibit list, Plaintiffs included a June 22, 2011 letter from two Trustee Defendants Affiliates, Deutsche Bank AG ("DB AG") and the Deutsche Bank Americas Foundation, regarding commitments they made to provide grants to Milwaukee community housing development organizations, as well as financing for a fund to rehabilitate vacant residential properties in Milwaukee.[8] *See* Bogo-Ernst Decl. Ex. 25 Plaintiffs' Initial Exhibit 1065 (WIT_00001395). The Deutsche Bank Americas Foundation sent the letter to Common Ground of Southeastern Wisconsin, an organization that had protested about property maintenance issues in Milwaukee at an annual Deutsche Bank AG shareholder meeting.

The letter is prejudicial because it invites the jury to find the Trustee Defendants liable based on the actions of non-party affiliates. Although these two DB Affiliates share the "Deutsche Bank" name, Plaintiffs have presented no evidence in this case that the Trustee Defendants were responsible for, or had input into, their actions. Notwithstanding the Court's dismissal of claims against DB AG, Plaintiffs appear to be seeking to slip allegations regarding DB AG's actions back into this case. However, due to the similarity in names, there is a significant risk that the jury will be confused and consider the conduct of the non-defendant DB Affiliates when assessing the liability of the Trustee Defendants. Evidence of the actions of DB Affiliates should be excluded as irrelevant under Fed. R. Evid. 401 and unduly prejudicial under Fed. R. Evid. 403(b). *See Hodgson*

---

[8] Deutsche Bank AG was a named defendant in the Complaint but was dismissed from the case after Plaintiffs conceded that it was not responsible for the alleged misconduct. Memorandum and Order (Dkt. No. 54), at 5,10, & 32.

*v. Wisconsin Cent. Ltd.*, 19-CV-15-JDP, 2020 WL 3251187, at *6 (W.D. Wis. June 16, 2020) (precluding reference to defendant's non-party parent company to avoid jury confusion and bias); *see also Africano v. Atrium Med. Corp.*, 17-CV-7238, 2021 WL 4477867, at *3 (N.D. Ill. Sept. 30, 2021) (barring evidence about the finances of defendant's parent company where "the parent is not a named party [and] the parent did not participate in the conduct giving rise to Plaintiff's claims"); *Mathias v. Accor Economy Lodging, Inc.*, 01-CV-6329, 2002 WL 1611582, at *1 (N.D. Ill. July 22, 2002) (same, noting "[a] corporation is a separate and distinct legal entity from its corporate affiliates.").

Similarly, in their statement of additional facts submitted on summary judgment, Plaintiffs included reference to a January 17, 2017 press release regarding a $7 billion settlement between the U.S. Department of Justice and "Deutsche Bank" concerning the latter's securitization, marketing, and sale of residential mortgage-backed securities to investors from 2006 to 2007. Dkt. No. 361, ¶ 139; Dkt. No. 369:10 (PJt Ex 101). This settlement has no relevance to this case at all, and is plainly designed to unfairly prejudice the Court and jurors to the mere mention of the words "Deutsche Bank." First, on its face, this settlement did not involve conduct of either of the Trustee Defendants. Rather, it involved the "packaging, securitization, marketing, sale and issuance of residential mortgage-backed securities," Dkt. 369-10, Ex. 101, none of which the Trustee Defendants are alleged to have engaged in. Instead, for all purposes relevant to this case, the Trustee Defendants played the limited role of indenture trustee. Reference to this irrelevant settlement seems designed to both unfairly prejudice the jury against the parties actually remaining in this case and condition jurors to believe that damages in the billions of dollars could somehow be justified. This irrelevant and inflammatory evidence should be excluded. *See Rockwell Graphics Sys., Inc. v. Dev. Indus., Inc.*, 84-CV-6746, 1992 WL 249618, at *2-3 (N.D. Ill. Sept. 25,

1992) (precluding evidence regarding convictions of the non-party parent company of plaintiff as prejudicial, confusing, and of no probative value); *see also Sabratek Liquidating LLC. V. KPMG LLP.*, 01-CV-9582, 2003 WL 22715820, at *6 (N.D. Ill. Nov. 18, 2003) ("the improper conduct of other firms … has little, if any relevance to [Defendant's] conduct at issue … [and] [t]he probative value of references to the accounting scandals of the past few years is substantially outweighed by the risk of unfair prejudice that could be given to such evidence by the jury.")

## MOTION NO. 6:
## TO EXCLUDE ANY EVIDENCE REGARDING POLICIES THAT DID NOT APPLY TO PROPERTIES AT ISSUE

Defendants move to preclude Plaintiffs from introducing, referring to, or otherwise placing before the jury evidence and/or testimony concerning Altisource's "High Value Asset Policy" or other actions taken for "high value" assets. Such evidence is not probative of any fact at issue in this litigation and, even if it were marginally probative, the probative value is substantially outweighed by its prejudicial effect. *See* Fed. R. Evid. 403.

### A.    The High Value Asset Policy

In or around 2016, Altisource developed the High Value Asset policy ("HVA Policy"), which identified certain activities that *could* be undertaken in connection with properties with a pre-foreclosure value exceeding $500,000. *See* Dkt. No. 370-26, Ex. 222 at ¶ 132. Such activity included specifying the number and type of photos needed in connection with marketing the property, as well as limited tasks that could enhance the sales appeal of the property. The HVA Policy was discontinued by 2019.  *See* Bogo-Ernst Decl. Ex. 26 Altisource 30(b)(6) Dep. Tr. 03/11/2021 44:5–23.

Pursuant to HVA Policy, Altisource excluded certain properties from the HVA Policy program, including properties with "structural damage, including foundation and exterior walls," and properties with a code violation. *See* Bogo-Ernst Decl. Exhibit 27 at 5–6 (HVA Policy). In other words, properties that entered REO status with maintenance deficiencies were not part of the HVA Policy program. The uncontroverted evidence demonstrates that none of the properties inspected by Plaintiffs in this litigation, including the properties in the majority census blocks, were part of the HVA Policy program. And because the HVA Policy was not developed until *after* Plaintiffs began their investigation, the HVA Policy is not relevant to how any of the 699 REO properties at issue in this case (the "At-Issue REO") were maintained during the applicable time

period.[9] Despite these uncontroverted facts, Plaintiffs have included the HVA Policy and related documents on their exhibit list.[10]

**B.      Admission of the HVA Policy Would Violate FRE Rule 403**

**1.      The HVA Policy is Not Relevant Because It Does Not Apply to Any At-Issue REO**

Plaintiffs have no evidence that the HVA Policy applied to any of the At-Issue REOs. The HVA Policy became effective on or about June 27, 2016, and applied only to REO properties with a pre-foreclosure value of $500,000 or more. Dkt. No. 370-26, Ex. 222 at ¶ 132. Servicing and valuation records for the agreed-upon property set show that 156 of the At-Issue REOs were in REO status at some point after June 27, 2016, but none had a last pre-foreclosure value of $500,000 or more. *Id.* In other words, the HVA Policy did not apply to any of the At-Issue REOs and, thus, has no bearing on the issues to be tried.

**2.      The HVA Policy Concerns Marketing of REO Properties, Which is No Longer at Issue in this Litigation**

 Plaintiffs' only remaining claim under § 3604(b) may be supported by evidence of alleged discriminatory *maintenance* conduct—not on marketing or sales policies. *See* Dkt. No. 442 at 104–05. The HVA Policy provided guidance about the *marketing*, and not the maintenance, of properties, so it is not relevant to the claims to be tried. For instance, it set forth provisions for the types of photos to be taken of the property, how to value the property, and how to market the property. *See* Bogo-Ernst Decl. Ex. 27 HVA Policy, Table of Contents. In fact, Plaintiffs themselves focused on the HVA Policy *only* in terms of marketing photos and sales price reductions when deposing Altisource's corporate representative.  *See* Bogo-Ernst Decl. Ex. 26 Altisource 30(b)(6)

---

[9]  Plaintiffs have asserted that there are 699 properties at issue in this litigation, as evidenced by such properties being included in Plaintiffs' statistical regression analysis. While Defendants do not concede that all 699 properties are indeed at issue, Defendants use that list of properties in defining "At Issue-REO" for purposes of this motion.
[10] *See* Bogo-Ernst Decl. Ex. 28 Pls' Exhibit List, Exs. 10, 1360, 1414, 1415, and 1479.

03/11/2021 Dep. Tr. 134:7–145:5. Because Defendants' sales and marketing practices are no longer at issue in the litigation, the HVA Policy is not relevant to Plaintiffs' pending claims. *See* Dkt. No. 442 at 104–05.

Plaintiffs seek to use the HVA Policy as evidence that Altisource provided more favorable preservation services to "high value" properties purportedly in white neighborhoods. But the HVA Policy specifically excluded properties with code violations or structural issues—i.e., the HVA Policy *did not apply* to homes in both white and minority census blocks with alleged deficiencies. Plaintiffs' inspections examined whether properties had *structural defects*, such as wood rot and roof issues. *See* Dkt. No. 369-6, Ex. 54 Part 1; 369-7, Part 2. As explained by NFHA CEO Rice, the investigation was designed to determine whether Defendants were "maintaining [the] REO assets in an equitable and fair fashion… based on the racial composition of the neighborhood," not on marketing practices. *See* Bogo-Ernst Decl. Ex. 29 Rice 10/08/2021 Dep. Tr. at 81:11–82:24. Because the HVA Policy program specifically excluded properties with code violations or structural deficiencies, it is evidence that properties worth more did not receive favorable treatment if they were in need of repair or code violation abatement.

Using Plaintiffs' own false equivalency between value and race (discussed further *infra*) the terms of the HVA Policy directly undercuts Plaintiffs' allegation that the HVA Policy provided homes in white neighborhoods better treatment than homes in minority communities when such properties had deficiencies that were relevant to Plaintiffs' study. In other words, even if the HVA Policy had been in operation during the relevant time period, it could not have been the policy or procedure that contributed to discrimination against properties in majority minority census blocks. *Ohio House, LLC v. City of Costa Mesa*, 122 F.4th 1097, 1120 (9th Cir. 2024) (requiring

a plaintiff to show "robust causality, beyond mere evidence of a statistical disparity, that the challenged policy… caused the disproportionate effect").

### 3. Inclusion of the HVA Policy Would be Highly Prejudicial.

Plaintiffs have alleged throughout this litigation that Altisource engaged in discrimination against lower value properties, which Plaintiffs equate with discrimination based on the racial composition of a particular census block.[11] This is a false equivalency that should not be permitted to make its way into argument or evidence at trial. Plaintiffs have not proffered any evidence, expert or otherwise, that homes in the United States with values over $500,000 are primarily in white census blocks or that homes in the United States valued at less than $500,000 are primarily in majority minority census blocks. In other words, while Plaintiffs allege that homes over $500,000 are in white neighborhoods, they do not have evidence demonstrating such an allegation is fact.

Nonetheless, even without such evidence, Plaintiffs seek to perpetuate a belief that higher valued homes are in whiter neighborhoods and lower value homes are in "communities of color." Dkt. No. 360 at 6-7. Plaintiffs will try to do so using the HVA Policy and references to "high value" properties.[12] Allowing Plaintiffs to use the HVA Policy or otherwise reference "high value" properties as a proxy for a white neighborhood is an unfairly prejudicial bell that, if allowed, would require robust curative instructions. *See US v. Richards*, 719 F.3d 746, 763 (7th Cir 2013)

---

[11] While Plaintiffs sometimes refer euphemistically to "communities of color," their statistical analysis relies on the smallest, most granular geographic unit used by the US Census: census block level data. This is often the "same as ordinary city blocks." https://learn.arcgis.com/en/related-concepts/united-states-census-geography.htm. Accordingly, given the small size of most of these units of measurement, any reference to a "community" of color is not accurate.

[12] In other words, there is a concern that Plaintiffs seek to persuade the jury, with no evidence, that Altisource's use of the term "high value asset" is a racial dog-whistle. It would be unfairly prejudicial for Plaintiffs to implant that suggestion through use of the HVA Policy because Plaintiffs do not have evidence that the HVA Policy is relevant to their allegations of discrimination.

(recognizing the importance of the court's "prophylactic steps to ensure the jury" did not draw improper inferences).

As set forth herein, the Court should preclude Plaintiffs from presenting evidence or argument about the HVA Policy and the use of the term "high value" assets. Such evidence or argument would be substantially more prejudicial than probative. In addition, it would prolong the trial, as Altisource would be forced to expend significant trial time presenting evidence and making arguments about its inapplicability to the issues to be decided in this litigation.

**MOTION NO. 7:**
**To Exclude Certain Investigation Evidence That Cannot Be Authenticated**

Defendants seek to exclude Plaintiffs' time records and diversion logs absent business-records foundation under Fed. R. Evid. 803(6).

Plaintiffs have proposed stipulated authentication of numerous time records and "diversion logs." However, discovery in this case has revealed that numerous such documents cannot be qualified as business records, as they were created long after the events reflected, were created for the purpose of litigation, or both.

For example, Toledo Fair Housing Center ("TFHC") testified that time records produced in this case were created years after the events described and were compiled by (1) running electronic searches through documents and (2) using those searches to attempt to reconstruct time records. *See* Bogo-Ernst Decl. Ex. 30 TFHC Dep. Tr. at 170:1–7.

South Suburban Housing Center ("SSHC") provided similar testimony from its corporate representative:

> Q. So if we go back up then to Bates number 1, Ms. Simpson's time, there's an entry -- the very first entry says:· October 19th, 2015 to 7/17/2018. Did she keep time records for each of those emails contemporaneously for when she wrote each of those emails, or is she coming up with this at some later time?
> …
> A. I don't know exactly how she did this. I do know that she produced this. Again, I don't know exactly how she produced this. **It appears that what she did was look at the number of emails that she was involved in doing over this time period and estimated the amount of time that she spent interacting on those emails.**

*See* Bogo-Ernst Decl. Ex. 2 SSHC Dep. Tr. at 181:23–183:5 (emphasis added)). SSHC further testified that, for certain of their employees: "keeping time, for the purpose of documenting expenses is not something that the other employees were used to doing." *Id.* at 181:19–22.

Another organization admitted to creating time records for former employees after the fact so they could be submitted in this litigation:

> Q.: So it's my understanding, based on your ·testimony -- and let me know if I'm wrong -- that some time entries may have been reconstructed for these folks who had left FHANC?
> A.· ·Yes.

*See* Bogo-Ernst Decl. Ex. 8 Fair Housing Advocates of Northern California Dep. Tr. at 156:21–

1).

Indeed, a Local Plaintiff witness admitted that one entry on time records produced in discovery had been created *more than a decade* after the activity described, and other time entries were adjusted just the week before her deposition so they would be a "fairer representation of the amount of time we spent talking about the REO investigation." *See* Bogo-Ernst Decl. Ex. 31 North Texas Fair Housing Center Dep. Tr. at 106:22–107:6; 107:18–108:10. Plaintiff Fair Housing Continuum testified to a similar process in the creation of its diversion log: the witness had reconstructed them by reviewing quarterly reports, and then allowing "the attorneys" to adjust it, presumably for use in this litigation. *See* Bogo-Ernst Decl. Ex. 3 Fair Housing Continuum Dep. Tr. at 184:1–9; 185:19–21. Connecticut Fair Housing Center ("CFHC") followed suit, producing time records created by its attorneys for this litigation. *Id.,* Ex. 4 CFHC Dep. Tr. at 189:1–4.

In light of these and numerous similar disclosures, Plaintiffs have not positioned Defendants to broadly stipulate to the admissibility of Plaintiffs' time records and "diversion logs." To the extent Plaintiffs are unable to lay a foundation for qualifying these documents as business records, they should be excluded as hearsay. *See Gatto v. Mortg. Specialists of Illinois, Inc.*, 442 F.Supp.2d 529, 535-36 (N.D. Ill. 2006) (excluding time records upon determination, *inter alia,* that records generated after the fact were not business records).

**MOTION NO. 8:**
**MOTION TO EXCLUDE EVIDENCE OF PURPORTED DAMAGES ALREADY**
**RULED IMPROPER**

The Court has already ruled that several categories of purported damages are not recoverable by Plaintiffs and, accordingly, the Court should preclude Plaintiffs from introducing evidence of (i) generalized harm to minority communities ("community harms"), (ii) past and future expenditures that are unrelated to Defendants' alleged discrimination ("precluded expenditures"), and (iii) unrelated lost opportunities. Additionally, the Court should exclude evidence and argument related to punitive damages until and unless a jury returns a verdict finding intentional discrimination.

In its Order and Opinion on Summary Judgment, this Court already barred recovery for these three categories of evidence on proximate cause grounds (*see* Dkt. 442 at 9). Plaintiffs themselves admit that establishing the causation of these damages requires expert testimony, and can offer none here. *See* Bogo-Ernst Decl. Ex. 10 HOME of VA 30(b)(6) Dep. Tr. 158:23–159:21 (testifying that frustration of mission damages is "probably also an expert issue"); *Id.*, Ex. 32 Fair Housing Center of the Greater Palm Beaches 30(b)(6) Dep. Tr. 155:5-14;[13] *see also* Clarification Mem. Op. at 9 (excluding expert opinion of Stacey Seicshnaydre). Despite their testimony, and in clear disregard of this Court's orders, Plaintiffs have included evidence of community harms, precluded expenditures, and lost opportunities on their exhibit list, and Defendants expect that Plaintiffs will attempt to offer such evidence at trial. Given the Court's prior rulings, this evidence

---

[13] Q. . . . Has the Fair Housing Center put a dollar figure on its alleged frustration of mission damages?

A. No, we haven't. As of this time, we haven't. We were probably-- well, not probably -- we will be using expert witnesses to show the damage to the community and so forth. But it has yet to be calculated completely.

Q. Completely. Has it been calculated at all?

A. No.

has no logical bearing on Plaintiffs' claimed diversion of resources or frustration of mission damages and should therefore be excluded under Rules 402 and 403 as irrelevant, prejudicial, and likely to confuse the jury as to the scope of available damages. Alternatively, the Court should exclude the evidence as inadmissible lay opinion.

## A. The Court Already Ruled That Proximate Cause Prohibits Plaintiffs From Presenting Evidence Of Community Harms, Precluded Expenditures, And Lost Opportunity

This Court held that no Plaintiff may recover damages "based on: impairment to services promoting housing choice and integration; programs for equal investment in the housing industry; and services promoting homeownership and neighborhood stability." Clarification Mem. Op. at 9 (emphasis added). The Court reviewed Plaintiffs' alleged community harms and precluded expenditures and concluded that they are "not sufficiently directly related to Defendants' conduct to satisfy proximate cause under the FHA." *NFHA II*, 2019 WL 5963633, at *8. Despite the Court's unambiguous prior rulings, Plaintiffs now include evidence of community harms and precluded expenditures on their proposed trial exhibit list. By way of example, Plaintiffs' proposed Exhibit 808[14] is a pamphlet called "Investing in Inclusive Communities" that describes grants awarded to Plaintiffs with Wells Fargo settlement funds. NFHA describes these grants as related to NFHA's "community stabilization mission." See Bogo-Ernst Decl. Ex. 33 Appendix E to Plaintiffs 06/28/2022 Amended Response to Defendants' Interrogatories at 5–6. Similarly,

---

[14] Exhibit 808 is identified as Bates Number NFHA_0064576. Several grants listed in this document and in NFHA's interrogatory responses are related to metropolitan areas outside the scope of this litigation, and for which NFHA seeks to prove neither liability nor damages. For example, NFHA listed in its interrogatory response, as evidence of its frustration of mission damages, a $590,000 grant provided to Metanoia Inc., an organization operating in Charleston, South Carolina. Appendix E to Plaintiffs 06/28/2022 Amended Response to Defendants' Joint May 22, 2020 Interrogatories at 9. When asked whether NFHA was alleging any discrimination in South Carolina, Ms. Rice confirmed that this was not the case. NFHA 30(b)(6) Tr. (Rice 07/13/2022) at 291:19–23. When then asked whether the grant was "part of the damages [NFHA] will seek for frustration of mission from the defendants in this litigation," Ms. Rice responded "[n]ot at this time." *Id*. at 292:11–18. Evidence of this grant is irrelevant to any issue in this litigation.

Plaintiffs' proposed Exhibit 1001 is a document titled "Wells Fargo Community Relief Report" which a Local Plaintiff describes as a report on programs "to promote homeownership, neighborhood stabilization, property renovations, and housing development in minority neighborhoods." *See* Bogo-Ernst Decl. Ex. 34 TFHC_0003277. This evidence is not only squarely within the categories of damages precluded by the Court in its prior proximate cause rulings[15] but is highly likely to confuse the jury as to the scope of available damages.[16] It should be excluded.

Additionally, in its proximate cause rulings, the Court held that Plaintiffs' damages claim related to expenditures and alleged lost opportunity (if any) "can be measured as the opportunity costs of discrimination" (Dkt. 460 at 7) meaning Plaintiffs must show both impairment to core services *and* a "consequent drain on resources." *NFHA III*, 2025 WL 975967, at *7–9. For this reason, this Court explained that if Plaintiff is able to show organizational impairment, "each plaintiff can (and must, for purposes of establishing the fact of injury) testify to out-of-pocket expenses" but those expenses must have been "spent to combat [D]efendants' REO conduct" to meet the proximate cause requirements. Dkt. 442 at 7. Therefore, any of Plaintiffs' expenditures or lost opportunity damages evidence *must* be tied only to properties for which the Trustee Defendants owned and which Ocwen and Altisource serviced and as to which disparities in maintenance have been demonstrated.

---

[15] Plaintiffs have also offered as exhibits their Form 990s, the same evidence of "annual budgets" relied upon by Stacey Seicshnaydre in her excluded expert report. *See* Clarification Mem. Op. at 8. This evidence should also be excluded as proof of damages.

[16] Similarly, Plaintiffs may not prove their damages by reference to charitable contributions offered by Deutsche Bank entities not named as defendants in this case, Plaintiffs' Exhibit 1065, WIT_00001395 (Bogo-Ernst Decl. Ex. 25) , nor by reference to Ocwen's partnership with the City of Milwaukee to "stabilize neighborhoods and keep families in their homes" during the foreclosure crisis. Plaintiffs' Exhibit 926, OCWEN_0048027 at OCWEN_0048029 (Bogo-Ernst Decl. Ex. 35). Assuming such evidence related to any issue in this litigation (it does not) it too is likely to confuse the jury as to the scope of the issues and is excludable under Rule 403.

This holding precludes Plaintiffs from presenting this evidence to prove either frustration of mission or diversion of resources damages because "[n]o inference can be drawn about disparity in uninspected Deutsche Bank properties," (Clarification Mem. Op. at 4) and because the "proper sample" for proving discrimination "must be limited to the REO properties serviced by Ocwen and Altisource" during the statute of limitations period—fewer than 699 properties between February 14, 2015 and February 2017—Plaintiffs cannot present evidence of expenditures or lost opportunities damages for harms arising from properties *not* contained within this sample. *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 CV 839, 2025 WL 975967 at *37 (N.D. Ill. Mar. 31, 2025).[17] All other alleged expenditures and lost opportunities damages evidence, not proximately caused by Defendants' should be excluded under Rule 403.

**B.** **The Court Should Exclude Plaintiffs' Testimony Attempting To Link Plaintiffs' Excluded Evidence To Damages As Inadmissible Lay Opinion**

Even if the evidence of community harms and precluded expenditures had more than minimal probative value and was not excludable under Rule 403, any evidence purporting to establish the causal link between such harms and expenditures (and related lost opportunities) and Defendants' conduct is excludable under Rule 701 as an inadmissible lay opinion or, in the alternative, a nondisclosed expert opinion under Rule 702. Plaintiffs can offer no expert testimony as to damages. *See* Dkt. 460 at 9 (excluding damages expert). Their lay witnesses may only offer opinion testimony, including to establish damages causation, where such testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

---

[17] Because "plaintiffs' theory of vicarious liability for Deutsche Bank necessarily relies on establishing an underlying violation of the act," evidence outside of Ocwen and Altisource's statute of limitations, but within the Deutsche Bank Trustees' statute of limitations, is irrelevant to damages and to liability. *NFHA III*, 2025 WL 975967, at *37.

It is well established that damages for harms to an organizations' business activities, such as Plaintiffs' purported frustration of mission damages here, are not provable by lay testimony where the "claimed losses depend on the inferences to be drawn from the raw data" on which they rely, "rather than these data … themselves." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) ("Reliable inferences depend on more than say-so[.]"). Testimony regarding the impact of complex market factors on a nonprofit corporation's operations is beyond the personal knowledge of any individual, and "[w]hile experts are allowed to give testimony based outside of their personal experience or observation, lay witnesses are not." *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 864 (7th Cir. 2009) (excluding testimony of company president as to lost profits); *see also Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 560–61 (7th Cir. 2008) (barring lay witness business owner from opining as to the value of a tire plant based on his extensive experience in the tire industry).

Plaintiffs themselves have admitted that they are not qualified to offer such testimony. Lisa Rice, the CEO of NFHA, testified that she did not "know how much we are asking" for any grant listed in NFHA's interrogatory responses, but that this analysis "would be generated in our expert report." See Bogo-Ernst Decl., Ex. 36 NFHA 30(b)(6) Tr. (Rice 07/13/2022) at 291:19–23; 292:19–23. Other Plaintiffs similarly deferred to expert opinion to explain the causal link between their claimed frustration of mission damages and Defendants' conduct. *See, e.g.*, Bogo-Ernst Decl., Ex. 37 HOPE FHC 30(b)(6) Dep. Tr. 192:24–193:4 ("[B]ecause it's a complex case with multiple plaintiffs, we would defer to an expert); *See* Bogo-Ernst Decl., Ex. 10 HOME of VA 30(b)(6) Dep. Tr. 165:18–166:3 ("I think if you were going to get at some kind of, you know, quantification of all the factors impacting these neighborhoods, you would need an expert do that."); *See* Bogo-

Ernst Decl., Ex. 38 FHCRR 30(b)(6) Dep. Tr. 160:3–9 (Q. "[H]as the Fair Housing Center calculated the amount of damages it's claiming for frustration of mission in connection with the Deutsche Bank REO Investigation? A. No. It's my understanding that there's going to be an expert witness in response to that portion of our claim."). Plaintiffs may not now offer unqualified lay opinion testimony regarding such frustration of mission damages because their expert's opinion has been excluded as unreliable.

**C.     Evidence and Argument Regarding Punitive Damages Should Not Be Presented Until And Unless The Jury Has Found That Plaintiffs Proved Intentional Discrimination**

Defendants further request, under Federal Rules of Evidence 401, 402, 403 and the Court's inherent authority to manage the presentation of proof at trial, to exclude any evidence, reference, or argument concerning punitive damages until and unless the jury finds that Plaintiffs' have proved intentional discrimination. Allowing punitive damages evidence before Plaintiffs make the requisite threshold showing would pose a substantial risk of unfair prejudice and juror confusion that far outweighs any marginal probative value. *See Munafo v. Metro. Transp. Auth.*, 2003 WL 21799913, at *23 (E.D.N.Y. Jan. 22 2003) (precluding evidence of punitive damages "until and unless the jury returns a verdict on liability" because of "the danger of unfair prejudice").

Under the Federal Rules of Evidence, the Court may exclude evidence whose probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. Punitive damages evidence and argument inviting jurors to punish carries a uniquely powerful, inflammatory effect and may lead the jury to draw improper inferences regarding culpability and compensatory damages. *N. Dakota Fair Hous. Council, Inc. v. Allen*, 298 F. Supp. 2d 897, 899 (D.N.D. 2004) ("Evidence of the defendants' net worth, although relevant to issues concerning the claim for punitive damages, can have an adverse effect on jury deliberations concerning liability and compensatory damages.") For this reason, such evidence and

argument should be excluded until and unless a jury reached a verdict against Defendants meriting punitive damages.

In addition, the Court should rule in limine that punitive damages are categorically unavailable where Plaintiffs prove only disparate impact, because punitive damages require a showing of willful, malicious, or recklessly indifferent conduct—not the non-intentional policies actionable under a disparate-impact theory. *See Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999) (holding that punitive damages under Title VII are limited to "cases of 'intentional discrimination'—that is, cases that do not rely on the 'disparate impact' theory of discrimination."); *see also Quigley v. Winter*, 598 F.3d 938, 952-53 (8th Cir. 2010) ("[Courts] apply the same standard for punitive damages in [FHA] cases as [they] do in employment discrimination cases . . . ."). Should Plaintiffs fail to prove intentional discrimination at trial, no punitive damages can be awarded, and evidence related to such damages is therefore irrelevant and unfairly prejudicial.

**MOTION NO. 9:**
**EXCLUDE TESTIMONY OF LOCAL FRUSTRATION OF MISSION WHICH**
**PLAINTIFFS HAVE DISCLAIMED**

The Court should exclude testimony of local frustration of mission which Plaintiffs'

organizations have disclaimed. Defendants repeatedly requested that Plaintiffs provide specific

disclosures quantifying their alleged frustration of mission and the evidence supporting it, yet

Plaintiffs have failed to do so. Hearing (Nov. 13, 2025) Tr., at 9:3–21. A series of rulings from this

Court has eliminated Plaintiffs' ability to (1) prove discrimination in any individual locality and

(2) to extrapolate from disparities in the aggregate to prove a disparity in any individual locality.

As a result, any assertion by Plaintiffs that a Local Plaintiff's mission was frustrated by any action

of Defendants is unsupported and unsupportable, and on that basis would risk confusing and

misleading the jury. For this reason, Plaintiffs should be barred from making any assertion that the

Local Plaintiffs' missions were frustrated.

In its March 31, 2025, the Court dismissed Plaintiffs' claims where the "discriminatory

effects" were not connected to the particular purported harm required for the underlying claim.

MSJ Mem. Op at 104. The Court dismissed Plaintiffs' § 3604(a) and § 3605 claims, holding that

Plaintiffs' Expert Ian Ayers's "regressions rely on [P]laintiffs' inspection data that measured

exterior maintenance and marketing deficiencies … regression analyses [that] do not create a

genuine issue of material fact of disparate impact on the availability of housing or real estate-

related transactions under § 3604(a) or § 3605." MSJ Mem. Op. at 104. As a result, Plaintiffs'

only remaining claims—the § 3604(b) claims—necessitate that Plaintiffs prove that Defendants'

actions caused a discriminatory effect as to the maintenance and repair of REO properties, with

the data analyzed in Dr. Ian Ayres's statistical analyses.

On July 9, 2025, the Court noted that "[P]laintiffs disclaimed proving statistical disparities

in a *single* service area." Clarification Mem. Op. at 4. The Court further held that "Plaintiffs'

inspection results cannot be extrapolated to infer the existence of maintenance disparities across all Deutsche Bank-owned REO properties within a broader metropolitan area." *Id*. Instead, the scope of inferences are limited to the analysis set of inspected properties, which lack statistical significance either nationally or in any specific service area. *Id*. Accordingly, Plaintiffs have no evidence of and no means to prove that Defendants' REO maintenance caused a disparate impact within a specific service area.[18]

Additionally, the Local Plaintiffs testified that their missions are to eliminate housing discrimination *within their respective regions.* These regions, which are either statewide or limited to certain municipalities, are referred to as each Local Plaintiffs' "service area."

| Local Plaintiff | Mission |
|---|---|
| South Suburban Housing Center | **Q.** What is the mission of the SSHC?<br>**A.** Our mission is to deal with all forms of housing discrimination that we find in our service area by conducting programs to counsel people and to investigate claims of discrimination to foster diverse communities throughout our service area." *See* Bogo-Ernst Decl., Ex. 2 SSHC 30(b)(6) Dep. Tr. 45:6-7. |
| Fair Housing Continuum | **Q.** Plaintiff Fair Housing Continuum is a private nonprofit fair housing agency dedicated to the elimination of housing discrimination in Florida?<br>**A.** Yes, ma'am. The portion "dedicated to the elimination of housing discrimination in Florida," is the predominance of our mission statement. *See* Bogo-Ernst Decl., Ex. 3 FHC 30(b)(6) Dep. Tr. 53:5-12. |
| Connecticut Fair Housing Center | **Q.** What is the mission of The Center?<br>**A.** The Center's mission is to insure that all Connecticut residents have access to the housing of their choice, free from housing discrimination. *See* Bogo-Ernst Decl., Ex. 4 CFHC 30(b)(6) Dep. Tr. 49:16-19. |
| Louisiana FH Action Center | **Q.** What is the mission of LaFHAC? |

---

[18] This is not surprising given the small number of properties inspected. For example, Dr. Ian Ayres's regression includes only one property in the Denver metro area inspected within the statute of limitations applicable to Ocwen and Altisource. It is of course impossible to prove a disparity premised on the maintenance of one property.

| Local Plaintiff | Mission |
|---|---|
|  | **A.** The mission of LaFHAC is to eradicate housing discrimination and segregation across the State of Louisiana. *See* Bogo-Ernst Decl., Ex. 5 LaFHAC 30(b)(6) Dep. Tr. 35:16-18. |
| Housing Opportunities Project For Excellence | **Q.** Do you have a mission statement at HOPE, Inc.? **A.** We do. **Q.** Do you know what it is currently or where I could find it? **A.** It's a mission of HOPE Incorporated, to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunity throughout Florida. *See* Bogo-Ernst Decl., Ex. 6 HOPE 30(b)(6) Dep. Tr. 43:16-23. |
| Fair Housing Center for Rights and Research | **Q.** What is the service area of the Fair Housing Center? **A.** We're a nonprofit organization incorporated in the State of Ohio. Our primary service area includes Cuyahoga and Moraine Counties, but we definitely do research work on statewide issues and in other areas throughout the state as well. *See* Bogo-Ernst Decl., Ex. 7 FHCRR 30(b)(6) Dep. Tr. 48:10-16. |
| Fair Housing Advocates of Northern California | **Q.** What is the service area of FHANC? **A.** We provide full fair housing services to Marin County, Sonoma County, and Solano County. But we also have provided various levels of service to other areas as well, including parts of Alameda County, specifically Oakland, and the Richmond area. FHANC 38:3-8. **Q.** What is the mission of Fair Housing Advocates of Northern California? **A.** It is to ensure equal housing opportunity and promote the value of diversity in our neighborhoods. *See* Bogo-Ernst Decl., Ex. 8 FHANC 30(b)(6) Dep. Tr. 39:4-7 |
| Metro Milwaukee Fair Housing Counsel | **Q.** What is the mission of Metro Milwaukee? **A.** Metro Milwaukee's mission is to promote fair housing throughout the State of Wisconsin, and to combat illegal housing discrimination. We are also -- our mission also includes creating and maintaining racially and economically integrated communities. *See* Bogo-Ernst Decl., Ex. 9 MMFHC 30(b)(6) Dep. Tr. 33:14-19. |
| Housing Opportunities Made Equal of VA | **Q.** What is HOME of Virginia's service area? **A.** That -- for fair housing, we serve the entire state of Virginia. So we are looking for instances of housing discrimination and assist people with complaints from across the state. *See* Bogo-Ernst Decl., Ex. 10 HOMEVA 30(b)(6) Dep. Tr. 35:6-10. |
| Fair Housing Center of West Michigan | **Q.** So I understand from looking at your website that the Fair Housing Center serves 12 counties in Western Michigan; is that right? **A.** That's correct. *See* Bogo-Ernst Decl., Ex. 39 FHCWM 30(b)(6) Dep. Tr. 28:3-6. |

| Local Plaintiff | Mission |
|---|---|
| Open Communities | **Q.** And then what would you describe Open Communities' service area as? **A.** Currently, it is from Howard Avenue, which is the north Edge of Chicago. That's our southern border. Our northern border is approximately North Chicago, Waukegan. Out eastern border are the communities along Lake Michigan, such as Evanston, Wilmette, Winnetka, Highland Park. And then our western border are the cities of Schaumburg and Des Plaines; that's our western border. *See* Bogo-Ernst Decl., Ex. 240 Open Communities 30(b)(6) Dep. Tr. 37:15-38:4. |
| Fair Housing Center of the Greater Palm Beaches | **Q.** So from the time that the Fair Housing Center started to present, what has been your service area? **A.** Palm Beach County and we do – the State of Florida basically, we consider our service area… but to be more specific, I guess you could call Palm Beach County our service area, immediate service area, yes. *See* Bogo-Ernst Decl., Ex. 32 FHCGPB 30(b)(6) Dep. Tr. 47:2-17. |
| HOPE Fair Housing Center | **Q.** So in addition to DuPage County, do I understand that HOPE services a number of counties – 29 I think you said – in northern Illinois? **A.** Yes. *See* Bogo-Ernst Decl., Ex. 41 HOPE FHC 30(b)(6) Dep. Tr. 131:3-6. |
| Fair Housing Center of Central Indiana | **Q.** What is the service area of the Center? **A.** Technically, it's 24 counties within Central Indiana. *See* Bogo-Ernst Decl., Ex. 42 FHCCI 30(b)(6) Dep. Tr. 38:17-22. |
| North Texas Fair Housing Center | **Q.** What's the service area of the North Texas Fair Housing Center? **A.** We serve 12 counties in North Texas. *See* Bogo-Ernst Decl., Ex. 31 NTFHC 30(b)(6) Dep. Tr. 33:2-4. |
| Central Ohio Fair Housing Association | **A.** COFHA's mission is to eliminate housing discrimination and ensure equal housing opportunity for all people in our region. **Q.** So that would be the mission statement to this then? **A.** Yes. *See* Bogo-Ernst Decl., Ex. 43 COFHA 30(b)(6) Dep. Tr. 32:2-17. |
| Toledo Fair Housing Center | **Q.** Why did the Fair Housing Center join the investigation of Deutsche Bank REO properties? **A.** Well, we knew that the maintenance of REO properties was – generally speaking, we knew it was a significant issue in the area, just from what we had seen as being operating in the Toledo community. *See* Bogo-Ernst Decl., Ex. 44 TFHC 30(b)(6) Dep. Tr. 85:14-21. |
| Miami Valley Fair Housing Center | **Q.** Just at a high level, what is the mission statement of Miami Valley? **A.** To eliminate housing discrimination and ensure equal housing |

| Local Plaintiff | Mission |
|---|---|
|  | opportunity throughout the Miami Valley – our region, the State of Ohio, and nationally. *See* Bogo-Ernst Decl., Ex. 45 MVFHC 30(b)(6) Dep. Tr. 61:1-5. |
| Denver Metro Fair Housing Center | **Q.** And do I understand your testimony correctly, that it was NFHA's decision to establish the Denver Metro Fair Housing Center?<br>**A.** NFHA applied for a grant to establish the Fair Housing Center in the Denver Metro area. *See* Bogo-Ernst Decl., Ex. 46 DMFHC 30(b)(6) Dep. Tr. 27:12-21. |

To establish frustration of mission, each local Plaintiff must prove that "defendants' discriminatory REO practices" impaired their services in that service area, for example their "ability to assist clients in finding suitable homes" within the area they serve. MSJ Mem. Op. at 18. However, this Court held that, among other things, Plaintiffs cannot extrapolate from disparities in the aggregate to prove disparities within the "metropolitan area" which each local Plaintiff serves. Clarification Mem. Op. at 4. As a result, no local Plaintiff can prove any discriminatory REO practices within their service area and no local Plaintiff can prove any resulting frustration of mission.

Because no Local Plaintiff can prove any discriminatory practices or resulting impairment within their service area, the Local Plaintiffs should be precluded under FRE 403 from asserting that Defendants' conduct caused frustration of their missions because such assertions would contradict the Court's ruling that Plaintiffs' have no evidence of disparities within any local service area.

The Court has already ruled that Plaintiffs have no evidence of and no means to prove REO maintenance disparities within any specific service area. Assertions by Plaintiffs that Defendants' conduct caused frustration of the Local Plaintiffs' missions—missions that are tied to single service areas—would merely serve to confuse the jury and circumvent the Court's ruling.

Critically, if the jury were to accept these assertions, the jury could return a verdict in direct contradiction to the Court's ruling. The risk that these assertions would confuse the jury and enable it to return a verdict on improper grounds warrants their exclusion under FRE 403. *Ledford v. Lamartz,* 462 F. Supp. 3d 905, 910 (N.D. Ind. 2020) (granting motion in limine to preclude evidence that "would serve only to encourage the jury to base its verdict on improper grounds"); *Fail-Safe, L.L.C. v. A.O. Smith Corp.,* 744 F. Supp. 2d 870, 900 (E.D. Wis. 2010) (excluding damages evidence given "the obvious danger of putting unrealistic damage figures before the jury" that "could easily confuse the jury and result in a decision that is contrary to applicable law").

In addition to being prejudicial, Plaintiffs' assertions that Defendants' conduct caused frustration of Local Plaintiffs' missions has no probative value. The Court has already ruled that Plaintiffs have no proof that Defendants' conduct caused disparate impact as to REO property maintenance within specific service areas. Therefore, any testimony by Local Plaintiffs concerning frustration of their missions would render the Court's ruling superfluous and have no relevance to the issues remaining at trial. Thus, the Court should exclude testimony of local frustration of mission by the Local Plaintiffs. *See Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 713 (7th Cir. 2005) (affirming exclusion of damages evidence that was "irrelevant and inapplicable to [Plainitff's] theory of liability").

**MOTION NO. 10:**
**TO REQUEST AN ADVERSE INFERENCE REGARDING SPOLIATIONAND**
**EXCLUDE TESTIMONY OR ARGUMENT ON "DRAFTS"**

Although the parties are continuing to meet and confer on proposed jury instructions that will be included in the January 14, 2026 Pretrial Order, it would aid trial planning for the Court to provide guidance now on (i) the nature of the instruction to be given and (ii) the scope of evidence that should be permitted at trial on issue of spoliation. The Court has already found spoliation and has ruled that all parties may present evidence to the jury concerning the missing inspection forms. Dkts. 282 at 4, 8; 288 at 4. In light of these rulings and the evidentiary posture for trial, Defendants respectfully request that the Court: (1) instruct the jury that it must draw an adverse inference upon a finding that Plaintiffs acted at least with "fault" in destroying or failing to preserve the forms— and that while bad faith is sufficient, it is not required for such an instruction—and, even if the jury does not find bad faith, it is permitted to presume the missing evidence is both relevant and favorable to Defendants after weighing all the evidence on the issue; (2) bar Plaintiffs from offering testimony or argument that the spoliated inspection forms were merely "drafts," which would mislead the jury and confuse the issues, and (3) issue a pretrial directive requiring Plaintiffs to identify replaced or altered records and to provide chain-of custody-witnesses for still-extant materials.

Pursuant to the Court's rules, the Parties conferred regarding whether these issues could be resolved without motions in limine. Plaintiffs have not indicated that filing this motion can be avoided.

**A.    The Jury Should Be Instructed on the Availability of a Mandatory and Permissive Adverse Inference on the Issue of Spoliation**

Although this request is not a traditional motion in limine, it is presented to obtain early guidance that will facilitate trial planning. Defendants will continue to meet and confer with

Plaintiffs on the instruction's wording as part of the pretrial process, but it would aid trial planning for the Court to provide guidance now on (i) the nature of the instruction to be given and (ii) the scope of evidence that should be permitted at trial on that issue. The Court has already determined that Plaintiffs committed spoliation. Dkt. 288 at 4. Seventh Circuit authority recognizes that sanctions for spoliation turn on willfulness, bad faith, or fault, and that a party's "fault" that deprives its opponent of critical evidence warrants severe sanctions, including adverse-inference instructions.. *See, e.g.*, *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992) (affirming severe sanctions where a party's "fault" deprives the opponent of critical evidence); *Sonrai Systems, LLC v. Romano*, No. 16-C-3371, 2021 WL 1418405, at *16 (N.D. Ill. Jan. 20, 2021); *Segerdahl Corp. v. Ferruzza*, No. 17-cv-3015, 2022 WL 21295096, at *5 (N.D. Ill. Sept. 20, 2022). The Court previously sanctioned Plaintiffs and permitted all parties to present evidence at trial regarding the spoliated materials, ruling that "[s]hould a jury believe that Plaintiffs spoliated evidence in bad faith, the Court will issue an appropriate instruction, such as an adverse inference." Defendants will present evidence that Plaintiffs destroyed the REO evaluation forms to insulate them from potential litigation scrutiny.

Consistent with the Seventh Circuit's framework and this Court's prior ruling, the jury should be instructed that, if it finds Plaintiffs acted with at least "fault" by destroying or failing to preserve the forms—conduct that need not rise to subjective bad faith—it must draw an adverse inference that the missing documents would have been unfavorable to Plaintiffs and undermined their theories of liability. *See Marrocco*, 966 F.2d at 224. *Marrocco* makes clear that bad faith is not a prerequisite: where a party's fault results in the loss of critical evidence and prejudice to the opponent, an adverse-inference instruction is an appropriate and proportionate sanction.

However, even if the jury does not find bad faith, the Court should give a permissive spoliation charge, instructing the jury that—after considering all evidence on the spoliation—it may presume the spoliated evidence was relevant and favorable to Defendants. *See Domanus v. Lewicki*, 284 F.R.D. 379, 392 (N.D. Ill. 2012). That approach aligns with *Marrocco*'s recognition that courts have broad discretion to tailor sanctions to the culpability and resulting prejudice, including where the conduct reflects "fault" short of bad faith, and it ensures the jury can fully weigh the consequences of Plaintiffs' misconduct and the prejudice to Defendants. *See Marrocco*, 966 F.2d at 224.

## B. Plaintiffs Should Be Barred from Presenting Argument or Testimony that Spoliated Evidence Were "Drafts"

Defendants anticipate that Plaintiffs will contend the missing handwritten evaluation forms were merely "drafts" that did not need to be retained because the information was later entered into the REO database. Plaintiffs may also argue that, even if they were mistaken about their duty to preserve, they subjectively believed the forms were unnecessary "drafts," and that this belief bears on whether they acted in good or bad faith. The Court should preclude any testimony or argument that the missing forms were "drafts," and should likewise preclude any testimony or argument that Plaintiffs' asserted belief that the forms were "drafts" excuses their destruction or otherwise mitigates the spoliation. Such evidence is irrelevant under Rules 401 and 402 and, in the alternative, substantially more prejudicial than probative under Rule 403.

The Court has already determined that Defendants were entitled to the forms and that Plaintiffs cannot produce them because they were destroyed, discarded, or lost. Dkts. 282, 288. Plaintiffs' post-hoc labelling of these documents as "drafts" does not alter the duty to preserve, which turns on relevance and foreseeability of litigation, not on a party's unilateral nomenclature. Whether Plaintiffs called these forms "drafts," or believed they were "just drafts," does not make

any fact of consequence to the elements of spoliation, the scope of the evidentiary record, or the jury's evaluation of the surviving evidence more or less likely. Fed. R. Evid. 401–402. The Court's spoliation rulings have already resolved that the forms should have been preserved and are missing. Plaintiffs' internal characterization and their asserted subjective belief do not change those facts and therefore are irrelevant.

Even if the "drafts" label or Plaintiffs' claimed belief had some marginal relevance, any probative value would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403. Allowing Plaintiffs to rebrand the missing documents as "drafts" would create a false impression that preservation obligations hinge on self-applied labels or post hoc state-of-mind narratives, rather than on objective legal standards. It would invite a collateral mini-trial over semantics, internal practices, and after-the-fact rationalizations that would distract the jury from the merits and risk undermining the Court's spoliation rulings.

To the extent Plaintiffs seek to use the "drafts" narrative to argue they acted in good faith, that argument is likewise improper in connection with the admissibility of the "drafts" label. The Court has permitted the parties to present evidence concerning bad faith at trial, and Defendants address that issue above. *See Supra*, MIL No. 10. But Plaintiffs should not be permitted to smuggle in a good-faith narrative by labeling the spoliated documents "drafts" or by offering self-serving testimony that they subjectively believed "drafts" were unnecessary to preserve. Nor, is it relevant to Plaintiffs' "fault." *See Marrocco*, 966 F.2d at 224. That testimony risks confusing the jury about the scope and effect of the Court's spoliation determinations and invites undue prejudice by suggesting the duty to preserve is excused by a party's unilateral, and concededly erroneous, belief. If the Court allows any evidence concerning Plaintiffs' intent, it should require an offer of proof

outside the presence of the jury and, at minimum, provide a limiting instruction clarifying that (i) the Court has already found the duty to preserve applied and the forms are missing; (ii) labels such as "drafts" do not affect the existence or scope of preservation obligations; and (iii) any state-of-mind testimony may be considered, if at all, only for the discrete issue of intent and not to negate the spoliation finding or to suggest compliance with preservation duties.

For these reasons, the Court should exclude any testimony, argument, or insinuation that the spoliated handwritten evaluation forms were "drafts," and should preclude Plaintiffs from arguing that their asserted belief that the forms were "drafts" excuses their destruction or mitigates the spoliation. In the alternative, if the Court allows any such evidence for the limited purpose of intent, it should require a threshold showing outside the jury's presence and give a contemporaneous limiting instruction to prevent juror confusion and prejudice.

For the foregoing reasons, the Court should: (1) instruct the jury that it may draw an adverse inference for destroying the evaluation forms; (2) bar Plaintiffs from arguing or suggesting that the missing handwritten forms were only "drafts."

## MOTION NO. 11:
## TO EXCLUDE IRRELEVANT AND INFLAMMATORY EVIDENCE

Defendants respectfully move this Honorable Court for an order *in limine* barring Plaintiffs, their counsel, and any witnesses called on their behalf from introducing, eliciting, referring to, or otherwise placing before the jury any evidence, testimony, and/or argument regarding the following inflammatory topic areas:

1. Settlements in other matters;

2. Unrelated enforcement actions against Defendants and/or any of their affiliates;

3. Plaintiffs' unrelated community work;

4. Altisource's offshore personnel;

5. Racially insensitive language on webpages Plaintiffs cannot prove Altisource personnel visited;

6. Ocwen's vendor audit and vendor risk assessment findings unrelated to this litigation;

7. The Deutsche Bank Trustees' knowledge of impact of REO maintenance on minority communities or response to community members;

8. Deutsche Bank Trustees' "failure" to terminate Ocwen or evaluate performance;

9. Evictions of or alleged harm to homeowners who are not parties to this case;

10. The historical overlap between Ocwen and Altisource, including past corporate affiliation or shared leadership, and any related lawsuits or investigations; and

11. Evidence purporting to show disparities or negligent maintenance where it consists of photographs of isolated homes presented without control variables.

The above evidence should be excluded under Rule 403 because it is irrelevant, and any probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury. *See* Fed. R. Evid. 403. These materials fall outside the scope of Plaintiffs' claims and do not bear on the issues to be tried. Their admission would instead introduce highly

inflammatory matters and require the jury to consider collateral issues unrelated to this case. Defendants address each category of evidence in turn.

*Settlement in Matters Unrelated to the Current Case.* Defendants anticipate Plaintiffs will seek to introduce evidence related to settlements entered into by Defendants, their affiliates, or Plaintiffs which are unrelated to the parties and issues in the current proceeding. For example, in Plaintiffs' Statement of Additional Facts submitted in opposition to Defendants' motion for summary judgment, Plaintiffs relied on a $7.2B settlement entered into by Deutsche Bank, AG (not the Deutsche Bank trust entities that are parties in this case) with the Department of Justice related to the sale of residential mortgaged-back securities in 2017.[19] Plaintiffs' exhibit list also includes an article about and the $2B settlement entered into by Defendant Ocwen Loan Servicing with the Consumer Financial Protection Bureau and state authorities related to mortgage servicing (not maintenance of REO properties).[20] Additionally, Plaintiffs may also seek to reference and enter evidence of settlements they have entered into with other banks, financial institutions, or servicers, including Fannie Mae and Wells Fargo, that were the subject of the same investigation as Defendants.[21] Settlements are not admissions of liability; therefore, they generally have no

---

[19] *See* Plfs' St. of Add. Facts, Dkt. 361 at ¶ 139 (citing PJt Ex. 101, Press Release, *Deutsche Bank Agrees To Pay $7.2 Billion For Misleading Investors In Its Sale Of Residential Mortgage-Backed Securities*, U.S. Attorney's Office for the Eastern District of New York, (Jan. 17, 2017), https://www.justice.gov/usao-edny/pr/deutsche-bank-agrees-pay-72-billion-misleading-investors-its-sale-residential-mortgage#:~:text=In%202017%2C%20Deutsche%20Bank%20agreed%20to%20pay,to%20the%20conduct%20covered%20by%20the%20agreement.)

[20] *See* Bogo-Ernst Decl. Ex. 28 Plfs' Ex. List at No. 1497, Press Release, *CFPB, State Authorities Order Ocwen to Provide $2 Billion in Relief to Homeowners for Servicing Wrongs*, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/about-us/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-billion-in-relief-to-homeowners-for-servicing-wrongs/#:~:text=The%20proposed%20order%20requires%20Ocwen%20to:%20*,only%20when%20signed%20by%20the%20presiding%20judge; *see also* Plfs' St. of Add. Facts, Dkt. 361 at ¶ 243(b).

[21] *See, e.g.*, Press Release, NFHA Reaches Historic Settlement with Fannie Mae, Nat'l Fair Hous. All. (Feb. 7, 2022), https://nationalfairhousing.org/nfha-reaches-historic-settlement-with-fannie-mae/; Conciliation Agreement between National Fair Housing Alliance et al. and Wells Fargo Bank, N.A., https://nationalfairhousing.org/wp-content/uploads/2021/07/ExecutionVersionofNFHAConciliationAgreement.pdf.

probative value here. This is particularly true given the settlements related to conduct unconnected to the facts and circumstances of this case and to entities that are not parties to this case

Accordingly, such evidence would only "unfairly prejudice the [fact-finder] by giving the appearance that the ultimate issues to be decided by it had already been decided by another entity." *Moore v. Principi*, No. 00 C 2975, 2002 WL 31767802, at *8 (N.D. Ill. Dec. 10, 2002). Because evidence of these settlements are unrelated to this case and will give the jury the unwarranted opportunity to draw the inference that Defendants have previously done something wrong, it should be excluded as unfairly prejudicial.

***Enforcement Actions Unrelated to the Current Case.*** Similarly, Defendants expect Plaintiffs will attempt to introduce evidence regarding federal or state enforcement actions against Defendants that are unrelated to this litigation. For example, Plaintiffs seek to interject wholly unrelated regulatory matters, including (1) the Securities Exchange Commission's investigation of William Erbey, the former CEO of Ocwen and Chairman of Altisource (resigned December 2014); (2) certain Fannie Mae audit findings; (3) the New York State Department of Financial Services investigation of Ocwen related to conflicts of interest with Altisource (which was resolved in 2014), and (4) the California Department of Business Oversight's agreement relating to Ocwen's alleged failure to provide certain information and documents during a licensing examination.[22] Evidence of unrelated enforcement actions that predate the applicable statute of limitations period for Ocwen and Altisource have no bearing on this case, especially whether Defendants maintained REO properties in a discriminatory manner.

---

[22] *See* Bogo-Ernst Decl. Ex. 1 Plaintiffs' Proposed Statement of Uncontested Facts, ¶¶ 198-202; *see also* Plfs' Proposed Exhibit List at No. 1373 and 1498 (both OCWEN_0015762) (Fannie Mae audit),1826-1829 (Ocwen's Response to RFAs Nos. 310, 311-313, and 314); Plfs' St. of Add. Facts at ¶ 243.

***Plaintiffs' Unrelated Community Work.*** Plaintiffs' evidence of their community work should be limited to that which pertains to the claims and related damages sought in this case. After summary judgment, Plaintiffs' remaining claim under § 3604(b) requires them to prove Defendants *maintained* REO properties in a discriminatory manner. So, for example, any evidence related to Plaintiffs' community work regarding *marketing*, *access to credit*, or *first-generation homeownership* is unrelated to their alleged frustration of mission *in this case* and only serves to confuse the jury to the prejudice of Defendants.[23]

***Altisource's and Ocwen's Offshore Personnel.*** Plaintiffs seek to introduce evidence related to Altisource's and Ocwen's "offshore" personnel, primarily located in India.[24] Throughout this litigation, Defendants' "offshore" employees have been referred to with xenophobic undertones.[25] Plaintiffs now seek to insert these inflammatory references in its proposed uncontested facts.[26] Plaintiffs suggest that they emphasize Altisource's employees' location to show that they are not local to the properties; however, the same would be true for an employee located in Nebraska. Dr. Korver-Glenn also admitted that she did not have "any evidence that someone who's located in India or located offshore would be more biased about a particular area in the United States than a person who actually lives in that area."[27] Plaintiffs emphasis on

---

[23] *See Our Work*, Nat'l Fair Hous. All. (last visited Dec. 17, 2025), https://nationalfairhousing.org/issues/.

[24] *See* Bogo-Ernst Decl. Ex. 1 Plfs' Proposed Statement of Undisputed Facts at ¶¶ 152 and 219; *see also* Plfs' Exhibit List Nos. 927, 929, 931-939, 1532, 1534, 1536-1542, 1544 (Defendants' Vendor Risk Assessment Reports), No. 1489, No. 1749, Nos. 1830-1835, and No. 1822 (Ocwen's Response to RFAs No. 306); *see also* Plfs' St. of Add. Facts, Dkt. 361 at 181 (¶257), 183 (¶262), 205 (¶ 294).

[25] *See, e.g.*, Bogo-Ernst Decl. Ex. 47 Korver-Glenn Dep. 62:17–19, 67:10–14 (suggesting offshore employees would not be able to recognize clear racially insensitive comments on the internet during the valuation process despite having no expertise on India); 68:21-73:3 (discussing reliance on "offshore" compared to "local").

[26] *See* Bogo-Ernst Decl. Ex. 1 Plaintiffs' Proposed Statement of Uncontested Facts ¶¶ 152, 157, 184, 219, and 242.

[27] Bogo-Ernst Decl. Ex. 47 Dep. of Dr. Korver-Glenn, 85:8-19.

Defendants' "offshore" and "Indian" employees is, thus, xenophobic. Such sentiment has no place in this litigation.

*Racially Insensitive Internet Websites.* Plaintiffs intend to introduce evidence related to racially insensitive internet websites that Plaintiffs cannot prove were visited by Altisource's offshore personnel and that are unrelated to the properties at issue in this case. For example, Plaintiffs included Figure V.6 from Dr. Korver-Glenn's report in their initial exhibit list:[28]



*Figure V.6.* Commentary on Near Northside Neighborhood in Houston, Texas from City-Data.com

Figure V.6 was offered by Dr. Korver-Glenn in support of her analysis that Altisource's policies and procedures, including instruction "to rely on online searches to find information about properties and their neighborhoods/market areas," is "problematic" and "deficient."[29] This Court already held that Dr. Korver Glenn "tread[] outside the scope of her expertise when she opines that Altisource's or Ocwen's policies and procedures were 'deficient.'"[30] The Court concluded that Dr. Korver-Glenn's opinions evaluating Ocwen's and Altisource's policies are not reliable conclusions based on her specialized expertise," that "conclusions that a policy is 'problematic' or 'inadequate' will not assist the trier of fact," and that "similar statements in other parts of her report where she expresses deficiencies or inadequacies in defendants' policies and procedures are

---

[28] *See* Bogo-Ernst Decl. Ex. 28 Plaintiffs' Initial Exhibit List, Ex. No. 1424; *see also* Plfs' St. of Add. Facts, Dkt. 397 at 205 (¶ 294).

[29] *See* Dkt. 347-1 at 58, 67-69.

[30] Dkt. 442 at 81.

inadmissible."[31]   Despite the Court's ruling, Plaintiffs seek to introduce quotes from external websites accessed by Dr. Korver-Glenn that there is no evidence that Altisource employees visited and which related to a neighborhood in Houston, Texas (a city not included in Plaintiffs' investigation) in 2011 (which is outside the statute of limitations).

To the extent that Plaintiffs more broadly seek to introduce evidence that Altisource's "offshore employees" visited websites such as Google.com, Google Maps, Trulia.com, Zillow.com, Realtor.com, Neteronline.com, and www.city-data.com that may have had race-based or racist commentary (as described by Dr. Korver-Glenn), the policies that Plaintiffs cite to – Altisource's DVS_Procedure_Non WSTRAT REO Review and Altisource's DVS_Procedure_SLR Hybird – these policies applied to Default *Valuation* Services, which is irrelevant to Plaintiffs' remaining claim regarding the maintenance of foreclosed properties.[32]   As the Court noted in its Order on Defendants' summary judgment motion, Plaintiffs relied on valuation policies in support of their argument that Defendants' practices "'effectively removed' REO properties owned by Deutsche Bank and serviced by Ocwen from 'open real estate markets.'"[33]  Availability of housing is an issue under §3604(a) – not §3604(b).[34]   Therefore, valuation policies, including their direction to confirm the accuracy of property addresses through online searches, is irrelevant to the claim to be tried in this case.

The suggestion that Altisource's "offshore employees" accessed websites with racist commentary without confirmation that any employee accessed such a website or the specific

---

[31] Dkt. 442 at 82-83.

[32] *See* Dkt. 347-1 at 68 (relying on ASI000033239-ASI000033276 and ASI000032944-ASI000033019).

[33] Dkt. 442 at 100.

[34] Dkt. 442 at 8.

content thereof and without any connection to Defendants' maintenance of REO properties would be highly prejudicial to Defendants.

**Ocwen's Vendor Audit and Vendor Risk Assessment Findings Unrelated to This Litigation.** Plaintiffs intend to introduce various audits and "Vendor Risk Assessment Reports" conducted by Ocwen.[35] To the extent those materials concern aspects of Ocwen's business unrelated to the issues in this litigation, including findings that do not pertain to Altisource or that pertain to pre-REO or foreclosure loan servicing, they are irrelevant and should be excluded.

**Deutsche Bank Trustees' Knowledge of Impact of REO Maintenance on Minority Communities or Response to Community Members.** Plaintiffs may seek to introduce evidence regarding Deutsche Bank Trustees' knowledge of any alleged impact of REO maintenance on minority communities.[36] This Court ruled that the Deutsche Bank Trustees cannot be held directly liable under the Fair Housing Act because the circumstantial evidence "that the servicers' failure to maintain REO properties affected non-white neighborhoods more heavily than white neighborhoods was insufficient to infer Deutsche Bank's knowledge under a deliberate-indifference standard" and to infer "that Deutsche Bank failed to act based on known race discrimination by the servicers."[37] Consequently, evidence or argument about what the Deutsche Bank Trustees allegedly knew concerning "impact" on minority communities, including anecdotes about community meetings, shareholder events abroad, or high-profile public incidents, are irrelevant to the existence of discriminatory maintenance by Ocwen or Altisource under § 3604(b).

**Deutsche Bank Trustees' "failure" to Terminate Ocwen or Evaluate Performance.** Plaintiffs seek to reference the Deutsche Bank Trustees' alleged "failure" to terminate Ocwen or

---

[35] *See* Bogo-Ernst Decl. Ex. 28 Plaintiffs' Initial Exhibit List, Ex. Nos. 927-39.

[36] *See* Plfs' St. of Add. Facts, Dkt. No. 361 at 68 (No. 112).

[37] Dkt 442 at 123.

evaluate performance.[38] However, pursuant to the governing agreements in place, the Deutsche Bank Trustees did not have the authority to terminate Ocwen. For at least 159 properties connected with the relevant trusts, there was a separate master servicer charged with overseeing Ocwen and empowered, to the exclusion of either Deutsche Bank Trustee, to terminate Ocwen under certain contractually-defined circumstances.[39] For another 125 properties connected with relevant trusts, there was a required consent party to any servicer termination.[40] Accordingly, any evidence or testimony regarding Deutsche Bank Trustees' failure to terminate of sufficiently oversee Ocwen is irrelevant.

Moreover, because Deutsche Bank Trustees can only be vicariously liable, whether they sufficiently oversaw Ocwen is irrelevant. The only questions are whether Ocwen was Deutsche Bank Trustees agent and whether Ocwen and Altisource are directly liable under § 3604(b).[41]

**_Evictions of or Alleged Harm to Homeowners Who Are Not Parties to This Case_**. Plaintiffs intend to introduce evidence of evictions of and alleged harm to homeowners who are not parties to and are otherwise unrelated to this case.[42] Such evidence is irrelevant to Plaintiffs' claim, which concerns the alleged discriminatory maintenance of _post_-foreclosure REO properties, not wrongful evictions or other pre-REO conduct. Moreover, Plaintiffs are fair housing organizations, not homeowners, and allegations of harm to individual borrowers, including those

---

[38] _See_ Bogo-Ernst Decl. Ex. 1 Plaintiffs' Proposed Statement of Undisputed Facts at ¶¶ 313 ("During the period 2009 through 2018, the Deutsche Bank Defendants did not evaluate whether Ocwen should be terminated as a Servicer based on the quality of the property preservation and maintenance work Ocwen performed at REO properties owned by the Trustees under the terms of RMBS Trusts and/or PSAs."); _see also id._ at ¶¶ 296, 311, 333-334, 339.

[39] _See_ Bogo-Ernst Decl. Ex. 13 Decl. of K. Rademacher in support of Defs' Mot. for Summary Judg., Dkt. 320-1 at ¶ 6.

[40] _See id._ at ¶ 7.

[41] _See_ Dkt. 442 at 123 (finding the Deutsche Bank Trustees can only be vicariously liable and noting that the record was insufficient to "support an inference that Deutsche Bank failed to act based on _known_ race discrimination by the servicers").

[42] _See_ Bogo-Ernst Decl. Ex. 1 Plaintiffs' Proposed Statement of Undisputed Facts at ¶¶ 316, 329.

who previously owned the homes at issue in this case, have no bearing on any injury Plaintiffs themselves claim to have sustained. Evidence of evictions would merely inflame the jury and prejudice Defendants. Therefore, evidence relating to evictions and other alleged harms to homeowners should be excluded.

**The Historical Overlap Between Ocwen And Altisource.** Plaintiffs intend to introduce evidence of and make arguments related to Ocwen and Altisource's past corporate affiliation, shared leadership, and related lawsuits or litigation.[43] However, such evidence is irrelevant because it has no bearing on Plaintiffs' claims, which concern the alleged discriminatory maintenance of post-foreclosure REO properties. Corporate history, shared personnel, and unrelated litigation do not make it more or less likely that Defendants engaged in the conduct at issue or that any challenged decision was made for a discriminatory reason. Instead, this evidence would cause unfair prejudice and confusion, as it invites the jury to draw improper inferences based on guilt by association and matters wholly outside the scope of this case. Thus, this evidence should be excluded pursuant to FRE 403.

Accordingly, the aforementioned evidence should be excluded because it is irrelevant to the claims to be tried and, even if marginally probative, would unfairly prejudice Defendants, confuse the issues, and mislead the jury.

---

[43] *See* Bogo-Ernst Decl. Ex. 1 Plaintiffs' Proposed Statement of Undisputed Facts at ¶¶ 134-36; *see also* Bogo-Ernst Decl. Ex. 28 Plfs' Proposed Exhibit List at No. 1819 (Ocwen's Response to RFAs No. 303), 1826 (Ocwen's Response to RFAs No. 310).

**MOTION NO. 12:**
**EXCLUDE EVIDENCE RELATED TO THE FORECLOSURE CRISIS AND**
**FORECLOSURE ISSUES**

Defendants anticipate that Plaintiffs will seek to introduce evidence and argument regarding the 2008 foreclosure crisis and issues surrounding foreclosures generally, and related communications. This case is not about these issues, which are clearly improper under Rules 401, 402, and 403. Rather, it concerns alleged discrimination in the preservation and maintenance of REO properties *after* the foreclosure process concluded and title transferred. The Court should exclude evidence tied to the foreclosure crisis and foreclosure issues, including: (1) evidence or argument that minorities were disproportionately affected by predatory lending during the foreclosure crisis; (2) evidence of Ocwen's policies and practices regarding loan modifications and foreclosure; and (3) evidence or argument concerning foreclosures or the Great Recession, including communications related to foreclosures. To that end, the Court should issue an order precluding these topics from opening statement, witness examinations, exhibits and closing argument.

Pursuant to the Court's rules, the Parties met and conferred to determine whether these motions in limine could be avoided. Plaintiffs have not indicated that Defendants could avoid filing any of the following motions in limine.

**A.    Evidence that Minorities Were Disproportionately Impacted by Predatory Lending During the Foreclosure Crisis Should Be Excluded**

Defendants anticipate that Plaintiffs may attempt to introduce sweeping generalized statements, including argument, evidence, testimony that minorities suffered comparatively greater harm from predatory lending during the foreclosure crisis than non-minorities. *See* Bogo-Ernst Decl. Ex. 48 [Jastrzemski Dep. (11/20/25)] at 40:3–45:10. That evidence should be excluded as irrelevant under Rules 401 and 402, or alternatively under Rule 403. Evidence is relevant only

if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402. Under Rule 403, the Court may exclude even relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

Plaintiffs have not brought claims based on predatory lending. Their claims concern alleged discrimination in preserving and maintaining REO properties—conduct occurring after foreclosure and unrelated to lending practices. Plaintiffs have not produced evidence that any of the Defendants engaged in any lending at all related to the specific REO properties Plaintiffs inspected. Evidence about predatory lending does not make any fact of consequence in this case more or less probable and must be excluded. See Fed. R. Evid. 401, 402.

In addition, Plaintiffs should be precluded from eliciting from any lay or fact witness generalized assertions, including, but not limited to, that "minorities were disproportionately impacted by predatory or subprime lending." Under Rule 701, lay opinion must be rationally based on the witness's personal perception, helpful to understanding that witness's testimony or a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Generalized, demographic conclusions about industry-wide practices and disparities necessarily rely on specialized knowledge, data analysis, and methodology reserved for qualified experts under Rule 702. To the extent Plaintiffs seek to introduce such opinions through fact witnesses, the testimony would either (i) exceed Rule 701 because it is not grounded in the witnesses' personal observations and entails specialized knowledge, or (ii) constitute undisclosed expert testimony subject to exclusion under Rule 37(c)(1) for failure to comply with Rule 26(a)(2). At minimum, any expert opinions at trial must be confined to the opinions, bases, and

methodologies properly disclosed and supported by a reliable methodology under Rule 702, and the Court should require Plaintiffs to approach the bench before eliciting any "disparate impact" opinions from lay witnesses. *See* Fed. R. Evid. 701, 702; Fed. R. Civ. P. 26(a)(2), 37(c)(1).

Even if the Court were to find some marginal relevance, the danger of unfair prejudice, confusion, and wasted time substantially outweighs any probative value. See Fed. R. Evid. 403. Foreclosure-related issues are emotionally charged. Presenting evidence or testimony on the effect of predatory lending on minorities risks inflaming the jury's passions, confusing the issues, and forcing a collateral mini-trial on a topic not at issue in this case, thereby prejudicing Defendants and consuming the Court's limited time. Because these dangers substantially outweigh any probative value, the Court should exclude this evidence.

## B. The Court Should Exclude Evidence of Ocwen Foreclosures

Plaintiffs should be barred from introducing evidence that Ocwen initiated or completed foreclosures on properties. Such evidence is irrelevant to the issues in this case and must be excluded under Rules 401 and 402, or alternatively under Rule 403.

This case concerns Ocwen's post-foreclosure responsibilities relating to the preservation and maintenance of REO properties as an asset manager for another lender. Whether Ocwen foreclosed on properties does not make any material fact in dispute more or less probable. *See* Fed. R. Evid. 401, 402.

Even if the Court were to find any marginal relevance, the probative value is substantially outweighed by the risks of confusing the issues, unfair prejudice, and wasting time. Introducing evidence about foreclosures would mislead the jury and divert the trial into collateral matters unrelated to post-foreclosure property maintenance. The topic of "foreclosures" is highly charged and emotive, particularly in the wake of the Great Recession, and discussion of foreclosure activity can easily inflame juror passions and bias them against loan servicers as a class, creating a

substantial risk that the jury will decide this case based on generalized moral judgment rather than the discrete issues the jury must resolve. Such "heat over light" threatens to overshadow the case-specific questions concerning post-foreclosure REO preservation and maintenance that are actually at issue. *See* Fed. R. Evid. 403. This case, as the Court has framed it, concerns the maintenance of REO properties post-foreclosure, not the initiation or propriety of foreclosure proceedings themselves.

In addition, admission would also open the door to unfair character evidence. Plaintiffs may attempt to use foreclosure-related communications or a generalized "foreclosure crisis" narrative to suggest that Defendants acted wrongfully in other transactions and therefore likely acted wrongfully here. That is classic propensity reasoning barred by Rule 404, which prohibits using other acts to show a person acted in conformity with a supposed bad character. Fed. R. Evid. 404(a), 404(b). Allowing the jury to hear evidence or argument inviting it to punish Defendants for perceived foreclosure conduct—or for an asserted role in the Great Recession—would improperly encourage verdicts based on character or punishment rather than the narrow question presented: whether Ocwen and Altisource met post-foreclosure preservation and maintenance obligations for the specific REO properties at issue. *See* Fed. R. Evid. 401, 402, 403, 404.

For these reasons, the Court should exclude any evidence or argument concerning foreclosures or the Great Recession—including any communications between Deutsche Bank Trustees and Ocwen relating to foreclosure activity—under Rules 401, 402, 403, and 404, because such materials are irrelevant to the post-foreclosure issues to be tried, unduly prejudicial and confusing, and risk improper propensity inferences untethered to the facts the jury must decide.

**C.     The Court Should Exclude Evidence or Argument Concerning Foreclosures or the Great Recession, Including Communications Between the Trustee Defendants and Ocwen Relating to Foreclosures**

Defendants anticipate that Plaintiffs may seek to introduce communications between Ocwen and the Deutsche Bank Trustees concerning foreclosures or to invoke broader references to the foreclosure crisis and the Great Recession. The Court should exclude such materials and argument in their entirety. This case concerns alleged failures in the preservation and maintenance of REO properties after the foreclosure process had concluded and title had transferred. Communications about the conduct, propriety, timing, or administration of foreclosures, as well as generalized narrative about the financial crisis or industry foreclosure practices, do not bear on whether Defendants met post-foreclosure preservation and maintenance obligations. Because these communications and narratives do not make any fact of consequence in this action more or less probable, they are irrelevant under Rules 401 and 402 and should be excluded.

Even if Plaintiffs were to identify some marginally probative aspect of such foreclosure-related communications or crisis-related themes, exclusion is still warranted under Rule 403. Foreclosure issues and the Great Recession remain highly charged topics that evoke strong emotions and biases. References to industry conduct in the wake of the financial crisis risk inviting a verdict based on passion rather than evidence, and they would mislead and confuse the jury about the actual issues to be decided -- namely, whether Defendants satisfied their post-foreclosure preservation and maintenance duties for the REO properties at issue. Admission of this collateral material would also require Defendants to embark on a series of mini-trials to rebut insinuations about foreclosure processes, market-wide practices, or macroeconomic conditions that are not at issue. This results in undue delay and wasting time that substantially outweighs any slight probative value.

Admission would also open the door to unfair character evidence. Plaintiffs may attempt to use foreclosure communications or a generalized foreclosure-crisis narrative to suggest that Defendants acted wrongfully in other transactions and therefore likely acted wrongfully here. This is classic propensity reasoning barred by Rule 404. It invites the jury to punish Defendants for perceived foreclosure conduct or for their purported role in the Great Recession rather than decide the discrete question presented – whether Ocwen and Altisource met post-foreclosure preservation and maintenance obligations with respect to the specific properties in dispute. For these reasons, the Court should exclude any evidence or argument concerning foreclosures or the Great Recession, including communications between Deutsche Bank Trustees and Ocwen relating to foreclosures, under Rules 401, 402, 403, and 404.

**D.    The Court Should Issue an Order Precluding the Aforementioned Topics from Plaintiffs' Opening Statement, Witness Testimony, Exhibits, and Closing Argument, Unless Plaintiffs' Can Proffer a Non-Prejudicial Purpose Related to a Property at Issue**

To effectuate these exclusions, Defendants request that the Court issue an order barring these topics from Plaintiffs' opening statement, witness testimony, exhibits, and closing argument, unless Plaintiffs, outside the presence of the jury, can offer the Court a non-prejudicial purpose for the topic to be discussed which directly relates to a specific property that was inspection during the limitations window. As has previously been demonstrated, this evidence is properly excluded under Federal Rules of Evidence 401–402, 403 and 404; the relevance of this evidence is a nullity, and to the extent that the Court finds some minimal degree of probative value, it is substantially outweighed by the danger of undue prejudice, confusion, waste of time, or forbidden character inferences.

To the extent, that Plaintiffs wish to produce this evidence, they must overcome the demands of these rules. The Court has previously ruled that only properties inspected between

February 14 of 2015 and the conclusion of Plaintiffs' investigation in 2017 may properly be considered in this lawsuit. Dkt. 442 at 31–32. Only information which has a direct connection to these specific properties can be relevant; Plaintiffs must be required to point to a specific property inspected within the limitations window and explain how discussion of these topics makes a fact about that property more or less probable. They must also indicate that the evidence should not otherwise be kept out by Rules 403 and 404 by presenting to the Court, outside the presence of the jury, a non-prejudicial purpose for which this evidence will be offered.

For the foregoing reasons, the Court should exclude evidence tied to the foreclosure crisis and foreclosure issues, including: (1) evidence that minorities were disproportionately affected by predatory lending during the foreclosure crisis; (2) evidence of Ocwen's policies and practices regarding loan modifications and foreclosure; and (3) evidence or argument concerning foreclosures or the Great Recession, including communications related to foreclosures; and should (4) issue an order precluding these topics from opening statement, witness examinations, exhibits and closing argument, unless Plaintiffs can make a property-specific proffer outside the jury's presence that shows a non-prejudicial purpose and directly ties the information to a property inspected within the limitations period.

**MOTION NO. 13:**
**TO EXCLUDE REFERENCE TO ALTISOURCE'S COMMENT POLICY WITHOUT**
**FOUNDATION**

Defendants respectfully move this Court for an order *in limine* barring Plaintiffs from introducing, eliciting, referring to, or otherwise placing before the jury any evidence and/or testimony pertaining to Altisource's "Inappropriate Comments" Policy.[44] In the summary judgment briefing, Plaintiffs cited the "Inappropriate Comments" policy in support of their disparate treatment claim, relying in part on a December 2018 memorandum to vendor partners and a December 2018 internal email to suggest that Altisource and Ocwen knew of the potential for race-based discrimination.[45] Defendants objected that Plaintiffs mischaracterized the policy, which was instituted not in response to a particular comment, but as a preventative measure.[46] This Court sustained Defendants' objection to Plaintiffs' reliance on the "Inappropriate Comments" policy as evidence of past racially derogatory comments.[47] Yet, Plaintiffs have included the same documents that the Court cited in sustaining Defendants' objection in their exhibit list for trial.[48] They have also included parts of these same email chains as separate exhibits.[49]

Because the Court ruled that the "Inappropriate Comments" Policy (and related documents) cannot be used as evidence of past discrimination, the policy is irrelevant to whether Defendants'

---

[44] *See* Bogo-Ernst Decl. Ex. 28 Plaintiffs' Exhibit List, Exhibits 1355-56, 1732.

[45] *See* Dkt. 442 at 111-112, n. 32.

[46] *See id.*

[47] Dkt. No. 442 at 112, n. 32.

[48] *See* Dkt. 442 at 112, n. 32 (citing Dkt. 370-9 (ASI000053601); *comp.* Ex. 28 Plfs' Ex. List at No. 71 (ASI000053601), No. 1732 (ASI000053601-53602); *see also* Dkt. 442 at 112, n. 32 (citing Dkt. 370-9 (ASI000561088); *comp.* Plfs' Ex. List at No. 75 (ASI000561082) (part of same email chain as ASI000561088).

[49] *See* Bogo-Ernst Decl. Ex. 28 Plfs' Ex. List at No. 1355 (ASI000053599) (12/14/2018 Email Re Urgent Re-Training & Communication Memo Needed for All Vendors Re: Inappropriate Verbiage Within Forms); *comp*. Dkt. 442 at 112, n. 32 (citing Dkt. 370-9 (ASI000561088) (12/20/2018 Email Re: Urgent Re-Training & Communication Memo Needed for All Vendors Re: Inappropriate Verbiage Within Forms)

conduct was motivated by a discriminatory purpose and only serves to prejudice Defendants.[50] To the extent that Plaintiffs seek to introduce evidence of the "Inappropriate Comments" policy as part of their argument that Defendants did not institute anti-discrimination policies (which Defendants dispute), the policy is again irrelevant because the existence of the "Inappropriate Comments" policy has no bearing on whether Defendants did or did not have other anti-discrimination policies.[51] Any attempt to introduce the "Inappropriate Comments" policy would merely conflate the issues and risk confusing the jury, and Plaintiffs should not be permitted to circumvent the Court's prior rulings to do so.[52]

---

[50] *See* Dkt. 442 at 110-112 (discussing the "Inappropriate Comments" policy in the context of the *Arlington Heights* standard in connection with Plaintiffs' disparate treatment claim under § 3604(b)).

[51] The Parties participated in a meet and confer regarding the topic of this motion in limine. Plaintiffs proposed that the Court issue a limiting instruction that the "Inappropriate Comments" policy cannot be considered evidence of past discrimination. Such a limiting instruction is insufficient because it would not prevent Plaintiffs from using the policy to more broadly suggest discriminatory intent in contravention of this Court's ruling and to the prejudice of Defendants. The limiting instruction would also allow Plaintiffs to use the "Inappropriate Comments" policy as part of their argument that Defendants did not have such a policy previously or that they did not have other anti-discrimination policies. Such use would be inappropriate because as the court held in *National Fair Housing Alliance v. Bank of Am., N.A.*, 2025 WL 2030225, *15 (D. Md. July 21, 2025), "'**the lack of policy**'" "**is not actionable**." (relying on *Tx. Dept. of Housing and Cmmty. Affairs v. Inclusive Cmtys. Proj. Inc.*, 576 U.S. 519, 533 and 543 (2015)) (emphasis added).

[52] Plaintiffs' exhibits tied to the "Inappropriate Comments" policy (either by explicit description or which correspond to Dkt. 370-9) appear to include: No. 50 (ASI000031962), No. 1355 (ASI000053599), No. 1356 (ASI000052522), No. 1597 (ASI000032261)No. 1731 (ASI000053593, ASI000053601-53602), No. 1732 (ASI000053594-53595). Dkt. 370-9 (ASI000576997) is version 16.6 of a Real Estate Owned Operational Vendor Guide. This document does not appear to be on Plaintiffs' exhibit list; however, other versions of this policy are including at Exhibit Nos. 28, 29, and 1390 (all ASI000010068), 83 and 84 (both ASI000571735), 85 and 86 (both ASI0005484312), 87 (ASI0005484493), 88 (ASI000585593), 1342 (ASI0000561557), 1343 (ASI000010068), 1386 (ASI000584493), 1387 (ASI00058036), 1388 (ASI000584312), and 1389 (ASI000571735).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant its motions in limine in their entirety.


Dated: December 19, 2025                    Respectfully submitted,

By: /s/ *Kenneth M. Kliebard*

Kenneth M. Kliebard
Tinos Diamantatos
Megan R. Braden
Michael W. Fakhoury
**MORGAN LEWIS & BOCKIUS LLP**
110 North Wacker Drive, Suite 2800
Chicago, Illinois 60606
 (312) 324-1000
kenneth.kliebard@morganlewis.com
tinos.diamantatos@morganlewis.com
megan.braden@morganlewis.com
michael.fakhoury@morganlewis.com

Kurt W. Rademacher (*pro hac vice*)
Bradie R. Williams (*pro hac vice*)
**MORGAN LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, Pennsylvania 19103
 (215) 963-5000
kurt.rademacher@morganlewis.com
bradie.williams@morganlewis.com

Mark Traut (*pro hac vice*)
**MORGAN LEWIS & BOCKIUS LLP**
101 Park Ave.
New York, NY 10178
(212) 309-6927

*Counsel for Defendants Deutsche Bank National Trust Company, as Trustee, and Deutsche Bank Trust Company Americas, as Trustee*

By: */s/ Debra Bogo-Ernst*
Debra Bogo-Ernst
Matthew J. Thomas
Sara Kim
Brandon E. Villa
Eve Hastings
Benjamin Halom
Tara Sohns
**WILLKIE FARR & GALLAGHER LLP**
300 N. LaSalle Dr.
Chicago, IL 60654
(312) 728-9000
dernst@willkie.com
mthomas@willkie.com
skim@willkie.com
bvilla@willkie.com
ehastings@willkie.com
bhalom@willkie.com
tsohns@willkie.com

*Counsel for Defendant Ocwen Loan Servicing, LLC, n/k/a Onity Group Inc.*

By: */s/ Nathan Garroway*

Nathan Garroway (*pro hac vice*)
Lisa M. Krigsten (*pro hac vice*)
Sarah Hannah Phillips (*pro hac vice*)
Mark G. Trigg (*pro hac vice*)
Kayla Lee (*pro hac vice*)
Alizé Mitchell (*pro hac vice*)
**DENTONS US LLP**
303 Peachtree Street, NE, Suite 5300
Atlanta, Georgia 30308
 (404) 527-4000
nathan.garroway@dentons.com
lisa.krigsten@dentons.com
sarahhannah.phillips@dentons.com
mark.trigg@dentons.com
kayla.lee@dentons.com
alize.mitchell@dentons.com

*Counsel for Defendant Altisource Solutions, Inc.*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that Defendants' Consolidated Motions in Limine was filed electronically with the Clerk of Court using the CM/ECF system on December 19, 2025, which will automatically send e-mail notifications of such filing to all attorneys of record.

By: */s/ Debra Bogo-Ernst*
Debra Bogo-Ernst