**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-00839<br><br><br>Judge Manish S. Shah |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONSOLIDATED FIRST ROUND
MOTIONS IN LIMINE**

# TABLE OF CONTENTS

I.      RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 1 .............................................1

   A.   Plaintiffs' Declarations Authenticate The REO Database But Do Not Render Its Hearsay Content Admissible .........................................................................................2

   B.   The Court Should Decline Plaintiffs' Request For Blanket Admissibility Of The REO Database Entries ...............................................................................................3

   C.   Any Ruling On Authenticity Of The REO Database Should Exclude Photographs That Were Taken By Local Plaintiffs. ....................................................................5

II.     RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 2 ...........................................12

   A.   Background. ..................................................................................................................12

   B.   Argument. .....................................................................................................................14

      1.   *The So-Called "Agreed Upon" 699 Property Set Is Not a Proper Statistical Population.* ......................................................................................14

      2.   *The 45 Properties Not Titled to The Trustee Defendants Should Be Excluded From the Property Set.* ............................................................16

      3.   *The 173 Properties For Which There Is No Evidence of Ownership Should Likewise Be Excluded From the Dataset.* ...................................17

      4.   *Plaintiffs Cannot Use a Motion in Limine to Revive Stricken Testimony.* ................18

III.    RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 3 ...........................................21

   A.   Purported Common Operational Activities Between DBNTC And DBTCA Are Immaterial Now That Plaintiffs' Only Remaining Claims Against The Trustee Defendants Are For Vicarious Liability. ...........................................................22

   B.   The Trustee Defendants Are Separate Legal Entities, And Treating Them As One Single Defendant Would Be Unfairly Prejudicial. .............................................24

   C.   Plaintiffs' Assertion That Corporate Separateness Is "Unsupported By The Record" Or "Contrary To The Court's Prior Determination" Is Incorrect. ......................26

IV.     RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 4 ...........................................28

   A.   Defendants' Discovery Responses Were Sufficient. ....................................................29

   B.   Plaintiffs Suffered No Prejudice Or Unfair Surprise. ..................................................30

   C.   Plaintiffs Cannot Convert An Unpursued Discovery Dispute Into The Exclusion Of Core Evidence. ...................................................................................................36

   D.   Plaintiffs' Motion Misstates Defendants' Burden. ......................................................37

V.      RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 5 ...........................................39

VI.     RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 6 ...........................................44

   A.   HUD Grant Funding Is Directly Relevant To Whether Plaintiffs Suffered Any Compensable Damages. ..........................................................................................44

   B.   The HUD Grants Bear Directly On Article III Standing And Frustration Of Mission. ..46

i

C.    Plaintiffs' Authorities Do Not Establish A Blanket, Invariable Collateral Source Rule For HUD Grants...................................................................................46

D.    The Nationwide, Multi-Lender Scope Of Plaintiffs' Grant-Funded Investigation Warrants Jury Consideration Of The Grants. ............................49

E.    Conclusion. ..............................................................................................50

VII.    RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 7.........................51

A.    Rule 1006 Requirements Cannot Be Met Because Plaintiffs Failed To Provide The Necessary Documents And Summary Evidence.............................................52

B.    There Is No Rule 1006 Shortcut For Plaintiffs' REO Database. .................53

C.    Plaintiffs' Investigation Time Records And Expenses Have No Foundation...............54

D.    Plaintiffs' Hypothetical Summary of The Trustee Defendants' Pooling And Services Agreements, Trust Agreements, And Indenture Agreements..........................55

E.    Defendants and This Court Cannot Properly Assess The Propriety Of Plaintiffs' Purported Summary Exhibits Because Plaintiffs Have Not Produced Them or Identified The Underlying Documents. ..........................................57

F.    Plaintiffs Have Not Identified Any Witness To Lay the Foundation for the Summary Exhibits And Seek An End-Run Around the Hearsay Rules.........................58

G.    Rule 107 Does Not Authorize Admission of Undisclosed Summaries and Does Not Salvage Plaintiffs' Request. ..........................................................59

## I.    RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 1

Plaintiffs ask this Court to deem all records and photographs in the REO Database self-authenticating and admissible in one stroke under Rules 902(11), 902(13), 902(14), and 803(6). That sweeping request should be denied. Self-authentication and admissibility are distinct inquiries governed by different rules and standards, and Plaintiffs' database materials — spanning disparate record types, sources, upload methods, and levels of reliability — cannot be rubber-stamped as both authentic and admissible without the individualized foundation those rules require. Rules 902(11), 902(13), and 902(14) demand competent certifications tethered to the specific systems and data at issue; Rule 803(6) requires a showing that each record was made and kept in the regular course of a regularly conducted activity and is trustworthy. Photographs and user-uploaded files in particular often reflect ad hoc submissions, third-party inputs, and post-hoc curation, none of which automatically satisfies the business-records exception or the heightened reliability contemplated by the electronic-records provisions. Because different categories of REO materials implicate different evidentiary concerns — ranging from provenance and chain of custody to hearsay and trustworthiness — the Court should reject Plaintiffs' categorical motion and require the record-by-record showing that the Rules mandate.

Defendants do not challenge the authenticity of the REO Database itself. If NFHA seeks to avoid presenting testimony simply to establish that the REO Database exists and reflects its then-current state at the time of its production, then Defendants have no objection on authenticity grounds. But Plaintiffs are asking the Court for much more than that. They are asking the Court for a broader ruling that all of the *contents* of the REO Database are admissible. The Court should deny this motion in limine for at least three reasons:

- First, as the Court already explained in its summary judgment order, the REO Database is hearsay. It is only admissible at trial if Plaintiffs establish that the Database qualifies as a business record under Rule 803(6).

- Second, even if the Database as a whole were to qualify under Rule 803(6), that does not make every individual entry in it automatically admissible. The Court already ruled that "Plaintiffs still bear the burden to lay the proper foundation for the database records to be admitted under Rule 803(6) at trial." Dkt. 442 at 30. Their motion in limine fails to do so.

- Last, the two NFHA declarations do not authenticate the photographs taken by Local Plaintiffs. Those declarants did not take the photographs, were not present when they were taken, and do not attest to when, where, how, and by whom the photographs were created. They simply recite that the photographs were uploaded to the REO Database and assume without basis that facts necessary to authenticate the photos have otherwise been established. That is not authentication.

These distinctions are critical because Plaintiffs are not offering the REO Database into evidence just to let jurors know that the Database exists or describe how it was assembled. Rather, they want jurors to mistakenly treat the REO Database as a factual record and to believe it accurately reflects property conditions and that the inspections occurred on the dates they claim. That is exactly the inference Plaintiffs want the jury to draw, and exactly the inference they are not entitled to draw without proper proof.

Plaintiffs badly overreach with their reliance on the *existence* of the REO Database, attempting to improperly sidestep establishing the reliability of photographs and the accuracy of the underlying entries, many or most of which were created by individuals who will not testify. That is not a shortcut the Rules of Evidence allow.

**A. Plaintiffs' Declarations Authenticate The REO Database But Do Not Render Its Hearsay Content Admissible.**

Plaintiffs must do more than establish that the REO Database is authentic for it to be admissible at trial. They must show that it qualifies as a business record under Rule 803(6). Authenticity and admissibility are governed by different rules, and Plaintiffs motion incorrectly collapses them into one.

2

Plaintiffs' motion leans heavily on Rule 902, which concerns only authenticity, not hearsay. The Advisory Committee Notes on the Rules for the 2017 Amendments to the Federal Rules of Evidence make that point explicit:

> A certification under this Rule can establish only that the proffered item has satisfied the admissibility requirements for authenticity. The opponent remains free to object to admissibility of the proffered item on other grounds — including hearsay, relevance, or in criminal cases the right to confrontation.
>
> . . .
>
> There is no intent to require, or permit, a certification under this Rule to prove the requirements of Rule 803(6). Rule 902(14) is solely limited to authentication, and any attempt to satisfy a hearsay exception must be made independently.

Fed. R. Evid. 902 Advisory Committee's note (2017).

The Committee Notes then provide examples of inadmissible evidence that mirror what Plaintiffs are trying to do here. A witness may certify the process used to retrieve a webpage, but that does not establish that the defendant posted the allegedly defamatory content on it. *Id*. Likewise, a witness can certify that a spreadsheet is an authentic computer output, but that does not establish that the information contained therein is reliable. *Id*.

That is exactly this case: NFHA employees may be able to certify that certain records are authentic outputs from the REO Database. That tells the jury where the records came from. But it does not tell the jury that those records are accurate, reliable, or admissible under Rule 803(6).

For that reason, Plaintiffs' focus on authentication does not carry their burden to establish the admissibility of hearsay REO Database records. It simply answers the wrong question.

**B.      The Court Should Decline Plaintiffs' Request For Blanket Admissibility Of The REO Database Entries.**

The distinction between authenticity and admissibility matters here because Plaintiffs have not carried their burden of showing that the REO Database qualifies as a business record under

Rule 803(6). For that reason alone, the Court should deny Plaintiffs' request to deem the REO Database records admissible wholesale.

At summary judgment, Plaintiffs submitted declarations in an effort to support admissibility. *See* Dkt. 174-7. The Court excluded some, but not all, of the REO Database records and made clear that Plaintiffs "still bear the burden to lay the proper foundation for the database records to be admitted under Rule 803(6) at trial." Dkt. 442 at 29–30 (excluding 45 records revised after the initiation of this lawsuit). That ruling reflects the Court's correct and important recognition that the REO Database is not a single monolithic document subject to "all or nothing" admissibility. Rather, the REO Database is a collection of thousands of individual entries, each purportedly tied to a particular inspection and property, and some entries are plainly more reliable than others.

Plaintiffs' motion ignores that instruction. They simply recycle the same declarations the Court has already seen. That is not what the Court contemplated when it required Plaintiffs to "lay the proper foundation" at trial. Plaintiffs must actually do the work Rule 803(6) requires — and that means establishing the elements of the business-records exception for the records they seek to introduce. The motion does not even attempt to do that. It therefore provides no basis for the blanket admissibility ruling sought by Plaintiffs.

By contrast, certain categories of REO Database entries can and should be excluded now for the reasons set forth in the Defendants' December 19, 2025, Motion in Limine No. 4. That motion seeks to exclude three specific categories of REO Database records.[1] Dkt. 504 at, 22–27.

---

[1] Specifically, the motion seeks to exclude: (a) altered database records based on Plaintiffs' changes that were made more than two weeks after the supposed inspection dates, (b) database records initially submitted by the Local Plaintiffs because they were not kept in the ordinary course of business, and (c) database records initially created by Local Plaintiffs wherein revisions were made by NFHA.

Defendants do not repeat those arguments here, but they remain valid and warrant exclusion of those entries.

As to the remaining entries, admissibility will depend on the particular REO Database record, the purpose for which Plaintiffs seek to introduce it, and the evidentiary objections it raises (including the relevance, unfair prejudice, and double hearsay). Those determinations are best made in context — when the Court can assess the purpose for which Plaintiffs seek to introduce those records.

This is especially true given that the two declarants on whom Plaintiffs relied to support their position that the REO Database is a business record are both on Plaintiffs' "will call" trial witness list. Plaintiffs cannot claim that a blanket advance ruling is needed to avoid the burden of live testimony while simultaneously intending to call these witnesses anyway.[2]

In short, Plaintiffs have not laid the foundation required for a global admissibility ruling, and the Court should decline to issue one.

### C. Any Ruling On Authenticity Of The REO Database Should Exclude Photographs That Were Taken By Local Plaintiffs.

Absent an applicable exception, photographs must be authenticated under Federal Rule of Evidence 901. Plaintiffs' motion does not come close to that standard for the photographs in the REO Database.

Photographs are not statements, and are therefore not hearsay. But that does not make them admissible. As the Court recognized, photographs must be authenticated at trial, typically through

---

[2] The cases Plaintiffs rely on in support of their contention that "REO Database records are no different than the other testing results that federal courts routinely accept as business records" do not support their argument. Dkt. 503 at 3. In each instance, between two and 12 testers' reports were introduced as evidence, often accompanied by deposition testimony from other testers who provided direct evidence of their personal observations, and without any inkling in the decision that anyone had edited or altered those records. That is a far cry from the REO Database records that Plaintiffs seek to introduce here.

testimony of a witness with knowledge. Dkt. 442 at 25. "When a party attempts to admit a photograph into evidence, it must make an attempt to show 'when, where, by whom, and under what circumstances the picture was taken.'" *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 5612340, at *11 (N.D. Ill. Sept. 22, 2015) (quoting *Moffett v. Sandoval*, No. 10-CV-5324, 2012 WL 2526624, at *4 (N.D. Ill. June 28, 2012)).

Plaintiffs nevertheless suggest that photographs in the REO Database are self-authenticating under Federal Rule of Evidence 902(13) and 902(14) because they were uploaded into the REO Database and therefore are "records generated by an electronic process or system" or "data copies from an electronic device, storage medium, or file." Dkt. 503 at 5. That argument fails at the threshold. Neither of those provisions of Rule 902 mentions photographs. Plaintiffs cite no authority extending either category to photographs, and the photographs were not "generated" by the REO Database in any meaningful sense.

What Plaintiffs really posit is that an unauthenticated photograph becomes authenticated the moment it is uploaded to a computer database that itself can be authenticated. That is not the law. Authentication of a container does not authenticate its contents. *See U.S. v. Weber*, 574 F.Supp.3d 791, 795 (D. Mont. 2021) (Rule 902(13) did not apply to images and videos because Rule "by its very terms, applies only to records created via an electronic process. It does not render self-authenticating substantive content created, shared, or stored, by a user . . . ."); *see generally U.S. v. Browne,* 834 F.3d 403, 410 (3d Cir. 2016) (distinguishing between existence of electronic record and its substantive content for purposes of considering authentication under Rule 902). And neither the photographs themselves nor the act of uploading a file into the REO Database can supply the foundational facts Rule 901 requires — when the photographs were taken, where they

were taken, who took them, and whether the photographs fairly and accurately depict the properties on the relevant dates (when they were owned by the Trustee Defendants and serviced by Ocwen).

Indeed, many of the photographs are images of isolated purported deficiencies. For example, the following photograph marked as Ex. 1[3] was produced:



More similar examples:



Ex. 2         Ex. 3         Ex. 4

---

[3] References to "Ex. __" herein refer to the exhibits to the Declaration of Debra Bogo-Ernst submitted herewith.



Ex. 5                    Ex. 6                    Ex. 7

The two declarants Plaintiffs offer to authenticate the photographs are not witnesses with personal knowledge. Most of the photographs were purportedly taken and uploaded by employees of Local Plaintiffs. Yet Plaintiffs offer only sworn declarations from NFHA personnel, who neither took the photographs nor were present when they were taken, and lack the ability to attest where the photographs were taken, when, or under what circumstances they were created.[4] In short, Plaintiffs' declarations establish only that at some point someone else took photographs of something and uploaded them to the REO Database. *See Griffin v. Bell*, 694 F.3d 817, 826–27 (7th Cir. 2012) (video properly excluded at trial, as affiant could not personally testify to basic facts regarding video's origin).[5] Without witnesses with personal knowledge of the photographs' creation and context, there is no evidentiary basis for admitting the photographs into evidence.

Plaintiffs' choice of NFHA witnesses is telling. The purpose of Rule 902 is to avoid the expense of a party having to call an authentication witness at trial. Fed. R. Evid. 902 Advisory

---

[4] Plaintiffs' memorandum acknowledges that some portion of the photographs are date-stamped. Dkt. 503 at 6.

[5] The circumstances presented here stand in stark contrast to those at issue in the few cases Plaintiffs cite in this section of their brief. For example, they cite *Peak v. Laborers Union Loc. No. 1*, No. 19-cv-3351, 2024 U.S. Dist. LEXIS 9927, at *9, 2024 WL 216698 (N. D. Ill. Jan. 19, 2024). In that case, the court overruled an objection to photographs that were introduced by defendant Esparza, whose declaration "provides the approximate date, and identity of individuals, and event depicted in each photograph." Plaintiffs omit to inform the court that those photographs were pictures of Esparanza taken at work and social events, including his son's birthday and graduation parties. Defendants' L.R. 56.1(C)(1) Reply in Support of their Motion for Summary Judgment, *Peak v. Laborers Union Loc. No. 1*, No. 19-cv-3351, Dkt. 137 at 13 n.19. Dkt. 137 at 13 n.19.

Committee's Note (2017). If Plaintiffs genuinely sought to avoid that burden, they would have submitted declarations of persons who actually took the photographs or supervised their collection. They do not. Instead they rely solely on NFHA witnesses who lack personal knowledge of the photographs. That choice strongly suggests Plaintiffs cannot supply the foundational support Rule 901 requires.

Plaintiffs next suggest that Defendants can authenticate the photographs using their own records because Defendants have a "database of photographs." Dkt. 503 at 6. That argument fails for at least two reasons.

First, many of the photographs lack a date stamp. Therefore, there is no basis to assume the photograph was taken at a time when the property was in REO, as opposed to being a photograph of the subject property taken before or after Defendants' involvement.

Second, many of the photographs are like those shown above: zoomed-in and decontextualized images — a patch of leaves, a weed, or a bag of trash — that cannot be meaningfully cross-checked against Altisource's maintenance records. In practice, only a narrow subset of the photographs (such as the lone "front only" photograph showing the entire façade of a house, including its house number) could conceivably be verified that way. Plaintiffs seek to use that small minority of photographs to smuggle into evidence a much larger set of context-free, unverifiable images. That matters because this is not a case about wide-angle shots of the facades of houses clearly showing the house and its condition. Plaintiffs themselves demonstrated that when their expert examined those more objective photographs: The result, subject to appropriate controls, was that there were no disparities at all. *See* Ex. 8 Skanderson Supplemental Report at ¶ 11.

9

This case is instead about the margins. Plaintiffs scored properties on 38 deficiency categories. Ex. 9 Ayres Report I at ¶ 37. Their entire case hinges on the claim that "REO properties in a majority Non-White block groups [sic] had 2.278 more deficiencies . . . than REO properties in majority White block groups . . . ." *Id*. ¶ 11. But unrebutted analysis shows how Plaintiffs themselves altered their results after their inspections. Plaintiffs removed, on average, 1.81 more deficiencies from properties in majority-White areas, making those houses look comparatively better maintained. Ex. 10 McCrary Report at ¶ 39. Accounting for deficiencies Plaintiffs added to majority-minority properties, "a property located in a majority minority neighborhood has an estimated 2.939 more deficiencies that result purely from Plaintiffs' Data Changes . . . ." *Id*. ¶ 40.

In other words, out of the 38 deficiency categories, fewer than three marginal changes per property were enough to flip Plaintiffs' results from one that found no disparities to a statistically significant one. *See id*. ¶ 41. Because Plaintiffs destroyed their inspection forms (the subject of a spoliation finding) and overwrote the REO Database with each edit, Defendants cannot reconstruct, and the jury cannot know, exactly how these changes were made. But given how small the margin is in this case, it is precisely the context-free photos — like isolated photographs of a clump of grass, leaves, or a piece of debris — that can drive the entire outcome.

Re-labelling an isolated photo taken at a majority-White property from "tall grass" to "neighbor's back yard," and an isolated photograph of an invasive plant to "neighbor's garden," is enough to create a disparity where none exists. Given the transitory nature of these deficiencies (grass gets cut, and weeds get pulled), Plaintiffs' suggestion that such photos could be authenticated by Ocwen and Altisource's own records is fanciful. Notably, Plaintiffs offered no examples of how this could be accomplished in practice; they simply speculate it could be done and place the burden for doing it on Defendants.

10

For all of these reasons, Plaintiffs have not authenticated the photographs under Rule 901. And because this case turns on marginal, context-dependent determinations — where a single label change can swing the result — admitting unauthenticated, context-free images would invite precisely the kind of speculation and distortion the Rules of Evidence are designed to prevent. Plaintiffs' motion should be denied.

## II.    <u>RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 2</u>

Plaintiffs ask this Court to preclude Defendants from impeaching their expert, Professor Ian Ayres, and from exposing foundational flaws in Plaintiffs' dataset by rebranding those merits issues as a motion in limine. Their second motion in limine attempts to insulate Professor Ayres from routine impeachment by repackaging cross-examination on data defects as an evidentiary ban. But Professor Ayres himself conceded that many properties in Plaintiffs' dataset are subject to disputes regarding, among other things, the timing of ownership by a Trustee Defendant and the ability of Ocwen and Altisource to service and maintain those properties. *See* Ex. 9 Ayres Report I at ¶ 50.[6] This Court has already addressed and rejected Plaintiffs' effort to paper over those defects when it struck Ayres's supplemental declaration. Dkt. 442 at 42–43. The Court expressly instructed that the "back-and-forth must come to an end," *id.*, yet Plaintiffs now seek to bar Defendants from exposing the very limitations and misassumptions embedded in Ayres's dataset and analysis, and from presenting contrary facts in their defense. Because challenges to the reliability, completeness, and provenance of the data on which an expert relies go to the heart of credibility and weight — not grounds for preemptive exclusion — Plaintiffs' attempt to foreclose legitimate impeachment should be rejected. The Court should deny Plaintiffs' Motion.

### A.    Background.

Over eight months, Ayres submitted five expert reports and a declaration, followed by a rebuttal report and a revised rebuttal report — repeatedly altering their analyses and introducing new material after the close of expert discovery. After Ayres' initial expert disclosure, Ayres submitted a series of "corrected" and "revised" reports and was deposed. Ayres then submitted a

---

[6] Ayres opines: "In addition, of the 893 properties in the Full Analysis Sample [properties Ayres asserted were owned by one of the Trustee Defendants at the time of inspection], 560 are in the list of [properties serviced at some point by Ocwen]." Ex. 9 Ayres Report I at ¶ 50.

"rebuttal" report and a revised "rebuttal" report that injected entirely new analyses of new subjects in this case. Ayres's disclosures also revealed that Ayres performed statistical analyses on the property inspection data that Plaintiffs collected and edited prior to filing suit. This pattern of an evolving and shifting record necessitated a second Ayres deposition.

Notwithstanding Ayres' self-serving characterization of a set of 699 properties as "Agreed Upon," Ex. 9, Ayres Report I at ¶ 39, Plaintiffs elide what was actually "agreed" about those properties. Defendants did not agree that each of those properties is properly at issue in this lawsuit. Rather, Ocwen and Altisource "agreed" only that, *at some point*, potentially long before or long after Plaintiffs inspected those properties, Ocwen had serviced, and Altisource had maintained, those properties. *See id.*

In support of their summary judgment motion, Defendants submitted the Rademacher Declaration pursuant to Federal Rule of Evidence 1006, summarizing voluminous records produced by both sides. *See* Dkt. 334-10 ("Rademacher Decl."). Defendants' motion for summary judgment demonstrated that many properties in the so-called "Agreed Upon" set were: (i) not owned by a Trustee Defendant at the time of inspection, (ii) not serviced by Ocwen or maintained by Altisource at the relevant time, and/or (iii) subject to contractual restrictions that precluded Defendants from responsibility for such properties. Plaintiffs do not dispute that the materials summarized in the Rademacher Declaration were timely produced during fact discovery between November 2020 and July 2022.

In response, Ayres attempted to submit a seventh expert report — styled as a 52-page "declaration" — offering new regression analyses to respond to Defendants' criticisms. *See* Dkt. 351-1 ¶ 6. Defendants moved to strike that submission. Dkt. 407. The Court granted the motion, finding the declaration untimely and prejudicial. Dkt. 442 at 42–43.

Plaintiffs now seek another bite at the apple by asking the Court to bar Defendants from impeaching Ayres using the very flaws the Court has already recognized, or from otherwise relying on relevant evidence produced in this litigation to defend themselves. The Court should reject Plaintiffs' transparent attempt to relitigate this issue under the guise of a motion in limine.

**B.** **Argument.**

1. *The So-Called "Agreed Upon" 699 Property Set Is Not a Proper Statistical Population.*

Ocwen and Altisource acknowledged servicing or maintaining 699 properties at *some point*. They did not acknowledge that they were responsible for those properties at the time Plaintiffs inspected them.

Plaintiffs now contend that even properties not owned at the time of Plaintiffs' inspections are properly included because a limited subset of activities ("pre-foreclosure appraisals," "surveillance," and "property securing") *could* occur before foreclosure. Dkt. 503 at 13. This is a striking pivot in Plaintiffs' case, one apparently disclosed for the first time in a pre-trial motion in limine. Even Ayres does not contend that such pre-foreclosure "securing" activities rendered non-owned properties proper subjects of an analysis intended to measure the full range of post-foreclosure maintenance activities.

This new theory contradicts Plaintiffs' own pleadings. The operative complaint is explicit: "The case is based on overwhelming objective evidence that Defendants discriminated against communities of color in the exterior maintenance and marketing of properties owned by Deutsche Bank *after* foreclosure in thirty metropolitan areas." Dkt. 70 ¶ 1 (emphasis added). Plaintiffs' newfound theory that the limited permitted *pre*-foreclosure activities are at issue defies both the record and common sense. Dkt. 503 at 13–14. Plaintiffs do not even explain how Ocwen would have performed invasive maintenance — repairing a roof, replacing siding, or remediating

14

pervasive mold — on homes still legally owned by a borrower. That would not be servicing. It would be trespassing.

And even if the Court were to accept Plaintiffs' late-breaking expansion of the case to pre-ownership conduct, that would solve only half the problem: the 699 property set also includes properties inspected by Plaintiffs *after* the properties were sold to new homeowners. Plaintiffs nevertheless insist there is "no dispute" that the 699 properties "are relevant to assessing Ocwen-Altisource liability." Dkt. 503 at 15. But that proposition has been disputed from the outset of this litigation. Ocwen and Altisource cannot be responsible for mowing lawns, removing mail, or maintaining properties that they no longer service and that were occupied by new, private owners. Plaintiffs do not contest that reality; they simply ignore the presence of post-sale properties in the "agreed upon" property set.

Plaintiffs next assert that "there can be not dispute that the 'agreed upon' set of 699 properties" are relevant to Ocwen's and Altisource's liability because Ayres relied on an "REO_DATE" field in Defendants' data. That assertion is misleading. It suggests — contrary to the record — that every property in the 699 property set is supported by reliable REO data. They are not. To the contrary, the "REO_DATE" often post-dates Plaintiffs' inspections, demonstrating that many properties should be excluded from any legitimate analysis of Defendants' conduct. *See* Ex. 9 Ayres Report I at ¶ 50 (noting exclusions from "Full Analysis Sample" based on servicer data). Further, many of the properties have no "REO_Date" at all. *See id*. ¶ 49. For these properties, Ayres relied on a third-party data vendor, ATTOM Data Solutions, to infer ownership dates, even though there is no admissible evidence establishing ownership for those properties, and Ayres is not, and does not purport to be, an expert in property titling or conveyancing.[7] Properties with

---

[7] Plaintiffs did not produce any "ATTOM Data Solutions" data in **fact** discovery. This unverified third-party data is hearsay that does not fall into an applicable hearsay exception.

unknown, pre-ownership, or post-sale status, do not belong in a dataset purporting to measure Defendants' conduct. Defendants are entitled to show that at trial.

Finally, Plaintiffs argue that titling is irrelevant under vicarious liability principles. Dkt. 503 at 16. That argument misreads both Defendants' position and this Court's ruling. Ownership is not just a defense for the Trustee Defendants — it is a defense for all Defendants. If a property was sold to a new homeowner before Plaintiffs inspected it, then Ocwen could not service and Altisource could not maintain that house — again, that would be trespassing. Vicarious-liability doctrines do not extend Defendants' responsibilities to properties they neither owned, serviced, nor had any legal right to enter.

In short, if a property was not titled to a Trustee Defendant at the time of inspection, then Ocwen and Altisource could not have serviced or maintained it regardless of Plaintiffs' vicarious liability theories.

>    2.    *The 45 Properties Not Titled to The Trustee Defendants Should Be Excluded From the Property Set.*

Column J of the Rademacher Declaration identifies 45 properties that were not titled to a Trustee Defendant at the time of Plaintiffs' inspection. *See* Dkt. 334-10. Those determinations are based on property records or other documents produced during fact discovery. *See id*. at Column J. For each of the REO Properties purportedly inspected by Plaintiffs those documents show that the property was not titled to a Trustee Defendant at the time Plaintiffs' inspection occurred. *See id*. Yet these are the properties that Professor Ayres nevertheless treats as having been serviced by Ocwen and maintained by Altisource.

Plaintiffs do not dispute that the Rademacher Declaration identifies 45 such properties not titled to a Trustee Defendant at the time of Plaintiffs' inspection. They argue instead that ownership is irrelevant and that the Court should disregard this evidence based on the Court's summary

judgment ruling. This argument fails for the same reason discussed *supra* at, pp. 14–16: if a property was no longer titled to a Trustee Defendant, then it was not being serviced by Ocwen or maintained by Altisource. Such properties are therefore irrelevant to claims against any Defendant.

Nor does the Court's summary judgment ruling require the admission of evidence that is legally irrelevant or factually incorrect. Summary judgment addressed whether Plaintiffs' claims could proceed in general; it did not bless the inclusion of properties that were outside Defendants' legal control at the time of inspection, and it did not transform non-owned properties into proper subjects of a statistical analysis of Defendants' conduct.

Finally, none of this is new. The documents summarized in the Rademacher Declaration were produced to Plaintiffs years ago. Plaintiffs' failure to review that discovery material or appreciate its significance until Defendants moved for summary judgment does not render evidence admissible or inadmissible at trial, nor does it justify presenting an inflated and inaccurate property set to the jury.

> 3. *The 173 Properties For Which There Is No Evidence of Ownership Should Likewise Be Excluded From the Dataset.*

For 173 properties, there is no evidence that a Trustee Defendant owned the property at the time of Plaintiffs' inspection. The Trustee Defendants lack information regarding the ownership of these properties, and Plaintiffs produced no evidence of ownership in fact discovery.

Plaintiffs express incredulity at the Trustee Defendants' lack of ownership information for certain properties. *See* Dkt. 503 at 17. But Plaintiffs' incredulity is not a substitute for evidence that can be used at trial. Notwithstanding Plaintiffs' feelings, it is entirely consistent with how many of the securitization transactions at issue in this case operated. In those transactions, although a Trustee Defendant formally took title, all information flow about foreclosure, disposition, and loan-level events was reported to parties other than the trustee. *See, e.g.,* Ex. 11 HarborView 2006-

14 PSA Excerpt at DB_NFHA00041483, DB_NFHA00041536, (Def. "Remittance Report" as report by servicer to Securities Administrator (Wells Fargo) of information regarding each mortgage loan); *id*. at § 3.15 (trustee acquires ownership); *id*. at § 5.05 ("Remittance Report" provided to Securities Administrator, not Trustee).

Plaintiffs attempted to fill this evidentiary gap through requests for admission. For hundreds of properties, that effort failed. Plaintiffs did not move to compel or otherwise timely challenge the Trustee Defendants' RFA responses. For many properties, the Trustee Defendants admitted ownership on particular dates. But where they lacked any knowledge, they properly denied knowledge. Dkt. 503 at 17. That is the undisputed record.

Plaintiffs now seek through a motion in limine to flip the burden of proof. Because Plaintiffs do not like Defendants' lack of knowledge, they ask the Court to bar Defendants from pointing out that Plaintiffs have no evidence. There is no legal basis for that maneuver. Plaintiffs bear the burden of proving ownership at the time of inspection. Plaintiffs cannot do so for these 173 properties.

Without evidence that a Trustee Defendant owned a property at the time Plaintiffs inspected it, the property cannot support liability against any Defendant. These properties therefore do not belong in a dataset purporting to measure Defendants' conduct. The Court should deny Plaintiffs' motion and exclude these 173 properties from the so-called "agreed upon" property set.

4.   *Plaintiffs Cannot Use a Motion in Limine to Revive Stricken Testimony.*

Plaintiffs' attempt to bar impeachment of Ayres is a motion for reconsideration in disguise and should be rejected for that reason alone. The Court has already ruled Ayres's revised analyses were untimely and prejudicial, finding "defendants would be prejudiced by being unable to respond to Ayres's revised regression analyses." Dkt. 442 at 43. Plaintiffs cannot now use a motion

18

in limine to accomplish what the Court has already refused to permit — nor can they shield Ayres from cross-examination about the flaws the Court has already recognized.

Nor does Plaintiffs' inability to submit yet another report from Ayres to rehabilitate those flaws constitute "unfair prejudice" to Plaintiffs that could justify barring Defendants from introducing relevant evidence in their own defense at trial. The exclusion of untimely expert opinions does not entitle a party to insulate its expert from impeachment or prevent the opposing party from introducing relevant, admissible evidence in its own defense.

Plaintiffs next complain that Defendants' *experts* did not raise these ownership critiques in their expert reports. That argument fails both legally and factually. Legally, there is no rule requiring a party to disclose every argument it intends to make at summary judgment or trial in the course of expert discovery. Rule 26 requires disclosure of expert opinions — not disclosure of every factual defect in the opposing party's proof. Consistent with the disclosure rules, Defendants timely produced the underlying documents in fact discovery, responded to RFAs, and summarized the relevant records under Rule 1006. That is what the rules require.

Factually, Defendants did not "sandbag" Plaintiffs. The ownership documents have been in Plaintiffs' possession for years. Plaintiffs and their expert simply failed to incorporate them. That failure does not become Defendants' problem.

In any event, ownership is not a statistical methodology issue — it is a factual issue. Statistical experts are not title experts. Ownership is a factual predicate, not a regression variable. A regression cannot cure the absence of evidence that Defendants owned, serviced, or maintained the properties at issue. This evidence is relevant both as a critique of Plaintiffs' experts' opinions, as well as to Plaintiffs' underlying claims.

Plaintiffs' motion is a transparent attempt to prevent Defendants from exposing fundamental flaws in Plaintiffs' dataset, expert analysis, and liability theories. The Court has already recognized those flaws. Plaintiffs' Motion should be denied.

III.    **RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 3**

Plaintiffs ask this Court to prohibit Defendants from referencing the legally dispositive distinctions between Deutsche Bank National Trust Company, as Trustee ("DBNTC"), and Deutsche Bank Trust Company Americas, as Trustee ("DBTCA"), and to treat the two separate trustee entities as interchangeable for purposes of liability. That request should be denied. DBNTC and DBTCA are distinct legal entities that, in their separate trustee capacities, held title to different subsets of the REO properties at issue. Plaintiffs' only remaining claims against the Trustee Defendants are vicarious, premised on an alleged principal–agent relationship between each trustee entity and Ocwen. Dkt. 442 at 122–23. Accordingly, Plaintiffs must prove, for each trustee separately, that Ocwen violated the FHA with respect to properties owned by that trustee and that Ocwen was acting as that trustee's agent when it did so. The distinctions Plaintiffs seek to exclude — ownership at the relevant time and the existence and scope of any agency — are not collateral; they are core elements of Plaintiffs' remaining claims and essential to the jury's assessment of liability. Precluding such evidence would improperly collapse separate legal entities, short-circuit Plaintiffs' burden of proof, and invite jury confusion on issues of property ownership, agency, and vicarious liability. The motion should be denied.

Through their motion, however, Plaintiffs now attempt to relieve themselves of that burden. Although Plaintiffs have produced no evidence that would justify disregarding the corporate separateness of DBNTC and DBTCA, they argue that any reference to the distinction between the two would only "mislead and confuse the jury and [] waste time." Dkt. 503 at 20. In support, Plaintiffs mischaracterize the Court's summary judgment ruling. The Court did not rule that DBNTC and DBTCA may be treated as a single entity, did not find that any shared operations between them supported a veil-piercing theory, and did not relieve Plaintiffs of their obligation to prove which Trustee Defendant owned which property.

21

Plaintiffs' premise — that they have already prevailed on some theory collapsing DBNTC and DBTCA — is simply incorrect. Plaintiffs never moved for summary judgment on that theory, and they certainly have not established it as a matter of law. A motion in limine is not a vehicle for retroactively obtaining summary judgment or rewriting the elements of Plaintiffs' claims. The Court should deny Plaintiffs' motion and hold Plaintiffs to their evidentiary burdens at trial.

A. **Purported Common Operational Activities Between DBNTC And DBTCA Are Immaterial Now That Plaintiffs' Only Remaining Claims Against The Trustee Defendants Are For Vicarious Liability.**

Plaintiffs argue that certain purported shared functions between DBNTC and DBTCA, including trust policies and procedures, require that DBNTC and DBTCA be treated as a unitary defendant. Dkt. 503 at 21–23. That argument is misplaced.

Shared policies had some relevance when Plaintiffs asserted ***direct*** claims against the Trustee Defendants — claims premised on the Trustee Defendants' own direct conduct by common authorized actors and the alleged failure to address known discrimination. But the Court dismissed those direct liability claims. Dkt. No. 442 at 122–23. Consequently, each Trustee Defendant's liability turns *exclusively* on its own legal relationships with Ocwen — specifically, whether Ocwen acted as agent for each of DBTCA and DBNTC such that each can be held vicariously liable for Ocwen's alleged direct FHA violations. *Id*. at 124. This surviving inquiry does not turn on whether DBNTC and DBTCA share internal functions; it turns on whether each had an agency relationship with Ocwen.

The evidence Plaintiffs themselves relied upon at summary judgment confirms this point. First, Plaintiffs pointed to servicing and trust governing agreements that they claimed "affirm" an "agency relationship." Dkt. No. 350 at 20. But Plaintiffs never argued, and could not have plausibly argued, that a contractual relationship between DBTCA and Ocwen created an agency relationship between DBNTC and Ocwen. DBNTC and Ocwen had their own separate agreements. Plaintiffs

did not offer any theory under which one entity's contract could create an agency relationship between non-contracting parties.

Second, Plaintiffs cited limited powers of attorney granted separately by each Trustee Defendant. *Id*. at 25–27. But again, Plaintiffs did not and could not argue that a power of attorney granted by DBTCA to Ocwen created an agency relationship between DBNTC and Ocwen, or vice versa. Nor do Plaintiffs offer any explanation why Ocwen's actions taken under authority granted by DBTCA, in DBTCA's name, could somehow be attributed to DBNTC.

Third, Plaintiffs relied on purported "course of conduct" evidence. But conduct relating to DBTCA-titled properties does not evidence an agency relationship between DBNTC and Ocwen, and conduct relating to DBNTC-titled properties does not evidence an agency relationship between DBTCA and Ocwen. For example, Plaintiffs cite an email exchange involving Ocwen and DBNTC employee Ronaldo Reyes. *See* Dkt. 350 at 23. Even assuming Mr. Reyes was corresponding about properties titled to DBTCA, Plaintiffs identify no legal principle by which the actions of an employee of DBNTC, acting with authority on behalf of DBTCA, could create an agency relationship between DBNTC and Ocwen. While DBNTC employed Mr. Reyes, he was authorized to act on behalf of DBTCA. Plaintiffs do not explain how a course of conduct undertaken by an authorized agent of DBTCA, regarding properties titled to DBTCA, could give rise to an agency relationship between DBNTC and Ocwen simply because it involved an employee of DBNTC. There is no evidence that Ocwen believed it was acting on behalf of DBNTC when servicing DBTCA-titled properties pursuant to a contract with DBTCA. Similarly, Plaintiffs have not suggested any logic by which Ocwen was acting as an agent of DBTCA when an employee of DBNTC forwarded a request to handle code violations on properties titled to DBNTC, as mandated by a contract between only DBNTC and Ocwen.

23

That certain operational tasks were performed by shared personnel does not negate the Trustee Defendants' status as separate corporate entities or collapse distinct principals into one. While some functions of the DBTCA trusts were undertaken by personnel of DBNTC (*e.g.*, receiving property code violations and notifying the relevant servicers of same), others were undertaken by DBTCA on its own behalf (*e.g.*, holding relevant trust accounts). *See, e.g.,* Ex. 12, SAST 2003-1 PSA Excerpt, at DB_NFHA00116085 (DBTCA as Trustee), DB_NFHA00116114 ("Def. Distribution Account"), DB_NFHA00116152 (Trustee establishes and maintains Distribution Account). Plaintiffs cite no authority for the proposition that corporate status vanishes when corporate affiliates use common employees to perform defined tasks. The law is to the contrary. *See Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 364–65 (7th Cir. 2016) ("fair amount of sharing" between corporations, including that of "certain employees' services" and a common "personnel manual" "bespeaks a certain degree of integration between the two corporations" but not "misuse of corporate form" that would permit veil piercing).

In short, Plaintiffs' "shared operations" theory is legally irrelevant to the only question that matters: whether Ocwen acted as an agent of DBNTC with respect to DBNTC-titled properties, and as an agent of DBTCA with respect to DBTCA-titled properties. Plaintiffs' motion seeks to replace that entity-specific inquiry with an amorphous "unitary defendant" theory they never alleged in their complaint, and have failed to substantiate in discovery. It should be denied.

## B. The Trustee Defendants Are Separate Legal Entities, And Treating Them As One Single Defendant Would Be Unfairly Prejudicial.

Excluding evidence and argument that DBNTC and DBTCA are separate entities would be unfairly prejudicial because it would deprive each Trustee Defendant of the right to have liability determined based on its own legal relationships and its own conduct. Plaintiffs' motion seeks to collapse the two Trustee Defendants into one "unitary" defendant so Plaintiffs can

24

aggregate their agency evidence and apply it indiscriminately against both Trustee Defendants, regardless of which entity that evidence actually concerns. That is not the law.

DBNTC and DBTCA are separate and distinct legal entities that are not liable for each other's conduct. *Mathias v. Accor Econ. Lodging, Inc.*, 2002 WL 1611582, at *1 (N.D. Ill. July 22, 2002) ("A corporation is a separate and distinct legal entity from its corporate affiliates.") (citing *Three Way Drywall, Inc. v. Spoons Rest., Inc.*, 1987 WL 8158 (N.D. Ill. Mar. 13, 1987)). Courts will disregard corporate distinctions only in exceptional circumstances — and only upon a showing that one entity so dominated the other that it was a mere instrumentality, and that honoring the separate forms would sanction a fraud or promote injustice. *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 205 (1981).

Plaintiffs do not come close to meeting this standard. They do not argue veil piercing. They do not identify domination, misuse, fraud, or injustice. Instead, Plaintiffs ask the Court to collapse the Trustee Defendants for trial purposes simply because Plaintiffs failed to develop entity-specific proof during discovery. That is not a basis for disregarding corporate form; it is an attempt to avoid the consequences of Plaintiffs' own litigation choices. This is not a request to prevent injustice — it is a request to relieve Plaintiffs of their burden of proof.

The burden to establish liability as to each Defendant rests with Plaintiffs. *See Allen v. Am. Cyanamid Co*, Nos. 11-CV-0055, 14-CV-1423, 2021 WL 1092804, at *5 (E.D. Wis. Mar. 22, 2021) ("each defendant can be held liable only for its own conduct … The Plaintiffs and their experts must be careful to specify which specific Defendant took part in any conduct discussed in their argument or testimony."); *U.S. v. Bainbridge Management, L.P.*, Nos. 01-CR-469–1, 01-CR-469–6, 2002 WL 31006135, at *1 (N.D. Ill., 2002) (ordering use of distinguishing shorthand names

for defendants, two corporate affiliates, to mitigate the risk that the jury would attribute evidence to the wrong defendant).

Plaintiffs' motion would do the opposite: it would affirmatively invite confusion by permitting Plaintiffs to blur entity lines and shift evidence between Defendants at will. That is unfair, legally improper, and highly prejudicial. The Court should deny Plaintiffs' request and require Plaintiffs to prove their claims — if they can — against each Trustee Defendant separately.

### C. Plaintiffs' Assertion That Corporate Separateness Is "Unsupported By The Record" Or "Contrary To The Court's Prior Determination" Is Incorrect.

Plaintiffs assert that testimony or evidence regarding the status of the Trustee Defendants as separate corporate entities is "unsupported by the record" or "contrary to the Court's prior determination." Dkt. 503 at 23. That assertion misstates both the record and the Court's prior ruling.

The Court did not determine that DBNTC and DBTCA should be treated as a single entity. The passage Plaintiffs invoke reflects a step in the Court's legal analysis undertaken at summary judgment — in a posture in which Plaintiffs were entitled to all reasonable inferences, and Defendants were the moving parties. Dkt. No. 442 at 52–53. It was not neither a finding of fact nor a ruling collapsing corporate distinctions as a matter of law, and not a determination that Plaintiffs had proven their claims.

Plaintiffs' motion proceeds on the assumption that they prevailed on summary judgment on this issue. They did not move for summary judgment on this issue, and no such ruling exists. That alone defeats Plaintiffs' request for exclusion, because a motion in limine requires them to demonstrate that the challenged evidence "clearly would be inadmissible for any purpose." *Dahlstrand v. FCA US, LLC*, No. 15-CV-7603, 2021 WL 4318322, at *1 (N.D. Ill. Jan. 14, 2021) (Shah. J., citing *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997)).

26

This is no longer summary judgment. At trial, Plaintiffs bear the burden of proof and are entitled to no favorable inferences. Plaintiffs will be required to show not only that there were cognizable disparities caused by Ocwen, but that those disparities occurred with respect to each Trustee Defendant under circumstances giving rise to vicarious liability.

This is precisely what Plaintiffs' evidence does not do. Plaintiffs' statistical study, which the Court limited as the universe for liability, does not demonstrate disparities among properties titled to DBNTC, or among properties titled to DBTCA. As a result, Plaintiffs cannot show whether either Trustee Defendant's properties experienced disparate treatment at all, let alone damages attributable to each.

That evidentiary gap is not a basis to exclude Defendants' evidence; it is a failure of Plaintiffs' proof. Plaintiffs may not use a motion in limine to prevent Defendants from pointing out that omission. For all the reasons above, Plaintiffs' Motion should be denied.

## IV.     RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 4

Plaintiffs ask this Court for the extraordinary and unwarranted remedy of excluding evidence concerning Defendants' business interests based on a purported discovery issue they never pursued when it mattered. Plaintiffs did not challenge Defendants' responses at the time, did not request any meet-and-confer, and never moved to compel. Having declined to raise any concern during discovery, Plaintiffs cannot now, through a motion in limine, manufacture a belated discovery dispute as a vehicle to deprive Defendants of a key defense. A motion in limine is not a substitute for a timely discovery motion, and Plaintiffs' tactical delay — coupled with the prejudice their requested exclusion would impose — provides independent grounds to deny the motion. The evidence at issue bears directly on Defendants' business interests and the defenses to Plaintiffs' claims, and excluding it would be an extreme and unwarranted sanction lacking any procedural or substantive basis.

Under the governing *McDonnell Douglas* and *Inclusive Communities* burden-shifting frameworks for disparate treatment and disparate impact liability under the Fair Housing Act, Plaintiffs' claims proceed on a three-step analysis: (1) the plaintiff must establish a prima facie case; (2) if the plaintiff establishes a prima facie case, the defendant may then offer a legitimate objective that justifies the policy responsible for the disparate outcome; and (3) the plaintiff must prove that the stated reason is pretextual (for disparate treatment) or identify an available less discriminatory alternative that serves the defendant's legitimate goals (for disparate impact). *See Nat'l Fair Hous. All. v. Bank of America, N.A.*, No. 18-CV-01919, 2025 WL 2030225 at *16, *24 (D. Md. July 21, 2025); *see also Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18-CV-00839, 2025 WL 975967 at *36, *42 (N.D. Ill. Mar. 31, 2025). Defendants' burden on the second step is a burden of production only, and Plaintiffs bear the burden of persuasion at all times. *Bank*

*of America*, 2025 WL 2030225 at *16 (citing *Tex. Dep't of Hous. and Comm. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 541 (2015)).

Should Plaintiffs be able to establish a prima facie case (which they cannot do), Defendants have evidence of legitimate business justifications for their policies that would establish a defense to any liability. Contrary to what Plaintiffs argue, there is no basis to exclude that evidence because, among other things: (1) Defendants sufficiently disclosed such information during discovery; (2) Plaintiffs will suffer no prejudice or unfair surprise at trial; (3) Plaintiffs failed to timely raise their newly-minted complaint during discovery; and (4) Plaintiffs' motion is premised upon the wrong legal standard. This motion in limine should therefore be denied.

## A. Defendants' Discovery Responses Were Sufficient.

Plaintiffs' argument fails for the simple reason that Ocwen's and Altisource's discovery responses were sufficient. In a contention raised for the first time in their motion in limine, Plaintiffs point to a general contention interrogatory that they served on Defendants and complain that Ocwen's and Altisource's responses "do[] not offer the factual basis" for any business justification. Dkt. 503 at 30. Not so. Ocwen's interrogatory response (1) identified its legitimate rationale to safeguard investor interests, (2) directed Plaintiffs to the governing servicing agreements, scopes of work, and policies and procedures related to its legitimate business interests, and (3) identified specific witnesses who could explain that rationale and the supporting documents. *See* Dkt. 503 at 26. Many of these witnesses had previously testified for multiple days regarding the business interests underlying Ocwen's policies. *See infra*, pp. 31–34. Altisource similarly disclosed its legitimate business rationale and identified witnesses in its Rule 26 materials regarding its property preservation and inspection obligations, among other things. Ex. 13. At the time of Altisource's response, Altisource's witnesses had similarly explained Altisource's business interests across days of testimony. *See infra*, pp. 31–34. This alone is sufficient to satisfy

29

Plaintiffs' broad "contention" interrogatory. *See, e.g., Abernathy v. Vill. of Park Forest*, No. 16-CV-02128, 2018 WL 11651217 at *1 (N.D. Ill. Sept. 18, 2018) (denying motion to compel where "very broad questions" are met with "a good deal of information" which identifies "a large number of documents" and describes the contention in "general terms."). Plaintiffs did not follow up with Defendants to seek any additional response. Defendants' response merits no order against them — much less total exclusion.

### B. Plaintiffs Suffered No Prejudice Or Unfair Surprise.

In claiming that they "now risk learning of Defendants' support for this defense for the first time *at trial*," Dkt. 503 at 31 (emphasis in original), Plaintiffs cite only to Defendants' responses to one interrogatory, and conveniently ignore that the discovery record is also replete with testimony supporting Ocwen's and Altisource's business justifications. Plaintiffs' sudden amnesia is belied by the extensive discovery *Plaintiffs* took on these very topics, including Rule 30(b)(6) testimony addressing how Ocwen's and Altisource's policies served investor interests by (1) maximizing REO sale price while minimizing repair costs and reducing hold times; (2) benchmarking repair decisions to market conditions and expected return on investment; and (3) hiring and deferring to vendors (in the case of Ocwen hiring Altisource), employees (in the case of Altisource), and contractors (in the case of Altisource) who offered relevant expertise at a competitive price point to ensure prudent decision making while controlling costs. Where Plaintiffs not only *had* extensive opportunities to seek discovery on Defendants' business justifications, but *actually pursued* these opportunities, Plaintiffs cannot show the level of prejudice required to exclude evidence at trial. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (finding no prejudice where a witness not included in a contention interrogatory response "was listed as a potential witness nearly a year and one-half before trial" and the discovering party "did not seek a continuance so that it could obtain additional information to rebut" the testimony). Here, Plaintiffs

had *thirty-three* days of depositions to elicit evidence of Ocwen and Altisource's business justifications. Plaintiffs could, and did, question Ocwen and Altisource regarding their business justifications. For example,

> Q: And how would the servicer know that the terms and conditions for the sale of a particular REO property are in the best interests of the certificate holders and in accordance with accepted servicing standards?

> A: … [I]n the case of the REO world, the best interests of the certificate holder is to maximize the return of the proceeds in the shortest amount of time possible.

Ex. 14 Ocwen 30(b)(6) Subject 4 (Jason Jastrzemski, 2021.02.17) Dep. Tr. at 40:13–41:15.[8]

Plaintiffs also elicited additional testimony including but not limited to the following:

| Deposition | Business Justification |
|---|---|
| Ex. 15 Ocwen 30(b)(6) Subject 7 (Jason Jastrzemski, 2021.01.14) Dep. Tr. | Ocwen uses a net present value calculation "to determine… does it make sense financially to do something in comparison to … the overall value of the property[.]" He explained that "[i]f my property's only worth $100,000 and I have $100,000 worth of code violations to resolve … it doesn't necessarily make sense to spend $100,000 in code violations." Ex. 15 at 98:5–16. |
| Ex. 14 Ocwen 30(b)(6) Subject 4 (Jason Jastrzemski, 2021.02.17) Dep. Tr. | Ocwen's expenditures were made as advances and were subject to challenges by the trust—if a repair was deemed excessive, Ocwen bore the loss: "Let's say … we advanced $10,000 to put a new roof on the house, right. And … third party reviews it and they determine that we shouldn't have replaced the roof. We should have just patched the roof, and it would have cost $2,000, right. So they're going to deny us $8,000 worth of recovery of that advance, because they didn't feel that it was prudent." Ex. 14 at 46:16–47:1. |
| Ex. 15 Ocwen 30(b)(6) Subject 7 (Jason Jastrzemski, 2021.01.14) Dep. Tr. | Ocwen "hires Altisource as our asset manager, because, in our view, they're the experts, and they hold the expertise in those areas." Ex. 15 at 91:15–92:13. |
| Ex. 16 Ocwen 30(b)(6) Subject 9 (Jason Jastrzemski, | Ocwen delegates authority to Altisource in order to take actions that were "most ideal to market and sell the property for the most amount, and… in |

---

[8] If Plaintiffs truly believed that such testimony was insufficient, they had (and used) the opportunity to follow up at later depositions, including one as recently as November 20, 2025.

| | |
|---|---|
| 2021.01.20) Dep. Tr. | the shortest amount of time, which is the goal of any REO sale." Ex. 16 at 27:20–28:10. |
| Ex. 16 Ocwen 30(b)(6) Subject 9 (Jason Jastrzemski, 2021.01.21) Dep. Tr. | Q. So when you said it's not just an Ocwen or -- Ocwen/Altisource/Deutsche Bank initiative, what were you referring to?<br><br>A. So I'm referring to the two components here that talks about maximizing eventual sale price and minimize REO maintenance costs, right. Like, that's a mortgage servicing standard, industry standard, like that's the expectation, right?<br><br>Ex. 16 at 89:4–11. |
| Ex. 16 Ocwen 30(b)(6) Subject 9 (Jason Jastrzemski, 2021.01.21) Dep. Tr. | Q. In responsibility section that's kind of in the middle of the page there, there's a bullet point, which is fourth bullet point down that says: Routinely review high-value assets to ensure conveyance strategy are focused on maximizing profit and reducing costs. Do you see that?<br><br>A. I do.<br><br>Ex. 16 at 202:1–7. |
| Ex. 17 Altisource 30(b)(6) Subject 2 (Marisol Avila, 2021.01.27) Dep. Tr. | Altisource uses foreign workers in order to "source talent in other locations but in a way that helped us reduce costs. It, then, actually allowed us to add additional layers of support." Ex. 17 at 66:21–67:9 |
| Ex. 18 Altisource 30(b)(6) Subject 8 Vol. II (Travis Britsch, 2021.03.11) Dep. Tr. | Altisource assesses repairs for "dollar for dollar" returns. A repair is not dollar for dollar if "it costs $5,000 to paint the interior of the property, but we're only going to be able to market and sell it for an extra $2,000 because of that." Ex. 18 at 259:11–260:6.<br><br>Altisource considers whether the benefit of a repair outweighs the delay it causes in an REO sale, because "if a repair was going to take 60 days or 90 days to actually be completed, that's an extra three months on the market holding cost." Ex. 18 at 261:4–262:1. |
| Ex. 19 Altisource 30(b)(6) Subject 14 Vol. 1 (Marisol Avila 2021.02.04) Dep. Tr. | Q. And it goes on to say: We have a responsibility to our clients. Our clients' investors and the communities we serve to ensure that properties in our care are serviced according to the highest standards. Your performance is critical to minimizing risk and preserving the value of the properties you service. Do you see that?<br><br>A. Yes.<br><br>Ex. 19 at 207:7–15. |

| | |
|---|---|
| Ex. 20 Altisource 30(B)(6) Subject 8 Vol 1 (Travis Britsch, 2021.03.10) Dep. Tr. | Q. And so does that relate to, back on page 6 of 43, ASI 33201, whether to, you know, make decision – or does it help the RSC, for example, make the decision about selling the property at a loss, fixing up and repairing it, renting – |
| | A. Well, just to be clear that, most of the time it's going to be a loss anyways. It's the how much of a loss to the seller, to the investor. And so our goal, as RSC managers, is to maximize value and, you know, sale price, you know, net to the client and the investor, client – |
| | Q. -- want to get the highest price that you can? |
| | A. Exactly. |
| | Ex. 20 at 196:2–14. |
| Ex. 21 Altisource 30(B)(6) Subject 10 (Travis Britsch, 2021.03.11) Dep. Tr. | Q. And so with respect to maximizing disposition gain, is that the gain that would then go to the investor or the owner of the property? |
| | A. It is. |
| | Ex. 21 at 48:14–17. |
| | Q. Why, in the case of the high value asset program in general, why is the number -- or the dollar $500,000 selected? Why was that selected by Altisource? |
| | A. I don't know why that number. In general, we know that it's higher -- you know, much higher than our average. And, again, I believe it's a business decision of, you know, how best to sell these properties to, you know, net the most for our client investors behind them. And I do know that selling properties in this price range are much more difficult. We have a lot fewer buyers in this price range. You don't have nearly as many investors. You're more marketing to owner occupants. And so you have a lot fewer buyers interested and that just flat can purchase properties at this price. |
| | Ex. 21 at 143:2–17. |
| Ex. 22 Altisource 30(b)(6) Subject 5 Vol. 1 (Marisol Avila 2021.01.27) Dep. Tr. | Q. Is it the case that the purpose of the delegated authority matrix is to follow the investor guidelines that are provided to Altisource by Ocwen? |
| | A. It can be. |
| | Q. Is there any other purpose of the delegated authority matrix? |

| | |
|---|---|
| | A. I would describe it as approval limits for Altisource to be able to perform work, to not have to take every single work order or work that needs to be completed on every property to Ocwen for review. They delegate us a certain approval limit based on types of work, and anything outside of that type of work would require client approval on their behalf.<br><br>Ex. 22 at 14:2–14.<br><br>Q. Is the purpose of the delegated authority matrix to increase the amount of profits that the investors in REO properties make?<br><br>...<br><br>A. I don't know. I would say that the main function of the delegated authority matrix is to not slow down the process waiting for approvals for every single work item. It allows us to be able to move quickly for work that needs to be done. And where it's outside of the standard, there is certain guidance. Example, you would need two bids between this level of cost. You would need three bids at this level of cost. And then present those bids to Ocwen for review.<br><br>Ex. 22 at 14:17–15:6. |
| Ex. 23 Altisource 30(b)(6) Subject 5 Vol. 2 (Marisol Avila 2021.01.27) Dep. Tr. | Q. There's a section on that page called: Investor approval review procedure. And it indicates that: The preservation coordinator can now approve vendor estimates, or VEs, and PRs -- which I believe are proposal requests – that are under the analyst queue after the investor's approval is obtained. And why would the preservation coordinator be doing that?<br><br>A. Okay. So if I'm understanding this correctly, the way that it's written, is exactly what we were talking about earlier with the pre-delegated authority matrix role-based and the delegated authority matrix. So the way that I'm understanding this is if we received approval for something that was outside of the analyst's authority but within the delegated authority matrix, then they would move forward with that.<br><br>Ex. 23 at 164:14–165:7. |

This testimony and the discovery record reflect legitimate business purposes, including operational efficiency, cost control, and adherence to investor and contractual requirements. *See Bank of America,* 2025 WL 2030225 at *18−19 (D. Md. July 21, 2025) (finding that business efficiency and cost reduction are legitimate business purposes). Plaintiffs cannot credibly claim that they will first learn of Defendants' business justifications at trial. *See* Dkt. 503 at 31. Even in

cases of very significant discovery violations, such as the total exclusion of a relevant witness from 26(a) disclosures and contention interrogatory responses, a party is not prejudiced by trial testimony where that party knew the witness was a potential witness, interviewed the witness and learned the subject of his testimony, did not seek further discovery, and introduced evidence to rebut the witness's testimony. *See Caterpillar*, 324 F.3d at 858. The record here far exceeds this standard.[9] All witnesses who may present testimony on this issue have been disclosed and deposed, and the record is replete with sworn testimony and written discovery previewing Defendants' business purposes. Moreover, Plaintiffs themselves have *already prepared* evidence which they believe rebuts Defendants' justifications. *See Deutsche Bank*, 2025 WL 975967 at *42 ("Plaintiffs present evidence to suggest that differential maintenance based on REO property values, including cost-cutting conduct for REO properties deemed low-value, has no profit justification — in other words, that it is pretextual.") Plaintiffs dispute whether Defendants' justifications are persuasive. However, Plaintiffs' mere disagreements with Defendants' justifications are best addressed by cross-examination and the presentation of contrary evidence — not exclusion.

---

[9] Plaintiffs' cited cases are not to the contrary. First, many of their cited cases deny motions to compel and do not support their argument. *See, e.g.*, *In re Northfield Lab'ys Inc. Sec. Litig.*, 264 F.R.D. 407 (N.D. Ill. 2009) (denying motion to compel). Second, in cases actually excluding evidence, two facts generally apply which are not present here: (1) the responding party provided no or essentially no response to the contention interrogatory and had provided no other response in discovery; and (2) the discovering party had repeatedly sought, and failed to receive, a more complete response from the responding party. For example, in *Sigle v. City of Chicago*, the plaintiff responded to the City of Chicago's contention interrogatory by stating that he had "no evidence" supporting his *Monell* claim, an answer which the court found prevented the city from deposing witnesses regarding his claims. No. 10-CV-04618, 2013 WL 1787579, at *6 (N.D. Ill. Apr. 25, 2013). Moreover, the city sent the plaintiff two letters requesting a more complete response before the close of discovery and received no answer. *Id.*; *see also Westefer v. Snyder*, 2009 WL 3672500, at *1 (S.D. Ill. 2009) (excluding undisclosed evidence of past lawsuits provided in support of retaliation claims where it was highly unlikely the defendant would otherwise be aware of them); *ADC Telecommunications, Inc. v. Thomas & Betts Corp.*, No. 98-CV-02055, 2001 WL 1381098 at *4 (D. Minn 2001) (excluding undisclosed prior art references in patent litigation where "the Court cannot find any mention in the record of these references ever being disclosed at all"); *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 420 (excluding evidence where a party "failed to respond" to a contention interrogatory). Here, Defendants did respond to Plaintiffs' interrogatory and identified substantial relevant evidence which had previously been produced in discovery and which supported their business justifications. Moreover, Plaintiffs made no attempt to follow up or request a more complete answer, if they believed that Defendants' answer was unsatisfactory.

35

### C. Plaintiffs Cannot Convert An Unpursued Discovery Dispute Into The Exclusion Of Core Evidence.

A motion in limine is not a backdoor discovery sanction. The record here shows nothing more than an untimely discovery dispute that Plaintiffs apparently wish they had raised during discovery but failed to pursue. Plaintiffs propounded "contention" interrogatories and admit that Ocwen and Altisource responded and objected. Dkt. 503 at, 26–27. Ocwen's and Altisource's responses and disclosures stated that their policies were designed to safeguard investor interests and pointed Plaintiffs to relevant documents and witnesses. *Id*. Many of the witnesses identified had testified extensively in deposition regarding the business purposes for Ocwen's and Altisource's policies. *See supra*. Now, on the eve of trial, Plaintiffs contend that this response was insufficient. This argument ignores a basic point of civil practice: the proper time to resolve discovery disputes is during discovery. If Plaintiffs were dissatisfied with the specificity of Ocwen's and Altisource's interrogatory responses, they were free to ask to confer or move to compel. They did not. That ends the matter for purposes of Rule 37 and forecloses Plaintiffs' exclusion motion. When a party objects to an interrogatory, the requesting party must attempt to resolve the dispute or move to compel. *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 549 (7th Cir. 2017) ("[T]he onus [is] on [the discovering] counsel to attempt to resolve the dispute or compel [discovery]."); *see also Inojosa v. Bd. of Trs. of City Colleges of Chicago, Cmty. Coll. Dist. 508*, No. 20-CV-01114, 2021 WL 4461579 at *3 (N.D. Ill. Apr. 12, 2021) (denying motion to compel answer to a contention interrogatory). Having failed to do either, "there can be no complaint about missing evidence." *Reed*, 869 F.3d at 549.

The principle is simple. Parties must seek discovery relief when the dispute arises. Plaintiffs did not, yet now seek extraordinary exclusion on the eve of trial. The Court should not

allow them to convert an ordinary, unpursued discovery dispute into a backdoor bid for summary judgment on step two of the burden-shifting framework.

### D. Plaintiffs' Motion Misstates Defendants' Burden.

Finally, Plaintiffs' motion also fails because it rests on the wrong legal standard. Defendants bear only a burden of production to show policies serving a legitimate, nondiscriminatory interest. *Bank of America*, 2025 WL 2030225 at *16 (citing *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 541 (2015)); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."); *Chi. Teachers Union, Local 1 v. Board of Education of City of Chicago*, 419 F. Supp. 3d 1038, 1050 (N.D. Ill. 2020) (holding that a defendant must produce evidence sufficient to show that its policies reflect "a reasonable and 'practical business choice'") (quoting *Inclusive Communities*, 576 U.S. at 533). This showing is not an affirmative defense, and the burden of persuasion remains upon the Plaintiffs at all times. *Bank of America*, 2025 WL 2030225 at *16 (collecting cases).[10]

In *Bank of America*, the same Plaintiffs argued the defendants had "failed to produce any evidence of a legitimate business interest," but the record refuted that claim. *Bank of America*, 2025 WL 2030225 at *17. The same is true here. The record reflects significant evidence of business justifications which Defendants will produce at trial to meet their burden. Plaintiffs may

---

[10] Plaintiffs misstate this burden by relying on case law interpreting defenses not relevant to the FHA burden-shifting framework, which they cite without pincites. The Supreme Court in *Meacham v. Knolls Atomic Power Lab* distinguished statutory affirmative defenses under the ADEA from the burden-shifting framework governing Title VII claims, which "has no like-worded defense" and places the burden upon the plaintiff at all times. 554 U.S. 84, 100 (2008). Defendants' burden under the Fair Housing Act "is analogous to the business-necessity standard under Title VII," not the distinguishable statutory affirmative defense under the ADEA. *Inclusive Communities*, 576 U.S. at 541. Similarly, *Snyder v. Chicago Transit Authority* discusses only administrative exhaustion, which bears no relation to the burden-shifting framework under the FHA. 2023 WL 7298943 at *3–4 (N.D. Ill. 2023).

disagree with Defendants' contention that their policies serve a valid interest, and may discount the evidence and sworn testimony Defendants have provided to support this contention. But this disagreement cannot be settled on a motion in limine. Instead, it is "'the province of the factfinder'" to "'weigh the persuasiveness of [Defendants'] evidence' on business justifications." *Bank of America,* 2025 WL 2030225 at *18 (quoting *EEOC v. Joint Apprenticeship Comm. of the Joint Indus. Bd. of the Elec. Indus.*, 186 F.3d 110, 122 (2d Cir. 1998)). Plaintiffs' motion should be denied.

## V.    RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 5

With their fifth motion *in limine*, Plaintiffs once again ask the Court to block Defendants from defending their case. Specifically, Plaintiffs ask the Court to prohibit evidence and argument which "implies that Plaintiffs acted in bad faith." Dkt. 503 at 32. Plaintiffs' request directly contradicts the law of the case, which expressly permits that Defendants may present such evidence at trial in order to establish that Plaintiffs did, in fact, act in bad faith. Consistent with this Court's prior rulings, Defendants intend to introduce evidence that Plaintiffs spoliated evidence in bad faith and will ask the Court to instruct the jury to draw adverse inferences accordingly. *See* Dkt. 504 at 52–56. Plaintiffs' motion should be denied.

Despite Plaintiffs' suggestions, this Court has <u>not</u> found that Plaintiffs did not spoliate evidence in bad faith. Instead, the Court expressly reserved the issue for trial. In motions filed in April 2022 and February 2023, Defendants informed the Court (1) that Plaintiffs had destroyed the handwritten inspection forms underlying their evidence of maintenance disparities and (2) that the analysis of Defendants' expert Dr. Justin McCrary indicated that Plaintiffs had altered the data captured in the original handwritten inspection forms, which showed no maintenance disparities, to produce a false picture of disparities in their REO database. *See* Dkt. 282 at 3–4; *see also* Dkt. 271. In response, this Court found that it was "undisputed" that Plaintiffs "destroyed the notes while having an affirmative duty to preserve relevant evidence" and that "Plaintiffs are at fault for destroying the documents." Dkt. 282 at 4–5. However, the Court declined to rule on whether Defendants' evidence merited total exclusion of the REO database. Citing the fact that Dr. McCrary's analysis of the handwritten forms was likely to be the subject of competing expert testimony, and that at that time "[n]either party has filed *Daubert* motions," the Court reserved the issue of bad faith spoliation and a resulting adverse inference for trial, when the extent of admissible expert testimony would be clear. *Id*. at 7, 4.

Plaintiffs' entire motion in limine is premised on a misrepresentation of this ruling. Tellingly, Plaintiffs selectively quote the Court's spoliation opinion but omit the controlling language. The full quote is as follows:

> As it stands now, the Court accepts Plaintiffs' explanation that they did not intend to hide information, but genuinely believed that the handwritten forms were duplicative of the information in the database. Currently, the record does not support a finding of bad faith. *Defendants may re-raise the issue of bad faith and further sanctions during trial. Should a jury believe that Plaintiffs spoliated evidence in bad faith, the Court will issue an appropriate instruction, such as an adverse inference.*

Dkt. 282 at 5 (emphasis added). Far from foreclosing the issue, the Court expressly left the question of bad faith for the jury, authorized presentation of the issue at trial, and contemplated an adverse inference instruction if the jury finds bad faith. Thus, whether Plaintiffs acted in bad faith will be an issue at trial, and evidence and arguments that Plaintiffs, for instance, manipulated data and destroyed the underlying forms in order to create a false picture of maintenance disparities certainly would have a tendency to make it more probable that Plaintiffs acted in bad faith. Thus, the challenged evidence is highly relevant and admissible under Rules 401 and 402.

Moreover, Plaintiffs' Rule 403 argument fails because Plaintiffs identify no *unfair* prejudice which *substantially outweighs* this probative value. *See* Fed. R. Evid. 403. Plaintiffs' concern that evidence of their intentional destruction of documents and manipulation of data will harm their case is no basis for exclusion of terms referring to this conduct: "Of course that evidence is prejudicial; all relevant evidence is. Why else use it?" *Thakore v. Universal Mach. Co. of Pottstown*, 670 F. Supp. 2d 705, 713 (N.D. Ill. 2009). The challenged evidence is prejudicial to Plaintiffs, but not unfairly so, as it tends to prove a material fact: that Plaintiffs intentionally destroyed relevant evidence because they feared that "defense lawyers would try to make a mountain out of a molehill" by using the evidence in litigation. Dkt. 505–23 at 105:23–106:16; *Lange v. City of Oconto*, 28 F.4th 825, 846 (7th Cir. 2022) ("Recognizing that most relevant

40

evidence is, by its very nature, prejudicial, we have emphasized that evidence must be *unfairly* prejudicial to require exclusion.") (emphasis in original). Nor does any risk of prejudice substantially outweigh the significant probative value of evidence going to Plaintiffs' conduct in connection with their spoliation of evidence. *See Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012) ("We employ a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice."); *see also* Dkt. 365-04 at 5–8. And evidence of bad faith cannot be "unfair" where the Court explicitly invited Defendants to present this issue at trial.

For the same reasons, Dr. Justin McCrary's testimony is admissible. Dr. McCrary opines that the pattern of post hoc changes NFHA made to its data would warrant research-misconduct inquiry in his field. *See* Dkt. 365-04 at 5–6, 7, 8. That opinion bears directly on whether Plaintiffs acted in bad faith and on the integrity and reliability of Plaintiffs' data. If Plaintiffs committed research misconduct under the standards applicable to statistical researchers in Dr. McCrary's field, it is more probable that they acted in bad faith than it would be without this evidence. *See* Fed. R. Evid. 401. The reliability of Plaintiffs' data is central to Plaintiffs' burden of proof in this litigation, and Plaintiffs' bad faith in spoliating key evidence is expressly of consequence given the Court's prior rulings. Dr. McCrary's testimony regarding the application of research standards in statistical and empirical studies to Plaintiffs' conduct will assist the jury in assessing research methods and data credibility in areas outside common experience but within the scope of Dr. McCrary's expertise. Significantly, Plaintiffs have not moved to exclude Dr. McCrary's opinion under Rule 702, and it should be admitted.

The same rationales apply to Plaintiffs' other contested terms, including "data doctoring," "manipulate," and "manufacture." If Plaintiffs manipulated data to create a false picture of maintenance disparities not reflected in the original inspection forms, this fact (1) tends to make it

more probable that they acted in bad faith in destroying the original inspection forms, and (2) tends to make it less likely that their study reliably proves maintenance disparities. *See* Fed. R. Evid. 401. Terms such as "manipulation" are a reasonable characterization of this evidence where Defendants' experts have shown that "[w]hen Plaintiffs' edited data is reverted to its original state… the purported relationship identified by Plaintiffs' experts between the number of deficiencies and neighborhood race *disappears*." Dkt. 365-04 at 5–6; *see U.S. v. Turner,* 651 F.3d 743, 752 (7th Cir. 2011) (holding that a prosecutor may argue that the defendant was lying where the evidence supports the comments). Plaintiffs may dispute the weight or characterization of the evidence, but that is a matter for cross-examination and rebuttal argument rather than exclusion. There is no basis for the Court to grant Plaintiffs' request to put a thumb on the scale in that dispute by limiting Defendants' ability to fully argue their position.

Courts routinely deny motions in limine seeking to prohibit the use of terms accurately reflecting the conduct of which a party is accused where the evidence supports the claims. *See U.S. v. Shankle*, 756 F. App'x 633, 634 (7th Cir. 2019) (holding that a challenge to the use of the word "victims" to describe women subject to sex trafficking "would be pointless because parties may make arguments supported by the evidence, and evidence suggested that the prostitutes were indeed victims"); *Green v. Howser*, No. 16-CV-00863, 2018 WL 11302924, at *2 (S.D. Ill. Jan. 29, 2018) ("If a jury finds that Defendants carried out the acts of which they are accused, then 'kidnapping' would accurately reflect their conduct, and Plaintiff would indeed be a 'victim[.]'"); *U.S. v. McDonald*, No.24-CV-00090, 2025 WL 1097156, at *4 (S.D. Ind. Apr. 14, 2025) (holding that where an indictment charged that women were victims of the defendant's alleged crimes, the prosecution could refer to these women as "victims"). Plaintiffs' cited cases are not to the contrary. These cases concern "inflammatory terms… that *do not bear on the issues being tried*," not factual

42

contentions directly relevant to core issues in the case. *See Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, No. 04-CV-10014, 2009 WL 3111766 at *7 (S.D.N.Y. Sept. 28, 2009) (emphasis added). These cases would bar, for example, "inflammatory remarks… linking [a defendant]… to the financial crisis," but not an expert's assessment of Plaintiffs' data management practices. *Id.*; *see also Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 192 (S.D.N.Y. 2008) (excluding evidence and argument that the defendant "committed a securities law violation or breached a fiduciary duty" where the plaintiff brought only a "third-party beneficiary breach of contract claim"). The evidence Plaintiffs seek to exclude here bears directly on an issue the jury must decide, and Plaintiffs cite no cases excluding such evidence.

This Court ruled that Plaintiffs spoliated evidence and that Defendants are entitled to present evidence at trial showing that such spoliation was done in bad faith. Defendants bear the burden of showing bad faith, and Plaintiffs may not now prevent Defendants from supporting their burden with admissible evidence simply because a finding of bad faith would undermine their case. Here, the jury should hear all the relevant evidence on the spoliation issue and decide whether Plaintiffs spoliated evidence in bad faith. Accordingly, the Court should deny Plaintiffs' motion.

## VI.    RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 6

Plaintiffs received grant money from the Department of Housing and Urban Development ("HUD") to investigate Defendants. Yet, Plaintiffs want to pretend that this money in their pockets does not exist. They ask this Court to preclude any evidence or argument that their HUD grants offset their purported damages. In effect, this would allow Plaintiffs to seek a double recovery for the same purported injury — expenses related to their investigation of Defendants. Plaintiffs' request is contrary to the law and the facts. In addition, it would deprive the jury of highly probative evidence on standing and damages. For the reasons below, Plaintiffs' motion should be denied.

### A.    HUD Grant Funding Is Directly Relevant To Whether Plaintiffs Suffered Any Compensable Damages.

The law does not allow Plaintiffs to enjoy a double recovery. Because claims for damages under the Fair Housing Act ("FHA") sound in tort, "general tort principles govern the award and calculation of damages," and under those principles, "compensatory damages are designed to place the plaintiff in a position substantially equivalent to the one that he would have enjoyed had no tort been committed." *Cty. of Cook v. Wells Fargo & Co.*, 335 F.R.D. 166, 170 (N.D. Ill. 2020) (quoting *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 52 (2d Cir. 2015)); *see also* Meyer v. Holley, 537 U.S. 280, 285 (2003). In *Cty. of Cook*, plaintiff brought FHA claims against a mortgage lender alleging discriminatory lending practices that purportedly increased foreclosures and imposed municipal costs. 335 F.R.D. at 168. On damages, the court applied tort "make-whole" principles and cautioned against windfalls and double recovery. *Id.* at 170–71. Although that court did not specifically analyze whether HUD grant funds should be netted against claimed losses, its make-whole rationale confirms that any governmental reimbursements or grants tied to the same alleged harm must be accounted for to avoid a double recovery. *See id.*

Awarding Plaintiffs damages for expenditures already funded by grants would not restore them to the status quo. Instead, it would place them in a better position than if the alleged tort had never occurred. This situation mirrors *Freedom's Path at Dayton v. Dayton Metropolitan Housing Authority*. No. 16-CV-00466, 2022 WL 1697937 (S.D. Ohio May 26, 2022). There, a private plaintiff sued under the ADA and FHA, seeking as damages a grant it had planned to use for its housing project but lost because defendant refused to apply for project-specific HUD funding on the plaintiff's behalf, causing the development to collapse. *Id.* at *1. The court rejected the argument that plaintiffs were entitled to compensation for the lost grant, reasoning that [t]he grant was offered as financing for the project[,] . . . not cash that was offered to Freedom's Path to put into its own pockets." *Id.* at *3. Because there was "no scenario in which Freedom's Path would have received these funds without the corresponding requirement that they actually spend them on building this project[,] . . . these are not recoverable as damages." *Id.*

Here, Plaintiffs relied on HUD grants specifically awarded for the purpose of conducting a nationwide investigation into foreclosed properties, and used them for that purpose. As in *Freedom's Path*, these are funds that were not intended for Plaintiffs themselves, but to be put towards conducting the REO enforcement specifically. Allowing Plaintiffs to collect for these funds — expended for their intended purpose — would amount to a windfall placing them in a better position than where they initially stood. The Court should allow the jury to consider this evidence because it goes to the heart of whether Plaintiffs suffered any compensable loss, and Defendants are entitled to offset any purported damages by money already received by Plaintiffs through HUD grants.

### B.    The HUD Grants Bear Directly On Article III Standing And Frustration Of Mission.

Plaintiffs also cannot fence off grant funding from the jury when it speaks to standing and causation. Defendants will show that Plaintiffs suffered no frustration of mission because "absent any evidence that [Plaintiffs] failed to fund any program, to pursue any initiative, or to provide any service as a result of an internal redistribution of resources, no reasonable jury could find that [Plaintiffs] suffered any compensable injury that was proximately caused by [D]efendants' alleged FHA violations." *Cnty. of Cook v. Bank of Am. Corp.*, 584 F. Supp. 3d 562, 587 (N.D. Ill. 2022) (ruling that, where the plaintiff county experienced no material increases in costs as a result of increased foreclosures, movement of funds between affected offices to cover provision of foreclosure-related governmental services was, by itself, insufficient for damages under the FHA), *aff'd sub nom. Cnty. of Cook, Illinois v. Bank of Am. Corp.*, 78 F.4th 970 (7th Cir. 2023). The record will show that Plaintiffs received grants specifically to fund a nationwide investigation and used the funds for that purpose, which undermines any claim of resource diversion or unmet programmatic needs traceable to Defendants. Evidence that Plaintiffs pursued a grant-funded nationwide investigation is probative of whether they experienced a cognizable injury in fact caused by Defendants. The jury should hear that evidence because it informs the threshold issue of standing and the causation and injury elements of Plaintiffs' claims.

### C.    Plaintiffs' Authorities Do Not Establish A Blanket, Invariable Collateral Source Rule For HUD Grants.

Plaintiffs' attempt to convert their out-of-circuit cases into a blanket rule fares no better. They assert that HUD grants to fair housing organizations are *de facto* collateral sources. *See* Dkt. 503 at 37. However, Plaintiffs' cited cases reveal no such blanket rule, but instead demonstrate that such grants are collateral sources only under a limited and specific set of circumstances: where a grant that could be applied to multiple initiatives is applied to a specific purpose, where a grant

intended for the benefit of an organization's entire service population is used for only a subset of beneficiaries, or where a grant for an unrelated purpose is diverted to fund the action at issue in the case. None of those circumstances apply in this case, as Plaintiffs received grant funding for enforcement actions and used it for its intended purpose.

Plaintiffs have not and cannot meet the clear guidelines for the collateral source rule. And, Plaintiffs' cited cases are inapposite here. For example, in *S. Cal. Hous. Rts. Ctr. v. Krug*, the plaintiff fair housing organization received grants to fulfill its mission of educating the public about fair housing laws, but diverted these funds intended for educational purposes to conducting familial discrimination testing on a single property. 564 F. Supp. 2d 1138, 1140 (C.D. Cal. 2007). There, the court found the grant to be a collateral source *because* it was being used for a purpose other than that for which it was intended. *Id.* at 1152. *Krug* is inapplicable here, because the grants Plaintiffs received were used for the purpose for which they were explicitly given: enforcement of FHA actions.

Similarly, in *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, the plaintiff fair housing organization had received a grant for addressing systemic issues related to criminal record screening in the housing application process for tenants. 478 F. Supp. 3d 259 (D. Conn. 2020). The organization then diverted funds from that grant into advocacy for a single individual who was harmed by CoreLogic's criminal record screening process. *Id.* at 272–73 (D. Conn. 2020). There, the court reasoned that funds allocated for activities intended to benefit an organization's entire constituency are a collateral source when they are used to advocate on behalf of a single person or a subset of the organization's constituency. *Id.* at 317. Again, this does not apply here because the intended beneficiaries of the grants — the nationwide community for NFHA and the

47

local communities for the local plaintiffs — were in fact the ones served by Plaintiffs' investigation.

Plaintiffs additionally rely on *Baltimore Neighborhoods, Inc. v. LOB, Inc.*, where a plaintiff housing rights organization, suing under ADA and the Fair Housing Amendments Act, sought to recover a portion of the cost of its Homebuilders Project, under which it would educate builders about fair housing laws, from a non-compliant developer under a diversion of resources theory. 92 F. Supp. 2d 456, 464 (D. Md. 2000). There, the defendant challenged these damages, arguing that the plaintiff organization had received a $100,000 federal grant to fund the Homebuilders Project, though according to the associate director of the organization, the funds could have been put to multiple uses. *Id.* at 464–465. In a footnote, the court explained that the federal grant was a collateral source, because the grant could have been used for multiple purposes and was not awarded for the explicit purpose of offsetting the costs incurred counteracting defendant's discriminatory practices. *Id.* at 465 n.9. That is not the case here, where the grant was explicitly given for, and was used for, funding enforcement of the FHA.

Plaintiffs' then cite a case that has nothing to do with grants at all. In *Valley Hous. LP v. City of Derby*, the issue was whether a loan and Housing Tax Credit Contributions given to the plaintiff by a fair housing organization were collateral. No. 06-CV-01319, 2011 WL 2144633, at *2 (D. Conn. May 31, 2011). Loans and tax credit contributions do not serve the same function as grants and are governed by different considerations, so comparison to this case is inapt.

Plaintiffs' authorities do not establish, and certainly do not justify, any categorical rule that all HUD-funded grants are "collateral" as a matter of law. At most, those decisions turn on specific statutory purposes, program structures, and the remedial context presented in each case. None of those decisions adopts a blanket, cross-cutting classification for every HUD program across all

causes of action and damages frameworks. More importantly, the rationales in those cases do not fit these facts. They involve grants used for purposes different from their intended aim, benefits limited to a distinct subset or a different constituency, or flexible funds diverted to one use among several. The grant at issue, its eligibility criteria, its conditions and restrictions, and the manner in which it addresses the very harm alleged by Plaintiffs differ in legally material ways from the programs discussed in Plaintiffs' cases. Accordingly, those authorities neither control this dispute nor supply a persuasive basis to deem the grant "collateral" under these facts. There is no authority endorsing a blanket collateral-source designation for all HUD grants, and the case-specific rationales Plaintiffs invoke do not apply here.

### D. The Nationwide, Multi-Lender Scope Of Plaintiffs' Grant-Funded Investigation Warrants Jury Consideration Of The Grants.

The jury should be allowed to consider Plaintiffs' HUD grants alongside the nationwide, multi-lender scope of Plaintiffs' investigation to properly frame any award of damages, and allow for the opportunity to offset for any grant-funded work not tied to Trustee Defendants' properties serviced by Ocwen and Altisource. This context is critical, as Plaintiffs seek recovery for work across 30 metropolitan areas that included properties of multiple nonparties, including Bank of America, Wells Fargo, and Fannie Mae. Dkt. 70 at 2; Ex. 24 NFHA 30(b)(6) (Augustine 10/01/21) Dep. Tr. at 35:21–24 ("Q. And as a whole, are you referencing, again, investigating any lender in any area of the country? A. That is correct, yes, so they could have investigated REO properties of any lender."). They now say their diversion is limited to Deutsche Bank properties, yet the numbers they present sweep in work from the larger grant-funded project that reaches beyond the relevant properties, servicers, and period. *See, e.g.*, Ex. 25 MMFHC 30(b)(6) (Tisdale) Dep. Tr. at 63:8–13 ("Q. So for time that you can't attribute – or that plaintiffs generally can't attribute to a particular lender, they use a general REO category and then apportion one-third of that time to each of those

lending institutions [Deutsche Bank, Bank of America, and Fannie Mae], right? A. That's correct."). The risk is concrete. The REO investigation included 12,844 property inspections across all Plaintiff organizations, but by Plaintiffs' own numbers at most 366 properties were Deutsche Bank Trustee properties serviced by Ocwen and Altisource during the limitations period. *See* Ex. 26, Ex. 9 Ayres Report I at ¶ 50.[11] Without specifically tying injury to those 366 properties, there is a serious risk that damages would be based on the entire 12,844 property effort. The Court should reject Plaintiffs' categorical framing, treat the grants as non-collateral on these facts, and ensure that any damages are offset at least by the amount of grant-funded work unrelated to Defendants and to the properties and timeframe at issue.

### E.    Conclusion.

Plaintiffs' motion seeks to exclude core evidence on standing and damages and to insulate a sweeping damages claim from basic scrutiny. The HUD grants are probative of whether Plaintiffs suffered a compensable injury, bear on Article III standing and causation, undermine any claim that Plaintiffs diverted resources from other programs, and are essential to ensuring that any damages reflect only work tied to Defendants and the properties and period at issue. Because the law does not support Plaintiffs' blanket proposition that the collateral source rule applies to all HUD grants without qualification and because Plaintiffs' authorities are neither controlling nor factually analogous, the Court should deny Plaintiffs' motion.

---

[11] Defendants do not concede that the number of properties discussed in the Ayres report is determinative of the number of properties at issue in this litigation.

## VII. RESPONSE TO PLAINTIFFS' MOTION IN LIMINE NO. 7

Plaintiffs ask this Court to grant a blanket, pretrial authorization to use undisclosed "summaries, charts, or calculations" under Rule 1006 — or, alternatively, Rule 107 — covering (1) the NFHA REO investigation database (including photographs, Plaintiffs' "deficiency assessments," and other property-specific data); (2) Plaintiffs' time records; (3) Plaintiffs' claimed investigation expenses; (4) Deutsche Bank trustee Pooling & Servicing Agreements, Trust Agreements, and Indenture Agreements; and (5) unspecified documents that "warrant summarization or presentation in chart format." *See* Dkt. 503 at 39, n. 11.

That sweeping request should be denied. Rule 1006 permits summaries only when the proponent identifies the specific, voluminous admissible materials to be summarized, makes those materials available to the opposing party, and lays a competent foundation establishing the summary's accuracy and neutrality. Plaintiffs have done none of this: they have not provided the summaries they seek to use, they have not identified the particular documents to be summarized, and several of the underlying materials they reference (including REO database records, photographs, and "deficiency assessments") remain disputed as to authenticity, hearsay, and relevance. Rule 1006 cannot be used to present argument as evidence or to launder inadmissible materials. And Rule 107 does not supply an alternative basis for pre-admission; at most, completeness principles address what additional portions must be considered when a specific item is introduced. Because admissibility depends on the content of each proposed summary and the admissibility of its sources, any request for categorical pre-approval should be denied. If Plaintiffs later proffer particular summaries, the Court can evaluate them case by case at trial based on a proper foundation and the Rules, including Rules 611 and 403, for any pedagogical demonstratives.

A. **Rule 1006 Requirements Cannot Be Met Because Plaintiffs Failed To Provide The Necessary Documents And Summary Evidence.**

Plaintiffs cannot meet the requirements of Rule 1006, which permits a party to use summaries only if the proponent shows that the underlying materials are admissible, sufficiently voluminous, and have been made available to the opposing party. *See* Dkt. 503 at 40–41; *see also Northeast Ill. Reg. Commuter Railroad Corp. v. Judlau Contracting, Inc.*, 724 F. Supp. 3d 721, 737 (N.D. Ill. 2024) (noting that summaries of voluminous records may be used to prove their content so long as the party produced the data and documents underlying the summary). As this Court has already explained, this rule is not a backdoor for "evidence that would otherwise be inadmissible." *NFHA v. Deutsche Bank Nat'l Trust*, 2025 WL 975967, at *11 (N.D. Ill. March 31, 2025). And even where Rule 1006 applies, "summary charts, like all other forms of evidence, are subject to balancing under Rule 403." *U.S. v. Page*, No. 23-CV-40621, 2025 WL 3534588, at *9 (5th Cir. Dec. 10, 2025).

None of these prerequisites are satisfied here. Plaintiffs have not identified the specific documents they seek to summarize, have not produced the summaries themselves, and have not cited evidence establishing that the underlying materials are admissible, voluminous, or have been made available. Without the source documents and the proposed summaries, neither Defendants nor this Court can assess admissibility, volume, availability, accuracy, or neutrality as Rule 1006 requires.

Plaintiffs' request therefore amounts to an impermissible attempt to obtain advance approval for unspecific summary evidence. For that reason alone, Plaintiffs' motion should be denied.

### B.     There Is No Rule 1006 Shortcut For Plaintiffs' REO Database.

Rule 1006 does not permit Plaintiffs to introduce their REO investigation database by summary evidence because Plaintiffs cannot make the full set of "voluminous writings, recordings or photographs" available to Defendants. Fed. R. Evid. 1006. A substantial portion of the original inspection forms no longer exist. That fact alone defeats application of Rule 1006. Rule 1006 is a presentation mechanism, not a hearsay exception. It allows a party use to prove the contents of voluminous evidentiary records through a summary only if those underlying materials are themselves admissible and available to the opposing party. *See* Fed. R. Evid. 1006. By contrast, Rule 803(6) supplies the hearsay exception that can render business records admissible in the first place. *See* Fed. R. Evid. 803(6).

Plaintiffs attempt to bridge that gap by cross-referencing arguments in its other motion in limine (apparently No. 1, though they do not specify), asserting that the REO files and records within are properly authenticated and admissible. *See* Dkt. 503 at 47. Not so. That contention is incorrect. As discussed above, and as this Court has already held, Plaintiffs must lay a proper foundation at trial for admission under Rule 803(6) and must authenticate the REO property photographs. *See NFHA*, 2025 WL 975967, at *13. Because admissibility turns on live testimony and proper foundation, Plaintiffs cannot use Rule 1006 as a workaround to introduce otherwise inadmissible evidence.

This problem is compounded by Plaintiffs' rebranding of missing inspection data as "deficiency assessments" and "other property-specific data" into this category. Dkt. 503 at 41. That recharacterization does cure the Rule 1006 defect. Plaintiffs cannot treat the REO database as a "summary" of inspection forms — or any derivative compilation — because the Court already found that Plaintiffs spoliated more than half of the original forms and therefore cannot produce

the underlying documents. *See NFHA*, 2025 WL 975967, at *13. Rule 1006 requires availability of the originals or duplicates; Plaintiffs' inability to produce them is fatal.

### C. Plaintiffs' Investigation Time Records And Expenses Have No Foundation.

Plaintiffs contend that their time records and expenses are admissible as business records and therefore may be summarized and admitted under Rule 1006. *See* Dkt. 47. But Plaintiffs do not offer proof of admissibility. Instead, they rely on future testimony, arguing that "[e]ach Plaintiff representative **will testify at trial** that their time records" satisfy the Rule 803(6). *Id*. (emphasis added). That is not evidence.

Admissibility is determined by proof in the record, not predictions about what witnesses might say later Under Rule 104(a), the Court decides preliminary questions of admissibility based on the evidence before it. Rule 803(6) requires a proponent to establish the business-records predicates through a custodian or other qualified witness — now, with competent testimony or stipulation — not by promising that such testimony will be offered at trial. Until Plaintiffs actually lay that foundation, the records remain hearsay, and Rule 1006 cannot be invoked at all. Promised testimony is too speculative to support an evidentiary ruling and deprives the Defendants and the Court of the ability to test admissibility, volume, or availability.

Nor are the deficiencies in Plaintiffs' underlying time records and expenses minor or technical. They bear directly on admissibility and whether Rule 1006 can be invoked at all. Plaintiffs assert that their time and expense records are admissible as business records because they were "generally recorded to 'Deutsche REO'" "or were recorded to a 'General REO' category" and because Plaintiffs were "examined and testified at deposition about their timekeeping and recordkeeping practices." Dkt. 503 at 47. But Plaintiffs cite no testimony, no exhibits, and no declarations establishing those predicates. *See id*. Unsupported assertions are not a foundation under Rule 803(6)

To the contrary, the records contain facial deficiencies that underscore a lack of reliability and admissibility, including entries tied to non-parties (such as Fannie Mae) and time spent on non-investigative activities (for example, watching a movie and getting snacks). *See, e.g.*, Ex. 27 (including an entry for "Big short" in cell K6366). Because Plaintiffs have not established that their time and expense records are admissible business records, they cannot use Rule 1006 to summarize them.

### D. Plaintiffs' Hypothetical Summary of The Trustee Defendants' Pooling And Services Agreements, Trust Agreements, And Indenture Agreements.

Plaintiffs ask the Court to pre-approve a hypothetical Rule 1006 summary of the Trustee Defendants' Pooling & Servicing Agreements, Trust Agreements, and Indenture Agreements. *See* Dkt. 503 at 39, 45–47. Plaintiffs point to the Court's prior judicial notice of a single Pooling & Servicing Agreement in 2018 and assert that contracts are "verbal acts" and thus are not hearsay. *See id*. at 46. But none of that established that the proposed summary — whose contents Plaintiffs have not disclosed — would satisfy Rule 1006.

Plaintiffs have not submitted any proposed summary exhibit, have not identified which agreements would be summarized, have not described who would prepare the summary, and have not explained what summary would be presented to the jury. Without that information, neither Defendant not the Court can evaluate what Rule 1006 requires in evaluating admissibility, accuracy, completeness, or neutrality.

As they have already advised Plaintiffs, the Trustee Defendants do not dispute the authenticity or admissibility of the governing agreements they have produced in this case. They do object, however, to admission of any misleading, selective, or interpretive "summary" of those agreements.

Plaintiffs' proposed prior use of summary exhibits in opposing summary judgment illustrates the problem. In opposing summary judgment, Plaintiffs submitted a chart to the Court supposedly summarizing contractual provisions bearing on whether Ocwen acted as the Trustee Defendants' agent. *See* Dkt. 351-1. Plaintiffs relied on this chart to argue that the contracts broadly established an agency relationship. *See* Dkt. 350 at 21. But the summary chart Plaintiffs offered did not neutrally summarize the contract language. Instead it collapse materially different provisions into a single category and obscured language that undermined Plaintiffs' narrative.

For example, Plaintiffs' chart purported to summarize contracts pursuant to which the "Servicer" "Services Loans on Behalf of/for Benefit of Trustee/Certificateholders." Dkt. 351-1, Column G. That formulation erased the distinction between servicing "for the benefit of the Trustee" and servicing "for the benefit of Certificateholders" — a distinction that goes directly against Plaintiffs' agency theory. Plaintiffs contend that servicing for the benefit of the "Trustee" supports an agency relationship,[12] but servicing for the benefit of "Certificateholders" — *i.e.,* investors, and not trustee — undercuts that contention. The chart Plaintiffs submitted collapsed those materially different concepts into a single category, and rather than quoting the actual contractual language so the Court could see Plaintiffs' attempted sleight-of-hand, Plaintiffs provided only a Bates number citation. A similar "summary" at trial would either mislead the jury or force it to consult dozens of the underlying agreements to discern what the contracts actually say and whether they supported, or contradicted, Plaintiffs' argument — defeating the vary purpose of FRE 1006.

---

[12] Even with respect to this assertion, Plaintiffs are incorrect, as a servicer undertaking actions for the benefit of a trustee, in its separate legal capacity as trustee, is in fact servicing for the benefit of the trust entity and its beneficiaries. *See NFHA v. Deutsche Bank*, 18-cv-839, 2018 WL 6045216, at *5 (N.D. Ill. Nov. 19, 2018) (dismissing claims against Trustee Defendants in their individual capacities and noting separate trustee capacities).

Plaintiffs' request also fails because Rule 1006 does not permit "summaries" that incorporate legal analysis, categorization, or argumentative interpretation. *See McCarthy v. Fuller*, 08-cv-994, 2014 WL 1091327, at *3 (S.D. Ind. Mar. 19, 2014) (excluding exhibit where it "did not simply summarize the information contained on the check stubs; rather, they included [the witness's] analysis regarding that information").

Worse, Plaintiffs' hypothetical summary chart may leave the jury with the mistaken impression that the contracts are uniform on points where they actually differ materially. Nor does Rule 1006 permit summaries that mask material variation among source documents. Such exhibits are properly excluded under Rule 403 because their probative value is outweighed by the risk of confusion and misleading the jury. *North Atlantic Security Co. v. Blache*, 19-cv-379, 2025 WL 326070, at *10 (M.D. La. Jan. 29, 2025); *see also U.S. v. Crinel*, 15-CR-61, 2017 WL 490635, at *8 (E.D. La. Feb. 7, 2017).

Plaintiffs advance request for approval of a theoretical trial summary of the trust governing agreements would deny the Defendants and the Court to evaluate whether any particular meets the requirements of FRE 1006 and 403. The request should be denied.

### E. Defendants and This Court Cannot Properly Assess The Propriety Of Plaintiffs' Purported Summary Exhibits Because Plaintiffs Have Not Produced Them or Identified The Underlying Documents.

Plaintiffs assert that Defendants may not object that any summary is incomplete, that its sources have not been introduced at trial, that a summary is "not evidence," or that it is "self-serving." *See* Dkt. 503 at 43–44. But without the summaries themselves or identification of the source documents, neither Defendants nor the Court can evaluate any of those objections.

Rule 1006 and controlling Seventh Circuit authority require that summaries "must not misrepresent their contents or make arguments about the inferences the jury should draw from them." *U.S. v. White*, 737 F. 3d 1121, 1135 (7th Cir. 2013); *see also U.S. v. Fenner*, 142 F. 4th

510, 518 (7th Cir. 2025. Because Plaintiffs have not produced their proposed summaries, Defendants cannot assess whether the summaries mischaracterize the underlying documents or embed improper argumentative inferences.

This concern is not hypothetical. However, as this Court already observed, many disputes in this case "rest on disagreements about characterization." *NFHA v. Deutsche Bank Nat'l Trust*, 2025 WL 975967, at *39 (N.D. Ill. March 31, 2025). This Court has likewise held that Plaintiffs' experts "may not supply the inference to establish the existence of a policy." Dkt. 442 at 101-102. Plaintiffs have also manipulated the data in their own REO database, changing the number of deficiencies to create the appearance disparities as confirmed by Defendants' expert analysis of the remaining original property inspection forms.

In that context, Plaintiffs' request for advance approval of undisclosed summaries invites precisely the kind of mischaracterization and inferential overlay Rule 1006 forbids. Whether a summary is accurate, neutral, complete, or misleading cannot be decided in the abstract. It must be evaluated exhibit by exhibit. Plaintiffs' request for categorical pre-approval should therefore be denied.

### F. Plaintiffs Have Not Identified Any Witness To Lay the Foundation for the Summary Exhibits And Seek An End-Run Around the Hearsay Rules.

Plaintiffs contend that a preparer of the summaries — potentially a paralegal — may testify regarding to establish the foundation for admissibility. *See* Dkt. 503 at 45–46. But Plaintiffs have not identified any such witness, and no such individual appears on their pretrial witness list. *See id.*; *see also* Ex. 28.

More fundamentally, Plaintiffs appear to be attempting to use counsel-office personnel; to bypass admissibility issues, including authentication to introduce records that would otherwise be inadmissible hearsay. That is improper. As this Court already held, Rule 1006 cannot be used as

"an end around to introducing evidence that would otherwise be inadmissible." *NFHA*, 2025 WL 975967, at *11.

Rule 1006 requires that: (1) the underlying records be admissible, (2) the summary be accurate and neutral, and (3) witness be competent to testify to the preparation and source of the summary. Plaintiffs have satisfied none of those requirements. They have not identified the witness, disclosed the summaries, or established admissibility of the source materials. Their request should be denied on that basis alone

### G. Rule 107 Does Not Authorize Admission of Undisclosed Summaries and Does Not Salvage Plaintiffs' Request.

Plaintiffs' cursory reliance on Rule 107 does not cure these defects. *See* Dkt. 503 at 41–42. Rule 107 permits illustrative aids — not evidence — and even then only where their probative value is not substantially outweighed by the risk of unfair prejudice, confusion, or misleading the jury. See *HBKY, LLC v. Elk River Export, LLC*, No. 21-CV-00101, 2025 WL 3303510, at *7 (E.D. Ky. Sept. 3, 2025).

The cases Plaintiffs cite largely predate Rule 107 and do not interpret it. *See* Dkt. 503 at 42 (citing *U.S. v. White*, 737 F. 3d 1121, 1134 (7th Cir. 2013) (discussing Rule 1006 and 611) and *U.S. v. Seleznev*, No. 11-CV-00070, 2016 WL 4140951 (W.D. Wash. 2016) (discussing Rule 1006). Rule 107 does not authorize admission of summary evidence, and it certainly does not permit undisclosed exhibits to be pre-approved in the abstract. *HBKY, LLC*, 2025 WL 3303510, at *7 (quoting Rule 107 and explaining that "the court may allow party to present an illustrative aid to help the trier of fact understand the evidence or argument if the aid's utility in assisting comprehension is not substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time.") (internal quotation omitted).

Without disclosure of the proposed aids or identification of the underlying materials, the Court cannot: (1) perform the required Rule 403 balancing, (2) assess accuracy or neutrality, or (3) impose appropriate safeguards under Rule 611. Plaintiffs' request for categorical pre-approval under Rule 107 should therefore be denied.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' Consolidated Motions in Limine in their entirety.

Dated: December 30, 2025

Respectfully submitted,

By: /s/ *Kenneth M. Kliebard*

Kenneth M. Kliebard
Tinos Diamantatos
Megan R. Braden
Michael W. Fakhoury
**MORGAN LEWIS & BOCKIUS LLP**
110 North Wacker Drive, Suite 2800
Chicago, Illinois 60606
 (312) 324-1000
kenneth.kliebard@morganlewis.com
tinos.diamantatos@morganlewis.com
megan.braden@morganlewis.com
michael.fakhoury@morganlewis.com

Kurt W. Rademacher (*pro hac vice*)
Bradie R. Williams (*pro hac vice*)
**MORGAN LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, Pennsylvania 19103
 (215) 963-5000
kurt.rademacher@morganlewis.com
bradie.williams@morganlewis.com

Mark Traut (*pro hac vice*)
**MORGAN LEWIS & BOCKIUS LLP**
101 Park Ave.
New York, NY 10178
(212) 309-6927

60

*Counsel for Defendants Deutsche Bank National Trust Company, as Trustee, and Deutsche Bank Trust Company Americas, as Trustee*

By: */s/ Debra Bogo-Ernst*
Debra Bogo-Ernst
Matthew J. Thomas
Sara Kim
Brandon E. Villa
Eve Hastings
Benjamin Halom
Tara Sohns
**WILLKIE FARR & GALLAGHER LLP**
300 N. LaSalle Dr.
Chicago, IL 60654
(312) 728-9000
dernst@willkie.com
mthomas@willkie.com
skim@willkie.com
bvilla@willkie.com
ehastings@willkie.com
bhalom@willkie.com
tsohns@willkie.com

*Counsel for Defendant Ocwen Loan Servicing, LLC, n/k/a Onity Group Inc.*

By: */s/ Nathan Garroway*

Nathan Garroway
Lisa M. Krigsten (*pro hac vice*)
Mark G. Trigg
Sarah Hannah Phillips
Alizé Mitchell
Kayla Lee
**DENTONS US LLP**
303 Peachtree Street, NE, Suite 5300
Atlanta, Georgia 30308
 (404) 527-4000
nathan.garroway@dentons.com
lisa.krigsten@dentons.com
sarahhannah.phillips@dentons.com
mark.trigg@dentons.com
kayla.lee@dentons.com

61

alize.mitchell@dentons.com

*Counsel for Defendant Altisource Solutions, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, hereby certifies that Defendants' Responses to Plaintiffs' First Round Consolidated Motions in Limine was filed electronically with the Clerk of Court using the CM/ECF system on December 30, 2025, which will automatically send e-mail notifications of such filing to all attorneys of record.

By: *<u>/s/ Debra Bogo-Ernst</u>*
Debra Bogo-Ernst