**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, et al., | |
| Plaintiffs, | Case No. 18 CV 839 |
| v. | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Judge Manish S. Shah |
| | Jury Trial Demanded |
| Defendants. | |

**PLAINTIFFS' DECEMBER 30, 2025 CONSOLIDATED RESPONSE TO DEFENDANTS'
FIRST ROUND MOTIONS IN LIMINE**

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

PLAINTIFFS' PRELIMINARY DAMAGES STATEMENT ................................................... 1

I.      THE COURT SHOULD DENY DEFENDANTS MOTION IN LIMINE NO. 1 AND
        ADMIT RELEVANT SALES AND MARKETING EVIDENCE ............................... 12

II.     THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 2 AND
        ADMIT RELEVANT EVIDENCE NOT TIED TO SPECIFIC PROPERTIES
        INVESTIGATED BY PLAINTIFFS ............................................................... 21

III.    THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 3. THE
        COURT'S RULING ON DR. KORVER-GLENN'S EXPERT TESTIMONY NEED
        NOT BE REVISITED.................................................................................. 33

IV.     THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 4.
        RECORDS IN THE REO DATABASE ARE ADMISSIBLE BUSINESS RECORDS.
        WHETHER OR NOT THEY HAVE BEEN EDITED PURSUANT TO A QUALITY
        CONTROL PROCESS DOES NOT MAKE THEM INADMISSIBLE. THE
        PHOTOGRAPHS IN THE DATABASE, WHETHER BUSINESS RECORDS OR
        NOT, HAVE NOT BEEN EDITED, AND ARE THEREFORE ADMISSIBLE........ 36

V.      THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 5 AND
        ALLOW RELEVANT EVIDENCE RELATED TO OTHER DEUTSCHE BANK
        ENTITIES.................................................................................................. 44

VI.     THE COURT SHOULD DENY DEFENDANTS' LIMINE MOTION NO. 6 AND
        ADMIT EVIDENCE RELATED TO ALTISOURCE'S HIGH VALUE PROGRAM
        ................................................................................................................ 49

VII.    THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 7
        BECAUSE PLAINTIFFS' TIME ENTRIES ARE BASED ON BUSINESS
        RECORDS, MEETING THE REQUIREMENTS OF F.R.E. 803(6). THE
        "DIVERSION LOGS" ARE MERELY F.R.E. 1006 SUMMARIES OF THOSE
        VOLUMINOUS BUSINESS RECORDS....................................................... 53

VIII.   THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 8
        BECAUSE THE CHALLENGED EVIDENCE IS ADMISSIBLE EVIDENCE OF
        COUNTERACTION..................................................................................... 57

IX.     DEFENDANTS' MOTION IN LIMINE NO. 9 FAILS BECAUSE EACH
        PLAINTIFF IS ENTITLED TO ADDUCE EVIDENCE OF ITS HARM. .............. 66

X.      THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 10. NO
        ADVERSE INFERENCE INSTRUCTION REGARDING SPOLIATION IS

i

WARRANTED. THERE IS NO BASIS TO PROHIBIT PLAINTIFFS FROM CHARACTERIZING PAPER INSPECTION RECORDS AS DRAFTS.................. 70

XI.    THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 11.  THE EVIDENCE DEFENDANTS SEEK TO EXCLUDE IS RELEVANT, SHOULD BE ADMITTED, AND IS MISCHARACTERIZED BY DEFENDANTS. ......................................................................................................................... 75

XII.   THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 12 TO EXCLUDE EVIDENCE RELATED TO THE FORECLOSURE CRISIS AND FORECLOSURE ISSUES ............................................................................. 92

XIII.  THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 13 TO EXCLUDE ANY EVIDENCE OF THE INAPPROPRIATE COMMENTS POLICY. ......................................................................................................................... 103

**INTRODUCTION**

Defendants offer thirteen motions in limine, each of which contains multiple fatal flaws. Many of Defendants' motions suffer from the same kinds of defects: Defendants frequently mischaracterize or outright ignore the Court's explicit rulings; misstate or misapprehend how Plaintiffs intend to use various components of the record; seek to exclude nebulous swaths of evidence without defining their challenged categories or even identifying the items in the record they seek to exclude; and ask the Court to exclude evidence that appears on Defendants' own exhibit list or that Plaintiffs offered to simply resolve. As set forth below, the Court should deny all of Defendants' Motions in Limine.

**PLAINTIFFS' PRELIMINARY DAMAGES STATEMENT**

Many of Defendants' evidentiary motions flow from a mischaracterization of the damages recoverable by Plaintiffs in this case. *See, e.g.*, Defendants Motion in Limine No. 2 (addressing in part evidence of so-called "local" frustration of mission);[1] No. 8 (addressing evidence related to activity impairment and counteraction); No. 9 (again addressing evidence of so-called "local" frustration of mission); and No. 11 (addressing in part evidence related to counteraction). Given this theme, Plaintiffs begin with an overview of the injuries and damages at issue before turning to their responses to Defendants' specific motions.

---

[1] Plaintiffs are all part of a national coalition of fair housing organizations that came together to investigate and counter the threat posed by Deutsche Bank's discriminatory REO maintenance and marketing practices across the nation. Plaintiffs are all members of the National Fair Housing Alliance ("NFHA") and regularly work with NFHA and each other on fair housing issues that have both a national and a local impact. Defendants have coined a phrase—"local frustration of mission"—to suggest that these fair housing organizations can only look down and locally in addressing fair housing issues, not up and nationally, to address fair housing issues, including nationally occurring and impactful problems. This contrived framing has no basis in how fair housing organizations actually operate and is starkly contradicted by the record in this case.

Plaintiffs may recover damages for the perceptible impairment to their activities and missions and for the consequent drain on their resources, so long as Plaintiffs' injuries are proximately caused by Defendants' discriminatory conduct. *See, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982); *Bank of America Corp. v. City of Miami*, 581 U.S. 189, 202-03 (2017). For purposes of trial, Plaintiffs will seek to recover damages arising from multiple actionable injuries, each of which has been affirmed by the Court. Plaintiffs' anticipated damages evidence will provide the jury with dollars-and-cents information that will facilitate the jury's assessment of damages. And although Defendants argue otherwise, these damages are different from injuries that were excluded at the motion-to-dismiss phase. To the extent the Court perceives any overlap between Plaintiffs' anticipated evidence of damages and its prior limitations, the record after discovery confirms that everything Plaintiffs currently seek to recover is consistent with proximate causation principles.

### A. Plaintiffs' Recoverable Damages.

As an initial matter, it is well settled at this point in the litigation that if Plaintiffs prove an impairment to their missions and activities, they may recover for the consequent drain on their resources. *See, e.g.*, ECF 97 at pp. 16-17 ("Here, there is a clear, direct and immediate path between Defendants' alleged discriminatory lack of maintenance and Plaintiffs' response to that lack of maintenance through investigations, reporting, and advocacy.") (citation and internal quotation marks omitted); ECF 442 at pp. 19 ("Plaintiffs also provide sufficient evidence at this stage of a consequent drain on resources.") (citation and internal quotation marks omitted). The Parties may disagree as to the admissible evidence of Plaintiffs' expenditure of time and resources, but there is no colorable argument that Plaintiffs may not present evidence of their

"diversion damages" at trial. Accordingly, Plaintiffs here focus not on diversion, but on their other damages.

The structural dispute underlying many of Defendants' Motions in Limine pertains to the contours of what the Parties and the Court have referred to as "frustration-of-mission damages." Reading the Court's prior decisions together, Plaintiffs understand that they may recover damages for impairments to their activities and missions that were proximately caused by Defendants' discriminatory REO conduct. *See, e.g.*, ECF 97 at pp. 18 (confirming sufficient "causal connection" between "the Defendants' misconduct and damage to Plaintiffs' mission of furthering fair housing"); ECF 442 at pp. 19 (discussing cognizable injury in terms of "perceptibl[e] impair[ment]" of "core" "activities").

The Court has repeatedly addressed the multiple ways that Plaintiffs may prove these harms at trial, irrespective of whether they offer expert testimony or whether they quantify every aspect of their damages:

- The Court has ruled that "Plaintiffs' damages for counteractive measures can be established at trial through testimony. The jury doesn't need Seicshnaydre to review plaintiffs' mission statements and activities to confirm that they are each dedicated to promoting and enforcing an equal housing market and counteracting residential racial segregation in their respective communities. Each plaintiff can explain its mission and how the shoddy maintenance of Deutsche Bank-owned properties frustrated community-based missions." ECF 460 at pp. 7 (internal alterations and citations omitted).
- The Court has ruled that Plaintiffs may pursue damages for "diminishment of complaint-based and consumer outreach services and for lost opportunities and special initiatives," even if they may not do so using Professor Seicshnaydre's formula. *Id.* at pp. 6-8.
- The Court has ruled that "[p]laintiffs can testify to the cost or value of forgone activities, and a jury may weigh their credibility in determining appropriate damages." *Id.* at pp. 8.

Plaintiffs understand "counteractive measures" to include both previous time and resources expended on responding to Defendants' discriminatory conduct—which are already captured in Plaintiffs' evidence of diversion—*as well as the work that remains to be done to repair their missions and activities.* This understanding is consistent with the caselaw cited by the Court and with other damages-stage cases brought by fair housing organizations like Plaintiffs. For example, as this Court expressly acknowledged, the Seventh Circuit affirmed a damages award to a fair housing organization for its *"expected* costs" for counteractive measures. ECF 460 at pp. 7 (emphasis added) (discussing *City of Chicago v. Matchmaker Real Est. Sales Ctr.*, 982 F.2d 1086, 1099 (7th Cir. 1992)).[2] Similarly, following a bench trial, the court in *Fair Housing Justice Center, Inc. v. Pelican Management., Inc.*, awarded "future compensatory damages for frustration of mission to counteract the injury caused" and outlined "three future activities." No. 22-cv-1654, 2023 WL 6390159, at *20 (S.D.N.Y. Sep. 29, 2023).[3]

This understanding is also consistent with all jury instructions that Plaintiffs have found for frustration-of-mission damages cases in the fair housing context. *See, e.g.*, *Cmty. House, Inc. v. City of Boise*, No. 1:05-cv-00283-CWD, ECF 374 (D. Idaho) (describing frustration damages to the jury as "what it will cost the organization to redress the harm done by the defendants . . . to the organization's mission as a result of the retaliation or any other violation of the Fair Housing Act you find"); *Whyte v. Alston Mgmt., Inc.*, Case No. 10-810410-CIV (S.D. Fla.) (instructing the jury that a fair housing organization was "entitled to be compensated for" "the damage to its

---

[2] The Seventh Circuit reversed a separate "frustration of purpose" award because "[t]he magistrate judge failed to articulate any basis for [it]." 982 F.2d at 1099. However, as this brief makes clear, there is a basis for all damages that Plaintiffs seek.
[3] *See also S. Cal. Hous. Rights. Ctr. v. Krug*, 564 F. Supp. 2d 1138, 1152 (C.D. Cal. 2007); *Hous. Rights Ctr. v. Snow*, No. CV05-4644SGL(JTLX), 2007 WL 91148, at *6 (E.D. Cal. Jan. 3, 2007).

4

mission and purpose" and that it "may consider the amount necessary to counteract Defendants' wrongdoing"); *see also* Ex. 1 at 71, jury instructions in *Kennedy v. City of Zanesville*, No. 2:04-CV-1047 (S.D. Ohio)). And this approach makes sense: compensatory damages are meant to repay a plaintiff for their losses: in this context, the loss includes the expense necessary to redress and repair the harm.

## B. Plaintiffs' Anticipated Damages Evidence.

Based on the Court's prior holdings, Plaintiffs will use record evidence and testimony to prove their damages. This presentation will include evidence of:

1. Plaintiffs' missions and how they were harmed by Defendants' discriminatory conduct;
2. Plaintiffs' programs, activities, and services and how this work was impaired by Defendants' discriminatory conduct, including information related to the costs of these programs, activities, and services;
3. Counteractive measures undertaken and expected, including information related to previous expenditures in similar contexts and expected costs;
4. Forgone activities and the value thereof[4]; and
5. Other drains on Plaintiffs' resources that were caused by Defendants' discriminatory conduct.

The jury may fairly consider each of the above when assessing and valuing Plaintiffs' damages.

Defendants' Motions in Limine implicate Plaintiffs' evidence related to their impaired work, their counteractive measures, and the costs of both. As set forth below, Plaintiffs' evidence will provide dollars-and-cents reference points for the jury to evaluate the impairments and counteraction.

---

[4] The Court has held that "plaintiffs can testify to the cost or value of forgone activities, and a jury may weigh their credibility in determining appropriate damages. *See, e.g.*, [338-1] at 30 (Plaintiff North Texas Fair Housing was unable to develop a fair housing certification program because of diminished capacity; Plaintiff Fair Housing Continuum withdrew from an architectural conference)." ECF 460 at pp. 8. Defendants' Motions in Limine do not challenge Plaintiffs' evidence of forgone activities.

***On impairment:*** Plaintiffs have argued—and have amassed evidence showing—that Defendants' REO conduct impaired the following activities, programs, and services: (1) complaint and consumer focused counseling and referrals, (2) neighborhood stabilization activities, (3) homeownership promotion, and (4) REO-specific training and education. ECF 435 at pp. 7-16.[5] These activities were not related to Defendants; rather, they comprise the bread-and-butter work that Plaintiffs do as fair housing organizations. The injury and damages flow from the fact that Defendants' conduct harmed Plaintiffs' missions and impaired their day-to-day operations. Plaintiffs are entitled to present evidence of those operations, including their costs, for the jury's consideration. And of course, this evidence will vary by Plaintiff depending on which programs were impaired and what evidence of programmatic costs is available. *Cf.* ECF 460 at pp. 8 (noting as part of decision to exclude Dr. Seicshnaydre that damages are not the same "for each organization given different operations").

Plaintiffs' evidence rightly encompasses evidence of the programmatic costs associated with the impaired programs, activities, and services. As just one example, Plaintiffs will present evidence of their annual programmatic staffing expenses, which are reflected in Part IX, lines 5 and 7 of Plaintiffs' annual IRS 990 forms. The jury may properly consider how much Plaintiffs paid their staff for the programs, activities, and services that were impaired by the REO conduct at issue in this case.

---

[5] The Court's summary judgment decision focused only on the impairment to Plaintiffs' counseling and referral activities for standing purposes. ECF 442 at pp. 15-17. It did not reject the impairments Plaintiffs identified to their activities related to blight, homeownership promotion, or education and outreach. *Id.* The Court also left open the question whether the need to counter racial stigma and stereotyping of communities of color due to discriminatory maintenance of REOs could constitute cognizable injury under Article III for purposes of standing. *Id.* at pp. 18 n.11.

***On counteraction:*** As noted above, this Court held: "Plaintiffs' damages for counteractive measures can be established at trial through testimony." ECF 460 at pp. 7. Plaintiffs' counteractive measures to date are in part reflected in their diversion evidence. But, absent a verdict in this case, Plaintiffs cannot fully redress the harm to their missions and work with required actions. Thus, Plaintiffs' evidence will include their expected counteraction costs. This evidence will show that Plaintiffs have previously undertaken similar measures and, therefore, that Plaintiffs can credibly testify as to the cost of such counteractive measures. This evidence will provide a sound basis for the jury to assess damages.

For example, Plaintiffs will testify that renovations of houses directly counteract the Defendant-generated "dilapidated properties" in communities of color. And Plaintiffs will testify how homeownership grants and counseling will facilitate the purchase of homes for owner occupants. Plaintiffs will explain why these measures are required to remedy Defendants' "impair[ment of] Plaintiffs' ability to assist clients in finding suitable homes." *See* ECF 442 at pp. 18. In the same vein, renovations and other beautification projects are directly tethered to the impairments to Plaintiffs' work to eliminate blight. Without such counteraction, the blight at issue will go unremedied, compounding the past impairment to Plaintiffs' programs to avoid and remove blight and to beautify these neighborhoods. Counteraction will also mitigate the negative racial stigma and stereotypes caused by Defendants' shoddy REO maintenance which impaired Plaintiffs' missions and activities undertaken to counter segregation.

Because Plaintiffs have previously undertaken similar work, they can testify from personal knowledge and experience regarding how much it will cost. Plaintiffs' evidence will show the costs of rehabilitating a blighted property, providing grants, helping consumers obtain and retain housing, and other similar activities. *See, e.g.*, Ex. 2 at 11 (Fair Housing Center of

7

Central Indiana, FHCCI 2015 report, Beg Bates FHCCI_0001202 at FHCCI_0001212, explaining cost of $75,000 for a full rehabilitation); Ex. 3 at 6 (Fair Housing Center of Western Michigan, FHCWM Beg Bates FHCWM_0003071, at FHCWM_0003076, distributing $120,000 for repairs to 48 homes in partnership with other community groups); Ex. 4 at 15 (Fair Housing Opportunities of NW Ohio, n/k/a Toledo Fair Housing Center, NFHA_0064590, replacing and repairing roofs and gutters for 144 homes in communities of color); Ex. 4 at 12 (NFHA_0064587, discussing how Plaintiff South Suburban Housing Center in Illinois selected 30 eligible communities and provided down payment assistance grants of up to $15,000 per household as part of its homeowner strategies). This detailed evidence will serve as benchmarks to assist the jury's assessment of counteraction-related damages.

This kind of testimony is well within the bounds of Federal Rule of Evidence 701. As the Advisory Committee Notes explain:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g., Lightning Lube, Inc. v. Witco Corp*. 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Advis. Comm. Note to Fed. R. Evid. 701. Plaintiffs here are entitled to rely on their personal knowledge of their own operations to explain the estimated cost of the counteractive measures necessitated by Defendants' conduct.

### C.  Plaintiffs' Damages Evidence Is Not Precluded by Prior Decisions.

The above-described injuries and evidence remain actionable in this case. In its 2019 motion to dismiss decision, the Court rejected two injuries asserted by Plaintiffs: (1) loss of

economic value and impact of specific community investments; and (2) harms to minority neighborhoods. ECF 97 at pp. 20-22. Neither holding is at odds with the above-described damages evidence.

As to the first injury, "Plaintiffs assert[ed] that their various financial investments in minority communities are undermined by deteriorating and poorly maintained Deutsche Bank-owned REO properties." *Id.* at pp. 20. The Court found that this injury was "surely" foreseeable and that Defendants' conduct was a "substantial factor" in Plaintiffs' harm, but the connection between the conduct and the harm was not sufficiently direct and damages would be administratively difficult to measure and apportion these damages. The extent to which Defendants' conduct "undermined" Plaintiffs' financial investments, as Plaintiffs alleged, is different from the extent to which Defendants' inferior provision of maintenance and marketing services impaired Plaintiffs' day-to-day programs, activities, and services. Plaintiffs will testify at trial to the impairments to their programs, services and activities, and why those impairments forced them to respond. This testimony will show that there are no intervening steps between Defendants' conduct and the impairment to Plaintiffs' work. Plaintiffs will not be introducing the total amount of money they have invested in the communities of color at issue and attempting to recover that amount in a 1:1 dollar ratio. Rather, Plaintiffs will show how Defendants' conduct interfered with their activities in these neighborhoods and the programmatic costs of those activities. And Plaintiffs will show that their previous community-improvement work informs their estimates of counteraction. The mere fact that an already-eliminated injury and still-extant one both use the word "community" does not make them the same.

As to harms to minority neighborhoods that Plaintiffs serve, the Court held that this injury was "not sufficiently directly related to Defendants' conduct to satisfy proximate cause

under the FHA." *Id.* at pp. 22. The Court also found proximate cause lacking because residents of these neighborhoods could potentially recover for these harms. But it should go without saying that residents cannot recover for the harm to Plaintiffs' missions and activities. This is because such harm is organizational in nature, and thus not attenuated. Thus, the damages Plaintiffs will prove at trial do not suffer from any of the indirectness concerns raised by the Court with respect to proximate cause.

To the extent that the Court perceives any tension between Plaintiffs' damages evidence and prior rulings, the Court's six-year-old analysis of the allegations should not dictate the admissibility of damages evidence that comports with proximate cause requirements and that has been the subject of multiple rounds of briefing just this year.

The Supreme Court ruled in *Bank of America Corp. v. Miami*, 581 U.S. 189 (2017), that proximate cause under the FHA requires "some direct relation between the injury asserted and the injurious conduct alleged," *id*. at 202-03, but otherwise declined to "draw the precise boundaries of proximate cause under the FHA." *Id*. Instead, the Court left the question open on remand for development in the lower courts. *Id.* It is well established that the proximate cause determination should in all but rare instances be a question for the jury. "Proximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can offer no evidence . . . should summary judgment be granted on the issue of causation." *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010) (citing *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) and *Cooper v. Carl. A. Nelson & Co*., 211 F.3d 1008, 1014 (7th Cir. 2000)). For that reason, both sides have proposed jury instructions that address proximate cause as part of the Parties' pretrial exchanges.

At this point in the litigation, Plaintiffs have articulated injury sufficient for Article III standing, have developed a substantial record of the harm they suffered due to Defendants' REO conduct, and have outlined the admissible evidence they will use to prove their damages at trial. It is time for the jury to weigh in. *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1392 (7th Cir. 1984) ("[T]he Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury.").

## I.   THE COURT SHOULD DENY DEFENDANTS MOTION IN LIMINE NO. 1 AND ADMIT RELEVANT SALES AND MARKETING EVIDENCE

Defendants move to exclude a broad and undefined category of "evidence and/or testimony pertaining to Defendants' marketing practices," but this request is fundamentally flawed for at least three reasons, each of which alone would require denial. First, Defendants wrongly conflate the Court's prior decisions regarding housing unavailability with all evidence of marketing and sales. Although Plaintiffs' housing unavailability claims under Sections 3604(a) and 3605 are no longer live, Defendants' differential provision of marketing and sales services remains at issue as part of Plaintiffs' Section 3604(b) claim. Second, Defendants ignore that, as a factual matter, marketing evidence is necessarily intertwined with maintenance evidence because Defendants were maintaining and marketing their properties for sale at the time they were inspected. The condition of an inspected REO in this case is thus, definitionally, the condition of a property during the marketing phase. Third, even if the Court were to somehow determine that marketing and sales evidence is not relevant to liability, it would nevertheless be admissible as relevant background evidence.

### A.   Plaintiffs' 3604(b) Claim Encompasses Defendants' Differential Provision of Marketing and Sales Services

Defendants mischaracterize the record, wrongly stating that marketing and sales evidence is not relevant to any claim, live or dismissed. ECF 504 at pp. 4-8. Not so. Section 3604(b) encompasses "discrimination" in the "provision of services" related to the "sale or rental of a dwelling." 42 U.S.C. § 3604(b). Just like the discriminatory provision of maintenance services is covered by this statute, so too is the discriminatory provision of marketing services. Sales and marketing practices—along with preservation and maintenance practices—are part of the REO lifecycle and are interconnected and directly relevant to Plaintiffs' 3604(b) claims. Plaintiffs have offered evidence that Defendants provided these indivisible services in a differential manner

based on racial composition of the neighborhood. That differential treatment is actionable under Section 3604(b) irrespective of whether Plaintiffs have separate claims related to the actual availability of housing under other provisions of the Fair Housing Act. Tellingly, Defendants offer no argument or explanation as to why the Court's holding on Plaintiffs' Sections 3604(a) and 3065 claims means that REO marketing and sales services would be excised from the Section 3604(b) claim.

Plaintiffs' marketing and sales evidence bears on both theories of liability for their terms-and-conditions claim. As to disparate treatment, Plaintiffs argue, *inter alia*, that Defendants' intent to discriminate can be inferred from the well-known historical record of regulators advising against using property value to dictate housing policy due to discriminatory impacts. ECF 360 at pp. 49-51. On this front, the Court has also expressly permitted one of Plaintiffs' experts, Dr. Elizabeth Korver-Glenn, to opine on both historical practices related to housing inequality, ECF 442 at pp. 81, and the negative effect of limited-service listings, *id.* at pp. 83.[6] As to disparate impact, Plaintiffs argue that "Defendants' policies subjected lower value REOs to more price reductions, thus trapping them in a spiral of deterioration and devaluation." ECF 360 at pp. 36-38. The deficiency disparities are thus linked to the marketing and sales practices, as is Dr. Ayres's value-drop analysis. Thus, these policies are closely tied to one of the discriminatory effects captured by Plaintiffs' statistical analyses.

---

[6] The Court's analysis of Plaintiffs' disparate treatment theory did not preclude them from introducing this evidence for this purpose, although it focused its analysis on other categories of evidence. *See* ECF 442 at pp. 108-12.

### B. Defendants' Marketing and Maintenance Policies and Procedures Operated in Tandem Throughout the REO Lifecycle

#### 1. Defendants' marketing and sales practices are an indispensable part of the REO lifecycle

Defendants' Motion wholly ignores that the maintenance policies traveled together along with the marketing and sales policies as part of Defendants' overall approach to REO properties. Put differently, it would be artificial, confusing, and likely impossible to omit REO marketing and sales evidence and tell an accurate and understandable story about REO maintenance because they are interdependent. All the policies at issue apply in what Defendants' themselves term the pre-marketing and marketing phases of the REO life cycle. This makes sense, as the purpose of Defendants servicing the properties *is to market them for sale*. The inseparability of Defendants' marketing and maintenance policies was succinctly described by Altisource's Vice President of Asset Management, who testified: "[O]ur goal was to sell the asset as fast as we could," and because Altisource "knew nobody wanted to live next to a place that was getting rundown" it aimed "to minimize those damages that would detract from curb appeal" including "broken windows, grass, unkempt lawn, trash, those kinds of things." ECF 369-10 at pp. 412-13 (125:8-16, 127:1-12). To wit, Defendants' maintenance and marketing policies are joined at the hip.

Additional examples abound that Defendants themselves viewed "marketing and sales" and "preservation, maintenance, and repair" as integrated facets of the REO lifecycle. For one, Ocwen 30(b)(6) testimony explained that Altisource is responsible to immediately bring REO properties into "marketable condition," ECF 370-3 at pp. 53 (27:12-19), which entails the property being "free of any life safety or health issues, free of any code violations, you know, free of any debris, any trash," *id.* at pp. 60-61 (57:22-58:3). In other words, Defendants'

definition of "marketability" neatly tracks the preservation and maintenance items central to

Plaintiffs' investigation and methodology.

Another example: Altisource's basic training slides describe the REO Life Cycle as "Pre-

Marketing" or "Marketing," with no delineation between maintenance, marketing, and sales:



(ASI000030995). Additionally, Defendants' property management system codes define "NMKT"

as "Property on market," and explains that in this phase, the "Property is available on market and

actively marketed. During this status the property is listed and available on the Altisource

website (HUBZU)." During this phase, ongoing "Preservation/Repair" occurs, which is

described as "[b]asic preservation and any other repair to increase the value of the

property/market the property." This is the period during which Plaintiffs' site visits occurred.

## REO life cycle – Marketing Phase

| Status | Abbreviation | Explanation | Preservation/ Repair |
|---|---|---|---|
| SALERAT | Sale ratification/ Sale confirmation | State rule states that the sale held on the foreclosure date needs to be legally confirmed before proceeding with the preservation activities. | Bi-Weekly inspection- Interior and Exterior, REDM/SALERAT Securing |
| WFCDOCS | Waiting for foreclosure document | As per the state rule DEED needs to be recorded before proceeding with marketing or eviction. | Vacant assets all basic preservation work can be performed |
| WLST | Waiting for listing | A listing agents been identified and an agreement has been sent to him. REO will receive the agreement signed by the Listing agent. | Subject to exception |
| NMKT | Property on market | Property is available on market and actively marketed. During this status the property is listed and available on the Altisource® website (HUBZU) | Basic preservation and any other repair to increase the value of the proprty/ market the property. |
| B-SUBMIT | Budget Submitted | On properties Greater than value 250000, the RSC prepares the budget and is submitted for an approval to the manager. | N/A Subject to exception |
| EVCT/MKT | Property under Rental Agreement | Here the tenant might have a valid lease agreement and Client will collect rent from them until the lease expires. Applicable only for Single family units. Marketed while occupied, eviction in process – Property is being marketed while still occupied, possible sale to the tenants. | N/A |
| LISTEXP | Listing agreement has Expired | Property is not being actively marketed. The listing agent was not successful to identify a buyer within the time agreed upon. | Basic preservation repairs |
| BPEXP | Budget Expired | The budget has expired on the property. | |
| O-SUBMIT | Offer Submitted for Approval | Offer has been received and needs to reviewed by the manager (seller). | N/A Subject to exception |

Altisource

© 2015 Altisource. All rights reserved.
CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

31

ASI000030488

(ASI000030488, above, Row 4). Once again, preservation and maintenance policies are irrevocably intertwined with marketing and sales policies, and Defendants offer no serious argument that their maintenance and marketing policies and practices do not work in tandem.

### 2. Defendants fail to justify exclusion of any particular marketing or sales evidence

In their motion, Defendants seek to exclude evidence related to "property valuation" and "property pricing," ECF 504 at pp. 4, but the broad collection of Defendants' value-based redlining policies mean the value or price of a property determines how Defendants maintain and market a property, which can further devalue a property, which can further depress maintenance and marketing, and so on. The marketing, sales, and maintenance policies are not a Venn diagram with minimal overlap, but one downward spiral.

16

Defendants' sales and marketing procedures and practices that depress property preservation, maintenance, and repair include, but are not limited to: (a) treating *and* selling properties "as is" without basic repairs (i.e. without bringing the property into "marketable condition"); (b) Altisource off-shore "Residential Sales Consultants," also known as "Asset Managers," refusing to approve needed maintenance suggested by inspectors or local vendors for perceived lower-value properties; (c) exercising discretion to refuse to remediate code violations (in violation of contracts, policies and local laws) for REOs with perceived lower values; (d) ratcheting up list and sales price declines according to discretionary value judgment calls by non-local staff and in special programs like "Last Chance Auction" or "Dynamic Pricing." *See generally* ECF 361 ¶ 200. Each of these practices, alone and together, directly affects how REOs serviced by Defendants are preserved and maintained. Specific policies mentioned in Defendants' motion are described in more detail below.

### i. Cash for Deed Program

Defendants specifically seek to preclude evidence related to their "Cash for Deed" program, ECF 504 at pp. 4, but this program typifies the inseparability of Defendants' marketing and maintenance policies and procedures. If, at any point in the REO lifecycle, Defendants' staff valued a property at $50,000 or less,[7] it was subject to the Cash for Deed program. *See* ECF 370-9 at pp. 111 (83:19-84:11). When a property enters the Cash for Deed program, maintenance work lacks priority, repair work is left undone and code violations are not remediated. ECF 370-

---

[7] This $50,000 threshold for properties to be marketed as Cash For Deed could be met through discretionary cuts to list prices and valuations by off-shore Altisource staff. *See* ECF 361 ¶¶ 200(m), 200(n). The lower a property was valued, the more discretion was afforded for increasingly frequent and sizeable additional cuts to the properties price. Cash For Deed program sales were directed by Defendants to investors, not ordinary community home buyers, resulting in additional disparate effects of Defendants' policies on the investigated REOs in communities of color.

27 at pp. 445, 448. Like other so-called marketing policies, the Cash for Deed program thus directly informs and contributes to the discriminatory maintenance at issue in this case.

> ii.     *Hubzu*

Defendants' attempt to exclude evidence related to Altisource's use of its proprietary Hubzu auction platform falls similarly flat. For one, the Court has already explicitly held this evidence is relevant and admissible. *See* ECF 442 at pp. 83 (holding that Dr. Korver-Glenn's opinion testimony on Defendants' use of Hubzu "is admissible"). [8] For another, the use of Hubzu to sell REOs eliminates local community real estate professionals who are traditionally part of the REO process, playing a key role in ensuring REOs are properly preserved and maintained. *See* ECF 370-16 at pp.183. Using an in-house auction platform like Hubzu is unique to Altisource and Ocwen, deviates from industry standards for REO maintenance, and decreases family homeownership. Indeed, the record shows that Altisource refused to work with Fannie Mae because Fannie Mae followed the industry standard of involving local realtors, whose requests for property maintenance Altisource found "very demanding." ECF 369-10 at pp. 176 (79:4-80:23).

> iii.     *Utilities*

The final specific evidence[9] Defendants seek to preclude is "the turning on and off of utilities in lower-value REOs." ECF 504 at pp. 4. First, it is unclear why Defendants consider disconnecting utilities for REOs with perceived lower values to be a "marketing" policy rather

---

[8] This equally applies to the Cash for Deed program, as properties in that program may never be put on the MLS at all.

[9] Defendants also seek to exclude non-specific "marketing practices for REO properties in *non-white* neighborhoods." ECF 504 at 4 (emphasis supplied). That Defendants seek to exclude evidence or practices only in communities of color supports Plaintiffs' argument that differential provision of marketing services based on neighborhood racial makeup is probative of Plaintiffs' disparate treatment claim.

than a "maintenance" policy. Indeed, Altisource 30(b)(6) testimony confirms that turning utilities on serves both maintenance and marketing purposes. *See* ECF 370-9 at pp. 119 (116:6-117:24). Second, connecting or disconnecting utilities based on perceived REO value deviates from industry standards for property preservation and maintenance, *see* ECF 370-16 at pp. 179, evidence which the Court has already found to be relevant and admissible, ECF 442 at pp. 67.

Coming full circle, the evidence shows that poor maintenance caused valuation drops across list and sales prices in REOs serviced by Defendants, and valuation drops in turn caused increasingly poor maintenance. The indivisibility of maintenance and marketing policies REO phases under 3604(b) is finally demonstrated by the fact that the same offshore employees monitored *all REO maintenance, marketing and sales activities*, and were known both as "asset managers" and also as "Residential Sales Consultants." *See* ECF 370-13 at pp. 7-8; ECF 370-22 at pp. 309 (27:1-18).

### C. Defendants' Marketing and Sales Policies and Procedures are Admissible as Relevant Background Evidence

The policies and practices discussed above are also independently admissible to provide helpful context for the jury's consideration. The REO life cycle spans from foreclosure through resale, and Defendants' treatment of REOs throughout that stage is necessary for the jury to understand Plaintiffs' claims. Indeed, Plaintiffs' evidence of discrimination includes the full lifespan of REOs: Plaintiffs present evidence that Defendants' policies and practices drove down the value of REOs in communities of color, evidence that is animated by the ultimate sale price. Defendants' REO marketing practices are part of that story, and it would be confusing to omit that part of the case, like fast-forwarding from Act I to Act III.

Courts routinely include evidence that is not strictly related to liability, and it should do the same here. For example, the Supreme Court has made clear that time-barred discrimination

19

claims are admissible as "background evidence" for timely claims of discrimination. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The Seventh Circuit has applied this logic to admit unexhausted claims as circumstantial evidence of discrimination for actionable claims. *Malin v. Hospira, Inc.*, 762 F.3d 552, 560-61 (2014). The same logic applies here: Defendants' value-based marketing policies are probative of their overall approach to REOs and thus can inform the jury's consideration of Plaintiffs' claims.

For the reasons stated above, the Court should deny Defendants' First Motion in Limine.

## II.   THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 2 AND ADMIT RELEVANT EVIDENCE NOT TIED TO SPECIFIC PROPERTIES INVESTIGATED BY PLAINTIFFS

Defendants' Motion in Limine No. 2 argues that: (a) Local Fair Housing Organization Plaintiffs should not be allowed to present evidence in support of frustration-of-mission damages; (b) Plaintiffs should not be permitted to introduce any evidence not directly tied to Plaintiffs' statistical analysis; and (c) Plaintiffs should not be permitted to use phrases such as "nationwide," "pervasive," and "systematic." Each of these arguments is baseless.

### A.  As Previously Held, Plaintiffs May Prove and Recover Frustration-of-mission damages.[10]

For the umpteenth time, Defendants seek to preclude Plaintiffs from recovering frustration-of-mission damages. This time, Defendants try some evidentiary hocus pocus claiming that because Plaintiffs' statistical study aggregates data across metropolitan areas, and the Local Fair Housing Organizations Plaintiffs have local missions, they can't show that they suffered any harm to their missions. The "logic" behind this argument is plainly flawed and the premises were previously rejected by the Court.

First, the Court has unequivocally rejected Defendants' arguments against permitting Plaintiffs to aggregate locally collected data for use in statistical analyses of Defendants' practices and conduct. *See* ECF 442 at pp. 96-97 (noting that "Defendants do not identify any localized variations in national policies that would render aggregation across cities improper" and that Dr. Ayres accounted for 85 non-race variables in their regression analyses, including "relevant neighborhood characteristics"). As discussed below, in response to Defendants' nationwide policies, Plaintiffs formed a nationwide coalition and undertook a nationwide

---

[10] The portion of Defendants' Motion in Limine No. 2 regarding frustration of mission overlaps substantially with Defendants' Motion in Limine No. 9. As demonstrated in response to both Motions, Defendants' request should be denied.

systemic investigation. Thus, to view Plaintiffs' missions as purely "local" in this case is inaccurate and prejudicial to Plaintiffs.

Second, subsequent to the Court's March 31, 2025 Opinion and in response to another of Defendants' series of motions seeking to limit damages, the Court unequivocally held that each of the Plaintiff Organizations, including the local organizations, could prove and recover damages at trial for frustration of mission: "To sum up, Seicshnaydre's testimony is excluded, but plaintiffs need not rely on expert testimony to establish damages at trial. Each plaintiff may testify to its organizational missions and activities undertaken or forgone." ECF 460 at pp. 9. And if that holding was not clear enough, the Court's Opinion further stated:

> The jury doesn't need [an expert] to review plaintiffs' mission statements and activities to "confirm[] that they are each dedicated to promoting and enforcing an equal housing market and counteracting residential racial segregation in their respective communities." …. Each plaintiff can explain its mission and how the shoddy maintenance of Deutsche Bank-owned properties frustrated community-based missions.

*Id.* at pp. 7 (citation and footnote omitted).

Somehow, Defendants don't bother to mention these holdings,[11] focusing instead on a chart that endeavors to emphasize the local nature of their work but in fact confirms that all the Plaintiffs do, in fact, have missions impacted by the discriminatory conduct alleged. Defendants then assert that it would be "counterfactual" to think that some negative consequences might flow from Defendants' unlawful conduct. But if a jury finds Defendants liable for discrimination in the maintenance and marketing of REO properties, the actual counterfactual would be a

---

[11] In another excerpt that Defendants apparently missed, the Court stated: "Defendants ask that I clarify whether '[p]laintiffs' inspection results can[] be extrapolated beyond the specific properties inspected to draw conclusions about properties titled to a DB Trustee more broadly.' ... As plaintiffs point out, …, this issue goes to liability rather than the scope of damages, which are not tied to specific REO properties." *Id.* at pp. 3 (citations omitted).

finding of no impact to the missions of the Plaintiffs working on the ground in the very communities where the evidence of discrimination was gathered. Defendants are free to challenge evidence that Plaintiffs will present in support of their claims for frustration-of-mission damages, but they are not free to silence the Plaintiffs from presenting such evidence.

### B. Relevant Evidence Extends to Matters Related to Properties That Were Not Part of Plaintiffs' Statistical Analyses.

Defendants next make an equally flawed argument that all evidence concerning properties that were not part of the statistical analyses conducted by Dr. Ayres must be excluded. ECF 504 at pp. 16. A blanket exclusion of such evidence would not comport with any recognized evidentiary principle and, based on the facts here, would likely exclude highly probative evidence bearing on intent, knowledge, policies, patterns or practices, and other relevant matters.

As an initial problem, Defendants' motion contains no limiting principles. It would be absurd to say, in a case about property maintenance and marketing, that includes disparate treatment claims, that there can be no property-related evidence beyond the statistical analysis. For example, if Ocwen left a note at a property across the street from one of the properties analyzed in Plaintiffs' investigation stating that, "we don't fix code violations on minority properties we service," how would that not possibly be relevant? It would be specific to a property, but not part of the statistical analysis, and according to Defendants, therefore inadmissible. Other examples in the evidentiary record may be slightly less dramatic but certainly have probative value.

Moreover, Defendants' national policies were not limited to the specific properties that were part of Dr. Ayres' statistical analyses. These include Defendants' policies related to value redlining and their system of unsupervised and discretionary property decisions. Thus, evidence of Defendants' policies and evidence of the discriminatory impact of those policies, including

Defendants' intentional abandonment and wanton disregard for maintenance issues, marketing and code violations in minority communities, should be admissible.

The three properties cited in this section of Defendants' motion do not provide a persuasive basis for exclusion. First, the property at 93 Mallory Height Drive in a predominantly African American neighborhood in Memphis, Tennessee was serviced by Ocwen (although not part of Dr. Ayres' study). Professor Daniel Schaffzin, of the University of Memphis Law School, provided documents and testimony that even after the Shelby County Environmental Court entered an August 11, 2016 Order certifying the property as a public nuisance and requiring Deutsche Bank to present a Development Plan to abate the nuisance, nothing happened, and the property remained in a severely neglected condition, with debris, graffiti, weeds, broken fencing, broken tree limbs, and damage to the roof and structure. ECF 369-52 at pp. 2, 10-12, 26-28, (Schaffzin Declaration, 5/6/22, ¶¶ 2, 23-25, 47, 49). The home was foreclosed in 2008. From then until it was sold in October 2019 at a foreclosure sale because Deutsche Bank failed to pay property taxes, Deutsche Bank and Ocwen failed to maintain and remediate the property. *Id.* at pp. 10-11, 14, 46-48, ¶¶ 23, 30, 86, 90. Whether or not this property was part of the Ayres' analysis hardly disqualifies its relevance based on the testimony of Professor Schaffzin regarding its treatment over 11 years, which is consistent with Plaintiffs' evidence of Defendants' intent, policies, procedures and conduct.

A second property referenced in this section of Defendants' motion, 6217 E. Hill Mar Circle, Prince George's County Maryland, is a Deutsche Bank property in a community of color that provides probative evidence related to the need or rationale for Plaintiffs to conduct their investigation—a topic which Defendants have previously challenged in various contexts including as to standing and damages. The next-door neighbor of that property, Victoria Plate,

observed squalid and filthy conditions at the property. With her father's help, Ms. Plate "occasionally cleaned the outside around the home at 6217 [and she] saw neighbors remove trash, rake leaves, shovel snow, trim shrubs or trees and make structural adjustments." She filled out NFHA's neighbor survey during the course of its investigation, stating "Please help us!...Mice/rats run around the property! ...Eye sore. Please help us! They said it[s] nothing they can do... please help us they need to clean the property....Scared to come out of my house." ECF 369-39 at pp. 137-139, 141-142 (Plate Declaration, 10/14/20, ¶¶ 6, 8-12, 14-16, and survey).

The third Deutsche Bank property cited in Defendants' motion, 2716 21st Avenue, Minneapolis, Minnesota, is located in a predominantly African-American neighborhood and tells a similar story. Amy Christiansen, a neighbor across the street, testified that "[w]hoever owned the property was not taking care of it, which was obvious from how it looked from the outside," While neighbors had to take care of the property, including picking up trash, living across from a severely neglected home was difficult and painful and Christiansen wrote on her NFHA survey form: "We gave up!!!" ECF 369-40 at pp. 3, 5 (Christiansen Declaration, 10/30/20, ¶¶7, 9 and survey) (emphasis in original). Since Ms. Christiansen will not be a witness at trial, Defendants' request here is moot.

### C. Evidence Regarding Common Ground's Activities is Relevant and Admissible.

Defendants' Motion in Limine No. 2 also seeks to exclude the evidence regarding the community organization called Common Gound of Southeastern Wisconsin ("Common Ground") on the basis that the evidence is not probative of whether there were racial disparities identified in Dr. Ayres' statistical study. ECF 504 at pp. 18. As discussed above, this is clearly not the correct measure of evidentiary relevance inasmuch as there are many issues that go beyond the disparities identified in the Ayres study, (*e.g.*, knowledge, intent, policies and practices and

other matters) as to which facts such as Common Ground's frequent interactions with the Deutsche Bank Defendants and Defendant Ocwen are highly probative. While Defendants' Motion takes a short, backhanded approach in attempting to exclude the Common Ground evidence, the critical nature of this evidence necessitates a more detailed response.

For several years, the Milwaukee Department of Neighborhood Services, led by then Commissioner Art Dahlberg from 2009 through 2015 (one of Plaintiffs' "will call" witnesses), worked in conjunction with Common Gound to combat the foreclosure crisis in Milwaukee. The City and Common Ground investigated abandoned REOs and related code violations and attempted to hold banks and servicers (including Deutsche Bank and Ocwen) accountable for their role in harming predominately African American neighborhoods in the City, including Sherman Park. In response to the City and Common Ground's efforts, Deutsche Bank (and later Ocwen[12]) eventually made small financial contributions targeting Sherman Park, but Plaintiffs' investigation confirms that Defendants' conduct did not change afterwards. *See, e.g.*, ECF 369-40 at pp. 21-25, 27-32 (Dahlberg Declaration, 1/19/22, ¶¶ 4, 6-16, 22-30); ECF 369-41 at pp. 47-65 (Connolly Declaration, 3/3/22, ¶¶ 3-27); ECF 369-42 at pp. 2-16 (Connolly Supplemental Declaration, 5/13/22, ¶¶ 3-32).

Defendants' proposed Exhibits include two documents regarding Ocwen's eventual proposal and contributions to Milwaukee in 2016. *See* Ex. 5 (Defendants' Exhibit List, 12/5/25, Exhibits 87 and 88). By presenting only their exhibits and moving to exclude Plaintiffs' evidence, Defendants seek to present Ocwen in a misleading positive light, while denying

---

[12] In this regard it might be noted that Ocwen's contribution came on the heels of the settlement that it entered into with the United States and CFPB requiring Ocwen to work with not-for-profits to address community blight. The bona fides of Ocwen's efforts might be questioned considering that its first ever Director of Oversight testified that he was unaware of Ocwen's activities in Milwaukee. *See* Ex. 8 (Jastrzemski Dep. at pp. 218)

Plaintiffs an opportunity to introduce (a) evidence of the extreme deterioration of Sherman Park and other predominantly minority neighborhoods Defendants caused in Milwaukee, (b) evidence that the City and Common Ground regularly presented data, maps and other facts to Defendants detailing the scope and location of the problem in those neighborhoods, (c) evidence that Defendants' knew their conduct was disparately impacting communities of color, and (d) evidence that, eventually, in response to the City and Common Ground's efforts, Deutsche Bank and Ocwen made limited financial contributions focusing on Sherman Park, without changing their subsequent conduct.

The highly relevant and compelling evidence that Defendants ignore includes "Ocwen's Milwaukee Portfolio," a one-page document shared by Ocwen in November 2014 with Common Ground and the City of Milwaukee. This document, on Ocwen letterhead, lists 674 REOs in Milwaukee among Ocwen's portfolio, identified by zip codes. ECF 369-42 at pp. 7, 40 (Connolly Supplemental Declaration, 5/13/22 ¶¶ 12-13 and Ex. 17). Former Commissioner Dahlberg testified about the destruction to neighborhoods in discrete zip codes in Milwaukee, including in the predominantly African American neighborhoods of Amani, Sherman Park and Metcalfe Park. He had meetings and phone calls with representatives from Deutsche Bank and Ocwen, during which the City "regularly shared lists of approximately 100 properties that had outstanding Orders reflecting Code Violations that needed to be remedied and we asked the banks and servicer representatives to tell us what they were doing with these properties. The Orders were based on neighbor complaints and City inspections. We also often shared maps of the City with representatives from major banks and servicers (including Deutsche Bank and Ocwen) that showed areas where the levels of code violations were the most dense, which was always in the neighborhoods referenced above." ECF 369-40 at pp. 22-23, 31-32 (Dahlberg Declaration,

1/19/22, ¶¶ 8, 11, 29-30). Dahlberg also testified that he shared the City's data and maps with Common Ground. *Id*. at pp. 25-28, ¶¶ 16-17, 19, 21-22.

Defendants complain about Mr. Connolly's testimony that Common Ground sought to "embarrass" Deutsche Bank AG. ECF 504 at pp. 18. Mr. Connolly testified that Common Ground sought to embarrass Deutsche Bank because it needed to get its attention after Deutsche Bank repeatedly failed to meaningfully respond to Common Ground's invitations to discuss the destruction of housing in Milwaukee. ECF 369-41 at pp. 47-48 (Connolly Declaration, 3/3/22, ¶¶ 4-7). Common Ground affixed signs in the front yards of Deutsche Bank's dilapidated REOs in minority neighborhoods, identifying them as abandoned homes owned by Deutsche Bank. ECF 369-46 at pp. 54 (Fraley Declaration, 3/9/22, ¶ 11); ECF 369-51 at pp. 5-6 (Davis Declaration, 2/13/22, ¶¶ 15-16). The culmination of Common Ground's 9-year campaign and Deutsche Bank's resistance was when two of its members (Dr. Susan Giaimo and Minister Mark Fraley) flew to Germany in 2010 to present the results of Common Ground's investigation to Deutsche Bank's shareholders and demand action. The microphone was turned off multiple times during Dr. Giaimo's presentation. ECF 369-43 at pp. 9 (Giamo Declaration, 1/11/22, ¶ 23).

Because of Common Ground and the City's persistent multi-year campaign, representatives from Deutsche Bank *and* Ocwen eventually *personally visited Milwaukee* and other U.S. cities.[13] Sherman Park is a predominantly African American neighborhood in Milwaukee. Mr. Connolly testified that during in-person meetings in Milwaukee, he told Deutsche Bank representatives "that the neglect of properties in Milwaukee and specifically

---

[13] This factual sequence also demonstrates that the technical differences between Deutsche Bank entities are insignificant to their actionable conduct: Common Ground reached out to the German bank itself, including travelling to Germany, and officials of its various U.S. apparitions eventually materialized to admonish Ocwen and drag Ocwen into U.S. cities to face the REOs (the most dilapidated of which were located in communities of color).

Sherman Park (which was the focus of our effort) was especially harsh on African American residents of the city and neighborhoods whose residents were mostly African American." ECF 369-41 at pp. 47, 57 (Connolly Declaration, 3/3/22, ¶¶ 4, 17).

Former Ocwen Senior Vice President Jill Showell visited with Common Ground starting in December 2014. She testified that the racial demographics of Sherman Park were discussed with Common Ground (including Mr. Connolly). Asked if "the extent to which the vacant REO properties in the Sherman Park neighborhood were having an impact on African American residents" was also discussed, she admitted that "[i]t's possible." (Ex. 6, Showell Dep., pp. 143-144). Showell recalled that she was taken on a tour of Sherman Park, where she observed "a neighborhood that was impacted by the financial and housing crisis. … some of [the homes] were in need of repair. … some that had boards on the windows." In addition, she shared that homes with boarded windows "should be a concern of anyone." Asked why there would be concern, she testified "It's obvious that the home needed some work, and, … that it was potentially impacting the neighborhood. … neighbors not wanting to live next to a home that was boarded-up would impact property values" and another concern would be "vandalism." *Id*. at pp. 99-105.[14]

Defendants' request to exclude evidence related to Common Ground is further undercut by the fact that Defendants list Ms. Showell (who worked for Ocwen from 2012 through 2019, *id*. at pp. 11) as Witness #2 on Defendants' "will call" witness list. (Plaintiffs also intend to call her.) Defendants identify Ms. Showell and describe her anticipated testimony as follows:

---

[14] Given the facts shared by Common Ground and the City of Milwaukee with representatives from Deutsche Bank and Ocwen regarding Sherman Park alone, Defendants' denials that they knew their REO conduct was disparately impacting communities of color in Milwaukee and other cities defy belief.

> Ms. Showell was a Senior Vice President of Government and Community Relations at Ocwen during the relevant time period. She has knowledge of, and will testify to, the facts at issue in this case, including but not limited to Ocwen's efforts to work with communities and organizations throughout the country to prevent blight and the subjects upon which she was deposed.

*See* Ex. 7 (Defendants' Updated Proposed Trial Witness List at pp. 2). Defendants'

description of Ms. Showell's testimony as including "Ocwen's efforts to work with

communities and organizations throughout the country to prevent blight" is plainly not

tied to any specific properties or limited to properties considered by any statistical expert.

Moreover, one of the "organizations" she worked with and will testify about was

Common Ground.[15]

The ties between Common Ground's activities and the issues related to Defendants'

conduct and liability go on and on. To take another example, the Court cited Deutsche Bank's

memoranda to Ocwen and other servicers in sustaining Plaintiffs' claim against the Deutsche

Bank Defendants in its March 31, 2025 Opinion. A long excerpt from a July 28, 2010

memorandum quoted in the Court's Opinion begins with, "The Trustee has received a number of

inquiries and complaints from government officials and community groups about the physical

condition of REO properties." (ECF No. 442 at pp. 118) The issuance of that memorandum to

Deutsche Bank's Servicers came after Common Ground's campaign to obtain action with regard

to REO properties, and Common Ground was clearly a "community group" referred to in the

memorandum.

---

[15] In fact, Defendants' Rule 26(a)(1) Amended Disclosures identified Ms. Showell with reference to her work with Common Ground: "Jill Showell – Former Senior Vice President, Government and Community Relations. Ms. Showell has knowledge of Ocwen's efforts to work with communities and organizations throughout the country, including Common Ground and its subsidiary Milwaukee Rising, to prevent neighborhood blight." Ex. 9 (Ocwen Rule 26(a)(1) disclosures, 6/28/22 at pp. 2, 4).

Finally, Defendants complain about photographs taken by Common Ground, citing a page of Common Ground's "Faces of Foreclosure" Report that includes a photograph of a home foreclosed by Deutsche Bank. ECF 504 at 18. Common Ground provided a copy of its Faces of Foreclosure Report to Deutsche Bank in 2010 to garner attention and encourage Deutsche Bank's representatives to meet with Common Ground to discuss the situation. ECF 369-41 at pp. 48-49 (Connolly Declaration, 3/3/22 ¶¶ 8-9). As such, the Report and photographs provide relevant information related to the efforts made by Common Ground to engage in a dialogue about REOs with the Defendants and provide additional evidence of Defendants' knowledge and intent.

**D. No Basis Exists for Precluding Plaintiffs from Using Words Like "Nationwide," "Pervasive," "Systematic," "Citywide," or "Metropolitan Area" Conduct or Activities.**

Finally, Defendants seek to minimize the scope of Plaintiffs' investigation and its consequences by precluding Plaintiffs from using the following words and similar terms: "Nationwide;" "Pervasive;" "Systematic," and "Citywide" or "Metropolitan Area." The motion fails because these terms accurately apply.

Plaintiffs' investigation was intentionally designed to be "nationwide," extending to thirty "metropolitan areas" throughout the entire country with high foreclosure rates and segregated communities. Not only was the investigation nationwide, but the policies followed by the Defendants and challenged by Plaintiffs were unquestionably "nationwide policies" that applied to these communities. *See, e.g.*, ECF 361 ¶¶ 187-192. Again, the Court's March 31, 2025 Opinion specifically observes that "plaintiffs' theory of liability is premised on defendants' "national model" of servicing REO properties [and that] Defendants do not identify any localized variations in national policies . . ." ECF 442 at pp. 97. Dr. Ayres' findings are also undeniably "nationwide" inasmuch as they are based on data from across the nation.

31

The Plaintiffs' investigation was also clearly "systematic." Plaintiffs followed the same rigorous procedures whether they investigated REO properties in Florida or Michigan. Likewise, Defendants' uniform policies created one system for how they handled REO property matters.

As far as "pervasive," that word is apt to describe a finding of liability across a sample of hundreds of properties across the country. Dr. Ayres' findings are not "anecdotal" or "isolated." Finally, use of the words "citywide" or "metropolitan area" should also be allowed where appropriate—the scope of the investigation involved different "metropolitan areas" and within those areas, properties were examined in different sections of the subject cities. To the extent that Defendants believe that Plaintiffs are using any of the foregoing terms inappropriately or unfairly a trial, Defendants should raise their objections then but are clearly not entitled to a blanket exclusion now.

For the reasons stated above, the Court should deny Defendants' Second Motion in Limine.

III. **THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 3. THE COURT'S RULING ON DR. KORVER-GLENN'S EXPERT TESTIMONY NEED NOT BE REVISITED**

Defendants' Third Motion in Limine "request[s] for the Court to reiterate that its rulings regarding [Dr.] Korver-Glenn will be enforced at trial."[16] ECF 504 at pp. 20. There is no need. Despite Defendants' sensationalist proposition that Plaintiffs plan to "disregard the Court's" rulings on Dr. Korver-Glenn's testimony, *id.,* the motion boils down to Defendants lodging objections to ten exhibits on Plaintiffs' initial exhibit list, *see id.* at pp. 20 & nn. 3, 4. Defendants' objections to Plaintiffs exhibit list are premature and largely without merit.[17] Moreover, Defendants' advance no support for the patently absurd claim that Plaintiffs' preliminary exhibit list connotes an attempt "to backdoor . . . excluded expert testimony in an effort to ignore this Court's ruling." *Id.* at pp. 21.

The Court ruled that Dr. Korver-Glenn may not (1) testify about "Ocwen's and Altisource's 'Statements of Work,'" (2) "opin[e] on the adequacy of Ocwen's and Altisource's manuals and policies," (3) "characterize[e] certain policies or documents as 'confusing' or 'indecipherable,'" or (4) "present[] a descriptive statistical analysis on the 'effects' of the servicer defendants' marketing and sales policies on REO values." ECF 442 at pp. 87-88. The Court permitted the remainder of Dr. Korver-Glenn's opinions and testimony, "so long as she does not cross the line into attributing causation to defendants' practices." *Id.* Although Plaintiffs disagree with the Court's decision, they will respect and abide by it.

---

[16] Defendants later frame the Third Motion as requesting "that the Court clarify its previous *Daubert* rulings on Plaintiffs' experts will be enforced at trial," ECF 504 at 21, but the motion exclusively discusses Dr. Kover-Glenn.

[17] Defendants did not raise these exhibits during the Parties' December 12 meet-and-confer call, and the Parties do not exchange exhibit objections until January 6, 2026, and will confer thereafter.

Defendants have no cause to claim otherwise. Instead, they object to four figures and six tables included on Plaintiffs' preliminary exhibit list that exist in sections of Dr. Korver-Glenn's report that also include opinions precluded by the Court. ECF 504 at pp. 21. While these exhibits cannot be used to support precluded opinion testimony from Dr. Kover-Glenn, it is axiomatic that "evidence may be admissible for one purpose even though inadmissible for others." *Thakore v. Universal Mach. Co. of Pottstown*, 670 F. Supp. 2d 705, 733 (N.D. Ill. 2009). Here, seven of ten exhibits to which Defendants' object pertain to opinions that have not been excluded and are independently admissible. Plaintiffs will agree to not use the remaining three exhibits at trial.

First, Defendants object to Plaintiffs' exhibits 1420-1423, which are Dr. Korver-Glenn's figures V.3, V.4, V.5, and V.5 (continued); *see* ECF 347-1 at pp. 62-65. Even though these figures exist alongside an opinion excluded by the Court—that certain Altisource documents are "vague, confusing, or indecipherable," *id.* at pp. 61—the figures themselves are excerpts of policy documents produced by Altisource that are independently relevant to Dr. Korver-Glenn's admissible opinions "draw[ing] on her academic research to criticize defendants' practices." ECF 442 at pp. 83. Second, Defendants object to Plaintiffs' inclusion on their exhibit list of Dr. Korver-Glenn's Tables VII.5, VII.6, and VII.7. *See* ECF 504 at pp. 21 n.4; *see also* ECF 347-1 at pp. 102-05. These tables are *not* part of Dr. Kover-Glenn's descriptive statistical analyses that were excluded by the Court. *See* ECF 442 at pp. 85-87; ECF 347-1 at pp. 106-12, 115-22. Rather, they reflect data "drawn from the compiled fields based on ASI000561076 . . . and include only the agreed upon properties for which data was provided by the Servicer Defendants." ECF 347-1 at pp. 102. These tables are admissible under Fed. R. Evid. 1006 as summaries of voluminous materials, provided Dr. Kover-Glenn does "not cross the line and attribute causation to

defendants' conduct." *See* ECF 442 at pp. 83-84; *see also generally* ECF 503 at pp. 39-44. Third, Plaintiffs will agree to not use Tables VII.16, VII.17, and VII.18 at trial.

In sum, Defendants' objections to Plaintiffs exhibit list are premature, largely without merit, and should have been addressed during meet and confers according to the agreed-upon pretrial schedule. Defendants advance no support for their argument that Plaintiffs seek to circumvent the Courts' limitations on Dr. Korver-Glenn's testimony, and their Third Motion in Limine should be denied.

IV. **THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 4. RECORDS IN THE REO DATABASE ARE ADMISSIBLE BUSINESS RECORDS. WHETHER OR NOT THEY HAVE BEEN EDITED PURSUANT TO A QUALITY CONTROL PROCESS DOES NOT MAKE THEM INADMISSIBLE. THE PHOTOGRAPHS IN THE DATABASE, WHETHER BUSINESS RECORDS OR NOT, HAVE NOT BEEN EDITED, AND ARE THEREFORE ADMISSIBLE.**

Defendants seek to exclude some—but not all—of the records stored in the REO Database. ECF 504 at pp. 22-27 (objecting only to (a) "altered" database records where changes were made more than two weeks after inspection occurred, (b) records uploaded by Local Plaintiffs, and (c) records uploaded by Local Plaintiffs that were edited by NFHA).

Plaintiffs have filed their own motion in limine regarding the admissibility of the photos and records in the REO Database and respectfully refer the Court to arguments and authorities in that motion for a more comprehensive discussion of this issue. *See* ECF 503 at pp. 1-9. The discussion below is more limited in scope and responds only to the specific arguments made by Defendants in their motion.

A. **NFHA's Quality Control Process Did Not Invalidate the Business Record Nature of Information in the Database.**

Defendants do not make any claim that the REO Database *as a whole*, or as a method of storing NFHA's investigation information, lacks the features of a "regularly conducted activity" within the meaning of FRE 803(6). As explained in Plaintiffs' affirmative motion, the REO Database is a proper method of storage of its investigation files and meets all the criteria for treatment as a business record under FRE 803(6). *See* ECF 503 at pp. 1-9.

Rather, Defendants claim that because some[18] records in the database were edited, or "overwritten," those records lose their status as business records. ECF 504 at p. 23 ("because of

---

[18] Defendants use the qualifier "most" records, but without citing authority for use of that term. And Defendants do not define what they mean by a "record." Do they use the term to refer to all of the data and information relating to a single REO property? Or are they referring to individual

the design of the database, an edited record **entirely overwrote** the original one.") But the ability to "overwrite" existing data is a fundamental and necessary feature of electronic databases. *See What is Overwrite?*, Twingate (Sep. 18, 2024), https://www.twingate.com/blog/glossary/overwrite. Database overwriting ensures that changes are accurately reflected and old, potentially outdated, information is corrected. It also prevents data breaches by securely wiping records when they are no longer needed or are incorrect. Expert witness Dr. Timothy Guetterman explained that, because NFHA's quality control process was based on photographs rather than handwritten forms, the REO Database maintained "cleaner" data than the handwritten forms. ECF 274-8 at pp. 5 (Expert Report of T. Guetterman at pp. 4). "In research terms, 'clean data' refers to data that is entered, prepared, and ready for analysis." *Id.*

Equating regularly maintained electronic database records to the kinds of records widely challenged prior to the rise of electronic recordkeeping—such as paper forms, memos, handwritten notes, etc.—is a mistake. Defendants fail to recognize that electronically stored information is now the most common way for businesses to store records of their "regularly conducted activities." FRE 803(6). Modern businesses routinely update, edit, and correct records stored in their databases, such as accounting ledgers, payroll and employee records, asset and inventory records, customer lists, pricing, etc. The amount and types of business information stored in databases is extensive and is evolving every day.

The Court has already addressed Plaintiffs' quality control process, ECF 442 at pp. 28-30, and the Declaration of Lindsay Augustine reaffirms that process. ECF 503-1 at pp. 22-23; *see also* ECF 249 at pp. 6-15 (describing database management and quality control in detail). Quality

---

data points within the property record, such as a date or a deficiency notation? In any event *no* photographs, 29,000 of which are preserved in the REO Database, were modified or edited.

control was a key element of Plaintiffs' investigation that assured its accuracy, consistency with applied standards, and reliability. 29,000 contemporaneous photographs—the basis for any editing that did occur—were used to ensure the accuracy of the REO Database, and to correct any errors that did not accurately reflect the photos. Defendants ignore that quality control was done using photographs in the REO Database even though, ironically, Defendants conduct their entire REO maintenance and marketing operation from afar using photographs.

The cases upon which Defendants rely do not support their claim that regularly maintained electronic database records lose their FRE 803(6) status by virtue of having been edited at a time later than when a record was originally created. The one-time spreadsheet excluded in *Sprosty v. Collins*, 2025 U.S. Dist. LEXIS 141757 at n.4, 2025 WL 2084217 (N.D. Ill. 2025) (Shah, J.), for example, suffered from a host of admissibility problems, including (a) no custodian or qualified witness provided an affidavit establishing the elements of FRE 803(6), (b) data in the spreadsheet (not a database) was based only on "memory," (c) the spreadsheet was not used to track any other employee, i.e., it was not a regular practice to create such a spreadsheet, and (d) the defendant did not respond to the objection to its admissibility. None of the other cases cited involved database records or editing such records for quality control purposes.[19]

In any event, Defendants have not shown that the "edited" records about which they complain show "a lack of trustworthiness," as they are required to do under FRE 803(6)(E). The

---

[19] *In re Processed Egg Prods. Antitrust Litig.*, 2018 U.S. Dist. LEXIS 59633, 2018 WL 1725802 (E.D. Pa. 2018) (emails, not database; editing/quality control not at issue); *Quiles v. United States*, 2021 U.S. Dist. LEXIS 232111, 2021 WL 5549438 (D.P.R. July 22, 2021) (medical evaluation, not database; editing/quality control not at issue); *Aguilera v. Baca*, 394 F. Supp. 2d 1203, 1207 n. 2 (C.D. Cal. 2005) (specially created spreadsheet, not database; no authenticating witness).

Declaration prepared by Defendants' Counsel Kurt Rademacher purports to evaluate how many records were edited and when, but it does not say the existing Database information, as edited, is incorrect. The photographs (non-hearsay) associated with each REO property confirm the basis for all the edits to the Database regarding deficiencies. Plaintiffs previously unequivocally demonstrated this to the Court in 2022, through an exhibit matching every challenged quality control edit to every corresponding property photograph in the REO Database. *See* ECF 249-1 (chart comparing every quality control edit with associated photo). Defendants may disagree with the quality control editor's assessments, but that disagreement does not disqualify the existing record as not having been conducted as part of NFHA's regular activity.

### B.  Database Records Originally Created by NFHA's Local Inspectors Are Still Business Records.

Defendants next seek to disqualify as valid business records any inspections in the REO Database that were conducted by a Local Plaintiff, as distinct from a NFHA employee. ECF 504 at pp. 24 (citing Rademacher analysis ¶ 6). Defendants claim because the Local Plaintiffs and NFHA are "separate organizations," NFHA personnel cannot attest to the requirements of FRE 803(6) for inspections conducted by the Local Plaintiffs, and Local Plaintiffs cannot attest to the edits made by NFHA personnel. *Id.*

The response to this objection is found in the text—or lack thereof—of FRE 803(6) itself. There is no requirement that the record of a regularly conducted activity be made by an "employee" of the organization maintaining the business record. It is undisputed that NFHA and the Local Plaintiffs acted as partners in conducting this unified nation-wide investigation. They acted as agents for each other in collecting, recording, and storing investigatory information. The local investigators qualify as "someone with knowledge" in connection with the creation of a specific property record, and the two NFHA quality control personnel qualify as "someone with

39

knowledge" as to any quality control edits that were made. The requirements of FRE 803(6) are met for both original creation and subsequent editing.

As in the previous section, the cases Defendants rely upon are not germane to this issue. In both *Datamatic Servs. v. United States*, 909 F.2d 1029 (7th Cir 1990), and *EEOC v. DHL Express USA, Inc.,* 2018 U.S. Dist. LEXIS 250994, 2018 WL 11631172 (N.D. Ill. 2018), the sources of the challenged information were "outsiders" who supplied no declarations or testimony authenticating the information sought to be admitted. Here, in contrast, the Local Plaintiffs were "insiders" who actually conducted the investigation, collected and stored the data for each REO property, and testified during discovery. The Local Plaintiffs collected and stored the data in a manner integrated with NFHA standards for site visits and photographic evidence, site visit coordination, uploading instructions and general oversight of a common standardized database. The two NFHA quality control "editors" of the Database also provided sworn testimony in deposition, and Lindsay Augustine, NFHA's Director of Enforcement, has supplied a Declaration as a "person with knowledge" meeting the requirements of FRE 803(6) with respect to both the creation of REO Database records and their quality control editing.

**C. The Database Records Were Made During, and Kept in the Course of, a Regularly Conducted Activity. The Fact That Deutsche Bank REOs Were Not Inspected By Some Local Plaintiffs During Some Periods of Time Does Not Make the Deutsche Bank REO Records Unique or Irregular**.

Defendants next argue that individual Deutsche Bank Trustee REO Database records were not created or kept in the course of a "regularly conducted activity," as required by FRE 803(6), because investigators were "trained" on how to use the centralized NFHA REO Database, and because there were gaps in time between inspections of Deutsche Bank REOs by some Local Plaintiffs. ECF 504 at pp. 25 (citing Rademacher analysis ¶¶ 7, 8).

40

Plaintiffs have already addressed the "regularly conducted activity" requirements of FRE 803(6) in the Declarations (and depositions) of NFHA President Lisa Rice and Director of Enforcement Lindsay Augustine. *See* ECF 503 at pp. 1-9; ECF 503-1. It is bizarre to suggest that training personnel on how to use a database or store electronic information negates the "regular" nature of the activity. The REO Database format required a particular schedule of inputs which were the same for all users, to upload photographs and input data points corresponding to the uploaded photographs. This involved a pre-set format and fillable form. Adequate training is a fundamental component of any business activity. And gaps in time when any individual Local Plaintiff conducted inspections *of Deutsche Bank REOs* is not germane to whether investigation records in the Database were created as part of a regularly conducted activity. During the entire span of their REO investigation, inclusive of periods of time mentioned by Defendants in their Motion, these Local plaintiffs were continually conducting investigations of *other owners* of REO properties and uploading their inspection results into the Database. Defendants know this through extensive discovery in this case and public filings (e.g., NFHA Reports and filings against Fannie Mae, Bank of America, Wells Fargo). Defendants cannot argue in good faith that the Local Plaintiffs were not engaging in the regularly conducted REO investigation activity during all of these periods.

**D. The REO Database Records Do Not Show a Lack of Trustworthiness.**

Finally, Defendants try to make an argument that records in the REO Database show a lack of "trustworthiness" within the meaning of FRE 803(6)(E). ECF 504 at pp. 26-27. They support this assertion by suggesting that (1) the REO investigation was motivated by a desire to obtain settlements, (2) NFHA's document destruction policy was motivated by a desire to block

41

access to primary source data, and (3) a defense expert opined that racial disparities appeared only after database entries were edited. *Id.*

The stray email comment cited by Defendants about a potential settlement of a lawsuit filed against a *different* lender involving *different facts* does not support an assertion that the REO investigation, begun in 2011, was motivated by a desire for financial gain. And it is even farther removed from the trustworthiness of the REO Database as a whole, which was created even before the investigation began and before any investigation results were known. All the evidence of record demonstrates that the REO investigation, which gathered evidence about several REO owners, not just the Defendants here, was prompted by reports of widespread disparities in communities of color—the elimination of which is a fundamental concern of Plaintiffs and consistent with their missions. See ECF 249 at pp. 4-6. And no claims were filed against the many investigated lenders or servicers who properly maintained their REO properties without any neighborhood discrimination. Defendants' mischaracterizations of Plaintiffs' motives are also belied by the fact that Plaintiffs issued several industry reports (including mentioning Defendants by name), filed administrative complaints, and otherwise attempted unsuccessfully to garner responses and corrective action from 2012 forward.

NFHA's former President and CEO might believe "defense lawyers . . . make a mountain over a molehill," ECF 504 at pp. 26, n. 7, but her opinion on this point has nothing to do with the trustworthiness of the REO Database. Defendants ignore testimony that the reason NFHA converted from a paper storage system to an electronic storage system was because the information being collected "was so voluminous." ECF 503-1 at pp. 30 (S. Smith Dep.). As Plaintiffs have proven several times previously in this litigation, the "source" documents for the

42

deficiency information in the Database are the *photographs*, NOT the paper records. See, e.g., ECF 249 at pp. 6-27.[20]

The opinion of defense expert McCrary cited by Defendants is irrelevant on this issue. He does not provide any opinion regarding the trustworthiness of the existing REO data or photographs, edited or otherwise. Defendants' experts consciously avoided systematically analyzing the photographic evidence in this case (from either side) that demonstrates statistically significant disparities in disparate property deficiencies in communities of color. This is obviously because the photographs confirm any other data points and, as such, there are no viable opinions contradicting those of Dr. Ayres, Deavay Tyler or Snapper Poche. In contrast to the *Murphy* opinion cited by Defendants,[21] here the photographs *do* provide an "internal mechanism" to ensure that the deficiency data is accurate.

For the reasons stated above, the Court should deny Defendants' Fourth Motion in Limine.

---

[20] Further responses to Defendants' "spoliation" of some paper records can be found later in this brief.
[21] *Murphy v. Caterpillar, Inc.*, 140 F.4th 900 (7th Cir. 2025). Tellingly, the court in *Murphy* suggested that "indicia of trustworthiness include factors *such as systematic checking and habits of precision on the part of the keeper,"* which is exactly what Plaintiffs' quality control procedure here was designed to do.

## V.     THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 5 AND ALLOW RELEVANT EVIDENCE RELATED TO OTHER DEUTSCHE BANK ENTITIES.

Defendants' Motion in Limine No. 5 seeks to preclude Plaintiffs from introducing important evidence concerning certain events and activities of Deutsche Bank corporate entities related to the Deutsche Bank Trustee Defendants that bear upon: (a) the principal-agent relationship between the Deutsche Bank Defendants and the Servicer Defendants; (b) the broad scope of the Defendant Servicers' unlawful conduct and its impact on the affected communities and Plaintiff organizations; (c) the knowledge possessed by the Defendant Servicers of the scope of problems being caused by their unlawful conduct regarding the maintenance and marketing of REO properties and its impact on minority communities; and (d) the measurement of Plaintiffs' damages for frustration of mission. In all respects, Defendants' Motion should be denied.

### A.  Background

As is common in the world of corporations, the Deutsche Bank Trustee Defendants are part of a large extended corporate family that includes myriad other corporate entities. *See e.g.*, Ex. 10, DB Rule 30(b)(6) Dep. Topic No. 1, Organization at pp. 22-32. In this case, Deutsche Bank corporate entities in addition to the Deutsche Bank Trustee Defendants became involved in events bearing on Plaintiffs' allegations and claimed damages. Plaintiffs' purpose in introducing such evidence is not to raise issues regarding the lawfulness of the conduct of these other Deutsche Bank corporate entities, but to provide relevant information to the jury bearing on the liability of the Defendant parties in the case.

Of particular significance here, in the face of efforts by the Defendant Servicers in this case to claim ignorance as to REO maintenance and marketing problems generally (and more specifically to REO maintenance and marketing problems in minority communities), is a series of events related to community groups in Milwaukee, Wisconsin who engaged with the "mother"

44

Deutsche Bank corporation in Germany. While these facts are discussed in more detail in Plaintiffs' Response to Defendants' Motion in Limine No. 2, we briefly summarize here: faced with devastating conditions in their communities as a result of the failure of REO owners and servicers to maintain REO properties, and receiving no response to their attempts to obtain any meaningful assistance, Common Ground and other Milwaukee community groups began publishing reports regarding REO issues. When the reports fell on deaf ears, Common Ground petitioned the Deutsche Bank CEO in Germany for help and traveled to Germany in May 2010 and 2011 to confront the Deutsche Bank top brass and its shareholders with the problems occurring in their City. (ECF 361 ¶¶ 112-113)

In addition, and in conjunction with Common Ground's efforts, from at least 2009 through 2015, Milwaukee's Department of Neighborhood Services engaged in meetings and communications with representatives from banks and servicers, including the Deutsche Bank Defendants and Ocwen, during which the City regularly shared information, data and maps showing the areas of the City that were hardest hit by the failure to maintain REOs, all of which were predominantly African-American and the subjects of the highest numbers of Code violations. *See* ECF 369-40, pp. 22-24 (Dahlberg Declaration, 1/19/22, ¶¶ 7-13, 16, 30); ECF 369-41, pp. 27, 57, 61 (Connolly Declaration, 3/3/22, ¶¶ 4, 17, 23); ECF 369-42, pp. 3-4, 16, (Connolly Supplemental Declaration, 5/13/22, ¶¶ 7, 32). Further, the City gave tours to the press "of foreclosed and abandoned properties … and shar[ed] pre and post foreclosure photos of properties with the press. The City also shared information with the press showing decreases in the values of properties pre and post foreclosure. The tours focused on the hardest hit neighborhoods." ECF 369-40, p. 27 (Dahlberg Declaration, 1/19/22, ¶22)

In the wake of these efforts by Common Ground and Milwaukee's Department of Neighborhood Services, a number of things occurred: (a) the Manager of Trust Administration for the Deutsche Bank Defendants, David Co, was summoned to Germany for three shareholder meetings beginning in 2010 to provide assistance related to responding to REO issues; (b) on October 8, 2010, a memo was sent out over a logo simply stating "Deutsche Bank" to "all Servicers," *inter alia*, "demand[ing] that each Servicer (including its agents) *immediately* . . . Cease and desist from taking any unlawful or improper action with respect to the servicing of Trust assets"; and (c) Mr. Co, at the invitation of the Deutsche Bank Defendants and with Ocwen and other servicers in tow, traveled to multiple cities —including Milwaukee, Chicago, Los Angeles, Boston, Providence and New Haven—to be confronted with the problems being caused by the abandoned and neglected REO properties. *See* ECF 351, ¶¶ 37, 44; ECF 361, ¶ 120. Milwaukee community leaders and city officials have testified that in the context of these meetings it was clear —and they informed the Defendants —that Defendants' REO malfeasance *was disparately affecting Black neighborhoods*. *See* ECF 361, ¶¶ 114-121. Ultimately, in 2011, Common Ground obtained a small measure of success with regard to relief from a Deutsche Bank affiliate Deutsche Bank AG ("DB AG") and the Deutsche Bank Americas Foundation, in only one neighborhood, and the City of Milwaukee received access to a small loan fund. *See* ECF 369-41 at pp. 137-139, (B. Connolly Declaration Ex. 10, DB 6-22-2011 Ltr to Connolly); *see also* ECF 351, ¶¶ 43-45.

### B. Argument.

Contrary to Defendants' contentions, Deutsche Bank entities besides the Trustee Defendants were involved in important activities and events bearing on issues in this case and evidence and testimony related to their involvement is admissible.

First, evidence related to the Deutsche Bank Defendants exercising control over the Defendant Servicers is part and parcel of the saga of the complaints Common Ground raised to officials of the principal Deutsche Bank corporate entity in Germany and at its shareholders meetings. The October 8, 2010 memo the Deutsche Bank Defendants sent to all servicers follows Common Ground's publications and appearance at the 2010 shareholder meeting, an event which the lead manager of the Deutsche Bank Defendants was summoned to attend. So too did the road show orchestrated by the Trustee Defendants (and attended by Servicers, including Ocwen) to cities with substantial numbers of Deutsche Bank REO properties, including Milwaukee. The entirety of this evidence bears on the contested issue of whether an agency relationship existed between the Deutsche Bank Defendants and the Servicers.

Second, the (international) efforts that Common Ground pursued to address REO conditions speaks to the widespread nature of the REO problem in Milwaukee and other cities involved in this case. The efforts necessitated also speak to the indifference and failure of the Servicer Defendants to consider and address such problems.

Third, the narrative flowing out of the engagement between Common Ground and the various Deutsche Bank entities, including the parent corporation in Germany, strongly implicates the Defendant Servicers' knowledge of discriminatory conduct and conditions. Milwaukee community leaders and city officials have testified and documented that they specifically indicated that REO conduct was disparately impacting Black neighborhoods. *See* ECF 369-40 at pp. 31-42 (¶ 30); ECF 369-41, at 57, 61 (¶¶ 17, 23); ECF 369-43, at 20-36, 45-46, (¶¶ 35-44, 46-63, 73).

Fourth, the limited assistance provided by two Deutsche Bank affiliates who are not Defendants in this case, Deutsche Bank AG ("DB AG") and the Deutsche Bank Americas

Foundation, provides directly relevant evidence related to Plaintiffs' damages theories in this case. Following meetings among Deutsche Bank, Ocwen and Milwaukee community groups who complained about Deutsche Bank REO conditions there, these Deutsche Bank affiliates provided $400,000 in grants and a $2 million loan program to Milwaukee in 2011. *See, e.g.*, ECF 369-41 at pp. 138-139. That contribution, considered in conjunction with a small measure of assistance later provided by Ocwen, serves as one rough benchmark for estimating Plaintiffs' counteractive costs in the case.

Finally, Defendants specifically object to any reference to the activities of other Deutsche Bank entities concerning the securitization, marketing, and sale of residential mortgage-backed securities to investors, as well as related enforcement proceedings and litigation relating to the same. Plaintiffs believe that these events may may be relevant to providing the jury with general background relating to the overall scope of events concerning the foreclosure crisis. As with the other categories of evidence discussed above, any potential prejudice can be addressed by the Court through a limiting instruction.

For the reasons stated above, the Court should deny Defendants' Fifth Motion in Limine.

## VI.    THE COURT SHOULD DENY DEFENDANTS' LIMINE MOTION NO. 6 AND ADMIT EVIDENCE RELATED TO ALTISOURCE'S HIGH VALUE PROGRAM

### A. Background

The record is replete with evidence that many of Altisource's policies and practices were built on the foundation of the perceived value of an REO property and that this caused Altisource to conduct REO maintenance and marketing activities differently on that basis. *See* ECF 369-10 at pp. 629, 648; *see also id*. at pp. 710, 719. The upshot of this evidence is that Defendants affirmatively implemented policies and practices that amounted to "value redlining"—singling out lower value REO properties for different and worse treatment. *See* ECF 361 §§VI. A—VI. B. For example, REO properties that Defendants deemed lower value or slated for "as is" treatment received vastly inferior maintenance. *See id.* ¶¶ 200, 210-213.

Another particularly striking example of this approach was the High Value Program instituted by Altisource in approximately 2017, which applied to the maintenance and marketing of properties with a pre-foreclosure value of $500,000 or more. Ex. 11, Asset Management High Value Program, ASI000034946, ASI000034950. As discussed in the expert report of Plaintiffs' Property Preservation expert, Deavay Tyler, the property preservation services provided under the High Value Program closely mirror the industry standards for what other servicers in the industry were providing at *all* properties, regardless of value or location. Thus, for eligible High Value properties, Altisource vendors would secure the property and turn on all utilities, including conducting plumbing repairs if the plumbing pressure test fails; winterize the property, with water service active at the meter; conduct repairs and maintenance of the property to ensure compliance with local code regulations; and coordinate with the property RSC "for effective and timely property review and ongoing services." *Id.* at ASI000034952. High-value properties would then subsequently receive weekly grass cut services, monthly interior cleaning services,

and bi-weekly inspections, and "an accurate and reliable as-is and as-repaired values, and repair estimates for the client to assist in the sale of the high value REO assets." *Id.* at ASI000034954. The problem with this is that the services Altisource mandated under the High Value Program sharply differ from the treatment Altisource afforded lower-value properties that it serviced, which disparately impacted communities of color. As Mr. Tyler opined:

> "The fact is that, other than planting annual flowers at the high value asset (not industry standard), Altisource's High Value Program revealed that it reserved what should be basic PPI services for high value assets only."[22] *See* ECF 370-16, at p. 179.

and

> "[P]roperties deemed to be 'high value' in various ways and under various procedures and processes receive different and better care than properties deemed 'low value' or below various thresholds stated in procedure documents." *Id.* at p. 178.

## B. Argument

Defendants' motion completely misses the mark by claiming that evidence regarding the High Value Asset program should be excluded because the properties contained in the subset of 699 properties analyzed by Dr. Ayres may not include these properties. The actual significance of the High Value Program is not as some basis for an additional statistical analysis of disparities at inspected properties; rather the institution of this value-based program by Altisource - *after administrative complaints naming Altisource were filed* - provides highly probative evidence going to matters such as Altisource's state of mind, practices and culture. Specifically, with respect to discriminatory intent, a jury could properly consider (along with other facts) Altisource deciding to implement a program entrenching higher-class status for higher valued properties as to basic work required by an owner on any property, amid Plaintiffs' allegations that the value-based policies of the Defendant Servicers discriminated against minority communities.

---

[22] Defendants fail to mention the discussion and analysis of the High Value Program provided in Mr. Tyler's Report.

Moreover, evidence regarding the High Value Program is relevant because it reflects the Servicer Defendants' consistent and continuing policy and pattern of institutionalized inferior maintenance and marketing of perceived lower-valued properties. The discriminatory nature of these practices is underscored by Defendants' admissions that the need and rationale for services applied to properties regardless of their perceived value: for example, Altisource's witness, Mr. Solohub, testified that curb appeal was equally important to properties valued above and below $500,000. *See* ECF 369-10 at pp. 667-68.

Defendants' second argument, that aspects of the High Value Program related to marketing (e.g., practices with respect to marketing programs and sales price reductions) are supposedly no longer part of the case is also unfounded. As discussed more fully in Plaintiffs' Response to Defendants' Limine Motion No. 1, Defendants completely misread and distort the Court's Opinion. At the cited pages, ECF 442 at pp. 104-05, the Court held that "the regression analyses do not create a genuine issue of material fact of disparate impact on the availability of housing or real estate-related transactions *under § 3604(a) or § 3605*" (emphasis added). However, the Court sustained Plaintiffs' claim under 42 U.S.C. § 3604(b), which specifically encompasses "discrimination" in the "provision of services" related to the "sale or rental of a dwelling." 42 U.S.C. § 3604(b). Just as the discriminatory provision of maintenance services is covered by this section of the statute, so too is the discriminatory provision of marketing services. Furthermore, as a factual matter, Defendants' position ignores that the maintenance and marketing policies were part and parcel of one overall approach to handling REO properties. The maintenance and marketing policies are inextricably entwined in terms of how REO properties were maintained and disposed. Accordingly, there are no grounds for excluding evidence regarding Altisource's High Value Program.

For the reasons stated above, the Court should deny Defendants' Sixth Motion in Limine.

**VII.**    **THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 7 BECAUSE PLAINTIFFS' TIME ENTRIES ARE BASED ON BUSINESS RECORDS, MEETING THE REQUIREMENTS OF F.R.E. 803(6). THE "DIVERSION LOGS" ARE MERELY F.R.E. 1006 SUMMARIES OF THOSE VOLUMINOUS BUSINESS RECORDS.**

Defendants seek "to exclude Plaintiffs' time records and diversion logs" absent a business-record foundation under FRE 803(6). In support of this motion, Defendants cite only to snippets of deposition testimony from a few Plaintiffs suggesting that some of the items appearing in the diversion ***summary log*** created by that Plaintiff was based on a review of records created at an earlier point in time. ECF 504 at pp. 37-38.

The Defendants have inappropriately conflated distinct evidentiary rules and concepts which, when analyzed properly, support the admissibility of Plaintiffs' diversion logs at trial. More significantly, they have mischaracterized the deposition testimony they rely upon.

**First**, the "diversion log" which each Plaintiff has prepared for use at trial constitutes a "summary, chart, or calculation" of voluminous records that cannot be conveniently examined in court. FRE 1006(a). Plaintiffs have never claimed that the diversion *logs themselves* are kept in the ordinary course of business. They are summaries, charts, or calculations based on the content of *other* records, which Plaintiffs have testified meet the requirements of FRE 803(6) records.

**Second,** the diversion logs are not required to be created contemporaneously with the events they describe. Indeed, by definition FRE 1006 charts are created for litigation, much later in time than the underlying records and the events they summarize. To the extent Defendants cite deposition testimony about when the ***log*** was created by that Plaintiff, that testimony is irrelevant.

**Third,** Defendants have conflated this use of FRE 1006 by referring to these diversion logs as "time records." *See* ECF 504 at 37. For example, the exhibit about which Defendants were examining SSHC's representative at deposition was SSHC's summary diversion log—*not*

the underlying business records from which the log was created for trial. *See* Ex. 12 (Def. Dep. Exh. 6273). In the deposition testimony of SSHC cited by Defendants in their motion, the witness indicated that some of the time included on this summary diversion log was based on a review of agency *emails*. ECF 504 at 37. The Plaintiff representative testified that those underlying emails are stored—and were produced here in discovery—as part of SSHC's electronic email system. *See* Ex. 13 (Dep. Tr. at pp. 116-117). Other business records, including "time records," were produced to Defendants. *See* Ex. 14 (sample SSHC organization time sheets produced in discovery). The summary logs are not "time records". They are summaries of time records or other business records which *were* created contemporaneously with the events described.[23]

In many instances, the information in the summary an individual Plaintiff will present at trial is based on printouts from computer timekeeping programs that reflect, are equivalent to, or are in the same format as, the manner in which a Plaintiff originally tracked their time and expenses. This relates to another example of Defendants' mischaracterization of the deposition testimony they rely on. Defendants assert that Toledo Fair Housing Center "time records . . . were created years after the events described" and were compiled "to attempt to reconstruct time records." *Id*. The deposition testimony cited by Defendants does not support that assertion. In fact, the witness testified that TFHC uses a case management system called STAT to record all its activities.[24] *See* Ex. 15 (Excerpts of TFHC Deposition). Employees enter their time into the STAT system on a daily basis, identifying to which TFHC project the time relates. *Id.* Time

---

[23] The same response applies to some of the other examples listed in Defendants' motion at 37-38.

[24] NFHA and HOPE Fair Housing Center (IL) use a program named Journyx similar to that used by Toledo,

entries—which are entered into the case management system contemporaneously -- can be extracted from STAT with simple queries. *Id.* That is what TFHC did in this case.

Defendants' mischaracterization of what these witnesses were testifying about at deposition requires denial of their motion.[25]

**Fourth,** the underlying records upon which diversion logs are based, are ordinary business records, contemporaneously created at the time, and meeting the parameters of FRE 803(6). These underlying business records—whether individual time entries, emails, calendar items and the like—are voluminous and have been produced in discovery in this case.[26] Defendants are free to use these underlying records to cross-examine the agency witness at trial and expose any inconsistencies or errors.

    a. Most of the Plaintiffs have testified that keeping a *contemporaneous* record of the time an employee devoted to a specific investigation, contract, or project (usually in an electronic time-keeping program), is a *regular practice* of the organization. *See, e.g.*, Ex. 16 (deposition testimony of Miami Valley FHC). The diversion logs for such organizations are merely summaries of those underlying time records.

    b. The few employees who "were not used to" keeping daily "time" records used *other* business records to include on that Plaintiff's diversion logs -- records contemporaneously created and kept in the ordinary course of business, such as calendars, emails, memoranda, training records, or the like.

**Finally,** the fact that a diversion ***log*** was edited during the course of this litigation does not make it inadmissible. *See* ECF 504 at p. 38 (citing witness testimony that time entries in the

---

[25] Similar observations can be made about the other selective characterizations of deposition testimony cited by Defendants at ECF 504 at pp. 37-38, but for brevity Plaintiffs will not respond to each one here. The point is made—the summary logs are distinct for analytical purposes from the underlying business records used to create them, and the underlying business records have been produced in discovery for Defendants' examination at trial.

[26] Plaintiffs have produced in discovery tens of thousands of individual daily time records, calendar appointments, emails, meeting agendas and minutes, and other records contemporaneously created and kept in the ordinary course of their businesses. For now, many of these underlying source records are compiled and listed on Plaintiffs' Proposed Trial Exhibit List, but the underlying records need not be introduced into evidence. The creation of the diversion logs under FRE 1006 are intended to short-cut the use of such underlying records.

diversion *log* were adjusted to be a "fairer representation" of the amount of time spent). The diversion log itself can, and should be, edited to correct misspellings, correct mathematical errors, delete entries that should not appear, and add entries based on business records recently reviewed.[27] As is apparent from Defendants' motion, they have had the opportunity to locate errors and are free to cross-examine the agency representative about them at trial.

    For these reasons, Defendants' motion in limine No. 7 should be denied.

---

[27] For example, a few of the diversion log summaries Plaintiffs intend to discuss and introduce at trial have been edited to *eliminate* time that is not appropriately charged to this investigation. Any edits made to summary diversion logs produced in discovery will be clearly shown on the trial summary exhibit.

## VIII. THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 8 BECAUSE THE CHALLENGED EVIDENCE IS ADMISSIBLE EVIDENCE OF COUNTERACTION.

In their Eighth Motion in Limine, Defendants cover a host of damages-related issues. This motion, combined with their Second and Ninth Motions in Limine, appear to ask the Court to abandon its recent decisions and preclude Plaintiffs from presenting any evidence of frustration-of-mission damages.

As to each of their arguments in this motion, which all are based on Federal Rules of Evidence 402 and 403, Defendants are wrong. First, Defendants seek to exclude several broad and undefined categories of evidence that they deem "damages already ruled improper" based on the Court's proximate cause ruling. ECF 504 at pp. 39. They fail to acknowledge that testimony and exhibits can relate to multiple issues and be offered for one purpose and not for another, and they misstate or misunderstand the relevance of the handful of documents they specify for exclusion. Second, Defendants erroneously contend that Plaintiffs' damages evidence "must be tied only to properties for which the Trustee Defendants owned and which Ocwen and Altisource serviced and as to which disparities in maintenance have been demonstrated," *id.* at pp. 41, an assertion that is untethered to the nature and scope of harm at issue and directly contradicts a prior ruling in this case. Third, Defendants attempt to limit Plaintiffs' damages evidence as inadmissible lay opinion, even though this Court has already deemed Plaintiffs competent to testify on their frustration-of-mission injuries. Fourth, despite the fact that much of the evidence regarding intentional discrimination and punitive damages is overlapping, Defendants ask that "any evidence, reference, or argument" concerning punitive damages be presented in a separate phase of trial after the jury has rendered a verdict on liability and compensatory damages. In the context of this case, that is not only impossible without harming Plaintiffs' liability case, but trying to do so will also result in protracted and duplicative proceedings.

57

### A. The Evidence Defendants Challenge Is Admissible to Show Damages.

Defendants Eighth Motion in Limine asks the Court to exclude "evidence of (i) generalized harm to minority communities ("community harms"), (ii) past and future expenditures that are unrelated to Defendants' alleged discrimination ("precluded expenditures"), and (iii) unrelated lost opportunities." ECF 504 at pp. 39.

As an initial matter, this request should fail because it is too vague to provide any administrable guidelines at trial. Defendants' proposal to exclude sweeping and ill-defined bodies of evidence "lacks the necessary specificity with respect to the evidence to be excluded." *Navarrete v. Madison Cnty.*, No. 17-CV-347, 2021 WL 2374350, at *1 (S.D. Ill. June 10, 2021) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996)). To grant this motion would create dilatory distractions at trial as the Parties and the Court would be repeatedly forced to navigate the muddy waters of Defendants' nebulous objections. This would undermine the very purpose of a motion in limine, which is to "streamlin[e] a trial so that extensive argument becomes unnecessary after a jury has been impaneled." *Awalt v. Marketti*, No. 11 C 6142, 2015 WL 4338048, at *1 (N.D. Ill. July 15, 2015) (citing *Jonasson v. Lutheran Child and Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997)). Defendants' motion would do just the opposite.

Even setting aside the amorphousness and breadth of Defendants' purported evidentiary categories, Defendants are wrong on the merits. As to the first category Defendants raise, evidence of impaired activities is materially distinct from the injuries the Court dismissed as too attenuated when resolving Defendants' motion to dismiss. *See supra* Plaintiffs' Preliminary Damages Statement. The Court held that Plaintiffs cannot recover damages for harm felt by the community, finding that injury insufficiently direct. But Defendants' discrimination can both harm the community and harm Plaintiffs' missions and activities; just because the Court found

the former indirect does not mean the latter is necessarily indirect as well. When it comes to directness in a case by an organizational plaintiff, the difference between harm to the community the organization serves and the harm to an organization itself is self-evident. This difference cannot be elided merely because that organization's work benefits the community or uses the word community.

As to the second and third categories of evidence that Defendants seek to exclude, Plaintiffs' evidence remains relevant for purposes of providing the jury with an understanding of Plaintiffs' programs and activities and as basis for determining an award of damages. *See supra* Plaintiffs' Preliminary Damages Statement. It is immaterial that Plaintiffs' prior activities may be unrelated to Defendants' conduct—evidence of these activities remains probative and necessary for Plaintiffs to show that their missions and activities were impaired. Similarly, Plaintiffs' past experiences with counteraction are relevant if they shed light on the cost of the counteracting Defendants' discrimination, irrespective of whether that past work related to the Defendants here.

When properly contextualized, the handful of specific documents that Defendants do identify provide useful benchmarks for the jury's damages assessment. Plaintiffs offer evidence of their historical program costs—including their 990 Forms—to show their expenditures on programmatic staff. The jury may properly consider this information on an organization-by-organization basis to assess the value of the impairments to Plaintiffs' operations. Similarly, Plaintiffs offer evidence of their past community development work not to show community harms or undermined investments, but instead to illustrate the cost of the counteractive measures necessitated by Defendants' conduct. For example, if Plaintiffs claim that renovation of blighted properties is necessary to fully redress their injuries, their personal knowledge of the cost of such

renovations, based on their past work, will assist the jury's assessment. *See supra* Plaintiffs' Preliminary Damages Statement.

Indeed, some of the documents Defendants address in Motion in Limine No. 8 corroborate Plaintiffs' experiences by showing that Defendants, too, expended significant funds to address poor REO maintenance and marketing issues. For example, in note 16, Defendants take issue with Plaintiffs' Exhibits 1065 and 926. Those documents reflect Deutsche Bank and Ocwen's agreements to provide funding to the predominantly African American neighborhood of Sherman Park in Milwaukee. As noted above in response to Defendants' Second Motion In Limine, Deutsche Bank and Ocwen's contributions followed extensive efforts by Common Ground and Milwaukee's Department of Neighborhood Services to hold Deutsche Bank and Ocwen accountable for the damage they caused to Sherman Park (and other neighborhoods) by failing to maintain their REO properties. In addition to relating to damages, this evidence reflects Defendants' knowledge and intent and relates to vicarious liability.

Furthermore, Defendants' own proposed exhibits contradict their Motion. Defendants propose to admit two documents reflecting Ocwen's contributions to Milwaukee. By seeking to admit their exhibits and exclude Plaintiffs' evidence, Defendants would deny the jury an understanding of the facts and unfairly present Defendants in a misleading positive light.

Finally, to grant Defendants' Motion would substantially encroach on the jury's role. Excluding all evidence related to Plaintiffs' programmatic expenses and counteraction will interfere with the jury's ability to assess damages to such a degree that it essentially removes the frustration inquiry from the jury entirely.

**B. Plaintiffs' Damages Evidence Is Not Limited By Properties and Is Not Inadmissible Lay Opinion.**

To justify their untenable positions on the scope of Plaintiffs' damages evidence and whether Plaintiffs can testify as to damages, Defendants offer two strained readings of prior decisions. Neither has merit, and both disregard unambiguous rulings to the contrary from the Court.

First, Defendants contend that when the Court stated that Plaintiffs must "testify to out-of-pocket expenses, including staff compensation, spent to combat defendants' REO conduct," ECF 460 at pp. 7, it was (*sub silentio*) limiting Plaintiffs' damages to expenditures and lost opportunities related only to the 699 agreed-upon properties, and nothing else, *see* ECF 504 at pp. 41-42. Yet earlier in the same decision the Court expressly stated that the statistical scope of the case "goes to liability *rather than the scope of damages, which are not tied to specific REO properties.*" ECF 460 at pp. 3 (emphasis added). The Court's actual holding makes good sense. Plaintiffs' damages arise from the impairment to their programs, services and activities and the frustration of their organizational missions, injuries that are not capable of conversion into some narrow property-based format. As to their out-of-pocket expenditures and lost time, Plaintiffs properly assert the "consequent drain on their resources." *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1982). Plaintiffs are entitled to present evidence at trial that Defendants caused a drain on Plaintiffs' resources beyond property-specific harm.

Second, Defendants cite inapposite authority for the proposition that Plaintiffs, as non-experts, may not "offer unqualified lay opinion testimony" on frustration-of-mission damages. ECF 504 at pp. 44. This is nothing but a reprise of an argument that the Court has already rejected, just in different procedural packaging. Specifically, after summary judgment, Defendants renewed their motion to exclude Plaintiffs' damages expert and argued that Plaintiffs

61

could not recover frustration-of-mission damages because they did not have an expert delineating them. *See* ECF 453. While agreeing to exclude Plaintiffs' expert, the Court expressly rejected Defendants' argument that an expert is required to quantify frustration-of-mission damages. ECF 460 at pp. 6 ("[P]laintiffs need not rely on expert testimony to establish damages at trial."); *see also id.* at pp. 9 ("[P]laintiffs need not rely on expert testimony to establish damages at trial."). Instead, the Court explained how Plaintiffs can testify to their missions and the injuries thereto. *Id.* at pp. 7.

Even if the Court is willing to rehash this issue yet again, Defendants are wrong now just as they were wrong before. Defendants cite no case stating that an impairment to organizational activities cannot be addressed by an organizational witness. To the contrary, the cases the Court has previously relied on did just that. *See* ECF 460 at pp. 7 (discussing organizational testimony on damages in *United States v. Balistrieri*, 981 F.2d 916, 933 (7th Cir. 1992), and *Matchmaker Real Est. Sales Ctr.*, 982 F.2d at 1099). And in other contexts, too, it is possible for a party to rely on their experience to testify as to the cost of fixing a problem for damages, much like Plaintiffs will rely on their prior activities to discuss counteraction costs. *See, e.g.*, *Weinberger v. AnchorBank, FSB*, No. 10–C–0996, 2011 WL 679343, at *3-4 (E.D. Wis. Feb. 16, 2011) ("[H]is lay opinion was based on his personal familiarity with the tooling in dispute, not on inadmissible hearsay. Vanden Busch, as one of the new owners of the tooling at issue, had reason to know the value of the tooling. . . . In sum, I conclude that expert testimony was not needed to prove the value of the missing collateral and the bankruptcy court did not abuse its discretion in allowing Vanden Busch testify as to how he determined what it would cost to replace it.").

Defendants' caselaw does not move the dial. In *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, cited by Defendants in support of requiring expert testimony for proof of

damages, ECF 504 at pp. 43, the Seventh Circuit affirmed the exclusion of a proffered expert as unreliable but it did not address whether an organizational witness could testify to organizational injury. 395 F.3d 416, 420 (7th Cir. 2005). In *Von der Ruhr v. Immtech Intern., Inc.*, the Seventh Circuit affirmed exclusion of proposed testimony because the witness lacked personal knowledge: "[The witness] intended to testify to his expectation of millions of dollars in profits from a brand new drug, which had not been approved by the FDA, which still needed a corporate partner, and for which no competitive market analysis had been conducted. It is difficult to imagine how anyone in this situation could possess the necessary personal knowledge to give a useful lay opinion based on his perception and it is clear that Von der Ruhr did not have such knowledge." 570 F.3d 858, 863 (7th Cir. 2009).[28] Notably, however, the Seventh Circuit affirmed that "lay opinion testimony is allowed in limited circumstances where the witness bases his opinion on particularized knowledge he possesses due to his position within the company. For example, the owner of an established business with a documented history of profits may testify to his expectation of continued or expanded profits when that opinion is based on his knowledge and participation in the day-to-day affairs of [his] business." *Id.* at 862. This is precisely what Plaintiffs will do here: their witnesses will use their past work to testify to their expectation of counteraction costs in this case. *See* Advisory Committee Note to Fed. R. Evid. 701 ("[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.").

---

[28] *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Intern., Inc.*, is distinguishable for the same reason: the witness at issue there also lacked personal knowledge. 533 F.3d 555, 560 (7th Cir. 2008).

### C.  The Court Should Not Defer Evidence of Punitive Damages.

Although not related to their other damages arguments, Defendants' Eighth Motion in Limine also includes a request "to exclude any evidence, reference, or argument concerning punitive damages until and unless the jury finds that Plaintiffs have proved intentional discrimination." ECF 504 at pp. 44-45. Here again, Defendants do not actually specify what evidence they would like to defer until a second stage. Assuming Defendants are referring to evidence of intent, reckless disregard, and of net worth, none should be delayed until after a preliminary verdict.

While a trial court may bifurcate issues of a trial "for convenience, to avoid prejudice, or to expedite and economize[,]" Fed. R. Civ. P. 42(b), "[b]ifurcation is . . . the exception, not the rule," and the movants must "justify bifurcation on the basis of the substantial benefits that it can be expected to produce." *Lewis v. City of New York*, 689 F. Supp. 2d 417, 428-29 (E.D.N.Y. 2010) (*citing Dallas v. Goldberg*, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001)) (denying motion to bifurcate liability and damages). As the Advisory Committee has noted in comments to Rule 42(b), "separation of issues for trial is not to be routinely ordered." Advis. Comm. Notes, 1966 Amend., Fed. R. Civ. P. 42(b).

Here, evidence bearing on Defendants' intent and/or reckless disregard is relevant to both liability and punitive damages. It would needlessly prolong the trial to make Plaintiffs put this evidence on twice, in two separate phases. And extending the trial is especially inappropriate because the jury instructions and verdict form can be drafted to ensure that the jury does not award punitive damages absent the requisite showing of intent. As to net worth, this is a discrete fact that may be covered quickly, whether through a stipulation or one or two questions to a designated witness from each corporate Defendant. Defendants simply have not justified

bifurcating the trial. As Defendants themselves have highlighted, there is already a lot of evidentiary ground to cover in a short amount of time.

For the reasons stated above, the Court should deny Defendants' Eighth Motion in Limine.

## IX.   DEFENDANTS' MOTION IN LIMINE NO. 9 FAILS BECAUSE EACH PLAINTIFF IS ENTITLED TO ADDUCE EVIDENCE OF ITS HARM.

Defendants' Ninth Motion in Limine requests exclusion of evidence of "local" frustration-of-mission injuries on the basis that Plaintiffs have not shown statistically significant disparities within individual metropolitan areas. ECF 504 at pp. 46-51. This request attempts to repackage arguments that this Court has already rejected and reflects a fundamental misunderstanding of the claims and damages at issue.

***First***, this Court has already specifically rejected Defendants' attempt to narrow the scope of relief based on the aggregate nature of Plaintiffs' statistical analysis. Defendants argued that Plaintiffs' claims are limited to the properties in their statistical analysis at summary judgment, *see* ECF 316, and then again in a motion for clarification, *see* ECF 451 and attachments. In July, this Court agreed that Plaintiffs' data "cannot be extrapolated to infer the existence of maintenance disparities across all Deutsche Bank-owned REO properties within a broader metropolitan area," ECF 460 at pp. 4, but made clear that "*this issue goes to liability rather than the scope of damages, which are not tied to specific REO properties*," *id.* at pp. 3 (emphasis added). The Court went on to explain how each Plaintiff can testify to its frustration-of-mission injuries. *Id.* at pp. 6-9.

Despite this unambiguous holding, Defendants' instant motion again asserts that Plaintiffs cannot "extrapolate . . . to prove a disparity in any individual locality," and thus cannot prove frustration-of-mission injury. ECF 504 at pp. 46. This Court should reject Defendants' effort to relitigate an already-decided issue. It is unsurprising that Defendants do not even attempt to show that the Court's prior determination rises to the level of "manifest error" or that there is new evidence as required for reconsideration motions, *Dahlstrom v. Sun-Times Media, LLC*, 346 F. Supp. 3d 1162, 1167 (N.D. Ill. 2018) (Leinenweber, J.), because they could not come close to

meeting that standard. There is no reason to disturb the Court's prior determination that damages in this case are not tied to specific properties.

**Second**, Defendants' Ninth Motion fails for the independent and overriding reason that it is wrong. The crux of Defendants' position is that a discriminatory practice cannot cause harm to a regional organization unless there are statistically significant disparities within that region.[29] With respect to Plaintiffs' disparate treatment claim, Defendants offer no reason why such a claim might require localized statistical analysis, because it does not. Although statistical disparities are probative of discriminatory intent, they are just one factor among many, and no case requires this factor to be localized.

As to disparate impact, Defendants' position conflates the merits inquiry with the damages inquiry. On the merits, Plaintiffs will offer evidence that Defendants' policies and practices caused statistically significant disparities in REO maintenance and marketing of the at-issue properties. On damages, Plaintiffs will offer evidence that Defendants' conduct caused Plaintiffs harm. For example, Plaintiffs inspection data includes that Plaintiffs inspected REOs within their regions, including specifically of communities of colors in their metropolitan areas. Plaintiffs' data also shows that one or more "at-issue" REO property in a community of color in each metropolitan area was confirmed to have at least 10 property deficiencies. Dr. Ayres found that the odds of communities of color having REOs with ten or more deficiencies was exponentially more than in majority white communities. ECF 361 ¶ 77. All of this means that the

---

[29] Rather than any legal authority, Defendants' Ninth Motion seems to be animated by a myopic fixation on the word "mission." The type of injury that that Plaintiffs assert has broadly been described as frustration of mission, but the harm Plaintiffs will prove is impairment to their core business activities and a consequent drain on resources. *See generally* ECF 442 at pp. 13-21. It is immaterial that Plaintiffs' mission statements include a geographic component because that is not probative of the impairment on their activities or their diversion of resources.

"dilapidated houses" that impaired Plaintiffs' missions and activities are demonstrable across the board. Plaintiffs will likewise prove how each suffered a consequent drain on its resources. ECF 460 at pp. 3 ("There is no question that the plaintiff organizations were aware of—and responded to—problems with Deutsche Bank-owned properties in their respective communities.").

Notably, the Court has already rejected Defendants' blurring of merits and injury. *Id.* at pp. 2 ("Defendants continue to conflate standing with the merits."). The Court explained that same injury may give rise to multiple causes of action, but the nature of the harm is not dependent on the statutory cause of action. *Id.* at pp. 2-3.

Defendants offer no authority for their position, perhaps because there is none. To the contrary, analogous cases in the Title VII context frequently allow plaintiffs to demonstrate discriminatory policies and practices by aggregating without defeating the ability to recover at individual locations. *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 523 (N.D. Cal. 2012) (rejecting argument that disparities must be analyzed at regional level, especially given that same policies applied across all regions); *Equal Employment Opportunity Commission v. Texas Roadhouse, Inc.*, 215 F. Supp. 3d 140, 171-72 (D. Mass. 2016) (same); *McReynolds v. Sodexho Marriott Services, Inc.*, 349 F. Supp. 2d 1, 15 (D.D.C. 2004) ("[I]f an expert isolates units or groups and runs separate analyses for them, such methodology may mask whether 'the overall decision-making process' produces a discriminatory result, whereas analyzing an entire group will indicate whether the identified employment practice was the cause of the disparity.").

The same logic applies here. This case concerns a nationwide foreclosure and REO crisis, Defendants' nationwide policies and practices, nationwide fair housing laws and, Plaintiffs' formation of a nationwide coalition to investigate Defendants on that basis. *See supra* Plaintiffs' Preliminary Damages Statement at n.1 (explaining the national coalition of fair housing

organizations). And, of course, also nationwide was the regulatory and industry guidance to avoid discrimination based on race, which addressed the location of REOs by neighborhood racial demographics and was known to Defendants.

Defendants do not specifically articulate any individual piece of evidence or testimony that should be excluded based on their Ninth Motion, and there are none. Evidence of impairments to each Plaintiffs' mission and activities is probative of the compensable harms at issue, and this remains true even though Plaintiffs will prove liability through an aggregate statistical analysis. The Court should therefore deny Defendants' Ninth Motion.

**X.    THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 10. NO ADVERSE INFERENCE INSTRUCTION REGARDING SPOLIATION IS WARRANTED. THERE IS NO BASIS TO PROHIBIT PLAINTIFFS FROM CHARACTERIZING PAPER INSPECTION RECORDS AS DRAFTS.**

In their Tenth Motion, Defendants seek three separate rulings relating to the paper inspection forms that some Plaintiffs did not retain, pursuant to their document retention policies, after information from the forms was uploaded into the REO Database. Specifically, Defendants ask that the Court: (1) instruct the jury that it must draw an adverse inference upon a finding that Plaintiffs acted at least with "fault" in destroying or failing to preserve the forms, even in the absence of a finding of bad faith; (2) bar Plaintiffs from offering testimony or argument that the paper inspection forms were merely "drafts"; and (3) issue a pretrial directive requiring Plaintiffs to provide chain-of custody-witnesses. ECF 504 at pp. 52-56. But Defendants have not identified a single piece of new evidence about Plaintiffs' intent, meaning they still cannot meet the high bar of showing bad faith, and thus have not met the standard for an adverse inference. For this reason and those set forth below, each of Defendants' requests must be denied.[30]

### A.  No Adverse Inference Instruction Regarding Spoliation is Warranted.

The Court's prior rulings on spoliation prohibit an adverse inference instruction regarding spoliation in this case. The prior orders state only that the parties may "introduce evidence and argument" related to the spoliated material at trial. ECF 282 at pp. 1, 8. An adverse inference instruction is warranted only if Plaintiffs are deemed to have spoliated evidence "in bad faith." *See* ECF 282 at p. 5 (only if Plaintiffs spoliated evidence "in bad faith" will an adverse instruction be considered).

---

[30] Defendants present no argument supporting their "chain-of-custody" request, so that part of their motion must be denied and is not addressed here.

The Seventh Circuit has clearly indicated that a finding of bad faith is required before an adverse inference instruction to a jury is appropriate. *Lewis v. McLean*, 941 F.3d 886, 892 (7th Cir. 2019) ("For an adverse-inference instruction to be given, [a party] need[s] to establish *both* a duty to preserve and destruction in bad faith.") (emphasis in original). This requirement is stated explicitly in the Pattern Jury Instructions at 1.20. The focus is on the reason for the destruction of the evidence and not merely the fact that the evidence was destroyed. *Buck v. Rigdon*, 2024 U.S. Dist. LEXIS 107414 at *12, 2024 WL 3032597 (N.D. Ill. 2024). "A document is destroyed in bad faith if it destroyed *for the purpose of hiding adverse information*." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008) (emphases added) (citation omitted). "Without bad faith, an adverse inference instruction is not warranted." *Id.* at *18. *See also Trask-Morton v. Motel 6 Operating L.P.,* 534 F.3d 672, 681 (7th Cir. 2008) ("[A] showing of [bad faith] is a prerequisite to imposing sanctions for the destruction of evidence.").

Defendants cite *Marrocco v. General Motors Corp.*, 966 F. 2d 220, 224 (7th Cir. 1992), but that case did not involve jury instructions or the standards for issuing adverse inference instructions to a jury. It involved violation of a court order, which triggers different sanctions. *See Buck v. Rigdon*, 2024 U.S. Dist. LEXIS 107414 at *11-12, 2024 WL 3032597 (N.D. Ill. 2024) (comparing the two different standards).

### 1. Plaintiffs' Lack of Bad Faith Has Already Been Litigated and Decided By the Court.

Plaintiffs submit that it is for the court, not the jury, to make the finding of "bad faith" before an adverse inference instruction may be given. Although Defendants cite one magistrate judge in this jurisdiction who would allow the jury to decide the issue, *Domanus v. Lewicki*, 284 F.R.D. 379, 392 (N.D. Ill. 2012), Plaintiffs believe the court, not the jury, must make a finding of bad faith, and may give an adverse inference instruction only after it has found both bad faith and

71

a duty to preserve. *See Garcia v. North Chi. Police Officer Muhammad Alka*, 2022 U.S. Dist. LEXIS 10478 at *3-4, 2022 WL 180750 (N.D. Ill. 2022) (denying a pretrial motion for Pattern Instruction 1.20); *Buck v. Rigdon*, 2024 U.S. Dist. LEXIS 107414 at *12, 2024 WL 3032597 (denying a pretrial motion for adverse inference instruction).[31]

Defendants have previously asked for a bad faith finding, but the Court has rejected it. ECF 282 at pp. 5; see also ECF 442 at pp. 30. The issue was extensively briefed by the parties, citing deposition testimony and other evidence. Defendants tried to prove that Plaintiffs acted "in bad faith." *See* ECF 282 at pp. 5 ("Defendants argue that Plaintiffs acted in bad faith"); ECF 228 at pp. 17-20 ("Plaintiffs' breach was caused by their willfulness, bad faith, or fault"); ECF 253 at pp. 3 ("Even if bad faith were required, it is present here"); *id*. at pp. 17 ("Plaintiffs . . . intentionally destroyed the handwritten forms in bad faith"). Plaintiffs responded with their explanation of why some handwritten inspection forms were not retained indefinitely. ECF 249 at pp. 27-33. Plaintiffs constructed an electronic database with the specific purpose of ensuring that all relevant information was collected in a single place and preserved. Plaintiffs produced their entire REO Database to Defendants, which included investigative data for all properties and over 29,000 timestamped photographs. The investigative protocol did not require maintenance of paper REO evaluation forms because those forms simply noted what was captured in the photos that were uploaded to the REO Database. Any destruction of paper REO evaluation forms was carried out as a matter of course, before this lawsuit was filed and even before there was any analysis of the data collected. ECF 249 at pp. 30 (citing record evidence). This applied to all

---

[31] In his original opinion regarding spoliation, Judge Leinenweber used the phrase "should a jury believe" that Plaintiffs spoliated evidence in bad faith. ECF 282 at 5. But the issue of who decides bad faith, court or jury, was not briefed at that time. The case he cited, *Lewis v. McLean*, also does not address the issue, although the trial court in that case clearly did *not* submit the issue to the jury.

lenders investigated, whether a lawsuit was ultimately filed or not, and before any decision was made as to whether the evidence justified the filing of a lawsuit. See *Griffith v. Brannick*, 2019 U.S. Dist. LEXIS 64359, 2019 WL 1597948, at *3 (S.D. Ind. Apr. 15, 2019) (holding that bad faith cannot be shown simply by fact that a party destroyed evidence intentionally; rather "the crucial element is not that evidence was destroyed but rather the reason for the destruction") (quoting *Park v. City of Chi.*, 297 F.3d 606, 615 (7th Cir. 2002)). Thus, Defendants were not denied any information, and Plaintiffs acted with complete candor and without any intent to deny Defendants adverse information.

Additionally, Plaintiffs' quality control process—whereby they made corrections to the deficiency data in the REO Database based on a review of photos in the REO Database—was to make the investigation more accurate, consistent, and reliable. Quality control edits were not done with the intent to deprive Defendants of anything. Plaintiffs produced the post-quality control electronic data along with all photos they reviewed, so Defendants could examine Plaintiffs' quality control process if they chose to do so. Moreover, because the quality control was done in an objective, consistent manner, quality control edits occurred in both directions— deficiencies were added in white neighborhoods, while deficiencies were removed from communities of color (and vice versa). ECF 249 at pp. 31. This also shows that Plaintiffs did not have any intent to deprive Defendants of adverse information. The preservation practice in the REO investigation was consistent with decades of NFHA's fair housing testing protocols. *Id.*

Judge Leinenweber agreed with Plaintiffs. "As it stands now, the Court accepts Plaintiffs' explanation that they did not intend to hide information, but genuinely believed that the handwritten forms were duplicative of the information in the database. Currently, the record does

not support a finding of bad faith." ECF 282 at pp. 5.[32] Although Judge Leinenweber suggested that the Defendants could "re-raise the issue of bad faith" later, *id.*, they have not done so in their motion. To the contrary, they argue (wrongly, see discussion above) that a showing of "bad faith" is not necessary for an adverse inference instruction. The record has not changed since the court's previous finding, and Defendants have not cited in their motion any "new evidence" that would call it into question. Their motion for an adverse inference instruction must therefore be denied.

### B. There is No Basis to Prohibit Plaintiffs From Characterizing Paper Inspection Records as "Drafts."

Defendants seek a pretrial order prohibiting Plaintiffs and their counsel from characterizing their written inspection forms as "drafts." ECF 504 at pp. 54-55. But if that is how Plaintiffs themselves perceived their written inspection forms, there is no legal basis to prohibit them from using that term. Defendants argue that the use of that term somehow relates to the "duty to preserve" them, but whether Plaintiffs called them drafts, or forms, or notes, or "scorecards" is of no moment to the duty to preserve. Most Plaintiffs preserved and produced these inspections forms in discovery anyway, so the Defendants' motion on this point is too extreme. How does characterizing written inspection forms as "drafts" relate to the forms that *were* preserved? There is no risk of confusion or unfair prejudice in the use of this term.

For the above stated reasons, Defendants' Tenth Motion in Limine should be denied.

---

[32] The District of Maryland made an identical finding on this issue in *Nat'l Fair Hous. All v. Bank of Am., N.A.*, 2023 U.S. Dist. LEXIS 127334 at *19, 2023 WL 4669560 (D. Md. 2023) ("The plaintiffs' conduct, albeit intentional, does not amount to bad faith.").

**XI.      THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 11.  THE EVIDENCE DEFENDANTS SEEK TO EXCLUDE IS RELEVANT, SHOULD BE ADMITTED, AND IS MISCHARACTERIZED BY DEFENDANTS.**

Defendants' Motion in Limine No. 11 challenges a hodge-podge of ten miscellaneous categories of purported evidence Defendants characterize as "irrelevant and inflammatory." Although Defendants' Motion lists eleven miscellaneous categories at the outset, ECF 504 at pp. 57, Defendants do not include any argument relating to the final category, so Plaintiffs will limit their response to the other ten. Defendants' characterizations are incorrect and their suggestions about purportedly inflammatory evidence are baseless. Defendants' Motion should be denied in its entirety.

1.  <u>Prior Settlements</u>. Defendants first take aim at "evidence related to settlements entered into by Defendants, their affiliates, or Plaintiffs which are unrelated to the parties and issues in the current proceeding." According to Defendants, "Settlements are not admissions of liability; therefore, they generally have no probative value here." ECF 504 at pp. 58-59. Defendants paint with too broad of a brush.

Plaintiffs will not seek to introduce written settlement agreements from other matters as evidence of liability admissions. Rather, evidence from the Deutsche Bank and Ocwen settlement agreements targeted in Defendants' Motion, *id*. at p. 58, nn. 19-20, bears on Defendants' knowledge of REO maintenance requirements and problems and relates to community relief work that the Plaintiffs have done to repair the damage caused to their missions, which also relates to standing and measurements of damages. Further, evidence related to the Freddie Mac settlement agreement noted by Defendants, *id*. at n. 21, reflects changes that were made to the property preservation requirements for Servicers, including Ocwen and Altisource. In fact, as the Court noted, Defendants' *Daubert* motion challenging one of Plaintiffs' testifying experts relied on facts regarding Freddie Mac. ECF 442 at pp. 64, n.21. Finally, for

reasons discussed above regarding the interactions between various Deutsche Bank entities and REO issues, Defendants' complaint that the Deutsche Bank settlement with the Department of Justice, *see* ECF 504 at p. 58, n.19, involved the Defendants' parent corporation or other affiliates does not defeat the relevance of the evidence.

Defendants also argue that Plaintiffs cannot introduce "evidence of settlements they have entered into with other banks, financial institutions, or servicers, including Fannie Mae and Wells Fargo, that were the subject of the same investigation as Defendants." To be clear, Plaintiffs do not seek to introduce the amount received in other settlements, either in the aggregate or individually. Nor do Plaintiffs intend to offer any written settlement agreements as evidence. However, Plaintiffs expect that Defendants will raise that Plaintiffs investigated multiple lenders for the same conduct. Indeed, their proposed deposition designations do just that. If Defendants open that door, then Plaintiffs should, in fairness, be able to answer limited questioning as to the outcomes of those investigations. Moreover, as discussed at the outset of this brief and in response to Motion in Limine No. 8, some of Plaintiffs' activities with other settlement funds provide useful benchmarks for the costs of the counteractive measures that Plaintiffs seek as damages here. Plaintiffs are entitled to admit this damages evidence, and to the extent Defendants have any concerns that the jury will misunderstand its role in the case, a clarifying instruction is the proper remedy, not exclusion.

2. <u>Other Enforcement Actions</u>. Defendants next challenge evidence regarding enforcement actions against them that they characterize as unrelated and describe as

> (1) the Securities Exchange Commission's investigation of William Erbey, the former CEO of Ocwen and Chairman of Altisource (resigned December 2014); (2) certain Fannie Mae audit findings; (3) the New York State Department of Financial Services investigation of Ocwen related to conflicts of interest with Altisource (which was resolved in 2014), and (4) the California Department of

Business Oversight's agreement relating to Ocwen's alleged failure to provide certain information and documents during a licensing examination.

*Id*. at pp. 59 (footnote omitted). Defendants' broad characterization of the enforcement actions as "unrelated" is incorrect.

First, Plaintiffs seek to introduce relevant evidence that the symbiotic and essentially unmonitored relationship between Ocwen and Altisource materially contributed to Defendants' REO misconduct, REO oversight failures, undue delegation and abdication, and Altisource's improper value redlining system from the 2009 Altisource spin-off through the period of Plaintiffs' investigation. Second, Plaintiffs seek to introduce evidence of Ocwen's motivation for belatedly initiating any oversight of Altisource as regards REOs was not due to concerns about REO property conditions or values in communities, but only to assuage regulatory actions against Ocwen for shoddy performance and to address self-dealing and conflicts of interests between the still connected management of Ocwen and Altisource, which in turn relate to Defendants' knowledge and intent after Ocwen spun off Altisource in 2009.

In 2009, Ocwen spun off Altisource, but the two companies remained intertwined by common ownership, management and control, including but not limited to common Chairman William Erbey. Ocwen's (and Altisource's) duties to its shareholders, clients and American communities (in this case, including the Deutsche Bank Trust investors and communities served by Plaintiffs) were harmed during this time frame and through 2017. Evidence of their "incestuous" relationship (the regulator's term) is documented in a December 2014 Consent Order with the New York State Department of Financial Services executed by Ocwen's president, Ronald Faris. *See* ECF 369-3, ¶¶ 20-23, 68 (NYSDFS Consent Order). The December 2014 Consent Order followed years of regulatory actions by NYSDFS based on Ocwen's poorly structured and improper business dealings impacting the housing industry. *See id.* ¶¶ 2-19. This

specifically included that (a) Ocwen did not engage in dealings with Altisource free of conflicts of interest between them, and (b) Altisource's Real Estate branch that is centrally relevant to the facts of this case (known as "RealHome"), the name on the Altisource signs in the yards of REOs investigated by Plaintiffs) was *principally operating without local realtors* and was taking advantage of Ocwen's clients. *Id.* ¶ 22.

Ocwen's creation and positioning of Altisource blurred and circumvented REO industry standards and servicer obligations, such as Ocwen's obligation to treat the REOs as if Ocwen itself owned them and its obligation to generate as much profit from sale of the REOs as possible for the benefit of the investors (e.g., the Deutsche Bank Trust investor). Evidence of Ocwen's failures and inappropriate Ocwen-Altisource policies and practices is replete in this record, and highly relevant. Among other things, Ocwen abdicated its responsibilities by failing to conduct oversight of Altisource and through undue delegation to Altisource, resulting in disparate harm to Plaintiffs and communities of color. Ocwen's failure to detect, prevent or oversee Altisource's improper (and excessively discretionary) value redlining system disparately impacted communities of color and deprived Deutsche Bank Trust investors of increased profits that could have been earned from the sale of all REOs regardless of the racial makeup of the neighborhoods in which they were located.

Ocwen ostensibly "spun off" Altisource in 2009 following the housing crash and Ocwen's ensuing accumulation of hoards of mortgage servicing rights (MSRs) from failing mortgage servicers. 2009 is also the year of the first REO servicing contracts between Ocwen and Altisource at issue in this case, revealing that Ocwen-Altisource common ownership created Altisource arms and affiliates to cover all REO preservation, maintenance, valuations, marketing and sales services needed for Deutsche Bank-owned REO properties for which Ocwen was

responsible. The central terms of the 2009 Ocwen-Altisource contracts at issue in this case remained in force until mid-2015 without Ocwen conducting meaningful oversight and affording Altisource undue discretion. Even August 2015 contract amendments once any REO oversight began, continued in this fashion. The Ocwen-Altisource relationship enabled and fostered a litany of bad results at issue in this case from poor REO property preservation, maintenance, and marketing.

From the period from the 2009 spin-off until 2014 Ocwen failed to initiate oversight of Altisource's REO services. In fact, Ocwen failed to institute actual or written REO oversight policies and procedures or materially revise its contracts with Altisource in this regard *until mid-2015.* In addition, Ocwen admitted that its REO oversight of Altisource was not fully rolled out *until 2017*, and was grudgingly started in response to the mountain of regulatory enforcement actions against Ocwen that slowed its exponential growth. *See* ECF 361 ¶¶ 243-245. This entire scenario (short of the need to conduct oversight of Altisource only because of regulators) is flatly admitted in Ocwen's SEC 10K for 2014. *See* ECF 369-3 at pp. 3.[33]

The evidence is also clear from Ocwen's own auditors that Ocwen's belated oversight of Altisource was half-hearted, inadequate and that the "scorecard" system of overseeing Altisource was based on misleading and inaccurate data—a symptom of their continuing embedded conflicts and lack of actual concern about REO property conditions. Considering all these facts and occurrences, the jury is entitled to hear relevant evidence regarding the history of the parties'

---

[33]The 2014 Form 10-K states: "From 2010 to 2013, our business grew rapidly via portfolio and business acquisitions. However, we made no significant acquisitions in during 2014 . . . . .Our growth ceased primarily as a result of significant regulatory scrutiny by the state of New York, which resulted in a settlement with the New York Department of Financial Services (NY DFS) in December 2014. We also entered into a more limited settlement with California Department of Business Oversight (CA DBO) in January 2015." ECF 369-3 at pp. 3.

relationship and evidence relating to the regulatory actions culminating in the NYSDFS Consent Order agreed to by Ocwen. This evidence is relevant because the conflicts of interest between Ocwen and Altisource did not vanish into thin air in December of 2014 and continued to manifest in ongoing violations of industry and investor standards impacting communities of color. Ocwen did not gratuitously take on a new oversight project beginning in 2014-2015, but only began (supposed) oversight of Altisource because it was forced to by regulators. Jason Jastrzemski, the first Director of Servicing Operations Oversight (Mortgage Servicing Oversight) at Ocwen during the relevant time period testified at his deposition that he was appointed to this "new position" because Ocwen needed to have someone dedicated to oversight of Altisource, what he called "operational oversight and partnership with Altisource." Ex. 8, Jastrzemski Fact Dep. pp. 47-48.

Even then, although Ocwen promised the regulators to follow all federal laws, Ocwen continued to default in this obligation as it relates to fair housing by repeatedly violating its own internal policies documenting its obligations to self-police Fair Housing Act compliance every year. Ocwen's in-name-only oversight and compliance is further belied by its continued refusal to safeguard its clients' interests or adhere to federal law, regulatory guidance or community concerns, such as directed by the Deutsche Bank Defendants' Servicer Memoranda addressing REO practices.

Plaintiffs intend at trial to focus on the NYSDFS Consent Order for the above facts. Plaintiffs should be allowed to refer to the common ownership, shareholders and management, including Mr. Erbey, since those facts are relevant to the conduct through December 2014 and beyond (the culture of the relationship obviously did not change). Plaintiffs also will introduce evidence of the Fannie Mae audit finding that Ocwen lacked proper management controls over

Altisource processes, (ECF 361, ¶243), Fannie Mae Servicer Quality & Risk Review Report) and the resulting vacuous "oversight" policy put in place to pay lip service to the finding. Finally, Plaintiffs do not intend to introduce evidence of Ocwen's withholding evidence during a California licensing exam or the SEC enforcement action against it, though these matters are consistent with Ocwen's poor attitude toward and disregard for regulation.

3. <u>Community Work</u>. Defendants next target what they refer to as "unrelated community work." Defendants do not identify any evidence offered by Plaintiffs and instead cite to Plaintiff NFHA's website. But even accepting Defendants' broad and unspecified proposition, it is wrong. All Plaintiffs are entitled to proffer evidence of their missions and activities, both so the jury can understand how Plaintiffs operate and how their work was impaired. Indeed, Plaintiffs argue that their day-to-day activities—most of which do not relate to Defendants— were harmed by Defendants' conduct. To prove this harm, Plaintiffs will of course have to offer evidence of their work, as discussed above in response to Motion in Limine No. 8. Plaintiffs will also offer evidence of their prior experience with the counteractive measures that are necessitated by Defendants' conduct, experience that is also separate from Defendants. *Id.* Simply put, it is immaterial whether all of Plaintiffs' organizational evidence concerns Defendants; what matters is whether it is probative of Plaintiffs' injury or damages.

4. <u>Altisource and Ocwen's Offshore Personnel</u>. In objections to Plaintiffs introducing evidence that Defendants conducted their REO operations through personnel working offshore in India and other countries, Defendants accuse Plaintiffs of prejudice. ECF 504 at pp. 60-61. The accusation is false and offensive. India is a country situated thousands of miles from Plaintiffs' serviced neighborhoods and has substantially different housing markets than those in the United States. Defendants suggest that any limitations inherent in having their employees in India would

be no different than having their employees in Nebraska. Defendants are free to suggest to the jury that their employees could just as well be working in Nebraska.

As to the facts, for the 60,000 REOs handled by Altisource at a given time, Altisource "performs the bulk of its activity remotely, engaging offshore human resources to manager vendors, issue/review Work Items and address code compliance issues." ECF 361 ¶ 257. In addition, Altisource required offshore valuators to rely on on-line sources of information about properties and neighborhood markets. *Id*. ¶ 294. The fact that personnel responsible for maintaining REOs in the United States are located so far away is relevant not because of their nationality, but because of their location: the distance between Defendants' employees and the properties being serviced provides information and context for a jury to consider Defendants' ability to observe REO conditions on the ground and address property preservation matters. A jury may conclude that Defendants' reliance on persons who could not visit properties being serviced and were unfamiliar with the housing market in the United States contributed to the lack of oversight and disparities in minority communities.

Moreover, the Court has already held that Plaintiffs' expert Deavay Tyler can testify that Defendants used offshore employees:

> As to Altisource's business model, Tyler opines that Altisource's system of remote-managing properties from outside the country contributed to poor property preservation services. …. He notes that Altisource's model is specific to its work with Deutsche Bank properties serviced by Ocwen—other clients did not permit offshore management of REO properties. …. Here too, Tyler may offer his views about the industry standard and how Altisource's model departs from those norms.

ECF 442 at pp. 64 (citations omitted). In fact, the Court noted that "Defendants are free to challenge Tyler's characterization of Altisource's model as a deviation from industry standards, but that goes to the weight rather than admissibility of Tyler's testimony." *Id*. at n.21.

     5.  <u>Racially Insensitive Websites</u>. Defendants' off-shore employees utilize questionable

and often unmonitored web sites to obtain information concerning REO properties in order to assess values. Plaintiffs' expert Dr. Korver-Glenn presents academic research and opinions about open-ended reliance on such websites, which have been known to include unfiltered information based on racial stereotypes. In her expert report, Dr. Korver-Glenn provided an example of a site that included a racially derogatory assessment of neighborhoods. Plaintiffs agree that there is no evidence that this particular example was viewed by Defendants' employees. As such, Plaintiffs will limit their evidence on this issue to the potential problems arising from Defendants' use of unvalidated Internet-based sources to evaluate property values.

6. <u>Ocwen's vendor audit and vendor risk assessment findings</u>. Defendants next broadly complain about "various audits … [t]o the extent those materials concern aspects of Ocwen's business unrelated to the issues in this litigation, including findings that do not pertain to Altisource or that pertain to pre-REO or foreclosure loan servicing, …." ECF 504 at pp. 63. Defendants' footnote, *id.* at n.35, cites to 13 documents. Defendants' broad brush fails to identify any aspect of these documents that they deem irrelevant and a blanket exclusion should be rejected. In a meet-and-confer conference, Plaintiffs offered to review and agree upon a redacted version of the relevant and important Ocwen audit documents. This matter remains to be discussed and, presumably, will lead to an agreement.

7. <u>The Deutsche Bank Defendants' knowledge</u>. Defendants' request in Motion in Limine No. 11 regarding the Deutsche Bank Defendants' knowledge tries to inconspicuously repeat their request in Motion in Limine No. 2 to exclude evidence related to Common Ground. We say inconspicuously because in Motion No. 11, ECF 504 at p. 63 & n.36, Defendants do not mention "Common Ground" and the page they cite in their footnote—ECF 361, p. 68—is incorrect. In any event, Defendants' reference at the end of their single paragraph argument to

"community meetings, shareholder events abroad, or high-profile public incidents" reveals that they are rehashing their request to exclude highly probative evidence involving Common Ground's foreclosure campaign in Milwaukee. Because of the critical importance of this issue, Plaintiffs provide a more detailed response.

For several reasons, Defendants' request should be denied. First, Defendants do not deny that Common Ground (in conjunction with Milwaukee's Department of Neighborhood Services) met with representatives from Deutsche Bank and Ocwen for several years and presented data, maps and detailed evidence that vast destruction was being caused by the failure to maintain REOs in predominantly African American neighborhoods, including Sherman Park. *See, e.g.*, ECF 369-41 at pp. 47-48, 57 (Connolly Declaration, 3/3/22, ¶¶ 4-7, 17); ECF 369-40 at pp. 22-32 (Dahlberg Declaration, 1/19/22, ¶¶ 6-17, 22-30).

For example, Bob Connolly (Common Ground's leader) testified that during meetings in Milwaukee with representatives from Deutsche Bank, "I and other members of Common Ground shared with Deutsche Bank representatives that the neglect of properties in Milwaukee and specifically Sherman Park (which was the focus of our effort) was especially harsh on African American residents of the city and neighborhoods whose residents were mostly African American." ECF 369-41 at pp. 57 (Connolly Declaration, 3/3/22, ¶ 17).

Likewise, Former Department of Neighborhood Services Commissioner Dahlberg similarly testified about the destruction to neighborhoods in discreet zip codes in Milwaukee, including in the predominantly African American neighborhoods of Amani, Sherman Park and Metcalfe Park. In meetings with representatives from Deutsche Bank and Ocwen, the City "regularly shared lists of approximately 100 properties that had outstanding Orders reflecting Code Violations that needed to be remedied and we asked the banks and servicer representatives

to tell us what they were doing with these properties. The Orders were based on neighbor complaints and City inspections." The "areas where the levels of code violations were the most dense … [were] always in the neighborhoods referenced above." ECF 369-40 at pp. 23-24, 27-32 (Dahlberg Declaration, 1/19/22, ¶¶ 10-14, 22-30).

Second, Defendants do not deny (nor could they) that the Deutsche Bank Defendants passed along information about REO maintenance issues to Servicers, including Ocwen. Indeed, in its Summary Judgment Opinion, the Court cited Deutsche Bank's memoranda to Servicers regarding various REO issues. The July 28, 2010 memo begins, "The Trustee has received a number of inquiries and complaints from government officials and community groups about the physical condition of REO properties." ECF No. 442 at pp. 118. The "community groups" referred to clearly include Common Ground.

Third, Defendants' request to exclude evidence related to Common Ground is further undercut by Defendants' identification of Ocwen's former employee Jill Showell as Witness #2 on their "will call" list. Defendants' description of her anticipated testimony, Ex. 7, Defendants' Updated Proposed Trial Witness List at pp. 2, and identification of Ms. Showell in their Amended Rule 26(a)(1) disclosures, Ex. 9, Ocwen Rule 26(a)(1) disclosures, 6/28/22 at pp. 2, 4, make it clear that Defendants intend to elicit testimony from Ms. Showell that includes her communications with Common Ground.

As explained above in response to Motion No. 2, Ms. Showell visited with Common Ground starting in December 2014, and discussed the racial demographics of Sherman Park, admitting that "[i]t's possible" that "the extent to which the vacant REO properties in the Sherman Park neighborhood were having an impact on African American residents" was also discussed. Ex. 6, Showell Dep. at pp. 143-144. During her tour of Sherman Park, she observed "a

neighborhood that was impacted by the financial and housing crisis. … some of [the homes] were in need of repair. … some that had boards on the windows. ,,, [which] should be a concern of anyone." She understood "that it was potentially impacting the neighborhood. … neighbors not wanting to live next to a home that was boarded-up would impact property values" and neighbors might be concerned about "vandalism." *Id*. at pp. 99-105.

Fourth, Defendants' Exhibit List includes 2 documents regarding Ocwen's eventual proposal and contributions to Milwaukee in 2016 which were the result of efforts by Common Ground and Milwaukee's Department of Neighborhood Services. Ex. 5, Defendants' Exhibit List, 12/5/25, Exhibits 87 and 88. One document omitted from Defendants' Exhibit List is "Ocwen's Milwaukee Portfolio," shared by Ocwen in November 2014 with Common Ground and the City of Milwaukee. This document, on Ocwen letterhead, lists 674 REOs in Milwaukee among Ocwen's portfolio, identified by zip codes. ECF 369-42 at pp. 7, 40 (Connolly Supplemental Declaration, 5/13/22, ¶¶ 12-13 and Ex. 17).

Fifth, Defendants obliquely refer in Motion No. 11 to "shareholder events abroad." ECF 504 at pp. 63. This is a veiled characterization of Common Ground's extensive efforts in Germany to get Deutsche Bank to pay attention to the destruction they were causing in Milwaukee. Common Ground members Dr. Susan Giaimo and Minister Mark Fraley flew to Germany to present the results of Common Ground's investigation to Deutsche Bank's shareholders and demand action. ECF 369-43 at pp. 4-15 (Giamo Declaration, 1/11/22, ¶¶ 12-28); ECF 369-46, pp. 76-78 (Fraley Declaration, 3/9/22, ¶¶ 29-34). It was not until after that event, which followed multiple other efforts, that Deutsche Bank finally agreed to send representatives to Milwaukee to meet with members of Common Ground in person. ECF 369-46 at pp. 78 (Fraley Declaration, 3/9/22, ¶ 34), leading to Deutsche Bank's eventual limited

financial contribution to address destruction in Sherman Park and various interactions with servicers, including Ocwen, and municipal officials and community groups. *See* ECF 369-41 at pp. 60-61 (Connolly Declaration, 3/3/22, ¶¶ 22-23); ECF 369-46 at pp. 91-94 (Fraley Declaration, 3/9/22, ¶¶ 46-50).

In sum, evidence of community meetings, anecdotes, shareholder events and other occurrences are inextricably tied to evidence bearing on the Defendant Servicers' knowledge and liability. This evidence bears directly on REO conditions and the discriminatory impact of Defendants' policies, practices and conduct in minority communities. The same evidence is probative regarding the Deutsche Bank Defendants' ability to control and influence the Servicers, which is relevant to whether an agency relationship existed between the Trustees and the Servicers. Finally, Defendants' apparent suggestion that, under the Court's ruling limiting claims against Deutsche Bank to a vicarious liability theory, it must be presumed that the Deutsche Bank Defendants lacked knowledge about the impact of REO maintenance on minority communities, would itself be probative on the issue of agency. The fact that knowledge regarding such a significant matter was entirely left to the province and judgment of the Servicer Defendants is indicative of a broad agency relationship.

8. Deutsche Bank's Failure to Terminate Ocwen or Evaluate Its Performance. The next category of evidence challenged in Motion No. 11 seeks to exclude reference to the Deutsche Bank Trustees' "failure" to terminate Ocwen or evaluate its performance. The initial paragraph of Defendants' argument in support of this category of evidence digresses to discuss Defendants' position about trustee authority to terminate servicers under some of the trusts. That is a disputed but important issue related to the existence of an agency relationship between the Deutsche Bank Defendants and Ocwen and unrelated to Defendants' request to limit reference to the fact that the

Deutsche Bank Defendants did not terminate Ocwen. As regards Defendants' actual request, it is relevant background that Ocwen was not, in fact, terminated by the Deutsche Bank Defendants and continued as servicer during the entirety of Plaintiffs' investigation, so that evidence should not be precluded.

The second aspect of the evidence challenged by Defendants in this portion of Motion 11 relates to the references regarding the Trustees "failing" to evaluate Servicer performance. Again, evidence that the Trustees did not, in fact, generally oversee the performance of the Servicers and instead authorized and relied on them to carry out duties related to the properties owned by the Trustees, bears significantly on agency issues and should not be excluded. On the other hand, at this point of the proceedings, Plaintiffs do not intend to argue about the wisdom or the scope of the efforts or non-effort of the Trustees to evaluate the Defendant Servicers.

9. Evictions of or alleged harm to homeowners who are not parties to this case.
Defendants' next challenge is another attempt to exclude a large swath of evidence with a seemingly simple request. When a property becomes an REO, there are occasions when owners who default on their mortgage do not leave, and servicers evict them. This fact is bound to be discussed at trial to explain to the jury aspects of the foreclosure process, but Plaintiffs do not intend to use evictions evidence to smear Defendants for removing persons from their homes. Instead, Plaintiffs will address Defendants' policies and practices and related events (such as vacancy) that trigger the onset of property preservation work. That work may include eviction services, which is within the Servicer Defendants' scope of work and part of the story. Without these facts, the jury might be confused about the life cycle of the property as it relates to more important issues.

In a footnote, Defendants cite two paragraphs from Plaintiffs' Proposed Statement of Undisputed Facts. ECF 504 at p. 64, n.42, citing ¶¶ 316, 329. The first paragraph quotes a lengthy memo from "Deutsche Bank Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to all Securitization Loan Servicers," requesting that all Servicers

> (a) "Exercise diligence to assure that all foreclosures and actions with respect to REO properties . . . are conducted in compliance with all federal, state and local rules and regulations . . ." (DBNFHA300619); " (b) "Consider developing working relationships with local housing officials and community organizations to address public concerns regarding foreclosure and eviction proceedings that might otherwise lead to public responses that might impede the realization of value on the Trusts' mortgage loans and REO properties . . ." ( DBNFHA300619-20) ; and (c) "To the extent permitted by applicable securitization documents, exercise sound discretion in evaluating whether or not eviction of tenants otherwise lawfully occupying Trust REO properties will maximize the realization of value on Trust assets; . . . maintaining occupancy may preserve the affected neighborhoods and thereby support the value of REO property . . ." (DBNFHA300620)

ECF 351 ¶ 39. The purpose of using this evidence is not to focus on eviction proceedings but, rather, to present evidence of the agency relationship among the Defendants and evidence of public concerns about foreclosures, generally, conveyed by Deutsche Bank to Ocwen. As such, the evidence is clearly relevant.

The second paragraph cited by Defendants quotes another lengthy document, this one setting forth terms of a Limited Power of Attorney executed by Deutsche Bank National Trust Company, authorizing Ocwen to act as "the Trustee's true and lawful Attorney-in-Fact, [to act] in the Trustee's name, place and stead and for the Trustee's benefit" in connection with various transactions," including, "the full enforcement of and preservation of the Trustee's interests in the Mortgage Notes, Mortgages or Deeds of Trust, and in the proceeds thereof, by way of, including but not limited to foreclosure …" ECF 351 ¶ 63. Likewise, the purpose of using this

evidence is not to focus on eviction proceedings but, rather, to present evidence of the existence of a broad agency relationship between the Deutsche Bank Defendants and the Servicers.

10.   <u>The historical overlap between Ocwen and Altisource</u>. The final category of evidence discussed in Defendants' Motion No. 11, addressed in detail above in Section 2 of Defendants' Motion 11, is curious and misguided. Defendants seek to exclude evidence of the historical overlap in the corporate history of Defendants Ocwen and Altisource. In a footnote, and without providing the text, Defendants cite three of Plaintiffs' proposed undisputed facts. Those facts state as follows:

> 134. Prior to 2009, Altisource Portfolio Solutions, S.A. operated as Ocwen Solutions, a wholly-owned subsidiary of Ocwen.
>
> 135. In 2009, Ocwen entered into "long-term servicing contracts" with Altisource Portfolio Solutions, S.A. ("Altisource"), which was spun off from Ocwen. The Altisource subsidiary named in this lawsuit is Altisource Solutions, Inc.
>
> 136. In 2009, Ocwen became Altisource's main customer and Altisource became Ocwen's third-party vendor to carry out Ocwen's servicer obligations relating to default and foreclosure activities pertaining to REOs, including REO properties owed by the Deutsche Bank Defendants, as Trustee, including in the areas of valuations, property maintenance and preservation, property inspection, marketing and sales.

Ex. 17, Proposed Statement of Undisputed Facts, ¶¶ 134-136. It is hard to imagine why the jury should not be informed of the relationship between the Servicer Defendants. The above facts are basic to understanding who these Defendants are and how they interacted with each other. Most importantly, the evidence relates to the Ocwen's failure to provide oversight of Altisource's property preservation activities, culminating in enforcement orders requiring such activity to be undertaken, discussed above. Plaintiffs' investigation into Ocwen-Altisource REO misconduct began in 2011 and spanned 2017. The evidence of Ocwen's failure to adequately monitor and oversee Altisource through 2017, and its spin-off's shoddy one-stop-shop approach to end-to-end

REO services effectuated mostly from off-shore is relevant to both Plaintiffs' disparate treatment and disparate impact claims in that (a) Ocwen's absence of oversight and unchecked delegation and grants of discretion to Altisource, coupled with their unjustified perceived value redlining system, constitute the identified, admitted, well-documented policies in this case, and (b) the evidence of Ocwen and Altisource acting in cahoots without regard to contractual, legal or community standards is relevant to their discriminatory motivations and harms caused.

Without referring to any other evidence (or proposed evidence), Defendants also argue that "unrelated litigation" should be excluded. ECF 504 at pp. 65. Because Defendants do not identify the litigation they characterize as "unrelated" and seek to exclude, it is difficult to respond. However, it appears that Defendants are referring to the same sort of evidence they discussed in their second category of evidence in Motion No. 11, above, namely, other enforcement actions. Plaintiffs incorporate their response to that portion of Defendants' argument as it relates to the argument alluded to here.

For the above reasons, Defendants Eleventh Motion in Limine should be denied.

XII.   **THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 12 TO EXCLUDE EVIDENCE RELATED TO THE FORECLOSURE CRISIS AND FORECLOSURE ISSUES**

Defendants' Motion in Limine No. 12 seeks to present the jury with a book on their treatment of foreclosed properties that skips the first chapter entirely and redacts unidentified pages from other chapters. That makes no sense and would unfairly prejudice Plaintiffs' presentation to the jury. Specifically, Defendants broadly request that the Court exclude "evidence related to the foreclosure crisis and foreclosure issues," a description that implicates the entire case. Nearly all evidence that will be presented at trial, including by Defendants, relates in some way to foreclosure issues. In addition, discrete evidence, to be presented by all parties, relates to the foreclosure crisis. Plaintiffs are entitled to present the jury with context and a full picture so they can understand the case.

Defendants describe three broad and amorphous categories of evidence they challenge, the third of which ("evidence or argument concerning foreclosures or the Great Recession, including communications related to foreclosures") could conceivably implicate the entire trial. Yet, throughout their seven pages of argument, Defendants cite no specific "evidence" they seek to exclude and cite only a few pages from the transcript of the recent deposition of one of Ocwen's witnesses. Simply put, Defendants fail to identify evidence to support their motion.

Moreover, as shown in the first section of our response, Defendants' request to exclude "evidence related to the foreclosure crisis and foreclosure issues" is inconsistent with a host of Defendants' prior statements, including their suggested "Case Statement" for the soon to be filed Final Pre-Trial Order, Defendants' various summary judgment and *Daubert* motion filings, and their own experts' reports. In fact, Defendants' request is also contradicted by statements by Ocwen's (then) President and CEO Ron Faris, prominently displayed in two of Defendants' proposed trial exhibits. In all respects, Defendants' Motion in Limine No. 12 should be denied.

## A. Defendants' Prior Statements Contradict Their Motion

As detailed below, Defendants have repeatedly made statements, including during this litigation, that contradict their current request to exclude evidence related to the foreclosure crisis and foreclosure issues.

### 1.  Defendants' Suggested Case Statement in the Final Pretrial Order

On December 5, 2025, Plaintiffs provided Defendants with a proposed draft of the Final Pre-Trial Order. In the "Case Statement" section, Plaintiffs' initial draft begins as follows:

> This case is about the treatment of homes after they have been subject to foreclosure. After the foreclosure process, title to a house is typically held in the name of the bank which foreclosed on the property. These houses then become known as Real Estate Owned properties or "REOs."

> Plaintiffs are twenty nonprofit fair housing organizations who allege that the Defendants' policies and practices related to REO maintenance, preservation, and marketing had the purpose and effect of discriminating based on race. Specifically, Plaintiffs allege that Defendants' treatment of REO properties in communities of color was worse than Defendants' treatment of REO properties in white neighborhoods. Plaintiffs contend that this differential treatment violated the Fair Housing Act and caused their organizations to suffer harm.

Ex. 18, Plaintiffs' 12/5/25 draft Final Pretrial Order at pp. 3.

On December 15, Defendants responded to Plaintiffs' draft with revisions to the Case Statement that keep the words "foreclosure" and "foreclosed," add "foreclosing bank," and add "Following the 2008 Financial Crisis." Defendants' proposed draft now begins as follows:

> This case is about the treatment of properties after ***foreclosure***. Once a property has been ***foreclosed*** on, title to the property is typically held in the name of the ***foreclosing bank***; these then become known as Real Estate Owned properties or "REOs."

> ***Following the 2008 Financial Crisis***, Plaintiffs, twenty nonprofit fair housing organizations, began an investigation into foreclosed REO properties in both white and minority neighborhoods, inspecting hundreds of REO properties across thirty metropolitan areas. …

Ex. 19, Defendants' 12/15/25 draft Final Pretrial Order at pp. 4 (emphasis added).

Proposing a draft that (appropriately) references "foreclosure," "foreclosed," "foreclosing

bank," and "Following the 2008 Financial Crisis" contradicts Defendants' Motion in Limine and shows that the foreclosure crisis is inextricable context that is necessary to tell the story of this case.

### 2. Defendants' Additional Proposed Uncontested Facts

On December 15, Defendants provided Plaintiffs with Defendants' Additional Proposed Uncontested Facts, including the following context and reference to foreclosure issues: "Plaintiffs designed their investigation to concentrate on geographic areas with high foreclosure rates." Ex. 20, Defendants' Additional Proposed Uncontested Facts at pp. 3, Fact #20. That statement again contradicts Defendants' Motion in Limine, and it reflects a concrete way that the foreclosure crisis animated the investigation procedure used by Plaintiffs.

### 3. Defendants' Motions for Summary Judgment Filings

Defendants' 2025 filings in support of their motions for summary judgment likewise contradict the broad evidentiary exclusion requested in their Motion in Limine. In those filings, Defendants made references to the "financial crisis" and "housing crisis," both of which are references to the "foreclosure crisis" and foreclosure issues. For example, Defendants' Memorandum in support of the Deutsche Bank Defendants' Motion for Summary Judgment included the following:

> Ocwen was originally named as servicer on only a small handful of trusts…. Thus, for hundreds of Trusts, Ocwen was not one of those Trusts' transaction parties when the Trustees were appointed. *See id.* Instead, **when the financial crisis resulted in massive disruptions in the industry**, many of the originally designated servicers either went bankrupt, into FDIC receivership, or otherwise sold their rights to service the Trusts. Ocwen then acquired servicing rights and became the successor servicer on hundreds of the Trusts at issue. *See id.* For many Trusts, Ocwen did not become servicer until years after Plaintiffs' investigation began. For hundreds more, a party other than Ocwen continues to serve as servicer or master servicer….

ECF 333 at pp. 3-4 (emphasis added) (citations omitted).

94

Similarly, Defendants' Reply Memorandum in support of the same motion referred to the

"financial crisis":

> Plaintiffs cite a handful of "memos" that the Trustees sent to servicers and master servicers **during the opening of the financial crisis** "advis[ing]" those parties that "all servicing activities, including foreclosure proceedings," must be conducted "in accordance with Governing Documents and all applicable laws" or "exercise sound discretion" in their treatment of REO properties.

ECF 403 at pp. 7-8 (emphasis added).

Defendants' Reply Memorandum in support of Defendants' Joint Motion for Summary

Judgment referred to "the housing crisis," as follows:

> Plaintiffs selected areas most heavily impacted by **the housing crisis** and are seeking to aggregate these areas as indicative of Defendants' *overall* practices.

ECF 408 at pp. 11 (emphasis added). Here, too, Defendants' own recitation of the relevant facts

reflects the relevance of the foreclosure crisis and foreclosure issues.

4. <u>Defendants' Expert Reports and related *Daubert* Filings</u>

The reports of Defendants' proposed testifying expert witnesses and Defendants' related

*Daubert* motion filings also reflect Defendants' understanding that this case relates to the

foreclosure crisis (referred to as the "financial crisis," "mortgage crisis" and "credit crisis"

below) and foreclosure issues and that Defendants believe such references provide helpful

context. The following are excerpts from several of Defendants' proposed testifying expert

witnesses' reports:

> **Following the onset of the mortgage crisis more than a decade ago**, in my role as head of GSF, I established a centralized unit, known as Specialized RMBS Services ("SMBS"), in response to increased inquiries, notices, and media coverage involving mortgage loans and REO property for which the bank, as trustee, was the nominal owner.

ECF 370-1, at p. 17 (Section 2.5).

95

> *Prior to the credit crisis*, trustees rarely, if ever, received property-specific correspondence, notices (including citations) or inquiries. *This changed, starting in or around 2009*, when borrowers or their counsel began inquiring about loan modifications, and municipalities began to reach out directly to trustees, because *servicers were initiating foreclosures* in the name of the trustee (as the legal titleholder of the note and mortgage).

*Id.* at 51 (Section 5.22) (emphasis added).

> *In or about June 2009*, I became responsible for managing the Fannie Mae team charged with the administration of the Making Home Affordable ("MHA") program. President Obama launched MHA under the Troubled Assets Relief Program. *MHA consisted of a number of foreclosure prevention programs. The program required participating servicers to offer struggling borrowers an alternative to foreclosure, such as a loan modification or a short sale.* President Obama announced MHA on February 18, 2009, and Treasury contracted with Fannie Mae the same day to serve as the program's administrator. MHA applied to all loans guaranteed by Fannie Mae and Freddie Mac (collectively, the "GSEs"), loans insured by an agency of the federal government, the Federal Housing Administration ("FHA"), and almost 90% of all the loans not guaranteed or insured by the GSEs or FHA.

Ex. 21, Bryar Report at pp. 4-5 (emphasis added).

> AMCs [appraisal management companies] have been a part of the real estate landscape for the past 50 years. However, their numbers remained limited until *the financial crisis of 2007—2008*. In 2009, the joint efforts of the New York Attorney General, government-sponsored enterprises Freddie Mac and Fannie Mae, and the Federal Housing Finance Agency ("FHFA") established the Home Valuation Code of Conduct ("HVCC") appraisal guidelines.

Ex. 22 Linne Report at pp. 14 (¶ 38) (emphasis added).

> The inspections took place over nearly a seven-year period, spanning different housing market conditions: from June 2011 (when the US was still experiencing a period of *high foreclosure rates as a result of the 2008-2009 financial crisis*) to May 2018 (when the economy was well past *the 2009 mortgage crisis*).

ECF 370-12, at 28 (¶ 33) (emphasis added)

Furthermore, in their response to Plaintiffs' *Daubert* motion challenging Mr. Bryar,

Defendants referred to the "housing crisis," as follows:

> Just by way of example, during his time at Fannie Mae, *Bryar played a prominent role in developing and implementing one of the federal government's*

> ***central programs to respond to the housing crisis***, the Making Home Affordable program, which included the Home Affordable Modification Program, or "HAMP." HAMP explored multiple avenues to address mortgage delinquencies, and Bryar worked tirelessly on mortgage servicing oversight.

ECF 366 at pp. 2 (emphasis added).

    5.  <u>Defendants' Proposed Exhibits</u>

As discussed above in response to Defendants' other Motions in Limine, Defendants' proposed exhibits include documents regarding Ocwen's eventual contributions to Milwaukee:

> <u>Defendants' Exhibit 87 (OCWEN_0047802 - 0047806)</u>: Letter from Ron Faris to Mayor Tom Barrett Re: Ocwen's Proposal to the City of Milwaukee, dated January 8, 2016.

> <u>Defendants' Exhibit 88 (OCWEN_0048024—0048026)</u>: News Release from Mayor Tom Barrett re City of Milwaukee and Ocwen Financial Corporation announce five-part plan to assist Milwaukee homeowners, dated January 26, 2016.[34]

Ex. 5, Defendants' Exhibit List, 12/5/25. These documents include statements by Ocwen that provide context and refer to the foreclosure crisis and foreclosure issues.

For example, the January 8, 2016 letter sent by Ocwen's then-President and CEO Ron Faris, addressed to Milwaukee's Mayor and Council President, includes the following references and context:

> Ocwen has more than 25 years of innovation in loss mitigation, and has completed more than 627,000 loan modifications throughout the United States, including more than $12 billion in principal reduction ***since 2008***….

* * * * *

> ***Avoiding foreclosure*** is a win-win for all parties and is a fundamental test for Ocwen's business model.

* * * * *

---

[34] The date on the news release and Defendants' Exhibit List has a typo. It was in 2016, not 2015. Ex. 6, Showell Dep. at pp. 243-246.

Ocwen will support ***local foreclosure mitigation efforts*** by providing financial support for local counseling and mediation efforts.

Ex. 23, Defendants' Proposed Exhibit 87 at pp. 1-2, 4 (emphasis added).

Likewise, Defendants' proposed January 26, 2016 news release includes the following

references to the "foreclosure crisis," including statements by Ocwen's President and CEO Faris:

"***The foreclosure crisis in Milwaukee*** was complex—its impact is still felt by many homeowners in our city," said Common Council President Michael J. Murphy. "Partnerships have been an integral element to ***fighting the debilitating effect foreclosures have on our neighborhoods***. This newest partnership will not only help people stay in their homes, but it also helps homeowners make the repairs needed to make their properties a positive asset in their neighborhood."

"***As a nationwide servicer, Ocwen understands the foreclosure crisis is not over and that many geographic areas in the country, including Milwaukee, are still dealing with the aftermath of the mortgage crisis***. We understand the problems facing homeowners and communities across America and we look forward to working with the City to offer real solutions and financial support that can help make a difference for homeowners in Milwaukee," commented Ron Faris, President and CEO of Ocwen. "***Since 2008***, more than 2,000 Milwaukee families have received a modification from Ocwen and over half of those involved a reduction in principal."

Mr. Faris continued, "We appreciate the assistance and guidance from Mayor Tom Barrett and Common Council President Michael Murphy, who helped us better understand the local challenges facing the community and worked with us to find solutions. Ocwen is committed to ***helping homeowners have every opportunity to remain in their homes*** and we are pleased to be working with the entire City of Milwaukee to make this happen."

Ex. 24, Defendants' Proposed Exhibit 88 at pp. 2 (emphasis added).

Defendants' Proposed Exhibit 502 similarly contradicts Defendants' Motion in Limine.

Defendants describe this exhibit as, "Holding or Folding? Foreclosed Property Durations and

Sales During the Mortgage Crisis (2010)." Ex. 5, Defendants' Exhibit List, 12/5/25.

     6.  <u>Defendants' Reference in Motion in Limine No. 8</u>

Finally, not surprisingly, Defendants' Motion in Limine No. 8 refers the "foreclosure

crisis" in contradiction to the relief requested in Motion in Limine No. 12. ECF 504 at pp. 41, n.16.

### B. Evidence Defendants Broadly Challenge is Admissible

Evidence is relevant if it has "any tendency" to make a material fact "more or less probable." Fed. R. Evid. 401. Relevance is a liberal standard, and the burden is on the party seeking to exclude evidence—here, Defendants—to show that it is not relevant and thus should be excluded. "A motion *in limine* to exclude evidence may be granted only if the evidence sought to be excluded is *clearly* inadmissible for *any* purpose." *Plair v. E.J. Brach & Sons, Inc.*, 864 F. Supp. 67, 69 (N.D. Ill. 1994) (citing *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1400 (N.D.Ill.1993)) (emphasis added).

Evidence regarding the foreclosure crisis is relevant for at least two reasons. First, Plaintiffs raise a claim of intentional discrimination in the marketing and maintenance of REO-owned properties, which the Court held may be proven using the framework set forth in *Metropolitan Housing Development Corp. v. Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977). ECF 442, pp. 10-11 & n.8. The *Arlington Heights* "relevant factors" include "the historical background of the challenged decision." *Id.*, n.8. Among other things, Defendants' extensive participation in the servicing industry and with foreclosures bears on their awareness of how their differential maintenance and marketing of properties they acquired as a result of the crisis could disproportionately impact communities of color.

Second, the foreclosure crisis underlies the entire case. A juror who was completely unaware of the foreclosure crisis might have difficulty understanding how and why Defendants owned and were responsible for maintaining thousands of foreclosed properties across 30 metropolitan areas. The Court's March 31, 2025 Opinion acknowledged the significance of

historical context in the "Background" section of the Court's summary judgment decision. The

Court began with reference to "the 2008 financial crisis" and explained how that Deutsche Bank

Defendants foreclosed on properties (REOs) and how the Servicer Defendants became

responsible for maintenance, marketing and sales of those properties:

> Plaintiffs are twenty national and regional fair housing organizations seeking to eliminate housing discrimination and to ensure equal housing opportunities…. Defendants Deutsche Bank National Trust and Deutsche Bank Trust Company Americas act as trustees for residential mortgage-backed securitization trusts. … As trustees, they hold legal title to certain "real estate owned properties." …. An REO property generally refers to a foreclosed property owned by the lender. In a residential mortgage-backed securities transaction, mortgage loans are pooled together and interests in the money generated from those loans are sold to investors. … ***After the 2008 financial crisis, financial institutions like Deutsche Bank foreclosed on the residential properties securing mortgages and took title***…. Generally, REO properties are serviced by mortgage loan servicers like defendant Ocwen Loan Servicing, LLC…. ***In 2009, Ocwen acquired the mortgage-servicing rights for the REO properties titled to Deutsche Bank and identified in this lawsuit***. ... Defendant Altisource Solutions, Inc. operated as a subsidiary of Ocwen until 2009 when it entered into long-term servicing contracts with Ocwen. ***... As Ocwen's exclusive third-party vendor, Altisource serviced the majority of the REO properties in this lawsuit***. ....

*Id*. at pp. 3-4 (citations omitted) (emphasis added).

In considering Defendants' *Daubert* motions, the Court noted that the report from

Plaintiffs' expert Dr. Elizabeth Korver-Glenn "covers eight topics, including a historical

background to contextualize defendants' valuation and value-based policies. … Defendants do

not seek to exclude her opinions on historical background, …." ECF 442 at pp. 80. Consistent

with the Court's observations, Defendants' suggestion that the foreclosure crisis is not relevant is

baseless. Background evidence will help the jury understand the case presented by all parties.

### C. Defendants' Motion Fails to Identify Specific Evidence That Warrants Exclusion

As noted above, Defendants fail to identify virtually any of the evidence they challenge.

Defendants do not cite a single document or proposed exhibit. Instead, over the course of 7 pages

of argument, Defendants' Motion challenges the relative impact of predatory lending on minority

communities and cites just 5 pages from the deposition testimony of former Ocwen employee Jason Jastrzemski (pp. 40-45). ECF 504 pp. 66. In this excerpt, Plaintiffs' counsel asked Mr. Jastrzemski whether he had prior knowledge of the disproportionate sub-prime mortgage lending in minority communities. He testified that he did not. He may have heard about it "based on the news," and that it was related to borrowers' "credit history," but it did not impact his job. He also testified that, "during any time period," he was not aware "that concerns were being raised that minorities were hardest hit by the housing crisis." Ex. 8, Jastrzemski Dep. at pp. 40:3-45:10. Asked to confirm that "the fact that minorities were hit the hardest by [the] housing crisis was not something [he] knew about," Mr. Jastrzemski unequivocally stated, "That is correct." *Id*. at pp. 45.

Among other issues, Mr. Jastrzemski's testimony relates to Defendants' knowledge and intent, which are plainly relevant. In addition, the questioning by Plaintiffs' counsel at the transcript pages Defendants cite does not provide a basis to broadly exclude evidence of the foreclosure crisis or foreclosure issues. Likewise, Defendants' vague reference to "foreclosure-related communications" and "propensity" evidence, ECF 504 at pp. 69, is not a sufficient basis for Plaintiffs to respond or the Court to consider what Defendants seek to exclude.

### D. Defendants' Arguments About Ocwen's Foreclosures and Prejudice Should Be Rejected

Without citing to any evidence, Defendants suggest that "Plaintiffs should be barred from introducing evidence that Ocwen initiated or completed foreclosures on properties." *Id*. at pp. 68-69. Any evidence about Ocwen initiating or completing foreclosures on properties relates to Defendants' knowledge and activities that they conducted as an agent of the Deutsche Bank Defendants, who owned the properties.

Defendants also argue that evidence should be excluded under Rule 403 because "[f]oreclosure-related issues are emotionally charged" and "discussion of foreclosure activity can easily inflame juror passions and bias them against loan servicers as a class." *Id*. at pp. 68. Again, Defendants do not identify any specific exhibit or testimony.

Rule 403 does not permit the exclusion of evidence merely because it is "emotionally charged" or just because it may be prejudicial to one or more parties. Under Rule 403, "The court may exclude relevant evidence if its probative value is ***substantially outweighed*** by a danger of one or more of the following: ***unfair prejudice ….***" FRE 403 (emphasis added).

Will the trial include emotionally charged evidence? Absolutely. Any trial about alleged discrimination is inherently emotional. Here, emotionally charged evidence will undoubtedly be presented demonstrating the nature of Defendants' conduct and the extensive harm Defendants caused. Defendants' Motion completely fails to establish that the "probative value" of any evidence "is substantially outweighed by a danger of … unfair prejudice."

For the above reasons, Defendants' Twelfth Motion in Limine should be denied.

## XIII.    THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 13 TO EXCLUDE ANY EVIDENCE OF THE INAPPROPRIATE COMMENTS POLICY.

Defendants seek to exclude "any evidence" eliciting, referring to or placing before the jury any testimony pertaining to Altisource's "Inappropriate Comments" Policy. This policy was implemented shortly after Plaintiffs filed this case, and is directed at two types of comments: (1) "Remarks about the community, its people and/or the residents, that could be considered discriminatory, including comments on the race, color, national or ethnic origin, ancestry, age, religion or religious creed, disability or handicap status, sex or gender, sexual orientation, or any other characteristic under applicable federal state or local laws," and (2) "Negative opinions and comments about the client, AFS [Altisource Field Services] team and/or processes, including an perceived opinion on the lack of training, communication or process." The Policy tells Altisource vendors that they must assure comments placed in VMS are appropriate and neutral, and that failure to adhere to these instructions will result in vendor work orders being placed on hold "so that you or your third-party partner can remove the inappropriate comments." The Inappropriate Comments Policy was rolled out in an unprecedented Memorandum to Altisource vendors, and the policy inserted into the central Vendor Operational Guide.

The genesis of Defendants' "Inappropriate Comments" Policy and various facts and documents relating to it are relevant and critical to:

- Explaining the late-era context and confirming a key Altisource admission that it did not manually review inspector's comments on inspection forms (Altisource inspection data is generally not machine readable, a fact noted by Defendants' experts). Altisource hires national drive-by type inspection companies for inspections but specifically withheld any authority from these faceless inspectors to cause or order REO deficiencies to be corrected. Further, the inspection forms are simplistic and non-descriptive, elevating the importance of the comment portion (that only allowed a restricted number of characters). The Altisource Field Services Manager who first raised concerns about embarrassing comments clients might see (eventually leading to the Inappropriate Comments Policy) circulated a highlighted inspection

103

form and confirmed that comments are not manually reviewed. Ex. 25, Altisource
RFA Responses Nos. 4-5.

- Understanding Altisource's failure to take action to address or correct the property-level consequences of its operational failure since 2009 to manually review inspection comments, and, instead, limiting direction to its vendors and their subcontractors in 2019 to "remove" inappropriate comments including "remarks about the community, its people and/or the residents" that could be considered discriminatory based on race, to shield them from Altisource's clients;[35]

- Establishing a basis for fair inferences the jury may draw from the contrast between Altisource directing removal of inappropriate comments and the fact that—even as of 2019 and to this day—Altisource failed to include in any Altisource manuals, operational guides or policies and procedures even a basic admonition (as in most modern business manuals) to prevent race discrimination in property preservation, maintenance and inspection services, (or to include a procedure under which concerns about neighborhood discrimination based on race or substandard Altisource processes or training could be raised or addressed, by anyone). A fair conclusion is that Altisource was only concerned about random embarrassment at its client (i.e. investor) level, not about prevention of actual discriminatory conduct at the REO property level.

- Establishing a basis for fair inferences the jury may draw arising from the contrast between the explicit 2019 Inappropriate Comments Removal Policy specifically addressing racially derogatory comments by REO preservation and maintenance vendors about communities and their people and the fact that Ocwen's and Altisource's fair housing (also known as fair lending) training did not mention at all information about (or prevention of) potential REO or neighborhood discrimination based on racial stereotypes or related "value" judgments.

- Underscoring the failure of the Servicer Defendant to actually examine and rectify practices and policies that might be racially discriminatory and in violation of the Fair Housing Act or other non-discrimination laws or regulations. As regards the probative weight of these matters, several points should be remembered. First, removal of racially discriminatory statements or statements questioning the effectiveness of

---

[35] Plaintiffs and their experts have analyzed examples of this failure, including Altisource's definitional failure to remove offensive graffiti in an REO in one late-stage (post 2016) inspection form done by a Regional Field Service Manager (RFSM). Obviously, even comments on the few elite RFSM inspections (that Plaintiffs' expert Tyler also tabulated and found to be conducted in a racially discriminatory manner) went unreviewed.

Altisource's policies and processes does not constitute addressing or correcting problems or legal violations. Second, the Servicer Defendants disregarded Plaintiffs' warnings and admonitions for so long and to such a great degree that they failed to even mention that their fair housing/lending "program" covered their REO portfolio until after Plaintiffs filed a Complaint of Discrimination with the U.S. Department of Housing and Urban Development adding Ocwen and Altisource as Respondents in addition to Deutsche Bank in February of 2017. Two more years after that in 2019, Altisource went to great lengths after a client apparently disliked an inspection comment, to analyze its unmonitored/unreviewed "comments" problem, issue the Inappropriate Comments Policy and reference it in in vendor manuals, on which Altisource's entire REO operation ran remotely by "manual."[36] But nothing was done even in 2019 to heighten prevention of, analyze, address or rectify potential neighborhood REO race discrimination because this never was a consideration or concern of Altisource or Ocwen, as they repeatedly admitted over and over in corporate depositions.

Plaintiffs agree that, due to (a) Altisource directing that past inappropriate comments not be included or be removed from its Vendor Management System (VMS), (b) Altisource declining to give Plaintiffs direct access to VMS in discovery, and (c) Plaintiffs' inability to finance a forensic examination of deleted records and their contents (*if* they could be forensically recovered at all), the *existence* of the Inappropriate Comments Policy is not proof that racially derogatory comments or comments questioning Altisource processes or training had been contained in VMS before being deleted per the Policy's overt directive to do so. But the facts and circumstances surrounding the Inappropriate Comments Policy remain relevant and relate more

---

[36] Especially in late stages, Altisource vendor contracts refer to Altisource's Business Ethics Policy. However the business ethics policy does not refer to or describe anything concerning treatment of all REOs equally and fairly regardless of the racial makeup of the community or neighborhood in which they are located. The policy addresses not tolerating harassment and *employment discrimination*, but says nothing whatsoever about non-discrimination in a vendor's property-based conduct. The Altisource-vendor contracts do, however, refer to and incorporate the main Vendor Operational Guide as a contract term. This is the same Vendor Operational Guide that fails to include a non-discrimination statement or admonition, or complaint procedure. This is Defendants' intentional blind spot, that comes out in many ways and that is laid bare by the 2019 Inappropriate Comments Policy scenario and facts.

generally to Defendants' intent to discriminate in light of all the other evidence relating to intent including that Defendants willfully (a) ignored and violated their own internal fair lending discrimination policies concerning their REO conduct, (b) ignored Deutsche Bank's servicer memoranda "urgent" admonitions from 207-2011 to follow federal law and its regulators, (c) ignored Plaintiffs' published REO industry reports about REO race discrimination for years, (d) were told their REO conduct in U.S. cities such as Milwaukee was disproportionately impacting Black neighborhoods, (e) ignored the 2012 Federal Reserve and other regulatory guidance about REO and neighborhood makeup/discrimination the Servicers were required to attend to in servicing Deutsche Bank REOs, (f) ignored their own numerous statements to "follow all federal and local laws"—but selectively failing to list the Fair Housing Act in first-time 2015 REO oversight policies, and (g) failed and refused to acknowledge, consider, evaluate or analyze the potentially disparate effects based on race of any of their policies, even though they were required to do so by their own long-standing cornerstone fair lending/fair housing Memorandum and Program. All these facts are admissible and go to intent under *Arlington Heights* (failure to follow defendant's own policies, evidence of historical context of actions, notice of and failure to address and correct discriminatory conduct).

Any undue prejudice to Defendants can be addressed by a limiting instruction to the jury. Defendants complain at note 15 to their consolidated first-round Motions In Limine that a limiting instruction would allow Plaintiffs to use the "Inappropriate Comments Policy" as part of their argument that Defendants did not have such a policy previously or that they did not have other anti-discrimination policies," claiming that such a use would be inappropriate under the Maryland Court's ruling that "the lack of policy" "is not actionable." *National Fair Housing Alliance v. Bank of Am., N.A.,* 2025 WL 2030225, *15 (D. Md. July 21, 2015). The cited

principle is inapplicable to this policy and to the present case. First, the conglomeration of Defendants' failures to abide by directions from Deutsche Bank's, by directions from regulator's, by their own internal policies, by Plaintiffs' warnings, by warnings of community witnesses—all about racial discrimination in REO conduct—are not "lack of policy." Second, the evidence of Defendants' policies in this case is extremely detailed, plentiful, and the policies are for the most part written in black-and-white and otherwise admitted. Again, there is no "lack of policy."

Defendants' motion to exclude any evidence of the Inappropriate Comments Policy should be denied, and the Court should consider the following (or similar) limiting jury instruction: *You may not consider the mere existence of Altisource's Inappropriate Comments Policy as proof that racially derogatory comments were included in and deleted from Altisource's Vendor Management System. You may consider Altisource's Inappropriate Comments Policy in context, along with other facts, to resolve the question of whether Altisource acted with discriminatory intent.*

Respectfully submitted,

*/s/ Jennifer K. Soule*

| | |
|---|---|
| Jennifer K. Soule | Lila Miller |
| James G. Bradtke | Edward Olds |
| Steven P. Schneck | Yiyang Wu |
| *Soule & Bradtke, PLLC* | Jennifer Klar |
| 155 N. Michigan Avenue, Ste. 504 | *Relman Colfax PLLC* |
| Chicago, IL 60601 | 1225 19th Street, N.W., Ste. 600 |
| | Washington, DC 20036 |
| | |
| Janell M. Byrd | Stephen M. Dane |
| Morgan Williams | *Dane Law LLC* |
| *National Fair Housing Alliance* | P.O. Box 1011 |
| 1331 Pennsylvania Ave, NW, Ste. 650 | Perrysburg OH 43552 |
| Washington, DC 20004 | |

Dated: December 30, 2025