**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, et al., | |
| Plaintiffs, | Case No. 18 CV 839 |
| v. | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Judge Manish S. Shah |
| Defendants. | Jury Trial Demanded |

**PLAINTIFFS' CONSOLIDATED SECOND-ROUND MOTIONS IN LIMINE
JANUARY 14, 2026**

## TABLE OF CONTENTS

I.     THE COURT SHOULD PRECLUDE ALL REFERENCES TO HUD'S DETERMINATION IN THE U.S. BANK PROCEEDINGS AND TO THE BANK OF AMERICA LITIGATION ................................................................................. 1

II.    THE COURT SHOULD PRECLUDE DEFENDANTS FROM WASTING TIME ON IRRELEVANT DEFICIENCY QUIZZES. ......................................................... 4

III.   THE COURT SHOULD PRECLUDE DEFENDANTS' ATTEMPTS TO ELICIT EXPERT TESTIMONY FROM LAY WITNESSES. ....................................... 11

IV.   THE COURT SHOULD EXCLUDE DOCUMENTS THAT DEFENDANTS FAILED TO TIMELY DISCLOSE OR PRODUCE. ................................................. 14

V.    THE COURT SHOULD EXCLUDE THE TESTIMONY OF KEVIN FLANNIGAN BECAUSE HE WAS NOT DISCLOSED TO PLAINTIFFS DURING DISCOVERY. .. 18

VI.   PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE REFERENCES TO PLAINTIFFS' RETENTION OF AN EXPERT WITNESS TO ADDRESS DAMAGES. ................................................................................................................ 27

VII.  MOTION TO BAR DEFENDANTS FROM INTRODUCING OR REFERRING TO EVIDENCE OF PLAINTIFFS' PRE-LITIGATION REGRESSION ANALYSIS. ......... 30

VIII. MOTION FOR ADMISSION OF FACTS PREVIOUSLY ADMITTED BY DEFENDANTS AND FOR RELATED RELIEF ............................................... 34

I. **THE COURT SHOULD PRECLUDE ALL REFERENCES TO HUD'S DETERMINATION IN THE U.S. BANK PROCEEDINGS AND TO THE BANK OF AMERICA LITIGATION**

Plaintiffs respectfully move the Court for an order *in limine* to preclude Defendants and their witnesses from making any reference to or soliciting any testimony regarding (a) the no-cause finding by HUD in NFHA's administrative complaint against U.S. Bank in 2016; and (b) Court rulings and proceedings in the *Bank of America* litigation that is currently on appeal in the Fourth Circuit. This Court has already determined that HUD's no-cause finding in the U.S. Bank matter is irrelevant, sustaining Plaintiffs' objection to that opinion in the summary judgment proceedings. ECF 442 at 6, n.6. Likewise, the Court rulings and proceedings in the *Bank of America* litigation are irrelevant. References to and solicitations of testimony regarding these matters would be highly prejudicial to Plaintiffs and, accordingly, the Court should enter an Order precluding such references and solicitations.

A. **HUD's No-Cause Finding in the U.S. Bank Matter Should Be Precluded.**

In their summary judgment filings, Defendants asserted evidence regarding the no-cause finding by HUD in NFHA's administrative complaint against U.S. Bank in 2016. *See, e.g.*, ECF 320, Rule 56.1 Statement, at ¶ 31. Plaintiffs responded that this evidence was immaterial and irrelevant. *See, e.g.*, ECF 362, at ¶ 31. In consideration of the parties' submissions, the Court sustained Plaintiffs' objection to relevance. ECF 442 at p.6, n.6.[1]

---

[1] Similarly, Judge Leinenweber did not acknowledge Defendants' U.S. Bank-related arguments in denying Defendants' Second Motion to Dismiss, ECF 97, after the issue was fully briefed by Plaintiffs, ECF 66 at 21-24. Plaintiffs objected to any consideration of the HUD No-Cause Determination in U.S. Bank because (a) an administrative agency's decision not to prosecute or enforce is presumptively unreviewable, (b) the HUD determination should carry no greater weight than positive resolutions with other large institutions resulting from Plaintiffs' REO investigations, and (c) the No-Cause Determination is riddled with error. *Id.*

Notwithstanding the Court's summary judgment ruling sustaining Plaintiffs' objection, Defendants have clearly indicated in their draft Final Pre-Trial Order documentation shared with Plaintiffs that Defendants intend to introduce evidence about HUD's no-cause finding at trial. Plaintiffs do not object to the introduction of evidence at trial regarding the fact that Plaintiffs' investigation of REO maintenance issues concerned multiple lenders including U.S. Bank. However, the HUD's no-cause finding in the U.S. Bank matter is not relevant to any issues to be presented at trial in this case.  Accordingly, Plaintiffs request that the Court enter an Order precluding Defendants and their witnesses from making or soliciting any reference to the no-cause finding by HUD in NFHA's administrative complaint against U.S. Bank in 2016. *See, e.g.*, *Estate of Collins ex rel. Collins v. U.S.*, No. 10–CV–35–F, 2011 WL 10977409, at *1 (D. Wyo. Feb. 9, 2011) (granting motion to exclude evidence of verdicts, judgments or awards from other cases); *Parr v. Sunbeam Prods., Inc.*, No. 06–1208, 2009 WL 10682264, at *9 (C.D.Ill. June 3, 2009) (excluding evidence of prior verdicts for or against a party because they "would likely cause undue prejudice by improperly influencing the province of the jury to function as an independent tribunal in assessing liability").

## B.  References To Bank of America Court Rulings and Proceedings Should Be Precluded.

As discussed with the Court during several pre-trial proceedings, the National Fair Housing Alliance and several of its members brought an action under the Fair Housing Act against Bank of America, N.A. and Safeguard Properties Management, LLC, in the District Court in Maryland. *National Fair Housing Alliance et al. v. Bank of America, N.A., et al.*, No. SAG-18-1919 (D. Md.). The District Court's summary judgment decision in that case is currently on appeal in the Fourth Circuit.

Plaintiffs do not object to the introduction of evidence at trial regarding the fact that Plaintiffs' investigation of REO maintenance issues concerned multiple lenders including Bank of America. However, for the same reasons underlying this Court's ruling sustaining Plaintiffs' objection to evidence regarding HUD's no-cause finding in the U.S. Bank matter, the Court rulings and proceedings in the *Bank of America* matter are not relevant to any issues to be presented at trial here. The only purpose in making references to or soliciting evidence regarding Court rulings and proceedings in the *Bank of America* matter would be to unfairly prejudice Plaintiffs. Accordingly, Plaintiffs request that the Court enter an Order precluding Defendants and their witnesses from making or soliciting any reference to the Court rulings and proceedings in the *Bank of America* litigation.

## II.    THE COURT SHOULD PRECLUDE DEFENDANTS FROM WASTING TIME ON IRRELEVANT DEFICIENCY QUIZZES.

At deposition, Defendants subjected Plaintiffs' employees to "quizzes" where Defendants presented pictures and asked deponents to score deficiencies. These quizzes often took up significant airtime, in no small part because of their inherently confusing and clunky nature. Defendants' proposed exhibits and deposition designations indicate that they intend to undertake these lengthy, confusing, and misleading detours at trial, too.

To permit these quizzes at trial would be wrong for two overarching reasons. First, the quizzes are irrelevant. When it comes to Plaintiffs' statistical evidence of disparities, the relevant dataset is the set of scores that NFHA validated pursuant to its quality control process. Plaintiffs do not offer the raw, unreviewed scores from on-site investigators, and scores elicited from Plaintiff representatives in years-later, out-of-context exercises are even more lacking in probative value. Put differently, any deficiency scores elicited at deposition or on the stand are wholly unrelated to the statistical disparities Plaintiffs will rely on at trial. Second, as a practical matter, these quizzes will be a confusing waste of time when there is already significant ground to cover in a compressed time. Accordingly, pursuant to Federal Rules of Evidence 402, 403, and 611(a), Plaintiffs seek to preclude Defendants from quizzing Plaintiffs about deficiencies at trial, through either live questioning or deposition testimony.

### A.  Plaintiffs' Inspection Methodology & Quality Control.

Plaintiffs begin with an overview of their inspection methodology and quality control process, which the Court as described as follows:

> The following facts are not from the Court's previous opinions, but they are not in dispute. Each investigation proceeded as follows: Investigators would arrive to the property and fill out a form listing 37 categories of deficiencies in exterior management (for example, trash on the curb, broken gutters, water damage, graffiti, etc.). (Resp. to Mot. to Excl. at 6–7, ECF No. 249.) Investigators would take a set of photos of the property that captured the "address, front view, right

> side view, back view, left side view, neighbor to the left, neighbor to the right, and neighbor to the opposite side." (*Id.* at 10.) Investigators would also take photos of each deficiency they noted, "as well as every sign posted on the property and positive maintenance and marketing features." (*Id.*) While completing these forms, investigators sometimes took handwritten notes describing the property. (*Id.*) The results of that investigation, including any pictures taken, were then uploaded to an electronic database. (*Id.* at 9–10.) The handwritten notes were not always transferred verbatim into the database. (*Id.* at 11.) Once the information was entered into the database, a "quality control" team from Plaintiff National Fair Housing Association ("NFHA") reviewed the information. (*Id.* 12–13.) This team edited the entries, allegedly to ensure that the deficiencies listed at each property were accurately reflected by the photographs. (*Id.* at 13.) Once the information was input into the database, Plaintiffs often destroyed or discarded the paper forms with the investigators' handwritten notes. (*Id.* at 12.)

ECF 282 at 2-3. As described above, all photographs taken during REO inspections were uploaded into the REO Database and electronically associated with what deficiencies were present at the properties (via the dropdown menu selections while uploading photos capturing a deficiency). Ex. 1 at 556-557 (Augustine Dep. Vol. III).

NFHA's quality control process entailed reviewing all the photos to see if the deficiencies were accurately selected. *Id.* at 574-575. For example, if an investigator uploaded records for ten properties, NFHA quality control team looked at the photographs uploaded with each of those ten records and examined whether the deficiencies selected were visible in the photographs and whether there were any deficiencies visible in the photographs that the investigator had not marked. *Id.* at 572, 574-575. NFHA also reviewed whether the correct deficiency was selected. For example, if a sign was incorrectly designated as a trespassing or warning sign and an accompanying deficiency noted, but the photo showed a winterization sign (which is not a deficiency), the deficiency was removed in quality control. *Id.* at 577. The NFHA employees who conducted the quality control will be testifying at trial.

5

### B. Defendants' Deposition Quizzes and Anticipated Evidence at Trial.

In 2021 and 2022, Defendants conducted depositions of Plaintiffs' corporate

representatives as well as of Plaintiffs' employees who conducted field inspections of at-issue

REO properties year earlier, between 2012 and 2017.

Defendants had access to Plaintiffs' scoring data (as validated by NFHA) and the

corroborating pictures. Defendants could have presented witnesses with pictures and the marked

deficiency and asked them to explain why the deficiency was merited. Instead, Defendants

presented witnesses with the photos alone and asked the witnesses to score deficiencies. These

photos were not necessarily of properties that the witness had scored, or even in the same state.

As just one example, Defendants presented witness Mari Houlihan of Plaintiff North Texas Fair

Housing Center with four packets of REO photos. *See* Ex. 2 at 93-116 (Houlihan Dep. Tr.).

Defendants did not identify which properties the photos corresponded to in Plaintiffs' dataset,

though they confirmed that at least two of the properties were not even Texas properties

inspected by Ms. Houlihan. *Id.* From the deposition transcript time stamps, it appears that

Defendants spent nearly an hour having Ms. Houlihan "score" the deficiencies in the photo

packets.

### C. NFHA's Quality Control Process Renders the Deficiency Scoring Quizzes Irrelevant.

The results of deficiency quizzes are irrelevant because they do not reflect the dataset at

issue or how NFHA validated it. Even if there were some scant relevance, permitting Defendants

to attempt to elicit different scores would be highly misleading and confusing. Rule 402 provides

that "irrelevant evidence is not admissible." Even for evidence that may have some probative

value, Rule 403 contemplates exclusion where that value is "substantially outweighed by a

danger of one or more of the following: unfair prejudice, confusing the issues, misleading the

jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Because the deficiency quizzes are both irrelevant and misleading, they should be excluded.

Conducting deficiency quizzes or reading in testimony of those that occurred at deposition may wrongly lead the jury to believe that the scores are probative of Defendants' liability, but they are not. As detailed above, Plaintiffs' inspection data in this case was subject to quality control by National Fair Housing Alliance ("NFHA") employees who will testify at trial. These employees used the inspection photographs to validate the deficiencies in the dataset analyzed by the parties' experts (the dataset that confirms statistically significant racial disparities, even after controlling for non-race factors). For deficiency scores, what matters is only how NFHA validated the data offered to prove disparities and the ultimate dataset yielded by that process. The irrelevance of this exercise remains the same no matter the results: Even if the witness precisely duplicated their on-site scoring, the scores would still be irrelevant because they would not have been through the last step in Plaintiffs' methodology, review by NFHA.

To the extent that Defendants argue that these quizzes are relevant to the jury's assessment of Plaintiffs' methodology, as opposed to the dataset, they are wrong. None of the field investigators ever scored properties from photographs—they performed their work in-person while on the premises. Only NFHA personnel engaged in a quality control process that entailed scoring properties from photographs. The fact that NFHA undertook quality control means that NFHA was the ultimate arbiter of the dataset. It would be wrong to imply to the jury that on-site inspectors' assessments governed when undisputed record evidence shows otherwise.[2]

---

[2] Because the Court has precluded Plaintiffs' expert Timothy Guetterman from testifying as to property photos, ECF 442 at 71, it would be inappropriate for Defendants to conduct a quiz with him, as they did at his deposition.

Defendants would hardly agree to such an absurd and inefficient approach to questioning their own employees or vendors about the condition of a property they were assigned to maintain. Instead of asking Defendants' employee whether he perceived that a hole in the roof at 123 Elm Street was a problem and why it was not fixed, would it make sense for Plaintiffs to show the employee roofs of houses in other states that had holes and ask for his opinion about them? Would it be efficient to make that employee guess whether the hole in the roof of the house he inspected was fixed, or would it be more productive to show him an inspection report he contemporaneously wrote and ask him about the basis for his decision?

Defendants are free to put on direct evidence of the deficiencies scored as compared to the pictures thereof. Defendants are also free to question NFHA witnesses on how they validated the scores in the database against the pictures, including specific changes made. (The litigation to date makes clear that Defendants intend to do just that.) And the jury may agree or disagree as to whether Plaintiffs' proffered deficiencies are supported by the photographs. But asking dozens of witnesses to score the properties in a vacuum says nothing about the actual dataset that Plaintiffs offer to prove discrimination or their methodology.

Given the low probative value, the high risk of confusing or misleading the jury, and the obvious implications for the trial calendar, the Court should preclude Defendants from quizzing Plaintiffs' witnesses on deficiency scores or hypotheticals. *See, e.g.*, *Federal Housing Finance Agency v. Nomura Holding America, Inc.*, 2014 WL 7229458, at *5 (S.D.N.Y. 2014) (excluding evidence of certain underwriting guidelines under Rule 403 because it would likely to result in improper comparisons by the jury and, "[a]t best, this mini-trial…would be a substantial distraction and waste of time."); *see also, e.g.*, *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1171 (7th Cir. 1983) (trial courts have discretion to place reasonable

time limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence).

### D. Conducting or Reading Deficiency Quizzes at Trial Would Be an Impenetrable Waste of Time.

On top of the irrelevance and impropriety of the deficiency quizzes is the fact that they will take up substantial trial time. The photo scoring exercises often took witnesses a long time to complete because they needed to look at the full set of photographs and compare them against each of the deficiencies on the checklist. The witnesses worked through the photo packets quietly, indicating there would be minutes-long stretches of dead air at trial. Defendants may attempt to protract this line of questioning even further at trial by following the quizzes with evidence of the deficiencies marked in the database for each property shown. There are twenty Plaintiffs and nearly forty types of deficiencies that would need to be addressed for each property. If Defendants are permitted free rein to ask witnesses to score multiple properties or speculate on deficiency hypotheticals, it will be impossible to complete this trial in the allotted time. Reading in the deposition designations is not a viable alternative. It is often hard to understand what pictures were being discussed or what part of a photo a witness is looking at when suggesting a deficiency. Because Defendants did not make an adequate record, understanding the transcripts requires substantial guesswork.

The Federal Rules of Evidence provide multiple tools to ensure that the already-scarce trial time is not needlessly burned on irrelevant, misleading, confusing, and prejudicial testimony. In addition to exclusion under Rule 403, Rule 611(a) instructs that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Together,

these rules support precluding Defendants from conducting or recreating deficiency quizzes at trial. This Court has the authority to control the questioning at trial to ensure that proceedings are focused on the relevant issues and do not take up needless time. The deficiency quizzes are not probative of the questions the jury must resolve, yet they will surely waste precious time. For this reason, and because the quizzes will be misleading and confusing, the Court should preclude Defendants from conducting quizzes at trial or reading in evidence of the same.

**III.**     **THE COURT SHOULD PRECLUDE DEFENDANTS' ATTEMPTS TO ELICIT EXPERT TESTIMONY FROM LAY WITNESSES.**

Plaintiffs, through Counsel, respectfully move the Court, pursuant to Federal Rules of Evidence 701 and 403, to preclude Defendants from attempting to elicit expert testimony from Plaintiffs' lay witnesses, through either live testimony or reading deposition designations. In particular, Plaintiffs request the Court prohibit Defendants from soliciting testimony from Plaintiffs' witnesses regarding industry standards for property preservation and maintenance. The Court should grant this motion for two reasons. First, Rule 701 prohibits lay witnesses from offering opinion testimony that is governed by Rule 702. Second, any minimal probative value of attempting to elicit expert testimony from lay witness would be substantially outweighed by unfair prejudice, a tendency to confuse and mislead the jury, and wasting time.

    **A.**   **Lay Witnesses May Not Offer Expert Testimony Under the Federal Rules of Evidence.**

Federal Rule of Evidence 701 "prohibits lay witnesses from offering opinions based on 'scientific, technical, or other specialized knowledge' governed by the expert witness rule [702]." *Feazell v. Wexford Health Sources, Inc.*, 140 F.4th 438, 444 (7th Cir. 2025) (quoting Fed. R. Evid. 701(c)); *see also United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) (lay testimony may not be used to "provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events" (quotation omitted)). "Lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Higgins v. Lake Cnty. Cir. Ct. Clerk's Off.*, No. 17-CV-07637, 2025 WL 3683058, at *9 (N.D. Ill. Dec. 18, 2025) (quoting *United States v. Christian*, 673 F.3d 702, 709 (7th Cir. 2012)).

**B. Industry Standards for Proper REO Preservation and Maintenance Are a Subject of Expert Testimony and Are an Inappropriate Topic for Questioning Lay Witnesses.**

Industry standards and best practices for properly maintaining an REO is the subject of expert testimony from Plaintiffs' expert, Deavay Tyler. *See* ECF 442 at 57, 67; *see also generally* ECF 357-1; ECF 357-2. Because these topics of testimony are "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Smith v. City of Chicago*, No. 21-CV-1159, 2025 WL 1744919, at *4 (N.D. Ill. June 24, 2025) (quoting Fed. R. Evid. 701(c)), they are inappropriate testimony topics for lay witnesses who lack such specialized knowledge.

Defendants' deposition designations make clear that they intend to elicit from lay witnesses expert testimony on industry standards for maintaining REO properties. Defendants designated dozens of pages of Lindsay Augustine's deposition testimony where she was exhaustively questioned on industry standards best practices for REO preservation and maintenance. *See* Ex. 3, Highlighted Excerpts of Oct. 15, 2021 L. Augustine Dep. Tr.[3] Ms. Augustine is questioned on industry standards for frequency of property visits, cutting grass, overgrown shrubbery, snowfall, cleaning gutters, broken windows, peeling and chipped paint, accumulated mail, and the cost of maintenance activities as compared to the value of the property. *See generally id.* The answers to all these questions are provided by Mr. Tyler, who, as recognized by the Court, has years of experience providing and managing the provision of preservation and maintenance services to REO properties. *See* ECF 442 at 57. Ms. Augustine has none of Mr. Tyler's specialized knowledge, training, or experience, and it would be wholly improper to allow Defendants to question her or any other Plaintiff witness on topics within Mr. Tyler's area of expertise.

---

[3] In this exhibit, Defendants' affirmative designations are highlighted in orange, and Plaintiffs' counter-designations are highlighted in green.

### C. Allowing Expert Questioning of Lay Witness Would Be Confusing, Misleading, and Unfairly Prejudicial to Plaintiffs.

The Court should also preclude Defendants from questioning Ms. Augustine or other witnesses about industry standards for REO maintenance under Federal Rule of Evidence 403. This rule permits the Court to exclude testimony for which the "probative value is substantially outweighed by . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time." Fed. R. Evid. 403. Because Ms. Augustine is not an expert in appropriate provision of preservation and maintenance services to REO properties, there is little to no probative value to her repeatedly testifying that she "doesn't know" the industry standards for one aspect of REO maintenance or another. *Cf.* Ex. 3. While it is unsurprising that a lay witness without the requisite specialized knowledge would be unable to offer substantive expert testimony, permitting this line of questioning would create unfair prejudice, would confuse and mislead the jury, and waste precious time. Jurors may not understand that Ms. Augustine is being asked questions that require expertise that she does not claim to possess. Jurors may also conflate questioning on REO maintenance industry standards with the questioning on the appropriateness of Plaintiffs evaluation criteria, which was developed in part through consultation with industry leaders.[4] Finally, the deposition designations show that allowing this line of irrelevant questioning would undoubtedly occupy a significant amount of limited trial time.

For the above reasons, Plaintiffs respectfully request that the Court preclude Defendants from attempting to elicit expert testimony on industry standards for REO preservation and maintenance from Ms. Augustine or other lay witnesses who lack the specialized knowledge to provide it.

---

[4] This motion does not seek to preclude questioning and testimony on Plaintiffs' process for developing the investigation criteria.

**IV.** **THE COURT SHOULD EXCLUDE DOCUMENTS THAT DEFENDANTS FAILED TO TIMELY DISCLOSE OR PRODUCE.**

Defendants' exhibit list includes documents that were not produced in discovery and that Plaintiffs did not know about until Defendants added them to their exhibit list on January 2, 2026. These documents are responsive to Plaintiffs' requests for production and should have been produced in discovery. Defendants' failure to timely disclose these documents violates Federal Rule of Civil Procedure 37 and warrants exclusion under Rule 37(c)(1). On top of that irretrievable flaw, many of these exhibits are separately excludable as irrelevant and unauthenticated hearsay.

**A. Defendants' Exhibit List Includes Undisclosed Materials.**

During discovery, Plaintiffs asked each Defendant to produce certain specific categories of relevant materials. Plaintiffs also asked each Defendant for "all documents not otherwise produced that Defendant will rely on to Defendant against Plaintiffs' claims" as well as for "all documents supporting or relating to Defendant's defenses set forth in its Answer." *See* Ex. 4 (compilation of discovery requests).

Despite these requests, Defendants are now attempting to offer documents at trial that they did not produce in discovery. For example:

- Defendants' Exhibit No. 500 is a Department of Housing and Urban Development ("HUD") news release on low value properties;

- Defendants' Exhibit No. 503 is an undated document from the Federal Reserve Board of Cleveland on strategies for low value properties;

- Defendants' Exhibit No. 2497 is a HUD document regarding application and award policies for Fair Housing Initiatives Program grants; and

- Defendants' Exhibit No. 5869 is the LinkedIn profile of an Altisource employee.[5]

---

[5] Plaintiffs identify these exhibits as relevant examples and reserve the right to challenge any document not produced in discovery under Federal Rule of Civil Procedure 37(c).

On January 9, Defendants asserted that these exhibits are "publicly available," and they provided copies of these materials just yesterday. *See* Ex. 5 (Jan. 9 Email from S. Kim); Ex. 6 (Jan. 13 Email from S. Kim). Yet none of the above documents has been confirmed as previously produced using a Bates number, a deposition exhibit number, or some other record of disclosure.

**B. Defendants' Undisclosed Exhibits Must Be Excluded Under Rule 37.**

Federal Rule of Civil Procedure 37(c) provides "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 37(c) serves as "a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a motion under subdivision (a)(2)(A)." Fed. R. Civ. P. 37(c), Advisory Committee Notes to the 1993 Amendment.

Defendants have listed these new materials on their trial exhibit list, indicating that they are responsive to Plaintiffs' requests for production, and thus should have been produced during discovery. Defendants have not justified their failure to disclose these materials. The fact that these materials may exist in the public domain does not excuse Defendants from their obligation to disclose them as relevant documents *in this case*. *See, e.g.*, *Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, No. 2:16-CV-00134-JRG, 2017 WL 2869365, at *1–2 (E.D. Tex. May 18, 2017) (rejecting Defendants' argument that information did not need to be disclosed during discovery because it was publicly available). For that reason, courts will exclude trial exhibits that were not disclosed in discovery, even when they are publicly available. *See, e.g.*, *TecSec v. Adobe Inc.*, No. 1:10-cv-115, 2018 WL 11388472, at *2 (E.D. Va. Nov. 21, 2018) (granting motion in limine to

15

exclude exhibits not produced in discovery and rejecting argument that the exhibits were admissible because they were public).

Nor is Defendants' failure to disclose justified or harmless. As to the lack of justification, Defendants' pretrial correspondence offered no reason for their belated identification of materials, including exhibits that pertain to Defendants' own personnel. Indeed, Defendants have long focused on Plaintiffs' receipt of HUD funding (despite its irrelevance), asking about it in discovery requests and at deposition, yet disclosing HUD award documents themselves only now. The untimely disclosure appears born not from recent factual developments, but rather a recent change in litigation strategy. *See, e.g.*, *Iglesias v. Guevara*, No. 19-CV-06508, 2025 WL 3171611, at *21 (N.D. Ill. Nov. 13, 2025) (finding that late disclosure of evidence without explanation was "neither substantially justified or harmless" and subject to exclusion). As to harm, Plaintiffs were deprived of the opportunity to conduct their own investigation into the context and implications of these materials. Plaintiffs were also deprived of the opportunity to question Defendants' witnesses about these documents at deposition. Plaintiffs accordingly have no sense of the undisclosed exhibits' relevance (if any) or how they will be used at trial.

This is precisely the kind of unfair surprise that the Federal Rules guard against. And because of the timing, there is no opportunity to cure this prejudice before trial. Under the Seventh Circuit caselaw, Defendants' belated disclosure is the type that merits exclusion under Rue 37. *See, e.g.*, *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) ("[W]e have indicated that the following factors should guide the district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness

involved in not disclosing the evidence at an earlier date."). The Court should exclude any of Defendants' exhibits that were not previously disclosed.

### C. Defendants' Undisclosed Exhibits Are Also Inadmissible as Irrelevant and Unauthenticated Hearsay.

Even if Defendants could justify their failure, the exhibits identified above are separately inadmissible for multiple other reasons. First, Defendants have not articulated their relevance in any meaningful way. It remains unclear why these non-party documents bear on the claims and defenses the jury will consider. The irrelevance of these exhibits is alone grounds for exclusion. *See* Fed. R. Evid. 401, 402. Second, Defendants have not explained how they will authenticate these materials when they appear to have been generated by non-parties, such as federal agencies, none of whom appear on either side's witness list. Third, the above-identified exhibits are out-of-court statements and thus constitute inadmissible hearsay. *See* Fed. R. Evid. 801(c), 802; *see also, e.g.*, *Kailin v. Greer*, No. 19 C 5188, 2025 WL 2108721, at *6 (N.D. Ill. Jul. 28, 2025) (excluding non-party statements as hearsay). For the foregoing reasons, the Court should exclude the above-identified exhibits.

## V. THE COURT SHOULD EXCLUDE THE TESTIMONY OF KEVIN FLANNIGAN BECAUSE HE WAS NOT DISCLOSED TO PLAINTIFFS DURING DISCOVERY.

On December 5, 2025, Defendants informed Plaintiffs for the very first time that Ocwen employee Kevin Flannigan may be called as a live witness in Defendants' case-in-chief.[6] But it is undisputed that Mr. Flannigan never appeared in Defendants' Rule 26 disclosures, as initially presented or as updated after the close of discovery. He was never disclosed in response to multiple relevant interrogatory requests. And, in early 2022, toward the end of discovery, when the parties engaged in an extended meet-and-confer about anticipated trial witnesses (and Plaintiffs explicitly said that they intended to depose everyone whom Defendants disclosed as someone they may call at trial), Mr. Flannigan was, once again, never mentioned.

Defendants' failure to disclose Mr. Flannigan until the eve of trial requires his exclusion under Federal Rule of Civil Procedure 37(c)(1). The Rule states that a party who not does disclose or supplement information as required by Rules 26(a) or (e) may not then offer that information as evidence at trial unless its "failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Defendants cannot establish that its failure to disclose Mr. Flannigan during discovery was either substantially justified or harmless, and accordingly they should not be permitted to present him at trial.

### A. Factual Background.

On February 28, 2020, Defendants first provided Plaintiffs with Rule 26 initial disclosures in this case. *See* Ex. 7 (Feb. 28, 2020 Initial Disclosures). Rule 26 states that each party <u>must</u> provide to the other party "the name and, if known, the address and telephone number

---

[6] Defendants at first disclosed Mr. Flannigan as part of their "Will Call" list—just one of four fact witnesses on their "Will Call" list. This morning (January 14, 2025), Defendants newly informed Plaintiffs that they have moved Mr. Flannigan from their "Will Call" list to their "May Call" list.

of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses…" Fed. R. Civ. P. 26(a)(1)(A)(i). On June 28, 2022, the parties' agreed-upon post-fact-discovery deadline for supplementing written discovery, and long after Defendants were aware of Plaintiffs' theory of the case, Defendants updated their initial disclosures again. *See* Ex. 8 (June 28, 2022 Initial Disclosures). Mr. Flannigan's name was not present in either version of Defendants' Rule 26 disclosures.

On July 2, 2020, Plaintiffs served interrogatory requests on Defendants, including an interrogatory directing Defendants to "identify each person with knowledge of any fact that supports or refutes the allegations of the Second Amended Complaint or your defenses, and briefly describe the nature of the person's knowledge." *See* Ex. 9 (Plaintiffs' Interrogatory 7).[7] Defendant Ocwen's responses are attached as Exhibits 10-12: they first responded on August 19, 2020 and amended two additional times (on January 6, 2021 and finally June 28, 2022)—never mentioning Mr. Flannigan.

Plaintiffs conducted discovery in reliance on the representations Defendants made in their disclosures. Most notably, *Plaintiffs deposed every individual* identified by Ocwen in its June 28, 2022 Rule 26 disclosures. This should have come as no surprise to Defendants; during a series of meet-and-confers in early 2022, Plaintiffs explicitly told Defendants that they wanted to know who Defendants planned to call at trial so that they could depose them. Defendants made

---

[7] Plaintiffs also served interrogatories asking Defendants to "identify the names of and job titles of all persons you employed who had responsibilities related to the Deutsche Bank REO properties" (Interrogatory No. 1) and to "identify each person with any responsibility for the maintenance, management, preservation, monitoring or marketing of the property" of properties Plaintiffs investigated (Interrogatory No. 8). Ocwen also responded to these interrogatories four times without naming Mr. Flannigan in response. *See* Ex. 10-12.

changes to their Rule 26 disclosures as a result of those conversations, removing a certain witness, and as a result Plaintiffs did not depose that witness. *See* Ex. 13 (Email Thread Between D. Bogo-Ernst and J. Soule, "Re: NFHA, et al. v. Deutsche Bank National Trust, et al. [MB-AME.FID1971713].").

On December 5, 2025, when Defendants first submitted a witness list that included Mr. Flannigan's name, Plaintiffs looked into the identity of Mr. Flannigan. To the best that Plaintiffs can determine, Mr. Flannigan has shown up in just two documents pertaining to this case—and just one during the discovery period. First, on May 8, 2018, before discovery in this matter had begun, Mr. Flannigan submitted a declaration that was attached to Defendants' Joint Motion to Dismiss. *See* Ex. 14 (Flannigan Declaration). In the declaration, Mr. Flannigan swore that he was a Senior Loan Analyst at Ocwen, and he averred that Ocwen had minimal or limited contacts within the state of Illinois. (The court's opinion rejected Ocwen's jurisdictional arguments, and Ocwen's jurisdiction has not been relevant in the case since.) Second, on August 19, 2020, Mr. Flannigan signed a sworn verification on behalf of Ocwen as part of its first set of responses to Plaintiffs' interrogatories. There, he again stated that he was a Senior Loan Analyst and swore that "to the best of [his] knowledge" that the responses contained in Ocwen's discovery were true. *See* Ex. 10 *supra*. (Plaintiffs are unaware of any further involvement or signatures by Mr. Flannigan submitted by Ocwen over the next two years.)

In other words, as best as Plaintiffs can tell: (1) Mr. Flannigan worked at Ocwen from at least 2018 and 2022; (2) Defendants were aware of Mr. Flannigan before the close of discovery; (3) Defendants nevertheless failed to disclose him as part of their disclosures or in response to Plaintiffs' targeted interrogatories; (4) and Defendants did not identify Mr. Flannigan in the

parties' meet and confer discussions concerning witnesses upon whom Defendants would rely at trial.

**B. Defendants Should Be Precluded from Introducing Mr. Flannigan's Testimony at Trial.**

Defendants violated their discovery obligations by not including Mr. Flannigan on their Rule 26 initial disclosures or interrogatory responses. Parties are required under Rules 26(a) and (e) to timely supplement their disclosures and interrogatory responses where they are incomplete or incorrect. Fed. R. Civ. P. 26(e)(1)(a). Under Rule 37(c)(1) of the Federal Rules, a party that does not disclose information as required by Rule 26(a) or (e) may not offer the information as evidence unless its "failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Here, there is no question that Defendants failed to include Mr. Flannigan when he was clearly responsive to interrogatory requests and should have been disclosed pursuant to Rule 26. The Seventh Circuit's reasoning in *Morris v. BNSF Railway Co.* is directly on point. 969 F.3d 753, 765 (7th Cir. 2020). In *Morris*, the trial court excluded the testimony of three witnesses who were belatedly disclosed after the close of a three-year discovery period and less than a month before trial. The Seventh Circuit affirmed this decision. It found that, especially in cases where "many [of defendant's] employees play a role in the facts, substantial document productions occur, and the parties have sharply competing views about what information is pertinent to claims and defenses," the "adherence to the duty to supplement takes on practical importance." *Id*. (quoting *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)); *see also id.* ("[T]he whole point of introducing the discovery mechanisms listed in Rule 26 was to ensure that trials would no longer be carried on in the dark.").

Failure to make proper Rule 26 disclosures cannot be substantially justified by the fact that a witness's name appeared as part of the discovery record. In *Morris*, the defendants had

disclosed the relevance of the witnesses in interrogatory responses and document production, and the plaintiff knew of the witnesses because he had been employed at the same company. The district court nevertheless found—and the Seventh Circuit affirmed—that this was insufficient. *Id.* at 766. It reasoned, "[i]t's one thing to know that a person's name is out there [but] it's another thing to know that the other side is intending to call him as a witness. That's why we have Rule 26(a) disclosures." *Id.* at 765; *see also Stephenson v. City of Chicago*, No. 21 CV 338, 2024 WL 3252332, at *7 (N.D. Ill. July 1, 2024) (same).

Defendants in the instant matter have done even less to comply with their discovery obligations than the defendant in *Morris.* Even after they disclosed Mr. Flannigan on their witness list, Defendants have not amended their Rule 26 disclosures to list him. Defendants have not identified any deposition during which Mr. Flannigan's name came up from any other witness. They also failed to disclose Mr. Flannigan on any responsive interrogatories, including as a person who worked on Deutsche Bank REO properties or on properties inspected by Plaintiffs. There is no basis for Plaintiffs to have known that, out of the thousands of Ocwen employees, Mr. Flannigan is one of a handful who would testify at trial.

When pressed on this matter, Defendants proffered that they would limit the testimony of Mr. Flannigan to three categories, *see* Ex. 15, but their argument still fails. Among other proffers, Defendants seek to elicit testimony from Mr. Flannigan about information Defendants conveyed in their August 2020 interrogatory responses because he signed a verification form. Such testimony is prejudicial on several levels. First, because Mr. Flannigan was never deposed, Plaintiffs have no understanding as to his basis for testifying about those subjects. (To the contrary, as discussed earlier, Mr. Flannigan was not even listed as someone who worked on Deutsche Bank properties or on properties inspected by Plaintiffs, so it is altogether unclear how

he would have sufficient foundation to testify about the interrogatories.) Second, the interrogatories include wide-ranging content, including information regarding Ocwen's vendors and contractors, the list of properties that were investigated by Plaintiffs that Ocwen admits to servicing, and the multiple software platforms Ocwen used for tasks related to REO property preservation and maintenance (and, presumably, the wide variety of data contained therein).[8] If the Court permitted Mr. Flannigan's testimony, Plaintiffs would have to prepare to cross-examine and rebut his testimony without being able to depose him, question other witnesses about him in an effort to identify conflicting testimony or develop testimony where other witnesses lacked knowledge, and/or obtain relevant information through interrogatories, document requests, and/or subpoenas to third parties. This would have the effect of reopening the door to a wide-ranging set of subjects about which discovery was closed long ago, including subjects and information on which experts on both sides have relied.

The relevant inquiry is not whether Plaintiffs were on notice that Mr. Flannigan signed certain case-related documents over the course of eight years; rather, it is whether he was disclosed as a witness. *See Ty, Inc. v. Publications Int'l, Ltd.*, No. 99 C 5565, 2004 WL 421984, at *4 (N.D. Ill. Feb. 17, 2004) ("[M]erely because the names of these witnesses appeared, among hundreds of other names, somewhere in the thousands of pages of documents produced by Ty,

---

[8] With respect to Ocwen's data and systems, Ocwen and Altisource specifically in lieu of live F.R.C.P. 30(b)(6) testimony about data systems and data sets, both participated by agreement in responding by letter to dozens of written questions and responses submitted by Plaintiffs concerning data fields, data sets, and Ocwen's data systems, some of which interrelate to and are integrated with Altisource's data systems. These responses were signed by Debra Bogo-Ernst (for Ocwen) and Nathan Garroway (for Altisource). Following this process, both Ocwen and Altisource agreed to stipulate that their answers to the data-related questions provide to Plaintiffs were investigated and collected within their entities and were answered in good faith to the best of their ability. Additionally, Ocwen's corporate designee and Ocwen's SEC 10K filings, exhibits for trial, already provide considerable information and testimony concerning Ocwen's data systems and usage.

does not mean that Ty should have anticipated that PIL would call these individuals as trial witnesses and deposed them accordingly."). None of his testimony should be permitted.[9]

For the above-stated reasons, the testimony of Mr. Flannigan must be excluded because Defendants' failure to disclose him is both unjustified and harmful. The Seventh Circuit has articulated four related factors that help a court decide on the severity of a failure to disclose. Those factors are: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (citations omitted) (finding non-disclosure of witness prejudicial and unjustified). Here, three, if not all four, factors support exclusion.

As to the <u>first</u> factor, as described above, both prejudice and surprise are present. Plaintiffs took great pains to ask Defendants who they anticipated introducing at trial, and organized their discovery and trial strategy around the information Defendants gave them. They have little to no knowledge about Mr. Flannigan and preparing for his cross-examination under these circumstances would be extremely prejudicial. *See King v. Ford Motor Co.,* 872 F.3d 833,

---

[9] With respect to Defendants' request to have Mr. Flannigan testify about the authentication of certain documents, Defendants have not identified the universe of such documents and have not even articulated a basis for thinking they would need to call him for this reason. To the contrary, this Court has stated that it intends to pre-admit many exhibits, and Plaintiffs have agreed to deem authentic Defendants' timely-produced corporate documents. The likelihood of needing Mr. Flannigan's authentication-related testimony is thus minimal at best. With respect to Defendants' request that Mr. Flannigan testify about information he conveyed about Ocwen's presence in Illinois—a subject on which Mr. Flannigan introduced a declaration at the motion to dismiss stage—Defendants have failed to explain why this testimony would be relevant at trial. With respect to Defendants' decision to move Mr. Flannigan from the "will call" list to the "may call" list, this makes no difference to the dispute in front of the Court. The prejudice remains— and in fact may be aggravated by the uncertainty of whether Defendants will call Mr. Flannigan. And Defendants have not further limited the scope of topics for which they intend to call him.

838 (7th Cir. 2017) ("[T]here is obvious prejudice in failing to disclose such a witness during discovery, as that prevented Ford from deposing Morton and conducting any appropriate follow-up discovery, so the violation was not harmless.").

The second and third factors go hand in hand. Defendants may suggest that allowing Plaintiffs to take the out-of-time deposition of Mr. Flannigan would cure any prejudice. But re-opening discovery would be a time-consuming, costly, and prejudicial "re-do" of discovery completed years ago, when Plaintiffs should be preparing for a trial. Theres is simply no time for Plaintiffs to undertake another deposition now. In addition, taking Mr. Flannigan's deposition would likely result in the need for additional documents and testimony from additional witnesses identified, but there would be no time for Plaintiffs to follow through with those leads. Plaintiffs would be forced to cross-examine Mr. Flannigan with such significantly imperfect information.

Defendants may in the alternative suggest that the trial be continued to allow Plaintiffs to conduct discovery, but this is no better. Trial is two weeks away, and the Court and Plaintiffs have a significant interest in seeing it through. In other words, either option—forcing Plaintiffs to meet the new evidence with both hands tied behind their backs or continuing the trial to reopen discovery and causing a delay in this long-running litigation—would result in significant prejudice to Plaintiffs. *See Ty, Inc.*, 2004 WL 421984, at *4 (striking witnesses because parties "are well past the discovery cutoff in this case, and I will not permit [defendant] to use the new witness designations as a backdoor method for reopening discovery."); *Hard Surface Sols., Inc. v. Sherwin-Williams Co.*, 271 F.R.D. 612, 617 (N.D. Ill. 2010).

Finally, with respect to the fourth factor, Judge Jenkins noted in *Stephenson* that recklessness can satisfy this factor: "Defendants repeatedly asked Stephenson to provide a witness list, objected to his general references to discovery materials, and eventually moved to

compel the production of a witness list. Despite these actions by Defendants, Stephenson failed to disclose Julie's name and gave no indication that he would rely on her testimony at summary judgment or trial. The Court finds that Stephenson was at least reckless as to the possibility that Defendants believed that he had disclosed every witness he would use to support his case, yet he allowed them to labor under that false impression." *Stephenson*, No. 21 CV 338, 2024 WL 3252332, at *7. Here, Defendants have offered no explanation for why they failed to disclose Mr. Flannigan until last month. This factor is, in other words, neutral at best.

The Seventh Circuit has made clear that "complying [with Rule 26] should be a priority—not something brushed off as tedious or unimportant so long as the information disclosed late can somehow be unearthed like a needle in a haystack within a prior discovery production." *Morris*, 969 F.3d 766. "Parties who do not attend diligently to their obligation to supplement initial disclosures proceed at their own peril." *Id.* Plaintiffs should not be prejudiced, and Defendants should not be awarded, for Defendants' failure to adhere to their discovery and disclosure obligations. For all these reasons, Plaintiffs respectfully request that the Court exclude the testimony of Mr. Flannigan.

## VI.    PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE REFERENCES TO PLAINTIFFS' RETENTION OF AN EXPERT WITNESS TO ADDRESS DAMAGES.

Plaintiffs respectfully move the Court for an order *in limine* to preclude Defendants and their counsel from making any reference to, or soliciting any testimony regarding, Plaintiffs' retention of an expert witness to provide an opinion assessing Plaintiffs' damages. The Court has granted Defendants' motion to exclude the testimony and opinions of damages expert witness Professor Stacy Seicshnaydre. ECF 460 at 4-9. Any references to and solicitations of testimony regarding such an expert retention would not make the likelihood or amount of damages any more or less probable, and is therefore irrelevant under FRE 401. In addition, soliciting the fact that plaintiffs hired an expert on this subject, and did not present the expert at trial, would be highly prejudicial to Plaintiffs. FRE 403. Accordingly, the Court should enter an Order precluding any such references and solicitations.

No adverse inference may be drawn from a party's failure to call a witness at trial, unless the missing witness was "peculiarly within the power" of the party to produce. *Oxman v. WLS-TV*, 12 F.3d 652, 660 (7th Cir. 1993). Pursuant to this Court's ruling prohibiting Professor Seicshnaydre from testifying, she is no longer "within Plaintiffs' power" to produce. *See also Herbert v. Wal-Mart Stores, Inc.,* 911 F.2d 1044, 1048 (5th Cir. 1990) (expert witness is not "peculiarly within the power" of a party to produce). Moreover, the Committee Comments to Seventh Circuit Civil Pattern Jury Instruction 1.19 ("Adverse Inference From Missing Witness") make clear that the court has discretion "to ensure that counsel does not make reference to matters not in evidence." Because Professor Seicshnaydre's expert opinion will not be in evidence, defense counsel should not be allowed to make reference to or ask questions referencing its omission. *See also Herbert*, 911 F.2d at 1048 (upholding trial court's refusal to give adverse inference instruction based on defendant's failure to call expert witness); *Jones v.*

27

*City of Chicago*, 2017 U.S. Dist. LEXIS 12857 at *25, 2017 WL 413613 (N.D. Ill. 2017)

(applying *Oxman v. WLS-TV*).

Notwithstanding the Court's exclusion of Professor Seicshnaydre's opinion testimony on damages, Defendants have clearly indicated in their designations of Plaintiffs' deposition testimony that they intend to introduce questions and answers about damages that make reference to "expert" testimony on the subject. For example, here are just a few of the deposition questions and answers Defendants have indicated they intend to introduce at trial:

> ·7 Q.· ·Have you calculated a precise amount of
> ·8· ·damages for frustration of mission?
> ·9· · · ·A.· ·No.
> 10· · · ·Q.· ·What evidence do you intend to give to an
> 11· ·expert witness to support these damages?
> 12· · · ·A.· ·I don't know.· We haven't settled upon that
> 13· ·yet.

Def. Dep. Designation, James McCarthy, 30(b)(6) of Central Ohio Fair Housing Association,

03/14/22, at p. 159.

> · Q.· ·So do you have a damages amount for what
> ·8· ·you're saying are opportunities that you had to pass on
> ·9· ·that would enable you to grow the organization and
> 10· ·expand on your mission?
> 11· · · ·A.· ·I don't think we've quantified that yet.
> 12· · · ·Q.· ·Is that going to be something that you're
> 13· ·going to rely on the experts to quantify?
> 14· · · ·A.· ·I think that will be a decision we'll reach
> 15· ·with the other plaintiffs and our legal counsel.

Def. Dep. Designation, James McCarthy, 30(b)(6) of Miami Valley Fair Housing Center,

10/06/2021, p. 245.

At the time the deposition answers were elicited, providing expert witness testimony on damages was indeed Plaintiffs' intent. However, in light of the Court's exclusion of such expert opinion testimony, Plaintiffs are now prohibited from doing so. Moreover, the Court has

indicated that expert opinion testimony on damages is not even necessary. ECF 460 at 9. To now allow the Defendants to introduce testimony suggesting that expert testimony is expected, or will be forthcoming, would unfairly prejudice Plaintiffs in the eyes of the jury.

Barring Defendants from referring to Plaintiffs' prior retention of an expert witness will not hinder Defendants presenting a vigorous defense regarding damages. All of the Plaintiffs provided extremely detailed discovery responses regarding their damages related to diversion of resources and frustration of mission and Defendants were provided with literally thousands of pages of responsive documents. Defendants then took the deposition of the corporate designee of each of the Plaintiff organizations, and regardless of whether the witness deferred to an expert with regard to "putting a number on" frustration of mission damages, Defendants pursued questions regarding Plaintiffs' claimed damages in excruciating detail. *See e.g.*, Rule 30(b)(6) deposition of FHANC corporate designee, pp. 39-45, 74-77, 118-206, 218-233 (deposition questions regarding organizational mission, impact on activities and opportunities, expenditure of time and resources, timekeeping entries and other matters related to damages). And, of course, a representative of each of the organizational Plaintiffs will testify at trial, providing Defendants with a further opportunity to inquire regarding the basis for Plaintiffs' damages claims.

Therefore, Plaintiffs request that the Court enter an Order precluding Defendants and their counsel from making or soliciting any reference to Plaintiffs' retention of an expert witness to provide an opinion regarding Plaintiffs' damages.

**VII.     MOTION TO BAR DEFENDANTS FROM INTRODUCING OR REFERRING TO EVIDENCE OF PLAINTIFFS' PRE-LITIGATION REGRESSION ANALYSIS.**

Plaintiffs respectfully move the Court to bar Defendants from introducing or referring to evidence of Plaintiffs' Pre-Litigation Regression Analysis. Plaintiffs' pre-litigation statistical analysis has no probative value because it has been supplanted by the work of Plaintiffs' testifying expert. Evidence related to the pre-litigation analysis would therefore be a distracting waste of time, and it should be excluded under Federal Rules of Evidence 401 and 403. In support of this motion, Plaintiffs state as follows:

**A.  Background.**

After Plaintiffs had conducted their property inspections into maintenance conditions at Deutsche Bank REO properties in majority white communities and communities of color, Plaintiffs sought expert consultation with regard to whether, as a preliminary matter, the investigation indicated that statistically significant disparities existed between the condition of properties in these communities.

In this regard, Plaintiffs engaged Dr. Jacob Rugh, a Professor in the Sociology Department at Brigham Young University to consult and conduct a preliminary statistical analysis. Dr. Rugh advised Plaintiffs of his opinion that the results of the investigation preliminarily indicated that statistically significant disparities existed between the maintenance of Deutsche Bank REO properties in white communities as compared to the maintenance of Deutsche Bank REO properties in communities of color. Dr. Rugh was not involved in the design or conduct of the Plaintiffs' investigation. His role in the case was limited to this preliminary analysis of Plaintiffs' inspection data.

Based on their consultations with Dr. Rugh, Plaintiffs alleged in their Complaint that statistical analysis indicated that disparities existed between REO conditions in white

communities as opposed to communities of color, and that these disparities were not explained by non-racial factors. *See* Complaint, ECF 1 at ¶¶ 83-84; Second Amended Complaint, ECF 70 at ¶¶ 106-108.

Judge Leinenweber believed that this allegation in the Complaint warranted allowing Defendants to obtain the preliminary analysis Dr. Rugh conducted as a consultant and, ultimately to depose him. ECF 161.[10]

Dr. Rugh is not one of Plaintiffs' expert witnesses for purposes of this trial, has not performed work in anticipation of trial and did not submit any expert report in this case.

In their list of proposed exhibits, Defendants have identified a whole series of documents relating to the preliminary statistical analysis performed by Dr. Rugh while consulting for Plaintiffs, including even emails with Plaintiffs' Counsel. The exhibits at issue are: Rugh Dep. Ex. 7862; STAT 248, STAT 404, STAT 289, STAT 466, STAT 502, STAT 546, STAT 554, STAT 557, NFHA 33466 and Dr. Rugh's resume.

### B. Dr. Rugh's Materials Are Irrelevant and Introduction at Trial Would Prejudice Plaintiffs.

Under Rule 401 evidence is relevant only if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Rule 403 permits the exclusion of evidence "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. The Advisory Committee Notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis."

---

[10] Plaintiffs opposed the request to depose Dr. Rugh and maintain that his analysis and opinions were irrelevant during discovery.

Documents relating to the preliminary statistical analysis conducted by Dr. Rugh should be excluded under both of these standards. First, we start with the fact that Dr. Rugh does not appear on either side's witness list and will not appear as a witness at trial. As such, even if there was any conceivable probative value to his preliminary analysis, there is no witness to explain what he was doing, the data he used, the assumptions he made or what the results meant. The proposed exhibits are mere disjoined documents without any substantive value.[11]

Second, the preliminary analysis conducted by Dr. Rugh and related documents should not be admissible at trial because the work Dr. Rugh performed was exactly that: *preliminary*. Dr. Rugh's consulting work was performed before discovery occurred in the case; it did not and could not consider the volumes of data and information that became available later in the case.

Third, Plaintiffs have disclosed a statistical expert, Dr. Ian Ayres, who has performed a comprehensive analyses of the data in this case and will testify at trial regarding his conclusions. In advance of his testimony, Dr. Ayres submitted three reports, Declarations, and been deposed two times in advance of the trial. Unlike the work of Dr. Rugh, the reports and conclusions of Dr. Ayres rely on data and information developed during the course of the case and were prepared in anticipation of trial.

Fourth, any use of Dr. Rugh's materials (or communications with counsel) would have a substantial likelihood of confusing the jury and would waste time at trial. Just attempting to explain the differences between matters considered by Dr. Rugh in 2017 and the analysis he performed and the matters considered by Dr. Ayres and the analyses Dr. Ayres performed would waste hours and almost certainly confuse the jury.

---

[11] Any use of Dr. Rugh's materials and analyses would also present obvious hearsay problems.

Accordingly, the Court should enter an Order barring Defendants from introducing or referring to evidence related to Plaintiffs' pre-litigation regression analysis.

## VIII.   MOTION FOR ADMISSION OF FACTS PREVIOUSLY ADMITTED BY DEFENDANTS AND FOR RELATED RELIEF

Plaintiffs, by their counsel, move the Court to enter facts into evidence at trial that were previously admitted by Defendants in their pleadings and discovery responses that Defendants refuse to acknowledge or agree to as part of the pretrial process related to identification of Uncontested Facts. Plaintiffs endeavored to streamline the trial by compiling a robust set of uncontested facts that Defendants have already admitted or that Plaintiffs understood to be uncontested. Defendants have refused to respond to these proposals individually or in good faith, instead offering categorical rejections. But Defendants cannot renege on facts that they have explicitly admitted in this litigation, and their conduct is at odds with the Court's explicit instructions to civil litigants. For purposes of this Motion, the Court should deem admitted those facts to which Defendants have already admitted to in this litigation, as set forth in Exhibits E and F attached hereto.

In support of this motion, Plaintiffs state as follows: Pursuant to this Court's Standing Order with Regard to Proposed Pretrial Orders, the parties are required to confer and act in good faith "to arrive at as many stipulations and uncontested facts as possible." During pretrial conferences, the Court has repeatedly emphasized that the parties should act cooperatively and undertake all measures that will facilitate the efficient conduct of the trial.

Plaintiffs believe that very substantial efficiencies can be attained during the trial through the acknowledgement of uncontested facts and presentation of certain evidence to the jury through their use. Here, numerous uncontested facts regarding the background, role and activities of the Defendants have been established by: (a) Defendants' responses to Local Rule 56.1 Statements; (b) Defendants' responses to Rule 36 Requests for Admission; (c) Rule 30(b)(6)

Deposition testimony provided by Defendants' representatives; and (d) uncontroverted documents produced by Defendants.

To begin, Defendants have not and cannot avoid their prior admissions in RFA responses and their summary judgment filings. The purpose of RFAs is to streamline matters for trial. *Sommerfield v. City of Chicago*, 251 F.R.D. 353, 355 (N.D. Ill. 2008). "A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. Pro. 36(b). Admissions obtained under Rule 36 may be offered in evidence at trial. Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2264 (3d ed.). Similarly, facts admitted at summary judgment may be deemed established by the Court. *See* Fed. R. Civ. Pro. 56(g) (permitting court to "enter an order stating any material fact --including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case"); *Greenbank v. Great American Assurance Company*, No. 3:18-cv-00239-SEB-MPB, 2020 WL 4604507, at *3 (S.D. Ind. Aug. 11, 2020) ("[T]he undisputed and admitted material facts from summary judgment are deemed established for purposes of trial."). Here, no Defendant has withdrawn or amended the admissions at issue in this motion.

Defendants' refusal to engage in a meaningful manner with regard to various broad categories of uncontested facts plainly contradicts the Court's Standing Order and directives. Plaintiffs made a substantial effort to identify and set out in numbered paragraphs relevant facts that, in light of the foregoing, can no longer reasonably be considered in dispute. *See* Ex. 16, Plaintiffs' Proposed Uncontested Facts. Plaintiffs transmitted this document to Defendants on December 5, 2025.

Defendants responded by letter on December 15, 2025. *See* Ex. 17, Defendants' Letter. As to virtually all of the Proposed Uncontested Facts (Nos. 2, 3 and Nos. 54-347), the totality of

Defendants' response consisted of one sentence: "The following facts are contested for being either irrelevant, argumentative or outside the scope of the litigation."[12] This response was deficient for numerous reasons, including that: (a) Defendants did not attempt to address whether they conceded or disputed the factual basis of any of the proposed Uncontested Facts as to which they asserted their blanket objections; (b) Defendants made no attempt to identify which of the vague grounds referenced in their December 15 letter was the basis for not answering or agreeing to the facts; and (c) Defendants did not attempt to explain how particular proposed facts were either irrelevant, argumentative, outside of the scope of the litigation or disputed.

Two days later, on December 17, 2025, Plaintiffs' counsel wrote to Defense counsel raising these and other issues concerning Defendants' response. (Ex. 18)

On January 6, Defendants responded by letter. (Ex. 19) Once again, Defendants made blanket objections with regard to the vast majority of proposed facts, failed to address whether the factual basis for the most of the proposed facts was contested, failed to respond individually to the vast majority of the proposed facts, and largely rested on vague objections regarding admissibility. *E.g.*, "Defendants . . . object to proposed "'facts'" concerning Common Ground (Nos. 60-84) on grounds that they are irrelevant, unduly prejudicial, and in various instances, outside the statute of limitations"; "Defendants also object to Plaintiffs' proposed 'facts' Nos. 113-125 on the grounds that they are irrelevant, unduly prejudicial and factually inaccurate"; "Defendants object to the vast majority of Plaintiffs' proposed 'facts' Nos. 126-168 as irrelevant as irrelevant, incomplete, unduly prejudicial, and/or contrary to prior Court Orders." In some instances, Defendants provided a general (and dubious) narrative regarding their evidentiary

---

[12] The only facts admitted or identified as potentially admitted subject to clarification concerned the existence of the Plaintiffs and, in some instances, the number of properties they investigated.

objections. *E.g.*, "several of the proposed facts [related to the Trustee Defendants] continue to address conduct that occurred before February 14, 2015 . . ."; "[Proposed facts] Nos. 228-231 are unduly prejudicial in that they focus on overseas operations." In a small number of instances, Defendants' letter mentions some specific basis for disputing the proposed undisputed fact. E.g., Ex. D at p. 4, "Plaintiffs have not used the correct Ocwen or Altisource entity names in Nos.134-135." A handful of additional facts were admitted.

The Court's direction to the parties to identify uncontested facts before trial should not be construed as an invitation for a party to stonewall responding substantively to proposed uncontested facts on the basis of vague, generic and unwarranted assertions about the admissibility of evidence. Nor can this pretrial process function and result in efficiencies if a party can freely ignore its prior admissions or dodge incontrovertible facts.

In the attached Exhibit 20, Plaintiffs have prepared a chart identifying a set of Proposed Uncontested Facts related to the Deutsche Bank Defendants that cannot be reasonably denied based on the prior admissions of these Defendants. For each fact that should be deemed admitted by the Court Plaintiffs provide: (a) the text of the proposed Uncontested Fact; (b) the evidentiary support for the proposed uncontested fact, including direct quotations from the relevant documents; and (c) additional explanatory information, if needed.

The scope and substance of this chart reveals that, as regards the Deutsche Bank Defendants and their role in this case, *almost all* of the operative facts regarding their role in the events related to this litigation cannot reasonably be disputed. If the Deutsche Bank Defendants would acknowledge their prior factual admissions for purposes of agreeing to Uncontested Facts proposed by Plaintiffs, the trial is likely to be much more efficient, with certain unnecessary and lengthy testimony avoided.

As far as proposed uncontested facts related to Defendants Ocwen and Altisource, while many more facts are generally disputed, certain foundational facts also cannot be reasonably contested in light of prior admissions by these Defendants. In Exhibit 21, Plaintiffs provide examples.

In each of the foregoing instances specifically identified in Exhibits E and F, the Court should enter an Order finding that the previously admitted fact is deemed admitted at trial. The Court should also order Defendants to individually address and respond substantively to Plaintiffs' other proposed uncontested facts that they have failed to respond to.

Plaintiffs accordingly request that their Motion for Admission of Facts Previously Admitted by Defendants be granted.

Respectfully submitted,

*/s/ Jennifer K. Soule*

| | |
|---|---|
| Jennifer K. Soule | Lila Miller |
| James G. Bradtke | Edward Olds |
| Steven P. Schneck | Yiyang Wu |
| *Soule & Bradtke, PLLC* | Jennifer Klar |
| 155 N. Michigan Avenue, Ste. 504 | *Relman Colfax PLLC* |
| Chicago, IL 60601 | 1225 19th Street, N.W., Ste. 600 |
| | Washington, DC 20036 |
| | |
| Janell M. Byrd | Stephen M. Dane |
| Morgan Williams | *Dane Law LLC* |
| *National Fair Housing Alliance* | P.O. Box 1011 |
| 1331 Pennsylvania Ave, NW, Ste. 650 | Perrysburg OH 43552 |
| Washington, DC 20004 | |

Dated: January 14, 2026