# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION


 3

    NATIONAL FAIR HOUSING           )
 4  ALLIANCE; HOPE FAIR HOUSING     )
    CENTER, et al.,                 )
 5                                  )
                                    )
 6                    Plaintiffs,   )
                                    )
 7          vs.                     ) No. 1:18-cv-00839
                                    )
 8  DEUTSCHE BANK NATIONAL          )
    TRUST, as trustee, et al.,      )
 9                                  )
                                    )
10                    Defendants.   )

11

12          The continued Fed. R. Civ. P. Rule 30(b)(6)

13  deposition on behalf of National Fair Housing Alliance,

14  called by the Defendants for examination, taken remotely

15  pursuant to notice and pursuant to the Federal Rules of

16  Civil Procedure for the United States District Courts

17  pertaining to the taking of depositions, taken before

18  April M. Metzler, Certified Shorthand Reporter,

19  Registered Merit Reporter, Certified Realtime Reporter,

20  and Notary Public, at Royersford, Pennsylvania,

21  commencing at 9:36 a.m. CST on the 17th day of

22  May, 2022.

23

24
```



 1    Ms. Augustine, if we can rely solely on the REO database

 2    contents?

 3          MR. BRADTKE:  Objection, form; objection, assumes

 4    facts not in evidence; objection, incomplete

11:20:57  5    hypothetical.

 6    BY THE WITNESS:

 7          A.   And can you be more specific about, what do

 8    you mean by they don't match?

 9          Q.   So there are attributes -- deficiencies

11:21:06 10    marked, for example, on the electronic printed version

 11    of the REO evaluation form, and you do not see those

 12    deficiencies in the REO database.  So, for example,

 13    boarded-up door.  You see it on the electronic

 14    evaluation form that's printed, but you don't see it in

11:21:24 15    the REO database.  So without the electronic form, we

 16    have no way of knowing that anybody made that initial

 17    observation, and that it changed in the REO database.

 18          So what circumstance would cause that to

 19    happen, Ms. Augustine?

11:21:38 20          MR. BRADTKE:  Same objections.

 21    BY THE WITNESS:

 22          A.   I mean, I can only guess, of course, about

 23    seeing the exact example.  But, you know, I did mention

 24    that NFHA did do quality control.  And so, you know,



1    everything -- I mean not everything.

2              You know, we have the deficiency data and our

3    photographs.  And if there is a deficiency marked, you

4    have to have evidence of it in the form of a photograph.

11:22:05  5    So the photograph has to show, you know -- Deutsche Bank

6    has a boarded window, we need to have proof that there

7    was a boarded window.

8              So I could guess that, you know, possibly was

9    marked there was no photographic evidence.  It could

11:22:22  10    have been that on occasion -- you know, we did see in

11    quality control sometimes investigators marked a damaged

12    window but it was actually just the screen was damaged.

13    So the actual window was fine, it was just the screen

14    that was broken.  And so that would be changed to

11:22:42  15    structure miscellaneous because the actual windows were

16    intact.  But all of that could very clearly be seen in

17    the REO database.

18              So you have the photograph of the deficiency

19    or lack of deficiency, and you also have the

11:22:59  20    deficiencies marked in the REO database and there are

21    comments to go along with the photographs.

22              So all of those contents would be present in

23    the database.

24         Q.   The REO database only saves the most recent



1      Q.   So once you knew that a plaintiff organization

2   uploaded information to the REO database, what steps did

3   NFHA take to QC, or quality control, those particular

4   records?

11:42:43   5      A.   Generally, what NFHA would have done is really

6   just review the records that they had added to the REO

7   database.  So if there were ten properties, you know, we

8   would have looked at each of the database records for

9   those ten properties, you know, looked at their

11:43:01  10   photographs and made sure that what they've marked is

11   visible in the photographs, and also make sure that

12   there weren't any very obvious deficiencies in their

13   photographs that they hadn't marked.

14          So really, kind of, looking at the whole

11:43:15  15   picture, all the photographs for the entry and the

16   deficiencies marked and any comments that went along

17   with the photographs.

18      Q.   How long did that process take of reviewing

19   the record and comparing it to the photographs?

11:43:33  20      MR. BRADTKE:  Objection, form.

21   BY THE WITNESS:

22      A.   I'm not sure if I could say.  I mean, that

23   could have been -- yeah.  I don't know.  I would have to

24   guess.



1    removed one, if there was no photographic evidence -- or

2    if they had marked it incorrectly, we may have changed

3    it to the correct deficiency.

4         Q.   So is it your testimony as NFHA's corporate

11:45:25  5    representative that NFHA looked at each of the potential

6    entries on the REO field evaluation forms and made sure

7    that NFHA agreed with that plaintiff organization's

8    decision whether to mark a deficiency or not in each

9    category based on the photograph?

11:45:42  10    MR. BRADTKE:  Objection, form.

11   BY THE WITNESS:

12        A.   And I'm sorry.  I lost track of the beginning,

13   would you mind repeating that?

14        Q.   Sure.

11:45:52  15    So is it your testimony as NFHA's corporate

16   representative that during this QC process, NFHA looked

17   at each of the categories on the REO field evaluation

18   form, compared it to the photographs, and made an

19   assessment that each of the categories were correctly

11:46:10  20    marked by the plaintiff organization?

21        A.   I don't know if I would categorize it exactly

22   as your words were.  But that was the process that we

23   did.

24             So it was really looking at 101 Main Street,



1    and NFHA would review all of the photographs that were

2    present in the database.  And then see, you know, Okay.

3    They marked four things, do I see those in the

4    photographs, is it correct.

11:46:39  5              And then really reviewing, if there's 30

6    photographs, reviewing all 30 in combination with the

7    items on the field evaluation -- going on our checklist

8    to see, you know, is there anything that wasn't marked

9    that should have been.

11:46:56 10       Q.   But NFHA was essentially performing a quality

11    control of all of the categories on the REO field

12    evaluation form to be sure that NFHA agreed with each

13    plaintiff's organization's submission; is that correct?

14       MR. BRADTKE:  Objection, form.

11:47:11 15    BY THE WITNESS:

16       A.   I don't know if I'd categorize it exactly as

17    NFHA agreeing, but that -- I mean, we did the quality

18    control to ensure that the checklist had been utilized

19    correctly, and that the deficiencies were marked

11:47:29 20    accurately.

21              So -- yeah, just to make sure that it was

22    accurate.

23       Q.   And NFHA felt like it could ensure that the

24    REO records were accurate, based on the photographs that

1            But, again, that wasn't just the photographs.

2    There's a lot of additional data in the database besides

3    the photographs themselves.

4        Q.    What additional data in the database are you

11:49:07   5    referring to?

6        A.    Sure.

7            Again, I'm referring to the comments, you

8    know, the descriptions of each photograph or the actual

9    deficiency tag.  So the photographs, for example, if the

11:49:24  10    fair housing organization tagged this photograph as a

11    broken window, I can open that photograph and see, Okay,

12    yes, there is a broken window, correct.  You know, we

13    could have also seen, Okay, this photograph was marked

14    as a trespassing or warning sign.

11:49:42  15            But once you look at it, it's actually a

16    winterization sign, you know, that's okay, that wasn't a

17    deficiency; so NFHA would have QC'd that.

18        Q.    So, I guess, what I'm trying to understand is

19    NFHA felt like it could change a deficiency, either from

11:49:59  20    a "yes" to a "no" or a "no" to a "yes," in this QC

21    process, correct?

22        A.    We did, yes.

23        Q.    And NFHA felt like it could make that change

24    based on the photographs and the comments in the



# Exhibit 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
      NATIONAL FAIR HOUSING         )
 4    ALLIANCE; HOPE FAIR HOUSING   )
      CENTER, et al.,               )
 5                                  )
                                    )
 6                    Plaintiffs,   )
                                    )
 7           vs.                    ) No. 1:18-cv-00839
                                    )
 8    DEUTSCHE BANK NATIONAL        )
      TRUST, as trustee, et al.,    )
 9                                  )
                                    )
10                    Defendants.   )

11

12            The videotaped deposition of MARI HOULIHAN,

13    called by the Defendant for examination, taken remotely

14    pursuant to notice and pursuant to the Federal Rules of

15    Civil Procedure for the United States District Courts

16    pertaining to the taking of depositions, taken before

17    April M. Metzler, Certified Shorthand Reporter,

18    Registered Professional Reporter, Certified Realtime

19    Reporter, and Notary Public, at Farmers Branch, Texas,

20    commencing at 10:04 a.m. Central Standard Time on the

21    16th day of August, 2021.

22

23

24
```



National Fair Housing Alliance vs Deutsche Bank National Trust

Mari Houlihan - 08/16/2021                                                    Page 93

```
 1   go for about another hour before we take the longer

 2   break.

 3          THE WITNESS:  Okay.

 4          THE VIDEOGRAPHER:  Time is 11:57.  We are now going

 5   off the record.

 6                    (A short break was had.)

 7          THE VIDEOGRAPHER:  The time is 12:04 p.m.  We are

 8   now back on the record.

 9          MS. NORRIS:  I think I may have lost the audio.

10   Can someone say something so I don't know.

11                    (Discussion off the record.)

12          MS. NORRIS:  Yes.  I lost the audio.  Give me a

13   second.

14          THE VIDEOGRAPHER:  I'll just take us off for the

15   recording --

16          MS. NORRIS:  I've got you now, Andrew.

17          THE VIDEOGRAPHER:  All righty.

18          MS. NORRIS:  My headphones.

19   BY MS. NORRIS:

20          Q.   Can you please pull up Exhibit 5461 and 5659.

21          A.   Can you please repeat the second one?

22          Q.   Yes.  It's 5461 and 5659.

23          A.   5659.  Okay.

24          Q.   Do you recognize Exhibit 5461?
```



National Fair Housing Alliance vs Deutsche Bank National Trust

Mari Houlihan - 08/16/2021

1      A.   Okay.  Hold on.  I'm so sorry.  5461.  Okay.

2  I didn't know where it went.

3           Yes, I do.

4      Q.   What is that?

5      A.   This is an REO field evaluation form.

6      Q.   And is this what you used on your property

7  inspections for the REO investigations?

8      A.   Yes.

9      Q.   I will represent to you that Exhibit 5659 is a

10  set of photographs from one of the REO property

11  inspections.

12      A.   Okay.

13      Q.   And what I want you to do is, take your time,

14  take a look through all of these photos, and then try to

15  score this property for me.

16      A.   Okay.  And I just want to confirm, 5659.

17      Q.   5659?

18      A.   Okay.

19      Q.   That should be Bates-stamped NFHA 005321

20  through NFHA 005343.

21      A.   Okay.

22      MR. COLFAX:  For foundational purposes, Jacey, can

23  you confirm whether this is a Texas property she

24  investigated?



National Fair Housing Alliance vs Deutsche Bank National Trust

Mari Houlihan - 08/16/2021                                       Page 95

```
 1        MS. NORRIS:  It is not, but I would like her to
 2   score it based on the photos.
 3        MR. COLFAX:  I will just have a standing objection
 4   to the form, given its lack of foundation.
 5        MS. NORRIS:  Understood.
 6   BY THE WITNESS:
 7        A.   I'm just going to use this blank field
 8   evaluation REO form to, kind of, make notes --
 9                    (Multiple speakers simultaneously
10                     speaking.)
11   BY THE WITNESS:
12        A.   -- because I can't really do it in my head.
13   Okay.
14             (Complying.)
15             Okay.
16        Q.   Can you walk me through the deficiencies that
17   you had marked for this property.
18        A.   I marked a deficiency for the bricks, the pile
19   of bricks in the driveway area.
20        Q.   And what did you mark that as?
21        A.   I marked that as miscellaneous curb appeal.
22        Q.   Did you receive training on the items that
23   should be marked for miscellaneous curb appeal?
24        A.   I can't recall if I received training specific
```



1    on that item.

2        Q.    So there's not a specific list of items that

3    would fall under that category, to your knowledge?

4        A.    No.  I understand "miscellaneous" to mean

5    anything that would be not listed in a category that I

6    would make note of.

7        Q.    And what constitutes "curb appeal"?

8        A.    According to this report, the items listed,

9    trash, mail, overgrown grass, et cetera.

10       Q.    And how did you know that a miscellaneous

11   belonged in the curb appeal category?

12       A.    I used my best judgment.  Misplaced bricks, I

13   would categorize as close to trash accumulated items

14   that don't belong there.  I would note, like,

15   miscellaneous curb appeal, yeah.

16       Q.    And this was based on your judgment?

17       A.    Yes.

18       Q.    What else did you mark?

19       A.    I marked holes and wood rot.  Holes based on

20   the photos -- sorry, I'm trying to pull it back up.

21   Now, where do I have it?

22            Page 14, window sills, how it's, like, rotted

23   out.  I marked that as wood rot.

24            Sorry, my computer is being slow.



National Fair Housing Alliance vs Deutsche Bank National Trust
Mari Houlihan - 08/16/2021                                    Page 97

1        Q.   It's okay.

2             For wood rot, was there a certain amount of

3    wood rot that you had to observe before that counted as

4    a deficiency?

5        A.   I would just use my best judgment.  There

6    wasn't a specific amount, like, a specific percentage

7    that I would use.

8        Q.   So there was no objective standard; it was

9    your judgment that you used?

10       A.   Yes.  I would report --

11                    (Multiple speakers simultaneously

12                     speaking.)

13       THE WITNESS:  Oh, sorry.

14                    (Stenographer clarification.)

15       MR. COLFAX:  I objected to form.

16   BY MS. NORRIS:

17       Q.   And you can answer, Ms. Houlihan.

18       A.   Yes, I would just use my best judgment.

19       Q.   And where did you see the holes?

20            And please take your time.  My computer also

21   moves through these very slowly.

22       A.   16, I would note holes in the door around the

23   lock -- the door lock there.

24       Q.   Did you see holes anywhere else?



National Fair Housing Alliance vs Deutsche Bank National Trust
Mari Houlihan - 08/16/2021

1    A.   No.

2    Q.   Would holes around the door lock be properly

3  scored as holes or as a damaged door?

4    A.   Specifically, those are holes; so I would mark

5  them as holes.

6    Q.   Can you tell how large the holes are?

7    A.   No, I didn't survey this property in person,

8  so it's difficult to determine how large they are.

9    Q.   Did you mark any other deficiencies?

10    A.   No.  I would potentially mark overgrown grass

11  for -- overgrown or dead shrubbery, but I don't feel

12  comfortable doing that, not having personally surveyed

13  the home.

14         It's hard to tell based on the photos exactly

15  the condition of the lawn.

16    Q.   Earlier you testified that you sometimes

17  edited your scoring after leaving a property based on

18  the photos; is that right?

19    A.   Yes.

20    Q.   Were the photos typically sufficient for

21  someone to tell what should be scored on a property?

22    A.   Yes.

23    Q.   For overgrown grass, was there a standard

24  height that the grass needed to reach before it was



1    overgrown?

2         A.   I would just use my best judgment.  I didn't

3    have a standard height.

4         Q.   Can you estimate how tall the grass should be

5    before it's overgrown?

6         A.   No, I'm not sure.

7         Q.   And did the NFHA training provide you with a

8    specific height that it indicated overgrown grass?

9         A.   I can't recall.

10        Q.   Is the same true for overgrown shrubbery?

11        A.   Yes.

12        Q.   Are there any other deficiencies that you see

13   that we haven't discussed?

14        A.   The only other thing of note is that, I'm not

15   sure what the sign says on the door on page 11.  Other

16   than that, no, I didn't note any other deficiencies.

17        Q.   And you testified a moment ago that you had --

18   Strike that.

19             Can you please pull up Exhibit 5660.

20        A.   Okay.

21        Q.   And we are going to go through the same

22   exercise here.  If you can please review the photos, and

23   then let me know what deficiencies you would mark and

24   what photos you base that on.



1      MR. COLFAX:  And for foundational purposes, is this

2  a Dallas property that she reviewed?

3      MS. NORRIS:  It is not.

4      MR. COLFAX:  I would again object to this exercise.

5      THE WITNESS:  What's the address of the home on

6  this one?

7  BY MS. NORRIS:

8      Q.   I don't think that's necessary for scoring.

9      A.   It just looks like there's a couple different

10  properties.  I just want to make sure I'm looking all at

11  the same one.

12      Q.   We did our best to exclude any photos of

13  neighboring properties.  But if you see one that appears

14  to be a neighboring property, feel free to point that

15  out.

16      A.   Okay.

17      MR. COLFAX:  So you're saying this is not a

18  complete package of photographs that was uploaded for a

19  particular property -- excluded some?

20      MS. NORRIS:  These are the photo -- this is a

21  complete package for this particular property, yes.

22  BY MS. NORRIS:

23      Q.   The neighboring properties may be included.  I

24  misspoke.  Sorry, Ms. Houlihan.



National Fair Housing Alliance vs Deutsche Bank National Trust
Mari Houlihan - 08/16/2021

1    A.    (Complying.)

2    MS. NORRIS:   And if it helps, the house number for

3    this one is 706.  If you can see that on one of the

4    houses.

5    THE WITNESS:   Okay.  Thank you.

6    Okay.

7    BY MS. NORRIS:

8    Q.    Okay.  What's the first deficiency that you

9    marked?

10    A.    Trash.

11    Q.    And what photograph do you rely on for that?

12    A.    Let me make sure I got all of them.

13    7, 8, 9, 14, 15, 23, 25, 26.  That's all.

14    Q.    In photograph number 7, which items are you

15    counting as trash that you can see?

16    A.    I would count the boat as trash.  The property

17    is not occupied, so the boat shouldn't be there.  It

18    also looks like that's not a boat that would float.

19    So, in general, I would describe that as

20    trash; the trash that's inside the boat, cups, looks

21    like pieces of paper, other items of trash that I can

22    see that are inside the boat.

23    Q.    How much trash needs to be present on a

24    property before you score a deficiency for trash?



National Fair Housing Alliance vs Deutsche Bank National Trust
Mari Houlihan - 08/16/2021                                    Page 102

1        A.   I would just use my best judgment.

2        Q.   Sure.

3             If you saw this property and all there was was

4    a single gum wrapper, would that be trash for purposes

5    of scoring?

6        A.   No --

7        MR. COLFAX:   Object to the form.

8    BY MS. NORRIS:

9        Q.   What about one empty soda can?

10       MR. COLFAX:   Object to the form.

11   BY THE WITNESS:

12       A.   No.

13       Q.   Two empty soda cans?

14       MR. COLFAX:   Object to the form.

15   BY THE WITNESS:

16       A.   I can't be sure, no.

17       Q.   And you indicated that you used your own

18   judgment to decide when there's sufficient trash to be a

19   deficiency; is that right?

20       A.   Yes.

21       Q.   Do you think different reviewers, different

22   people inspecting properties might have different ideas

23   of how much trash is enough trash for a deficiency?

24       MR. COLFAX:   Object to the form, calls for



National Fair Housing Alliance vs Deutsche Bank National Trust
Mari Houlihan - 08/16/2021                                    Page 103

 1   speculation.

 2   BY THE WITNESS:

 3       A.   Yes.

 4       Q.   What other deficiencies did you mark for this

 5   property, if any?

 6       A.   I marked graffiti, which would be on page 10;

 7   a damaged window boarded, 21; holes on 16; miscellaneous

 8   I put window screen damaged on 18; For Sale sign

 9   missing, I don't see a For Sale sign in these photos;

10   peeling and chipped paint on 17.

11           And those are the deficiencies I marked.

12       Q.   Do you know whether vacant homes are required

13   to be boarded in either Dallas or Fort Worth?

14       A.   No.

15       Q.   Do you know if any municipalities have the

16   requirement that vacant homes have boarded windows or

17   doors?

18       MR. COLFAX:  Object to the form.

19   BY THE WITNESS:

20       A.   I don't know.

21       Q.   You indicated that on page 18 you see a window

22   screen damaged.

23           Should that count as miscellaneous damage or

24   damaged window?



National Fair Housing Alliance vs Deutsche Bank National Trust
Mari Houlihan - 08/16/2021

Page 104

```
1          A.   I understand damaged windows to mean the
2     window itself, not the window screen.
3          Q.   What does the window itself include?
4          A.   Glass, window, window pane.
5          Q.   And you indicated that there was a For Sale
6     sign missing, right?
7          A.   I don't see a For Sale sign in these photos.
8          Q.   Do you know if every REO property that you
9     inspected was ready for sale?
10         A.   I don't know.
11         Q.   Were there any other deficiencies you would
12    mark for this property?
13         A.   No.
14         Q.   Let's turn to Exhibit 5661.
15         A.   5661?
16         Q.   That's correct.
17         A.   Okay.
18         Q.   And we will be doing the same thing again.
19         A.   Okay.
20         MR. COLFAX:  Jacey, you marked, like, some 25 of
21    these photo packets.  Are we really going to go through
22    25 of these and do this exercise on properties she
23    hasn't reviewed ever?  Ones she did review was five
24    years ago.  She got trained on this five, six years ago.
```



1    Is this the process you're going to go through?

2          MS. NORRIS:  I don't intend to do 25, but I

3    certainly intend to do this one.

4          MR. COLFAX:  It's your deposition.

5                Oh, and standing objection to this exercise.

6          THE WITNESS: (Complying.)

7                Okay.

8    BY MS. NORRIS:

9          Q.    What's the first deficiency, if any, that you

10   marked?

11         A.    Trash on 16 and 17.

12         Q.    And what's the next deficiency you marked?

13         A.    Mail accumulated, 9 and 10.

14         Q.    Can you point me to the accumulated mail in 9

15   and 10?

16         A.    The two pieces of mail that are on the porch,

17   or what it looks like -- I can't be completely certain,

18   but what it looks like to be mail.

19         Q.    Can you tell if those are phonebooks?

20         A.    Looks like it.

21         Q.    Are phonebooks mail?

22         A.    Yes.

23         Q.    How much mail constitutes accumulated mail?

24         A.    I would classify accumulated mail, if the



National Fair Housing Alliance vs Deutsche Bank National Trust

Mari Houlihan - 08/16/2021

1    mailbox is full, if there's mail on the ground and not

2    in the mailbox.

3         Q.   I see that these phonebooks are on the ground

4    in photographs 9 and 10.

5              Can you tell how long they've been there?

6         A.   No.

7         Q.   Does it matter how long they have been there?

8         A.   No.

9         Q.   What if they were delivered today, the day of

10   the inspection?

11        A.   It's to note their presence not to note the

12   date of the mail being -- that the mail's been

13   accumulated.  I wasn't asked to mark when it was

14   delivered.

15        Q.   Does the word "accumulated" imply that it

16   would be more than one day's worth of mail?

17        A.   I don't know.

18        Q.   Can you tell if these phonebooks were picked

19   up the next day after the inspection?

20        A.   No.

21        Q.   Can you tell if any deficiency on the property

22   was repaired the day after your inspection?

23        A.   No.

24        Q.   Did you ever revisit a property to see if any



National Fair Housing Alliance vs Deutsche Bank National Trust

Mari Houlihan - 08/16/2021

```
 1    of the deficiencies had been repaired?

 2         A.   No.

 3         Q.   What's the next deficiency you marked, if any?

 4         A.   Overgrown grass on 20.

 5         Q.   And, again, you determined whether grass was

 6    overgrown based on your own judgment?

 7         A.   Yes.  I feel, by looking at this photo, I can

 8    tell that the grass is pretty high, higher than you

 9    would expect to see in a well-maintained residential

10    property, based on height even compared to the tree

11    that's next to it.

12         Q.   But there's not a specific height that the

13    grass would have to reach to be overgrown?

14         A.   No.  I don't have a specific height in mind.

15         Q.   Did you mark any other deficiencies?

16         A.   Overgrown or dead shrubbery on 7.

17         Q.   Any others?

18         A.   Damaged windows, 18 and 19.

19         Q.   Any others?

20         A.   Peeling or chipped paint on 14, 15, and 21.

21         Q.   Anything else?

22         A.   And I noted water damage on the photo on

23    page 22, but I can't be totally sure, since I actually

24    didn't inspect this one.  But to me it looks like that
```



National Fair Housing Alliance vs Deutsche Bank National Trust
Mari Houlihan - 08/16/2021

```
 1    may be water damage.

 2         Q.   How would you be able to tell if it was water

 3    damage if you were on the property itself?

 4         A.   I might touch it, maybe could smell it, just

 5    being able to observe it in person would help me know if

 6    it was water damage or not.

 7         Q.   Is that something you could do when you were

 8    reviewing the photos from your property inspections to

 9    determine if your scoring was correct?

10         A.   No.  But I would rely on my first observation

11    when I was there in person if I noted water damage.

12         Q.   And if anyone else was to conduct a quality

13    control of your scoring and reviewed the photographs,

14    they wouldn't be able to smell or touch the potential

15    water damage; is that correct?

16         A.   They wouldn't.

17         Q.   Any other deficiencies to the property?

18         A.   No.

19         MS. NORRIS:  I think now might be a good time for

20    us to break for lunch.  How long would you like?

21         THE WITNESS:  What's --

22         MS. NORRIS:  An hour, whatever you need.

23         THE WITNESS:  I don't need a -- I don't need a full

24    hour.  But if the group needs to make an hour, that's
```



1    fine.

2          MS. NORRIS:  Why don't we just take half an hour,

3    if that's good for you?

4          THE WITNESS:  That's fine.

5          MS. NORRIS:  All right.  Great.

6          THE VIDEOGRAPHER:  Time is 12:46 p.m.  We are now

7    going off the record.

8                      (Lunch break.)

9          MS. NORRIS:  Let's go back on the record.

10         THE VIDEOGRAPHER:  Time is 1:19 p.m.  We are now

11   back on the record.

12   BY MS. NORRIS:

13         Q.   Ms. Houlihan, can you please pull up

14   Exhibit 5662.

15         A.   5662?

16         Q.   5662.

17              We'll be doing the same exercise here, please

18   take a look at the photos and score them.

19         MR. COLFAX:  I'll continue to object to this

20   exercise.  It seems it has no purpose whatsoever.

21         MS. NORRIS:  Noted, Counsel.

22         THE WITNESS:  (Complying.)

23              Okay.  You're on mute.

24   BY MS. NORRIS:



1    Q.   Sorry.

2         What's the first deficiency that you marked?

3    A.   I noted miscellaneous and structure, newspaper

4    over windows, 6 and 7.  This would be something that I

5    might have reviewed with Frances when I came back in to

6    the office.  My initial thought that is that it might be

7    under miscellaneous.  But because windows fall under

8    structure, ultimately, here, I decided to note the

9    newspaper over all the windows and ...

10        Q.   And that's different than a boarded window,

11   for example?

12        A.   Yes.

13        Q.   What else did you mark, if anything?

14        A.   For sale missing.  I noted peeling or chipped

15   paint on picture 6, and exposed utilities on picture 10.

16        Q.   Is there anything else that you marked for

17   this property?

18        A.   No.

19        Q.   So I noticed in photo 1, it's just a picture

20   of a closed mailbox.

21        If the mailbox was closed, were you able to

22   check for accumulated mail?

23        A.   If I were able to open the mailbox, I would

24   have done so for accumulated mail.



National Fair Housing Alliance vs Deutsche Bank National Trust

Mari Houlihan - 08/16/2021                                    Page 111

1        Q.    Let's turn to Exhibit 5463.

2        A.    Can you repeat it?

3        Q.    Sure.  It's 5463.

4        A.    5463.

5        Q.    And same thing here.

6        MR. COLFAX:  And continuing my objection.

7        THE WITNESS:  (Witness complying.)

8            Okay.

9    BY MS. NORRIS:

10       Q.    What's the first deficiency, if any, that you

11   marked?

12       A.    Trash on photo 3.

13       Q.    Did you mark any other deficiency?

14       A.    I noted damaged window screen under

15   miscellaneous structure, photo 4, and I also noted

16   damaged siding on photo 4.  And those are the only notes

17   that I made for this one.

18       Q.    Do you see leaves on the ground in any of

19   these photos?

20       A.    Yes.

21       Q.    Do you think that the amount of leaves on the

22   ground is reasonable on this property and that's why you

23   didn't mark it as a deficiency?

24       A.    Not being actually on this property, so from



National Fair Housing Alliance vs Deutsche Bank National Trust
Mari Houlihan - 08/16/2021

1  what I can tell from the photos today, based on what I

2  can see on the property and then compared to the photos

3  of the neighboring properties, it looks pretty

4  comparable; so I didn't note a deficiency.

5       Q.   And is looking at neighboring properties part

6  of how you determined whether the lawn care was

7  sufficient for a property?

8       A.   Accumulated leaves, yes, I would take in to

9  consideration neighboring properties.

10      Q.   Let's look at Exhibit 5466, and we're going to

11 do the same thing, but I will tell you I think this is

12 the last one I'm going to make you walk through.

13      A.   Okay.  5466?

14      Q.   That's correct.

15      A.   (Complying.)

16           Okay.

17      Q.   What's the first deficiency, if any, that you

18 had marked?

19      A.   Overgrown or dead shrubbery on 3, 4, and 20.

20      Q.   And, again, is there a particular standard for

21 what constitutes overgrown shrubbery or dead shrubbery?

22      A.   Looking at picture 3, to me, this clearly

23 brown is dead plants, shrubbery.

24           Looking at 4, it's plants that are in the box



1    here are clearly out growing, but I think most people

2    would consider, again, a normal kept length, I just used

3    my best judgment in these photos and what I would

4    consider a property that is well kept would look like.

5         Q.   And is there a set height for what a normal

6    kept length of shrubbery is, that you're aware of?

7         A.   No.  I mean, I think it would definitely vary

8    plant to plant, as some plants are probably meant to be

9    higher than others, but there seems to be no, you

10   know -- like, there's no one tending to this.  It

11   doesn't look like it's just being overgrown.

12             So, no, I don't have a number to give to that.

13        Q.   Are there times of year in the Dallas-Fort

14   Worth area when shrubbery is more likely to be dead or

15   dormant?

16        A.   I don't know.

17        Q.   You haven't observed a difference in how much

18   dead or dormant shrubbery you see in summer versus

19   winter, for example?

20        A.   I think in both seasons, the conditions could

21   make plants dead or dormant in the cold or not; so I'm

22   not able to really make a distinction there.

23        Q.   Is it fair to compare shrubbery that was

24   inspected in the summer to shrubbery inspected in the



National Fair Housing Alliance vs Deutsche Bank National Trust
Mari Houlihan - 08/16/2021                                    Page 114

1    winter and expect to see the same thing?

2          A.    I -- I'm not sure.

3          Q.    What other deficiencies did you mark, if any?

4          A.    I noted dead grass in 6, 7, 14, and 20.  I'm

5    not able to give a percentage, because I'm not there

6    today.  I believe this is a property I did survey myself

7    in 2015.  But not having been reasonable to the

8    property, I don't think I'd be able to give a good

9    percentage of what is dead, but I noted dead grass in

10   this --

11         Q.    When you were -- I apologize.

12               When you were physically present, inspecting a

13   property, how did you determine the percentage of dead

14   grass?

15         A.    I used my best judgment by looking at what

16   grass is dead and comparing it to the whole of the back

17   and the front of the house's yards.

18         Q.    So it was determined based on a visual survey

19   not a precise measuring tool?

20         A.    That's right.

21         Q.    What other deficiencies did you mark, if any?

22         A.    I noted hanging wires in 19 as miscellaneous

23   curb appeal.

24         Q.    Are hanging wiring different than an exposed



1    utility?

2         A.    I wasn't sure, so that's why I put it in

3    miscellaneous on this one.  I did consider putting it in

4    exposed utility, but I wasn't quite sure.

5         Q.    And when you weren't sure what category to put

6    a deficiency in in your scoring, did you just use your

7    best judgment to make a call?

8         A.    I would most likely bring this one to Frances

9    and say -- maybe get a second opinion, like, What would

10   you consider this to be miscellaneous, curb appeal, or

11   utility.

12        Q.    If you were unsure how to score a deficiency,

13   did you ever consult directly with NFHA?

14        A.    No.

15        Q.    Did you mark any other deficiencies for this

16   property?

17        A.    Damage to roof on 11.

18        Q.    What constitutes a damaged roof for purposes

19   of scoring?

20        A.    To me this is clearly warped, broken,

21   chipping; damaged in general.

22        Q.    Is there a minimum amount of damage a roof

23   should have before you mark it as a deficiency?

24        A.    I would just use my best judgment on the kind



National Fair Housing Alliance vs Deutsche Bank National Trust

Mari Houlihan - 08/16/2021                                                    Page 116

1    of damage that I can see.  This one looks pretty

2    significant, so I noted it.

3         Q.   For example, if there were a shingle roof and

4    it was missing a single shingle, would that be a damaged

5    roof?

6         MR. COLFAX:  Object to the form.

7    BY THE WITNESS:

8         A.   No, I would not mark that as damaged.

9         Q.   How many shingles would have to be missing for

10   it to be a damaged roof?

11        A.   I don't know.

12        Q.   Did you mark any other deficiencies for this

13   property?

14        A.   Yes.  I marked holes on 12 -- excuse me -- 13.

15   I did not mean 12, I meant 13.  I noted the damaged

16   window screen in miscellaneous structure on 10, and I

17   noticed a broken and hanging gutter on 18.

18             And that's all.

19        Q.   Can you pull up Exhibit 5397.

20        A.   Okay.

21        Q.   I will represent to you that this is the score

22   sheet that, it appears, you filled out for the property

23   we were just reviewing.

24        A.   Okay.



1    Q.   If you go down to the section that says "curb

2    appeal," I see that there are several entries where you

3    marked yes, and then you crossed it out, and then it

4    looks like you may have marked no and crossed that out

5    and gone back to yes.

6         Do you see that?

7    A.   Yes.

8    Q.   Can you walk me through that process?

9    A.   I can't be sure that this yes, okay, is my own

10   note.  And this was too long ago for me to be able to

11   recall exactly what that was.

12   Q.   Do you know who else might make notes on your

13   property inspection forms?

14   A.   No, I don't.

15   Q.   You recognize the handwriting on this form?

16   A.   Yes.  I mean, some of it is my handwriting.  I

17   don't recognize the "okay."  I don't think that's me.  I

18   can't be sure.

19   Q.   Do you remember ever crossing out scoring and

20   changing it on your forms?

21   A.   It wasn't -- yes.  I mean, from time to time,

22   I would, after referencing my photos during an upload,

23   change an answer that I had originally put down.

24   Q.   And if you changed an answer you had



Exhibit 3

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
      NATIONAL FAIR HOUSING          )
 4    ALLIANCE; HOPE FAIR HOUSING    )
      CENTER, et al.,                )
 5                                   )
                                     )
 6                      Plaintiffs,  )
                                     )
 7           vs.                     ) No. 1:18-cv-00839
                                     )
 8    DEUTSCHE BANK NATIONAL         )
      TRUST, as trustee, et al.,     )
 9                                   )
                                     )
10                      Defendants.  )

11

12           The continued videotaped Fed. R. Civ. P.

13    Rule 30(b)(6) deposition on behalf of National Fair

14    Housing Alliance, called by the Defendants for

15    examination, taken remotely pursuant to notice and

16    pursuant to the Federal Rules of Civil Procedure for the

17    United States District Courts pertaining to the taking

18    of depositions, taken before April M. Metzler, Certified

19    Shorthand Reporter, Registered Merit Reporter, Certified

20    Realtime Reporter, and Notary Public, at Royersford,

21    Pennsylvania, commencing at 9:05 a.m. CST on the

22    15th day of October, 2021.

23

24
```



```
 1    BY THE WITNESS:

 2         A.   Yes -- I mean, yes, we would have maintained

 3    all of our ...

 4         Q.   So let's turn to the second amended complaint,

 5    which is Exhibit 5341.

 6         A.   I do have that.

 7         MR. BRADTKE:  I need a second.  Sorry.

 8              Okay.  Thank you.

 9         MS. KRIGSTEN:  Okay.

10    BY MS. KRIGSTEN:

11         Q.   So if we look at paragraph number 131 in the

12    second amended complaint, it's on the bottom number of

13    this page.  The bottom number is 47, if that helps you.

14         A.   Yes, it does.  Thank you.

15              All right.  The paragraph -- I'm sorry, which

16    paragraph?

17         Q.   131.

18         A.   Oh, 131.

19              Yes.

20         Q.   There's -- the paragraph begins:  Defendants

21    deviated from well-established practices concerning

22    property maintenance and preservation in communities of

23    color, which include upkeep of the routine exterior

24    maintenance items plaintiffs visually investigated at
```



```
1    Deutsche Bank-owned homes.

2              Did I read that -- I think I read that

3    correctly -- did I read that correctly?

4         A.   Yes.

5         Q.   So what are the well-established practices

6    that are referenced in this paragraph?

7         A.   I would say generally well-established

8    practices would be accurately (phonetic) maintaining

9    properties in all neighborhoods, regardless of race; so,

10   you know, routine exterior maintenance, such as mowing

11   the lawn, picking up trash, securing -- et cetera.

12   Yeah.

13        Q.   Anything else?

14        A.   I think generally well-established practices

15   was just what owners of REOs and property preservation

16   companies in general are expected and are required to do

17   when upkeeping a property; so as I mentioned, the

18   routine maintenance that they are expected to do in all

19   communities.

20        Q.   Where would we find those practices?

21        A.   I know there are -- you know, there's been

22   research and articles and studies on the effects of not

23   maintaining properties properly.  I mean, we can look

24   to, you know, bank and property preservation, you know,
```



1    checklists and their own guidelines for how they're

2    supposed to be maintaining and preserving their

3    properties.

4              And then some of it, I think, is just common

5    sense of, you know, generally taking care of your

6    properties in all communities.

7         Q.   I guess, you know, the way this is written,

8    there's a term "well-established practices."

9              So I'm -- I just want to make sure I

10   understand what plaintiffs are referencing -- what

11   specific practices plaintiffs are referencing there.

12             Like, are there specific documents?  Are there

13   specific codified practices?  Are there specific --

14   like, what specifically demonstrates what practices are

15   referenced?

16        MR. BRADTKE:  Objection, form.

17   BY THE WITNESS:

18        A.   I'm not sure.  No -- no specific document

19   comes to mind in this moment.  But, again, just

20   generally, looking at their own policies and procedures

21   that they say that they follow and just general industry

22   best practices and expectations for taking care of REO

23   properties.  I'm not sure exactly what specific

24   documents this could refer to or --



1      Q.   And where are the industry general best

2  practices and expectations, where are those found?

3      MR. BRADTKE:  Objection, form.

4  BY THE WITNESS:

5      A.   Well, I mean, NFHA would have, you know, heard

6  general best practices and expectations from the

7  industry itself, you know; so from companies working on

8  the ground, property preservation companies, real estate

9  agents, appraisal agents, et cetera.  You know, just

10  have common knowledge.

11          I can't -- you know, I can't think of any

12  particular system (phonetic) that would list them out

13  right now, but ...

14      Q.   Maybe we can approach this a different way.

15          So what is the industry-accepted standard for

16  the frequency of visiting an REO property?

17      A.   I don't -- I don't know the specific

18  frequency.  I believe generally, you know, it's supposed

19  to have eyes on the property, you know, weekly or

20  biweekly or, you know, frequently.  I don't know what

21  the key facts (phonetic) number is.

22      Q.   And what is the source for your testimony that

23  there should be eyes on the property frequently?

24      A.   Facts -- this has been, again, speaking with,



National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II  - 10/15/2021

Page 329

```
 1    you know, real estate agents and property preservation

 2    companies and, you know, banks that have REOs that would

 3    tell NFHA, you know, Yes, we have, you know -- vendors

 4    are supposed to be on the ground every two weeks or

 5    there's -- you know, the real estate broker is at the

 6    property once a week, every other week, et cetera.

 7            Just so there's a general understanding that,

 8    you know, the property -- if following actual policies

 9    and procedures properly -- is not supposed to go a long

10    time without anyone evaluate- -- you know, seeing it.

11        Q.   So if defendants had a policy that the vendor

12    would inspect or visit a property twice a month, would

13    that be consistent with the industry standards?

14        MR. BRADTKE:   Objection, form.

15    BY THE WITNESS:

16        A.   Again, I don't know exactly what the industry

17    standard is.  But that could be -- that sounds like a

18    general -- to my knowledge, a general frequency that

19    many companies have.  But ...

20        Q.   What is the industry-accepted standard or the

21    well-established practice for grass-cutting?

22        A.   Again, I don't know the exact standard.  You

23    know, I understand generally that there is a schedule,

24    you know, with frequency that is specified in different
```



Case: 1:18-cv-00839 Document #: 513-1 Filed: 01/14/26 Page 43 of 224 PageID #:51955

National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II  - 10/15/2021                    Page 330

1    context, but I don't know, sitting here, exactly what

2    that would be.

3        Q.   And what is the industry-accepted standard or

4    well-established for practice addressing overgrown

5    shrubbery back?

6        A.   Again, I don't know -- you know, I don't know

7    if "X" times per month or, you know, whatever.  I

8    just -- you know, we do know generally that addressing

9    overgrown shrubbery was an item that banks and their

10   property preservation companies that were doing the work

11   were expected to address on an ongoing basis.  But I

12   don't know the frequency.

13       Q.   And which banks and property preservation

14   companies are you referencing?

15       A.   You know, generally, I've seen -- NFHA has

16   seen public property preservation checklists for Fannie

17   Mae, so the vendors at Fannie Mae would have used.  You

18   know, discussions with other banks.  And, again, some of

19   their checklists are public.

20            And then again, speaking with vendors and, you

21   know, real estate agents and industry folks on the

22   ground that we ...

23       Q.   Are you able to name any of the vendors, real

24   estate agents, or industry folks on the ground who



 1   provided this information?

 2        A.    Again, publicly, I and NFHA has seen Fannie

 3   Mae's vendor checklist, that may include Safeguard

 4   properties, and other vendors that they use that also do

 5   work for many other lenders who have REO properties.

 6             You know, over the years NFHA has spoken with

 7   a wide range of real estate professionals but has

 8   ongoing relationships with the National Association of

 9   Realtors, National Hispanic -- I'm forgetting they have

10   acronyms -- NAREB and -- I'm forgetting what they stand

11   for.  But specific trade groups for real estate

12   professionals, you know, NFHA has spoken to those and

13   has given trainings over many years, you know, dealing

14   with real estate agents and industry workers directly.

15        Q.    If I understood your prior testimony, there

16   are no notes or there's nothing memorializing NFHA's

17   discussions with vendors or real estate agents, or the

18   individuals you call industry folks about the

19   maintenance -- you know, about information that those

20   individuals provided regarding maintenance of REO

21   properties; is that right?

22        A.    I believe I said last time -- I may have or I

23   should have -- you know, there may have been email

24   correspondence, and if so, that would have been pulled.



National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II  - 10/15/2021

Page 332

1  If there were any notes, those would have also been

2  pulled.

3          So I know nothing comes to mind, but they

4  could exist in email form, or -- yeah.  But oftentimes,

5  they were during, you know, trainings; so, you know,

6  one-on-one speaking with people directly, you know, a

7  verbal conversation, or as we were in the field at an

8  REO property and we, you know, spoke to a property

9  preservation worker.

10          And so those wouldn't have been memorialized

11  anywhere, other than either in email or possibly as, I

12  mentioned last time, on the REO field evaluation form in

13  the notes, but ...

14       Q.   So going back to the question I asked about

15  overgrown shrubbery, is there a particular

16  industry-accepted standard or well-established practice

17  for addressing overgrown shrubbery?

18       A.   I don't know the specificity of addressing it,

19  but I mean, generally the best practice would be to not

20  have overgrown shrubbery, to have it be maintained

21  shrubbery.

22       Q.   What is the industry-accepted standard or

23  well-established practice for addressing snowfall?

24       A.   Again, I don't know the exact, you know,



National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II - 10/15/2021

Page 333

1    specific amount of time for which a vendor has to remove

2    snow.  But I know, you know, generally it's to be

3    addressed and shoveled as soon as possible.  You know,

4    I -- I'm sure that there is an expectation and a

5    standard for which -- how much time they have to address

6    it.  I don't know what that is, but ...

7         Q.   What is the industry-accepted standard or

8    well-established practice for cleaning gutters?

9         A.   Again, without knowing specificity of

10   contracts and what they lay out, just generally the best

11   practices is to routinely be, you know, reviewing to see

12   if gutters are obstructed or, you know -- and to address

13   it when found.

14             So, I guess, you know, it's -- the other items

15   are just ongoing review and addressing them as they

16   occur, because they should be continually addressed.

17        Q.   But is there a specific length of time for

18   which a vendor is expected to address -- you know, so --

19   Strike that.

20             What is the window of time in which a vendor

21   may address or a preservation company may address

22   gutters that may have leaves in them?

23        A.   I don't know the specific window of time that

24   vendors -- but, again, that it should be an ongoing



1   thing, you know, that is noted, continually reviewed to

2   make -- you know, to assess whether or not its

3   presence -- you know, I don't know what their contract

4   would lay out, but ...

5        Q.   So I guess I -- putting aside the contract,

6   I'm just trying to decide how to measure whether the

7   defendants complied with industry standards or

8   well-accepted practices.

9            So what is the industry standard for how often

10  gutters are cleaned?

11       MR. BRADTKE:  Objection, asked and answered.

12  BY THE WITNESS:

13       A.   Again, I don't know the industry standard for

14  exactly how often they're supposed to be cleaned, but I

15  would say generally, the best practice is to not have

16  obstructed gutters ever, so -- you know, as opposed to

17  not being obstructed, so ...

18       Q.   Where is that best practice found?

19       A.   Again, that would just generally be -- I mean,

20  part of this is common sense, right, when you're

21  upkeeping a property, it should always be maintained.

22  And as, again, NFHA has heard from the industry, real

23  estate agents, et cetera, just the importance of the,

24  you know, curb appeal and continually upkeeping the

National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II   - 10/15/2021                  Page 335

```
 1   exterior of the property.

 2            So, you know, I couldn't point you to a

 3   specific document in this moment, but just generally,

 4   that's ...

 5                      (Stenographer clarification.)

 6   BY THE WITNESS:

 7        A.   -- that's a best practice.

 8        THE WITNESS:   I forget what I said now, but ...

 9   BY MS. KRIGSTEN:

10        Q.   And so going back, my question had been:

11   Where is that best practice found, and at this point,

12   you can't point us to a particular source of that best

13   practice?

14        MR. BRADTKE:   Objection, form.

15   BY MS. KRIGSTEN:

16        Q.   Is that correct?

17        A.   I -- in this moment, I can't point you to

18   specific document or person or website, et cetera.

19        Q.   What is the industry-accepted standard or

20   well-established practice for replacing broken windows?

21        A.   That would be similar to the other items.  You

22   know, again I don't know what -- you know, the different

23   vendors are expected to do on timelines.

24            But just generally, it is, you know, the
```



 1    practice that windows shouldn't be unsecured or broken,

 2    you know.  And that boarded windows are an eyesore and a

 3    curb appeal issue to the community.

 4            I don't know the specifics, but ...

 5        Q.   So I think maybe there are two parts of that.

 6            So one is that windows shouldn't be unsecured

 7    or broken.

 8            Do you know how long generally the industry

 9    standard is for repairing a broken window?

10        A.   I know -- I don't know what they are required

11    by their -- contractually, but I would say generally it

12    would be as soon as possible.  As soon as, you know --

13    that's -- safety issue, so, I mean, as soon as possible.

14        Q.   I know you referenced the contract, but I

15    guess my question is a bit different, which is, NFHA's

16    accusing defendants of deviating from well-established

17    practices.  So I'm trying to determine, is there a

18    well-established practice for how quickly a broken

19    window should be repaired?

20        MR. BRADTKE:  Objection, form.

21    BY THE WITNESS:

22        A.   I mean, there is a general well-established

23    practice that windows should be repaired and as soon as

24    possible.  And, you know, we found that in communities



National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II  - 10/15/2021

1    of color that was not the same extent as in white

2    neighborhoods.  So -- you know, again, I can't comment

3    on, you know, X powers or days of, you know, whatever it

4    may be.  But just in general, that should be addressed

5    as soon as possible, and that it shouldn't be present.

6        Q.    And what is the source of that testimony?

7        A.    Again, that would be just general common

8    knowledge.  But also, you know, the same sources that

9    we've heard from in the field -- real estate agents,

10   property preservation companies, you know, community

11   members, you know, neighbors that live in the community.

12   I know there's research done on the effects of broken

13   and boarded windows in a community, et cetera.

14       Q.    Right.

15             And so my question isn't what the effects are.

16             My question is what the standard is, right; so

17   the source of information about, you know, does the

18   vendor have three days?  Does it have a week?  Does it

19   have two weeks?

20             What is the industry-accepted standard for

21   repairing a broken window?

22       MR. BRADTKE:  Objection, asked and answered.

23   BY THE WITNESS:

24       A.    And I don't know the exact number that ...



1      Q.   You also testified that boarded windows are an

2   eyesore.  I guess my question is a bit different.

3           Is there an industry-accepted standard or a

4   well-accepted practice about whether to board windows?

5      A.   I guess, can you specify whether to board

6   windows, I guess, what would be the alternative?

7           I'm not quite sure I understand.

8      Q.   Right.

9           So you brought up boarded windows.

10          Are there situations in which it is

11  appropriate under industry-accepted standards to board a

12  broken window?

13     A.   You know, I mean, we know -- I do know

14  generally that, if a window is unsecured, they may board

15  it, you know, that may be the procedure in that moment

16  to board it.

17          You know, regardless, NFHA, you know, has

18  damaged windows that included boarded windows as a

19  deficiency.  So, you know, even if they were, you

20  know -- if people were required to board, we would still

21  view that as a curb appeal and view it as a deficiency

22  for our evaluation.

23     Q.   I guess, just to be clear:  Is there an

24  industry-accepted standard or a well-accepted practice



National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II - 10/15/2021

Page 339

```
 1   in the industry that boarding -- about boarding windows?

 2       A.   I don't know it with any specificity, yeah.

 3       Q.   What is the industry-accepted standard for

 4   repairing -- Or strike that.

 5            What is the industry-accepted standard or

 6   well-established practice for repairing siding?

 7       MR. BRADTKE:  Objection, form.

 8   BY THE WITNESS:

 9       A.   You know, again, you know, any specific

10   language in the different contracts, you know,

11   generally, you know, I mean -- we do know that if there

12   is a hole in the siding or any other damage that would

13   allow, you know, water or the elements or animals,

14   et cetera, into the property, that is to be addressed as

15   soon as possible.

16            You know, I can't speak to the specifics of

17   siding requirements, but ...

18       Q.   What is the industry-accepted standard for

19   allocating funds between exterior maintenance and

20   interior maintenance of an REO property?

21       MR. BRADTKE:  Objection, form.

22   BY THE WITNESS:

23       A.   I couldn't speak to that.  I don't know.  You

24   know, I don't know how different lenders and, you know,
```



1    companies allocated their funds.

2            But I just -- generally, the best practice

3    would be to, you know, ensure that you are upkeeping the

4    property -- the exterior of the property the same in all

5    communities, and that, you know, there aren't such

6    deficiencies that we've been talking about.

7            So as far as allocating exterior versus

8    interior, I don't know.

9        Q.   So are there any other specific sources of

10   best practices or industry standards or well-accepted

11   practices that you haven't testified about?

12       MR. BRADTKE:  Objection, form.

13   BY THE WITNESS:

14       A.   Not that come to mind in this moment ...

15            No, not any more that come to mind.

16       Q.   So claimants did what I think you've referred

17   to or what we've been referring to as inspections of

18   defendants' REO properties; is that correct?

19       A.   You could call them inspection, yeah, you

20   know, investigations/inspections, yes.

21       Q.   So let's turn to tab 15 -- well, before I do

22   that.

23            So I believe it might be 12:30 or so where

24   you're located; is that right?



```
 1              So, you know -- yeah, I don't know if I have
 2    anything else to say on that, but ...
 3         Q.   Let's turn to the paint and siding category.
 4              So this appears to have five components to it,
 5    including a miscellaneous component.
 6              So what are the industry standards for the
 7    components of paint and siding here?  What are the
 8    industry standards that plaintiffs believe exist when it
 9    comes to these components?
10         A.   You know, regarding graffiti, it's NFHA's
11    understanding that the industry standard is that it
12    should be addressed immediately, that there should be no
13    presence of graffiti.
14         Q.   And where does that -- where is that industry
15    standard from?
16         A.   Again, the same type of sources I mentioned,
17    you know, seeing vendor checklists, speaking with
18    property preservation companies, and real estate agents,
19    and just, that was -- just a general best practice as
20    well, you know, obviously, and curb appeal -- I'm
21    sorry -- obviously, graffiti is a curb appeal issue.
22         Q.   And what is the industry standard for peeling
23    and chipped paint?
24         A.   You know, I -- again, I don't know the
```



National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II  - 10/15/2021                    Page 385

 1    intricacies of different contracts and how those work.

 2          But it's NFHA's understanding of the industry,

 3    you know, is that you would address things like peeling

 4    and chipped paint, you know, damaged siding, you know,

 5    damaged shutters, et cetera.  All -- so those would be

 6    items that, you know, the banks would be reviewing and

 7    repairing as part of their maintenance.

 8          Q.   In what time frame?

 9          A.   Again, I don't -- I couldn't say a specific

10    time frame.

11          Q.   And have you already -- and we've -- I know

12    I've asked a lot of questions and you've provided

13    testimony on this.

14          Have you told us everything you know about the

15    source of best practices or the factors under paint and

16    siding?

17          A.   You know, again, I mean, those same sources I

18    mentioned, those are the ones that come to mind, yes.

19          Q.   What evidence did plaintiffs gather showing

20    that defendants repaired or replaced siding on any

21    property in a white neighborhood?

22          A.   You know, again our evidence was documenting

23    the existence for absence of our deficiencies on our

24    checklist.  So those would be our photographs that would

National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II  - 10/15/2021

Page 400

1      A.    Again, you know, generally the entire

2  checklist is, you know, all of the items contribute to

3  the curb appeal of the home.  You know, this curb appeal

4  subsection was just things, I guess, intuitively you

5  would see from the curb, you know, like trash or

6  overgrown grass or a broken mailbox, you know, that was

7  just how we inspect -- separated it as we did with

8  gutters or with our other items, I guess.

9          Not to say that, you know, if it wasn't in the

10 curb appeal section, it's not curb appeal-related, or if

11 it wasn't in the structure section, it wasn't

12 structurally related, but hopefully that makes sense.

13     Q.    So in terms of mail, what is the industry

14 expectation or best practice in terms of taking mail out

15 of the mailbox?

16     A.    Sure.

17          So, you know, again, I couldn't comment on

18 specific instructions per contracts and policies,

19 et cetera.  But, you know, it is NFHA's general

20 understanding that when a vacant property is supposed to

21 be, you know, registered as a vacant property, so it

22 won't be receiving mail.  You know, accumulated mail is

23 very important, because it's just another indication --

24 when it's accumulated and piling out at the home -- it's



National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II - 10/15/2021                    Page 401

1    vacant and it's abandoned and nobody is regularly, you

2    know, taking care of it.

3           So just, you know, a general, I guess, best

4    practice that, you know, mail -- there shouldn't be

5    accumulated mail indicating that nobody is maintaining

6    the home regularly.

7           Q.   And what is NFHA's understanding or

8    plaintiff's understanding of whether defendants can take

9    mail out of a mailbox?

10          A.   I -- I don't know.  I don't know.

11          Q.   And what's plaintiff's understanding about the

12   standard for what is an invasive plant?  How are

13   invasive plants defined within the industry?

14          A.   Again, I -- I don't know if I can say the

15   specific -- you know, the specific definition of an

16   invasive plant.  But, you know, generally that includes

17   weeds, you know, plant overgrowth, you know, that it's

18   not a shrub, it's usually a weed or it's just a plant

19   that is invasive.

20          So it could be on the side of the home, could

21   be in the flower beds, could be along the sidewalk,

22   et cetera, you know, weeds ...

23          Q.   So an "invasive plant" means weeds?

24          A.   It could mean weeds.  But it could also



1    include, you know, invasive vines or, you know, other

2    plants that, I guess, they would be weeds.

3             But, yeah, it's not just weeds, but weeds as a

4    large source of invasive -- could be a large source of

5    invasive plant.

6         Q.   Okay.  And I think I know your answer to this,

7    but I have to make sure.

8             The information you have that homes in

9    communities of color were treated differently by

10   defendants than homes in white communities is found

11   within your REO database, the field evaluation form and

12   the photographs; is that right?

13        A.   That is correct, yes.  Of course, mentioning,

14   you know, we also have the evidence that we've gathered

15   from neighbors as well and other, you know -- review and

16   other sources.  But nothing else that I haven't already

17   mentioned, I believe.

18        Q.   And NFHA --

19        MR. BRADTKE:  I'm sorry.  We've been going for,

20   like, 90 minutes.  Is it okay if we take a short break,

21   please?

22        MS. KRIGSTEN:  Sure.  Happy to.

23        MR. BRADTKE:  Thank you.

24        THE VIDEOGRAPHER:  Time is 1:50.  We are now going



Case: 1:18-cv-00839 Document #: 513-1 Filed: 01/14/26 Page 59 of 224 PageID #:51971

National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II  - 10/15/2021                    Page 403

```
 1   off the record.

 2                   (A short break was had.)

 3        THE VIDEOGRAPHER:  The time is 2:06 p.m.  We are

 4   now back on the record.

 5   BY MS. KRIGSTEN:

 6        Q.   Okay.  Good.

 7             Ms. Augustine, we were talking about the curb

 8   appeal, and I want to go back to one issue that I asked

 9   about earlier.

10             I believe your testimony is that, you're not

11   aware of a specific industry-accepted practice or

12   standard for how often grass is cut; is that right?

13        A.   I would say I don't know exactly what it is.

14   I'm sure that there is a general industry standard for

15   grass cuts, I just don't know with specificity what it

16   is.

17        Q.   There are observations that plaintiffs made

18   that the grass was appropriate -- or it was not

19   overgrown in white neighborhoods -- or that there wasn't

20   a deficiency for grass cuts in white neighborhoods.

21             What does NFHA know about neighbors in white

22   neighborhoods cutting the grass of neighboring REO

23   properties?

24        A.   I mean, I know we have on our REO neighbor
```



National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II  - 10/15/2021                    Page 433

1   believe that these issues were addressed within the

2   industry within 30 days; what industry-accepted standard

3   exists for these -- that these other factors should be

4   addressed within 30 days?

5         MR. BRADTKE:  Objection, form.

6   BY THE WITNESS:

7         A.   You know, just -- again, our general

8   understanding of, you know, the initial property

9   services that go on within the first 30 days, like the

10  trash-out, you know, securing the property, doing -- you

11  know, establishing the exterior maintenance, like mowing

12  the lawn, et cetera.

13            You know, again, I don't know specific

14  policies or contracts that would say, you know, you have

15  "X" days to fix "X" thing.  But, again, after the 30-day

16  grace period or if it was actively listed on Hubzu or

17  actively, you know, on an auction website or otherwise,

18  then we used -- all of the items on our checklist were

19  marked.

20        Q.   What evidence did plaintiffs gather about how

21  much repairs or certain activities cost?

22        A.   I don't know that we have any data collection

23  about what repairs cost, and especially not any, you

24  know, Deutsche Bank-specific repair cost, because that



1    wasn't publicly accessible to us.

2         Q.   What are the industry standards or the

3    well-accepted practices for an entity to evaluate the

4    cost of repair in comparison to the value of a property?

5         MR. BRADTKE:  Objection, form.

6    BY THE WITNESS:

7         A.   I don't know -- I don't know what those would

8    be.

9         Q.   When is it appropriate for an entity to

10   consider the cost of the maintenance issue when

11   determining whether to undertake it?

12        A.   Can you rephrase that?  I'm not sure I

13   understand that question.

14        Q.   Sure.

15             When is an entity, such, as let's say the

16   Deutsche Bank defendants, when was it appropriate for

17   them to consider the cost of a repair, or -- a repair --

18   or, you know, addressing a maintenance issue in

19   determining whether to undertake that repair?

20        A.   I'm not sure I know if I could -- I don't know

21   if I could answer when it's appropriate.

22             But, I mean, generally that would be, you

23   know, as we've been talking about all day, you know, is

24   it a curb appeal issue, is it a structural issue, is it



1  a health and safety issue, is it something that we are

2  contractually obligated to address as the owner of the

3  property?

4          Again, I don't know their internal policies

5  and how they -- that works, but ...

6          Q.   So the allegations that plaintiffs have raised

7  is that it is inappropriate -- part of the

8  allegations -- is it was inappropriate for Deutsche Bank

9  defendants not to repair certain things or maintain --

10 make improvements on certain properties, because they

11 were located in communities of color.

12         Do I understand that right?

13         A.   Sorry.  Can you rephrase that?  That's not --

14         Q.   Sure.

15         So let me ask this a different way.

16         So one of the things that NFHA is alleging --

17 that plaintiffs are alleging is that, defendants

18 maintained properties in communities of color

19 differently than white communities.

20         I think we can agree on that, right?

21         A.   Yes.

22         Q.   And we've explored the evidence around

23 plaintiffs' formulating that argument.

24         What I'm asking about is whether plaintiffs



National Fair Housing Alliance vs Deutsche Bank National Trust
Corporate Rep 30(b)(6) NFHA - Lindsay Augustine - Vol. II  - 10/15/2021

Page 436

1    ever evaluated the extent or whether the cost of, let's

2    say, addressing damaged siding, whether expending that

3    cost was necessary, given the value of the property.  So

4    is there any evaluation of things like that?

5         A.   To my knowledge, you know, we did not do any

6    evaluation of -- you know, again, we didn't have access

7    to repair information.  And, you know, we used the

8    checklist regardless of what it was valued.

9         Q.   So one of the factors on the evaluation form

10   is peeling and chipped paint.  So I believe I've asked

11   this, but I want to make sure.

12            What is the industry's evaluation of whether a

13   home with peeling or chipped paint should be repainted;

14   like, what industry standard exists that NFHA

15   understands?

16        MR. BRADTKE:  Objection, form.

17        A.   The general -- I believe the general industry

18   standard is that, you know, chipped or peeling, it

19   should be scraped off.  And, you know, it's a curb

20   appeal issue to have peeling, chipped -- chipping paint,

21   and so it should be repainted.  You know, it's just

22   another -- as I said, it's a curb appeal issue.  And,

23   you know, it would increase the value of the home, you

24   know, and could potentially affect the sale of the home

Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Jury Trial Demanded |
| Defendants. | |

**RESPONSES AND OBJECTIONS OF DEFENDANTS DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE, AND DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE, TO PLAINTIFFS' DECEMBER 29, 2021, REQUEST FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants Deutsche Bank National Trust Company, as trustee, and Deutsche Bank Trust Company Americas, as trustee, (collectively, the "Trustees"), provide their Objections and Responses to Plaintiffs' December 29, 2021, Request for Production of Documents. The following responses are subject to the "General Objections" contained in the Trustees' Responses to Plaintiffs First, Second, and June 3, 2021, requests for Production of Documents, which are fully incorporated herein.

The Trustees' objections and responses are based on information currently available to and located by the Trustees, and are made without prejudice to the Trustees' right to use or rely on subsequently discovered information and to modify, alter, and/or supplement their objections or responses accordingly. Furthermore, nothing contained in these objections or responses is an admission by the Trustees concerning the existence or nonexistence of any information or documents, and no objection or answer should be construed as an admission regarding the

**Response:** In addition to its General Objections, the Trustees object to this Request on the grounds that the Request is overbroad, unduly burdensome, and seeks information that is not proportionate to the needs of this case. The Trustees also object to the extent the Request seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, the expert privilege, or any other recognized legal privilege. The Trustees further object to this Request as being overly broad in time, scope, and duration to the extent it seeks to identify or request documents related to a time frame that predates to the applicable limitations period and to the extent that it seeks information created after the date of the filing of the Complaint in this matter. The Trustees also object to this Request to the extent it seeks information duplicative of, or produced in response to, any other Request, including but not limited to, Plaintiffs' First and Second Requests for Production to the Trustees, or requests made to other parties in this case.

Subject to and without waiving the foregoing objections, the Trustees do not believe any such non-privileged documents exist in their possession, custody, or control.

**Request No. 7.** All documents not otherwise produced that Defendant will rely on to defend against Plaintiffs' claims.

**Response:** The Trustees object to this Request to the extent it seeks information duplicative of, or produced in response to, any other Request, including but not limited to, Plaintiffs' First and Second Requests for Production to the Trustees, or requests made to other parties in this case. The Trustees also object to this Request on the grounds that it is vague in light of Plaintiffs' ever-evolving legal theories and murky claims. The Trustees also object to the extent the Request seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, the expert privilege, or any other recognized legal privilege. In particular, the Request

seeks the work-product of the Trustees' counsel, including their mental impressions of the evidence.

**Request No. 8.** All documents not otherwise produced that discuss or relate to Plaintiff NFHA or any of the regional Plaintiff organizations.

**Response:** In addition to its General Objections, the Trustees object to this Request on the grounds that the Request is overbroad, unduly burdensome, and seeks information that is not proportionate to the needs of this case. The Trustees also object to the extent the Request seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, the expert privilege, or any other recognized legal privilege. The Trustees further object to this Request as being overly broad in time, scope, and duration to the extent it seeks to identify or request documents related to a time frame that predates to the applicable limitations period and to the extent that it seeks information created after the date of the filing of the Complaint in this matter. The Trustees also object to this Request to the extent it seeks information duplicative of, or produced in response to, any other Request, including but not limited to, Plaintiffs' First and Second Requests for Production to the Trustees, or requests made to other parties in this case.

Subject to and without waiving the foregoing objections, the Trustees will produce additional documents created on or after February 1, 2010, responsive to this Request identified using reasonable search terms derived or selected from those proposed by Plaintiffs by in Exhibit A to their letter dated December 29, 2021, and to be applied to custodians to be agreed to with Plaintiffs selected from the list of proposed custodians on Exhibit B to that letter.

**Request No. 9.** All documents sufficient to identify the enrollment of any Deutsche Bank owned REOs mortgages or loans into Ocwen's Homeward program.

Dated: January 28, 2022

Respectfully,

/s/ Kenneth M. Kliebard
Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: (312) 324-1000
Email:  kenneth.kliebard@morganlewis.com
*Counsel to Defendants Deutsche Bank National
Trust Company, as trustee, and Deutsche Bank
Trust Company Americas, as trustee*

**CERTIFICATE OF SERVICE**

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via email on January 28, 2022.

/s/ *Kenneth M. Kliebard*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:18-cv-00839 |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, as trustee; DEUTSCHE BANK TRUST COMPANY AMERICAS, as trustee; OCWEN FINANCIAL CORP.; and ALTISOURCE PORTFOLIO SOLUTIONS, INC., | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**OBJECTIONS AND RESPONSES OF DEFENDANTS DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE, AND DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE, TO PLAINTIFFS' MARCH 6, 2020, REQUEST FOR PRODUCTION**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants Deutsche Bank National Trust Company, as trustee, and Deutsche Bank Trust Company Americas, as trustee, (collectively, the "Trustees") hereby serve their Objections and Responses to Plaintiffs' March 6, 2020, Request for Production to the Trustees (the "Requests").

**GENERAL OBJECTIONS AND RESPONSES**

1. The Trustees object to the Requests to the extent they exceed the scope of permissible discovery under the Federal Rules of Civil Procedure, local rules, the rulings and individual rules of the Court, and/or other applicable rules or law.

2. The Trustees will produce relevant, responsive, non-privileged, non-duplicative documents within their possession, custody, or control, to the extent they exist, and that the Trustees locate after performing a reasonably diligent search of the files most likely to have

as it seeks documents not related to any claim or defense in this matter and is not proportional to the needs of the case. The Trustees further object to this request to the extent it seeks information and documents subject to the attorney-client privilege or work product protection. Subject to their General Objections and the foregoing objections, the Trustees previously produced trust governing agreements at DB_NFHA00000001 to DB_NFHA00121123 that may be responsive to this request; the Trustees will produce any additional responsive, non-privileged documents in their possession, custody, or control located after a diligent and reasonable search.

**REQUEST NO. 36**: All documents supporting or relating to Defendant's defenses set forth in its Answer.

**RESPONSE:** The Trustees incorporate by reference their General Objections as if fully set forth herein. The Trustees object to Request No. 36 because it is vague, overly broad, and unduly burdensome as it seeks documents not related to any claim or defense in this matter and is not proportional to the needs of the case. The Trustees further object to this request to the extent it seeks information and documents subject to the attorney-client privilege or work product protection. Subject to their General Objections and the foregoing objections, the Trustees previously produced trust governing agreements at DB_NFHA00000001 to DB_NFHA00121123 that may be responsive to this request; the Trustees will produce any additional responsive, non-privileged documents in their possession, custody, or control located after a diligent and reasonable search.

**REQUEST NO. 37:** All documents Defendant relied upon, referenced or identified in answering Plaintiffs' Interrogatories.

**RESPONSE:** The Trustees incorporate by reference their General Objections as if fully set forth herein. The Trustees object to Request No. 37 because it is overly broad and unduly burdensome as it seeks documents not related to any claim or defense in this matter and is not proportional to

Dated: June 22, 2020

Respectfully,

/s/ Kenneth M. Kliebard
Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: (312) 324-1000
Email: kenneth.kliebard@morganlewis.com

*Counsel to Defendants Deutsche Bank National Trust Company, as trustee, and Deutsche Bank Trust Company Americas, as trustee*

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true and correct copy of the foregoing was served upon all parties of record via email on June 22, 2020.

/s/ Kenneth M. Kliebard

-27-

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | ) |
| | ) Case No. 1:18-cv-00839 |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS | ) Magistrate Judge Sidney I. Schenkier |
| TRUSTEE, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT OCWEN'S OBJECTIONS AND RESPONSES TO PLAINTIFFS'
SEPTEMBER 1, 2020 REQUEST FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Ocwen Loan Servicing, LLC n/k/a PHH Mortgage Corporation ("Ocwen"), by and through its attorneys, hereby submits its responses and objections to Plaintiffs' September 1, 2020 Request for Production of Documents to Defendant Ocwen Loan Servicing, LLC (the "Requests"). The following responses are provided subject to the "Preliminary Statement," "General Objections," "Objections to Definitions," and "Objections to Instructions" set forth fully in Ocwen's June 22, 2020 Objections and Responses to Plaintiffs' First Request for Production of Documents, which Ocwen hereby incorporates by reference into each response.

**RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST NO. 1:**

All records containing information regarding the property maintenance and property preservation of any REO properties on the attached Ex. 1 for which you or any vendor or contractor retained by you (or by any vendor or contractor otherwise retained) have had any responsibilities,

**REQUEST NO. 2:**

All documents that relate to any of the Affirmative Defenses asserted by Defendant in its Answer.

**RESPONSE TO REQUEST NO. 2:**

In addition to its General Objections, Ocwen specifically objects to this Request on the grounds that this Request is duplicative of Request No. 52 in Plaintiffs' March 6, 2020 Request for Production of Documents to Defendant Ocwen Loan Servicing, LLC. Ocwen also objects to this Request as overly broad and unduly burdensome in that it seeks "all documents that relate to" Ocwen's Affirmative Defenses without limitation. Ocwen further objects to this Request as overly burdensome because it is unreasonably compounds and complex in that it seeks documents related to each of Ocwen's 57 Affirmative Defenses. Ocwen further objects to this Request to the extent that it seeks Privileged Documents or Information, as well as any other documents related to Ocwen's legal theories, which are protected against disclosure by Rule 26(b)(3)(B).

Subject to and without waiving its General Objections, Ocwen states that it will produce, to the extent they exist and are readily retrievable, certain non-privileged documents that Ocwen will use to support its defenses in this case.

Dated: October 1, 2020                   Respectfully Submitted,

Ocwen Loan Servicing, LLC, n/k/a PHH Mortgage Corporation

By: /s/ Debra Bogo-Ernst
        One of Its Attorneys

Debra Bogo-Ernst
Matthew Sostrin
Jacey Norris
Mayer Brown LLP
71 S. Wacker Drive

Chicago, IL 60606
Tel: (312) 701-7403
Fax: (312) 706-8474
dernst@mayerbrown.com
msostrin@mayerbrown.com
jnorris@mayerbrown.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | ) | |
| | ) | Case No. 1:18-cv-00839 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT OCWEN'S OBJECTIONS & RESPONSES TO
PLAINTIFFS' DECEMBER 29, 2021 REQUEST FOR PRODUCTION
OF DOCUMENTS TO OCWEN LOAN SERVICING, LLC**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Ocwen Loan Servicing, LLC n/k/a PHH Mortgage Corporation ("Ocwen"), by and through its attorneys, hereby submits its Objections and Responses to Plaintiffs' December 29, 2021 Request for Production of Documents to Ocwen Loan Servicing, LLC (the "Requests").

**PRELIMINARY STATEMENT**

Ocwen reserves its right to assert any and all applicable objections to the Requests or the use of any responses thereto in any proceeding in any action (including any trial), including without limitation, objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, and the like, and any and all other objections on the grounds that it would require the exclusion of any responses herein if offered in Court.

No incidental or implied admissions are intended in these responses. Ocwen's response to any Request should not be taken as an admission that Ocwen accepts or admits the existence of any fact(s) set forth or assumed by such Request or that such response constitutes admissible

objects to this Request to the extent that it seeks Privileged Documents or Information (as defined in Ocwen's June 22, 2020 Response to Plaintiffs' First Request for Production of Documents). Finally, Ocwen objects to this Request to the extent that it is duplicative of, or seeks documents already produced in response to, any other Request including Plaintiffs' First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Requests for Production to Ocwen, or requests made to other parties in this case.

Subject to and without waiving its objections, Ocwen is not aware of documents responsive to this Request.

**REQUEST NO. 13:**

All documents not otherwise produced that Defendant will rely on to defend against Plaintiffs' claims.

**RESPONSE TO REQUEST NO. 13:**

In addition to its General Objections, Ocwen specifically objects to this Request on the grounds that it is duplicative of previous requests including Request No. 52 in Plaintiffs' March 6, 2020 Request for Production of Documents to Defendant Ocwen Loan Servicing, LLC. Ocwen further objects to this Request on the ground that it is premature. Ocwen also objects to this Request to the extent that it seeks Privileged Documents or Information (as defined in Ocwen's June 22, 2020 Response to Plaintiffs' First Request for Production of Documents). Ocwen further objects to this Request to the extent that it is duplicative of, or seeks documents already produced in response to, any other Request including Plaintiffs' First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Requests for Production to Ocwen, or requests made to other parties in this case including Request No. 2 of Plaintiffs' September 1, 2020 Request for Production. Finally, Ocwen objects to this Request on the ground that it is premature to the extent that it purports to

seek the disclosure and production of materials that will be provided during the expert discovery phase of the litigation.

Subject to and without waiving its General Objections, Ocwen has produced, and will continue to produce, documents on which Ocwen will rely for its defenses in this case.

**REQUEST NO. 14:**

All documents not otherwise produced that discuss or relate to Plaintiff NFHA or any of the regional Plaintiff organizations.

**RESPONSE TO REQUEST NO. 14:**

In addition to its General Objections, Ocwen specifically objects to this Request on the grounds that it is overly broad, unduly burdensome, and seeks documents that are neither relevant to the claims or defense in this action nor reasonably calculated to lead to the discovery of admissible evidence. Ocwen further objects to this request on the grounds that it is overly broad in time, scope, and duration and concerns documents that fall outside the relevant time period as to Ocwen for this litigation, starting in February 2015. Ocwen additionally objects to this Request to the extent that it is not specifically directed at Ocwen and seeks documents outside of Ocwen's possession, custody, or control. Ocwen also objects to this Request to the extent that it seeks Privileged Documents or Information (as defined in Ocwen's June 22, 2020 Response to Plaintiffs' First Request for Production of Documents). Finally, Ocwen objects to this Request to the extent that it is duplicative of, or seeks documents already produced in response to, any other Request including Plaintiffs' First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Requests for Production to Ocwen, or requests made to other parties in this case.

Subject to and without waiving its objections, Ocwen will conduct the custodial email searches set forth in D. Bogo-Ernst's January 14, 2022 letter.

that it is overly broad in time, scope, and duration and concerns documents that fall outside the relevant time period as to Ocwen for this litigation, which starts in February 2015. Ocwen also objects to this Request to the extent that is seeks documents outside of Ocwen's possession, custody, or control. Ocwen further objects to this Request to the extent that it seeks Privileged Documents or Information (as defined in Ocwen's June 22, 2020 Response to Plaintiffs' First Request for Production of Documents). Finally, Ocwen objects to this Request to the extent that it is duplicative of, or seeks documents already produced in response to, any other Request including Plaintiffs' First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Requests for Production to Ocwen, or requests made to other parties in this case.

Subject to and without waiving its General Objections Ocwen will conduct the custodial email searches set forth in D. Bogo-Ernst's January 14, 2022 letter.


Dated: February 4, 2022                    Respectfully Submitted,

Ocwen Loan Servicing, LLC, n/k/a PHH Mortgage Corporation


By: /s/ Debra Bogo-Ernst
       One of Its Attorneys

Debra Bogo-Ernst
Matthew Sostrin
Jacey Norris
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel: (312) 701-7403
Fax: (312) 706-8474
dernst@mayerbrown.com
msostrin@mayerbrown.com
jnorris@mayerbrown.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | |
| | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Harry D. Leinenweber |
| | Magistrate Judge Sidney I. Schenkier |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | |
| Defendants. | Jury Trial Demanded |

**DEFENDANT ALTISOURCE SOLUTIONS, INC.'S RESPONSES AND OBJECTIONS
TO PLAINTIFFS' DECEMBER 29, 2021
REQUEST FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant Altisource Solutions, Inc. ("Altisource"), by and through its undersigned counsel, provides its responses to Plaintiffs' December 29, 2021 Request for Production of Documents to Altisource Solutions, Inc. (the "Requests"). The following responses are subject to the "Preliminary Statement" and "General Objections," as well as the other objections contained in Altisource's Responses to Plaintiffs' First, Second, Third, Fourth, Fifth, and Sixth Requests for Production of Documents, which are fully incorporated herein.

**DOCUMENTS REQUESTED**

**Request No.1.** For the time frame of January 1, 2008 to December 31, 2017, all documents related to meetings with community, civic, municipal, or public individuals, groups, organizations or entities regarding complaints or issues regarding the maintenance, condition, or marketing of foreclosed properties in neighborhoods serviced by Ocwen and Altisource under agreements where Deutsche Bank acted as Trustee or investor, including documents describing any activities

Altisource also objects on the ground that the Request seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, the expert privilege, or another recognized legal privilege. Altisource further objects to this Request as being overly broad in time, scope, and duration to the extent it seeks to identify or request documents created prior to or no longer in use as of February 14, 2015. Altisource objects to this Request where it seeks information duplicative of, or produced in response to, any other Request, including but not limited to, Plaintiffs' First, Second, Third, Fourth, Fifth, and Sixth Requests for Production to Altisource, or requests made to other parties in this case. For example, this RFP appears to encompasses information already sought by Plaintiffs in in RFP 10, RFP 22, and RFP 57 of their March 6, 2020 Requests. Altisource further objects on the basis that the parties have already spent a significant amount of time meeting and conferring to narrow the categories of documents that would be responsive to these prior requests. Altisource also objects to the extent this Request seeks documents that are not in its possession, custody, or control, or have already been produced by other Defendants in this case. Moreover, since discovery's February 2020 start, Plaintiffs have served 122 requests to which Altisource has produced 67,072 documents over 16 volumes, totaling 390,789 pages and hundreds of thousands of entries reflecting property-specific data, information, and communications. In light of this substantial production, Altisource objects to this Request as particularly overbroad, duplicative, and burdensome.

Subject to and without waiving its objections, Altisource states that it believes it has exhausted its discovery obligations and will not produce additional documents in response to this Request.

**Request No.8.** All documents not otherwise produced that Defendant will rely on to defend against Plaintiffs' claims.

**RESPONSE:** In addition to its General Objections, Altisource objects to this Request as vague and/or ambiguous because the term "rely on" is not defined. Altisource also objects on the ground that the Request seeks documents that are protected from disclosure by attorney-client privilege, the work product doctrine, the expert privilege, or another recognized legal privilege. Altisource further objects to this Request as being overly broad in time, scope, and duration to the extent it seeks to identify or request documents created prior to or no longer in use as of February 14, 2015. Altisource also objects to the extent this Request seeks any documents previously produced by another party to this case, obtained through a validly-issued subpoena, or is derived from some other judicially-noticeable source.

Subject to and without waiving its objections, Altisource states that it will produce any un-produced documents that it intends to rely on at trial (or in mediation), or for a dispositive pleading in this case.

**Request No. 9.** All documents not otherwise produced that discuss or relate to Plaintiff NFHA or any of the regional Plaintiff organizations.

**RESPONSE:** In addition to its General Objections, Altisource objects to this Request as vague and ambiguous. Altisource further objects on the grounds that the Request is overbroad, unduly burdensome, and seeks information that is not relevant to any claim or defense by seeking "[a]ll documents not otherwise produced that discuss or relate to Plaintiff NFHA or any of the regional Plaintiff organizations" Such a request is broad in scope and could conceivably encompass ESI that is burdensome and costly to extract yet lacks any relevance to this case. The mere fact a plaintiff is mentioned in a document does not mean it has any bearing on the claims or defenses at issue. Altisource further objects to the request to the extent it seeks information not relevant to this case, nor likely to lead to the discovery of relevant or admissible evidence.

13

volumes, totaling 390,789 pages and hundreds of thousands of entries reflecting property-specific data, information, and communications. In light of this substantial production, Altisource objects to this Request as particularly overbroad, duplicative, and burdensome.

Subject to and without waiving its objections, Altisource states that it will produce additional documents responsive to this Request, to the extent any exist.

Dated: February __, 2022.

Respectfully submitted,

By: /s/ *Nathan Garroway*
Nathan Garroway (admitted *pro hac vice*)
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com

Shannon Y. Shin
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Email: shannon.shin@dentons.com

Lisa Krigsten (admitted *pro hac vice*)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
Telephone: (816) 460-2400
Email: lisa.krigsten@dentons.com
*Counsel to Defendant Altisource Solutions, Inc.*

Exhibit 5

## Maggie McKernin

| | |
|---|---|
| **From:** | Kim, Sara <SKim@willkie.com> |
| **Sent:** | Friday, January 9, 2026 11:21 PM |
| **To:** | Lila Miller; Jennifer Soule; Jim Bradtke; Steven Schneck; Stephen Dane; Ted Olds; Andrea Lyon; Maggie McKernin; Morgan Williams; Janell Byrd-Chichester |
| **Cc:** | Bogo-Ernst, Debra; Thomas, Matthew J.; Villa, Brandon E.; Hastings, Eve; Halom, Benjamin; Sohns, Tara; mark.trigg@dentons.com; Nathan L. Garroway; sarahhannah.phillips@dentons.com; Kirwin, Sean M.; Mitchell, Alizé D.; kayla.lee@dentons.com; lisa.krigsten@dentons.com; Kenneth M. Kliebard; tinos.diamantatos@morganlewis.com; megan.braden@morganlewis.com; Fakhoury, Michael W.; Kurt William Rademacher; Williams, Bradie R.; Kraut, Michael S. |
| **Subject:** | NFHA v. DBNT - Defendants' 1/9 Pretrial Exchange |
| **Attachments:** | [2026.01.09 Pretrial Exchange] Defendants' Objections to Plaintiffs' Revised Punitive Damages Instruction.pdf; [2026.01.09 Pretrial Exchange] Defendants' Red Line Revisions to Plaintiffs' Proposed Punitive Damages Instruction.pdf; [2026.01.09 Pretrial Exchange] Defendants' Objections and Counter-Designations to Plaintiffs' 2025.12.30 Supplemental Deposition Designations.xlsb; [2026.01.09 Pretrial Exchange] Defendants' Objections to Plaintiffs' Exhibit List.xlsx; [2026.01.09 Pretrial Exchange] Defendants' Proposed Exhibit List.xlsx |

Counsel,

For today's pretrial exchange, please see attached for the following:

(1)  defendants' objections to plaintiffs' revised punitive damages instruction and redline,
(2)  defendants' objections and counter-designations to plaintiffs' supplemental deposition designations,
(3)  defendants' objections to plaintiffs' exhibit list,
(4)  defendants' updated exhibit list.

As previewed, defendants' updated exhibit list removes Exs. 499, 4191-4413, and 4415-4525. We would also note that Exhibits 500-503 are publicly available documents. Exhibits 4011-4084, 4086-4090, and 4099-4102 are duplicates of already produced documents or generally publicly available.

Best,
Sara

**Sara Kim**
**Willkie Farr & Gallagher LLP**
300 North LaSalle Dr. | Chicago, IL 60654-3406
Direct: +1 312 728 9034 | Fax: +1 312 728 9199
skim@willkie.com | vCard | www.willkie.com bio

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

# Exhibit 6

## Maggie McKernin

| | |
|---|---|
| **From:** | Lila Miller <lmiller@relmanlaw.com> |
| **Sent:** | Tuesday, January 13, 2026 3:52 PM |
| **To:** | Bogo-Ernst, Debra; Kim, Sara; Fakhoury, Michael W.; Jennifer Soule; Ted Olds; Steven Schneck; Stephen Dane; Andrea Lyon; Morgan Williams; Janell Byrd-Chichester; Jim Bradtke; Maggie McKernin; Thomas, Matthew J.; Villa, Brandon E.; Hastings, Eve; Halom, Benjamin; Sohns, Tara; mark.trigg@dentons.com; Nathan L. Garroway; sarahhannah.phillips@dentons.com; Sean M.; Alizé D.; kayla.lee@dentons.com; lisa.krigsten@dentons.com |
| **Cc:** | Kliebard, Kenneth M.; Diamantatos, Tinos; Braden, Megan R.; Rademacher, Kurt W.; Kraut, Michael S.; Williams, Bradie R. |
| **Subject:** | RE: NFHA, et al. v. DBNT, et al. - Updated Deposition Designation Materials |

Hi Deb,

As I said, we'll review in good faith, but we also see documents on today's spreadsheet for which there is no record of previous disclosure/production and no indication of an expert's reliance. If Defendants want to withdraw those exhibits, let us know.

I believe we're still waiting to hear from Defendants on voir dire, jury instructions, and the stipulations (other than out-of-town witnesses). It would be great to get that information so we can get things ready for tomorrow.

Thanks,
Lila

**From:** Bogo-Ernst, Debra <DErnst@willkie.com>
**Sent:** Tuesday, January 13, 2026 4:44 PM
**To:** Lila Miller <lmiller@relmanlaw.com>; Kim, Sara <SKim@willkie.com>; Fakhoury, Michael W. <michael.fakhoury@morganlewis.com>; Jennifer Soule <jsoule@sbllegal.com>; Ted Olds <tolds@relmanlaw.com>; Steven Schneck <sschneck@sbllegal.com>; Stephen Dane <sdane@fairhousinglaw.com>; Andrea Lyon <alyon@lyonkerr.com>; Morgan Williams <mwilliams@nationalfairhousing.org>; Janell Byrd-Chichester <jbyrd-chichester@nationalfairhousing.org>; Jim Bradtke <jbradtke@sbllegal.com>; Maggie McKernin <office@sbllegal.com>; Thomas, Matthew J. <MThomas@willkie.com>; Villa, Brandon E. <BVilla@willkie.com>; Hastings, Eve <EHastings@willkie.com>; Halom, Benjamin <BHalom@willkie.com>; Sohns, Tara <TSohns@willkie.com>; mark.trigg@dentons.com; Nathan L. Garroway <nathan.garroway@dentons.com>; sarahhannah.phillips@dentons.com; Sean M. <sean.kirwin@dentons.com>; Alizé D. <alize.mitchell@dentons.com>; kayla.lee@dentons.com; lisa.krigsten@dentons.com
**Cc:** Kliebard, Kenneth M. <kenneth.kliebard@morganlewis.com>; Diamantatos, Tinos <tinos.diamantatos@morganlewis.com>; Braden, Megan R. <megan.braden@morganlewis.com>; Rademacher, Kurt W. <kurt.rademacher@morganlewis.com>; Kraut, Michael S. <michael.kraut@morganlewis.com>; Williams, Bradie R. <bradie.williams@morganlewis.com>
**Subject:** RE: NFHA, et al. v. DBNT, et al. - Updated Deposition Designation Materials

Lila,

Please take a look at the specifics related to each of the "publicly available" documents. We provided more detail in the Excel; some of this, for example, is a long-disclosed document on which an expert relied. We really shouldn't be disputing the use of stuff like that. Happy to talk if you'd like to do so.

Deb

**Debra Bogo-Ernst**
**Willkie Farr & Gallagher LLP**
300 North LaSalle Dr. | Chicago, IL 60654-3406
Direct: +1 312 728 9062 | Fax: +1 312 728 9199
dernst@willkie.com | vCard | www.willkie.com bio
Pronouns: she, her, hers

---

**From:** Lila Miller <lmiller@relmanlaw.com>
**Sent:** Tuesday, January 13, 2026 2:33 PM
**To:** Kim, Sara <SKim@willkie.com>; Bogo-Ernst, Debra <DErnst@willkie.com>; Fakhoury, Michael W.
<michael.fakhoury@morganlewis.com>; Jennifer Soule <jsoule@sbllegal.com>; Ted Olds <tolds@relmanlaw.com>;
Steven Schneck <sschneck@sbllegal.com>; Stephen Dane <sdane@fairhousinglaw.com>; Andrea Lyon
<alyon@lyonkerr.com>; Morgan Williams <mwilliams@nationalfairhousing.org>; Janell Byrd-Chichester <jbyrd-
chichester@nationalfairhousing.org>; Jim Bradtke <jbradtke@sbllegal.com>; Maggie McKernin <office@sbllegal.com>;
Thomas, Matthew J. <MThomas@willkie.com>; Villa, Brandon E. <BVilla@willkie.com>; Hastings, Eve
<EHastings@willkie.com>; Halom, Benjamin <BHalom@willkie.com>; Sohns, Tara <TSohns@willkie.com>;
mark.trigg@dentons.com; Nathan L. Garroway <nathan.garroway@dentons.com>; sarahhannah.phillips@dentons.com;
Sean M. <sean.kirwin@dentons.com>; Alizé D. <alize.mitchell@dentons.com>; kayla.lee@dentons.com;
lisa.krigsten@dentons.com
**Cc:** Kliebard, Kenneth M. <kenneth.kliebard@morganlewis.com>; Diamantatos, Tinos
<tinos.diamantatos@morganlewis.com>; Braden, Megan R. <megan.braden@morganlewis.com>; Rademacher, Kurt W.
<kurt.rademacher@morganlewis.com>; Kraut, Michael S. <michael.kraut@morganlewis.com>; Williams, Bradie R.
<bradie.williams@morganlewis.com>
**Subject:** RE: NFHA, et al. v. DBNT, et al. - Updated Deposition Designation Materials

<div style="background-color:yellow">*** EXTERNAL EMAIL ***</div>

Thank you, Sara. We appreciate this information. That said, the fact that a document is publicly available does not
necessarily excuse Defendants' failure to produce it in discovery. We will assess the necessity of a motion on
undisclosed documents in good faith, but we reserve the right to file tomorrow as planned.

---

**From:** Kim, Sara <SKim@willkie.com>
**Sent:** Tuesday, January 13, 2026 2:58 PM
**To:** Lila Miller <lmiller@relmanlaw.com>; Bogo-Ernst, Debra <DErnst@willkie.com>; Fakhoury, Michael W.
<michael.fakhoury@morganlewis.com>; Jennifer Soule <jsoule@sbllegal.com>; Ted Olds <tolds@relmanlaw.com>;
Steven Schneck <sschneck@sbllegal.com>; Stephen Dane <sdane@fairhousinglaw.com>; Andrea Lyon
<alyon@lyonkerr.com>; Morgan Williams <mwilliams@nationalfairhousing.org>; Janell Byrd-Chichester <jbyrd-
chichester@nationalfairhousing.org>; Jim Bradtke <jbradtke@sbllegal.com>; Maggie McKernin <office@sbllegal.com>;
Thomas, Matthew J. <MThomas@willkie.com>; Villa, Brandon E. <BVilla@willkie.com>; Hastings, Eve
<EHastings@willkie.com>; Halom, Benjamin <BHalom@willkie.com>; Sohns, Tara <TSohns@willkie.com>;
mark.trigg@dentons.com; Nathan L. Garroway <nathan.garroway@dentons.com>; sarahhannah.phillips@dentons.com;
Sean M. <sean.kirwin@dentons.com>; Alizé D. <alize.mitchell@dentons.com>; kayla.lee@dentons.com;
lisa.krigsten@dentons.com
**Cc:** Kliebard, Kenneth M. <kenneth.kliebard@morganlewis.com>; Diamantatos, Tinos
<tinos.diamantatos@morganlewis.com>; Braden, Megan R. <megan.braden@morganlewis.com>; Rademacher, Kurt W.
<kurt.rademacher@morganlewis.com>; Kraut, Michael S. <michael.kraut@morganlewis.com>; Williams, Bradie R.
<bradie.williams@morganlewis.com>
**Subject:** RE: NFHA, et al. v. DBNT, et al. - Updated Deposition Designation Materials

Lila,

Following up on our meet and confer, please see the attached Excel providing responses to Plaintiffs' requests for additional information on certain of Defendants' proposed exhibits. As referenced in the Excel, the attached zip file includes some of the non-Bates stamped, publicly available documents included on Defendants' exhibit list. We think this should largely resolve Plaintiffs' contemplated motion in limine on this topic, but please let us know if you disagree.

Best,
Sara

---

**From:** Lila Miller <lmiller@relmanlaw.com>
**Sent:** Tuesday, January 13, 2026 12:10 PM
**To:** Bogo-Ernst, Debra <DErnst@willkie.com>; Fakhoury, Michael W. <michael.fakhoury@morganlewis.com>; Jennifer Soule <jsoule@sbllegal.com>; Ted Olds <tolds@relmanlaw.com>; Steven Schneck <sschneck@sbllegal.com>; Stephen Dane <sdane@fairhousinglaw.com>; Andrea Lyon <alyon@lyonkerr.com>; Morgan Williams <mwilliams@nationalfairhousing.org>; Janell Byrd-Chichester <jbyrd-chichester@nationalfairhousing.org>; Jim Bradtke <jbradtke@sbllegal.com>; Maggie McKernin <office@sbllegal.com>; Thomas, Matthew J. <MThomas@willkie.com>; Villa, Brandon E. <BVilla@willkie.com>; Hastings, Eve <EHastings@willkie.com>; Halom, Benjamin <BHalom@willkie.com>; Sohns, Tara <TSohns@willkie.com>; Kim, Sara <SKim@willkie.com>; mark.trigg@dentons.com; Nathan L. Garroway <nathan.garroway@dentons.com>; sarahhannah.phillips@dentons.com; Sean M. <sean.kirwin@dentons.com>; Alizé D. <alize.mitchell@dentons.com>; kayla.lee@dentons.com; lisa.krigsten@dentons.com
**Cc:** Kliebard, Kenneth M. <kenneth.kliebard@morganlewis.com>; Diamantatos, Tinos <tinos.diamantatos@morganlewis.com>; Braden, Megan R. <megan.braden@morganlewis.com>; Rademacher, Kurt W. <kurt.rademacher@morganlewis.com>; Kraut, Michael S. <michael.kraut@morganlewis.com>; Williams, Bradie R. <bradie.williams@morganlewis.com>
**Subject:** RE: NFHA, et al. v. DBNT, et al. - Updated Deposition Designation Materials

**\*\*\* EXTERNAL EMAIL \*\*\***

Michael and Deb,

Thanks for following up.

In light of Defendants' removal of the Rademacher declaration from their exhibit list, Plaintiffs will withdraw the contemplated motion.

We struggle to see why Mr. Kevin Flannigan is a necessary or appropriate witness. Because Judge Shah intends to pre-admit many exhibits and because we agreed to deem authentic Defendants' timely-produced corporate documents, we do not see what documents he would be authenticating. As to potential testimony on the substance of the August 2020 interrogatory responses and 2018 declaration, Mr. Flannigan should have been named in Defendants' 26(a)(1) disclosures and their interrogatory responses. He also was not identified in the Parties' early 2022 conferrals about anticipated trial witnesses and thus was not deposed. Accordingly, unless Defendants will withdraw him from their witness list, Plaintiffs intend to move for his exclusion.

For 1006 summary exhibits (other than the property-specific exhibits I outlined yesterday), we think more than two days' notice is necessary to provide adequate time to review, confer, and raise with the Court if needed. Plaintiffs suggest that the Parties exchange summary exhibits on January 26 and provide notice of planned use consistent with Judge Shah's two-day rule. (And of course, we would expect the parties to cooperate if any minor edits are needed for a previously disclosed summary exhibit.)

We also still owe you a proposed notification timeline on the out-of-town witnesses. I'll follow up on that topic later today.

Thanks,
Lila

**From:** Bogo-Ernst, Debra <DErnst@willkie.com>
**Sent:** Tuesday, January 13, 2026 9:13 AM
**To:** Fakhoury, Michael W. <michael.fakhoury@morganlewis.com>; Lila Miller <lmiller@relmanlaw.com>; Jennifer Soule <jsoule@sbllegal.com>; Ted Olds <tolds@relmanlaw.com>; Steven Schneck <sschneck@sbllegal.com>; Stephen Dane <sdane@fairhousinglaw.com>; Andrea Lyon <alyon@lyonkerr.com>; Morgan Williams <mwilliams@nationalfairhousing.org>; Janell Byrd-Chichester <jbyrd-chichester@nationalfairhousing.org>; Jim Bradtke <jbradtke@sbllegal.com>; Maggie McKernin <office@sbllegal.com>; Thomas, Matthew J. <MThomas@willkie.com>; Villa, Brandon E. <BVilla@willkie.com>; Hastings, Eve <EHastings@willkie.com>; Halom, Benjamin <BHalom@willkie.com>; Sohns, Tara <TSohns@willkie.com>; Kim, Sara <SKim@willkie.com>; mark.trigg@dentons.com; Nathan L. Garroway <nathan.garroway@dentons.com>; sarahhannah.phillips@dentons.com; Sean M. <sean.kirwin@dentons.com>; Alizé D. <alize.mitchell@dentons.com>; kayla.lee@dentons.com; lisa.krigsten@dentons.com
**Cc:** Kliebard, Kenneth M. <kenneth.kliebard@morganlewis.com>; Diamantatos, Tinos <tinos.diamantatos@morganlewis.com>; Braden, Megan R. <megan.braden@morganlewis.com>; Rademacher, Kurt W. <kurt.rademacher@morganlewis.com>; Kraut, Michael S. <michael.kraut@morganlewis.com>; Williams, Bradie R. <bradie.williams@morganlewis.com>
**Subject:** Re: NFHA, et al. v. DBNT, et al. - Updated Deposition Designation Materials

Lila,

Following up on our meet and confer yesterday, Ocwen will stipulate to limit Kevin Flannigan's testimony to: (i) authenticating documents, if necessary; (ii) the information that he verified in Ocwen's Objections and Responses to Plaintiffs' First Set of Interrogatories from Aug. 2020; and (iii) the information contained in the declaration attached to Defendants' Joint Motion to Dismiss (from May 2018), if necessary. We believe this should resolve Plaintiffs' contemplated motion in limine on this topic, but please let me know if you disagree.

Deb

_
On January 12, 2026 at 8:47:03 PM CST, Fakhoury, Michael W. <michael.fakhoury@morganlewis.com> wrote:

**\*\*\* EXTERNAL EMAIL \*\*\***

Lila,
Following up on our meet and confer this afternoon, Defendants agree to remove the Declaration of Kurt W. Rademacher in Support of Defendants' Motions for Summary Judgment (Dkt. 334-10) from their exhibit list, which we understand should resolve Plaintiffs' Second Round MIL No. 10 ("Motion to Exclude Substantive Attorney-Generated Evidence").
Thanks,
Michael

**Michael W. Fakhoury**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1764 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.fakhoury@morganlewis.com | www.morganlewis.com



CONFIDENTIALITY AND PRIVACY NOTICE: This email is from a law firm and may contain information that is confidential, privileged, and/or attorney work product. This email may also contain personal data, which we process in accordance with applicable data protection laws and our Privacy Policies and Notices. If you are not the intended recipient, you may not review, copy, or distribute this message. If you have received this email in error, please contact the sender immediately and delete all copies from your system.

**Debra Bogo-Ernst**
**Willkie Farr & Gallagher LLP**
300 North LaSalle Dr. | Chicago, IL 60654-3406
Direct: +1 312 728 9062 | Fax: +1 312 728 9199
dernst@willkie.com | vCard | www.willkie.com bio
Pronouns: she, her, hers

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-00839<br><br><br><br><br><br><br><br><br><br><br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) | |

<u>**OCWEN'S RULE 26(a)(1) INITIAL DISCLOSURES**</u>

Defendant Ocwen Loan Servicing, LLC n/k/a PHH Mortgage Corporation ("Ocwen") hereby submits its initial disclosures under Rule 26(a)(1) of the Federal Rules of Civil Procedure. The representations set forth herein are made in good faith and based upon current information and belief.

By providing these disclosures pursuant to Rule 26(a)(1), Ocwen does not waive any objections that may be appropriate, including without limitation: (a) to the use, for any purpose, by any party to this litigation, of any of the information or documents disclosed, for any purpose other than the defense of this lawsuit; (b) to the admissibility or relevancy of any of the documents or information disclosed; (c) to the production of any document prior to the entry of an appropriate protective order; or (d) to any applicable privilege, including without limitations, attorney-client privilege, bank examination, and/or work-product doctrine. These disclosures are made based on information reasonably available to Ocwen at the present time, and Ocwen reserves the right to supplement its disclosures.

<u>Rule 26(a)(1)(A)(i) Disclosure:</u>

*The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.*

<u>Rule 26(a)(1)(A)(i) Response:</u>

The following individuals are likely to have discoverable information that Ocwen may use to support its claims or defenses. All of the witnesses identified as Ocwen representatives should be contacted through Ocwen's counsel of record in this action:

1.       Ocwen's corporate representative(s) to testify about mortgage servicing provided by Ocwen with respect to certain Deutsche Bank Trustee-Titled Properties identified in Plaintiffs'

allegations and further identified through discovery as well as Ocwen's related policies and procedures;

2.      Plaintiffs, to testify about the allegations of their complaint and their purported damages;

3.      All witnesses listed or later identified by Plaintiffs and by the other defendants in this action;

4.      Any witness necessary to authenticate documents; and

5.      Rebuttal witnesses.

At this time, Ocwen has not determined which representatives may be required to rebut issues raised by Plaintiffs' or Plaintiffs' experts, or to discuss the context or contents of relevant documents.   When Plaintiffs' witnesses and experts are identified and made available for deposition, or when documents that Plaintiffs' witnesses and experts will rely upon are identified, such persons may be named.   Ocwen reserves the right to amend or supplement this list as necessary during the course of discovery and further proceedings in this case and/or disclose such information in discovery.

Rule 26(a)(1)(A)(ii) Disclosure:

*A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.*

Rule 26(a)(1)(A)(ii) Response:

To the extent relevant and readily available and subject to any and all claims of applicable privilege, Ocwen will make hard copy documents and electronically stored information relating to this matter available at a mutually convenient time for Plaintiffs' review and copying.   To the extent such documents are confidential, Ocwen will make such documents available following entry of a mutually-agreeable protective order.   In the meantime, below please find a description

of the categories of non-privileged documents that Ocwen may use to support its claims or defenses, to the extent such documents exist:

1.      Non-privileged documents related to Ocwen's servicing of certain Deutsche Bank Trustee-Titled Properties identified in Plaintiffs' allegations and further identified through discovery;

2.      All documents identified by Plaintiffs and other defendants; and

3.      Rebuttal documents.

Statements made herein are made solely for the purpose of this disclosure and shall not be construed as a waiver of an objection or applicable privilege, including the attorney-client privilege, the bank examination privilege, the work-product doctrine, or any other applicable privilege or rule limiting disclosure.  Ocwen's investigation of this matter is ongoing. Accordingly, Ocwen reserves the right to supplement this list as necessary during the course of discovery and further proceedings in this case and/or disclose such information in discovery.

Rule 26(a)(1)(A)(iii) Disclosure:

*A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.*

Rule 26(a)(1)(A)(iii) Response:

Rule 26(a)(1)(A)(iii) disclosures are not applicable to Ocwen in this action.

Rule 26(a)(1)(A)(iv) Disclosure:

*For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.*

Rule 26(a)(1)(A)(iv) Response:

Pursuant to Rule 26(a)(1)(A)(iv) and based on information reasonably available at this time, Ocwen is not aware of any insurance agreements under which an insurance business may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated: February 28, 2020

Respectfully Submitted,

Ocwen Loan Servicing, LLC, n/k/a PHH Mortgage Corporation


By: /s/ Debra Bogo-Ernst
    One of Its Attorneys

Debra Bogo-Ernst
Matthew Sostrin
Jacey Norris
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel: (312) 701-7403
Fax: (312) 706-8474
dernst@mayerbrown.com
msostrin@mayerbrown.com
jnorris@mayerbrown.com

## CERTIFICATE OF SERVICE

I, Debra Bogo-Ernst, hereby certify that on this 28th day of February, 2020, a copy of the foregoing was sent by electronic mail to following counsel of record:

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell Street
Suite 100
Geneva, IL 60134

Stephen M. Dane
Yiyang Wu
*Relman, Dane & Colfax PLLC*
1225 19th Street, N.W.
Suite 600
Washington, DC 20036

Morgan Williams
*National Fair Housing Alliance*
1331 Pennsylvania Ave., NW
Suite 650
Washington, DC 20004

Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: (312) 324-1000

Shannon Y. Shin
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Email: shannon.shin@dentons.com

Lisa Krigsten (admitted *pro hac vice*)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
Telephone: (816) 460-2400
Email: lisa.krigsten@dentons.com

Nathan Garroway (admitted *pro hac vice*)
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com

/s/ Debra Bogo-Ernst_____
Debra Bogo-Ernst

# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:18-cv-00839<br><br><br><br><br><br><br><br><br><br>Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

<u>**OCWEN'S AMENDED RULE 26(a)(1) INITIAL DISCLOSURES**</u>

Defendant Ocwen Loan Servicing, LLC n/k/a PHH Mortgage Corporation ("Ocwen") hereby submits these amended disclosures under Rule 26(a)(1) of the Federal Rules of Civil Procedure. The representations set forth herein are made in good faith and based upon current information and belief.

By providing these disclosures pursuant to Rule 26(a)(1), Ocwen does not waive any objections that may be appropriate, including without limitation: (a) to the use, for any purpose, by any party to this litigation, of any of the information or documents disclosed, for any purpose other than the defense of this lawsuit; (b) to the admissibility or relevancy of any of the documents or information disclosed; (c) to the production of any document prior to the entry of an appropriate protective order; or (d) to any applicable privilege, including without limitations, attorney-client privilege, bank examination, and/or work-product doctrine. These disclosures are made based on information reasonably available to Ocwen at the present time, and Ocwen reserves the right to supplement its disclosures.

Rule 26(a)(1)(A)(i) Disclosure:

*The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.*

Rule 26(a)(1)(A)(i) Response:

The following individuals are likely to have discoverable information that Ocwen may use to support its claims or defenses. Per Fed. R. Civ. P. 26(a)(1)(A)(i), Ocwen is not identifying individuals who may have discoverable information if those individuals' information would be used solely for impeachment purposes. All of the witnesses identified as Ocwen representatives should be contacted through Ocwen's counsel of record in this action:

1.      Ocwen's corporate representative(s) to testify about mortgage servicing provided by Ocwen with respect to certain Deutsche Bank Trustee-Titled Properties identified in Plaintiffs' allegations and further identified through discovery,[1] the subject matters identified in Plaintiffs' Rule 30(b)(6) deposition notice to Ocwen and related deposition testimony, Ocwen's policies and procedures related to the maintenance, marketing, and sale of REO properties, and documentation produced by Ocwen in the litigation;

2.      Plaintiffs, to testify about, among other things, the allegations of their complaint, their purported damages, and the subject matter covered at their depositions;

3.      All witnesses listed by Plaintiffs and by the other defendants in this action;

4.      The below current and former Ocwen employees:

1.      <u>Jason Jastrzemski</u> – Former Director, Servicing Operations Oversight, for the period of January 2014 to April 2020.

2.      <u>Corey Carpenter</u> – Former Senior Manager, Servicing Operations Oversight.  Mr. Carpenter was responsible for vendor oversight of REO PPI Vendor (ASPS).

3.      <u>Michael Hawkins</u> – Former Senior Manager, Servicing Operations Oversight.  Mr. Hawkins was involved in the marketing and selling of REO properties.

4.      <u>John W. Hastings</u> – Former Specialist, Mortgage Servicing and Oversight.  Mr. Hasting was an onsite staff appraiser who performed review and quality control of certain REO valuations.

5.      <u>Teresita Duran</u> – Former Senior Manager, Valuations.   Ms. Duran led the Valuations group within Servicing Operations Oversight.

---

[1]      Ocwen acknowledges that it serviced 699 properties included in the operative complaint; Plaintiffs claim that the lawsuit is about additional properties, and Ocwen disputes that contention.

6. <u>Michael Yanniello</u> –  Vice President, Investor Relations. Mr. Yanniello has knowledge concerning investor relations issues, including investor guidelines.

7. <u>Jill Showell</u> – Former Senior Vice President, Government and Community Relations.  Ms. Showell has knowledge of Ocwen's efforts to work with communities and organizations throughout the country, including Common Ground and its subsidiary Milwaukee Rising, to prevent neighborhood blight.

8. <u>Katie Brewer</u>— Former Vice President, Collateral Based Solutions.  As Ms. Brewer testified at her deposition, she held a supervisory role over certain REO activities during her time with Ocwen.

5. Any third parties who produced documents and/or were deposed in the litigation;

6. Any witness necessary to authenticate documents;

7. Any witness necessary to impeach testimony offered by Plaintiffs; and

8. Rebuttal witnesses (e.g., any witness necessary to rebut testimony offered by Plaintiffs, etc.).

At this time, Ocwen has not determined which representatives may be required to rebut issues raised by Plaintiffs' or Plaintiffs' experts, including but not limited to damages, or to discuss the context or contents of relevant documents.  When Plaintiffs' witnesses and experts are identified and made available for deposition, or when documents upon which Plaintiffs' witnesses and experts will rely are identified, Ocwen will name such persons.  Ocwen reserves the right to amend or supplement this list as necessary during the course of discovery and further proceedings in this case.

<u>Rule 26(a)(1)(A)(ii) Disclosure:</u>

*A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.*

Rule 26(a)(1)(A)(ii) Response:

Without waiving objections as to relevance and admissibility, Ocwen provides the following list of documents, electronically stored information, and tangible things responsive to Rule 26(a)(1)(A)(ii): (1) All documents and data produced by Ocwen including, but not limited to, policies and procedures, contracts and related documents with Altisource Solutions, Inc., REALServicing data, i-Case data, etc.; (2) All documents produced by Plaintiffs; (3) All documents produced by third parties; (4) All documents produced by the other Defendants in this litigation; (5) All documents and data related to the properties at issue in the litigation;[2] (6) All documents which will be relied upon by any expert witness or consultant identified by Plaintiffs or Defendants; and (7) All documents that may become known, or later produced, during the discovery process or otherwise.

Statements made herein are made solely for the purpose of this disclosure and shall not be construed as a waiver of any objection (e.g., relevance, materiality, admissibility, etc.) or any applicable privilege, including the attorney-client privilege, the bank examination privilege, the work-product doctrine, or any other applicable privilege or rule limiting disclosure. Discovery continues, and Ocwen's investigation of this matter is ongoing. Ocwen reserves the right to supplement the information herein, as necessary, and as required by the Federal Rules of Civil Procedures and the Local Rules of the Northern District of Illinois.

Rule 26(a)(1)(A)(iii) Disclosure:

*A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.*

---

[2]     *See note* 1.

Rule 26(a)(1)(A)(iii) Response:

Rule 26(a)(1)(A)(iii) disclosures are not applicable to Ocwen in this action.

Rule 26(a)(1)(A)(iv) Disclosure:

*For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.*

Rule 26(a)(1)(A)(iv) Response:

Pursuant to Rule 26(a)(1)(A)(iv) and based on information reasonably available at this time, Ocwen is not aware of any insurance agreements under which an insurance business may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated:  June 28, 2022

Respectfully Submitted,

Ocwen Loan Servicing, LLC, n/k/a PHH Mortgage Corporation


By: /s/ Debra Bogo-Ernst
     One of Its Attorneys

Debra Bogo-Ernst
Matthew Sostrin
Jacey Norris
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel: (312) 701-7403
Fax: (312) 706-8474
dernst@mayerbrown.com
msostrin@mayerbrown.com
jnorris@mayerbrown.com

## CERTIFICATE OF SERVICE

I, Debra Bogo-Ernst, hereby certify that on this 28th day of June, 2022, a copy of the foregoing was sent by electronic mail to following counsel of record:

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell Street
Suite 100
Geneva, IL 60134

Stephen M. Dane
Yiyang Wu
*Relman, Dane & Colfax PLLC*
1225 19th Street, N.W.
Suite 600
Washington, DC 20036

Morgan Williams
*National Fair Housing Alliance*
1331 Pennsylvania Ave., NW
Suite 650
Washington, DC 20004

Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: (312) 324-1000

Shannon Y. Shin
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Email: shannon.shin@dentons.com

Lisa Krigsten (admitted *pro hac vice*)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
Telephone: (816) 460-2400
Email: lisa.krigsten@dentons.com

Nathan Garroway (admitted *pro hac vice*)
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com

/s/ Debra Bogo-Ernst_____
Debra Bogo-Ernst

Exhibit 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | Case No. 18 CV 839 |
| Plaintiffs, | |
| v. | Judge Harry D. Leinenweber<br>Magistrate Judge Sidney I. Schenkier |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | Jury Trial Demanded |
| Defendants. | |

**PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT
OCWEN LOAN SERVICING, LLC**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs hereby request that Defendant Ocwen Loan Servicing, LLC respond to the following Interrogatories, within 30 days of service, in writing and under oath, in accordance with the instructions set forth below.

**INSTRUCTIONS**

1.      In answering these interrogatories, you should furnish all such information as is known to Defendant, as well as Defendant's employees, agents, representatives and attorneys.  If you are unable to answer any interrogatory in full, please explain why you were unable to answer the interrogatory, state the nature of the information and knowledge that you cannot furnish, and answer the interrogatory to the extent possible.

2.      Unless otherwise specified in an interrogatory, the time period for all interrogatories is from January 1, 2010 through the present.

1

Interrogatory No. 3.    Identify any REO properties that Plaintiffs have identified in their March 3, 2020 production to Defendants as to which you provided any services, and describe the services you provided (whether directly or through a vendor, contractor or other party).

Interrogatory No. 4.    Identify all prior or pending litigation matters, including court or administrative complaints, related to REO maintenance or property preservation, in which claims have been asserted against you or in which you have asserted a claim against a vendor or contractor with responsibilities related to REO preservation or maintenance.

Interrogatory No. 5.    State the name of your department(s), division(s), or other organizational entities that gather information on, manage, maintain, monitor, or otherwise have had responsibilities with respect to Deutsche Bank REO properties.

Interrogatory No. 6.    Identify the custodian of any records produced in response to Plaintiffs' Request for Production of Documents, as "custodian" is used in Federal Rule of Evidence 803(6).  If more than one custodian is associated with the records produced, please specify the records associated with each custodian identified.

Interrogatory No. 7.    Identify each person with knowledge of any fact that supports or refutes the allegations of the Second Amended Complaint or your defenses, and briefly describe the nature of the person's knowledge.

Interrogatory No. 8.    For each REO property that Plaintiffs identified in their March 3, 2020 production to Defendants, identify each person with any responsibility for the maintenance, management, preservation, monitoring or marketing of the property, and identify the scope of their responsibilities.

Interrogatory No. 9.    Does Ocwen maintain one or more databases containing any information concerning or relating to its REO properties?  If Yes, identify all of the

6

categories/fields of information contained in any such databases (by way of example only – date

of acquisition, date of disposition, name or number of trust, property address, etc.).

<div align="center">Respectfully Submitted,</div>

<div align="center"><em>/s/ Jennifer K. Soule</em></div>

| | | |
|---|---|---|
| Jennifer K. Soule | Yiyang Wu, *pro hac vice* | Morgan Williams, *pro hac vice* |
| James G. Bradtke | Tara Ramchandani, *pro hac vice* | NFHA |
| Kelly K. Lambert | *Relman Colfax PLLC* | 1331 Pennsylvania Ave, NW |
| *Soule, Bradtke & Lambert* | 1225 19th Street, N.W. | Suite 650 |
| 402 Campbell Street, Suite 100 | Suite 600 | Washington, DC 20004 |
| Geneva, IL 60134 | Washington, DC 20036 | *Attorney for Plaintiff NFHA* |
| *Attorneys for Plaintiffs* | *Attorneys for Plaintiffs* | |

Stephen M. Dane, *pro hac vice*
*Dane Law LLC*
312 Louisiana Avenue
Perrysburg, OH 43551
*Attorney for Plaintiffs*


Dated: July 2, 2020

Exhibit 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | ) | |
| | ) | Case No. 1:18-cv-00839 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS | ) | Magistrate Judge Sidney I. Schenkier |
| TRUSTEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANT OCWEN'S OBJECTIONS AND RESPONSES TO
### PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Ocwen Loan Servicing, LLC n/k/a PHH Mortgage Corporation ("Ocwen") hereby provides the following objections and responses to Plaintiffs' First Set of Interrogatories to Defendant Ocwen Loan Servicing, LLC ("Interrogatories").

### PRELIMINARY STATEMENT

Ocwen reserves its right to assert any and all applicable objections to the Interrogatories or the use of any responses thereto in any proceeding in any action (including any trial), including without limitation, objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, and the like, and any and all other objections on the grounds that it would require the exclusion of any responses herein if offered in Court.

No incidental or implied admissions are intended in these responses. Ocwen's response to any Interrogatory should not be taken as an admission that Ocwen accepts or admits the existence of any fact(s) set forth or assumed by such Interrogatory or that such response constitutes

admissible evidence. Ocwen's response to any such Interrogatory is not intended to be, and shall not be construed to be, any waiver by Ocwen of any or all objections(s) to the Interrogatory.

Ocwen has not yet completed its (a) investigation of the facts relating to this case, (b) discovery in this action, or (c) preparation for trial. The following responses are based upon information known at this time and are given without prejudice to Ocwen's right to amend, supplement, and revise these responses with any subsequently discovered information. To the extent that Ocwen states it will not produce documents in response to an Interrogatory, Ocwen is willing to meet and confer with Plaintiffs to identify parameters that will allow for a reasonably narrowed request, including the identification of terms and custodians relevant to the claims and defenses at issue. The following responses are provided subject to this Preliminary Statement, which Ocwen hereby incorporates by reference into each response.

## GENERAL OBJECTIONS

1.      In responding to the Interrogatories, Ocwen does not concede that any of the information or documents provided are relevant or material to the subject matter of this litigation or reasonably calculated to lead to the discovery of admissible evidence. Ocwen reserves the right to object to the admissibility at trial of any of the information or documents produced in response to the Interrogatories.

2.      Ocwen objects to any request and instruction contained in the Interrogatories to the extent that they purport to impose any obligations on Ocwen beyond the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and/or any applicable Local Rules or other court order.

3.      Ocwen's responses made herein are solely for the purposes of this civil action. Each response is subject to any and all objections to competency, relevancy, materiality, propriety,

and admissibility, and to any and all other objections and grounds that would require the exclusion of any information or document identified or produced herein if the information or document was asked of or disclosed by a witness present and testifying in court, all of which objections and grounds are hereby expressly reserved and may be interposed at a later date.

4.      Ocwen objects to the Interrogatories, and each and every definition, instruction, and request therein, to the extent that the information and/or documents sought: (a) contain privileged attorney-client communications; (b) constitute work product; (c) were prepared in anticipation of or in connection with litigation or trial; (d) disclose the mental impressions, conclusion, opinions or legal theories of any attorney for or other representative of Ocwen; (e) are subject to the common-interest or joint-defense privileges; (f) contain privileged bank examination documents; or (g) are otherwise privileged or exempt from discovery (collectively, "Privileged Documents or Information").  Ocwen does not intend to disclose or produce any Privileged Documents or Information.  Any disclosure of Privileged Documents or Information in response to any of the Interrogatories is inadvertent and shall not be deemed a waiver or any applicable privileges or protections, and Ocwen requests that any such information or documents be returned promptly.

5.      Ocwen objects to the Interrogatories on the ground and to the extent that they seek information that is not in Ocwen's possession, custody, or control.

6.      Ocwen objects to the Interrogatories, and each and every definition, instruction, and request therein, on the grounds and to the extent that they state a legal conclusion, or assume or appear to assume that any fact or event is true.  By responding to any such Interrogatory, Ocwen does not concede the accuracy of any such conclusion or assumption.

7.      Ocwen objects to the Interrogatories on the ground and to the extent that they are overly broad, unduly burdensome, and oppressive.

3

8.    Ocwen objects to the Interrogatories on the ground and to the extent that they are vague, ambiguous, and lacking in particularization.

9.    Ocwen objects to the Interrogatories on the ground and to the extent that they are not limited to the time period relevant to this litigation,  and on the ground and to the extent that they seek documents that are neither relevant to claims or defenses in this action or not reasonably calculated to lead to the discovery of admissible evidence.  Ocwen states that it will not, and does not commit to, producing any documents or information outside to the relevant time period for this action, which begins on February 14, 2015 with respect to Ocwen.  Ocwen further objects to the Interrogatories to the extent that they do not contain an end date.  Unless otherwise noted, Defendants will not search for documents created after February 14, 2017 (the date when Plaintiff added Ocwen as a respondent to its administrative complaint with the U.S. Department of Housing and Urban Development).  The failure to include an end date is unduly burdensome, given the breadth of the requests and the length of the time period at issue.

10.    To the extent the Interrogatories seek confidential business and propriety information, trade secrets, personal, private, client or sensitive private consumer financial information, other confidential business, financial or otherwise commercially sensitive or commercially competitive information and documents, and/or documents protected from disclosure by law, including, but not limited to, banking laws, privacy laws, court orders, or any confidentiality or nondisclosure agreements, Ocwen objects to the production nor disclosure of such information and documents.  Moreover, Ocwen will not produce documents containing information in which individuals' privacy rights and/or expectations outweigh Plaintiffs' alleged need for the discovery.  Ocwen looks forward to meeting and conferring with Plaintiffs on ways

to minimize – to the greatest extent possible – the risk of any unauthorized disclosure of personal financial or other sensitive information.

11.     Ocwen objects to the Interrogatories on the ground and to the extent that they are cumulative or duplicative of other Interrogatories and/or to the extent that they seek information obtainable from other more convenient or less burdensome or expensive sources, including public sources, and/or to the extent that such materials are already in Plaintiffs' possession.

12.     Ocwen will respond to the Interrogatories based on its knowledge as of the date of the responses and after a reasonable inquiry.  Discovery is ongoing, and Ocwen's investigation continues.  Ocwen reserves the right to supplement, amend, and correct these responses and objections, if necessary, based on information later obtained through investigation, discovery, or otherwise.

13.     Ocwen has made reasonable efforts to respond to the Interrogatories, subject to general and specific objections, as Ocwen understands and interprets each Interrogatory.  If Plaintiffs subsequently assert any interpretation of any Interrogatory that differs from Ocwen's interpretation of the Interrogatory, Ocwen reserves the right to supplement and amend its objections and responses.

14.     None of the specific responses below is an admission relative to the existence of any document, the relevance or admissibility of any documents or information, or the truth or accuracy of any statement or characterization contained in any particular Interrogatory.

15.     Ocwen incorporates each of the foregoing "General Objections" as though fully set forth in each response and objection below.

## OBJECTIONS TO INSTRUCTIONS

1.      Ocwen objects to each and every Instruction to the extent that it purports to impose any obligations on Ocwen beyond the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and/or any applicable Local Rules or other court order.

2.      Ocwen objects to Instruction No. 2 to the extent that it seeks to impose an obligation on Ocwen to identify or produce documents created prior to or no longer in use as of February 14, 2015, the beginning of the relevant time period for this litigation.  Ocwen also objects to Instruction No. 2 to the extent that it seeks to impost an obligation on Ocwen to identify or produce documents created after February 14, 2017, the end of the relevant time period for this litigation.

## OBJECTIONS TO DEFINITIONS

1.      Ocwen objects to the definition of the terms "you," "your," or "Ocwen" as vague, ambiguous, and overly broad in that, among other things, it encompasses unnamed successors and predecessors.  In addition, Ocwen objects to this definition to the extent that it includes legal counsel and/or outside consultants to Ocwen and to the extent that it requests Privileged Documents or Information.

2.      Ocwen objects to the definition of "Defendant" to the extent that it includes legal counsel and/or outside consultants to Ocwen and to the extent that it requests Privileged Documents or Information.

3.      Ocwen objects to the definition of "Describe" or "state" as vague, ambiguous, and overly broad in that, among other things, it calls for "every fact" without limitation.

4.      Ocwen objects to the definition of "Communication" as overly broad, vague, and ambiguous, and to the extent that it imposed obligations upon Ocwen beyond the obligations imposed by the Federal Rules of Civil Procedure or the Federal Rules of Evidence.

5.     Ocwen objects to the definition of the terms "concerning," "regarding." "referencing," and "relating to" as vague, ambiguous, lacking in particularization, and overly broad.

6.     Ocwen objects to the definition of "Deutsche Bank REO Properties" as vague, ambiguous, lacking in particularization, and overly broad.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify the names of and job titles of all persons you employed who had responsibilities related to the Deutsche Bank REO properties, including but not limited to the management and/or monitoring of the properties, and briefly describe the scope of each individual's job responsibilities.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to its General Objections, Ocwen specifically objects to this Interrogatory on the grounds that the term "all persons you employed" is undefined, vague, and ambiguous. Ocwen further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information unrelated to the specific Deutsche Bank REO properties that were the subject of Plaintiffs' investigation. Ocwen also objects to this Interrogatory as overly broad and unduly burdensome to the extent it purports to require Ocwen to compile and/or generate information that is not maintained or kept in the format or manner requested in the ordinary course of business. Ocwen additionally objects to this Interrogatory on the grounds that it is overly broad in time, scope, and duration to the extent that it seeks information about persons not "employed" by Ocwen during the relevant time period for this litigation.

Subject to and without waiving its objections, Ocwen states that, with respect to relevant properties at issue and the relevant time period for this litigation, Servicing Operations Oversight was the Ocwen business unit who worked with Altisource on management and monitoring of the Deutsche Bank-owned properties. Various individuals within Servicing Operations Oversight would have worked with Altisource during the 2015 to 2017 time period. Ocwen will investigate whether organizational charts exist and are readily available for this business unit during the relevant time period and, if so, Ocwen will produce them.

**INTERROGATORY NO. 2:**

Identify any vendors, contractors, servicers or other persons or entities who provided services related to the Deutsche Bank REO properties, and briefly describe the scope of the services provided by each of them.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to its General Objections, Ocwen specifically objects to Interrogatory No. 2 on the grounds that it is vague, overbroad, and unduly burdensome. For example, it seeks information about vendors, contractors, servicers, and "other persons or entities" without any limitation regarding who hired those entities or what "services" they provided with respect to the properties at issue. To the extent that these "persons or entities" were not hired by Ocwen, this Interrogatory seeks information that is outside of Ocwen's possession, custody, or control. Ocwen also objects to this Interrogatory on the ground that it seeks information that is neither relevant to the claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information unrelated to the specific Deutsche Bank REO properties that were the subject of Plaintiffs' investigation. Ocwen additionally objects to this Interrogatory as overly broad and unduly burdensome to the extent it purports to require Ocwen to compile and/or

generate information that is not maintained or kept in the format or manner requested in the ordinary course of business. Ocwen further objects to this Interrogatory on the grounds that it is overly broad in time, scope, and duration to the extent that it seeks information that falls outside of the relevant time period for this litigation.

Subject to and without waiving its objections, Altisource provided REO property preservation, maintenance, and marketing services to Ocwen related to the Deutsche Bank-owned properties at issue in the litigation during the 2015 to 2017 time period. The scope of such services are set forth in certain contractual documentation, which will be produced pursuant to Fed. R. Civ. P. 33(d).

**INTERROGATORY NO. 3:**

Identify any REO properties that Plaintiffs have identified in their March 3, 2020 production to Defendants as to which you provided any services, and describe the services you provided (whether directly or through a vendor, contractor or other party).

**RESPONSE TO INTERROGATRY NO. 3:**

In addition to its General Objections, Ocwen specifically objects to Interrogatory No. 3 on the ground that it is overbroad to the extent that it seeks information about "services" Ocwen may have provided that are unrelated to the property preservation and maintenance services at issue in this litigation. Ocwen additionally objects to this Interrogatory as improper because it contains more than 25 discrete subparts. Ocwen further objects to this Interrogatory as overly broad and unduly burdensome to the extent it purports to require Ocwen to compile and/or generate information that is not maintained or kept in the format or manner requested in the ordinary course of business. Ocwen also objects to this Interrogatory as overly broad in time, scope, and duration to the extent that it seeks information that falls outside of the relevant time period for this litigation.

Subject to and without waiving its objections, Ocwen states that Ocwen and Altisource produced a joint list of the REO properties identified in Plaintiffs' March 3, 2020 production on August 17, 2020, pursuant to Fed. R. Civ. P. 33(d), that Ocwen and Altisource have been able to locate within in their internal systems.  In addition, Ocwen will produce documentation related to the services provided at these properties for the time period at issue of 2015-2017.

**INTERROGATORY NO. 4:**

Identify all prior or pending litigation matters, including court or administrative complaints, related to REO maintenance or property preservation, in which claims have been asserted against you or in which you have asserted a claim against a vendor or contractor with responsibilities related to REO preservation or maintenance.

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to its General Objections, Ocwen specifically objects to this Interrogatory on the ground that the phase "prior or pending litigation matters" is undefined, vague, and ambiguous. Ocwen will not be reviewing its files to determine if there is any court or administrative matter which "relates" to REO maintenance or property preservation.  Ocwen further objects on the ground that it seeks information that is neither relevant to the claims or defense in this action nor reasonably calculated to lead to the discovery of admissible evidence.  For example, the Interrogatory seeks information about Ocwen's past and present claims against vendors and contractors that have no connection to the Deutsche Bank REO properties at issue in this action. Ocwen also objects to this Interrogatory on the ground that it is overbroad, unduly burdensome, and disproportionate to the needs of this case.  Ocwen additionally objects to this Interrogatory on the grounds that it is overly broad in time, scope, and duration to the extent that it seeks information

that falls outside the relevant time period for this litigation. Ocwen also objects to this Interrogatory to the extent that it seeks Privileged Documents or Information.

Subject to and without waiving its objections, Ocwen states that, to the extent that litigation matters related to the Deutsche Bank-owned properties at issue in the litigation is within the property-specific files, such information will be produced, relevant to the 2015-2017 time period at issue, pursuant to Fed. R. Civ. P. 33(d).

## INTERROGATORY NO. 5:

State the name of your department(s), division(s), or other organizational entities that gather information on, manage, maintain, monitor, or otherwise have had responsibilities with respect to Deutsche Bank REO properties.

## RESPONSE TO INTERROGATORY NO. 5:

In addition to its General Objections, Ocwen specifically objects to this Interrogatory on the ground that the terms "other organizational entities" and "gather information on" are undefined, vague, and ambiguous. Ocwen further objects to this Interrogatory as overly broad and unduly burdensome to the extent it purports to require Ocwen to compile and/or generate information that is not maintained or kept in the format or manner requested in the ordinary course of business. Ocwen also objects to this Interrogatory on the ground that it seeks information that is neither relevant to the claims or defense in this action nor reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information unrelated to the specific Deutsche Bank REO properties at issue in this action. Ocwen additionally objects to this Interrogatory on the ground that it is overly broad in time, scope, and duration to the extent that it seeks information that falls outside the relevant time period for this litigation.

Subject to and without waiving its objections, Ocwen incorporates its response to Interrogatory No. 1 as if fully set forth herein.

**INTERROGATORY NO. 6:**

Identify the custodian of any records produced in response to Plaintiffs' Request for Production of Documents, as "custodian" is used in Federal Rule of Evidence 803(6). If more than one custodian is associated with the records produced, please specify the records associated with each custodian identified.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to its General Objections, Ocwen specifically objects to this Interrogatory on the ground that it is overly broad and unduly burdensome to the extent that it purports to require Ocwen to compile and/or generate information that is not maintained or kept in the format or manner requested in the ordinary course of business. Ocwen additionally objects to this Interrogatory as improper because it contains more than 25 discrete subparts. Ocwen also objects to this Interrogatory as premature because the parties have not entered into a Protective Order or begun to exchange documents in this action.

Subject to and without waiving its objections, Ocwen states that, to the extent information regarding the custodians of the documents is available, it will produce such information in response to Plaintiffs' Request for Production of Documents with each produced document.

**INTERROGATORY NO. 7:**

Identify each person with knowledge of any fact that supports or refutes the allegations of the Second Amended Complaint or your defenses, and briefly describe the nature of the person's knowledge.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to its General Objections, Ocwen specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and disproportionate because it seeks information concerning multiple overly broad, undefined subject matters without limitation. Ocwen also objects to this Interrogatory as seeking information that is outside of Ocwen's possession, custody, or control to the extent that it seeks information about persons unaffiliated with Ocwen who may be knowledgeable about the allegations of Plaintiffs' Second Amended Complaint. Ocwen additionally objects to this Interrogatory as overly broad and unduly burdensome to the extent it purports to require Ocwen to compile and/or generate information that is not maintained or kept in the format or manner requested in the ordinary course of business. Ocwen also objects to this Interrogatory as an untimely, premature request to identify witnesses and evidence to be used at trial. Ocwen further objects to this Interrogatory to the extent that it seeks Privileged Documents or Information.

Subject to and without waiving its objections, Ocwen refers Plaintiffs to Ocwen's Rule 26(a)(1)(A)(i) Initial Disclosures served on February 28, 2020 from which Plaintiffs may ascertain information sought by this Interrogatory. Ocwen further incorporates its response to Interrogatory No. 1 herein. Further answering, Ocwen states that it will supplement its response to this Interrogatory and disclose any lay and expert witnesses it may call at trial in this action at the appropriate time, and as required by the Federal Rules of Civil Procedure, applicable Local Rules, or any applicable Orders of this Court.

**INTERROGATORY NO. 8:**

For each REO property that Plaintiffs identified in their March 3, 2020 production to Defendants, identify each person with any responsibility for the maintenance, management,

preservation, monitoring or marketing of the property, and identify the scope of their responsibilities.

## RESPONSE TO INTERROGATORY NO. 8:

In addition to its General Objections, Ocwen specifically objects to this Interrogatory on the ground that it is overly broad and unduly burdensome to the extent it purports to require Ocwen to compile and/or generate information that is not maintained or kept in the format or manner requested in the ordinary course of business. Ocwen additionally objects to this Interrogatory as improper because it contains more than 25 discrete subparts. Ocwen further objects on the grounds that this Interrogatory is duplicative of Interrogatory Nos. 1, 2, and 4. Ocwen also objects to this Request on the ground that it is premature because the parties have not yet agreed upon the properties at issue in this litigation. Ocwen further objects to this Interrogatory to the extent that it seeks information that is outside of the possession, custody, and control of Ocwen. For example, the Interrogatory seeks information about "each person with any responsibility" related to certain properties. This category of persons likely includes persons with no affiliation with Ocwen and of whom Ocwen has no knowledge. Ocwen additionally objects to this Interrogatory on the ground that it is overly broad in time, scope, and duration to the extent that it seeks information that falls outside the relevant time period for this litigation.

Subject to and without waiving its objections, Ocwen incorporates by reference its responses to Interrogatory Nos. 1, 2, and 4.

## INTERROGATORY NO. 9:

Does Ocwen maintain one or more databases containing any information concerning or relating to its REO properties? If Yes, identify all of the categories/fields of information contained

in any such databases (by way of example only – date of acquisition, date of disposition, name or number of trust, property address, etc.).

## RESPONSE TO INTERROGATORY NO. 9:

In addition to its General Objections, Ocwen specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seek information that is neither relevant to the claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information regarding databases rather than specific documents. Ocwen also objects to this Interrogatory as vague and ambiguous with respect to what "categories/fields of information" encompasses. As noted on a meet and confer with Plaintiffs' counsel, "all of the categories/fields of information" in a database can be voluminous and will contain irrelevant information. Ocwen will not provide a list of every field in every relevant database.

Subject to and without waiving its objections, Ocwen states that it used the following databases for tasks related to REO property preservation and maintenance conducted by Altisource during the relevant time period at issue (2015-2017) for certain properties including, but not limited to, Deutsche-Bank owned properties:

- <u>Real Remit</u>: a platform used by Altisource to manage invoicing on REO properties.

- <u>Real Servicing</u>: Altisource product used as Ocwen's servicing platform.

- <u>Real Resolution</u>: a platform used by Altisource to manage REO properties.

- <u>Real Tran Next Generation</u>: a platform used to manage REO property valuations.

Dated:  August 19, 2020

Respectfully Submitted,

Ocwen Loan Servicing, LLC, n/k/a PHH Mortgage Corporation

By: /s/ Debra Bogo-Ernst
     One of Its Attorneys

Debra Bogo-Ernst
Matthew Sostrin
Jacey Norris
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel: (312) 701-7403
Fax: (312) 706-8474
dernst@mayerbrown.com
msostrin@mayerbrown.com
jnorris@mayerbrown.com

## CERTIFICATE OF SERVICE

I, Debra Bogo-Ernst, hereby certify that on this 19th day of August, 2020, a copy of the foregoing was sent by electronic mail to following counsel of record:

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell Street
Suite 100
Geneva, IL 60134

Stephen M. Dane
Yiyang Wu
*Relman, Dane & Colfax PLLC*
1225 19th Street, N.W.
Suite 600
Washington, DC 20036

Morgan Williams
*National Fair Housing Alliance*
1331 Pennsylvania Ave., NW
Suite 650
Washington, DC 20004

Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: (312) 324-1000

Shannon Y. Shin
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Email: shannon.shin@dentons.com

Lisa Krigsten (admitted *pro hac vice*)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
Telephone: (816) 460-2400
Email: lisa.krigsten@dentons.com

Nathan Garroway (admitted *pro hac vice*)
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com

/s/ Debra Bogo-Ernst
Debra Bogo-Ernst

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | ) |
| | ) Case No. 1:18-cv-00839 |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS | ) Magistrate Judge Sidney I. Schenkier |
| TRUSTEE, et al., | ) |
| | ) |
| Defendants. | ) |

**VERIFICATION OF KEVIN FLANNIGAN**

STATE OF TEXAS

COUNTY OF HARRIS

I, Kevin Flannigan, having first been duly sworn on oath, hereby depose and state as follows:

1.  My title is Senior Loan Analyst at PHH Mortgage Corporation.

2.  I have reviewed Ocwen's Objections and Responses to Plaintiffs' First Set of Interrogatories. To the extent the document contains responses rather than objections or references to produced documentation pursuant to Federal Rule of Civil Procedure 33(d), the responses contained therein are true and accurate to the best of my knowledge and information based upon available information gathered from others and my own investigation and knowledge.

_____
KEVIN FLANNIGAN

Sworn to and subscribed before me

This 19th day of August, 2020.

_____  05/19/2020

Notary Public

> TASNEEM ABBAS
> Notary Public, State of Texas
> Comm. Expires 09-10-2022
> Notary ID 131716026

AMECURRENT 737975557.1 19-Aug-20 13:15

Exhibit 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | ) | |
| | ) | Case No. 1:18-cv-00839 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT OCWEN'S SUPPLEMENTAL RESPONSE TO INTERROGATORY**
**NO. 1 OF PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Ocwen Loan Servicing, LLC n/k/a PHH Mortgage Corporation ("Ocwen") hereby provides the following Supplemental Response to Interrogatory No. 1 of Plaintiffs' First Set of Interrogatories to Defendant Ocwen Loan Servicing, LLC.

**GENERAL OBJECTIONS**

Ocwen incorporates its August 19, 2020 General Objections, Objections to Definitions, and Objections to Instructions from Ocwen's Objections and Responses to Plaintiffs' First Set of Interrogatories as if fully set forth herein.

**OBJECTIONS AND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

**INTERROGATORY NO. 1:**

Identify the names of and job titles of all persons you employed who had responsibilities related to the Deutsche Bank REO properties, including but not limited to the management and/or

monitoring of the properties, and briefly describe the scope of each individual's job responsibilities.

## RESPONSE TO INTERROGATORY NO. 1:

In addition to its General Objections, Ocwen specifically objects to this Interrogatory on the grounds that the term "all persons you employed" is undefined, vague, and ambiguous. Ocwen further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information unrelated to the specific Deutsche Bank REO properties that were the subject of Plaintiffs' investigation. Ocwen also objects to this Interrogatory as overly broad and unduly burdensome to the extent it purports to require Ocwen to compile and/or generate information that is not maintained or kept in the format or manner requested in the ordinary course of business. Ocwen additionally objects to this Interrogatory on the grounds that it is overly broad in time, scope, and duration to the extent that it seeks information about persons not "employed" by Ocwen during the relevant time period for this litigation.

Subject to and without waiving its objections, Ocwen states that, with respect to relevant properties at issue and the relevant time period for this litigation, Servicing Operations Oversight was the Ocwen business unit who worked with Altisource on management and monitoring of the Deutsche Bank-owned properties. Various individuals within Servicing Operations Oversight would have worked with Altisource during the 2015 to 2017 time period. Ocwen will investigate whether organizational charts exist and are readily available for this business unit during the relevant time period and, if so, Ocwen will produce them.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Subject to and without waiving its objections, Ocwen incorporates its Response (above) and further states that, within the Servicing Operations Oversight which was the Ocwen business unit who worked with Altisource on management and monitoring of the Deutsche Bank-owned properties, Ocwen identifies the following individuals:

1. <u>Corey Carpenter</u> – Former Senior Manager with responsibility for property preservation;

2. <u>Michael Hawkins</u> – Former Senior Manager with responsibility for oversight of REO function;

3. <u>Teresita Duran</u> – Former Senior Manager with responsibility for valuations;

4. <u>Jason Jastrzemski</u> – Former Director of Servicing Operations Oversight;

5. <u>Satyabrata Majhi</u> – Former Senior Manager with responsibility for PPI and valuations; and

6. <u>Hetal Shah</u> – Current Senior Manager with responsibility for PPI and valuation.

Dated:  January 6, 2021                                Respectfully Submitted,

Ocwen Loan Servicing, LLC, n/k/a PHH Mortgage Corporation

By: <u>/s/ Debra Bogo-Ernst</u>
        One of Its Attorneys

Debra Bogo-Ernst
Matthew Sostrin
Jacey Norris
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
Tel: (312) 701-7403
Fax: (312) 706-8474
dernst@mayerbrown.com
msostrin@mayerbrown.com
jnorris@mayerbrown.com

## CERTIFICATE OF SERVICE

I, Jacey Norris, hereby certify that on this 6th day of January, 2021, a copy of the foregoing was sent by electronic mail to following counsel of record:

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell Street
Suite 100
Geneva, IL 60134

Stephen M. Dane
Yiyang Wu
*Relman, Dane & Colfax PLLC*
1225 19th Street, N.W.
Suite 600
Washington, DC 20036

Morgan Williams
*National Fair Housing Alliance*
1331 Pennsylvania Ave., NW
Suite 650
Washington, DC 20004

Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: (312) 324-1000

Shannon Y. Shin
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Email: shannon.shin@dentons.com

Lisa Krigsten (admitted *pro hac vice*)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
Telephone: (816) 460-2400
Email: lisa.krigsten@dentons.com

Nathan Garroway (admitted *pro hac vice*)
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com

/s/  Jacey Norris_____
Jacey Norris

4

# Exhibit 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | ) | |
| | ) | Case No. 1:18-cv-00839 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| DEUTSCHE BANK NATIONAL TRUST, AS | ) | Magistrate Judge Sidney I. Schenkier |
| TRUSTEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT OCWEN'S OBJECTIONS AND SECOND AMENDED RESPONSES
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Ocwen Loan Servicing, LLC n/k/a PHH Mortgage Corporation ("Ocwen") hereby provides the following second amended response to Interrogatory No. 1 of Plaintiffs' First Set of Interrogatories to Defendant Ocwen Loan Servicing, LLC ("Interrogatories").

**GENERAL OBJECTIONS**

Ocwen incorporates its August 19, 2020 General Objections, Objections to Definitions, and Objections to Instructions from its Objections and Responses to Plaintiffs' First Set of Interrogatories as if fully set forth herein.

**OBJECTIONS AND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**

**INTERROGATORY NO. 1:**

Identify the names of and job titles of all persons you employed who had responsibilities related to the Deutsche Bank REO properties, including but not limited to the management and/or

monitoring of the properties, and briefly describe the scope of each individual's job responsibilities.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to its General Objections, Ocwen specifically objects to this Interrogatory on the grounds that the term "all persons you employed" is undefined, vague, and ambiguous. Ocwen further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the claims or defenses in this action nor reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks information unrelated to the specific Deutsche Bank REO properties that were the subject of Plaintiffs' investigation. Ocwen also objects to this Interrogatory as overly broad and unduly burdensome to the extent it purports to require Ocwen to compile and/or generate information that is not maintained or kept in the format or manner requested in the ordinary course of business. Ocwen additionally objects to this Interrogatory on the grounds that it is overly broad in time, scope, and duration to the extent that it seeks information about persons not "employed" by Ocwen during the relevant time period for this litigation.

Subject to and without waiving its objections, Ocwen states that, with respect to relevant properties at issue and the relevant time period for this litigation, Servicing Operations Oversight/ Mortgage Servicing Oversight were the Ocwen business units who worked with Altisource on management and monitoring of the Deutsche Bank-owned properties. Various individuals within Servicing Operations Oversight would have worked with Altisource during the 2015 to 2017 time period.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Subject to and without waiving its objections, Ocwen identifies the following individuals:

1. Jason Jastrzemski – Former Director, Servicing Operations Oversight, for the period of January 2014 to April 2020.

2. Corey Carpenter – Former Senior Manager, Servicing Operations Oversight. Mr. Carpenter was responsible for vendor oversight of REO PPI Vendor (ASPS).

3. Michael Hawkins – Former Senior Manager, Servicing Operations Oversight. Mr. Hawkins was involved in the marketing and selling of REO properties.

4. Tony Combs – Former Supervisor, Mortgage Servicing and Oversight. Mr. Combs was involved in the marketing and selling of REO properties, working under the direction of Michael Hawkins.

5. John W. Hastings – Former Specialist, Mortgage Servicing and Oversight. Mr. Hastings was an onsite staff appraiser who performed review and quality control of certain REO valuations.

6. Teresita Duran – Former Senior Manager, Valuations. Ms. Duran led the Valuations group within Servicing Operations Oversight.

7. Michael Yanniello – Vice President, Investor Relations. Mr. Yanniello has knowledge concerning investor relations issues, including investor guidelines.

8. Katie Brewer— Former Vice President, Collateral Based Solutions. As Ms. Brewer testified at her deposition, she held a supervisory role over REO activities during her time with Ocwen.

Dated:  June 28, 2022

Respectfully Submitted,

Ocwen Loan Servicing, LLC, n/k/a PHH Mortgage Corporation

By: /s/ Debra Bogo-Ernst
       One of Its Attorneys

       Debra Bogo-Ernst
       Matthew Sostrin
       Jacey Norris
       Mayer Brown LLP
       71 S. Wacker Drive
       Chicago, IL 60606
       Tel: (312) 701-7403
       Fax: (312) 706-8474
       dernst@mayerbrown.com
       msostrin@mayerbrown.com
       jnorris@mayerbrown.com

## CERTIFICATE OF SERVICE

I, Debra Bogo-Ernst, hereby certify that on this 28th day of June, 2022, a copy of the foregoing was sent by electronic mail to following counsel of record:

Jennifer K. Soule
James G. Bradtke
Kelly K. Lambert
*Soule, Bradtke & Lambert*
402 Campbell Street
Suite 100
Geneva, IL 60134

Stephen M. Dane
Yiyang Wu
*Relman, Dane & Colfax PLLC*
1225 19th Street, N.W.
Suite 600
Washington, DC 20036

Morgan Williams
*National Fair Housing Alliance*
1331 Pennsylvania Ave., NW
Suite 650
Washington, DC 20004

Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
Telephone: (312) 324-1000

Shannon Y. Shin
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Email: shannon.shin@dentons.com

Lisa Krigsten (admitted *pro hac vice*)
DENTONS US LLP
4520 Main Street
Suite 1100
Kansas City, MO 64111
Telephone: (816) 460-2400
Email: lisa.krigsten@dentons.com

Nathan Garroway (admitted *pro hac vice*)
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: (404) 527-4000
Email: nathan.garroway@dentons.com

/s/  Debra Bogo-Ernst_____
Debra Bogo-Ernst

Exhibit 13

## Maggie McKernin

**From:** Jennifer Soule
**Sent:** Friday, February 25, 2022 2:49 PM
**To:** Bogo-Ernst, Debra
**Cc:** Maggie McKernin; Norris, Jacey D.; McElhaney III, William J.; Sostrin, Matthew; Wood, Cody N.; adriana.grabowski@dentons.com; Shin, Shannon Y.; Krigsten, Lisa M.; Garroway, Nathan L.; michael.fakhoury@morganlewis.com; Monteiro, David I.; Cruz, Victor H.; Kurt Rademacher; kenneth.kliebard_morganlewis.com; kevin.papay@morganlewis.com; Kelly Lambert; Jim Bradtke; Steven Schneck; Morgan Williams; Stephen Dane; Yiyang Wu; Reed Colfax; Jennifer Klar; tolds@relmanlaw.com; Soohyun Choi; Gemma Donofrio; Rebecca Livengood; Lila Miller
**Subject:** Re: NFHA, et al. v. Deutsche Bank National Trust, et al. [MB-AME.FID1971713]

Debra: I was just finishing up a letter to Defendants putting together a deponent list and notes- I will edit it some in response to your note, below, and send along in a little while.

On Mr. Combs, we sought to depose him in large part because Ocwen listed him as a witness on whom Ocwen intended to rely. If that is no longer the case, we can very likely take him off the deponent list.

I need to check with folks on my team about Wednesday, and based on my availability we will be looking at the morning.

Jennifer K. Soule
Attorney At Law
Soule, Bradtke & Lambert
402 Campbell Street, Suite 100
Geneva, Illinois 60134
P: 630.333.9144
F: 630.607.0266
Email: JSoule@sbllegal.com
www.soulebradtkeandlambert.com

**CONFIDENTIAL AND PRIVILEGED:** This email message (including any attachments hereto) contains information which may be confidential and attorney-client privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in the message. If you have received this message in error, please advise the sender by reply email and delete this message.

On Feb 25, 2022, at 1:09 PM, Bogo-Ernst, Debra wrote:

Jennifer and Team,
I would like to set a meet and confer to discuss the issues presented in your February 22, 2022 letter. Please let me know if you are free on Wednesday, March 2 between 9:30 a.m. and 2:30 p.m. CT. I think we will need 2 hours.
Also, on February 22, 2022, you served a deposition notice on Ocwen for the deposition of Tony Combs. As I've mentioned to you previously, Mr. Combs is no longer employed by Ocwen, and we have been unable to reach him to discuss your request to depose him. We should discuss that on next week's call as well.
Finally, I'd like to discuss the deposition schedule with you.
Thank you,
Best,

Debra

**From:** Maggie McKernin
**Sent:** Tuesday, February 22, 2022 2:32 PM
**To:** Bogo-Ernst, Debra
**Cc:** Norris, Jacey D. ; McElhaney III, William J. ; Sostrin, Matthew ; Wood, Cody N. ; adriana.grabowski@dentons.com; Shin, Shannon Y. ; Krigsten, Lisa M. ; Garroway, Nathan L. ; michael.fakhoury@morganlewis.com; 'Monteiro, David I.' ; 'Cruz, Victor H.' ; Kurt Rademacher ; 'kenneth.kliebard_morganlewis.com' ; kevin.papay@morganlewis.com; Jennifer Soule ; Kelly Lambert ; Jim Bradtke ; Steven Schneck ; Morgan Williams ; Stephen Dane ; Yiyang Wu ; 'Reed Colfax' ; 'Jennifer Klar' ; tolds@relmanlaw.com; Soohyun Choi ; Gemma Donofrio ; 'Rebecca Livengood' ; 'Lila Miller'
**Subject:** NFHA, et al. v. Deutsche Bank National Trust, et al.

<span style="color:red">**EXTERNAL SENDER**</span>

Ms. Bogo-Ernst,

Attached please find correspondence from Ms. Soule.

Thank you,

Maggie McKernin
*Assistant to Jennifer K. Soule, James G. Bradtke,*
*and Kelly K. Lambert*
Soule, Bradtke & Lambert
402 Campbell Street, Suite 100
Geneva, Illinois 60134
p: (630) 333-9144
f: (630) 607-0266
Office@sbllegal.com
www.soulebradtkeandlambert.com

**CONFIDENTIALITY:** This email message (including any attachments hereto) contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone this message or any information contained in the message. If you have received this message in error, please advise the sender by reply email and delete this message.

---

This email and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. If you are not the named addressee you should not disseminate, distribute or copy this e-mail.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities, including Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England), Mayer Brown (a Hong Kong partnership) and Tauil & Chequer Advogados (a Brazilian partnership).

Information about how we handle personal information is available in our Privacy Notice.

# Exhibit 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; HOUSING RESEARCH & ADVOCACY CENTER; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK; DEUTSCHE BANK AG; DEUTSCHE BANK NATIONAL TRUST; DEUTSCHE BANK TRUST COMPANY AMERICAS; OCWEN FINANCIAL CORP.; and ALTISOURCE PORTFOLIO SOLUTIONS, INC.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 1:18-cv-00839<br><br>Judge Harry D. Leinenweber |

**DECLARATION OF KEVIN FLANNIGAN IN SUPPORT OF OCWEN FINANCIAL
CORPORATION'S MOTION TO DISMISS**

I, Kevin Flannigan, declare as follows:

1.      I am employed by Ocwen Financial Corporation ("Ocwen") as a Senior Loan Analyst. I have personal knowledge of the facts stated herein and could and would competently testify thereto if called as a witness.

2.      Ocwen is a Florida corporation headquartered in West Palm Beach, Florida.

3.      Ocwen is a holding company that directly or indirectly owns subsidiaries that originate and service loans.

4.      Ocwen has never been qualified to do business as a foreign corporation in Illinois or conducted business in Illinois. Ocwen has thus never provided services for any real-estate owned properties in Illinois.

5.      Ocwen has never owned real property in Illinois or had an office in Illinois.

I declare under penalty of perjury that the foregoing to true and correct to the best of my knowledge from information in my personal possession and information conveyed to me.

Dated: May 8, 2018                 By: _____
                                          Kevin Flannigan

# Exhibit 15

| | |
|---|---|
| **From:** | Bogo-Ernst, Debra |
| **To:** | Fakhoury, Michael W.; Lila Miller; Jennifer Soule; Ted Olds; Steven Schneck; Stephen Dane; Andrea Lyon; Morgan Williams; Janell Byrd-Chichester; Jim Bradtke; Maggie McKernin; Thomas, Matthew J.; Villa, Brandon E.; Hastings, Eve; Halom, Benjamin; Sohns, Tara; Kim, Sara; mark.trigg@dentons.com; Nathan L. Garroway; sarahhannah.phillips@dentons.com; Sean M.; Alizé D.; kayla.lee@dentons.com; lisa.krigsten@dentons.com |
| **Cc:** | Kliebard, Kenneth M.; Diamantatos, Tinos; Braden, Megan R.; Rademacher, Kurt W.; Kraut, Michael S.; Williams, Bradie R. |
| **Subject:** | Re: NFHA, et al. v. DBNT, et al. - Updated Deposition Designation Materials |
| **Date:** | Tuesday, January 13, 2026 8:13:54 AM |
| **Attachments:** | image001.png image002.png image003.png image004.png image005.png image001.png image002.png image003.png image004.png image005.png |

Lila,

Following up on our meet and confer yesterday, Ocwen will stipulate to limit Kevin Flannigan's testimony to: (i) authenticating documents, if necessary; (ii) the information that he verified in Ocwen's Objections and Responses to Plaintiffs' First Set of Interrogatories from Aug. 2020; and (iii) the information contained in the declaration attached to Defendants' Joint Motion to Dismiss (from May 2018), if necessary. We believe this should resolve Plaintiffs' contemplated motion in limine on this topic, but please let me know if you disagree.

Deb

‒
On January 12, 2026 at 8:47:03 PM CST, Fakhoury, Michael W. <michael.fakhoury@morganlewis.com> wrote:

**\*\*\* EXTERNAL EMAIL \*\*\***

Lila,

Following up on our meet and confer this afternoon, Defendants agree to remove the Declaration of Kurt W. Rademacher in Support of Defendants' Motions for Summary Judgment (Dkt. 334-10) from their exhibit list, which we understand should resolve Plaintiffs' Second Round MIL No. 10 ("Motion to Exclude Substantive Attorney-Generated Evidence").

Thanks,

Michael

**Michael W. Fakhoury**
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive, Suite 2800 | Chicago, IL 60606-1511
Direct: +1.312.324.1764 | Main: +1.312.324.1000 | Fax: +1.312.324.1001
michael.fakhoury@morganlewis.com | www.morganlewis.com

    

CONFIDENTIALITY AND PRIVACY NOTICE: This email is from a law firm and may contain information that is confidential, privileged, and/or attorney work product. This email may also contain personal data, which we process in accordance with applicable data protection laws and our Privacy Policies and Notices. If you are not the intended recipient, you may not review, copy, or distribute this message. If you have received this email in error, please contact the sender immediately and delete all copies from your system.

**Debra Bogo-Ernst**
**Willkie Farr & Gallagher LLP**
300 North LaSalle Dr. | Chicago, IL 60654-3406
Direct: +1 312 728 9062 | Fax: +1 312 728 9199
dernst@willkie.com | vCard | www.willkie.com bio
Pronouns: she, her, hers

---

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

# Exhibit 16

**18 CV 0839**
**Exhibit A to Pre-Trial Order – Plaintiffs' December 5, 2025**
**Proposed Uncontested Facts**

1.     Plaintiff National Fair Housing Alliance ("NFHA") is a national nonprofit fair housing organization with its principal place of business in Washington, D.C.

2.     NFHA organized and led Plaintiffs' investigation of REO properties owned by Deutsche Bank National Trust Company, as Trustee, and serviced by Ocwen and Altisource.

3.     Together, all Plaintiffs investigated 699 REO properties owned by Deutsche Bank National Trust Company, as Trustee, and serviced by Ocwen and Altisource.

4.     NFHA investigated REO 64 Baltimore-area properties owned by Deutsche Bank National Trust Company, as Trustee, 40 of which were serviced by Ocwen and Altisource.

5.     NFHA investigated REO 10 Kansas City-area properties owned by Deutsche Bank National Trust Company, as Trustee, 8 of which were serviced by Ocwen and Altisource.

6.     NFHA investigated REO 61 Memphis-area properties owned by Deutsche Bank National Trust Company, as Trustee, 36 of which were serviced by Ocwen and Altisource.

7.     NFHA investigated REO 24 Minneapolis-area properties owned by Deutsche Bank National Trust Company, as Trustee, 14 of which were serviced by Ocwen and Altisource.

8.     NFHA investigated REO 61 Prince George's County-area properties owned by Deutsche Bank National Trust Company, as Trustee, 43 of which were serviced by Ocwen and Altisource.

9.     NFHA investigated REO 28 Philadelphia-area properties owned by Deutsche Bank National Trust Company, as Trustee, 18 of which were serviced by Ocwen and Altisource.

10.     NFHA investigated REO 43 Suburban Detroit-area properties owned by Deutsche Bank National Trust Company, as Trustee, 34 of which were serviced by Ocwen and Altisource.

11.     NFHA investigated REO 27 Tampa-area properties owned by Deutsche Bank National Trust Company, as Trustee, 17 of which were serviced by Ocwen and Altisource.

12.     Plaintiff Denver Metro Fair Housing Center ("DMFHC") is a nonprofit fair housing organization based in Denver, Colorado and serving six Denver Metro Counties.

13.     DMFHC investigated REO 21 Denver-area properties owned by Deutsche Bank National Trust Company, as Trustee, 12 of which were serviced by Ocwen and Altisource.

14.     Plaintiff Fair Housing Advocates of Northern California ("FHANC") is a nonprofit fair housing organization based in San Rafael, California.

15.    FHANC investigated REO 22 Bay Area, California properties owned by Deutsche Bank National Trust Company, as Trustee, 10 of which were serviced by Ocwen and Altisource.

16.    Plaintiff Central Ohio Fair Housing Association ("COFHA") a nonprofit fair housing organization based in Columbus, Ohio.

17.    COFHA investigated 25 Columbus-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 13 of which were serviced by Ocwen and Altisource.

18.    Plaintiff Connecticut Fair Housing Center ("CFHC") is a nonprofit fair housing organization based in Hartford, Connecticut and serving the State of Connecticut.

19.    CFHC investigated 17 Hartford-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 12 of which were serviced by Ocwen and Altisource.

20.    Plaintiff Fair Housing Center of Central Indiana ("FHCCI") is a nonprofit fair housing organization based in Indianapolis, Indiana and serving 24 Central Indiana Counties.

21.    FHCCI investigated 18 Indianapolis-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 14 of which were serviced by Ocwen and Altisource.

22.    Plaintiff Fair Housing Center of the Greater Palm Beaches ("FHCGPB") is a nonprofit fair housing organization serving the Greater Palm Beaches, Florida area.

23.    FHCGPB investigated 41 West Palm Beach-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 25 of which were serviced by Ocwen and Altisource.

24.    Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a nonprofit fair housing organization based in Grand Rapids, Michigan and serving 12 Western Michigan Counties.

25.    FHCWM investigated 30 Muskegon-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 17 of which were serviced by Ocwen and Altisource.

26.    FHCWM investigated 11 Grand Rapids-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 8 of which were serviced by Ocwen and Altisource.

27.    Plaintiff Fair Housing Continuum, Inc. ("the Continuum") is a nonprofit fair housing organization based in Rockledge, Florida and serving 6 Central Florida Counties.

28.    The Continuum investigated 65 Orlando-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 36 of which were serviced by Ocwen and Altisource.

29.     Plaintiff Louisiana Fair Housing Action Center ("LFHAC") is a nonprofit fair housing organization based in New Orleans, Louisiana and serving the State of Louisiana.

30.     LFHAC investigated 42 New Orleans-area properties owned by Deutsche Bank National Trust Company, as Trustee, 32 of which were serviced by Ocwen and Altisource.

31.     LFHAC investigated 19 Baton Rouge-area properties owned by Deutsche Bank National Trust Company, as Trustee, 13 of which were serviced by Ocwen and Altisource.

32.     Plaintiff HOPE Fair Housing Center ("HOPE FHC"), is a nonprofit fair housing organization based in Wheaton, Illinois, serving the Chicago area and various downstate Illinois counties.

33.     HOPE FHC investigated 62 Chicago-area and Illinois properties owned by Deutsche Bank National Trust Company, as Trustee, 27 of which were serviced by Ocwen and Altisource.

34.     Plaintiff Housing Opportunities Made Equal of Virginia ("HOME of Virginia") is a nonprofit fair housing organization based in Richmond, Virginia and serving the Commonwealth of Virginia.

35.     HOME of Virginia investigated 39 Richmond-area properties owned by Deutsche Bank National Trust Company, as Trustee, 28 of which were serviced by Ocwen and Altisource.

36.     HOME of Virginia investigated 17 Hampton Roads-area properties owned by Deutsche Bank National Trust Company, as Trustee, 14 of which were serviced by Ocwen and Altisource.

37.     Plaintiff Housing Opportunities Project for Excellence, Inc. ("HOPE, Inc.") is a nonprofit fair housing organization based in Miami, Florida and serving Miami-Dade County and Broward County.

38.     HOPE, Inc. investigated 65 Miami-area properties owned by Deutsche Bank National Trust Company, as Trustee, 45 of which were serviced by Ocwen and Altisource.

39.     Plaintiff Fair Housing Center for Rights & Research ("FHCRR") is a nonprofit fair housing organization based in Cleveland, Ohio.

40.     FHCRR investigated 32 Cleveland-area properties owned by Deutsche Bank National Trust Company, as Trustee, 23 of which were serviced by Ocwen and Altisource.

41.     Plaintiff Miami Valley Fair Housing Center ("MVFHC") is a nonprofit fair housing organization based in Dayton, Ohio.

42.     MVFHC investigated 36 Dayton-area properties owned by Deutsche Bank National Trust Company, as Trustee, 18 of which were serviced by Ocwen and Altisource.

43. Plaintiff Metropolitan Milwaukee Fair Housing Council ("MMFHC") is a nonprofit fair housing organization based in Milwaukee, Wisconsin and 9 Wisconsin Counties.

44. MMFHC investigated 84 Milwaukee-area properties owned by Deutsche Bank National Trust Company, as Trustee, 46 of which were serviced by Ocwen and Altisource

45. Plaintiff North Texas Fair Housing Center ("NTFHC") is a nonprofit fair housing organization based in Dallas, Texas.

46. NTFHC investigated 62 Dallas-area properties owned by Deutsche Bank National Trust Company, as Trustee, 38 of which were serviced by Ocwen and Altisource.

47. Plaintiff Open Communities is a nonprofit fair housing organization based in Evanston, Illinois and serving 17 north suburban communities in the Chicago, Illinois area.

48. Open Communities investigated 16 Chicago-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 7 of which were serviced by Ocwen and Altisource.

49. Plaintiff South Suburban Housing Center ("SSHC") is a nonprofit fair housing organization serving the south metropolitan Chicago area, including underserved areas of northwest Indiana.

50. SSHC investigated 28 Chicago-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 15 of which were serviced by Ocwen and Altisource.

51. SSHC investigated 22 Gary, Indiana-area REO properties owned by Deutsche Bank National Trust Company, as Trustee, 13 of which were serviced by Ocwen and Altisource.

52. Plaintiff Fair Housing Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair Housing Center ("TFHC") is a nonprofit fair housing organization based in Toledo, Ohio.

53. FHCRR investigated 26 Toledo-area properties owned by Deutsche Bank National Trust Company, as Trustee, 15 of which were serviced by Ocwen and Altisource.

54. In 2009, the City of Milwaukee Department of Neighborhood Services developed a process to register vacant buildings and properties going through the foreclosure process.

55. Since at least 2009, residents in the Milwaukee neighborhoods of Amani, Sherman Park and Metcalfe Park have been predominantly African-American.

56. Art Dahlberg was the Commissioner of the Department of Neighborhood Services for the City of Milwaukee, from March 2009 through October 2015.

57.     From 2009 through approximately 2015, Art Dahlberg participated in numerous meetings and phone calls with representatives from Deutsche Bank and Ocwen about vacant foreclosed properties (REOs).  During such meetings, the Milwaukee Department of Neighborhood Services regularly shared lists of approximately 100 properties that had outstanding Orders (which were based on neighbor complaints and City inspections) reflecting code violations that needed to be remedied.

58.     The Department of Neighborhood Services also often shared maps of the City of Milwaukee with representatives from Deutsche Bank and Ocwen, that showed areas where the numbers of code violations were the densest, which were always in the Amani, Sherman Park and Metcalfe Park neighborhoods.

59.     During the years 2009 through 2015, the Department of Neighborhood Services collected data showing that the high numbers of foreclosures in Milwaukee were mostly occurring in very discrete zip codes, and those zip codes are also the areas for which the highest number of code violation orders were issued by the City.  This information was regularly shared with representatives from Deutsche Bank and Ocwen, often on a monthly basis.

60.     Common Ground of Southeastern Wisconsin (known as "Common Ground") is an organization of congregations, schools, unions, small businesses, and neighborhood associations representing over 50,000 people in metropolitan Milwaukee.

61.     In 2009, Common Ground began a Foreclosure Campaign (later called "Milwaukee Rising"), focusing on foreclosed properties in predominantly African-American neighborhoods of Milwaukee, including Sherman Park, Amani and Metcalf Park.

62.     Public ownership records reviewed by Common Ground for 300 vacant properties in the 200 square blocks of the Sherman Park neighborhood in Milwaukee revealed that Deutsche Bank owned the highest number of those properties.

63.     On January 1, 2010, Common Ground released its "Faces of Foreclosure" Research & Action Report, and sent a copy of the Report to Deutsche Bank in 2010.

64.     Common Ground invited Deutsche Bank to attend Common Ground's public hearing announcing its Foreclosure Campaign in Milwaukee on November 19, 2009.  Deutsche Bank National Trust Company's Manager David Co wrote in response to Common Ground that he sent the invitation "to loan servicers who represent the trusts on foreclosure and REO property maintenance and disposition matters and [] encouraged the servicers to attend …."

65.     Common Ground sent letters and Common Ground's "Faces of Foreclosure" Research & Action Report to Deutsche Bank's CEO Joseph Ackermann, and to General Counsul Onno Huckmann, German Consulate in Chicago.

66.     Common Ground volunteers traveled to the German Consulate in Chicago on May 18, 2010, and delivered a letter addressed to Deutsche Bank CEO Ackermann.

67.     Members of Common Ground (Dr. Susan Giaimo and Minister Mark Fraley) traveled to Frankfurt, Germany and delivered presentations at Deutsche Bank's shareholders meetings in Frankfurt, Germany in May 2010 and May 2011.

68.     After Common Ground's representatives made presentations at the May 2010 Deutsche Bank shareholders meeting in Germany, Bob Connolly and other Common Ground members had several meetings in Milwaukee with Deutsche Bank representatives.

69.     Members of Common Ground had meetings with representatives from Deutsche Bank and Ocwen in Milwaukee, including on June 23, 2010, October 24, 2010, and May 2, 2011.

70.     Common Ground provided Deutsche Bank with Common Ground's comprehensive Sherman Park Revitalization Plan, dated January 21, 2011.

71.     During Art Dahlberg's tenure working as the Commissioner for the Milwaukee Department of Neighborhood Services, the information and data regarding foreclosed properties that the Department shared with Deutsche Bank and Common Ground identified: (a) Aldermanic Districts where properties were located; (b) the property addresses; (c) the date on which a bank foreclosed on a note or mortgage related to the property and thereby became the property owner, called the "conveyance date"; (d) the Assessed Values of properties based on assessments conducted by the City of Milwaukee; and (e) information about Sheriff sales of foreclosed properties.

72.     Art Dahlberg attended meetings with Susan Giaimo and Mark Fraley (members of Common Ground), Milwaukee Mayor Tom Barrett, Milwaukee Alderman Michael Murphy, Maria Prioletta (Milwaukee Department of City Development), Preston Cole (Milwaukee Department of Public Works), and representatives from banks including Deutsche Bank, including on July 23, 2010.

73.     During a meeting with Deutsche Bank held on May 20, 2011, the City of Milwaukee noted the following: (a) the average cost to the City of Milwaukee to demolish a foreclosed property was $12,000; (b) as of January 2011, the City listed 151 properties for which Deutsche Bank was identified as trustee; (c) from 2005 through January 2010, Deutsche Bank was the recipient of 3,046 Orders from the Department of Neighborhood Services on 1,230 properties involving 14,970 individual code violations that needed to be remedied; (d) from June 2010-May 2011, the Department of Neighborhood Services issued 364 additional Orders to Deutsche Bank on 172 properties involving 2,071 individual code violations that needed to be remedied; and (e) the Department of Neighborhood's analysis showed a trend that Deutsche Bank was selling properties in bulk numbers and low prices before fixing the properties to address the code violations.

74.     Common Ground and Deutsche Bank reached an agreement in June 2011, under which Deutsche Bank provided funding for Common Ground's rehabilitation of several homes in the Sherman Park neighborhood in Milwaukee.

75.     Common Ground provided Deutsche Bank with a 2014 Report from Local Initiatives Support Coalition ("LISC") regarding Common Ground's rehabilitation of vacant and abandoned foreclosed homes partially funded by Deutsche Bank's 2011 agreement with Common Ground, noting that the neighborhood affected is 80% African American.

76.     From 2014 through 2018, Common Ground continued to provide information to Ocwen regarding foreclosed homes for which Ocwen was the servicer in predominantly African American neighborhoods, including by (a) sending correspondence, (b) participating in phone calls, and (c) attending in-person meetings with the following Ocwen representatives: Ron Faris (Ocwen's President and CEO), Bill Lacey (Member of Ocwen's Board of Directors), Jill Showell (Senior Vice President, Government and Community Relations), Andrew Wine (Senior Vice President and Deputy General Counsel), and Amber Gomez (Senior Manager, Community Relations, Ocwen Financial Corporation).

77.     During discussions and in correspondence, Ocwen also shared data with Common Ground, acknowledging the size of Ocwen's REO portfolio in or near Sherman Park, and identifying properties Ocwen "charged off" after Ocwen did not pay property taxes and the City acquired the properties in tax foreclosure proceedings.

78.     In 2014, Common Ground provided a tour of the Sherman Park neighborhood to Jill Showell, Ocwen's Senior Vice President, Government and Community Relations, during which Showell observed homes with boarded windows and expressed was concerned about the impact that had on neighbors and property values. Showell was also informed that the racial demographics in Sherman Park involved "higher percentages of minority groups."

79.     During Common Ground's discussions and negotiations with Deutsche Bank and Ocwen, including with Ron Faris (Ocwen's President and CEO), Jill Showell (Senior Vice President, Government and Community Relations), and Amber Gomez (Senior Manager, Community Relations, Ocwen Financial Corporation), Common Ground was told that Deutsche Bank had hired servicers for the foreclosed properties, including Ocwen, and Ocwen would first have to call Deutsche Bank to get Deutsche Bank's permission to convey certain properties to Common Ground that Common Ground wanted to restore and thereby restore the housing market in the Sherman Park neighborhood.

80.     During discovery, Deutsche Bank produced a copy of a letter from Lorie Koehler, dated April 26, 2016, regarding the REO at 3932 W. Florist Avenue, Milwaukee, WI 53209.

81.     On or about Aril 2016, Deutsche Bank received a copy of a letter from Lorie Koehler, Dated April 26, 2016, regarding the REO at 3932 W. Florist Avenue, Milwaukee, WI 53209.

82.     As of April 26, 2016, the REO at 3932 W. Florist Avenue, Milwaukee, WI 53209 was owned by Deutsche Bank National Trust Company, as Trustee, and serviced by Ocwen.

83.     Deutsche Bank National Trust Company did not respond to Ms. Koehler's April 26, 2016 Letter.

7

84.     Ocwen did not respond to Ms. Koehler's April 26, 2016 Letter.

85.     The University of Memphis Neighborhood Preservation Clinic (the "Clinic") represents the City of Memphis in lawsuits seeking the abatement of badly neglected vacant and abandoned properties throughout Memphis that are alleged to be public nuisances under the Tennessee Neighborhood Preservation Act.

86.     The Clinic was created when the City of Memphis decided to ramp up its capacity to address vacant and abandoned properties in the aftermath of the housing foreclosure crisis, which saw foreclosures more than triple annually from 2000 to 2009, and more than 25,000 total vacant housing units in 2009.

87.     As of 2016, nearly 9,500 single-family houses and nearly 4,000 multi-family housing units were vacant or abandoned in Memphis.

88.     Under the Tennessee Neighborhood Preservation Act, upon certifying the subject property as a public nuisance, the court may enter "an order of compliance" requiring the owner to provide "a development plan for the abatement of the public nuisance." If an owner does not comply with the development plan, however, the statute authorizes the court to appoint a receiver to complete the abatement.

89.     The City of Memphis Department of Public Works, Code Enforcement, inspects properties, records code violations, reaches out to owners requesting remediation, and, if problems are not corrected, violation notices are sent to property owners. The system is complaint-based, so all cases begin as complaints to the City's 3-1-1 system.

90.     Code Enforcement responds to complaints by opening "Service Requests" for each complaint and conducting property inspections until the service request can be closed. If the complaints are substantiated by the inspection, then Code Enforcement takes administrative action to try to get the violations resolved. If those administrative actions fail to resolve the violations, then the property may be deemed a public nuisance and referred to the Neighborhood Preservation Clinic for the filing of a lawsuit in the Shelby County Environmental Court under the Tennessee Neighborhood Preservation Act.

91.     One of the lawsuits filed by the Clinic on behalf of the City of Memphis involved the property at 93 Mallory Heights Drive, Memphis, TN 38109.

92.     Deutsche Bank National Trust Company, as Trustee, was the owner of record of the 93 Mallory Heights property and the named defendant in the lawsuit filed by the Clinic.

93.     The lawsuit against Deutsche Bank National Trust, Co. was filed on behalf of the City of Memphis in 2015 in the Shelby County (TN) Environmental Court ("the Environmental Court"), *City of Memphis, Tennessee v. Deutsche Bank National Trust Co.*, Civil Warrant No. 15640976.

94.     The 93 Mallory Heights property in Memphis is located in the predominantly Black or African American neighborhood of Whitehaven.

95.     Per the most recent US Census in 2020, the property at 93 Mallory Heights sits in Block Group 3 of Census Track 55 in Shelby County, Tennessee, and 756 of the Block Group's 773 residents (97.8%) identified as Black or African American.

96.     In November 2006, Shirlean Thompson purchased the 93 Mallory Heights property and executed a promissory note in the amount of $63,000.

97.     In March 2007, Ms. Thompson's promissory note was pooled in a securitized trust by virtue of *Pooling and Servicing Agreement dated as of March 1, 2007 Securitized Asset Backed Receivables LLC Trust 2007-BR1 Mortgage Pass-Through Certificates, Series 2007-BR1.* Under the Pooling and Services Agreement, Deutsche Bank National Trust Company was trustee for the trust.

98.     In August 2008, Deutsche Bank commenced foreclosure proceedings for the 93 Mallory Heights property and on August 28, 2008, Deutsche Bank National Trust Company became the owner of the property when it purchased the property at the foreclosure sale for $50,579.28.

99.     On August 11, 2016, the Shelby County Environmental Court entered an Order certifying the 93 Mallory Heights property as a Public Nuisance, and an Order that Deutsche Bank National Trust Company present a "Development Plan" to abate the public nuisance at the property by the next setting on September 22, 2016.

100.    Deutsche Bank did not present "a development plan for the abatement of the public nuisance" at the 93 Mallory Heights property.

101.    Ocwen was the servicer for the property at 93 Mallory Heights.

102.    Throughout the Clinic's litigation and efforts regarding the 93 Mallory Heights property, Ocwen did not communicate with the Clinic regarding servicing this property.

103.    In 2019, the property at 93 Mallory Heights was sold in the Tax Sale for a minimum bid of $7,004, which reflected Shelby County delinquent taxes, interest, penalties and costs owed by Deutsche Bank National Trust Company for the years 2012 through 2017 totaling $3,200.41; City of Memphis delinquent taxes, interest, penalties, and costs for the years 2012 through 2018 owed by Deutsche Bank National Trust Company totaling $3,599.60; and a minimum Clerk's commission calculated as $203.99. The delinquent taxes owed by Deutsche Bank National Trust Company to the City of Memphis included assessments for costs incurred by the City to board the property and cut the grass during the years of 2014 to 2019.

104.    The NPA lawsuit regarding the 93 Mallory Heights property was dismissed on October 10, 2019, because Deutsche Bank National Trust Company did not pay property taxes to

either the City of Memphis, Tennessee or Shelby County, Tennessee for the years 2012 through 2019, and lost title to the property by way of property tax foreclosure.

105.    The property located at 1041 Palmetto Avenue, Memphis, TN 38107 was the subject of a lawsuit brought by the Neighborhood Preservation Clinic.

106.    Deutsche Bank National Trust Company was the trustee of the property at 1041 Palmetto Avenue from November 2015 to December 2016. The property was transferred to DTH REO Inc. in December 2016 via a Quit Claim Deed which lists Deutsche Bank National Trust Company and Ocwen Loan Service LLC as the "Grantor." The Quit Claim Deed was executed after Code Enforcement attempted to serve notices of code violations in August 2016.

107.    Ocwen was the servicer for the REO at 1041 Palmetto Avenue.

108.    The 1041 Palmetto Avenue property is in a predominantly Black or African American Neighborhood in Memphis. Per the most recent US Census in 2020, the property sits in Block Group 2 of Census Track 19 in Shelby County, Tennessee, and 789 of the Block Group's 811 residents (97.3%) identified as Black or African American.

109.    The initial Code Enforcement violation notices for the property at 1041 Palmetto Avenue were issued by Inspector James Ferguson and mailed to Deutsche Bank National Trust Company in August 2016 at its address of record, 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409, which is the address for Ocwen Loan Servicing LLC, and the address provided on the Substitute Trustee's Deed, which transferred ownership of the property to Deutsche Bank National Trust Company in November 2015.

110.    Deutsche Bank was the trustee for the property at 5138 Cana Road, Memphis, TN, from September 2015 until August 2016.

111.    Ocwen was the servicer for the REO at 5138 Cana Road.

112.    Code Enforcement Inspector J. Jackson conducted an inspection of the property at 5138 Cana Road in December 2015, found the exterior to be out of compliance with local housing code, and sent notices to Deutsche Bank National Trust Company at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409, which is the address for Ocwen Loan Servicing LLC.

113.    Annick Joele Ngameni is 51 years old, African-American, works as a Registered Nurse and is a single mother of four children.

114.    Since May 2015, Ms. Ngameni has lived with her mother and four children in their home at 320 Carmody Hills Drive, Capital Heights, MD 20743, which is a predominantly African-American neighborhood.

115. On January 26, 2018, Ms. Ngameni completed a survey from the National Fair Housing Alliance concerning the home at 322 Carmody Hills Drive, which is next to Ngamani's home.

116. Deutsche Bank National Trust Company acquired the property at 322 Carmody Hills Drive in foreclosure. The Notice of Default was filed on June 27, 2014; the Notice of Sale was filed on July 5, 2016; the Deed transferring the property to Deutsche Bank National Trust Company is dated October 10, 2017; and Deutsche Bank transferred the property in a deed dated January 24, 2018.

117. Ocwen was the servicer for the REO at 322 Carmody Hills Drive.

118. The home at 322 Carmody Hills Drive was vacant before May 2015 through sometime after January 26, 2018.

119. Marvin Adams is 48 years old, African-American, and works as a federal police officer for the Treasury Department, in the Bureau of Engraving.

120. Since approximately 2008, Marvin Adams has owned and lived in a home at 6513 Walters Place, in District Heights, Maryland, in a predominately African-American neighborhood and next door to the home at 6515 Walters Place.

121. On August 2, 2016, Adams completed a survey from the National Fair Housing Alliance.

122. Deutsche Bank National Trust Company acquired the property at 6515 Walters Place in foreclosure.

123. Ocwen was the servicer of the REO at 6515 Walters Place.

124. Dexter Craig is 54 years old, African-American, works as a Special Operations Officer for the United States Army, and lives with his wife and family in Washington, D.C. From 2003 until approximately late 2016, Dexter Craig and his wife and children lived in their home at 6516 Walters Place, in District Heights, Maryland.

125. In July 2015, the house at 6515 Walters Place had a fire and suffered significant damage.

126. Defendant Ocwen Loan Servicing, LLC, now known as Onity, is a national company that services mortgage loans. Servicing mortgage loans includes tasks ranging from processing monthly mortgage payments, to addressing delinquent payments, to foreclosing on loans, to taking care of properties owned by banks or trusts after foreclosure.

127. Ocwen's headquarters are in Palm Beach, Florida, United States.

128. Ocwen's total revenue was $1.7 billion in 2015 and $1.3 billion in 2016.

129.    As mortgage servicer for mortgages held in trusts such as those in this case owned by the Deutsche Bank Defendants, as Trustee, Ocwen acts to service loans and resolve delinquencies in the best interest of the investor, i.e. the loan owner.

130.    Ocwen is retained by contract to act as mortgage servicer on a national basis by lenders, GSEs or trustees such as the Deutsche Bank Defendants.

131.    For Real Estate Owned properties ("REOs") held in trusts, including REO properties owned by the Deutsche Bank Defendants, as Trustee, the servicer must act to achieve the greatest return for the investor in the shortest amount of time.

132.    Pursuant to Pooling and Servicing Agreements, an investor provides delegated authority to the mortgage servicer to manage post-foreclosure (or REO) property preservation, inspection and sales.

133.    Ocwen is not compensated based on the work performed on REO properties. Ocwen passes through the costs of post-foreclosure activities to the investor.

134.    Prior to 2009, Altisource Portfolio Solutions, S.A. operated as Ocwen Solutions, a wholly-owned subsidiary of Ocwen.

135.    In 2009, Ocwen entered into "long-term servicing contracts" with Altisource Portfolio Solutions, S.A. ("Altisource"), which was spun off from Ocwen.  The Altisource subsidiary named in this lawsuit is Altisource Solutions, Inc.

136.    In 2009, Ocwen became Altisource's main customer and Altisource became Ocwen's third-party vendor to carry out Ocwen's servicer obligations relating to default and foreclosure activities pertaining to REOs, including REO properties owed by the Deutsche Bank Defendants, as Trustee, including in the areas of valuations, property maintenance and preservation, property inspection, marketing and sales.

137.    In 2009 Ocwen acquired mortgage servicing rights ("MSRs") for hundreds of billions of dollars in Unpaid Principal Balance ("UPB") from several major servicers, which grew Ocwen's share of servicing subprime U.S mortgages.

138.    Pursuant to Governing Agreements where the Deutsche Bank Defendants acted as trustee, Ocwen and Altisource serviced the majority of Deutsche Bank Defendant-owned REO investigated in this case, through the stages of loan default, pre-foreclosure, foreclosure and the REO life cycle.

139.    2016 Ocwen audits of Altisource reported in 2016 that Altisource Solutions, Ocwen's third-party vendor, processed approximately 360,000 property preservation and inspection transactions each month including standard repeating services and one-off services, i.e. property securing, winterization, grass cuts, maintenance, inspections, etc., for an

approximate monthly spend of $27 million, $324 million annually, and $16 million monthly for Preservation and Capital Repairs/Renovation services.

140. Once a foreclosure sale for a property serviced by Ocwen is completed, Ocwen automatically refers the property to Altisource through shared electronic systems; Altisource then begins all the activities required to market and sell the property.

141. Altisource's activities required to market and sell a property include completing property appraisals, carrying out all necessary property preservation work to get the property into a marketable condition, then creating the listing agreement, and finally listing the property for sale.

142. The operative contracts between Ocwen and Altisource were executed between Ocwen and Altisource Portfolio Solutions. S.A. These consist of Servicing Letters and Statements Of Work.

143. The 2009 contracts between Ocwen and Altisource were known as Statements Of Work, and they covered the REO activities in this case, such as property valuations, property inspections, property preservation and maintenance, and property marketing and sales.

144. The Ocwen-Altisource Statements of Work list types of activities and work Altisource will perform, and "Service Level Agreements," which provide the timelines in which Altisource was required to perform its activities.

145. The Ocwen-Altisource Statements Of Work were substantially revised in August 2015.

146. The Ocwen-Altisource Statements Of Work delegated authority to Altisource to carry out activities and perform work on REOs in Altisource's discretion.

147. There was one set of servicing Contracts between Ocwen and Altisource covering all U.S. foreclosed properties serviced by Ocwen and owned by the Deutsche Bank Defendants, as Trustee.

148. Ocwen and Altisource rely on one set of national contracts, policies, and procedures applicable to foreclosure servicing activities. These contracts define Altisource as Ocwen's third-party contractor, and state that Altisource, in turn, uses other third-party contractors.

149. The Deutsche Bank Defendants have one set of written policies pertaining to their responsibilities as Trustee for RMBS Trusts that apply nationally.

150. Altisource pricing and sales models are applicable on a national basis regardless of the geographic locality in the United Sates.

151.    Altisource staff and third-party contractors use Altisource policy and procedure manuals, which generally apply to REO properties regardless of location in the United States.

152.    Ocwen's mortgage servicing activities in the United States, including servicing of REOs owned by the Deutsche Bank Defendants as Trustee, were carried out by mostly offshore staff, such as individuals located in India.

153.    Altisource uses its proprietary computer software system known as "Vendor Management System" or "VMS" to manage Ocwen-serviced REO properties in the United States.

154.    Altisource Residential Sales Consultants utilize a manual known as the Residential Sales Consultant Procedure.

155.    Altisource third-party vendors who perform work on REO homes in the United States that are owned by Deutsche Bank as Trustee and serviced by Ocwen use procedure manuals including the REO Vendor Guide for VMS and REO Operational Vendor Guide.

156.    Ocwen orders an appraisal or other valuation on all pre-foreclosure properties it services in the United States when the mortgage is in default.

157.    Altisource carries out valuations on Ocwen-serviced mortgages from pre-foreclosure through REO sale, either through Altisource Valuations Services staff in India or by third-party contractors in the United States, known as Regional Vendors.

158.    An REO's "marketable condition" refers to a property being in a condition where it can be sold to buyers free of any life safety or health issues, free of any code violations, free of any debris, any trash.

159.    Altisource vendors perform preservation activities on REO properties to enhance the property value, to maintain the appearance of the property and to ensure that the property is kept up to the standards dictated by the city or local municipalities.

160.    Altisource vendors are tasked with the upkeep of the property to ensure that the asset value does not decline due to neglect and to protect investors from unforeseen liability for vacant and abandoned properties.

161.    Altisource expects its vendors to maintain a property so as to minimize the appearance that it is vacant.

162.    REO maintenance, preservation, repair, and marketability-related activities should be completed within 30 days of a property entering REO status.

163.    Ocwen and Altisource worked in a shared electronic system known as REALServicing to service mortgages through foreclosure, property maintenance, and REO sales.

164.    One part of REALServicing called REALResolution flags new REOs with the acronym "PPI," triggering the performance of a set of initial services, including securing the home, removing trash and debris, janitorial service, lawn maintenance, and completion of an Initial Property Review form.

165.    The Service Level Agreement portions of the Ocwen-Altisource Statements of Work require many initial and basic services on REO homes to be performed by Altisource and its 3rd-party vendors within a matter of days, such as 2 days, 5 days, 7 days.

166.    According to Altisource's testimony, its third-party vendors are not permitted to make SLA turnaround times longer, only "shorter" or "more aggressive." Altisource testified that "time is of the essence."

167.    "Delegated Authority" is a term used between Ocwen and Altisource since 2009 to describe (a) Ocwen delegating authority to Altisource to carry out tasks relating to REO properties in the Statements Of Work, and (b) Ocwen delegating to Altisource preapproved monetary authority to pay for the tasks.

168.    The 2009-August 2015 Statements Of Work between Ocwen and Altisource stated the following about REO property preservation and inspection services:
   a) Property preservation services will be performed to preserve and maintain the property in a marketable condition.
   b) Altisource will perform initial property preservation services for vacant properties with delegated authority from the Customer party including lock changes, boarding, winterization, lawn maintenance and exterior debris as appropriate.
   c) Altisource will verify that: all hazardous debris has been removed from the property; there are no visible interior or exterior damages on the property in any location; no health hazards exist on the property, in accordance with customer guidelines, requirements, rules, regulations, handbooks, and mortgagee letters.
   d) Altisource will use photographs provided by its inspection vendors to determine the need for preservation services.
   e) Altisource will communicate all work required on the property via email to the respective Real Estate Sales Consultant (RSC).
   f) Altisource will not perform such services for which delegated authority has not been granted without approval of Ocwen.
   g) Altisource will provide preservation services as required by Ocwen for Real Estate Owned properties to secure the financial interest of the mortgage servicer or mortgage owner by physically securing the subject property to prevent theft, vandalism, unnecessary damage or deterioration of condition. This would include maintaining vacant or abandoned property and remedying code violations.

169.    For the REO properties investigated by the Plaintiffs in this case, Altisource generally determined the manner in which the properties would be marketed and sold.

170.     Ocwen utilized Powers of Attorney that gave Altisource the discretion to decide how to market, what to sell the properties for, and how to negotiate the prices of the properties.

171.     Ocwen-Altisource 2015 SOWs provide: "Altisource discretion. Altisource's determination that an Asset requires a PPI Service shall be made by Altisource using its reasonable business judgment and in accordance with Altisource's standard operating procedures, industry standard practices and the Business Requirements Document, as may be amended from time to time."

172.     Altisource had and used its discretion to make determinations that REO properties with different asset values would receive different types of services, more services, or more frequent services. Ocwen was not involved.

173.     Ocwen's expectation of Altisource regarding valuations and setting list prices to market and sell REO properties was: "whatever they felt was required in order to sell the property as quickly as possible for the highest amount of money was within their authority."

174.     Ocwen delegated marketing and sales of REOs to Altisource's discretion, left to Altisource's discretion what work would be done on an REO to maximize the ability to sell the property, and left to Altisource's discretion what was necessary to remediate emergency situations.

175.     The Ocwen-Altisource-Ocwen REO Sales and Management Business Requirements Document delegated Altisource $10,000 per property, without regard to property value, for "marketability improvements."

176.     The 2015 Ocwen-Altisource Statement Of Work for Property Preservation and Inspection authorized $2,500 and $10,000 for non-standard repairs and code violations.

177.     "Preservation repairs" are a category of property preservation and inspection work required to be performed by Altisource.

178.     Residential Sales Consultants employed by Altisource and stationed outside of country signed United States REO home sales listing agreements as the Seller, based on Ocwen being the Servicer acting on behalf of the owner, which in this case means one of the Deutsche Bank Defendants, as Trustee.

179.     Altisource REALHome Sales Services ("RHSS") is a national real estate brokerage operated by Altisource located in Missouri.  RHSS was the listing real estate broker for all Ocwen-serviced REOs.

180.     RHSS employees held licenses for states in which REOs were located, but realtors in the locations of the REOs themselves were not used.  Only Hubzu auction platform signs were placed on Ocwen-serviced REOs owned by the Deutsche Bank Defendants, as Trustee.

181.    Non-local real estate brokerage employees working for Altisource at "REALHome Services and Solutions, Inc" ("RHSS"), counter-signed as realtor on United States REO home sales listing agreements.

182.    RHSS is a wholly owned subsidiary of Altisource Portfolio Solutions, Inc.

183.    Listing agreements signed by Altisource employees as both Seller and Realtor reaffirm Ocwen REO servicing obligations to the owner that Altisource was required to carry out on Ocwen's behalf, including REO maintenance, marketing and sales, and valuations.

184.    Altisource's Asset Management department is staffed by employees stationed outside of the country in India known as Residential Sales Consultants (or "RSCs").

185.    The RSCs make decisions in their discretion regarding repair bids for marketability improvements. RSCs focus on achieving the maximum return for the owner/seller on REO properties.

186.    Ocwen relied on Altisource's discretion to make decision about repair bids for marketability improvements.

187.    Altisource permitted RSCs to determine not to remediate code violations.

188.    Altisource permitted RSCs to defer property maintenance and repair deficiencies, including code violation remediation, to the buyer under "Hold Harmless Agreements" with the buyer.

189.    RSCs were permitted to keep utilities shut off for certain REOs based on perceived property value, which prevented light or electricity usage.

190.    Altisource permitted RSCs to decide if a property was deemed "low value."

191.    RSCs were granted discretion to decide whether to complete repairs on REO homes, or to sell the homes without repair.

192.    RSCs were given the discretion to denote whether an REO home would be sold "as is" or "as repaired."

193.    Altisource had a proprietary home auction website known as "Hubzu."

194.    RSCs had discretion to reduce REO home listing prices on Hubzu.

195.    For REO homes listed for sale on Hubzu, RSCs were granted the discretion to select which home purchasing finance types, such as "cash," "conventional loans," or "rehab loans," would be accepted.

196.    RSCs were granted the discretion to accept offers for REOs through Hubzu, and to determine the amount at which to counter an offer.

197.    Ocwen did not undertake oversight of REO preservation and maintenance activities for foreclosed homes it was servicing for the Deutsche Bank Defendants, as Trustee, until beginning in 2014, and pursuant to revised contracts with Altisource in mid-2015.

198.    In December of 2012, Ocwen signed a Consent Order Pursuant to New York Banking Law Section 44, with the State of New York State Department of Financial Services (the "Department), in the wake of Ocwen acquiring mortgage servicing rights ("MSRs") for hundreds of billions of dollars in Unpaid Principal Balances from other major servicers.

199.    The Department sought to ensure that Ocwen had sufficient capacity to properly acquire and manage a significant portfolio of distressed loans, including the ability to effectively manage the increased volume and comply with requirements under the federal Home Affordable Modification Program, Ocwen's internal loss mitigation policies and procedures, and laws and regulations governing Ocwen's mortgage loan servicing and foreclosure activities.

200.    In 2013, Ocwen was subject to a comprehensive review by the New York State Department of Financial Services of its servicing operations, including (a) its compliance program and operational policies and procedures (b) the robustness of Ocwen's established policies and procedures and (c) Ocwen's compliance with federal and state law.

201.    In January of 2014, Ocwen appointed Jason Jastrzemski to a new position entitled "Director, Mortgage Servicing Oversight (MSO)," a newly created Ocwen business unit to oversee Ocwen's pre- and post-foreclosure activities. Jastrzemski was informed he was placed in the Director of MSO in order to provide oversight of Altisource Portfolio Solutions, Inc., including Altisource Solutions, Inc.

202.    In December of 2014, Ocwen signed a Consent Order with the New York State Department of Financial Services, reciting the history of DFS review of Ocwen and conflicts of interest with related companies, including Altisource Portfolio. Ocwen resolved the regulatory enforcement action with assurances of future compliance.

203.    Ocwen's newly created 2014 REO oversight business unit, known as Mortgage Servicing Oversight, did not go into full operation immediately and was still being built out into 2017.

204.    It was not part of Ocwen's program or standard procedure to conduct any direct surveillance of REO properties on any kind of periodic basis.

205.    In 2016 and 2017, Ocwen's scorecards of Altisource were still being developed.

206.    Ocwen's April 28, 2016 Vendor Risk Assessment Report noted as "open" that "vendor performance does not appear adequate nor transparent;"

207. A 2016 Third-Party Risk audit of Altisource stated with regard to Ocwen's scorecards of Altisource: "Ocwen PPI has expressed concerns that the current scorecard does not accurately depict APPI [Altisource Property Preservation and Inspection] performance...the scorecards are formulated from the skewed and manipulated data being provided directly by APPI itself."

208. In 2017, the Ocwen Review Team noted "APPI internal reports have many scorecard line items which are failing the Service Level Agreements (SLA) whereas the Ocwen scorecard is reporting 100% meeting SLA for all parameters of the scorecard."

209. The audits of Ocwen's oversight of Altisource did not include or mention compliance with the Fair Housing Act.

210. Ocwen's Audit Department stated in 2017 that Ocwen's Statements Of Work with Altisource do not adequately define what is "within" or "in excess" of the "Delegated Authority" given to Altisource.

211. Altisource's instructions to local vendors concerning Property Preservation and Inspection ("PPI"), including those regarding monitoring and clearing properties of trash and debris, did not address accumulated mail, and Ocwen did not monitor or score Altisource on removal of incidental debris.

212. Altisource contracted with national third-party vendors to conduct monthly inspections of REO homes.

213. Altisource third-party inspection vendors did not have authority to issue work orders.

214. Altisource inspection results were not inputted or stored as machine readable data in Vendor Management System ("VMS"), Altisource's electronic REO management tool.

215. The Altisource Monthly Quality Control inspection form included a "comment" section for inspectors to include information that might not be listed in preprinted categories with check boxes.

216. Comments on Altisource inspection forms were not typed into Altisource data systems and were not manually reviewed.

217. Altisource had no U.S.-based oversight over third-party local REO vendors until 2014, when it announced it would employ 11 Regional Field Services Managers to cover the United States, each covering multiple cities and states.

218. Ocwen documented in 2015 that Altisource handled 360,000 Ocwen property preservation work orders and transactions each month.

219.    Altisource's Regional Field Services Manager manual states that Altisource "performs the bulk of its activity remotely, engaging offshore human resources to manage vendors, issue/review Work Items and address code compliance issues."

220.    The Regional Field Service Manager manual sets out the job duties for Altisource Regional Field Service Managers.

221.    Regional Field Service Managers possessed authority to undertake their own property inspections.

222.    Altisource manuals for vendors, Residential Sales consultants, inspectors, coordinators, and Regional Field Service Managers did not contain non-discrimination statements.

223.    Altisource manuals for vendors, Residential Sales consultants, inspectors, coordinators, and Regional Field Service Managers did not contain any reference to the Fair Housing Act.

224.    Altisource Vendor Management Organization, operations and Third-Party risk management compliance did not undertake any analysis of the rates or quality of work completion by neighborhood racial makeup.

225.    Altisource did not have any procedures that would address the actions it should take if racially biased comments were found in valuation products, other than deleting the comment.

226.    Altisource did not have any testing procedures to be performed by Altisource to determine if Altisource's valuation approach had any detrimental effect on communities based on race or national origin.

227.    Altisource did not have any policy on how to handle complaints about race discrimination in the maintenance or marketing of REO properties.

228.    Both Ocwen and Altisource relied on more overseas staff than U.S. staff to carry out Ocwen's servicing of defaulted and foreclosed loans and REO properties.

229.    Altisource utilized electronically transmitted photographs from overseas to oversee conditions on REO properties owned by the Deutsche Bank Defendants, as Trustee.

230.    Altisource Vendor Management Organization managers were located in Uruguay and did not conduct on-site oversight for REO homes serviced by Ocwen and Altisource.

231.    Altisource Vendor Management Organization managers only visited Ocwen-Altisource REOs possibly once a year near annual convention sites in the United States.

232.     In 2015, Altisource removed a bi-weekly lawn maintenance requirement and granted full discretion and responsibility to its third-party landscaping vendors in the United States regarding when to conduct lawn maintenance of REO homes serviced by Ocwen.

233.     The Ocwen-Altisource REO property appraisal and valuation system set prices for REO homes at multiple points in the property default cycle.

234.     Ocwen-Altisource REO appraisals were used to determine amounts and types of work performed by Altisource on REO preservation and maintenance, how properties were marketed, the prices at which REOs serviced by Ocwen were sold, and to whom the REOs were sold.

235.     Altisource's valuations system used different approaches based on REO property value and allowed for more discretionary decisions about REOs based on property values.

236.     Altisource's Broker Price Opinion form included a "neighborhood" section, which was not required by Ocwen, that solicited information regarding the number of vacant/boarded homes and number of neighborhood REOs.

237.     Altisource directed sales of REO properties owned by the Deutsche Bank Defendants, as Trustee, to investors who were unlikely to occupy the homes, especially REO homes deemed of lower value.

238.     More REO homes inspected by Plaintiffs in communities of color were sold to investors than REO homes inspected by Plaintiffs in majority white communities.

239.     All REO properties owned by Deutsche Bank Defendants, as Trustee, that were serviced by Ocwen were listed and sold through Altisource's online auction site Hubzu.

240.     If properties were listed on the Multiple Listing Service, or MLS system, potential buyers were required to use the Hubzu auction platform to purchase Ocwen-serviced REOs owned by the Deutsche Bank Defendants, as Trustee.

241.     The Hubzu on-line REO auction site required users to pay various fees in addition to a real estate commission, such as a Buyer Premium Fee, a Web Technology Fee, and a Bid Cancellation fee.

242.     Altisource's "Asset Managers," or RSCs were located in India and were the Seller contact on Hubzu.

243.     An information sheet titled "Important Information Regarding Properties Being Sold by REALHome Services and Solutions" lists various aspects of Altisource's processes relating to sales of Ocwen-serviced REO homes.

244.    High level Altisource officials acknowledged in preparing 2017 Q&A responses that "barriers" exist to use of Hubzu by "consumers" and that Hubzu impedes real estate purchases by regular owner-occupied, non-investor buyers.

245.    At times, Defendants sold Ocwen-serviced REOs owned by the Deutsche Bank Defendants, as Trustee, that they "valued" at less than $50,000 singularly or in groups directly to a list created by Altisource of investor purchasers through a "Cash For Deed" policy.

246.    Cash transactions, not purchases through conventional mortgages, constituted the majority of all Ocwen-Altisource-facilitated REO sales.

247.    As used by Ocwen and Altisource, the term "As Is" relates to ongoing treatment of REOs by "situation," in addition to "selling" "as is."  The label "as is" is tied to perceived values but not one particular value band, is discretionary, and is used in myriad ways and is often designated by asset managers in Ocwen data systems during early REO phases.

248.    Remediation of code violations is required under Ocwen-Altisource contracts and procedures.

249.    Altisource did not remediate all code violations on REO properties.

250.    Altisource created a Secondary Status Code system for code violations that included acronyms for code violations that showed "closed" on its data system but were not remediated.

251.    Ocwen never assessed whether the limited auction process had an impact on home values in the surrounding area.

252.    Altisource has never analyzed differences that may exist between selling REOs to investors or to owner-occupants.

253.    Altisource did not evaluate whether there was a concentration of REO properties in communities of color.

254.    Altisource did not evaluate the effects of any concentration of REO properties in communities of color.

255.    Altisource did not use its technology and data systems to determine whether its approach to valuations had any detrimental effect on communities or neighborhoods based on race or national origin.

256.    Various words relating to REO value used in Altisource-Ocwen processes, including "book value," "asset value," "market value," "net present value," "total preservation cost," and "total repair cost," have not been defined.

257.     Work that would otherwise be necessary on an REO property can be deemed to be not required if Ocwen and/or the Residential Sales Consultant chooses to treat the REO property "as is."

258.     Listing descriptions were tied to the REO home value that Altisource had determined: "Quality of listing should be parallel with quality/value of home/property…. the nicer/more expensive the home is the more detailed/long the description should be."

259.     Work might or might not be performed on Ocwen-serviced REO homes, depending on various factors in Altisource policies and procedures relating to the value attributed to the REO by Altisource.

260.     Code violations and life-safety issues might not be remediated or repaired by Altisource if the REO home was deemed "low value" or "as is" by Altisource.

261.     Code violations at REO properties could be closed without remediation in circumstances where asset management indicated the property was being treated "as-is" and a Hold Harmless Agreement would be obtained from the buyer, or because the management team otherwise approves closure.

262.     If Residential Sales Consultants determine a property is of "low value" or "as is," utilities could be turned off and kept off and all open work orders could be cancelled.

263.     High quality marketing photos are used only for REO homes deemed by Altisource to be valued over $100,000.

264.     Although digital, a smaller number of interior and exterior marketing photos are used for properties deemed by Altisource to be valued under $70,000.

265.     Ocwen and Altisource permitted more frequent and greater reductions in REO list and sales prices the lower assessed property values was,

266.     Valuation products that were used differed based on Altisource-assessed REO property values.

267.     The Ocwen-Altisource "Cash For Deed" sale program sold properties deemed valued at $50,000 or below directly to investors sourced by Altisource.

268.     Altisource's "High Value Asset" program for REO homes Altisource valued at over $500,000 required curb appeal and marketability activities and that utilities remain on.

269.     Ocwen-Altisource policies and contracts affirm a duty to increase the return on investment to the REO property owner.

270.     Ocwen and Altisource policies and procedures tying various practices to the assessed value of REO properties are uniformly applied across all United States locations.

23

271.    The responsibilities of companies in the United States housing industry such as banks and mortgage servicers include complying with the federal Fair Housing Act.

272.    The Deutsche Bank Defendants, as Trustee, issued Memoranda to its servicers concerning issues raised related to their servicing of REOs and informed its servicers, among other things, that the Deutsche Bank Defendants were required to comply with guidance from its regulators, including the Federal Reserve.

273.    The Federal Reserve issued guidance in June 2012 stating that the marketing and sale of REOs must comply with the Fair Housing Act, including, "an institution's marketing and sales strategies may not be based on the racial or ethnic composition of the geographies where the properties are located."

274.    Ocwen's 2011 Fair Lending Memorandum sent to all Ocwen employees and received by Jason Jastrzemski applies to all Ocwen services, describes and defines "Overt Discrimination," "Comparative Disparate Treatment," and "Disparate Impact."

275.    Ocwen's Fair Lending Program required an annual fair lending risk assessment to identify the fair lending laws and regulations applicable to Ocwen's operations and documentation of the key controls in place at Ocwen, there is no documentation indicating that this was done concerning Ocwen's pre and post foreclosure servicing activities at issue in this case.

276.    Jason Jastrzemski, Director of Mortgage Servicing Oversight, cannot confirm or recall that Ocwen performed a fair lending risk assessment relating to REO oversight.

277.    The 2011 Ocwen Fair Lending Memorandum required that both the Compliance Department and Internal Audit Department include fair lending considerations in their testing and audit plans where applicable in Ocwen's business model.

278.    Ocwen conducted Corporate Compliance and Third-Party Risk Management audits of Ocwen's oversight of Altisource.

279.    Fourteen of these audits, spanning the years 2014 through 2018, were produced in discovery. These audits do not reference "fair housing," "fair lending," "Fair Housing Act," "testing" for compliance in REO activities, "disparate impact" "discrimination," or other concepts addressed in the 2011 Ocwen Fair Lending Memorandum.

280.    Ocwen did not review Altisource's performance for Fair Housing Act compliance.

281.    Ocwen claimed to undertake a sampling and "quality assurance process" relating to Altisource, it did not undertake any review of Altisource valuation products that took into account the racial makeup of the neighborhood, testifying that: "in no way, shape or form is [the racial makeup of the neighborhood] a variable at all, in terms of any oversight, any review, anything."

24

282.     Ocwen did not undertake reviews or studies either internally or through consultants of the impacts that the conditions of the REOs it was servicing had on neighborhoods or surrounding communities.

283.     Ocwen did not measure through sampling or other means whether Altisource was maintaining REO properties consistently with their surrounding neighborhoods or communities.

284.     Ocwen did not know what Altisource variables were used in valuation products that took into account impacts on the surrounding community's market values, and Ocwen did not require Altisource to consider impacts on neighborhood market values when Altisource was conducting valuations.

285.     Ocwen did not perform any assessment with regard to the "last chance auction campaign" described in Business Requirements Documents and in its policies to determine whether there were disparate impacts on neighborhoods based on racial makeup.

286.     Ocwen did not provide training to employees involved in REO oversight with regard to the foreclosure crisis in the United States impacting communities of color, "because it was irrelevant.

287.     During the time period relevant to this litigation, Ocwen had the authority to terminate Altisource as a vendor.

288.     Ocwen did not terminate Altisource or decline to renew Altisource's contracts to perform property preservation work on REO properties.

289.     The numbers of REO properties owned by the Deutsche Bank Defendants, as Trustee, that were investigated by Plaintiffs increased between 2012 through 2016 (including in Milwaukee).

290.     Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (collectively referred to herein as "the Deutsche Bank Defendants") have acted as Trustees for thousands of Residential Mortgage-Backed Security ("RMBS") trusts holding millions of mortgages, with trust assets totaling hundreds of billions of dollars.

291.     The Deutsche Bank Defendants held legal title to certain Real Estate Owned ("REO") properties that that were inspected by Plaintiffs.

292.     Mortgage Servicers retained in connection with RMBS Trusts are not the owners of the REO properties, and there is no other legal owner of the properties than the Trustee.

293.     As the owner of REO properties in RMBS trusts, the Deutsche Bank Defendants receive hundreds of communications a month relating to the properties collectively, including communications relating to matters such as code violations, unpaid property taxes, health and safety conditions, unpaid utilities and complaints.

294.    The Deutsche Bank Defendants use "contract employees" hired through a temporary placement agency to carry out certain activities relating to REO properties that they own as Trustee.   These employees review, log, process and forward to Servicers correspondence received by the Deutsche Bank Defendants relating to code violations, litigation notices and other matters pertaining to the maintenance or marketing of REO properties owned by either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas.

295.    The general rights and obligations of parties to an RMBS Trust are stated in documents referred to as Governing Agreements.  The Governing Agreements follow a typical structure, although there are substantive variations.

296.    The Deutsche Bank Defendants do not have a set of criteria stating when discretionary powers they sometimes have under Governing Agreements should be exercised to terminate a Servicer or Master Servicer in default.

297.    Under the Governing Agreements, Servicers are required to manage, conserve, protect and operate REO properties.

298.    The conduct of Servicers and Master Servicers is required to comport with "Accepted Servicing Standards," which generally direct that the loans must be serviced in accord with the Governing Agreements and in the same manner in which the Servicer administers similar mortgage loans in its own portfolio, giving due consideration to the customary and usual standards of practice of prudent mortgage lenders and Loan Servicers administering similar mortgage loans.

299.    The Deutsche Bank Defendants are unaware of any documents that explain what the customary and usual standards or practices of prudent mortgage lenders and Loan Servicers are in administering similar mortgage loans.

300.    The Deutsche Bank Defendants do not maintain documents that describe standards for performance of the maintenance or marketing by parties designated as Servicers of the REO properties to which a Trustee held legal title.

301.    The Deutsche Bank Defendants do not have a policy that provides direct guidance or instructions to Servicers with regard to how they should remediate code violation complaints.

302.    If a complaint is received about a Trustee-owned REO property involving health or safety issues such as open sewage, the Deutsche Bank Defendants follow their normal practice of transmitting the complaint to the Servicer.

303.    In general, The Deutsche Bank Defendants' understanding of their role as RMBS trustees is that they do not have a duty to look out for the interests of the trust beneficiaries.

304.    The Deutsche Bank Defendants admit that they did not evaluate the physical condition of the REO properties to which they held legal title, as Trustee, during the years 2009 through 2018.

305.     The Deutsche Bank Defendants did not take any actions in response to the National Fair Housing Alliance reports alleging discriminatory maintenance and marketing of REO properties that were published in 2011, 2012 and 2014.

306.     During the years 2009 through 2018, the Trustees did not compare whether the preservation, maintenance, or marketing of REO properties in predominantly minority communities to which a Trustee held legal title under the terms of RMBS Trusts and/or Pooling and Servicing Agreements ("PSAs") were comparable to the preservation, maintenance or marketing of REO properties to which a Trustee held legal title under the terms of RMBS Trusts and/or PSAs in predominantly white communities.

307.     During the years 2009 through 2018, the Trustees did not request hat Defendant Ocwen regularly report to the Trustees, and Ocwen did not in fact report to the Trustees, as to whether code violations existing at REO properties owned by the Trustees under the terms of RMBS Trusts and/or PSAs had been cured.

308.     During the period 2010 through 2018 the Trustees did not request that Defendant Ocwen regularly report to the Trustees, and Ocwen did not in fact report to the Trustees, as to whether code violations existing at REO properties owned by the Trustees under the terms of RMBS Trusts and/or PSAs had been cured.

309.     The Deutsche Bank Defendants are unaware if they ever exercised their rights under provisions of certain Governing Agreements to examine Servicer documents or discuss servicing issues with officers of the Servicer.

310.     Under the Governing Agreements, the unremedied material failure of a Servicer or Master Servicer to perform its obligations, including its unremedied failure to comply with federal, state or local law, constitutes an event of default.

311.     Under certain RMBS Trusts in which the properties inspected by Plaintiffs were held, actions available to the Trustee with regard to Servicer or Master Servicer events of default or potential events of default included the following:
   a) Notifying a Servicer or Master Servicer in default, identifying the occurrence of an event of default and demanding that it be cured within a specified time period.
   b) Notifying Certificateholders that an event of default has occurred and advise them of their rights.
   c) Notifying rating agencies for the Servicer or Master Servicer that an event of default has occurred.
   d) Sending an "Informational Notice" to Certificateholders advising them of a potential event of default.
   e) Retaining outside expert assistance to advise the Trustee regarding alleged events of default.
   f) Retaining independent counsel to advise the Trustee regarding alleged events of default and potential courses of action.

    g) Proceeding to terminate a Servicer or Master Servicer known by the Trustee to be in default, subject to any other applicable conditions.

    h) Proceeding to terminate a Servicer or Master Servicer in default, acting with the consent or pursuant to direction of other deal parties.

312.    The DB Defendants have never sought the consent or participation of other parties to the Governing Agreements with regard to terminating Ocwen for failing to maintain or market REO properties in a racially non-discriminatory

313.    During the period 2009 through 2018, the Deutsche Bank Defendants did not evaluate whether Ocwen should be terminated as a Servicer based on the quality of the property preservation and maintenance work Ocwen performed at REO properties owned by the Trustees under the terms of RMBS Trusts and/or PSAs.

314.    DBNFHA300612-14 is a memorandum dated October 8, 2010, sent by Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to all Securitization Loan Servicers. The October 8, 2010 memo raises an "urgent issue" and: (a) "expresses the Trustee's serious concern regarding allegations of potential defects in foreclosure practices, procedures and/or documentation . . ."; (b) "reiterates to all Servicers the importance of their duties and obligations relating to such matters (emphasis in original); and (c) directs that "[a]s the Trustee has advised on more than one occasion, all Servicers and their agents . . . must conduct all servicing activities, including foreclosure proceedings, in accordance with the Governing Documents and all applicable laws." (DBNFHA300612-13, emphasis in original) The October 8, 2010 memo to the Servicers further states that "the Trustee demands that each Servicer (including its agents) immediately: Inform that Trustee of: (i) any Alleged Foreclosure deficiencies relating to mortgage loans serviced by the Servicer on behalf of the Trust . . .; Cease and desist from taking any unlawful or improper action with respect to the servicing of Trust assets …; and Require each of its agents to comply with the foregoing demands and all legal requirements applicable to any services that they perform on behalf of the Trusts." (DBNFHA300613, emphasis in original)

315.    DBNFHA300611-14 is a notification dated October 25, 2010, sent by Deutsche Bank National Trust Company and Deutsche Bank Americas to all holders of RMBS securities for which Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas served as trustee. The notification states that the Trustees had communicated with all loan servicers for U.S. residential mortgage-backed securities trusts "demanding that servicers comply with all applicable laws relating to foreclosures" and requested additional information from certain loan servicers who had announced suspensions of foreclosure activity to alleged deficiencies. (DBNFHA 300611)

316.    DBNFHA300619-20, is a memorandum dated August 30, 2007, sent by Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to all Securitization Loan Servicers. The memo requests, inter alia, that the Servicers: (a) "Exercise diligence to assure that all foreclosures and actions with respect to REO properties . . . are conducted in compliance with all federal, state and local rules and regulations . . ." (DBNFHA300619); " (b) "Consider developing working relationships with local housing officials and community

organizations to address public concerns regarding foreclosure and eviction proceedings that might otherwise lead to public responses that might impede the realization of value on the Trusts' mortgage loans and REO properties . . ." ( DBNFHA300619-20) ; and (c) "To the extent permitted by applicable securitization documents, exercise sound discretion in evaluating whether or not eviction of tenants otherwise lawfully occupying Trust REO properties will maximize the realization of value on Trust assets;  . . . maintaining occupancy may preserve the affected neighborhoods and thereby support the value of REO property . . ."  (DBNFHA300620)

317.    DBNFHA300615-18, is a memorandum dated July 28, 2008, sent by Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to Securitization Loan Servicers.  The memo "focuses on certain issues relating to servicing practices that have come to the attention of the trustee" and states, inter alia, that:  (i) " . . .servicers must exercise diligence to assure that they conduct all foreclosures and other actions with respect to REO properties . . . in compliance with all federal, state, and local laws, rules, regulations and court procedures (DBNFHA300615, emphasis in original) ;"  (ii) "Servicers must ensure that loss mitigation personnel and professionals engaged by servicers . . . understand the mechanics of the relevant securitization transactions, and related custodial practices, in sufficient detail to address . . . questions in a timely and accurate manner;" (DBNFHA300616, emphasis in original); and (iii) "The Trustee urges servicers to stay abreast of and, where appropriate, participate in, governmental policy discussions and rule-making processes that may affect servicing activities. . . . In addition, the Trustee urges servicers to exercise diligence and, where appropriate, involve or cooperate with law enforcement agencies regarding a variety of unethical and, in some cases, illegal real estate transaction schemes targeting distressed borrowers.  In particular, servicers should be on the lookout for third parties who . . .seek private data concerning borrowers . . . [or] purport to act based on an asserted affiliation or association with the servicer, the Trustee or the Trusts."  ( DBNFHA300617).

318.    The July 28, 2010 memo sent by the Deutsche Bank Defendants to the Securitization Loan Servicers, DBNFHA300615-18, also specifically addressed certain REO Maintenance issues, stating:  "The Trustee has received a number of inquiries and complaints from government officials and community groups about the physical condition of REO properties.  Such inquiries and complaints also are receiving increasing attention from the media, law enforcement agencies, and courts.  Under standard securitization documentation, loan servicers are expressly responsible for managing all aspects of the REO disposition process, including appropriate maintenance of REO properties.  Failure to fulfill these responsibilities may expose the Trusts to financial losses, potentially depressing the value of Trust property and exposing the Trusts to legal and financial liability.   Because title to REO properties typically includes the name of the Trustee institution, these failures also expose the Trustee to legal claims and reputational harm.  To protect against such consequences, which are likely to give rise to indemnification claims against servicers, the Trustee urges servicers to exercise heightened diligence with respect to REO maintenance and disposition.  In addition, we urge Servicers to engage property managers who will take proactive steps to protect REO properties, including when they are vacant for extended periods of time."  (DBNFHA300617, emphasis in original)"

319.    The Deutsche Bank Defendants did not receive from Ocwen a written response to the memos sent by the Deutsche Bank Defendants to Servicers collected in Pls 56.1 PDB Ex. 17.

320.    After the memos to the Servicers collected in PDB Ex. 17 were sent out, the Deutsche Bank Defendants did not monitor whether the Servicers had taken actions to address the REO issues noted, and the Deutsche Bank Defendants continued their usual process of transmitting REO matters to the Servicers.  The Deutsche Bank Defendants have never sent out memos to servicers raising concerns over issues of unlawful discrimination in connection with the maintenance and marketing of REO properties.

321.    In some cities where the Deutsche Bank Defendants owned REO properties as Trustee, including Milwaukee, Chicago, Cincinnati, Boston, Los Angeles and New Haven, the Deutsche Bank Defendants asked Servicers to attend meetings regarding foreclosures and/or REO property conditions with municipal officials and Loan Servicers, set up the meetings and attended the meetings.  Some of these meetings were attended by representatives of Ocwen.

322.    The Governing Agreements set out various duties, obligations and authority of the parties thereto. Pls 56.1 PDB Ex. 14, Summary of Trustee-Servicer Provisions, provides citations to certain duties, obligations and authority of Trustee, Servicer and Master Servicer parties reflected in a set of 100 of the Governing Agreements produced in discovery by the Deutsche Bank Defendants. Pls 56.1 PDB Ex. 15, Examples of Governing Agreements Language, provides some examples of language contained in this set of Governing Agreements relating to the duties, obligations and authority of Trustee, Servicer and Master Servicer parties. (Bradtke Declaration, ¶9)

323.    While there is some variation in provisions of the Governing Agreements produced by the Deutsche Bank Defendants, examples of the rights, duties of obligations of the parties under particular Governing Agreements include the following:
   a) The Servicer/Master Servicer services loans on behalf of or for the benefit of the Trustee and Certificateholders.: DBNFHA84184: "The Master Servicer shall service and administer the Mortgage Loans on behalf of the Trustee . . ."; DBNFHA9309: "The Master Servicer shall service and administer the Mortgage Loans on behalf of the Trustee  . . ."; DBNFHA41842: "in those instances where [the Master Servicer] is taking action in the name of Trustee, [the Master Servicer shall be] deemed to be the agent of the Trustee on behalf of the Trust Fund."
   b) The Servicer/Master Servicer maintains mortgage files and funds for the benefit of the Trustee:  DBNFHA5668: "All Mortgage Files and funds collected or held by, or under the control of, the Master Servicer . . . shall be held by the Master Servicer for and on behalf of the Trustee and the Certificateholders and shall be and remain the sole and exclusive property of the Trustee . . ."; DBNFHA252: "the Servicer is holding the Mortgage File in trust for the Trustee . . ."; DBNFHA118535:  "All Mortgage Files and funds collected or held by, or under the Control of the Servicer . . . shall be held by the Servicer for and on behalf of the Trustee and shall be and remain the sole and exclusive property of the Trustee . . ."
   c) The Servicer/Master Servicer manages, conserves, protects and/or operates REO property on behalf of Trust/Trustee. PDB Ex. 14, Column L; E.g., PDB Exs.1, 15, Row 6, DBNFHA 33109:  "The Servicer shall manage, conserve, protect and

30

operate each REO Property for the Trustee solely for the purpose of its prompt disposition and sale"; DBNFHA51531: "The Servicer shall manage, conserve, protect and operate each REO Property for the Trustee solely for the purpose of its prompt disposition and sale"; DBNFHA98238: "Each Servicer shall manage, conserve, protect and operate each related REO Property for the Trustee solely for the purpose of its prompt disposition and sale."

d) The Servicer/Master Servicer markets, sells and transfers REO properties on behalf of the Trustee. Pls 56.1 PDB Ex. 14, Row 9; E.g., PDB Exs.1, 15, Column I, DBNFHA52767: "The Servicer shall use its best efforts to dispose of the REO Property as soon as possible (subject to the Trustee's right to veto any proposed sale of the REO Property) and shall sell such REO Property in any event within three years after title has been taken . . ."; DBFNHA95871: "Each Servicer shall attempt to sell [the REO Property] . . .on such terms and conditions as such Servicer deems to be in the best interest of the Trustee"; DBNFHA20641: "the Master Servicer . . . is hereby authorized and empowered by the Trustee . . . to market, sell and transfer title of REO properties held in the name of the Trust Fund to third party purchasers..."

e) The Servicer/Master Servicer institutes foreclosure proceedings on behalf of the Trust/Trustee. Pls 56.1 PDB Ex. 14, Column Z; E.g., Pls 56.1 PDB Exs. 1, 15, Row 20, DBNFHA20641: "The Master Servicer . . . is hereby authorized and empowered by the Trustee . . . to institute foreclosure proceedings . . . "; DBNFHA51529: "The Servicer shall use reasonable efforts to realize upon such defaulted Mortgage Loans in such manner as will maximize the receipt of principal and interest by the Trustee, taking into account, among other things, the timing of foreclosure proceedings"; DBNFHA3179: "The Master Servicer shall . . . have full power and authority . . . to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any Mortgage Loan . . ."

f) The Servicer/Master Servicer is required to report to the Trustee regarding the status of REO properties. PDB Ex. 14, Column AJ; E.g., PDB Exs. 1, 15, Row 30, DBNFHA 33109: "The Servicer shall notify the Trustee from time to time as to the status of each REO Property"; DBNFHA32945: "The Servicer shall notify the Trustee from time to time as to the status of each REO Property";" DBNFHA79722: "The Servicer shall notify the Trustee from time to time as to the status of each REO property."

g) The Servicer/Master Servicer follows the Trustee's directions or otherwise act in the best Interests of the Trustee/Trust as to Environmental Issues Affecting Defaulted Properties. PDB Ex.14, Column AD; E.g., PDB Exs.1, 15, Row 24, DBNFHA102102: "With respect to any Mortgage Loan as to which the Servicer . . . has received notice of, or has actual knowledge of, the presence of any toxic or hazardous substance on the Mortgaged Property, the Servicer shall promptly notify the Trustee, and shall act in accordance with any such directions and instructions provided by the Trustee"; DBNFHA102667: "With respect to any Mortgage Loan as to which the Servicer . . . has received notice of, or has actual knowledge of, the presence of any toxic or hazardous substance on the Mortgaged Property, the Servicer shall promptly notify the Trustee, and shall act in accordance with any such directions and instructions provided by the Trustee";

DBNFHA27754: "If the Servicer determines . . . that it is in the best economic interest of the Trust Fund to take such actions are necessary to bring any such Mortgaged Property into compliance with applicable environmental laws . . . then the Servicer shall take such action as it deems to be in the best economic interest of the Trust Fund."

h) The Servicer/Master Servicer take a deeds for foreclosed properties as issued/held in the name of the Trustee/Trust. Pls 56.1 PDB Ex. 14, Column AB; E.g., Pls 56.1 PDB Exs. 1, 15, Row 22, DBNFHA85462: "The deed or certificate of sale of any REO Property shall be taken in the name of the Trustee, or its nominee, on behalf of the Trust;" DBNFHA94928: "each servicer . . . is hereby authorized and empowered by the Trustee . . . to hold or cause to be held title to such properties, on behalf of the Trustee."; DBNFHA7082: "In the event that title to a Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Trustee, on behalf of the Certificateholders and the Guarantor . . ."

i) The Servicer/Master Servicer establishes and maintains a Collection Account/REO Account in the name of/on behalf of Trustee/Trust. PDB Ex. 14, Column V; E.g., Pls 56.1 PDB Exs. 1, 15, Row 16, DBNFHA27746: "On behalf of the Trust Fund, the Servicer shall establish and maintain . . . one or more accounts (such account or accounts, the "Collection Account"), held in trust for the benefit of the Trustee and the Certificateholders"; DBNFHA32936: "On behalf of the Trustee, the Servicer shall establish and maintain, or cause to be established or maintained, one or more segregated Eligible Accounts (each such account or accounts, a 'Collection Account'), held in trust for the benefit of the Trustee."; DBNFHA61174: "On behalf of the Trustee, the Servicer shall establish and maintain, or cause to be established or maintained, one or more segregated Eligible Accounts (such account or accounts, the "Collection Account"), held in trust for the benefit of the Trustee."

j) The Servicer/Master Servicer notifies the Trustee of claims and prosecutes and defends related claims on behalf of the Trust/Trustee. PDB Ex. 14, Column Y; E.g., Pls 56.1 PDB Exs. 1, 15, Row 19, DBNFHA20641: "The Master Servicer . . . is hereby authorized and empowered by the Trustee . . . to bring or respond to civil actions or complaints . . . "; DBNFHA27523: "The Servicer shall immediately notify the Trustee . . . if a claim is made that may result in such claims, losses, penalties, fines, forfeitures, legal fees or related costs, judgments or any other costs, fees and expenses . . ."; DBNFHA7071: "The Master Servicer shall give prompt notice to the Trustee . . . of any action of which the Master Servicer has actual knowledge, to . . . assert a claim against the Trust Fund . . ."

k) The Servicer/Master Servicer files tax reports/furnishes tax information to/on behalf of the Trustee or other parties. PDB Ex. 14, Column AO; E.g., Pls 56.1 PDB Exs. 1, 15, Row 35, DBNFHA118575: "the Servicer covenants and agrees that it shall act as agent (and the Servicer is hereby appointed to act as agent) on behalf of each such REMIC and . . . in such capacity it shall . . . prepare and file . . . a U.S. Real Estate Mortgage Investment Conduit Income Tax Return . . ."; DBFNHA:86096: "The Servicer shall file information returns with respect to the receipt of mortgage interest, reports of foreclosures and abandonments of any

Mortgaged Property and cancellation of indebtedness income . . . as required by Sections 6050H, 6050J and 6050P of the Code, respectively"; DBNFHA116197: "[t]he Master Servicer covenants and agrees that it shall act as agent (and the Master Servicer is hereby appointed to act as agent) on behalf of each such REMIC and that in such capacity it shall . . . prepare and file . . . a U.S. Real Estate Mortgage Investment Conduit Income Tax Return . . ."

l) The Servicer/Master Servicer is required to permit the Trustee to inspect servicer operations and servicing documents, and interview servicer officers and employees. Pls 56.1 PDB Ex. 14, Column AQ; E.g., Pls 56.1 PDB Exs. 1, 15, Row 37, DBNFHA81977: "The Servicer shall afford . . . the Trustee, upon reasonable notice, during normal business hours, access to all records maintained by the Servicer (and any such Sub-Servicer) in respect of the Servicer's rights and obligations hereunder and access to officers of the Servicer . . . responsible for such obligations"; DBNFHA80054: "Each Servicer agrees that on reasonable prior notice, it will permit any representative of the . . . Trustee during such Servicer's normal business hours, to examine all books of account, records, reports and other papers of such Servicer relating to the Mortgage Loans, . . . and to discuss its affairs, finances and accounts relating to the Mortgage Loans with its officers, employees and independent public accountants . . ."; DBNFHA121014: "The Servicer shall afford the Company and the Trustee, upon reasonable notice, during normal business hours access to all records maintained by the Servicer, in respect of the Mortgage Loans and in respect of its rights and obligations hereunder and access to such of its officers as are responsible for such obligations."

324. Provisions of the Governing Agreements for GSAMP Trust 2005-WMC3 authorized the Trustee to veto a proposed sale of an REO property. DBNFHA52767: "The Servicer shall use its best efforts to dispose of the REO Property as soon as possible (subject to the Trustee's right to veto any proposed sale of the REO Property) and shall sell such REO Property in any event within three years after title has been taken to such REO property. . ."

325. The provisions of the Governing Agreements for NovaStar Mortgage Funding Trust, Series 2006-5, require the Servicer to consult with the Deutsche Bank Defendants and follow their instructions with regard to the handling of properties that may be foreclosed upon that are affected by environmental issues. DBNFHA102102: "With respect to any Mortgage Loan as to which the Servicer . . . has received notice of, or has actual knowledge of, the presence of any toxic or hazardous substance on the Mortgaged Property, the Servicer shall promptly notify the Trustee, and shall act in accordance with any such directions and instructions provided by the Trustee".

326. The Deutsche Bank Defendants communicated with Servicers, including Ocwen, regarding the status of REO properties, the steps being taken to remediate code violations and/or priorities for taking remedial actions. Examples of such communications are:

a) ASI 49987, includes an email from Ronaldo Reyes (Deutsche Bank) to Michael Yaniello (Ocwen) and Victoria Vazquez (Ocwen), dated May 16, 2014, discussing 27 violations noted by Milwaukee's Department of Neighborhood Services and

indicating that "DB needs to know:   1. What steps Ocwen is taking to resolve these violations?  2.  What is the property's status:  charge-off, foreclosure or reo.  3.  Who at Ocwen and when will Ocwen be calling DNS to discuss next steps regarding the property?  This needs to be done by next week.  I can be on the call if you need me to be."

b) ASI49992, is an email from Melinda Pilcher (Deutsche Bank) to Victoria Vasquez (Ocwen), dated May 15, 2014, regarding a "Milwaukee Property Registration/Violation report" and stating:  "The list of Ocwen properties are at the bottom of this email.  Please have your team provide me with an update as soon as possible."

c) ASI 49994, includes an email from Melinda Pilcher (Deutsche Bank) to Abigail McCutcheon (Altisource), cc'ed to Victoria Vasquez (Ocwen), dated May 15, 2014, and stating in part:  "On 05/06/14 I sent Victoria a monthly report from the City of Milwaukee regarding properties that either needed to be registered or has [sic.] outstanding violations.  Can you verify if you received this report and provide an update for the following properties?"

d) ASI 49989 is an email from Melinda Pilcher (Deutsche Bank) to Victoria Vasquez (Ocwen), dated May  16, 2014, advising that she was directed by Ronaldo Reyes to send an email to all Servicers "making each servicer aware of the severity of this [sic.] issues," referring to violations at vacant REO properties in Milwaukee.

e) DBNFHA186807 is an email from Luz Meda (Deutsche Bank) to Victoria Vasquez (Ocwen), dated June 13, 2016, stating: "Please see the attached violations /notices/statements and address accordingly."

f) ASI49993 includes an email from Melinda Pilcher (Deutsche Bank) to Victoria Vasquez (Ocwen), dated May 15, 2014, referencing the preparation of a report for the City of Milwaukee with regard to REO properties and asking: "How were you handling this before with Melissa?"

g) ASI 49990, includes an email from Melinda Pilcher (Deutsche Bank)  to Victoria Vasquez (Ocwen), dated May 16, 2014, regarding the Mayor of d and Commissioner of the Department of Neighborhood Services, Arthur Dahlberg, "putt[ing] together a package of information about vacant properties, some that have had foreclosure action taken back as far as 7 years ago and are now vacant and not registered with the City.   Some of these may show Deutsche Bank as the trustee and you as the servicer." The email then requests that Ocwen "please follow up with your team to verify they have taken a look at it and complete the necessary steps to make sure these properties are in compliance as a priority."

h) The Deutsche Bank Defendants sometimes communicated with Ocwen about and had input with regard to repairing code violations and approval of the costs of repairing the code violations.

i) The Deutsche Bank Defendants communicated with Servicer employees regarding inquiries the Deutsche Bank Defendants received from prospective purchasers of Deutsche Bank REO properties and requested them to respond to the inquiries.  (Yanniello Dep. 43-45; Emails to Prospective Purchaser, DBNFHA194427-28, DBNFHA194432-33)

34

327.    The Deutsche Bank Defendants' standard Tender of Defense and Indemnity form (PDB Ex. 20, DBNFHA121758-61) transmitted to Servicers states that "The PSA governs your obligations in this matter.  If you determine that some different course of action is preferable in the Action, you must discuss the proposed course of action with the Trustee and obtain the Trustee's written waiver/consent."  (DBNFHA121761)

328.    Pursuant to the Governing Agreements, the Deutsche Bank Defendants provided Servicers and Master Servicers for RMBS Trusts with limited powers of attorney authorizing certain activities to be taken on their behalf, as reflected in the following examples:  HBO602, DBNFHA61167:  "the Trustee hereby grants to the Servicer . . .a power of attorney to carry out [servicing and administrative] duties including a power of attorney to take title to Mortgaged Properties after foreclosure on behalf of the Trustee"; Governing Agreement AQ0301, DBNFHA7523:  "the Trustee, on behalf of the Trust Fund, hereby grants to the Master Servicer a power of attorney to execute and deliver all documents necessary to carry out any and all servicing duties . . . (including the taking of and transferring title of REO Properties to third parties held in the name of the Trustee for the benefit of the Trust)"; Governing Agreement DC04M1, DBNFHA31078:  "the Trustee hereby grants to the Servicer . . .a power of attorney to carry out [servicing and administrative] duties including a power of attorney to take title to Mortgaged Properties after foreclosure on behalf of the Trustee")

329.    DBNFHA 194442-44 is a Limited Power of Attorney executed by Deutsche Bank National Trust Company, as Trustee of an RMBS trust, which authorizes the Servicer (Ocwen) to act as "the Trustee's true and lawful Attorney-in-Fact, [to act] in the Trustee's name, place and stead and for the Trustee's benefit" in connection with various transactions," including, "the full enforcement of and preservation of  the Trustee's interests in the Mortgage Notes, Mortgages or Deeds of Trust, and in the proceeds thereof, by way of, including but not limited to foreclosure . . ."  and the other matters summarized below:

     a)  the modification or recording of a mortgage or deed of trust; the subordination of the lien of a mortgage or deed of trust to an easement in favor of a public utility or government agency; the conveyance of properties to a mortgage insurer or the closing of the title to the property to be acquired as real estate owned; the completion of loan assumption agreements; the full satisfaction/release of a mortgage or deed or full conveyance upon payment and discharge of all sums secured thereby; the assignment of any mortgage or deed of trust and the related mortgage note in connection with the repurchase of the mortgage loan secured and evidenced thereby; the full assignment of a mortgage or deed of trust upon payment and discharge of all sums secured thereby in conjunction with the refinancing thereof, including the assignment of the related mortgage note; the full enforcement of and preservation of the Trustee's interests in the mortgage notes, mortgages or deeds of trust, and in the proceeds thereof, including by foreclosure; the taking of a deed in lieu of foreclosure; the prosecution of eviction actions, and the pursuit of title insurance, hazard insurance and claims in bankruptcy proceedings; the substitution of a trustee serving under a deed of trust in accordance with state law and the deed of trust; the preparation and issuance of statements of breach or non-performance; the preparation and filing of notices of default and/or notices of sale; the cancellation/recission of notices of default

and/or notices of sale; the taking of a deed in lieu of foreclosure; the filing, prosecution and defense of claims and appearances on behalf of the Trustee in bankruptcy cases affecting mortgages, mortgage notes or deeds of trust; the preparation and service of notices to quit and all other documents necessary to initiate, prosecute and complete eviction actions or proceedings; the tendering, filing, prosecution and defense of hazard insurance and title insurance claims; the preparation and execution of such other documents and performance of such other actions as may be necessary under the terms of the mortgage, deed of trust or state law to expeditiously complete various transactions; the execution of listing agreements; the execution of purchase and sale agreements; the execution of grant/warranty/quit claim deeds or any other deed causing the transfer of title to the property; the execution of escrow instructions; the execution of any and all documents necessary to effect the transfer a property; and the modification or amendment of escrow agreements established for repairs to a mortgaged property or reserves for replacement of personal property.

330.    The August 2014 HUD Charge filed by Plaintiffs regarding the maintenance and marketing of Deutsche Bank REO properties alleged that Plaintiffs were challenging a "systemic and particularized practice of engaging in differential treatment in maintaining and/or marketing REO properties on the basis of race, color and/or national origin."

331.    Many Governing Agreements produced by the Deutsche Bank Defendants refer to a party as a "Master Servicer," although that party is directly tasked with the basic servicing activities for the trust and no Servicer is named within that agreement:  E.g., Governing Agreement RF02Q6, DBNFHA104074, "Master Servicer to act as Servicer.  The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement . . ."; Governing Agreement AQ04R3, DBNFHA10730 , "The Master Servicer shall service and administer the Mortgage Loans on behalf of the Trustee and in the best interests of and for the benefit of the Certificateholders . . ."; Governing Agreement NC0502, DBNFHA100794, "The Master Servicer shall service and administer the Mortgage Loans on behalf of the Trust Estate and in the best interests of and for the benefit of the Noteholders."

332.    Under the terms of some Governing Agreements, a party referred to as a "Master Servicer" is tasked with responsibilities related to monitoring the Servicer.  E.g., Governing Agreement UBO6S2, DBNFHA118945:  "The Master Servicer shall be responsible for reporting to the Trustee . . . the compliance by each Servicer with its respective duties under the related Servicing Agreement."

333.    Under some of the RMBS Trusts in which the properties inspected by Plaintiffs were held and there was a functional Master Servicer party, the Trustee can take actions in the event of an uncured event of default or potential event of default that include the following:
   a)   Sending a notice to the Master Servicer identifying the occurrence of a Master Servicer event of default and demanding that it be cured within a specified time period.
   b)   Sending a notice to the Certificateholders informing them that a Master Servicer event of default has occurred and advising them of their rights.

c) Sending a notice to rating agencies for the Master Servicer informing the ratings agencies that a default has occurred. (Ps 56.1 PDB Ex. 12, Summary of Governing Agreement Provisions Regarding Material Breach, Column H; Rule 30(b)(6) Dep. of DB Defendants, PSA Obligations, 150-1)

d) Sending an "Informational Notice" to Certificateholders advising them of a potential Event of Default on the part of the Master Servicer.

e) Retaining outside expert assistance to advise the Trustee regarding alleged events of Master Servicer default.

f) Retaining independent counsel to advise the Trustee regarding alleged Master Servicer events of default and potential courses of action.

g) Proceeding to terminate a Master Servicer known by the Trustee to be in default, subject to any other applicable conditions.

h) Proceeding to terminate a Master Servicer in default, acting with the consent or pursuant to direction of other deal parties.

334. In some Governing agreements where a Master Servicer with monitoring responsibilities is a party, the Governing Agreements may provide the Trustee with authority to take actions directly affecting the Servicer's conduct, including the following situations: (a) a Trustee possessing authority to terminate a Servicer in default based on provisions granting such authority where the corporate affiliation of that Servicer is the same as the Master Servicer and (b) a Trustee possessing authority to serve notices of events of default directly to the Servicer notwithstanding the Master Servicer's presence.

335. As to each of the Ocwen-serviced properties identified in columns F and G of Defendants' Ex. A to the Rademacher Declaration, (Ocwen-serviced properties held in trusts with a Master Servicer party with monitoring responsibilities), the Trustees had available options and actions they could take in response to Master Servicer events of default or potential events of default, including providing the Master Servicer with a notice of a Master Servicer event of default, terminating the Master Servicer, providing notices of default to rating agencies and providing informational notices to Certificateholders).

336. Under various Governing Agreements relating to the Ocwen-serviced properties identified in Columns F and G of Defendants' Ex. A to the Rademacher Declaration (properties held in trust with Master Servicer party with monitoring responsibilities), the Governing Agreements provide the Trustee with authority to take direct action in response to a Servicer event of default, e.g., serving notice of default on the Servicer)

337. The Deutsche Bank Defendants sent the memos collected in Pls 56.1 PDB Ex. 17 to all Securitization Loan Servicers who serviced loans on behalf of an RMBS Trust for which a Deutsche Bank Defendant acted as Trustee and made no distinction between sending them to Loan Securitization Servicers for RMBS Trusts without Master Servicers as opposed to Loan Securitization Servicers for RMBS Trusts with Master Servicers.

338. The Deutsche Bank Defendants executed powers of attorney running in favor of the Servicers for RMBS Trusts as to which a Deutsche Bank Defendant acted as Trustee, regardless of whether a Master Servicer was a party to the transaction. (E.g., DBNFHA296884-

37

92 (power of attorney executed by DBNTC in favor of Ocwen for properties held in Trust with Master Servicer party).

339.    Under the Governing Agreements, if a Master Servicer with responsibilities related to monitoring Servicer activities is terminated, the Trustee is generally authorized to act as the successor Master Servicer and/or to take steps to appoint a successor Master Servicer.

340.    On at least one occasion, a Deutsche Bank Trustee Defendant "acted as servicer" for an RMBS Trust after the entity previously acting as Servicer ceased acting in that capacity.

341.    Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas have each acted as Trustee for RMBS transactions.  Whether one entity or the other acts as the named Trustee for a particular transaction depends on client preference:  some clients may want a national banking association for their structure, whereas others may want a New York State Banking corporation.

342.    The day-to-day RMBS trustee operational duties under the Governing Agreements to which either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas was a party were carried out by Deutsche Bank National Company.

343.    Whether Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas acted as the Trustee under a particular Governing Agreement, the same policies, practices and documents were utilized on behalf of the named Trustee to carry out day-to-day duties.

344.    Correspondence relating to code violations, litigation notices and other matters pertaining to the maintenance or marketing of REO properties owned by either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas were processed and forwarded to servicers by Deutsche Bank National Trust Company employees pursuant to the same procedures and under the supervision of the same manager.  Violations at properties owned by either Trustee were maintained on the spreadsheets kept by Deutsche Bank National Trust Company employees.

345.    Memoranda and notices sent to Servicers and Holders regarding foreclosures and REO conditions were transmitted over the name of both Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas.

346.    The goal of maximizing the return of principal and interest on defaulted loans to investors is a general servicer obligation under the Governing Agreements.

347.    On occasion, a Deutsche Bank representative attended meetings with municipal officials and/or community groups with regard to issues related to foreclosures or REO properties.  On occasion, an Ocwen representative attended such meetings.

# Exhibit 17

*Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 CV 839 (N.D. Ill.)

## DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED UNCONTESTED FACTS AND DEFENDANTS' PROPOSED UNCONTESTED FACTS

Uncontested Facts.  The following facts are not contested or have been agreed to or stipulated to by the parties:  Plaintiffs' Proposed Uncontested Fact Nos. 1, 12, 14, 16, 18, 20, 22, 24, 27, 29, 32, 34, 37, 39, 41, 43, 45, 47, 49, and 52.

Uncontested Facts—Subject to Sufficient Clarification.  The following facts are not contested in theory; however, Defendants request further discussion in order to correct them factually: Plaintiffs' Proposed Uncontested Fact Nos. 4–11, 13, 15, 17, 19, 21, 23, 25–26, 28, 30–31, 33, 35–36, 38, 40, 42, 44, 46, 48, 50–51, and 53.

Contested Facts:  The following facts are contested for being either irrelevant, argumentative, or outside of the scope of the litigation:  Plaintiffs' Proposed Uncontested Fact Nos. 2, 3, and 54–347.

Additional Proposed Uncontested Facts.  The Defendants' proposed uncontested facts are listed below:

1. Defendant Deutsche Bank National Trust ("DBNTC") is a national banking association organized and existing under the laws of the United States to carry on the business of a limited purpose trust company, and Defendant Deutsche Bank Trust Company Americas ("DBTCA", together with DBNTC, the "Deutsche Bank Trustees") is a New York State chartered banking corporation, organized and existing under the laws of the State of New York.  Deutsche Bank Trustees act as trustees for residential mortgage-backed securitization trusts, and in those capacities, hold legal title on behalf of certain residential mortgage-backed securitization trusts to certain properties that are maintained and serviced by mortgage loan servicers.

2. Ocwen Loan Servicing, LLC n/k/a Onity Group ("Ocwen") is one of the largest servicers in the country, focused on delivering a variety of servicing and lending programs.

3. Altisource Solutions, Inc. ("Altisource") is an integrated service provider and marketplace for the real estate and mortgage industries.

4. Ocwen and Altisource contracted with national Government Sponsored Enterprises.

5. A residential mortgage-backed securities ("RMBS") transaction involves pooling residential mortgage loans and selling to investors interests in the cash flows generated by the pool of loans.

6. Residential mortgage loan servicing is a highly specialized and heavily regulated industry requiring specific skills, systems, and licensing.

7. In an RMBS transaction, after originators make mortgage loans to borrowers, loans are conveyed to a sponsor, who bundles the loans into a pool.

8. The depositor then conveys the loan pool to the trust in exchange for securities; the depositor sells the certificates to investors, entitling certificate holders to a share of payments received on the loan pool.

9. Sponsors select and engage trustees based upon the trustee's experience in acting as a corporate trustee for RMBS transactions, after designating other deal parties, including the servicer, and determining the legal and economic structure of the transaction.

10. Servicers, who are selected by sponsors, maintain the day-to-day relationships with borrowers on the loans in the trust, collect loan payments, and enforce the terms of the loan documents.

11. Sponsors may also engage master servicers who monitor, oversee, and enforce the servicers' performance and ensure that each servicer complies with its contractual servicing obligations.

12. Each of the trusts at issue here is governed by a Pooling & Servicing Agreement, Trust Agreement, Indenture, or similar contract (collectively, the "Governing Agreements") that set forth the rights and obligations of the trustee or indenture trustee and other transaction participants.

13. Plaintiffs investigated REO properties; in connection with Plaintiffs' inspection of REO properties in this action, Plaintiffs sought to determine whether Defendants maintained REO properties differently in majority minority neighborhoods than in predominantly white neighborhoods by assessing "1,141 properties [purportedly] owned by the Deutsche Bank defendants," which Plaintiffs later increased to about 1,276 properties.

14. Defendants were not aware, at the relevant time, that Plaintiffs were investigating REO properties owned by the Deutsche Bank Trustees and serviced by Ocwen and Altisource.

15. Plaintiffs collected data on Defendants' maintenance of REO properties from 2011 to 2018 through on-site inspections of REOs purportedly owned by the Deutsche Bank Trustees.

16. Of those 560 Deutsche Bank-titled properties serviced by Ocwen and Altisource, 366 were inspected on or after February 14, 2015.

17. All but one of the properties identified by Ian Ayres as owned by Deutsche Bank at the time of inspection and agreed to as serviced by Ocwen and Altisource were inspected prior to 2017. One property was inspected on May 9, 2018.

18. Public-record checks and Plaintiffs' own subsequent acknowledgments identified a subset of properties in Plaintiffs' database that were not held in trusts for which the Deutsche Bank Trustees served as trustee at the time of inspection.

19. Plaintiffs classified a zip code as predominantly white or non-white if it was composed of at least 50.1% of that demographic.

20. Plaintiffs designed their investigation to concentrate on geographic areas with high foreclosure rates.

21. Plaintiffs did not take a random sample of REO properties.

22. In selecting properties for inclusion in the investigation, Plaintiffs did not evaluate block-group-level homeownership rates, income levels, average home value, average age of homes, or crime rate.

23. Plaintiffs engaged on-site inspectors to evaluate REO properties based on a scoring checklist that Plaintiffs developed.

24. Plaintiffs' inspectors were aware that the subject of the investigation involved maintenance of REO properties.

25. Plaintiffs' on-site inspection consisted of recording the address, observing the property, taking photos to substantiate what was observed, and recording deficiencies observed at the property, usually on paper inspection forms.

26. Plaintiffs did not inspect properties if maintenance was ongoing.

27. Plaintiffs uploaded data concerning their investigation into an "REO database."

28. The information uploaded to the database was sometimes consistent with the markings on paper inspection forms, and at other times reflected different markings.

29. NFHA staff members made changes in the database, which overrode the original inputs from inspectors, sometimes without receiving any input from the inspectors or having access to the original property inspection forms.

30. NFHA's REO database editing process was conducted by NFHA employees Shanti Abedin and Lindsay Augustine.

31. Changes were made to the property information listed in NFHA's REO database from June 23, 2011 to August 6, 2020.

32. Plaintiffs' database did not record prior versions of the database, or the content of edits made to the database.

33. NFHA instructed Local Plaintiff organizations to destroy the original, handwritten evaluation forms.

34. Following the upload of the paper inspection forms to the REO database, paper copies of the inspection forms were not retained by the Fair Housing Center of the Greater Palm Beaches; the Metropolitan Milwaukee Fair Housing Council; Housing Opportunities Made Equal of Virginia; Open Communities; the Toledo Fair Housing Center; and the Fair Housing Center for Rights and Research.

*Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 CV 839 (N.D. Ill.)

35.    Following the upload of the inspection forms to the REO database, some of the paper copies of the inspection forms were "lost" by the Fair Housing Advocates of Northern California.

36.    438 of Plaintiffs' original, handwritten inspection forms were lost or destroyed or became otherwise unavailable.

37.    On August 14, 2014, six of the current Plaintiffs organizations filed a U.S Department of Housing and Urban Development ("HUD") complaint alleging various claims, including disparate treatment claims, against the Deutsche Bank Trustees.

38.    The August 14, 2014 HUD complaint did not refer to Ocwen's or Altisource's role in the maintenance of REO properties.

39.    Plaintiffs continued investigating Deutsche Bank REOs after the filing of the administrative complaint with HUD on February 26, 2014.

40.    Plaintiffs later added Ocwen and Altisource as respondents to the complaint on February 14, 2017.

41.    In addition to Defendants, Plaintiffs investigated four entities (Fannie Mae, Bank of America, Wells Fargo, and US Bank) for discrimination in the maintenance of REO properties.

Exhibit 18

# SOULE & BRADTKE, PLLC

## ATTORNEYS AT LAW

155 N. Michigan Avenue, Suite 504
Chicago, Illinois 60601
(312) 616-4422

*Correspondence by mail:*
PO Box 231
Geneva, Illinois 60134
(630) 333-9144

Jennifer K. Soule
JSoule@SBLLegal.com

James G. Bradtke
JBradtke@SBLLegal.com
*Of Counsel*

Steven P. Schneck
SSchneck@SBLLegal.com
*Special Counsel*, REO Litigation

December 17, 2025

<u>Sent Via Email</u>

Debra Bogo-Ernst
Willkie Farr & Gallagher LLP
300 North LaSalle Dr.
Chicago, IL 60654-3406

Kenneth M. Kliebard
Morgan, Lewis & Bockius LLP
110 N. Wacker Drive, Suite 2800
Chicago, IL 60601

Nathan L. Garroway
Dentons US LLP
303 Peachtree Street, NE, Suite 5300
Atlanta, GA 30308

Kurt Rademacher
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103

Re:   <u>Defendants' Response to Plaintiffs' Proposed Statement of Uncontested Facts</u>

Dear Counsel:

Consistent with the discussion before Judge Shah yesterday encouraging continued discussion and resolution, the purpose of this letter is to address Defendants' response to Plaintiffs' Proposed Uncontested Facts.

Judge Shah has repeatedly directed the parties to undertake measures that will serve to facilitate the efficient conduct of the trial. We believe that very substantial efficiencies can be achieved through the presentation of certain evidence to the jury through the use of uncontested facts. As such, Plaintiffs devoted substantial resources to carefully identifying relevant facts that we do not believe can be reasonably contested by Defendants in light of: (a) Defendants' responses to Requests for Admission; (b) Defendants' responses to Plaintiffs' Local Rule 56.1 Statements in connection with Summary Judgment proceeding; and/or (c) the sworn testimony of Plaintiffs' corporate designees at FRCP Rule 30(b)(6) depositions.

We do not believe that the Defendants meaningfully responded to the vast majority of our Proposed Uncontested Facts. As to proposed Uncontested Facts (Nos. 2, 3 and 54-347), the totality of Defendants' response consists of one sentence: "The following facts are contested for being either irrelevant, argumentative or outside the scope of the litigation." This response is deficient for at least three reasons: (a) Defendants do not attempt to address whether they concede or dispute the factual basis of any of the proposed Uncontested Facts; (b) Defendants

1

have made no attempt to identify which of the three asserted grounds for claiming that a particular fact is "contested" apply to particular proposed Uncontested Facts; and (c) Defendants' response makes no attempt to explain how particular proposed Uncontested Facts are either irrelevant, argumentative, outside the scope of the litigation (or disputed).

In the event that Defendants admit that they do not dispute the factual basis of any of Proposed Uncontested Facts 2, 3 and 54-347, which is what Defendants' Response appears to indicate, we ask that you identify which of the three objections that you raised (irrelevant, argumentative or outside the scope of the litigation) apply and briefly explain your position. If Defendants seek to raise additional objections to proposed Uncontested Facts going to the truth of the matter asserted, Defendants should do by responding to each proposed Uncontested Fact so disputed and describing the grounds of your objection. As regards Proposed Uncontested Facts Nos. 4-11, 13, 15, 17, 19, 21, 23, 25-26, 28, 30-31, 33, 35-36, 38, 40, 42, 44, 46, 48, 50-51 and 53, please describe the clarifications that you believe are necessary.

If Defendants simply decide to withdraw your prior objections as to all or some of the proposed Uncontested Facts, please identify those by number and provide the information requested in the preceding paragraphs as to any remaining proposed Uncontested Facts that you do not agree to.

Given the pre-trial schedule, please provide your amended response to us no later than the close of business on Monday, December 22nd. After we review your response, we will decide whether we need to seek relief from the Court. We encourage you to consider that hours of trial time can be cut through the use of Uncontested Facts and that the use of such facts will benefit the jury's understanding of the case.

Sincerely,

Jennifer K. Soule

cc: Counsel of Record

2

# Exhibit 19

# WILLKIE FARR & GALLAGHER LLP

300 North LaSalle
Chicago, IL 60654-3406
Tel: 312 728 9000
Fax: 312 728 9199

January 6, 2026

**VIA E-MAIL TRANSMISSION**

Jennifer K. Soule (jsoule@sbllegal.com)
James G. Bradtke (jbradtke@sbllegal.com)
Steven P. Schneck (sschneck@sbllegal.com)
Soule & Bradtke PLLC
155 N. Michigan Ave., Ste. 504
Chicago, IL 60601

Lila Miller (lmiller@relmanlaw.com)
Yiyang Wu (ywu@relmanlaw.com)
Jennifer Klar (jklar@relmanlaw.com)
Ted Olds (tolds@relmanlaw.com)
Relman Colfax PLLC
1225 19th Street, N.W., Ste. 600
Washington, D.C. 20036

Janell M. Bryd
(jbyrd-chichester@nationalfairhousing.org)
Morgan Williams
(mwilliams@nationalfairhosing.org)
National Fair Housing Alliance
1331 Pennsylvania Ave., NW, Ste. 650
Washington, DC 20004

Stephen M. Dane
(sdane@fairhousinglaw.com)
Dane Law LLC
P.O. Box 1011
Perrysburg, OH 43552

Re:     *National Fair Housing Alliance v. Deutsche Bank National Trust, et al.*, No. 1:18-cv-00839 (N.D. Ill.)

Dear Counsel:

We write in response to your December 17, 2025 letter regarding Plaintiffs' 347 proposed "uncontested" facts. Before turning to our specific responses, we make two threshold points. First, as we explained in our December 12 meet and confer, many of these proposed facts are repackaged from Plaintiffs' LR 56.1 statements that Defendants disputed in the summary judgment briefing. Those disputes have not disappeared, and they will be resolved at trial. Second, there is no obligation for Defendants to agree to Plaintiffs' proposed facts. And, as explained below, the vast majority of Plaintiffs' proposed uncontested facts suffer from serious defects. Many are factually incorrect, irrelevant, go to issues that remain squarely contested in the case, and are unduly prejudicial under the Federal Rules of Evidence; several more present an unfair, incomplete picture of the facts.

Nevertheless, Defendants remain committed to working with you in good faith to reach appropriate agreements in advance of trial where doing so would promote efficiencies and streamline the presentation of evidence at trial. To that end, Defendants have already agreed to 20

of Plaintiffs' "uncontested" facts.[1] If additional of Plaintiffs' proposals can be appropriately corrected or narrowed, then Defendants are open to considering further agreements. Please review Defendants' responses below, and we are then happy to join a meet and confer with you to discuss these items in greater detail.

Also, as Defendants have now expended significant time to carefully consider Plaintiffs' 347 proposed uncontested facts, Defendants ask that Plaintiffs provide us with the courtesy of responding to Defendants' proposed uncontested facts by COB on January 9, 2026. Plaintiffs have not done so yet.

## I.     Plaintiffs' Proposed Facts Relating to the Properties at Issue are Inaccurate.

Plaintiffs have 31 proposed statements of uncontested facts concerning the particular properties that each Plaintiff inspected in specific areas: 4–11, 13, 15, 17, 19, 21, 23, 25–26, 28, 30–31, 33, 35–36, 38, 40, 42, 44, 46, 48, 50–51, and 53. Based on Defendants' review of the relevant records, these statements are factually inaccurate and incomplete.

That said, and subject to a stipulation that Defendants will not waive any objections to: (i) the admissibility and authenticity of the REO database and related records; and (ii) the deficiencies in Plaintiffs' study, including that Defendants contest that the Deutsche Bank trusts held legal title to many of the properties discussed in these 31 statements at the time of Plaintiffs' inspection, Defendants are open to discussing a compromise concerning these proposed 31 statements. To start, they need to be accurate. For example, in Fact No. 4, Plaintiffs state that NFHA inspected 40 properties in the Baltimore-area that were Deutsche Bank-owned and serviced by Ocwen and Altisource. However, records produced in the litigation (which are subject to motions in limine, and are themselves inadmissible) indicate that Plaintiffs only inspected 21 properties that fit this criteria.[2] This type of inaccuracy is not a singular, nor isolated mistake, but instead, is pervasive throughout Plaintiffs' proposed facts. In Fact No. 13, as another example, Plaintiffs state that Plaintiff Denver Metro Fair Housing Center ("DMFHC") inspected 12 properties in the Denver-area that were Trustee Defendant-owned and serviced by Ocwen and Altisource. However, records (which again, are subject to motions in limine) indicate that DMFHC only inspected 4 properties that fit this criteria.[3]

As we indicated in our initial response to Plaintiffs' uncontested facts, Defendants are willing in principle to agree to appropriate facts once there has been a meaningful opportunity to meet and confer to correct the numerous inaccuracies and ambiguities in Plaintiffs' proposal. This case involves a large volume of data, and the parties appear to be using different definitions of key terms such as "Baltimore-area" and "Denver-area." Without clarity as to the specific properties,

---

[1] Plaintiffs' Proposed Uncontested Fact Nos. 1, 12, 14, 16, 18, 20, 22, 24, 27, 29, 32, 34, 37, 39, 41, 43, 45, 47, 49, and 52.

[2] In the interest of transparency, Defendants provide the relevant properties:  3406 Mary Ave.; 204 N. Milton Ave.; 2410 W. Garrison Ave.; 161 North Monastery Avenue; 117 North Ellwood Avenue; 7936 Eastdale Road; 1022 Elston Avenue; 4115 Norfolk Avenue; 4016 Woodhaven Avenue; 5429 Omaha Avenue; 4806 Midline Road; 1103 Poplar Grove Street; 3310 Dorithan Road; 3141 Sequoia Avenue; 3415 Olympia Avenue; 6 Wheeler Avenue; 39 North Eden Street; 4711 Elison Avenue; 4202 Hamilton Avenue; 4222 Belmar Avenue; and 3211 Carlisle Avenue.

[3] 487 Empire St.; 5250 S. Logan St.; 5035 Titan Ct.; and 1205 Verbena St.

time periods, and datasets to which Plaintiffs are referring, Defendants cannot responsibly and in good faith agree to them.

Moreover, as part of any compromise with respect to these 31 statements, for completeness, Defendants ask Plaintiffs to stipulate to the total number of properties they inspected in a given area, as well as those properties owned by Trustee Defendant at the time of inspection and serviced by Ocwen and Altisource.

Finally, Plaintiffs' proposed "facts" Nos. 2-3 are inaccurate. No. 2, as it is currently drafted, mischaracterizes Plaintiffs' investigation. NFHA's investigation was not undertaken for the purpose of investigating Deutsche Bank-owned properties that were serviced by Ocwen and Altisource. Instead, NFHA's investigation was organized for investigating REO properties more generally and involved inspecting properties owned by many other large financial institutions including Bank of America, Wells Fargo, and US Bank. We would be amenable to agreeing to this fact only if it is revised to include the full context of the genesis of NFHA's investigation rather than the incomplete and misleading version currently proposed. As to No. 3, this is the subject of a current motion in limine and a forthcoming motion in limine by Defendants; the parties simply do not agree that all 699 properties serviced by Ocwen and Altisource were held in Deutsche Bank-administered trusts at the time of the inspections. *See, e.g.*, Plaintiffs' Motion in Limine No. 2. This contested issue has no place in purported uncontested statements of fact.

## II. Plaintiffs' Proposed Facts Regarding Common Ground.

Defendants also object to proposed "facts" concerning Common Ground (Nos. 60-84) on the grounds that they are irrelevant, unduly prejudicial, and, in various instances, outside the applicable statute of limitations. Defendants will not stipulate to any of these proposed facts; this is the subject of Defendants' Motion in Limine No. 2. Moreover, the property discussed in certain "facts," 3932 W. Florist Avenue in Milwaukee, is not a property at issue in this litigation.

## III. Plaintiffs' Proposed Facts Discussing the University of Memphis Neighborhood Preservation Clinic Lawsuits.

Defendants further object to Plaintiffs' proposed "facts" Nos. 85–112 as irrelevant, unduly prejudicial, outside of the applicable statute of limitations in certain instances, and factually inaccurate. *See, e.g.*, *Burbach Aquatics, Inc. v. City of Elgin, Ill.*, No. 08-CV-04061, 2011 WL 148394, at *2 (N.D. Ill. Jan. 18, 2011) ("The Court reminds the parties that the outcome of a lawsuit cannot be used in subsequent suits as evidence of underlying facts."). The only conceivable purpose for Plaintiffs' reliance on the outcome of another lawsuit is to use it as purported proof of the underlying facts in this case, which is improper and outside of the scope of this litigation. Moreover, Plaintiffs have not established that either 93 Mallory Heights Drive, Memphis, TN 38109 or 1041 Palmetto Avenue, Memphis, TN 38107 was held in Trustee Defendant-administered trusts at the time of Plaintiffs' inspections. With respect to the former, Plaintiffs have not produced any admissible evidence of ownership. With respect to the latter, Defendants have produced evidence showing that it was not owned by a Trustee Defendant at the time Plaintiffs claim to have inspected it. *See* Dkt. 334-10.

### IV.    Plaintiffs' Proposed Facts Regarding Individuals Unrelated to this Litigation.

Defendants also object to Plaintiffs' proposed "facts" Nos. 113–125 on the grounds that they are irrelevant, unduly prejudicial, and factually inaccurate. Those proposed "facts" primarily concern the personal backgrounds of three individuals who are not named plaintiffs in this case: Annick Joele Ngameni, Marvin Adams, and Dexter Craig. These purported facts are therefore improper and will be the subject of a motion in limine to be filed by Defendants in the next round.

### V.    Plaintiffs' Proposed Facts Establishing the Policies Of, and Relationships Between, the Deutsche Bank Trustees, Ocwen, and Altisource.

Defendants object to the vast majority of Plaintiffs' proposed "facts" Nos. 126-168 as irrelevant, incomplete, unduly prejudicial, and/or contrary to prior Court orders. It is not Defendants' obligation to go through each and every one of these and provide a response. But, in the spirit of good faith and cooperation, we provide many illustrative examples herein of why Plaintiffs' proposed "facts" are objectionable to Defendants. For example, Defendants cannot agree to No. 126 as written. Among other things, Ocwen's new name is irrelevant and, in any event, Plaintiffs have not provided the complete name. In addition, in No. 128, Plaintiffs stated that Ocwen's total revenue was $1.7 billion in 2015 and $1.3 billion in 2016. A party's total revenue is not relevant to the issues in the litigation and is highly prejudicial. In that same vein, Nos. 134-135 are similarly unduly prejudicial against the Defendants, as they state that Altisource previously operated as part of Ocwen. But that is entirely irrelevant to this litigation and is the subject of a motion in limine. *See* Motion in Limine No. 11. Moreover, Plaintiffs have not used the correct Ocwen or Altisource entity names in Nos. 134-135. By way of another example, No. 137 introduces subprime lending, which is irrelevant and unduly prejudicial. No. 139 was part of Plaintiffs' 56.1 statements in connection with Defendants' motion for summary judgment, to which Defendants objected. Nos. 152 and 157 likewise introduce undue prejudice by stating that Ocwen's mortgage servicing activities and Altisource's functions were carried out by mostly offshore staff in India. This is also the subject of a motion in limine. *Id.* No. 158 highlights the very heart of the parties dispute – *Defendants do not agree that, among other things, "marketable condition" means that a property is free of debris or trash.* And No. 162 purports to inject a fictional, incorrect 30-day standard for REO servicing into the litigation, which the Court already rejected when Judge Shah struck this portion of Pamela Kisch's report. *See Nat'l Fair Hous. All v. Deutsche Bank Nat'l Tr.*, No. 18-CV-00839, 2025 WL 975967, *28–30 (N.D. Ill. Mar. 31, 2025).

### VI.    Plaintiffs' Proposed Facts Regarding Defendants' Marketing Practices & Other Issues.

Defendants object to the vast majority of Plaintiffs' proposed "facts" Nos. 169–96, 233–71, and 284-285 as irrelevant because marketing-related issues are outside of the scope of this litigation. In the motion for summary judgment order, Judge Shah expressly rejected Plaintiffs' marketing-based claims:

> Plaintiffs also advance a theory of unavailability based on defendants' marketing practices such as: Altisource's use of the Hubzu platform, which imposes barriers on prospective buyers; inferior marketing practices for REO properties in non-

white neighborhoods; leaving utilities turned off in lower-value REOs, which discourse on-site real estate showings for those properties; and the Cash for Deed Sales model, which sold REO properties to investors rather than individual buyers. Defendants' use of a specific sales platform does not take those properties off the market and make them truly unavailable under § 3604(a) … Defendants are entitled to judgment as a matter of law on plaintiffs' cause of action under § 3604(a). *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18-CV-00389, 2025 WL 975967, at *35 (Mar. 31, 2025).

In compliance with Judge Shah's order and opinion, marketing-related claims are no longer within the scope of the litigation. Plaintiffs attempt to reintroduce them and, therefore, Defendants stand on their objection to Plaintiffs' proposed uncontested facts related to Defendants' marketing practices.

To the extent that there are some non-marketing proposed "facts" within this set, they are also objectionable as irrelevant, argumentative, incomplete, and/or unduly prejudicial. For example, Nos. 171, 176, 177, and 248 are incomplete, unduly prejudicial, and unfairly take items out of context that are more properly presented at trial in a cohesive fashion. Likewise, Nos. 254 and 257 are argumentative.

## VII. Plaintiffs' Proposed Facts Regarding Ocwen's Pre-Existing Relationship with the State of New York Department of Financial Services & Miscellaneous Issues.

Defendants object to Plaintiffs' proposed "facts" Nos. 197–232 because they are both irrelevant and unduly prejudicial. First, the proposed facts largely discuss conduct that occurred *before* February 14, 2015, including Nos. 198–203. Second, Nos. 198–200 and 202 attempt to discuss the State of New York Department of Financial Services' interactions with Ocwen and Altisource; none of this is relevant to the current lawsuit, and it is the subject of a motion in limine. *See* Motion in Limine No. 11. Third, several of these purported facts are inaccurate, *e.g.*, Nos. 203, 205. Fourth, many purported facts are incomplete and taken out of context, *e.g.*, Nos. 206-208, 210, 215, 218. Fifth, Nos. 201, 204, and 203–232, among others, are argumentative. For example, No. 209 states: "The audits of Ocwen's oversight of Altisource did not include or mention compliance with the Fair Housing Act." This is an argumentative characterization of Ocwen's oversight practices as their audits of Altisource state that their objective is to determine if Altisource was following federal regulations, which includes the Fair Housing Act. Another example is No. 225: "Altisource did not have any procedures that would address the actions it should take if racially biased comments were found in valuation products, other than deleting the comment." Not only is No. 225 a mischaracterization of Altisource procedure and therefore argumentative, it is *irrelevant* because it is about *marketing* practices, which is outside of the scope

of this litigation. Defendants are not willing to agree to these proposed facts. Nos. 228-231 are unduly prejudicial in that they focus on overseas operations.

### VIII. Plaintiffs' Proposed Conclusory Facts Regarding Ocwen's and Altisource's Purported Liability Under the Fair Housing Act and Other Items.

Defendants object to Plaintiffs' proposed "facts" about Ocwen's and Altisource's alleged FHA liability for many reasons. For example, Nos. 272-275, and 277 are irrelevant to the lawsuit and outside of the statute of limitations. Others within this category are factually inaccurate because they misrepresent the Defendants' policies and procedures. One example is No. 280, which states: "Ocwen did not review Altisource's performance for Fair Housing Act compliance." As discussed above, that is not an accurate characterization of Ocwen's policies. Another example is No. 282, which states: "Ocwen did not undertake reviews or studies either internally or through consultants of the impacts that the conditions of the REOs it was servicing had on neighborhoods or surrounding communities." Ocwen's policies and procedures involved extensive review of the conditions of REO properties. Plaintiffs' characterization of Ocwen's policies and procedures is inaccurate. Likewise, statements like Nos. 287 and 288 about Ocwen's ability to fire Altisource are not relevant to the lawsuit and are argumentative.

### IX. Plaintiffs' Proposed Conclusory Facts Regarding the Trustee Defendants.

Defendants object to Plaintiffs' proposed "facts" Nos. 289–347 facts as argumentative, factually inaccurate, and largely irrelevant.

First, several the proposed facts continue to address alleged conduct that occurred before February 14, 2015, including Nos. 304–08, 313–18, and 330, and are therefore outside of the relevant time period.

Second, many of these proposed facts are factually incorrect or misleading. For example, No. 294 asserts that the Trustee Defendants use "contract employees" to handle certain REO property-related activities. Even if that assertion were once relevant, it is not relevant now. No. 300 states that "[t]he Deutsche Bank Defendants do not maintain documents that describe standards for performance of the maintenance or marketing by parties designated as Servicers of the REO properties to which a Trustee held legal title." That assertion is false. The Trust Governing Agreements, which are "maintained" by the Trustee Defendants and were produced in this litigation, establish the standards for servicer performance.

No. 305 states that "[t]he Deutsche Bank Defendants did not take any actions in response to the National Fair Housing Alliance reports alleging discriminatory maintenance and marketing of REO properties that were published in 2011, 2012 and 2014." There is no evidence that the Trustee Defendants received a report issued by NFHA in 2011, and NFHA does not claim to have sent this report to any of the Defendants.

Other proposed stipulated facts just selectively quote from documents that speak for themselves. *See, e.g.,* Nos. 317 & 329. Still others are argumentative or so vague as to be misleading. *See, e.g.,* No. 335 (the Trustees "had available options" in the case of a Master Servicer default).

Nonetheless, Defendants are willing to agree to proposed fact Nos. 291 and 301. For the foregoing reasons, however, Defendants are not willing to agree to the balance of these proposed facts Nos. 289–347.

* * *

Defendants are disappointed that so many of Plaintiffs' proposed "uncontested" facts focus on claims and issues clearly outside the scope of the litigation following summary judgment and, in addition, mischaracterize the factual record. Plaintiffs' approach has required Defendants to review and respond to hundreds of facts that are irrelevant, argumentative, or inaccurate, resulting in an unnecessary expenditure of time and resources by Defendants. This letter is meant to provide specific, concrete examples of Defendants' objections; to the extent any particular purported "fact" is not addressed herein, Defendants do not stipulate to it.

While Defendants cannot agree to many of Plaintiffs' proposed facts for the reasons set forth above, nor can they be compelled to do so,[4] Defendants have demonstrated, and will continue to demonstrate, a willingness to meet and confer in good faith regarding any proposals that can be appropriately corrected. Let us know when you would like to discuss.

Sincerely,

*/s/ Debra Bogo-Ernst*
Debra Bogo-Ernst

cc: Counsel of Record

---

[4] Nor can Defendants be forced into stipulating to facts of which they do not agree. *See Greenwich Indus., L.P. v. Specialized Seating, Inc.*, No. 02-CV-05000, 2003 WL 21148389, at *1 (quoting *J.F. Edwards Construction Co. v. Anderson Safeway Guard Rail Corp.*, 542 F.2d 1318, 1322 (7th Cir. 1976)) ("Rule 16 of the Federal Rules of Civil Procedure does not authorize a court to force parties to stipulate to facts to which they will not voluntary[ily] agree.").

# Exhibit 20

| Plaintiffs' Proposed Uncontested Fact <u>Not</u> Agreed to by Defendants in PTO | Defendants' Prior Admissions of Fact | Additional Explanation (if necessary) |
|---|---|---|
| Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (collectively referred to herein as "the Deutsche Bank Defendants") have acted as Trustees for thousands of Residential Mortgage-Backed Security ("RMBS") trusts holding millions of mortgages, with trust assets totaling hundreds of billions of dollars. (Plaintiffs' Proposed Uncontested Fact No. 290) | The Trustees admitted the following in their LR 56.1 Response, No. 1: "Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (collectively referred to herein as "the Deutsche Bank Defendants") have acted as Trustees for thousands of Residential Mortgage-Backed Security ("RMBS") trusts holding millions of mortgages, with trust assets totaling hundreds of billions of dollars." | |
| Mortgage Servicers retained in connection with RMBS Trusts are not the owners of the REO properties, and there is no other legal owner of the properties than the Trustee. (Plaintiffs' Proposed Uncontested Fact No. 292) | The Trustees admitted the following in their LR 56.1 Response, No. 4: "Mortgage Servicers retained in connection with RMBS Trusts are not the owners of the REO properties, and there is no other legal owner of the properties than the Trustee." | |
| As the owner of REO properties in RMBS trusts, the Deutsche Bank Defendants receive hundreds of communications a month relating to the properties collectively, including communications relating to matters such as code violations, unpaid property taxes, health and safety conditions, unpaid utilities and complaints. (Plaintiffs' Proposed Uncontested Fact No. 293) | The Trustees admitted the following in their LR 56. 1 Response, No 6, subject to an asserted qualification that the paragraph was referring to communications received "collectively" across their portfolio: "As the owner of foreclosed properties in RMBS trusts ("REO Properties"), the Deutsche Bank Defendants receive hundreds of communications a month relating to the properties, including communications relating to matters such as code violations, unpaid property taxes, health and safety conditions, unpaid utilities and complaints." | Although the LR 56.1 phrasing clearly referred to the Trustees' properties generally, Plaintiffs added the word "collectively" in response to Defendants' comment. |
| The general rights and obligations of parties to an RMBS Trust are stated in documents referred to as Governing Agreements. The Governing Agreements follow a typical structure, although there are substantive variations. (Plaintiffs' Proposed Uncontested Fact No. 295) | The Trustees admitted the following in their LR 56.1 Response, No. 8: "The general rights and obligations of parties to an RMBS Trust are stated in documents referred to as Governing Agreements. The Governing Agreements follow a typical structure, although there are substantive variations." | |
| The conduct of Servicers and Master Servicers is required to comport with "Accepted Servicing Standards," which generally direct that the loans must be | The Trustees admitted the following in their LR56.1 Response, No. 12: "The conduct of Servicers and Master Servicers is required to comport with | |

| | | |
|---|---|---|
| serviced in accord with the Governing Agreements and in the same manner in which the Servicer administers similar mortgage loans in its own portfolio, giving due consideration to the customary and usual standards of practice of prudent mortgage lenders and Loan Servicers administering similar mortgage loans. (Plaintiffs' Proposed Uncontested Fact No. 298) | "Accepted Servicing Standards," which generally direct that the loans must be serviced in accord with the Governing Agreements and in the same manner in which the Servicer administers similar mortgage loans in its own portfolio, giving due consideration to the customary and usual standards of practice of prudent mortgage lenders and Loan Servicers administering similar mortgage loans." | |
| The Deutsche Bank Defendants use "contract employees" hired through a temporary placement agency to carry out certain activities relating to REO properties that they own as Trustee. These employees review, log, process and forward to Servicers correspondence received by the Deutsche Bank Defendants relating to code violations, litigation notices and other matters pertaining to the maintenance or marketing of REO properties owned by either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas. (Plaintiffs' Proposed Uncontested Fact No. 294) | The Trustees admitted the following in their LR 56.1 Response, No. 7, subject to qualifications that that the Trustees did not have contractual responsibilities related to the properties and that the Trustees owned the properties as Trustee: "The Deutsche Bank Defendants use 'contract employees' hired through a temporary placement agency to carry out many activities relating to REO properties that they own as Trustee. These employees review, log, process and forward to Servicers correspondence received by the Deutsche Bank Defendants relating to code violations, litigation notices and other matters pertaining to the maintenance or marketing of REO properties owned by either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas." | The proposed uncontested fact does not imply or state anything regarding the Trustees' contractual responsibilities for REOs. The proposed uncontested fact expressly refers to "properties that they [the Deutsche Bank Defendants] own as Trustee." |
| The Deutsche Bank Defendants are unaware of any documents that explain what the customary and usual standards or practices of prudent mortgage lenders and Loan Servicers are in administering similar mortgage loans. (Plaintiffs' Proposed Uncontested Fact No. 299) | The Trustees admitted the following in their LR 56.1 Response, No. 13: "Neither the corporate designee of the Deutsche Bank Defendants for Rule 30(b)(6) depositions nor the Deutsche Bank Defendants' expert witness regarding RMBS Trusts were aware of any documents that explain what the customary and usual standards or practices of prudent mortgage lenders and Loan Servicers are in administering similar mortgage loans." | |
| If a complaint is received about a Trustee-owned REO property involving health or safety issues such as open sewage, the Deutsche Bank Defendants follow their normal practice of transmitting the complaint to the | The Trustees admitted the following in their LR 56.1 Response, No. 18: " If a complaint is received about a Trustee-owned REO property involving health or safety issues such as open sewage, the Deutsche Bank Defendants follow | |

| | | |
|---|---|---|
| Servicer. (Plaintiffs' Proposed Uncontested Fact No. 302) | their normal practice of transmitting the complaint to the Servicer." | |
| The Deutsche Bank Defendants admit that they did not evaluate the physical condition of the REO properties to which they held legal title, as Trustee, during the years 2009 through 2018. (Plaintiffs' Proposed Uncontested Fact No. 304) | In their Responses to Plaintiffs' Requests for Admissions, Nos. 5-14, the Trustees admitted, subject to generic objections, a series of requests phrased in the following manner: "Admit that during [year], Defendants did not assess the physical condition of the REO properties owned by Defendants, as Trustees, pursuant to the terms of RMBS Trusts and/or PSAs." | The Trustees further admitted this fact in their LR 56.1 Response to No. 23: "The Deutsche Bank Defendants admit that they did not evaluate the physical condition of the REO properties to which they held legal title, as Trustee, during the years 2009 through 2018." |
| During the period 2010 through 2018 the Trustees did not request that Defendant Ocwen regularly report to the Trustees, and Ocwen did not in fact report to the Trustees, as to whether code violations existing at REO properties owned by the Trustees under the terms of RMBS Trusts and/or PSAs had been cured. (Plaintiffs' Proposed Uncontested Fact No. 308) | In their Responses to Plaintiffs' Requests for Admissions, Nos. 37-54, the Trustees admitted that "during [year] Defendant Ocwen did not regularly report to the Trustees as to whether code violations existing at REO properties owned by the Trustees, under the terms of RMBS Trusts and/or PSAs, had been cured . . ." | The Trustees further admitted this fact in their LR56.1 Response to No. 28: "The Deutsche Bank Defendants admit that during the period 2010 through 2018 the Trustees did not request that Defendant Ocwen regularly report to the Trustees, and Ocwen did not in fact report to the Trustees, as to whether code violations existing at REO properties owned by the Trustees under the terms of RMBS Trusts and/or PSAs had been cured." |
| The Deutsche Bank Defendants are unaware if they ever exercised their rights under provisions of certain Governing Agreements to examine Servicer documents or discuss servicing | The Trustees admitted in their L.R. 56.1 Response, No. 29, that "The Deutsche Bank Defendants are unaware if they ever exercised their rights under provisions of Governing Agreements to | |

| | | |
|---|---|---|
| issues with officers of the Servicer. (Plaintiffs' Proposed Uncontested Fact No. 309) | examine Servicer documents or discuss servicing issues with officers of the Servicer." | |
| Under certain RMBS Trusts in which the properties inspected by Plaintiffs were held, actions available to the Trustee with regard to Servicer or Master Servicer events of default or potential events of default included the following:<br><br>  a. Notifying a Servicer or Master Servicer in default, identifying the occurrence of an event of default and demanding that it be cured within a specified time period.<br>  b. Notifying Certificateholders that an event of default has occurred and advise them of their rights.<br>  c. Notifying rating agencies for the Servicer or Master Servicer that an event of default has occurred.<br>  d. Sending an "Informational Notice" to Certificateholders advising them of a potential event of default.<br>  e. Retaining outside expert assistance to advise the Trustee regarding alleged events of default.<br>  f. Retaining independent counsel to advise the Trustee regarding alleged events of default and potential courses of action.<br>  g. Proceeding to terminate a Servicer or Master Servicer known by the Trustee to be in default, subject to any other applicable conditions.<br>  h. Proceeding to terminate a Servicer or Master Servicer in default, acting with the consent or pursuant to direction of other deal parties. | The Trustees admitted in their L.R. 56.1 Response, No. 32, that the corresponding subparts (a), (b), (c), (e) and (f) of this paragraph "describe certain duties or rights of Trustees under certain of their Governing Agreements, but denied the use of the word "authority" by Plaintiffs in referring to these provisions. The Trustees denied other subparts of the paragraph based upon various other aspects of the wording of those subsections. | Plaintiffs' Proposed Uncontested Fact No. 311 addresses each of the objections raised by the Trustees. |

| | | |
|---|---|---|
| (Plaintiffs' Proposed Uncontested Fact No. 311) | | |
| DBNFHA300612-14 is a memorandum dated October 8, 2010, sent by Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to all Securitization Loan Servicers.  The October 8, 2010 memo  raises an "urgent issue" and: (a) "expresses the Trustee's serious concern regarding allegations of potential defects in foreclosure practices, procedures and/or documentation . . ."; (b) "reiterates to all Servicers the importance of their duties and obligations relating to such matters" (emphasis in original); and (c) directs that "[a]s the Trustee has advised on more than one occasion, all Servicers and their agents . . . must conduct all servicing activities, including foreclosure proceedings, in accordance with the Governing Documents and all applicable laws."  (DBNFHA300612-13, emphasis in original)  The October 8, 2010 memo to the Servicers further states that "the Trustee demands that each Servicer (including its agents) immediately:  Inform that Trustee of: (i) any Alleged Foreclosure deficiencies relating to mortgage loans serviced by the Servicer on behalf of the Trust . . .; Cease and desist from taking any unlawful or improper action with respect to the servicing of Trust assets …; and Require each of its agents to comply with the foregoing demands and all legal requirements applicable to any services that they perform on behalf of the Trusts."  (Plaintiffs' Proposed Uncontested Fact No. 314) | The Trustees admitted the identically worded assertion in LR 56.1 Response, No. 37. | |
| DBNFHA300611-14 is a notification dated October 25, 2010, sent by Deutsche Bank National Trust Company and Deutsche Bank Americas to all holders of RMBS securities for which Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas served as trustee.   The notification states that the | The Trustees admitted the identically worded assertion in LR 56.1 Response, No. 38. | |

| | | |
|---|---|---|
| Trustees had communicated with all loan servicers for U.S. residential mortgage-backed securities trusts "demanding that servicers comply with all applicable laws relating to foreclosures" and requested additional information from certain loan servicers who had announced suspensions of foreclosure activity to alleged deficiencies. (Plaintiffs' Proposed Uncontested Fact No. 315) | | |
| DBNFHA300619-20, is a memorandum dated August 30, 2007, sent by Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to all Securitization Loan Servicers. The memo requests, inter alia, that the Servicers: (a) "Exercise diligence to assure that all foreclosures and actions with respect to REO properties . . . are conducted in compliance with all federal, state and local rules and regulations . . ." (PDB Ex. 17, DBNFHA300619); " (b) "Consider developing working relationships with local housing officials and community organizations to address public concerns regarding foreclosure and eviction proceedings that might otherwise lead to public responses that might impede the realization of value on the Trusts' mortgage loans and REO properties . . ." (PDB Ex. 17, DBNFHA300619-20) ; and (c) "To the extent permitted by applicable securitization documents, exercise sound discretion in evaluating whether or not eviction of tenants otherwise lawfully occupying Trust REO properties will maximize the realization of value on Trust assets; . . . maintaining occupancy may preserve the affected neighborhoods and thereby support the value of REO property . . ." (Plaintiffs' Proposed Uncontested Fact No. 316) | The Trustees admitted the identically worded assertion in LR 56.1 Response, No. 39. | |
| DBNFHA300615-18, is a memorandum dated July 28, 2008, sent by Deutsche Bank National Trust Company and Deutsche Bank Trust Company | The Trustees admitted the identically worded assertion in LR 56.1 Response, No. 40. | |

| | | |
|---|---|---|
| Americas to Securitization Loan Servicers. The memo "focuses on certain issues relating to servicing practices that have come to the attention of the trustee" and states, inter alia, that: (i) " . . .servicers must exercise diligence to assure that they conduct all foreclosures and other actions with respect to REO properties . . . in compliance with all federal, state, and local laws, rules, regulations and court procedures (DBNFHA300615, emphasis in original) ;" (ii) "Servicers must ensure that loss mitigation personnel and professionals engaged by servicers . . . understand the mechanics of the relevant securitization transactions, and related custodial practices, in sufficient detail to address . . . questions in a timely and accurate manner;" (DBNFHA300616, emphasis in original); and (iii) "The Trustee urges servicers to stay abreast of and, where appropriate, participate in, governmental policy discussions and rule-making processes that may affect servicing activities. . . . In addition, the Trustee urges servicers to exercise diligence and, where appropriate, involve or cooperate with law enforcement agencies regarding a variety of unethical and, in some cases, illegal real estate transaction schemes targeting distressed borrowers. In particular, servicers should be on the lookout for third parties who . . .seek private data concerning borrowers . . . [or] purport to act based on an asserted affiliation or association with the servicer, the Trustee or the Trusts." (Plaintiffs' Proposed Uncontested Fact No. 317) | | |
| The July 28, 2010 memo sent by the Deutsche Bank Defendants to the Securitization Loan Servicers, DBNFHA300615-18, also specifically addressed certain REO Maintenance issues, stating: "The Trustee has received a number of inquiries and complaints from government officials and community groups about the | The Trustees admitted the identically worded assertion in LR 56.1 Response, No. 41. | |

| | | |
|---|---|---|
| physical condition of REO properties. Such inquiries and complaints also are receiving increasing attention from the media, law enforcement agencies, and courts. Under standard securitization documentation, loan servicers are expressly responsible for managing all aspects of the REO disposition process, including appropriate maintenance of REO properties. Failure to fulfill these responsibilities may expose the Trusts to financial losses, potentially depressing the value of Trust property and exposing the Trusts to legal and financial liability. Because title to REO properties typically includes the name of the Trustee institution, these failures also expose the Trustee to legal claims and reputational harm. To protect against such consequences, which are likely to give rise to indemnification claims against servicers, the Trustee urges servicers to exercise heightened diligence with respect to REO maintenance and disposition. In addition, we urge Servicers to engage property managers who will take proactive steps to protect REO properties, including when they are vacant for extended periods of time." (Plaintiffs' Proposed Uncontested Fact No. 318) | | |
| The Deutsche Bank Defendants did not receive from Ocwen a written response to the memos sent by the Deutsche Bank Defendants to Servicers collected in PDB Ex. 17. (Plaintiffs' Proposed Uncontested Fact No. 319) | The Trustees admitted in their L.R. 56.1 Response, No. 42, that " they did not receive from Ocwen a written response to any of the memos referenced above in paragraphs 37-41." | The fact was also admitted in Defendants' Responses to Plaintiffs' Requests for Admissions, Nos. 78-79 |
| In some cities where the Deutsche Bank Defendants owned REO properties as Trustee, including Milwaukee, Chicago, Cincinnati, Boston, Los Angeles and New Haven, the Deutsche Bank Defendants asked Servicers to attend meetings regarding foreclosures and/or REO property conditions with municipal officials and Loan Servicers, set up the meetings and attended the | The Trustees admitted in their L.R. 56.1 Response, No. 44 that " In some cities where the Deutsche Bank Defendants owned REO properties as Trustee, including Milwaukee, Chicago, Cincinnati, Boston, Los Angeles and New Haven, the Deutsche Bank Defendants asked Servicers to attend meetings regarding foreclosures and/or REO property conditions with | |

| | | |
|---|---|---|
| meetings. Some of these meetings were attended by representatives of Ocwen. (Plaintiffs' Proposed Uncontested Fact No. 321) | municipal officials and Loan Servicers, set up the meetings and attended the meetings." | |
| The Governing Agreements set out various duties, obligations and authority of the parties thereto. PDB Ex. 14, Summary of Trustee-Servicer Provisions, provides citations to certain duties, obligations and authority of Trustee, Servicer and Master Servicer parties reflected in a set of 100 of the Governing Agreements produced in discovery by the Deutsche Bank Defendants. PDB Ex. 15, Examples of Governing Agreements Language, provides some examples of language contained in this set of Governing Agreements relating to the duties, obligations and authority of Trustee, Servicer and Master Servicer parties. (Plaintiffs' Proposed Uncontested Fact No. 322) | The Trustees admitted in their LR 56.1 Response, No. 46 that "The Governing Agreements set out various duties, obligations and authority of the parties thereto. PDB Ex.14, Summary of Trustee-Servicer Provisions, identifies and provides citations to certain duties, obligations and authority of Trustee, Servicer and Master Servicer parties reflected in a set of 100 of the Governing Agreements produced in discovery by the Deutsche Bank Defendants." PDB Ex. 15, Examples of Governing Agreements Language, provides examples of language contained in this set of Governing Agreements relating to the duties, obligations and authority of Trustee, Servicer and Master Servicer parties." | |
| While there is some variation in provisions of the Governing Agreements produced by the Deutsche Bank Defendants, examples of the rights, duties of obligations of the parties under particular Governing Agreements include the following: [quoting various Governing Agreements and listing categories (a) through (m) of rights, duties and obligations] Plaintiffs' Proposed Uncontested Fact (No. 323) | As regards the enumerated rights, duties and obligations identified in the corresponding paragraph of Plaintiffs' LR 56.1 Statement, the Trustees' Response, No. 47, admitted "these statements with respect to the terms of the quoted Governing Agreements," while noting "that the terms and duties set forth in different Governing Agreements vary from one another." | Plaintiffs added language acknowledging that variation exists in the provisions of different Governing Agreements. |
| Provisions of the Governing Agreements for GSAMP Trust 2005-WMC3 authorized the Trustee to veto a proposed sale of an REO property. PDB Ex. 1, DBNFHA52767: "The Servicer shall use its best efforts to dispose of the REO Property as soon as possible (subject to the Trustee's right to veto any proposed sale of the REO Property) and shall sell such REO Property in any event within three years after title has been taken to such REO property. . ." (Plaintiffs' Proposed Uncontested Fact No. 324) | The Trustees admitted in their L.R. 56.1 Response, No. 48 that " Provisions of the Governing Agreements for GSAMP Trust 2005-WMC3 authorized the Trustee to veto a proposed sale of an REO property. PDB Ex. 1, DBNFHA52767: "The Servicer shall use its best efforts to dispose of the REO Property as soon as possible (subject to the Trustee's right to veto any proposed sale of the REO Property) and shall sell such REO Property in any event within three years after title has been taken to such REO property. . ." | |
| The Deutsche Bank Defendants communicated with Servicers, including | The Trustees admitted in their L.R. 56.1 Response, No. 50 that: " As reflected in | |

9

| | | |
|---|---|---|
| Ocwen, regarding the status of REO properties, the steps being taken to remediate code violations and/or priorities for taking remedial actions.  Examples of such communications are:   [listing subparts (a)-(g)]  (Plaintiffs' Proposed Uncontested Fact No. 326) | paragraphs Nos. 51 – 58 below, the Deutsche Bank Defendants communicated with Servicers, including Ocwen, regarding the status of REO properties, the steps being taken to remediate code violations and/or priorities for taking remedial actions.  PDB Ex. 18, ASI 49987, ASI49992, ASI 49994, ASI 49989, DBNFHA186807, ASI49993, ASI 49990; PDB Ex. 10, Yanniello Dep. p. 48)". | |
| The Deutsche Bank Defendants' standard Tender of Defense and Indemnity form (PDB Ex. 20, DBNFHA121758-61) transmitted to Servicers states that "The PSA governs your obligations in this matter. If you determine that some different course of action is preferable in the Action, you must discuss the proposed course of action with the Trustee and obtain the Trustee's written waiver/consent."  (Plaintiffs' Proposed Uncontested Fact No. 327) | The Trustees admitted in their L.R. 56.1 Response, No. 61 that: "'The Deutsche Bank Defendants' standard Tender of Defense and Indemnity form (PDB Ex. 20, DBNFHA121758-61) transmitted to Servicers states that 'The PSA governs your obligations in this matter. If you determine that some different course of action is preferable in the Action, you must discuss the proposed course of action with the Trustee and obtain the Trustee's written waiver/consent.'" | |
| Pursuant to the Governing Agreements, the Deutsche Bank Defendants provided Servicers and Master Servicers for RMBS Trusts with limited powers of attorney authorizing certain activities to be taken on their behalf [citing examples].  (Plaintiffs' Proposed Uncontested Fact No. 328) | The Trustees admitted in their L.R. 56.1 Response, No. 62, (subject to noting that the powers of attorney were limited and did not apply to REO maintenance), that:  "Pursuant to the Governing Agreements, the Deutsche Bank Defendants provided Servicers and Master Servicers for RMBS Trusts with powers of attorney. [citing same examples]." | For purposes of the PTO, Plaintiffs revised the statement to include the word "limited." Nothing in the proposed paragraph indicates that the power of attorney applies to REO maintenance. |
| Many Governing Agreements produced by the Deutsche Bank Defendants refer to a party as a "Master Servicer," although that party is directly tasked with the basic servicing activities for the trust and no Servicer is named within that agreement . . ."  (Plaintiffs' Proposed Uncontested Fact No. 331) | The Trustees admitted in their L.R. 56.1 Response, No. 66, that " Many Governing Agreements produced by the Deutsche Bank Defendants refer to a party as a "Master Servicer," although that party is directly tasked with the basic servicing activities for the trust and no Servicer is named within that agreement: . . ." | |
| Under the terms of some Governing Agreements, a party referred to as a "Master Servicer" is tasked with | The Trustees admitted in their L.R. 56.1 Response, No. 67 that " Under the terms of some Governing Agreements, a party | |

| | | |
|---|---|---|
| responsibilities related to monitoring the Servicer. E.g., Governing Agreement UBO6S2, DBNFHA118945: "The Master Servicer shall be responsible for reporting to the Trustee . . . the compliance by each Servicer with its respective duties under the related Servicing Agreement." (Plaintiffs' Proposed Uncontested Fact No. 332) | referred to as a "Master Servicer" is tasked with responsibilities related to monitoring the Servicer. E.g., PDB Ex. 1, Governing Agreement UBO6S2, DBNFHA118945: "The Master Servicer shall be responsible for reporting to the Trustee . . . the compliance by each Servicer with its respective duties under the related Servicing Agreement." | |
| Under some of the RMBS Trusts in which the properties inspected by Plaintiffs were held and there was a functional Master Servicer party, the Trustee can take actions in the event of an uncured event of default or potential event of default that include the following:<br><br>a. Sending a notice to the Master Servicer identifying the occurrence of a Master Servicer event of default and demanding that it be cured within a specified time period.<br><br>b. Sending a notice to the Certificateholders informing them that a Master Servicer event of default has occurred and advising them of their rights.<br><br>c. Sending a notice to rating agencies for the Master Servicer informing the ratings agencies that a default has occurred. (Ps 56.1 PDB Ex. 12, Summary of Governing Agreement Provisions Regarding Material Breach, Column H; Rule 30(b)(6) Dep. of DB Defendants, PSA Obligations, 150-1)<br><br>d. Sending an "Informational Notice" to Certificateholders advising them of a potential Event of Default on the part of the Master Servicer.<br><br>e. Retaining outside expert assistance to advise the | In a lengthy L.R. 56.1 Response to the corresponding paragraph of that document, No. 68, the Trustees made various admissions, denials and objections. | The paragraph was rewritten for purposes of the PTO to address each of the technical matters raised by the Trustees. |

| | | |
|---|---|---|
| Trustee regarding alleged events of Master Servicer default.<br><br>f. Retaining independent counsel to advise the Trustee regarding alleged Master Servicer events of default and potential courses of action.<br><br>g. Proceeding to terminate a Master Servicer known by the Trustee to be in default, subject to any other applicable conditions.<br><br>h. Proceeding to terminate a Master Servicer in default, acting with the consent or pursuant to direction of other deal parties.<br><br>(Plaintiffs' Proposed Uncontested Fact No. 333) | | |
| In some Governing agreements where a Master Servicer with monitoring responsibilities is a party, the Governing Agreements may provide the Trustee with authority to take actions directly affecting the Servicer's conduct, including the following situations: (a) a Trustee possessing authority to terminate a Servicer in default based on provisions granting such authority where the corporate affiliation of that Servicer is the same as the Master Servicer and (b) a Trustee possessing authority to serve notices of events of default directly to the Servicer notwithstanding the Master Servicer's presence. (Plaintiffs' Proposed Uncontested Fact No. 334) | The Trustees admitted in their L.R. 56.1 Response, No. 69 that "In some Governing agreements where a Master Servicer with monitoring responsibilities is a party, the Governing Agreements may provide the Trustee with authority to take actions directly affecting the Servicer's conduct, including in situations where: (a) a Trustee possesses authority to terminate a Servicer in default based on provisions granting such authority where the corporate affiliation of that Servicer is the same as the Master Servicer and (b) the Governing Agreements provide the Trustee with authority to serve notices of events of default directly to the Servicer notwithstanding the Master Servicer's presence." | |
| As to each of the Ocwen-serviced properties identified in columns F and G of Defendants' Ex. A to the Rademacher Declaration, (Ocwen-serviced properties held in trusts with a Master Servicer party with monitoring responsibilities), the Trustees had available options and actions they could | The Trustees admitted in their L.R. 56.1 Response, No. 70 that " As to each of the Ocwen-serviced properties identified in columns F and G of Defendants' Ex. A to the Rademacher Declaration, (Ocwen-serviced properties held in trusts with a Master Servicer party with monitoring | |

| | | |
|---|---|---|
| take in response to Master Servicer events of default or potential events of default, including providing the Master Servicer with a notice of a Master Servicer event of default, terminating the Master Servicer, providing notices of default to rating agencies and providing informational notices to Certificateholders).  (Plaintiffs' Proposed Uncontested Fact No. 335) | responsibilities), the Trustees had available options and actions they could take in response to Master Servicer events of default or potential events of default, including providing the Master Servicer with a notice of a Master Servicer event of default, terminating the Master Servicer, providing notices of default to rating agencies and providing informational notices to Certificateholders." | |
| Under various Governing Agreements relating to the Ocwen-serviced properties identified in Columns F and G of Defendants' Ex. A to the Rademacher Declaration (properties held in trust with Master Servicer party with monitoring responsibilities), the Governing Agreements provide the Trustee with authority to take direct action in response to a Servicer event of default, e.g., serving notice of default on the Servicer) (Plaintiffs' Proposed Uncontested Fact No. 336) | The Trustees admitted in their L.R. 56.1 Response, No. 71, that " Under various Governing Agreements relating to the Ocwen-serviced properties identified in Columns F and G of Defendants' Ex. A to the Rademacher Declaration (properties held in trust with Master Servicer party with monitoring responsibilities), the Governing Agreements provide the Trustee with authority to take direct action in response to a Servicer event of default, e.g., serving notice of default on the Servicer)" | |
| The Deutsche Bank Defendants sent the memos collected in Pls 56.1 PDB Ex. 17 to all Securitization Loan Servicers who serviced loans on behalf of an RMBS Trust for which a Deutsche Bank Defendant acted as Trustee and made no distinction between sending them to Loan Securitization Servicers for RMBS Trusts without Master Servicers as opposed to Loan Securitization Servicers for RMBS Trusts with Master Servicers. (Plaintiffs' Proposed Uncontested Fact No. 337) | The Trustees admitted in their L.R. 56.1 Response, No. 72, that "the Deutsche Bank Defendants sent the memos described above at paragraphs 37, 39, 40 and 41 to all Securitization Loan Servicers who serviced loans on behalf of an RMBS Trust for which a Deutsche Bank Defendant acted as Trustee and made no distinction between sending them to Loan Securitization Servicers for RMBS Trusts without Master Servicers as opposed to Loan Securitization Servicers for RMBS Trusts with Master Servicers." | |
| Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas have each acted as Trustee for RMBS transactions.  Whether one entity or the other acts as the named Trustee for a particular transaction depends on client preference:  some clients may want a national banking association for their structure, whereas others may want a New York State Banking | The Trustees admitted in their L.R. 56.1 Response, No. 79, that " Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas have each acted as Trustee for RMBS transactions. Whether one entity or the other acts as the named Trustee for a particular transaction depends on client preference: some clients may want a national banking association for their structure, whereas others may want a New York State Banking corporation." | |

| | | |
|---|---|---|
| corporation. (Plaintiffs' Proposed Uncontested Fact No. 341) | | |
| The day-to-day RMBS trustee operational duties under the Governing Agreements to which either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas was a party were carried out by Deutsche Bank National Company. (Plaintiffs' Proposed Uncontested Fact. No. 342) | The Trustees admitted in their L.R. 56.1 Response No. 80, (subject to a qualification referencing "daily administrative work") that "RMBS trustee duties under the Governing Agreements to which either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas was a party were carried out by Deutsche Bank National Company." | For purposes of the PTO Uncontested Facts, and to address the Trustees' qualification, Plaintiffs added the phrase "operational duties." |
| Whether Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas acted as the Trustee under a particular Governing Agreement, the same policies, practices and documents were utilized on behalf of the named Trustee to carry out day-to-day duties. (Plaintiffs' Proposed Uncontested Fact No. 343) | The Trustees admitted in their L.R. 56.1 Response, No. 81 that " Whether Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas acted as the Trustee under a particular Governing Agreement, the same policies, practices and documents were utilized on behalf of the named Trustee." | |
| Correspondence relating to code violations, litigation notices and other matters pertaining to the maintenance or marketing of REO properties owned by either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas were processed and forwarded to servicers by Deutsche Bank National Trust Company employees pursuant to the same procedures and under the supervision of the same manager. Violations at properties owned by either Trustee were maintained on the spreadsheets kept by Deutsche Bank National Trust Company employees. (Plaintiffs' Proposed Uncontested Fact No. 344) | The Trustees admitted in their L.R. 56.1 Response No. 82 that "Correspondence relating to code violations, litigation notices and other matters pertaining to the maintenance or marketing of REO properties owned by either Deutsche Bank National Trust Company or Deutsche Bank Trust Company Americas were processed and forwarded to servicers by Deutsche Bank National Trust Company employees pursuant to the same procedures and the supervision of Mr. Reyes." | |

# Exhibit 21

| Plaintiffs' Proposed Uncontested Facts <u>Not</u> Agreed to by Defendants in PTO | Defendants' Prior Admissions of Fact | Additional Explanation (if necessary) |
|---|---|---|
| Prior to 2009, Altisource Portfolio Solutions, S.A. operated as Ocwen Solutions, a wholly-owned subsidiary of Ocwen.  (Plaintiffs' Proposed Uncontested Fact, No. 134) | In its Response to RFA No. 300, Ocwen stated in part, "Ocwen admits that, prior to 2009, Altisource Portfolio Solutions, S.A. operated as Ocwen Solutions, a wholly-owned subsidiary of Ocwen." | |
| In 2009, Ocwen entered into "long-term servicing contracts" with Altisource Portfolio Solutions, S.A. ("Altisource"), which was spun off from Ocwen.  The Altisource subsidiary named in this lawsuit is Altisource Solutions, Inc. (Plaintiffs' Proposed Uncontested Fact No. 135) | In its Response to RFA No. 303, Ocwen stated in part, "Ocwen admits that it entered into 'long-term servicing contracts' with Altisource Portfolio Solutions, S.A. in 2009…" | |
| Ocwen's headquarters are in Palm Beach, Florida, United States.  (Plaintiffs' Proposed Uncontested Fact No. 127) | Ocwen's SEC Form 10-K's provide this information. | |
| Ocwen and Altisource worked in a shared electronic system known as REALServicing to service mortgages through foreclosure, property maintenance, and REO sales. (Plaintiffs' Proposed Uncontested Fact No. 163) | In its Response to Plaintiffs' First Set of Interrogatories, No. 9, Ocwen stated in part that "it used the following databases for tasks related to REO property preservation and maintenance conducted by Altisource during the relevant time period:  . . . Real Servicing." | |
| In 2009, Ocwen became Altisource's main customer and Altisource became Ocwen's third-party vendor to carry out Ocwen's servicer obligations relating to default and foreclosure activities pertaining to REOs, including REO properties owned by the Deutsche Bank Defendants, as Trustee, including in the areas of valuations, property maintenance and preservation, property inspection, marketing and sales.   (Plaintiffs' Proposed Uncontested Fact No. 136) | In their LR 56.1 Response, No. 10, Defendants admitted that "Ocwen became Altisource's 'main customer' in 2009, and that Altisource was Ocwen's exclusive vendor for certain services at that time . . ." | |
| During the time period relevant to this litigation, Ocwen had the authority to terminate Altisource as a | In their LR 56.1 Response, No. 11, Defendants admitted that "for the time period relevant to this litigation, | |

1

| | | |
|---|---|---|
| vendor. (Plaintiffs' Proposed Uncontested Fact No. 287) | Ocwen had the authority to terminate Altisource . . ." | |
| The operative contracts between Ocwen and Altisource were executed between Ocwen and Altisource Portfolio Solutions. S.A. These consist of Servicing Letters and Statements of Work. (Plaintiffs' Proposed Uncontested Fact No. 142 | In their LR 56.1 Response, No. 12, Defendants admitted (subject to certain objections) that "the Ocwen-Altisource mortgage servicing structure is found in two main Servicing Letters and their attached Statements of Work . . ." | |
| Ocwen's total revenue was $1.7 billion in 2015 and $1.3 billion in 2016. (Plaintiffs' Proposed Uncontested Fact No. 128) | Ocwen's SEC Form 10-K's state these figures. (PJt Ex. 35) | |
| 2016 Ocwen audits of Altisource reported in 2016 that Altisource Solutions, Ocwen's third-party vendor, processed approximately 360,000 property preservation and inspection transactions each month including standard repeating services and one-off services, i.e. property securing, winterization, grass cuts, maintenance, inspections, etc., for an approximate monthly spend of $27 million, $324 million annually, and $16 million monthly for Preservation and Capital Repairs/Renovation services. (Plaintiffs' Proposed Uncontested Fact No. 139) | In their LR 56.1 Response, No. 16, Defendants admit that "In 2016, Altisource, Ocwen's third party vendor was paid $324 million annually for certain categories of services, $192 million annually for PPI services . . .and $16 million monthly for Capital Repairs/Renovation services . . ." | |
| Ocwen never assessed whether the limited auction process had an impact on home values in the surrounding area. (Plaintiffs' Proposed Uncontested Fact, No. 251) | In their LR 56.1 Response, No. 182, Defendants admitted "that Ocwen's corporate designee testified that Ocwen never specifically performed and assessment on whether the limited auction process had an impact on home values in the surrounding area." | |
| Altisource permitted RSCs to determine not to remediate code violations. (Plaintiffs' Proposed Uncontested Fact No. 187) | In Defendants' LR 56.1 Response No. 237, Defendants admitted that "RSC's can determine not to remediate code violations." | |
| The Altisource Monthly Quality Control inspection form included a "comment" section for inspectors to include information that might not be | In Defendants' LR 56.1 Response No. 263, Defendants admitted that The Altisource Monthly Quality Control inspection form included a | |

2

| | | |
|---|---|---|
| listed in preprinted categories with check boxes.  (Plaintiffs' Proposed Uncontested Fact No. 215) | "comment" section for inspectors to include information that might not be listed in preprinted categories with check boxes ." | |
| Altisource did not evaluate whether there was a concentration of REO properties in communities of color. (Plaintiffs' Proposed Uncontested Fact No. 253) | In its Response to RFA No. 24, Altisource stated in part, "Altisource admits that it did not evaluate the concentration of REO properties in communities of color." | |