**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, OPEN COMMUNITIES; SOUTH SUBURBAN HOUSING CENTER; HOUSING OPPORTUNITIES MADE EQUAL OF VIRGINIA; FAIR HOUSING OPPORTUNITIES OF NORTHWEST OHIO, INC.; FAIR HOUSING CONTINUUM; GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER; DENVER METRO FAIR HOUSING CENTER; METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL; FAIR HOUSING CENTER OF WEST MICHIGAN; THE MIAMI VALLEY FAIR HOUSING CENTER; FAIR HOUSING CENTER FOR RIGHTS & RESEARCH; FAIR HOUSING CENTER OF THE GREATER PALM BEACHES; FAIR HOUSING CENTER OF CENTRAL INDIANA; CENTRAL OHIO FAIR HOUSING ASSOCIATION; HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.; CONNECTICUT FAIR HOUSING CENTER; NORTH TEXAS FAIR HOUSING CENTER; and FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA, | ) ) ) ) Case No. 1:18-cv-00839 ) ) ) ) ) ) ) ) ) ) ) ) Judge Manish S. Shah ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE; DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE; OCWEN LOAN SERVICING, LLC.; and ALTISOURCE SOLUTIONS, INC., | ) ) ) ) ) |
| Defendants. | ) |

**DEFENDANTS' CONSOLIDATED ROUND II MOTIONS IN LIMINE**

## INTRODUCTION

Plaintiffs' proposed stipulated facts and trial exhibits confirm that Plaintiffs are again attempting to put before the jury what they could not preserve through motion practice: claims, theories, and evidence that this Court has already rejected. Despite repeated rulings narrowing the scope of this case – losing direct liability against the Trustee Defendants, losing broad temporal scope, losing property scope, and losing the ability to prove liability except through a tightly cabined statistical showing tied to specific properties – Plaintiffs now propose to present the jury with sweeping narratives, generalized accusations, and evidence concerning properties and conduct that the Court has already ruled are outside the remaining scope of this case.

These motions in limine therefore do not seek new limitations. They seek enforcement of existing ones. The Court has already drawn the relevant lines – at the pleading stage, at summary judgment, and in its prior evidentiary rulings. Plaintiffs' current trial plan would erase those lines and effectively relitigate claims, time periods, theories, and categories of evidence that the Court has already rejected. If permitted, Plaintiffs' approach would convert carefully limited surviving claims into a free-ranging trial about alleged misconduct untethered to the properties, Defendants, theories, and time periods that remain in the case.

The Court should enforce the limits it has already imposed by excluding irrelevant, misleading, and unfairly prejudicial evidence and by ensuring that trial is confined to the narrow, specific, and properly supported claims that survived pre-trial motion practice.

## MEET-AND-CONFER STATEMENT

Pursuant to this Court's rules, Defendants met and conferred with Plaintiffs as to the instant motions in limine. That discussion was unsuccessful in obviating the need to file these consolidated motions.

**MOTION NO. 14:**

<u>LIMITING SCOPE OF REO PROPERTIES AT ISSUE AND EXCLUDE EVIDENCE
RELATED TO PROPERTIES OUTSIDE THE PROPER SCOPE</u>

Despite this Court's rulings at both the pleading and summary judgment stages limiting what Plaintiffs can demonstrate statistically and barring them from incorporating out-of-scope conduct into their analyses,[1] Plaintiffs have telegraphed their intent to present to the jury evidence concerning REO properties that are irrelevant under those prior rulings. Plaintiffs have even moved to bar Defendants from arguing that any of the 699 REO properties examined by their statistical expert are outside the scope of this case, Dkt. 503 at 13–18, even though that property set includes numerous properties that should be excluded pursuant to intervening orders of the Court. The Court therefore should (a) exclude evidence concerning REO properties that fall outside the limitations period for the limited claims that survived summary judgment, (b) exclude evidence concerning REO properties that were not owned, serviced, or maintained by any Defendant at the relevant times, and (c) bar generalized references to Defendants' conduct untethered to the specific properties actually at issue in this case.

**A.** **<u>The Court Should Exclude All Evidence Concerning Properties Inspected
Outside the Applicable Limitations Period for Ocwen and Altisource.</u>**

Until summary judgment, Plaintiffs asserted direct liability claims against each of the Trustee Defendants, Ocwen, and Altisource. *See NFHA I*, 2018 WL 6045216, at *11. Because Plaintiffs first filed an administrative complaint against the Trustee Defendants, and only later against Ocwen and Altisource, Judge Leinenweber ruled that "Plaintiffs may complain only of the Deutsche Bank Defendants' actions dating back to February 26, 2012, and of Ocwen and Altisource's actions dating back to February 14, 2015." *Id*. at 3. But on summary judgment, the

---

[1] *See NFHA v. Deutsche Bank Nat'l Tr.*, No. 18-cv-839, 2018 WL 6045216, at *11 (N.D. Ill. Nov. 19, 2018) ("*NFHA I*") (dismissing claims on the basis that "Plaintiffs' statistics have been undercut due to their reliance on barred conduct.")

Court dismissed Plaintiffs' direct liability theory against the Trustee Defendants, leaving only a respondeat superior theory based on the alleged actions of Ocwen. *See NFHA v. Deutsche Bank Nat'l Tr.*, No. 18-cv-839, 2025 WL 975967, at *47 (N.D. Ill. Mar. 31, 2025) ("*NFHA III*").

As the Court previously noted, "[t]raditional vicarious liability rules apply" to questions of agency arising under the Fair Housing Act. *NFHA III,* 2025 WL 975967, at *43 (citing *Meyer v. Holley,* 537 U.S. 280, 285 (2003)). Under those traditional rules as applied in the Seventh Circuit, where, as here, Plaintiffs are limited to a respondeat superior theory against a purported principal, claims that are time-barred as to the putative agent are also time barred as to the principal. *See Bachenski v. Malnati*, 11 F.3d 1371, 1378–79 (7th Cir. 1993) (dismissal of claims agent for failure to timely serve operated as adjudication on the merits mandating dismissal of agency claims against principal); *Turner v. M.B. Fin. Bank*, No. 14-cv-9880, 2017 WL 4390367, at *6 (N.D. Ill. Oct. 3, 2017) ("Because the claims against [the alleged agent] are time-barred, vicarious liability for his actions cannot be imposed against [the alleged principal]."); *Kapitan v. DT Chicagoland Express Inc.*, No. 12-cv-321, 2013 WL 5655704, at *4 (N.D. Ind. Oct. 15, 2013) (where court concluded that cause of action against employee was time-barred, plaintiff could not pursue action against employer for respondeat superior); *cf. United Fire & Cas. Co. v. Prate Roofing & Installations, LLC,* 7 F.4th 573, 585 (7th Cir. 2021) ("The principal's liability exists solely because of the agent's liability; if the latter is erased, so is the former."); *Freeman v. Carter,* No. 20-cv-631, 2021 WL 4146999, at *9 (N.D. Ind. Sept. 13, 2021) (dismissing claims against purported principal where claims against putative agents were dismissed for failure to serve them (citing *Kapitan*, 2013 WL 5655704, at *2)); *Preis v. Lexington Ins. Co.*, 508 F.Supp.2d 1061, 1078 (S.D. Ala. 2007) ("Without a viable claim against the agent, there can be no recovery against the principal under the respondeat superior theory on which the plaintiffs are traveling."). "Vicarious

liability is not an independent cause of action, but rather is a legal concept used to transfer liability from an agent to a principal." *Gaston v. Ghosh*, 920 F.3d 493, 497 (7th Cir. 2019) (quoting *Crawford v. Signet Bank*, 179 F.3d 926, 929 (D.C. Cir. 1999)). It naturally follows that, as Ocwen cannot be liable for conduct occurring before February 14, 2015, there is no liability to transfer for actions occurring before that date.

In their motions in limine, Plaintiffs assert that both this Court and Judge Leinenweber previously held that the "statute of limitations as to Deutsche Bank's vicarious liability" dates to 2012. Dkt. 503 at 18. No such rulings exist. In ruling on the motions to dismiss the Second Amended Complaint, Judge Leinenweber held that Plaintiffs had adequately pleaded a claim for *direct* liability against the Trustee Defendants, *NFHA v. Deutsche Bank Nat'l Tr.*, No. 18-cv-839, 2019 WL 5963633, at *10 (N.D. Ill. Nov. 13, 2019) ("*NFHA II*"), and then ruled that the applicable "statute of limitations in this case" dated to February 26, 2012, for the Trustee Defendants, *id.* at *11. Judge Leinenweber never had the occasion to consider what limitations period would apply to vicarious liability claims standing on their own.

Plaintiffs nevertheless cite this Court's *denial* of their own request to overturn Judge Leinenweber's limitations rulings as supposed support for the proposition that the Court also ruled on the limitations period applicable to vicarious liability claims. Dkt. 503 at 18 (citing Dkt. 442 at 31). That is incorrect. As with Judge Leinenweber's earlier decision, the summary judgment order first addressed limitations periods in a procedural posture in which Plaintiffs still had surviving *direct* liability claims against the Trustee Defendants, *NFHA III*, 2025 WL 975967, at *13, and only later in that decision addressed the direct liability claims on other grounds, *id.* at *47. No party raised on summary judgment the question whether the limitations period would apply to vicarious liability claims standing alone because, at that time, those claims were not standing alone.

After the Court dismissed Plaintiffs' direct liability claims against the Trustee Defendants, the only surviving claims as to those Defendants arise from Ocwen's conduct. *See id.* at *46. As Judge Leinenweber held in 2018 and reaffirmed on reconsideration, the "actionable allegations window" for Ocwen's conduct dates to February 14, 2015. *NFHA I*, 2018 WL 6045216, at *4; *accord NFHA II*, 2019 WL 5963633, at *11. When Plaintiffs asked again that the Court revisit that ruling, the Court likewise reaffirmed that Ocwen's conduct is subject to a later limitations period — "to conduct after February 14, 2015." *NFHA III*, 2025 WL 975967, at *13 (citing *NFHA I*, 2018 WL 6045216, at **3-5). Because, after summary judgment, the Trustee Defendants can be held liable only for Ocwen's conduct, that same limitations period necessarily governs the vicarious liability claims against the Trustee Defendants.

Plaintiffs have already acknowledged that they created a separate statistical analysis for the shorter limitations period. *See* Dkt. 503 at 18 ("Dr. Ayres' analyses accounted for the respective statutes of limitations."). The Court should hold Plaintiffs to that concession. The Court should exclude evidence of conduct falling within the now-irrelevant limitations period applicable only to direct liability claims against the Trustee Defendants and admit only evidence related "to conduct after February 14, 2015," *NFHA III*, 2025 WL 975967, at *13.

**B.     Evidence Concerning REO Properties That Were Not Maintained by Altisource, Serviced by Ocwen, and Titled to a Trustee Defendant at the Time of Plaintiffs' Inspection Should Be Excluded.**

As set forth in the operative Second Amended Complaint ("SAC"), Plaintiffs' claims are based on the allegation that "Defendants discriminated against communities of color in the exterior maintenance and marketing of properties *owned by* Deutsche Bank *after* foreclosure in thirty metropolitan areas." Dkt. 70 ¶ 1 (emphasis added). On summary judgment, the Court drew a bright line limit on the scope of potential liability, confining it to properties included in Plaintiffs' statistical study, which, setting aside the statute of limitations and ownership issues addressed in

part below, includes only 498 of the 699 that Plaintiffs continue to claim are at issue. *NFHA v. Deutsche Bank Nat'l Tr.,* No. 18-cv-939, 2025 WL 3306306, at *3 (N.D. Ill. July 9, 2025) ("*NFHA IV*"); *see also* Kliebard Decl. Ex. 1, Expert Report of David M. Skanderson at Section 9.4 ¶ 125 n.87, and Appendix 4.[2]

Notwithstanding how they defined their own claims in the SAC, Plaintiffs asserted for the first time in their first-round motions in limine that they intend to present evidence regarding purported maintenance deficiencies present on properties inspected by Plaintiffs *before* those properties were owned by a Trustee Defendant. *See* Dkt. 503 at 13.[3] Plaintiffs likewise seek to introduce evidence related to REO properties they inspected *after* Defendants had already sold them to new homeowners.[4]

Plaintiffs have not presented any statistical evidence suggesting that disparities exist with respect to the limited sorts of activities a servicer is allowed to do prior to foreclosure. Neither Ocwen nor Altisource were authorized to undertake many of the actions Plaintiffs now fault them

---

[2] References to "Ex. __" herein refer to the exhibits to the Declaration of Kenneth M. Kliebard submitted herewith.

[3] As an example, Plaintiffs include both in the list of 699 properties and in Ayres' regression the property located at 9837 Bluffcreek Rd., Dallas, TX 75227. *See* Kliebard Decl. Ex. 2, Ayres Report I ¶ 39 (citing "Agreed Property List – 2022.04.22 (from Ocwen).xlsx"). This property went into REO status on March 8, 2012, but was inspected four months before on December 7, 2011. *See id*. Ex. 3, ASI000023620 (RealRes-Prop details (2)); *id*. Ex. 4, NFHA_0033462 (db_county_data_v3_2018 1219 (3)). Similarly Plaintiffs and Ayres include 7717 S. Ada St., Chicago, IL 60620 though it went into REO status on March 11, 2013 but was inspected by Plaintiffs more than a year before on February 9, 2012. *See id*.

[4] For example, the list of 699 properties (and Ayres' regression analysis) includes 16973 Western Ave., Hazel Crest, IL 60429. *See* Kliebard Decl. Ex. 2, Ayres Report I ¶ 39 (citing "Agreed Property List – 2022.04.22 (from Ocwen).xlsx"). Plaintiffs inspected this property on June 20, 2013. *See id*. Ex. 6 NFHA_0000001 (Plaintiffs' "REO Database"). However, Deutsche Bank National Trust Company sold the property to a Jerry Holt on February 5, 2013. *See id*. Ex. 5, DB_NFHA00181610 (deed recorded in Cook County Recorder of Deeds at Doc. # 1305726126). Other examples of properties that were sold prior to inspection and that are included in the set of 699 include those located at 3155 North Norfolk St., Indianapolis, IN, 46224; 9921 Hoyt Cir., Randallstown, MD 21133; 1015 W. 50th Pl., Hialeah, FL 32810; and 3829 26th St. NE, Washington, D.C. 20018. *See id*. Ex. 7, ASI000023618 (Hubzu – NFHA – Data – 12- May-20), Ex. 6 NFHA_0000001.

for, such as removing homeowner mail, remediating mold, or re-siding a house. *See Hardie v. Deutsche Bank Tr. Co. Am.*, 544 F.Supp.3d 547, 559 (D. Md. 2021) (declining to dismiss unjust enrichment claim where mortgagor removed personal property from home prior to foreclosure). As Defendants explained in opposing Plaintiffs' motions in limine, the sort of invasive maintenance Plaintiffs suggest would often constitute trespassing. At best, evidence concerning pre-foreclosure properties is irrelevant. At worst, it is misleading because it invites the jury to hold Defendants responsible for property conditions they were powerless to address. Such evidence should therefore be excluded under Fed. R. Evid. 401 and 403.

Plaintiffs have never articulated any basis for including in their study properties that were inspected after those homes had been sold to new homeowners. As Defendants explained in opposing Plaintiffs' motion in limine, the unrebutted evidence shows that numerous properties Plaintiffs seek to include in their study have a listed "REO_DATE" – the date a property was listed as owned by a homeowner – that post-dates Plaintiffs' inspections. *See* Kliebard Decl. Ex. 2, Ayres Report I ¶ 50 (noting exclusions from "Full Analysis Sample" based on servicer data). For many other properties, there was no available servicer data of ownership at all. *See id*. ¶ 49. And, Plaintiffs failed to produce their own admissible evidence of ownership in fact discovery.

For a subset of these properties, Plaintiffs' expert (Ayres) purports to infer ownership dates from data obtained from a third-party vendor, ATTOM Data Solutions.[5] But Ayres's reliance on that hearsay does not render it admissible for any purpose other than within the confines of Ayres's work. *See Holwill v. AbbVie Inc.*, No. 18-cv-6790, 2025 WL 1908156, at *5 (N.D. Ill. July 10, 2025) ("Rule of Evidence 703 does not authorize an expert to be a conduit for otherwise

---

[5] Even Ayres admits that Defendants did not own 130 of the 699 properties at the time of inspection. *See* Kliebard Decl. Ex. 1, Expert Report of David M. Skanderson at Section 9.4, ¶ 125, n.87, and Appendix 4.

inadmissible hearsay." (quotations omitted)). Plaintiffs should therefore be precluded from presenting evidence — such as photographs, neighbor testimony, or assertions of maintenance deficiencies — regarding REO properties inspected only after they were sold, or to which Plaintiffs have failed to produce evidence of ownership.

In sum, where a property was not owned by a Trustee Defendant at the time of Plaintiffs' inspection, or where Plaintiffs have failed to adduce any admissible evidence of ownership, that property falls outside the scope of this case.[6] Evidence of disrepair as to such properties would be unfairly prejudicial because it would suggest they Defendants are responsible for conditions they could do not address. That evidence should be excluded.

**C.**     **References to Generalized Conduct That Did Not Occur With Respect to Properties Properly Included in Plaintiffs' Study Should Be Barred.**

As noted above, the Court has issued express guidance regarding the scope of liability available in this case. *NFHA IV*, 2025 WL 3306306, at *3. Namely, liability is confined to what Plaintiffs can show within the confines of their statistical results of properties they actually inspected. Nonetheless, Plaintiffs have throughout this case made generalized assertions regarding Defendants' alleged conduct untethered to the properties they inspected. For example, Plaintiffs have organized the records they propose to present to the jury under generalized labels like "Deutsche REO" and "General REO." Dkt. 503 at 45. Plaintiffs go further, affirmatively moving to bar any discussion of distinctions amongst Defendants, insisting that they must be lumped together lest Plaintiffs be put to the task of proving liability as to each of them. *See id.* at 22.

---

[6] If a property was not owned by a Trustee Defendant at the time of Plaintiffs' inspection, it was also not serviced by Ocwen or maintained by Altisource. Plaintiffs have never alleged nor produced any evidence to show that a property at issue in this case was serviced by Ocwen and maintained by Altisource but owned by some non-party.

Generalized assertions of wrongdoing untethered to the scope of liability available to Plaintiffs run the risk of nullifying this Court's limiting orders. In any presentation to the jury, the Court should require Plaintiffs to identify the specific Defendant being described and tie any argument to a specific, in-scope purported disparities. The Court should bar unsupported and unsupportable references to nationwide, systemic, or citywide discrimination, as well as other sweeping terms that, the evidence in this case has now established, cannot be proven.

**MOTION NO. 15:**
**EXCLUDE TESTIMONY OF THIRD-PARTY WITNESSES**

The Court has consistently held that this case is narrowly focused on whether there was a racial disparity in Defendants' maintenance of a defined set of REO properties owned by the Trustee Defendants, serviced by Ocwen, and maintained by Altisource during the relevant time period. Plaintiffs now seek to disregard that narrow scope in an attempt to inflame the jury and unfairly prejudice Defendants by presenting a parade of fourteen third-party witnesses whose proposed testimony bears little or no connection to the conduct actually at issue.

Those witnesses would be offered by Plaintiffs to testify about, among other things, generalized community events and conditions that pre-date the statute of limitations period, broad opinion-based narratives about alleged foreclosure-era, industry-wide conduct and public-relations controversies untethered to Defendants' alleged conduct at issue in this case, and properties that were neither owned by Trustee Defendants nor maintained by Servicer Defendants. None of that testimony is probative of the questions the jury must decide. Instead, it would inject irrelevant and highly prejudicial information into trial, invite the jury to decide the case based on generalized grievances or sympathy rather than evidence, and risks confusion, mini-trials on collateral issues, and needless consumption of time, particularly in a case where Plaintiffs have identified more than forty live witnesses and extensive deposition designations.

For the reasons discussed below, this Court should exclude under Federal Rules of Evidence 401, 402, 403, 602, and/or 701, the fourteen non-party witnesses: (1) the six Milwaukee-based Common Ground affiliates ("Common Ground"), (2) the six neighbors or other community members near certain properties, and (3) the two third-parties connected to the University of Memphis Neighborhood Preservation Clinic.

### A.      Common Ground Witnesses And Testimony Should Be Barred.

Common Ground is a non-profit community organization in Southeastern Wisconsin that organizes congregations, schools, nonprofits, and small businesses to pursue community-driven solutions, including its foreclosure-related "Milwaukee Rising" initiative focused on block-by-block revitalization in the Sherman Park neighborhood of Milwaukee. In the wake of the 2008–2012 foreclosure crisis, Common Ground applied public pressure (and later worked collaboratively with) several multiple major banks and servicers — not just Defendants here — to support localized neighborhood repair, investment, and loan programs. Common Ground is not a party to this lawsuit. Its efforts were localized and collaborative, focused on improving one Milwaukee neighborhood, and were not related to the Plaintiff organizations' multi-city preservation and maintenance allegations concerning Defendants' maintenance of REO properties. For that reason alone, Common Ground's activities are irrelevant to any claim or defense in this litigation. At most, Plaintiffs appear to be offering this testimony to suggest Defendants were on some form of "notice." But that theory fails. Any such "notice" concerns a single Milwaukee neighborhood outside the relevant MSAs. In other words, Common Ground's work is irrelevant to this litigation.

Plaintiffs have included on their trial witness list the following six witnesses from third-party Common Ground affiliates: Dr. Susan Giaimo ("Giaimo"), Robert Connolly ("Connolly"), Minister Mark Fraley ("Fraley"), Pastor Willie Davis ("Davis"), Lauretta Turnbull ("Turnball") and Jennifer Vellinga ("Vellinga") (collectively, the "Common Ground Witnesses"). Giaimo, Connolly, Fraley, and Davis are listed as witnesses Plaintiffs will call in person at trial, and Turnbull and Vellinga as witnesses Plaintiffs may call in person at trial. Plaintiffs intend to present testimony from the Common Ground Witnesses to tell a generalized and irrelevant story about the

foreclosure crisis, public advocacy, and alleged industry practices. The Court should bar each of them from testifying.

>    1.    *Common Ground witnesses should be barred under Rules 401, 402, and 403 because that testimony is irrelevant and highly prejudicial.*

The Court should exclude the Common Ground Witnesses and related testimony because it is irrelevant, and any marginally probative value is substantially outweighed by the risk of unfair prejudice, confusion, and undue consumption of time. Their anticipated testimony consists largely of third-party accounts and advocacy materials about events and campaigns from roughly 2008 to 2011 — well before the February 2015 limitations start date — and is untethered to the properties at-issue, Defendants' post-February 2015 maintenance practices, or any specific conduct alleged in this case. Allowing Plaintiffs to present that narrative would divert the trial to collateral disputes over historical advocacy, media strategy, and alleged industry-wide misconduct rather than the elements Plaintiffs must prove.

Beyond that, the non-party Common Ground Witnesses are not parties to this case, claim no interest in the properties at issue, and do not contend that their organizations' missions were frustrated by Defendants' conduct. Yet Plaintiffs intend to call four of the six Common Ground Witnesses in their case-in-chief, with the option to add two more from their "may call" list. This diversion will consume significant trial time to present testimony that is not probative to this case and prejudicial. The Federal Rules of Evidence do not permit that detour, and exclusion is therefore warranted under Rules 401, 402, and 403.

For example, Dr. Susan Giaimo, a professor and a volunteer for Common Ground's foreclosure campaign, submitted a declaration during discovery that focuses almost entirely on 2008 to 2011 events, including shareholder meetings, city-hall meetings, press conferences, and correspondence – none of which concern the properties at issue in this case. *See generally* Kliebard

Decl. Ex. 8, Giaimo Decl. Her declaration further reproduces inflammatory comments from a 2010 article attributing to her the statement that "Deutsche Bank is destroying Milwaukee homes. Germany built Milwaukee and now a German bank is destroying Milwaukee homes." *Id*. ¶ 54. Her declaration also quotes, in full, a 2011 press release in which she stated, "We are very disappointed that Deutsche Bank, as one of the biggest trustees of foreclosed properties in Milwaukee, still doesn't acknowledge its responsibility for the crisis." *Id*. ¶ 63.

These statements are not probative of any issue the jury must decide in this case, which concerns only whether Defendants engaged in discriminatory maintenance preservation practices with respect to a defined set of properties during a narrow time period. Giaimo's testimony instead invites the jury to decide the case based on generalized condemnation of "Deutsche Bank's" perceived role in the foreclosure crisis, rather than the maintenance practice challenged here. On top of that, "Deutsche Bank" is not a defendant in this lawsuit. Judge Leinenweber dismissed "Deutsche Bank" from the case in 2018, as that is "simply a trade name and does not identify a particular legal entity." *NFHA I*, 2018 WL 6045216, at *2. The testimony is therefore irrelevant and, in any event, its prejudicial effect would substantially outweigh any conceivable probative value. Exclusion is warranted under Rules 401, 402, and 403.

Similarly, Bob Connolly, a retired small business owner and Common Ground volunteer, submitted a declaration recounting a Milwaukee-specific campaign in the Sherman Park neighborhood that involved REO properties owned and serviced through numerous financial institutions and that culminated in 2011, well before the statute of limitations in this case. *See* Kliebard Decl. Ex. 9, Connolly Decl. ¶¶ 8–13, 15–24. That commentary is not probative of any issue the jury must decide in this case, but it instead invites the jury to decide this case based on prejudicial, inflammatory, and unsupported narratives about the foreclosure crisis in one

Milwaukee neighborhood rather than the property maintenance conduct with respect to the specific properties at issue in this case.

The prejudice is particularly acute here because none of the loans associated with the properties at issue were originated by the Trustee Defendants or any of their subsidiaries, and this case does not concern the causes or consequences of sub-prime lending. The testimony is therefore irrelevant and unfairly prejudicial, and exclusion is warranted under Rules 401, 402, and 403.

Next, Mark Fraley, a minister and former Common Ground Executive Director, likewise submitted a declaration and exhibits concerning collateral and outdated activities, including a 2009 photo-survey, a November 2009 public hearing, as well as bank engagements and press releases from 2010 to 2011. *See generally* Ex. 10, Fraley Decl. Fraley's declaration further includes speculative and highly charged commentary on "Deutsche Bank's" treatment of homes in minority neighborhoods, including the statement that "Nothing during my career has ever made me angrier than the behavior of banks I observed and was forced to confront during the Faces of Foreclosure campaign, especially the misconduct, attitude and behavior by Deutsche Bank and its obvious disdain for the minority neighborhoods they devasted." *Id*. ¶ 54.

That commentary is not probative of any issue the jury must decide in this case and instead invites the jury to decide the case based on moral condemnation and generalized narratives about the foreclosure crisis rather than evidence of Defendants' conduct with respect to the specific properties at issue. The testimony is therefore irrelevant and unfairly prejudicial, and exclusion is warranted under Rules 401, 402, and 403.

Finally, Reverend Davis (a pastor at a Milwaukee church), Ms. Vellinga (a retired medical technologist), and Ms, Turnbull (a retired paraprofessional) likewise submitted declarations describing activities that predate the limitations by several years, including 2008 to 2010

15

community walks, mapping, and Common Ground's "Faces of Foreclosure" report released in 2010. None of that material concerns the properties at issue here, Defendants' post-February 2015 maintenance practices, or any conduct alleged in this litigation.

The Common Ground Witnesses' declarations also contain generalized, speculative, and highly charged opinions about "Deutsche Bank" and the foreclosure crisis, including: "We thought: why in the world is a German-based bank owning homes in Milwaukee?" (Kliebard Decl. Ex. 11, Davis Decl. ¶ 9); "I definitely believe that race was a reason why Deutsche Bank neglected vacant/foreclosed homes in the Milwaukee inner city, where the residents are primarily African American" (Kliebard Decl. Ex. 12, Vellinga Decl. ¶ 21); and "For many years, I felt that I needed to leave my neighborhood, since the value of my property was decreasing, and the conditions of my neighborhood were getting worse because of abandoned and neglected homes following the foreclosure crisis" (Kliebard Decl. Ex. 13, Turnbull Decl. ¶ 13). Neither of the Trustee Defendants is a "German-based bank," *see* Dkt. 101 ¶ 35, and there is no evidence that the properties described were serviced by Ocwen (as opposed to one of the numerous other servicers servicing for Trustee-Defendant administered trusts at that time).

As with the other Common Ground witnesses, this testimony is not probative of any issue the jury must decide in this case and instead invites the jury to decide the case based on generalized grievances and moral judgments about the foreclosure crisis rather than evidence of Defendants' conduct with respect to maintenance of the specific properties at issue. The testimony is therefore irrelevant and unfairly prejudicial, and exclusion is warranted under Rules 401, 402, and 403.

Significantly, the Common Ground Witnesses provide no post-2015, maintenance-focused observations, data, or analysis tied to the Defendants or to the at-issue properties owned by Trustee Defendants and maintained by Ocwen and Altisource. Instead, their testimony consists of

unrelated anecdotes and accounts of their advocacy efforts that shed no light on whether Defendants maintained properties in a discriminatory manner during the relevant period. The testimony therefore does not make any fact of consequence more or less probable with respect to Plaintiffs' § 3604(b) maintenance claims and is inadmissible under Rule 402.

Additionally, the Common Ground Witnesses — which include a minister, a pastor, a professor, and volunteers — are highly sympathetic figures whose testimony is likely to carry substantial emotional weight with the jury. Yet, their proposed testimony is not probative of the issues in the jury must decide and instead consists of inflammatory and highly charged characterization of Defendants' alleged role in the foreclosure crisis and related public controversies. That combination creates a substantial risk of unfair prejudice by inviting the jury to conflate broader industry narratives with Defendants' specific conduct at issue here.

For example, Giaimo describes telling "Deutsche Bank's" CEO that the bank was "destroying Milwaukee," and recounts press characterizations referring to a "PR disaster" and the "destruction of social capital." *See* Kliebard Decl. Ex. 8, Giaimo Decl. ¶¶ 12, 24, 34. She also quotes her remarks from a Deutsche Bank AG shareholders meeting where she said, "In short, DB privatized the profit but socialized the risks of its actions, with US taxpayers, city governments, and neighborhoods footing the bill. DB cannot walk away from these properties just because these investments went sour." *Id*. ¶ 67.

Similarly, Connolly characterizes multiple banks as having "abused" homeowners and celebrates Common Ground's public-pressure tactics and confrontations, reflecting advocacy goals including sending its leaders to Frankfurt twice to confront Deutsche Bank AG's CEO at shareholder meetings. This proposed testimony reflects Connolly's advocacy objectives directed to a non-Defendant (Deutsche Bank AG), rather than evidence probative of Defendants' alleged

conduct in this case. Kliebard Decl. Ex. 9 Connolly Decl. ¶ 7 (stating that that "Deutsche Bank" "did not negotiate willingly - we had to embarrass them quite a bit and even. But the pressure worked - they did the right thing for the wrong reason.").

Fraley's declaration and supporting exhibits raise similar concerns, describing his role in the "Faces of Foreclosure campaign" and attributing to "Deutsche Bank" a "significant role in destroying" neighborhoods. Kliebard Decl. Ex. 10, Fraley Decl. ¶ 24. Introducing this emotionally charged, pre-statute of limitations narrative would invite the jury to decide this case based on moral condemnation (of a non-Defendant no less), rather than based on evidence of Defendants' property maintenance practices for a defined set of properties in a narrow time period. It would risk jury confusion by shifting the focus from Defendants' specific property maintenance practices into a referendum on the role of all banks and servicers in the foreclosure crisis. This is precisely the type of unfair prejudice and confusion Rule 403 was designed to exclude.

> 2. *The Common Ground Witnesses lack foundation for the specific, disputed issues in this case.*

Even apart from irrelevance and unfair prejudice, the Common Ground witnesses lack the personal knowledge necessary to offer fact or lay-opinion testimony on the specific issues the jury must decide here, namely, whether Ocwen and Altisource engaged in discriminatory property maintenance properties for a defined set of properties.

The Common Ground Witnesses do not claim to have inspected, visited, or analyzed the properties at issue. They did not review Defendants' documents, maintenance records, policies and procedures, or practices. They did not perform any comparative analysis of the Defendants' property maintenance practices in majority-white and majority-minority communities. Instead, their testimony is based on impressions from neighborhood walks, advocacy experiences, and

media or community narratives from 2008 and 2011 that are not tied to Defendants' post-2015 conduct.[7]

Whatever personal knowledge these witnesses may have on their own advocacy activities and historical events, they lack first-hand knowledge of issues specific to this case. As a result, the Common Ground Witnesses are not competent to offer opinions or inferences about whether Defendants maintained properties in a discriminatory manner, whether any disparities existed, or what caused any such disparities. Their testimony would therefore lack a proper evidentiary foundation under Rules 602 and 701 and would risk presenting speculation and advocacy as evidence. Exclusion is warranted on that independent basis.

For these reasons, the Court should exclude all testimony, evidence, and argument from the Common Ground Witnesses, and any related exhibits, statements, press materials, or advocacy documents reflecting Common Ground's activities, under Federal Rules of Evidence 401, 402, 403, 602, and 701.

### B. The Testimony of Neighbors of REO-Properties is Irrelevant and Unduly Prejudicial.

Plaintiffs also seek to present at trial the testimony of six neighborhood residents who lived near, but did not own, inspect, or manage the REO properties at issue: Annick Joele Ngameni ("Ngameni"), Officer Marvin Adams ("Adams"), Special Operations Officer Dexter Craig ("Craig"), Victoria Plate ("Plate"), Carol Keith ("Keith"), and Laurie Koehler ("Koehler")

---

[7] For example, Giaimo testified that her work focused on "getting Deutsche Bank to the table" in 2009, 2010, and 2011, and negotiating, not on any technical analysis of maintenance standards, servicer protocols, or REO operations tied to the specific Defendants or the disputed issues in this case. *See* Kliebard Decl. Ex. 14, Giaimo Dep. Tr. at 62:5–19; *see also* Kliebard Decl. Ex. 11, Davis Decl. ¶ 20 ("In July 2008, GNBC and other CG members conducted a neighborhood walk in the area surrounding the church."); Kliebard Decl. Ex. 13, Turnbull Decl. ¶ 5 ("I was part of the walk around in neighborhoods talking to residents…"); Kliebard Decl. Ex. 12, Vellinga Decl. ¶ 18 ("I was later part of a group from Common Ground that gave a guided tour of vacant homes in the Sherman Park neighborhood…").

(collectively, the "Neighbors"). *See* Dkt. 505-1, ¶¶ 113–25; *see also* Kliebard Decl. Ex. 15, Pls.' Revised Witness List. Like the Common Ground witnesses, these individuals lack any connection to Defendants' maintenance decisions or practices, and their testimony is therefore irrelevant to the issues the jury must decide.

None of these neighbors claim to have inspected the interiors of the subject properties, reviewed maintenance records for the subject properties, interacted with Defendants or their agents regarding the conditions of the subject properties, or conducted any systematic or comparative assessment of maintenance by race, neighborhood, owner, servicer, or time period. At most, they offer anecdotal observations and personal impressions about neighborhood conditions or property appearances, untethered to the set of properties at issue, the relevant time period, or Defendants' actual conduct. Such testimony does not make it more or less probable that Defendants' maintenance practices caused any racial disparity at the properties at issue. Instead, it invites the jury to draw inferences about discriminatory conduct drawn from anecdotes about generalized neighborhood conditions. The Rules of Evidence do not permit such an inference.

The Neighbors also lack personal knowledge of facts relevant to Plaintiffs' claims. *See* Fed. R. Evid. 602. Their testimony would therefore risk an emotional verdict untethered to the elements Plaintiffs must prove and should be excluded under Rules 401, 402, 403, and 602.

The relevance defect is especially clear with respect to the testimony of Plate and Koehler. Their testimony will concern properties that were not serviced by Ocwen nor maintained by Altisource and, thus, are not within the scope of this litigation – 6217 E. Hil Mar Circle, District Heights, MD 20747 and 3932 West Florist Avenue, Milwaukee, WI 53209, respectively. Kliebard Decl. Ex. 15, Pls.' Revised Witness List ¶ (43); *id.* at Ex. 16, Plate Decl.; *id*. at Ex. 17, Koehler Decl.; *id*. at Ex. 18, DB_NFHA00307539, Agreed Property List - 2022.04.22.xlsx;

DB_NFHA00307539 ( showing Bank of America as servicer for Florist Ave. property). Because Plate and Koehler cannot offer information that would make a fact of consequence regarding the at-issue properties more or less likely, their personal and anecdotal accounts are irrelevant and inadmissible under Rule 401, 402 and 602.

For the remaining proposed neighborhood witnesses, Plaintiffs appear to offer that testimony to suggest either Ocwen or Altisource acted with a racially discriminatory intent. But none of these witnesses is competent to offer such an opinion. They lack personal knowledge of these Defendants' intent, policies, or decision-making, and they did not perform any comparative analysis of Defendants' property maintenance practices in majority-white versus majority-minority neighborhoods. Any inference they might draw about discriminatory intent would therefore be speculative and inadmissible under Rules 602 and 701.

Ms. Keith's testimony illustrates this point. She acknowledges that she never contacted either of the Trustee Defendants to express concerns about the property at 5524 Walker Mill Rd., Capitol Heights, MD. As a result, there was no opportunity for the Trustee Defendants (or the relevant servicer to which her concerns would have been forwarded) to respond to or address any alleged deficiencies, and no basis for Ms. Keith to have any personal knowledge concerning Defendants' intent, practices, or responsiveness. Kliebard Decl. Ex. 19, Keith Decl. ¶ 8. As a result, there was no opportunity for Defendants to respond to or address any alleged deficiencies — and no basis for Ms. Keith to have any personal knowledge regarding Ocwen's or Altisource's intent, practices, or responsiveness.

Ms. Ngameni likewise declined to communicate with anyone who could have addressed the issues she observed, and her testimony concerns the inside of the home, which is not at issue in this litigation. *See* Kliebard Decl. Ex. 20, Ngameni Decl. ¶¶ 10, 12 ("On at least two occasions

when it was vacant, fire were started inside the home at 322. . . . The police also arrived at the scene when the first occurred. . . . I did not volunteer to talk with the police when they arrived to investigate."). That testimony does not support any inference about Defendants' maintenance practices or intent.

Mr. Craig testified that he contacted the county and a city council member's office, but he does not claim that he informed any Defendant, nor does he indicate whether the offices he contacted ever relayed his information to any Defendant. *See* Kliebard Decl. Ex. 21, Craig Decl. ¶ 8. He therefore likewise lacks personal knowledge of Defendants' conduct or intent.

The lone neighbor who contacted a Defendant directly, Mr. Adams, confirms that the issue he raised was addressed. *See* Kliebard Decl. Ex. 22, Adams Decl. ¶ 15 ("I called the bank at least once to complain that the grass was crazy. . . and there were squatters living in the house. Eventually, . . . someone came to 6515 and cut some of the grass."). He does not claim any personal knowledge of Ocwen's or Altisource's processes or policies, and therefore cannot offer a foundation for an opinion about Defendants' discriminatory intent or practices.

Moreover, much of the proposed testimony concerns squatters or unauthorized occupants of REO properties. *See* Kliebard Decl. Ex. 19, Keith Decl. ¶ 7 (someone using the vacant property at 5524 Walker Mill Rd. for an ad-hoc car mechanic business.); *id.* Ex. 22, Adams Decl. ¶11 (squatters); *id.* Ex. 21. Craig Decl. ¶ 7 (unauthorized persons). As Defendants will show, maintenance and preservation activities cannot be performed at properties that are occupied, and Defendants are legally constrained from doing so. *See infra* MIL No. 19(b). Indeed, Plaintiffs even excluded from their study houses that were occupied. Because the neighbors do not — and cannot — have personal knowledge of those constraints, any inference from the neighbors' testimony that Defendants failed to perform maintenance on an occupied home as somehow reflecting

discriminatory conduct is outside the scope of their personal knowledge and impermissibly speculative.

Because the Neighbors' lack personal knowledge of any facts bearing on the Defendants' liability, their testimony is irrelevant. They are not parties; they do not claim any possessory interest in any property at issue; they were not involved in Plaintiffs' investigation; and they are not experts in building codes, property maintenance, or servicer obligations. Their limited, anecdotal observations therefore have no bearing on whether Defendants engaged in discriminatory maintenance practices that proximately harmed Plaintiffs. As such, their limited, personal, anecdotal accounts have no bearing on whether Defendants engaged in discriminatory maintenance practices, which proximately harmed Plaintiffs. The testimony is thus inadmissible under Rules 401 and 402, and any attempt to stretch it beyond the witnesses' personal knowledge to manufacture relevance is barred under Rule 602.

The risk of unfair prejudice is substantial. The Neighbors include figures of authority, such as a police officer (Adams), a Special Operations Officer in the U.S. Army (Craig), and a retired State Department Financial Officer (Keith), as well as sympathetic witnesses, including a registered nurse living with her children and grandchildren (Ngameni). Their testimony about squatters, neighborhood decline, and personal distress is likely to evoke strong reactions on the jury while offering little, if any, probative value on Defendants' maintenance practices for the properties at issue in the relevant time frame. As a result, such testimony invites an emotional verdict untethered to the elements Plaintiffs must prove.

The testimony is also needlessly cumulative and would waste trial time. Plaintiffs seek to offer multiple witnesses regarding the conditions of the same properties (e.g., Ngameni regarding 322 Carmody Hills Drive, Capitol Heights, MD 20743 (Dkt. 505-1, ¶ 115), and Adams and Craig

conditions regarding 6515 Walters Place, District Heights, MD 20747. (Dkt. 505-1, ¶¶ 121, 124.).)

Any marginal relevance that this testimony might have is needlessly cumulative and can be

presented, if at all, through Plaintiffs' own investigation materials, including inspection forms and

property photographs, without layering superfluous anecdotal testimony, which does not add any

additional relevant context.

In short, the Neighbors' testimony cannot support any admissible inference about

Defendants' intent, policies, or comparative practices and would invite the jury to speculate about

causation and motivation based on anecdote rather than evidence. It should therefore be excluded

under Rules 602 and 701.

### C. The Previous Legal Actions and Work Associated With the University of Memphis' Neighborhood Preservation Clinic are Irrelevant and Unduly Prejudicial.

Plaintiffs have identified on their will-call witness list two individuals affiliated with the

University of Memphis School of Law: Brigid Welsh[8] and David Schaffzin[9] (collectively,

"Memphis Law Witnesses"). Plaintiffs' proposed fact stipulations further make clear that they

intend to use these third-party witnesses and related exhibits to tell a broader narrative untethered

to the at-issue properties, the relevant time period, or Defendants' post-February 2015 REO

maintenance practices. *See* Dkt. 505-1, at ¶¶ 85–121.

As described below, Walsh and Schaffzin are expected to testify about the activities of the

University of Memphis Neighborhood Preservation Clinic, Code Enforcement inquiries

concerning properties largely outside the scope of this case, and the Clinic's prior lawsuits and

---

[8] Welsh was a former Staff Attorney at Memphis Law's Neighborhood Preservation Clinic and is currently the Director of Experiential Learning at the Memphis School of Law. Kliebard Decl. Ex. 15, Pls.' Revised Witness List ¶ (a)(6).

[9] Schaffzin was a former Associate Professor of Law and Director of Experiential Learning at Memphis Law. Kliebard Decl. Ex. 15, Pls.' Revised Witness List ¶ (a)(10).

their outcomes. None of that evidence bears on any disputed issue relevant to Plaintiffs' remaining § 3604(b) maintenance claim. Instead, it would introduce collateral matters that risk unfair prejudice, juror confusion, mini-trials on unrelated proceedings, and needless duplication. Defendants therefore respectfully request that this Court exclude the Memphis Law Witnesses and any related evidence, including studies, clinic reports, presentations, and press releases under Rules 401, 402, and 403.

Relevance is the threshold inquiry. Evidence is admissible only if it has a tendency to make a disputed fact of consequence more or less probable. *See* Fed. R. Evid. 401–402. The Memphis Law Witnesses' anticipated testimony and related written materials do not satisfy that standard. They do not tend to prove or disprove any disputed fact about Defendants' intent or conduct with respect to the properties at issue and instead would divert the trial into collateral matters involving third-party advocacy and unrelated proceedings.

The Memphis Law Witnesses are not parties to this case, and their testimony and evidence regarding prior clinic work does not make any fact of consequence more or less probable as to Plaintiffs' remaining § 3604(b) maintenance claim. The disconnect is particularly clear because Plaintiffs' Memphis Law narrative focuses on properties outside the scope of this case. For example, Ms. Welsh testified as to several properties that are indisputably not at issue in this case.[10] The only property potentially at issue that Welsh addressed is 5138 Cana Rd., Memphis, TN, but

---

[10] In her deposition, Brigid Welsh discussed the following properties: 60 W. Frank Ave., Memphis, TN 38109; 2030 Waskom Dr., Memphis, TN 38116; and 5081 Wingdale Rd., Memphis, TN 38117, which were not serviced by Ocwen and maintained by Altisource. *See* Dkt. 369-39 (Ex. 270), p. 26; *see also* Agreed Property List - 2022.04.22.xlsx. She also referenced 1041 Palmetto Ave., Memphis, TN 38107 that was sold three months *prior* to Plaintiffs' inspection and, therefore, was not owned by Trustee Defendants, serviced by Ocwen, or maintained by Altisource at the relevant time. *See* Kliebard Decl. Ex. 4, NFHA_0033462.xlsx (showing inspection on April 21, 2016); *comp. id*. Ex. 7, ASI000023618.xlsx (showing sale on January 27, 2016).

she does not claim any independent personal knowledge of facts surrounding the property beyond information gleaned secondhand through code-enforcement requests and a cursory internet search regarding ownership. *See* Kliebard Decl. Ex. 23, Welsh Decl. ¶ 11a; *see also id.* at Ex. 24, Welsh Dep. Tr. at 62:12-24. Mr. Schaffzin similarly cannot identify a single property at issue about which he has personal knowledge. [11]

Testimony about non-issue properties, and about properties as to which the witnesses lack personal knowledge, does not advance the jury's resolution of the claim that Defendants engaged in discriminatory practices in majority-minority neighborhoods when compared to majority-white neighborhoods. Nor does such testimony establish that Defendants' maintenance practices proximately harmed Plaintiffs. Thus, it should be excluded under Rule 401 and 402, and 602.

Additionally, Rule 403 independently requires exclusion. Even if Plaintiffs could articulate some marginal relevance to the Memphis Law Witnesses' testimony (they cannot), the probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, and wasting time. *See* Fed. R. Evid. 403. Based on Plaintiffs' proposed fact stipulations, Plaintiffs appear poised to have Schaffzin and Welsh testify regarding the Clinic's previous legal claims as well as the outcomes of those legal claims. Kliebard Decl. Ex. 25, Pls.' Proposed Uncontested Facts ¶¶ 91, 99, 105–06. The only conceivable reason for attempting to bring in information of the outcome of previous legal actions is to provide evidence of underlying facts, which is not only improper and outside of the scope of this litigation,

---

[11] Mr. Schaffzin's declaration included reference to 1041 Palmetto Ave., Memphis, TN 38107 about which Ms. Welsh also seeks to testify and which is not at issue for the reasons set forth *supra* at n.10. Mr. Schaffzin also seeks to testify regrading 93 Mallory Heights Dr., Memphis, TN 38109; however, Plaintiffs' expert (Ayres) admits that the Trustee Defendants did not own the property at the time of inspection and excluded it from their regression analysis. *See* Dkt. 320-1 at ¶ 4 (citing Ayres_000003 and Ayres_000011); *see also* Kliebard Decl. Ex. 1, Expert Report of David M. Skanderson at Section 9.4, ¶ 125, fn 87, and Appendix 4 (analyzing properties in regression).

but also unduly prejudicial. *See, e.g.*, *Burbach Aquatics, Inc. v. City of Elgin, Ill.*, No. 08-CV-04061, 2011 WL 148394, at *2 (N.D. Ill. Jan. 18, 2011) ("The Court reminds the parties that the outcome of a lawsuit cannot be used in subsequent suits as evidence of underlying facts"); *see also Schmidt v. Klinman*, No. 05-02134, 2005 WL 6939158, at *9 (N.D. Ill. Dec. 2, 2005) ("Evidence about unrelated lawsuits is inflammatory and likely to prejudice the jury …"). The fact that both witnesses are faculty at a law school further magnifies the risk that their prejudicial testimony will be given undue weight by the jury. Such evidence is therefore irrelevant under Rules 401 and 402 and inadmissible for lack of foundation under Rule 602.

Rule 403 also bars the admission of needlessly cumulative evidence. Any testimony by Ms. Welsh regarding the property at 5138 Cana Rd. would be duplicative of Plaintiffs' own property-condition evidence, including their inspection forms and property photographs, without layering anecdotal and secondhand testimony on top of Plaintiffs' other evidence. Allowing Ms. Welsh to present limited personal observations and derived from code-enforcement activities would therefore add little, if any, probative value while needlessly consuming trial time. Rule 403 does not permit that inefficiency, and exclusion is warranted on that independent basis.

Because the testimony and related materials presented by Memphis Law Witnesses do not bear on any disputed issue the jury must decide and would instead invite unfair prejudice, juror confusion, wasted time, and collateral mini-trials, the Court should exclude them under Rules 401, 402, and 403.

## MOTION NO. 16:
## <u>EXCLUDE DAMAGES EVIDENCE AND COMPUTATIONS PLAINTIFFS REFUSED TO DISCLOSE IN FACT DISCOVERY</u>

### A.    <u>Introduction.</u>

It is undisputed that Plaintiffs have never produced any calculation or evidentiary basis for their alleged frustration of mission damages during fact discovery. The only damages calculation Plaintiffs provided was through their damages expert, and that opinion has now been stricken by this Court as arbitrary, speculative, and offered "[w]ithout any explanation or evidence to support her conclusions." Dkt. 460 at 9. That failure is dispositive. Plaintiffs had an independent obligation to disclose this information during discovery, including in response to Defendants' written discovery requests, follow-up correspondence seeking that information, and deposition questions to each Plaintiff organization specifically tasking them to articulate these alleged damages. Each time, Plaintiffs declined to respond, instead deferring entirely to their anticipated expert. Plaintiffs thus made the strategic choice to withhold any damages evidence from fact discovery and instead to attempt to prove damages solely through an expert whose opinion has now been excluded. Plaintiffs now seek to pivot and submit the issue to the jury without any evidentiary foundation and without having disclosed the support for that testimony during fact discovery. This is not permissible. This is not a personal injury in which emotional distress damages may be left to juror intuition. Plaintiffs had an obligation to produce competent, admissible evidence during discovery so it could be tested. Plaintiffs failed to do so. As a result, any attempt to present undisclosed damages evidence or computations at trial should be excluded.

### 1.    *The Court's clarification recognized measurable organizational damages but did not relieve Plaintiffs of proof and disclosure obligations.*

The Court's order on the motion for clarification recognized that "organizational damages *can be measured* as the opportunity costs of discrimination," but it did not relieve Plaintiffs of

their obligation to actually measure, quantify, and disclose those damages through competent evidence. Dkt. 460 at 7 (internal quotations omitted) (emphasis added). To prove such opportunity costs, Plaintiffs "can (*and must, for purposes of establishing the fact of injury*) testify to out-of-pocket expenses, including staff compensation spent to combat defendants' REO conduct." *Id.* (emphasis added). But Plaintiffs do not intend to offer any such testimony or evidence at trial. Instead, Plaintiffs seek to proceed to trial without any testimony or evidence of opportunity costs and invite the jury to award frustration mission damages untethered to any proof of actual expenditures or loss.

### 2. *The Seventh Circuit rejects unquantified, abstract frustration of mission damages.*

Plaintiffs' approach is not permitted and conflicts with controlling Seventh Circuit precedent. After establishing standing, a plaintiff may recover damages for "staff time spent on [an enforcement] effort and the cost of that effort" so long as the plaintiff "explain[s] [its] figures to the jury." *NFHA IV*, 2025 WL 3306306 at *7 (citing *United States v. Balistrieri*, 981 F.2d 916, 933 (7th Cir. 1992)). Courts that have allowed frustration of mission damages have done so only when the plaintiff identified and quantified their costs for future remedial efforts with concrete evidence. *See, e.g.*, *Fair Hous. Ctr. of Cent. Ind., Inc. v. Smitley*, 2018 U.S. Dist. LEXIS 110814, at *6, n.4 (S.D. Ind. 2018) (awarding $5,600 where the organization identified two trainings at $1,200 each, a mailing to 400 residents at $200, and a HUD-approved billboard at $3,000); *Fair Housing of Marin v. Combs*, No. C 97-1247-MJJ, 2000 WL 3650289, at *4 (N.D. Cal. Mar. 29, 2000) *aff'd* 285 F.3d 899, 907 (9th Cir. 2002) (reducing frustration of mission award where plaintiff failed to show "any need for expenditures on training, supervising or monitoring" of defendant and a "charge of a part-time outreach position to his account" was not necessary). Plaintiffs produced no such evidence during fact discovery.

29

### 3. *Exclusion is warranted because Plaintiffs did not comply with its affirmative obligations.*

The Seventh Circuit does not permit unquantified or abstract frustration-of-mission awards for amorphous or abstract harms untethered to the plaintiff's to mission. In *City of Chicago v. Matchmaker Real Est. Sales Ctr.*, 982 F.2d 1086, 1099 (7th Cir. 1992), the court struck an award for frustration of purpose where it simply doubled compensatory damages without any independent evidentiary basis.

For that reason, Plaintiffs had an affirmative obligation to disclose "a computation of each category of damages claimed" and to produce "the documents or other evidentiary material … on which each computation is based," without awaiting any discovery request. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011) (quoting Fed. R. Civ. P. 26(a)(1)(A)(iii)). Rule 26(e)(1) likewise requires supplementation as the case develops. *Id*. If a party fails to comply, "the party is not allowed to use that information … at a trial, unless the failure was substantially justified or was harmless." *Id*. (quoting Fed. R. Civ. P. 37(c)(1)). Seventh Circuit precedent further "places the onus on a plaintiff to provide (1) a top-line computation of its claimed damages; and (2) specific categories of damages." *Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 94 F.4th 588, 605 (7th Cir. 2024). That obligation is especially important where, as here, plaintiffs seek consequential business damages—such as mission impairment and lost opportunities—because alleged damages for work not performed cannot be readily derived from financial statements that track work that was performed. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006).

Plaintiffs did not comply with these requirements. They identified no specific remedial efforts, quantified no costs, and disclosed no supporting evidence during discovery. Their attempt to submit frustration of mission damages to the jury without any explanation or evidentiary foundation is therefore foreclosed by controlling law. Plaintiffs instead deferred entirely to their

expert, and when that expert's methodology was excluded as unreliable, the record was left with no evidence supporting frustration of mission damages computation at all — "knocking out [that] theory" of damages. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005). Under Rule 37(c)(1), a party that fails to meet these disclosure and supplementation requirements "is not allowed to use that information … at a trial, unless the failure was substantially justified or was harmless." In assessing whether a failure is harmless, courts consider "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc*., 324 F.3d 851, 857 (7th Cir. 2003). Plaintiffs have not complied with these requirements and the harm to Defendants is substantial. As further explained, this Court should preclude Plaintiffs from presenting, testimony, argument, and evidence concerning its purported frustration of mission damages.[12]

### B. **Argument.**

#### a. *Plaintiffs' Initial Rule 26(a)(1) Disclosures relied on their excluded expert.*

At every point during fact discovery, Plaintiffs declined to produce concrete evidence supporting their claimed frustration of mission damages, instead repeatedly representing that they would rely on a damages expert to supply that proof. For example, in response to repeated requests

---

[12] Defendants previously filed Motions in Limine Nos. 7 and 8, which addressed separate damages issues. *See* Dkt. 504, 37–45. This motion does not seek to relitigate those motions or obtain duplicative relief. Rather, it targets a distinct and subsequent defect: Plaintiffs' failure to disclose any Rule 26(a)(1)(A)(iii) computation of frustration-of-mission damages after their sole disclosed computation was eliminated when the Court struck their expert's opinions. The relief requested here is limited to exclusion of any frustration-of-mission damages evidence, testimony, or argument that Plaintiffs never disclosed.

by Defendants to produce evidentiary support for their damages, *see, e.g.,* Kliebard Decl. Ex. 26, Letter from N. Garroway to J. Soule dated 8/30/2022, *id*. Ex. 27, Letter from N. Garroway to J. Soule dated 10/17/2022, Plaintiffs tendered their final updates to their amended Rule 26(a)(1) disclosures on Defendants on November 18, 2022. Dkt. 454-1. These disclosures relied entirely on a newly generated supplemental report from Plaintiff's purported damages expert, Stacy Seicshnaydre, now excluded, to compute Plaintiffs' frustration of mission damages. *See* Dkt. 454-1 at 17; Dkt. 460 at 9. Plaintiffs pointed to no documents supporting their frustration of mission other than a bare reference to the production of unidentified "numerous other documents related to the categories of damages claimed."  Dkt. 454-1 at 16.

Thus, Plaintiffs' own Rule 26(a)(1) disclosures confirm that they chose to base their damages claim exclusively on an expert opinion that has now been excluded, and that they never disclosed any independent evidentiary basis for their claimed damages during fact discovery.

### b. *Plaintiffs' interrogatory responses relied on their now-excluded expert.*

Defendants specifically asked Plaintiffs to articulate their damages computations in interrogatories, and Plaintiffs failed to do so. Instead, Plaintiffs repeatedly deferred to anticipated expert testimony and declined to provide any calculation or methodology themselves.

For example, in response to a contention interrogatory asking for "all facts and evidence" supporting damages, including the "calculation of such damages, the basis for that calculation [and] any mathematical formula used," Plaintiffs provided no frustration of mission damages computation. Kliebard Decl. Ex. 28, Pls.' 6/28/2022 Resp. to Defs.' Interrogatories at 5. Instead, they referred to narrative exhibits, undefined "back-up information," and "other pertinent documents and information," and Plaintiffs further represented that they "anticipate[d] providing expert testimony" to quantify their frustration of mission damages. *Id.* Plaintiffs further stated that they, themselves, could not "perform a precise calculation" and that their damages "may be the

subject of expert testimony." Kliebard Decl. Ex. 29, Exhibit D to Pls.' 6/28/2022 Resp. to Defs.' Interrogatories at 4, 14, 21, 38, 44, 50, 68, 76, 88, 101, 108, 114, 122, 126, 134, 139, 148; Kliebard Decl. Ex. 30, Exhibit D to Pls.' 6/28/2022 Resp. to Defs.' Interrogatories at 26.

Several Plaintiffs provided carbon copy, conclusory assertions of frustration that do not purport to substantiate any *amount* of such damages. For example, these Plaintiffs asserted Defendants had "frustrated Plaintiff's mission(s) and goal(s) of: Increasing fair and equal access to housing; eliminating racial segregating; eradication discrimination; and promoting fair housing and fair lending." Kliebard Decl. Ex. 29 at 13. These identical assertions were repeated across multiple Plaintiffs' discovery responses, despite differences in their service areas, budgets, and operations. *Compare id.* at 13 (listing these categories for COFHA) *with id.* at 20 (listing the same categories for CFHC) *with id.* at 75 (listing these same damages for Greater New Orleans Fair Housing Center).

Plaintiffs also referenced grants, programs, and activities relating generally to "fund and time expended," but offered no evidence or testimony that would allowing those expenses to be apportioned to Defendants' alleged conduct in this case. *See* Kliebard Decl. Ex. 30 at 6. As a result, Plaintiffs' interrogatory responses provided no way for to distinguish between responsive and non-responsive expenditures, no way to identify the specific harms any Plaintiff actually intended to claim, and no basis on which to compute Plaintiffs' alleged damages.

Plaintiffs chose not to disclose any computation, methodology, or evidentiary basis for their alleged frustration of mission damages during fact discovery, instead relying exclusively on an expert whose opinions have now been excluded, leaving no admissible damages evidence in the record. Allowing Plaintiffs to proceed to trial on an undisclosed, unquantified, and unsupported damages theory would prejudice Defendants, undermine the discovery rules, and invite the jury to

speculate about damages untethered to any proof. Accordingly, under Rules 26 and 37 and controlling precedent, Plaintiffs should be precluded from offering any testimony, argument, or evidence concerning frustration-of-mission damages at trial. *See* § A.2, 3 *supra*.

### c. *Plaintiffs' corporate representatives relied on their now-excluded damages expert.*

Plaintiffs' failure to compute and disclose their alleged frustration of mission damages written discovery was not inadvertent; it reflected an intentional choice to introduce such damages evidence solely through an expert rather than through any fact witnesses. That choice was confirmed repeatedly in the corporate representative depositions. Defendants specifically asked each Plaintiff to identify its purported frustration of mission damages. Each time, Plaintiffs' designee offered only conclusory assertions that frustration of its mission had occurred and referred Defendants to an anticipated damages expert.

This testimony was strikingly uniform. For example, NFHA's corporate representative, Lisa Rice, testified that NFHA did not seek damages for certain grants listed in Plaintiffs' interrogatory responses "at this time." Kliebard Decl. Ex. 31, NFHA 30(b)(6) Dep. Tr. (Rice 07/13/2022) at 292:11–18. She further testified that identifying which listed grants were potentially attributable to the Defendants in this litigation "would be generated in our expert report." *Id*. at 292:19–23. COFHA's designee similarly answered "No" as to whether COFHA had calculated frustration of mission damages, and "I don't know" as to what evidence would support any calculation. Kliebard Decl. Ex. 32. COFHA 30(b)(6) Dep. Tr. at 159:7–13. FHANC's designee likewise testified "No" as to whether any documents supported an amount for frustration of mission damages, and stated that this was something "experts would decide." Kliebard Decl. Ex. 33, FHANC 30(b)(6) Dep. Tr. at 232:11–233:4.

Plaintiffs' witnesses repeatedly disclaimed any computation and pointed instead to their expert as the source of damages:

| Plaintiff | Testimony |
|---|---|
| Kliebard Decl. Ex. 34, HOME of VA 30(b)(6) Dep. Tr. at 158:13–22. | "Q. And then how do we quantify the extent to which defendants' conduct frustrated HOME of Virginia's mission? A. I think that would probably be a question for an expert to help determine, because I can tell you what we spent. You know, to some degree, I can tell you how much we spent on extra foreclosure prevention. I can tell you how many first-time home buyers we were serving in that era. But actually determining what those costs were is probably an issue for an expert." |
| Kliebard Decl. Ex. 35, Connecticut Fair Housing Center 30(b)(6) Dep. Tr. at 213:1–213:24. | Q "What is the precise amount of damages that you are claiming for each of these items? … A. We do not have a precise amount of damages that we're claiming at this time. Q. Do you plan to produce anything to substantiate these damages or to put a dollar amount on them? … A. Not at this time. … Q. Are there documents showing that there were activities, programs, and services with which Deutsche Bank frustrated plaintiffs' mission? … A. No." |
| Kliebard Decl. Ex. 36, Fair Housing Center of Central Indiana 30(b)(6) Dep. Tr. at 182:1–182:6 | Q. "Are you aware of anything produced in this case that would show a dollar amount for The Center's frustration of mission damages? A. I do not recall reviewing anything on this case at this time." |
| Kliebard Decl. Ex. 37, Fair Housing Center of the Greater Palm Beaches 30(b)(6) Dep. Tr. at 154:19–23; 155: 4–14. | "Q. Do you have any documentation to support the frustration of mission damages that you're alleging here? A. No documentation. I just know what we were going to do."; "Q… has the Fair Housing Center put a dollar figure on its alleged frustration of mission damages? A. No, we haven't. As of this time, we haven't. We were probably-- well, not probably -- we will be using expert witnesses to show the damage to the community and so forth. But it has yet to be calculated completely. Q. Completely. Has it been calculated at all? A. No." |
| Kliebard Decl. 38, Fair Housing Center of West Michigan 30(b)(6) Dep. Tr. at 223:1–223:7 | "Q. Has the Fair Housing Center put a dollar figure on the frustration of mission damages? A. Not … Not that I know of." |
| Kliebard Decl. Ex. 39, Fair Housing Continuum 30(b)(6) Dep. Tr. at 198:6–10. | "Q. And how did Continuum quantify [frustration of mission damages]? A. I don't believe we did. I don't believe there's a number for frustration of mission." |
| Kliebard Decl. Ex. 40, HOPE Fair Housing Center | "Q. What amount of damages, if you know, is HOPE claiming for frustration of mission as a result of the Deutsche Bank REO |

| | |
|---|---|
| 30(b)(6) Dep. Tr. at 192:24–193:4. | investigation? A. That, because it's a complex case with multiple plaintiffs, we would defer to an expert." |
| Kliebard Decl. Ex. 41, Metropolitan Milwaukee Fair Housing Council 30(b)(6) Dep. Tr. at 137:1–137:12, 147:10–147:15. | "Q. Is there a precise amount of damages that Metro Milwaukee is claiming for its frustration of mission? A. That hasn't been fully calculated, no. Q. Has it been partially calculated? A. No." "Q. How do we know what portion of your REO work related to Deutsche Bank contributed to these lost opportunities? A. At this point, the frustration calculation would be made by our experts and by – with consultation with our attorneys." |
| Kliebard Decl. Ex. 42, Miami Valley Fair Housing Center 30(b)(6) Dep. Tr. at 278:17–278:24. | "Q. Has Miami Valley put a dollar figure or an amount on its frustration of mission damages? A. No, because we feel like our frustration of mission damages are continuing until the issue is resolved. Q. Have you put a dollar figure on the frustration of mission damages to date? A. No." |
| Kliebard Decl. Ex. 43, North Texas Fair Housing Center 30(b)(6) Dep. Tr. at 36:11–36:13. | "Q. Are you able to quantify your frustration of mission damages? A. Not at this time." |
| Kliebard Decl. Ex. 44, Open Communities 30(b)(6) Dep. Tr. at 40:9–22; 133:4–15. | "Q. Do you have an estimate on what the frustration of mission damaged [sic] would amount to? … A. I do not." "Q. How would calculate your frustration of mission damages? A. It's hard to put a dollar amount to the frustration of mission, but just to the degree that the defendants' actions impaired us from ensuring that there was a diverse, integrated community, that's the extent that Open Communities' mission was harmed." |
| Kliebard Decl. Ex. 45, Toledo Fair Housing Center 30(b)(6) Dep. Tr. at 222:17–223:2 | Q. "Do you have the amount that the Fair Housing Center is claiming as a frustration of mission damages? … A. No. Q. Has that amount been calculated? … A. No." |
| Kliebard Decl. Ex. 46, Louisiana Fair Housing Action Center 30(b)(6) Dep. Tr. at 115:15–115:21; 129:1–129:6; 143:8–143:12; 232:8-232:13; 232:23–233:23 | LFHAC's representative replied with some form of "I don't know" to at least five direct questions regarding the scope of LFHAC's claimed damages, and instead deferred to "our damages information that's provided" in written discovery and document production. |
| Kliebard Decl. Ex. 47, Michell Morgan Dep. Tr. 05/18/2021 at 163:4–164:3 | Michelle Morgan, who will testify for LFHAC at trial, testified that she did not know what damages LFHAC claimed. Q. "[D]o you know what testing [sic] you will be asked to provide in terms of frustration of mission? A. I do not. … Q. What information do you have about LFHAC's mission being frustrated? A. I don't know[.]" |
| Kliebard Decl. Ex. 48, Fair Housing Center for Rights and Research 30(b)(6) Dep. Tr. at 160:3–160:9 | "Q. And then going back to frustration of mission, has the Fair Housing Center calculated the amount of damages it's claiming for frustration of mission in connection with the Deutsche Bank REO investigation? A. No. And it's my understanding that there's |

| | going to be an expert witness in response to that portion for our claim." |
|---|---|
| Kliebard Decl. Ex. 49, South Suburban Housing Center 30(b)(6) Dep. Tr. at 165:23–166:4; 162:22–163:12. | "Q. Did you rely on anything specific when you already made the damage claim? … A. We have not made a specific damage claim." When asked what materials were consulted to show that opportunities were lost, SSHC responded that "[t]here's all kinds of academic studies that have been done to show that the service area that we're in had the highest rate of foreclosure, had the most homes that were underwater mortgages, that had suffered all kinds of data from the housing market." |
| Kliebard Decl. Ex. 50, Denver Metro Fair Housing Center 30(b)(6) Dep. Tr. at 127:16-129:2. | Denver Metro Fair Housing listed "gala 2015, gala 2016, and gala 2017" as part of its damages, but did not explain how or why it sought damages for fundraising and general awareness-raising events that "broke even" every year. |
| Kliebard Decl. Ex. 51, HOPE Inc. 30(b)(6) Dep. Tr. at 200:4–200:7 | "Q. Has HOPE, Inc. determined a dollar amount related to its frustration of mission damages in this case? A. We have not." |

Plaintiffs should therefore be precluded at trial from offering evidence or testimony that was not disclosed in discovery or that contradicts their sworn depositions testimony.

### d. Plaintiffs' expert's methodology was excluded as unreliable.

Despite Plaintiffs' promises, Plaintiffs' expert did not actually supply a frustration of mission computation grounded in fact. She did not review Plaintiffs' expenditures and Defendants' alleged conduct to determine the quantity of Plaintiffs' mission-related costs attributable to Defendants. Instead, she applied percentages to "average annual programmatic staffing expenses" taken from Form 990s, without explaining why the chosen percentage was reasonable, how the per-plaintiff figures were derived, or why damages would be the same across different organizations. *NFHA IV*, 2025 WL 3306306 at *6. For this reason, this Court properly excluded her report in its entirety, leaving Plaintiffs with no disclosed admissible computation of their frustration of mission damages at all. *Id*.

> **e.** *Plaintiffs' latest, undisclosed damages theories mirror their expert's excluded methodology.*

After the Court excluded Plaintiffs' damages expert, Defendants again asked Plaintiffs to identify their frustration of mission damages they intended to seek at trial, and Plaintiffs again refused to provide any such computation. Indeed, Plaintiffs' pretrial submissions indicate that they propose once again to measure frustration of mission damages as percentages of Form 990 program expenditures—the same methodology the Court has already rejected as unreliable. Dkt. 511 at 9. Plaintiffs' submission does not explain how Defendants' alleged conduct caused any specific, measurable increase in Plaintiffs' cost, nor does it identify any computation, formula, or supporting materials. *Compare* Dkt. 511 at 9 *with NFHA IV*, 2025 WL 3306306 at *6. Instead, Plaintiffs appear to be attempting to reintroduce, through argument rather than expert testimony, the same speculative damages framework the Court has already excluded. The remainder of Plaintiffs' purported damages statement identifies categories the Court has already ruled are not recoverable on proximate-cause grounds, which are excludable for the reasons set forth in Defendants' MIL No. 8 and briefly summarized below:

| Plaintiffs' Purported Damages | The Court's Ruling |
|---|---|
| "Plaintiffs will testify that renovations of houses directly counteract the Defendant-generated 'dilapidated properties' in communities of color." Dkt. 511 at 10. | Harms to minority neighborhoods are "not sufficiently related to Defendants' conduct to satisfy proximate cause under the FHA," because the Court cannot "apportion damages for the widespread economic harms" resulting from dilapidated properties "between Plaintiffs and the actual residents of those neighborhoods." *NFHA II,* 2019 WL 5963633, at *8. |
| "Plaintiffs will testify how homeownership grants and counseling will facilitate the purchase of homes for owner occupants." Dkt. 511 at 10. | Damages for "services promoting home ownership and neighborhood stability" are "too tenuously connected with defendants' conduct" to justify damages. Dkt. 460 at 6. These damages do not become recoverable simply because Plaintiffs label them "counteraction." |
| "In the same vein, renovations and other beautification projects are directly tethered to the impairments | Damages for community blight (and work to repair it) "wind through too many other potential causes" to be recoverable and are "precisely the 'ripples' that *City of Miami* cautions 'flow far beyond [a] defendant's |

| | |
|---|---|
| to Plaintiffs' work to eliminate blight." Dkt. 511 at 10. | misconduct,' which risk massive and complex damages litigation, and involve too many intricate, uncertain inquiries to establish proximate cause." *NFHA II*, 2019 WL 5963633, at *7–8. |
| "Counteraction will also mitigate the negative racial stigma and stereotypes caused by Defendants' shoddy REO maintenance which impaired Plaintiffs' missions and activities undertaken to counter segregation." Dkt. 511 at 8. | This Court has previously rejected Plaintiffs' argument that Defendants' conduct "stigmatized communities of color," finding that they relied on "inadmissible expert testimony to support their argument" and failed to "raise a genuine question of material fact that Defendants' perpetuates racial segregation in the selected communities." *NFHA III,* 2025 WL 975967, at *41. |

In short, Plaintiffs *still* have still not disclosed any recoverable frustration of mission damages. And even if such damages were theoretically recoverable, Plaintiffs possessed all the information necessary to compute and disclose them during discovery in their initial disclosures, interrogatory responses, and depositions, and deliberately chose not to do so. On this record, Plaintiffs have failed to offer a computation of frustration of mission damages as required under the Federal Rules and exclusion is required under Rule 37(c)(1).

### f. *Plaintiffs' failure to disclose damages requires exclusion under Rules 26 and 37.*

As discussed above, *see* [II]A.3 [Introduction to MIL No. 16] *supra*, Plaintiffs had an obligation to disclose a computation of and specific basis for its alleged damages. There is no dispute that Plaintiffs have failed to quantify their frustration of mission damages, and refused to say what computation they will ask the jury to award at trial. That failure is neither justified nor harmless, and all relevant factors favor exclusion. *See David*, 324 F.3d at 857.

### i. **Plaintiffs' discovery failure prejudices Defendants.**

Without a disclosed computation, Defendants cannot ascertain the monetary basis for any frustration of mission damages or identify which activities or programs purportedly support such a figure. It is "hardly fair to expect [Defendants] to use educated guesswork to divine Plaintiffs' damages theories from their trial exhibits," and Defendants should not be required to do so simply

because Plaintiffs have refused to articulate these theories across years of litigation and dozens of depositions. *Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, No. 07 C 2680, 2022 WL 22412619 at *3 (N.D. Ill. Aug. 19, 2022), *aff'd*, 94 F.4th 588 (7th Cir. 2024).

Plaintiffs repeatedly declined, including during deposition testimony, to explain their frustration of mission damages figures or even to explain what, if any, activities and programs listed in Plaintiffs discovery responses form the basis for their damages claims. *See supra* [Argument (B)(1–5)]; *see also* Kliebard Decl. Ex. 31, NFHA 30(b)(6) Dep. Tr. (Rice 07/13/2022) at 292:11–23. Plaintiffs' last ditch effort — inviting Defendants to comb through voluminous 990s and other produced documents to piece together Plaintiffs' own theory — is exactly what the Seventh Circuit has explicitly rejected. Simply "[s]prinkling various financial documents among thousands of pages of discovery over several years," as Plaintiffs have done, "is neither 'early in the case' nor a 'calculation'" and does not satisfy Rule 26's requirements. *Chicago Joe's*, 94 F.4th at 605.

### ii. This discovery failure cannot be cured on the eve of trial.

Defendants are prejudiced because they do not know how Plaintiffs intend to prove their monetary damages for frustration of mission. With trial less than three weeks away, that prejudice cannot be cured now, and allowing Plaintiffs to introduce this evidence for the first time at trial would be highly disruptive and unfair to Defendants. In discovery, Plaintiffs for years refused to identify evidence purporting to quantify the monetary impact of the impairments to their mission, and in fact denied possessing such evidence. *See* § [B.1–5] *supra*; *see, e.g.*, Kliebard Decl. Ex. 35. Connecticut Fair Housing Center 30(b)(6) Dep. Tr. at 213:1–213:24. Because Plaintiffs refused to provide any computation or supporting evidence in discovery or deposition, addressing any newly asserted computation now would require reopening to explore its basis. The need to reopen discovery on the eve of trial renders Plaintiffs unable to cure any prejudice and would jeopardize

an expeditious trial in this case. *See Karum Holdings LLC v. Lowe's Companies, Inc.*, No. 15 C 380, 2017 WL 10311207, at *5 (N.D. Ill. Sept. 8, 2017).

> **g.** ***Plaintiffs failed to produce in discovery the evidence they now assert they will use at trial.***

The need for exclusion is further reinforced by the willfulness of Plaintiffs' discovery violation. Plaintiffs' predicament is one of their own making. After declining for years to disclose their damage s calculation and evidentiary support, Plaintiffs now propose — for the first time in pretrial submissions — to quantify their frustration of mission damages in terms of the "costs of [the] programs, activities, and services" allegedly impaired by the defendants and the counteractive measures taken in response. Dkt. 511 at 8.

Even assuming such frustration of mission damages could be substantiated in that manner, Plaintiffs failed to disclose any such theory, computation, or supporting evidence in fact discovery and refused to provide Defendants with the required computation of these costs before trial. Instead, Plaintiffs repeatedly represented that an expert would supply the computation and identify which costs were attributable to Defendants, but neither occurred. *See* § [B.1–6] *supra*; Dkt. 460 at 9.

Because "Plaintiffs could have offered these theories during fact discovery but chose not to do so," and because Defendants are prejudiced by these late disclosures, exclusion is warranted further supports their exclusion. *Karum Holdings*, 2017 WL 10311207 at *6.

**C.     Conclusion.**

For these reasons, Defendants respectfully request that the Court issue an order in limine excluding at trial any previously undisclosed evidence, testimony, and computations concerning Plaintiffs' purported frustration of mission damages under Federal Rules of Civil Procedure 26(a)(1)(A)(iii), 26(e), and 37(c)(1).

## MOTION NO. 17:
## TO EXCLUDE IRRELEVANT AND INFLAMMATORY EVIDENCE

Defendants respectfully move in limine to preclude Plaintiffs, their counsel, and their witnesses from referring to or introducing three categories of irrelevant, inflammatory, and unfairly prejudicial language and material including: (1) "Black History Month," "historical racism," "value redlining," and other terms that describe systemic, societal wrongs and not Defendants' specific conduct at issue in this case; (2) "robo-signing" and any national mortgage settlement materials unrelated to REO property maintenance; and (3) "Memos to Servicers" that are dated years before the facts at issue in this case and for which Ocwen had not been servicing many of the relevant, at-issue trusts at the time.[13] Each of these categories consist of irrelevant and unfairly prejudicial material. The categories serve only to inflame the jury and distract from the narrow factual and legal issues actually presented in this case.

***Black History Month and Historical Racism.*** Plaintiffs should be barred from discussing "Black History Month," "institutional racism," "systemic racism," "systemic discrimination," "historical racism," the "history of racial segregation," "value redlining," or other broad societal narratives that risk conflating sweeping social issues with the narrow issues to be tried on Plaintiffs' sole remaining claim under 42 U.S.C. § 3604(b). This case concerns whether certain Defendants' property-specific maintenance practices of foreclosed homes in a limited number cities over a limited period of time caused actionable disparities under the Fair Housing Act.[14] It

---

[13] Defendants previously moved in limine to prevent Plaintiffs from referencing other irrelevant and inflammatory topics in Motion in Limine Number 11. *See* Dkt. 504 at 57–65.

[14] Because the Deutsche Bank Trustees can only be vicariously liable based on Ocwen and Altisource's conduct, and Ocwen and Altisource can only be liable based on their conduct after February 14, 2015, all evidence should be limited to that date in 2015 and later to reflect statute of limitations period applicable to Ocwen and Altisource. *See NFHA III*, 2025 WL 975967, at *13; *see also* Motion in Limine No. 14.

is not a referendum on the existence, causes, or moral significance of historical or systemic racism in the United States. Accordingly, the question for the jury is whether Defendants violated § 3604(b) — not whether they are responsible for broader societal inequities in the United States.

References to "Black History Month," "institutional racism," "systemic racism," "historical racism," "systemic discrimination,"[15] "history of segregation," "value redlining," or comparable concepts would invite the jury to decide the case based on generalized judgments about societal wrongs rather than the specific evidence and elements of the claims before it. Such references are irrelevant to Plaintiffs' sole remaining theory of liability, and even if marginally relevant, are more prejudicial than probative, diverting the jury into broad social assessments and moral judgments unrelated to whether Defendants' maintenance practices caused actionable disparities with respect to the limited set of properties owned by the Trustee Defendants, serviced by Ocwen, and maintained by Altisource at the time of Plaintiffs' inspection. *See* Fed. R. Ev. 402-403; *see also infra* at Motion in Limine No. 14.

***Robo-signing and other national mortgage settlement materials.*** Plaintiffs should be precluded from mentioning "robo-signing" and any other conduct that was the subject of the New York State Departments of Financial Services' ("NYSDFS") investigation of Ocwen and related Consent Orders.[16] Plaintiffs' Proposed Statement of Uncontested Facts makes clear that they intend to introduce evidence of such conduct, improperly suggesting that the NYSDFS

---

[15] As set forth in Defendants' Motion in Limine No. 2, Plaintiffs have already demonstrated that they intend to inject precisely this type of rhetoric. The Second Amended Complaint, repeatedly invokes "systemic discrimination" and related concepts. *See* Dkt. 504 at 18 (citing SAC at ¶¶ 125-139). Without an in limine ruling, Plaintiffs plainly will attempt to import those themes into trial.

[16] Defendants have moved in limine to preclude Plaintiffs from introducing evidence regarding various federal and state enforcement actions brought against Defendants, including the action pursued by the New York State Department of Financial Services. *See* Dkt. 504 at 59-60 (Motion in Limine No. 11). While that subject is addressed in Motion No. 11, out of an abundance of caution, Defendants move separately here, to clarify that both the conduct and related evidence should be excluded.

investigation related to REO property maintenance. *See* Kliebard Decl. Ex. 25, Plaintiffs' Proposed Statement of Uncontested Facts, ¶¶ 198-202; *see also id*, Kliebard Decl. Ex. 52, Pls.' Trial Ex. 1159 (2014 Consent Order Pursuant To New York Banking Law § 44).

The Consent Order itself demonstrates that the NYSDFS's investigation was unrelated to post-foreclosure conduct or property maintenance. Rather, the investigation related to (1) robo-signing; (2) inaccurate affidavits and failure properly to validate document execution processes; (3) missing documentation; (4) wrongful foreclosure; (5) failure to maintain books and records properly, and (6) initiation of foreclosure actions without proper legal standing. *See id*. ¶ 2; *see also id.* at ¶ 8. None of these is at issue in this case. This case concerns only whether Defendants engaged in discriminatory maintenance of post-foreclosure REO properties — not foreclosure practices, documentation errors, or recordkeeping.

Accordingly, references to the NYSDFS investigation, the Consent Order, or any of the underlying conduct are irrelevant and inadmissible under FRE 401 and highly prejudicial under FRE 403. Ocwen has already been held to account for the conduct addressed in the NYSDFS's investigation, which occurred back in 2010 and 2011 and therefore long before the relevant period in this case. *See id*. at ¶ 2, Plaintiffs should not be allowed to relitigate that unrelated historical conduct by repackaging it in this case as evidence of discriminatory post-foreclosure property maintenance.

***Trustee Defendants "Memos to Servicers."*** Pursuant to Fed. R. Evid. 402, 403, 901 and 902, Plaintiffs should be precluded from referring to or introducing "Memos to Servicers" that are included on Plaintiffs' Exhibit List. *See* Kliebard Decl. Ex. 53, Pls.' Trial Exhibit (DB_NFHA00300611-620). The Memos to Servicers were issued on October 8, 2010, July 28, 2008, and August 30, 2007, and were attached to an October 25, 2010, letter to *investors*. *See id*.,

Memos to Servicers at DB_NFHA00300611 (letter), DB_NFHA0030612-614 (2010 Memo), DB_NFHA00300615-618 (2008 Memo), and DB_NFHA0030619-620 (2007 Memo).

The 2010 Memo addressed "foreclosure practices, procedures and/or documentation used by certain major loan servicers and their agents," noting that the pooling and servicing agreements assign loan collection activities, including foreclosure and maintenance and sale of REO properties, to the servicer. *See id.* at DB_NFHA00300612. The 2008 Memo discussed (1) foreclosure procedures (including verifying ownership of properties), (2) descriptions of the servicer role (and absence of a role for the trustee) in the foreclosure process and related education opportunities, and (3) maintenance of REO properties (including reference to indemnification). *See id.* at DB_NFHA00300615–617. The 2007 Memo was a general reminder issued amid increasing foreclosures relating to servicers' (1) exercise of diligence in complying with federal, state, and local laws; (2) coordinating with local housing officials and community organizations regarding foreclosure and eviction proceedings, and (3) exercise of discretion in eviction proceedings involving rental properties in REO status. *See id.* at DB_NFHA00300619–620.

The Memos should be excluded for several independent reasons. *First*, their subject matter is not relevant to any claim in this case. This case concerns whether Defendants engaged in discriminatory maintenance practices for post-foreclosure REO properties during a much later and narrower period. The Memos predate the applicable limitations period by approximately four-and-a-half to seven-and-a-half years. *See id*. at DB_NFHA00300612, 615, 619. They therefore do not reflect the property maintenance at issue in this case or the relationship, rights, and responsibilities of the Trustee Defendants and Ocwen during the relevant timeframe.

The Memos concern topics not at issue in this case — including foreclosure practices, coordination with local housing authorities regarding foreclosure and eviction proceedings, and

eviction practices for rental properties entering foreclosure. This case is not about foreclosure practices or eviction decisions; it is about whether Defendants discriminated in the maintenance of a defined set of post-foreclosure REO properties. Even if the Memos were marginally relevant, their probative value would be substantially outweighed by the risk of unfair prejudice and confusion. The Memos would divert the jury's focus into moral and emotional judgments about foreclosures and evictions rather than the narrow factual issue before it, and they would inflame jury sentiment on issues entirely unrelated to whether Defendants' maintenance practices caused actionable disparities with respect to the specific at-issue properties owned by the Trustee Defendants, serviced by Ocwen, and maintained by Altisource. For these reasons, the Memos should be excluded under FRE 402 and 403.

*Second*, these memos were sent to "all servicers" at a time when Ocwen had not yet become servicer on all but a small handful of the Trusts at issue in this case. *See, e.g.*, Kliebard Decl. Ex. 53, Pls.' Trial Exhibit 124 (DB_NFHA00300611–620). Ocwen only assumed servicer responsibilities on thousands of trusts after the original servicers designated in the PSAs faltered, entered bankruptcy, or were placed into receivership. Consistent with that timing, when Plaintiffs asked Ocwen's witnesses Jason Jastrzemski and Michael Yanniello whether they had ever seen the Memos to Servicers, ever discussed the Memos to Servicers with anyone, or were ever aware that the Trustee Defendants advised servicers of the content of the Memos to Servicers., they both testified they had not. *See* Kliebard Decl. Ex. 54, J. Jastrzemski Dep. Tr. 74:16-23 (Q: "…with respect to this Exhibit 540, before yesterday, had you ever – this is a collection of three memoranda from Deutsche Bank to servicers. They each have a different date…Have you ever seen these before yesterday?" "A: No, I have not."); *see also id.* at 75:11–15 (Q: "Even though you may not have seen this before yesterday or today, the documents in 540, did you learn of these documents

at any time during your employment at Ocwen" A: "No, I did not."); 84:5–12 (Q: "And with respect to this memorandum, did anyone talk with you about it during – either before or during the time you were director of mortgage servicing oversight?" A: "No."); *see id.* at 88:10–89:2 (Q: "…were you made aware that Deutsche Bank had on more than one occasion advised its servicers of this [content from Memos to Servicers]?" A: "I do not recall."); *see, e.g.*, 71:17–72:6; 75:21–76:1; 76:21–77:20; 84:14–85:20; 86:2–12; 87:22–89:2.

Michael Yanniello likewise testified that he had never seen the memos before preparing for his deposition and did not recall receiving any similar communications from Deutsche Bank during his time at Ocwen. *See* Kliebard Decl. Ex. 55, M. Yanniello Dep. Tr. 41:13–42:10. Plaintiffs did not ask any other Ocwen witness — either fact or corporate representative — about the Memos to Servicers.[17] Plaintiffs therefore lack any evidentiary basis to contend that the Memos to Servicers had any effect on Ocwen's servicing, or that they were relevant to any relationship between the Trustee Defendants and Ocwen, as Ocwen appears to have been entirely unaware of them. For that reason as well, the Memos are irrelevant and their admission would only heighten the risk of unfair prejudice and jury confusion.

*Finally*, admitting into evidence the Memos to Servicers contradicts Plaintiffs' Supplemental Proposed Stipulations in which Plaintiffs proposed that "the parties stipulate that no witness or counsel will make reference to any claim for indemnification between or among the defendants." Kliebard Decl. Ex. 56, Pls.' Supplemental Proposed Stipulations at ¶ 1. Yet each of the Memos includes or expressly refers to an indemnification provision requiring servicers to indemnify the Trustee Defendants. *See* Kliebard Decl. Ex. 53 at DB_NFHA00300613–614 ("The

---

[17] Defendants' counsel did not identify any testimony related to Plaintiffs' Exhibit 540 or to the "Memos to Servicers" beyond the testimony of Ronaldo Reyes, David Co, Jason Jastrzemski, and Michael Yanniello cited here.

cost of any such indemnification . . . must be paid by the Servicer out of its own funds and should not be charged by any Servicer against any Trust."), DB_NFHA00300617 ("To protect against such consequences, which are likely to give rise to indemnification claims against servicers, the Trustee urges servicers to exercise heightened diligence with respect to REO maintenance and disposition"). Indeed, the explicit purpose for the issuance of such Memos was to notify the servicers of the Trustees' indemnification rights pursuant to the parties governing agreements and applicable law. *See id*. Allowing Plaintiffs to introduce the Memos would therefore circumvent their own proposed limitation, inject indemnification issues the parties have agreed should be excluded, and risk confusing the jury with collateral contractual disputes unrelated to the claims at issue. The Memos should be excluded for this additional reason.

Because Plaintiffs cannot show that the Memos to Servicers were ever provided to Ocwen, and cannot show that, even if they had been provided to Ocwen, the Memos governed or prescribed the conduct of the Trustees Defendants or Ocwen with respect to the properties at issue, the Memos are irrelevant under Fed. R. Evid. 402 and more prejudicial than probative under Fed. R. Ev. 403. The Memos to Servicers should therefore be excluded.

**MOTION NO. 18:**
**EXCLUDE UNSUPPORTED TESTIMONY REGARDING**
**DEFENDANTS' "NOTICE" OF REO MAINTENANCE ISSUES**

Plaintiffs have included in their pretrial exchanges of exhibit lists numerous exhibits that indicate they intend to argue that Defendants were "on notice" of racially discriminatory maintenance through notice of property violations. *See, e.g.*, Kliebard Decl. Ex. 57, Pls.' Trial Exhibit 67 (ASI000049987, ASI000049992, ASI000049994, ASI000049989, DB_NFHA00186807, ASI000049993, ASI000049990); and Kliebard Decl. Ex. 58, Pls.' Trial Exhibit 1069 (WIT_00001541). In addition to irrelevance of this evidence to questions of intentional discrimination and discriminatory impact under the Fair Housing Act, this "evidence" of notice lacks any foundation for Plaintiffs' intended point — that Defendants knew of racially discriminatory conduct and did nothing about it. Rather, these exhibits and any related testimony only show that Defendants were aware of code violations, not racial discrimination. Plaintiffs should be precluded from offering evidence or argument that Defendants were "on notice" of violations pertaining to the at-issue properties where plaintiffs cannot identify admissible record evidence establishing such notice.

Plaintiffs have already tried to argue in this case that exhibits showing Defendants were put on notice of maintenance-related issues and acted on the information shows that Defendants knew that such maintenance conduct was based on neighborhood race. *See NFHA III*, 2025 WL 975967, at **46-47. The Court rejected that argument – finding that such documents only reveal knowledge of maintenance related issues and reveal nothing about knowledge of racially discriminatory conduct. *Id*. Any argument that these individual notices of code violations, particularly notices for properties that are not at issue, put Defendants on notice of allegedly racially discriminatory maintenance would cause significant jury confusion on the issues the jury must decide—discriminatory treatment and discriminatory impact—and would require a limiting

jury instruction. *Id*. at *31 ("At trial, a limiting instruction may also be necessary to prevent proof of code violations from being used as proof of discrimination.").

**MOTION NO. 19:**
**CLARIFY "TRUSTEE DEFENDANTS," LIMIT SCOPE OF VICARIOUS-LIABILITY,**
**AND REQUIRE SPECIFICITY AS TO ALLEGED POLICIES**

**A.  Exclude Evidence Regarding Trustees' Culpability Through Vicarious Liability Only and Mandate That Defendants Be Referenced With Specificity At Trial.**

Plaintiffs' direct liability claims against the Trustee Defendants, which were based on deliberate indifference to known discrimination, were dismissed at summary judgment. *NFHA III,* 2025 WL 975967, at \*48. Plaintiffs had marshaled all of their evidence that the Trustee Defendants received reports of property maintenance problems, and the Court correctly held that knowledge of maintenance issues is not knowledge of racial discrimination, ruling that the evidence in this case "does not ultimately support an inference that Deutsche Bank failed to act based on *known* race discrimination by the servicers." *Id*. at \*47 (emphasis in original). And before expert discovery, Plaintiffs had never produced any statistical analysis attributing disparities to Ocwen, rather than an aggregated analysis of more than dozen servicers that maintained properties held in Trustee Defendant-administered trusts.[18]

Yet Plaintiffs continue to treat this Court's rulings against them as speed bumps to be maneuvered around rather than limits to be respected. They now propose stipulated facts designed to suggest that the Trustee Defendants knew about maintenance issues on REO properties. For example, Plaintiffs assert that the Trustee Defendants did not "evaluate whether Ocwen should be terminated" as a result of "property preservation and maintenance work." But the Court has already held that knowledge of maintenance issues is not knowledge of racial discrimination. *NFHA III,*

---

[18] The statistical analysis presented in the SAC and its various prior iterations agglomerated the alleged conduct of numerous non-party servicers in addition to Ocwen. The Court dismissed claims related to the conduct of these non-party servicers on summary judgment. *NFHA III*, 2025 WL 975967, at \*37.

2025 WL 975967, at *47. That issue is settled, and under the law of the case such evidence is irrelevant.

Plaintiffs plainly seek to leave the jury with the misimpression that the Trustee Defendants were deliberately indifferent to discrimination — a theory the Court has already rejected because there is no evidence to support it. Evidence offered for that purpose is irrelevant and therefore inadmissible under Fed. R. Evid. 402, and unfairly prejudicial under Fed. R. Evid. 403 because it invites the jury to infer direct culpability and punitive blame when the Court has already ruled the evidence does not support such an inference. Evidence relevant only to claims dismissed on summary judgment should not be presented at trial. *See Jones v. New York City Health & Hosp. Corp.*, No. 00-cv-7002, 2003 WL 21262087, at *1 (S.D.N.Y. May 29, 2003) (excluding evidence of racial discrimination where racial discrimination claim was dismissed on summary judgment).

Moreover, to avoid jury confusion regarding the distinct roles of Defendants and theories of liability as to each of Defendant, the Court should bar Plaintiffs from suggesting that the Trustee Defendants may be directly liable and should issue a targeted instruction informing the jury that the Trustee Defendants can *only* be found liable, if at all, on a vicarious liability theory.

### B. Exclude Plaintiffs From Conflating "Ownership" With "Control" Without Competent Evidence.

Defendants move in limine for an order that precludes Plaintiffs, their counsel, and their witnesses from stating, suggesting, or implying that mere title or "ownership" of any REO property establishes control, duty, or causation. The order should also bar any questions, testimony, exhibits, or argument asserting that Defendants could direct or perform preservation or maintenance during periods when governing contracts or law prohibited such activity, including statutory redemption or active eviction, unless Plaintiffs offer competent property-specific proof. The order should further require Plaintiffs to lay a proper foundation—outside the jury's presence

52

if necessary—through the applicable pooling and servicing agreements, servicing letters, amendments, and written instructions before using the terms "control," "right to control," or "ability to maintain" for any property at issue. This relief is warranted under Rules 401 and 403 because equating ownership with control would misstate the law, mislead the jury on causation, invite collateral mini-trials, and cause unfair prejudice.

Plaintiffs allege injuries arising from Servicer Defendants' improper maintenance of REO properties, in violation of the FHA. Because FHA claims sound in tort, general tort principles, including the requirement that a defendant's conduct be both an actual and proximate cause of the plaintiff's injuries, apply. *See Meyer v. Holley*, 537 U.S. 280, 285 (2003); *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132) ("It is a 'well established principle of [the common] law that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause.' . . . We assume Congress 'is familiar with the common-law rule and does not mean to displace it *sub silentio*' in federal causes of action."). The burden to prove both actual and proximate causation at trial rests with Plaintiffs.

The Court narrowed the scope of potential damages in this matter to properties that were owned by the Trustee Defendants and serviced by Ocwen and Altisource at the time of Plaintiffs' inspections within the limitations period. *See* Dkt. 442 at 31 (noting Plaintiffs' allegations are limited to conduct after February 14, 2015 for Ocwen and Altisource); *id.* at 120–23 (limiting the Trustee Defendants' potential liability to vicarious-liability). Plaintiffs may recover, if at all, only for damages relating to the maintenance and preservation of the at-issue properties. If either Trustee Defendant did not own a particular property at the time of Plaintiffs' inspection, that property is not "at issue" and no damages are recoverable. Because ownership of an REO property

is a threshold condition to any potential liability regarding that property, Plaintiffs should be required to prove that the Trustee Defendants owned the property at the time of inspection by presenting evidence of the specific governing contracts and servicing agreements demonstrating that alleged ownership.

Ownership alone, however, is insufficient to establish causation. Plaintiffs must also prove that Defendants exercised control over the property such that Defendants' conduct in preservation or maintenance could have proximately caused the alleged injuries. When a property entered foreclosure, the Servicer Defendants were prohibited from performing preservation or maintenance on an occupied foreclosed property until eviction proceedings concluded. Kliebard Decl. Ex. 59, 24th Amendment to Services Letter, OCWEN_0013161 ("During an active [eviction] redemption period, Altisource…*shall not perform interior or exterior property preservation activity*…") (emphasis added). In those circumstances, even if a Trustee Defendant owned the property, Defendants did not — and could not — exercise control. Without the ability to control the property, Defendants could not undertake preservation activities and therefore could not have been the proximate cause of any injury that Plaintiffs attribute to the property's preservation or maintenance. Because causation cannot be established absent proof of both ownership and control, Plaintiffs should not be permitted to collapse that distinction for convenience or rhetorical effect. Throughout this litigation, Plaintiffs have demonstrated an insistence on disregarding these basic facts. For example, Plaintiffs have repeatedly claimed that, 30 days after a property passes into REO status, all aspects of property condition are properly attributable to the REO owner and any deficiencies should be remedied. *See, e.g.*, Kliebard Decl. Ex. 60, NFHA 30(b)(6) (Augustine 10/15/2020) at 432:16-432:22. This Court has already excluded testimony conflating ownership for thirty days with an obligation (or ability) to address

54

all relevant maintenance issues, and it should similarly exclude this testimony from lay witnesses. *See* Dkt. 442 at 74-75. Such testimony incorrectly conflates ownership with control and ignores the multitude of issues which may prevent Defendants from accessing and maintaining an REO property, inviting the jury to reach a verdict on the basis of conditions for which Defendants bear no responsibility. As Plaintiffs bear the burden of proof by a preponderance of the evidence, they must present competent evidence that Defendants both owned and controlled any given property at the time of Plaintiffs' inspection for any property for which Plaintiffs seek damages. Plaintiffs should be precluded from erasing that distinction, because doing so would mislead the jury on causation and create a substantial risk of confusion and unfair prejudice. Fed. R. Evid. 403.

**MOTION NO. 20:**
**TO EXCLUDE EVIDENCE RELEVANT ONLY TO**
**DISMISSED OR UNAVAILABLE DAMAGE CATEGORIES**

Defendants respectfully move to exclude, limit or sequence certain evidence that is relevant only to punitive damages. *First*, the Court should exclude any punitive damages related evidence or argument as to the Trustee Defendants. The Court's summary judgment ruling forecloses punitive damages against the Trustee Defendants because the law of the case establishes that the Trustee Defendants lacked notice of race discrimination by Ocwen and therefore could not have ratified any such conduct. Evidence offered solely to support punitive damages against the Trustee Defendants is thus irrelevant and unduly prejudicial and should be excluded. *Second*, as to the Servicer Defendants, and to the extent the Court denies Defendants' pending motion to bifurcate all evidence related to punitive damage (*see* Dkt. No. 504, Motion in Limine 8.C), the Court should at a minimum order that any financial information related to Defendants that is relevant only to the amount of punitive damages should be withheld from the jury unless and until the jury first finds a predicate basis for Defendants' liability for punitive damages. This approach enforces Rules 401 and 402 and avoid unfair prejudice and juror confusion under Rule 403

A. **Evidence Relevant Only To Punitive Damages Should Be Excluded Because Punitive Damages Are Unavailable Against Trustee Defendants.**

In dismissing Plaintiffs' direct liability claims against the Trustee Defendants at summary judgment, the Court held that the evidence in this case "does not ultimately support an inference that [the] Deutsche Bank [trustees] failed to act based on known race discrimination by the servicers." *NFHA III*, 2025 WL 975967, at *47. The Court therefore dismissed the direct liability claims against the Trustee Defendants, leaving only a vicarious liability claim for the alleged conduct of Ocwen as their purported agent. *See id.* at **46-47. Plaintiffs nonetheless have

indicated they intend to seek punitive damages against the Trustee Defendants and to introduce evidence relevant only to such damages.

In this Circuit, punitive damages under the Fair Housing Act cannot be awarded against a principal absent proof that the principal "knew of or ratified the [discriminatory] acts." *Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d at 1100 (quoting *Hamilton v. Svatik*, 779 F.2d 383, 389 (7th Cir. 1985)); *see also Pumphrey v. Stephan Homes, Inc.*, No. 95-1998, 1997 WL 135688, *3 (4th Cir. Mar. 25, 1997) (granting summary judgment that punitive damages could not be awarded against principal unless it ratified known acts of discrimination under Fair Housing Act); *U.S. v. Gumbaytay,* 757 F.Supp.2d 1142, 1153 (M.D. Ala. 2010) (barring punitive damages against principle where there was no evidence it knew of and "countenanced or approved" the discrimination). But after the Court's decision in *NFHA III,* it is the law of the case that the Trustee Defendants were not on notice of known race discrimination by Ocwen. As noted above, Plaintiffs did not produce any statistical analysis purporting to show Ocwen was engaged in discrimination until expert discovery. Because the Trustee Defendants were not on notice of discrimination, they could not have ratified it, and punitive damages against them is therefore foreclosed. Evidence offered solely to support a punitive damages award against the Trustee Defendants should accordingly be excluded.

## B. Exclude Evidence of Defendants' Finances Until the Amount of Punitive Damages Needs to be Determined.

Evidence of the Defendants' financial information should be excluded from the case until needed (if at all) to address the amount of punitive damages, after issues of liability and compensatory damages have been decided by the jury. Even where punitive damages may be legally available, a defendant's financial position is relevant, if at all, only to quantify punishment once a jury has determined that punitive damages are warranted. Here, the Court should sequence

the presentation of such information in order to ensure the jury considers only relevant information and is shielded from inflammatory and unfairly prejudicial information that could impermissibly influence and bias its verdict on liability and compensatory damages on liability and compensatory damages.

Rule 42(b) authorizes bifurcation of the presentation of evidence "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). Even if the Court declines to have a separate follow-on phase for all punitive-damages-related evidence (going to both liability and amount), the Court at a minimum should exercise its discretion to sequence the presentation of evidence of Defendants' financials and other evidence related solely to the *amount* of punitive damages, such that no evidence of Ocwen's or Altisource's financial condition is presented unless and until the jury returns a verdict that includes the predicate liability findings necessary to permit punitive damages. Courts routinely adopt this case-management approach to avoid confusing the jury with punitive issues and to prevent premature exposure to financial evidence that has no tendency to prove liability or compensatory damages. *See, e.g.*, *Byrne v. Yale Univ., Inc.*, No. 3:17-CV-1104, 2020 WL 5258998, at *14 (D. Conn. Sept. 3, 2020) (bifurcating deliberation of punitive damages and allowing disclosure of financial resources only if necessary).

This tailored sequencing enforces Rule 401 and 402 because financial information bears on no fact of consequence until the jury first finds the culpable mental state needed for punitive damages. *See United States v. Balistrieri*, 981 F.2d 916, 936 (7th Cir. 1992) (punitive damages require at least reckless or callous disregard); *see also Sanders v. Jackson*, 209 F.3d 998, 1002 (7th Cir. 2000) (financial evidence is relevant, if at all, to ensure punitive damages are "meted out according to a business's ability to absorb the penalty"); *see also Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 508 (7th Cir. 1992) (warning that corporate assets are "unrelated to either the injury

done to the victim or the size of the award needed to cause corporate managers to obey the law") (internal quotation omitted). Thus, evidence concerning Defendants' financial resources and any other issues tied specifically to the amount of punitive damages is not relevant to, and therefore would not overlap with the evidence presented on, the issues of Defendants' liability (including for punitive damages) and the amount of compensatory damages.

By contrast, failing to separate out Defendants' financial information from issues of liability and compensatory damages poses a substantial risk of undue prejudice and juror confusion. The Supreme Court has recognized that punitive damages "serve the same purposes as criminal penalties." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). Allowing a jury to hear a corporate defendant's financial information before it determines liability risks transforming the trial into a referendum on perceived corporate wealth rather than a reasoned assessment of the elements and defenses at issue. Courts repeatedly warn that evidence of net worth can invite bias against large businesses, mislead the jury, and distract from the merits, thereby creating precisely the type of unfair prejudice and confusion Rule 403 is designed to prevent. *See Honda Motor Co. v Oberg,* 512 U.S. 415, 432 (1994) ("[T]he presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses[.]")

Here, the risk of undue prejudice to Defendants is even greater. Plaintiffs have failed to marshal admissible evidence substantiating their alleged frustration of mission damages and have not provided any principled quantification of such alleged harm. *See* Defendants' Motion in Limine No. 16 *supra*. Instead, Plaintiffs intend to throw the issue to the jury and ask them to quantify frustration of mission damages. *See* Dkt. 454 at 8. Thus, risk is manifest that if the jury is then simultaneously presented evidence of Defendants' finances, the jury will fill the vacuum

created by the lack of Plaintiff-specific monetary harm by improperly considering Defendants' net worth to arrive at inflated compensatory damages. This is plainly impermissible. *Zazu Designs*, 979 F.2d at 506 (7th Cir. 1992) ("Using a percentage of some number unrelated to the plaintiff's injury is an unacceptable way to estimate damages[.]"); *see also Pivot Point Int'l, Inc. v. Charlene Prods.*, Inc., 932 F. Supp. 220, 223 (N.D. Ill. 1996) (excluding financial and tax information absent focused need and noting substantial potential to distract the jury). To avoid this impermissible outcome, the Court should bar evidence of Defendants' finances until a follow-on phase addressing the amount of punitive damages, after liability and the amount of compensatory damages have already been determined free of such potential bias and undue influence.

### C.  <u>Conclusion.</u>

For the foregoing reasons, the Court should (1) exclude all evidence offered solely to support punitive damages against the Trustee Defendants and (2) as to Ocwen and Altisource, sequence the presentation of any financial evidence related to Defendants so that it is not presented until a follow-on phase addressing the amount of punitive damages, as needed and only if the jury first returns the predicate liability findings necessary to permit punitive damages.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Round 2 motions in limine in their entirety.

Dated: January 14, 2026                    Respectfully submitted,

By: /s/ *Kenneth M. Kliebard*

Kenneth M. Kliebard
Tinos Diamantatos
Michael W. Fakhoury
**MORGAN, LEWIS & BOCKIUS LLP**
110 North Wacker Drive, Suite 2800
Chicago, Illinois 60606-1511
Telephone: (312) 324-1000
kenneth.kliebard@morganlewis.com
michael.fakhoury@morganlewis.com

Kurt W. Rademacher (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, Pennsylvania 19103-3007
Telephone: (215) 963-5000
kurt.rademacher@morganlewis.com

*Counsel for Defendants Deutsche Bank National Trust Company, as Trustee, and Deutsche Bank Trust Company Americas, as Trustee*

By: /s/ *Debra Bogo-Ernst*

Debra Bogo-Ernst
Matthew J. Thomas
Sara Kim
Brandon E. Villa
**WILLKIE FARR & GALLAGHER LLP**
300 N. LaSalle Dr.
Chicago, IL 60654
(312) 728-9000
dernst@willkie.com
mthomas@willkie.com
skim@willkie.com
bvilla@willkie.com

*Counsel for Defendant Ocwen Loan Servicing, LLC, n/k/a Onity Group Inc.*

By: */s/ Nathan Garroway*

Nathan Garroway
Lisa M. Krigsten
Sarah Hannah Phillips
Mark G. Trigg
**DENTONS US LLP**
303 Peachtree Street, NE, Suite 5300
Atlanta, Georgia 30308
Telephone: (404) 527-4000
nathan.garroway@dentons.com
lisa.krigsten@dentons.com
sarahhannah.phillips@dentons.com
mark.trigg@dentons.com

*Counsel for Defendant Altisource Solutions, Inc.*