**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE; HOPE FAIR HOUSING CENTER, et al., | |
| | Case No. 18 CV 839 |
|    Plaintiffs, | |
| | |
|     v. | |
| | Judge Manish S. Shah |
| DEUTSCHE BANK NATIONAL TRUST, AS TRUSTEE, et al., | |
| | Jury Trial Demanded |
|     Defendants. | |

**PLAINTIFFS' JANUARY 21, 2026 CONSOLIDATED RESPONSE TO DEFENDANTS'**
**SECOND ROUND MOTIONS IN LIMINE**

# TABLE OF CONTENTS

I.  THE COURT SHOULD DENY DEFENDANTS' LATEST ATTEMPT TO PARE DOWN THE PROPERTIES AT ISSUE THROUGH REGURGITATED ARGUMENTS IN MOTION IN LIMINE NO. 14. ...................................................... 1

II.  THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 15 AND PERMIT THE JURY TO HEAR PLAINTIFFS' THIRD-PARTY EVIDENCE .................................................................................................................11

III.  THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 16 BECAUSE IT GROSSLY MISREPRESENTS THE FACTUAL RECORD AND THE APPLICABLE LEGAL FRAMEWORK. ............................................. 19

IV.  THE COURT SHOULD DENY DEFENDANTS' MOTION NO. 17 AND ADMIT RELEVANT EVIDENCE CONCERNING DEFENDANTS' COURSE OF CONDUCT ................................................................................................. 30

V.  THE COURT SHOULD DENY DEFENDANTS' EIGHTEENTH MOTION AND ADMIT EVIDENCE SHOWING DEFENDANTS WERE ON NOTICE OF DISCRIMINATORY REO MAINTENANCE. ............................................. 42

VI.  THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 19 PURPORTEDLY SEEKING TO CLARIFY THE SCOPE OF VICARIOUS LIABILITY AND REQUIRE SPECIFICITY AS TO ALLEGED POLICIES......... 46

VII.  THE COURT SHOULD DENY DEFENDANTS' TWENTIETH MOTION IN LIMINE AND PERMIT PLAINTIFFS TO INTRODUCE PUNITIVE DAMAGES EVIDENCE ................................................................................................. 50

I.    **THE COURT SHOULD DENY DEFENDANTS' LATEST ATTEMPT TO PARE DOWN THE PROPERTIES AT ISSUE THROUGH REGURGITATED ARGUMENTS IN MOTION IN LIMINE NO. 14.**

In what appears to be a fit of Nietzsche-esque eternal recurrence, Defendants' Motion in Limine No. 14 cobbles together three well-trod arguments: (a) a contention that, despite previous holdings from this Court and Judge Leinenweber, claims against Deutsche Bank should now be curtailed to February 14, 2015 onward instead of February 26, 2012 onward; (b) an argument that any evidence regarding certain "Agreed Upon Properties" serviced by Ocwen and Altisource should be excluded prior to even considering disputed evidence relating to them; and (c) an argument that evidence related to "generalized conduct" of the Defendants with regard to properties not part of Plaintiffs' statistical study should be excluded. Each of these recycled arguments is baseless.

   A.   **The Statute of Limitations That Has Been Applied to Claims Against Deutsche Bank Should Not Be Changed.**

      1.   **The Court Has Previously Resolved Limitation Issues.**

Based on the HUD Complaint filed by the Plaintiffs against Deutsche Bank, Judge Leinenweber's November 2018 decision set the limitations period that applies to claims against the Deutsche Bank Defendants in this litigation as February 26, 2012 onward. ECF 54. This limitations period was affirmed by this Court in its March 31, 2025, Opinion. ECF 442. Neither of these Opinions made any distinction as to different claims or theories of liability that Plaintiffs asserted against Deutsche Bank.

Defendants' eleventh hour claim the Court should drastically revise the limitations period with respect to claims against Deutsche Bank because the direct liability claims against it were dismissed in March is wrong for multiple reasons, (see sections A.2 and A.3 below), but the first problem is simply that it is another attempt by Defendants to persuade the Court to reach a

contrary decision and undo a settled issue in the case. While claiming that proceeding on a vicarious liability theory changes the applicable limitations period, *Defendants conveniently ignore the fact that in the very Opinion in which this Court endorsed a vicarious liability theory against Deutsche Bank, it expressly reaffirmed application of the February 26, 2012 limitations period to claims against it*. And despite all of the motions for reconsideration and clarification presented by Defendants on a regular basis during the past 10 months, the Defendants never before bothered to request that the Court reconsider this portion of its Opinion. As such, the limitations period that has governed the litigation for the past seven years should stand.

### 2. The Case Law Cited by Defendants is Inapposite and Ignores the Weight of Authority.

Defendants' brief cites a few cases applying state law to run-of-the-mill tort litigation in an employer-employee context (e.g., taxi cab accident) for the purported proposition that the owner of a property, such as Deutsche Bank, cannot be held liable in a Fair Housing Act case for discriminatory conduct of its agent that falls within the limitations period that applies to the owner but, due to the passage of time, no longer presents a claim that can be pursued against the agent. This argument falls flat for several reasons.

First, Defendants ignore that, even in the general tort setting, the weight of precedent from federal and state courts holds that a principal may be held accountable for conduct of its agent in circumstances where claims against the agent are no longer viable for reasons not going to the merits, including the passing of the statute of limitations. *See e.g.*, *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 935-955 (8th Cir. 2021); *Krekelberg v. City of Minneapolis*, 2018 WL 3621031 (D. Minn. July 30, 2018) (dismissal based on the statute of limitations should not operate to preclude vicarious liability because such a dismissal does not actually address if the agent's conduct supports an actionable claim); *Byrd v. J Rayl Transp., Inc.*, 106 F. Supp. 3d 999,

1001 (D. Minn. 2015") ("[i]t is the negligence of the servant that is imputed to the master, not the liability."); *ISP Chemicals LLC v. Dutchland, Inc.*, No. 5:08–CV–153, 2011 WL 2690029, at *3 (W.D. Ky. July 6, 2011")("[U]nder Kentucky law, the principal can be held vicariously liable for the agent's conduct even if the statute of limitations bars [the plaintiff's] claim against the agent himself"); *Cameron v. Osler*, 930 N.W.2d 661, 666 (S.D. 2019") ("it is the negligence of the servant that is imputed to the master, not the liability"); *Juarez v. Nelson*, 61 P.3d 877, 886 (N.M. Ct. App. 2002), *overruled on other grounds*, 116 P.3d 105 (N.M. 2005) ("Defendant has not cited, and we are not aware of, any New Mexico case applying the principle that the exoneration of the servant operates in tort to exonerate the principal of vicarious liability where the employee has been exonerated by a statute of limitations"); *Verrastro v. Bayhospitalists, LLC*, 208 A.3d 720, 725 (Del. 2019) (allowing plaintiff to proceed against an employer where the statute of limitations has run on the plaintiff's suit against the employee but not on the suit against the employer); *Hughes v. Doe*, 639 S.E.2d 302, 304 (Va. 2007) (reversing judgment and remanding to trial on vicarious liability claim against employer because "the dismissal with prejudice of [employee] was not an affirmative finding of non-negligence; it merely terminated [plaintiff's] ability to hold [employee] liable for any alleged negligence"); *Women First OB/GYN Assoc. LLC v. Harris*, 161 A.3d 28, 40, 45 (2017) (case against the principal should not be dismissed unless dismissal of the agent was on merits).

The reasoning in *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 953-955 (8th Cir. 2021), is typical of these decisions. In that case, the plaintiff sued the City of Minneapolis and several of its employees for alleged violations of a federal statute, the Driver's Privacy Protection Act. 991 F.3d at 952. After the court dismissed the claims against the individual employees on statute of limitations grounds, the city moved to dismiss the claims against it, arguing that the

3

employees' dismissals barred vicarious liability claims against the city. *Id.* at 953. The District Court held that the vicarious liability claims against the city could proceed, even though the employees/agents could not be held individually liable, and the Eighth Circuit affirmed that decision. *Id.* at 953-955. The Court of Appeals held that a dismissal of claims against an agent on limitations grounds was not a judgment on the merits, and, as such, claims against the principal for the agent's conduct could be pursued in the absence of the agent. *Id.* The Court of Appeals placed particular emphasis on the fact that when Congress enacted the DPPA in 1994, it did so against the legal background of the Restatement (Second) of Agency (Am L. Inst. 1958), and that the proper interpretation of provisions of the Restatement was that only a judgment finding that the agent was "not culpable" would bar claims against the principal. 991 F.3d at 954-55.

Second, none of the three cases cited by Defendants as directly supporting its position relate to the Fair Housing Act (or any federal statute at all). *See* ECF 514 at 4. The Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*. was enacted to provide, within constitutional limits, for fair housing throughout the United States, 42 U.S.C. § 3601. The Supreme Court has recognized that the intention of Congress in passing the Act was to end the unfairness of racial discrimination forever and has described the statute as "broad and inclusive." *Trafficante v. Metro Life Ins. Co.*, 409 U.S. 205, 209 (1972). As such, in applying the statute, courts have afforded the statute a "generous construction." *City of Edmonds v. Oxford House, Inc*., 514 U.S. 725, 731 (1995). This includes in circumstances relevant to the present case, where the issue of whether an agency relationship exists for purposes of the Fair Housing Act has been decided under federal rather than state law. *See Cabrera v. Jakabovitz*, 24 F.3d 372, 386 n.13 (2d Cir. 1994).

4

Here, the policy of broadly enforcing the Fair Housing Act weighs against Defendants' extremely narrow interpretation of how limitation provisions should be applied. So long as an agent of a property owner has not been exonerated on the merits for its conduct, the Congressional purpose of eradicating racial discrimination weighs in favor of allowing claims against the principal to proceed.

### 3. The Limitations Period Applied to Claims Against Deutsche Bank Does Not Affect Plaintiffs' Statistical Analysis.

Defendants tack on an assertion that Plaintiffs' statistical analysis should be limited to property inspections conducted after February 14, 2015 based on its claims that the statute of limitations for Deutsche Bank should be changed. In point of fact, no matter how the limitations period was applied, however, it would have no bearing on the scope and validity of Plaintiffs' statistical analysis. Both Judge Leinenweber and this Court have recognized that Defendants' conduct outside the limitations period can be used as evidence to prove liability for behavior occurring within the limitations period. ECF 97 at 36 (Nov, 13, 2019 Memorandum and Order on Defendants' Joint Motion to Dismiss); ECF 442 at 31-32 (Mar. 31, 2025, Memorandum and Order). These prior holdings comport with well-accepted principles. *See e.g.*, *AMTRAK v. Morgan*, 536 U.S. 101 (2002) ("provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability"); *Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014); *Wilbern v. Culver Franchising Sys.*, No. 13 C 3269, 2015 WL 5722825 at *22 (N.D. Ill. Sep. 29, 2015).

### B. Defendants' Continued Attempts to Mischaracterize and Improperly Limit Evidence Related To Plaintiffs' Statistical Study Should Be Rejected.

Mindful of Defendants' streams of arguments directed toward the goal of reducing the size of the dataset supporting Plaintiffs' statistical analysis, Plaintiffs filed their Motion in Limine

No. 2 ("Motion to Bar Defendants' Counsel or Witnesses from Making Unsupported, Untimely and Misleading Claims Regarding the Agreed Upon Dataset of Properties Serviced by Ocwen and Altisource") as part of their first-round motions in limine. *See* ECF 503. The purpose of the motion was to preempt attacks by Defendants on Plaintiffs' statistical analysis that were belated, meritless and based on erroneous and/or disputed facts. During the summary judgment process, contentions about the Plaintiffs' dataset were raised by Defendants' counsel that had never been disclosed in discovery and lacked any expert support or analysis. In this Motion, Plaintiffs noted that, as a general matter, the Court's ruling on vicarious liability cast the spotlight squarely on whether properties had been serviced by Ocwen or Altisource (the Defendants with primary liability) as opposed to various arguments made by Deutsche Bank about ownership of properties, based largely on Deutsche Bank's own inability to state whether it owned the properties. Defendants filed a long response to this motion.[1]

Defendants' current Motion in Limine rehashes many of Defendants' prior arguments, muddies the waters further, and requires a step back to explain the parameters of the dataset(s) being discussed and the relationship to Plaintiffs' statistical analysis. During this litigation, after a series of formal and informal exchanges of information between the parties, Defendant Ocwen sent an email dated April 26, 2022, attaching the agreed list of 699 Deutsche Bank REOs serviced by Ocwen-Altisource. (Ex. 1, Ocwen email attaching Agreed 699 property list, and related correspondence). As such, this Agreed Upon list of properties owned and serviced by Defendants was a reasonable starting point for consideration by Plaintiffs' expert, Dr. Ayres. *See* Ex. 2 (Ayres Report at 15-16). There is nothing problematic about Plaintiffs referencing this set

---

[1] In its January 20, 2026 Order, ECF 520, the Court denied this motion, but expressly noted that "the factual predicate for plaintiffs' inferences of discrimination is disputed," and that attempts at impeachment of Dr. Ayres by Defendants "does not render admissible untimely or improper expert testimony . . ."

of properties expressly agreed to by the Defendants in Plaintiffs' analysis since it provided one of the core sets of data to be analyzed.

But the critical fact omitted by Defendants is this: Dr. Ayres did not limit their comprehensive regression analyses to this set of 699 properties, but rather conducted their regression analyses across all potentially relevant smaller subsets of properties that took into account all the information that Dr. Ayres obtained relating to ownership of properties, as it intersected with information regarding the date of Plaintiffs' inspection, the results of the inspection, Defendants' Servicer data and the list of Agreed Upon properties. See Ex. 2 at 21 and Fig. 2; Exs. 6-1 - 6-9 (Ayres Report). All the materials Dr. Ayres relied upon in their analyses were fully disclosed in their reports. See Ex. 2 at 44-46 (Ayres Report).

As such, the far-out scenario that Defendants now try to suggest to the effect that many properties considered in Plaintiffs' statistical analysis fall outside the window of when Defendants serviced the properties is baseless. The properties cited in Defendants' memorandum at notes 3 and 4 as supposedly being problematic were already excluded by Dr. Ayres in the regression analyses. Ex. 3 (Declaration of J. Soule). To the extent there may be any small further subset of properties where there is conflicting evidence or conflicting inferences may be drawn, that is hardly an issue to be decided based on speculation and suggestions from Defense counsel, as opposed to testimony from Dr. Ayres at trial. See ECF 520 (January 20, 2026 Order on Pls. Limine Mot. No. 2, noting disputed factual issues to be resolved at trial). Moreover, under all circumstances, Dr. Ayres is entitled to the opportunity to testify that any such disputes (not raised by Defendants until the middle of the summary judgment proceedings) do not affect the ultimate conclusions of their analysis that statistically significant disparities exist with regard to maintenance of REO properties in white communities as opposed to communities of color.

Defendants' backhanded attack on one of the data sources that Dr. Ayres used—information obtained from ATTOM Data Solutions—is unfounded. *See* ECF 514 at 8. Dr. Ayres will confirm in trial testimony that ATTOM data is a well-respected source of data, routinely relied upon by experts and analysts such as themselves in cases involving facts and information contained in the ATTOM database. The ATTOM data includes historical information on property sales, including the identities of the seller and buyer, information on mortgages, and information on property characteristics collected by municipalities. Ex. 2 at 19 (Ayres Report). For some communities, the county recorder data goes back as far as 1984, and the county assessor data back to 2001. *Id.* ATTOM's community data includes current characteristics of Census block groups, including crime indexes that indicate the risk of certain types of crimes (including burglary, larceny, and motor vehicle theft) relative to the nationwide risk of those crimes. *Id.* There is no basis for Defendants to claim that this source of information on property ownership that was disclosed to them is "hearsay" while the far less comprehensive information they have cited in some instances from a company called "Data Tree" is not. In any event, all bases of Dr. Ayres' analyses are proper under F.R.E. 703. The statement that "Ayres's reliance on that hearsay does not render it admissible for any purpose other than within the confines of Ayres's analysis" is puzzling. ECF 514 at 8. Clearly, that was the purpose of Dr. Ayres using and analyzing this information. At the same time, Defendants offer no evidence that data retrieved through ATTOM is problematic, which would simply raise a question of fact for the jury.

While there are other omissions and inaccuracies related to Defendants' motion, they are not material and require only brief comment here. For example, as to Defendants' speculation about pre- or post-ownership inspections, Defendants fail to mention that Plaintiffs applied a 30-day grace period before inspection after ownership changed or that the expert analysis of Dr.

Ayres specifically controlled for "months held by a lender." *E.g.*, Ex. 2 at Exhibit 6-1 (Ayres Report). Defendants further fail to consider their own Servicer maintenance data or consider the property records and data reviewed by Dr. Ayres.

For all these reasons, Defendants' motion should be denied. Defendants will have the opportunity at trial to cross-examine Dr. Ayres about any issues that Defendants perceive exist related to their statistical analyses.

### C. No Basis Exists for Barring References to "Generalized Conduct" Not Directly Related to the Properties in Plaintiffs' Statistical Analysis.

The last section of Motion in Limine No. 14 ("References to Generalized Conduct that Did Not Occur With Respect to Properties Properly Included in Plaintiffs' Statistical Study Should be Barred") is a short regurgitation of the identical arguments previously made by Defendants in their Motion in Limine No. 2 ("Evidence Regarding Properties Excluded from the Operative Statistical Study Should be Excluded . . .").[2] The arguments are wrong for the same reasons discussed in Plaintiffs' prior response. *See* ECF 503 at 21-32

Briefly, a blanket exclusion of such evidence would not comport with any recognized evidentiary principle and, based on the facts here, would likely exclude highly probative evidence bearing on intent, knowledge, policies, patterns or practices, and other relevant matters. All Defendants' policies and practices were national and were not limited to the specific properties that were part of Dr. Ayres' statistical analyses. These include Defendants' policies related to their system of unsupervised and discretionary property decisions. Moreover, discriminatory conduct by Defendants directed toward properties in communities of color outside of those in the statistical study may be probative of a pattern of conduct and indicative of

---

[2] In its January 20, 2026 Order, ECF 520, the Court denied Defendants' Motion in Limine No. 2, holding that "evidence related to properties that were not within plaintiffs' statistical study is not categorically irrelevant."

intent. Thus, evidence of Defendants' policies and evidence of the discriminatory impact of those policies, including Defendants' intentional abandonment and wanton disregard for maintenance issues, marketing and code violations in minority communities, should be admissible.

For the reasons explained above, Defendants' Motion in Limine No. 14 should be denied.

II.      **THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 15 AND PERMIT THE JURY TO HEAR PLAINTIFFS' THIRD-PARTY EVIDENCE**

Defendants' Motion No. 15 seeks to "exclude testimony of third-party witnesses." Defendants' presentation is misleading, incorrect, incomplete, and should be denied.

### A.  Introduction

Defendants challenge three groups of witnesses. First, Defendants seek to exclude testimony from several "Common Ground" witnesses who challenged Defendants' failure to maintain REOs in Milwaukee, from 2009 through 2018, and informed Deutsche Bank and Ocwen's representatives, including former Ocwen Senior Vice President Jill Showell, that Defendants conduct was devastating African American Milwaukee neighborhoods. ECF 511 at 25-30. To support their claim that this evidence is irrelevant, Defendants suggest the wrong end date (ECF 514 at 13), do not mention Ms. Showell, even though she is Defendants' Witness #2 and on Plaintiffs' "will call list" (ECF 516-3) and was given an informative neighborhood tour by Common Ground (ECF 511 at 29), and omit that Common Ground members told Deutsche Bank and Ocwen of their conduct's discriminatory impact (*id*. at 28-29).

Second, Defendants ask the Court to exclude testimony from neighbors of REO properties investigated by Plaintiffs in this case, claiming that their evidence is irrelevant. That is incorrect. The witnesses are homeowners with knowledge of Defendants' failure to maintain REOs in their neighborhoods. The nearby REOs were neglected, unsecured, deteriorating and dangerous. ECF 369-39 at 109-113 (Ngameni Decl.); ECF 369-39 at 115-116 (Craig Decl.); ECF 369-39 at 118-123 (Adams Decl.); ECF 369-39 at 137-149 (Plate Decl.); ECF 515-17 (Koehler Decl.). Moreover, this case is not limited to statistical evidence alone. Not surprisingly, Defendants' proposed witnesses include many who Defendants describe as having evidence that has nothing to do with statistics or specific properties. ECF 516-3.

11

Defendants' last challenge targets witnesses from the University of Memphis School of Law's Neighborhood Preservation Clinic (Daniel Schaffzin and Brigid Welsh). The Clinic brings litigation on behalf of the City of Memphis, seeking to abate public nuisances created by neglected REOs in Memphis. NFHA investigated Deutsche Bank REOs serviced by Ocwen-Altisource in Memphis. Schaffzin and Welsh will present evidence about two REOs foreclosed and owned by the Deutsche Bank Defendants and serviced by Ocwen that were the subject of litigation by the Clinic because of substandard property maintenance. As detailed below, the facts asserted by Defendants to justify preventing Schaffzin and Welsh from testifying are false and contradicted by public records produced to Defendants in discovery years ago.

Ironically, the most candid statements in Defendants' Motion No. 15 are that the witnesses they seek to prevent from testifying will impress the jury. *E.g.*, ECF 514 at 17 (Common Ground's witnesses "include a minister, a pastor, a professor, and volunteers …highly sympathetic figures whose testimony is likely to carry substantial emotional weight with the jury.") The fact that witnesses will be compelling is not a basis to exclude their testimony.

The witnesses Defendants attempt to silence have highly probative evidence, regarding: (1) Defendants' failure to maintain REOs; (2) Defendants' knowledge of the devastating impact of their misconduct in minority-majority neighborhoods served by Plaintiffs and their missions; (3) Defendants' continued misconduct despite such knowledge; and/or (4) the agency relationship between the Deutsche Bank Defendants and the Servicer Defendants, all of which additionally relates to Plaintiffs' organizational standing and damages.

**B. Non-Party Witnesses Can Properly Testify.**

A common theme in Motion No. 15 is Defendants' contention that Plaintiffs' non-party witnesses should be excluded if they do not have evidence about specific properties that were part of the statistical analyses conducted by Dr. Ayres. That argument was first presented in

Defendants' Motion No. 2 and rejected by the Court in the January 20, 2026 Order: "Evidence related to properties that were not within plaintiffs' statistical study is not categorically irrelevant. Such properties may be examples of certain plaintiffs' missions in action and relevant to an organization's damages even if not a basis for a finding of liability." ECF 520 at 4.

In addition, discriminatory intent is "rarely susceptible to direct proof," and its determination requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The Seventh Circuit has taken a broad view of the various types and combinations of circumstantial evidence that may be used to establish discrimination, including in fair housing cases. *See Kormoczy v. HUD ex rel. Briggs*, 53 F.3d 821, 824 (7th Cir. 1995). Probative evidence of all types is relevant to the determination, *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760, 765 (7th Cir. 2016), and it is not disqualifying that evidence comes from non-parties or is outside of Plaintiffs' statistical analysis. Other non-party witnesses provide testimony directly related to Plaintiffs' standing and damages, *e.g.*, Victoria Plate, who completed a NFHA survey with a plea for NFHA to help ("Please help us!"). ECF 369-39 at 142.

## C. The Non-Party Witnesses Will Be Efficiently Examined.

Plaintiffs are acutely aware of the time limitations governing the upcoming trial. As such, Plaintiffs anticipate and are planning for a short, concise and highly focused examination of the non-party witnesses. The Plaintiffs will avoid redundant or cumulative testimony. In view of these considerations, Plaintiffs have determined not to call non-party witness Loretta Turnbull at trial, have moved Marvin Adams to "may call," and will make similar determinations, as necessary. The Plaintiffs will fully comply with instructions from the Court at trial to expedite the non-party witness testimony.

**D. Evidence from Common Ground and a key City of Milwaukee Public Official is Relevant and Highly Probative.**

As previously demonstrated (ECF 511 at 25-31), Common Ground's evidence is relevant and highly probative regarding many significant issues. Much of this evidence was implicated by Defendants' Motion 5, which addressed "evidence related to non-party affiliates of the Deutsche Bank Trustees." ECF 504 at 28. In the January 20 Order, the Court held that "Evidence related to Deutsche Bank non-party affiliates is excluded as irrelevant, *except to the extent the servicer defendants were directly involved in communications or meetings that bear on the servicer's property-maintenance work.* An instruction limiting the evidence of the Milwaukee grants and loan program for damages only and prohibiting the jury from considering it as evidence of liability will adequately protect defendants from improper inferences." ECF 520 at 4 (emphasis supplied). The following briefly reviews the relevance of the Common Ground evidence.

First, the Plaintiffs, including Metropolitan Milwaukee Fair Housing Council, inspected numerous REO properties in Milwaukee owned by Deutsche Bank and serviced by Ocwen and Altisource. For several years, Common Ground members (working with Milwaukee's Department of Neighborhood Services) met with representatives from Deutsche Bank and Ocwen and presented data, maps and detailed evidence that vast destruction was being caused by the failure to maintain REOs in predominantly African American neighborhoods in Milwaukee. *See, e.g.*, ECF 369-41 at 47-48, 57 (Connolly Decl., ¶¶ 4-7, 17); ECF 369-40 at 22-32 (Dahlberg Decl., ¶¶ 6-17, 22-30). Common Ground's leader, Bob Connolly, testified that during meetings in Milwaukee with representatives from Deutsche Bank, "I and other members of Common Ground shared with Deutsche Bank representatives that the neglect of properties in Milwaukee and specifically Sherman Park (which was the focus of our effort) was especially harsh on African

14

American residents of the city and neighborhoods whose residents were mostly African American." ECF 369-41 at 57 (Connolly Decl., ¶ 17).

Jill Showell is one of just four corporate employees on Defendants' live "Will Call" List (ECF 516-3 at 2) and will also be called by Plaintiffs. She visited Common Ground starting in December 2014. Ms. Showell testified that the racial demographics of Sherman Park were discussed with Common Ground (including Mr. Connolly) and admitted that "[i]t's possible" that "the extent to which the vacant REO properties in the Sherman Park neighborhood were having an impact on African American residents" was also discussed. ECF 511-1 at 28-29 (Showell Dep. at 143-144). Showell was taken on a tour of Sherman Park, where she observed "a neighborhood that was impacted by the financial and housing crisis" that "should be a concern of anyone." ECF 511-1 at 28-29 (Showell Dep. at 99-105). Second, the Milwaukee Department of Neighborhood Services was led by Art Dahlberg from 2009 through 2015. He similarly testified about the destruction to neighborhoods in discrete zip codes in Milwaukee, including the predominantly African American neighborhoods of Amani, Sherman Park and Metcalfe Park. In meetings with representatives from Deutsche Bank and Ocwen, the City "regularly shared lists of approximately 100 properties that had outstanding Orders reflecting Code Violations that needed to be remedied and we asked the banks and servicer representatives to tell us what they were doing with these properties. The Orders were based on neighbor complaints and City inspections." The maps they shared showed that "areas where the levels of code violations were the most dense … [were] always in the neighborhoods referenced above." ECF 369-40 at 23-24, 27-32 (Dahlberg Decl., ¶¶ 10-14, 22-30). Third, the Deutsche Bank Defendants passed along information about REO maintenance issues to Servicers, including Ocwen. The Court's Summary Judgment Opinion cited Deutsche Bank's memoranda to Servicers regarding various

15

REO issues. The July 28, 2008 memo, under the heading "Maintenance of REO Properties,"
states: "The Trustee has received a number of inquiries and complaints from government
officials and community groups about the physical condition of REO properties." ECF No. 442
at 118. The "community groups" obviously include Common Ground. Based in part on that
evidence, the Court held, "In sum, there's sufficient evidence in the record for a jury to infer the
existence of an agency relationship, whether by contract or conduct, between the Deutsche Bank
defendants as principals and the servicer defendants as their agents." *Id.*, p. 120.

Third, and contrary to Defendants' refrain about "a single Milwaukee neighborhood"
(ECF 514 at 12), which in any event is representative evidence, Common Ground's evidence of
Defendants' knowledge and conduct is not limited to Sherman Park. For example, "Ocwen's
Milwaukee Portfolio" is a one-page document shared by Ocwen in November 2014 with
Common Ground and the City of Milwaukee. This document, on Ocwen letterhead, lists 674
REOs in Milwaukee among Ocwen's portfolio, identified by 24 zip codes. ECF 369-42 at 7, 40
(Connolly Supplemental Decl., ¶¶ 12-13 and Ex. 17). Ocwen's Milwaukee REO portfolio is
consistent with Commissioner Dahlberg's testimony noted above, that the City regularly shared
code violation information identified by zip codes with Deutsche Bank and Ocwen. ECF 369-40
at 22-23, 31-32 (Dahlberg Decl., ¶¶ 8, 11, 29-30).

Fourth, in response to the City and Common Ground's efforts, Deutsche Bank (and later
Ocwen) eventually made small financial contributions to Sherman Park. Two of Defendants'
Exhibits relate to Ocwen's contributions in 2016. ECF 516-5, Exs. 87 and 88. That relief was a
drop in the bucket compared to the devastation throughout the City's predominantly African
American neighborhoods. *See, e.g.*, ECF 369-40 at 21-25, 27-32 (Dahlberg Decl., ¶¶ 4, 6-16, 22-
30); ECF 369-41 at 47-65 (Connolly Decl., ¶¶ 3-27); ECF 369-42 at 2-16 (Connolly

Supplemental Decl., ¶¶ 3-32). This evidence is also relevant in this case as a damages benchmark.

Fifth, as noted above, Defendants' suggestion that evidence from Common Ground witnesses is temporally irrelevant is incorrect. Again, the Court's summary judgment ruling cites a 2008 memo from Deutsche Bank to its Servicers. ECF No. 442 at 118, 120. Presumably, even Defendants intend to introduce evidence that predates statutes of limitations they believe apply. Both Judge Leinenweber and this Court have ruled that evidence outside of the statute of limitations may be relevant and admissible.

Sixth, the relief requested in Defendants' Motion is extreme. Even if the Court determined in advance of their testimony that certain evidence known by Plaintiffs' witnesses should not be presented at trial, that would not justify excluding their entire testimony.

Plaintiffs briefly outline the testimony of the expected Common Ground witnesses and respond to the assertions about them in Defendants' motion in the attached Ex. 4, Section 1.

### E. Defendants' Challenges to Neighborhood Witnesses Who Personally Observed and Experienced the Effects of Defendants' Conduct Should Be Denied.

As noted above, Defendants' claim that neighbors' testimony is irrelevant is incorrect. Defendants also complain that neighborhood witnesses did not conduct "systematic or comparative assessment of maintenance by race, neighborhood, owner, servicer, or time period." ECF 514 at 20. That is true, but it is also true of Defendants' non-expert (and expert) witnesses. Conducting such systematic or comparative assessments are not requirements for lay witnesses to testify about their personal experiences of the effects of Defendants' conduct in this case. These are people Plaintiffs' missions serve. As previously demonstrated, (ECF 511 at 24-25), and demonstrated in Exhibit 4, Section 2, Defendants' relevancy argument is also incorrect. All of the neighbors have evidence bearing on Defendants' conduct.

### F.  Defendants' Request to Exclude the Memphis Neighborhood Preservation Clinic Witnesses, whose testimony is highly relevant and probative Should Be Denied.

Defendants' request to exclude witnesses from the University of Memphis School of Law's Neighborhood Preservation Clinic (Daniel Schaffzin and Brigid Welsh) is similarly deficient and should be denied. As set forth in Declarations and deposition testimony, the Clinic works to abate public nuisances created by neglected REOs in Memphis. Their testimony relates to REO properties owned by the Deutsche Bank Defendants and serviced by Ocwen that suffered substandard property maintenance conditions that impacted neighborhoods and Plaintiffs' missions. It is relevant, probative and admissible. The anticipated testimony of Mr. Schaffzin and Ms. Welsh is summarized in Ex. 4, Section 3.

For the reasons explained above, Defendants' Motion in Limine No. 15 should be denied.

**III.      The Court Should Deny Defendants' Motion in Limine No. 16 Because It Grossly Misrepresents the Factual Record and the Applicable Legal Framework.**

Defendants' Motion in Limine No. 16 rests on two irretrievably flawed premises. First, Defendants wrongly assert that Plaintiffs "deferred entirely to their damages expert." This is demonstrably false. Over the years-long course of fact discovery, all Plaintiffs provided significant information about their frustration-of-mission damages, including documents, interrogatory responses, and testimony. Although not necessary, Plaintiffs then offered an expert to quantify this type of harm. The Court's exclusion of that expert does not somehow erase the mountain of record evidence on which she relied. To the contrary, that evidence remains relevant and admissible. Second, Defendants' motion continues to press their already-rejected position that Plaintiffs must mathematically compute a specific dollar amount for their frustration of mission damages. This, too, is wrong. Frustration damages are available to Plaintiffs using the evidence the Court itself described: testimony on the impairments to their missions and operations. ECF 460 at 7-9. Defendants' reliance on inapposite authority is unavailing, and their effort to shoehorn Plaintiffs' admissible evidence into prior decisions falls flat.

Tellingly, Defendants do not actually identify any evidence to be excluded. This is likely because all of Plaintiffs' damages-related evidence—identified through relevance descriptors on their exhibit list, *see* ECF 516-4—bear Bates numbers or deposition exhibit numbers confirming production during discovery. Had Defendants attempted to grapple with Plaintiffs' actual evidence, they would have been forced to acknowledge that it has been in the record all along. Defendants' failure to specify what actual evidence they seek to exclude also means their Motion "lacks the necessary specificity with respect to the evidence to be excluded." *Navarrete v. Madison Cnty.*, No. 17-CV-347, 2021 WL 2374350, at *1 (S.D. Ill. June 10, 2021) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co. Group*, 937 F. Supp. 276, 287

(S.D.N.Y. 1996)). Defendants essentially ask the Court and Plaintiffs to guess what questions or documents they believe fall within the penumbra of their Motion, an approach that leaves Plaintiffs hostages to fortune at trial. This approach undermines the very purpose of a Motion in Limine, which is to "streamlin[e] a trial so that extensive argument becomes unnecessary after a jury has been impaneled." *Awalt v. Marketti*, No. 11 C 6142, 2015 WL 4338048, at *1 (N.D. Ill. July 15, 2015) (citing *Jonasson v. Lutheran Child and Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997)). Defendants' motion does just the opposite.

### A.  Plaintiffs Timely Disclosed their Damages Evidence.

This Court has outlined the organizational evidence that Plaintiffs may offer to prove their frustration-of-mission damages. The record in this case is replete with precisely the kind of information that this Court has articulated.

When last addressing Plaintiffs' damages, the Court explained that expert testimony is not necessary because Plaintiffs themselves may prove their organizational damages. More specifically, the Court held has follows:

- "**Plaintiffs' damages for counteractive measures can be established at trial through testimony.** The jury doesn't need Seicshnaydre to review plaintiffs' mission statements and activities to confirm that they are each dedicated to promoting and enforcing an equal housing market and counteracting residential racial segregation in their respective communities. **Each plaintiff can explain its mission and how the shoddy maintenance of Deutsche Bank-owned properties frustrated community-based missions.**" ECF 460 at 7 (internal alterations and citations omitted).
- Plaintiffs may pursue damages for "**diminishment of complaint-based and consumer outreach services and for lost opportunities and special initiatives**," even if they may not do so using Professor Seicshnaydre's formula. *Id.* at 6-8.
- "Plaintiffs can testify to **the cost or value of forgone activities**, and a jury may weigh their credibility in determining appropriate damages." *Id.* at 8.

During fact discovery, Plaintiffs presented exhaustive disclosures, interrogatory responses, documentary information, and testimony that aligns with the Court's decision. Defendants completely ignore this information, choosing instead to burden the Court with a

groundless motion. In their Federal Rule of Civil Procedure 26(a)(1) Disclosures, Plaintiffs

stated, *inter alia*:

> Plaintiffs also seek damages to compensate them for frustration of their missions. Defendants have frustrated Plaintiffs' missions by interfering with their activities, programs, and services, thus impairing Plaintiffs' abilities to provide the services they were formed to provide; harming their clients and client communities in ways that frustrate Plaintiffs' missions; and impairing their broader goals. Defendants' discriminatory maintenance and marketing practices undermine and frustrate Plaintiffs' goals and missions intended to be achieved by their community investment and neighborhood stabilization programs, activities, and services. Defendants' conduct impaired Plaintiffs' mission that their clients and client communities be free of housing discrimination and gain equal access to housing, and the goal of eliminating racial segregation in housing…. Plaintiffs' frustration of mission damages include future costs Plaintiffs will be forced to expend to rectify the continuing effects of Defendants' discriminatory actions. Plaintiffs' future costs will also include costs that they will expend to counteract Defendants' discriminatory actions, costs incurred to monitor Defendants' conduct, and costs to engage in future educational efforts in a variety of spheres.

Ex. 6 at 11-13 (Plaintiffs' June 28, 2022 Supplemental Rule 26(a)(1) disclosures). At the end of a

two-page, frustration-specific response, Plaintiffs noted "Plaintiffs' damages will also be

supported by expert testimony in accord with the deadline for expert reports. Plaintiffs will

supplement their initial disclosures in accordance with the Federal Rules." *Id.* at 12. Disclosing a

plan to use an expert *in addition to* the other damages disclosures simply does not square with

"deferring entirely" to an expert.

Plaintiffs' interrogatory responses were similarly robust. Each provided detailed

responses about their damages, *across 198 pages of narrative exhibits* to their interrogatory

responses. *See* ECF 515-29 (Exhibit D to Plaintiffs' Interrogatory Responses) and 515-30

(Exhibit E to Plaintiffs' Interrogatory Responses). Each organization detailed diversion of

resources, frustration of mission, lost opportunities, and community outreach. For example, as to

frustration of mission, Plaintiff Fair Housing Advocates of Northern California responded, *inter

alia*:

Deutsche Bank has frustrated Plaintiff's mission since at least January 2013 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals. Specifically, Deutsche Bank's discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From January 2013 to December 2019, Plaintiff's programs and activities included homeownership promotion (e.g., predatory lending/pre-purchase education);
- From January 2013 to December 2019, Plaintiff's programs and activities included foreclosure prevention (e.g., workshops, counsel clients on mortgage modifications or how to bring mortgages current); and
- From January 2013 to December 2019, Plaintiff's programs and activities included accessibility modifications. . . .

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages may be the subject of expert testimony, and the amount of such damages is to be determined by a jury.

*See* ECF 515-29 at 4-5 (Exhibit D to Plaintiffs' Interrogatory Responses). Similarly, Plaintiff

HOPE, Inc. responded, *inter alia*:

Deutsche Bank's discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:
- From March 6, 2014 to August 14, 2017, Plaintiff's programs and activities included homeownership promotion (e.g., housing counseling, down payment assistance; closing cost assistance);
- From August 27, 2014 to June 16, 2015, Plaintiff's programs and activities included housing rehabilitation;
- From October 16, 2014 to present, Plaintiff's programs and activities included accessibility modifications;
- From May 13, 2014 to February 25, 2016, Plaintiff's programs and activities included community enhancement (e.g., construction of gardens, school programs, and leadership training);
- From January 7, 2012 to present, Plaintiff's programs and activities included conducting fair housing workshops in Miami-Dade and Broward counties and throughout Florida.

*Id.* at 100-01. Defendants are correct that many Plaintiffs provided similar responses regarding

the impairments to their activities, and for good reason. Plaintiffs are Fair Housing Initiatives

Program ("FHIP") organizations, meaning that their activities are often dictated by the terms of

the funding they receive from the U.S. Department of Housing and Urban Development. Plaintiffs have similar structures, similar goals, and similar programs. It stands to reason that they would likewise experience similar harm.

Plaintiffs' document production confirmed their missions and activities, related expenditures, and costs of counteraction. Among other documents, Plaintiffs produced annual reports, strategic plans, budgets, staff compensation, and tax forms. *See* ECF 516-4 (Plaintiffs' Exhibit List). As just one example, Plaintiff National Fair Housing Alliance produced its *Investing in Inclusive Communities* report, which detailed the community development activities of thirteen Plaintiffs. Indeed, in respond to Defendants' last set of Motions in Limine, Plaintiffs outlined some of their damages evidence citing exclusively to materials produced in discovery. *See* ECF 511 at 8-11; ECF 511-1 at 5-6, 8-9, and 11-13.

Although their chart does not show it, Defendants inquired about this information at Plaintiffs' depositions. For example, although declining to assign a dollar value, Plaintiff Metro Milwaukee Fair Housing Council provided an in-depth description of the various ways that Defendants' conduct frustrated the organization's mission and activities. Ex. 7 at 137-47 (Deposition Tr. of W. Tisdale). The same was true of other Plaintiffs' corporate representatives. *See e.g.*, Ex. 8 (Deposition Tr. of Fair Housing Center of West Michigan at 220-23). Defendants' selective quotation of testimony about computation does not displace the other testimony about the nature of Plaintiffs' frustration-of-mission damages.

All said, Defendants have been provided with significant information about Plaintiffs' frustration-of-mission damages, and there is nothing undisclosed in Plaintiffs' anticipated presentation of damages to the jury.

**B. Plaintiffs' Damages Evidence Need Not Be Quantified by a Final Dollar Amount.**

Defendants' contention that Plaintiffs have not disclosed damages evidence is driven by their myopic focus on the fact that, apart from their expert, Plaintiffs have not computed a specific total for their frustration-of-mission damages. True, but irrelevant. This Court has already made clear that Plaintiffs need not offer a damages expert to quantify a precise total frustration-of-mission damages and, as noted above, these damages can instead be established at trial through Plaintiffs' own organizational evidence. The Court's approach here is consistent with well-established law permitting juries to award non-economic damages even absent a computation.

Plaintiffs intend to offer the jury timely-produced information about the cost of their operations and their expected costs of counteraction, *see* ECF 511 at 2-9, and the Court has just confirmed that "the cost of counteracting the harms defendants caused to plaintiffs' organizations" is "probative of frustration-of-mission damages," ECF 520 at 5. Plaintiffs' testimony on their previous programmatic costs and the costs associated with their expected counteraction will assist the jury in monetizing this category of damages. For frustration-of-mission damages, this evidence is more than sufficient to support a jury award.

Defendants focus their Motion on the fact that, at deposition, Plaintiffs declined to offer specific dollar amounts for their non-diversion damages. *See* ECF 514 at 35-37. But declining to offer a computation or suggesting that a computation would come from an expert, does not somehow swallow all other damages related evidence. This Court held that there is "not [] a requirement, as defendants suggest, that plaintiffs present an expert to quantify those [frustration-of-mission] damages." ECF 460 at 6. This is because, as outlined above, Plaintiffs have other avenues for proving this type of harm. *See supra*. Plaintiffs may testify to the "cost or value" of their organizational work, and "a jury may weigh their credibility in determining appropriate

damages." ECF 460 at 8. That Plaintiffs will no longer use an expert to quantify their frustration of mission damages does not mean that Plaintiffs no longer have evidence of this type of harm, nor has this Court imposed any sort of computation requirement in its prior decisions.

Plaintiffs' approach is appropriate given the nature of frustration-of-mission injuries. When first acknowledging this type of organizational injury, the Supreme Court held that a fair housing organization may seek redress for its "noneconomic interest[s]" if it is able to "demonstrate at trial that it has indeed suffered impairment." *Havens Realty Corp. v. Coleman*, U.S. 363, 379 n.20 & n.21 (1982). Courts have recognized that non-economic damages are not susceptible to computation and are instead within the province of the jury. *See, e.g.*, *Flair Airlines Ltd. v. Gregor LLC*, No. 18-cv-2023, 2020 WL 5521419, at *1 (N.D. Ill. Feb. 27, 2020) (rejecting request to bar evidence of punitive damages and noting that "[p]unitive damages, like damages for emotional suffering, are not amenable to the requirements of Rule 26(a)(1)(A)(iii)." (citation omitted)).

Indeed, it is well-established that damages are not rendered unavailable merely because they are not easy to quantify. *See, e.g.*, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931) ("[T]he rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."); *Wilbern v. Culver Franchising System, Inc.*, No. 13 C 3269, 2015 WL 5722825, at *15–16 (N.D. Ill. Sep. 29, 2015) ("The Court would be usurping the role of the jury were it to conclude that CFSI's view of the evidence and inferences to be drawn therefrom should prevail as a matter of law. CFSI's argument that Gordon's damages testimony is speculative because the evidence is controverted . . . is an argument CFSI must make to the jury.").

Plaintiffs understand the need to provide the jury with information it may use to value Plaintiffs' damages, and their presentation of evidence will do just that. But Plaintiffs may seek frustration-of-mission damages and offer evidence thereof even without assigning a specific dollar value to this category of harm.

### C. Defendants' Authority Is Inapplicable.

Defendants support their Motion in Limine by misreading fair housing cases and citing cases about different kinds of damages. In truth, no case holds that frustration-of-mission damages must be quantified for a jury. There is, however, unambiguous in-district authority rejecting a similar effort to eliminate a category of damages by Defendant Ocwen.

Defendants cite two cases—brought by Plaintiffs in this action—for the proposition that "Courts that have allowed frustration of mission damages have done so only when the plaintiff identified and quantified their costs for future remedial efforts with concrete evidence." ECF 514 at 9 (citing *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002), and *Fair Housing Center of Central Indiana, Inc. v. Smitley*, No. 1:16-cv-880-WTL-DML, 2018 WL 3237860, at *2 (S.D. Ind. Jul. 3, 2018)). To begin, Defendants are wrong. Neither case includes any such limitation, and Defendants wholly ignore the cases Plaintiffs have cited in earlier briefing. *See, e.g.*, ECF 511 at 7-10 (discussing organizational damages jury instructions).

In *Smitley*, Plaintiff Fair Housing Center of Central Indiana noted in its trial brief that "Courts do not require fair housing organizations to calculate an exact figure down to the penny to grant compensatory damages for the tasks the organizations perform when investigating a case." No. 1:16-cv-880-WTL-DML, ECF 79 at 9-10 (S.D. Ind. 2016). At the damages hearing, Amy Nelson, who will testify on behalf of the same organization in this case, stated that "We—I feel it's imperative that we counteract the discrimination . . . by providing information to the

26

public about fair housing laws so that people who may have seen that sign or heard of that sign do not believe that that is lawful." No. 1:16-cv-880-WTL-DML, ECF 84-1 at 54 (S.D. Ind. 2016). She went on to estimate certain costs, just as Plaintiffs here will use documents produced in discovery to estimate the costs of the counteraction they believe is necessary to remedy Defendants' discriminatory conduct—the same counteraction referred to in Plaintiffs' interrogatory responses. *See* ECF 514-29 at 5 ("Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Deutsche Bank's discriminatory conduct, as well as costs it will be forced to expend in the future."). Defendants' citation to *Combs* fares no better: the Court relied on the fair housing organization's testimony regarding anticipated future costs, without imposing any sort of computational requirements, precisely what Plaintiffs propose here. 285 F.3d at 905.

Defendants also rely on *Chicago Joe's Tea Room, LLC v. Village of Broadview*, 94 F.4th 588, 604–05 (7th Cir. 2024), a categorically distinct scenario in a lost-profits case. There, the Plaintiff "submitted its initial Rule 26 disclosure on December 7, 2012 and had not updated it in the intervening decade." Those disclosures "fail[ed] to provide a top-line computation of damages or any identification of damages categories." By contrast, Plaintiffs have disclosed that they seek frustration-of-mission damages from the first, including the costs of future counteraction. Defendants' other citations are inapposite because, like Chicago Joe's, they pertain to lost profits, which are subject to computation, *see Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295–96 (2d Cir. 2006), and to situations where a party truly did present no damages evidence other than the opinion of an excluded expert, *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, No. 01 C 4366, 2003 WL 22284326, at *1 (N.D. Ill. Oct. 2, 2003) ("This ruling was based on WH–TV's failure to provide a responsive answer to a Zenith contention

interrogatory asking for the nature, amount, and basis for calculation of damages, other than its expert reports.").

On the other side of the ledger, courts have resisted Defendant Ocwen's past efforts to exclude all damages evidence following exclusion of an expert. *Saccameno v. Ocwen Loan Servicing, LLC*, 15 C 1164, 2018 WL 10609876, at *2 (N.D. Ill. Mar. 21, 2018). In *Saccameno*, the court held that a failure to timely produce expert testimony would implicate the expert testimony only, "not, as defendants appear to request, to forbid Saccameno from presenting any testimony at all in support of these damages." *Id.* Here, Defendants do not identify any evidence that Plaintiffs failed to produce, so there is nothing to be excluded. Rather, Plaintiffs' timely disclosed, non-expert damages evidence remains admissible. Moreover, the court in *Saccameno* rejected Ocwen's argument that the plaintiff could not support damages for loss of income and medication costs solely with testimony at both the summary judgment and Motion in Limine phases. *See id.* at *4; *Saccameno v. Ocwen Loan Servicing, LLC*, 15 C 1164, 2018 WL 1240347, at *5 (N.D. Ill. Mar. 9, 2018). Here, too, Plaintiffs' testimony provides competent proof of damages.

In sum, Defendants have identified no damages evidence that was not timely produced, and Plaintiffs may present the evidence this Court endorsed to the jury.

### D. Plaintiffs' Damages Evidence Has Not Been Excluded by Prior Decisions.

Defendants also argue that Plaintiffs' damages evidence has already been excluded either as part of this Court's *Daubert* decision or at the motion to dismiss phase. ECF 514 at 38. This argument, too, is wrong.

When this Court excluded Professor Stacy Seischnaydre's opinions, it did not exclude all the evidence on which she relied. To the contrary: the Court held that Plaintiffs may put this

evidence on directly, using their personal knowledge. *See* ECF 460 at 7-9. It follows that Plaintiffs will use the same documentary evidence on which their expert relies to testify to their organizational costs and impairments. Nor has Plaintiffs' damages evidence been excluded at any other point in the litigation. Defendants' chart on this front, *see* ECF 514 at 38, rests on biased interpretations, cherry picked quotations, and ignoring inconvenient truths. To correct the record:

- Plaintiffs' expected counteraction costs for renovations to dilapidated properties and for beautification projects arise from the impairment to their stabilization activities, not from harm to communities. *See* Dkt. 511 at 8-9.
- Plaintiffs' expected counteraction costs for home purchase grants and counseling arise from the impairment to their homeownership programs, not from Plaintiffs' prior financial investments in communities of color, which is what was at issue in the 2019 motion to dismiss decision. *Id.*
- Plaintiffs' expected counteraction costs related to stigma arise from impairments to Plaintiffs' missions of "counteracting residential racial segregation in their respective communities," ECF 460 at 7, which will be addressed through organizational testimony, not expert opinion.

In sum, the exclusion of Professor Seicschnaydre does not render the preexisting record evidence inadmissible, and the damages evidence Plaintiffs will present is well within the bounds of the topics outlined by the Court in its March 31 and July 9 decisions. ECF 442 and 460.

For the reasons explained above, Defendants' Motion in Limine No. 16 should be denied.

IV. **THE COURT SHOULD DENY DEFENDANTS' MOTION NO. 17 AND ADMIT RELEVANT EVIDENCE CONCERNING DEFENDANTS' COURSE OF CONDUCT.**

A. **The Court Should Deny Defendants' Motion Concerning "Broad Societal Narratives," Which Encompasses Patently Relevant Evidence and Is Impossible to Administer.**

Defendants seek to preclude Plaintiffs and counsel from discussing "broad societal narratives" such as "systemic racism" and "systematic discrimination," which Defendants argue are irrelevant.[1] As the Court has already recognized, this could not be further from the truth. Terms concerning historical racism in housing are relevant because they are inextricably related to Defendants' liability and Plaintiffs' damages in this *race discrimination* case. As courts in this District have made clear, "[e]vidence should be excluded on a Motion in Limine only when evidence is clearly inadmissible on all potential grounds," *Austin v. Cook County*, No. 07-C-3184, 2012 WL 1530452, at *1 (N.D. Ill. Apr. 30, 2012) (citations and alterations omitted), and Defendants' motion does not come close to meeting this "high standard," *id.* Moreover, Defendants' request is vague and would be impossible for the Court to administer, and it should also be denied on that basis.

Terms concerning historical discrimination are relevant to liability in several ways. As the Court explained in denying Defendants' motion for summary judgment, a central question in this case is whether "defendants violated the Fair Housing Act by discriminatorily maintaining and marketing [real estate owned] properties based on race," ECF 442 at 1, including whether Defendants were "motivated by discriminatory intent" or whether their policies "caused a discriminatory effect," *id.* at 12. In resolving these questions, the jury must determine "whether a neighborhood's racial makeup affected the quality of maintenance and marketing of REO properties," ECF 442 at 4.

Evidence related to historic discrimination in housing transactions, from neighborhood demographic patterns to appraisals to assumptions that properties in communities of color are of less value than similar properties in majority white communities, is relevant to this determination. First, a key factor in the *Arlington Heights* disparate treatment framework is the "historical background of the decision" *Vill. of Arlington Heights v. Metro. Hsg. Dev. Corp.*, 429 U.S. 252, 267 (1977). The historic background of the challenged decision includes "the historical background of the foreclosure crisis in non-white neighborhoods," ECF 442 at 110, and to this end, the Court has already determined that Plaintiffs' expert, Elizabeth Korver-Glenn, "may rely on her academic and research experience to explain historical or contemporary real-estate appraisal practices in the context of housing inequality," ECF 442 at 81. And the Court has expressly held that "evidence of the foreclosure crisis will be necessary to explain REO properties." ECF 520 at 6.

Next, the Court has also recognized that under the *Arlington Heights* test, "notice to defendants that Deutsche Bank-owned REO properties were being poorly maintained," was probative of intent, ECF 442 at 110-12. On this point, the Court determined at summary judgment that Plaintiffs had "provide[d] admissible evidence" that "defendants were aware that REO maintenance conduct affected communities of color more heavily," *id.* at 110, citing *Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 508 (9th Cir. 2016), for the relevance of a defendant's awareness of the racial impact of a decision "in light of historical patterns of segregation by race," ECF 442 at 110.

Moreover, as the Court recognized, a key mechanism through which Plaintiffs contend Defendants discriminated against communities of color was through "policies of value redlining," *id.* at 32, or "singling out lower-value REO properties for difference and worse

31

treatment," *id.* at 99. The testimony of Dr. Korver-Glenn contextualizes Defendants' value-based REO property maintenance structures within the backdrop of historic housing patterns and housing industry practices, as documented in government and academic studies and literature. Terms such as "value redlining," which Defendants explicitly seek to exclude, are thus critical to the jury's determination, and excluding such a term would impermissibly *obscure* relevant information.

Historical racism is also relevant to the defenses that Plaintiffs must address. *Defendants themselves* invoked historical race discrimination as a causation defense to their conduct: "There are a myriad of reasons why access to affordable, safe housing in communities of color is a challenge. Crime, unemployment, historical segregation, economic disparity, and other factors all contribute to this problem," ECF 440 at 8. *See also* ECF 442 at 19–20. It is notable that Defendants did not move under *Daubert* to exclude Dr. Korver-Glenn's historical background overview or related opinions. Whether or not Defendants advance this argument at trial, Plaintiffs must address it because as the Court noted, for Plaintiffs to prove their disparate impact case, they must demonstrate that "REO disparities do not simply reflect existing economic and social inequalities in neighborhoods." ECF 442 at 102. Plaintiffs stand ready to show causation at trial through Dr. Korver-Glenn, Dr. Ian Ayres (controlling for various factors relating to racial stereotypes), Albert Poche (citing literature and studies from his field that poor maintenance of vacant homes tends to *cause* crime and ill effects), and Deavay Tyler (basic property maintenance required of *all* REOs regardless of value or location).

Finally, historic discrimination in housing is central to the Plaintiff organizations' missions and activities, and thus to their injuries and damages. As this Court has explained, "Plaintiffs are twenty national and regional fair housing organizations seeking to eliminate

32

housing discrimination and to ensure equal housing opportunities," ECF 442 at 3. Plaintiffs' damages include frustration of their missions, including impairing mission-driven activities, and in order to testify about their missions and activities, the Plaintiffs will touch on historical racism in housing. *See* ECF 442 at 18-19 (citing deposition testimony from Plaintiff Metropolitan Milwaukee Fair Housing Council about its mission to "stabilize neighborhoods," a mission that cannot be explained without reference to historic housing discrimination).

In addition to seeking to improperly exclude patently relevant references to historical racism, Defendants' proposal is vague and would be impossible to administer, and it should be denied on that basis. *See Navarrete v. Madison Cnty.*, No. 17-CV-347, 2021 WL 2374350, at *1 (S.D. Ill. June 10, 2021) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996)) (denying Motion in Limine that "lacks the necessary specificity with respect to the evidence to be excluded."). Defendants' request to exclude discussions of "broad societal narratives," ECF 514 at 42, lacks clear definition. For example, the Court described Plaintiffs' burden as including an obligation to show that the harm to communities was not caused by "existing economic and social inequalities," ECF 442 at 102. Would that phrase trespass this ban? The line Defendants seek is so poorly defined that the Court has no way of knowing. This lack of specificity is separately fatal to Defendants' motion, and the motion should be denied.

### B. The Court Should Deny Defendants' Motion to Exclude Evidence of the Conduct Underlying Regulatory Enforcement Actions.

Defendants previously moved to exclude evidence of regulatory enforcement actions against them, and now they seek to exclude any mention of the conduct underlying those enforcement actions. As described in Plaintiffs' opposition to Defendants' prior Motion in Limine, the investigations concerned the relationship between Ocwen and Altisource and

Ocwen's overall failure to oversee Altisource during the same period as Plaintiffs' investigation. *See* ECF 511 at 76–81. The Court has just confirmed that "[e]vidence of historical overlap between Ocwen and Altisource is permissible as relevant background and not excluded." ECF 520 at 6. Thus, to the extent the underlying conduct is probative of that overlap, it should be admitted. In particular, the conduct Defendants now seek to exclude is necessary to provide context for the facts Plaintiffs outlined in their previous opposition brief, which go to Ocwen's oversight failure, a core issue in this case.

This evidence is also relevant to Plaintiffs' intent claims—evidence that Ocwen had been notified by regulators that its failure to oversee Altisource led to legal violations, and then continued to fail to oversee Altisource, is probative of Ocwen's intent. *Cf. Saccameno v. Ocwen Loan Servicing LLC*, No. 15-C-1164, 2018 WL 10609658, at *2 (N.D. Ill. Apr. 2, 2018) ("[E]vidence of Ocwen's awareness of problems with its loan servicing practices is also relevant to the litigation," because the plaintiff intended to show "that by failing to correct the problems identified in the consent judgment, Ocwen acted with the culpability required to warrant punitive damages.").

At a minimum, the Court should not prohibit Plaintiffs from offering this evidence and permit Defendants to present evidence or testimony implying effects of or regarding the underlying conduct or enforcement actions. If Defendants attempt to do so, then Plaintiffs must be permitted to respond.

### C. The Court Should Deny Defendants' Motion to Exclude Servicer Memos Deutsche Bank Sent to Its Servicers Specifically Addressing REO and Foreclosure Conduct.

Defendants seek to exclude memos Deutsche Bank sent to its servicers regarding maintenance of REO properties during a time when it concedes Ocwen was a servicer on essentially three bases: (1) Defendants contend Plaintiffs cannot prove Ocwen received the

memos; (2) they argue the memos were sent outside of the limitations period; and (3) they argue

that Plaintiffs cannot show that the memos governed Defendants' obligations with respect to the

properties at issue, both because the properties assigned to Ocwen at that time were different

from the properties at issue in this case and because in addition to addressing REO maintenance,

the memos addressed topics *other than* REO maintenance. ECF 514 at 44-48.[2] These memos,

which the Court viewed as relevant in its March 30, 2025 decision, ECF 442 at 118, remain

relevant, and each argument Defendants make to the contrary is either incorrect, supports

admission, or has no bearing on the issue.

      As an initial matter, the memos are relevant to Deutsche Bank's liability in at least three

ways. They show (1) Deutsche Bank's ability to direct and control the conduct of servicers when

it chose to, and (2) Deutsche Bank's knowledge of the likely consequences of inadequate REO

maintenance. The July 28, 2008 memo says that Deutsche Bank "has received a number of

inquiries and complaints from government officials and community groups about the *physical

condition of REO properties*," and reminds servicers that they are "expressly responsible

for managing *all aspects of the REO disposition process, including appropriate maintenance of

REO properties*." ECF 442 at 118 (citing ECF 405 ¶ 41) (emphasis added). The Deutsche Bank

memos were communications from the Deutsche Bank Defendants as Trustees, issued amid an

unprecedented and highly publicized national foreclosure and REO crisis. In the July 28 memo,

Deutsche Bank acknowledges a core part of the case, that failing to maintain properties could

drive their values down: "[f]ailure to fulfill these responsibilities may expose the Trusts to

financial losses [by] potentially depressing the value of Trust property." *Id. See also* ECF 405*,

¶ 37, October 8, 2010 Memo* (Directing servicers to "[c]ease and desist from taking any unlawful

or improper action with respect to the servicing of Trust assets"); ECF 405, ¶ 39, *August 30,*

*2007 Memo* (Directing servicers to "[e]xercise diligence to assure that all foreclosures and actions with respect to REO properties . . . are conducted in compliance with all federal, state and local rules and regulations….[a]ttentiveness to governmental and community concerns about the impacts of foreclosure and eviction activities on neighborhoods promotes healthy, stable communities and may maximize the value of Trust assets in those neighborhoods and reduce remedial costs.[3]). Deutsche Bank's ability to direct and control servicer conduct, and its knowledge of the consequences of failing to do so, are core issues for the jury in this case. As set forth below, none of Defendants' arguments are to the contrary, and in fact, all underscore the relevance of the memos.

### 1. Ocwen's Receipt of the Servicer Memos.

First, with respect to whether Ocwen received the memos, this fact is utterly irrelevant to the point that the memos show Deutsche Bank's ability to direct and control servicer action. But even so, Defendants' position concedes that the memos *were* sent to Ocwen--indeed, Defendants admit that the memos were sent to all servicers, ECF 405 at ¶ 37; ECF 514 at 44, and that Ocwen was a servicer at the time, ECF 514 at 46. Testimony in discovery in this case includes that, in connection with NFHA's administrative complaint against Deutsche Bank, Deutsche Bank's representative informed NFHA that Ocwen performed 80 percent of field service REO vending for Deutsche Bank. Ex. 9 at 166 (S. Smith Deposition, p. 166). Nothing about the memos was specific to the obligations of large-scale servicers; they concerned REO activities of all servicers, including Ocwen. *See*, ECF 405, ¶ 37, *October 8, 2010 Memo* ("reiterat[ing] to *all Servicers* the importance of their duties and obligations") (emphasis in original).

The 2010 Servicer Memo specifically addresses conduct strikingly similar to the bases for a later 2013 Consent Order between Ocwen and 49 states and the District of Columbia resulting from a CFPB enforcement action concerning widespread mortgage servicing misconduct (that was the subject of corporate testimony in this case and that Ocwen seeks to exclude from mention at trial). Specifically, the 2010 Deutsche Memo Ocwen pretends it did not receive addresses "Alleged Foreclosure Deficiencies" of servicers in media reports that "may include the execution and filing by certain Servicers and/or their agents of potentially defective documents, possibly containing alleged untrue assertions of fact, in connection with certain foreclosure proceedings."

Defendants can put forth no argument that the memos did not concern the kind of servicing activity Ocwen was engaged in, nor have they offered any evidence that Ocwen, a servicer, did *not* receive the memo because such an argument would be absurd. (If true, why did Deutsche Bank produce the memos in discovery?) Defendants cite the testimony of two individual Ocwen employees who testified at fact depositions[4] that they had not seen the memos. Whether individual employees saw a memo that Deutsche Bank sent to their company is of little probative value to whether the memo was sent, particularly when Deutsche Bank concedes that it sent the memos to servicers and that Ocwen was a servicer at that time.

On the other hand, a jury could find the fact that individual employees had not seen the memos supported Defendants' liability—the jury may conclude that the fact that Ocwen did not disseminate these memos to its employees, including its Director of REO oversight and an investor relations employee is relevant to the question of whether Ocwen took adequate steps to ensure compliance with investor (Deutsche Bank) guidelines that servicers must obtain the highest profit possible from REO sales while reducing costs (specifically addressed in

Deutsche Bank's Servicer Memos and directly relevant to any Ocwen-Altisource claimed business justification), federal fair housing laws or regulatory guidance (directly relevant to Ocwen's intent, in that Ocwen failed to mention, consider or apply the Fair Housing Act, its internal directives to examine FHA compliance or 2012 Federal Reserve guidance to avoid disparate impacts of REO conduct based on neighborhood racial composition). The jury may also consider the fact that Ocwen (and Altisource) employees who were working on REO servicing later were not made aware of or did not receive the earlier-sent memos as evidence that Deutsche Bank should have continued to exert the direction and oversight reflected in the earlier memos. Ocwen does not claim here that its Vice President of Government and Community Relations, Jill Showell, who Ocwen will call at trial and who was directly involved in meetings concerning the very controversies and failures that related to the Servicer Memos, was not aware of them. There is no way in which the employee testimony Defendants cite makes the memos irrelevant.

### 2. Timing of the Servicer Memos.

Next, Defendants argue that the memos were sent outside the limitations period. Again, this fact cuts against Defendants. As an initial matter, the *Arlington Heights* test contemplates conduct occurring outside of the limitations period as relevant, *Vill. of Arlington Heights*, 429 U.S. at 267, and the Court has explained that Plaintiffs may "us[e] defendants' conduct outside the limitations period as evidence of discriminatory intent for conduct that occurred within the limitations period." ECF 442 at 32. Deutsche Bank's Servicer Memos are just such conduct. Moreover, the fact that Deutsche Bank sent these memos outside of the limitations period, but then *did not have to send them* again during the period of Plaintiffs' investigation or the limitations period, is probative of how Deutsche Bank exercised the control it possessed over

servicer conduct during the relevant period. The memos did not have an end date. The fact that

the memos were sent only outside of the limitations period makes them *more*, not less, relevant

to Deutsche Bank's liability.

### 3. Deutsche Bank's Servicer Memos bear upon Ocwen's intent under *Arlington Heights* and Lack of Ocwen-Altisource Business Justification.

The Deutsche Bank 2007-2010 Servicer Memos are also events relevant to Ocwen's (and

Altisource's) intent in this case. Specifically, the Deutsche Bank Servicer Memos underscore

Ocwen's willful failure to consider, address, or redress the effects of its substandard REO

conduct, about which it was specifically on provable notice via the Deutsche Bank Servicer

Memos, among other means. The Servicer Memos are part and parcel of astonishing levels of

willful conduct by Ocwen and Altisource violating servicer obligations to investors concerning

REO values, profits and costs, ignoring long-recognized obligations to comply with federal

law (reaffirmed in Deutsche Bank's Servicer Memo directives and Ocwen's own 2011 Fair

Lending Memorandum mandating self-testing of Fair Housing Act compliance *all* servicing

activities, never done concerning its REO policies and practices), and failing follow 2012

Federal Reserve guidance to avoid REO conduct discrimination based on REO neighborhood

racial makeup. The evidence at trial will include not only that the Servicer Memos directed

compliance with Federal Reserve regulation, but also that Ocwen's corporate risk management

policies list compliance with Federal Reserve guidance as mandatory. While all of this existed on

the one hand, Ocwen's belated REO oversight arm and Altisource created and applied a (not

neutral) value-based REO maintenance scheme and intentionally failed to list, mention or

consider in any way the federal Fair Housing Act or non-discrimination based on race in its REO

practices or policies.

The 2007-2010 Deutsche Bank Servicer Memos are also related to the subsequent Deutsche Bank U.S. tour of terrible REO community impacts (concentrated in communities of color by sight alone and explicitly confirmed to Deutsche Bank by Plaintiffs' Milwaukee witnesses). Evidence at trial from Deutsche Bank and third-party witnesses will include that Milwaukee residents spoke at a Deutsche Bank shareholder meeting in Germany in 2010 about REOs (serviced by Ocwen) and that Deutsche Bank's majority REO servicer, Ocwen, attended meetings with Milwaukee officials and community members from 2010-2015 at Deutsche Bank's behest and was informed its REO conduct was disparately impacting Black neighborhoods. *See,* ECF 361at 34-38. This Court's January 20, 2026 ruling confirms that events related to meetings Ocwen attended are admissible at trial. ECF 520 at 4. As noted above, the Deutsche Bank Servicer Memos also explicitly confirm Ocwen's and Altisource's business interest in properly maintaining REOs to (a) gain the most Deutsche Bank Trustee investor profit from their sale, and (b) to prevent increased costs and liabilities resulting from Servicer failure to properly maintain REO properties. This is consistent with Dr. Ayres' findings that observed deficiencies in routine exterior property maintenance result in REO value reduction, and Dr. Ayres' opinion that Deutsche Bank's interest in gaining as much profit as possible for its investors (to which Ocwen was obligated to adhere through the governing agreements' servicing standards) applies equally to all REOs, regardless of perceived value. Thus, the Servicer Memos are relevant to disprove Ocwen's and Altisource's claimed (unavailable) business justification.

### 4. Defendants' Obligations with Respect to the Properties at Issue.

Nothing in the memos is limited to a subset of REO properties. Defendants contend that the properties Ocwen was ultimately responsible for differ from the properties it was servicing at the time the memos were sent, but Defendants have not explained why this matters, nor can they. Defendants have identified no intervening change that altered the servicers' obligations for

the properties, nor Deutsche Bank's oversight obligations. Moreover, the fact that the memos concern obligations other than maintenance is no reason to exclude the memos: the Court expressly held that a limited power of attorney between Deutsche Bank and the Servicers that did *not* reference REO maintenance was in any case still "probative, even if not dispositive, of the relationship between Deutsche Bank and the master servicer and servicers. ECF 442 at 117.

The memos are relevant to Defendants' liability and should be admitted. For the reasons explained above, Defendants' Motion in Limine No. 17 should be denied.

**V.      THE COURT SHOULD DENY DEFENDANTS' EIGHTEENTH MOTION AND ADMIT EVIDENCE SHOWING DEFENDANTS WERE ON NOTICE OF DISCRIMINATORY REO MAINTENANCE.**

Defendants' Motion in Limine No. 18 seeks to preclude Plaintiffs from presenting evidence that Defendants were aware of the inordinate number of code violations for REO properties in Milwaukee owned by Deutsche Bank and serviced by Ocwen. This Motion is a strange effort to exclude a component piece of a narrative because it does not singlehandedly tell the full story. Evidence of Defendants' knowledge of the Milwaukee situation is part of a larger picture showing that Defendants were aware that their REO maintenance policies and practices were disproportionately harming communities of color but took no remedial action. This evidence is relevant and admissible because it probative of Defendants' discriminatory intent, and Defendants' motion should therefore be denied.[3]

**A.  Evidence That Defendants Were Aware of, But Ignored, the Discriminatory Effect of their REO Practices Is Probative of Discriminatory Intent.**

It is hornbook law that whether Defendants' actions "bear[] more heavily on one race than on another, . . . may provide an important starting point" in "[d]etermining whether invidious discriminatory purpose was a motivating factor" animating Defendants' conduct. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (citation omitted). As such, courts routinely recognize that "[discriminatory] effect is probative of intent, so that an unexplained discriminatory effect may by itself support an inference of discriminatory intent." *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1533 (7th Cir. 1990) (citation omitted). This Court

---

[3] The evidence at issue is also independently admissible to show the agency relationship between Defendants.

itself has held that "[s]tatistical evidence of a disparity otherwise unexplained by race-neutral factors may raise an inference of discrimination in disparate-treatment cases." ECF 442 at 109.

In their eighteenth Motion in Limine, Defendants seek to preclude Plaintiffs from relying on (1) emails between Deutsche Bank and Ocwen regarding shoddy REO maintenance in communities of color in Milwaukee and (2) a letter from a Common Ground representative to Deutsche Bank. These documents are one piece of the evidentiary puzzle showing that Defendants were aware of the discriminatory effect of the maintenance of REO properties in owned by Deutsche Bank and serviced by Ocwen. A second, critical puzzle piece is the substantial evidence showing that Common Ground and other community members repeatedly informed Defendants that their shoddy REO maintenance practices were specifically harming communities of color. *See, e.g.*, ECF 369-40 at 57 (B. Connolly Declaration ¶ 17, 23); ("I and other members of Common Ground had several meetings with Deutsche Bank representatives . . . . During these meetings, I and other members of Common Ground shared with Deutsche Bank representatives that the neglect of properties in Milwaukee . . . was especially harsh on African American residents of the city and neighborhoods whose residents were mostly African American."); ECF 369-40 at 31-32 (A. Dahlberg Declaration ¶ 30) ("[W]ithout a doubt, the data we collected in Milwaukee during the years 2009 through 2015 showed that the high numbers of foreclosures were mostly occurring in very discrete zip codes. . . . [T]his information was regularly shared with representatives from Deutsche Bank and Ocwen.").

These two pieces fit seamlessly into Plaintiffs overall evidentiary picture, which shows in relevant part that (1) Defendants enacted REO maintenance policies that had an adverse and disproportionate effect on communities of color, and (2) Defendants were made aware of the discriminatory effect of these policies, but (3) Defendants made no attempt to change their

practices to ameliorate the discriminatory effect of their policies. As this Court has held, this evidence "may raise an inference of discrimination," supporting Plaintiffs' disparate treatment claim. ECF 442 at 109. The Court should accordingly reject Defendants' unsupported attempt to prevent Plaintiffs from using this evidence to show Defendants were aware of the issues caused by their failure to appropriately maintain REO properties in communities of color.

**B. The Evidence Is Separately Admissible to Show the Existence of an Agency Relationship Between Defendants.**

The evidence Defendants seek to exclude is separately admissible because it is probative of the existence of an agency relationship between the Deutsche Bank defendants and Ocwen and Altisource. Indeed, the Court relied on the very documents Defendants now attempt to exclude to hold that "[a] jury could reasonably infer the existence of an agency relationship" between the Deutsche Bank defendants and Ocwen and Altisource. *Compare* ECF 442 at 119, 120, *with* ECF 515-57 at 7. The Court recognized that a key factor evincing an agency relationship is that "the principal is capable of providing instructions to the agent." ECF 442 at 115 (quoting Restatement (Third) Of Agency § 1.01, cmt c. (2006)). Emails showing that Deutsche Bank provided instructions to Ocwen regarding the appropriate maintenance of REO properties is undeniably relevant and admissible for the purpose of proving agency.

**C. Defendants' Motion Incorrectly Extends a Deutsche Bank-Specific Holding to All Defendants.**

Defendants eighteenth motion attempts to broadly apply a narrow holding that pertained solely to the Deutsche Bank Defendants. Discussing Plaintiffs' theory that Deutsche Bank was deliberately indifferent Ocwen's and Altisource's intentional discrimination, the Court decided that although "Deutsche Bank was on notice of Ocwen's and Altisource's failure to maintain REO properties, [] the record does not suggest that Deutsche Bank had knowledge that the servicers' maintenance conduct was based on neighborhood race." ECF 442 at 122. Nothing in

the Court's opinion discusses Ocwen and Altisource's notice that their REO maintenance policies and practices was having a discriminatory effect. *See supra* Section V.A. In fact, the decision indicates just the opposite: that Plaintiffs have adduced and may presented evidence of the Servicer Defendants' knowledge of the discriminatory effect of their practices. ECF 442 at 110.

For the above reasons, the Court should deny Defendants' Motion in Limine No. 18 in its entirety.

**VI.      THE COURT SHOULD DENY DEFENDANTS' MOTION IN LIMINE NO. 19 PURPORTEDLY SEEKING TO CLARIFY THE SCOPE OF VICARIOUS LIABILITY AND REQUIRE SPECIFICITY AS TO ALLEGED POLICIES.**

The title of Defendants' Motion in Limine No. 19 has little to do with the actual substance of the motion (as best we understand it). The motion appears to seek two things: (a) citing one purported example from Plaintiffs' Proposed Uncontested facts, an Order broadly barring an unenumerated body of evidence construed by Defendants to relate only to a theory of direct liability against the Defendant Trustees and (b) the exclusion of also unspecified evidence that Defendants believe would conflate the Trustees' ownership of property with control of property, primarily as it relates to damages issues. As discussed below, there is no basis for excluding evidence in either of these categories.

**A.   No Basis Exists for Barring Evidence Related to the Roles, Duties and Obligations of the Defendants Under the Governing Agreements or to the Liability of any of the Defendants.**

In the first section of Defendants' Motion in Limine No. 19, Defendants complain about a potential impression of Deutsche Bank they fear unspecified evidence may have on the jury. ECF 514 at 52. In support of this motion, Defendants reference exactly one fact (previously admitted by Defendants) from Plaintiffs' Proposed Uncontested Facts,[4] which stated that the Trustee Defendants did not "evaluate whether Ocwen should be terminated as result of property preservation and maintenance work." *Id.* at 51 (quoting in part quoting Plaintiffs' Proposed Uncontested Fact No. 313).

As a general matter, the admissibility of facts is governed by Federal Rules of Evidence 402 and 403 and not the feelings of a party to the case. Under the evidentiary framework provided by these Rules, no basis exists for excluding relevant facts that may reflect negatively

---

[4] Defendants do not bother to quote the proposed fact in its entirety or provide a citation to it.

(or positively) on the Deutsche Bank Defendants in circumstances where these facts describe the roles, duties or responsibilities of the parties to the Governing Agreements. Nor is there any basis for barring facts that bear on the course of events and provide the context relevant to the events at issue in this case. And most importantly, facts should not be excluded that bear on the potential liability of any of the Defendants.

The single fact cited in the motion, previously admitted by the Trustee Defendants, is clearly admissible under these principles for several reasons. First, the assertion challenged by Defendants as improper does not accuse the Trustees of "improperly" or "unlawfully" failing to evaluate Ocwen and only asserts that they did not, in fact, do it. Had the Deutsche Bank Defendants evaluated Ocwen's performance regarding REO maintenance and concluded that it was satisfactory, that might well bear on a jury's assessment of Ocwen's liability regarding Plaintiffs' claims and discourage the jury from finding liability. It follows that information that no actual assessment approving of Ocwen's conduct was made is likewise probative and should not be excluded. Second, this evidence bears on the respective roles and activities of the parties under the Governing Agreements and the narrative and circumstances related to Plaintiffs' claims. There may well be questions in the jury's mind as to the reasons and circumstances relating to Ocwen continuing to perform its servicing duties in the wake of Plaintiffs' allegations regarding its discriminatory conduct, and this is information related to that part of the story. Finally, Defendants complain that Plaintiffs "propose stipulated facts designed to suggest that the Trustee Defendants knew about maintenance issues on REO properties."[5] ECF 514 at 51. True. And, as recognized by the Court, evidence tending to prove this knowledge is directly relevant to

---

[5] Taking a shotgun approach, Defendants also argue that "knowledge of maintenance issues is not knowledge of racial discrimination." ECF 514 at 51. This argument is unavailing for the reasons explained in the response to Defendants' Motion in Limine No. 18, *supra*.

and probative of the agency relationship between the Deutsche Bank Defendants and the Servicers in terms of the Deutsche Bank Defendants' control and supervision over the Servicers. *See* ECF 442 at 122 ("[T]he evidence in the record shows Deutsche Bank was on notice of Ocwen's and Altisource's failure to maintain REO properties . . . ."); *see also id.* at 120 ("[T]here's other evidence in this record to suggest that Deutsche Bank exerted control over maintenance conduct with the threat of enforcement."). For all these reasons, the first part of Defendants' Motion in Limine No. 19 should be denied.

### B. No Basis Exists for Excluding Evidence Based on Defendants' Assertions Regarding the Concepts of "Ownership" and "Control."

Defendants next make a convoluted argument for excluding evidence or argument that they believe would conflate a distinction they draw between "ownership" and "control" of properties. This argument gets off the wrong foot with the Trustee Defendants suggesting that the Court has limited the damages that can be recovered by Plaintiffs to those relating "to the maintenance and preservation of the at-issue properties" and that damages are not recoverable with respect to a property not "at issue." ECF 514 at 53. In reality, as is clear under the Court's prior rulings, ECF 460 at 3, Plaintiffs are not seeking to recover damages based upon the effects of Defendants' conduct on particular properties but based upon evidence of the effects of Defendants' conduct on Plaintiffs in terms of diversion of resources and frustration of their missions. *See* Plaintiffs' Response to Defendants' First-Round Motion in Limine at 2-9 (Preliminary Damages Statement).

Defendants go on to argue that "ownership" of a property does not necessarily establish "control" with respect to that property. ECF 514 at 54-55. This may be true in exceptional situations—none of which Defendants have specifically identified—but the record evidence here shows that in almost all instances those attributes travel together. Defendants' make no showing

48

justifying the broad preemptive relief they seek. The only scenario discussed (hypothetically) by Defendants in their motion concerns the possibility that problems with regard to eviction proceedings or similar developments might conceivably interfere with Defendants exercising control over an REO property, even though the property was technically owned by a Defendant Trustee. But the only support for suggesting that the 30-day grace period afforded by NFHA after ownership changed would be inadequate is Defendants' mischaracterization of the Court's Summary Judgment Opinion to claim that "This Court has already excluded testimony conflating ownership for thirty days with an obligation (or ability) to address all relevant maintenance issues . . ." ECF 514 at 54-55. In fact, all the Court actually held was that Plaintiffs' witness, Pamela Kisch, "never explain[ed] why the 30-day period is a reasonable design protocol." ECF 442 at 74. Defendants fail to mention that the Court went to specifically state that with regard to the reasonableness of the thirty-day grace period, "The problem doesn't lie with Kisch's ultimate conclusion but how she supports it." ECF 442 at 75 n.23. In other words, Defendants' sole support for their speculation is a readily rebuttable misreading of this Court's prior decision.

Finally, to the extent that Defendants are making some argument directed to the general concept of "control" as exercised by the Trustees (and it is difficult to tell be because of the generic references to "Defendants" in Motion in Limine No. 19) an additional reason weighs against granting the motion. For purposes of determining whether the Deutsche Bank Defendants and the Servicers are in agency relationship, the issue of "control" - control of the Trustee Defendants over the Servicers—is an important consideration. Defendants' request in Limine No. 19 for relief broadly limiting references to "control" would tend to have significant potential to prejudice Plaintiffs' ability to prove their claims and confuse the jury.

For the reasons explained above, Defendants' Motion in Limine No. 19 should be denied.

49

**VII.     THE COURT SHOULD DENY DEFENDANTS' TWENTIETH MOTION IN LIMINE AND PERMIT PLAINTIFFS TO INTRODUCE PUNITIVE DAMAGES EVIDENCE**

Finally, Defendants' Motion in Limine No. 20 seeks to (1) preclude Plaintiffs from presenting punitive damages evidence regarding the Deutsche Bank Defendants, and (2) preclude Plaintiffs from presenting evidence of Defendants' finances until after issues of liability and compensatory damages have been decided by the jury. Both arguments lack merit.

**A.  This Court's Summary Judgment Ruling Does Not Preclude Plaintiffs from Seeking Punitive Damages Against the Deutsche Defendants.**

As an initial matter, Defendants assert that "evidence relevant only to punitive damages should be excluded because punitive damages are unavailable against Trustee Defendants," ECF 514 at 56, without pointing to a single exhibit or piece potential testimony that Defendants believe should be excluded. Because this motion "lacks the necessary specificity with respect to the evidence to be excluded." *Navarrete*, 2021 WL 2374350, at *1 (quotation omitted), it should be denied. Denial is particularly appropriate for this motion because Defendants do not even attempt to explain what evidence may be offered that supports punitive damages against the Trustee Defendants (for whom Defendants believe punitive damages are not available) but that does not also support punitive damages against Ocwen or Altisource (whom Defendants recognize are potentially liable for punitive damages).

Even if Defendants had identified specific evidence they seek to exclude, their motion would still fail. The Deutsche Bank Defendants first assert that, under the law-of-the-case doctrine, this Court's summary judgment ruling precludes Plaintiffs from seeking punitive damages against them. But the summary judgment ruling never addressed punitive damages. Nevertheless, the Deutsche Bank Defendants claim that this Court's decision on an entirely

separate issue—whether they were directly liable or vicariously liable—somehow precluded punitive damages against them. This argument is wrong for several reasons.

To start, Defendants reliance on the law-of-the-case doctrine is misplaced. Law of the case applies when a party seeks to relitigate "the precise issue" decided at an earlier stage of the litigation. *Flynn v. FCA US LLC*, 39 F.4th 946, 954 (7th Cir. 2022). This Court has never decided whether punitive damages are available here, because Defendants did not seek summary judgment on that issue. Thus, through their Motion in Limine, the Deutsche Bank Defendants make an impermissible, belated attempt to secure summary judgment on punitive damages.

Further, the Court's dismissal of the direct liability claim against the Deutsche Bank Defendants did not resolve the availability of punitive damages. A defendant that is vicariously liable is still subject to punitive damages. *See, e.g.*, *United States v. Sabbia*, No. 10-cv-5967, 2011 WL 1900055, at *10 (N.D. Ill. May 19, 2011); *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 101-05 (2d Cir. 2024) (affirming availability under the FHA of punitive damages against defendant who is vicariously liable); *cf. City of Chicago v. Matchmaker Real Est. Sales Ctr., Inc.*, 982 F.2d 1086, 1100 (7th Cir. 1992). Nor did the reasoning underlying the Court's ruling on direct liability preclude punitive damages. The Court dismissed the direct liability claim against the Deutsche Bank defendants because it was not persuaded that they were "deliberate[ly] indifferent" to "*known* race discrimination by the servicers." ECF 442 at 123 (emphasis in original). This is not the showing Plaintiffs must make to secure punitive damages under the Fair Housing Act.

In this Circuit, a jury can award punitive damages based on the defendant's "reckless or callous disregard for the plaintiff's rights, [or] intentional violations of federal law." *Tyus v. Urb. Search Mgmt.*, 102 F.3d 256, 266 (7th Cir. 1996) (internal quotation marks omitted). "This does

51

not mean that the defendant had to know he was violating the law." *United States v. Balistrieri*, 981 F.2d 916, 936 (7th Cir. 1992). Instead, it is sufficient that "the conduct upon which liability is founded evidences reckless or callous disregard for the plaintiff's rights." *Id.* (internal quotation marks omitted); *see also Badami v. Flood*, 214 F.3d 994, 998 (8th Cir. 2000) (issue of punitive damages should be submitted to the jury if "a reasonable jury could find the defendants acted with malice or reckless indifference that their actions might violate a federal statute of which they were aware").

In sum, Plaintiffs are not required to show that the Deutsche Bank Defendants knew their agents were discriminating based on race—they must only show that Deutsche Bank Defendants acted with reckless disregard for the potential violation of the Fair Housing Act or other federal mortgage laws.[1] That the Deutsche Bank Defendants were not put on notice of "known race discrimination" does not mean that the Deutsche Bank Defendants did not act with reckless disregard of the potential discriminatory effect of their agents' actions. *See, e.g.*, *supra* Section V. Further, in a vicarious liability case, a jury may award punitive damages if a principal knew of *or ratified* its agent's discriminatory conduct. Even if Deutsche Bank defendants were not *initially* aware of the illegal conduct here, they learned of it (1) through meetings in Milwaukee with witnesses who will testify at this trial, (2) likely from their US city tour involving REO complaints, and (3) certainly when Plaintiffs filed a HUD complaint against them in 2014. They nevertheless failed to take action to rectify the issue, thereby ratifying their agents' conduct, that is at issue through 2017. Plaintiffs should be permitted to present evidence of Deutsche Bank defendants' inaction to the jury.

In addition, there is little reason to decide this issue now. To the extent Plaintiffs are able to discern Defendants' intent, the punitive damages evidence that Deutsche Bank defendants seek

to exclude is admissible for other purposes. Plaintiffs plan to use evidence of Deutsche Bank's oversight of (and participation in) the discriminatory conduct to establish its agency relationship with the servicers. Plaintiffs intend to introduce this same evidence to establish the servicers' liability, by showing that they were aware of their obligations under the Fair Housing Act and communicated with Deutsche Bank defendants about those obligations. *See supra* Section V. Defendants have not pointed to any evidence that *could* be used to establish punitive damages but *could not* be used to establish liability. Accordingly, their Motion in Limine should be denied.

### B. This Court's Should Not Bifurcate the Presentation of Evidence Regarding Defendants' Finances.

Defendants also ask this Court to bar the presentation of evidence regarding their financial position until the jury determines that Plaintiffs are entitled to punitive damages. As the Court recognized in its order on the Parties' first-round motions in limine, "[b]ifurcation will not result in any efficiency." ECF 520 at 5. Like Defendants' Motion in Limine No. 8, the relief sought by their present motion is inefficient and burdensome for the jury because it will require this Court to split the trial into two separate phases.

Nor do Defendants justify the inefficiency inherent in their proposal. They instead rely on unsupported fearmongering that the jury will be tricked into awarding "inflated compensatory damages" based on its knowledge of Defendants' net worth. But this concern is animated by Defendants frequently raised contention that "Plaintiffs have failed to marshal admissible evidence substantiating their alleged frustration of mission damages." ECF 512 at 59. As Plaintiffs explain in their response to Defendants' Motion in Limine No. 16, Plaintiffs *have* substantiated their frustration of mission damages, obviating Defendants' concern. This is in alignment with the Court's July 9, 2025 and January 29, 2016 rulings.

Defendants also fail to point to relevant authority to support their motion. The citation to *Sanders v. Jackson* is particularly misleading, ECF 514 at 58, as Defendants excerpt a fragment from a sentence discussing Congressional intent in enacting the Fair Debt Collection Practices Act's "net worth" provision. *See Sanders v. Jackson*, 209 F.3d 998, 1002 (7th Cir. 2000) ("Thus, by making the extent of the penalty directly proportional to a percentage of the defendant's net worth, Congress hoped that punishment might be meted out according to a business's ability to absorb the penalty."). The remainder of Defendants' cases fare no better. *Zazu Designs v. L'Oreal, S.A.* reversed a district court's arbitrary, unsupported, and legally improper $1 million award for "corrective advertising" in a Lanham Act case. 979 F.2d 499, 506–08 (7th Cir. 1992). *Byrne v. Yale Univ., Inc.* involved a "single plaintiff against a single defendant," and the bifurcation of punitive damages deliberations caused no inefficiency. No. 3:17-CV-1104 (VLB), 2020 WL 5258998, at *14 (D. Conn. Sept. 3, 2020). And last, *Honda Motor Co. v. Oberg* concerned a due process challenge to an Oregon constitutional amendment that prohibited judicial review of punitive damages awards. 512 U.S. 415, 418 (1994).

Finally, Defendants' concern is easily ameliorated by a limiting instruction on the proper way to calculate compensatory damages. Through such an instruction, the Court can address any Defendants' concerns without burdening the jury or causing unneeded inefficiencies.

For the reasons explained above, Defendants' Motion in Limine No. 20 should be denied.

Respectfully submitted,

*/s/ Jennifer K. Soule*

| | |
|---|---|
| Jennifer K. Soule | Lila Miller |
| James G. Bradtke | Edward Olds |
| Steven P. Schneck | Yiyang Wu |
| *Soule & Bradtke, PLLC* | Jennifer Klar |
| 155 N. Michigan Avenue, Ste. 504 | *Relman Colfax PLLC* |
| Chicago, IL 60601 | 1225 19th Street, N.W., Ste. 600 |

Washington, DC 20036

Janell M. Byrd                                    Stephen M. Dane
Morgan Williams                                   *Dane Law LLC*
*National Fair Housing Alliance*                  P.O. Box 1011
1331 Pennsylvania Ave, NW, Ste. 650               Perrysburg OH 43552
Washington, DC 20004

Dated: January 21, 2026