## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NATIONAL FAIR HOUSING ALLIANCE; HOPE )
FAIR HOUSING CENTER, OPEN )
COMMUNITIES; SOUTH SUBURBAN HOUSING )
CENTER; HOUSING OPPORTUNITIES MADE ) Case No. 1:18-cv-00839
EQUAL OF VIRGINIA; FAIR HOUSING )
OPPORTUNITIES OF NORTHWEST OHIO, INC.; )
FAIR HOUSING CONTINUUM; GREATER NEW )
ORLEANS FAIR HOUSING ACTION CENTER; )
DENVER METRO FAIR HOUSING CENTER; )
METROPOLITAN MILWAUKEE FAIR HOUSING )
COUNCIL; FAIR HOUSING CENTER OF WEST )
MICHIGAN; THE MIAMI VALLEY FAIR )
HOUSING CENTER; FAIR HOUSING CENTER )
FOR RIGHTS & RESEARCH; FAIR HOUSING )
CENTER OF THE GREATER PALM BEACHES; ) Judge Manish S. Shah
FAIR HOUSING CENTER OF CENTRAL )
INDIANA; CENTRAL OHIO FAIR HOUSING )
ASSOCIATION; HOUSING OPPORTUNITIES )
PROJECT FOR EXCELLENCE, INC.; )
CONNECTICUT FAIR HOUSING CENTER; )
NORTH TEXAS FAIR HOUSING CENTER; and )
FAIR HOUSING ADVOCATES OF NORTHERN )
CALIFORNIA, )
)
Plaintiffs, )
)
v. )
)
DEUTSCHE BANK NATIONAL TRUST, AS )
TRUSTEE; DEUTSCHE BANK TRUST )
COMPANY AMERICAS, AS TRUSTEE; OCWEN )
LOAN SERVICING, LLC.; and ALTISOURCE )
SOLUTIONS, INC., )
)
Defendants. )

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONSOLIDATED SECOND ROUND MOTIONS IN LIMINE

# TABLE OF CONTENTS

I.    RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 1. .........1

II.   RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 2. .........5

    A.   Defendants' Critique of Plaintiffs' Scoring Criteria and Methodology are Highly Relevant. ........................................................................................................5

    B.   Rule 403 Does Not Justify Exclusion, and Rule 611(a) Supports an Efficient, Controlled Cross Examination..............................................................11

III.   RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 3. .......14

    A.   Plaintiffs Have Placed Their Witnesses' Knowledge of Industry Standards at Issue. ......................................................................................................15

    B.   The Proposed Questioning Elicits Lay Opinion. ...................................................16

    C.   The Testimony Is Not Excludable Under Rule 403...............................................17

    D.   Conclusion ............................................................................................................18

IV.   RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 4. .......19

V.   RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 5. .......25

    A.   Legal Standard .....................................................................................................25

    B.   Ocwen Disclosed "Any Witness Necessary to Authenticate Documents," and Plaintiffs Knew of Mr. Flannigan's Identity and Role From the Outset........26

    C.   Ocwen's "Non-Disclosure" is Harmless................................................................26

    D.   Conclusion. ..........................................................................................................28

VI.   RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 6. .......29

    A.   References to Plaintiffs' Inability to Quantify Damages Are Relevant and Admissible. ..........................................................................................................29

    B.   Plaintiffs' Missing-Witness Theory is Misplaced.................................................31

    C.   There is No Risk of Unfair Prejudice. ..................................................................32

    D.   Conclusion. ..........................................................................................................33

VII.   RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 7. .......34

    A.   Rugh's Analysis Is Relevant For Impeachment and Cross Examination. .............35

    B.   Rugh's Analysis Is Squarely Relevant and Admissible........................................36

VIII.  RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 8. .......38

CONCLUSION .....................................................................................................................44

## I.     RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 1.

Plaintiffs ask the Court to impose a categorical prohibition on any reference to HUD's no-cause determination in response to NFHA's 2016 administrative complaint against U.S. Bank (the "HUD Determination") and to proceedings in the *Bank of America* litigation, arguing both are irrelevant and prejudicial. Dkt. 513 at 3–4[1]. Plaintiffs ignore that they themselves have repeatedly placed both proceedings directly at issue in this case. A blanket ban would improperly exclude evidence that is relevant and potentially necessary to Defendants' defense precisely because of Plaintiffs' own evidence and theories.

Plaintiffs' contention that the HUD Determination and *Bank of America* litigation are irrelevant is incorrect. The investigation underlying this case was not limited to Defendants. Plaintiffs investigated numerous financial institutions and asserted claims against all of them. Certain of the Plaintiffs made internal determinations about how to allocate purported diversion of resources "overhead" damages based on whether their claims against Plaintiffs' litigation targets were rejected by the relevant forums.

For example, the Connecticut Fair Housing Center testified, "During the course of the U.S. Bank investigation, we thought there was enough evidence of differential treatment to warrant a complaint. But HUD disagreed with that; therefore, we did not have to divert our resources in order to counteract what we considered illegal activity by U.S. Bank." Ex.[2] 1 at 172:10–15. In other words, this Plaintiff determined that Defendants in this case are responsible for a greater proportion of Plaintiffs' investigation expenses because Plaintiffs' claims against other targets

---

[1] Unless otherwise indicated, page citations to docket filings refer to the ECF-generated page numbers appearing in the court-stamped header.

[2] References to "Ex. __" herein refer to the exhibits to the Declaration of Debra Bogo-Ernst submitted herewith.

were dismissed. *See id.*; *see also* Ex. 2 at 194:18–195:10 (allocation of expenses to Defendants changed from one quarter to one third based on number of "active" investigations occurring at the time). Defendants are entitled to examine Plaintiffs on the bases for the damages they seek, and they cannot do so if they are barred from referring to the very events driving Plaintiffs' own allocation decisions.

Evidence concerning those Plaintiffs' investigation of other financial institutions is also relevant to Plaintiffs' motivations and potential bias. When training Local Plaintiffs to conduct the investigation that led to both this case and the *Bank of America* litigation, NFHA told at least one group of trainees that their goal was to obtain a $100 million settlement from Bank of America. *See* Dkt. 505-24 ("Bank of America is their [NFHA's] next target, they are hoping for a $100 settlement."). Evidence bearing on Plaintiffs' motivation and credibility in bringing this and similar actions is probative. *Hopey v. Spear*, 2016 WL 9665165, at *4 (C.D. Ill. June 23, 2016) ("If evidence exists to show that Plaintiff had improper motives in bringing suit … such evidence and argument would be very relevant to the issue at hand."). This evidence does more than just suggest Plaintiffs are litigious; it relates to the common methodology of how Plaintiffs develop and conduct "impartial" investigations with a pre-stated desired outcome. *See Gastineau v. Fleet Mortg. Corp.*, 137 F.3d 490, 494–95 (7th Cir. 1998) (affirming admittance of evidence that related to plaintiff's motivation and use of a "common scheme" to bring lawsuits.")

A categorical prohibition on Defendants would also unfairly prejudice them from rebutting unfounded inferences that Plaintiffs may introduce at trial. Plaintiffs have proposed exhibits to that refer to the combined investigation of Defendants, U.S. Bank, and Bank of America. If Defendants are not allowed to refer to the HUD determination and the *Bank of America* litigation, they would be unable to correct the misimpression that those other claims were sustained. Plaintiffs' motion

thus improperly seeks to preclude evidence that may be necessary to Defendants' defense. *Isbell v. John Crane, Inc.*, 74 F. Supp. 3d 893, 898 (N.D. Ill. 2014) (denying motion in limine where it would "deprive [Defendant] of a potential defense"); *Tzoumis v. Tempel Steel Co.*, 168 F. Supp. 2d 871, 874 (N.D. Ill. 2001) (denying motion in limine where it is "uncertain to what degree such evidence may prove relevant to [Defendant's] defense.")

At a minimum, Plaintiffs' request is premature. If Plaintiffs open the door by analogizing outcomes across lenders or referencing unrelated investigations to imply vindication of their investigation against Defendants, Defendants may be permitted to rebut those arguments with targeted references to the HUD Determination and *Bank of America* litigation to prevent juror confusion and prejudice. *United States v. Martinez*, 988 F.2d 685, 702 (7th Cir. 1993) (trial court may admit otherwise inadmissible evidence to rebut unfair prejudice introduced by other improper evidence under the "open the door" doctrine). Whether such rebuttal is necessary best determined at trial. *Tzoumis*, 168 F Supp. 2d at 873 (quoting *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F. Supp. 1398, 1400 (N.D. Ill. 1993) ("[G]enerally, 'evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in the proper context.'"). If their experts open the door by asserting that a widely recognized industry-standard methodology for determining racial disparity is authoritative, we are entitled to confront them with contrary evidence, including that — regardless of any ultimate conclusion — HUD has criticized that approach. *See generally* Dkt. 29-2.

Finally, Plaintiffs' assertion that the Court has already ruled the HUD Determination is irrelevant is incorrect. *See* Dkt. 513 at 3. The Court sustained an objection to a Rule 56.1 statement of fact concerning a specific legal ruling by HUD that "[A]ny testing sufficient to prove disparate treatment due to a lack of maintenance must likewise be two-dimensional (occur over time)." *See*

3

*NFHA v. Deutsche Bank National Trust,* 18-cv-839, 2025 WL 975967, at *2, n.6 (N.D. Ill. Mar. 31, 2025) (citing Dkt. 362 ¶ 31). That summary judgment ruling did not constitute a motion limine determination and did not resolve admissibility of all related subject matter in a trial context. Evidentiary rulings are made fact-by-fact and in trial context. *See SEC v. Ferrone*, 163 F. Supp. 3d 549, 563 (N.D. Ill. 2016) (citing *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1055 (N.D. Ill. 2009) ("There is a general principle that evidentiary rulings related to relevance are best deferred until trial so that they can be resolved in the proper context.").

    For all of these reasons, the Court should deny Plaintiffs' motion.

4

## II.    RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 2.

The reliability of Plaintiffs' investigation — including their identification of purported property deficiencies allegedly demonstrating a racial disparity in maintenance — is a central issue in this case. Plaintiffs' entire case theory rests on observations of onsite volunteers. Defendants contend that these volunteers applied vague, subjective, and flawed grading criteria that necessarily produced inconsistent results, rendering Plaintiffs' study unreliable.

One way Defendants intend to demonstrate this defect is by showing that Plaintiffs themselves applied inconsistent standards and reached different conclusions when evaluating the subject properties. During depositions, Defendants provided Plaintiffs' witnesses with photographs of subject properties and asked them to score those properties using their own property checklist, with no time constraints. The results varied wildly and materially. Plaintiffs did not score the properties consistently during this photo review — an inconsistency that presents a fundamental problem for Plaintiffs' case.

This type of evidence is highly probative of the reliability — or lack thereof — of Plaintiffs' core proof. While Plaintiffs correctly recognize that this testimony and evidence of the inconsistent deficiency scoring undermines their claims, that is not a basis for exclusion. The evidence is neither unfairly prejudicial nor cumulative. To the contrary, the evidence directly tests the soundness of Plaintiffs' investigation that Plaintiffs ask the jury to credit. Excluding it would unfairly prejudice Defendants by depriving them of a foundational criticism of Plaintiffs' study. There is no basis to exclude this evidence at trial, and the motion should be denied.

### A.    Defendants' Critique of Plaintiffs' Scoring Criteria and Methodology are Highly Relevant.

The reliability of the criteria Plaintiffs used to assess the at-issue properties goes to the heart of this case. Plaintiffs contend that the standards and scoring instructions given to its onsite

5

investigators were concrete, objective, and designed to yield consistent grading. *See, e.g.*, Ex. 3 at 702:3–7 ("Q. So from NFHA's perspective, all of the subcategories and other categories on the REO evaluation form, all of those are objective according to NFHA; is that correct? A. I think that's correct, yeah."). Plaintiffs further assert that these same criteria could be reliably applied to photographs of properties alone; in fact, Plaintiffs relied predominantly on photographs during their so-called "quality control" process and NFHA admitted the process could be accomplished utilizing only a blank REO form and the photographs of the property. *See* Ex. 3 at 630:14–631:11[3].

Whether Plaintiffs' grading criteria were in fact objective and capable of producing consistent results across all of nearly 700 at-issue properties in metropolitan areas is a central factual issue for the jury. Plaintiffs' claim of systemic racial disparity depends on the premise that their inspection methodology generated reliable, comparable scores that could be validly incorporated into their expert's regression analysis. But the regression analysis is only as reliable as the underlying data on which it is based. Defendants are therefore entitled to challenge the reliability of Plaintiffs' underlying data and the methodology used to generate it.

Defendants revealed substantial evidence to the contrary, namely, that Plaintiffs' inspection criteria were neither objective nor reliable. When Plaintiffs' own witnesses applied NFHA's scoring criteria to Plaintiffs' own photographs, their scores frequently diverged from the

---

[3] "Q. So you keep referring to, you know, it's important to provide context. You know, what are we looking to evaluate a property on, right? So a blank checklist has the parameters by which NFHA has decided it's appropriate to evaluate REO properties. So could you evaluate the properties based on the photos and just the form blank checklist alone, or was it helpful or important to have the actual inspectors' comments and observations in your possession while you were evaluating these properties?
. . .
A. You know, of course, as I mentioned having, like, the comments in the database, it's not not helpful. You know, it's there, and you would see it, and it's good context. But theoretically could I sit down with blank form, if they have followed the protocols, so taking all those initial photos and taking photographs of all the deficiencies, then I should be able to. You know, if the photos will -- should show any and all deficiencies that were documented."

original evaluation-form scores. These discrepancies occurred even when the witness was the same individual who performed the original inspection. The chart below provides examples of these deposition-based property reviews compared to the original inspection scores:

| Witness | Property Address[4] | # of Deficiencies Match (deposition v. original inspection) | # of Deficiencies Not Matching (deposition vs. original inspection) |
|---|---|---|---|
| James McCarthy (COFHA) | 748 Prairie Rd., Galloway, OH (Deposition Exhibit 7470)[5] | Seven[6] | Eleven[7] |
| James McCarthy (COFHA) | 1240 South Ohio Avenue, Columbus, OH (Deposition Exhibit 7471)[8] | Six[9] | Nine[10] |
| James McCarthy (MVFHC) | 416 Lorenz Avenue, Dayton, OH (Deposition Exhibit 6118)[11] | One[12] | Nine[13] |
| Keenya Robertson (HOPE) | 1001 Bayberry Point Dr., Plantation, FL (Deposition Exhibit 7102)[14] | Five[15] | Nine[16] |

The below figure also provides outcomes of these deposition property reviews.[17]

---

[4] By using the properties for this purpose, Defendants do not necessarily concede that these properties are at issue in this case.

[5] Ex. 4.

[6] Ex. 5 at 216:10–218:7; Ex. 6.

[7] Ex. 5 [Excerpt of 30(b)(6) Deposition Transcript of James McCarthy (3/14/22)] at 216:10–218:7; Ex. 6.

[8] Ex. 7.

[9] Ex. 5 at 218:9–218:22; Ex. 8.

[10] Ex. 5 at 218:9–218:22; Ex. 8.

[11] Ex. 9.

[12] Ex. 10 at 450:24–459:3; Ex. 11.

[13] Ex. 10 at 450:24–459:3; Ex. 11.

[14] Ex. 12.

[15] Ex. 13 at 246:21–255:14; Ex. 14.

[16] Ex 13 at 246:21–255:14; Ex. 14.

[17] Defendants previously filed this figure in support of its spoliation motion (Dkt. 252 at 8) and all citations therein refer to those papers.



Figure 1

Plaintiffs' property-review testimony underscores the probative value of Defendants' evidence. NFHA's deficiency criteria are not truly objective because they require individualized

8

judgment and yield materially different results across witnesses and across time, even when the same witness reviews the same property. Defendants are therefore entitled to elicit this testimony at trial to challenge the reliability of Plaintiffs' investigation criteria. To hold otherwise would impermissibly handicap Defendants and shield from the jury a highly-probative critique of the foundational methodology underlying Plaintiffs' study.

Plaintiffs' argument that their "quality control" process renders this evidence irrelevant misses the mark. As an initial matter, Plaintiffs' insistence that this case has always been centered on a "quality control" review of photographs, rather than on judgments made by local Plaintiff inspectors during on-site inspections, is flatly contradicted by the evidentiary record. For example, the Connecticut Fair Housing Center testified:

> The evaluations were not done based upon photos. The evaluations were done based upon what was seen at the property. When things were seen at the property, they were marked on the evaluation form. It was not the other way around. They didn't look at photos and then put it on the evaluation form.

Ex. 1 at 100:5–10.

NFHA itself acknowledged that that it did not conduct "quality control" review of all of the photographs before filing this lawsuit, implicitly conceding that it had relied on on-site Local Plaintiffs' deficiency assessments to support their claims. *See* NFHA 30(b)(6) Dep. June 15, 2021 113:9-11 ("Is it did we review every single photo of every single property? I don't – you know, I don't think I could say that."). Plaintiffs' newly minted narrative of a centrally administered "quality control" process is revisionist history — one Plaintiffs landed on only after they were caught destroying the original on-site deficiency assessments. Defendants are entitled show the jury how Plaintiffs actually designed and implemented their investigation, including how local

Plaintiffs graded deficiencies and NFHA officers later shifted scoring under the guise of "quality control."

Moreover, even if certain photographs were later subject to "quality control" by NFHA officers, the on-site judgments made by each of the local Plaintiffs remain highly probative. That is because Local Plaintiffs were trained to take photographs only after determining, in the field, that a given property condition met the deficiency criteria established by NFHA. As the Connecticut Fair Housing Center 30(b)(6) witness testified, local inspectors "were also instructed to take pictures of anything that they had marked on the evaluation sheet. It's hard to take a picture of something that doesn't exist." Ex. 1 at 101:9–12.

In other words, if a local Plaintiff concluded on site that a condition did not constitute a deficiency, no photograph would exist for NFHA to "quality control" review. Those unphotographed, unreviewable judgments rendered under NFHA's vague and amorphous standards necessarily persist in Plaintiffs' database to this day. That Local Plaintiffs reached wildly inconsistent judgments on whether a given deficiency exists therefore remains highly relevant, notwithstanding Plaintiffs' counterfactual assertions that this case has only ever been about photo review alone.

At trial, Defendants will contend — and the challenged evidence shows — that NFHA's criteria was so vague and amorphous that different people applying the same criteria to the same property were all but guaranteed of reaching different deficiency score conclusions. Having yet another person apply those same subjective criteria to assess the properties, whether labeled as "quality control" or otherwise, does not cure that defect. Rather, it compounds it by introducing yet another layer of subjective judgment. Indeed, if Plaintiffs' inspection criteria were incapable

10

of producing consistent and reliable results, then a jury could reasonably conclude that they were immune from any meaningful quality control.

Accordingly, Plaintiffs' property-review testimony goes directly to the efficacy and credibility of NFHA's "quality control" process and to whether NFHA's study can reliably show any racial disparity. Notably, NFHA's own corporate designee responsible for "Quality Control," Lindsay Augustine, failed this very exercise during her deposition. The jury is entitled to hear whether NFHA's subjective criteria escaped any meaningful quality control. Plaintiffs may argue that their "quality control" process fixes these defects, but that goes to weight and not admissibility. And it does not justify excluding Defendants' evidence or permitting Plaintiffs to present a one-sided narrative of what they claim was methodological rigor.

In short, the property-review testimony — elicited through a similar photo review that NFHA believes would yield the same results as its quality control process — demonstrates that NFHA's process is not objective, not reliably reproducible, and not capable of consistent application. Because the accuracy and effectiveness of Plaintiffs' methodology, from initial inspection through "quality control," is a central disputed issue, this evidence is highly probative and admissible under Rules 401 and 402.

### B. Rule 403 Does Not Justify Exclusion, and Rule 611(a) Supports an Efficient, Controlled Cross Examination.

Plaintiffs' Rule 403 objections — premised alleged juror confusion and purported inefficiency — are unfounded. This cross-examination goes to the core of Plaintiffs' liability theory by testing the reliability, objectivity, and consistency of the deficiency judgments that generated the underlying data. The inquiry is narrow and squarely probative of a central issue in the case: when Plaintiffs apply NFHA's own criteria to Plaintiffs' own photographs, do they reach

11

consistent results, or do those criteria produce ambiguous and inconsistent outcomes? That question is central to the merits of this case, not a collateral sideshow, and its substantial probative value is not outweighed by any risk of confusion.

Excluding this cross-examination would unfairly prejudice Defendants by insulating Plaintiffs' methodology from meaningful adversarial testing. Plaintiffs' desired result would also reject the Court's recognition that issues surrounding data accuracy, contemporaneity, and post-hoc edits are for the jury, including in light of the Court's spoliation ruling. *See* Dkt. 282 at 8. The jury is entitled to hear both sides' evidence when evaluating how Plaintiffs' property-deficiency judgments were made and whether that process yields inconsistent or ambiguous outcomes. Rule 403 does not bar evidence simply because it is case-dispositive or exposes weaknesses in a party's case.

Plaintiffs' efficiency arguments fare no better. Property-review exercises are an efficient, concrete way to present the reliability issues and are more probative than Plaintiffs' suggested "alternatives," which pursue different lines of inquiry and do not test the application of Plaintiffs' own criteria to their own photographs. Any time-management concerns are speculative and readily manageable. Plaintiffs' witnesses have already been deposed on this subject under circumstances where they were afforded more time to review photographs and should be prepared to address it at trial. Indeed, Plaintiffs' suggestion that their witnesses cannot answer similar questions at trial contradicts Plaintiffs' core contention that property efficiencies can be readily ascertained solely by looking at photographs. *See* ex. 3 at 143:14–144:11.

Nor should Plaintiffs be able to avoid highly probative and material cross examination simply by suggesting pretrial that their witnesses could be evasive on this line of questioning. To the extent the Court harbors any residual concern regarding scope or duration, Rule 611(a)

12

provides ample authority for the Court to address those concerns at trial by "exercis[ing] reasonable control over the mode and order of examining witnesses and presenting evidence" to ensure the presentation is effective, efficient, and not wasteful of the jury's time. But there is no basis under Rules 403, 611(a) or otherwise to exclude in limine this entire line of cross-examination on a plainly relevant issue.

For these reasons, the Court should deny Plaintiffs' motion and permit the photo-review cross-examination.

## III.     RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 3.

Plaintiffs move to preclude Defendants from eliciting lay-witness testimony regarding "industry standards" for REO maintenance, invoking Rules 701 and 403. That motion rests on a fundamental mischaracterization of both Plaintiffs' own case and the testimony Defendants intend to elicit.

At the heart of Plaintiffs' study is an REO checklist created by Plaintiffs to score properties, which purports to measure Defendants' compliance with industry standards for maintenance and preservation of REO properties. Yet Plaintiffs now seek to shield those witnesses from cross-examination on whether they possessed any familiarity with the very subjects their checklists were designed to measure. But Defendants do not intend to proffer any Plaintiff witness as a lay expert. Nor do Defendants intend to ask any Plaintiff fact witness to opine on what the relevant industry standards are. Rather, Defendants' anticipated cross examination will elicit exactly what Plaintiffs themselves concede is appropriate: testimony concerning Plaintiffs' "process for developing the investigation criteria" and *how* those criteria were implemented in the field. Dkt. 513 at 15 n.4. Evidence that Plaintiffs designed an "investigation" purportedly to measure compliance with industry standards, while lacking any knowledge of those industry standards, is squarely relevant. Indeed, it is precisely why Defendants are entitled to ask Plaintiffs' witnesses about their familiarity (or lack thereof) with industry standards.

Limiting Defendants' cross-examination on this issue would be improper and highly prejudicial. Defendants are entitled to test the factual foundation for Plaintiffs' inspection criteria, including whether the individuals who designed the checklist, trained inspectors, and applied the scoring methodology had any actual understanding of the industry standards that allegedly underlie Plaintiffs' study. This inquiry does not call for expert testimony. It seeks factual evidence from

14

percipient witnesses, who were personally involved in the design and implementation of the study that is the centerpiece of this case. This foundational cross-examination goes to the credibility of Plaintiffs' fact witnesses and weight of the evidence.

**A.     Plaintiffs Have Placed Their Witnesses' Knowledge of Industry Standards at Issue.**

Plaintiffs' witnesses' knowledge of industry standards is relevant to this case. In written discovery responses, Plaintiffs represented that NFHA used "industry standards" "to refine its checklist." Ex. 15 at 15. Likewise, NFHA's corporate designee, Ms. Augustine, testified that NFHA's review of industry standards "confirmed that we had the right items on our checklist" and that their checklist "was in line with what the industry was looking for." Ex. 16 at 669:1–8, 673:11–674:2; *see also* Dkt. 513-1 at 328:1–13 (Plaintiffs testified that NFHA developed the inspection protocol based, in part, on "general best practices and expectations from the industry itself."). Shanna Smith, who led the design of NFHA's protocol, testified that NFHA relied on checklists maintained by Freddie Mac and Fannie Mae and that NFHA's study captured departures from "the standards that Freddie Mac had in writing… [and] generally accepted standards that were with other lenders." Ex. 17 at 57:9–60:6. ("[W]e had meetings with Freddie Mac and they shared their checklist with us[.]")

Having used industry standards as the very foundation of Plaintiffs' lay-person-created REO checklist, they cannot insulate those same witnesses from cross-examination on this topic. Plaintiffs argue Ms. Augustine and other inspection witnesses are not experts "in appropriate provision of preservation and maintenance services to REO properties." Dkt. 513 at 15. But that is the precise point on which Defendants are entitled cross examine them. Plaintiffs are not experts on industry standards, but they purported to use them to create the REO checklist. So, what is the

15

basis upon which they did so? What factors did they consider and where did they get them? Those are ripe areas for the jury to consider as to Plaintiffs' credibility and the reliability of the study. And even if a Plaintiff witness testifies that the individual actually "doesn't know" the industry standards that the witness was intending to capture in the inspection form, as Plaintiffs now suggest (*see* Dkt. 513 at 13), that, too, would be highly relevant to the jury's assessment of the credibility of Plaintiffs' witnesses and the weight that should be given to the study they designed.

### B.     The Proposed Questioning Elicits Lay Opinion.

Courts in the Seventh Circuit draw a clear distinction between expert testimony, which draws on specialized knowledge to make evidentiary connections for the jury, and lay testimony, which results from reasoning processes familiar in everyday life. *United States v. Christian*, 673 F.3d 702, 709 (7th Cir. 2012). Under this framework, testimony relating to specialized knowledge remains lay testimony where "a witness with specialized … knowledge was also personally involved in the factual underpinnings of the case" and that witness offers "fact testimony … influenced by … specialized knowledge," such as testimony regarding a state of mind or subjective experience that was informed by specialized training. *Id*. at 709–10. It is that precise testimony that Defendants will elicit at trial.

Defendants expect that Plaintiffs' witnesses will testify to their subjective belief that NFHA "had the right items on our checklist" and that their checklist appropriately tracked REO maintenance practices. Ex. 16 at 669:1–8. Lisa Rice, for example, testified at deposition that meetings "with different industry stakeholders" validated NFHA's methodology by showing "that the criteria that we were using in our evaluation form was essentially the same as the criteria that industry stakeholders were using." Exhibit 18 at 170:2–173:7. Defendants are entitled to examine Plaintiffs' witnesses regarding the factual basis for this belief, including whether they possessed

16

any actual familiarity with the industry standards they claim to have incorporated. This is cross-examination directed at the foundation and credibility of the witnesses' description of their personal observations of the facts at issue, not an attempt to elicit expert opinions.

Plaintiffs' cited authorities are not to the contrary. Each case involves proposed direct testimony offering opinions on matters outside the witness's perception, not cross-examination probing the basis for a witness's knowledge. *See Smith v. City of Chicago*, No. 21-CV-1159, 2025 WL 1744919, at *5 (N.D. Ill. June 24, 2025) (barring testimony from witnesses who "were not first-hand witnesses to the murders"); *Feazell v. Wexford Health Sources, Inc.*, 140 F.4th 438, 444 (7th Cir. 2025) (barring plaintiff from explaining medical procedure results); *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) (barring testimony where witness "was not asked to summarize his observations" but rather to offer expertise distinguishing firearms); *Higgins v. Lake Cnty. Cir. Ct. Clerk's Off.*, No. 17-CV-07637, 2025 WL 3683058, at *9 (N.D. Ill. Dec. 18, 2025) (permitting lay testimony on present value of pension benefits). None of these cases suggests that a party may insulate its witnesses from cross-examination regarding the factual basis for their claimed beliefs.[18]

## C.     The Testimony Is Not Excludable Under Rule 403.

Finally, this testimony is not excludable under Rule 403 as cumulative or unduly prejudicial simply because both parties will also offer expert testimony on related topics. As courts

---

[18] Plaintiffs cannot fairly seek to insulate Ms. Augustine from questions about industry standards while simultaneously designating deposition testimony that probes those very issues with Defendants' witnesses. *See* Ex. 19 at 40:24–41:15 (Plaintiffs' questioning of Mr. Jastrzemski regarding how a servicer would "know that the terms and conditions for sale of a particular property are… in accordance with accepted servicing standards."); Ex. 20 at 206:21–207:6; *see also* Ex. 21 at 112:3–15 (Avila confirming reliance on HUD and GSE guidance and that the applicable guidelines vary based on property type and need). Plaintiffs' own designations confirm the relevance and propriety of limited questioning on industry standards.

in this district have recognized, "[t]here is a significant difference between a retained expert who offers Rule 702 testimony" and the testimony of fact witnesses who participated in the relevant conduct, even where their testimony overlaps. *United States v. Smith*, No. 1:19-CR-00669-1, 2023 WL 12131059 (N.D. Ill. Aug. 16, 2023), *aff'd*, 150 F.4th 832 (7th Cir. 2025). Depending on the circumstances, "jurors could reasonably give less credence to an expert or a [fact witness]," and so testimony offered from both is neither duplicative nor a waste of time. *Id*.

This lack of prejudice is heightened here by the distinct functions of the expert and lay witness testimony. Subject to Rule 702 and prior *Daubert* limitations, Plaintiffs' expert Deavay Tyler may opine on the existence, content, and application of industry standards, while testimony about what Plaintiffs actually knew, considered, and/or intended in designing and implementing their study — and how they described their inspection forms — properly comes from fact witnesses. This goes to Plaintiffs' state of mind, an issue for which only Plaintiffs' witnesses such as Ms. Augustine can speak directly too. These distinct inquiries — first the standards, and second the parties' state of mind and intent in implementing them — merit both expert and lay witness testimony on this issue.

### D.    Conclusion

For the foregoing reasons, Plaintiffs' motion in limine should be denied.

18

## IV.     RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 4.

Plaintiffs move the Court to exclude four Defense exhibits — Exhibit 500 (HUD news release), Exhibit 503 (Federal Research materials), Exhibit 2497 (HUD FHIP grant guidance), and Exhibit 5869 (a former Altisource employee's LinkedIn profile) — on the grounds that Defendants "failed to timely disclose or produce" them in discovery. That assertion is flatly contradicted by Plaintiffs' own motion. As Plaintiffs concede, Defendants shared the public materials with Plaintiffs in the days immediately preceding Plaintiffs' filing and identified them as publicly available.[19] *See* Dkt. 513 at 16.

Plaintiffs' motion thus refutes itself. One of the challenged documents bears Plaintiffs' own exhibit stamp, something Plaintiffs overlooked before filing their motion. Ex. 22. Plaintiffs likewise seek exclusion of another document (Exhibit 2497) that is already included on Plaintiffs' exhibit list. And the documents Plaintiffs previously relied upon (including the HUD grant policy and Katherine Smith's LinkedIn page) are plainly not "new" as Plaintiffs now contend. they were produced in the case and used by Plaintiffs themselves.

The remaining two public materials fare no better under Rule 37. Their admission causes Plaintiffs no prejudice, involves no surprise, and reflects no discovery violation. Plaintiffs' effort to exclude them is therefore unsupported by both the record and the governing law, and the motion should be denied in its entirety.

---

[19] Plaintiffs suggest that these are examples of documents not previously produced in the case and yet again seek a blanket ruling regarding admissibility of unidentified documents. *See* Dkt. 513 at 16, n. 5. Without identifying the specific documents, it is not possible to assess whether they are admissible under Fed. R. Evid. 37 and the rules of relevance, authenticity, and hearsay. *See id.* at 17-19.

***Defendants' Exhibits 2497 and 5869.*** Plaintiffs seek exclusion of documents that are not only in their possession, but also on their own exhibit list and previously used by Plaintiffs in deposition. That request turns Rule 37 on its head. There is no surprise to cure and no prejudice to remediate. Excluding mutually identified and previously used documents would serve only to distort the evidentiary record, not to enforce disclosure obligations.

Defendants' Exhibits 2497 and 5869 should not be excluded because Plaintiffs themselves have utilized these documents years ago and are, therefore, are not "undisclosed." For example, ***Plaintiffs*** relied on Defendants Exhibit 2497 (HUD FHIP grant guidance) during its April 2023 deposition of one of Defendants' experts. *See* Ex. 23 at 274:2–275:12; *see also* Ex. 24; Ex 25. Further, this exhibit appears on Plaintiffs' own exhibit list. *See* Ex. 26 (Pltfs. Ex. 1729).

Similarly, ***Plaintiffs*** relied on Defendants' Exhibit 5869 (a former Altisource employee's LinkedIn profile) during that employee's May 2022 deposition. *See* Ex. 27; *see also* Ex. 22 (stamped as Plaintiffs' Exhibit 828; this exhibit was additionally attached to an email Plaintiffs offer at Dkt. 513-1 at 88–89); Ex. 28 at 9:16–13:3. Because these documents are on Plaintiffs' own exhibit lists, they are not "undisclosed" and should not be excluded under Rule 37. Plaintiffs' motion should be denied because these exhibits were long in Plaintiffs' possession, used by Plaintiffs in depositions, and appear on Plaintiffs' own exhibit list, leaving no plausible claim for surprise or prejudice.

***Defendants' Exhibits 500 and 503.*** Defendants should not be precluded from relying upon HUD and Federal Reserve articles because they are publicly available, and Plaintiffs cannot show any harm under Rule 37. Plaintiffs rely on out-of-circuit case law to suggest that publicly available information is inadmissible. *See* Dkt. 513 at 17–18. But, Seventh Circuit law is clear: absent surprise, publicly available information is admissible. *See, e.g.*, *Cerda v. Chicago Cubs Baseball*

20

*Club, LLC*, 2023 WL 11951488, *4–5 (N.D. Ill. April 5, 2023) (finding late disclosure of intent to use a document after the close of discovery was justified where document was publicly available and Plaintiff could not claim surprise because he previously knew of the record). In assessing whether non-disclosure is harmless, courts consider "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id*. at *4.

None of those factors favor Plaintiffs. As an initial matter, Plaintiffs only substantively address Defendants' Exhibit 2497 — which, as discussed above, Plaintiffs' included on its own exhibit list and also used at a deposition years ago. *See* Dkt. 513 at 18; *see supra* at p. 19. There is no credible basis to claim prejudice or surprise to documents that have long been in Plaintiffs' possession and even used by Plaintiffs during discovery. Plaintiffs, however, cannot show any harm sufficient to require exclusion.

Defense Exhibits 500 and 503 are publicly available HUD and Federal Reserve articles closely tied to Plaintiffs' evidence and theories. Their use, therefore, cannot constitute surprise. Defendants' Exhibit 500 is a June 2016 HUD article, titled "FHA Announces Most Significant Improvements to Date for Distressed Notes Sales Program." Ex. 29. Here, Plaintiffs claim that their mission was frustrated, in part, by spending time submitting "testimony to the Financial Services Committee of the US House of Representatives on Changes to HUD's Distressed Asset Stabilization Program (DASP)" on July 13, 2016 — just two weeks after this disputed article was published. Ex. 30 at 23, 44–45.

Likewise, Defendants' Exhibit 503 is the summary of "Panel 4: Strategies for Low Value Properties" that was presented at the "Renters, Homeowners, & Investors: The Changing Profile

of Communities" meeting hosted on February 26, 2013 by the Federal Reserve Board of Governors and the Federal Reserve Banks of Philadelphia and Cleveland.[20] *See* Ex. 31. Plaintiffs' expert, Dr. Elizabeth Korver-Glenn, relies on multiple articles published by the Federal Reserve Bank, including "Spatial Analysis of the Impact of Vacant, Abandoned and Foreclosed Properties" and "The Impact of Vacant, Tax-Delinquent, and Foreclosed Property on Sales Prices of Neighboring Homes." Ex. 32 at 50, n. 55, 56; *see also* Ex. 33 at 24, n. 16. The former article is also referenced in Plaintiffs' production in an exhibit that was utilized at the corporate designee deposition of the Miami Valley Fair Housing Center. *See* Ex. 34 James McCarthy Tr. 127:11–128:9; *see also* Ex. 35 at MVFHC_0012993, n. 42 ("Mortgage Foreclosures: Additional Mortgage Servicer Actions Could Help Reduce the Frequency and Impact of Abandoned Foreclosures"). That article was written by one of the panelists featured in the presentation referenced in Exhibit 503. *See id*.; *see also* Ex. 31.

Exhibits 500 and 503 are closely tied to Plaintiffs' own exhibits and cannot form the basis of surprise, nor are Plaintiffs "deprived of the opportunity to conduct their own investigation into the context and implications of these materials" as they assert. Dkt. 513 at 18. These are not Defendants' internal records that may require testimony or other document discovery. They are two-page public articles, the context of which is readily apparent from their face. Ex. 29 and 31 (Defendants' Exhibits 500 and 503). Plaintiffs are likewise not prejudiced by any alleged inability to depose Defendants' witnesses about these materials as it is Plaintiffs' witnesses who will be asked about them.

---

[20] https://www.federalreserve.gov/newsevents/conferences/renters-homeowners-investors-agenda.htm

Here, Rule 37 provides no basis to exclude public documents that Plaintiffs themselves have long relied upon and cannot plausibly claim to find surprising or prejudicial. Accordingly, the motion should be denied.

### Defendants' Exhibits are Not Precluded Based on Relevance, Hearsay, or Authenticity.

Notably, Plaintiffs object to Defendants' exhibits as irrelevant and unauthenticated hearsay while listing the same categories of documents on their own exhibit list. *See* Dkt. 513 at 17; Ex. 26 at 688 (Final Report Submitted by Metropolitan Milwaukee Fair Housing Council related to FHIP Grant covering January 1, 2014 through June 30, 2015); 963 (FHIP PEI MYFC Grant 2016 Performance); 988 (FHIP Lending Discrimination grant and related documentation, including Statements of Work); 1167 (Ocwen employee LinkedIn profile); 2095 (Altisource employee LinkedIn profile); 1616 and 1669 (same) (presentation by member of the Federal Reserve Board at NFHA conference). Regardless, Plaintiffs' conclusory relevance, hearsay, and authenticity objections fail as to all four exhibits.

Exhibits 2497 (HUD grant policy) and 5869 (LinkedIn profile) are relevant as evidenced by Plaintiffs' own reliance on them and because the former pertains to Plaintiffs' budget and costs, and the latter relates to an Altisource employee's background. Exhibits 500 (HUD article) and 503 (Federal Reserve publication) discuss "low-value" properties, which is relevant to Plaintiffs' claim that Defendants' value-based policies constitute "value redlining" and are discriminatory. *See* Ex. 32 at 42, 44–45.

Plaintiffs also assert — without explanation — that Exhibits 500, 503, 2497, and 5869 are hearsay. *See* Dkt. 513 at 19). But, these materials are not offered for the truth of the matter asserted and therefore are not hearsay. *See O'Sullivan v. City of Chicago*, 2007 WL 671040, *12 (N.D. Ill.

23

2007) (holding that articles that were not offered for the truth of the matter asserted were not hearsay and properly admitted).[21]

Lastly, many of these exhibits were published by HUD or the Federal Reserve Board, meaning they are self-authenticating. *U.S. SEC v. Berrettini*, 2015 WL 5159746, *6 (N.D. Ill. Sept. 1, 2015) (relying on *Williams v. Long*, 585 F. Supp. 2d, 679, 686–89 (D. Md. 2008) ("[R]ecords from government websites generally are considered to be self-authenticating."). For example, Exhibits 500 and 2497 were published by HUD, and Exhibit 503 was published on the Federal Reserve Board of Governors website (*see supra* at n. 20). Because these exhibits are from government websites, they are self-authenticating.[22] The remaining exhibit is a LinkedIn profile page of Altisource's employee, which was used by Plaintiffs during deposition and included in deposition designation by Plaintiffs. *See, e.g.*, Ex. 22; *see also* Ex. 36 at 9:16–9:17, 8:20–8:21, 10:16–11:14.

Accordingly, Defendants' Exhibits 500, 503, 2497, and 5869 should be admitted because Plaintiffs' have failed to show that they are irrelevant, inadmissible hearsay, or unauthenticated.

---

[21] Alternatively, Exhibits 500, 503, and 2497 may be admissible under the hearsay exception set out in Fed. R. Ev. 801(18).

[22] In addition, these documents are akin to newspapers and periodicals and are, thus, self-authenticating under Fed. R. Ev. 902(6). *See Berrettini*, 2015 WL 5159746 at *6.

24

## V.    RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 5.

Plaintiffs motion seeks to bar Ocwen's witness Kevin Flannigan from testifying. Plaintiffs'

motion should be denied because Plaintiffs have long been on notice of Mr. Flannigan's role and

potential testimony, there is no prejudice or surprise, and Ocwen has agreed to strictly cabin his

testimony to materials that Plaintiffs themselves possess and have attached to their motion. Ocwen

informed Plaintiffs that it will limit Mr. Flannigan's testimony to three categories: authenticating

documents if necessary, the information verified in Ocwen's August 2020 interrogatory responses,

and the information in his May 2018 declaration. Dkt. 513-1 (Pltfs. Ex. 15).

The August 2020 interrogatory responses relate to basic information including

identification of Ocwen personnel and departments responsible for Deutsche Bank REO

properties, identification of Ocwen's property vendors and their services, and identification of

Ocwen's REO-related databases — all information well known to Plaintiffs at this stage of

litigation. Additionally, the May 2018 declaration which was filed in support of Ocwen's Motion

to Dismiss certifies jurisdictional information about Ocwen as a corporation including where it is

headquartered — again, information that is not new or unknown to Plaintiffs at this stage of

litigation.

Each of these categories corresponds to materials Plaintiffs already possess and filed with

the Court, eliminating any need for expanded discovery or trial delays. The stipulation prevents

any foray into technical data systems or vendor relationships beyond what the verified responses

already state, thereby addressing Plaintiffs' stated concerns about scope.

### A.    Legal Standard

Federal Rule of Civil Procedure 37(c)(1) authorizes exclusion for nondisclosure only where

a party fails to meet its obligations under Rule 26(a) or 26(e) and the failure is not substantially

justified or harmless. Plaintiffs invoke this standard and urge exclusion, but as Plaintiffs' own authorities recognize, the criteria are prejudice, surprise, the ability to cure, trial disruption, and bad faith or willfulness. Those factors overwhelmingly favor denial of Plaintiffs' motion here given Ocwen's disclosure of authenticators concerning Mr. Flannigan, Plaintiffs' preexisting knowledge of Mr. Flannigan's identity and role, and Ocwen's stipulation that Mr. Flannigan's testimony will be narrowed to the very materials Plaintiffs have put in the record.

### B. Ocwen Disclosed "Any Witness Necessary to Authenticate Documents," and Plaintiffs Knew of Mr. Flannigan's Identity and Role From the Outset.

Ocwen's initial *and* amended Rule 26(a)(1) disclosures included "Any witness necessary to authenticate documents," preserving the ability to call a custodian/authenticator at trial. *See* Dkt. 513–1 (Pltfs. Ex. 7–8). Plaintiffs' assertion that Mr. Flannigan "never appeared" in Rule 26 disclosures overlooks this categorical disclosure that specifically contemplates an authenticating witness such as Mr. Flannigan.

Additionally, Plaintiffs concede that (i) Mr. Flannigan submitted a declaration in May 2018, and (ii) he executed the August 19, 2020 verification for Ocwen's interrogatory responses — confirming his identity, role, and involvement years before trial. Dkt. 513–1 (Pltfs. Exs. 10, 14). Plaintiffs attached those very materials to their motion, demonstrating their possession of the relevant information and their ability to evaluate any potential testimony.

### C. Ocwen's "Non-Disclosure" is Harmless.

Rule 37(c)(1) does not support exclusion here because any omission in specifically identifying Mr. Flannigan was substantially justified and, in any event, harmless given Plaintiffs' longstanding notice of his limited authentical role and prior involvement in the record. The familiar factors — prejudice or surprise, ability to cure, risk of trial disruption, and bad faith — all weigh in favor of denying Plaintiffs' motion.

*First*, there is no prejudice or surprise. Ocwen disclosed the category of authenticating witnesses. Plaintiffs have long known who Mr. Flannigan is and what he did from his declaration and the verified interrogatories. Ocwen has now stipulated to limit his testimony precisely to those materials. Dkt. 513-1 (Pltfs. Ex. 10, 14–15). Plaintiffs' own motion confirms they possess and have reviewed all such materials because they attached them to their filing. Under these circumstances there is nothing for Plaintiffs to discover. The proposed testimony is tethered to documents and sworn statements that have been in their hands for over five years.

*Second*, any theoretical prejudice is fully cured. Ocwen's stipulation sharply narrows the testimony to authentication and the contents of materials already produced and filed. Dkt. 513-1 (Pltfs. Ex. 15). Plaintiffs speculate that allowing Mr. Flannigan to testify would reopen discovery into wide ranging topics reflected in interrogatory responses. The stipulation, however, forecloses any such expansion. Mr. Flannigan will not go beyond the verified responses and his declaration. Plaintiffs also contend that authentication is unnecessary because many exhibits will be pre-admitted. That contention only further reduces any burden or need to prepare; Defendants clearly will not present a witness to authenticate documents which are already authenticated. Indeed, Mr. Flannigan is listed as a "may call" witness, only to be used if necessary at trial.

*Third*, allowing this narrow testimony will not disrupt trial. The stipulation ensures any examination will be brief and focused. Plaintiffs' point that many exhibits are to be pre-admitted underscores that trial time will not be consumed litigating authentication or foundation except if truly necessary.

*Fourth*, there is no bad faith. Plaintiffs identify no evidence of willful concealment. The record reflects category based disclosure of authenticators, early identification of Mr. Flannigan

27

through his declaration and verification, and Ocwen's proactive stipulation that cabins his testimony to materials known to Plaintiffs.

*Last*, Plaintiffs' authorities do not support exclusion on these facts. Plaintiffs rely on *Morris v. BNSF* and similar decisions to suggest that late identification of trial witnesses after extended discovery can warrant exclusion based on prejudice and surprise. 969 F.3d 753 (7th Cir. 2020). Here, however, Ocwen disclosed authenticators. Plaintiffs knew exactly who Mr. Flannigan was and what he did. Ocwen has limited his testimony to authenticating documents and the precise content of the sworn materials. Plaintiffs' citations concerning the burdens of reopening discovery are likewise inapposite because Ocwen's stipulation eliminates any need for new discovery and confines the testimony to what is already in the record.

### D. Conclusion.

Because Plaintiffs have long known of Mr. Flannigan's identity and role, because Ocwen's disclosures encompassed authenticating witnesses, and because Ocwen has stipulated to limit any testimony to materials in Plaintiffs' possession, any purported non-disclosure is harmless and exclusion is unwarranted under Rule 37(c)(1). The Court should deny Plaintiffs' motion in limine and, consistent with Ocwen's stipulation, permit Mr. Flannigan to testify — if necessary — to authenticate documents and to the contents of his 2018 declaration and the 2020 verified interrogatory responses.

28

## VI.    RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 6.

Plaintiffs have a predicament of their own making — they put all their eggs in one basket, and the basket is gone now. Defendants asked each Plaintiff in their deposition about the amount of their frustration of mission damages, but none could answer the question. They all claimed that they lacked knowledge of frustration of mission damages and deferred to a future expert for an answer. But the Court struck Plaintiffs' damages expert's opinions as arbitrary, speculative, and offered "[w]ithout any explanation or evidence to support her conclusions." Dkt. 460 at 9. So, Plaintiffs now want to erase their own deposition testimony. Specifically, they ask the Court to bar Defendants from referencing Plaintiffs' from using Plaintiffs' sworn testimony, in which they chose to reference a damages expert and to assert that they could not themselves quantify their alleged damages. The Court should deny this request. Plaintiffs' admissions are relevant and admissible as, among other things, party statements and for impeachment. The exclusion of Plaintiffs' damages expert does not erase their witnesses' admissions or shield them from impeachment with their own words.

Plaintiffs' motion relies on a missing-witness theory, but Defendants will not seek any adverse inference from the absence of a damages expert. Defendants instead will use Plaintiffs' testimony to undercut their credibility, including as to any new, invented frustration of mission damages number that Plaintiffs refused to provide before.

### A.    References to Plaintiffs' Inability to Quantify Damages Are Relevant and Admissible.

Plaintiffs' admissions that they could not quantify damages absent expert testimony are relevant under Rules 401 and 402. Plaintiffs have run out of road. With trial less than two weeks away, Plaintiffs still have not quantified a single dollar of their purported frustration of mission damages. That failure is not oversight. It is the predicable result of a theory that has never been

29

supported by evidence or case law. Faced with that problem, Plaintiffs now shift positions for the first time in a response to a motion in limine. Despite Plaintiffs' failure to ever disclose frustration of mission numbers in any phase of discovery, they now claim they will offer through fact witnesses "dollars-and-cents reference points for the jury" to evaluate frustration of mission damages. Dkt. 511 at 8.[23] Plaintiffs should not be allowed to suddenly claim knowledge of facts they previously asserted were unknowable, nor should they be able to pretend that this invented-for-trial testimony is consistent with sworn testimony asserting the necessity of an expert.

The Court should allow Defendants to present Plaintiffs' testimony confirming that they did not quantify, and could not quantify, any frustration of mission damages. Defendants will not ask the jury to speculate about what an excluded expert *would* have said. Defendants instead will use this testimony to establish what Plaintiffs cannot properly say. Specifically, Defendants will appropriately impeach Plaintiffs with their own prior sworn statements and will offer those statements as admission of a party opponent for the truth of what they contain: an admission that the Plaintiffs previously disavowed their ability to do precisely what they will now attempt to do a t trial. *See Ross v. City of Chicago*, No. 13 C 751, 2014 WL 1344279 (N.D. Ill. Apr. 3, 2014)("[I]t is a fundamental trial strategy to point to the absence of evidence to support a plaintiff's case," and a defendant should not be prohibited "from making such argument as to the absence of witnesses" where they "have not indicated that they intend to argue" for an adverse inference).

The robust record confirms Plaintiffs' shifting positions. For example, Plaintiffs say they will quantify damages through trial testimony about the "costs of … providing grants." Dkt. 511 at 10. However, NFHA's corporate representative previously testified that not even she knew "how

---

[23] Such evidence is inadmissible and irrelevant for the reasons discussed in Defendants' motions in limine 7, 8, and 16 and described in the Court's clarification opinion. *See* Dkt. 504 at 37–45; Dkt. 514 at 28–41; Dkt. 460 at 7.

much we are asking" for grants awarded because she was "waiting for [their] expert analysis to determine that." Ex. 37 at 285:11–286:1. Plaintiffs now point to "expected counteraction costs" for harms to minority communities (Dkt. 510 at 10), but previously testified that it was beyond their ability to quantify their damages or determine what portion, if any, is attributable to Defendants. *See, e.g.*, Dkt. 515-34 at 159:22–160:21 (Plaintiff HOME of Virginia testifying that "it is just beyond my expertise to be able to tell you the damage that was inflicted as a whole, and then to parse down how much that was Deutsche Bank's fault."); *see also* Dkt. 515-40 at 192:24–193:4 (Plaintiff HOPE Fair Housing Center testifying that "a complex case with multiple plaintiffs" left it unable to calculate these costs without deferring to an expert); *see also* Dkt. 513 at 30 (Plaintiff Central Ohio Fair Housing Association and Miami Valley Fair Housing Center testifying that it had not calculated frustration of mission damages and did not know what evidence would support it).

In short, Plaintiffs' admissions are relevant and admissible because they bear on the credibility, foundation, and reliability of Plaintiffs' anticipated trial testimony.

### B. Plaintiffs' Missing-Witness Theory is Misplaced.

Plaintiffs' motion rests on the "missing witness" doctrine, which prohibits a party from arguing that an adverse inference should be drawn from another party's failure to call a witness. The doctrine addresses "the presumption that the testimony, if produced, would be unfavorable." *Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1046 (5th Cir. 1990) (internal quotations omitted); *see also Oxman v. WLS-TV*, 12 F.3d 652, 660 (7th Cir. 1993). Defendants seek no such inference.

Plaintiffs' motion misrepresents this doctrine. The Seventh Circuit draws a clear line "between asking the jury to infer that a missing witness's testimony would be unfavorable (which

31

is not allowed according to the missing-witness rule) and asking a jury to question a party's credibility because it produced no corroborating evidence (*which is permissible*)." *Lewis v. City of Chicago Police Dept.*, 590 F.3d 427, 444 (7th Cir. 2009) (emphasis added). That distinction is dispositive here. A party may "point out holes and deficient evidence in a plaintiff's case," including the absence of witnesses, so long as it does not "raise an adverse inference" that the missing testimony would be negative. *Jones v. City of Chicago*, 2017 WL 413613 at *8 (N.D. Ill. 2017).

This is exactly what Defendants will do; they will show that Plaintiffs testified they could not calculate their own damages based on personal knowledge or internal documents. Defendants do not need an adverse inference about what excluded or unproduced evidence might have shown. Defendants' position rests on what Plaintiffs actually said under oath and what the admissible record actually contains.

### C. There is No Risk of Unfair Prejudice.

The probative value of Plaintiffs' admissions substantially outweighs any minimal risk of unfair prejudice. The jury is entitled to assess the credibility and foundation of Plaintiffs' alleged damages numbers. Defendants will not argue that any missing expert would have testified unfavorably, so there is no unfair prejudice. The law permits argument "that insufficient corroborating evidence casts shade on [Plaintiffs'] own credibility." *See Oshana v. Aer Lingus Ltd.*, No. 20 C 2041, 2022 WL 138140, at *5 (N.D. Ill. Jan. 12, 2022). Because Plaintiffs testified that they lack sufficient knowledge and needed expert corroboration to prove damages, those admissions are directly relevant to their trial presentation, and there is no risk of unfair prejudice.

Plaintiffs' proposed blanket exclusion of evidence would instead unduly prejudice ***Defendants***. Precluding any reference to Plaintiffs' prior testimony would leave the jury with the

false impression that Plaintiffs have always been able to quantify their damages. In reality, Plaintiffs repeatedly disclaimed that ability under oath. Defendants are entitled to argue that Plaintiffs lack sufficient knowledge to prove damages, including by impeaching Plaintiffs' witnesses at trial and admitting those statements as admissions of a party-opponent.

### D. Conclusion.

Accordingly, Plaintiffs' motion should be denied.

## VII. RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 7.

Prior to filing this action, Plaintiffs retained Dr. Jacob Rugh as an expert to perform a regression analysis based on the property inspection reports prepared by Plaintiffs' investigators. In their Second Amended Complaint, Plaintiffs make specific allegations regarding Rugh's analysis, asserting that he controlled for numerous variables across the subject REO properties, including as "prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until the Organizational Plaintiffs' site visit, and property values." SAC ¶ 106. Plaintiffs' allegation of racial disparity — on which the basis of this lawsuit entirely depends — relied on Rugh's purported findings.

Discovery, including Rugh's deposition, revealed that Rugh's regression was bare-bones and inaccurate in material respects. For examples, Plaintiffs overstated both the scope of the analysis (including the number of properties examined) and the nature of the variables Rugh actually incorporated. Rugh's analysis also failed to identify or rule out non-racial factors that could fully explain any purported disparity.

Despite having relied on Rugh's analysis to plead their case and to present it as validating Plaintiffs' conclusions of racial discrimination, Plaintiffs abandoned Rugh at the expert disclosure phase and replaced him with a different statistician, Prof. Ian Ayres, apparently in an attempt to retrofit a defensible analysis onto a defective pre-suit methodology. That Plaintiffs have relied on two separate expert analyses in this case, which materially diverge in their control variables, inputs, and outputs, is highly probative of the credibility and reliability of the statistical analysis Plaintiffs now intend to present at trial.

34

The relevance is underscored by Ayres' testimony of having reviewed Rugh's analysis before Ayres conducted any analysis of their own. Ex. 38, at 53:19–54:1. Rugh's pre-suit regression is therefore relevant for non-hearsay purposes, including to impeach Ayres, to explain the evolution of Plaintiffs' theories, and to contextualize subsequent changes made by Ayres. That Plaintiffs used Rugh's analysis as a foundational predicate for their Complaint, and that their replacement expert reviewed and engaged with this analysis, further confirms its relevance.

Plaintiffs cannot invoke Rugh's analysis when it suits them and erase it once its deficiencies are exposed. Plaintiffs' motion to exclude this evidence should be denied.

### A. Rugh's Analysis Is Relevant For Impeachment and Cross Examination.

Plaintiffs relied on a single statistical expert to author regression analyses in Plaintiffs' Bank of America litigation (*NFHA v. Bank of Am*., N.A., No. CV SAG-18-1919 (D. Md.)), and in this case. Rugh was deposed here. Thereafter, Plaintiffs abruptly withdrew Rugh as a trial expert.

Rugh's analysis conflicts in material respects with the analysis Plaintiffs now intend to present through Ayres. Those conflicts go directly to Ayres's credibility and reliability of Plaintiffs' statistical proof, particularly where Plaintiffs retained Rugh first, used Rugh's analysis as a foundation for their pleading and litigation strategy, and where Ayres reviewed that work before conducting Ayres' own analysis. A jury is entitled to understand that Plaintiffs retained two separate statistical experts, that those experts reached divergent conclusions, and that they employed different assumptions, datasets, and statistical modeling decisions

For example, Rugh and Ayres disagree regarding the dataset construction and on key model selection decisions that materially affect the interpretation of each of their regression results. These are not collateral or insignificant matters; rather, they strike at the core methodological choices that Plaintiffs contend establish racially discrimination.

35

Ayres has conceded to having considered Rugh's regression work before Ayres formed an expert opinion. *See* Ex. 38 at 53:19–54:1 (I "did review some regression analysis that Rugh did on the plaintiffs' inspection data, yes."). Ayres also confirmed to having "reviewed some documents of [Rugh's statistical] output." Ex. 39 at 70:10–16. Where a testifying expert drew upon prior regression work, whether for methodological context, data familiarity, or analytical approaches, that prior work becomes admissible. *See United States v. Dish Network, L.L.C.*, 297 F.R.D. 589 (2013) (requiring disclosure of prior statistical analysis where expert used data to inform analysis).

Because Ayres' opinions were informed, at least in part, by Rugh's prior analyses, Defendants are entitled to probe the inconsistencies between the two experts' analyses, challenge the assumptions Plaintiffs decided to abandon, and test the reliability of Plaintiffs' "new and improved" statistical narrative. Excluding Rugh's analysis from the jury would improperly shield Ayes from avenues of meaningful cross-examination and deprive the jury of valuable context necessary to evaluate Plaintiffs' statistical evidence.

## B. Rugh's Analysis Is Squarely Relevant and Admissible.

The challenged evidence is plainly relevant and admissible under FRE 401 and 402. This Court has already recognized that Defendants are entitled to expose flaws in Plaintiffs' datasets and analytic assumptions at trial because this case "involves competing statistical models and data sets that lend itself to endless iterations of regression analyses." Dkt. 442 at 43. At the core of this dispute are Plaintiffs' statistical outputs and methodologies, particularly the construction of Plaintiffs' dataset and the and choices they made that drive their asserted findings of racial disparity.

Rugh's inconsistent statistical analysis is directly probative to the reliability and credibility of Ayres's opinions. Defendants intend to introduce limited, non-duplicative evidence of Rugh's

36

output, analysis, and findings to demonstrate to the jury the internal inconsistencies in Plaintiffs' statistical case. The evidence Plaintiffs seek to exclude is admissible for multiple independent reasons, including to explain Plaintiffs' statistical methodologies and to impeach of Plaintiffs' testifying statistical expert (Ayres).

Plaintiffs' Rule 403 argument fails because Plaintiffs identify no unfair prejudice that substantially outweighs the probative value. *See* Fed. R. Evid. 403. That evidence of divergent statistical analyses by their two experts may weaken their case is not a basis for exclusion. The evidence is prejudicial to Plaintiffs in the permissible sense because it tends to prove a material fact: that Plaintiffs' own retained experts applied different assumptions and different methodologies on the same subject dataset with different conclusions. Such prejudice is not unfair. *See Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012) ("We employ a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice.").

Defendants will present this evidence efficiently and without undue duplication. But a categorical exclusion would improperly insulate Plaintiffs' pre-suit analytic choices from scrutiny despite the centrality of dataset construction and model selection in this case. Plaintiffs' motion should be denied.

## VIII.   RESPONSE TO PLAINTIFFS' SECOND ROUND MOTION IN LIMINE NO. 8.

Plaintiffs' Motion in Limine Number 8 asks the Court to admit into evidence hundreds of so-called "uncontested facts" that are irrelevant, unduly prejudicial, plainly inaccurate, and vigorously disputed. Plaintiffs advance this request under the guise that these statements were "previously admitted' by Defendants through various procedural mechanisms prior to trial. In doing so, Plaintiffs improperly accuse Defendants of acting in bad faith.

The record shows the opposite. Defendants have engaged with Plaintiffs' proposals where possible, including by addressing these "uncontested" facts in an eight-page letter dated January 6, 2026, explaining why many of the proposed "facts" are and have always been contested. Dkt. 513-1 (Ex. 19). Rather than working cooperatively with Defendants to correct pervasive errors, Plaintiffs instead ask the Court to intervene and deem admitted facts to which Defendants do not agree, in direct contravention of Rule 16. *See Greenwich Indus. L.P. v. Specialized Seating, Inc.*, No. 02-CV-05000, 2003 WL 21148389 (quoting *J.F. Edwards Construction Co. v. Anderson Safeway Guard Rail Corp.*, 542 F.2d 1318, 1322 (7th Cir. 1976)) ("Rule 16 of the Federal Rules of Civil Procedure does not authorize a court to force parties to stipulate to facts to which they will not voluntar[ily] agree."). Plaintiffs' motion should be denied.

Although Plaintiffs style their motion as one seeking admission of "facts" previously admitted, they engage in sleight of hand seeking admission of two categories of statements: (1) facts "admitted" solely for purposes of Rule 56.1 at summary judgment, and (2) facts that were expressly denied at summary judgment, but to which Plaintiffs simply disagree with Defendants' basis for denial. Neither category is subject to Court-mandated admission for trial.

As for the first category, Rule 56.1 does not operate the way Plaintiffs suggest because admissions under that Rule apply only for purposes of summary judgment only and do not render

those facts admissible at trial. *See Torrence v. Parkway Gardens for Am. Apt' Mgmt.*, No. 5-CV00282, 2006 WL 8461520 at *5, n.1 (N.D. Ill. Jan. 10, 2006) ("L.R. 56.1 statements, however, are proper in support of summary judgment motions **only**.") (emphasis added). Even facts that were uncontroverted at summary judgment remain subject to the Federal Rules of Evidence, including objections based on relevance, unfair prejudice, and confusion of the issues.

Plaintiffs' motion ignores those principles. For example, Plaintiffs demand that the following "undisputed fact" be admitted for trial:

| Plaintiffs' Proposed Stipulated Fact | Plaintiffs' Rule 56.1 Statement of Fact | Defendants' Response |
|---|---|---|
| 2016 Ocwen audits of Altisource reported in 2016 that Altisource Solutions, Ocwen's third-party vendor, processed approximately 360,000 property inspection transactions each month including standard repeating services and one-off service, i.e. property securing, winterization, grass cuts, maintenance, inspection, etc., for an approximate monthly spend of $27 million, $324 million annually, and $16 million monthly for Preservation and Capital Repairs/Renovation services.<br><br>**Dkt. 515-25 at No. 139** | In 2016, Altisource, Ocwen's third-party vendor, was paid $324 million annually for certain categories of services, $192 million annually for PPI services (excluding sales and marketing identified as "REO Services" in Ocwen audits), and $16 million monthly for Preservation and Capital Repairs/Renovation services.<br><br>**Dkt. 361 at No. 16.** | Defendants object to Statement 16 because it is not material to any claim or defense at issue in this case. Subject to this objection, Defendants admit Statement 16.<br><br>**Dkt. 397 at No. 16.** |

RFA's are only binding to the "matter admitted," not manipulated rephrasing or extrapolated propositions. Plaintiffs' attempt to transmute multi-faceted issues into deemed admissions through blanket characterizations improperly circumvents the pretrial order process.

Defendants are willing to stipulate to relevant facts that are narrowly tailored to matters actually admitted, but the Court should require plaintiffs to identify line-by-line the precise RFA text and the exact factual proposition they contend was admitted, and then resolve any objections on a granular basis.

Plaintiffs' second maneuver is a sleight of hand: they ask to the Court to deem admitted facts Defendants expressly denied at summary judgment on the theory that Plaintiffs have now "resolved" Defendants' bases for denial. They have not. Plaintiffs' assertion that they have "resolved" the bases for Defendants' denials of various requests is unsupported.

For example, Plaintiffs attempt to distill "certain" of the hundreds of applicable Trust governing agreements in an eight-subpart "fact" purporting to describe the "actions available" to the Trustee Defendants upon a servicer default. Dkt. 513-1 (Ex. 21) at 4. When Plaintiffs advanced this same formulation at summary judgment, Defendants denied that assertion with a detailed explanation why it was false and misleading. *See* Dkt. 405 at No. 32. Plaintiffs now claim to have cured these defects by removing some of the more overt mischaracterizations from the summary. But that a statement is that marginally less self-serving now does not transform Plaintiffs' remaining legal conclusions and characterizations into undisputed facts.

This problem is illustrated by subpart (g) of this multi-prong "fact," which originally asserted that the Trustee had "[a]uthority to unilaterally terminate a Servicer or Master Servicer in default." Defendants originally denied that assertion because Plaintiffs failed to identify a single Governing Agreement granting the Trustee Defendants a "unilateral" right to terminate a servicer or master servicer. *See id.* Plaintiffs now propose to replace "unilateral" with "subject to any other applicable conditions," while still refusing to tie the assertion to any particular Pooling and Servicing Agreement. *See* Dkt. 513-1 (Ex. 21) at 4. Plaintiffs' vague reference to "[c]ertain

40

conditions" is itself misleading. For many Trusts, the "condition" is consent of another independent transaction party, meaning the Trustee could not terminate a servicer at all. *See* Dkt. 351-1 at rows 161 and 198. For numerous other Trusts, the Trustee lacked any termination authority under any circumstances. *See id.* at row 192.

This example is merely illustrative. Defendants' January 6, 2026 written response identified pervasive inaccuracies, definitional disputes[24], and reliance on documents that are themselves the subject of motions in limine, underscoring why Plaintiffs' attempt to introduce wholesale these sweeping "facts" is improper.

The same defect pervades Plaintiffs' purportedly "uncontested" facts concerning Common Ground Milwaukee (Dkt. 515-25 (Plaintiffs Uncontested Facts) Nos. 60–84) and the anecdotal neighbor accounts regarding REO properties (Dkt. 515-25 (Plaintiffs Uncontested Facts) Nos. 113–25). The problems with these assertions, including any reliance on previously admitted facts regarding Common Ground, are addressed in Defendants' Motion in Limine No. 15, filed on January 14, 2026. *See* Dkt. 514, 11–27. As further outlined in Defendants' January 6, 2026 letter, Defendants explained that these facts are irrelevant, unduly prejudicial, frequently refer to activity outside of the statute of limitations, and at least one case involve properties not at issue in this case. Dkt. 513-1 (Ex. 19).

Finally, it is unclear why the testimony of neighbors would belongs in Plaintiffs' Motion in Limine here asserting "uncontested" facts. Defendants have never conceded the truth of this

---

[24] As explained in Defendants' letter, Plaintiffs have propounded uncontested facts that inaccurately state the number of properties inspected by Plaintiffs in certain metropolitan areas, which could be the result of a definitional discrepancy related to metropolitan areas or a more foundational error. Dkt. 513-1 (Ex. 19) at 2–3. Defendants cannot responsibly and in good faith to agree to such "facts."

deposition testimony, and it admissibility remains disputed. These assertions are therefore anything but uncontested.

Plaintiffs have also raised additional issues concerning proposed "facts" Dkt. 515-25 at Nos. 126–68 and 228–31, but Defendants have already explained in their January 6, 2026 letter why these proposals are improper. Dkt. 513-1 (Ex. 19) at 4–6. For example, proposed facts regarding a company's total revenue have no relevance to the issues in this litigation and are highly prejudicial. Similarly, Altisource's historical operations as a part of Ocwen are irrelevant, misleading and prejudicial as addressed in Defendants' Motion in Limine No. 11.

With respect to proposed facts Nos. 134–35, Plaintiffs' imprecision is particularly problematic. Some Defendants, including the Trustee Defendants, are a part of larger corporate entities, some of which have been dismissed from this case. It is therefore essential that Plaintiffs use the proper corporate names in their proposed facts. Plaintiffs' proposed facts Nos. 228–31 regarding Defendants' overseas operations are similarly unduly prejudicial and therefore inadmissible under FRE 403.

Plaintiffs' approach is further undermined by their retreat from previously admitted facts. For example, Plaintiffs no longer agree to a statement of fact that NFHA staff members made changes in NFHA's REO database. Defendants included the following undisputed fact in their Rule 56.1 Statement: "NFHA staff members made the "quality control" changes in the database, which overrode the original input from inspectors, sometimes without receiving any input from the inspectors or having access to the original property inspection forms." Dkt. 362 at 12. Plaintiffs admitted that statement without objection. *Id.* Yet Plaintiffs later declined to include this fact in the parties' uncontested facts in the final pretrial exchange on January 15, 2026. *See* Dkt. 516-1

(Ex. 1). Plaintiffs' selective withdrawal from their own admissions underscores why their effort to deem disputed and argumentative propositions as "facts" should be rejected.

Defendants remain willing to stipulate to narrow, relevant, and genuinely undisputed facts supported by precise language and citations. Defendants will, however, preserve objections to argumentative, irrelevant, or hearsay-laden proposals. That approach is fully consistent with the Court's instructions to promote efficiency while preserving Defendants' right to trial by evidence based on admissible evidence. Plaintiffs' Motion should be denied.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs'

Consolidated Second Round Motions in Limine in their entirety.


Dated: January 21, 2026                    Respectfully submitted,


                                           By: /s/ *Kenneth M. Kliebard*


                                           Kenneth M. Kliebard
                                           Tinos Diamantatos
                                           Megan R. Braden
                                           Michael W. Fakhoury
                                           **MORGAN LEWIS & BOCKIUS LLP**
                                           110 North Wacker Drive, Suite 2800
                                           Chicago, Illinois 60606
                                            (312) 324-1000
                                           kenneth.kliebard@morganlewis.com
                                           tinos.diamantatos@morganlewis.com
                                           megan.braden@morganlewis.com
                                           michael.fakhoury@morganlewis.com


                                           Kurt W. Rademacher (*pro hac vice*)
                                           Bradie R. Williams (*pro hac vice*)
                                           **MORGAN LEWIS & BOCKIUS LLP**
                                           2222 Market Street
                                           Philadelphia, Pennsylvania 19103
                                            (215) 963-5000
                                           kurt.rademacher@morganlewis.com
                                           bradie.williams@morganlewis.com


                                           Mark Traut (*pro hac vice*)
                                           **MORGAN LEWIS & BOCKIUS LLP**
                                           101 Park Ave.
                                           New York, NY 10178
                                           (212) 309-6927


                                           *Counsel for Defendants Deutsche Bank*
                                           *National Trust Company, as Trustee, and*
                                           *Deutsche Bank Trust Company Americas, as*
                                           *Trustee*

By: */s/ Debra Bogo-Ernst*
Debra Bogo-Ernst
Matthew J. Thomas
Sara Kim
Brandon E. Villa
Eve Hastings
Benjamin Halom
Tara Sohns
**WILLKIE FARR & GALLAGHER LLP**
300 N. LaSalle Dr.
Chicago, IL 60654
(312) 728-9000
dernst@willkie.com
mthomas@willkie.com
skim@willkie.com
bvilla@willkie.com
ehastings@willkie.com
bhalom@willkie.com
tsohns@willkie.com

*Counsel for Defendant Ocwen Loan Servicing, LLC, n/k/a Onity Group Inc.*

By: */s/ Nathan Garroway*

Nathan Garroway
Lisa M. Krigsten (*pro hac vice*)
Mark G. Trigg
Sarah Hannah Phillips
Alizé Mitchell
Kayla Lee
**DENTONS US LLP**
303 Peachtree Street, NE, Suite 5300
Atlanta, Georgia 30308
 (404) 527-4000
nathan.garroway@dentons.com
lisa.krigsten@dentons.com
sarahhannah.phillips@dentons.com
mark.trigg@dentons.com
kayla.lee@dentons.com
alize.mitchell@dentons.com

45

*Counsel for Defendant Altisource Solutions, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that Defendants' Opposition to Plaintiffs' Second Round Consolidated Motions in Limine was filed electronically with the Clerk of Court using the CM/ECF system on January 21, 2026, which will automatically send e-mail notifications of such filing to all attorneys of record.

By: */s/ Debra Bogo-Ernst*

Debra Bogo-Ernst